# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

### VENUE: SAN FRANCISCO

UNITED STATES OF AMERICA,

V.

**CR18     0577**

CRB

MICHAEL RICHARD LYNCH and
STEPHEN KEITH CHAMBERLAIN,

**FILED**

**NOV 29 2018**

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

DEFENDANT(S).

# INDICTMENT

18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 2 – Aiding and Abetting; and
18 U.S.C. §§ 981(a)(1)(C) & 982(a) & 28 U.S.C. § 2461 – Criminal Forfeiture

A true bill.

_____
Foreman

Filed in open court this _29th_ day of

_November, 2018_

ROSE MAHER

**NO BAIL WARRANT**

_____
Clerk

THOMAS S. HIXSON
UNITED STATES MAGISTRATE JUDGE

Bail, $ _____

AO 257 (Rev. 6/78)

**DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT**

FILED

BY: ☐ COMPLAINT   ☐ INFORMATION   ☒ INDICTMENT
☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

NOV 29 2018
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

—— **OFFENSE CHARGED** ——

18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 2 – Aiding and Abetting; and
18 U.S.C. §§ 981(a)(1)(C) & 982(a) & 28 U.S.C. § 2461 –
Criminal Forfeiture

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:  See attachment.

— **DEFENDANT - U.S** —

▶ Michael Richard Lynch and Stephen Keith Chamberlain

DISTRICT COURT NUMBER

CR18   0577

CRB

—————————— **PROCEEDING** ——————————

Name of Complainant Agency, or Person (& Title, if any)

FEDERAL BUREAU OF INVESTIGATION

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY   ☐ DEFENSE   } SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant   } MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under   }

Name and Office of Person
Furnishing Information on this form      ALEX G. TSE

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)      ADAM A. REEVES

— **DEFENDANT** —

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District) _____

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction   } ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution _____

Has detainer ☐ Yes   If "Yes"
been filed?  ☐ No    give date filed _____

DATE OF ▶ _____  Month/Day/Year
ARREST
Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED ▶ _____  Month/Day/Year
TO U.S. CUSTODY

☐ This report amends AO 257 previously submitted

——————— **ADDITIONAL INFORMATION OR COMMENTS** ———————

PROCESS:
☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT      Bail Amount: _____

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

Defendant Address:

_____

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____   Before Judge: _____

Comments:

PENALTY SHEET

*United States v. Lynch and Chamberlain (Autonomy)*

CR18    0577

Counts One through Fourteen

The maximum penalties for a conviction for conspiracy, in violation of 18 U.S.C. § 1349, and for wire fraud, in violation of 18 U.S.C. § 1343, are:

- a twenty (20) year term of imprisonment (18 U.S.C. § 1343);
- a $250,000 fine (or twice the gross gain/loss, whichever is greater) (18 U.S.C. § 3571(b)(3) and (d));
- a three (3) year term of supervised release (18 U.S.C. § 3583(b)(2));
- a $100 special assessment (18 U.S.C. § 3013(a)(2)(A)); and
- restitution and asset forfeiture in amounts to be determined by the Court.

FILED

NOV 29 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

1

ALEX G. TSE (CABN 152348)
United States Attorney

**FILED**

**NOV 29 2018**

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) **CR18   0577** |
| Plaintiff, | ) <u>VIOLATIONS</u>: 18 U.S.C. § 1349 – |
| | ) Conspiracy to Commit Wire Fraud; 18 |
| v. | ) U.S.C. § 1343 – Wire Fraud; 18 U.S.C. |
| | ) § 2 – Aiding and Abetting; 18 U.S.C. |
| MICHAEL RICHARD LYNCH and | ) §§ 981(a)(1)(C) & 982(a) & 28 U.S.C. |
| STEPHEN KEITH CHAMBERLAIN, | ) § 2461 – Criminal Forfeiture |
| Defendants. | ) SAN FRANCISCO VENUE |
| | ) |
| | ) |

INDICTMENT

The Grand Jury charges:

Introductory Allegations

A.   Autonomy Corporation plc

1.      Autonomy Corporation plc ("Autonomy") was a company incorporated in England and Wales with a registered office in Cambridge, United Kingdom.  Autonomy was the holding company of a group of companies engaged in software development and distribution.  Autonomy maintained dual headquarters in San Francisco, California, and Cambridge.

