# EXHIBIT 1

CAND 89B  (Rev. 6/17) Subpoena to Produce Documents or Objects in a Criminal Case

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SUBPOENA TO PRODUCE |
| Plaintiff, | DOCUMENTS OR OBJECTS |
| | IN A CRIMINAL CASE |
| v. | Case No.: 3:18-cr-00577-CR |
| STEPHEN K. CHAMBERLAIN | |
| Defendant(s). | |

TO:  Hafeez Bux Daud Khan

YOU ARE COMMANDED to produce at the place, date, and time specified the document(s) or object(s) indicated below.  If compliance would be unreasonable or oppressive, you may file a motion requesting the court to quash or modify the subpoena, to review the documents in camera, or to permit production only pursuant to a protective order.

| PLACE | | | | COURTROOM/JUDGE |
|---|---|---|---|---|
| ☑ U.S. Courthouse 450 Golden Gate Ave. San Francisco, CA 94102 | ☐ U.S. Courthouse 280 South First St. San Jose, CA 95113 | ☐ U.S. Courthouse 3140 Boeing Ave. McKinleyville, CA 95519 | ☐ U.S. Courthouse 1301 Clay Street Oakland, CA 94612 | 6/Breyer |
| | | | | DATE AND TIME 12/30/2021 09:00 |

*If the document(s) or object(s) are produced in advance of the date specified, either to the court in an envelope delivered to the clerk's office or to the issuing attorney whose name and address appears below, no appearance is necessary.*

The following document(s) or object(s) shall be produced:

All records and communications in the possession of Hafeez Bux Daud Khan relating to Autonomy, Mr. Stephen Chamberlain, or Dr. Michael Lynch, including but not limited to, electronic or hard copy documents, hand-written notes, reports (and drafts thereof), emails (including emails sent or received by Daud.Khan@gmail.com), chat messages, text messages, social media account communications, voicemails and audio recordings.

NOTE: Subpoena forms requiring the appearance of a witness to testify at a criminal proceeding or to testify and bring documents to a criminal proceeding, must use Form CAND 89A, *Subpoena to Testify in a Criminal Case*) or for the production of state law enforcement personnel or complaint records (CAND 89C, *Subpoena to Produce State Law Enforcement Personnel Or Complaint Records in a Criminal Case*) are available at the Court's website: cand.uscourts.gov.

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT | DATE |
|---|---|
| | |
| (By) Deputy Clerk | |

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER:

Gary S. Lincenberg
Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, PC.
1875 Century Park East, 23rd Floor, Los Angeles, CA  90067-2561
310-201-2100

CAND 89B  (Rev. 6/17) Subpoena to Produce Documents or Objects in a Criminal Case

| PROOF OF SERVICE | | |
|---|---|---|
| RECEIVED BY SERVER | DATE | PLACE |
| SERVED | DATE | PLACE |
| SERVED ON (PRINT NAME) | | FEES AND MILEAGE TENDERED TO WITNESS<br><br>☐ YES  ☐ NO   AMOUNT $ |
| SERVED BY (PRINT NAME) | | TITLE |

| DECLARATION OF SERVER |
|---|
| I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.<br><br>Executed on _____        _____<br>               DATE                                SIGNATURE OF SERVER<br><br>                                              ADDRESS: |

| ADDITIONAL INFORMATION |
|---|
| |

# EXHIBIT 2

1

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT**

8

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>MICHAEL R. LYNCH AND<br>STEPHEN K. CHAMBERLAIN<br><br>Defendants. | CASE NO. 3:18-cr-00577-CRB<br><br>**[PROPOSED] LETTER ROGATORY TO THE APPROPRIATE JUDICIAL AUTHORITY OF THE UNITED KINGDOM**<br><br><br><br>Hon. Charles R. Brever |

The Honorable Charles R. Breyer, United States District Court Judge of the United States District Court for the Northern District of California, presents his compliments to the Appropriate Judicial Authority of the United Kingdom of Great Britain and Northern Ireland and requests international assistance to obtain evidence to be used in a criminal proceeding before this Court in the above-captioned matter.

This Court requests the assistance described herein as necessary in the interests of justice and for the purpose of a full and fair trial. The assistance requested is that the appropriate judicial authority of the Crown compel Hafeez Bux Daud Khan to produce the documents identified below.

## I.    FACTUAL BACKGROUND

This request relates to a criminal case brought against Stephen Chamberlain by the United States of America in the Northern District of California. The Second Superseding Indictment ("SI") alleges that Mr. Chamberlain, Dr. Michael Lynch, and others defrauded purchasers and sellers of Autonomy securities, including, specifically, Hewlett-Packard Company ("HP") in connection with its purchase of Autonomy Corporation plc ("Autonomy") in August 2011. SI at ¶¶ 19, 21. The case against Mr. Chamberlain is in pretrial proceedings at present. This Letter Rogatory stems from a request by counsel for Mr. Chamberlain for materials which this Court has found are relevant and material for his defense at trial and requested in the interests of justice.

The charges against Mr. Chamberlain rely in part on the testimony of Mr. Khan, a former securities analyst who covered Autonomy, and who has previously testified in related proceedings, including *United States v. Hussain*, No. CR 16-462 CRB, and *Autonomy* Corp. Ltd. v. Lynch, Claim No. HC-2015-001324 (High Court of Justice, Chancery Division, London, U.K.). Mr. Khan has testified that Autonomy's senior management misled him and other market participants regarding Autonomy's finances and products. The SI alleges that analysts such as Mr. Khan relied on Autonomy's financial statements that Mr. Chamberlain helped to prepare, and that Mr. Chamberlain presented deceptive information regarding Autonomy's (i) revenue from hardware sales; (ii) Original

Equipment Manufacturer ("OEM") revenue; and (iii) cost allocation relating to the launch of its new Structured Probabilistic Engine ("SPE") product in Q3 2009, among other things.  Mr. Khan has claimed that this inflated financial information led to an inflated share price.

The record as of now is materially incomplete, as Mr. Chamberlain currently has access to only a limited set  of Mr. Khan's relevant communications.  As such, it will be critical for Mr. Chamberlain to receive additional evidence from Mr. Khan in order establish that, contrary to Mr. Khan's testimony, he was not deceived and that there was no fraudulent scheme.

## II.   RECIPROCITY

The United States District Court for the Northern District of California expresses its willingness to provide similar assistance to judicial authorities of the United Kingdom of Great Britain and Northern Ireland, should the need arise, and to the extent permissible by law.

## III.   REIMBURSEMENT FOR COSTS

The United States District Court for the Northern District of California assures the Courts of the United Kingdom of Great Britain and Northern Ireland that Mr. Chamberlain stands ready to reimburse the judicial authorities of the United Kingdom of Great Britain and Northern Ireland for any costs incurred in executing the requesting court's letters rogatory.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1

## IV.    EVIDENCE TO BE OBTAINED

This request is directed to Hafeez Bux Daud Khan's ("Daud Khan"), Flat B, 19 Chetwode Road, London SW17 7RF, for the production of the materials identified below:

1.    All records and communications in the possession of Hafeez Bux Daud Khan relating to Autonomy, Mr. Stephen Chamberlain, or Dr. Michael Lynch, including but not limited to, electronic or hard copy documents, hand-written notes, reports (and drafts thereof), emails (including emails sent or received by Daud.Khan@gmail.com), chat messages, text messages, social media account communications, voicemails and audio recordings.

DATED: _____   _____
Honorable Charles R. Breyer
United States District Court Judge
Northern District of California

# EXHIBIT 3

CAND 89B  (Rev. 6/17) Subpoena to Produce Documents or Objects in a Criminal Case

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SUBPOENA TO PRODUCE DOCUMENTS OR OBJECTS IN A CRIMINAL CASE |
| Plaintiff, | |
| v. | Case No.: 3:18-cr-00577-CR |
| STEPHEN K. CHAMBERLAIN | |
| Defendant(s). | |

TO:  JP Morgan Chase Bank, N.A

YOU ARE COMMANDED to produce at the place, date, and time specified the document(s) or object(s) indicated below.  If compliance would be unreasonable or oppressive, you may file a motion requesting the court to quash or modify the subpoena, to review the documents in camera, or to permit production only pursuant to a protective order.

| PLACE | | | | COURTROOM/JUDGE 6/Breyer |
|---|---|---|---|---|
| ☑ U.S. Courthouse 450 Golden Gate Ave. San Francisco, CA 94102 | ☐ U.S. Courthouse 280 South First St. San Jose, CA 95113 | ☐ U.S. Courthouse 3140 Boeing Ave. McKinleyville, CA 95519 | ☐ U.S. Courthouse 1301 Clay Street Oakland, CA 94612 | DATE AND TIME 12/30/2021 09:00 |

*If the document(s) or object(s) are produced in advance of the date specified, either to the court in an envelope delivered to the clerk's office or to the issuing attorney whose name and address appears below, no appearance is necessary.*

The following document(s) or object(s) shall be produced:

All communications and documents, in hard copy or electronic form, generated by or sent to Mr. Daud Khan, relating to Autonomy, Mr. Stephen Chamberlain, or Dr. Michael Lynch, including but not limited to chat messages or transcripts, emails (including from daud.khan@cazenove.com, Daud.Khan@jpmorgan.com and Daud.Khan@JPMResearchmail.com), instant messages, Bloomberg communications (including from DKHAN5@Bloomberg.net), voicemails, audio recordings, hand-written notes, and reports (or drafts thereof).

NOTE: Subpoena forms requiring the appearance of a witness to testify at a criminal proceeding or to testify and bring documents to a criminal proceeding, must use Form CAND 89A, *Subpoena to Testify in a Criminal Case*) or for the production of state law enforcement personnel or complaint records (CAND 89C, *Subpoena to Produce State Law Enforcement Personnel Or Complaint Records in a Criminal Case*) are available at the Court's website: cand.uscourts.gov.

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT | DATE |
|---|---|
| (By) Deputy Clerk | |

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER:

Gary S. Lincenberg
Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, PC.
1875 Century Park East, 23rd Floor, Los Angeles, CA  90067-2561
310-201-2100

CAND 89B  (Rev. 6/17) Subpoena to Produce Documents or Objects in a Criminal Case

| PROOF OF SERVICE | | |
|---|---|---|
| RECEIVED BY SERVER | DATE | PLACE |
| SERVED | DATE | PLACE |
| SERVED ON (PRINT NAME) | | FEES AND MILEAGE TENDERED TO WITNESS ☐ YES ☐ NO   AMOUNT $ |
| SERVED BY (PRINT NAME) | | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____          _____
                        DATE                                    SIGNATURE OF SERVER

                                            ADDRESS:

ADDITIONAL INFORMATION

# EXHIBIT 4

CAND 89B  (Rev. 6/17) Subpoena to Produce Documents or Objects in a Criminal Case

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SUBPOENA TO PRODUCE |
| Plaintiff, | DOCUMENTS OR OBJECTS |
| | IN A CRIMINAL CASE |
| v. | |
| | Case No.: 3:18-cr-00577-CR |
| STEPHEN K. CHAMBERLAIN | |
| Defendant(s). | |

TO:  Joh. Berenberg, Gossler & Co. KG

YOU ARE COMMANDED to produce at the place, date, and time specified the document(s) or object(s) indicated below.  If compliance would be unreasonable or oppressive, you may file a motion requesting the court to quash or modify the subpoena, to review the documents in camera, or to permit production only pursuant to a protective order.

| PLACE | | | | COURTROOM/JUDGE |
|---|---|---|---|---|
| ☑ U.S. Courthouse<br>450 Golden Gate Ave.<br>San Francisco, CA 94102 | ☐ U.S. Courthouse<br>280 South First St.<br>San Jose, CA 95113 | ☐ U.S. Courthouse<br>3140 Boeing Ave.<br>McKinleyville, CA 95519 | ☐ U.S. Courthouse<br>1301 Clay Street<br>Oakland, CA 94612 | 6/Breyer |
| | | | | DATE AND TIME<br>12/30/2021 09:00 |

*If the document(s) or object(s) are produced in advance of the date specified, either to the court in an envelope delivered to the clerk's office or to the issuing attorney whose name and address appears below, no appearance is necessary.*

The following document(s) or object(s) shall be produced:

All communications and documents, in hard copy or electronic form, generated by or sent to Mr. Daud Khan, relating to Autonomy, Mr. Stephen Chamberlain, or Dr. Michael Lynch, including but not limited to chat messages or transcripts, emails, text messages, Bloomberg communications, voicemails, audio recordings, hand-written notes, and reports (or drafts thereof).

NOTE: Subpoena forms requiring the appearance of a witness to testify at a criminal proceeding or to testify and bring documents to a criminal proceeding, must use Form CAND 89A, *Subpoena to Testify in a Criminal Case*) or for the production of state law enforcement personnel or complaint records (CAND 89C, *Subpoena to Produce State Law Enforcement Personnel Or Complaint Records in a Criminal Case*) are available at the Court's website: cand.uscourts.gov.

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT | DATE |
|---|---|
| | |
| (By) Deputy Clerk | |

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER:

Gary S. Lincenberg
Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, PC.
1875 Century Park East, 23rd Floor, Los Angeles, CA  90067-2561
310-201-2100

CAND 89B  (Rev. 6/17) Subpoena to Produce Documents or Objects in a Criminal Case

| PROOF OF SERVICE | | |
|---|---|---|
| RECEIVED BY SERVER | DATE | PLACE |
| SERVED | DATE | PLACE |
| SERVED ON (PRINT NAME) | | FEES AND MILEAGE TENDERED TO WITNESS<br><br>☐ YES  ☐ NO   AMOUNT $ |
| SERVED BY (PRINT NAME) | | TITLE |

<div align="center">DECLARATION OF SERVER</div>

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____          _____
                              DATE                                          SIGNATURE OF SERVER

                                                                  ADDRESS:

ADDITIONAL INFORMATION

# EXHIBIT 5

CAND 89B  (Rev. 6/17) Subpoena to Produce Documents or Objects in a Criminal Case

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SUBPOENA TO PRODUCE DOCUMENTS OR OBJECTS IN A CRIMINAL CASE |
| Plaintiff, | |
| v. | Case No.: 3:18-cr-00577-CR |
| STEPHEN K. CHAMBERLAIN | |
| Defendant(s). | |

TO:  Paul Gilmer Morland

YOU ARE COMMANDED to produce at the place, date, and time specified the document(s) or object(s) indicated below.  If compliance would be unreasonable or oppressive, you may file a motion requesting the court to quash or modify the subpoena, to review the documents in camera, or to permit production only pursuant to a protective order.

| PLACE | | | | COURTROOM/JUDGE 6/Breyer |
|---|---|---|---|---|
| ☑ U.S. Courthouse 450 Golden Gate Ave. San Francisco, CA 94102 | ☐ U.S. Courthouse 280 South First St. San Jose, CA 95113 | ☐ U.S. Courthouse 3140 Boeing Ave. McKinleyville, CA 95519 | ☐ U.S. Courthouse 1301 Clay Street Oakland, CA 94612 | DATE AND TIME 12/30/2021 09:00 |

*If the document(s) or object(s) are produced in advance of the date specified, either to the court in an envelope delivered to the clerk's office or to the issuing attorney whose name and address appears below, no appearance is necessary.*

The following document(s) or object(s) shall be produced:

All records and communications in the possession of Paul Morland relating to Autonomy, Mr. Stephen Chamberlain, or Dr. Michael Lynch, including but not limited to, electronic or hard copy documents, hand-written notes, reports (and drafts thereof), emails, chat messages, text messages, social media account communications, voicemails and audio recordings.

NOTE: Subpoena forms requiring the appearance of a witness to testify at a criminal proceeding or to testify and bring documents to a criminal proceeding, must use Form CAND 89A, *Subpoena to Testify in a Criminal Case*) or for the production of state law enforcement personnel or complaint records (CAND 89C, *Subpoena to Produce State Law Enforcement Personnel Or Complaint Records in a Criminal Case*) are available at the Court's website: cand.uscourts.gov.

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT | DATE |
|---|---|
| | |
| (By) Deputy Clerk | |

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER:

Gary S. Lincenberg
Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, PC.
187s5 Century Park East, 23rd Floor, Los Angeles, CA  90067-2561
310-201-2100

CAND 89B  (Rev. 6/17) Subpoena to Produce Documents or Objects in a Criminal Case

| PROOF OF SERVICE | | |
|---|---|---|
| RECEIVED BY SERVER | DATE | PLACE |
| SERVED | DATE | PLACE |
| SERVED ON (PRINT NAME) | | FEES AND MILEAGE TENDERED TO WITNESS<br><br>☐ YES  ☐ NO   AMOUNT $ |
| SERVED BY (PRINT NAME) | | TITLE |

| DECLARATION OF SERVER |
|---|
| I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.<br><br>Executed on _____          _____<br>                    DATE                               SIGNATURE OF SERVER<br><br>                                        ADDRESS: |

| ADDITIONAL INFORMATION |
|---|
| |

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>MICHAEL R. LYNCH AND<br>STEPHEN K. CHAMBERLAIN<br><br>Defendants. | CASE NO. 3:18-cr-00577-CRB<br><br>**[PROPOSED] LETTER ROGATORY TO THE APPROPRIATE JUDICIAL AUTHORITY OF THE UNITED KINGDOM**<br><br><br>Hon. Charles R. Brever |

The Honorable Charles R. Breyer, United States District Court Judge of the United States District Court for the Northern District of California, presents his compliments to the Appropriate Judicial Authority of the United Kingdom of Great Britain and Northern Ireland and requests international assistance to obtain evidence to be used in a criminal proceeding before this Court in the above-captioned matter.

This Court requests the assistance described herein as necessary in the interests of justice and for the purpose of a full and fair trial.  The assistance requested is that the appropriate judicial authority of the Crown compel Paul Gilmer Morland to produce the documents identified below.

## I.   FACTUAL BACKGROUND

This request relates to a criminal case brought against Stephen Chamberlain by the United States of America in the Northern District of California.  The Second Superseding Indictment ("SI") alleges that Mr. Chamberlain, Dr. Michael Lynch, and others defrauded purchasers and sellers of Autonomy securities, including, specifically, Hewlett-Packard Company ("HP") in connection with its purchase of Autonomy Corporation plc ("Autonomy") in August 2011. SI at ¶¶ 19, 21. The case against Mr. Chamberlain is in pretrial proceedings at present. This Letter Rogatory stems from a request by counsel for Mr. Chamberlain for materials which this Court has found are relevant and material for his defense at trial and requested in the interests of justice.

The charges against Mr. Chamberlain rely in part on the testimony of Mr. Morland, a former securities analyst who covered Autonomy, and who has previously testified in related proceedings, including *United States v. Hussain*, No. CR 16-462 CRB, and *Autonomy* Corp. Ltd. v. Lynch, Claim No. HC-2015-001324 (High Court of Justice, Chancery Division, London, U.K.).  Mr. Morland has testified that Autonomy's senior management misled him and other market participants regarding Autonomy's finances and products. The SI alleges that analysts such as Mr. Morland relied on Autonomy's financial statements that Mr. Chamberlain helped to prepare, and that Mr. Chamberlain presented

deceptive information regarding Autonomy's (i) revenue from hardware sales; (ii) Original Equipment Manufacturer ("OEM") revenue; and (iii) cost allocation relating to the launch of its new Structured Probabilistic Engine ("SPE") product in Q3 2009, among other things.  Mr. Morland has claimed that this inflated financial information led to an inflated share price.

The record as of now is materially incomplete, as Mr. Chamberlain currently has access to only a limited set of Mr. Morland's relevant communications.  As such, it will be critical for Mr. Chamberlain to receive additional evidence from Mr. Morland in order to establish that, contrary to Mr. Morland's testimony, he was not deceived and that there was no fraudulent scheme.

## II.     RECIPROCITY

The United States District Court for the Northern District of California expresses its willingness to provide similar assistance to judicial authorities of the United Kingdom of Great Britain and Northern Ireland, should the need arise, and to the extent permissible by law.

## III.    REIMBURSEMENT FOR COSTS

The United States District Court for the Northern District of California assures the Courts of the United Kingdom of Great Britain and Northern Ireland that Mr. Chamberlain stands ready to reimburse the judicial authorities of the United Kingdom of Great Britain and Northern Ireland for any costs incurred in executing the requesting court's letters rogatory.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## IV.      EVIDENCE TO BE OBTAINED

This request is directed to Paul Gilmer Morland ("Paul Morland"), c/o Alvarium Capital, 1st Floor, 10 Old Burlington Street, London, W1S 3AG, for the production of the documents identified below:

1.      All records and communications in the possession of Paul Morland relating to Autonomy, Mr. Stephen Chamberlain, or Dr. Michael Lynch, including but not limited to, electronic or hard copy documents, hand-written notes, reports (and drafts thereof), emails, chat messages, text messages, social media account communications, voicemails and audio recordings.

DATED: _____      _____
                                                                    Honorable Charles R. Breyer
                                                                    United States District Court Judge
                                                                    Northern District of California

# EXHIBIT 7

CAND 89B  (Rev. 6/17) Subpoena to Produce Documents or Objects in a Criminal Case

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SUBPOENA TO PRODUCE |
| | DOCUMENTS OR OBJECTS |
| Plaintiff, | IN A CRIMINAL CASE |
| v. | Case No.: 3:18-cr-00577-CR |
| STEPHEN K. CHAMBERLAIN | |
| Defendant(s). | |

TO:  Northland Capital Partners Limited (previously known as Astaire Securities)

YOU ARE COMMANDED to produce at the place, date, and time specified the document(s) or object(s) indicated below.  If compliance would be unreasonable or oppressive, you may file a motion requesting the court to quash or modify the subpoena, to review the documents in camera, or to permit production only pursuant to a protective order.

| PLACE | | | | COURTROOM/JUDGE |
|---|---|---|---|---|
| ☑ U.S. Courthouse<br>450 Golden Gate Ave.<br>San Francisco, CA 94102 | ☐ U.S. Courthouse<br>280 South First St.<br>San Jose, CA 95113 | ☐ U.S. Courthouse<br>3140 Boeing Ave.<br>McKinleyville, CA 95519 | ☐ U.S. Courthouse<br>1301 Clay Street<br>Oakland, CA 94612 | 6/Breyer |
| | | | | DATE AND TIME<br>12/30/2021 09:00 |

*If the document(s) or object(s) are produced in advance of the date specified, either to the court in an envelope delivered to the clerk's office or to the issuing attorney whose name and address appears below, no appearance is necessary.*

The following document(s) or object(s) shall be produced:

All communications and documents, in hard copy or electronic form, including but not limited to instant messages, texts, emails, voicemails, hand-written notes, reports (including drafts thereof), or audio recordings, generated by or sent to Paul Morland, relating to Autonomy, Mr. Stephen Chamberlain, or Dr. Michael Lynch.

NOTE: Subpoena forms requiring the appearance of a witness to testify at a criminal proceeding or to testify and bring documents to a criminal proceeding, must use Form CAND 89A, *Subpoena to Testify in a Criminal Case*) or for the production of state law enforcement personnel or complaint records (CAND 89C, *Subpoena to Produce State Law Enforcement Personnel Or Complaint Records in a Criminal Case*) are available at the Court's website: cand.uscourts.gov.

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT | DATE |
|---|---|
| | |
| (By) Deputy Clerk | |

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER:

Gary S. Lincenberg
Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, PC.
1875 Century Park East, 23rd Floor, Los Angeles, CA  90067-2561
310-201-2100

CAND 89B  (Rev. 6/17) Subpoena to Produce Documents or Objects in a Criminal Case

| PROOF OF SERVICE | | |
|---|---|---|
| RECEIVED BY SERVER | DATE | PLACE |
| SERVED | DATE | PLACE |
| SERVED ON (PRINT NAME) | | FEES AND MILEAGE TENDERED TO WITNESS ☐ YES  ☐ NO   AMOUNT $ |
| SERVED BY (PRINT NAME) | | TITLE |

| DECLARATION OF SERVER |
|---|

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____     _____
                                DATE                                      SIGNATURE OF SERVER

ADDRESS:

ADDITIONAL INFORMATION

# EXHIBIT 8

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>MICHAEL R. LYNCH AND<br>STEPHEN K. CHAMBERLAIN<br><br>Defendants. | CASE NO. 3:18-cr-00577-CRB<br><br>**[PROPOSED] LETTER ROGATORY TO THE APPROPRIATE JUDICIAL AUTHORITY OF THE UNITED KINGDOM**<br><br><br><br>Hon. Charles R. Brever |

1      The Honorable Charles R. Breyer, United States District Court Judge of the United

2  States District Court for the Northern District of California, presents his compliments to

3  the Appropriate Judicial Authority of the United Kingdom of Great Britain and Northern

4  Ireland and requests international assistance to obtain evidence to be used in a criminal

5  proceeding before this Court in the above-captioned matter.

6      This Court requests the assistance described herein as necessary in the interests of

7  justice and for the purpose of a full and fair trial.  The assistance requested is that the

8  appropriate judicial authority of the Crown compel Northland Capital Partners Limited

9  (formerly Astaire Securities) to produce the materials identified below.

10  **I.    FACTUAL BACKGROUND**

11      This request relates to a criminal case brought against Stephen Chamberlain by the

12  United States of America in the Northern District of California.  The Second Superseding

13  Indictment ("SI") alleges that Mr. Chamberlain, Dr. Michael Lynch, and others defrauded

14  purchasers and sellers of Autonomy securities, including, specifically, Hewlett-Packard

15  Company ("HP") in connection with its purchase of Autonomy Corporation plc

16  ("Autonomy") in August 2011. SI at ¶¶ 19, 21. The case against Mr. Chamberlain is in

17  pretrial proceedings at present. This Letter Rogatory stems from a request by counsel for

18  Mr. Chamberlain for materials which this Court has found are relevant and material for his

19  defense at trial and requested in the interests of justice.

20      The charges against Mr. Chamberlain rely in part on the testimony of Mr. Morland,

21  a former securities analyst who covered Autonomy, and who has previously testified in

22  related proceedings, including *United States v. Hussain*, No. CR 16-462 CRB, and

23  *Autonomy* Corp. Ltd. v. Lynch, Claim No. HC-2015-001324 (High Court of Justice,

24  Chancery Division, London, U.K.).  Mr. Morland has testified that Autonomy's senior

25  management misled him and other market participants regarding Autonomy's finances and

26  products. The SI alleges that analysts such as Mr. Morland relied on Autonomy's financial

27  statements that Mr. Chamberlain helped to prepare, and that Mr. Chamberlain presented

28  deceptive information regarding Autonomy's (i) revenue from hardware sales; (ii) Original

Equipment Manufacturer ("OEM") revenue; and (iii) cost allocation relating to the launch of its new Structured Probabilistic Engine ("SPE") product in Q3 2009, among other things.  Mr. Morland has claimed that this inflated financial information led to an inflated share price.

The record as of now is materially incomplete, as Mr. Chamberlain currently has access to only a limited set of Mr. Morland's relevant communications.  As such, it will be critical for Mr. Chamberlain to receive additional evidence from Mr. Morland in order to establish that, contrary to Mr. Morland's testimony, he was not deceived and that there was no fraudulent scheme.

## II.   RECIPROCITY

The United States District Court for the Northern District of California expresses its willingness to provide similar assistance to judicial authorities of the United Kingdom of Great Britain and Northern Ireland, should the need arise, and to the extent permissible by law.

## III.   REIMBURSEMENT FOR COSTS

The United States District Court for the Northern District of California assures the Courts of the United Kingdom of Great Britain and Northern Ireland that Mr. Chamberlain stands ready to reimburse the judicial authorities of the United Kingdom of Great Britain and Northern Ireland for any costs incurred in executing the requesting court's letters rogatory.

## IV.   EVIDENCE TO BE OBTAINED

Mr. Morland worked at Astaire Securities from July 2008 through October 2010, and reported on and communicated about Autonomy throughout his period of employment. Therefore, Mr. Morland's communications and documents from this period will be relevant to his coverage of Autonomy and to whether or not he was deceived.

This request is directed to Northland Capital Partners Limited (formerly Astaire Securities), Prince Fredrick House, 35-39 Maddox Street, London W1S 2PP, for the production of the materials identified below:

1       1.     All communications and documents, in hard copy or electronic form, including but not limited to instant messages, texts, emails, voicemails, hand-written notes, reports (including drafts thereof), or audio recordings, generated by or sent to Paul Morland, relating to Autonomy, Mr. Stephen Chamberlain, or Dr. Michael Lynch.

DATED: _____    _____

Honorable Charles R. Breyer
United States District Court Judge
Northern District of California

# EXHIBIT 9

CAND 89B  (Rev. 6/17) Subpoena to Produce Documents or Objects in a Criminal Case

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>  v.<br><br>STEPHEN K. CHAMBERLAIN<br><br>       Defendant(s). | **SUBPOENA TO PRODUCE DOCUMENTS OR OBJECTS IN A CRIMINAL CASE**<br><br>Case No.: 3:18-cr-00577-CR |

TO:  Peel Hunt LLP

YOU ARE COMMANDED to produce at the place, date, and time specified the document(s) or object(s) indicated below.  If compliance would be unreasonable or oppressive, you may file a motion requesting the court to quash or modify the subpoena, to review the documents in camera, or to permit production only pursuant to a protective order.

| PLACE | | | | COURTROOM/JUDGE<br>6/Breyer |
|---|---|---|---|---|
| ☑ U.S. Courthouse<br>450 Golden Gate Ave.<br>San Francisco, CA 94102 | ☐ U.S. Courthouse<br>280 South First St.<br>San Jose, CA 95113 | ☐ U.S. Courthouse<br>3140 Boeing Ave.<br>McKinleyville, CA 95519 | ☐ U.S. Courthouse<br>1301 Clay Street<br>Oakland, CA 94612 | DATE AND TIME<br>12/30/2021 09:00 |

*If the document(s) or object(s) are produced in advance of the date specified, either to the court in an envelope delivered to the clerk's office or to the issuing attorney whose name and address appears below, no appearance is necessary.*

The following document(s) or object(s) shall be produced:

All communications and documents, in hard copy or electronic form, generated by or sent to Mr. Paul Morland, relating to Autonomy, Mr. Stephen Chamberlain, or Dr. Michael Lynch, including but not limited to chat messages or transcripts, emails, instant messages, texts, voicemails, hand-written notes, audio recordings, and reports (or drafts thereof).

NOTE: Subpoena forms requiring the appearance of a witness to testify at a criminal proceeding or to testify and bring documents to a criminal proceeding, must use Form CAND 89A, *Subpoena to Testify in a Criminal Case*) or for the production of state law enforcement personnel or complaint records (CAND 89C, *Subpoena to Produce State Law Enforcement Personnel Or Complaint Records in a Criminal Case*) are available at the Court's website: cand.uscourts.gov.

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT | DATE |
|---|---|
| <br><br>(By) Deputy Clerk | |

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER:

Gary S. Lincenberg
Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, PC.
1875 Century Park East, 23rd Floor, Los Angeles, CA  90067-2561
310-201-2100

CAND 89B  (Rev. 6/17) Subpoena to Produce Documents or Objects in a Criminal Case

| PROOF OF SERVICE | | |
|---|---|---|
| RECEIVED BY SERVER | DATE | PLACE |
| SERVED | DATE | PLACE |
| SERVED ON (PRINT NAME) | | FEES AND MILEAGE TENDERED TO WITNESS<br><br>☐ YES  ☐ NO  AMOUNT $ |
| SERVED BY (PRINT NAME) | | TITLE |

<div align="center">DECLARATION OF SERVER</div>

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

<div style="text-align:center">DATE</div>                    SIGNATURE OF SERVER

ADDRESS:

ADDITIONAL INFORMATION

# EXHIBIT 10

_____

| | |
|---|---|
| **From:** | Paul Morland <pmorland@astaire.co.uk> |
| **To:** | Khan, Daud <daud.khan@cazenove.com> |
| **Sent:** | 9/8/2009 10:17:05 PM |
| **Subject:** | FW: Citi AU note from today |

Amended version with **** removed

Paul Morland | Equity Analyst | Astaire Securities
D: +44 (0)20 7448 9740
W: www.astairesecurities.co.uk | E: mailto:pmorland@astaire.co.uk
-------------------------------------------------------------------------

From: Paul Morland
Sent: 08 September 2009 23:12
To: Khan, Daud; Roger Phillips
Subject: RE: Citi AU note from today

Sad to still be in the office but this DB note is amazing.
It really could be the worst note ever written.
I thought it was bad when they said the H2 09 growth rate was
undemanding when looking at what was achieved in H2 08, completely
forgetting to mention the $40m dollar first time benefit from large
deals in H2 08.
But then I started looking at the model cash conversion table. My three
year old could have produced something more meaningful. Figure 6 looks
quite elaborate but all it is saying is that a company with 30% tax,
depreciation at 2% of profits (4% of sales and 45% margin) and no
working capital movements will convert 72% of EBITDA into cash after
tax. NO **** SHERLOCK. This is a table with 22 lines that tells us that
100-30+2=72.
The model appears to completely ignore working capital which one would
have thought was the whole point of having a growth sensitivity table in
Fig. 7. The model company has 70% pre-paid maintenance which would
surely do better than just 72% conversion (or 102% before tax). And how
is this relevant if Autonomy's maintenance is closer to 20%? The
resulting Fig. 7 is complete nonsense, partly because it is based on
quarter on quarter growth rather than annual, but then if you are
ignoring working capital movements does it really matter?
Who is head of research at DB?

-----Original Message-----
From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 08 September 2009 10:25
To: Paul Morland; Roger Phillips
Subject: RE: Citi AU note from today

Figured out the db note now - he is comparing EBITDA to Operating cash
AFTER TAX!!!

-----Original Message-----
From: Paul Morland [mailto:pmorland@astaire.co.uk]
Sent: 08 September 2009 08:24
To: Roger Phillips; Khan, Daud
Subject: RE: Citi AU note from today

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)    JPMC-AU-DOJ-00008557

I will send Goodman a mail this morning to ask if the marketing spend is going according to plan and how much has been spent to date


Paul Morland | Equity Analyst | Astaire Securities
D: +44 (0)20 7448 9740
W: www.astairesecurities.co.uk | E: mailto:pmorland@astaire.co.uk
------------------------------------------------------------------
--
From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 07 September 2009 09:31
To: Khan, Daud
Cc: Paul Morland
Subject: RE: Citi AU note from today


I think it is fairly ad-hoc stuff initiated by the funds at this point.
I don't get the feel we are being set up for an event but I didn't see IWOV coming either

I do think there is massive bullshit on the way for the new product and this has to be prepared for

-----Original Message-----
From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 07 September 2009 09:23
To: Roger Phillips
Cc: Paul Morland
Subject: RE: Citi AU note from today

Do you know who are setting up these meetings.

I think these meetings might be crucial as if there is another share placement, these might be the investors that lap it up.


-----Original Message-----
From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 07 September 2009 09:21
To: Khan, Daud; Paul Morland
Subject: RE: Citi AU note from today


Potential new. Funds that were underweight it during the last rise due to scepticism, and now want to see if this is a suitable entry point

Apparently their new London hedge fund type offices are extremely bullish. Historically a sell signal when a firm gets a new set of offices.....

-----Original Message-----
From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 07 September 2009 09:19
To: Roger Phillips; Paul Morland
Subject: RE: Citi AU note from today

Existing holders or potential new ones?

-----Original Message-----
From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]

Sent: 07 September 2009 09:02
To: Paul Morland; Khan, Daud
Subject: RE: Citi AU note from today

AU are doing some meetings with one or two pretty serious investors this
week so I will get some feedback on what's being said

-----Original Message-----
From: Paul Morland [mailto:pmorland@astaire.co.uk]
Sent: 05 September 2009 14:25
To: daud.khan@cazenove.com; Roger Phillips
Subject: Re: Citi AU note from today

I may be on holiday (one week at start of summer and one now) but I have
to say I found the permatan comment v. Amusing. I can honestly say I
have never used a sunbed if that is what you are getting at.
Looking forward to getting back to some Autonomy bashing on Monday.
Working on a pre-results note that I will run past you.
We still need to think how we get them for that selective disclosure to
the bulls which they denied to me in an e-mail. Might be worth getting
a view from the FSA?
Btw they confirmed to me last week there is no hosting in def inc
release.

Paul Morland | Equity Analyst | Astaire Securities
D: +44 (0)20 7448 9740
W: www.astairesecurities.co.uk | E: mailto:pmorland@astaire.co.uk
-------------------------------------------------------------------
--

From: Khan, Daud <daud.khan@cazenove.com>
To: Roger Phillips <Roger.Phillips@evosecurities.com>
Cc: Paul Morland
Sent: Fri Sep 04 11:41:43 2009
Subject: RE: Citi AU note from today

had a look at the whit andrews research - not as critical as might first
seem.

basically a very good product that is flexible and powerful but

expensive and complex to install. customer support lacking for the
smaller deals with more focus on the big customers.

_____

From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 04 September 2009 11:29
To: Khan, Daud
Cc: Paul Morland
Subject: RE: Citi AU note from today

How big is Endeca? Sub-$100m rev?

Sounds like AU needed a deal and had all channels open. Endeca still feels like an SAP buy though with the manufacturing vertical expertise

I barely track OpenV....it's in the "Irrelevant" bucket along with Kenjin the "Lycos-Killer" and Blinkx the "Google of Video Search". Oh how I remember enjoying talking to investors convinced Blinkx was going to be huge...

If you see examples of structured database search elsewhere let me know

_____

From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 04 September 2009 11:24
To: Roger Phillips
Cc: Paul Morland
Subject: RE: Citi AU note from today

yes when i tried to contact them last year the were very evasive - think Au might have been talking to them last year.

You may be right about the spin off.

Do you think that OpenV might get spun out for a ridiculous valuation?

just got a hard copy of that whit andrews note- will read and give you the highlights as don't have a soft copy.

_____

From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 04 September 2009 11:11
To: Khan, Daud
Cc: Paul Morland
Subject: RE: Citi AU note from today

Interesting comments on Endeca and structured database search. I guess this goes back to your view that Autonomy might buy them, but doesn't SAP hold a stake?

We are going to have to prepare for a massive amount of hype about this at 3Q with AU....I think it is possible they spin off a new probabilistic structured division with a load of shared cost in it and $1m of revenue.

Cue Gerardus writing notes about how this deserves an EV/Sales of a
grillion times as databases are a $110bn market

---

From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 04 September 2009 10:49
To: Roger Phillips
Cc: Paul Morland
Subject: RE: Citi AU note from today

no we don't have access. seen the e-discovery report and made the same
point as you in a note a while back.

i'llsee if our tech guys have it

---

From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 04 September 2009 10:46
To: Khan, Daud
Cc: Paul Morland
Subject: RE: Citi AU note from today

Have you Gartner access? because you should search for Whit Andrews...he
recently did a hatchet job on Autonomy in mid-July or so with a note on
IDOL being a poor choice

http://www.gartner.com/DisplayDocument?id=1070012

Autonomy is only rated "Positive" in the last Gartner eDiscovery
Marketscope in Dec 08 which I use....FTI, Clearwell and others are rated
higher. Did you see EMC buy Kazeon? AU just got a big new competitor for
"upstream" eDiscovery

http://mediaproducts.gartner.com/reprints/ca/163258.html

---

From: Khan, Daud [mailto:daud.khan@cazenove.com]

Sent: 04 September 2009 10:38
To: Roger Phillips
Cc: Paul Morland
Subject: RE: Citi AU note from today

have you seen the latest magic quadrant from Gartner. Au continues to slip

---

From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 04 September 2009 09:56
To: Khan, Daud
Cc: Paul Morland
Subject: RE: Citi AU note from today

How d'you think Morlo maintains that radioactive permatan J

---

From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 04 September 2009 08:29
To: Roger Phillips
Cc: Paul Morland
Subject: RE: Citi AU note from today

that Appendix 1 is a joke. Its got nothing to do with accounting (or at least the vast majority of it).

Paul - how many days holiday to you get at Astaire? I thought you'd already had your summer holiday.

---

From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 03 September 2009 16:04
To: Khan, Daud; Paul Morland
Subject: Citi AU note from today

fyi...makes the UBS note look terrific by comparison IMO

The last couple of months have been challenging for Autonomy as bears put a lot of scrutiny on accounting. While, this has yielded limited result, in our view, it has left the investor base somewhat confused and AU underperformed the FTSE 100 by 26% since its Q2 trading update. In this note we do give our view on accounting but the main focus is on the fundamental case and this should be seen as a follow up from our January note where we compared Autonomy with Oracle. In this report we focus on

four key areas:

*   First we look at the overall opportunity for Autonomy's IDOL technology - we argue that with the move to unstructured data (such as emails, video, voicemails, etc) all software need to be able to handle unstructured data over time. To size this opportunity we have used AU's OEM model and conclude that the unstructured data opportunity is $6.7-22.3bn. While this will be a gradual uptake there are two shorter term catalysts including eDiscovery and Meaning Based Marketing. And this brings me to the second area
*   We revisited eDiscovery and conclude that after the initial data gathering stage, corporations are now looking to reduce the costs of maintaining and reviewing this data. This results in strong demand for automated solutions like Autonomy and software for eDiscovery should grow c30% through 2012
*   Thirdly, the recovery will drive a new opportunity for Autonomy which is around the optimisation and analysis of e-commerce. Autonomy has combined the product it acquired from Interwoven (Optimost) with IDOL, and eTalk. We value the market opportunity in this so-called Meaning Based Marketing (MBM) at $1.0-2.3bn. Direct competition, like Omniture grew organically at 70% in '07, 50% in '08 and is projected to grow 15-20% this year, despite the current recession. While this opportunity might be still 12 months out it should pick up from eDiscovery.
*   Finally we discuss the accounting where we conclude that AU has added value via acquisitions, is seeing the best growth in the software industry and generates cash at a level which is appropriate given its growth. However, we argue that AU will have to increase disclosure if it want to end these ongoing discussions around accounting.

Concluding, demand for eDiscovery remains strong and Meaning Based Marketing is around the corner which should help AU to continue to grow around the 20% mark. This is not reflected in the valuation as AU is now trading at 14.5x 2010E eps which is well below its historical 20x+ range and makes it one of the most attractive buys in the sector.

I have attached our note, if you want to discuss the note please let Hoi or myself know
Kind regards
Gerardus
<<AU - meaningful opportunities.pdf>>

Gerardus Vos CFA
Software & IT Services
Citigroup Investment Research

Office: +44 (0) 207 986 4246
Mobile: +44 (0) 77 99 145 745
Fax:    +44 (0) 207 986 4313
Email:   gerardus.vos@citigroup.com <mailto:gerardus.vos@citigroup.com>
Hoi Lam CFA
Software & IT Services
Citigroup Investment Research

Office: +44 (0) 207 986 4139
Mobile: +44 (0) 77 99 418 438
Fax:    +44 (0) 207 986 4313
Email:   hoi.chuen.lam@citi.com <mailto:hoi.chuen.lam@citi.com>

Citigroup Centre
Canada Square, Canary Wharf
London E14 5LB United Kingdom

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

Citigroup Global Markets Limited
Registered in England with number 1763297
Registered office : Citigroup Centre, Canada Square, London E14 5LB
Authorised and regulated by the Financial Services Authority

IMPORTANT DISCLOSURES
For important disclosures regarding Citigroup Investment Research,
including with respect to any issuers mentioned herein, please refer to
the Citigroup Investment Research disclosure website at
https://www.citigroupgeo.com/geopublic/Disclosures/disclosure.html
<https://www.citigroupgeo.com/geopublic/Disclosures/disclosure.html> .

The Evolution Group e-mail system is for business purposes only.
Messages are not confidential and may be reviewed by authorised
personnel or provided to authorities with a legal right to access such
information. If you are not the addressee thereof or the person
responsible for its delivery, please permanently delete all copies of
this message. Any dissemination or copying of this message by anyone
other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of
THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an
authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood
Street, London EC2V 7AN), Member of the London Stock Exchange,
Authorised and Regulated by the Financial Services Authority (FSA No.
143999).

Whilst we run anti-virus software, you are solely responsible for
ensuring that any e-mail or attachment you receive is virus-free. We
disclaim liability for any damage you suffer as a consequence of
receiving any such virus.

This e-mail is confidential and is for the addressee only. Please refer
to www.cazenove.com/disclaimers/cazenove.htm for important disclaimers
and the firm's regulatory position.

The Evolution Group e-mail system is for business purposes only.
Messages are not confidential and may be reviewed by authorised
personnel or provided to authorities with a legal right to access such
information. If you are not the addressee thereof or the person
responsible for its delivery, please permanently delete all copies of
this message. Any dissemination or copying of this message by anyone
other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of
THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an
authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood
Street, London EC2V 7AN), Member of the London Stock Exchange,
Authorised and Regulated by the Financial Services Authority (FSA No.
143999).

Whilst we run anti-virus software, you are solely responsible for
ensuring that any e-mail or attachment you receive is virus-free. We
disclaim liability for any damage you suffer as a consequence of
receiving any such virus.

The Evolution Group e-mail system is for business purposes only.
Messages are not confidential and may be reviewed by authorised
personnel or provided to authorities with a legal right to access such
information. If you are not the addressee thereof or the person
responsible for its delivery, please permanently delete all copies of
this message. Any dissemination or copying of this message by anyone
other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of
THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an
authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood
Street, London EC2V 7AN), Member of the London Stock Exchange,
Authorised and Regulated by the Financial Services Authority (FSA No.
143999).

Whilst we run anti-virus software, you are solely responsible for
ensuring that any e-mail or attachment you receive is virus-free. We
disclaim liability for any damage you suffer as a consequence of
receiving any such virus.

The Evolution Group e-mail system is for business purposes only.
Messages are not confidential and may be reviewed by authorised
personnel or provided to authorities with a legal right to access such
information. If you are not the addressee thereof or the person
responsible for its delivery, please permanently delete all copies of
this message. Any dissemination or copying of this message by anyone
other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of
THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an
authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood
Street, London EC2V 7AN), Member of the London Stock Exchange,
Authorised and Regulated by the Financial Services Authority (FSA No.
143999).

Whilst we run anti-virus software, you are solely responsible for
ensuring that any e-mail or attachment you receive is virus-free. We
disclaim liability for any damage you suffer as a consequence of
receiving any such virus.

The Evolution Group e-mail system is for business purposes only.
Messages are not confidential and may be reviewed by authorised
personnel or provided to authorities with a legal right to access such
information. If you are not the addressee thereof or the person
responsible for its delivery, please permanently delete all copies of
this message. Any dissemination or copying of this message by anyone
other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of

THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood Street, London EC2V 7AN), Member of the London Stock Exchange, Authorised and Regulated by the Financial Services Authority (FSA No. 143999).

Whilst we run anti-virus software, you are solely responsible for ensuring that any e-mail or attachment you receive is virus-free. We disclaim liability for any damage you suffer as a consequence of receiving any such virus.

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

The Evolution Group e-mail system is for business purposes only. Messages are not confidential and may be reviewed by authorised personnel or provided to authorities with a legal right to access such information. If you are not the addressee thereof or the person responsible for its delivery, please permanently delete all copies of this message. Any dissemination or copying of this message by anyone other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood Street, London EC2V 7AN), Member of the London Stock Exchange, Authorised and Regulated by the Financial Services Authority (FSA No. 143999).

Whilst we run anti-virus software, you are solely responsible for ensuring that any e-mail or attachment you receive is virus-free. We disclaim liability for any damage you suffer as a consequence of receiving any such virus.

The Evolution Group e-mail system is for business purposes only. Messages are not confidential and may be reviewed by authorised personnel or provided to authorities with a legal right to access such

information. If you are not the addressee thereof or the person responsible for its delivery, please permanently delete all copies of this message. Any dissemination or copying of this message by anyone other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood Street, London EC2V 7AN), Member of the London Stock Exchange, Authorised and Regulated by the Financial Services Authority (FSA No. 143999).

Whilst we run anti-virus software, you are solely responsible for ensuring that any e-mail or attachment you receive is virus-free. We disclaim liability for any damage you suffer as a consequence of receiving any such virus.

The Evolution Group e-mail system is for business purposes only. Messages are not confidential and may be reviewed by authorised personnel or provided to authorities with a legal right to access such information. If you are not the addressee thereof or the person responsible for its delivery, please permanently delete all copies of this message. Any dissemination or copying of this message by anyone other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood Street, London EC2V 7AN), Member of the London Stock Exchange, Authorised and Regulated by the Financial Services Authority (FSA No. 143999).

Whilst we run anti-virus software, you are solely responsible for ensuring that any e-mail or attachment you receive is virus-free. We disclaim liability for any damage you suffer as a consequence of receiving any such virus.

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

# EXHIBIT 11

**From:**     BRAM CORNELISSE <BCORNELISSE@Bloomberg.net>
**To:**       DAUD KHAN <DKHAN5@Bloomberg.net>;DAUD KHAN <daud.khan@cazenove.com>
**Sent:**     10/12/2010 4:20:01 PM
**Subject:**

10/12/2010 04:25:02 BRAM CORNELISSE, FARRINGDON CAPITAL M has joined the room
10/12/2010 04:25:32 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
btw, how is the cfo feeling about his recent purchase of au shares? well timed!

10/12/2010 04:25:32 DAUD KHAN, JPMORGAN SECURITIES has joined the room
10/12/2010 04:25:32 DAUD KHAN, JPMORGAN SECURITIES says:
*** JPMORGAN SECURITIES (30034063) Disclaimer: THIS IS FOR INFORMATION ONLY, NOT AN OFFER OR
SOLICITATION FOR THE PURCHASE OR SALE OF ANY FINANCIAL INSTRUMENT, NOR AN OFFICIAL
CONFIRMATION OF TERMS. THE INFORMATION IS BELIEVED TO BE RELIABLE, BUT WE DO NOT WARRANT ITS
COMPLETENESS OR ACCURACY. PRICES AND AVAILABILITY ARE INDICATIVE ONLY AND ARE SUBJECT TO
CHANGE WITHOUT NOTICE. WE MAY HOLD A POSITION OR ACT AS A MARKET MAKER IN ANY FINANCIAL
INSTRUMENT DISCUSSED HEREIN. CLIENTS SHOULD CONSULT THEIR OWN ADVISORS REGARDING ANY TAX,
ACCOUNTING OR LEGAL ASPECTS OF THIS INFORMATION AND EXECUTE TRANSACTIONS THROUGH A J.P. MORGAN
ENTITY IN THEIR HOME JURISDICTION UNLESS GOVERNING LAW PERMITS OTHERWISE.

10/12/2010 04:27:24 DAUD KHAN, JPMORGAN SECURITIES says:
clearly over the moon - I am maybe being too hopeful but I can see an image of a hitler moment
for Mike, where his generals tell him the war is lost and that he has to step down

10/12/2010 04:28:23 DAUD KHAN, JPMORGAN SECURITIES says:
Raimo still pushingthe positives here

10/12/2010 04:28:40 DAUD KHAN, JPMORGAN SECURITIES says:
one of few analyst still buyers - GS, CS, Barcap

10/12/2010 04:30:25 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
I just had a meeting with him

10/12/2010 04:31:19 DAUD KHAN, JPMORGAN SECURITIES says:
does he really believe its a buy?

10/12/2010 04:31:26 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
... there are no generals strong enough tro throw him out, nor to take over from him so I
don't think it is about to happen

10/12/2010 04:31:56 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
it is not a stong conviction from raimo

10/12/2010 04:32:14 DAUD KHAN, JPMORGAN SECURITIES says:
well then his generals will leave and leave him exposed

10/12/2010 04:32:16 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
tiaa cref selling I have seen

10/12/2010 04:32:26 DAUD KHAN, JPMORGAN SECURITIES says:
really, when?

10/12/2010 04:32:35 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
yday... went below 4%

10/12/2010 04:32:35 DAUD KHAN, JPMORGAN SECURITIES says:
that was before the warning - no?

10/12/2010 04:32:44 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
i wouldn't think so

10/12/2010 04:32:48 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
but am not sure

10/12/2010 04:33:55 DAUD KHAN, JPMORGAN SECURITIES says:

ah seen it now niclely hidden among some Autonomy Pr announcement

10/12/2010 04:34:07 DAUD KHAN, JPMORGAN SECURITIES says:
must be post warning

10/12/2010 04:34:35 DAUD KHAN, JPMORGAN SECURITIES says:
they sold before as well so have gone from 5.5% to 3.94% in a few weeks

10/12/2010 04:34:51 DAUD KHAN, JPMORGAN SECURITIES says:
difficult to find holders now

10/12/2010 04:35:16 DAUD KHAN, JPMORGAN SECURITIES says:
not much in the UK - must be the Europeans as even US funds that use to own it no longer do

10/12/2010 04:36:31 DAUD KHAN, JPMORGAN SECURITIES says:
high volume selling this morning

10/12/2010 04:36:48 DAUD KHAN, JPMORGAN SECURITIES says:
75% daily volume already

10/12/2010 04:38:50 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
i am buying back a little more.

10/12/2010 04:39:12 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
(will keep a position though)

10/12/2010 05:07:02 DAUD KHAN, JPMORGAN SECURITIES says:
well hope you have made some money finally - i'll be gib=ving you grief though when the stock
is at �6

10/12/2010 05:07:32 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
yes + fair enough!!

10/12/2010 06:59:00 DAUD KHAN, JPMORGAN SECURITIES says:
next short to look at is Software AG. another where i have been wrong foe a while but am
confident it will come good in a big way.

10/12/2010 07:00:04 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
i am tied up at the moment, but of course would love to chat to you about it.

10/12/2010 07:01:14 DAUD KHAN, JPMORGAN SECURITIES says:
plenty of time

10/12/2010 12:20:01 BRAM CORNELISSE, FARRINGDON CAPITAL M has left the room

# EXHIBIT 12

| From: | SHERIEF BAKR <SBAKR2@Bloomberg.net> |
|---|---|
| To: | SHERIEF BAKR <SBAKR2@Bloomberg.net>;SHERIEF BAKR <sherief.bakr@citi.com>;DAUD KHAN <DKHAN5@Bloomberg.net>;DAUD KHAN <daud.khan@cazenove.com> |
| Sent: | 4/28/2009 10:40:37 AM |
| Subject: | |

```
04/28/2009 04:34:56 SHERIEF BAKR, CITIGROUP GLOBAL MAR has joined the room
04/28/2009 04:34:56 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
*** CITIGROUP GLOBAL MAR (135983) Disclaimer: This communication is made by Citigroup Global
Markets Limited and any services or products referred to herein are available solely to
eligible counterparties and professional clients (as defined by the FSA). The content of this
communication is not intended for any other person. If you are not the intended recipient
please notify the sender immediately, delete this message from your system and do not copy,
transfer or disclose this message or its contents to any third party. If this communication is
Market Commentary please go to: www.citigroupgcib.com/data/documents
/Disclaimer_Market_Commentary.pdf We reserve the right to monitor and record all e-mail
messages whether received or sent by us.

04/28/2009 04:35:01 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
hey dude

04/28/2009 04:35:01 DAUD KHAN, CAZENOVE has joined the room
04/28/2009 04:35:01 DAUD KHAN, CAZENOVE says:
*** CAZENOVE (431221) Disclaimer: This information represents a personal view, is not Cazenove
research, but may contain extracts from published research. It is not an offer or solicitation
for the purchase or sale of any financial product and is not suitable for private customers.

04/28/2009 04:35:15 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
apparently Mike Lynch was dissing you yesterday

04/28/2009 04:35:25 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
he did a sales meeting here

04/28/2009 04:35:37 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
said your analysis was wrong

04/28/2009 04:35:53 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
am sure you appreciate his comments.......

04/28/2009 04:36:34 DAUD KHAN, CAZENOVE says:
oh yes - its so nice of him to tell everyone that the analysis is wrong but strange how he
couldnt show me why it wrong

04/28/2009 04:37:19 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
are you still covering it?

04/28/2009 04:37:25 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
or have you been told to ease off

04/28/2009 04:38:10 DAUD KHAN, CAZENOVE says:
still covering it, but have been asked to take foot off pedal - but that was back in jan

04/28/2009 04:38:33 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
i think it is shocking

04/28/2009 04:38:46 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
i really hope you are provend right on this one!

04/28/2009 04:39:02 DAUD KHAN, CAZENOVE says:
well you know he threatened his lawyers on me

04/28/2009 04:39:08 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
no way

04/28/2009 04:39:33 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
```

when was this?

04/28/2009 04:39:37 DAUD KHAN, CAZENOVE says:
yep - phrased it the way a mafiosa would

04/28/2009 04:39:52 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
you should report him to the FSA

04/28/2009 04:40:43 DAUD KHAN, CAZENOVE says:
he said something like - by challenging our numbers you are challenging our professional
advisors and you should be aware of the consequences

04/28/2009 04:41:02 DAUD KHAN, CAZENOVE says:
he not regulated by the FSA

04/28/2009 04:41:03 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
disrespecting him

04/28/2009 04:41:13 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
sounds like marlon brando

04/28/2009 04:41:28 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
we have been cut off mby Temenos

04/28/2009 04:41:54 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
amazing how badly companies react to criticism

04/28/2009 04:42:17 DAUD KHAN, CAZENOVE says:
its odd that Gerdus is so harsh on other software companies and the biggest culprit he lets
off scott free - even if you are brokers

04/28/2009 04:43:18 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
i think he was bullsih before we won the brokership

04/28/2009 04:43:28 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
i think geall was very involved is us winning it

04/28/2009 04:43:46 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
geall was in mexico last week

04/28/2009 04:43:56 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
no one has heard from him since

04/28/2009 04:44:33 DAUD KHAN, CAZENOVE says:
the old swine flu must have taken him out - hes in some quarantine centre in Mexico being
jabbed with needles

04/28/2009 04:44:45 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
possibly

04/28/2009 04:44:56 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
i was ill over the weekend and was pretty worried!

04/28/2009 04:45:22 DAUD KHAN, CAZENOVE says:
did you get ill before or after hearing about the flu

04/28/2009 04:45:27 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
before

04/28/2009 04:46:09 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
i am due to go to the US next week and am thinking of cancelling

04/28/2009 04:46:29 DAUD KHAN, CAZENOVE says:
you prob should esp if you think you are prone to contracting flu

04/28/2009 04:46:50 DAUD KHAN, CAZENOVE says:
also dont want to bring anything back to joseph

04/28/2009 04:46:52 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
it's pretty scary stuff

04/28/2009 04:47:15 DAUD KHAN, CAZENOVE says:
muslims would have a field day if a swine flu pandemic occured

04/28/2009 04:47:25 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
i bet

04/28/2009 04:47:51 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
although they were very quiet about bird ful!

04/28/2009 04:47:54 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
flu

04/28/2009 04:48:16 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
have you heard from omar sheikh at all?

04/28/2009 04:48:44 DAUD KHAN, CAZENOVE says:
no - i think they are all still at dresdner - just not doing any work waiting to be laid off

04/28/2009 04:49:00 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
i thought the whole thing got shut down in feb?

04/28/2009 04:49:15 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
i hear that a whole bunch are going to join evolution

04/28/2009 04:50:35 DAUD KHAN, CAZENOVE says:
so did i - but a guy here said his mate is still turning up to work, going to the gym and making personal calls

04/28/2009 04:50:42 DAUD KHAN, CAZENOVE says:
no research going out

04/28/2009 04:50:54 DAUD KHAN, CAZENOVE says:
but no official redundancy yet either

04/28/2009 04:51:10 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
did you hear that mammoun is now in geneva

04/28/2009 04:51:27 DAUD KHAN, CAZENOVE says:
no - how come - has MAn got a geneva office now?

04/28/2009 04:51:39 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
yep - he is running the geneva office

04/28/2009 04:51:55 DAUD KHAN, CAZENOVE says:
what him and a dog

04/28/2009 04:52:01 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
i think so

04/28/2009 04:52:06 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
did you hear about Gower?

04/28/2009 04:52:12 DAUD KHAN, CAZENOVE says:
no

04/28/2009 04:52:24 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
he's been done by the FSA for selective disclosure

04/28/2009 04:52:32 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
career over

04/28/2009 04:52:40 DAUD KHAN, CAZENOVE says:
really! what selective disclosure

04/28/2009 04:52:48 DAUD KHAN, CAZENOVE says:

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

front running

04/28/2009 04:52:54 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
not sure, ask mortlock or harty

04/28/2009 04:53:10 DAUD KHAN, CAZENOVE says:
very juicy gossip that

04/28/2009 04:53:20 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
not bad eh?

04/28/2009 04:53:35 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
another team here has gone

04/28/2009 04:53:42 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
support services to nomura

04/28/2009 04:53:55 DAUD KHAN, CAZENOVE says:
looks like you'll have no-one left

04/28/2009 04:54:07 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
it might not be a bad thing

04/28/2009 04:54:28 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
some big costs are out of the business now

04/28/2009 04:54:47 DAUD KHAN, CAZENOVE says:
so your bosses can get paid more

04/28/2009 04:54:55 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
haha

04/28/2009 04:55:03 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
probably

04/28/2009 04:55:49 DAUD KHAN, CAZENOVE says:
got to jump on a call now - speak later

04/28/2009 04:56:29 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
laters

04/28/2009 05:38:34 SHERIEF BAKR, CITIGROUP GLOBAL MAR has left the room
04/28/2009 06:16:58 DAUD KHAN, CAZENOVE says:
hey

04/28/2009 06:16:59 SHERIEF BAKR, CITIGROUP GLOBAL MAR has joined the room
04/28/2009 06:16:59 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
*** CITIGROUP GLOBAL MAR (135983) Disclaimer: This communication is made by Citigroup Global
Markets Limited and any services or products referred to herein are available solely to
eligible counterparties and professional clients (as defined by the FSA). The content of this
communication is not intended for any other person. If you are not the intended recipient
please notify the sender immediately, delete this message from your system and do not copy,
transfer or disclose this message or its contents to any third party. If this communication is
Market Commentary please go to: www.citigroupgcib.com/data/documents
/Disclaimer_Market_Commentary.pdf We reserve the right to monitor and record all e-mail
messages whether received or sent by us.

04/28/2009 06:17:15 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
hey dude

04/28/2009 06:17:43 DAUD KHAN, CAZENOVE says:
dont tell geradus but Au tried to pin that selective disclosure thing on me

04/28/2009 06:17:55 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
wow

04/28/2009 06:18:03 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
when did they do that?

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

04/28/2009 06:18:14 DAUD KHAN, CAZENOVE says:
last year May

04/28/2009 06:18:59 DAUD KHAN, CAZENOVE says:
hence why im certain im right

04/28/2009 06:19:10 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
did they tapoe your calls or seomthing?

04/28/2009 06:19:13 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
tape

04/28/2009 06:19:19 DAUD KHAN, CAZENOVE says:
claimed they had a tape

04/28/2009 06:19:28 DAUD KHAN, CAZENOVE says:
and threatened to send it

04/28/2009 06:19:36 DAUD KHAN, CAZENOVE says:
unless i didnt publish

04/28/2009 06:19:42 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
how did they get a tape?

04/28/2009 06:19:52 DAUD KHAN, CAZENOVE says:
they say from a client

04/28/2009 06:20:01 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
did they pay him to do it?!!

04/28/2009 06:20:05 DAUD KHAN, CAZENOVE says:
but have heard nothing in the last year

04/28/2009 06:20:13 DAUD KHAN, CAZENOVE says:
so must have been fabrication

04/28/2009 06:20:17 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
sounds like it

04/28/2009 06:20:29 DAUD KHAN, CAZENOVE says:
so why would a co. go to so much trouble to stop an analyst publishing

04/28/2009 06:20:39 DAUD KHAN, CAZENOVE says:
unless im on to something

04/28/2009 06:20:50 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
agreed

04/28/2009 06:21:41 DAUD KHAN, CAZENOVE says:
instead of adressing my issues directly he goes around rubbishing it - have yet to find a
client who can show im wrong

04/28/2009 06:22:01 DAUD KHAN, CAZENOVE says:
yet they continue to believe mgmt - the two are inconsistent

04/28/2009 06:22:06 DAUD KHAN, CAZENOVE says:
however

04/28/2009 06:22:10 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
very odd

04/28/2009 06:22:20 DAUD KHAN, CAZENOVE says:
sales here have been really unhelpful

04/28/2009 06:22:28 DAUD KHAN, CAZENOVE says:
got a bad review coz of Auu

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

04/28/2009 06:22:36 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
how come?

04/28/2009 06:22:42 DAUD KHAN, CAZENOVE says:
bad stock call

04/28/2009 06:22:57 DAUD KHAN, CAZENOVE says:
no credit for the actual quality of work

04/28/2009 06:23:05 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
shame

04/28/2009 06:23:11 DAUD KHAN, CAZENOVE says:
and the fact that we generated significant comm

04/28/2009 06:23:33 DAUD KHAN, CAZENOVE says:
really annoyed me

04/28/2009 06:24:11 DAUD KHAN, CAZENOVE says:
so now i take pleasure in windingup Lynch

04/28/2009 06:24:30 DAUD KHAN, CAZENOVE says:
thorn in his side..

04/28/2009 06:24:39 DAUD KHAN, CAZENOVE says:
then a dagger

04/28/2009 06:24:44 DAUD KHAN, CAZENOVE says:
then an ak 47

04/28/2009 06:24:51 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
i hear he is a bit of an odd ball

04/28/2009 06:24:57 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
wow - he has realyl wound you up

04/28/2009 06:25:28 DAUD KHAN, CAZENOVE says:
to be honest the sales thing has wound me up - i actually dont care what he says

04/28/2009 06:25:44 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
what did your boss say?

04/28/2009 06:26:05 DAUD KHAN, CAZENOVE says:
havent spoken to him, got the feedback from stacy who is head of team

04/28/2009 06:26:19 DAUD KHAN, CAZENOVE says:
am still fuming

04/28/2009 06:26:29 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
was this recently?

04/28/2009 06:26:30 DAUD KHAN, CAZENOVE says:
need to calm down before i speak with him

04/28/2009 06:26:36 DAUD KHAN, CAZENOVE says:
Fridayy

04/28/2009 06:26:51 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
is stacy supportive?

04/28/2009 06:27:15 DAUD KHAN, CAZENOVE says:
yes

04/28/2009 06:27:47 DAUD KHAN, CAZENOVE says:
but in a year like this you need good sales votes to get paid or even keep your job - despite
all my client votes going throughth eroof

04/28/2009 06:28:03 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:

surely the client votes count?

04/28/2009 06:28:24 DAUD KHAN, CAZENOVE says:
not politically

04/28/2009 06:28:39 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
sure, but is stacy well regarded?

04/28/2009 06:28:47 DAUD KHAN, CAZENOVE says:
even worse than me

04/28/2009 06:29:01 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
at least that's good!

04/28/2009 06:29:44 DAUD KHAN, CAZENOVE says:
well my issue is that my votes very polarized, lots of commentary - some saying brilliant
others saying crap - Stacy's had no comments just lots of below avergae votes

04/28/2009 06:30:03 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
isn't that better than hers?

04/28/2009 06:32:43 DAUD KHAN, CAZENOVE says:
in principle yes - but its clear that there are vocal sales people that think im crap - better
to be mediocre and lot in the crowd than stand outto be shot

04/28/2009 06:33:15 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
maybe, but at least you can point to specific client support

04/28/2009 06:34:04 DAUD KHAN, CAZENOVE says:
guess so - doesnt make me less angry though to think im in the bottom quartile of analysts at
caz

04/28/2009 06:34:28 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
i'd speak to you boss and defend your case

04/28/2009 06:34:55 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
the autonomy thing demonstrates that you have got something on management

04/28/2009 06:35:10 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
if lynch is dissing you, then he is clearly worried

04/28/2009 06:38:11 DAUD KHAN, CAZENOVE says:
head of research asked me to back off as it would be impossible to prove fraud

04/28/2009 06:38:40 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
sounds like a messy situation

04/28/2009 06:38:58 DAUD KHAN, CAZENOVE says:
yep - might be joining adnaan on the sofa

04/28/2009 06:39:09 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
i hope not

04/28/2009 06:39:23 DAUD KHAN, CAZENOVE says:
one way of avoidingtax hikes

04/28/2009 06:39:30 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
i guess......

04/28/2009 06:39:48 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
aren't barcap hiring in you sector?

04/28/2009 06:40:22 DAUD KHAN, CAZENOVE says:
dunno - why are they hiring in research?

04/28/2009 06:40:37 SHERIEF BAKR, CITIGROUP GLOBAL MAR says:
absolutely - they have taken about 10 people from here

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

# EXHIBIT 13

| | |
|---|---|
| **From:** | PETER MCNALLY <PMCNALLY8@Bloomberg.net> |
| **To:** | PETER MCNALLY <PMCNALLY8@Bloomberg.net>;PETER MCNALLY <Pm@lewischarles.com>;DAUD KHAN <DKHAN5@Bloomberg.net>;DAUD KHAN <daud.khan@cazenove.com> |
| **Sent:** | 1/25/2010 3:23:26 PM |
| **Subject:** | |

```
01/25/2010 03:21:40 PETER MCNALLY, LEWIS CHARLES SECURI has joined the room
01/25/2010 03:21:45 PETER MCNALLY, LEWIS CHARLES SECURI says:
yo

01/25/2010 03:21:45 DAUD KHAN, CAZENOVE has joined the room
01/25/2010 03:21:45 DAUD KHAN, CAZENOVE says:
*** CAZENOVE (431221) Disclaimer: This information represents a personal view, is not Cazenove
research, but may contain extracts from published research. It is not an offer or solicitation
for the purchase or sale of any financial product and is not suitable for private customers.

01/25/2010 03:21:53 PETER MCNALLY, LEWIS CHARLES SECURI says:
how you doin dude?

01/25/2010 03:22:11 DAUD KHAN, CAZENOVE says:
yo, not bad, surviving - you?

01/25/2010 03:22:21 PETER MCNALLY, LEWIS CHARLES SECURI says:
not bad. new job at the same place

01/25/2010 03:22:43 PETER MCNALLY, LEWIS CHARLES SECURI says:
we have a managed cfd fund so i have a small carve out of it

01/25/2010 03:23:00 PETER MCNALLY, LEWIS CHARLES SECURI says:
how are things over there? merger time and all...

01/25/2010 03:23:43 DAUD KHAN, CAZENOVE says:
yeah - i remeber you saying when we met at Whitecros st. Merger issues - I feel like im going
across as a gimp wiyth Stacy head of team - so have told them i need a new role

01/25/2010 03:23:54 PETER MCNALLY, LEWIS CHARLES SECURI says:
of course

01/25/2010 03:24:06 PETER MCNALLY, LEWIS CHARLES SECURI says:
wow

01/25/2010 03:24:09 PETER MCNALLY, LEWIS CHARLES SECURI says:
doing what?

01/25/2010 03:24:20 PETER MCNALLY, LEWIS CHARLES SECURI says:
does she have a following???

01/25/2010 03:25:59 DAUD KHAN, CAZENOVE says:
not really - but our roles havent changed - so she was head of team and so moves across as
such - head of research realises that im not happy so is looking for another role - maybe tech
specialist, or a differenr research team

01/25/2010 03:26:44 PETER MCNALLY, LEWIS CHARLES SECURI says:
dude, go to another sector

01/25/2010 03:26:53 PETER MCNALLY, LEWIS CHARLES SECURI says:
that would be perfect

01/25/2010 03:27:02 PETER MCNALLY, LEWIS CHARLES SECURI says:
dont do tech sales

01/25/2010 03:27:13 PETER MCNALLY, LEWIS CHARLES SECURI says:
you need something refreshing
```

01/25/2010 03:27:23 DAUD KHAN, CAZENOVE says:
have to wait to see what they offer me

01/25/2010 03:27:29 DAUD KHAN, CAZENOVE says:
bit fed up with what im doing now

01/25/2010 03:27:38 DAUD KHAN, CAZENOVE says:
your right need a change

01/25/2010 03:27:45 DAUD KHAN, CAZENOVE says:
LAthifa wnats to move abroad

01/25/2010 03:27:50 DAUD KHAN, CAZENOVE says:
maybe Australia

01/25/2010 03:28:47 PETER MCNALLY, LEWIS CHARLES SECURI says:
i'm not sure if australia is it - maybe. but a change of job might do you a world of good

01/25/2010 03:29:08 PETER MCNALLY, LEWIS CHARLES SECURI says:
a new sector would get you interested again.

01/25/2010 03:30:15 DAUD KHAN, CAZENOVE says:
i think ideally id go hedge fund but difficult to get role. hoping Autonomy blows up and its
my ticket outta here

01/25/2010 03:33:15 PETER MCNALLY, LEWIS CHARLES SECURI says:
how about a long only job in sydney?

01/25/2010 03:34:30 DAUD KHAN, CAZENOVE says:
yeah that would be great - yo uknow the mkt opens at 10am there and closes at 4

01/25/2010 03:34:45 PETER MCNALLY, LEWIS CHARLES SECURI says:
frickin geniuses

01/25/2010 03:35:39 DAUD KHAN, CAZENOVE says:
I know - it sounds great - LAthifa would get a fortune as a doctor there - salaries are 200k
AUD min

01/25/2010 03:36:03 PETER MCNALLY, LEWIS CHARLES SECURI says:
pretty expensive there though from what i hear. a friend of mine just got back

01/25/2010 03:36:30 DAUD KHAN, CAZENOVE says:
only sydney - if you live up the coast its alot cheaper

01/25/2010 03:36:39 DAUD KHAN, CAZENOVE says:
an hour out of syndey

01/25/2010 03:36:54 PETER MCNALLY, LEWIS CHARLES SECURI says:
sure, but why live out in the sticks

01/25/2010 03:36:59 DAUD KHAN, CAZENOVE says:
on the coast, near a beach etc etc

01/25/2010 03:37:22 PETER MCNALLY, LEWIS CHARLES SECURI says:
no terrorism

01/25/2010 03:37:27 DAUD KHAN, CAZENOVE says:
also easier for lathifa to find work out of sydney

01/25/2010 03:37:38 PETER MCNALLY, LEWIS CHARLES SECURI says:
no crime

01/25/2010 03:37:42 PETER MCNALLY, LEWIS CHARLES SECURI says:
good food

01/25/2010 03:38:01 DAUD KHAN, CAZENOVE says:
only downside is its a long way from home

01/25/2010 03:38:04 PETER MCNALLY, LEWIS CHARLES SECURI says:
dude, i'm coming with you

01/25/2010 03:38:26 PETER MCNALLY, LEWIS CHARLES SECURI says:
finally i can open up my restaurant, "Bob's Kabobs"

01/25/2010 03:38:47 DAUD KHAN, CAZENOVE says:
sounds great - stick it on the barby

01/25/2010 03:39:33 DAUD KHAN, CAZENOVE says:
fancy lunch soon

01/25/2010 03:39:53 PETER MCNALLY, LEWIS CHARLES SECURI says:
yes, kind of touch and go with me though. depends if i have anything on now

01/25/2010 03:40:21 PETER MCNALLY, LEWIS CHARLES SECURI says:
and i'm not talking clothes

01/25/2010 03:40:47 DAUD KHAN, CAZENOVE says:
well I know how you lke to take your shirt off and give yourself a wedgy!

01/25/2010 10:23:26 PETER MCNALLY, LEWIS CHARLES SECURI has left the room

# EXHIBIT 14

| | | |
|---|---|---|
| 1. | On behalf of | Claimants |
| 2. | Initials/Surname of witness | H B D Khan |
| 3. | Statement No | 3 |
| 4. | Date | 7 January 2019 |

**Claim No. HC-2015-001324**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

**B E T W E E N:**

**(1)  ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY CORPORATION LIMITED)**
**(2) HEWLETT-PACKARD VISION BV**
**(3) AUTONOMY SYSTEMS LIMITED**
**(4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.**

**Claimants**

**-and-**

**(1) MICHAEL RICHARD LYNCH**
**(2) SUSHOVAN TAREQUE HUSSAIN**

**Defendants**

---

**THIRD WITNESS STATEMENT OF HAFEEZ BUX DAUD KHAN**

---

I,  HAFEEZ BUX DAUD KHAN of Electric Works, Sheffield Digital Campus, Sheffield, S1 2BJ, STATE AS FOLLOWS:

1.      I make this further Supplemental Witness Statement on behalf of the Claimants in connection with the above-named proceedings.  The Claimants' solicitors have asked me to consider the Witness Statements of Philip Pearson dated 8 November 2018 ("**Pearson 1**") and Philip Shelley dated 15 November 2018 ("**Shelley 1**"), and have drawn to my attention certain statements in the Second Witness Statement of Dr Lynch dated 16 November 2018 ("**Lynch 2**"), as well as in the Witness Statements of Andrew Kanter (dated 15 November 2018) ("**Kanter 1**"), Jonathan Bloomer (dated 15 November 2018) ("**Bloomer 1**") and Robert Webb QC (dated 1 November 2018) ("**Webb 1**").

2.      This is my third witness statement in these proceedings. I refer below to my original Witness Statement dated 13 September 2018 as "**Khan 1**" and to my Supplemental Witness Statement dated 15 November 2018 as "**Khan 2**", and adopt the definitions used therein.

1

3.     Except where it otherwise appears, the facts and matters to which I refer in this Supplemental Witness Statement are within my own knowledge and are true. Where facts are from another source, I identify the source and I believe them to be true. Where the source of my understanding or information is from the Claimants' solicitors, I have identified this in the Supplemental Witness Statement but without any waiver of legal professional privilege.

**Statements relating to my "agenda", competence and conduct**

4.     Mr Kanter (at paragraphs 192 to 210 of Kanter 1), Dr Lynch (at paragraphs 11-12 and 105 of Lynch 2), and Mr Pearson (at paragraph 22 of Pearson 1), appear to suggest that in my coverage of Autonomy I was guided by some form of "agenda" and make a number of disparaging comments relating to my competence and conduct.

5.     To the extent that Mr Kanter is indeed suggesting, at paragraph 193 of Kanter 1, that I had some sort of agenda in my coverage of Autonomy, this is simply incorrect.  I described in Khan 1 (at paragraph 9) the reasons why in mid-2007 I changed my positive "buy" recommendation to "neutral", and then (in early 2008) to "sell".  I was, of course, aware that I was in the minority of analysts who viewed Autonomy with a fair degree of scepticism; I had genuine reservations about a number of aspects of its business, as described in Khan 1.  However, there was no "agenda" – I was not "working with" short sellers (as suggested by Dr Lynch at paragraph 105(c) of Lynch 2[1]) in the sense of treating them preferentially relative to other investors or specifically seeking to further their interests. Like any other clients, I fielded calls from short sellers and made outbound calls to them. It was part of my job as an analyst to speak to investors who would be interested in my thoughts on Autonomy (e.g. following the release of its results) and these would include investors that were long the stock and (less frequently) investors that were short the stock. I did not view Miura differently to other investors. Nor did I ever exploit information relating to Autonomy "*to the benefit of [my] hedge fund clients*" (see paragraph 12 of Lynch 2).  Rather, I was at all times giving my honest assessment of Autonomy's performance and its future prospects.

6.     In a similar vein, I note Mr Pearson's comment at paragraph 22 of Pearson 1 that he recalls that I was one of the analysts that he suspected of "*talking his clients' book*".  I have no idea what Mr Pearson is referring to here. My opinions were my own and they were never swayed by my clients' portfolios. Indeed, I spent most of my time speaking with investors who were long the stock. I would never, as (also at paragraph 22 of Pearson 1[2]) Mr Pearson suggests, have deliberately forecast high earnings figures for Autonomy (or any other company) in order to set the company up to fail.  My sell case on Autonomy was far

---

[1] Dr Lynch refers specifically to Miura Global as a hedge fund investor that I "*worked with*". See also paragraph 22 of Webb 1 and paragraphs 119 and 120 of Bloomer 1.
[2] See also paragraph 33 of Pearson 1.

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-02932255

more detailed and reasoned than any single quarter's performance.  Mr Pearson refers to his dealings with me, but as I explain at paragraph 21 below, I cannot recall any occasion when he "*dealt*" with me via email or phone in relation to Autonomy after early 2008.

7.  Mr Kanter alleges at paragraph 195 of Kanter 1 that I had a "*mediocre reputation in the marketplace*" and cites in apparent support of this statement various analyst rankings in the period 2011 to 2015.  However, he seems to ignore those years where I received high rankings (which I discuss below).

8.  As Mr Shelley points out at paragraph 22 of Shelley 1, there are two outfits in particular that produce analyst rankings based on institutional investor feedback / votes: Institutional Investor and Extel.  These are the rankings that are considered by the analyst and investor community to be the most prestigious and relevant, although there are other ways in which analyst performance is recognised, for example the Thomson Reuters Analyst Awards (formerly known as the Thomson Reuters StarMine Analyst Awards, or "StarMine").

9.  In 2001, I was part of the Merrill Lynch team that was voted number 1 in Institutional Investor for Pan European Software/Services. In 2002 and 2003 I co-led the Merrill Lynch team that was voted number 2 in Institutional Investor for the same category.  In 2008, I, alongside the IT Software Team at Cazenove, was named by StarMine as the number 1 stock picker and number 2 earnings estimator (second to Paul Morland) in the Technology Equipment & Services category for the UK and Ireland.

10.  Mr Kanter states that I was rated 22nd for "UK/Euro technology" by Extel in 2011.  However, he seems to confuse the two separate Extel surveys.  One is the European Extel survey for analysts covering pan European large cap stocks; the other is a UK small mid cap survey for analysts covering UK mid cap (FTSE 250 and below) stocks.  It is therefore not clear to me if his reference to "*UK/Euro technology*" is a reference to the European Extel survey or to the UK small mid cap survey.  In any event, he omits to note that I was voted number 7 in Institutional Investor's Pan European Software/Services category in 2012, which applied to the previous year (i.e. covering part of my time at JP Morgan) and as far as I can recollect I was ranked in the top 10 of the same survey in 2011.  He also ignores the fact that in 2011, I was absent for 4 months as I transitioned from JP Morgan to Berenberg in September 2011 and did not publish any research until March 2012 and hence I did not produce any research to qualify for voting in the survey.  Despite this, I was ranked number 16 in Extel's European Software & IT Services category for 2012.

11.  During my time at Berenberg (September 2011 to December 2015), I was also voted number 10 in 2013, number 7 in 2014, and number 9 in 2015 in Extel's European Software & IT Services analyst rankings, and number 10 in 2014 and number 9 in 2015 in

FOIA CONFIDENTIAL TREATMENT REQUESTED                                    HP-SEC-02932256

Institutional Investor's Pan European Software/Services category.[3] I was ranked number 10 by Institutional Investor in the same category in 2016 despite having left Berenberg in November 2015. Within a year of joining Canaccord,[4] I had secured a top 10 ranking in Extel's Small Mid Cap survey for UK technology.

12.     Mr Kanter also refers to my rankings by "*Tip Rankings*" (which I understand from the Claimants' solicitors may be a reference to a website called TipRanks) and InvestorOne. I have never heard of, and have never been judged by any of my employers against, either of these outfits. However, having looked them up online, it would appear that TipRanks is only based on stocks that are quoted in the US – I note that such stocks formed only part of my coverage at that time.

13.     At paragraphs 196 to 199 of Kanter 1, Mr Kanter states that I had "*a difficult relationship with Autonomy that stretched back nearly a decade*", citing various events from 2004 onwards.

14.     He refers (at paragraphs 196 and 197) to a research note on Autonomy that I wrote whilst at Clear Capital. I do not recognise Mr Kanter's account of what happened. I do not recall Mr Kanter or anyone else at Autonomy ever contacting me to object to the contents of the note. I see from paragraph 198 of his witness statement that Mr Kanter complained to the FSA about my note. I never heard anything from the FSA. If Mr Kanter is implying at paragraph 199 of Kanter 1 that I left Clear Capital as a result of the complaint, then he is mistaken. I was a founding partner, finance director and technology analyst at Clear Capital. I received an offer from Commerzbank to join as a software analyst. I weighed up the prospects of Clear Capital at that time and the offer from Commerzbank and decided to join Commerzbank. My decision to move had nothing to do with my research or recommendations.

15.     As far as I was concerned, I enjoyed a good relationship with Dr Lynch and Mr Hussain up until around 2007/8 (see paragraph 9 of Khan 1). Indeed, I recall that when I got back in touch with Dr Lynch in, I believe, the first half of 2006, I asked him about opportunities in the private equity field, and he took me out to lunch. I was unaware of any objections from Autonomy management to my research up to that date. I also recall that in 2007, Dr Lynch, as a non-executive director of the BBC, helped to put me in touch with the relevant people at the BBC regarding another technology company that I wished to discuss with them.

---

[3] As Mr Shelley points out at paragraph 27 of Shelley 1, Berenberg was a (much) smaller bank than JP Morgan. At paragraph 22 of Shelley 1, he (correctly) observes that analysts' rankings depended to a large extent on market reach: "*Analysts at larger banks or brokers were naturally able to reach more voters.*" To be consistently ranked in the top 10 whilst working for a relatively small player was something I was very proud of.

[4] I joined Canaccord in March 2016.

FOIA CONFIDENTIAL TREATMENT REQUESTED                                     HP-SEC-02932257

revenues included direct sales to customers that had purchased software from an Autonomy OEM customer. To be clear, I understood from my conversations with Dr Lynch that IDOL had multiple capabilities or features, and that an OEM agreement between Autonomy and an OEM counterparty might confer on the OEM counterparty the right to license only some of those capabilities or features to the OEM counterparty's customers. When I learned that Autonomy had made direct sales to certain end-customers who were also customers of an OEM counterparty, I assumed that such sales would have involved giving the customer the right to enhance its use of IDOL by taking advantage of additional features within IDOL beyond those that were available under the customer's agreement with the OEM counterparty. In other words, I believed that the purpose of the direct Autonomy sale was to enable the customer to supplement the features of IDOL that it had already licensed from the OEM counterparty. It did not occur to me that the direct Autonomy sales might be separate from or unrelated to the customer's arrangements with the OEM counterparty.

I believe that the facts stated in this Supplemental Witness Statement are true.


.......*[signature]*.......

SIGNED

HAFEEZ BUX DAUD KHAN

.......7/1/19.......

DATED

7

# EXHIBIT 15



Autonomy Corporation Limited and Ors v Michael Richard Lynch and Anor

Day 14

April 17, 2019

Opus 2 International - Official Court Reporters

Phone: +44 (0)20 3008 5900
Email: transcripts@opus2.com
Website: https://www.opus2.com

HP-SEC-02929820

Wednesday, 17 April 2019

1  (10.00 am)

2  MR RABINOWITZ: My Lord, our next witness is Mr Khan.

3               MR DAUD KHAN (affirmed)

4  MR JUSTICE HILDYARD: You should have some water. If you

5      need a break at any time -- do you have some water

6      there?

7  A.  No.

8  MR JUSTICE HILDYARD: If he could be provided with some.

9            Examination-in-chief by MR RABINOWITZ

10 MR RABINOWITZ: Good morning, Mr Khan. Can you please be

11     given bundle C -- maybe both bundles, but can we go

12     first to bundle C, tab 10 {C/10/1}. Do you see there

13     a document headed "Witness statement of Hafeez Bux

14     Daud Khan"?

15 A.  Yes.

16 Q.  If you go to the back of that document at page 13

17     {C/10/13}, do you see there a signature?

18 A.  Yes.

19 Q.  Can you confirm that that is your signature?

20 A.  It is.

21 Q.  And that this is your first witness statement in these

22     proceedings?

23 A.  It is.

24 Q.  Thank you. I want you to go next, if you can, to

                              1

1      bundle C at tab 34 {C/34/1}. Do you have that?

2  A.  Yes.

3  Q.  Thank you. You should see a document "Supplemental

4      witness statement of Hafeez Bux Daud Khan", do you have

5      that?

6  A.  Yes.

7  Q.  If you go to the back of that document, three pages on,

8      again you should see a signature?

9  A.  Yes.

10 Q.  Can you confirm that this is your signature?

11 A.  Yes, it is.

12 Q.  And that this is your second witness statement in these

13     proceedings?

14 A.  Yes, it is.

15 Q.  Finally, Mr Khan, if we can go to tab 40.6 in bundle C

16     {C/40.6/1}. Do you have that?

17 A.  Yes.

18 Q.  Again, you should see a document titled "Third witness

19     statement of Hafeez Bux Daud Khan"?

20 A.  Yes.

21 Q.  Again if we can go to the back of that document, do you

22     see there a signature?

23 A.  Yes.

24 Q.  Can you confirm that that is your signature and this is

25     the third statement you've made in these proceedings?

                              2

1  A.  Yes, it is.

2  Q.  Thank you. Now, Mr Khan, if we can go in the document

3      you have in front of you to page 3 {C/40.6/3}, if I can

4      ask you just to read the first two lines of paragraph 11

5      to yourself.

6          (Pause)

7  A.  Okay.

8  Q.  You should have in front of you a letter that was sent

9      to the defendants' solicitors last night. Can I just

10     ask you to read that to yourself.

11         My Lord, you should have one in front of you.

12 MR JUSTICE HILDYARD: I have got it, thank you.

13 A.  Yes.

14 MR RABINOWITZ: Thank you. Mr Khan, can you confirm that

15     subject to making the changes you've identified in your

16     letter to your witness statement, the contents of your

17     first, second and third witness statements are true to

18     the best of your knowledge and belief?

19 A.  Yes, they are.

20 MR RABINOWITZ: Thank you very much. Can you wait there,

21     please, there will be some questions.

22            Cross-examination by MR SHIVJI

23 MR SHIVJI: Mr Khan, you were here for Mr Morland's

24     testimony yesterday, weren't you?

25 A.  No, I wasn't.

                              3

1  Q.  You didn't attend court yesterday?

2  A.  No.

3  Q.  Have you seen the transcript of his testimony, or parts

4      of it?

5  A.  No, I haven't.

6  Q.  Have you discussed any of the contents of what was said

7      yesterday with anybody?

8  A.  No.

9  Q.  I'm grateful.

10         Your FSA registration has lapsed, hasn't it?

11 A.  I've left the analyst industry or the banking industry

12     in February of last year and then after a month it

13     lapses because I'm now in the technology industry.

14 Q.  So the answer to my question is yes?

15 A.  Yes.

16 Q.  You're not here as an expert witness today, are you?

17 A.  No.

18 Q.  And you confirmed in your US testimony that in the

19     period 2009 to 2011 you didn't have access to other

20     people's research notes; that's right, isn't it?

21 A.  In general, yes.

22 Q.  Well, the confirmation you gave in the US was that you

23     didn't have access?

24 A.  I wouldn't have access to any research unless that

25     research was sent to me.

                              4

1  Q.  And you haven't, in preparation for today, done a review
2      of all the analysis that was carried out by brokers at
3      that time?
4  A.  No, I haven't.
5  Q.  And you haven't discussed in your preparation for this
6      case your evidence with any other analyst, have you?
7  A.  During the time from 2011 onwards I've had conversations
8      with a number of different analysts about the events
9      post HP's announcement around the write-down.
10 Q.  Yes and one of those is Mr Morland?
11 A.  Yes.
12 Q.  And you're giving evidence today to support HP's case,
13     aren't you?
14 A.  I'm giving evidence today to support my findings during
15     my time as an analyst, whether that supports HP's case
16     or not.
17 Q.  Okay.  How did you get involved in this case?  Did you
18     reach out to HP or were you put in contact with HP by
19     Mr Morland?
20 A.  I believe I was put in contact with HP's lawyers by
21     Mr Morland.
22 Q.  And for the US prosecutor is that the same, you were put
23     in contact by Mr Morland?
24 A.  No.  With the US prosecutors I was contacted by my
25     former employers JP Morgan who informed me that the

5

1      US Government had reached out to them to contact me and
2      that they would provide me with a lawyer and that's how
3      the contact came about with the US authorities.
4  Q.  Do you still have a lawyer involved for yourself?
5  A.  No.
6  Q.  But you did at that time?
7  A.  Yes.
8  Q.  And for what period did you have your own lawyer
9      involved?
10 A.  From the time the Department of Justice contacted me,
11     which would have been I think around 2012, until I gave
12     testimony in the US last year, so February 2018.
13 Q.  So for about five or six years?
14 A.  Yes, but only for the periods where they were required,
15     ie the Department of Justice had contacted me.
16 Q.  So over the years you've probably had multiple meetings
17     with lawyers about this matter?
18 A.  Actually I've only had -- I've had a few meetings with
19     the lawyer that was given to me and I've had two
20     meetings in the UK with the Department of Justice before
21     my testimony in the US.
22 Q.  And meetings with the claimants' lawyers as well?
23 A.  For this case, I've had one face-to-face meeting -- or
24     two face-to-face meetings with the claimants' lawyers
25     and a bunch of email conversations regarding my

6

1      statement.
2  Q.  You were here earlier on in this trial, weren't you,
3      watching part of the trial?
4  A.  For the day that Mr Apotheker was on the stand I was
5      here.
6  Q.  In the course of any of those meetings that we've talked
7      about, were any of those meetings meetings where
8      Mr Morland was there as well?
9  A.  No.
10 Q.  You've also had engagement with the SEC; that's right,
11     isn't it?
12 A.  Not to my knowledge, unless they were attending one of
13     those meetings.  The meetings were led by the Department
14     of Justice and attended by the FBI.
15 Q.  And in those meetings with the Department of Justice,
16     they helped you prepare for giving evidence in the US,
17     didn't they?
18 A.  There was no preparation session, they were all
19     information-gathering sessions.  Prior to my giving
20     testimony, I arrived in the US a few days beforehand,
21     they met with me to go over that same information
22     gathering, ie what I'd said and whether those things
23     still held true or I knew them to be true.
24 Q.  You've also had engagement with the press, haven't you,
25     in relation to this case?

7

1  A.  Post 2011 I've had some contact with the press, yes.
2  Q.  Would you accept that it's inevitable, given the passage
3      of time and the many discussions you've had about this
4      case, that your recollection of events may be influenced
5      by some of the subsequent discussions you've had?
6  A.  I don't believe so, on the basis that my recollection of
7      events are really based around my published research,
8      the documents that were available at that time.  I have
9      learnt -- since the criminal trial, I have learnt other
10     things about this case, but that hasn't changed my view
11     or marked my view about what I knew at the time.
12 Q.  Now, in terms of the analysts who covered Autonomy at
13     the time, there was a range of different views,
14     weren't there?
15 A.  Yes, there was.
16 Q.  And you were at the more conservative end of the
17     spectrum?
18 A.  Yes.
19 Q.  Would you accept you're naturally cautious as an
20     analyst?
21 A.  I wouldn't say so.  I'm very balanced as an analyst.
22     I think if you look my ratings over my career of circa
23     20 years, I probably had more buy recommendations than
24     sell recommendations.
25 Q.  But on Autonomy you were more pessimistic than the

8

1   general body of analysts?
2   A.  Post 2007, or post 2008, then yes.
3   Q.  Berenberg was a place that you worked more recently;
4       that's right, isn't it?
5   A.  Yes, that's right.
6   Q.  You were there for over four years?
7   A.  Yes, that's right.
8   Q.  And that was the longest position you held in the
9       financial services industry after your time at Cazenove?
10  A.  Yes, it was.
11  Q.  And you moved there because they offered you a wider
12      remit because you were covering then US tech stocks as
13      well as European tech stocks?
14  A.  Yes, so historically I covered UK/European technology
15      stocks; Berenberg had opened up the position which would
16      be covering European stocks as well as some US stocks.
17  Q.  Whilst you were at Berenberg, you and a colleague issued
18      a significant piece of research that predicted that high
19      profile tech stocks were overvalued and that the bubble
20      would burst; that's right, isn't it?
21  A.  Yes.  I can't remember the exact date of that, but we --
22      as a matter of course at Berenberg we would write
23      quarterly thematic pieces of research and that was one
24      of them.
25  Q.  It was around June 14, is that right?

9

1   A.  If you say so, yes.
2   Q.  That was a non-consensus view, wasn't it?  You were
3       outliers in that position?
4   A.  Yes, we formulated that view based on various
5       comparisons with the dotcom bubble and where we were at
6       that time.
7   Q.  And you were wrong in that view, weren't you, the bubble
8       didn't burst?
9   A.  It didn't, but I think through that research what we
10      said was that the pace of the bull market could continue
11      for a number of years before that collapse.  So, yes, up
12      to now it hasn't come true.
13  Q.  No, and your colleague, Mr Ahmed, was saying, by way of
14      example, that the Apple share price would fall to about
15      $60 a share?
16  A.  I can't remember his price target, but if you tell me
17      that, then yes.
18  Q.  Around that level?
19  A.  I have no recollection of what his level of, you know,
20      price target would have been at that time.
21  Q.  But that fell within your remit as a US tech stock?
22  A.  Not my remit.  So the Berenberg technology team had two
23      heads: Mr Ahmed headed the hardware portion of that
24      technology team and I headed the software and IT
25      services portion of that technology team.

10

1   Q.  But, as we have discussed, you issued advice saying the
2       software component of the tech industry was overvalued
3       and that the bubble would burst?
4   A.  Certain elements of it, yes.
5   Q.  You were ultimately fired from your role, weren't you,
6       at Berenberg?
7   A.  Yes, I was let go from Berenberg.
8   Q.  You used the word "fired" in the US; that's a fair
9       description, isn't it?
10  A.  Well, I believe the attorney presented me with that word
11      and rather than argue it I said "Yes".
12  Q.  Because it was truthful?
13  A.  I don't think I was fired from the role.  I think within
14      the financial services industry, redundancies are not
15      considered firings .
16  Q.  And the reason you were let go, to use that term, from
17      Berenberg is because you had had an unduly bearish
18      outlook on the market?
19  A.  No, I don't believe it was due to the bearish outlook on
20      the market.  I'm aware of press articles that suggested
21      that Mr Ahmed was let go because of his Apple
22      recommendation, but, again, I think the nuances of why
23      we were let go are more political than just
24      recommendations within the company.
25  Q.  It's fair to say, isn't it, that the press coverage at

11

1       the time said that Mr Ahmed was let go because he was
2       unduly bearish?
3   A.  That was the press coverage at the time, yes.
4   Q.  Now, you don't mention your experience at Berenberg in
5       your witness statement, do you?
6   A.  No, I don't.
7   Q.  But it was your most senior role and also your second
8       longest in your career?
9   A.  It was as senior a role as I had when I was at
10      Merrill Lynch where I also headed up the software and --
11      software team at Merrill Lynch.
12  Q.  Okay, and you left Merrill Lynch in 2002, didn't you?
13  A.  Yes.
14  Q.  So it was your most senior role over the last 17 years?
15  A.  Yes.
16  Q.  Now, for Autonomy, you were one of a small group of
17      negative analysts; that's right, isn't it?
18  A.  That is true, yes.
19  Q.  And from January 2008 onwards you were consistently
20      recommending either a sell of Autonomy or for some
21      limited periods a neutral position; that's right,
22      isn't it?
23  A.  Yes.
24  Q.  And Autonomy was one of the most shorted stocks in the
25      FTSE 100 at around that time?

12

1  A.  I'm not aware of what the borrow level was on the
2      Autonomy stock versus the rest of the FTSE 100.
3  Q.  You were aware, weren't you, that Autonomy was subject
4      to a high degree of short-term speculation?
5  A.  Actually I wasn't.  I felt that the consensus view from
6      both the buy side, meaning the investors, and the
7      sell side was positive.  A lot of stocks within the UK,
8      certainly technology space, were shorted.  Now, whether
9      Autonomy was more shorted or not, you would have to show
10     me the evidence of that, but I was unaware it was a more
11     shorted stock than others.
12 Q.  Well, it was more shorted than the other stocks in the
13     FTSE 100?
14 A.  There are very few technology stocks in the FTSE 100, so
15     you may be right there, but relative to technology
16     stocks, I'm not sure.
17 Q.  My question was about the FTSE 100.
18 A.  Okay, then, yes, if you say so, because I don't have the
19     evidence in front of me.
20 Q.  So you wouldn't be able to express a view one way or the
21     other as to whether Autonomy was subject to more
22     speculation than other stocks within the FTSE 100?
23 A.  Unfortunately I can't.
24 Q.  Now, a number of your clients had short positions,
25     didn't they?

13

1  A.  Yes, as well as long positions.
2  Q.  Can you just name some of the clients who had short
3      positions -- big clients?
4  A.  From my recollection, we had, that I spoke to, Kynikos.
5  Q.  And that's Mr Chanos, isn't it?
6  A.  That was run by Jim Chanos, yes.  A smaller client was
7      Farringdon Capital.  Miura, which is mentioned in the
8      statements.  That's the only ones that come to mind.
9  Q.  What about Artemis?
10 A.  I didn't speak to Artemis.
11 Q.  And Lone Pine?
12 A.  I believe Lone Pine was long on the stock.
13 Q.  Did you speak to Lone Pine?
14 A.  Yes, I did.
15 Q.  And you mentioned the Kynikos fund and they had a big
16     short position, didn't they, in Autonomy over this
17     period?
18 A.  I have no idea of the size of the short position because
19     Kynikos was a very secretive type of fund but it's
20     a short only fund, which is why I know they had a short
21     position, but how large that was I had no idea at the
22     time.
23 Q.  It's a very high profile fund, he tends to take big
24     positions, doesn't he?
25 A.  In hindsight, that's how I understood it.  At the time,

14

1      you know, Kynikos was one of many clients and so the
2      size of the short again wasn't relevant to my advice to
3      them.
4  Q.  Now, isn't it fair to say that it's self-selecting once,
5      as an analyst, you give a sell recommendation, that your
6      clients become essentially short clients?
7  A.  No, actually I think the way I looked at it at the time
8      was that my primary role was actually to persuade those
9      clients that own the stock, ie that are long the stock,
10     to sell their position.  So they wouldn't be short the
11     stock but they would reduce their position or sell out
12     of their position entirely.  That was my primary aim and
13     my primary goal as having a negative view on stock.  In
14     terms of servicing hedge funds that were short, that was
15     a secondary angle to what I did.
16     And when you give a sell recommendation, it may have the
17     impact of driving the share price down; that's right,
18     isn't it?
19 A.  Yes, it may.
20 Q.  So the clients who were short, they may actually benefit
21     from when you issue a sell recommendation?
22 A.  Yes, it could.
23 Q.  Now, over the period from January 2008 to April 2011,
24     you issued by our estimation 36 sell notes on Autonomy?
25 A.  I haven't counted them but I'll accept that there were

15

1      a number of notes.
2  Q.  Does that sound roughly the right sort of number?
3  A.  Three years ... yes, I would have said something between
4      25 and 30, but if you say 36 ...
5  Q.  Essentially averaged about one a month?
6  A.  I think the important thing to note is that on a results
7      announcement you would normally get a flash note which
8      would be a one-pager which would be a summary of the
9      results of the day and there would be a follow-up note
10     either later that day or in a couple of days' time, so
11     for every quarter within that period there would
12     automatically be two notes, so for a three-year period
13     that's twelve quarters, that's 24 notes, without -- any
14     analyst would have produced 24 notes in that period.  If
15     you're saying that I produced more than that then that
16     seems reasonable.
17 Q.  In April 2011 you produced five sell notes for Autonomy?
18 A.  Sorry, in April?
19 Q.  2011.
20 A.  Again, I can't recollect the numbers of notes within
21     that period, but again if you have them then, yes, I can
22     believe that.
23 Q.  We know that a number of people were short at that time,
24     including the Kynikos fund.  Is it fair that on
25     reflection you may have been influenced in producing

16

1    your notes by the fact that a number of these funds were
2    short and would benefit from you issuing the sell
3    notice?
4  A. No, I completely disagree with that, on the basis that
5    my views were always my own, as had to be stated within
6    the research notes that I produced. Whether someone was
7    short or long, you know, my view was always to put
8    forward my view on the stock, whether I thought that was
9    going down or whether I thought it was going up. I was
10   never swayed by either a holder of a stock or someone
11   who was short the stock.
12 Q. Now, just taking that first quarter of 2011, it's fair
13   to say, isn't it, that Autonomy had a small group of
14   analysts who were consistently negative about Autonomy
15   at that time?
16 A. Yes, I believe so.
17 Q. And they were very vocal in the press, weren't they?
18 A. I'm not sure how vocal they were in the press. I can't
19   recollect the number of articles et cetera. I know that
20   I didn't speak to the press at that time, just because
21   of policy of the employer that I was at, I avoided
22   speaking with the press.
23 Q. And there were also some very vocal and negative
24   investors as well at around that time?
25 A. Yes, I believe so.

17

1  Q. And one often saw short selling into the results and
2    immediately post announcement on the back of negative
3    comment from analysts and investors?
4  A. Sorry, can you repeat that?
5  Q. One often saw short selling into the results and
6    immediately following announcements on the back of
7    negative comment from analysts and investors?
8  A. I'm never sure whether that's on the back of negative
9    comments or whether that's based on the analysis done by
10   the analyst and then short sellers going short the stock
11   on a belief that things were getting worse. I don't
12   believe that any investor fully relies on any single
13   piece of research because it would, you know, that would
14   put them in a very difficult position with their own
15   clients to believe that they would follow
16   recommendations only from one analyst.
17 Q. Now, as an analyst who was recommending a sell, if
18   clients follow your recommendation, it's quite
19   difficult, isn't it, for you to reverse your position
20   and then move to a buy, because you may end up causing
21   your clients to lose money?
22 A. No, I don't think that's true. I think, you know, the
23   way that I approached my research was to put forward my
24   view based on the assumptions that I had. If I believed
25   at any point in time that those assumptions had changed

18

1    due to change in strategy within the business --
2    you know, it could be a change of management within the
3    business, it could be an acquisition that changes the
4    scope of it -- I would be happy to turn from a sell to
5    a buy, which I've done on other stocks that I've covered
6    in the past.
7  Q. Your sell rating for Autonomy in January 2008 was at
8    a point where the share price was £9.63. Do you recall
9    that rough level?
10 A. Roughly, yes.
11 Q. And as we've discussed, the next three years you had an
12   on and off sell rating but never a buy rating?
13 A. Yes.
14 Q. And as we know, the acquisition price was at £25.50;
15   that's right, isn't it?
16 A. Yes.
17 Q. But investors who followed your advice over that period,
18   they will have lost a lot of money?
19 A. Yes, they would.
20 Q. And were some of your clients pretty angry with you when
21   the acquisition happened?
22 A. I was actually on gardening leave on my move to
23   Berenberg at that time, but I had no negative
24   commentary, that I could tell, via my previous employers
25   about the take-out. I think what investors realise is

19

1    that take-outs happen and the biggest risk to being
2    short of stock is ultimately a take-out.
3  Q. Now, as you said, you were on gardening leave at that
4    point, but you were hoping, weren't you, after the
5    acquisition was announced that HP might still pull out?
6  A. Again, I wasn't in the industry at that time, so
7    I didn't have any particular view one way or another.
8    I thought that through -- I was surprised that HP had
9    made the acquisition given, you know, my concerns about
10   the company, but I didn't take it any further than that.
11 Q. Do you remember speaking to Mr Collet at around that
12   time?
13 A. Can you remind me who Mr Collet is?
14 Q. He was an individual who sent out a couple of emails to
15   the market under the moniker Joe Bloggs.
16 A. I don't recollect speaking with him.
17 Q. Do you remember emailing him?
18 A. I may have done but I don't remember it.
19 Q. Would you accept that you were in contact with him at
20   around that time?
21 A. If you have evidence to show that I have, but I don't
22   recollect it personally.
23 Q. Do you have any recollection --
24 A. I recollect the name now and that he wrote some things
25   and whether he was in contact with me or... I can't

20

1   remember actually communicating with him.
2   Q.   Okay.  Maybe we'll quickly go to his email, if we go to
3        {K23/125/2} page 2.  There were two emails that
4        Mr Collet sent out.  We regrettably don't have many
5        copies, we've asked for copies and we might get some
6        more but at the moment we have emails from two periods.
7             Do you recall seeing an email like this at the time?
8   A.   Yes, I believe so.
9   Q.   And would you have seen drafts of this email before it
10       went out?
11  A.   Again I don't recollect, but I don't think so.
12  Q.   Is it possible?
13  A.   It's possible but, again, because my recollection is
14       poor on this front, I don't believe that I had much
15       contact with this individual.  So this would have been
16       a random email to me, you know, from an individual that
17       I didn't know.  What I'm speculating is that I may have
18       made some comments about the way they've analysed the
19       pieces that they've written about.
20  Q.   You say "they" --
21  A.   Or he, or -- you know, it could be -- the thing is it
22       could have been more than one person.
23  Q.   It was, it was two people.  You were right to say
24       "they".  The other individual was Alex Marshall, do you
25       recall Mr Marshall?

21

1   A.   Again, I don't recollect that name.
2   Q.   But your recollection was that there was more than one
3        person involved in this?
4   A.   No, I said that on the basis that usually when these
5        things happen, one person sends out an email but,
6        you know, it's a blog site that is run by a few people.
7        But, as I said, I have no recollection of Alex Marshall,
8        being in contact with Alex Marshall, or knowing that
9        Alex Marshall was a part of this.
10  Q.   This email sets out various questions.  It says at the
11       beginning:
12            "Key questions HP should be asking about Autonomy's
13       OEM business."
14            Then there's lots of detail about Autonomy's OEM
15       business that we don't need to go to at the moment.
16            If we move slightly further down in the document to
17       page 3 {K23/125/3}, there's a section "Guidance on areas
18       to investigate".  There are a lot of questions there.
19       Then "People to speak to" and towards the bottom there
20       are "Former Autonomy OEM sales representatives", you
21       will see Mr Collet's name is item 10 and Mr Marshall's
22       at item 11.  Then "Financial analysts" and if we go over
23       again to page 4 we have someone from Lone Pine Capital
24       and then in the next paragraph:
25            "Former JP Morgan tech analyst who has covered

22

1   Autonomy extensively (now with Berenberg) Daud Khan."
2        That's you, isn't it?
3   A.   Yes.
4   Q.   This is 15 September 2008, you hadn't actually started
5        at Berenberg then, had you?
6   A.   I can't remember the exact date I started, but I think
7        I started in September.
8   Q.   This communication has your personal email address.  How
9        do you think they may have got your personal email
10       address?
11  A.   I'm not sure.  It may have been provided to them by
12       somebody else who was on that list, or ... what I know
13       for certain is that I didn't reach out to these people
14       and I'm increasingly questioning whether I had any
15       interaction with them in terms of putting together their
16       statement.  I do remember seeing this email and I do
17       remember seeing my name on there.
18            I now understand your question around Lone Pine, but
19       I'm of a strong belief that Lone Pine were long the
20       stock because we had numerous arguments around my sell
21       position and their long position.
22   Q.   So -- we'll come to the FCA register in a minute -- in
23       fact by this stage you were actually at Berenberg, you
24       started at Berenberg on 8 September 2011.
25   A.   Okay.

23

1   Q.   So thank you for that point.
2        If we just look at the clients listed there,
3        Reed Coleman at Miura, that's one of your clients, we
4        discussed it?
5   A.   That's someone I spoke to, yes.
6   Q.   What about Mike Seidenberg at RCM?
7   A.   That's not a name that I recognise.
8   Q.   Often, with misses like this -- we see misses like this
9        in the market -- they're intended to achieve
10       a particular result, aren't they?
11  A.   Well, usually these, you know, what we'd call, for the
12       sake of argument, call them short reports that are
13       produced, are usually for companies that are listed and
14       the aim of those reports are to try and drag the share
15       price down.  This is clearly a report post an
16       acquisition; you know, there may be an ulterior motive
17       which is that they wish HP to pull out of the deal.
18  Q.   Yes, as you said, these short reports are often designed
19       to drag the share price down?
20  A.   Yes.
21  Q.   And for short clients -- short hedge funds, they'll make
22       money if it goes down?
23  A.   Yes.
24  Q.   Let's just go back perhaps to the body of the analysts
25       covering Autonomy at this time.  In one of your research

24

# EXHIBIT 16

|   |   |   |
|---|---|---|
| 1. | On behalf of | Claimants |
| 2. | Initials/Surname of witness | H B D Khan |
| 3. | Statement No | 1 |
| 4. | Date | 13/09/2018 |

**Claim No. HC-2015-001324**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

B E T W E E N:

### (1) ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY CORPORATION LIMITED)
### (2) HEWLETT-PACKARD VISION BV
### (3) AUTONOMY SYSTEMS LIMITED
### (4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.

**Claimants**

-and-

### (1) MICHAEL RICHARD LYNCH
### (2) SUSHOVAN TAREQUE HUSSAIN

**Defendants**

---

#### WITNESS STATEMENT OF HAFEEZ BUX DAUD KHAN

---

I, HAFEEZ BUX DAUD KHAN of Electric Works, Sheffield Digital Campus, Sheffield, S1 2BJ, STATE AS FOLLOWS:

1.  I am Vice President of Corporate Development at WANdisco, a technology company specialising in distributed computing. I make this Witness Statement on behalf of the Claimants in connection with the above named proceedings. Except where it otherwise appears, the facts and matters to which I refer in this Witness Statement are within my own knowledge and are true. Where facts are from another source, I identify the source and I believe them to be true. Where the source of my understanding or information is from the Claimants' lawyers, I have identified this in the Witness Statement but without any waiver of legal professional privilege.

1

HP-SEC-02929409

2.    I have not attached the documents to which I refer in this Witness Statement. Instead I have provided document references for those documents. I understand that the document references are the Document Production IDs allocated to the documents by the parties as part of the disclosure in the current proceedings. I have relied upon these documents to refresh my recollections and refer to the specific content of a number of them.

## Professional History and Background

3.    I graduated from Cambridge University in 1994 with an MA in Computer Science and Management Studies. I joined Price Waterhouse (now part of PricewaterhouseCoopers) in 1995 and qualified as a chartered accountant in 1998.

4.    I started work in the financial services industry as a technology analyst in 1999. I worked for Merrill Lynch (now Bank of America Merrill Lynch) for three and a half years. After that I worked for various institutions, including, from 2006 to 2011, Cazenove (which was acquired by JP Morgan in 2010) and, from 2016 to early 2018, Cannacord Genuity. I continued as an analyst up until February 2018 when I left Cannacord Genuity to join WANdisco.

5.    Throughout my time as an analyst, my focus was on software companies based in the UK, Europe and the US. My role was to provide analysis and investment recommendations for institutional investors, based primarily on analysis of publicly available financial data, and conversations with the management teams of the companies that I covered.

6.    In my research notes I would, broadly speaking, give one of three recommendations: (i) "outperform" (i.e. "buy"); (ii) "in-line" (i.e. "neutral") (where we believed that the share price was in line with the market); or (iii) "underperform" or "underweight" which was effectively a "sell" recommendation.

## Autonomy

7.    I first started covering Autonomy in 2001. It was around that time that I got to know Mike Lynch, Autonomy's CEO, and Sushovan Hussain, its CFO. Between 2001 and 2003, I was the Autonomy coverage analyst at Merrill Lynch. From around the end of 2006, I again took up full-time coverage of Autonomy when I joined Cazenove.

8.    Over the course of the ten or so years that I covered Autonomy, I attended numerous earnings calls. In this way, I was able to observe the relationship between Dr Lynch and Mr Hussain. Dr Lynch appeared to me very much the dominant figure in the relationship. As well as understanding every aspect of Autonomy's business, he had a very good grasp

2

HP-SEC-02929410

of accounting principles, and he tended to answer most of the questions asked by analysts during the earnings calls, even those that I might ordinarily have expected the finance director to answer. Mr Hussain, by contrast, came across as shy and reserved and invariably looked to Dr Lynch to field analysts' questions. The impression I got was that Mr Hussain did not relish these calls.

9.  I had what I believe was a good relationship with Dr Lynch and Mr Hussain up until around the time of the banking crisis in 2007/8. From late 2006 (when I resumed coverage of Autonomy) until mid-2007 I had a positive recommendation on Autonomy's stock. However, in my 1 June 2007 research note I switched from "buy" to "neutral" {D006670280}. I believed that the financial crisis would adversely impact the software industry because it would affect IT budgets, leading to less predictable financial results from Autonomy's licence business, and also a negative impact on the OEM business, which relied on third-party software companies selling products that had Autonomy's technology embedded in them. Consequently, despite the fact that Autonomy had, until that point, consistently delivered results that either met or exceeded the expectations of the analyst community, I was of the opinion that it would become much harder for Autonomy to sustain the rate at which it had grown historically (even though Autonomy management was telling investors that the changing regulatory environment would be positive for Autonomy). Accordingly, I moved my recommendation from positive to neutral.

10. In my 21 January 2008 research note, as Autonomy's share price continued to rise, I moved my recommendation to "sell" {D005015860}. This was for two main reasons: (i) the macroeconomic climate was worsening; and (ii) based on its disclosures in respect of acquisitions, I started to suspect that the company was overstating its reported organic growth rates, by including growth that in fact resulted from acquisitions in its reported organic growth figures. By way of example, if a company's revenues increase from $100 million in one year to $120 million a year later, that is 20% growth. However, if there was an acquisition in the intervening period and that acquisition contributed $10 million of revenue, then organic growth would only be 10%. If the contribution from the acquisition was understated, the rate of organic growth would be overstated. As I said at page 3 of my research note dated 13 May 2008, my concern was that "*Autonomy's acquisition strategy is the primary vehicle for growth as it provides new customers to leverage IDOL sales*", and the "*model is unsustainable and requires Autonomy to continue making similar acquisitions to fuel the growth in IDOL.*" {D005449503}

11. When I first moved to a negative recommendation, which was based on purely macroeconomic circumstances, there had been no objection from Autonomy. However, on 11 April 2008 I sent Dr Lynch a draft of the research note mentioned in the final sentence of the previous paragraph discussing my concerns about Autonomy's reported

HP-SEC-02929411

concerned, a meaningless metric of little use to analysts. Importantly, hosting arrangements involve variable and unpredictable data volumes so, even assuming the Commit figure was properly understood, it could only have provided an estimate of future cloud revenues. For an insight into Autonomy's future hosting revenues, it was much more helpful to refer to the amount of recognised cloud revenue in a given quarter (drawing on the IDOL Cloud category) and, given the recurring nature of the revenue, let that inform one's view about future quarters.

I believe that the facts stated in this Witness Statement are true.

SIGNED

HAFEEZ BUX DAUD KHAN

13/9/18

DATED

HP-SEC-02929421

# EXHIBIT 17

**Software & IT Services/Internet**



# Confessions of an Autonomy bear

- The story of Autonomy-HP is likely to resurface at some point before receding into the annals of corporate history. We believe there are significant lessons for investors in terms of key tests that all analysts should be using and with respect to how being negative on a stock can provoke extreme reactions from the company in question.

- We are not looking to prove or disprove HP's allegations, we will leave that to the relevant authorities, but we are interested in recounting some of the events and analysis undertaken to act as a case study. We hope to show that examination of the cash flow statement and balance sheet should not be ignored in favour of an income statement approach. Management's commentary serves as a blueprint for the understanding of a company and the underlying financial statements should mirror those comments. When the financial statements begin to tell a different story from that being offered by management then questions naturally arise. Satisfactory answers may resolve these queries while less than satisfactory answers can result in more queries and further work.

- Ultimately, from our perspective, Autonomy was a company that grew through acquisitions funded by shareholders. We believe that, following an acquisition, the business used accelerated revenue recognition to improve growth and margins. With the subsequent rise in the stock price, Autonomy was able to issue more shares at a higher value to fund the next acquisition. This was a repeatable exercise which was dependent on shareholders' willingness to continue to fund acquisitions. The attractiveness of the acquisitions, in our opinion, was primarily based on the level of deferred revenue rather than growth or the margin profile.

- We do not attempt to give a full description of everything that happened between 2008 and 2011 but aim to convey some of the important events and analysis. Even those who followed the research written at that time should find the events behind the research interesting.

6 March 2013

**Daud Khan**
Analyst
+44 20 3465 2638
daud.khan@berenberg.com

MRL00028945

**Software & IT Services/Internet**



# Cash, working capital, bust-ups and independence

## Background

Autonomy has been perceived as one of the great UK technology success stories. It was floated on the main London stock exchange in October 2000 at £30 and peaked at nearly £35. The story was simple. Autonomy had a patented technology (based on the doctoral research of Dr Michael Lynch, one of the founders) that could automate the searching of unstructured information (such as emails, videos and voice calls). The expectation was that this would revolutionise the world of data management by reducing the need for manual "librarian" processes, which add cost and delay to information management. The core technology was known as IDOL (Intelligent Data Operating Layer) and was the company's secret ingredient. Companies would be acquired and IDOL would replace the technology core of the acquired company, thereby "super-charging" the company and leading to faster income growth and improved margins.

The first of Autonomy's major acquisitions, Verity, occurred at the end of 2005. Verity had been a close – and larger – competitor of Autonomy. However, Autonomy generally dismissed the effectiveness of the technology while grudgingly giving Verity management credit for its marketing capabilities. Hence the strategy around the acquisition made sense in terms of "IDOLising", a term analysts would grow familiar with as Autonomy acquired more companies. Removing much of the superfluous services business and reducing the unnecessary costs within the business resulted in a very accretive acquisition.

After the Verity acquisition, earnings momentum was strong and the company had a flawless record in delivering consensus expectations. Blinkx, the consumer video search unit, was spun off in June 2007 with a high valuation. Success seemed to be breeding more success.

It was barely a month after this that Autonomy made its second major acquisition, Zantaz (4 July 2007), a cloud-based email archiving company for $375m. This was combined with a very upbeat trading statement and a placing of shares to fund the acquisition. Autonomy made another acquisition in late October 2007, of Meridio, which despite being small ($41m) was a subject that caused us to challenge the company publicly at a later date.

In late 2007, it seemed a fair bet that the macro environment was deteriorating. With Autonomy being a pure software company (i.e. it had limited professional services revenue), and given the growing OEM stream of revenue derived from other software companies, we believed the company was exposed to a downturn in technology spending.

Sometimes one needs a bit of luck or something to push you to dig deeper. We recently attended a presentation by Herman Hauser, a founder of ARM, who suggested that the USP of being low power came from luck as in the early days ARM had limited resources to over-engineer the chip designs. For us, we were sitting on a negative recommendation and felt it warranted further analysis other than a just macro call. The counter argument to the macro was that the quality of the business (in terms of growth and margins) could ride the impending downturn.

### Questioning organic growth
One of the key investment highlights of Autonomy appeared to be the significantly improved organic growth following the Verity acquisition. For any business where

MRL00028946

## Software & IT Services/Internet



acquisitions are involved, there is some scope for interpretation of organic growth. This seemed a fair starting point for a deeper delve into the business.

The company took exception to the draft of our report, citing "a significant number of factual inaccuracies and misquotes of the company". Despite a protracted process, we persisted — believing our analysis had value. The analysis became public in May 2008, a month after the draft and was titled *The hidden 20%* — a play on Autonomy's mantra of *Understanding the hidden 80%*, which refers to the level of unstructured data in businesses. Our main conclusion was that underlying organic growth was lower than Autonomy had reported.

Prior to the publication of the research, Autonomy reported Q1 2008 results that disappointed the market in terms of growth. During the Q1 results presentation, the last we would be able to attend for a year, we wanted to raise some questions about Meridio, the small acquisition made in October 2007. Autonomy management had described Meridio as a technology acquisition with a revenue run rate of $10m and a loss of $5m after it had disposed of the unwanted services business. However, we obtained the annual report which was filed in Ireland and found a number of articles about Meridio that painted a very different picture.

- Meridio was forecast to notch up $27m in revenue for the year to June 2007; it was projected to be profitable and growing at about 40%.

- Meridio was a product company and a presentation given in 2006 suggested that 70% of revenue came from licences, which implies that another 20% might be maintenance and the rest services. Supporting this was the fact that Meridio was a product spin-out from the services company Kainos. Added to this, the accounts showed a 95% gross margin.

It did not take a huge leap of faith to believe that, in 2008, Meridio could record $35m in revenue vs. the $10m run rate indicated by Autonomy. However, when asking for more clarity on Meridio, we were told that services formed the majority of the business. This painted a very different picture from the one presented by Meridio just a year earlier and in more recent interviews. It was only after the earnings presentation that we received an email from the CFO stating that he was surprised by our 95% gross margin comment and he did not know where we got our information from. This may surprise readers given that it was lifted from the Meridio annual report filed with the relevant authority. Anyway, in that email he said that, under GAAP, some companies record professional services cost in opex and that Meridio had about 40 people doing services at the time of acquisition. But given we had information suggesting that Meridio had around 160 people, how could services be the majority of the business? We pushed the issue to one side, knowing that we would not get much further.

While this was a small transaction, it was the catalyst to think about the level of discontinued business in the prior acquisitions and the organic growth reported following these deals. While Autonomy firmly made the point that its organic growth figures were audited, we have yet to find an auditor that can perform substantive testing to ensure the accuracy of organic growth. In fact, based on conversations with auditors, it appears that the auditor would only check the mathematical consistency of the calculation and not the accuracy of the figures themselves. In addition, the wording in the quarterly reviews clearly stated that the auditors performed a review and not a full audit. From experience as an auditor, this would involve no testing but merely a review with executives.

The characteristic of discontinuing revenue was for the revenue to be discontinued very quickly with very few restructuring charges. These businesses were not sold

MRL00028947

**Software & IT Services/Internet**



but closed. Thinking logically, software companies ran a services business to respond to customer demand. They would prefer it if the work was passed to partners but sometimes customers want the software vendor to implement, to provide one source of responsibility. To discontinue a business too quickly risks damaging customer relationships as work in the pipeline is passed to partners that were not chosen by the customer. Equally, the services contracts had to be agreed on equal terms so as not to affect the customer. But Autonomy suggested these discontinued operations had no margin. Hence in our view the expectation should have been for a slow ramp down of any services business. The fact that restructuring charges were so low was unusual given that service units are people intensive. For the Zantaz acquisition, Autonomy achieved $25m in cost synergies at a cost of $1m and within a quarter of the acquisition closing.

MRL00028948

**Software & IT Services/Internet**



## Breaking down the Autonomy myths

Management painted a picture of the company which was important from an investment perspective. It described itself as a pure software company with a fully indirect sales model. This served to give high operating leverage as additional revenue did not require any additional cost. In general, Autonomy was against acquisitions in the software industry except where its IDOL technology could significantly disrupt a market segment. Acquisition products were "IDOLised" quickly and all future growth was thus organic. OEM revenue, the licensing of a small sub-set of IDOL functionality to software vendors, was all IDOL based and not linked to any acquisitions. Most importantly, the IDOL technology was unique and the only available technology that could deal with the automated understanding of unstructured data.

From an investor's perspective, this was a mainly an organic growth company with theoretically limitless operating leverage and operating in a structural growth market. Simply put, this was an attractive investment case. Add the fact that acquisitions became accretive very quickly with growth accelerating and margins improving within a couple of quarters and there is no surprise the majority of sell-side analysts were bullish and that it was a well-loved company among investors.

From our perspective, analysis is about critiquing the investment case and finding evidence that either supports the case or raises questions. Our own view was very different from that painted by the company. This was a company that grew through acquisitions funded by shareholder share issues. Following an acquisition, the business used accelerated revenue recognition to improve growth and margins – which led to a rise in the stock price. This in turn helped the company to issue more shares at a higher value to fund the next acquisition. This was a repeatable exercise which was dependent on shareholders' willingness to continue to fund acquisitions.

 Below, we address some of what we see as company myths.

## Accounts cannot be challenged because they are audited

Autonomy used this line of argument many times in its discussions. The first point is to look at the wording within the quarterly reports. It was described as an "independent review", not an audit. "The report is made solely to the Company…we do not accept or assume responsibility to anyone other than the company." "A review…consists of making inquiries, primarily of persons responsible for financial and accounting matters, and applying analytical and other review procedures. A review is substantially less in scope than an audit conducted in accordance with International Standards on auditing." Despite this very clear wording, the company continued to refer to its quarterly results as audited, in particular the organic growth figures.

The annual report was very clearly audited by the Deloitte Cambridge office. All our analysis was based on the numbers reported; we only questioned the impact of changing revenue recognition to revenue and margins based on those figures. One of the aspects of the accounts which was interesting from an audit perspective was the lack of an internal audit function until the 2011 accounts, after the company had hired Jonathan Bloomer (ex Prudential CFO) as a non-executive director.

MRL00028949

**Software & IT Services/Internet**



## Autonomy was not an acquisitive company

Autonomy often made the point that, in general, acquisitions in software were a bad thing and that it was the least acquisitive software company. Acquisitions were only done where the combination with IDOL technology could make a transformative shift in a particular market. While it is true that in terms of numbers of transactions Autonomy could have been considered a company that was acquisition averse, the size of the acquisitions in relation to its existing business suggested that acquisitions were one of the most important elements of the strategy.

**Sources of cash (1997-2010)**



*Source: Company accounts, Berenberg Bank*

**Uses of cash (1997-2010)**



*Source: Company accounts, Berenberg Bank*

6

**Software & IT Services/Internet**



**Sources of cash (cumulative 1997-2010)**



*Source: Company accounts, Berenberg Bank*

**Uses of cash (cumulative 1997-2010)**



*Source: Company accounts, Berenberg Bank*

In our opinion, there are two clear messages that come from the charts above.

1. The vast majority of cash the company generated actually came from shareholders and not through operating cash, suggesting the acquisition profile of the company would not have been possible without shareholders directly funding it through share issues.

2. The majority of the cash used by the business (92%) was for acquisitions, making it very clear that acquisitions were an essential part of the growth story.

Of course, this was not necessarily a bad thing: companies that create shareholder value through inorganic growth should be valued at a premium. However, what was surprising was the complete denial by management that acquisitions were a key part of the strategy.

MRL00028951

**Software & IT Services/Internet**



## OEM revenue was all IDOL

For whatever reason, the company was adamant that OEM revenue was all organic. At the time of the Verity acquisition, Autonomy made statements to suggest that Verity, while it reported an OEM stream of revenue, did not have any recurring revenue from OEMs and that any revenue stream was discontinued upon acquisitions. Indeed, having seen a draft copy of our May 2008 research note, Autonomy reiterated its statements on its OEM business in its Q1 2008 results meeting, before we had published. The CEO said: "We've seen some commentary [ours, which had not been published] when Autonomy acquired Verity, it acquired an OEM stream of revenue. That is not accurate. Although Verity did OEM keyword search technologies, the nature of the keyword search OEM market was one-off payments, so when Autonomy acquired Verity, there was no ongoing OEM revenue stream. Furthermore, Autonomy actually discontinued immediately selling the K2 product [Verity's core product]."

At the same time as the acquisition, the number of OEM signings each quarter tripled to 12 although, according to the company, this had nothing to do with Verity. We would have been prepared to drop the issue as – in the scheme of our concerns – this was minor. However, having tracked down an ex-Verity executive, we received an email which stated: "We had a large amount of ongoing revenues from the OEM channel" and we responded with the quotes from the Autonomy CEO. We received the following in response: "I sat through their investor presentation at a conference after the acquisition and I was amazed at how they have re-written history". Clearly someone was being liberal with the truth but the only question was why. Again, we believed this was related to not wanting further examination of the acquisitions, which only stimulated our interest further.

## Cash conversation was good

Autonomy consistently mentioned the strength of its cash collection. But when we analysed the cash conversion (cash from operations as a percentage of EBITDA), we noted that it was poor relative to what we would have expected. Software companies are generally negative working capital businesses (which means that, as they grow, they generate strong cash flows). This negative working capital is a result of the maintenance revenue and the subscription revenue from Software as a Service (SaaS). Generally speaking, customers pay up front for a period of a year. So while the cash is collected up front, the revenue is recognised pro rata. Partially offsetting this is the growth in new business for which there is a payment period (days sales outstanding or DSO). In general, the two effects combine to achieve cash conversion of over 90% and, in the case of a pure SaaS business, over 100%.

MRL00028952

**Software & IT Services/Internet**





*Source: Company reports, Berenberg*

Operating cash conversion improved over the years as we would expect it should, particularly as the company acquired cloud assets (in particular Zantaz). However, despite the improvement in cash conversion peaking at 90% in 2010, there was the unanswered issue of what happened to the cash leakage from the poor cash conversion in the past. We referred to this as the "cash hole" i.e. the cumulative difference between a cash EBITDA metric and operating cash flow. Ultimately this should come through the cash flow line, resulting in above 100% cash conversion. Up to the acquisition this did not happen and we noted that cash conversion fell again in H1 2011, to 75%.

| Cash hole (cumulative adjusted EBITDA less adjusted operating cashflow) $m |



*Source: Company reports, Berenberg*

In response to the cash conversion analysis, the company began presenting its own version of cash conversion which essentially compared this quarter's operating cash with the prior quarter's EBITDA; this showed cash conversion close to 100%. Rather than explaining our metric, which was well understood by the market, it chose to use a unique metric which had no comparability to peers in the

MRL00028953

**Software & IT Services/Internet**



sector. The reasoning behind this new metric was that its DSO was c.90 days, i.e. it took 90 days to get paid after making a licence sale. The market seemed to accept this as rational but, to us, this was not about finding two numbers that when divided by each other get to 100% but to understand what was happening in the business. We believe the redefined cash conversion metric ignored the benefit of deferred revenue and even Autonomy produced a theoretical model of cash conversion, which showed that the maximum was c.90%. However, in this model, which it published on its website, it ignored deferred revenue completely.

It is probably important to add here some of the adjustments that were required to arrive at adjusted EBITDA and adjusted operating cash flow.

1.  EBITDA needed to add back the net benefit from capitalised R&D. In the days of UK GAAP accounting and what continues to be the case in US GAAP, all R&D expenses were expensed as occurred. With the introduction of IFRS (IAS 38), software companies were required to consider capitalising certain aspects of its R&D. We continue to be of the opinion that there is a large amount of discretion involved, and generally speaking the companies present to the auditors the amounts that require capitalising. Auditors are not product experts and thus only need to be persuaded that the principles of the accounting standard are being applied. Taking SAP AG as an example, it continues to expense all of its R&D and yet it adheres to IAS 38.

2.  On operating cash flow, we also need to adjust for capitalised R&D which falls below the operating cash line. The other adjustment is to factor in any post-acquisition restructuring which was "allowed" to fall in a line item below the operating cash line. Autonomy had argued that this complied with accounting standards and we agreed that it was compliant but that it needed to be adjusted in reading operating cashflow.

One flawed criticism we faced regarding our adjustments was that they were non-GAAP based. We always felt that this was a weak argument based on the fact that all software companies report non-GAAP metrics to provide a better understanding of the business. All we were trying to do was provide the best comparability between an income statement metric (EBITDA) and the cash flow statement (adjusted operating cash flow).

## The mystery of working capital

While cash conversion raised questions, it provided few answers. The analysis of cash moved to an analysis of working capital. Most companies in software have seasonal working capital flows dependent on when renewals for maintenance contracts occur (high cash collection and therefore deferred revenue) and the seasonality of new software sales (higher receivables). What became fascinating was the examination of Autonomy's working capital and how it seemed wholly dependent on the timing of acquisitions.

MRL00028954

**Software & IT Services/Internet**





Source: Company reports, Berenberg Bank

Starting from the basic assumption that a business with negative working capital can grow quickly without consuming working capital, we were surprised by the trend in working capital following the acquisitions. A negative working capital situation would also be consistent with an indirect sales model (something the company continually pointed to), whereby growth is achieved without the incremental investment in people. We would expect to see a combined business with a very favourable cash conversion profile (>100%), and therefore the resultant sub-100% ratio is unexpected.

Autonomy seemed to be acquiring companies with significant negative working capital (high deferred revenue and high cash conversion), sufficient to take the combined group into negative working capital, and then the business would go through a transition whereby it would progressively become a positive working capital business until the next acquisition. Again, the analysis pointed to acquisitions as being the crux of the business despite the company's comments to the contrary.

We theorised that the reasoning behind these shifts in working capital was linked to deferred revenue. This was the bulk of the negative working capital acquired. When we tried to track organic growth in deferred revenue, we concluded that growth was either flat or negative – despite the group reporting strong double-digit organic growth and indeed accounts receivable growing in line with sales. We saw a risk that Autonomy was changing the nature or structure of contracts, allowing greater upfront recognition and thus a lower run rate of ongoing deferred revenue. Acquisitions would occur to re-fill the "deferred revenue" tank and further contracts could be re-structured or re-negotiated. We talk later of a specific example which gave us confidence that these types of re-negotiations were happening.

To explain the lack of deferred revenue growth following the Zantaz acquisition, management said that the business model had been changed from a pre-paid model (which is typically the norm for SaaS business) to a post-pay model, where Autonomy would invoice monthly in arrears.

What was the reason behind this? According to the company, on the Q2 2009 call: "As a small, VC-backed entity Zantaz would license its technology and services in a pure SaaS model and would attempt to receive as much cash upfront as possible (prepay essentially)…Autonomy did not have this short-term cash need and has moved to a higher value hybrid model with one-third licence and two-thirds

MRL00028955

**Software & IT Services/Internet**



hosted. As explained, the hosted is guaranteed but can be invoiced on a monthly basis and thus will not hit the balance sheet at the quarterly earnings snapshot." Essentially, Autonomy was saying it did not need the cash and that the subscription model would not hit deferred revenue. In that case, companies such as Salesforce.com (significantly larger than Autonomy) should stop trying to annualise invoicing and move to monthly billing. Also, the incremental administrative costs of running a monthly bill process rather than an annual one should not be underestimated. We will discuss accounts receivable later.

Even if one were to accept Autonomy's explanation for the lack of deferred revenue growth, there are two things which surprised us.

1. If the shift in business model explained the change in the working capital then it only serves to ask what happened after the Verity or Interwoven acquisition, where the working capital changes are similar. Was there also a change in the classic licence maintenance model?

2. In the quarters immediately following the Zantaz acquisition, there was no mention of a change in the business model. From Q1 2008, "In terms of balance sheet classifications of deferred revenue…customers buy up front. We then look at the software-as-service and split the deferred revenue in the balance sheet between short and long term. We've seen e-mail traffic increasing, we believe as a result of subprime, and so with expected usage faster than before, we have moved from longer term to shorter term…we would be expecting to replenish the deferred as we continue." And from the same call: "There's deals that we have that go into deferred revenue. There's things like hosted that is paid for upfront, as we talked about, and goes into deferred revenue." In Q3 following our criticisms around the slower growth in deferred revenue, the CEO noted: "For things like our hosted services, it's important to realise those are paid monthly, they're not all paid in advance."

An example is probably helpful to understand how two identical companies with the same underlying growth profile use different revenue recognition.

| Normal recognition of deferred – company one | | | Accelerated recognition of deferred – company two | | |
|---|---|---|---|---|---|
| Years | 1 | 2 | Years | 1 | 2 |
| Licence | 96 | 96 | License | 96 | 96 |
| Maintenance | 110 | 118.9 | Maintenance | 110 | 129 |
| **Total** | **206.0** | **214.9** | **Total** | **206.0** | **224.6** |
| Total revenue growth % | | 4% | Total revenue growth % | | 9.0% |
| *Gross margin* | *90%* | *90%* | *Gross margin* | *90%* | *90%* |
| **Gross Profit** | **185** | **193** | **Gross Profit** | **185** | **202** |
| Cost (ex depn) | 100 | 100 | Cost (ex depn) | 100 | 100 |
| **EBITDA** | **85.4** | **93.4** | **EBITDA** | **85.4** | **102.1** |
| *EBITDA%* | *41%* | *43%* | *EBITDA%* | *41%* | *45%* |
| **Operating Cash** | **85.4** | **93.4** | **Operating Cash** | **85.4** | **93.4** |
| *Cash conversion* | *100%* | *100%* | *Cash conversion* | *100%* | *91%* |
| Deferred Rev | 73.7 | 79.7 | Deferred Rev | 73.7 | 70.0 |
| Deferred Revenue growth | | 8% | Deferred Rev recognised | | 9.7 |
| Maintenance rate | | 15% | | | |
| Renewal Rate | | 95% | | | |

*Source: Berenberg Bank*

MRL00028956

**Software & IT Services/Internet**



The key differences to note are the following:

- company two reports revenue growth of 9% vs. 4% for company one; and

- company two reports EBITDA growth of 20% vs. 9% for company one.

The cash generated by both businesses is the same and the underlying business is identical. However, company two would probably achieve a higher rating if the income statement were viewed as it has higher growth and operating leverage. When we look at the cash flow and balance sheet, we see that cash conversion is below 100% (but not poor) and there is a small decline in deferred revenue. This illustrates that two potential indicators of earlier revenue recognition are lower cash conversion and muted growth in deferred revenue.

**Implications for valuation**

Ultimately, we as analysts and investors are looking to value companies in the most appropriate way. Some use earnings multiples or a form of PEG analysis, EV/EBITDA, FCF yield or DCF. In the case of Autonomy, we often came across flawed DCF valuations. Flawed not because of the assumed growth or margin profile but flawed in terms of the level of working capital outflows. Between 2005 and 2009, working capital outflows were equivalent to c.10% of sales. It was only in 2010 that this dropped to around 6%, but this was also the year when growth slowed and margins fell. Below, we illustrate a company that grows at 15% a year (using Autonomy sales figures), has sustainable 40% EBIT margins but has a working capital outflow of 10% of sales. One can see the huge implications it has for a discounted cash flow valuation. Remember the stock traded at £16 before being acquired for £25.50.

| DCF | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| Revenue | 251 | 343 | 503 | 740 | 870 | 1001 | 1151 | 1324 | 1522 | 1751 | 2013 | 2315 | 2662 | 3062 | 3521 |
| y/y growth | | 37% | 47% | 47% | 18% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% |
| Adj. op profit | 67.8 | 108.8 | 207.5 | 328.9 | 377 | 400 | 460 | 529 | 609 | 700 | 805 | 926 | 1065 | 1225 | 1408 |
| % margin | 27% | 32% | 41% | 44% | 43% | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% |
| Net Cap R&D | -3 | -5 | -7 | -16 | -21 | -26 | -30 | -34 | -39 | -45 | -52 | -60 | -69 | -79 | -91 |
| % total cost | 1.6% | 2.1% | 2.4% | 3.9% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% |
| Adj op. profit | 64.8 | 103.8 | 200.5 | 312.9 | 355 | 375 | 431 | 495 | 570 | 655 | 753 | 866 | 996 | 1146 | 1318 |
| depn | 4 | 9 | 14 | 16 | 14 | 15 | 17 | 20 | 23 | 26 | 30 | 35 | 40 | 46 | 53 |
| EBITDA | 68.8 | 112.8 | 214.5 | 328.9 | 369 | 390 | 448 | 515 | 592 | 681 | 784 | 901 | 1036 | 1192 | 1370 |
| EBITDA % | 27% | 33% | 43% | 44% | 42% | 39% | 39% | 39% | 39% | 39% | 39% | 39% | 39% | 39% | 39% |
| Cash tax | 7 | 7 | 32 | 37 | 61 | 78 | 90 | 103 | 118 | 136 | 157 | 180 | 207 | 238 | 274 |
| Cash tax rate | 10% | 6% | 15% | 11% | 16% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% |
| CapEx | -3 | -7 | -11 | -25 | -60 | -50 | -58 | -66 | -76 | -88 | -101 | -116 | -133 | -153 | -176 |
| % sales | 1% | 2% | 2% | 3% | 7% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| Increase in WCAP | -26 | -35.2 | -46.8 | -73.9 | -68 | -100 | -115 | -132 | -152 | -175 | -201 | -232 | -266 | -306 | -352 |
| % sales | 10% | 10% | 9% | 10% | 8% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% |
| FCF | 32.8 | 63.6 | 124.7 | 193 | 181 | 162 | 186 | 214 | 246 | 282 | 325 | 374 | 430 | 494 | 568 |
| depn/CapEx | 133% | 129% | 127% | 64% | 23% | 30% | 30% | 30% | 30% | 30% | 30% | 30% | 30% | 30% | 30% |

| | |
|---|---|
| EV | 3,758 |
| Net debt | 45 |
| Mkt Cap | 3,803 |
| No. of shares | 269 |
| | |
| Terminal growth | 2% |
| WACC | 11.0% |
| Terminal period Margin | 43.0% |
| | |
| share price ($) | 14.1 |
| £/$ Fx | 0.7 |
| share price £ | 9.3 |

*Source: Berenberg Bank*

MRL00028957

**Software & IT Services/Internet**



*Private Bankers* *founded 1590*
**BERENBERG BANK**
*Joh. Berenberg, Gossler & Co. KG*

| DCF sensitivities | | | | | |
|---|---|---|---|---|---|
| | | **Revenue growth** | | | |
| | | **5.0%** | **10.0%** | **15.0%** | **20.0%** |
| **Adj. EBIT %** | **25.0%** | 1.1 | 1.6 | 2.2 | 3.0 |
| | **30.0%** | 2.3 | 3.2 | 4.6 | 6.4 |
| | **35.0%** | 3.5 | 4.9 | **6.9** | 9.8 |
| | **40.0%** | 4.7 | 6.6 | 9.3 | 13.2 |

*Source: Berenberg Bank*

As an aside, HP disclosed an $8.8bn write-down on its $10.3bn acquisition, giving an implied valuation of $1.5bn. On the website erected after the allegations, Mike Lynch queries the $5bn write-down related to accounting irregularities. Using our sensitivity table, we demonstrate how a lower growth rate and lower margin easily justify a significant write-down. We have adjusted WCAP outflow to a more reasonable 20% of the change in sales. Based on commentary from HP CEO Meg Whitman, we have assumed 5% revenue growth and 28% EBIT margins. From HP filings, it appears that the Autonomy business is currently in decline.

| DCF | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 251 | 343 | 503 | 740 | 870 | 914 | 960 | 1008 | 1058 | 1111 | 1166 | 1225 | 1286 | 1350 | 1418 |
| y/y growth | | 37% | 47% | 47% | 18% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| Adj. op profit | 67.8 | 108.8 | 207.5 | 328.9 | 377 | 256 | 269 | 282 | 296 | 311 | 327 | 343 | 360 | 378 | 397 |
| % margin | 27% | 32% | 41% | 44% | 43% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% |
| Net Cap R&D | -3 | -5 | -7 | -16 | -21 | -28 | -30 | -31 | -33 | -34 | -36 | -38 | -40 | -42 | -44 |
| % total cost | 1.6% | 2.1% | 2.4% | 3.9% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% |
| Adj op. profit | 64.8 | 103.8 | 200.5 | 312.9 | 355 | 228 | 239 | 251 | 263 | 277 | 290 | 305 | 320 | 336 | 353 |
| depn | 4 | 9 | 14 | 16 | 14 | 14 | 14 | 15 | 16 | 17 | 17 | 18 | 19 | 20 | 21 |
| EBITDA | 68.8 | 112.8 | 214.5 | 328.9 | 369 | 241 | 253 | 266 | 279 | 293 | 308 | 323 | 340 | 357 | 374 |
| EBITDA % | 27% | 33% | 43% | 44% | 42% | 26% | 26% | 26% | 26% | 26% | 26% | 26% | 26% | 26% | 26% |
| Cash tax | 7 | 7 | 32 | 37 | 61 | 48 | 51 | 53 | 56 | 59 | 62 | 65 | 68 | 71 | 75 |
| Cash tax rate | 10% | 6% | 15% | 11% | 16% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% |
| CapEx | -3 | -7 | -11 | -25 | -60 | -46 | -48 | -50 | -53 | -56 | -58 | -61 | -64 | -68 | -71 |
| % sales | 1% | 2% | 2% | 3% | 7% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| Increase in WCAP | -26 | -35.2 | -46.8 | -73.9 | -68 | -9 | -9 | -10 | -10 | -11 | -11 | -12 | -12 | -13 | -14 |
| % Inc in sales | | 38% | 29% | 31% | 52% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% |
| FCF | 32.8 | 63.6 | 124.7 | 193 | 181 | 139 | 146 | 153 | 160 | 169 | 177 | 186 | 195 | 205 | 215 |
| depn/CapEx | 133% | 129% | 127% | 64% | 23% | 30% | 30% | 30% | 30% | 30% | 30% | 30% | 30% | 30% | 30% |

| | |
|---|---|
| EV | 1,759 |
| Net debt | 0 |
| Mkt Cap | 1,759 |
| No. of shares | 269 |
| | |
| Terminal growth | 2% |
| WACC | 11.0% |
| Terminal period Margin | 43.0% |

*Source: Berenberg Bank*

## Autonomy followed strict revenue recognition

One of the allegations from HP has been the mis-categorisation of some hardware revenue as software and the allegation of "stuffing the channel". Autonomy argues on its website (www.autonomyaccounts.org) that it has followed correct accounting procedures under IFRS, which may differ from US GAAP. In Q3 2009, the company gave a detailed presentation including references to revenue recognition, which we believe was prompted by concerns in this regard.

MRL00028958

**Software & IT Services/Internet**



On that call, the Head of IR said: "We continue to follow the most stringent set of guidelines available in the industry." The CFO said, "There is no change in revenue recognition policies. We use IFRS and where IFRS is silent we use SOP 97-2."

On the presentation slide, Autonomy notes: "where IFRS is silent, we voluntarily adhere to US GAAP SOP 97-2, which is far more detailed, prescriptive and conservative than IFRS". So it appears that Autonomy accepted the more relaxed rules of IFRS and only where IFRS is "silent" was US GAAP used. It would be surprising if IFRS is wholly silent on any aspect of revenue recognition so it opens up the question of where US GAAP was applied and where IFRS was applied.

### Autonomy was a fully indirect sales company

Autonomy often spoke about its high operating leverage driven by its fully indirect sales model. In other words, $1 of additional sales did not require an additional $1 of costs. Hence the analytical argument for Autonomy was that there was no theoretical limit to how high the operating profit could go. Below we examine two timeframes (2005-07 and 2008-10), both of which suggest that there was very little leverage. We have chosen those timeframes to try to minimise any impact from big acquisition years.

**Comparison of change in EBITDA (%) and staff costs as a percentage of sales (2005-07)**



*Source: Company reports, Berenberg Bank*

MRL00028959

**Software & IT Services/Internet**





*Source: Company reports, Berenberg Bank*

## Quality of earnings

One of the tell-tale signs of a company struggling to make consensus earnings is the progressive deterioration of earnings quality. This includes lower tax rates, higher R&D capitalisation or using additional marketing costs as an excuse for missing earnings. All these effects seem to have started making themselves felt in H2 2009 and remained an issue until the company was acquired. The additional marketing expenses represent an area where HP alleges Autonomy recorded the cost of hardware sales. We make some contribution to this debate later.

## Accounts receivable

One of the main reasons why working capital progressively became more positive was the widening gap between receivables and deferred revenue. We had a number of unanswered questions on receivables where the explanations seemed inadequate in our view.

- In Q2 2008, Autonomy had indicated that commercial DSO were 30-40 days and it was government contracts that provided the delta to DSO of 85-95 days. The company had also indicated at various times that government revenue was c.25% of sales. A simple calculation suggests that government contracts had DSO of c.250 days. In the 2010 annual report, Autonomy reported gross receivables of $293m. If government customers indeed had DSO of 250 days, this would imply receivables of c.$200m and yet receivables past due were only $76.4m. This in itself was incongruous unless payment terms for government were longer than commercial, which would be a helpful way of limiting the amount of receivables past due.

- Interwoven, the business acquired in Q1 2009 had DSO of 60 days and yet the group DSO did not fall as a result. Apparently the main reason for this was that payment terms were aligned with Autonomy's, which implies a lengthening.

- Bad debt provisions at Autonomy were c.9% in 2009 and 2010, which is very high considering the blue-chip nature of the customer base. Sage, a UK company selling to small and medium-sized businesses, had a 12% bad debt provision (FY 2011) but the risk of default is much higher for smaller

MRL00028960

**Software & IT Services/Internet**



companies. Its overall DSO (based on gross balance sheet trade receivables) was 75 days compared with 121 at Autonomy (2010) on the same basis. This was despite the fact that Autonomy claimed c.70% of revenue was recurring.

- Other receivables is an item that should not be ignored. From 2006 to 2010, other receivables grew 640%. In the same period, gross receivables rose 225%. Other receivables grew from being 8% of total receivables to 21% in 2010. This was supposed to represent pre-paid insurance for directors and employees, pre-paid rents and a small amount of accrued income. However, from 2006 to 2010, the employee base increased only 100%.

Autonomy had always been adamant that it had no issue with the collection of receivables. One way to examine receivables is to take a pro-forma analysis of gross receivables growth from 2008 (which includes the Interwoven acquisition) and 2009.

**Pro-forma revenue growth ($M)**



*Source: Company reports, Berenberg Bank*

**Pro-forma receivables growth**



*Source: Company reports, Berenberg Bank*

**Software & IT Services/Internet**



So gross receivables increased 27% (with provisions up 54%) but pro-forma revenue growth was only 2%. In our view, the collectability of receivables had deteriorated whether due to extending payment terms or the delay of payments.

## Recurring revenue

In Autonomy's response to HP, mainly through the media interviews, it has claimed that the bureaucracy at HP destroyed the business and that it was using the management of Autonomy as scapegoats. Looking back at historical comments from Autonomy, it suggested that 25% of revenues came from government (intelligence departments) and 75% from commercial customers. When Autonomy reported its last quarter before acquisition, it noted that 62% of IDOL software sales were recurring. Adding in the maintenance stream of revenue suggested that 72% of revenue (ex-services) was recurring. Autonomy also reported a "commit" metric which represents contracted revenues not yet recognised (including deferred revenue). This grew 27% yoy in Q2 2011. Of the remainder of "new" licences, Autonomy reported that these were regulatory driven (80-90%) and therefore high visibility.

So how is it that HP managed to cripple a business with such high levels of recurring revenue and growing "committed" revenue within a year?

## How to make organic growth look better

Organic growth was always an area of contention for us and our estimates differed wildly from the reported figures. Below is a summary of the ways in which organic growth can be enhanced. These are the types of things we suspected were leading to higher reported organic growth:

- overstating the level of discontinued revenue or, in the case of the acquisition of the CA Information governance assets, Autonomy assumed that the original products were not sold and thus it was all organic;

- understating the level of stub revenue in the quarter of acquisition. An example of this was the acquisition of the Iron Mountain digital assets in Q2 2011. Autonomy estimated the stub revenue to be $9.6m for 28 days whereas Iron Mountain had suggested that it was losing c.$47m of revenue a quarter or c.$15m for 28 days. While these amounts may seem small, one has to remember that quarters were made or broken with a small delta in organic growth and margins;

- understating the level of total revenue being acquired. For example, CA was acquired in Q2 2010 for c.$18m and supposedly a run rate of $6m of revenue annually. Through correspondence with CA and an examination of its SEC filings, we estimate that the asset had an annual revenue stream four times higher; and

- asking the company being acquired to reduce invoicing of sales until after the closing of the acquisition.

## Rebuttal is a form of flattery

Following the Q1 2008 results, management presented to clients on its roadshow its calculations for organic growth. The table that was presented was of a similar format to that in the draft research we had presented, only with different assumptions and calculations. We heard from investors who were surprised that Autonomy was presenting such information as it seemed superfluous at the time.

**Software & IT Services/Internet**



It appears that, while regulations bind analysts to not discussing future research, there is nothing barring the company from responding to research that has yet to be published.

Our examination of cash conversion led to the company addressing our concerns by presenting its own calculation and building a theoretical company model to show a theoretical maximum cash conversion (though Autonomy omitted to mention it ignored the positive effects of deferred revenue). As the questions mounted, Autonomy created an entire section of its website dedicated to responding to these questions and those from a small but growing base of bearish analysts. Despite the effort, which we appreciated, the answers were convoluted and ultimately did not satisfy us.

In response to analysis in June 2009, the company sent an email direct to institutional clients: "Gents, We have seen the bear awake from its winter hibernation. It looks as if it is trying to re-ignite some arguments that had been discredited last year. In case you are using Google rather than Kenjin on your desktop here are a few reminders to some of the greyer points…" After we published a follow up to the rebuttal, the company sent out another email: "Good Afternoon…have published a follow-up to their last note. That note had a series of factual errors and mistakes, which have since been addressed by sell-side analysts. The good news on the new note is that it is a half hearted affair, and has dropped the cash hole argument since others published the correct calculation. Here for completeness are some of the points I noted in a quick read through". The email then proceeded to detail some points which required more than a "quick" read and in our view in no way answered our points.

The company liberally employed the use of the phrase "factual errors and mistakes" and seemed convinced that the analysis had been rebutted by sell-side analysts, so why bother sending another email to clients?

## Autonomy as an acquisition target

One of the pervasive risks of being a bear on Autonomy was the constant threat that someone would acquire the business. The perception we got from the company was that there was almost a revolving door in this respect at its Cambridge office. There was always interest but never at the right price.

It would not be a surprise to investors that any bid approach would have been known by the CFO. On that basis, if there had been real interest in the company, we would have expected the CFO to build a decent shareholding. Now one could argue that his base pay plus bonus was much lower than that of equivalent finance directors. But if you believed there was a high probability of the company being acquired in conjunction with the belief that you were part of a game-changing business, you would want to hold some position or at the very least allow your share options the maximum time before vesting.

The reality was that the CFO exercised options well ahead of their lapse dates and at the time of acquisition only owned c.10,000 shares, of which 5,000 were acquired in 2010 after an earnings warning.

Below is the table of share-option and share-ownership activity for the CFO. Remember that these options were being exercised well ahead of the lapsing. The CFO held 1.5% of all shares exercised.

MRL00028963

**Software & IT Services/Internet**



*Private Bankers founded 1590*
**BERENBERG BANK**
*Joh. Berenberg, Gossler & Co. KG*

| CFO share option and share ownership | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Share options** | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** |
| Awarded | 145 | 125 | 50 | 95 | 99 | 105 | 70 | 50 |
| Exercised | | | | 20 | 215 | 210 | 125 | 105 |
| Outstanding | 345 | 470 | 530 | 605 | 489 | 384 | 329 | 274 |
| | | | | | | | | |
| Ownership | | | 0 | 2945 | 5.945 | 5.945 | 5.945 | 9.978 |

*Source: Autonomy reports*

- Conversely, the CEO never exercised any options, although these were immaterial compared to his shareholding. Any significant selling by the founder would clearly have sent a negative signal to shareholders.

### Brands versus division

We thought we would squeeze in this side issue as at the time we found it fascinating. Autonomy had acquired etalk, Verity and Zantaz and told the markets that they would be run as separate divisions. When we suggested to the management that IFRS rules were changing, requiring more disclosures particularly on revenue for divisions of the business, it responded that these were not divisions but brands. We then saw that, over the following few weeks, the logos for the acquisitions changed to "X" — a brand of Autonomy — and the commentary on calls only spoke of brands, where previously divisions had been referred to.

### A question of IFRS versus US GAAP

Aside from the extensive analytical work on the financial statements, we periodically made investigations by speaking with customers or trying to communicate with former executives of acquired businesses. We have already mentioned our communication with a former executive of Verity and the resulting concerns around the source of the OEM stream of revenue. Based on our belief that the way deferred revenue was accounted for under US GAAP and IFRS differed and helped Autonomy report higher balances, we wanted to speak with an ex-executive at Interwoven.

With regard to the difference, we believed that it was normal under US GAAP to only record the deferred revenue on the balance sheet when the cash was received and not merely when the invoice was issued. However, under IFRS, the deferred revenue was recognised on invoicing — allowing companies under IFRS to report higher deferred balances than under US GAAP.

Autonomy had suggested that the standards were the same for both companies but we wanted to double check as the SEC filings for Interwoven were inconclusive. Our accounting analyst in the US suggested that it should be on cash receipt. So we reached out to the former CFO of Interwoven, John Calonico, who had joined Aster Data (now a part of Terradata).

We never received a reply but continued to believe there was a difference in the way US and IFRS based companies reported deferred revenue.

### Breaking down in tears

This sub-heading had little to do with us but a lot to do with Autonomy. We had the opportunity to speak with a large customer of Autonomy in 2010, indeed one

MRL00028964

**Software & IT Services/Internet**



that believed it was among Autonomy's largest. Much of the discussion was around the legacy contract that it had with Zantaz and IBM and how, following the acquisition by Autonomy, the relationship had transferred wholly to Autonomy without the need for IBM as an intermediary. Below is a summary of some of the more interesting points in our discussion.

- **IDOL, what IDOL?** When asked whether the integration of IDOL (Autonomy's core technology) into Zantaz had gone smoothly, we were told that IDOL had not been integrated despite promises to do so. We had been told by the company the integration was complete at the time of acquisition.

- **Customer support and services**: When asked about customer support, we were told that Autonomy appeared slow in responding to support needs. This was interesting to us given that Zantaz was meant to be one of Autonomy's largest customers. Imagine the situation with smaller customers. We were also surprised that the services contract was with Autonomy, given the idea of a fully indirect model. This was a contract that historically had not been with Zantaz but with IBM; rather than leaving it with IBM, it was brought in house.

- **Contract restructuring**: The customer explained a recent re-negotiation of an existing contract. It was surprised by a call from Autonomy asking for the renegotiation of a contract that had been signed only about a year earlier. The call came on the first day of the last month of the quarter and was completely out of the blue. Autonomy was offering more technology at a lower price in return for a change in the structure of the contract. That change was to turn a rental contract into a licence contract. This clearly would have had significant implications for revenue recognition and provided anecdotal support for our theory that contract structures were being changed to benefit revenue recognition. The customer went on to say that the day before the quarter ended, it had informed the US CEO of Autonomy that it was unlikely the deal would get signed off before the quarter end. Paraphrasing what the customer said, the Autonomy US CEO almost broke down in tears in his office and, within half an hour, the group CEO, Mike Lynch was on the phone asking at what price the deal needed to be done to be signed. According to the customer, the deal was eventually signed at midnight on the last day of the quarter. Now we should stress that all software companies are chasing to get signatures at the end of a quarter. But what is surprising in this case is that the deal was forced i.e. there was no need to re-negotiate other than the change in contract terms. Essentially, Autonomy managed to change a rental agreement into a licence sale.

## The culture of employees

We are strong believers that happy employees make good businesses as ultimately they drive a strong culture, loyalty and good teamwork. On coming across the website www.glassdoor.com, which is a forum for employees to discuss their company and CEO, we noted that Autonomy was one of the most unpopular companies – as rated by its employees. We cite below some of the comments, split between pros and cons and advice to management.

MRL00028965

**Software & IT Services/Internet**



### Pros
- Adequate pay, free lunch on Fridays
- If you get lucky and land a monster deal, you can make a ton of money
- View of the Bay from offices

### Cons
- Products are not designed, coded and tested. Company products are categorised by 'Power', 'Protect' and 'Promote'. All employees know the biggest category is 'Pretend'
- Software is very much secondary to Autonomy. The goal is sales. Software just gets in the way
- Antagonistic, punitive management style. Developing and respect for people doesn't take place here
- Autonomy is a marketing and sales company masquerading as a software company
- Senior management micromanages everything such that local CEOs and managers are figureheads and puppets
- Unhappy customers due to lack of support
- They regularly acquire other companies, not so much for their technologies but to get their customer lists – not surprising as their selling strategy seems to be tell the customer "yes, we can provide that – in fact we have it already" then fob them off while dev staff frantically cobble together some flakey solution that gets shipped to the customer – definitely a "take the money and run" approach
- Constant bullying from the management. Depressing environment
- Customer care is non-existent
- Generous use of FIBCAMM (Fear and Intimidation-Based Computer-Aided Micro Management)
- Yes, it is as bad (or worse) as you've read...do yourself a favor and don't work here – period. You will end up having to explain why you had such a brief stint at Autonomy on your resume 12 months after you accept

## The hardware question

HP accused Autonomy of misrepresenting hardware as software.

- "The mischaracterization of revenue from negative-margin, low-end hardware sales with little or no associated software content as "IDOL product," and the improper inclusion of such revenue as "licence revenue" for purposes of the organic and IDOL growth calculations.
  - This negative-margin, low-end hardware is estimated to have comprised 10-15% of Autonomy's revenue."

Our first encounter with hardware revenue at Autonomy was in Q1 2010, when inventory jumped from a negligible amount to $10m. The company noted that this inventory related to its sale of Arcpliance, an appliance based e-discovery product where "the software is still the bit that dominates in terms of the cost of an Arcpliance". During that same call, the CEO noted that "we have very little

**Software & IT Services/Internet**



interest in just selling hardware…so what we are not doing here is acting as a generic company that resells hardware". Since these statements, Mike Lynch in interviews has disclosed that Autonomy did sell hardware at a loss and treated part of the cost of sales as a marketing cost. He claimed that it was only 2% of sales, not the 10-15% alleged by HP.

In terms of additional sales and marketing spend, this seems to have originated in Q3 2009 and continued until the sale of the company. The additional marketing spending was linked to product launches, seizing opportunities due to the low cost of advertising and the sponsoring of Tottenham Hotspur football club. It should be easy for any investigation to find the source of those marketing costs.

MRL00028967

**Software & IT Services/Internet**



Private Bankers founded 1590
**BERENBERG BANK**
Joh. Berenberg, Gossler & Co. KG

# Contacts: Investment Banking

E-mail: firstname.lastname@berenberg.de; internet www.berenberg.de

## Equity Research

**BANKS**

| | |
|---|---|
| Nick Anderson | +44 (0) 20 3207 7838 |
| James Chappell | +44 (0) 20 3207 7844 |
| Andrew Lowe | +44 (0) 20 3465 2743 |
| Eleni Papoula | +44 (0) 20 3465 2741 |

**BEVERAGES**

| | |
|---|---|
| Philip Morrisey | +44 (0) 20 3207 7892 |
| Josh Puddle | +44 (0) 20 3207 7881 |

**BUSINESS SERVICES**

| | |
|---|---|
| William Foggon | +44 (0) 20 3207 7882 |
| Simon Mezzanotte | +44 (0) 20 3207 7917 |
| Arash Roshan Zamir | +44 (0) 20 3465 2636 |
| Konrad Zomer | +44 (0) 20 3207 7920 |

**CAPITAL GOODS**

| | |
|---|---|
| Frederik Bitter | +44 (0) 20 3207 7916 |
| Benjamin Glaeser | +44 (0) 20 3207 7918 |
| William Mackie | +44 (0) 20 3207 7837 |
| Margaret Paxton | +44 (0) 20 3207 7934 |
| Alexander Virgo | +44 (0) 20 3207 7856 |
| Felix Wienen | +44 (0) 20 3207 7915 |

**CHEMICALS**

| | |
|---|---|
| Jade Barkett | +44 (0) 20 3207 7937 |
| Asad Farid | +44 (0) 20 3207 7932 |
| John Philipp Klein | +44 (0) 20 3207 7930 |
| Jaideep Pandya | +44 (0) 20 3207 7890 |

**CONSTRUCTION**

| | |
|---|---|
| Chris Moore | +44 (0) 20 3465 2737 |
| Robert Muir | +44 (0) 20 3207 7860 |
| Michael Watts | +44 (0) 20 3207 7928 |

**DIVERSIFIED FINANCIALS**

| | |
|---|---|
| Pras Jeyanandhan | +44 (0) 20 3207 7899 |
| Richard Perrott | +44 (0) 20 3207 7925 |

## Sales

### Specialist Sales

**CONSUMER**

| | |
|---|---|
| Rupert Trotter | +44 (0) 20 3207 7815 |

**INSURANCE**

| | |
|---|---|
| Trevor Moss | +44 (0) 20 3207 7893 |

**LONDON**

| | |
|---|---|
| Miel Bakker | +44 (0) 20 3207 7808 |
| John von Berenberg-Consbruch | +44 (0) 20 3207 7805 |
| Ronald Bernette | +44 (0) 20 3207 7828 |
| Matt Chawner | +44 (0) 20 3207 7847 |
| Toby Flaux | +44 (0) 20 3465 2745 |
| Sean Heath | +44 (0) 20 3465 2742 |
| David Hogg | +44 (0) 20 3465 2628 |
| Ben Hutton | +44 (0) 20 3207 7804 |
| James Matthews | +44 (0) 20 3207 7807 |
| David Mortlock | +44 (0) 20 3207 7850 |
| Peter Nichols | +44 (0) 20 3207 7810 |
| George Smibert | +44 (0) 20 3207 7911 |
| Max von Doetinchem | +44 (0) 20 3207 7826 |
| Paul Walker | +44 (0) 20 3465 2632 |

**FRANKFURT**

| | |
|---|---|
| Michael Brauburger | +49 (0) 69 91 30 90 741 |
| Nina Buechs | +49 (0) 69 91 30 90 735 |
| André Grosskurth | +49 (0) 69 91 30 90 734 |
| Boris Koegel | +49 (0) 69 91 30 90 740 |
| Joachim Kopp | +49 (0) 69 91 30 90 742 |

**ECONOMICS**

| | |
|---|---|
| Dr. Holger Schmieding | +44 (0) 20 3207 7889 |
| Dr. Christian Schulz | +44 (0) 20 3207 7878 |
| Robert Wood | +44 (0) 20 3207 7822 |

**FOOD MANUFACTURING**

| | |
|---|---|
| Fintan Ryan | +44 (0) 20 3465 2748 |
| James Targett | +44 (0) 20 3207 7873 |

**GENERAL RETAIL & LUXURY GOODS**

| | |
|---|---|
| Bassel Choughari | +44 (0) 20 3465 2675 |
| John Guy | +44 (0) 20 3465 2674 |

**HEALTHCARE**

| | |
|---|---|
| Scott Bardo | +44 (0) 20 3207 7869 |
| Alistair Campbell | +44 (0) 20 3207 7876 |
| Charles Cooper | +44 (0) 20 3465 2637 |
| Louise Hinds | +44 (0) 20 3465 2747 |
| Adrian Howd | +44 (0) 20 3207 7874 |
| Tom Jones | +44 (0) 20 3207 7877 |

**HOUSEHOLD & PERSONAL CARE**

| | |
|---|---|
| Seth Peterson | +44 (0) 20 3207 7891 |
| Andrew Steele | +44 (0) 20 3207 7926 |

**INSURANCE**

| | |
|---|---|
| Tom Carstairs | +44 (0) 20 3207 7823 |
| Peter Eliot | +44 (0) 20 3207 7880 |
| Matthew Preston | +44 (0) 20 3207 7913 |
| Sami Taipalus | +44 (0) 20 3207 7866 |

**MEDIA**

| | |
|---|---|
| Emma Coulby | +44 (0) 20 3207 7821 |
| Laura Janssens | +44 (0) 20 3465 2639 |
| Sarah Simon | +44 (0) 20 3207 7830 |

**MID-CAP GENERAL**

| | |
|---|---|
| Gunnar Cohrs | +44 (0) 20 3207 7894 |
| Bjoern Lippe | +44 (0) 20 3207 7845 |
| Anna Patrice | +44 (0) 20 3207 7863 |
| Alexandra Schlegel | +44 (0) 20 3207 7896 |
| Stanislaus von Thurn und Taxis | +44 (0) 20 3207 7631 |

**REAL ESTATE**

| | |
|---|---|
| Kai Klose | +44 (0) 20 3207 7888 |
| Estelle Weingrod | +44 (0) 20 3207 7931 |

**TECHNOLOGY**

| | |
|---|---|
| Adnaan Ahmad | +44 (0) 20 3207 7851 |
| Sebastian Grabert | +44 (0) 20 3207 7834 |
| Daud Khan | +44 (0) 20 3465 2638 |
| Ali Khwaja | +44 (0) 20 3207 7852 |
| Tammy Qiu | +44 (0) 20 3465 2673 |

**TELECOMMUNICATIONS**

| | |
|---|---|
| Wassil El Hebil | +44 (0) 20 3207 7862 |
| Usman Ghazi | +44 (0) 20 3207 7824 |
| Stuart Gordon | +44 (0) 20 3207 7858 |
| Laura Janssens | +44 (0) 20 3465 2639 |
| Paul Marsch | +44 (0) 20 3207 7857 |
| Barry Zeitoune | +44 (0) 20 3207 7859 |

**TOBACCO**

| | |
|---|---|
| Erik Bloomquist | +44 (0) 20 3207 7870 |
| Kate Kalashnikova | +44 (0) 20 3465 2665 |

**UTILITIES**

| | |
|---|---|
| Robert Chantry | +44 (0) 20 3207 7861 |
| Andrew Fisher | +44 (0) 20 3207 7937 |
| Lawson Steele | +44 (0) 20 3207 7887 |

E-mail: firstname.lastname@berenberg.com; Internet www.berenberg.de

**HEALTHCARE**

| | |
|---|---|
| Frazer Hall | +44 (0) 20 3207 7875 |

**TECHNOLOGY**

| | |
|---|---|
| Jean Beaubois | +44 (0) 20 3207 7835 |

**HAMBURG**

| | |
|---|---|
| Susette Mantzel | +49 (0) 40 350 60 694 |
| Marco Weiss | +49 (0) 40 350 60 719 |

**PARIS**

| | |
|---|---|
| Christophe Choquart | +33 (0) 1 5844 9508 |
| Dalila Farigoule | +33 (0) 1 5844 9510 |
| Clémence La Clavière-Peyraud | +33 (0) 1 5844 9521 |
| Olivier Thibert | +33 (0) 1 5844 9512 |

**ZURICH**

| | |
|---|---|
| Stephan Hofer | +41 (0) 44 283 2029 |
| Carsten Kinder | +41 (0) 44 283 2024 |
| Gianni Lavigna | +41 (0) 44 283 2038 |
| Benjamin Stillfried | +41 (0) 44 283 2033 |

**CRM**

**LONDON**

| | |
|---|---|
| Greg Swallow | +44 (0) 20 3207 7833 |
| Laura Cooper | +44 (0) 20 3207 7806 |

**CORPORATE ACCESS**

**LONDON**

| | |
|---|---|
| Patricia Nehring | +44 (0) 20 3207 7811 |

**UTILITIES**

| | |
|---|---|
| Benita Barretto | +44 (0) 20 3207 7829 |

**INDUSTRIALS**

| | |
|---|---|
| Chris Armstrong | +44 (0) 20 3207 7809 |
| Kaj Alftan | +44 (0) 20 3207 7879 |

### Sales Trading

**HAMBURG**

| | |
|---|---|
| Paul Dontenwill | +49 (0) 40 350 60 563 |
| Christian Endras | +49 (0) 40 350 60 359 |
| Gregor Labahn | +49 (0) 40 350 60 571 |
| Chris McKeand | +49 (0) 40 350 60 798 |
| Fin Schaffer | +49 (0) 40 350 60 596 |
| Lars Schwartau | +49 (0) 40 350 60 450 |
| Marvin Schweden | +49 (0) 40 350 60 576 |
| Tim Storm | +49 (0) 40 350 60 415 |
| Philipp Wiechmann | +49 (0) 40 350 60 346 |

**LONDON**

| | |
|---|---|
| Stewart Cook | +44 (0) 20 3465 2752 |
| Simon Messman | +44 (0) 20 3465 2754 |
| Stephen O'Donohoe | +44 (0) 20 3465 2753 |

**PARIS**

| | |
|---|---|
| Sylvain Granjoux | +33 (0) 1 5844 9509 |

**EVENTS**

**LONDON**

| | |
|---|---|
| Natalie Meech | +44 (0) 20 3207 7831 |
| Charlotte Kilby | +44 (0) 20 3207 7832 |
| Hannah Whitehead | +44 (0) 20 3207 7922 |

## US Sales

**BERENBERG CAPITAL MARKETS LLC**

E-mail: firstname.lastname@berenberg-us.com

**Member FINRA & SIPC**

| | | | |
|---|---|---|---|
| Andrew Holder | +1 (617) 292 8222 | Kelleigh Faldi | +1 (617) 292 8288 |
| Colin Andrade | +1 (617) 292 8230 | Kieran O'Sullivan | +1 (617) 292 8292 |
| Cathal Carroll | +1 (646) 445 7206 | Emily Mouret | +1 (646) 445 7204 |
| Burr Clark | +1 (617) 292 8282 | Jonathan Saxon | +1 (646) 445 7202 |
| Julie Doherty | +1 (617) 292 8228 | | |

MRL00028968

**Software & IT Services/Internet**



## Disclaimer

**Please note:**

**For disclosures, historical price targets and rating changes pertaining to the companies included in this publication as well as analyst certifications, please visit our disclosure listing page on our website at:**

https://www.berenberg.de/cgi-bin/compliance.cgi?rm=comp_start&lang=englisch

**or refer to our research comments and reports which are available for download (password required) at:**

https://www.berenberg.de/cgi-bin/crm.cgi?rm=login&lang=englisch

or on demand (crm@berenberg.de).

**Please note that the disclosures, historical price targets and rating changes reflect the status of the most recently published comments or reports on the companies.**

---

### Valuation basis/rating key

The recommendations for companies analysed by Berenberg Bank's equity research department are either made on an absolute basis ("absolute rating system") or relative to the sector ("relative rating system"), which is clearly stated in the financial analysis. For both absolute and relative rating system, the three-step rating key "Buy", "Hold" and "Sell" is applied. For a detailed explanation of our rating system, please refer to our website at

http://www.berenberg.de/research.html?&L=1

NB: During periods of high market, sector or stock volatility, or in special situations, the rating system criteria as described on our website may be breached temporarily.

---

### Competent supervisory authority

Bundesanstalt für Finanzdienstleistungsaufsicht - BaFin - (Federal Financial Supervisory Authority), Graurheindorfer Straße 108, 53117 Bonn and Lurgiallee 12, 60439 Frankfurt am Main, Germany

---

### General investment-related disclosures

Joh. Berenberg, Gossler & Co. KG ("Berenberg Bank") has made every effort to carefully research all information contained in this document. The information on which the research note is based has been obtained from sources which Berenberg Bank believes to be reliable such as, for example, Thomson Reuters, Bloomberg and the relevant specialised press as well as the company which is the subject of this research note.

Only that part of the document is made available to the issuer, who is the subject of this analysis, which is necessary to properly reconcile with the facts. Should this result in considerable changes, a reference is made in the research note.

Opinions expressed in this research note are Berenberg Bank's current opinions as of the issuing date indicated on this document. The companies analysed by Berenberg Bank are divided into two groups: those under "full coverage" (regular updates provided); and those under "screening coverage" (updates provided as and when required at irregular intervals).

The functional job title of the person/s responsible for the recommendations contained in this report is "Equity Research Analyst", unless otherwise stated on the cover.

**The following internet links provide further remarks on Berenberg Bank's financial analyses:**

http://www.berenberg.de/research.html?&L=1&no_cache=1

MRL00028969

**Software & IT Services/Internet**



## Legal disclaimer

This document has been prepared by Berenberg Bank. This document does not claim completeness regarding all the information on the stocks, stock markets or developments referred to in it.

On no account should the document be regarded as a substitute for the recipient procuring information for himself/herself or exercising his/her own judgements.

The document has been produced for information purposes for institutional clients or market professionals.

Private customers, into whose possession this document comes, should discuss possible investment decisions with their customer service officer as differing views and opinions may exist with regard to the stocks referred to in this document.

This document is not a solicitation or an offer to buy or sell the mentioned stock.

The document may include certain descriptions, statements, estimates, and conclusions underlining potential market and company developments. These reflect assumptions, which may turn out to be incorrect. Berenberg Bank and/or its employees accept no liability whatsoever for any direct or consequential loss or damages of any kind arising out of the use of this document or any part of its content.

Berenberg Bank and/or its employees may hold, buy or sell positions in any securities mentioned in this document, derivatives thereon or related financial products. Berenberg Bank and/or its employees may underwrite issues for any securities mentioned in this document, derivatives thereon or related financial products or seek to perform capital market or underwriting services.

### Remarks regarding foreign investors

The preparation of this document is subject to regulation by German law. The distribution of this document in other jurisdictions may be restricted by law, and persons into whose possession this document comes should inform themselves about, and observe, any such restrictions.

### United Kingdom

This document is meant exclusively for institutional investors and market professionals, but not for private customers. It is not for distribution to or the use of private investors or private customers.

### United States of America

This document has been prepared exclusively by Berenberg Bank. Although Berenberg Capital Markets LLC, an affiliate of Berenberg Bank and registered US broker-dealer, distributes this document to certain customers, Berenberg Capital Markets LLC does not provide input into its contents, nor does this document constitute research of Berenberg Capital Markets LLC. In addition, this document is meant exclusively for institutional investors and market professionals, but not for private customers. It is not for distribution to or the use of private investors or private customers.

This document is classified as objective for the purposes of FINRA rules. Please contact Berenberg Capital Markets LLC (+1 617.292.8200), if you require additional information.

### Copyright

Berenberg Bank reserves all the rights in this document. No part of the document or its content may be rewritten, copied, photocopied or duplicated in any form by any means or redistributed without Berenberg Bank's prior written consent.

© June 2012 Berenberg Bank

MRL00028970

# EXHIBIT 18

| 1. | On behalf of | Claimants |
|----|----|----|
| 2. | Initials/Surname of witness | P G Morland |
| 3. | Statement No | 1 |
| 4. | Date | 13/09/2018 |

Claim No. HC-2015-001324

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

**B E T W E E N:**

**(1) ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY**
**CORPORATION LIMITED)**
**(2) HEWLETT-PACKARD VISION BV**
**(3) AUTONOMY SYSTEMS LIMITED**
**(4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.**

Claimants

-and-

**(1) MICHAEL RICHARD LYNCH**
**(2) SUSHOVAN TAREQUE HUSSAIN**

Defendants

WITNESS STATEMENT OF PAUL GILMER MORLAND

I, PAUL GILMER MORLAND of 88 Wood Street, London, EC2V 7QR, STATE AS FOLLOWS:

1.   I am a Senior Analyst at Canaccord Genuity, the global capital markets division of Canaccord Genuity Group Inc. I make this Witness Statement on behalf of the Claimants in connection with the above-named proceedings. Except where it otherwise appears, the facts and matters to which I refer in this Witness Statement are within my own knowledge and are true. Where facts are from another source, I identify the source and I believe them to be true. Where the source of my understanding or information is from the Claimants' lawyers, I have identified this in the Witness Statement but without any waiver of legal professional privilege.

2.   I have not attached the documents to which I refer in this Witness Statement. Instead I have provided document references for those documents. I understand that the document references are the Document Production IDs allocated to the documents by the parties as part of the disclosure in the current proceedings. I have relied upon these

HP-SEC-02929380

documents to refresh my recollections and refer to the specific content of a number of them.

**Professional History and Background**

3.  I attended Manchester University, where I graduated with a degree in Liberal Studies in Science. In 1982, after leaving university, I joined Price Waterhouse (now PricewaterhouseCoopers) where, after three years, I qualified as a chartered accountant.

4.  When, in 1994, I first started working as an analyst (at NatWest Securities), I covered smaller companies across multiple sectors. In 1996, I started to cover the support services sector. In 1998, that sector diverged into two sectors, the business services sector and the technology sector, at which point I started to focus on the technology sector.

5.  In March 2000, I left the City to become Finance Director of a private IT services business called netdecisions. I returned to the City in 2002 and, after a brief spell as an analyst at Bank of America, I joined Société Générale in early 2003 to cover the pan-European software and IT services sector, remaining there until October 2005, when I moved to Arbuthnot Securities. From July 2008 to June 2010, I worked at Astaire Securities, a small brokerage firm. I was at Peel Hunt from June 2010 to June 2013. Thereafter, I was self-employed, before moving to Arden Partners in October 2014. I joined Canaccord Genuity in February 2016.

6.  Since 2005, I have been covering UK technology companies, with a particular focus on software and IT services companies.

**My experience covering Autonomy**

7.  At various points in this Witness Statement I refer to what I consider to be, or to have been, the views of other analysts. In so doing I am indicating what I believe other analysts covering Autonomy (and indeed other software companies) are likely to think or to have thought about a particular issue. I base this on my deep experience of covering software companies for over 20 years and working with other software analysts from both the UK and the US. I would discuss my thoughts on Autonomy with analysts at other firms to understand how they were interpreting the earnings releases and compare this with my own analysis. In the same way, I also refer at various points to how, in my view, the market is likely to have reacted to certain information. This comes from my experience of talking with investors about numerous software companies, including Autonomy, over the same time period.

2

HP-SEC-02929381

8.  I started covering Autonomy in around 2005 when I was at Société Générale.

9.  As a general matter, in my view the key value drivers for software companies are revenue growth, profitability, "visibility" (i.e. reliability or predictability of revenue streams) and cash generation. The healthier these value indicators, the higher one would expect the valuation multiples at which a software company trades to be. Valuations are often expressed as a multiple of a particular metric, for example price per share as a multiple of earnings per share, known as the price to earnings or "P/E" ratio. If a company is trading at a P/E multiple of, say, 20x, it implies that an investor is willing to pay £20 for £1 of historical, or more commonly, forecast annual earnings.

10. As far as I am concerned, the key valuation metric is organic software revenue growth because, in indicating underlying, repeatable growth, it provides the best measure of how successful and competitive a software company's products are in the market(s) in which it operates. Software growth is also important because software is usually the most profitable revenue line and determines the level of follow-on maintenance and services revenues, which add to future revenue visibility.

11. Organic growth in the context of a company like Autonomy refers to the software revenue growth in a company's own business, as opposed to revenue growth resulting from mergers or acquisitions. When calculating organic software growth, it is therefore important to strip out, as reliably as possible, the impact of acquisitions and any non-software sales. The impact of mergers or acquisitions is stripped out in comparing one period to another in order to compare like-with-like, the aim being to identify how the business is growing organically rather than by buying other companies. If this is not done properly, the calculation will not reliably represent the underlying, repeatable growth of the software business, thus giving an unreliable view of the value of the company. For example, if the contribution from acquisitions were understated, organic growth would be overstated. Where the company earns some of its revenues in a different currency to that in which it reports, foreign exchange movements should also be stripped out in order to reliably compare one period with another.

12. Companies with high organic growth rates tend to be valued significantly more highly than companies with lower organic growth. They trade at higher multiples, and in my experience it is not uncommon for a company with double the organic growth rate of another, say 20% per annum as against 10% per annum, to attract double the valuation multiple. In the period in question Autonomy generally reported high rates of organic growth and this resulted in it trading on high multiples.

13. Autonomy management, in Autonomy's quarterly press releases, annual reports and earnings calls, frequently cited high organic growth figures. Over the period in which I

3

HP-SEC-02929382

that it was held out to be a recurring revenue stream (i.e. that Cloud revenue in a given quarter would generally recur in subsequent quarters). If the Claimants are correct, then Autonomy's reported recurring hosting revenues were overstated, and the conclusions I drew about Autonomy's future incoming hosting revenues were based on a false premise and, therefore, incorrect. Had the position been as the Claimants contend, it would have negatively impacted on my valuation of Autonomy, given the importance of this high quality and therefore highly rated (by the market) form of revenue.

I believe that the facts stated in this Witness Statement are true.

SIGNED

PAUL GILMER MORLAND

DATED

# EXHIBIT 19

**To:**       'Morland, Paul'[Paul.Morland@peelhunt.com]
**From:**     Binns, Rob
**Sent:**     Thur 12/6/2012 4:03:29 AM
**Importance:**        Normal
**Subject:**  RE: Autonomy/HPQ - research

Thanks for sharing these, and I'll take a read.  Look forward to the discussion.


Rob Binns

Investor Relations


Email : rob.binns@hp.com

Cell : +1 408219 7230


*Attorney Client Privileged Communication. This electronic transmission, and any documents attached to it, may contain confidential and/or legally privileged information. This information is intended only for the use by the recipient named above and should not be copied or distributed or disclosed to anyone other than the addressee.  The contents are not to be regarded as a contractual offer or acceptance.  HP is not liable for any viruses that may be contained in this electronic transmission or any attachments.  If you have received this message in error, please notify the sender and delete it promptly.  Any disclosure, copying, distribution or use of this message and its contents received in error is strictly prohibited*


**From:** Morland, Paul [mailto:Paul.Morland@peelhunt.com]
**Sent:** Thursday, December 06, 2012 1:00 AM
**To:** Binns, Rob
**Subject:** RE: Autonomy/HPQ - research


Rob

I attach three research notes (from the twelve I have starting in June 2009).

The first, There's something about Autonomy, from Jan 2010, goes through 10 warning signals that I identified at that time. It also looks at the poor cash conversion and low deferred income was developing in an unusual way.

Then a note from Sept 2009 looking at how growth rates were being optimised plus more on cash conversion, working capital movements, impact of acquisitions and the rising DSOs. At this time Au was getting its house brokers eg. UBS to write notes countering the claims of bears such as myself. Their arguments were deeply flawed in my opinion.

The third, from March 2011, looks at the dramatic slowdown in the core business, weakening margins (probably due to hardware which for me was impossible to quantify although I was alerted to it by the inclusion of $10m stock on the balance sheet in Q1 2010) and the dramatic increase in the capitalisation of intangibles (presumably to mask increasing S&M due to hardware).

Regards

Paul


**From:** Binns, Rob [mailto:rob.binns@hp.com]
**Sent:** 05 December 2012 18:58
**To:** Morland, Paul
**Cc:** Keller, Nancy
**Subject:** Autonomy/HPQ


Paul


Thanks for your note to HP Investor Relations, and I appreciate your offer of engagement.  I'll set up a call so we can better understand your input.


Thanks

Rob


Rob Binns

Investor Relations

Email : rob.binns@hp.com

Cell : +1 408219 7230

*Attorney Client Privileged Communication. This electronic transmission, and any documents attached to it, may contain confidential and/or legally privileged information.  This information is intended only for the use by the recipient named above and should not be copied or distributed or disclosed to anyone other than the addressee.  The contents are not to be regarded as a contractual offer or acceptance.  HP is not liable for any viruses that may be contained in this electronic transmission or any attachments.  If you have received this message in error, please notify the sender and delete it promptly.  Any disclosure, copying, distribution or use of this message and its contents received in error is strictly prohibited*

This email is intended solely for the addressee(s) and may be legally privileged and/or confidential. If received in error please delete it and all copies of it from your system, destroy any hard copies of it and contact the sender. Any unauthorised use or disclosure may be unlawful. The accuracy or completeness of this email is not guaranteed. Any opinion expressed in this email may not necessarily reflect the opinions of Peel Hunt. Any personal information contained in this e-mail is provided solely for the purpose stated in the message. All emails may be monitored in accordance with legal requirements contained in Regulation of Investigatory Powers Act, Data Protection Act, Telecommunications Regulations Act and Human Rights Act. This email and any reply maybe monitored for operational reasons or lawful business practices. If you do not consent to such monitoring, you should contact the sender of the email.

Peel Hunt LLP
Registered Office: 120 London Wall, London EC2Y 5ET.  Registered in England and Wales no. OC357088.  Vat No: 100 1485 76.  Peel Hunt is a member of the London Stock Exchange;  Authorised and Regulated by the Financial Services Authority.

# EXHIBIT 20

Volume 16

Pages 2971 - 3243

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )          NO. CR 16-00462 CRB
                               )
SUSHOVAN TAREQUE HUSSAIN,      )
                               )
          Defendant.           )
_____)
                               San Francisco, California
                               Tuesday, March 27, 2018

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
          BY:  **ROBERT S. LEACH**
               **ADAM A. REEVES**
               **WILLIAM FRENTZEN**
               **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:

                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
          BY:  **JOHN W. KEKER**
               **JAN NIELSEN LITTLE**
               **BROOK DOOLEY**
               **KATE LAZARUS**
               **NIC MARAIS**
               **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

 1  **Tuesday - March 27, 2018**                    **9:01 a.m.**

 2                      P R O C E E D I N G S

 3                         ---oOo---

 4      (Proceedings were heard out of presence of the jury:)

 5          **MR. FRENTZEN:**  Your Honor, we had talked about

 6  possibly calling the other witness out of order.

 7          **THE COURT:**  You want to rearrange something.  That's

 8  fine.  Bring them in.

 9      (Proceedings were heard in the presence of the jury:)

10          **THE COURT:**  Let the record reflect all jurors are

11  present; parties are present.

12      You may realize that this is not Antonia Anderson because

13  we are trying to rearrange witnesses to accommodate travel

14  schedules.  So from time to time, even if the witness is in the

15  middle of an examination, we'll interrupt that witness, put on

16  a different witness.

17      You're able to multitask; right?  Okay.  So there is that

18  slight rearrangement.

19      I also wanted to tell you that we are definitely on for

20  Friday -- afraid to say it, Friday the 13th.  We've worked out

21  and we'll work out any of the conflicts.  The 20th may present

22  other issues, so I'll have to give some further thought to it,

23  but please plan on being here on Friday the 13th -- is it the

24  16th?

25          **THE CLERK:**  No.  The 13th is good and the 6th as well.

 1              **THE COURT:**  Yes.  The 6th -- we had no problems on the

 2   6th, I mean, other than everybody being inconvenienced.  We had

 3   no problems on the 6th.  So the 6th and the 13th.  We'll

 4   discuss the 20th in due course.  I think that's -- I think

 5   we're okay.

 6         Go ahead, Mr. Frentzen.  Call a new witness.

 7              **MR. FRENTZEN:**  Thank you, Your Honor.  The Government

 8   calls Daud Khan.

 9              **THE CLERK:**  Please stand to be sworn.

10                        **HAFEEZ BUX DAUD KHAN**,

11   called as a witness for the Government, having been duly sworn,

12   testified as follows:

13              **THE CLERK:**  Please be seated.  Please state your full

14   name for the record and spell your last name.

15              **THE WITNESS:**  Full name is had fees bucks Daud can and

16   can is spelled KHAN.

17   **BY MR. FRENTZEN:**

18   **Q.**   For the court reporter, can you spell your --

19   **A.**   HAFEEZ.  Bux is B-U-X.  Daud, D-A-U-D.

20   **Q.**   Mr. Khan, where do you live?

21   **A.**   I live in the UK in London.

22   **Q.**   And what do you currently do for a living?

23   **A.**   I currently work for a technology company called WANdisco,

24   which is based in -- headquartered in San Ramon on the East

25   Bay.  I joined February the 19th of this year.

PROCEEDINGS

1  **Q.**   And do you -- you work for that company, but you

2  nonetheless you live in the UK?

3  **A.**   Yes.  They have another headquarter in the UK as well.

4  **Q.**   And I think you said you've been doing that for a short

5  time?

6  **A.**   Yes.  That's right.

7  **Q.**   Can you tell us a little bit about your education, please,

8  sir.

9  **A.**   Yes.  So I graduated from Cambridge University in computer

10 science and management.  Following that, I qualified as a

11 chartered accountant with Price Waterhouse Coopers in the UK,

12 and following that qualification, I joined the financial

13 services industry working first for Merrill Lynch back in 1999.

14 Worked for a number of organizations, financial institutions

15 since then, including JPMorgan, JPMorgan Cazenove, Berenberg,

16 and most recently Canaccord Genuity.

17 **Q.**   And during a chunk of that time, did you function as an

18 analyst?

19 **A.**   Yes.  So from 1999, I was a technology analyst up until

20 the time that I left Canaccord Genuity in February of this

21 year.

22 **Q.**   So what do you do -- what did you do as an analyst?

23 **A.**   As an analyst, my role was to provide stock

24 recommendations for institutional investors, and that

25 recommendation was based on conversations with the management

1   of companies, technology companies, use of financial data which

2   was publicly available, and any other type of data that I may

3   have through conversations of industry-related participants.

4   **Q.**   And so in terms of the -- the data that you get to analyze

5   as an analyst, is that largely what's publicly available?

6   **A.**   Yes.  It's all publicly-available information.

7   **Q.**   All right.  Publicly-available information or information

8   if you can get people to talk to you?

9   **A.**   Information that is not insider related, so anything the

10  management gleans that they want to discuss with the analyst

11  community, the investor community, and other participants

12  outside of the company that work in the same industry that may

13  be customers of technology company.

14  **Q.**   And then when you take that information, what's your goal

15  in taking that information?  What are you trying to produce for

16  your customers?

17  **A.**   So ultimately it's a provision of advice, and that advice

18  comes in the form of research notes, conversations with

19  investors around how they view that technology company, both

20  from a strategic perspective and also from an evaluation

21  perspective; i.e., does the strategy qualify the valuation that

22  is currently in the stock market, in which case are we a buyer

23  of the stock, do we believe that the -- the share price is up

24  with events and therefore we're in neutral, or do we believe

25  that the share price reflects an over-inflated valuation, in

1  which case it would be a sell or underperform or underweight

2  recommendation.

3  **Q.**   In terms of your career -- and let's talk from the time

4  you started up through about 2011 -- did you have a particular

5  sort of specialty or focus?

6  **A.**   My focus was on software companies based in the UK and

7  based within Europe.  That was my focus area of research

8  reports.

9  **Q.**   Approximately how many different companies would you cover

10  at any given time?

11  **A.**   It could range -- through my career, it's ranged up to

12  sort of through 15 companies, but it can be as low as 8, 6 to 8

13  companies.

14  **Q.**   I want to direct your attention, if I could, to a company

15  called Autonomy.  Are you familiar with Autonomy?

16  **A.**   Yes.

17  **Q.**   Was Autonomy one of the companies that for a period of

18  time you covered?

19  **A.**   Yes.  I knew Autonomy from the time that they IPO'd in the

20  UK market back in 2001.  I was an analyst off and on on the

21  stock until around 2006 where I took up full-time coverage of

22  the stock from 2006 -- end of 2006 until the beginning of 2011.

23  **Q.**   And during that period, can you just tell us what entities

24  were you working for over that period of time?

25  **A.**   So in 2006, I was working for Cazenove, which had a joint

1    venture with JPMorgan.  That then became JPMorgan Cazenove in

2    2010.

3    **Q.**   Can you spell that for us?

4    **A.**   So Cazenove is C-A-Z-E-N-O-V-E.

5    **Q.**   Thank you.

6         And in terms of covering Autonomy and other companies,

7    what's -- what's your compensation?  In other words, how does

8    that work?

9    **A.**   Compensation is normally a base salary.  And then on

10   performance, which is ranked in various metrics such as I

11   sit -- I sat on the research side.  There would be a sales

12   desk, so the sales desk would have some input into what a

13   year-end bonus might be.

14        The management at JPMorgan Cazenove would have input on

15   that annual bonus and that would come down to things like

16   recommendations, it would come down to what clients, our

17   institutional investors, were saying about me as an analyst in

18   terms of they would have quarterly voting systems.

19   **Q.**   Okay.  All right.  When you first started covering

20   Autonomy, did you get to know some of the managers at Autonomy?

21   **A.**   Yes.  Even from sort of 2001, 2002, I knew Michael Lynch,

22   the CEO, and Sushovan Hussain, the CFO.

23   **Q.**   And at some point in time in 2005, did you have a meeting

24   with Mr. Lynch or Dr. Lynch to discuss your job prospects?

25   **A.**   Yes.  So at the time, I was -- I was working for a company

1   called Man Group, m-A-N, and Autonomy had acquired a company

2   called Verity, and I had got in touch with Dr. Lynch explaining

3   that I was looking at other possibilities of work outside of

4   the technology analyst industry, so looking at private equity,

5   etc.

6        So he invited me for lunch.  We had a lunch together where

7   he discussed his connections with the private equity industry

8   and that he would see what opportunities were out there.

9   **Q.**   Friendly meeting?

10  **A.**   Yes.  I mean, we'd always be on very good terms since sort

11  of 2002.

12  **Q.**   In around 2000 -- the 2007 to 2008 time period, did you

13  start to take a different view of Autonomy as an analyst?

14  **A.**   Yes.

15  **Q.**   Can you describe briefly for us sort of what was the

16  underpinning of that?

17  **A.**   So the starting point was as an analyst, you have to take

18  into account both what happens in the company and what is

19  happening in the economy.  So post, kind of, financial crisis

20  time, my view was that this would impact the technology

21  industry from the ability for technology companies to be able

22  to sell into -- into their customers.

23       And hence I took a macroeconomic view that while Autonomy

24  had, until that point, delivered results either meeting or

25  beating expectations of the analyst community, I felt that it

 1  was going to become harder for them to continue to grow at the

 2  rate that they had grown at historically, and hence I moved the

 3  recommendation, which was a positive recommendation, into a

 4  neutral recommendation.

 5  **Q.**   What does a neutral recommendation mean?

 6  **A.**   A neutral recommendation ultimately means that the stock

 7  price is up with events.  We don't expect the stock price to

 8  appreciate relative to the market anymore.  So, in fact, to an

 9  investor, that would mean that if they had other opportunities

10  for stocks where they felt the stock would out-perform the

11  market, that they should switch from one into the other.

12  **Q.**   In or around 2008, did you start to take a look into

13  Autonomy's acquisitions of other companies?

14  **A.**   Yes.

15  **Q.**   Can you describe that, please.

16  **A.**   So as a explained, I initially took a neutral view on the

17  stock recommendation, but given that the stock price continued

18  to rise, I moved that recommendation to a negative

19  recommendation which is -- at the time would have been an

20  under-performer, an underweight recommendation meaning that I

21  was advising investors that they should sell the stock.

22      The reason behind this was again starting point was

23  that -- the macroeconomic environment, that I felt that that

24  was deepening and that that would have an effect on the share

25  price.

PROCEEDINGS

1          But secondly, I started to investigate the reported

2     organic growths at Autonomy and started to suspect that the

3     organic growth rates that the company was reporting was

4     actually overstating the underlying growth within the business.

5              MS. LITTLE:  I'm going to object and move to strike.

6              THE COURT:  Okay.  Wait a minute.

7              MS. LITTLE:  This man's opinion about organic growth

8     in 2008 is not part of the charges in this case, and his just

9     general view about Autonomy back in 2008 is not relevant.  And

10    I move object and move to strike.

11             MR. FRENTZEN:  It is, Your Honor, if I can get into

12    it.  This is sort of the first time that the rating of Autonomy

13    moved to underweight or a recommendation against their stock

14    and there were reactions by the company that informed the

15    continuing sort of back and forth between this witness and the

16    defendant and his colleagues at Autonomy.

17             THE COURT:  I will let it, in subject to a motion to

18    strike.

19             MR. FRENTZEN:  Thank you, Your Honor.

20    Q.   In terms of your moving to an underweight -- in other

21    words, a negative note about Autonomy in 2008, did you do

22    anything to reach out to the managers at Autonomy before

23    publishing that note?

24    A.   Yes.  So the first thing I'd like to clarify is that when

25    I first moved to an underweight recommendation, there was no

1    objection from the company, which was based on a purely

2    macroeconomic standpoint.

3         When I then provided a draft piece of research, which was

4    part of Cazenove policy at the time for longer pieces of note,

5    that -- that note discussed the organic growth and the stated

6    organic growth of the company.

7         Having provided that draft piece of research, I received

8    communication from Dr. Lynch on the same evening that that

9    draft note was sent and many objections to publishing of that

10   note was made at that time.

11        I also became aware on the following Monday that Andrew

12   Kanter, the COO at Autonomy, had contacted my head of research

13   at Cazenove to again object to the publication of this research

14   until a face-to-face meeting was held by Dr. Lynch,

15   Mr. Hussain, and the Cazenove head of research.

16   **Q.**   Did you, in fact, have a face-to-face meeting with those

17   individuals?

18   **A.**   Yes, I did.  In that same following week.

19   **Q.**   Where did that meeting take place?

20   **A.**   It took place in the offices of Cazenove in London.

21   **Q.**   Who attended that meeting?

22   **A.**   That was myself, David Knox, who is the head of research

23   at Cazenove; Sushovan Hussain, the CFO; and Dr. Lynch, the CEO.

24   **Q.**   In the course of that meeting, could you tell us about --

25   what was the conversation?

PROCEEDINGS

1   **A.**   The conversation generally talked about how my

2   calculations were inaccurate, that they -- that they had

3   published organic growth rates, that they claimed these growth

4   rates had been audited, and that my challenging those growth

5   rates was in fact me challenging their professional advisers.

6   **Q.**   Was anything more said during the course of that meeting

7   about you going forward with your note?

8   **A.**   So the end conclusion of that meeting was that there would

9   be a dialogue between the company -- that would be Mr. Hussain,

10  Dr. Lynch and myself -- to try and address some of the

11  company's concerns around my assumptions and my research note

12  before publication.

13  **Q.**   During the course of the meeting, did Mr. Lynch make any

14  statements about what would happen if you went forward with the

15  note?

16  **A.**   Yes.   There was a moment in the meeting where Mr. Lynch

17  explained to both myself and Mr. Knox that if we were to

18  persist and publish our note without consultation with the

19  company, they would see that as us having -- having a go at

20  their professional advisers, at which point David Knox sort of

21  interrupted and asked whether that was a threat to either

22  myself or the company, to which Dr. Lynch said it's not a

23  threat, but we're a public company and we need to defend

24  ourselves.

25  **Q.**   In connection with this note or publishing of this note,

PROCEEDINGS

1    did you then have a conversation directly with Mr. Hussain?

2    **A.**   So once -- so the -- I don't recollect post that meeting

3    whether there was a direct conversation around the publication

4    of that note.  The last conversation I had with Mr. Hussain was

5    post the Quarter 1/2008 results, which involved the speculation

6    around the reported revenue from a recent acquisition called

7    Meridio.

8    **Q.**   What was the issue, as you saw it, with Meridio?

9    **A.**   So from my investigation, I had -- I had pulled out the

10   accounts for Meridio.  It was an Irish private company and --

11           **MS. LITTLE:**  I'm going to make the same objection

12   here.  Meridio is not part of this case and his opinions about

13   Meridio are not relevant.

14           **MR. FRENTZEN:**  It's the background to his views on

15   Autonomy, Your Honor.

16           **THE COURT:**  Overruled, subject to a motion to strike.

17           **MR. FRENTZEN:**  Thank you, Your Honor.

18           **THE WITNESS:**  So having pulled out the accounts, what

19   I realized was that Autonomy was presenting that Meridio would

20   contribute revenue of a fairly small amount of a few million

21   dollars to their -- their consolidated accounts.

22           What I pulled out from the accounts of Meridio was that

23   Meridio was actually -- already had much higher revenue and it

24   had gross margins of over -- over 90 percent.

25           Now, what that normally means is that Merido is a

1  technology company, a software company.  Mr. Hussain and

2  Dr. Lynch presented the idea that the reason why the revenue

3  had dropped was that they were discontinuing parts of the

4  business, which was low margin services business.

5      What I knew from Merido from articles which had been

6  published in trade magazines was that Merido was actually a

7  technology product spinout from a services business and had

8  very little services as part of the mix, and therefore there

9  was a disconnect between what Dr. Lynch and Mr. Hussain were

10  saying about Merido versus what I had uncovered around Merido.

11          MS. LITTLE:  Same objection and move to strike.

12          THE COURT:  Well, it's overruled, subject to a motion

13  to strike.

14      I assume you're going -- this is part of the history of

15  the testimony that this person is giving with respect to the --

16  with respect to the -- how the stock is viewed and his

17  opinions.

18          MR. FRENTZEN:  It is, Your Honor.  If I could just

19  move forward into it --

20          THE COURT:  Okay.  So it's come in subject to a motion

21  to strike.

22          MR. FRENTZEN:  Thank you, Your Honor.

23  Q.  Could you describe for us, what were your concerns about

24  Autonomy related to organic growth and cash conversion?  And if

25  you could explain that in sort of a high level.

1    **A.**    Yeah.  Sure.

2         So my thesis around Autonomy became deeper in the sense

3    that I began to investigate issues that I felt were at the

4    company, and this was driven mainly by the reaction to the

5    company to my publishing of research.

6         I had already spoken about the issues around organic

7    growth and I then investigated the issues around cash

8    conversion.

9         So very simply put at a very high level, I questioned the

10   organic growth at the company and whether they were overstating

11   profits in the company because profits were not matching cash.

12   And this would have a huge implication to valuation and

13   therefore the stock price that the market should be perceiving.

14   **Q.**    Can you give us a very brief -- what do you mean by

15   organic growth, to start with?

16   **A.**    So companies that make no acquisitions from one period,

17   say, from a Q1 in one year to a Q1, Quarter 1, in another year,

18   if there is no acquisitions, that's pure organic growth, so

19   there is no implications of other -- other acquisitions or

20   anything else that can disrupt the calculated amount of growth.

21   So a company grows from a hundred million one year to 120

22   million another year, that's 20 percent growth.

23        However, when a company grows from 100 million to 120

24   million and there was an acquisition in that intervening period

25   and let's say that acquisition contributed $10 million of

1  revenue, then organic growth would be the 120 less the 10 to

2  110, which would be a 10 percent organic growth.

3  **Q.**   So you were concerned about whether there was organic

4  growth or if it was coming from these acquisitions?

5  **A.**   Yes.  And ultimately, it was driven by what was the

6  correct valuation for Autonomy.  If, in fact, organic growth

7  been overstated, that would impact valuation.  If, in fact,

8  profitability had been overstated, that would have an impact on

9  valuation as well.

10  **Q.**   And cash conversion, can you describe for us what you

11  observed and what your concerns were about cash conversion?

12  **A.**   So most software companies have a -- at that time

13  particularly, have a model where they sold licenses which

14  essentially was an upfront fee for the use of the product, and

15  there would be a maintenance and support contract that the

16  company would have.

17      That maintenance and support contract usually is paid one

18  year in advance but is recognized as revenue over the period of

19  the contract, which was usually one year.

20      When -- so for most technology companies or software

21  companies, the cash conversion, which is how much cash do you

22  generate from the profit that you report, is usually close to a

23  hundred percent, and the reason for that is that before you've

24  even recognized revenue from maintenance and support contracts,

25  you've already collected the cash.

1   So there's cash in your bank balance, but you haven't yet

2   reported the revenue.  Now, there's obviously areas where

3   you've provided software to companies that you need to get paid

4   for, but if you balance these things out and you look across

5   the industry, most software companies report cash conversion of

6   over 90 percent.

7   **Q.**   And the issues that you saw with -- are issues with cash

8   conversion -- can they sometimes relate to accelerated revenue

9   recognition?

10  **A.**   They can sometimes, and it was one of the things that I

11  had speculated was that -- that --

12      **MS. LITTLE:**  Objection.  Calls for speculation.

13      **THE COURT:**  He used the word "speculation," so

14  sustained.

15      **MR. FRENTZEN:**  Maybe I can ask a clarifying question.

16      **THE COURT:**  Reframe the question.

17  **BY MR. FRENTZEN:**

18  **Q.**   When you're saying "speculated," is this something that

19  you concluded in -- and actually wrote in some of your notes?

20      **MS. LITTLE:**  Objection.  Leading.

21      **THE COURT:**  Overruled.

22      **THE WITNESS:**  Yes.  So I -- so I wrote that this was

23  my -- my thesis, that revenue was being aggressively recognized

24  or accelerated in order to -- which would lead to cash

25  conversion being much lower than the peer group.

1    BY MR. FRENTZEN:

2    Q.   When you -- when you were first moving to underweight and

3    in this 2008 time period, as a result, did you come to learn

4    that Mr. Kanter had made any contact with your boss, David

5    Knox?

6    A.   Yes.  So --

7    Q.   How was that brought to your attention?

8    A.   So prior to the publication of this note, which involved

9    organic growth, I was called into the office of David Knox, and

10   I was -- who is the head of research at Cazenove, and he

11   informed me that he had been contacted by Mr. Kanter at

12   Autonomy and had been told that Autonomy was in possession of

13   some audiotapes which they felt breached FSA, which is the UK

14   regulator -- FSA regulations and that I was in breach of them.

15        In response to that, David Knox and the compliance

16   department at Cazenove had gone through all my audio recordings

17   for the past month, concluded that there wasn't an issue, and

18   David Knox informed me that they would publish the note as they

19   felt that this was a baseless claim.

20   Q.   After the publication of your note, were you -- let me

21   start with this.

22        What are earnings calls, Mr. Khan?

23   A.   Earnings calls are events where public companies report

24   their financials on a quarterly or half yearly basis, and this

25   is a point where analysts and investors can attend a -- an

1    earnings call, either through an audio conference or actually

2    physically present within a meeting room where management of a

3    company would present their results for the quarter.

4    **Q.**   Following this -- the call from Mr. Kanter, were you also

5    excluded from earnings calls for Autonomy for a period of a

6    little over a year?

7    **A.**   Yes.  So usually what happens is that you get invited to

8    an earnings call or an earnings event, so these were physical

9    meetings at the time.

10       Q1 or Quarter 1/2008 was the last time that I was invited

11   to a meeting until Q1/2010.  I was allowed to listen to the

12   conference calls but was unable to ask questions on those

13   conference calls.

14   **Q.**   Did you eventually reach out to Autonomy to ask to be

15   brought back into those earnings calls?

16   **A.**   I had heard from an investor that had a meeting with the

17   investor relations officer at the time, which was a Mr. Geall,

18   and he had asked why -- why I had been excluded from these

19   events, and Mr. Geall responded that they weren't aware of any

20   reason why I should be excluded.

21       At that point, I contacted Mr. Geall and said, "Am I

22   invited to the next earnings call," and he said, "Yes."

23   **Q.**   So in early 2010, Mr. Geall invited you back into the

24   earnings calls?

25   **A.**   Yes.

**PROCEEDINGS**

1  **Q.**  All right.  Just in terms of your own -- I mean, was the

2  complaint made by Autonomy to your supervisors -- was that

3  fully vetted?

4  **A.**  When you say "vetted" --

5  **Q.**  By them.

6  **A.**  Yes.

7  **Q.**  To your knowledge or understanding, was there ever any

8  action taken by the FSA or any other entity with respect to any

9  of the things you had done?

10  **A.**  No.

11  **Q.**  I'd like to now show you a series of documents.  This is

12  going to be Exhibit 174, 219, 901, 946, 1058, 1166, 1649, and

13  2982, and I don't plan on going through all of these.

14      Could you take a look at these, please, Mr. Khan and just

15  see if you recognize what each of those documents is, please.

16  **A.**  (Witness reviews documents.)

17          **THE COURT:**  Is it your intention to offer those

18  exhibits?

19          **MR. FRENTZEN:**  It is, Your Honor.

20          **MS. LITTLE:**  May I look at them, please?

21          **THE COURT:**  Oh, of course.  Sure.  Do it one at a

22  time.

23          **MS. LITTLE:**  Are these just his analyst notes?

24          **MR. FRENTZEN:**  Yes.

25          **MS. LITTLE:**  No objection.

1          **THE COURT:**  Okay.  These may be admitted.

2       174, 219, 901, 946, 1058, 1166, 1649, 2982, admitted.

3       (Trial Exhibits 174, 219, 901, 946, 1058, 1166, 1649

4        and 2982 received in evidence)

5          **MR. FRENTZEN:**  Thank you, Your Honor.

6       Can we pull up Exhibit 174, please.

7                   (Exhibit published to jury.)

8    **BY MR. FRENTZEN:**

9    **Q.**   All right.  Mr. Khan, can you describe for us what this

10   is?

11   **A.**   This is one of my research reports written while I was at

12   Cazenove on Autonomy.

13   **Q.**   I would like to focus your attention to the date here.

14   When was this note from?

15   **A.**   This is 28th of July, 2009.

16   **Q.**   All right.  And then right below where it says "Autonomy,"

17   it says "stock recommendation."  What does that mean?

18   **A.**   So the stock recommendation is essentially my advice to

19   the investment community as to what -- how the stock will

20   perform in a period of usually sort of 9 to 12 months post the

21   publication of the note.

22       What this is saying is that I believe that at that time,

23   Autonomy would underperform the market, the market being the --

24   the technology sector, and how that -- how that would perform

25   in that period.

1   **Q.**   Incidentally, around this time, are you aware of how many

2   other analysts were covering Autonomy, approximately?

3   **A.**   Around 15.

4   **Q.**   And with respect to, let's say, most of those, did they

5   see things the same way you did?

6   **A.**   No.  Most of them were positive.

7   **Q.**   If we could go, scroll up just a little bit to the second

8   paragraph here.  All right.

9       And, Mr. Khan, the second paragraph here, does that sort

10  of summarize some of the things that you've already talked

11  about in terms of cash conversion?

12  **A.**   Yes.  It talks about cash conversion and revenue

13  recognition.

14  **Q.**   All right.  And that's -- up here in the first sentence

15  here, "cash conversion within Autonomy is poor."  And down here

16  in the middle, "continuing lack of organic deferred revenue

17  growth in our view may be a function of revenue recognition."

18      What did you mean by that?

19  **A.**   So, again, through my research, most companies, when

20  they're selling, as I've described, licensed-based products and

21  there is an associated maintenance contract with it, if the

22  license stream is growing at a particular rate, you would

23  expect that the maintenance stream was also growing at a

24  similar -- a similar rate.

25      The way to monitor that was through a line in the balance

1   sheet called "deferred revenue," and deferred revenue was this

2   bucket of cash that the company had collected for the

3   maintenance contracts but yet to recognize as revenue.

4       Now, in my research what I showed was that the deferred

5   revenue was not growing organically in the same -- at the same

6   rate that the company was reporting overall organic growth.

7   **Q.**  I'd like to move now --

8           **MS. LITTLE:**  I renew my motion to strike.  Deferred

9   revenue is also not an issue in this case.  This is not

10  relevant, and for this gentleman to give a general referendum

11  on his views --

12          **THE COURT:**  I think revenue is very much an issue in

13  this case.

14          **MR. FRENTZEN:**  I believe that's right.

15          **THE COURT:**  Overruled.

16          **MR. FRENTZEN:**  Thank you, Your Honor.

17      Could we go to Exhibit 219, please, briefly.

18                  (Exhibit published to jury.)

19  **BY MR. FRENTZEN:**

20  **Q.**  Exhibit 219, this is a note.  What date, Mr. Khan?

21  **A.**  29th of September, 2009.

22  **Q.**  Was your recommendation the same here?

23  **A.**  Yes.

24  **Q.**  I'd just like to go to the second paragraph of this.  If

25  we could just scroll up a little bit.

**PROCEEDINGS**

1        Does this mention IDOL SPE, Mr. Khan?

2   **A.**   Yes.

3   **Q.**   And did you -- do you have a recollection of IDOL SPE

4   being kind of a big issue for Autonomy around this time period?

5   **A.**   Yes.  It was a major product launch for Autonomy.  It was

6   a product that would combine what Autonomy's historic strength

7   had been, which was being able to process unstructured data

8   like social media, emails, Word documents, and combining that

9   with analysis of structured data which sits in databases such

10  as airline ticketing information or human resources information

11  on employees, etc.

12  **Q.**   If we could, could we go to page 7, please, and scroll

13  down.  All right.

14        Is there further discussion here about IDOL SPE, Mr. Khan?

15  **A.**   Yes.

16  **Q.**   And to your view, was IDOL SPE something new or inventive

17  that you thought would change the course for Autonomy?

18  **A.**   It was not something that I believed would be a major

19  contributor to Autonomy's revenue, but Autonomy, Dr. Lynch,

20  Mr. Hussain, believed that it would be a material contributor

21  going forward.

22        There was a lot of discussion around how much the launch

23  event in terms of marketing would cost and how much was spent

24  on the marketing for the initial launch.

25  **Q.**   Did you continue to have concerns -- I'm at the bottom

**PROCEEDINGS**

1    here -- about potential aggressive revenue recognition?

2    **A.**   Yes.   So underlying all my research over that time period

3    was the same underlying thesis that the poor cash conversion,

4    the -- led me to believe that organic growth was overstated,

5    that profitability was overstated, and thus the valuation was

6    too high.

7    **Q.**   I'd like to go now to 2010, Mr. Khan, and in 2010, were

8    you invited back to the earnings calls after your year and a

9    half or so of being excluded from them?

10   **A.**   Yes.   So Q1, Quarter 1/2010, was the first call that I was

11   invited back to and the first opportunity that I had to ask

12   questions directly of Dr. Lynch and Mr. Hussain.

13           **MR. FRENTZEN:**   Your Honor, at this time, if I could

14   approach, I'd like to offer a series of exhibits that are the

15   transcripts of earnings calls.

16           **MS. LITTLE:**   What are the numbers?

17           **MR. FRENTZEN:**   58, 167, 291, 776, 1006, 1189, 1539 --

18           **THE COURT:**   1539.

19           **MR. FRENTZEN:**   Sorry, Your Honor.   1539, 1794, and

20   2032.

21           **THE COURT:**   Any objection?

22           **MS. LITTLE:**   Your Honor, as we've discussed, the

23   transcripts are to be used simply as aids to the jury.  They're

24   not accurate.   They haven't been certified as accurate.

25       I know that Mr. Frentzen plans to play some tapes of the

**PROCEEDINGS**

 1  transcripts generally, but as aids, they're not admissible.

 2          **MR. FRENTZEN:**  We can do this the slow way --

 3          **THE COURT:**  I can play all the tapes.  Maybe that

 4  would be five, seven hours.  I don't know what it would be.

 5          **MR. FRENTZEN:**  We plan --

 6          **THE COURT:**  Well --

 7          **MR. FRENTZEN:**  If I could just inform the Court, I

 8  plan on directing his attention to a few spots on a couple of

 9  these.  I plan on playing a few excerpts from one particular

10  call.

11      Maybe if I can just display them without playing the audio

12  for one of them, and we can argue about their admission later.

13          **THE COURT:**  Well, I don't think the rules are going to

14  change about admission.  I think defense is correct that the

15  tapes come in -- well, let's start at the beginning.

16      Do you have any objection to the tapes coming in?

17          **MS. LITTLE:**  It depends on which tapes --

18          **THE COURT:**  He has identified 1, 2, 3, 4, 5, 6, 7, 8,

19  9 -- 9 tapes -- he has identified 9 transcripts, but they are

20  transcripts of tapes.

21      My first question is do you have any objection to the

22  tapes coming in, because that's the best evidence?

23          **MS. LITTLE:**  He only told me about two of them.  I

24  have listened to those.  I haven't listened to the others.

25          **THE COURT:**  Well, they've been provided to you in

PROCEEDINGS

```
 1   advance of trial.  Let's leave it at that.

 2       So is there any -- you know, let me ask the question

 3   again.  Any objection to the tapes coming in?

 4           MS. LITTLE:  I guess what I object to is the tapes

 5   coming in untethered to any testimony.

 6           THE COURT:  Well, okay.  We can -- I don't know that

 7   that's necessarily -- okay.  As to that objection, overruled.

 8       So do you have any other objection as to the tapes coming

 9   in?

10           MS. LITTLE:  I guess not.

11           THE COURT:  Okay.  All right.  So the tapes are in

12   evidence.

13       The question is about the transcripts.  What I'm going to

14   do is allow the Government and allow the defense to play any

15   portion of the tapes that they want and to show simultaneously

16   the transcript in aid of the jury's determination, with the

17   understanding to the jury that it is the tape that is the

18   evidence, not the transcript.

19       So it is what you hear that's important, not necessarily

20   what is written down because there is no stipulation that the

21   transcripts are accurate reproductions of the tapes.  So --

22           MR. FRENTZEN:  Understood, Your Honor.

23       Go ahead.  I'm sorry.

24           THE COURT:  Well, no.  So I just want to sort of round

25   it out by saying I'm not going to allow anything that hasn't
```

**PROCEEDINGS**

1   been played to the jury or cited in the transcript -- and we'll

2   have a session outside the presence of the jury -- to come in.

3   So, in other words, I don't want anybody to be surprised in

4   argument, is really what I'm concerned about.

5           **MS. LITTLE:**  That's what I'm concerned about, too.

6           **THE COURT:**  I understand that.  That's a genuine

7   concern.  So I'm going to -- I'll try to do a lot of this

8   outside the presence of the jury because it just takes time.

9           But you may go ahead and do any of the following:  One,

10  you may play any of the tape; two, you may play -- you may show

11  them the transcript of that, and I will then have a session

12  outside the presence of the jury to determine whether or not

13  there is any basis for a difference between the transcript and

14  the tape.

15          **MR. FRENTZEN:**  I want to show them one -- parts of one

16  transcript, Your Honor, and then play and show parts of one

17  other transcript, and I'll be done with this, and we can talk

18  about it later.

19          **THE COURT:**  Okay.

20          **MS. LITTLE:**  Your Honor, just one other minor point.

21  In going through the last set of exhibits, the last one

22  Mr. Frentzen mentioned was 2982.  That was not on the

23  disclosure list.  I don't have it.

24          **THE COURT:**  Okay.  We'll give it to you -- we'll make

25  sure you do have it and then you've reserved an objection as to

PROCEEDINGS

1    that and we'll deal with that outside the presence of the jury.

2             MS. LITTLE:  Thank you.

3             THE COURT:  Okay.  Well -- okay.  Are we all caught

4    up, in a manner of speaking?  Okay.

5             MR. FRENTZEN:  All right.  If I can -- if we could

6    bring up 5 -- I'm sorry.  592 to start with.

7                     (Exhibit published to jury.)

8    BY MR. FRENTZEN:

9    Q.   Mr. Khan, do you see what this is, sir?

10   A.   Yes.  It's a transcript from the Q4/2009 Autonomy results.

11   Q.   Okay.  And what does that mean when it's Q4/2009?

12   A.   So that is the period which refers to the 1st of October

13   to the 31st of December, 2009.  This is a transcript of the

14   company -- company management talking about their results over

15   that period.

16   Q.   And to your recollection, was the phrase "pure software

17   model" or "pure software company" something that you heard

18   frequently coming from folks at Autonomy?

19   A.   Yes.  Very frequently.

20   Q.   What do you mean by that?

21   A.   It was a -- it was a term that was used by Autonomy from

22   the early days of its IPO within the UK market, so back from

23   2001 all the way through to 2011.  It was a -- it was something

24   that they used to differentiate themselves between other

25   software companies.

1  **Q.**  All right.  And "pure software model," what is that a

2  reference to?

3  **A.**  Pure software, as I understood it, meant that the company

4  did very little professional services and that the business was

5  mainly made up of software licenses, maintenance and support,

6  and royalty revenues from their OEM business.

7  **Q.**  Did you have any indication from Autonomy -- well, we'll

8  get into that in a second.  Sorry.

9      All right.  Can we go to page 4 of this document, please.

10     I want to direct your attention to the very top paragraph

11 there, Mr. Khan.  And is that -- actually -- and I apologize.

12 Can we go just to the page before so we can see the speaker.

13 Page -- yeah.  Okay.  Great.

14     All right.  So this is supposed to be -- this is Michael

15 Lynch speaking here?

16 **A.**  Yes.  According to the transcript, yes.

17 **Q.**  Let's go to the next page.  All right.

18     And in the course of this earnings call -- first of all,

19 can you describe for us one of these earnings calls -- what's

20 it look like?  What's going on here?

21 **A.**  So usually when -- and I can't recollect whether this was

22 a -- just an audio conference or whether it was a physical --

23 physical meeting, but generally in a physical meeting, you

24 would have -- you would have a -- let's say, a high table where

25 the Autonomy management, which was usually Dr. Lynch,

**PROCEEDINGS**

 1   Mr. Hussain, and Mr. Kanter, would sit, and they would stand at

 2   a podium or -- and talk about their financial results for that

 3   period, and then they would open it up to Q and A to both the

 4   floor, so the people in the room and also people on the audio

 5   conference call.

 6   **Q.**   All right.  And if we could, just quickly in this first

 7   paragraph here, is there discussion of the introduction of IDOL

 8   SPE by Dr. Lynch?

 9   **A.**   Yes.

10   **Q.**   And could you scroll down to just a little bit more.  All

11   right.

12        And right here, do we see Dr. Lynch talking about "the

13   pure software model working very well and very strong

14   profitability growth"?

15   **A.**   Yes.

16   **Q.**   Could we go to the next page, please.

17        On the next page, is Dr. Lynch discussing that "it's a

18   pure software company and there's very little at our size or

19   scale"?

20   **A.**   Yes.

21   **Q.**   Next page.  And on the next page -- could we just scroll

22   up just a little bit.  All right.  Great.

23        Is there here discussion here about introduction of an

24   appliance?

25   **A.**   Yes.

**PROCEEDINGS**

1  **Q.**   Could you discuss for us what is an appliance?  Is an

2  appliance a term of art in the industry?

3  **A.**   Yes.  So generally speaking, you know, in the technology

4  industry when people talk about software, software can be

5  delivered in a number of ways.  You can either deliver it in a

6  packaged CD as someone like Microsoft would do and you load it

7  up onto your PC, or, you know, there is this talk of appliance,

8  and appliance is essentially an embedding of a software

9  company's software into a hardware device, so a physical box,

10 but it's a physical box that's finely tuned with the software.

11 So there is some integration work that the software company

12 would do to call it an appliance.

13      Examples of this -- and Dr. Lynch used those as examples,

14 I think, in this call -- would be the Google appliance, which

15 is a way for companies to search for things or the Barracuda

16 appliance, which was a firewall appliance or box.

17 **Q.**   And is this a discussion of doing appliances so that

18 consumers can get it really quickly?

19 **A.**   Yes.

20 **Q.**   All right.  And what was the gist of that, that there

21 might be a crisis and so people might want an appliance ready

22 to go?

23 **A.**   Yes.  So there was a regulatory backdrop which Dr. Lynch

24 explained caused companies to want to -- to be able to deploy

25 the software as quickly as possible.  And when sold as an

**PROCEEDINGS**

1  appliance, you know, the box can be plugged into an information

2  repository and the various analytical search work that needed

3  to be done could be done very quickly.

4  **Q.**   So if the feds are banging down your door, you can get up

5  to search quickly?

6  **A.**   Exactly.

7  **Q.**   Can we go to the next page, please, and the very top

8  paragraph.

9       I just want to ask you, does this paragraph indicate "one

10  interesting aspect of SPE is that it was the key winning

11  differentiator in a $12 million deal, so although the deal was

12  many other" -- well, this says "over things" -- "it was one of

13  the key differentiators."

14      Do you see that?

15  **A.**   Yes.

16  **Q.**   Was that a plug for IDOL SPE, basically?

17  **A.**   I think it was an idea that IDOL SPE was opening up

18  potentially new markets or opportunities or business

19  opportunities for Autonomy.

20  **Q.**   Can we go to page 13, please.  All right.

21      And this, again, is Dr. Lynch.

22      And can you scroll up just a little bit.  Great.  Thank

23  you.

24      I just want to point out this paragraph right here.

25  Mr. Khan.  Is this indicating "So in 2009, we saw 66 deals over

1    $1 million, which is significantly up from 2008.  And those

2    $1 million deals in the current climate and also in general,

3    most software companies don't have deals for pure software in

4    those numbers at those levels, so that's very much an Autonomy

5    thing."

6          Do you see that?

7    **A.**   Yes.

8    **Q.**   Okay.  Great.  All right.

9          I want to move now to another earnings call, if I could,

10   and we've got a couple of audio clips.

11         Your Honor, this is going to be -- the audio recording

12   itself is 2688.  And we've got a transcript for the -- to go

13   with the -- with a couple of clips that I was planning on

14   playing.

15         **THE COURT:**  2688 admitted.

16         (Trial Exhibit 2688 received in evidence)

17         **MR. FRENTZEN:**  Your Honor, this is a clip from

18   Q1/2010, Autonomy earnings calls, and the date of that was

19   April 21st, 2010.

20   **Q.**   Mr. Khan, do you recall attending that particular earnings

21   call or --

22   **A.**   Yes.

23   **Q.**   -- participating?

24   **A.**   Yes.

25         **MR. FRENTZEN:**  And if we could, please, could we start

1    off --

2    **Q.**   And have you listened to this audio?

3    **A.**   Yes.

4    **Q.**   Does this appear to be a -- a fair and accurate depiction

5    of the conversation that you heard and were a participant in?

6    **A.**   Yes.

7             **MR. FRENTZEN:**   Could we play clip No. 3, please.

8    Start with 3.

9    **Q.**   First of all, Mr. Khan, who is speaking here in this first

10   clip?

11   **A.**   Well, according to the transcript, it's Mr. Hussain.

12   **Q.**   All right.  Well, we'll play it, and if you think it's

13   somebody different, you can tell us.

14       (Whereupon, the audio was played for the jury.)

15   **BY MR. FRENTZEN:**

16   **Q.**   Do you recognize that as Mr. Hussain?

17   **A.**   Yes.

18   **Q.**   All right.  Was Mr. Hussain there going through and trying

19   to detail list the -- what the earnings were for that -- what

20   the revenue streams were for that quarter?

21   **A.**   Yes.

22   **Q.**   And in that, did you hear him make any reference at all to

23   selling hardware?

24   **A.**   No.

25   **Q.**   During this Q1/2010 conference call, do you recall there

1    being an issue raised about there being $10 million in

2    inventory on Autonomy's balance sheet?

3    **A.**   Yes.

4    **Q.**   And what issues, if any, did that $10 million in inventory

5    raise for you and perhaps for other analysts at that call?

6    **A.**   So it was a exceptional number, $10 million.  We'd never

7    seen in any quarterly results an inventory level that high.

8    Generally speaking, any inventory on the balance sheet was half

9    a million dollars or less, so seeing something of a magnitude

10   of 20 times what we normally saw resulted in a number of

11   people, including myself, asking questions as to what it

12   related to.

13   **Q.**   All right.  And what concerns, if any, would you have

14   about there being inventory on the balance sheets at Autonomy?

15   **A.**   It wasn't really a concern.  It was a case of trying to

16   understand what it related to.

17        If it was hardware that was sitting on the balance sheet

18   at the end of the quarter, there were a number of questions,

19   which was if that -- when we talk about the balance sheet, we

20   talk about a snapshot at a particular period.  So at that

21   particular moment in time, there was $10 million of hardware on

22   the balance sheet.

23        So a number of questions arose from that, which is well,

24   was there any hardware that was sold during the period or was

25   this just a -- a one-off number that appeared at the end of the

1  period.

2      And the second question was if there was a -- what was the

3  hardware related to, and our understanding and my understanding

4  from that call was it related to the Arcpliance product, which

5  meant that it was software embedded into some hardware.  There

6  would be some clever integration work done and that was being

7  provided to customers.

8  Q.  And in general, if it's -- if the 10 million in inventory

9  is hardware for an Arcpliance, what does that mean in terms of

10  the revenues that that sort of inventory could generate?

11  A.  So, again, Autonomy -- and I believe also as mentioned on

12  this same quarterly earnings call, Autonomy -- I think it was

13  Dr. Lynch focused on the idea that it wasn't really about the

14  hardware.  That the value of the product they were selling, the

15  Arcpliance, was all in the software.

16      And what that meant was that if there was $10 million of

17  hardware being sold in Arcpliance, my assumption was that the

18  overall sales value of that Arcpliance would be between 50 and

19  maybe even a hundred million dollars of Arcpliance product.

20  This would mean all the value was in the software and very

21  little -- very little in -- or very little value in the

22  hardware being sold.

23  Q.  Was that, in fact, something that the folks from Autonomy

24  were telling you during this earnings call?

25  A.  As far as I remember, they -- they weren't specific about

PROCEEDINGS

1    how much the sales would be, but they were very specific that

2    there would be no particular impact on gross margin.  And by

3    that I mean that, you know, Autonomy reported gross margins of

4    90 percent-ish and that meant that there would be a significant

5    amount of software associated with that hardware, with that

6    Arcpliance product.

7           **MR. FRENTZEN:**  Can we play the first clip.

8    **Q.**   Does this appear to be a question from you?

9    **A.**   Yes, it does.

10   (Whereupon, the audio was played for the jury.)

11   **BY MR. FRENTZEN:**

12   **Q.**   So, Mr. Khan, what did you understand Dr. Lynch was

13   telling you there about this hardware and hardware sales?

14   **A.**   That the ten million dollars of inventory was all related

15   to Arcpliance.

16   Secondly, he was pointing out that the value of the

17   Arcpliance product was all in the software and not in the

18   hardware.

19   And that most -- and thirdly, that the majority of that

20   hardware or that appliance that was related to that hardware

21   would be sold in Q2.

22          **MR. FRENTZEN:**  Can we go to the last clip, please.

23   **Q.**   Just before we get started, do you know who David Toms is?

24   **A.**   Yes.

25   **Q.**   Who is David Toms?

1    **A.**   David Toms is another analyst that works for Newman

2    Securities.

3              **MR. FRENTZEN:**  Go ahead.

4         (Whereupon, the audio was played for the jury.)

5    **BY MR. FRENTZEN:**

6    **Q.**   Mr. Khan, there again -- well, first of all, let me ask,

7    what is Morse?

8    **A.**   Morse was a UK-listed technology company that was a

9    reseller of hardware and other things.

10   **Q.**   What does that mean, a reseller of hardware?

11   **A.**    It would provide a service to its end customers where it

12   would buy hardware from a third party, maybe it's a Dell, maybe

13   it's, you know, Sun Microsystems at the time, and then they

14   would sell that on to its customers.

15   **Q.**   And in what way or what was Dr. Lynch there describing

16   that -- distinguishing Autonomy from Morse and saying that they

17   did not do?

18   **A.**    What I interpreted from that at the time was that Autonomy

19   did not resell any hardware.  It was not interested in

20   hardware.  This was a -- as you described it, a pure software

21   company.

22   **Q.**    All right.  And in terms of the hardware that was being

23   dealt with, did he reiterate that was the Arcpliance, which in

24   a rush when people really need it fast, they can get it ready

25   to go?

**PROCEEDINGS**

1   **A.**   Exactly.

2          **MR. FRENTZEN:**   I would like to show Exhibit 901, if we

3   could.   901, which I believe we've admitted.

4                     (Exhibit published to jury.)

5   **BY MR. FRENTZEN:**

6   **Q.**   Is this following that call, Mr. Khan?

7   **A.**   Yes.

8   **Q.**   And here it says "JPMorgan Cazenove."   Can you describe,

9   was there some soft of a shift or change in terms of --

10  **A.**   So when I joined Cazenove in 2006, they had a joint

11  venture with JPMorgan which gave JPMorgan the option to acquire

12  Cazenove in its entirety, which then occurred in 2010.   So the

13  firm was re-branded as JPMorgan Cazenove for the purposes of

14  equity research.

15  **Q.**   Here it says "underweight.   Is that basically the same as

16  underperform?

17  **A.**   It's exactly the same as underperform.

18  **Q.**   All right.   And in terms of this note, did you continue to

19  express concerns about Autonomy's sort of organic growth and

20  profitability?

21  **A.**   Yes.   So the underlying thesis again had been unchanged

22  from -- from the -- from 2008 onwards.

23  **Q.**   Could we just go to page 3 briefly.

24          And on page 3, did you also make reference to a purchase

25  of 10 million of hardware related to Arcpliance inventory and

1   so on?

2   **A.**   Yes.

3   **Q.**   In 2010, effectively, did you continue to have concerns

4   about Autonomy and continue to publish underweight

5   recommendations?

6   **A.**   Yes.

7   **Q.**   Did something happen in terms of Autonomy creating issues

8   with your management again?

9   **A.**   Yes.  So in -- I can't remember the exact time frame, but

10  post the publication of this note, I was contacted by the

11  JPMorgan compliance team and informed that --

12          **MS. LITTLE:**  Objection.  Hearsay.

13          **MR. FRENTZEN:**  It's not for the truth, Your Honor.

14          **THE COURT:**  Okay.

15      Ladies and gentlemen, what the witness is about to state

16  is that he was given certain information.  The information that

17  he was given -- or certain statements were made.

18      The information or the statements made are not offered for

19  the truth of the matter; that is, they're not in evidence for

20  you to consider is that statement correct or is that statement

21  not correct.  Rather, it's being introduced to show what this

22  witness' state of mind was who had heard these various -- these

23  various statements, and then it's for you to accept or reject

24  whatever the witness says with respect to his state of mind and

25  his conduct.

PROCEEDINGS

1           **MS. LITTLE:**  And I would submit that his state of mind

2    about this incident is not relevant.

3           **THE COURT:**  Okay.  Overruled.

4       Go ahead.

5    **BY MR. FRENTZEN:**

6    **Q.**   Go ahead, Mr. Khan.

7    **A.**   So I was contacted by the compliance team at JPMorgan with

8    reference to the fact that someone at Autonomy, which I believe

9    was Andrew Kanter, had contacted JPMorgan compliance and had

10   informed them that they believed that I was using social media

11   to gain access to ex-employees of Autonomy to gain insider

12   information about the company.

13   **Q.**   Did that result in actions being taken by your employer?

14   **A.**   Yes.  There was -- again it stimulated an investigation of

15   my social media accounts and my communications, etc., and again

16   I was cleared.

17   **Q.**   In the interim before you were cleared, did you

18   effectively have to take on a ghostwriter?

19   **A.**   Yes.  So in order to protect JPMorgan, what they decided

20   was that any research note that I published on Autonomy should

21   be reviewed by at least two people.  One of those was the head

22   of accounting research at JPMorgan and the other would be one

23   of the heads of research at JPMorgan.

24   **Q.**   And along with that ghostwriter, did you nonetheless

25   remain recommendation of underweight in terms of Autonomy?

PROCEEDINGS

1    **A.**    Yes.

2    **Q.**    I'd like to just jump ahead now to 2011.  Did you remain

3    skeptical about Autonomy up to -- and this is -- if we could

4    bring up 1649.

5                    (Exhibit published to jury.)

6    **BY MR. FRENTZEN:**

7    **Q.**    -- skeptical about Autonomy up to, here we are, March 25,

8    2011?

9    **A.**    Yes.

10   **Q.**    Remaining underweight?

11   **A.**    Yes.

12   **Q.**    All right.  And -- one moment.

13          Can we go to page 3 of this note, please, and scroll up a

14   little bit.  Okay.

15          And in here, did you continue to have concerns about

16   accelerated revenue recognition into 2011, Mr. Khan?

17   **A.**    Yes.

18   **Q.**    Mr. Khan, when -- can you give us some idea of what

19   happens when a company misses consensus in a quarter?

20   **A.**    So the market, in every quarter for any company, has an

21   expectation about what the revenue results will be, what their

22   profitability will be.

23          When a company misses those expectations, there is

24   generally a very negative reaction from investors.  The stock

25   price generally falls anywhere from 10 to 50 percent sometimes,

 1  based on the fact that there is a perception that the company

 2  hasn't been able to manage expectations correctly, and then

 3  there is a concern that expectations for the future will also

 4  be challenged in terms of not being able to meet those

 5  expectations.

 6  **Q.**   Mr. Khan, because of your job, did you spend an excessive

 7  amount of time studying Autonomy with the resources that you

 8  had publicly available?

 9  **A.**   Yes.

10  **Q.**   And during the course of your analyzing Autonomy, did you

11  have any idea, for example, in 2009 that Autonomy sold

12  approximately $53 million in hardware?

13  **A.**   I had no idea.

14  **Q.**   What effect, if any, would that have had on your view of

15  Autonomy in 2009?

16  **A.**   Well, it was very clear that, from my perspective, I had

17  no idea that Autonomy was -- was selling hardware in that way.

18  It would have had a negative impact on valuation because

19  selling hardware has -- doesn't have the same value as selling

20  software.

21       And lastly, without having sold that hardware, Autonomy

22  would have missed market expectations, and, in my opinion,

23  there would have been a negative reaction on the share price.

24  **Q.**   How negative?

25       **MS. LITTLE:**  Objection.  Calls for speculation.  Also

**PROCEEDINGS**

 1   this is starting to sound like expert testimony, so I would

 2   move to strike.

 3               **THE COURT:**  Well, I think he can --

 4               **MR. FRENTZEN:**  Professional analyst.

 5               **THE COURT:**  I think he can give his opinion in this

 6   area.  Overruled.

 7               **THE WITNESS:**  Given the way that Autonomy had built up

 8   its reputation in the market, 50 million of revenue that --

 9   that wouldn't have been there, then I would have guessed that

10   there would have been at least a 30 -- 30 percent negative hit

11   to the share price.

12   **BY MR. FRENTZEN:**

13   **Q.**   In 2010, did you have any idea that Autonomy had sold

14   approximately 100 million in hardware?

15   **A.**   No.  My only realization of any type of hardware was

16   through the Arcpliance product.

17   **Q.**   And, again, the Arcpliance product, the profit, the --

18   most of the revenue comes from the software?

19   **A.**   From the software, yes.

20   **Q.**   In 2011, Quarters 1 And Quarters 2, did you have any idea

21   they sold approximately 50 million in hardware?

22   **A.**   No idea.

23   **Q.**   And do you have the same view in terms of 2010 and 2011 in

24   terms of what the hardware sales -- knowing what that would

25   have done to the valuation of Autonomy?

 1          **MS. LITTLE:**  Same objection.

 2          **THE COURT:**  Overruled.

 3          **THE WITNESS:**  Yes.  If the market had become aware

 4    that there was reselling of hardware, there would have been a

 5    re-definition of what the correct valuation for Autonomy would

 6    have been, and in my opinion, it would have been significantly

 7    lower.

 8          **MR. FRENTZEN:**  May I have one moment, Your Honor?

 9       (Government counsel confer off the record.)

10          **MR. FRENTZEN:**  That's all I have for now.  Thank you.

11          **THE COURT:**  Ladies and gentlemen, we are going to take

12    our recess now.  We will be in recess until 10:25.

13       Remember the admonition given to you:  Don't discuss the

14    case, allow anyone to discuss it with you, form or express any

15    opinion.

16                    (Recess taken at 10:12 a.m.)

17                 (Proceedings resumed at 10:29 a.m.)

18       (Proceedings were heard in the presence of the jury:)

19          **THE COURT:**  Please be seated.

20       Let the record reflect all jurors are present, the parties

21    are present.

22       Cross-examination.

23          **MS. LITTLE:**  Thank you, Your Honor.

24       And I did have a chance over the break to look at that

25    Exhibit 2982, I think it was, and I'm fine with it.

```
 1              THE COURT:  It's all right?

 2              MS. LITTLE:  Yeah.

 3              THE COURT:  Okay.  Thank you.  It will be admitted as

 4     well.

 5          (Trial Exhibit 2982 received in evidence)

 6              THE COURT:  Okay.  Thank you.

 7                         CROSS-EXAMINATION

 8     BY MS. LITTLE:

 9     Q.   Good morning, Mr. Khan.

10     A.   Good morning.

11     Q.   My name is Jan Little, and I am one of Mr. Hussain's

12     attorneys; and we haven't met before, so good morning.

13          And good morning, members of the jury.

14          Mr. Khan, in the last 20 years since 1999 that you've been

15     an analyst, you've changed jobs a number of times, haven't you?

16     A.   Yes.

17     Q.   You told us that you started at Merrill Lynch in 1999; is

18     that right?

19     A.   Yes, that's right.

20     Q.   And you left there about three and a half years later?

21     A.   Yes.

22     Q.   And you went to a firm called Clear Capital; right?

23     A.   Yes.

24     Q.   And you were there for about a year?

25     A.   Yes.
```

1    Q.    What happened to Clear Capital?

2    A.    Clear Capital, I was one of the founding partners.  It

3    was -- we set up the company to try and take advantage of

4    various changes in financial regulations.  After a year within

5    the firm, it was the realization that we were too early in our

6    business proposition, and I received an offer from

7    Commerce Bank at the time to join them.

8    Q.    So basically Clear Capital failed; right?

9    A.    Clear Capital was ultimately acquired, but I left before

10   the acquisition.

11   Q.    Okay.  And then you were briefly with a firm called New

12   Street Research?

13   A.    No.  New Street was our umbrella company for Clear

14   Capital, the umbrella regulatory company.

15   Q.    Okay.  So your next job, then, was in 2005.  You were an

16   analyst for The Mann Group?

17   A.    Well, as I said, there was a brief period with

18   Commerce Bank before they closed down their Equity Research

19   Department.  I then joined Mann Group.

20   Q.    Okay.  So we go from Merrill Lynch to Clear Capital to --

21   what was the other one?

22   A.    Commerce Bank.

23   Q.    -- Commerce Bank, and then to The Mann Group?

24   A.    Yes.

25   Q.    That's the group that eventually became MF Global?

1    **A.**    Yes.

2    **Q.**    Okay.  And you were there for a year; right?

3    **A.**    Slightly longer than a year.

4    **Q.**    Okay.  What happened to that job?

5    **A.**    To be honest, I didn't enjoy the job very much in terms of

6    the way it was panning out.  Again, I received a call from a

7    headhunter about a job at Cazenove.  I attended that interview

8    and got the job and left Mann Group.

9    **Q.**    So, then, for five years you were at Cazenove, which then

10   was acquired by JP Morgan; correct?

11   **A.**    That's right.

12   **Q.**    That was from 2006 to 2011?

13   **A.**    That's right.

14   **Q.**    Okay.  Why did you leave JP Morgan?

15   **A.**    Again, I was approached by another bank to take up a role

16   as an analyst, a bank called Berenberg.  It's a German bank.

17   And it was a job that was a larger remit to the one I had.  It

18   was global software coverage, so covering both U.S. and

19   European software companies.

20   **Q.**    Were you asked to leave JP Morgan?

21   **A.**    No.

22   **Q.**    So, then, for four years you were at Berenberg?

23   **A.**    Yes.

24   **Q.**    And you were fired from Berenberg; right?

25   **A.**    In fact, the terminology they use is they -- "we mutually

 1    agreed to terminate the contract."

 2    **Q.**   You were fired; right?

 3    **A.**   Yeah.

 4    **Q.**   And then you were an analyst -- by the way, you were fired

 5    in part because you and another gentleman, Mr. Ahmed, were

 6    really wrong in your predictions about Apple; right?

 7    **A.**   I wasn't the analyst covering Apple.

 8    **Q.**   Mr. Ahmed was?

 9    **A.**   Mr. Ahmed was.

10    **Q.**   And he gave really bad predictions about Apple?

11    **A.**   He was incorrect in his opinion about Apple, yes.

12    **Q.**   And you were both fired?

13    **A.**   We were, yeah, fired at the same time.

14    **Q.**   And then you were an analyst with Canaccord Genuity?

15    **A.**   That's right.

16    **Q.**   And you were there for two years?

17    **A.**   Just under, yes.

18    **Q.**   What happened to that job?

19    **A.**   Again, through that period of covering being an analyst at

20    Canaccord Genuity, I was approached by one of the companies

21    that I was looking at, and they offered me an opportunity to

22    join them as part of the senior management team.  I decided to

23    accept that offer.

24    **Q.**   And so, then, you went to WANdisco?

25    **A.**   That's right.

 1   **Q.**   And that's your eighth job in the last 20 years?

 2   **A.**   Yes.

 3   **Q.**   And you're not an analyst anymore?

 4   **A.**   No.

 5   **Q.**   And, in fact, your license with the Financial Conduct

 6   Authority is inactive; correct?

 7   **A.**   Currently, yes.

 8   **Q.**   Let's talk about -- well, first of all, you have received

 9   relatively poor ratings as a financial analyst over the years,

10   haven't you?

11   **A.**   You'd have to refresh me on what that -- what you mean by

12   that.

13   **Q.**   Okay.  Well, let's take a look in your book, please, at

14   Exhibit 6302.  Can you describe to me --

15   **A.**   Do you want me to look?

16   **Q.**   Yes, please.  It's near the back of your book.  6302.

17         Are you familiar with the rating service TipRanks?

18   **A.**   No.

19            **MR. FRENTZEN:**  I'm going to object to this.

20            **THE COURT:**  Let me look at it first.

21                  (Pause in proceedings.)

22   **BY MS. LITTLE:**

23   **Q.**   Are you aware, sir, that there are Internet --

24            **THE COURT:**  No.  Wait, wait, wait.  Let me look at it.

25   You're saying 6302?

1          **MS. LITTLE:**  It's an analyst profile from a service

2    called TipRanks, which rates analysts.

3          **MR. FRENTZEN:**  It's like Yelp.

4          **THE COURT:**  Objection sustained.

5    **BY MS. LITTLE:**

6    **Q.**   Are you aware, sir, that there have been rating services

7    that have given you negative ratings for your conduct as an

8    analyst?

9    **A.**   No, I'm not aware of it.  We -- as analysts, we follow

10   certain external polls.  So while I was at Merrill Lynch, I was

11   ranked number two as the European software analyst across all

12   analysts for two years in a row.

13         When I was at Berenberg, I was ranked top 10 of analysts

14   within Europe.

15         And within Canaccord Genuity I was ranked as top 10 as

16   U.K. analysts.

17         And back in 2006, I was picked as the number one U.K.

18   stock picker across all analysts in technology.

19         Those are the ones I'm aware of.

20   **Q.**   And you're not aware of any negative ratings of you at

21   all?

22   **A.**   I'm sure there must have been negative ratings, but I've

23   never read them.

24   **Q.**   Okay.  You never read this one?

25   **A.**   I never heard of TipRanks.

1   Q.   Okay.  Sir, you're generally what's called a bear analyst;

2   correct?

3   A.   I'm sorry?

4   Q.   Do you consider yourself a bear analyst, B-E-A-R?

5   A.   No, not particularly.

6   Q.   Is it the case that most of the time you take the negative

7   view of companies?

8   A.   I think across my career there's probably a balance

9   between positives and negatives if you looked at every single

10  stock I had coverage of over the 20-year period.

11  Q.   Isn't it more like about 49 percent negative?

12  A.   You would have to show me the evidence because I would

13  suggest that it's actually probably less than that.

14  Q.   Well, if you could take a look at that rating sheet right

15  in front of you, which indicates --

16       THE COURT:  Well, wait, wait.  He said it's balanced

17  and apparently your questions are is:  It around 50-50?  I

18  mean, it's about 50-50.

19       MS. LITTLE:  Okay.  I'll move on.

20       THE COURT:  Okay.

21  BY MS. LITTLE:

22  Q.   I think you testified that you had kind of a rocky

23  relationship with Dr. Lynch and Mr. Kanter since around 2008?

24  A.   Yes.

25  Q.   You had a disagreement with Dr. Lynch, that you testified

1    about, and Mr. Kanter concerning your May 2008 note?

2    **A.**   Yes.  And Mr. Hussain.

3    **Q.**   We'll talk about that.

4         You were unhappy that Autonomy didn't invite you to

5    analyst meetings in 2009?

6    **A.**   I was shocked rather than angry.

7    **Q.**   You were unhappy about it?

8    **A.**   I guess I was unhappy, yes.

9    **Q.**   And you were unhappy about this incident in 2010

10   concerning your allegedly trying to get inside information?

11   You were unhappy about that too; right?

12   **A.**   It didn't trouble me because it only made me more

13   confident that I was on the right track.

14   **Q.**   You weren't bothered about it?  You weren't unhappy about

15   it?

16   **A.**   The investigation was made.  I was cleared.  I knew I had

17   done nothing wrong, so I had nothing to be upset about.

18   **Q.**   But you're not really happy with your relationship with

19   Dr. Lynch and Mr. Kanter; right?

20   **A.**   I've not had a relationship with Dr. Lynch or Mr. Kanter

21   of any real format since 2008, so I have no -- I have no

22   negative or positive feelings.  We have no relationship.

23   **Q.**   You have no negative feelings about Mr. Kanter?

24   **A.**   No.

25   **Q.**   Okay.  Is it fair to say that in your career of covering

1    Autonomy, you were pretty consistently saying negative things

2    about Autonomy?

3    **A.**    From 2000 -- end of 2006 to somewhere mid-2007, I actually

4    had a positive rating on Autonomy; but from then on, it was

5    either neutral or negative.

6    **Q.**    From 2008 and on it was always negative; right?

7    **A.**    No.  There was a period where it went back to neutral.

8    **Q.**    But it was never positive?

9    **A.**    No.

10    **Q.**    And you published -- what? -- something like 30 notes that

11    were either neutral or negative?

12    **A.**    If you say so, yes.

13    **Q.**    Let's talk about this incident in May of 2008 that you

14    testified about where you had a draft note that you were about

15    to publish.  Do you recall that testimony?

16    **A.**    Yes.

17    **Q.**    And you sent that draft note to Dr. Lynch on April 11th,

18    right, 2008?

19    **A.**    I believe it was sent to Dr. Lynch and Mr. Hussain.

20    **Q.**    And you were saying that you wanted -- you were inviting

21    Dr. Lynch to comment on it; right?

22    **A.**    Yes.

23    **Q.**    Let's take a look at Exhibit 6326 in your binder there,

24    which is an e-mail from you to Dr. Lynch.

25             **MS. LITTLE:**  I'd like to move its admission.

1          **THE COURT:**  6326?

2          **MS. LITTLE:**  Correct.

3          **THE COURT:**  Admitted.

4      (Trial Exhibit 6326 received in evidence)

5  **BY MS. LITTLE:**

6  **Q.**   And you can look at it on the screen, sir, if that's

7  easier.

8      So starting at the bottom of this e-mail, you've got on

9  April 4th -- it says "11/4/2008."  In England that's

10 April 11th; right?

11 **A.**   That's right.

12 **Q.**   Okay.  So on April 11th you write to Dr. Lynch (reading):

13          "Mike, I'm attaching a draft of a note that I'm

14      looking to publish that covers a number of areas on which

15      you may wish to comment.  For compliance purposes, the

16      recommendation is removed along with any fair value

17      calculations."

18      So you were inviting Dr. Lynch to comment; right?

19 **A.**   Yes, as was policy.

20 **Q.**   Okay.  And Dr. Lynch responded to you.  This is the next

21 e-mail up.  Dr. Lynch says he's surprised that the note

22 contains a significant number of factual inaccuracies.  He goes

23 on to say that some of the calculations are inaccurate, and he

24 says (reading):

25          "While we in no way have any issue with opinions or

1          conclusions you may draw from the fact of your note,

2          knowing it contains inaccurate information is deeply

3          troubling."

4          Right?

5    A.    Yes.

6    Q.    And at the last sentence he says (reading):

7              "All we ask is accurate on the facts.  The conclusion

8          you draw on these is obviously your own."

9          Correct?

10   A.    Yes.

11   Q.    So he's wanting you to be factually accurate; right?

12   A.    Absolutely.

13   Q.    He's not telling you to change your opinion or change your

14   conclusions, but he wants you to be factually accurate?

15   A.    Yes.

16   Q.    There's nothing wrong with that; right?

17   A.    No.

18   Q.    In fact, you invited it; right?

19   A.    Exactly.

20   Q.    Okay.  And if an analyst is about to publish something

21   about a company that the CEO thinks is inaccurate, it's his

22   duty to try to correct that, isn't it?

23   A.    Absolutely.

24   Q.    And let's take a look at the response.  This is

25   Exhibit 2655, which is earlier in your book.

1          MS. LITTLE:  It's another e-mail that concerns this

2    that Mr. Khan is on.  I would move its admission.

3          THE COURT:  Admitted.

4       (Trial Exhibit 2655 received in evidence)

5          MR. FRENTZEN:  Can I just get the number again?

6          MS. LITTLE:  2655.

7          MR. FRENTZEN:  Thank you.

8    BY MS. LITTLE:

9    Q.   So, again, let's start at the bottom here.

10        Oh, by the way, that last e-mail, Mr. Hussain was not on

11   that e-mail.

12   A.   Okay.

13   Q.   Okay.  So it's in evidence.  The jury can look at it.

14        All right.  Let's now look at this response, 2655,

15   starting at the bottom.  This is from Andrew Kanter to

16   Mr. Knox.  Mr. Knox is your boss; right?

17   A.   Yes.

18   Q.   Okay.  And Mr. Kanter, he says (reading):

19             "I've been provided your name by the Cazenove

20        reception."

21        And in the second paragraph he says (reading):

22             "With this e-mail, we are informing you that a draft

23        note prepared by Daud Khan, Equity Analyst, blah, blah,

24        blah, contains material and misleading inaccuracies."

25        Correct?

KHAN - CROSS / LITTLE

1    **A.**    Correct.

2    **Q.**    And he goes on to say that you've been informed there are

3    material issues related to the note and that, among other

4    things, it contains factual inaccuracies, misquotations of the

5    company, the calculations are inaccurate, misleading, and

6    inconsistent.  Do you see that?

7    **A.**    I see that.

8    **Q.**    And, again, Mr. Kanter is perfectly in his rights, indeed

9    his duties, to point out if there's inaccurate information

10   that's going to be published; correct?

11   **A.**    Absolutely.

12   **Q.**    All right.  And this gets forwarded on to you, and then

13   you respond to your boss that you've responded -- this is the

14   first line -- you've responded to the CEO, you're not trying to

15   squeeze the note out on Monday, and then you discuss having a

16   meeting; correct?

17   **A.**    Exactly, yes.

18   **Q.**    And that's what led to the meeting with Dr. Lynch; right?

19   **A.**    Yes.

20   **Q.**    And, again, Mr. Hussain is not copied anywhere on these

21   e-mails?

22   **A.**    That appears so.

23   **Q.**    And so you did meet, then, with Dr. Lynch; right?

24   **A.**    Yes.

25   **Q.**    All right.  If we could take a look at Exhibit 2656, which

1   should be the next one in your binder.

2         **MS. LITTLE:**  Now, this is -- Mr. Khan is not copied on

3   this e-mail, but this is part of the same set of

4   communications, and I would move its admission.

5         **THE COURT:**  Admitted.

6      (Trial Exhibit 2656 received in evidence)

7   **BY MS. LITTLE:**

8   **Q.**   So we take a look at this e-mail, sir.  This is from

9   Dr. Lynch to your boss again, Mr. Knox; correct?

10  **A.**   Yes.

11  **Q.**   And Dr. Lynch explains (reading):

12            "Andy has had to go overseas, so I would" --

13       That's Andy Kanter; right?

14  **A.**   Yes.

15  **Q.**   (reading)

16       -- "so I would propose a meeting with myself, our CFO,

17       yourself, and Daud."

18       Correct?

19  **A.**   Yes.

20  **Q.**   It says "yourelf" but I assume it means "yourself."

21       So the reason Mr. Hussain was attending this meeting is

22  because Mr. Kanter was out of town?

23  **A.**   It appears so.

24  **Q.**   Okay.  And then again Dr. Lynch states in the second

25  paragraph (reading):

KHAN - CROSS / LITTLE

1           "Once again, let me stress we have no issue with a

2      negative view of the company or its prospects and, in

3      fact, we've seen a well-written note published along those

4      lines recently.  However, the current note contains a

5      number of factual inaccuracies, incorrect assumed

6      numbers," et cetera.

7      Correct?

8   A.  That's what it says.

9   Q.  So, again, Dr. Lynch is saying "You can draw whatever

10  conclusions you want, but the facts had better be right"?

11  A.  Yes.

12  Q.  And when you had this meeting with Dr. Lynch, he claimed

13  your note was factually inaccurate; right?

14  A.  Yes.

15  Q.  And he objected to your calculations of organic growth

16  rates?

17  A.  Yes.

18  Q.  And at this meeting Dr. Lynch drove the meeting.  He did

19  most of the talking; right?

20  A.  A majority of the talking, yes.

21  Q.  And then eventually you did make some edits before

22  publishing the note; right?

23  A.  Yes.

24  Q.  To try to make it more accurate?

25  A.  Yes.

1  **Q.**   All right.  And then sometime after that Mr. Hussain --

2  you said you didn't talk to Mr. Hussain about this, but

3  actually Mr. Hussain did call you after you published the note;

4  right?

5  **A.**   Yes.

6  **Q.**   And he said that Autonomy was okay with the note; right?

7  **A.**   I don't recollect that.

8  **Q.**   Okay.  Well, let me refresh your recollection.  If you

9  could look at a report of a statement that you gave to the

10  Government.  This is Exhibit 5268 --

11        **THE COURT:**   52 --

12  **BY MS. LITTLE:**

13  **Q.**   -- and it would be at page 2.

14  **A.**   (Witness examines document.)

15  **Q.**   So if we could take a look, sir, at page 2 -- let me find

16  it -- excuse me, page 3, the second paragraph from the bottom,

17  the paragraph that begins "After the meeting sometime in

18  April."  If you just read that to yourself.

19  **A.**   (Witness examines document.)  I've read it.

20  **Q.**   Okay.  Did you tell the Government that sometime after

21  April or May 2008, Mr. Hussain called you and told you that

22  Autonomy was okay with the draft note?

23  **A.**   I don't recollect saying those exact words.  What I

24  believe I said to whoever was recording this was that

25  Mr. Hussain had called me post the quarter one 2008 results,

1   and he reiterated much of what you've shown as evidence in

2   terms of e-mail conversation, that he has no issue with any

3   negative opinion on the company but wants to ensure that the

4   facts are accurate.

5   **Q.**   Okay.  And he did tell you that Autonomy was okay with it

6   at this point; right?

7   **A.**   I don't recollect him saying that because there was

8   concern -- there was ongoing issues, as I'd explained to the

9   other attorney, that the -- the reason why Andrew Kanter had

10  contacted Mr. Knox was in order to try and prevent the

11  publication of the note as it was; and that what happened was a

12  decision was made by my boss that we were going to publish

13  because we'd done everything possible to address the concerns

14  of the company.  And that now that they were being obstructive,

15  we should ignore further comments and we should publish.  That

16  was a decision made not by me but by my boss.

17  **Q.**   And you did publish it?

18  **A.**   We did publish it.

19  **Q.**   All right.  And then you testified that at some point you

20  got a call from Mr. Kanter saying that he had a recording of

21  you speaking to investors?

22  **A.**   I didn't get the call.  The call was made to Mr. Knox.

23  Mr. Knox, after having reviewed all my tapes and recordings, he

24  called me into his office to discuss what he had received and

25  the work that he and the Compliance Department had done to

1    ensure that I hadn't breached any regulations.  They were happy

2    that I hadn't, and that we should publish the note.

3    **Q.**   Okay.  That's actually not what happened, is it?

4    Mr. Kanter didn't say that he had a recording, did he?

5    **A.**   Again, I'm only testifying to what Mr. Knox told me.  I

6    didn't get a call from Mr. Kanter.

7    **Q.**   Okay.  I'd like you to take a look, if you would, at

8    Exhibit 2658.

9             **MS. LITTLE:**  This is an e-mail between Mr. Kanter and

10   Mr. Khan's boss.  Again, Mr. Khan is not on this e-mail but it

11   relates to these subject matters that he's testified about and

12   I would move its admission?

13            **THE COURT:**  Admitted.

14      (Trial Exhibit 2658 received in evidence)

15   **BY MS. LITTLE:**

16   **Q.**   So, Mr. Khan, going to the second page, the bottom of this

17   e-mail.  This is on May 1st, 2008, from Mr. Kanter to your

18   boss, Mr. Knox; right?

19   **A.**   Yes.

20   **Q.**   And Mr. Kanter says (reading):

21            "It has come to our attention that there may have

22        been highly questionable activities going on on behalf of

23        your analyst Daud Khan.  We feel it's probably not

24        appropriate for us to continue to speak directly with

25        Daud."

1          Do you see that?

2    **A.**   Yes.

3    **Q.**   So this is something that was brought to Mr. Kanter's

4    attention?

5    **A.**   According to the e-mail, yes.

6          **MR. FRENTZEN:**  Your Honor, I object at this point.  We

7    let this in as probably hearsay, but now this is double

8    speculation, asking him what Kanter did or didn't know based on

9    an e-mail that he never got.

10         **THE COURT:**  Sustained.  It speaks for itself.

11   Whatever it is, it is, but I don't know that you can ask him to

12   interpret this particular document.

13         **MS. LITTLE:**  Fair enough.

14   **Q.**   Were you aware, sir, that Mr. Kanter had been made aware

15   that a number of fund managers had recordings?  Not that he had

16   them but that fund managers had recordings?

17         **MR. FRENTZEN:**  Objection.  Foundation.  Speculation.

18         **THE COURT:**  Sustained.

19   **BY MS. LITTLE:**

20   **Q.**   Did you have discussions with your boss about this?

21   **A.**   About these recordings?

22   **Q.**   Uh-huh.

23   **A.**   It wasn't really a discussion.  He told me that he'd

24   reviewed all the tapes, and these tapes are between myself and

25   fund managers, and he felt that there was no breach of

1    regulation and that we should publish.

2    **Q.**    And so your boss and Cazenove did an investigation into

3    this?

4    **A.**    They pulled my tapes with fund managers and they listened

5    to the tapes, yes.  So if you want to call that an

6    investigation.

7    **Q.**    And while that investigation was going on, it was

8    Mr. Kanter's view that he shouldn't have direct contact with

9    you and that Autonomy shouldn't have direct contact with you?

10            **MR. FRENTZEN:**  Objection as to Kanter's view unless it

11    was expressed to him directly.

12            **THE COURT:**  Sustained.

13   **BY MS. LITTLE:**

14   **Q.**    What was your understanding?

15   **A.**    My understanding was that based on this FSA/FCA potential

16   investigation where I was told that Autonomy would provide

17   these tapes to the FCA, that they shouldn't be in direct

18   contact with me.

19   **Q.**    And then in June of 2008, you reached out to Mr. Hussain,

20   did you not, and asked to reestablish a line of communication?

21   **A.**    Yes, on the advice of Mr. Knox.

22   **Q.**    Okay.  And if you could take a look, sir, at Exhibit 2660.

23           **MS. LITTLE:**  And this is a communication from Mr. Khan

24   to Mr. Hussain.  I would move its admission.

25           **MR. FRENTZEN:**  No objection.

1              **THE COURT:**  Admitted.

2         (Trial Exhibit 2660 received in evidence)

3    **BY MS. LITTLE:**

4    **Q.**   So starting at the bottom, sir, you communicate to

5    Mr. Hussain (reading):

6              "Dear Sushovan,

7              "I'm writing to attempt to reestablish a line of

8         communication."

9         Do you see that?

10   **A.**   (Witness examines document.)

11   **Q.**   Yes?

12   **A.**   Yes.

13   **Q.**   All right.  And you say you'd like very much to help

14   reinstitute an open dialogue; right?

15   **A.**   Yes.

16   **Q.**   And then going up the e-mail chain to the response, you

17   get a response from Mr. Kanter.  So apparently Mr. Hussain had

18   forwarded it on to Mr. Kanter for response.  He says (reading):

19              "Sushovan has forwarded your e-mail to me."

20         And Mr. Kanter again says (reading):

21              "We have again last week been approached by the

22         FSA" --

23         That's the securities regulators; right?

24   **A.**   That's right.

25   **Q.**   (reading)

1          -- "who are, as I believe you're aware, conducting an

2          investigation as to matters raised by a third party."

3          Correct?

4     A.   That's what it says.

5     Q.   And so Mr. Kanter says (reading):

6              "From this we must conclude that the matter is

7          ongoing and so until resolved, I think it not appropriate

8          for us to communicate directly."

9          Correct?

10    A.   Correct.

11    Q.   So all he's doing is saying while this investigation is

12    pending, they think it's best not to have direct communication

13    with you?

14    A.   That's what they're saying.

15    Q.   And nobody from Autonomy was threatening you at this

16    point; right?

17    A.   No.

18    Q.   Certainly Mr. Hussain wasn't?

19    A.   No.

20    Q.   You talked about this May 2018 note, and I have it marked

21    as Exhibit 6304.  I don't know if you have it marked as a

22    different number, but maybe just for now for expedience we

23    could use Exhibit 6304, which is the May 13th, 2008, note.

24              **THE COURT:**  Admitted.

25         (Trial Exhibit 6304 received in evidence)

1   BY MS. LITTLE:

2   Q.   Is this the note, sir, that we've been talking about, the

3   May 2018 note?

4   A.   Yes.  It looks like it.

5   Q.   And I just want to direct your attention to the third page

6   of the note.  Up at the top you say -- let's highlight that --

7   it's the very first sentence up there (reading):

8          "Standing is the minority negative voice in a torrent

9          of positive opinion warrants some clarification."

10  A.   Yes.

11  Q.   So you were proud of the fact that you were the minority

12  negative voice here; right?

13  A.   I'm not sure pride had anything to do with it.

14  Q.   Well, how many analysts -- you said about 15 analysts were

15  covering Autonomy in 2009 and 2011?

16  A.   Approximately.

17  Q.   So it's fair to say there was a torrent or a chorus of

18  analysts saying positive things about Autonomy; right?

19  A.   Yes.

20  Q.   So an individual voice saying negative things would really

21  stand out; right?

22  A.   Yes.

23  Q.   And if the chorus of positive voices ends up being right,

24  it's kind of not a big deal; but if the one lone voice ends up

25  being right, it is a big deal; right?

```
 1   A.    I guess so, yes.

 2   Q.    And you talked about how your bonuses could be based on

 3   recommendations by the sales desk.  If you had ended up as the

 4   lone voice being right, that would have affected your

 5   compensation; right?

 6   A.    It may have done.

 7   Q.    And, conversely, if you're wrong, it can be devastating;

 8   right?

 9   A.    I wouldn't use the word "devastating."

10   Q.    Well, it was devastating for Mr. Ahmed, right, at

11   Berenberg?

12   A.    You know, why Mr. Ahmed was made redundant from Berenberg

13   I don't think has -- you know, has bearing on his

14   recommendations because a bunch of his recommendations were

15   correct.  Apple was actually the only one he had wrong.

16   Q.    Would you agree with me, sir, that if you're wrong, it can

17   be very detrimental to your reputation?

18   A.    In aggregate, yes, not for a single stock, though.

19   Q.    And in 2009 to 2011, when you were covering Autonomy, it

20   was trading at between 10 and 20 pounds per share

21   approximately?

22   A.    Yes.

23   Q.    And then when Autonomy was acquired in 2011, it was

24   acquired at 25 pounds a share; correct?

25   A.    Yes.
```

1  Q.   So you were wrong in your predictions, weren't you?

2  A.   In terms of the stock price, yes.

3  Q.   And that hurt your reputation?

4  A.   I don't think it had any material impact on my pay or my

5  reputation.

6  Q.   Being right -- being wrong doesn't hurt your reputation?

7  A.   Again, you know, you're focusing on one company.  In

8  aggregate of all the companies I covered, I can't honestly say

9  it had an impact on what I got paid or my job prospects.

10  Q.   One way to help restore your reputation is for you to come

11  in here and say, "Hey, guess what?  I was right all along";

12  right?

13  A.   Again, I think the outcome of this trial has no

14  implication to my job prospects or reputation.

15  Q.   You've testified that you were excluded from analyst

16  presentations during the 2009 time period.  You were always

17  welcome to dial in, weren't you?

18  A.   Yes, but unable to ask questions.

19  Q.   But you did dial in; right?

20  A.   I did dial in.

21  Q.   And there was another representative from Cazenove,

22  Ms. Pollard, who was allowed to participate?

23  A.   Yes.  She went to the meetings to collect the

24  presentations.

25  Q.   And I think you testified that in January of 2010, you

1   approached Mr. Geall to ask if you could attend; and he said,

2   "Of course.  You're welcome to attend," at that point?

3   **A.**   Exactly, yes.

4   **Q.**   Let's talk about the Q3 '09 call that you talked about.

5        Well, first of all, you were asked about your note in

6   September of 2009 when you were talking about the SPE marketing

7   spend.

8   **A.**   Uh-huh.

9   **Q.**   You didn't have any insight into what sort of marketing

10  Autonomy was doing; right?

11  **A.**   In the approach to the quarter, what I usually did as an

12  analyst would be to look through trade press, look at the

13  normal areas where I'd see advertising from companies like

14  Autonomy, and I hadn't noted any specific increase in activity

15  or any particular mention or increased mention of IDOL SPE.

16       I think post -- post the call itself, it was clear from --

17  I'm not sure whether it occurred within the --

18  **Q.**   Let me ask you about the call.  Did you listen in to

19  the --

20            **MR. FRENTZEN:**  I object to that, Your Honor.  I think

21  the witness wasn't finished answering the question.

22            **THE COURT:**  Let him finish.  Go ahead.

23  BY MS. LITTLE:

24  **Q.**   Go ahead.

25  **A.**   Whether it happened in the call or post the call, so

1    usually after a meeting, then we have a discussion as everyone

2    come moves to the head table and asks questions of Dr. Lynch or

3    Mr. Hussain.

4        And I think it was at that time there was a discussion

5    which said that the IDOL SPE marketing expenses revolved around

6    flying in industry analysts, flying in customers, paying for

7    their hotel bills, et cetera, so a big kind of launch event of

8    getting people to the event, which would -- which would partly

9    explain why, then, I wouldn't see print advertising or any

10   particular increase in advertising if all the spend went in

11   bringing people to the event.

12   **Q.**   And Dr. Lynch talked about that on the call; right?

13   **A.**   As I said, I can't recollect whether it was on the call or

14   it was -- there was a post-meeting kind of offline discussion.

15   **Q.**   Did you listen in to the call?

16   **A.**   I did, yes.

17   **Q.**   And the tape is in evidence and we're not going to burden

18   the jury with it, but do you recall that Dr. Lynch spent about

19   15 minutes talking about SPE and about the advertising and the

20   positioning with analysts and the positioning with customers,

21   these various things you've described?

22   **A.**   Yes, but I think post the meeting he discussed things in

23   terms of, you know, flying people in, paying for hotels, which

24   wasn't part of the call.

25   **Q.**   Okay.  But the positioning with the customers, that was

1   discussed on the call; right?

2   **A.**   Yes.   The Quik Stop program, I believe.

3   **Q.**   And the beta program; right?

4   **A.**   Yes.

5   **Q.**   And then for the Q -- the next earnings call, the Q4

6   earnings call, you participated in that call?   That's the one

7   when you were invited back; right?

8   **A.**   Yes.

9   **Q.**   January of 2010?

10  **A.**   Yes.

11  **Q.**   And during that call, which again is in evidence, you

12  asked a question but you didn't ask any questions about SPE,

13  did you?

14  **A.**   No, because the biggest factor in that quarter was the

15  inventory, which was -- in fact, if you look through all the

16  questions, that was one of the biggest topics of that call.

17  **Q.**   Okay.   So you had a chance to ask questions about SPE, but

18  you chose not to?

19  **A.**   What normally happened in these calls is that you get one

20  question.   You don't get a redirect or -- you know, so you ask

21  the question that is the most pressing at the time.

22  **Q.**   Okay.   And Mr. Frentzen asked you about a statement in

23  that call about SPE as being a key differential.   You have no

24  understanding of what sort of discussions Autonomy might have

25  been having with its customers about SPE; right?

 1   **A.**   No, other than what Dr. Lynch talked about.

 2   **Q.**   In connection with that Q4 call, we heard various snippets

 3   where you're talking about -- or where Dr. Lynch was talking

 4   about pure software.  Do you recall that?

 5   **A.**   Yes.

 6   **Q.**   And one of the references to pure software that

 7   Mr. Frentzen didn't play, I'd like to just show you -- the tape

 8   is in evidence, but I'd like to just show you on the screen the

 9   transcript.

10          **MS. LITTLE:**  It's page -- it's Exhibit 592, Jeff, at

11   page 14.

12        We can play it.  I guess maybe we should play it,

13   actually, to get it into evidence or --

14          **THE COURT:**  Well, if you want to go through just the

15   transcript, that's okay because the transcript, that portion,

16   would be in evidence by virtue of question and answer.

17          **MS. LITTLE:**  Okay.  Good.

18   **Q.**   So if you would take --

19          **THE COURT:**  You should read that portion into the

20   record.  Okay?

21          **MS. LITTLE:**  Okay.

22   **Q.**   So this is Exhibit 92 at page 14 -- yep, we've got it --

23   and I'll just read it into the record (reading):

24             "Revenue to net cash conversion at 34 percent.

25        Because it is basically at the top of the industry

```
 1        numbers, we don't think that's going to go any higher.  We
 2        think that's reasonable there."
 3        And then Dr. Lynch says (reading):
 4             "The pure software model means that we do not think
 5        that revenue employees should keep ticking up and
 6        consequently profit for employees should keep ticking up."
 7        And then he says (reading):
 8             "Immediately the other number that we have here, one
 9        of these new numbers -- and we'll talk about that in a
10        minute -- which is committed if you like, now it's
11        important to say we're not Capgemini, we're not a services
12        business."
13        Do you see that, sir?
14   A.   Yes.
15   Q.   So in this portion of the call, which was not played,
16   Dr. Lynch is contrasting the pure software model with companies
17   that have a services business.  And you've testified that that
18   was a distinction in your mind; right?
19   A.   Yes.
20   Q.   And that's also the way it was described in Autonomy's
21   annual report; right?
22   A.   You would have to show me that, but I think that's
23   correct.
24   Q.   Well, let's take a look at Exhibit 428, which is in
25   evidence -- we can put it on the screen -- page 9 of
```

1    Exhibit 428.

2         And let me find the spot.  So the bottom right-hand corner

3    where it says "Financial Model."  Can you blow that up?  Thank

4    you, Jeff.  (reading)

5              "Autonomy is one of the very rare examples of a pure

6         software model.  Many software companies have a large

7         percentage of revenues that stems from professional

8         services."

9         Do you see that?

10   **A.**   Yes.

11   **Q.**   So that's the distinction that's being drawn when they

12   talk about a pure software model; right?

13   **A.**   My perception as an analyst and in my opinion when someone

14   talks about a pure software company, they talk about it being

15   software and maintenance and very little services.  When a

16   normal software company talks about being a software company,

17   they talk about software, maintenance, and services.  In either

18   case, there is no real discussion that hardware should be a

19   material part of the conversation.

20        So I think on many occasions, and I think even in the

21   snippet that we saw about the breakdown of revenue, that all

22   pointed to it being software or a little bit of services, some

23   OEM revenues, some cloud revenues.  That's how I understood it.

24   **Q.**   Okay.  We're going to talk about that in a minute.

25        Let's take a look at Exhibit 1352, which is the 2010

 1    annual report.

 2            **MS. LITTLE:**  I don't think that's in evidence yet, but

 3    if it's not, I'd move its admission.

 4            **MR. FRENTZEN:**  No objection.

 5            **THE COURT:**  Admitted.

 6         (Trial Exhibit 1352 received in evidence)

 7            **MS. LITTLE:**  So we can take a look at page 15 of that

 8    report on the screen, Jeff.  Up at the -- oh, page 15 of the

 9    exhibit.  Keep going.  There we go.

10    **Q.**   Up at the top, "Financial Model," we have the same

11    language here (reading):

12            "Autonomy is one of the very rare examples of a pure

13         software model.  Many software companies have a large

14         percentage of revenues that stem from professional

15         services."

16         Do you see that?

17    **A.**   Yes.

18    **Q.**   Okay.  And then if we look at page 18 of this report, up

19    at the top left-hand corner under "Services," and again the

20    last sentence of that paragraph (reading):

21            "Autonomy operates on a pure software model under

22         which our goal is that most implementation work is carried

23         out by approved partners."

24         So, again, it's drawing the distinction between software

25    and services; right?

1  **A.**   Yes.

2  **Q.**   And while we're on this page, let's just move down to the

3  revenue descriptions.

4       So you see there it says "Revenue," Core IDOL reported

5  revenues 574 million for 2010; right?

6  **A.**   Yes.

7  **Q.**   And then there's a little Footnote 1, and the Footnote 1

8  beneath there says (reading):

9           "Core IDOL," which is the reported revenues, "is made

10          up of IDOL Product, IDOL Cloud, and IDOL OEM categories,

11          described above.

12       Right?

13  **A.**   Yes.

14  **Q.**   And that's the same categories that Mr. Hussain talked

15  about in the tape that was played; right?  IDOL Product --

16  **A.**   Yes.

17  **Q.**   -- IDOL Cloud, IDOL OEM?

18  **A.**   Yes.

19  **Q.**   That's how Autonomy defined its revenue; right?

20  **A.**   Yes.

21  **Q.**   And are you aware, sir, of the notion of one operating

22  segment under the IFRS rules, IFRS Rule 8?

23  **A.**   Yes.

24  **Q.**   And under IFRS 8, it is determined whether you have to

25  break out your revenue streams into different categories in

1   your financial statements; right?

2   **A.**   That's right.

3   **Q.**   And are you aware that this is an issue that was discussed

4   between Autonomy and its auditors to determine whether they

5   needed to break out revenues into different categories?

6   **A.**   I imagine they had that conversation as every auditor

7   would with their company.

8   **Q.**   And if we can take a look in this particular exhibit at

9   page 60.

10   **A.**   (Witness examines document.)

11   **Q.**   This is a section called "Segmental Analysis."  That's

12   what we're talking about -- right? -- where you have to report

13   different segments of your revenue?

14   **A.**   Yes.

15   **Q.**   And this portion of the annual report -- by the way, this

16   was part of the consolidated financial statements -- that's the

17   portion of the report that's audited by Deloitte; right?

18   **A.**   Yes.

19   **Q.**   Generally the back end of the annual report, that's what

20   Deloitte audits and certifies as accurate; right?

21   **A.**   They audit financial statements and the notes that relate

22   to those financial statements.

23   **Q.**   Okay.  And if we can take a look at the paragraph

24   beginning -- it's the third paragraph -- "The group is a

25   software business."

1        And what that says is (reading):

2             "The group is a software business that utilizes its

3        single technology in a set of standard products to address

4        unique business problems."

5        Do you see that?

6   A.   Yes.

7   Q.   And then it goes on in the third sentence (reading):

8             "Each customer selects from a list of options but

9        underneath from a single unit of the proprietary core

10       technology platform.  As a result, no analysis of revenues

11       by product type can be provided."

12       Do you see that?

13  A.   Yes.

14  Q.   And then it says (reading):

15            "The delivery of Autonomy's core technology is done

16       via a number of methods depending on the demands of the

17       customers."

18       Correct?

19  A.   Yes.

20  Q.   And this was all approved by Deloitte; right?

21  A.   Yes.

22  Q.   You can take that down.

23       And many software companies do sell some hardware; right?

24  A.   Yes, generally.

25  Q.   Most do; right?

1    **A.**   It depends in what form, but I would imagine that the

2    amounts of hardware sold is relatively small compared to the

3    size of the company if it's a software company.

4    **Q.**   Okay.  Let's talk about the April 2010 earnings call that

5    you testified about on direct.  You participated in that call

6    by phone; right?

7    **A.**   This is, sorry, which quarter?

8    **Q.**   So it would be the Q1 2010 call.  It was in April of 2010.

9    Mr. Frentzen played certain segments for you.

10   **A.**   Okay.  It was either by phone or in person.  I think maybe

11   it was on the phone.  I can't remember.

12   **Q.**   Actually, if you look at the transcript, it's pretty clear

13   that no one was physically present at that call.

14   **A.**   So I think there were a few calls where they didn't do a

15   physical meeting.  In general, for most U.K. companies listed

16   in the U.K. there's usually a physical meeting.  And if you

17   look through all of the quarters that Autonomy reported, I

18   would say that 90 percent were probably done physically.

19   **Q.**   Do you recall a sort of natural event in April of 2010

20   when there was a volcanic eruption in Iceland?

21   **A.**   Yes, I do now.

22   **Q.**   And do you recall that when that happened, there was an

23   ash cloud and British airspace was closed for a week?

24   **A.**   Yes.

25   **Q.**   And was that at the time of this call?

1  A.   Yeah, I believe so.

2  Q.   So everybody was on the phone; right?  Nobody could get

3  there physically.

4  A.   Yes.

5  Q.   And were you aware that Dr. Lynch was actually in the

6  United States?  He was in California for that call?

7  A.   I believe that was mentioned in the call maybe, or I knew

8  that they weren't all in the same place.

9  Q.   And so if a call happened at 8:30 in the morning Greenwich

10  Mean Time, it would have been the middle of the night in

11  California for Dr. Lynch; right?

12  A.   Yes.

13  Q.   Okay.  And during that call, you asked about the inventory

14  numbers.

15       And let's just put the transcript piece on the display

16  here.  It's page 11 of Exhibit 776.  This is what Mr. Frentzen

17  played.

18       And what Dr. Lynch says to you is -- the first thing he

19  says in response to your question is (reading):

20            "I'm afraid I'm not going to give you an exact number

21       because that's rather commercially sensitive."

22       Do you see that?

23  A.   Yes.

24  Q.   So right off the bat he's telling you that there's some

25  information that's sensitive that he's not going to disclose to

1    you?

2    **A.**    Yes.

3    **Q.**    And then he goes on to say that the software component of

4    the revenue is far higher than the hardware component; right?

5    **A.**    Yes.

6    **Q.**    And you understood that, that there were small amount of

7    hardware sales that accompany a larger amount of software

8    sales?

9    **A.**    For the Arcpliance, that the component or the hardware

10   component of the appliance was a small part of the overall

11   sales value of that product.  That's what I understood.

12   **Q.**    And then he goes on to say the software is the bit that

13   dominates; right?

14   **A.**    Yes.

15   **Q.**    And then later in the call we heard the section that

16   Mr. Toms spoke about.  It's on page 14 of the transcript.

17        If you pull that up down at the bottom, Dr. Lynch's

18   response.  There we go.

19        And this is what Mr. Frentzen played here.  And the second

20   line there, what Dr. Lynch says (reading):

21             "We have very little interest in just selling

22        hardware."

23        Correct?  Do you see that?

24   **A.**    Yes.

25   **Q.**    And that was true; right?

1    **A.**   As I understood it, yes.

2    **Q.**   Now, you've written notes about the fact that Autonomy

3    sold some hardware; right?

4    **A.**   On the -- post the Arcpliance, post that quarter talking

5    about the 10 million of inventory, yes.

6    **Q.**   And Mr. Frentzen asked you about Exhibit 901, which is in

7    evidence.  Maybe we can just pull that up quickly.  Page 3 of

8    that note.

9         Let's see if I can find it.

10        Okay.  So, yeah, the sentence that begins -- the paragraph

11   (reading):

12             "With the purchase of 10 million in hardware," you

13        say "we expected guidance to increase and that the cost of

14        the hardware would be passed through to the end customer."

15             **MR. FRENTZEN:**  She just skipped over the middle part

16   of that, Your Honor.

17             **MS. LITTLE:**  Okay.  I can read the whole thing.

18   (reading)

19             "We would expect guidance to increase by at least

20        10 million as the cost of the hardware would be passed

21        through to the end customer."

22   **Q.**   Right?

23   **A.**   Yes.

24   **Q.**   And it was -- what I skipped is "expected to be sold in

25   Q2"; right?

1    **A.**    Yes.

2    **Q.**    And so you're --

3          **MR. FRENTZEN:**  Skipped as it was related to the

4    Arcpliance?

5          **MS. LITTLE:**  Okay.  (reading)

6          "10 million of hardware related to the Arcpliance

7          inventory, which is expected to be sold in Q2, we would

8          have expected guidance to be increased by 10 million as

9          the cost of the hardware would be passed through to the

10         end customer."

11         **THE WITNESS:**  So for any appliance sale -- Google

12   appliance, Barracuda appliance -- the cost of the hardware you

13   normally sell with a very small margin; whereas, the real value

14   of the value of the appliance is in the software.  So the

15   conservative assumption is that 10 million of inventory will

16   lead to at least 10 million of sales.

17   **BY MS. LITTLE:**

18   **Q.**    Okay.  And this is what we would call a pass-through of

19   hardware; right?

20   **A.**    Yes.

21   **Q.**    Okay.  And you've written other times about this.  If you

22   would take a look in your binder, sir, Exhibit 6316, which is a

23   note that you wrote in July of 2010.

24         **THE COURT:**  Admitted.

25         (Trial Exhibit 6316 received in evidence)

1              MS. LITTLE:  Let me find the reference.

2    Q.   The third bullet point, again you say "assuming around

3    $10 million of hardware pass-through revenue"; right?

4    A.   Yes.

5    Q.   Okay.  And other analysts have written about -- oh, wait.

6    There's one more that you wrote.  I'm sorry.

7         Exhibit 1649.  I'm not sure if that's in evidence, but

8    it's another one of your reports.

9              THE COURT:  Admitted.

10             MS. LITTLE:  Let me find the page.

11             THE COURT:  It is in evidence.

12             MS. LITTLE:  It's in evidence, and I'm not -- I

13   apparently forgot to highlight the part, but I'll represent

14   that there's a reference to hardware in here too.  I'll have to

15   find it.

16             MR. FRENTZEN:  Again, related to Arcpliance?

17             MS. LITTLE:  I'll have to find it.  I didn't mark it.

18   I'm sorry.

19   Q.   Are you aware that other analysts have also talked about

20   hardware in relation to Autonomy?

21   A.   I believe so, but I wasn't -- I didn't have access to

22   other people's research notes.  It's generally not provided to

23   the analyst community.

24   Q.   Okay.  Well, there's Exhibit 5804 in evidence, which is a

25   report written by Marc Geall.  If we can just bring that up

1    quickly.

2              **THE COURT:**  Admitted -- well --

3              **MS. LITTLE:**  This is already in evidence.

4    **Q.**   And in here it talks about "Gross margins of 86 percent

5    was below the 88 to 89 percent guidance due to additional costs

6    associated with hardware sales"; right?

7    **A.**   Yes.

8    **Q.**   And then if we could also take a look at another report.

9    This is not yet in evidence, but it's Exhibit 1535.  It's a

10   report by Mr. Toms who was on that other analyst call.

11             **MR. FRENTZEN:**  Your Honor, I'm going to object at this

12   point.  I don't know why we're showing this stuff he's never

13   seen.

14             **THE COURT:**  Sustained.

15   **BY MS. LITTLE:**

16   **Q.**   Now, you've testified, sir, that if analysts knew that

17   Autonomy was selling hardware at a loss, the valuation of the

18   company would be changed in your view?

19   **A.**   Yes.

20   **Q.**   Would you agree with me, sir, that selling hardware

21   actually lowers a company's profits; right?

22   **A.**   Yes.

23   **Q.**   So it doesn't make the company look better.  It makes it

24   look worse; right?

25   **A.**   I'm not quite sure what you're trying to --

1    Q.   Well, it would drive the gross margins down and drive the

2    profits down; right?

3    A.   Yes.  So selling hardware should impact the gross margin,

4    yes.

5    Q.   And when you were valuing Autonomy, you did it based on

6    earnings per share; right?  Based on profit?

7    A.   I used multiple methods but one of them was earnings per

8    share, yes.

9    Q.   And so, again, you would agree with me if Autonomy was

10   selling hardware at a loss, this would make the reported

11   profits worse, not better?

12   A.   Yes.

13   Q.   You testified about an incident where there was an

14   accusation that you were using social media to get inside

15   information.  Do you recall that testimony?

16   A.   Yes.

17   Q.   Did that relate to a contact that you had with

18   Mr. Calonico?

19   A.   Yes.

20   Q.   Mr. Calonico is someone that used to work at Interwoven;

21   right?

22   A.   Yes.

23   Q.   And Autonomy acquired Interwoven in January of 2009?

24   A.   Yes.

25   Q.   And then you contacted Mr. -- well, Mr. Calonico left

1  Interwoven shortly after the acquisition?

2  **A.**   Yes.

3  **Q.**   And then you contacted Mr. Calonico when he was at a new

4  company, AstroData; right?

5  **A.**   Yes.

6  **Q.**   And you were trying to get information kind of outside of

7  regular channels; right?

8  **A.**   I was asking information about the ex-financial director

9  or CFO of Interwoven about historic financials.  So I didn't

10 feel that what I was asking was inside.  It was a clarification

11 on accounting principles at Interwoven.

12 **Q.**   You recognized that what you were doing was sort of

13 outside of regular channels; right?

14 **A.**   No, because it's something that I would do and I had done

15 for Autonomy on other acquisitions as well.

16 **Q.**   Let's take a look, if we could, sir, at Exhibit 873, which

17 should be in your binder.

18         **MS. LITTLE:**  And I'd move its admission.

19         **THE COURT:**  Admitted.

20         **MR. FRENTZEN:**  I'm sorry, Your Honor.  873?

21         **MS. LITTLE:**  873.

22         **MR. FRENTZEN:**  I don't have that.

23         **MS. LITTLE:**  It should be in your book.

24         **THE COURT:**  E-mail from Lynch to Kanter.

25         **MR. FRENTZEN:**  I don't have it.  Based on that, I'd

1   object.  I mean, I haven't seen it.  I don't want to slow this

2   down, but I don't have it here.

3          THE COURT:  Well, why don't you show it to him.

4          MR. FRENTZEN:  And if it's between those two, it

5   sounds like hearsay to this witness.

6          THE COURT:  Why don't you look at it and tell me if

7   there's an objection.  It's not this person's document, so...

8                     (Pause in proceedings.)

9          MR. FRENTZEN:  I don't object to the e-mail from this

10  witness, Your Honor, which we have, without the rest of this.

11         THE COURT:  I'm sorry?

12         MS. LITTLE:  There's a portion of 873, page 2 of the

13  exhibit can come in.

14         THE COURT:  Okay.

15     (Trial Exhibit 873, page 2, received in evidence)

16         MS. LITTLE:  So if we can put page 2 on the screen,

17  please.

18  Q.  This is your e-mail, sir, to Mr. Calonico; right?

19  A.  Yes.

20  Q.  And you say (reading):

21          "Apologies for the intrusion, but I was passed your

22          details by an investor.  I am an analyst at JP Morgan and

23          the coverage analyst on Autonomy."

24      And you say (reading):

25          "I appreciate this is slightly unusual."

1        Correct?

2    **A.**    Yes.

3    **Q.**    So you were going a little bit outside of channels; right?

4    **A.**    I was doing my job.  It's not normal to do that, but it's

5    within my remit.

6    **Q.**    It's not normal; is it?

7    **A.**    I've done it a few times but, yes, if you want to say it's

8    not normal.

9    **Q.**    Okay.  Well, those are your words; right?

10   **A.**    Yeah.  Mr. Calonico would have been surprised to have

11   received an e-mail about a company that he has left about

12   historical financials which he signed off on previously.  So,

13   yes, in that way it's unusual.

14   **Q.**    Okay.  And then going down to the one, two, three, four,

15   five, sixth paragraph, you say (reading):

16            "I appreciate you're very busy but having exhausted

17        all other avenues of getting a reasonable answer, I felt

18        you would be the one person who could clear up any

19        confusion."

20        Do you see that?

21   **A.**    Yes.

22   **Q.**    So you tried the regular avenues, the proper avenues

23   first, and that didn't work; right?

24   **A.**    I tried -- well, as -- the avenues would be conversation

25   with management.  My conversation with Dr. Lynch and

1    Mr. Hussain was very limited at that point.  I'd gone through

2    the official filings for Interwoven.  Those are the official

3    routes, but I couldn't get clarification to my question.

4    Q.   So you were trying to kind of sneak in the backdoor, huh?

5              MR. FRENTZEN:  Objection.  Argument.  Relevance.

6              THE COURT:  Sustained.

7    BY MS. LITTLE:

8    Q.   I'd like to also show you what's been marked as

9    Exhibit 946, which I hope is in your book this time.

10             MS. LITTLE:  Again, this is an e-mail from Mr. Khan to

11   Mr. Calonico -- two e-mails from Mr. Khan to Mr. Calonico, and

12   I would move their admission?

13             THE COURT:  946 is admitted.

14             MR. FRENTZEN:  No objection.

15      (Trial Exhibit 946 received in evidence)

16   BY MS. LITTLE:

17   Q.   So going down again to the bottom, we have that same

18   e-mail, "Apologies for the intrusion."  That's the one we just

19   talked about; right?

20   A.   Yes.

21   Q.   And then the next e-mail up you communicate again to

22   Mr. Calonico.  Apparently he didn't answer you and so you

23   communicate to him again (reading):

24             "I just want to follow up on the request below.  I

25        appreciate that you might be slightly reluctant to address

1         some or all these questions."

2         Do you see that?

3    **A.**   Yes.

4    **Q.**   So you recognized that this was an unusual and

5    uncomfortable request that you were making; right?

6    **A.**   I was pointing out that it would be difficult.  He may not

7    want to answer these questions.

8    **Q.**   Because it would be improper; right?

9    **A.**   I don't think the questions were improper, but he may have

10   felt that he didn't want to answer them.

11   **Q.**   If you were asking for inside information, it would be

12   improper for him to answer those questions; right?

13   **A.**   Yes, but I don't believe it was inside information.

14   **Q.**   And then JP Morgan instituted an investigation of you

15   because of this; right?  You testified to that?

16   **A.**   Yes.

17   **Q.**   So with respect to a number of the things you've talked

18   about today -- about hardware disclosure, organic growth and

19   cash conversion -- those are all issues that would be discussed

20   between Autonomy and its auditors; right?

21   **A.**   I'm sorry?

22         **MR. FRENTZEN:**  Objection, Your Honor.  Objection.

23         **THE COURT:**  Sustained.

24   **BY MS. LITTLE:**

25   **Q.**   Generally speaking, does a company like Autonomy discuss

1    the types of issues you've talked about today with their

2    auditors?

3              **MR. FRENTZEN:**  Same objection, and also vague.

4              **THE COURT:**  Sustained.

5    **BY MS. LITTLE:**

6    **Q.**   Do you have any idea of what review and analysis Deloitte

7    did of any of Autonomy's financials?

8    **A.**   I'm not aware of specifics of testing.

9    **Q.**   And you have no idea of what accounting judgments Deloitte

10   might have made on any of the transactions you've talked about?

11   **A.**   No.

12   **Q.**   And you have no idea what testing or research Deloitte

13   did?

14   **A.**   No.

15   **Q.**   And you have no idea what review Autonomy's Audit

16   Committee did?

17   **A.**   No.

18             **MS. LITTLE:**  I've got nothing further.  Oh, wait.

19             **THE COURT:**  Well, one minute, Mr. Frentzen.

20                      (Pause in proceedings.)

21             **MS. LITTLE:**  Nothing further.

22             **THE COURT:**  Okay.  Any redirect?

23             **MR. FRENTZEN:**  Yes, Your Honor.

24                      **REDIRECT EXAMINATION**

25   \\\

1    **BY MR. FRENTZEN:**

2    **Q.**   When you were publishing these notes about Autonomy,

3    Mr. Khan, was your license active then?

4    **A.**   Yes.

5    **Q.**   And would you generally say that your views on Autonomy in

6    terms of your reputation ended up sort of bearing you out or

7    being a problem for you?

8    **A.**   It ultimately had a positive impact on my reputation.

9    **Q.**   Did any of these issues that Autonomy brought to the

10   attention of your bosses, JP Morgan -- were you cleared by your

11   bosses?

12   **A.**   Yes.

13   **Q.**   And did the FSA ever come knocking on your door and say

14   that you had done anything wrong?

15   **A.**   No.

16           **MR. FRENTZEN:**   And very briefly, Your Honor, I'd like

17   to offer Government's 26 -- I'm sorry, Exhibits 2651 and 2652.

18           **MS. LITTLE:**   I'd object as beyond the scope,

19   Your Honor.

20           **THE COURT:**   Well, let me see.   26 --

21           **MR. FRENTZEN:**   '51, and 2652, Your Honor.

22           **THE COURT:**   Okay.   Just a moment.

23                     (Pause in proceedings.)

24           **MR. FRENTZEN:**   They just evidence the vetting of what

25   Mr. Khan was reporting, Your Honor.

 1          **THE COURT:**  Admitted.

 2       (Trial Exhibits 2651 and 2652 received in evidence)

 3          **MR. FRENTZEN:**  Thank you, Your Honor.

 4   **Q.**   2651, Mr. Khan, with respect to this e-mail, were there --

 5   does this evidence the in-house vetting of the facts that

 6   Autonomy was saying you had gotten incorrect?

 7   **A.**   I'm just reading the e-mail.

 8       (Witness examines document.)

 9   **Q.**   "I've read Daud's note in detail.  I'm happy with his

10   analysis," et cetera, et cetera?

11   **A.**   Yes.  Pete Elwin was the head of accounting research at

12   Cazenove.

13          **MS. LITTLE:**  Objection.  I think this was in 2009.  I

14   don't think this has to do with the 2008 note.

15          **MR. FRENTZEN:**  Well, I'm talking about throughout,

16   Your Honor.

17          **MS. LITTLE:**  So it's beyond the scope.

18          **THE COURT:**  No, I think the question was related to

19   2008.  That was my recollection.  But is that wrong?  Is that

20   my recollection?

21          **MR. FRENTZEN:**  Well, I --

22          **MS. LITTLE:**  The testimony was about 2008.  This is

23   about some problem in 2009, which I think is beyond the scope.

24          **THE COURT:**  Well, was --

25          **MR. FRENTZEN:**  I'll --

1          **THE COURT:**  Was this inquired into by the Defense?  I

2     don't think so.

3          **MR. FRENTZEN:**  I thought it was, Your Honor.  If I'm

4     mistaken, that's fine, I can withdraw it.  It will make it

5     quicker.

6          **THE COURT:**  Okay.  Withdrawn.

7     BY MR. FRENTZEN:

8     **Q.**   Did Peter Elwin and others, did they check your work when

9     Autonomy raised questions?

10    **A.**   Yes.  On many occasions, yes.

11    **Q.**   And when they checked your work, were they okay with your

12    analysis and allow you to proceed with your notes?

13    **A.**   Yes.

14    **Q.**   And that's after they satisfied themselves that they had

15    checked whatever facts it was you were reporting?

16    **A.**   They themselves wouldn't check the facts, but any input

17    from the company was taken into account.

18    **Q.**   The fact that you were excluded from analyst calls, in

19    your experience was that abnormal?

20    **A.**   Yes.  It never happened to me before.

21    **Q.**   In terms of the discussion of hardware sales by Autonomy,

22    in terms of your notes when you were describing the hardware

23    sales that you were shown by Defense counsel, were those all

24    related to this Arcpliance?

25    **A.**   Yes.

1   **Q.**   All right.  And that was different than hardware sales

2   that were not appliances in your view?

3   **A.**   Yes.  I was unaware of other -- or any other material

4   hardware sales other than appliance-based sales.

5   **Q.**   And I think what you were describing to us, if you were,

6   did you feel that in terms of the pure software model, when

7   you're a software company, describing that you don't sell

8   hardware in and of itself, would you expect that in the annual

9   report, for example?

10  **A.**   No.

11  **Q.**   What were you explaining to us?  Can you describe that?

12  **A.**   So as a software company or the description that Autonomy

13  used as a pure software company was trying to differentiate

14  itself from other software companies; and, again, other

15  software companies would report three -- three revenue lines.

16  One was license revenue, which is the sale of software;

17  maintenance and support, which is the support contracts around

18  the license revenue; and services revenue.

19      So the idea of the pure software model was to -- that

20  Autonomy described was to differentiate between those companies

21  by saying that we don't do as much of the services portion of

22  it, but equally all those other software companies would do

23  very little hardware as well.

24  **Q.**   All right.  And, again, the numbers that I described for

25  you in terms of hardware sales, despite the question about

KHAN - REDIRECT / FRENTZEN

1   earnings per share, would that have had an impact on the

2   analysts view of Autonomy?

3   **A.**   Yes, in my opinion.

4   **Q.**   Why?

5   **A.**   As I said, that, you know, my issues with Autonomy were

6   the valuation of Autonomy was built around its organic growth,

7   which was somewhere between 10 and 20 percent.  It was driven

8   by the idea that profitability would continue to increase

9   because of this pure software model.

10       And if I can just explain what that means is that Autonomy

11   described the ability to sell software without having to hire

12   any new people.  So every time you sold new software, you

13   didn't have to hire additional people and, therefore, the sales

14   you got from that software would fall to your profit line.

15       The issue around valuation would have been, from my

16   perspective, that I didn't believe the growth, the organic

17   growth, was stated accurately.

18       And, secondly, the profitability was overstated because

19   if -- you know, as an example, if company X reports 100 million

20   of profit and in their cash flow statement I can only see

21   60 million of profit, I see there's a problem because all

22   valuation ultimately stems from the ability to generate cash.

23   **Q.**   In the various earnings calls with Autonomy, did they ever

24   describe their marketing as selling 50 million, 100 million

25   worth of hardware at a loss in order to engender some sort of

KHAN - REDIRECT / FRENTZEN

 1  appreciation from potential customers?

 2  **A.**   Never.

 3  **Q.**   Would that have shocked you or had an impact on your

 4  analysis?

 5  **A.**   It would have a huge impact.

 6  **Q.**   Why?

 7  **A.**   Because it would redefine what the company was.  I mean,

 8  if I can take an example of, you know, a company that sells

 9  coffee beans.  If I were to find out -- and they said they were

10  a pure coffee company and they only sold coffee beans and then

11  I found out they were actually selling coffee machines, that

12  would change my opinion of what the company did.

13        And I think any revelation around hardware sales would

14  have impacted my view of what Autonomy was.  I would certainly

15  redefine it as not a pure software company.

16  **Q.**   At a certain point did you have questions about marketing

17  expenses by Autonomy?

18  **A.**   Yes.

19  **Q.**   And when you had questions about marketing expenses, did

20  they tell you "We're selling dozens of millions of hardware" or

21  did they talk about a couple of sports teams?

22  **A.**   There was no -- the sales and marketing was all revolved

23  around their product launches or sports marketing sort of being

24  on the shirts of a football club or on the side of a Formula

25  One racing car.

KAHN - RECROSS / LITTLE

```
 1   Q.    Is that the Tottenham Hotspurs?

 2   A.    Yes.

 3              MR. FRENTZEN:  May I have a moment, Your Honor?

 4                   (Pause in proceedings.)

 5              MR. FRENTZEN:  That's all I have.  Thank you very

 6   much, Mr. Khan.

 7              THE COURT:  Yes, Ms. Little.

 8                   RECROSS-EXAMINATION

 9   BY MS. LITTLE:

10   Q.    Sir, if the coffee company sells coffee cups at a loss to

11   bring people into its store, there's nothing wrong with that;

12   right?

13   A.    If the coffee company told me they were doing that,

14   there's nothing wrong doing that.

15   Q.    It's still a coffee company; right?

16   A.    Yes.

17   Q.    Okay.  And you testified that it was abnormal to be

18   excluded from these calls in your experience.  In your

19   experience, is it abnormal for an analyst who's under active

20   investigation to be kept away from analyst calls?

21   A.    Again, it's a situation I've never seen before where a

22   potential accusation that no one was aware of, other than it

23   seems Autonomy, would have an effect.  I don't know.  It's

24   never happened to me before either.

25   Q.    Only when you're under investigation?
```

1    **A.**   I guess so.  I've never been under investigation.  I've

2    never been proven I've been under investigation.

3             **MS. LITTLE:**  Okay.  That's all I have.

4                   **FURTHER REDIRECT EXAMINATION**

5    **BY MR. FRENTZEN:**

6    **Q.**   The investigation was brought to the attention of your

7    employers by who on both occasions?

8    **A.**   Andrew Kanter.

9    **Q.**   And you were asked questions about a bad relationship with

10   Mr. Kanter and Dr. Lynch.  There was a question about no

11   threats from Mr. Hussain.

12            **MS. LITTLE:**  This is beyond the scope, sir.

13            **THE COURT:**  Sustained.

14            **MR. FRENTZEN:**  That's all I have then.  Thank you,

15   Mr. Khan.

16            **THE WITNESS:**  Thank you.

17            **THE COURT:**  Thank you very much, Mr. Khan.

18                        (Witness excused.)

19            **THE COURT:**  Okay.  Let's bring back Ms. Anderson.

20            **MR. LEACH:**  Thank you, Your Honor.

21            **THE COURT:**  Do you want to stretch, everybody?  We'll

22   take a break around noon, but we've got 20 minutes here, let's

23   fill it.

24   \\\

25   \\\

1          MR. KEKER:  He's always hopeful.

2          THE COURT:  Then that's good enough for me.  If he's

3    hopeful, then that's good enough for me.  Thank you.

4          MR. FRENTZEN:  Thank you, Your Honor.

5          MR. LEACH:  Thank you, Your Honor.

6          MR. REEVES:  Thank you, Your Honor.

7          MR. KEKER:  Thank you, Your Honor.  Have a good trip.

8               (Proceedings adjourned at 4:43 p.m.)

9                         ---oOo---

10

11                   CERTIFICATE OF REPORTERS

12          I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14

15    DATE:  Tuesday, March 27, 2018

16

17

18

19    _____

20    Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              U.S. Court Reporter

21

22

23    _____

24    Pamela A. Batalo, CSR No. 3593, RMR, FCRR
              U.S. Court Reporter

25

# EXHIBIT 21

**Volume 23**

**Pages 4538 - 4825**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. CR 16-00462 CRB** |
| | ) | |
| SUSHOVAN TAREQUE HUSSAIN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

San Francisco, California
Friday, April 13, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

ALEX G. TSE
Acting United States Attorney
450 Golden Gate Avenue
San Francisco, California  94102
**BY:  ROBERT S. LEACH**
**ADAM A. REEVES**
**WILLIAM FRENTZEN**
**ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:

KEKER & VAN NEST
633 Battery Street
San Francisco  CA  94111
**BY:  JOHN W. KEKER**
**JAN NIELSEN LITTLE**
**BROOK DOOLEY**
**KATE LAZARUS**
**NIC MARAIS**
**ATTORNEYS AT LAW**

Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
Pamela Batalo, CSR No. 3593, FCRR
Official Reporters

PROCEEDINGS

1    earlier.

2            MR. KEKER:  If you grant them all, we will be finished

3    earlier.  If you don't grant them all --

4            THE COURT:  Weeks.

5            MR. FRENTZEN:  And apropos of my point earlier,

6    Your Honor, I can't wait to see the defense call the witnesses

7    who got pitched on all of the resold hardware to make this Bank

8    of America deal happen.

9            MR. KEKER:  Can we sort of save the arguments until

10   argument time?

11           MR. FRENTZEN:  Well, this is on a point that happened

12   earlier this morning.  I'm simply reiterating my earlier point.

13       Thank you, Your Honor.

14           THE COURT:  Great.  Everyone have a nice lunch.

15           (Luncheon recess was taken at 12:06 p.m.)

16   **Afternoon Session**                           **1:03 p.m.**

17       (Proceedings were heard in the presence of the jury:)

18           THE COURT:  Please be seated.

19               (Pause in proceedings.)

20           MR. FRENTZEN:  The Government calls Paul Morland.

21           THE CLERK:  Please raise your right hand.

22                        **PAUL MORLAND**,

23   called as a witness for the Government, having been duly sworn,

24   testified as follows:

25           THE WITNESS:  I do.

| 1 | **THE CLERK:**  Thank you.  Please be seated. |

2          Please state your full name for the record and spell your

3    last name.

4                **THE WITNESS:**  Paul Morland, M-O-R-L-A-N-D.

5          **THE CLERK:**  Thank you.

6          **MR. FRENTZEN:**  Proceed, Your Honor?

7          **THE COURT:**  Yes.

8                        **<u>DIRECT EXAMINATION</u>**

9    **BY MR. FRENTZEN:**

10   **Q.**   Good afternoon, Mr. Morland.

11         Where do you live?

12   **A.**   I live in Somerset, England.

13   **Q.**   And what do you currently do for a living?

14   **A.**   I'm an activities analyst covering the technology sector.

15   **Q.**   How long have you been an analyst?

16   **A.**   I've been an analyst for most of the last 25 years.

17   **Q.**   Could you give the members of the jury some idea about

18   your education, sir?

19   **A.**   So I read liberal studies in science at Manchester

20   University.  After leaving university, I joined

21   Price Waterhouse, an accountancy firm, where I became a charged

22   accountant after three years.

23   **Q.**   All right.  And then in terms of being an analyst, could

24   you give us some idea of how much of your time as an analyst

25   you focused on technology?

MORLAND - DIRECT / FRENTZEN

1  **A.**    When I first became an analyst, I covered a sector called

2  the support services sector; and in the U.K. in 1998, that

3  sector was split into two sectors, the business services sector

4  and the technology sector, and I started following the

5  technology sector in 1998.

6  **Q.**    In the course of your work, I'd like to direct your

7  attention to around the time of let's start in late 2008.

8  Around that time, were you working as an analyst?

9  **A.**    I was.

10 **Q.**    And could you tell us who you were an analyst for?

11 **A.**    I was working for Astaire Securities.

12 **Q.**    And what was Astaire?

13 **A.**    It was a small brokerage firm.

14 **Q.**    And the jurors have heard from some analysts, but could

15 you just give us an idea of what your -- what entities you

16 covered?

17 **A.**    Okay.  So typically an analyst would cover between 12 and

18 15 different quoted stocks; and because I look at the

19 technology sector, all of my stocks would have been technology

20 stocks ranging from hardware stocks, IT services stocks, and

21 software stocks.

22 **Q.**    Was one of the companies that you covered in 2008 through

23 2011 a company called Autonomy?

24 **A.**    It was, yes.

25 **Q.**    Okay.  And do you have a recollection of when you first

1    started covering Autonomy?

2    **A.**    I first became aware of the company when it floated in the

3    sort of late 1990s, but I didn't actually write research on it

4    back then.  So I was aware of it going back quite a long time.

5    I probably started covering it round about 2005 probably.

6    **Q.**    I'd like to show you what's been marked as Exhibit 11 and

7    just see if you recognize what Exhibit 11 is, sir.

8    **A.**    (Witness examines document.)  Yes, this was a note that I

9    wrote in October 2008.

10          **THE COURT:**  Admitted.

11       (Trial Exhibit 11 received in evidence)

12          **MR. FRENTZEN:**  Thank you, Your Honor.

13          **THE WITNESS:**  If I might just say, it's got Blue Oar

14   on it but Blue Oar changed its name to Astaire Securities so

15   it's the same company.

16   **BY MR. FRENTZEN:**

17   **Q.**    Same company, different name?

18   **A.**    Yeah.

19   **Q.**    Okay.  I'd like to just start with this particular note.

20   Was this a note in which you were covering Autonomy and some

21   other tech companies?

22   **A.**    Yes, it was.

23   **Q.**    All right.  So in the course of this note, did you also

24   have some comments about other companies --

25   **A.**    I did.

1   **Q.**   -- within it?

2       And if we could, just if I could focus your attention --

3   and there's a screen right next to you there, Mr. Morland -- do

4   you see what I've circled right there?

5   **A.**   (Nods head.)

6   **Q.**   Was that your -- in October of 2008, was that your

7   recommendation related to Autonomy?

8   **A.**   It was, yes.

9   **Q.**   And if you could, could you just very briefly, from a very

10  high level, in 2008 what was your view on Autonomy that you

11  thought was positive?

12  **A.**   Well, first of all, it was a software company and software

13  companies tend to attract very high valuations because software

14  is something that is relatively easy to replicate and,

15  therefore, it can be sold at very high margins.  Software

16  companies can both generate high margins and also they can grow

17  very, very quickly when they've got good software.

18      Also, they give quite good -- they can give quite good

19  visibility of revenues as well, which is another important

20  thing to an analyst, and that's in terms of the maintenance

21  contracts that you sell.  Typically back in those days you

22  would sell a software license and then maintenance would come

23  on the back of that, and then maintenance was renewable on an

24  annual basis so it gave investors some idea that it was

25  visibility in the model.

MORLAND - DIRECT / FRENTZEN

 1          I remember that during 2008, Autonomy signed a number of
 2    very large deals with large banking clients, and it looked as
 3    if those deals would last for multiple years.  So the prospects
 4    for the company looked very good indeed, and that's why I had a
 5    buy recommendation.
 6    **Q.**   And if I could, could we go to page 21 of this note,
 7    please?
 8          And I just wanted to highlight one issue that you included
 9    in your note, Mr. Morland.
10          Page 21 if you would.  Can you scroll this up?  Great.
11    Right there.
12          Okay.  Mr. Morland, do you see the paragraph here about
13    positive impact from financial crisis?
14    **A.**   Yes.
15    **Q.**   And was that something that around this time that folks at
16    Autonomy were talking about to analysts and to the investors
17    such as yourself?
18    **A.**   It was, yes.  It was generally quite a difficult time for
19    corporate entities.
20    **Q.**   This was, like, the great recession 2008 and the crash?
21    **A.**   Yes.  Generally, you know, the economic situation wasn't
22    looking good, and so people were getting worried about
23    companies' ability to generate profits, but it appeared that
24    Autonomy software was actually going to be very beneficial in
25    this environment by helping banks with their discovery process.

1  **Q.**  So meaning that the crash would create litigation and

2  litigation would create a need to utilize software such as

3  Autonomy's?

4  **A.**  Correct.

5  **Q.**  All right.  And this was one of the things that in 2008

6  you thought would be potentially beneficial as Autonomy was

7  promoting?

8  **A.**  Yes, I did.

9  **Q.**  I'd like to turn your attention now to the 2009 period and

10  there is an exhibit I'd like to show you, Exhibit 81.

11      Take a quick look at Exhibit 81 and see if you recognize

12  what that is, sir.

13  **A.**  (Witness examines document.)

14      **THE COURT:**  81 admitted.

15      (Trial Exhibit 81 received in evidence)

16      **MR. FRENTZEN:**  Thank you, Your Honor.

17      **THE WITNESS:**  I recognize it, yes.

18  **BY MR. FRENTZEN:**

19  **Q.**  All right.  And so is this one of your -- or is this sort

20  of more of a report and less of a note, if you will?

21  **A.**  Yes.

22  **Q.**  Or does that even make a difference?

23  **A.**  Yes.  This is more of a thematic piece.

24  **Q.**  And in the course of this, were you sort of pointing out

25  things to watch out for in the technology sector?

MORLAND - DIRECT / FRENTZEN

1   **A.**   Yes.  We called them red flags in the industry, things to
2   look out for, things going on in companies that might be
3   warning signals about what might happen in the future.

4   **Q.**   All right.  And was one of sort of the test cases in this
5   report that you mentioned Autonomy?

6   **A.**   Yes, it was.

7   **Q.**   All right.  And if we could, could we go to page 13 of
8   this document, please?  And if we could scroll down a little
9   bit.

10       Was one of your concerns around audits?

11  **A.**   It was, yes.

12  **Q.**   And can you describe that for us, please, sir?

13  **A.**   There's regulations that cover the audit industry that
14  requires single offices not to have clients that are overly
15  important to them in terms of revenue for that particular
16  office.

17  **Q.**   Was that a concern around Autonomy for you?

18  **A.**   It was a potential concern given that they were audited by
19  the Deloitte's Cambridge office, and I would normally have
20  expected such a large company to be audited by the London
21  office.

22  **Q.**   Was this an issue in "Small Office of a Large Firm" that
23  you brought up for investors?

24  **A.**   Yes, it was.

25  **Q.**   I'd like to take your attention to earnings calls, please,

1    Mr. Morland.

2        In the time that you spent covering Autonomy, did you

3    participate in earnings calls?

4    **A.**   I did, yes.

5    **Q.**   Could you tell us -- we've heard about earnings calls, but

6    just briefly if you could remind us, what are the earnings

7    calls?  What takes place and what are you looking for as an

8    analyst?

9    **A.**   Okay.  So typically every -- every six months, but in

10   Autonomy's case it was every three months, which is the case in

11   the U.S., companies report results on a quarterly basis.  They

12   report their results between a month and two months after the

13   period end.  They release those results in the U.K. at

14   7:00 a.m. in the morning, and they typically have an earnings

15   call or a meeting with analysts which typically starts at

16   9:00 or 9:30 that morning.

17   **Q.**   Okay.  And did you attend the earnings calls for Autonomy

18   for the third quarter in 2009?

19   **A.**   I did, yes.

20   **Q.**   And, actually, I apologize.  I want to back up and cover

21   one other issue first.

22        I want to show you what's been marked as Exhibit 176.

23            **MR. FRENTZEN:**  And, actually, Your Honor, this is a

24   large batch of notes.  I have no problem breaking it down if

25   there's an objection to any of them in particular.

1           **MS. LITTLE:**  No objection.

2           **MR. FRENTZEN:**  Great.  Thank you.

3           **THE COURT:**  Admitted.

4       (Trial Exhibit 176 received in evidence)

5           **MR. FRENTZEN:**  So could we bring up 176, page 18?

6   **Q.**   All right.  Mr. Morland, do you recognize a note that you

7   wrote related to Autonomy in September of 2009?

8   **A.**   Yes, I do.

9   **Q.**   All right.  And at that time what was your recommendation

10  on Autonomy?

11  **A.**   I had a sell recommendation at that time.

12  **Q.**   Okay.  What does that mean?

13  **A.**   It means different things for different brokerages, but

14  typically it means that you think the share price is going to

15  go down.

16  **Q.**   All right.  Okay.  And at this point in time -- could we

17  scroll up just a little bit?  Great.  That's good -- did you

18  have concerns about the growth at Autonomy?

19  **A.**   I did, yes.

20  **Q.**   And why was growth a concern with Autonomy just in terms

21  of -- I mean, what would that mean for the company if growth

22  was -- growth and core licenses has gone into reverse?

23  **A.**   Okay.  One of the reasons I was concerned about growth was

24  it was -- in Q1 that year, Autonomy bought Interwoven and I was

25  worried about the adjustments that the company was making when

1    it calculated the organic growth rate.

2         Because if you buy a business and that business doesn't

3    have -- will then contribute to your revenues in the future but

4    it doesn't contribute to the comparable period.  So to

5    calculate organic growth you need to strip out those revenues

6    to work out what the organic growth was.

7         So I started to think at that time that Autonomy was

8    exaggerating its organic growth, and that's very important

9    because companies -- the principal valuation metric -- and you

10   can see it on the front page of that note -- is the PE ratio

11   and there's a very close relationship between the PE ratio and

12   how fast a company is growing.  So high-growth companies tend

13   to have high PEs, which means high valuation.  So growth is

14   very important, particularly in the software sector.

15   **Q.**   All right.  And just to be clear, at this time in

16   September of 2009, did you have any clue at this particular

17   time that Autonomy was selling or was engaging in sales of

18   hardware in terms of its revenue -- affecting its revenue

19   figures?

20   **A.**   I did not, no.

21   **Q.**   I'd like to show you now what's been marked as

22   Exhibit 206.  Would you take a quick look at 206 and see if you

23   recognize what that is, sir?

24             **THE COURT:**  Admitted.

25        (Trial Exhibit 206 received in evidence)

 1          **THE WITNESS:**   (Witness examines document.)

 2    **BY MR. FRENTZEN:**

 3    **Q.**   Was -- well, following your note of 18th September 2009

 4    recommending a sell, did Autonomy write to your, I guess --

 5    well, did they write about you to Astaire?

 6    **A.**   They did, yeah.

 7    **Q.**   Okay.  Was that brought to your attention?

 8    **A.**   Yes, it was.

 9    **Q.**   And could you tell us, in terms of the allegations made by

10    Autonomy -- could we scroll down a little bit? -- what were

11    the -- what were the complaints Autonomy was making about you

12    to Astaire?

13    **A.**   From what I remember, they were saying that I had made

14    incorrect statements and these statements were known by me to

15    be incorrect.  Of course, any analyst can make -- unknowingly

16    make incorrect statements.  We try not to but it does happen,

17    but it would be very unusual, I'd suggest, to knowingly make an

18    incorrect statement.

19    **Q.**   Why do you see that?  As an analyst, why do you say that?

20    **A.**   As an analyst in the market, and bear in mind in the

21    London market covering technology at the time there were

22    probably about, I don't know, seven or eight recognized

23    analysts, maybe a couple more and your reputation is very

24    important to you, and you could ruin a career by deliberately

25    saying something that you didn't believe.

1   **Q.**   Are there also issues just with -- I mean, as an analyst,

2   do you get anything out of knowingly falsifying something?

3   **A.**   It's very hard to imagine a case or a situation.

4   **Q.**   Why do you say that?  I mean, who is your consumer?

5   **A.**   The institutional investor.

6   **Q.**   And so if you knowingly mislead an institutional investor,

7   what do you get out of that?

8   **A.**   Well, you're trying to give them good recommendations so

9   they can make money; and if you knowingly falsify someone,

10  that's probably not going to be a -- end up in giving them a

11  good recommendation.

12  **Q.**   All right.  In addition to accusing you of that, was there

13  a second accusation -- and if we could scroll up just a little

14  bit -- made about you?

15  **A.**   Yes.

16  **Q.**   What was that?

17  **A.**   I believe it said that I had access to price-sensitive

18  information.

19  **Q.**   And could we just scroll down to see who wrote or signed

20  this document?

21       Do you know who Andy Kanter is?

22  **A.**   Yes.  He sat -- I can't remember if he was on the board,

23  but he used to sit in all the analyst call meetings.

24  **Q.**   It says here "Chief Operating Officer"?

25  **A.**   Yeah.  He was an employee of Autonomy, yeah, the chief

MORLAND - DIRECT / FRENTZEN

1    operating officer.

2    **Q.**   In terms of this -- or these allegations, could you just

3    briefly tell us how this was resolved?

4    **A.**   Well, Astaire at the time was a very small brokerage and

5    it couldn't risk getting involved in any kind of litigation, so

6    they decided to retract the statement that I'd made.

7    **Q.**   All right.  Let me show you what's been marked as

8    Exhibit 235.  Take a look and see if you recognize 235.

9    **A.**   (Witness examines document.)

10        **THE COURT:**  Admitted.

11        (Trial Exhibit 235 received in evidence)

12        **MR. FRENTZEN:**  Thank you, Your Honor.

13        Could we blow up the top part?

14    **Q.**   Do you see here, sir, there's an e-mail October 1st, 2009?

15    **A.**   Yes.

16    **Q.**   And it's from Michael Armitage.  Who's that?

17    **A.**   He was the head of research at Astaire and also the

18    telecom's analyst.

19    **Q.**   And this is to Andrew Kanter at Autonomy with a cc to you?

20    **A.**   Yes.

21    **Q.**   And you said a retraction.  Do you see here that it's

22    described as a clarification by Mr. Armitage?

23    **A.**   (Witness examines document.)  Yes.

24    **Q.**   Okay.  Could we go to page 8, please?

25        All right.  And does this appear to be the clarification

MORLAND - DIRECT / FRENTZEN

1   that was sent?

2   **A.**   Yes, it does.

3   **Q.**   All right.  And if you could scroll up, please.  Keep

4   going.  Great.

5       Okay.  Was this actually a retraction or was this

6   basically just a clarification, Mr. Morland?

7   **A.**   Well, I wasn't keen to retract my statement and I still

8   stand by it today, so I've described it as a clarification.

9   **Q.**   All right.  And in terms of what got clarified, it's

10  indicated "We accept this can be open to misinterpretation,"

11  et cetera, et cetera.

12      And then can we go down to "Astaire view"?  If you could

13  keep scrolling.

14      Okay.  Does it then go on to say (reading):

15          "We continue to believe that Autonomy has

16      consistently recognized revenues too aggressively at

17      acquired companies, exaggerated organic rates of growth,

18      and delivered consistently poor cash conversion as

19      discussed in our recent note"?

20  **A.**   Yes, it does.

21  **Q.**   So it's a clarification but not much of a change and not a

22  change on the ultimate conclusion?

23  **A.**   Correct.

24  **Q.**   Autonomy's accusations about your utilizing nonpublic

25  information, did that go anywhere?

**A.** It didn't.

**Q.** Why not?

**A.** I can't remember precisely, but the document that they were referring to certainly wasn't -- I mean, to be price sensitive, it has to be unpublished, and it was definitely from published sources, the information that I had.

**Q.** All right. I want to take you past this time period in early October to late October and get to that earnings call, if we could.

**MR. FRENTZEN:** May I have one moment, Your Honor?

**THE COURT:** Yes.

(Pause in proceedings.)

**MR. FRENTZEN:** Your Honor, at this time if it's not already in evidence, I'd like to offer Exhibit 3042, which is the audio of the Q3 2009 earnings call.

**MS. LITTLE:** No objection with the same proviso that the tape is the evidence and the transcripts are just an aid.

**THE COURT:** The tape is the evidence.

**MS. LITTLE:** Correct. And the transcripts are an aid.

**MR. FRENTZEN:** Yeah. What I just referred to is the tape. The transcript, Your Honor, is Exhibit 291. I propose to play some clips and display Exhibit 291 while playing the audio.

**THE COURT:** So 291 will be marked for identification.

(Trial Exhibit 291 marked for identification)

MORLAND - DIRECT / FRENTZEN

1        **THE COURT:**  3042 is admitted.

2        (Trial Exhibit 3042 received in evidence)

3        **MR. FRENTZEN:**  Great.  Thank you, Your Honor.

4        Okay.  Could we just blow up the first page of this?

5        Oh, sorry.  I don't want to mess up what you're doing.

6        No?  Not going to happen?

7                        (Pause in proceedings.)

8        **MR. FRENTZEN:**  Can we just blow up right here

9    (indicating) just to show the -- okay.  There you go.

10   **Q.**  And, Mr. Morland, is this the Q3 2009 earnings call on

11   October 20th, 2009?  Is that what it appears to be?

12   **A.**  Yes.

13       **MR. FRENTZEN:**  Could we go to the first clip?

14       And, Your Honor, for the record we're starting at

15   6 minutes, 15 seconds into the --

16       **MS. LITTLE:**  Your Honor, if I could just ask for some

17   clarification.  I don't see Mr. Morland listed on page 2, so we

18   need to have some foundation as to whether he participated in

19   this call.

20       **THE COURT:**  Sustained.

21       **MR. FRENTZEN:**  Well, okay.  May I approach with the

22   transcript, which is not in evidence?

23       **THE COURT:**  Yes.

24       **MR. FRENTZEN:**  Let me just ask.

25   **Q.**  Mr. Morland, did you attend this conference?

MORLAND - DIRECT / FRENTZEN

```
 1    A.    Yes.

 2    Q.    Okay.  And so, in other words, you didn't call in; you

 3    actually attended physically?

 4    A.    Correct.

 5    Q.    And you recall being there?

 6    A.    (Nods head.)

 7    Q.    And if I could -- may I approach, Your Honor?

 8          If you just take a look at page 2, does that list

 9    "Corporate Participants" and then "Conference Call

10    Participants"?

11    A.    (Witness examines document.)  Yes.

12    Q.    Okay.  And so it lists people that are there for the

13    corporation and folks that apparently called in?

14    A.    Yes, but not the people who are sitting in the audience.

15    Q.    So you were sitting in the audience?

16    A.    Yes.

17    Q.    Okay.  Great.

18              MR. FRENTZEN:  May I proceed now, Your Honor?

19              THE COURT:  Yes.

20              MR. FRENTZEN:  Thank you.

21          If we could start at 6:15, start the first clip and blow

22    up...

23                          (Pause in proceedings.)

24              MR. FRENTZEN:  Just to indicate I'm starting here

25    (indicating).
```

1                    (Pause in proceedings.)

2                 (Audio was played but not reported.)

3          **MR. FRENTZEN:**  If we could just bring up what we had,

4    and I'll ask a couple of questions off of that.

5          **MS. LITTLE:**  Are you in a different part of the tape

6    or what?

7          **MR. FRENTZEN:**  No.  I was going to point something

8    out.

9          **MS. LITTLE:**  Okay.

10                    (Pause in proceedings.)

11   **BY MR. FRENTZEN:**

12   **Q.**   Okay.  Mr. Morland, do you remember a big issue in the

13   course of this earnings call was a discussion of the launch of

14   a new product?

15   **A.**   Yes, I do.

16   **Q.**   And do you also -- do you have a recollection of whether

17   or not there was a discussion later around this Quick Start

18   program?

19   **A.**   Yes.  There was a discussion on that as well, yeah.

20   **Q.**   Do you have a recollection of whether or not in the course

21   of this that Autonomy was telling investors and analysts that

22   there was a large amount of extra spend on sales and marketing

23   due to this new product?

24   **A.**   Yes.  I think the extra spend on sales and marketing in

25   this quarter was about $20 million.

1  Q.  And was that also reflected in a PowerPoint that was

2  handed out to the analysts in connection with this

3  presentation?

4  A.  Yes, it was.

5           MR. FRENTZEN:  All right.  If we could, can we

6  continue from where we were?  Is that possible?

7           SPECIAL AGENT BRYANT:  Yes.

8               (Audio was played but not reported.)

9  BY MR. FRENTZEN:

10 Q.  All right.  So during the course of this, Mr. Morland, was

11 Mr. Lynch ascribing this uptick in the spend to IDOL SPE, the

12 launch of IDOL SPE, and this Quick Start program?

13 A.  Yes, he was.

14          MR. FRENTZEN:  And, actually, one moment.

15               (Pause in proceedings.)

16 BY MR. FRENTZEN:

17 Q.  And I think I should say for the record, Mr. Morland, the

18 voice that was speaking on the clip we just heard, who was

19 that?

20 A.  Mike Lynch.

21          MR. FRENTZEN:  And I'd like to go now to a clip.

22 Your Honor, this is going to start at 19 minutes, 48 seconds,

23 and this is on page 7 in terms of the transcript.

24               (Audio was played but not reported.)

25 \\\

BY MR. FRENTZEN:

Q.   So, Mr. Morland, was Mr. Hussain describing the revenues for the year?

A.   Yes.

Q.   All right.  And is that normal?

A.   Yes.

Q.   All right.  And in terms of product sales, did he describe that as "Product sales, which include OEM and hosted, showed strong growth"?

A.   Yes.

Q.   And in terms of the margins, are margins important as an analyst observing margins for a software company?

A.   Yes.

Q.   Why is that?

A.   It's a measure of the profitability and ultimately profits that turn into cash, and it's the cash that the business generates that dictates its value over the long term.

Q.   Okay.  And when Mr. Hussain describes 86 percent as the gross margins and he says, "We saw the effect of a couple of percentage points of the overdemand on the Quick Start program for the new product release," what did you take that to mean?

A.   It's quite unusual to have an extra cost because demand's high.  Normally you spend to create demand and then the demand comes later.  But I think that was just to try and explain why the gross margin was a little bit lower than an analyst might

1  have expected for a software company.

2  **Q.**   Okay.  So meaning at 86 percent it was a little low that

3  quarter?

4  **A.**   Yes.  I think it was 2 or 3 percent below where it would

5  normally be.  It was normally around 88, 89 percent.

6  **Q.**   Did Mr. Hussain at any point during the course of this

7  earnings call describe the effect of the margin or the extra

8  spend on the basis of selling hardware?

9  **A.**   No.

10       **MR. FRENTZEN:**  Could we go to the next clip, very

11  short, 25 minutes, 51 seconds?

12            (Audio was played but not reported.)

13  **BY MR. FRENTZEN:**

14  **Q.**   So that statement there by Mr. Hussain, Mr. Morland,

15  "Sales and marketing expenses increased in the quarter versus

16  previously in relation to the new product launch," what did you

17  take that to mean?

18  **A.**   I took that to mean that there was a lot of marketing

19  expenditure required in the quarter to drive sales of the new

20  product.

21  **Q.**   Okay.  And, again, did Mr. Hussain tell you that increase

22  in sales and marketing was due to purchases of hardware for

23  resale?

24  **A.**   No, he did not.

25  **Q.**   What sort of issues would that have raised for you as an

 1   analyst?

 2   **A.**   Well, it would have come as a shock for one.

 3   **Q.**   Why is that?

 4   **A.**   Well, Autonomy always told the analyst community that it

 5   was a pure software company and pure software companies don't

 6   sell hardware.

 7   **Q.**   I'd like to now show you --

 8            **MR. FRENTZEN:**   May I have one moment, Your Honor?

 9            **THE COURT:**   Yes.

10   BY MR. FRENTZEN:

11   **Q.**   -- that is the clip starting at 33:03.

12                        (Pause in proceedings.)

13                   (Audio was played but not reported.)

14            **MR. FRENTZEN:**   Pause.

15   **Q.**   Who is speaking here, Mr. Morland?

16   **A.**   Sushovan Hussain.

17   **Q.**   And in terms of -- can we blow that section back up,

18   please, on the transcript?

19       Okay.  And in terms of the discussion here on revenue

20   recognition, what was Mr. Hussain telling you as an analyst

21   about the standards applied for revenue recognition by

22   Autonomy?

23   **A.**   He was basically saying -- or the message, as I took it,

24   was that they took the most prudent revenue recognition policy.

25   They were acquired to abide by IFRS, which is the European

1    standard; but if they felt that -- I think that should be "SOP"

2    rather than "SAP" -- but SOP 97-2 where it was more

3    conservative, they applied that.

4    **Q.**   And SOP 97-2, is that a part or a section of U.S. GAAP?

5    **A.**   It is, yes.

6    **Q.**   And one that specifically relates to what sort of product?

7    **A.**   Revenue recognition of software.

8    **Q.**   And I think this may be a typo.  Is it SOP?

9    **A.**   Yes.

10   **Q.**   All right.  So in terms of you as an analyst, the

11   investing public, was it Autonomy's position for revenue

12   recognition, "Hey, we just follow IFRS," or was it something a

13   little different?

14   **A.**   Something a little different.

15   **Q.**   And what is that?

16   **A.**   I think the message here was that they followed what they

17   considered to be the most prudent approach, whether it be the

18   U.S. GAAP or U.K. European GAAP.

19   **Q.**   And there's reference here to the website.  Have you

20   actually seen this on the website?

21   **A.**   I haven't, no.

22   **Q.**   This -- I mean, and I'm saying them talking about IFRS

23   versus U.S. GAAP on their website, the Autonomy website.

24   **A.**   I can't remember if I've seen it on the website.

25   **Q.**   All right.  We'll get into it.

1    **A.**   I can remember them talking about it in meetings, though.

2    **Q.**   We'll get into it in a minute.

3    **A.**   Okay.

4    **Q.**   In terms of them going on here, does Mr. Hussain make

5    reference twice to pure software companies?

6    **A.**   Yes, he does.

7    **Q.**   All right.  Describing Autonomy?

8    **A.**   Yes.

9          **MR. FRENTZEN:**  And I'd like to go now, if we could, to

10   a clip at 1 hour, 4 minutes and 22 seconds.

11              (Audio was played but not reported.)

12   **BY MR. FRENTZEN:**

13   **Q.**   Mr. Morland, that question and answer there, was that a

14   question about the extra expense in the quarter; and what was

15   the description there by Mr. Hussain?

16   **A.**   He said that the extra expense was due to sales and

17   marketing around SPE and it wouldn't be repeated in future

18   quarters.

19   **Q.**   I'd like to now direct your attention to Exhibit 630.

20        I don't have it here.

21          **MR. FRENTZEN:**  Is it already in evidence?

22          **THE CLERK:**  No.

23          **MR. FRENTZEN:**  I'll do it like this.

24          **THE COURT:**  630 admitted.

25        (Trial Exhibit 630 received in evidence)

1   BY MR. FRENTZEN:

2   **Q.**   Mr. Morland, are you familiar with the Investors' Question

3   Board for Autonomy?

4   **A.**   Yes, I am.

5   **Q.**   Okay.  All right.  And what's the Investors' Question

6   Board?

7   **A.**   It's really for people who didn't get an opportunity to

8   ask questions at the meeting or any sort of follow-up questions

9   were addressed to the board and then Autonomy, there IR

10  Department, would answer the questions on the board.

11  **Q.**   Was this on a website or posted on a website do you know?

12  **A.**   Yes, it was.

13  **Q.**   All right.  So when we talked earlier about the website,

14  is this part of Autonomy's website?

15  **A.**   Yes.

16  **Q.**   Okay.  And if we could, could we scroll down -- could we

17  go to page 2, please, and scroll up some?

18       I want to focus your attention, Mr. Morland, on this Q & A

19  right here that shows a pin next to it.  Could you tell us what

20  is stated here and what the answer is?

21  **A.**   It says that Autonomy doesn't -- didn't make any sales to

22  MicroLink in Q4 2009.

23  **Q.**   And there were no Q4 '09 revenues for MicroLink?

24  **A.**   That's what it says.

25  **Q.**   Could we go to page 10, please?

1        And at the top do you see here -- do you see where I put a

2   little box around?  And the question is (reading):

3            "What types of revenue streams do you have?"

4   And does the response appear to be (reading):

5            "We sell standard software and 95 percent of Group

6        revenues are product related"?

7   **A.**   Yes.

8   **Q.**   All right.  And do you see then there's a list of items

9   here (reading):

10           "Upfront license revenues.  Normally perpetual and

11       recognized on delivery in accordance with IFRS, which in

12       terms of revenue recognition is consistent with U.S. GAAP

13       SOP 97-2.  SOP 97-2 contains more detailed specific

14       guidance on software revenue recognition which fits within

15       the framework of IFRS."

16   Number two, "Maintenance Revenues" and it talks about the

17   percentages.  (reading)

18           "Hosted SAAS revenues, pay as you go or subscription

19       recognized rateably.

20           "OEM revenues split as development and ongoing."

21   Do you see each of those categories?

22   **A.**   Yes, I do.  Yeah.

23   **Q.**   And as an analyst, as somebody observing information that

24   Autonomy has put out, does any of that appear to be hardware?

25   **A.**   None of that's hardware.  "Product" was used as a term

MORLAND - DIRECT / FRENTZEN

1  to -- it meant software product, and those four items are all

2  categories of software revenue.

3  **Q.**  Okay.  Then it says "Other" and it says (reading):

4          "Primarily professional services but can include

5      training and appliances."

6      Do you see that?

7  **A.**  Yes.

8  **Q.**  Is that the first reference in this -- or the only

9  reference in this list of things to any sort of hardware?

10  **A.**  Yes, it is.

11  **Q.**  I'd like to go now to page 11, and if we could go to the

12  bottom of page 11, please.

13      Can you comment in more detail on your revenue recognition

14  policy?  Do you see that there, Mr. Morland?

15  **A.**  Yeah.

16  **Q.**  Okay.  All right.  And does this go on to say effectively

17  that Autonomy uses IFRS as the formal recognition policy used

18  to prepare its accounts; but then rather than stop going on

19  (reading):

20          "However, being in a pure software business, there

21      are certain areas where IFRS does not have specific

22      guidelines to cater for all situations but merely provides

23      guiding principles.  Thus, for revenue recognition, we

24      voluntarily adhere to the principles set out in U.S. GAAP

25      SOP 97-2, which is far more detailed, prescriptive, and

1          conservative than IFRS and that has made it the gold

2          standard for other software companies like Oracle and

3          Microsoft.  In fact, the guidelines to SOP 97-2 and SAB

4          101 run to over 100 pages as they have evolved over the

5          years in tandem with the much broader U.S. software market

6          requirements.  IFRS, on the other hand, is far less

7          detailed and less conservative when it comes to software

8          companies.  In short, we use SOP 97-2 because it is

9          designed specifically for software revenue recognition

10         and" -- if we could go to the next page -- "hence, tends

11         to be more relevant; but if IFRS for any revenue

12         recognition point became more relevant or restrictive than

13         SOP 97-2, we would use IFRS for revenue recognition since

14         that is the formal policy."

15         And then goes on to list or to describe aspects of

16    SOP 97-2.

17         So as an analyst, as an investor, does this strengthen

18    what you were talking about previously in terms of

19    Mr. Hussain's statement to you about how or what rules Autonomy

20    used for revenue recognition?

21    **A.**   Yes, it does.

22    **Q.**   Okay.  And can you just describe for us -- I mean, what

23    was your view on how Autonomy recognized revenue?

24    **A.**   Well, it used -- I mean, this makes it clear that it uses

25    GAAP specifically designed for software recognition and

MORLAND - DIRECT / FRENTZEN

1   reinforces the argument really that Autonomy was a pure

2   software company and that's why it was using GAAP designed for

3   software companies.

4        And it also makes the point that they were very

5   conservative in their recognition as well because where they

6   thought IFRS wasn't conservative enough, they would voluntarily

7   adopt SOP 97.

8   **Q.**   And that's information that was out there for investors

9   for the public?

10  **A.**   Yes, it was.

11  **Q.**   Can we scroll up some?  Yeah, the other way.  Great.  Keep

12  going.  All right.  Stop here.

13       I want to direct your attention here to this paragraph,

14  Mr. Morland.  And the question here posted was (reading):

15            "Autonomy has been very successful at maintaining

16       consistently high operating leverage.  Please, can you

17       help me understand the company's margin profile and what I

18       should expect going forward?"

19       What's "margin profile" refer to?

20  **A.**   Two things really.  One, how I can expect the margin to

21  develop in the future; and, two, something that's called

22  operational gearing, which is whether if you've got a high

23  gross margin, then each additional sale you make contributes

24  directly to the bottom line and can ultimately mean that you

25  generate a higher or a rising operating margin.

MORLAND - DIRECT / FRENTZEN

1    **Q.**   All right.  Does this, then, go on to talk about pure

2    software model?

3    **A.**   It does.

4    **Q.**   (reading)

5              "Autonomy is one of the very rare examples of pure

6         software model.  Many software companies are actually

7         pseudo-services outfits that do an awful lot of

8         customization work on a product for every single

9         implementation while Autonomy ships a standard product

10        that requires very little tailoring with the necessary

11        implementation work carried out by approved partners such

12        as IBM Global Services, Accenture, and others.  This means

13        that after the cost base has been covered, for every extra

14        dollar of revenue that comes in, you simply take off

15        9 cents to get to the gross margin and then a further

16        10 cents, which is paid in commissions to our partner

17        managers.  That leaves 81 cents which falls straight

18        through to the bottom line.  We see no reason operating

19        margins of 45 to 50 percent should not be consistently

20        achievable in the future."

21        Is that a description of Autonomy as a pure software

22    model?

23    **A.**   Yes, it is.

24    **Q.**   And could we now take a look at the last paragraph here?

25    Does this last paragraph here actually relate to hardware?

```
 1   A.   (Witness examines document.)  Yes.

 2   Q.   Okay.  In other words -- well (reading):

 3            "Historically, companies that have achieved these

 4        levels often diversify into hardware or other areas, which

 5        has a big impact on operating margin.  For Autonomy, it's

 6        hard to see what other areas could be valuable enough to

 7        warrant such a large departure from the pure software

 8        model."

 9        Does it appear here that Autonomy is saying "pure software

10   model" means "we don't get into hardware"?

11   A.   It does.

12   Q.   Did you take that to mean that as an analyst in advising

13   your investors?

14   A.   I did.

15   Q.   And was that available for the public, the Investor Board

16   Questions?

17   A.   Yes.  I mean, it states quite clearly that it has no

18   intention of Autonomy to ever get into the sale of hardware.

19   Q.   I'd like to now go very -- actually, let me -- I want to

20   show you one more document.  I don't have a copy of it here.

21            MR. FRENTZEN:  Counsel, is there any objection to 293,

22   the PowerPoint?

23            MS. LITTLE:  (Shakes head.)

24            MR. FRENTZEN:  Your Honor, I'd offer 293 into

25   evidence.
```

1              **THE COURT:**  Admitted.

2         (Trial Exhibit 293 received in evidence)

3              **MR. FRENTZEN:**  And could we go quickly to page 3?

4    **Q.**   And, Mr. Morland, is this the PowerPoint that came with

5    your -- that was handed out at that Q3 '09 earnings call?

6    **A.**   Yes, it is.

7    **Q.**   Okay.  And do you see this?  Was this one of the lively

8    topics of discussion there, was that new product-related spend

9    at about 20 million?

10   **A.**   Yes, it was.

11   **Q.**   And could we go to the next page, please?

12        Okay.  And here there's discussion about launching IDOL

13   SPE, which we heard about before --

14   **A.**   Yes.

15   **Q.**   -- on the recording?

16        Okay.  And I'd just like to go briefly, if we could, to

17   page 17.

18        On page 17 is there more discussion about this launch with

19   a beta program and a Quick-Start initiative and customer

20   events, and so on?

21   **A.**   Yes.  The Quick-Start initiative is the initiative that

22   affected the gross margin that we mentioned earlier.

23   **Q.**   Describing some of the money they spent, the extra

24   20 million, on this launch?

25   **A.**   I believe the Quick Start was about 4 million and then

 1   16 million was the extra sales and marketing.  So the total

 2   extra spend was 20 million.

 3   **Q.**   Thank you.

 4       I want to direct your attention now to a slightly

 5   different time period.  And if we could, do you recall an

 6   Autonomy earnings call in April of 2010 for the Q1 2010 --

 7   sorry -- that earnings call?

 8   **A.**   Yes, I do, Q1 2010 earnings call.

 9   **Q.**   All right.  And the jurors have already heard, we've

10   already heard a fair amount of that; but if you could just,

11   first, from your recollection -- then I want to play one brief

12   clip from that call -- do you recall there being a pretty

13   lively issue there about inventory?

14   **A.**   Yes, I do.

15   **Q.**   And could you just describe for us what was that issue?

16   What's your recollection about that?

17   **A.**   I can remember the results and when I first saw the

18   results, there was an item in inventory of $10 million; and up

19   to that point in all the years I'd covered Autonomy, it had

20   never been above 1 million so it looked quite odd, and then I

21   think it became quite a major topic of conversation in the

22   ensuing meeting.

23   **Q.**   And do you have a recollection of whether or not that

24   $10 million -- well, first of all, just why did that become an

25   issue?

1    **A.**    Software companies -- I mean, inventory and stock, it's

2    the same thing.  Software companies don't tend to carry stock

3    but hardware companies do.  So it was an indication that

4    Autonomy might be selling hardware so there were a number of

5    questions, I believe, at the meeting to investigate that matter

6    further.

7    **Q.**    And in the course of that -- in the entire course of that

8    meeting, was it ever revealed to you as an analyst that

9    Autonomy was engaging in the resell of hardware without a

10   connection to software?  In other words, was that ever told to

11   you?

12   **A.**    I don't recall that being mentioned.  My recollection is

13   that the hardware was described by Mr. Lynch, I believe, as

14   being an appliance which was used to load the software up to

15   speed up the process of selling the software to the client.

16            **THE COURT:**  Let's take just a little recess so

17   people --

18            **MR. FRENTZEN:**  Sorry, Your Honor.

19            **THE COURT:**  -- can stand and stretch before we start.

20       About how much longer do you have?

21            **MR. FRENTZEN:**  Not long, Your Honor.  I'm almost

22   there.

23                    (Pause in proceedings.)

24            **MR. FRENTZEN:**  Thank you, Your Honor.

25       Could we listen to 2688?  And this clip is at about 45

 1    minutes, Your Honor.  And this is one I just want to remind

 2    this witness, and then we'll get into it.

 3                    (Audio was played but not reported.)

 4    **BY MR. FRENTZEN:**

 5    **Q.**   Mr. Morland, was that basically the upshot that you got

 6    from that earnings call related to what that inventory was

 7    about and what that hardware was about?

 8    **A.**   Yes, it was.

 9    **Q.**   And if, instead, you knew that Autonomy was reselling

10    hardware at a loss during that period of time, would that have

11    been significant to you in your coverage of Autonomy?

12    **A.**   It would have been very significant.

13    **Q.**   Why is that?

14    **A.**   You know, I'm more of a software expert than a hardware

15    expert, but I have followed hardware companies in the past and

16    hardware companies, I would say the average margin of a

17    hardware company, operating margin, is round about 5 percent.

18         I think at its peak Autonomy generated a 50 percent

19    operating margin with its pure software model.  So that's 10

20    times the average margin of a hardware company and, hence,

21    software companies are valued much more highly than hardware

22    companies.

23    **Q.**   And I'd like to take you now to 176, and if we could go to

24    page 42 of 176.

25              **MR. FRENTZEN:**  And, again, Your Honor, this is a large

 1    group of different notes by Mr. Morland.

 2              **THE COURT:**  Okay.

 3    **BY MR. FRENTZEN:**

 4    **Q.**   All right.  In July of 2010, would this be a note after

 5    your attendance at that Q1 2010 earnings call?

 6    **A.**   (Witness examines document.)  Yes.

 7    **Q.**   And you're still at Sell?

 8    **A.**   Yes, I am.

 9    **Q.**   Okay.  And you say there's evidence to suggest early

10    recognition of revenues?

11    **A.**   Yes.

12    **Q.**   I want to go now to page 57, if we could, which is within

13    that same note, 176, page 57.  And could you go down to the

14    bottom?  Okay.  Great.

15        All right.  And in the course of this particular note, did

16    you get into sales of an appliance?

17    **A.**   I talked about it, yes.

18    **Q.**   And you said (reading):

19            "Key issues for Q2 2010 are likely to be around

20        organic growth," and so on.

21        And then you said (reading):

22            "Cash from $10 million of Arcpliance stock that

23        appeared on the balance sheet in Q1."

24    **A.**   Yes.

25    **Q.**   All right.  And just in terms of your note, then, did that

1  incorporate your view that the sales of hardware were related

2  to an appliance?

3  **A.**   Yes, it did.

4  **Q.**   And I think the jury has heard a lot about this, but are

5  sales of appliances different than reselling hardware at a

6  loss?

7  **A.**   Yes, it is.

8  **Q.**   Why or how?

9  **A.**   Well, the sale of an appliance is very closely related to

10  that software because the software's loaded onto it and then

11  it's sold as a package.  If you're just reselling hardware,

12  then the customer can put any kind of software on that

13  hardware.

14  **Q.**   Mr. Morland, did you at some point in time send a copy of

15  a worksheet that you kept to the federal government?

16  **A.**   I did, yes.

17          **MR. FRENTZEN:**   Okay.  And, Your Honor, at this time

18  I'd offer Exhibit 2520.  I don't need the e-mail.  I just want

19  the attachment.

20          **MS. LITTLE:**   No objection.

21          **THE COURT:**   Admitted.

22      (Trial Exhibit 2520 received in evidence)

23          **MR. FRENTZEN:**   Can we pull up 2520, please?  Sorry.

24  The attachment.

25                      (Pause in proceedings.)

1          **MR. FRENTZEN:**  Is it not here?

2                          (Pause in proceedings.)

3          **MR. FRENTZEN:**  If you guys want to take the screen

4     down and look for that, I'll get into some other stuff.

5     **Q.**   Mr. Morland, did you -- in your time spent working on

6     Autonomy, did you spend a fair amount of time focused on the

7     details of Autonomy's business as best you could?

8     **A.**   I did.

9     **Q.**   Can you describe that for us?  I mean, how did you go

10    about doing that, and how much time would you spend basically

11    taking in the information you could find about Autonomy?

12    **A.**   It became a matter of focus each time the company

13    reported.  So every three months when you knew the company was

14    going to report, you would read the statements in detail,

15    attend the meetings, and crucially you would have discussions

16    with management around what the future looked like, what the

17    order book was like, what the growth rate was likely to be, how

18    sustainable the margins were, whether the margins were going to

19    go up or down.

20         And then you would use all that information to update your

21    model because the most important thing about keeping a model on

22    a company for an analyst is to forecast future earnings because

23    a company is valued off its future earnings typically.

24    **Q.**   And do you believe there were areas that you could have

25    looked into that were publicly available that you just

1    disregarded in terms of trying to figure out how to advise the

2    investors that were consuming your product?

3    **A.**    I'm not aware of anything that I deliberately disregarded,

4    no.

5    **Q.**    And so during the course of 2009, from your vantage point,

6    did you have any idea at all that Autonomy during 2009 had

7    resold hardware, not appliances, untethered to software in the

8    amount of $57 million?

9    **A.**    I had no idea.

10    **Q.**    And during that period of time, did you have any idea that

11    in 2010, Autonomy in the same fashion sold approximately

12    $100 million worth of hardware?

13    **A.**    I had no idea.

14    **Q.**    And in terms of -- were that true, would that be a

15    surprise to you?

16    **A.**    It would be a very big surprise, yeah.

17    **Q.**    When you were first asked about that in London, do you

18    recall your reaction to it?

19    **A.**    I think I said "Blimey."

20    **Q.**    What does that mean for those of us who live over here?

21    **A.**    It means it's awesomely surprising I would say.

22    **Q.**    And what sort of impact would that type of information

23    have had for you as an analyst in evaluating Autonomy?

24    **A.**    I mean, it would have had a massive impact.  I mean,

25    firstly, I described how much more valuable software is than

 1    hardware, so it would have had a huge impact on how the

 2    analysts and the investment community in general perceived

 3    Autonomy.  It would be clear that it wasn't a pure software

 4    stock; and then it would, of course, beg the question, you

 5    know, how material is this and what are margins on that

 6    hardware.

 7         So you'd have to completely reassess the way you valued

 8    the company because it would be -- you'd have to value it as

 9    some sort of hybrid model rather than just a pure software

10    company.

11         And the second ramification of it would be that the

12    investment community would have grown very concerned about what

13    they'd been led to believe by management.  One of the most

14    important things in stock analysis is the credibility of the

15    management; and if management had apparently been hiding the

16    fact that they'd been selling hardware, then it would be very

17    bad indeed for management's reputation and that would have a

18    very negative impact on the stock as well.

19    Q.   What about if this was part of the revenue that was

20    recognized in each of those years, would there have been issues

21    in terms of evaluating Autonomy's growth?

22    A.   There would have been, yes.  I mean, to calculate growth,

23    of course, you look at the revenues from the corresponding

24    period in the prior year and see how much that has grown over

25    that 12-month period.  So you would need to know how much

1   hardware the company sold in the prior period.  So if there was

2   no hardware at all in the prior period, then any hardware that

3   was sold in the next year would all represent growth.

4        So the 57 million that you suggested that I think it was

5   in 2009, if they hadn't sold any hardware in 2008, then all of

6   that 57 million would have contributed to growth.  And if you

7   subtracted that from the software growth that they reported,

8   you would probably reach the conclusion that the actual

9   software business itself was not growing at all.

10  **Q.**   And all of these things, would this have had any impact on

11  Autonomy's value?

12          **MS. LITTLE:**  Objection.  Calls for speculation.

13          **THE COURT:**  Overruled.

14          **THE WITNESS:**  It would have had a very seriously

15  negative impact on the valuation, yes.

16          **MR. FRENTZEN:**  May I have a moment, Your Honor?

17                    (Pause in proceedings.)

18          **MR. FRENTZEN:**  That's all I have, Your Honor, other

19  than we'll figure out what's going on with that one exhibit

20  but, thank you.

21          **THE COURT:**  Okay.  Ladies and gentlemen, let's take a

22  recess until 20 to 3:00.

23       Remember the admonition given to you:  Don't discuss the

24  case, allow anyone to discuss it with you, form or express an

25  opinion.

PROCEEDINGS

```
 1           (Proceedings were heard out of the presence of the jury:)

 2           THE COURT:  Okay.  Let the record reflect the jurors

 3    have left.

 4       So cross, do you have any idea about how long?

 5           MR. KEKER:  Do you want to get him off, Your Honor?

 6           THE COURT:  Sure.

 7       You can step down.  You don't have to sit here.  You can

 8    leave.  I mean, you have to come back.

 9           THE WITNESS:  I can't go back to England?

10           THE COURT:  Not quite yet.

11       I was going to inquire how long the cross -- you

12    anticipate the cross to be?

13           MS. LITTLE:  I'm going to look at it during the break.

14    There's some things I can take out.  Half hour, 45 minutes.

15           THE COURT:  Sorry?

16           MS. LITTLE:  Half hour, 45 minutes.

17           THE COURT:  Okay.  All right.  So do we have another

18    witness after this?

19           MR. FRENTZEN:  We do, Your Honor.

20           THE COURT:  How long is that witness?  Who is it?

21           MR. LEACH:  It's Andy Johnson, Your Honor.  We may be

22    able to start him.  I don't think we'll be able to finish him.

23           THE COURT:  Oh, okay.

24           MR. LEACH:  But he's local as well.

25           THE COURT:  Okay.  All right.  I want to conclude by
```

 1    4:00 today.  Okay.

 2                **MR. LEACH:**  Understood.

 3                      (Recess taken at 2:25 p.m.)

 4                   (Proceedings resumed at 2:44 p.m.)

 5        (Proceedings were heard in the presence of the jury:)

 6                **THE COURT:**  Let the record reflect all jurors are

 7    present.

 8        Cross-examination.

 9                **MS. LITTLE:**  Thank you, Your Honor.

10                          **CROSS-EXAMINATION**

11    **BY MS. LITTLE:**

12    **Q.**   Good afternoon, Mr. Morland.  My name is Jan Little and

13    I'm one of Mr. Hussain's attorneys.  Good afternoon.

14    **A.**   Good afternoon.

15    **Q.**   Mr. Morland, the jury has heard from another analyst who

16    followed Autonomy, Mr. Daud Khan.  You and Mr. Khan are

17    friends; right?

18    **A.**   Correct.

19    **Q.**   You both went to work at Canaccord Securities around the

20    same time?

21    **A.**   Correct.

22    **Q.**   That was in about February or March 2016?

23    **A.**   Correct.

24    **Q.**   And you worked together at Canaccord?

25    **A.**   We did.

MORLAND - CROSS / LITTLE

1  **Q.**   In fact, on your LinkedIn page, you specifically mention

2  that you work with Mr. Khan; right?

3  **A.**   I can't remember, but maybe, yeah.

4  **Q.**   Are you aware that Mr. Khan came here to this courtroom

5  last month to testify in this trial?

6  **A.**   I am, yeah.

7  **Q.**   Have you talked with Mr. Khan about his testimony?

8  **A.**   He mentioned it to me when he came back, and we talked

9  probably for about a minute about it, yeah.

10  **Q.**   And what did he say and what did you say?

11  **A.**   He said that he'd been asked to explain what pure software

12  was.  And he said he'd been on the stand for -- he was on the

13  stand for about two hours.  And what else did he say?  Not a

14  lot.  Not a lot more.

15  **Q.**   But you talked about the substance of what he testified

16  to; correct?

17  **A.**   Yes.

18  **Q.**   Did anyone advise you that there is a rule in this

19  courtroom that witnesses are not supposed to talk with each

20  other about their testimony?

21  **A.**   No.

22  **Q.**   What was your purpose in talking to him about his

23  testimony?

24  **A.**   There was no purpose.  He -- he -- I knew he was going to

25  California, and he called me when he got back, and I said at

1   the time that I wasn't going because I didn't think at the time

2   I was going to be required.

3        I was told in February I would be required and then I was

4   told I wouldn't be required.  And then about two weeks ago, I

5   was told that I'd be required again.

6   **Q.**   Okay.  And then you talked to him to find out what he

7   testified to before you came and testified here today?

8   **A.**   Yes.

9   **Q.**   Did he tell you -- give you any tips?

10  **A.**   He just told me about the pure software, that he said what

11  he thought pure software was.

12  **Q.**   Was he asking you to testify in the same manner that he

13  was testifying?

14  **A.**   No.

15  **Q.**   Was he trying to make sure you were consistent?

16  **A.**   No.

17  **Q.**   Are you aware of a news article that the *Telegraph*

18  published about Mr. Khan's testimony?

19  **A.**   I am, yes.

20  **Q.**   Did Mr. Khan tell you about it?

21  **A.**   No.  I -- I didn't know it included -- I was told by

22  somebody that it included something he had said, but the reason

23  I know about it is somebody said it quoted me from when I'd

24  written a *Telegraph* article some time ago.  It referred to me

25  as a veteran analyst.  That's what I remember.

1    **Q.**   The article about Mr. Khan also talked about you; correct?

2    **A.**   Yeah.  I didn't know he was mentioned in it, actually.

3    **Q.**   Well, you read the article and it was a description of his

4    testimony; right?

5    **A.**   I didn't read the article.  Somebody pointed it out to me

6    and said, "This is a bit about you," and I only read the bit

7    that was about me.  I haven't read the whole article.

8    **Q.**   Have you talked to the *Telegraph* or any media sources

9    about your anticipated testimony today?

10   **A.**   No, I haven't.

11   **Q.**   Have you talked to anyone in the last month, other than

12   Mr. Khan, about your anticipated testimony today?

13   **A.**   I've told people I'm coming here, yes.  My family.

14   **Q.**   Other than your family, have you talked with any of your

15   colleagues about it?

16   **A.**   I would say that some of my colleagues are aware.  I had

17   to tell them at work why I needed to take two days off work.

18   Our head of sales asked me where I was going to be today and I

19   said I'm going to California to testify in a trial.  I didn't

20   specify what it was.  It has been necessary to tell a few

21   people, yes.

22   **Q.**   And you're a UK citizen; right?

23   **A.**   Yes.

24   **Q.**   You didn't have any legal obligation to come here to

25   testify.  You are here voluntarily; correct?

MORLAND - CROSS / LITTLE

1    **A.**    I am, yeah.

2    **Q.**    You mentioned that you started following the tech sector

3    in 1998; is that right?

4    **A.**    Yes.   That's correct.

5    **Q.**    About 20 years ago.   And in the last 20 years, you've held

6    a number of different positions as an analyst; correct?

7    **A.**    Yes.

8    **Q.**    In the late '90s, you were at NatWest Securities?

9    **A.**    Correct.

10   **Q.**    And then you were an analyst at Deutsche Bank for a short

11   time?

12   **A.**    That's right.   Deutsche Bank acquired NatWest Securities.

13   **Q.**    All right.   Then in 2003, you were an analyst at Societe

14   Generale, a French company?

15   **A.**    Yes.

16   **Q.**    And you were there for about two and a half years, March

17   2003 to October 2005?

18   **A.**    Correct.

19   **Q.**    And then after about two and a half years, you moved --

20   and I won't pronounce it right -- Arbuthnot?

21   **A.**    Arbuthnot, correct.

22   **Q.**    You were there for a little under three years?

23   **A.**    Correct.

24   **Q.**    And after that, you moved to BlueOar Securities, which

25   later became Astaire?

MORLAND - CROSS / LITTLE

1   **A.**   Astaire, correct.

2   **Q.**   You were there for about two and a half years?

3   **A.**   Correct.

4   **Q.**   And then after that, you moved to Peel Hunt?

5   **A.**   Yes.

6   **Q.**   And you were an analyst at Peel Hunt for a little less

7   than three years?

8   **A.**   Correct.

9   **Q.**   And then you were on your own for about a year, right,

10   from June of 2013 to December of 2014?

11   **A.**   Self-employed, correct.

12   **Q.**   And then after that, you spent a little over a year at

13   Arden Securities or Arden Partners?

14   **A.**   That is correct.

15   **Q.**   And then after that, you moved to Canaccord Securities

16   where you've been for the last two years; correct?

17   **A.**   Correct.

18   **Q.**   So ten positions in 20 years?

19   **A.**   Correct.

20   **Q.**   During the period of 2009 to 2011, you covered Autonomy;

21   correct?

22   **A.**   Correct.

23   **Q.**   And there were between 20 and 30 analysts covering

24   Autonomy?

25   **A.**   I would say less than that, but ...

1  Q.   Less than 30 or less than 20?

2  A.   Less 20.

3  Q.   About how many?

4  A.   I'd say 10 to 15, probably.

5  Q.   Is it fair to say that most of the analysts had a positive

6  view, but there were a few of you who were negative on

7  Autonomy; correct?

8  A.   That's right, yeah.

9  Q.   You and Mr. Khan in particular; right?

10 A.   Correct.

11 Q.   And you spent, I think you said, about a quarter of your

12 time analyzing and writing about Autonomy?  Twenty percent,

13 something like that?

14 A.   Twenty percent probably, yeah.

15 Q.   And you became fairly committed in your negative views

16 about Autonomy; correct?

17 A.   I did, yeah.

18 Q.   You've published, we've seen, a fair number of research

19 notes critical of Autonomy?

20 A.   Correct.

21 Q.   And since 2009, you've been consistently negative on

22 Autonomy; right?

23 A.   That's right.

24 Q.   You have been communicating with the Government a fair

25 amount in the last few years about this case; right?

**MORLAND - CROSS / LITTLE**

1   **A.**   Correct.

2   **Q.**   You spoke to the Government by phone a couple times in mid

3   2005?  Do you remember that?  2015.  Excuse me.

4   **A.**   I was going to say --

5   **Q.**   2015.  My apologies.

6   **A.**   Yes.  That's probably right.

7   **Q.**   And then after that, you began sending the FBI emails with

8   various documents; correct?

9   **A.**   Correct.

10  **Q.**   And you would send them things that you thought would be

11  helpful to them?

12  **A.**   Correct.

13  **Q.**   Or things that you said might be of interest or

14  interesting?

15  **A.**   Correct.

16  **Q.**   And you said, "Hopefully this is of some help to you."

17  You were trying to help them; right?

18  **A.**   Correct.

19  **Q.**   And you're still trying to help them; right?

20  **A.**   Correct.

21  **Q.**   And after sending these mails, did you meet with the

22  Government in July of 2015?

23  **A.**   I don't recollect the date, but right about that time, I

24  definitely met with them in London, yes.

25  **Q.**   Around July 22, 2015?

**MORLAND - CROSS / LITTLE**

1   **A.**   What was the first date you gave me?

2   **Q.**   July 22nd, 2015 did you meet with the Government?

3   **A.**   Is that the second date?

4   **Q.**   I think that's the first, but you tell me.

5        When was the first time you met with the Government?

6   **A.**   I've met with them twice, and the first time was around

7   that date and the second time was more recently.  This year.

8   **Q.**   Just to refresh your recollection, take a look at Exhibit

9   2520.  We can put that up on the screen.  It's in evidence.

10                 (Exhibit published to jury.)

11   **BY MS. LITTLE:**

12   **Q.**   Just look up at the top just to refresh your recollection

13   here.  It's an email from Mr. Castro.  He is an FBI agent;

14   right?

15   **A.**   Yes.

16   **Q.**   Or to Mr. Castro from you.  Excuse me.  Right.

17        And you said, "Okay, how about 3:00 p.m. on the 22nd?"

18   **A.**   Okay, yeah.

19   **Q.**   So does that refresh your recollection that you met with

20   someone from the Government on July 22nd?

21   **A.**   Yes.

22   **Q.**   And do you recall where you met?

23   **A.**   I remember the chief station was Marble Arch, and it was a

24   hotel near that.

25   **Q.**   And who was present?

1   **A.**   There were three FBI people and two government lawyers.

2   **Q.**   Was it any of the government lawyers who are here today?

3   **A.**   Yes.

4   **Q.**   Who was it?

5   **A.**   The two on this end.

6   **Q.**   Mr. Reeves and Mr. Leach?

7   **A.**   Yeah.

8   **Q.**   How long was that meeting?

9   **A.**   About four hours, I think.

10   **Q.**   And did anyone take notes at that meeting?

11   **A.**   I didn't notice, but I expect so, yeah.

12        **MS. LITTLE:**   Your Honor, at this point I would ask

13   that the notes or any report of that meeting be produced.   They

14   haven't been produced.

15        **MR. FRENTZEN:**   Your Honor, I think they have.   I think

16   the dates are just crisscrossed.

17        **THE COURT:**   Proceed.

18   **BY MS. LITTLE:**

19   **Q.**   You talked to the FBI and the Government again in 2017 and

20   you met with them in 2018; correct?

21   **A.**   Correct.

22   **Q.**   And, again, you would continue to sort of give them tips

23   on what they should be looking out for or what they should look

24   at?

25   **A.**   Yes.

 1    **Q.**   And you also talked to lawyers and representatives of HP,

 2    Hewlett-Packard; correct?

 3    **A.**   I don't remember.  I spoke to somebody from HP at a

 4    meeting in relation to something else.  I don't remember

 5    speaking to an HP lawyer.

 6    **Q.**   Do you remember speaking on the phone to attorneys from

 7    the firm of Morgan Lewis representing HP in 2015?

 8    **A.**   I can't remember.  Maybe.

 9    **Q.**   You've testified about some various concerns that you had

10    about organic growth.  Do you recall that testimony?

11    **A.**   Yes, I do.

12    **Q.**   And your concerns were based on estimates and opinions

13    that you had.  You didn't have access to the company's books

14    and records; correct?

15    **A.**   Correct.

16    **Q.**   Obviously Autonomy management had those records, and are

17    you aware that their auditors would have had access to those

18    records?

19    **A.**   Yes.

20    **Q.**   And would you agree with me that the auditors would be in

21    a better position than you to understand the rationale behind

22    calculation of organic growth rates?

23          **MR. FRENTZEN:**  Objection.  I'm sorry.  Objection.

24    Calls for speculation.

25          **THE COURT:**  Sustained.

1    BY MS. LITTLE:

2    **Q.**    And your view on organic growth was based on an

3    understanding about Autonomy's acquisitions; correct?

4    **A.**    Correct.

5    **Q.**    It's acquisitions of other companies?

6    **A.**    Yeah.

7    **Q.**    Did you review the press releases of when Autonomy would

8    acquire other companies?

9    **A.**    Yes, I did.

10   **Q.**    And did you review those to have an understanding of the

11   reasoning behind those acquisitions?

12   **A.**    Yes, I did.

13   **Q.**    And I'd like to just offer as a group five press releases.

14   It's Exhibit 6889, 6890 --

15           **THE COURT:**  Wait, wait, wait.  68 -- 6889 --

16           **MS. LITTLE:**  6890.

17           **THE COURT:**  90 --

18           **MS. LITTLE:**  6891, 6892, and 6893.

19           **MR. FRENTZEN:**  I'm sorry.  Counsel, are you sure -- I

20   don't have press releases for two --

21           **THE COURT:**  Those are the numbers I have.

22           **MR. FRENTZEN:**  6898 I've got is a note by this

23   witness.  Not that I'm objecting to -- it's probably already

24   in.  I'm just saying I don't think it's a press release.

25           **THE COURT:**  6889 is something from 2005.  6890 is

1   2007.  6891 is 2009.  6892 is 2010.  6893 is 2011.

2          **MR. FRENTZEN:**  Sorry.  I didn't go deep enough.  Thank

3   you.

4          **THE COURT:**  Okay.  Admitted.

5      (Trial Exhibits 6889, 6890, 6891, 6892 and 6893

6       received in evidence)

7          **MS. LITTLE:**  If we just take a quick look on the

8   screen at 6889.

9                  (Exhibit published to jury.)

10  **BY MS. LITTLE:**

11  **Q.**   Is this the December 2009 press release for Autonomy's

12  acquisition of Verity?

13  **A.**   Yes.

14  **Q.**   Did you review this press release?

15  **A.**   That's a long time ago.

16         **THE COURT:**  When?  When are you asking?

17  **BY MS. LITTLE:**

18  **Q.**   Well, at any time.  Did you review it when you were making

19  your statements about acquisitions and organic growth?  Did you

20  go back and look at the press releases about Autonomy's

21  acquisitions?

22  **A.**   I can't remember that I looked at this one, but my work

23  around acquisitions really started with Zantaz in 2007.

24  **Q.**   Okay.

25  **A.**   I can remember the Verity acquisition, but I can't

1   remember the detail of it and I can't remember if I looked at

2   that particular statement.

3   **Q.**   You remember that Verity was a serious competitor of

4   Autonomy's; correct?

5   **A.**   Yes.  I remember that, yeah.

6   **Q.**   And then you did look at the press release for Zantaz,

7   which is Exhibit 6890.

8                        (Exhibit published to jury.)

9           **THE WITNESS:**  I'm sure I would have done -- I can't

10  specifically remember reading it.

11  **BY MS. LITTLE:**

12  **Q.**   The acquisition of Zantaz permitted Autonomy to get into

13  the archiving eDiscovery --

14  **A.**   Correct.

15                        (Exhibit published to jury.)

16  **BY MS. LITTLE:**

17  **Q.**   And then the Interwoven acquisition, which is Exhibit 6891

18  in March of 2009, did you review that press release?

19  **A.**   Yes.

20  **Q.**   And the acquisition of Interwoven was for Autonomy to get

21  into, I think they call it, HCI, Human Computer Interaction?

22  **A.**   It was -- I thought of it more as document management,

23  really.

24  **Q.**   It was specifically to assist law firms and regulators in

25  managing information, right, or regulated industries?

1  **A.**   It enabled them to apply their IDOL software to that sort

2  of the application, yes, by putting the two together.  That was

3  the logic, I think.

4                      (Exhibit published to jury.)

5  **BY MS. LITTLE:**

6  **Q.**   And then Exhibit 6892 pertains to the January 2010

7  acquisition of MicroLink.  Did you review that one?

8  **A.**   Yes.

9  **Q.**   That pertained to the need for a cleared company to do

10 classified government work; correct?

11 **A.**   Yes.

12                      (Exhibit published to jury.)

13 **BY MS. LITTLE:**

14 **Q.**   And then Exhibit 6893, finally, is the 2011 acquisition of

15 Iron Mountain.  Do you recall that?

16 **A.**   Yes, I do.

17 **Q.**   And that pertained to moving more -- into more eDiscovery

18 and storage; correct?

19 **A.**   Yes.

20 **Q.**   All right.  I want to talk just for a minute about your --

21 your research notes.

22       Mr. Frentzen showed you a number of research notes, and

23 you'd agree with me that these reports that you write represent

24 your opinion; correct?

25 **A.**   Correct.

1    **Q.**   And people may have different opinions?

2    **A.**   Correct.

3    **Q.**   In fact, at the end of each of your reports, you put a

4    disclaimer saying "this is just my opinion"; right?

5    **A.**   Yes.

6    **Q.**   And if we can just look really quickly at Exhibit 11,

7    which is in evidence, page 47.

8                      (Exhibit published to jury.)

9    **BY MS. LITTLE:**

10   **Q.**   In about the middle of the page, it says, "The company may

11   have provided information to the office in relation to the

12   matter covered by this report, but the opinions stated in this

13   report are those of the authors.  Opinions expressed are

14   current opinions as of the date appearing and relate to this

15   material only"; correct?

16   **A.**   Correct.

17   **Q.**   It also goes -- they skip a line -- "Any opinions

18   expressed are subject to change without notice"?

19   **A.**   Correct.

20   **Q.**   And if we look at all the other reports, we'll find a

21   similar disclaimer at the end saying "this is our opinion"?

22   **A.**   They tend to change from year to year with regulations,

23   but that's pretty much consistent across them all, I'd say,

24   yeah.

25   **Q.**   Okay.  You testified about the -- hang on a second here.

1  Okay.

2      You testified about the Q1/2010 earnings call, and a

3  little snippet of that was played for you.  Do you recall that?

4  **A.**   Yes.

5  **Q.**   And you weren't physically present for that call, were

6  you?

7  **A.**   I can't remember.

8  **Q.**   The jury has heard testimony that there was a volcano, a

9  volcanic eruption then and people couldn't fly.  Do you

10  remember that?

11  **A.**   I do.  But I thought I was there.

12  **Q.**   Well, Dr. Lynch was not physically present for that call;

13  correct?

14  **A.**   Okay.  I can't remember.

15  **Q.**   You don't know.  Okay.

16      But you've mentioned that the topic of hardware or

17  appliances came up in this call; correct?

18  **A.**   Yes.

19  **Q.**   And you found out sometime after that that Autonomy had

20  classified part of its hardware costs as sales and marketing;

21  correct?

22  **A.**   Yes.

23  **Q.**   And you spoke to Dr. Lynch about it; right?

24  **A.**   I can't remember.

25  **Q.**   Did you speak to Mr. Lynch and did he explain to you that

1    the justification for putting hardware -- some hardware costs

2    under sales and marketing?

3    **A.**    I have heard the justification.  I can't remember if he

4    told it to me, but I do remember the justification.  I can't

5    remember whether it was Mr. Lynch or Mr. Hussain or the head of

6    IR or who it would have been I would have been speaking to.  I

7    can't remember.

8    **Q.**    Didn't Dr. Lynch tell you that the justification for

9    putting some hardware costs under sales and marketing was that

10   the hardware sales led to software sales?

11   **A.**    Yes.  That's correct.

12   **Q.**    And you understood that?

13   **A.**    Yes.

14   **Q.**    And you also wrote a note -- it's not one that

15   Mr. Frentzen showed you -- but you wrote a round around the

16   Q2/2010 earnings that discussed hardware; correct?

17   **A.**    Yes.

18   **Q.**    If you would take a look at Exhibit 6898, which is in your

19   book.  It's a note that you wrote on July 23rd, 2010.

20         I'd offer it, Your Honor.

21              **THE COURT:**  Sorry.  What number?  6898?

22              **MS. LITTLE:**  6898.

23              **THE COURT:**  Admitted.  Admitted.

24              (Trial Exhibit 6898 received in evidence)

25                   (Exhibit published to jury.)

BY MS. LITTLE:

Q.   It's way in the back.  Is this a note you published in July of 2010, sir?

A.   Yes, it is.

Q.   Going down to the bottom paragraph, it says, "The Q2 results appear to confirm our concerns about true organic growth rates and the performance looks even more disappointing given the contribution of two large banking deals in the quarter and a boost from the sale of hardware."

A.   Correct.

Q.   Those are your words; right?

A.   Yes.

Q.   And anybody reading this would conclude that there was a sale of hardware; right?

A.   Yes.  I think I said earlier that I wasn't aware of the sale of hardware in 2009, but after Q1/2010 when the stock appeared on the balance sheet, that's when I first became aware of the sale of hardware.

Q.   And it's right out there for anyone to see.  Anyone reading your report is going to see that; right?

A.   From 2010 onwards, yes, correct.

Q.   And I take it you don't know what Hewlett-Packard knew or didn't know about Autonomy's hardware sales when it made its acquisition?

A.   I didn't know what they knew, no.

1  **Q.**   Mr. Frentzen showed you Exhibit 630, which was the

2  investor bulletin board.  Do you recall that?

3  **A.**   Yes.

4  **Q.**   Just to pause for a moment, the types of information that

5  are publicly available to you as an analyst, the sort of the --

6  the number one thing you look at is the annual reports; right?

7  That's sort of the --

8  **A.**   More the earnings releases, but the annual reports follow

9  the earnings release, so they just contain a bit more detailed

10  information, but it's really the earnings release, is the main

11  focus, because that's what you get first, and the full year of

12  earnings release tends to have a lot of information in it, you

13  know, almost as much information as the annual report.

14      The annual report just has lots of pictures and a bit more

15  discussion about the company.  So it's really the earnings

16  release first.  And the annual report normally comes out a

17  couple months after -- sometimes at the same time, but normally

18  after the earnings release.  So it gets less attention based on

19  it, yes.

20  **Q.**   And reporting annually is something that is required of a

21  public company in the UK; correct?

22  **A.**   Yes.  That is correct.

23  **Q.**   And then there is also a half year report you've talked

24  about?

25  **A.**   Yes.

1   **Q.**   And that's required, but it's generally not as detailed as

2   the annual reports; right?

3   **A.**   Correct.

4   **Q.**   Then there were quarterly press releases; correct?

5   **A.**   Yes.

6   **Q.**   Those are not required, but some companies voluntarily do

7   them; is that right?

8   **A.**   It depends on what exchange you're on.  In some markets,

9   it's required.  In some, it's not.

10  **Q.**   And then there could be analyst calls?

11  **A.**   And there will be, yeah.  If there is an earnings release,

12  there will be an analyst call as well.

13  **Q.**   And then there's other various pieces of information such

14  as this bulletin board that was on the website that you looked

15  at?

16  **A.**   Yes.  That's quite unusual.  I mean, I've not seen any

17  other company do that, but Autonomy used it as an extra way to

18  communicate with investors, which I think people found quite

19  helpful.

20  **Q.**   And you don't know who wrote the material on that bulletin

21  board or who maintained the bulletin board?

22  **A.**   I think it was probably the head of IR.

23  **Q.**   Okay.  I'd like to show you a page of that exhibit, 630,

24  the bulletin board, page 12.  And Mr. Frentzen was reading you

25  some of the language at the very top of the page that talks

```
 1   about SOP 97-2 and IFRS; correct?

 2   A.   Yes.

 3   Q.   Do you recall that?

 4   A.   Yes, I do, yeah.

 5   Q.   And then some -- a part that wasn't read to you begins,

 6   "Software revenue should be recognized if the following

 7   criteria are met," and you see that there are four criteria

 8   that are listed here.  "Persuasive evidence of an arrangement";

 9   correct?

10   A.   Correct.

11   Q.   And then "delivery has occurred" --

12   A.   Correct.

13   Q.   -- correct?

14        And then moving down, "the vendor's fee is fixed or

15   determinable"?

16   A.   Correct.

17   Q.   And then the last one is "collectibility is probable"?

18   A.   Correct.

19   Q.   Those, as far as you understood, were the criteria that

20   Autonomy applied in recognizing revenue; correct?

21   A.   Correct.

22   Q.   You testified about the Q3/2009 earnings call which --

23   where there was a discussion of SPE and Mr. Frentzen played you

24   various clips from that.  Do you recall that?

25   A.   I do.
```

1    **Q.**   And you were physically present for that call; right?

2    **A.**   Yes.

3    **Q.**   And do you recall in addition to what Mr.  Frentzen played

4    you, that Dr. Lynch made a long presentation about SPE;

5    correct?

6    **A.**   Yes.

7    **Q.**   It was about 10 or 15 minutes long?

8    **A.**   A long time, yeah.

9    **Q.**   And he showed a video; right?

10   **A.**   Yeah.

11   **Q.**   And there was an opportunity for analysts to ask

12   questions?

13   **A.**   Yeah.

14   **Q.**   And many analysts did ask questions; right?

15   **A.**   Yes.

16   **Q.**   You didn't ask any at that particular call or you didn't

17   ask about SPE certainly?

18   **A.**   No.

19   **Q.**   And are you aware that Deloitte, Autonomy's auditors,

20   generally would listen in on these calls?

21   **A.**   I didn't know that, no.

22   **Q.**   I'd like to direct your attention to the September 2009

23   issue with the letter from Mr. Kanter.  Do you recall

24   testifying about that?

25   **A.**   Yes, I did.  Sorry.

1   Q.   And you had reported in your note that Autonomy had

2   changed its accounting policies with respect to Zantaz hosted

3   revenue; correct?

4   A.   Yes.

5   Q.   And Mr. Kanter told you that that was incorrect; right?

6   A.   Yes, he did.

7   Q.   And if we could take a look at Exhibit 206 and

8   particularly page 32.

9                      (Exhibit published to jury.)

10  BY MS. LITTLE:

11  Q.   Can we blow that up.

12       This is an email from Peter Goodman to you; correct?

13  A.   Correct.

14  Q.   And who is Peter Goodman?

15  A.   He would have been the head of IR at the time.

16  Q.   And is this email Mr. Goodman saying, "I saw your note,"

17  and he's raising questions about what you said in your note;

18  correct?

19  A.   Correct.

20  Q.   And he tells you in the third paragraph, "This is

21  factually inaccurate as it would be misaccounting to recognize

22  a hosted service," etc., etc.   "I'm certain you would want to

23  correct this misinformation in the market as soon as possible.

24  Please could you confirm when you have done this."

25       Do you see that?

1   **A.**    Yes, I can.

2   **Q.**    You never responded to this email, did you?

3   **A.**    Probably not, no.

4   **Q.**    And then the next paragraph says, "On a second matter, you

5   mentioned that you had access to what we understand to be

6   non-public Zantaz documents."

7          You're the one that mentioned the information that gave

8   Autonomy concern; correct?

9   **A.**    Are you saying that we -- we are saying --

10          **MR. FRENTZEN:**    Excuse me.  Vague as to "information."

11   I don't -- is she insinuating that he said he has non-public

12   information?

13   **BY MS. LITTLE:**

14   **Q.**    No.

15          I'm saying you are the one that brought it up; right?

16   You're the one that mentioned to people at Autonomy that you

17   had access to certain information; correct?

18   **A.**    I had access to a Zantaz closing balance sheet, yeah.  But

19   the point I made earlier was that it was publicly available.

20   **Q.**    Well, Mr. Goodman said in the last sentence here, "We are

21   concerned that this may be inside information"; correct?

22   **A.**    Correct.

23   **Q.**    And you never responded; right?

24   **A.**    Yeah.  I'm surprised I didn't respond, but I can't

25   remember responding.

1    **Q.**   Let's take a look at page 1 of this exhibit and the one,

2    two, three, four, fifth paragraph which says -- this is a

3    letter, by the way, to your boss; right?

4    **A.**   Yes.

5    **Q.**   And the fifth paragraph says, "The matter has been raised

6    directly with the analyst, attachment 3."  We just looked at

7    attachment 3.  "But as of the writing of this letter, we have

8    had no reply."

9    **A.**   Right.

10   **Q.**   And it's appropriate, wouldn't you agree, that if Autonomy

11   writes to you and you don't reply and there's genuine concern,

12   they escalate it to your boss; right?

13          **MR. FRENTZEN:**  Objection.  This is just argument.

14          **THE COURT:**  Overruled.

15          **THE WITNESS:**  Yeah.  I don't think that's unreasonable

16   to escalate to my boss.

17   **BY MS. LITTLE:**

18   **Q.**   And then Astaire looked at this and then they sent out the

19   clarification as we discussed; right?

20   **A.**   Yes.

21   **Q.**   And in the clarification, it was made clear that the

22   change in revenue recognition timing was not due a change in

23   policy, but simply how the deals were structured; correct?

24   **A.**   Exactly.  That's correct.

25   **Q.**   Okay.  Finally, sir, were you involved in a company called

MORLAND - CROSS / LITTLE

1    Imaginatik?

2    **A.**   Yes, I was.

3    **Q.**   In the spring of 2011, did you approach Dr. Lynch and

4    Mr. Hussain about Autonomy's buying Imaginatik?

5    **A.**   I don't recall that, no.

6    **Q.**   Would you take a look, sir, at Exhibit 6894.

7              **THE COURT:**  Admitted.

8              **MR. FRENTZEN:**  I'm sorry, Your Honor, I object.  None

9    of this -- he's not on this.  If the Court will take a

10   moment --

11             **MS. LITTLE:**  If you look at the bottom, it's an email

12   from Paul Morland to Dr. Lynch and Mr. Hussain.

13             **MR. FRENTZEN:**  Hang on.

14             **THE COURT:**  I don't have it.

15             **MS. LITTLE:**  Oh, you don't have it?  Oh, my goodness.

16             **THE COURT:**  Maybe it's here in the black binder.

17             **MR. FRENTZEN:**  If I could just --

18             **THE COURT:**  Wait a minute.  Let me look at it.  6894.

19   6894.

20             **MR. FRENTZEN:**  I got it.  Sorry, Your Honor.  There is

21   a different name that it's from, so  ...

22             **THE COURT:**  Pardon me.

23             **MR. FRENTZEN:**  It's from somebody else's email

24   address.

25             **MS. LITTLE:**  I can lay a foundation.

1    **Q.**    Who is Sean Taylor, sir?

2    **A.**    He is the CFO of Imaginatik.

3    **Q.**    And looking at this email, Exhibit 6894, it says "Regards,

4    Paul" at the end.

5         This is from you, is it not?

6    **A.**    I can't see it, sorry.

7    **Q.**    Okay.  It's in the black binder.  It should be right

8    toward the end.

9         **THE COURT:**  I see.  It's on the second page.  That's

10   the problem.

11        **MR. FRENTZEN:**  Yes.  That's --

12        **THE WITNESS:**  What number is it?

13        **THE COURT:**  6894.  It's one page, but take a look at

14   the -- turn over the first page, and that's, I think, what

15   counsel is referring to.

16        Do you see that?

17        **MS. LITTLE:**  Mine printed on one page, but different

18   printer.

19        **THE COURT:**  Anyway, it's admitted.

20             (Trial Exhibit 6894 received in evidence)

21                  (Exhibit published to jury.)

22   **BY MS. LITTLE:**

23   **Q.**    If it's admitted, we can put it up on the screen.

24        Is this an email from you to Dr. Lynch and Sushovan

25   Hussain about Imaginatik?

 1    A.    Yes.

 2    Q.    You say, "Mike/Sushovan, if we can put to one side for a

 3    moment our differences about what constitutes organic growth

 4    and what is an acceptable level of cash conversion for a growth

 5    company" -- those are the things you wrote about in your notes

 6    about Autonomy?

 7    A.    Correct.

 8    Q.    "I have a very interesting company that I think you should

 9    have a look at.  At least if you did buy it, I could never say

10    it didn't make strategic sense."

11    A.    Correct.

12    Q.    You were asking Dr. Lynch and Mr. Hussain to have Autonomy

13    look at this company, Imaginatik, that you were involved with;

14    correct?

15    A.    Right.

16    Q.    And this is after you had been writing various negative

17    things about Autonomy, you still thought enough of them that

18    you were willing to try to sell them -- have them buy your

19    company; right?

20    A.    Yes.

21    Q.    And then Dr. Lynch said he would consider buying it;

22    correct?

23          You can take a look at Exhibit 6895.  It's the next one in

24    your binder.

25                THE COURT:  Admitted.

```
 1                 (Trial Exhibit 6895 received in evidence)

 2                      (Exhibit published to jury.)

 3   BY MS. LITTLE:

 4   Q.    So up at the top, Dr. Lynch writes back, "May be a bit

 5   small for us, but happy to learn more"; right?

 6   A.    Yep.

 7   Q.    No hard feelings, no problems?

 8   A.    No problems at all.

 9   Q.    And then --

10   A.    We were sort of joking because, you know, I did write a

11   lot -- very negative stuff about them and, you know, it -- your

12   conversations with the company have to be sort of open, and I

13   don't think either of us wanted to stop communicating with each

14   other.  They just needed to demonstrate that I was wrong and

15   obviously I thought I was right.  So, you know, there was no

16   point in stopping communicating.  So -- yeah.

17   Q.    And again you thought well enough of Autonomy that you

18   would consider pitching this company for them to buy; right?

19   A.    Correct.

20          MS. LITTLE:  Nothing further.

21                        REDIRECT EXAMINATION

22   BY MR. FRENTZEN:

23   Q.    You were asked what you thought about Autonomy at that

24   time.  Did you think they had a lot of money?

25   A.    Are you talking about Imaginatik?
```

1   **Q.**   Did you think Autonomy had a lot of money?

2   **A.**   Yeah.  Autonomy had a lot of money.

3   **Q.**   You were looking for a buyer?

4   **A.**   Yes.

5   **Q.**   I want to go back to -- there were questions about sort of

6   do you know who wrote the website.  Do you remember those

7   questions?

8   **A.**   Yes.

9   **Q.**   And if we could, could we pull up Exhibit 291, page 11.

10                  (Exhibit published to jury.)

11  **BY MR. FRENTZEN:**

12  **Q.**   And I just want to -- so can you see this -- again, this

13  is from the -- the 2009 earnings call.  It's Mr. Hussain

14  talking here and then can we scroll down.

15       Okay.  Great.

16       And right here, do you see what Mr. Hussain said --

17  sorry -- said to the group there on revenue recognition.  "I'll

18  again restate what Mark has already said.  There is no change

19  in revenue recognition policies.  We use IFRS, and where IFRS

20  is silent, we use SOP 97-2, which again you can find on our

21  website"?

22  **A.**   Yes.

23  **Q.**   So does it appear Mr. Hussain was aware of what was

24  written on the website of Autonomy?

25  **A.**   Yes.

1   **Q.**   You were asked questions about that one note that made a

2   reference to hardware.  I'd like to get back into that for a

3   moment.  If I could get some assistance from the other side.

4   6898, please.

5                    (Exhibit published to jury.)

6   **BY MR. FRENTZEN:**

7   **Q.**   If we can just -- all right.  First of all, this note --

8   do you see the date here, Mr. Morland?

9   **A.**   Yes.

10  **Q.**   July 23, 2010?

11  **A.**   Yeah.

12  **Q.**   And actually, here you are -- you moved to a hold from a

13  sell.  What does that mean?

14  **A.**   That meant that I was feeling a bit more positive about

15  the company.

16  **Q.**   And I just want to go down to the part that you were asked

17  about, and I think it was in this paragraph here where there is

18  a reference to the sale of hardware.

19       If you would, could you take a look up above in the

20  paragraph above, and do you see you made a reference to the

21  sale of some 5 million of hardware?

22  **A.**   Yes, I see that.

23  **Q.**   And would you agree that a sale of 5 million of hardware

24  is different than a sale of a hundred million dollars worth of

25  hardware?

1  **A.**   Yes, it is.

2  **Q.**   And do you have a recollection that there was actually a

3  earnings call the very day before on July 22nd, 2010?

4  **A.**   Yes.   That would be the timing of when the earnings calls

5  were after the quarter end which would have been a June quarter

6  end.

7  **Q.**   So then this would be for Q2/2010?

8  **A.**   Yes.

9          **MR. FRENTZEN:**   And, Your Honor, I will represent we'll

10  get the audio clip of this, but I'd like to go to a portion of

11  the transcript from that just to address this issue.   Thank

12  you, Your Honor.

13          Can we get -- and I apologize.   Can we switch back over.

14  Can we get Exhibit 1006.par.

15                  (Exhibit published to jury.)

16  **BY MR. FRENTZEN:**

17  **Q.**   Do you see here, Mr. Morland, on July 22, 2010, there was

18  the Q2/2010 earnings call for Autonomy?

19  **A.**   Yes.

20  **Q.**   Can we go now to page 16, please.   Can we go to the bottom

21  of the page and blow up from here down -- that's pretty good.

22          So do you see here a question and answer, Mr. Morland, and

23  go ahead and take a look at this.   Is this what you were

24  talking about in your note of the next day?

25  **A.**   Yes, it was.

1   **Q.**   So Mr. Briest is asking -- he is another analyst?

2   **A.**   Yes, he is.

3   **Q.**   "On the inventory, I notice there was still about 6

4   million on the balance sheet at the end of Q2.  I was expecting

5   that to have flowed through in the quarter.  Can you talk a bit

6   about that and when we should expect those deals to close."

7        Okay.  And do you see here Mr. Lynch -- Dr. Lynch -- "on

8   the inventory, that inventory was actually sold last quarter."

9        Is this a continuing reference to the 10 million in

10  inventory and the whole discussion about the appliance from

11  Q1/2010 that's just continued into Q2/2010?

12  **A.**   Yes, it is.  There was 10 million on the balance sheet at

13  the end of the first quarter and the understanding of the

14  analysts was that that would have disappeared by the end of the

15  second quarter, but there was still 6 million left.  And I

16  think Mike Lynch goes on to explain that the customer for

17  whatever reason delayed the purchase of that stock and then it

18  was subsequently sold in Q3.

19  **Q.**   Can we go through to the next page, to the top of that

20  page.

21        And basically Dr. Lynch is saying, "Half of it went on day

22  one.  Half of it they're going to get around to when they dealt

23  with the other things they're dealing with.  It's already sold.

24  We expect it to be delivered this quarter.  Obviously that will

25  be recognized -- be recognized after delivery set hasn't been

 1   recognized yet"?

 2   **A.**   Yes.

 3   **Q.**   So this was still this same chunk of appliances that

 4   Dr. Lynch said was the inventory from Q1/2010.  He's now

 5   attributing that inventory to these appliances in Q2 and then

 6   presumably into Q3 of 2010?

 7   **A.**   Yes.

 8   **Q.**   And so is that specifically what you were referencing in

 9   your note when you talk about a 5 million-dollar boost of

10   hardware?

11   **A.**   Yes.

12   **Q.**   And --

13   **A.**   Although I should just point out that it's not possible to

14   work out exactly what the sale value of an item of inventory is

15   because you don't know what the pricing is and also that 6

16   million of stock at the end of Q2 might not have been part of

17   the 10 million that was there at the end of Q1.  They might

18   have sold that and bought some more, so, you know, it's very

19   difficult for an analyst.  All you can see is the snapshot at

20   the end of the quarter.

21   **Q.**   All right.  But this was being attributed again to the

22   appliances that Dr. Lynch had talked about in the prior

23   quarter?

24   **A.**   It was, yeah.

25   **Q.**   So this was not reselling hardware in -- what you were

1  referencing in your note.  This was still appliances?

2  **A.**  Correct.

3  **Q.**  Just briefly, you were asked whether or not you spoke with

4  Mr. Khan.  Did your conversation with Mr. Khan influence your

5  testimony here today at all?

6  **A.**  No.

7  **Q.**  Are you represented by a lawyer at all in this case?

8  **A.**  I'm not, no.

9  **Q.**  You were asked whether or not you wanted to be helpful to

10  the Government.  Can you explain what you meant by this?

11  **A.**  What I meant by being helpful?

12  **Q.**  You were asked if you were being helpful to the

13  Government, and you said, "Yeah, at times."  Can you just

14  explain for us what you mean by that?

15  **A.**  Yes.  I'm -- this is a complicated case and I think that

16  I'm as close to anybody from the outside.  It was mentioned

17  earlier in this -- in this courtroom that the analyst is only

18  able to see publicly-available information.  I mean, of course

19  all the auditors in the company itself, they get to see

20  everything.  So that's why it has to be my opinion based on

21  what I see and it's all third-party information.

22      So, you know, you're at a bit of a disadvantage as an

23  analyst, but you have as much information as anybody, outside

24  the auditor and the company, because you spend a lot of time

25  looking at it.  So, you know, I was keen to pass on my

 1   knowledge and expertise and experience around what I've been

 2   doing around this over a three-year period to the

 3   investigation.

 4   **Q.**   Trying to just provide the information you have?

 5   **A.**   That's right if it helps the case.  I think we all want to

 6   see justice done, and if that helps, then ...

 7            **MR. FRENTZEN:**  May I have one moment, Your Honor?

 8        (Government counsel confer off the record.)

 9            **MR. FRENTZEN:**  That's all I have.  Thank you,

10   Your Honor.

11        Thank you very much, Mr. Morland.

12            **MS. LITTLE:**  Nothing further.

13            **THE COURT:**  Thank you.  You're excused.  Thank you for

14   coming.

15        Next witness.

16            **MR. LEACH:**  Your Honor, it's 3:30.  I don't think I

17   will finish the next witness.  We're happy to call him or wait

18   until Monday.

19            **THE COURT:**  Why don't we wait until Monday.  Everybody

20   has had a full day.

21        Ladies and gentlemen of the jury, you are, of course,

22   interested in how we're doing in terms of where we are, and I

23   believe on Monday, I will be able to give you a fairly concrete

24   picture.  The Government is about to wrap up their case.  I

25   would anticipate that that will be done in the first part of

PROCEEDINGS

1    a Government witness.  We'll give them the order as we have

2    done.  I would like to know the defense case as I've been

3    promised.

4             **THE COURT:**  They said they would get it to you

5    tonight.

6             **MR. REEVES:**  Thank you, Your Honor.

7             **MR. KEKER:**  Yes, we will.

8             **THE COURT:**  Okay.  Thank you.

9                  (Proceedings adjourned at 5:47 p.m.)

10                      ---oOo---

11

12                  **CERTIFICATE OF REPORTERS**

13        I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15

16   DATE:   Friday, April 13, 2018

17

18

19   _____

20        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                  U.S. Court Reporter

21

22

23   _____

24        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                  U.S. Court Reporter

25

# EXHIBIT 22

**Volume 2**

**Pages 1 - 191**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )      **NO. CR 16-00462 CRB**
                               )
SUSHOVAN TAREQUE HUSSAIN,      )
                               )
          Defendant.           )
_____)
                               San Francisco, California
                               Monday, February 26, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:
                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            BY:  **ROBERT S. LEACH**
                 **ADAM A. REEVES**
                 **WILLIAM FRENTZEN**
                 **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
            BY:  **JOHN W. KEKER**
                 **JAN NIELSEN LITTLE**
                 **BROOK DOOLEY**
                 **KATE LAZARUS**
                 **NIC MARAIS**
                 **ATTORNEYS AT LAW**

Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

<u>**I N D E X**</u>

Monday, February 26, 2018 - Volume 2

|                                        | **PAGE** | **VOL.** |
|----------------------------------------|---------:|:--------:|
| Preliminary Jury Instructions          |        7 |    2     |
| Opening Statement by Mr. Leach         |       14 |    2     |
| Opening Statement by Mr. Keker         |       49 |    2     |

| <u>**GOVERNMENT'S WITNESSES**</u>      | **PAGE** | **VOL.** |
|----------------------------------------|---------:|:--------:|

<u>**SULLIVAN, MICHAEL**</u>

|                                        | **PAGE** | **VOL.** |
|----------------------------------------|---------:|:--------:|
| (SWORN)                                |       75 |    2     |
| Direct Examination by Mr. Leach        |       76 |    2     |

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | **IDEN** | **EVID** | **VOL.** |
|---------------------------|:--------:|---------:|:--------:|
| 50                        |          |       94 |    2     |
| 68                        |          |       98 |    2     |
| 73                        |          |      103 |    2     |
| 90                        |          |      104 |    2     |
| 115                       |          |      107 |    2     |
| 117                       |          |      108 |    2     |
| 118                       |          |      111 |    2     |
| 131                       |          |      124 |    2     |
| 136                       |          |      119 |    2     |
| 151                       |          |      113 |    2     |
| 152                       |          |      115 |    2     |
| 155                       |          |      115 |    2     |
| 180                       |          |      126 |    2     |
| 188                       |          |      128 |    2     |

1    So I'd like to take a few minutes to walk through some of

2    the accounting terms that you're going to hear a lot about in

3    this case.  As I mentioned earlier, Autonomy was a public

4    company.  That means its shares were bought and sold by

5    investors all over the world.  Autonomy was required to have

6    financial statements.  It had a balance sheet, its assets, and

7    its liabilities, and it had an income statement, which is its

8    revenue less the expenses and either a profit or a loss.

9        Autonomy had outside auditors.  The auditors were from a

10   small office in Cambridge of Deloitte in the UK.  You're going

11   to hear from some of the Deloitte auditors in this case.  The

12   evidence will show that they were misled about many of the

13   transactions you're going to hear about.

14       You will hear that for a software company like Autonomy,

15   revenue was the name of the game, and for the defendant,

16   Mr. Hussain, revenue was everything.  Revenue is the top line

17   on your income statement.  You report or, in the accounting

18   lingo, recognize revenue when you've satisfied all of the

19   criteria for revenue recognition, when you have a real,

20   *bone fide*, noncancelable sale where the risks of reward of

21   ownership has been transferred and the buyer has effective

22   control of the goods.

23       You will hear about the importance of revenue from some of

24   the analysts who followed Autonomy.  The analysts had the job

25   of scouring the public domain for information about Autonomy,

 1   reading its financial statements, reading news reports, talking

 2   to Mr. Hussain, talking to Mr. Lynch, talking to anybody they

 3   could find who had information about the company, and then

 4   preparing reports or research that projected how Autonomy was

 5   going to do, what was its revenue going to be.  And it sold

 6   those reports to investors who made investment decisions on

 7   whether to buy or sell Autonomy securities.

 8        Each quarter the analysts would estimate or forecast how

 9   much revenue Autonomy was going to bring in, and the average of

10   those estimates were called the consensus estimates, and that

11   became the measure of success or failure for the defendant.

12   Beating the estimate meant that Autonomy was growing more

13   quickly than everyone thought; and, as a general matter, that

14   meant the stock would go up.

15        If you missed the consensus estimate, that means you're

16   growing slower than everyone anticipated; and, as a general

17   matter, your stock goes down, the stock that the defendant

18   owned goes down.

19        You will hear that a miss of even a few million dollars

20   would mean disaster for Hussain and the stock price of the

21   shares that he owned; and you will see that in order to hit

22   consensus estimates, Hussain time and time again used a variety

23   of schemes to hit that number.  He was managing earnings, the

24   evidence will show, and he did this to artificially inflate

25   Autonomy's stock price and its reported income.

**PROCEEDINGS**

1    always ask.

2            **MR. LEACH:**  I think I have about 30 to 45 more

3    minutes, Your Honor.

4            **THE COURT:**  Okay.  All right.  Thank you very much.

5            (Proceedings adjourned at 4:02 p.m.)

6                        ---oOo---

7

8

9            <u>**CERTIFICATE OF REPORTER**</u>

10           I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12

13   DATE:   Monday, February 26, 2018

14

15

16

17   _____

18       Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

19

20

21

22

23

24

25

# EXHIBIT 23

---

| | |
|---|---|
| **From:** | Khan, Daud <daud.khan@cazenove.com> |
| **To:** | Vijay Anand <Vijay.Anand@noblegp.in> |
| **Sent:** | 1/27/2010 2:03:28 PM |
| **Subject:** | RE: Autonomy |
| **Attachments:** | image001.gif |

but OEM is not a number given in the annual report so they could define it however they want.

I see the point on pre-paid. I pressed them a few years ago on OEM post Verity and they claimed none of the rise was due to Verity, as verity did not have ongoing royalties. I then tracked down the ex verity CFO who said that was absolutely incorrect and that they had significant royalty streams. This is actually when I first began to suspect that all was not as it seemed Autonomy.

If they do a deal post in the next 3 months what do you think the reaction would be from investors?

---

**From:** Vijay Anand [mailto:Vijay.Anand@noblegp.in]
**Sent:** 27 January 2010 13:53
**To:** Khan, Daud
**Cc:** Arun George
**Subject:** RE: Autonomy

I think Paul from Astaire told Arun that you will be attending!

We are just using different terms here as the "upfront license" is what the prospect refers to as "pre-paid royalty". Not sure if the figure is still $250k though. OEM business picked up momentum post Verity. So the 2006 figures should still consist of mostly pre-paid royalties and the average seems to be closer to $600-650k ($36m for 52 deals). Could mean both a) Autonomy is recognizing more upfront – again this theory has stemmed from some ex-employees or b) More products per OEM.

The comment on licenses apportioned to the OEM business is also quite interesting – may be the reason why revenues from acquired companies do not grow in the first year post closing? But then not sure if they will be allowed to do this as OEM is necessarily a third party.

On IDOL SPE – nope haven't seen anything which could justify a $24m marketing spend. Would be interesting to hear some customer feedback!

Vijay

---

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** Wednesday, January 27, 2010 6:38 PM
**To:** Vijay Anand
**Subject:** RE: Autonomy

hi,

yes I'll hopefully be there (who did you here from?). will be a bit odd sitting face to face wit the mighty Lynch.

I haven't heard that before but is definitely an interesting theory. I have struggled to understand how they could grow OEM at 30%+ when its big OEM partners had licenses declining at 30. The original prospectus suggests upfront fees of $250k as pre-paid royalty, there was no mention of any license related to OEM.

I heard from one ex-employee that acquired entities have part of its licenses apportioned to the OEM business. I.e. if IWOV sells $100 license then $20 is allocated to OEM as that is the "charge for IDOL" usage.

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

JPMC-AU-DOJ-00002590

Have you noted/seen any marketing related to IDOL SPE?


Daud

---

**From:** Vijay Anand [mailto:Vijay.Anand@noblegp.in]
**Sent:** 27 January 2010 12:59
**To:** Khan, Daud
**Subject:** Autonomy

Hi Daud,


Hope you are well. I understand that you will be attending Autonomy's results – it would be good to have you back J


Heard something regarding Autonomy's OEM revenue recognition! As always no way to prove or disprove this, but for what its worth – apparently Autonomy structures its OEM contracts in order to maximize upfront revenue recognition, i.e., higher license component at the cost of lower royalties. The basis is that given the significant deals signed in 06-07, the acceleration in OEM revenues should have happened in 08-09 (which didn't transpire). As you know Autonomy's counter is that weak macro resulted in fewer product launches. But some people believe that the acceleration may not happen at all as:

·  Given the deal structures, major proportion has already been recognized

·  Barring IDOL SPE there are no major products left for OEM partners to license

·  No major OEM partners to add (Autonomy pretty much has most of them)


Have you come across this before? Think Autonomy should disclose the split between licenses and royalties or atleast give out the average royalty rate.


Cheers,

Vijay

---

C Vijay Anand
Analyst, Technology


# NOBLE


Direct (UK)    : + 44 (0) 20 7763 2236
Direct (India) : + 91 (0) 22 4211 0911

---

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

JPMC-AU-DOJ-00002591

120 Old Broad Street
London
EC2N 1AR

701 Powai Plaza,
Hiranandani Gardens,
Powai, Mumbai-400076

www.noblegp.com

Enabled clients can access our research via Bloomberg NBLE <GO>, Reuters, Thomson, Factset and Capital IQ

Email Disclaimer/Confidentiality Notice This e-mail and files transmitted with it are confidential, may contain privileged information and are intended for the addressee only. Access to this message by any other person is prohibited. If you are not the intended recipient (or responsible for its delivery to such a recipient), please inform the sender and delete the message immediately. This message has been virus scanned by us before dispatch. We do not accept responsibility for any adverse effect it may have on your systems or data. This message is issued by a member of the Noble Group Limited group of companies. Noble Group Limited has a number of subsidiary undertakings incorporated under the UK Companies Act, five of which are authorised and regulated by the Financial Services Authority. Further details about Noble Group Limited and its subsidiary undertakings are provided below: Noble Group Limited is registered in Scotland No. SC203624 Registered office: 76 George Street Edinburgh EH2 3BU Noble Financial Holdings Limited is registered in Scotland No. SC127487 Registered office: 76 George Street Edinburgh EH2 3BU Noble & Company Ltd. is authorised and regulated by the Financial Services Authority. Registered in Scotland No. SC127487 Registered office: 76 George Street Edinburgh EH2 3BU. A member of the London Stock Exchange plc. Member of PLUS Markets Group. Approved Nominated Adviser and Broker for AIM. UK member of Global M&A Noble Fund Managers Ltd. is authorised and regulated by the Financial Services Authority. Registered in Scotland No. SC199908 Registered office: 76 George Street Edinburgh EH2 3BU Noble Fund Advisers Ltd. is authorised and regulated by the Financial Services Authority Registered in Scotland No. SC177570 Registered office: 76 George Street Edinburgh EH2 3BU Noble Corporate Management Ltd. is authorised and regulated by the Financial Services Authority. Registered in Scotland No. SC166074 Registered office: 76 George Street Edinburgh EH2 3BU Clear Capital Limited is authorised and regulated by the Financial Services Authority. Registered in England & Wales No.4637166. Registered office: 120 Old Broad Street, London EC2N 1AR www.noblegp.com

This e-mail is confidential and is for the addressee only. Please refer to www.cazenove.com/disclaimers/cazenove.htm for important disclaimers and the firm's regulatory position.

This e-mail has been scanned for viruses, spam and inappropriate mail content by emailsystems mail filtering services, before it has reached the Noble network.

Email Disclaimer/Confidentiality Notice This e-mail and files transmitted with it are confidential, may contain privileged information and are intended for the addressee only. Access to this message by any other person is prohibited. If you are not the intended recipient (or responsible for its delivery to such a recipient), please inform the sender and delete the message immediately. This message has been virus scanned by us before dispatch. We do not accept responsibility for any adverse effect it may have on your systems or data. This message is issued by a member of the Noble Group Limited group of companies. Noble Group Limited has a number of subsidiary undertakings incorporated under the UK Companies Act, five of which are authorised and regulated by the Financial Services Authority. Further details about Noble Group Limited and its subsidiary undertakings are provided below: Noble Group Limited is registered in Scotland No. SC203624 Registered office: 76 George Street Edinburgh EH2 3BU Noble Financial Holdings Limited is registered in Scotland No. SC127487 Registered office: 76 George Street Edinburgh EH2 3BU Noble & Company Ltd. is authorised and regulated by the Financial Services Authority. Registered in Scotland No. SC127487 Registered office: 76 George Street Edinburgh EH2 3BU. A member of the London Stock Exchange plc. Member of PLUS Markets Group. Approved Nominated Adviser and Broker for AIM. UK member of Global M&A Noble Fund Managers Ltd. is authorised and regulated by the Financial Services Authority. Registered in Scotland No. SC199908 Registered office: 76 George Street Edinburgh EH2 3BU Noble Fund Advisers Ltd. is authorised and regulated by the Financial Services Authority Registered in Scotland No. SC177570 Registered office: 76 George Street Edinburgh EH2 3BU Noble Corporate Management Ltd. is authorised and regulated by the Financial Services Authority. Registered in Scotland No. SC166074 Registered office: 76 George Street Edinburgh EH2 3BU Clear Capital Limited is authorised and regulated by the Financial Services Authority. Registered in England & Wales No.4637166. Registered office: 120 Old Broad Street, London EC2N 1AR www.noblegp.com