# EXHIBIT 24

| | |
|---|---|
| **From:** | Khan, Daud <daud.khan@cazenove.com> |
| **To:** | Gladwyn, John <john.gladwyn@blackrock.com> |
| **Sent:** | 5/1/2009 3:25:03 PM |
| **Subject:** | RE: Have you ever done calls with vivisimo? |

David Toms mentioned this little spat to me. What's great is that Keyview is the technology AU acquired from Verity. Au claims no ongoing royalties from Verity products but its quite clear that alot of OEM revenue is keyview related.

**From:** Gladwyn, John [mailto:john.gladwyn@blackrock.com]
**Sent:** 01 May 2009 16:21
**To:** Khan, Daud
**Subject:** RE: Have you ever done calls with vivisimo?

http://secunia.com/blog/15/

you could read these to cheer yourself up on a slow friday afternoon!

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** Friday, May 01, 2009 4:19 PM
**To:** Gladwyn, John
**Subject:** RE: Have you ever done calls with vivisimo?

that's the assumption our legals have made

**From:** Gladwyn, John [mailto:john.gladwyn@blackrock.com]
**Sent:** 01 May 2009 16:18
**To:** Khan, Daud
**Subject:** RE: Have you ever done calls with vivisimo?

so nothing coming as far as you know?

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** Friday, May 01, 2009 4:17 PM
**To:** Gladwyn, John
**Subject:** RE: Have you ever done calls with vivisimo?

don't know - all I know is what they have told us - that Autonomy counsel has advised management they should not communicate with me

**From:** Gladwyn, John [mailto:john.gladwyn@blackrock.com]
**Sent:** 01 May 2009 16:16
**To:** Khan, Daud
**Subject:** RE: Have you ever done calls with vivisimo?

where are you with any autonomy legislation against you by the way?

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** Friday, May 01, 2009 4:14 PM
**To:** Gladwyn, John
**Subject:** RE: Have you ever done calls with vivisimo?

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

I've tried e-mailing post the deal but never heard back. I'll give it another go.

---

**From:** Gladwyn, John [mailto:john.gladwyn@blackrock.com]
**Sent:** 01 May 2009 16:13
**To:** Khan, Daud
**Subject:** RE: Have you ever done calls with vivisimo?

obv autonomy had them booted out of iwoven after they replaced the autonomy product for enterprise search.

maybe worth giving them another call, since they now have been outed from that.

---

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** Friday, May 01, 2009 3:28 PM
**To:** Gladwyn, John
**Subject:** RE: Have you ever done calls with vivisimo?

yes pre-IWOV

growing very quickly, profitable, biggest competitor is Autonomy, see them in almost every deal. Have replaced Au in a number of accounts - didn't specify though.

---

**From:** Gladwyn, John [mailto:john.gladwyn@blackrock.com]
**Sent:** 01 May 2009 15:24
**To:** Khan, Daud
**Subject:** RE: Have you ever done calls with vivisimo?

did anything interesting come from it? this was pre losing their iwoven business to autonomy...

---

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** Friday, May 01, 2009 3:23 PM
**To:** Gladwyn, John
**Subject:** RE: Have you ever done calls with vivisimo?

met with the head of product marketing last year - Rebecca something

---

**From:** Gladwyn, John [mailto:john.gladwyn@blackrock.com]
**Sent:** 01 May 2009 15:22
**To:** Khan, Daud
**Subject:** Have you ever done calls with vivisimo?


THE INFORMATION CONTAINED IN THIS MESSAGE AND ANY ATTACHMENT MAY BE PRIVILEGED, CONFIDENTIAL, PROPRIETARY OR OTHERWISE PROTECTED FROM DISCLOSURE. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and permanently delete it from your computer and destroy any printout thereof.

This e-mail is confidential and is for the addressee only. Please refer to www.cazenove.com/disclaimers/cazenove.htm for important disclaimers and the firm's regulatory position.

THE INFORMATION CONTAINED IN THIS MESSAGE AND ANY ATTACHMENT MAY BE PRIVILEGED, CONFIDENTIAL, PROPRIETARY OR OTHERWISE PROTECTED FROM DISCLOSURE. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and permanently delete it from your computer and destroy any printout thereof.

THE INFORMATION CONTAINED IN THIS MESSAGE AND ANY ATTACHMENT MAY BE PRIVILEGED, CONFIDENTIAL, PROPRIETARY OR OTHERWISE PROTECTED FROM DISCLOSURE. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and permanently delete it from your computer and destroy any printout thereof.

THE INFORMATION CONTAINED IN THIS MESSAGE AND ANY ATTACHMENT MAY BE PRIVILEGED, CONFIDENTIAL, PROPRIETARY OR OTHERWISE PROTECTED FROM DISCLOSURE. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and permanently delete it from your computer and destroy any printout thereof.

THE INFORMATION CONTAINED IN THIS MESSAGE AND ANY ATTACHMENT MAY BE PRIVILEGED, CONFIDENTIAL, PROPRIETARY OR OTHERWISE PROTECTED FROM DISCLOSURE. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and permanently delete it from your computer and destroy any printout thereof.

THE INFORMATION CONTAINED IN THIS MESSAGE AND ANY ATTACHMENT MAY BE PRIVILEGED, CONFIDENTIAL, PROPRIETARY OR OTHERWISE PROTECTED FROM DISCLOSURE. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and permanently delete it from your computer and destroy any printout thereof.

# EXHIBIT 25

| From: | Khan, Daud <daud.khan@cazenove.com> |
|---|---|
| To: | Roger Phillips <Roger.Phillips@evosecurities.com>;Paul Morland <pmorland@astaire.co.uk> |
| Sent: | 9/9/2009 4:25:05 PM |
| Subject: | RE: Citi AU note from today |

they are essentially saying that the LT deferred is the only amount relevant to hosting - I think, so all other contracts that have been renewed are on the new model. but the def rev movements don't make sense then - we would have seen bigger declines wouldn't we.

---

**From:** Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
**Sent:** 09 September 2009 17:21
**To:** Paul Morland; Khan, Daud
**Subject:** RE: Citi AU note from today

5% basically means a large chunk of prepaid hosted revs with existing customers got switched to paid in arrears. Presumably to get a licence up front. Which was suggested before

What's the game on IWOV? Verity was term, ZANTAZ prepaid, IWOV just looks like a boring core perpetual model to me

---

**From:** Paul Morland [mailto:pmorland@astaire.co.uk]
**Sent:** 09 September 2009 16:24
**To:** Khan, Daud; Roger Phillips
**Subject:** RE: Citi AU note from today

Yes, it caught my NO **** SHERLOCK comment yesterday
Goodman came back on the marketing and said he couldn't tell me anything because it would be selective disclosure. He also said the extra marketing wasn't all related to probabilistic search. Didn't they say it was?
**Most interesting of all.**
He said that only 5% of deferred revenues related to hosting. Doesn't that suggest that only $8m of Zantaz deferred revenue taken over of $45m is left? Or was some of the $45m ordinary maintenance? Given that we are now two years post the Z acquisition I suppose we should expect all of its deferred is now gone. And presumably replaced with one third license and two thirds hosted and invoiced in arrears. But what about the large banking deals? Aren't they contributing towards deferred? Or do we think they are also being invoiced in arrears? I feel another Excel table coming on.

I won't push him on the selective disclosure of stuff to the bulls until I have all I need from him.

Another thought for you. If they can buy OEM partners such as IWOV and massively improve the functionality of their products as they have apparently done with iManage. Would it not make sense to acquire all of their OEM partners, one by one?

**Paul Morland | Equity Analyst | Astaire Securities**

**D:** +44 (0)20 7448 9740

**W:** www.astairesecurities.co.uk | **E:** pmorland@astaire.co.uk

---

From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 09 September 2009 15:37
To: Roger Phillips; Paul Morland
Subject: RE: Citi AU note from today

Salesforce is pre paid quarterly or annually. Although one client told me they have had to move to monthly pre-paid in certain cases because of

the environment.

The Caz filter is very annoying (Websense or Message labs)

-----Original Message-----
From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 09 September 2009 15:35
To: Khan, Daud; Paul Morland
Subject: FW: Citi AU note from today


Lets try this again....Caz email filter caught it the first time for
swearing

-----Original Message-----
From: Roger Phillips
Sent: 09 September 2009 15:33
To: 'Khan, Daud'; Paul Morland
Subject: RE: Citi AU note from today


I think the concept that post paid monthly is the industry norm is
b*****cks

To me it is indisputable that ZANTAZ revenue recognition has been
changed to be more aggressive for new deals. How this can be interpreted
as a good thing I do not understand.

Whether or not existing ZANTAZ deals have been accelerated is however
open to question

What does salesforce.com do on payment terms?

-----Original Message-----
From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 09 September 2009 15:19
To: Roger Phillips; Paul Morland
Subject: RE: Citi AU note from today

I've never taken a close look but the only risk is a good cash
conversion business is the mismatch between the contracts that are being
recognised and the cash that is being collected.

BTW here is the Noble note

Makes a good point about DSO's (acquired companies have lower DSO's).
Also apparently, the Zantaz model is similar to Fidessa (I called to ask
what they meant by the change being an industry norm) ie post paid
monthly - do you know Fidessa? But I've just had a quick look at Fidessa
and cash conversion is 100%.

Any luck on the expected marketing spend or an admittance from the
company of selected disclosure.

-----Original Message-----
From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 09 September 2009 14:56
To: Paul Morland; Khan, Daud
Subject: RE: Citi AU note from today


Nothing I am particularly aware of on MCRO accounting. One fair value
adjustment on creds for one deal last year but not material. Cash
conversion 90% EBITDA, deferred rev growth broadly tracks rev. 85% of
licence revenues are runtime licences or deployment which some people
criticise as not being true organic growth. The related bear story is
that licence revs are boosted by legal settlements but don't think this
is material again.

Don't think there are bogeys in there but Kelly leaving has people
wondering if he looked under the covers of either BORL or Compuware and
realised he stepped on a landmine.

I wonder if the 8% bad debt provision is related to the large deals i.e.
auditors forcing them to take it because their recognition on these
large deals is aggressive given the real risk attached. Having said that
bad debt provision was 5% in 2007.

-----Original Message-----
From: Paul Morland [mailto:pmorland@astaire.co.uk]
Sent: 09 September 2009 14:39
To: Khan, Daud; Roger Phillips
Subject: RE: Citi AU note from today

People keep telling me there is something wrong with MCRO accounting I
can't see anything wrong with it. What am I missing?

I have confirmed today with two companies that DSOs should be calculated
on gross debtors ie. Not net of BDP. Both were also amazed that Au has a
7% provision. I can only think that people buy the software and then
don't pay when they can't get it to work. Good for Au because they get
the sale and the growth and only the margin suffers when they don't get
paid. Ie. They never reverse the sale.


Paul Morland | Equity Analyst | Astaire Securities
D: +44 (0)20 7448 9740
W: www.astairesecurities.co.uk | E: mailto:pmorland@astaire.co.uk
-------------------------------------------------------------------
--

From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 09 September 2009 12:30
To: Roger Phillips; Paul Morland
Subject: RE: Citi AU note from today

No its Stacy.

She's had a call with pretty much everyone today - Stephen, Nick and
Kevin Loosemore.

-----Original Message-----
From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 09 September 2009 12:03
To: Khan, Daud; Paul Morland
Subject: RE: Citi AU note from today


Josep doesn't even have the excuse of a corporate relationship like the
others

The UBS argument has actually at least added to the discussion in terms
of being worthy of a response

Who else follows MCRO? Daud, are you the man at Caz who does it?

-----Original Message-----
From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 09 September 2009 07:22
To: Paul Morland
Cc: Roger Phillips
Subject: RE: Citi AU note from today


 It is truly shocking. I don't often take pleasure in making a fool of
someone but will make a few calls today to disparage the quality of this

note. I honestly think it is a crime to put out something as misleading
as this. The UBS note is now beginning to shine out as the best of a bad
bunch.

I think the head of research at DB should be told (no idea who he is
though) - I think I might suggest it to a few clients.

-----Original Message-----
From: Paul Morland [mailto:pmorland@astaire.co.uk]
Sent: 08 September 2009 23:18
To: Khan, Daud
Subject: FW: Citi AU note from today


Amended version with **** removed


Paul Morland | Equity Analyst | Astaire Securities
D: +44 (0)20 7448 9740
W: www.astairesecurities.co.uk | E: mailto:pmorland@astaire.co.uk
-----------------------------------------------------------------------
--

From: Paul Morland
Sent: 08 September 2009 23:12
To: Khan, Daud; Roger Phillips
Subject: RE: Citi AU note from today

Sad to still be in the office but this DB note is amazing.
It really could be the worst note ever written.
I thought it was bad when they said the H2 09 growth rate was
undemanding when looking at what was achieved in H2 08, completely
forgetting to mention the $40m dollar first time benefit from large
deals in H2 08.
But then I started looking at the model cash conversion table. My three
year old could have produced something more meaningful. Figure 6 looks
quite elaborate but all it is saying is that a company with 30% tax,
depreciation at 2% of profits (4% of sales and 45% margin) and no
working capital movements will convert 72% of EBITDA into cash after
tax. NO **** SHERLOCK. This is a table with 22 lines that tells us that
100-30+2=72.
The model appears to completely ignore working capital which one would
have thought was the whole point of having a growth sensitivity table in
Fig. 7. The model company has 70% pre-paid maintenance which would
surely do better than just 72% conversion (or 102% before tax). And how
is this relevant if Autonomy's maintenance is closer to 20%? The
resulting Fig. 7 is complete nonsense, partly because it is based on
quarter on quarter growth rather than annual, but then if you are
ignoring working capital movements does it really matter?
Who is head of research at DB?



-----Original Message-----
From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 08 September 2009 10:25
To: Paul Morland; Roger Phillips
Subject: RE: Citi AU note from today

Figured out the db note now - he is comparing EBITDA to Operating cash
AFTER TAX!!!

-----Original Message-----
From: Paul Morland [mailto:pmorland@astaire.co.uk]
Sent: 08 September 2009 08:24
To: Roger Phillips; Khan, Daud
Subject: RE: Citi AU note from today

 I will send Goodman a mail this morning to ask if the marketing spend
is going according to plan and how much has been spent to date


Paul Morland | Equity Analyst | Astaire Securities
D: +44 (0)20 7448 9740
W: www.astairesecurities.co.uk | E: mailto:pmorland@astaire.co.uk
----------------------------------------------------------------------
--

From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 07 September 2009 09:31
To: Khan, Daud
Cc: Paul Morland
Subject: RE: Citi AU note from today


I think it is fairly ad-hoc stuff initiated by the funds at this point.
I don't get the feel we are being set up for an event but I didn't see
IWOV coming either

I do think there is massive bullshit on the way for the new product and
this has to be prepared for

-----Original Message-----
From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 07 September 2009 09:23
To: Roger Phillips
Cc: Paul Morland
Subject: RE: Citi AU note from today

Do you know who are setting up these meetings.

I think these meetings might be crucial as if there is another share
placement, these might be the investors that lap it up.


-----Original Message-----
From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 07 September 2009 09:21
To: Khan, Daud; Paul Morland
Subject: RE: Citi AU note from today


Potential new. Funds that were underweight it during the last rise due
to scepticism, and now want to see if this is a suitable entry point

Apparently their new London hedge fund type offices are extremely
bullish. Historically a sell signal when a firm gets a new set of
offices.....

-----Original Message-----
From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 07 September 2009 09:19
To: Roger Phillips; Paul Morland
Subject: RE: Citi AU note from today

Existing holders or potential new ones?

-----Original Message-----
From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 07 September 2009 09:02
To: Paul Morland; Khan, Daud
Subject: RE: Citi AU note from today


AU are doing some meetings with one or two pretty serious investors this
week so I will get some feedback on what's being said

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

```
-----Original Message-----
From: Paul Morland [mailto:pmorland@astaire.co.uk]
Sent: 05 September 2009 14:25
To: daud.khan@cazenove.com; Roger Phillips
Subject: Re: Citi AU note from today

I may be on holiday (one week at start of summer and one now) but I have
to say I found the permatan comment v. Amusing. I can honestly say I
have never used a sunbed if that is what you are getting at.
Looking forward to getting back to some Autonomy bashing on Monday.
Working on a pre-results note that I will run past you.
We still need to think how we get them for that selective disclosure to
the  bulls which they denied to me in an e-mail. Might be worth getting
a view from the FSA?
Btw they confirmed to me last week there is no hosting in def inc
release.


Paul Morland | Equity Analyst | Astaire Securities
D: +44 (0)20 7448 9740
W: www.astairesecurities.co.uk | E: mailto:pmorland@astaire.co.uk
--------------------------------------------------------------------
--

From: Khan, Daud <daud.khan@cazenove.com>
To: Roger Phillips <Roger.Phillips@evosecurities.com>
Cc: Paul Morland
Sent: Fri Sep 04 11:41:43 2009
Subject: RE: Citi AU note from today

had a look at the whit andrews research - not as critical as might first
seem.

basically a very good product that is flexible and powerful but

expensive and complex to install. customer support lacking for the
smaller deals with more focus on the big customers.


_____
From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 04 September 2009 11:29
To: Khan, Daud
Cc: Paul Morland
Subject: RE: Citi AU note from today



How big is Endeca? Sub-$100m rev?



Sounds like AU needed a deal and had all channels open. Endeca still
feels like an SAP buy though with the manufacturing vertical expertise



I barely track OpenV....it's in the "Irrelevant" bucket along with
Kenjin the "Lycos-Killer" and Blinkx the "Google of Video Search". Oh
how I remember enjoying talking to investors convinced Blinkx was going
to be huge...



If you see examples of structured database search elsewhere let me know
```

_____

From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 04 September 2009 11:24
To: Roger Phillips
Cc: Paul Morland
Subject: RE: Citi AU note from today


yes when i tried to contact them last year the were very evasive – think
Au might have been talking to them last year.


You may be right about the spin off.


Do you think that OpenV might get spun out for a ridiculous valuation?


just got a hard copy of that whit andrews note- will read and give you
the highlights as don't have a soft copy.


_____

From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 04 September 2009 11:11
To: Khan, Daud
Cc: Paul Morland
Subject: RE: Citi AU note from today

Interesting comments on Endeca and structured database search. I guess
this goes back to your view that Autonomy might buy them, but doesn't
SAP hold a stake?


We are going to have to prepare for a massive amount of hype about this
at 3Q with AU....I think it is possible they spin off a new
probabilistic structured division with a load of shared cost in it and
$1m of revenue.


Cue Gerardus writing notes about how this deserves an EV/Sales of a
grillion times as databases are a $110bn market


_____

From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 04 September 2009 10:49
To: Roger Phillips
Cc: Paul Morland
Subject: RE: Citi AU note from today

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

no we don't have access. seen the e-discovery report and made the same
point as you in a note a while back.


i'llsee if our tech guys have it


_____
From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 04 September 2009 10:46
To: Khan, Daud
Cc: Paul Morland
Subject: RE: Citi AU note from today

Have you Gartner access? because you should search for Whit Andrews...he
recently did a hatchet job on Autonomy in mid-July or so with a note on
IDOL being a poor choice


http://www.gartner.com/DisplayDocument?id=1070012


Autonomy is only rated "Positive" in the last Gartner eDiscovery
Marketscope in Dec 08 which I use....FTI, Clearwell and others are rated
higher. Did you see EMC buy Kazeon? AU just got a big new competitor for
"upstream" eDiscovery


http://mediaproducts.gartner.com/reprints/ca/163258.html


_____
From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 04 September 2009 10:38
To: Roger Phillips
Cc: Paul Morland
Subject: RE: Citi AU note from today


have you seen the latest magic quadrant from Gartner. Au continues to
slip


_____
From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 04 September 2009 09:56
To: Khan, Daud

Cc: Paul Morland
Subject: RE: Citi AU note from today

How d'you think Morlo maintains that radioactive permatan J

_____

From: Khan, Daud [mailto:daud.khan@cazenove.com]
Sent: 04 September 2009 08:29
To: Roger Phillips
Cc: Paul Morland
Subject: RE: Citi AU note from today

that Appendix 1 is a joke. Its got nothingto do with accounting (or at
least the vast majority of it).

Paul - how many days holiday to you get at Astaire? I thought you'd
already had your summer holiday.

