Gary S. Lincenberg - State Bar No. 123058
  glincenberg@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant Stephen Keith
Chamberlain

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | CASE NO. 3:18-cr-00577-CRB |
|---|---|
| Plaintiff, | **DEFENDANT STEPHEN CHAMBERLAIN'S NOTICE OF MOTION AND MOTION FOR BILL OF PARTICULARS, FEDERAL RULE OF CRIMINAL PROCEDURE 7(f); MEMORANDUM OF POINTS AND AUTHORITIES** |
| vs. | |
| MICHAEL RICHARD LYNCH AND STEPHEN KEITH CHAMBERLAIN | |
| Defendants. | |

Date:     November 24, 2021
Time:     1:30 p.m.
Crtrm.:   6

Assigned to Hon. Charles R. Brever

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on November 24, 2021 at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 6, 17th Floor, of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Stephen Chamberlain will and hereby does move for an order directing the government to file a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f). For the reasons set forth in the accompanying Memorandum of Points and Authorities, Chamberlain requests that the government be ordered to:

1. Identify, with specificity, all "agreements," "contracts," "transactions," "invoices," "statements," "entries to Autonomy's books and records," "quarterly and annual reports," and "other documents" referenced in Paragraphs 22(a) through 22(j) of the Superseding Indictment (ECF No. 21) ("SI"), as well as the names of all alleged coconspirators the government contends participated in each instance of conduct.

2. Identify all "others," "co-conspirators," "Autonomy officers," "finance officers," and "employees" referenced in Paragraphs 23 and 24 of the SI and its subparagraphs.

3. Identify all "false and misleading statements" that the government alleges were made by Chamberlain or his alleged coconspirators in Paragraphs 24(a) through 24(e) of the SI, as well as the approximate dates on which the government alleges those statements were made, the identity of the specific coconspirator the government alleges made the statement, and what the government contends was false and misleading about each such statement.

4. Identify the specific "writings, signs, signals, pictures, and sounds," that the government intends to present at trial as to Count 1, as alleged in Paragraph 26 of the SI, including the dates on which the government alleges that Chamberlain or any of his alleged coconspirators "did transmit, and caused to be transmitted by means of wire communication in interstate and foreign commerce," those "writings, signs, signals, pictures, and sounds," and the names of the coconspirators who made each alleged transmission.

5. For each of Counts 2 through 15 (Paragraph 28 of the SI), identify (1) any coconspirators, and/or aiders and abettors that the government alleges committed each offense; (2)

any alleged victims of each alleged offense; and (3) the specific theory of liability the government intends to pursue against Chamberlain.

6.      For each overt act allegedly committed in furtherance of the conspiracy charged in Count 17 in Paragraphs 34(a) through (q) of the SI, identify (1) which of the four alleged objects of the conspiracy (as stated in Paragraph 32) the government alleges were furthered by the act; (2) the identities of all alleged coconspirators the government alleges participated in the act; and (3) the basis on which the government contends that the act furthered the alleged conspiracy.

Chamberlain's motion is based on this notice, the accompanying Memorandum of Points and Authorities, the records in this case, and any argument that may be made at the hearing on this motion.

DATED:  November 1, 2021                Gary S. Lincenberg
                                        Bird, Marella, Boxer, Wolpert, Nessim,
                                        Drooks, Lincenberg & Rhow, P.C.


                                By:      /s/ Gary S. Lincenberg
                                        _____
                                             Gary S. Lincenberg
                                        Attorneys for Defendant Stephen Keith
                                        Chamberlain

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ...................................................................................................4

TABLE OF AUTHORITIES .............................................................................................5

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................7

I.       SUMMARY OF ARGUMENT ................................................................................7

II.      BACKGROUND.......................................................................................................8

      A.    Much of the Chamberlain Indictment Is Similar to the Hussain Indictment ............8

      B.    The Government Refuses to Provide Additional Information About Chamberlain's Alleged Involvement in the Fraudulent Scheme ...........................9

III.     ARGUMENT ..........................................................................................................10

      A.    Legal Standard...........................................................................................10

      B.    The Government Should Be Ordered to Identify Each Specific Statement It Contends Was "False and Misleading" ................................................................10

      C.    The Government Should Be Ordered to Identify All Currently Unnamed Coconspirators....................................................................................................14

      D.    The Government Should Be Ordered to Provide Clarifying Details About Its Theories of Chamberlain's Criminal Liability ...................................................16

           1.    Counts Two through Fifteen ........................................................16

           2.    Count Seventeen ........................................................................16

IV.     CONCLUSION ......................................................................................................17

DECLARATION OF GARY S. LINCENBERG ...........................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Alvarez*,
No. 14-cr-120-EMC, 2014 WL 7240670 (N.D. Cal. Dec. 19, 2014)....................................16

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) ...............................................................................................13

*United States v. DiCesare*,
765 F.2d 890 (9th Cir. 1985) ..............................................................................................10

*United States v. Etienne*,
No. 17-cr-93-WHA, 2019 WL 2548790 (N.D. Cal. June 20, 2019)...............................16, 17

*United States v. Feil*,
2010 WL 1525263 (N.D. Cal. Apr. 15, 2010) .................................................................12, 13

*United States v. Holmes*,
No. 18-cr-00258-EJD, 2020 WL 666563 (N.D. Cal. Feb. 11, 2020)....................11, 12, 13, 15

*United States v. Hussain*,
No. 16-cr-00462-CRB ..............................................................................................*passim*

*United States v. Liang Chen*,
No. 17-cr-00603-BLF, 2020 WL 6342931 (N.D. Cal. Oct. 29, 2020)...................................10

*United States v. Nachamie*,
91 F. Supp. 2d 565 (S.D.N.Y. 2000) ....................................................................................15

*United States v. Williams*,
No. 13-cr-764-WHO, 2015 WL 3830515 (N.D. Cal. June 19, 2015)....................................16

**Statutes**

15 U.S.C. § 78m ......................................................................................................................16

18 U.S.C. § 371 .......................................................................................................................16

18 U.S.C. § 1343 .....................................................................................................................11

18 U.S.C. § 1349 .....................................................................................................................11

18 U.S.C. § 1505 .....................................................................................................................16

18 U.S.C. § 1512 .....................................................................................................................16

18 U.S.C. § 1957 .....................................................................................................................16

1  **Other Authorities**

2  Federal Rule of Criminal Procedure 7(c)(1) .................................................................. 10

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      SUMMARY OF ARGUMENT

As Autonomy's Vice President of Finance, Defendant Stephen Chamberlain was involved in making thousands of the company's accounting decisions, statements to Autonomy's auditors, and other communications about Autonomy's finances. After years of investigation and a full trial of Chamberlain's immediate supervisor, the government now alleges that an unspecified number of Chamberlain's statements and communications over a nearly decade-long time frame were part of a conspiracy to defraud purchasers and sellers of Autonomy securities, including HP and its shareholders. But the SI does not tell Chamberlain *which* statements the government believes were false, nor does it identify everyone else it believes participated in this alleged conspiracy. And the government has refused to provide these particulars in correspondence. This refusal unfairly deprives Chamberlain of the opportunity to adequately prepare his defense against the SI's serious allegations of criminal conduct. He is entitled to receive this information so he can meaningfully prepare for trial.

As he informed the government last year, Chamberlain seeks additional detail regarding six specific sections of the SI. This information generally falls into three categories: (1) identification of the precise statements and communications that the government alleges that Chamberlain and his purported coconspirators falsely made to HP and Autonomy's auditors; (2) identification of the unnamed coconspirators alleged throughout those paragraphs; and (3) more specificity about the nature of and Chamberlain's alleged involvement in the criminal charges alleged throughout the SI. Courts in this district have ordered that the government specify similar categories of information in other cases involving broad conspiracy allegations.

The government's response brushed off his concerns, asserted in a conclusory fashion that the SI complied with applicable law, and referred him to both its voluminous production in this case and the trial record from *United States v. Hussain*, No. 16-cr-00462-CRB ("*Hussain*"). But it did not commit to limiting its presentation against Chamberlain to the theories it pursued in that earlier case, nor did it give Chamberlain a clue about which of the tens of millions of pages in its production contained the theories it plans to use at his trial.

Chamberlain's ability to prepare a defense and prevent unfair surprise at trial require the government to identify the limited universe of statements and transactions it plans to place at issue against him. The government is more than capable of doing so. If it intends to simply repeat the same theories it made against Hussain, it should be required to say so. Short of that, the government should be required to provide Chamberlain the details he requested.

## II.     BACKGROUND

### A.     Much of the Chamberlain Indictment Is Similar to the Hussain Indictment

The government filed its original indictment against Chamberlain (and his co-defendant Michael Lynch) on November 29, 2018 (ECF No. 1), and filed the SI on March 21, 2019 (ECF No. 21). The original indictment is a nearly verbatim copy of the indictment from *Hussain*. It alleged the same conspiracy to commit wire fraud between January 2009 and October 2011, as well as 13 of the 14 wire fraud counts based on specific communications in 2011. The Superseding Indictment added Count Fifteen (the additional wire fraud count alleged against Hussain that was omitted from the original indictment against Lynch and Chamberlain); Count Sixteen against Lynch alone; and Count Seventeen against both Lynch and Chamberlain. Count Seventeen alleges a separate conspiracy to commit four separate offenses between October 2011 and November 2018. SI ¶¶ 31–34.

Although Counts One through Fifteen largely mirror the *Hussain* indictment, there are significant differences between the two defendants. For one, Chamberlain was Hussain's subordinate and—unlike Hussain—had little or no direct involvement in Autonomy's high-level decision making. In the context of the HP acquisition, Chamberlain gathered information at the behest of Hussain and others in higher positions and had little interaction with HP representatives. Chamberlain is mentioned by name in only three of the 31 acts the government alleges were undertaken "in furtherance of the scheme to defraud," *see generally* SI ¶¶ 23(a)–(ee),[1] only once in Counts Two through Fifteen (and only then as the recipient, not sender, of the single email at

---

[1]     Hussain was mentioned by name eleven times in the same paragraphs in his indictment that the government duplicated in the Superseding Indictment. *See Hussain* Indictment ¶¶ 26(a)–(ee).

issue in Count Two), *see* SI ¶ 28, and only twice among the seventeen alleged overt acts in Count Seventeen (once because he was hired by an Invoke affiliate, allegedly at Lynch's behest, in 2016), *see* SI ¶ 34(o).

Chamberlain must assume, then, that a substantial portion of the government's case will involve *statements made by others* with whom Chamberlain may or may not have communicated. But in the course of his day-to-day activities as the Vice President of Finance, Chamberlain made innumerable statements regarding Autonomy's transactions, both internally and to the company's auditors. So did his colleagues, some of whom are presumably unnamed coconspirators. The SI simply alleges that some portion of these statements were fraudulent, without specifying which ones, making it difficult for Chamberlain to identify the specific potential statements and communications he will be forced to defend at trial.

**B.      The Government Refuses to Provide Additional Information About Chamberlain's Alleged Involvement in the Fraudulent Scheme**

On August 26, 2020, Chamberlain, through counsel, sent the government a letter requesting more information about the nature of the charges against him. *See* Declaration of Gary S. Lincenberg ("Lincenberg Decl.") Ex. 1. The letter requested that the government provide particulars as to the six paragraphs in the SI that are at issue in this motion. At a general level, Chamberlain requested that the government identify (1) the specific allegedly false statements that it intends to present at trial to prove the charges against Chamberlain, (2) the identities of the unnamed coconspirators referenced throughout the SI, and (3) the government's theory of how Chamberlain's single alleged over act in Count Seventeen related to the other acts and objects of the conspiracy.

The government responded on October 28, 2020. See Lincenberg Decl. Ex. 2. Its response did not address the categories of information specified in the initial letter or provide any of the requested details. Instead, the government asserted, in conclusory fashion, that the SI "meets or exceeds the requirements of Rule 7." *Id.* at 2. It then claimed that a bill of particulars "is particularly unnecessary in light of the litigation" in the *Hussain* case, directed Chamberlain to the record in that trial, and claimed as to Count Seventeen, "the government's theory and evidence are

readily ascertainable from the discovery that has been provided." *Id.* The government stopped short of stating that it would not pursue any theories other than those it had pursued in *Hussain*. Nor did it direct Chamberlain to where in the multiple terabytes—and tens of millions of pages—of discovery the government has produced so far, he could "ascertain" the government's intended theory.

## III.   ARGUMENT

### A.   Legal Standard

An indictment is required to provide a defendant with "the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "A bill of particulars is appropriate when the indictment is insufficient to permit the preparation of an adequate defense." *United States v. DiCesare*, 765 F.2d 890, 897 (9th Cir. 1985). A bill of particulars "has three functions":

> to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, to avoid or minimize the danger of surprise at the time of trial, and to enable him to plead his acquittal or conviction in bar of another prosecution for the same offense when the indictment itself is too vague, and indefinite for such purposes.

*United States v. Liang Chen*, No. 17-cr-00603-BLF, 2020 WL 6342931, at *4 (N.D. Cal. Oct. 29, 2020) (quoting *United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979)). Here, a bill of particulars is necessary to enable Chamberlain to prepare for trial and avoid unfair surprises from the government's case. The Court should order the government to provide one.

### B.   The Government Should Be Ordered to Identify Each Specific Statement It Contends Was "False and Misleading"

Paragraphs 22, 24, and 26 each purport to describe the various means and methods—i.e., the allegedly fraudulent statements—the government claims Chamberlain made (or helped make) to further the alleged conspiracy. But these paragraphs are woefully lacking in detail:

- Paragraph 22 and its subparagraphs describe the "variety of means and methods" allegedly employed by Chamberlain and others in furtherance of the fraud alleged in the indictment. But these paragraphs contain no details about the "agreements," "contracts," "false and misleading statements," "fraudulent entries," or "false and misleading quarterly annual reports" referenced in its subparagraphs.

- Paragraph 24 alleges that Chamberlain and his alleged coconspirators "caused Autonomy to make materially false and misleading statements directly to HP regarding Autonomy's financial condition, performance, and business," but does not identify any specific statements.

- Paragraph 26 alleges that Chamberlain conspired with others to "transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of [18 U.S.C. §§ 1343 and 1349]," but it does not identify any specific "writings, signs, signals, pictures, and sounds" that the government alleges were fraudulent.

These paragraphs do not provide enough information for Chamberlain to understand with particularity the conduct of which the government intends to accuse him at trial. Autonomy was a publicly-traded company that engaged in thousands of transactions a year, and Chamberlain no doubt made made countless "statements" to other Autonomy employees (some of whom are named in the SI and other of whom are presumably the coconspirators referenced throughout the SI) as well as its auditors about those transactions. He should not be forced to guess which of those hundreds of thousands of statements the government believes are false and fraudulent; requiring him to do so would essentially allow the government to shift its theories on a whim, including during trial.

Courts in this district have held that defendants facing similar conspiracy charges are entitled to more details. In *United States v. Holmes*, No. 18-cr-00258-EJD, 2020 WL 666563 (N.D. Cal. Feb. 11, 2020), the defendants, similarly accused of a broad-ranging fraudulent scheme, moved for a bill of particulars seeking details about alleged coconspirators and identification of the specific misrepresentations the government alleged they had made. The indictment in that case alleged, among other things, that the defendants "made misrepresentations to the media, on the Theranos website, and in advertisements and marketing materials," and that these misrepresentations included "implicit" ones. *Id.* at *9. The court partially granted the defendants' request for a bill of particulars and ordered the government to "identify (1) the specific implicit and explicit false and fraudulent misrepresentations in the advertisements and marketing materials, (2) what about them is false, (3) who made them, and (4) how Defendants caused them to be made." *Id.* Chamberlain seeks similar categories of information.

1    Likewise, *United States v. Feil*, 2010 WL 1525263 (N.D. Cal. Apr. 15, 2010), involved an

2  indictment that alleged three separate multiyear conspiracies: two related to marijuana distribution,

3  and one to engage in monetary transactions with criminally derived property. *Id.* at *2. The court

4  partially granted a motion for a bill of particulars specifically as to "the Defendants' overt acts in

5  support of the alleged conspiracy, or conspiracies" and "the 'manner in which [Defendants] and

6  each alleged coconspirator, whether or not named in the indictment, contributed to the charged

7  conspiracy' or conspiracies, and the times and places of such participation." *Id.* at *3. The court

8  noted that while a bill of particulars is not always warranted in conspiracy cases, the time span of

9  the alleged conspiracy ("three to seven years") and the volume of discovery ("over 70,000

10 pages"), warranted requiring the government to provide more information. *Id.*

11   Chamberlain's situation is on par with the defendants in *Holmes*, and is more compelling

12 that the defendants in *Feil*. Here, like in *Holmes*, "the universe of potential misrepresentations is

13 vast," 2020 WL 666563 at *9: it includes potentially every statement or communication

14 Chamberlain *and other Autonomy employees* had with each other, with HP, and with Autonomy's

15 auditors. Moreover, the alleged misrepresentations in this case are of a different and more

16 technical nature—the truth or falsity of the accounting treatment of a particular transaction will

17 require analysis of the details of the underlying transaction, an application of the relevant

18 accounting principles, and an understanding of the ultimate statement itself. To be able to prepare

19 a meaningful defense against these allegations, Chamberlain will need to analyze each statement

20 and any transactions or agreements to which it relates, including, if needed, by working with

21 expert witnesses who can address the government's claims of accounting impropriety. That would

22 be impossible if he is forced to consider every conceivable transaction, statement, or

23 communication that the government elects to raise at trial without prior notice.

24   In its October 28, 2020 letter, the government argues that the Chamberlain "has the benefit

25 of a witness list, and exhibit list, a trial record, and an appeal record" from the *Hussain* case. But

26 the letter does not state that the *Hussain* record represents the universe of potential evidence the

27 government may use against Chamberlain. In addition, Chamberlain held a different (and lower-

28 level) position than Hussain, and the government's decision to level nearly identical accusations

against Chamberlain only raises more questions than it answers. For example, Paragraph 24 alleges that Chamberlain "caused Autonomy to make materially false and misleading statements directly to HP," and is identical to an allegation in the Hussain indictment. But unlike Hussain, *Chamberlain rarely, if ever, made any statements "directly to HP."* If it is, in fact, the government's position that it will limit its presentation at trial to evidence relating to transactions, statements, and communications that it presented in *Hussain*, the government should be compelled to say so. However, if the government intends to prove its case against Chamberlain based on allegedly fraudulent statements that it did not introduce in *Hussain*, Chamberlain should be made aware of them.

Moreover, like in both *Holmes* and *Feil*, the massive volume of discovery provided by the government obscures the specific theories it plans to pursue at trial. The government has produced over six terabytes of material, amounting to tens of millions of pages. Lincenberg Decl. ¶ 4. More is expected. The court in *Holmes* observed that the "immense" amount of discovery in that case— "more than 20 million pages of documents"—"create[s] a substantial risk that Defendants may be unfairly surprised at trial." 2020 WL 666563 at *9. And that volume utterly eclipses the "over 70,000 pages of discovery" that the court found sufficient to warrant a bill of particulars in *Feil*. 2010 WL 1525263 at *3; *see also United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) ("The Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified ….").

Finally, the need for particulars is uniquely strong here because there is such a vast body of transcripts and documents that are unlikely to be relevant. For example, there was an eight-month civil trial in the United Kingdom, which involved a plethora of accounting issues and sub-issues which are unlikely to be part of the government's case. HP's allegations in that case spanned eight separate categories, and each category involved dozens, if not hundreds, of individual transactions which in turn involved countless accounting determinations subject to both internal and external auditing. Without more particulars from the government, preparing for a criminal case that parallels that civil case would be practically impossible. Counsel should not have to spend thousands of hours spinning wheels to try to understand which particulars are at play in this case

and which are not.

The government seeks to convict Chamberlain because he allegedly made, or helped others make, fraudulent statements to Autonomy's auditors and HP's investors. Yet it refuses to tell Chamberlain what statements it is talking about and expects him to sift through tens of millions of pages to guess at what it will present at trial. Chamberlain cannot prepare a defense, and cannot receive a fair trial, unless he receives more information. The Court should order the government to provide it.

