Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 1 of 69

TRANSCRIPT OF AN INTERVIEW HELD AT THE SERIOUS FRAUD OFFICE, 2-4 COCKSPUR STREET, LONDON ON MONDAY, 21ST OCTOBER 2013.

CASE REFERENCE WHA01

DISK 1 OF A BATCH OF 1

PERSON BEING INTERVIEWED: MR ROBERT KNIGHT

PERSONS PRESENT:

| | | |
|---|---|---|
| MR SAMUEL WRIGHT | - | SERIOUS FRAUD OFFICE |
| MS JULIET AMBLER | - | SERIOUS FRAUD OFFICE |
| MR JULIAN RANDALL | - | LEGAL ADVISOR |
| MS CAROLINE SIMMONDS | - | DELOITTE |

-------------------------------------------------------------

S WRIGHT:       This interview is being recorded. The time by my watch is 10.38 on the 21st October 2013.  We are in interview room one at the Serious Fraud Office.  I am Samuel Wright, an Investigative Lawyer and assisting in investigating the affairs of Michael Lynch and Sushovan Hussain. I am interviewing Rob Knight who is accompanied by his legal advisers.  I am going to ask them to identify themselves by giving us their full names, addresses and dates of birth to assist in voice identification.  Rob, if we could start with you please?

R KNIGHT:       Yes, so I'm Robert John Knight.  My address is

OPS2095                                                    FINAL DRAFT

FBI 100003786

EXH 5103-0107

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 2 of 69

|  |  |
|---|---|
|  | River Cottage, Ardingly Road, Lindfield, West Sussex. Date of birth 29/03/1974. |
| J RANDALL: | Julian Randall, 101 South Hill Park, London, NW3 2SB. |
| C SIMMONDS: | Caroline Simmonds, 21 Robinson Road, Oxford, OX1 5LE. |
| S WRIGHT: | Also present is my colleague… |
| J AMBLER: | Juliet Ambler, Principal Investigator. |
| S WRIGHT: | Can you please confirm, Rob Knight, that you have received a Section 2 notice dated the 1st October 2013 in respect of Michael Lynch and Sushovan Hussain? |
| R KNIGHT: | Yes I have. |
| S WRIGHT: | Did you understand that notice? |
| R KNIGHT: | Yes, I did. |
| S WRIGHT: | Rob Knight, during this interview you will be asked to provide information to assist in this investigation into suspected serious or complex fraud.   You are obliged in law to answer truthfully and to give a full explanation of any question asked of you or any document you may be shown.   You have been required to answer questions or furnish information under Section 2 of the Criminal Justice Act 1987.

You may be prosecuted if without reasonable excuse you fail to comply with this requirement or if you knowingly or recklessly make a statement which is false or misleading in a material particular.

You are obliged by law to answer truthfully and to give a full explanation of any question asked |

OPS2095                                                    FINAL DRAFT

2

FBI 100003787

EXH 5103-0108

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 3 of 69

|  |  |
|---|---|
|  | of you or any document that you may be shown. You can be prosecuted if you withhold any information without good cause or if you knowingly give false or misleading information. Any statement that you make today cannot be used in evidence against you, unless, in a later criminal trial, evidence relating to it is adduced or a question relating to it is asked by or on your behalf. |
|  | Do you understand what I've just said? |
| R KNIGHT: | Yes, I do. |
| S WRIGHT: | Thank you very much.  Rob, if we could just begin please, by just giving us a bit of a potted history of your career to date, that would be most helpful? |
| R KNIGHT: | Yes, okay.  So I joined as a graduate with Deloitte in 1997; I made it through the ranks working in Cambridge, I transferred to our St Albans office in 2008 as a director.  I made partner in 2010 and I'm now working in our Gatwick office. |
| S WRIGHT: | And can you tell us the professional qualifications that you hold, please? |
| R KNIGHT: | Yes, I'm a qualified chartered accountant as of the, 2001. |
| S WRIGHT: | And how much auditing experience do you have? |
| R KNIGHT: | Throughout that period. |
| S WRIGHT: | And have you ever audited software companies before? |
| R KNIGHT: | I've audited Autonomy since 2003, and I have done other work with other software companies as |

OPS2095                                                                FINAL DRAFT

3

FBI 100003788

EXH 5103-0109

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 4 of 69

|               |                                                      |
|---------------|------------------------------------------------------|
|               | well.                                                |
| S WRIGHT:     | And you're, sorry you're current role is, you mentioned Gatwick office, that is-? |
| R KNIGHT:     | Yes, partner in the Gatwick office, yes.             |
| S WRIGHT:     | Do you hold any directorships, executive or non-executive with any other organisation or body? |
| R KNIGHT:     | No, I do not.                                         |
| S WRIGHT:     | If we then begin by looking at when you became involved with Autonomy as a customer.  Could you tell us a bit about that, when did that, when did that take place – you mentioned 2003? |
| R KNIGHT:     | Yes, I think 2003 - so came on board as the manager on the account in 2003.  I worked through there during my time as a director, I'm still on the account through till 2008 was my, the end of my involvement in the, in the classic sort of audit, audit role. |
|               | In 2009 I was involved, but that was really to transition across to, to Lee Welham.  Richard Knights, as the audit partner, asked me to remain involved really to help with that transfer across to Lee, so although I wasn't sort of formally involved in the sort of audit reporting line, I did have a role on Autonomy in 2009. |
| S WRIGHT:     | So you were in effect in Lee's role before he took over? |
| R KNIGHT:     | Yes I was, yes, yes.                                  |
| S WRIGHT:     | And who was in your team at the time when you took over, just the individuals that were in |

FBI 100003789

EXH 5103-0110

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 5 of 69

|  |  |
|---|---|
|  | your audit team, if you could explain who they were? |
| R KNIGHT: | The time when I took on in 2003? |
| S WRIGHT: | I don't think that's necessarily that relevant, let's move to 2009. |
| R KNIGHT: | On the team in 2009 were Lee Welham, who was really leading, Thomas Murray, Adam Milburn-Smith was on in 2009; Antonia Anderson, and beneath that I don't really know, yes. And then part of the team was Richard Knights and I think Stuart Henderson as EQAR; and there was an independent partner as well. |
| J AMBLER: | So how would you describe your function in 2009 then. I know you said it was part of the – |
| R KNIGHT: | Yes – |
| J AMBLER: | - transition but did you have a specific function in terms of the audit or you were just sort of hovering on the fringes – ? |
| R KNIGHT: | No, it was, well Richard and I discussed me moving out, as I, as I said earlier I transferred across to the St Albans office so I was no longer based in Cambridge. Richard was keen that that was quite a seamless transition across with an important client, so asked me to just be around. And since I was there I would be nosy and pick up, pick up some of the issues as, as I saw them. So depending on which quarter it was I was involved to a greater or lesser extent, but typically the way that would work is I'd go in, I would sit with the client for a day you know, that was part of the role. |

FINAL DRAFT

FBI 100003790

EXH 5103-0111

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 6 of 69

|                |                                                                          |
| -------------- | ------------------------------------------------------------------------ |
|                | So Richard would, would ask me to be around and as there were significant transactions, unusual deals then I would get involved, ask some questions around that and pass, pass those back to Richard and say this is what, this is where we are. So that was the role, does that answer the question? |
| J AMBLER:      | I think so yes, thanks.                                                   |
| S WRIGHT:      | So in some terms it was like playing a similar role to Stuart Henderson who of course had that independent over-sight if you like – |
| R KNIGHT:      | Err –                                                                     |
| S WRIGHT:      | - a bit like that?                                                        |
| R KNIGHT:      | No, Stuart wasn't independent, he was part of the engagement team, I would best describe it as you know, a sort of critical sounding board for Richard. So I would go in, I had the experience of working with the company, so the role I would play would be, go in, play the, the sceptical auditor role, go in ask questions and you know, if there were things coming out, help to resolve some of those, those matters. But ultimately you know, the results and conclusions of those matters would get documented in audit files, make it to audit committee packs and that's how the, the sort of resolution process would work. |
| J AMBLER:      | But you weren't involved in the audit committee per se?                   |
| R KNIGHT:      | No, in 2009, no.                                                          |
| J AMBLER:      | Yes, right.                                                               |
| R KNIGHT:      | I don't think I attended any audit committees in |

OPS2095                                                          FINAL DRAFT

FBI 100003791

EXH 5103-0112

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 7 of 69

|  |  |
|---|---|
|  | 2009, I can't recall the last one I went to but they were happening on a quarterly basis so it was difficult to remember whether, which ones I went to in 2008. |
| J AMBLER: | Okay, thank you. |
| S WRIGHT: | I'm mainly going to be asking you questions about the EMC deal in 2009 – |
| R KNIGHT: | Yes. |
| S WRIGHT: | – but just as a general starter can you tell us what Autonomy did as a company as you understood it to be? |
| R KNIGHT: | Yes, so yes, Mike was a bright mathematician so they used complex bayesian algorithms so it was complicated mathematical formulae to, and what they did was they used that to process and understand what they called unstructured information so, if you, if you say most of an organisation's information is held on emails, word documents, things that sit away from databases, what Autonomy software did was help people, they call it, make sense of unstructured information; so apply those algorithms to that unstructured information in a software product to try and help organisations and the government institutions make sense of unstructured data. And then they could put different front ends on that, so whether it was you know, video recognition, voice recognition, you know, there were various different sort of, applications for that. |
| S WRIGHT: | When you said 'Mike' there, I take it that's |

FBI 100003792

EXH 5103-0113

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB    Document 220-4    Filed 09/29/23    Page 8 of 69

|  |  |
|---|---|
|  | Mike Lynch you're referring to |
| R KNIGHT: | Yes, yes, yes. |
| S WRIGHT: | And your, your dealings with Mike Lynch and of course Sushovan Hussain, – |
| R KNIGHT: | Yes. |
| S WRIGHT: | – was that, was that fairly regular, could you just give us an understanding of that? |
| R KNIGHT: | Sushovan yes, Mike no, is the, is the simple answer.  You know I would be, you know throughout, from 2003 to 2008 was involved with Sushovan.  If you think these things were happening on a quarterly basis, you were never more than nine weeks away from going back to Autonomy and you know, in the early days that was very much the role I played.  Mike, typically the relationship would have been handled with the audit partner but there was much less contact with Mike than there was with Sushovan. |
| J AMBLER: | So would you say you knew, knew them personally or…? |
| R KNIGHT: | I, I wouldn't say I knew Mike personally, I, I knew of him, he's probably said, 'Hello Mr Auditor' to me a couple of times, but that, that's about it.  Sushovan yes, I got to know Sushovan pretty well during the time. |
| S WRIGHT: | Explain for us the purpose of an audit, if you would Rob, please? |
| R KNIGHT: | Yes, so I mean the best place to start is, is the audit opinion, and if you look at the audit opinion, the audit opinion is an opinion |

OPS2095                                                      FINAL DRAFT

FBI 100003793

EXH 5103-0114

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 9 of 69

addressed to the shareholders of a company which basically expresses a view on behalf of the firm, which says that the accounts show a true and fair view and are prepared in accordance with the Companies Act.  And so interpretation of that is you know, 'Do these accounts comply with the regulations under which they're supposed to be prepared?', and that covers principally the numbers, but then you have a sort of consistency argument about, in a case of a listed company, front end disclosures, particularly those in the director's report, about the consistency of that disclosure in the overall annual report with the rest of the financial statements.

