# EXHIBIT B

| 1. | On behalf of | Claimants |
|---|---|---|
| 2. | Initials/Surname of witness | F Lucini |
| 3. | Statement No | 1 |
| 4. | Date | 14 September 2018 |

**Claim No. HC-2015-001324**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

**B E T W E E N:**

**(1) ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY CORPORTATION LIMITED)**
**(2) HEWLETT-PACKARD VISION BV**
**(3) AUTONOMY SYSTEMS LIMITED**
**(4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.**

**Claimants**

**-and-**

**(1) MICHAEL RICHARD LYNCH**
**(2) SUSHOVAN TAREQUE HUSSAIN**

**Defendants**

---

**WITNESS STATEMENT OF FERNANDO LUCINI GONZALEZ-PARDO**

---

I, FERNANDO LUCINI GONZALEZ-PARDO of 22 Hyde St., West Wickham, Cambridge, CB21 4RY, STATE AS FOLLOWS:

1.  I am the Managing Director of Artificial Intelligence at Accenture, a global professional services company. I make this Witness Statement on behalf of the Claimants in connection with the above named proceedings. Except where it otherwise appears, the facts and matters to which I refer in this Witness Statement are within my own knowledge and are true. Where facts are from another source, I identify the source and I believe them to be true. Where the source of my understanding or information is the Claimants' solicitors, I have identified this in this Witness Statement but without any waiver of legal professional privilege.

2.  I have not attached the documents to which I refer in this Witness Statement. Instead I have provided references for those documents. I understand that the document references are the Document Production IDs allocated to the documents by the parties as part of the disclosure in the current proceedings. In certain instances, I have relied

HP-SEC-02930152

upon these documents to refresh my recollections and refer to the specific content of a number of them.

**Professional History and Background**

3.  I graduated with a BEng in electrical engineering from The University of Kent at Canterbury in 1998. In 2005, I received an MBA from the IE Business School in Madrid. After I graduated from The University of Kent in 1998, I joined Dataware Technologies (an IT consultancy firm), where I held the position of Solutions Center Manager. Dataware then changed its name to Leading Side.  I worked for Leading Side until around 1999.  In April 2000, I joined Autonomy as a Technical Director working in pre-sales. Pre-sales was Autonomy's technology selling arm. Members of the pre-sales team, also known as systems/sales engineers ("**SEs**"), had a deep understanding of Autonomy's technology and were able to explain its functionality to customers and apply it to customer use cases. This is to be distinguished from the conventional sales team, who managed the business relationships with customers and negotiated commercial terms with them. As part of the pre-sales team, I explained Autonomy's technology to customers, helped them to understand its value and explained how it could be deployed to meet their particular needs.

4.  Early-on in my career at Autonomy, I was responsible for opening Autonomy's Asia office in Singapore. In 2004, I moved back to Autonomy's Cambridge office and became Head of Support, where I ran Autonomy's support organisation. Within a year, I became Head of Pre-sales. In approximately 2007, I became Chief Technology Officer ("**CTO**") of Aungate, Autonomy's compliance group which was eventually subsumed into Zantaz (a data hosting company that Autonomy acquired in 2007).  In approximately 2009, I returned to my role as Head of Pre-sales and also assumed the role of Chief Architect, which meant that I was one of Autonomy's senior technology leaders. As part of my role as Head of Pre-sales, I oversaw the pre-sales teams; each region had its own pre-sales team leader who managed locally but reported in to me. To the best of my recollection, during 2008 to 2011, the pre-sales team consisted of around 200 to 250 engineers. I stayed with the business after it was acquired by HP, and left HPE in 2016.

**Senior Autonomy Personnel**

5.  In my role as Chief Architect, I worked with Autonomy's other technology leaders in its Cambridge office, including Dr Sean Blanchflower (Head of Research and Development) and Darren Gallagher (Head of Development). I also worked with Autonomy's senior management, including Dr Michael Lynch (Autonomy's Chief Executive Officer), Sushovan Hussain (Autonomy's Chief Financial Officer), Andrew Kanter (Autonomy's Chief Operating Officer and General Counsel); and Peter Menell (Autonomy's CTO).

HP-SEC-02930153

6.    I was in regular contact with Dr Lynch. By way of example, I helped him prepare for and accompanied him to meetings with and presentations to the senior management of customers and potential customers, I prepared the written materials and built the software demonstrations for these meetings and then presented them alongside Dr Lynch.  I was also responsible for opening Autonomy's new healthcare division, which Dr Lynch took a keen interest in, and had frequent discussions with him about that.

7.    Dr Lynch was a marketing genius who could tell a convincing story with incredible ease and take very little and make a lot out of it.  He had a unique combination of obsession and clarity of vision and could focus on items one at a time with such determination that the rest of the team could not keep up with him.  I had great respect for Dr Lynch's ability to recognise what was important to a customer and then translate that into something that Autonomy could build for that customer.

8.    Dr Lynch was very involved in the day-to-day management of Autonomy's business up until about 2008.  From about 2009 onwards, Dr Lynch began travelling a lot and was less visibly involved in our day-to-day work.  Even then, though, Dr Lynch had a level of force and influence that was felt by me and indeed all of Autonomy's employees.

9.    I also interacted with Mr Hussain on, nearly, a daily basis.  Mr Hussain was very involved in sales and discussed with me Autonomy's technology, its larger customer accounts, and presentations to senior management of customers and the materials prepared for those presentations.  I had a positive and productive working relationship with Mr Hussain.

10.   My immediate manager was Dr Menell. Working with Dr Menell was difficult and frustrating. Part of that difficulty stemmed from the fact that, at least when compared with Autonomy's other senior technology leaders, he was not as technologically competent.  He relied on me and others to fill in the blanks for him.

11.   Another reason that Dr Menell was so difficult to work with was his unusual style of personal interaction.  There were times, for example, when I went to Dr Menell's desk and asked him a question when he simply ignored me and acted as though I was not there. He frequently berated employees for trivial matters.  It was particularly frustrating that the instructions Dr Menell gave us were almost always unclear or incomplete. He also seemed to be paranoid, particularly about emails.  We were often told to keep certain information within a specific group of people or told not to write emails about particular issues.  Dr Menell's emails were typically written in a way which no one could understand.  This was deliberate – I remember Dr Menell joking about the confusing nature of his own emails and saying that, if they were to appear in Court, it would be impossible to interpret them.

