# EXHIBIT G

| | | |
|---|---|---|
| 1. | On behalf of | Claimants |
| 2. | Initials/Surname of witness | C J R Goodfellow |
| 3. | Statement No | 3 |
| 4. | Date | 10 February 2019 |

Claim No. HC-2015-001324

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

**B E T W E E N :**

(1) ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY CORPORATION LIMITED)
(2) HEWLETT-PACKARD VISION BV
(3) AUTONOMY SYSTEMS LIMITED
(4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.

**Claimants**

-and-

(1) MICHAEL RICHARD LYNCH
(2) SUSHOVAN TAREQUE HUSSAIN

**Defendants**

---

**THIRD WITNESS STATEMENT OF CHRISTOPHER JAMES ROBIN GOODFELLOW**

---

I, CHRISTOPHER JAMES ROBIN GOODFELLOW of The Old Manse, 49 High Street, Burwell, Cambridge, Cambridgeshire, CB25 0HD, STATE AS FOLLOWS:

1. I make this further Supplemental Witness Statement on behalf of the Claimants in connection with the above-named proceedings and in response to certain statements made by Eloy Avila in his Witness Statement dated 15 November 2018 (**"Avila 1"**), Alastair Martin in his Witness Statement dated 16 November 2018 (**"Martin 1"**), Dr Lynch in his Second Witness Statement dated 16 November 2018 (**"Lynch 2"**) and Andrew Kanter in his Witness Statement dated 15 November 2018 (**"Kanter 1"**), to which the Claimants' solicitors have drawn my attention. This is my third witness statement in these proceedings. I refer below to my First Witness Statement dated 14 September 2018 as **"Goodfellow 1"**.

2. Except where it otherwise appears, the facts and matters to which I refer in this Third Witness Statement are within my own knowledge and are true. Where facts are from another source, I identify the source and I believe them to be true. Where the source of my understanding or information is from the Claimants' solicitors, I have identified this in the Third Witness Statement but without any waiver of legal professional privilege.

3. I have not attached the documents to which I refer in this Third Witness Statement. Instead I have provided document references for those documents. I understand that the document references are the Document Production IDs allocated to the documents by the parties as part of the disclosure in the current proceedings.

**Digital Safe**

4. At paragraph 35 of Martin 1, Mr Martin refers to paragraph 6 of Goodfellow 1 and states that *"it would be inaccurate to say [Autonomy] had no competition"*. Firstly, I did not say that Autonomy had no competition; I said that it had no *"meaningful competition"*. It is important to distinguish between, on the one hand, Digital Safe and its large financial services customers and, on the other hand, the on-premise software offerings (like CAMM and EAS) that were better suited for Autonomy's smaller, unregulated customers. Mr Martin refers to *"two of the other bigger players in the archiving space"*, Symantec and Commvault. These were primarily competitors for Autonomy's (non-Digital Safe) on-premise software offerings. They did occasionally compete against Digital Safe, but in my view they were not a significant or major threat. Digital Safe was the industry-leading compliant archiving solution, which is a key reason why, as I explained at paragraph 16 of Goodfellow 1, customer relationships were *"usually long-lasting"*.

5. Mr Avila and Mr Martin state that, when Digital Safe sat on a customer's premises, *"Autonomy used VPN to check on customers' safes from time to time… Vendors that service these large enterprise organizations often are given the ability to "dial in" via VPN or otherwise to check in to make sure everything is fine…"* (paragraph 31 of Avila 1 and paragraph 40 of Martin 1). It is true that software vendors use VPN connections to assist in situations where customers encounter technical issues. Notwithstanding this sporadic intervention, for standard enterprise software, customers would still expect to monitor, administer and maintain the system themselves. The situation with Digital Safe was very different and very difficult. VPN connections (allowing Autonomy access to on-premise customer safes) did not exist so that Autonomy could fix occasional technical issues; they existed so that Autonomy could provide constant monitoring and management of Digital Safe (in the same way that Autonomy would have done had the customer's data been hosted in Autonomy's data centres).

6. Dr Lynch suggests that *"Autonomy did not consistently maintain a perpetual connection to Citi's Digital Safe"* (paragraph 75(c) of Lynch 2). That is incorrect. Citi's VPN connection was permanent; data flowed constantly over the connection so that Autonomy could continuously monitor and manage Citi's safe. The document to which Dr Lynch refers ({**D002812852**}) makes this clear – Christopher Tang is correcting a misstatement by Kimberly Hill that Citi's connection was not perpetual. Mr Martin refers to Merck and the SFO as customers who granted Autonomy request only access to their on-premise safes

HP-SEC-02933716

(paragraph 38 of Martin 1). It is true that customers were sometimes mis-sold Digital Safe on-premise, meaning they were sold Digital Safe without a constant VPN connection and therefore without the means for their safes to be continually monitored and managed by Autonomy. I know that Merck, although it initially objected to having a constant VPN connection, did ultimately grant Autonomy open access. Lower down the same chain referred to by Dr Lynch ({**D002812852**}), Roger Wang makes it clear that perpetual access would also be required for Merck.

