1  PATRICK D. ROBBINS (CABN 152288)
   Attorney for the United States,
2  Acting Under Authority Conferred by 28 U.S.C. § 515

3  THOMAS A. COLTHURST (CABN 99493)
   Chief, Criminal Division
4
   ROBERT S. LEACH (CABN 196191)
5  ADAM A. REEVES (NYBN 2363877)
   KRISTINA GREEN (NYBN 5226204)
6  Assistant United States Attorneys

7        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495
8        Telephone: (415) 436-7014
         Fax: (415) 436-7234
9        Email: Robert.Leach@usdoj.gov
               Adam.Reeves@usdoj.gov
10             Kristina.Green@usdoj.gov

11 Attorneys for United States of America

12              UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                SAN FRANCISCO DIVISION

15 UNITED STATES OF AMERICA,            )  Case No. 18-CR-577 CRB
                                        )
16       Plaintiff,                     )  UNITED STATES' OPPOSITION TO:
                                        )
17    v.                                )  DEFENDANT STEPHEN CHAMBERLAIN'S
                                        )  MOTION TO DISMISS COUNTS ONE THROUGH
18 MICHAEL RICHARD LYNCH and            )  FIFTEEN AND COUNT SEVENTEEN AS TIME-
   STEPHEN KEITH CHAMBERLAIN,           )  BARRED AND FOR PREINDICTMENT DELAY
19                                      )  [ECF No. 217]; AND
         Defendants.                    )
20                                      )  DEFENDANT MICHAEL RICHARD LYNCH'S
                                        )  MOTION 1) TO DISMISS COUNTS ONE
21                                      )  THROUGH SIXTEEN, AND CERTAIN OBJECTS
                                        )  OF COUNT SEVENTEEN, OF THE
22                                      )  SUPERSEDING INDICTMENT AS TIME-
                                        )  BARRED AND 2) FOR DISCOVERY [ECF No.
23                                      )  221]
                                        )
24                                      )  Date:   November 1, 2023
                                        )  Time:  1:30 p.m.
25 _____  )  Court: Hon. Charles R. Breyer
                                        )          Courtroom 6, 17th Floor
26

27

28

1

## <u>TABLE OF CONTENTS</u>

2   INTRODUCTION ....................................................................................................................1

3   FACTS ...................................................................................................................................1

4   I.       THE OFFICIAL REQUESTS TO VATICAN CITY STATE AND ITALY ..................1

5   II.      THE OFFICIAL REQUESTS TO THE UNITED KINGDOM .....................................3

6            A.       UK MLAT 1 ...............................................................................................3

7            B.       Voluntary Requests of Ernst & Young LLP in the UK ..................................4

8            C.       UK MLAT 2 ...............................................................................................5

9   III.     ACTION BY FOREIGN AUTHORITIES ON THE OFFICIAL REQUESTS ...............6

10  IV.      THE GOVERNMENT'S TOLLING APPLICATIONS .................................................8

11  ARGUMENT ........................................................................................................................10

12  I.       LEGAL STANDARD.................................................................................................10

13  II.      COUNTS ONE THROUGH SIXTEEN ARE TIMELY .............................................12

14           A.       Tolling Order 1 Validly Suspended the Statute of Limitations for 289 Days
                      and Before the Statute of Limitations Expired on Count 2................................13
15
             B.       Tolling Order 2 Validly Suspended the Statute of Limitations for the
16                    Remainder of the Three-Year Period in 18 U.S.C. § 3292(c)(1).......................15

17           C.       Tolling Order 3 Validly Suspended the Statute of Limitations for at Least 595
                      Days ...........................................................................................................18
18
    III.     COUNT SEVENTEEN IS TIMELY .........................................................................20
19
    IV.      THE COURT SHOULD NOT ORDER DISCOVERY OF GOVERNMENT WORK
20           PRODUCT AND MENTAL IMPRESSIONS .............................................................20

21  V.       DEFENDANTS FAIL TO ESTABLISH A CLAIM OF PREJUDICIAL
             PREINDICTMENT DELAY......................................................................................22
22
    CONCLUSION .....................................................................................................................26
23

24

25

26

27

28

1

## **TABLE OF AUTHORITIES**

2

### **Cases**

3

*DeGeorge v. U.S. Dist. Ct.*,
 219 F.3d 930 (9th Cir. 2000) ................................................................ 1, 10, 11, 16

4

*Franks v. Delaware*,
 438 U.S. 154 (1978) .................................................................................................. 22

5

*United States v. Barken*,
 412 F.3d 1131 (9th Cir. 2005) ................................................................................. 23

6

*United States v. Bases*,
 2020 WL 5909072 (N.D. Ill. Oct. 6, 2020) ............................................................ 21

7

8

*United States v. Bischel*,
 61 F.3d 1429 (9th Cir. 1995) .............................................................................. 11, 17

9

*United States v. Bogucki*,
 316 F. Supp. 3d 1177 (N.D. Cal. 2018) ................................................................. 22

10

11

*United States v. Broughton*,
 689 F.3d 1260 (11th Cir. 2012) .......................................................................... 11, 16

12

*United States v. Chen*,
 *No. 1-12-CR-350-03-SCJ*, 2014 WL 5307518 (N.D. Ga. Oct. 15, 2014) ............ 21

13

*United States v. DeGeorge*,
 380 F.3d 1203 (9th Cir. 2004) ............................................................................ 11, 16

14

15

*United States v. DiCesare*,
 765 F.2d 890, *amended*, 777 F.2d 543 (9th Cir. 1985) ......................................... 22

16

*United States v. Dozier*,
 844 F.2d 701 (9th Cir. 1988) .................................................................................... 22

17

18

*United States v. Fowlie*,
 24 F.3d 1059 (9th Cir. 1994) .................................................................................... 22

19

*United States v. Hagege*,
 437 F.3d 943 (9th Cir. 2006) .............................................................................. 11, 12

20

21

*United States v. Hammett*,
 236 F.3d 1054 (9th Cir. 2001) .................................................................................. 22

22

*United States v. Huntley*,
 976 F.2d 1287 (9th Cir. 1992) ........................................................................ 1, 23, 24

23

*United States v. Hussain*,
 818 Fed. Appx. 765 (9th Cir. Aug. 26, 2020) ......................................................... 5

24

25

*United States v. Hussain*,
 972 F.3d 1138 (9th Cir. 2020) .................................................................................. 14

26

*United States v. Jaramillo Suarez*,
 950 F.2d 1378 (9th Cir. 1991) .................................................................................. 22

27

*United States v. Jenkins*,
 633 F.3d 788 (9th Cir. 2011) ............................................................................... 10, 11

28

*United States v. Jinian*,
  725 F.3d 954 (9th Cir. 2013) ........................................................................ 14

*United States v. Kachkar*,
  No. 16-20595-CR-GAYLES, 2018 WL 6933159 (S.D. Fla. Dec. 19, 2018) ........................................ 21

*United States v. Lovasco*,
  431 U.S. 783 (1977) ........................................................................ 23, 25

*United States v. Lyttle*,
  667 F.3d 220 (2d Cir. 2012) ........................................................................ 11, 16, 17

*United States v. Marion*,
  404 U.S. 307 (1971) ........................................................................ 23, 24

*United States v. Motz*,
  936 F.2d 1021 (9th Cir. 1991) ........................................................................ 22

*United States v. Rafoi*,
  60 F.3d 4th 982 (5th Cir. 2023) ........................................................................ 11

*United States v. Trainor*,
  376 F.3d 1325 (11th Cir. 2004) ........................................................................ 10

## **Federal Statutes**

18 U.S.C. § 371 ........................................................................ 20

18 U.S.C. § 1343 ........................................................................ 14

18 U.S.C. § 3282 ........................................................................ 12

18 U.S.C. § 3292 ........................................................................ passim

18 U.S.C. § 3301 ........................................................................ 12

28 U.S.C. § 515 ........................................................................ 1, 26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

The United States respectfully opposes Defendant Stephen Chamberlain's Motion to Dismiss Counts One Through Fifteen and Count Seventeen as Time-Barred and for Preindictment Delay [ECF No. 217]; Defendant Michael Richard Lynch's Motion 1) to Dismiss Counts One Through Sixteen, and Certain Objects of Count Seventeen, of the Superseding Indictment as Time-Barred and 2) for Discovery [ECF No. 221]; and Defendant Michael Richard Lynch's Joinder in Defendant Stephen Chamberlain's Motion to Dismiss Counts One Through Fifteen and Count Seventeen as Time-Barred and for Preindictment Delay [ECF No. 229].

