# EXHIBIT 1

BRIAN J. STRETCH (CABN 163973)
Acting United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7534
    Fax: (415) 436-7234
    Robert.Leach@usdoj.gov
    Adam.Reeves@usdoj.gov

Attorneys for United States of America

ORIGINAL
RECEIVED FILED

JAN 29 2016

JAN 29 2016

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE GRAND JURY INVESTIGATION NO. 2012R02242, | Case No. CR 14-90491 MISC EMC |
| | **UNDER SEAL** |
| | DECLARATION OF AUSA ROBERT S. LEACH IN SUPPORT OF THE UNITED STATES' *EX PARTE* APPLICATION FOR AN ORDER SUSPENDING THE STATUTE OF LIMITATIONS PURSUANT TO 18 U.S.C. § 3292 |

I, Robert S. Leach, state the following:

1.    I am an Assistant United States Attorney for the Northern District of California. I am one of the prosecutors assigned to this case. I submit this declaration in support of the United States' *Ex Parte* Application for an Order Suspending the Statute of Limitations Pursuant to 18 U.S.C. § 3292, filed concurrently.

2.    A grand jury in this district is conducting an investigation of former senior officers of Autonomy Corporation plc ("Autonomy"), including former Chief Executive Officer Michael Lynch, former Chief Financial Officer Sushovan Hussain, former Vice President of Finance Stephen

USAO 00002293

Chamberlain, and former Chief Operating Officer and General Counsel Andrew Kanter, for the

following possible criminal offenses: 15 U.S.C. §§ 78j(b) & 78ff (securities fraud), 18 U.S.C. § 371

(conspiracy), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1348 (securities

fraud), and 18 U.S.C. § 1349 (attempt and conspiracy).

The Investigation

3.    The following information is to the best of my knowledge and belief and is based on

information provided to me by federal law enforcement officers, information obtained in connection

with the investigation, and my review of documents and testimony relevant to this investigation,

including the documents attached hereto.

4.    Autonomy was a software developer with dual headquarters in the United Kingdom and

San Francisco, California.  Prior to October 2011, Autonomy was a publicly traded company whose

shares were listed on the London Stock Exchange.  As a public company, Autonomy issued quarterly

and annual financial statements that were disseminated to the public by means of interstate and foreign

wires.  In or about October 2011, Hewlett-Packard Company ("HP"), headquartered in Palo Alto,

California, bought Autonomy for approximately $11 billion.  Among other things, the grand jury is

investigating whether executives at Autonomy fraudulently inflated Autonomy's revenues in its

financial statements and whether HP was defrauded by executives at Autonomy because HP relied on

the alleged accuracy of Autonomy's financial statements in deciding to buy Autonomy.

5.    In its statements to the public (two of which are attached below), Autonomy claimed that

its financial statements were prepared in accordance with International Financial Reporting Standards

("IFRS").  Attached to this declaration as Exhibit A is a true and correct copy of International

Accounting Standard 18 *Revenue*.  Under this standard, revenue from the sale of goods shall be

recognized when all of the following conditions have been satisfied:

(a)    the entity has transferred to the buyer the significant risks and rewards of ownership of the goods;

(b)    the entity retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold;

(c)    the amount of revenue can be measured reliably;

USAO 00002294

(d)     it is probable that the economic benefits associated with the transaction will flow to the entity; and

(e)     the costs incurred or to be incurred in respect of the transaction can be measured reliably.

6.     Among other things, the grand jury is investigating whether executives at Autonomy fraudulently inflated Autonomy's alleged revenue by improperly recording revenue on software sales in violation of certain of the above-quoted criteria in IFRS.  More specifically, the grand jury is investigating, among other possible schemes, whether executives at Autonomy used certain so-called "value added resellers" ("VARs") to carry out a scheme to falsify Autonomy's financial statements by pretending Autonomy had complied with IFRS when it really had not.  Evidence gathered by the grand jury indicates that, from 2009 to 2011, Autonomy often recorded revenue on alleged sales to certain VARs who purportedly bought the software for resale to a specific customer or "end user."  Evidence gathered by the grand jury also indicates that Autonomy recognized revenues from sales to certain VARs even though (1) Autonomy did not transfer the significant risks and rewards of ownership of the goods; (2) Autonomy did retain continuing managerial involvement to the degree usually associated with ownership or effective control over the goods sold; and (3) it was not probable that the economic benefits associated with the transaction would flow to Autonomy.

7.     The grand jury investigation extends to multiple VAR transactions which Autonomy may have used to improperly recognize revenue in this manner.  At least four of those VAR transactions involve evidence located in foreign countries.  Those four transactions involved the following entities: (1) Sales Consulting S.R.L. ("Sales Consulting"); (2) Microtechnologies, LLC ("MicroTech"); (3) Auxilium Tech S.R.L. ("Auxilium"); and (4) Red Ventures S.R.L. ("Red Ventures").

8.     Attached to this declaration as Exhibit B is a true and correct copy of HP-SEC-01406405 to HP-SEC-01406415, which I understand was produced to the Securities and Exchange Commission ("SEC") by HP in a parallel civil investigation, and which purports to be e-mail among Autonomy personnel titled "Poste One off for Your records."  The document includes an agreement dated December 31, 2009, in which Autonomy allegedly licensed software to Sales Consulting, a VAR in Rome, Italy, for €1,500,000 for resale to Poste Italiane ("Poste").  My research indicates Poste is in

USAO 00002295

1   Italy.   The document also includes a separate letter dated December 31, 2009, purportedly signed by

2   Kanter.

3         9.      Attached to this declaration as Exhibit C is a true and correct copy of HP-SEC-01429938-

4   951, which I understand was produced to the SEC by HP, and which purports to be a press release titled

5   "Autonomy Corporation PLC Announces Results for the Twelve Months and Fourth Quarter Ended

6   December 31, 2009."

7         10.     Attached to this declaration as Exhibit D is a true and correct copy of HP-SEC-01550349,

8   which I understand was produced to the government by HP.  I understand this is an excerpt from an

9   exhibit to a claim made by HP subsidiaries in a UK court.  According to the document, Autonomy

10  recognized €1,500,000 of the revenue for the sale to Sales Consulting in its Q4 2009 (Year End)

11  financial statements.  Although the government seeks further evidence in Italy to verify this, it appears

12  that, in the end, neither Autonomy nor Sales Consulting ever re-sold the software to Poste or any other

13  end-user; and Sales Consulting never made any payments to Autonomy under the agreement.

14        11.     Attached to this declaration as Exhibit E is a true and correct copy of HP-SEC-01309275-

15  277, which I understand was produced to the SEC by HP, and which purports to be a fax from Sales

16  Consulting advising Autonomy that Sales Consulting had been placed into liquidation.

17        12.     Attached to this declaration as Exhibit F is a true and correct copy of HP-SEC-

18  00129022-23, which I understand was produced to the SEC by HP, and which purports to be a memo

19  from Hussain to Autonomy's board regarding a possible transaction with Bibliotheca Apostolica

20  Vaticana ("BAV"), the Vatican Library, which is located in Vatican City State.

21        13.     Attached to this declaration as Exhibit G is a true and correct copy of HP-SEC-01596101,

22  which I understand was produced to the government by HP, and which purports to be an e-mail from an

23  Autonomy salesman to Hussain and others.  The document suggests that in or around February 2010,

24  Autonomy contemplated partnering with Postecom, S.p.A. ("Postecom"), a subsidiary of Poste located

25  in Rome, Italy, to act as a value added reseller which would resell Autonomy's archiving system to

26  BAV.

27

28

LEACH DECL. RE EX PARTE APPLIC. RE STATUTE OF LIMITATIONS
CASE NO. CR-14-90491MISC EMC                          4

USAO 00002296

14.     Attached to this declaration as Exhibit H is a true and correct copy of HP-SEC-01596272-276, which I understand was produced to the government by HP, and which purports to be an e-mail from an Autonomy salesman to Hussain and others. The document suggests that, in late March 2010, Autonomy received a letter of intent between Postecom and BAV, which generally stated that Postecom had had preliminary discussions about possible involvement in the archiving project and intended to complete verification activities necessary to complete a collaboration proposal. The letter of intent further suggested that BAV was seeking financing for the project. According to its terms, the letter of intent was not binding on Postecom or BAV. The government's investigation to date demonstrates that, by March 31, 2010, when the Q1 2010 closed, Autonomy had no binding agreement with BAV or Postecom.

15.     Attached to this declaration as Exhibit I is a true and correct copy of MICROTECH 082784-787, which was marked as Exhibit 265 during grand jury testimony. The government's investigation to date, based on this document and other information, reveals that, on April 1, 2010, one day after Q1 2010 had closed, Autonomy approached a representative of MicroTech, another VAR based in Virginia, seeking MicroTech's agreement to pay Autonomy $11 million for software, purportedly for resale to BAV.

16.     Attached to this declaration as Exhibit J is a true and correct copy of Cronin0003277-280, which was marked as Exhibit 266 during grand jury testimony. The document reflects that on April 1, 2010, Steve Truitt (MicroTech's COO) returned an $11 million purchase order dated March 31, 2010, to John Cronin, who is believed to be a consultant to MicroTech and Autonomy.

17.     Attached to this declaration as Exhibit K is a true and correct copy of HP-SEC-01550355, which I understand was produced to the government by HP. I understand this is an excerpt from an exhibit to a claim made by HP subsidiaries in a UK court. According to the document, Autonomy recognized $11 million in revenue on the MicroTech deal. Based on the government's investigation to date, MicroTech appears to have had no relevant contact with BAV and undertook no efforts to sell Autonomy software to BAV. While it did make some payments to Autonomy on the $11 million order, MicroTech did so with money from a roundtrip transaction with Autonomy, whereby Autonomy made

USAO 00002297

1    purchases from MicroTech (and a related party) and then MicroTech made payments to Autonomy for

2    the license to BAV.  From April 2010 through 2011, Autonomy continued to attempt to consummate a

3    sale of software to BAV or an intermediary, but no deal was reached.

4        18.    Attached to this declaration as Exhibit L is a true and correct copy of a printout from the

5    Vatican Library's website, reflecting that Monsignor Cesare Pasini is the Prefect of the Vatican Library.

6        19.    Attached to this declaration as Exhibits M, N, and O are true and correct copies of HP-

7    SEC-00094071-74, 0094086-88, and 00130127-28, which I understand were produced to the SEC by

8    HP, and which reflect that in and after December 2010, Lynch and Hussain personally met and

9    corresponded with Monsignor Pasini about the possible digitization project.

10       20.    Attached to this declaration as Exhibit P is a true and correct copy of HP-SEC-

11   00520732, which I understand was produced to the SEC by HP, and which appears to be an e-mail dated

12   April 11, 2010, in which Kanter was asked to prepare a draft license agreement between Autonomy and

13   Auxilium.

14       21.    Attached to this declaration as Exhibit Q is a true and correct copy of HP-SEC-1596378-

15   392, which I understand was produced to the government by HP, and which appears to be Kanter's

16   response.

17       22.    Attached to this declaration as Exhibit R is a true and correct copy of HP-SEC-01656672-

18   73, which was produced to the government by HP, and which reflects that Auxilium signed a product

19   schedule, dated March 31, 2010, to pay €1,300,000 for the right to sublicense Autonomy software to

20   BAV for a specified number of users and to pay €125,000 in support and maintenance, and that

21   Autonomy recognized €1,300,000 in revenue on the Auxilium transaction in Q1 2010.  The

22   government's investigation to date reveals that Auxilium made no payments to Autonomy and Auxilium

23   does not appear to have made any sale of Autonomy software to BAV.

24       23.    Attached to this declaration as Exhibit S is a true and correct copy of HP-SEC-01639621-

25   633, which I understand was produced to the government by HP, and which appears to be Autonomy's

26   press release for Q1 2010 stating that Autonomy exceeded earnings expectations of analysts following

27   Autonomy stock.

28

LEACH DECL. RE EX PARTE APPLIC. RE STATUTE OF LIMITATIONS
CASE NO. CR-14-90491MISC EMC                              6

USAO 00002298

24.     Attached to this declaration as Exhibit T is a true and correct copy of HP-SEC-01550364, which I understand was produced to the government by HP.  I understand this is an excerpt from an exhibit to a claim made by HP subsidiaries in a UK court.  According to the document, Autonomy recognized revenue on a license agreement, dated September 30, 2010, whereby Autonomy purported to license software to Red Ventures for €2,000,000 for resale to Poste.  Payment under the agreement was due beginning December 2010.  Red Ventures made no payments by that date, or at any point.  Red Ventures does not appear to have made any sale of the listed software to Poste, nor did Autonomy ever consummate a sale of such software to Poste.  The government's investigation to date reveals that Autonomy appears to have been attempting to sell software directly to Poste prior to September 30, 2010, and after the purported sale to Red Ventures.   Documents produced in the investigation reflect that Red Ventures was located in Italy.

<u>The Official Requests</u>

25.     Attached to this declaration as Exhibit U is a true and correct copy of a Diplomatic Note, which was sent at my office's request on August 10, 2015, by the Embassy of the United States of America to the Holy See to the Secretariat of State for the Holy See and the Vatican City State.  The Diplomatic Note attached a list of questions and documents the USAO and FBI wished to discuss.

26.     Attached to this declaration as Exhibit V is a true and correct copy of a Note Verbale dated October 8 2015, which was received from the Secretariat of State for the Holy See and the Vatican City State.

27.     Attached to this declaration as Exhibit W is a true and correct copy of Diplomatic Note, No. 3-2016.  On January 14, 2016, at my office's request, the Embassy of the United States of America to the Holy See delivered the Diplomatic Note to the Secretariat of State, enclosing a Request for International Judicial Assistance from the Office of International Affairs of the Department of Justice ("OIA").  The Secretariat of State has requested a translated version of the request, which is being prepared, and has yet to provide a substantive response.

28.     On December 23, 2015, OIA made an official request to the Central Authority of Italy for legal assistance in obtaining evidence, pursuant to the 2006 U.S.-Italy Mutual Legal Assistance

USAO 00002299

Instrument.  A true and correct copy of the letter transmitting the request, which at the time had not been translated into Italian, is attached as Exhibit X.

29.    On January 4, 2016, OIA delivered a translated version of the request to the Central Authority of Italy.  A true and correct copy of the letter transmitting the translated version of the request is attached as Exhibit Y.  The request seeks business records, including agreements, correspondence, and e-mails, from Sales Consulting, Auxilium, Red Ventures, Postecom, and Poste, which will evidence whether Autonomy appropriately recorded revenue on the transactions.  Specifically, the request seeks:

- From Sales Consulting, for the period December 2009 to October 2011, all agreements with Poste and/or Autonomy; all communications with Autonomy relating to any sale to Sales Consulting and/or any resale of Autonomy software by Sales Consulting; all communications with Poste relating to any sale of Autonomy software; all documents reflecting efforts by Sales Consulting to resell Autonomy software; and financial statements for the periods ended December 31, 2009, 2010, and 2011.

- From Auxilium, for the period December 2009 to October 2011, all agreements with BAV (or any other unit/agency of the Vatican City State and/or Holy See) and/or Autonomy; all communications with Autonomy relating to any sale to Auxilium and/or any resale of Autonomy software by Auxilium; all communications with BAV or Postecom relating to any sale of Autonomy software; all documents reflecting efforts by Auxilium to resell Autonomy software; and financial statements for the periods ended December 31, 2009, 2010, and 2011.

- From Postecom, for the period December 2009 to October 2011,  all agreements with BAV relating to Autonomy; all agreements with Autonomy; all communications with Autonomy relating to any sale of software to BAV; all communications with BAV relating to any sale of Autonomy software; and all documents reflecting efforts by Auxilium and/or Postecom to resell Autonomy software.

- From Red Ventures, for the period December 2009 to October 2011, all agreements with Poste and/or Autonomy; all communications with Autonomy relating to any sale of software to Poste and/or any resale of Autonomy software by Red Ventures; all communications with Poste relating to any sale of Autonomy software; all documents reflecting efforts by Red Ventures to resell Autonomy software; and financial statements for the periods ended December 31, 2009, 2010, and 2011.

USAO 00002300

- From Poste, for the period December 2009 to October 2011, all agreements with Sales Consulting, Red Ventures, and/or Autonomy; all communications with Autonomy relating to any sale of certain software to Poste; and all communications with Sales Consulting and/or Red Ventures relating to any sale and/or resale of Autonomy software.

Italy has not yet responded to the MLAT.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  January 29, 2016

ROBERT S. LEACH
Assistant United States Attorney

LEACH DECL. RE EX PARTE APPLIC. RE STATUTE OF LIMITATIONS
CASE NO. CR-14-90491MISC EMC                    9

USAO 00002301

# EXHIBIT A

USAO 00002302

EC staff consolidated version as of 16 September 2009.
FOR INFORMATION PURPOSES ONLY

EN – EU IAS 18

# International Accounting Standard 18
## *Revenue*

## Objective

Income is defined in the *Framework for the Preparation and Presentation of Financial Statements* as increases in economic benefits during the accounting period in the form of inflows or enhancements of assets or decreases of liabilities that result in increases in equity, other than those relating to contributions from equity participants. Income encompasses both revenue and gains. Revenue is income that arises in the course of ordinary activities of an entity and is referred to by a variety of different names including sales, fees, interest, dividends and royalties. The objective of this Standard is to prescribe the accounting treatment of revenue arising from certain types of transactions and events.

The primary issue in accounting for revenue is determining when to recognise revenue. Revenue is recognised when it is probable that future economic benefits will flow to the entity and these benefits can be measured reliably. This Standard identifies the circumstances in which these criteria will be met and, therefore, revenue will be recognised. It also provides practical guidance on the application of these criteria.

## Scope

1   **This Standard shall be applied in accounting for revenue arising from the following transactions and events:**

    **(a)**    **the sale of goods;**

    **(b)**    **the rendering of services; and**

    **(c)**    **the use by others of entity assets yielding interest, royalties and dividends.**

2   This Standard supersedes IAS 18 *Revenue Recognition* approved in 1982.

3   Goods includes goods produced by the entity for the purpose of sale and goods purchased for resale, such as merchandise purchased by a retailer or land and other property held for resale.

4   The rendering of services typically involves the performance by the entity of a contractually agreed task over an agreed period of time. The services may be rendered within a single period or over more than one period. Some contracts for the rendering of services are directly related to construction contracts, for example, those for the services of project managers and architects. Revenue arising from these contracts is not dealt with in this Standard but is dealt with in accordance with the requirements for construction contracts as specified in IAS 11 *Construction Contracts*.

5   The use by others of entity assets gives rise to revenue in the form of:

    (a)    interest—charges for the use of cash or cash equivalents or amounts due to the entity;

    (b)    royalties—charges for the use of long-term assets of the entity, for example, patents, trademarks, copyrights and computer software; and

    (c)    dividends—distributions of profits to holders of equity investments in proportion to their holdings of a particular class of capital.

6   This Standard does not deal with revenue arising from:

    (a)    lease agreements (see IAS 17 *Leases*);

    (b)    dividends arising from investments which are accounted for under the equity method (see IAS 28 *Investments in Associates*);

1

USAO 00002303

(c)      insurance contracts within the scope of IFRS 4 *Insurance Contracts*;

(d)      changes in the fair value of financial assets and financial liabilities or their disposal (see IAS 39 *Financial Instruments: Recognition and Measurement*);

(e)      changes in the value of other current assets;

(f)      initial recognition and from changes in the fair value of biological assets related to agricultural activity (see IAS 41 *Agriculture*);

(g)      initial recognition of agricultural produce (see IAS 41); and

(h)      the extraction of mineral ores.

## Definitions

7      The following terms are used in this Standard with the meanings specified:

*Revenue* **is the gross inflow of economic benefits during the period arising in the course of the ordinary activities of an entity when those inflows result in increases in equity, other than increases relating to contributions from equity participants.**

*Fair value* **is the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction.**

8      Revenue includes only the gross inflows of economic benefits received and receivable by the entity on its own account. Amounts collected on behalf of third parties such as sales taxes, goods and services taxes and value added taxes are not economic benefits which flow to the entity and do not result in increases in equity. Therefore, they are excluded from revenue. Similarly, in an agency relationship, the gross inflows of economic benefits include amounts collected on behalf of the principal and which do not result in increases in equity for the entity. The amounts collected on behalf of the principal are not revenue. Instead, revenue is the amount of commission.

## Measurement of revenue

9      **Revenue shall be measured at the fair value of the consideration received or receivable.**\*

10     The amount of revenue arising on a transaction is usually determined by agreement between the entity and the buyer or user of the asset. It is measured at the fair value of the consideration received or receivable taking into account the amount of any trade discounts and volume rebates allowed by the entity.

11     In most cases, the consideration is in the form of cash or cash equivalents and the amount of revenue is the amount of cash or cash equivalents received or receivable. However, when the inflow of cash or cash equivalents is deferred, the fair value of the consideration may be less than the nominal amount of cash received or receivable. For example, an entity may provide interest free credit to the buyer or accept a note receivable bearing a below-market interest rate from the buyer as consideration for the sale of goods. When the arrangement effectively constitutes a financing transaction, the fair value of the consideration is determined by discounting all future receipts using an imputed rate of interest. The imputed rate of interest is the more clearly determinable of either:

(a)      the prevailing rate for a similar instrument of an issuer with a similar credit rating; or

(b)      a rate of interest that discounts the nominal amount of the instrument to the current cash sales price of the goods or services.

The difference between the fair value and the nominal amount of the consideration is recognised as interest revenue in accordance with paragraphs 29 and 30 and in accordance with IAS 39.

---

\*    See also SIC-31 *Revenue  Barter Transactions Involving Advertising Services*

2

USAO 00002304

EC staff consolidated version as of 16 September 2009.
FOR INFORMATION PURPOSES ONLY

12      When goods or services are exchanged or swapped for goods or services which are of a similar nature and value, the exchange is not regarded as a transaction which generates revenue. This is often the case with commodities like oil or milk where suppliers exchange or swap inventories in various locations to fulfil demand on a timely basis in a particular location. When goods are sold or services are rendered in exchange for dissimilar goods or services, the exchange is regarded as a transaction which generates revenue. The revenue is measured at the fair value of the goods or services received, adjusted by the amount of any cash or cash equivalents transferred. When the fair value of the goods or services received cannot be measured reliably, the revenue is measured at the fair value of the goods or services given up, adjusted by the amount of any cash or cash equivalents transferred.

## Identification of the transaction

13      The recognition criteria in this Standard are usually applied separately to each transaction. However, in certain circumstances, it is necessary to apply the recognition criteria to the separately identifiable components of a single transaction in order to reflect the substance of the transaction. For example, when the selling price of a product includes an identifiable amount for subsequent servicing, that amount is deferred and recognised as revenue over the period during which the service is performed. Conversely, the recognition criteria are applied to two or more transactions together when they are linked in such a way that the commercial effect cannot be understood without reference to the series of transactions as a whole. For example, an entity may sell goods and, at the same time, enter into a separate agreement to repurchase the goods at a later date, thus negating the substantive effect of the transaction; in such a case, the two transactions are dealt with together.

## Sale of goods

14      **Revenue from the sale of goods shall be recognised when all the following conditions have been satisfied:**

    (a)     **the entity has transferred to the buyer the significant risks and rewards of ownership of the goods;**

    (b)     **the entity retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold;**

    (c)     **the amount of revenue can be measured reliably;**

    (d)     **it is probable that the economic benefits associated with the transaction will flow to the entity; and**

    (e)     **the costs incurred or to be incurred in respect of the transaction can be measured reliably.**

15      The assessment of when an entity has transferred the significant risks and rewards of ownership to the buyer requires an examination of the circumstances of the transaction. In most cases, the transfer of the risks and rewards of ownership coincides with the transfer of the legal title or the passing of possession to the buyer. This is the case for most retail sales. In other cases, the transfer of risks and rewards of ownership occurs at a different time from the transfer of legal title or the passing of possession.

16      If the entity retains significant risks of ownership, the transaction is not a sale and revenue is not recognised. An entity may retain a significant risk of ownership in a number of ways. Examples of situations in which the entity may retain the significant risks and rewards of ownership are:

    (a)     when the entity retains an obligation for unsatisfactory performance not covered by normal warranty provisions;

    (b)     when the receipt of the revenue from a particular sale is contingent on the derivation of revenue by the buyer from its sale of the goods;

    (c)     when the goods are shipped subject to installation and the installation is a significant part of the contract which has not yet been completed by the entity; and

3

USAO 00002305

EC staff consolidated version as of 16 September 2009.                    EN – EU IAS 18
FOR INFORMATION PURPOSES ONLY

(d)     when the buyer has the right to rescind the purchase for a reason specified in the sales contract and the entity is uncertain about the probability of return.

17      If an entity retains only an insignificant risk of ownership, the transaction is a sale and revenue is recognised. For example, a seller may retain the legal title to the goods solely to protect the collectibility of the amount due. In such a case, if the entity has transferred the significant risks and rewards of ownership, the transaction is a sale and revenue is recognised. Another example of an entity retaining only an insignificant risk of ownership may be a retail sale when a refund is offered if the customer is not satisfied. Revenue in such cases is recognised at the time of sale provided the seller can reliably estimate future returns and recognises a liability for returns based on previous experience and other relevant factors.

18      Revenue is recognised only when it is probable that the economic benefits associated with the transaction will flow to the entity. In some cases, this may not be probable until the consideration is received or until an uncertainty is removed. For example, it may be uncertain that a foreign governmental authority will grant permission to remit the consideration from a sale in a foreign country. When the permission is granted, the uncertainty is removed and revenue is recognised. However, when an uncertainty arises about the collectibility of an amount already included in revenue, the uncollectible amount or the amount in respect of which recovery has ceased to be probable is recognised as an expense, rather than as an adjustment of the amount of revenue originally recognised.

19      Revenue and expenses that relate to the same transaction or other event are recognised simultaneously; this process is commonly referred to as the matching of revenues and expenses. Expenses, including warranties and other costs to be incurred after the shipment of the goods can normally be measured reliably when the other conditions for the recognition of revenue have been satisfied. However, revenue cannot be recognised when the expenses cannot be measured reliably; in such circumstances, any consideration already received for the sale of the goods is recognised as a liability.

## Rendering of services

20      When the outcome of a transaction involving the rendering of services can be estimated reliably, revenue associated with the transaction shall be recognised by reference to the stage of completion of the transaction at the end of the reporting period. The outcome of a transaction can be estimated reliably when all the following conditions are satisfied:

(a)     the amount of revenue can be measured reliably;

(b)     it is probable that the economic benefits associated with the transaction will flow to the entity;

(c)     the stage of completion of the transaction at the end of the reporting period can be measured reliably; and

(d)     the costs incurred for the transaction and the costs to complete the transaction can be measured reliably.

21      The recognition of revenue by reference to the stage of completion of a transaction is often referred to as the percentage of completion method. Under this method, revenue is recognised in the accounting periods in which the services are rendered. The recognition of revenue on this basis provides useful information on the extent of service activity and performance during a period. IAS 11 also requires the recognition of revenue on this basis. The requirements of that Standard are generally applicable to the recognition of revenue and the associated expenses for a transaction involving the rendering of services.

22      Revenue is recognised only when it is probable that the economic benefits associated with the transaction will flow to the entity. However, when an uncertainty arises about the collectibility of an amount already included in revenue, the uncollectible amount, or the amount in respect of which recovery has ceased to be probable, is recognised as an expense, rather than as an adjustment of the amount of revenue originally recognised.

---

See also SIC-27 *Evaluating the Substance of Transactions in the Legal Form of a Lease* and SIC-31 *Revenue Barter Transactions Involving Advertising Services*

4

23   An entity is generally able to make reliable estimates after it has agreed to the following with the other parties to the transaction:

(a)   each party's enforceable rights regarding the service to be provided and received by the parties;

(b)   the consideration to be exchanged; and

(c)   the manner and terms of settlement.

It is also usually necessary for the entity to have an effective internal financial budgeting and reporting system. The entity reviews and, when necessary, revises the estimates of revenue as the service is performed. The need for such revisions does not necessarily indicate that the outcome of the transaction cannot be estimated reliably.

24   The stage of completion of a transaction may be determined by a variety of methods. An entity uses the method that measures reliably the services performed. Depending on the nature of the transaction, the methods may include:

(a)   surveys of work performed;

(b)   services performed to date as a percentage of total services to be performed; or

(c)   the proportion that costs incurred to date bear to the estimated total costs of the transaction. Only costs that reflect services performed to date are included in costs incurred to date. Only costs that reflect services performed or to be performed are included in the estimated total costs of the transaction.

Progress payments and advances received from customers often do not reflect the services performed.

25   For practical purposes, when services are performed by an indeterminate number of acts over a specified period of time, revenue is recognised on a straight-line basis over the specified period unless there is evidence that some other method better represents the stage of completion. When a specific act is much more significant than any other acts, the recognition of revenue is postponed until the significant act is executed.

26   **When the outcome of the transaction involving the rendering of services cannot be estimated reliably, revenue shall be recognised only to the extent of the expenses recognised that are recoverable.**

27   During the early stages of a transaction, it is often the case that the outcome of the transaction cannot be estimated reliably. Nevertheless, it may be probable that the entity will recover the transaction costs incurred. Therefore, revenue is recognised only to the extent of costs incurred that are expected to be recoverable. As the outcome of the transaction cannot be estimated reliably, no profit is recognised.

28   When the outcome of a transaction cannot be estimated reliably and it is not probable that the costs incurred will be recovered, revenue is not recognised and the costs incurred are recognised as an expense. When the uncertainties that prevented the outcome of the contract being estimated reliably no longer exist, revenue is recognised in accordance with paragraph 20 rather than in accordance with paragraph 26.

## Interest, royalties and dividends

29   **Revenue arising from the use by others of entity assets yielding interest, royalties and dividends shall be recognised on the bases set out in paragraph 30 when:**

(a)   **it is probable that the economic benefits associated with the transaction will flow to the entity; and**

(b)   **the amount of the revenue can be measured reliably.**

30   **Revenue shall be recognised on the following bases:**

(a)   **interest shall be recognised using the effective interest method as set out in IAS 39, paragraphs 9 and AG5–AG8;**

5

USAO 00002307

EC staff consolidated version as of 16 September 2009.
FOR INFORMATION PURPOSES ONLY

(b)   royalties shall be recognised on an accrual basis in accordance with the substance of the relevant agreement; and

(c)   dividends shall be recognised when the shareholder's right to receive payment is established.

31   [Deleted]

32   When unpaid interest has accrued before the acquisition of an interest-bearing investment, the subsequent receipt of interest is allocated between pre-acquisition and post-acquisition periods; only the post-acquisition portion is recognised as revenue.

33   Royalties accrue in accordance with the terms of the relevant agreement and are usually recognised on that basis unless, having regard to the substance of the agreement, it is more appropriate to recognise revenue on some other systematic and rational basis.

34   Revenue is recognised only when it is probable that the economic benefits associated with the transaction will flow to the entity. However, when an uncertainty arises about the collectibility of an amount already included in revenue, the uncollectible amount, or the amount in respect of which recovery has ceased to be probable, is recognised as an expense, rather than as an adjustment of the amount of revenue originally recognised.

## Disclosure

35   An entity shall disclose:

(a)   the accounting policies adopted for the recognition of revenue, including the methods adopted to determine the stage of completion of transactions involving the rendering of services;

(b)   the amount of each significant category of revenue recognised during the period, including revenue arising from:

   (i)   the sale of goods;

   (ii)   the rendering of services;

   (iii)   interest;

   (iv)   royalties;

   (v)   dividends; and

(c)   the amount of revenue arising from exchanges of goods or services included in each significant category of revenue.

36   An entity discloses any contingent liabilities and contingent assets in accordance with IAS 37 *Provisions, Contingent Liabilities and Contingent Assets*. Contingent liabilities and contingent assets may arise from items such as warranty costs, claims, penalties or possible losses.

