# EXHIBIT 5

BRIAN J. STRETCH (CABN 163973)
United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
Assistant United States Attorneys

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7534
Fax: (415) 436-7234
Robert.Leach@usdoj.gov
Adam.Reeves@usdoj.gov

Attorneys for United States of America

ORIGINAL
FILED
JUN - 7 2016
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

IN RE GRAND JURY INVESTIGATION NO. 2012R02242,

Case No. CR 14-90491 MISC EMC

**UNDER SEAL**

DECLARATION OF AUSA ROBERT S. LEACH IN SUPPORT OF THE UNITED STATES' *EX PARTE* APPLICATION FOR AN ORDER SUSPENDING THE RUNNING OF THE STATUTE OF LIMITATIONS PURSUANT TO 18 U.S.C. § 3292

I, Robert S. Leach, state the following:

1. I am an Assistant United States Attorney for the Northern District of California. I am one of the prosecutors assigned to this case. I submit this declaration in support of the United States' *Ex Parte* Application for an Order Suspending the Running of the Statute of Limitations Pursuant to 18 U.S.C. § 3292, filed concurrently.

2. A grand jury in this district is conducting an investigation of former senior officers of Autonomy Corporation plc ("Autonomy"), including former Chief Executive Officer Michael Lynch, former Chief Financial Officer Sushovan Hussain, former Vice President of Finance Stephen

Chamberlain, and former Chief Operating Officer and General Counsel Andrew Kanter, for the following possible criminal offenses: 15 U.S.C. §§ 78j(b) & 78ff (securities fraud), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1348 (securities fraud), and 18 U.S.C. § 1349 (attempt and conspiracy). To date, no indictment has been returned.

The Investigation

3. The following information is to the best of my knowledge and belief and is based on information provided to me by federal law enforcement officers, information obtained in connection with the investigation, and my review of documents and testimony relevant to this investigation, including the documents attached hereto.

4. Autonomy was a software developer with dual headquarters in the United Kingdom and San Francisco, California. Prior to October 2011, Autonomy was a publicly traded company whose shares were listed on the London Stock Exchange. Autonomy issued quarterly and annual financial statements that were disseminated to the public by means of interstate and foreign wires. In or about October 2011, Hewlett-Packard Company ("HP"), headquartered in Palo Alto, California, bought Autonomy for approximately $11 billion.[1] HP acquired Autonomy by means of a cash offer by its wholly owned subsidiary, Hewlett-Packard Vision B.V. ("HP Vision"), to buy the outstanding shares of Autonomy for £25.50 ($42.11) per share. Among other things, the grand jury is investigating whether executives at Autonomy fraudulently inflated Autonomy's revenues in its financial statements and made false and misleading statements to HP to induce it to buy Autonomy.

5. In its publicly disseminated financial statements, Autonomy claimed that its financial statements were prepared in accordance with International Financial Reporting Standards ("IFRS"). Attached to this declaration as Exhibit A is a true and correct copy of International Accounting Standard 18 *Revenue*. Among other things, the grand jury is investigating whether executives at Autonomy fraudulently inflated Autonomy's alleged revenue by improperly recording revenue on software sales in

[1] In or around 2015, HP changed its name to "HP Inc." and spun out "Hewlett Packard Enterprise Company" as a new company. For ease of reference, I refer to all three entities as HP.

violation of certain criteria in IFRS. The grand jury is also investigating whether executives at Autonomy concealed from HP substantial sales of third-party computer hardware.

6. Attached as Exhibit B is a true and correct copy of HP-SEC-01661598-625, titled "Capita Registrars Limited and Hewlett-Packard Vision B.V. Agreement for the Provision of Receiving Agent Services Relating to the Acquisition of Autonomy Corporation plc," which was produced to the government by HP.

7. Attached as Exhibit C is a true and correct copy of HP-SEC-01662046-070, an e-mail regarding "Exercise of Autonomy Options Under HP offer," which was produced to the government by HP.

8. Attached as Exhibit D is a true and correct copy of HP-SEC-01661629-131, a letter dated October 4, 2011, which was produced to the government by HP.

9. Attached as Exhibit E is a true and correct copy of HP-SEC-00669637-638, an e-mail dated July 30, 2011, which was produced by HP and reflects that Hussain's cellphone was [redacted]7012.

10. Attached as Exhibit F is a true and correct copy of CITI007142-7146, an e-mail dated July 21, 2010, which I understand was produced by Citibank and reflects Hussain's cellphone was [redacted]9540.

11. Attached as Exhibit G is a true and correct copy of a letter to me and AUSA Adam A. Reeves dated February 10, 2016, from counsel to HP.

12. Attached as Exhibit H is a true and correct copy of HP-SEC-01649854-855, an e-mail dated April 23, 2010, which was produced by HP.

13. Attached as Exhibit I is a true and correct copy of HP-SEC-01650576-577, an e-mail dated June 15, 2010, which was produced by HP.

14. Attached as Exhibit J is a true and correct copy of HP-SEC-01650413-414, an e-mail dated March 12, 2010, which was produced by HP.

15. Attached as Exhibit K is a true and correct copy of HP-SEC-01650403-404, a UBS Sale Instruction Form that appears to be signed by Kanter, which was produced by HP.

16. Attached as Exhibit L is a true and correct copy of HP-SEC-01662036, titled "List of Irrevocable Undertakings Autonomy Corporation plc," which was produced by HP.

17. During the investigation, the United States received information from authorities in the United Kingdom that, as of March 2013, Lynch held an account at Credit Suisse AG in London; that Angela Bacares held Account number [redacted] at HSBC plc; and that Lynch held at J.P. Morgan International Bank Limited in the United Kingdom Account numbers [redacted], [redacted], [redacted], and [redacted]. I understand that Bacares is Lynch's wife and at certain times was an Autonomy employee.

18. During the investigation, the United States received information from authorities in the Bailiwick of Guernsey and the United Kingdom that, in 2008, Lynch and Bacares each established accounts with Merrill Lynch Portfolio Managers Limited, which was acquired by the Julius Baer group of companies in or around July 2013. The United States received information that the assets were transferred to account or relationship number [redacted] held by Lynch and account or relationship number [redacted] held by Bacares.

The Official Request

19. On January 29, 2016, the Office of International Affairs of the Department of Justice submitted a Request for Assistance in the Investigation of Autonomy Corporation to the Central Authority of the United Kingdom (the "UK MLAT"). A true and correct copy of the UK MLAT and the transmittal letter are attached as Exhibit M. The United Kingdom has not yet produced documents in response to the UK MLAT.

20. Attached as Exhibit N is a true and correct copy of the Court's January 29, 2016 Order Suspending the Running of the Statute of Limitations Under 18 U.S.C. § 3292.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 7, 2016

ROBERT S. LEACH
Assistant United States Attorney

# EXHIBIT A

USAO 00002460

# International Accounting Standard 18 *Revenue*

## Objective

Income is defined in the *Framework for the Preparation and Presentation of Financial Statements* as increases in economic benefits during the accounting period in the form of inflows or enhancements of assets or decreases of liabilities that result in increases in equity, other than those relating to contributions from equity participants. Income encompasses both revenue and gains. Revenue is income that arises in the course of ordinary activities of an entity and is referred to by a variety of different names including sales, fees, interest, dividends and royalties. The objective of this Standard is to prescribe the accounting treatment of revenue arising from certain types of transactions and events.

The primary issue in accounting for revenue is determining when to recognise revenue. Revenue is recognised when it is probable that future economic benefits will flow to the entity and these benefits can be measured reliably. This Standard identifies the circumstances in which these criteria will be met and, therefore, revenue will be recognised. It also provides practical guidance on the application of these criteria.

## Scope

1 **This Standard shall be applied in accounting for revenue arising from the following transactions and events:**

(a) **the sale of goods;**

(b) **the rendering of services; and**

(c) **the use by others of entity assets yielding interest, royalties and dividends.**

2 This Standard supersedes IAS 18 *Revenue Recognition* approved in 1982.

3 Goods includes goods produced by the entity for the purpose of sale and goods purchased for resale, such as merchandise purchased by a retailer or land and other property held for resale.

4 The rendering of services typically involves the performance by the entity of a contractually agreed task over an agreed period of time. The services may be rendered within a single period or over more than one period. Some contracts for the rendering of services are directly related to construction contracts, for example, those for the services of project managers and architects. Revenue arising from these contracts is not dealt with in this Standard but is dealt with in accordance with the requirements for construction contracts as specified in IAS 11 *Construction Contracts*.

5 The use by others of entity assets gives rise to revenue in the form of:

(a) interest—charges for the use of cash or cash equivalents or amounts due to the entity;

(b) royalties—charges for the use of long-term assets of the entity, for example, patents, trademarks, copyrights and computer software; and

(c) dividends—distributions of profits to holders of equity investments in proportion to their holdings of a particular class of capital.

6 This Standard does not deal with revenue arising from:

(a) lease agreements (see IAS 17 *Leases*);

(b) dividends arising from investments which are accounted for under the equity method (see IAS 28 *Investments in Associates*);

(c) insurance contracts within the scope of IFRS 4 *Insurance Contracts*;

(d) changes in the fair value of financial assets and financial liabilities or their disposal (see IAS 39 *Financial Instruments: Recognition and Measurement*);

(e) changes in the value of other current assets;

(f) initial recognition and from changes in the fair value of biological assets related to agricultural activity (see IAS 41 *Agriculture*);

(g) initial recognition of agricultural produce (see IAS 41); and

(h) the extraction of mineral ores.

## Definitions

7 **The following terms are used in this Standard with the meanings specified:**

***Revenue* is the gross inflow of economic benefits during the period arising in the course of the ordinary activities of an entity when those inflows result in increases in equity, other than increases relating to contributions from equity participants.**

***Fair value* is the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction.**

8 Revenue includes only the gross inflows of economic benefits received and receivable by the entity on its own account. Amounts collected on behalf of third parties such as sales taxes, goods and services taxes and value added taxes are not economic benefits which flow to the entity and do not result in increases in equity. Therefore, they are excluded from revenue. Similarly, in an agency relationship, the gross inflows of economic benefits include amounts collected on behalf of the principal and which do not result in increases in equity for the entity. The amounts collected on behalf of the principal are not revenue. Instead, revenue is the amount of commission.

## Measurement of revenue

9 **Revenue shall be measured at the fair value of the consideration received or receivable.***

10 The amount of revenue arising on a transaction is usually determined by agreement between the entity and the buyer or user of the asset. It is measured at the fair value of the consideration received or receivable taking into account the amount of any trade discounts and volume rebates allowed by the entity.

11 In most cases, the consideration is in the form of cash or cash equivalents and the amount of revenue is the amount of cash or cash equivalents received or receivable. However, when the inflow of cash or cash equivalents is deferred, the fair value of the consideration may be less than the nominal amount of cash received or receivable. For example, an entity may provide interest free credit to the buyer or accept a note receivable bearing a below-market interest rate from the buyer as consideration for the sale of goods. When the arrangement effectively constitutes a financing transaction, the fair value of the consideration is determined by discounting all future receipts using an imputed rate of interest. The imputed rate of interest is the more clearly determinable of either:

(a) the prevailing rate for a similar instrument of an issuer with a similar credit rating; or

(b) a rate of interest that discounts the nominal amount of the instrument to the current cash sales price of the goods or services.

The difference between the fair value and the nominal amount of the consideration is recognised as interest revenue in accordance with paragraphs 29 and 30 and in accordance with IAS 39.

* See also SIC-31 *Revenue – Barter Transactions Involving Advertising Services*

12 When goods or services are exchanged or swapped for goods or services which are of a similar nature and value, the exchange is not regarded as a transaction which generates revenue. This is often the case with commodities like oil or milk where suppliers exchange or swap inventories in various locations to fulfil demand on a timely basis in a particular location. When goods are sold or services are rendered in exchange for dissimilar goods or services, the exchange is regarded as a transaction which generates revenue. The revenue is measured at the fair value of the goods or services received, adjusted by the amount of any cash or cash equivalents transferred. When the fair value of the goods or services received cannot be measured reliably, the revenue is measured at the fair value of the goods or services given up, adjusted by the amount of any cash or cash equivalents transferred.

## Identification of the transaction

13 The recognition criteria in this Standard are usually applied separately to each transaction. However, in certain circumstances, it is necessary to apply the recognition criteria to the separately identifiable components of a single transaction in order to reflect the substance of the transaction. For example, when the selling price of a product includes an identifiable amount for subsequent servicing, that amount is deferred and recognised as revenue over the period during which the service is performed. Conversely, the recognition criteria are applied to two or more transactions together when they are linked in such a way that the commercial effect cannot be understood without reference to the series of transactions as a whole. For example, an entity may sell goods and, at the same time, enter into a separate agreement to repurchase the goods at a later date, thus negating the substantive effect of the transaction; in such a case, the two transactions are dealt with together.

## Sale of goods

14 **Revenue from the sale of goods shall be recognised when all the following conditions have been satisfied:**

(a) **the entity has transferred to the buyer the significant risks and rewards of ownership of the goods;**

(b) **the entity retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold;**

(c) **the amount of revenue can be measured reliably;**

(d) **it is probable that the economic benefits associated with the transaction will flow to the entity; and**

(e) **the costs incurred or to be incurred in respect of the transaction can be measured reliably.**

15 The assessment of when an entity has transferred the significant risks and rewards of ownership to the buyer requires an examination of the circumstances of the transaction. In most cases, the transfer of the risks and rewards of ownership coincides with the transfer of the legal title or the passing of possession to the buyer. This is the case for most retail sales. In other cases, the transfer of risks and rewards of ownership occurs at a different time from the transfer of legal title or the passing of possession.

16 If the entity retains significant risks of ownership, the transaction is not a sale and revenue is not recognised. An entity may retain a significant risk of ownership in a number of ways. Examples of situations in which the entity may retain the significant risks and rewards of ownership are:

(a) when the entity retains an obligation for unsatisfactory performance not covered by normal warranty provisions;

(b) when the receipt of the revenue from a particular sale is contingent on the derivation of revenue by the buyer from its sale of the goods;

(c) when the goods are shipped subject to installation and the installation is a significant part of the contract which has not yet been completed by the entity; and

(d) when the buyer has the right to rescind the purchase for a reason specified in the sales contract and the entity is uncertain about the probability of return.

17 If an entity retains only an insignificant risk of ownership, the transaction is a sale and revenue is recognised. For example, a seller may retain the legal title to the goods solely to protect the collectibility of the amount due. In such a case, if the entity has transferred the significant risks and rewards of ownership, the transaction is a sale and revenue is recognised. Another example of an entity retaining only an insignificant risk of ownership may be a retail sale when a refund is offered if the customer is not satisfied. Revenue in such cases is recognised at the time of sale provided the seller can reliably estimate future returns and recognises a liability for returns based on previous experience and other relevant factors.

18 Revenue is recognised only when it is probable that the economic benefits associated with the transaction will flow to the entity. In some cases, this may not be probable until the consideration is received or until an uncertainty is removed. For example, it may be uncertain that a foreign governmental authority will grant permission to remit the consideration from a sale in a foreign country. When the permission is granted, the uncertainty is removed and revenue is recognised. However, when an uncertainty arises about the collectibility of an amount already included in revenue, the uncollectible amount or the amount in respect of which recovery has ceased to be probable is recognised as an expense, rather than as an adjustment of the amount of revenue originally recognised.

19 Revenue and expenses that relate to the same transaction or other event are recognised simultaneously; this process is commonly referred to as the matching of revenues and expenses. Expenses, including warranties and other costs to be incurred after the shipment of the goods can normally be measured reliably when the other conditions for the recognition of revenue have been satisfied. However, revenue cannot be recognised when the expenses cannot be measured reliably; in such circumstances, any consideration already received for the sale of the goods is recognised as a liability.

## Rendering of services

20 **When the outcome of a transaction involving the rendering of services can be estimated reliably, revenue associated with the transaction shall be recognised by reference to the stage of completion of the transaction at the end of the reporting period. The outcome of a transaction can be estimated reliably when all the following conditions are satisfied:**

(a) **the amount of revenue can be measured reliably;**

(b) **it is probable that the economic benefits associated with the transaction will flow to the entity;**

(c) **the stage of completion of the transaction at the end of the reporting period can be measured reliably; and**

(d) **the costs incurred for the transaction and the costs to complete the transaction can be measured reliably.***

21 The recognition of revenue by reference to the stage of completion of a transaction is often referred to as the percentage of completion method. Under this method, revenue is recognised in the accounting periods in which the services are rendered. The recognition of revenue on this basis provides useful information on the extent of service activity and performance during a period. IAS 11 also requires the recognition of revenue on this basis. The requirements of that Standard are generally applicable to the recognition of revenue and the associated expenses for a transaction involving the rendering of services.

22 Revenue is recognised only when it is probable that the economic benefits associated with the transaction will flow to the entity. However, when an uncertainty arises about the collectibility of an amount already included in revenue, the uncollectible amount, or the amount in respect of which recovery has ceased to be probable, is recognised as an expense, rather than as an adjustment of the amount of revenue originally recognised.

* See also SIC-27 *Evaluating the Substance of Transactions in the Legal Form of a Lease* and SIC-31 *Revenue – Barter Transactions Involving Advertising Services*

23 An entity is generally able to make reliable estimates after it has agreed to the following with the other parties to the transaction:

(a) each party's enforceable rights regarding the service to be provided and received by the parties;

(b) the consideration to be exchanged; and

(c) the manner and terms of settlement.

It is also usually necessary for the entity to have an effective internal financial budgeting and reporting system. The entity reviews and, when necessary, revises the estimates of revenue as the service is performed. The need for such revisions does not necessarily indicate that the outcome of the transaction cannot be estimated reliably.

24 The stage of completion of a transaction may be determined by a variety of methods. An entity uses the method that measures reliably the services performed. Depending on the nature of the transaction, the methods may include:

(a) surveys of work performed;

(b) services performed to date as a percentage of total services to be performed; or

(c) the proportion that costs incurred to date bear to the estimated total costs of the transaction. Only costs that reflect services performed to date are included in costs incurred to date. Only costs that reflect services performed or to be performed are included in the estimated total costs of the transaction.

Progress payments and advances received from customers often do not reflect the services performed.

25 For practical purposes, when services are performed by an indeterminate number of acts over a specified period of time, revenue is recognised on a straight-line basis over the specified period unless there is evidence that some other method better represents the stage of completion. When a specific act is much more significant than any other acts, the recognition of revenue is postponed until the significant act is executed.

26 **When the outcome of the transaction involving the rendering of services cannot be estimated reliably, revenue shall be recognised only to the extent of the expenses recognised that are recoverable.**

27 During the early stages of a transaction, it is often the case that the outcome of the transaction cannot be estimated reliably. Nevertheless, it may be probable that the entity will recover the transaction costs incurred. Therefore, revenue is recognised only to the extent of costs incurred that are expected to be recoverable. As the outcome of the transaction cannot be estimated reliably, no profit is recognised.

28 When the outcome of a transaction cannot be estimated reliably and it is not probable that the costs incurred will be recovered, revenue is not recognised and the costs incurred are recognised as an expense. When the uncertainties that prevented the outcome of the contract being estimated reliably no longer exist, revenue is recognised in accordance with paragraph 20 rather than in accordance with paragraph 26.

## Interest, royalties and dividends

29 **Revenue arising from the use by others of entity assets yielding interest, royalties and dividends shall be recognised on the bases set out in paragraph 30 when:**

**(a) it is probable that the economic benefits associated with the transaction will flow to the entity; and**

**(b) the amount of the revenue can be measured reliably.**

30 **Revenue shall be recognised on the following bases:**

**(a) interest shall be recognised using the effective interest method as set out in IAS 39, paragraphs 9 and AG5–AG8;**

  (b) **royalties shall be recognised on an accrual basis in accordance with the substance of the relevant agreement; and**

(c) **dividends shall be recognised when the shareholder's right to receive payment is established.**

31 [Deleted]

32 When unpaid interest has accrued before the acquisition of an interest-bearing investment, the subsequent receipt of interest is allocated between pre-acquisition and post-acquisition periods; only the post-acquisition portion is recognised as revenue.

33 Royalties accrue in accordance with the terms of the relevant agreement and are usually recognised on that basis unless, having regard to the substance of the agreement, it is more appropriate to recognise revenue on some other systematic and rational basis.