2.      Autonomy's major subsidiaries included Autonomy, Inc. ("AU Inc."), with offices in San Francisco and San Jose, California; Interwoven, Inc. ("Interwoven"), with offices in San Jose; and

INDICTMENT

1  ZANTAZ, Inc. ("Zantaz"), with offices in Pleasanton, California.

2      3.    Autonomy was a public company whose shares were listed on the London Stock

3  Exchange under the trading symbol "AU" and were bought, held, and sold by individuals and entities

4  throughout the United States.  In 2010, $592,358,000 of Autonomy's $870,366,000 in reported revenues

5  (approximately 68%) came from the United States and other countries in the Americas.

6  B.    <u>The Defendants</u>

7      4.    Defendant MICHAEL RICHARD LYNCH was a resident of the United Kingdom.  From

8  approximately 1996 until 2011, he was the Chief Executive Officer ("CEO") of Autonomy.  He also was

9  a director of Autonomy from approximately 1996 until 2011.  As Autonomy's CEO and a director,

10  LYNCH was responsible for certifying Autonomy's publicly filed financial statements.  LYNCH was

11  also responsible for the accuracy of statements made by him and others at Autonomy to market analysts,

12  shareholders, and others persons in the investing public about the nature and composition of

13  Autonomy's products, revenue, and expenses and its potential for growth.

14      5.    Defendant STEPHEN KEITH CHAMBERLAIN was a resident of the United Kingdom.

15  From approximately 2005 until 2011, he was Vice President of Finance at Autonomy.

16  CHAMBERLAIN was a qualified Chartered Accountant.  As one of Autonomy's most senior finance

17  officers, CHAMBERLAIN was responsible for the preparation of Autonomy's financial statements.

18  CHAMBERLAIN also was responsible for the accuracy of statements made by him and others at

19  Autonomy to Autonomy's independent auditor in the United Kingdom.

20  C.    <u>Hewlett-Packard Company</u>

21      6.    Hewlett-Packard Company ("HP") was a Delaware corporation with principal executive

22  offices in Palo Alto, California.  HP provided computing and imaging products, technologies, software,

23  and services to customers.

24      7.    HP was a public company whose shares were listed on the New York Stock Exchange

25  under the trading symbol "HPQ" and were bought, held, and sold by individuals and entities throughout

26  the United States.  HP securities were registered with the Securities and Exchange Commission under

27  Section 12 of the Securities Exchange Act of 1934.

28  ///

INDICTMENT        2

D.   HP's Purchase of Autonomy

8.   On or about August 18, 2011, HP and Hewlett-Packard Vision B.V. ("HP Vision"), an indirect wholly-owned subsidiary of HP, entered into an Offer Agreement with Autonomy and publicly announced an offer to acquire Autonomy for approximately $11 billion.

9.   On or about August 18, 2011, in a press release announcing the acquisition, HP emphasized that "Autonomy's recent operating and financial performance has been strong."  HP also stated that "[o]ver the last five years, Autonomy has grown its revenues at a compound annual growth rate of approximately 55 percent and adjusted operating profit at a rate of approximately 83 percent." Among the acquisition's "[s]trategic and financial benefits," HP said Autonomy would enhance HP's financial profile because "Autonomy's strong growth and profit margin profile complement[ed] HP's efforts to improve its business mix by focusing on enterprise software and solutions.  Autonomy [had] … a consistent track record of double-digit revenue growth, with 87 percent gross margins and 43 percent operating margins in calendar year 2010."

10.   Under the terms of the offer, HP, through HP Vision, offered to buy all the outstanding shares of Autonomy for £25.50 ($42.11) per share in cash.

11.   On or about October 3, 2011, when all conditions relating to the offer had been satisfied, HP's acquisition of Autonomy closed and HP acquired control of Autonomy.  At or about that time, LYNCH and CHAMBERLAIN became employees of HP.

12.   On or about October 3, 2011, LYNCH owned or controlled approximately 7% of Autonomy's total outstanding shares of stock and CHAMBERLAIN owned or controlled approximately 99,000 shares of Autonomy's stock.  After the acquisition closed, and their shares were acquired by HP, LYNCH made approximately $815 million and CHAMBERLAIN made approximately $4 million.

E.   Autonomy's Financial Statements

13.   From in or about 2004 to in or about July 2011, Autonomy issued quarterly and annual financial statements to the investing public in the United Kingdom, the United States, and other places. In its statements to the public, Autonomy said that the financial statements were prepared in accordance with regulations for public companies in the United Kingdom.  Autonomy also stated that its annual financial statements were audited, and its quarterly financial statements were reviewed, by an

INDICTMENT                                3

1  independent auditor in the United Kingdom.