_____

From: Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
Sent: 03 September 2009 16:04
To: Khan, Daud; Paul Morland
Subject: Citi AU note from today

fyi...makes the UBS note look terrific by comparison IMO

The last couple of months have been challenging for Autonomy as bears
put a lot of scrutiny on accounting. While, this has yielded limited
result, in our view, it has left the investor base somewhat confused and
AU underperformed the FTSE 100 by 26% since its Q2 trading update. In
this note we do give our view on accounting but the main focus is on the
fundamental case and this should be seen as a follow up from our January
note where we compared Autonomy with Oracle. In this report we focus on
four key areas:

*     First we look at the overall opportunity for Autonomy's IDOL
technology - we argue that with the move to unstructured data (such as
emails, video, voicemails, etc) all software need to be able to handle
unstructured data over time. To size this opportunity we have used AU's
OEM model and conclude that the unstructured data opportunity is $6.7-
22.3bn. While this will be a gradual uptake there are two shorter term
catalysts including eDiscovery and Meaning Based Marketing. And this
brings me to the second area
*     We revisited eDiscovery and conclude that after the initial data
gathering stage, corporations are now looking to reduce the costs of
maintaining and reviewing this data. This results in strong demand for
automated solutions like Autonomy and software for eDiscovery should
grow c30% through 2012
*     Thirdly, the recovery will drive a new opportunity for Autonomy
which is around the optimisation and analysis of e-commerce. Autonomy
has combined the product it acquired from Interwoven (Optimost) with
IDOL, and eTalk. We value the market opportunity in this so-called
Meaning Based Marketing (MBM) at $1.0-2.3bn. Direct competition, like
Omniture grew organically at 70% in '07, 50% in '08 and is projected to
grow 15-20% this year, despite the current recession. While this
opportunity might be still 12 months out it should pick up from
eDiscovery.
*     Finally we discuss the accounting where we conclude that AU has

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

added value via acquisitions, is seeing the best growth in the software industry and generates cash at a level which is appropriate given its growth. However, we argue that AU will have to increase disclosure if it want to end these ongoing discussions around accounting.

Concluding, demand for eDiscovery remains strong and Meaning Based Marketing is around the corner which should help AU to continue to grow around the 20% mark. This is not reflected in the valuation as AU is now trading at 14.5x 2010E eps which is well below its historical 20x+ range and makes it one of the most attractive buys in the sector.

I have attached our note, if you want to discuss the note please let Hoi or myself know
Kind regards
Gerardus
<<AU - meaningful opportunities.pdf>>


Gerardus Vos CFA
Software & IT Services
Citigroup Investment Research

Office: +44 (0) 207 986 4246
Mobile: +44 (0) 77 99 145 745
Fax:    +44 (0) 207 986 4313
Email:  gerardus.vos@citigroup.com <mailto:gerardus.vos@citigroup.com>
Hoi Lam CFA
Software & IT Services
Citigroup Investment Research

Office: +44 (0) 207 986 4139
Mobile: +44 (0) 77 99 418 438
Fax:    +44 (0) 207 986 4313
Email:  hoi.chuen.lam@citi.com <mailto:hoi.chuen.lam@citi.com>

Citigroup Centre
Canada Square, Canary Wharf
London E14 5LB United Kingdom

Citigroup Global Markets Limited
Registered in England with number 1763297
Registered office : Citigroup Centre, Canada Square, London E14 5LB
Authorised and regulated by the Financial Services Authority

IMPORTANT DISCLOSURES
For important disclosures regarding Citigroup Investment Research, including with respect to any issuers mentioned herein, please refer to the Citigroup Investment Research disclosure website at https://www.citigroupgeo.com/geopublic/Disclosures/disclosure.html <https://www.citigroupgeo.com/geopublic/Disclosures/disclosure.html> .




The Evolution Group e-mail system is for business purposes only. Messages are not confidential and may be reviewed by authorised personnel or provided to authorities with a legal right to access such information. If you are not the addressee thereof or the person responsible for its delivery, please permanently delete all copies of this message. Any dissemination or copying of this message by anyone other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an authorised representative.

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood Street, London EC2V 7AN), Member of the London Stock Exchange, Authorised and Regulated by the Financial Services Authority (FSA No. 143999).

Whilst we run anti-virus software, you are solely responsible for ensuring that any e-mail or attachment you receive is virus-free. We disclaim liability for any damage you suffer as a consequence of receiving any such virus.

This e-mail is confidential and is for the addressee only. Please refer to www.cazenove.com/disclaimers/cazenove.htm for important disclaimers and the firm's regulatory position.


The Evolution Group e-mail system is for business purposes only. Messages are not confidential and may be reviewed by authorised personnel or provided to authorities with a legal right to access such information. If you are not the addressee thereof or the person responsible for its delivery, please permanently delete all copies of this message. Any dissemination or copying of this message by anyone other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood Street, London EC2V 7AN), Member of the London Stock Exchange, Authorised and Regulated by the Financial Services Authority (FSA No. 143999).

Whilst we run anti-virus software, you are solely responsible for ensuring that any e-mail or attachment you receive is virus-free. We disclaim liability for any damage you suffer as a consequence of receiving any such virus.


The Evolution Group e-mail system is for business purposes only. Messages are not confidential and may be reviewed by authorised personnel or provided to authorities with a legal right to access such information. If you are not the addressee thereof or the person responsible for its delivery, please permanently delete all copies of this message. Any dissemination or copying of this message by anyone other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood Street, London EC2V 7AN), Member of the London Stock Exchange, Authorised and Regulated by the Financial Services Authority (FSA No. 143999).

Whilst we run anti-virus software, you are solely responsible for ensuring that any e-mail or attachment you receive is virus-free. We disclaim liability for any damage you suffer as a consequence of receiving any such virus.


The Evolution Group e-mail system is for business purposes only. Messages are not confidential and may be reviewed by authorised personnel or provided to authorities with a legal right to access such information. If you are not the addressee thereof or the person

JPMC-AU-DOJ-00008099
Page 11

responsible for its delivery, please permanently delete all copies of this message. Any dissemination or copying of this message by anyone other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood Street, London EC2V 7AN), Member of the London Stock Exchange, Authorised and Regulated by the Financial Services Authority (FSA No. 143999).

Whilst we run anti-virus software, you are solely responsible for ensuring that any e-mail or attachment you receive is virus-free. We disclaim liability for any damage you suffer as a consequence of receiving any such virus.

The Evolution Group e-mail system is for business purposes only. Messages are not confidential and may be reviewed by authorised personnel or provided to authorities with a legal right to access such information. If you are not the addressee thereof or the person responsible for its delivery, please permanently delete all copies of this message. Any dissemination or copying of this message by anyone other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood Street, London EC2V 7AN), Member of the London Stock Exchange, Authorised and Regulated by the Financial Services Authority (FSA No. 143999).

Whilst we run anti-virus software, you are solely responsible for ensuring that any e-mail or attachment you receive is virus-free. We disclaim liability for any damage you suffer as a consequence of receiving any such virus.

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

The Evolution Group e-mail system is for business purposes only.

Messages are not confidential and may be reviewed by authorised
personnel or provided to authorities with a legal right to access such
information. If you are not the addressee thereof or the person
responsible for its delivery, please permanently delete all copies of
this message. Any dissemination or copying of this message by anyone
other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of
THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an
authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood
Street, London EC2V 7AN), Member of the London Stock Exchange,
Authorised and Regulated by the Financial Services Authority (FSA No.
143999).

Whilst we run anti-virus software, you are solely responsible for
ensuring that any e-mail or attachment you receive is virus-free. We
disclaim liability for any damage you suffer as a consequence of
receiving any such virus.

The Evolution Group e-mail system is for business purposes only.
Messages are not confidential and may be reviewed by authorised
personnel or provided to authorities with a legal right to access such
information. If you are not the addressee thereof or the person
responsible for its delivery, please permanently delete all copies of
this message. Any dissemination or copying of this message by anyone
other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of
THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an
authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood
Street, London EC2V 7AN), Member of the London Stock Exchange,
Authorised and Regulated by the Financial Services Authority (FSA No.
143999).

Whilst we run anti-virus software, you are solely responsible for
ensuring that any e-mail or attachment you receive is virus-free. We
disclaim liability for any damage you suffer as a consequence of
receiving any such virus.

The Evolution Group e-mail system is for business purposes only.
Messages are not confidential and may be reviewed by authorised
personnel or provided to authorities with a legal right to access such
information. If you are not the addressee thereof or the person
responsible for its delivery, please permanently delete all copies of
this message. Any dissemination or copying of this message by anyone
other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of
THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an
authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood
Street, London EC2V 7AN), Member of the London Stock Exchange,
Authorised and Regulated by the Financial Services Authority (FSA No.
143999).

Whilst we run anti-virus software, you are solely responsible for
ensuring that any e-mail or attachment you receive is virus-free. We
disclaim liability for any damage you suffer as a consequence of
receiving any such virus.

This message and any files transmitted with it may contain confidential
information and are intended only for the individual or entity to whom
they are addressed. If you are not the named addressee you should not

disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

The Evolution Group e-mail system is for business purposes only. Messages are not confidential and may be reviewed by authorised personnel or provided to authorities with a legal right to access such information. If you are not the addressee thereof or the person responsible for its delivery, please permanently delete all copies of this message. Any dissemination or copying of this message by anyone other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood Street, London EC2V 7AN), Member of the London Stock Exchange, Authorised and Regulated by the Financial Services Authority (FSA No. 143999).

Whilst we run anti-virus software, you are solely responsible for ensuring that any e-mail or attachment you receive is virus-free. We disclaim liability for any damage you suffer as a consequence of receiving any such virus.

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

The Evolution Group e-mail system is for business purposes only. Messages are not confidential and may be reviewed by authorised personnel or provided to authorities with a legal right to access such information. If you are not the addressee thereof or the person responsible for its delivery, please permanently delete all copies of this message. Any dissemination or copying of this message by anyone other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood Street, London EC2V 7AN), Member of the London Stock Exchange, Authorised and Regulated by the Financial Services Authority (FSA No. 143999).

Whilst we run anti-virus software, you are solely responsible for ensuring that any e-mail or attachment you receive is virus-free. We disclaim liability for any damage you suffer as a consequence of receiving any such virus.

The Evolution Group e-mail system is for business purposes only. Messages are not confidential and may be reviewed by authorised personnel or provided to authorities with a legal right to access such information. If you are not the addressee thereof or the person responsible for its delivery, please permanently delete all copies of this message. Any dissemination or copying of this message by anyone other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood Street, London EC2V 7AN), Member of the London Stock Exchange, Authorised and Regulated by the Financial Services Authority (FSA No. 143999).

Whilst we run anti-virus software, you are solely responsible for ensuring that any e-mail or attachment you receive is virus-free. We disclaim liability for any damage you suffer as a consequence of

```
receiving any such virus.
```

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

The Evolution Group e-mail system is for business purposes only. Messages are not confidential and may be reviewed by authorised personnel or provided to authorities with a legal right to access such information. If you are not the addressee thereof or the person responsible for its delivery, please permanently delete all copies of this message. Any dissemination or copying of this message by anyone other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood Street, London EC2V 7AN), Member of the London Stock Exchange, Authorised and Regulated by the Financial Services Authority (FSA No. 143999).

Whilst we run anti-virus software, you are solely responsible for ensuring that any e-mail or attachment you receive is virus-free. We disclaim liability for any damage you suffer as a consequence of receiving any such virus.

| | |
|---|---|
| **From:** | Khan, Daud <daud.khan@cazenove.com> |
| **To:** | Knox, David P <david.knox@cazenove.com> |
| **Sent:** | 7/28/2009 12:16:01 PM |
| **Subject:** | FW: Peter could you take a look at Autn response - comments |

| | |
|---|---|
| **From:** | Elwin, Peter J |
| **Sent:** | 28 July 2009 12:23 |
| **To:** | Khan, Daud |
| **Subject:** | RE: Peter could you take a look at Autn response - comments |

Daud,
Regarding their first point, the following comments are relevant:

They said
"This is factually incorrect. Under S80 of the Companies Act 1985 a limited liability company has the right to issue 1/3rd of its issued share capital for non-cash consideration without shareholder approval (i.e. if the company did a share for share exchange in buying another company). A further 1/3rd is can also be issued on the same basis but only with a pre-emptive rights issue. However, Stock Exchange rules prohibit publicly quoted companies from issuing more than 5% without pre-emption rights (if it's for cash) and 10% if it's for shares. In addition there are complex 3 year rolling average rules restricting the 5% issuances.

So the AGM approval statement is correct but the follow up statement that Autonomy has the ability to raise $3.3bn without shareholder approval is incorrect."

**My comments:**
1. Their response is factually incorrect (if we want to be silly about this!) - they are muddling various Companies Act provisions with ABI guidelines and FSA Listing Rule pronouncements.

2. s80 covers the way in which directors get shareholder authority to allot shares irrespective of the issue method (i.e. cash or non-cash etc). s80 does not limit the ability of shareholders to give the directors authority to issue shares so the ABI has proposed its own guidelines to constrain the actions of companies and enable shareholders to assess what s80 requests might be regarded as reasonable. The limits that Autonomy mentions come from these (recently revised) guidelines, not from s80.

3. s89 ("Offers to shareholders to be on a pre-emptive basis") requires share issues to be pre-emptive unless one of the exceptions apply. The principal exception is when shares are issued for "non-cash consideration" or where shareholders give their consent (see s95 below). Again, there are no specific limits or restrictions on the size of such non-cash issues in s89 (or elsewhere in the Companies Act).

4. s95 ("Disapplication of pre-emption rights") enables shareholders to specifically override the s89 requirement that cash issues must be pre-emptive. To do so requires a Special Resolution (75% of votes cast). S95 does not place specific restrictions on the size of such non-pre-emptive issues, leaving it to the shareholders to determine what is appropriate.

5. As noted above, the ABI has established guidelines which suggest appropriate limits to the authority granted to directors to issue shares (under s80) and the extent to which they should be allowed to avoid pre-emption rights (under s95). A long-standing guideline restricting s80 has been that directors should not normally be given authority to issue new shares (pre-emptively or otherwise) equivalent to more than 1/3rd of the issued share capital. In Jan 09 this guideline was amended so that the ABI now regards as "routine" requests for authority to issue new shares equivalent to up to an additional 1/3rd of the issued share capital provided this authority only relates to a rights issue.

Putting it another way, it is now standard practice for companies to ask shareholders for authority to increase their shares in issue by up to 2/3rds, provided the authority specifies that an amount equivalent to at least 1/3rd is issued by way of a rights issue. The objective of this change was to enable companies to seek standing permission for larger rights issues than had

# EXHIBIT 26

**Briest, Michael**

From:    Morland, Paul
Sent:    Fri 7/23/2010 7:21 AM (GMT-00:00)
To:      Briest, Michael
Cc:
Bcc:
Subject: Au

I know you didn't consider the hardware sale material yesterday but consider this----
Let's assume the $6m of stock is sold for $7m in Q3.
Now guidance for Q3 sales is $210m and we can be fairly sure that OEM will be close to $35m, Services $10m and def inc release $61m giving a total of $106m.
This suggests that guidance for IDOL product and cloud is $104m. Now subtract the $7m for the stock and you get $97m for what used to be called license. That compares with over $100m last year. There are only two ways to look at this. Either all your growth is coming from hardware or license sales are in reverse.

So I would say it is wrong to ignore hardware sales. Let's face it, this is the oldest trick in the book and nothing like as clever as selling $15m of license to Microlink just before they bought it. This explains why debtors fell by $18m in Q1, $15m was the elimination of the inter co. balance with Microlink, while the inflow in the cash flow statement was just $2m. Unless you have another explanation? The company doesn't!

**Paul Morland FCA**

Technology research

Direct: +44 (0)20 7418 8827

Mobile: 075455 14341

Email: paul.morland@kbcpeelhunt.com

**KBC Peel Hunt Ltd**
111 Old Broad Street
London EC2N 1PH

--

"KBCPH" refers to KBC Peel Hunt Ltd.

This email is intended solely for the addressee(s) and may be legally privileged and/or confidential. If received in error please delete it and all copies of it from your system, destroy any hard copies of it and contact the sender. Any unauthorised use or disclosure may be unlawful. The accuracy or completeness of this email is not guaranteed. Any opinion expressed in this

UBS00000785

email may not necessarily reflect the opinions of KBCPH. Any personal
information contained in this e-mail is provided solely for the purpose
stated in the message. All emails may be monitored in accordance with legal
requirements contained in Regulation of Investigatory Powers Act, Data
Protection Act, Telecommunications Regulations Act and Human Rights Act. This
email and any reply maybe monitored for operational reasons or lawful
business practices. If you do not consent to such monitoring, you should
contact the sender of the email.

KBC Peel Hunt Ltd

Registered Office: 111 Old Broad Street, London EC2N 1PH

Registered in England and Wales no. 2320252

Vat No: 778 1029 12

KBC Peel Hunt is a member of KBC Group NV.

KBC Peel Hunt is a member of the London Stock Exchange and PLUS Markets;

Authorised and Regulated by the Financial Services Authority

CONFIDENTIAL

UBS00000786

# EXHIBIT 27

Volume 28

Pages 5691 - 5900

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
  VS.                               )           NO. CR 16-00462 CRB
                                    )
SUSHOVAN TAREQUE HUSSAIN,           )
                                    )
            Defendant.              )
_____)
                                    San Francisco, California
                                    Monday, April 23, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            BY:   **ROBERT S. LEACH**
                  **ADAM A. REEVES**
                  **WILLIAM FRENTZEN**
                  **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:

                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
            BY:   **JOHN W. KEKER**
                  **JAN NIELSEN LITTLE**
                  **BROOK DOOLEY**
                  **KATE LAZARUS**
                  **NIC MARAIS**
                  **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

<u>**I N D E X**</u>

Monday, April 23, 2018 - Volume 28

|  | <u>PAGE</u> | <u>VOL.</u> |
|---|---|---|
| Defense Rests | 5701 | 28 |
| Jury Instructions | 5701 | 28 |
| Closing Argument by Mr. Reeves | 5719 | 28 |
| Closing Argument by Mr. Keker | 5844 | 28 |

<u>**E X H I B I T S**</u>

| <u>TRIAL EXHIBITS</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| 2687 |  | 5695 | 28 |
| 6990 |  | 5701 | 28 |

1   revenue which he describes as pipelines, and then he goes

2   further.  He says (reading):

3           "David, I think you have misunderstood what that

4       revenue is.  It's not hardware revenue.  What it is is the

5       selling of an appliance.  So you may be familiar with the

6       Google appliance or the Barracuda appliances.  We have

7       very little interest in just selling hardware, and

8       consequently the revenue that goes for it is not related

9       to the hardware cost.  It's solely a component of the

10      sale.  So what we are not doing here is acting as a

11      generic company that resells hardware, like Morse or

12      something like that."

13      That is 100 percent completely untrue, and it is exactly

14  the opposite of what was really happening within Autonomy and

15  it's exactly what Mr. Hussain knew.

16      Mr. Morland and Mr. Toms both testified about the

17  importance of this information.  Mr. Morland said that if he'd

18  known about the scale of the hardware sales, that would have

19  had a massive impact -- negative impact on his evaluation of

20  the company.

21      And he goes a little bit further and says that -- and he

22  starts to calculate the amount of the hardware revenue and what

23  it really means for the growth potential for Autonomy, and he

24  says the following, this is Paul Morland (reading):

25          "So the 20 -- 57 million that you suggested that I

1

2

3                        **CERTIFICATE OF REPORTERS**

4            I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:   Monday, April 23, 2018

8

9

10

11   _____

12        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                      U.S. Court Reporter

13

14

15   _____

16        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                      U.S. Court Reporter

17

18

19

20

21

22

23

24

25

# EXHIBIT 28



Autonomy Corporation Limited and Ors v Michael Richard Lynch and Anor

Day 14

April 17, 2019

Opus 2 International - Official Court Reporters

Phone: +44 (0)20 3008 5900
Email: transcripts@opus2.com
Website: https://www.opus2.com

HP-SEC-02929820

Wednesday, 17 April 2019

1     (10.00 am)
2     (10.00 am)
3     MR RABINOWITZ: My Lord, our next witness is Mr Khan.
4                   MR DAUD KHAN (affirmed)
5     MR JUSTICE HILDYARD: You should have some water. If you
6          need a break at any time -- do you have some water
7          there?
8     A.   No.
9     MR JUSTICE HILDYARD: If he could be provided with some.
10              Examination-in-chief by MR RABINOWITZ
11    MR RABINOWITZ: Good morning, Mr Khan. Can you please be
12         given bundle C -- maybe both bundles, but can we go
13         first to bundle C, tab 10 {C/10/1}. Do you see there
14         a document headed "Witness statement of Hafeez Bux
15         Daud Khan"?
16    A.   Yes.
17    Q.   If you go to the back of that document at page 13
18         {C/10/13}, do you see there a signature?
19    A.   Yes.
20    Q.   Can you confirm that that is your signature?
21    A.   It is.
22    Q.   And that this is your first witness statement in these
23         proceedings?
24    A.   It is.
25    Q.   Thank you. I want you to go next, if you can, to

                        1

1          bundle C at tab 34 {C/34/1}. Do you have that?
2     A.   Yes.
3     Q.   Thank you. You should see a document "Supplemental
4          witness statement of Hafeez Bux Daud Khan", do you have
5          that?
6     A.   Yes.
7     Q.   If you go to the back of that document, three pages on,
8          again you should see a signature?
9     A.   Yes.
10    Q.   Can you confirm that this is your signature?
11    A.   Yes, it is.
12    Q.   And that this is your second witness statement in these
13         proceedings?
14    A.   Yes, it is.
15    Q.   Finally, Mr Khan, if we can go to tab 40.6 in bundle C
16         {C/40.6/1}. Do you have that?
17    A.   Yes.
18    Q.   Again, you should see a document titled "Third witness
19         statement of Hafeez Bux Daud Khan"?
20    A.   Yes.
21    Q.   Again if we can go to the back of that document, do you
22         see there a signature?
23    A.   Yes.
24    Q.   Can you confirm that that is your signature and this is
25         the third statement you've made in these proceedings?