C.     **The Government Should Be Ordered to Identify All Currently Unnamed Coconspirators**

Even where the SI does provide descriptions of specific incidents, it still omits the identities of many of the alleged coconspirators for whose acts the government seeks to hold Chamberlain criminally liable. This is apparent from the three parts of the SI that Chamberlain referenced in his letter to the government:

- The subparagraphs for Paragraph 23 purport to allege 31 specific acts supposedly committed in furtherance of the charged conspiracy, but do not identify the participants who performed those acts. Specifically, Paragraphs 23(e), (f), (p), (t), (w) and (x) alleges specific acts undertaken by alleged unnamed coconspirators, and Paragraphs 23(a) through (d), (g) through (k), (m), (o), (s), (u), (y), and (z) *do not allege the involvement of a coconspirator at all.*

- Paragraph 28—specifically the allegations for Counts Two through Fifteen—specifies the date, time, and general description of the alleged wire fraud violations but, for most, do not identify the originators of the alleged fraudulent communications. Only one of the counts identifies Chamberlain specifically: Count Two, which alleges that he was the recipient (not sender) of an email. Nine of the counts do not name any individuals at all.

- Paragraphs 34(g), (h), (i), and (n)—each of which describes an alleged overt act undertaken in furtherance of the Count Seventeen conspiracy charge—expressly reference unnamed co-conspirators.

The government should be required to identify all unnamed coconspirators it believes were involved in the events described in these paragraphs (whether or not the paragraphs expressly use the word "coconspirator." Courts in this district apply a six-factor test to determine whether the

government should be required to identify unnamed coconspirators:

> (1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to coconspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's investigation.

*Holmes*, 2020 WL 666563 at *10 (citing *United States v. Barrett*, 153 F. Supp. 3d 552, 572 (E.D.N.Y. 2015)). Those factors support disclosure here.[2]

*First*, the number of potential coconspirators is large: potentially all other Autonomy employees and auditors could qualify. *Second*, the duration and breadth of the alleged conspiracy is also extensive: the SI alleges conduct between 2009 and 2018, nearly a decade. *Third*, the government has refused to provide information about the identities of the coconspirators in other sources. *Fourth*, as discussed above, the volume of pretrial disclosure is massive: tens of millions of pages spanning six terabytes of data. Lincenberg Decl. ¶ 4. *Fifth*, the government has never claimed that revealing the identity of unnamed coconspirators would result in any "potential danger" to them. *Cf. United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) (finding "no legitimate concern that disclosing the names of unindicted co-conspirators will endanger [them]" because "this case charges Medicare fraud—not narcotics trafficking or murder"). And *sixth*, the government's investigation would not be harmed by identifying the alleged coconspirators—since it has already completed a trial for one of them, its investigation is presumably complete. These factors entitle Chamberlain to know who made the statements for which the government seeks to hold him criminally liable. *See Holmes*, 2020 WL 666563 at *11 (requiring the government "to provide the names of speakers" by identifying specific misrepresentations).

---

[2] The court in *Holmes* denied the defendants' separate request for the identity of all unnamed coconspirators, but only because it granted their request for the specific misrepresentations the government alleged they made, which "require[d] the Government to provide the names of speakers." 2020 WL 666563 at *11.

1

**D.**     **The Government Should Be Ordered to Provide Clarifying Details About Its**

2          **Theories of Chamberlain's Criminal Liability**

3          **1.     Counts Two through Fifteen**

4          Counts Two through Fifteen charge Chamberlain with 14 separate acts of wire fraud, but

5    do not explain what theory of liability the government intends to prove at trial as to Chamberlain.

6    Only one of these counts—Count Two—even references Chamberlain by his initials, and only as

7    the *recipient*, not sender, of an email. It is therefore unclear how the government intends to

8    establish Chamberlain's criminal liability. Does the government allege Chamberlain is the

9    principal who made each allegedly fraudulent communication? That he aided and abetted those

10   who did? That he is liable under a *Pinkerton* theory?

11         Courts in this district have consistently held that Chamberlain is entitled to this

12   information. *See, e.g.*, *United States v. Etienne*, No. 17-cr-93-WHA, 2019 WL 2548790, at *6

13   (N.D. Cal. June 20, 2019) (ordering the government to provide a bill of particulars "clarifying the

14   variant of principal liability it will rely on at trial"); *United States v. Williams*, No. 13-cr-764-

15   WHO, 2015 WL 3830515, at *2 (N.D. Cal. June 19, 2015) (ordering a bill of particulars to

16   "include the government's factual theory of the defendant's involvement" in a crime, "including

17   whether he was a principal or aided others" or "had accomplices"); *United States v. Alvarez*, No.

18   14-cr-120-EMC, 2014 WL 7240670, at *3 (N.D. Cal. Dec. 19, 2014) (ordering the government to

19   "specify its theory of prosecution as to each defendant," including whether "they [are] principals,

20   and if so, on what variant of principal liability will the government rely").

21         Accordingly, for each of Counts Two through Fifteen, the Court should order the

22   government to specify its theory of liability as to Chamberlain.

23         **2.     Count Seventeen**

24         Count Seventeen is the only "new" charge against Chamberlain that was not charged

25   against Hussain. It alleges a single multi-object conspiracy under 18 U.S.C. § 371 to violate four

26   different federal statutes: 15 U.S.C. § 78m (circumventing a system of internal accounting controls

27   of an issuer of securities); 18 U.S.C. § 1512 (witness tampering); 18 U.S.C. § 1505 (obstruction of

28   proceedings before departments, agencies, and committees); and 18 U.S.C. § 1957 (engaging in

monetary transactions in property derived from specified unlawful activity). SI ¶ 32. The SI then alleges 17 separate "overt acts" undertaken in furtherance of the conspiracy. Chamberlain is mentioned by name in only two alleged overt acts:

- Paragraph 34(e) alleges that "[o]n or about February 3, 2012, CHAMBERLAIN and Hussain directed an HP finance employee to falsely record approximately $5.5 million in revenue to be included in HP's financial statements for the period ending January 31, 2012."

- Paragraph 34(o) alleges that "[i]n or around May 2016, LYNCH caused an Invoke affiliate to hire CHAMBERLAIN."

Chamberlain does not seek a bill of particulars because these allegations lack detail—instead, he seeks more information regarding how the government believes that Chamberlain's involvement in the alleged conspiracy ties into the overall scheme. On its face, it is difficult to see how Chamberlain's sole affirmative act alleged in this count—his alleged instruction that an employee falsely record revenue—ties into the same overall conspiracy as Lynch's decision to transfer funds between his own bank accounts, or Lynch's purchase of Hussain's shares. It is also difficult to see how Chamberlain's alleged conduct could be part of a conspiracy to "pay[] hush money" to witnesses or "launder[] the proceeds of the Autonomy acquisition."

Chamberlain is entitled to understand how his single alleged overt act in February 2012 that allegedly involves conduct six years after Chamberlain left HP Autonomy ties into the multi-object conspiracy alleged in the count. *See United States v. Etienne*, No. 17-cr-93-WHA, 2019 WL 2548790, at *5 (N.D. Cal. June 20, 2019) (ordering the government to provide a bill of particulars explaining how an alleged crime "furthered the conspiracy"). Accordingly, for each of the overt acts alleged in Paragraphs 34(a) through (q), the government should be required to identify which of the four alleged objects of the conspiracy (as alleged in Paragraph 32) the government alleges were furthered by the act, and explain how those acts furthered their respective objects.

## IV.    CONCLUSION

For these reasons, the Court should order the government to provide the information Chamberlain requested in his August 26, 2020 letter and:

1.    Identify, with specificity, all "agreements," "contracts," "transactions," "invoices,"

"statements," "entries to Autonomy's books and records," "quarterly and annual reports," and "other documents" referenced in Paragraphs 22(a) through 22(j) of the Superseding Indictment, as well as the names of all alleged coconspirators the government contends participated in each instance of conduct.

2.     Identify all unnamed coconspirators referenced throughout Paragraph 23 of the Superseding Indictment and its subparagraphs.

3.     Identify all "false and misleading statements" that the government alleges were made by Chamberlain or his alleged coconspirators in Paragraphs 24(a) through 24(e) of the Superseding Indictment, as well as the approximate dates on which the government alleges those statements were made, the identity of the specific coconspirator the government alleges made the statement, and what the government contends was false and misleading about each such statement.

4.     Identify the specific "writings, signs, signals, pictures, and sounds," that the government intends to present at trial as to Count 1, as alleged in Paragraph 26 of the Superseding Indictment, including the dates on which the government alleges that Chamberlain or any of his alleged coconspirators "did transmit, and caused to be transmitted by means of wire communication in interstate and foreign commerce," those "writings, signs, signals, pictures, and sounds," and the names of the coconspirators who made each alleged transmission.

5.     For each of Counts 2 through 15, identify (1) any coconspirators that the government alleges committed each offense; (2) any alleged victims of each alleged offense; and (3) the specific theory of liability the government intends to pursue against Chamberlain.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1     6.     For each overt act allegedly committed in furtherance of the conspiracy charged in

2  Count 17 in Paragraphs 34(a) through (g), identify (1) which of the four alleged objects of the

3  conspiracy (as stated in Paragraph 32) the government alleges were furthered by the act; (2) the

4  identities of all alleged coconspirators the government alleges participated in the act; and (3) the

5  basis on which the government contends that the act furthered the alleged conspiracy.

6  DATED: November 1, 2021              Respectfully submitted,

7                                      Gary S. Lincenberg
                                       Bird, Marella, Boxer, Wolpert, Nessim,
8                                      Drooks, Lincenberg & Rhow, P.C.

9

10
                                       By:    /s/ Gary S. Lincenberg
11                                            Gary S. Lincenberg
                                       Attorneys for Defendant Stephen Keith
12                                     Chamberlain

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF GARY S. LINCENBERG

I, Gary S. Lincenberg, declare as follows:

1.      I am an active member of the Bar of the State of California and a Principal with Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow PC, attorneys of record for Defendant Stephen Keith Chamberlain in this action. I make this declaration in support of Defendant Stephen Chamberlain's Motion for Bill of Particulars. Except for those matters stated on information and belief, I make this declaration based upon personal knowledge and, if called upon to do so, I could and would so testify.

2.      Attached as **Exhibit 1** is a true and correct copy of a letter dated August 26, 2020 sent by my colleague Ariel Neuman by email to Adam Reeves, Robert Leach, and William Frentzen.

3.      Attached as **Exhibit 2** is a true and correct copy of Mr. Leach's letter response, dated October 28, 2020.

4.      Page 2 of the government's response claims that "the government's theory and evidence" as to Count Seventeen "are readily ascertainable from the discovery that has been provided." To date, the government has produced six volumes of discovery materials, comprised of approximately 640 load files, totaling approximately six terabytes of documents, amounting to approximately 4.4 million documents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I executed this declaration on November 1, 2021, at Los Angeles, California.


/s/ Gary S. Lincenberg
Gary S. Lincenberg

# EXHIBIT 1



**Ariel A. Neuman**
aneuman@birdmarella.com

1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone (310) 201-2100
Facsimile (310) 201-2110
www.BirdMarella.com

File 4142.2

August 26, 2020

Adam Reeves                                    William Frentzen
Chief Assistant United States Attorney         Assistant United States Attorney
adam.reeves@usdoj.gov                          william.frentzen@usdoj.gov

Robert S. Leach
Assistant United States Attorney
robert.leach@usdoj.gov

Re:    *United States v. Michael Lynch and Stephen Chamberlain*, CR 18-577-CRB

Dear Messrs. Reeves, Leach, and Frentzen:

We write to request additional information regarding the Superseding Indictment (SI) against our client Stephen Chamberlain in order to obviate a motion for a bill of particulars under Federal Rule of Criminal Procedure 7(f). Please respond at your convenience.

As you know, an indictment is required to provide "the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "A bill of particulars is appropriate when the indictment is insufficient to permit the preparation of an adequate defense." *United States v. DiCesare*, 765 F.2d 890, 897–98 (9th Cir. 1985). Although the SI provides sufficient detail for some allegations, other allegations are vaguer and create substantial uncertainty about the potential statements, transactions, and communications that are intended to be covered. We are privy to enough of the Hussain trial, the UK civil trial, and the proceedings before the UK's Financial Reporting Council to recognize that the broad and all-encompassing nature of the allegations as currently presented in the SI could seriously impact our ability to prepare a meaningful defense to these allegations unless more specification is provided. Moreover, having additional particulars regarding the allegations throughout the SI can both save an enormous number of hours of preparation time and help focus the trial substantially.

*First*, **Paragraph 22** and its subparagraphs describe the "variety of means and methods" allegedly used by Mr. Chamberlain and his alleged coconspirators in furtherance of the fraud alleged in the indictment. The subparagraphs, however, are short on particulars. For example, they contain virtually no particulars about the subject transactions, the allegedly false statements, or the identities of the alleged coconspirators (other than Michael Lynch and Sushovan Hussain) who allegedly used these means and methods to further the objects of the alleged conspiracy:

Adam Reeves
Robert S. Leach
William Frentzen
August 26, 2020
Page 2

- Paragraph 22(a) alleges that Mr. Chamberlain and his alleged coconspirators participated in a scheme to "[a]rtificially inflat[e] revenues" by backdating unspecified "agreements," recording revenue relating to various unspecified "contracts" and "reciprocal or roundtrip transactions," and "structuring or restructuring" unspecified "contracts." But it does not identify the contracts at issue, the parties to these contracts, the relevant transactions, or the dates on which the alleged fraudulent conduct occurred. As you know, Autonomy engaged in, and the government has produced discovery related to, a vast number of transactions that occurred during the relevant time period. The SI's lack of specificity prevents Mr. Chamberlain from being able to identify (1) the specific means and methods the government believes he *personally* used to further the alleged conspiracy; (2) the specific means and methods the government believes his alleged coconspirators used to further the alleged conspiracy; and (3) the specific transactions the government believes were implicated in the alleged conspiracy.

- Paragraph 22(b) alleges that Mr. Chamberlain and his coconspirators made "false and misleading statements to Autonomy's independent auditor." But it does not identify the content or dates of those statements. Given that Mr. Chamberlain communicated regularly with Autonomy's auditors *and* the conspiracy is alleged to have run for nearly three years (beginning more than a decade ago), this allegation creates a functionally limitless universe of potential statements even if narrowed to the ones in which he was personally involved. Of course, given the nature of the conspiracy charge, the universe of statements that the government might choose to present at trial is even broader.

- Paragraphs 22(d) through 22(j) allege that Mr. Chamberlain and others made various "false and misleading statements" without specifying the dates (or even a range of dates) on which those statements were made, to whom those statements were made, or in what context. Nor does the indictment identify with any particularity the content of those statements, opting instead for vague and general descriptions. This presents the same issues as for Paragraph 22(b).

In light of the above, **please identify with specificity the "agreements," "contracts," "transactions," "invoices," "statements," "entries to Autonomy's books and records," "quarterly and annual reports," and "other documents" referenced in Paragraphs 22(a) through 22(j) of the SI, as well as the names of all alleged coconspirators the government contends participated in each instance of conduct.**

**Paragraph 23** lists 33 specific acts allegedly committed in furtherance of the charged conspiracy. Although these allegations contain more detail concerning relevant dates and events than those contained in Paragraph 22, they are still missing the details necessary for Mr. Chamberlain to be able to prepare his defense. Mr. Chamberlain is alleged to have participated in

Adam Reeves
Robert S. Leach
William Frentzen
August 26, 2020
Page 3

three of these 33 acts. SI ¶¶ 23(q), (p), (aa). Six of the overt acts are alleged to have been committed by unnamed coconspirators. SI ¶¶ 23(e), (f), (p), (t), (w), (x). Fifteen of these acts *do not allege the involvement of a coconspirator at all*. SI ¶¶ 23(a)–(d), (g)–(k), (m), (o), (s), (u), (y)–(z).  Accordingly, **please identify the specific coconspirators you allege engaged in each of the overt acts alleged in Paragraph 23 and its subparagraphs.**

**Paragraph 24** alleges that Mr. Chamberlain and his alleged coconspirators "caused Autonomy to make materially false and misleading statements directly to HP regarding Autonomy's financial condition, performance, and business." But it does not provide the dates of those statements (or even a date range within which the alleged statements were made) or identify any coconspirator allegedly involved in making each statement, nor what those specific statements were. As I recall from our discussions of a few years ago, here you were focused on Mr. Chamberlain's involvement in preparing a Top 40 list of customers in 2011. If that is the sum total of the allegedly false and misleading statements referenced here, please so confirm. If it is not, without more detail, it will be impossible for Mr. Chamberlain to prepare a defense to address each allegedly false or misleading statement the government intends to present at trial. **Please (1) identify each false or misleading statement the government contends was made by Mr. Chamberlain or his alleged coconspirators; (2) the identity of the specific speaker— whether Mr. Chamberlain or a different coconspirator—the government alleges made the statement; and (3) what the government contends was false and misleading about each such statement**.

**Paragraph 26** purports to describe the conduct constituting conspiracy to commit wire fraud. It generally alleges that Mr. Chamberlain "did transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343." But it does not contain a single detail that would allow Mr. Chamberlain to determine what "writings, signs, signals, pictures, and sounds" the government is referring to. Of course, the universe of wire transmissions during the relevant time period is virtually limitless. This lack of specificity presents the same issues identified above. Accordingly, **please identify all specific "writings, signs, signals, pictures, and sounds," that the government alleges relate to Count 1, as alleged in Paragraph 26 of the SI, including the names of the coconspirators the government alleges made each transmission and the dates on which the transmissions allegedly took place.**

**Counts 2 through 15** do not specify the alleged fraudulent statements in the various video conferences, conference calls, press releases and emails. Nor do the Counts specify who made the relevant statements. Furthermore, given that Mr. Chamberlain is not alleged to have had any direct involvement in thirteen of the fourteen transmissions described in these counts, the government's theory of liability as to Mr. Chamberlain is unclear. To the extent the government

Adam Reeves
Robert S. Leach
William Frentzen
August 26, 2020
Page 4

is alleging in these counts that Mr. Chamberlain is liable for the acts of others, he is entitled to know (1) which specific coconspirators the governments alleges committed the specific criminal conduct alleged in each count, and (2) the specific manner in which the government believes each wire transmission furthered a conspiracy in which he was involved. Without more information, we are left uncertain regarding what statements the government believes were false, which specific financial transactions those statements relate to, and how the government intends to prove Mr. Chamberlain's guilt as to each count. Accordingly, for each of Counts Two through Fifteen, **please (1) identify any coconspirators that the government alleges committed each offense; and, (2) to the extent Mr. Chamberlain's alleged liability is based on the acts of others, how each offense furthered the object or objects of an alleged conspiracy in which Mr. Chamberlain was involved.**

**Count 17** alleges a conspiracy to violate *four* separate federal criminal statutes through seventeen overt acts over seven years. There is no indication which object of the conspiracy was allegedly furthered by each overt act, or how. The relationship between the overt acts is not apparent from the face of the SI. For example, it is entirely unclear how the single overt act Mr. Chamberlain is alleged to have committed in February 2012 (mere months before he left the company) furthers each of the four alleged objects. Similarly, it is entirely unclear how the single overt act Mr. Chamberlain is alleged to have committed relates to a conspiracy that allegedly involved Mr. Lynch's purchase of shares from Mr. Hussain in June 2018. Further, four of the overt act allegations reference unnamed coconspirators. SI ¶¶ 34(f)–(h), (n). **For each overt act alleged in Paragraphs 34(a) through (g), please (1) identify which of the four alleged objects of the conspiracy (as stated in Paragraph 32) the government alleges were furthered by the act; (2) identify all alleged coconspirators the government alleges participated in the act; and (3) the basis on which the government contends that the act furthered the alleged conspiracy.**

* * *

Our requests for additional information are consistent with the law of both this circuit and this court in particular. Courts in the Northern District of California have granted motions for a bill of particulars for indictments that omitted similar details. *See, e.g.*, *United States v. Alvarez*, 2014 WL 7240670 (N.D. Cal. Dec. 19, 2014) (ordering bill of particulars detailing attendees at meetings of coconspirators, what was said at those meetings, and what acts each co-defendant committed to indicate participation in the conspiracy); *United States v. Cervantes*, 2013 WL 345876 (N.D. Cal. July 9, 2013) (ordering bill of particulars to clarify allegation that defendants engaged in "other criminal conduct"); *United States v. Ablett*, 2010 WL 3063145 (N.D. Cal. Aug. 3, 2010) (ordering government to clarify the phrase "among other things" in the first paragraph of an indictment).