J AMBLER:       And you, you've said that the shareholders are effectively the readers of this.  Do you think that the true and fair view needs to be an informed person or can anybody who is a shareholder understand them?

R KNIGHT:       I think if you asked would a layman understand a complex listed company set of accounts, the answer to that is no.  Typically the sort of person that are investing in equities, whether it's institutions or private investors, I would class as more than a layman –

J AMBLER:       Mm-hmm.

R KNIGHT:       - a sort of semi-informed reader if you like, and, you know, the accounts have to be understandable by them.

J AMBLER:       So effectively would it be fair to say that the

OPS2095                                        FINAL DRAFT

9

FBI 100003794

EXH 5103-0115

|              |                                                                                                                                                                              |
|--------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|              | true and fair view is, you're effectively giving the layman shareholder some confidence that he can trust those accounts?                                                    |
| R KNIGHT:    | Yes, yes.                                                                                                                                                                     |
| J AMBLER:    | Because he isn't going to be able to understand them in detail?                                                                                                              |
| R KNIGHT:    | Well I, no I wouldn't, I wouldn't say that. Ultimately it's the reader's responsibility to be able to look at the accounts and understand them.  What we're saying is, here's a note to the shareholders, we have been through this, you know, we say, we're saying they're an accurate or true and fair reflection of what the company has done.  So we're not out there telling lay shareholders, 'This is a great company to invest in' – |
| J AMBLER:    | No.                                                                                                                                                                          |
| R KNIGHT:    | - it's, our role is to just say, 'They're a reasonable reflection of the company's results'.                                                                                 |
| J AMBLER:    | Yes, no it was the true and fair bit that I –                                                                                                                                |
| R KNIGHT:    | Yes.                                                                                                                                                                         |
| J AMBLER:    | - was looking at -                                                                                                                                                           |
| R KNIGHT:    | Yes, yes.                                                                                                                                                                    |
| J AMBLER:    | - particularly, but as far as the layman reader –                                                                                                                           |
| R KNIGHT:    | Yes.                                                                                                                                                                         |
| J AMBLER:    | - is concerned, your audit opinion effectively says that you can rely on them being a true and fair view?                                                                    |
| J RANDALL:   | Mm, gives an opinion, isn't it?                                                                                                                                              |
| J AMBLER:    | Yes.                                                                                                                                                                         |

OPS2095                                                                    FINAL DRAFT

FBI 100003795

EXH 5103-0116

| | |
|---|---|
| J RANDALL: | Yes. |
| S WRIGHT: | Rob, the EMC deal in Q3 2009? |
| R KNIGHT: | Yes. |
| S WRIGHT: | Tell us what you know about it, what was the purpose behind it? |
| R KNIGHT: | Well obviously this is, this is a long time ago, but I've done some reading over the various emails and the subject matter since, just to kind of refresh, refresh my memory, but I'll, tell, tell you what I know. |
| | This was a deal entered into with EMC and obviously you've seen what now I know has become known as the Hussain memorandum, but that really puts across the company's perspective. This was a deal the company entered into which made them a loss with a view to securing better and stronger relationships with financial institutions into which they could sell software in the future. |
| | So there were three elements to this deal. There was effectively a purchase of hardware, a marketing element and a future product development element, the Arcpliance. But effectively the numbers on that deal were, it was a 45 million purchase for the company and a 36 million sale so, you know a net loss of $9 million. |
| S WRIGHT: | If we turn to tab one – |
| R KNIGHT: | Yes. |
| S WRIGHT: | - please. For the benefit of the tape, the UID WHA01DRR0002-29-HP-SEC-00091839. Fear not, I |

OPS2095                                                      FINAL DRAFT

FBI 100003796

EXH 5103-0117

|  |  |
|---|---|
|  | won't be reading all of those out for every document. |
| R KNIGHT: | I was going to say, we'd be here for more than 20 minutes. |
| S WRIGHT: | It's just for the starting - |
| R KNIGHT: | Yes. |
| S WRIGHT: | - for the starting document.  Now had you ever seen this email, these emails before.  I'll just explain again for the benefit of the tape.  The first email from Mike Sullivan to Bill Scannell on Friday the 18th September 2009, in general terms explaining the nature of the deal and then there was a response by Mike Scannell[sic] later on the very same day.  Have you seen this email before Rob? |
| R KNIGHT: | I, I can't recall, but I've looked through other emails that suggest I did, yes, so I think there's, there's sort of evidence that suggests I did, so yes. |
| S WRIGHT: | Yes, and points one and two, the, the first email that I mentioned, do you see towards the bottom of that page, do you see that? |
| R KNIGHT: | Yes. |
| S WRIGHT: | It reads, 'Under the programme Autonomy offers to purchase products from EMC at the price consisting of EMC's discounted price to Autonomy which typically will represent a discount of list price but will be determined on a deal by deal basis.  Point two, plus a marketing incentive supplied to EMC to be determined on a deal by deal basis.' |

OPS2095                                                    FINAL DRAFT

FBI 100003797

EXH 5103-0118

R KNIGHT:        Yes.

S WRIGHT:        Does that really, as you understand it, the deal
                 to be about, fairly accurately summarise the
                 position?

R KNIGHT:        Yes, yes, to say there's more than, if you think
                 about this from Autonomy's perspective, they
                 weren't just in the habit of giving £9 million
                 to hardware companies for no reason, you know
                 there was future benefit in it and, and that's
                 what this email's referring to.

S WRIGHT:        Tab two please; the last five digits 51463; it's
                 really the second and third pages that you see
                 Rob, which is a spread-sheet, and you've already
                 mentioned the loss making deals and the elements
                 of it.

R KNIGHT:        Yes.

S WRIGHT:        Again, does that accurately as far as you can
                 tell represent the picture, and just giving us a
                 bit more detail because there are figures?

R KNIGHT:        I'm just trying to see what these figures
                 actually tally to. Well I can't see the 45 or
                 36 million on here, so I, I don't know what
                 these figures are actually tallying to.

J AMBLER:        But those figures appear to show for the actual
                 product itself, 30 million would seem to be a
                 split of COGS 22 million and marketing 14.8
                 million?

R KNIGHT:        That's what this says here, yes.

J AMBLER:        Yes, so that would appear to be a sort of as of,
                 just looking at the date, the 22nd September
                 that would appear to be a sort of first cut on

OPS2095                                          FINAL DRAFT

FBI 100003798

EXH 5103-0119

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

|                |                                                                                      |
|----------------|--------------------------------------------------------------------------------------|
|                | the –                                                                                |
| R KNIGHT:      | Yes.                                                                                 |
| J AMBLER:      | - COGS marketing split.                                                              |
| R KNIGHT:      | Okay.                                                                                |
| S WRIGHT:      | Tab three please Rob?                                                                |
| R KNIGHT:      | Yes.                                                                                 |
| S WRIGHT:      | Zero, for the benefit of the tape, 07917.  It's the one-liner at the top and then email from Sushovan Hussain to Stephen Chamberlain on the 30th September 2009.  Rob, of course you weren't copied in to this particular email.  Had you ever seen it before? |
| R KNIGHT:      | No, no.                                                                              |
| S WRIGHT:      | And can you, can you help us at all, you see that first line in Sushovan's email where he says, 'Need to get COGS down by at least $5 million so that it is 50-50.'  Can you possibly assist us with why he might want to do that.  I appreciate it's not you and I do understand that, but just with your knowledge – |
| R KNIGHT:      | Yes, yes.                                                                            |
| S WRIGHT:      | - of this particular deal, why that might be the case? |
| R KNIGHT:      | So obviously I can't sort of step into the shoes of management – |
| S WRIGHT:      | No, of course.                                                                       |
| R KNIGHT:      | - obviously, but you know, the company has to make or reflect this transaction in its books, and there is a certain amount of judgment as to how that transaction gets recorded, and I imagine this is just part of the process of |

OPS2095                                                        FINAL DRAFT

FBI 100003799

EXH 5103-0120

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 15 of 69

|  | Sushovan saying, Steve, this doesn't feel right. You know we need to get the, in my mind this is the number that we should be shooting for, so you know, go away and substantiate that, can you go away and substantiate that.  That would be how I'd interpret this email. |
| J AMBLER: | So you don't think it's any element of, of pressure, perhaps from Mike Lynch coming back down to Sushovan saying – |
| R KNIGHT: | Well there's no – |
| J AMBLER: | - it needs to be [inaudible] – |
| R KNIGHT: | Eh – |
| J AMBLER: | - I know there's no indication of that. |
| R KNIGHT: | Well there's no – |
| J AMBLER: | It's speculative. |
| R KNIGHT: | - there's no evidence, there's, there's absolutely nothing on here that suggests that Mike is involved in this chain of emails so I wouldn't like to say – |
| J AMBLER: | No, no. |
| R KNIGHT: | I couldn't possibly say. |
| J AMBLER: | Yes. |
| R KNIGHT: | And there's no evidence here that this is pressure. |
| J AMBLER: | Perhaps from the market or, they would expect to see… |
| R KNIGHT: | Well, I can't answer that question, but this would seem to me to be a sort of normal way of it, you know when you're trying to reflect a complex transaction you would normally expect to see you know, discussion between your CFO and |

OPS2095                                                  FINAL DRAFT

FBI 100003800

EXH 5103-0121

|              |                                                              |
|--------------|--------------------------------------------------------------|
|              | your FC about how to record it, so that's what that, that email says to me. Whether there was pressure, that's a question for Sushovan. |
| J AMBLER:    | Okay, thanks.                                                |
| S WRIGHT:    | Tab four, 70209; the top email we're interested in here, Rob.  From Mike Sullivan to Sushovan Hussain, Stephen Chamberlain, on the 2nd October 2009.  I'll just read the first paragraph out. 'We will need to discuss, they will not okay anything that says that we paid them-,' '-what we paid them-,' sorry, '-was for something other than for the product we purchased in this period.  Nor will they say the money will be spent on marketing etc.  They are extremely sensitive to these kinds of letters.'  Were you aware of any concerns on the part of EMC, can you help us out, perhaps if there was any background, background knowledge you have as regards EMC's concern? |
| R KNIGHT:    | No, I wasn't, and this, but this, this email is, is perhaps something you would expect to see you know, if you, if you bear in mind that the technology market particularly amongst the big players and Autonomy was one of these, they're extremely paranoid about everything that they release to, to the market and you know, if you were to suddenly turn round to EMC and say, can you give me a piece of paper that suggests that we're involved in this close tie-up relationship, EMC are probably going to say, well, not without going through all the |

FBI 100003801

EXH 5103-0122

necessary protocols that as a sort of 20 billion turnover US corporation that we would have to go through to release that.  So you know, as auditor you always hope to get something extra, you, you hope for the best quality of evidence that you can get to support a set of transactions.  But in reality you have to go in accepting that you're not going to get something from perhaps EMC to say you know, you might want the piece of paper that says yes, you know we've got this allocation amongst cost of goods sold and sales and marketing that describes exactly what you want to describe, but you're never going to get it.  So that's, that's how I would interpret this email.

S WRIGHT:        And just sticking with that train of thought as it were, you've mentioned the component part of it being sales and marketing.  Would you expect anything back from EMC explaining what they're going to be spending the monies on, how much money they require; would you expect anything like that?