HP-SEC-02930154

**SMS calls**

12.    I was involved personally in Autonomy's efforts to sell its products across the world. I participated in Autonomy's weekly Sales Management System ("**SMS**") calls with Autonomy's sales managers and sales representatives. SMS was software that Autonomy developed for its internal use to enable it to track all of its sales opportunities. During these calls, we talked to Autonomy's sales representatives from around the world, beginning in Asia and ending in the United States of America. The SMS calls were a way of running through each sales representative's top deals.

13.    Mr Hussain led the SMS calls. Until around 2006, Dr Lynch nearly always sat in on or participated in the calls. After 2006, Dr Lynch didn't attend these calls as frequently as he had before. Mr Hussain asked each sales representative what their top three accounts were. He would then ask, for example, what they were doing on those accounts, whether the proofs of concept were going well and whether they had begun negotiating the commercial terms with the customer. We would then consider whether the right things were being done on each account and give advice where appropriate. The discussion with each sales representative was brief, but detailed. We asked questions which allowed us to determine whether a sale was likely and to identify any issues of which we should be aware. Given my role overseeing Autonomy's pre-sales team, my main reason for being on the SMS calls was to evaluate the pre-sales team to ensure that they were both effective and productive. It also gave me a useful insight into the business side of sales and how particular products were selling.

**Structured Probabilistic Engine ("SPE")**

14.    Intelligent Data Operating Layer ("**IDOL**") was Autonomy's main product. IDOL was predominantly a search engine that indexed data and used probabilistic algorithms to automatically recognise patterns, concepts and ideas expressed in many different data types. All development work in relation to IDOL was undertaken at Autonomy's Cambridge office, by the Cambridge research and development ("**R&D**") team.

15.    IDOL was conceived, developed and marketed to solve the difficult problem of analysing unstructured data in all its forms. The premise was to make it the best unstructured engine in the world, and by 2009 it had become a recognised market leader in this field. Unstructured data is data such as emails, Word, voice and video, which does not have a defined structure. 80% of the world's data is unstructured. Structured data is data which resides in a fixed field within a record or file, including data contained in relational databases and spreadsheets.

16.    As appears from the email thread at {**D004169163**}, in May 2009 Matt Brown of Forrester, a leading IT industry analyst, suggested that one of the interesting trends in

HP-SEC-02930155

the enterprise search market was using search platforms to access structured data. This was communicated back to, amongst others, Dr Lynch, Nicole Eagan (Autonomy's Chief Marketing Officer) and me. In response, Dr Lynch asked for a white paper on Autonomy's structured and semi-structured capabilities {**D004169163**}, which was drafted and circulated on 2 June 2009 by Da Hye Huh (an Autonomy employee) {**D004107898**}, {**D004107899**}. I believe that this was the driver for the subsequent development and, in September 2009, launch of SPE. The premise for SPE was extending IDOL's advanced probabilistic technology to structured as well as unstructured data.

<u>The development and launch of SPE</u>

17.   SPE and the SPE demonstration were created by Dr Blanchflower and members of the Cambridge R&D team over the summer of, and in September, 2009. I understand that Dr Blanchflower will be giving a Witness Statement, so I will leave him to explain precisely what was involved. My understanding has always been that the development of SPE was not a major undertaking, involving no more than a few configuration changes within IDOL, the creation of a SQL proxy to enable IDOL to "communicate" with structured data and the creation of the SPE demonstration, presentation and marketing materials.

18.   My principal responsibility in the period leading up to the SPE launch was preparing the associated powerpoint presentations and marketing materials. In order to do this, I had to liaise closely with Dr Blanchflower (with whom I had a very good working relationship) to make sure that these materials tied in with the demonstration that Dr Blanchflower and his team were building. I also helped draft the SPE press release {**POS00134961**}. This was all done in something of a rush at the end of August and in early September 2009, as is apparent from the email threads from that period, which I refer to below.

19.   On 25 August 2009, I sent an email to Messrs Blanchflower and Gallagher in relation to the SPE demo: "*We need to prepare in advance. As surprises will come as the demo gets close, yet no demo exists*" {**D003782835**}. Dr Blanchflower confirmed that they had in fact been working on the demo "*for a couple of weeks*" {**D003782835**}. On 27 August 2009, I sent an email to Ms Eagan and Ian Black (Autonomy's Director of Corporate Communications / Head of Global Operations) updating them on the SPE demonstration that Dr Blanchflower and his team were creating {**D003760264**}. I also said that "*Dev have been asked by pete to be discrete so I have removed Marianna and Bob. Obviously we can clarify with him if this is a misinterpretation from dev.*" Only a few Autonomy employees worked on the launch and development of SPE.

20.   Dr Lynch was pushing hard at this time to get things ready for a launch in mid-September 2009. On 1 September 2009, I sent an email to Dr Lynch setting out "*Some thoughts on*

HP-SEC-02930156

*positioning of the structured probabilistic modelling product*" and I asked Dr Lynch whether "*you think this is in the right direction"* {**D003743496**}. Dr Lynch responded "*yep*". Dr Lynch was also interested in the SPE demonstration. On 2 September 2009, I sent Dr Blanchflower an email: "*Analyst demo next Wednesday. Need to show the demo to MRL TOMORROW!!*" {**D003738525**}. I also sent Dr Lynch an email on 3 September 2009 attaching a "*storyboard of the Structured Probabilistic Resolution (can come up with another name) demo. I have dev building. Looking for your thoughts*" {**D003728596**}, {**D003728597**}.

21.  SPE was formally launched with a press statement released on 16 September 2009 {**POS00134961**}. The claims made for SPE in the press release were more aspirational than real, as is commonplace when launching new products in the software industry, including, for example, the description of SPE as "*a radical shift in the intelligence businesses can gain from [structured] information*". The SPE product itself i.e. the technology, was not a radical shift. There were already a number of big companies in that market such as Oracle, who were already solving similar problems to those at which SPE was said to be aimed with their own technologies.

22.  The real purpose of the press release was to generate publicity and customer interest in a product that was then in a fledgling state. If the publicity had generated market appetite and identified genuine use cases for SPE, the development team would then have set to work to further develop and tailor SPE for those use cases and, if successful, sales would have followed.

23.  Conceptually, SPE was a good idea. There was definitely customer demand, for example, for a product which enabled structured data to be retrieved from expensive relational databases and then searched and analysed along with unstructured data using the same software. This would have required a very substantial further investment in R&D however, which never happened. In any event, as far as I am aware, a suitable use case for SPE never was identified, and, again as far as I am aware, there never were any genuine sales of SPE (as opposed to it being added in to contracts along with a suite of other IDOL features or functionalities). Once the hype around SPE's launch and subsequent presentations and demonstrations to the press and internally within Autonomy had subsided, SPE was largely forgotten about.