7. At paragraph 32 of Avila 1, Mr Avila states that customers successfully operated certain archiving products on-premise, *"such as ACA and Arcpliance"*. Mr Avila goes on to state that *"ACA and Arcpliance shared code and/or modules with the Digital Safe software; in fact, Mr. Goodfellow even acknowledges that "ACA was a marketing term used to describe a range of Autonomy's archiving products (Digital Safe included)""* (this is repeated by Mr Martin in paragraph 31 of Martin 1). Mr Avila is confused. To be clear, Digital Safe could also be operated on-premise using Autonomy's implementation and ongoing managed services. ACA was indeed a marketing term used to describe a range of archiving products, Digital Safe included. When "ACA" was used to describe Digital Safe, ACA obviously used the Digital Safe code given that they were one and the same solution. When "ACA" was used to describe another archiving product (such as CAMM), ACA did not use or share the Digital Safe code. Arcpliance was a term that was sometimes used to describe Digital Safe when it sat on-premise. Dr Lynch suggests that Arcpliance *"could get up and running quickly, with little implementation"* (paragraph 75(e) of Lynch 2). Similarly, Mr Martin describes Arcpliance as *"a turn-key appliance"* (paragraph 30 of Martin 1). The intention of Arcpliance might have been for it to be a turn-key solution. In practice, it was not; it was still Digital Safe, so it still required Autonomy's involved implementation and thereafter managed services.

8. I understand from the Claimants' solicitors that a number of the hosted Digital Safe arrangements complained of involved the sale of software other than Digital Safe. I can confirm that the following pieces of such software could only have worked with Digital Safe: (i) Digital Safe Connector; (ii) Digital Safe Extraction Connector; (iii) Digital Safe Universal Access; and (iv) Retention/Deletion.

**Post-acquisition**

9. At paragraph 124 of Kanter 1, Mr Kanter states that Autonomy staff were required to wear 'Visitor' badges when attending HP offices and that this made one of the senior Autonomy lawyers feel like an "*unwanted stepchild*". Mr Kanter is correct to say that, in the period immediately following HP's acquisition of Autonomy, an Autonomy visitor to an HP office would be issued with a 'Visitor' badge. However, this was not surprising to me, nor did I view it as an indication of HP's attitude towards Autonomy

3

HP-SEC-02933717

(and certainly did not suggest to me that Autonomy was "*unwanted*"). I understood that the plan – as agreed between HP and Autonomy senior management – was for Autonomy to remain largely independent and not to be fully integrated within HP. As a result, the HP system did not recognise Autonomy badges and the Autonomy system did not recognise HP badges. This was no different to how things were when Autonomy made acquisitions. I recall that when I first visited the Zantaz office in Pleasanton (shortly after Autonomy acquired Zantaz), I was issued a 'Visitor' badge because the Zantaz systems had not been integrated with the Autonomy systems; similarly, Zantaz employees had to use 'Visitor' badges when visiting the Autonomy offices.

I believe that the facts stated in this Third Witness Statement are true.

*[signature: Goodfellow]*

SIGNED

CHRISTOPHER JAMES ROBIN GOODFELLOW

10th February 2019

DATED

HP-SEC-02933718

| | | |
|---|---|---|
| 1. | On behalf of | Claimants |
| 2. | Initials/Surname of witness | C J R Goodfellow |
| 3. | Statement No | 3 |
| 4. | Date | 10 February 2019 |

Claim No. HC-2015-001324

**IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS
OF ENGLAND AND WALES
BUSINESS LIST (CHD)**

B E T W E E N:

(1) **ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY CORPORATION LIMITED)**
(2) **HEWLETT-PACKARD VISION BV**
(3) **AUTONOMY SYSTEMS LIMITED**
(4) **HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.**

**Claimants**

-and-

(1) MICHAEL RICHARD LYNCH
(2) SUSHOVAN TAREQUE HUSSAIN

**Defendants**

---

**THIRD WITNESS STATEMENT OF
CHRISTOPHER JAMES ROBIN GOODFELLOW**

---

Travers Smith LLP
10 Snow Hill
London  EC1A 2AL
Tel: 020-7295 3000
Fax: 020-7295 3500
Ref: TPR/AAK/JJB/SEL

HP-SEC-02933719

| | | |
|---|---|---|
| 1. | On behalf of | Claimants |
| 2. | Initials/Surname of witness | C J R Goodfellow |
| 3. | Statement No | 3 |
| 4. | Date | 10 February 2019 |

Claim No. HC-2015-001324

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

B E T W E E N :

(1) ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY CORPORATION LIMITED)
(2) HEWLETT-PACKARD VISION BV
(3) AUTONOMY SYSTEMS LIMITED
(4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.

**Claimants**

-and-

(1) MICHAEL RICHARD LYNCH
(2) SUSHOVAN TAREQUE HUSSAIN

**Defendants**

INDEX OF EXHIBITS TO THE
THIRD WITNESS STATEMENT OF CHRISTOPHER JAMES ROBIN GOODFELLOW

| | Paragraph | Production ID |
|---|---|---|
| 1 | 6 | D002812852 |