Three times this Court suspended the statute of limitations for conspiracy, wire fraud, and securities fraud offenses against Defendants. The Court did so consistent with 18 U.S.C. § 3292 based on evidence of official requests to multiple foreign countries seeking evidence of a scheme to defraud, the use of wire transmissions, and Defendants' receipt of money and property through a scheme to defraud and conspiracy that was located in foreign countries. Because one country did not take final action on one of the official requests until at least March 2019, the Court's Tolling Orders validly suspended the statute of limitations on all counts in the Superseding Indictment. Defendants' argument that the official requests did not seek evidence of the specific offenses charged ignores multiple elements of the offenses and the "broad" view the Ninth Circuit accords to the term "evidence" in 18 U.S.C. § 3292. *See DeGeorge v. U.S. Dist. Ct.*, 219 F.3d 930, 937-38 (9th Cir. 2000). Defendants also fail to establish a basis for discovery into the government's mental impressions and motivations for issuing official requests and seeking tolling orders. Finally, they fail to carry their "heavy burden" to show the "actual, non-speculative prejudice" from preindictment delay necessary for a due process violation. *United States v. Huntley*, 976 F.2d 1287, 1290 (9th Cir. 1992). For these reasons, as discussed below, the Court should deny the motions.

# FACTS

## I.   THE OFFICIAL REQUESTS TO VATICAN CITY STATE AND ITALY

Since 2012, the government has been investigating, among other things, whether Autonomy Corporation fraudulently recognized revenue and mispresented its financial condition to potential purchasers of its securities. Among the transactions within the scope of the investigation were an $11

million transaction between Autonomy and a United States-based reseller, Microtechnologies, LLC, whereby MicroTech purportedly acquired Autonomy software to resell to the Vatican Library, and three multi-million-dollar transactions between Autonomy and Italian-based resellers (Sales Consulting S.R.L., Auxilium Tech S..L., and Red Ventures S.R.L.), whereby the Italian resellers purportedly acquired Autonomy software to resell to Poste Italiane and the Vatican Library.  10/13/2023 Declaration of Robert S. Leach in Support of United States' Opposition to Defendants' Motions to Dismiss re Timeliness ("Leach Decl."), Ex. 1, ¶¶ 4-8.  Revenue from these transactions was included in Autonomy's publicly reported financial statements and provided to Hewlett-Packard Co. as it considered whether to acquire Autonomy.  The transactions relating to Sales Consulting, MicroTech, and Auxilium were among the proof of the scheme to defraud in the trial of Sushovan Hussain, Autonomy's former Chief Financial Officer.  *See* Order Denying Motions for New Trial and Judgment of Acquittal at 11-12, *United States v. Hussain*, CR 16-462 CRB (N.D. Cal. Jul. 30, 2018), ECF No. 419 ("Hussain Rule 29 Order").

On August 10, 2015, the government submitted a Diplomatic Note to Vatican City State seeking information from a Vatican representative (Monsignor Cesare Pasini) familiar with Autonomy's efforts to sell software to the Vatican.  Leach Decl. Ex. 1, ¶ 25 & Ex. U.  The Note attached a list of questions and background documents designed to elicit evidence about the potential sale of software and the Vatican's ties, or lack thereof, with MicroTech.  *Id.*; Leach Decl. Ex. 2.

In September 2015, two government prosecutors and agents of the FBI travelled to Europe to interview numerous witnesses in the United Kingdom and Vatican City State.  The government made travel arrangements to interview Monsignor Pasini in the Vatican City State on Monday, September 28, 2015, but on Friday, September 25, 2015, Vatican City State authorities cancelled the interview.  Leach Decl. ¶ 4.  On Saturday, September 26, 2015, the government interviewed Corrado Broli, the primary Autonomy sales representative for Italy, who was involved with efforts sell Autonomy software to Vatican Library and Poste Italiane and who had knowledge of the transactions with the three Italian resellers.  Leach Decl. ¶ 4, Ex. 3.

On October 8, 2015, Vatican City State submitted a Note Verbale to the United States acknowledging the August 10, 2015 Diplomatic Note and stating "it will willingly consider how to assist

1  in the question raised once the Secretariat has received, through normal diplomatic channels, a formal

2  request of international judicial assistance from the competent American judicial authorities."  Leach

3  Decl. Ex. 1, ¶ 26 & Ex. V at USAO 00002419.

4        On December 23, 2015, the government made an official request to the Central Authority of Italy

5  for legal assistance in obtaining evidence, pursuant to the 2006 U.S.-Italy Mutual Legal Assistance

6  Instrument ("MLAT").  The MLAT requested business records, including agreements, correspondence,

7  and emails, from Sales Consulting, Auxilium, and others, "which will enable the prosecutor to determine

8  whether Autonomy appropriately recorded revenue on the transactions."  Leach Decl. ¶ 5, Ex. 4 at 2;

9  Leach Decl. Ex. 1, ¶ 28 & Ex. X.

10        On January 14, 2016, the government submitted to the Vatican City State a Diplomatic Note

11  enclosing a Request for International Judicial Assistance.  Leach Decl. Ex. 1, ¶ 27 & Ex. W.  The

12  request explained the government was investigating "whether Autonomy properly recorded revenue" on

13  transactions with MicroTech and Auxilium.  *Id.* at USAO 00002423-2424.  The government requested

14  "business records, including agreements, correspondence, and emails, from [Vatican Library] relating to

15  its dealings with Autonomy, MicroTech (if any), Auxilium (if any), and [another party] and testimony

16  from Monsignor Cesare Pasini and [another], which will enable the prosecutor to determine whether

17  Autonomy appropriately recorded revenue on the transactions with MicroTech and Auxilium."  *Id.* at

18  USAO 00002424.

19  **II.**     **THE OFFICIAL REQUESTS TO THE UNITED KINGDOM**

20      **A.**     **UK MLAT 1**

21        On January 29, 2016, the government submitted a request for assistance to the UK under the

22  1994 Treaty of Mutual Legal Assistance ("UK MLAT 1").  Leach Decl. Ex. 5, ¶ 19 & Ex. M.  UK

23  MLAT 1 explained that "U.S. authorities seek assistance in obtaining bank and brokerage records of

24  several accounts in the UK to demonstrate these accounts received money from the scheme to defraud";

25  "records from the receiving agent that was involved with HP's acquisition of Autonomy, who is

26  believed to possess evidence that the alleged conspirators tendered their Autonomy shares and received

27  payment for them"; and phone records for Hussain.  *Id.* at USAO 00002554-2555.  UK MLAT 1

28  identified Lynch and Chamberlain as subjects and securities fraud, wire fraud, and conspiracy as among

1  the offenses under investigation.  *Id.* at USAO 00002554, 2561-2562.  The request sought, among other

2  things, bank and brokerage records from various financial institutions in the UK – Barclays PLC, Credit

3  Suisse AG, HSBC Bank PLC, J.P. Morgan International Bank Limited, and UBS AG – for accounts

4  held by Lynch, Chamberlain, or Hussain during the period 2009 to the present.  *Id.* at USAO 00002562-

5  2566.

6          The request also sought records from Capita Registers Limited, located in the UK, which acted

7  as a receiving agent for the HP offer and handled payment of acquisition funds to Autonomy

8  shareholders.  The requested records included documents relating to "services performed" by Capita "in

9  connection with . . . HP's acquisition of Autonomy"; "payments to Autonomy shareholders in

10  connection with the HP acquisition"; and Lynch, Hussain, and Chamberlain (including communications

11  between them and Capita).  *Id.* at USAO 00002559, 2566-2567.

12          UK Request 1 also sought records from the bank in the UK – Royal Bank of Scotland ("RBS") –

13  that Capita used to receive money from HP and pay money to Autonomy shareholders like Lynch,

14  Hussain, and Chamberlain.  The requested records included documents evidencing the bank's and

15  Capita's services, correspondence with Lynch, Hussain, and Chamberlain, spreadsheets showing

16  payments to shareholders, and bank documents and statements.  *Id.* at USAO 00002559, 2564, 2566-

17  2567.

18          Finally, UK Request 1 sought records from Vodaphone and Telefonica UK Limited for records

19  of Hussain's phone calls, explaining how the government believed Hussain had used the phone as part

20  of the scheme to contact United States-based resellers and HP.  *Id.* at USAO 00002557-2558, 2567.

21      **B.    Voluntary Requests of Ernst & Young LLP in the UK**

22          No later than February 2, 2016, the government also endeavored to secure voluntary cooperation

23  from Ernst & Young LLP in the UK ("E&Y UK").  Leach Decl. Ex. 6.  Ernst & Young was hired to

24  audit the restated financial statements of an Autonomy subsidiary, which evidenced the falsity of

25  Autonomy's statements to the market and HP.  The restatement was part of the proof of the scheme to

26  defraud in the *Hussain* trial.  *See* Hussain Rule 29 Order at 23, 40-41, 57-59.