## Effective date

37   **This Standard becomes operative for financial statements covering periods beginning on or after 1 January 1995.**

38   Cost of an Investment in a Subsidiary, Jointly Controlled Entity or Associate (Amendments to IFRS 1 First-time Adoption of International Financial Reporting Standards and IAS 27 Consolidated and Separate Financial Statements), issued in May 2008, amended paragraph 32. An entity shall apply that amendment prospectively for annual periods beginning on or after 1 January 2009. Earlier application is permitted. If an entity applies the related amendments in paragraphs 4 and 38A of IAS 27 for an earlier period, it shall apply the amendment in paragraph 32 at the same time.

6

USAO 00002308

# EXHIBIT B

USAO 00002309

**To:**      Brent Hogenson[Brent.Hogenson@autonomy.com]; Percy
Tejeda[Percy.Tejeda@autonomy.com]; 'Aline Pels'[apels@autonomy.com]; 'Matt
Stephan'[matt.stephan@autonomy.com]
**Cc:**      Trish Williamson[Trish.Williamson@autonomy.com]
**From:**    Julie Dolan
**Sent:**    Tue 1/5/2010 6:26:47 AM
**Importance:**    **Normal**
**Subject:**  Poste One Off for Your records
2009-12-31-SC-Poste-OneOff-executed.pdf

I will provide the fully executed version this week.


Kind Regards


Julie Dolan

Autonomy Corporate Counsel

Direct    +44(0) 1223 488505

Mobile   +44(0) 7730 781360


The information contained in this message is for the intended addressee only and may
contain confidential and/or privileged information. If you are not the intended
addressee, please delete this message and notify the sender, and do not copy or
distribute this message or disclose its contents to anyone. Any views or opinions
expressed in this message are those of the author and do not necessarily represent
those of Autonomy Systems Limited or of any of its associated companies. No reliance
may be placed on this message without written confirmation from an authorised
representative of the company. Autonomy Systems Limited, Registered Office:
Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number
03063054.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01406405

USAO 00002310

Autonomy One Off Reseller Agreement

31 December 2009 ("Effective Date")

Sales Consulting S.r.l.
Via Nicolo' Tartaglia 11
00187 Roma
Italy

**Autonomy**

Understanding what matters

Dear Sirs:

This document sets forth the terms of the One Off Reseller Agreement ("Agreement") between Autonomy Systems Limited ("Autonomy") and Sales Consulting S.r.l. ("Reseller") under which Autonomy will supply the Autonomy products listed in Exhibit A ("Autonomy Software") to Reseller and grant Reseller the right to resell and provide first line support services for said Autonomy Software to the end user Poste Italiane ("End User"). Autonomy shall provide Reseller with second line support services in accordance with Autonomy's then current support terms ("Maintenance Services"). Autonomy's current the current Maintenance Services are set out in Exhibit B.

1.   Products Licensed and Services Provided.   Reseller should only place an order with Autonomy when Reseller has received an order from the End User. Upon Autonomy's receipt of a valid purchase order identifying the end user name, address, email address and the licence fees set forth in Section 2, Autonomy shall provide to Reseller, and Reseller will resell to End User, the Autonomy Software. For orders equal or greater than $100,000 USD, further evidence of sell through in the form of a purchase order or other form of order between Reseller and End User shall also be provided. Reseller shall resell the Autonomy Software to End User subject to the terms set forth in Autonomy's End User Agreement and Product Use Certificate, which will accompany the Autonomy Software Products. In addition, upon Autonomy's receipt of a valid purchase order and the support fees referred to in Section 2, Autonomy shall provide one year of second line Maintenance Services for the Autonomy Software Products. If End User wishes to renew another one year Maintenance Services, Autonomy shall provide them to Reseller in consideration for the price separately agreed by Autonomy and Reseller. To the extent that Reseller has subscribed to receive Maintenance Services and so long as Reseller has paid all fees associated with such Maintenance Services, Autonomy will provide Reseller with Maintenance Services. The term of Maintenance Services shall be for one year (1) term. Reseller may purchase additional consulting services from Autonomy on behalf of End User, if agreed to in writing by Autonomy.

2.   Fees and Payment Terms.   Reseller shall pay to Autonomy the license fees set forth in Exhibit A for the Autonomy Software licensed to End User. All such fees are exclusive of applicable taxes (including consumption tax), customs, and duties. In addition, Reseller shall pay to Autonomy the annual support fee set forth in Exhibit A, in consideration of Autonomy's provision of Maintenance Services to Reseller for the Autonomy Software. Any charges payable by Reseller under this Agreement shall be paid within thirty (30) days after receipt of Autonomy's invoices by Reseller unless otherwise agreed between the parties in Exhibit A. Reseller shall be responsible for all applicable national and local taxes applied to the transaction hereunder, however designated, arising from or based upon this Agreement, except for those taxes based on Autonomy's income. Reseller has no right to return any ordered Autonomy Software and/or have the fees refunded. Neither does Reseller have any right to return a Autonomy Software and have it exchanged against another Autonomy Software or against a credit for a future order of a Autonomy Software.

3.   Delivery.   Upon receipt of a valid purchase order and the licence fees set forth in the applicable Exhibit, Autonomy shall ship the Autonomy Software, F.O.B. Autonomy's facility, electronically, via FTP or, if requested, via overnight delivery to End User at the address set forth in the relevant Exhibit. Following execution of this Agreement Reseller may receive a temporary access code allowing temporary access to and temporary use of the Autonomy Software. Unless otherwise specified in Exhibit A such temporary access code may expire ninety (90) days from the date of delivery of the Autonomy Software. Upon receipt by Autonomy of all applicable fees in accordance with this Agreement and receipt of the applicable purchase order, Reseller will receive an access code that will allow for Reseller's and in turn End User's use of and access to the Autonomy Software (i) with respect to Autonomy Software licensed

OneOffReseller (ver.2008.3)
Autonomy Systems Limited Company Number 3063054

Autonomy Confidential

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-01406406

USAO 00002311

for a perpetual term (as set out in Exhibit A), on a permanent basis, subject to the terms of this Agreement, or (ii) with respect to Autonomy Software licensed for a fixed term (as set out in Exhibit A), until the Expiry Date (as set out in Exhibit A), subject to the terms of this Agreement.  In the event Reseller fails to timely pay applicable fees, Autonomy may withhold delivery of such further access code, which will result in Reseller's and in turn End User's inability to access and use the Autonomy Software after expiry of the temporary license key.

4.    No Representations/Ownership.   Reseller shall not make any representations or warranties about the Autonomy Software to End User, and represents and warrants it has not made any such representations or warranties.  No licence or other rights in or to the Autonomy Software, or the intellectual property rights therein, are granted to Reseller. All intellectual property rights in and to the Autonomy Software are and shall remain the exclusive property of Autonomy.

5.    DISCLAIMERS AND LIMITS ON LIABILITIES.  EITHER PARTY SHALL NOT BE LIABLE TO THE OTHER FOR ANY LOST REVENUE, LOST PROFITS OR OTHER CONSEQUENTIAL, INCIDENTAL, SPECIAL, OR PUNITIVE DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL EITHER PARTY'S AGGREGATE LIABILITY UNDER THIS AGREEMENT EXCEED THE AMOUNTS PAID BY RESELLER TO AUTONOMY HEREUNDER EXCLUDING DAMAGES ARISING OUT OF (1) PROPERTY DAMAGE DUE TO GROSS NEGLIGENCE OF EITHER PARTY, BUT NOT MORE THAN TWO TIMES THE FEES PAID BY RESELLER, (2) BREACH OF CONFIDENTIALITY OR (3) INFRINGEMENT ON THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS OF AUTONOMY SOFTWARE PRODUCTS.   EXCEPT AS PROVIDED HEREIN, AUTONOMY MAKES NO REPRESENTATIONS OR WARRANTIES TO RESELLER OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE AUTONOMY SOFTWARE PRODUCTS INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT.

6.    WARRANTY. Autonomy warrants each Autonomy Software only to End User pursuant to the terms of the applicable Autonomy Software Licence Agreement, and no warranty is extended to Reseller or any third parties, except to the Reseller as an end user for demonstration purposes.

7.    INDEMNITY. VAR shall indemnify Autonomy from, and defend Autonomy against, any damages, losses, liability (including settlements and judgments) or expenses (including attorneys' fees and expenses) arising out of or relating to any claim relating to any breach of (a) Autonomy's intellectual property and (b) Section 8 (Confidentiality).

8.    CONFIDENTIALITY.   Both parties acknowledge that the Autonomy product(s), documentation, terms of this Agreement, and all other information clearly marked as confidential ("Confidential Information") is confidential and proprietary to Autonomy. Both parties agrees to safeguard such Confidential Information with a degree of care commensurate with reasonable standards of industrial security for the protection of trade secrets and proprietary information so that no unauthorized use is made of such information and no disclosure of any part of their contents is made to anyone other than your employees, subsidiaries or parent company of both parties agents or consultants whose duties reasonably require such disclosure.

9.    Miscellaneous. Both parties shall not disclose the terms of this Agreement, including the applicable Exhibit, to any third party.  Failure by either party to enforce any provision of this Agreement shall not be deemed a waiver of future enforcement of that or any other provision.  Any waiver, amendment, supplementation or other modification or supplementation of any provision of this Agreement shall be effective only if in writing and signed by both parties.  If for any reason a court of competent jurisdiction finds any provision or portion of this Agreement to be unenforceable, that provision of this Agreement shall be enforced to the maximum extent permissible so as to affect the intent of the parties, and the remainder of this Agreement shall continue unmodified except as necessary to avoid unfairness. This Agreement, including the Exhibits, represent the entire Agreement between the parties hereto concerning the subject matter hereof and supersedes any and all prior correspondence, quotations and negotiations.  Reseller expressly agrees that this Agreement and the Exhibits hereto shall have priority over any contrary terms or conditions contained in any purchase order or other form hereafter delivered by Reseller to Autonomy.  This Agreement is valid for the specific transaction between Autonomy and

2

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01406407

USAO 00002312

Reseller pursuant to the purchase order to be placed by Reseller to Autonomy on or before 31 December 2009 only. Reseller expressly agrees that this Agreement and the Exhibits hereto shall have priority over any additional or inconsistent terms contained on such purchase orders or other forms hereafter delivered by Reseller to Autonomy.

**Autonomy Systems Limited**

By: _____

Name: _____

Title: _____

Date: _____

**Sales Consulting S.r.l.**

By: _____

Name: _LEONARDO SERGIO MARICA_

Title: _AMMoe DUc_

Date: _____

3

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-01406408

USAO 00002313

**Exhibit A**
**PURCHASE ORDER**

31 December 2009 ("Effective Date")

| To: | Autonomy Systems Limited<br>Cambridge Business Park<br>Cowley Road<br>Cambridge CB4 0WZ ("Autonomy") |
|---|---|

| From: | Sales Consulting S.r.l.<br>Via Nicolo' Tartaglia 11<br>00187 Roma<br>Italy ("VAR") |
|---|---|

This Purchase Order is issued under and pursuant to that certain One Off Reseller Agreement dated as of 31 December 2009 (the "Agreement"), between VAR and Autonomy.  This Purchase Order is for end user Poste Italiane ("End User")  The terms set forth below to the extent they contradict the Agreement shall supersede the Agreement.  All other terms and conditions contained in the Agreement shall remain in full force and effect.

1.  Software; Authorized Environment; Authorized Use/Users; Restrictions on Use

| Content Management Software |
|---|
| TeamSite User |
| TeamSite Additional CPU |
| TeamSite Additional 10-Branch Pack |
| TeamSite Additional Store |
| MediaBin Services for TeamSite (Windows Platform Only) |
| **Targeting & Engagement Software** |
| Interwoven LiveSite - quad core CPU |
| LiveSite Non-Production Server - quad core CPU |
| **Content Intelligence Software** |
| MetaTagger Server |
| MetaTagger Standby Server |
| MetaTagger Non-Production Server |
| **Content Provisioning Software** |
| OpenDeploy Reciever |

2.  Platform                          :   Windows

4

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01406409

USAO 00002314

**Exhibit A**
**PURCHASE ORDER**

31 December 2009 ("Effective Date")

| To: | Autonomy Systems Limited<br>Cambridge Business Park<br>Cowley Road<br>Cambridge CB4 0WZ ("Autonomy") |
|---|---|

| From: | Sales Consulting S.r.l.<br>Via Niccolo' Tartaglia 11<br>00187 Roma<br>Italy ("VAR") |
|---|---|

This Purchase Order is issued under and pursuant to that certain One Off Reseller Agreement dated as of 31 December 2009 (the "Agreement"), between VAR and Autonomy.  This Purchase Order is for end user Poste Italiane ("End User") The terms set forth below to the extent they contradict the Agreement shall supersede the Agreement.  All other terms and conditions contained in the Agreement shall remain in full force and effect.

1.  Software; Authorized Environment; Authorized Use/Users; Restrictions on Use

| Content Management Software |
|---|
| TeamSite User |
| TeamSite Additional CPU |
| TeamSite Additional 10-Branch Pack |
| TeamSite Additional Store |
| MediaBin Services for TeamSite (Windows Platform Only) |
| **Targeting & Engagement Software** |
| Interwoven LiveSite - quad core CPU |
| LiveSite Non-Production Server - quad core CPU |
| **Content Intelligence Software** |
| MetaTagger Server |
| MetaTagger Standby Server |
| MetaTagger Non-Production Server |
| **Content Provisioning Software** |
| OpenDeploy Reciever |

2.  Platform                          :   Windows

4

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01406410

USAO 00002315

3.  Number of Copies                        :   One each of (1) above

4.  Number of Instances                     :   One each of (1) above per Server above

5.  Territory of Software                    :   Italy
    installation

6.  Licensee Technical Support               :   Name:   _____
    Contacts                                     Phone:  _____
                                                 E-mail: _____

7.  License Fee                              :   €1,500,000, excluding VAT, invoiced immediately

8.  Support Fee (first year)                 :   15% of License Fee per annum (€225,000), excluding VAT, for Standard
                                                 Support Services, first year to be invoiced immediately and thereafter
                                                 invoiced annually in advance of each anniversary of the Commencement
                                                 Date.

9.  License and Support Fee                  :   50% (€862,500) 120 days from date of invoice
    Payment Terms                                50% (€862,500) 180 days from date of invoice

10. Delivery                                 :   Shipped EXW Point of Manufacture (per Incoterms 2000) via electronic
                                                 delivery to the contact in Section 6 above.

11. Commencement Date                        :   On the Effective Date.

12. Expiry Date                              :   None, subject to termination pursuant to Agreement

13. Additional Deployment Terms              :   1. For a period of three (3) years from the Effective Date ("Deployment
                                                 Period"), VAR may allow End User to deploy and put into production, on an
                                                 as needed basis, perpetual licenses of the Software products listed in above
                                                 table. The annual Support Services Fee, as described below, is not subject
                                                 to change by reason of Licensee's actual deployment of Software licenses.

                                                 2.  For clarity, "put into production" shall mean the Software is placed in
                                                 operational use by End User for its internal use only on End User's intranet
                                                 and internet environment. At the end of the Deployment Period, End User
                                                 shall not have the right to deploy any additional perpetual licenses to the
                                                 Software.

                                                 4.  At the end of the Deployment Period, VAR may not allow End User to
                                                 deploy any additional Software licenses, and VAR and Autonomy will agree
                                                 in writing on the final quantities of the Software that End User will be
                                                 thereafter authorized to use in production. Within thirty (30) days from the
                                                 expiration of the Deployment Period, Customer shall provide Interwoven
                                                 with a written document signed by an authorized officer of End User and
                                                 VAR which documents the final quantities of the Software licenses deployed
                                                 and put into production, including the number of Branches, Stores, Servers,
                                                 and the address of each such installation. Autonomy reserves the right to
                                                 audit VAR and End User to verify the total number of licenses deployed by
                                                 End User and to ensure End User's compliance with the terms and
                                                 conditions of provisions of this Purchase Order. VAR shall be liable for
                                                 ensuring End User's compliance.

                                                 5.  End User's right to deploy and put into production the Software licenses
                                                 during this Deployment Period shall be limited to the deployment for benefit
                                                 of or by the corporate structure of End User as of the Effective Date and
                                                 does not include the right to deploy and put into production the Software
                                                 licenses by any acquired or merged entities after the Effective Date.

5

NOTE:  Except to the extent otherwise specified in this Product Schedule, Licensee shall be entitled to install and use the Software on one (1) Server for Production Use with two (2) CPUs per Server.

Applicable Definitions:

**Branch:** means the project unit represented in certain Software to manage content for a certain group of Users.  A Branch contains the content for a website or a collection of related content (such as the program files for a software application or the image and text files for a book).

**CPU:** a single core central processing unit on a computer.

**Developer:** an individual employed and authorized by Licensee to Use and access the functionality of the Development Software for purposes of developing or administrating the Software, regardless of whether the individual is actually using or accessing the Software at any given time.

**Development Software:** the tool and other portions of the Software which are used to incorporate the Run-Time Software into other products or software and/or to and enable the Run-Time Software to provide the applicable functionality.

**Documents:** as a document section or page from a multi-paged or single paged document (e.g., a page in .pdf or .doc document) that is no more than 4096 characters in size.

**Non-Production Use:** development, quality assurance, testing, and disaster recovery usage.

**Production Use:** live or fail-over usage for commercial, business or production purposes.

**Run-Time Software:** the portion of the Software which executes the functionality of the Software.

**Servers:** computing devices acting as a server for a network of interconnected computing devices, whether within an enterprise or other Web, intranet or internet environment and including virtual machines or logical partitions, upon which the Software may be installed or accessed.  All Servers shall be owned and/or leased and controlled by Licensee.

**Store:** means as follows: (a) for licensees of MetaTagger, a single database, filesystem or similar information storage system used to store input files and/or generated metadata; or (b) for licensees of TeamSite, a file-based repository or database used to store and manage content assets.

**User:** an individual authorized by Licensee to use or access the functionality of the Software, regardless of whether the individual is actually using or accessing the applicable Product at any given time.

6

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01406412

USAO 00002317

Description:  Program errors that prevent some function or process from substantially meeting functional specification, but have a reasonable work-around.

Autonomy Response: Autonomy shall use commercially reasonable efforts to provide a work-around to Reseller and shall exercise commercially reasonable efforts to include the fix for the error in the next software maintenance release.

C) Priority III Errors.

Description:  Program errors that prevent some portion of a function from substantially meeting functional specification but do not seriously affect the overall performance of the function.

Autonomy Response: Autonomy may include the fix for the error in the next major release of the Product.

8

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01406413

USAO 00002318



December 31, 2009

Autonomy Systems Limited
Cambridge Business Park
Cowley Road,
Cambridge CB40WZ, UK
www.autonomy.com

Dear Mr. Zignani,

I am happy to confirm on behalf of Autonomy Systems Limited ("Autonomy") the following relating to Sales Consulting S.r.l. ("Sales Consulting") purchase of Autonomy technology for resale to Poste Italiane pursuant to a purchase order dated the date hereof. Sales Consulting will receive a discount of E300,000 for this transaction.

In the unlikely event that Poste Italiane decides not to pursue its current project, Autonomy will consent to a resale by Sales Consulting of the Poste Italiane licence (or similar Autonomy's products) to a number of different customers for similar purposes and for a combined similar value. Autonomy will not require an additional purchase order provided the total values reflect the same, but must be notified of the details relating to such purchases. All other terms and conditions of the purchase order remain unchanged. Specifically, the payment terms of the purchase order shall not change regardless of the consent to resale.

Autonomy will take every effort to support Sales Consulting with respect to this transaction, and are particularly please to be working with Sales Consulting given your expertise on Autonomy's technology and investment in the account.

Please do not hesitate to contact me with any questions or for any additional assistance.

Best regards,

Andrew Kanter
Company Secretary
Autonomy Systems Limited

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01406414

USAO 00002319



**Autonomy**

Autonomy Systems Limited
Cambridge Business Park, Cowley Road,
Cambridge, CB4 0WZ
Tel +44 (0) 1223 448 000
Fax +44 (0) 1223 421 040
www.autonomy.com

# Proof of Delivery

**Courier – must return POD to Autonomy to: JULIE DOLAN**

**Date Despatched:** 31 December 2009

**Contact Name:** Gianluca Zignani

**Company Name:** Sales Consulting S.r.l.

**Company Address:** Via Nicolo' Tartaglia 11 – 00187 Rome – Italy

| Qty | Item | Description |
|---|---|---|
| 1 | Software DVD | As set forth on the attached spreadsheet<br>Your Order n. _____ dated 31 December 2009 |

**Received by:**

**Signature:** _____

**Print Name:** LEONARDO SERGIO CARREGA

**Title:** AMM. DE. SUB

**Date Received:** 31st December 2009

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01406415

USAO 00002320

# EXHIBIT C

USAO 00002321



## AUTONOMY CORPORATION PLC ANNOUNCES RESULTS FOR
## THE TWELVE MONTHS AND FOURTH QUARTER ENDED DECEMBER 31, 2009

*Record Full Year and Q4 results with strong organic growth; Full Year EPS (adj.) up 42%;*
*Highest revenues and profits in Autonomy's history; Full Year revenues up 47%; Full Year*
*Profit from Operations (adj.) up 59%*

**Cambridge, England** – February 3, 2010 – Autonomy Corporation plc (LSE: AU. or AU.L), a global leader in infrastructure software, today reported financial results for the twelve months and fourth quarter ended December 31, 2009.

### Financial Highlights

- Record full year revenues of $740 million, up 47% from 2008 including strong organic growth of 16%[1], and the successful integration of Interwoven
- Gross profits (adj.) at $652 million for full year, up 42% from 2008; gross margins (adj.) at 88%
- Record full year operating margins (adj.) at 44%, compared to 41% in 2008
- Record full year profit before tax (adj.) at $323 million, up 55% from 2008
- Record full year fully diluted EPS (adj.) of $0.97 (versus consensus of $0.97), up 42% from 2008. Fully diluted EPS (IFRS) of $0.80 up 31% from 2008
- Full year and Q4 2009 revenue, profits and cash conversion in line with analyst consensus

[1] See supplemental metrics on page 5.

Commenting on the results, Dr. Mike Lynch, Group CEO of Autonomy said today: "We are pleased to announce another excellent set of results for Autonomy. Over the last five years, we have seen a five year adjusted EPS CAGR of 73% and Autonomy has grown to become one of Europe's largest software companies. Looking back on 2009, despite an economic environment that can be described at best as difficult, and an unhelpful FX headwind, Autonomy produced outstanding results with adjusted profit from operations growing by 59% at a time when most of our software peers have seen small or negative growth. We delivered this strong growth on top of an exceptionally strong performance in Q4 2008."

Dr. Lynch continued: "During 2009 Autonomy did a lot of work to prepare for a possible upturn in 2010, including significant new IDOL product developments, launches and expansion of our IDOL hosted capabilities. After this exceptional expenditure we are now seeing our cost base return to its traditional model with an operating margin of 50% in the fourth quarter. The driver for our business is the need for computers to understand and process human friendly information automatically. We believe this driver will continue to accelerate, and as customers find discretionary budgets again we expect to see good growth in the Meaning Based Marketing ('Promote') applications of our technology alongside our resilient information governance ('Protect') applications. On the larger theme of Meaning Based Computing, we have extended our technologies from the unstructured world to the structured, with validation of this endeavour with the first IDOL SPE customers signed and first showcase events."

"We continue to see our strongest growth in the new models of the software industry such as OEM and cloud computing. Whilst it may still take a little time for people to understand how these models differ from traditional software businesses, we believe the momentum in these areas is accelerating."

Dr. Lynch concluded: "We begin 2010 with the strongest Meaning Based Computing portfolio in the industry and an ever-expanding understanding in the market of the challenges associated with unstructured information. With our unmatched product portfolio, scale and vision, we look forward to the challenges to be presented in 2010 regardless of the environment. At the very end of Q4 2009 we began to see some indicators of an initial improvement in the macro environment, which gives us confidence in the outlook for 2010, and accordingly we are adjusting our business plan."

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429938

USAO 00002322

**Twelve Month 2009 highlights**

- Cemented Autonomy's position as the industry leader, dominating enterprise search with the largest market share and fastest growth, and achieving top marks from Gartner for eDiscovery technology
- Successful launch of IDOL SPE, Arcpliance, ICE, IDOL Social Media and Interwoven product range built on IDOL
- Winner of industry accolades, including: Her Majesty the Queen's Award for Enterprise 2009 and Britain's Most Admired Software Company Award 2009
- Acknowledged as the leader in cloud computing and the hottest enterprise software company
- 66 deals over $1 million and 47 new OEM agreements signed during 2009
- Record net profit (adj.) of $232.8 million, up 57% from 2008 (IFRS: $191.6 million, up 45%)
- R&D investment up 26% year-on-year
- Very strong cash collection from customers; cash collection at 102% of revenues $_{Q4123}$
- One of the highest revenue to cash conversion ratios in the industry
- Cash conversion for 2009 at 80%, 91% when lagged by to allow one quarter for the cash to be collected and 99% when adjusting for lagging by one quarter and paying down of the acquired Interwoven trade debt
- Positive cash flow generated by operations of $286.6 million (2008: $178.8 million), up 60%
- Gross cash of $242.8 million with debt of $197.5 million, giving net cash of $45.3 million.

**Fourth quarter 2009 Highlights**

- Blue chip fourth quarter wins include: American Airlines, Amgen, AT&T, BAE Systems, Boeing, Charles Schwab, Citi, Ericsson, KPMG, McAfee, Merck, Peugeot Citroen, Qatar Airways, Santander, Whirlpool and Wolters Kluwer, as well as new and repeat licenses with multiple government, defence and intelligence agencies around the globe including in the US, the UK, NATO, Australia, Brazil, the Netherlands, Romania and Sweden
- 12 OEM deals signed including new deals and extensions with McAfee, HP, Trend Micro and Sybase
- Strong organic growth of 18% from Q4 2008
- Record quarterly revenue of $223.1 million, up 53% from Q4 2008
- Gross margin (adj.) back in targeted range at 89%
- Record profit before tax (adj.) of $111.0 million, up 51% from Q4 2008 (IFRS: $96 million, up 36%)
- Operating margin (adj.) returns to record highs of 50% (Q4 2008: 50%), confirming one-time nature of IDOL SPE investment in Q3 2009
- Fully diluted EPS (adj.) of $0.33, up 35% from 2008 (IFRS: $0.29, up 21%)
- Record cash collection of $216.0 million generated from Q3 2009 revenues of $191.6 million; positive cash flow generated by operations of $72.2 million (Q4 2008: $58.0 million), up 25%
- Cash conversion at forecast levels of 58% ($_{Q4\ CFFO/Q4\ adj\ EBITDA}$), reflecting the fact that the Q4 2009 cash flow generated by seasonally weaker Q3 2009 business is divided by the seasonally stronger Q4 2009 EBITDA, and payment of Q3 2009 exceptional payables of $24 million relating to new product launch (adjusting for this: 78%). Cash conversion is 97% ($_{Q4\ CFFO/Q3\ adj\ EBITDA}$) when lagged by one quarter to reflect growth
- Average selling price for meaning-based technologies at $390,000 (Q4 2008: $400,000)
- Deferred revenue increased to $173.5 million (Q4 2008: $99.2 million)
- DSOs back in normal range at 88 days (Q4 2008: 84 days) due to strong cash collection during the quarter
- Cost base returned to traditional model after Q3 2009 product launch costs, with fixed cost base modulated by seasonal marketing spend and revenue-tracking sales commissions

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429939

USAO 00002323

## Twelve Month and Fourth Quarter Financial Highlights

### Revenues

Revenues for the twelve months ended December 31, 2009, totalled $739.7 million, up 47% from $503.2 million for the twelve months ended December 31, 2008. During 2009 there were 66 deals over $1.0 million. In 2009, Americas revenues of $517.2 million represented 70% of total revenues, and Rest of World revenues of $222.5 million represented 30% of total revenues.

Revenues for the fourth quarter of 2009 totalled $223.1 million, up 53% from $145.4 million for the fourth quarter of 2008. During the fourth quarter of 2009 there were 24 deals over $1.0 million. In the fourth quarter of 2009, Americas revenues of $162.3 million represented 73% of total revenues, and Rest of World revenues of $60.8 million represented 27% of total revenues.

The increase in revenues in the year and the fourth quarter is a combination of strong organic growth and the successful integration of Interwoven.

### Gross Profits and Gross Margins

Gross profits (adj.) for the twelve months ended December 31, 2009, were $651.9 million, up 42% from $458.2 million for the twelve months ended December 31, 2008. Gross margins (adj.) for the twelve months ended December 31, 2009, were 88%, compared to 91% for the twelve months ended December 31, 2008. Gross profits (IFRS) for the twelve months ended December 31, 2009 were $602.3 million, up 37% from $438.7 million for the twelve months ended December 31, 2008. Gross margins (IFRS) for the twelve months ended December 31, 2009 were 81%, compared to 87% for the twelve months ended December 31, 2008. Gross margins were impacted at the beginning of 2009 as a result of the Interwoven acquisition, and in Q3 2009 by the IDOL SPE Quick Start program, but have returned to historic levels in Q4 2009 as planned.

Gross profits (adj.) for the fourth quarter of 2009 were $199.4 million, up 50% from $133.1 million for the fourth quarter of 2008. Gross margins (adj.) for the fourth quarter of 2009 were 89%, compared to 92% for the fourth quarter of 2008. As previously announced, the one-time additional costs in Q3 2009 from the IDOL SPE Quick Start program were not repeated in Q4. Gross profits (IFRS) for the fourth quarter of 2009 were $184.8 million, up 44% from $128.7 million for the fourth quarter of 2008. Gross margins (IFRS) for the fourth quarter of 2009 were 83%, compared to 89% for the fourth quarter of 2008.

### Profit from Operations and Operating Margins

Profit from operations (adj.) for the twelve months ended December 31, 2009 was $328.9 million, up 59% from $207.5 million for the twelve months ended December 31, 2008. Operating margins (adj.) were 44% in 2009, up from 41% in 2008. Profit from operations (IFRS) for the twelve months ended December 31, 2009 was $272.2 million, up 46% from $186.5 million for the twelve months ended December 31, 2008. Operating margins (IFRS) were 37% in 2009 consistent with 37% in 2008. Operating margins (adj.) have increased year on year due to the increased revenues and the operating leverage within the Autonomy business model. Operating margins (IFRS) are static due to higher non-cash charges related to the purchased intangibles acquired with Interwoven.

Profit from operations (adj.) for the fourth quarter of 2009 was $112.6 million, up 55% from $72.8 million for the fourth quarter of 2008. Operating margins (adj.) were 50% in the fourth quarter of 2009, consistent with 50% in the fourth quarter of 2008. Profit from operations (IFRS) for the fourth quarter of 2009 was $96.9 million, up 37% from $70.9 million for the fourth quarter of 2008. Operating margins (IFRS) were 43% in the fourth quarter of 2009 compared to 49% in the fourth quarter of 2008. Operating margins (adj.) have returned to record highs of 50% following the completion of the IDOL SPE quick start spend in Q3 2009. Operating margins (IFRS) have decreased due to the higher non-cash amortization of purchased intangibles.

### Taxation

The effective tax rate for the twelve months ended December 31, 2009, was as forecast at 28.0%, down from 29.1% for the twelve months ended December 31, 2008. The decrease from 2008 is a combination of the full year impact of the change in the UK corporation tax rate from 30% to 28% combined with the standard utilisation of losses during 2009.

Page 3

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429940

USAO 00002324

The effective tax rate in the fourth quarter of 2009 was 27.5%, up from 27.1% in the fourth quarter of 2008.

**Foreign Exchange Impact**
The effect on revenue of movements in foreign exchange rates in the twelve months ended December 31, 2009, was a decrease of $7.9 million compared to 2008 (i.e. if revenues were reported for each quarter using the same exchange rates as those prevailing in the previous year, revenues in 2009 would have been $7.9 million higher, or $747.6 million). In 2009 the U.S. Dollar strengthened versus Sterling to an average of $1.57 versus $1.86 in 2008.

The effect on revenue in the fourth quarter of 2009 of movements in foreign exchange rates was an increase of $1.2 million compared to the fourth quarter of 2008. In the fourth quarter of 2009 the U.S. Dollar weakened slightly versus Sterling to an average of $1.63 versus $1.58 in the fourth quarter of 2008.