34 Revenue is recognised only when it is probable that the economic benefits associated with the transaction will flow to the entity. However, when an uncertainty arises about the collectibility of an amount already included in revenue, the uncollectible amount, or the amount in respect of which recovery has ceased to be probable, is recognised as an expense, rather than as an adjustment of the amount of revenue originally recognised.

## Disclosure

35 **An entity shall disclose:**

(a) **the accounting policies adopted for the recognition of revenue, including the methods adopted to determine the stage of completion of transactions involving the rendering of services;**

(b) **the amount of each significant category of revenue recognised during the period, including revenue arising from:**

(i) **the sale of goods;**

(ii) **the rendering of services;**

(iii) **interest;**

(iv) **royalties;**

(v) **dividends; and**

(c) **the amount of revenue arising from exchanges of goods or services included in each significant category of revenue.**

36 An entity discloses any contingent liabilities and contingent assets in accordance with IAS 37 *Provisions, Contingent Liabilities and Contingent Assets*. Contingent liabilities and contingent assets may arise from items such as warranty costs, claims, penalties or possible losses.

## Effective date

37 **This Standard becomes operative for financial statements covering periods beginning on or after 1 January 1995.**

38 Cost of an Investment in a Subsidiary, Jointly Controlled Entity or Associate (Amendments to IFRS 1 First-time Adoption of International Financial Reporting Standards and IAS 27 Consolidated and Separate Financial Statements), issued in May 2008, amended paragraph 32. An entity shall apply that amendment prospectively for annual periods beginning on or after 1 January 2009. Earlier application is permitted. If an entity applies the related amendments in paragraphs 4 and 38A of IAS 27 for an earlier period, it shall apply the amendment in paragraph 32 at the same time.

# EXHIBIT B

USAO 00002467



CAPITA
REGISTRARS

**CAPITA REGISTRARS LIMITED**

**AND**

**HEWLETT-PACKARD VISION B.V.**

**AGREEMENT FOR THE PROVISION OF RECEIVING AGENT SERVICES**

**RELATING TO THE ACQUISITION OF AUTONOMY CORPORATION PLC**

Receiving Agent Agreement v3.2

Capita Registrars Limited
Registered Office: The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU.
Registered in England No. 2605568. VAT No. 618184140.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661598

USAO 00002468

**DATE:** 19 August 2011

**PARTIES:**

(1) **Capita Registrars Limited**, a company registered in England with registered number 2605568 and having its registered office situated at The Registry, 34 Beckenham Road, Beckenham, Kent, BR3 4TU ("**Capita**"); and

(2) **Hewlett-Packard Vision B.V.**, incorporated in The Netherlands a with registered number 53342577 and having its registered office situated at Startbaan 16, 1187 XR Amstelveen, The Netherlands (the "**Offeror**"),

each a "**party**" and together the "**parties**".

**BACKGROUND:**

A. Capita is in the business of providing receiving agent services.

B. The Offeror has made the Offer to acquire the entire share capital of the Offeree.

C. The Offeror now wishes to appoint Capita as its receiving agent in connection with the Offer to provide, or procure the provision of, the Services, on the terms and conditions set out below.

**IT IS AGREED AS FOLLOWS:**

**1. DEFINITIONS AND INTERPRETATION**

1.1 Unless the context otherwise requires, when used herein, the following words and expressions shall have the meanings ascribed below:

| | |
|---|---|
| **"Affiliate"** | means, in respect of a party, any company which is a direct or indirect "holding company" or "subsidiary" of that party or the direct or indirect "subsidiary" of such "holding company", as such terms are defined in section 1159 of the Companies Act 2006; |
| **"Agreement"** | means this agreement and all Schedules attached to it; |
| **"CREST"** | means the computer based system for the transfer of uncertificated securities operated by Euroclear UK & Ireland; |

© 2011 Capita Registrars Limited. All rights reserved.

| | |
|---|---|
| **"Effective Date"** | means the date of this Agreement; |
| **"Euroclear UK & Ireland"** | means Euroclear UK & Ireland Limited (a subsidiary of Euroclear SA), which operates CREST; |
| **"Fees"** | means the fees and charges set out in the Fee Schedule as amended from time to time; |
| **"Fee Schedule"** | means the Fee Schedule attached hereto as Schedule 2 or such replacement Fee Schedule issued pursuant to clauses 5 or 6, from time to time; |
| **"Forms of Acceptance"** | means the forms of acceptance to be posted to Offeree Shareholders under the terms of the Offer; |
| **"Information Rights Register"** | means a register maintained by or on behalf of the Offeree of persons nominated to enjoy information rights pursuant to the Companies Act 2006; |
| **"Offer"** | means the offer by the Offeror; |
| **"Offer Document"** | means the offer document dated on or about 22 August 2011; |
| **"Offer Period"** | means the period from the Effective Date to the last date on which the Offer is capable of acceptance; |
| **"Offeree"** | means Autonomy Corporation Plc; |

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661600

USAO 00002470

**"Offeree Shareholders"** means the shareholders of the Offeree and shall include where the shares are held jointly, each joint holder of the relevant shares and the duly authorised representative of any shareholder;

**"Persons with Information Rights"** means persons specified on the copy Information Rights Register provided to Capita by the Offeree;

**"Services"** means the services to be provided by Capita, as set out in the Services Schedule attached hereto as Schedule 1 or such replacement Services Schedule issued pursuant to clause 5, from time to time.

1.2 Terms not otherwise defined in this Agreement shall have the same meaning given to them in the Offer Document.

1.3 References in this Agreement to a **"clause"** or **"Schedule"** shall mean a clause, or Schedule of this Agreement. References to legislation, regulations, orders or rules shall mean such legislation, regulations, orders or rules, as amended from time to time or any replacement legislation, regulations, orders or rules, from time to time.

1.4 Any reference in this Agreement to a **"day"** means a business day, which is not a Saturday or Sunday and on which the London Stock Exchange is open for business.

1.5 Clause headings are for convenience only and do not affect the interpretation of this Agreement.

**2. APPOINTMENT AND CAPITA'S DUTIES**

2.1 Capita's appointment

From the Effective Date, the Offeror appoints Capita, which accepts such appointment, to be receiving agent and escrow agent in respect of the Offer to provide the Services on the terms and conditions set out in this Agreement.

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661601

2.2 Performance standards

Capita shall use all reasonable skill and care in the performance of its obligations under this Agreement and shall maintain all necessary authorisations and other approvals in compliance with all applicable statutory, legal, and regulatory requirements in force in England (**"Regulatory Requirements"**) for the provision of the Services.

2.3 Proper Instructions

(a) Capita shall accept, and shall be entitled to act upon, proper and reasonable instructions in relation to the Services, which may be given to Capita from time to time, as described in this clause (**"Proper Instructions"**).

(b) Proper Instructions shall, for the purposes of this Agreement, mean written, emailed, facsimiled or any other electronic instructions in respect of the Services issued or purported to be issued by any person(s) authorised by the Offeror, (including, but not limited to, the Offeror's corporate advisers/brokers, solicitors or principal registrar, where relevant). When acting pursuant to Proper Instructions, Capita shall not be under any duty to make any enquiry as to the genuineness or authenticity of such instructions so long as the instructions reasonably appear to be genuine and authentic and do not contain any manifest error on their face. The Company shall indemnify Capita for any liabilities it may suffer in connection with any change to the acceptance criteria or to the terms of the Offer after the Offer Document is published.

(c) Where Capita receives evidence of the authority of any person(s) to act under sub-clause (b) above, it will consider such authority in full force and effect until receipt of written notice to the contrary.

(d) In instances agreed in advance with Capita, Capita may also act pursuant to Proper Instructions given by telephone provided that written confirmation of such instructions is sent to Capita as soon as practicable.

2.4 Service continuity

Capita will take all reasonable steps to:

(a) ensure the continued performance and operational resilience of the Services by means of contingency, back-up and disaster recovery facilities and processes; and

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED


(b) fully restore the Services as soon as practicable in the event of non-availability or failure of Capita's systems for whatever reason.

2.5 Dissentient services

The Offeror agrees to appoint Capita (or an Affiliate of Capita) to administer the register of the Offeree's non-assenting shareholders on its behalf. Such services shall be subject to separate fees and charges to be agreed between the parties at the relevant time. The Offeror agrees that Capita may transmit the details of such non-assenting shareholders to its Affiliate, Capita Tracing Solutions Limited, so that Capita Tracing Solutions Limited may carry out an asset reunification program on an exclusive basis to try to locate the relevant non-assenting shareholders, provided that such program shall be at no cost to the Offeror.

**3. THE OFFEROR'S DUTIES**

3.1 Information and assistance

The Offeror undertakes to perform this Agreement in compliance with all the Regulatory Requirements applicable to it, including its Articles, and to:

(a) give such information or assistance as shall be reasonably necessary to enable Capita to perform its obligations under this Agreement;

(b) promptly provide and/or instruct any third parties (including but not limited to, where relevant, corporate advisers/brokers, solicitors, Euroclear UK & Ireland, the Offeree's principal registrar and/or former registrar, as applicable) to provide such information, records and other materials as Capita may, from time to time, request to enable it to perform the Services;

(c) inform Capita of any treasury shares as defined in section 724(5) of the Companies Act 2006, acquired by the Offeree, if applicable to the provision of the Services by Capita;

(d) furnish Capita with draft copies of the documents to be issued to Offeree Shareholders in order that Capita shall have sufficient and reasonable time to review and comment on such documents prior to publication;

© 2011 Capita Registrars Limited. All rights reserved.

(e) instruct its printers or mailing house to provide Capita with, by no later than the date of publication of the Offer Document, sufficient copies of the Offer Document in hard copy to meet requests for copies of such documents; and

(f) ensure that any shareholder forms relating to the Services that are published on a website of the Company or an Affiliate and are capable of being downloaded, are clearly marked as "void" or "specimen" or otherwise clearly marked to indicate that they may not be used in connection with the Services.

The Offeror acknowledges that Capita will need to liaise (where applicable) with the Offeree's corporate nominee or depositary (the "**Nominee**") prior to the Effective Date in connection with the provision of the Services. The Offeror authorises Capita to contact the Nominee directly in connection with the provision of the Services both before and after the Effective Date and shall procure that the Nominee promptly provides all reasonable assistance to Capita as it may require to assist Capita in providing the Services.

3.2 Due diligence

Capita reserves the right to carry out due diligence on the Offeror under applicable Regulatory Requirements during the term of this Agreement. The Offeror agrees to promptly provide all relevant documentation and information reasonably requested by Capita and the provision of the Services shall be conditional on the Offeror continuing to satisfy all due diligence requirements imposed by the Regulatory Requirements. Where a suitable introduction certificate has been provided to Capita by the Offeror's advisors the amount of such documentation and information is likely to be significantly reduced.

3.3 Exclusive appointment

The Offeror shall not instruct any third party to provide, and shall not itself provide, services similar to the Services during the term of this Agreement.

**4. TERM**

4 This Agreement shall commence on and from the Effective Date and shall, unless earlier terminated in accordance with clause 14, continue until the completion of the Services.

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661604

USAO 00002474

5. **CHANGE CONTROL PROCEDURE**

5.1 Any request by a party to this Agreement (the "**Requesting Party**") for a change to the scope of the Services shall be reasonably considered by the other party (the "**Other Party**"). Both parties, acting reasonably at all times, agree to discuss the proposed change(s) and negotiate any consequential amendments required to this Agreement as a result including, without limitation, the time and costs within which implementation can be achieved and the impact on the Fees from the date of the implementation of the change. Changes required as a result of changes to the Regulatory Requirements shall become effective as soon as practicable following the request from the Requesting Party. No other change to this Agreement shall be effective unless it is in writing and signed by or on behalf of each party.

5.2 All costs of any change caused by changes to the Regulatory Requirements shall be borne by the Offeror. Capita will inform the Offeror of the total costs of any such change.

6. **PAYMENT OF FEES AND EXPENSES**

6.1 In consideration for the provision of the Services the Offeror shall pay the Fees to Capita in accordance with the Fee Schedule.

6.2 In addition, Capita is entitled to recover from the Offeror all reasonable out of pocket expenses incurred in connection with the Agreement. Out of pocket expenses shall include but not be limited to postage, Euroclear UK & Ireland message and network charges, reports, telephony services, electronic transmission charges, mailing, stationery, banking charges, printing, photocopying, courier expenses, and reasonable travelling expenses incurred in connection with the provision of the Services.

6.3 Capita will invoice the Offeror according to the invoice period set out in the Fee Schedule and the Offeror shall pay such invoice according to the payment terms set out in the Fee Schedule.

6.4 Capita shall be entitled to charge interest on any amounts owing from the Offeror but which are unpaid, at an annual rate equal to four percent (4%) above the base interest rate established by Capita's main UK bank, from time to time, from the due date until the date of payment in full.

6.5 The Offeror agrees that Capita may from time to time require legal advice in connection with the provision of the Services. Capita shall be solely responsible for obtaining any such advice but the reasonable cost of such advice will be chargeable to the Offeror.

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661605

6.6 The Fees and any expenses or disbursements incurred in connection with the provision of Services are quoted exclusive of any value added tax ("**VAT**"), which shall be payable by the Offeror in addition thereto (unless an exemption applies).

6.7 The parties acknowledge that the Fees for the Services have been calculated taking into account the recoverability of input VAT wholly or partly attributable to the provision of the Services.

6.8 Where as a result of any change of law, any new or amended VAT ruling, any new or altered practice or interpretation of H.M. Revenue & Customs ("**HMRC**") or any Court or tribunal decision (which events shall be referred to individually or collectively as a "**Change of Law**") Capita revises the Fees to take into account any resulting irrecoverable input VAT or increased recoverable VAT, any resulting increase in the Fees will be payable (plus VAT if applicable) by the Offeror.

6.9 Where as a result of any Change of Law the Fees for Services already supplied are deemed, as a result of such change, to have borne an amount in respect of VAT which was not VAT properly due thereon ("**Overpaid VAT**") and the Offeror requests in writing that Capita seeks a refund of the overpaid VAT from HMRC, Capita shall take the necessary action to claim a refund of the Overpaid VAT to the fullest amount permitted under UK legislation and will remit to the Offeror a sum equal to the amount actually received from HMRC in respect of such claim, less any costs and expenses incurred in relation to the claim.

6.10 Capita shall not be required to take any action referred to in clause 6.9 which involves engaging in any litigation or dispute with HMRC or any other tax authority or any third party, and shall not be obliged to take or omit to take any action which it, in its sole discretion, believes is or could be contrary to the interests of its business.

6.11 For the avoidance of doubt, save in accordance with clause 6.9, Capita shall have no liability to pay any amount to the Offeror in respect of any Overpaid VAT.

## 7. MATERIAL INTEREST

Capita hereby notifies and discloses that it and its Affiliates:

(a) undertake similar services to those provided under this Agreement for other companies;

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661606

(b) may act as agent or make arrangements for the Offeror or on its instructions in relation to transactions in which it is also acting for other companies; and

(c) may from time to time receive and retain remuneration from a third party in consequence of performing its functions under this Agreement.

**8. CAPITA'S WARRANTIES**

8.1 Capita warrants that:

(a) it has full capacity and authority and all necessary consents to enter into and to perform this Agreement and to provide the Services; and

(b) this Agreement is executed by its duly authorised representative with full power and authority to bind Capita.

8.2 All of the warranties specified in this clause 8 are without prejudice to any other warranties expressed in this Agreement. Each such warranty shall be construed as a separate warranty and shall not be limited or restricted by reference, or inference from, the terms of any other warranty or any other term.

8.3 Capita acknowledges and agrees that compliance by it with each such warranty shall not relieve it of any of its other obligations under this Agreement.

**9. OFFEROR'S WARRANTIES**

9.1 The Offeror represents, warrants and undertakes to Capita that:

(a) it has full capacity and authority and all necessary consents to enter into and to perform this Agreement;

(b) this Agreement is executed by its duly authorised representative with full power and authority; and

(c) all the responses and information provided to Capita by the Offeree and Offeror (and their advisers, representatives and agents) are true, accurate and not misleading in any material respect; and

(d) that any shares of the Offeree held in its name or on its behalf, either at the commencement of the Offer Period, or that may subsequently be purchased in its name or on its behalf during the Offer Period and any shares held by it either directly or indirectly that are used for the purposes of the statement required by the final paragraph of Rule

© 2011 Capita Registrars Limited. All rights reserved.

17.1 (Announcement of Acceptance Levels) of the Takeover Code and specifically for inclusion in the Receiving Agent Certificate, do not fall into the category described in Note 8 on Rule 10 (Borrowed shares) of the Takeover Code.

9.2 All of the warranties specified in this clause 9 are without prejudice to any other warranties expressed in this Agreement. Each such warranty shall be construed as a separate warranty and shall not be limited or restricted by reference, or inference from, the terms of any other warranty or any other term.

9.3 The Offeror acknowledges and agrees that compliance by it with each such warranty shall not relieve it of any of its other obligations under this Agreement.

10. **LIABILITY**

10.1 Subject to clauses 10.2 and 10.3, the aggregate liability of Capita and its Affiliates, or its or their directors, officers, employees, or agents under this Agreement (including, but not limited to, contractual or tortious liability, including negligence, breach of statutory duty, restitution or otherwise) for any damage or other loss howsoever caused arising out of or in connection with this Agreement or the provision of the Services will be limited to the lesser of:

(a) £250,000; or

(b) an amount equal to five (5) times the fee payable to Capita hereunder.

10.2 Notwithstanding anything to the contrary in this Agreement (but subject to clause 10.3), neither Capita, or its Affiliates, or any of Capita or its Affiliates' directors, officers, employees, or agents shall have any liability of any type (including, but not limited to, contractual or tortious liability, including negligence and non-fraudulent misrepresentation, breach of statutory duty, restitution or otherwise), for any special, incidental, indirect or consequential loss or damages, or direct or indirect loss of profits, opportunity or goodwill, loss of reputation or customers or any other pure economic loss in connection with or arising out of this Agreement or the Services.

10.3 Nothing in this clause 10 excludes or limits liability for death or personal injury caused by Capita's negligence, for fraud or any other liability which cannot be excluded by law.

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661608

10.4 Nothing in this clause 10 shall exclude or limit the right of Capita to recover, or the obligation of the Offeror to pay, any sums due and payable under this Agreement including, without limitation, any Fees.

10.5 In the event that Capita relies on the Offeror or any third parties (including but not limited to, where relevant, the Offeree, corporate advisers/brokers, solicitors, Euroclear UK & Ireland or the Offeror's principal and/or former registrar, as applicable) to forward, in a timely manner, documents, materials or information necessary for Capita to conduct the Services or to otherwise cooperate with Capita in order for Capita to perform its obligations, Capita shall not be liable to any party for errors, delays or other consequences arising from such failure.

10.6 Where under the Disclosure Rules and Transparency Rules published by the Financial Services Authority (**"FSA"**), Capita has been appointed to maintain an insider list for the purposes of recording the details of those having access to inside information (the **"Insider List"**) Capita shall use reasonable efforts to update and maintain the Insider List, but shall have no liability whatsoever in respect of any errors in doing so.

**11. INDEMNIFICATION**

11.1 The Offeror shall indemnify, defend and hold harmless Capita and its Affiliates, and its and their directors, officers, employees and agents (each, a **"Capita Indemnified Party"**), from and against any and all losses, damages, liabilities, professional fees (including but not limited to legal fees), court costs, and expenses (collectively **"Losses"**) incurred by the Capita Indemnified Party resulting or arising from any breach of the Agreement, and in addition any third-party claims, actions, proceedings, investigations or litigation relating to or arising from or in connection with this Agreement or the Services contemplated herein, except to the extent such Losses are determined to have resulted solely from the fraud or wilful default of the Capita Indemnified Party seeking indemnity under it.

11.2 Capita shall give the Offeror prompt notice of any such claim or lawsuit (including a copy of such claim or lawsuit) served upon it and shall fully co-operate with the Offeror and its legal representatives in the investigation of any matter the subject of indemnification. Capita shall not unreasonably withhold its approval of the settlement of any claim, liability, or action covered by this indemnification provision.

© 2011 Capita Registrars Limited. All rights reserved.