2  14.   In its quarterly and annual reports, Autonomy stated that its financial statements had been

3  prepared in accordance with International Financial Reporting Standards ("IFRS") and, in particular, the

4  accounting requirements for revenue recognition defined by International Accounting Standard 18 –

5  Revenue ("IAS 18"). In other public documents and conference calls with Autonomy analysts,

6  Autonomy also claimed that it followed revenue recognition rules under United States Generally

7  Accepted Accounting Principles ("US GAAP"), including Statement of Position ("SOP") 97-2, Software

8  Revenue Recognition. In its quarterly and annual financial statements, Autonomy made statements

9  about the "revenue" it recognized in the quarter and its "gross margin," an alleged measure of its

10 profitability.

11 15.   For example, Autonomy, in its quarterly financial statements, claimed to have revenues

12 (in millions of U.S. dollars) and gross margins in the approximate amounts specified below:

13

| Quarter | Revenue | Gross Margin |
| --- | --- | --- |
| Q1 2009 | $129.8 | 91% |
| Q2 2009 | $195.2 | 89% |
| Q3 2009 | $191.6 | 85.6% |
| Q4 2009 | $223.1 | 89.4% |
| Q1 2010 | $194.2 | 88.9% |
| Q2 2010 | $221.1 | 86.3% |
| Q3 2010 | $210.6 | 87.6% |
| Q4 2010 | $244.5 | 86.3% |
| Q1 2011 | $219.8 | 88.3% |
| Q2 2011 | $256.3 | 87.1% |

25 16.   In its annual reports and elsewhere, Autonomy held itself out as a "pure software"

26 company. For example, in its 2009 annual report, Autonomy claimed it "operates in the realm of pure

27 software." It stated: "Autonomy is one of the very rare examples of a pure software model."

28 / / /

INDICTMENT                    4

F.    HP Relied on Autonomy's Financial Statements

17.    Between January and August 2011, LYNCH and others acting on behalf of Autonomy provided Autonomy's financial statements and documents reflecting Autonomy's results for the year ended 2009, the year ended 2010, the first half of 2011, and other periods to persons at, or acting on behalf of, HP in the course of HP's consideration of whether to buy Autonomy and, if so, for what price.

18.    Among other information, HP relied on the accuracy and truthfulness of the statements and disclosures made in Autonomy's historically reported financial statements and other public statements including, but not limited to, Autonomy's claims about its financial performance, revenues, expenses, and products and its claim to be a "pure software" company with high gross margins.

The Scheme to Defraud

19.    Beginning in or about January 2009 and continuing through in or about October 2011, defendants LYNCH and CHAMBERLAIN, together with others including former Chief Financial Officer Sushovan Hussain, engaged in a fraudulent scheme to deceive purchasers and sellers of Autonomy securities about the true performance of Autonomy's business, its financial performance and condition, the nature and composition of its products, revenue and expenses and its prospects for growth.

20.    The objectives of the scheme to defraud were, among other things, (a) to ensure that Autonomy reported that it had met or exceeded projected quarterly results for, among other things, revenue, gross margin, net income, and earnings per share, (b) to maintain and increase the defendants' positions within the company, and to enrich themselves and others through bonuses, salaries, and options, and (c) to artificially increase and maintain the share price of Autonomy securities to, among other things, make Autonomy attractive to potential purchasers.

21.    In or about 2011, LYNCH and others met with representatives of HP about a potential acquisition of Autonomy by HP. At or about that time, LYNCH and others used Autonomy's false and misleading financial statements from 2009, 2010, and early 2011, and other false and misleading documents created by CHAMBERLAIN and others to make Autonomy more attractive to a potential purchaser like HP.

22.    In furtherance of the scheme to defraud, LYNCH, CHAMBERLAIN, Hussain, and others used a variety of means and methods, including:

INDICTMENT                                    5

a.      Artificially inflating revenues by, among other things, (i) backdating written agreements to record revenue in prior periods; (ii) recording revenue on contracts that were subject to side letters or other agreements with contingencies or other terms impacting revenue recognition; (iii) improperly recording revenue for reciprocal or roundtrip transactions whereby Autonomy granted a software license to a counterparty which purchased product or services from Autonomy at a greater price; (iv) improperly recording revenue where all of the criteria in IFRS, IAS 18, and Autonomy's revenue recognition policy had not been satisfied; and (v) structuring or restructuring contracts to accelerate revenue recognition while reducing future recurring revenue;

b.      Making false and misleading statements to Autonomy's independent auditor about the facts and circumstances of transactions allegedly supporting the recognition of revenue, expenses, costs, and other items in Autonomy's financial statements, including, but not limited to, (i) backdating contracts, invoices, agreements, and other documents in order to make it appear that they had been reached with a counterparty in a prior period; (ii) falsely representing, among other things, that Autonomy's auditors had been provided all relevant information and that there were no undisclosed side letters; (iii) making false and misleading statements about whether the criteria in IFRS, IAS 18, and Autonomy's revenue recognition policy had been satisfied; and (iv) making false and misleading statements about Autonomy's research and development, marketing, and other expenses;

c.      Making false and misleading statements to market analysts covering Autonomy about its financial statements, the true performance of its business, its financial condition, the nature and composition of its products, revenue, and expenses, and its prospects for growth;

d.      Making false and misleading statements to Autonomy's regulators in response to inquiries about its financial statements;

e.      Making false and misleading statements that Autonomy was a "pure software" company while concealing the fact that Autonomy was engaged in hidden, loss-making resales of hardware, separate from its disclosed practice of selling "appliances";

f.      Making false and misleading statements about Autonomy's alleged sales of original manufactured equipment or "OEM" licenses, the alleged royalty revenues from such sales, and

the Autonomy software products allegedly being used in equipment manufactured by other information technology companies;

       g.     Making and causing fraudulent entries to Autonomy's books and records;

       h.     Issuing materially false and misleading quarterly and annual reports;

       i.     Intimidating, pressuring, and paying-off persons who raised complaints about or openly criticized Autonomy's financial practices and performance; and

       j.     Intimidating and pressuring analysts and other persons who raised questions about or openly criticized Autonomy's financial practices and performance.

23.     Also in furtherance of the scheme to defraud, LYNCH, CHAMBERLAIN, and others took the following actions, among others:

       a.     On or about April 23, 2009, Autonomy issued a press release about, among other things, its financial performance in the first quarter of 2009.

       b.     On or about July 16, 2009, Autonomy issued a press release about, among other things, its financial performance in the second quarter of 2009.

       c.     On or about October 20, 2009, Autonomy issued a press release about, among other things, its financial performance in the third quarter of 2009.

       d.     On or about December 31, 2009, Autonomy entered into a First Amendment to License and Distribution Agreement with a counterparty in the United States whereby the counterparty licensed "EDD" or electronic data discovery software for approximately $4 million plus maintenance and support.

       e.     On or about January 1, 2010, a co-conspirator called an officer of a counterparty in the United States that Autonomy was about to acquire and asked if the counterparty would agree to a transaction to license software from Autonomy, which ultimately was recorded as revenue in the fourth quarter of 2009.

       f.     On or about January 4, 2010, a co-conspirator caused a side letter to be signed respecting a transaction ultimately recorded as revenue in the fourth quarter of 2009.

       g.     On or about February 3, 2010, Autonomy issued a press release about, among other things, its financial performance in the fourth quarter (year-end) of 2009.

1    h.  On or about February 22, 2010, Autonomy issued its Annual Report and Accounts

2 for the year ended 31 December 2009.

3    i.  On or about March 10, 2010, Autonomy paid a counterparty $1,425,000, by

4 means of a check written on an account maintained at a financial institution in San Francisco, for "EDD

5 Processing" that was not performed.

6    j.  On or about April 1, 2010, an Autonomy officer in the United States called the

7 principal of a counterparty in the United States and asked if the counterparty would agree to a

8 transaction to license software from Autonomy, which ultimately was recorded as revenue in the first

9 quarter of 2010.

10    k.  On or about April 21, 2010, Autonomy issued a press release about, among other

11 things, its financial performance in the first quarter of 2010.

12    l.  On or about April 21, 2010, LYNCH told the market and others following

13 Autonomy securities "[w]e have very little interest in just selling hardware . . . what we are not doing

14 here is acting as a generic company that resells hardware like Morse or something like that.  Obviously,

15 those people do that business and we have no interest in it."

16    m.  On or about July 22, 2010, Autonomy issued a press release about, among other

17 things, its financial performance in the second quarter of 2010.

18    n.  On or about July 28, 2010, LYNCH caused Autonomy to fire a finance officer in

19 the United States who questioned whether Autonomy's financial statements were accurately stated.

20    o.  On or about October 19, 2010, Autonomy issued a press release about, among

21 other things, its financial performance in the third quarter of 2010.