                        2

1     A.   Yes, it is.
2     Q.   Thank you. Now, Mr Khan, if we can go in the document
3          you have in front of you to page 3 {C/40.6/3}, if I can
4          ask you just to read the first two lines of paragraph 11
5          to yourself.
6               (Pause)
7     A.   Okay.
8     Q.   You should have in front of you a letter that was sent
9          to the defendants' solicitors last night. Can I just
10         ask you to read that to yourself.
11              My Lord, you should have one in front of you.
12    MR JUSTICE HILDYARD: I have got it, thank you.
13    A.   Yes.
14    MR RABINOWITZ: Thank you. Mr Khan, can you confirm that
15         subject to making the changes you've identified in your
16         letter to your witness statement, the contents of your
17         first, second and third witness statements are true to
18         the best of your knowledge and belief?
19    A.   Yes, they are.
20    MR RABINOWITZ: Thank you very much. Can you wait there,
21         please, there will be some questions.
22              Cross-examination by MR SHIVJI
23    MR SHIVJI: Mr Khan, you were here for Mr Morland's
24         testimony yesterday, weren't you?
25    A.   No, I wasn't.

                        3

1     Q.   You didn't attend court yesterday?
2     A.   No.
3     Q.   Have you seen the transcript of his testimony, or parts
4          of it?
5     A.   No, I haven't.
6     Q.   Have you discussed any of the contents of what was said
7          yesterday with anybody?
8     A.   No.
9     Q.   I'm grateful.
10              Your FSA registration has lapsed, hasn't it?
11    A.   I've left the analyst industry or the banking industry
12         in February of last year and then after a month it
13         lapses because I'm now in the technology industry.
14    Q.   So the answer to my question is yes?
15    A.   Yes.
16    Q.   You're not here as an expert witness today, are you?
17    A.   No.
18    Q.   And you confirmed in your US testimony that in the
19         period 2009 to 2011 you didn't have access to other
20         people's research notes; that's right, isn't it?
21    A.   In general, yes.
22    Q.   Well, the confirmation you gave in the US was that you
23         didn't have access?
24    A.   I wouldn't have access to any research unless that
25         research was sent to me.

                        4

HP-SEC-02929821

1  Q.  As we've discussed the acquisition price was £25.50?
2  A.  Yes.
3  Q.  Now, the date of this note is 13 May 2008?
4  A.  Yes.
5  Q.  Are you aware that in terms of this case, the first
6      impugned transaction is actually 29 May 2008, so after
7      this note?
8  A.  I wasn't aware of that, no.
9  Q.  Fair enough. Just looking at some of the points you
10     made, that second bullet point is the one that we talked
11     about earlier, wasn't it, that "acquisitions are
12     a vehicle for growth"?
13  A.  Yes.
14  Q.  You also make that first bullet point about "organic
15     growth may be slowing"?
16  A.  Yes.
17  Q.  Again, organic growth slowing, acquisitions, they were
18     themes of your analysis running right the way through
19     from this point?
20  A.  One of the themes, yes.
21  Q.  At around this time, before this note was published, you
22     had been speaking to fund managers, hadn't you, saying
23     that you were shortly about to publish a bearish note on
24     Autonomy?
25  A.  No, that's inaccurate. What -- so Autonomy published

53

1      their Q1 results which included their usual kind of
2      metrics around growth et cetera and, unusually for
3      Autonomy, during that call they seemed to be addressing
4      points in the note that was about to be published by me.
5      Therefore in conversations with fund managers I would
6      discuss the fact that, you know, I'm working on a bigger
7      piece which will explain some of these things, which
8      explain growth, which will ... at no point did I say that
9      that would be -- you know, remember I'm already a sell
10     on the stock from that January note that you mentioned,
11     so there's no change of recommendation, there's just an
12     idea that there's more analysis to come.
13  Q.  You're saying unusual Autonomy tried to address concerns
14     in its releases, but isn't that a good thing? If
15     a company is listening to the market, trying to respond
16     to concerns, that's a positive point, isn't it?
17  A.  Well, the reason why these conversations were occurring
18     with fund managers is because the fund managers were
19     obviously unaware that there was unrest in the market
20     place and they were questioning why Autonomy was
21     addressing questions that hadn't even been asked. So
22     I was put in a position to say, "I'm working on some
23     analysis that might help".
24  Q.  Right. Let's have a look at what you were saying to
25     fund managers. If we go to {K1/92.1/1}, this is an

54

1      email from someone at Piper Jaffray to Mr Hussain and
2      this is after the earnings call but before the
3      publication of your note. What he says there is:
4          "From what I hear our friend Daud is making a bit of
5      noise in the market with his Autonomy spin. The two
6      things he's arguing are:
7          " - organic growth is being exaggerated and the
8      growth in the business is driven primarily by
9      acquisitions [...]"
10         Do you see that?
11  A.  Yes.
12  Q.  The second point:
13         " - he's also challenging how capable and unique
14     Autonomy's products and technology really are."
15         Now, it's fair to say that this is what you were
16     saying, it's an accurate description of what you were
17     saying to investors at the time?
18  A.  Again I don't recollect exactly what I was saying to
19     people, but what I probably said, and my memory of what
20     I said was that, you know, the organic growth that
21     Autonomy is stating I think is being overstated, I'm
22     working on further analysis to see -- to break that
23     down. But I probably left it at that, I wouldn't have
24     given any numbers, I wouldn't have given any indication
25     of when publication would have occurred. You know, this

55

1      seems to be a succinct version of what I was saying, not
2      the words I was saying.
3  Q.  It's fair to say that by this stage relations between
4      people at Autonomy and you personally weren't great,
5      were they?
6  A.  At this point, which is April --
7  Q.  April/May 2008.
8  A.  No, they weren't great.
9  Q.  You must have sensed that the people at Autonomy had
10     issues with you personally?
11  A.  I never sensed they had issues with me personally.
12     I sensed at this point that they had issues with the
13     research that I was publishing. I never at this point,
14     or certainly at any other point -- that these were
15     a personal matter between myself and the management or
16     the management and myself.
17  Q.  Do you recall that Autonomy asked if another analyst
18     could take over coverage of Autonomy?
19  A.  Certainly never came to me. I was unaware. The first
20     time that someone asked whether I should allow
21     Stacy Pollard to cover it was a banker at JP Morgan just
22     post the merger of the two firms, who asked -- who
23     happened to be the relationship banker with Autonomy,
24     who said something of the ilk: "Wouldn't it be a good
25     idea if you allowed Stacy to cover the stock now?"

56

HP-SEC-02929834

1  Q.  But Ms Pollard started attending the earnings meetings,
2      didn't she?
3  A.  The invite to the earnings presentations was
4      discontinued for me, so  ...
5  Q.  The answer to my question -- I know that's the evidence
6      you want to give, but I've asked you about Ms Pollard
7      for a moment.
8  A.  But I'm giving you a full answer as to why she was
9      attending.
10 Q.  Let's start with my question. Ms Pollard was invited to
11     and attended the earnings presentation, didn't she?
12 A.  Yes.
13 Q.  And she was the person that Autonomy wanted to cover
14     Autonomy?
15 A.  There was no other analyst at Cazenove that could have
16     covered Autonomy, so it was either myself or
17     Stacy Pollard.
18 Q.  And she was, as we've discussed, the head of the team?
19 A.  Yes.
20 Q.  And she was allowed to ask questions, wasn't she, at all
21     of those meetings?
22 A.  She -- yes.
23 Q.  And as head of the software team she was sufficiently
24     experienced to understand the issues that would have
25     been discussed at those meetings?

57

1  A.  I disagree with that on the basis that she had never
2      covered Autonomy and therefore didn't know everything
3      about the company, certainly didn't know enough about
4      the company to be coverage analyst of the company at
5      that time.
6  Q.  But her name, as we've seen and we will see, her name
7      appears on all the Cazenove notes for Autonomy?
8  A.  Yes, it does, as my name appeared on her companies that
9      she covered that I had no input on.
10 Q.  Now, in your witness statement you say that you were
11     able to listen in to the earnings call? That's right?
12     You were welcome to dial in, weren't you, to the calls?
13 A.  Yes.
14 Q.  There was no issue about that, you could dial in?
15 A.  Yes, there was communication from FTI, the PR agency for
16     Autonomy, to say that I wasn't invited to the meetings
17     but that I could listen in to the conference call.
18 Q.  Okay, fine. Let's just go to your witness statement,
19     {C/40.6/5}, page 5. It's footnote 5 at the bottom. You
20     say there:
21         "Mr Bridges [this is someone from FD who was part of
22     FTI] was, I believe, the person who informed Cazenove
23     that I was no longer welcome to join the earnings calls
24     following publication of my May 2008 research note
25         [...]"

58

1          That's not accurate, is it, because you were always
2      welcome to join the earnings calls?
3  A.  Yes, I think the wording is slightly inaccurate in that
4      it was the earnings presentations that I was not allowed
5      to join.
6  Q.  Yes. And that's because Ms Pollard was the nominated
7      person?
8  A.  Ms Pollard was invited and unusually for a UK company,
9      the presentations at that time weren't available online
10     and therefore Ms Pollard had to attend the meetings in
11     order to collect the presentation.
12 Q.  And that practice continued, didn't it, right the way
13     through until -- for about a year, until in fact the
14     invitations were then extended again to you?
15 A.  So until the Q1 earnings meeting in 2010 I was excluded,
16     yes.
17 Q.  Well, "excluded" is an odd way of looking at it. You
18     weren't invited, were you? Ms Pollard was the person
19     who was invited?
20 A.  Prior to the publication of the May 2008 report, both
21     Ms Pollard and I were invited to the earnings
22     presentations at Autonomy. Post the publication of
23     that May 2008 note, Ms Pollard continued to be invited
24     to the Autonomy meeting, I was no longer invited.
25 Q.  Right, okay. We can pick up, just so we have an

59

1      accurate record of it, if we look at the emails from
2      Mr Bridges {K5/478/1}. If you pick up the email at the
3      bottom first of all which is from Ms Pollard to
4      Mr Bridges:
5          "Hey Ed,
6          "I asked yesterday whether Daud could attend the AUT
7      meeting tomorrow [this is April 2009]. No response from
8      your team saying that he could not - can you please
9      confirm. Otherwise, we'll assume that he can, since we
10     know of no reason why he couldn't."
11         Then Mr Bridges responds in the middle:
12         "No change in position since last quarter so we look
13     forward to seeing Stacy Pollard at the results. If Daud
14     wishes to listen in, the concall is available to him."
15         That was the position over this period, wasn't it?
16 A.  It was.
17 Q.  Then subsequently -- look at the top -- for the Q4 2009
18     results which were then published in January 2010, you
19     then started being extended an invitation to attend?
20 A.  Yes. Well, to clarify the point, I had to reach out to
21     the investor relations individual, who at that time was
22     Mark Geall, to ask and I asked on the basis that an
23     investor had contacted me and had met with Mr Geall and
24     had asked why I had been excluded or banned from these
25     meetings, Mr Geall's response was that he sees no reason

60

1    why I would be excluded from these meetings.
2  Q. You mentioned a discussion with someone from JP Morgan
3    in I think it was early 2010 you were talking about, is
4    that right?
5  A. Remind me of the --
6  Q. You said that someone senior from JP Morgan had spoken
7    to you about who the coverage analyst should be for
8    Autonomy?
9  A. Sorry, you're going to have to remind me of what...
10 Q. Okay, we'll pick this up another way.
11      By early 2010, JP Morgan's acquisition of Cazenove
12    had completed, hadn't it?
13 A. Yes.
14 Q. There must have been a degree of clash of culture, as
15    there always is, when a large organisation acquires
16    another smaller one?
17 A. Yes.
18 Q. So JP Morgan are a very substantial investment bank,
19    they'd come in and acquired Cazenove which was
20     relatively  a comparatively small house?
21 A. Yes.
22 Q. You knew that Autonomy had been speaking to JP Morgan in
23    New York on the investment banking side; that's right?
24 A. I was informed of that at the point where JP Morgan had
25    acquired Cazenove, yes.

61

1  Q. So someone told you that the concern on Autonomy's side
2    was that market sensitive information about Autonomy on
3    the investment banking side might reach you and be
4    leaked?
5  A. Sorry, explain that again?
6  Q. Did someone explaining to you that Autonomy was
7    concerned that information relating to Autonomy on the
8    investment banking side might reach you and then be
9    leaked by you?
10 A. No, I was never informed of that.
11 Q. Were you aware that there were concerns that you might
12    leak information?
13 A. From the investment banking side?
14 Q. Yes.
15 A. No.
16 Q. Now, it's right that in 2010 you were passing some
17    non-public information to Mr Morland, weren't you, about
18    Autonomy?
19 A. I don't believe so. I don't believe I was in possession
20    of any non-public information.
21 Q. Did you ever pass non-public information about Autonomy?
22 A. I don't believe I was in possession of what I would
23    determine as non-public information.
24 Q. Do you recall in July 2010 Autonomy entered a contract
25    with a large investment bank for $15 million?

62

1  A. Yes.
2  Q. And the reason you recall that is because someone has
3    raised that with you, have they, recently?
4  A. Sorry?
5  Q. Has someone raised that with you recently, that
6    transaction?
7  A. No, I remember it very vividly because it was a kind of
8    eureka moment in terms of understanding my analysis of
9    Autonomy.
10 Q. Okay. And you went to speak to JP Morgan's procurement
11    department, didn't you, about that contract?
12 A. So the background to this --
13 Q. Can you answer my question?
14 A. To answer the question I need to give you the background
15    of how I got this contact within JP Morgan. The contact
16    within JP Morgan was provided to me by the head of
17    research Europe JP Morgan who said "Here is the contact
18    of the individual that deals with Autonomy within
19    JP Morgan, you're free to speak to him". That was done
20    in sort of early 2010. I had a conversation with that
21    individual, whose name I do not recollect at the moment,
22    at that time and then I had a subsequent conversation
23    with that individual some time in, you know, July,
24    late July 2010.
25 Q. In those conversations, you found out the terms of

63

1    JP Morgan's contract with Autonomy?
2  A. I didn't find out the terms of the contract. I learnt
3    about the substance of how the contract had changed.
4  Q. And you found out about the pricing, didn't you?
5  A. No. I had no information about pricing.
6  Q. Your understanding was that the contract price had been
7    discounted?
8  A. Again, if I can give you the words that were used by the
9    individual that was talking to me, said that when he had
10    told the head of the US, which I believe was
11    Stouffer/Egan, that the deal couldn't close by 30 June,
12    that Mr Egan almost broke down in tears in his office,
13    saying "We have to get this deal done" and within
14    15 minutes to 30 minutes Dr Lynch was on the phone with
15    this individual telling him "We need to get this deal
16    done, what price do you want?"
17 Q. And was it your understanding that there had been
18    a discounting?
19 A. That was his implication, that we got a great deal.
20    I don't know what the price of that deal was, how it was
21    structured. I know it was structured -- it was
22    a changed structure from a rental recurring deal that
23    JP Morgan had in place with Autonomy which had been
24    recast as a licence-based contract with a hosting
25    element for the storage of data.

64

1  Q.  And you got this information from this person at
2      procurement?
3  A.  I got this information, I then shared it with my head of
4      research that this is the information I had been
5      provided, so I disclosed the fact that this information
6      had been given to me.
7  Q.  Did you disclose it to JP Morgan's compliance
8      department?
9  A.  Yes, they were aware of it.
10 Q.  You disclosed it to JP Morgan's compliance department?
11 A.  I can't recollect if I disclosed it or the head of
12     research disclosed it.
13 Q.  Did you check that it had been disclosed?
14 A.  I know that the compliance department was aware of that.
15 Q.  How did you know?
16 A.  Because I believe -- I had a long meeting with the
17     compliance team subsequent to that around probably an
18     email that you're going to bring up at some point, an
19     email that I sent to the ex-finance director of
20     Interwoven, so at that meeting I discussed everything
21     that I knew and didn't know, opened up my social media
22     accounts et cetera et cetera.  So compliance -- that was
23     a one-hour, two-hour meeting.  In that meeting
24     I discussed the fact that I had this information.
25 Q.  So when you were subsequently investigated by compliance

65

1      for a subsequent complaint, you disclosed this to them?
2  A.  What I did was proper in the instance that I gained the
3      information, which was to pass it on to my head of
4      research.
5  Q.  No, you're not answering my question.  I want you to
6      focus on my question.
7  A.  So the purpose --
8  Q.  Let me re-ask my question because I want you to focus on
9      the question, it's important.
10         So when you were subsequently investigated by
11     compliance for a subsequent complaint, you disclosed
12     this information to them?
13 A.  I disclosed everything that I knew at that point.  That
14     didn't mean that they didn't know at that time.
15 Q.  But you can't point to any occasion when prior to that
16     you disclosed this information to compliance?
17 A.  Yes, I can't recollect.
18 Q.  And you can't identify any occasion on which you
19     enquired whether compliance knew about this information
20     before that investigation?
21 A.  No.
22 Q.  The individual you spoke to in procurement, you said you
23     can't remember his name.  Was it Larry Feinsmith; does
24     that jog your memory?
25 A.  I don't think it was that individual.

66

1  Q.  In the course of that conversation, did they also tell
2      you that there was a hardware component to the contract?
3  A.  No, they didn't.
4  Q.  But you asked questions, didn't you, about the contract
5      and they gave you the information that you were after?
6  A.  To be honest, it wasn't a -- I can't remember it being
7      a particularly long call.  It started out with the
8      individual telling me that -- because I tried to have
9      a conversation with them earlier because we were meant
10     to have a follow-up call and he said "The reason
11     I haven't spoken to you in a few weeks is that we were
12     dealing with this, you know, this Autonomy contract",
13     you know at which I think I probably said "Is this the
14     deal that was announced, circa $15 million", he said
15     "Sounds like it", without telling me that it was
16     actually that deal.
17 Q.  Just pausing there for a moment.  Your understanding was
18     it was that deal -- I mean if you're saying it was done
19     with a nod and a wink, there's no doubt in your mind
20     that you were talking about the same deal?
21 A.  Again, I couldn't with any certainty say that it was
22     that deal, because Autonomy signed a number of
23     investment banking deals and what was slightly strange
24     was that what I had been told when Cazenove was still
25     separate from JP Morgan was that -- from my head of

67

1      research -- that Autonomy had signed a deal with
2      JP Morgan.  So that was in 2009 and that's why it was
3      slightly confusing when thinking that there was
4      a subsequent deal that was being signed in Q2 2010.
5      I can only tell you what they told me, which was,
6      "It sounds like that deal".
7  Q.  Right.  And you passed that information to Mr Morland,
8      didn't you?
9  A.  I don't recollect passing it on to Mr Morland, but
10     I spoke to investors about my concerns about that deal,
11     which reinforced what I'd been talking about in terms of
12     the restructuring of these Zantaz deals.
13 Q.  Now, some of that information that you had obviously was
14     non-public information?
15 A.  It was customer information, but, as I've explained to
16     you in the past, part of my research efforts was to
17     speak to customers about what are they using the product
18     for, was it a material deal, how was the deal
19     structured?  Et cetera.
20 Q.  It's more than that, isn't it?  This is non-public
21     information that's come into your possession because of
22     your employment at JP Morgan?
23 A.  The way I answer that question is that I don't believe
24     it constituted non-public information given that
25     I disclosed to my head of research that the information

68

1    had been provided to me. As you mention, I subsequently
2    disclosed it to compliance, who had no issue with me
3    knowing that.
4        Now, what I did after that was I said to my head of
5    research, "I'd love to be able to put this guy on
6    a phone with a bunch of clients to explain how these
7    deals work. These deals are being restructured and
8    I think that will have a material impact on the way that
9    investors are looking at the stock". The head of
10   research at the time declined that that was the way
11   forward, that I should just continue to pursue various
12   avenues of research that I already have.
13 MR SHIVJI:  My Lord, I'm looking at the time.  Is now
14   a convenient moment?
15 MR JUSTICE HILDYARD:  Yes. We'll have a five- to ten-minute
16   break, Mr Khan, and then resume.
17 (11.30 am)
18               (A short break)
19 (11.44 am)
20 MR SHIVJI:  Mr Khan, do you recall that in the first half of
21   2010 there was also a complaint from Autonomy that you
22   were trying to solicit non-public information from
23   former employees?
24 A.  Yes, I was informed of that by compliance.
25 Q.  The way you refer to it in your witness statement is it

69

1    was a complaint about your use of social media?
2 A.  Yes, that was the way the complaint was addressed.
3 Q.  But the complaint didn't just relate to you using social
4    media, did it, it also related to emails you had sent?
5 A.  I didn't see the actual complaint, so I got it
6    second-hand. I've seen it subsequently and it does
7    include emails.
8 Q.  Let's have a look at one of the emails {K9/289.2/2}.
9    This was an email from you, June 2010, to
10   Mr Calonico and Mr Calonico was a former chief financial
11   officer of Interwoven, is that right?
12 A.  Yes.
13 Q.  And that was a company that Autonomy had acquired?
14 A.  Yes.
15 Q.  If we have a look at part of that email, you say:
16       "Dear John,
17       "Apologies for the intrusion but I was passed your
18   details by an investor. I am an analyst at J.P. Morgan
19   and am the coverage analyst on Autonomy. I appreciate
20   this is slightly unusual but I had a few short questions
21   about Interwoven and the answers I have received so far
22   have been a little confusing."
23       Do you see that?
24 A.  Yes.
25 Q.  Then you go on to ask some questions about various

70

1    aspects of Interwoven's accounts; that's right,
2    isn't it?
3 A.  Yes.
4 Q.  Let's just pick up on some of the wording. First of all
5    you say there you appreciate it's slightly unusual.
6    When you say "slightly unusual", you would accept,
7    wouldn't you, this is an unusual email for an investment
8    analyst to send?
9 A.  It's certainly -- I've only ever sent them with regards
10   to Autonomy.
11 Q.  And it's not good practice, is it, for an analyst to
12   send an email like this to a former employee?
13 A.  That I would disagree with. You know, if it's an open
14   channel, if it's a way to get information, then it
15   should be an open channel to be able to get that
16   information that's required.
17 Q.  So soliciting information from former employees that is
18   non-public is, as far as you're concerned, acceptable?
19 A.  I was trying to confirm the accounting policy of
20   a business based on historic accounts. That's,
21   you know -- so it's a question that if I was covering
22   Interwoven and I would have asked John Calonico at the
23   time if I wanted to know that answer.
24 Q.  Sure, and he was no longer the CFO of Autonomy, was he?
25 A.  Absolutely.