Adam Reeves
Robert S. Leach
William Frentzen
August 26, 2020
Page 5

Courts have recognized the heightened need for a bill of particulars in cases like this one, that involve multi-year conspiracy allegations and voluminous discovery. For example, in *United States v. Feil*, 2010 WL 1525263 (N.D. Cal. Apr. 15, 2010), the court partially granted a motion for a bill of particulars specifically as to "the Defendants' overt acts in support of the alleged conspiracy, or conspiracies" and "the 'manner in which [Defendants] and each alleged coconspirator, whether or not named in the indictment, contributed to the charged conspiracy' or conspiracies, and the times and places of such participation." *Id.* at *3. The court noted that while a bill of particulars is not always warranted in conspiracy cases, the time span of the alleged conspiracy ("three to seven years") and the volume of discovery ("over 70,000 pages"), warranted requiring the government to provide more information. *Id.* The charges against Mr. Chamberlain span a far longer period, and the volume of discovery is significantly larger.

More recently, in an order partially granting a request for a bill of particulars in the Theranos matter, *United States v. Holmes*, No. 5:18-cr-00258-EJD,[1] the court ordered the government to provide additional information regarding the government's charge that the defendants engaged in a scheme to defraud. Based on the "vast" universe of potential statements at issue and the "immense" volume of discovery produced by the government, the Court ordered the government to disclose (1) details of the alleged scheme to defraud, including "the specific implicit and explicit false and fraudulent misrepresentations," "what about them is false," "who made them," and "how Defendants caused them to be made." *Holmes* Order at 13–16. The Court also ordered the government to disclose the names of all coconspirators known to the government. *Id.* at 17–19.

As with the cases described above, this case necessitates more specific government disclosures than are contained in the SI. The need for identification of all specific transactions and statements at issue is especially critical in this case because of the large number of transactions in which Autonomy engaged during the relevant time period, and the complexity of the accounting related to many of those transactions. As you are aware, during each *quarter* Autonomy engaged in scores of commercial transactions, each of which we could be required to analyze if we do not receive further clarification. Mr. Chamberlain's ability to prepare his defense concerning a particular statement relating to a particular transaction requires a thorough analysis of both the statements and the underlying transactions they concern. This is not a task that can reasonably be completed the night after a transaction is presented at trial. It is therefore critical to Mr. Chamberlain's ability to prepare a defense that the government define a limited universe of statements and transactions that it intends to use to support its criminal charges.

---

[1]     *United States v. Holmes*, No N:18-cr-00258-EJD, ECF No. 330 (N.D. Cal. Feb. 11, 2020) (the "*Holmes* Order") (**Exhibit 1**).

Adam Reeves
Robert S. Leach
William Frentzen
August 26, 2020
Page 6

For these same reasons, the government's discovery production does not assist in identifying those transactions, statements, etc. that the government believes were problematic. The government has produced over six terabytes (amounting to tens of millions of pages) of written material, with more to come. Much of it relates to complex transactions which may be entirely irrelevant, depending on the government's allegations. Without more specificity, we could spin our wheels *ad nauseum* over transactions that popped up in the civil case, for example, but are not intended as part of the criminal case. It is fundamentally unfair to tie Mr. Chamberlain's ability to prepare a meaningful defense to his ability to guess which precise transactions and statements the government intends to use to prove its case. *See United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) ("The Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified ….").[2]

I therefore request that the government provide particulars as to all transactions it intends to present at trial, and particulars of Counts 2 through 15, including but not limited to:

- All "agreements," "contracts," "transactions," "invoices," "statements," "entries to Autonomy's books and records," "quarterly and annual reports," and "other documents" referenced in Paragraphs 22(a) through 22(j) of the SI, as well as the names of all alleged coconspirators the government contends participated in each instance of conduct.

- The identity of all coconspirators referenced in Paragraph 23 of the SI and its subparagraphs.

- All "false and misleading statements" that the government alleges were made by Mr. Chamberlain or his alleged coconspirators in Paragraph 24(a) through 24(e) of the SI, as well as the approximate dates on which the government alleges those statements were made, the identity of the specific coconspirator the government alleges made the statement; and what the government contends was false and misleading about each such statement.

- The specific "writings, signs, signals, pictures, and sounds," that the government intends to present at trial as to Count 1, as alleged in Paragraph 26 of the SI, including the dates

---

[2]     Attached as **Exhibit 2** is a copy of Exhibit 2749 from the Hussain matter, which includes schedules of revenue adjustments. Many of the individual transactions listed in that document were not discussed by fact witnesses at the trial despite being included in the exhibit. Which of those transactions does the government allege are relevant to the charged conspiracies here?

Adam Reeves
Robert S. Leach
William Frentzen
August 26, 2020
Page 7

on which the government alleges that Mr. Chamberlain or any of his alleged
coconspirators "did transmit, and caused to be transmitted by means of wire
communication in interstate and foreign commerce," those "writings, signs, signals,
pictures, and sounds," and the names of the coconspirators who made each alleged
transmission.

•   For each of Counts 2 through 15, please (1) identify any coconspirators that the
    government alleges committed each offense; and, (2) to the extent Mr. Chamberlain's
    alleged liability is based on the acts of others, please describe how each offense furthered
    the object or objects of an alleged conspiracy in which Mr. Chamberlain was involved.

•   For each overt act alleged in Paragraphs 34(a) through (g), please (1) which of the four
    alleged objects of the conspiracy (as stated in Paragraph 32) the government alleges were
    furthered by the act; (2) the identities of all alleged coconspirators the government alleges
    participated in the act; and (3) the basis on which the government contends that the act
    furthered the alleged conspiracy.

I look forward to your response.

Sincerely,

Ariel A. Neuman

AAN:rss

3649211.6

# EXHIBIT 1

1

2

3

4                           UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6                                 SAN JOSE DIVISION

7

8    UNITED STATES OF AMERICA,                Case No.  5:18-cr-00258-EJD
                  Plaintiff,
9                                             **ORDER GRANTING IN PART &**
10        v.                                  **DENYING IN PART DEFENDANTS'**
                                              **MOTION TO DISMISS THE**
11   ELIZABETH A. HOLMES and RAMESH           **SUPERSEDING INDICTMENT FOR**
     "SUNNY" BALWANI,                         **LACK OF NOTICE; DENYING**
                                              **MOTION TO DISMISS SUPERSEDING**
12                Defendants.                 **INDICTMENT FOR FAILURE TO**
                                              **ALLEGE FALSITY; GRANTING IN**
13                                            **PART & DENYING IN PART**
                                              **DEFENDANTS' MOTION TO DISMISS**
14                                            **COUNTS TWO AND NINE THROUGH**
                                              **ELEVEN OF SUPERSEDING**
15                                            **INDICTMENT**

16                                            Re: Dkt. Nos. 204, 205, 206

17          Defendants Elizabeth Holmes and Ramesh "Sunny" Balwani are charged with nine counts

18   of wire fraud in violation of 18 U.S.C. § 1343 and two counts of conspiracy to commit wire fraud

19   in violation of 18 U.S.C. § 1349.  The charges stem from Defendants' allegedly deceptive

20   representations about their company, Theranos, and its technology.  Three motions are before the

21   Court: (1) Defendants'[1] motion to dismiss the superseding indictment for lack of notice and, in the

22   alternative, for a bill of particulars; (2) Defendants' motion to dismiss the superseding indictment

23   in part for failure to allege falsity and motion to strike; and (3) Defendants' motion to dismiss

24   _____

25   [1] While Defendant Holmes brought the three motions to dismiss, Defendant Balwani joined each
     motion and reply.  *See* Dkt. Nos. 207, 208, 209, 306, 307, 308.
26   Case No.: 5:18-cr-00258-EJD
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                            1

counts two and nine through eleven of superseding indictment.  Having had the benefit of oral argument on February 10, 2020 and having considered the Parties' papers, the Court **GRANTS in part** and **DENIES in part** Defendants' (1) motion to dismiss for lack of notice and (2) motion to dismiss counts two and nine through eleven and **DENIES** Defendants' motion to dismiss for failure to allege falsity.

## I.      BACKGROUND

### A.  Factual Background

Defendant Holmes founded Theranos, a health care and life sciences company, in 2003.  Superseding Indictment ¶ 1 ("SI"), Dkt. 39.  Defendant Holmes served as the Chief Executive Officer of the company.  *Id.*  Defendant Balwani served as a board member, the President, and the Chief Operating Officer of Theranos.  *Id.* ¶ 2.

Theranos' stated mission was to revolutionize medical laboratory testing through its allegedly innovative methods of drawing blood, testing blood, and diagnosing patients.  *Id.* ¶ 5.  During the company's first ten years, it pursued the development of proprietary technology that could run clinical tests using only tiny drops of blood.  *Id.*  Theranos also worked to develop a method for drawing only a few drops of capillary blood from a patient's finger using a small lancet.  *Id.*  That blood was then stored in a "nanotainer."  *Id.*  Theranos sought to develop a second device, termed the "TSPU" (Theranos Sample Processing Unit), "Edison," or "miniLab," that could quickly and accurately analyze blood samples collected in the nanotainer.  *Id.*  The Government contends that the promises of these devices were never realized; the devices "consistently" produced inaccurate and unreliable results.  *Id.*  Despite this, Defendants began a publicity campaign to promote the company.  And, in September 2013, Theranos offered blood testing at Walgreens' "Wellness Centers" in California and Arizona.  *Id.* ¶ 10.

The Government argues that Defendants conspired to commit and committed two fraudulent schemes: a scheme to defraud investors and a scheme to defraud doctors and patients.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

2

United States District Court
Northern District of California

The Court outlines these below.

**Scheme to Defraud Investors.**  Defendants allegedly made materially false and misleading statements to investors and failed to disclose material facts to investors.  Based on the false statements, investors invested money in Theranos.  Specifically, from 2013 to 2015, Defendants made misstatements regarding:

1. **Theranos' Proprietary Analyzer:** Defendants allegedly made misstatements about Theranos' proprietary analyzer—the TSPU, Edison, or miniLab—when they claimed the analyzer was presently capable of accomplishing certain tasks, with more precision than other blood tests, and at a faster rate, when, in fact, Defendants knew these statements were false.  *Id.* ¶ 12(A).

2. **Theranos' Financial Health:** Defendants allegedly misrepresented Theranos' financial well-being when they told investors the company was financially strong and stable and would make huge profits in 2014 and 2015 when, in fact, they knew Theranos would only generate modest revenue.  *Id.* ¶ 12(B).

3. **Technology Demonstrations:** Defendants allegedly deceived investors through misleading technology demonstrations where they intended to cause potential investors to believe blood tests were being conducted on Theranos' proprietary analyzer when, in fact, Defendants knew the analyzer was operating in "null protocol."  *Id.* ¶ 12(C).

4. **Walgreens' Partnership:** Defendants allegedly misled investors when they told them Theranos had an expanding partnership with Walgreens when, in fact, the Walgreens rollout had stalled due to concerns with Theranos' performance.  *Id.* ¶ 12(D).

5. **United States Department of Defense ("DOD") Relationship:** Defendants allegedly told investors the company had a profitable and revenue-generating business relationship with the DOD and that Theranos technology was deployed on the battlefield.  In fact, Defendants knew that Theranos had limited revenue from military contracts and that its

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

United States District Court
Northern District of California

technology was not used in the battlefield.  *Id.* ¶ 12(E).

6. **Food and Drug Administration ("FDA") Approval:** Defendants allegedly misled investors when they told investors that Theranos did not need the FDA to approve its proprietary analyzer and tests when, in fact, Defendants knew this to be false.  *Id.* ¶ 12(F).

7. **Patient Testing:** Defendants allegedly told investors that patient tests were conducted using Theranos manufactured analyzers.  In fact, Defendants knew that Theranos used third-party, commercially available analyzers.  *Id.* ¶ 12(G).

8. **Peer Review:** Defendants allegedly falsely told investors that Theranos technology had been examined, used, and validated by several national or multinational pharmaceutical companies and research institutions.  *Id.* ¶ 12(H).

9. **Media Representations:** Defendants allegedly made the false and misleading statements described above to reporters and then shared the resulting articles directly with potential investors and via the Theranos website.  *Id.* ¶ 12(I).

**Scheme to Defraud Doctors and Patients.**  The Government argues from 2013 to 2016, Defendants advertised and marketed Theranos technology to doctors and patients and falsely claimed that the tests were accurate and reliable.  *Id.* ¶¶ 15–16.  Claims about Theranos technology were implicit and explicit.  *Id.* ¶ 15.  Despite knowing that Theranos' technology[2] suffered from recurring accuracy and reliability problems, Defendants allegedly advertised the tests as accurate and reliable.  *Id.* ¶ 17.  Specifically, Defendants used materially false and misleading marketing materials and advertisements and transmitted Theranos blood results that Defendants knew contained, or likely contained, inaccurate information.  *Id.*  For instance, Theranos' public website touted its labs ability to perform tests "quickly and accurately on samples as small as a single

---

[2] The SI names specific blood tests—"calcium, chloride, potassium, bicarbonate, HIV, HbA1C, hCG, and sodium"—but also notes that the list of known, inaccurate blood tests is not limited to this list.  SI ¶ 16.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
4

1   drop." *Id.* ¶ 9.  Defendants also allegedly provided reports to patients that contained or were likely

2   to contain: (1) inaccurate and unreliable results; (2) improperly adjusted reference ranges defining

3   a normal or healthy result for a given test; (3) improperly removed "critical" results, *i.e.* results

4   suggesting a patient needed medical attention; and (4) results generated from improperly validated

5   assays, further decreasing the reliability of those tests.  *Id.* ¶ 17.

6   **B.  Procedural History**

7   Defendants filed three motions to dismiss.  The first motion argues the SI must be

8   dismissed because it is unconstitutionally vague.  Motion to Dismiss Superseding Indictment for

9   Lack of Notice and, in the Alternative, for a Bill of Particulars ("Notice Mot."), Dkt. 204.  The

10  Government opposes this motion and argues that the SI is not vague because it gives Defendants

11  sufficient information to understand their charges.  United States' Opposition to Defendants'

12  Motion to Dismiss Superseding Indictment for Lack of Notice, and, in the Alternative, for a Bill of

13  Particulars ("Notice Opp."), Dkt. 265.  Defendants maintain that the SI fails to provide adequate

14  notice.  Reply in Support of Motion to Dismiss Superseding Indictment for Lack of Notice

15  ("Notice Reply"), Dkt. 296.

16  The second motion argues that the SI must be dismissed because it does not support a

17  conclusion that Defendants' alleged statements and omissions were materially false.  Motion to

18  Dismiss Superseding Indictment in Part for Failure to Allege Falsity ("Falsity Mot."), Dkt. 205.

19  The Government opposes this.  United States' Opposition to Defendants' Motion to Dismiss the

20  Superseding Indictment in Part for Failure to Allege Falsity and Motion to Strike ("Falsity Opp."),

21  Dkt. 266.  In their Reply, Defendants maintain that material falsity is not shown in the SI.  Reply

22  in Support of Motion to Dismiss in Part for Failure to Allege Falsity ("Falsity Reply"), Dkt. 297.

23  The third motion argues that the counts in the SI (counts two and nine through eleven)

24  must be dismissed because they fail to allege the required element of specific intent to commit

25  wire fraud.  Motion to Dismiss Counts Two and Nine Through Eleven of Superseding Indictment

("Counts Mot."), Dkt. 206.  The Government opposes this.  United States' Opposition to Defendants' Motion to Dismiss Counts Two and Nine Through Eleven of Superseding Indictment ("Counts Opp."), Dkt. 267.  Defendants maintain that these counts fail to allege intent to defraud. Reply in Support of Motion to Dismiss Counts Two and Nine Through Eleven of Superseding Indictment ("Counts Reply"), Dkt. 298.

The Court addresses each motion in turn.

## II.   DEFENDANTS' MOTION TO DISMISS FOR LACK OF NOTICE AND, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS

### A.  Lack of Notice

#### 1.  Legal Standard

Federal Rule of Criminal Procedure 7 requires that an indictment contain a "plain, concise, and definite written statements of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  To pass constitutional muster, an indictment must

> furnish the defendant with a sufficient description of the charges against him to enable him to prepare his defense, to ensure that the defendant is prosecuted on the basis of facts presented to the grand jury, to enable him to plead jeopardy against a later prosecution, and to inform the court of the facts alleged so that it can determine the sufficiency of the charge.

*United States v. Cecil*, 608 F.3d 1294, 1297 (9th Cir. 1979); *but see Russell v. United States*, 369 U.S. 749, 763 (1962)) ("[W]here the definition of an offence, whether it be at common law or by statute, includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,—it must descend to particulars." (quotation mark and citation omitted)).

At the motion to dismiss stage, "the issue in judging the sufficiency of the indictment is whether the indictment adequately alleges the elements of the offense and fairly informs the defendant of the charge, not whether the Government can prove its case."  *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir. 1982).  So long as the indictment contains the "essential facts

1   necessary to apprise a defendant of the crime charged," the indictment must stand.  *Id.*  "Because

2   the requirement of a sufficient indictment serves these important purposes, the indictment must be

3   considered as it was actually drawn, not as it might have been drawn."  *United States v. Pirro*, 212

4   F.3d 86, 92 (2d Cir. 2000); *see also United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002) ("In

5   ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, the district

6   court is bound by the four corners of the indictment.").[3]

7           **2.   Analysis**

8           The essential elements of wire fraud are: (1) a scheme to defraud; (2) the use of a wire,

9   radio, or television to further the scheme; and (3) a specific intent to defraud.  *United States v.*

10  *Lindsey*, 850 F.3d 1009, 1013 (9th Cir. 2017).[4]

11          Defendants argue that because wire fraud is "generic in nature," the SI must contain factual

12  particularity above and beyond the generic statutory language.  Notice Mot. at 3.  In Defendant's

13  view, because materially false or fraudulent representations are "part and parcel" of wire fraud, an

14  indictment must go beyond the "generic" requirements of wire fraud and specify, in detail, the

15  particular fraudulent representations and pretenses that make up an alleged scheme to defraud.  *Id.*

16  at 4.  The Government rebuts this and argues that Defendants are on "fair notice" of what they will

17  face at trial.  Notice Opp. at 7.  In the Government's view, the SI outlines Defendants' overall

18  schemes to defraud investors, patients, and doctors, and provides details about those schemes.  *Id.*

19  at 3–4.  The Government contends that an indictment need not allege verbatim quotes to

20  adequately provide notice.  *Id.* at 11.  The Government argues the SI is constitutionally sound

21  because it provides details about the "substance" of the allegations and so Defendants have "fair

22  _____

23  [3] For this reason, the Court does not consider Defendants' arguments about what the
    Government's motions assert.  *See, e.g.*, Notice Reply at 1.

24  [4] Conspiracy requires an agreement "among two or more persons that would satisfy the elements
    of the substantive offense of wire fraud."  *United States v. Hussain*, 2017 WL 4865562, at *5

25  (N.D. Cal. Oct. 27, 2017).  Hence, to state a charge of conspiracy, the indictment must adequately
    specify the underlying fraud.

26  Case No.: 5:18-cr-00258-EJD
    ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO

27  DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
    TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;

28  GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
    COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

7

United States District Court
Northern District of California

United States District Court
Northern District of California

1    notice" about what they will face at trial. *Id.* at 8.

2       Defendants rely primarily on *Russell v. United States*, 369 U.S. 749 (1962), *United States*

3 *v. Cecil*, 608 F.2d 1294 (9th Cir. 1979), *United States v. Curtis*, 506 F.2d 985 (10th Cir. 1974),

4 and *United States v. Keuylian*, 23 F. Supp. 3d 1126 (C.D. Cal. 2014). In *Russell*, the Supreme

5 Court held that the indictment was unconstitutionally vague. 369 U.S. 754–55. There, the

6 defendants were convicted of refusing to answer certain questions posed by a congressional

7 subcommittee. *Id.* at 752. The indictment, however, failed to identify the subject matter under

8 congressional subcommittee inquiry. *Id.* This, the Supreme Court concluded, was a constitutional

9 violation because the underlying charge depended on the subject-matter of the questions. *Id.* at

10 764, 768. The indictment's failure to contain the subject-matter that was under inquiry resulted in

11 two main problems: (1) the defendant would be forced to proceed to trial with a "cryptic"

12 indictment that leaves the "chief issue[s] undefined" and (2) the prosecution could fill in the gaps

13 of an indictment by "surmise or conjecture." *Id.* at 766. The Supreme Court thus held that the

14 indictment failed the constitutional requirement of fair notice. *Id.*

15       In *Cecil*, the Ninth Circuit held that the indictment's "glaring lack of factual particularity"

16 ran afoul of the fair notice requirement. 608 F.2d at 1294. There, the "rather barren" indictment

17 mostly tracked the text of the relevant conspiracy statutes. *Id.* at 1296. It only made "two specific

18 allegations concerning the conspiracies:" (1) it identified the locations of the conspiracy and (2) it

19 stated the names of the alleged conspirators. *Id.* at 1297. The indictment, however, failed to place

20 the conspiracies within any timeframe or provide any facts or circumstance about the conspiracy.