R KNIGHT:        No.

S WRIGHT:        Looking at the bottom of that very same email Rob, you can see it starts, 'Bill-'  I'll just read out the sentence or the paragraph.  'Thanks for participating in our key customer marketing programme during the most recent quarter.  As you know the programme is on-going and I would like to discuss the next stage which could include  mutual  cross  referrals,  account

OPS2095                                              FINAL DRAFT

17

FBI 100003802

EXH 5103-0123

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 18 of 69

|            | introductions, re-selling and development of an appliance bundle with our software delivered on EMC hardware.' A few words I'm interested in, 'Development of an appliance bundle.' |

R KNIGHT:       Mm-hmm.

S WRIGHT:       Were you aware of any sort of appliance bundle being developed. Can you tell us a bit more about your knowledge there?

R KNIGHT:       Well it's, again difficult to recall what I was aware of and when I was aware of it, but from reading the Hussain memo, you know, which obviously was around at the time, the appliance bundle is something referred to in that memo that was under development, or, or was to be developed, and you know that's the extent of that I'm aware of it you know, it's, quite what I saw at the time,

S WRIGHT:       Yes.

R KNIGHT:       Can't really recall, but…

S WRIGHT:       Do you recall seeing any sort of marketing strategy, do you recall even seeing, for example, a don't know, a presentation of what the device might be, anything like that, does anything like that pop into your mind?

R KNIGHT:       No, no.

J AMBLER:       Would you consider that you know, based on the fact that you were previously quite heavily involved as part of the audit in 2008, did, did that strike you as unusual or, perfectly typical for this sort of company?

J RANDALL:      Sorry, what?

OPS2095                                              FINAL DRAFT

18

FBI 100003803

EXH 5103-0124

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 19 of 69

J AMBLER:       Well the fact –

R KNIGHT:       That, that -

J AMBLER:       - that you haven't actually seen any, any
                marketing strategy or any documentation?

J RANDALL:      No, before, before a device is produced or –

J AMBLER:       Yes.

J RANDALL:      Or –

J AMBLER:       Yes, when they're thinking of producing [in
                advance?].

J RANDALL:      Because it's all about timing this, isn't it,
                so –

J AMBLER:       Well –

R KNIGHT:       I don't –

J AMBLER:       - this, this element –

R KNIGHT:       Look I –

J AMBLER:       - is just whether that's quite normal that they
                don't produce such documents?

R KNIGHT:       I would have-, Autonomy was obviously a fast
                growing dynamic company that, that seized market
                opportunity when they saw it.  What I read into
                this deal was they'd said, we need to be
                offering more to financial services customers.
                Do I believe that they would have just entered
                into a loss-making transaction to buy hardware,
                no, so there's obviously more to it than that.
                They're telling us that actually this involves
                joint marketing and development of the
                Arcpliance product and we have something from
                EMC saying, yes, great.  That to me is, is about
                what I'd expect from, from this organisation to
                receive.

OPS2095                                        FINAL DRAFT

FBI 100003804

EXH 5103-0125

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 20 of 69

S WRIGHT:       And in terms of the, we've mentioned the
                loss-making deals, just to go back slightly.
                Recalling that you said that you started working
                with Autonomy in 2003, had you seen anything
                like this before, this type of arrangement, a
                loss-making deal?

R KNIGHT:       No.

S WRIGHT:       You hadn't seen it?

R KNIGHT:       No.

S WRIGHT:       Okay.  Tab five please.

R KNIGHT:       Yes.

S WRIGHT:       Last five, 17795.  The bottom email Rob, I'll
                just read out the contents of the email –

R KNIGHT:       Yes.

S WRIGHT:       - it's from Stephen Chamberlain to Mike Sullivan
                on the 5th October 2009.  Within this particular
                email there's the following line.  'The key at
                this stage is to get something which states that
                there will be a future investment by EMC.'

R KNIGHT:       Yes.

S WRIGHT:       Do you recall if you as the auditors, as the
                auditing team were as it were, trying to get
                something to, to substantiate this –

R KNIGHT:       Yes.

S WRIGHT:       - to get more on it –

R KNIGHT:       Yes, yes.

S WRIGHT:       - do you recall if that was the case?

R KNIGHT:       As, as I said, you always ask for more and
                that's what would have prompted this email, you
                know we would have been pushing the company as
                hard as we possibly could to try and get

FBI 100003805

EXH 5103-0126

everything that we could to support the judgment that they were making in their accounts. So, so that's quite probably what's, what's prompted, although actually looking at the date of this email, Monday 5th October, that would typically be before we've started most of our work, so actually this is probably the company pre-empting the fact we're going to have to justify how we're looking at this so let's try and get what we can from, from EMC.

S WRIGHT:      Tab six please; last five 02226. An email from Rob Knight on the 7th October to Sushovan Hussain, Stephen Chamberlain, Richard Knights and Lee Welham. Rob, interested really here in two paragraphs. I think generally speaking it's fair to say this was an email from you describing some of the concerns that you had.

R KNIGHT:      Yes.

S WRIGHT:      I'll just read out the fir…, the second paragraph. 'A clear explanation of the commercial rationale for selling at a loss, this needs to explain the exact nature of the benefit you are getting from doing this deal at a loss, and how this alters your relationship with JPMC, Citi etc. and also the relationship with EMC. I suspect this part of the memo will need input from those who negotiated the deal.' If it isn't too much of a bone question, what did you mean by that, could you just perhaps give us the background to that particular, that paragraph?

R KNIGHT:      Yes, so, so as I said at the start, you know

OPS2095                                          FINAL DRAFT

FBI 100003806

EXH 5103-0127

|  |  |
|---|---|
|  | when you, when you pick up something you're not expecting to receive, like a transaction, transaction of this nature you need to understand it. And the best thing as auditor, rather than going off and trying to just go off on your own and understand it from lots of different people, is to get the company to write up a memo. That was what I was pushing for here, and this is you know, in part at least what probably prompted the company to, to produce the memo which they produced. |
| S WRIGHT: | And then the third paragraph. 'Sushovan spoke of an appliance being developed by EMC which will have autonomy embedded into it. Can you please explain the nature of this appliance, what legal rights will Autonomy have over this appliance and will this appliance generate direct OEM style royalty revenues for Autonomy in the future; please provide the documentation around this. If this appliance is to be accounted as an intangible asset how does it meet the IAS 38 definition and how do you separately identify the value of the assets and prove that you control it.' Again we here have mention of the appliance, and you mentioned Arcpliance earlier on – |
| R KNIGHT: | Yes. |
| S WRIGHT: | - is this the very same thing, this is the – |
| R KNIGHT: | Yes, I believe so, yes, yes. So, so I mean, maybe it's worth me just talking about this paragraph, because I mean the important thing |

FBI 100003807

EXH 5103-0128

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 23 of 69

for this paragraph is probably in the bottom. In the early stages of the discussion about this particular deal, bear in mind the company was making a $45 million purchase and selling for 36 million, was, you know the company were very keen to try and explore the avenue of parking costs on the balance sheet.

Now what that would have done is show a very different bottom line profit, because any element that you park on the balance sheet obviously you're reducing your loss or increasing your profit line. So you know, immediately you, you hear capitalising things, parking things on the balance sheet, as an auditor you're thinking, okay I need to be, need to be careful here, I need to be looking at this. You know, I was very keen because the company is trying to explore sales and marketing angles and you know it's a fast growing company, I was very keen that actually the company wouldn't park costs on the balance sheet or capitalise costs on the balance sheet in relation to this unless it was absolutely clear that they fulfilled the criteria of IAS38. And IAS38 requires you to have you know, a clear plan, a view to actually getting profit from this deal in the future. And given the nature of this deal from what I knew at this time, it would have been practically impossible to do that.

So we were, the aim of this part of the email is

FBI 100003808

EXH 5103-0129

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 24 of 69

|  |  |
|---|---|
|  | to say, guys, you know, look at the, if you're talking about IAS38 and capitalisation I want a clear justification for why on earth you would progress down that route.  So that's… |
| S WRIGHT: | And did you discuss your concerns, I appreciate that's my word, with other individuals from Deloitte, Richard Knights for example Lee Welham? |
| R KNIGHT: | Yes I would have, yes I mean, Richard, Lee you know, we would have talked about IAS38 and capitalisation of this deal – |
| S WRIGHT: | Mm. |
| R KNIGHT: | - you know.  When you look at it, it's, it's a significant transaction in the quarter, actually the way really to look at this is, it's a net $9 million investment in marketing spend for a company that has you know, has significant market expenditure in the year, and obviously we have the Sushovan Hussain memo but, you know this is an attempt to try an angle to get into financial services institutions in New York and really embed those relationships for, for the company to sell software. |
|  | So the key here for me was, 'Put those expenses through the income statement please'. |
| S WRIGHT: | I appreciate it's a long time ago.  Do you recall if there was any sort of written reply to this, that, that you saw? |
| R KNIGHT: | In the form of the memo. |
| S WRIGHT: | That was it, was it? |
| R KNIGHT: | That, that would have been, yes I mean, I'm sure |

OPS2095                                                    FINAL DRAFT

FBI 100003809

EXH 5103-0130

if there, if there was a written reply you would have it but, I, I don't recall it, four years ago.

Just carrying on on that one, you know the principal agent discussions were also important for us because there are two ways of accounting for this. Obviously if, if you're a principal to the transaction you would report the 45 million purchase and the £36 million, the $36 million sale.  If you were not  a principal to the transaction you would merely record the nine million net expenditure, but we did look at that in detail as well and that was documented on the audit files.

So, so it's very important to us to make sure we'd got that documented correctly and accounted for correctly.

J AMBLER:       Perhaps it would help to clarify exactly what you mean by principal and agent?

R KNIGHT:       Yes, so did they take the risks and rewards of owning that, so they bought it from EMC, they then sold it on to banks; should they merely, account for both ends of that transaction or me-, i.e. 45 million, 36 million, or should they merely account for a $9 million expenditure. And how you would typically look at that is, well did you take the risks associated with selling that, selling that hardware on to the customer, which they did and we looked at.

S WRIGHT:       Tab seven please; last five, 02467.  An email from Rob Knight on the 9th October 2009 to Lee

FBI 100003810

EXH 5103-0131

|  | Welham, Richard Knights.  Rob here in this email, you I think and correct me if I'm wrong in terms of my sum…, summary of what's this email is about.  Essentially you're, you're forwarded the email that is, that is we've already seen at tab one – |
| R KNIGHT: | Yes. |
| S WRIGHT: | – 'And your response is helpful but not enough to substantiate a $25 million marketing element in my view.'  Second line, 'I have asked if EMC can quantify but I suspect this is all we will get, Rob.'  Let's just start with the first line? |
| R KNIGHT: | Yes. |
| S WRIGHT: | What did you mean by that? |
| R KNIGHT: | So you know, we have judgments to make as auditors and we always push for, for the perfect level of information that, that we can get.  As I said you'd know, you'd like EMC to write to you and tell you this, this and this.  You actually have to deal with what you get and then you have to make a judgment, does that evidence substantiate the accounting treatment which we're putting forward, and this is an email on the 9th October that basically says, I'd like to see a bit more please.