Q3 2009 R&D costs

24.  As Autonomy's Chief Architect, I was familiar with the R&D efforts expended on product development generally, and had oversight over any SE involvement in R&D. In the case of SPE, I was very aware, given my personal involvement and collaboration with Dr Blanchflower and his team, of what had gone in to the product's development.

HP-SEC-02930157

25. In the context of preparing to give evidence in Mr Hussain's US criminal trial ("**the US Trial**"), I was asked to consider, based on my own personal observations in 2009, what the true cost of developing SPE was. The figure I came up with was $70,000, based on my best estimate of six or seven weeks of person time at an average cost of $2,000 per person per day. The actual cost may have been more or less than that, but I do not see how it could possibly have exceeded $100,000. The $2,000 per day rate is the industry standard for charging out IT technicians. The internal Autonomy salary cost is much less than that at maybe $2,000 per person week. On that measure, the cost of developing SPE would also have been much lower at approximately $14,000 (and certainly no more than $20,000).

26. I have been shown a copy of a document dated 15 October 2009, entitled "*R&D Memo Q3 09 third draft*", which I am informed was prepared by Poppy Prentis (an Autonomy finance employee) and shared with Deloitte ("**Autonomy R&D Memo**") {POS00135381}. I did not see a copy of the Autonomy R&D Memo at the time. I understand that the Autonomy R&D memo was provided to Deloitte in order to "*clarify the level of R&D capitalised*" in Q3 2009. Many of the statements made in the Autonomy R&D Memo bear no relation to reality.

27. In the Autonomy R&D Memo, US$4.8 million[1] of SE time is attributed to the development of SPE. "Core" and (in Q2 2009) Verity SEs are said to have spent 75% of their time working on SPE from Q1 2009, the costs of which are said to have been $700,000 in Q1 2009 and $1.4 million in Q2 2009. As I have said, to the best of my knowledge, Autonomy did not begin the development of SPE until the summer of 2009. Self-evidently, SEs cannot have been working on SPE before it was created in Q3 2009.

28. The number of SEs working on SPE in Q3 2009 is said to have increased and the costs attributed to that in the Autonomy R&D Memo are $2.7 million. As I was in charge of the pre-sales team, with good visibility over what SEs were doing, I can say with confidence that this is false. I have explained the role of the pre-sales team at paragraph 3 above. It does not include the development of products, features or functions, which was the role of the (quite separate) development teams. Only the development teams (and not the pre-sales team) had access to the development environment in which new code was written. If 75% of the SE workforce's time had been diverted to developing SPE in Q3 2009, not only would everyone at Autonomy have known about it, but also the normal day to day activities of the company would have been crippled. Based on what I saw at

---

[1] I note that although Autonomy's R&D memo states that $4.7m of SE time was attributed to the development of SPE (page 2), the SE costs set out for Q1 ($0.7m), Q2 ($1.4m) and Q3 2009 ($2.7m) total $4.8m, rather than $4.7m.

HP-SEC-02930158

the time, I can only think of one SE who did anything on SPE, Rajiv Kala, who helped build the SPE demonstration.

29.    In addition to the $4.8 million of SE time attributed to the development of SPE, the Autonomy R&D Memo states that there was a significant ramp up of development team time spent on SPE, the cost of which is said to be $2.5 million. This in turn is broken down between four development teams, being those in Cambridge ($0.4 million) and at Discovery Mining ($0.1 million), iManage ($0.7 million) and WCM ($1.2 million)[2]. This is false. As I have said, SPE was a set of configuration changes within IDOL. The only development team who had access to the IDOL source code, and could therefore make configuration changes, was that at Cambridge. The Discovery Mining, iManage and WCM teams were located in the US, had no access to the IDOL source code, and therefore could not have participated in the development of SPE. The $0.4 million of time attributed to the Cambridge team equates to 40 person weeks at $2,000 per person per day. When I gave evidence in the US Trial, I estimated, based on my own involvement and observations at the time that a total of seven person weeks was spent developing SPE. I understand that Dr Blanchflower has given his own over-inclusive estimate of 24 person weeks.  I would be surprised if it were that much, but as most of the work was done by Dr Blanchflower and his R&D team, I will defer to his view.  I do not know what the internal cost to Autonomy of 24 person weeks was but it would have been nothing like $0.4 million.

30.    For completeness, I address a matter that I was asked about when I was cross examined in the US Trial. It was put to me that, as SPE relied on existing IDOL functionality, development work involving changes to the IDOL source code might not necessarily be marked down as work on the development of SPE. My answer at the time, which I confirm now, was as follows. IDOL was created for the premise of unstructured data. It happened to be the case that IDOL could be used for another use case, namely structured data. I am not an accountant and therefore unable to comment on the accounting rules for R&D, but common sense tells me that work done developing IDOL for use with unstructured data cannot be viewed as work done on SPE, the premise for which was structured data. The example that I gave in my testimony in the US Trial was the development of a feature associated with understanding faces in pictures (which are unstructured data). I do not see how that can be viewed as part of the development of SPE, which to my mind is limited to features which specifically allow the ordering of structured data in a particular way (such as the SQL proxy function).

---

[2] These are the costs as set out in the Autonomy R&D Memo. However, I note that the costs for the four development teams' apparent contribution to the development of SPE total $2.4 million, rather than $2.5 million.

HP-SEC-02930159

Sales and marketing ("**S&M**")

31.    I was not aware at the time, but have since been informed, that Autonomy's reported S&M expenses for Q3 2009 were approximately $22million higher than in the previous quarter. I have also been shown a copy of the transcript of the Q3 2009 earnings call {**D003523857**}, at pages 11 to 14 of which Dr Lynch purports to explain the reason for the increase, namely marketing spend on SPE. I comment below on three elements of that spend, the supposed SPE Beta programme, Quick Start initiative and customer seminars.

32.    A Beta programme is basically a second phase of software testing in which a sample of the intended customer base tries the product out and provides feedback before the product is officially released. Beta programmes were used by some of the companies acquired by Autonomy (e.g. Interwoven and Zantaz), but to the best of my knowledge, Autonomy never ran a single Beta programme in relation to IDOL or any feature of IDOL software. It certainly did not do so for SPE. A Beta programme would have required significant input from members of the SE team, which I oversaw. Furthermore, we would have been receiving feedback from the selected samples of customers and applying it as part of the SPE development effort. It is improbable that all of this could have happened without my knowledge and involvement. I do not believe that it happened.