27          The government sought a voluntary interview from David Hales, the E&Y UK engagement

28  partner, and a "complete, voluntary production of documents from E&Y."  Leach Decl. Ex. 6.  On May

9, 2016, two government prosecutors met in London with outside counsel for E&Y UK.  Leach Decl. ¶ 8, Ex. 7.  E&Y UK declined to voluntarily produce documents or make Mr. Hales available.  Leach Decl. ¶ 8.  Between October and December 2016, the government continued to engage with counsel for E&Y UK, advising counsel that the government was preparing an MLAT for E&Y UK and sharing the proposed language of the official request.  Leach Decl. Exs. 8 & 9.

The government listed Mr. Hales on its witness list in the *Hussain* trial.  United States' Amended Witness List at 2, *United States v. Hussain*, CR 16-462 CRB (N.D. Cal. Jan. 17, 2018), ECF No. 200.  While in London in January 2018 government prosecutors again sought to interview Mr. Hales but he again declined.  Leach Decl. ¶ 11, Ex. 10.  During the *Hussain* trial, the Court admitted Autonomy's restatement, which included a report from E&Y UK on its work signed by Mr. Hales.  Hussain Rule 29 Order at 57-60 ("The restatement went directly to the question of falsity."), *aff'd*, *United States v. Hussain*, 818 Fed. Appx. 765, 765-66 (9th Cir. Aug. 26, 2020) ("[W]e . . . conclude there was no abuse of discretion here because the accounting restatement was highly probative and not unfairly prejudicial."); *see also Hussain* ECF Nos. 143 (government motion to admit restatement) & 143-1 (restatement); *Hussain* 3/27/2018 Trial. Tr. at 3132-3136 (admitting restatement as Ex. 2445).

**C.     UK MLAT 2**

On May 1, 2017, the government submitted a second request for assistance to the UK under the 1994 Treaty of Mutual Legal Assistance ("UK MLAT 2").  Leach Decl. ¶ 12, Ex. 11 at ¶ 6 & Ex. 3.  UK MLAT 2 sought "documents related to a 'data room' established by Autonomy's U.K. counsel Slaughter and May in connection with HP's due diligence prior to [the] acquisition of Autonomy and (2) documents prepared by [E&Y UK] in connection with an audit of an Autonomy subsidiary's financial statements."  *Id.* at USAO 00003581-3582.  UK MLAT 2 explained that the government believed the Slaughter & May records would "help evidence the representations Autonomy made and the information Autonomy provided to HP during due diligence."  *Id.* at USAO 00003582.  It also explained that the government believed the E&Y UK records would "help evidence the falsity of Autonomy's financial statements."  *Id.*  UK MLAT 2 provided three pages of "Additional Facts" explaining the relevance of the requested records, which included documents placed in the data room,

email to users of the data room, documents showing the location of the servers where the data room was maintained, and E&Y UK's work papers relating to Autonomy.  *Id.* at USAO 00003582-3586.

## III.    ACTION BY FOREIGN AUTHORITIES ON THE OFFICIAL REQUESTS

On April 18, 2016, the government received records in response to the official requests to the Vatican City State.  Leach Decl. ¶ 13; ECF No. 217-7.

On April 28, 2016, and May 25, 2016, the government received records in response to the official request to Italy.  Leach Decl. ¶ 13; ECF Nos. 217-8 & 217-9.

Between November 7 and 23, 2016, the UK produced business records of Capita.  Leach Decl. ¶ 14, Ex. 12.[1]  The records included a spreadsheet evidencing that Lynch, Hussain, and Chamberlain elected to tender their shares to HP in the acquisition and actually received hundreds of millions of pounds in consideration.  Leach Decl. ¶ 15, Ex. 13.  It revealed that Lynch was paid £489,295,173 to a UBS account and £15,567,750 to another account on October 7, 2011, and £11,092,500 through Autonomy on October 18, 2011.  *Id.*  It revealed that Hussain was paid £177,939 and £76,500 in two checks on October 7, 2011, and an additional £8,797,500 through Autonomy on October 18, 2011.  *Id.*  It revealed Chamberlain was paid £9,715.50 by check on October 7, 2011, and received an additional £2,515,728 through Autonomy on October 18, 2011.  *Id.*  The Capita production also included a spreadsheet evidencing HP's payments to Capita for the Autonomy acquisition and Capita's payments to shareholders.  Leach Decl. ¶ 16, Ex. 14.

Between November 28, 2016, and January 12, 2017, the UK produced records of RBS, the bank that Capita used to receive payments from HP and make payments to Autonomy shareholders.[2]  Leach Decl. ¶ 17, Ex. 15.  Those records included:

- A check dated October 7, 2011, on an RBS account to Hussain on behalf of Capita in the amount of £177,939.  Leach Decl. ¶ 18, Ex. 16 at MLAT_AU 00009060.

---

[1]    November 7, 2016 is the date reflected in a stamp as the received date by the UK Central Authority from the UK Serious Fraud Office.  Leach Decl. Ex. 12 at MLAT_AU 0000541.  November 23, 2016 is the date of the letter by which the RBS records were transmitted by FedEx from DOJ's Office of International Affairs ("OIA") in Washington to the United States Attorney's Office ("USAO").  *Id.* at MLAT_AU 0000539.

[2]    November 28, 2016 date is the date of the custodian of records declaration.  January 12, 2017 is the date of the letter by which the RBS records were transmitted by FedEx from OIA in Washington to the USAO.  Leach Decl. Ex. 15 at MLAT_AU 00009057-59.

- A check dated October 7, 2011, on an RBS account to Hussain on behalf of Capita in the amount of £76,500.  *Id.* at MLAT_AU 00009061.

- A check dated October 7, 2011, on an RBS account to Chamberlain on behalf of Capita in the amount of £9,715.  *Id.* at MLAT_AU 00009062.

- Bank records for a Capita account evidencing payments by HP and outflows from the account.  Leach Decl. ¶ 19, Ex. 17.

On or about March 30, 2017, the UK produced records of HSBC relating to Hussain's bank account.  Leach Decl. ¶ 20, Ex. 18.  Those records evidence that on October 10, 2011, Hussain deposited £255,654.54.  Leach Decl. ¶ 21, Ex. 19.  They also evidence Hussain was in the United States three days before HP announced the Autonomy acquisition.  Leach Decl. ¶ 22, Ex. 20.

On or about June 9, 2017, the UK produced additional HSBC bank records relating to Hussain and Barclays bank records relating to Chamberlain.  Leach Decl. ¶ 23, Ex. 21.  The Barclays records evidence that Chamberlain deposited the £9,715 check from Capita on October 11, 2011, and was paid an additional £466,822.35 on account of the Autonomy acquisition on October 31, 2011.  Leach Decl. ¶ 24, Ex. 22.  The additional HSBC records indicated that Hussain's £255,654.54 deposit on October 10, 2011, included the £177,939 and £76,500 checks issued by Capita on October 7, 2011, for the HP acquisition.  Leach Decl. ¶ 25, Ex. 23.

On or about August 11, 2017, the UK produced additional records of HSBC relating to Hussain. Leach Decl. ¶ 26, Ex. 24.

On or about October 12, 2017, the UK produced records of Merrill Lynch relating to Lynch and his wife Angela Bacares.  Leach Decl. ¶ 27, Ex. 25.  The Merrill Lynch records evidence that Bacares sold 610,500 Autonomy shares in the HP acquisition on October 7, 2011, for proceeds of £15,567,750. Leach Decl. ¶ 28, Ex. 26.

Sometime after August 15, 2017, the UK provided records of UBS, including screenshots that appear to show Lynch's ownership of 19,188,046 shares of Autonomy and his receipt of £489,295,173.00 through the acquisition.  Leach Decl. ¶¶ 29-30, Exs. 27 & 28.

On or about December 13, 2017, the UK produced records of Slaughter & May.  ECF No. 217-12.

On March 28, 2018, the UK produced records of Vodafone, evidencing Hussain's phone calls during the period 2011 to May 2012.  Leach Decl. ¶ 37, Ex. 35.  Among other things, the records prove that Hussain was in the United States for a meeting with a so-called value-added reseller where a backdated transaction was discussed.  Leach Decl. ¶ 38, Ex. 36.  The records evidence Hussain was in the United States between August 7 and 20, 2011, when the HP acquisition was finalized, and evidence additional phone calls which may have supported wire fraud counts.  Leach Decl. ¶ 39, Ex. 37.