**Net Profits**
Net profit (adj.) for the twelve months ended December 31, 2009, was $232.8 million, or $0.97 per diluted share, compared to net profit (adj.) of $148.0 million, or $0.68 per diluted share, for the twelve months ended December 31, 2008. Net profit (IFRS) for the twelve months ended December 31, 2009, was $191.6 million, or $0.80 per diluted share, compared to net profit (IFRS) of $131.7 million, or $0.61 per diluted share, for the twelve months ended December 31, 2008.

Net profit (adj.) for the fourth quarter of 2009 was $80.5 million, or $0.33 per diluted share, compared to net profit (adj.) of $53.5 million, or $0.25 per diluted share, for the fourth quarter of 2008. Net profit (IFRS) for the fourth quarter of 2009 was $69.4 million, or $0.29 per diluted share, compared to net profit (IFRS) of $51.4 million, or $0.24 per diluted share, for the fourth quarter of 2008.

**IAS 38 Charges and Capitalization**
Under IAS 38 the company is required to capitalize certain aspects of its research and development activities. R&D capitalization for the twelve months ended December 31, 2009, was $24.7 million (2008: $11.2 million), offset by amortization charges of $8.9 million (2008: $4.8 million) during the year arising from historical R&D capitalization. The capitalization and offsetting charges resulted in a net credit (before tax) in the year of $15.8 million (2008: $6.4 million). R&D capitalization increased in the year primarily due to the new IDOL SPE product reaching commercial exploitation phase in Q3 2009, but returned to historical levels in Q4 2009. The net margin impact for the full year is 2% (2008: 1%).

R&D capitalization in the fourth quarter of 2009 was $5.6 million (Q4 2008: $2.4 million). Capitalization has returned to traditional levels of approximately 2.5% of revenues after completion of IDOL SPE in Q3 2009. Q4 2009 R&D capitalization is offset by amortization charges of $3.2 million (Q4 2008: $1.5 million) arising from historical R&D capitalization. The capitalization and offsetting charges resulted in a net credit (before tax) in the quarter of $2.4 million (Q4 2008: $0.9 million), and a net margin impact of 1% (Q4 2008: 1%).

**Balance Sheet and Cash Flow**
Cash balances were $242.8 million at December 31, 2009, an increase of $43.6 million from $199.2 million at December 31, 2008 (prior to the Interwoven acquisition). Movements in cash flow during 2009 of note (other than those discussed above) included:

- Acquisition of Interwoven Inc for an aggregate consideration of approximately $800 million funded by an underwritten placing of ordinary shares, a new revolving credit facility from Barclays and a portion of Interwoven and Autonomy's cash reserves;
- Early repayment of the Interwoven credit facility of $37.5 million;
- Expenditure on product development, resulting in a cash outflow of $24.7 million (2008: $11.2 million). The increase in R&D spend in 2009 is attributed to new R&D efforts associated with the acquisition of Interwoven and the one-off spend in relation to the development of new products;
- One-off costs incurred at the end of Q3 2009 relating to the new IDOL SPE product, which were paid in full in Q4 2009; and

Page 4

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429941

USAO 00002325

- Whilst there were no acquisitions in the quarter, Autonomy invested $4.3 million in a public offering of shares by blinkx plc.

Trade receivables at December 31, 2009, were $230.2 million, compared to $141.3 million at December 31, 2008. Accounts receivable days sales outstanding were 88 days at December 31, 2009, compared to 84 days at December 31, 2008 and 97 days at September 30, 2009. As forecast, DSOs returned to the company's normal range of 85-90 days after one-off factors that impacted Q3 2009. Deferred revenues were $173.5 million at December 31, 2009, compared with $99.2 million at December 31, 2008. Despite the difficult economic climate, bad debt write off in the year was less than 1% of revenues.

Accrued income at December 31, 2009 was not material, at under 5% of revenues.

### Supplemental Metrics

Autonomy is supplying supplemental metrics to assist in the understanding and analysis of Autonomy's business.

#### Twelve Months Ended Dec. 31, 2009

| | |
|---|---|
| Organic Growth* ....................................................................... | 16%[1] |
| Cash conversion (LTM CFFO/LTM adj EBITDA**) ........................................ | 80% |
| Cash conversion (lagged to account for growth and seasonality of the business) ......... | 91% |
| Cash conversion (lagged to account for growth and seasonality of the business and acquired Interwoven trade debt) .......... | 99% |
| Cash conversion as a percentage of the theoretical maximum (87%) ................... | 91% |

#### Three Months Ended Dec. 31, 2009

| | |
|---|---|
| Product including hosted and OEM* ...................................................... | $153m |
| Service revenues* ...................................................................... | $9m |
| Deferred revenue release (primarily maintenance)* ..................................... | $61m |
| OEM derived revenues* ................................................................. | $27m |
| Organic Growth* ....................................................................... | 18%[1] |
| Deals over $1 million ................................................................. | 24 |
| Tax rate .............................................................................. | 28% |
| Available tax losses* ................................................................. | $218m |
| Cash conversion (Q4 CFFO/Q4 adj EBITDA**) ............................................. | 58% |
| Cash conversion (lagged to account for growth and seasonality of the business) ......... | 97% |

- LTM revenue with terms >365 days in normal range (<2% of revenues)
- Accrued income in normal range (<5% of revenues)

\* The above items are provided for background information and may include qualitative estimates.
\*\* Adj EBITDA is defined as operating cash flow before movements in working capital.

[1] The company integrates acquired businesses immediately upon acquisition such that it is not possible to identify results from acquired businesses separately from the results of the group. In order to estimate organic growth the company has combined the reported results for Autonomy and Interwoven for 2008, adjusted for $66m in FY2008 and $19m in Q4 2008 of discontinued operations, and then compared this to the reported results for the enlarged group in 2009.

### Q4 Product Sales

During the fourth quarter of 2009, major customer wins included: American Airlines, Amgen, AT&T, BAE Systems, Boeing, Charles Schwab, Citi, Ericsson, KPMG, McAfee, Merck, Peugeot Citroen, Qatar Airways, Santander, Whirlpool and Wolters Kluwer, as well as new and repeat licenses with multiple government, defence and intelligence agencies around the globe including in the US, the UK, NATO, Australia, Brazil, the Netherlands, Romania and Sweden. Repeat business from existing customers accounted for approximately 45% of revenue for the quarter.

### Strategic Partnerships and OEMs

Autonomy's OEM Program continued to grow strongly during Q4 2009. Agreements were signed with 12 customers during the quarter, including new and extended agreements with McAfee, HP, Trend Micro and Sybase.

Page 5

HP-SEC-01429942

USAO 00002326

**Q4 Corporate Developments**

During the fourth quarter of 2009 Autonomy continued to extend its market leadership with the introduction of key new and upgraded IDOL technologies, including the launches of:

- Industry's first Collection to the Cloud service for eDiscovery and compliance;
- New archiving appliance for organizations seeking a simplified yet scalable solution to regulatory challenges;
- New capabilities in Autonomy iManage to cater for updated Federal Data Privacy requirements under the HIPAA; and
- Autonomy Records Management solutions achieved renewed US DoD 5015.2 certification.

During the fourth quarter Autonomy was recognised in multiple ways for its market leadership and unmatched technology, including being:

- Awarded the highest possible rating in the December 2009 Gartner MarketScope for eDiscovery;
- Named "Technology Provider of the Year" at the British Legal Awards 2009;
- Lauded as the "Biggest Contribution to Business Technology" at the UK IT Industry Awards 2009; and
- Voted Britain's most admired Software Company, BMAC 2009.

**Scheduling of Conference Call and Further Information**

Autonomy's results conference call will be available live at www.autonomy.com on February 3, 2010, at 9:00 a.m. GMT/4:00 a.m. EST/1:00 a.m. PST.

From time to time the company answers investors' questions on its website which may include information supplemental to that set forth above.   Questions and answers can be found at: www.autonomy.com/investors/questions.

**About Autonomy Corporation plc**

Autonomy Corporation plc (LSE: AU. or AU.L), a global leader in infrastructure software for the enterprise, spearheads the Meaning Based Computing movement.   IDC recently recognized Autonomy as having the largest market share and fastest growth in the worldwide search and discovery market.  Autonomy's technology allows computers to harness the full richness of human information, forming a conceptual and contextual understanding of any piece of electronic data, including unstructured information, such as text, email, web pages, voice, or video. Autonomy's software powers the full spectrum of mission-critical enterprise applications including pan-enterprise search, customer interaction solutions, information governance, end-to-end eDiscovery, records management, archiving, business process management, web content management, web optimization, rich media management and video and audio analysis.

Autonomy's customer base is comprised of more than 20,000 global companies, law firms and federal agencies including: AOL, BAE Systems, BBC, Bloomberg, Boeing, Citigroup, Coca Cola, Daimler AG, Deutsche Bank, DLA Piper, Ericsson, FedEx, Ford, GlaxoSmithKline, Lloyds Banking Group, NASA, Nestlé, the New York Stock Exchange, Reuters, Shell, Tesco, T-Mobile, the U.S. Department of Energy, the U.S. Department of Homeland Security and the U.S. Securities and Exchange Commission. More than 400 companies OEM Autonomy technology, including Symantec, Citrix, HP, Novell, Oracle, Sybase and TIBCO.   The company has offices worldwide.   Please visit www.autonomy.com to find out more.

Autonomy and the Autonomy logo are registered trademarks or trademarks of Autonomy Corporation plc. All other trademarks are the property of their respective owners.

**Financial Media Contacts:**
Edward Bridges / Haya Chelhot
Financial Dynamics
+44 (0)20 7831 3113

**Analyst and Investor Contacts:**
Marc Geall, Head of IR and Corporate Strategy
Autonomy Corporation plc
+44 (0)1223 448 000

Page 6

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-01429943

USAO 00002327

**AUTONOMY CORPORATION plc**
**CONDENSED CONSOLIDATED INCOME STATEMENT**
(in thousands, except per share amounts)

| | Twelve Months Ended (unaudited) | | Three Months Ended (unaudited) | |
|---|---|---|---|---|
| | Dec 31, 2009 | Dec 31, 2008 | Dec 31, 2009 | Dec 31, 2008 |
| Continuing operations | $'000 | $'000 | $'000 | $'000 |
| Revenues (see note 3) | 739,688 | 503,229 | 223,111 | 145,387 |
| Cost of revenues (excl. amortization) | (87,747) | (45,038) | (23,686) | (12,257) |
| Amortization of purchased intangibles | (49,650) | (19,489) | (14,601) | (4,424) |
| Total cost of revenues | (137,397) | (64,527) | (38,287) | (16,681) |
| Gross profit | 602,291 | 438,702 | 184,824 | 128,706 |
| Operating expenses: | | | | |
| Research and development | (98,785) | (78,410) | (26,141) | (18,859) |
| Sales and marketing | (170,797) | (135,159) | (45,621) | (32,219) |
| General and administrative | (60,627) | (42,624) | (17,046) | (10,395) |
| Other costs | | | | |
| Post-acquisition restructuring costs | (846) | (1,157) | — | — |
| Gain on foreign exchange | 942 | 5,141 | 852 | 3,699 |
| Total operating expenses | (330,113) | (252,209) | (87,956) | (57,775) |
| Profit from operations | 272,178 | 186,493 | 96,868 | 70,931 |
| Share of (loss) profit of associate | (273) | (2,196) | 457 | (962) |
| Interest receivable | 1,205 | 3,353 | 230 | 1,064 |
| Interest payable | (7,044) | (1,943) | (1,798) | (541) |
| Profit before income taxes | 266,066 | 185,707 | 95,757 | 70,492 |
| Income taxes (see note 4) | (74,515) | (53,958) | (26,363) | (19,097) |
| Net profit | 191,551 | 131,749 | 69,394 | 51,395 |
| Basic earnings per share (see note 6) | 0.81 | 0.61 | 0.29 | 0.24 |
| Diluted earnings per share (see note 6) | 0.80 | 0.61 | 0.29 | 0.24 |
| | | | | |
| Weighted average number of ordinary shares outstanding. | 237,531 | 214,523 | 240,017 | 215,628 |
| Weighted average number of ordinary shares outstanding, assuming dilution | 240,555 | 217,158 | 243,418 | 218,048 |

**Reconciliation of Adjusted Financial Measures**

| | Twelve Months Ended (unaudited) | | Three Months Ended (unaudited) | |
|---|---|---|---|---|
| | Dec 31, 2009 | Dec 31, 2008 | Dec 31, 2009 | Dec 31, 2008 |
| | $'000 | $'000 | $'000 | $'000 |
| Gross profit | 602,291 | 438,702 | 184,824 | 128,706 |
| Amortization of purchased intangibles | 49,650 | 19,489 | 14,601 | 4,424 |
| Gross profit (adj.) | 651,941 | 458,191 | 199,425 | 133,130 |
| | | | | |
| Profit before income taxes | 266,066 | 185,707 | 95,757 | 70,492 |
| Amortization of purchased intangibles | 49,650 | 19,489 | 14,601 | 4,424 |
| Share-based compensation (see note 5) | 7,173 | 5,484 | 1,994 | 1,132 |
| Post-acquisition restructuring costs | 846 | 1,157 | — | — |
| Gain on foreign exchange | (942) | (5,141) | (852) | (3,699) |
| Share of loss (profit) of associate | 273 | 2,196 | (457) | 962 |
| Profit before tax (adj.) | 323,066 | 208,892 | 111,043 | 73,311 |
| Provision for income taxes | (90,268) | (60,891) | (30,571) | (19,861) |
| Net profit (adj.) | 232,798 | 148,001 | 80,472 | 53,450 |
| | | | | |
| Profit from operations | 272,178 | 186,493 | 96,868 | 70,931 |
| Amortization of purchased intangibles | 49,650 | 19,489 | 14,601 | 4,424 |
| Share-based compensation (see note 5) | 7,173 | 5,484 | 1,994 | 1,132 |
| Post-acquisition restructuring costs | 846 | 1,157 | — | — |
| Gain on foreign exchange | (942) | (5,141) | (852) | (3,699) |
| Profit from operations (adj.) | 328,905 | 207,482 | 112,611 | 72,788 |

The accompanying notes are an integral part of these consolidated financial statements

Page 7

FOIA CONFIDENTIAL TREATMENT REQUESTED

# AUTONOMY CORPORATION plc
## CONDENSED CONSOLIDATED BALANCE SHEET

| | As at (unaudited) | |
|---|---|---|
| | Dec 31, 2009 $'000 | Dec 31, 2008 $'000 |
| **ASSETS** | | |
| **Non-current assets:** | | |
| Goodwill | 1,287,042 | 796,632 |
| Other intangible assets | 399,277 | 98,894 |
| Property and equipment, net | 33,886 | 27,350 |
| Equity and other investments | 16,608 | 7,441 |
| Deferred tax asset | 24,015 | 13,467 |
| Total non-current assets | 1,760,828 | 943,584 |
| **Current assets:** | | |
| Trade receivables, net | 230,219 | 141,252 |
| Other receivables | 45,231 | 35,554 |
| Total trade and other receivables | 275,450 | 176,806 |
| Inventory | 486 | 715 |
| Cash and cash equivalents | 242,791 | 199,218 |
| Total current assets | 518,727 | 376,739 |
| TOTAL ASSETS | 2,279,555 | 1,320,323 |
| **CURRENT LIABILITIES** | | |
| Trade payable | (14,926) | (12,434) |
| Other payables | (54,517) | (19,511) |
| Total trade and other payables | (69,443) | (31,945) |
| Bank loan | (52,375) | (10,637) |
| Tax liabilities | (43,338) | (27,905) |
| Deferred revenue | (164,931) | (89,794) |
| Provisions | (2,731) | (426) |
| Total current liabilities | (332,818) | (160,707) |
| Net current assets | 185,909 | 216,032 |
| **NON-CURRENT LIABILITIES** | | |
| Bank loan | (145,152) | (26,594) |
| Deferred tax liabilities | (85,087) | (2,537) |
| Deferred revenue | (8,576) | (9,414) |
| Other payables | (1,020) | (1,171) |
| Provisions | (5,123) | — |
| Total non-current liabilities | (244,958) | (39,716) |
| Total liabilities | (577,776) | (200,423) |
| NET ASSETS | 1,701,779 | 1,119,900 |
| **Shareholders' equity:** | | |
| Ordinary shares (1) | 1,333 | 1,214 |
| Share premium account | 1,130,767 | 798,279 |
| Capital redemption reserve | 135 | 135 |
| Own shares | (845) | (905) |
| Merger reserve | 27,589 | 27,589 |
| Stock compensation reserve | 21,959 | 14,846 |
| Revaluation reserve | 4,499 | 2,987 |
| Translation reserve | (12,032) | (18,261) |
| Retained earnings | 528,374 | 294,016 |
| TOTAL EQUITY | 1,701,779 | 1,119,900 |

(1) At December 31, 2009, 600,000,000 ordinary shares of nominal value 1/3 pence each authorized, 240,574,304 issued and outstanding; as of December 31, 2008, 600,000,000 ordinary shares of nominal value 1/3 pence each authorized, 215,817,197 issued and outstanding.

The accompanying notes are an integral part of these consolidated financial statements

Page 8

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429945

USAO 00002329

## AUTONOMY CORPORATION plc
### CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Twelve Months Ended (unaudited) | | Three Months Ended (unaudited) | |
|---|---|---|---|---|
| | Dec 31, 2009 | Dec 31, 2008 | Dec 31, 2009 | Dec 31, 2008 |
| | $'000 | $'000 | $'000 | $'000 |
| **Cash flows from operating activities:** | | | | |
| Profit from operations | 272,178 | 166,493 | 96,868 | 70,931 |
| Adjustments for: | | | | |
| Depreciation and amortization | 81,083 | 38,408 | 25,490 | 9,576 |
| Share based compensation | 7,173 | 5,484 | 1,994 | 1,132 |
| Foreign currency movements | (942) | (5,141) | (852) | (3,699) |
| Post-acquisition restructuring costs | 846 | — | 250 | — |
| Other non-cash items | 128 | 353 | 1 | 353 |
| Operating cash flows before movements in working capital | 360,466 | 225,597 | 123,751 | 78,293 |
| Changes in operating assets and liabilities (net of impact of acquisitions): | | | | |
| Receivables | (78,396) | (54,870) | (13,021) | (25,978) |
| Inventories | 235 | (154) | (33) | 51 |
| Payables | 4,267 | 8,210 | (38,503) | 5,591 |
| Cash generated by operations | 286,572 | 178,783 | 72,194 | 57,957 |
| Income taxes paid | (36,551) | (32,447) | (10,368) | (8,519) |
| Net cash provided by operating activities | 250,021 | 146,336 | 61,826 | 49,438 |
| **Cash flows from investment activities:** | | | | |
| Interest received | 1,127 | 3,321 | 152 | 1,064 |
| Purchase of property, plant and equipment and intangibles | (34,429) | (14,285) | (11,031) | (3,480) |
| Purchase of investments | (6,449) | (2,327) | (4,297) | — |
| Expenditure on product development | (24,722) | (11,159) | (5,574) | (2,415) |
| Acquisition of subsidiaries, net of cash acquired | (630,052) | (6,226) | (1,522) | (167) |
| Net cash used in investing activities | (694,525) | (30,676) | (22,272) | (4,998) |
| **Cash flows from financing activities:** | | | | |
| Proceeds from issuance of shares, net of issuance costs | 24,668 | 17,409 | 7,472 | 1,918 |
| Proceeds from share placing, net of issuance costs | 308,512 | — | — | — |
| Interest on bank loan | (5,340) | (1,943) | (1,380) | (541) |
| Repayment of bank loan | (37,450) | (10,700) | — | — |
| Drawdown of bank loan | 200,000 | — | — | — |
| Payment of arrangement fee | (3,846) | — | — | (2,675) |
| Net cash provided by (used in) financing activities | 486,544 | 4,766 | 6,092 | (1,298) |
| Net increase in cash and cash equivalents | 42,040 | 120,426 | 45,646 | 43,142 |
| Beginning cash and cash equivalents | 199,218 | 92,571 | 200,732 | 165,695 |
| Effect of foreign exchange on cash and cash equivalents | 1,533 | (13,779) | (3,587) | (9,619) |
| Ending cash and cash equivalents | 242,791 | 199,218 | 242,791 | 199,218 |

## AUTONOMY CORPORATION plc
### CONDENSED CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME

| | Twelve Months Ended (unaudited) | | Three Months Ended (unaudited) | |
|---|---|---|---|---|
| | Dec 31, 2009 | Dec 31, 2008 | Dec 31, 2009 | Dec 31, 2008 |
| | $'000 | $'000 | $'000 | $'000 |
| Net profit | 191,551 | 131,749 | 69,394 | 51,395 |
| Revaluation of equity investment | 1,512 | (7,176) | (967) | (4,156) |
| Translation of overseas operations | 6,229 | (42,062) | (3,995) | (29,206) |
| Other comprehensive income | 7,741 | (49,238) | (4,962) | (33,362) |
| Total comprehensive income | 199,292 | 82,511 | 64,432 | 18,033 |

The accompanying notes are an integral part of these consolidated financial statements

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429946

USAO 00002330

## AUTONOMY CORPORATION plc
### CONDENSED CONSOLIDATED STATEMENT OF CHANGES IN EQUITY

| | Ordinary shares $'000 | Share premium $'000 | Capital redemption reserve $'000 | Own shares $'000 | Merger reserve $'000 | Sub-total $'000 |
|---|---|---|---|---|---|---|
| At January 1, 2008 | 1,196 | 780,888 | 135 | (981) | 27,589 | 808,827 |
| Retained profit | — | — | — | — | — | — |
| Other comprehensive income | — | — | — | — | — | — |
| Stock compensation | — | — | — | — | — | — |
| Share options exercised | 18 | 17,391 | — | — | — | 17,409 |
| EBT options exercised | — | — | — | 76 | — | 76 |
| Deferred tax on stock options | — | — | — | — | — | — |
| At Dec 31, 2008 | 1,214 | 798,279 | 135 | (905) | 27,589 | 826,312 |

| | Sub-total Forwarded $'000 | Stock comp'n reserve $'000 | Revaluation reserve $'000 | Translation reserve $'000 | Retained earnings $'000 | Total $'000 |
|---|---|---|---|---|---|---|
| At January 1, 2008 | 808,827 | 9,438 | 10,163 | 23,801 | 146,084 | 998,313 |
| Retained profit | — | — | — | — | 131,749 | 131,749 |
| Other comprehensive income | — | — | (7,176) | (42,062) | — | (49,238) |
| Stock compensation | — | 5,484 | — | — | — | 5,484 |
| Share options exercised | 17,409 | — | — | — | — | 17,409 |
| EBT options exercised | 76 | (76) | — | — | — | — |
| Deferred tax on stock options | — | — | — | — | 16,183 | 16,183 |
| At Dec 31, 2008 | 826,312 | 14,846 | 2,987 | (18,261) | 294,016 | 1,119,900 |

| | Ordinary shares $'000 | Share premium $'000 | Capital redemption reserve $'000 | Own shares $'000 | Merger reserve $'000 | Sub-total $'000 |
|---|---|---|---|---|---|---|
| At January 1, 2009 | 1,214 | 798,279 | 135 | (905) | 27,589 | 826,312 |
| Retained profit | — | — | — | — | — | — |
| Other comprehensive income | — | — | — | — | — | — |
| Stock compensation | — | — | — | — | — | — |
| Share placing | 103 | 308,409 | — | — | — | 308,512 |
| Share options exercised | 16 | 24,079 | — | — | — | 24,095 |
| EBT options exercised | — | — | — | 60 | — | 60 |
| Deferred tax on stock options | — | — | — | — | — | — |
| At Dec 31, 2009 | 1,333 | 1,130,767 | 135 | (845) | 27,589 | 1,158,979 |

| | Sub-total Forwarded $'000 | Stock comp'n reserve $'000 | Revaluation reserve $'000 | Translation reserve $'000 | Retained earnings $'000 | Total $'000 |
|---|---|---|---|---|---|---|
| At January 1, 2009 | 826,312 | 14,846 | 2,987 | (18,261) | 294,016 | 1,119,900 |
| Retained profit | — | — | — | — | 191,551 | 191,551 |
| Other comprehensive income | — | — | 1,512 | 6,229 | — | 7,741 |
| Stock compensation | — | 7,173 | — | — | — | 7,173 |
| Share placing | 308,512 | — | — | — | — | 308,512 |
| Share options exercised | 24,095 | — | — | — | — | 24,095 |
| EBT options exercised | 60 | (60) | — | — | — | — |
| Deferred tax on stock options | — | — | — | — | 42,807 | 42,807 |
| At Dec 31, 2009 | 1,158,979 | 21,959 | 4,499 | (12,032) | 528,374 | 1,701,779 |

The accompanying notes are an integral part of these consolidated financial statements

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429947

USAO 00002331

AUTONOMY CORPORATION plc

NOTES TO THE CONDENSED SET OF CONSOLIDATED FINANCIAL STATEMENTS FOR THE
THREE AND TWELVE MONTHS ENDED DECEMBER 31, 2009 - UNAUDITED

1.   General information

The accompanying quarterly and twelve month consolidated financial statements of Autonomy Corporation plc
are based on the company's financial statements which are prepared in accordance with International Financial
Reporting Standards as adopted for use in the EU ("IFRS").   The quarterly and twelve month consolidated
financial statements have been prepared using accounting policies consistent in all material respects with those
to be applied in the Company's Annual Report for the year ended December 31, 2009 and those applied in the
Company's Annual Report for the year ended December 31, 2008.

Quarterly and twelve month information is unaudited, but reflects all normal adjustments which are, in the opinion
of management, necessary to provide a fair statement of results and the company's financial position for and as
at the periods presented.   The results of operations for the three months and twelve months ended December 31,
2009, are not necessarily indicative of the operating results for future operating periods.   The financial information
set out in the announcement does not constitute the company's statutory accounts for the years ended
December 31, 2009 or 2008.   The financial information for the year ended December 31, 2008, is derived from
the statutory accounts for that year which have been delivered to the Registrar of Companies.   The auditors
reported on those accounts; their report was unqualified, did not draw attention to any matters by way of
emphasis without qualifying their report and did not contain a statement under s498(2) or (3) Companies Act
2006 or equivalent preceding legislation.   The quarterly and twelve month information should be read in
connection with the company's audited Consolidated Financial Statements and the notes thereto for the year
ended December 31, 2008.   The audit of the statutory accounts for the year ended December 31, 2009, is not yet
complete.   These accounts will be finalised on the basis of the financial information presented by the directors in
this preliminary announcement and will be delivered to the Registrar of Companies following the company's
annual general meeting.   This announcement was approved by the Board of Directors on February 2, 2010.

2.   Accounting policies

Whilst the financial information included in this quarterly and twelve month announcement has been computed in
accordance with International Financial Reporting Standards (IFRSs), this announcement does not itself contain
all of the disclosures required by IFRSs.

Basis of preparation
The same accounting policies, presentation and methods of computation are followed in the condensed set of
financial statements as applied in the group's 2008 Annual Report, except for as described below.

Adoption of new and current standards
In the current financial year, the group has adopted International Financial Reporting Standard 8 "Operating
Segments" as required, and applied these principles throughout the year.   IFRS 8 requires operating segments to
be identified on the basis of internal reports about components of the Group that are regularly reviewed by the
Chief Executive to allocate resources to the segments and to assess their performance.   In contrast, the
predecessor Standard (IAS 14 "Segment Reporting") required the group to identify two sets of segments
(business and geographical), using a risks and rewards approach, with the group's system of internal financial
reporting to key management personnel serving only as the starting point for the identification of such segments.
The adoption of this standard has resulted in no changes in the segmental disclosures provided in note 3 of this
condensed set of financial statements, or in any prior periods.

Going Concern
The group has considerable financial resources together with a significant number of customers across different
geographic areas and industries.   At December 31, 2009 the group has cash balances of $242.8 million and total
debt of $197.5 million.   The group has no net debt.   As a consequence, the directors believe that the group is well
placed to manage business risks successfully despite the current uncertain economic outlook.

After making enquiries and considering the cash flow forecasts of the group the directors have a reasonable
expectation that the group has adequate resources to continue in operational existence for the foreseeable
future.   Accordingly, they continue to adopt the going concern basis in preparing the twelve month and quarterly
consolidated financial statements

Adjusted Results
Although IFRS disclosure provides investors and management with an overall view of the company's financial
performance, Autonomy believes that it is important for investors to also understand the performance of the
company's fundamental business without giving effect to certain specific, non-recurring and non-cash charges.
Consequently, the non-IFRS (adj.) results exclude share of profit/loss of associates, post-acquisition restructuring

Page 11

HP-SEC-01429948

USAO 00002332

costs and non-cash charges for the amortization of purchased intangibles, share-based compensation, non-cash translational foreign exchange gains and losses and associated tax effects. Management uses the adjusted results to assess the financial performance of the company's operational business activities.

See reconciliations on page 7.

3.    Segmental information

The Company is organized internally along group function lines with each line reporting to the group's chief operating decision maker, the Chief Executive Officer. The primary group function lines include: finance; operations, including legal, HR, and operations, marketing, sales and technology. Each of these functions supports the overall business activities, however they do not engage in activities from which they earn revenues or incur expenditure in their operations with each other. No discrete financial information is produced for these function lines. The company integrates acquired businesses and products into the Autonomy model such that separate financial data on these entities is not maintained post acquisition.

The group has operations in various geographic locations however no discrete financial information is maintained on a regional basis. Decisions around the allocation of resources are not determined on a regional basis and the chief operating decision maker does not assess the group's performance on a geographic basis.

The group is a software business that utilises its single technology in a set of standard products to address unique business problems associated with unstructured data. The group offers over 500 different functions and connectors to over 400 different data repositories as part of its product suite. Each customer selects from a list of options, but underneath from a single unit of the proprietary core technology platform. As a result, no analysis of revenues by product type can be provided.

Each of the group's virtual brands is founded on the group's unique Intelligent Data Operating Layer (IDOL), the group's core infrastructure for automating the handling of all forms of unstructured information. Separate financial information is not prepared for each virtual brand so as to assess its performance for the purpose of resource allocation decisions. The pervasive nature of the group's technology across each brand requires decisions to be taken at the group level and financial information is prepared on that basis.

A significant proportion of the group's cost base is fixed and represents payroll and property costs which relate to the multiple function lines of the group. As a result the business model drives enhanced performance though growing sales and accordingly group wide revenue generation is the key performance metric that is monitored by the chief operating decision maker. The revenue financial data used to monitor performance is a prepared and compiled on a group wide basis. No separate revenue financial analysis is maintained on revenues from any of the virtual brands.

The Company's chief operating decision maker is the group's Chief Executive Officer, who evaluates the performance of the Company on a group wide basis and any elements within it on the basis of information from junior executives and group financial information and is ultimately responsible for entity-wide resource allocation decisions.

As a consequence of the above factors the group has one operating segment in accordance with IFRS 8 "Operating Segments". IFRS 8 also requires information on a geographic basis and that information is shown below.