**12. CONFIDENTIALITY**

12.1 It is understood that during the course of this Agreement, a party (the "**Receiving Party**") may receive or be exposed to data and information that is confidential or proprietary to the other party (the "**Disclosing Party**") or its licensors. All such data and information (including but not limited to, data, documents, methodologies, software, trade secrets, personnel records, business strategies, pricing and financial arrangements and commercial affairs), whether written, machine readable or verbal, made available, disclosed, or otherwise made known to a party and its employees or Affiliates as a result of this Agreement (whether disclosed before, on or after the date of this Agreement) shall be considered confidential and shall be considered the sole property of the Disclosing Party (hereinafter "**Confidential Information**").

12.2 The Confidential Information shall be used by the Receiving Party only for purposes of this Agreement. The Receiving Party agrees that it will not reveal, publish or otherwise disclose the Confidential Information of the Disclosing Party or the terms of this Agreement to any third party without the prior written consent of the Disclosing Party, except that each party may disclose Confidential Information:

12.2.1 to its Affiliates, agents and professional advisers or as necessary in the performance of this Agreement or the Services, provided that such persons are made aware of the confidentiality obligations set out herein; and

12.2.2 to the extent obliged to do so by any Regulatory Requirement, an order of any competent judicial, governmental or regulatory body or the rules of any listing authority or stock exchange on which the party's securities are traded.

12.3 The foregoing obligations shall not apply to Confidential Information to the extent that it can be shown, by verifiable written records:

12.3.1 to be publicly available at the time of its disclosure or to have become publicly available thereafter other than as a result of a breach of this Agreement by the Receiving Party; or

12.3.2 to have been in the possession of or to be known by the Receiving Party prior to its receipt from the Disclosing Party; or

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661610

12.3.3 to have become available to the Receiving Party from a source other than the Disclosing Party, which source is not bound by any duty of confidentiality owed in relation to such Confidential Information.

12.4 Notwithstanding clauses 12.1 and 12.2, Capita may disclose for marketing purposes the fact that the Offeror is a client of Capita.

12.5 The Offeror agrees that Capita may use the Offeror's name and logo to the extent necessary for the purpose of the provision of the Services for the term of this Agreement. The Offeror shall not use the name or logo of Capita in any publicly issued documents, without the prior written consent of Capita.

12.6 Neither this Agreement nor the disclosure of Confidential Information by one party to another shall be taken as implying an assignment, licence or transfer to the Receiving Party of patents, know-how, copyright, trade secrets or any other intellectual property rights in the Confidential Information.

12.7 The Offeror agrees that Capita may utilise information contained in the Offeree's share register for the purposes of informing the Offeree Shareholders of other services provided by Capita or its Affiliates, and in respect of providing such services.

**13. DATA PROTECTION**

13.1 All parties shall comply at all times with the Data Protection Act 1998 ("**DPA**") and any regulations made under the DPA.

13.2 Capita acknowledges that it holds personal data as a "**Data Processor**" as defined by the DPA and, in such capacity undertakes that it shall only act on the instructions of the Offeror and in accordance with this Agreement in relation to the processing of any personal data as part of the Services.

13.3 The Offeror authorises Capita to use and disclose such personal data as is necessary for the performance of this Agreement and/or the Services, to any person with legal, administrative or regulatory power over Capita in respect of the Services; or Capita's Affiliates who are involved in carrying out functions related to the Services including such Affiliates which are outside of the EEA in countries which do not have similar protections in place regarding the information and its use. Capita shall ensure that any such Affiliates have put in place proper security measures to ensure at least the same level of protection of the personal data as is required under the DPA.

© 2011 Capita Registrars Limited. All rights reserved.

13.4 The Offeror agrees to comply with the obligations of a **"Data Controller"** as defined in the DPA in respect of all personal data processed under this Agreement and undertakes that:

13.4.1 it has made and shall maintain sufficient registrations and/or notifications under the DPA so that it may control personal data;

13.4.2 it shall provide Capita with details of any material changes to the registrations and notifications referred to in clause 13.4.1; and

13.4.3 it shall ensure that where personal data is supplied to or disclosed to Capita by the Offeror it has made all necessary disclosures to and obtained all consents from the data subjects so that the processing of such personal data by Capita in the manner set out in this Agreement shall fully comply with the DPA.

**14. TERMINATION**

14.1. Either party may terminate this Agreement:

14.1.1 if the other party commits a material breach of its obligations under this Agreement (including a payment default) which that party has failed to remedy within 14 days of receipt of a written notice to do so from the first party; or

14.1.2 if a resolution is passed or an order made for the winding-up, dissolution or administration of the other party, or if the other party is declared insolvent or if an administrator, administrative receiver, manager or provisional liquidator (or similar officer to any of the foregoing in the relevant jurisdiction) is appointed over the whole of or a substantial part of the other party or its assets or undertakings.

14.2 If this Agreement is terminated, the parties shall promptly meet to prepare a close-out schedule and Capita shall cease performing all work not necessary for the orderly close-out of the Services. The Offeror shall pay Capita the Fees in respect of all work actually performed, and reimburse Capita for all Fees and expenses incurred, including, but not limited to, all non-cancellable costs incurred prior to termination but paid after the termination date. The Offeror shall pay for all actual costs, including time spent by Capita personnel to complete activities associated with the termination and close-out of the Services, including the fulfilment of any Regulatory Requirements, if applicable.

© 2011 Capita Registrars Limited. All rights reserved.

14.3 Upon termination of this Agreement and against payment of all sums owing to Capita by the Offeror, all materials and data of the Offeror, regardless of the method of storage or retrieval, shall be delivered to the Offeror in such form as is then in the possession of Capita at the Offeror's risk and expense. Capita, however, reserves the right to retain, at its own cost, and subject to the confidentiality provisions herein, copies of all materials that may be needed to satisfy Regulatory Requirements or resolve disputes regarding the Services, where applicable.

## 15. FORCE MAJEURE

15.1 No party will be liable for a delay or failure to carry out any of its obligations under this Agreement to the extent to which this is caused by any event beyond the reasonable control of the relevant party including, without limitation, strikes, labour disputes, natural disasters, war, riot, vandalism, terrorism, civil commotion, malicious damage, compliance with any law or governmental order, rule, regulation or direction or any overriding emergency procedures, failures of utility or telecommunications supply, accident, breakdown of plant or machinery, fire, flood and storm ("**Force Majeure**"). Notwithstanding the foregoing, nothing in this Agreement shall excuse a delay or failure to comply with a payment obligation under it.

15.2 The party whose performance has been delayed or prevented by Force Majeure shall promptly notify the other party on becoming aware of the Force Majeure and the parties shall take all reasonable steps to overcome and mitigate the effects of Force Majeure by the operation of contingency plans, back-up or disaster recovery or other relevant procedures as soon as reasonably practicable.

## 16. ASSIGNMENT AND SUBCONTRACTING

16.1 The parties cannot assign any of their contractual rights and obligations referred to in this Agreement without the prior written consent of the other party, save that Capita may assign its rights and obligations to any of its Affiliates, provided that, in its reasonable opinion, such Affiliate has the necessary expertise and resources to carry out such obligations.

16.2 Capita may sub-contract certain aspects of the provision of the Services provided that Capita shall, at all times, remain responsible for the provision of the Services and be liable for all acts and omissions of its sub-contractors to the extent that, had such acts and omissions been of Capita, Capita would have been liable in connection with this Agreement.

© 2011 Capita Registrars Limited. All rights reserved.

**17. GENERAL**

17.1 Notices

17.1.1 Any notice required or permitted to be given under this Agreement shall be sent, in writing, to the address or number set out below or to such other address or number notified in accordance with clause 17.2.2, and shall be deemed given:

(a) on the date received if delivered personally or by an overnight delivery service;

(b) two (2) business days after the date of posting if sent by first class post;

(c) five (5) business days after the date of posting if sent by airmail; or

(d) upon dispatch if sent by fax,

in the case of Capita to:

Capita Registrars Limited
The Registry
34 Beckenham Road
Beckenham
Kent
BR3 4TU

Fax: 020 7901 0197

Attention: The Company Secretary

in the case of the Offeror to:

Hewlett-Packard Vision B.V.
Startbaan 16
1187 XR Amstelveen
The Netherlands

Fax:

Attention: The Company Secretary

17.1.2 Any party may amend its details for service of notices at any time by written notice.

17.2 Non-waiver

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661614

No failure, delay, relaxation or forbearance on the part of any party in exercising any right, power or privilege provided by law or under this Agreement will operate as a waiver of it, nor will any single or partial exercise of it preclude any further exercise or the exercise of any other right, power or privilege under this Agreement or otherwise.

17.3 Entire Agreement and modifications

This Agreement (including the Schedules) sets forth and will constitute the entire agreement between the parties in respect of its subject matter and supersedes all previous agreements (oral or written), negotiations and communications in respect of the same subject matter. It may be amended, varied or modified only in writing, signed by a duly authorised person of each of the parties.

17.4 Contracts (Rights of Third Parties) Act 1999

Any third party referred to in clauses 10 and 11 of this Agreement has the right to enforce such rights under this Agreement in accordance with the provisions of the Contracts (Rights of Third Parties) Act 1999. Except as stated in this clause 17.4, the parties to this Agreement do not intend that any of its terms will be enforceable by virtue of the Contracts (Rights of Third Parties) Act 1999 by any person not a party to it.

17.5 Survival of clauses

The rights and obligations of the parties, which by intent or meaning have validity beyond such termination (including, but not limited to, rights with respect to confidentiality, ownership, indemnification and liability limitations) shall survive the termination of this Agreement.

17.6 Severability

If any provisions herein are found to be illegal or unenforceable on the grounds that they are overly broad or in conflict with applicable laws or policy, it is the intent of the parties that such provisions be replaced, reformed or narrowed so that their original business purpose can be accomplished to the extent permitted by law, and that the remaining provisions shall not in any way be affected or impaired thereby.

17.7 No partnership, etc.

The parties acknowledge and agree that nothing in this Agreement or the provision of the Services shall be taken to constitute, create

© 2011 Capita Registrars Limited. All rights reserved.

or imply a joint venture, partnership or formal business association of any kind.

17.8 Counterparts

This Agreement may be executed in any number of counterparts, and by the parties to it on separate counterparts, but shall not be effective until each party has executed at least one counterpart. Each counterpart shall constitute an original of this Agreement, but all the counterparts shall together constitute one and the same instrument.

**18. GOVERNING LAW AND JURISDICTION**

This Agreement and any contractual or non-contractual claim or dispute arising out of or in connection with it will in all respects be governed and construed in accordance with the laws of England and all parties submit to the exclusive jurisdiction of the English courts.

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661616

Page 20 of 28

**This Agreement** has been signed by the parties' duly authorised representatives:

For and on behalf of )
**Capita Registrars Limited** )

Name: GARY ANGUS
Authorised Signatory

Signed for and on behalf of )
**Hewlett-Packard Vision B.V.** )

Name: SERGIO LETELIER

Title: Director

In the presence of:

Signature:

Name: EMMA WALTON

Title ATTORNEY

27471

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661617

USAO 00002487

## SCHEDULE 1

### THE SERVICES

In Capita's capacity as receiving agent and escrow agent it shall provide the following Services in connection with the Offer.

1 Provide assistance in the preparation of the Offer documents (including commenting on proofs of, inter alia, the forms of acceptance ("**Forms of Acceptance**") and the Offer Document to be sent to the Offeree Shareholders and, where applicable, to Persons with Information Rights) and in particular in relation to the procedure for acceptance of, and settlement of consideration under, the Offer.

2 Request from the registrars of the Offeree a copy of the register of members (giving details of Offeree Shareholders holding shares in both certificated and uncertificated form) together with a copy of the Information Rights Register at the date of the announcement of the Offer or, such other date as may be agreed between Capita and the Offeror (the "**Copy Register(s)**") and, on a daily basis, to liaise with the said registrars and Euroclear UK & Ireland to the extent necessary and practicable to obtain duplicate register update requests ("**RURs**"), copies of all documents which would lead to a change in the register and any such other information to ensure that information is received to keep the list of holders and, where appropriate, Persons with Information Rights up to date.

3 Make available a file to the appointed printers or mailing house for the purposes of personalising the Forms of Acceptance and despatch of the Offer Document or, where applicable, a website notification letter and Forms of Acceptance.

4 Provide to the appointed printers or mailing house details of Persons with Information Rights for the purposes of despatch of a copy of the Offer Document or, where applicable, a website notification letter.

5 Notify Euroclear UK & Ireland in a timely manner of the details of the Offer for corporate action purposes.

6 During the Offer Period (including any extension thereof):

6.1 Receive from certificated shareholders the Forms of Acceptance in respect of the Offer together with share certificates and/or other documents of title or transfers to escrow ("**TTE**") from CREST holders in accordance with the terms of the Offer and verify such forms or TTE to the Copy Register;

6.2 Maintain an escrow account to which Offeree shares may be transferred by Offeree Shareholders sending a TTE instruction;

© 2011 Capita Registrars Limited. All rights reserved.

6.3 Act as escrow agent in respect of the shares transferred to an escrow balance in connection with the acceptances under the Offer in accordance with the facilities and requirements of CREST and in accordance with the provisions of the Offer Document;

6.4 Deal with any queries and correspondence arising in relation to the completion of the Forms of Acceptance;

6.5 In the event that any Form of Acceptance has been improperly completed or executed, or the share certificate(s) and/or other document(s) of title accompanying such a Form of Acceptance are not in the proper form for transfer (as requested by the instructions set out in the Form of Acceptance) or if in either case some other irregularity in connection with any tender of share certificate(s) and/or other document(s) of title make reasonable enquiries into such irregularity to cause such action to be taken as is necessary and appropriate to correct such irregularity;

6.6 Capita shall not be under any duty to give notice of any defects or irregularities in documents and/or CREST instructions received, and will not incur any liability for failure to give any such notice;

6.7 Upon request of any Offeree Shareholder, furnish to such person (except for any person in jurisdictions where, under the terms of the Offer, documents may not be sent unless the Offeror previously authorises such furnishing in writing), copies of the Offer Document, any supplements to the Offer Document, Forms of Acceptance, any revisions thereof and the other materials referred to in the Offer Document as being available to Offeree Shareholders provided that the Offeror has supplied Capita with sufficient copies of such documents to meet such requests;

6.8 Upon request of any Person with Information Rights, furnish to such person (except for any person in jurisdictions where, under the terms of the Offer, documents may not be sent unless the Offeror previously authorises such furnishing in writing) copies of the Offer Document and any supplements to the Offer Document being made available to Offeree Shareholders provided that the Offeror has supplied Capita with sufficient copies of such documents in hard copy form "marked "For Information Only" to meet such requests in accordance with Rule 19.9 of the Takeover Code;

6.9 Obtain, from the registrars of the Offeree, any brokers to the Offeror appointed from time to time or such other persons as the Offeror may designate, transfers, or from Euroclear UK & Ireland, duplicate RURs, in respect of purchases of shares by or on behalf of the Offeror and to verify them to the Copy Register;

© 2011 Capita Registrars Limited. All rights reserved.

6.10 Report to the Offeror with details of all valid acceptances under the Offer received and purchases made, (such reports being made, where appropriate, at an appropriate time of day and containing the relevant information to enable the Offeror to comply in all respects with the requirements of Rule 17 of the Takeover Code);

6.11 Ensure that all acceptances and purchases counted as valid meet the requirements set out in Notes 4 and 5 on Rule 10 of the Takeover Code and, if appropriate, Note 6 on Rule 10 of the Takeover Code; and

6.12 Issue at the request of the Offeror any certificate complying with Note 7 on Rule 10 of the Takeover Code and to address such certificate to the Offeror.

7 Following confirmation that the Offer is declared or becomes unconditional in all respects:

7.1 Effect the processing of the individual Forms of Acceptances and/or TTE instructions (including, for the avoidance of doubt, acceptances received after the Offer becomes, or is declared, unconditional in all respects) and calculate the actual entitlements due to individual accepting shareholders of the Offeree under the terms of the Offer;

7.2 In the case of Offeree shares in certificated form, calculate the amount of stamp duty or stamp duty reserve tax due on each individual transfer to the Offeror (or such person as it may nominate), prepare for signature by the Offeror or agent appointed by the Offeror for such purpose any and all forms of transfer and/or other such document(s) necessary in order to register transfers of Offeree shares to the Offeror (or such person as it may nominate), to arrange for the stamping of forms of transfer by HMRC (subject to being placed in funds by or on behalf of the Offeror to meet the costs of any stamp duty or stamp duty reserve tax); and to deliver to the registrars of the Offeree valid Forms of Acceptance, and/or such forms of transfer and/or other document(s) in favour of the Offeror (or such person as it may nominate) together with the relevant share certificates or other documents of title so as to receive the resultant share certificate(s) for Offeree shares for onward transmission to the Offeror (or such person as it may nominate);

7.3 In the case of Offeree shares in uncertificated form, make the relevant calculation for stamp duty or stamp duty reserve tax, the arrangements for the payment of stamp duty or stamp duty reserve tax and in addition to do all such things as are necessary to effect the transfer of such shares to the Offeror (or such person as it may nominate) in accordance with the facilities and requirements of CREST (subject to being placed in funds by or on behalf of the

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661620

Offeror to meet the costs of any stamp duty or stamp duty reserve tax payable in connection therewith);

7.4 Issue to accepting shareholders of the Offeree the consideration and to despatch (subject to being placed in funds by or on behalf of the Offeror), in accordance with the terms of the Offer and within the time periods required by Rule 31.8 of the Takeover Code (subject to the provisions for overseas Offeree Shareholders resident in jurisdictions where documentation in relation to the Offer may not be sent) and the authority contained in the Forms of Acceptance, such consideration due to accepting shareholders of the Offeree under the terms of the Offer, provided that no consideration will be sent to an accepting shareholder until its document(s) of title to the relevant Offeree shares has been received or the relevant TTE has settled; and

7.5 Open, maintain and operate a bank account for the purpose of issuing cash entitlements to or, where relevant, crediting member accounts of accepting shareholders of the Offeree and make the relevant payment on being placed in funds by or on behalf of the Offeror.

8 Assist in the preparation, in accordance with instructions received from or on behalf of the Offeror, for despatch on the applicable date(s), of notices pursuant to sections 974 to 991 of the Companies Act 2006 and deal with the compulsory acquisition of shares held by non-assenting Offeree Shareholders and, the Offeror agrees to appoint Capita to administer the register of such non-assenting shareholders on its behalf. Such services shall be subject to separate fees and charges to be agreed in a separate agreement signed between Capita and the Offeror at the relevant time.

9 If the Offer does not become or is not declared unconditional or lapses, return all share certificates and/or other documents of title together with the appropriate Forms of Acceptance to the persons entitled thereto, within 14 days of the Offer lapsing; or immediately after the lapsing of the Offer (or within such longer period as the Panel may permit, not exceeding 14 days of the lapsing of the Offer) give instructions to Euroclear UK & Ireland to transfer all Offeree shares held in escrow balances and for which we are the escrow agent for the purposes of the Offer to the original available balances of the shareholders concerned, in accordance with the provisions of the Offer Document.

10 Receive from any Offeree Shareholder wishing to exercise their withdrawal rights (where permitted under Rule 34 of the Takeover Code) a valid notice of withdrawal and, to return all share certificates and/or other documents of title lodged with the appropriate Form of Acceptance and , where relevant, transfer all Offeree shares held in escrow balances to the original available balances of the Offeree Shareholders concerned.

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661621

11 Comply in all respects with Appendix 4 to the Takeover Code and to inform and consult with the Offeror and its advisers if we require direct access to the Panel on Takeovers and Mergers.

12 Undertake:

12.1 Not to send or distribute any documents (including, without limitation, the Offer Document and the Forms of Acceptance) in or into a jurisdiction where documentation in relation to the Offer may not, under the terms of the Offer, be sent, unless the Offeror previously authorises such sending or distribution in writing; and

12.2 Not to send Forms of Acceptance to Persons with Information Rights; and

12.3 To notify you immediately of any Form of Acceptance which appears to have been executed in, or sent from, a jurisdiction where documentation in relation to the Offer may not, under the terms of the Offer, be sent or which provides an address in any such jurisdiction for the delivery of the consideration under the Offer, or which does not include the warranty relating to overseas shareholders contained in the form of acceptance; or

12.4 To notify you immediately of any Restricted Escrow Transfer.

13 In relation to documents received, check by purely visual inspection to see if the same reasonably appear on their face to be genuine. Capita shall not be held responsible if it treats as valid any document, which appears on its face to have been properly completed and executed but which later proves to have been executed fraudulently or otherwise without authority. If Capita is unable to determine the validity of any document reference shall be made to the Offeror, who will make a decision and instruct Capita in writing of the action to be taken.