22    p.  On or about December 29, 2010, a co-conspirator directed Autonomy employees

23 to prepare a side letter for a transaction that would not otherwise close in the fourth quarter of 2010.

24    q.  On or about January 18, 2011, CHAMBERLAIN caused an Autonomy employee

25 in San Francisco to backdate a draft, unexecuted license agreement with a counterparty.

26    r.  On or about January 26, 2011, CHAMBERLAIN caused an Autonomy officer to

27 e-mail a backdated license agreement to Autonomy's independent auditors.

28    s.  On or about February 1, 2011, Autonomy issued a press release about, among

INDICTMENT      8

1  other things, its financial performance in the fourth quarter (year-end) of 2010.

2          t.      On or about February 22, 2011, while in the United States, a co-conspirator
3  directed an Autonomy officer to sign, on Hussain's behalf, a management representation letter to
4  Autonomy's independent auditors stating that there were no side letters excluded from Autonomy's
5  signed sales contracts.

6          u.      On or about February 22, 2011, Autonomy issued its Annual Report and Accounts
7  for the year ended 31 December 2010.

8          v.      On or about March 4, 2011, while in Palo Alto, LYNCH participated in a video
9  conference among participants in Palo Alto and the United Kingdom to present financial and other
10  information about Autonomy to HP.

11          w.      On or about April 4, 2011, a co-conspirator caused a counterparty in the United
12  States to prepare and backdate an agreement to license Autonomy software, which ultimately was
13  recorded as revenue in the first quarter of 2011.

14          x.      On or about April 14, 2011, a co-conspirator met in San Francisco with the
15  counterparty and an Autonomy officer and discussed a backdated licensing agreement.

16          y.      On or about April 21, 2011, Autonomy issued a press release about, among other
17  things, its financial performance in the first quarter of 2011.

18          z.      On or about July 27, 2011, Autonomy issued a press release about, among other
19  things, its financial performance in the second quarter of 2011.

20          aa.     On or about August 4, 2011, LYNCH, CHAMBERLAIN, and others caused
21  Autonomy to provide to HP and its advisors false and misleading listings of Autonomy's top contracts
22  and customers.

23          bb.     On or about August 18, 2011, to induce the offer by HP and HP Vision, LYNCH
24  executed a letter irrevocably undertaking to accept the offer, agreeing to recommend the offer to others,
25  and warranting that all information provided by him for inclusion in any document issued in connection
26  with the offer was true and accurate in all respects and not misleading in any respect.

27      24.     As part of the scheme to defraud, LYNCH, CHAMBERLAIN, Hussain, and others,
28  caused Autonomy to make materially false and misleading statements directly to HP regarding

INDICTMENT                          9

1   Autonomy's financial condition, performance, and business, including:

2          a.      Making false and misleading statements regarding the nature of Autonomy's

3   products and concealing Autonomy's non-appliance hardware sales;

4          b.      Making false and misleading statements regarding the number and nature of

5   Autonomy's OEM license sales and revenues;

6          c.      Making false and misleading statements regarding Autonomy's top customers;

7          d.      Making false and misleading statements regarding Autonomy's top contracts; and

8   Making other false and misleading statements during HP's "due diligence" about Autonomy prior to

9   announcing the acquisition.

10  COUNT ONE:    (18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud)

11         25.     The factual allegations in Paragraphs 1 through 24 are re-alleged and incorporated by

12  reference.

13         26.     Beginning in or about January of 2009, and continuing until in or about October 2011, in

14  the Northern District of California and elsewhere, the defendants,

15                          MICHAEL RICHARD LYNCH and
                            STEPHEN KEITH CHAMBERLAIN,
16

17  and others, did knowingly conspire to devise and intend to devise a scheme and artifice to defraud as to

18  a material matter and to obtain money and property by means of materially false and fraudulent

19  pretenses, representations, and promises, and by concealment of material facts, and, for the purpose of

20  executing such scheme and artifice and attempting to do so, did transmit, and cause to be transmitted, by

21  means of wire communication in interstate and foreign commerce, certain writings, signs, signals,

22  pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

23         In violation of Title 18, United States Code, Section 1349.

24  ///

25  ///

26  ///

27  ///

28  ///

INDICTMENT                              10

1  COUNTS TWO THROUGH FOURTEEN:  (18 U.S.C. §§ 1343 and 2 – Wire Fraud)

2      27.    The factual allegations in Paragraphs 1 through 24 are re-alleged and incorporated by

3  reference.