71

1 Q.  So the person to direct your enquiries to was Autonomy,
2    wasn't it?
3 A.  Yes, it would have been.
4 Q.  But instead what you're trying to do is solicit
5    non-public information from a former employee?
6 A.  What I had was tried to approach Autonomy through
7    investor relations, through investors asking questions
8    of Autonomy as to what those accounting policies were
9    and I hadn't got answers that made sense to me. So the
10   way to clarify all of this would be to contact the
11   person who signed off on the accounts of Interwoven to
12   say, "How did you account for deferred revenue? This is
13   the way I understand it, but can you confirm?"
14 Q.  Yes, and what you're trying to do -- as I asked, can you
15   answer my question -- is solicit non-public information
16   from a former employee?
17 A.  Again, your definition of "non-public information",
18   I was asking questions of public accounts and asking for
19   verification on a certain accounting matter. That's the
20   same question that I would ask of Autonomy about their
21   own accounts and therefore -- which might not be listed
22   in their accounts as to "this is how we do it", but it
23   would be a question that the finance officer could
24   answer or the CEO could answer. So not everything is
25   listed in the accounts. If you want clarification you

72

1    go to the executives. You ask the question.  If you
2    don't get an answer then what I write here is that, yes,
3    it's slightly  unusual because normally you would expect
4    that I would get a fair  and fulsome answer from the
5    company themselves, but when I didn't,  you know, wanting
6    to know the truth I  went and asked an ex-executive.
7  Q.  I'm going to ask the question one final  time and this
8    time I'd like you to focus on it.  What you're trying to
9    do is  solicit  non-public information from a former
10   employee?
11 A.  No.
12 Q.  Well, the information you're seeking is  not public,
13   is it?
14 A.  The query that I have with counsel is the  definition  of
15   "non-public information".
16 Q.  Right, then answer my question.  The information you're
17   trying to seek is not public, is it?
18 A.  It's not in their accounts.
19 Q.  No, answer my question.  The information you're trying
20   to obtain is not public, is it?
21 A.  The reason I'm having this  debate is  that, you know, the
22   idea of non-public has a certain  air to it,  certainly
23   from -- in my role as an analyst.  So I would never
24   start  to seek what we would define within the industry
25   under the FSA regulations  as non-public information.

73

1  Q.  Sure.  So that's why I've revised my question and I've
2    asked it a  different  way and I would like you to focus
3    on that.  The information you're trying to obtain is not
4    public, is it?
5  A.  It is not public.
6  Q.  There's that email.  You don't receive a response to
7    that email, do you?
8  A.  No.
9  Q.  So if we go back up a page and we'll see your next email
10   to him:
11        "Dear John,
12        "I just wanted to follow up on the request below.
13   I appreciate that you may be slightly  reluctant to
14   address some or all of these questions.  However,
15   I wanted to assure you that your answers would not be
16   used within any research report but would confirm or
17   negate any line of  argument that has been used in the
18   past.  I attach a previous report which contains some
19   analysis on Interwoven."
20        Now, there are two things  that are going on there.
21   I just want to pick up on the second one.  Where you say
22   you're not going to use his answers in any research
23   report, you're saying that to give him comfort,
24   aren't you?
25 A.  What I'm saying -- yes, I'm saying it to give him

74

1    comfort that I'm not going to use his name.
2  Q.  Or his answers?
3  A.  Well, his answers are quite  simplistic  in the sense that
4    it's a confirmation of an accounting policy , it's
5    a confirmation of whether a certain  balance, as
6    described by the Autonomy management, was as he
7    understood it.
8  Q.  So you're saying there you're not going to use his
9    answers in any research report.
10 A.  Yes.
11 Q.  And that's to give him comfort?
12 A.  Yes.
13 Q.  And that's because the information that you're seeking
14   is  not public?
15 A.  No.
16 Q.  You also say there that he may be slightly  reluctant.
17   Now, again that's understating it,  isn't it?  He would
18   be reluctant  because of whatever duties of
19    confidentiality  he owed Interwoven as his former
20   employer?
21 A.  I wouldn't be aware of what those  restrictions  might be,
22   but those executives  might have some restriction  to make
23   them reluctant.  And I say that in  this  email as in 2008
24   I also  sent an email to the ex-CFO of Verity , which is
25   also  a business that was acquired by Autonomy, and he

75

1    did respond to me.  So this wasn't the  first  time I'd
2    done it.  It  was a way of trying  to understand an answer
3    that was given to me by the Autonomy management which
4    didn't  make sense to me, so I'm trying  to  verify  it , as
5    any good analyst would want to do.
6  Q.  So the request you sent to Verity , again that was
7    a request for information which was not public?
8  A.  It was a request to confirm or deny statements made by
9    Autonomy management, not to gain any other additional
10   information but for  information that had been provided
11   by Autonomy, Autonomy management, and for these
12   individuals  to  tell  me whether that was accurate or
13   inaccurate.
14 Q.  It's not good practice, is  it , for an analyst to send
15   these sort  of  emails?
16 A.  I would argue that it's excellent  practice that an
17   analyst should not rely  wholly on what management of the
18   company they're covering is  telling  them, particularly
19   if they don't think it makes sense.  Good practice will
20   be to seek out the truth; good practice will be to
21   ensure that the way you seek out the truth is within the
22   compliance and framework that we work in, which I've
23   always done, so I would say, no, it  is  good practice.
24 Q.  Right.  So did you do this  for any other companies that
25   you were covering ever?

76

1  A.  No.
2  Q.  There are a number of other issues that Autonomy had
3      with your work at the time.  Let's go to {K2/489.7/1},
4      this is a letter from Mr Kanter to Robert Webb. Do you
5      recall Mr Webb, who was the chairman of Autonomy?
6  A.  Yes, I know the name.
7  Q.  Do you know about his background in broad terms?  He's
8      a very well-respected non-executive director?
9  A.  Again, I can't recollect right now, but, yes, at the
10     time I remember him having a good background.
11 Q.  Having impressive credentials?
12 A.  Yes.
13 Q.  Have you seen this letter before?
14 A.  No.
15 Q.  So this is a letter from Mr Kanter to Mr Webb but it's
16     about you and your work at Cazenove and Mr Kanter is
17     identifying to Mr Webb in late 2009 some of the issues
18     that they're having with your work.  If I pick up the
19     first one in the third paragraph:
20         "The first is a perverse timing issue: documents are
21     being dropped in our laps clearly intentionally
22     awkwardly."
23         Would you accept that when you were providing your
24     draft reports to Autonomy they often came late in the
25     day with limited opportunity for Autonomy to comment on

77

1      them?
2  A.  I can't recollect the times that they were sent but it's
3      most likely that they would be sent at the end of
4      a working day given the work that was being put into it,
5      but it wasn't in any way for them to be able to comment
6      overnight before it would be published, particularly if
7      they felt there were any inaccuracies.  Which is -- as
8      you've present the note from May 2008, where we actually
9      worked with Autonomy for an entire month.
10 Q.  You're talking about overnight comments; the incident
11     Mr Kanter is complaining about here is one of those
12     incidents where the comments were sent with a very
13     limited window to provide answers.  Were you aware that
14     Autonomy was unhappy about that?
15 A.  Again, my communication directly with Autonomy was very
16     limited, so in regards to providing draft research I was
17     being guided by the head of research.  So a lot of my
18     research that was published in this timeframe was
19     actually being overseen, every word that I was writing
20     was being overseen by the head of research, and before
21     you ask, that would never normally happen. You know, as
22     you say, I was solely responsible but I had people
23     looking at what I was writing and giving me guidance as
24     to how long we should give Autonomy to look at things,
25     send it now et cetera.  I left all of that to compliance

78

1      and the head of research.
2  Q.  Right.  Let's look at the second complaint that
3      Mr Kanter identifies to Mr Webb:
4          "The second issue is the ignoring of simple facts
5      and publicly available information put to the analyst,
6      in favour of unsupported speculative assumptions [...]"
7          Are you aware that that was also a concern that
8      Autonomy had at the time?
9  A.  You would have to be specific as to what those -- what
10     he's pointing to.
11 Q.  Let's just pick up some of the other complaints that had
12     been raised at the time.  There were concerns about you
13     coordinating notes with Mr Morland, are you aware of
14     that?
15 A.  I was not aware of that.
16 Q.  Were you coordinating notes with Mr Morland?
17 A.  No.  Primarily Mr Morland and I were competitors at the
18     time.  Analysis that I would deem to be interesting
19     I would first publish to my clients, ie institutional
20     investors.  Post publication I would potentially discuss
21     this with other analysts including Mr Morland.
22 Q.  Okay, but the JP Morgan contract we were talking about
23     earlier, that was an example of something which wasn't
24     in your published research but which you had passed
25     privately to Mr Morland?

79

1  A.  And other people, yes.
2  Q.  And that's something you did from time to time?
3  A.  Yes, I think so.
4  Q.  And that's an odd thing to do, isn't it, in relation to
5      someone who, as you said, was a competitor?
6  A.  No, not necessarily.  Mr Morland passed me information
7      about resellers that he'd spoken to.  I mean, what's
8      interesting in this is that we both clearly had a view
9      that the rhetoric coming from the Autonomy management
10     didn't make sense when related to the financial
11     statements and when we got little tidbits they would
12     either support our argument or cancel out certain
13     arguments or theories that we may have. So the idea
14     that we were sharing information in that way is not
15     unusual.  I've done that with other stocks and other
16     analysts in the past.
17 Q.  Okay. Let's just analyse that for a moment. Mr Morland
18     would also pass you information of a similar nature to
19     the information that you provided him in relation to
20     that JP Morgan contract?
21 A.  Yes, I believe so.
22 Q.  Let's just pick up a few other points, Mr Khan.
23     Actually just one small point.  You say in your witness
24     statement that you had the sense at around this time
25     that Autonomy was pursuing a vendetta against you.

80

# EXHIBIT 29

**From:**       BRAM CORNELISSE <BCORNELISSE@Bloomberg.net>
**To:**         BRAM CORNELISSE <BCORNELISSE@Bloomberg.net>;BRAM CORNELISSE
                <bc@farringdoncap.com>;DAUD KHAN <DKHAN5@Bloomberg.net>;DAUD KHAN
                <daud.khan@cazenove.com>
**Sent:**       1/11/2011 5:16:45 PM
**Subject:**

01/11/2011 03:48:01 BRAM CORNELISSE, FARRINGDON CAPITAL M has joined the room
01/11/2011 03:48:24 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
Happy New Year! - May autonomy bring to you in 2011 what it did in 2010

01/11/2011 03:48:25 DAUD KHAN, JPMORGAN SECURITIES has joined the room
01/11/2011 03:48:25 DAUD KHAN, JPMORGAN SECURITIES says:
*** JPMORGAN SECURITIES (30034063) Disclaimer: THIS IS FOR INFORMATION ONLY, NOT AN OFFER OR
SOLICITATION FOR THE PURCHASE OR SALE OF ANY FINANCIAL INSTRUMENT, NOR AN OFFICIAL
CONFIRMATION OF TERMS. THE INFORMATION IS BELIEVED TO BE RELIABLE, BUT WE DO NOT WARRANT ITS
COMPLETENESS OR ACCURACY. PRICES AND AVAILABILITY ARE INDICATIVE ONLY AND ARE SUBJECT TO
CHANGE WITHOUT NOTICE. WE MAY HOLD A POSITION OR ACT AS A MARKET MAKER IN ANY FINANCIAL
INSTRUMENT DISCUSSED HEREIN. CLIENTS SHOULD CONSULT THEIR OWN ADVISORS REGARDING ANY TAX,
ACCOUNTING OR LEGAL ASPECTS OF THIS INFORMATION AND EXECUTE TRANSACTIONS THROUGH A J.P. MORGAN
ENTITY IN THEIR HOME JURISDICTION UNLESS GOVERNING LAW PERMITS OTHERWISE.

01/11/2011 03:50:42 DAUD KHAN, JPMORGAN SECURITIES says:
happy new year to you - A nervous few days to come. your performance in December would have
made Mike Lynch proud. Are you still in the name?

01/11/2011 03:51:25 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
i am ... was thinking of shorting some more

01/11/2011 03:51:57 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
I am surprised the stock has continued to go up so many days affter yet another msft oracle
rumour

01/11/2011 03:52:09 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
why do u think it is going up?

01/11/2011 03:53:00 BRAM CORNELISSE, FARRINGDON CAPITAL M says:
i was fully out at 1250, then reshorted a little at 1400 with the intention to do more at 1600

01/11/2011 03:55:46 DAUD KHAN, JPMORGAN SECURITIES says:
partly because expectation for software names is positive for Q4 - and Au is an underperfomer
- so expecting a beat.

01/11/2011 04:21:57 DAUD KHAN, JPMORGAN SECURITIES says:
getting close to 16

01/11/2011 12:16:45 BRAM CORNELISSE, FARRINGDON CAPITAL M has left the room

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

# EXHIBIT 30

| | |
|---|---|
| **From:** | Paul Morland <pmorland@astaire.co.uk> |
| **To:** | Khan, Daud <daud.khan@cazenove.com> |
| **Sent:** | 7/29/2009 2:15:03 PM |
| **Subject:** | RE: Large deals |

I moved to Sell the moment I saw the Q2 results

---

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** 29 July 2009 15:14
**To:** Paul Morland
**Subject:** RE: Large deals

yes fido inUS I think

when are you going to join the SELL Club

---

**From:** Paul Morland [mailto:pmorland@astaire.co.uk]
**Sent:** 29 July 2009 15:07
**To:** Khan, Daud
**Subject:** RE: Large deals

I think the longer term holders could be a little more reluctant
Am I right in thinking Fido have been lightening their holding?
Funny to see the stock down on an up day and big contract win day

---

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** 29 July 2009 14:55
**To:** Paul Morland
**Subject:** RE: Large deals

just spoke with lone pine - they would be happy to support a deal

---

**From:** Paul Morland [mailto:pmorland@astaire.co.uk]
**Sent:** 29 July 2009 12:17
**To:** Khan, Daud
**Subject:** RE: Large deals

I think a deal in Q4 gets them out of a hole but would confirm our concerns and hit credibility hard

---

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** 29 July 2009 09:41
**To:** Paul Morland
**Subject:** RE: Large deals

yes i was coming short based on your first email.

Lets face it they have alot of leeway with these deals now that it is 'hybrid' - so 1/3 to licenses when they feel like it. Agree that cash conversion is going to be weak going forward but deal may come in q4.

---

**From:** Paul Morland [mailto:pmorland@astaire.co.uk]
**Sent:** 29 July 2009 08:59
**To:** Khan, Daud

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

**Subject:** RE: Large deals

I included the April deal in error. So 205 less 65 gives the right figure of 140
However, they added 15m to the backlog in Q2 while the April deal was 20m – Could mean they took $5m to licenses
And Q3 will be interesting as they have signed $35m of deals to date so if they only recognize 15m to 20m the backlog should jump up. However, I fear they may recognize a lot of this and accept the poor cash conversion it will inevitably lead to.

| | Large banking deals | |
|---|---|---|
| 03/01/2009   Citibank | | 70 |
| Morgan Stanley | | 65 |
| Deutsche Bank | | 20 |
| 12/08 | | 25 |
| 1/09 | | 25 |
| 4/09 | | 20 |

---

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** 29 July 2009 08:22
**To:** Paul Morland
**Subject:** RE: Large deals

can you break down the deals you are counting in the backlog.

they had some noddy compalints e.g. my version of cash conversion was not on an IFRS basis. they totally misunderstood the relevance of my working cap chart. no complaint on cash taxes

---

**From:** Paul Morland [mailto:pmorland@astaire.co.uk]
**Sent:** 29 July 2009 08:12
**To:** Khan, Daud
**Subject:** RE: Large deals

Like the note. In particular the post deal working cap graph
I will have to try and find something new for mine

---

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** 29 July 2009 07:42
**To:** Paul Morland
**Subject:** RE: Large deals

timing of this announcement is interesting. We downgraded yesterday afternoon - the co. had the note from Monday morning.

For your eyes only

---

**From:** Paul Morland [mailto:pmorland@astaire.co.uk]
**Sent:** 29 July 2009 07:40
**To:** Khan, Daud
**Subject:** Large deals

By the end of Q1 Autonomy had announced large deals totalling $225m (now $260m)

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

The had recognised revenues of $65m
So why was the backlog not $160m instead of $140m?
Perhaps they have been recognising more than they say they have!

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

This e-mail is confidential and is for the addressee only. Please refer to www.cazenove.com/disclaimers/cazenove.htm for important disclaimers and the firm's regulatory position.

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which

you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

# EXHIBIT 31



Autonomy Corporation Limited and Ors v Michael Richard Lynch and Anor

Day 13

April 16, 2019

Opus 2 International - Official Court Reporters

Phone: +44 (0)20 3008 5900
Email: transcripts@opus2.com
Website: https://www.opus2.com

HP-SEC-02929754

1                          Tuesday, 16 April 2019
2    (10.30 am)
3    MR RABINOWITZ: My Lord, our next witness is
4        Mr Paul Morland.
5                    MR PAUL MORLAND (affirmed)
6    MR RABINOWITZ: Good morning, Mr Morland.
7    MR JUSTICE HILDYARD: Are you comfy there? You have some
8        water.   If you need a break, you must say.
9    A.  Thank you.
10           Examination-in-chief by MR RABINOWITZ
11   MR RABINOWITZ: Mr Morland, you should have, I hope, in
12       front of you bundle C open at tab 16 {C/16/1}.  Do you
13       have there a document titled "Witness statement of Paul
14       Gilmer Morland"?
15   A.  I do.
16   Q.  Can you go to the back of that document at page 19
17       {C/16/19}.  You should see there a signature.
18   A.  I do.
19   Q.  Can you confirm that that is your signature?
20   A.  That is my signature.
21   Q.  And that this is your first witness statement in these
22       proceedings?
23   A.  This is my first witness statement.
24   Q.  You've done another statement I think.  Can we go to
25       tab 40.10 {C/40.10/1}.  Do you have there a document

1

1        "Supplemental witness statement of Paul Gilmer Morland"?
2    A.  Yes.
3    Q.  If you go to the back of that document, it's at page 6
4        {C/40.10/6}, again there is a signature.  Can you
5        confirm that is your signature?
6    A.  That is my signature.
7    Q.  And that this is your second witness statement in these
8        proceedings?
9    A.  It is.
10   Q.  Now, I understand that you want to make a correction to
11       your first statement and I wonder if you could just be
12       given or taken to bundle N6, tab 28 {N6/28/1}.  I think
13       there is a copy of a letter there.  Your Lordship has
14       a copy of that on your desk.  I just invite you to read
15       that, Mr Morland.  (Pause).
16   A.  Yes.
17   Q.  Now, subject to making the changes that are identified
18       in that letter to your witness statement, can you
19       confirm that the contents of your first and second
20       witness statements are true to the best of your
21       knowledge and belief?
22   A.  They are.
23   MR RABINOWITZ: Thank you very much. Can you wait there,
24       please, there will be some questions for you.
25                 Cross-examination by MR SHIVJI

2

1    MR SHIVJI:  Mr Morland, you qualified as an accountant in
2        the mid-1980s, didn't you?
3    A.  I did.
4    Q.  And at that stage IFRS had not been introduced, had it?
5    A.  It had not been introduced.
6    Q.  And so you didn't train in IFRS?
7    A.  I was not trained in IFRS, no.
8    Q.  And you don't practise as an accountant, do you?
9    A.  I don't practise as an accountant.
10   Q.  And you don't have a practising certificate to practise
11       as an accountant?
12   A.  No.
13   Q.  So you're not able to provide professional accounting
14       services on IFRS, are you?
15   A.  No.
16   Q.  Aside from the lawyers, you haven't discussed the
17       content of your evidence that you're going to give today
18       with anyone, have you?
19   A.  No.
20   Q.  Have you read the part 35 guidance on expert witnesses
21       in the CPR?
22   A.  No.
23   Q.  So you're not purporting to appear today as an expert
24       witness, are you?
25   A.  I'm not, no.