21 *Id.* The complete lack of factual allegations prevented the defendants from understanding the

22 charges and preparing a defense.

23       Likewise, in *Curtis*, the Tenth Circuit held that the indictment was so vague that "the grand

24 jury may have had a concept of the scheme essentially different from that relied upon by the

25 government before the trial jury." 506 F.2d at 989. There, the defendant founded a dating service.

26 Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27 DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28 GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

1   *Id.* at 986–87.  All the indictment alleged was that the service was a sham, it provided no detail as

2   to why it was a sham.  *Id.*  Thus, on appeal, the court concluded that the indictment was

3   unconstitutionally vague because it contained no language about *what* conduct formed the scheme.

4   *Id.* at 992

5       Finally, in *Keuylian*, the court held that the indictment had to be dismissed because it

6   tracked the statutory language.  23 F. Supp. 3d at 1129.  The indictment never stated the alleged

7   false statements, misrepresentations, or false pretenses that constituted the scheme to defraud.  *Id.*

8       Defendants admitted at oral argument that the SI contains more detail than the indictments

9   at issue in the above cases.  Nevertheless, they argue that this case is analogous to those cases.

10   Defendants argue that because this case focuses on two complex, immense, and vast schemes, the

11   above cases support the requirement of an indictment with more specificity.  The SI's factual and

12   temporal span makes the omission of details like the names of speaker(s) and the targets, dates,

13   context, and verbatim wording of misstatements unconstitutional.

14       But Defendants misread *Russell*, *Cecil*, *Curtis*, and *Keuylian*.  Admittedly, none of these

15   cases require an indictment to contain such extensive detail.  The vastness of the schemes alleged

16   do not change this conclusion—the Government need not allege in the indictment its case theory

17   or the evidence underlying the charges.  The Government must only provide enough facts to

18   apprise a defendant of what defense should be prepared for trial.  Hence, the Government need not

19   allege specific misstatements to meet the "fair notice" requirement.  This is confirmed by *United*

20   *States v. Buckley*, 689 F.2d 893 (9th Cir. 1982).  "[A]n indictment should be: (1) read as a whole;

21   (2) read to include facts which are necessarily implied; and (3) construed according to common

22   sense."  *Id.* at 899.  Common sense, not specific allegations is the standard.  *See Curtis*, 506 F.2d

23   at 990 ("While the particulars of the scheme . . . must be described with a degree of certainty

24   sufficient to . . . fairly to acquaint the defendant will [sic] the particular fraudulent scheme charged

25   against him, still the scheme itself need not be pleaded with all the certainty in respect of *time*,

26   Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
9

*place, and circumstance . . . .*" (emphasis added)).

Reading the indictment as a whole and with common sense, the Court holds that the SI is constitutionally sound because it:

- **Establishes a Particular Factual Universe.**  The SI establishes the "universe" of facts giving rise to the charges.  For instance, paragraphs four through nine adequately apprise Defendants that Theranos' statements promising "quick" and "accurate" diagnostic blood testing using "a single drop [of blood]" are at issue and underlie the wire fraud and conspiracy charges.  *Compare* SI ¶¶ 4–9, *id.* § 10 (describing Theranos' partnership with Walgreens, their alleged fraudulent promises, and other facts giving rise to the charges), *with Keuylian*, 23 F. Supp. 3d at 1129 (dismissing indictment because it failed to describe any of the deceptive acts underlying the alleged scheme to defraud and thus only showed willful breach of contract).

- **States the Acts Underlying the Investor Scheme.**  After establishing that Theranos' representations about their blood tests form the basis of the SI, the indictment informs Defendants *what* misrepresentations underlie the scheme to defraud investors.  *See* SI ¶¶ 11–12 (establishing relevant time period as 2013–2015); *cf. Cecil*, 608 F.2d at 1297 (noting indictment's failure to establish a relevant timeframe).  The SI informs Defendants that nine misrepresentations form the basis of the scheme and thus that Defendants should focus their defense on these nine areas.  *Compare* SI ¶ 12 (claiming Theranos misrepresented its "proprietary analyzer," financial strength, use and examination of technology, partnership with Walgreens, U.S. Department of Defense, and FDA), *with Curtis*, 506 F.2d at 992 (holding indictment failed to provide notice because it lacked any detail as to what conduct formed scheme).

- **States the Acts Underlying the Doctor/Patient Scheme.**  The SI also informs Defendants what conduct underlies the scheme to defraud doctors and patients.  *See* SI ¶ 14 (establishing relevant time period as 2013–2016); *cf. Cecil*, 608 F.2d at 1297 (noting indictment's failure to establish a relevant timeframe).  The SI apprises Defendants that the conduct underlying this scheme is Theranos' allegedly deceptive "advertisements and marketing materials" that stated Theranos could provide "accurate, fast, reliable, and cheap blood tests and test results."  SI ¶ 15; *see also id.* ¶ 12(C) (alleging Defendants transmitted false blood tests).  Hence, unlike *Russell*, where the Supreme Court held the indictment invalid because it failed to specify the subject-matter underlying the charges, the SI tells Defendants the alleged misconduct forming the indictment.  369 U.S. at 754–55.

Defendants argue that even while the SI informs them of the events underlying the charges, it nonetheless remains vague because it raises more questions and thus fails to provide fair notice.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

10

United States District Court
Northern District of California

United States District Court
Northern District of California

For instance, Defendants point to Paragraph 12(A), which alleges that Defendants misrepresented the capabilities of their proprietary analyzers. Defendants argue the term "proprietary analyzer" is vague since Theranos had many "proprietary analyzers." But, read as a whole, the SI defines "proprietary analyzers" as the Edison, miniLab, or TSPU. Next, Defendants contend that no timeframe is given as to the misrepresentations and that the range of statements the SI could cover is too vast. But the indictment expressly confines the investor scheme timeframe to 2013–2015 and informs Defendants about the subject-matter of the alleged misstatements. SI ¶¶ 11, 12.

Defendants next argue that the FDA claim is vague because FDA guidance documents indicated that Theranos did not need to obtain clearance. Notice Mot. at 6. The Government argues they have contrary evidence. Notice Opp. at 10. This amounts to an evidentiary dispute. The indictment stage, however, "is not the appropriate time to require the Government to present its proof." *Buckley*, 689 F.2d at 900. Ironically, the fact that Defendants can pick apart the truth of the events in the indictment indicates that the SI is constitutionally sound—it means Defendants *know* what they will face at trial. *Cf.* Notice Mot. at 6 (arguing the *substance* of the Walgreens allegation); *see also Curtis*, 506 F.2d at 987–88 (citing Form 3 of the Appendix of Forms annexed to the Federal Rules of Criminal Procedure which requires false statements be alleged in substance only and not by quotation).

Finally, Defendants argue Count Two is similarly vague because the Government fails to define "reliable and accurate" or the meaning of "held out." Notice Mot. at 8. But, Count Two expressly limits its factual universe to "advertisements and marketing materials" and "test results." *See* SI ¶¶ 16–17. The indictment, read as a whole, clarifies that Defendants are charged with implicitly[5] and explicitly claiming that Theranos' tests could consistently produce accurate and

---

[5] Because the Court determines that the SI contains sufficient factual particularity to inform Defendants what events underlie the charged counts, the Court finds that Defendants' arguments about what conduct constitutes a misrepresentation and what "implicit" means better suited for the Bill of Particulars analysis.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

United States District Court
Northern District of California

1 reliable results when, in fact, it could not.  *See Buckley*, 689 F.2d at 899.  Indeed, as Paragraph 9

2 of the SI states, the company's public website stated that Theranos' lab could perform tests

3 "quickly and accurately on samples as small as a single drop."  Because Defendants know both the

4 statutes they allegedly violated and the conduct underlying those alleged violations, the SI is

5 particularized enough to provide fair notice and Defendants' motion to dismiss for lack of fair

6 notice is **DENIED**.[6]

7         **B.  Bill of Particulars**

8         Rule 7(f) of the Federal Rules of Criminal Procedure provides that "[t]he court may direct

9 the government to file a bill of particulars."  A bill of particulars is appropriate where a defendant

10 requires clarification in order to prepare a defense and is "designed to apprise the defendant of the

11 specific charges being presented to minimize danger of surprise at trial, to aid in preparation and

12 to protect against double jeopardy."  *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983);

13 *United States v. Mitchell*, 744 F.2d 701, 705 (9th Cir. 1984); *Yeargain v. United States*, 314 F.2d

14 881, 882 (9th Cir. 1963) ("The purpose of a bill of particulars is to protect a defendant against a

15 second prosecution for an inadequately described offense, and enable him to prepare an intelligent

16 defense.").  A defendant, however, is not entitled to "know all the evidence the government

17 intends to produce, but *only the theory* of the government's case."  *Yeargain*, 314 F.2d at 882

18 (emphasis added).  The decision to require a bill of particulars is within a trial court's broad

19 discretion.  *Long*, 706 F.2d at 1054.

20         Defendants seek an order compelling the Government to identify (1) the details concerning

21 the alleged false or fraudulent representations or omissions, (2) the names of persons who may

22 testify about being deceived, (3) the names of all known coconspirators, and (4) the facts giving

23 rise to an alleged duty to disclose and any material omissions that are alleged to have violated that

24

25 [6] The Court does not reach the Government's *United States v. Woods*, 335 F.3d 993 (9th Cir. 2003) argument.

26 Case No.: 5:18-cr-00258-EJD

27 ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;

28 GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

12

duty.  The Court addresses each in turn.

### 1.  Details Concerning the Alleged False or Fraudulent Representations

Defendants contend that for Counts One and Two, the Government must specify the false and fraudulent representations allegedly made by Defendants and any coconspirator(s) during the course of the two frauds.  Defendants further argue that the Government must identify (1) who made the representation, (2) the precise content of the representation, (3) the form of the representation, *i.e.* oral or written, (4) the date of the representation, (5) to whom the representation is alleged to have been made, and (6) the manner in which the representation is claimed to be false or fraudulent.  *Id.* at 10.

Defendants contend that "[i]n cases less substantial than this one in scope and complexity, courts have ordered the government to identify the specific false or misleading statements." Notice Reply at 7.  As support, Defendants cite to *United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987), *United States v. Caine*, 270 F. Supp. 801 (S.D.N.Y. 1967) (holding bill of particulars required because indictment had no explanation about why the representations were false and misleading), and *United States v. Trie*, 21 F. Supp.2d 7 (D.D.C. 1998).

In *Bortnovsky*, the Second Circuit held that the district court erred in denying the defendants' motion for a bill of particulars.  820 F.2d at 573.  There, the defendants were indicted for engaging in a scheme to defraud a federal agency.  *Id.*  The indictment alleged that defendants "submit[ted] false claims for burglary losses to the Federal Insurance Administration" and "the New York Property Insurance Underwriting Association."  *Id.* at 574.  While the indictment provided a list of suspect pieces of mail along with their approximate dates of mailing and addresses, it failed to specify the dates of the staged burglaries or enumerate which of the numerous documents were falsified.  *Id.*  Thus, the "relevance of the key events was shrouded in mystery at the commencement of and throughout the trial" meaning the defendants were "forced to explain . . . events . . . unrelated to the charges pending.  *Id.* at 574–75.  The defendants' ability

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

13

to view the 4,000 pages of documents at issue before trial was unhelpful because they had to assess the "mountains of documents" without guidance as to which documents were relevant and only had four days to complete the task.  *Id.*  Hence, without a bill of particulars as to which documents and burglaries were fraudulent, the defendants could not adequately prepare a defense for trial.  *Id.*

Likewise, in *Trie*, the court granted the defendant's motion for a bill of particulars and ordered the government to provide information as to "exactly what the false statements [were], what about them [was] false, who made them, and how [the defendant] caused them to be made." 21 F. Supp. 2d at 22.  There, the defendant was indicted for, among other things, making false statements to the government.  *Id.* at 13.  The government provided the defendant with 45 pages of excerpts in which the statements were contained.  *Id.* at 21.  The pages contained "175 names" and "a variety of information about each person or entity listed."  *Id.*  This, the court held, rendered the disclosure insufficient because "a defendant faced with false statements charges should not have to waste precious pre-trial preparation time guessing which statements he has to defend against or which contributor may be witnesses against him."  *Id.*

Defendants argue this case is more complex than *Bortnovsky*, *Caine*, and *Trie* and thus a bill of particulars is required.  Notice Reply at 7.  First, Defendants highlight that in the Government's three recently filed oppositions, it offers a new theory of its case.  *Id.* at 8 ("[T]he government now claims to base its case in part on supposed 'implicit' representations without identifying a basis for implying such representations.").  They argue that they cannot determine the "implicit representations" at issue when the SI provides no further detail as to this theory.  *Id.* Second, Defendants argue the conspiracy and schemes to defraud are vast—they span at least three years and implicate the operations of a company that employed many hundreds of persons. *Id.*; *cf. United States v. Stukenbrock*, No. 5:15-cr-00034-EJD at , Dkt. 143 (N.D. Cal. filed June 26, 2018) (denying bill of particulars after noting that scheme was "not particularly complex or

United States District Court
Northern District of California

1  difficult to comprehend").

2         The Government argues that here, in contrast to *Bortnovsky*, *Caine*, and *Trie*, the SI gives

3  "notice of specific misrepresentations Defendants will need to address at trial" and thus goes

4  beyond the "generic" indictments at issue in three discussed cases.  Notice Opp. at 14; *see also*

5  *United States v. Bidloff*, 82 F. Supp. 2d 78, 84–85 (W.D.N.Y. 1999) ("[A]lthough the court in

6  *Caine* granted further particulars as to the specific pretenses . . . the indictment . . . failed to

7  provide any indication as to the substance of the falsehoods. . . . [It does not] establish[] a general

8  rule that particularization of specific false pretenses is required in every mail fraud prosecution.").

9  The Government also contends that Defendants have received extensive discovery that discloses

10 the scope of the evidence against them.[7]  Notice Opp. at 14–15.  In light of this discovery, the

11 Government argues a bill of particulars is unnecessary.  *Id.* at 16 (citing *United States v. Giese*,

12 597 F.2d 1170, 1180 ("[T]he government provided appellant with a large volume of information,

13 including physical evidence offered at trial, grand jury testimony, and memoranda which revealed

14 the government's theory of the case.  Full discovery also obviates the need for a bill of

15 particulars.")).

16        While the Government has provided Defendants with witness interviews, as demonstrated

17 by *Trie* this is not always specific enough to overcome the need for a bill of particulars.  Indeed,

18 the witness interviews do not identify the alleged misrepresentations.  Further, the universe of

19 potential misrepresentations is vast—the Government claims that Defendants made

20 misrepresentations to the media, on the Theranos website, and in advertisements and marketing

21 materials.  This is especially true for the doctor/patient fraud.  *See* SI ¶¶ 14–17 (confining the

22 scheme to "implicit and explicit" false claims made in Theranos "advertisements and marketing

23

24 _____

[7] Additionally, the Government argues that Defendants delay in bringing this motion for a bill of
25 particulars and their ability to litigate the case without a bill shows a bill of particulars is
unnecessary.  Notice Opp. at 15.

26 Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27 DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
28 COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

United States District Court
Northern District of California

materials" but not labeling specific types of materials or the type of implicit conduct at issue); *cf. Caine*, 270 F.3d at 806.  The Government's theory of "implicit" representations only expands the scope of possible misrepresentations and the SI lacks any clear explanation of the Government's implicit misrepresentation case theory.  In contrast, the investor fraud describes the specific type of misrepresentations at issue.  *See id.* ¶ 12.  Defendants thus are not left to guess about the Government's investor-fraud case theory.

Finally, much like in *Bortnovsky*, the discovery in this case is immense.  *See* Notice Reply at 9 ("The government has produced more than 20 million pages of documents."); *cf. Trie*, 21 F. Supp. 2d at 21 (finding 45 pages of excerpt testimony with 175 names prohibitive).  These realities create a substantial risk that Defendants may be unfairly surprised at trial.  Accordingly, the Government must provide Defendants information as to the **doctor/patient fraud**.  The Government shall identify (1) the specific implicit and explicit false and fraudulent misrepresentations in the advertisements and marketing materials, (2) what about them is false, (3) who made them, and (4) how Defendants caused them to be made.  This includes the particular tests that the Government claims Theranos was not capable of consistently producing.  *See Bortnovsky*, 820 F.2d at 574 (noting that a defendant should not be forced to prepare unnecessary defenses); *Trie*, 21 F. Supp. 2d at 21 (noting that a defendant should not have to guess about what statements he will have to defend against).

### 2. Names of Investors, Doctors, or Patients Who May Testify

"It is not uncommon for the Government to be required to disclose the names of some potential witnesses in a bill of particulars, where the information is necessary or useful in the defendant's preparation for trial." *Will v. United States*, 389 U.S. 90, 99 (1967).  This must be balanced against the proposition that a bill of particulars is "not to obtain disclosure of evidence or witnesses to be offered by the Government at trial." *United States v. Nachamie*, 91 F. Supp. 2d 565, 570 (S.D.N.Y. 2000).

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

United States District Court
Northern District of California

1      Defendants argue they need a list of victims who may testify so that they can prepare to

2  confront those witnesses.  Notice Mot. at 11.  They argue this is necessary to "help the defense

3  attempt to identify the statements at issue."  Notice Reply at 11.  At present, however, the

4  Government has already disclosed to Defendants the names of alleged victims.  Notice Opp. at 17

5  ("Defendants have full access to all of the information in the government's possession concerning

6  the victims and how they might testify . . . ."); *see also* Notice Reply at 11 ("The government has

7  interviewed more than 120 witnesses and continues to interview more.").  Defendants, thus,

8  already have the names of people who may testify.  Accordingly, the request for names of victims

9  who may testify is **denied**.

10              **3.  Names of All Known Conspirators**

11      Courts regularly employ a six-factor test to evaluate whether the Government should

12  identify unnamed coconspirators.  *United States v. Barrett*, 153 F. Supp. 3d 552, 572 (E.D.N.Y.

13  2015).  They look to: (1) the number of co-conspirators; (2) the duration and breadth of the alleged

14  conspiracy; (3) whether the government otherwise has provided adequate notice of the particulars;

15  (4) the volume of pretrial disclosure; (5) the potential danger to coconspirators and the nature of

16  the alleged criminal conduct; and (6) the potential harm to the Government's investigation.  *Id.*;

17  *see also United States v. Feil*, 2010 WL 1525263, at *3 (N.D. Cal. Apr. 15, 2010) (granting bill of

18  particulars requiring the government to name unnamed coconspirators due to lengthy duration and

19  scope of conspiracy and the heavy volume of discovery); *cf. United States v. DiCesare* 765 F.2d

20  890, 897 (9th Cir. 1985) (holding that it was not an abuse of discretion to deny the defendant's

21  request for a bill of particulars as to the names of coconspirators).

22      Defendants argue that the Government should identify all known coconspirators charged in

23  counts one and two.  *See* SI ¶¶ 20, 22 (alleging conspiracies among Defendants and "other known

24  and unknown to the Grand Jury").  They contend that in cases with sprawling indictments that

25  allege complex schemes, like this, courts regularly require the names of coconspirators to be

26  Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27  DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28  GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
17

United States District Court
Northern District of California

1    disclosed.  They further argue that because the SI does not identify the speaker of the alleged

2    misrepresentations, an "unbounded set" of possible coconspirators exists and Defendants may be

3    unfairly surprised at trial by such coconspirator testimony.  Notice Mot. at 12.  Hence, they argue,

4    the universe of speakers must be limited.

5        The Government opposes this request and contends that it need not identify unnamed

6    coconspirators because Defendants fear of unfair surprise is unfounded.  Notice Opp. at 18.  The

7    Northern District of California's Criminal Local Rules already requires detailed pre-trial

8    disclosure of any co-conspirator statements intended to be offered under Fed. R. Evid.

9    801(d)(2)(E).  The Government also argues that the case law does not support the Defendants'

10   request.  Other cases that required a bill of particulars as to the unnamed coconspirators had more

11   defendants.  *Id.* at 18 (citing *United States v. Bazezew*, 783 F. Supp. 2d 160 (D.D.C. 2011)).