Given who it's directed to, you know, the aim of this email is to say you know, we're on the 9th October let's keep pushing because we want as much as we can to demonstrate and understand this transaction, make sure it's recorded |

FBI 100003811

EXH 5103-0132

|   |   |
|---|---|
| | correctly.   So, so on the 9th October I'm sending an email that says, let, 'Let's keep going'. |
| S WRIGHT: | And the second line? |
| R KNIGHT: | I think this comes back to the point I alluded to earlier on which is, you know you can ask a $20 billion company if they'll, if they'll provide you with this but this is a very, very small deal for them, and they're never going to get you it, so you know, they're never going to provide you with more evidence than, than we've already got. |
| S WRIGHT: | So you say, 'I have asked if EMC can quantify but I suspect this is all we will get?'. |
| R KNIGHT: | Yes. |
| S WRIGHT: | Do you recall exactly what you did ask of EMC? |
| R KNIGHT: | Well I wouldn't have asked anything directly of EMC, – |
| S WRIGHT: | Yes – |
| R KNIGHT: | - I would have asked through the company. |
| S WRIGHT: | Yes. |
| R KNIGHT: | So… |
| J AMBLER: | And that would be quite [inaudible] normal in your experience? |
| R KNIGHT: | Yes, I mean I have no authority to go and speak to EMC direct – |
| J AMBLER: | Well no, obviously not – |
| R KNIGHT: | Yes. |
| J AMBLER: | - but, but that a $20 billion company would not - |
| R KNIGHT: | Yes, absolutely. |

OPS2095                                    FINAL DRAFT

FBI 100003812

EXH 5103-0133

| | |
|---|---|
| J AMBLER: | - provide this level of information? |
| R KNIGHT: | Yes, and that comes back to my point earlier. If you know, what might have been seen as a really important strategic deal by Sushovan at a point in time, was probably seen by EMC as yes, we want to work with you guys, and fantastic if you think you can sell more of our hardware by putting some of your wizzy software on it then fantastic and we'll work with you on it, but were they obsessing thinking it was a strategic deal, no, it was probably any number of things that were going on at EMC at the time.  You know, I don't audit EMC but I imagine they'd got quite a number of things like that going on at any point in time. |
| J AMBLER: | How did you satisfy yourself that the marketing element actually had something for it, had some sort of tangible effect by EMC because they were getting all this money – |
| R KNIGHT: | Yes. |
| J AMBLER: | - and how did you satisfy yourself that they weren't just saying thank you very much and putting it in the bank and ignoring it totally – |
| R KNIGHT: | Yes. |
| J AMBLER: | - because it was obviously quite a small deal as far as there was – |
| R KNIGHT: | Yes. |
| J AMBLER: | - they were concerned? |
| R KNIGHT: | Yes. |
| J AMBLER: | Yet there's an implication or there's an inference created that you know, there's going |

FBI 100003813

EXH 5103-0134

|              |                                                            |
| ------------ | ---------------------------------------------------------- |
|              | to be some sort of campaign –                              |
| R KNIGHT:    | Yes.                                                       |
| J AMBLER:    | - that Autonomy is going to benefit from –                 |
| R KNIGHT:    | Yes.                                                       |
| J AMBLER:    | - because otherwise why are they paying you[?].            |

R KNIGHT:     Well that, I mean in fact you almost answered
              your own question in a way which is, when you
              look at this you say, would Autonomy pay someone
              effectively $9 million to you know, for no, for
              no apparent benefit, and, so they obviously knew
              they were getting something in return which was
              all part of the arguments that Sushovan put
              forward in the memo, so, now that memo contains,
              it, it basically tries to go some way to explain
              how you apportion costs in the profit and loss
              account.
              So if you take it back to – the first point is,
              did they record all the costs in the income
              statement; yes because the company and we concur
              that these were not capitalised or under IAS38 –

J AMBLER:     Yes.

R KNIGHT:     - so there's no cost in the income statement.
              Then you have to say, well how do you apportion
              those costs in the income statement.  And this
              is a matter that's not, that's not governed by
              legislation and it's not, you know IAS1 which is
              the standard that looks at how you present items
              in the income statement is, you know, present
              them you know, according to function or nature I
              think it says, so, but it doesn't say costs of
              this type have to go in here, so you have to

FBI 100003814

EXH 5103-0135

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 30 of 69

|                | make a judgment [as what?], management have to make a judgment about where they think it should go, and that's what they've attempted to do with their, with their memo.  And then as auditor you have to say you know, is that reasonable. |
| J AMBLER: | So you, you wouldn't expect to see, oh well we've got a, we've got a big release day coming up, you know sort of, all these people are going to be invited, sort of, perhaps a sort of, a bit something like the Apple – |
| R KNIGHT: | Yes. |
| J AMBLER: | - do in terms of – |
| J RANDALL: | [Inaudible] from EMC or from Autonomy? |
| J AMBLER: | Well, no from Sushovan Hussain not from EMC. |
| J RANDALL: | Right. |
| J AMBLER: | Because we've already established that this was effectively too small – |
| R KNIGHT: | Yes. |
| J AMBLER: | - but perhaps I might have expected Sushovan Hussain to come along and say, well, yes I can show you we're getting something because, look we've got this you know – |
| R KNIGHT: | Yes. |
| J AMBLER: | - marketing day that's coming up – |
| R KNIGHT: | Yes. |
| J AMBLER: | - or, you know, look, these are the new brochures – |
| R KNIGHT: | Yes. |
| J AMBLER: | - that we've developed.  Something that shows that there is something real to this marketing rather than, I'm sure we're going to get |

OPS2095                                                      FINAL DRAFT

FBI 100003815

EXH 5103-0136

|  |  |  |
|---|---|---|
|  |  | something. |
| R KNIGHT: | | Yes.  So I think, you know Sushovan would have looked at this deal very differently than EMC would have looked at this deal – |
| J AMBLER: | | Yes. |
| R KNIGHT: | | - you know, and you know, does it surprise me that Sushovan didn't have a detailed schedule of these are the types of marketing activities – |
| J AMBLER: | | Not necessarily a detailed schedule but one or two bits and pieces – |
| R KNIGHT: | | Yes. |
| J AMBLER: | | - you know, sort of I'm going to be attending this marketing – |
| R KNIGHT: | | Yes. |
| J AMBLER: | | - this conference, and so much time in this conference is going to be given to our new product, or something – |
| R KNIGHT: | | Yes. |
| J AMBLER: | | - just something that shows – |
| R KNIGHT: | | Yes. |
| J AMBLER: | | - that there's something tangible. |
| R KNIGHT: | | Well to be honest what, the way I'm probably best placed to answer that question is to say, what we had to do was allocate these costs or the company had to allocate these costs between three buckets, and we have a cost of goods sold element, which is obviously the element attributed to the hardware, and once you've allocated that, and the way that was done was by looking at re-sale margins – to say what would someone expect to pay for this product on its |

OPS2095                                              FINAL DRAFT

FBI 100003816

EXH 5103-0137

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 32 of 69

own, what is a reasonable approximation of what should go up into the cost of goods sold line. And so the effort on the company's behalf and on our behalf in understanding that transaction was to say, is that number reasonable. So once you have you have your, your revenue is known, then you know what you sold it for, the cost of goods sold becomes what you think an appropriate re-seller margin is, that gives you your costs, costs of goods sold element; you're then into saying, well we have a residual that has to be split between sales and marketing and research and development costs. And to be honest by the time we got to that stage in a quarter you're talking about an allocation below the gross profit line, but it doesn't impact gross profit, it doesn't impact operating profit and there's no legislation about how you do it. So the company's saying, right, we're getting this, we're getting these types of, these types of marketing activities and we're getting the development of the Arcpliance, they're attributing it to those two buckets. Very difficult to say that's not a reasonable allocation. So that's the way we would have looked at it.

J AMBLER:      But you were, you were happy with the allocation, the cost of goods sold?

R KNIGHT:      Yes.

S WRIGHT:      Can we just turn over the page Rob, still in tab eight.

OPS2095                                          FINAL DRAFT

FBI 100003817

EXH 5103-0138

R KNIGHT:        Yes.

S WRIGHT:        Turn over again, sorry, it's the last [inaudible].

R KNIGHT:        Mm-hmm.

S WRIGHT:        Forgive me, I think I'm on a slightly different, I'm on a slightly different tab.

R KNIGHT:        In tab eight, sorry.

S WRIGHT:        You're into tab eight.

R KNIGHT:        Yes.

S WRIGHT:        I'm right aren't I, we were, we're in tab eight now, is that right, we've just jumped ahead, I'm just getting –

AJ:              Yes.

S WRIGHT:        Yes, tab eight.

R KNIGHT:        Yes; document 92338.

S WRIGHT:        That's the one, yes.

R KNIGHT:        Yes.

S WRIGHT:        And if you turn over the page, there's an email there from Sushovan Hussain to Stephen Chamberlain on the 12th October 2009, last five 92338. It's the second paragraph, I'll just read out the sentence I'm interested in. 'We would strongly argue that the large proportion of the monies are being used for the development of the appliance which has significant future value, but we are, we have taken a very prudent view and have expensed the total amounts.'
In relation to, and I appreciate this again is an email from Sushovan, and he does make reference to the, a large proportion of the monies are being used for the development of the

FBI 100003818

EXH 5103-0139

|              |                                                                 |
|--------------|-----------------------------------------------------------------|
|              | appliance.  Certainly insofar as what we've been                |
|              | able to discover, can you assist with perhaps                   |
|              | how, how such a comment is made, on what basis                  |
|              | might he have determined that.  If seemingly                    |
|              | nothing is for, is coming back from EMC –                       |
| R KNIGHT:    | Mm.                                                             |
| S WRIGHT:    | – how is he determining, and I appreciate I'm                   |
|              | slightly straining to what you might be, what                   |
|              | Sushovan might be thinking here, but I'm –                       |
| R KNIGHT:    | Yes.                                                            |
| S WRIGHT:    | – what I'm try-, I guess the question is, had                   |
|              | you seen anything which justified that comment                  |
|              | which is that a large portion of the monies are                 |
|              | being used for the development of the appliance.                |
|              | Had you seen any document or supporting material                |
|              | that might assist with that?                                    |
| R KNIGHT:    | I, I again, I don't recall seeing anything                      |
|              | specifically, that's probably best directed to                  |
|              | the audit files to see if there's anything else                 |
|              | in there that I'm not aware of; and the first                   |
|              | part of your question you know, that's a                        |
|              | question for Sushovan really as well.                           |
| S WRIGHT:    | Yes.                                                           |
| J AMBLER:    | Right.                                                         |
| S WRIGHT:    | I'm just checking.  Rob, have I asked you about                 |
|              | the first, first email in tab eight.  I'm                       |
|              | slightly losing my own train of thought –                       |
| R KNIGHT:    | You haven't, no.                                               |
| S WRIGHT:    | – I haven't, I haven't –                                        |
| R KNIGHT:    | No.                                                            |
| S WRIGHT:    | – thank you, thank you very much for that.  This                |

OPS2095                                                    FINAL DRAFT

34

FBI 100003819

EXH 5103-0140

|                |                                                              |
|----------------|--------------------------------------------------------------|
|                | document 92338 –                                             |
| R KNIGHT:      | Yes.                                                         |
| S WRIGHT:      | - where, it's an email from yourself on the 12th October to Stephen Chamberlain and Lee Welham. I'll just read the whole email out. |
| R KNIGHT:      | Yes.                                                         |
| S WRIGHT:      | 'Steve, Sushovan, can we get anything from EMC quantifying the hardware amount.  Is there a set marketing programme or any other further information available which can help us to quantify the marketing element e.g. a joint marketing plan or similar.  Evidence that helps us understand the marketing side in some more depth would be very helpful.  Again on the appliance development is there anything to further substantiate the amount of development you are funding as opposed to relying on this being a balancing figure, thanks, Rob.' |
| R KNIGHT:      | Yes.                                                         |
| S WRIGHT:      | The question is at the third paragraph; did you get anything back in relation to your question on a marketing programme or anything of that nature? |
| R KNIGHT:      | I think I've just answered that in terms of, this is sort of, this is what you'd like to get, but in reality there was nothing coming back from EMC and I suspect the company had not got as far as saying, yes these are the schedules of activities which we'll, we'll agree upon.  So you know, I don't recall getting anything you know, that sophisticated. |

OPS2095                                                        FINAL DRAFT

FBI 100003820

EXH 5103-0141

J AMBLER:       Can you answer me, something that puzzles me
                very slightly –

R KNIGHT:       Mm.