33.    Dr Lynch said this about the Quick Start initiative: "*But most important thing we did was the Quick Start initiative. This was where we went to strategic customers... and we said, rather than us sit in the committee and tell you what this thing does and have long meetings, what we'll do is we'll turn up, we'll turn up with a piece of hardware, we'll plug it in, we'll give you some people, we'll turn it on and we'll make it work*". The people who would have been turning up and plugging it in would have been SEs from the pre-sales team which, given the supposed scale of the operation (Dr Lynch said it cost about $4 million), I would have known about. As with the Beta programme, the Quick Start initiative did not happen.

34.    Finally as regards S&M, Dr Lynch stated that "*The other key part of the process was flying key customers from around the world to special selective seminars. These were small affairs; done about 15 customers at a time where, over a period of two days, we could really explain the technology and what it did to them -- for them, and that worked very well*". The SPE demonstration and presentation materials were only finalised in the first week of September 2009. Further, I believe that all of the presentations of SPE to analysts and the press around the 16 September 2009 launch date were given by me. I do not think that the seminars for key customers could have taken place in Q3 2009 without me being involved (which I was not) or at least knowing about it (which I did not).

HP-SEC-02930160

<u>HP HAVEn</u>

35.   HP HAVEn was HP's big data analytics platform, which combined a number of HP's software assets, including (following HP's acquisition of Autonomy) IDOL. It was primarily a marketing tool to demonstrate to customers that HP could handle all types of data, including both unstructured and structured data. HP HAVEn did not involve any integration of products, rather it grouped HP's various software assets under a single umbrella. HP HAVEn's structured data capabilities were provided by Vertica (another software company acquired by HP), which had one of the best structured data products in the world and did everything that SPE could do and more.  SPE formed no part of HP HAVEn's structured data vocabulary.

**Third Party software**

36.   We at Autonomy were very proud of the fact that we built our own technology. The philosophy was that we didn't need anything from anyone else.  If a customer requirement arose, we would write the software or devise a solution ourselves.  This applied even to quite complex products.  There was a certain amount of internal bravado about this, but it also made good business sense.  If our customers required a change in the technology and the technology was ours, we were the responsible entity and we could do that for them ourselves.  If we didn't own the technology but licensed it from a third party, we would have to call that third party and ask it to make the changes for us. If Autonomy really wanted or needed a piece of software, and couldn't develop it itself, its preferred approach was to buy the company that owned the software – that way we acquired the intellectual property and the source code so could control our own destiny. Occasionally, we purchased specialist software from a third party for immediate on-sale to a particular customer which had specifically requested that software, in which case we would integrate the software with IDOL for that customer and recover the cost from the customer. I cannot recall a single occasion on which we made a material purchase of a license to third party software for wider integration with IDOL.

37.   I or one of Dr Blanchflower and Mr Gallagher would often be asked by Dr Menell to carry out an analysis or evaluation of another company's software.  Typically, Dr Menell would not share with us the reason for asking us to do this.  We were simply expected to carry out his instruction and report back.  There were many possible reasons for looking at third party software.  Autonomy might have been considering acquiring the company that owned it.  Or we might have wanted to understand a competitor's offering to assess whether it offered greater functionality than our products and, if so, whether we should develop that functionality ourselves.  The culture of not buying third party software was so ingrained in us that, when I was asked to look at third party software, it did not occur to me that Autonomy was thinking of buying it.

HP-SEC-02930161

**FileTek Inc ("FileTek")**

38.     I understand from the Claimants' solicitors that (1) on 31 December 2009, Autonomy Inc
        purchased a limited licence to use FileTek's StorHouse software (and related support)
        for $10.4 million {**POS00152814**}, (2) on 11 May 2010, Autonomy Inc purchased further
        licences for StorHouse software (and related support) for $11,518,214 {**POS00158260**},
        {**POS00158261**} and (3) Autonomy Inc purchased yet another series of licences to use
        StorHouse in March, June and August 2011 for a total of $11,673,397.

39.     I was not aware of these transactions at the time. When I learned of them (from the
        Claimants' lawyers), I was genuinely shocked.  It appears that Autonomy paid over $30
        million for a product that, to the best of my knowledge, it never used.

40.     In my opinion, there may have been some commercial rationale for at least looking at
        StorHouse.  StorHouse is a database archiving product.  Autonomy did not have a
        significant presence in the structured data market, which was dominated by other
        companies such as IBM.  StorHouse offered a way to offload some of the data held in
        expensive databases to less costly servers.  To build a similar product from scratch would
        have been a substantial undertaking for Autonomy.

41.     Before buying StorHouse, however, I would absolutely have expected significant due
        diligence to have been undertaken.  On the technical side, there should have been a
        deep and extensive period of testing and dedicated work to integrate StorHouse into
        Autonomy's software. This would have required a substantial commitment of
        engineering, money and resource, and for a large purchase like this, I would expect a
        long and protracted exchange between FileTek and Autonomy as part of the integration
        effort.  I would have been involved in, or at the very least aware of, this process.  I saw
        none of it.  Commercially, I would expect detailed consideration to have been given to
        why StorHouse was being bought, how and when it would be marketed and sold, and
        the likely profit or return on the investment.  I would then expect to have seen heavy
        marketing campaigns and PR aimed at achieving that return – software does not sell
        itself if you don't tell the market about it.  There was no such marketing.  As far as I am
        aware, StorHouse was never sold to a customer, and certainly not on the scale that
        would have been required to justify the $30 million that Autonomy paid for it.  To me,
        therefore, the StorHouse purchases are commercially inexplicable.

42.     Although I did not know about the StorHouse purchases, I did have some knowledge and
        awareness of the product.  My first involvement with StorHouse was just before the first
        purchase in December 2009.  Dr Menell asked me to have a look at StorHouse and let
        him know what I thought about it.  I foraged for information on the internet and looked
        at manuals (we did not have a test license or anything like that so my review was

HP-SEC-02930162

necessarily at a very high level), but did no more than that.  Mr Gallagher was then asked to do a similar review and write it up, which I believe he did.  I had no idea why we were asked to do this, and as far as I was aware at the time, nothing came of it.