On or about December 4, 2018, the UK produced records of UBS, including account statements evidencing Lynch's receipt of £489,295,173 on October 7, 2011, through HP's purchase of his Autonomy shares.  Leach Decl. ¶¶ 31-33, Exs. 29, 30, & 31.  Indeed, Lynch's October 2011 UBS account statement evidences:

| 07 Oct 2011 | 07 Oct 2011 | 4741351 | TAKEOVER FOR CASH BASED ON YOUR HOLDING OF 19,188,046.0000 AUTONOMY CORP PLC ORD 0.00333 | | 489,295,173.00 | 189,295,614.34 CR |

Leach Decl. Ex. 30.  The government offered some of the UBS documents as exhibits for an evidentiary hearing in *United States v. Hussain* to determine the gain for sentencing purposes.  Leach Decl. ¶ 34, Ex. 32; *Hussain* ECF Nos. 512 & 515 at 14-15.

On or about December 17, 2018, the UK produced records of E&Y UK, including work program documents, summary papers, memos relating to the audit, emails relating to the engagement, and documents provided Autonomy.  Leach Decl. ¶ 35, Ex. 33.  Among other things, E&Y UK produced document compilations relating to problematic transactions like the MicroTech/Vatican deal.  Leach Decl. ¶ 36, Ex. 34.

On or about March 22, 2019, the UK produced records of HSBC relating to Lynch.  Leach Decl. ¶ 40; ECF No. 217-13.

## IV.   THE GOVERNMENT'S TOLLING APPLICATIONS

On January 29, 2016, the government filed an *Ex Parte* Application for an Order Suspending the Statute of Limitations Pursuant to 18 U.S.C. § 3292.  Leach Decl. ¶ 41, Ex. 38.  The application described the government's investigation, the relevance of the transactions with Sales Consulting, MicroTech, and Auxilium, and the official requests to Vatican City State and Italy.  *Id.*  The application

was supported by a declaration by an Assistant United States Attorney familiar with the investigation attaching numerous exhibits.  Leach Decl. Ex. 1.  On January 29, 2016, the Court (Hon. Edward Chen) found, by a preponderance of evidence, that official requests had been made to the Vatican City State and Italy for evidence of conspiracy, wire fraud, and securities fraud and that it reasonably appeared such evidence was in the Vatican City State and Italy.  The Court granted the application and suspended the statute from August 10, 2015, to the date on which the Vatican City State took final action, and from December 23, 2015, to the date on which Italy took final action.  ECF No. 217-6.

On June 7, 2016, the government filed a second *Ex Parte* Application for an Order Suspending the Statute of Limitations Pursuant to 18 U.S.C. § 3292.  Leach Decl. ¶ 42, Ex. 39.  The application described the government's investigation, the official request to the UK, and the relevance of the records.  *Id.*  The application was supported by a declaration by an Assistant United States Attorney familiar with the investigation attaching numerous exhibits.  Leach Decl. Ex. 5.  On June 7, 2016, the Court (Hon. Edward Chen) found, by a preponderance of evidence, that an official request had been made to the UK for evidence of conspiracy, wire fraud, and securities fraud and that it reasonably appeared such evidence was in the UK.  The Court granted the application and suspended the statute from January 29, 2016, to the date on which the UK took final action.  ECF No. 217-11.

On July 27, 2018, after the *Hussain* trial, the government filed a third *Ex Parte* Application for an Order Suspending the Running of the Statute of Limitations Pursuant to 18 U.S.C. § 3292.  Leach Decl. ¶ 43, Ex. 40.  The application described the government's investigation, including the fact that the government had been presenting evidence to a new Grand Jury since on or about March 15, 2018.  *Id.* The application also described the prior official requests, UK MLAT 2, and the relevance of the requests.  *Id.*  The application was supported by a declaration by an Assistant United States Attorney familiar with the investigation attaching numerous exhibits.  Leach Decl. Ex. 11.

On August 8, 2018, the Court (Hon. Charles Breyer) granted the government's application and issued a Third Order Suspending the Running of the Statute of Limitations Under 18 U.S.C. § 3292.  ECF No. 217-16.  The Court found, by a preponderance of evidence, that an official request had been made to the UK for evidence of conspiracy, wire fraud, and securities fraud and that it reasonably appeared such evidence was in the UK.  *Id.*  The Court suspended the statute of limitations for

1   conspiracy, wire fraud, and securities fraud from May 1, 2017, the date of the official request, until the

2   date the UK took final action on UK MLAT 2.  *Id.*  The Court also continued its prior tolling orders

3   based on UK MLAT 1 and the official requests to the Vatican City State and Italy.  *Id.*

**ARGUMENT**

**I.    LEGAL STANDARD**

Title 18, United States Code, Section 3292(a) provides:

> Upon application of the United States, filed before return of an indictment, indicating that
> evidence of an offense is in a foreign country, the district court before which a grand jury
> is impaneled to investigate the offense shall suspend the running of the statute of
> limitations for the offense if the court finds by a preponderance of the evidence that an
> official request has been made for such evidence and that it reasonably appears, or
> reasonably appeared at the time the request was made, that such evidence is, or was, in
> such foreign country.

18 U.S.C. § 3292(a)(1).

A suspension of the running of the statute of limitations is appropriate when the district court

finds, by a preponderance of the evidence, "that (1) an official request has been made for the evidence

and (2) it reasonably appears or appeared at the time the request was made that the evidence of the crime

is or was in a foreign country."  *United States v. Jenkins*, 633 F.3d 788, 797 (9th Cir. 2011).  The

Section 3292 preponderance standard may be satisfied by "'something of evidentiary value . . . tending

to prove it reasonably likely that evidence of the charged offenses is in a foreign country.'"  *Id.* at 798

(alteration in original) (quoting *United States v. Trainor*, 376 F.3d 1325, 1332-34 (11th Cir. 2004)).  For

example, in *Jenkins*, the Ninth Circuit held that a suspension order was adequately supported by the

sworn declaration of a person knowledgeable about the grand jury investigation and the evidence

already recovered "tending to indicate that further evidence of the offenses was abroad."  *Id.*

The Ninth Circuit has held that the term "evidence," as used Section 3292(a)(1), includes, but is

not limited to, "admissible, documentary evidence," and should be viewed "broad[ly]" and consistent

with the context of grand jury investigations.  *DeGeorge v. U.S. Dist. Ct.*, 219 F.3d 930, 937-38 (9th Cir.

2000).  The Ninth Circuit twice has rejected the notion that evidence sought by an MLAT "must be

essential to bringing charges" for tolling to be appropriate.  *Id.* at 938.  In *DeGeorge I*, the Ninth Circuit

emphasized:

1

2

3

4

5

> [Defendant] asserts that any evidence the government seeks must be essential to bringing charges against the target of the government's investigation. The only support he offers for this interpretation is legislative history, which we disregard because . . . of the plain language of the statute. The statute clearly states that the government need only establish that "evidence of an offense," not evidence essential to bringing charges on an offense, is in a foreign country. [Defendant's] proposed interpretation of the statute would require district courts to make a determination of the value of the foreign evidence the government seeks – to second-guess the government's investigation – which the statute simply does not contemplate.

6   *Id.* at 938-39 (cleaned up). In *DeGeorge II*, the Ninth Circuit again rejected a requirement that evidence

7   sought by an official request be material, otherwise essential, or outside the government's possession.

8   *United States v. DeGeorge*, 380 F.3d 1203, 1213 (9th Cir. 2004) ("DeGeorge argues that a district court

9   may issue an order under § 3292 suspending the statute of limitations only if the government is seeking

10   evidence that 1) is not already in its possession and 2) is 'material or otherwise essential' to the charges.

11   We are unpersuaded."). Similarly, the Second Circuit has held:

12

13

14

15

> Section 3292 does not demand that the foreign evidence sought be pivotal to the indictment; rather, it need only be evidence of an offense. Grand juries are not required to vote on indictments as soon as they have probable cause: A grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed. Section 3292 does not alter this long-standing precept, but rather facilitates it by providing a means to suspend the statute of limitations while evidence is sought from abroad.

16   *United States v. Lyttle*, 667 F.3d 220, 225 (2d Cir. 2012) (citations and internal quotations omitted);

17   *United States v. Broughton*, 689 F.3d 1260, 1275 (11th Cir. 2012) ("It is neither here nor there that . . .

18   none of the evidence requested or obtained by the Government was needed at trial." (internal quotations

19   omitted)).