The group's operations are located primarily in the United Kingdom, the US and Canada. The company also has a significant presence in a number of other European countries as well as China, Japan, Singapore and Australia. The following tables provide an analysis of the group's sales and net assets by geographical market based upon the location of the group's customers.

| | Twelve Months Ended (unaudited) | | Three Months Ended (unaudited) | |
|---|---|---|---|---|
| | Dec 31, 2009 | Dec 31, 2008 | Dec 31, 2009 | Dec 31, 2008 |
| Revenue by region: | $'000 | $'000 | $'000 | $'000 |
| Americas | 517,185 | 324,287 | 162,341 | 95,722 |
| Rest of World | 222,503 | 178,942 | 60,770 | 49,665 |
| Total | 739,688 | 503,229 | 223,111 | 145,387 |

Page 12

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429949

USAO 00002333

3.      Segmental information (continued)

Information about these geographical regions is presented below:

| | Twelve Months Ended (unaudited) | | | | | |
| | Dec 31, 2009 | | | Dec 31, 2008 | | |
| | Americas | ROW | Total | Americas | ROW | Total |
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
|---|---|---|---|---|---|---|
| Result by region | 212,775 | 59,307 | 272,082 | 139,104 | 43,405 | 182,509 |
| Post-acq'n restruct. costs | | | (846) | | | (1,157) |
| Gain on foreign exch. | | | 942 | | | 5,141 |
| Operating profit | | | 272,178 | | | 186,493 |
| Share of loss of associate | | | (273) | | | (2,196) |
| Interest receivable | | | 1,205 | | | 3,353 |
| Interest payable | | | (7,044) | | | (1,943) |
| Profit before tax | | | 266,066 | | | 185,707 |
| Tax | | | (74,515) | | | (53,958) |
| Profit for the period | | | 191,551 | | | 131,749 |

| | Three Months Ended (unaudited) | | | | | |
| | Dec 31, 2009 | | | Dec 31, 2008 | | |
| | Americas | ROW | Total | Americas | ROW | Total |
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
|---|---|---|---|---|---|---|
| Result by region | 76,549 | 19,467 | 96,016 | 48,982 | 18,250 | 67,232 |
| Gain on foreign exch. | | | 852 | | | 3,699 |
| Operating profit | | | 96,868 | | | 70,931 |
| Share of profit (loss) of associate | | | 457 | | | (982) |
| Interest receivable | | | 230 | | | 1,064 |
| Interest payable | | | (1,798) | | | (541) |
| Profit before tax | | | 95,757 | | | 70,492 |
| Tax | | | (26,363) | | | (19,097) |
| Profit for the period | | | 69,394 | | | 51,395 |

4.      Income taxes

| | Twelve Months Ended (unaudited) | | Three Months Ended (unaudited) | |
| | Dec 31, 2009 | Dec 31, 2008 | Dec 31, 2009 | Dec 31, 2008 |
| | $'000 | $'000 | $'000 | $'000 |
|---|---|---|---|---|
| Tax charge by region: | | | | |
| UK | 46,413 | 41,148 | 22,562 | 16,810 |
| Foreign | 28,102 | 12,810 | 3,801 | 2,287 |
| Total | 74,515 | 53,958 | 26,363 | 19,097 |

5.      Share based compensation

Share based compensation charges have been charged in the consolidated income statement within the following functional areas:

| | Twelve Months Ended (unaudited) | | Three Months Ended (unaudited) | |
| | Dec 31, 2009 | Dec 31, 2008 | Dec 31, 2009 | Dec 31, 2008 |
| | $'000 | $'000 | $'000 | $'000 |
|---|---|---|---|---|
| Research and development | 1,926 | 1,654 | 535 | 304 |
| Sales and marketing | 3,517 | 2,739 | 978 | 555 |
| General and administrative | 1,730 | 1,091 | 481 | 273 |
| Total share based compensation charge | 7,173 | 5,484 | 1,994 | 1,132 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429950

USAO 00002334

6.      Earnings per share

The calculation of the basic and diluted earnings per share is based on the following data:

|  | Twelve Months Ended (unaudited) | | Three Months Ended (unaudited) | |
| --- | --- | --- | --- | --- |
|  | Dec 31, 2009 | Dec 31, 2008 | Dec 31, 2009 | Dec 31, 2008 |
|  | $'000 | $'000 | $'000 | $'000 |
| Earnings for the purposes of basic and diluted earnings per share being net profit | 191,551 | 131,749 | 69,394 | 51,395 |
| **Number of shares** | | | | |
| Weighted average number of ordinary shares for the purposes of basic earnings per share | 237,531 | 214,523 | 240,017 | 215,628 |
| Effect of dilutive potential ordinary shares: | | | | |
| Share options | 3,024 | 2,635 | 3,401 | 2,420 |
| Weighted average number of ordinary shares for the purposes of diluted earnings per share | 240,555 | 217,158 | 243,418 | 218,048 |

Earnings per share (adj.) is calculated by dividing the net profit (adj.) amounts shown on page 7 by the share denominators shown above.

7.      Related Party Transactions

There have been no related party transactions, or changes in related party transactions described in the latest annual report, that could have a material effect on the financial position or performance of the group in the financial year.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429951

USAO 00002335

# EXHIBIT D

USAO 00002336

9. SALES CONSULTING S.R.L. ("SALES CONSULTING") / POSTE ITALIANE (Q4 2009)

| | |
|---|---|
| Autonomy Entity | ASL |
| VAR | Sales Consulting |
| Proposed End-User | Poste Italiane |
| Date of Sales Agreement | 31 December 2009 |
| Licence Fee | €1,500,000 (plus €225,000 support and maintenance) |
| Payment Terms | Payable in two instalments:<br>50% (€862,500) due within 120 days of invoice date<br>50% (€862,500) due within 180 days of invoice date |
| Payment Received | No payments received from Sales Consulting in relation to this transaction |
| Sales Invoice Date | 31 December 2009 |
| Date Product Delivered | 31 December 2009 |
| Revenue Recognition on VAR Transaction | Licence revenue of €1,500,000 (at a GBP equivalent value of £1,361,409 and a USD equivalent value of $2,249,400) was recorded on 31 December 2009 in ASL's general ledger but transferred on the same date by an intercompany journal and recognised as revenue in Interwoven Inc. Support and maintenance of €225,000 (at a GBP equivalent value of £204,211 and a USD equivalent value of $326,738) was deferred, on the same date, to be recognised over the following year in ASL's general ledger. |
| Transaction between Autonomy and End-User | No transaction concluded. |
| Ultimate Conclusion of VAR Transaction | On 24 May 2010, Sales Consulting informed ASL that, as of 6 May 2010, they had been placed into liquidation.<br><br>By Q2 2011, a total bad debt provision of $1,567,577 had been recorded in respect of this deal. In Q3 2011, the invoice was written off in full. |
| False Accounting | Non-compliance with IAS 18 paragraph 14(a) and (d). |

12

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01550349

USAO 00002337

# Sales Consulting S.r.l. in Liquidazione

## COVER PAGE FAX

**OBJECT:** COPY our Comunicationa n. Prot.: Lettera-041-gz  del 24 maggio 2010

Number page: 1+ 2

**TO:**  AUTONOMY SYSTEM Ltd
Cambridge Business Park
Cowley Rd. Cambridge
CB40WZ, UK
Mr. Chamberlein,
Mr.Kanter,
Mr. Broli,
Mr. Sushovan;

**TO:**  Internal legal consultant Mr. Petrucci Simone,
address: Piazza Cavour 19-00191 Rome Italy
Tel. 0039 06 88920660-Mobile 0039 392 1471654
email: avvocatopetrucci @yahoo.it;

**FROM:** Rubano Saverio Liquidatore Via Erminio Spalla 53 00142 Rome Italy;

Regards

Legal Representative
Mr. Rubano Saverio

RACHEL

Sales Consulting S.r.l. Socio Unico in Liquidazione
Sede Legale: Via Erminio Spalla, 53 · 00142 Roma
Codice Fiscale e Partita IVA 10588686006

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01309275

USAO 00002338

# Sales Consulting S.r.l. in Liquidazione

Spett.le
**AUTONOMY SYSTEM Ltd**
**Cambridge Business Park**
**Cowley Rd. Cambridge**
**CB40WZ, UK**

Prot.: Lettera-041-gz        del 24 maggio 2010

Dear Steven Chamberlein,
as anticipated through Mr. Corrado Broli, on May 6th 2010 the company Sales Consulting Srl, in Via Nicolò Tartaglia 11, Rome, was placed in liquidation in accordance with the legislation in force in Italy.

The reasons that led the propriety to that decision are:

- Budget losses recorded in fiscal and financial management 2009;
- Very strong market restrictions and competition from large corporations due to the global financial crisis;
- Massive cuts in spending budget of the public administration and as a consequence of private too;

Moreover, the customer named Poste Italiane SpA, who had already expressed some difficulties with its delays (which we communicated to you in the email dated in april), is not in the right condition to acquire software applications and related services throughout 2010.

It is therefore with great regret that our company cannot maintain the conditions for the acquisition of the rights to the software registered by you on December 31st, 2009. We therefore ask you to adhere to one of the following requests, in order to close all negotiations easily and in partnership, which are object of our agreement on the customer named Poste Italiane:

A) A credit note issued by you for the total amount recorded on invoice No 4436-ASL dated 12/31/2009;
B) The resale to third party customers with total support by you in the research of the same as per your formal commitment dated 12/31/2009 which we include to the present letter;
C) The handover of the contract-agreement to resellers-third party vendors to the company indicated by you;

Given the state of irremediable difficulties our company is facing we believe it would be useful to reach a formal agreement not later than June 30th, 2010.

Awaiting for your prompt reply.

Yours sincerely

Legal Representative
Mr. Rubano Saverio

Sales Consulting S.r.l. Socio Unico in Liquidazione
Sede Legale: Via Erminio Spalla, 53 - 00142 Roma
Codice Fiscale e Partita IVA 10618845008

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01309276

USAO 00002339



December 31, 2009

Autonomy Systems Limited
Cambridge Business Park
Cowley Road,
Cambridge CB4 0WZ, UK
www.autonomy.com

Dear Mr. Zignani,

I am happy to confirm on behalf of Autonomy Systems Limited ("Autonomy") the following relating to Sales Consulting S.r.l. ("Sales Consulting") purchase of Autonomy technology for resale to Poste Italiane pursuant to a purchase order dated the date hereof. Sales Consulting will receive a discount of E300,000 for this transaction.

In the unlikely event that Poste Italiane decides not to pursue its current project, Autonomy will consent to a resale by Sales Consulting of the Poste Italiane licence (or similar Autonomy's products) to a number of different customers for similar purposes and for a combined similar value. Autonomy will not require an additional purchase order provided the total values reflect the same, but must be notified of the details relating to such purchases. All other terms and conditions of the purchase order remain unchanged. Specifically, the payment terms of the purchase order shall not change regardless of the consent to resale.

Autonomy will take every effort to support Sales Consulting with respect to this transaction, and are particulary please to be working with Sales Consulting given your expertise on Autonomy's technology and investment in the account.

Please do not hesitate to contact me with any questions or for any additional assistance.

Best regards,

Andrew Kanter
Company Secretary
Autonomy Systems Limited

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01309277

USAO 00002340

# EXHIBIT F

USAO 00002341

**Memorandum to the Board of Autonomy Plc**
**Approval to proceed with the Vatican transaction**

Prepared by:  Sushovan Hussain (CFO & Peter Menell (CTO)

Date:          27th November 2009

For the past 2 years we have been in discussions with the Vatican investigating an opportunity to digitally preserve the priceless manuscripts held in the Vatican Library. The project has been formally known as 'Digitalizzazione dell'Archivio della Biblioteca Apostolica Vatican).

The scale and significance of the project is immense both in practical and cultural terms. The library and the attached so called "secreted archives" house over 170 kilometres of shelving containing parchment and papyrus dating back to the first century AD. The repository amounts to arguably the world's greatest single concentration of original art, philosophy, politics, science and multidenominational religious works. Original material from some of the most significant and iconic historical figures from the last two millennia known to be present include that from Botticelli, Dante, Michelangelo, Louis XIV of France, Henry VIII of England and Napoleon Bonaparte, Galileo, St. Peter, Martin Luther and Mozart. The library also includes among other items whole preserved religious pieces such as a 6th century Matthew's Gospel Old Testament Book of kings, Absolution for leaders of Templar, and the Gutenberg Bible. Many works have been lost to history due to errors or omissions in cataloging and the fact is that only 12% of the inventory to date has undergone any form of academic inspection. This project will have an impact not only through the ability to codify and index this material for the first time and hence illuminating its hidden intellectual wealth but also for the first time permitting universal popular access around the world through it digital presence.

The current projected time line to complete the digital capture of the sources within the library alone is a minimum of 10 years using a purpose built 24/7 scanning vault containing 60 specially constructed optical platforms. A project of this scale and potential historical and cultural impact has not yet been attempted elsewhere and nor could it be given the singular nature of the collection. Thus the Vatican has approached Autonomy for our unique technological leadership and guidance in creation and analysis of such a complex index.

We have analysed the requirements and have negotiated directly with the Vatican state a fee of Euro 75 million (approximately $106 million) over a 10 year period for the provision of hardware, software, maintenance and services to deliver the project. We have also agreed a fee of Euro 35.9 million (approximately $51 million) as the initial purchase order to cover software, hardware, maintenance and services for the initial 3 year period. Please note that we would never be required to (or allowed to) access or touch the source manuscripts – this work will be carried out by the Vatican librarians. We would provide services to make sure the hardware and software works in accordance with the contract. Having entered into contractual negotiations we have agreed that the contract will be directly with the Vatican state and that the contract and first purchase order will be signed by the Secretary of State. Our principal contact during the negotiations has been with Cardinal Farina (Chief Librarian of the Vatican, and President of the Vatican School for Paleography) and Msgr Cesare Pasini (The Vatican Library Prefect). The payment terms have been agreed at 120 days and the standard technical warranty is for 1 year with monies refundable if the product cannot be repaired and replaced in the event of technical problems. The technical specification is straight forward and we have been involved in its preparation. The project would start in January 2010.

As a completely separate item, the Vatican extended a formal invitation to Autonomy to participate in a foundation that they propose to eventually establish to conduct this digital bibliography. The costs and technological input into such a program are understandably immense and the Vatican is looking for partners who can not only scientifically advise at this

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00129022

USAO 00002342

specialist level but who recognize the potential cultural impact to the world. Other members of the proposed foundation are the Italian Government, Finmecanica and Banco Uni Credito among others. UNESCO, the United Nations Educational, Scientific and Cultural Organization, has previously offered to assist and may be involved in the future. The foundation would be Vatican controlled entity designated for the delivery of the project only.

In recognition of this historic opportunity and chance to participate on a select intimate level we propose to donate Euro 10 million over the projected lifetime of the project (10 years). The initial donation would be Euro 2 million. The Vatican have stated that if the foundation is not established then any donation made would be refunded. In addition we would only make any commitments after our contract with the Vatican and PO is signed.

The proposed donation would not only secure one of the 5 board positions within the foundation and allow witness to the creation of this archive but from a pragmatic R&D protective accelerate many of our in-house research programs. By definition these programs rely on and are a function of data types and variance. Amongst other sources from within the foundation we would have access to unique written and pictorial Indo-European and Semitic language group data that will accelerates all forms of our ICR, OCR and Script recognition algorithms. Core routines that lie at the heart of IDOL data acquisition. The despite the historical content the outlying nature of this data will I predict dramatically boost contemporary edge case handling and overall transitional variance handling of both written and graphical material. When R&D and cultural significance are jointly considered such a charitable contribution would seem more than justified.

In addition, in our minds this is an utterly and supremely worthy cultural endeavor in which to have a chance at participation but also given the importance of Italy to Autonomy in business terms this will provide a huge lift in our Italian profile and publicity for which a charitable contribution of this size is a relatively small amount to secure.

**Approval required**
Given that this is the most important, the largest ever contract and the potentially the most public contract that we will have ever signed, we request the Board's authority to enter into the contract on the basis of the negotiated outcome described above.

In addition we request the Board's authority to commit to the donation of Euro 10 million over a 10 year period with the first tranche being Euro 2 million.

FOIA CONFIDENTIAL TREATMENT REQUESTED

# EXHIBIT G

USAO 00002344

From:          Corrado Broli [corradob@autonomy.com]
Sent:          Thursday, February 25, 2010 12:10 PM
To:            peter m; sushovan
Cc:            marco z
Subject:       Poste Italiane for BAV

I met Mr. Cuturi (Managing Director of Postecom) about their sponsorship/partnership. They
are evaluating the possibility to put 20/25 M€ in the project (for Phase 1) but would like to
agree an exclusivity with us regarding similar projects. They can take in charge the e-
commerce part of the project.

He would like to involve Mr. Sarmi (CEO of Poste Italiane) in the next meeting with us.
Because of this he will give me a confirmation tomorrow afternoon about the meeting on
Thursday 4 March. I'll keep you informed asap.

Ciao,
Corrado

P.S. Since I'm now travelling by train the line is not always available but please call me
for any details you need.

1

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596101

USAO 00002345

# EXHIBIT H

USAO 00002346

| | |
|---|---|
| From: | Marco Zanchini [marcoz@autonomy.com] |
| Sent: | Sunday, March 28, 2010 8:30 PM |
| To: | Sushovan Hussain; 'Corrado Broli' |
| Cc: | 'Julie Dolan'; 'Andrew Kanter'; marcoz@autonomy.com; peterm@autonomy.com |
| Subject: | Re: FW: MOU-POSTE-02.doc ultima release |
| Attachments: | Letter of intent.doc |

Here it is. Forgive me not using the correct legal language.
Ciao
Marco

-----Original Message-----
From: "Sushovan Hussain" <sushovanh@autonomy.com>
To: "'Corrado Broli'" <corradob@autonomy.com>, "'Marco A. Zanchini'"
<marcoz@autonomy.com>
Cc: "'Julie Dolan'" <julied@autonomy.com>, "'Andrew Kanter'"
<andrewk@autonomy.com>
Date: Sun, 28 Mar 2010 12:59:52 +0100
Subject: FW: MOU-POSTE-02.doc  ultima release

> Can we have this translated please asap.
>
>
>
>   ------
>
> From: Corrado Broli [mailto:corradob@autonomy.com]
> Sent: 28 March 2010 00:53
> To: Sushovan Hussain
> Cc: Peter Mennel
> Subject: I: MOU-POSTE-02.doc ultima release
>
>
>
> Sushovan,
>
> please find here attached a copy (in Italian.) of the LOI signed by
> BAV and Postecom.
>
>
>
> Ciao,
>
> Corrado
>
>
>
> Disclaimer: The information contained in this message is for the
> intended addressee only and may contain confidential and/or privileged
> information.
> If you are not the intended addressee, please delete this message and
> notify the sender; do not copy or distribute this message or disclose
> its contents to anyone. Any views or opinions expressed in this
> message are those of the author and do not necessarily represent those

1

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596272

> of Autonomy Systems Limited or of any of its associated Companies. No
> reliance may be placed on this message without written confirmation
> from an authorised representative of the Company.
>
> _____
>
> Da: Luciano Ammenti [mailto:ammenti@vatlib.it]
> Inviato: sabato 27 marzo 2010 23.59
> A: Corrado Broli
> Oggetto: Fwd: MOU-POSTE-02.doc ultima release
>
>
>
> ****************************************************
>    Biblioteca Apostolica Vaticana
>
> Responsabile Coordinamento dei Servizi Informatici
> C.E.D Director Luciano Ammenti
> Tel. 39+0669885004 39+0669879449 39+0669879523
> Fax. 39+0669884795 39+0669885327 :-) :-) :-) :-)
>
> ****************************************************
>

2

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596273

USAO 00002348

Letter of Intent

between

Biblioteca apostolica Vaticana, located at Citta' del Vaticano, Palazzo Apostolico, in the person of the Prefect, Reverendo Monsignor Cesare Pasini (from here denominated "BAV");

and

Postecom S.p.A. P. IVA 05838841004, located in Rome, Viale Europa, 175 by the Legal Representative Giovanni Cuturi (from here denominated Postecom)

(jointly referred to as 'parties' or singularly 'party')

Given that

a) BAV and Autonomy Systems Ltd. ("Autonomy") have told Postecom reserved and public information relating to the project of digitalization of BAV's manuscripts developed by them in collaboration and based on the use of Autonomy's software (the "Progetto BAV") and have entertained with Postecom preliminary discussions on the possible involvement of Postecom in BAV's project;

b) The type of role that Postecom declared to be ready to cover, in the hypothesis of its involvement, is in the completition of the operative development of BAV's project, according to agreements that have to be perfected between the parties, as also eventually e-commerce operations;

c) Postecom, in the next sixty days, has the intention of finalizing the verification activities that she has started, in order to be able to communicate, by the expiration of this deadline, a complete proposal on the opportunities of collaboration within the BAV project;

d) In this view, based on Postecom's proposal, BAV has agreed to be available, and for the term of sixty days starting from the signature of the present document, not to close agreements or issue proposals or undergo discussions with third parties that foresee the collaboration with entities, different from Postecom, for a role equal or similar to the one that is at present under discussion for the assignement to Postecom.

This said, between the parties is agreed what follows:

1    PREAMBLE

Preambles constitute an integral and substantial part of this agreement.

2    OBJECT OF AGREEMENT – DUTIES BETWEEN PARTIES

2.1    Parties agree that for the term of sixty days elapsing from the signature of the present agreement, BAV will not agree or will not formulate proposals or will not entertain any discussions with third parties that foresee the entrusting to a third party, different from Postecom, of a role identical or

FOIA CONFIDENTIAL TREATMENT REQUESTED

analogous to that which parties are at present discussing of entrusting to Postecom, in other words a role that is pertaining to the fulfilment of the BAV project.

2.2    For the same perdiod expressed above Postecom agrees not to sign agreements or formulate proposals or entertain in any case discussions with third parties that foresees the development by Postecom, in collaboration with third parties different from BAV and Autonomy, of projects similar to the BAV project.

2.3    At the expiration of the period outlined at paragraph 2.1 Postecom will unfold to BAV the terms of its collaboration proposal in respect to the BAV project. If this communication will not arrive within the required time, BAV will be free of the obligation mentioned in paragraph 2.1

2.4    Should Postecom within the period outlined in paragraph 2.1, communicate its collaboration proposal, Parties will discuss based on this and in good faith the terms of their possible collaboration. In any case it will be excluded for BAV any obbligation, even preliminary, to negotiate on the base of this proposal, in conformity to previsions of article 5.

## 3    PRIVACY

31. Each party recognises the reserved nature of any information exchanged with each other for the execution of the present Agreement and before it and thus it commits to:
a) do not disclose and / or communicate to third parties, in part or in whole in written or verbal or graphical or on magnetic media or any other form any whatsoever information received by the other party without its preventive written consent;
b) not to use as a whole or in part any communication whatsoever transmitted from the other Party for a scope that is different from the execution of the verification and analisys that are covered in this agreement;
c) not to disclose or communicate to third parties the fact that it is participating to the project that is covered in this agreement;
d) not to disclose or communicate to third parties, as a whole or in part, the results of the activities developed in relation to this agreement, independently of their completition.

Parties mutually agree that are not to be considered reserved, in any case, the following:
a)  information already of public domain at the moment of their communication or that became such subsequently without the party that has received them violating the present agreement;
b)  information whose disclosure has previously been authorized in written form by the party that has disclosed them.

## 4    BEGINNING AND DURATION

The present agreement has a duration of 60 (sixty) days commencing on its signature by both parties. It is understood hoewever that arrangements contained in this agreement related to privacy as the commitment undertaken by parties will remain effective even after the end on whichever cause of the present agreement so that information as mentioned in article 3 will be reserved for the following 5 (five) years.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596275

5    NON OBLIGATION TO SIGN

The present agreement does not bind the parties in signing any collaboration contract; in any case nothing shall be given for activities undertaken in the execution of this agreement.

6    COMMUNICATION TO THE PUBLIC

None of the parties will be able to output press releasesor public announcement of any type in realtion to the subjects covered in this agreement unless there is an explicit consent from BAV and the other Parties, with the exception of the communictions required by law or by a legitimate disposition of an Administration.

7    REALTIONSHIPS BETWEEN PARTIES

The relationship between Parties is between independent subscribing entities that dispose of, each in its activity branch, a structure and and an organization completely autonomous and independent. None of the prevision of the present agreement has to be interpreted as a means to constitute a partnership or a joint-venture.

8    APPLICABLE LAW AND ARBITRATION

The present agreement is governed by vatican law and all eventual controversies realted to it will be dealth upon exclusively by a body of three umpires located in the Vatican city. The decision of the body will be according to the law and definitive. In case Parties do not reach an agreement the naming of the president of the body will be the President fo the Vatican Tribunal.

Undersigned in two originals in the Vaticna City on the 25th of March 2010

# EXHIBIT I

USAO 00002352

| From: | John Cronin |
|---|---|
| To: | Steve Truitt |
| Sent: | 4/1/2010 4:44:26 PM |
| Subject: | order |
| Attachments: | 2010-03-001 MicroTech - Vatican.doc |

Steve,
Here is the order for.
It needs to be signed and emailed back to me, assuming it meets your expectation.

---

**From:** Steve Truitt [mailto:STruitt@microtech.net]
**Sent:** Thursday, April 01, 2010 5:33 PM
**To:** John Cronin
**Subject:** RE: transaction

Should I send to Cynthia?

**Steve Truitt**
Executive Vice President and Chief Operating Officer (COO)
703-674-9185

---

**From:** John Cronin [mailto:john.cronin@fedbd.com]
**Sent:** Thursday, April 01, 2010 5:18 PM
**To:** Steve Truitt
**Subject:** RE: transaction

AU says they have confirmed the transfer on their end... which I guess means it left their account.
Let me know what you find out on that

---

**From:** Steve Truitt [mailto:STruitt@microtech.net]
**Sent:** Thursday, April 01, 2010 5:12 PM
**To:** John Cronin
**Subject:** RE: transaction

Not as of 3:00 will check as soon as I get out of this meeting and will get check out.

**Steve Truitt**
Executive Vice President and Chief Operating Officer (COO)
703-674-9185

---

**From:** John Cronin [mailto:john.cronin@fedbd.com]
**Sent:** Thursday, April 01, 2010 4:28 PM
**To:** Steve Truitt
**Subject:** transaction

I just talked w/ Dave re the most recent AU conversations.
I'm available to help w/ this... am awaiting details from AU.

Did the deposit make it to you?

CONFIDENTIAL TREATMENT
REQUESTED BY MICROTECH

MICROTECH 082784

PURCHASE ORDER
Under
Autonomy Government Reseller Agreement
Dated as of June 29, 2006

PURCHASE ORDER NO. ___AUT-03-20-001_____

Purchase Order Date:          March 31, 2010 ("Effective Date")

| | |
|---|---|
| From : | MicroTech, LLC ("Reseller")<br>8330 Boone Blvd., Suite 600<br>Vienna, VA 22182 |
| Ship to: | MicroTech, LLC<br>8330 Boone Blvd., Suite 600<br>Vienna, VA 22182 |

Shipping Method: Electronic, such as via FTP transfer

| | |
|---|---|
| To: | Autonomy, Inc.<br>One Market, Spear Tower, 19th Floor<br>San Francisco, CA 94105 |

1.  Software:                        IDOL Server licensed for the following operations:

(i)     Retrieval – Advance
(ii)    Retrieval – Lite
(iii)   Retrieval – Parametric
(iv)    Retrieval – Standard
(v)     Spelling Correction
(vi)    Summarisation
(vii)   Hyperlinking
(viii)  Script & Icon Recognition
(ix)    OCR
(x)     Z39.50 Federation

**Connectors for use with IDOL server:**
All currently available connectors

**Autonomy LiquidOffice**

**Autonomy FITS PlugIn**

**Autonomy SPE**

**Autonomy Mediabin**
(i)  FITS image resampling

**Autonomy Archive Solution with the following operations:**
(i)   Digital Safe Core Appliance
(ii)  Dual-write functionality
(iii) Compression
(iv)  User Interface Portal
(v)   Object Splitting and Combination

CONFIDENTIAL TREATMENT
REQUESTED BY MICROTECH

MICROTECH 082785

2. Languages : All Autonomy supported languages including Latin, Greek and Hebrew.

3. Platform : All current Autonomy supported platforms

4. Number of Copies : One each of (1) above

5. Number of Instances : Unlimited

6. Number of Production Servers : Unlimited

7. Number of Non-Production Servers : Unlimited

8. Authorized Use : Licensee may use the Software and Hardware for the BAV for the project entitled "Digitalizzazione dell'Archivio della Biblioteca Apostolica Vaticana" for storage, processing and search of scanned manuscript images currently held in the Vatican Library.

9. Authorised Number of Uses : 200 concurrent users

10. Territory of Software installation : Vatican Territory

11. Fees (Software License,Support and Maintenance) :

|  | Phase 1 $ |
| --- | --- |
| Software plus first year Support and Maintenance | 11,550,000 |
|  |  |
|  |  |
|  |  |

17. Payment Terms : Licensee shall pay Autonomy in accordance with the following:

| Amount | Due and Payable |
| --- | --- |
| $11.55 million | 90 days from the Effective Date |
|  |  |

18. Software Delivery : Shipped ExWorks point of manufacture (per Incoterms

CONFIDENTIAL TREATMENT
REQUESTED BY MICROTECH

MICROTECH 082786

USAO 00002355

Address                    2000) via electronic delivery

20. Commencement Date    :  On Effective Date

21. Expiry Date          :  30 March 2013

Signature below represents Reseller's agreement to purchase the products and services referenced above pursuant to terms
of the Autonomy Government Reseller Agreement dated June 29, 2006, and the terms set forth above.

Company signature      _____

Name                   _____Steven B. Truitt_____

Title                  _____COO_____

Date                   _____3/31/2010_____

CONFIDENTIAL TREATMENT
REQUESTED BY MICROTECH

MICROTECH 082787

USAO 00002356

# EXHIBIT J

USAO 00002357

| | |
|---|---|
| **From:** | Steve Truitt <STruitt@microtech.net> |
| **Sent:** | Thursday, April 1, 2010 6:08 PM |
| **To:** | John Cronin <john.cronin@fedbd.com> |
| **Subject:** | Vatican |
| **Attach:** | 3466_001.pdf |

Latest po.

**Steve Truitt**
Executive Vice President and Chief Operating Officer (COO)
703-674-9185

**From:** MTcolorcopier@microtech.net [mailto:MTcolorcopier@microtech.net]
**Sent:** Thursday, April 01, 2010 6:05 PM.
**To:** Steve Truitt
**Subject:** Attached Image



Cronin0003277

PURCHASE ORDER
Under
Autonomy Government Reseller Agreement
Dated as of June 29, 2006

PURCHASE ORDER NO. AUT-03-20-001

Purchase Order Date:          March 31, 2010 ("Effective Date")

| From : | MicroTech, LLC ("Reseller")<br>8330 Boone Blvd., Suite 600<br>Vienna, VA 22182 |
| --- | --- |
| Ship to: | MicroTech, LLC<br>8330 Boone Blvd., Suite 600<br>Vienna, VA 22182 |
| | Shipping Method: Electronic, such as via FTP transfer |
| To: | Autonomy, Inc.<br>One Market, Spear Tower, 19th Floor<br>San Francisco, CA 94105 |

**1. Software:**        **IDOL Server licensed for the following operations:**

(i)     Retrieval – Advance
(ii)    Retrieval – Lite
(iii)   Retrieval – Parametric
(iv)    Retrieval – Standard
(v)     Spelling Correction
(vi)    Summarisation
(vii)   Hyperlinking
(viii)  Script & Icon Recognition
(ix)    OCR
(x)     Z39.50 Federation

**Connectors for use with IDOL server:**
All currently available connectors

**Autonomy LiquidOffice**

**Autonomy FITS Plugin**

**Autonomy SPE**

**Autonomy Mediabin**
(i)  FITS image resampling

**Autonomy Archive Solution with the following operations:**
(i)  Digital Safe Core Appliance
(ii)  Dual-write functionality
(iii)  Compression
(iv) User Interface Portal
(v) Object Splitting and Combination

Cronin0003278

USAO 00002359

2. Languages : All Autonomy supported languages including Latin, Greek and Hebrew.

3. Platform : All current Autonomy supported platforms

4. Number of Copies : One each of (1) above

5. Number of Instances : Unlimited

6. Number of Production Servers : Unlimited

7. Number of Non-Production Servers : Unlimited

8. Authorized Use : Licensee may use the Software and Hardware for the BAV for the project entitled "Digitalizzazione dell'Archivio della Biblioteca Apostolica Vaticana" for storage, processing and search of scanned manuscript images currently held in the Vatican Library.