14 Not withstanding any other clause of this Agreement, or any or deemed term and condition of the Offer, Capita shall only process original duly completed Forms of Acceptance, bearing the original signature(s) of the shareholder(s), which are received by the deadline(s) for the receipt of Forms of Acceptance. Forms of Acceptance delivered by email or facsimile or other electronic transmissions or copies will not be accepted or processed.

15 Capita shall not process any Forms of Acceptance received that have been or appear to have been published on and/or downloaded from a website.

 © 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661622

Page 26 of 28

16 Capita shall not be responsible for any document(s) or notice(s) delivered by or on behalf of an Offeree Shareholder to any address other than the Capita address specified for the delivery of such document(s) or notice(s).

27471

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661623

USAO 00002493

**SCHEDULE 2**

**FEE SCHEDULE**

The Offeror shall pay Capita's Fees in accordance with the payment schedule below. Capita will invoice the Offeror in arrears. Settlement of our invoice is to be strictly on presentation and payment shall be made into such bank account as Capita shall nominate.

| | |
|---|---|
| Professional advisory fee (to include a central point of corporate action expertise; liaising with the Offeror's corporate and legal advisers et cetera; undertaking detailed review of the offer documentation; providing specialist guidance and advice on the timetable, offer terms and processes (ensuring adherence to market best practice); assisting in the drafting of forms of acceptance; ensuring key project milestones are achieved; providing Euroclear UK & Ireland with details of the corporate action and/or supporting the Offeror in any application(s) to be made to Euroclear UK & Ireland; undertaking full security reconciliation with CREST (where appropriate); participating in conference calls and/or attending logistics meetings; and project planning). | £200 per hour |

**The above is subject to a separate minimum advisory fee of £2,250**

| | |
|---|---|
| Cost per Offeree Shareholder/Persons with Information Rights | £5.45 per Shareholder based on the issue of personalised forms of acceptance |
| Set-up and maintenance of the Copy Registers in accordance with the Takeover Code | £200 set-up fee plus 15p per register update received |

**The above are subject to a separate minimum aggregate processing fee of £5,000**

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661624

USAO 00002494

| | |
|---|---|
| Undertaking the extraction and return of forms of acceptance and share certificates with enclosure letter and/or inputting TFE instructions to return shares held in escrow balances in connection with notices of withdrawal received in accordance with the Takeover Code | £10 per notice of withdrawal and/or ESA message received |
| Management and facility fee where the consideration settlement cycle is to be a period of five or less business days after the receipt of an acceptance (or any official closing date) under the terms of the offer or, if required by the offeror | £795 per settlement |
| Opening premises on non-business days (if required by the terms of the Offer and/or the Takeover Code) | £5,000 per day |

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-01661625

# EXHIBIT C

USAO 00002496

**To:** 'Andy Ward'[Andy.Ward@computershare.co.uk]; 'Barke, Carli (Shareholder Services)'[CBarke@capitaregistrars.com]
**Cc:** '#UK CS BRS Key Account Team - Client Support'[KeyAccountSupportTeam@computershare.co.uk]; 'Andrew Kanter'[andrewk@autonomy.com]
**From:** Lisa Harris
**Sent:** Tue 10/4/2011 4:32:03 AM
**Importance:** Normal
**Subject:** RE: Exercise of Autonomy Options under HP offer
exercise by person.xlsx

Hi Andy,

Please find attached the spreadsheet that we discussed.

All these staff are exercising options YESTERDAY 3rd October – please issue share certificates BUT DO NOT POST THEM TO THE STAFF – you need to put them into new accounts and let Capita know this information.

Hi Carli – these staff have all accepted HP's offer and are selling these shares to HP for £25.50 – HOWEVER the monies is not to go to the individuals but should all come to Autonomy Corporation Ltd – the total is £126,304,458 and the bank account details are:

A/C name: Autonomy Corporation PLC

A/C number [REDACTED]

Sort code; 20-17-19

Bank: Barclays Bank

St Andrews Street

Cambridge

Many thanks,

LISA HARRIS

Group Financial Controller

( +44 (0) 1223 448011

6 +44 (0) 1223 448040

* lisah@autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

**From:** Andy Ward [mailto:Andy.Ward@computershare.co.uk]
**Sent:** 30 September 2011 12:23
**To:** 'Barke, Carli (Shareholder Services)'; Lisa Harris
**Cc:** #UK CS BRS Key Account Team - Client Support
**Subject:** RE: Exercise of Autonomy Options under HP offer

Carli,

I'm sure it won't be a problem this end – I'll speak to our processing team.

Can you confirm the timeframe that you'll need this turned around in?

Thanks

Andy

**From:** Barke, Carli (Shareholder Services) [mailto:CBarke@capitaregistrars.com]
**Sent:** 30 September 2011 12:19
**To:** Andy Ward; Lisa Harris
**Cc:** #UK CS BRS Key Account Team - Client Support
**Subject:** RE: Exercise of Autonomy Options under HP offer

Andy

We need to block off this allotment in terms of acceptance and payment so will require new accounts to be set up. This should just be a case of using new reference numbers for each account – obviously I do not know how your system works but we use this process (which is not manual) regularly.

Kind regards

**Carli Barke**

Corporate Actions Manager

Capita Registrars

Capita Registrars, The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU

**T:** +44 (0) 20 8639 2112 | **F:** +44 (0)20 8639 2142 | **E:** cbarke@capitaregistrars.com

www.capitaregistrars.com

Please consider the environment before printing this email

**Shareholders** can contact us on:
UK: 0871 664 0321 (calls cost 10p per minute plus network extras.)
International: +44 (0) 208 639 3399
Lines are open 9am - 5.30pm, Monday - Friday, excluding public holidays.

---

**From:** Andy Ward [mailto:Andy.Ward@computershare.co.uk]
**Sent:** 30 September 2011 11:18
**To:** 'Lisa Harris'
**Cc:** #UK CS BRS Key Account Team - Client Support; Barke, Carli (Shareholder Services)
**Subject:** RE: Exercise of Autonomy Options under HP offer

Carli,

Please can you clarify why you require us to open new accounts for each individual on the expected list. This will cause a large amount of manual work as we will have to inspect the details of every person listed on the schedule.

Lisa – if there is no option but to check all the records, I am sure you will appreciate the amount of work this will cause my team. As such, there will be additional resource needed and we will levy appropriate charges to bring in additional personnel.

When can we expect the allotment details are when do you require this to be completed?

Kind regards

Andy

**From:** Lisa Harris [mailto:lisah@autonomy.com]
**Sent:** 30 September 2011 11:10
**To:** Andy Ward
**Cc:** #UK CS BRS Key Account Team - Client Support; 'Barke, Carli (Shareholder Services)'
**Subject:** RE: Exercise of Autonomy Options under HP offer

Hi Andy,

I'm afraid have no idea which staff already have accounts – this would be a private matter.

I can confirm that the allotment will all be in one batch – and will be communicated on a spreadsheet – I have attached a draft of the spreadsheet (all with no names), is this going to be enough information for you? Obviously we'll have real names and addresses on the real thing. Do you prefer first name and surname in separate columns?

BTW it's 427 staff not 472 – my typo, sorry.

Many thanks,

LISA HARRIS

Group Financial Controller

( +44 (0) 1223 448011

6 +44 (0) 1223 448040

* lisah@autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

**From:** Andy Ward [mailto:Andy.Ward@computershare.co.uk]
**Sent:** 30 September 2011 10:06
**To:** 'Lisa Harris'
**Cc:** #UK CS BRS Key Account Team - Client Support; 'Barke, Carli (Shareholder Services)'
**Subject:** RE: Exercise of Autonomy Options under HP offer

Lisa,

This is possible for us to do, however we would need confirmation beforehand of which staff already have accounts and the respective reference numbers. This will need to be provided to us in a spreadsheet so that we can have resource put in place prior to the allotment date(s).

Can you confirm if the allotments will be keyed as a single batch or will they be spread across multiple allotments?

Thanks

Andy

**From:** Lisa Harris [mailto:lisah@autonomy.com]
**Sent:** 30 September 2011 10:01
**To:** Andy Ward
**Cc:** #UK CS BRS Key Account Team - Client Support; 'Barke, Carli (Shareholder Services)'
**Subject:** FW: Exercise of Autonomy Options under HP offer

Hi Andy,

I have been talking with Cally Greatbanks about the allotment of shares for staff exercising options when the HP offer goes unconditional. Please see below an eMAIL form Carli Brake at Capita, she is dealing with the shareholders acceptances.

We expect 472 staff to exercise options over just under 5 million shares.

Carli has stated that it is important that the shares allotted are:-

- Issued in certificate form, however
- The certificates should not be printed out
- The allotments should be to new accounts for each person (some staff will already have shares, these new allotments should be put in a different account)

Please can you confirm that you will be able to do this, or let me know if you have any questions.

I have copied Carli into the eMAIL as I am unfamiliar with the terminology and process; she can jump in if I have misunderstood what Capita need!

Many thanks,

LISA HARRIS

Group Financial Controller

(  +44 (0) 1223 448011

6 +44 (0) 1223 448040

* lisah@autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information.  If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone.  Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies.  No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office:  Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

**From:** Barke, Carli (Shareholder Services) [mailto:CBarke@capitaregistrars.com]
**Sent:** 30 September 2011 09:06
**To:** Lisa Harris
**Cc:** Andrew Kanter
**Subject:** RE: Exercise of Autonomy Options under HP offer

Morning Lisa

Thank you for your e-mail. Effectively I will need a copy of the allotment list you send to Computershare confirm the registration details of the shareholders for which Autonomy will be arranging payment through payroll including the

relevant number of shares. I will also need confirmation that you have received correctly completed exercise and accept forms for all these shareholders and are happy for capita to process such acceptances on this basis. All allotments should be in certificate form for the above process to work.

Alongside this, to aid the above process, it would be helpful if you could instruct Computershare NOT to produce certificates for these option allotments and also confirm this to Capita.

Please provide the allotment lists to me and Computershare on the same day so we can keep a close eye on this. As discussed all allotments should be to 'new' accounts and not combined with any holding they currently have on the register – please confirm this with Computershare also.

Once I have the above information/confirmation, we can arrange for the funds relating to these acceptances to be chaps to Autonomy to arrange payment through payroll. Please provide the account details in due course.

Many thanks

**Carli Barke**

Corporate Actions Manager

Capita Registrars

Capita Registrars, The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU

**T:** +44 (0) 20 8639 2112 | **F:** +44 (0)20 8639 2142 | **E:** cbarke@capitaregistrars.com

www.capitaregistrars.com

Please consider the environment before printing this email

**Shareholders** can contact us on:
UK: 0871 664 0321 (calls cost 10p per minute plus network extras.)
International: +44 (0) 208 639 3399
Lines are open 9am - 5.30pm, Monday - Friday, excluding public holidays.

---

**From:** Lisa Harris [mailto:lisah@autonomy.com]
**Sent:** 28 September 2011 13:39
**To:** Barke, Carli (Shareholder Services)
**Cc:** 'Andrew Kanter'
**Subject:** Exercise of Autonomy Options under HP offer

Hello Carli

I hope you can read my attachments – we have a new scanner which I have yet to master!

I have attached my own HP election form so you can see the format of what staff are completing – I was able to attach all my option certificates when I submitted my form but the majority of staff have ticked the declaration on the 2nd page that they have lost these. Our HR department has a copy of everyone's option certificates on file .

The forms do look slightly different dependent on whether the options that staff are electing to exercise were granted under:-

- Autonomy UK plan rules
- Autonomy US plan rules

- Discovery Mining plan rules
- Optimost plan rules
- Interwoven, Verity, Virage, Zantaz or Cardiff plan rules

I have also attached a "no-names" version of the spreadsheet showing everyone that is exercising based on today's vested options – there are 3 thousand options vesting next week and 3 hundred the week after, this would increase the numbers exercising.

I have spoken to Computershare and am waiting for them to get back to me regarding what they do with the share certificates.

Many thanks,

LISA HARRIS

Group Financial Controller

( +44 (0) 1223 448011

6 +44 (0) 1223 448040

* lisah@autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

Click here to report this email as spam.

*********************************************************************************************
*

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the intended recipient, please e-mail the sender immediately by replying to this message and delete the material from any computer.

This Message is attributed to the sender and may not necessarily reflect the view of Capita Registrars Limited, its subsidiaries or associates.

If you would like to find out more about Capita Registrars Limited, please visit our website at http://www.capitaregistrars.com

Registered Office:
The Registry
34 Beckenham Road
Beckenham
Kent
BR3 4TU

Registered in England no: 2605568

Any regulated business is conducted by Capita IRG Trustees Limited which is authorised and regulated by the Financial Services Authority (http://www.fsa.gov.uk/register/, number 184113). Registered office as above. Registered in England no: 2729260

Part of The Capita Group Plc.

*********************************************************************************************
*

This email and any attachment to it are confidential. Unless you are the intended recipient, you may not use, copy or disclose either the message or any information contained in the message. If you are not the intended recipient, you should delete this email and notify the sender immediately.

Any views or opinions expressed in this email are those of the sender only, unless otherwise stated. All copyright in any Capita material in this email is reserved.

All emails, incoming and outgoing, may be recorded by Capita and monitored for legitimate business purposes.

Capita exclude all liability for any loss or damage arising or resulting from the receipt, use or transmission of this email to the fullest extent permitted by law.

Computershare Investor Services PLC is registered in England & Wales Company No. 3498808. Registered Office: The Pavilions, Bridgwater Road, Bristol BS13 8AE. Computershare Investor Services PLC is authorised and regulated by the Financial Services Authority, Registered Office: 25 The North Colonnade, Canary Wharf, London E14 5HS.

Please visit the following website to read the Computershare legal notice: http://www.computershare.com/disclaimer/emea

4,953,116 126,304,458.00

| STS_EMP_ ID | AUDIT ID | legal first name | legal last name |
|---|---|---|---|
| 2580 | 401 | Alan | Acheff |
| 4750 | 404 | Richard | Adegbeyeni |
| 5152 | 2678 | Qazi | Ahmad |
| 5153 | 2504 | Mudasir S. | Ahmed |
| 5707 | 4089 | Jason | Albert |
| 3918 | 409 | Jeffrey | Aldridge |
| 5155 | 2331 | John | Alfini |
| 4862 | 253 | John | Allen |
| 3842 | 910236 | Sarah | Ambrose |
| 5156 | 2039 | Amol | Anand |
| 3129 | 421 | John | Andrews |
| 5164 | 2034 | Allwyn | Aranha |
| 5165 | 2524 | Neil | Araujo |
| 4610 | 424 | David | Archibald |
| 2652 | Con 1 | Barry | Ariko |
| 5820 | 154 | Pepi | Armara |
| 5169 | 2802 | Tracy | Askam |
| 5171 | 2666 | Sanjay | Aurora |
| 2890 | 432 | Eloy | Avila |
| 3768 | 165 | Unal | Ayo Aresti |
| 4930 | 435 | Jennifer | Bailey |
| 4904 | 298 | Darren | Baldwin |
| 5800 | 5002 | Sharad | Bansal |
| 5822 | 930307 | Andrew | Barclay |
| 4613 | 1222 | Deborah | Baron |
| 3676 | 910243 | Stuart | Barrett |
| 4892 | 1323 | Julio | Barton |
| 3820 | Bix 1 | Andrew | Baylis |
| 5179 | 2134 | Chris | Bazalgette |
| 4752 | 1243 | Robert | Belknap |
| 4929 | 1 | Jeffrey | Bell |
| 5180 | 2285 | James | Bennett |
| 5184 | 2299 | Jason | Berkin |
| 5801 | 5036 | Sathisha | Bettegowda |
| 2830 | 910007 | David | Bettinson |
| 5807 | 5004 | Manjunath | Bharadwaj |
| 4768 | 1296 | Nicholas | Billeci |
| 3010 | 910249 | Ian | Black |
| 3599 | 910202 | Sean | Blanchflower |
| 3081 | 462 | Jeffrey | Blank |
| 3445 | 910232 | Paula | Boddy |
| 3019 | 27 | Jack | Bogart |
| 5192 | 2170 | Daniel | Boland |

FOIA CONFIDENTIAL TREATMENT REQUESTED

| | | | |
|---|---|---|---|
| 4927 | 74 | Greg | Bolton |
| 3604 | 470 | Serge | Bonte |
| 3952 | 900053 | Vance | Briggs |
| 2770 | 361 | Corrado | Broll |
| 4849 | 910231 | Natasha | Brown |
| 5204 | 2798 | Tom | Brown |
| 5711 | 930725 | Derek | Brown |
| 5823 | 930459 | Steven | Bruce |
| 4926 | [illegible] | Brindusa | Hensel |
| 5207 | 2300 | Jason | Buehner |
| 5686 | 930327 | Sarah | Burke |
| 3355 | 900054 | Michael | Byrns |
| 4551 | 494 | Scott | Byron |
| 5213 | 2670 | Sarah | Cabassa |
| 4649 | 1246 | Dennis | Carmen |
| 3173 | 249 | Justin | Carreiro |
| 5086 | 2658 | Samuel R. | Carter |
| 2632 | 505 | Anna | Catalana |
| 5088 | 2069 | Arnout | Cator |
| 3656 | 910292 | Stephen | Chamberlain |
| 3986 | 900073 | Christopher | Chan |
| 3327 | 508 | Michael | Cheng |
| 4895 | 509 | Timothy | Chang |
| 3237 | 29 | Leslie | Chapman |
| 4647 | 512 | Gregory | Chase |
| 2879 | 513 | Edward | Chau |
| 5662 | 43 | Svitlana | Chaykovska |
| 5098 | 2483 | Michelle | Chee |
| 5663 | 174 | Tung Jin | Chew |
| 4757 | 255 | Parag | Chhibber |
| 5712 | 521 | Paul | Chicoine |
| 4866 | 910296 | Siong | Chin |
| 4919 | 522 | Stephen | Cho |
| 5687 | 2066 | Arijit | Chowdhury |
| 2597 | 910083 | Allen | Chu |
| 3367 | 47 | Miles | Clarke |
| 5112 | 2530 | Nick | Clarke |
| 5713 | 930767 | Alexis | Clark |
| 5688 | 910348 | Graham | Collier |
| 5830 | 920226 | David | Collier |
| 4685 | 539 | Jacqueline | Comeau |
| 4896 | 78 | Alexis | Con Hon |
| 4938 | 543 | Shane | Connelly |
| 3063 | 547 | Jeffrey | Cornelius |
| 5664 | 550 | Benjamin | Couch |
| 5808 | [illegible] | Vinay | Chakravarthy |

| | | | |
|---|---|---|---|
| 3154 | 553 | Joseph | Cronin |
| 4883 | 554 | James | Crumbacher |
| 3232 | 557 | Laura | Dann |
| 4725 | 558 | Mark | Daoust |
| 4588 | 559 | Brian | DaRosa |
| 3298 | 910390 | Martyn | Davis |
| 3948 | 562 | Cynthia | Davis |
| 4901 | 910280 | Sophie | Dazin |
| 5729 | 5300 | Keith | Deane |
| 5690 | 2402 | Laurent | Delorme |
| 2888 | 568 | Elizabeth | Demirjian |
| 2933 | 162 | Frederic | Demongeot |
| 3207 | 583 | Kevin | Dodson |
| 4868 | 910303 | Julie | Dolan |
| 3636 | 589 | Stacey | Dougherty |
| 5684 | 68 | Robert | Duke |
| 3515 | 593 | Richard | Eads |
| 3412 | 1136 | Nicole | Ward |
| 3674 | 597 | Christopher | Egan |
| 5080 | 2620 | Ray | Ehrke |
| 5014 | 2049 | Andrew | Elsner |
| 5730 | 5302 | Richard | Ellis |
| 5017 | 2769 | Susan | Emery |
| 5022 | 2082 | Barbara | Estes |
| 3033 | 36 | James | Everett |
| 5026 | 2287 | Shaochen | Fan |
| 3058 | 341 | Jean-Philippe | Favrot |
| 4691 | 613 | Joel | Fernandez |
| 5694 | 910313 | Stephen | Fielding |
| 5841 | 931278 | Edward | Filby |
| 5665 | 619 | Justin | Fiore |
| 3834 | 910266 | Michael | Flint |
| 5029 | 2248 | Glenn | Fong |
| 4590 | 624 | Blake | Foster |
| 3174 | 139 | Justin | Fuga |
| 2802 | 900057 | Darren | Gallagher |
| 5035 | 2210 | Elio | Gambetta |
| 4946 | 634 | Alvin | Garcia |
| 2749 | 636 | Christine | Gardiner |
| 5038 | 2178 | David | Gaskins |
| 5039 | 2498 | Mohammed | Gazal |
| 3330 | 40 | Michael | Geddes |
| 5040 | 2272 | Ilan | Gendellman |
| 5042 | 2083 | Barbara | Gerth |
| 2754 | 900055 | Christopher | Goodfellow |
| 5053 | 2553 | Partha Saradhi | Govind |