4      28.    On or about the dates set forth below, in the Northern District of California and

5  elsewhere, the defendants,

6                          MICHAEL RICHARD LYNCH and
                           STEPHEN KEITH CHAMBERLAIN,
7

8  did knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud

9  as to a material matter and to obtain money and property by means of materially false and fraudulent

10  pretenses, representations, and promises, and by concealment of material facts, and, for the purpose of

11  executing such scheme and artifice and attempting to do so, did transmit and cause to be transmitted, by

12  means of wire communication in interstate and foreign commerce, certain writings, signs, signals,

13  pictures, and sounds, namely:

14

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| TWO | 1/26/2011 | E-mail from J.S. in the Northern District of California to S.C. dated 1/26/2011 regarding "FW: autn_boa" |
| THREE | 2/1/2011 | Press release titled "Autonomy Corporation plc Announces Results for the Year Ended December 31, 2010," distributed from Cambridge, England, to the Northern District of California |
| FOUR | 2/3/2011 | Video conference involving participants in Palo Alto, California, and the United Kingdom |
| FIVE | 3/4/2011 | Video conference involving participants in Palo Alto, California, and the United Kingdom |
| SIX | 4/4/2011 | E-mail from M.H. to S.E. in the Northern District of California dated 4/4/2011 regarding "Prisa VAR" |
| SEVEN | 4/21/2011 | Press release titled "Autonomy Corporation plc Trading Update for the Quarter Ended March 31, 2011," distributed from the United Kingdom to the Northern District of California |
| EIGHT | 7/27/2011 | Press release titled "Autonomy Corporation plc Announces Interim Results for the Six Months Ended June 30, 2011," distributed from United Kingdom to the Northern District of California |
| NINE | 8/1/2011 | Conference call to United States toll-free number (866) 409-2889 by multiple numbers in the Northern District of California and United Kingdom |

INDICTMENT                                    11

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| TEN | 8/2/2011 | Conference call to United States toll-free number (866) 409-2889 by multiple numbers in the Northern District of California and United Kingdom |
| ELEVEN | 8/3/2011 | Conference call to United States toll-free number (866) 409-2889 by multiple numbers in the Northern District of California and United Kingdom |
| TWELVE | 8/4/2011 | Conference call to United States toll-free number (866) 409-2889 by multiple numbers in the Northern District of California and United Kingdom |
| THIRTEEN | 8/4/2011 | E-mail from A.H. in the United Kingdom to F.M. and others in the Northern District of California regarding "Project Daniel 1Room" attaching "Data Room Updates 509381013.4DOC" |
| FOURTEEN | 8/5/2011 | E-mail from A.K. to M.S. and others in the Northern District of California regarding "RE: Tesla: Updated Legal DD Questions" |

Each in violation of Title 18, United States Code, Sections 1343 and 2.

FORFEITURE ALLEGATION:          (18 U.S.C. §§ 981(a)(1)(C) & 982(a) & 28 U.S.C. § 2461 – Criminal Forfeiture)

29.     The allegations in Paragraphs 1 through 28 are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28, United States Code, Section 2461.

30.     Upon conviction of any of the offenses alleged in Counts One through Fourteen, the defendants,

MICHAEL RICHARD LYNCH and
STEPHEN KEITH CHAMBERLAIN,

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28, United States Code, Section 2461, any property, real and personal, which constitutes or is derived from proceeds traceable to said violations, including but not limited to a sum of, not less than $815 million by LYNCH and $4 million by CHAMBERLAIN, each sum representing the amount of proceeds obtained as a result of the offenses alleged in Counts One through Fourteen.

31.     If, as a result of any act or omission of the defendant, any of said property

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to or deposited with a third person;

c. has been placed beyond the jurisdiction of the Court;

INDICTMENT                              12

1          d.  has been substantially diminished in value; or

2          e.  has been commingled with other property, which cannot be divided without difficulty;

3    any and all interest defendant has in any other property shall be forfeited to the United States, pursuant

4    to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28, United States Code,

5    Section 2461.

6         All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28,

7    United States Code, Section 2461.

8    DATED:  November 29, 2018                                    A TRUE BILL

9

10                                                                                  FOREPERSON

11

12   ALEX G. TSE
     United States Attorney

13

14

15   JOHN H. HEMANN
     Deputy Chief, Criminal Division

16

17   Approved as to form:

18

19
     ADAM A. REEVES
20   ROBERT S. LEACH
     WILLIAM FRENTZEN
21   Assistant United States Attorneys

22

23

24

25

26

27

28

INDICTMENT                                       13