3

1    Q.  And you haven't spoken to other market participants
2        about the evidence you're going to give, have you?
3    A.  I haven't, no.
4    Q.  And you haven't conducted a survey of the views of other
5        participants in presenting your evidence, have you?
6    A.  No.
7    Q.  Now, over the relevant period in 2009 to 2011, there
8        were around 15 to 20 analysts covering Autonomy; that's
9        right, isn't it?
10   A.  That's probably about right, yes.
11   Q.  And in some areas there was no consensus amongst those
12       analysts; that's correct, isn't it?
13   A.  That is correct.
14   Q.  And in some areas there was some degree of consensus?
15   A.  Yes.
16   Q.  And there might have been some areas where, although
17       there wasn't consensus per se, the analysts' views were
18       cast in a particular area?
19   A.  Yes, it's true to say that some analysts had the same
20       view.
21   Q.  Now, over that period, 2009 to 2011, those analysts
22       covering Autonomy would have produced a large number of
23       broker notes amongst them; that's correct, isn't it?
24   A.  Yes.
25   Q.  And you haven't been back to read those broker notes or

4

HP-SEC-02929755

1   analyse them, have you?
2   A.  I've seen some of them.
3   Q.  Have you gone back and reviewed all of them over that
4       period?
5   A.  I've not reviewed them all but I've seen some of them as
6       part of this process.
7   Q.  There probably would be many hundreds, wouldn't there,
8       over that period?
9   A.  Probably, yes.
10  Q.  And it would probably take many months to read them and
11      analyse them?
12  A.  Probably.
13  Q.  But in any event, you haven't done a comprehensive
14      review of those notes?
15  A.  No.
16  Q.  At the relevant time, you didn't generally have access
17      to that body of material, did you?
18  A.  I did have access to it, but I didn't usually -- it
19      wasn't really worth my time reading other people's
20      research as a general rule.
21  Q.  Now, given the answers that you've provided, your
22      evidence today is about your own personal experience of
23      Autonomy, isn't it?
24  A.  It is, yes.
25  Q.  And you're setting out your views at the time; that's

5

1   right, isn't it?
2   A.  I am.
3   Q.  You're not purporting to set out the views of others at
4       the time, are you?
5   A.  I'm not, no.
6   Q.  Now, we will have a look at some of your published
7       research.  You explain in that research that you set
8       a target price for Autonomy from time to time; that's
9       correct, isn't it?
10  A.  It is.
11  Q.  And that target price, as you explain in your research,
12      was based on a DCF model, wasn't it?
13  A.  It was not based solely on a DCF model, no; it was based
14      on a number of different ways of valuing public
15      companies.
16  Q.  Well, perhaps we can turn up one of your pieces of
17      research.  The reference is {K1/44.1/1}.  This is a note
18      from January 2008 from a broker called Arbuthnot and
19      you're the analyst that wrote this note, aren't you?
20  A.  I am, yes.
21  Q.  If you look at the bottom bullet point on the first
22      page, in the third sentence you say:
23          "Our price target however remains unchanged at [£1]
24      and is based on our DCF model which assumes 15% CAGR
25      over the next 10 years and terminal margins of 44%."

6

1       So your target price was based on your DCF model,
2       wasn't it?
3   A.  At this time the DCF model was the final arbiter of the
4       price target, but a price target as any analyst will
5       tell you is an agglomeration of lots of ways of looking
6       at a company.  A DCF model is often used as a final
7       justification, but there will be a lot more that goes
8       into a setting of a target price than just looking at
9       a DCF model.
10  Q.  Well, you had a DCF model at the time, didn't you?
11  A.  Yes, I did.
12  Q.  And you operated a DCF model throughout the period,
13      didn't you?
14  A.  Yes, I did.
15  Q.  The DCF model is a way of calculating the value of the
16      company, isn't it?
17  A.  It is.
18  Q.  And out of the various research methods available to
19      you, it is the most quantitative, isn't it?
20  A.  It's probably fair to say yes, it is the most
21      quantitative, yes.
22  Q.  So is it fair to say that your DCF model would have been
23      one of the principal drivers of your target price?
24  A.  Yes, it would.
25  Q.  And it would take quite a lot, wouldn't it, to depart

7

1       from your DCF model if it was giving you a particular
2       result?
3   A.  Yes, although the assumptions that underlie a DCF model
4       do change from time to time.
5   Q.  Yes, of course.  You need to make sure the assumptions
6       are valid assumptions, don't you?
7   A.  Yes.
8   Q.  But if you have valid assumptions, then it would be
9       methodologically inappropriate to depart from your
10      model, wouldn't it?
11  A.  Correct.
12  Q.  Let's just go to your DCF model, we have various
13      versions of it.  There's one that appears at {K6/189.1}.
14      We just have to wait for it to download.
15  EPE OPERATOR: Sorry, I haven't got that document.
16  MR SHIVJI:  I'm told it's in a temporary folder.  (Pause).
17  EPE OPERATOR: Sorry, I haven't got it.
18  MR SHIVJI:  I'm told it's in a temporary folder of 16 April
19      and the reference, just to give you it again, it's
20      {K6/189.1/1}.
21          (Pause)
22          If I may, my Lord, I'll ask some general questions
23      about it and then we'll have a look at the document in
24      a moment.
25  MR JUSTICE HILDYARD: Yes, we'll proceed in that way, but if

8

# EXHIBIT 32

| | |
|---|---|
| **From:** | Khan, Daud <daud.khan@cazenove.com> |
| **To:** | Paul Morland <pmorland@blueoarsecurities.co.uk> |
| **Sent:** | 1/27/2009 3:27:37 PM |
| **Subject:** | RE: Autonomy cash question |
| **Attachments:** | Autonomy 2008 09 01.ps.zip |

Hi Paul,

How are things?

I should reply by saying its proprietary but the more people that understand this, the more will question them. I unfortunately am banned from speaking to them so can't get any answer..

Here's my note that will explain the cash issue. doesn't include the effect of H2 but you'll get the picture


Happy to chat to you about it.


Daud


**From:** Paul Morland [mailto:pmorland@blueoarsecurities.co.uk]
**Sent:** 27 January 2009 14:38
**To:** Khan, Daud
**Subject:** Autonomy cash question

Daud
When you talk about a cumulative cash deficit of $130m, can you tell me when the starting point is and how you calculate it?
Regards
Paul

| Contact |
|---|
| Paul Morland    +44 (0)20 7448 9740 |
| pmorland@blueoarsecurities.co.uk |

This message and any files transmitted with it contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify Blue Oar Plc immediately by return e-mail if you have received this e-mail by mistake and delete this e-mail from your system. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. Blue Oar Plc therefore does not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst Blue Oar Plc has taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network. Blue Oar Group's Investment Research and Conflicts of Interest Policy is available at http://www.blueoarsecurities.co.uk

BLUE OAR SECURITIES PLC IS A MEMBER OF THE LONDON STOCK EXCHANGE AND IS AUTHORISED AND REGULATED BY THE FINANCIAL SERVICES AUTHORITY.

30 OLD BROAD STREET LONDON EC2N 1HT. TEL: +44 (0)20 7448 4400 FAX: +44 (0)20 7448 4433 STX: 72222 EMAIL: info@blueoarsecurities.co.uk

(REGISTERED OFFICE. REGISTERED IN ENGLAND NO. 2617599)

INTEQ LIMITED IS REGULATED BY THE AUSTRALIAN SECURITIES & INVESTMENTS COMMISSION AND HOLDS AUSTRALIAN FINANCIAL SERVICES LICENCE 237244.

SYDNEY Level 6, 175 Macquarie Street, Sydney NSW 2000 T+61 (0)2 9231 3322

MELBOURNE Level 6, 22 William St, Melbourne VIC 3000 T +61 (0)3 8637 1540

PERTH Suite 11, 38 Colin Street, West Perth WA 6005 T + 61 (0)8 6430 1630


This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

Blue Oar Securities Plc is a wholly owned subsidiary of Blue Oar plc. Member of the London Stock Exchange and authorised and regulated by the Financial Services Authority. Registered in England and Wales at 30 Old Broad Street, London EC2N 1HT. Company No. 2617599

# EXHIBIT 33

| | |
|---|---|
| **From:** | Ashton, Kevin <Kevin.Ashton@canaccord.com> |
| **To:** | Khan, Daud <daud.khan@cazenove.com> |
| **Sent:** | 1/22/2010 11:37:47 AM |
| **Subject:** | RE: hello |

Hi Daud

Sure.... as long as we are careful not to breach any rules and regs - that would be pretty interesting. Just about to dive back into it my self - been busy on other things...

Kevin

**Kevin Ashton**
**Director, Equity Research**

**CANACCORD** | Adams

7th Floor, Cardinal Place, 80 Victoria Street, London SW1E 5JL
S/Board:  +44 (0)20 7050 6500
Direct:      +44 (0)20 7050 6637
Mobile:    +44 (0)7770 435114
kevin.ashton@canaccordadams.com

P Please consider the environment before printing this email

---

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** 22 January 2010 11:24
**To:** Ashton, Kevin
**Subject:** hello

Hi Kevin,

Currently Paul Morland, Roger Phillips and I have a little discussion forum running on Autonomy - i.e. its an information sharing exercise and idea bouncing e-mail circle.

Do you fancy being part of it? I'll have to check with the other two but shouldn't be an issue with them.

Hope all is well.

Daud

**Daud Khan**
**Cazenove**
**Equity Research - Technology**

Direct Line: +44 207 155 6125
Direct Fax: +44 207 155 9259
Switchboard: 020 7588 2828
Mobile: +44 7973 695240
daud.khan@cazenove.com
www.cazenove.com

This e-mail is confidential and is for the addressee only. Please refer to www.cazenove.com/disclaimers/cazenove.htm for important disclaimers and the firm's regulatory position.

---

The information contained herein has been compiled by Canaccord Adams Ltd. ("CA") from sources believed to be reliable, but no representation or warranty, express or implied, is made by CA, its affiliates or any other person as to its accuracy, completeness or correctness. All estimates, opinions and other information contained herein are subject to change without notice notice and are provided in good faith but without legal responsibility or liability. Opinion may be personal to the author and may not reflect the opinons of CA. Communications from sales persons, sales traders or traders should not be regarded as investment research and may contain opinions or trading ideas which are different from CA research opinions. CA and its affiliates may have a Corporate Finance or other relationship with any company mentioned herein and the relevant research disclosures can be found on CA website at www.canaccordadams.com/research/Disclosure.htm.
The information herein is provided for information purposes only and does not constitute an offer or solicitation to buy or sell any Designated Investments discussed herein in any jurisdiction where such offer or solicitation would be prohibited. As a result, the Designated Investments discussed herein may not be eligible for sale in some jurisdictions. This is not, and under no circumstances should be construed as, a solicitation to act as a securities broker or dealer in any jurisdiction by any person or company that is not legally permitted to carry on the business of a securities broker or dealer in that jurisdiction. To the fullest extent permitted by law, neither CA, its affiliates nor any other person accepts any liability whatsoever for any direct or consequential loss arising from any use of the information contained herein. The information herein may not be altered in any way, or transmitted to or distributed to any other party, without the prior express written permission of CAL

This email, including any attachments, is confidential and may be privileged or otherwise protected from disclosure. If you are not the intended recipient, any distribution, use or copying of this email or the information it contains is unauthorized. If you received this email in error, please advise the sender (by return email or otherwise) immediately and please delete this message and any attachments from your system.

Canaccord Adams Limited is a Limited Company registered in London Reg: 2814897, is authorized and regulated by the Financial Services Authority, and is a member of the London Stock Exchange.

JPMC-AU-DOJ-00001098

# EXHIBIT 34

| | |
|---|---|
| **From:** | Paul Morland <pmorland@astaire.co.uk> |
| **To:** | Khan, Daud <daud.khan@cazenove.com>;Roger Phillips <Roger.Phillips@evosecurities.com> |
| **Sent:** | 1/22/2010 1:02:02 PM |
| **Subject:** | RE: Question for the results day |

But Lynch could just say - 'we are always looking at deals, I am not going to say if one is imminent'.

On Kevin, I think getting above 3 gets a bit unweildy.
Also, I think the three of us are unlikely to miss something significant and it is probably a good thing to have some 'independent' bears.
If you two feel differently then let me know because I have absolutely nothing against Kevin and think he is a very good analyst.
Do we know if he wants to join?

**Paul Morland | Equity Analyst | Astaire Securities**
**D:** +44 (0)20 7448 9740
**W:** www.astairesecurities.co.uk | **E:** pmorland@astaire.co.uk

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** 22 January 2010 11:20
**To:** Roger Phillips; Paul Morland
**Subject:** RE: Question for the results day

true but if imminent surely he can't lie

**From:** Roger Phillips [mailto:Roger.Phillips@evosecurities.com]
**Sent:** 22 January 2010 11:16
**To:** Khan, Daud; Paul Morland
**Subject:** RE: Question for the results day

he could do a deal and then say we hadnt considered it at the time of the results meeting, it was all very quick. Given the terminological inexactitudes of past meetings, I doubt they would really be held to account.

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** 22 January 2010 11:14
**To:** Paul Morland
**Cc:** Roger Phillips
**Subject:** RE: Question for the results day

should we invite Kevin Ashton onto our discussion forum?

**From:** Paul Morland [mailto:pmorland@astaire.co.uk]
**Sent:** 22 January 2010 11:07
**To:** Khan, Daud
**Subject:** RE: Question for the results day

Not sure that would help our case

**Paul Morland | Equity Analyst | Astaire Securities**
**D:** +44 (0)20 7448 9740
**W:** www.astairesecurities.co.uk | **E:** pmorland@astaire.co.uk

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

**Sent:** 22 January 2010 10:53
**To:** Paul Morland; Roger Phillips
**Subject:** Question for the results day


Do you intend to make any material acquisitions over the next 3 months?

He can't say no and then announce a deal. It would have to be watch this space, stuff in the pipe etc.

**Daud Khan**
**Cazenove**
**Equity Research - Technology**

Direct Line: +44 207 155 6125
Direct Fax: +44 207 155 9259
Switchboard: 020 7588 2828
Mobile: +44 7973 695240
daud.khan@cazenove.com
www.cazenove.com

This e-mail is confidential and is for the addressee only. Please refer to www.cazenove.com/disclaimers/cazenove.htm for important disclaimers and the firm's regulatory position.


This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

The Evolution Group e-mail system is for business purposes only. Messages are not confidential and may be reviewed by authorised personnel or provided to authorities with a legal right to access such information. If you are not the addressee thereof or the person responsible for its delivery, please permanently delete all copies of this message. Any dissemination or copying of this message by anyone other than the addressee is strictly prohibited.

Information expressed in this message is not given or endorsed by any of THE EVOLUTION GROUP PLC's subsidiaries unless otherwise indicated by an authorised representative.

EVOLUTION SECURITIES LTD is registered in England No. 2316630 (100 Wood Street, London EC2V 7AN), Member of the London Stock Exchange, Authorised and Regulated by the Financial Services Authority (FSA No. 143999).

Whilst we run anti-virus software, you are solely responsible for ensuring that any e-mail or attachment you receive is virus-free. We disclaim liability for any damage you suffer as a consequence of receiving any such virus.

This message and any files transmitted with it may contain confidential information and are intended only for the

individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

# EXHIBIT 35

| | |
|---|---|
| **From:** | Khan, Daud <daud.khan@cazenove.com> |
| **To:** | Paul Morland <pmorland@astaire.co.uk>;Roger Phillips <Roger.Phillips@evosecurities.com> |
| **CC:** | Ashton, Kevin <Kevin.Ashton@CanaccordAdams.com> |
| **Sent:** | 1/22/2010 12:48:05 PM |
| **Subject:** | The Autonomy discussion group |

Introducing KA to the discussion forum.

Does anyone think they would pull a double bluff and actually have OK deferred revenues i.e they know we would pick up on missing commentary on the trading statement.

Bit worried that Marc Geall has allowed me to come because the results are going to look good.

**Daud Khan**
**Cazenove**
**Equity Research - Technology**

Direct Line: +44 207 155 6125
Direct Fax: +44 207 155 9259
Switchboard: 020 7588 2828
Mobile: +44 7973 695240
daud.khan@cazenove.com
www.cazenove.com

# EXHIBIT 36

| | |
|---|---|
| **From:** | Paul Morland <pmorland@astaire.co.uk> |
| **To:** | Khan, Daud <daud.khan@cazenove.com> |
| **Sent:** | 9/21/2009 5:41:02 PM |
| **Subject:** | RE: Upsetting Autonomy |

That's what I thought.

What they now appear to be saying is that for hosted deals they switched from pre-pay to pay as you go. But revenue recognition is unchanged. Is that possible?

On the Z B/S. Can you tell me the source on the internet? Or do you want me to keep quiet on where I got it from? Whether it is public or not is really irrelevant as I don't think that the balance sheet of an acquired company can really be regarded as price sensitive.

---

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** 21 September 2009 18:20
**To:** Paul Morland
**Subject:** Re: Upsetting Autonomy

As far as I remember it was for all new contracts. Ie the shift to hybrid is for everything.

Daud Khan
Cazenove
Equity Research - Software/IT services

Direct Line: +44 207 155 6125
Direct Fax: +44 207 155 9259
Switchboard: 020 7588 2828
Mobile: +44 7973 695240
daud.khan@cazenove.com
www.cazenove.com

---

**From:** Paul Morland
**To:** Khan, Daud
**Sent:** Mon Sep 21 18:15:44 2009
**Subject:** RE: Upsetting Autonomy

Cheers

When they said 1/3 license and 2/3 hosting were they talking about mega-deals or hosting deals in general? Maybe there is no license element of hosted deals?

Paul

---

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** 21 September 2009 16:13
**To:** Paul Morland; Roger.Phillips@evosecurities.com
**Subject:** Re: Upsetting Autonomy

I'm out today but my thoughts based on previous experience is as follows:

They enjoy making an issue of semantics. I believe your point is fine as it can be interpreted correctly as the hosted model has now changed to one third license and the rest hosted. They are interpreting it as hosted revenue is being pulled forward as license. Ultimately the end result is the same.

On point two it is a public filing ie anyone with internet access can get hold of it. I wouldn't send it to them as they are well aware of this as I have referred to it on more than one occassion.

I would not advise pandering to their concerns as without doubt they will continue to point out issues and expect further corrections thereby discrediting the note or by saying you are only selectively correcting inaccuracies.

Daud Khan

---

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

Cazenove
Equity Research - Software/IT services

Direct Line: +44 207 155 6125
Direct Fax: +44 207 155 9259
Switchboard: 020 7588 2828
Mobile: +44 7973 695240
daud.khan@cazenove.com
www.cazenove.com

---

**From:** Paul Morland
**To:** Khan, Daud; Roger Phillips
**Sent:** Mon Sep 21 13:26:40 2009
**Subject:** Upsetting Autonomy
Take a look at this.
On point one should I have said 'one third of the hosted contract has now been replaced by a license sale'? Would that have been ok? They call hosted sales license so what's their problem?
On point two. I thought the Zantaz closing balance sheet came from a US legal filing. Even if it was unpublished, they would struggle to convince me that it was price sensitive, especially now that it is two years old. Thoughts?
If that is all they can come up with, can we safely assume that all my other points about flattering growth rates and giving out wrong debtors figures are correct?

---

**From:** Peter Goodman [mailto:pgoodman@autonomy.com]
**Sent:** 21 September 2009 11:45
**To:** Paul Morland
**Subject:** Note

Hi Paul,

We saw your note, and I noticed it makes the following statement:

*"What is clear is that Autonomy has changed the revenue recognition policy at Zantaz which used to recognise its hosted revenues evenly over the period of the contract. Autonomy has changed this such that one third of hosted revenues are now taken up front (as if they were a license) with the rest spread as before."*

This is factually inaccurate. As it would be misaccounting to recognise a hosted service other than ratably (ie as and when delivered), I'm certain you would want to correct this misinformation in the market as soon as possible. Please could you confirm when you have done this?