12       The Government's argument as to mandatory disclosures misses the mark.  There is no

13   guarantee the Criminal Local Rules will ameliorate the alleged lack of notice.  Coconspirator

14   statements could be offered for something other than "the truth of the matter asserted."  Moreover,

15   the number of named defendants in a case is irrelevant; it does not bear on the unfair surprise

16   inquiry.  Here, the relevant factors counsel towards requiring the Government to name all known

17   coconspirators.  First, the number of co-conspirators is vast.  Second, while the alleged

18   conspiracies only spanned three years, the scope of the alleged conspiracies is broad—they cover a

19   vast range of alleged misrepresentations made to investors, doctors, and patients about Theranos'

20   products and productivity.  Third, the SI is vague as to who else (beyond the Defendants) may be a

21   coconspirator.  Fourth, the volume of discovery is immense—millions of pages of documents have

22   been produced.  *Cf. Feil*, 2010 WL 1525263, at *3 (noting that the 70,000 plus pages of discovery

23   counseled in favor of granting bill of particulars as to request for coconspirator names).  Fifth, the

24   danger of harm to the coconspirators is not present in this case.  *See Nachamie*, 91 F. Supp. 2d at

25   573 ("[T]here is no legitimate concern that disclosing the names of unindicted coconspirators will

26   Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO

27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;

28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

United States District Court
Northern District of California

1   endanger those individuals or compromise the Government's investigation. . . . [T]his case charges

2   Medicare fraud—not narcotics trafficking or murder . . . .").

3        While these factors may counsel in favor of granting Defendants' request, the fear of unfair

4   surprise is obviated by the Court granting Defendants' first request for a bill of particulars as to the

5   specific misrepresentations pertaining to the doctor-patient fraud.  This requires the Government

6   to provide the names of speakers.  *Cf.* Notice Mot. at 12 (discussing how it is impracticable for

7   Defendants to guess at the "universe of speakers").  Accordingly, this request is **denied** as to count

8   two but **granted** as to count one.

9                    **4.   Facts Giving Rise to an Alleged Duty to Disclose/Material Omissions**

10       Defendants seek a bill of particulars about what facts underlie the Defendants' material

11  omissions and their duty to disclose.  *See* SI ¶¶ 13, 15, 24.  They argue that the SI lacks a

12  description of the alleged material omissions and fails to describe the basis of the alleged duty to

13  disclose.  Thus, they contend, the Government must identify (a) who made the alleged omission,

14  (b) precisely what is alleged to have been omitted, (c) when that omission is alleged to have

15  occurred, (d) the nature of the alleged duty to disclose, (e) to whom the duty allegedly was owed

16  and to whom the omission is alleged to have been directed, and (f) the manner in which the

17  omission is claimed to be fraudulent.  Notice Mot. at 13.  The Government argues in response the

18  SI already alleges the facts that Defendants withheld from their victims, like that Theranos relied

19  on third-party analyzers for its tests and that its Walgreens rollout had stalled.

20       The SI only alleges that Defendants had a "duty to disclose" "material facts."  It says

21  nothing about the *type* of duty or *what* facts must be disclosed.  *See, e.g.*, SI ¶ 11.  In another

22  opposition, however, the Government argues a "duty of trust" existed between Defendants and

23  investors and that Defendants' alleged "half-truths" gave rise to a duty to correct.  *See* Falsity Opp.

24  at 9.  Likewise, the Government grounds its omissions theory in the already-alleged material

25  misrepresentation—for instance, the Government argues that by telling investors the Walgreens

26  Case No.: 5:18-cr-00258-EJD
    ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27  DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
    TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28  GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
    COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                     19

1    relationship was growing, when in fact it had stalled, Defendants omitted material information that

2    they had a duty to disclose.  Hence, Defendants can infer the Government's case-theory and there

3    is no need for a bill of particulars.  *See Yergain*, 314 F.2d at 882 (noting that a bill of particulars is

4    permissible to understand the Government's "theory of the . . .case").  Accordingly, this request is

5    **denied.**

6    **III.    DEFENDANTS' MOTION TO DISMISS SUPERSEDING INDICTMENT IN
            PART FOR FAILURE TO ALLEGE FALSITY AND MOTION TO STRIKE**

7

8          Defendants argue the SI fails to state an offense for conspiracy to commit wire fraud

9    because it fails to allege material falsity in Paragraphs 12(D), 12(E), and 16.  Falsity Mot. at 3–4.

10   They contend that the SI must be dismissed insofar as it relies on these allegations and that the

11   allegations should be struck to avoid prejudice.  *Id.* at 4.  Defendants further argue that the SI fails

12   to allege facts sufficient to support a fraud-by-omission theory because it alleges no duty to

13   disclose and identifies no material omissions.  *Id.* at 6.

14         **A.  Legal Standard**

15         Rule 7 requires that an indictment contain "a plain, concise, and definite written statements

16   of the essential facts constituting the offense charged."  Fed. R. Crim P. 7(c)(1).  An indictment's

17   failure to detail each element of the charged offense generally constitutes a "fatal defect."  *United

18   States v. Keith*, 605 F.2d 462, 464 (9th Cir. 1979); *see also United States v. Carroll*, 2015 WL

19   2251206, at *1 (N.D. Cal. May 13, 2015) ("An indictment fails to state an offense if it does not

20   allege facts which, if proven, would constitute a violation of 'the statute, rule, regulation, or other

21   provision of law that the defendant is alleged to have violated.'" (quoting Fed. R. Crim P.

22   7(c)(1))).

23         The Government argues that an indictment must be "liberally construed in favor of

24   validity."  Falsity Opp. at 4 (quoting *United States v. Holden*, 806 F.3d 1227, 1233 (9th Cir.

25   2015)).  This is the standard for post-trial review.  *Compare United States v. James*, 980 F.2d

26   Case No.: 5:18-cr-00258-EJD
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

                                              20

1314, 1317 (9th Cir. 1970) ("When the sufficiency of the indictment is challenged *after trial*, it is only required that the necessary facts appear in *any form* or *by fair construction* can be found within the terms of the indictment." (quotation marks and citation omitted) (first emphasis added)), *with United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) ("The timing of the defendant's objection is important to the level of scrutiny employed; a defendant who objects to the indictment *before* trial . . . is entitled to *a more exacting review* of the indictment than one who waits until after trial to object." (emphasis added)).  Hence, because this is a pretrial challenge to the indictment, the "liberal construction" standard advocated by the Government is misplaced.  The relevant inquiry is whether the SI contains sufficient detail to state an offense for wire fraud or conspiracy to commit wire fraud.  *See, e.g.*, *Carroll*, 2015 WL 2251206 at *1.

### B.  Analysis

#### 1.  Wire Fraud/Conspiracy to Commit Wire Fraud

Wire fraud requires: "(1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme; and (3) a specific intent to defraud." *Lindsey*, 850 F.3d at 1013. It is well-settled that materiality is an element of a "scheme or artifice to defraud" under the federal wire fraud statute. *Neder v. United States*, 527 U.S. 1, 21–25 (1999).  Material falsehood may be proven by means other than a specific false statement. *United States v. Omer*, 395 F.3d 1087, 1088 (9th Cir. 2005).  *Neder*, however, makes clear that in order to prove fraud, the Government must prove the materiality of the falsehoods.  527 U.S. at 20–25.  An indictment's failure to recite an essential element of the charged offense, namely materiality, is a fatal flaw that requires dismissal of the indictment. *Omer*, 395 F.3d at 1089.

The Government argues that, under this standard, it need not allege specific misrepresentations because a scheme to defraud may rest on something other than false statements.  Falsity Opp. at 4–5.  But this misses the point—the SI explicitly alleges that Defendants made "materially false and misleading *statements* . . . and failed to disclose material

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

21

United States District Court
Northern District of California

facts." SI ¶ 12.  The issue, thus, is not whether an indictment must plead specific misrepresentations, but whether the indictment sufficiently alleges materiality as to the misstatements at issue.[8]

"[A] false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed."  *Neder*, 527 U.S. at 16 (internal quotations and alterations omitted).  An indictment need not explain all factual evidence to be proved at trial.  *United States v. Blinder,* 10 F.3d 1468, 1476 (9th Cir.1993).

Three alleged false statements are at issue: (1) the statements made to investors concerning the Walgreens contract, see SI ¶ 12(D); (2) the statements made to investors concerning the profitability of military contracts, see SI ¶ 12(E); and (3) the statements made to doctors and patients concerning the accuracy and reliability of the blood tests, see SI ¶ 16.  Specifically, the SI alleges:

- Defendants told investors that Theranos had an "expanding partnership" with Walgreens when, in fact, the partnership "had stalled" by late 2014.  SI ¶ 12(D).

- Defendants told investors they had a profitable relationship with the U.S. Department of Defense, and that Theranos technology had been deployed to the battlefield when, in fact, Defendants knew Theranos had limited revenue from its military contracts and that Theranos technology had not been deployed to the battlefield.  *Id.* ¶ 12(E).

- Defendants told doctors and patients that their devices could provide "accurate, fast,

---

[8] There is some tension between *United States v. Woods*, 335 F.3d 993 (9th Cir. 2003) and *Omer*, 395 F.3d 1087.  *Woods* seems to require that materiality be shown as to *each* alleged misstatement.  *See* 335 F.3d at 1000 ("*All* deceptive or misleading statements, false statements and half-truths, which are generally referred to as statements, and concealed, omitted and nondisclosed facts . . . *must be material to form the basis* of mail or wire fraud charges." (emphasis added)); *see also* Falsity Opp. at 5 (arguing alleged misstatements can be considered as material evidence of the fraud); *United States v. Hossain*, 2014 WL 4354125, at *3 (D. Nev. Sept. 2, 2014) (analyzing the four alleged false statements and finding that each was material).  In contrast, *Omer* states only the "materiality of the scheme or artifice must be alleged" and that "the materiality of the specific statement need not be pleaded."  395 F.3d at 1089.  This begs the question—pursuant to *Omer*, may the Court assess the statement's materiality in light of the whole indictment, *or* must the Court assess each statement's materiality individually?  Because *Omer* did not concern alleged misstatements, while *Woods* did, the Court follows *Woods*' instruction that each misstatement must be "material" to form the basis of the wire fraud charges.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

22

United States District Court
Northern District of California

1    reliable, and cheap blood tests and test results," when, in fact, they knew that these
     tests could not "consistently produc[e] accurate and reliable results." *Id.* ¶ 16.

2        Defendants fixate on the minute details in the indictment, like what the meaning of

3    "consistently" is. *See* Falsity Reply at 4–5. They also argue with semantics and point out that

4    Theranos could have an "expanding partnership" with Walgreens, even if it, at one point, had

5    "stalled." This misunderstands the relevant standard at a motion to dismiss phase. *See Buckley*,

6    689 F.2d at 897 (noting that at the motion to dismiss stage, "the issue in judging the sufficiency of

7    the indictment is whether the indictment adequately alleges the elements of the offense . . . not

8    whether the Government can prove its case." At trial, the defense may argue about the meaning of

9    Defendants' Walgreens representations. But, *at this stage*, such arguments are not appropriate; the

10   relevant inquiry is whether the indictment adequately alleges the elements of the offense.

11   Materiality does not require alleged misstatements to be accurate—it only requires the alleged

12   misstatements to have a "natural tendency to influence." The three above statements exceed this

13   standard; the first two tend to give the false impression to an investor that Theranos' business was

14   growing, that it was a profitable company, and that it was a good investment. Likewise, the third,

15   tends to give a false impression to the doctor and patient that Theranos' technology would provide

16   accurate results. The SI thus sufficiently alleges a factual basis for its claim that the alleged

17   misrepresentations were material.

18                                    **2. Fraud-by-Omission Theory**

19       "It is settled in this Circuit that a scheme to defraud need not be an active

20   misrepresentation. A nondisclosure or concealment may serve as a basis for the fraudulent

21   scheme." *United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984), *rev'd on other grounds*,

22   473 U.S. 207 (1985). The ability to use an omission to form the basis of a scheme to defraud is

23   narrow. *Id.* at 1450. It may only be used "when there exists an independent duty (either fiduciary

24   or derived from an explicit and independent statutory requirement) and such a duty has been

25   breached." *Id.* A contrary rule would bring "almost any illegal act within the province of

26   Case No.: 5:18-cr-00258-EJD
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
     GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
28   COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

the . . . fraud statute." *Id.* Hence, an indictment must allege facts giving rise to a duty to disclose. *See United States v. Lonich*, 2016 WL 324039, at *8 (N.D. Cal. Jan. 27, 2016) (holding that if the government wishes to prosecute based on an omissions theory, the indictment must allege that defendant owed a duty to disclose); *see also United States v. DuBo*, 186 F.3d 1177, 1179 (9th Cir. 1999) ("Implied, necessary elements, not present in the statutory language, must be included in an indictment.").

The SI alleges that Defendants omitted material facts that they had a "duty to disclose." *See* SI ¶¶ 11, 12, 15. Defendants argue that the Government may not proceed with its fraud-by-omission theory because the Government has not sufficiently alleged that they had a duty to disclose information to investors, doctors, or patients. Falsity Mot. at 6. The Government rebuts this and contends that Defendants had a duty to disclose omitted, material information pursuant to a "duty of trust" and a "duty to correct" half-truths. Falsity Opp. at 8.

Half-truths and omissions are distinct concepts. *See, e.g.*, *United States v. Sumeru*, 449 F. App'x 617, 621–22 (9th Cir. 2011) (noting that half-truths and omissions are different legal theories); *United States v. Petrossi*, 786 F. App'x 286, 288–89 (2d Cir. 2019). An actionable omission occurs when the defendant *fails* to speak despite the existence of a duty requiring him to speak. In contrast, in a half-truths case, the duty to disclose arises because critical qualifying information was omitted from speech. While half-truths create a "duty to correct" speech, omissions trigger an independent duty to speak. Both, however, create a "duty to disclose." *See* SI ¶ 11, 12, 15. Because omissions and half-truths are distinct theories, the Court addresses each in turn.

Regarding omissions, the Government argues that an independent "duty of trust" existed between Defendants and their investors. "Fiduciary" is a broad term; it encompasses "informal" trusting relationships where one party "acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise." *United States v. Shields*,

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

844 F.3d 819, 822–23 (9th Cir. 2016).  The Government argues that by making misrepresentations to investors, Defendants induced investors to relax their ordinary care and vigilance and thus entered into a "trusting relationship" with the investors.  Falsity Opp. at 9.  In other words, because the misrepresentations led investors to trust Defendants, Defendants owed investors a duty of trust and were required to disclose all material omitted information, *i.e.* information about Theranos' financial status, technological ability, etc.  *Id.*  Defendants argue rooting a duty of trust in the representation itself threatens to "swallow[s] the *Shields* rule . . . by permitting juries to convict on the basis of omissions whenever the government also alleges false statements, without any independent duty to disclose."  Falsity Reply at 8–9; *see also Dowling*, 739 F.2d at 1449 (noting that omissions-liability is narrow).

Defendants fear is misplaced.  Simply alleging that a defendant misrepresented something to an investor does not create a duty of trust.  Rather, the inquiry is whether the facts alleged in the indictment show that a defendant, acting for the benefit of an investor, induced the investor to relax the care and vigilance they would ordinarily exercise.  *See Shields*, 844 F.3d at 822–23.  Here, the SI does this—as shown in Paragraph 12(C), Defendants used deceptive technology demonstrations to reassure investors that Theranos' proprietary technology worked.  Likewise, as shown in Paragraphs 12(F) and 12(H), Defendants induced investors to trust Theranos technology by misrepresenting that *others*, like the FDA, concluded that the technology worked.  Moreover, Defendants, were both officers of Theranos; their position indicated that they knew about Theranos' technology.  Accordingly, Defendants alleged misrepresentations were sufficient to relax an investors ordinary duty of care because they purposefully caused an investor to believe that Theranos was successful, profitable, and a secure investment.  The SI thus sufficiently alleges that Defendants "duty to disclose" material omissions to investors was rooted in a duty of trust.  *See* SI ¶ 11, 12.

Regarding half-truths, "even in the absence of a trust relationship," one "cannot

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

affirmatively tell a misleading half-truth about a material fact." *See United States v. Laurienti*, 611 F.3d 530, 541 (9th Cir. 2010); *see also United States v. Harder*, 116 F. Supp. 3d 1197, 1206 (D. Or. 2015) ("Omissions of material fact and half-truths may be used to establish a scheme to defraud."); *United States v. Montgomery*, 384 F.3d 1050, 1063–64 (9th Cir. 2004) (holding the defendant's half-truths and concealment of material facts was actionable fraud).  Half-truths and concealment may be premised on verbalized words, the arrangement of words, or the circumstances in which they are conveyed.  *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967).

In the alternative to a duty of trust, once Defendants made inflated representations about Theranos' success and profitability, they needed to tell the "whole truth," *i.e.*, that Theranos' profitability was declining and that its partnership with Walgreens was stalling.  Likewise, by representing their tests as "accurate" and "reliable," Defendants had a duty to disclose to doctors and patients that their tests "consistently" produced wrong results.  Defendants argument that the Government is "transforming" the duty to correct asserted half-truths into an independent duty to disclose is thus misplaced.  Falsity Reply at 9.

The SI alleges that Defendants "omitted" information that they had a duty to disclose.  SI ¶¶ 11, 12, 15–17, 26.  Hence, read as a whole, see *Buckley*, 689 F.2d at 899, the SI alleges that Defendants had (1) a duty of trust with investors and, pursuant to that duty, had a duty to disclose material information about Theranos' technology and profitability to investors, (2) a duty to disclose to investors the "whole truth" about Theranos' technology and profitability based on their "half-truths," and (3) a duty to disclose to doctors and patients the "whole truth" about Theranos blood tests' accuracy and reliability based on their "half-truths."  *Cf.* Falsity Mot. at 7 (arguing certain paragraphs contain only "boilerplate allegations of unspecified omissions).  Accordingly, Defendants motion to dismiss for failure to allege falsity is **DENIED.**

United States District Court
Northern District of California

United States District Court
Northern District of California

### IV.   DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

Defendants argue that counts two and nine through eleven, which relate to the scheme to defraud doctors and patients, must be dismissed because they do not allege that Defendants acted with the specific intent to obtain money or property from any doctors or patients through deceit. Counts Mot. at ECF 7.  Defendants contend that the SI's shortcomings are twofold: first, counts two and nine through eleven fail to allege that Defendants intended to deprive non-paying patients and doctors of their money or property.  *Id.*  Second, the counts fail to allege that Defendants intended to deprive patients of the benefit of the bargain.  *Id.*  The Court addresses each in turn.

#### A.  Scheme to Obtain Money or Property from Victims

As noted, to prevail on a charge of wire fraud, the Government must prove: (1) a scheme to defraud; (2) the use of a wire, radio, or television to further the scheme; and (3) a specific intent to defraud.  *United States v. Lindsey*, 850 F.3d at 1013.[9]  On a motion under Federal Rule of Criminal Procedure 12, the failure to allege facts that, if proven, would satisfy the intent element of the offense is a fatal defect requiring dismissal of the indictment.  *See United States v. Mitchell*, 867 F.2d 1232, 1233 (9th Cir. 1989) ("To charge a scheme to defraud under section 1341, *McNally* requires an allegation that Mitchell intended to deprive the city of money or property. The indictment in this case is devoid of any such allegation." (citations omitted)).

"[F]or purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim."  *Cleveland v. United States*, 531 U.S. 12, 15 (2000); *see also Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987) ("The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here.").  The

---

[9] A conspiracy under Section 1349 "requires an agreement among two or more persons that would satisfy the elements of the substantive offense" of wire fraud.  *Hussain*, 2017 WL 4865562, at *5. Accordingly, an indictment charging conspiracy to commit wire fraud must specify the underlying fraud.  *See supra* n.3.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
27

specific intent element of wire fraud, thus, "must be [the intent] to obtain money or property from the one who is deceived." *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989); *see also United States v. Ali*, 620 F.3d 1062, 1071 (9th Cir. 2010) ("[U]nder *Lew*, Microsoft must be the victim from whom property was taken."); *Monterey Plaza Hotel Ltd. P'ship v. Local 483 of Hotel Emps. & Rest. Emps. Union*, 215 F.3d 923, 927 (9th Cir. 2000) ("The purpose of the mail fraud and wire fraud proscriptions is to punish wrongful transfers of property from the victim to the wrongdoer, not to salve wounded feelings.").