J AMBLER:       – because when you actually look at the, the
                re-sell, the standard re-seller rates, if they
                put the cost of goods sold in at the standard
                re-seller rate, would that not generate what is
                effectively an artificial profit on this deal.
                Because we know they didn't make a profit on
                this deal, they made a [inaudible]?

R KNIGHT:       No, it wouldn't, it wouldn't, the answer is it
                wouldn't generate, this is about classification
                in the profit and loss account, so all of these
                costs are in there –

J AMBLER:       Oh yes, no, I appreciate that –

R KNIGHT:       – so it's –

J AMBLER:       – I'm just looking at the gross profit line.

R KNIGHT:       The gross profit level –

J AMBLER:       Yes.

R KNIGHT:       – well it wouldn't create an artificial profit,
                it would create a profit, yes.

J AMBLER:       Yes.

R KNIGHT:       So it would, it puts profit there but you know,
                that's –

J AMBLER:       We'd you know, give with one hand and take away
                with the other.

R KNIGHT:       Exactly, that's exactly it, yes.

J AMBLER:       I'm just looking at the, sort of the overall
                view of this if one was to look at the gross
                profit, does that not distort things slightly?

J RANDALL:      Distort what, distort?

OPS2095                                         FINAL DRAFT

36

FBI 100003821

EXH 5103-0142

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 37 of 69

J AMBLER:      Well, that it's creating an artificial profit
               where none exists?

R KNIGHT:      Well if you, well I mean if you –

J AMBLER:      On that line [inaudible] I fully appreciate.

R KNIGHT:      But if you, I mean if you look at it and say,
               what would happen if this deal had not been
               done, gross profit margin in percentage terms
               would have been higher.

J AMBLER:      Yes.

R KNIGHT:      So, because the company makes a fortune out of
               selling software, and that's what the company
               was aiming to do longer term with this, so yes,
               it has contributed a number to the gross profit
               line, but as a result of the allocation that's,
               that's been completed by the company.  Yes.

J AMBLER:      So it didn't, you didn't feel uncomfortable that
               it was –

R KNIGHT:      More important that the cost –

J AMBLER:      - giving a slightly unusual portrayal of…

R KNIGHT:      It didn't strike me that it was giving an
               unusual portrayal, you know, it was giving an
               unusual portrayal in that it was an unusual
               transaction, so it was giving an appropriate
               portrayal for, for the transaction that had been
               completed.  You know when you sell something you
               normally expect the costs to go into the cost of
               goods sold on –

J AMBLER:      Yes, yes.

R KNIGHT:      - that's the normal because you're normally
               buying something that you're going to sell, but
               here they were clearly buying more than having

OPS2095                                            FINAL DRAFT

FBI 100003822

EXH 5103-0143

|               | just something to sell. |
|---------------|---|
| J AMBLER:     | Okay, thanks. |
| S WRIGHT:     | Tab nine please; 92361, the last five. An email from Lee Welham on the 13th October 2009, to Sushovan Hussain, Stephen Chamberlain, copying Richard Knights, Rob Knight and Antonia Anderson. Rob I appreciate this was a long time ago, do you recall seeing this email? |
| R KNIGHT:     | I would have got an email like this every quarter, as you try and close out all of the, all of the specific sort of key items at any one quarter to be able to issue your review opinion, you will have a, you know, these are the things that I've got to do just like any business would. So do I remember this specific email, no; does it look out of place, no, it looks like the sort of email I would have received and clearly did get. |
| S WRIGHT:     | Tab 10 please; last five 87699. An email from Stephen Chamberlain on the 13th October, to Lee Welham; copying Richard Knights, Rob Knight and Antonia Anderson. In some sense I would guess this email is best described as a reply, but I'll just read out the interesting couple of lines. 'COGS other not sure what support you need. I have provided analysis, there are clear adjustments I have also demonstrated not material-' and in brackets '-(in cost of gross margins)' close brackets. 'Revenue EPS balance sheet cash flow all unaffected so only considering gross margin impact. What else do |

FBI 100003823

EXH 5103-0144

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 39 of 69

|  |  |
|---|---|
|  | you need.'  Did you agree with that Rob in terms of his reply, did you feel that was as it were a, a substantial enough argument in response to the requests that were being made? |
| R KNIGHT: | Well I don't think this was the end of the story – |
| S WRIGHT: | No. |
| R KNIGHT: | - I think this was you know, we would, it's a classic example of a robust Steve Chamberlain response to, to an email, and you'd quite often get that and you'd keep pushing and you'd get a little bit more so, yes I think what does this show, it shows you know, Steve is trying to work to a timetable to get the review report prepared.  It shows that you know, there's a certain amount of frustration there in terms of saying, tell me exactly what more you need and I'll try and get it for you and that's, but the way he would work was to give a robust response and then you'd have to sort of work on him to, to get more. So, so you know, it's a classic response from Steve.  The second line is actually quite interesting there, because it does show how the company was looking at this, which is that what we're talking about here is only gross margin. |
|  | You know he's saying effectively you know, everything else, every other measure that the company considers is completely unaffected by this, this is just an arbitrary split into the income statement between sales and marketing and |

FBI 100003824

EXH 5103-0145

|  |  |
|---|---|
| | research and development costs which are focussed on by, well, I can't say nobody focuses on them, but in my opinion you know, you, you look at the key, the key performance metrics of the company and that arbitrary split in the income statement between R&D and sales and marketing is probably something that not many people focus on. |
| J AMBLER: | So you didn't feel that they were sort of holding out no matter what? |
| R KNIGHT: | On the 13th October no, because classically you've got at least 20 days before and they'll all be working days – |
| J AMBLER: | Mm-hmm. |
| R KNIGHT: | - so at this point this would just be sort of a robust push-back from the company and then a… |
| J AMBLER: | It's, it's sort of like an opening salvo almost? |
| R KNIGHT: | Exactly, yes.  Steve was quite good at firing opening salvos. |
| J AMBLER: | Yes. |
| S WRIGHT: | Tab 11 please; 92395, an email from Richard Knights to Mike Lynch, Sushovan Hussain on the 14th October 2009. |
| R KNIGHT: | Yes. |
| S WRIGHT: | Appreciate you weren't copied in to this email Rob.  Does this necessarily add anything to your understanding of what was going on, I mean it's a, in the second line is reference by Richard there to, '…I have a sense, that the engine is running a little hot in certain areas of the Q3 numbers and would appreciate your thoughts on |

FBI 100003825

EXH 5103-0146

|              |                                                                         |
| ------------ | ----------------------------------------------------------------------- |
|              | one key matter which we have been discussing, the EMC transactions.' Was your understanding that things were a little tense at that particular time as regards how they would deal with these issues? |
| J RANDALL:   | Does that, is that what it says?                                         |
| S WRIGHT:    | That's what it says, I just read it out.                                |
| J RANDALL:   | 'The engine running a little hot'?                                       |
| S WRIGHT:    | Yes, it says, 'the engine is running a little hot.'                      |
| J RANDALL:   | Does that mean tense?                                                    |
| S WRIGHT:    | I think it does.                                                         |
| J RANDALL:   | Okay, that's [inaudible].                                                |
| S WRIGHT:    | Would you agree Rob? I think that's a, a fair perhaps summary of what that means. |
| R KNIGHT:    | Well, yes I, Richard would typically probably only interact with Mike on a fairly infrequent basis, so maybe once a quarter, and this is probably trying to appraise Mike of the position which is, you know, we're still talking about the EMC transaction, don't consider everything closed while we're still talking about it. |
|              | So he's definitely trying to get it on Mike's, Mike's radar and that is what I would read into that email. So 'The engine's running a little hot,' can you pay some attention to this please, because we're still, we're still looking at it. I'm not Richard, despite the confusion it may cause having a Rob Knight and a Richard Knights - |
| S WRIGHT:    | Sure.                                                                    |

OPS2095                                                    FINAL DRAFT

41

FBI 100003826

EXH 5103-0147

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 42 of 69

R KNIGHT:      - but that, that's really a question for Richard.

J AMBLER:      Yes, you know, the bit that I'm quite interested in is the, is the three possible landing areas?

R KNIGHT:      Yes.

J AMBLER:      Which is 45 million to be sold, shown as cogs.

R KNIGHT:      Yes.

J AMBLER:      36 as cost of sale with nine as sales & marketing –

R KNIGHT:      Yes.

J AMBLER:      - or a different split –

R KNIGHT:      Yes.

J AMBLER:      - and those seem both to be at this late stage of the negotiations to be very far adrift from where the company's looking at which is a much, much bigger marketing and R&D element, and I was just intrigued by –

R KNIGHT:      By what this, what this means?

J AMBLER:      Yes.

R KNIGHT:      I think this –

J AMBLER:      So clearly he's coming back over the same ground you've been.

R KNIGHT:      Yes, yes, but I, I think this is Richard trying to simplify something for a chief exec into three bullets, because if you give a chief exec a long email he's not going to read it. And, and what he's probably doing here is saying, look, there are a number of different ways you can look at this contract, can you pay some attention to this please because you could end up with some very different accounting answers

OPS2095                                        FINAL DRAFT

42

FBI 100003827

EXH 5103-0148

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 43 of 69

depending on what the nature of the contract actually is and how it's split. And I don't know if at this point we've got the same memorandum, I'm not sure the dates we actually ever got that, but if this is before we got the memo, sending an email to the chief exec saying, you've still got some numbers floating around that you haven't locked down yet, would be a fantastic way of making sure that memo comes through to you in a reasonably short period of time. So, so I wasn't Richard, I didn't write the email –

J AMBLER:      No, I fully appreciate that.

R KNIGHT:      - but yes, yes.

J AMBLER:      Yes, it's just the, the two out of the three appear to be quite a long way wide of the mark of where –

R KNIGHT:      Where you ended up.

J AMBLER:      - the transaction actually ended –

R KNIGHT:      Yes –

J AMBLER:      - up –

R KNIGHT:      But –

J AMBLER:      - and that –

R KNIGHT:      Well, yes but I would say –

J AMBLER:      - but it's much closer to the views you have been expressing all the way through, insofar as you all seem to be pushing for a bigger COGS element.