43.   I was also aware of attempts being made to integrate StorHouse with Digital Safe at some time in 2010.  I had no direct involvement in this myself, but Chris Goodfellow (CTO of Infrastructure Technology at Autonomy) and Mr Gallagher did and, as we all worked closely together, I heard it being talked about.

44.   My final encounter with StorHouse came in the summer of 2011, when Dr Menell asked me to create a StorHouse demonstration.  The request was unusually vague, even for Dr Menell.  I was asked to create a demonstration showing how StorHouse could be used in Autonomy's data centres. It was very unusual to be creating a demonstration of a third party product.  I did not know why we were doing it. I was not told which of Autonomy's products I should use for the demonstration or given a specific use case that the demonstration should address.  Nor was I told that the demonstration was for any particular customer – the instruction was just to build something.  This too was unusual. Normally, demonstrations were prepared for presentation to someone, which did not seem to be the case here.  Although I did not understand why Dr Menell wanted the demonstration, I had my orders and I went ahead and got it done as quickly as possible.

45.   The Autonomy product which I chose to showcase working with StorHouse was LiveVault.  LiveVault was a cloud based data backup and disaster recovery product which Autonomy had acquired through the acquisition of Iron Mountain's archiving business in June 2011.  I contacted Mark Kaufman, who was part of the development team which had come over to Autonomy with the Iron Mountain business, and asked him to help with the demonstration so that we could get it completed as quickly as possible. We had to ask for licenses and figure out how StorHouse worked, so it never occurred to me that we already owned licenses.  We worked hard and, within a few days, we succeeded in creating a script and building one demonstration instance.  Mr Kaufman described the demonstration in his email to me of 3 August 2011: *"We start by showing some rows from a simulated HR database in Oracle and also from StorHouse in the cloud.  The two match.  We then update the rows in Oracle, back it up, flow the data from LV [LiveVault] to StorHouse and show the updated information then matches. We then go into the LV retrieve window and pick an older version of the database and send that to StorHouse. Now StorHouse has the old data while Oracle is still running with the latest"* {**D000353068**}.

46.   The demonstration did what I was told it should do – it showed StorHouse working with LiveVault, but was very raw. This did not involve integrating StorHouse with LiveVault. It was an orchestrated and tightly controlled demonstration. We may have written a small

HP-SEC-02930163

amount of script for the demonstration, but this script was only applicable to the demonstration itself. It was utterly useless for industrialisation, let alone for sale to customers and was as far away from integration as you could get. Integration would have required considerable additional development effort and rigour and the application of all of the controls necessary to achieve productisation. I would have been happy to take things forward from the demonstration towards integration if asked to do so by Dr Menell, but that request never came.   I am as confident as I can be that the demonstration was never shown to any customer, and that StorHouse never was integrated with LiveVault or any other Autonomy product.

**Video Monitoring Services of America**

47. I understand that, on 30 June 2009, Autonomy Inc purchased rights from VMS LP to license VMS's data feed for three years for $13 million {**D003997524**}. I also understand that, on 31 December 2010, Autonomy Inc purchased further data licences from VMS LP for $8.4 million {**D001451843**}, which granted Autonomy additional data and licensing rights and increased the term of the 30 June 2009 agreement to five years. I was not aware of either of these transactions at the time, although I subsequently learned that Autonomy had acquired the right to use the VMS data feed if it wished to do so.

48. For a number of years up to 2009, Autonomy received a free data feed from Moreover Technologies Inc ("**Moreover**"), which we used in our demonstration environment. Moreover's data feed was sophisticated and was more than sufficient for Autonomy's purposes. In June 2009, Moreover told us that it was unwilling to continue providing its data feed for free but offered to keep the feed running for £50,000 per annum {**D003924207**}. This elicited a typical response from Dr Menell in his email to Mr Hussain dated 20 July 2009: "*Moreover is a good clean and reliable feed. However, like the rest of the world (remember Bloomberg) technology wise its built on our stuff and other simple 3rd party bit and pieces that we have our own and frankly superior version off [sic]... So renewing Moreover would  be something we would do if a ) we were lazy and have been lazy b) we ever listened to humans  calling themselves "product managers". Thus time to bite that bullet and package our own that given our technology will utterly obliterate the likes of Moreover*" {**D003920125**}. Dr Menell forwarded this email to me, Mr Goodfellow and Dr Blanchflower, stating: "*You know what to do – it is time to eat our own dog food. We have until the 31st and I want something we can use AND sell to our customer as a clean pre classified plug and play tagged feed package. Fern lead the charge*" {**D003920940**}. This is reflective of Autonomy's internal bravado when it came to third party software – the knee jerk reaction was always to create something ourselves wherever we could. In response to Dr Menell's instruction, Dr Blanchflower developed an internal news feed, which took over from the Moreover feed when it was cut at the end of July {**D003920953**}.  The feed created by Dr Blanchflower was perfectly

HP-SEC-02930164

adequate for our demonstration purposes, and we were still using it in the main demonstration environment when I left HPE in 2016.

49.    On 3 December 2009, Eloy Avila (one of Autonomy's technology leaders) sent an email to me, Mr Gallagher and Dr Blanchflower informing us that VMS had "*provided some sample data for this VMS Data feed we licensed*" {**D003346437**}. Mr Gallagher replied on 7 December 2009 asking what the feed was and why Autonomy had licensed the feed {**D003335068**}.  Mr Avila explained: "*It was part of the last deal we did with them as far as I know, we can integrate this "feed" within our demos or products and upsell customers into full VMS features*" {**D003335063**}. It appears that Mr Gallagher reviewed the sample data from VMS's data feed and found the data to be of poor quality and that we would not want the data feed to be used in the demonstration environment: "*From what I've seen the quality of the content is pretty poor......not at all sure how it could be used in our demo network*" {**D003335066**}. Mr Gallagher also stated: "*So far my random sampling of the 130 XML files on the FTP site show them all to be crappy local news broadcasts...........we don;t [sic] want these in the demo*" {**D003329529**}.  I replied to the email chain, stating: "*I'm not sure we get much value from getting a raw feed of unprocessed info....it would be funny if we end up getting moreover again but coming from vms! ... If it's meaningful we can put it through maindemo beta and see if it plays well......*" {**D003329532**}. Mr Avila replied: "*...given we seemingly paid for this I would hope we can use it somehow, even if just moreover*" {**D003329531**}. I also replied: "*Indeed we should get something out of it and if we don't like it we should push....for sure*" {**D003329530**}. I believe, though, that we ultimately concluded that the VMS feed offered no advantages over the feed that we had created ourselves, so we stuck with that.