20          A suspension under Section 3292 begins on the date an official request is made and ends on the

21   date the foreign court or authority takes final action on the request. 18 U.S.C. § 3292(b). A foreign

22   country is not deemed to have taken "final action" on an official request until it has made a "dispositive

23   response" – that is, "disposition, up or down, of each of the items" in the official request. *United States*

24   *v. Bischel*, 61 F.3d 1429, 1434 (9th Cir. 1995); *see Jenkins*, 633 F.3d at 800; *United States v. Hagege*,

25   437 F.3d 943, 955-56 (9th Cir. 2006). Congress has authorized suspensions to obtain foreign evidence

26   to last up to three years. 18 U.S.C. § 3292 (c)(1); *United States v. Rafoi*, 60 F.4th 982 (5th Cir. 2023)

27   ("In the case of investigations involving foreign evidence . . . Congress determined that investigators

28

1  ought to have the opportunity to toll the statute of limitations in certain circumstances to compensate for

2  delays attendant in obtaining records from other countries." (internal quotation omitted)).

3  **II.     COUNTS ONE THROUGH SIXTEEN ARE TIMELY**

4          On November 29, 2018, the Grand Jury returned an Indictment charging Lynch and Chamberlain

5  with one count of conspiracy to commit wire fraud and thirteen counts of wire fraud.  ECF No. 1.  On

6  March 21, 2019, the Grand Jury returned a Superseding Indictment, adding Counts Fifteen (wire fraud

7  against both Defendants), Sixteen (securities fraud against Lynch), and Seventeen (conspiracy against

8  both Defendants).  ECF No. 21.

9          Count One alleges a conspiracy continuing until "in or about October 2011."  ECF No. 21 ¶ 26.

10  Counts Two through Fifteen are based on wires during the period January 26, 2011, and October 4,

11  2011.  *Id.* ¶ 28.  Count Sixteen alleges an offense "[i]n or about August 2011."  *Id.* ¶ 30.  And Count 17

12  alleges an offense "[b]eginning in or about October 2011, and continuing until in or about November

13  2018."  *Id.* ¶ 31.

14          The statute of limitations is five years for wire fraud and conspiracy and six years for securities

15  fraud.  18 U.S.C. § 3282 (non-capital offenses) & 18 U.S.C. § 3301 (securities fraud).  Absent the

16  Court's Tolling Orders, the statute of limitations would have expired as follows:

| Count | Date of Offense | Statute of Limitations Absent Tolling |
|-------|-----------------|----------------------------------------|
| 1 | Oct. 31, 2011 | Oct. 31, 2016 |
| 2 | Jan. 26, 2011 | Jan. 26, 2016 |
| 3 | Feb. 1, 2011 | Feb. 1, 2016 |
| 4 | Feb. 3, 2011 | Feb. 3, 2016 |
| 5 | Mar. 4, 2011 | Mar. 4, 2016 |
| 6 | Apr. 4, 2011 | Apr. 4, 2016 |
| 7 | Apr. 21, 2011 | Apr. 21, 2016 |
| 8 | July 27, 2011 | July 27, 2016 |
| 9 | Aug. 1, 2011 | Aug. 1, 2016 |
| 10 | Aug. 2, 2011 | Aug. 2, 2016 |
| 11 | Aug. 3, 2011 | Aug. 3, 2016 |
| 12 | Aug. 4, 2011 | Aug. 4, 2016 |
| 13 | Aug. 4, 2011 | Aug. 4, 2016 |
| 14 | Aug. 5, 2011 | Aug. 5, 2016 |

| 15 | Oct. 4, 2011 | Oct. 4, 2016 |
| 16 | Aug. 31, 2011 | Aug. 31, 2017 |
| 17 | Nov. 30, 2018 | Nov. 30, 2023 |

As discussed below, the Court's Tolling Orders validly suspended the statute of limitations for the three-year period authorized in Section 3292(c)(1) and through the date of the Indictment (for Counts 1 through 14) and the Superseding Indictment (for Counts 15 through 17).

A.   **Tolling Order 1 Validly Suspended the Statute of Limitations for 289 Days and Before the Statute of Limitations Expired on Count 2**

The government submitted an official request to the Vatican City State on August 10, 2015. Leach Decl. Ex. 2.  It submitted an official request to Italy on December 23, 2015.  Leach Decl. Ex. 4. The Vatican City State completed its production on April 18, 2016, and Italy completed its production on May 25, 2016.  ECF No. 217-7 to 217-8.  Tolling Order 1, by its terms, suspended the statute of limitations from August 10, 2015, through the date of final action by Vatican City State or Italy.  ECF No. 217-6.  No one appears to question that Tolling Order 1, if it is effective, suspended the statute of limitations for the conspiracy, wire, and securities fraud offenses for 289 days beginning August 10, 2015, through May 25, 2016.

Defendants nonetheless argue Tolling Order 1 did not suspend the statute of limitations for Count 2 because the "wire transmission for Count 2 is a January 26, 2011 email concerning a transaction with DiscoverTech, an American company."  ECF No. 217 at 15.  The argument appears to be that the official requests to Vatican City State and Italy relate to information and records for certain Autonomy transactions (with Vatican Library, MicroTech, Auxilium, and Sales Consulting) and Count 2 relates to a wire transmission relating to a transaction with DiscoverTech; therefore, the argument goes, the offense alleged in Count 2 was not validly suspended by Tolling Order 1.

Neither Defendant cites a single case for this cramped analysis, and the Court should reject it. The wire transmission is one of multiple elements of "the offense."  The wire fraud statute defines the offense as "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate

1    or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such

2    scheme or artifice, [is guilty of an offense]."  18 U.S.C. § 1343.  "There are thus three elements of wire

3    fraud: "(1) a scheme to defraud, (2) use of the wires in furtherance of the scheme and (3) a specific

4    intent to deceive or defraud."  *United States v. Hussain*, 972 F.3d 1138, 1143 (9th Cir. 2020) (quoting

5    *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001)).  The relevant wire need only further the

6    scheme to defraud – it need not contain a misrepresentation.  *United States v. Jinian*, 725 F.3d 954, 960

7    (9th Cir. 2013).  Even if he did not personally send or receive the wire, a Defendant is criminally

8    responsible if he aided and abetted, caused, or was a co-schemer in the offense, or if he conspired to

9    commit wire fraud and the offense fell within the scope of the conspiracy and could reasonably have

10   been foreseen.  *See* Jury Instructions at 18, 23, 26, 27, *United States v. Hussain*, CR 16-462 CRB (N.D.

11   Cal. Apr. 24, 2018), ECF No. 374.

12       Evidence sought by the official requests to the Vatican City State and Italy were relevant to

13   whether Autonomy's financial statements were correct or incorrect and thus relevant to whether there

14   was a scheme to defraud (for both wire and securities fraud, which depended on the falsity of

15   Autonomy's financial statements).  As the government explained in the official requests to the Vatican

16   City State, the requested information "will enable the prosecutor to determine whether Autonomy

17   appropriately recorded revenue on the transactions with MicroTech and Auxilium."  Leach Decl. Ex. 1,

18   ¶ 27, Ex. W at USAO 00002424.  Defendants' arguments that these documents do not relate to

19   DiscoverTech are irrelevant; they do relate to Autonomy's financial statements and whether they were

20   correctly or incorrectly stated.  They thus are relevant to whether there was a scheme to defraud.  The

21   January 26, 2011 wire furthered the overall scheme to defraud, and the Vatican City State and Sales

22   Consulting/Auxilium information were relevant to the scheme to defraud.

23       Because the government sought evidence relevant to the conspiracy, wire fraud, and securities

24   fraud offenses charged against Defendants, the Court correctly suspended the statute of limitations based

25   on the official requests to the Vatican City State and Italy.  The statute of limitations was validly

26   suspended 289 days, from August 10, 2015, through May 25, 2016, the date Italy completed its

27   production and took final action.

28

**B.     Tolling Order 2 Validly Suspended the Statute of Limitations for the Remainder of the Three-Year Period in 18 U.S.C. § 3292(c)(1)**

**1.     UK Request 1 Sought Records Relevant to the Charged Offenses**

There is no dispute the January 29, 2016 MLAT to the UK (UK Request 1) was an official request within the meaning of § 3292, nor that it reasonably appeared the documents sought by UK Request 1 were in the UK, as the Court found.  Nor does there appear to be a dispute that the UK continued to produce documents responsive to UK Request 1 through at least March 22, 2019, and thus took "final action" more than three years from January 29, 2016, the date of the official request.  Section 3292(c)(1) provides that the "total of all periods of suspension . . . shall not exceed three years."  18 U.S.C. § 3292(c)(1).  Tolling Order 2 thus, by its terms, suspended the statute of limitations for the full three-year period.