9. Authorised Number of Uses : 200 concurrent users

10. Territory of Software installation : Vatican Territory

11. Fees (Software License, Support and Maintenance) :

|  | Phase 1 $ |
|---|---|
| Software plus first year Support and Maintenance | 11,550,000 |
|  |  |
|  |  |

17. Payment Terms : Licensee shall pay Autonomy in accordance with the following:

| Amount | Due and Payable |
|---|---|
| $11.55 million | 90 days from the Effective Date |

18. Software Delivery : Shipped ExWorks point of manufacture (per Incoterms

Cronin0003279

USAO 00002360

Address                      2000) via electronic delivery

20. Commencement Date   :   On Effective Date

21. Expiry Date          :   30 March 2013

Signature below represents Reseller's agreement to purchase the products and services referenced above pursuant to terms of the Autonomy Government Reseller Agreement dated June 29, 2008, and the terms set forth above.

Company signature

Name                     Steven B. Truitt

Title                    COO

Date                     3/31/2010

Cronin0003280

USAO 00002361

# EXHIBIT K

USAO 00002362

## 13. MICROTECH / VATICAN LIBRARY (Q1 2010)

| | |
|---|---|
| **Autonomy Entity** | Autonomy Inc |
| **VAR** | MicroTech |
| **Proposed End-User** | Vatican Library |
| **Date of Sales Agreement** | 31 March 2010 purchase order (issued under a 29 June 2006 agreement) |
| **Licence Fee** | $11,000,000 (plus $550,000 support and maintenance) |
| **Payment Terms** | Due within 90 days (by 29 June 2010) |
| **Payment Received** | Payments totalling $9,221,332 received as follows:<br>$500,000 (on 14 October 2010)<br>$4,321,332 (on 31 December 2010)<br>$2,000,000 (on 21 April 2011)<br>$2,400,000 (on 30 June 2011 but cheque dated 1 July 2011) |
| **Sales Invoice Date** | 31 March 2010 |
| **Date Product Delivered** | 31 March 2010 |
| **Revenue Recognition on VAR Transaction** | Licence revenue of $11,000,000 was recognised as revenue immediately on 31 March 2010. Support and maintenance of $550,000 was deferred, to be recognised over the following year. |
| **Transaction between Autonomy and End-User** | No transaction concluded. |
| **Ultimate Conclusion of VAR Transaction** | On 31 December 2010, a payment of $9,600,000 was made by ASL (via an Autonomy bank account) to MicroTech in relation to a licence for the use for three years of an ATIC. On the same date, a payment of $6,305,140 was received by Autonomy Inc from MicroTech, of which $4,321,332 was allocated against the invoice raised to MicroTech in relation to this transaction (and the remainder was allocated to other amounts outstanding from MicroTech).<br><br>The Autonomy group received no discernible value in return for ASL's payment of $9,600,000.<br><br>During Q2 and Q3 2011, a further $4,400,000 was paid to Autonomy Inc by MicroTech in relation to this transaction.<br><br>On 11 October 2011, the outstanding balance of $2,328,668 that MicroTech owed to Autonomy Inc in relation to this transaction was written off. |
| **False Accounting** | Non-compliance with IAS 18 paragraph 14(a), (b) and (d). |

18

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01550355

USAO 00002363

# EXHIBIT L

USAO 00002364

## Administration

Print

### ARCHIVIST AND LIBRARIAN OF THE HOLY ROMAN CHURCH

**His Excellence Most Reverend
Msgr Jean-Louis Bruguès, O.P.**

### PREFECT

**Msgr Cesare Pasini**

 **Tel:**
+39/06698.79400
 **Fax:**
+39/06698.85327

### VICE PREFECT

**Dr Ambrogio M. Piazzoni**

 **Telefono:**
+39/06698.79481
 **Fax:**
+39/06698.85804

### COUNCIL

$T$ he Council is a consultative organ which assists the Librarian and the Prefect in dealing with the most important matters regarding the activities of the Library. It is presided by the Librarian and has the following members: the Prefect, the Vice Prefect, the Department Directors, the Secretary and the Bursar.

USAO 00002365

# EXHIBIT M

USAO 00002366

| To: | 'pasini@vatlib.it'[pasini@vatlib.it] |
|---|---|
| Cc: | 'ammenti@vatlib.it'[ammenti@vatlib.it]; 'Corrado Broli'[corradob@autonomy.com] |
| From: | Sushovan Hussain |
| Sent: | Sun 12/19/2010 5:17:50 PM |
| Importance: | Normal |
| Subject: | RE: Commercial proposal on the digitisation of the Vatican library |

Dear Monsignor Cesare Pasini,

I would like to say a heartfelt thank you for your gift. It is a marvelous gift and I will treasure it. Also thank you for attending the meeting last Wednesday. The meeting gave me a deeper understanding as to the commercial framework that may facilitate our shared goal. Following on from the meeting, we at Autonomy have given great thought on how we could structure a solution to the goal of digitizing the Vatican library. I have explored some of these ideas with Corrado Broli and he has shared them with Mr. Luciano Ammenti. In this letter I set out my latest thinking and I hope that the Vatican library will be able to socialize the commercial terms with other parts of the Vatican state for financing.

**Commercial proposal**

To make the project viable I believe it is necessary to break it down into a smaller initial phase. We therefore propose that the project is broken down into a one year production pilot which will provide the Vatican with a fully functioning system and infrastructure and a maximum of 3,800 books and manuscripts indexed and archived. There will then be 9 more years left to archive and index the whole of the library.

FOIA CONFIDENTIAL TREATMENT REQUESTED

The cost for this one year production system is proposed at <u>Euro 13.0 million</u>. At a high level this includes:

-

Scanners, cameras, data centre build out, hardware and software

-

Operators and tutors (Vatican Library employees but paid for by Autonomy)

At the end of the year Vatican Library will have 2 fully functioning data centres and 3,800 documents captured and processed. The overall cost over 10 years (including the 1 year production pilot described above) is estimated to be Euro 100.5m (made up of scanners, software, hardware etc of $77.5m and operators and tutors of Euro 23 million). These costs can be confirmed during the first year build out phase as both of
us gain more experience and at this stage can be part of a Memorandum of Understanding for the whole project.

<u>**Technical validation**</u>

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**HP-SEC-00094072**

USAO 00002368

We have been working with the Vatican Library now for nearly two years. During this extended period of time we have completed several technical proofs of concept and pilots. Our team has remained constant throughout this period. We have shared these with the Vatican and very positive feedback has been received. In addition it is Autonomy's core business to build out data centres and host many petabytes of data in highly secure facilities. So we have no problem in guaranteeing the quality and timeliness of our work. Finally Autonomy is a large company with a market value of $6 billion and we have over $1 billion of cash on our balance sheet. So financially we are very strong and are able to provide a full end-to-end service for the Vatican Library.

**Financing proposal**

We at Autonomy view this project as a vital gift to history. So we have considered the maximum investment that we can provide to the project at E6.5 million. This should kick start the project and if the Vatican Library is able to finance the remaining E6.5m then the project can commence with immediate effect as we have already negotiated the contract. The thoughts I had as to how the Vatican Library could finance are a combination of own cash, further gifts from the Vatican state and others could be interested in providing secured financing because there will be hardware and data centres at the end of the project with value for collateral.

We would like to start the project as soon as possible and are available to assist in any way including making presentations to qualified others.

Yours sincerely,

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

Sushovan Hussain

Chief Financial Officer

Autonomy Corp plc

FOIA CONFIDENTIAL TREATMENT REQUESTED

# EXHIBIT N

USAO 00002371

**To:**      sushovanh@autonomy.com[sushovanh@autonomy.com]
**From:**    Mike Lynch
**Sent:**    Tue 12/28/2010 10:19:13 AM
**Subject:** Fwd: Guidelines

how should i reply


X-Spam-Processed: autonomy.com, Thu, 23 Dec 2010 16:32:14 +0000
      (not processed: spam filter heuristic analysis disabled)
X-Rcpt-To: mrl@autonomy.com
X-MDRcpt-To: mrl@autonomy.com
X-Return-Path: pasini@vatlib.it
X-Envelope-From: pasini@vatlib.it
X-MDaemon-Deliver-To: mrl@autonomy.com
From: "mons. Cesare Pasini" <pasini@vatlib.it>
To: <mrl@autonomy.com>
Cc: <angelab@autonomy.com>,
      <sushovanh@autonomy.com>,
      "Corrado Broli" <corradob@autonomy.com>
Subject: Guidelines
Date: Thu, 23 Dec 2010 17:32:08 +0100
X-Mailer: Microsoft Office Outlook 12.0
Thread-index: AcuivvD/dKEVN3o/RVKOZIDqhyAadw==
X-Virus-Scanned: by bsmtpd at autonomy.com
X-MDAV-Processed: autonomy.com, Thu, 23 Dec 2010 16:32:15 +0000

Dear Mr. Lynch,
Â Â Â Â Â Â Â Â Â Â Â Â Â  I remember with pleasure meeting with you, your
wife and Dr. Sushovan last December 11 and having the chance to share the
importance of the Vatican Libraryâ€™s manuscript digitalization project - a project
that has great universal value, i.e. safeguarding the great treasures of humanity at
the service of the sameÂ  humanity. On that occasion I listened with deep gratitude
and joy to your promise to apply the maximum flexibility in order to guarantee the
start of this project.
Â Â Â Â Â Â Â Â Â Â Â Â Â  I think that it is a good idea to let you know â€' in an
informal way but for the precise purpose of finding a concretely practical way â€' the
guidelines that in a relatively brief time frame, could lead to the constitution of a
Foundation specifically dedicated to the Project and to the stipulating of an
agreement worthy of the Project itself.
Â Â Â Â Â Â Â Â Â Â Â Â Â  The first point, as I understand it, is finding the
capital to provide to the Foundation, necessary to launch the planning and executive
activities. In this regard, the involvement of Autonomy is crucial. In fact, the minimum
capital needed to be able to start the project the first year appears to be €6,000,000
of which €5,000,000 should be invested by Autonomy and €1,000,000 by the Holy

FOIA CONFIDENTIAL TREATMENT REQUESTED

See within the six following months.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â  The Vatican Library will also devote to the project a year in kind value of €1,250,000, for a total of 10 years and therefore €12,500,000, covering two locations of the Information Technology department (one on Via della Conciliazione 5 and the other at Castelgandolfo), 32 fully equipped rooms, necessary electrical power, security guards and insurance for the manuscripts being moved, the use of the local conservation deposit site on Via della Conciliazione 5 and CED and administration personnel (4+2 people). On the other hand, Autonomy will furnish software, licenses and personnel necessary for the development and maintenance of the web interface and digital database research software, for the estimated in kind value of €7,000,000 in the first triennial.

Â Â Â Â Â Â Â Â Â Â Â Â Â  Autonomy will be bound to guarantee only the start-up of the project and the completion of the first year. All of the payments for the third parties suppliers hardware and software installed by Autonomy within the first three years, will be paid to Autonomy by installments on 36 months. The €6,000,000 conferred to the Foundation will be used by the same to pay for the technology from the first year on, and the remaining capital of €7,500,000, necessary to complete the first triennial will be tied exclusively to the Foundationsâ€™ ability to raise funds.

Â Â Â Â Â Â Â Â Â Â Â Â Â  For the first five year of the project, Autonomy shall be guaranteed to remain as the main contractor of the project and a member of the Vatican Foundation. Members of the board of the Foundation shall be appointed in equal numbers by Autonomy and the Vatican Library, with the exception of the chair who will be designated by the Holy See. For the same period, Autonomy will be alongside the Vatican Library in every scientific conference and media event as the main sponsor of the Digital preservation project.

Â Â Â Â Â Â Â Â Â Â Â Â Â  Until the end of the fifth year of the project, equipment will be considered property of the Foundation (or joint property of Autonomy and Vatican Library). Only after the fifth year, the equipment will come into the full ownership of the Vatican Library, which, in light of the then existing capital of the Foundation, may autonomously decide whether to continue the process of digitizing or decrease the pace of the work depending on the economic feasibility.

Â Â Â Â Â Â Â Â Â Â Â Â Â  Dear Mr. Lynch, we really want to reach a solution with the flexibility you need, and al-ready dream of the day in which we could attend an audience with the Holy Father, with you and your wife, at which we present the project by then up and running.

Â Â Â Â Â Â Â Â Â Â Â Â Â  Warmest regards,
don Cesare Pasini

—

Mons. Cesare Pasini
Prefetto
Biblioteca Apostolica Vaticana

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00094087

USAO 00002373

Cortile del Belvedere
V-00120 Città del Vaticano
tel. +39 06 698 83301
prefetto@vatlib.it


Dr Mike Lynch OBE FREng

CEO Autonomy

www.autonomy.com

The information contained in this message is for the intended addressee only and may contain
confidential and/or privileged information. If you are not the intended addressee, please delete
this message and notify the sender, and do not copy or distribute this message or disclose its
contents to anyone. Any views or opinions expressed in this message are those of the author and
do not necessarily represent those of Autonomy Systems Limited or of any of its associated
companies. No reliance may be placed on this message without written confirmation from an
authorised representative of the company. Autonomy Systems Limited, Registered Office:
Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00094088

USAO 00002374

# EXHIBIT O

USAO 00002375

From:          Sushovan Hussain [sushovanh@autonomy.com]
Sent:          Wednesday, January 19, 2011 8:02 AM
To:            'Marco A. Zanchini'
Subject:       FW: Guidelines

**From:** Mike Lynch [mailto:mrl@autonomy.com]
**Sent:** 11 January 2011 22:49
**To:** pasini@vatlib.it
**Subject:** re:Guidelines

Dear Mons. Pasini,

Thank you very much for your letter and please accept my apologies, for the delay in my response as I have been trying to find a route forward and awaiting feedback from third parties. Thank you also for your kind hospitality and your gift Angela and I will treasure it always.

As I said at our meeting, I myself and Autonomy also share your belief that the Vatican Library manuscript digitalization project has great universal value. We also agree with the Vatican that the best way for achieving this is through the setting up of a Foundation through which capital can be raised and the project can be run. Whilst my colleague Mr. Broli has tried very hard to gain sponsors this has not been successful to date. We will carry on trying.

In terms of the project financing, if I understand the figures correctly, Autonomy would be investing Euro 5 million and the Vatican would invest Euro 1 million for a one year project. Whilst this sounds interesting to us,I fear I may not be able to convince our board to approve this as they would be concerned the project was under funded and too important to risk under funding such important work. There would also be a complication as they would have to be informed our year 1 costs from third party suppliers is around Euro 6 million.

I have been thinking long and hard about how we could kick this project off. Perhaps an idea would be to go ahead on an even smaller scale project say Euro 2 million. We would invest Euro 1 million and the library would invest Euro 1 million. We could agree on the machines and small scale build out which would provide a showcase with which to make publicity and therefore gather sponsors. If at the end of the period sponsors have not come forward then we could discuss different financing strategies.

I sincerely hope we can reach a solution to the financing issue which would allow this great work to commence and my colleague Mr. Hussain is available to meet with you at any time.

Yours sincerely and my best wishes for the new year,

Mike Lynch

1

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00130127

USAO 00002376

Dr Mike Lynch OBE FREng

CEO Autonomy

www.autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00130128

USAO 00002377

# EXHIBIT P

USAO 00002378

| | |
|---|---|
| **From:** | Corrado Broli [corradob@autonomy.com] |
| **Sent:** | Sunday, April 11, 2010 6:31 AM |
| **To:** | Andrew Kanter |
| **Cc:** | Sushovan Hussain |
| **Subject:** | RE: BEE Team |

Andy,
could you please prepare the paperwork (3 MEuro + 5% maintenance) for:

AUXILIUM Group
via Giulio Vincenzo Bona, 85
00156 Roma

The CEO is Mr. Luca Mastroianni

Ciao and thanks,
Corrado

Disclaimer: The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender; do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated Companies. No reliance may be placed on this message without written confirmation from an authorised representative of the Company.

**From:** Andrew Kanter [mailto:andrewk@autonomy.com]
**Sent:** venerdì 9 aprile 2010 9.46
**To:** 'Corrado Broli'
**Subject:** RE: BEE Team


**From:** Corrado Broli [mailto:corradob@autonomy.com]
**Sent:** 09 April 2010 08:39
**To:** Andrew Kanter
**Subject:** BEE Team

Andy,
could you please prepare a new "2x" version changing the amount from 7 to 5 Million Euro + 5% support & maintenance ? The VAR agreement should be signed by BEE Sourcing instead of BEE Team.

Thanks,
Corrado

Disclaimer: The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender; do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated Companies. No reliance may be placed on this message without written confirmation from an authorised representative of the Company.

1

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00520732

USAO 00002379

# EXHIBIT Q

USAO 00002380

To:          'Corrado Broli'[corradob@autonomy.com]
From:        Andrew Kanter
Sent:        Sun 4/11/2010 2:38:36 PM
Importance:  Normal
Subject:     docs
2008-07-17 Autonomy VAR agreement3.doc
2.3.doc

attached

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596378

USAO 00002381



Autonomy

### PRODUCT SCHEDULE

| | | |
|---|---|---|
| 1. | Software | : |

IDOL Server licensed for the following operations:
- (i) Retrieval – Advance
- (ii) Retrieval – Lite
- (iii) Retrieval – Parametric
- (iv) Retrieval – Standard
- (v) Spelling Correction
- (vi) Summarisation
- (vii) Hyperlinking
- (viii) Script & Icon Recognition
- (ix) OCR
- (x) Z39.50 Federation

Connectors for use with IDOL server:
- All currently available connectors

Autonomy LiquidOffice

Autonomy FITS Plugin

Autonomy SPE

Autonomy Mediabin
- (i) FITS image resampling

Autonomy Archive Solution with the following operations:
- (i) Digital Safe Core Appliance
- (ii) Dual-write functionality
- (iii) Compression
- (iv) User Interface Portal
- (v) Object Splitting and Combination

| | | | |
|---|---|---|---|
| 2. | Languages | : | All Autonomy supported languages including Latin, Greek and Hebrew. |
| 3. | Platform | : | All current Autonomy supported platforms |
| 4. | Number of Copies | : | One each of (1) above |
| 5. | Number of Instances | : | Unlimited |
| 6. | Number of Production Servers | : | Unlimited |
| 7. | Number of Non–Production Servers | : | Unlimited |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596379

USAO 00002382

| 8. | Authorized Use | : | Licensee may use the Software and Hardware for the BAV for the project entitled "Digitalizzazione dell'Archivio della Biblioteca Apostolica Vaticana" for storage, processing and search of scanned manuscript images currently held in the Vatican Library. |
|---|---|---|---|
| 9. | Additional warranty | : | For a period of twelve (12) months from the date of initial delivery each component of the Software to VAR, the Software will substantially perform in accordance with the Autonomy's standard data sheets. Further, at any time during the first 180 days from the date of this purchase order, should VAR request a demonstration of the Software in situ and such demonstration fails to meet the applicable specifications set forth in the standard data sheets, then such failure would also entitle VAR to invoke a warranty breach. |

The above warranty applies only to problems reported by VAR to Autonomy in writing during the aforesaid warranty period.  The foregoing warranty shall not apply to any Software that has been modified other than by Autonomy, or that has been improperly installed or used in any manner other than as authorized under this Agreement. LICENSEE'S SOLE AND EXCLUSIVE REMEDY UNDER ANY WARRANTY SHALL BE LIMITED TO SUPPORT OR REPLACEMENT OF THE SOFTWARE.  IN THE EVENT AUTONOMY IS NOT ABLE TO SUPPORT OR REPLACE THE SOFTWARE, LICENSEE MAY TERMINATE THE AGREEMENT AND/OR RECEIVE A REFUND FOR THE APPLICABLE SOFTWARE FEES.

| 10. Authorised Number of users | : | 200 concurrent users |
|---|---|---|
| 11. Territory of Software installation | : | Vatican Territory |
| 12. Fees (Software License, Support and Maintenance) | : | Software plus first year Support and Maintenance | Euro 3,150,000 |
| 17. Payment Terms | : | Licensee shall pay Autonomy in accordance with the following: |

| Amount | Due and Payable |
|---|---|
| Euro 3 million | 90 days from the Effective Date |
| Euro 150,000 | 120 days from the Effective Date |

| 18. Software Delivery Address | : | Shipped ExWorks point of manufacture |
|---|---|---|
| 20. Commencement Date | : | 31 March 2010 |
| 21. Expiry Date | : | 31 March 2013 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596380

USAO 00002383

# Autonomy

This AUTONOMY VALUE ADDED RESELLER AGREEMENT ("Agreement") is entered into as of 31 March 2010 ("Effective Date"), between Autonomy Systems Limited, part of the Autonomy Group, with offices located at Autonomy House, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, UK ("Autonomy"), and AUXILIUM Group, with offices at via Giulio Vincenzo Bona, 85, 00156 Roma ("VAR").

## 1.   DEFINITIONS AND CONSTRUCTION.

1.1     Definitions. In this Agreement and the Exhibits to this Agreement, the terms set forth below shall have the following meaning:

(a)     "Autonomy Trade Marks" shall mean such trade marks, service marks, logos and designs owned by Autonomy and used by VAR from time to time in relation to the Autonomy Products, including those listed in Exhibit A.

(b)     "Confidential Information" shall have the meaning set forth in Section 19.

(c)     "End Users" shall mean third party entities for whom VAR provides Services in respect of Autonomy Products.

(d)     "Enhancement" shall mean a change or addition to the Autonomy Products, other than an Error Correction or a New Release, that (i) improves the function of, (ii) adds a new function to or (iii) substantially enhances the performance of an Autonomy Product, provided that Enhancements shall not include any improvements or new functions, in any form, that have a value or utility separate from the use of the Autonomy Products and that may be priced and offered separately from the Autonomy Products.

(e)     "Error Correction" shall mean a change to any Autonomy Product that allows such Autonomy Product to re-establish material conformity with the specifications for such Autonomy Product.

(f)     "New Release" shall mean any revision of the Autonomy Products, other than an Enhancement or an Error Correction, for which the version or revision number of such Autonomy Product is increased by a whole number.

(g)     "Products" shall mean the software and associated products and materials specified in Exhibit A.

(h)     "Services" shall mean services provided to an End User by VAR which may include demonstration, pre-sales support, installation, customisation, training and other consulting or integration of the Autonomy Products.

(i)     "Term" shall have the meaning set forth in Section 14.

(j)     "Territory" shall mean the territory set forth in Exhibit A.

(k)     "VAR Program Fees" shall mean the VAR program fees specified in Exhibit C.

1.2     References, Headings and Interpretation. In this Agreement and the Exhibits to this Agreement: (a) the Exhibits to this Agreement shall be incorporated into and deemed part of this Agreement and all references to this Agreement shall include the Exhibits; (b) references to any law, legislative act, rule or regulation shall include any changes, supplements, successors or replacements thereto; (c) the Section headings are for reference and convenience only and shall not be considered in the interpretation of this Agreement; and (d) in the event of a conflict between this Agreement and any of the Exhibits, the terms of this Agreement shall prevail.

## 2.   APPOINTMENT.   Autonomy hereby appoints VAR, and VAR hereby accepts such appointment, to act as Autonomy's non-exclusive reseller of Autonomy Products in the Territory.

## 3.   OBLIGATIONS OF VAR.

3.1     Performance. VAR agrees with Autonomy that VAR shall: (a) use its best efforts to promote, market, and sell Autonomy Products to End Users within the Territory, and perform Services in connection therewith, all in accordance with the terms and conditions contained herein; (b) maintain a sufficient number of VAR's sales personnel, pre-sales and consulting personnel trained in the features and functions of the current version of the Autonomy Products to (i) actively solicit orders for the Autonomy Products from End Users; (ii) properly inform and demonstrate to End Users the features and capabilities of the Autonomy Products; and (iii) provide or arrange provision of pre- and post-sales technical assistance, service and support to End Users; (c) require VAR's sales, pre-sales, consulting and technical personnel to attend Autonomy's training classes as may be required by Autonomy; and (d) not make any representations, warranties, conditions or guarantees with respect to the specifications, features or capabilities of the Autonomy Products that are inconsistent with or in addition to those made by Autonomy in writing.

FOIA CONFIDENTIAL TREATMENT REQUESTED

3.2     Territory and Customers.   (a) The Autonomy Products may be distributed by VAR only in the Territory set forth on Exhibit A.   (b)  Autonomy reserves the right to sell the Autonomy Products directly to customers inside or outside the Territory.

3.3     Sales.   (a) Except as otherwise provided in this Agreement, VAR shall assume all responsibility and liability to its customers with respect to the Autonomy Products.   (b) VAR shall require each customer to enter into a standard software licence agreement with VAR containing terms no less restrictive that those set forth in Autonomy's standard licence agreement available at www.autonomy.com/content/EULA.

3.4     Advertising and Promotion.   With respect to the promotion of the Autonomy Products:   (a) VAR shall be responsible for all costs associated with VAR's promotional activity for the Autonomy Products.   (b) All co-operative advertising activities shall be coordinated and approved by Autonomy in writing.   (c) The parties shall discuss from time to time VAR's promotional and advertising plans for the Autonomy Products.  VAR shall not publish, issue or display or authorise the publication, issuance or display of any advertisement or promotional materials relating to the Autonomy Products without Autonomy's prior written approval.  Autonomy may supply Autonomy's own promotional and advertising materials to VAR for inclusion in VAR's own promotional and advertising materials for the Autonomy Products.   (d) VAR agrees that Autonomy may refer to VAR and the Autonomy Products licensed by VAR's End Users with other Autonomy customers or prospective customers and that Autonomy may provide to third parties VAR's name and the names of End Users.

3.5     Marketing Plan.   Within 30 days of the Effective Date, and on approximately a quarterly basis, VAR and Autonomy shall develop, mutually approve and update a "Joint Business Plan" for promotion of the Autonomy products.

3.6     Business Practices.   VAR agrees with Autonomy:   (a) to conduct business in a manner which reflects favourably at all times on the Autonomy Products and the good name, goodwill and reputation of Autonomy;   (b) to avoid deceptive, misleading or unethical practices that are or might be detrimental to Autonomy or the Autonomy Products, including but not limited to disparagement of Autonomy or the Autonomy Products;   (c) to make no false or misleading representations with regard to Autonomy or the Autonomy Products;   (d) to comply with all applicable international, national and local laws and regulations in performing its duties hereunder and in any of its dealings with respect to the Autonomy Products, including without limitation all import and export regulations;  and   (e) that VAR shall, in all correspondence, documents and applications concerning the Autonomy Products, identify the Autonomy Products as originating from Autonomy.

3.7     Expenses.   Except as otherwise provided in this Agreement, VAR shall bear the entire cost and expense of the performance of its obligations under this Agreement, including bad debt expenses, inventory losses, Autonomy Product returns, commissions and taxes.

3.8     Press Releases.   VAR shall make no public statement regarding this Agreement and the Autonomy Products without Autonomy's prior written approval.  At Autonomy's election, within 30 days of the Effective Date VAR and Autonomy shall issue a joint and mutually agreed upon press release relating to this Agreement.  VAR further agrees to cooperate with and support Autonomy in its press release and publicity materials.

3.9     Leads.   With respect to any Lead provided to VAR by Autonomy, VAR agrees not to market or sell any products competitive with the Autonomy Products to such Lead for the specific Lead opportunity identified and will promptly notify Autonomy if such Lead is considering purchasing a competitive product.   "Lead" means a potential customer with whom VAR had contact as a result of the use of any Autonomy resource (human, financial, electronic or otherwise) that played a substantial factor in the introduction or sale of the Autonomy Products.

4.      **OBLIGATIONS OF AUTONOMY.**

4.1     Initial Delivery.   Following completion by VAR's delegates of the training course detailed in Exhibit C Section 3, Autonomy will deliver to VAR one copy of the Autonomy Products.  VAR may make additional copies of the Autonomy Products only to the extent required for demonstration, training or development purposes and in accordance with Exhibit C and Exhibit D.  Autonomy shall make available to VAR, at Autonomy's standard pricing, reasonable quantities of Autonomy's sales and technical brochures.

4.2     Training.   Autonomy may make available to VAR training courses as available at Autonomy's discounted partner pricing.

4.3     Support.   (a) With respect to VAR, provided VAR is current in its payment of the VAR Program Fees, Autonomy shall provide to VAR support and maintenance services for the Autonomy Products in accordance with its then-current support service policies for VAR's internal use only.  Those support service policies support matters to be logged by VAR into, and initiated solely through, the Autonomy electronic helpdesk system (currently known as Automater) .  Autonomy will not be liable for any failures or delays arising as a result of VAR's failure to properly log tickets.   (b) With respect to End Users, all support of Autonomy Products to End Users shall be provided by VAR.

5.      ORDERS.   VAR shall submit to Autonomy a written purchase order for Autonomy Products setting forth the information in Exhibit B hereto and, if requested, a copy of a signed End User Licence Agreement between the End User and VAR.  Autonomy has the right to reject any purchase order prior to shipment.  Once the Autonomy Products on a

Page 2
Autonomy VAR Agreement
20080717

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01595382

USAO 00002385

purchase order have been shipped by Autonomy, VAR may not cancel or amend the purchase order without the prior written consent of Autonomy. In the event of any conflict between the terms of a purchase order and this Agreement, the terms of this Agreement shall prevail.

**6.      PRICE; PRICING.**

6.1      Price to VAR.   All Autonomy Products purchased by VAR from Autonomy shall be sold to VAR at the fees and/or discounts specified in Exhibit C. Autonomy reserves the right to change its prices, terms and conditions at any time prior to acceptance of an order.

6.2      Support Payments.   With respect to each End User, Autonomy shall issue an invoice to VAR for support annually in advance commencing on the first day on which the sale is made.

6.3      Pricing by VAR.   VAR is free to determine its own prices and per copy fees to End Users. Autonomy may from time to time publish suggested wholesale or retail prices and per copy fees, provided, however, that such prices and fees are suggestions only and VAR is and shall be free to determine the actual prices and per copy fees at which the Autonomy Product will be licensed to its End Users.

6.4      VAR Program Fees.   In consideration of VAR's payment to Autonomy of the VAR Program Fees, VAR shall be entitled to:  (a) the licence rights as set forth in this Agreement; (b) Autonomy support services; and (c) purchase Autonomy training classes to be held at Autonomy training facilities.  The VAR Program Fees shall be invoiced annually by Autonomy and shall be due within 30 days after the date of such invoice.

**7.      PAYMENTS.**   (a) Upon receipt and acceptance of an order for the Autonomy Products, Autonomy shall deliver an invoice to VAR indicating the amount due for the Autonomy Products.  (b) Charges set forth in such invoice shall be due and payable to Autonomy within 30 days of the date of Autonomy's invoice.  (c) VAR shall not be relieved of its obligations to pay fees owed to Autonomy hereunder by the non-payment of fees by an End User.  (d) Balances past due shall accrue interest until paid in full at the lower of (i) 0.5% per month or (ii) the maximum rate permitted by law.  (e) VAR shall be responsible for timely payment of all taxes (including without limitation, sales, value added and withholding taxes), fees import and export fees and duties arising from the performance by the parties of the terms of this Agreement, other than taxes based upon the net income of Autonomy, or VAR shall furnish Autonomy with appropriate tax exemption certificates.

**8.      SHIPPING.**   Autonomy Products shall be shipped by means and on media agreed between the parties, and in the absence of agreement otherwise shall be ExWorks point of manufacture (per Incoterms 2000) and delivery may be electronic, such as via FTP.  Autonomy may at its discretion make any New Releases and Error Corrections available for downloading by VAR from Autonomy's web site.  Autonomy shall not be liable for any delay in delivery or failure to give such notice of delay.  VAR shall bear all expenses of physical shipment.

**9.      REPORTS, NOTICES AND AUDITS.**

9.1      Sales Reports.   VAR agrees to provide Autonomy from time to time as Autonomy may reasonably request, order and sales reports detailing its End Users (including contact names and details), Autonomy Products sold, prices and revenue accrued, for purposes of monitoring VAR's obligations under the terms of this Agreement.

9.2      Other Reports.   VAR shall furnish to Autonomy, at Autonomy's request, such periodic forecasts, budgets and promotional schedules as Autonomy may reasonably request.  VAR will notify Autonomy in writing within five working days of any (i) knowledge of any claimed or suspected defects in the Autonomy Products; (ii) knowledge of any claim or proceeding involving the Autonomy Products; or (iii) (A) change in the management or voting control of VAR; or (B) transfer of all or substantially all of VAR's assets.