| | | | |
|---|---|---|---|
| 4859 | 13 | Steven | Graff |
| 4920 | 660 | Benjamin | Greene |
| 5719 | 4060 | Steven | Greenfeld |
| 3469 | 178 | Phillip | Greenwood |
| 5056 | 2810 | Valentina | Gribkova |
| 3828 | 931071 | Federico | Grosso |
| 4936 | 666 | Livius | Guiao |
| 5809 | 5030 | Deepika | Gunda |
| 5698 | 172 | Adam | Guthrie |
| 3955 | 669 | Gilmore | Gutierrez |
| 5845 | 931003 | Timothy | Halbert |
| 3914 | 1348 | Evan | Hammer |
| 5070 | 2629 | Richard | Hammond |
| 5699 | 900034 | Dermot | Hardy |
| 5700 | 677 | Danny | Harlin |
| 3244 | 910275 | Elizabeth Jane | Harris |
| 5073 | 2841 | Wayne | Harris |
| 3075 | 681 | Jeffrey | Hartkopf |
| 5074 | 2231 | Gabrial | Hartnett |
| 3485 | 275 | Rachel | Haverfield |
| 4823 | 685 | Peter | Hedge |
| 4698 | 688 | Leviskie | Henry |
| 4876 | 690 | Bryan | Herger |
| 5076 | 2235 | Garth | Hermanson |
| 3814 | 691 | Yvette | Hernendez |
| 5078 | 2628 | Ricardo | Hexsel |
| 5079 | 2383 | Kevin | Hicks |
| 4845 | 910214 | Adam | Hickson |
| 4795 | 1253 | Kimberly | Hill |
| 3045 | 910320 | Jason | Holland |
| 5666 | 910030 | John | Horman |
| 4955 | 2240 | Geoff | Hornsby |
| 2994 | 144 | Henry | Horst |
| 5846 | 910032 | Mark | Houghton |
| 5667 | 705 | Marcia | Howard |
| 3366 | 708 | Mike | Huang |
| 2813 | 910364 | David | Humphrey |
| 3692 | 910381 | Sushovan | Hussain |
| 4909 | 303 | Nigel | Hutchinson |
| 4935 | 712 | B. Lee | Hutton |
| 4934 | 910319 | Katerina | Ilina |
| 4970 | [illegible] | Sudarshan | Iyengar |
| 4971 | 2441 | Mark | Jackson |
| 4974 | 2704 | Shelly | Jain |
| 5702 | 4 | Oliver | Jeal |
| 5668 | 726 | Clare | Johnson |

| | | | |
|---|---|---|---|
| 4987 | 2278 | Ivy Lim | Jong |
| 3850 | [illegible] | Elahe | Walti |
| 4989 | 2111 | Brian | Joyce |
| 4991 | 2276 | Ish | Jumani |
| 4879 | 735 | Daniel | Junger |
| 4993 | 2709 | Shreejit | K |
| 4884 | 910201 | Maha | Kadirkamanathan |
| 5810 | 5022 | Robinjith | Kalpaka |
| 2614 | 278 | Andrew | Kanter |
| 3009 | 215 | Hussein | Kassam |
| 5001 | 2076 | Atul | Kavathekar |
| 5002 | 2772 | Svetlana | Kavtsner |
| 5703 | 930531 | David | Kemp |
| 3902 | 910006 | Graeme | Kennedy |
| 5007 | 2641 | Rohit | Kerhalkar |
| 5009 | 2632 | Rizwan | Khan |
| 4742 | 749 | Jarod | Kidd |
| 5811 | 5055 | Adithya | Kini |
| 2646 | 910185 | April | Kirkup |
| 4743 | 1307 | John | Klink |
| 5724 | 4037 | Thomas | Knobloch |
| 5596 | 2221 | Erich | Kolb |
| 5599 | 2239 | Eugene | Kratochvil |
| 3963 | 767 | Helen | Ku |
| 4563 | 1294 | Shan | Kuang |
| 4915 | 768 | Qiao | Kuang |
| 5601 | 2479 | Michael | Kuehn |
| 3854 | 770 | Kathy | Kuehne |
| 5606 | 2247 | Girish | Kumar |
| 5607 | 2675 | Satoru | Kumashiro |
| 5671 | 1349 | James | LaBarge |
| 4745 | 776 | Jason | Labriola |
| 4853 | 777 | Beth | Ladd |
| 3336 | 778 | Michael | Lai |
| 4899 | 45 | Troy | Lantz |
| 3822 | 173 | Daniel | Lau |
| 5615 | 2309 | Jean | Lavigne |
| 5616 | 2341 | John | Law |
| 5618 | 2492 | Minh | Le |
| 3960 | 52 | Richard | Leavitt |
| 3810 | 353 | Yik Koon | Lee |
| 3985 | 793 | Mickie | Lee |
| 3969 | 146 | Charles | Lemaire |
| 5625 | 2133 | Chia Ying | Li |
| 5626 | 2842 | Weiqun | Li |
| 5629 | 2759 | Su-Kang | Lim |

FOIA CONFIDENTIAL TREATMENT REQUESTED

| | | | |
|---|---|---|---|
| 4850 | 808 | Courtney | Linweber |
| 5705 | 2 | Chul | Liu |
| 2572 | 815 | Adisa | Lluzza |
| 5637 | [redacted] | Nica | Medina |
| 5638 | 2074 | Ashley | Lobb |
| 4941 | 910387 | Moazzam | Lodhi |
| 5640 | 2138 | Chris | Loesch |
| 5643 | 2304 | Jay | Long |
| 4657 | 822 | Jennifer | Long |
| 4939 | 824 | Sergio | Look |
| 2856 | 86 | David | Lord |
| 5704 | 910428 | James | Losam |
| 5647 | 2214 | Eileen Y.T. | Lu |
| 2916 | 900055 | Eric | Luchi |
| 5726 | Ferrando | | Lundgren |
| 2732 | 4000 | Chau | Ly |
| 3239 | 827 | Michael | Lynch |
| 5648 | 279 | Michael | Lysejko |
| 3979 | 2480 | Edouard | Na Poon |
| 5550 | 19 | Daviann | Mackenzie |
| 5652 | 2177 | David | Madsen |
| 5654 | 2181 | Surfinder | Mago |
| 3192 | 2725 | Kelly | Mah |
| 3922 | 234 | Marvin | Marvin |
| 4575 | 95 | Robert | Mark |
| 2592 | 1398 | Alfred | Manela |
| 2581 | 843 | Alastair | Martin |
| 5528 | 164 | Andrew | Martin |
| 4576 | 5353 | Rudy | Martino |
| 3140 | 1260 | Michael | Mateer |
| 3958 | 847 | Alfred | Matocha |
| 4916 | 70 | Keith | Mawhinney |
| 4940 | 129 | Michael | Mayer |
| 5534 | 62 | Joseph | Mazumdar |
| 4659 | 2701 | Shashi | McCaskill |
| 4898 | 1332 | Joseph | McCoy |
| 4657 | 191 | Debra | McCulloch |
| 3118 | 1207 | John | McDonnell |
| 3954 | 11 | Arnold | McElroy |
| 3456 | 858 | Peter | Mckell |
| 4531 | 910839 | Sandrine | Mehly |
| 2893 | 865 | Emmanuel | Metiot |
| 3944 | 348 | Donald | Miller |
| 2547 | 870 | Pamela | Jooeja |
| 4502 | 1232 | Valevijse | Mirasenko |
| 5554 | 2702 | Shawn | Misquitta |



HP-SEC-01662066

| | | | | | |
|---|---|---|---|---|---|
| 5812 | 5000 | Parveen | Mittal | 15,000 | |
| 5557 | 2586 | Rafiq | Mohammadi | 54,582 | |
| 3970 | 67 | Sayeed | Khawja Mohammed | 1,000 | |
| 5559 | 2481 | Michael | Montero | 23,711 | |
| 4602 | 1319 | Cynthia | Montes | 833 | |
| 3744 | 880 | Timothy | Mora | 8,214 | |
| 5723 | 4023 | Scott | Morgan | 1,250 | |
| 3468 | 87 | Peter | Morrison | 5,000 | |
| 5563 | 2092 | William J. | Moyer | 1,456 | 29 Sep 11 |
| 3545 | 887 | Robert | Murphy | 9,210 | |
| 5564 | 2745 | Stephen | Murphy | 5,000 | |
| 5565 | 2290 | James | Murray | 46,161 | |
| 5567 | 2500 | Mohit | Mutreja | 16,041 | |
| 3615 | 56 | Shawn | Nagase | 13,977 | |
| 5813 | 5059 | Vijayalakshmi | Nair | 2,250 | |
| 5572 | 2344 | John | Narbeitz | 417 | |
| 5814 | 5015 | Navamoni | Paul | 2,250 | |
| 3219 | 318 | Kitty | Nederstigt | 298 | |
| 2818 | 894 | David | Neubert | 30,677 | |
| 5849 | 140 | Matthew | Nevada | 2,000 | |
| 5574 | 2787 | Tigger | Newman | 2,149 | |
| 4855 | 3 | Nicholas | Ng | 19,132 | |
| 5575 | 2778 | Tammy | Nguyen | 207 | |
| 5570 | [redacted] | Julia | Swenson | 2,309 | |
| 3411 | 908 | Nicole | Noivo | 203 | |
| 4878 | 910401 | Annette | O'Connell | 2,835 | |
| 5697 | 920244 | James | O'Gara | 1,000 | |
| 5584 | 2775 | Takashi | Oguchi | 1,858 | |
| 5585 | 2497 | Mohammad Haiz | Omar | 290 | |
| 4604 | 1330 | Cheryl | O'Neill | 8,729 | |
| 5696 | 930191 | Emily | Orton | 9,000 | |
| 4925 | 229 | Gorkem | Ozbek | 7,931 | |
| 5815 | [redacted] | Jayaraman | Parameswaran | 5,000 | |
| 2861 | 147 | Dominic | Page | 1,124 | |
| 5465 | 2345 | John | Palmisano | 1,859 | |
| 5816 | 5006 | Bhaktavatsalam | Pamidipati | 2,250 | |
| 5469 | 2780 | Lefteris | Papadopoulos | 1,316 | |
| 5475 | 2637 | Robert | Patrick | 871 | |
| 5476 | 2843 | Wendy | Paue | 388 | |
| 2681 | 286 | Robert | Pearson | 4,000 | |
| 2594 | 319 | Aline | Pels-Gerritsen | 84 | |
| 4533 | 1321 | Stacy | Peng | 93 | |
| 4703 | 940 | Glenn | Perachio | 47,800 | |
| 4905 | 941 | Ruben | Perez | 1,000 | |
| 3522 | Con 2 | Richard | Perle | 20,000 | |
| 2670 | 910085 | Bichthao | Pham | 1,476 | |

| | | | | |
|---|---|---|---|---|
| 5483 | 2063 | Anthony | Phillips | 5,689 |
| 4815 | 1287 | Reshmi | Pillay | 24 |
| 3523 | 205 | Richard | Pinaroc | 167 |
| 5487 | 2442 | Mark | Pivoney | 2,083 |
| 5490 | 2291 | James | Pope | 50 |
| 5491 | 2791 | Tim | Porter | 232 |
| 3956 | 64 | Todd | Poston | 500 |
| 5676 | 920231 | Poppy | Prentis | 63,500 |
| 3499 | 250 | Randall | Putnam | 10,605 |
| 2822 | 910338 | David | Pye | 8,591 |
| 3974 | 968 | Cornelius | Quinn | 5,249 |
| 4872 | 110 | Kevin | Race | 20,000 |
| 4910 | 193 | Ian J | Raine | 8,640 |
| 4503 | 1288 | Viswanathan | Rajamannar | 2,319 |
| 3680 | 72 | Sukumar | Ramaraj | 1,631 |
| 5498 | 2829 | Vinod | Ramaswamy | 97 |
| 5677 | 974 | Adam | Ramjane | 1,000 |
| 5840 | 900018 | Christopher | Rayson | 15,000 |
| 5678 | 900040 | Andrew Robert | Reid | 3,084 |
| 4887 | 1272 | Ann | Reigelman | 147 |
| 2705 | 910183 | Bryan | Rellinger | 1,983 |
| 3538 | 12 | Robert | Richardson | 500 |
| 4854 | 910012 | Jose | Rivera | 7,433 |
| 4582 | 997 | Andrew | Roach | 916 |
| 3959 | 57 | Koby | Roberts | 500 |
| 3767 | 1001 | Tyshemia | Robinson | 4,715 |
| 5512 | 2542 | Oliver | Roehl | 494 |
| 4606 | 1006 | Chad | Rosner | 666 |
| 3159 | 206 | Joshua | Ross | 2,611 |
| 5517 | 2347 | John M. | Rossi | 289 |
| 5518 | 2005 | Adam | Rossio | 1,250 |
| 5717 | 4038 | Margarita | Safonova | 1,250 |
| 5805 | 5009 | Sagarika | Mitra | 2,250 |
| 5523 | 2491 | Milind | Sahasrabudhe | 1,457 |
| 5525 | 2267 | Hiroshi | Sakamoto | 522 |
| 5837 | 910327 | George | Saldatvala | 25,000 |
| 4851 | 1014 | Jorge | Salazar | 3,000 |
| 4870 | 58 | Edward | Sassone | 2,157 |
| 5398 | 2244 | Ghaneshyam | Satpathy | 30 |
| 3878 | Blx 2 | Matthew | Scheybeler | 3,334 |
| 3107 | 910415 | Joel | Scott | 13,959 |
| 5409 | 2599 | Rajib | SenGupta | 6,641 |
| 5685 | 1234 | Veena | Setlur | 1,750 |
| 5695 | 176 | Robert | Severn | 2,000 |
| 5416 | 2536 | Yin | Shen | 232 |
| 5835 | 328 | Jian Qiang | Shi | 10,000 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

| | | | | |
|---|---|---|---|---|
| 5321 | [redacted] | Maltinajun | Shigil | 1,673 |
| 2312 | 1039 | Eugene | Sith | 6,667 |
| 5418 | 2661 | Samer | Shourykat | 4,231 |
| 3603 | Blk 3 | Serena | Stefer | 2,500 |
| 4721 | 2490 | Michael | Silano | 7,211 |
| 5421 | 930064 | Graham | Silk | 10,000 |
| 5884 | 1275 | Johanna | Silvestre | 806 |
| 4731 | 2071 | Arvind | Singhal | 8,749 |
| 5426 | 2389 | Jason | Smith | 10,706 |
| 5430 | 5001 | Natarajin | Smith | 7,500 |
| 5804 | 2084 | Barbara | Srinivasan | 7,500 |
| 5447 | 2186 | David N. | Shen | 1,458 |
| 5449 | 1075 | Zhengwei | Stone | 1,577 |
| 4507 | 1076 | Joseph | Su | 1,416 |
| 4721 | 1077 | Michael | Sullivan | 4,574 |
| 4164 | 920234 | Matthew | Sullivan | 67,969 |
| 5632 | 5610 | Surna | Sullivan | 10,000 |
| 5603 | 221 | James | Vaitoh | 2,250 |
| 4813 | 291 | Leeming | Swaringen | 2,210 |
| 3897 | 1279 | Christopher | Tang | 4,500 |
| 4894 | 2274 | Imran | Tang | 250 |
| 3533 | 2050 | Bijo | Taufiq | 696 |
| 5338 | 1250 | Tharih | Thomas | 916 |
| 4812 | 1089 | Jared | Tran | 5,907 |
| 4733 | [redacted] | Alan | Tucker | 11,583 |
| 4580 | 2657 | Shemandar | Turner | 666 |
| 5346 | 2233 | Ganesh | Vagimere | 52 |
| 5547 | 1108 | Janon | Vedyanathan | 1,760 |
| 4734 | 1226 | Fong | Venas | 54 |
| 4641 | 435 | Jennifer | Vang | 1,750 |
| 4715 | 2668 | Santhi | Bailey | 45 |
| 5351 | 1115 | Antonio | Velayudhan | 1,123 |
| 5680 | 5078 | Vikram | Villarreal | 666 |
| 5802 | 2459 | Maureen | Vidhal | 2,250 |
| 5355 | 910400 | Srinivas | Voong | 436 |
| 3950 | 156 | Hoy | Voora | 4,000 |
| 5827 | 1237 | Bojan | Vu | 2,000 |
| 4595 | 1122 | Agustina | Vulojevic | 3,951 |
| 2574 | 2563 | Paul | Wali | 1,420 |
| 5360 | 293 | Clare | Walker | 3,805 |
| 5826 | 1129 | Charles | Walsh | 10,000 |
| 2728 | 230 | Roger | Walton | 2,783 |
| 3553 | 2671 | Sarah | Wang | 59,847 |
| 3564 | 295 | Sarah | Waterhouse | 1,201 |
| 3844 | 2061 | Anne | Webster | 3,700 |
| 5369 | 2313 | Jeffrey | Weinberger | 18,999 |
| 5374 | | | Weisover | 2,083 |



HP-SEC-01662069

USAO 00002518

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 5375 | 2099 | Robert | Whitaker | | | | | | 1,587 |
| 4922 | 75 | Buddy | Whittenburg | | | | | | 110 |
| 4709 | 1281 | Gerald | Wichmann | | | | | | 8,702 |
| 5380 | 2839 | Walter | Wojciechowski | | | | | | 1,859 |
| 5390 | 2431 | Makiko | Yakata | | | | | | 164 |
| 4545 | 1238 | Samuel | Yan | | | | | | 13,459 |
| 4659 | 1239 | Emily | Yee | | | | | | 210 |
| 5257 | 2284 | Ang | Yeong Hwan | | | | | | 252 |
| 3738 | 910198 | Timothy | Young | | | | | | 57,599 |
| 5259 | 2315 | Jeff | Young | | | | | | 4,735 |
| 3225 | 263 | Kwan Mo | Yuen | | | | | | 500 |
| 5260 | 2406 | Leonid | Zarkhin | | | | | | 116 |
| 5261 | 2269 | Hong | Zhao | | | | | | 4,182 |
| 5262 | 2412 | Suyu | Zhou | | | | | | 310 |
| 5264 | 2323 | Jianping | Zhuang | | | | | | 677 |
| 5708 | 4096 | Jack | Zito | 20 Rustic Rd. | Yaphank | NY | USA | 11980 | 500 |

# EXHIBIT D

USAO 00002520

# CAPITA

REGISTRARS

4 October 2011

Our ref: TO81/27471/1

The Directors
HEWLETT-PACKARD VISION B.V.
Startbaan 16
1187 XR Amstelveen
The Netherlands

By email to:

cas.sydorowitz@georgeson.com
domenic.brancati@georgeson.com
mark.harwood@georgeson.com
dominic.dennis@georgeson.com
reza.eftekhari@georgeson.com
hrcost@gibsondunn.com
Sally.Wokes@SlaughterandMay.com
Gary.EABORN@SlaughterandMay.com
trolls@pwpartners.com
ghowells@pwpartners.com
AndyJohnson@hp.com
Manish.Sarin@hp.com
Sergio.letelier@hp.com
ProjectTeslaCore@barclayscapital.com
Jennifer.Williams@SlaughterandMay.com
Emma.walton@hp.com
David.ritenour@hp.com
SSagayam@gibsondunn.com
JRoberts@gibsondunn.com
sowles@gibsondunn.com
nadja.oehriger@qatalyst.com
Peter.Sugden@SlaughterandMay.com

Dear Sirs,

**RECOMMENDED CASH OFFER FOR AUTONOMY CORPORATION PLC ("AUTONOMY")**

We write to advise you that following the offer being declared wholly unconditional, cash funding is required to meet payments to be issued on 7 October 2011 in respect of those Autonomy shareholders who have submitted valid acceptances by 3 October 2011

The funding amounts required are set out in the table below and relate to:

- The cheques to be posted to certificated acceptors;
- The payments to be credited to CREST accounts in respect of uncertificated acceptors;
- The amount of stamp duty reserve tax ("SDRT") required in respect of the shares being acquired from uncertificated acceptors;
- The amount of stamp duty required in respect of the shares being acquired from certificated acceptors;
- Payment in connection with our provisional Receiving Agent fees. Please note that the final invoice detailing all the Receiving Agent's fees, expenses and any further payment amounts due will be issued at expiry of the offer.

| | Autonomy Shares Accepted | Cash Consideration to be Issued / Receiving Agent Fee | Stamp Duty Reserve Tax "SDRT" Required | Stamp Duty Required* |
|---|---|---|---|---|
| **CREST** | 212,486,340 | £5,418,401,670.00 | £27,092,008.35 | Not applicable |
| **CERTIFICATED** | 935,606 | £23,857,953.00 | Not applicable | £121,300.00 |
| **CERTIFICATED** | 1,635 | £41,692.50 | Not applicable | Tax Exempt |
| **RECEIVING AGENT FEE** | Not applicable | £44,880.00 | Not applicable | Not applicable |
| | **213,423,581** | **£5,442,346,195.50** | **£27,092,008.35** | **£121,300.00** |

* (at the rate of ½ % of the value of the consideration above £1,000.00 per acceptance rounded up to the nearest £5 multiple)

**Corporate Actions**

The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU
Tel 0871 664 0321 (calls cost 10p per minute plus network extras lines are open from 9am – 5.30pm Monday – Friday)
Fax 020 8639 3047
Email newissues@capitaregistrars.com www.capitaregistrars.com
A trading name of Capita Registrars Limited

Registered office: The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU Registered in England No 2605568
Part of The Capita Group Plc, www.capita.co.uk



Please therefore arrange to credit the following payments to the account details specified below.