On a second matter, you mentioned you had access to what we understand to be non-public ZANTAZ documents. Could you please, as requested in my previous email, confirm whether you have access to these documents, and if so how you obtained them? We are concerned that this may be inside information.

Kind regards,

Peter


Peter Goodman
Investor Relations Manager
T: +44 (0) 207 907 2300

**"Autonomy dominates the enterprise search market" – IDC, 2008**

**"Autonomy's search technology is becoming a de facto standard for companies" – FT, 2007**

---

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information.  If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone.  Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies.  No reliance may be placed on this message without written confirmation from an authorised representative of the company.  Autonomy Systems Limited, Registered Office:  Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

This e-mail is confidential and is for the addressee only. Please refer to www.cazenove.com/disclaimers/cazenove.htm for important disclaimers and the firm's regulatory position.

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as

information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

The Astaire group includes Astaire Securities Plc and Astaire & Partners Limited, both are authorised and regulated by the FSA and are Members of the London Stock Exchange. Company No. 2617599.

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

# EXHIBIT 37

| | |
|---|---|
| **From:** | Khan, Daud <daud.khan@cazenove.com> |
| **To:** | Paul Morland <pmorland@blueoarsecurities.co.uk>;David Toms <D.Toms@numiscorp.com> |
| **Sent:** | 5/14/2009 9:05:02 AM |
| **Subject:** | RE: Fact of the day |

gosh - way too much discussion for a thurs morning. I will check and see if I can get a billings number.

---

**From:** Paul Morland [mailto:pmorland@blueoarsecurities.co.uk]
**Sent:** 14 May 2009 09:49
**To:** David Toms; Khan, Daud
**Subject:** RE: Fact of the day

Exactly
In your example $80m of your revenue comes from billings in the quarter, add that to the $30m and we are back at your $110m.
Violent agreement – billings equals amount invoiced in the period (
As David says, we really need to know if billings was higher than the $125m of revenues

---

**From:** David Toms [mailto:D.Toms@numiscorp.com]
**Sent:** 14 May 2009 09:37
**To:** Paul Morland; Khan, Daud
**Subject:** RE: Fact of the day

your billings calc is only talking about the billings related to def rev (at least that's how I read it, maybe I'm misunderstanding)
whereas mine adds on the revenue that is booked straight to the P&L.
$100m rev inc $20m DRR
DR $50m open $60m close.
Billings= $100m + 60-50 = $110m
On your methodology you'd get $60-50+20= $30m
Unless by recognised you meant overall rev recognised, rather than just DRR. In which case we're violently agreeing!

If the diff between the rev numbers is simply semantics/nomenclature then I agree its not low-balling to talk abotu GAAP rev
instead of billings. Depends if Daud can revisit his source and find out what the billings number was and see if that was much
higher - say $150m.

---

**From:** Paul Morland [mailto:pmorland@blueoarsecurities.co.uk]
**Sent:** 14 May 2009 09:30
**To:** David Toms; Khan, Daud
**Subject:** RE: Fact of the day

Not sure if I am on blacklist yet.
Sent mail to Sushovan on 28 April with some pretty harmless questions like 'If you only convert 83% of prior quarter sales into
cash, how do you keep DSOs below 90 days?'
Yet to get a response other than to say if you look at last four quarters it is 96%!
On def. rev.
If Closing balance = Opening balance less recognized plus invoiced. Then Invoiced = Closing bal – opening bal + recognized.
Therefore invoiced = change in bal. plus recognized = billings (as I say below)
I am not sure you can say Autonomy were low-balling Zantaz revenues because they ignored billings, which should always be
higher than revenues for a growing business.

---

**From:** David Toms [mailto:D.Toms@numiscorp.com]
**Sent:** 14 May 2009 08:59
**To:** Paul Morland; Khan, Daud
**Subject:** RE: Fact of the day

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

no - I call rev + change in def rev 'billings'. They called it revenue. i.e. when Zantaz talked about rev, they were talking about amount invoiced to custoemrs in period, irrespective of whether it went to rev or def rev.

I get the same as you on IWOV maintenance renewals (and published indicating my surprise that half of custs didn't renew in a period when salesforce were agressively targetted on getting cash in).

Are you on blacklist as well now ?

---

**From:** Paul Morland [mailto:pmorland@blueoarsecurities.co.uk]
**Sent:** 14 May 2009 08:56
**To:** Khan, Daud; David Toms
**Subject:** RE: Fact of the day

Did they really call change in def rev Billings?

To me the change in def rev has three parts 1. recognized from bal b/f  2. invoiced in the period  3. amount recognized of amount invoiced.  I would define 2. as Billings. This is why Autonomy's deferred income release category is completely meaningless in my view because it would exclude maintenance that was recognized in the quarter it was invoiced ie. 25% of it.

What is pretty clear is that Autonomy recognizes more from deferred than both Zantaz and Interwoven did. IWOV deferred most likely fell $14m in Q1 because Autonomy recognized it rather then because people weren't renewing maintenance as they said. I estimate that $14m would mean that half of IWOV customers didn't renew maintenance. Anyone heard of that happening before?

---

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** 14 May 2009 08:29
**To:** David Toms; Paul Morland
**Subject:** RE: Fact of the day

Good question. As it was told to me its revenue including professional services. On the basis that deferred rev at the time of Acq was $44m, I doubt it was up $19m.

It would also make sense from the point of view that 25m of revs discontinued and 25m of costs saved.

---

**From:** David Toms [mailto:D.Toms@numiscorp.com]
**Sent:** 14 May 2009 08:24
**To:** Khan, Daud; Paul Morland
**Subject:** RE: Fact of the day

was that revenue as we define it or billings?  Zantaz used to define revenue as rev + change in def rev, i.e. billings.  Steve Klei's bio (post Zantaz) used to state that he'd grown Zantaz rev to $135m at time of sale to Autn, but historically some of the Zantaz docs I've seen do blur rev and billings.

---

**From:** Khan, Daud [mailto:daud.khan@cazenove.com]
**Sent:** 14 May 2009 08:21
**To:** Paul Morland; David Toms
**Subject:** Fact of the day

Don't ask me how I found out but Zantaz reported $125m in 2006. slightly different to the $106m that we have been told.

**Daud Khan**
**Cazenove**
**Equity Research - Technology**

Direct Line: +44 207 155 6125
Direct Fax: +44 207 155 9259
Switchboard: 020 7588 2828
Mobile: +44 7973 695240
daud.khan@cazenove.com
www.cazenove.com

This e-mail is confidential and is for the addressee only. Please refer to www.cazenove.com/disclaimers/cazenove.htm for important disclaimers and the firm's regulatory position.

---

This message and any files transmitted with it contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify Blue Oar Plc immediately by return e-mail if you have received this e-mail by mistake and delete this e-mail from your system. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. Blue Oar Plc therefore does not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst Blue Oar Plc has taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network. Blue Oar Group's Investment Research and Conflicts of Interest Policy is available at http://www.blueoarsecurities.co.uk

BLUE OAR SECURITIES PLC IS A MEMBER OF THE LONDON STOCK EXCHANGE AND IS AUTHORISED AND REGULATED BY THE FINANCIAL SERVICES AUTHORITY.

30 OLD BROAD STREET LONDON EC2N 1HT. TEL: +44 (0)20 7448 4400 FAX: +44 (0)20 7448 4433 STX: 72222 EMAIL: info@blueoarsecurities.co.uk

(REGISTERED OFFICE. REGISTERED IN ENGLAND NO. 2617599)

INTEQ LIMITED IS REGULATED BY THE AUSTRALIAN SECURITIES & INVESTMENTS COMMISSION AND HOLDS AUSTRALIAN FINANCIAL SERVICES LICENCE 237244.

SYDNEY Level 6, 175 Macquarie Street, Sydney NSW 2000 T+61 (0)2 9231 3322

MELBOURNE Level 6, 22 William St, Melbourne VIC 3000 T +61 (0)3 8637 1540

PERTH Suite 11, 38 Colin Street, West Perth WA 6005 T + 61 (0)8 6430 1630

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

Blue Oar Securities Plc is a wholly owned subsidiary of Blue Oar Group plc. Member of the London Stock Exchange and authorised and regulated by the Financial Services Authority. Registered in England and Wales at 30 Old Broad Street, London EC2N 1HT. Company No. 2617599.

This message and any files transmitted with it contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify Blue Oar Plc immediately by return e-mail if you have received this e-mail by mistake and delete this e-mail from your system. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. Blue Oar Plc therefore does not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst Blue Oar Plc has taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network. Blue Oar Group's Investment Research and Conflicts of Interest Policy is available at http://www.blueoarsecurities.co.uk

BLUE OAR SECURITIES PLC IS A MEMBER OF THE LONDON STOCK EXCHANGE AND IS AUTHORISED AND REGULATED BY THE FINANCIAL SERVICES AUTHORITY.

30 OLD BROAD STREET LONDON EC2N 1HT. TEL: +44 (0)20 7448 4400 FAX: +44 (0)20 7448 4433 STX: 72222 EMAIL: info@blueoarsecurities.co.uk

(REGISTERED OFFICE. REGISTERED IN ENGLAND NO. 2617599)

INTEQ LIMITED IS REGULATED BY THE AUSTRALIAN SECURITIES & INVESTMENTS COMMISSION AND HOLDS AUSTRALIAN FINANCIAL SERVICES LICENCE 237244.

SYDNEY Level 6, 175 Macquarie Street, Sydney NSW 2000 T+61 (0)2 9231 3322

MELBOURNE Level 6, 22 William St, Melbourne VIC 3000 T +61 (0)3 8637 1540

PERTH Suite 11, 38 Colin Street, West Perth WA 6005 T + 61 (0)8 6430 1630

This message and any files transmitted with it may contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

Blue Oar Securities Plc is a wholly owned subsidiary of Blue Oar Group plc. Member of the London Stock Exchange and authorised and regulated by the Financial Services Authority. Registered in England and Wales at 30 Old Broad Street, London EC2N 1HT. Company No. 2617599.

All incoming and outgoing emails are recorded for an indefinite period. The information contained in this message (and any accompanying attachments) may be legally privileged and confidential. The information is intended only for the recipient named in this message. If the reader of  this message is not the

JPMC-AU-DOJ-00008111
Page 4

```
intended recipient you are notified that any use, disclosure, copying
or distribution of the information is prohibited. If you receive this
message in error please notify us immediately. Thank you.

Numis Securities Limited is authorised and regulated by the
Financial Services Authority and is entered on the latter's Register,
www.fsa.gov.uk/register, under number 144822.

Numis Securities Limited is incorporated in England & Wales,
Company Registration No: 2285918 and has its registered office at
10 Paternoster Square, London EC4M 7LT

A member of the London Stock Exchange.

Tel: (+44)2072601000

E-mail: mail@numiscorp.com
URL: www.numiscorp.com

VAT No: 243623281

Please consider the environment before printing this e-mail.
```

This message and any files transmitted with it contain confidential information and are intended only for the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify Blue Oar Plc immediately by return e-mail if you have received this e-mail by mistake and delete this e-mail from your system. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. Blue Oar Plc therefore does not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst Blue Oar Plc has taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network. Blue Oar Group's Investment Research and Conflicts of Interest Policy is available at http://www.blueoarsecurities.co.uk

BLUE OAR SECURITIES PLC IS A MEMBER OF THE LONDON STOCK EXCHANGE AND IS AUTHORISED AND REGULATED BY THE FINANCIAL SERVICES AUTHORITY.

30 OLD BROAD STREET LONDON EC2N 1HT. TEL: +44 (0)20 7448 4400 FAX: +44 (0)20 7448 4433 STX: 72222 EMAIL: info@blueoarsecurities.co.uk

(REGISTERED OFFICE. REGISTERED IN ENGLAND NO. 2617599)

INTEQ LIMITED IS REGULATED BY THE AUSTRALIAN SECURITIES & INVESTMENTS COMMISSION AND HOLDS AUSTRALIAN FINANCIAL SERVICES LICENCE 237244.

SYDNEY Level 6, 175 Macquarie Street, Sydney NSW 2000 T+61 (0)2 9231 3322

MELBOURNE Level 6, 22 William St, Melbourne VIC 3000 T +61 (0)3 8637 1540

PERTH Suite 11, 38 Colin Street, West Perth WA 6005 T + 61 (0)8 6430 1630

This message and any files transmitted with it may contain confidential information and are intended only for the

individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail or any part of it. Please notify us immediately by return if you have received this e-mail by mistake and delete it from your system. We apologise for any inconvenience that this may have caused you. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. Information contained is this message may be subject to legal, professional or other regulatory privilege. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, arrive late or incomplete. We therefore do not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. The contents of this message or attachment may contain software viruses which could damage your own computer system. Whilst we have taken reasonable steps to minimise this risk, we cannot accept liability for any damage which you sustain as a result of such software viruses. We reserve the right to monitor all e-mail messages passing through our network.

Blue Oar Securities Plc is a wholly owned subsidiary of Blue Oar Group plc. Member of the London Stock Exchange and authorised and regulated by the Financial Services Authority. Registered in England and Wales at 30 Old Broad Street, London EC2N 1HT. Company No. 2617599.

# EXHIBIT 38

**Briest, Michael**

---

From:        Briest, Michael
Sent:        Fri 4/16/2010 11:53 AM (GMT-00:00)
To:          marcg@autonomy.com
Cc:
Bcc:
Subject:     FW: Autonomy : FY Trading statement is disappointing - ALERT
Attachments: JPM_Autonomy_2010-04-16_398778.pdf

In case you hadn't seen.

---

**From:** Drankiewicz, Kristopher [mailto:kristopher.drankiewicz@highbridge.com]
**Sent:** 16 April 2010 12:48
**To:** Briest, Michael
**Subject:** FW: Autonomy : FY Trading statement is disappointing - ALERT

**From:** Daud Khan [mailto:daud.khan@jpmresearchmail.com]
**Sent:** Friday, April 16, 2010 7:44 AM
**To:** Drankiewicz, Kristopher
**Subject:** Autonomy : FY Trading statement is disappointing - ALERT

|  |
|---|
| ☒ The linked image cannot be displayed. The file may have been moved, renamed, or deleted. Verify that the link points to the correct file and location. |

**Europe Equity
Research**

---

# Autonomy: FY Trading statement is disappointing - ALERT

Click here for the full Alert and disclaimers.

- ☒ Autonomy issued a trading statement for FY 09. Expected revenue and Adj. EPS of $193m and $0.25c are in-line with Bloomberg consensus and our expectations. However, in our view this statement is disappointing for a number of reasons.

- ☒ Software companies both in the US and Europe have indicated an increased level of IT CapEx which led to better performance in Q4 and Oracle reported strong February quarter results. Autonomy on the other hand has only just met consensus for the prior two quarters. This is unusual for a business that over multiple years has made a habit of beating consensus.

- ☒ The revenue run rate in the business in Q2 last year was $195m and we see no reason why the seasonality should be any weaker in Q1 and hence the underlying business has not grown.

CONFIDENTIAL

UBS00004376

- The statement reports that Microlink (acquisition made in early February) had a negligible impact on revenues. This business had annual sales of over $25m and even if the business going forward is discontinued, this should have had a positive impact on sales for the last month of the quarter.

- Deferred revenue is expected to follow a seasonal pattern in Q1. In our view this means a sequential decrease in deferred revenue (decline in deferred revenue occurred in 2006, 2007, 2008 and in 2009 on a pro-forma basis). In contrast DSO is expected to rise by a few days (due to government debtors) which would equate to trade receivables in Q1 of c. $206m. Hence the expected rebound in cash conversion in Q1 is likely to be muted.

Full results will be reported on 22nd April and, as we have argued in previous research, we expect the announcement of a sizeable acquisition ($1bn+) soon afterwards.

**Daud Khan**
(44-20) 7155 6125
daud.khan@jpmorgan.com

**Stacy Pollard**
(44-20) 7155 6124
stacy.pollard@jpmorgan.com

If you no longer wish to receive these e-mails then click here to unsubscribe          **www.morganmarkets.com**

Analyst certification: I certify that: (1) all of the views expressed in this research accurately reflect my personal views about any and all of the subject securities or issuers; and (2) no part of my compensation was, is, or will be directly or indirectly related to the specific recommendations or views expressed herein. Important disclosures, including price charts, related to the companies recommended in this report are available in the PDF attachment, through the search function on J.P. Morgan's website https://mm.jpmorgan.com/disclosures/company, or by calling this toll free number (1-800-477-0406).

J.P. Morgan does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.

J.P. Morgan Securities Ltd. Registered in England & Wales No. 2711006. Registered Office 125 London Wall, London, EC2Y 5AJ. All authorised and regulated by the Financial Services Authority.

Confidentiality and Security Notice: This transmission may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by JPMorgan Chase & Co., its subsidiaries and affiliates, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format.

CONFIDENTIAL

UBS00004377

# EXHIBIT 39

| From: | Leopold Arminjon <Leopold.Arminjon@gartmore.com> |
| To: | <Marc_Geall/db/dbcom%DBEMEA> |
| Sent: | 9/8/2010 8:49:05 AM |
| Subject: | FW: Autonomy : Weakness near term but promise of a better tomorrow |
| Attachments: | JPM_Autonomy_2010-09-07_451832.pdf |

**From:** Daud Khan [mailto:daud.khan@jpmresearchmail.com]
**Sent:** 08 September 2010 06:00
**To:** Leopold Arminjon
**Subject:** Autonomy : Weakness near term but promise of a better tomorrow

# J.P.Morgan CAZENOVE

**Europe Equity Research**

## Autonomy: Weakness near term but promise of a better tomorrow
**Underweight**

Click **here** for the full Note and disclaimers.

**Our estimates remain below consensus** following a disappointing set of Q2 results in which underlying earnings would appear to be 16% below consensus (Bloomberg) factoring in the lower tax rate and higher R&D capitalisation.

·       **Earnings momentum appears to be negative.** In Q3 last year the company set out a scenario for FY 10 earnings of $1.25 under a continuing weak economic backdrop vs. $1.30+ in an improving macro environment. If one were to factor in the lower tax and higher R&D capitalisation in Q2, the target for FY 10 earnings would be c. $1.17. Thus we believe some investors may view this as the beginning of negative earnings momentum.

·       **Current management steer for Q3 and FY 10 implies a tough Q4.** If one takes the given range of $206-211m for Q3 revenue and 25-26c EPS, this implies 30-35% sequential revenue growth in Q4 10 and 58-59% operating margin. Investors will likely note that this margin has not been achieved in the past and follows a number of quarters that have disappointed the market.

·       **Management steer for strong FY 11 contrasts with near-term trading challenges.** Despite the prospect of a tough Q4, Autonomy raised expectations for FY 11 to $1.45-50 (which assumes 52-54% operating margins) from c. $1.40 consensus (Bloomberg pre results). The market appears not to have moved estimates despite this steer.

·       **Data from CA SEC filings may raise investor questions.** CA filed information relating to the disposal of its Information Governance Assets to Autonomy. CA adjusted previous revenue backlog by $17m due to the disposal, which compares with Autonomy's comment that the business had a $6m annual revenue run rate.

·       **Valuation..** Stock trades on 25.0x our FY11E earnings and 6.7x EV/Sales.

**Daud Khan**
(44-20) 7155 6125
daud.khan@jpmorgan.com

If you no longer wish to receive these e-mails then click here to unsubscribe                        **www.morganmarkets.com**

Analyst certification: I certify that: (1) all of the views expressed in this research accurately reflect my personal views about any and all of the subject securities or issuers; and (2) no part of my compensation was, is, or will be directly or indirectly related to the specific recommendations or views expressed herein. Important disclosures, including price charts, related to the companies recommended in this report are available in the PDF

Confidential Treatment Requested Under FOIA By Deutsche Bank Securities Inc.

DBSI00015387
Page 1

attachment, through the search function on J.P. Morgan's website https://mm.jpmorgan.com/disclosures/company, or by calling this toll free number (1-800-477-0406).

J.P. Morgan does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.

J.P. Morgan Securities Ltd.. Registered in England & Wales No. 2711006. Registered Office 125 London Wall, London, EC2Y 5AJ. All authorised and regulated by the Financial Services Authority.

Confidentiality and Security Notice: This transmission may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by JPMorgan Chase & Co., its subsidiaries and affiliates, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format.

To view our disclaimer see http://epolicy.gartmore.com

Gartmore Investment Management Limited (GIM), Gartmore Investment Limited (GIL) and Gartmore Fund Managers Limited (GFM) are all registered in England and Wales (nos 953703, 1508030 and 1137353). The registered address of GIM, GIL and GFM is Gartmore House, 8 Fenchurch Place, London, EC3M 4PB. Gartmore Global Partners (GGP) is a general partnership registered in Delaware, USA, EIN 56-1903611. The registered office of GGP is One International Place, Fort Hill Square, Boston, Massachusetts 02110, USA. GIL, GFM and GGP are authorised and regulated by the Financial Services Authority under the references 119236 (GIL), 122610 (GFM) and 172616 (GGP). See www.fsa.gov.uk/register for more details. GGP is also a SEC registered investment advisor.