### 1. "Non-Paying" Patients[10]

The SI acknowledges that many of the alleged patient victims did not pay for Theranos tests and so Defendants argue that these patients are not "victims" under *Lew*. Counts Mot. at ECF 9; *see also* SI ¶ 15 ("Based on [Defendants'] representations, [about Theranos's ability to provide accurate, fast, reliable, and cheap blood tests and test results] many hundreds of patients, paid, *or caused their medical insurance companies to pay*, Theranos, or *Walgreens acting on behalf of Theranos*, for blood tests and tests results . . . ." (emphasis added)). Defendants thus argue that portions of the SI that rely on "non-paying" patient victims must be dismissed.

In *Lew*, the Ninth Circuit held that the defendant could not be convicted of mail fraud because the government failed to allege and prove that the defendant had the specific intent to deprive the alleged victim of property or money. 875 F.2d at 222. There, the defendant, an immigration attorney, allegedly misrepresented his immigrant-client's employment status to the Department of Labor. *Id.* at 220–21. The government argued that defendant intended to defraud his immigrant-clients of money because he made them pay a fee and deceived them into believing that they could lawfully become permanent residents. *Id.* at 220. The court, however, disagreed and found that there was no evidence that the defendant intended to deceive his clients. *Id.*

---

[10] This class of patients refers to patients who did not pay for the blood-tests because their insurance provider paid in full for the test.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

United States District Court
Northern District of California

1   Rather, the evidence showed that the defendant intended to deceive the Department of Labor.  *Id.*

2   at 221.  The jury instructions permitted the defendant to be convicted for wire fraud even though

3   the money was not received from the party deceived.  *Id.* at 221, 222.  This, the court held, was

4   improper because it failed to instruct the jury about the requisite convergence between the intent to

5   defraud and the intent to deprive a victim of money or property.  *Id.* at 222.  Due to this, the wire

6   fraud convictions were reversed.  *Id.* at 222.

7        *Ali* maintains *Lew*'s requirement of convergence.  In *Ali*, the defendants devised a scheme

8   in which they fraudulently obtained software and then resold the software for a profit.  620 F.3d at

9   1064.  Microsoft sells Academic Edition ("AE") software through its Authorized Education

10  Reseller ("AER") program.  *Id.*  Only authorized distributors could sell AE software and they

11  could only sell it to AERs.  *Id.* at 1064–65.  The defendants fraudulently attained AER status by

12  creating new companies under false names to purchase existing AER companies.  *Id.* at 1065.

13  This allowed the defendants to acquire and distribute AE software without ever becoming an

14  authorized distributor, thus diverting potential profits from Microsoft.  *Id.*  The Ninth Circuit first

15  determined that the diversion of profits qualified as "money or property" because it ultimately

16  denied Microsoft their right to full payment for AE software.  *Id.* at 1067.  The court next

17  concluded that there was convergence—the alleged victim, Microsoft, lost money.  *Id.* at 1068.

18  Accordingly, the defendants had the "intent to defraud" Microsoft.

19       Pursuant to *Lew* and *Ali*, the indictment must show that the defendant intended to deprive

20  the alleged victim of their money or property.  The Government does not allege that the patient-

21  victims had a property interest in receiving accurate test results or not being medically harmed.

22  *But see* Counts Opp. at 3–4 (discussing the trauma experienced by patients who received false

23  results); *cf. United States v. Slay*, 717 F. Supp. 689, 692 (E.D. Mo. 1989) (finding that while

24  *Carpenter* holds certain intangible property rights are within the scope of the wire fraud statute,

25  the right to accurate information is not a cognizable property interest); *United States v. Sadler*, 750

26  Case No.: 5:18-cr-00258-EJD
    ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27  DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
    TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28  GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
    COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

United States District Court
Northern District of California

F.3d 585, 591 (6th Cir. 2014) ("[E]thereal right to accurate information doesn't fit within [limited property rights protected by wire fraud statute].")"; *Cleveland*, 531 U.S. at 27 ("Absent clear statement by Congress, we will not read the mail fraud statute to place under federal superintendence a vast array of conduct traditionally policed by the States.")"; *McNally v. United States*, 483 U.S. 350, 359–60 (1987), *overruled on other grounds by Skilling v. United States*, 561 U.S. 358 (2010) ("The Court has often stated that when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher one only when Congress has spoken in clear and definite language.").

Instead, the Government argues the SI sufficiently alleges that Defendants deprived patient-victims of "the money that Theranos's customers would pay for testing services." Counts Opp. at 1. But there is a fundamental issue with the Government's theory—some customers did not pay for their blood tests. Indeed, the SI specifically contemplates that not all patient-victims paid for the test.

- **Paragraph 15:** HOLMES and BALWANI devised a scheme to defraud doctors and patients, through advertisements and marketing materials, through explicit and implicit claims concerning Theranos's ability to provide accurate, fast, reliable, and cheap blood tests and test results, and through omissions concerning the limits of and problems with Theranos's technologies. Based on these representations, many hundreds of patients paid, *or caused their medical insurance companies to pay*, Theranos, or Walgreens acting on behalf of Theranos, for blood tests and test results, sometimes following referrals from their defrauded doctors.

- **Paragraph 26:** On or about the dates set forth below, within the Northern District of California, and elsewhere, the defendants, for the purpose of executing the material scheme and artifice to defraud doctors and patients, and for obtaining money and property from patients, doctors, *and insurance companies* by means of materially false and fraudulent pretenses, representations, promises, and material omissions with a duty to disclose, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and pictures, that is, laboratory and blood test results and payments for the purchase of advertisements soliciting patients and doctors for its laboratory business, as further set forth below, in violation of Title 18, United States Code, Section 1343.

These paragraphs of the SI highlight the problem; the SI acknowledges that two types of patient victims exist—ones who paid and ones whose insurance paid. Much like in *Lew*, there is

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

30

United States District Court
Northern District of California

United States District Court
Northern District of California

1   divergence between the intent to defraud and the harm suffered.  Pursuant to the SI, the non-

2   paying patients did not suffer a monetary harm.  At first glance, this seems like the same scenario

3   as *United States v. Utz*, 886 F.2d 1148 (9th Cir. 1989).  There, the Ninth Circuit noted that it is

4   enough for "the government [to] charge and the jury [to] find either that the victim was actually

5   deprived of money or property *or* that the defendant intended to defraud the victim of the same.

6   *Utz*, 886 F.2d at 1151.  Closer review, however, shows that this case is unlike *Utz*.  The "intent to

7   defraud" still requires convergence; the defendant must intend to deprive the alleged victim of

8   money or property.  *Utz* does not eradicate this requirement.  Under the SI, non-paying patients

9   were not deprived of any money *and* because of their insurance-status, the SI contemplates that

10  Defendants did not intend to deprive them of money.  *Boren*, 278 F.3d at 914 ("D]istrict court is

11  bound by the four corners of the indictment.").  Indeed, insured customers are more like the third-

12  party distributors in *Ali*.  There, the third-party distributors, like the insured customers, were not

13  victims of the scheme because there was no showing that the defendants intended to deprive them

14  of money or property.  *Ali*, 320 F.3d at 1068; *cf. United States v. Bonallo*, 858 F.2d 1427, 1434 n.9

15  (9th Cir. 1988) (holding that "intent to defraud" met as to bank because bank was a victim of the

16  scheme).

17      In the alternative, the Government argues that insured patients were deprived money

18  because they paid premiums.  Counts Opp. at 12 ("[P]remiums . . . mean[] that the money health

19  insurance companies use to pay medical service providers is ultimately derived from, and

20  indirectly reimbursed by, the covered patients.  An indirect connection between the victim of the

21  fraud and funds obtained by the fraudster is acceptable . . . .").  But, even in "indirect connection"

22  cases, the victim must still be deprived of their property or money.  *See, e.g.*, *Bonallo*, 858 F.2d at

23  1434 n.9 (noting that indirect victim, the bank, still was deprived of money); *Ali*, 620 F.3d at 1062

24  (affirming wire fraud conviction even where Microsoft was not the target of the scheme because

25  Microsoft lost money from the scheme).  Here, in contrast to *Bonallo* and *Ali*, the patients would

26  Case No.: 5:18-cr-00258-EJD

1   have paid their premiums *regardless* of Theranos' blood tests.  There is no showing or argument

2   by the Government that patients were required to pay a higher premium because of Theranos tests

3   or that premiums were specific for Theranos testing.  Hence, this case is not an "indirect

4   connection" case because insured victims did not lose money.

5          Finally, the Government's reliance on *United States v. Crawford* is misplaced.  *Crawford*

6   holds that a fraud conviction does not require the government to prove the identity of the fraud

7   victim.  239 F.3d 1086, 1092 (9th Cir. 2001).  There, the defendant sold a painting that did not

8   belong to her.  *Id.* at 1089.  The defendant argued on appeal that because ownership of the painting

9   had not yet been established, there was no identifiable victim and the government could not prove

10  she had the specific intent to defraud someone.  *Id.* at 1092.  The court disagreed and held that

11  because she knew she did not own the painting, she intended to deprive the owner, whoever that

12  may be, of its use.  *Id.* at 1093.

13         *Crawford* does not eradicate the requirement that a defendant's "intent must be to obtain

14  money or property from the one who is deceived."  *Lew*, 875 F.2d at 221.  The SI alleges that

15  Defendants intended to defraud two types of patients—ones who paid and ones whose insurance

16  paid for the blood tests.  Indeed, comparative to *Crawford*, where there was only *one possible*

17  *owner* of the painting, here, there are two sources of money.  Thus, even if the Government need

18  not prove specific patients' identities, it still must prove that Defendants intended to deprive the

19  *class* of victims of their money or property.  A contrary finding would make the wire fraud statue

20  limitless; any vague recitation of a class of persons would satisfy the statute.  But this would

21  contravene *McNally* and *Lew* because it would allow distinct sets of victims to be clumped into

22  one group, which would erode any type of convergence requirement.

23         There are four types of possible victims in the doctor/patient scheme: paying patients, non-

24  paying patients, doctors, and insurance companies.  The SI does not allege insurance companies

25  were defrauded.  It does, however, allege that insured patients were defrauded.  But it fails to

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
32

United States District Court
Northern District of California

United States District Court
Northern District of California

1    connect a specific intent to defraud to such patients because it does not show Defendants intended

2    to deprive them of money.  Rather, the SI indicates that the money flowed from the insurance

3    company.  Hence, the SI does not show that Defendants intended to obtain money from the non-

4    paying patient-victims, *i.e.*, the one who was allegedly deceived.  *See id.*

5        For these reasons, the Court **GRANTS** Defendants' motion to dismiss counts two and nine

6    through eleven to the extent they depend on insured and non-paying patient-victims.[11]

7                **2.  Doctors**

8        Defendants next argue that the SI fails to allege that Defendants intended to deprive

9    doctors of money or property.  Counts Mot. at ECF 9.

10       The Government points the Court towards *United States v. Harkonen*, 510 F. App'x 633

11   (9th Cir. 2013).  In *Harkonen*, the Ninth Circuit held that there was sufficient evidence for the jury

12   to find that the defendant knowingly participated in a scheme to defraud and possessed the specific

13   intent to deceive or defraud.  510 F. App'x at 636.  There, the defendant issued a fraudulent press

14   release that overstated a pharmaceutical product's success and was "at least 'capable' of

15   influencing the decision of doctors to prescribe, or patients to seek, prescriptions of [the drug]."

16   *Id.*  Based on this, the jury convicted the defendant of wire fraud and the Ninth Circuit upheld the

17   conviction.  *Id.*

18       *Harkonen* is unhelpful to the Government's case.  It says *nothing* about (1) who the

19   defendant intended to defraud or (2) whether or not a property or money interest was alleged in the

20   indictment.  These are the issues before this Court.  Hence, *Harkonen* is unhelpful in answering

21   the question: can the Government maintain its allegation that Defendants had the specific intent to

22   defraud doctors of property or money?  *See Lew*, 875 F.2d at 222 (requiring a showing of intent to

23

24   [11] The Court does not view the presence of Walgreens as significant.  Theranos sponsored the tests
     and ran the results.  Defendants collected money from paying patients through Walgreens.  Hence,

25   Walgreens presence in the action is irrelevant.  Accordingly, this class of patients includes
     patients, with insurance, who either visited their doctors directly or used Walgreens.

26   Case No.: 5:18-cr-00258-EJD
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO

27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;

28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

defraud a victim of money or property).

The Court holds that the SI fails to allege that Defendants intended to deprive doctors of their money or property.  The SI alleges that Defendants "induc[ed] doctors to refer and patients to pay for and use its laboratory and blood testing services under the false and fraudulent pretense that Theranos technology produced reliable and accurate blood test results."  SI ¶ 22; *see also id.* ¶ 26 (alleging Defendants intended to defraud doctors of money and property).  The contrast between doctors and patients is plain; the SI alleges patients *paid* while doctors *referred*. Paragraph 26 does not save this conclusion—its bare-bones recitation that Defendants intended to deprive doctors of money or property does not provide the "meat on the bones" sufficient to satisfy the fair notice requirement discussed above.  Moreover, the Government's argument at trial that a specific doctor lost property is unconvincing.  The Court is bound by the four-corners of the indictment which fail to allege that Defendants intended to deprive doctors of their money or property.  *See Boren*, 278 F.3d at 914 (noting that court is bound by four-corners of the indictment).

In the alternative, the Government argues that the doctors were unwilling participants in the alleged scheme and passed along fraudulent information to their patients in recommending Theranos.  Counts Opp. at 12.  The Government relies on *United States v. Ciccone*, 219 F.3d 1078, 1084 (9th Cir. 2000) for support.  But this case is equally unhelpful.

*Ciccone* involved a telemarketing scheme where the defendant's employees made misrepresentations to victims.  219 F.3d at 1083–85.  Specifically, the defendant paid solicitors to telephone people as part of a scheme to get callers to send money to Feed America (the defendant's organization).  *Id.* at 1080.  The solicitors told people that they had won money, a fabulous prize, and the opportunity to donate to charitable causes.  *Id.*  But, first people had to pay a sum to Feed America, who only returned 10% of their donation.  *Id.*  The defendant argued on appeal that he could not be convicted of mail fraud because he did not personally make the calls.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
34

United States District Court
Northern District of California

United States District Court
Northern District of California

*Id.* at 1083.  The Ninth Circuit rejected this argument and held that, even if he did not make the calls, he directed his solicitor-employees to perpetrate the scheme by (1) providing solicitors with lists identifying victims of other telemarketing schemes and (2) crafting the sales pitch that was "rich with misrepresentations." *Id.* at 1084.  The defendant's criminal liability was thus premised on his own fraudulent behavior and his own intent to defraud the alleged victims.

This case differs from *Ciccone*.  First, there is no showing that Defendants directed doctors to make misrepresentations to their patients.  Indeed, the defrauded doctors were not Theranos employees (at least, pursuant to the SI).  The contrary is alleged.  The SI maintains that the "defrauded doctors" referred patients to Theranos.  SI ¶ 15.  This shows that the doctors were *not* operating at the direction of Defendants.  Second, in *Ciccone*, the alleged victims of the fraud lost money and the defendant intended to defraud those victims.  There was thus convergence.  In contrast, here, there is no showing that the doctors lost money or property or that Defendants intended for them to lose money or property.

Furthermore, any similarity between *Ciccone* and this case is unhelpful to the Government.  The doctors can be compared to the telemarketer-employees who placed the calls, while the recipients of the calls (the victims) can be compared to the paying patients.  There was no argument that the defendant's telemarketer-employees were victims of the scheme.  *Ciccone*, 219 F.3d at 1080.  Thus, any comparison between the cases favors Defendants' argument that the SI does not allege that the doctors were victims of the scheme to defraud.  Accordingly, *Ciccone* is unpersuasive and the Court **GRANTS** Defendants request to dismiss counts two and nine through eleven to the extent they depend on doctor-victims.

### B.  Benefit of the Bargain

Defendants next argue that the SI must be dismissed as it relates to *all* patients because it fails to allege that Defendants mispresented the "nature of the deal."  Counts Mot. at ECF 10.  In Defendants view, the patient-victims got "what they paid for."  *Id.* at ECF 11.  The SI alleges that

1    Defendants claimed, through advertisements and marketing materials,  that Theranos could

2    produce accurate, fast, reliable, and cheap blood tests and results.  SI ¶ 15.  While the SI alleges

3    these claims were false, it does not explicitly allege that Theranos could *not* provide accurate, fast,

4    reliable, and cheap blood tests and test results.  Counts Mot. at ECF 10.  This is where Defendants

5    hang their hat.  In their view, because the SI does not explicitly claim that Defendants promised

6    patients a certain result, the SI fails to allege that Defendants misrepresented the nature of the deal.

7        The wire-fraud statute makes criminal any "scheme or artifice to defraud."  18 U.S.C.

8    § 1343.  As established above, the statute punishes schemes intended to "deprive [people] of their

9    money or property."  *Cleveland*, 531 U.S. at 19.  In this instance, that means the indictment must

10    allege that Defendants knowingly used an interstate wire communication to further a scheme to

11    defraud paying[12] patient-victims of their money or property.  "Money or property" at first glance

12    seems clear.  Indeed, as analyzed above, in the classic scenario, the relevant question is whether a

13    defendant intended to take a victim's money or property?  *See, e.g. Ali*, 620 F.3d at 1067

14    (Microsoft deprived of money); *Crawford*, 239 F.3d at 1088 (defendant took property of another).

15        This question can become harder to answer in the commercial setting.  In this case,

16    Defendants transacted with patients to provide a blood testing (a service).  There is no dispute that

17    some patients paid Theranos for this service.  *See* SI ¶ 15.  There is, however, a dispute as to

18    whether or not the patients *got what they paid for*.  Hence, the relevant inquiry is whether

19    Defendants misrepresented the nature of the bargain.  *See United States v. Takhalov*, 827 F.3d

20    1307, 1313 (11th Cir. 2016) ("[A] schemer who tricks someone to enter into a transaction has not

21    'schemed to defraud' so long as he does not intend to harm the person he intends to trick.  And

22    _____

23    [12] Because the Court held above that the SI did not allege that Defendants had the SI to deprive
       non-paying patient-victims of their money, this portion of the Order only addresses paying patient-

24    victims, *i.e.* patients who either paid in full for the blood tests or paid a co-pay for the blood test.
       *See supra* IV.A.1.  Defendants do not argue that the "benefit of the bargain" theory applies to the

25    doctor-victims and so the Court does not discuss the doctor-victims in this portion of the Order.
       *But see supra* IV.A.2.

26    Case No.: 5:18-cr-00258-EJD
       ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO

27    DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
       TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;

28    GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
       COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

1    this is so even if the transaction would not have occurred but for the trick."); *United States v.*

2    *Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) ("Our cases have drawn a fine line between schemes that

3    do no more than cause their victims to enter into transactions they would otherwise avoid—which

4    do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a

5    misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud

6    statutes.").

7         In *Takhalov*, the Eleventh Circuit held that, in the commercial context, a "scheme to

8    defraud" refers only to schemes in which a defendant "lies about the nature of the bargain itself."

9    827 F.3d at 1313.  There, the defendants were tried and convicted of wire fraud.  *Id.* at 1310.  The

10   defendants operated clubs and hired Eastern European women to pose as tourists, locate visiting

11   businessmen, and lure them into the defendants' clubs.[13]  *Id.*  The defendants asked for a jury

12   instruction that "[f]ailure to disclose the financial arrangement between the [Eastern European

13   women] and the Bar, in and of itself, is not sufficient to convict a defendant of any offense[.]"  *Id.*

14   at 1311 (first alteration in original).  The Eleventh Circuit held that the district court erred in

15   denying this instruction because the proposed instruction was an accurate statement of law.  The

16   presence of the women was irrelevant ; the victims still got what they "bargained" for.  *Id.* at

17   1315–16.  Hence, a defendant's lie about the nature of the bargain is actionable in two primary

18   forms.  First, the defendant might lie about the price of a good, *i.e.* represent that a good is $5

19   when it is in fact $10.  *Id.* at 1313–14.  Or, the defendant might lie about the characteristics of the

20   good, *i.e.* represent that a product is designer when it is in fact a knock-off.  *Id.* at 1314.

21        The following hypotheticals are instructive.  Imagine you go to the doctor's office for a

22   blood test.  The nurse tells you that before test, he will bring you apple juice.  Instead, because he

23   dislikes you, he brings you cranberry juice.  He takes your blood and you get your (accurate)

24

25   _____

     [13] Part of the scheme involved swindling the men once they were inside the club.  That part of the
     scheme was not at issue on appeal and is not discussed herein.