R KNIGHT:      Yes, and the, well I don't think we're, we're pushing for a bigger cogs element, we're pushing to understand the transaction to try and

FBI 100003828

EXH 5103-0149

|  |  |
|---|---|
| | understand how it should be accounted. So we're not going to the co-, we're not creating the accounts – |
| J AMBLER: | No. |
| R KNIGHT: | - we're, we're, at this point we're reviewing them, and we're pushing to understand the transaction as best we can so Richard can say at the end of the quarter, you know, we're, you know to the extent that we're required to, that we haven't noted any material modifications required in the wording of the review opinion. So what he's saying here is, if this was basically just a purchase of hardware it would go 45 million to cost of sales, but as we know it wasn't because why would you do that, why would you literally just go and spend $9 million for nothing – |
| J AMBLER: | Yes. |
| R KNIGHT: | - you wouldn't do it – |
| J AMBLER: | No. |
| R KNIGHT: | - so there was something more, so it's, yes. |
| J AMBLER: | I suppose that really the interesting bit is how big is the something more and how you value the something more? |
| R KNIGHT: | And that's where, where I come to, we need to, there's judgment involved here – |
| J AMBLER: | Yes. |
| R KNIGHT: | - it's not exact science, and as long as you can get a reasonable approximation for that cost of sale element based on re-seller margins, then you got, you've got you've locked down a |

OPS2095                                              FINAL DRAFT

44

FBI 100003829

EXH 5103-0150

|          | supportable cost of sale number – |
|----------|-----------------------------------|

J AMBLER:      Mm.

R KNIGHT:      - and a supportable gross profit line, and once you've done that the sales and marketing and the R&D description –

J AMBLER:      - become a balancing figure, effectively.

R KNIGHT:      Effectively you've got to come to a reasonable approximation between those two but it's a much less sensitive area of the accounting.

S WRIGHT:      Page three in the same tab; last 592401, an email from Sushovan Hussain to Mike Lynch on the 14th October.

R KNIGHT:      Yes.

S WRIGHT:      Have you got that one?  The second line reads, 'We have firm evidence of the product cost of the hardware so the residual is clearly marketing, which we have explained to Richard as being for seminars, meetings, customer events, incentives to the EMC sales force to bring us deals, development of the appliance.'  It's fair to say, isn't it, that's exactly what you'd expect the, the marketing budget to cover, that type of thing?

R KNIGHT:      Yes, yes, exactly.  You know, the company wasn't, you know, what Sushovan is setting out here to Mike is saying, these are the things that we're getting for the, for the, for the EMC deal, and it says he's explained that to Richard, so that is obviously part of the way Richard got happy enough to, with the allocation at the end of the quarter.

OPS2095                                              FINAL DRAFT

FBI 100003830

EXH 5103-0151

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 46 of 69

J AMBLER:       I suppose I'm just curious to know how he knew that, because there's no evidence –

R KNIGHT:       How Sushovan knew that?

J AMBLER:       Yes, or whether that's –

R KNIGHT:       Well, I imagine –

J AMBLER:       - what he assumed it would involve?

R KNIGHT:       Yes.   So given the speed Autonomy would operate and the speed that EMC would operate you know, classically you know, US corporations have much greater documentation, have you know, much more you know, they're unable to move at the speed that Autonomy could move at because it was you know, the executive management team Autonomy had a, you know, they were involved in almost all the key decisions that the company was, was undertaking, and yes they had a second tier of management but they were able to move really quickly and that's what enabled them to make the acquisitions that they made really quickly and you know complete deals really quickly.

So they were probably 10 steps ahead of EMC and EMC were looking at this as a lot lower priority. So at some, you know, at some point there was an agreement between the company and EMC that said, look this is what we'll pay you but we want this in return.   There's an agreement, now is that a chief exec handshake is that a CFO handshake is that, you know, what level of documentation is I don't know, but that's what Sushovan's alluding to here.

J AMBLER:       Okay thanks.

OPS2095                                                 FINAL DRAFT

FBI 100003831

EXH 5103-0152

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 47 of 69

R KNIGHT:       Yes.

S WRIGHT:       Tab 12 please; then we finally get to the memo. Last five –

R KNIGHT:       Yes.

S WRIGHT:       - 20750, an email from Stephen Chamberlain to Rob Knight, Richard Knights and then there are other individuals copied in, and the attachment there strategic deals memo, the last five are 20753. It's just interesting actually Rob, you mentioned a moment ago that when we were talking about, I believe it was tab 11, that the timing, that email was sent at 9.30, and it was just interesting what your comment as regards of the timings of the memo in that particular email and of course the -

R KNIGHT:       Yes.

S WRIGHT:       - memo comes at 19 minutes past 10.

R KNIGHT:       [Inaudible] past, yes, that, that is interesting.  However despite  Sushovan's fantastic engine and energy I doubt he could have knocked this memo together in 49 minutes.

S WRIGHT:       No, no, no, absolutely –

R KNIGHT:       But I, but I, yes, he, so yes, did this, did that email precipitate this, I, I, or the release of this, I don't know.  You know, we would have got this, we wouldn't have been able to sign off the quarter without this anyway, we'd been pushing them for a write-up, you know we need to get that write-up and we've got the write-up, but you know, did Mike perhaps get on the phone to Sushovan and say, finish that memo

FBI 100003832

EXH 5103-0153

|              | and get it over to the auditors because they need it – |
|--------------|---|
| S WRIGHT:    | Yes. I think just for your own knowledge though Rob, we've actually seen a number of iterations of this particular memo which – |
| R KNIGHT:    | Okay. |
| S WRIGHT:    | - ca…, started on the about the 2nd October – |
| R KNIGHT:    | Okay. |
| S WRIGHT:    | So that, those developments of the memo, memo was something that started in that month just for your own knowledge. |
| R KNIGHT:    | Yes. |
| S WRIGHT:    | We don't think it appropriate in this particular interview to show you each of those – |
| R KNIGHT:    | Thank you. |
| S WRIGHT:    | - memos, but if you go to the, perhaps the third page, and two-thirds of the way down, paragraphs, 'On this basis Autonomy has allocated 17.1 million cost of cost of goods sold representing the standard cost of hardware – with the remaining costs being split between sales and marketing expense and research and development.  The sales and marketing amount represents the return of the Autonomy profit of the transaction which has been agreed with the EMC will be re-invested in the relationship in the manner set out above.'<br><br>Next paragraph, 'The additional payment relates to payments to EMC for the development of the appliance referred to above.  Management did not feel that this payment met the definitions of |

FBI 100003833

EXH 5103-0154

|   |   |
|---|---|
|   | IAS38 for capitalisation and hence has expensed this payment during the quarter.' |
|   | That last paragraph that I have just read out there Rob, in relation to capitalisation – |
| R KNIGHT: | Mm. |
| S WRIGHT: | Could you just explain perhaps what, what that means in your understanding? |
| R KNIGHT: | Yes, so if you were paying somebody for development of a product, you have effectively two ways of potentially accounting for that that are governed by IAS38.  IAS38, the aim of IAS38 as I see it, is to stop people capitalising spurious marketing costs and parking them on their balance sheet rather than charging them through the income statement. |
|   | And IAS38 asks you to look at things like technical feasibility and commercial feasibility, so effectively if we're making a payment to a supplier for a piece of development, unless we can say, okay this stuff, we definitely have the technological ability to finish it and complete it, and it's reasonably within our powers and the powers of the person that's doing it for us to complete it, and we have a cer-, a reasonable certainty that this is going to be commercially successful.  So unless you have those two ingredients then the standard does not want you parking costs on the balance sheet rather than releasing them to the income statement.  And what this is saying is effectively, we've considered this because I'm |

FBI 100003834

EXH 5103-0155

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 50 of 69

sure the executive would have considered this the most appropriate, sorry, the most not appropriate, they would have considered this the most beneficial, you know the most favoured accounting treatment – if they could have got to this they would have done, because it would have meant that they wouldn't have had to charge those costs to profit you know, they had to book a £9 million loss on that transaction which I think they knew they would always have to do but they would have tried quite hard to try and get to an alternative accounting treatment.

What this says is, we looked at this, it didn't work, which was one of the key things we looked at first off with this deal.

J AMBLER:     Was there any way that you would have accepted the R&D as true R&D costs and put on the balance sheet or –

R KNIGHT:     No.

J AMBLER:     No.

R KNIGHT:     I think that's, it would have been so difficult and –

J AMBLER:     Yes.

R KNIGHT:     - you know just the level of documentation and, and certainty you know, so Sushovan has described it as a strategic, you know something of strategic importance. Autonomy was a dynamic company trying to, trying to go down avenues of investing money in trying to build its sales growth and ultimately its profitability and its operating cash flows. Yes, but to describe it

FBI 100003835

EXH 5103-0156

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 51 of 69

|  |  |
|---|---|
|  | as strategic, you know, they tried this, they wanted to do it, they threw some money at it, you know, but, and they accounted for it appropriately so, by not putting it on the balance sheet. |
| S WRIGHT: | 13 please; last five 17798.  Two emails, the first from Sushovan Hussain to Mike Sullivan on September 15th 2009, and the second email on the same day, later on the very same day.  Rob just to take a moment perhaps to read that – |
| R KNIGHT: | Mm-hmm. |
| S WRIGHT: | - the first email – the last paragraph. |
| R KNIGHT: | Am I on the right tab? |
| S WRIGHT: | Yes I think, yes you've got it, that one there, just that. |
| R KNIGHT: | Okay – |
| S WRIGHT: | Just that. |
| R KNIGHT: | - yes. |

**Pause.**

| R KNIGHT: | Okay. |
|---|---|
| S WRIGHT: | That line in the paragraph where it says, 'In addition you will receive a special bonus of 50,000 if you are able to extract an email that allows us to allocate the associated costs appropriately in my opinion.'  Clearly this email, correct me if I'm wrong in your opinion, is, is the offering of a bonus if certain conditions are satisfied? |
| R KNIGHT: | Mm-hmm. |
| S WRIGHT: | Just generally speaking, is this something you've come across before in your auditing |

OPS2095                                                     FINAL DRAFT

FBI 100003836

EXH 5103-0157

|              |                                                                              |
|--------------|------------------------------------------------------------------------------|
|              | experience, the offering of bonuses to, to get certain information for the purposes of reflecting it in the accounts? |
| R KNIGHT:    | No, no, it's not something I've seen before. No it's not something I've seen before. |
| S WRIGHT:    | In your view, is this type of thing appropriate, the offering of such a bonus? |
| R KNIGHT:    | Well it's, I mean, it's, it's asking for information, it's difficult to say whether it's appropriate or not appropriate, it depends what Sushovan means by obtaining information that's appropriate for an audit and that's something you'd have to ask Sushovan for. Is it inappropriate to offer someone a bonus for going out and getting information, no. Is it unusual, I would think so, yes. |
| S WRIGHT:    | Had you have seen this email or any one had mentioned to you at the particular time that these bonuses, this bonus was being offered – |
| R KNIGHT:    | Mm. |
| S WRIGHT:    | - can you tell us what you might have done about it, do you think it would have changed the auditing picture? |
| R KNIGHT:    | We would certainly have asked the company about it, yes, so we would have investigated you know, what does this email mean, why are you trying to get this information, what are you, what are you paying him the money for. Yes. |
| J AMBLER:    | Would you say, it strikes me and this is purely a personal point of view that it's, it's unusual to be asking an employee to go and extract |