50.    As with the purchases of StorHouse referred to above, I was shocked to learn that Autonomy had paid a total of $21 million for the VMS data feed.  We certainly didn't need the VMS feed in our main demonstration environment and, although we had access to it, we chose not to use it.  I am told that another supposed justification for the purchase was to integrate it with Interwoven's (a company that Autonomy acquired) Web Content Management (Teamsite and Livesite) and Optimost product sets in order to generate increased sales of those products.  I was very familiar with Interwoven's products.  I believe that, at about this time, I built a demonstration of these products for Dr Lynch to show to analysts.  I was also involved in lots of forward thinking about the products and how they might be optimised.  I would have known if VMS had been integrated with any of them and it was not. We did end up integrating our own news feed with TeamSite, LiveSite and another product called Autonomy Explore, but this was not material to the business. Even if the VMS data feed had been integrated into Interwoven's products, I am highly sceptical that this would have generated anywhere

HP-SEC-02930165

like sufficient increased sales of the Interwoven products to justify an investment of $21 million.  In my opinion, buying VMS in the way that Autonomy did, defies commercial logic.

**DiscoverPoint Engine Software**

51.  I understand that, on 30 June 2011, Autonomy Inc purchased 800 instances of the DiscoverPoint Engine ("**DiscoverEngine**") software from Discover Technologies LLC ("**DiscoverTech**") for a sum of $4.4 million {**D000480651**} and that on 26 and 28 September 2011, Autonomy Inc purchased a further 285 instances of DiscoverEngine software and source code from DiscoverTech for a sum of $3.2 million {**D000040224**}, {**D000040226**}. At the time, I was not aware of either of these transactions.

52.  I am familiar, however, with the DiscoverEngine software as, in September 2011, Dr Menell asked me to evaluate it and report back to him.  I was asked to review and test the software and then summarise my analysis for Dr Menell. I have been shown a copy of an email that David Truitt (DiscoverTech's Chief Executive) sent to Mr Hussain on 13 September 2011, attaching a proposal for the sale of DiscoverEngine software {**DISCOVERTECH007158**}, {**DISCOVERTECH007159**}. Mr Hussain sent the proposal to Dr Menell asking for his thoughts and Mr Hussain asked him to obtain a copy of DiscoverEngine's source code in order to analyse it {**D000137205**}, {**D000317206**}. Dr Menell commented: "*Will need to see how much overlap if any there is with what we already have...*" {**D000129485**}. Dr Menell forwarded the email chain to me on 14 September 2011, instructing me to review DiscoverEngine to determine whether it was of value: "*See below need the troops to test this asap and see if it's of value*" {**D010858988**}. I recall Dr Menell explicitly telling me, verbally, to "make it a positive review".

53.  On a basic level, DiscoverEngine is a Microsoft SharePoint connector. SharePoint is a Microsoft content management system which facilitates collaboration by allowing users to put documents into a repository where they can be shared with other users. At the time, Microsoft had two live versions of SharePoint, SharePoint 2007 and SharePoint 2010. A connector is a component that allows you to retrieve data from one source, for example, SharePoint, and transfer the data to another source, for example, IDOL.

54.  Following Dr Menell's request, I contacted DiscoverTech and asked them for a test licence to the product {**D010859011**}. I then asked an Autonomy pre-sales employee to review the software and to let me know his thoughts on it {**D010859040**}. A review was produced, and forwarded to Dr Menell, which  essentially confirmed that DiscoverEngine did what it was said it could do {**D010859166**}, {**D010859167**}. The review did not comment on overlap with Autonomy's existing products. I concluded in that regard that

HP-SEC-02930166

DiscoverEngine was very similar to Autonomy's in-house SharePoint connectors. Autonomy had a connector for both the old and new version of SharePoint. Insofar as there were any differences, I did not consider them to be material. I also thought that, if there was a customer need for any function of DiscoverEngine that Autonomy SharePoint Connector did not already have, we could quickly and easily have added those functions to our connectors. As an example, DiscoverEngine had a user interface which allowed information to be audited, before deciding what information to retrieve. If there had been a customer demand for that functionality, we could have replicated it in a weekend. I also told Dr Menell, verbally, that Autonomy's SharePoint connector was a comparable connector and that we therefore had no use for DiscoverEngine. As far as I was aware, following our review of the DiscoverEngine software, nothing further happened.

55.   In October 2011, around the time that HP acquired Autonomy, Dr Menell instructed me to upload a number of products to Automater, Autonomy's software delivery system.  I see from the email chain between me, Adam Booth (who was responsible for the Automater system) and Unai Ayo, that DiscoverEngine was one of the products concerned {**POS000469224**} . I thought this strange at the time, but lots of strange things were happening then and I just did as I was told.

56.   I can think of no legitimate reason for Autonomy purchasing DiscoverEngine software and source code for a total of $7.6 million when it already had its own SharePoint connectors that were perfectly adequate and which we could easily have adapted to add functionality if a customer demand had arisen. I have no knowledge of DiscoverEngine ever being used in any Autonomy product.

**The Vatican library ("the Vatican")**

57.   In 2009 and 2010, a great deal of Autonomy effort was put into a potential transaction with the Vatican.  The Vatican had a library which contained a great many ancient, rare and valuable books and manuscripts, many of which were in medieval languages.  Early in 2009, Autonomy learned through its Italian salesforce that the Vatican was looking to digitalise its entire library so that it could be accessed by scholars and others without compromising the preservation of the originals.  Autonomy decided to pitch for the project.  I created the Autonomy proposal for the Vatican, which sets out the Vatican's requirements as understood by Autonomy and Autonomy's proposed solution {**D003949866**}, {**D003949867**}.  This was a huge project and, if we had won it, it would have been the biggest deal we had ever done (in July 2009 we put forward a revised proposal which set out pricing over a 10 year period of more than €74 million {**D003431417**}).

HP-SEC-02930167

58.   Initially, there was a good deal of excitement and enthusiasm within Autonomy about the Vatican project.  The project was led by Dr Menell throughout.  Mr Hussain was involved at least in the early stages, Mr Goodfellow was heavily involved and Dr Blanchflower was creating the software necessary to deal with the medieval script.  We also had a number of our Italian salesmen on the ground dealing with the Vatican on a day-to-day basis.  We prepared and presented a detailed proof of concept and supplied expensive hardware such as a top of the range digital camera free of charge.  Over time, the Vatican deal came in and out of focus on our SMS calls, but after a few quarters it became a bit of a joke and was not referred to any more on those calls.  After Dr Menell left HP in 2012, I learned that the deal had gone to a competitor.  Dr Menell had not let me retrieve the camera and other hardware that we had supplied to the Vatican, apparently on the basis that this would be pulling the plug on a deal, whereas if we left the hardware where it was, we at least had the chance of a deal.  Shortly after he left HP, I arranged for the hardware to be returned to Autonomy.