Defendants, however, argue Tolling Order 2 is of no import because, they claim, UK Request 1 did not seek evidence of the offenses charged in Counts 1 through 16.[3]  ECF No. 217 at 10, 11-2, 13-14.  They are wrong.  UK Request 1, among other things, sought records evidencing receipt by Lynch, Chamberlain, and Hussain of money and property through the scheme to defraud.  As with Count 2, Defendants focus on the nature of the wire transmission underlying Counts 3 through 15 but wholly ignore the remaining elements of conspiracy, securities fraud, and wire fraud, including the elements of a scheme to defraud or for obtaining money or property by means of false or fraudulent statements and intent.  The evidence sought by UK Request 1 is highly relevant to multiple elements of the conspiracy and fraud offenses:

- First, as detailed above, the requests for Capita and bank and brokerage records were relevant to showing Defendants' and their co-conspirators' actual receipt of money and property from the scheme to defraud.  The UBS records, some of which were not produced until December 4, 2018, demonstrate Lynch pocketed £489,295,173 from the scheme.  The Merrill Lynch records, which were not produced until October 12, 2017, demonstrate Lynch's spouse pocketed £15,567,750 from the scheme.  The HSBC

---

[3]      In a footnote, Chamberlain concedes UK Request 1 "may have sought" evidence pertaining to Count 15.  ECF No. 217 at 13 n.8.  Yet he explicably argues Count 15 should be dismissed.

records, produced between March 30, 2017, and August 11, 2017, demonstrated Chamberlain and Hussain both pocketed money from the scheme.  The records also demonstrate Defendants' financial condition and thus are probative of their state of mind and financial motive and thus their intent to defraud.

- Second, because HP did not simply wire money to Autonomy shareholders, but instead used a receiving agent, Capita and RBS records were equally relevant to showing Defendants' receipt of money and property by means of false statements.

- Third, the bank and brokerage records may also have revealed additional wire transfers supporting additional wire fraud charges or overt act allegations relating to the conspiracy.

- Fourth, Hussain's phone records are highly relevant to demonstrating when and how he was communicating with Lynch and Chamberlain, as well as Autonomy Vice President of Sales Stouffer Egan, the so-called value-added resellers, and other Autonomy personnel and when and how he was communicating with HP during the diligence.

Defendants' myopic focus on the wires underlying Counts 2 through 15 ignores the additional elements of conspiracy, wire fraud, and securities fraud.  When viewed in the context of *all* of the elements of conspiracy, wire fraud, and securities fraud, the evidence sought was highly probative.

  **2.**  **Defendants' Additional Arguments for Disregarding Tolling Order 2 Fail**

Defendants' repeated claims that evidence sought by UK MLAT 1 was "not needed" are irrelevant.  ECF No. 217 at 12 n.6, 15.  Courts including the Ninth Circuit have repeatedly held that the only relevant inquiry is whether the statutory elements of Section 3292 are met – not whether the evidence sought is "material," "otherwise essential," or already in the government's possession. *DeGeorge II*, 380 F.3d at 1213; *DeGeorge I*, 219 F.3d at 937-38; *Lyttle*, 667 F.3d at 225; *Broughton*, 689 F.3d at 1275.

In any event, the Defendants are wrong.  The evidence sought by the UK MLAT 1 was *not* in the United States' possession and is highly relevant to multiple elements of the offenses, most tellingly their actual receipt of money and property.  Defendants cite to an October 15, 2015 letter from attorneys for HP as support for the claim "the Government already had in its possession from prior communications

with HP's counsel" "information" about "equity redemptions" by Lynch, Chamberlain, and Hussain. ECF No. 217 at 20.  Tellingly, the letter they cite does not show Lynch, Chamberlain, and Hussain's actual receipt of hundreds of millions of pounds through the Autonomy acquisition.  There is no allegation, let alone evidence, the government obtained, or expected to obtain, through HP the private bank and brokerage records of Lynch, Chamberlain, and Hussain evidencing their receipt of money and property.  Nor can the defense credibly argue that responsible prosecutors can cease their investigative efforts when counsel for a victim assures them of a fact, instead of taking steps to ensure admissible evidence of a defendant's receipt of money and property is available for use a trial.  Defendants' suggestion that the bank and brokerage records were "not needed" because of HP's lawyers' hearsay does not withstand scrutiny.

Without citing evidence or authority, Lynch suggests the government could have obtained some of the bank records through subpoenas on United States affiliates.  ECF No. 221 at 14.  But "nothing in § 3292 suggests that the foreign evidence must be obtainable *only* through diplomatic channels for the statute of limitations to be suspended.  Rather, the plain text of § 3292 requires the district court, upon proper application, to suspend the statute of limitations when the government chooses to pursue foreign evidence through an official diplomatic request, regardless whether it might have been able to obtain the foreign evidence by other means."  *Lyttle*, 667 F.3d at 224-25 (rejecting argument that tolling order was not effective because relevant foreign bank had offices in United States and thus records could have been obtained by domestic subpoena).  The Ninth Circuit too has declined to read a diligence requirement into the statute.  *Bischel*, 61 F.3d at 1435 ("Bischel also argues that § 3292 is constitutionally infirm because it lacks any requirement that the government diligently seek evidence located in a foreign country. . . . We decline to read a diligence requirement into § 3292.").  Even if *Lyttle* and *Bischel* were wrong, Defendants do not even suggest the Vatican, Sales Consulting, Capita, Slaughter & May, and E&Y UK records could have been compelled through domestic means.

### 3.    The Statute of Limitations Did Not Run on Counts 1 Through 16

Because UK MLAT 1 sought records relevant to the offenses charged, Defendants' efforts to ignore Tolling Order 2 fail.  The Court validly suspended the statute of limitations.  The UK continued to produce highly relevant records in response to UK MLAT 1 through March 22, 2019.  Accordingly,

either by its own effect or in combination with Tolling Order 1, Tolling Order 2 suspended the statute of limitations for the three-years permitted by Section 3292.  The following illustrates the proper application of the statute of limitations in this case:

| Count | Date of Offense | Statute of Limitations Absent Tolling | Tolling Based on Vatican City State and Italy Requests (289 days) | Tolling Based on UK MLAT 1 (remainder of 3-year maximum) |
|---|---|---|---|---|
| 1 | 10/31/2011 | 10/31/2016 | 8/16/2017 | 10/31/2019 |
| 2 | 1/26/2011 | 1/26/2016 | 11/10/2016 | 1/26/2019 |
| 3 | 2/1/2011 | 2/1/2016 | 11/16/2016 | 2/1/2019 |
| 4 | 2/3/2011 | 2/3/2016 | 11/18/2016 | 2/3/2019 |
| 5 | 3/4/2011 | 3/4/2016 | 12/18/2016 | 3/4/2019 |
| 6 | 4/4/2011 | 4/4/2016 | 1/18/2017 | 4/4/2019 |
| 7 | 4/21/2011 | 4/21/2016 | 2/4/2017 | 4/21/2019 |
| 8 | 7/27/2011 | 7/27/2016 | 5/12/2017 | 7/27/2019 |
| 9 | 8/1/2011 | 8/1/2016 | 5/17/2017 | 8/1/2019 |
| 10 | 8/2/2011 | 8/2/2016 | 5/18/2017 | 8/2/2019 |
| 11 | 8/3/2011 | 8/3/2016 | 5/19/2017 | 8/3/2019 |
| 12 | 8/4/2011 | 8/4/2016 | 5/20/2017 | 8/4/2019 |
| 13 | 8/4/2011 | 8/4/2016 | 5/20/2017 | 8/4/2019 |
| 14 | 8/5/2011 | 8/5/2016 | 5/21/2017 | 8/5/2019 |
| 15 | 10/4/2011 | 10/4/2016 | 7/20/2017 | 10/4/2019 |
| 16 | 8/31/2011 | 8/31/2017 | 6/16/2018 | 8/31/2020 |

**C.      Tolling Order 3 Validly Suspended the Statute of Limitations for at Least 595 Days**

Because Tolling Order 2 (either by itself of in combination with Tolling Order 1) suspended the statute of limitations beyond the relevant indictment date for each offense, the Court need not consider Tolling Order 3 or UK MLAT 2.[4]

Tolling Order 3 and UK MLAT 2 would have relevance if the Court disregarded Tolling Order 2.  In other words, if the period between January 29, 2016, to March 22, 2019, based on UK MLAT 1

---

[4]      At the time the government sought Tolling Order 3, it could not have known when the UK would take final action on the UK MLAT 1 or whether a Defendant would challenge the sufficiency of the applications for Tolling Orders 1 or 2.  Because of such uncertainty, it was entirely prudent for the government to seek tolling where appropriate even if the total period of suspensions exceeded three years.