9.3      Records.   VAR shall keep and maintain full, true and accurate records containing all data reasonably required for the accurate verification of VAR's performance under the terms of this Agreement.

9.4      Inspection.   For the term of this Agreement and for a period of two years after the date of termination, VAR shall make available to Autonomy for inspection and copying, upon reasonable written notice, all books and records of VAR that pertain to VAR's performance of and compliance with its obligations, warranties and representations under this Agreement including, to the extent reasonably necessary, access to all facilities of VAR in which VAR performs its obligations under this Agreement.

**10.      SOFTWARE LICENCES.**

10.1      Grant of Licence to Resell Autonomy Products.   Subject to the terms of this Agreement, Autonomy hereby grants to VAR, during the term of this Agreement, a limited, nonexclusive, non-transferable right and licence to distribute copies of the Autonomy Products to VAR's customers.

10.2      Grant of Licence for Demonstration, Training and Project Development.   Provided that VAR has met the requirements set forth in this Agreement and Exhibits, Autonomy hereby grants to VAR a non-exclusive, non-transferable licence to reproduce and use a reasonable number of copies of the Autonomy Products, except those that contain third

Page 3
Autonomy VAR Agreement
20080717

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596333

USAO 00002386

party royalty bearing technology, solely for (a) demonstrating the Autonomy Products on VAR's premises or at trade shows or seminars; (b) providing training on VAR's premises; (c) demonstrating the Autonomy Products at a prospective End User's site; (d) the development of VAR's internal expertise of Autonomy Products; and (e) the development, testing, support and delivery by VAR of Services to End Users.

10.3    Licence Exclusions.  Except as provided in Sections 10.1 and 10.2, VAR shall have no rights in respect of any intellectual property rights owned or used by Autonomy, including with respect to Autonomy Products, and VAR acknowledges that, except as expressly provided in this Agreement, it shall not acquire any rights in respect of them and that all such intellectual property rights are and shall remain vested in or controlled by Autonomy.  No other rights to Autonomy Products are granted by Autonomy to VAR, or may be granted by VAR to any third party.  Specifically, but not by way of limitation, VAR shall not:  (a) appoint third parties to market, sublicense or otherwise distribute the Autonomy Products, and neither VAR nor any of its employees, agents or representatives may manufacture, reproduce or sublicense (except as otherwise expressly permitted herein) the Autonomy Products, or distribute derivative works of the Autonomy Products; (b) except as required to be allowed by applicable law, modify, change, decompile, disassemble, reverse compile or reverse engineer the Autonomy Products without Autonomy's prior consent; (c) rent, electronically distribute or timeshare the Autonomy Products or market the Autonomy Products by interactive cable or remote processing services; (d) use the Autonomy Products provided to VAR hereunder in any way for its own internal business purposes; (e) use the Autonomy Products for the purposes of conducting comparative analysis, evaluations or product benchmarks without Autonomy's prior written approval; (f) provide the Autonomy Products to any person or entity other than a licensed End User of the Autonomy Products; or (g) do or authorise any third party to do any act which would or might invalidate or be inconsistent with any intellectual property rights of Autonomy and shall not do or authorise any third party to do any act which, by its omission, would have that effect.

11.    ENHANCEMENTS AND NEW RELEASES.

11.1    Enhancements and New Releases.  Autonomy may provide Enhancements or New Releases to VAR for inclusion in, or as replacements for, the Autonomy Products.  Upon the delivery of any such Enhancements or New Releases to VAR by Autonomy, each such Enhancement or New Release shall become part of, or replace the applicable Autonomy Products, for purposes of this Agreement.

11.2    Restricted Releases.  If VAR receives any version of the Autonomy Products marked as alpha, beta or otherwise designated as a "Restricted Release": (a) VAR shall promptly report to Autonomy any error discovered in the Restricted Release; (b) Autonomy shall have no obligation to deliver Enhancements or New Releases for the Restricted Release; (c) Autonomy shall have no obligation to support the Restricted Release; (d) VAR shall provide Autonomy with appropriate test data for the Restricted Release if necessary to resolve errors in the Restricted Release encountered by VAR; (e) the Restricted Release shall be provided to VAR on an as-is basis with no warranty of any kind, express or implied, shall be deemed experimental and may contain errors; (f) neither party shall be responsible or liable to the other for any losses, claims or damages of whatever nature arising out of or in connection with the performance or non-performance of the Restricted Release; (g) VAR's use of the Restricted Release shall be for testing purposes only and shall not be related in any way to production applications or to VAR's delivery of Services to an End User; and (h) VAR shall not distribute the Restricted Release to third parties without the prior written consent of Autonomy.

12.    PROPRIETARY MARKINGS.

12.1    Licence Grant.  Subject to and conditioned upon VAR's compliance with the terms and conditions of this Agreement, Autonomy hereby grants to VAR a non-exclusive, non-transferable right to use within the Territory the Autonomy Trademarks, solely in conjunction with VAR's performance under this Agreement.  Any reference to, or use of, the Autonomy Trademarks must follow Autonomy's trademark guidelines and contain appropriate trademark notices.  Upon termination of this Agreement, VAR will immediately cease all use of any Autonomy name, trademark or logo.  The Autonomy logos may not be altered by any party other than Autonomy.

12.2    Retention of Rights.  Autonomy expressly reserves all rights not specifically granted to VAR hereunder.  Without limiting the generality of the above, VAR expressly agrees that Autonomy retains all right, title, and interest in and to all of the Autonomy Trademarks.  All use of the Autonomy Trademarks by Partner will inure to the benefit of Autonomy.  VAR shall not at any time represent that it is the owner of the Autonomy Trademarks, shall not dispute the validity of the Autonomy Trademarks and shall not at any time register, or cause to be registered, in its name or in the name of any other person, or use or employ during or after the Term, any of the Autonomy Trademarks or any trademark, service mark, trade name, logo or design resembling or similar to any of the Autonomy Trademarks.  VAR agrees to use the Autonomy Trademarks in advertisements, letterheads or otherwise only as may be approved in advance in writing by Autonomy.

13.    INTELLECTUAL PROPERTY RIGHTS.

13.1    Limited Rights.  Except as provided in Sections 10.1, 10.2 and Section 12, VAR shall have no rights, express or implied, in respect of any intellectual property rights owned or used by Autonomy in relation to the Autonomy Products, including copyright in the Autonomy Products, and VAR acknowledges that, except as expressly provided in this Agreement, it shall not acquire any such rights and that all such are and shall remain vested in or controlled by Autonomy.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596384

USAO 00002387

13.2    Notification of Infringement.  VAR will immediately inform Autonomy in writing of any infringement of Autonomy's intellectual property rights relating to the Autonomy Products or the Autonomy Trademarks coming to VAR's attention, or any claim coming to VAR's attention that the Autonomy Products or the Autonomy Trademarks infringe the intellectual property rights of a third party.

13.3    Maintenance of Rights.  During the term of this Agreement VAR shall take all such steps at Autonomy's cost as Autonomy may reasonably require to assist Autonomy in maintaining the availability and enforceability of the intellectual property rights of Autonomy in the Autonomy Products or the Autonomy Trademarks.

14.    **TERM AND TERMINATION.**

14.1    Term.  The initial term of this Agreement shall commence on the Effective Date and continue until the first anniversary thereof, and automatically renew for a period of one year on the annual anniversary of the Effective Date (each one year period being the "Term"), unless (a) this Agreement is terminated earlier pursuant to this Section 14; or (b) either party notifies the other at least 30 days prior to the end of any one year term that such party does not desire to renew this Agreement.

14.2    Termination by Autonomy.  Notwithstanding the provisions of Section 14.1, Autonomy may terminate this Agreement with immediate effect upon notice to VAR in the event that: (a) VAR attempts to assign this Agreement without the consent of Autonomy; or (b) there is a direct or indirect change in ownership or control or corporate reorganization of VAR including a sale, transfer or lease of all or any substantial part of its assets other than in the ordinary course of business.

14.3    Termination by Either Party.  Either party may terminate this Agreement upon notice to the other party in the event that the other party (a) ceases conducting business in the normal course, (b) commits an act of bankruptcy, (c) is adjudicated bankrupt, (d) enters into liquidation, whether compulsory or voluntary (other than for the purposes of amalgamation or reconstruction), (e) compounds with its creditors generally, (f) has a receiver, administrator, administrative receiver, liquidator or manager appointed over all or any of its assets, (g) suffers execution or distress, (h) becomes unable to pay its debts as they fall due; or (i) takes or suffers any similar action in consequence of debt.

14.4    Termination for Default.  If either party defaults in the performance of any of its material obligations (or repeatedly defaults in the performance of any of its other obligations) under this Agreement and does not cure such default within 10 days of receipt of a notice of default, then the non-defaulting party may, by giving notice to the defaulting party, terminate this Agreement as of the termination date specified in the notice.

14.5    Termination for Convenience.  Either party may terminate this Agreement upon 60 days' prior notice to the other party.

14.6    Effect of Termination or Expiration.  Upon termination or expiration of this Agreement: (a) VAR shall immediately cease (i) the advertising, promotion, resale and distribution of the Autonomy Products; (ii) using any of the Autonomy Trademarks; and (iii) promoting itself as a partner or associated with Autonomy; (b) the due dates of all outstanding invoices for VAR for the Autonomy Products will automatically be accelerated so they become due and payable by the effective date of termination, even if longer terms had been previously agreed; (c) all or part of any orders received from VAR which have not been shipped as of the date of termination or expiration, even if previously accepted, may be cancelled by Autonomy without liability to either party; (d) at Autonomy's option and request, and at VAR's expense, VAR shall immediately destroy or return to Autonomy all marketing and proprietary materials and any manuals or other technical documentation relating to the Autonomy Products and any and all other property of Autonomy in the possession or control of VAR; and (e) each party will warrant to the other within five days of termination that all Confidential Information of the other party then in its possession has been destroyed or returned. Autonomy shall not be liable to VAR for damages of any kind, including incidental or consequential damages, on account of the termination of this Agreement.

14.7    Rights.  Termination of this Agreement shall not prejudice the rights of the parties, which may have arisen on or before the date of termination.

14.8    Discontinued Autonomy Products.  This Agreement shall automatically terminate as to any Autonomy Product if Autonomy ceases to manufacture or sell such Autonomy Product.

15.    **RELATIONSHIP OF THE PARTIES.**  (a) During the Term, VAR shall act as an independent contractor and neither this Agreement nor the performance of any of its obligations under this Agreement shall be construed to constitute VAR as an agent or legal representative of Autonomy for any purpose, nor shall this Agreement be deemed to establish a joint venture, partnership or any other legal entity.  (b) VAR will not have, and will not represent that it has, any power, right or authority to bind or commit Autonomy, or to assume or create any obligation or responsibility, express or implied, written or oral, on behalf of or in Autonomy's name, except as herein expressly provided.

16.    **REPRESENTATIONS AND WARRANTIES.**

16.1    By Autonomy.  (a) Autonomy represents and warrants that (i) it has the right to licence the Autonomy Products to VAR; and (ii) for a period of ninety (90) days from the date of shipment of the Autonomy Products to VAR

Page 5
Autonomy VAR Agreement
20060717

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596325

USAO 00002388

pursuant to this Agreement, the Autonomy Products will perform in all material respects with the technical specifications provided by Autonomy for the Autonomy Products where the Autonomy Products are loaded onto suitably configured equipment and set up to process data in accordance with the technical specifications for the Autonomy Products.  (b) All warranty claims must be made in writing or not received by Autonomy within the time period specified above shall be deemed waived. Autonomy's warranty and obligation is solely for the benefit of VAR, who has no authority to extend this warranty to any other person or entity.  (c) Autonomy shall have no liability under the warranty in Section 16.1(a) if the non-performance is attributable to (i) VAR's incorporation, attachment or otherwise engagement of any attachment, feature, program or device to the Autonomy Products, or any misuse, alteration or modification of the Autonomy Products by VAR, or any part thereof; (ii) failure to provide a suitable installation environment; (iii) use of supplies or materials not meeting specifications; (iv) use of the Autonomy Products for other than the specific purpose for which the Autonomy Products are designed; or (v) use of the Autonomy Products on any systems other than hardware platforms specified by Autonomy for the Autonomy Products.

    16.2   Disclaimer.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AUTONOMY DISCLAIMS ANY AND ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, WITH RESPECT TO THE AUTONOMY PRODUCTS, IMPLIED WARRANTIES OF QUALITY AND FITNESS FOR A PARTICULAR PURPOSE.  AUTONOMY DOES NOT WARRANT THAT THE AUTONOMY PRODUCTS OR THE FUNCTIONS CONTAINED IN THE AUTONOMY PRODUCTS WILL MEET VAR'S OR ANY END USER'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION OR BE ERROR FREE.

**17.**    **INDEMNIFICATION.**

    17.1   Indemnity by Autonomy.  Autonomy shall indemnify VAR from, and defend VAR against, any damages, losses, liability (including settlements and judgments) or expenses (including attorneys' fees and expenses) arising out of or relating to any claim that any Autonomy Product infringes any intellectual property right of any third party save that Autonomy shall not be liable for any such claim that arises as a result of (i) any modification of the Autonomy Product by VAR, or (ii) use of a superseded release of the Autonomy Product if the infringement would have been avoided by the timely implementation of an Error Correction or Enhancement supplied by Autonomy.

    17.2   Indemnity by VAR.  VAR shall indemnify Autonomy from, and defend Autonomy against, any damages, losses, liability (including settlements and judgments) or expenses (including attorneys' fees and expenses) arising out of or relating to any claim relating to VAR's advertising, promotion, resale, distribution, storage or transportation of the Autonomy Products unless otherwise provided pursuant to Section 17.1 above.

**18.**    **REMEDIES AND LIMITATION OF LIABILITY.**

    18.1   Remedies.  In the event of any claim relating to the Autonomy Products, Autonomy's sole and exclusive liability to VAR for any such claim, and VAR's sole and exclusive remedy in respect of such claim, shall be, at Autonomy's discretion, support or the replacement of the Autonomy Products.

    18.2   LIMITATION OF LIABILITY.  EXCEPT IN THE EVENT OF PERSONAL INJURY OR DEATH AS A RESULT OF NEGLIGENCE, AUTONOMY SHALL NOT BE LIABLE FOR, NOR SHALL THE MEASURE OF DAMAGES INCLUDE, UNDER ANY THEORY OF LIABILITY, WHETHER IN CONTRACT, TORT STRICT LIABILITY OR OTHERWISE, ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES (INCLUDING LOSS OF PROFITS OR LOSS OF BUSINESS) ARISING OUT OF OR RELATING TO AUTONOMY'S PERFORMANCE OR FAILURE TO PERFORM UNDER THIS AGREEMENT.  IN NO EVENT WILL AUTONOMY'S AGGREGATE LIABILITY TO VAR EXCEED THE TOTAL AMOUNTS PAID BY VAR TO AUTONOMY PRIOR TO THE DATE ON WHICH THE LOSS OR DAMAGE GIVING RISE TO THE CLAIM AROSE.

**19.**    **CONFIDENTIAL INFORMATION.**  The parties have imparted and may from time to time impart to each other certain Confidential Information (as defined below) and the parties may otherwise obtain Confidential Information concerning the business and affairs of the other pursuant to this Agreement.  Each party agrees that it will use such Confidential Information solely for the purposes of this Agreement, and that it shall be held in confidence by the receiving party to the same extent in at least the same manner as such party protects its own confidential or proprietary information.  Each party shall not disclose, publish, release, transfer or otherwise make available such Confidential Information, directly or indirectly, to any third party without the disclosing party's consent.  For the purposes of this Agreement, "Confidential Information" shall mean all information and documentation of a party disclosed to or accessed by the other party in connection with this Agreement, including (a) all information of a party that is not permitted to be disclosed to third parties under local laws or regulations; (b) information relating to a party's customers, employees, technology, operations, facilities, markets, products, capacities, systems, procedures, security practices, research, development, business affairs and finances, ideas, concepts, innovations, inventions, designs, business methodologies, improvements, trade secrets, copyrightable subject matter, patents and other intellectual property and proprietary information; (c) the terms of this Agreement; and (d) any information developed by a party by reference to the other party's information.  Except to the extent that any applicable law provides otherwise, "Confidential Information" shall not include information that (a) is independently developed by the receiving party without violating the disclosing party's proprietary rights, as shown by the receiving party's written records; (b) is or becomes publicly known other than through unauthorised disclosure; (c) is disclosed by a party to a third party free of any obligation of confidentiality; or (d) is already known by the receiving party at the time of disclosure, as shown by such party's written records, and such party

Page 8
Autonomy VAR Agreement
20080717

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596386

USAO 00002389

has no obligation of confidentiality other than pursuant to this Agreement or any confidentiality agreements entered into before the Effective Date.

20.    NOTICES. Any notice required or permitted to be delivered hereunder shall be in writing and shall be deemed to have been effectively given: (a) immediately upon personal delivery or delivery by facsimile transmission with confirmation receipt; (b) two days after deposit with a commercial overnight courier with tracking capabilities; or (c) five days after being sent by first class pre-paid post or registered or certified mail, to the respective addresses of the parties set forth above. All transmissions shall be marked for the attention of the company General Counsel.

21.    ASSIGNMENT. VAR shall not, without the prior written consent of Autonomy, assign or transfer this Agreement or any amounts payable pursuant to this Agreement by any means, including without limitation by operation of law, change in control, merger, corporate reorganization or otherwise. Autonomy's consent to any assignment of this Agreement shall not constitute Autonomy's consent to further assignment. This Agreement shall be binding on the parties and their respective successors and permitted assigns. Any assignment in contravention of this subsection shall be void.

22.    WAIVER. Failure or neglect by either party to enforce at any time any of the provisions of this Agreement shall not be construed as a waiver of either party's rights under this Agreement nor in any way affect the validity of the whole or any part of this Agreement nor prejudice either party's rights to take subsequent action.

23. ENTIRE AGREEMENT; AMENDMENT. This Agreement sets forth the complete and exclusive agreement between the parties with respect to its subject matter and supersedes any and all other written or oral agreements previously existing between the parties with respect to such subject matter. No alterations, modifications or additions to this Agreement shall be valid unless made in writing and signed by a Director or Officer of each party. The terms of any purchase orders or the like submitted by the Licensee which conflict with any terms in this Agreement or whether or not countersigned as accepted by Autonomy shall not be binding on Autonomy, regardless of Autonomy's failure to object to such terms.

24.    GOVERNING LAW. This Agreement shall be governed by and construed in accordance with English law and the parties submit and consent to the exclusive jurisdiction of the English courts.

25.    SEVERABILITY. If any provision of this Agreement shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

26.    REMEDIES. The parties agree that a material breach of this Agreement adversely affecting Autonomy's proprietary rights in the Autonomy Products would cause irreparable injury to Autonomy for which monetary damages would not be an adequate remedy and that Autonomy shall be entitled to equitable relief in addition to any remedies it may have hereunder or at law.

27.    NON-SOLICITATION. Each party agrees that it will not, directly or indirectly, solicit for employment any employee of the other party who becomes know to the other party in connection with the transactions contemplated by this Agreement, other than pursuant to general solicitations for employment not directed at the other party, at any time from the Effective Date until six months following the termination hereof.

28.    COUNTERPARTS. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one single agreement between the parties.

29.    SURVIVAL. Section 1 (Definitions and Construction), Section 7 (Payments), Section 9.3 (Records), Section 9.4 (Inspection), Section 13 (Intellectual Property Rights), Section 14.6 (Effect of Termination or Expiration), Section 18 (Remedies and Limitation of Liability), Section 19 (Confidential Information), Section 20 (Notices), Section 24 (Governing Law), Section 27 (Non-Solicitation) and Section 29 (Survival) shall survive any termination or expiration of this Agreement.

Executed by a duly authorised signatory for each of the parties on the date set out above.

AUTONOMY SYSTEMS LIMITED.                          AUXILIUM Group

Signed: _____                    Signed: _____

Name: _____                      Name: _____

Title: _____                     Title: _____

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596387

USAO 00002390

EXHIBIT A

SECTION 1: AUTONOMY PRODUCTS

| Autonomy IDOL server |
| --- |
| Other Autonomy Products as may be offered to VAR for resale from time to time |

SECTION 2: TERRITORY

| ITALY |
| --- |

SECTION 3: AUTONOMY TRADEMARKS



- Autonomy, Inc.®, Virage, Inc.®, Verity, Inc.®, Cardiff Software, Inc.®, Ultraseek® , Zantaz® and Meridio®
- Those product names as marked in this Exhibit A

Page A-1

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596388

USAO 00002391

EXHIBIT B

### FORM OF PURCHASE ORDER

PURCHASE ORDER

[DATE]

| From : | [VAR]<br>[ADDRESS] |
| --- | --- |

| To: | [AUTONOMY ENTITY NAME]<br>[AUTONOMY ENTITY ADDRESS] |
| --- | --- |

This Purchase Order is issued under and pursuant to a Value Added Reseller Agreement dated [        ] entered into between Autonomy and VAR ("the Agreement").

The terms set forth below to the extent they contradict the Agreement shall supersede the Agreement provided Autonomy has signed this Purchase Order accepting it. All other terms and conditions contained in the Agreement shall remain in full force and effect.

| 1. | End User | : | [XX] |
| --- | --- | --- | --- |
| 2. | Software | : | [XX] |
| 3. | Languages | : | [XX] |
| 4. | Platform | : | [XX] |
| 5. | Number of Instances | : | One each of (1) above per server below |
| 6. | Number of Production Servers | : | and [XX] for Failover/Distribution [to be used if end user is licensed failover/distribution above] |
| 7. | Number of Non-Production Servers | : | [XX] for development, [XX] for QA/testing, [XX] for backup/disaster recovery |
| 8. | Number of Production CPUs | : | [XX] |
| 9. | Number of Developers | : | [XX] |
| 10. | Maximum Number of Documents | : | [XX] |
| 11. | Authorised Production Use | : | [ ] Intranet |

[    ] Password-protected Extranet for _____ [ WHO CAN ACCESS]

[ ] On-Line Service

Restrictions:

[ ] Name of Application: _____

[ ] Application Description: _____

Other restrictions:

_____ [LIMIT TO

DIVISION/GROUP; TYPE OF USAGE; OTHER]

Page B-1

HP-SEC-01596389

USAO 00002392

| | | |
|---|---|---|
| 12. If Intranet or Extranet, Number of Users | : | [XX] |
| 13. If On-Line Service, domain address and usage | : | www.          , for use solely for                    [DESCRIBE] |
| 14. If On-Line, will Licensee receive compensation for use | | [ ] Yes |
| | | [ ] No |
| 15. Territory of Software installation | : | [XX] |
| 16. Technical Support Contacts | : | VAR: Technical Contact<br>Name:<br>Phone:<br>E-mail:<br><br>End User Technical Contact<br>Name:<br>Phone:<br>E-mail: |
| 17. Licence Fee | : | [XX], invoiced immediately |
| 18. Support Fee (first year) | : | [First / Second Line Support]<br><br>[XX]% of Licence Fee per annum, first year to be invoiced immediately and thereafter to be invoiced annually on each anniversary of the Commencement Date |
| 19. Licence and Support Fee Payment Terms | : | 30 days from date of invoice |
| 20. Delivery Address | : | Shipped ExWorks point of manufacture (per Incoterms 2000) via electronic delivery, and, if requested, hard copy to: |
| 21. Commencement Date | : | On Effective Date |
| 22. Expiry Date | : | [XX] [None], subject to termination pursuant to Agreement |

[If K2, add:] Licensee acknowledges that the Software may be shipped with certain libraries and other code that are not licensed under this Agreement, but rather are provided to Licensee pursuant to the terms and conditions of separate open-source licence agreements ("Open Source Code"). Such separate licence terms are provided on the Product disc in the ThirdPartyLicence.txt file. Any support warranty or indemnification Autonomy provides for the Product does not extend to Open Source Code. Notwithstanding the terms to the contrary in this section, to the extent that the Product includes any Open Source Code that is licensed under the GNU Lesser General Public Licence ("LGPL Code") or Apache Code, Licensee may modify the Open Source Code in the Product for Licensee's own use and reverse-engineer the Open Source Code in the Product solely to the extent necessary to debug Licensee's modifications, in both cases solely to the extent necessary for Licensee to modify the LGPL Code and/or Apache Code and relink the modified LGPL Code/Apache Code to the Product.

Applicable Definitions:

CPU: a single core central processing unit on a computer.

Developer: an individual employed and authorised by Licensee to Use and access the functionality of the Development Software for purposes of developing or administrating the Application, regardless of whether the individual is actually using or accessing the Software at any given time.

Development Software: the tool and other portions of the Software which are used to incorporate the Run-Time Software in the Application and enable the Run-Time Software to provide the applicable functionality within the Application.

Page B-2

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596390

USAO 00002393

**Documents:** For the purposes of this Contract a "Document" shall be defined as a document section or page from a multi-paged or single paged document (eg, a page in .pdf or .doc document) that is no more than 4096 characters in size.

**Non-Production Use:** development, quality assurance, testing, and disaster recovery usage.

**On-Line Service:** any dial-up, remote access, interactive, Internet-based or other on-line service or World Wide Web site supported by one or more servers.

**Production Use:** live or fail-over usage for commercial, business or production purposes.

**Run-Time Software:** the portion of the Software which must be incorporated in an Application to execute the search, retrieval and other functionality of the Software.

**Servers:** computing devices acting as a server for a network of interconnected computing devices, whether within an enterprise or other Web, intranet or internet environment, which are owned/leased and controlled by Licensee, upon which the Product may be installed or accessed.

**User:** an individual authorised by Licensee to use or access the functionality of the Product, regardless of whether the individual is actually using or accessing the applicable Product at any given time.

| VAR Signature | | Accepted by Autonomy | |
|---|---|---|---|
| Name | | Name | |
| Title | | Title | |
| Date | | Date | |

Page B-3

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596391

USAO 00002394

EXHIBIT C

SECTION 1:  AUTONOMY VAR PROGRAM FEES

The fee payable pursuant to Section 8.4 is USD$25,000.00 annually.

SECTION 2:  SUBLICENCE FEES

Pursuant to Clause 6.1 the price discount (off of Autonomy list price) to VAR shall be as follows: 20%.

SECTION 3:  TRAINING

Following payment of the VAR program fees, VAR shall be entitled to one training day of free training for two delegates at an applicable Autonomy Training course.

Page C-1

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596392

USAO 00002395

# EXHIBIT R

USAO 00002396

FOIA CONFIDENTIAL TREATMENT REQUESTED

## Auxilium Tech S.r.l / Biblioteca Apostolica Vaticana

| Reporting period | Posting Date | Description | General Ledger account | Dr £ | Cr £ | Dr £ | Cr £ | Reference to supporting document |
|---|---|---|---|---|---|---|---|---|
| 1) Revenue was accrued in relation to the Alternate Product Schedule (€2,590,000 / £1,161,265) | | | | | | | | |
| Q2 2010 | 31-Mar-10 | A VAR arrangement with Auxilium was entered into on 31 March 2010, with fees of €2,625,000 (being €2,500,000 relating to the license and Biblioteca Apostolica Vaticana ("BAV") for the "Digitalisation of the Vatican Library data Archive data Biblioteca Apostolica Vaticana" project, being the digitalised archiving of the Vatican Library (see HP-SEC-01656660 to HP-SEC-01656673. No revenue was booked or recognised in relation to these amounts in Q2 2010. | Unbilled receivables / License revenue | 1,161,265 | 1,161,265 | 1,898,024 | 1,898,024 | HP-SEC-01656670 (row 130); HP-SEC-01656708" HP-SEC-01656677 (row 139); HP-SEC-01656708" |
| 2) An invoice was issued on 28 May 2010 in relation to the 31 March 2010 VAR arrangement (€2,625,000 / £2,277,662) | | | | | | | | |
| Q2 2010 | 28-May-10 | On 27 May 2010, Auxilium issued a sale order (see HP-SEC-01656656) for the total fees under the 31 March 2010 VAR arrangement, being €2,625,000, which all related to the license fee of €2,500,000 and first year maintenance invoiced to Auxilium by ASL on 28 May 2010 (see HP-SEC-01656674 to HP-SEC-01656675). On 28 May 2010, ASL recognised license fees of £2,188,821 (the GBP equivalent of €2,500,000) in license revenue and deferred the maintenance fees of £108,441 (£125,000) to be released to revenue over a one year period. | Accounts receivable License revenue Deferred revenue – maintenance | 2,277,662 | 2,188,821 108,441 | 3,543,419 | 3,470,114 175,206 | HP-SEC-01656660 to HP-SEC-01656618 HP-SEC-01656699 to HP-SEC-01656609 (see HP-SEC-01656618) |
| 3) An adjustment was made to remove the license revenue recognised on the 28 May 2010 invoice | | | | | | | | |
| Q3 2010 | 30-Jun-10 | On 30 June 2010, part of the license fee revenue (£1,007,556) that had been recognised on 28 May 2010 was deferred to the balance sheet. On the same date, a journal was posted to remove £1,161,265 from the P&L. The net effect of these postings and those in point (2) above was that no net license revenue was recognised in Q2 2010. | License revenue Deferred revenue – license License revenue Unbilled receivables | 1,007,556 1,161,265 | 1,007,556 1,161,265 | 1,610,090 1,898,024 | 1,610,090 1,898,024 | HP-SEC-01656684 HP-SEC-01656694 HP-SEC-01656677 to HP-SEC-01656699 (at HP-SEC-01656679) HP-SEC-01656699 |
| 4) A bad debt provision was created | | | | | | | | |
| Q1 2011 | 31-Mar-11 | No payment was remitted by Auxilium to ASL. In Q1 2011, Autonomy made a provision of £911,558 (the USD equivalent of £956,000), which was recorded in ASL's general ledger on 31 March 2011. | Bad debt expense (P&L) Allowance for doubtful debt accts (balance sheet) | 956,000 | 956,000 | 911,558 | 911,558 | HP-SEC-01656508 ('Data' tab, cell 1444) |
| 5) An additional bad debt provision was created | | | | | | | | |
| Q2 2011 | 30-Jun-11 | In Q2 2011, Autonomy recorded an "Addtn Provision" of £438,272, (the USD equivalent of £275,641, as a consolidation adjustment at 30 June 2011. | Bad debt expense (P&L) Allowance for doubtful debt accts (balance sheet) | 275,641 | 275,641 | 438,272 | 438,272 | HP-SEC-01656508 ('Data' tab, cell V444) |

USAO 00002397

HP-SEC-01656672

FOIA CONFIDENTIAL TREATMENT REQUESTED

| Reporting period | Posting Date | Description | General ledger account | Dr £¹ | Cr £¹ | Dr $¹ | Cr $¹ | Reference to supporting document |
|---|---|---|---|---|---|---|---|---|
| **6) An adjustment was made to write off the bad debt in relation to the 28 May 2010 invoice (see transaction no. 2 above)** | | | | | | | | |
| Q3 2011 | 30-Sep-11 | (On 30 September 2011, the 28 May 2010 invoice was fully written off in ASL's general ledger. At this stage, debtors were reduced by £2,277,262 (the GBP equivalent of the original invoice amount of £2,625,007).) | Accounts receivable | | 2,277,262 | | 3,643,619 | HP-SEC-01656337 to HP-SEC-01656356 (at HP-SEC-01656350); HP-SEC-01656276 |
| | | | AR translation | | | | 3,643,619 | HP-SEC-01656337 to HP-SEC-01656356 (at HP-SEC-01656353); HP-SEC-01656357 |
| | | | Bad debt expense (P&L) | 2,277,262 | | 3,643,619 | | HP-SEC-01656357; HP-SEC-01656311 to HP-SEC-01656356 (at HP-SEC-01656338)² |
| | | | AR translation | | 2,277,262 | | 3,643,619 | HP-SEC-01656311 to HP-SEC-01656356 (at HP-SEC-01656353)² |
| **7) An adjustment was made to reclassify and then to remove the remaining balance from the balance sheet** | | | | | | | | |
| Q2 2012 | 15-Feb-12 | A credit balance of £1,007,556 relating to deferred income from Q2 2010 continued to be carried on the balance sheet. This was subsequently transferred to prepayments and then written back against opening reserves during 2012. | Deferred revenue - license | 1,007,556 | | 1,612,090 | | HP-SEC-01656597 |
| | | | Prepaid expenses - acquisition | | 1,007,556 | | 1,612,090 | HP-SEC-01656597 |
| Q4 2012 | 31-Oct-12 | | Prepaid expenses - acquisition | 1,007,556 | | 1,612,090 | | HP-SEC-01656598; HP-SEC-01656599 (tab "Oct 12", row 72) |
| | | | Retained earnings - opening | | 1,007,556 | | 1,612,090 | HP-SEC-01656599 (tab "Oct 12", row 72) |

**Notes:**
¹ Accounting entries in Autonomy Systems Limited are recorded in GBP. The USD figures shown above are generally translations at a rate of $1.60 : £1.00.
² Autonomy finance have matched this journal to the Audilum transaction based on the timing and the amount of the accrual.