**The requested payments below must be credited to the accounts specified by no later than 6 October 2011 in order to ensure payments can be released on the due date.**

**Payment 1 Details**

| | |
|---|---|
| **Bank** | Royal Bank of Scotland Plc |
| **BIC** | RBOSGB2L |
| **Sort Code** | 15-10-00 |
| **IBAN** | GB21RBOS15100022369035 |
| **Address** | London City Office, 62/63 Threadneedle Street, London EC2R 8LA |
| **Account Name** | Capita Registrars Limited CREST Clearing Account |
| **Account No.** | 22369035 |
| **Net Amount Required** | £ 5,445,493,678.35 |

**Payment 2 Details**

| | |
|---|---|
| **Bank** | Royal Bank of Scotland Plc |
| **BIC** | RBOSGB2L |
| **Sort Code** | 15-10-00 |
| **IBAN** | GB49RBOS15100023083615 |
| **Address** | London City Office, 62/63 Threadneedle Street, London, EC2R 8LA |
| **Account Name** | Capita Registrars Ltd Re: Hewlett-Packard Vision B.V./ Autonomy Corporation plc – Takeover Cash Consideration A/C |
| **Account No.** | 23083615 |
| **Net Amount Required** | £ 24,065,825.50 |

We also take this opportunity to attach two block transfer forms relating to the certificated shares accepted in this settlement which kindly arrange to be signed, **but not dated**, and returned to us as soon as possible. The reason that there are two block transfer forms is that in accordance with new stamp duty rules consideration of £1,000 or less per acceptance is not subject to Stamp Duty. Therefore block transfer form 1 relates to stamp duty to be paid where consideration is greater than £1,000 per acceptance and block transfer form 1A relates to where consideration is £1,000 or less per acceptance. The declaration that the transfer is exempt from *Ad Valorem* stamp duty at the bottom of block transfer form 1A also requires to be signed at the same time. On receipt of the stamp duty monies we will arrange for the appropriate transfer to be stamped by HMRC in order that HEWLETT-PACKARD VISION B.V. can become the registered holder of the AUTONOMY CORPORATION PLC shares.

**Corporate Actions**

The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU
Tel 0871 664 0321 (calls cost 10p per minute plus network extras lines are open from 9am – 5.30pm Monday – Friday)
Fax 020 8639 3047
Email newissues@capitaregistrars.com www.capitaregistrars.com
A trading name of Capita Registrars Limited

Registered office: The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU Registered in England No. 2605568
Part of The Capita Group Plc. www.capita.co.uk



CAPITA

With regards to the CREST acceptances, once the SDRT amount has been received we will arrange for these shares to be firstly transferred from the relevant participants by means of Transfers from Escrow into the name of Capita Registrars Limited, and thereafter transferred to HEWLETT-PACKARD VISION B.V.

At this point we would mention that additional amounts, which will not be known until later, may be required on 17 October 2011 to settle the CREST/certificated holders in respect of the second settlement, which is scheduled below, together with the details of the subsequent settlements.

| Settlement | Acceptances Received | Capita to advise on Funding Requirements | CREST and Certificated Funds Required on | Consideration Posted |
|---|---|---|---|---|
| 2 | 04/10/11 - 10/10/11 | 11/10/11 | 17/10/11 | 18/10/11 |
| 3 | 11/10/11 - 17/10/11 | 18/10/11 | 24/10/11 | 25/10/11 |
| 4 | 18/10/11 - 24/10/11 | 25/10/11 | 31/10/11 | 01/11/11 |
| 5 | 25/10/11 - 31/10/11 | 01/11/11 | 07/11/11 | 08/11/11 |
| 6 | 01/11/11 - 07/11/11 | 08/11/11 | 14/11/11 | 15/11/11 |
| 7 | 08/11/11 - 14/11/11 | 15/11/11 | 21/11/11 | 22/11/11 |

If you have any questions, then please do not hesitate to contact us.

Yours faithfully,

Authorised Signatory

**Corporate Actions**

The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU
Tel 0871 664 0321 (calls cost 10p per minute plus network extras lines are open from 9am - 5.30pm Monday - Friday)
Fax 020 8639 3047
Email newissues@capitaregistrars.com www.capitaregistrars.com
A trading name of Capita Registrars Limited

Registered office: The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU, Registered in England No. 2605568
Part of The Capita Group Plc, www.capita.co.uk

# EXHIBIT E

USAO 00002524

**To:** Sarin, Manish[manish.sarin@hp.com]
**From:** Hsiao, Emily (SCD)
**Sent:** Sat 7/30/2011 11:36:16 AM
**Importance:** Normal
**Subject:** RE: WGL
WGL from Tesla 7.30.11.xlsx

See attached.

**From:** Sarin, Manish
**Sent:** Saturday, July 30, 2011 6:53 AM
**To:** Hsiao, Emily (SCD)
**Subject:** FW: WGL

Emily – from this list strip out our contact details and make a WGL for Tesla only. Then please circulate to us internally, Barclays, PW, Freshfields & Gibson.

**From:** Andrew Kanter [mailto:andrewk@autonomy.com]
**Sent:** Saturday, July 30, 2011 1:00 AM
**To:** Sarin, Manish
**Subject:** WGL

Attached is updated with a second tab for us.

Regards

--Andy

This document produced in native file format only

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-0066963

USAO 00002526

| First Name | Role | Location | Email | Work Telephone | Mobile | Assistants |
|---|---|---|---|---|---|---|
| **Internal** | | | | | | |
| **Arsenal** | | | | | | |
| Mike Lynch | CEO | London, UK | | | | |
| Sushovan Hussain | CFO | London, UK | | | | |
| Andrew Kanter | COO | London, UK | | | | |
| Peter Menell | CRO | London, UK | | | | |
| Steve Chamberlain | VP Finance | Cambridge, UK | | | | |
| **External** | | | | | | |
| **Qatalyst** | | | | | | |
| Frank Quattrone | | San Francisco, CA | | | | |
| George Boutros | | San Francisco, CA | | | | |
| Jonathan Turner | | San Francisco, CA | | | | |
| Ian MacLeod | | San Francisco, CA | | | | |
| Jean Tardy-Joubert | | London, UK | | | | |
| Adrian Dollard | | San Francisco, CA | | | | |
| Brian Cayne | | San Francisco, CA | | | | |
| Nadja Gehriger | | London, UK | | | | |
| Alan Bressers | | San Francisco, CA | | | | |
| Gajan Rajanathan | | London, UK | | | | |
| Michael Hughes | | London, UK | | | | |
| Daniel Axelsen | | San Francisco, CA | | | | |
| Peter Spofforth | | London, UK | | | | |
| **Slaughter and May** | | | | | | |
| Stephen Cooke | Partner | London, UK | stephen.cooke@slaughterandmay.con | T: +44 (0)20 7090 3261 | M: +44 (0)7768 234 011 | Assistant: Alexandra Ireland +44 (0)20 7( alexandra.ireland@slaughterandmay.com |
| Gary Eaborn | Partner | London, UK | gary.eaborn@slaughterandmay.com | T: +44 (0)20 7090 3222 | M: +44 (0)7717 505 139 | Assistant: Amy McGuinness +44 (0)20 7( amy.mcguinness@slaughterandmay.com |
| Sally Wokes | Associate | London, UK | sally.wokes@slaughterandmay.com | T: +44 (0)20 7090 5312 | M: +44 (0)7824 592 921 | Assistant: Alexandra Ireland +44 (0)20 7( alexandra.ireland@slaughterandmay.com |
| **Morgan, Lewis & Bockius LLP – Anti-trust** | | | | | | |
| Harry T. Robins | Partner | New York, NY | hrobins@morganlewis.com \| www.mc 212.309.6728 | | | Assistant: Evelyn Perry \| 212.309.6081 \| eperry@morganlewis.com |

# EXHIBIT F

USAO 00002528

**From:** Robert Mark <robert.mark@autonomy.com>
**Sent:** Wednesday, July 21, 2010 9:00 AM
**To:** ian.robert.adams@citi.com
**Subject:** Re: Disk purchase

His cell -
9540

Robert Mark
Director, Global Accounts
Autonomy, Inc.
P: 631-385-8766 | F: 631-367-6581
C: 516-445-5033
robert.mark@autonomy.com

----- Original Message -----
From: Adams, Ian Robert <ian.robert.adams@citi.com>
To: Robert Mark
Sent: Wed Jul 21 05:45:25 2010
Subject: RE: Disk purchase

Robert,

What number is he on today ?

Ian

From: Robert Mark [mailto:robert.mark@autonomy.com]
Sent: 21 July 2010 13:09
To: Adams, Ian Robert [CCC-OT_IT]
Subject: Re: Disk purchase

Ian, please call Sushovan directly to discuss further.

Robert

Robert Mark
Director, Global Accounts
Autonomy, Inc.
P: 631-385-8766 | F: 631-367-6581
C: 516-445-5033
robert.mark@autonomy.com

----- Original Message -----
From: Adams, Ian Robert <ian.robert.adams@citi.com>
To: Robert Mark
Sent: Wed Jul 21 03:53:54 2010

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CITIGROUP

Subject: RE: Disk purchase

Robert,

I am advised that we have no way to pay a company who is not an approved supplier. If the invoice comes from you that is fine. I need to get this closed today.

Ian

From: Robert Mark [mailto:robert.mark@autonomy.com]
Sent: 20 July 2010 23:09
To: Adams, Ian Robert [CCC-OT_IT]
Subject: RE: Disk purchase

Ian, I spoke with my legal folks and they have quickly revised the documents that are required for an order (Addendum and Order Form), to result in no changes to terms and Citi's rights, but simply allow for a third party to invoice and be paid on our behalf (please see the attached documents with redlines showing the changes). If this is acceptable, the discounts remain as they were and the documents reflect this. Sushovan has not authorized any other option.

Robert

Robert Mark

Director, Global Accounts

Autonomy, Inc.

P: 631-385-8766 | F: 631-367-6581

C: 516-445-5033

robert.mark@autonomy.com

---

From: Adams, Ian Robert [mailto:ian.robert.adams@citi.com]
Sent: Tuesday, July 20, 2010 4:36 AM
To: Robert Mark
Subject: RE: Disk purchase

Robert,

Please urgently let me know the situation. I believe there is risk here and need to determine how I manage it.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CITIGROUP

Ian

From: Robert Mark [mailto:robert.mark@autonomy.com]
Sent: 19 July 2010 20:27
To: Adams, Ian Robert [CCC-OT_IT]
Subject: RE: Disk purchase

With all due respect, that's not really fair. We've continued to find ways to maintain the original discount that we offered multiple times, which cost us money due to holding the inventory over for so long. There was no valid reason that Sourcing couldn't add the reseller other than executing the process. That said, I will of course see what I can do.

Robert

Robert Mark

Director, Global Accounts

Autonomy, Inc.

P: 631-385-8766 | F: 631-367-6581

C: 516-445-5033

robert.mark@autonomy.com

---

From: Adams, Ian Robert [mailto:ian.robert.adams@citi.com]
Sent: Monday, July 19, 2010 1:46 PM
To: Robert Mark
Subject: RE: Disk purchase

Like I said, I would have expected more given the relationship.

Give me a price for new disks please.

Ian

From: Robert Mark [mailto:robert.mark@autonomy.com]
Sent: 19 July 2010 18:45
To: Adams, Ian Robert [CCC-OT_IT]
Subject: RE: Disk purchase

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CITIGROUP

Ian, I've been discussing this with Joe for a number of months, so the supplier could already have been approved. I've also been telling him as well as you staff that we're running out of storage, but no one has reacted to that. I can easily resolve it but we would have to purchase new cells at new prices and that will impact the discount we offered.

Robert Mark

Director, Global Accounts

Autonomy, Inc.

P: 631-385-8766 | F: 631-367-6581

C: 516-445-5033

robert.mark@autonomy.com

---

From: Adams, Ian Robert [mailto:ian.robert.adams@citi.com]
Sent: Monday, July 19, 2010 8:29 AM
To: Robert Mark
Subject: RE: Disk purchase

Robert,

It's a long process for us to get a supplier accredited to use. We are out of runway on these disks and need to get them in. This is going to get very ugly. I need you to step up and resolve it on your side.

Ian

From: Robert Mark [mailto:robert.mark@autonomy.com]
Sent: 16 July 2010 17:17
To: Adams, Ian Robert [CCC-OT_IT]
Subject: RE: Disk purchase

Ian, I don't think it's necessary for me to say that our relationship continues to be extremely important to Autonomy, as evidenced by the continued support resources we provide, as well as the no-charge DSMail offer we made to you.

That said, this purchase has been the most frustrating of all. It dates back to Q4 of last year, but I won't take you through all the detail. Suffice to say we've repeatedly made discount offers to close the deal within each of the last 2 quarters, tying up inventory that we were then not able to move. Where we are now is, we've agreed to honor the last discount we offered even though we didn't close by June 30th. However, in order to do that, we need to process the order through one of our reseller partners (which we do all the time), as they have the cells at the price point that allows this. We've provided a short paragraph to amend our agreement that provides for us to use a third part y to bill, and Citi to pay, with absolutely no change to the terms or your rights under our agreement.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CITIGROUP

Joe Angelucci continues to tell me that he doesn't want to do this through our reseller, though we're maintaining our offer of 13TB cells for the price of 10TB, plus a 15% discount on top of that, which combined totals a 35% discount. I don't know where to go from here.

Robert

---

Robert Mark

Director, Global Accounts

Autonomy, Inc.

phone: (631) 385-8766 | fax: (631) 367-6581

cell: (516) 445-5033

robert.mark@autonomy.com

---

From: Adams, Ian Robert [mailto:ian.robert.adams@citi.com]
Sent: Fri 7/16/2010 11:31 AM
To: Robert Mark
Subject: Disk purchase

Robert,

What is going on. The guy's tell me Autonomy are being deliberately obstructive. I would have thought our relationship was stronger than that, despite our current checks in the market place.

This is one step from Otto calling Mike Lynch. Why are we here and can we not get this resolved ?.

Ian

# EXHIBIT G

USAO 00002534

Morgan Lewis

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Tel. +1.212.309.6000
Fax: +1.212.309.6001
www.morganlewis.com

**Martha B. Stolley**
Partner
+1.212.309.6858
mstolley@morganlewis.com

February 10, 2016

**VIA FEDERAL EXPRESS**

Adam A. Reeves, Esq.
Robert S. Leach, Esq.
Assistant U.S. Attorney
United States Attorney's Office
450 Golden Gate Avenue, 11th Floor
San Francisco, CA 94102

*Re:* *Autonomy*

Dear Mr. Reeves and Mr. Leach:

As you know, we represent Hewlett-Packard Enterprise ("HPE" or the "Company") in the above-referenced matter. We write in response to the Department of Justice's ("DOJ") January 27, 2016 written request for documents confirming whether the bank accounts previously noted by HPE as belonging to Mike Lynch ("Lynch") and Sushovan Hussain ("Hussain") are the same bank accounts Autonomy used to set up direct deposit payments for each of them. The DOJ also requested that HPE confirm the time period during which those bank accounts were used by Autonomy for direct deposit payments. Enclosed please find a CD containing responsive documents, Bates Nos. HP-SEC-01657266-HP-SEC-01658604.

Please note that a number of the documents are multi-tabbed spreadsheets that have been redacted to preserve the confidentiality of bank account information regarding former and/or current Autonomy employees that either are not involved in, or not the focus of, the DOJ's investigation in the above-referenced matter. Given the DOJ's ongoing interest in Steve Chamberlain, Andy Kanter, and Pete Menell, however, we left intact their financial information.[1]

Because of the redactions, we were unable to produce the spreadsheets in native format. In an effort to make the documents as comprehensible as possible, we are providing formatted .pdf versions of the spreadsheets and also are producing hard copy color print-outs on oversized paper. Nevertheless, the data spans multiple pages, making it difficult to track. Accordingly, we have distilled the key information from these spreadsheets in the chart below:

[1] None of the enclosed documents reference Joel Scott or Stouffer Egan.

Almaty Astana Beijing Boston Brussels Chicago Dallas Dubai Frankfurt Harrisburg Hartford Houston London Los Angeles Miami Moscow New York Orange County Paris Philadelphia Pittsburgh Princeton San Francisco Santa Monica Silicon Valley Tokyo Washington Wilmington
DB1/ 86400049.1

USAO 00002535

| Name of Account Holder | Dates Bank Account Used by AU Payroll | Bank Sort Code[2] | Bank Account No. |
|---|---|---|---|
| Mike Lynch | 2005 through his departure | | |
| Sushovan Hussain | 2005-2006 | | |
| | 2007-2010 | | |
| | 2011 through his departure | | |
| Steve Chamberlain | 2005 through his departure | | |
| Andrew Kanter | 2005 through his departure | | |
| Peter Menell | 2005 through his departure | | |

* * * * * * * *

The materials and the information contained herein (HP-SEC-01657266-HP-SEC-01658604) represent information that is confidential within the contemplation of the applicable provisions of the Freedom of Information Act ("FOIA") and the rules of the Commission which implement that Act, 17 C.F.R. § 200.83, ("Rule 83") and is furnished solely for the use of the Commission and DOJ. Accordingly, we request the documents, and the information contained therein, be afforded confidential treatment pursuant to FOIA and the rules of the Commission implementing the Act. Pursuant to Rule 83, a request for confidential treatment has also been delivered to the Commission's FOIA Office. In accordance with Rule 83, please notify the undersigned of any request for disclosure of the materials made pursuant to the FOIA. After completion of the investigation concerning the above referenced matter, we ask that all confidential materials be returned to us.

The requests set forth in the preceding paragraphs also apply to any memoranda, notes, transcripts or other writings of any sort whatsoever that are made by, or at the request of, any employee of the SEC or DOJ and which (1) incorporate, include or relate to any of this letter and its enclosures; or (2) refer to any conference, meeting, or telephone conversation relating to this letter and its enclosures between HPE, its current or former employees, representatives, agents, auditors or counsel on the one hand and employees of the SEC or DOJ on the other.