Confidential Treatment Requested Under FOIA By Deutsche Bank Securities Inc.

DBSI00015388

Page 2

# EXHIBIT 40

| | |
|---|---|
| **From:** | Marc_Geall/db/dbcom |
| **Sent:** | Wednesday, September 08, 2010 10:30 AM |
| **To:** | sushovanh@autonomy.com |
| **Subject:** | Fw: Autonomy : Weakness near term but promise of a better tomorrow |
| **Attachments:** | JPM_Autonomy_2010-09-07_451832.pdf |

Kind regards,

Marc



Marc Geall
Managing Director | Head of European Tech Research

Deutsche Bank AG, Filiale London
Global Markets
99 Bishopsgate, EC2M 3XD London, United Kingdom
Tel. +44(20)754-58494
Email marc.geall@db.com

*** The II survey is due to begin shortly. Please be aware this survey is important to us. If you have valued our service through the year, please consider voting for us ***

*Passion to Perform*

----- Forwarded by Marc Geall/db/dbcom on 08/09/2010 11:29 -----
**Marc Geall/db/dbcom**

08/09/2010 11:26

To mrl@autonomy.com, sushovan.hussain@autonomy.com

cc

Subject Fw: Autonomy : Weakness near term but promise of a better tomorrow

**From:** Daud Khan [mailto:daud.khan@jpmresearchmail.com]
**Sent:** 08 September 2010 06:00
**To:**
**Subject:** Autonomy : Weakness near term but promise of a better tomorrow

1

Confidential Treatment Requested Under FOIA By Deutsche Bank Securities Inc.

DBSI00007310

# J.P.Morgan CAZENOVE

**Europe Equity Research**

## Autonomy: Weakness near term but promise of a better tomorrow
**Underweight**

Click here for the full Note and disclaimers.

- **Our estimates remain below consensus** following a disappointing set of Q2 results in which underlying earnings would appear to be 16% below consensus (Bloomberg) factoring in the lower tax rate and higher R&D capitalisation.

- **Earnings momentum appears to be negative.** In Q3 last year the company set out a scenario for FY 10 earnings of $1.25 under a continuing weak economic backdrop vs. $1.30+ in an improving macro environment. If one were to factor in the lower tax and higher R&D capitalisation in Q2, the target for FY 10 earnings would be c. $1.17. Thus we believe some investors may view this as the beginning of negative earnings momentum.

- **Current management steer for Q3 and FY 10 implies a tough Q4.** If one takes the given range of $206-211m for Q3 revenue and 25-26c EPS, this implies 30-35% sequential revenue growth in Q4 10 and 58-59% operating margin. Investors will likely note that this margin has not been achieved in the past and follows a number of quarters that have disappointed the market.

- **Management steer for strong FY 11 contrasts with near-term trading challenges.** Despite the prospect of a tough Q4, Autonomy raised expectations for FY 11 to $1.45-50 (which assumes 52-54% operating margins) from c. $1.40 consensus (Bloomberg pre results). The market appears not to have moved estimates despite this steer.

- **Data from CA SEC filings may raise investor questions.** CA filed information relating to the disposal of its Information Governance Assets to Autonomy. CA adjusted previous revenue backlog by $17m due to the disposal, which compares with Autonomy's comment that the business had a $6m annual revenue run rate.

- **Valuation.** Stock trades on 25.0x our FY11E earnings and 6.7x EV/Sales.

Daud Khan
(44-20) 7155 6125
daud.khan@jpmorgan.com

If you no longer wish to receive these e-mails then click here to unsubscribe                **www.morganmarkets.com**

Analyst certification: I certify that: (1) all of the views expressed in this research accurately reflect my personal views about any and all of the subject securities or issuers; and (2) no part of my compensation was, is, or will be directly or indirectly related to the specific recommendations or views expressed herein. Important disclosures, including price charts, related to the companies recommended in this report are available in the PDF attachment, through the search function on J.P. Morgan's website https://mm.jpmorgan.com/disclosures/company, or by calling this toll free number (1-800-477-0406).

J.P. Morgan does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.

J.P. Morgan Securities Ltd. Registered in England & Wales No. 2711006. Registered Office 125 London Wall, London, EC2Y 5AJ. All authorised and regulated by the

Confidential Treatment Requested Under FOIA By Deutsche Bank Securities Inc.                    DBSI00007311

Financial Services Authority.

Confidentiality and Security Notice: This transmission may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by JPMorgan Chase & Co., its subsidiaries and affiliates, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format.

---

To view our disclaimer see http://epolicy.gartmore.com

3

Confidential Treatment Requested Under FOIA By Deutsche Bank Securities Inc.

DBSI00007312

# EXHIBIT 41

| | |
|---|---|
| From: | Lee X Kirbach [lee.kirbach@jpmchase.com] |
| Sent: | Wednesday, October 06, 2010 10:58 AM |
| To: | Joe, Danny |
| Cc: | Tribolet, John; Mitroff, Andrea; Campbell, Jason; Cao, Virginia ; Daud Khan |
| Subject: | Danny : Autonomy : Negative trading statement - still UW |
| Attachments: | ATT00001..gif; ATT00002..gif; image001.jpg; JPM_Autonomy_2010-10-06_482612.pdf |

Danny -

Here are Daud's comments.  He's still *way* below consensus for 2011, and thinks the shares could go to GBP 10.  We'll try to call shortly.

Regards, Lee

Lee Kirbach | Executive Director |European Equity Sales | J.P. Morgan | 560 Mission St, 5th Floor, San Francisco, CA 94105 | T: 415-315-7926 | M: 415-225-8165 | lee.kirbach@jpmorgan.com | jpmorgan.com



Top Ideas:
ABInBev @ €36 (close 41.6) ---> BAE Systems (3-1 reward-risk, 5.6% yield) @ 303p (Aug 16)
Air Liquide (200 contracts in the works, 13x vs hist 17x PE) - May, '10 @ €75.4
BAT Indus @ 2005p (close 2258) ---> IMT (there w/b *more* smokers in 2030 than today) @ 1860 (Aug 16)
Credit Suisse (4.5% 2011 yield, trading below TBV ex WM biz) - May, '10 @ CHF 44.5
HHLA (20+% thru-cycle ROIC, dredging Elbe will double eps) - July, '10 @ €26
Repsol (4.9% yield, 3.5% vol growth, strong R&M, selling down YPF, sub 10 PE) - May 7 @ €15,5
Rio Tinto (5x PE, 17% fcf yield in 2011) - July, '10 - 3100p
Roche (4.5% yield, pipeline adds 41% to Emb Value) - May 7 @ CHF 162
Teva (there w/b $150 billion drugs going off patent by 2013) - June, '10 @ $52
Vodafone (5.7% yield, looking likely that VZW w/b resolved) - May, 10 @ 133p

.................................................................................

Please see attached hyperlink to access full email communications disclaimer :

http://www.jpmorgan.com/pages/jpmorgan/email

_____

**J.P.Morgan** CAZENOVE                                    **Europe Equity Research**

_____

## Autonomy: Negative trading statement - ALERT

Click here for the full Alert and disclaimers.

1

TIAA-CAM0006553

- Autonomy pre-announced Q3 results this morning at 11:15am.

- According to the release Autonomy expects to report Q3 revenues of $206m-$211m, this compares to our forecast of $215m and consensus $213.4m. The company guides for fully diluted EPS of $0.25 to $0.26, this compares to our forecast for $0.28 and consensus $0.26.

- Guidance: the company is guiding down on full year revenue by 3% on current consensus, which currently stands at $894m according to Bloomberg, which would imply $867m. This compares to our forecast for 2010E revenues of $860m. PBT growth is now projected to be 20% year on year c. $390m which is exactly inline with our estimate. We believe this translates into FY adj. EPS of $1.10-1.11. This compares to guidance of $1.23 and consensus of $1.19. Investors should be aware that the $1.23 guidance had followed the lowering of the tax rate for the full year and higher than expected R&D capitalization (which we believe had a 5-6c positive impact on EPS).

- Gross margins are expected to improve from the lower than expected 86% in Q2. DSOs are expected to be 90-94 days up from 82 days in Q2.

**Daud Khan**
(44-20) 7155 6125
daud.khan@jpmorgan.com

If you no longer wish to receive these e-mails then click here to unsubscribe                                    **www.morganmarkets.com**

Analyst certification: I certify that: (1) all of the views expressed in this research accurately reflect my personal views about any and all of the subject securities or issuers; and (2) no part of my compensation was, is, or will be directly or indirectly related to the specific recommendations or views expressed herein. Important disclosures, including price charts, related to the companies recommended in this report are available in the PDF attachment, through the search function on J.P. Morgan's website https://mm.jpmorgan.com/disclosures/company, or by calling this toll free number (1-800-477-0406).

J.P. Morgan does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.

J.P. Morgan Securities Ltd. Registered in England & Wales No. 2711006. Registered Office 125 London Wall, London, EC2Y 5AJ. All authorised and regulated by the Financial Services Authority.

Confidentiality and Security Notice: This transmission may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by JPMorgan Chase & Co., its subsidiaries and affiliates, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format.

This communication is for informational purposes only. It is not intended as an offer or solicitation for the purchase or sale of any financial instrument or as an official confirmation of any transaction. All market prices, data and other information are not warranted as to completeness or accuracy and are subject to change without notice. Any comments or statements made herein do not necessarily reflect those of JPMorgan Chase & Co., its subsidiaries and affiliates. This transmission may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received

TIAA-CAM0006554

and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by JPMorgan Chase & Co., its subsidiaries and affiliates, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format. Thank you. Please refer to http://www.jpmorgan.com/pages/disclosures for disclosures relating to European legal entities.

3

TIAA-CAM0006555

# EXHIBIT 42

| | |
|---|---|
| **From:** | Lee X Kirbach [lee.kirbach@jpmchase.com] |
| **Sent:** | Wednesday, November 24, 2010 11:23 AM |
| **To:** | Joe, Danny |
| **Cc:** | Tribolet, John; Mitroff, Andrea; Campbell, Jason; Cao, Virginia ; Daud Khan |
| **Subject:** | Danny: **Autonomy Shares Declines as Much as 9.2% on Acquisition Plan - says it is working on a "sig. acquisition" |

Haven't heard from Daud - I'm guessing he's at the Capital Markets Day

Regards, Lee

Lee Kirbach | Executive Director | European Equity Sales | J.P. Morgan | 560 Mission St, 5th
Floor, San Francisco, CA 94105 | T: 415-315-7926 | M: 415-225-8165 | lee.kirbach@jpmorgan.com
| jpmorgan.com Top Ideas:  BAE Systems, Air Liquide, IMT, Swiss Re, HHLA, Repsol, Rio Tinto,
Roche, Teva, Vodaone

Please see attached hyperlink to access full email communications disclaimer :

http://www.jpmorgan.com/pages/jpmorgan/email
_____

software stocks one of the best performing in the market today...this Autonomy remark is
helping.....CTXS +4%, VMW +3.6%, AKAM +3.5%, CA +2.6%, BMC +2.3%, QSFT +2.3%, TIBX +3.6%, RHT
+3%, ADSJ +3%, SYMC +3.2% (also helping is continued spec around HPQ ramping up its
acquisitions.....there was an article overnight talking about how HPQ could look to buy
companies such as MSTR and TDC

Autonomy Shares Declines as Much as 9.2% on Acquisition Plan
2010-11-24 15:56:13.479 GMT

By Simon Thiel
     Nov. 24 (Bloomberg) -- Autonomy Corp. dropped as much as
9.2 percent in London trading after the U.K.'s second-largest
software company said work on a "specific acquisition" that it
has been looking at for several months is "ongoing.''
     Recent developments within talks have led to an additional
opportunity that warrants further examination, which could
extend the company's planned acquisition time scale, Autonomy
said in a statement today.

Link to Company News:{AU/ LN <Equity> CN <GO>}

For Related News and Information:
Top Stories:{TOP<GO>}

To contact the editor responsible for this story:
Simon Thiel at +44-20-7673-2814 or
sthiel1@bloomberg.net

This communication is for informational purposes only. It is not

1

TIAA-CAM0015943

intended as an offer or solicitation for the purchase or sale of
any financial instrument or as an official confirmation of any
transaction. All market prices, data and other information are not
warranted as to completeness or accuracy and are subject to change
without notice. Any comments or statements made herein do not
necessarily reflect those of JPMorgan Chase & Co., its subsidiaries
and affiliates.

This transmission may contain information that is privileged,
confidential, legally privileged, and/or exempt from disclosure
under applicable law. If you are not the intended recipient, you
are hereby notified that any disclosure, copying, distribution, or
use of the information contained herein (including any reliance
thereon) is STRICTLY PROHIBITED. Although this transmission and any
attachments are believed to be free of any virus or other defect
that might affect any computer system into which it is received and
opened, it is the responsibility of the recipient to ensure that it
is virus free and no responsibility is accepted by JPMorgan Chase &
Co., its subsidiaries and affiliates, as applicable, for any loss
or damage arising in any way from its use. If you received this
transmission in error, please immediately contact the sender and
destroy the material in its entirety, whether in electronic or hard
copy format. Thank you.

Please refer to http://www.jpmorgan.com/pages/disclosures for
disclosures relating to European legal entities.

TIAA-CAM0015944

# EXHIBIT 43

**From:**        daud khan <daud.khan@gmail.com>
**To:**          Khan, Daud <daud.khan@cazenove.com>
**Sent:**        1/10/2010 9:13:02 PM
**Subject:**
**Attachments:**      preview 2010 01 06 Citi.pdf; preview 2010 01 08 BoAi.pdf; SOW 2010 01 05 Berenburg.pdf

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

# EXHIBIT 44

| | |
|---|---|
| **From:** | Khan, Daud <daud.khan@cazenove.com> |
| **To:** | daud.khan@gmail.com <daud.khan@gmail.com> |
| **Sent:** | 1/18/2010 7:13:47 PM |
| **Subject:** | Daud Wish List |
| **Attachments:** | Daud Wish List.doc |

CONFIDENTIALITY REQUESTED UNDER FED. R. CRIM. P. 6(E)

# EXHIBIT 45

| **From:** | Mike Lynch <mrl@autonomy.com> |
| **To:** | sushovanh@autonomy.com |
| **Date:** | 12 Feb 2006 at 15:26 |
| **Attachments:** | CV - Daud Khan.pdf |
| **Subject:** | Fwd: Daud Khan CV |

Authentication-Results: AUTNVECTOR
   from=daud.khan@gmail.com
DomainKey-Signature: a=rsa-sha1; q=dns; c=nofws;
   s=beta; d=gmail.com;
   h=received:message-id:date:from:to:subject:mime-version:content-type;

b=dIV9i3pUT5WZvpjoHsNmRHye+qL33C6zEX6Fg5sn/G2YZKSyj4ks+yXwj1lGLO8LST67x9b2a7hsbWaIcDU1Cf4RSmPSbEejbh96lUZpvx0kuXMc0oUZEXWmv5B+TplbQHn6AcwVkiFs2he
Date: Mon, 6 Feb 2006 22:35:34 +0000
From: daud khan  <daud.khan@gmail.com>
To: mrl@autonomy.com
Subject: Daud Khan CV
X-Spam-Processed: AUTNVECTOR, Mon, 06 Feb 2006 22:33:59 +0000
   (not processed: spam filter disabled)
X-MDRcpt-To: mrl@autonomy.com
X-Rcpt-To: mrl@autonomy.com
X-Return-Path: daud.khan@gmail.com
X-MDaemon-Deliver-To: mrl@autonomy.com
X-MDAV-Processed: AUTNVECTOR, Mon, 06 Feb 2006 22:33:59 +0000

Mike,

As promised, my CV. Thank you again for your help on this.
Hope the roadshow goes well.

Best Regards

Daud
Content-Type: application/pdf; name="CV - Daud Khan.pdf"
X-Attachment-Id: f_ejdcw3i1
Content-Disposition: attachment; filename="CV - Daud Khan.pdf"

Mike Lynch

CEO Autonomy

www.autonomy.com

The information contained in this message is for  the intended addressee
only and may contain confidential and/or privileged  information.  If you
are not the intended addressee, please delete this  message and notify
the sender; do not copy or distribute this message or  disclose its
contents to anyone.  Any views or opinions expressed in  this message are
those of the author and do not necessarily represent those  of Autonomy
Systems Limited or of any of its associated companies.  No  reliance
may be placed on this message without written confirmation from  an
authorised representative of the company

# EXHIBIT 46

**From:** Harald Collet
**To:** Alex Marshall
**Sent:** 9/16/2011 2:58:32 PM
**Subject:** Fwd: Key Questions HP Should be Asking about Autonomy's OEM Business

Begin forwarded message:

**From:** "Childs,Sheila" <Sheila.Childs@gartner.com>
**Date:** September 16, 2011 5:53:54 PM EDT
**To:** "Harald P. F. Collet" <haraldcollet@yahoo.com>
**Subject: RE: Key Questions HP Should be Asking about Autonomy's OEM Business**

Thanks, so much, Harald! I'm going to read this over the weekend – talk to you soon...

**Sheila Childs**

*Research VP*

*Storage Technologies and Strategies, Gartner*

(281) 431-0259 (office)

(203) 651-1093 (fax)

sheila.childs@gartner.com

**From:** Harald P. F. Collet [mailto:haraldcollet@yahoo.com]
**Sent:** Friday, September 16, 2011 3:53 PM
**To:** Childs,Sheila
**Subject:** Key Questions HP Should be Asking about Autonomy's OEM Business

Confidential - Produced In Response To Grand Jury Subpoena

AM-GJ-00005988
Page 1

## *How to use the information below: Investigative Framework*

A key factor in Autonomy's valuation by financial analysts is the success of its Original Equipment Manufacturer (OEM) business. An OEM business consists of licensing a product to third party for inclusion in that third party's product. For example, automotive manufacturers do not make all of the components in the cars they sell. The speakers in your Ford car were made by another company and sold in an end product (the car) by Ford. For example, if they were Bose speakers, we would say that Bose has an OEM business (where they license manufacturers like Ford to build products that include their speakers) as well as a direct business (where consumers buy Bose branded speakers directly). There are some important factors in a successful OEM business that make it attractive:

1. **It represents a validation of unique intellectual property that is either difficult or expensive to reproduce.** To use our earlier example, Ford relies on Bose to be experts in making excellent speakers that ultimately helps Ford sell a higher quality product. The alternative would be for Ford to invest in a speaker-making division, which would both be outside of Ford's expertise in manufacturing vehicles and likely never produce speakers of as high quality as Bose's, despite high investment costs over a long period of time.

2. **An OEM business is driven and made successful by volume and scale.** OEMing a product is a way to leverage 3rd party suppliers to scale in a way that would otherwise be very difficult in a direct model. Continuing our theoretical examples, Bose is able to sell main more speakers by relying on Ford's high volume of vehicle sales than by trying to reach the same number of customers through direct consumer sales. Another way of saying this is that an OEM business allows the originating company to sell their product into multiple different markets, thus multiplying overall sales with costs increasing at a much slower rate, resulting in very high margins.

Returning to Autonomy, we have a slightly different situation to our Ford/Bose example. In Autonomy's case, their OEM customers are all in the same *type* of business: software. For Autonomy's OEM business to be successful and contribute to a high valuation, it must be true that no other software company is able to either create comparable technology (lack of software engineering expertise) or obtain comparable technology at lower cost. Autonomy's core technology (developed in house rather than acquired) is a proprietary search engine called "IDOL". There are various companies that produce or produced competing technology: Verity (acquired by Autonomy), FAST (acquired by Microsoft), Exalead, Vivisimo, Attivio, and Lucene/Solr (open source and license-free). Autonomy also OEMs a technology now called "IDOL KeyView" (formerly "KeyView"), which was acquired through the acquisition of Verity inc. in 2005. The KeyView technology is rather specialized, and only two other companies license competing technology: Stellent Outsidein or INSO filters (now owned by Oracle) and technology from ISYS. ISYS is a newer entrant to this particular market, which was formerly dominated by KeyView and Stellent's Outsidein technology.

We can now see why a successful OEM business translates to a high valuation and why highlighting it to investors is important:

1. **It validates the uniqueness of Autonomy's intellectual property (otherwise other software companies would not license from Autonomy).**

2. **If adoption of Autonomy technology is broad (they claim "99% of the software industry"), Autonomy is in the position of collecting a large royalty stream and raising margins.**

Confidential - Produced In Response To Grand Jury Subpoena

The second point is important. Software OEMs are normally done through revenue share agreements (royalties). Thus if adoption of Autonomy technology is broad, Autonomy should expect to claim a share of the software industry's revenue that is equal to the average royalty rate and total revenue stream that Autonomy's OEM products are part of. It is also possible to agree to an OEM license without any royalties. This might be done if up-front cash was more important or if there is uncertainty in the expected future royalties.