26   Case No.: 5:18-cr-00258-EJD
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

results.  Did you get what you bargained for?  Yes.  You still got your blood test and received the correct results.  The fact that you got cranberry juice is irrelevant; you did not ask for juice; it was secondary to the core transaction.  Next imagine, you go to the doctor's office for the same blood test.  The nurse comes to your patient-room and tells you about a new type of blood test.  He says this new test only requires a couple drops of blood but remains just as accurate and reliable as a classic blood test.  You agree to use the new test, only to discover later that the test was neither accurate nor reliable.  Have, you been defrauded?  Yes.  Why?  Because the misrepresentation went to the value of the bargain.  You paid for something that you did not receive.  You paid for an accurate and reliable test and, because you did not receive that, you have been deceived about the characteristics of the good.  *See id.* at 1314.

The SI accords with the second scenario.  It alleges that Defendants used advertisements and marketing materials to misrepresent Theranos' ability to provide accurate, reliable, fast, and cheap blood tests.  SI ¶ 15.  It further alleges that Defendants knew that their technology was not capable of producing "accurate and reliable results."  *Id.* ¶ 16.  And, despite knowing about the problems with their technology, Defendants sent out inaccurate test results.  *Id.* ¶ 17.  Part of the bargain struck with consumers was thus that the tests and results would be accurate and reliable.  The accuracy and reliability guarantees were "characteristics" of the good.  *See Takhalov*, 827 F.3d at 1314.  Viewing the indictment as a whole and with common sense, it is plain that it sufficiently alleges that patients did not receive the benefit of the bargain.  *See Giese*, 597 F.2d at 1178 (noting that an indictment must be read with common sense).  They did not receive the accurate and reliable test that they were promised.  Accordingly, this is not the "sweeping expansion" Defendants claim it to be, see Counts Opp. at ECF 12, and the Court **DENIES** Defendants' request to dismiss Counts Two and Nine through Eleven as to paying patient-victims.

1

### V.      CONCLUSION

2      For the foregoing reasons, the Court:

3   1.   **GRANTS in part** and **DENIES in part** Defendants' Motion to Dismiss the SI for lack of

4        fair notice.  The Court holds the SI provides Defendants fair notice of the charges they face

5        but orders the Government to produce a bill of particulars as to the specific

6        misrepresentations underlying the doctor-patient fraud and the names of any co-

7        conspirators supporting count one.

8   2.   **DENIES** Defendants' Motion to Dismiss the SI for failure to allege falsity.

9   3.   **GRANTS in part** and **DENIES in part** Defendants' Motion to Dismiss Counts Two and

10       Nine through Eleven.  These counts remain as to paying patients, but to the extent they rely

11       on non-paying patients or doctors, they must be dismissed.

12       **IT IS SO ORDERED.**

13   Dated: February 11, 2020

14

15   EDWARD J. DAVILA
     United States District Judge

16

17

18

19

20

21

22

23

24

25

26   Case No.: 5:18-cr-00258-EJD
27   ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
     DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
     GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
28   COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

United States District Court
Northern District of California

# EXHIBIT 2

SUMMARY OF REVENUE ADJUSTMENTS - 2009 TO OCTOBER 2011

ASL STATUTORY ACCOUNTS REVENUE ADJUSTMENTS

Figures in this table are in GBP £'m and are subject to rounding.
Negative figures represent debits, being decreases in revenue. Positive figures represent credits, being increases in revenue.

| | Retained Earnings (Note 3) As at Dec 2009 | Revenue Total 2010 | Revenue Jan - Oct 2011 |
|---|---|---|---|
| **Originally Stated (Note 1)** | 180.01 | 175.63 | 108.64 |
| **Adjustments in respect of restated transactions (Note 2)** | | | |
| *VAR transactions* | (31.85) | (23.94) | 8.73 |
| MicroLink | (2.52) | 2.71 | - |
| MicroLink | (3.72) | (2.89) | - |
| Integration de Negocios en Tecnologia de Información/Various end users | (7.98) | 1.46 | 1.78 |
| Capax Discovery/Kraft Foods Global | - | - | - |
| MicroTech/Honeywell Aerospace | (1.09) | - | - |
| MicroTech/Discover Technologies | (5.74) | - | - |
| MicroTech/Morgan Stanley & Co | (2.81) | 2.81 | - |
| Capax Discovery/Eli Lilly and Company | (3.61) | 3.61 | - |
| MicroTech/Amerian Insurance Services | (0.15) | 0.15 | - |
| MicroTech/Century Link | (0.42) | 0.42 | - |
| AS Computadoras y Servicios/Secretaria de Gobernacion | (1.58) | 0.87 | 0.77 |
| Sales Consulting/Poste Italiane | (0.49) | - | - |
| MicroLink/Discover Technologies | (1.99) | - | - |
| Capax Discovery/Financial Services Authority | - | (1.99) | 2.21 |
| MicroTech/Biblioteca Apostolica Vaticana (Vatican Library) | - | (3.74) | 3.46 |
| Discover Technologies/Philip Morris International Management | - | - | - |
| Discover Technologies/CitiGroup Technology | - | - | - |
| Auxilium Tech/Biblioteca Apostolica Vaticana (Vatican Library) | - | (1.24) | (0.05) |
| Comercializadora Cobalta/TV Azteca | - | (0.90) | 0.94 |
| Filetek/United States Veterans Administration Authority | - | (6.05) | 1.75 |
| Capax Discovery/Bank of America - Amgen | - | (4.18) | - |
| Red Ventures/Various end users | - | (1.74) | (0.06) |
| Capax Discovery/Defense Knowledge Online | - | (1.18) | 1.18 |
| MicroTech/US Department of the Interior | - | (1.86) | 1.86 |
| Discover Technologies/Bank of America | - | (3.25) | 0.31 |
| Discover Technologies/Bank of America | - | (1.45) | - |
| Capax Discovery/Merrill Lynch - Bank of America | - | (1.00) | 1.00 |
| Tikit/KPMG | - | (3.85) | 2.25 |
| Discover Technologies/ThinkTech | - | - | 0.29 |
| Capax Discovery/McAfee | - | - | (3.02) |
| Discover Technologies/Prisa | - | - | (0.46) |
| MicroTech/Bank of Montreal | - | - | - |
| Capax Discovery/UBS | - | - | - |
| Capax Discovery/UBS | - | - | - |
| Discover Technologies/Abbott Laboratories | - | - | 0.19 |
| Discover Technologies/Hyatt/Dell | - | - | 0.17 |
| MicroTech/Hewlett Packard | - | - | (7.25) |
| Other VAR transactions (adjustments < $1.2m) | (3.40) | 1.17 | 0.05 |
| *Reciprocal transactions* | (13.66) | (13.67) | 2.06 |
| Capax Discovery (FDIC) | (1.27) | - | (1.20) |
| Video Monitoring Services | (6.58) | 0.90 | 1.40 |
| Filetek | (6.90) | 1.16 | 1.01 |
| Vidient Systems | (1.51) | 0.91 | 0.92 |
| Filetek | - | (6.05) | 1.20 |
| Mercedes-Benz Grand Prix | - | (1.04) | (0.05) |
| Realise Limited/Credit Suisse Securities | - | (1.27) | (0.08) |
| EMC | - | (2.36) | 0.60 |
| Vidient Systems | - | (1.21) | - |
| Video Monitoring Services (Software) | - | (2.86) | (1.60) |
| Video Monitoring Services (Hardware) | - | (3.65) | 3.75 |
| Tottenham Hotspur | - | - | (4.12) |
| MicroTech LLC | - | - | (6.44) |
| Other reciprocal transactions (adjustments < $1.5m) | - | - | - |
| *Hosting transactions* | (19.62) | (24.99) | (9.26) |
| *Other adjustments* | (13.08) | (9.55) | (20.47) |
| BBC Monitoring | (3.58) | (0.61) | (1.14) |
| Canna Konsern | 0.04 | - | - |
| Tottenham Hotspur | - | (5.90) | 0.72 |
| Play | - | (1.09) | 1.09 |
| Prisa | - | (3.72) | (0.14) |
| Serious Fraud Office | - | - | (1.38) |
| Apple | (2.02) | - | 1.11 |
| UBS | - | - | (5.18) |
| Other Value adjustments (adjustments < $1.5m) | (7.53) | 1.98 | (12.06) |
| **Total adjustments in respect of restated transactions** | (86.15) | (74.25) | (17.39) |
| **As adjusted for restated transactions** | 107.88 | 101.38 | 90.73 |
| Adjustments in respect of changes in accounting policy (principally ceasing to capitalise R&D ) | 1.01 | (20.09) | (17.25) |
| **As restated in the FY11 statutory accounts of ASL (Note 2)** | 108.55 | 81.29 | 73.48 |
| Hardware revenue | (12.24) | (11.45) | (5.01) |
| | | | |
| Percentage restated | -42.1% | -53.7% | -32.4% |
| | | | |
| Percentage restated (including hardware revenue) | 35.6% | 47.0% | 25.0% |

Note 1 - Originally stated for Dec 09 and FY10 relate to the values reported in the originally filed ASL 2010 statutory accounts. Originally stated for FY11 relate to the values originally recorded in ASL's draft statutory accounts prepared mid 2012 but not filed. This FY11 start position has been further adjusted to remove the revenue recorded on the sale of IP from ASL to Longsand, because this was an intercompany sale in September 2011, it has no impact on the consolidated accounts and distorts the analysis - therefore it has been removed from the starting figures.

Note 2 - The FY11 revenue values in the FY11 statutory accounts are restated compared to what was drafted in the original version FY11 accounts (not filed). The FY10 and FY09 figures are restated compared to what was filed in the original FY10 statutory accounts (see also Note 1).

Note 3 - The FY09 revenue figures are not disclosed in the FY11 accounts and as such their restatement is not presented. Instead the FY09 closing retained earnings were restated and have therefore been presented above. This ASL retained earnings restatement includes all impacts to ASL's retained earnings whether arising through revenue or costs restatements and whether arising in FY09 or prior years.

Note 4 - Deals separately identified are those with an adjustment to group revenue exceeding $1.5 million in any given quarter or in total across the relevant period (Q1 2009 - Oct 2011 inclusive). These deals are presented in the same order as in the Summary of Revenue Adjustments for the group.

Note 5 - The financial statements of ASL are impacted by the restatements identified in ASL itself and the restatements identified in several of the non US UK group entities, as a result of the group's transfer pricing arrangements. Differences in the value of individual adjustments between the Summary of Revenue Adjustments for ASL and the Summary of Revenue Adjustments for the group arise as a result of i) these transfer pricing arrangements and ii) translation between GBP£ and US$.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-02332635

EXH 2749-0001

HP-SEC-02332636

FOIA CONFIDENTIAL TREATMENT REQUESTED

EXH 2749-0002

HP-SEC-02332637

FOIA CONFIDENTIAL TREATMENT REQUESTED

# ADJUSTED AUTONOMY GROUP CONSOLIDATED REVENUE

## SUMMARY OF REVENUE ADJUSTMENTS - Q1 2009

Figures in this schedule are in USD $'m and are subject to rounding.
Negative figures represent debits, being decreases in revenue. Positive figures represent credits, being increases in revenue.

| | Revenue |
|---|---|
| | Q1 2009 |
| **Originally stated revenue (Note 1)** | **129.78** |
| **Total restated transactions (Notes 2 & 3):** | **(14.24)** |
| Capax Discovery (EDD) | (7.50) |
| MicroLink | (3.01) |
| Camsa Konzern | (1.60) |
| Hosting transactions | 0.81 |
| Adjustments < $1.5m in this quarter | (2.93) |
| **Restated revenue** | **115.54** |
| | |
| **Hardware revenue (Note 4):** | **-** |
| | |
| **Percentage restated** | **-11.0%** |
| **Percentage restated (including hardware revenue)** | **-11.0%** |

4

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-02332638

EXH 2749-0004

HP-SEC-02332639

# ADJUSTED AUTONOMY GROUP CONSOLIDATED REVENUE

## SUMMARY OF REVENUE ADJUSTMENTS - Q2 2009

Figures in this schedule are in USD $'m and are subject to rounding.

Negative figures represent debits, being decreases in revenue. Positive figures represent credits, being increases in revenue.

| | Revenue |
|---|---|
| | Q2 2009 |
| **Originally stated revenue (Note 1)** | **195.19** |
| **Total restated transactions (Notes 2 & 3):** | **(24.09)** |
| Video Monitoring Services | (8.57) |
| MicroLink | (5.43) |
| MicroLink | (4.58) |
| Integracion de Negocios en Tecnologia de Informacion/Various end users | (3.66) |
| Hosting transactions | 0.64 |
| Adjustments < $1.5m in this quarter | (2.50) |
| **Restated revenue** | **171.10** |

| | |
|---|---|
| **Hardware revenue (Note 4):** | **6.24** |
| Morgan Stanley | 6.00 |
| JP Morgan | 0.24 |

| | |
|---|---|
| **Percentage restated** | **-12.3%** |
| **Percentage restated (including hardware revenue)** | **-15.5%** |

5

FOIA CONFIDENTIAL TREATMENT REQUESTED

EXH 2749-0005

HP-SEC-02332640

# ADJUSTED AUTONOMY GROUP CONSOLIDATED REVENUE

## SUMMARY OF REVENUE ADJUSTMENTS - Q3 2009

Figures in this schedule are in USD $'m and are subject to rounding.

Negative figures represent debits, being decreases in revenue. Positive figures represent credits, being increases in revenue.

|  | Revenue |
|---|---|
|  | Q3 2009 |
| **Originally stated revenue (Note 1)** | **191.61** |
| **Total restated transactions (Notes 2 & 3):** | **(9.57)** |
| MicroLink | (4.91) |
| Capax Discovery/Kraft Foods Global | (4.00) |
| Hosting transactions | 2.28 |
| Adjustments < $1.5m in this quarter | (2.94) |
| **Restated revenue** | **182.04** |

| Hardware revenue (Note 4): | **37.64** |
|---|---|
| Citigroup | 18.38 |
| JP Morgan | 10.68 |
| Bloomberg | 7.13 |
| Morgan Stanley | 1.26 |

| **Percentage restated** | **-5.0%** |
|---|---|
| **Percentage restated (including hardware revenue)** | **-24.6%** |

6

FOIA CONFIDENTIAL TREATMENT REQUESTED

EXH 2749-0006

HP-SEC-02332641

# ADJUSTED AUTONOMY GROUP CONSOLIDATED REVENUE

## SUMMARY OF REVENUE ADJUSTMENTS - Q4 2009

Figures in this schedule are in USD $'m and are subject to rounding;
Negative figures represent debits, being decreases in revenue. Positive figures represent credits, being increases in revenue.

| | Revenue |
| --- | --- |
| | Q4 2009 |
| **Originally stated revenue (Note 1)** | **223.11** |
| **Total restated transactions (Notes 2 & 3):** | **(60.41)** |
| MicroTech/Discover Technologies | (9.52) |
| Filetek | (8.00) |
| Capax Discovery/Eli Lilly and Company | (5.99) |
| MicroTech/Morgan Stanley & Co | (4.66) |
| Capax Discovery (EDD) | (4.00) |
| AS Computadoras y Servicios/Secretaria de Gobernacion | (2.62) |
| Vident Systems | (2.50) |
| MicroLink/Discover Technologies | (2.30) |
| Sales Consulting/Poste Italiane | (2.25) |
| MicroTech/Honeywell Aerospace | (1.80) |
| Capax Discovery/Kraft Foods Global | 4.00 |
| Hosting transactions | (18.05) |
| Adjustments < $1.5m in this quarter | (2.73) |
| **Restated revenue** | **162.70** |

| | |
| --- | --- |
| **Hardware revenue (Note 4):** | **9.42** |
| Morgan Stanley | 5.90 |
| Credit Suisse | 4.25 |
| SHI | 1.03 |
| JP Morgan | (2.03) |
| Other | 0.27 |

| | |
| --- | --- |
| **Percentage restated** | **-27.1%** |
| **Percentage restated (including hardware revenue)** | **-31.3%** |

7

FOIA CONFIDENTIAL TREATMENT REQUESTED

EXH 2749-0007

# ADJUSTED AUTONOMY GROUP CONSOLIDATED REVENUE

## SUMMARY OF REVENUE ADJUSTMENTS - Q1 2010

Figures in this schedule are in USD $?m and are subject to rounding.
Negative figures represent debits, being decreases in revenue. Positive figures represent credits, being increases in revenue.

|  | Revenue |
|---|---|
|  | Q1 2010 |
| **Originally stated revenue (Note 1)** | **194.18** |
| **Total restated transactions (Notes 2 & 3):** | **(34.82)** |
| MicroTech/Biblioteca Apostolica Vaticana (Vatican Library) | (11.00) |
| Filetek | (8.50) |
| Discover Technologies/CitiGroup Technology | (5.50) |
| Capax Discovery/Financial Services Authority | (4.29) |
| Discover Technologies/Philip Morris International Management | (4.19) |
| Mercedes-Benz Grand Prix | (1.60) |
| MicroLink | 2.70 |
| MicroTech/Morgan Stanley & Co | 4.66 |
| Hosting transactions | (8.14) |
| Adjustments < $1.5m in this quarter | 1.03 |
| **Restated revenue** | **159.36** |

| **Hardware revenue (Note 4):** | **11.84** |
|---|---|
| Morgan Stanley | 5.29 |
| SHI | 5.22 |
| Fannie Mae | 1.28 |
| Other | 0.06 |

| **Percentage restated** | **-17.9%** |
|---|---|
| **Percentage restated (including hardware revenue)** | **-24.0%** |

8

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-02332642

EXH 2749-0008

HP-SEC-02332643

# ADJUSTED AUTONOMY GROUP CONSOLIDATED REVENUE

## SUMMARY OF REVENUE ADJUSTMENTS - Q2 2010

Figures in this schedule are in USD $m and are subject to rounding.
Negative figures represent debits, being decreases in revenue. Positive figures represent credits, being increases in revenue.

| | Revenue |
| --- | --- |
| | Q2 2010 |
| **Originally stated revenue (Note 1)** | **221.13** |
| **Total restated transactions (Notes 2 & 3):** | **(31.19)** |
| Tottenham Hotspur | (6.24) |
| Realise Limited/Credit Suisse Securities | (1.99) |
| Auxilium Tech/Biblioteca Apostolica Vaticana (Vatican Library) | (1.90) |
| Discover Technologies/Philip Morris International Management | 4.19 |
| Capax Discovery/Eli Lilly and Company | 5.99 |
| Hosting transactions | (28.70) |
| Adjustments < $1.5m in this quarter | (2.54) |
| **Restated revenue** | **189.93** |

| **Hardware revenue (Note 4):** | **31.06** |
| --- | --- |
| SHI | 20.12 |
| Insight | 5.25 |
| Metro Business Systems | 4.46 |
| Morgan Stanley | 0.69 |
| JP Morgan | 0.54 |
| Other | 0.00 |

| **Percentage restated** | **-14.1%** |
| --- | --- |
| **Percentage restated (including hardware revenue)** | **-28.2%** |

9

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-02332644

# ADJUSTED AUTONOMY GROUP CONSOLIDATED REVENUE

## SUMMARY OF REVENUE ADJUSTMENTS - Q3 2010

Figures in this schedule are in USD $'m and are subject to rounding.
Negative figures represent debits, being decreases in revenue. Positive figures represent credits, being increases in revenue.

| | Revenue |
| --- | --- |
| | Q3 2010 |
| Originally stated revenue (Note 1) | 210.56 |
| Total restated transactions (Notes 2 & 3): | (30.91) |
| FileTek/United States Veterans Administration Authority | (10.00) |
| Capax Discovery/Bank of America – Amgen | (9.00) |
| EMC | (5.01) |
| Red Ventures/Various end users | (2.75) |
| Vidient Systems | (2.00) |
| Play | (1.66) |
| Comercializadora Cobalt's/TV Azteca | (1.50) |
| Discover Technologies/CitiGroup Technology | 5.50 |
| Hosting transactions | (2.13) |
| Adjustments < $1.5m in this quarter | (2.36) |
| Restated revenue | 179.65 |

| Hardware revenue (Note 4): | 26.80 |
| --- | --- |
| Zones | 12.21 |
| Morgan Stanley | 5.65 |
| SHI | 3.96 |
| Insight | 2.43 |
| Metro Business Systems | 2.18 |
| Bank of NY Mellon | 0.20 |
| Other | 0.17 |

| Percentage restated | -14.7% |
| --- | --- |
| Percentage restated (including hardware revenue) | -27.4% |