FBI 100003837

EXH 5103-0158

|  |  |
|---|---|
|  | information from a company with which you're apparently doing this big strategic initiative – |
| R KNIGHT: | Well, yes but – |
| J AMBLER: | – it seems to imply a degree of reluctance on the – |
| R KNIGHT: | But if you – |
| J AMBLER: | part of EMC? |
| R KNIGHT: | Yes, but as I said earlier, what you have is, you have a big US organisation, technology sector, which is paranoid about what information you can release and what you can't release.  Is that the, these are really questions for Sushovan because I can't put – |
| J AMBLER: | Yes, no, I do appreciate that. |
| R KNIGHT: | – myself in the place of management, but you know, he's obviously trying quite hard to get that information.  Perhaps because he just wants to get the issue you know, resolved and answered you know, $50,000 sounds like an awful lot of money, but – |
| J AMBLER: | Mm. |
| R KNIGHT: | – Mike Sullivan is a very well remunerated individual I imagine, and Autonomy were giving out fantastic commission payments to their sales guys for securing licence contracts, so to Mike this is probably a nice new car or whatever else but you know, it's – |
| J AMBLER: | I think that's [inaudible ]. |
| R KNIGHT: | – not, yes, these guys are yes, well remunerated, but it is quite interesting though that he does say here, 'If you're able to |

FBI 100003838

EXH 5103-0159

|  |  |
|---|---|
|  | extract an email that allows us to allocate the associated costs appropriately in my opinion', because you know, the use, I just highlighted when I got this email earlier, I just underlined the word 'appropriately,' because that does seem to suggest that he's going, he's trying to get something that he considers is the right allocation of costs, so, but that again is a question - |
| J AMBLER: | But whether that, that is one that with which the auditors would agree is a, as we don't know what he considers the right – |
| R KNIGHT: | Yes, these are, these are really are questions for Sushovan aren't they, yes. |
| J AMBLER: | Yes. |
| S WRIGHT: | Tab 14? |
| R KNIGHT: | Yes. |
| S WRIGHT: | It's still an email in relation to the, the bonus issue that the last one. 93166, an email from Sushovan Hussain to Mike Sullivan on the 15th November. |
| R KNIGHT: | Yes. |
| S WRIGHT: | I don't think this changes what you've already said in relation to bonus payments, unless you think otherwise |
| R KNIGHT: | Just give me a second to read it again please. |
| **Pause.** |  |
| R KNIGHT: | No I don't think it does, it just introduces Dell as a new, a new party, but other than that. |
| J AMBLER: | So you, you don't find it unusual that in point two, 50,000 for extracting the necessary written |

FBI 100003839

EXH 5103-0160

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 55 of 69

|                |                                                                     |
|----------------|---------------------------------------------------------------------|
|                | confirmation signed off by the auditors as though –                 |
| R KNIGHT:      | Well, it sa-, I said I find that unusual –                           |
| J AMBLER:      | Yes.                                                                 |
| R KNIGHT:      | - and I found it's, it's saying exactly the same thing as the –     |
| S WRIGHT:      | Mm.                                                                  |
| R KNIGHT:      | - previous email.  It is unusual –                                  |
| J AMBLER:      | Yes.                                                                 |
| R KNIGHT:      | - and I would have asked about it.                                   |
| J AMBLER:      | Yes.                                                                 |
| S WRIGHT:      | Yes.  Tab 15 please; UID WHA01B000050-89-50, an email from Mike Lynch, sent on the 11th July 2000…, forgive me 7th November, it's an American email, 7th November at 4.33 from Sushovan Hussain.  The second paragraph where it says 'EMC – Billy is saying no more to any more, because internally people are saying we're a competitor, it means we're reliant on Hitachi and Gel, and Dell.' |

And just turning over into the next tab as well Rob, I think it helps just to read these two emails at the same time. Last four, 89-52, an email from Bill Scannel to Mike Sullivan on December 9th.  'Mike, my apologies for not responding, at this point we are unfortunately are uncomfortable with these deals, I did check again tonight but got the same answer.  I will try to call you in the morning but know you are anxious to get this feedback.  Best, Bill.'

Rob, in late 2009 or early 2010 what was your

FBI 100003840

EXH 5103-0161

|  |  |
|---|---|
|  | understanding as regards the position with EMC and Autonomy – |
| R KNIGHT: | Mm. |
| S WRIGHT: | - and whether or not there was an on-going relationship or whether or not as these emails tend to suggest, the relationship might be coming to an end? |
| R KNIGHT: | I, I don't think I knew anything beyond the date that the quarter end was actually signed off. Does it surprise me that EMC are suddenly saying we're not doing any more of this. I don't think I really understand what this email actually means. Does it mean we're not doing any more of these hardware deals; does it mean we're not continuing with the Arcpliance development; does it mean, yes, I would take that to mean, no to any more deals at this point. |
| J AMBLER: | I think, I think based on what evidence we can find it seems to be no to all of the above. |
| R KNIGHT: | Yes. |
| J AMBLER: | We're not playing any more. |
| R KNIGHT: | Well there weren't any more sales afterwards really [inaudible] – |
| J AMBLER: | No, there weren't any more sales – |
| R KNIGHT: | Yes. |
| J AMBLER: | - and there's no evidence that the Arcpliance used EMC hardware. So it seems to be an initiative that came undone – |
| R KNIGHT: | That failed. |
| J AMBLER: | - that failed, yes, it didn't go anywhere. |
| R KNIGHT: | Yes, I, I think if it fell over it fell over. |

OPS2095                                          FINAL DRAFT

FBI 100003841

EXH 5103-0162

|  |  |
|---|---|
|  | You know, Autonomy was trying a number of different avenues to, to get advantage and would have ploughed money into doing these things. If it didn't work, it didn't work, you know, I don't have any more insight than that really. |
| J AMBLER: | Right. |
| R KNIGHT: | Yes, the company would be able to explain you know, what happened with EMC, exactly what happened with the Arcpliance, you know, why did it fall over. |
| J AMBLER: | If you'd been aware of that would you have expected that to have an impact on the overall split when you got to the final audit? |
| R KNIGHT: | No, because, so what this does, to me, is it kind of tells me you made the right judgment and the company made the right judgment in not capitalising any of these costs, because if we'd capitalised nine million of costs on the balance sheet, as soon as we got this piece of evidence and, and let's say the Arcpliance doesn't go to fruition and everything stops, then you would be writing off a loss in quarter four that actually you were probably inappropriately carrying on the balance sheet at quarter three. So what this does is tell me you accounted for the costs in the income statement appropriately at Q three. Would it have changed the way you looked at the gross margin level, no, because you know, you were paying for something, it didn't work out, but you're still paying for something, you still expense the cost, you still booked it in |

OPS2095                                                FINAL DRAFT

57

FBI 100003842

EXH 5103-0163

|              |                                                             |
|--------------|-------------------------------------------------------------|
|              | the right way, so I don't think it really                   |
|              | changes, I don't think it would change –                    |
| J AMBLER:    | It wouldn't have changed the, the overall split             |
|              | because –                                                   |
| R KNIGHT:    | No, we, we certainly would have –                           |
| J AMBLER:    | - they would appeared to have paid a lot more               |
|              | for –                                                       |
| R KNIGHT:    | Yes.                                                        |
| J AMBLER:    | - something that –                                          |
| R KNIGHT:    | I mean we definitely would have had discussion              |
|              | and again you know, I wasn't involved in this,              |
|              | you know, I don't know what we knew when we knew             |
|              | it.  I don't know if Richard knew this at Q4 and            |
|              | had this discussion with the company, I don't               |
|              | know about that, but –                                      |
| J AMBLER:    | I don't think he did to be honest.                          |
| R KNIGHT:    | Okay, but on the face of it I don't necessarily             |
|              | think it would change the accounting, because               |
|              | you know, you make your judgement, you've booked            |
|              | it, and all you would have been talking about is            |
|              | potentially a re-classification and I don't                 |
|              | think there's enough evidence here to suggest               |
|              | that re-classification would have been                      |
|              | appropriate.                                                |
| J AMBLER:    | Right, because they continued to make some                  |
|              | loss-making sales not with EMC.                             |
| R KNIGHT:    | Right.                                                      |
| J AMBLER:    | Those appear to have been, the whole lot was                |
|              | written off to –                                            |
| R KNIGHT:    | Okay.                                                       |
| J AMBLER:    | - cost of goods sold, so –                                  |

OPS2095                                                        FINAL DRAFT

FBI 100003843

EXH 5103-0164

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 59 of 69

R KNIGHT:      When was that?

J AMBLER:      That was 2010 which we appreciate you weren't –

R KNIGHT:      Okay.

J AMBLER:      - involved with.

R KNIGHT:      And I guess accounting for those contracts you would look at individually and say what are we buying and, you know, you would account for that according to what evidence you could get about what you were buying.

J AMBLER:      Yes, I think those were seen as being one-offs.

J RANDALL:     Yes, that's exactly [inaudible] –

J AMBLER:      I think what we've been struggling with is the difference between this one off and those one offs.

R KNIGHT:      Yes, yes.

J AMBLER:      As it turned out.

R KNIGHT:      Yes.

J AMBLER:      But you were not aware of the fact that the EMC deal –

R KNIGHT:      No.

J AMBLER:      - had come to a somewhat abrupt –

R KNIGHT:      No, no.

J AMBLER:      - end?

R KNIGHT:      No.

J AMBLER:      Should you have known that do you think?

J RANDALL:     Or should, should they have told us, you mean?

J AMBLER:      Yes, should it yes, no, not should you have known, should you have been told, do you think?

R KNIGHT:      Should Deloitte have been told that this particular deal had come to an end?

J AMBLER:      Mm.

OPS2095                                              FINAL DRAFT

FBI 100003844

EXH 5103-0165

R KNIGHT:       Probably wasn't high on anyone's agenda to be honest, because what, if there's no, critically if there's no accounting impact of that judgment coming to an end, you, you would probably go back and look at your allocation and say, you know did we get this right, but you know there's not enough evidence here to suggest that, that allocation would, would be any different so, but again it wouldn't have been, wouldn't have been high on anyone's agenda because of the nature of any correcting entry.

J AMBLER:       Okay, thanks.

S WRIGHT:       Tab 17 please Rob?

R KNIGHT:       Yes.

S WRIGHT:       Last five, 02855.  If you just have a look at page 2-, are we on 17?

R KNIGHT:       Yes, have we, did we, that was, do 16?

S WRIGHT:       Yes we covered, yes we did –

R KNIGHT:       Yes.

S WRIGHT:       Yes.  If you just have a look at the second page of that particular tab there, a couple of emails there, I won't read out those.  I think it's fair to say the first email is from Lee Welham and it describes a press release for Q3 2009, and then on the first page of that particular tab there is an email from you on the 16th October to Richard Knights and the second line, the second paragraph there that reads, 'If they do not want to talk about hardware then the solution could be to get them to remove comments about organic growth and IDOL growth -

OPS2095                                                  FINAL DRAFT

FBI 100003845

EXH 5103-0166

R KNIGHT:        Yes.