59.   I have been shown a copy of a purchase order dated 31 March 2010 from MicroTech to Autonomy relating to the purchase of software by MicroTech for end-user the Vatican {**D002807019**}.  The purchase price was $11 million plus $550,000 for support and maintenance.  I had no knowledge of this transaction at the time.

60.   This reseller transaction makes no sense to me.  MicroTech is a company based, I believe in Vienna, Virginia.  I never heard mention of MicroTech as a possible reseller and fail to see what it could possibly have contributed to the Vatican project.  If a reseller had been required (which, for the reasons given below, was not the case), it would have made sense to use a large Italian reseller such as Selex, which had already had some involvement in the project and which was embedded in and understood the Italian market and the Italian language.  In any event, Autonomy's proposal was always for an "*end to end solution*", i.e. Autonomy was to supply all software, hardware, implementation, maintenance and support (see also in this regard my exchange of emails with Mr Goodfellow on 26 October 2009, which makes clear that our offering to the Vatican was of "*single supplier sourcing*" with Autonomy providing "*the whole solution – hardware, software and services*" {**D003501775**}.  The purchase order provided for payment by MicroTech 90 days from the date of the contract.  There was no prospect of a deal with the Vatican concluding within that timeframe – indeed by 31 March 2010 I think there was very little prospect of there being any deal at all.  For all of these reasons, I simply do not understand why Autonomy would use a US reseller for any part of the Vatican deal.

**Prisa**

HP-SEC-02930168

61.    I had a fair amount of involvement from the beginning in Autonomy's relationship with Prisa, a Spanish company.  I am Spanish and speak the language so was the obvious candidate for making presentations to and discussing solutions with Prisa.

62.    On 10 December 2010, Autonomy and Prisa entered into an agreement for the sale to Prisa of software licences, three years' support and maintenance, 2640 days of professional services and training {**D001544739**}.  I was involved in the pre-sales phase of this deal and had oversight of and helped manage and audit certain aspects of its implementation.  Prisa is a leading Spanish-Language media group with newspapers, radio and TV stations throughout the Spanish – speaking world.  This was a major project to transform Prisa's existing operations into more digital web-based products.

63.    Autonomy was one of a number of technology businesses who, in August 2011, tendered for the Prisa digitisation project. Prisa made it clear that it was looking to completely overhaul its technology and that the project would likely span three years.

64.    Prisa chose to partner with Autonomy and purchased the software which it was envisaged would be required in the course of the project's implementation. The software alone was of little or no use to Prisa because delivery of the solution it was looking for required Autonomy's implementation services and expertise.

65.    In December 2010, I met with Prisa in Madrid to present a proof of concept in relation to the project. At that stage Prisa did not know exactly what the scope of the project would be, save that it wanted to focus in the first instance on Prisa Radio and building its online presence and revenues. In my experience, partnerships of this nature are complex and customers often do not know what they need until we have worked with them for a period to define the scope.

66.    In May 2011, six months after the agreement was signed, I was concerned that there was still no defined scope for the project, that the milestones and key deliverables had not been agreed and that a statement of work had not been signed. In an email I sent to Mr Hussain and Dr Menell on May 19, 2011, I said "...*the data [I had received from the Autonomy project management team] simply points out that we have achieved nothing and at some point someone at the customer will ask for what they are getting for their money...at some point a very senior figure in Prisa is going to demand to know what he has to show for 13 million after x months of purchase, and independent of how well you get on with the locals and the yanks they will most definitively point the finger at us...we are about to embark on a complicated project without the appropriate measures to actually positively deliver and get acceptance from the customer. What's more I think that in the present conditions we can never succeed as the customers perception and reality of what they are going to receive is simpl[y] that...a perception....*" {**D010840486**}

HP-SEC-02930169

67.  I was primarily concerned that the project was way off track and that Autonomy would be blamed, given that so much time had passed and there was no project framework in place.  In the same vein, on May 20, 2011, I told Steve Loughran (EMEA Consulting Manager at Autonomy), who was running the delivery of the project, "*This will be the first project in the world where the client pays millions and accepts it if the results are shit in their view*" and "*...and we haven't delivered ANYTHING in 6 months and apparently going live in a month...*" {**D010840628**}. In the absence of a defined scope for the project, project milestones or agreed deliverables, it would not have been possible to reliably estimate what services would be required of Autonomy in order to deliver the project.

68.  I understand that a statement of work was finally signed in December 2011, although the project was eventually shelved by Prisa in 2013.

69.  In the summer of 2011, I was involved in another pre-sales effort with Prisa, this time in connection with the proposed outsourcing of Prisa's IT functions.  In July 2011, I gave a presentation of Autonomy's proposal to Prisa at a meeting in Spain.  IT outsourcing was not one of Autonomy's core competencies and the presentation did not go well – Prisa made it very clear at the meeting that we had missed the mark by same way. Unsurprisingly in the circumstances, we did not get the contract.

70.  I have been shown a copy of an agreement dated 31 March 2011 relating to the purchase by DiscoverTech of e-Discovery software for end-user Prisa {**DISCOVERTECH006268**}.  I find this transaction inexplicable.  e-Discovery software is typically sold to law firms and financial institutions or other large companies with significant in-house legal or compliance departments.  I have never heard of this type of software being sold to a media group like Prisa.  In all of my interactions with Prisa, mention was never made of any requirement for e-Discovery software.  To me, it is very unlikely that Prisa had such a requirement and, if it did, it is inconceivable that it would have bought this software from Autonomy without me knowing about it.

**Morgan Stanley**

71.  I understand that, on 31 March 2011, Zantaz (a data hosting company which Autonomy acquired in 2007) entered into a hosting agreement with Morgan Stanley under which Morgan Stanley re-restructured its data hosting arrangements and paid $5 million for a perpetual licence to use the same software previously licensed, as well as certain new software including version 9 of Digital Safe with Filetek's StorHouse software {**D001031127**}.