1    were ignored, Tolling Order 1 (suspending the statute for 289 days) and Tolling Order 3 (suspending the

2    statute for 595 days) would make timely the charges alleged in Counts 8 through 14 and 16 because the

3    statute of limitations would expire on or after December 28, 2018, for wire fraud and on January 31,

4    2020, for securities fraud.[5]

5         But there is no basis to disregard Tolling Order 3.  Again, no one questions that UK MLAT 2 is

6    an official request, and the government correctly believed the evidence was located in the UK.  No one

7    questions that the UK government did not take final action until December 17, 2018, 595 days from

8    May 1, 2017, when UK MLAT 2 was sent.  Instead, Defendants argue the evidence sought by UK

9    MLAT 2 is not evidence of the offenses alleged in Counts 8 through 14 or 16.

10        For the reasons described above, this argument is wrong and based on an unjustifiably narrow

11   view of the "offense."  UK MLAT 2 sought the workpapers of E&Y, which was hired to audit the

12   restated financial statements of an Autonomy subsidiary.  Those restated financial statements came into

13   evidence in the *Hussain* trial.  While the defendants dismiss the relevance of the restated financial

14   statements as "after the events" (ECF No. 217 at 15), this Court has held: "The restatement went directly

15   to the question of falsity."  Hussain Rule 29 Order at 60.  Slaughter & May's documents also are

16   relevant to the offenses.  Their documents helped evidence what was available in the data room made

17   available to HP for diligence.  While HP was *a* source for that information, Slaughter & May was an

18   important source to eliminate discrepancies or disputes about what was available.  Moreover, the

19   evidence requested would establish that access to the data room by HP advisers in the United States

20   involved the use of interstate wires and thus could support additional wire fraud charges.

21        Because UK MLAT 2 sought evidence relevant to the conspiracy, wire fraud, and securities

22   fraud offenses charged against Defendants, the Court correctly suspended the statute of limitations based

23   on UK MLAT 2.  The statute of limitations was validly suspended 595 days, from May 1, 2017, through

24   December 28, 2018, the date the UK completed its production of the E&Y UK and Slaughter & May

25   records and took final action on UK MLAT 2.

26

27   [5]    If the Court disregards Tolling Order 2, Counts 2 through 7 would be time barred because the
     tolling from Tolling Order 1 extends the statute of limitations to dates *before* the government sent the
28   official request in UK MLAT 3 on May 1, 2017.  In addition, the statute of limitations for Count 15
     would expire on January 6, 2019.

1      **III.    COUNT SEVENTEEN IS TIMELY**

2             The Superseding Indictment alleges a conspiracy "[b]eginning in or about October 2011, and

3      continuing until in or about November 2018, in the Northern District and elsewhere."  ECF No. 21 ¶ 31.

4      It further alleges numerous overt acts, including that "[i]n or around January 2013, *and thereafter*,

5      Lynch refused to return books and records and other property belonging to HP."  *Id.* ¶ 34(m) (emphasis

6      added).  Fairly read, the superseding indictment alleges Lynch continued to circumvent HP controls and

7      obstruct proceedings through his unlawful retention of HP records throughout the time period alleged in

8      Count 17.

9             Count 17 thus is timely on the face of the indictment.  To the extent the Defendants suggest the

10     government cannot prove an overt act within the statute of limitations, that determination should await

11     the proof and jury instructions.  The government anticipates evidence Lynch continued to use stolen

12     documents from HP to obstruct proceedings through a website he maintained.  *See, e.g.*,

13     https://autonomyaccounts.org/archive (December 2014 post claiming that "internal HP document"

14     shows no fraud).

15            Moreover, contrary to Defendant's assertions, the Court's Tolling Orders validly suspended the

16     statute of limitations for Count 17.  Each of the relevant orders specified 18 U.S.C. § 371 as one of the

17     offenses suspended.  And the evidence sought by the requests is reasonably related to and evidence of

18     the specific offense alleged.  Count 17 generally alleges multiple acts to cover up the fraud.  But that

19     presupposes the fraud, and evidence sought by the official requests is relevant to showing Defendants'

20     motives to obstruct proceedings and circumvent HP's controls.

21            Because Count 17 is timely on its face, and the Tolling Orders apply in any event, the Court

22     should deny the motion to dismiss Count 17.

23     **IV.    THE COURT SHOULD NOT ORDER DISCOVERY OF GOVERNMENT WORK
             PRODUCT AND MENTAL IMPRESSIONS**
24
              Chamberlain moves for "discovery into the Government's actual motives for making UK
25
       Requests 1 and 2."  ECF No. 217 at 21; *see also id.* at 14-16.  Lynch moves for even broader discovery,
26
       including "discovery relating to the MLAT requests . . . including email correspondence and other
27

28

1   communications between: the DOJ prosecutors . . . ." ECF No. 221 at 14.  The Court should decline to

2   order further discovery.

3          "[S]o long as the government has established the two statutory requirements – presence of

4   information abroad and a request for it – the government's motivation behind the MLAT request is not

5   relevant to whether the applicable statute of limitations should be tolled; it must."  *United States v.*

6   *Bases*, 2020 WL 5909072, at *4 (N.D. Ill. Oct. 6, 2020); *see United States v. Chen*, No. 1-12-CR-350-

7   03-SCJ, 2014 WL 5307518, at *13 (N.D. Ga. Oct. 15, 2014) (finding "no case law supporting . . .

8   argument that a pretextual MLAT request voids [the request or any tolling order relying on it]"); *United*

9   *States v. Kachkar*, No. 16-20595-CR-GAYLES, 2018 WL 6933159, at *4 (S.D. Fla. Dec. 19, 2018)

10  (rejecting argument that a § 3292 tolling order is invalid even assuming that the government's pursuit of

11  foreign evidence "was merely a pretext, designed to forestall the expiration of the statute of

12  limitations").

13         These authorities demonstrate:  the government's motives in issuing MLATs and applying for

14  tolling orders are not relevant.  The only relevant question is does the government's application support

15  a finding by a preponderance of the evidence that an official request has been made for "such evidence"

16  – i.e. evidence of an offense – and that it reasonably appears, or reasonably appeared at the time the

17  request was made, that such evidence is, or was, in such foreign country.  If the answer to that question

18  is yes, the government's motives are beside the point.

19         Even if the government's motives in issuing the official requests or seeking tolling orders were

20  relevant, Defendants present no evidence demonstrating that the government acted solely for the purpose

21  of tolling the statute of limitations, or did not genuinely want the evidence listed in the official requests.

22  The government first sought evidence from Vatican City State in August 2015 – more than five months

23  before the statute of limitations would otherwise have run on the January 2011 wire underlying Count 2.

24  The government's initial request to the UK sought documents evidencing the conspirators' actual receipt

25  of money from the scheme to defraud – evidence that is highly relevant to allegations of fraud and

26  conspiracy.  In addition, the government pursued voluntary information from E&Y UK for months

27  before the firm made clear an MLAT was necessary, and the government indicated as early as December

28  2016 that it was pursuing an official request.

Against this backdrop, there is no basis for the Court to reconsider its multiple orders suspending the statute of limitations.[6]  The Court should reject the Defendants' superficial appeals to the order of an evidentiary hearing in *United States v. Bogucki*, 316 F. Supp. 3d 1177, 1183 (N.D. Cal. 2018).  In *Bogucki*, the defendant alleged the government sought irrelevant evidence it already possessed or had access to from a bank that had pleaded guilty to offenses and was required to provide the documents sought by the foreign request to the government.  It did so days before the expiration of the statute of limitations on the last possible count.  In this case, even before August 2015, the government sought highly relevant evidence, repeatedly, that it did not have and actually used in related proceedings.  This case is nothing like *Bogucki*, where it may have appeared to the Court that the government, on the eve of the statute of limitations expiring on the last possible count, issued a frivolous MLAT for irrelevant evidence the government already possessed.  The Defendants fail to establish a basis for discovery into the government's mental impressions and work product.