# EXHIBIT S

USAO 00002399

**AUTONOMY CORPORATION PLC ANNOUNCES RESULTS FOR
THE FIRST QUARTER ENDED MARCH 31, 2010**

*Record Q1 results with strong EPS growth in line with analysts' consensus estimates;
EPS (adj.) up 44%; Revenues up 50%; Profit from operations (adj.) up 48%*

**Cambridge, England** – April 21, 2010 – Autonomy Corporation plc (LSE: AU. or AU.L), a global leader in infrastructure software, today reported financial results for the first quarter ended March 31, 2010.

Financial Highlights

- Record first quarter revenues of $194.2 million (versus analysts' consensus of $193 million), up 50% from Q1 2009 including strong organic growth of 17%[1]
- Gross profits (adj.) at $172.6 million, up 48% from Q1 2009; gross margins (adj.) at 89%
- Q1 operating margins (adj.) at 44%
- Record Q1 profit before tax (adj.) at $85.3 million, up 47% from Q1 2009
- Record Q1 fully diluted EPS (adj.) of $0.25 (versus analysts' consensus of $0.25), up 44% from Q1 2009. Fully diluted EPS (IFRS) of $0.21 compared to $0.15 in Q1 2009

---

[1] See supplemental metrics on page 3.

Commenting on the results, Dr Mike Lynch, Group CEO of Autonomy said today: "We entered 2010 with strong momentum after significant market share gains in 2009, aided by strong product positioning and increased marketing expenditure at a time when other companies were scaling back. This strength is now reinforced with discretionary spend being made available as companies look to invest for growth. Whilst Q1'10 reflected the expected seasonality as one of our traditionally weaker quarters, the stronger pipeline and improved closure rates mean that we are growing more confident about a possible recovery. Customers have resumed planning for larger projects, the main effects of which we expect to see in the second half."

Dr Lynch continued: "Also during the quarter, Chairman Robert Webb QC fulfilled his commitment to appoint two new non-executive directors to Autonomy's Board. We are privileged to be joined by Jonathan Bloomer and Dr Frank Kelly, each of whom brings a wealth of experience."

Dr Lynch concluded: "Understanding of the applicability of IDOL SPE continues to increase and interest in this nascent market together with new product launches in the meaning based marketing and protect areas strengthen our overall offering. We continue to make our technology available across a host of platforms from OEM and software license to appliance and cloud. These are likely to be strong growth drivers in 2010 and underpin our positive outlook, but we also remain mindful of the fragility of the global macro-economic environment. We have been able to raise sufficient capital at an attractive rate to facilitate the next phase of our strategy and so look forward to the rest of the year."

First quarter 2010 Highlights

- Blue chip first quarter wins include: AT&T, Genentech, Lloyds Bank, American Automobile Association, Carnival Cruises, Citi, Kraft, O2, Samsung, Tesco, Visa, Bank of America and Bayer, as well as new and repeat licenses with multiple government, defence and intelligence agencies around the globe, including in the United States, the United Kingdom, the European Commission, Canada, Spain and Abu Dhabi
- 11 OEM deals signed including new deals and extensions with Adobe, McAfee and Siemens
- Repeat business accounted for 51% of revenue in Q1
- Strong organic growth of 17% from Q1 2009
- Record Q1 revenue of $194.2 million, up 50% from Q1 2009
- Gross margins (adj.) in targeted range at 89%
- Record Q1 profit before tax (adj.) of $85.3 million, up 47% from Q1 2009 (IFRS: $68.8 million, up 38%)
- Operating margins (adj.) stable at 44% (Q1 2009: 45%)
- Fully diluted EPS (adj.) of $0.25, up 44% from Q1 2009 (IFRS: $0.21, up 41%)

Page 1

**FOIA CONFIDENTIAL TREATMENT REQUESTED**                    HP-SEC-01639621

USAO 00002400

- Positive cash flow generated by operations of $85.5 million (Q1 2009: $51.1 million), up 67%
- Average selling price for meaning-based technologies continues to increase.
- Deferred revenue increased to $172.2 million (Q1 2009: $163.7 million)
- DSOs increased slightly to 93 days (Q1 and Q4 2009: 88 days) due to an outstanding government related debtor and the timing of significant commercial customer payments received just after quarter end. This is expected to return to the normal range of 85-90 days during Q2 2010.

### Revenues
Revenues for the first quarter of 2010 totalled $194.2 million, up 50% from $129.8 million for the first quarter of 2009 due to strong organic growth and full quarter Interwoven contribution. During the first quarter of 2010 there were 19 deals over $1.0 million. In the first quarter of 2010, Americas revenues of $135.6 million represented 70% of total revenues, and Rest of World revenues of $58.6 million represented 30% of total revenues.

### Gross Profits and Gross Margins
Gross profits (adj.) for the first quarter of 2010 were $172.6 million, up 48% from $117.0 million for the first quarter of 2009. Gross margins (adj.) for the first quarter of 2010 were 89%, compared to 90% for the first quarter of 2009. Gross profits (IFRS) for the first quarter of 2010 were $158.1 million, up 42% from $111.6 million for the first quarter of 2009. Gross margins (IFRS) for the first quarter of 2010 were 81%, compared to 86% for the first quarter of 2009.

### Profit from Operations and Operating Margins
Profit from operations (adj.) for the first quarter of 2010 was $86.2 million, up 48% from $58.1 million for the first quarter of 2009. Operating margins (adj.) were 44% in the first quarter of 2010, consistent with 45% in the first quarter of 2009. Profit from operations (IFRS) for the first quarter of 2010 was $73.1 million, up 45% from $50.3 million for the first quarter of 2009. Operating margins (IFRS) were 38% in the first quarter of 2010 compared to 39% in the first quarter of 2009.

### Taxation
The effective tax rate in the first quarter of 2010 was 28%, in line with the forecast 2010 full year effective tax rate (2009: 28%) and down from 31% in the first quarter of 2009. Pending the completion of a s382 tax study, which considers the potential availability of further US tax losses, the full year tax rate may decrease from the current forecast level of 28% should further acquired losses become available.

### Foreign Exchange Impact
The effect on revenue in the first quarter of 2010 of movements in foreign exchange rates was a decrease of approximately $0.9 million compared to the fourth quarter of 2009. In the first quarter of 2010 the U.S. Dollar strengthened slightly versus Sterling to an average of $1.56 versus $1.63 in the fourth quarter of 2009 (Q1 2009: $1.44).

### Net Profits
Net profit (adj.) for the first quarter of 2010 was $61.7 million, or $0.25 per diluted share, compared to net profit (adj.) of $40.2 million, or $0.17 per diluted share, for the first quarter of 2009. Net profit (IFRS) for the first quarter of 2010 was $49.7 million, or $0.21 per diluted share, compared to net profit (IFRS) of $34.5 million, or $0.15 per diluted share, for the first quarter of 2009.

### IAS 38 Charges and Capitalization
Under IAS 38 the company is required to capitalize certain aspects of its research and development activities. R&D capitalization in the first quarter of 2010 was $6.6 million (Q1 2009: $3.3 million; Q4 2009: $5.6 million), reflecting a full quarter of Interwoven contribution. Q1 2010 R&D capitalization is offset by amortization charges of $3.5 million (Q1 2009: $1.8 million; Q4 2009: $3.2 million) arising from historical R&D capitalization. The capitalization and offsetting charges resulted in a net credit (before tax) in the quarter of $3.1 million (Q1 2009: $1.5 million; Q4 2009: $2.4 million), and a net margin impact of 1.6% (Q1 2009: 1.2%; Q4 2009: 1.1%).

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639622

USAO 00002401

### Balance Sheet and Cash Flow

Cash balances were $910.9 million at March 31, 2010, an increase of $668.1 million from $242.8 million at December 31, 2009.   Movements in cash flow during the first quarter of 2010 of note included:

- Repayment of the Interwoven credit facility of $54 million;
- Acquisition of MicroLink LLC;
- Net proceeds of Autonomy's convertible bond offering; and
- Purchasing of inventory of $10 million for Q2 2010 sales, most of which have now completed.

Adjusting for purchase of inventory and monies received immediately after quarter end, primarily from government debtors, cash conversion was over 100%.   Trade receivables at March 31, 2010, were $211.4 million, compared to $230.2 million at December 31, 2009.   Accounts receivable days sales outstanding were 93 days at March 31, 2010, compared to 88 days at March 31, 2009 and at December 31, 2009.   Deferred revenues were $172.2 million at March 31, 2010, compared with $173.5 million at December 31, 2009 showing normal seasonality.   Despite the difficult economic climate, bad debt write off in the quarter was less than 1% of revenues.

Accrued income at March 31, 2010 was not material, at under 5% of revenues.

### Supplemental Metrics

Autonomy is supplying supplemental metrics to assist in the understanding and analysis of Autonomy's business.

| Three Months Ended March 31, 2010 | |
|---|---|
| Organic Growth* | 17%[1] |
| Cash conversion (LTM CFFO/LTM adj EBITDA**) | 81% |
| Cash conversion (lagged to account for growth and seasonality of the business) | 89% |
| Cash conversion as a percentage of the theoretical maximum (87%) | 93% |
| Product including hosted and OEM* | $121m |
| IDOL Product | $47m |
| IDOL Cloud | $45m |
| Service revenues* | $11m |
| Deferred revenue release (primarily maintenance)* | $62m |
| OEM derived revenues* | $29m |
|     OEM Dev | $3m |
|     OEM Ongoing | $26m |
| Deals over $1 million | 19 |
| Tax rate | 28% |
| Available tax losses* | $187m |
| LTM revenue with terms >365 days in normal range (<2% of revenues) | |
| Accrued income in normal range (<5% of revenues) | |

\* The above items are provided for background information and may include qualitative estimates.
\*\* Adj. EBITDA is defined as operating cash flow before movements in working capital.
[1]    The company integrates acquired businesses immediately upon acquisition such that it is not possible to identify results from acquired businesses separately from the results of the group.   In order to estimate organic growth the company has combined the reported results for Autonomy and Interwoven for Q1 2009 leading to a pro forma adjustment of $38 million from Interwoven revenues from January 1, 2009 up to March 17, 2009.

### Q1 2010 Product Sales

During the first quarter of 2010, major customer wins included:  AT&T, Genentech, Lloyds Bank, American Automobile Association, Carnival Cruises, Citi, Kraft, O2, Samsung, Tesco, Visa, Bank of America and Bayer.   Repeat business from existing customers accounted for approximately 51% of revenue for the quarter.   Q1 2010 business also included new and repeat licenses with multiple government, defence and intelligence agencies around the globe, including in the United States, the United Kingdom, the European Commission, Canada, Spain and Abu Dhabi.

### Strategic Partnerships and OEMs

Autonomy's OEM Program continued to grow strongly during Q1 2010.   Agreements were signed with 11 customers during the quarter, including new and extended agreements with Adobe, McAfee and Siemens.

Page 3

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639623

USAO 00002402

### Q1 2010 Corporate Developments

During the first quarter of 2010 Autonomy continued to extend its market leadership with the introduction of key new and upgraded IDOL technologies, including the launches of:

- World's first Meaning Based multichannel customer interaction analytics application;
- New innovations across Autonomy's Meaning Based Marketing (MBM) platform;
- Unique integrated web content management, search, optimization and rich media on a single platform;
- DSMail self-service archiving solution for email management, governance and eDiscovery; and
- Industry-leading eDiscovery technology now available on an easy to use appliance.

During the first quarter Autonomy was recognised in multiple ways for its market leadership and unmatched technology, including being:

- Rated "Strong Positive" in Gartner's eDiscovery market report; and
- Receiving top honours at the sixth annual law technology news awards for Autonomy's end-to-end eDiscovery platform.

### Scheduling of Conference Call and Further Information

Autonomy's results conference call will be available live at www.autonomy.com on April 21, 2010, at 9:30 a.m. BST/4:30 a.m. EST/1:30 a.m. PST.

From time to time the company answers investors' questions on its website which may include information supplemental to that set forth above. Questions and answers can be found at: www.autonomy.com/investors/questions.

### About Autonomy Corporation plc

Autonomy Corporation plc (LSE: AU. or AU.L), a global leader in infrastructure software for the enterprise, spearheads the Meaning Based Computing movement. IDC recently recognized Autonomy as having the largest market share and fastest growth in the worldwide search and discovery market. Autonomy's technology allows computers to harness the full richness of human information, forming a conceptual and contextual understanding of any piece of electronic data, including unstructured information, such as text, email, web pages, voice, or video. Autonomy's software powers the full spectrum of mission-critical enterprise applications including pan-enterprise search, customer interaction solutions, information governance, end-to-end eDiscovery, records management, archiving, business process management, web content management, web optimization, rich media management and video and audio analysis.

Autonomy's customer base is comprised of more than 20,000 global companies, law firms and federal agencies including: AOL, BAE Systems, BBC, Bloomberg, Boeing, Citigroup, Coca Cola, Daimler AG, Deutsche Bank, DLA Piper, Ericsson, FedEx, Ford, GlaxoSmithKline, Lloyds Bank, NASA, Nestlé, the New York Stock Exchange, Reuters, Shell, Tesco, T-Mobile, the U.S. Department of Energy, the U.S. Department of Homeland Security and the U.S. Securities and Exchange Commission. More than 400 companies OEM Autonomy technology, including Symantec, Citrix, HP, Novell, Oracle, Sybase and TIBCO. The company has offices worldwide. Please visit www.autonomy.com to find out more.

Autonomy and the Autonomy logo are registered trademarks or trademarks of Autonomy Corporation plc. All other trademarks are the property of their respective owners.

**Financial Media Contacts:**
Edward Bridges / Haya Herbert-Burns
Financial Dynamics
+44 (0)20 7831 3113

**Analyst and Investor Contacts:**
Marc Geall, Head of IR and Corporate Strategy
Autonomy Corporation plc
+44 (0)1223 448 000

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639624

USAO 00002403

**AUTONOMY CORPORATION plc**
**CONDENSED CONSOLIDATED INCOME STATEMENT**
(in thousands, except per share amounts)

| | Three Months Ended (unaudited) | |
|---|---|---|
| | March 31, 2010 $'000 | March 31, 2009 $'000 |
| Revenues (see note 3) | 194,180 | 129,779 |
| Cost of revenues (excl. amortization) | (21,542) | (12,789) |
| Amortization of purchased intangibles | (14,534) | (5,354) |
| Total cost of revenues | (36,076) | (18,143) |
| Gross profit | 158,104 | 111,636 |
| Operating expenses: | | |
| Research and development | (27,782) | (20,010) |
| Sales and marketing | (42,900) | (28,760) |
| General and administrative | (17,255) | (11,288) |
| Other costs | | |
|     Post-acquisition restructuring costs | — | (846) |
|     Profit (loss) on foreign exchange | 2,961 | (433) |
| Total operating expenses | (84,976) | (61,337) |
| Profit from operations | 73,128 | 50,299 |
| Share of loss of associate | (338) | (441) |
| Interest receivable | 807 | 623 |
| Interest payable | (4,797) | (504) |
| Profit before income taxes | 68,800 | 49,977 |
| Income taxes (see note 4) | (19,086) | (15,461) |
| Net profit | 49,714 | 34,516 |
| Basic earnings per share (see note 6) | $ 0.21 | $ 0.15 |
| Diluted earnings per share (see note 6) | $ 0.21 | $ 0.15 |
| Weighted average number of ordinary shares outstanding | 240,888 | 231,704 |
| Weighted average number of ordinary shares outstanding, assuming dilution of options and convertible loan notes | 251,343 | 235,348 |

**Reconciliation of Adjusted Financial Measures**

| | Three Months Ended (unaudited) | |
|---|---|---|
| | March 31, 2010 $'000 | March 31, 2009 $'000 |
| Gross profit | 158,104 | 111,636 |
| Amortization of purchased intangibles | 14,534 | 5,354 |
| Gross profit (adjusted) | 172,638 | 116,990 |
| | | |
| Profit before income taxes | 68,800 | 49,977 |
| Amortization of purchased intangibles | 14,534 | 5,354 |
| Share-based compensation (see note 5) | 1,494 | 1,124 |
| Post-acquisition restructuring costs | | 846 |
| (Profit) loss on foreign exchange | (2,961) | 433 |
| Interest payable on convertible loan notes | 3,119 | — |
| Share of loss of associate | 338 | 441 |
| Profit before income taxes (adjusted) | 85,324 | 58,175 |
| Provision for income taxes | (23,670) | (17,997) |
| Net profit (adjusted) | 61,654 | 40,178 |
| | | |
| Profit from operations | 73,128 | 50,299 |
| Amortization of purchased intangibles | 14,534 | 5,354 |
| Share-based compensation (see note 5) | 1,494 | 1,124 |
| Post-acquisition restructuring costs | | 846 |
| (Profit) loss on foreign exchange | (2,961) | 433 |
| Profit from operations (adjusted) | 86,195 | 58,056 |

The accompanying notes are an integral part of these consolidated financial statements

Page 5

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639625

USAO 00002404

**AUTONOMY CORPORATION plc**
**CONDENSED CONSOLIDATED BALANCE SHEET**

| | As at | |
|---|---|---|
| | (unaudited) | |
| | March 31, 2010 | December 31, 2009 |
| | $'000 | $'000 |
| **ASSETS** | | |
| Non-current assets: | | |
| Goodwill | 1,343,624 | 1,287,042 |
| Other intangible assets | 401,302 | 399,277 |
| Property and equipment, net | 30,822 | 33,886 |
| Equity and other investments | 14,599 | 16,608 |
| Deferred tax asset | 20,153 | 24,015 |
| Total non-current assets | 1,810,500 | 1,760,828 |
| Current assets: | | |
| Trade receivables, net | 211,409 | 230,219 |
| Other receivables | 47,883 | 45,231 |
| Total trade and other receivables | 259,292 | 275,450 |
| Inventory | 10,250 | 486 |
| Cash and cash equivalents | 910,876 | 242,791 |
| Total current assets | 1,180,418 | 518,727 |
| TOTAL ASSETS | 2,990,918 | 2,279,555 |
| | | |
| **CURRENT LIABILITIES** | | |
| Trade payable | (11,639) | (14,926) |
| Other payables | (47,447) | (54,517) |
| Total trade and other payables | (59,086) | (69,443) |
| Bank loan | (78,163) | (52,375) |
| Tax liabilities | (35,201) | (43,338) |
| Deferred revenue | (164,557) | (164,931) |
| Provisions | (2,480) | (2,731) |
| Total current liabilities | (339,487) | (332,818) |
| Net current assets | 840,931 | 185,909 |
| | | |
| **NON-CURRENT LIABILITIES** | | |
| Bank loan | (65,922) | (145,152) |
| Convertible loan notes | (644,824) | |
| Deferred tax liabilities | (85,668) | (85,087) |
| Deferred revenue | (7,627) | (8,576) |
| Other payables | (2,178) | (1,020) |
| Provisions | (4,618) | (5,123) |
| Total non-current liabilities | (810,837) | (244,958) |
| Total liabilities | (1,150,324) | (577,776) |
| NET ASSETS | 1,840,594 | 1,701,779 |
| | | |
| Shareholders' equity: | | |
| Ordinary shares (1) | 1,337 | 1,333 |
| Share premium account | 1,236,511 | 1,130,767 |
| Capital redemption reserve | 135 | 135 |
| Own shares | (803) | (845) |
| Merger reserve | 27,589 | 27,589 |
| Stock compensation reserve | 23,411 | 21,959 |
| Revaluation reserve | 1,688 | 4,499 |
| Translation reserve | (26,324) | (12,032) |
| Retained earnings | 577,050 | 528,374 |
| TOTAL EQUITY | 1,840,594 | 1,701,779 |

(1) At March 31, 2010, 600,000,000 ordinary shares of nominal value 1/3 pence each authorized, 241,342,371 issued and outstanding; as of December 31, 2009, 600,000,000 ordinary shares of nominal value 1/3 pence each authorized, 240,574,304 issued and outstanding.

The accompanying notes are an integral part of these consolidated financial statements

Page 6

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-01639626

USAO 00002405

**AUTONOMY CORPORATION plc**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Three Months Ended | |
|---|---|---|
| | (unaudited) | |
| | March 31, 2010 | March 31, 2009 |
| | $'000 | $'000 |
| **Cash flows from operating activities:** | | |
| Profit from operations | 73,128 | 50,299 |
| Adjustments for: | | |
| Depreciation and amortization | 26,631 | 10,543 |
| Share based compensation | 1,494 | 1,124 |
| Foreign currency movements | (2,961) | 433 |
| Post-acquisition restructuring costs | — | 596 |
| Other non-cash items | — | 126 |
| Operating cash flows before movements in working capital | 98,292 | 63,121 |
| Changes in operating assets and liabilities (net of impact of acquisitions): | | |
| Receivables | 1,578 | (8,492) |
| Inventories | (9,767) | 247 |
| Payables | (4,627) | (3,735) |
| Cash generated by operations | 85,476 | 51,141 |
| Income taxes paid | (23,780) | (10,781) |
| Net cash provided by operating activities | 61,696 | 40,360 |
| | | |
| **Cash flows from investment activities:** | | |
| Interest received | 221 | 623 |
| Purchase of property, plant and equipment | (17,623) | (4,073) |
| Purchase of investments | (2,500) | (980) |
| Expenditure on product development | (6,573) | (3,284) |
| Acquisition of subsidiaries, net of cash acquired | (55,952) | (610,763) |
| Net cash used in investing activities | (82,427) | (618,477) |
| | | |
| **Cash flows from financing activities:** | | |
| Proceeds from issuance of shares, net of issuance costs | 7,165 | 7,755 |
| Proceeds from share placing, net of issuance costs | — | 308,512 |
| Proceeds from convertible loan notes, net of issuance costs | 765,912 | — |
| Interest on bank loan | (1,272) | (201) |
| Repayment of bank loan | (53,906) | — |
| Drawdown of bank loan | — | 200,000 |
| Payment of arrangement fee | — | (3,500) |
| Net cash provided by financing activities | 717,899 | 512,566 |
| | | |
| Net increase (decrease) in cash and cash equivalents | 697,168 | (65,551) |
| Beginning cash and cash equivalents | 242,791 | 199,218 |
| Effect of foreign exchange on cash and cash equivalents | (29,083) | (1,352) |
| Ending cash and cash equivalents | 910,876 | 132,315 |

**AUTONOMY CORPORATION plc**
**CONDENSED CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME**

| | Three Months Ended | |
|---|---|---|
| | (unaudited) | |
| | March 31, 2010 | March 31, 2009 |
| | $'000 | $'000 |
| Net profit | 49,714 | 34,516 |
| | | |
| Revaluation of equity investment | (2,811) | 1,394 |
| Translation of overseas operations | (14,292) | 62 |
| Other comprehensive income | (17,103) | 1,456 |
| Total comprehensive income | 32,611 | 35,972 |

The accompanying notes are an integral part of these consolidated financial statements

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639627

USAO 00002406

**AUTONOMY CORPORATION plc**
**CONDENSED CONSOLIDATED STATEMENT OF CHANGES IN EQUITY**

| | Ordinary shares | Share premium | Capital redemption reserve | Own shares | Merger reserve | Sub-total |
|---|---|---|---|---|---|---|
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
| At January 1, 2010............ | 1,333 | 1,130,767 | 135 | (845) | 27,589 | 1,158,979 |
| Retained profit.................. | — | — | — | — | — | — |
| Other comprehensive income ........................... | — | — | — | — | — | — |
| Stock compensation .......... | — | — | — | — | — | — |
| Share options exercised ... | 4 | 7,929 | — | — | — | 7,933 |
| EBT options exercised ....... | — | — | — | 42 | — | 42 |
| Equity element of convertible loan notes........ | — | 97,815 | — | — | — | 97,815 |
| Deferred tax on stock options...... | — | — | — | — | — | — |
| At March 31, 2010 ............ | 1,337 | 1,236,511 | 135 | (803) | 27,589 | 1,264,769 |

| | Sub-total Forwarded | Stock comp'n reserve | Revaluation reserve | Translation reserve | Retained earnings | Total |
|---|---|---|---|---|---|---|
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
| At January 1, 2010............ | 1,158,979 | 21,059 | 4,499 | (12,032) | 528,374 | 1,701,779 |
| Retained profit .................. | — | — | — | — | 49,714 | 49,714 |
| Other comprehensive income ........................... | — | — | (2,811) | (14,292) | — | (17,103) |
| Stock compensation .......... | — | 1,494 | — | — | — | 1,494 |
| Share options exercised ... | 7,933 | — | — | — | — | 7,933 |
| EBT options exercised ....... | 42 | (42) | — | — | — | — |
| Equity element of convertible loan notes........ | 97,815 | — | — | — | — | 97,815 |
| Deferred tax on stock options...... | — | — | — | — | (1,038) | (1,038) |
| At March 31, 2010 ............ | 1,264,769 | 23,411 | 1,688 | (26,324) | 577,050 | 1,840,594 |

The accompanying notes are an integral part of these consolidated financial statements

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639628

USAO 00002407

AUTONOMY CORPORATION plc

NOTES TO THE CONDENSED SET OF CONSOLIDATED FINANCIAL STATEMENTS FOR THE
THREE MONTHS ENDED MARCH 31, 2010 - UNAUDITED

1.   General information

Quarterly information is unaudited, but reflects all normal adjustments which are, in the opinion of management,
necessary to provide a fair statement of results and the company's financial position for and as at the periods
presented.  The results of operations for the three months ended March 31, 2010, are not necessarily indicative
of the operating results for future operating periods.  The quarterly financial statements should be read in
connection with the company's audited Consolidated Financial Statements and the notes thereto for the year
ended December 31, 2009.  The information for the year ended December 31, 2009 does not constitute statutory
accounts as defined in section 435 of the Companies Act 2006.  A copy of the statutory accounts for that year
has been delivered to the Registrar of Companies.  The auditors reported on those accounts; their report was
unqualified, did not draw attention to any matters by way of emphasis and did not contain a statement under
section 498(2) or (3) of the Companies Act 2006.

2.   Accounting policies

Whilst the financial information included in this quarterly announcement has been computed in accordance with
International Financial Reporting Standards (IFRSs) as adopted by the European Union, this announcement does
not itself contain all of the disclosures required by IFRSs.

Basis of preparation
The same accounting policies, presentation and methods of computation are followed in the condensed set of
consolidated financial statements as applied in the group's 2009 Annual Report, except for as described below.

Adoption of new and current standards
The accounting policies adopted in the preparation of the interim condensed consolidated financial statements
are consistent with those followed in the preparation of the Group's financial statements for the year ended 31
December 2009, except for the adoption of new standards and interpretations. In the current financial year, the
Group has adopted International Financial Reporting Standard 3 (Revised 2008) "Business Combinations" and
International Accounting Standard 27 (Revised 2008) "Consolidated and Separate Financial Statements" as
required, and will apply these principles throughout the year. Adoption of these standards did not have any
significant effect on the financial position or performance of the Group.

Going Concern
The group has considerable financial resources together with a significant number of customers across different
geographic areas and industries.  At March 31, 2010 the group had cash balances of $911 million and total debt
of $789 million. The group has no net debt.  As a consequence, the directors believe that the group is well placed
to manage business risks successfully despite the current uncertain economic outlook.

After making enquiries and considering the cash flow forecasts of the group the directors have a reasonable
expectation that the group has adequate resources to continue in operational existence for the foreseeable
future.  Accordingly, they continue to adopt the going concern basis in preparing the twelve month and quarterly
consolidated financial statements

Adjusted Results
Although IFRS disclosure provides investors and management with an overall view of the company's financial
performance, Autonomy believes that it is important for investors to also understand the performance of the
company's fundamental business without giving effect to certain specific, non-recurring and non-cash charges.
Consequently, the non-IFRS (adj.) results exclude share of profit/loss of associates, post-acquisition restructuring
costs and non-cash charges for the amortization of purchased intangibles, share-based compensation, non-cash
translational foreign exchange gains and losses and associated tax effects.  Management uses the adjusted
results to assess the financial performance of the company's operational business activities.

See reconciliations on page 5.

Page 9

FOIA CONFIDENTIAL TREATMENT REQUESTED                                                     HP-SEC-01639629

USAO 00002408

3.    Segmental information

The Company is organized internally along group function lines with each line reporting to the group's chief operating decision maker, the Chief Executive Officer.   The primary group function lines include:   finance; operations, including legal, HR and operations; marketing; sales; and technology.    Each of these functions supports the overall business activities, however they do not engage in activities from which they earn revenues or incur expenditure in their operations with each other.  No discrete financial information is produced for these function lines.   The company integrates acquired businesses and products into the Autonomy model such that separate financial data on these entities is not maintained post acquisition.

The group has operations in various geographic locations however no discrete financial information is maintained on a regional basis. Decisions around the allocation of resources are not determined on a regional basis and the chief operating decision maker does not assess the group's performance on a geographic basis.

The group is a software business that utilises its single technology in a set of standard products to address unique business problems associated with unstructured data.  The group offers over 500 different functions and connectors to over 400 different data repositories as part of its product suite.  Each customer selects from a list of options, but underneath from a single unit of the proprietary core technology platform.  As a result, no analysis of revenues by product type can be provided.

Each of the group's virtual brands is founded on the group's unique Intelligent Data Operating Layer (IDOL), the group's core infrastructure for automating the handling of all forms of unstructured information. Separate financial information is not prepared for each virtual brand to assess its performance for the purpose of resource allocation decisions. The pervasive nature of the group's technology across each brand requires decisions to be taken at the group level and financial information is prepared on that basis.

A significant proportion of the group's cost base is fixed and represents payroll and property costs which relate to the multiple function lines of the group. As a result the business model drives enhanced performance though growing sales and accordingly group wide revenue generation is the key performance metric that is monitored by the chief operating decision maker.   The revenue financial data used to monitor performance is prepared and compiled on a group wide basis. No separate revenue financial analysis is maintained on revenues from any of the virtual brands.

The Company's chief operating decision maker is the group's Chief Executive Officer, who evaluates the performance of the Company on a group wide basis and any elements within it on the basis of information from junior executives and group financial information and is ultimately responsible for entity-wide resource allocation decisions.

As a consequence of the above factors the group has one operating segment in accordance with IFRS 8 "Operating Segments". IFRS 8 also requires information on a geographic basis and that information is shown below.