[2] The bank sort code identifies the bank and the branch where the account is held.

This letter is not intended to and does not waive any applicable privilege or other legal basis under which information may be protected from disclosure. If it is concluded that any of the enclosed materials disclose privileged matter, such disclosure is inadvertent. By the production of this letter and its enclosures, HPE does not intend to and has not waived the attorney-client privilege or any other protections.

To further promote confidentiality, the enclosed CD is being produced with password protection. The password will be sent separately via email.

Finally, we note that HPE is making every effort to produce documents as quickly and as efficiently as possible. However, the inadvertent disclosure of material protected by the attorney-client, work product or any other applicable privilege may occur during the course of these productions. We respectfully request that the Commission and DOJ allow for the "clawback" of any such privileged materials upon prompt notification by HPE.

Please feel free to contact me should you have any questions.

Sincerely,

Martha B. Stolley

Enclosure

cc: ENF-CPU
U.S. Securities and Exchange Commission
100 F St., N.E. Mailstop 5973
Washington, D.C. 20549-5973

Jason Habermeyer, Esq. (without enclosures)
Attorney, Division of Enforcement
U.S. Securities and Exchange Commission
San Francisco Regional Office
44 Montgomery Street, Suite 2800
San Francisco, CA 94104

Freedom of Information Officer (without enclosures)
Office of Freedom of Information and Privacy Act Operations
Securities and Exchange Commission Operations Center
100 F Street NE
Mail Stop 5100
Washington, D.C. 20549

DB1/ 86400049.1

# EXHIBIT H

USAO 00002538

**To:** Lisa Harris[lisah@autonomy.com]
**Cc:** payroll@autonomy.com[payroll@autonomy.com]
**From:** payroll@autonomy.com
**Sent on behalf of:** sh-ukcorporatedealing@ubs.com
**Sent:** Fri 4/23/2010 7:53:48 AM
**Subject:** [payroll] Options | 23/04/10
disclaim.txt

Lucy,

I can confirm that we have sold 129,459 shares at 1858p per share.

Kind regards

Warren

Warren Carroll
Corporate Broking
UBS Limited
1 Finsbury Avenue
London
EC2M 2PP
Tel. 020 7568 6219
Fax. 020 7336 3219

---

**From:** Lucy Brown [mailto:lucy.brown@autonomy.com]
**Sent:** 23 April 2010 12:17
**To:** sh-ukcorporatedealing@ubs.com
**Cc:** payroll@autonomy.com
**Subject:** Options | 23/04/10

Hi Tara & Warren,

Please see attached spreadsheet. Paperwork will be e-mailed later today.

**Selling all shares:**

Sushovan Hussain – needs to be announced

Peter Menell (min £18.00)

Ann Reigelman

Shashi Mazumdar

William A Turner

Many thanks,

**Lucy Brown** | Accounts Assistant | +44 1223 488 564

*The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.*

# EXHIBIT I

USAO 00002541

**To:** Poppy Prentis[Poppy.Prentis@autonomy.com]
**Cc:** payroll@autonomy.com[payroll@autonomy.com]
**From:** payroll@autonomy.com
**Sent on behalf of:** sh-ukcorporatedealing@ubs.com
**Sent:** Tue 6/15/2010 8:41:37 AM
**Subject:** [payroll] Options | 15/06/10
disclaim.txt

Gemma

I confirm we have sold 27,986 shares @ 1957.4563p

Kind regards

Tara Blyth
Director
UBS Investment Bank
1-2 Finsbury Ave
London EC2M 2PP
ph: 020 7568 2205
fax:020 7568 7722
tara.blyth@ubs.com

---

**From:** Gemma Reavley [mailto:gemmar@autonomy.com]
**Sent:** 15 June 2010 11:54
**To:** sh-ukcorporatedealing@ubs.com
**Cc:** payroll@autonomy.com
**Subject:** Options | 15/06/10

Hi Tara & Warren,

Please see attached spreadsheet. Paperwork will be e-mailed later today.

**Selling all shares:**

Michael D'Auria

Nandeep Singh

Blynda Stallings

Kailash Kothari

Joel Scott

Jean-Pierre

Steve Chamberlain

Rachel Haverfield

************************************************************************
************************************************************************
****

Gemma Reavley
Payables Supervisor
Autonomy Systems Limited, Cowley Road Business Park, Milton Road, Cambridge CB4 0WZ

Tel: +44 (0) 1223 448106
Fax: +44 (0) 1223 448040
E-Mail: gemmar@autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy's search technology is becoming a *de facto* standard for companies.

Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

**Consider the environment. Please don't print this e-mail unless you really need to**

# EXHIBIT J

USAO 00002544

**To:** Lisa Harris[lisah@autonomy.com]
**Cc:** payroll@autonomy.com[payroll@autonomy.com]
**From:** payroll@autonomy.com
**Sent on behalf of:** sh-ukcorporatedealing@ubs.com
**Sent:** Fri 3/12/2010 8:23:47 AM
**Subject:** [payroll] Options | 12/03/10- Kanter
disclaim.txt

Lucy

I confirm we have sold 40,000 shares @1721.864p

Kind regards

Tara Blyth
Director
UBS Investment Bank
1-2 Finsbury Ave
London EC2M 2PP
ph: 020 7568 2205
fax:020 7568 7722
tara.blyth@ubs.com

---

**From:** Lucy Brown [mailto:lucy.brown@autonomy.com]
**Sent:** 12 March 2010 10:26
**To:** sh-ukcorporatedealing@ubs.com
**Cc:** payroll@autonomy.com
**Subject:** Options | 12/03/10

Hi Tara & Warren,

Please see attached spreadsheet. Paperwork will be e-mailed later today.

**Selling all shares:**

Todd R Poston

Percy Tejeda

David Lord

**Selling all shares with minimum price £17.15:**

Andrew Kanter

Kind regards,

**Lucy Brown** | Accounts Assistant | +44 1223 488 564

*The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.*

# EXHIBIT K

USAO 00002547

 UBS Limited
1 Finsbury Avenue
London EC2M 2PP

www.ubs.com

# SALE INSTRUCTION FORM (ESOP)
# PAYE version

Dear Sir/Madam,

**Sale of shares under the arrangements established by UBS Limited for employees/executives of Autonomy Corporation (the "Facility")**

In connection with the option(s) set out below granted to me to acquire Ordinary shares of 1/3p each in Autonomy Corporation (the "Company"), I, ANDREW KANTER (please insert your name), have completed a Notice of Exercise in respect of the following options: * SUBJECT TO LIMITS IN ATTACHED INSTRUCTIONS *

| Date of Grant | Option price per share (A) | Number of shares to be exercised (B) | Exercise Cost (A) x (B) |
|---|---|---|---|
| 17 DEC 04 | 149p | 21,450 | $31,960.50 |
| 01 AUG 05 | 229p | 50,000 | $114,500.00 |
| 11 SEP 06 | 384p | 25,000 | $96,000.00 |
| | TOTALS | | $242,460.50 |

Please accept the following instructions:

**1.EXERCISE FINANCE (Loan)**

*Please tick one box*

(i) Please pay the full amount now due to the Company on my behalf, being £ 242,460.50 ☒ *or*

(ii) Please pay £ ________ to the Company on my behalf which, together with my contribution of £________ will total the full amount now due to the Company. ☐ *or*

(iii) I do not require funding from UBS Limited and have paid the full amount now due to the Company from my own resources. ☐

***(I can confirm that in order for UBS Limited to effect same day execution an instruction to sell the shares must be received by 2.30pm)***

**2.TRANSFER OF SHARES TO SPOUSE**

*Please tick if required*

Following the issue or transfer of shares, I wish to transfer ________ shares to my spouse, whose full name is ________ ☐

***NB: Shares will only be transferred to your spouse provided sufficient shares are sold in your name to meet your obligations relating to the loan transaction and costs, tax and NI (if applicable). If your spouse wishes to sell any of these shares, he/she needs to complete the Spouse Sale Form.***

**3.SALE OF SHARES**

Following the issue or transfer of shares, I hereby irrevocably authorise you forthwith, in accordance with the terms and conditions of the Facility:

*Please tick one box*

(i) to sell ALL shares in my name. ☒ *or*

(ii) to sell sufficient shares in my name to cover, as near as possible, repayment of my loan and costs. ☐ *or*

(iii) to sell sufficient shares in my name to cover repayment of my loan and costs and to raise an additional £________ ☐

**UBS Investment Bank is a business group of UBS AG**
**UBS Limited is a subsidiary of UBS AG**
UBS Limited is incorporated as a limited liability company in England & Wales Registered Address: 1 Finsbury Avenue, London EC2M 2PP. Regulated in the UK by the Financial Services Authority
Company Number: 2035362
UBS Limited is a member of the London Stock Exchange

*Effective 09 June 2003*

**4.PROCEEDS OF SALE**

I understand that the proceeds of the sale, after deduction of sums due to UBS Limited under the Facility, will be paid to the Company, who will deduct the appropriate taxes and pay the balance to me.

**5.SHARES BEING RETAINED**

I understand that the shares which I acquire will be issued or transferred by the Company into a nominee company of UBS Limited for the purposes of settlement. Any shares which I retain should be:

***Please tick one box***

(i) Registered in my own name and a share certificate should be issued and sent to me in due course; ☐ ***or***

(ii) Registered in the name of the following CREST member and the shares transferred to the following CREST account: ☐

| Name of CREST Member: | |
|---|---|
| CREST Participant Code: | CREST Member Account ID: |

**6.DECLARATION AND AUTHORITY**

I have read and understood the terms and conditions of the Facility and understand that these are applicable to me in relation to these instructions. I confirm that I shall meet my obligations under the Facility in that I shall repay my loan and associated costs from the proceeds of sale arising from the sale of shares in my name. If such proceeds are not sufficient I shall repay the amount outstanding on the loan immediately on demand.

I can confirm that in effecting transactions set out in these instructions I am not in possession of any Unpublished Information in respect of the Company nor are the transactions being effected during any Close Period in relation to the Company to which I am subject.

I understand that the exercise of this option may give rise to an income tax and/or employees' national insurance liability which is required to be paid to the Inland Revenue under the deduction at source arrangements (PAYE).

I confirm my agreement that the above references to "associated costs" and the references to "costs" above shall include not only the interest and transaction costs referred to in the terms and conditions of the Facility (as amended from time to time) but also any income tax and employees' national insurance liabilities for which the Company (or any subsidiary of it) is liable to account for in connection with the exercise of my option and accordingly I hereby irrevocably authorise and instruct UBS Limited to act on the instructions of the Company with regard to the calculation of any such liabilities and I understand that additional shares will be sold as necessary to put the Company in funds to pay any such liabilities.

I can confirm that any issue or transfer of shares to my spouse specified overleaf is a gift which falls within category L in the Schedule to the Stamp Duty (Exempt Investment) Regulations 1987.

I hereby authorise UBS Limited or any person nominated by them to complete all relevant documentation and/or input all relevant computerised instructions necessary in order to effect this transfer. I hereby authorise the Company to pass to UBS Limited any information and to keep such records as UBS Limited may require for regulatory reasons in connection with this Facility which the Company may have in its possession.

| **Signed** | [signature] Date 12 NOV 2009 |
|---|---|
| Full Name | ANDREW KNOTTER |
| Residential Address | [redacted] |
| | |
| | |
| | Post Code SG8 8SN |

**UBS Investment Bank is a business group of UBS AG**
**UBS Limited is a subsidiary of UBS AG**
UBS Limited is incorporated as a limited liability company in England & Wales Registered Address: 1 Finsbury Avenue, London EC2M 2PP. Regulated in the UK by the Financial Services Authority
Company Number: 2035362
UBS Limited is a member of the London Stock Exchange

*Effective 09 June 2003*

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-0165040

USAO 00002549

# EXHIBIT L

USAO 00002550

**LIST OF IRREVOCABLE UNDERTAKINGS**

**AUTONOMY CORPORATION PLC**

| IRREVOCABLE UNDERTAKING | NO. OF SHARES | REGISTERED SHAREHOLDING | REGISTERED SHARES HELD | VALIDLY ACCEPTED | BALANCE OUTSTANDING | DATE ACCEPTED | COMMENTS |
|---|---|---|---|---|---|---|---|
| Michael Lynch | 19,798,546 | UBS Private Banking Nominees Limited (Mainpool ACCT) | 19,188,046 | 19,188,046 | 0 | Tuesday, August 23, 2011 | |
| | | HSBC Client Holdings Nominee (UK) Limited 636179 ACCT | 610,500 | 610,500 | 0 | Wednesday, August 24, 2011 | |
| Sushovan Hussain | 9,978 | Sushovan Hussain | 6,978 | 6,978 | 0 | Friday, August 26, 2011 | |
| | | Sushovan Tareque Hussain | 3,000 | 3,000 | 0 | Monday, September 05, 2011 | |
| Richard Gaunt | 2,372,601 | UBS Private Banking Nominees Limited (Mainpool ACCT) | 2,372,601 | 2,372,601 | 0 | Monday, August 22, 2011 | |
| Robert Webb | 8,941 | Robert Stopford Webb | 8,109 | 8,109 | 0 | Tuesday, August 30, 2011 | |
| | | BBHISL Nominees Limited 120077 ACCT | 832 | 832 | 0 | Friday, August 26, 2011 | |
| **TOTALS:** | **22,190,066** | | **22,190,066** | **22,190,066** | **0** | | |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01662036

USAO 00002551

# EXHIBIT M

USAO 00002552



**U.S. Department of Justice**

Criminal Division
Office of International Affairs

MDR:KJH:JEC:MHP:jmf
DOJ No. 182-53177

*Washington, D.C. 20530*

January 29, 2016

VIA E-MAIL AND FEDEX

Jude DeSouza
United Kingdom Central Authority
Home Office
3rd Floor, Seacole Building
2 Marsham Street
London, England SW1P 4DF

SUBJECT: Request for Assistance in the Investigation of Autonomy Corporation

Dear Mr. DeSouza:

Attached is a request for assistance pursuant to the 1994 Treaty of Mutual Legal Assistance in Criminal Matters between the United States of America and the United Kingdom, as amended by the 16 December 2004 Instrument and exchange of notes. Should you have any questions regarding the assistance requested, please contact me by telephone at 202-598-8012 or by e-mail at Martyna.Pospieszalska@usdoj.gov. In my absence, please contact Jason Fischer, International Affairs Specialist, by telephone at 202-305-1995 or by e-mail at Jason.Fischer@usdoj.gov. Thank you for your assistance in this matter.

Sincerely,

Mary D. Rodriguez
Acting Director

By: [signature] for
Martyna H. Pospieszalska
Trial Attorney

Enclosure



**U.S. Department of Justice**

Criminal Division

MDR:KJH:JEC:MHP:jf
DOJ No. 182-53177
*Office of International Affairs*

*Washington, D.C. 20530*

January 29, 2015

TO: The Central Authority of the United Kingdom

SUBJECT: Request for Assistance in the Investigation of Autonomy Corporation

The Central Authority of the United States of America requests the assistance of the Central Authority of the United Kingdom under the 1994 Treaty of Mutual Legal Assistance in Criminal Matters between the United States of America and the United Kingdom, as amended by 16 December 2004 Instrument and exchange of notes ("the Treaty"). The United States Attorney for the Northern District of California ("the prosecutor") and the Federal Bureau of Investigation (collectively, "the U.S. authorities") have been investigating violations of U.S. criminal law involving a scheme to defraud Hewlett-Packard Company ("HP") based on Autonomy Corporation plc's ("Autonomy") materially misstated financial statements. U.S. authorities are investigating whether Autonomy misstated its financial performance in annual and quarterly reports as a part of a scheme to defraud HP and others.

Autonomy was a publicly traded company in the United Kingdom until its sale in October 2011 to HP. The investigation to date reflects that individuals at Autonomy including Michael Richard Lynch ("Lynch"), Sushovan Tareque Hussain ("Hussain"), Stephen Keith Chamberlain ("Chamberlain"), Andrew Mark Kanter ("Kanter"), and other senior officers of Autonomy caused financial statements with material misstatements to be released. Accordingly, the U.S. authorities seek assistance in obtaining bank and brokerage records of several accounts in the UK to demonstrate these accounts received money from the scheme to defraud. The U.S.

authorities also seek records from the receiving agent that was involved with HP's acquisition of Autonomy, who is believed to possess evidence that the alleged conspirators tendered their Autonomy shares and received payment for them. Finally, the U.S. authorities seek phone records for one of the alleged conspirators.

## CONFIDENTIALITY

The details of this criminal investigation are considered sensitive. Accordingly, please keep this request confidential in all respects, and do not share its contents, its subject matter, or the fact that the request has been made with any private persons (including the subjects of the investigation), or any government officials whose knowledge is not absolutely necessary for purposes of executing this request. In addition, please advise all who must be made aware of this request for assistance that the request, its contents, and its subject matter are to be kept confidential and should not be shared. If the request cannot be executed without public disclosure, the United States asks that the authorities of the United Kingdom notify the Central Authority of the United States before any action is taken towards execution.

## THE FACTS

Autonomy was a company incorporated in England and Wales with a registered office in Cambridge, United Kingdom. Its principal activities were software development and distribution. Autonomy maintained dual headquarters in San Francisco, California, and Cambridge, United Kingdom. Autonomy was a publicly traded company whose shares were listed on the London Stock Exchange and were bought, held, and sold by individuals and entities throughout the United States, including the Northern District of California.

Lynch co-founded Autonomy and served as its Chief Executive Officer (CEO) from 1996 until May 2012. Hussain was the Chief Financial Officer (CFO) of Autonomy from June 2001 until May 2012. Chamberlain was the Vice President of Finance from 2005 until March 2012. Kanter was Autonomy's Chief Operating Officer (COO) and General Counsel from 2001 to May 2012.

From 2009 through July 2011, Autonomy published annual and quarterly reports including its financial results. Autonomy stated in its annual and quarterly reports that its financial statements were prepared in accordance with International Financial Reporting Standards ("IFRS"). Autonomy also stated or suggested that it followed Generally Accepted Accounting Principles ("GAAP") in the United States for software revenue recognition. For example, Autonomy stated on its website:

> for revenue recognition we voluntarily adhere to the principles set out in US GAAP SOP 97-2, which is far more detailed, prescriptive and conservative than IFRS, and that has made it the 'gold standard' for other software companies like Oracle and Microsoft.

Lynch, Hussain, Chamberlain, and Kanter each reviewed Autonomy's quarterly reports. Lynch and Hussain also signed statements of responsibility with respect to Autonomy's 2009 and 2010 annual reports, as well as its reports for the quarters ended June 2009, June 2010, and June 2011. Lynch and Hussain, along with Kanter, also participated in calls with analysts who followed Autonomy's stock.

During the period from at least the first quarter of 2009 through October 2011, Lynch and others engaged in a scheme designed to falsely inflate the revenue that Autonomy had earned, and would report those false revenues in its annual and quarterly reports. As a result, Lynch and others were able to create the false appearance that the company was growing quickly, and

thereby inflate the price of Autonomy's stock. For example, in certain instances where Autonomy was unable to close a sale of software with a client by the end of a quarter, Autonomy claimed to have "sold" the software to a "value added reseller" (VAR) instead.[1] However, Autonomy had not satisfied certain IFRS requirements concerning its sale to the VAR, including that Autonomy had not transferred to the buyer the significant risks and rewards of ownership of the goods; it retained effective control over the goods sold; and it was not probable that the economic benefits associated with the transaction would flow to Autonomy. In fact, the VARs lacked the ability or intent to pay and had no independent use for the software.

In addition to improperly recognizing revenue on certain "VAR" transactions in violation of the IFRS requirements, Autonomy also engaged in certain reciprocal transactions whereby it sold software to a customer at one price and purchased products or services from the same customer at a greater price – thus resulting in a "roundtrip" of cash that made Autonomy's revenue (and growth) greater than they really were. Finally, Autonomy also failed to disclose that it engaged in substantial sales of third-party computer hardware, without modification and unaccompanied by any Autonomy software. Omitting this information made Autonomy look like a quickly growing software company rather than a more slowly growing hardware company. After HP acquired Autonomy, HP discovered that Autonomy owed a substantial amount to an HP competitor for computer hardware and ultimately learned of the full scope of Autonomy's hardware sales.