One final point worth mentioning is a historical one. Prior to the acquisition of Verity Inc. in 2005, Autonomy had a small OEM business with a handful of customers. Autonomy's IDOL product was not new in 2005. Verity brought with it a well-established OEM business with 260 customers.

*Putting all of the above together, if Autonomy's OEM revenue stream does not have the composition and scale that is claimed, this would potentially have a very negative impact on Autonomy's valuation and the price HP should be willing to pay. The publicly-available facts in the article below highlight a different story.*

## Guidance on Areas to Investigate

A successful investigation into Autonomy's OEM business would focus on the bottom -- are customers actually using Autonomy technology as extensively as claimed? By asking some basic yes/no questions around usage, particular product being OEMed from Autonomy, and what their future plans are, the results would indicate agreement or otherwise with Autonomy's public statement.

Some searching questions would be:

- Who OEMs IDOL in the software industry?

- Who OEMs "IDOL Key View" in the software industry?

- How pervasive is Autonomy's "IDOL" technology in the software industry's products?

- How accurate is Autonomy's list of OEM customers on their website? Autonomy claims that "99%" of the software industry OEMs Autonomy technology.

- How many companies OEM "IDOL Key View" versus IDOL? Does this match with Autonomy's claims that IDOL is licensed across most of the software industry?

- What are the royalty rates that Autonomy's current or former OEM customers are paying?

- How many of Autonomy's OEM customers pay royalties? Does this match with Autonomy's public statements?

AM-GJ-00005990
Page 3

Example script with a customer:

- Do you currently OEM Autonomy technology?

- Do you OEM "IDOL" or "IDOL Key View"?
- What percentage of your revenue / What percentage of your products actually embed Autonomy technology?
- Are you currently or planning to investigate alternatives to Autonomy technology?

Example script with a former OEM sales rep:

- Were customers receptive to OEMing Autonomy technology?

- How often did you meet your quota?

- What percentage of your customers decided to do a new license agreement for Autonomy IDOL technology versus renewing an existing OEM arrangement with legacy technology? (Former technologies from Verity Inc. OEM customer base include: VDK, K2, and Key View, now called "IDOL Key View").

# People to Speak to

Forrester blog: http://blogs.forrester.com/leslie_owens/11-08-26-what_is_autonomy_without_its_marketing

**Former Autonomy OEM Sales representatives:**

1. Matthew Deluca - delucam@gmail.com
2. Chad Raynal - chad.raynal@gmail.com
3. Joe Cronin - croninjoseph@gmail.com
4. John Lawson - lawsonj@gmail.com
5. Michael Neiswender - (see LinkedIn)
6. Andy Crowder (see LinkedIn)
7. Anand Karasi - anandkarasi@gmail.com
8. Tuan Le - tuanle67@yahoo.com
9. Bradley Paster - bpaster@gmail.com
10. Harald Collet - (see LinkedIn)
11. Alex Marshall - (see LinkedIn)
12. Parag Patkar (see linkedin)
13. Mark Trunper - markjtrunper@yahoo.com
14. Jeff McGlynn - (see linkedin)
15. Mark Sheridan (see linkedin)

Confidential - Produced In Response To Grand Jury Subpoena

AM-GJ-00005991
Page 4

**Financial analysts:**

Leonie Foong
Lone Pine Capital (HK) Limited
Room 3507, Edinburgh Tower,
The Landmark, 15 Queen's Road Central, Hong Kong
D: +852 3969 1218
T: +852 3969 1200
F: +852 3015 7881
E: LF@Lpcap.com

- Also at the same firm: Krishnan, Eashwar<ek@lpcap.com>; Gaonkar, Mala<mg@lpcap.com>

- Former JPMorgan tech analyst who has covered Autonomy extensively (now with Behrenberg) Daud Khan - 44-20-7155-6125 - daud_khan@gmail.com
- Deutsche Bank software analyst Marc Geall (former Autonomy employee): Work: +44 20 754 5849 / marc_geall@db.com
- Hedge fund (short): Reed Coleman / rcoleman@muraglobal.com / cel 516-445-7850 / office 1-212-984-8836
- Hedge fund (short): Mike Seidenberg / mseidenberg@rcm.com / 1-415-954-5458 / CELL PHONE 415-722-8533
- Hedge fund (short): Tim Steer / +44-20-7399-6000 / TIM.STEER@ARTEMISFUNDS.COM

-------------------------------------------------

*All information in the following article can be independently verified via public sources. For example, Autonomy and Verity Inc. earnings announcements, financial statements, investor presentations, regulatory filings, etc.*

# Key Questions HP Should be Asking about Autonomy's OEM Business

HP's $10.3B offer to purchase Autonomy has invited additional scrutiny of Autonomy's business model. One of the top two or two drivers in Autonomy's revenues and in the valuation of the company has been the OEM business, which is reported to grow 35% y-o-Y and 27% in Q2 2011 alone.

According to Autonomy the entire software industry - more than 400 software companies by Q2 2011 - is building software applications on Autonomy's IDOL search platform. The average OEM deal is reported as $200,000 software license with a 4% royalty rate. With almost 100% gross margin on royalties and 30% annual growth, this business is a key reason for Autonomy's valuation.

**Consider these facts:**

Analyzing Autonomy's quarterly earnings releases since 2006 demonstrates that the company has reported a suspiciously consistent number of quarterly OEM signings:

| Quarter | OEM Customer Add | Reported Revenue | Named customers |
|---|---|---|---|
| 1999 Q2 | **1** | | Octane |
| 1999 Q3 | - | | |
| 1999 Q4 | - | | Sybase, FileNET |
| 2000 Q1 | - | | Sybase |
| 2000 Q2 | - | | HP |
| 2000 Q3 | - | 0.2MM royalties | Documentum, Viador, Intershop |
| 2000 Q4 | - | 0.4MM royalties | Business Objects, e.piphany, Appropria, Portal Ware, iManage (now Autonomy) |
| 2001 Q1 | **4** | 0.7MM royalties; 1.7MM *or* 3.0MM total | BEA (now Oracle), Support.com |
| 2001 Q2 | 7 | 0.7MM royalties; 1.4MM *or* 2.6MM total | Vignette (now Oracle) |

Confidential - Produced In Response To Grand Jury Subpoena

AM-GJ-00005993
Page 6

AM-GJ-00005994
Page 7

| | | | |
|---|---|---|---|
| 2001 Q3 | 4 | 0.4MM royalties | CA |
| 2001 Q4 | 4 | 0.6MM royalties; 2.2MM total | CA, Eidos, Elsag |
| 2002 Q1 | 6 | 0.8MM royalties; 3.0MM total | EDS |
| 2002 Q2 | 4 | 0.8MM royalties; 2.7MM *or* 2.4MM total | ATG, Vignette (now Oracle) |
| 2002 Q3 | 4 | 0.6MM royalties; 2.3MM *or* 2.0MM total | Citrix |
| 2002 Q4 | - | 2.2MM *or* 3.2MM total | |
| 2003 Q1 | 5 | 2.2MM | Vignette, Novell, Saperion |
| 2003 Q2 | 5 | 2.4MM | Veritas, EDS |
| 2003 Q3 | 5 | 2.0MM | BEA (now Oracle), Novell |
| 2003 Q4 | - | 3.2MM | |
| 2004 Q1 | 4 | 3.0MM | |
| 2004 Q2 | 3 | 2.1MM | BEA, Vignette (now Oracle) |
| 2004 Q3 | 4 | 2.7MM | |

Confidential - Produced In Response To Grand Jury Subpoena

AM-GJ-00005995
Page 8

| | | | |
|---|---|---|---|
| 2004 Q4 | - | 2.7MM *or* 3.6MM | |
| 2005 Q1 | - | 3.2MM | |
| 2005 Q2 | 4 | | BEA |
| 2005 Q3 | - | 3.0MM | Vignette (now Oracle), Unigraphics |
| 2005 Q4 | 4 | | Symantec |
| 2006 Q1 | 13 | | Interwoven (now Autonomy), Kana, ZANTAZ (now Autonomy) |
| 2006 Q2 | 12 | | Interwoven (now Autonomy), Oracle, Cisco |
| 2006 Q3 | 13 | | SRA, EMC, Nortel, Sybase |
| 2006 Q4 | 14 | | HP, MatrixOne (now Dassault), OpenWave |
| 2007 Q1 | 15 | | Oracle, IBM, Symantec, HP, Iron Mountain (now Autonomy), Tibco |
| 2007 Q2 | 13 | | Siemens, Iron Mountain (now Autonomy), IBM, Dassault |
| 2007 Q3 | 13 | | Oracle, Case Central, Kana, Cisco, Fatwire (announced in 2002) |
| 2007 Q4 | 13 | | Vignette (now OpenText), Adobe, Oracle, EMC, Tablus, Xerox, Sybase, Symantec |
| 2008 Q1 | 12 | | Oracle, Symantec, Tumbleweed (now Axway and |

Confidential - Produced In Response To Grand Jury Subpoena

| Quarter | Number | MM | Companies |
|---|---|---|---|
|  |  |  | originally announced in 2004), Openwave |
| 2008 Q2 | 11 |  | Nortel, Talisma (originally announced in 2007), Verdasys, Yahoo! |
| 2008 Q3 | 12 |  | Xerox, HP, Kana, Hyland (originally announced in 2002), Tumbleweed (now Axway) |
| 2008 Q4 | 12 |  | Symantec, Dassault, Tridion |
| 2009 Q1 | 12 |  | Symantec, Proofpoint (originally announced in 2004 and 2011 announcement of OEM agreement with competitor ISYS), Verdasys |
| 2009 Q2 | 12 |  | Cisco, CCL, VMS, Siemens |
| 2009 Q3 | 11 | 24MM* | Adobe, Kana, Axway, Websense (originally announced in 2008) |
| 2009 Q4 | 12 | 27MM* | McAfee, HP, Trend Micro (originally announced in 2002), Sybase |
| 2010 Q1 | 11 | 29MM* | Adobe, McAfee, Siemens |
| 2010 Q2 | 9 | 38MM* | Dassault, IBM, Open Text, Oracle |
| 2010 Q3 | 12 | 31MM* | GE (an OEM partnership with IDX was first announced in 2005, IDX was acquired by GE in 2006), Iron Mountain, Symantec |
| 2010 Q4 | 10 | 34MM | HP, Nuance, Vericept (originally announced in 2008) |
| 2011 Q1 | 12 | 37MM | Symantec, HP |

Confidential - Produced In Response To Grand Jury Subpoena

AM-GJ-00005996
Page 9

| 2011 Q2 | 14 | 47MM | Xerox, Rand, McAfee, Open Text |
|---|---|---|---|
| **TOTAL** | **336** | | |

**Note 1:** Yellow highlighting indicates the very first public mention of a customer in end of quarter results announcements going back to 1999.

**Note 2:** FY2005 OEM revenues (the last time reported until 2009 Q3) were 13.8MM.

**Note 3:** Revenues marked with an asterisk are marked in Autonomy's financial statements with the following notice: "The above items are provided for background information and may include qualitative estimates."

**Note 4:** Verity Inc. was acquired in December 2005. Verity claimed to have 260 OEM applications using their technology at the time.

**Note 5:** Prior to 2005 there are financial statements with conflicting measures of OEM revenue. Subsequent financial statements, comparing to past results, do not agree with the results as originally stated. For example, see 2004 Q4.

**Uncanny consistency?**

According to the November 2010 Autonomy Investor Forum presentation, a team of only 5 OEM sales reps will always deliver between 9-14 OEM deals every quarter 5 years in a row. The number of quarterly deals never goes outside this range, a consistency that is practically impossible to achieve in real life. A LinkedIn search reveals that the OEM team has had at least 5 different managers in the last five years, a turn-over rate that would make it even more difficult to achieve consistency.

**Major Inconsistency in amount of reported OEM customers/applications.**

In November 2005, Verity claimed to have 260 OEM applications using their technology before Autonomy acquired the company. In Q4 2005, Autonomy claimed at least 15 *new* agreements in 2005 (representing $13.8M in annual revenues) growing from at least 60 OEMs as claimed in the 2004 annual report. In 2011, however, Autonomy only claims 400+ OEM applications, which does not square with the historic numbers (260+336) that add up to 596.
http://www.autonomy.com/content/News/Releases/2005/1116.en.html

**Few new OEM customers.**

Autonomy's has been reporting a declining number of new OEM customers with only 3 previously unannounced OEMs announced in the last 8 quarters.

**Where are the references?**

Autonomy's list of OEM references on their website is full of OEMs that have been acquired (Authoria, Escalate Retail), are out of business (Coemergence), or have replaced Autonomy's

Confidential - Produced In Response To Grand Jury Subpoena

AM-GJ-00005997
Page 10

OEM software (BEA, Stellent, Sybase, Verdasys, Dassault, etc.)

http://www.autonomy.com/content/Partners/OEMs/OEM-Portfolio/index.en.html

**Industry analysts now question actual OEM adoption.**

Independent industry analyst Leslie Owens at Forrester Research stated that software companies are in fact NOT building applications on Autonomy IDOL. This flies in the face of Autonomy's claims that 99% of the industry has standardized on Autonomy IDOL.

http://blogs.forrester.com/leslie_owens/11-08-19-what_is_autonomy_without_its_marketing

Other independent analysts, including The Real Story (formerly CMS Watch), are beginning to question Autonomy's OEM business:

http://www.realstorygroup.com/Blog/2215-Another-look-at-the-Autonomy-IDOL-OEM-business

http://cloudcomputing.sys-con.com/node/1958938

**OEMs are replacing Autonomy.**

Companies such as Oracle (BEA, PeopleSoft, Siebel, and Stellent), Adobe, Huron Consulting, and Dassault Systemes have publicly announced that they are replacing their Autonomy (or formerly Verity Inc.) OEM technology with open source or competing alternatives.  See supporting links below.

**Most OEMs do not actually use IDOL search platform, but only simplistic Keyview document file filtering.**

Most OEMs are not building applications on Autonomy's platform, only using simple document filtering software called Keyview (now re-branded IDOL Keyview). As independent industry analyst 451 Group points out, *"Autonomy doesn't distinguish between its two main OEM product when it announces OEM deals, but there's a big difference between OEMing IDOL and OEMing its Keyview document filters, as we have discussed before; we think a lot of the OEM deals are for the latter, rather than for IDOL itself; although we have no way of proving that, except to say that we speak regularly to these leading software vendors and they don't appear to be using IDOL as their core search and classification engine nearly as widely as Autonomy claims."*

http://blogs.the451group.com/information_management/2011/04/06/iron-mountain-autonomy-between-a-rock-and-a-hard-place/


**SUPPORTING LINKS - AUGUST and SEPTEMBER 2011**


**eDJ To Conduct Deeper Analysis of HP's Autonomy Acquisition**

http://ediscoveryjournal.com/2011/08/edj-to-conduct-deeper-analysis-of-hps-autonomy-acquisition/


**Proofpoint Selects ISYS Document Filters to Enhance Email Security and Compliance Solutions with High-Performance Text Extraction**

http://finance.yahoo.com/news/Proofpoint-Selects-ISYS-bw-2299096084.html

Confidential - Produced In Response To Grand Jury Subpoena

AM-GJ-00005998
Page 11

**Huron Consulting Replaces Autonomy with Nuix Software**

http://www.businesswire.com/news/home/20110815005654/en/Huron-Consulting-Replaces-Autonomy-Nuix

**"Hewlett-Packard: With Little Recourse to Stop the Autonomy Deal, What's Next for Shareholders?"**

*Bernstein Research, September 13, 2011*

*A.M. (Toni) Sacconaghi, Jr. (Senior Analyst), saccoaghi@bernstein.com, +1 212 407 5843*

*Eric C. Garfunkel, CFA, eric.garfunkel@bernstein.com, +1 212 969 6965*

*Mit R. Shah, mit.shah@bernstein.com, +1 212 969 2514*

**HP Investors' Exasperation Runs High, Bernstein Analyst Sacconaghi Says**

http://www.bloomberg.com/news/2011-09-14/hp-investors-exasperation-runs-high-bernstein-analyst-sacconaghi-says.html

**"HP offer for Autonomy: Searching for Meaning"**

*Deutsche Bank Global Markets Research, 23 August 2011*

*Marc Geall (Research Analyst), marc.geall@db.com, +44 20 754 58494*

**Understanding Autonomy's Family Tree**

http://www.realstorygroup.com/Blog/2219-Understanding-Autonomys-Family-Tree

*Mike Lynch told the Wall Street Journal that "Autonomy is one of the least acquisitive in the world".*

**HP's Autonomy Acquisition Creating Opportunities for Others?**

http://ediscoveryjournal.com/2011/09/hps-autonomy-acquisition-creating-opportunities-for-others/

**ADDITIONAL SUPPORTING LINKS**

Confidential - Produced In Response To Grand Jury Subpoena

AM-GJ-00005999
Page 12

**Selected list of companies replac**

GigaTrust - http://www.gigatrust.com/index.shtml
hpiccariello@gigatrust.com Harry Piccariello
Palisade Systems
Coemergence
Fanvire
NMS Imaging
Palisade Systems
MRO (IBM)
SAIC
Epiq
ProofPoint
LanDesk

Intralinks

LexisNexis Examiner

**Verdasys Replaces Autonomy IDOL with Attivio**

2009
http://www.autonomy.com/content/News/Releases/2009/0817_en.html

2011
http://www.verdasys.com/press_releases.php?id=82
http://www.attivio.com/poweringbusiness/case-studies/651-attivio-case-study-verdasys.html

**Sybase replaces Autonomy 'IDOL' Keyview with ksys document filtering software**
http://www.sybase.com/detail?_id=1081931

**Attensity replaces Autonomy 'IDOL' Keyview**
http://www.mspnews.com/news/2011/08/16/5708307.htm

**Intralinks replaces Autonomy IDOL with Attivio**
http://www.attivio.com/attivio-news/361-intralinks-selects-attivio-to-power-advanced-search-capabilities.html

**Dassault replaces Autonomy IDOL:**
http://pdir.techindat.cz/V6r2012/pdf/ENOVIA_ProductEnhancementOverview_V6R2012.pdf

"ENOVIA Full-text Search Server with Exalead (SXD) is introduced as a new search engine in this release. Once installed, ENOVIA Full-text Search Server with Exalead functions as the default search engine for all ENOVIA products. ENOVIA Full-text Search Server with Autonomy IDOL is still available as an alternative. However, Full-text Search Server with Exalead is a more powerful search engine and provides simpler administration."

**BEA replaces IDOL with Oracle Secure Enterprise Search:** http://download.oracle.com/docs/cd/E15019_01/xlp.1032/e14253/overview.htm

Confidential - Produced In Response To Grand Jury Subpoena

AM-GJ-00006000
Page 13

**Oracle Database 11g replaces Autonomy Keyview with Oracle Outside In for file filtering:** http://download.oracle.com/docs/cd/B28359_01/text.111/b28304/afilsupt.htm

Certain document formats are not supported if you upgrade from release 11.1.0.6 to 11.1.0.7. This is because Oracle Text filtering technology has been migrated to Oracle Outside In HTML Export technology. To filter these unsupported formats, you can plug in a third party filtering technology using USER_FILTER. See "USER_FILTER" for more information.

**PeopleSoft replaces Autonomy Verity K2**
http://blogs.oracle.com/peopletools/entry/new__peoplesoft_applications_search

PeopleSoft Applications Search framework uses Oracle's Secure Enterprise Search as its search engine. Most Customers will benefit from the new search when it is delivered with applications. However, customers can start deploying it after a Tools-only upgrade. In this case, however, customers would have to create their own indices and implement security.

**Oracle Stellent Replaces Autonomy Verity K2 with Oracle Secure Enterprise Search**
http://blogs.oracle.com/ecmalerts/entry/new__restricted-use_secure_ente

**Oracle replaces Verity K2 in Siebel**

http://www.destinationcrm.com/Articles/CRM-News/Daily-News/Oracle-Boosts-Siebel-CRM-42303.aspx
"As for search enhancements, Oracle Secure Enterprise Search 10g, its standalone search engine. is provided out-of-box with Siebel as part of the answer."

**Adobe replaces Autonomy IDOL with Lucene SOLR open source search in Adobe ColdFusion offering:**
http://osdir.com/ml/solr-user_lucene.apache.org/2011-08/msg00633.html

**"The billion dollar question; downgrading to Hold"**

*Deutsche Bank Global Markets Research, 10 October 2010*

*Marc Geall (Research Analyst), marc.geall@db.com, +44 20 754 58494*

This e-mail message, including any attachments, is for the sole use of the person to whom it has been sent, and may contain information that is confidential or legally protected. If you are not the intended recipient or have received this message in error, you are not authorized to copy, distribute, or otherwise use this message or its attachments. Please notify the sender immediately by return e-mail and permanently delete this message and any attachments. Gartner makes no warranty that this e-mail is error or virus free.

AM-GJ-00006001
Page 14

Confidential - Produced In Response To Grand Jury Subpoena