10

FOIA CONFIDENTIAL TREATMENT REQUESTED

EXH 2749-0010

# ADJUSTED AUTONOMY GROUP CONSOLIDATED REVENUE

## SUMMARY OF REVENUE ADJUSTMENTS - Q4 2010

Figures in this schedule are in USD $'m and are subject to rounding.
Negative figures represent debits, being decreases in revenue. Positive figures represent credits, being increases in revenue.

| | Revenue |
| --- | --- |
| | **Q4 2010** |
| **Originally stated revenue (Note 1)** | **244.51** |
| **Total restated transactions (Notes 2 & 3):** | **(59.24)** |
| Prisa | (9.49) |
| Discover Technologies/Bank of America | (7.00) |
| Tikit/KPMG | (6.16) |
| Video Monitoring Services (Hardware) | (6.05) |
| Video Monitoring Services (Software) | (4.75) |
| MicroTech/US Department of the Interior | (4.00) |
| Discover Technologies/Bank of America | (3.50) |
| Capax Discovery/Defense Knowledge Online | (1.95) |
| Capax Discovery/Merrill Lynch - Bank of America | (1.66) |
| Hosting transactions | (8.78) |
| Adjustments < $1.5m in this quarter | (5.90) |
| **Restated revenue** | **185.27** |

| | |
| --- | --- |
| **Hardware revenue (Note 4):** | **29.38** |
| Zones | 8.58 |
| SHI | 8.54 |
| Morgan Stanley | 6.26 |
| JP Morgan | 1.73 |
| Bank of NY Mellon | 1.35 |
| Amulet Hotkey | 1.09 |
| Insight | 0.22 |
| Other | 1.60 |

| | |
| --- | --- |
| **Percentage restated** | **-24.2%** |
| **Percentage restated (including hardware revenue)** | **-36.2%** |

11

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-02332645

EXH 2749-0011

# ADJUSTED AUTONOMY GROUP CONSOLIDATED REVENUE

## SUMMARY OF REVENUE ADJUSTMENTS - Q1 2011

Figures in this schedule are in USD \$?m and are subject to rounding.
Negative figures represent debits, being decreases in revenue. Positive figures represent credits, being increases in revenue.

| | Revenue |
| --- | --- |
| | Q1 2011 |
| Originally stated revenue (Note 1) | 219.79 |
| Total restated transactions (Notes 2 & 3): | (47.35) |
| Capax Discovery/UBS | (8.00) |
| Tottenham Hotspur | (6.40) |
| Capax Discovery/McAfee | (5.00) |
| MicroTech LLC | (3.86) |
| Discover Technologies/Prisa | (3.60) |
| MicroTech/Bank of Montreal | (2.88) |
| Discover Technologies/ThinkTech | (1.80) |
| BBC Monitoring | (1.69) |
| Capax Discovery (EDD) | (1.60) |
| Hosting transactions | (8.21) |
| Adjustments < \$1.5m in this quarter | (4.31) |
| **Restated revenue** | **172.45** |

| Hardware revenue (Note 4): | 20.09 |
| --- | --- |
| SHI | 12.28 |
| Amulet Hotkey | 4.03 |
| Bank of NY Mellon | 3.16 |
| Insight | 0.38 |
| JP Morgan | 0.16 |
| Other | 0.08 |

| **Percentage restated** | **-21.5%** |
| --- | --- |
| **Percentage restated (including hardware revenue)** | **-30.7%** |

12

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-02332646

EXH 2749-0012

HP-SEC-02332647

# ADJUSTED AUTONOMY GROUP CONSOLIDATED REVENUE

## SUMMARY OF REVENUE ADJUSTMENTS - Q2 2011

Figures in this schedule are in USD $'m and are subject to rounding.
Negative figures represent debits, being decreases in revenue. Positive figures represent credits, being increases in revenue.

| | Revenue |
|---|---|
| | Q2 2011 |
| **Originally stated revenue (Note 1)** | **256.25** |
| **Total restated transactions (Notes 2 & 3):** | **(31.67)** |
| Discover Technologies/Abbott Laboratories | (8.61) |
| Capax Discovery/UBS | (7.66) |
| MicroTech/Hewlett Packard | (7.00) |
| Discover Technologies/Hyatt/Dell | (5.33) |
| Serious Fraud Office | (2.36) |
| Play | 1.83 |
| Apple | 1.84 |
| Capax Discovery/Defense Knowledge Online | 1.95 |
| Hosting transactions | (7.27) |
| Adjustments < $1.5m in this quarter | 0.95 |
| **Restated revenue** | **224.58** |
| | |
| **Hardware revenue (Note 4):** | **20.85** |
| SHI | 8.80 |
| JP Morgan | 5.69 |
| Bank of NY Mellon | 3.14 |
| Amulet Hotkey | 2.28 |
| Insight | 0.83 |
| Other | 0.10 |
| | |
| **Percentage restated** | **-12.4%** |
| **Percentage restated (including hardware revenue)** | **-20.5%** |

Note 1 - Originally Stated refers to the revenue disclosed in Autonomy's quarterly earnings releases.

Note 2 - The adjustments shown in respect of transactions represent the net adjustments to revenue in each quarter.

Note 3 - Deals separately identified are those with an adjustment to group revenue exceeding $1.5 million in this particular quarter. This does not apply to hosting deals which have been disclosed in total and hardware deals whereby deals with specific customers have been separately disclosed (see Note 4).

Note 4 - Hardware transactions involving Citigroup, Bloomberg, JP Morgan, Morgan Stanley, Credit Suisse, SHI, Fannie Mae, Insight, Metro Business Systems, Zones, Amulet Hotkey and Bank of NY Mellon have been separately identified.

13

FOIA CONFIDENTIAL TREATMENT REQUESTED

**Appendix to Summary of ASL's Statutory Revenue Adjustments: 2009 to October 2011**

Below is a list of the underlying business records from Autonomy and/or HP which form the basis of the Summary of Adjustments to Autonomy Systems Limited's ("ASL") Restated Accounts (the "Summary Charts") organized by transaction(s) and in alphabetical order.  The Summary Charts are also supported by business records from Autonomy and/or HP previously produced at Bates Nos. HP-SEC-02166029 to HP-SEC-02166034.

| Software Transaction(s) | Bates Range |
| --- | --- |
| AIG | HP-SEC-02319597 - HP-SEC-02319621 |
| | HP-SEC-02327949 - HP-SEC-02328211 |
| | HP-SEC-02331944 - HP-SEC-02332109 |
| Apple | HP-SEC-02327465 - HP-SEC-02327552 |
| | HP-SEC-02330953 - HP-SEC-02330980 |
| | HP-SEC-02330982 - HP-SEC-02330982 |
| AS Computadoras y Servicios Secretaria de Gobernacion | HP-SEC-02326148 - HP-SEC-02326207 |
| | HP-SEC-02330506 - HP-SEC-02330590 |
| Auxilium Tech Biblioteca Apostolica Vaticana (Vatican Library) | HP-SEC-02323024 - HP-SEC-02323253 |
| | HP-SEC-02330234 - HP-SEC-02330280 |
| BBC Monitoring | HP-SEC-02326208 - HP-SEC-02326364 |
| | HP-SEC-02330591 - HP-SEC-02330748 |
| Camsa Konzern | HP-SEC-02326365 - HP-SEC-02326421 |
| Capax Discovery/Bank of America – Amgen | HP-SEC-02318061 - HP-SEC-02318305 |
| | HP-SEC-02327676 - HP-SEC-02327736 |
| Capax Discovery/Defense Knowledge Online | HP-SEC-02317153 - HP-SEC-02317214 |
| Capax Discovery/EDD | HP-SEC-02325657 - HP-SEC-02325944 |
| | HP-SEC-02330984 - HP-SEC-02330986 |
| | HP-SEC-02330988 - HP-SEC-02330988 |
| Capax Discovery/Eli Lilly and Company | HP-SEC-02327737 - HP-SEC-02327741 |
| | HP-SEC-02318306 - HP-SEC-02318389 |
| Capax Discovery/Financial Services Authority | HP-SEC-02318390 - HP-SEC-02318566 |
| Capax Discovery/Kraft Foods Global | HP-SEC-02317215 - HP-SEC-02317293 |
| Capax Discovery/McAfee | HP-SEC-02317294 - HP-SEC-02317454 |
| | HP-SEC-02327597 - HP-SEC-02327608 |
| Capax Discovery/Merrill Lynch - Bank of America | HP-SEC-02327743 - HP-SEC-02327747 |
| | HP-SEC-02318567 - HP-SEC-02318640 |
| Capax Discovery/UBS | HP-SEC-02323254 - HP-SEC-02323434 |
| | HP-SEC-02330281 - HP-SEC-02330296 |
| | HP-SEC-02323435 - HP-SEC-02323462 |
| | HP-SEC-02330297 - HP-SEC-02330308 |
| Comercializadora Cobal's TV Azteca | HP-SEC-02323463 - HP-SEC-02323508 |
| | HP-SEC-02330309 - HP-SEC-02330350 |
| Discover Technologies/Abbott Laboratories | HP-SEC-02327609 - HP-SEC-02327644 |
| | HP-SEC-02317534 - HP-SEC-02317555 |
| Discover Technologies/Bank of America | HP-SEC-02318773 - HP-SEC-02318889 |

1

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-02332648
EXH 2749-0014

**Appendix to Summary of ASL's Statutory Revenue Adjustments: 2009 to October 2011**

| Software Transaction(s) | Bates Range |
| --- | --- |
| | HP-SEC-02318641 - HP-SEC-02318772 |
| Discover Technologies/CitiGroup Technology | HP-SEC-02323509 - HP-SEC-02324261 |
| | HP-SEC-02330351 - HP-SEC-02330386 |
| Discover Technologies/Hyatt/Dell | HP-SEC-02317556 - HP-SEC-02317575 |
| | HP-SEC-02327645 - HP-SEC-02327669 |
| Discover Technologies/Philip Morris International Management | HP-SEC-02324262 - HP-SEC-02324308 |
| | HP-SEC-02330387 - HP-SEC-02330397 |
| Discover Technologies/Prisa | HP-SEC-02324309 - HP-SEC-02324362 |
| Discover Technologies/ThinkTech | HP-SEC-02317455 - HP-SEC-02317533 |
| EMC | HP-SEC-02324363 - HP-SEC-02324490 |
| | HP-SEC-02330398 - HP-SEC-02330402 |
| Filetek | HP-SEC-02318890 - HP-SEC-02319014 |
| | HP-SEC-02327748 - HP-SEC-02327819 |
| | HP-SEC-02319015 - HP-SEC-02319148 |
| Filetek /United States Veterans Administration Authority | HP-SEC-02327820 - HP-SEC-02327894 |
| | HP-SEC-02319149 - HP-SEC-02319231 |
| Integracion de Negocios Various end users | HP-SEC-02326422 - HP-SEC-02326748 |
| | HP-SEC-02330749 - HP-SEC-02330902 |
| Items 8, 11, 12, 47, 57 and 60 – "Cancelled transactions" (See VMS, J.P. Morgan Chase, and SHI International) | HP-SEC-02320124 - HP-SEC-02320137 |
| Mercedes-Benz Grand Prix | HP-SEC-02326749 - HP-SEC-02326913 |
| MicroLink | HP-SEC-02326914 - HP-SEC-02327182 |
| | HP-SEC-02330903 - HP-SEC-02330906 |
| MicroTech/Assurian Insurance Services | HP-SEC-02327553 - HP-SEC-02327596 |
| | HP-SEC-02330981 - HP-SEC-02330981 |
| | HP-SEC-02330983 - HP-SEC-02330983 |
| MicroTech/Bank of Montreal | HP-SEC-02327670 - HP-SEC-02327673 |
| | HP-SEC-02317576 - HP-SEC-02317660 |
| MicroTech/Century Link | HP-SEC-02327183 - HP-SEC-02327241 |
| MicroTech/Department of the Interior | HP-SEC-02327674 - HP-SEC-02327675 |
| | HP-SEC-02317793 - HP-SEC-02317892 |
| MicroTech/Discover Technologies | HP-SEC-02327895 - HP-SEC-02327915 |
| | HP-SEC-02319232 - HP-SEC-02319411 |
| MicroTech/Hewlett Packard | HP-SEC-02330403 - HP-SEC-02330413 |
| | HP-SEC-02324491 - HP-SEC-02324583 |
| MicroTech/Honeywell Aerospace | HP-SEC-02319412 - HP-SEC-02319529 |
| | HP-SEC-02327916 - HP-SEC-02327943 |
| MicroTech LLC | HP-SEC-02324584 - HP-SEC-02324727 |
| | HP-SEC-02330414 - HP-SEC-02330431 |
| MicroTech/Morgan Stanley & Co | HP-SEC-02327944 - HP-SEC-02327948 |
| | HP-SEC-02319530 - HP-SEC-02319596 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-02332649
EXH 2749-0015

**Appendix to Summary of ASL's Statutory Revenue Adjustments: 2009 to October 2011**

| Software Transaction(s) | Bates Range |
|---|---|
| MicroTech/Vatican Library | HP-SEC-02317661 - HP-SEC-02317792 |
| Play | HP-SEC-02327242 - HP-SEC-02327308 |
| Prisa | HP-SEC-02325945 - HP-SEC-02326147 |
| | HP-SEC-02330987 - HP-SEC-02330987 |
| Realise Limited Credit Suisse Securities | HP-SEC-02324847 - HP-SEC-02324986 |
| Red Ventures/Various end users | HP-SEC-02324728 - HP-SEC-02324763 |
| | HP-SEC-02330432 - HP-SEC-02330457 |
| Sales Consulting Poste Italiane | HP-SEC-02324987 - HP-SEC-02325051 |
| | HP-SEC-02330458 - HP-SEC-02330483 |
| Serious Fraud Office | HP-SEC-02327309 - HP-SEC-02327332 |
| | HP-SEC-02330907 - HP-SEC-02330949 |
| Tikit KPMG | HP-SEC-02325052 - HP-SEC-02325257 |
| Tottenham Hotspur | HP-SEC-02325258 - HP-SEC-02325533 |
| | HP-SEC-02330484 - HP-SEC-02330488 |
| UBS | HP-SEC-02327333 - HP-SEC-02327464 |
| | HP-SEC-02330950 - HP-SEC-02330952 |
| Video Monitoring Services (Software and Hardware) | HP-SEC-02320124 |
| | HP-SEC-02320132 |
| | HP-SEC-02324764 - HP-SEC-02324846 |
| | HP-SEC-02325534 - HP-SEC-02325656 |
| | HP-SEC-02330489 - HP-SEC-02330505 |
| | HP-SEC-02332110 - HP-SEC-02332341 |
| Vidient Systems | HP-SEC-02317893 - HP-SEC-02317983 |
| | HP-SEC-02317984 - HP-SEC-02318060 |

| Hardware Transaction(s) | Bates Range |
|---|---|
| Amulet Hotkey | HP-SEC-02166030 |
| Bank of NY Mellon | HP-SEC-02166030 |
| Bloomberg LP | HP-SEC-02319622 - HP-SEC-02319631 |
| | HP-SEC-02328212 - HP-SEC-02328267 |
| Citicorp | HP-SEC-02319632 - HP-SEC-02319638 |
| | HP-SEC-02328268 - HP-SEC-02328386 |
| | HP-SEC-02330989 - HP-SEC-02331062 |
| Credit Suisse | HP-SEC-02319639 - HP-SEC-02319770 |
| | HP-SEC-02328387 - HP-SEC-02328444 |
| Fannie Mae | HP-SEC-02166030 |
| Insight | HP-SEC-02319771 - HP-SEC-02320123 |
| | HP-SEC-02328445 - HP-SEC-02328602 |
| J.P. Morgan Chase | HP-SEC-02320125 - HP-SEC-02320131 |
| | HP-SEC-02320137 - HP-SEC-02320485 |
| | HP-SEC-02328603 - HP-SEC-02329004 |
| Metro Business Systems | HP-SEC-02320486 - HP-SEC-02320944 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-02332650
EXH 2749-0016

**Appendix to Summary of ASL's Statutory Revenue Adjustments: 2009 to October 2011**

| Hardware Transaction(s) | Bates Range |
|---|---|
| | HP-SEC-02329005 - HP-SEC-02329225 |
| Morgan Stanley | HP-SEC-02320945 - HP-SEC-02321077 |
| | HP-SEC-02329226 - HP-SEC-02329570 |
| | HP-SEC-02332342 - HP-SEC-02332634 |
| | HP-SEC-02331063 - HP-SEC-02331398 |
| SHI International | HP-SEC-02320133 - HP-SEC-02320136 |
| | HP-SEC-02321078 - HP-SEC-02323023 |
| | HP-SEC-02329571 - HP-SEC-02330233 |
| | HP-SEC-02331399 - HP-SEC-02331530 |
| | HP-SEC-02331789 - HP-SEC-02331943 |
| Zones Inc. | HP-SEC-02331531 - HP-SEC-02331788 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-02332651
EXH 2749-0017

EXHIBIT 2



*United States Attorney*
*Northern District of California*

*1301 Clay Street, Suite 340S*      *(510) 637-3680*
*Oakland, California 94612*      *Fax: (510) 637-3724*

October 28, 2020

*By Email*

Gary S. Lincenberg, Esq.
Ariel A. Neuman, Esq.
Bird, Marella, Boxer, Wolpert, Nessim,
 Drooks, Lincenberg & Rhow, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561

        Re:     *United States v. Chamberlain*
               Case No. CR 18-577 CRB

Dear Counsel:

     I write in response to your letter dated August 26, 2020, requesting particulars as to certain allegations in the Superseding Indictment.

     To suffice under Rule 7, an indictment need be only a "plain, concise, and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1). A bill of particulars is unwarranted unless the defendant "demonstrates surprise, prejudice, or an increased risk of double jeopardy." *United States v. Robertson*, 15 F.3d 862, 874 (9th Cir. 1994); *United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979). Where the indictment specifies the means and methods used to carry out the conspiracy (as the Superseding Indictment in this case does) and the government has produced a significant amount of discovery (as the government has in this case), a bill of particulars is unnecessary. *United States v. Ayers*, 924 F.2d 1468, 1484 (9th Cir. 1991); *United States v. Mitchell*, 744 F.2d 701, 705 (9th Cir. 1984) (affirming denial of bill of particulars when "the indictment itself provides sufficient details of the charges and . . . the Government provides full discovery to the defense"); *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983) (affirming denial of bill of particulars because "[f]ull discovery will obviate the need for a bill of particulars").

     In the absence of surprise or prejudice, there is no absolute requirement that the government identify other relevant persons at all. *United States v. Burt*, 765 F.2d 1364, 1367 (9th Cir. 1985); *United States v. DiCesare*, 765 F.2d 890, 897-898 (9th Cir. 1985) (affirming denial of bill of particulars that "requested the names of any unknown coconspirators"). "A defendant is not entitled to know all the evidence the government intends to produce, but only

the government's theory of the case." *Yeargain v. United States*, 314 F.2d 881, 882 (9th Cir. 1963).

The Superseding Indictment meets or exceeds the requirements of Rule 7. And a bill of particulars is particularly unnecessary in light of the litigation in the related case, *United States v. Hussain*, CR 16-462 (filed November 10, 2016). In *Hussain*, the defendant moved for a bill of particulars on an indictment with offenses identical or substantially similar to those alleged in Counts 1 through 16. Dkt. 41, 49, 54. The Court denied the motion. Dkt. 59; Dkt. 64 at 20-26.[1] In addition, Mr. Chamberlain now has the benefit of a witness list, an exhibit list, a trial record, and an appeal record from the related case, which alleged offenses identical or substantially similar to those alleged in Counts 1 through 16. Although Count 17 was not present in the *Hussain* charging document, the government's theory and evidence are readily ascertainable from the discovery that has been provided.

For these reasons, a bill of particular is not necessary or appropriate and the government will oppose any motion for an order that one be granted.

Very truly yours,

DAVID L. ANDERSON
United States Attorney

*/s Robert S. Leach*
_____
ROBERT S. LEACH
WILLIAM FRENTZEN
ADAM A. REEVES
Assistant United States Attorneys

---

[1] Although Hussain's motion for a bill of particulars was filed before the filing of the superseding indictment, Hussain argued the addition of the securities fraud charges made a bill of particulars even more necessary. Dkt. 64 at 20:4-26:7.