S WRIGHT:        - signed, Rob.  Quite simply, what was the issue
                 with regard to talking about hardware; was there
                 an issue about talking about hardware?

R KNIGHT:        The company seemed somewhat reluctant to make
                 explicit statements about hardware, it's fair to
                 say, that's the, that seems to be the chain of
                 emails.  Quite why, I think it was partly
                 snobbery on their, on their behalf. You know
                 they were very keen to you know, this was a
                 software company, what it did was software, it
                 didn't have a very big services division, it was
                 all about software, so you know they, to talk
                 about hardware would just sort of interfere with
                 a lot of their messaging that's probably where,
                 why they got to where they got.

J AMBLER:        Do you think that that gave a fair view to
                 effectively, it's not quite concealed but not
                 mentioned?

J RANDALL:       Do you mean fair view in a context of true and
                 fair?

J AMBLER:        Possibly slightly broader than that, more in a
                 generic normal English rather than specifically
                 true and fair.

J RANDALL:       I'm just wondering –

J AMBLER:        I'm just –

J RANDALL:       - would you say, do you think they're misleading
                 the public or what would you say?

J AMBLER:        Well yes, is, is it not as probably as strong as
                 misleading, but it does present a slightly
                 misleading view of the way in which their

FBI 100003846

EXH 5103-0167

|  |  |
|---|---|
|  | business appears to be developing do you think. That, that's the sense I get from some of your emails, that you are concerned that it isn't, it isn't quite as – |
| R KNIGHT: | We wanted them – |
| J AMBLER: | - open and transparent – |
| R KNIGHT: | Yes. |
| J AMBLER: | - as it could be. |
| R KNIGHT: | We wanted them to put more in, you know, we, we had discussions about organic growth and you know how those discussions effectively concluded was, they said well actually if you think about organic growth and acquired growth, growth can either be organic or acquired, this is actually organic by definition, was the argument that, that Steve put forward because it did not come from acquisitions, it simply came from the fact that you know, we have booked a number and within our existing business, so therefore it is organic and it's difficult to argue that that's, it's impossible to argue that's not true, it is organic growth it does not come from acquisitions. |
| J AMBLER: | Can I just stop you and say well what was your concern about the organic growth, where would sort of, the email doesn't make it all that clear as to exactly what – |
| R KNIGHT: | Yes. |
| J AMBLER: | - particular aspect – |
| R KNIGHT: | Yes, yes. |
| J AMBLER: | - is bothering you? |

OPS2095                                    FINAL DRAFT

FBI 100003847

EXH 5103-0168

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 63 of 69

R KNIGHT:        Well I think it was the fact that this was
                 something different, and on the revenue line it
                 was a big number, so if you were cutting it and
                 looking at it in a purist way you could come to
                 two different arguments as to about what organic
                 growth was.  But you know, looking at it how
                 they describe it, their number is the right one.

J AMBLER:        So are you saying that you didn't feel hardware
                 was really organic growth, is that, I'm just
                 trying to get it straight in my head?

R KNIGHT:        It cer-, I didn't think of it as software –

J AMBLER:        Right.

R KNIGHT:        - you know it was different to software, and you
                 know, that was, that was what we were wrestling
                 with, is I think in Richard's email further down
                 he says, well it's you know, not this or it's
                 not this, but actually I think there is a clear
                 argument that could be said this is organic
                 growth.

J AMBLER:        So was it that this perhaps was nearer to
                 representing a new operating segment?

R KNIGHT:        No, it wasn't a new operating segment.  Yes
                 it's, so when you think about operating segments
                 under the IFRS 8 definition you look at the way
                 which the chief operating decision maker in the
                 business looks at the business and governs the
                 business.  You know to be a separate operating
                 segment you'd need to look at this as you know,
                 a separate part of the business which is
                 separately managed, creates its own numbers and
                 it just wasn't, it was never, that was never an

OPS2095                                          FINAL DRAFT

63

FBI 100003848

EXH 5103-0169

|  |  |
|---|---|
| | argument really that this is a separate operating segment. |
| J AMBLER: | So effectively it was a means to an end not an end in itself, the hardware element? |
| R KNIGHT: | Yes, yes, yes, they were never about, they were never about to set up a hardware business, they were never – |
| J AMBLER: | Perhaps – |
| R KNIGHT: | Well in my view. |
| J AMBLER: | – if it had been wrong, would it be fair to say that perhaps their reluctance was that people might perceive that they were moving into this side of things? |
| R KNIGHT: | That, exactly, that was my point about snobbery. You know, if Autonomy – |
| J AMBLER: | I wasn't suggesting necessarily snobbery – |
| R KNIGHT: | But if, but, yes – |
| J AMBLER: | – bit just that it might, that might be construed to be misleading because it looks as though they were setting up a hardware division? |
| R KNIGHT: | Exactly, yes and they're not setting up a hardware division.  This is purely a marketing piece of spend to sell more software, that's what they're trying to do, sell more and more software. |
| J AMBLER: | Thanks. |
| S WRIGHT: | Tab 18 please; last five 87714, an email from Richard Knights on the 18th October to Stephen Chamberlain, Lee Welham and Rob Knight.  I guess this takes the discussion further in relation to the organic growth point. |

OPS2095                                              FINAL DRAFT

FBI 100003849

EXH 5103-0170

Protected Materials subject to the January, 11, 2017 Protective Order in United States v. Hussain, Case No. CR 16-462 CRB

Case 3:18-cr-00577-CRB   Document 220-4   Filed 09/29/23   Page 65 of 69

R KNIGHT:        Yes.

S WRIGHT:        I don't know if there's anything in that email
                 that you feel clarifies the position any
                 further?

R KNIGHT:        No, I think this is just, it just says the same.

S WRIGHT:        And if we go to tab 19.

R KNIGHT:        Just, sorry bear with me a second.

S WRIGHT:        Take your time.

**Pause.**

R KNIGHT:        Yes.

S WRIGHT:        And so we continue in tab 19; last five 87730,
                 an email from Stephen Chamberlain on the 18th
                 October to Richard Knights, Lee Welham and Rob
                 Knight, where Stephen Chamberlain, I'll just
                 read the email out because it's his, his
                 response. 'EMC is organic, it is not from
                 acquisitions and hence it's organic.  This is
                 black and white, Lee, Rob, Tom and Antonia have
                 the calculations, happy to provide them again, I
                 do seem to have to provide everything multiple
                 times which at this stage is incredibly
                 frustrating.'
                 Did you agree with that response in relation to
                 the first line there, as regards it being black
                 and white?

R KNIGHT:        Well, Stephen is looking at this in a very
                 binary, binary way.  There is obviously you
                 know, he is making a definition of organic
                 growth that says that is the existing business
                 as opposed to acquisitions.  It is clear that it
                 was a part of the existing business that was

FBI 100003850

EXH 5103-0171

|              | purchasing and completing the sale with EMC, so from that perspective it is black and white. I suspect it would be difficult to find a dictionary definition or an investopedia or wherever that would come to a different conclusion than the one Stephen's got to. So you know, there are different ways of looking and disclosing a set of results. This is one way. |
|--------------|---------------------------|

J AMBLER:      Would it be fair to say that you'd have been happy with a slightly greyer press release that didn't create the unspoken inference that the increase was all software, because you could read that into the way they were portraying it?

R KNIGHT:      Yes, I mean –

J AMBLER:      They managed to conceal this unusual transaction –

R KNIGHT:      Yes –

J AMBLER:      - quite effectively?

R KNIGHT:      I mean, as an auditor I would like my client's press releases to say you know, exactly what they do, exactly you know, but there would have been commercial sensitivity around this as well. So, so you know, if clients all prepared the press release that I want them to prepare, they'd go out of business very, very quickly, because they'd just be disclosing everything –

J AMBLER:      Yes.

R KNIGHT:      - and it would be commercially to their disadvantage. So, so yes I would always push always push for more greater disclosure, but

OPS2095                                          FINAL DRAFT

FBI 100003851

EXH 5103-0172

there comes a point when the audit partner makes a judgment about you know, do we think, you know if you, you look at the standards we operate under for review opinions, it's governed by ISRE2410 which basically says, your responsibility when you're completing a review which at Q3 you are, obviously you do the audit at the end of the year on the statutory accounts, but I think you basically have to say, is there anything that's materially in the front end of the account, in the front end of the release statement that is in with this Q3 release that, that is materially at odds with what the financials are saying, and the opinion –

J AMBLER:      There wasn't?

R KNIGHT:      - the opinion we reached as a firm was there wasn't.

J AMBLER:      Thank you.

S WRIGHT:      Tab 20: last five 92471, an email from Sushovan Hussain on the 18th October to Stephen Chamberlain, Rob Knight and Richard Knights. Still on the issue of the, the press release where Sushovan says, 'Comments, this is completely fundamental, organic growth is defined as excluding the acquisition of companies. We have bought an asset, integrated it and sold it as part of the strategic sales. Remember we sold multiple times to Citi, JPMC and MS in this quarter and previous quarter, that's organic sales, you can't define it any

FBI 100003852

EXH 5103-0173

<table>
<tr><td></td><td>other way.' And so the conversation as it were seems to come to an end as regards a discussion –</td></tr>
</table>

R KNIGHT:      Yes.

S WRIGHT:      - of organic sales.

R KNIGHT:      Yes.

S WRIGHT:      I don't think we need –

R KNIGHT:      No.

S WRIGHT:      - perhaps, to dwell on that any more.

Tab 21, we get to the press release. The Q3 2009 Autonomy Corporation and Conference Call and Presentation, on the 20th October 2009 at 8.30. On page three, Rob, this is Mike Lynch's bit if you like. Just towards the very bottom of the page, you see he says the following, 'The business is growing strongly organically despite a very different [inaudible] from last year. I think from memory we had 50% licence growth in Q3 last year, we are seeing strong organic growth of plus 15%.'

Clearly he makes reference to organic growth in this particular press release, the issue was seemingly resolved. Is that, is that your understanding of how matters developed?

R KNIGHT:      Well it's important to remember this isn't a press release, this is the, this is the minutes of a conference call.

S WRIGHT:      Yes, sure, yes.

R KNIGHT:      Without the numbers in front of me, it's difficult to remember where the growth was occurring in the business. You know it's, I

FBI 100003853

EXH 5103-0174

|               |                                                                                  |
|---------------|----------------------------------------------------------------------------------|
|               | don't have the numbers in front of me, I can't sort of comment on whether this – |
| J RANDALL:    | You can't audit conference calls.                                                |
| R KNIGHT:     | Yes, yes.                                                                         |
| S WRIGHT:     | I appreciate that.                                                               |
| R KNIGHT:     | I don't –                                                                         |
| S WRIGHT:     | Forgive me, my mistake, I've seen other press releases, it's my mistake, getting confused with them.  Nothing further to add on that Julia? |
| J AMBLER:     | No, no.  I think now is the time unless you've got anything else to say.  Is there anything else you think you would like to explain to us, this is, any areas that perhaps we've not covered and we should have covered and you'd like to provide us with any further comments? |
| R KNIGHT:     | No, no I'm happy with interview.                                                 |
| S WRIGHT:     | The time by my watch is now 12.07 and this concludes our interview with Rob Knight. |

**End of Disk 01 of 01.  End of Interview.**

FBI 100003854

**EXH 5103-0175**