72.  On 29 March 2011, I received an email from James Crumbacher (Autonomy in-house counsel) saying: "*Chris [i.e. Chris Goodfellow], Fer, is there a version 9 of the Safe?  Need it for Morgan Stanley (8.0 won't work), and Michael's telling me there's no v.9 on*

HP-SEC-02930170

Automater. *If Ver 9.0 exists, can we get it up on Automater for delivery?"* {D001055839}. Lower down the same chain, on 28 March 2011 (three days before the deal signed), Mr Crumbacher had asked Michael McCarthy (Contracts Manager at Autonomy) to confirm delivery of the software to be sold to Morgan Stanley under this re-restructure. Mr McCarthy replied to say *"I don't have a 9.0 version of Digital safe [sic] I don't have the filetek pieces as a deliverables [sic]. (I have heard rumors that Roger may have a copy but it isn't on automater)"*. Mr Crumbacher responded *"What version of the safe do you have?"*, to which Mr McCarthy replied *"digital safe 8.0"*.

73. I replied to Mr Crumbacher's request on 30 March 2011 saying *"Ok. we [sic] will put [version 9] up there..."* {D001047588}. I recall being unclear at the time exactly what I was meant to be uploading and someone (possibly Dr Menell) telling me that it did not matter as Autonomy would continue to host Digital Safe anyway. I cannot now recall what was uploaded. It may have been a copy of an earlier version of Digital Safe, or possibly just an empty zip file.

## Conclusion

74. Reading the allegations which have been made about Autonomy and looking over some of the facts has been terrible for me. I believed that we had built a great company through a lot of dedication and hard work and that we had done so in a very clean, highbrow and intellectual way. I wonder now how any of the things that I address in this statement or have otherwise heard or read about could have happened. It is heart-breaking for me, given the immense part of my life that I invested in Autonomy, and that some of the people who appear to have engaged in the behaviour concerned are people who I never thought would be capable such conduct.

I believe that the facts stated in this Witness Statement are true.

SIGNED

FERNANDO LUCINI GONZALEZ-PARDO

14 September 2018.

DATED

HP-SEC-02930171

| | | |
|---|---|---|
| 1. | On behalf of | Claimants |
| 2. | Initials/Surname of witness | F Lucini |
| 3. | Statement No | 1 |
| 4. | Date | 14 September 2018 |

## Claim No. HC-2015-001324

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (ChD) DIVISION**

**B E T W E E N:**

**(1) ACL NETHERLANDS B.V. (AS SUCCESSOR TO**
**AUTONOMY CORPORTATION LIMITED)**
**(2) HEWLETT-PACKARD VISION BV**
**(3) AUTONOMY SYSTEMS LIMITED**
**(4) HEWLETT-PACKARD ENTERPRISE NEW**
**JERSEY, INC.**

**Claimants**

**-and-**

**(1) MICHAEL RICHARD LYNCH**
**(2) SUSHOVAN TAREQUE HUSSAIN**

**Defendants**

---

**WITNESS STATEMENT OF**
**FERNANDO LUCINI GONZALEZ-PARDO**

---

Travers Smith LLP
10 Snow Hill
London  EC1A 2AL
Tel: 020-7295 3000
Fax: 020-7295 3500
Ref: TPR/AAK/JJB/SEL

HP-SEC-02930172

| | | |
|---|---|---|
| 1. | On behalf of | Claimants |
| 2. | Initials/Surname of witness | F Lucini |
| 3. | Statement No | 1 |
| 4. | Date | 14 September 2018 |

**Claim No. HC-2015-001324**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

**B E T W E E N:**

**(1)  ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY**
**CORPORATION LIMITED)**
**(2)  HEWLETT-PACKARD VISION BV**
**(3)  AUTONOMY SYSTEMS LIMITED**
**(4)  HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.**

**Claimants**

**-and-**

**(1)  MICHAEL RICHARD LYNCH**
**(2)  SUSHOVAN TAREQUE HUSSAIN**

**Defendants**

---

**INDEX OF EXHIBITS TO THE**
**WITNESS STATEMENT OF FERNANDO LUCINI GONZALEZ-PARDO**

---

| | **Paragraph** | **Production ID** |
|---|---|---|
| 1 | 16 | **D004169163** |
| 2 | | **D004107898** |
| 3 | | **D004107899** |
| 4 | 18 | **POS00134961** |
| 5 | 19 | **D003782835** |
| 6 | | **D003760264** |
| 7 | 20 | **D003743496** |
| 8 | | **D003738525** |
| 9 | | **D003728596** |

HP-SEC-02930173

|    | Paragraph | Production ID |
|----|-----------|---------------|
| 10 |           | D003728597 |
| 11 | 21        | POS00134961 |
| 12 | 26        | POS00135381 |
| 13 | 31        | D003523857 |
| 14 | 38        | POS00152814 |
| 15 |           | POS00158260 |
| 16 |           | POS00158261 |
| 17 | 45        | D000353068 |
| 18 | 47        | D003997524 |
| 19 |           | D001451843 |
| 20 | 48        | D003924207 |
| 21 |           | D003920125 |
| 22 |           | D003920940 |
| 23 |           | D003920953 |
| 24 | 49        | D003346437 |
| 25 |           | D003335068 |
| 26 |           | D003335063 |
| 27 |           | D003335066 |
| 28 |           | D003329529 |
| 29 |           | D003329532 |
| 30 |           | D003329531 |
| 31 |           | D003329530 |
| 32 | 51        | D000480651 |
| 33 |           | D000040224 |
| 34 |           | D000040226 |
| 35 | 52        | DISCOVERTECH007158 |
| 36 |           | DISCOVERTECH007159 |
| 37 |           | D000137205 |
| 38 |           | D0000317206 |

HP-SEC-02930174

|    | Paragraph | Production ID |
|----|-----------|---------------|
| 39 |           | D000129485 |
| 40 |           | D010858988 |
| 41 | 54        | D010859011 |
| 42 |           | D010859040 |
| 43 |           | D003949866 |
| 44 |           | D003949867 |
| 45 | 55        | POS000469224 |
| 46 | 57        | D003949866 |
| 47 |           | D003949867 |
| 48 |           | D003431417 |
| 49 | 59        | D002807019 |
| 50 | 60        | D003501775 |
| 51 | 62        | D001544739 |
| 52 | 66        | D010840486 |
| 53 | 67        | D010840628 |
| 54 | 70        | DISCOVERTECH006268 |
| 55 | 71        | D001031127 |
| 56 | 72        | D001055839 |
| 57 | 73        | D001047588 |

HP-SEC-02930175