## V.     DEFENDANTS FAIL TO ESTABLISH A CLAIM OF PREJUDICIAL PREINDICTMENT DELAY

In three pages of briefing, based on two paragraphs of a declaration from his counsel, Chamberlain argues an indictment brought within the applicable statute of limitations nonetheless

---

[6]     Under *Franks v. Delaware*, 438 U.S. 154 (1978), a defendant can attack the validity of a search warrant affidavit if, and only if, he or she shows that the affiant intentionally or recklessly made a materially false statement.  In applying *Franks*, the Ninth Circuit has identified five requirements that a defendant must meet to obtain a hearing, namely, the defendant must:  (1) allege specifically which portions of the affidavit are allegedly false; (2) assert that the false statements or omissions were made deliberately or recklessly; (3) present a detailed offer of proof, including affidavits, to support these allegations; (4) challenge only the veracity of the affiant; and (5) challenge statements that are necessary to find probable cause.  *United States v. Jaramillo Suarez*, 950 F.2d 1378, 1387 (9th Cir. 1991); *see also United States v. DiCesare*, 765 F.2d 890, 894-95, *amended*, 777 F.2d 543 (9th Cir. 1985).  The defendant bears the burden of making "a substantial preliminary showing" that all of these elements are met by a preponderance of the evidence.  *See United States v. Hammett*, 236 F.3d 1054, 1058 (9th Cir. 2001); *see also United States v. Dozier*, 844 F.2d 701, 705 (9th Cir. 1988).  If the challenged statements are not necessary to find probable cause, then the defendant is not entitled to an evidentiary hearing.  *See United States v. Fowlie*, 24 F.3d 1059, 1066-67 (9th Cir. 1994); *United States v. Motz*, 936 F.2d 1021, 1024 (9th Cir. 1991).  To the extent the Court finds analogies to the *Franks* context useful, Defendants come nowhere near meeting the standard.  They do not allege let alone present evidence suggesting a representation in the declarations supporting the tolling order applications was false or misleading, or establish how the allegedly false or misleading statement was relevant to the Section 3292 analysis.

1  violates his due process rights.  ECF No. 217 at 17-20; ECF No. 217-1 ¶¶ 3-4.  Lynch joins the motion
2  but presents no evidence.  The claim fails.

3       In *United States v. Marion*, 404 U.S. 307, 313 (1971), the Supreme Court rejected the notion that
4  the Sixth Amendment right to a speedy trial had any application before a defendant becomes an accused.
5  In the course of deciding the case, the Court noted the government's concession that "the Due Process
6  Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that
7  the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and
8  that the delay was an intentional device to gain tactical advantage over the accused."  *Id.* at 324.  But the
9  Court observed:  "No actual prejudice to the conduct of the defense is alleged or proved, and there is no
10  showing that the Government intentionally delayed to gain some tactical advantage over appellees or to
11  harass them."  *Id.* at 325.  And it wrote that "prejudice inherent in any extended delay" including that
12  "memories will dim, witnesses become inaccessible, and evidence be lost" "[i]n light of the applicable
13  statute of limitations" were not "in themselves enough to demonstrate" prejudice or warrant dismissal of
14  an indictment.  *Id.* at 325-26.

15       Six years later, in *United States v. Lovasco*, 431 U.S. 783, 790 (1977), the Court *reversed* the
16  dismissal of an indictment for alleged preindictment delay and observed that "proof of prejudice is
17  generally a necessary but not sufficient element of a due process claim."

18       Synthesizing these cases, the Ninth Circuit applies "a two-part test to determine whether
19  preindictment delay denies due process: (1) the defendant must prove actual, non-speculative prejudice
20  from the delay; and (2) the length of the delay, when balanced against the reason for the delay, must
21  offend those fundamental conceptions of justice which lie at the base of our civil and political
22  institutions."  *United States v. Huntley*, 976 F.2d 1287, 1290 (9th Cir. 1992) (internal quotations
23  omitted).

24       "The defendant's burden to show actual prejudice is heavy and is rarely met."  *United States v.*
25  *Barken*, 412 F.3d 1131, 1134 (9th Cir. 2005).  A defendant must show he suffered actual, non-
26  speculative prejudice from the delay, "meaning proof that demonstrates exactly how the loss of evidence
27  was prejudicial."  *Id.*  Almost forty years ago, the Ninth Circuit observed this burden was so heavy it had

28

found only two cases since 1975 in which any circuit had upheld a due process claim. *Huntley*, 976 F.2d at 1290.

Defendants fail to meet this heavy burden.[7]  Chamberlain argues, without citation to authority, the Court should presume prejudice and that the timing of the indictment violates some general "right to repose." ECF No. 217 at 17-18.  He cites no case for the proposition this is "actual, non-speculative" prejudice within the meaning of the standard.

Next, he argues the timing of the indictment placed him in a "state of limbo" and prevented him from moving on with is life.  He neglects to note he was working for Lynch much of the time, but regardless, he cites no case equating this with "actual, non-speculative" prejudice within the meaning of the standard.

Third, he argues two witnesses who verbally "expressed a willingness to give evidence" in 2016 now insist on being deposed in the UK.  This too is not "actual, non-speculative" prejudice within the meaning of the standard.  It is unclear how firm the witnesses were in their "willingness," why they apparently changed their minds, or when or why they did so.  The Supreme Court in *Marion* emphasized that "prejudice inherent in any extended delay" including that "witnesses become inaccessible" is not in itself sufficient to demonstrate prejudice or warrant dismissal of an indictment.  404 U.S. at 325-26.  More fundamentally, Chamberlain does not begin to argue, let alone prove, how their testimony is relevant, admissible, and uniquely exculpatory.

Fourth, he argues Rule 15 depositions, if granted, are not adequate to preserve his right to cross-examine witnesses.  This too is speculation.

In the end, Chamberlain's argument seems to be, the government had enough in 2016 and therefore the Constitution required the government to indict by 2016.  Most defendants urge the government to act with greater care, deliberation, and circumspection.  In any event, Chamberlain's you-

---

[7]     Chamberlain's motion makes a number of assertions unsupported by any declaration which the government disputes.  Chamberlain argues the government made "repeated statements that it would make indictment decisions . . . in 2016"; "[a] review of discovery . . . shows no evidence of any continuing investigation of Mr. Chamberlain by the Government"; "it was clear the Government's investigation had turned up all of the information it needed"; "Chamberlain moved on with this life"; and "[h]e has fewer resources available to him with which to mount a defense."  ECF No. 217 at 17-18.  These are unsupported and irrelevant.

1   had-probable-cause-and-therefore-were-required-to-indict argument was squarely rejected in *Lovasco*.

2   431 U.S. at 790-91.  There the Supreme Court wrote:

3   > It requires no extended argument to establish that prosecutors do not deviate from
    > "fundamental conceptions of justice" when they defer seeking indictments until they have

4   > probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a
    > prosecutor to recommend an indictment on less than probable cause.  It should be equally

5   > obvious that prosecutors are under no duty to file charges as soon as probable cause
    > exists but before they are satisfied they will be able to establish the suspect's guilt beyond

6   > a reasonable doubt.  To impose such a duty "would have a deleterious effect both upon
    > the rights of the accused and upon the ability of society to protect itself."

7
8   431 U.S. at 790-91 (footnote and citation omitted); *id.* at 792-93 ("[C]ompelling a prosecutor to file

9   public charges as soon as the requisite proof has been developed against one participant on one charge

10  would cause numerous problems in those cases in which a criminal transaction involves more than one

11  person or more than one illegal act."); *id.* at 793 ("insisting on immediate prosecution once sufficient

12  evidence is developed to obtain a conviction would pressure prosecutors into resolving doubtful cases in

13  favor of early and possibly unwarranted prosecutions"); *id.* at 794 ("requiring the Government to make

14  charging decisions immediately upon assembling evidence sufficient to establish guilt would preclude

15  the Government from giving full consideration to the desirability of not prosecuting in particular

16  cases").

17          Because Defendants cannot prove actual, non-speculative prejudice from any alleged delay, and

18  the length of the delay does not offend fundamental conceptions of justice lying at the base of our civil

19  and political institutions, their claim of prejudicial preindictment delay fails.[8]

20

21

22

23

24

25

26

27  _____
    [8]      The alleged prejudicial delay between November 2016 and November 2018 pales in comparison
28  the delay *post-indictment*.  Chamberlain's consent and acquiescence to Speedy Trial Act exclusions for
    the four-plus years since indictment belie any argument of prejudice from preindictment delay.

1

## CONCLUSION

2

For these reasons, the Court should deny the motions to dismiss.

3

DATED:  October 13, 2023                              Respectfully submitted,

4                                                                PATRICK D. ROBBINS
                                                                 Attorney for the United States,
5                                                                Acting Under Authority Conferred by
                                                                 28 U.S.C. § 515
6

7                                                                */s/ Robert S. Leach*
                                                                 ROBERT S. LEACH
8                                                                ADAM A. REEVES
                                                                 KRISTINA GREEN
9                                                                Assistant United States Attorneys

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28