The group's operations are located primarily in the United Kingdom, the US and Canada. The company also has a significant presence in a number of other European countries as well as China, Japan, Singapore and Australia. The following tables provide an analysis of the group's sales and net assets by geographical market based upon the location of the group's customers.

|  | Three Months Ended | |
| --- | --- | --- |
|  | (unaudited) | |
|  | March 31, 2010 | March 31, 2009 |
|  | $'000 | $'000 |
| Revenue by region: |  |  |
| Americas | 135,595 | 85,183 |
| Rest of World | 58,585 | 44,596 |
| Total | 194,180 | 129,779 |

Page 10

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639630

USAO 00002409

Information about these geographical regions is presented below:

| | Three Months Ended | | | | | |
| | (unaudited) | | | | | |
| | March 31, 2010 | | | March 31, 2009 | | |
| | Americas | ROW | Total | Americas | ROW | Total |
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
| Result by region............. | 55,484 | 14,683 | 70,167 | 38,529 | 13,049 | 51,578 |
| Post-acq'n restr. costs. ..... | | | — | | | (846) |
| Profit (loss) on foreign exch. ........................... | | | 2,961 | | | (433) |
| Operating profit................. | | | 73,128 | | | 50,299 |
| Share of loss of associate.......................... | | | (338) | | | (441) |
| Interest receivable ............. | | | 807 | | | 623 |
| Interest payable ................. | | | (4,797) | | | (504) |
| Profit before tax ................. | | | 68,800 | | | 49,977 |
| Tax....................................... | | | (19,086) | | | (15,461) |
| Profit for the period ........... | | | 49,714 | | | 34,516 |

4.    Income taxes

| | Three Months Ended | |
| | (unaudited) | |
| | March 31, 2010 | March 31, 2009 |
| | $'000 | $'000 |
| Tax charge by region: | | |
| UK....................................................................... | 13,399 | 7,443 |
| Foreign.............................................................. | 5,687 | 8,018 |
| Total .......................................................... | 19,086 | 15,461 |

5.    Share based compensation

Share based compensation charges have been charged in the consolidated income statement within the following functional areas:

| | Three Months Ended | |
| | (unaudited) | |
| | March 31, 2010 | March 31, 2009 |
| | $'000 | $'000 |
| Research and development ............................................................. | 401 | 302 |
| Sales and marketing ....................................................................... | 733 | 551 |
| General and administrative ............................................................. | 360 | 271 |
| Total share based compensation charge ....................................... | 1,494 | 1,124 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639631

USAO 00002410

6.    Earnings per share

The calculation of the basic and diluted earnings per share is based on the following data:

| | Three Months Ended (unaudited) | |
|---|---|---|
| | March 31, 2010 | March 31, 2009 |
| | $'000 | $'000 |
| Earnings for purpose of basic earnings per share, being net profit | 49,714 | 34,516 |
| Effect of dilutive potential ordinary shares: | | |
| Interest on convertible loan notes (net of tax) | 2,254 | — |
| Earnings for the purposes of diluted earnings per share (IFRS) | 51,968 | 34,516 |
| **Number of shares** | | |
| Weighted average number of ordinary shares for the purposes of basic earnings per share | 240,888 | 231,704 |
| Effect of dilutive potential ordinary shares: | | |
| Share options | 3,231 | 3,644 |
| Convertible loan notes | 7,224 | — |
| Weighted average number of ordinary shares for the purposes of diluted earnings per share | 251,343 | 235,348 |

Earnings per share (adj.) is calculated by dividing the net profit (adj.) amounts shown on page 5 by the share denominators shown above.

7.    Related Party Transactions

There have been no related party transactions, or changes in related party transactions described in the latest annual report, that could have a material effect on the financial position or performance of the group in the financial period.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639632

USAO 00002411

**INDEPENDENT REVIEW REPORT TO AUTONOMY CORPORATION PLC**

We have been engaged by the company to review the condensed set of financial statements in the quarterly financial report for the three months ended March 31, 2010, which comprises the condensed consolidated income statement, the condensed consolidated balance sheet, the condensed consolidated statement of changes in equity, the condensed consolidated statement of comprehensive income, the condensed consolidated statement of cash flows and related notes 1 to 7. We have read the other information contained in the quarterly financial report and considered whether it contains any apparent misstatements or material inconsistencies with the information in the condensed set of financial statements.

This report is made solely to the Company in accordance with International Standard on Review Engagements 2410 "Review of Interim Financial Information Performed by the Independent Auditor of the Entity" issued by the Auditing Practices Board.   Our work has been undertaken so that we might state to the Company those matters we are required to state to them in an independent review report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the Company, for our review work, for this report, or for the conclusions we have formed.

**Directors' responsibilities**

The quarterly financial report is the responsibility of, and has been approved by, the directors.

As disclosed in note 2, the annual financial statements of the Company are prepared in accordance with the recognition and measurement criteria of IFRSs as adopted by the European Union.   The condensed set of financial statements included in this quarterly financial report has been prepared in accordance with the accounting policies the group intends to use in preparing its next annual financial statements.

**Our responsibility**

Our responsibility is to express to the Company a conclusion on the condensed set of financial statements in the quarterly financial report based on our review.

**Scope of Review**

We conducted our review in accordance with International Standard on Review Engagements (UK and Ireland) 2410, "Review of Interim Financial Information Performed by the Independent Auditor of the Entity" issued by the Auditing Practices Board for use in the United Kingdom. A review of quarterly financial information consists of making inquiries, primarily of persons responsible for financial and accounting matters, and applying analytical and other review procedures. A review is substantially less in scope than an audit conducted in accordance with International Standards on Auditing (UK and Ireland) and consequently does not enable us to obtain assurance that we would become aware of all significant matters that might be identified in an audit. Accordingly, we do not express an audit opinion.

**Conclusion**

Based on our review, nothing has come to our attention that causes us to believe that the accompanying quarterly financial information is not prepared, in all material respects, in accordance with the recognition and measurement criteria of IFRSs as adopted for use in the EU and the basis set out in note 2.

Deloitte LLP
Chartered Accountants and Statutory Auditors
April 21, 2010
Cambridge, UK

Page 13

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-01639633

USAO 00002412

# EXHIBIT T

USAO 00002413

### 19. RED VENTURES S.R.L. ("RED VENTURES") / POSTE ITALIANE (Q3 2010)

| | |
|---|---|
| **Autonomy Entity** | ASL |
| **VAR** | Red Ventures |
| **Proposed End-User** | Poste Italiane |
| **Date of Sales Agreement** | 30 September 2010 |
| **Licence Fee** | €2,000,000 (plus €100,000 support and maintenance) |
| **Payment Terms** | Payable within 90 days from the date of the invoice |
| **Payment Received** | No payments received from Red Ventures in relation to this transaction |
| **Sales Invoice Date** | 14 October 2010 |
| **Date Product Delivered** | 30 September 2010 |
| **Revenue Recognition on VAR Transaction** | Licence revenue of €2,000,000 (at a GBP equivalent value of £1,722,057 and a USD equivalent value of $2,755,291) was accrued on 30 September 2010 in ASL (no invoice had been raised at this time). In October 2010, an invoice was raised to Red Ventures and £1,721,615 posted to licence revenue in ASL. The accrual was reversed on 31 October 2010.<br><br>Support and maintenance of £86,081 (at a USD equivalent value of $137,730) was deferred in October 2010, to be recognised over the following year. |
| **Transaction between Autonomy and End-User** | No transaction concluded. |
| **Ultimate Conclusion of VAR Transaction** | On 30 September 2011, the invoice total of £1,807,695 was classified as bad debt and written off. |
| **False Accounting** | Non-compliance with IAS 18 paragraph 14(a) and (d). |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01550364

USAO 00002414

# EXHIBIT U

USAO 00002415

No. 143-2015

The Embassy of the United States of America to the Holy See presents its compliments to the Secretariat of State and has the honor to inform the Secretariat that the United States Attorney's Office (USAO) and the Federal Bureau of Investigation (FBI) are currently investigating the financial reporting of Autonomy, a public company.   As part of the investigation, the USAO and FBI are requesting information concerning a potential transaction in 2010 connected to the Vatican Apostolic Library.

The Embassy respectfully asks if Monsignor Cesare Pasini, Prefect of the Vatican Apostolic Library, would be willing to speak to investigators from the USAO and FBI about this investigation.   The investigators are seeking information from Monsignor Pasini to aid their investigation of Autonomy.   Neither Monsignor Pasini, nor the Holy See or Vatican City State is a target of this investigation.

DIPLOMATIC NOTE

USAO 00002416

The Embassy has the honor to attach to this request a list of the questions that the investigators hope to ask Monsignor Pasini in person and another document with background on the case.

The Embassy of the United States of America to the Holy See takes this opportunity to renew to the Secretariat of State the assurances of its highest consideration.

Embassy of the United States of America to the Holy

Rome, ITALY                    August 10, 2015

USAO 00002417

# EXHIBIT V

USAO 00002418



SECRETARIAT OF STATE

No. 82.962

## NOTE VERBALE

The Secretariat of State presents its compliments to the Embassy of the United States of America and has the honor to acknowledge Verbal Note No. 143-2015 of 10 August 2015, transmitting the request of the United States Attorney's Office (USAO) and the Federal Bureau of Investigation (FBI) to interview Monsignor Cesare Pasini, Prefect of the Vatican Apostolic Library, regarding an investigation by the USAO and FBI into the association *Autonomy*.

The Secretariat of State, grateful for the Verbal Note's precision in indicating that Monsignor Pasini, the Holy See and Vatican City State are not under investigation, is pleased to inform the Embassy that it will willingly consider how to assist in the question once the Secretariat has received, through normal diplomatic channels, a formal request of international judicial assistance from the competent American judicial authorities, which must include the questions to be posed to Monsignor Pasini.   As the Holy See does not allow representatives of the requesting Party to participate in the interview, the questioning will be conducted by judges of the Vatican Tribunal.

The Secretariat of State avails itself of the occasion to renew to the Embassy of the United States of America the assurance of its highest consideration.

From the Vatican, 8 October 2015

The Embassy of the United States of America
Via Sallustiana, 49
00187 Roma

USAO 00002419

# EXHIBIT W

USAO 00002420

No. 3 - 2016

The Embassy of the United States of America to the Holy See presents its compliments to the Secretariat of State and has the honor to transmit the enclosed message from the United States Department of Justice requesting time-sensitive international judicial assistance with a criminal investigation into the activities of Autonomy Corporation plc, ("*Autonomy*").

The Embassy has the further honor to refer to the Note Verbale from the Secretariat of State of the Holy See and Vatican City State, dated October 8, 2015, in which the Vatican City State graciously agreed to entertain a request by the United States Department of Justice for investigatory assistance.

The Embassy had the privilege of conveying to the Secretariat of State on August 10, 2015, Note Verbale No.143-2015, wherein the United States Attorney's Office (USAO) and the Federal Bureau of Investigation (FBI) communicated details of the ongoing investigation into some aspects of Autonomy's financial reporting affairs, and requested assistance in the investigation.

DIPLOMATIC NOTE

The Embassy had the further privilege of conveying the United States Department of Justice request for information pertaining to a potential transaction in 2010 connected to the Vatican Apostolic Library.

The Embassy of the United States of America to the Holy See takes this opportunity to renew to the Secretariat of State the assurances of its highest consideration.

Enclosure:  As stated.

Embassy of the United States of America to the Holy See,

Rome, ITALY                    January 14, 2016.





**U.S. Department of Justice**

Criminal Division
*Office of International Affairs*

JEC:CMP
182-

*Washington, D.C. 20530*

December 18, 2015

TO:        Secretariat of State for the Holy See and Vatican City State

SUBJECT:   Request for International Judicial Assistance in the Criminal Investigation of
           Autonomy Corporation

In accordance with the Note Verbale from the Secretariat of State of the Holy See and
Vatican City State, dated October 8, 2015, the United States Department of Justice submits this
Request for International Judicial Assistance. The United States Attorney for the Northern
District of California (the prosecutor) is conducting an investigation into the activities of
Autonomy Corporation plc ("Autonomy"), a software developer located in San Francisco,
California, and the United Kingdom, which is suspected of defrauding Hewlett-Packard
Company ("HP") into acquiring the outstanding shares of Autonomy in October 2011.
Autonomy induced HP into acquiring Autonomy in part based on Autonomy's publicly reported
financial results.

The prosecutor is investigating whether Autonomy misstated its publicly reported
financial results by improperly recording revenue on software transactions when there was no
final sale, when the purported purchaser lacked the ability or intent to pay, and when Autonomy
retained effective control over the software sold. The prosecutor is investigating, among other
things, whether Autonomy properly recorded revenue on the following transactions:

USAO 00002423

- A purported license agreement, dated March 31, 2010, whereby Autonomy purported to license software to Microtechnologies, LLC ("MicroTech"), an entity based in Virginia in the United States, for $11 million for resale to the *Biblioteca Apostolica Vaticana* ("BAV").

- A purported license agreement, dated March 31, 2010, whereby Autonomy purported to license software to Auxilium Tech S.R.L. ("Auxilium"), an Italian entity, for €2,500,000 for resale to BAV.

The prosecutor's investigation to date reveals that Autonomy was in discussions with BAV and an Italian entity, Postecom S.p.A., both before and after March 31, 2010, regarding a possible sale of Autonomy software to BAV to create a digital archive of materials in the Vatican Library. Those discussions included Monsignor Cesare Pasini and Mr. Luciano Ammenti. The prosecutor's investigation to date reveals that no agreement was reached to acquire Autonomy software.

The prosecutor therefore respectfully seeks business records, including agreements, correspondence, and emails, from BAV relating to its dealings with Autonomy, MicroTech (if any), Auxilium (if any), and Postecom, and testimony from Monsignor Cesare Pasini and Mr. Luciano Ammenti, which will enable the prosecutor to determine whether Autonomy appropriately recorded revenue on the transactions with MicroTech and Auxilium.

## CONFIDENTIALITY

The details of this U.S. criminal investigation are considered sensitive. Therefore, please treat this document, its contents, the fact that this request has been made and the results of its execution as confidential and do not disclose it publicly or share it with the subjects of the investigation. Also, please instruct all those who must be made aware of this request for

2

USAO 00002424

purposes of its execution that the request, its contents and subject matter are to be kept confidential and should not be shared with the subjects of the investigation nor disclosed publicly. Any transfer of information to others may seriously jeopardize the ongoing investigation.

### URGENCY

Please inform the executing authority that the U.S. authorities respectfully request that the records be produced no later than **April 30, 2016.**

### THE FACTS

Autonomy was a company incorporated in England and Wales with a registered office in Cambridge, United Kingdom. Its principal activities were software development and distribution. Autonomy maintained dual headquarters in San Francisco, California, and Cambridge, England, UK. Autonomy was a publicly traded company whose shares were listed on the London Stock Exchange and were bought, held, and sold by individuals and entities throughout the United States.

During the period 2009 through July 2011, Autonomy published financial results on a quarterly basis. It stated that its financial statements were prepared in accordance with International Financial Reporting Standards ("IFRS"). IFRS accounting requirements for revenue recognition are defined largely by International Accounting Standard 18 – Revenue ("IAS 18"), which provides in relevant part as follows:

14. Revenue from the sale of goods shall be recognised when all the following conditions have been satisfied:

(a) the entity has transferred to the buyer the significant risks and rewards of ownership of the goods;

3

USAO 00002425

(b) the entity retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold;

(c) the amount of revenue can be measured reliably;

(d) it is probable that the economic benefits associated with the transaction will flow to the entity; and

(e) the costs incurred or to be incurred in respect of the transaction can be measured reliably.

Autonomy also stated or suggested that it followed Generally Accepted Accounting Principles in the United States for software revenue recognition.

Between 2009 and March 2010, Autonomy personnel, including its Chief Financial Officer Sushovan Hussain, Peter Menell, Julie Dolan, and Corrado Broli, were pursuing a transaction with BAV, whereby Autonomy software would be used to digitize and archive materials in the Vatican Library. In December 2009, Autonomy provided Monsignor Pasini and Mr. Ammenti draft proposals, but none were accepted.

In or around February 2010, Autonomy contemplated partnering with Postecom, a subsidiary of Poste Italiane, to deliver an archiving system to BAV. Documents reflect that Autonomy had discussions and/or meetings with Giovanni Cuturi of Postecom regarding a potential partnership. In late March, Autonomy was provided a letter of intent between Postecom and BAV, which generally stated that Postecom had had preliminary discussions about possible involvement in the archiving project and intended complete verification activities necessary to complete a collaboration proposal; suggested that BAV was seeking financing for the project; and provided for a 50-day period during which BAV would not sign a competing proposal. The letter stated that it did not bind Postecom or BAV to sign a collaboration agreement.

Autonomy had no binding agreement with BAV or Postecom on or before March 31, 2010. Nonetheless, on or about April 1, 2010, Autonomy approached a representative of

4

MicroTech, seeking MicroTech's agreement to pay Autonomy $11 million for software, purportedly for resale to BAV. On or about April 1, 2010, MicroTech signed and returned an $11 million purchase order. The purchase order was backdated to March 31, 2010. Autonomy recorded $11 million in revenue on the MicroTech transaction for the quarter ended March 31, 2010, which revenue was included in Autonomy's publicly reported results and enabled Autonomy to meet expectations of analysts following Autonomy stock.

In addition, on or after April 11, 2010, Autonomy entered into a purported license agreement with Auxilium, whereby Auxilium agreed to pay €2,500,000 for the right to sublicense Autonomy software to BAV and to pay €125,000 in support and maintenance. The agreement was backdated to March 31, 2010. Autonomy recorded license revenue in respect of the Auxilium transaction, which revenue was included in Autonomy's publicly reported results.

MicroTech appears to have no relevant contact with BAV and took no efforts to sell Autonomy software to BAV. Auxilium made no payments to Autonomy. Auxilium does not appear to have made any sale of the listed software to BAV.

From April 2010 through 2011, Autonomy continued to attempt to consummate a sale of software to BAV or an intermediary, but no deal was reached. Documents reflect that Monsignor Pasini may have met personally with Hussain and the CEO of Autonomy, Mike Lynch.

The United States Department of Justice reiterates its prior assurance that Monsignor Pasini, Luciano Ammenti and the Holy See and Vatican City State are not the targets of this investigation.

## **THE OFFENSES**

| | |
|---|---|
| 18 U.S.C. § 371. | Conspiracy to commit offense |
| 18 U.S.C. § 1341. | Fraud by wire, radio, or television. |
| 18 U.S.C. § 1348. | Securities and commodities fraud. |

5

USAO 00002427

18 U.S.C. § 1349.      Attempt and conspiracy.

## NEED FOR ASSISTANCE

The prosecutor is seeking documents from BAV to determine whether it was appropriate for Autonomy to record revenue; whether Autonomy's financial statements were misstated; and whether Autonomy's senior officers intended to misstate Autonomy's financial statements. The prosecutor needs documents from BAV to determine whether, with respect to the purported sales, Autonomy genuinely transferred the significant risks and rewards of ownership of the goods; whether Autonomy retained continuing managerial involvement to the degree usually associated with ownership or effective control over the goods sold; and whether it was probable that the economic benefits associated with the transaction would flow to Autonomy.

### Documents Needed

A.   Business Records

1.      For the period December 2009 to October 2011, please provide complete, certified copies of the following records of BAV:

a.  All agreements, memoranda of understanding, and/or letters of intent with Autonomy, Postecom, Poste Italiane, Auxilium, and/or any purported reseller of Autonomy software regarding the sale/acquisition of Autonomy Software.

b.  All communications (including emails and correspondence) with Autonomy relating to any sale/acquisition of Autonomy software.

c.  All communications (including emails and correspondence) with the following entities relating to Autonomy:  Postecom, Poste Italiane, Auxilium, and/or any purported reseller of Autonomy software.

d.  All communications relating to Lynch, including communications relating any

6

USAO 00002428

possible or actual financial donations, contributions, or funding to any foundation to benefit

BAV or the Vatican City State.

<u>Testimony Needed</u>

We respectfully request that the Vatican Tribunal interview Monsignor Pasini and Mr.

Armentti and ask the following questions:

1.      What is your full name?

2.      What is your date of birth?

3.      Where do you reside?

4.      What is your title?

5.      How long have you held that role?

6.      In 2009, were you working on a project to digitize and archive material in the

Vatican Library?

7.      Please describe the project.

8.      Were you considering Autonomy as a software provider in connection with the

project?

9.      Why?

10.      Were you considering other hardware or software providers?

11.      Please describe your interactions with Autonomy in 2009.  With respect to

meetings, conference calls, or other interactions, please describe: the location, the participants,

and the terms discussed.

12.      In 2009, did Autonomy provide BAV any written proposals?  What did they

consist of?

13.      How were those received?

14.      Did BAV reach an agreement with Autonomy by end of year 2009?

15.      Why not?

7

USAO 00002429

16.   How did you perceive the negotiations with Autonomy at that time – for example, were you optimistic a deal would be done?

17.   Did you continue discussions with Autonomy between January 2010 and March 2010? Please describe those discussions.  With respect to meetings, conference calls, or other interactions, please describe: the location, the participants, and the terms discussed.

18.   How did Postecom become involved in the project?

19.   With whom at Postecom did you have significant interactions?

20.   Did BAV reach a binding agreement with Autonomy or Postecom by the end of March 2010?

21.   If not, why not?

22.   How did you perceive the negotiations with Autonomy and Postecom at that time – for example, were you optimistic a deal would be done?

23.   Are you familiar with a firm called MicroTech?  Auxilium?  What are they?

24.   Please describe your communications, if any, with Autonomy and/or Postecom regarding MicroTech and/or Auxilium.

25.   Was there any discussion with Autonomy or Postecom about the use of resellers, such as MicroTech or Auxilium?

26.   Were you aware that Autonomy had sold software to MicroTech or Auxilium for resale to BAV?  If so, when did you learn that?

27.   Did you ever have any intention of purchasing software from MicroTech? Auxilium?

28.   What role, if any, did MicroTech and Auxilium have in the project?

29.   After March 31, 2010, please describe your interactions with Autonomy regarding the project?  Who did you meet with when?  Was any firm agreement reached?  Why not?

30.   To the extent not already stated, please describe your communications with the following:  (a) Mike Lynch, (b) Sushovan Hussain, (c) Andy Kanter, (d) Corrado Broli, (e) Pete Menell, (f) Julie Dolan, and (g) Giovanni Cuturi.

8

31.     During negotiations with Autonomy, was there any discussion of Autonomy, or any officer or director including Mike Lynch, making a contribution to the Vatican or affiliated entity? Was there discussion of creation of a foundation? What did that involve?

32.     Describe all communications relating to MicroTech.

33.     Did BAV end up using another vendor for the project? Why?

## PROCEDURES TO BE FOLLOWED

<u>Authentication of Official Records</u>

Under United States law, foreign official records are usually admitted into evidence at trial only after the party offering them proves, through a qualified witness (who either gives testimony at trial or provides a certification), that:

1.     the records are true and accurate copies of records maintained by a foreign government office or agency;

2.     the foreign government office or agency is authorized by foreign law to maintain them; and

3.     the foreign official providing the records is doing so in his or her official capacity.

The testimony of a qualified witness may be unnecessary to establish authenticity where a qualified witness provides a certification containing essentially the same information noted above. Therefore, please:

1.     Have the custodian (or other person authorized by law) providing the records attach an attestation that the records are true and correct, maintained by a governmental office or agency as authorized by law, and provided in his or her official capacity. In the event that the custodian (or other authorized person) does not have a formal certificate, stamp, or seal of attestation bearing this information, have him or her complete and attach an Attestation of Authenticity of Official Records (Form A, attached);

2.     Have an official whose signature and official position are known to the U.S. Embassy certify as to the genuineness of the signature and official position of the custodian (or other authorized person) attesting that the records are official

9

USAO 00002431

records provided in an official capacity. Please then permit an appropriate official of the U.S. Embassy to attach a Final Certification as to the genuineness of the signature and official position of the official certifying as to the genuineness of the signature and official position of the custodian (or other authorized person) attesting that the records are official records provided in an official capacity (Form B, attached); and

3.      Transmit the records with attachments to the Office of International Affairs or as otherwise arranged by the appropriate authorities of the Vatican with the Office of International Affairs.

If the custodian (or other person authorized by law) ordered to provide official records fails, after a diligent search, to discover such records, the we request that the custodian, acting in his official capacity, complete and attach an Attestation of Absence of Official Records (Form C, attached). We further request that this attestation be authenticated as prescribed above.

Authentication of Business Records

Under United States law, foreign business records are usually admitted into evidence in a proceeding in the United States after the party offering them proves, through the testimony at trial of a qualified witness, that:

1.      the records produced are true and accurate copies of original records in the custody of the business;

2.      the business made or kept the originals in the ordinary course of business and as a regular business practice; and

3.      the originals were made, at or near the time of the occurrence of the transactions they record, by a person who either had knowledge of those transactions or received the information from a person with such knowledge.

The testimony of a qualified witness may be unnecessary at trial in the United States where that witness makes or provides a written declaration in a foreign jurisdiction that (1) contains essentially the same information noted in items 1 through 3 above, and (2) subjects the

10

USAO 00002432

witness to criminal penalties under the laws of the foreign jurisdiction if the declaration is false.
Accordingly, please have the appropriate authorities in the Vatican City State do the following:

1.   Require each bank/business official producing records to appear, complete, and sign a Certificate of Authenticity of Business Records (Form D, attached); and

2.   Attach the completed certificate to the corresponding records produced by the business official; and

3.   Transmit the records with attachments to the Office of International Affairs or as otherwise arranged by the appropriate authorities of the Vatican with the Office of International Affairs.

In addition, please invite each official producing records to appear, if it should become necessary, at a date to be determined, in the United States, at the expense of the United States government, to testify at trial.  If the witness chooses not to appear in the United States, a formal deposition of the witness at some future date may be requested.

## NEED FOR PROCEDURE REQUESTED

The execution of the attached Certificate of Authenticity of Official Records is needed to receive the requested official records into evidence in accordance with the requirements of United States law.  Ordinarily, foreign public records may be received into evidence if they purport to be executed or attested in an official capacity by a person authorized by the laws of the foreign country to make the execution or attestation and are accompanied by an apostille, pursuant to the Hague Convention, certifying the official position and the genuineness of the signature of the official who produced the records.

Ordinarily, business records may be received into evidence only if a competent representative of the business appears at trial as a witness and testifies as to the authenticity of the records and the manner in which they are prepared and maintained at the business.  However, with respect to foreign business records, the appearance and testimony at trial of a representative

11

USAO 00002433

of a foreign business may not be required if the records (or true copies thereof) are accompanied by a written declaration such as the attached certificate. The statute permitting this procedure (Title 18, United States Code, Section 3505) requires an executed certificate.

Please accept the assurances of our highest esteem.

Jason E. Carter
Acting Deputy Director
Office of International Affairs
Criminal Division

12

USAO 00002434

FORM A

## ATTESTATION OF AUTHENTICITY OF OFFICIAL RECORDS

I, _____, attest that my position with the Vatican City State is
      (Name)

_____ and that in that position I am authorized by the laws of the Vatican City State

to attest that the documents attached hereto and described below:

(1)    are true copies of official records which are authorized by the laws of the Vatican City
State

to be recorded or filed in _____, which is a
                     (Name of Public Office or Agency)
government office or agency.

(2)    set forth matters that are required by the laws of the Vatican City State to be reported and

recorded or filed.

Description of Documents:

                                   _____
                                   (Signature)

(SEAL)
                                   _____
                                   (Date)

13

USAO 00002435

FORM B

### Final Certification

_____        )
       (Country)               )
                                    )
_____        )
  (State, province, etc.)     )
                                    )   ss:
_____        )
        (City)             )
                                    )
_____        )
 (Name of consular post)     )
of the United States of America        )

     I certify that the annexed document is executed by the genuine signature and seal of the

following named official who, in an official capacity, is empowered by the laws of the Vatican

City State to execute that document:  (typed name of official who executed the annexed

document)

     I certify under penalty of perjury under the laws of the United States that the foregoing is

true and correct.

                    _____
                    (Signature of Consular Officer)
                    (Typed name of Consular Officer)
                    (Title of Consular Officer)
                    Consul of the United States of America

                    DATE:

14

USAO 00002436

FORM C

### ATTESTATION OF ABSENCE OF OFFICIAL RECORDS

      I, _____ [NAME], attest that my position with the Holy See and Vatican City State is [OFFICIAL TITLE] and that in that position I am official custodian of records for the [RELEVANT AGENCY], which is required to record or report matters, or file with respect to matters, that are required by the laws of the Vatican City State to be regularly recorded, reported or filed by this agency/organization.

      I further attest that I have made, or caused to be made, a diligent search for the following records:

      *(set forth description of record(s) for which the search was conducted)*

and that no such record(s) is/are found to exist therein.


I certify that the records for which a search was conducted set forth matters which are required by the laws of the Vatican City State to be recorded or filed and reported, and such matters regularly are recorded or filed and reported by _____ [RELEVANT AGENCY]_____ .



                                _____
                                     (Signature)

      (SEAL)

                                _____
                                     (Date)

15

USAO 00002437

FORM D

## CERTIFICATE OF AUTHENTICITY OF BUSINESS RECORDS

I, _____ (Name), attest on penalty of criminal punishment for false

statement or false attestation that I am employed by _____

(Name of Business from which documents are produced) and that my official title is

_____ (Official Title). I further state that each of the records attached

hereto is the original or a duplicate of the original of records in the custody of

_____ (Name of Business from which documents are

produced). I further state that:

A)    such records were made at or near the time of the occurrence of the matters set

forth, by (or from information transmitted by) a person with knowledge of those

matters;

B)    such records were kept in the course of a regularly conducted business activity;

C)    the business activity made the records as a regular practice; and

D)    if any of such records is not the original, such record is a duplicate of the original.

_____      _____
(Signature)                                              (Date)

Sworn to or affirmed before me, _____ (Name), a _____ (notary

public, judicial officer, etc.), this _____ day of _____, 20____.

16

USAO 00002438

# EXHIBIT X

USAO 00002439



**U.S. Department of Justice**
Criminal Division
Office of International Affairs

United States Embassy – Rome, Italy

| Embassy Address: | U.S. Mail: | Tel.:   + 39 06 4674 2680 |
| Via Vittorio Veneto 119/A | DOJ, Unit 9500, Box 23 | Fax:   + 39 06 4674 2266 |
| 00187 Rome, Italy | DPO AE 09624-0023 | Email:  cristina.posa@usdoj.gov |

23 dicembre 2015

**VIA CORRIERE**

Dott. Stefano Opilio
Direttore, Ufficio II, D.G.A.P
Ministero della Giustizia
Via Arenula, 70
00186 Roma

Oggetto:    Richiesta di assistenza giudiziaria nell'indagine ai danni di Autonomy
Corporation

Egr. Dott. Opilio,

Si trasmette ai sensi del vigente Trattato di Mutua Assistenza tra gli Stati Uniti
d'America e la Repubblica Italiana in Materia Penale, l'unita richiesta di assistenza giudiziaria
in lingua inglese, con preghiera di inoltrarla all'Autorità competente per l'esecuzione.

Si rende noto che vi invieremo la traduzione italiana dopo le festività Natalizie.

Si coglie l'occasione per rinnovare i sensi della più alta stima e considerazione.

Distinti saluti.

Cristina M. Posa
Department of Justice Attaché

# EXHIBIT Y

USAO 00002441



**U.S. Department of Justice**
Criminal Division
Office of International Affairs

United States Embassy – Rome, Italy

| Embassy Address: | U.S. Mail: | Tel.: +39 06 4674 2680 |
| Via Vittorio Veneto 119/A | DOJ, Unit 9500, Box 23 | Fax: +39 06 4674 2266 |
| 00187 Rome, Italy | DPO AE 09624-0023 | Email: cristina.posa@usdoj.gov |

4 gennaio 2016

**VIA CORRIERE**
Dott. Stefano Opilio
Ufficio II, D.G.A.P
Ministero della Giustizia
Via Arenula, 70
00186 Roma

Oggetto:    Richiesta di assistenza giudiziaria nelle indagini penali a carico di Autonomy
            Corporation

Gentile Dott. Opilio,

    Si trasmette la traduzione in lingua italiana della richiesta giudiziaria in oggetto, con preghiera di inoltrarla all'Autorità competente per l'esecuzione. Abbiamo già trasmesso la richiesta in lingua inglese al suo ufficio il 23 dicembre 2015.

    Si coglie l'occasione per rinnovare i sensi della più alta stima e considerazione.

                                        Distinti saluti.

                                        Cristina M. Posa
                                        Department of Justice Attaché

USAO 00002442