Hussain's Telephone Numbers

E-mails and documents provided by HP and other records obtained by U.S. authorities, demonstrate that Hussain used two cellular phone numbers to communicate with Autonomy

[1] A VAR is a company that adds features or services to an existing product and then resells it.

employees and others in the U.S. relating to VAR and other transactions throughout the scheme: +[redacted]7012, operated by Vodaphone, and +[redacted]9540, operated by Telefonica UK Limited. For example, U.S. phone records reflect that +[redacted]9540 was used to call the CFO of one of the VARs on or about January 1, 2010. The CFO of the VAR has indicated to U.S. authorities that Hussain called him that day to request that the VAR agree to a software sale, on which Autonomy ultimately improperly recognized revenue in their reports for the year 2009. U.S. phone records also reflect that [redacted]7012 was used on or about April 4, 2011, to call an Autonomy employee located in the U.S. who was responsible for facilitating VAR transactions. In addition, +[redacted]7012 was provided as the contact number for Hussain on a contact list for those working on HP's acquisition of Autonomy.

Barclays PLC & UBS AG Accounts Utilized by Autonomy Officers

During the scheme to inflate Autonomy's value and shares, Autonomy made payments, including payment for their salaries, to Lynch into Barclays PLC ("Barclays Bank") account number [redacted]4105; to Hussain into HSBC account number [redacted]627; and to Chamberlain into Barclays Bank account number [redacted]103.[2] Hussain, Chamberlain, and Kanter also exercised stock options through accounts held by UBS AG ("UBS") in London, but the account numbers remain unknown. U.S. authorities learned of these bank accounts and stock option exercises from information in the possession of HP, including a spreadsheet of stock option exercises by Hussain, Chamberlain, and Kanter.

[2] U.S. authorities do not know the address for these accounts. Barclays Bank appears to be a subsidiary of Barclays PLC, which is located at 1 Churchill Place, London E14 5HP, United Kingdom, telephone number [redacted]

HP's Acquisition of Autonomy

In or around December 2010 or January 2011, Lynch authorized an investment banker based in California to approach HP and others about the possibility of acquiring Autonomy. On or about August 18, 2011, HP and Hewlett-Packard Vision B.V. ("HP Vision"), an indirect wholly-owned subsidiary of HP, entered into an Offer Agreement with Autonomy and publicly announced an offer to acquire the outstanding shares of Autonomy for £25.50 ($42.11) per share in cash. The offer directed that acceptances be delivered to Capita Registrars Limited ("Capita"), located at the Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU (Telephone [REDACTED]), which acted as a receiving agent for the offer and handled payment of acquisition funds to Autonomy shareholders.

To facilitate the sale, Capita opened bank accounts at the Royal Bank of Scotland to receive payments from HP. Specifically, account number 22369035 (Sort Code 15-10-00) was opened under the name "Capita Registrars Limited CREST Clearing Account," and account number [REDACTED] (Sort Code 15-10-00) was opened under the name "Capita Registrars Limited Re: Hewlett-Packard Vision B.V. / Autonomy Corporation plc – Takeover Case Consideration A/C." Lynch, Hussain, Chamberlain, and Kanter were among those who accepted the offer. Each tendered their shares as part of the acquisition and received millions of dollars as a result. Angela Maria Bacares ("Bacares"), Lynch's wife and at times an Autonomy employee, also tendered shares in her name and profited as a result of the acquisition.

Accounts Suspected of Receiving Proceeds of the Sale of Autonomy to HP

Prior to October 2011, according to e-mails and account statements between Lynch and a UBS money manager provided to U.S. authorities by HP, Lynch and Bacares maintained a wealth management and/or securities brokerage account or accounts holding Autonomy shares at

UBS in London. The account number(s) is unknown. As of March 2013, U.S. authorities have have determined that Lynch continues to be associated with accounts at UBS in London, but those account number(s) remain unknown.

The U.S. authorities also have learned through investigation that, in 2008, Lynch and Bacares each established accounts with Merrill Lynch Portfolio Managers Limited in the UK. In or around July 2013, Merrill Lynch Portfolio Managers Limited was acquired by Julius Baer Group and custody of the assets in the accounts were transferred to Guernsey. Assets in the Merrill Lynch and Julius Baer accounts contain part of the proceeds that Lynch received from the sale of Autonomy. Lynch holds relationship number 4508.1443 and Bacares holds relationship number 4508.1772. Although the assets in the account were transferred to Guernsey, U.S. authorities believe Julius Baer Group affiliates in the UK – Julius Baer International Limited and Julius Baer Portfolio Managers Limited – may still hold relevant records because that is where Lynch resides.

Finally, during the course of their investigation, the U.S. authorities have learned that Lynch maintained bank, brokerage, or investment accounts at J.P. Morgan International Bank Limited in the UK, including account numbers [redacted], [redacted], [redacted], [redacted]; that, as of March 2013, Lynch held an account at Credit Suisse in London (account number unknown); and that Bacares held private bank account number [redacted] (Sort Code [redacted]) at HSBC in the UK, which may have received proceeds from the Julius Baer accounts. As of January 2014, Hussain also held an account at HSBC Bank PLC in the UK, but the account number remains unknown. In order to further the investigation into the scheme, as well as identify assets that may be subject to forfeiture under U.S. law, U.S. authorities seek the assistance of the

appropriate UK authorities to identify the bank accounts currently unknown to U.S. authorities, and to obtain bank records for the accounts outlined in this request.

## THE OFFENSES

**18 U.S.C. § 371. Conspiracy to commit offense or to defraud United States.**
If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be . . . imprisoned not more than five years . . . .

**18 U.S.C. § 1343. Fraud by wire, radio or television.**
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be . . . imprisoned not more than 20 years . . . . If the violation occurs in relation to . . . or affects a financial institution, such person shall be . . . . imprisoned not more than 30 years . . . .

**18 U.S.C. § 1348. Securities and commodities fraud.**

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud any person in connection with any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 15 U.S.C 78*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d); or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any of any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer with a class of securities registered under Section 12 of the Security Exchange Act of 1934 (15 U.S.C*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d). such] security . . . shall be . . . imprisoned not more than 25 years . . . .

**18 U.S.C. § 1349. Attempt and conspiracy.**
Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

## PERSONS AND ENTITIES INVOLVED

TARGETS/SUBJECTS

1. **MICHAEL RICHARD LYNCH**

| Alias: | Dr. Michael Lynch<br>Mike Lynch |
|---|---|

| | |
|---|---|
| Date of Birth: | [redacted] |
| Place of Birth: | United Kingdom |
| Citizenship: | United Kingdom |
| Passport Number: | UK passport ([redacted]) |
| Address: | [redacted] |

2. **SUSHOVAN TAREQUE HUSSAIN**

| | |
|---|---|
| Date of Birth: | [redacted] |
| Place of Birth: | Bangladesh |
| Citizenship: | United Kingdom |
| Passport Number: | UK passport ([redacted]) |
| Address: | [redacted] |

3. **STEPHEN KEITH CHAMBERLAIN**

| | |
|---|---|
| Alias: | Steve Chamberlain |
| Date of Birth: | [redacted] |
| Citizenship: | United Kingdom |
| Race: | Caucasian |
| Passport Number: | UK passport ([redacted]) |
| Address: | [redacted] |

4. **ANDREW MARK KANTER**

| | |
|---|---|
| Alias: | Andy Kanter |
| Date of Birth: | [redacted] |
| Place of Birth: | United States |
| Citizenship: | United States |
| Address: | [redacted] |

5. **ANGELA MARIA BACARES**

| | |
|---|---|
| Alias: | Angela Lynch |
| Date of Birth: | [redacted] |
| Place of Birth: | United States |
| Citizenship: | United Kingdom |
| Passport Number: | UK passport ([redacted]) |
| Address: | [redacted] |

## ASSISTANCE REQUESTED

### I. Bank and Brokerage Records

For the period from January 1, 2009, to the present, please provide complete certified records from BARCLAYS PLC (including, without limitation, BARCLAYS BANK PLC and

any subsidiary and/or affiliate), located at 1 Churchill Place, London E14 5HP, United Kingdom, relating to:

1. Account [redacted] held by Michael Richard Lynch;
2. Account [redacted] held by Stephen Keith Chamberlain; and
3. any and all any accounts traceable to these accounts held by or for the benefit of:
   a. Michael Richard Lynch; and/or
   b. Stephen Keith Chamberlain.

For the period from January 1, 2009, to the present, please provide complete certified records from CREDIT SUISSE AG (including, without limitation, Credit Suisse Securities (Europe) Ltd, Credit Suisse (UK) Limited, Credit Suisse International, and any subsidiary or affiliate), located at One Cabot Square, London E14 4QJ, United Kingdom, relating to any accounts held by or for the benefit of Michael Richard Lynch.

For the period from January 1, 2009, to the present, please provide complete certified records from HSBC BANK PLC (and any subsidiary or affiliate), located at 8 Canada Square, London E14 5HQ, relating to:

1. Account number [redacted] held by Angela Bacares;
2. Account number [redacted] held by Sushovan Tareque Hussain; and
3. any and all any accounts traceable to these accounts held by or for the benefit of:
   a. Angela Bacares; and/or
   b. Sushovan Tareque Hussain.

For the period from January 1, 2009, to the present, please provide complete certified records from J.P. MORGAN INTERNATIONAL BANK LIMITED (including, without limitation, J.P. Morgan Securities plc, J.P. Morgan Limited, and any subsidiary or affiliate), located at 1 Knightsbridge, London SW1X 7LX, United Kingdom, relating to the following accounts held by or for the benefit of Michael Richard Lynch:

1. Account number [redacted];

2. Account number [redacted];
3. Account number [redacted];
4. Account number [redacted]; and
5. any and all any accounts traceable to these accounts held by or for the benefit of Michael Richard Lynch.

For the period from January 1, 2013, to the present, please provide complete certified records from JULIUS BAER INTERNATIONAL LIMITED and JULIUS BAER PORTFOLIO MANAGERS LIMITED (including, without limitation, any subsidiary or affiliate) relating to:

1. account or relationship numbers [redacted] held by Michael Richard Lynch, and/or [redacted], held by Angela Maria Bacares; and
2. any and all any accounts traceable to these accounts held by or for the benefit of Michael Richard Lynch and/or Angela Maria Bacares.[3]

For the period from January 1, 2009, to the present, please provide complete certified records from MERRILL LYNCH INTERNATIONAL (including, without limitation, Merrill Lynch International Bank Limited, Merrill Lynch Portfolio Managers Limited, and any subsidiary or affiliate), located at 2 King Edward Street, London EC1Q 1 HQ, United Kingdom, relating to any accounts held by or for the benefit of Michael Richard Lynch and/or Angela Maria Bacares.

For the period from January 1, 2011, to May 2012, please provide complete certified records from ROYAL BANK OF SCOTLAND PLC (including, without limitation, any subsidiary or affiliate), located at City Office, 62/63, Threadneedle Street, London EC2R 8LA, relating to:

1. Account number [redacted] held in the name of "Capita Registrars Limited CREST Clearing Account" (Sort Code 15-10-00); and
2. Account number [redacted] held in the name of "Capita Registrars Limited Re: Hewlett-Packard Vision B.V. / Autonomy Corporation plc – Takeover Case Consideration A/C" (Sort Code 15-10-00).

[3] Please note U.S. authorities have also requested these documents from the Bailiwick of Guernsey. However, UK authorities seek any records that may remain in the United Kingdom.

For the period from January 1, 2009, to the present, please provide complete certified records from UBS AG (including UBS Group, UBS AG, Investment Bank, UBS Wealth Management, UBS Securities Limited, and any parent, subsidiary, or affiliate), located at 1 Finsbury Avenue, London EC2M 2PP, United Kingdom, relating to:

1. trading in Autonomy securities (including options) by Michael Richard Lynch, Sushovan Tareque Hussain, Andrew Mark Kanter, and/or Stephen Keith Chamberlain;
2. any and all any accounts traceable to these accounts held by or for the benefit of
   a. Michael Richard Lynch;
   b. Sushovan Tareque Hussain;
   c. Stephen Keith Chamberlain;
   d. Andrew Mark Kanter; and/or
   e. Angela Maria Bacares;
3. Communications with Michael Richard Lynch, Sushovan Tareque Hussain, Andrew Mark Kanter, and/or Stephen Keith Chamberlain.

Records from the above-listed banks should include, but not be limited to:

- original signature cards;
- documentation of account opening;
- account ledger cards;
- periodic account statements;
- records (copied front and back) of all items deposited, withdrawn, or transferred;
- wire transfers;
- correspondence to, from, or on behalf of the account holder;
- shares and/or securities purchased and/or sold;
- copies of electronic recordings of any conversations;
- instructions relating to the receipt or transfer of any funds into or out of the account;
- powers of attorney and other banking authorizations; and
- memoranda related to the account.

Additionally, the period from January 1, 2009, to the present, please provide all identifying information of any accounts held at BARCLAYS PLC, CREDIT SUISSE AG, HSBC BANK PLC, J.P. MORGAN INTERNATIONAL BANK LIMITED, JULIUS BAER INTERNATIONAL LIMITED, JULIUS BAEAR PORTFOLIO MANAGERS LIMITED,

MERRILL LYNCH INTERNATIONAL, ROYAL BANK OF SCOTLAND PLC, and UBS AG or elsewhere held in the name of or for the benefit of Michael Richard Lynch, Sushovan Tareque Hussain, Andrew Mark Kanter, Stephen Keith Chamberlain; and/or Angela Maria Bacares. The identifying information should include the bank name, bank address, account number, account holder(s), account signatories, account balance, and account opening documents.

## II. Business Records

For the period January 1, 2011, to May 2012, please provide complete certified records from CAPITA REGISTRARS LIMITED (including, without limitation, Capita PLC and any subsidiary and/or affiliate) relating to:

1. services performed by CAPITA REGISTRARS LIMITED in connection with the HP's acquisition of Autonomy;
2. payments to Autonomy shareholders in connection with the HP acquisition;
3. Michael Richard Lynch, Sushovan Tareque Hussain, Stephen Keith Chamberlain, and/or Andrew Mark Kanter, including, without limitation, communications with any of them; payments to any of them; and documents relating to their acceptance of the offer;
4. acceptances of HP and HP Vision's offer by UBS AG, CREDIT SUISSE AG, MERRILL LYNCH INTERNATIONAL, J.P. INTERNATIONAL BANK LIMITED, and/or any subsidiary or affiliate.

For the period from January 1, 2011, to May 2012, please provide complete certified records from ROYAL BANK OF SCOTLAND PLC (including, without limitation, any subsidiary or affiliate) relating to:

1. the bank's services in connection with the HP's acquisition of Autonomy;
2. Capita Registrars Limited's services in connection with HP's acquisition of Autonomy.

Records from CAPITA REGISTRARS LIMITED and ROYAL BANK OF SCOTLAND PLC should include, but not be limited to:

- agreements and communications with HP, HP Vision, Autonomy, or Autonomy shareholders;

- correspondence with Michael Richard Lynch, Sushovan Tareque Hussain; Stephen Keith Chamberlain, and/or Andrew Mark Kanter;
- Spreadsheets showing payments to shareholders;
- Bank documents & statements; and
- Wire transfers.

For the period from January 1, 2009, to May 31, 2012, please provide complete certified records from VODAPHONE relating to phone numbers [redacted]7012, and records from TELEFONICA UK LIMITED relating to phone numbers [redacted]9540. Records from VODAPHONE and TELEFONICA UK LIMITED should include, but not be limited to account statements showing calls made and received, and subscriber information.

**PROCEDURES TO BE FOLLOWED**

**I. Business/Bank Records**

Under United States law, foreign business records are usually admitted into evidence in a proceeding in the United States after the party offering them proves, through the testimony at trial of a qualified witness, that:

1. the records produced are true and accurate copies of original records in the custody of the business;

2. the business made or kept the originals in the ordinary course of business and as a regular business practice; and

3. the originals were made, at or near the time of the occurrence of the transactions they record, by a person who either had knowledge of those transactions or received the information from a person with such knowledge.

The testimony of a qualified witness may be unnecessary at trial in the United States where that witness makes or provides a written declaration in a foreign jurisdiction (*i.e.*, the United Kingdom) that (1) contains essentially the same information noted in items 1-3 above and (2) subjects the witness to criminal penalties under the laws of the foreign jurisdiction if the declaration is false. Article 8(5) of the Treaty provides for such a declaration.

In accordance with Article 8 of the Treaty, please have the appropriate authorities in the United Kingdom do the following:

1. require each bank/business official producing records to complete, and sign the attached Certificate of Authenticity of Business Records;

2. attach the completed certificate to the corresponding records produced by the bank/business official and transmit the records with certificate, through or as directed by the Central Authority for the United Kingdom, to the Office of International Affairs, U.S. Department of Justice.

In accordance with Article 10(2) of the Treaty, please invite each bank/business official producing records to appear, if it should become necessary, at a date to be determined, in San Francisco, California, at the expense of the United States government, to testify at trial.

We thank you for your assistance with this matter and ask that you keep us apprised of all developments.

29 January 2016
Date

Sincerely,

Kenneth J. Harris
Acting Deputy Director
Office of International Affairs
Criminal Division
U.S. Department of Justice

CERTIFICATE OF AUTHENTICITY OF BUSINESS RECORDS

I, ________________________________ (Name), attest on penalty of criminal punishment for false statement or false attestation that I am employed by ______________________________________ (Name of Business from which documents are produced) and that my official title is ________________________________ (Official Title). I further state that each of the records attached hereto is the original or a duplicate of the original of records in the custody of ____________________________________________________ (Name of Business from which documents are produced). I further state that:

A) such records were made at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;

B) such records were kept in the course of a regularly conducted business activity;

C) the business activity made the records as a regular practice; and

D) if any of such records is not the original, such record is a duplicate of the original.

_____________________________________ (Signature)

_____________________________________ (Date)

Sworn to or affirmed before me, ________________________(Name), a ___ (notary public, judicial officer, etc.), this ____________day of __________________, 20____________.

FILED

JAN 29 2016

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

BRIAN J. STRETCH (CABN 163973)
Acting United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
Assistant United States Attorneys

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7534
Fax: (415) 436-7234
Robert.Leach@usdoj.gov
Adam.Reeves@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE GRAND JURY INVESTIGATION NO. 2012R02242, | Case No. CR 14-90491 MISC EMC<br><br>~~[PROPOSED]~~ ORDER SUSPENDING THE RUNNING OF THE STATUTE OF LIMITATIONS UNDER 18 U.S.C. § 3292<br><br>**UNDER SEAL** |

Upon application of the United States, indicating that evidence of offenses, namely 15 U.S.C. §§ 78j(b) & 78ff (securities fraud), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1348 (securities fraud), and 18 U.S.C. § 1349 (attempt and conspiracy), is in the Vatican City State and in Italy, the Court finds, by a preponderance of the evidence, that an official request has been made to the Vatican City State for evidence of the foregoing offenses and it reasonably appears that such evidence is in the Vatican City State. The Court further finds, by a preponderance of the evidence, that an official request has been made to Italy for evidence of the foregoing offenses and it reasonably appears that such evidence is in Italy.

WHEREFORE, it is ordered that the United States' *Ex Parte* Application for an Order Suspending the Statute of Limitations Pursuant to 18 U.S.C. § 3292 is GRANTED.

It is further ordered that the running of the statute of limitations for the foregoing offenses is SUSPENDED beginning on August 10, 2015, the date on which the official request to the Vatican City State was made, and ending on the date on which the Vatican City State takes final action on the request.

It is further ordered that the running of the statute of limitations for the foregoing offenses is SUSPENDED beginning on December 23, 2015, the date on which the official request to Italy was made, and ending on the date on which Italy takes final action on the request.

It is further ordered that the Clerk of the Court shall seal this Order, as well as the United States' *Ex Parte* Application for an Order Suspending the Statute of Limitations and the Declaration of AUSA Robert S. Leach in support thereof, pending further order of the Court.

IT IS SO ORDERED.

Dated: 1/29, 2016

THE HONORABLE ~~JAMES DONATO~~ EDWARD CHEN
United States District Judge

cc: Robert S. Leach