1  PATRICK D. ROBBINS (CABN 152288))
   Attorney for the United States
2  Acting Under Authority Conferred by 28 U.S.C. § 515

3  MARTHA BOERSCH (CABN 126569)
   Chief, Criminal Division
4
   ROBERT S. LEACH (CABN 196191)
5  ADAM A. REEVES (NYBN 2363877)
   KRISTINA N. GREEN (NYBN 5226204)
6  ZACHARY G.F. ABRAHAMSON (CABN 310951)
   Assistant United States Attorneys
7
        450 Golden Gate Avenue, Box 36055
8       San Francisco, California 94102-3495
        Telephone: (415) 436-6912
9       Fax: (415) 436-7234
        Email: Robert.Leach@usdoj.gov
10
   Attorneys for United States of America
11
                      UNITED STATES DISTRICT COURT
12
                   NORTHERN DISTRICT OF CALIFORNIA
13
                        SAN FRANCISCO DIVISION
14

15
   UNITED STATES OF AMERICA,          )   No. CR-18-577 CRB
16                                     )
              Plaintiff,               )
17                                     )   DECLARATION OF KRISTINA GREEN IN
        v.                             )   SUPPORT OF GOVERNMENT'S MOTION *IN*
18                                     )   *LIMINE* #3: TO EXCLUDE EXPERT TESTIMONY
   MICHAEL RICHARD LYNCH AND           )
19  STEPHEN KEITH CHAMBERLAIN,         )
                                       )
20                                     )
              Defendant.               )
21                                     )
   _____ )
22

23  I, Kristina Green, declare and state as follows:

24       1.  I am an Assistant United States Attorney for the Northern District of California assigned to

25  the prosecution of the above-captioned case.

26       2.      Attached hereto as Exhibit A is a true and correct copy of the expert report of Mr. Steven

27  Brice, served on November 8, 2023 ("Brice Report 1").

28

3.      Attached hereto as Exhibit B is a true and correct copy of the expert report of Mr. Steven Brice with selected appendices H, I, J, K, L, served on January 3, 2024 ("Brice Report 2").

4.      Attached hereto as Exhibit C is a true and correct copy of the expert report of Mr. Philippe Cerf, served on December 7, 2023.

5.      Attached hereto as Exhibit D is a true and correct copy of the expert report of Mr. Greig Taylor, served on December 7, 2023.

6.      Attached hereto as Exhibit E is a true and correct copy of the expert report of Mr. John Levitske, served on December 7, 2023.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

DATED:  January 17, 2024

_____/s/_____
KRISTINA GREEN
Assistant United States Attorney

# Exhibit A

United States

V

(1) Michael Richard Lynch
(2) Stephen Chamberlain

---

# Summary of independent expert accounting opinions of Steven Brice FCA

# 8 November 2023

---



**Private & Confidential**

United States Attorney's Office
11th Floor, Federal Building
450 Golden Gate Avenue, Box 36055
San Francisco
California 94102

Date:      8 November 2023

Dear Sir / Madam

**United States V (1) Michael Richard Lynch (2) Stephen Chamberlain**

I have been instructed as an Independent Expert Accountant by the United States Attorney's Office in the matter of United States versus Dr Michael Richard Lynch and Mr Stephen Chamberlain. Dr Lynch is the former chief executive officer of Autonomy Corporation plc and Mr Chamberlain is the former vice president of finance.

I understand that my duty as an Independent Expert Accountant is to help the Court by giving independent assistance by way of objective, unbiased opinion on matters within my expertise, both in preparing reports and giving oral evidence. I understand that this duty overrides any obligation to the party by whom I am engaged or the person who has paid or is liable to pay me. I confirm that I have complied with, and will continue to comply with, that duty.

I confirm that I have not entered into any arrangement where the amount or payment of my fees is in any way dependent upon the outcome of the case. I know of no conflict of interest of any kind which would prevent me from acting in this matter.

I confirm that the contents of this summary report are true to the best of my knowledge and belief and that the opinions I have expressed represent my true and complete professional opinion.

Yours faithfully

**Steven Brice**
Partner



**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**mazars**   **Summary of independent expert accounting opinions of Steven Brice FCA**

# Contents

Page

**1    Introduction** ................................................................................................... **6**

1.1   My qualifications and experience .......................................................... 6

1.2   Summary background ............................................................................ 6

1.3   My instructions ...................................................................................... 7

1.4   My instruction in United States versus Sushovan Tareque Hussain ................... 7

1.5   The available information ....................................................................... 8

1.6   Scope of this summary report................................................................ 9

**2    Summary of my opinion in relation to software sales transactions** ..................... **10**

2.1   Introduction.......................................................................................... 10

2.2   The starting point for my analysis: the software sales transactions reported by Autonomy as revenue during the Relevant Period .............................. 10

2.3   The applicable accounting standards .................................................. 14

2.4   Overview to my summary conclusions ................................................ 16

2.5   My summary conclusions in relation to Misstatements arising from transactions with resellers which contained one or more revenue recognition issues............ 19

2.6   My summary conclusions in relation to Misstatements arising from transactions which contained linked or reciprocal transactions ................................ 24

2.7   My summary conclusions in relation to Misstatements arising from transactions being accounted for as a sale of goods rather than the rendering of services ... 25

2.8   My summary conclusions in relation to Misstatements arising from transactions being accounted for as a sale of goods rather than royalties ............................. 29

2.9   My summary conclusions in relation to Misstatements arising from transactions which contain timing errors.................................................................. 31

2.10  My summary conclusions in relation to Misstatements arising from transactions which contain errors of valuation ........................................................ 32

**3    Summary of my opinion in relation to hardware sales transactions** ..................... **34**

3.1   Introduction.......................................................................................... 34

3.2   The starting point for my analysis: the hardware sales transactions reported by Autonomy as revenue during the Relevant Period .............................. 34

3.3   Overview to my summary conclusions ................................................ 36

3.4   My summary conclusions in relation to the inappropriate accrual or deferral of revenue arising from hardware sales transactions between reporting periods .. 38

3.5   My summary conclusions in relation to the inappropriate reporting of all or part of the cost of purchasing the hardware as being a "*Sales and marketing*" expense ................................................................................................... 41

_____

3.6    My summary conclusions in relation to Autonomy's failure to disclose the existence of a material amount of hardware sales transactions......................... 43

**4    My summary conclusions in relation to the revenue streams reported by Autonomy from Q1 2010 onwards ............................................................. 46**

4.1    Introduction........................................................................................................ 46

4.2    The starting point for my analysis: the revenue streams reported by Autonomy in its commentary to the market ......................................................... 46

4.3    Applicable financial reporting requirements......................................................... 47

4.4    Overview to my summary conclusions ................................................................. 49

4.5    My summary conclusions in relation to the reporting of the IDOL OEM revenue stream ................................................................................................................ 50

4.6    My summary conclusions in relation to the reporting of the IDOL Cloud revenue stream ................................................................................................................ 52

4.7    My summary conclusions in relation to Autonomy's failure to disclose the existence of a material amount of hardware sales transactions in their other financial information .......................................................................................... 55

4.8    My summary conclusions in relation to the double reporting of the reported IDOL OEM and IDOL Cloud revenue streams........................................................... 57

**5    Summary of my overall conclusions ...................................................................... 59**

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**mazars**        **Summary of independent expert accounting opinions of Steven Brice FCA**

**Appendices**

| | |
|---|---|
| Curriculum Vitae of Steven Brice | Appendix A |
| Documents I have relied upon | Appendix B |
| The Software Focus Transactions | Appendix C |
| The hardware sales transactions per the Quarterly Revenue Breakdowns compared with the hardware sales transactions recorded in the Hardware Ledger | Appendix D |
| The Hardware Focus Transactions | Appendix E |
| Narrative explanation relating to each Software Focus Transaction for which I have identified a Misstatement | Appendix F |

_____

mazars

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

# 1      Introduction

## 1.1     My qualifications and experience

1.1.1   I am Steven Brice, a Partner and Head of Accounting Technical Services for Mazars LLP ("**Mazars**"), the UK firm of the Mazars Group.  The Mazars Group is an international, integrated and independent organisation specialising in audit, advisory, accounting and tax services, with a direct presence in more than 95 countries drawing on the expertise of 47,000 professionals.

1.1.2   I am a Fellow of the Institute of Chartered Accountants in England and Wales (the "**ICAEW**") and I have over 25 years of technical accounting experience.  I regularly advise clients and audit teams on the application of International Financial Reporting Standards ("**IFRS**") when preparing or auditing financial information and am routinely instructed to review financial statements for compliance with IFRS.  I hold a current Practising Certificate and have Responsible Individual status for audit work within Mazars which means that I can take responsibility for audit work and sign audit reports.

1.1.3   Given my experience, I am routinely engaged as an expert accountant to consider matters involving the accounting treatment of particular transactions under various accounting frameworks and I have provided independent expert evidence in a number of different forums, including in the High Court of England and Wales and the International Dispute Resolution Centre in London.

1.1.4   Further details of my qualifications and experience are set out in my curriculum vitae in Appendix A, including a list of publications that I have authored in the last 10 years and a listing of the matters in which I have testified as an expert at trial or by deposition in the last four years.

## 1.2     Summary background

1.2.1   This summary report is provided in the matter of United States versus Dr Michael Richard Lynch ("**Dr Lynch**") and Mr Stephen Chamberlain ("**Mr Chamberlain**").  Dr Lynch is the former chief executive officer of Autonomy Corporation plc ("**Autonomy**"), a company that was incorporated in England and Wales[1].   Mr Chamberlain is the former vice president of finance.

---

[1] Autonomy's major subsidiaries comprised (i) Autonomy, Inc. ("**AU Inc**"), Interwoven, Inc. ("**Interwoven**") and ZANTAZ, Inc. ("**Zantaz**"), all of which were incorporated in the United States; and (ii) Autonomy Systems Limited ("ASL"), a company incorporated in England and Wales

**mazars**

1.2.2   Hewlett-Packard Company ("**HP**") acquired all the outstanding shares in Autonomy on or about 3 October 2011.

1.2.3   According to the Superseding Indictment it is alleged that, between 2009 and 2011, Dr Lynch and Mr Chamberlain engaged in a scheme to defraud HP (as well as other purchasers and sellers of Autonomy securities) about the true financial performance of Autonomy's business, its financial condition and its prospects for growth.

## 1.3    My instructions

1.3.1   I have been provided with a significant volume of documents, to which I refer in Section 1.5.

1.3.2   My instructions relate to the period 1 January 2009 to 30 September 2011 (the "**Relevant Period**").  Based upon my review of the information provided to me, I have been instructed to:

   (a)   review software sales transactions reported by Autonomy during the Relevant Period as revenue, and give my opinion on whether these sales transactions were properly reported in accordance with the applicable accounting standards;

   (b)   review hardware sales transactions reported by Autonomy during the Relevant Period as revenue, and give my opinion on whether these sales were properly reported and disclosed in accordance with the applicable accounting standards; and

   (c)   review the revenue streams reported by Autonomy during the Relevant Period[2] and give my opinion on whether the description of these streams is consistent with the nature of the underlying transactions.

1.3.3   This report reflects a summary of the opinions I have reached in addressing my instructions, including the bases and reasons for reaching my conclusions.  I note that at the date of my report my work is ongoing.

## 1.4    My instruction in United States versus Sushovan Tareque Hussain

1.4.1   I was previously instructed as an independent expert accountant by the United States Attorney's Office in the matter of United States versus Mr Sushovan Tareque Hussain.  Mr

---

[2] As explained further in Section 4, this specifically includes IDOL Product, IDOL OEM, IDOL Cloud, services and deferred revenue release as reported in the financial information published with Autonomy's quarterly and annual financial statements

mazars

Hussain was the former Chief Financial Officer of Autonomy.  I issued a summary of my expert accounting opinions in that matter in a report dated 31 October 2017 ("**My Hussain Report**").

1.4.2    The issues I was instructed to address in My Hussain Report covered certain of the issues I am instructed to address in this report.  I note that I have received a significant amount of additional information since I issued My Hussain Report.  Where opinions have developed as a result of the additional information I have now seen, I have noted so in this summary report.

## 1.5    The available information

1.5.1    The conclusions in this summary report are based on my experience and on the evidence I have seen.  If further evidence becomes available to me, these conclusions may change.

1.5.2    For the purposes of my work, I have been provided with a significant number of documents. This information includes:

(a)      contemporaneous information (such as contracts, emails and downloads from accounting records);

(b)      the audit working papers used by Deloitte LLP ("**Deloitte**") when auditing or reviewing the financial reports issued during the Relevant Period together with the report of the Financial Reporting Council's Disciplinary Tribunal relating to Deloitte's audits and reviews during the Relevant Period[3];

(c)      the pleadings, disclosure, witness testimonies, expert reports, transcripts and Judgment in the matter of United States versus Sushovan Tareque Hussain; and

(d)      the pleadings, disclosure, witness testimonies, expert reports and transcripts in a related case in the High Court in London (the "**High Court Proceedings**")[4].

1.5.3    In total I have been provided with more than 650,000 documents.  In light of the number of documents provided to me, I have used an eDiscovery Platform to undertake targeted searches and reviews, aimed at identifying the documents of relevance to my instructions.  I provide in Appendix B a list of the documents I have relied upon in preparing this summary report.

---

[3] Report titled "*Explanatory Memorandum to the Tribunal Report*" in the matter of The Executive Counsel to the Financial Reporting Council versus (1) Deloitte LLP (2) Richard Knights (3) Nigel Mercer
[4] (1) ACL Netherlands B.V. (as successors to Autonomy Corporation Limited) (2) Hewlett-Packard The Hague B.V. (as successors to Hewlett-Packard Vision B.V.) (3) Autonomy Systems Limited (4) Hewlett-Packard Enterprise New Jersey, Inc versus (1) Michael Richard Lynch (2) Sushovan Tareque Hussain

**mazars**

## 1.6    Scope of this summary report

1.6.1    It should be noted that the work I have completed does not constitute an audit and, other than as expressly set out in this report, I have not verified or in any other way checked the information set out in the documents I have reviewed.

1.6.2    In completing my work, I have been assisted by individuals within the Forensic and Investigation and Accounting Technical Services teams at Mazars.  I have supervised and reviewed their work and I confirm that the opinions expressed in this summary report are my own.

1.6.3    Mazars' fees for this engagement are not contingent on the outcome of the proceedings. Mazars is being compensated at a rate of $693 per hour for my time and between $39 and $693 per hour for staff working under my direction.

1.6.4    I have prepared this report solely for the use in these proceedings.  It is confidential in all respects other than to be used in the proceedings as appropriate.  This summary report should not be used, reproduced or circulated for any other purpose without my prior written consent. Mazars accepts no responsibility to third parties in relation to the matters in this summary report and / or for any breaches of this obligation.

1.6.5    Some figures in this report have been rounded and as a result some tables may include rounding differences.

---

**mazars**

# 2     Summary of my opinion in relation to software sales transactions

## 2.1     Introduction

2.1.1     I am instructed to review software sales transactions reported by Autonomy during the Relevant Period as revenue, and give my opinion on whether these sales were properly reported in accordance with the applicable accounting standards.  In this section of my report, I provide a summary of my opinion.

## 2.2     The starting point for my analysis: the software sales transactions reported by Autonomy as revenue during the Relevant Period

2.2.1     I have identified, for each quarter[5] during the Relevant Period (apart from Q3 2011), spreadsheets that break down Autonomy's revenue by customer and by revenue type (for example licence, hosting, maintenance and services)[6].  I refer to these spreadsheets as the "**Quarterly Revenue Breakdowns**".

2.2.2     I have compared the total revenue amounts in the Quarterly Revenue Breakdowns to the total revenue reported in Autonomy's quarterly financial statements[7] and I have found that they agree.  The total revenue reported by Autonomy in both the Quarterly Revenue Breakdowns and the quarterly financial statements is shown in Table 2.1:

---

[5] Autonomy issued financial information on a quarterly basis.  I refer to the period 1 January 2010 to 31 March 2010 as "**Q1 2010**", to the period 1 April 2010 to 30 June 2010 as "**Q2 2010**", to the period 1 July 2010 to 30 September 2010 as "**Q3 2010**", *et seq*

[6] HP-SEC-00739438 and SEC-AUSA5-EPROD-000641095

[7] HP-SEC-00567458 (Q1 2009), HP-SEC-00009847 (Q2 2009), HP-SEC-00025166 (Q3 2009), HP-SEC-00097914 (Q4 2009), HP-SEC-00009127 (Q1 2010), FTIGJ00002722 (Q2 2010), HP-SEC-00155426 (Q3 2010) and HP-SEC-00024459 (Q4 2010), HP-SEC-00024002 (Q1 2011), HP-SEC-00564873 (Q2 2011)

**mazars**

Table 2.1: Total revenue reported by Autonomy in the Relevant Period (apart from Q3 2011)

| Quarter | Revenue ($m) |
|---------|--------------|
| Q1 2009 | 129.8 |
| Q2 2009 | 195.2 |
| Q3 2009 | 191.6 |
| Q4 2009 | 223.1 |
| Q1 2010 | 194.2 |
| Q2 2010 | 221.1 |
| Q3 2010 | 210.6 |
| Q4 2010 | 244.5 |
| Q1 2011 | 219.8 |
| Q2 2011 | 256.2 |
| **Total** | **2,086.1** |

2.2.3    I have also compared the quarterly revenue reported by Autonomy in the Relevant Period with the consensus of market analysts' expectations for revenue in each quarter.  My analysis is provided in the graph below:

Figure 2.1: Quarterly revenue reported by Autonomy in the Relevant Period compared with market consensus[8]



2.2.4    Given the quantum of some of the sales transactions, this consistent pattern of achieving actual revenues at or very close to market analysts' expectations is perhaps surprising.  I am

---

[8] The market consensus is based upon the mean average as reported by S&P Capital IQ

**mazars**

therefore evaluating this matter further in terms of whether similarly situated companies report revenues which are at or very close to market analysts' expectations.

2.2.5    The Quarterly Revenue Breakdowns identify a number of transactions in each quarter as being "*Hardware*".  Hardware sales transactions are not relevant to this section of my report – my summary conclusions in relation to hardware are instead provided in Section 3 – and it is therefore necessary to exclude them from my analysis.  The revenue reported by Autonomy, excluding revenue from hardware sales transactions, in the Quarterly Revenue Breakdowns is shown in Table 2.2:

Table 2.2: Total revenue reported by Autonomy in the Relevant Period (apart from Q3 2011), excluding revenue from hardware sales transactions

| Quarter | Total reported revenue ($m) | Hardware revenue ($m) | Revenue excluding hardware ($m) |
|---|---|---|---|
| Q1 2009 | 129.8 | 0.0 | 129.8 |
| Q2 2009 | 195.2 | 6.0 | 189.2 |
| Q3 2009 | 191.6 | 42.2 | 149.4 |
| Q4 2009 | 223.1 | 7.2 | 215.9 |
| Q1 2010 | 194.2 | 7.1 | 187.1 |
| Q2 2010 | 221.1 | 31.1 | 190.1 |
| Q3 2010 | 210.6 | 26.7 | 183.9 |
| Q4 2010 | 244.5 | 35.5 | 209.0 |
| Q1 2011 | 219.8 | 20.1 | 199.7 |
| Q2 2011 | 256.2 | 20.8 | 235.4 |
| **Total** | **2,086.1** | **196.7** | **1,889.4** |

2.2.6    According to the Quarterly Revenue Breakdowns, the total revenue excluding hardware sales transactions (of $1,889.4 million) is comprised of 4,052 line items.  In order to address my instruction in relation to software sales transactions, it is therefore necessary to identify a smaller population of transactions to focus upon.  Using the Quarterly Revenue Breakdowns, I have therefore identified all transactions of more than $2 million[9].  I summarise in Table 2.3 the total value and number of these transactions by quarter:

---

[9] The witness statement of Mr Welham in the High Court Proceedings, dated 14 September 2018, explained that the Deloitte audit team undertook "*audit work in respect of all sales made by Autonomy of more than $1m*".  In the context of the materiality for Autonomy's financial statements (which I discuss further in Section 2.3 below), a testing threshold of $1m is not unreasonable.  However, in relation to the analysis in this section, analysing all software sales transactions greater than $1m would significantly increase the size of the population (to more than 500 transactions).  Therefore, I have increased the size of my testing threshold for the software sales transactions to $2m, thereby reducing the number of identified transactions

**mazars**

Table 2.3: Transactions greater than $2 million reported as revenue by Autonomy in the Relevant Period (apart from Q3 2011), excluding revenue from hardware sales transactions

| Quarter | Revenue excluding hardware ($m) | Total value of contracts over $2m (excluding hardware) ($m) | Number of contracts over $2m (excluding hardware) |
|---|---|---|---|
| Q1 2009 | 129.8 | 74.6 | 15.0 |
| Q2 2009 | 189.2 | 123.2 | 20.0 |
| Q3 2009 | 149.4 | 96.0 | 17.0 |
| Q4 2009 | 215.9 | 157.4 | 25.0 |
| Q1 2010 | 187.1 | 141.0 | 18.0 |
| Q2 2010 | 190.1 | 141.7 | 19.0 |
| Q3 2010 | 183.9 | 139.2 | 21.0 |
| Q4 2010 | 209.0 | 143.8 | 21.0 |
| Q1 2011 | 199.7 | 153.9 | 24.0 |
| Q2 2011 | 235.4 | 187.2 | 28.0 |
| **Total** | **1,889.4** | **1,358.1** | **208.0** |

2.2.7   Whilst for most of the transactions in Table 2.3 the Quarterly Revenue Breakdowns cite a client name, there are certain transactions which only have a generic description, such as "*hosting*", "*services*" or "*maintenance*". Without the client name, I am unable to identify the underlying transactional documents and give my opinion on whether these transactions have been accounted for in accordance with the applicable accounting standards.

2.2.8   By excluding the transactions with generic descriptions in the Quarterly Revenue Breakdowns[10], I have arrived at the software sales transactions that I will focus on in this section of my report (the "**Software Focus Transactions**")[11]. The Software Focus Transactions are summarised by quarter in Table 2.4 below and a full list by client is provided in Appendix C:

---

[10] I have also excluded certain transactions which refer to "*Microlink*". These transactions appear to relate to revenue generated by MicroLink, LLC, a reseller which was acquired by Autonomy in January 2010. Without the client name, I am unable to identify the underlying transactional documents and give my opinion on whether these transactions have been accounted for in accordance with the applicable accounting standards

[11] I note that in My Hussain Report I was instructed to "*review the lists identifying Autonomy's Top 40 Contracts and Top 40 Customers provided to HP as part of the due diligence process with my software and hardware samples, noting any apparent omissions from those lists*" (My Hussain Report, paragraph 1.2.3(e)). I noted four software transactions which were omitted from the Top 40 Contract list and 10 customers omitted from the Top 40 Customer list. The four software transactions which were omitted remain Software Focus Transactions and therefore my conclusions in this regard have not changed

Table 2.4: The Software Focus Transactions

| Quarter | Total value of contracts over $2m ($m) | Number of contracts over $2m | Total value of Software Focus Transactions ($m) | Number of Software Focus Transactions |
|---|---|---|---|---|
| Q1 2009 | 74.6 | 15.0 | 27.0 | 5.0 |
| Q2 2009 | 123.2 | 20.0 | 40.0 | 9.0 |
| Q3 2009 | 96.0 | 17.0 | 20.6 | 6.0 |
| Q4 2009 | 157.4 | 25.0 | 68.1 | 13.0 |
| Q1 2010 | 141.0 | 18.0 | 48.0 | 8.0 |
| Q2 2010 | 141.7 | 19.0 | 49.5 | 9.0 |
| Q3 2010 | 139.2 | 21.0 | 45.1 | 10.0 |
| Q4 2010 | 143.8 | 21.0 | 51.7 | 12.0 |
| Q1 2011 | 153.9 | 24.0 | 61.0 | 13.0 |
| Q2 2011 | 187.2 | 28.0 | 72.7 | 13.0 |
| **Total** | **1,358.1** | **208.0** | **483.7** | **98.0** |

2.2.9   Autonomy therefore reported total revenue relating to the Software Focus Transactions during the Relevant Period (apart from Q3 2011) of $483.7 million.  This is around 23%[12] of the total revenue reported by Autonomy in these quarters during the Relevant Period.

## 2.3   The applicable accounting standards

### International Financial Reporting Standards

2.3.1   Autonomy stated that its financial statements were prepared in accordance with IFRS.  IFRS comprises Standards referred to as IFRS, as well as other Standards such as "*International Accounting Standards*" (typically known as "**IAS**"), with each Standard devoted to a particular type of transaction or item in a set of financial statements.  Reference should also be made to the "*Conceptual Framework For Financial Reporting*" (the "**Conceptual Framework**").  Whilst not a Standard *per se*, it sets out the concepts which underpin all Standards within IFRS, as well as assisting preparers of financial statements in applying IFRS and assisting auditors in forming an opinion on whether financial statements comply with IFRS[13].

### What does compliance with IFRS mean?

2.3.2   Information is not accounted for in accordance with IFRS if a misstatement (being an omission from or misstatement to the financial statements) exists that is deemed to be "*material*"[14].

---

[12] Being $483.7m / $2,086.1m

[13] In this summary report, I have referred to and quoted the standards that were extant for the preparation of Autonomy's financial statements for the year ended 31 December 2010.  Whilst the standards I refer to were in force throughout the Relevant Period, they may have been subject to some minor consequential amendments arising from changes to other standards in IFRS. Moreover, I note that the Conceptual Framework was introduced in September 2010 as a replacement for the "*Framework for the Preparation and Presentation of Financial Statements*" (the "**Framework**").  Where I refer to the Conceptual Framework, I also provide references to the equivalent guidance within the Framework

[14] IAS 8 "*Accounting Policies, Changes in Accounting Estimates and Errors*" ("**IAS 8**") states that "*Financial statements do not comply with IFRSs if they contain either material errors or immaterial errors made intentionally to achieve a particular presentation of an entity's financial position, financial performance or cash flows*".  (IAS 8, paragraph 41)

mazars

Pursuant to IFRS, materiality (including the question of whether an identified misstatement is material) is assessed by reference to an item's "*size*" as well as its "*nature*"[15].

2.3.3    In relation to an item's size, accountants will typically ascribe a materiality by applying a percentage to an identified metric, such as revenue or net profit.  Deloitte determined its materiality by applying a percentage to the reported revenues of Autonomy[16].  Where revenue is selected as the appropriate starting point Mazars would typically arrive at a figure for materiality by applying between 0.5% to 2% to the stated revenue figure.

2.3.4    In Table 2.5 below, I summarise the computed materiality using these percentages, and I also set out the materiality that Deloitte used in its audit or review of Autonomy's financial statements[17]:

**Table 2.5: Materiality during the Relevant Period (excluding Q3 2011)[18]**

| Quarter | Autonomy's Consolidated Revenue ($m) | Mazars' materiality methodology | | Deloitte's assessed materiality ($m) |
|---|---|---|---|---|
| | | Low (0.5% of revenue) ($m) | High (2.0% of revenue) ($m) | |
| Q1 2009 | 129.8 | 0.6 | 2.6 | 3.7 |
| Q2 2009 | 195.2 | 1.0 | 3.9 | 5.4 |
| Q3 2009 | 191.6 | 1.0 | 3.8 | 3.6 |
| Q4 2009 | 223.1 | 1.1 | 4.5 | N/A |
| **Full year 2009** | **739.7** | **3.7** | **14.8** | **20.0** |
| Q1 2010 | 194.2 | 1.0 | 3.9 | 5.0 |
| Q2 2010 | 221.1 | 1.1 | 4.4 | 4.9 |
| Q3 2010 | 210.6 | 1.1 | 4.2 | 4.3 |
| Q4 2010 | 244.5 | 1.2 | 4.9 | N/A |
| **Full year 2010** | **870.4** | **4.4** | **17.4** | **22.5** |
| Q1 2011 | 219.8 | 1.1 | 4.4 | 5.5 |
| Q2 2011 | 256.2 | 1.3 | 5.1 | 5.5 |

---

[15] IAS 1 "*Presentation of Financial Statements*" ("**IAS 1**") provides the following definition for "*material*": "*Omissions or misstatements of items are material if they could, individually or collectively, influence the economic decisions that users make on the basis of the financial statements. Materiality depends on the size and nature of the omission or misstatement judged in the surrounding circumstances.  The size or nature of the item, or a combination of both, could be the determining factor. Assessing whether an omission or misstatement could influence economic decisions of users, and so be material, requires consideration of the characteristics of those users. The Framework for the Preparation and Presentation of Financial Statements states in paragraph 25 that 'users are assumed to have a reasonable knowledge of business and economic activities and accounting and a willingness to study the information with reasonable diligence'.  Therefore, the assessment needs to take into account how users with such attributes could reasonably be expected to be influenced in making economic decisions*".  (IAS 1, paragraph 7)*

[16] ISA 320 "*Materiality in planning and performing an audit*" ("**ISA 320**") explains the requirements of an auditor when determining a financial statement materiality.  Whilst ISA 320 enables auditors to apply professional judgment when determining financial statement materiality, the guidance contained therein explains that for profit generating entities the benchmark for determining materiality is typically profit before tax rather than revenue

[17] I note that Autonomy did not produce quarterly financial statements for Q4 as instead it produced annual financial statements for the financial year then ended.  Accordingly Deloitte did not calculate a materiality for Q4

[18] Deloitte's reports to the audit committee titled: "*Report to the Audit Committee on the Q1 2009 Review*", "*Report to the Audit Committee on the Q2 2009 Review*", "*Report to the Audit Committee on the Q3 2009 Review*", "*Report to the Audit Committee on the 2009 Audit*", "*Report to the Audit Committee on the Q1 2010 Review*", "*Report to the Audit Committee on the 2010 Interim Review*", "*Report to the Audit Committee on the Q3 2010 Review*", "*Report to the Audit Committee on the 2010 Audit*", "*Report to the Audit Committee on the Q1 2011 Review*", "*Report to the Audit Committee on the Q2 2011 Review*"

**mazars**

2.3.5    Given Deloitte's assessed materiality is broadly consistent with the range suggested by the Mazars methodology, I have adopted Deloitte's materiality methodology when considering the transactions.

2.3.6    That is to say, for example, a misstatement of more than $4.3m in Q3 2010 would be deemed a material error by quantum by Deloitte and mean that the quarterly financial statements were not prepared in accordance with IFRS.

## 2.4    Overview to my summary conclusions

2.4.1    For each of the Software Focus Transactions, I have sought to identify contemporaneous information pertaining to the transaction in order to understand its underlying substance and economic reality.  This information comprises, for example:

(a)    contractual documentation between Autonomy and its counterparty;

(b)    email correspondence between (i) individuals within Autonomy in relation to the Software Focus Transaction; (ii) individuals within Autonomy's counterparty in relation to the Software Focus Transaction; (iii) Autonomy and its counterparty in relation to the Software Focus Transaction; and (iv) Autonomy and Deloitte in relation to the Software Focus Transaction;

(c)    financial records of Autonomy, such as general ledgers, customer ledgers and bank confirmations of payments or receipts; and

(d)    financial information of Autonomy's counterparty, such as financial statements and bank confirmations of payments or receipts.

2.4.2    Based on this information, I have then considered how this revenue should have been accounted for pursuant to the requirements of IFRS and Autonomy's published accounting policies[19].  I have considered both the date on which any revenue should be recognised and the amount of that revenue.

2.4.3    I have then compared my assessment with the amount and/or timing of revenue actually reported by Autonomy during the Relevant Period.  Where a difference exists between my assessment and the actual reporting for a specific quarter, I have identified this as a "**Misstatement**".

---

[19] IAS 8 explains that "*Accounting policies are the specific principles, bases, conventions, rules and practices applied by an entity in preparing and presenting financial statements*".  (IAS 8, paragraph 5)

2.4.4   Of the Software Focus Transactions totalling $483.7 million, my overview conclusions are that:

     (a)     transactions with a total reported revenue of $102.8 million appear to have been accounted for in accordance with IFRS; and

     (b)     I have identified the existence of a Misstatement in respect of timing and/or amount (that is, my assessment of the amount of revenue that should have been recognised is different to the revenue actually reported by Autonomy) in relation to transactions with a total reported revenue of $380.9 million.

2.4.5   I summarise these overview conclusions in Table 2.6 below:

**Table 2.6: My overview conclusions for the Software Focus Transactions by quarter**

| Quarter | Reported revenue ($m) | Reported revenue of the Software Focus Transactions ($m) | Reported revenue of the Software Focus Transactions for which: | |
|---|---|---|---|---|
| | | | No Misstatement was identified ($m) | A Misstatement was identified ($m) |
| Q1 2009 | 129.8 | 27.0 | 5.3 | 21.7 |
| Q2 2009 | 195.2 | 40.0 | 12.4 | 27.5 |
| Q3 2009 | 191.6 | 20.6 | 8.3 | 12.3 |
| Q4 2009 | 223.1 | 68.1 | 11.7 | 56.3 |
| Q1 2010 | 194.2 | 48.0 | 5.6 | 42.4 |
| Q2 2010 | 221.1 | 49.5 | 17.6 | 31.9 |
| Q3 2010 | 210.6 | 45.1 | 2.7 | 42.4 |
| Q4 2010 | 244.5 | 51.7 | 14.4 | 37.4 |
| Q1 2011 | 219.8 | 61.0 | 16.8 | 44.2 |
| Q2 2011 | 256.2 | 72.7 | 7.9 | 64.8 |
| **Total** | **2,086.1** | **483.7** | **102.8** | **380.9** |

2.4.6   In relation to the transactions where I have identified a Misstatement, I have assessed the total Misstatement to be $308.2 million.  The Misstatements are summarised by quarter in the table below:

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

mazars

Summary of independent expert accounting opinions of Steven Brice
FCA

**Table 2.7: The Misstatements identified in relation to the Software Focus Transactions by quarter**

| Quarter | Reported Revenue of the Software Focus Transactions ($m) | Misstatement identified in relation to Software Focus Transactions ($m) |
|---------|---------------------------------------------------------|-------------------------------------------------------------------------|
| Q1 2009 | 27.0 | (21.7) |
| Q2 2009 | 40.0 | (26.7) |
| Q3 2009 | 20.6 | (11.3) |
| Q4 2009 | 68.1 | (46.8) |
| Q1 2010 | 48.0 | (32.5) |
| Q2 2010 | 49.5 | (25.6) |
| Q3 2010 | 45.1 | (27.0) |
| Q4 2010 | 51.7 | (29.0) |
| Q1 2011 | 61.0 | (33.2) |
| Q2 2011 | 72.7 | (54.6) |
| **Total** | **483.7** | **(308.2)** |

2.4.7    Given the materiality ranges identified in Table 2.5, the Misstatements in each quarter were clearly material.  This means that the financial statements in each quarter were not prepared in accordance with IFRS.

2.4.8    In addition, I note that following HP's acquisition of Autonomy in October 2011, HP undertook to restate the comparative figures in ASL's financial statements for the period 1 January 2011 to 31 October 2011[20] (the "**Restatement**")[21].   Where relevant, I have considered the Restatement when reviewing the Software Focus Transactions.

2.4.9    I have identified six principal reasons why the Misstatement exists – that is, reasons why these Software Focus Transactions were not accounted for in accordance with IFRS:

(a)     certain transactions with resellers contained one or more revenue recognition issues;

(b)     certain transactions contained linked or reciprocal transactions;

(c)     certain transactions were accounted for as a sale of goods rather than the rendering of services;

(d)     certain transactions were accounted for as a sale of goods rather than royalties;

(e)     certain transactions contained timing errors; and

---

[20] HP had changed ASL's reporting financial period from 31 December to 31 October to be consistent with HP

[21] I note that the Restatement was reported in pounds sterling, whereas my summary conclusions on the Software Focus Transactions are prepared in US dollars

(f)      certain transactions contained errors of valuation.

2.4.10   I address each of these areas in turn in Sections 2.5 to 2.10 below. In Appendix F I provide a narrative explanation relating to each Software Focus Transaction for which I have identified a Misstatement.  Whilst the conclusions in these schedules are my carefully considered view based upon the information I have reviewed, these appendices are still a work in progress, and they should be read with this caveat in mind.  For this reason, they have been marked as draft and subject to change.  I will identify in further iterations of these schedules if there any fundamental changes to the analysis contained in the draft schedules.

## 2.5   My summary conclusions in relation to Misstatements arising from transactions with resellers which contained one or more revenue recognition issues

2.5.1   A number of the Software Focus Transactions relate to instances where Autonomy sold software licences to value added resellers (often referred to as a "**VAR**").  Typically, the VAR would not purchase the software for its own use but instead would acquire the right to sell the software licence on to a named end-user.

2.5.2   Autonomy recognised revenue arising from transactions with VARs as a "*sale of goods*".  In this regard, IAS 18 distinguishes between revenue generated from the "*sale of goods*", the "*rendering of services*" and the "*use by others of entity assets*"[22].

2.5.3   In order to recognise revenue from the sale of goods under IFRS, there are five criteria that **must** be met.  Importantly, if one or more of these criteria is not met, the revenue cannot be recognised (and thus the recognition of any revenue in relation to that transaction would be a misstatement).

2.5.4   Based upon my review of the contemporaneous information, I have identified that for many of the Software Focus Transactions which relate to sales to VARs, one or more of the revenue recognition criteria in IFRS had not been met and therefore revenue should not have been recognised:

(a)      in order to recognise revenue under IFRS, the entity must have transferred to the buyer (in the case of the Software Focus Transactions, the VAR) the "*significant risks and rewards of ownership of the goods*"[23].  However, I have identified that, in relation to a number of the Software Focus Transactions, the risks and rewards of

---

[22] IAS 18 "*Revenue*" ("**IAS 18**"), paragraph 1
[23] IAS 18, paragraph 14(a)

mazars

ownership had clearly not been transferred to the VAR.  The evidence I have seen includes, for example, (i) evidence that the VAR made no efforts to sell the software licence it had acquired to the named end-user[24], and (ii) evidence that the VAR could not have independently sold the software licence it had acquired to the named end-user, because the only route through which it would have been able to do so was via a restructuring of the end-users' existing contractual agreements with Autonomy[25];

(b)     in order to recognise revenue under IFRS, the reporting entity must not retain "*continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold*"[26].   However, I have identified that, in relation to a number of the Software Focus Transactions, Autonomy retained continuing managerial involvement in the software sold to the VAR.  The evidence I have seen includes, for example, evidence that Autonomy continued to negotiate the sale to the named end-user even after it had completed the sale to the VAR[27]; and

(c)     in order to recognise revenue under IFRS, it must be "*probable that the economic benefits associated with the transaction will flow to the entity*"[28].   However, I have identified that in relation to a number of the Software Focus Transactions, it was not probable[29] that Autonomy would receive an inflow of economic benefit from the VAR.  The evidence I have seen includes, for example, (i) financial information for the VAR which demonstrates that the payment obligation imposed on the VAR would exhaust its cash reserves or net assets[30], (ii) financial information for the VAR which demonstrates that the VAR was loss making or was otherwise unable to fund the purchase of the software[31], (iii) in certain instances where Autonomy did ultimately receive an inflow of economic benefit from the VAR, evidence that this inflow was facilitated by Autonomy first remitting cash to the VAR (in relation to purchases made from the VAR by Autonomy) or by Autonomy requesting that funds owed to Autonomy relating to a separate transaction completed with the named end-user be remitted to the VAR instead of Autonomy[32], and (iv) evidence that

---

[24] For example, Software Focus Transaction #050, named "*MicroTech*" in Q1 2010

[25] For example, Software Focus Transaction #028, named "*IBM/Ameriprise*" in Q3 2009

[26] IAS 18, paragraph 14(b)

[27] For example, Software Focus Transaction #046, named "*PMI (Discover)*" in Q1 2010

[28] IAS 18, paragraph 14(d)

[29] In IFRS, "*probable*" means more likely than not

[30] For example, Software Focus Transaction #038, named "*Dell – Morgan Stanley*" in Q4 2009

[31] For example, Software Focus Transaction #069, named "*Veterans Affairs / National Archive, Big 4, Iron*" in Q3 2010

[32] For example, Software Focus Transaction #121, named "*USPS archive – mt*" in Q2 2011

Autonomy did not receive any inflow of economic benefit from the VAR, and instead later cancelled the amount owed by the VAR[33].

2.5.5    As a consequence of one or more of these revenue recognition issues, the revenue from certain VAR transactions should not have been recognised.

2.5.6    In addition to the revenue recognition issues explained above, the revenue recognised for certain of the transactions with VARs should not have been recognised because, when considered against the requirements of IFRS, the transaction had no apparent substance.  In this regard, a fundamental qualitative characteristic of financial statements prepared under IFRS is that they should present a "*faithful representation*" of the transactions and events that they purport to represent[34].  Achieving a "*faithful representation*" requires that transactions are presented in accordance with their "*substance and economic reality*", and not merely their legal form[35].  For certain of the Software Focus Transactions with VARs, based upon the available contemporaneous evidence I have seen, there is no apparent economic substance to the transactions.

2.5.7    In practice, when considering whether a particular transaction has economic substance, it is important to consider whether the other party to the transaction would be held to its terms.  Applying this to the Software Focus Transactions relating to transactions with VARs, I have considered whether it is reasonable to conclude that the VAR would have been held to the terms of its agreement with Autonomy.  The evidence I have seen which leads to a conclusion that certain of the Software Focus Transactions had no apparent economic substance includes:

(a)    evidence that the Software Focus Transaction was executed in a very short space of time (over a matter of hours), with little to no negotiation (or, in some instances, with Autonomy drafting unexplained and uncontested increases to the amount that the VAR would owe Autonomy following the transaction), and on the last day of Autonomy's reporting period[36];

---

[33] For example, Software Focus Transaction #090, named "*Bank of Montreal*" in Q1 2011

[34] The Conceptual Framework explains that "*Financial reports represent economic phenomena in words and numbers. To be useful, financial information must not only represent relevant phenomena, but it must also faithfully represent the phenomena that it purports to represent*".  (Conceptual Framework, paragraph QC12)

[35] The Conceptual Framework explains that "*In assessing whether an item meets the definition of an asset, liability or equity, attention needs to be given to its underlying substance and economic reality and not merely its legal form*".  (Conceptual Framework, paragraph 4.6)

[36] For example, Software Focus Transaction #105, named "*UBS – capax*" in Q2 2011

(b)      evidence that the VAR had no realistic prospect of being able to pay the amounts owed to Autonomy unless the VAR was successful in selling the software to the named end-user[37];

(c)      the named end-user having no apparent need to purchase the software licence from the VAR, for example when: (i) the only apparent route through which the sale of the software licence to the named end-user could be achieved required a restructuring of existing contracts with Autonomy which the VAR was unable to enact[38]; and (ii) the individual through whom the transaction with the VAR was executed was also the co-founder of the named-end user (to whom the VAR now had the right to sell the software licence)[39];

(d)      the existence of a pattern of behaviour between Autonomy and the VAR which has resulted in transactions collectively indicating that transactions did not appear to have economic substance;

(e)      evidence that, in the absence of a transaction between the VAR and the named end-user occurring (or if Autonomy entered a transaction with the named end-user, rather than the VAR), Autonomy either cancelled the amounts owed by the VAR in relation to the Software Focus Transaction[40], or facilitated the VAR's settlement of the amounts owed by first remitting cash to[41], or arranging for cash to be remitted to[42], the VAR; and

(f)      evidence that, following the completion of a transaction between Autonomy and the end-user, Autonomy paid the VAR a commission despite the VAR having no apparent involvement in the transaction[43].

2.5.8    The Software Focus Transactions with Misstatements arising from transactions with VARs which contained one or more revenue recognition issues are set out in the table below:

---

[37] For example, Software Focus Transaction #045, named "*FSA – Capax*" in Q1 2010

[38] For example, Software Focus Transaction #065, named "*Amgen*" in Q3 2010

[39] For example, Software Focus Transaction #041, named "*MircoLink/DiscoverTech*" in Q4 2009

[40] For example, Software Focus Transaction #089, named "*UBS*" in Q1 2011

[41] For example, Software Focus Transaction #088, named "*Mcafee - Capax*" in Q1 2011

[42] For example, Software Focus Transactions #079a, named "*discover tech baml*" #079b, named "*capax baml*" and #079c, named "*BAML extra*" in Q4 2010

[43] For example, Software Focus Transaction #040a, named "*Capax*" in Q4 2009

**Table 2.8: Software Focus Transactions with Misstatements arising from transactions with VARs which contained one or more revenue recognition issues[44],[45]**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---|---|---|---|
| Q1 2009 | 011 | Capax Global | 7.5 |
| Q2 2009 | 017 | Integracion | 3.0 |
| Q2 2009 | 020 | NSA | 4.8 |
| Q3 2009 | 026 | Kraft | 4.0 |
| Q3 2009 | 028 | IBM/Ameriprise | 3.8 |
| Q4 2009 | 033 | Federal (Microtech) | 9.5 |
| Q4 2009 | 038 | Dell - Morgan Stanley | 4.7 |
| Q4 2009 | 040a | Capax | 6.0 |
| Q4 2009 | 040b | Capax | 4.0 |
| Q4 2009 | 041 | MicroLink/DiscoverTech | 2.0 |
| Q4 2009 | 043 | Poste | 2.2 |
| Q1 2010 | 045 | FSA - Capax | 4.3 |
| Q1 2010 | 046 | PMI (Discover) | 4.2 |
| Q1 2010 | 050 | MicroTech | 11.0 |
| Q1 2010 | 051 | DiscoverTech - Citi 32 cells | 5.5 |
| Q3 2010 | 062 | Poste Italiane - Cyber Crime | 2.4 |
| Q3 2010 | 065 | Amgen | 9.0 |
| Q3 2010 | 069 | Veterans Affairs / National Archive, Big 4, Iron | 10.0 |
| Q4 2010 | 079a | discover tech baml | 7.0 |
| Q4 2010 | 079b | capax baml | 1.7 |
| Q4 2010 | 079c | BAML extra | 3.5 |
| Q4 2010 | 080 | MicroTech doi | 4.0 |
| Q4 2010 | 082 | KPMG | 6.0 |
| Q1 2011 | 085 | Bank of America - MT | 3.9 |
| Q1 2011 | 088 | Mcafee - Capax | 5.0 |
| Q1 2011 | 089 | UBS | 8.0 |
| Q1 2011 | 090 | Bank of Montreal | 2.9 |
| Q1 2011 | 091 | Prisa | 3.6 |
| Q2 2011 | 101 | ABBOTT LABS - dt | 8.6 |
| Q2 2011 | 105 | UBS - capax | 7.7 |
| Q2 2011 | 120 | Dell Hyatt - mt | 5.3 |
| Q2 2011 | 121 | USPS archive - mt | 7.0 |

2.5.9    In correcting these Misstatements, I have reversed the revenue originally recognised by Autonomy in relation to the sale of the software licence to the VAR.  In some instances, Autonomy entered into a direct transaction with the named end-user after the date of the VAR agreement, but did not recognise revenue in relation to these subsequent sales.  In those situations, I have recognised the revenue arising from these subsequent direct sales in accordance with their substance[46].

---

[44] Software Focus Transactions #011 and #040b would have also given rise to Misstatements as they were accounted for as a sale of goods rather than as royalties (see Section 2.8 below)

[45] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to one Software Focus Transaction (not including certain other trivial adjustments)

[46] That is, either as the sale of a good or the provision of a service

**mazars**

## 2.6 My summary conclusions in relation to Misstatements arising from transactions which contained linked or reciprocal transactions

2.6.1   When applying the revenue recognition requirements of IFRS, the criteria are "*usually applied separately to each transaction*"[47].   However, under IFRS, the criteria are applied to two or more transactions together when the transactions are "*linked in such a way that the commercial effect cannot be understood without reference to the series of transactions as a whole*"[48].   IFRS provides an example of a linked transaction: "*an entity may sell goods and, at the same time, enter into a separate agreement to repurchase the goods at a later date, thus negating the substantive effect of the transaction; in such a case, the two transactions are dealt with together*"[49].   When considering whether the revenue recognition criteria should be applied to two or more transactions together, the entity should adopt the approach which provides a faithful representation of the economic substance of the transactions.

2.6.2   I have identified a number of Software Focus Transactions which, pursuant to the requirements of IFRS, should have been considered together with certain other linked transactions entered into by Autonomy.   Further, when considering the linked transactions together, it is clear that the revenue recognition requirements of IFRS were not met and therefore the revenue should not have been recognised.

2.6.3   The evidence I have seen which demonstrates that the Software Focus Transactions should have been considered together with other transactions includes: (i) transactions entered into in close time proximity to each other, negotiated by the same individuals, and their mutual existence is acknowledged in the negotiations[50], (ii) transactions which are economically co-dependant; that is, one party's ability to settle the amounts due to the counterparty in relation to its purchase is wholly dependant upon that party first receiving cash from the counterparty in relation to its sale[51], (iii) a lack of evidence existing (which evidence I would expect to exist) to support the amounts payable by the parties as being fair value[52], and (iv) evidence that the transactions were entered into above the fair value of the products or services sold[53].

---

[47] IAS 18, paragraph 13
[48] IAS 18, paragraph 13
[49] IAS 18, paragraph 13
[50] For example, Software Focus Transaction #081, named "*VMS*" in Q4 2010
[51] For example, Software Focus Transaction #066, named "*Vidient*" in Q3 2010
[52] For example, Software Focus Transaction #071, named "*EMC*" in Q3 2010
[53] For example, Software Focus Transaction #039, named "*file tech*" in Q4 2009

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

mazars

2.6.4    The Software Focus Transactions with Misstatements arising from transactions which contained linked or reciprocal transactions are set out in the table below:

Table 2.9: Software Focus Transactions with Misstatements arising from transactions which contained linked or reciprocal transactions[54,55]

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---|---|---|---|
| Q2 2009 | 019 | VMS | 8.6 |
| Q4 2009 | 036 | Vidient Systems | 2.5 |
| Q4 2009 | 039 | file tech | 8 |
| Q1 2010 | 049 | FileTek | 8.5 |
| Q3 2010 | 066 | Vidient | 2 |
| Q3 2010 | 071 | EMC | 5.7 |
| Q4 2010 | 081 | VMS | 4.8 |
| Q1 2011 | 084 | Tottenham | 6.4 |

2.6.5    In correcting these Misstatements, I have accounted for the linked sales and purchases to and from the same customer as a single transaction.  If this results in an outflow of economic benefit from Autonomy, the revenue recognition criteria of IFRS has not been met, and no revenue is recognised.

## 2.7    My summary conclusions in relation to Misstatements arising from transactions being accounted for as a sale of goods rather than the rendering of services

2.7.1    As I explain above, IFRS distinguishes between revenue derived from the "*sale of goods*" and revenue derived from the "*rendering of services*"[56].  Whilst revenue from the sale of goods is typically recognised under IFRS when the risks and rewards of ownership of the goods are passed to the buyer, where an entity enters into an agreement to perform a service for its customer, IFRS requires the revenue to be recognised over the period in which the services are performed.   Specifically, IFRS requires the entity to apply what is described as the "*percentage of completion*" method[57], subject to which revenue is recognised by reference to the percentage of the work completed at the end of the reporting period.

---

[54] Were it not for the linked transaction, Software Focus Transactions #039, #049, #066 and #071 would have nevertheless given rise to Misstatements as they were accounted for as a sale of goods rather than as royalties (see Section 2.8 below)

[55] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to three Software Focus Transactions (not including certain other trivial adjustments)

[56] IAS 18, paragraph 1

[57] IAS 18, paragraph 20

**mazars**

2.7.2    Moreover, pursuant to IFRS, when services are performed by an indeterminate number of acts over a specified period of time, revenue is recognised on a "*straight-line basis*"[58].  Under the "*straight-line basis*", the total consideration due to the entity for the provision of the service is recognised as revenue evenly over the period in which the service is performed.

2.7.3    During the Relevant Period, Autonomy offered customers what it described as a "*Software-as-a-Service and hosted delivery model in the cloud, where the solution is run on hardware owned by Autonomy in a dedicated data centre*"[59].  From my review of the Software Focus Transactions, it appears that Autonomy's "*hosted delivery model*" included the provision of services related to:

(a)    the hosting and archiving of customer data (such as emails) in data centres owned and operated by Autonomy; and

(b)    the hosting of customer data for the purposes of eDiscovery services.

2.7.4    In certain of the Software Focus Transactions, Autonomy sold both a software licence to a customer and also entered into an agreement with that customer to provide ongoing hosted archiving or hosted eDiscovery services for a set period of time[60].  In these transactions, Autonomy recognised the total consideration[61] it was due to receive in relation to the software licence as revenue as if it were all for the sale of goods.

2.7.5    For these Software Focus Transactions, I have first considered whether the commercial effect of the sale of the software licence can be understood without reference to the ongoing hosting or eDiscovery service.  If the two elements cannot be understood without reference to one another, IFRS requires that the elements be accounted for as a single transaction.  As a result, the consideration payable to Autonomy in relation to the software licence should have been considered a prepayment in relation to future hosted archiving or hosted eDiscovery service, and should have been recognised under IFRS as revenue using the "*percentage of completion*" method over the period for which the hosted services were to be performed.

2.7.6    Determining whether the commercial effect of the sale of the software licence can be understood without reference to the ongoing hosting or eDiscovery service requires a

---

[58] Unless there is evidence that some other method better represents the stage of completion of the service. (IAS 18, paragraph 25)
[59] Autonomy's FY2010 Annual Report and Accounts, page 12.  Autonomy's FY2009 Annual Report and Accounts contained an equivalent description
[60] The actual Software Focus Transaction is invariably the value of the software licence sold to the customer
[61] Less, in many instances, an immaterial carve out of consideration deemed to be attributable to ongoing maintenance and support services Autonomy had also simultaneously undertaken to provide

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

mazars

consideration of the specific events and conditions surrounding each of the Software Focus Transactions.  However, I have seen evidence that, for certain of the Software Focus Transactions, the sale of the software licence was connected to the provision of an ongoing hosted archiving or hosted eDiscovery service (and thus the revenue should have been recognised over the period the services were to be performed).  The evidence I have seen includes:

(a)     evidence that the software sold to the customer was restricted in its use, such that it could only be used by the customer in relation to the ongoing hosting services that Autonomy had simultaneously agreed to provide (or was already providing) to the customer[62];

(b)     evidence that, whilst not restricted in its use, the software sold to the customer was to be used as an element of the ongoing hosting services Autonomy had simultaneously agreed to provide (or was already providing) to the customer, and that it would not make commercial sense for the customer to use it in any other way[63];

(c)     evidence that Autonomy had proposed the sale of the software licence to the customer as part of a restructuring of the customer's pre-existing arrangements for hosting services.  This is especially relevant when (i) the proposed restructure discounted or waived amounts payable by the customer in relation to its pre-existing arrangements for hosting services, with the net effect of the restructure being a projected cash saving to the customer[64,65], (ii) the extent or level of the pre-existing hosted services provided by Autonomy were unaffected by the sale of the software licence to the customer in the proposed restructure, and/or (iii) Autonomy's proposals had identified that the software licence had been included in the restructure because it enabled Autonomy to recognise revenue on the transaction immediately[66];

(d)     evidence that Autonomy's customer considered the specific software licenced to be inconsequential to the transaction, for example (i) evidence that the customer had sought to acquire an ongoing hosted archiving or hosted eDiscovery service, rather

---

[62] For example, Software Focus Transaction #013, named "*BofA*" in Q1 2009
[63] For example, Software Focus Transaction #058, named "*Metlife DS*" in Q2 2010
[64] That is, the cash cost of the software licence plus the anticipated cash cost of the services under the restructured arrangement was less than the anticipated cash cost of the services under the pre-existing arrangement
[65] For example, Software Focus Transaction #086, named "*DB Restructure*" Q1 2011
[66] For example, Software Focus Transaction #077, named "*Amgen*" in Q4 2010

**mazars**

than a software licence, or communications from the customer to Autonomy informing Autonomy that it did not intend to use the software licence[67], (ii) evidence that the software licence fee was set before Autonomy and the customer had decided what pieces of software were to be included in the transaction, or that the software licence fee payable by the customer was unaltered by the addition or removal of pieces of software[68], and (iii) evidence that the customer had already acquired a licence for the software, or otherwise had unfettered access to the software, via its previous agreements with Autonomy[69]; and

(e)    evidence that Autonomy internally considered the sale of the software licence incidental to the transaction, for example by internally describing the transaction as "*hosting*", or similar[70].

2.7.7    A Misstatement arises when Autonomy accounted for the sale of software licences and the provision of services separately, despite it not being possible to understand the commercial effect of the series of transactions without reference to one another.  In my opinion, the following Software Focus Transactions gave rise to such Misstatements:

---

[67] For example, Software Focus Transaction #032, named "*Schwab*" in Q4 2009
[68] For example, Software Focus Transaction #087, named "*Morgan Stanley DS*" in Q1 2011
[69] For example, Software Focus Transaction #077, named "*Amgen*" in Q4 2010
[70] For example, Software Focus Transaction #102, named "*JPMC – EDD*" in Q2 2011

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**mazars**    Summary of independent expert accounting opinions of Steven Brice
FCA

Table 2.10: Software Focus Transactions with Misstatements arising from transactions being accounted for as a sale of goods rather than the rendering of services[71]

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---------|---|----------------------------------|-------------------------------------------------------------------|
| Q1 2009 | 013 | BofA | 9.2 |
| Q2 2009 | 022 | JP Morgan Chase | 6.4 |
| Q4 2009 | 032 | Schwab | 3.4 |
| Q4 2009 | 035 | Morgan Stanley | 12.0 |
| Q1 2010 | 048 | B of A | 8.9 |
| Q2 2010 | 053 | BP | 13.5 |
| Q2 2010 | 058 | Metlife DS | 7.0 |
| Q2 2010 | 059 | JPMC | 8.7 |
| Q3 2010 | 063 | Citadel | 3.7 |
| Q3 2010 | 067 | Bank of America | 2.7 |
| Q4 2010 | 076 | Ahold | 2.8 |
| Q4 2010 | 077 | Amgen | 5.7 |
| Q4 2010 | 078 | Bank of America | 2.0 |
| Q1 2011 | 086 | DB Restructure | 7.1 |
| Q1 2011 | 087 | Morgan Stanley DS | 5.0 |
| Q1 2011 | 093 | Johnson & Johnson | 2.3 |
| Q2 2011 | 102 | JPMC - EDD | 2.6 |
| Q2 2011 | 109 | USPS, eDiscovery | 6.3 |
| Q2 2011 | 116 | MetLife | 5.5 |
| Q2 2011 | 117 | National Bank of Canada | 3.0 |

2.7.8    In order to correct these Misstatements, it is necessary to reverse the amount of revenue that had been recognised in relation to the sale of the software licence, and instead recognise the revenue over the period for which Autonomy was providing the hosted archive or hosted eDiscovery service[72].  I also note that under IFRS any income arising from the rendering of services required separate disclosure[73].

## 2.8    My summary conclusions in relation to Misstatements arising from transactions being accounted for as a sale of goods rather than royalties

2.8.1    As I explain above, IFRS distinguishes revenue derived from the "*sale of goods*" from revenue derived from "*the use of an entity's assets*"[74], including the entity's patents, trademarks, copyrights and computer software (so-called "*royalty arrangements*").

---

[71] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to two Software Focus Transactions (not including certain other trivial adjustments)

[72] In doing so, I have applied the guidance of IAS 18.25, insofar as I have recognised the licence fee on a "*straight line*" basis, unless there is evidence that a more appropriate systematic basis might be applied

[73] IAS 18, paragraph 35(b)[ii]

[74] IAS 18, paragraph 1

2.8.2   Under IFRS, revenue earned from royalty arrangements should be recognised on an accrual basis in accordance with the substance of the relevant agreement[75].  For example, if an agreement entitles an entity to receive a five per cent royalty in relation to each sale by a third party, the entity would recognise revenue based on five per cent of total sales made by the third party.

2.8.3   Certain of the Software Focus Transactions relate to royalty arrangements whereby Autonomy granted counterparties the right to sell Autonomy's software, or the right to embed Autonomy's software in its own software for onward sale.  In these Software Focus Transactions relating to royalty arrangements, Autonomy received an up-front, non-refundable payment from the counterparty, against which future royalty payments would offset until the payment was exhausted[76].  Autonomy recognised these up-front payments as revenue at a single point in time, on the date on which it entered the royalty arrangement.

2.8.4   In my opinion these up-front, non-refundable payments were, in substance, the prepayment of royalty fees that were to be earned over the duration of the relevant royalty arrangement. The prepayment of a royalty fee does not alter the substance of the underlying royalty arrangement and therefore revenue from the royalty arrangements should still have been recognised on an accrual basis.

2.8.5   A Misstatement therefore arises for those Software Focus Transactions where Autonomy recognised a prepaid royalty as revenue on the date on which it entered the royalty arrangement, as opposed to recognising revenue from the royalty arrangement on an accrual basis in accordance with the terms of the arrangement.

2.8.6   Further, under IFRS, revenue from royalty arrangements should only be recognised when it is probable that[77]:

(a)   "*the economic benefits associated with the transaction will flow to an entity; and*

(b)   *the amount of revenue can be measured reliably*".

2.8.7   Reliably measuring the amount of revenue that is earned from a royalty arrangement requires the entity to have an appropriate basis from which to measure the amount of revenue.  In my experience, for most royalty arrangements, the basis will be periodic royalty reports shared

---

[75] IAS 18 explains that "*Royalties accrue in accordance with the terms of the relevant agreement and are usually recognised on that basis unless, having regard to the substance of the agreement, it is more appropriate to recognise revenue on some other systematic and rational basis*".  (IAS 18, paragraph 33)
[76] And thereafter, any further royalties would be payable to Autonomy in line with the terms of the agreement
[77] IAS 18, paragraph 29

**mazars**

by the counterparty to the reporting entity.  However, other appropriate bases might instead include the entity's experience of similar royalty arrangements.

2.8.8    In the absence of an appropriate basis, the amount of revenue cannot be measured reliably and therefore no revenue should have been recognised.  A Misstatement therefore arises for Software Focus Transactions where Autonomy recognised the full pre-paid royalty as revenue despite not having evidence that the royalty had been earned in accordance with the terms of the contract.  In my opinion, the following Software Focus Transactions gave rise to such Misstatements:

**Table 2.11: Software Focus Transactions with Misstatements arising from transactions being accounted for as a sale of goods rather than royalties**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---------|-----|----------------------------------|-------------------------------------------------------------------|
| Q1 2009 | 012 | Verdasys | 5.0 |
| Q2 2009 | 018 | EMC | 4.7 |
| Q2 2011 | 106 | Rand | 2.3 |

2.8.9    In order to correct these Misstatements, it is necessary to reverse the amount of revenue that had been recognised, and instead recognise the prepaid royalty on an accruals basis.  Unless there is evidence which suggests a more appropriate basis is available[78], I have assumed that the prepaid royalty was earned as revenue evenly over the duration of the arrangement.  I also note that under IFRS any income arising from royalties required separate disclosure[79].

## 2.9    My summary conclusions in relation to Misstatements arising from transactions which contain timing errors

2.9.1    As I explain above, in order to recognise revenue under IFRS, the entity must have transferred to the buyer the "*significant risks and rewards of ownership of the goods*"[80].  IFRS provides examples of situations where an entity might retain the significant risks and rewards of ownership of the goods, including "*when the goods are shipped subject to installation and the installation is a significant part of the contract which has not yet been completed by the entity*"[81].  In such situations, IFRS requires revenue to be deferred until the installation process is complete.

---

[78] For example, periodic reports showing the sales of Autonomy software made by the counterparty, or confirmation from the counterparty as to the value of sales made
[79] IAS 18, paragraph 35(b)[iv]
[80] IAS 18, paragraph 14(a)
[81] IAS 18, paragraph 16(c)

**mazars**

2.9.2   A number of the Software Focus Transactions were sales of goods which included a significant installation process and, in certain instances, it was projected that the installation process would be ongoing for a number of months before the software could "go live". However, Autonomy recognised the revenue from the sale of this software before the installation was complete.  In such instances a Misstatement therefore arises.  In my opinion, the following Software Focus Transactions gave rise to such Misstatements:

**Table 2.12: Software Focus Transactions with Misstatements arising from transactions which contain timing errors**[82]

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---------|---|----------------------------------|------------------------------------------------------------------|
| Q3 2009 | 027 | Pfizer | 4.5 |
| Q4 2009 | 044 | Goldman Sachs | 2.0 |
| Q2 2010 | 057 | BNP Paribas | 2.7 |
| Q3 2010 | 064 | Xcel Energy | 3.2 |
| Q3 2010 | 072 | Mattel | 3.7 |

2.9.3   In order to correct these Misstatements, it is necessary to reverse the amount of revenue that had been recognised, and instead recognise the revenue when the installation was complete.

## 2.10   My summary conclusions in relation to Misstatements arising from transactions which contain errors of valuation

2.10.1   IFRS requires revenue to be recognised at the "*fair value*"[83] of the consideration received or receivable[84].   Whilst in most instances, the fair value of the consideration received or receivable is the amount of cash (or cash equivalents) received, there are exceptions.

2.10.2   Where an entity enters into a transaction with a counterparty which it subsequently acquires (or from whom it subsequently acquires trade and assets)[85], the amount of the cash or cash equivalents receivable in a transaction might not be an indicator of the fair value of consideration.   This is because the parties may be subsidising the transaction via the exchange of consideration notionally related to the business combination.  In such situations, the acquiring entity is therefore required under IFRS to determine[86]:

---

[82] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to two Software Focus Transactions (not including certain other trivial adjustments).  I now do not consider the adjustments in relation to these two Software Focus Transactions necessary

[83] IAS 18 defines fair value as follows: "*Fair value is the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction*".  (IAS 18, paragraph 7)

[84] IAS 18 explains that "*The amount of revenue arising on a transaction is usually determined by agreement between the entity and the buyer or user of the asset. It is measured at the fair value of the consideration received or receivable taking into account the amount of any trade discounts and volume rebates allowed by the entity*".  (IAS 18, paragraph 10)

[85] The acquisition of an entity (or certain trade and assets of an entity) is referred to as a "*Business Combination*"

[86] IFRS 3 "*Business Combinations*" ("**IFRS 3**"), paragraph 51 (with guidance at IFRS 3, paragraph B50)

**mazars**

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**Summary of independent expert accounting opinions of Steven Brice FCA**

(a) whether the previous transactions with the acquired entity were separate from the acquisition, or whether, in substance, the transactions formed part of the acquisition; and, if the latter

(b) what the "*fair value*" of the transactions was, with such amounts included in the total value of the consideration.

2.10.3 When these requirements are applied, parties would be prevented from artificially inflating or deflating the purchase price of an acquisition via the simultaneous transfer of assets at below or above their fair value.

2.10.4 I have identified one Software Focus Transaction in respect of which Autonomy engaged in a number of transactions with a counterparty in the period prior to a business combination. This resulted in Misstatements as follows:

(a) Autonomy failed to determine that certain transactions were linked to the business combination, and therefore failed to assess the fair value of the transaction; and

(b) for transactions which Autonomy did consider to be part of the business combination, the fair value determined by Autonomy was misstated.

2.10.5 In my opinion, the following Software Focus Transactions gave rise to such Misstatements:

**Table 2.13: Software Focus Transactions with Misstatements arising from errors of valuation[87],[88]**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---------|-----|----------------------------------|-------------------------------------------------------------------|
| Q2 2011 | 096 | Iron Mountain - OEM | 16.5 |

2.10.6 In order to correct these Misstatements, it is necessary to reverse the amount of revenue that had been recognised, and instead recognise the revenue at its fair value.

---

[87] Notwithstanding the errors of valuation, Software Focus Transaction #096 would have nevertheless given rise to a Misstatement as it was accounted for as a sale of goods despite partially relating to a royalty arrangement (see Section 2.8 above)

[88] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to one Software Focus Transaction (not including certain other trivial adjustments)

**mazars**

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
**Summary of independent expert accounting opinions of Steven Brice FCA**

# 3    Summary of my opinion in relation to hardware sales transactions

## 3.1    Introduction

3.1.1    I am instructed to review hardware sales transactions reported by Autonomy during the Relevant Period as revenue and give my opinion on whether these sales were properly accounted for and disclosed in accordance with the applicable accounting standards.  In this section of my report, I provide a summary of my opinion.

## 3.2    The starting point for my analysis: the hardware sales transactions reported by Autonomy as revenue during the Relevant Period

3.2.1    As noted in Section 2 above, using the Quarterly Revenue Breakdowns (which I have found agree to the total revenue reported in the quarterly financial statements), I have identified the revenue reported by Autonomy in each quarter during the Relevant Period (apart from Q3 2011) that arose from hardware sales transactions.  The total revenue reported by Autonomy arising from hardware sales transactions in each period is shown in Table 3.1:

Table 3.1: Total revenue arising from hardware sales transactions reported by Autonomy in the Relevant Period (apart from Q3 2011)[89]

| Quarter | Hardware revenue ($m) |
|---------|----------------------|
| Q1 2009 | 0.0 |
| Q2 2009 | 6.0 |
| Q3 2009 | 42.2 |
| Q4 2009 | 7.2 |
| Q1 2010 | 7.1 |
| Q2 2010 | 31.1 |
| Q3 2010 | 26.7 |
| Q4 2010 | 35.5 |
| Q1 2011 | 20.1 |
| Q2 2011 | 20.8 |
| **Total** | **196.7** |

3.2.2    Given the materiality ranges identified in Table 2.5, with the exception of Q1 2009 (in which no hardware revenue was recognised) the revenue recognised from hardware transactions was material.

---

[89] These are hardware sales of Autonomy, Inc. only.  There are also small amounts of hardware sales in ASL and Autonomy ETalk totalling approximately $3 million over the period Q1 2009 to Q2 2011

**mazars**

3.2.3    Whilst the Quarterly Revenue Breakdowns include information relating to the hardware sales transactions – such as (in most instances) the relevant customer – they do not provide other information, such as the relevant invoice numbers or dates.

3.2.4    I have also been provided with downloads from the Autonomy general ledger[90] and have identified one particular ledger account called "*470000 – Hardware Revenue – CDF*" (the "**Hardware Ledger**").   At face value, this would appear to be the ledger in which Autonomy recorded the revenue from hardware sales transactions.   The Hardware Ledger is helpful because in addition to the relevant customer name, it records other information, such as invoice numbers, that are not recorded on the Quarterly Revenue Breakdowns.

3.2.5    I have compared the revenue from hardware sales transactions per the Quarterly Revenue Breakdowns with the transactions recorded in the Hardware Ledger and have found that the figures broadly agree.   My analysis is provided in Appendix D.

3.2.6    According to the Hardware Ledger, the revenue arising from hardware sales transactions is comprised of over 1,000 hardware sales transactions.   In order to address my instructions, it is necessary to identify a smaller population of transactions to focus upon.   I have therefore identified invoices from the Relevant Period (apart from Q3 2011) of more than $1 million[91].   It is these transactions I will focus on in order to address my instructions (the "**Hardware Focus Transactions**")[92,93].   The Hardware Focus Transactions are summarised by the quarter in which each invoice was posted to the Hardware Ledger in Table 3.2 below and a full list by client and invoice is provided in Appendix E.

---

[90] The general ledger is the hub of the accounting system, each dedicated to a particular type of transaction (such as revenue from hardware transactions) or to a category of party with whom the entity transacts (such as suppliers or related companies)

[91] As noted in footnote 9 above, the witness statement of Mr Welham in the High Court Proceedings, dated 14 September 2018, explained that the Deloitte audit team undertook "*audit work in respect of all sales made by Autonomy of more than $1m*".   On the basis that this testing threshold of $1m is not unreasonable, I have adopted it in my testing of the hardware sales transactions

[92] I do not have a complete population of relevant documents for all of the Hardware Focus Transactions, and I have not identified any documents for one Hardware Focus Transaction

[93] I note that in My Hussain Report I was instructed to "*review the lists identifying Autonomy's Top 40 Contracts and Top 40 Customers provided to HP as part of the due diligence process with my software and hardware samples, noting any apparent omissions from those lists*" (My Hussain Report, paragraph 1.2.3(e)).   I noted three hardware transactions which were omitted from the Top 40 Contract list and 10 customers omitted from the Top 40 Customer list.   The three hardware transactions which were omitted remain Hardware Focus Transactions and therefore my conclusions in this regard have not changed

Table 3.2: Hardware Focus Transactions

| Quarter | Total value of Hardware Focus Transactions ($m) |
|---------|------------------------------------------------|
| Q3 2009 | 34.2 |
| Q4 2009 | 3.5 |
| Q1 2010 | 14.3 |
| Q2 2010 | 15.2 |
| Q3 2010 | 12.0 |
| Q4 2010 | 17.1 |
| Q1 2011 | 7.5 |
| Q2 2011 | 7.9 |
| **Total** | **111.7** |

3.2.7   Autonomy therefore reported total revenue relating to the Hardware Focus Transactions during the Relevant Period (apart from Q3 2011) of $111.7 million.  This is around 5.4%[94] of the total revenue reported by Autonomy in these quarters during the Relevant Period.

## 3.3   Overview to my summary conclusions

3.3.1   For each of the Hardware Focus Transactions, I have sought to identify contemporaneous information pertaining to the transaction in order to understand its underlying substance and economic reality.  This information comprises, for example:

(a)   documents sent between Autonomy and its hardware suppliers, such as agreements, quotes, purchase orders, and invoices;

(b)   documents sent between Autonomy and its customers, such as agreements, quotes, purchase orders and invoices and delivery documents;

(c)   audit working papers where relevant; and

(d)   general ledger postings (including the Hardware Ledger) and other underlying accounting information.

3.3.2   In summary, I understand from the contemporaneous information that:

(a)   the majority of transactions recorded in the Hardware Ledger appear to be simply resales to customers of products purchased from third parties (such as Dell or EMC). I have not seen any evidence to suggest that Autonomy software was loaded onto this hardware before its onward sale to a third party customer;

---

[94] Being $111.7m / $2,086.1m

**mazars**

(b)   the products purchased from third parties were mostly hardware products although, in certain transactions, part of the products sold appear to have been third party software;

(c)   most of these sales were made at a loss to Autonomy, because the price at which the hardware was sold by Autonomy was less than the price at which it had been purchased;

(d)   initially, the cost of purchasing the hardware was primarily reported in Autonomy's quarterly financial statements in both "*Cost of revenues*" and "*Sales and marketing*" costs (often applying a 50:50 split).  In mid-2010 the practice changed and most of the cost of purchasing the hardware was reported as a "*Cost of revenues*" with primarily just the loss that Autonomy made on each sale being reported as "*Sale and marketing*" costs; and

(e)   journals posted in the Hardware Ledger moved the recognition of revenue from hardware sales transactions between quarters.

3.3.3   Having identified the underlying substance and economic reality of the Hardware Focus Transactions, I have then considered whether these transactions were properly accounted for and disclosed in accordance with IFRS.  Based upon the information I have seen, my overview conclusions are as follows:

(a)   in breach of the requirements of IFRS, Autonomy would inappropriately accrue or defer the recognition of revenue arising from certain hardware sales transactions between reporting periods.  This led to material misstatements in the revenue reported by Autonomy during the Relevant Period;

(b)   in breach of the requirements of IFRS, Autonomy would inappropriately report part of the cost of purchasing the hardware as being a cost of "*Sales and marketing*". This led to material misstatements in the reported "*Cost of revenues*" (and thus the computed "*Gross profit*"), as well as a material misstatement in the reported cost of "*Sales and marketing*"; and

(c)   in breach of the requirements of IFRS, Autonomy did not make any disclosure about the existence of a material amount of revenue arising from hardware sales transactions.

3.3.4   I address each of these areas in turn in Sections 3.4 to 3.6 below.

**mazars**

### 3.4   My summary conclusions in relation to the inappropriate accrual or deferral of revenue arising from hardware sales transactions between reporting periods

3.4.1   The recognition of revenue from the sale of goods is required by IFRS to take place on the date that the transfer of the "*significant risks and rewards of ownership of the goods*" takes place[95].  In most cases, the date of the transfer of the risks and rewards of ownership of the goods "*coincides with the transfer of the legal title or the passing of possession to the buyer*"[96].

3.4.2   In the Hardware Ledger, there are a number of journals which defer revenue recorded following the posting of invoices for specific named customers to the subsequent quarter.  In addition, in four quarters journals were posted which either accrued the revenue (that is, brought forwards the date on which the revenue was reported) or deferred the revenue (that is, delayed the date on which the revenue was reported), as follows[97]:

(a)   two journals meant that $6.2m of revenue was accrued and recognised in Q2 2009 rather than in Q3 2009;

(b)   two journals meant that $7.7m of revenue was deferred and not recognised in Q1 2010 and instead was recognised in Q2 2010;

(c)   one journal meant that $7.8m of revenue was deferred and not recognised in Q2 2010 and instead was recognised in Q3 2010; and

(d)   one journal meant that $3.9m of revenue was deferred and not recognised in Q1 2011 and instead was recognised in Q2 2011.

3.4.3   In practice, there are various reasons why an entity might appropriately post journals which have the result of accruing or deferring revenue between reporting periods.  For example:

(a)   an entity may accrue revenue (that is bring forwards the reporting of revenue) because the relevant posting in the ledger had not been made (perhaps because there had been a delay in the issuance of the invoice) but the goods had been delivered and the revenue recognition criteria of IFRS had been met; and

---

[95] IAS 18, paragraph 14
[96] IAS 18, paragraph 15
[97] Hardware Ledger

mazars

(b)     an entity may defer revenue (that is delay the recognition of the revenue) because there had been a delay in the delivery of the goods meaning that the revenue recognition criteria of IFRS had not been met at the period end.

3.4.4     I have sought to review the information underpinning the sales transactions that were accrued or deferred from one period to another, and I have identified that, in certain instances, journals or other entries posted by Autonomy were not appropriate.   These journals meant that revenue arising from hardware sales was misstated in two reporting periods; the period in which the income is recognised is overstated and the period in which the revenue should have been reported is understated. Where the quantum of any such misstatements is material, the financial statements cannot be said to have been prepared in accordance with IFRS.

3.4.5     I provide two examples below:

Example of inappropriate accrual of income: the reporting of $6.0m of revenue in Q2 2009 rather than Q3 2009

3.4.6     Autonomy accrued $6m in the Hardware Ledger in Q2 2009 and recognised this as revenue (rather than in Q3 2009).  This revenue represents a sale by Autonomy to Morgan Stanley of $6m of Hitachi Data Systems ("**HDS**") hardware which was ordered by Morgan Stanley[98], invoiced to Morgan Stanley by Autonomy[99], shipped to Morgan Stanley[100] and invoiced by HDS to Autonomy[101] all in Q3 2009.  The revenue recognition criteria of IFRS were therefore not met until Q3 2009 and revenue should not have been recognised until this quarter.  The sales invoice was posted to the Hardware Ledger in Q3 2009, but the reversal of the accrual recognised in Q2 2009 meant that the net impact on revenue was $0.

3.4.7     In conclusion, revenue in Q2 2009 was overstated by $6m and revenue in Q3 2009 was understated by $6m.

Example of inappropriate deferral of income: the reporting of $5.6m of revenue in Q3 2010 rather than Q1 2010

3.4.8     Two journals posted to the Hardware Ledger in Q1 2010 had the effect of deferring $5.6m of sales from Q1 2010 to a later quarter[102].  This deferral comprised 23 separate invoices for

---

[98] HP-SEC-01654186-01654188

[99] HP-SEC-01654189

[100] HP-SEC-01654198-01654212 and HP-SEC-01654193-01654196

[101] HP-SEC-01654191

[102] The two journals deferred revenue of $4.47m and $3.28m, in total $7.75m.  A breakdown of the revenue deferred between customers is provided in the attachment to Mr Chamberlain's email to Cynthia Watkins on 8 April 2010. (HP-SEC-00100357-00100359)

**mazars**

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
**Summary of independent expert accounting opinions of Steven Brice FCA**

sales by Autonomy of HDS hardware to Morgan Stanley.  These are listed on an Autonomy tracking spreadsheet that also records the date the products were delivered against each invoice[103].  The products for each of these 23 invoices were delivered in Q1 2010.

3.4.9   One of these invoices is over $1m in value and therefore was one of my Hardware Focus Transactions.  The documents available to me for this transaction show that in Q1 2010:

(a)     HDS provided a quote to Autonomy[104];

(b)     Morgan Stanley issued a purchase order to Autonomy[105];

(c)     Autonomy issued a purchase order to HDS[106];

(d)     the products were shipped to Morgan Stanley[107];

(e)     Autonomy issued its invoice to Morgan Stanley[108]; and

(f)     HDS issued its invoice to Autonomy[109].

3.4.10  The Master Purchase Agreement between Autonomy and Morgan Stanley dated 30 June 2009 states that title and risk of loss passes to Morgan Stanley upon shipment from the manufacturer and that the products are deemed accepted upon delivery to the specified address[110].  It is evident therefore that the revenue recognition criteria of IFRS were met in Q1 2010 and revenue should have been recognised in this quarter.  Given the remaining 22 invoices were also shipped in Q1 2010 and would have been covered by the same Master Purchase Agreement, it is reasonable in my opinion to assume that each of these sales also met the IFRS revenue recognition criteria in Q1 2010 and should have been recognised in this quarter.  Accordingly, revenue in Q1 2010 was understated by $5.6m and revenue in Q3 2010 was overstated by this amount.

3.4.11  In Q2 2010, whilst the two journals referred to were reversed, a separate journal deferred $7.8m of revenue to Q3 2010.  The $5.6m of sales to Morgan Stanley were part of this deferral and therefore ultimately this revenue was not recognised until Q3 2010.

---

[103] HP-SEC-01855197
[104] HP-SEC-01655154
[105] HP-SEC-01655149-01655150
[106] HP-SEC-01655152
[107] HP-SEC-01655153
[108] HP-SEC-01655147
[109] HP-SEC-01655155
[110] HP-SEC-01654676-01654684, clause 2 and clause 5

mazars

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

3.4.12   Deloitte included this particular transaction (and one other from the $5.6m total) in its Q3 2010 hardware revenue testing and concluded that in their opinion the revenue should have been recognised in Q1 2010[111].

## 3.5   My summary conclusions in relation to the inappropriate reporting of all or part of the cost of purchasing the hardware as being a "*Sales and marketing*" expense

3.5.1   My review of the available information has identified that Autonomy reported part of the cost of purchasing the hardware that it would then sell to third parties as being a "*Sales and marketing*" expense[112].

3.5.2   In my view, pursuant to the requirements of IFRS, the cost to Autonomy of purchasing the hardware should have been reported as a "*Cost of revenues*" and not as a "*Sales and marketing*" expense for the following reasons:

(a)   pursuant to IFRS, "*inventories*" are assets "*held for sale in the ordinary course of business*"[113] and specifically "*encompass goods purchased and held for resale*"[114]. It is therefore clear that where goods are held at the end of the reporting period, this should be reported as part of inventory.  A reporting entity is required by IFRS to report in its financial statements the "*amount of inventories recognised as an expense during the period*"[115], and IFRS notes that this is "*often referred to as cost of sales*"[116].  In my view, "*cost of sales*" is analogous with "*cost of revenues*", being the term that Autonomy used.  Therefore, Autonomy was required to report as part of its "*Cost of revenues*" the cost of all inventory (goods purchased and held for resale) recognised as an expense; and

(b)   in its 2010 consolidated financial statements Autonomy disclosed that:

---

[111] Q3-8130 Hardware Testing.xls
[112] For example, as described in the "*Strategic Deals Memorandum*", DEL00100362-DEC00100369
[113] IAS 2 "*Inventories*" ("**IAS 2**"), paragraph 6 defines inventories as follows: "*Inventories are assets: (a) held for sale in the ordinary course of business; (b) in the process of production for such sale; or (c) in the form of materials or supplies to be consumed in the production process or in the rendering of services*"
[114] IAS 2, paragraph 8
[115] IAS 2, paragraph 36(d)
[116] IAS 2, paragraph 38

**mazars**

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
**Summary of independent expert accounting opinions of Steven Brice FCA**

    (i)    "*Cost of revenues*" included the "*costs of product media, product duplication, hardware and manuals*"[117], confirming that the cost of purchasing hardware for resale should be included in this cost component; and

    (ii)    "*sales and marketing costs comprise the costs of the sales force, commissions and costs of promoting new products and entering into new markets*"[118], confirming that the cost of hardware should not be included in this cost component.

3.5.3    I note that I have seen evidence that Autonomy justified its practice to report the cost of hardware as a cost of "*Sales and marketing*" by reference to there being a strategic partnership in place with the hardware suppliers[119].  However:

    (a)    my review of the available information suggests that no such strategic marketing alliance was in place – the transactional documents appear to reflect the buying and selling of hardware.  Where contemporaneous documents refer to the potential for marketing, this appears to be from Autonomy's perspective[120] or is at the sole discretion of the hardware supplier[121]; and

    (b)    if, pursuant to a strategic partnership agreement, marketing was undertaken by the hardware supplier in addition to its supply of the hardware goods (and I have seen no evidence to suggest this was the case), the fair value of these services could be reported as part of the cost of "*Sales and marketing*" if the component of that cost could be reliably measured.  It would also need appropriate disclosure (including in the accounting policies reflected above).

3.5.4    As a result, in my view, the "*Cost of revenues*" in Autonomy's quarterly financial statements were understated and the reported costs of "*Sales and marketing*" were overstated.  Further, the computed gross profit and gross profit margin (which are both important measures of profitability) were also misstated.  Importantly, I have seen evidence that the users of the financial statements were particularly interested in the gross profit margin – for example in an earnings conference call from Q2 2010 an analyst at Piper Jaffray asked "*you saw that spike in appliance sales, that inventory moving through.  Did that have any gross margin impact?*"

---

[117] Autonomy's FY2010 Annual Report and Accounts, page 51
[118] Autonomy's FY2010 Annual Report and Accounts, page 52
[119] For example, as described in the "*Strategic Deals Memorandum*", DEL00100362-DEC00100369
[120] For example, the purchase orders issued by Autonomy to Dell, such as US-PWC 00002646
[121] For example, the "Joint Marketing Efforts" clause in Attachment B to the Value Added Reseller Agreement between Dell and Autonomy.  (US-PWC 00002327-00002338)

**mazars**

and an analyst at Nomura International asked "*I just wanted to come back to the gross margin* […] *So, is it possible that you might get in Q3/Q4 more of slightly lower margin hardware-related deals?*"[122].

## 3.6 My summary conclusions in relation to Autonomy's failure to disclose the existence of a material amount of hardware sales transactions

3.6.1 Autonomy's financial statements disclose that the "*group is a software business*"[123] and do not make reference to Autonomy's sales of hardware products.  Importantly, the nature and economic realities of Autonomy's software sales transactions were significantly different to the nature and economic realities of Autonomy's hardware sales, for example:

(a) whilst Autonomy described that its software business had a fixed cost base[124], which means that incremental revenue is additive to reported profit, the cost base for hardware sales was clearly not fixed (because every incremental sale required Autonomy to purchase the goods)[125]; and

(b) whilst software was a high margin business, it is clear from my analysis of the Hardware Focus Transactions that the hardware business was a low margin business (and many of the transactions were actually loss making).

3.6.2 In addition to the significant difference between the two business models including a different nature and economic reality to the relevant transactions, by reference to the materiality thresholds in Table 2.5 the quantum of hardware sales was material.

3.6.3 Given the above, pursuant to the requirements of IFRS, Autonomy should have disclosed the existence of a material amount of revenue being generated from hardware sales transactions, which were significantly different in nature and economic reality to the software sales transactions that were described in the financial statements.  My conclusion is based upon the following:

(a) IFRS requires "*fair presentation*", including the "*faithful representation*" of the effects of transactions[126].  In particular, fair presentation requires an entity to provide additional disclosures to "*enable users to understand the impact of particular*

---

[122] EMC-HP-026620 and EMC-HP-026623

[123] Autonomy's FY2010 Annual Report and Accounts, page 58

[124] "*A significant proportion of the group's cost base is fixed*".  (Autonomy's FY2010 Annual Report and Accounts, page 58)

[125] "*the business model drives enhanced performance though growing sales*".  (Autonomy's FY2010 Annual Report and Accounts, page 58)

[126] IAS 1, paragraph 15

*transactions*"[127].  Without a separate disclosure in relation to the hardware sales
transactions, users would not be able to understand their impact;

(b)     IFRS requires that an entity should "*present separately items of a dissimilar nature
or function unless they are immaterial*"[128].  The hardware sales transactions were
clearly items of a dissimilar nature and were material, and therefore should have
been presented separately;

(c)     the Conceptual Framework to IFRS requires:

(i)     financial statements to "*represent economic phenomena in words and
numbers*"[129] and for this information to not only represent relevant phenomena,
but it must also "*faithfully represent the phenomena that it purports to
represent*"[130].  The representation of a material amount of hardware sales as
being software sales is not a faithful representation; and

(ii)    financial statements to be "*complete*"[131] in that they include *"all information
necessary for a user to understand the phenomenon being depicted, including
all necessary descriptions and explanations*"[132].  Of particular relevance to the
hardware sales transactions, the Conceptual Framework further provides that
"*For some items, a complete depiction may also entail explanations of significant
facts about the quality and nature of the items, factors and circumstances that
might affect their quality and nature*"[133].  Explanations regarding the hardware
sales transactions were therefore required in order to enable the users of the
financial statements to understand how Autonomy was generating its revenue;

(d)     IFRS required Autonomy to disclose the amount of revenue included in "*each
significant category of revenue*"[134].  In my view, revenue from hardware sales

---

[127] IAS 1, paragraph 17(c)

[128] IAS 1, paragraph 29

[129] Conceptual Framework, paragraph QC12; equivalent guidance on "*Faithful Representation*" and "*Substance over form*" is found at paragraphs 33 to 35 of the Framework

[130] Conceptual Framework, paragraph QC12

[131] Conceptual Framework, paragraph QC12; equivalent guidance on "*Completeness*" is found at paragraph 38 of the Framework

[132] Conceptual Framework, paragraph QC13

[133] Conceptual Framework, paragraph QC13

[134] "*An entity shall disclose: (a) the accounting policies adopted for the recognition of revenue, including the methods adopted to determine the stage of completion of transactions involving the rendering of services; (b) the amount of each significant category of revenue recognised during the period, including revenue arising from: (i) the sale of goods; (ii) the rendering of services; (iii) interest; (iv) royalties; (v) dividends; and (c) the amount of revenue arising from exchanges of goods or services included in each significant category of revenue*".  (IAS 18, paragraph 35)

transactions was a significant category of revenue and therefore required separate disclosure;

(e)  IFRS required Autonomy to disclose the amount of hardware inventory they had recognised as an expense during the period[135]; and

(f)  IFRS requires a reporting entity to disclose separate financial information (including revenue and segment profits) for each "*operating segment*"[136].  Had this information for hardware sales transactions been disclosed, the information would certainly have been helpful for the users of the accounts because it would have enabled them to understand the nature and financial effects of these transactions.  Autonomy would have been required to disclose this information if Dr Lynch, the chief operating decision maker of Autonomy[137], regularly reviewed the operating results relating to hardware in order to assess performance.  Even if Dr Lynch did not regularly review the operating results relating to hardware, meaning that Autonomy only had one operating segment, Autonomy was required by IFRS to report the revenues for "*each product and service, or each group of similar products and services*"[138].  This therefore required Autonomy to separately disclose the revenues for hardware sales[139].

---

[135] "*The financial statements shall disclose… (d) the amount of inventories recognised as an expense during the period*".  (IAS 2, paragraph 36)

[136] IFRS 8 "*Operating segments*" ("**IFRS 8**"), paragraph 5

[137] Autonomy's FY2010 Annual Report and Accounts, page 58

[138] IFRS 8, paragraph 32

[139] The only reason for not doing so, per paragraph 32 of IFRS 8, is if "*the necessary information is not available and the cost to develop it would be excessive, in which case that fact shall be disclosed*".  Not only was there no disclosure that the information on hardware revenues was not available, this information was clearly available as it was recorded separately in the Hardware Ledger

# 4    My summary conclusions in relation to the revenue streams reported by Autonomy from Q1 2010 onwards

## 4.1    Introduction

4.1.1    I am instructed to review the revenue streams reported by Autonomy during the Relevant Period and give my opinion on whether the description of these streams is consistent with the nature of the underlying transactions[140].  In this section of my report I provide a summary of my opinion.

## 4.2    The starting point for my analysis: the revenue streams reported by Autonomy in its commentary to the market

4.2.1    From Q1 2010 onwards, Autonomy reported the following revenue streams in the financial information published with its quarterly and annual financial statements[141]:

(a)    "*IDOL Product*", which is described as licensed software paid for up-front with an ongoing support and maintenance stream;

(b)    "*IDOL Cloud*", which is described as a Software-as-a-Service (SaaS) model;

(c)    "*IDOL OEM*", which is where Autonomy's IDOL is embedded inside other software companies' products;

(d)    "*Deferred revenue release*", which stems from support and maintenance contracts recognised in arrears; and

(e)    "*Services*", which relate to third party and internal implementation consultants and training[142,143].

---

[140] I note that in My Hussain Report I was instructed to "*comment on Autonomy's compound annual growth rate reported in HP's press release dated 18 August 2011*" (My Hussain Report, paragraph 1.2.3(d)).  In addressing these instructions I recalculated Autonomy's compound annual growth rate over the five year period from 2005 to 2010 adjusting 2010 consolidated revenue for the total adjustments arising from HP's restatement exercise.  This resulted in a compound annual growth rate of 49%, 6% lower than that reported in the HP press release

[141] These revenue streams were not reported in Autonomy's annual or quarterly financial statements themselves

[142] Refer to the Autonomy presentation "*Q3 09 Results 20 October 2009*" (HP-SEC-00025157-HP-SEC-00025179) for Autonomy's first identification of these revenue streams

[143] Given the low monetary value and nature of this revenue stream I have done no further analysis in respect of services

**mazars**

4.2.2    The sum of the revenues reported in these revenue streams agrees to the total revenues reported by Autonomy in its quarterly financial statements, as shown for the period Q1 2010 to Q2 2011 in the table below:

Table 4.1: Quarterly breakdown of revenue across the reported revenue streams from Q1 2010 to Q2 2011

| $m | Q1 2010 | Q2 2010 | Q3 2010 | Q4 2010 | Q1 2011 | Q2 2011 |
|---|---|---|---|---|---|---|
| IDOL Product | 46.0 | 62.4 | 58.3 | 84.3 | 54.4 | 68.5 |
| IDOL Cloud | 45.5 | 46.9 | 46.6 | 50.6 | 52.7 | 64.3 |
| IDOL OEM | 29.1 | 37.5 | 31.2 | 34.5 | 37.2 | 47.1 |
| Services | 11.0 | 11.0 | 10.0 | 9.0 | 9.0 | 8.8 |
| Deferred revenue release | 62.0 | 63.0 | 64.0 | 66.0 | 66.5 | 67.5 |
| **Total** | **193.7** | **220.8** | **210.1** | **244.4** | **219.8** | **256.2** |

4.2.3    The table above illustrates that the total of the reported IDOL Cloud and IDOL OEM revenues were generally increasing across the period, whereas IDOL Product revenue was fluctuating. Additionally, the total reported IDOL Cloud and IDOL OEM revenues were 163.0% of IDOL Product revenues in Q1 2010 and 162.8% of reported IDOL Product revenues in Q2 2011 (with a peak of 166.7% in Q1 2011).

## 4.3    Applicable financial reporting requirements

4.3.1    The above-mentioned revenue streams were not reported in Autonomy's quarterly financial statements themselves but were instead disclosed to the market within the accompanying management commentary provided by Autonomy[144] alongside its quarterly financial statements.

4.3.2    Given Autonomy was listed on the London Stock Exchange, it was required to comply with the requirements of the Disclosure and Transparency Rule ("**DTR**").  The DTR:

(a)    required that Autonomy prepare a management report to accompany its annual financial statements.  Such management reports were required to provide a fair

---

[144] For example by way of financial information published with its quarterly and annual financial statements, trading updates, results presentations, or investor Q&As

review of the business, including a balanced and comprehensive analysis of the financial performance[145];

(b)      required that Autonomy prepare a management report to accompany its interim financial statements[146].   Autonomy was required to also provide a responsibility statement attesting that the management report provided a fair review of the information required[147]; and

(c)      required Autonomy to make interim management statements within the first and second six months of its financial year[148], which were required to provide *inter alia* a general description of the financial performance during the relevant period[149]. Such statements, like all disclosures to the market, were covered by the requirement of the DTR that issuers take reasonable care to ensure that any information reported is not "*misleading, false or deceptive*"[150].

4.3.3    Further, it is my view that the above-mentioned revenue streams were an element of Autonomy's "*other financial reporting*", which is explained in the Preface to IFRS as being "*information provided outside financial statements that assists in the interpretation of a complete set of financial statements that assists in the interpretation of a complete set of financial statements or improves users' ability to make efficient economic decisions*"[151].

4.3.4    The Conceptual Framework explains that a fundamental qualitative characteristic of useful financial information is that it faithfully represents what it purports to represent[152], and is "*complete, neutral, and free from error*"[153].   As such, it is my opinion that the revenue streams reported by Autonomy to the market in its "*other financial reporting*" should have reflected Autonomy's definitions of those revenue streams.

---

[145] "*The management report must contain: 1. a fair review of the issuer's business; and 2. a description of the principal risks and uncertainties facing the issuer.  The review required by DTR 4.1.8 R must: 1. be a balanced and comprehensive analysis of: a) the development and performance of the issuer's business during the financial year; and b) the position of the issuer's business at the end of that year, consistent with the size and complexity of the business; 2. include, to the extent necessary for an understanding of the development, performance or position of the issuer's business: a) analysis using financial key performance indicators; and b) where appropriate, analysis using other key performance indicators including information relating to environmental matters and employee matters; and 3. include references to, and additional explanations of, amounts included in the issuer's annual financial statements, where appropriate*".  (DTR, paragraphs 4.1.8 and 4.1.9)

[146] DTR, paragraph 4.2.7

[147] DTR, paragraph 4.2.10(3)

[148] DTR, paragraph 4.3.2

[149] DTR, paragraph 4.3.5

[150] DTR, paragraph 1.3.4

[151] Preface to IFRS, paragraph 7

[152] Conceptual Framework, paragraph QC4; equivalent guidance on "*Faithful Representation*" and "*Substance over form*" is found at paragraphs 33 to 35 of the Framework

[153] Conceptual Framework, paragraph QC12

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of independent expert accounting opinions of Steven Brice
FCA

mazars

4.3.5  Finally, I note that pursuant to the Companies Act 2006, Autonomy was required to prepare a fair review of its business and a balanced and comprehensive analysis of its financial performance[154].  In my opinion, this requirement is again consistent with a requirement that the revenue streams reported by Autonomy to the market in its "*other financial reporting*" should have reflected Autonomy's definitions of those revenue streams[155].

## 4.4  Overview to my summary conclusions

4.4.1  In my opinion, the revenue streams disclosed in Autonomy's "*other financial reporting*" did not faithfully represent the nature of the revenues generated by Autonomy, and did not constitute a fair and balanced analysis of Autonomy's financial performance.  I have reached this conclusion because:

(a)  certain Software Focus Transactions were reported as having generated IDOL OEM revenues, despite those Software Focus Transactions not matching Autonomy's depiction of the IDOL OEM revenue stream[156].  I note that for certain of these Software Focus Transactions I have proposed adjustments which would reduce the revenue recognised;

(b)  certain Software Focus Transactions were inappropriately reported as having generated IDOL Cloud revenues, despite those Software Focus Transactions not meeting Autonomy's depiction of the IDOL Cloud revenue stream.  I note that for certain of these Software Focus Transactions I have proposed adjustments which would reduce the revenue recognised;

(c)  sales of hardware were reported as having generated IDOL Product revenues, despite hardware sales not meeting Autonomy's depiction of the IDOL Product revenue stream; and

---

[154] "*The business review must contain – a) a fair review of the company's business, and b) a description of the principal risks and uncertainties facing the company.  The review required is a balanced and comprehensive analysis of – a) the development and performance of the company's business during the financial year, and b) the position of the company's business at the end of that year, consistent with the size and complexity of the business.  In the case of a quoted company the business review must, to the extent necessary for an understanding of the development, performance or position of the company's business, include – a) the main trends and factors likely to affect the future development, performance and position of the company's business; and […] the review must, where appropriate, include references to, and additional explanations of, amounts included in the company's annual accounts*".  (Companies Act 2006, Section 417)

[155] Moreover, I note that auditors performing reviews or audits or annual or quarterly information were required to review accompanying financial information to identify material inconsistencies between that information and the information presented in the quarterly or annual financial statements themselves.  (ISRE 2410 "*Review of Interim Financial Information Performed by the Independent Auditor of the Entity*" and ISA 720 A "*Other information and documents containing audited financial statements*")

[156] I note that throughout the Relevant Period, Autonomy reported revenue arising from its OEM business using various terms, including: "*IDOL OEM*", "*OEM derived revenues*" and "*IDOL OEM derived revenues*"

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

mazars    Summary of independent expert accounting opinions of Steven Brice
FCA

(d)     revenues associated with certain transactions were reported within both the IDOL
OEM and IDOL Cloud revenue streams[157].

## 4.5    My summary conclusions in relation to the reporting of the IDOL OEM revenue stream

4.5.1   "*IDOL OEM*" is not a term which is defined in IFRS.  However, in its "*other financial reporting*",
Autonomy depicted its IDOL OEM revenue stream in the following ways:

(a)     in its presentation titled "*Q3 09 Results 20 October 2009*"[158], Autonomy described
its "*OEM Dev*" revenue as comprising "*a development licence fee that is paid upfront
and is non-refundable*" and "*OEM Ongoing*" revenue as "*Revenues from sales of
OEMs' products*";

(b)     in its document "*Investor Relations Bulletin: 19 October 2010*"[159], Autonomy
explained that "*IDOL OEM revenues do not generate deferred revenue as the
royalties are paid quarterly in arrears*";

(c)     in its "*Financial Overview*" provided alongside the financial statements for the year
ended 31 December 2010[160], Autonomy explained that "*IDOL OEM is where
Autonomy's IDOL is embedded inside other software companies' products. IDOL is
now embedded in most major software companies' products addressing most
software vertical markets.  This is a particularly important revenue stream as it
generates ongoing business across the broadest product set possible, in addition to
up-front development licences*"[161];

(d)     in its presentation titled "*Autonomy Q1 trading update*"[162], Autonomy described its
IDOL OEM revenue stream as where customers "*Purchase a royalty-paying
competitor's product – this model does not generate deferred revenue*"; and

(e)     in its presentation "*Autonomy Q2 and H1 Results*"[163], Autonomy described "*cloud
and OEM*" as "*recurring models*".

---

[157] And, as a consequence, were excluded from the IDOL Product revenue stream
[158] HP-SEC-00025157-HP-SEC-00025179
[159] SEC-AUSA5-EPROD-000492750
[160] Autonomy's FY2010 Annual Report and Accounts, page 15
[161] Equivalent descriptions were included in Autonomy's "*Trading Update for the Quarter Ended March 31, 2011*" and "*Trading Update for the Quarter Ended 30 June 2011*"
[162] HP-SEC-00159120, page 105
[163] SEC-AUSA5-EPROD-000714279

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

mazars

4.5.2   As explained above, in my opinion, the transactions reported within the IDOL OEM revenue stream should have had characteristics which were consistent with Autonomy's depiction of the IDOL OEM revenue stream to the market.  In the light of Autonomy's own description of the IDOL OEM revenue stream, in my opinion transactions classified as generating IDOL OEM revenue should have the following key characteristics:

(a)   the transaction should relate to a sale in which Autonomy's software was embedded into the customer's product for the customer to sell-on to third parties.  As such:

(i)   I do not consider that transactions to non-software companies are consistent with Autonomy's depiction of IDOL OEM revenue; and

(ii)   I do not consider that arrangements with software companies where the software company would simply sell-on Autonomy's software without first embedding it into its own product are consistent with Autonomy's depiction of IDOL OEM revenue; and

(b)   the transaction should generate recurring revenues for Autonomy[164].  As such I do not consider that transactions involving one-off, pre-paid royalties (where amounts were recognised immediately by Autonomy) are consistent with Autonomy's depiction of IDOL OEM revenue[165].

4.5.3   In Section 2 above I explained that I have reviewed the Software Focus Transactions and considered whether they were properly accounted for in accordance with IFRS.  Throughout that process I also considered whether, in my opinion, the Software Focus Transactions reported as giving rise to IDOL OEM revenues had characteristics which were consistent with Autonomy's depiction of the IDOL OEM revenue stream.

4.5.4   My analysis has identified that the following Software Focus Transactions were reported as generating IDOL OEM revenues despite having characteristics which were inconsistent with Autonomy's depiction of the IDOL OEM revenue stream:

---

[164] If disclosed as "*OEM Ongoing*"
[165] If disclosed as "*OEM Ongoing*"

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

![mazars logo] **Summary of independent expert accounting opinions of Steven Brice FCA**

Table 4.2: Software Focus Transactions I have identified which were reported as generating IDOL OEM revenues despite having characteristics which were inconsistent with Autonomy's depiction of the IDOL OEM revenue stream

| Quarter | # | Quarterly Revenue Breakdown name | Revenue reported as IDOL OEM ($m) |
|---|---|---|---|
| Q1 2010 | 048 | B of A | 8.9 |
| Q1 2010 | 049 | Filetek | 8.5 |
| Q2 2010 | 055 | Amgen Info Governance | 4.5 |
| Q2 2010 | 058 | MetLife DS | 7.0 |
| Q2 2010 | 059 | JPMC | 8.7 |
| Q3 2010 | 065 | Amgen | 9.0 |
| Q3 2010 | 066 | Vidient | 2.0 |
| Q3 2010 | 067 | Bank of America | 2.7 |
| Q3 2010 | 071 | EMC | 5.7 |
| Q3 2010 | 072 | Mattel | 3.7 |
| Q4 2010 | 074 | Prisa | 9.0 |
| Q4 2010 | 079a | discovertech baml | 7.0 |
| Q4 2010 | 081 | VMS | 10.8 |
| Q1 2011 | 084 | Tottenham | 6.4 |
| Q1 2011 | 088 | Mcafee – Capax | 5.0 |
| Q1 2011 | 091 | Prisa | 3.6 |
| Q1 2011 | 092a | KPMG | 5.4 |
| Q2 2011 | 096 | Iron Mountain – OEM | 16.5 |
| Q2 2011 | 120 | Dell Hyatt - mt | 5.3 |
| Q2 2011 | 121 | USPS archive – mt | 7.0 |
| Q2 2011 | 102 | JPMC – EDD | 2.6 |
| Q2 2011 | 105 | UBS – capax | 7.6 |
| Q2 2011 | 106 | Rand | 2.3 |

## 4.6    My summary conclusions in relation to the reporting of the IDOL Cloud revenue stream

4.6.1    "*IDOL Cloud*" is also not a term which is defined in IFRS.  However, in its "*other financial reporting*", Autonomy depicted its IDOL Cloud revenue stream in the following ways:

(a)    in its presentation titled "*Q3 09 Results 20 October 2009*"[166], Autonomy described its IDOL Cloud revenue as being "*Solutions for which the major party is executed in the SaaS or hosted model*".  Autonomy's description continued:

(i)    "*In hosted, the customer has access to our IDOL software running on our hardware, single tenant*";

(ii)    "*In SaaS, the customer has access to our IDOL software running on our hardware, multi tenant.  For hosted or SaaS, no licence revenues are generated*"; and

---

[166] HP-SEC-00025157-HP-SEC-00025179

(iii)   "*These customers may occasionally separately buy IDOL licence to run on their hardware systems for the purpose of feeding information to our hosted/SaaS system.  This licence sale is recognised as a normal software licence as Autonomy has no ongoing obligations in relation to it*";

(b)   in its document "*Investor Relations Bulletin: 19 October 2010*"[167], Autonomy explained that "*IDOL Cloud delivers Autonomy's IDOL Cloud delivers Autonomy's product on a Software as a Service (SaaS) basis, which is invoiced monthly in arrears and does not generate deferred revenue. As a result, any organic revenue growth analysis needs to bear in mind that headline rates of growth are understated given the shift away from license sales (recognised immediately) to subscription fees (recognised over time). SaaS revenues are generally considered to be higher quality over the long term given their predictable, sticky characteristics*";

(c)   in its "*Financial Overview*" provided alongside the financial statements for the year ended 31 December 2010[168], Autonomy explained that "*IDOL Cloud delivers Autonomy's IDOL on a Software-as-a-Service (Saas) model, which is generally invoiced monthly in arrears and generally does not generate deferred revenue. There are two key drivers of cloud revenues for Autonomy: the first and most significant relates to complex processing of information delivered as a service, the second relates to the quantity of data under management*"[169];

(d)   in its presentation titled "*Autonomy Q1 trading update*"[170], Autonomy described its IDOL Cloud revenue stream as "*Subscribe to our Software as a Service (billed monthly) – this model does not generate deferred revenue*"; and

(e)   in its presentation "*Autonomy Q2 and H1 Results*"[171], Autonomy described "*cloud and OEM*" as "*recurring models*".

4.6.2    As explained above, in my opinion, the transactions reported within the IDOL Cloud revenue stream should have had characteristics which were consistent with Autonomy's depiction of the IDOL Cloud revenue stream to the market.  In the light of Autonomy's own description of

---

[167] SEC-AUSA5-EPROD-000492750
[168] Autonomy's FY2010 Annual Report and Accounts, page 15
[169] Equivalent descriptions were included in Autonomy's "*Trading Update for the Quarter Ended March 31, 2011*" and "*Trading Update for the Quarter Ended 30 June 2011*"
[170] HP-SEC-00159120, page 105
[171] SEC-AUSA5-EPROD-000714279

**mazars**

the IDOL Cloud revenue stream, in my opinion transactions reported as generating IDOL Cloud should have the following characteristics:

(a)     the transaction should be for the provision of ongoing services.  As such, (subject to the single exception set out in paragraph 4.6.3 below) I do not consider that transactions of the sale of software licences are consistent with Autonomy's depiction of IDOL Cloud revenue;

(b)     the majority of the revenue reported in the IDOL Cloud revenue stream should relate to transactions related to the complex processing of information delivered as a service, with transactions related to the hosting of data also being a significant contributor; and

(c)     the transaction should generate recurring revenue for Autonomy.  As such I do not consider that transactions involving the recognition of revenue in one-off, lumpsum amounts are consistent with Autonomy's depiction of IDOL Cloud revenue.

4.6.3   Autonomy's depiction of the IDOL Cloud revenue stream in its "*Q3 09 Results 20 October 2009*"[172] does explain that "*customers may occasionally separately buy IDOL licence to run on their hardware systems* […] *This licence sale is recognised as a normal software licence as Autonomy has no ongoing obligations in relation to it*".  In my opinion, this disclosure is unclear as to whether the "*licence sale*" is recognised within the IDOL Cloud revenue stream or within the IDOL Product revenue stream.  In any event, to the extent that the sale of a software licence was reported within the IDOL Cloud revenue stream, in my opinion:

(a)     the transaction should be for a software licence installed on the customer's hardware.  As such, I do not consider that transactions in which a software licence was purchased and installed on Autonomy's hardware are consistent with Autonomy's depiction; and

(b)     notwithstanding the above, from its "*Financial Overview*" provided alongside the financial statements for the year ended 31 December 2010 onwards[173], Autonomy's depiction of the IDOL Cloud revenue stream made no reference to the inclusion of software licences whatsoever.  As such from 31 December 2010, in my opinion no revenue related to the sale of a software licence should be reported as IDOL Cloud revenue.

---

[172] HP-SEC-00025157-HP-SEC-00025179
[173] See, for example, Autonomy's FY2010 Annual Report and Accounts, page 15

4.6.4   In Section 2 above I explained that I have reviewed the Software Focus Transactions and considered whether they were properly accounted for in accordance with IFRS.  Throughout that process, I also considered whether, in my opinion, the Software Focus Transactions reported as giving rise to IDOL Cloud revenues had characteristics which were consistent with Autonomy's depiction of the IDOL Cloud revenue stream.

4.6.5   My analysis has identified that the following Software Focus Transactions were reported as having generated IDOL Cloud revenues despite having characteristics which were inconsistent with Autonomy's depiction of the IDOL Cloud revenue stream:

**Table 4.3: Software Focus Transactions I have identified which were reported as generating IDOL Cloud revenues despite having characteristics which were inconsistent with Autonomy's depiction of the IDOL Cloud revenue stream**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue reported as IDOL Cloud ($m) |
|---------|-----|----------------------------------|-------------------------------------|
| Q1 2010 | 046 | PMI (Discover) | 4.2 |
| Q1 2010 | 048 | B of A | 4.5 |
| Q1 2010 | 051 | Discover tech – Citi 32 cells | 5.5 |
| Q2 2010 | 053 | BP | 12.2 |
| Q2 2010 | 059 | JPMC | 8.7 |
| Q3 2010 | 063 | Citadel | 3.7 |
| Q3 2010 | 064 | Xcel Energy | 2.4 |
| Q3 2010 | 065 | Amgen | 9.0 |
| Q3 2010 | 071 | EMC | 5.7 |
| Q4 2010 | 076 | Ahold | 2.8 |
| Q4 2010 | 077 | Amgen | 5.7 |
| Q4 2010 | 079a | discovertech baml | 7.0 |
| Q4 2010 | 080 | Microtech doi | 4.0 |
| Q4 2010 | 079b | capax baml | 1.7 |
| Q4 2010 | 079c | BAML extra | 3.5 |
| Q1 2011 | 086 | DB Restructure | 7.1 |
| Q1 2011 | 087 | Morgan Stanley DS | 5.0 |
| Q1 2011 | 089 | UBS | 8.0 |
| Q1 2011 | 091 | Prisa | 3.6 |
| Q1 2011 | 093 | Johnson & Johnson | 2.3 |
| Q2 2011 | 101 | ABBOTT LABS – dt | 8.6 |
| Q2 2011 | 120 | Dell Hyatt – mt | 5.3 |
| Q2 2011 | 102 | JPMC – EDD | 2.6 |
| Q2 2011 | 109 | USPS, eDiscovery | 6.3 |
| Q2 2011 | 117 | National Bank of Canada | 1.5 |
| Q2 2011 | 116 | Metlife | 5.5 |

## 4.7   My summary conclusions in relation to Autonomy's failure to disclose the existence of a material amount of hardware sales transactions in their other financial information

4.7.1   As mentioned above, in accordance with the DTR, Companies Act 2006 and the Conceptual Framework, Autonomy was required to provide a balanced and comprehensive analysis of its financial performance.  Of particular relevance to the hardware sales transactions, the

**mazars**

Conceptual Framework further provides that for certain items a complete depiction may also involve explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature[174].

4.7.2   Furthermore, as mentioned in Section 3.5, in accordance with IFRS Autonomy was required to provide a fair representation and to present separately items of a dissimilar nature or function unless they are immaterial.  As such, Autonomy was required to disclose that revenue was being generated from the sale of hardware products.

4.7.3   However, as discussed in Section 3.5 above, in breach of IFRS, Autonomy did not include any disclosure on the existence of a material amount of hardware sales transactions.

4.7.4   My analysis has identified that the following hardware transactions were reported as generating revenue in the IDOL Product or deferred revenue release revenue streams, despite being hardware transactions which should have been disclosed separately:

---

[174] The Conceptual Framework states that "*For some items, a complete depiction may also entail explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature*".  (Conceptual Framework, paragraph QC13)

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

Table 4.4: Hardware transactions which were reported in the IDOL Product or deferred revenue release revenue streams

| Quarter | Quarterly Revenue Breakdown name | Revenue reported as IDOL Product ($m) | Revenue reported as deferred revenue release ($m) |
|---|---|---|---|
| Q1 2010 | Fannie Mae | 1.3 | |
| Q1 2010 | Morgan Stanley | | 0.6 |
| Q1 2010 | SHI International Corp | | 5.2 |
| Q2 2010 | Insight | 2.5 | |
| Q2 2010 | JPMorgan Chase Bank N.A. | 0.5 | |
| Q2 2010 | Metro Business Systems | 1.3 | 3.5 |
| Q2 2010 | Morgan Stanley | 0.5 | 5.6 |
| Q2 2010 | SHI International Corp | 16.1 | |
| Q3 2010 | Insight | 2.4 | |
| Q3 2010 | SHI International Corp | 4.1 | |
| Q3 2010 | Zones, Inc | 10.5 | |
| Q3 2010 | Q2'Revenue - Hardware | | 8.7 |
| Q3 2010 | Low margin | 0.9 | |
| Q4 2010 | Amulet Hotkey | 1.1 | |
| Q4 2010 | Bank of New York Mellon | 1.4 | |
| Q4 2010 | Insight | 0.2 | |
| Q4 2010 | JPMorgan Chase Bank, N.A. | 1.7 | |
| Q4 2010 | Morgan Stanley | 6.3 | |
| Q4 2010 | Progressive Insurance | 1.2 | |
| Q4 2010 | SHI International Corp | 6.4 | |
| Q4 2010 | Low margin from deferred | | 2.1 |
| Q4 2010 | Toronto Police Service + Fannie Mae | 0.1 | |
| Q4 2010 | Union Pacific Railroad | 0.3 | |
| Q4 2010 | Video Monitoring Services | 6.0 | |
| Q4 2010 | Zones, Inc | 8.6 | |
| Q1 2011 | Amulet Hotkey | 1.9 | 2.1 |
| Q1 2011 | Bank of New York Mellon | 3.2 | |
| Q1 2011 | Insight | 0.4 | |
| Q1 2011 | JPMorgan Chase Bank, N.A. | 0.2 | |
| Q1 2011 | Northwestern Mutual Life | 0.1 | |
| Q1 2011 | SHI International Corp | 12.3 | |
| Q2 2011 | Amulet Hotkey | | 1.2 |
| Q2 2011 | SHI International Corp | 3.3 | |
| Q2 2011 | Closed – poppy | 12.4 | |
| Q2 2011 | Deferred Hardware | | 3.9 |

## 4.8 My summary conclusions in relation to the double reporting of the reported IDOL OEM and IDOL Cloud revenue streams

4.8.1 As shown in Table 4.1, Autonomy reported revenue across five revenue streams (IDOL Product, IDOL Cloud, IDOL OEM, service and deferred revenue release). Aggregating the revenues derived from these five revenue streams agrees to the total revenues reported in Autonomy's quarterly financial statements. This confirms that the revenues generated by an individual transaction is only reported in one of the five revenue streams.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

mazars    Summary of independent expert accounting opinions of Steven Brice
FCA

4.8.2    However, I have identified several instances in the Quarterly Revenue Breakdowns where the revenue generated from a single transaction was reported within both the IDOL OEM and IDOL Cloud revenue streams.  I set out these transactions in the table below[175]:

**Table 4.5: Transactions within the Quarterly Revenue Breakdowns which were reported within both the IDOL OEM and IDOL Cloud revenue streams**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue reported as both IDOL OEM and IDOL Cloud ($m) |
|---------|------|-----------------------------------|-------------------------------------------------------|
| Q1 2010 | N/A | EDD hosted | 3.5 |
| Q1 2010 | N/A | services + maintenance | 3.0 |
| Q1 2010 | 48 | B of A | 4.5 |
| Q2 2010 | 59 | JPMC | 8.7 |
| Q2 2010 | N/A | EDD hosted | 3.2 |
| Q3 2010 | 65 | Amgen | 9.0 |
| Q3 2010 | 71 | EMC | 5.7 |
| Q4 2010 | 74 | Prisa | 0.9 |
| Q4 2010 | 079a | discovertech baml | 7.0 |
| Q1 2011 | N/A | GCPD | 0.2 |
| Q1 2011 | N/A | BBC | 1.7 |
| Q1 2011 | 91 | Prisa | 3.6 |
| Q1 2011 | N/A | ATG | 0.5 |
| Q2 2011 | 102 | JPMC - EDD | 2.6 |
| Q2 2011 | 120 | Dell Hyatt -mt | 5.3 |

4.8.3    It is my view that reporting a single transaction within both the IDOL OEM and IDOL Cloud revenue streams overstates these revenue streams in a manner which is inconsistent with the requirements and guidance of the Conceptual Framework, DTR and Companies Act 2006 set out in Section 4.3 above.

---

[175] I note that these transactions were not double reported in Autonomy's total revenue disclosed to the market, because a consequence of the double reporting in the IDOL OEM and IDOL Cloud revenue streams meant that Autonomy's IDOL Product revenue stream was understated by an equivalent amount as the amount reported in the IDOL OEM revenue stream

**mazars**

# 5    Summary of my overall conclusions

5.1.1    Based on the information I have seen, my summary conclusions are that, in Autonomy's quarterly financial statements issued during the Relevant Period:

(a)    the revenue from software sales transactions was not reported in accordance with IFRS (as I identified in Section 2);

(b)    the revenue from hardware sales transactions was not reported or disclosed in accordance with IFRS (as I identified in Sections 3 and 4.7); and

(c)    the descriptions of the IDOL OEM, IDOL Cloud and IDOL Product revenue streams were not reported or disclosed in accordance with the DTR, Conceptual Framework or Companies Act 2006 (as I identified in Section 4).

5.1.2    As a result, Autonomy's quarterly reporting – including both the financial statements and the commentary in the annual report – did not provide a faithful representation of Autonomy's financial performance during the Relevant Period.

5.1.3    By way of illustration, in the chart below I set out the revenue reported in respect of Q2 2011 by Autonomy broken down by revenue stream, as well as my assessment of that revenue (again broken down by revenue stream) had the financial statements been prepared in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006:

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

**mazars**    Summary of independent expert accounting opinions of Steven Brice
FCA

**Figure 5.1: Revenue reported by Autonomy by revenue stream in Q2 2011 and my assessment of that revenue had it been reported in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006**[176]



5.1.4    As discussed in paragraph 4.2.3, in Q2 2011 the total of the reported IDOL Cloud and IDOL OEM revenues were 162.8% of reported IDOL Product revenues.  However, as can be seen from the figure above, the total of the IDOL Cloud and IDOL OEM revenues which would have been reported had the financial statements been prepared in accordance with the relevant requirements would have only made up 69.1% of the IDOL Product revenues which would have been reported had the financial statements been prepared in accordance with the relevant requirements.

5.1.5    Further, the figure above shows that, although reported revenues were split broadly evenly over the IDOL Product and IDOL Cloud revenue streams (with IDOL Cloud revenue making up 93.9% of IDOL Product revenue), in actual fact IDOL Cloud revenue was significantly less than IDOL Product revenue, at just 58.2%.  With respect to the IDOL OEM revenue stream, reported revenue made up 68.9% of IDOL Product revenue.  If the financial statements had been prepared in accordance with the relevant requirements IDOL OEM revenue would have made up 11.0% of IDOL Product revenue.  In summary, if revenues had been reported in

---

[176] For the purposes of this chart I separate out hardware revenue recognised in the quarter.  However, at this stage I have not made any adjustments to the quantum of hardware revenue recognised in the quarter as my analysis of this category of sales is ongoing

accordance with the relevant requirements, IDOL Product revenue would have been far greater than that of IDOL Cloud and IDOL OEM.

5.1.6   In addition to this, if revenue had been reported in accordance with the relevant requirements hardware would have made up 10.4% of total revenue, compared to 0% in the reported revenue.

Exhibit B

United States

V

(1) Michael Richard Lynch
(2) Stephen Chamberlain

---

**Summary of independent expert accounting opinions of Steven Brice FCA**

**3 January 2024**

---



**Private & Confidential**

United States Attorney's Office
11th Floor, Federal Building
450 Golden Gate Avenue, Box 36055
San Francisco
California 94102

Date:        3 January 2024

Dear Sir / Madam

**United States V (1) Michael Richard Lynch (2) Stephen Chamberlain**

I have been instructed as an Independent Expert Accountant by the United States Attorney's Office in the matter of United States versus Dr Michael Richard Lynch and Mr Stephen Chamberlain. Dr Lynch is the former chief executive officer of Autonomy Corporation plc and Mr Chamberlain is the former vice president of finance.

I understand that my duty as an Independent Expert Accountant is to help the Court by giving independent assistance by way of objective, unbiased opinion on matters within my expertise, both in preparing reports and giving oral evidence. I understand that this duty overrides any obligation to the party by whom I am engaged or the person who has paid or is liable to pay me. I confirm that I have complied with, and will continue to comply with, that duty.

I confirm that I have not entered into any arrangement where the amount or payment of my fees is in any way dependent upon the outcome of the case. I know of no conflict of interest of any kind which would prevent me from acting in this matter.

I confirm that the contents of this summary report are true to the best of my knowledge and belief and that the opinions I have expressed represent my true and complete professional opinion.

Yours faithfully

**Steven Brice**
Partner



**mazars**

# Contents

Page

**1    Introduction** ...................................................................................................... **6**

    1.1    My qualifications and experience ........................................................ 6

    1.2    Summary background .......................................................................... 6

    1.3    My instructions ................................................................................... 7

    1.4    My instruction in United States versus Sushovan Tareque Hussain ................... 8

    1.5    The available information .................................................................... 8

    1.6    Scope of this summary report .............................................................. 9

**2    Summary of my opinion in relation to software sales transactions** ..................... **10**

    2.1    Introduction ...................................................................................... 10

    2.2    The starting point for my analysis: the software sales transactions reported by Autonomy as revenue during the Relevant Period ........................... 10

    2.3    The applicable accounting standards ................................................. 14

    2.4    Overview to my summary conclusions ............................................... 16

    2.5    My summary conclusions in relation to Misstatements arising from transactions with resellers which contained one or more revenue recognition issues ........... 19

    2.6    My summary conclusions in relation to Misstatements arising from transactions which contained linked or reciprocal transactions ............................ 25

    2.7    My summary conclusions in relation to Misstatements arising from transactions being accounted for as a sale of goods rather than the rendering of services ... 26

    2.8    My summary conclusions in relation to Misstatements arising from transactions being accounted for as a sale of goods rather than royalties ............................. 30

    2.9    My summary conclusions in relation to Misstatements arising from transactions which contain timing errors ................................................................. 32

    2.10   My summary conclusions in relation to Misstatements arising from transactions which contain errors of valuation ...................................................... 33

**3    Summary of my opinion in relation to hardware sales transactions** ..................... **35**

    3.1    Introduction ...................................................................................... 35

    3.2    The starting point for my analysis: the hardware sales transactions reported by Autonomy as revenue during the Relevant Period ........................... 35

    3.3    Overview to my summary conclusions ............................................... 37

    3.4    My summary conclusions in relation to the inappropriate accrual or deferral of revenue arising from hardware sales transactions between reporting periods and the inappropriate early recognition of hardware sales ........................................ 39

3.5     My summary conclusions in relation to the inappropriate reporting of all or part of the cost of purchasing the hardware as being a "*Sales and marketing*" expense ........................................................................................................ 44

3.6     My summary conclusions in relation to Autonomy's failure to disclose the existence of a material amount of hardware sales transactions ........................ 46

**4       My summary conclusions in relation to the revenue streams reported by Autonomy from Q1 2010 onwards .......................................................................... 49**

4.1     Introduction...................................................................................................... 49

4.2     The starting point for my analysis: the revenue streams reported by Autonomy in its commentary to the market................................................................................ 49

4.3     Applicable financial reporting requirements....................................................... 50

4.4     Overview to my summary conclusions ............................................................. 52

4.5     My summary conclusions in relation to the reporting of the IDOL OEM revenue stream............................................................................................................... 53

4.6     My summary conclusions in relation to the reporting of the IDOL Cloud revenue stream............................................................................................................... 55

4.7     My summary conclusions in relation to Autonomy's failure to disclose the existence of a material amount of hardware sales transactions in their other financial information............................................................................................ 59

4.8     My summary conclusions in relation to the double reporting of the reported IDOL OEM and IDOL Cloud revenue streams.............................................................. 60

**5       My review of the Taylor Report and the Levitske Report ...................................... 63**

5.1     Introduction...................................................................................................... 63

5.2     My summary comments on the Taylor Report.................................................. 63

5.3     My summary comments on the Levitske Report............................................... 66

**6       Summary of my overall conclusions ...................................................................... 73**

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**mazars**

**Summary of independent expert accounting opinions of Steven Brice FCA**

**Appendices**

Curriculum Vitae of Steven Brice                                                                Appendix A

Documents I have relied upon                                                                    Appendix B

The Software Focus Transactions                                                                 Appendix C

The hardware sales transactions per the Quarterly Revenue Breakdowns           Appendix D
compared with the hardware sales transactions recorded in the Hardware Ledger

The Hardware Focus Transactions                                                                 Appendix E

Narrative explanation relating to each Software Focus Transaction for which I        Appendix F
have identified a Misstatement

Narrative explanation for Hardware Focus Transactions for which I have identified   Appendix G
a Misstatement

My comments on Sections 2 to 6 of the Taylor Report                                         Appendix H

My comments on Appendix 3 to the Taylor Report                                              Appendix I

My corrected version of Mr Levitske's analysis of year-over-year revenue growth    Appendix J

My comments on the analyses relating to software in the Levitske Report               Appendix K

My corrected version of Mr Levitske's analyses of the adjustments relating to        Appendix L
software

The revenue reported by Autonomy by revenue stream and my assessment of        Appendix M
that revenue had the financial statements been prepared in accordance with
relevant requirements

# 1 Introduction

## 1.1 My qualifications and experience

1.1.1 I am Steven Brice, a Partner and Head of Accounting Technical Services for Mazars LLP ("**Mazars**"), the UK firm of the Mazars Group.  The Mazars Group is an international, integrated and independent organisation specialising in audit, advisory, accounting and tax services, with a direct presence in more than 95 countries drawing on the expertise of 47,000 professionals.

1.1.2 I am a Fellow of the Institute of Chartered Accountants in England and Wales (the "**ICAEW**") and I have over 25 years of technical accounting experience.  I regularly advise clients and audit teams on the application of International Financial Reporting Standards ("**IFRS**") when preparing or auditing financial information and am routinely instructed to review financial statements for compliance with IFRS.  I hold a current Practising Certificate and have Responsible Individual status for audit work within Mazars which means that I can take responsibility for audit work and sign audit reports.

1.1.3 Given my experience, I am routinely engaged as an expert accountant to consider matters involving the accounting treatment of particular transactions under various accounting frameworks and I have provided independent expert evidence in a number of different forums, including in the High Court of England and Wales and the International Dispute Resolution Centre in London.

1.1.4 Further details of my qualifications and experience are set out in my curriculum vitae in Appendix A, including a list of publications that I have authored in the last 10 years and a listing of the matters in which I have testified as an expert at trial or by deposition in the last four years.

## 1.2 Summary background

1.2.1 This summary report is provided in the matter of United States versus Dr Michael Richard Lynch ("**Dr Lynch**") and Mr Stephen Chamberlain ("**Mr Chamberlain**").  Dr Lynch is the former chief executive officer of Autonomy Corporation plc ("**Autonomy**"), a company that was incorporated in England and Wales[1].   Mr Chamberlain is the former vice president of finance.

---

[1] Autonomy's major subsidiaries comprised (i) Autonomy, Inc. ("**AU Inc**"), Interwoven, Inc. ("**Interwoven**") and ZANTAZ, Inc. ("**Zantaz**"), all of which were incorporated in the United States; and (ii) Autonomy Systems Limited ("**ASL**"), a company incorporated in England and Wales

**mazars**

1.2.2   Hewlett-Packard Company ("**HP**") acquired all the outstanding shares in Autonomy on or about 3 October 2011.

1.2.3   According to the Superseding Indictment it is alleged that, between 2009 and 2011, Dr Lynch and Mr Chamberlain engaged in a scheme to defraud HP (as well as other purchasers and sellers of Autonomy securities) about the true financial performance of Autonomy's business, its financial condition and its prospects for growth.

## 1.3   My instructions

1.3.1   I have been provided with a significant volume of documents, to which I refer in Section 1.5.

1.3.2   My instructions relate to the period 1 January 2009 to 30 September 2011 (the "**Relevant Period**").  Based upon my review of the information provided to me, I have been instructed to:

    (a)   review software sales transactions reported by Autonomy during the Relevant Period as revenue, and give my opinion on whether these sales transactions were properly reported in accordance with the applicable accounting standards;

    (b)   review hardware sales transactions reported by Autonomy during the Relevant Period as revenue, and give my opinion on whether these sales were properly reported and disclosed in accordance with the applicable accounting standards;

    (c)   review the revenue streams reported by Autonomy during the Relevant Period[2] and give my opinion on whether the description of these streams is consistent with the nature of the underlying transactions; and

    (d)   review and comment on the Summary of Independent Expert Accounting Opinions of Mr Greig Taylor ("**Mr Taylor**") dated 7 December 2023 (the "**Taylor Report**") and the Expert Report of Mr John Levitske ("**Mr Levitske**") also dated 7 December 2023 (the "**Levitske Report**") in so far as it is within the scope of my expertise.

1.3.3   This report reflects a summary of the opinions I have reached in addressing my instructions, including the bases and reasons for reaching my conclusions.  I submitted a summary report on 8 November 2023 (my "**Interim Report**") at which date I noted that my work was ongoing.

---

[2] As explained further in Section 4, this specifically includes IDOL Product, IDOL OEM, IDOL Cloud, services and deferred revenue release as reported in the financial information published with Autonomy's quarterly and annual financial statements

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

## 1.4    My instruction in United States versus Sushovan Tareque Hussain

1.4.1    I was previously instructed as an independent expert accountant by the United States Attorney's Office in the matter of United States versus Mr Sushovan Tareque Hussain.  Mr Hussain was the former Chief Financial Officer of Autonomy.  I issued a summary of my expert accounting opinions in that matter in a report dated 31 October 2017 ("**My Hussain Report**").

1.4.2    The issues I was instructed to address in My Hussain Report covered certain of the issues I am instructed to address in this report.  I note that I have received a significant amount of additional information since I issued My Hussain Report.  Where opinions have developed as a result of the additional information I have now seen, I have noted so in this summary report.

## 1.5    The available information

1.5.1    The conclusions in this summary report are based on my experience and on the evidence I have seen.  If further evidence becomes available to me, these conclusions may change.

1.5.2    For the purposes of my work, I have been provided with a significant number of documents. This information includes:

(a)    contemporaneous information (such as contracts, emails and downloads from accounting records);

(b)    the audit working papers used by Deloitte LLP ("**Deloitte**") when auditing or reviewing the financial reports issued during the Relevant Period together with the report of the Financial Reporting Council's ("**FRC's**") Disciplinary Tribunal relating to Deloitte's audits and reviews during the Relevant Period[3];

(c)    the pleadings, disclosure, witness testimonies, expert reports, transcripts and Judgment in the matter of United States versus Sushovan Tareque Hussain;

(d)    the pleadings, disclosure, witness testimonies, expert reports and transcripts in a related case in the High Court in London (the "**High Court Proceedings**")[4]; and

---

[3] Report titled "*Explanatory Memorandum to the Tribunal Report*" in the matter of The Executive Counsel to the Financial Reporting Council versus (1) Deloitte LLP (2) Richard Knights (3) Nigel Mercer
[4] (1) ACL Netherlands B.V. (as successors to Autonomy Corporation Limited) (2) Hewlett-Packard The Hague B.V. (as successors to Hewlett-Packard Vision B.V.) (3) Autonomy Systems Limited (4) Hewlett-Packard Enterprise New Jersey, Inc versus (1) Michael Richard Lynch (2) Sushovan Tareque Hussain

**Mazars**

(e)      the expert reports of Mr Taylor and Mr Levitske and a Summary of Expert Opinions of Philippe Cerf, dated 7 December 2023 (the "**Cerf Report**")[5].

1.5.3    In total I have been provided with more than 650,000 documents.  In light of the number of documents provided to me, I have used an eDiscovery Platform to undertake targeted searches and reviews, aimed at identifying the documents of relevance to my instructions.  I provide in Appendix B a list of the documents I have relied upon in preparing this summary report.

## 1.6      Scope of this summary report

1.6.1    It should be noted that the work I have completed does not constitute an audit and, other than as expressly set out in this report, I have not verified or in any other way checked the information set out in the documents I have reviewed.

1.6.2    In completing my work, I have been assisted by individuals within the Forensic and Investigation and Accounting Technical Services teams at Mazars.  I have supervised and reviewed their work and I confirm that the opinions expressed in this summary report are my own.

1.6.3    Mazars' fees for this engagement are not contingent on the outcome of the proceedings. Mazars is being compensated at a rate of $693 per hour for my time and between $39 and $693 per hour for staff working under my direction.

1.6.4    I have prepared this report solely for the use in these proceedings.  It is confidential in all respects other than to be used in the proceedings as appropriate.  This summary report should not be used, reproduced or circulated for any other purpose without my prior written consent. Mazars accepts no responsibility to third parties in relation to the matters in this summary report and / or for any breaches of this obligation.

1.6.5    Some figures in this report have been rounded and as a result some tables may include rounding differences.

---

[5] The Cerf Report does not respond to my Interim Report and primarily addresses matters that are outside the scope of my expertise.  As such, I do not comment on it further

**mazars**

# 2    Summary of my opinion in relation to software sales transactions

## 2.1    Introduction

2.1.1    I am instructed to review software sales transactions reported by Autonomy during the Relevant Period as revenue, and give my opinion on whether these sales were properly reported in accordance with the applicable accounting standards.  In this section of my report, I provide a summary of my opinion.

## 2.2    The starting point for my analysis: the software sales transactions reported by Autonomy as revenue during the Relevant Period

2.2.1    I have identified, for each quarter[6] during the Relevant Period (apart from Q3 2011), spreadsheets that break down Autonomy's revenue by customer and by revenue type (for example licence, hosting, maintenance and services)[7].  I refer to these spreadsheets as the "**Quarterly Revenue Breakdowns**".

2.2.2    I have compared the total revenue amounts in the Quarterly Revenue Breakdowns to the total revenue reported in Autonomy's quarterly financial statements[8] and I have found that they agree.  The total revenue reported by Autonomy in both the Quarterly Revenue Breakdowns and the quarterly financial statements is shown in Table 2.1:

---

[6] Autonomy issued financial information on a quarterly basis.  I refer to the period 1 January 2010 to 31 March 2010 as "**Q1 2010**", to the period 1 April 2010 to 30 June 2010 as "**Q2 2010**", to the period 1 July 2010 to 30 September 2010 as "**Q3 2010**", *et seq*

[7] HP-SEC-00739438 and SEC-AUSA5-EPROD-000641095

[8] HP-SEC-00567458 (Q1 2009), HP-SEC-00009847 (Q2 2009), HP-SEC-00025166 (Q3 2009), HP-SEC-00097914 (Q4 2009), HP-SEC-00009127 (Q1 2010), FTIGJ00002722 (Q2 2010), HP-SEC-00155426 (Q3 2010) and HP-SEC-00024459 (Q4 2010), HP-SEC-00024002 (Q1 2011), HP-SEC-00564873 (Q2 2011)

mazars

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice
FCA

Table 2.1: Total revenue reported by Autonomy in the Relevant Period (apart from Q3 2011)

| Quarter | Revenue ($m) |
|---|---|
| Q1 2009 | 129.8 |
| Q2 2009 | 195.2 |
| Q3 2009 | 191.6 |
| Q4 2009 | 223.1 |
| Q1 2010 | 194.2 |
| Q2 2010 | 221.1 |
| Q3 2010 | 210.6 |
| Q4 2010 | 244.5 |
| Q1 2011 | 219.8 |
| Q2 2011 | 256.2 |
| **Total** | **2,086.1** |

2.2.3   I have also compared the quarterly revenue reported by Autonomy in the Relevant Period with the consensus of market analysts' expectations for revenue in each quarter.  My analysis is provided in the graph below:

Figure 2.1: Quarterly revenue reported by Autonomy in the Relevant Period compared with market consensus[9]



2.2.4   Given the quantum of some of the sales transactions, this consistent pattern of achieving actual revenues at or very close to market analysts' expectations is perhaps surprising. Autonomy's consistent pattern of achieving actual revenues at or very close to market analysts' expectations is also surprising given that, in many quarters, internal accounting

---

[9] The market consensus is based upon the mean average as reported by S&P Capital IQ

records indicate that, even at the end of or after the quarter, Autonomy was not expecting that it would achieve market analysts' expectations.  For example:

(a)    in Q2 2010, market analysts' expectation was that Autonomy would achieve revenues of $222.4 million.   However, in a spreadsheet dated 30 June 2010, Autonomy's total projected revenue for Q2 2010 was only $217.6 million[10]. Autonomy eventually reported to the market that it had achieved revenues of $221.1 million in Q2 2010;

(b)    in Q4 2010, market analysts' expectation was that Autonomy would achieve revenues of $241.9 million.  However, in a spreadsheet dated 30 December 2010, Autonomy's total projected revenue for Q4 2010 was only $239.9 million[11]. Autonomy eventually reported to the market that it had achieved revenues of $244.5 million in Q4 2010; and

(c)    in Q2 2011, market analysts' expectation was that Autonomy would achieve revenues of $253.2 million.   However, in a spreadsheet dated 6 July 2011, Autonomy's total projected revenue was only $241.3 million[12].  Autonomy eventually reported to the market that it had achieved revenues of $256.2 million in Q2 2011.

2.2.5    The Quarterly Revenue Breakdowns identify a number of transactions in each quarter that I have been able to match to hardware sales per the general ledger.   Hardware sales transactions are not relevant to this section of my report – my summary conclusions in relation to hardware, including how I have identified these sales transactions, are instead provided in Section 3 – and it is therefore necessary to exclude them from my analysis in this section. The revenue reported by Autonomy, excluding revenue from hardware sales transactions, in the Quarterly Revenue Breakdowns is shown in Table 2.2:

---

[10] HP-SEC-00739256
[11] HP-SEC-00739191
[12] HP-SEC-00739432

**mazars**

**Table 2.2: Total revenue reported by Autonomy in the Relevant Period (apart from Q3 2011), excluding revenue from hardware sales transactions[13]**

| Quarter | Total reported revenue ($m) | Hardware revenue ($m) | Revenue excluding hardware ($m) |
|---|---|---|---|
| Q1 2009 | 129.8 | 0.0 | 129.8 |
| Q2 2009 | 195.2 | 6.2 | 189.0 |
| Q3 2009 | 191.6 | 38.0 | 153.6 |
| Q4 2009 | 223.1 | 9.4 | 213.7 |
| Q1 2010 | 194.2 | 11.8 | 182.4 |
| Q2 2010 | 221.1 | 31.1 | 190.1 |
| Q3 2010 | 210.6 | 26.8 | 183.7 |
| Q4 2010 | 244.5 | 35.5 | 209.0 |
| Q1 2011 | 219.8 | 20.1 | 199.7 |
| Q2 2011 | 256.2 | 20.9 | 235.3 |
| **Total** | **2,086.1** | **199.9** | **1,886.2** |

2.2.6    According to the Quarterly Revenue Breakdowns, the total revenue excluding hardware sales transactions (of $1,886.2 million) is comprised of 4,052 line items.  In order to address my instruction in relation to software sales transactions, it is therefore necessary to identify a smaller population of transactions to focus upon.  Using the Quarterly Revenue Breakdowns, I have therefore identified all transactions of more than $2 million[14].  I summarise in Table 2.3 the total value and number of these transactions by quarter:

**Table 2.3: Transactions greater than $2 million reported as revenue by Autonomy in the Relevant Period (apart from Q3 2011), excluding revenue from hardware sales transactions**

| Quarter | Revenue excluding hardware ($m) | Total value of contracts over $2m (excluding hardware) ($m) | Number of contracts over $2m (excluding hardware) |
|---|---|---|---|
| Q1 2009 | 129.8 | 74.6 | 15.0 |
| Q2 2009 | 189.0 | 123.2 | 20.0 |
| Q3 2009 | 153.6 | 96.0 | 17.0 |
| Q4 2009 | 213.7 | 157.4 | 25.0 |
| Q1 2010 | 182.4 | 141.0 | 18.0 |
| Q2 2010 | 190.1 | 141.7 | 19.0 |
| Q3 2010 | 183.7 | 139.2 | 21.0 |
| Q4 2010 | 209.0 | 143.8 | 21.0 |
| Q1 2011 | 199.7 | 153.9 | 24.0 |
| Q2 2011 | 235.3 | 187.2 | 28.0 |
| **Total** | **1,886.2** | **1,358.1** | **208.0** |

2.2.7    Whilst for most of the transactions in Table 2.3 the Quarterly Revenue Breakdowns cite a client name, there are certain transactions which only have a generic description, such as

---

[13] I note that hardware revenue, and therefore revenue excluding hardware, have been updated since my Interim Report.  An explanation of the changes is included in Appendix D

[14] The witness statement of Mr Welham in the High Court Proceedings, dated 14 September 2018, explained that the Deloitte audit team undertook "*audit work in respect of all sales made by Autonomy of more than $1m*".  In the context of the materiality for Autonomy's financial statements (which I discuss further in Section 2.3 below), a testing threshold of $1 million is not unreasonable.  However, in relation to the analysis in this section, analysing all software sales transactions greater than $1 million would significantly increase the size of the population (to more than 500 transactions).  Therefore, I have increased the size of my testing threshold for the software sales transactions to $2 million, thereby reducing the number of identified transactions

**mazars**

"*hosting*", "*services*" or "*maintenance*".  Without the client name, I am unable to identify the underlying transactional documents and give my opinion on whether these transactions have been accounted for in accordance with the applicable accounting standards.

2.2.8    By excluding the transactions with generic descriptions in the Quarterly Revenue Breakdowns[15], I have arrived at the software sales transactions that I will focus on in this section of my report (the "**Software Focus Transactions**")[16].    The Software Focus Transactions are summarised by quarter in Table 2.4 below and a full list by client is provided in Appendix C:

**Table 2.4: The Software Focus Transactions**

| Quarter | Total value of contracts over $2m ($m) | Number of contracts over $2m | Total value of Software Focus Transactions ($m) | Number of Software Focus Transactions |
|---------|----------------------------------------|------------------------------|-------------------------------------------------|---------------------------------------|
| Q1 2009 | 74.6 | 15.0 | 27.0 | 5.0 |
| Q2 2009 | 123.2 | 20.0 | 40.0 | 9.0 |
| Q3 2009 | 96.0 | 17.0 | 20.6 | 6.0 |
| Q4 2009 | 157.4 | 25.0 | 68.1 | 13.0 |
| Q1 2010 | 141.0 | 18.0 | 48.0 | 8.0 |
| Q2 2010 | 141.7 | 19.0 | 49.5 | 9.0 |
| Q3 2010 | 139.2 | 21.0 | 45.1 | 10.0 |
| Q4 2010 | 143.8 | 21.0 | 51.7 | 12.0 |
| Q1 2011 | 153.9 | 24.0 | 61.0 | 13.0 |
| Q2 2011 | 187.2 | 28.0 | 72.7 | 13.0 |
| **Total** | **1,358.1** | **208.0** | **483.7** | **98.0** |

2.2.9    Autonomy therefore reported total revenue relating to the Software Focus Transactions during the Relevant Period (apart from Q3 2011) of $483.7 million.  This is around 23%[17] of the total revenue reported by Autonomy in these quarters during the Relevant Period.

## 2.3    The applicable accounting standards

### International Financial Reporting Standards

2.3.1    Autonomy stated that its financial statements were prepared in accordance with IFRS.  IFRS comprises Standards referred to as IFRS, as well as other Standards such as "*International Accounting Standards*" (typically known as "**IAS**"), with each Standard devoted to a particular type of transaction or item in a set of financial statements.  Reference should also be made to the "*Conceptual Framework For Financial Reporting*" (the "**Conceptual Framework**").

---

[15] I have also excluded certain transactions which refer to "*Microlink*".  These transactions appear to relate to revenue generated by MicroLink, LLC, a reseller which was acquired by Autonomy in January 2010.  Without the client name, I am unable to identify the underlying transactional documents and give my opinion on whether these transactions have been accounted for in accordance with the applicable accounting standards

[16] I note that in My Hussain Report I was instructed to "*review the lists identifying Autonomy's Top 40 Contracts and Top 40 Customers provided to HP as part of the due diligence process with my software and hardware samples, noting any apparent omissions from those lists*" (My Hussain Report, paragraph 1.2.3(e)).  I noted four software transactions which were omitted from the Top 40 Contract list and 10 customers omitted from the Top 40 Customer list.  The four software transactions which were omitted remain Software Focus Transactions and therefore my conclusions in this regard have not changed

[17] Being $483.7 million / $2,086.1 million

Whilst not a Standard *per se*, it sets out the concepts which underpin all Standards within IFRS, as well as assisting preparers of financial statements in applying IFRS and assisting auditors in forming an opinion on whether financial statements comply with IFRS[18].

What does compliance with IFRS mean?

2.3.2   Information is not accounted for in accordance with IFRS if a misstatement (being an omission from or misstatement to the financial statements) exists that is deemed to be "*material*"[19]. Pursuant to IFRS, materiality (including the question of whether an identified misstatement is material) is assessed by reference to an item's "*size*" as well as its "*nature*"[20].

2.3.3   In relation to an item's size, accountants will typically ascribe a materiality by applying a percentage to an identified metric, such as revenue or net profit. Deloitte determined its materiality by applying a percentage to the reported revenues of Autonomy[21]. Where revenue is selected as the appropriate starting point Mazars would typically arrive at a figure for materiality by applying between 0.5% to 2% to the stated revenue figure.

2.3.4   In Table 2.5 below, I summarise the computed materiality using these percentages, and I also set out the materiality that Deloitte used in its audit or review of Autonomy's financial statements[22]:

---

[18] In this summary report, I have referred to and quoted the standards that were extant for the preparation of Autonomy's financial statements for the year ended 31 December 2010. Whilst the standards I refer to were in force throughout the Relevant Period, they may have been subject to some minor consequential amendments arising from changes to other standards in IFRS. Moreover, I note that the Conceptual Framework was introduced in September 2010 as a replacement for "*Framework for the Preparation and Presentation of Financial Statements*" (the "**Framework**"). Where I refer to the Conceptual Framework, I also provide references to the equivalent guidance within the Framework

[19] IAS 8 "*Accounting Policies, Changes in Accounting Estimates and Errors*" ("**IAS 8**") states that "*Financial statements do not comply with IFRSs if they contain either material errors or immaterial errors made intentionally to achieve a particular presentation of an entity's financial position, financial performance or cash flows*". (IAS 8, paragraph 41)

[20] IAS 1 "*Presentation of Financial Statements*" ("**IAS 1**") provides the following definition for "*material*": "*Omissions or misstatements of items are material if they could, individually or collectively, influence the economic decisions that users make on the basis of the financial statements. Materiality depends on the size and nature of the omission or misstatement judged in the surrounding circumstances. The size or nature of the item, or a combination of both, could be the determining factor. Assessing whether an omission or misstatement could influence economic decisions of users, and so be material, requires consideration of the characteristics of those users. The Framework for the Preparation and Presentation of Financial Statements states in paragraph 25 that 'users are assumed to have a reasonable knowledge of business and economic activities and accounting and a willingness to study the information with reasonable diligence'. Therefore, the assessment needs to take into account how users with such attributes could reasonably be expected to be influenced in making economic decisions*". (IAS 1, paragraph 7)

[21] ISA 320 "*Materiality in planning and performing an audit*" ("**ISA 320**") explains the requirements of an auditor when determining a financial statement materiality. Whilst ISA 320 enables auditors to apply professional judgment when determining financial statement materiality, the guidance contained therein explains that for profit generating entities the benchmark for determining materiality is typically profit before tax rather than revenue

[22] I note that Autonomy did not produce quarterly financial statements for Q4 as instead it produced annual financial statements for the financial year then ended. Accordingly Deloitte did not calculate a materiality for Q4

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

Table 2.5: Materiality during the Relevant Period (excluding Q3 2011)[23]

| Quarter | Autonomy's Consolidated Revenue ($m) | Mazars' materiality methodology | | Deloitte's assessed materiality ($m) |
| | | Low (0.5% of revenue) ($m) | High (2.0% of revenue) ($m) | |
|---|---|---|---|---|
| Q1 2009 | 129.8 | 0.6 | 2.6 | 3.7 |
| Q2 2009 | 195.2 | 1.0 | 3.9 | 5.4 |
| Q3 2009 | 191.6 | 1.0 | 3.8 | 3.6 |
| Q4 2009 | 223.1 | 1.1 | 4.5 | N/A |
| **Full year 2009** | **739.7** | **3.7** | **14.8** | **20.0** |
| | | | | |
| Q1 2010 | 194.2 | 1.0 | 3.9 | 5.0 |
| Q2 2010 | 221.1 | 1.1 | 4.4 | 4.9 |
| Q3 2010 | 210.6 | 1.1 | 4.2 | 4.3 |
| Q4 2010 | 244.5 | 1.2 | 4.9 | N/A |
| **Full year 2010** | **870.4** | **4.4** | **17.4** | **22.5** |
| | | | | |
| Q1 2011 | 219.8 | 1.1 | 4.4 | 5.5 |
| Q2 2011 | 256.2 | 1.3 | 5.1 | 5.5 |

2.3.5    Given Deloitte's assessed materiality is broadly consistent with the range suggested by Mazars' methodology, I have adopted Deloitte's materiality methodology when considering the transactions.

2.3.6    That is to say, for example, a misstatement of more than $4.3 million in Q3 2010 would be deemed a material error by quantum by Deloitte and mean that the quarterly financial statements were not prepared in accordance with IFRS.

## 2.4    Overview to my summary conclusions

2.4.1    For each of the Software Focus Transactions, I have sought to identify contemporaneous information pertaining to the transaction in order to understand its underlying substance and economic reality.  This information comprises, for example:

(a)    contractual documentation between Autonomy and its counterparty;

(b)    email correspondence between (i) individuals within Autonomy in relation to the Software Focus Transaction; (ii) individuals within Autonomy's counterparty in relation to the Software Focus Transaction; (iii) Autonomy and its counterparty in relation to the Software Focus Transaction; and (iv) Autonomy and Deloitte in relation to the Software Focus Transaction;

---

[23] Deloitte's reports to the audit committee titled: "*Report to the Audit Committee on the Q1 2009 Review*", "*Report to the Audit Committee on the Q2 2009 Review*", "*Report to the Audit Committee on the Q3 2009 Review*", "*Report to the Audit Committee on the 2009 Audit*", "*Report to the Audit Committee on the Q1 2010 Review*", "*Report to the Audit Committee on the 2010 Interim Review*", "*Report to the Audit Committee on the Q3 2010 Review*", "*Report to the Audit Committee on the 2010 Audit*", "*Report to the Audit Committee on the Q1 2011 Review*", "*Report to the Audit Committee on the Q2 2011 Review*"

**mazars**

(c)      financial records of Autonomy, such as general ledgers, customer ledgers and bank confirmations of payments or receipts; and

(d)      financial information of Autonomy's counterparty, such as financial statements and bank confirmations of payments or receipts.

2.4.2    Based on this information, I have then considered how this revenue should have been accounted for pursuant to the requirements of IFRS and Autonomy's published accounting policies[24]. I have considered both the date on which any revenue should be recognised and the amount of that revenue.

2.4.3    I have then compared my assessment with the amount and/or timing of revenue actually reported by Autonomy during the Relevant Period. Where a difference exists between my assessment and the actual reporting for a specific quarter, I have identified this as a "**Misstatement**".

2.4.4    Of the Software Focus Transactions totalling $483.7 million, my overview conclusions are that:

(a)      transactions with a total reported revenue of $102.8 million appear to have been accounted for in accordance with IFRS; and

(b)      I have identified the existence of a Misstatement in respect of timing and/or amount (that is, my assessment of the amount of revenue that should have been recognised is different to the revenue actually reported by Autonomy) in relation to transactions with a total reported revenue of $380.9 million.

2.4.5    I summarise these overview conclusions in Table 2.6 below:

---

[24] IAS 8 explains that "*Accounting policies are the specific principles, bases, conventions, rules and practices applied by an entity in preparing and presenting financial statements*". (IAS 8, paragraph 5)

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

**mazars**   Summary of independent expert accounting opinions of Steven Brice FCA

**Table 2.6: My overview conclusions for the Software Focus Transactions by quarter**

| Quarter | Reported revenue ($m) | Reported revenue of the Software Focus Transactions ($m) | Reported revenue of the Software Focus Transactions for which: | |
|---|---|---|---|---|
| | | | No Misstatement was identified ($m) | A Misstatement was identified ($m) |
| Q1 2009 | 129.8 | 27.0 | 5.3 | 21.7 |
| Q2 2009 | 195.2 | 40.0 | 12.4 | 27.5 |
| Q3 2009 | 191.6 | 20.6 | 8.3 | 12.3 |
| Q4 2009 | 223.1 | 68.1 | 11.7 | 56.3 |
| Q1 2010 | 194.2 | 48.0 | 5.6 | 42.4 |
| Q2 2010 | 221.1 | 49.5 | 17.6 | 31.9 |
| Q3 2010 | 210.6 | 45.1 | 2.7 | 42.4 |
| Q4 2010 | 244.5 | 51.7 | 14.4 | 37.4 |
| Q1 2011 | 219.8 | 61.0 | 16.8 | 44.2 |
| Q2 2011 | 256.2 | 72.7 | 7.9 | 64.8 |
| **Total** | **2,086.1** | **483.7** | **102.8** | **380.9** |

2.4.6    In relation to the transactions where I have identified a Misstatement, I have assessed the total Misstatement to be $308.2 million.  The Misstatements are summarised by quarter in the table below:

**Table 2.7: The Misstatements identified in relation to the Software Focus Transactions by quarter**

| Quarter | Reported Revenue of the Software Focus Transactions ($m) | Misstatement identified in relation to Software Focus Transactions ($m) |
|---|---|---|
| Q1 2009 | 27.0 | (21.7) |
| Q2 2009 | 40.0 | (26.7) |
| Q3 2009 | 20.6 | (11.3) |
| Q4 2009 | 68.1 | (46.8) |
| Q1 2010 | 48.0 | (32.5) |
| Q2 2010 | 49.5 | (25.6) |
| Q3 2010 | 45.1 | (27.0) |
| Q4 2010 | 51.7 | (29.0) |
| Q1 2011 | 61.0 | (33.2) |
| Q2 2011 | 72.7 | (54.6) |
| **Total** | **483.7** | **(308.2)** |

2.4.7    Given the materiality ranges identified in Table 2.5, the Misstatements in each quarter were clearly material.  This means that the financial statements in each quarter were not prepared in accordance with IFRS.

**mazars**

2.4.8   In addition, I note that following HP's acquisition of Autonomy in October 2011, HP undertook to restate the comparative figures in ASL's financial statements for the period 1 January 2011 to 31 October 2011[25] (the "**Restatement**")[26].

2.4.9   I have identified six principal reasons why the Misstatement exists – that is, reasons why these Software Focus Transactions were not accounted for in accordance with IFRS:

(a)   certain transactions with resellers contained one or more revenue recognition issues;

(b)   certain transactions contained linked or reciprocal transactions;

(c)   certain transactions were accounted for as a sale of goods rather than the rendering of services;

(d)   certain transactions were accounted for as a sale of goods rather than royalties;

(e)   certain transactions contained timing errors; and

(f)   certain transactions contained errors of valuation.

2.4.10   I address each of these areas in turn in Sections 2.5 to 2.10 below. In Appendix F I provide a narrative explanation relating to each Software Focus Transaction for which I have identified a Misstatement.

## 2.5   My summary conclusions in relation to Misstatements arising from transactions with resellers which contained one or more revenue recognition issues

2.5.1   A number of the Software Focus Transactions relate to instances where Autonomy sold software licences to value added resellers (often referred to as a "**VAR**"). Typically, the VAR would not purchase the software for its own use but instead would acquire the right to sell the software licence on to a named end-user.

---

[25] HP had changed ASL's reporting financial period from 31 December to 31 October to be consistent with HP

[26] I note that the Restatement was reported in pounds sterling, whereas my summary conclusions on the Software Focus Transactions are prepared in US dollars

---

**mazars**

2.5.2   Autonomy recognised revenue arising from transactions with VARs as a "*sale of goods*".  In this regard, IAS 18 distinguishes between revenue generated from the "*sale of goods*", the "*rendering of services*" and the "*use by others of entity assets*"[27].

2.5.3   In order to recognise revenue from the sale of goods under IFRS, there are five criteria that **must** be met.  Importantly, if one or more of these criteria is not met, the revenue cannot be recognised (and thus the recognition of any revenue in relation to that transaction would be a misstatement).

2.5.4   Based upon my review of the contemporaneous information, I have identified that for many of the Software Focus Transactions which relate to sales to VARs, one or more of the revenue recognition criteria in IFRS had not been met and therefore revenue should not have been recognised:

(a)   in order to recognise revenue under IFRS, the entity must have transferred to the buyer (in the case of the Software Focus Transactions, the VAR) the "*significant risks and rewards of ownership of the goods*"[28].  However, I have identified that, in relation to a number of the Software Focus Transactions, the risks and rewards of ownership had clearly not been transferred to the VAR.  The evidence I have seen includes, for example, (i) evidence that the VAR made no efforts to sell the software licence it had acquired to the named end-user[29], and (ii) evidence that the VAR could not have independently sold the software licence it had acquired to the named end-user, because the only route through which it would have been able to do so was via a restructuring of the end-users' existing contractual agreements with Autonomy[30];

(b)   in order to recognise revenue under IFRS, the reporting entity must not retain "*continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold*"[31].  However, I have identified that, in relation to a number of the Software Focus Transactions, Autonomy retained continuing managerial involvement in the software sold to the VAR.  The evidence I have seen includes, for example, evidence that Autonomy continued to negotiate

---

[27] IAS 18 "*Revenue*" ("**IAS 18**"), paragraph 1
[28] IAS 18, paragraph 14(a)
[29] For example, Software Focus Transaction #050, named "*MicroTech*" in Q1 2010
[30] For example, Software Focus Transaction #028, named "*IBM/Ameriprise*" in Q3 2009
[31] IAS 18, paragraph 14(b)

mazars

the sale to the named end-user even after it had completed the sale to the VAR[32]; and

(c)    in order to recognise revenue under IFRS, it must be "*probable that the economic benefits associated with the transaction will flow to the entity*"[33].  However, I have identified that in relation to a number of the Software Focus Transactions, it was not probable[34] that Autonomy would receive an inflow of economic benefit from the VAR.  The evidence I have seen includes, for example, (i) financial information for the VAR which demonstrates that the payment obligation imposed on the VAR would exhaust its cash reserves or net assets[35], (ii) financial information for the VAR which demonstrates that the VAR was loss making or was otherwise unable to fund the purchase of the software[36], (iii) in certain instances where Autonomy did ultimately receive an inflow of economic benefit from the VAR, evidence that this inflow was facilitated by Autonomy first remitting cash to the VAR (in relation to purchases made from the VAR by Autonomy) or by Autonomy requesting that funds owed to Autonomy relating to a separate transaction completed with the named end-user be remitted to the VAR instead of Autonomy[37], and (iv) evidence that Autonomy did not receive any inflow of economic benefit from the VAR, and instead later cancelled the amount owed by the VAR[38].

2.5.5    As a consequence of one or more of these revenue recognition issues, the revenue from certain VAR transactions should not have been recognised.

2.5.6    In addition to the revenue recognition issues explained above, the revenue recognised for certain of the transactions with VARs should not have been recognised because, when considered against the requirements of IFRS, the transaction had no apparent substance.  In this regard, a fundamental qualitative characteristic of financial statements prepared under IFRS is that they should present a "*faithful representation*" of the transactions and events that they purport to represent[39].  Achieving a "*faithful representation*" requires that transactions are presented in accordance with their "*substance and economic reality*", and not merely their

---

[32] For example, Software Focus Transaction #046, named "*PMI (Discover)*" in Q1 2010

[33] IAS 18, paragraph 14(d)

[34] In IFRS, "*probable*" means more likely than not

[35] For example, Software Focus Transaction #038, named "*Dell – Morgan Stanley*" in Q4 2009

[36] For example, Software Focus Transaction #069, named "*Veterans Affairs / National Archive, Big 4, Iron*" in Q3 2010

[37] For example, Software Focus Transaction #121, named "*USPS archive – mt*" in Q2 2011

[38] For example, Software Focus Transaction #090, named "*Bank of Montreal*" in Q1 2011

[39] The Conceptual Framework explains that "*Financial reports represent economic phenomena in words and numbers. To be useful, financial information must not only represent relevant phenomena, but it must also faithfully represent the phenomena that it purports to represent*".  (Conceptual Framework, paragraph QC12)

**mazars**

legal form[40].  For certain of the Software Focus Transactions with VARs, based upon the available contemporaneous evidence I have seen, there is no apparent economic substance to the transactions.

2.5.7   In practice, when considering whether a particular transaction has economic substance, it is important to consider whether the other party to the transaction would be held to its terms. Applying this to the Software Focus Transactions relating to transactions with VARs, I have considered whether it is reasonable to conclude that the VAR would have been held to the terms of its agreement with Autonomy.  The evidence I have seen which leads to a conclusion that certain of the Software Focus Transactions had no apparent economic substance includes:

(a)   evidence that the Software Focus Transaction was executed in a very short space of time (over a matter of hours), with little to no negotiation (or, in some instances, with Autonomy drafting unexplained and uncontested increases to the amount that the VAR would owe Autonomy following the transaction), and on the last day of Autonomy's reporting period[41];

(b)   evidence that the VAR had no realistic prospect of being able to pay the amounts owed to Autonomy unless the VAR was successful in selling the software to the named end-user[42];

(c)   the named end-user having no apparent need to purchase the software licence from the VAR, for example when: (i) the only apparent route through which the sale of the software licence to the named end-user could be achieved required a restructuring of existing contracts with Autonomy which the VAR was unable to enact[43]; and (ii) the individual through whom the transaction with the VAR was executed was also the co-founder of the named-end user (to whom the VAR now had the right to sell the software licence)[44];

---

[40] The Conceptual Framework explains that "*In assessing whether an item meets the definition of an asset, liability or equity, attention needs to be given to its underlying substance and economic reality and not merely its legal form*".   (Conceptual Framework, paragraph 4.6)

[41] For example, Software Focus Transaction #105, named "*UBS – capax*" in Q2 2011

[42] For example, Software Focus Transaction #045, named "*FSA – Capax*" in Q1 2010

[43] For example, Software Focus Transaction #065, named "*Amgen*" in Q3 2010

[44] For example, Software Focus Transaction #041, named "*MircoLink/DiscoverTech*" in Q4 2009

    (d)      the existence of a pattern of behaviour between Autonomy and the VAR which has resulted in transactions collectively indicating that transactions did not appear to have economic substance;

    (e)      evidence that, in the absence of a transaction between the VAR and the named end-user occurring (or if Autonomy entered a transaction with the named end-user, rather than the VAR), Autonomy either cancelled the amounts owed by the VAR in relation to the Software Focus Transaction[45], or facilitated the VAR's settlement of the amounts owed by first remitting cash to[46], or arranging for cash to be remitted to[47], the VAR; and

    (f)      evidence that, following the completion of a transaction between Autonomy and the end-user, Autonomy paid the VAR a commission despite the VAR having no apparent involvement in the transaction[48].

2.5.8    The Software Focus Transactions with Misstatements arising from transactions with VARs which contained one or more revenue recognition issues are set out in the table below:

---

[45] For example, Software Focus Transaction #089, named "*UBS*" in Q1 2011

[46] For example, Software Focus Transaction #088, named "*Mcafee - Capax*" in Q1 2011

[47] For example, Software Focus Transactions #079a, named "*discover tech baml*" #079b, named "*capax baml*" and #079c, named "*BAML extra*" in Q4 2010

[48] For example, Software Focus Transaction #040a, named "*Capax*" in Q4 2009

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**mazars**   Summary of independent expert accounting opinions of Steven Brice FCA

**Table 2.8: Software Focus Transactions with Misstatements arising from transactions with VARs which contained one or more revenue recognition issues[49,50]**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---|---|---|---|
| Q1 2009 | 011 | Capax Global | 7.5 |
| Q2 2009 | 017 | Integracion | 3.0 |
| Q2 2009 | 020 | NSA | 4.8 |
| Q3 2009 | 026 | Kraft | 4.0 |
| Q3 2009 | 028 | IBM/Ameriprise | 3.8 |
| Q4 2009 | 033 | Federal (Microtech) | 9.5 |
| Q4 2009 | 038 | Dell - Morgan Stanley | 4.7 |
| Q4 2009 | 040a | Capax | 6.0 |
| Q4 2009 | 040b | Capax | 4.0 |
| Q4 2009 | 041 | MicroLink/DiscoverTech | 2.0 |
| Q4 2009 | 043 | Poste | 2.2 |
| Q1 2010 | 045 | FSA - Capax | 4.3 |
| Q1 2010 | 046 | PMI (Discover) | 4.2 |
| Q1 2010 | 050 | MicroTech | 11.0 |
| Q1 2010 | 051 | DiscoverTech - Citi 32 cells | 5.5 |
| Q3 2010 | 062 | Poste Italiane - Cyber Crime | 2.4 |
| Q3 2010 | 065 | Amgen | 9.0 |
| Q3 2010 | 069 | Veterans Affairs / National Archive, Big 4, Iron | 10.0 |
| Q4 2010 | 079a | discover tech baml | 7.0 |
| Q4 2010 | 079b | capax baml | 1.7 |
| Q4 2010 | 079c | BAML extra | 3.5 |
| Q4 2010 | 080 | MicroTech doi | 4.0 |
| Q4 2010 | 082 | KPMG | 6.0 |
| Q1 2011 | 085 | Bank of America - MT | 3.9 |
| Q1 2011 | 088 | Mcafee - Capax | 5.0 |
| Q1 2011 | 089 | UBS | 8.0 |
| Q1 2011 | 090 | Bank of Montreal | 2.9 |
| Q1 2011 | 091 | Prisa | 3.6 |
| Q2 2011 | 101 | ABBOTT LABS - dt | 8.6 |
| Q2 2011 | 105 | UBS - capax | 7.7 |
| Q2 2011 | 120 | Dell Hyatt - mt | 5.3 |
| Q2 2011 | 121 | USPS archive - mt | 7.0 |

2.5.9    In correcting these Misstatements, I have reversed the revenue originally recognised by Autonomy in relation to the sale of the software licence to the VAR.  In some instances, Autonomy entered into a direct transaction with the named end-user after the date of the VAR agreement, but did not recognise revenue in relation to these subsequent sales.  In those situations, I have recognised the revenue arising from these subsequent direct sales in accordance with their substance[51].

---

[49] Software Focus Transactions #011 and #040b would have also given rise to Misstatements as they were accounted for as a sale of goods rather than as royalties (see Section 2.8 below)

[50] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to one Software Focus Transaction (not including certain other trivial adjustments)

[51] That is, either as the sale of a good or the provision of a service.  In one transaction, being Software Focus Transaction #038 "*Dell – Morgan Stanley*", the subsequent transaction related to the sale of hardware

## 2.6  My summary conclusions in relation to Misstatements arising from transactions which contained linked or reciprocal transactions

2.6.1   When applying the revenue recognition requirements of IFRS, the criteria are "*usually applied separately to each transaction*"[52].   However, under IFRS, the criteria are applied to two or more transactions together when the transactions are "*linked in such a way that the commercial effect cannot be understood without reference to the series of transactions as a whole*"[53].   IFRS provides an example of a linked transaction: "*an entity may sell goods and, at the same time, enter into a separate agreement to repurchase the goods at a later date, thus negating the substantive effect of the transaction; in such a case, the two transactions are dealt with together*"[54].   When considering whether the revenue recognition criteria should be applied to two or more transactions together, the entity should adopt the approach which provides a faithful representation of the economic substance of the transactions.

2.6.2   I have identified a number of Software Focus Transactions which, pursuant to the requirements of IFRS, should have been considered together with certain other linked transactions entered into by Autonomy.   Further, when considering the linked transactions together, it is clear that the revenue recognition requirements of IFRS were not met and therefore the revenue should not have been recognised.

2.6.3   The evidence I have seen which demonstrates that the Software Focus Transactions should have been considered together with other transactions includes: (i) transactions entered into in close time proximity to each other, negotiated by the same individuals, and their mutual existence is acknowledged in the negotiations[55], (ii) transactions which are economically co-dependant; that is, one party's ability to settle the amounts due to the counterparty in relation to its purchase is wholly dependant upon that party first receiving cash from the counterparty in relation to its sale[56], (iii) a lack of evidence existing (which evidence I would expect to exist) to support the amounts payable by the parties as being fair value[57], and (iv) evidence that the transactions were entered into above the fair value of the products or services sold[58].

---

[52] IAS 18, paragraph 13
[53] IAS 18, paragraph 13
[54] IAS 18, paragraph 13
[55] For example, Software Focus Transaction #081, named "*VMS*" in Q4 2010
[56] For example, Software Focus Transaction #066, named "*Vidient*" in Q3 2010
[57] For example, Software Focus Transaction #071, named "*EMC*" in Q3 2010
[58] For example, Software Focus Transaction #039, named "*file tech*" in Q4 2009

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**Summary of independent expert accounting opinions of Steven Brice FCA**

mazars

2.6.4    The Software Focus Transactions with Misstatements arising from transactions which contained linked or reciprocal transactions are set out in the table below:

**Table 2.9: Software Focus Transactions with Misstatements arising from transactions which contained linked or reciprocal transactions[59,60]**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---|---|---|---|
| Q2 2009 | 019 | VMS | 8.6 |
| Q4 2009 | 036 | Vidient Systems | 2.5 |
| Q4 2009 | 039 | file tech | 8 |
| Q1 2010 | 049 | FileTek | 8.5 |
| Q3 2010 | 066 | Vidient | 2 |
| Q3 2010 | 071 | EMC | 5.7 |
| Q4 2010 | 081 | VMS | 4.8 |
| Q1 2011 | 084 | Tottenham | 6.4 |

2.6.5    In correcting these Misstatements, I have accounted for the linked sales and purchases to and from the same customer as a single transaction.  If this results in an outflow of economic benefit from Autonomy, the revenue recognition criteria of IFRS has not been met, and no revenue is recognised.

## 2.7    My summary conclusions in relation to Misstatements arising from transactions being accounted for as a sale of goods rather than the rendering of services

2.7.1    As I explain above, IFRS distinguishes between revenue derived from the "*sale of goods*" and revenue derived from the "*rendering of services*"[61].  Whilst revenue from the sale of goods is typically recognised under IFRS when the risks and rewards of ownership of the goods are passed to the buyer, where an entity enters into an agreement to perform a service for its customer, IFRS requires the revenue to be recognised over the period in which the services are performed.  Specifically, IFRS requires the entity to apply what is described as the "*percentage of completion*" method[62], subject to which revenue is recognised by reference to the percentage of the work completed at the end of the reporting period.

---

[59] Were it not for the linked transaction, Software Focus Transactions #039, #049, #066 and #071 would have nevertheless given rise to Misstatements as they were accounted for as a sale of goods rather than as royalties (see Section 2.8 below)

[60] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to three Software Focus Transactions (not including certain other trivial adjustments)

[61] IAS 18, paragraph 1

[62] IAS 18, paragraph 20

2.7.2   Moreover, pursuant to IFRS, when services are performed by an indeterminate number of acts over a specified period of time, revenue is recognised on a "*straight-line basis*"[63].  Under the "*straight-line basis*", the total consideration due to the entity for the provision of the service is recognised as revenue evenly over the period in which the service is performed.

2.7.3   During the Relevant Period, Autonomy offered customers what it described as a "*Software-as-a-Service and hosted delivery model in the cloud, where the solution is run on hardware owned by Autonomy in a dedicated data centre*"[64].  From my review of the Software Focus Transactions, it appears that Autonomy's "*hosted delivery model*" included the provision of services related to:

(a)   the hosting and archiving of customer data (such as emails) in data centres owned and operated by Autonomy; and

(b)   the hosting of customer data for the purposes of eDiscovery services.

2.7.4   In certain of the Software Focus Transactions, Autonomy sold both a software licence to a customer and also entered into an agreement with that customer to provide ongoing hosted archiving or hosted eDiscovery services for a set period of time[65].  In these transactions, Autonomy recognised the total consideration[66] it was due to receive in relation to the software licence as revenue as if it were all for the sale of goods.

2.7.5   For these Software Focus Transactions, I have first considered whether the commercial effect of the sale of the software licence can be understood without reference to the ongoing hosting or eDiscovery service.  If the two elements cannot be understood without reference to one another, IFRS requires that the elements be accounted for as a single transaction.  As a result, the consideration payable to Autonomy in relation to the software licence should have been considered a prepayment in relation to future hosted archiving or hosted eDiscovery service, and should have been recognised under IFRS as revenue using the "*percentage of completion*" method over the period for which the hosted services were to be performed.

2.7.6   Determining whether the commercial effect of the sale of the software licence can be understood without reference to the ongoing hosting or eDiscovery service requires a

---

[63] Unless there is evidence that some other method better represents the stage of completion of the service. (IAS 18, paragraph 25)

[64] Autonomy's FY2010 Annual Report and Accounts, page 12.  Autonomy's FY2009 Annual Report and Accounts contained an equivalent description

[65] The actual Software Focus Transaction is invariably the value of the software licence sold to the customer

[66] Less, in many instances, an immaterial carve out of consideration deemed to be attributable to ongoing maintenance and support services Autonomy had also simultaneously undertaken to provide

**mazars**

consideration of the specific events and conditions surrounding each of the Software Focus Transactions.  However, I have seen evidence that, for certain of the Software Focus Transactions, the sale of the software licence was connected to the provision of an ongoing hosted archiving or hosted eDiscovery service (and thus the revenue should have been recognised over the period the services were to be performed).  The evidence I have seen includes:

(a)     evidence that the software sold to the customer was restricted in its use, such that it could only be used by the customer in relation to the ongoing hosting services that Autonomy had simultaneously agreed to provide (or was already providing) to the customer[67];

(b)     evidence that, whilst not restricted in its use, the software sold to the customer was to be used as an element of the ongoing hosting services Autonomy had simultaneously agreed to provide (or was already providing) to the customer, and that it would not make commercial sense for the customer to use it in any other way[68];

(c)     evidence that Autonomy had proposed the sale of the software licence to the customer as part of a restructuring of the customer's pre-existing arrangements for hosting services.  This is especially relevant when (i) the proposed restructure discounted or waived amounts payable by the customer in relation to its pre-existing arrangements for hosting services, with the net effect of the restructure being a projected cash saving to the customer[69,70], (ii) the extent or level of the pre-existing hosted services provided by Autonomy were unaffected by the sale of the software licence to the customer in the proposed restructure, and/or (iii) Autonomy's proposals had identified that the software licence had been included in the restructure because it enabled Autonomy to recognise revenue on the transaction immediately[71];

(d)     evidence that Autonomy's customer considered the specific software licenced to be inconsequential to the transaction, for example (i) evidence that the customer had sought to acquire an ongoing hosted archiving or hosted eDiscovery service, rather

---

[67] For example, Software Focus Transaction #013, named "*BofA*" in Q1 2009
[68] For example, Software Focus Transaction #058, named "*Metlife DS*" in Q2 2010
[69] That is, the cash cost of the software licence plus the anticipated cash cost of the services under the restructured arrangement was less than the anticipated cash cost of the services under the pre-existing arrangement
[70] For example, Software Focus Transaction #086, named "*DB Restructure*" Q1 2011
[71] For example, Software Focus Transaction #077, named "*Amgen*" in Q4 2010

**mazars**

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
**Summary of independent expert accounting opinions of Steven Brice FCA**

than a software licence, or communications from the customer to Autonomy informing Autonomy that it did not intend to use the software licence[72], (ii) evidence that the software licence fee was set before Autonomy and the customer had decided what pieces of software were to be included in the transaction, or that the software licence fee payable by the customer was unaltered by the addition or removal of pieces of software[73], and (iii) evidence that the customer had already acquired a licence for the software, or otherwise had unfettered access to the software, via its previous agreements with Autonomy[74]; and

(e)     evidence that Autonomy internally considered the sale of the software licence incidental to the transaction, for example by internally describing the transaction as "*hosting*", or similar[75].

2.7.7     A Misstatement arises when Autonomy accounted for the sale of software licences and the provision of services separately, despite it not being possible to understand the commercial effect of the series of transactions without reference to one another.   In my opinion, the following Software Focus Transactions gave rise to such Misstatements:

---

[72] For example, Software Focus Transaction #032, named "*Schwab*" in Q4 2009
[73] For example, Software Focus Transaction #087, named "*Morgan Stanley DS*" in Q1 2011
[74] For example, Software Focus Transaction #077, named "*Amgen*" in Q4 2010
[75] For example, Software Focus Transaction #102, named "*JPMC – EDD*" in Q2 2011

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

Table 2.10: Software Focus Transactions with Misstatements arising from transactions being accounted for as a sale of goods rather than the rendering of services[76]

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---|---|---|---|
| Q1 2009 | 013 | BofA | 9.2 |
| Q2 2009 | 022 | JP Morgan Chase | 6.4 |
| Q4 2009 | 032 | Schwab | 3.4 |
| Q4 2009 | 035 | Morgan Stanley | 12.0 |
| Q1 2010 | 048 | B of A | 8.9 |
| Q2 2010 | 053 | BP | 13.5 |
| Q2 2010 | 058 | Metlife DS | 7.0 |
| Q2 2010 | 059 | JPMC | 8.7 |
| Q3 2010 | 063 | Citadel | 3.7 |
| Q3 2010 | 067 | Bank of America | 2.7 |
| Q4 2010 | 076 | Ahold | 2.8 |
| Q4 2010 | 077 | Amgen | 5.7 |
| Q4 2010 | 078 | Bank of America | 2.0 |
| Q1 2011 | 086 | DB Restructure | 7.1 |
| Q1 2011 | 087 | Morgan Stanley DS | 5.0 |
| Q1 2011 | 093 | Johnson & Johnson | 2.3 |
| Q2 2011 | 102 | JPMC - EDD | 2.6 |
| Q2 2011 | 109 | USPS, eDiscovery | 6.3 |
| Q2 2011 | 116 | MetLife | 5.5 |
| Q2 2011 | 117 | National Bank of Canada | 3.0 |

2.7.8    In order to correct these Misstatements, it is necessary to reverse the amount of revenue that had been recognised in relation to the sale of the software licence, and instead recognise the revenue over the period for which Autonomy was providing the hosted archive or hosted eDiscovery service[77].  I also note that under IFRS any income arising from the rendering of services required separate disclosure[78].

## 2.8    My summary conclusions in relation to Misstatements arising from transactions being accounted for as a sale of goods rather than royalties

2.8.1    As I explain above, IFRS distinguishes revenue derived from the "*sale of goods*" from revenue derived from "*the use of an entity's assets*"[79], including the entity's patents, trademarks, copyrights and computer software (so-called "*royalty arrangements*").

---

[76] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to two Software Focus Transactions (not including certain other trivial adjustments)

[77] In doing so, I have applied the guidance of IAS 18.25, insofar as I have recognised the licence fee on a "*straight line*" basis, unless there is evidence that a more appropriate systematic basis might be applied

[78] IAS 18, paragraph 35(b)[ii]

[79] IAS 18, paragraph 1

**mazars**

2.8.2   Under IFRS, revenue earned from royalty arrangements should be recognised on an accrual basis in accordance with the substance of the relevant agreement[80].  For example, if an agreement entitles an entity to receive a five per cent royalty in relation to each sale by a third party, the entity would recognise revenue based on five per cent of total sales made by the third party.

2.8.3   Certain of the Software Focus Transactions relate to royalty arrangements whereby Autonomy granted counterparties the right to sell Autonomy's software, or the right to embed Autonomy's software in its own software for onward sale.  In these Software Focus Transactions relating to royalty arrangements, Autonomy received an up-front, non-refundable payment from the counterparty, against which future royalty payments would offset until the payment was exhausted[81].  Autonomy recognised these up-front payments as revenue at a single point in time, on the date on which it entered the royalty arrangement.

2.8.4   In my opinion these up-front, non-refundable payments were, in substance, the prepayment of royalty fees that were to be earned over the duration of the relevant royalty arrangement. The prepayment of a royalty fee does not alter the substance of the underlying royalty arrangement and therefore revenue from the royalty arrangements should still have been recognised on an accrual basis.

2.8.5   A Misstatement therefore arises for those Software Focus Transactions where Autonomy recognised a prepaid royalty as revenue on the date on which it entered the royalty arrangement, as opposed to recognising revenue from the royalty arrangement on an accrual basis in accordance with the terms of the arrangement.

2.8.6   Further, under IFRS, revenue from royalty arrangements should only be recognised when it is probable that[82]:

(a)   "*the economic benefits associated with the transaction will flow to an entity; and*

(b)   *the amount of revenue can be measured reliably*".

2.8.7   Reliably measuring the amount of revenue that is earned from a royalty arrangement requires the entity to have an appropriate basis from which to measure the amount of revenue.  In my experience, for most royalty arrangements, the basis will be periodic royalty reports shared

---

[80] IAS 18 explains that "*Royalties accrue in accordance with the terms of the relevant agreement and are usually recognised on that basis unless, having regard to the substance of the agreement, it is more appropriate to recognise revenue on some other systematic and rational basis*".  (IAS 18, paragraph 33)
[81] And thereafter, any further royalties would be payable to Autonomy in line with the terms of the agreement
[82] IAS 18, paragraph 29

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

mazars   Summary of independent expert accounting opinions of Steven Brice
FCA

by the counterparty to the reporting entity.  However, other appropriate bases might instead include the entity's experience of similar royalty arrangements.

2.8.8   In the absence of an appropriate basis, the amount of revenue cannot be measured reliably and therefore no revenue should have been recognised.  A Misstatement therefore arises for Software Focus Transactions where Autonomy recognised the full pre-paid royalty as revenue despite not having evidence that the royalty had been earned in accordance with the terms of the contract.  In my opinion, the following Software Focus Transactions gave rise to such Misstatements:

**Table 2.11: Software Focus Transactions with Misstatements arising from transactions being accounted for as a sale of goods rather than royalties**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---|---|---|---|
| Q1 2009 | 012 | Verdasys | 5.0 |
| Q2 2009 | 018 | EMC | 4.7 |
| Q2 2011 | 106 | Rand | 2.3 |

2.8.9   In order to correct these Misstatements, it is necessary to reverse the amount of revenue that had been recognised, and instead recognise the prepaid royalty on an accruals basis.  Unless there is evidence which suggests a more appropriate basis is available[83], I have assumed that the prepaid royalty was earned as revenue evenly over the duration of the arrangement.  I also note that under IFRS any income arising from royalties required separate disclosure[84].

## 2.9   My summary conclusions in relation to Misstatements arising from transactions which contain timing errors

2.9.1   As I explain above, in order to recognise revenue under IFRS, the entity must have transferred to the buyer the "*significant risks and rewards of ownership of the goods*"[85].  IFRS provides examples of situations where an entity might retain the significant risks and rewards of ownership of the goods, including "*when the goods are shipped subject to installation and the installation is a significant part of the contract which has not yet been completed by the entity*"[86].  In such situations, IFRS requires revenue to be deferred until the installation process is complete.

---

[83] For example, periodic reports showing the sales of Autonomy software made by the counterparty, or confirmation from the counterparty as to the value of sales made
[84] IAS 18, paragraph 35(b)[iv]
[85] IAS 18, paragraph 14(a)
[86] IAS 18, paragraph 16(c)

**mazars**

2.9.2    A number of the Software Focus Transactions were sales of goods which included a significant installation process and, in certain instances, it was projected that the installation process would be ongoing for a number of months before the software could "go live". However, Autonomy recognised the revenue from the sale of this software before the installation was complete.  In such instances a Misstatement therefore arises.  In my opinion, the following Software Focus Transactions gave rise to such Misstatements:

**Table 2.12: Software Focus Transactions with Misstatements arising from transactions which contain timing errors[87]**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---------|---|----------------------------------|-------------------------------------------------------------------|
| Q3 2009 | 027 | Pfizer | 4.5 |
| Q4 2009 | 044 | Goldman Sachs | 2.0 |
| Q2 2010 | 057 | BNP Paribas | 2.7 |
| Q3 2010 | 064 | Xcel Energy | 3.2 |
| Q3 2010 | 072 | Mattel | 3.7 |

2.9.3    In order to correct these Misstatements, it is necessary to reverse the amount of revenue that had been recognised, and instead recognise the revenue when the installation was complete.

## 2.10    My summary conclusions in relation to Misstatements arising from transactions which contain errors of valuation

2.10.1    IFRS requires revenue to be recognised at the "*fair value*"[88] of the consideration received or receivable[89].   Whilst in most instances, the fair value of the consideration received or receivable is the amount of cash (or cash equivalents) received, there are exceptions.

2.10.2    Where an entity enters into a transaction with a counterparty which it subsequently acquires (or from whom it subsequently acquires trade and assets)[90], the amount of the cash or cash equivalents receivable in a transaction might not be an indicator of the fair value of consideration.   This is because the parties may be subsidising the transaction via the exchange of consideration notionally related to the business combination.  In such situations, the acquiring entity is therefore required under IFRS to determine[91]:

---

[87] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to two Software Focus Transactions (not including certain other trivial adjustments).  I now do not consider the adjustments in relation to these two Software Focus Transactions necessary

[88] IAS 18 defines fair value as follows: "*Fair value is the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction*".  (IAS 18, paragraph 7)

[89] IAS 18 explains that "*The amount of revenue arising on a transaction is usually determined by agreement between the entity and the buyer or user of the asset. It is measured at the fair value of the consideration received or receivable taking into account the amount of any trade discounts and volume rebates allowed by the entity*".  (IAS 18, paragraph 10)

[90] The acquisition of an entity (or certain trade and assets of an entity) is referred to as a "*Business Combination*"

[91] IFRS 3 "*Business Combinations*" ("**IFRS 3**"), paragraph 51 (with guidance at IFRS 3, paragraph B50)

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

(a)   whether the previous transactions with the acquired entity were separate from the acquisition, or whether, in substance, the transactions formed part of the acquisition; and, if the latter

(b)   what the "*fair value*" of the transactions was, with such amounts included in the total value of the consideration.

2.10.3   When these requirements are applied, parties would be prevented from artificially inflating or deflating the purchase price of an acquisition via the simultaneous transfer of assets at below or above their fair value.

2.10.4   I have identified one Software Focus Transaction in respect of which Autonomy engaged in a number of transactions with a counterparty in the period prior to a business combination.  This resulted in Misstatements as follows:

(a)   Autonomy failed to determine that certain transactions were linked to the business combination, and therefore failed to assess the fair value of the transaction; and

(b)   for transactions which Autonomy did consider to be part of the business combination, the fair value determined by Autonomy was misstated.

2.10.5   In my opinion, the following Software Focus Transactions gave rise to such Misstatements:

**Table 2.13: Software Focus Transactions with Misstatements arising from errors of valuation[92,93]**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---------|-----|----------------------------------|-------------------------------------------------------------------|
| Q2 2011 | 096 | Iron Mountain - OEM | 16.5 |

2.10.6   In order to correct these Misstatements, it is necessary to reverse the amount of revenue that had been recognised, and instead recognise the revenue at its fair value.

---

[92] Notwithstanding the errors of valuation, Software Focus Transaction #096 would have nevertheless given rise to a Misstatement as it was accounted for as a sale of goods despite partially relating to a royalty arrangement (see Section 2.8 above)
[93] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to one Software Focus Transaction (not including certain other trivial adjustments)

mazars

# 3 Summary of my opinion in relation to hardware sales transactions

## 3.1 Introduction

3.1.1 I am instructed to review hardware sales transactions reported by Autonomy during the Relevant Period as revenue and give my opinion on whether these sales were properly accounted for and disclosed in accordance with the applicable accounting standards.  In this section of my report, I provide a summary of my opinion.

## 3.2 The starting point for my analysis: the hardware sales transactions reported by Autonomy as revenue during the Relevant Period

3.2.1 As noted in Section 2 above, using the Quarterly Revenue Breakdowns (which I have found agree to the total revenue reported in the quarterly financial statements), I have identified the revenue reported by Autonomy in each quarter during the Relevant Period (apart from Q3 2011) that arose from hardware sales transactions.  I have identified the hardware sales revenue by comparing transactions in the Quarterly Revenue Breakdowns with the transactions recorded in general ledger[94] account "*470000 – Hardware Revenue – CDF*" (the "**Hardware Ledger**")[95], which, at face value, appears to be the ledger in which Autonomy recorded the revenue from hardware sales transactions.  The Hardware Ledger is helpful because in addition to the relevant customer name, it records other information, such as invoice numbers, that are not recorded on the Quarterly Revenue Breakdowns.  My analysis is provided in Appendix D.

3.2.2 The total revenue reported by Autonomy arising from hardware sales transactions in each period is shown in Table 3.1:

---

[94] The general ledger is the hub of the accounting system, with each general ledger account dedicated to a particular type of transaction (such as revenue from hardware transactions) or to a category of party with whom the entity transacts (such as suppliers or related companies)
[95] I have used downloads from the Autonomy general ledger

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**mazars**   Summary of independent expert accounting opinions of Steven Brice FCA

**Table 3.1: Total revenue arising from hardware sales transactions reported by Autonomy in the Relevant Period (apart from Q3 2011)[96],[97]**

| Quarter | Hardware revenue ($m) |
|---------|----------------------|
| Q1 2009 | 0.0 |
| Q2 2009 | 6.2 |
| Q3 2009 | 38.0 |
| Q4 2009 | 9.4 |
| Q1 2010 | 11.8 |
| Q2 2010 | 31.1 |
| Q3 2010 | 26.8 |
| Q4 2010 | 35.5 |
| Q1 2011 | 20.1 |
| Q2 2011 | 20.9 |
| **Total** | **199.9** |

3.2.3   Given the materiality ranges identified in Table 2.5, with the exception of Q1 2009 (in which no hardware revenue was recognised) the revenue recognised from hardware transactions was material.

3.2.4   According to the Hardware Ledger, the revenue arising from hardware sales transactions is comprised of over 1,000 hardware sales transactions.  In order to address my instructions, it is necessary to identify a smaller population of transactions to focus upon.  I have therefore identified invoices from the Relevant Period (apart from Q3 2011) of more than $1 million[98]. It is these transactions I will focus on in order to address my instructions (the "**Hardware Focus Transactions**")[99],[100].   The Hardware Focus Transactions are summarised by the quarter in which each invoice was posted to the Hardware Ledger in Table 3.2 below and a full list by client and invoice is provided in Appendix E.

---

[96] These are hardware sales of Autonomy, Inc. only.  There are also small amounts of hardware sales in ASL and Autonomy ETalk totalling approximately $3 million over the period Q1 2009 to Q2 2011

[97] I note that hardware revenue in each of Q3 2009, Q4 2009 and Q1 2010 have been updated since my Interim Report.  An explanation of the changes is included in Appendix D

[98] As noted in footnote 14 above, the witness statement of Mr Welham in the High Court Proceedings, dated 14 September 2018, explained that the Deloitte audit team undertook "*audit work in respect of all sales made by Autonomy of more than $1m*".  On the basis that this testing threshold of $1 million is not unreasonable, I have adopted it in my testing of the hardware sales transactions

[99] I do not have a complete population of relevant documents for all of the Hardware Focus Transactions, and I have not identified any documents for one Hardware Focus Transaction

[100] I note that in My Hussain Report I was instructed to "*review the lists identifying Autonomy's Top 40 Contracts and Top 40 Customers provided to HP as part of the due diligence process with my software and hardware samples, noting any apparent omissions from those lists*" (My Hussain Report, paragraph 1.2.3(e)).  I noted three hardware transactions which were omitted from the Top 40 Contract list and 10 customers omitted from the Top 40 Customer list.  The three hardware transactions which were omitted remain Hardware Focus Transactions and therefore my conclusions in this regard have not changed

**mazars**

Table 3.2: Summary of the Hardware Focus Transactions[101]

| Quarter | Total value of Hardware Focus Transactions ($m) |
|---------|------------------------------------------------|
| Q3 2009 | 34.2 |
| Q4 2009 | 3.5 |
| Q1 2010 | 14.3 |
| Q2 2010 | 15.2 |
| Q3 2010 | 12.0 |
| Q4 2010 | 17.1 |
| Q1 2011 | 7.5 |
| Q2 2011 | 7.9 |
| **Total** | **111.7** |

3.2.5     Autonomy therefore reported total revenue relating to the Hardware Focus Transactions during the Relevant Period (apart from Q3 2011) of $111.7 million.  This is around 5.4%[102] of the total revenue reported by Autonomy in these quarters during the Relevant Period.

## 3.3     Overview to my summary conclusions

3.3.1     For each of the Hardware Focus Transactions, I have sought to identify contemporaneous information pertaining to the transaction in order to understand its underlying substance and economic reality.  This information primarily comprises:

(a)        documents sent between Autonomy and its hardware suppliers, such as agreements, quotes, purchase orders, and invoices;

(b)        documents sent between Autonomy and its customers, such as agreements, quotes, purchase orders and invoices and delivery documents;

(c)        audit working papers where relevant; and

(d)        general ledger postings (including the Hardware Ledger) and other underlying accounting information.

3.3.2     In summary, I understand from the contemporaneous information that:

(a)        the majority of transactions recorded in the Hardware Ledger appear to be simply resales to customers of products purchased from third parties (such as Dell or EMC).

---

[101] It is apparent that in, for example, Q1 2010, the total value of the Hardware Focus Transactions is greater than the total hardware revenue in Q1 2010.  This is because I have selected the Hardware Focus Transactions from invoices posted in each quarter.  Journals also posted to the Hardware Ledger in Q1 2010 reduce the total quantum of invoices posted in this quarter
[102] Being $111.7 million / $2,086.1 million

**mazars**

I have not seen any evidence to suggest that Autonomy software was loaded onto this hardware before its onward sale to a third party customer;

(b)   the products purchased from third parties were mostly hardware products although, in certain transactions, part of the products sold appear to have been third party software;

(c)   most of these sales were made at a loss to Autonomy, because the price at which the hardware was sold by Autonomy was less than the price at which it had been purchased;

(d)   initially, the cost of purchasing the hardware was primarily reported in Autonomy's quarterly financial statements in both "*Cost of revenues*" and "*Sales and marketing*" costs (often applying a 50:50 split).  In mid-2010 the practice changed and most of the cost of purchasing the hardware was reported as a "*Cost of revenues*" with primarily just the loss that Autonomy made on each sale being reported as "*Sale and marketing*" costs; and

(e)   journals posted in the Hardware Ledger moved the recognition of revenue from hardware sales transactions between quarters.

3.3.3   Having identified the underlying substance and economic reality of the Hardware Focus Transactions[103], I have then considered whether these transactions were properly accounted for and disclosed in accordance with IFRS.  Based upon the information I have seen, my overview conclusions are as follows:

(a)   in breach of the requirements of IFRS, Autonomy inappropriately accrued or deferred the recognition of revenue arising from certain hardware sales transactions between reporting periods.  In addition, Autonomy recognised revenue for certain hardware sales before the revenue recognition criteria of IFRS had been met.  This led to material misstatements in the revenue reported by Autonomy during the Relevant Period;

(b)   in breach of the requirements of IFRS, Autonomy inappropriately reported part of the cost of purchasing the hardware as being a cost of "*Sales and marketing*".  This led to material misstatements in the reported "*Cost of revenues*" (and thus the

---

[103] For those Hardware Focus Transactions where sufficient relevant documents were provided to me

mazars

computed "*Gross profit*"), as well as a material misstatement in the reported cost of "*Sales and marketing*"; and

(c)     in breach of the requirements of IFRS, Autonomy did not make any disclosure about the existence of a material amount of revenue arising from hardware sales transactions.

3.3.4   I address each of these areas in turn in Sections 3.4 to 3.6 below.

## 3.4   My summary conclusions in relation to the inappropriate accrual or deferral of revenue arising from hardware sales transactions between reporting periods and the inappropriate early recognition of hardware sales

3.4.1   The recognition of revenue from the sale of goods is required by IFRS to take place on the date that the transfer of the "*significant risks and rewards of ownership of the goods*" takes place[104].  In most cases, the date of the transfer of the risks and rewards of ownership of the goods "*coincides with the transfer of the legal title or the passing of possession to the buyer*"[105].

3.4.2   In the Hardware Ledger, there are a number of journals which defer revenue recorded following the posting of invoices for specific named customers to the subsequent quarter.  In addition, in four quarters journals were posted which either accrued revenue for unnamed customers (that is, brought forwards the date on which the revenue was reported) or deferred revenue from unnamed customers (that is, delayed the date on which the revenue was reported), as follows[106]:

(a)     two journals meant that $6.2 million of revenue was accrued and recognised in Q2 2009 rather than in Q3 2009;

(b)     two journals meant that $7.7 million of revenue was deferred and not recognised in Q1 2010 and instead was recognised in Q2 2010;

(c)     one journal meant that $7.8 million of revenue was deferred and not recognised in Q2 2010 and instead was recognised in Q3 2010; and

---

[104] IAS 18, paragraph 14
[105] IAS 18, paragraph 15
[106] Hardware Ledger

**mazars**

(d)     one journal meant that $3.9 million of revenue was deferred and not recognised in Q1 2011 and instead was recognised in Q2 2011.

3.4.3    In practice, there are various reasons why an entity might appropriately post journals which have the result of accruing or deferring revenue between reporting periods.  For example:

(a)     an entity may accrue revenue (that is bring forwards the reporting of revenue) because the relevant posting in the ledger had not been made (perhaps because there had been a delay in the issuance of the invoice) but the goods had been delivered and the revenue recognition criteria of IFRS had been met; and

(b)     an entity may defer revenue (that is delay the recognition of the revenue) because there had been a delay in the delivery of the goods meaning that the revenue recognition criteria of IFRS had not been met at the period end.

3.4.4    I have sought to review the information underpinning the sales transactions that were accrued or deferred from one period to another, and I have identified that, in certain instances, journals or other entries posted by Autonomy were not appropriate.  These journals meant that revenue arising from hardware sales was misstated in two reporting periods; the period in which the income is recognised was overstated and the period in which the revenue should have been reported was understated.  In addition, the available evidence around shipment and delivery for some of my Hardware Focus Transactions demonstrates that revenue was recognised before the revenue recognition criteria of IFRS were met.  Where the quantum of any such misstatements is material, the financial statements cannot be said to have been prepared in accordance with IFRS.

3.4.5    I provide examples below:

Example of inappropriate accrual of income: the reporting of $6.0 million of revenue in Q2 2009 rather than Q3 2009

3.4.6    Autonomy accrued $6 million in the Hardware Ledger in Q2 2009 and recognised this as revenue (rather than in Q3 2009).  This revenue represents a sale by Autonomy to Morgan Stanley of $6 million of Hitachi Data Systems ("**HDS**") hardware which was ordered by Morgan Stanley[107], invoiced to Morgan Stanley by Autonomy[108], shipped to Morgan Stanley[109] and invoiced by HDS to Autonomy[110] all in Q3 2009.  The revenue recognition criteria of IFRS

---

[107] HP-SEC-01654186-01654188
[108] HP-SEC-01654189
[109] HP-SEC-01654198-01654212 and HP-SEC-01654193-01654196
[110] HP-SEC-01654191

were therefore not met until Q3 2009 and revenue should not have been recognised until this quarter.  The sales invoice was posted to the Hardware Ledger in Q3 2009, but the reversal of the accrual recognised in Q2 2009 meant that the net impact on revenue in Q3 2009 was $0.

3.4.7   In conclusion, revenue in Q2 2009 was overstated by $6 million and revenue in Q3 2009 was understated by $6 million.  More detail about this transaction is provided in Appendix G.

Example of inappropriate deferral of income: the reporting of $5.6 million of revenue in Q3 2010 rather than Q1 2010

3.4.8   Two journals posted to the Hardware Ledger in Q1 2010 had the effect of deferring $7.75 million of sales from Q1 2010 to a later quarter, including $5.6 million resales of HDS hardware to Morgan Stanley[111].  This deferral of revenue from the resale of HDS hardware to Morgan Stanley comprised 23 separate invoices.  These are listed on an Autonomy tracking spreadsheet that also records the date the products were delivered against each invoice[112]. The products for each of these 23 invoices were delivered in Q1 2010.

3.4.9   One of these invoices is over $1 million in value and therefore was one of my Hardware Focus Transactions.  The documents available to me for this transaction show that in Q1 2010:

(a)     HDS provided a quote to Autonomy[113];

(b)     Morgan Stanley issued a purchase order to Autonomy[114];

(c)     Autonomy issued a purchase order to HDS[115];

(d)     the products were shipped to Morgan Stanley[116];

(e)     Autonomy issued its invoice to Morgan Stanley[117]; and

(f)      HDS issued its invoice to Autonomy[118].

---

[111] The two journals deferred revenue of $4.47 million and $3.28 million, in total $7.75 million.  A breakdown of the revenue deferred between customers is provided in the attachment to Mr Chamberlain's email to Cynthia Watkins on 8 April 2010. (HP-SEC-00100357-00100359)
[112] HP-SEC-01855197
[113] HP-SEC-01655154
[114] HP-SEC-01655149-01655150
[115] HP-SEC-01655152
[116] HP-SEC-01655153
[117] HP-SEC-01655147
[118] HP-SEC-01655155

**mazars**

3.4.10   The Master Purchase Agreement between Autonomy and Morgan Stanley dated 30 June 2009 states that title and risk of loss passes to Morgan Stanley upon shipment from the manufacturer and that the products are deemed accepted upon delivery to the specified address[119].  It is evident therefore that the revenue recognition criteria of IFRS were met in Q1 2010 and revenue should have been recognised in this quarter.  Given the remaining 22 invoices were also shipped in Q1 2010 and would have been covered by the same Master Purchase Agreement, it is reasonable in my opinion to assume that each of these sales also met the IFRS revenue recognition criteria in Q1 2010 and should have been recognised in this quarter.  Accordingly, revenue in Q1 2010 was understated by $5.6 million and revenue in Q3 2010 was overstated by this amount.

3.4.11   In Q2 2010, whilst the two journals referred to were reversed, a separate journal deferred $7.83 million of revenue from Q2 2010 to Q3 2010.  The $5.6 million of sales to Morgan Stanley were part of this deferral and therefore ultimately this revenue was not recognised until Q3 2010.

3.4.12   Deloitte included the transaction that is one of my Hardware Focus Transactions (and one other from the $5.6 million total) in its Q3 2010 hardware revenue testing and concluded that in their opinion the revenue should have been recognised in Q1 2010[120].

Example of inappropriate recognition of revenue before the revenue recognition criteria of IFRS had been met (1)

3.4.13   The deferral of $7.75 million referred to in paragraph 3.4.8 above also included the deferral of a $1.31 million sale of Dell hardware to SHI, with reference "WHE5P".  The attachment to Mr Chamberlain's email to Cynthia Watkins[121] demonstrates that as at 7 April 2011, it was intended that both this sale and a second sale of Dell hardware to SHI for $1.3 million with reference "WHE5Q" should be deferred, but one day later only WHE5P was to be deferred.

3.4.14   The documents available for these two transactions are summarised in Appendix G.  I conclude that the revenue recognition criteria of IFRS were not met with regards to either of these two sales in Q1 2010, specifically that the risks and rewards of ownership had not transferred to the buyer at 31 March 2010 because delivery of the hardware did not take place until April 2010.   Accordingly, an additional $1.31 million in revenue should have been deferred from Q1 2010 to Q2 2010.

---

[119] HP-SEC-01654676-01654684, clause 2 and clause 5
[120] Deloitte working paper "Q3-8130 Hardware Testing.xls"
[121] HP-SEC-00100357-00100359

**mazars**

*Example of inappropriate recognition of revenue before the revenue recognition criteria of IFRS had been met (2)*

3.4.15   Revenue of $2.524 million for a hardware sale to SHI was recognised in Q1 2011.  Documents relevant to this transaction are summarised in Appendix G.

3.4.16   Whilst the hardware had not been delivered until early Q2 2011, the quote provided by Autonomy to SHI provided that title passed to SHI from Autonomy upon Dell's delivery at Dell's plant to a common carrier and that Autonomy was responsible for delivering the products to SHI[122].

3.4.17   An email chain between Julia Perez of Dell and Jeffrey Guido of Autonomy[123] clearly sets out that on 31 March 2011 the hardware was in transit from a Dell facility in China to a Dell facility in Nashville where it would be processed, packaged and shipped.  In my view it is clear that as at 31 March 2011, the hardware had not been delivered by Dell to a common carrier and accordingly, the revenue recognition criteria of IFRS had not been met.  I therefore consider this revenue should not have been recognised until Q2 2011.

*Example of inappropriate recognition of revenue before the revenue recognition criteria of IFRS had been met (3)*

3.4.18   Revenue of $2.650 million for a hardware sale to SHI was recognised in Q2 2011.  Documents relevant to this transaction are summarised in Appendix G.

3.4.19   The purchase order reference for this sale was WHZM2[124] and an email from Julia Perez of Dell to Stephen Chamberlain and Poppy Prentis of Autonomy on 14 July 2011 states that order WHZM2 is "*in production – eta for orders to ship is 7/29*"[125].

3.4.20   The quote provided by Autonomy to SHI provided that title passed to SHI from Autonomy upon Dell's delivery at Dell's plant to a common carrier and that Autonomy was responsible for delivering the products to SHI[126].  However, it is apparent from the email referred to above the hardware was still in production and so cannot have been delivered by Dell to a common carrier as at 30 June 2011 and accordingly, the revenue recognition criteria of IFRS had not been met.  I therefore consider this revenue should not have been recognised until Q3 2011.

---

[122] HP-SEC-01654950-01654952
[123] HP-SEC-01654955-1654956
[124] HP-SEC-01654642
[125] HP-SEC-01867367
[126] HP-SEC-01654637-01654639

**mazars**

Video Monitoring Services ("**VMS**")

3.4.21    In addition to the examples of hardware revenue recognised in the wrong accounting quarter that are summarised above, the revenue attributable to hardware sales to VMS in Q4 2010 is considered to be overstated by $3.4 million.

3.4.22    These sales are linked to one of my Software Focus Transactions (SW-10-081 Video Monitoring Systems).  In that Appendix I conclude that three transactions between Autonomy and VMS are linked and that the net inflow of economic benefit to Autonomy across all three transactions of $2,604,066 should be allocated to the hardware sale.  Accordingly, revenue of $6 million recognised for these sales in Q4 2010 should be reduced by $3.4 million.

3.4.23    More detail is provided in Appendix G.

## 3.5    My summary conclusions in relation to the inappropriate reporting of all or part of the cost of purchasing the hardware as being a "*Sales and marketing*" expense

3.5.1    My review of the available information has identified that Autonomy reported part of the cost of purchasing the hardware that it would then sell to third parties as being a "*Sales and marketing*" expense[127].

3.5.2    In my view, pursuant to the requirements of IFRS, the cost to Autonomy of purchasing the hardware should have been reported as a "*Cost of revenues*" and not as a "*Sales and marketing*" expense for the following reasons:

(a)      pursuant to IFRS, "*inventories*" are assets "*held for sale in the ordinary course of business*"[128] and specifically "*encompass goods purchased and held for resale*"[129]. It is therefore clear that where goods are held at the end of the reporting period, this should be reported as part of inventory.  A reporting entity is required by IFRS to report in its financial statements the "*amount of inventories recognised as an expense during the period*"[130], and IFRS notes that this is "*often referred to as cost of sales*"[131].  In my view, "*cost of sales*" is analogous with "*cost of revenues*", being the term that Autonomy used.  Therefore, Autonomy was required to report as part

---

[127] For example, as described in the "*Strategic Deals Memorandum*", DEL00100362-DEC00100369

[128] IAS 2 "*Inventories*" ("**IAS 2**"), paragraph 6 defines inventories as follows: "*Inventories are assets: (a) held for sale in the ordinary course of business; (b) in the process of production for such sale; or (c) in the form of materials or supplies to be consumed in the production process or in the rendering of services*"

[129] IAS 2, paragraph 8

[130] IAS 2, paragraph 36(d)

[131] IAS 2, paragraph 38

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of independent expert accounting opinions of Steven Brice
FCA

mazars

of its "*Cost of revenues*" the cost of all inventory (goods purchased and held for resale) recognised as an expense; and

(b)    in its 2010 consolidated financial statements Autonomy disclosed that:

    (i)    "*Cost of revenues*" included the "*costs of product media, product duplication, hardware and manuals*"[132], confirming that the cost of purchasing hardware for resale should be included in this cost component; and

    (ii)    "*sales and marketing costs comprise the costs of the sales force, commissions and costs of promoting new products and entering into new markets*"[133], confirming that the cost of hardware should not be included in this cost component.

3.5.3    I note that I have seen evidence that Autonomy justified its practice to report the cost of hardware as a cost of "*Sales and marketing*" by reference to there being a strategic partnership in place with the hardware suppliers[134].  However:

(a)    my review of the available information suggests that no such strategic partnership was in place – the transactional documents appear to reflect the buying and selling of hardware.  Where contemporaneous documents refer to the potential for marketing, this appears to be from Autonomy's perspective[135] or is at the sole discretion of the hardware supplier[136]; and

(b)    if, pursuant to a strategic partnership agreement, marketing was undertaken by the hardware supplier in addition to its supply of the hardware goods (and I have seen no evidence to suggest this was the case), the fair value of these services could be reported as part of the cost of "*Sales and marketing*" if the component of that cost could be reliably measured.  It would also need appropriate disclosure (including in the accounting policies reflected above).

3.5.4    As a result, in my view, the "*Cost of revenues*" in Autonomy's quarterly financial statements were understated and the reported costs of "*Sales and marketing*" were overstated.  Further, the computed gross profit and gross profit margin (which are both important measures of

---

[132] Autonomy's FY2010 Annual Report and Accounts, page 51
[133] Autonomy's FY2010 Annual Report and Accounts, page 52
[134] For example, as described in the "*Strategic Deals Memorandum*", DEL00100362-DEC00100369
[135] For example, the purchase orders issued by Autonomy to Dell, such as US-PWC 00002646
[136] For example, the "Joint Marketing Efforts" clause in Attachment B to the Value Added Reseller Agreement between Dell and Autonomy.  (US-PWC 00002327-00002338)

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

mazars

profitability) were also misstated.   Importantly, I have seen evidence that the users of the financial statements were particularly interested in the gross profit margin – for example in an earnings conference call from Q2 2010 an analyst at Piper Jaffray asked "*you saw that spike in appliance sales, that inventory moving through.  Did that have any gross margin impact?*" and an analyst at Nomura International asked "*I just wanted to come back to the gross margin* […] *So, is it possible that you might get in Q3/Q4 more of slightly lower margin hardware-related deals?*"[137].

## 3.6    My summary conclusions in relation to Autonomy's failure to disclose the existence of a material amount of hardware sales transactions

3.6.1   Autonomy's financial statements disclose that the "*group is a software business*"[138] and do not make reference to Autonomy's sales of hardware products.  Importantly, the nature and economic realities of Autonomy's software sales transactions were significantly different to the nature and economic realities of Autonomy's hardware sales, for example:

(a)     whilst Autonomy described that its software business had a fixed cost base[139], which means that incremental revenue is additive to reported profit, the cost base for hardware sales was clearly not fixed (because every incremental sale required Autonomy to purchase the goods)[140]; and

(b)     whilst software was a high margin business, it is clear from my analysis of the Hardware Focus Transactions that the hardware business was a low margin business (and most of the Hardware Focus Transactions were actually loss making).

3.6.2   In addition to the significant difference between the two business models including a different nature and economic reality to the relevant transactions, by reference to the materiality thresholds in Table 2.5 the quantum of hardware sales was material.

3.6.3   Given the above, pursuant to the requirements of IFRS, Autonomy should have disclosed the existence of a material amount of revenue being generated from hardware sales transactions, which were significantly different in nature and economic reality to the software sales transactions that were described in the financial statements.  My conclusion is based upon the following:

---

[137] EMC-HP-026620 and EMC-HP-026623
[138] Autonomy's FY2010 Annual Report and Accounts, page 58
[139] "*A significant proportion of the group's cost base is fixed*".  (Autonomy's FY2010 Annual Report and Accounts, page 58)
[140] "*the business model drives enhanced performance though growing sales*".  (Autonomy's FY2010 Annual Report and Accounts, page 58)

(a)    IFRS requires "*fair presentation*", including the "*faithful representation*" of the effects of transactions[141].   In particular, fair presentation requires an entity to provide additional disclosures to "*enable users to understand the impact of particular transactions*"[142].   Without a separate disclosure in relation to the hardware sales transactions, users would not be able to understand their impact;

(b)    IFRS requires that an entity should "*present separately items of a dissimilar nature or function unless they are immaterial*"[143].   The hardware sales transactions were clearly items of a dissimilar nature and were material, and therefore should have been presented separately;

(c)    the Conceptual Framework to IFRS requires:

   (i)    financial statements to "*represent economic phenomena in words and numbers*"[144] and for this information to not only represent relevant phenomena, but it must also "*faithfully represent the phenomena that it purports to represent*"[145].   The representation of a material amount of hardware sales as being software sales is not a faithful representation; and

   (ii)   financial statements to be "*complete*"[146] in that they include "*all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations*"[147].   Of particular relevance to the hardware sales transactions, the Conceptual Framework further provides that "*For some items, a complete depiction may also entail explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature*"[148].   Explanations regarding the hardware sales transactions were therefore required in order to enable the users of the financial statements to understand how Autonomy was generating its revenue;

---

[141] IAS 1, paragraph 15
[142] IAS 1, paragraph 17(c)
[143] IAS 1, paragraph 29
[144] Conceptual Framework, paragraph QC12; equivalent guidance on "*Faithful Representation*" and "*Substance over form*" is found at paragraphs 33 to 35 of the Framework
[145] Conceptual Framework, paragraph QC12
[146] Conceptual Framework, paragraph QC12; equivalent guidance on "*Completeness*" is found at paragraph 38 of the Framework
[147] Conceptual Framework, paragraph QC13
[148] Conceptual Framework, paragraph QC13

**mazars**

(d)     IFRS required Autonomy to disclose the amount of revenue included in "*each significant category of revenue*"[149].   In my view, revenue from hardware sales transactions was a significant category of revenue and therefore required separate disclosure[150];

(e)     IFRS required Autonomy to disclose the amount of hardware inventory they had recognised as an expense during the period[151]; and

(f)     IFRS requires a reporting entity to disclose separate financial information (including revenue and segment profits) for each "*operating segment*"[152].   Had this information for hardware sales transactions been disclosed, the information would certainly have been helpful for the users of the accounts because it would have enabled them to understand the nature and financial effects of these transactions.   Autonomy would have been required to disclose this information if Dr Lynch, the chief operating decision maker of Autonomy[153], regularly reviewed the operating results relating to hardware in order to assess performance.   Even if Dr Lynch did not regularly review the operating results relating to hardware, meaning that Autonomy only had one operating segment, Autonomy was required by IFRS to report the revenues for "*each product and service, or each group of similar products and services*"[154].   This therefore required Autonomy to separately disclose the revenues for hardware sales[155].

---

[149] "*An entity shall disclose: (a) the accounting policies adopted for the recognition of revenue, including the methods adopted to determine the stage of completion of transactions involving the rendering of services; (b) the amount of each significant category of revenue recognised during the period, including revenue arising from: (i) the sale of goods; (ii) the rendering of services; (iii) interest; (iv) royalties; (v) dividends; and (c) the amount of revenue arising from exchanges of goods or services included in each significant category of revenue*".  (IAS 18, paragraph 35)

[150] I note irrespective of whether hardware sales are considered to be a "*significant category of revenue*", in my opinion disclosure is required under IFRS 8 paragraph 32 for each product and service (or each group of similar products and services).  Further, IAS 1.17(c) requires an entity to provide additional disclosures to "*enable users to understand the impact of particular transactions*" and ensure a fair presentation

[151]  "*The financial statements shall disclose… (d) the amount of inventories recognised as an expense during the period*".  (IAS 2, paragraph 36)

[152] IFRS 8 "*Operating segments*" ("**IFRS 8**"), paragraph 5

[153] Autonomy's FY2010 Annual Report and Accounts, page 58

[154] IFRS 8, paragraph 32

[155] The only reason for not doing so, per paragraph 32 of IFRS 8, is if "*the necessary information is not available and the cost to develop it would be excessive, in which case that fact shall be disclosed*".  Not only was there no disclosure that the information on hardware revenues was not available, this information was clearly available as it was recorded separately in the Hardware Ledger

**mazars**

# 4    My summary conclusions in relation to the revenue streams reported by Autonomy from Q1 2010 onwards

## 4.1    Introduction

4.1.1    I am instructed to review the revenue streams reported by Autonomy during the Relevant Period and give my opinion on whether the description of these streams is consistent with the nature of the underlying transactions.  In this section of my report I provide a summary of my opinion.

## 4.2    The starting point for my analysis: the revenue streams reported by Autonomy in its commentary to the market

4.2.1    From Q1 2010 onwards, Autonomy reported the following revenue streams in the financial information published with or alongside its quarterly and annual financial statements[156]:

    (a)    "*IDOL Product*", which is described as licensed software paid for up-front with an ongoing support and maintenance stream;

    (b)    "*IDOL Cloud*", which is described as a Software-as-a-Service (SaaS) model;

    (c)    "*IDOL OEM*", which is where Autonomy's IDOL is embedded inside other software companies' products;

    (d)    "*Deferred revenue release*", which stems from support and maintenance contracts recognised in arrears; and

    (e)    "*Services*", which relate to third party and internal implementation consultants and training[157,158].

4.2.2    The sum of the revenues reported in these revenue streams agrees to the total revenues reported by Autonomy in its quarterly financial statements, as shown for the period Q1 2010 to Q2 2011 in the table below:

---

[156] These revenue streams were not reported in Autonomy's annual or quarterly financial statements themselves

[157] Refer to the Autonomy presentation "*Q3 09 Results 20 October 2009*" (HP-SEC-00025157-HP-SEC-00025179) for Autonomy's first identification of these revenue streams

[158] Given the low monetary value and nature of this revenue stream I have done no further analysis in respect of services

**Table 4.1: Quarterly breakdown of revenue across the reported revenue streams from Q1 2010 to Q2 2011**

| $m | Q1 2010 | Q2 2010 | Q3 2010 | Q4 2010 | Q1 2011 | Q2 2011 |
|---|---|---|---|---|---|---|
| IDOL Product | 46.0 | 62.4 | 58.3 | 84.3 | 54.4 | 68.5 |
| IDOL Cloud | 45.5 | 46.9 | 46.6 | 50.6 | 52.7 | 64.3 |
| IDOL OEM | 29.1 | 37.5 | 31.2 | 34.5 | 37.2 | 47.2 |
| Services | 11.4 | 10.9 | 10.2 | 9.5 | 9.0 | 8.8 |
| Deferred revenue release | 62.2 | 63.4 | 64.3 | 65.6 | 66.5 | 67.5 |
| **Total** | **194.2** | **221.1** | **210.6** | **244.5** | **219.8** | **256.3** |

4.2.3   The table above illustrates that the total of the recurring revenue streams, reported as IDOL Cloud and IDOL OEM, were generally increasing across the period, whereas IDOL Product revenue was fluctuating.  Additionally, the total reported IDOL Cloud and IDOL OEM revenues were 162.3% of IDOL Product revenues in Q1 2010 and 162.8% of reported IDOL Product revenues in Q2 2011 (with a peak of 165.1% in Q1 2011).

## 4.3   Applicable financial reporting requirements

4.3.1   The above-mentioned revenue streams were not reported in Autonomy's quarterly financial statements themselves but were instead disclosed to the market within the accompanying management commentary provided by Autonomy[159] alongside its quarterly financial statements.

4.3.2   Given Autonomy was listed on the London Stock Exchange, it was required to comply with the requirements of the Disclosure and Transparency Rule ("**DTR**").  The DTR:

(a)   required that Autonomy prepare a management report to accompany its annual financial statements.  Such management reports were required to provide a fair review of the business, including a balanced and comprehensive analysis of the financial performance[160];

(b)   required that Autonomy prepare a management report to accompany its interim financial statements[161].  Autonomy was required to also provide a responsibility

---

[159] For example by way of financial information published with its quarterly and annual financial statements, trading updates, results presentations, or investor Q&As

[160] "*The management report must contain: 1. a fair review of the issuer's business; and 2. a description of the principal risks and uncertainties facing the issuer.  The review required by DTR 4.1.8 R must: 1. be a balanced and comprehensive analysis of: a) the development and performance of the issuer's business during the financial year; and b) the position of the issuer's business at the end of that year, consistent with the size and complexity of the business; 2. include, to the extent necessary for an understanding of the development, performance or position of the issuer's business: a) analysis using financial key performance indicators; and b) where appropriate, analysis using other key performance indicators including information relating to environmental matters and employee matters; and 3. include references to, and additional explanations of, amounts included in the issuer's annual financial statements, where appropriate*".  (DTR, paragraphs 4.1.8 and 4.1.9)

[161] DTR, paragraph 4.2.7

statement attesting that the management report provided a fair review of the information required[162]; and

(c)      required Autonomy to make interim management statements within the first and second six months of its financial year[163], which were required to provide *inter alia* a general description of the financial performance during the relevant period[164]. Such statements, like all disclosures to the market, were covered by the requirement of the DTR that issuers take reasonable care to ensure that any information reported is not "*misleading, false or deceptive*"[165].

4.3.3      Further, it is my view that the above-mentioned revenue streams were an element of Autonomy's "*other financial reporting*", which is explained in the Preface to IFRS as being "*information provided outside financial statements that assists in the interpretation of a complete set of financial statements that assists in the interpretation of a complete set of financial statements or improves users' ability to make efficient economic decisions*"[166].

4.3.4      The Conceptual Framework explains that a fundamental qualitative characteristic of useful financial information is that it faithfully represents what it purports to represent[167], and is "*complete, neutral, and free from error*"[168].  As such, it is my opinion that the revenue streams reported by Autonomy to the market in its "*other financial reporting*" should have reflected Autonomy's definitions of those revenue streams.

4.3.5      Finally, I note that pursuant to the Companies Act 2006, Autonomy was required to prepare a fair review of its business and a balanced and comprehensive analysis of its financial performance[169].  In my opinion, this requirement is again consistent with a requirement that

---

[162] DTR, paragraph 4.2.10(3)

[163] DTR, paragraph 4.3.2

[164] DTR, paragraph 4.3.5

[165] DTR, paragraph 1.3.4

[166] Preface to IFRS, paragraph 7

[167] Conceptual Framework, paragraph QC4; equivalent guidance on "*Faithful Representation*" and "*Substance over form*" is found at paragraphs 33 to 35 of the Framework

[168] Conceptual Framework, paragraph QC12

[169] "*The business review must contain – a) a fair review of the company's business, and b) a description of the principal risks and uncertainties facing the company.  The review required is a balanced and comprehensive analysis of – a) the development and performance of the company's business during the financial year, and b) the position of the company's business at the end of that year, consistent with the size and complexity of the business.  In the case of a quoted company the business review must, to the extent necessary for an understanding of the development, performance or position of the company's business, include – a) the main trends and factors likely to affect the future development, performance and position of the company's business; and […] the review must, where appropriate, include references to, and additional explanations of, amounts included in the company's annual accounts*".  (Companies Act 2006, Section 417)

**mazars**

the revenue streams reported by Autonomy to the market in its "*other financial reporting*" should have reflected Autonomy's definitions of those revenue streams[170].

## 4.4   Overview to my summary conclusions

4.4.1   In my opinion, the revenue streams disclosed in Autonomy's "*other financial reporting*" did not faithfully represent the nature of the revenues generated by Autonomy, and did not constitute a fair and balanced analysis of Autonomy's financial performance.   I have reached this conclusion because:

(a)      certain Software Focus Transactions were reported as having generated IDOL OEM revenues, despite those Software Focus Transactions not matching Autonomy's depiction of the IDOL OEM revenue stream[171].   I note that for certain of these Software Focus Transactions I have proposed adjustments which would reduce the revenue recognised;

(b)      certain Software Focus Transactions were inappropriately reported as having generated IDOL Cloud revenues, despite those Software Focus Transactions not meeting Autonomy's depiction of the IDOL Cloud revenue stream.   I note that for certain of these Software Focus Transactions I have proposed adjustments which would reduce the revenue recognised;

(c)      sales of hardware were reported as having generated IDOL Product revenues, despite hardware sales not meeting Autonomy's depiction of the IDOL Product revenue stream; and

(d)      revenues associated with certain transactions were reported within both the IDOL OEM and IDOL Cloud revenue streams or within both IDOL OEM and deferred revenue release revenue streams[172].

---

[170] Moreover, I note that auditors performing reviews or audits or annual or quarterly information were required to review accompanying financial information to identify material inconsistencies between that information and the information presented in the quarterly or annual financial statements themselves.   (ISRE 2410 "*Review of Interim Financial Information Performed by the Independent Auditor of the Entity*" and ISA 720 A "*Other information and documents containing audited financial statements*")
[171] I note that throughout the Relevant Period, Autonomy reported revenue arising from its OEM business using various terms, including: "*IDOL OEM*", "*OEM derived revenues*" and "*IDOL OEM derived revenues*"
[172] And, as a consequence, were excluded from the IDOL Product revenue stream

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**mazars**   Summary of independent expert accounting opinions of Steven Brice FCA

## 4.5   My summary conclusions in relation to the reporting of the IDOL OEM revenue stream

4.5.1   "*IDOL OEM*" is not a term which is defined in IFRS.  However, in its "*other financial reporting*", Autonomy depicted its IDOL OEM revenue stream in the following ways:

(a)   in its presentation titled "*Q3 09 Results 20 October 2009*"[173], Autonomy described its "*OEM Dev*" revenue as comprising "*a development licence fee that is paid upfront and is non-refundable*" and "*OEM Ongoing*" revenue as "*Revenues from sales of OEMs' products*";

(b)   in its document "*Investor Relations Bulletin: 19 October 2010*"[174], Autonomy explained that "*IDOL OEM revenues do not generate deferred revenue as the royalties are paid quarterly in arrears*";

(c)   in its "*Financial Overview*" provided alongside the financial statements for the year ended 31 December 2010[175], Autonomy explained that "*IDOL OEM is where Autonomy's IDOL is embedded inside other software companies' products. IDOL is now embedded in most major software companies' products addressing most software vertical markets.  This is a particularly important revenue stream as it generates ongoing business across the broadest product set possible, in addition to up-front development licences*";

(d)   in its presentation titled "*Autonomy Q1 trading update*"[177], Autonomy described its IDOL OEM revenue stream as where customers "*Purchase a royalty-paying competitor's product – this model does not generate deferred revenue*"; and

(e)   in its presentation "*Autonomy Q2 and H1 Results*"[178], Autonomy described "*cloud and OEM*" as "*recurring models*".

4.5.2   As explained above, in my opinion, the transactions reported within the IDOL OEM revenue stream should have had characteristics which were consistent with Autonomy's depiction of the IDOL OEM revenue stream to the market.  In the light of Autonomy's own description of

---

[173] HP-SEC-00025157-HP-SEC-00025179
[174] SEC-AUSA5-EPROD-000492750
[175] Autonomy's FY2010 Annual Report and Accounts, page 15
[177] HP-SEC-00159120-00159133
[178] SEC-AUSA5-EPROD-000714279

**mazars**

the IDOL OEM revenue stream, in my opinion transactions classified as generating IDOL OEM revenue should have the following key characteristics:

(a) the transaction should relate to a sale in which Autonomy's software was embedded into the customer's product for the customer to sell-on to third parties. As such:

(i) I do not consider that transactions to non-software companies are consistent with Autonomy's depiction of IDOL OEM revenue; and

(ii) I do not consider that arrangements with software companies where the software company would simply sell-on Autonomy's software without first embedding it into its own product are consistent with Autonomy's depiction of IDOL OEM revenue; and

(b) the transaction should generate recurring revenues for Autonomy[179]. As such I do not consider that transactions involving one-off, pre-paid royalties (where amounts were recognised immediately by Autonomy) are consistent with Autonomy's depiction of IDOL OEM revenue[180].

4.5.3 In Section 2 above I explained that I have reviewed the Software Focus Transactions and considered whether they were properly accounted for in accordance with IFRS. Throughout that process I also considered whether, in my opinion, the Software Focus Transactions reported as giving rise to IDOL OEM revenues had characteristics which were consistent with Autonomy's depiction of the IDOL OEM revenue stream.

4.5.4 My analysis has identified that the following Software Focus Transactions were reported as generating IDOL OEM revenues despite having characteristics which were inconsistent with Autonomy's depiction of the IDOL OEM revenue stream:

---

[179] If disclosed as "*OEM Ongoing*"
[180] If disclosed as "*OEM Ongoing*"

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

Table 4.2: Software Focus Transactions I have identified which were reported as generating IDOL OEM revenues despite having characteristics which were inconsistent with Autonomy's depiction of the IDOL OEM revenue stream[181]

| Quarter | # | Quarterly Revenue Breakdown name | Revenue reported as IDOL OEM ($m) |
|---|---|---|---|
| Q1 2010 | 048 | B of A | 8.9 |
| Q1 2010 | 049 | Filetek | 8.5 |
| Q2 2010 | 055 | Amgen Info Governance | 4.5 |
| Q2 2010 | 058 | MetLife DS | 7.0 |
| Q2 2010 | 059 | JPMC | 8.7 |
| Q3 2010 | 065 | Amgen | 9.0 |
| Q3 2010 | 066 | Vidient | 2.0 |
| Q3 2010 | 067 | Bank of America | 2.7 |
| Q3 2010 | 071 | EMC | 5.7 |
| Q3 2010 | 072 | Mattel | 0.2 |
| Q4 2010 | 074 | Prisa | 9.0 |
| Q4 2010 | 079a | discovertech baml | 7.0 |
| Q4 2010 | 081 | VMS | 10.8 |
| Q1 2011 | 084 | Tottenham | 6.4 |
| Q1 2011 | 088 | Mcafee – Capax | 5.0 |
| Q1 2011 | 091 | Prisa | 3.6 |
| Q1 2011 | 092a | KPMG | 5.4 |
| Q2 2011 | 096 | Iron Mountain – OEM | 16.5 |
| Q2 2011 | 120 | Dell Hyatt - mt | 5.3 |
| Q2 2011 | 121 | USPS archive – mt | 7.0 |
| Q2 2011 | 102 | JPMC – EDD | 2.6 |
| Q2 2011 | 105 | UBS – capax | 7.7 |
| Q2 2011 | 106 | Rand | 2.3 |

## 4.6 My summary conclusions in relation to the reporting of the IDOL Cloud revenue stream

4.6.1 "*IDOL Cloud*" is also not a term which is defined in IFRS.  However, in its "*other financial reporting*", Autonomy depicted its IDOL Cloud revenue stream in the following ways:

(a)     in its presentation titled "*Q3 09 Results 20 October 2009*"[182], Autonomy described its IDOL Cloud revenue as being "*Solutions for which the major party is executed in the SaaS or hosted model*".  Autonomy's description continued:

(i)     "*In hosted, the customer has access to our IDOL software running on our hardware, single tenant*";

---

181 I note that $3.7 million was recognised as IDOL OEM revenue in Q3 2010 in respect of Mattel.  In my opinion $0.2 million of this did not meet the revenue recognition requirements of IAS 18 in this quarter and should be reversed
182 HP-SEC-00025157-HP-SEC-00025179

    (ii)    "*In SaaS, the customer has access to our IDOL software running on our hardware, multi tenant.  For hosted or SaaS, no licence revenues are generated*"; and

    (iii)   "*These customers may occasionally separately buy IDOL licence to run on their hardware systems for the purpose of feeding information to our hosted/SaaS system.  This licence sale is recognised as a normal software licence as Autonomy has no ongoing obligations in relation to it*";

(b)    in its document "*Investor Relations Bulletin: 19 October 2010*"[183], Autonomy explained that "*IDOL Cloud delivers Autonomy's IDOL Cloud delivers Autonomy's product on a Software as a Service (SaaS) basis, which is invoiced monthly in arrears and does not generate deferred revenue. As a result, any organic revenue growth analysis needs to bear in mind that headline rates of growth are understated given the shift away from license sales (recognised immediately) to subscription fees (recognised over time). SaaS revenues are generally considered to be higher quality over the long term given their predictable, sticky characteristics*";

(c)    in its "*Financial Overview*" provided alongside the financial statements for the year ended 31 December 2010[184], Autonomy explained that "*IDOL Cloud delivers Autonomy's IDOL on a Software-as-a-Service (Saas) model, which is generally invoiced monthly in arrears and generally does not generate deferred revenue. There are two key drivers of cloud revenues for Autonomy: the first and most significant relates to complex processing of information delivered as a service, the second relates to the quantity of data under management*"[185];

(d)    in its presentation titled "*Autonomy Q1 trading update*"[186], Autonomy described its IDOL Cloud revenue stream as "*Subscribe to our Software as a Service (billed monthly) – this model does not generate deferred revenue*"; and

(e)    in its presentation "*Autonomy Q2 and H1 Results*"[187], Autonomy described "*cloud and OEM*" as "*recurring models*".

---

[183] SEC-AUSA5-EPROD-000492750
[184] Autonomy's FY2010 Annual Report and Accounts, page 15
[185] Equivalent descriptions were included in Autonomy's "*Trading Update for the Quarter Ended March 31, 2011*" and "*Trading Update for the Quarter Ended 30 June 2011*"
[186] HP-SEC-00159120, page 105
[187] SEC-AUSA5-EPROD-000714279

**mazars**

4.6.2    As explained above, in my opinion, the transactions reported within the IDOL Cloud revenue stream should have had characteristics which were consistent with Autonomy's depiction of the IDOL Cloud revenue stream to the market.  In the light of Autonomy's own description of the IDOL Cloud revenue stream, in my opinion transactions reported as generating IDOL Cloud should have the following characteristics:

(a)    the transaction should be for the provision of ongoing services.  As such, (subject to the single exception set out in paragraph 4.6.3 below) I do not consider that transactions of the sale of software licences are consistent with Autonomy's depiction of IDOL Cloud revenue;

(b)    the majority of the revenue reported in the IDOL Cloud revenue stream should relate to transactions related to the complex processing of information delivered as a service, with transactions related to the hosting of data also being a significant contributor; and

(c)    the transaction should generate recurring revenue for Autonomy.  As such I do not consider that transactions involving the recognition of revenue in one-off, lumpsum amounts are consistent with Autonomy's depiction of IDOL Cloud revenue.

4.6.3    Autonomy's depiction of the IDOL Cloud revenue stream in its "*Q3 09 Results 20 October 2009*"[188] does explain that "*customers may occasionally separately buy IDOL licence to run on their hardware systems* […] *This licence sale is recognised as a normal software licence as Autonomy has no ongoing obligations in relation to it*".  In my opinion, this disclosure is unclear as to whether the "*licence sale*" is recognised within the IDOL Cloud revenue stream or within the IDOL Product revenue stream.  In any event, to the extent that the sale of a software licence was reported within the IDOL Cloud revenue stream, in my opinion:

(a)    the transaction should be for a software licence installed on the customer's hardware.  As such, I do not consider that transactions in which a software licence was purchased and installed on Autonomy's hardware are consistent with Autonomy's depiction; and

(b)    notwithstanding the above, from its "*Financial Overview*" provided alongside the financial statements for the year ended 31 December 2010 onwards[189], Autonomy's depiction of the IDOL Cloud revenue stream made no reference to the inclusion of

---

[188] HP-SEC-00025157-HP-SEC-00025179
[189] See, for example, Autonomy's FY2010 Annual Report and Accounts, page 15

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

software licences whatsoever.  As such from 31 December 2010, in my opinion no revenue related to the sale of a software licence should be reported as IDOL Cloud revenue.

4.6.4   In Section 2 above I explained that I have reviewed the Software Focus Transactions and considered whether they were properly accounted for in accordance with IFRS.  Throughout that process, I also considered whether, in my opinion, the Software Focus Transactions reported as giving rise to IDOL Cloud revenues had characteristics which were consistent with Autonomy's depiction of the IDOL Cloud revenue stream.

4.6.5   My analysis has identified that the following Software Focus Transactions were reported as having generated IDOL Cloud revenues despite having characteristics which were inconsistent with Autonomy's depiction of the IDOL Cloud revenue stream:

**Table 4.3: Software Focus Transactions I have identified which were reported as generating IDOL Cloud revenues despite having characteristics which were inconsistent with Autonomy's depiction of the IDOL Cloud revenue stream**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue reported as IDOL Cloud ($m) |
|---|---|---|---|
| Q1 2010 | 046 | PMI (Discover) | 4.2 |
| Q1 2010 | 048 | B of A | 4.5 |
| Q1 2010 | 051 | Discover tech – Citi 32 cells | 5.5 |
| Q2 2010 | 053 | BP | 12.2 |
| Q2 2010 | 059 | JPMC | 8.7 |
| Q3 2010 | 063 | Citadel | 3.7 |
| Q3 2010 | 064 | Xcel Energy | 2.4 |
| Q3 2010 | 065 | Amgen | 9.0 |
| Q3 2010 | 071 | EMC | 5.7 |
| Q4 2010 | 076 | Ahold | 2.8 |
| Q4 2010 | 077 | Amgen | 5.7 |
| Q4 2010 | 079a | discovertech baml | 7.0 |
| Q4 2010 | 080 | Microtech doi | 4.0 |
| Q4 2010 | 079b | capax baml | 1.7 |
| Q4 2010 | 079c | BAML extra | 3.5 |
| Q1 2011 | 086 | DB Restructure | 7.1 |
| Q1 2011 | 087 | Morgan Stanley DS | 5.0 |
| Q1 2011 | 089 | UBS | 8.0 |
| Q1 2011 | 091 | Prisa | 3.6 |
| Q1 2011 | 093 | Johnson & Johnson | 2.1 |
| Q2 2011 | 101 | ABBOTT LABS – dt | 8.6 |
| Q2 2011 | 120 | Dell Hyatt – mt | 5.3 |
| Q2 2011 | 102 | JPMC – EDD | 2.6 |
| Q2 2011 | 109 | USPS, eDiscovery | 6.3 |
| Q2 2011 | 117 | National Bank of Canada | 1.5 |
| Q2 2011 | 116 | Metlife | 5.5 |

**4.7    My summary conclusions in relation to Autonomy's failure to disclose the existence of a material amount of hardware sales transactions in their other financial information**

4.7.1    As mentioned above, in accordance with the DTR, Companies Act 2006 and the Conceptual Framework, Autonomy was required to provide a balanced and comprehensive analysis of its financial performance.  Of particular relevance to the hardware sales transactions, the Conceptual Framework further provides that for certain items a complete depiction may also involve explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature[190].

4.7.2    Furthermore, as mentioned in Section 3.6, in accordance with IFRS Autonomy was required to provide a fair representation and to present separately items of a dissimilar nature or function unless they are immaterial.  As such, Autonomy was required to disclose that revenue was being generated from the sale of hardware products.

4.7.3    However, as discussed in Section 3.6 above, in breach of IFRS, Autonomy did not include any disclosure on the existence of a material amount of hardware sales transactions.

4.7.4    My analysis has identified that the following hardware transactions were reported as generating revenue in the IDOL Product or deferred revenue release revenue streams, despite being hardware transactions which should have been disclosed separately:

---

[190] The Conceptual Framework states that "*For some items, a complete depiction may also entail explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature*".  (Conceptual Framework, paragraph QC13)

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

**mazars** Summary of independent expert accounting opinions of Steven Brice FCA

Table 4.4: Hardware transactions which were reported in the IDOL Product or deferred revenue release revenue streams

| Quarter | Quarterly Revenue Breakdown name | Revenue reported as IDOL Product ($m) | Revenue reported as deferred revenue release ($m) |
|---|---|---|---|
| Q1 2010 | Fannie Mae | 1.3 | |
| Q1 2010 | Morgan Stanley | | 0.6 |
| Q1 2010 | SHI International Corp | | 5.2 |
| Q1 2010 | Dell - Morgan Stanley | | 4.7 |
| Q2 2010 | Insight | 2.5 | |
| Q2 2010 | JPMorgan Chase Bank N.A. | 0.5 | |
| Q2 2010 | Metro Business Systems | 1.3 | 3.5 |
| Q2 2010 | Morgan Stanley | 0.5 | 5.6 |
| Q2 2010 | SHI International Corp | 16.1 | |
| Q3 2010 | Insight | 2.4 | |
| Q3 2010 | SHI International Corp | 4.1 | |
| Q3 2010 | Zones, Inc | 10.5 | |
| Q3 2010 | Q2'Revenue - Hardware | | 8.7 |
| Q3 2010 | Low margin | 0.9 | |
| Q4 2010 | Amulet Hotkey | 1.1 | |
| Q4 2010 | Bank of New York Mellon | 1.4 | |
| Q4 2010 | Insight | 0.2 | |
| Q4 2010 | JPMorgan Chase Bank, N.A. | 1.7 | |
| Q4 2010 | Morgan Stanley | 6.3 | |
| Q4 2010 | Progressive Insurance | 1.2 | |
| Q4 2010 | SHI International Corp | 6.4 | |
| Q4 2010 | Low margin from deferred | | 2.1 |
| Q4 2010 | Toronto Police Service + Fannie Mae | 0.1 | |
| Q4 2010 | Union Pacific Railroad | 0.3 | |
| Q4 2010 | Video Monitoring Services | 6.0 | |
| Q4 2010 | Zones, Inc | 8.6 | |
| Q1 2011 | Amulet Hotkey | 1.9 | 2.1 |
| Q1 2011 | Bank of New York Mellon | 3.2 | |
| Q1 2011 | Insight | 0.4 | |
| Q1 2011 | JPMorgan Chase Bank, N.A. | 0.2 | |
| Q1 2011 | Northwestern Mutual Life | 0.1 | |
| Q1 2011 | SHI International Corp | 12.3 | |
| Q2 2011 | Amulet Hotkey | | 1.2 |
| Q2 2011 | SHI International Corp | 3.3 | |
| Q2 2011 | Closed – poppy | 12.4 | |
| Q2 2011 | Deferred Hardware | | 3.9 |

## 4.8 My summary conclusions in relation to the double reporting of the reported IDOL OEM and IDOL Cloud revenue streams

4.8.1 As shown in Table 4.1, Autonomy reported revenue across five revenue streams (IDOL Product, IDOL Cloud, IDOL OEM, service and deferred revenue release). Aggregating the revenues derived from these five revenue streams agrees to the total revenues reported in Autonomy's quarterly financial statements. This confirms that the revenues generated by an individual transaction should only be reported in one of the five revenue streams.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

mazars   Summary of independent expert accounting opinions of Steven Brice FCA

4.8.2   However, I have identified several instances in the Quarterly Revenue Breakdowns where the revenue generated from a single transaction was reported within both the IDOL OEM and IDOL Cloud revenue streams.  I set out these transactions in the table below[191]:

**Table 4.5: Transactions within the Quarterly Revenue Breakdowns which were reported within both the IDOL OEM and IDOL Cloud revenue streams[192]**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue reported as both IDOL OEM and IDOL Cloud ($m) |
|---------|-----|------------------|------------------|
| Q1 2010 | N/A | EDD hosted | 3.5 |
| Q1 2010 | 048 | B of A | 4.5 |
| Q2 2010 | 059 | JPMC | 8.7 |
| Q2 2010 | N/A | EDD hosted | 3.2 |
| Q3 2010 | 065 | Amgen | 9.0 |
| Q3 2010 | 071 | EMC | 5.7 |
| Q4 2010 | 074 | Prisa | 0.9 |
| Q4 2010 | 079a | discovertech baml | 7.0 |
| Q1 2011 | N/A | GCPD | 0.2 |
| Q1 2011 | N/A | BBC | 1.7 |
| Q1 2011 | 091 | Prisa | 3.6 |
| Q1 2011 | N/A | ATG | 0.5 |
| Q2 2011 | 102 | JPMC - EDD | 2.6 |
| Q2 2011 | 120 | Dell Hyatt -mt | 5.3 |

4.8.3   It is my view that reporting a single transaction within both the IDOL OEM and IDOL Cloud revenue streams overstates these revenue streams in a manner which is inconsistent with the requirements and guidance of the Conceptual Framework, DTR and Companies Act 2006 set out in Section 4.3 above.

4.8.4   In addition to the above, two transactions were reported in both the IDOL OEM and deferred revenue release revenue streams.  I set out these transactions in the table below[193]:

---

[191] I note that these transactions were not double reported in Autonomy's total revenue disclosed to the market, because a consequence of the double reporting in the IDOL OEM and IDOL Cloud revenue streams meant that Autonomy's IDOL Product revenue stream was understated by an equivalent amount as the amount reported in the IDOL OEM revenue stream
[192] I note that I have removed $3.0 million of revenue relating to "*services + maintenance*" in Q1 2010 since my Interim Report
[193] I note that these transactions were not double reported in Autonomy's total revenue disclosed to the market, because a consequence of the double reporting in the IDOL OEM and deferred revenue release revenue streams meant that Autonomy's IDOL Product revenue stream was understated by an equivalent amount as the amount reported in the IDOL OEM revenue stream

**Table 4.6: Transactions within the Quarterly Revenue Breakdowns which were reported within both the IDOL OEM and deferred revenue release revenue streams**

| Quarter | Quarterly Revenue Breakdown name | Revenue recognised in both IDOL OEM and deferred revenue release ($m) |
|---------|----------------------------------|-----------------------------------------------------------------------|
| Q1 2011 | ATG | 0.5 |
| Q1 2011 | BBC | 1.7 |

4.8.5    It is my view that reporting a single transaction within both the IDOL OEM and deferred revenue release revenue streams overstates these revenue streams in a manner which is inconsistent with the requirements and guidance of the Conceptual Framework, DTR and Companies Act 2006 set out in Section 4.3 above.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
**Summary of independent expert accounting opinions of Steven Brice FCA**

**mazars**

# 5   My review of the Taylor Report and the Levitske Report

## 5.1   Introduction

5.1.1   I am instructed to review and comment on the Taylor Report and the Levitske Report in so far as it is within the scope of my expertise.  In this section of my report I provide a summary of my opinions on the Taylor Report and the Levitske Report[194].  On the basis that this section is a summary of my opinions, where I do not comment on a particular conclusion or paragraph in the Taylor Report or Levitske Report, it should not be taken as my agreement with that conclusion or paragraph.

## 5.2   My summary comments on the Taylor Report

### Mr Taylor's first instruction

5.2.1   Mr Taylor states that he was instructed to set out his "*opinions and the bases thereon in respect of* [IFRS], *under which Autonomy prepared its financial statements during the* [Relevant Period]"[195].  This instruction is addressed in Sections 2 to 6 of the Taylor Report.

5.2.2   Mr Taylor limits his opinions to certain areas in IFRS, namely (i) revenue recognition, (ii) adjusting or restating the accounting treatment of transactions, (iii) disclosures and presentation, and (iv) the capitalization of expenses.  It is not entirely clear to me why Mr Taylor has limited his report to only these aspects of IFRS when compliance with IFRS is achieved by financial statements complying with all requirements in IFRS Standards[196].

5.2.3   Parts of Mr Taylor's summaries are either quotes taken from extant Standards within IFRS or mirror closely the narrative explanations provided in 2009 PWC IFRS Manual of Accounting.  As such, there are paragraphs within these sections of the Taylor Report where I do not disagree with what Mr Taylor has written.  However, my general observations on Sections 2 to 6 of the Taylor Report are as follows:

(a)   Mr Taylor addresses many aspects of IFRS at a high and generic level, without any application to the specifics and circumstances applicable to Autonomy during the Relevant Period;

---

[194] I have also received a copy of the Cerf Report but this does not refer to my Interim Report and primarily addresses matters that are outside of the scope of my expertise.  I therefore do not comment further on the Cerf Report
[195] Taylor Report, paragraph 1.1.3
[196] IAS 1, paragraph 16

**mazars**

(b)     Mr Taylor has not applied IFRS to any of the specific Software Focus Transactions or Hardware Focus Transactions which were considered in detail in my Interim Report.  As identified in paragraph 5.2.7 below, he has not provided an opinion on whether any of these transactions did or did not comply with IFRS; and

(c)     Mr Taylor places significant and repeated emphasis on the requirement for judgement to be applied in the application of IFRS.  Whilst IFRS does require the use of judgement, this does not mean that all judgements are reasonable nor that judgemental areas cannot result in accounting misstatements.  In my view, Mr Taylor is overemphasising the extent to which different judgements can reasonably justify materially different accounting treatments.

5.2.4     Further, there are a number of specific paragraphs in sections 2 to 6 of the Taylor Report with which I either disagree or, in my view, could be misleading without further comment.  I provide a summary of these comments in Appendix H.

### Mr Taylor's second instruction

5.2.5     Mr Taylor states that he has "*also been instructed to review and comment on* [my Interim Report]"[197].  Further, Mr Taylor explains that he has "*been asked to consider certain sections where Mr Brice provides an opinion on the application of IFRS and set out* [his] *observations on* [my] *opinions*"[198].  This instruction is addressed in Appendix 3 to the Taylor Report.

5.2.6     The sections in my Interim Report that Mr Taylor has been instructed to review are:

(a)     Sections 2.4 to 2.10, being my summary conclusions related to software sales transactions; and

(b)     Sections 3.4 to 3.6, being my summary conclusions related to hardware sales transactions.

5.2.7     First, and importantly, whilst Mr Taylor provides his opinion on certain statements that I have made in these sections of my Interim Report, Mr Taylor has not provided any opinion on:

(a)     whether the Software Focus Transactions or Hardware Focus Transactions complied with IFRS; nor

---

[197] Taylor Report, paragraph 1.1.5
[198] Taylor Report, paragraph 1.1.5

**mazars**

(b)     whether the financial statements issued during the Relevant Period complied with IFRS.

5.2.8     Second, Mr Taylor has not been instructed to review, and he has not commented, cited or in any way indicated that he has reviewed, the detailed appendices that underpin the sections of my Interim Report that he has been instructed to review.  As a result, in my view he has misunderstood the significance of many of the points that I made in my Interim Report.  For example, Mr Taylor disagrees that it would be appropriate to consider financial information of a counterparty, such as its financial statements, when determining whether to recognise revenue, on the basis that in his view it is not reasonable to expect a company to have obtained such contemporaneous information.  However, this view is contrary to my experience in practice, as well as the contemporaneous actions of Autonomy and its auditor Deloitte (who both sought and obtained financial information of counterparties when assessing whether revenue recognition criteria had been met).

5.2.9     Third, Mr Taylor has failed to identify that, whilst the sections of my Interim Report that he has been instructed to review summarise and provide examples of broad themes that apply to the transactions that I have reviewed, each transaction is often impacted by more than one of these themes.  For example, the revenue relating to Software Focus Transaction #040b "*Capax*" should not have been recognised for multiple reasons, as set out in Appendix F.  It is therefore important to consider the contemporaneous accounting evidence for each transaction on a cumulative basis.  The importance of considering information on a cumulative basis is an approach endorsed by auditing standards[199] which apply to auditors forming opinions on whether financial statements have been properly prepared in accordance with IFRS (or another financial reporting framework).

5.2.10     Fourth, Mr Taylor does not appear to have looked at any of the underlying contemporaneous accounting and other evidence upon which the conclusions in my Interim Report are based[200].  On this basis, I cannot see how Mr Taylor can provide opinions on statements I have made in my report without having undertaken any of the detailed work that I have undertaken in order to reach my conclusions.  It is, for example, inconceivable that an auditor would seek to provide opinions relevant to the appropriate accounting for a material transaction without having regard to any of the underlying documents.

---

[199] ISA 500 "*Audit Evidence*", paragraph A1

[200] Appendix 2 to the Taylor Report lists the documents he has relied upon.  This is limited to the 2009 PwC IFRS Manual of Accounting, three articles, various Autonomy annual report and accounts and quarterly results and various accounting standards and other accounting guidance documents

**mazars**

5.2.11   Fifth, Mr Taylor also makes reference to International Standards on Auditing ("**ISAs**").  Mr Taylor and I agree that ISAs are helpful in considering the software sales transactions and the hardware sales transactions, which is not surprising given that ISAs detail the objectives and requirements for an auditor conducting an audit of financial statements and provide guidance for the auditors to achieve those objectives and requirements.  However, Mr Taylor makes a number of points in his report that do not take into account or are contrary to the requirements and guidance of ISAs.  For example, in Appendix 3 to the Taylor Report, Mr Taylor states that the relevant conditions for revenue recognition set out in IAS 18 "*do not contain criteria related to the existence of a pattern of behaviour between a seller and a buyer*".  However, in my experience, the existence or emergence of a pattern of behaviour between Autonomy and a VAR can indicate that a sale transaction does not have economic substance.  The guidance to ISA 240 "*The Auditor's Responsibilities Relating to Fraud in an Audit of Financial Statements*" supports my experience, stating "*a retrospective review of similar management judgements and assumptions applied in prior periods may also provide insight about the reasonableness of judgements and assumptions supporting management estimates*"[201].   In my view, this guidance makes it clear that patterns of behaviour between a seller and a buyer are relevant to an assessment of whether the revenue recognition criteria of IAS 18 have been met.

5.2.12   Finally, there are a number of specific points in Mr Taylor's appendix with which I either disagree or, in my view, could be misleading without further comment.  I provide a summary of these comments in Appendix I.

## 5.3   My summary comments on the Levitske Report

5.3.1   Mr Levitske sets out his instructions at paragraphs 1.3.2 to 1.3.6 of the Levitske Report.  In summary, Mr Levitske has been instructed to "*advise regarding valuation process and relevant considerations in the process* [of the Transaction]"[202], which requires a consideration of the impact of certain[203] of the adjustments to revenue set out in my Interim Report and assess the impact of those adjustments on Autonomy's reported profit from operations (including profit from operation margins), reported cash flow, and reported year-over-year revenue growth.

5.3.2   I have a number of significant concerns with Mr Levitske's analysis, and therefore the observations that he makes, as I summarise below.  I understand from the Levitske Report

---

[201] ISA 240, Appendix 1

[202] Levitske Report, paragraph 1.1.1

[203] Mr Levitske has only been instructed to consider certain of the adjustments to revenue set out in my Interim Report because there are a number of adjustments that Mr Levitske has not been instructed to consider

**mazars**

that Mr Levitske is assuming, "*hypothetically, that the revenue accounting adjustments asserted in the VBOP and the Brice Report that I have relied upon in this Report are appropriate. I have been asked to opine about the impact of applying those hypothetical adjustments to Autonomy's historical reported financial statements*"[204]. As explained further below, certain of the adjustments that Mr Levitske has made are not consistent with the adjustments in my report, nor the way that they were originally accounted for by Autonomy[205]. It is not clear to me whether this is because of further assumptions that Mr Levitske is instructed to make in his report, or whether these further assumptions are deemed by Mr Levitske to be appropriate.

### The periods of analysis considered by Mr Levitske

5.3.3    Whilst Mr Levitske is instructed to consider "*year-over-year revenue growth*", Mr Levitske is only instructed to consider the financial performance in Q1 and Q2 of 2010 ("**H1 2010**") compared with Q1 and Q2 of 2011 ("**H1 2011**"). As such, Mr Levitske's analysis makes no reference to a substantial number of adjustments to revenue that I have identified for Q3 and Q4 of 2010 and also no reference to the substantial number of adjustments to revenue that I have identified for 2009.

5.3.4    In my view, which is based upon my experience of undertaking financial statement analysis, whilst comparing H1 2010 with H1 2011 might be one relevant comparison, I would also expect analysis to be undertaken on various other periods, including for example:

(a)    the Last Twelve Months ("**LTM**"), being the period 1 July 2010 to 30 June 2011, compared with the twelve months prior to that, being the period 1 July 2009 to 30 June 2010 ("**LTM-1**");

(b)    the last quarter (being Q2 2011) compared with the equivalent quarter in the prior financial period (being Q2 2010); and

---

[204] Levitske Report, paragraph 2.1.4

[205] For example, (i) the adjustments relating to VAR transactions which Mr Levitske notes at paragraph 2.1.16 "*I was asked by counsel to assume that the related expense was recorded in the same period in which the select VAR transaction was recognised as revenue*". However, this is not consistent with Autonomy's original reporting of the transactions; and (ii) the adjustments relating to hardware, which Mr Levitske notes at paragraph 2.1.9 "*I have been asked to opine about the impact of financial statement analysis in the context of a valuation of removing the hardware revenues in the Subject Period*". However, this is not consistent with the adjustments I have made relating to hardware and ignores the fact that hardware sales did take place

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
**Summary of independent expert accounting opinions of Steven Brice FCA**

mazars

(c)        analyses over a longer period of time.  I note that Mr Levitske's attachments all make reference to the "*Change*" in the period "*H1 2010 to H2 2011*"[206] but this appears to be a typographical error as these figures are not included in the Levitske Report.

5.3.5   In the remainder of this section, I have also set out the comparison of LTM-1 and LTM and of Q2 2010 with Q2 2011.  I note that this analysis is not exhaustive.

### The significance of the total impact on the reported revenue

5.3.6   Whilst Mr Levitske makes a number of observations relating to the year-over-year revenue growth, he surprisingly does not place any significance on the fact that the adjustments lead to a significant reduction in Autonomy's reported revenue figures.   The decrease in the reported revenue figures would appear to be a significant conclusion given:

(a)        market expectations and reactions to Autonomy's reported revenue figures[207];

(b)        the importance of revenue that was placed by Deloitte when auditing Autonomy's financial statements; and

(c)        the nature and extent of market analysts' focus on aspects of Autonomy's revenue.

### Mr Levitske's adjustments relating to hardware

5.3.7   In considering the impact of the adjustments relating to hardware, Mr Levitske has "*removed*"[208] from Autonomy's reported revenue <u>all</u> revenue generated from the sale of hardware.

5.3.8   However, as explained in Section 3 above, in my adjustments to revenue relating to hardware sales transactions, I have only made adjustments for certain hardware sales transactions and these adjustments relate to the timing of the revenue (not the removal of the revenue[209]).  For the avoidance of doubt, I have not concluded that the transactions did not take place and/or that these transactions should not have been reported as revenue[210].  I also understand that it is not disputed that the hardware transactions took place.  As such, Mr Levitske's approach of removing all revenue from hardware sales transactions and thus presenting a financial performance assuming the transactions did not take place is, in my view, not consistent with

---

[206] As opposed to "*H1 2010 to H1 2011*"

[207] For example, the FRC's Disciplinary Tribunal relating to Deloitte's audits and reviews during the relevant period found at paragraph 352 that "*on 6 October 2010 the share price dropped 20% because of a 3% adjustment to the full year revenue model*"
[208] Levitske Report, paragraph 2.1.10

[209] With the exception of one transaction of $3.4 million which I concluded should not have been recognised
[210] With the exception of one transaction of $3.4 million which I concluded should not have been recognised

**mazars**

an attempt to assess the impact of applying the accounting adjustments in my Interim Report to Autonomy's historical reported financial statements.

5.3.9    In Appendix J I have sought to reperform Mr Levitske's analysis but instead of removing all revenue from hardware sales transactions, I have instead adjusted the timing of revenue for certain transactions as identified in Section 3 above.  On the basis of his analysis Mr Levitske concluded that, after removing all hardware sales transactions, the revenue growth between H1 2010 and H1 2011 is greater (at 16.8%[211]) than the revenue growth originally reported by Autonomy (of 14.6%).  However, once this analysis is reperformed, the opposite conclusion is reached: the revenue growth after the relevant hardware adjustments have been made is 12.5%, less than the 14.6% originally reported by Autonomy.

5.3.10    Moreover, following the hardware revenue adjustments[212]:

(a)    the growth in revenue between LTM-1 and LTM is 9.2% compared with the revenue growth of 12.2% originally reported by Autonomy; and

(b)    the growth in revenue between Q2 2010 and Q2 2011 is 15.1% compared with the revenue of 15.9% originally reported by Autonomy.

5.3.11    Mr Levitske also concludes that, following his adjustments for the hardware sales transactions:

(a)    "*Autonomy would have had higher profits and higher profit margins*"[213].    This conclusion is because Mr Levitske has removed all hardware transactions from the reported financial performance of Autonomy.  On the basis that the transactions were primarily loss making, their removal would be expected to increase reported profits and reported margins.  However, as noted above, Mr Levitske's removal of all revenue and costs relating to hardware sales transactions is contrary to the adjustments that I proposed in Section 3 .  Indeed, subject to certain timing differences[214], the correction of the accounting for hardware sales transactions would not impact the reported profit or reported profit margins; and

(b)    "*Autonomy's cash flow would have been higher*"[215].  Again, this conclusion is based upon Mr Levitske's removal of all hardware sales transactions, rather than

---

[211] Levitske Report, Attachment A
[212] Appendix J
[213] Levitske Report, paragraph 3.1.2(a)
[214] With the exception of an amount of $3.4 million relevant to one transaction which I concluded should not have been recognised
[215] Levitske Report, paragraph 3.1.2(c)

adjustment to their timing[216].   I have not seen any evidence that suggests the hardware sales transactions led to a misstatement in the amount of reported cash.

### Mr Levitske's adjustments relating to software

5.3.12    Mr Levitske has been instructed to consider the impact of three categories of software transaction adjustments: (i) linked transactions, (ii) VAR transactions and (iii) multi-period hosting transactions.

5.3.13    In relation to these three categories, I have a number of significant concerns with the adjustments that Mr Levitske has made, including:

(a)    there are a number of figures used by Mr Levitske that do not agree to the adjustments in my Interim Report;

(b)    in relation to linked transactions and VAR transactions, Mr Levitske's methodology for adjusting for the relevant costs is, in my view, flawed.   This is because Mr Levitske has assumed in his analysis that these costs would not have been incurred and therefore he has added them back to the reported costs.   However, many of these costs had in fact been capitalised by Autonomy[217] and thus not reported as a cost.   As such, it is not appropriate to add them back; and

(c)    given the periods that Mr Levitske has analysed (to which I referred at paragraph 5.3.3 *et seq*. above), Mr Levitske has not made adjustments for many of the adjustments I have identified.   For example, in relation to linked transactions, Mr Levitske has only adjusted for two transactions, whereas during the Relevant Period I have identified eight transactions in this category[218].

5.3.14    I provide further explanation and analysis in relation to (a) and (b) in Appendix K.   This appendix shows that, correcting for Mr Levitske's error results in fundamentally different conclusions to those reached by Mr Levitske in his report.

5.3.15    Mr Levitske also concludes that in relation to linked transactions and VAR transactions that correcting the relevant accounting would likely increase the balance of cash.   However, this is not correct.   I have not seen any evidence which suggests that Autonomy's reporting of these transactions led to a misstatement in the amount of cash.   Mr Levitske's flawed

---

[216] With the exception of an amount of $3.4 million relevant to one transaction which I concluded should not have been recognised
[217] Or, in the case of one purchase, recognised as an expense a number of months after the recognition of the associated revenue
[218] Table 2.9

conclusion is seemingly because he considers the position as if the transactions had never happened (i.e. "*removing the revenues, related costs and expenses*"[219]) rather than the position had these transactions been appropriately accounted for.

5.3.16    In relation to the multi-period hosting transactions, Mr Levitske again concludes that correcting the relevant accounting would increase the balance of cash.  In my opinion, correcting the accounting for the multi-period hosting transactions would have no impact on the balance of cash at Autonomy.  It appears that Mr Levitske's identified increase in the balance of cash is assessed by reference to a calculation which includes a number of high-level assumptions which do not reflect my understanding of the specifics of the relevant multi-period hosting transactions.  For example, Mr Levitske assumes that the full amount of cash was received for these transactions and recorded upfront.  However, in many transactions, and as shown in the detailed appendices to my report, the balance of cash was not received upfront but was instead received at different points during the life of the contract.  For illustration, Mr Levitske examines in Attachment D to his report, Software Focus Transaction #059 "*JPMC*", in which $4.7 million of the total "*license fee*" of $8.7 million was in fact payable two years after the date of the contract[220].   Even when the accounting is amended to appropriately recognise revenue rateably over the contract, this does not imply that the related cash will be received at different times.

5.3.17    Moreover, in respect of multi-period hosting transactions, Mr Levitske also provides an analysis of the impact of recognising revenue over the duration of a contact compared with recognising the revenue upfront.  Mr Levitske identifies that the "*revenue is the same* […] *over the contract duration*"[221].  This is not a surprising conclusion as the difference is simply one of timing.  However, Mr Levitske does not stress the problem from a user of the financial statements' perspective of revenue being inappropriately accelerated.  Mr Levitske also concludes that where the revenue is spread over the life of the contract that "*the patterns of revenue and profit contributions* […] *are comparatively more predictable*"[222].   Importantly, I note that this revenue was reported by Autonomy as being part of IDOL Cloud (where a user of the financial statements would expect this revenue to be recurring and spread over the contract period (including future periods) but in fact all revenue from these contracts had already been recognised in full).

---

[219] Levitske, paragraph 2.1.24(b) and 2.1.24(c)
[220] Appendix F
[221] Levitske Report, paragraph 2.1.20(a)[i]
[222] Levitske Report, paragraph 2.1.21

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

5.3.18    Finally, I note that Mr Levitske has not been instructed to consider the impact of all of the software transaction adjustments that I have identified; adjustments of $14.4 million across H1 2010 and H1 2011 have been excluded from his analysis.  Had these adjustments been included, conclusions regarding the year-over-year revenue growth would be significantly different.  Following all identified adjustments relating to software sales transactions[223]:

(a)    growth between H1 2010 and H1 2011 is 8.0% compared with 14.6% originally reported by Autonomy;

(b)    growth between Q2 2010 and Q2 2011 is 1.9% compared with 15.9% originally reported by Autonomy; and

(c)    growth between LTM-1 and LTM is 9.6% compared with 12.2% originally reported by Autonomy.

### Total adjustments

5.3.19    In Attachment G of the Levitske Report, Mr Levitske calculates that after all revenue adjustments that he is instructed to make, the growth in revenue between H1 2010 and H2 2011 was 17.5% compared with 14.6% originally reported by Autonomy.

5.3.20    I have noted the many errors in Mr Levitske's calculations which mean that, in my view, this conclusion is fundamentally flawed.  Correcting for these errors and incorporating all of the adjustments to revenue that I have identified, results in significantly different conclusions[224]:

(a)    growth between H1 2010 and H1 2011 is 5.6% compared with 14.6% originally reported by Autonomy;

(b)    growth between Q2 2010 and Q2 2011 is 1.1% compared with 15.9% originally reported by Autonomy; and

(c)    growth between LTM-1 and LTM is 6.2% compared with 12.2% originally reported by Autonomy.

---

[223] Appendix J
[224] Appendix J

# 6 Summary of my overall conclusions

6.1.1 Based on the information I have seen, my summary conclusions are that, in Autonomy's financial statements[225] issued during the Relevant Period:

(a) the revenue from software sales transactions was not reported in accordance with IFRS (as I identified in Section 2);

(b) the revenue from hardware sales transactions was not reported or disclosed in accordance with IFRS (as I identified in Section 3); and

(c) the descriptions of the IDOL OEM, IDOL Cloud and IDOL Product revenue streams were not reported or disclosed in accordance with the DTR, Conceptual Framework or Companies Act 2006 (as I identified in Section 4).

6.1.2 As a result, Autonomy's reporting – including both the financial statements and the commentary in the annual report – did not provide a faithful representation of Autonomy's financial performance during the Relevant Period.  The reports provided by Mr Taylor and Mr Levitske (in response to my Interim Report) do not lead me to change these conclusions.  I have set out my observations on these reports separately in Section 5.

6.1.3 By way of illustration, in the chart below I set out the revenue reported in respect of Q2 2011 by Autonomy broken down by revenue stream, as well as my assessment of that revenue (again broken down by revenue stream) had the financial statements been prepared in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006:

---

[225] Comprising quarterly accounts, interim accounts and annual reports

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

**Figure 6.1: Revenue reported by Autonomy by revenue stream in Q2 2011 and my assessment of that revenue had it been reported in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006**



6.1.4    As discussed in paragraph 4.2.3, in Q2 2011 the total of the reported IDOL Cloud and IDOL OEM revenues were 162.8% of reported IDOL Product revenues.  However, as can be seen from the figure above, the total of the IDOL Cloud and IDOL OEM revenues which would have been reported had the financial statements been prepared in accordance with the relevant requirements would have only made up 64.4% of the IDOL Product revenues which would have been reported had the financial statements been prepared in accordance with the relevant requirements.

6.1.5    Further, the chart above shows that, although reported revenues were split broadly evenly over the IDOL Product and IDOL Cloud revenue streams (with IDOL Cloud revenue making up 93.9% of IDOL Product revenue), in actual fact IDOL Cloud revenue was significantly less than IDOL Product revenue, at just 55.1%.  With respect to the IDOL OEM revenue stream, reported revenue made up 68.9% of reported IDOL Product revenue.  If the financial statements had been prepared in accordance with the relevant requirements IDOL OEM revenue would have made up only 9.4% of IDOL Product revenue.  In summary, if revenues had been reported in accordance with the relevant requirements, IDOL Product revenue would have been far greater than that of IDOL Cloud and IDOL OEM.

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

**mazars**   Summary of independent expert accounting opinions of Steven Brice FCA

6.1.6    In addition, if revenue had been reported in accordance with the relevant requirements hardware would have made up 10.2% of total revenue.

6.1.7    In Appendix M I provide equivalent charts by quarter for Q1 2010 to Q1 2011. These charts re-confirm the observations set out above. Of particular importance in these charts are the hardware figures because they illustrate the importance of the hardware sales transactions to the reported growth of Autonomy during the Relevant Period (apart from Q3 2011). By way of illustration, in the chart below I set out the reported quarterly revenue during the Relevant Period (apart from Q3 2011):

**Figure 6.2: Reported quarterly revenue during the Relevant Period (apart from Q3 2011)**[226]



6.1.8    The reported revenue growth of Autonomy was:

(a)    47.0%[227] when comparing 2008 with 2009; and

(b)    17.7%[228] when comparing 2009 with 2010.

---

[226] Table 2.1
[227] $739.7 million / $503.2 million – 1
[228] $870.4 million / $739.7 million – 1

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

6.1.9    The quarter on quarter reported revenue growth of Autonomy during the Relevant Period (apart from Q3 2011) is set out in the table below:

Table 6.1: Quarter on quarter reported revenue growth during the Relevant Period (apart from Q3 2011)

| | Q1 2009 vs Q1 2010 | Q2 2009 vs Q2 2010 | Q3 2009 vs Q3 2010 | Q4 2009 vs Q4 2010 | Q1 2010 vs Q1 2011 | Q2 2010 vs Q2 2011 |
|---|---|---|---|---|---|---|
| Quarter on quarter growth | 49.6% | 13.3% | 9.9% | 9.6% | 13.1% | 15.9% |

6.1.10    I have also prepared a further chart which analyses the reported quarterly revenue excluding my assessment of hardware sales revenue during the Relevant Period (apart from Q3 2011). This therefore shows the reported quarterly revenue and growth of the underlying software business.  I have also included in grey the reported quarterly revenue of Autonomy.

Figure 6.3: Reported quarterly revenue of the underlying software business during the Relevant Period (apart from Q3 2011)[229]



6.1.11    The growth in reported quarterly revenue of the underlying software business was:

(a)    36.0%[230] when comparing 2008 with 2009 (compared with reported total growth of 47.0% over the same period); and

---

[229] For the avoidance of doubt, the line in Figure 6.3 labelled "*Reported quarterly revenue of the underlying software business*" is calculated as quarterly reported revenue less my assessment of hardware revenue
[230] $686.0 million / $503.3 million − 1

(b)      12.3%[231] when comparing 2009 with 2010 (compared with reported total growth of
17.7% over the same period).

6.1.12   The quarter on quarter growth in reported quarterly revenue of the underlying software
business during the Relevant Period (apart from Q3 2011) is set out in the table below:

**Table 6.2: Quarter on quarter growth in reported quarterly revenue of the
underlying software business during the Relevant Period (apart from Q3 2011)**

|  | Q1 2009 vs Q1 2010 | Q2 2009 vs Q2 2010 | Q3 2009 vs Q3 2010 | Q4 2009 vs Q4 2010 | Q1 2010 vs Q1 2011 | Q2 2010 vs Q2 2011 |
|---|---|---|---|---|---|---|
| Quarter on quarter growth | 37.2% | -3.3% | 28.4% | 0.4% | 13.5% | 24.9% |

6.1.13   As such, the hardware sales transactions were in my opinion contributing significantly to the
overall reported revenue growth of Autonomy during the Relevant Period.

6.1.14   Moreover, I have identified in Section 2 of my report that the reported revenue figures were
misstated in respect of software sales transactions and, in the chart below, I set out my
assessment of the adjusted revenue figures in respect of software sales transactions.  This
chart therefore shows the actual revenue generated by the underlying software business, and
the associated revenue growth.  I have also included in grey the reported quarterly revenue
of Autonomy and the reported quarterly revenue of the underlying software business.

---

[231] $765.2 million / $686.0 million - 1

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**Summary of independent expert accounting opinions of Steven Brice FCA**

**Figure 6.4: My assessment of the revenue of the underlying software business during the Relevant Period (apart from Q3 2011)**



6.1.15   Therefore, the growth in revenue of the underlying software business was:

(a)   15.2%[232] when comparing 2008 with 2009 (compared with reported total growth of 47.0% over the same period); and

(b)   12.3%[233] when comparing 2009 with 2010 (compared with reported total growth of 17.7% over the same period).

6.1.16   The quarter on quarter revenue growth of the underlying software business during the Relevant Period (apart from Q3 2011) is set out in the table below:

**Table 6.3: Quarter on quarter revenue growth of the underlying software business during the Relevant Period (apart from Q3 2011)**

|  | Q1 2009 vs Q1 2010 | Q2 2009 vs Q2 2010 | Q3 2009 vs Q3 2010 | Q4 2009 vs Q4 2010 | Q1 2010 vs Q1 2011 | Q2 2010 vs Q2 2011 |
|---|---|---|---|---|---|---|
| Quarter on quarter growth | 38.6% | 2.9% | 8.4% | 7.9% | 11.1% | 8.3% |

---

[232] $579.6 million / $503.2 million - 1
[233] $651.1 million / $579.6 million - 1

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**mazars**     Summary of independent expert accounting opinions of Steven Brice FCA

6.1.17   In the chart below I have also included my assessment of the actual revenue from the IDOL OEM, IDOL Cloud and IDOL Product revenue streams from Q1 2010 to Q2 2011.  This chart is important as it shows the revenue and revenue growth generated by the recurring revenue streams (IDOL OEM and IDOL Cloud).

**Figure 6.5: My assessment of the actual revenue generated by the IDOL OEM, IDOL Cloud and IDOL Product revenue streams during the Relevant Period (apart from Q3 2011)**



6.1.18   As can be seen from the figure above, my assessment of the actual revenue generated by the IDOL OEM and IDOL Cloud revenue streams (i.e. those which generated recurring revenues) did not see significant growth (if any) over the period from Q1 2010 to Q2 2011.

6.1.19   It is in my view also worth noting that prior to and during the Relevant Period Autonomy had acquired a number of businesses, including Zantaz, Verity, Meridio, Iron Mountain and Interwoven.  These acquisitions would have also contributed to Autonomy's reported revenue growth during the Relevant Period.

**mazars**

# 1    Appendix H - My comments on Sections 2 to 6 of the Taylor Report

## 1.1    Introduction

1.1.1    In Table 1.1, I respond to Mr Taylor's comments in Sections 2 to 6 of the Taylor Report.

Table 1.1: My response to Mr Taylor's report

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| 2.3.2 | Where principles are to be applied, there are circumstances where two different accountants, faced with the same transaction, would record the transaction in different ways.  That is not to say that one accountant is wrong and the other is right; instead, it is a recognized feature of the application of principles under IFRS that different, but valid, accounting results can be reached due to the application of differing management or accounting judgements. | I agree that the application of IFRS requires the use of judgement, and accept that in some circumstances, different accountants may on occasion reach conclusions which, whilst different from one another, are both reasonable and both result in a "fair presentation" being achieved.  Often after, *inter alia*, referring to guidance (such as accounting manuals issued by large accounting firms), in most cases the accounting for a transaction would ordinarily be expected to be treated in a materially consistent manner. |
|  |  | That is not to say however that matters that require the application of judgement cannot be "wrong".  If unreasonable judgement is used, the resulting accounting treatment may be incorrect and result in financial statements which do not comply with IFRS.  Indeed, in my experience, errors in the application of IFRS almost always relate to areas of judgement. |
|  |  | In my view, a judgement might be considered unreasonable if it does not encompass the qualitative characteristics of useful financial information: that is, the judgement does not result in financial information which is relevant |

**mazars**

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | and a "*faithful representation*"[1].  A faithful representation is one which is complete, neutral and free from error[2]. |
| | | With regard to the concept of a "*neutral*" presentation, the Framework explains: |
| | | "*to be reliable, the information contained in financial statements must be neutral, that is, free from bias.  Financial statements are not neutral if, by the selection of presentation of information, they influence the making of a decision or judgement in order to achieve a predetermined result or outcome*"[3]. |
| | | Similarly, the Conceptual Framework defines neutral as: |
| | | "*A neutral depiction is without bias in the selection or presentation of financial information.  A neutral depiction is not slanted, weighted, emphasised, de-emphasised or otherwise manipulated to increase the probability that financial information will be received favourably or unfavourably by users*"[4]. |
| | | A judgement may be considered unreasonable if it misuses, or fails to use, relevant facts and information which existed and which could have been taken into account by the preparer of the financial statements.  For example, if a sale was made to a counterparty in serious financial difficulty, it would be unreasonable for a preparer to judge that an inflow of economic benefit was probable because they had ignored available information about the financial health of the counterparty. |
| 2.4.4 | No industry-specific guidance on revenue recognition for software was provided under IFRS.  The same revenue recognition standard (IAS 18 (Revenue)) which was issued in 1993 and remained applicable until | Paragraphs 10-12 of IAS 8 "*Accounting Policies, Changes in Accounting Estimates and Errors*" ("**IAS 8**") set out how an entity should develop and |

---

[1] Conceptual Framework, paragraph QC5.  Relevance and faithful representation (as a key pillar of reliability) were also qualitative characteristics in the Framework which preceded the Conceptual Framework the (Framework, paragraphs 26 and 33 for example)

[2] Conceptual Framework, paragraph QC12

[3] Framework, paragraph 36

[4] Conceptual Framework, paragraph QC14

**mazars**

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | 2018 (other than minor changes) applied equally to software as to any other product generating revenue. | apply an accounting policy in the absence of an IFRS that specifically applies to a transaction, other event or condition: |
| | | "*In the absence of an IFRS that specifically applies to a transaction, other event or condition, management shall use its judgement in developing and applying an accounting policy that results in information that is:* |
| | | *(a) relevant to the economic decision-making needs of users; and* |
| | | *(b) reliable, in that the financial statements:* |
| | | *(i) represent faithfully the financial position, financial performance and cash flows of the entity;* |
| | | *(ii) reflect the economic substance of transactions, other events and conditions, and not merely the legal form;* |
| | | *(iii) are neutral, ie free from bias;* |
| | | *(iv) are prudent; and* |
| | | *(v) are complete in all material respects.* |
| | | *In making the judgement described in paragraph 10, management shall refer to, and consider the applicability of, the following sources in descending order:* |
| | | *(a) the requirements in IFRSs dealing with similar and related issues; and* |
| | | *(b) the definitions, recognition criteria and measurement concepts for assets, liabilities, income and expenses in the Framework* |
| | | *In making the judgement described in paragraph 10, management may also consider the most recent pronouncements of other standard-setting bodies that use a similar conceptual framework to develop accounting standards, other accounting literature and accepted industry practices, to the extent that these do not conflict with the sources in paragraph 11.*" |
| | | Whilst I have not seen that Autonomy created its own accounting policy for software revenue, I understand from Deloitte's 2010 audit file of Autonomy Inc that when making judgements on the application of IAS 18, Autonomy |

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | sometimes referred to the requirements of ASC 985-685-15 (formerly Statement of Position 97-2 "*Software Revenue Recognition*" ("**SOP 97-2**")). SOP 97-2 was cleared by the United States' Financial Accounting Standards Board ("**FASB**") which established accounting principles under US Generally Accepted Accounting Principles ("**US GAAP**"), and explains how companies applying US GAAP should account for software transactions. The Accounting Standards Codification ("**ASC**") is developed and maintained by the FASB. It is important to note that when referring to guidance from other accounting frameworks, such as US GAAP, care should be taken that the guidance used does not result in accounting treatments which conflict with the requirements of IFRS. <br><br> I also note that some limited, but relevant, guidance related to software transactions is provided in the Appendix to IAS 18. |
| 2.4.6 | It is against this background in the Relevant Period (i.e., the recent first-time adoption of IFRS, non-existent industry-specific guidance, the continuing introduction of new standards and interpretations, and an evolving product offering), that Autonomy was applying IFRS. | I disagree that during the Relevant Period, Autonomy can be properly categorised as a recent first-time adopter of IFRS. As Mr Taylor has explained in paragraph 2.4.3, Autonomy first adopted IFRS in 2005, so the first set of financial statements in the Relevant Period (for the financial year ended 31 December 2009) was the fifth set that Autonomy had prepared under IFRS. <br><br> I also disagree that the "*continuing introduction of new standards and interpretations*" is especially relevant to the revenue recognition issues in this case. As Mr Taylor explains in paragraphs 2.4.4 and 3.1.1, IAS 18: Revenue, which is the primary standard for determining when it was appropriate to recognise revenue for both software and hardware contracts in the Relevant Period, was in effect between 1993 and 2018 with only minor changes in the period. |
| 2.5.2 | As stated in paragraph 17 of IAS 1 (Presentation of Financial Statements), "*In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs*". On this basis, it is only in exceptional circumstances that an accountant would need to look outside of a specific IFRS to determine the appropriate accounting treatment. | I disagree that it is only in exceptional circumstances that an accountant would need to look outside of a specific IFRS to determine the appropriate accounting treatment. As a primary observation, all standards of IFRS explicitly state that they should be read in the context of (i.e., applied with consideration to) the "*Preface to International Financial Report Standards*" and the Conceptual Framework / Framework. |

**mazars**

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | Moreover, when applying an individual standard such as IAS 18, preparers also need to consider the requirements of other relevant standards of IFRS. For example, IAS 10 "*Events after the Reporting Period*" ("**IAS 10**") explains the extent to which entities should take account of events which occurred after the end of the financial period, and these requirements clearly need to be adhered to when applying the requirements of IAS 18 in an appropriate manner[5]. |
| | | I therefore disagree with Mr Taylor's interpretation of IAS 1, paragraph 17, insofar as he asserts that it confirms that "*it is only in exceptional circumstances that an accountant would need to look outside of a specific IFRS to determine the appropriate accounting treatment*" [emphasis added]. Instead, I consider that IAS 1, paragraph 17 explains that the appropriate application of <u>all</u> IFRSs that are relevant to the entity will achieve a "*fair presentation*". |
| | | In addition, Mr Taylor does not comment on the rest of IAS 1, paragraph 17 despite reproducing it in footnote 9 of the Taylor Report.  For ease of reference, the full text of IAS 1, paragraph 17 is set out below: |
| | | "*In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs.  <u>A fair presentation also requires an entity</u>*: |
| | | (a)   to select and apply accounting policies in accordance with IAS 8 *Accounting Policies, Changes in Accounting Estimates and Errors*. IAS 8 sets out a hierarchy of authoritative guidance that management considers in the absence of an IFRS that specifically applies to an item. |
| | | (b)   to present information, including accounting policies, in a manner that provides relevant, reliable, comparable and understandable information. |
| | | (c)   to provide additional disclosures when compliance with the specific requirements in IFRSs is insufficient to enable users to understand the impact of particular transactions, other events and conditions on the |

---

[5] IAS 18 itself provides no requirements regarding the accounting treatment of events which occurred after the reporting period

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *entity's financial position and financial performance*".   [Emphasis added]<br><br>It is therefore necessary for an entity to ensure it has also complied with paragraphs (a) to (c) above as well as the requirements of the specific relevant accounting standard. |
| 3.1.1 | […] by complying with IAS 18 (Revenue), an entity achieves a fair presentation with regard to the recognition of revenue. | Whilst I agree that IAS 18 is the primary standard applicable to the recognition of revenue, I disagree that a "*fair presentation*" can be achieved through compliance with IAS 18 alone.<br><br>First, and as noted above, IAS 18 itself states that it should be read in the context of the Framework / Conceptual Framework.  As such, when applying IAS 18 it is my opinion that preparers should appreciate that judgements reached when applying IAS 18 should be, *inter alia*, neutral and unbiased. The requirement for financial statements to be neutral and unbiased is not specifically mentioned in IAS 18 but is instead a principle which is pervasive to the application of IFRS.<br><br>Moreover, and as also explained above, there are a number of other standards which set requirements which can be directly relevant to the correct application of IAS 18, such as IAS 10 or IAS 8.  The requirements of these standards also need to be considered and adhered to in order to achieve a "*fair presentation*" with regard to the recognition of revenue.<br><br>Finally, IFRS itself recognises that there may be rare circumstances where complying with a requirement in IFRS would be so misleading it would conflict with the objective of financial statements set out in the Framework/Conceptual Framework, and so an entity can depart from that requirement to ensure fair presentation (subject to necessary disclosure)[6]. I note that in my opinion no departure was necessary from IFRS for the Software Focus Transactions or hardware transactions that I considered. |
| 3.1.3 | The more principles-based nature of IFRS, along with the lack of any industry-specific guidance on software revenue recognition and the | Whilst there are accounting items for which different accountants could reasonably form different conclusions (for example, the likelihood of a debtor |

---

[6] IAS 1, paragraphs 19 to 20

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | bespoke nature of the products offered by Autonomy, meant that IAS 18 (Revenue) required judgement in application.  As a result, different accountants could validly form different conclusions when presented with the same transactions, each of which could be appropriate under IAS 18 (Revenue). | balance being recovered), the resulting judgement must comply with the requirements of IFRS and be a faithful representation of the transaction, that is, it must be neutral and unbiased.
I have identified a significant number of software transactions and a limited number of hardware sales where, based on an examination of contemporaneous factual documents, correspondence and accounting entries, I have concluded that revenue was inappropriately recognised in the relevant quarter, by reference to the revenue recognition criteria of IAS 18.14[7] (and/or IAS 18.20 and/or IAS 18.29).
Whilst Mr Taylor suggests that a different accountant could form a valid different conclusion under IAS 18, he does not explain why, or even if, he disagrees with my assessment for each individual transaction, and I therefore do not know whether or not Mr Taylor considers that there is an alternative valid conclusion that could be applied in each situation.
Moreover, where I consider that Autonomy's accounting breached the requirements of IFRS, I do not consider that a reasonable accountant, with sight of the same information and evidence that I have seen, would reach a conclusion which materially differed from my own across such a significant number of transactions. |
| 3.2.4 | The IFRS Foundation (of which the IASB is part) published an annual "IFRS Briefing for Chief Executives, Audit Committees and Boards of Directors". This document sets out summaries of IFRS at a high level and in non-technical language for Chief Executives, members of Audit Committees, Boards of Directors, and others who want a broad overview of IFRSs and the business implications of implementing them. | The IFRS Foundation document "*IFRS Briefing for Chief Executives, Audit Committees and Boards of Directors*" is not a component of IFRS.
For the avoidance of doubt, in Autonomy's 2009 Financial Statements and 2010 Financial Statement, Dr Lynch confirmed that, to the best of his knowledge, the financial statements were prepared in accordance with IFRS[8]. |
| 3.2.9 | These examples would often be subject to specific clauses in the sales contract which would set requirements, obligations, or milestones to be | I disagree that there is no further commentary which could be used as guidance as to the meaning of the term "significant" in the phrase "*when the* |

---

[7] Indeed, in many instances, the Software Focus Transactions did not meet the criteria for revenue recognition for multiple reasons
[8] Autonomy's FY2009 Annual Report and Accounts, page 34 and Autonomy's FY2010 Annual Report and Accounts, page 43

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | reached. However, the use of the word "significant" in the third example when installation is part of the product being sold is notable. There is no further commentary on this threshold (e.g., whether the installation: (i) represented a "significant" amount of the revenue; (ii) was required before the buyer was required to pay; or (iii) would take a "significant" amount of time to complete). | *goods are shipped subject to installation and the installation is a significant part of the contract which has not yet been completed by the entity*".

In particular, Illustrative Example 2 accompanying IAS 18 explains that "*Revenue is normally recognised when the buyer accepts delivery, and installation and inspection are complete.  However, revenue is recognised immediately upon the buyer's acceptance of delivery when: (i) **the installation process is simple in nature**, for example the installation of a factory tested television receiver which only requires unpacking and connection of power and antennae […]*" [emphasis added].

In my opinion, this illustrative example shows that revenue should only be recognised on delivery of the goods when any "*installation*" element is relatively simple, and by extension any installation process that is not "*simple in nature*" should be considered "a *significant part of the contract*" for the purposes of applying IAS 18.16. |
| 3.2.13 | As with the examples provided when assessing the transfer of significant risks and rewards, these examples would often be subject to specific clauses in the sales contract which would identify specific rights and obligations.  While these examples are not an exhaustive list, if none of the five examples apply, then the likelihood increases that the entity retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold. | The examples cited by Mr Taylor in this paragraph are drawn from the 2009 PWC IFRS Manual of Accounting, rather than IAS 18 itself.  I do not consider that Mr Taylor's comment "*if none of the five examples apply, then the likelihood increases that the entity retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold*" is appropriate since, as Mr Taylor himself notes, the examples cited in the PWC IFRS Manual of Accounting are non-exhaustive.

Determining whether the entity retains continuing management involvement or effective control over the goods sold requires consideration of the transaction specific conditions which existed.  I would therefore not expect the PWC IFRS Manual of Accounting to provide a list of all possible factors which might be relevant to a consideration of whether the entity retains continuing managerial involvement over the goods sold.  It is entirely reasonable to expect that the transaction specific events and conditions which existed in relation to certain of the Software Focus Transactions would demonstrate that Autonomy retained continuing management involvement or effective control over the goods sold for reasons not stated in the PWC IFRS Manual of Accounting. |

mazars

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | I note that Mr Taylor's citation of the PWC IFRS Manual of Accounting is at odds with his claim that there was a "*lack of any industry-specific guidance on software revenue recognition*". The PWC IFRS Manual of Accounting was a guide used by preparers of financial statements, and in my opinion it could be used to help determine whether the judgements reached by Autonomy in the Relevant Period were reasonable or unreasonable. |
| 3.2.14 | To the extent that there is any ongoing managerial involvement, an assessment must be made whether this would be considered equivalent to ownership and would therefore curtail revenue recognition. It is important to note that this assessment (along with the assessment of the other revenue recognition conditions) will be based on the situation at the time the sale is made – such conditions could subsequently change, and this would not impact the initial recognition of revenue. | I agree with Mr Taylor's comment that determining whether Autonomy retained managerial involvement or effective control over goods sold requires an assessment of the transaction specific conditions which existed at the time of the sale.<br><br>However, it is important to note that in some instances events will occur, or information will be obtained, after the date of a sale which provide evidence of conditions which existed as at the date of a sale. IFRS requires that such events or information be taken into account when considering whether the revenue recognition criteria for a transaction had been met.<br><br>For example, Autonomy immediately continuing to negotiate with an end-user in relation to a sale of software which it had purportedly already sold to a VAR is an event which occurs after the sale to the VAR, but which could be evidence that, as at the time of the sale to the VAR, Autonomy intended to retain managerial involvement over the goods sold. |
| 3.2.25 | Where an uncertainty subsequently arises about the collectibility [sic] of an amount that has been recognized as revenue, the appropriate accounting treatment is generally not to adjust the amount of revenue, but rather to recognize the uncollectible amount as an expense (i.e., as a bad debt) when that uncertainty arises. This expense impacts net profit in the period in which it is recorded, but it does not impact revenue or gross profit in either the original period in which revenue was recognized nor the period in which the expense is recorded. The circumstances where the accounting for a transaction may be adjusted or restated by subsequent events is discussed further in section 4 below. | I do not agree with Mr Taylor's summary. If a preparer identifies an uncertainty regarding the collectability of a debt, consideration must be given to whether the uncertainty existed at the time of the original sale, or if the uncertainty arose due to events and conditions which only came to exists after the date of the sale.<br><br>If the former is the case, the revenue recognition criteria of IAS 18 had not been met and no revenue should be recognised on the transaction.<br><br>An example of this is where an entity sells goods to a customer who goes into administration shortly after the sale had completed. In such a scenario, the fact that the customer has entered administration is persuasive evidence that, as at the date of the sale, it was not probable that the company would |

**MAZARS**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | receive an inflow of economic benefit from the transaction, and no revenue should be recognised. |
| 3.4.10 | As a result, whether transactions are considered to be linked is another area of IAS 18 (Revenue) where judgement is required, and thus accountants can reach different, valid conclusions for the same transactions. | Where I have concluded that Software Focus Transactions are linked to a corresponding purchase made by Autonomy from its customer, based on the specific facts and circumstances, I do not expect that a reasonable accountant would reach a conclusion which differed materially from mine across such a significant number of transactions. |
| 3.5.1 | The use of "Value Added Resellers" (or VARs) was described in Autonomy's Annual Report and Accounts for 2009 and 2010 as "Autonomy's primary revenue channel". A reseller model typically results in goods or services being sold to the reseller, and then a subsequent separate sale is made between the reseller and an end-user. | Mr Taylor's description of how a reseller transaction "typically" operates is inconsistent with the typical operation of the Software Focus Transactions which involved a reseller. In those Software Focus Transactions, it was not typical for the reseller to enact a sale of the software with the end user; indeed, in most instances, the reseller never made any sale of the goods to the named end user. |
| 3.5.2 | Under IAS 18 (Revenue), revenue must be recognized when the conditions are met for the sale to the reseller, as the reseller is the customer. It is not necessary to consider the subsequent sale to any end-user by the reseller. | The Software Focus Transactions in which Autonomy made sales to VARs had a number of transaction specific characteristics which meant that the revenue recognition criteria of IAS 18 was clearly not met.<br><br>However, addressing Mr Taylor's general observation, I disagree that it is not necessary to consider the subsequent sale to any end-user by the reseller. In my opinion, such a consideration is necessary if, for example:<br><br>• the reseller's attempts to sell the product (or lack of attempts to sell the product) provide evidence that the original seller retained managerial control of the goods sold (thereby failing to satisfy the revenue recognition criteria); and<br><br>• the reseller's ability to pay the original seller was contingent on it first selling the goods to an end-user (in which case the revenue recognition criteria of IAS 18 would only be met when the uncertainty was removed, that is, when the reseller sold the goods to the end user). |

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| 3.5.7 | The example provided by Autonomy explains that an upfront non-refundable fee was payable upon the sale of the license to the OEM before the longer term sales volume-based licence fees became payable. For the upfront non-refundable fee to be recognized as revenue, it needs to meet the conditions for sale of goods under IAS 18.14. Revenue recognition for the later sales-based licence fees is then also assessed under IAS 18.14 based on the amount of product sold as reported by the OEM. | IFRS sets out different revenue recognition criteria for transactions involving the sale of goods, the provision of services, and the use of an entity's assets (such as a royalty arrangement).  The appropriate revenue recognition criteria to apply to a transaction is determined by the substance of the transaction itself.<br><br>The accounting policy identified by Mr Taylor implies that Autonomy was applying the revenue recognition criteria applicable to the sale of goods to all OEM transactions (the Software Focus Transactions I reviewed which were "*OEM*" transactions were royalty arrangements).<br><br>In my opinion it is clearly incorrect to apply the revenue recognition criteria applicable to the sale of goods to transactions which are, in substance, royalty arrangements[9].<br><br>Moreover, IAS 1 "*Presentation of financial statements*" paragraph 18, explains that "*An entity cannot rectify inappropriate accounting policies either by disclosure of the accounting policies used or by notes or explanatory material*". |
| 3.5.12 | Autonomy accounted for the revenue arising from these multiple-element transactions in two separate parts, both of which were subject to the conditions under IAS 18.14. | IFRS sets out different revenue recognition criteria for transactions involving the sale of goods, the provision of services, and the use of an entity's assets (such as a royalty arrangement).  The appropriate revenue recognition criteria to apply to a transaction is determined by the substance of the transaction itself.<br><br>The accounting policy identified by Mr Taylor implies that Autonomy was applying the revenue recognition criteria applicable to the sale of goods to hosting transactions (the Software Focus Transactions I reviewed which were "hosting" related to the provision of a service) over time. |

---

[9] I note that the 2009 PWC IFRS Manual of Accounting explains that "*an up-front non-refundable payment might be made to the entity by another party and then a royalty of one per cent of sales might be receivable thereafter.  In that situation, it would be appropriate to reflect the agreement's substance rather than its form and spread the up-front receipt over the expected number of sales to be made in the future where, in substance, the receipt is an advance royalty*" (2009 PWC IFRS Manual of Accounting, paragraph 9.226).  I do not know whether Mr Taylor considered this element of the 2009 PWC IFRS Manual of Accounting when he addressed my conclusions on OEM transactions

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | In my opinion, it is clearly incorrect to apply the revenue recognition criteria applicable to the sale of goods to transactions which are, in substance, the rendering of a service over time. |
| | | Moreover, IAS 1, paragraph 18, explains that "*An entity cannot rectify inappropriate accounting policies either by disclosure of the accounting policies used or by notes or explanatory material*". |
| 4.3.10 | As defined in IAS 8 (Accounting Policies, Changes in Accounting Estimates and Errors), the assessment of "materiality" is not wholly quantitative. | Materiality depends on the size and nature of an item, therefore the assessment of materiality is both quantitative and qualitative.  Whether an item is qualitatively material is as relevant as whether it is quantitatively material. |
| 4.3.17 | Examples of events which could occur after a transaction is recorded but which would not result in a retrospective restatement are:<br><br>(a) where a customer subsequently did not pay their debt [...]<br><br>(b) where a separate, subsequent sale by a customer of the same goods to its end-user did not ultimately complete [...]<br><br>(c) where a customer subsequently did not use the purchased goods in the manner contemplated by the parties at the time of the sale [...]<br><br>(d)  where, having sold goods to a customer, the customer subsequently sells goods to the seller. | Mr Taylor provides four examples of "*events which could occur after a transaction is recorded but which would not result in a retrospective restatement*".<br><br>None of the examples cited by Mr Taylor are identified as examples of "*non-adjusting events*" in IAS 10 itself.<br><br>None of the example cited by Mr Taylor are identified as examples of "*non-adjusting events*" in the PWC IFRS Manual of Accounting.<br><br>I disagree with Mr Taylor's assertion that the four cited examples should be considered "*non-adjusting events*".  In each example cited, the correct application of IFRS requires the preparer to consider whether the events give evidence of condition which existed at the end of the reporting period (or as at the date of the initial transaction).  If the events do give evidence of conditions which existed as at the date of the reporting period (or as at the date of the initial transaction), the examples cited by Mr Taylor would be considering "adjusting events" and a retrospective restatement should be made.<br><br>I also note that Mr Taylor's example (a) in his comment on paragraph 4.3.17 does not accord with the circumstances outlined in IAS 10 paragraph 9(b)[i] where for example "*the bankruptcy of a customer that occurs after the* |

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *reporting period usually confirms*" that the customer was credit-impaired at the end of the reporting period. |
| 5.1.2 | IAS 18 (Revenue) indicates that "significant" revenue categories are the five groupings listed above but does not preclude additional "significant" categories being disclosed if the revenue recognized is not captured within those five categories.  Therefore, the "sale of goods" category captures the sales of all goods, with no additional requirement in IAS 18 (Revenue) for it (or any of the other categories) to include further sub-categories. | I consider that as hardware was a material category of revenue it should have been separately disclosed under IAS 18.35.  However, irrespective of whether hardware sales are considered to be a "*significant category of revenue*", in my opinion disclosure is required under IFRS 8 paragraph 32 for each product and service (or each group of similar products and services).   Further IAS 1.17(c) requires an entity to provide additional disclosures to "*enable users to understand the impact of particular transactions*" and ensure a fair presentation. |
| 5.2.4 | In addition to the segmental reporting, IFRS 8 (Operating Segments) also required certain entity-wide disclosures at a revenue-only level.  If a company provided a geographic split as its segmental reporting, under IFRS 8.32, it was required to "report the revenues from external customers for each product or service, or each group of similar products and services". | I disagree that IFRS 8.32 only comes into effect where a company has provided a geographic split as its segmental reporting.  This is not stated in IFRS 8.  IFRS 8.32 states:

"*An entity shall report the revenues from external customers for each product and service, or each group of similar products and services, unless the necessary information is not available and the cost to develop it would be excessive, in which case that fact shall be disclosed.  The amounts of revenues reported shall be based on the financial information used to produce the entity's financial statements*".

The decision that Autonomy had only one Operating Segment was made on the basis that Dr Lynch, the Chief Operating Decision Maker, only reviewed and considered financial and resource information at a group level.  Deloitte noted that[10]:

- "*Whilst separate financial information is prepared (quarterly) for each business unit for the purpose of producing the group consolidation, in no way are these business units operated or monitored like individual companies/Operating Segments*";
- "*No forecasts are prepared on a business unit basis, and those in managerial positions within the group are not assessed or* |

---

[10] Deloitte's audit working paper "2241a IFRS 8 – Accounting for Operating segments (FY2010) memo", Exhibit to witness statement of Mr Welham in the UK Civil proceedings

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | rewarded on the financial performance of anything other than the group as a whole"; and <br><br> • "Mike Lynch also only ever reviews and considers financial and resource information at a group level, with no consideration given to individual product lines or business units". <br><br> I have seen no evidence that an analysis of the similarity or otherwise of the various products and services was undertaken by Autonomy or Deloitte. This assessment is required in determining whether additional disclosure is required under IFRS 8.32.  It is incorrect to suggest that this paragraph is only required where an entity has provided a geographic split as its segmental reporting. <br><br> Whether or not Autonomy correctly judged it had only one operating segment depends on whether Dr Lynch (as the  Chief Operating Decision Maker) did or did not regularly review the operating results of hardware sales.  I note that spreadsheets that were sent to Dr Lynch included more detail than just financial information at a group level only.  For example, a spreadsheet titled "group revenue 29th sept SH.xls.edc" that was sent to Dr Lynch by Mr Hussain on 29 September 2009[11] included tabs titled "IDOL Europe", "IDOL US", "Iwov", "Cardiff", "etalk", "Zantaz" and "meridio" as well as a "revenue" tab.  The Zantaz tab includes amounts that I can identify were recorded as hardware revenue in Autonomy's general ledger, refers to hardware in the comments and includes an analysis of sales of EMC products, the majority of which were sales of hardware. <br><br> I note that the FRC Disciplinary Tribunal[12] concluded that "The software and the hardware were both physically and economically different products.  We conclude, therefore, that the hardware sales should have been disclosed under IFRS 8 para 32"[13]. |

---

[11] HP-SEC-02338481 and HP-SEC-02338482

[12] The FRC regulates UK firms providing audit services.  The Disciplinary Tribunal heard the Formal Complaint brought by the FRC's Executive Counsel against Deloitte regarding Deloitte's audits of Autonomy for the 2009 and 2010 financial years.
[13] FRC Tribunal Report, paragraph 353

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| 5.2.5 | IFRS 8.32 permits grouping "similar products and services".  However, there is no commentary or guidance in IFRS 8 (Operating Segments) as to how "similar products and services" should be determined.  As a result, the definition of "similar products and services" is a matter of judgement. | Whilst IFRS 8.32 does not explain how an entity should assess the similarity or otherwise of its products, it is reasonable and appropriate to look for guidance elsewhere in accounting standards.

For the purposes of assessing whether operating segments can be aggregated, IFRS 8.12 requires that those operating segments have similar economic characteristics <u>and</u> that the segments are similar in <u>each</u> of the following respects:

*"(a) the nature of the products and services;*

*(b) the nature of the production processes;*

*(c) the type or class of customer for their products and services;*

*(d) the methods used to distribute their products or provide their services; and*

*(e) if applicable, the nature of the regulatory environment, for example, banking insurance or public utilities".*

It is apparent that the nature of the production process for hardware (physical construction) is completely different to software (writing code) and the methods by which hardware is distributed (transport) is completely different to the methods by which software is distributed (electronically).  It is also apparent that hardware and software have very different economic characteristics – Autonomy made a gross loss on the majority of its hardware sales but made gross profits in excess of 80% on its software sales.

If Autonomy had judged that hardware and software were separate operating segments, it would not have been permitted to aggregate these segments under IFRS 8.12 due to the dissimilar characteristics of hardware and software.

In my opinion, the evidence that hardware and software are dissimilar products is clear.  I have not seen an assessment by Autonomy that justifies why hardware sales were not separately disclosed under IFRS 8.32 and I note that Mr Taylor has not explained why hardware and software can reasonably be seen as similar products or why management's judgement not |

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | to separately disclose this information resulted in a faithful representation of its business.<br><br>As noted above, the FRC Disciplinary Tribunal concluded that hardware and software were physically and economically different products and should have been separately disclosed under IFRS 8.32. |
| 5.2.9 | The lack of any stated quantitative basis or threshold in IFRS 8.32 suggests a more qualitative approach is preferred, which is consistent with the "management approach" basis of IFRS 8 (Operating Segments). In other words, for purposes of segmental reporting under the IFRS 8, the standard for disclosure (i.e., management approach) is not the same as the standard of materiality (i.e., user approach). | I disagree. Under IFRS 8.32, the fact of whether Product A is dissimilar to Product B requires the application of judgement, however if it was judged that they were dissimilar products but Product A was not material to the entity (either quantitatively or qualitatively) then separate disclosure of the revenue earned from Product A would not be required.<br><br>PwC, in its publication "*A practical guide to segment reporting*"[14] poses the question "*What is the definition of 'material' where an entity is required to disclose separately material revenues and material non-current assets from an individual foreign country*", stating that "*IFRS 8 does not define the term 'material' for the purpose of determining whether an individual country's revenue or non-current assets should be separately disclosed*". Therefore, whilst this addresses disclosure in respect of individual foreign countries, PwC is addressing how to assess materiality when IFRS 8 does not provide a definition.<br><br>PwC's view is that:<br><br>"*The entity should consider materiality from **both quantitative and qualitative** perspectives. When considering materiality quantitatively, the standard uses the threshold of 10% or more in determining whether an operating segment is a reportable segment. Therefore, it may be appropriate to apply the same test to determine whether an individual country's revenue or assets are material for the purpose of separate disclosure*" [emphasis added].<br><br>I note that hardware sales were circa 7.3% of revenue in 2009, but 12.1% in 2010. |

---

[14] https://www.pwc.com/gx/en/ifrs-reporting/pdf/segment-reporting.pdf

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| 5.2.10 | The underlying basis for IFRS 8 (Operating Segments) and the limited details on how to implement the entity-wide disclosures suggest a range of interpretations could have been made when implementing this new standard.  This is illustrated by a post implementation review of IFRS 8 by the IASB in July 2013.  In relation to entity-wide disclosures, the feedback noted that:<br><br>"*Many participants think that entity-wide disclosures are poorly understood … Many think that entity-wide disclosures are inconsistently applied across entities and it is claimed that regulators frequently challenge the entity-wide disclosure made*". | The response from the IASB to this point was:<br><br>"*We accept that the disclosures required are difficult to systematise and are often not reviewed by the CODM.  We think, however, that they provide useful information to investors and consequently we do not think that this area warrants any changes at this time*"[15].<br><br>Whilst entity-wide disclosures may have been poorly understood and not consistently applied across entities, the IASB confirmed that it considered such disclosure was useful and the fact that Autonomy made no entity-wide disclosures despite hardware being a very different product to software. |
| 5.3.3 | There is limited guidance in IFRS on where a specific expense should be recorded within the profit and loss account.  As a result, there is no explicit requirement or guidance under IFRS regarding how expenses should be allocated to particular line items in the financial statements. | Whilst IFRS does not explicitly prescribe how expenses should be allocated to particular line items in the financial statements, I refer to paragraph 3.5.2 of my report which notes that Autonomy's 2010 financial statements disclose that "*cost of revenues*" includes the cost of hardware (among other things) and that its disclosure of the components of sales and marketing costs does not include the cost of hardware.  In the absence of other disclosure therefore, a user of the financial statements would reasonably expect that the costs of hardware sales were included in the "*cost of revenues*" line in 2010. |

---

[15] Post-implementation Review: IFRS 8 Operating Segments, page 24

# 1    Appendix I – My comments on Appendix 3 to the Taylor Report

## 1.1    Introduction

1.1.1    Table 1.1 and 1.2 below, I set out my responses to Mr Taylor's observations in Appendix 3 to the Taylor Report.

**Table 1.1: My response to Mr Taylor's observations on Software Sales Transactions**

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| 2.4.1 (b) / 2.4.1 (b) | I disagree that, under IAS 8 (Accounting Policies Changes in Accounting Estimates and Errors) and IAS 18 (Revenue), it is appropriate to consider correspondence between individuals within a counterparty in relation to a transaction to determine whether to recognize revenue. It is not reasonably expected that a company could have obtained such contemporaneous information. | In my experience, correspondence between individuals within a counterparty is appropriate where it provides evidence of conditions which existed in relation to the transaction which Autonomy could reasonably have been expected to have obtained or taken into account.<br><br>In my opinion, it is entirely reasonable to consider emails between individuals within a counterparty if the emails provide evidence of the internal knowledge within Autonomy regarding a Software Focus Transaction.  For example, in relation to Software Focus Transaction #049 "*file tech*", I referred to emails between Mr Bill Loomis and Mr Gary Szukalski of FileTek, Inc ("**FileTek**") in which Mr Bill Loomis records the notes of a "*Telecon*" which appears to have involved individuals at Autonomy, and which recorded Autonomy's description of a series of transactions and explanation to FileTek of when the transactions would occur.<br><br>Similarly, in my opinion it is entirely reasonable to consider emails between individuals within a counterparty if the emails provide evidence of conditions which existed and which Autonomy could reasonably be expected to have obtained and considered at the time of the Software Focus Transaction.  For example, in relation to Software Focus Transaction #040a "*Capax*" I referred to an email from Mr John Baiocco |

**mazars**

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
|  |  | of Capax Discovery, LLC ("**Capax Discovery**") in which he sets out the amounts owed to / from Autonomy and Capax Discovery, information which should also have been available to Autonomy. |
|  |  | I therefore disagree with Mr Taylor's observation that it is inappropriate to consider correspondence between individuals within a counterparty when determining whether it was appropriate to recognise revenue on the Software Focus Transactions when considered based on the relevant facts and circumstances. |
| 2.4.1 (d) / 2.4.1 (d) | I disagree that, under IAS 8 (Accounting Policies Changes in Accounting Estimates and Errors) and IAS 18 (Revenue), it is appropriate to consider financial information of a company's counterparty, such as financial statements and bank confirmations of payments or receipts to determine whether to recognize revenue. It is not reasonably expected that a company could have obtained such contemporaneous information.<br><br>To the extent a counterparty's financial statements are available to the company, they may be used in the company's assessment of collectibility [sic]. The assessment of collectibility [sic] is subject to judgement and may include other indicators of the counterparty's creditworthiness. | In my experience, financial information of a counterparty to a transaction (including, where relevant, financial statements), is information that could reasonably be expected to be obtained by an entity when determining whether revenue should be recognised in relation to a transaction. I therefore disagree with Mr Taylor's observation.<br><br>I note my position is consistent with both:<br><br>• Autonomy, who sought and obtained financial information of counterparties in certain instances. For example, on 14 April 2010 Mr Thomas Esterrich of MicroTech, LLC ("**MicroTech**") emailed Mr Stephen Chamberlain of Autonomy with an attachment which "*contains MicroTech's Corporate Information, as requested*"[1]; and<br><br>• Autonomy's auditor Deloitte, who sought financial information of counterparties in certain instances in the context of its assessment of whether the revenue recognition criteria of IFRS had been met. For example, in relation to Software Focus Transaction #066 ("*Vidient*"), Mr Thomas Murray of Deloitte emailed Mr Stephen Chamberlain of Autonomy requesting, *inter* |

---

[1] Refer to Software Focus Transaction #050 "*MicroTech*"

**mazars**

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *alia*, "*Financial information to support the recoverability of the deal with Vidient Systems ($2.0 million licence deal)*"[2]. |
| | | I therefore disagree with Mr Taylor's observation that it not reasonably expected that an entity would obtain financial information of a counterparty, such as financial statements and bank confirmations of payments or receipts to determine whether to recognise revenue. |
| 2.4.8 / 2.4.8 | I disagree that, under IAS 8 (Accounting Policies Changes in Accounting Estimates and Errors) and IAS 18 (Revenue), it is appropriate to consider a subsequent restatement of certain comparative figures to determine whether to recognize revenue. It is not reasonably expected that a company could have obtained such information contemporaneously. | IAS 8 states that prior period restatements should only be made when an entity has failed to use, or misused, evidence which was available (or could reasonably have expected to have been available) at the date the financial statements were authorised for issue. |
| | | As such, the Restatement is relevant context as it shows that the evidence available to Autonomy (or which should have been available to Autonomy) at the date Autonomy's financial statements were issued should have precluded the recognition of revenue on Software Focus Transactions. |
| | | Notwithstanding the above, and importantly, I note that none of the adjustments I have proposed in relation to the Software Focus Transactions are reliant on the Restatement. |
| 2.5.4 (a) / 2.5.4 (a) | I disagree that the significant risks and rewards of ownership of the goods had clearly not been transferred to the buyer if there was contemporaneous evidence that the buyer made no efforts to sell the goods it had acquired to a named end-user. | In my experience, determining whether the significant risks and rewards of ownership of goods have transferred to the buyer requires a consideration of the cumulative evidence of the transaction specific conditions which exists. Cumulative evidence may also help understand the substance (or lack of substance) behind the transaction. |
| | I disagree that the significant risks and rewards of ownership of the goods had clearly not been transferred to the buyer if there was contemporaneous evidence that the buyer could not have independently sold the goods it had acquired to a named end-user, even when the only route through which the buyer would have been | In my opinion, there were multiple Software Focus Transactions where the cumulative evidence made it clear that the significant risks and rewards of ownership of the software had not transferred to the buyer at the transaction date. |

---

[2] HP-SEC-01929718

![mazars logo]

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
|  | able to do so was via a restructuring of the end-users' existing contractual agreements with the seller.<br><br>If management had determined that the significant risks and rewards of ownership of goods transferred to the buyer, it is not relevant whether the buyer made efforts to sell the goods to a named end-user. | I do not know whether Mr Taylor disagrees with the Misstatements I identified arising from transactions where I considered that Autonomy retained the significant risks and rewards of ownership of the goods sold. Mr Taylor does not express an opinion disagreeing with my opinions on individual Software Focus Transactions, nor does he express an opinion confirming that he considers Autonomy's original accounting for the Software Focus Transactions appropriate. |
| 2.5.4 (b) / 2.5.4 (b) | The evaluation of whether the seller retains continuing managerial involvement to the degree usually associated with ownership or effective control over the goods sold is made at the time of the sale. If the conditions for revenue recognition are satisfied at the time of the sale, then any subsequent changes would not affect the initial revenue recognized.<br><br>The seller is not prohibited from contacting the end-user after the sale to the buyer has completed. To the extent the seller continued to discuss the specific transaction with the end-user, it would be necessary to assess the seller's level of involvement and it would be a matter of judgement whether this was demonstrative of "continuing managerial involvement to the degree usually associated with ownership or effective control over the goods sold". | The determination of whether Autonomy retained continuing managerial involvement to the degree usually associated with ownership or effective control over the goods sold is based on the conditions which existed as at the time of the Software Focus Transaction. I do not consider this to be analogous to Mr Taylor's assertion that the determination is made "*at the time of the sale*".<br><br>Information obtained after the date of the Software Focus Transaction is relevant to an evaluation of whether Autonomy retained continuing managerial involvement of the goods sold if it provides evidence of conditions which existed as at the date of the Software Focus Transaction. For example, Autonomy immediately continuing to negotiate with an end-users even after it had completed a sale to a VAR is an event which occurs after the date of the time of the sale but gives evidence of conditions which existed as at the date of the sale.<br><br>In my opinion, a seller continuing to negotiate the sale of goods to an end-user, despite these goods having previously been "sold" to a different party, is a significant indicator that the seller has retained managerial control over the goods. I note that such a situation is consistent with the guidance of PwC quoted by Mr Taylor, specifically that "*Indicators of continuing managerial involvement or retention of control might include* […] *The seller can control the future price of the item* [and] *The seller has control over the re-sale of the item to third parties (for example, the seller can control the selling price, timing or counterparty of any re-sale transaction or, alternatively, re-sale is entirely prohibited)*". |

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | I agree with Mr Taylor's observation that a seller is not prohibited from contacting the end-user after a sale to a buyer has completed.  Mr Taylor also comments that "*it would be necessary to assess the seller's level of involvement and it would be a matter of judgement whether this was demonstrative of "continuing managerial involvement to the degree usually associated with ownership or effective control over the goods sold""*, and I note my assessment as to whether Autonomy retained the continuing managerial involvement is based on my detailed review of each individual Software Focus Transactions |
| | | I do not know whether Mr Taylor disagrees with the Misstatements I identified arising from transactions where I considered that Autonomy retained managerial involvement over the goods sold to the degree usually associated with control.  Mr Taylor does not express an opinion disagreeing with my opinions on individual Software Focus Transactions, nor does he express an opinion confirming that he considers Autonomy's original accounting for the Software Focus Transactions appropriate. |
| 2.5.4 (c) / 2.5.4 (c) | Under IFRS, a threshold of a greater than 50% chance has been adopted in practice to assess probability. This assessment is subjective and is made at the time of the original sale, without the use of hindsight. Financial information about a buyer's cash position or profitability is not the only indicator of whether collectibility [sic] is probable. Subsequent purchases from a buyer, or subsequent evidence that a buyer did not pay its debt, do not form part of the original assessment of probability. | The determination of whether it was probable that Autonomy would receive an inflow of economic benefit from a Software Focus Transaction is based on the conditions which existed as at the time of the Software Focus Transaction.  I do not consider this to be analogous to Mr Taylor's assertion that the determination is made "*at the time of the original sale*". |
| | | In my opinion and experience, factors which could indicate that it is not probable that an entity could receive and inflow of economic benefit from a transaction include, *inter alia*: |
| | | • business practices, including the customer's (or VAR's) operating history, informal communications, or competitive pressures which indicate that the customer's (or VAR's) payment is largely contingent on the VAR making a sale of the products to an end-user; |

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | • the financial health of the customer (or VAR), including whether the customer (or VAR) is under-capitalised or in financial hardship; and<br><br>• historical patterns of settlement (or conversely, lack of settlement) with a customer (or VAR) which suggest that in the absence of a deal with an end-user, debts were cancelled or settled only once Autonomy had made purchases from the customer (or VAR).<br><br>If information is obtained from events which occurred after the date of the Software Focus Transaction which gives evidence that, as at the date of the Software Focus Transaction, it was not probable that Autonomy would receive an inflow of economic benefit, this should be considered when determining whether the Software Focus Transaction met the revenue recognition requirements.  For example, in my experience:<br><br>• a customer going into default soon after a sale is completed is often evidence that, as at the date of the initial sale, it was not probable that the seller would receive an inflow of economic benefit from the transaction;<br><br>• a customer making payments to the seller after the date of the initial sale only once the seller has committed to make purchases from the customer is often evidence that, as at the date of the initial sale, it was not probable that the seller would receive an inflow of economic benefit from the transaction; and<br><br>• a customer's debt being cancelled or written off after the date of the initial sale can be relevant to an assessment of whether, at the time of the initial sale, it was probable that the seller would receive an inflow of economic benefit from the transaction.  This is particularly true if no events or conditions arose after the date of the transaction which caused the debt to be cancelled or written off.<br><br>In addition, information obtained from events arising after the Software Focus Transaction is relevant to a determination of whether the Software |

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | Focus Transaction met the revenue recognition requirements if that information could reasonably have been expected to have been known or obtained by Autonomy.  For example, correspondence between individuals within a customer which highlights a customer's inability to pay is relevant to the application of IFRS, as it is reasonable to expect that Autonomy would have been able to obtain information on the financial health of the customer.<br><br>I note my conclusions as to whether it was probable that Autonomy would receive an inflow of economic benefit in relation to a sale is based on my reviews of the cumulative transaction specific evidence related to individual Software Focus Transactions.<br><br>I do not know whether Mr Taylor disagrees with the Misstatements I identified arising from transactions where I considered that it was not probable that Autonomy would receive an inflow of economic benefit from the transaction.  Mr Taylor does not express an opinion disagreeing with my opinions on individual Software Focus Transactions, nor does he express an opinion confirming that he considers Autonomy's original accounting for the Software Focus Transactions appropriate. |
| 2.5.6 / 2.5.6 | I disagree that additional requirements of IFRS need to be considered over and above the revenue recognition conditions of IAS 18 (Revenue).<br><br>The relevant conditions for revenue recognition are set out in IAS 18 (Revenue). If these conditions are met, then the financial statements are presumed to present a faithful representation of the transactions and events that they purport to represent. | As a primary observation I note Mr Taylor's view that there was "*No industry-specific guidance on revenue recognition for software was provided under IFRS*", and Mr Taylor footnotes the IAS hierarchy of authoritative guidance that management considers in the absence of an IFRS that specifically applies to an item[3].  Mr Taylor seems inconsistent when suggesting there is no industry guidance and then also citing the IAS 18 hierarchy.  I also note that Deloitte notes in its 2010 Audit File (Planning) that Autonomy looks outside of IAS 18.  Deloitte note that "*The critical accounting policy is IAS 18 revenue recognition, as revenue is the key driver.  Deloitte will assess whether revenue is appropriately recognised on a detailed basis.  Given guidance in IAS 18 is not always specific to software companies, Autonomy have traditionally looked* |

---

[3] IAS 8, paragraphs 10 to 12

**MAZARS**

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *towards ASC 985-605-15 (formerly SOP 97-1) for additional guidance*". It is therefore unclear why Mr Taylor did not consider (or did not address whether Autonomy should have also considered) the requirements and guidance of other standard setters outside of IFRS, including ASC 985-605-13 (formerly SOP 97-2) regarding software sales[4].

The overarching principal of financial statements prepared in accordance with IFRS is that they present a "fair presentation". Indeed, IFRS explains that, whilst rare, there may be instances where an entity needs to deviate from the requirements of IFRS so as to ensure that a fair presentation is achieved.  As such I disagree that it is solely the requirements of IAS 18 that are relevant when considering whether revenue should have been recognised on the Software Focus Transactions.

Determining whether a Software Focus Transaction had economic substance requires a consideration of the cumulative evidence of the specific conditions which existed in relation to the Software Focus Transaction.

However, for the avoidance of doubt, if a transaction lacked economic substance, it goes without saying that the revenue recognition requirements of IAS 18 would not be met.  For example, it would not be probable that Autonomy would receive an inflow of economic benefit from a Software Focus Transaction that lacked economic substance. Similarly, if a Software Focus Transaction had no economic substance, it follows that there was no transfer of the risks and rewards of ownership of the goods, and Autonomy would maintain managerial control over the goods purportedly sold in the Software Focus Transaction. |
| 2.5.7 (a) / 2.5.7 (a) | I disagree that additional requirements of IFRS need to be considered over and above the revenue recognition conditions of IAS 18 (Revenue). | Mr Taylor's comments refer to the Software Focus Transactions relating to transactions with VARs. |

---

[4] Whilst Autonomy unequivocally stated that the Relevant Financial Statements were prepared in accordance with IFRS, I note that Autonomy did consider certain US GAAP guidance including ASC 985-605-13 (formerly SOP 97-2) when making judgements in relation to the application of IAS 18

**mazars**

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | The relevant conditions for revenue recognition are set out in IAS 18 (Revenue). <br><br> None of these conditions contain criteria related to the extent of negotiations or the timing within an entity's reporting period required to agree a transaction. If the IAS 18 (Revenue) conditions for revenue recognition are met, revenue is recognized. | Based on my experience, conditions which could indicate that a transaction did not have economic substance include instances where transactions are executed with VARs in a very short space of time (over a matter of hours), with little to no negotiation, and on the last day of an entity's reporting period. It is therefore clear to me that these conditions are relevant to the evaluation of whether a Software Focus Transaction met the revenue recognition requirements of IFRS. <br><br> In his report, Mr Taylor refers to the International Standards on Auditing in the context of a discussion on materiality. International Standards on Auditing set out the requirements of auditors when reaching a conclusion on whether financial statements have been prepared in accordance with an accounting framework such as IFRS. It appears that Mr Taylor and I agree that International Standards on Auditing can provide useful guidance on what could be relevant to an evaluation of whether financial statements have been prepared in accordance with IFRS. <br><br> International Standard on Auditing 240 is titled "*The Auditor's Responsibilities Relating to Fraud in an Audit of Financial Statements*" ("**ISA 240**"). ISA 240 sets out requirements and guidance applicable to auditors when evaluating whether financial statements are materially misstated due to fraud. In this context, ISA 240 explains that a "*fraud*" is defined as an intentional action that results in a misstatement of the financial statements[5]. <br><br> It is my view the guidance contained within ISA 240 regarding the risk factors that could indicate the existence of fraudulent transactions is also helpful guidance to consider when evaluating whether a Software Focus Transaction had an economic substance. To that end, ISA 240 highlights the following conditions as being "*risk factors*" which warrant consideration[6]: |

---

[5] It is my view that certain Software Focus Transactions did not have an economic substance. I note that this is not the same as me making a legal determination as to whether a fraud has occurred
[6] ISA 240, Appendix A

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | • "*Significant, unusual, or highly complex transactions, **especially those close to period end** that pose difficult "substance over form" questions*"; [emphasis added] and |
| | | • "*Use of business intermediaries for which there appears to be no clear business justification*". |
| | | In my opinion, the above guidance of ISA 240 makes it clear that evaluating conditions related to negotiations and timing can be highly relevant to the correct application of IFRS, especially if transactions were executed with VARs in a very short space of time (over a matter of hours), with little to no negotiation, and on the last day of an entity's reporting period.  Consequently, where such conditions existed in relation to a Software Focus Transaction, they should be considered when determining whether it was appropriate to recognise revenue. |
| 2.5.7 (b) / 2.5.7 (b) | Under IFRS, a threshold of a greater than 50% chance has been adopted in practice to assess probability, not "realistic prospects". This assessment is subjective and is made at the time of the original sale, without the use of hindsight.<br><br>If collectibility [sic] is deemed to be probable, and the other conditions in IAS 18 (Revenue) for revenue recognition are met, then revenue is recognized. | I agree with Mr Taylor's observation that, in accordance with IAS 18, it needs to be probable that an entity will receive an inflow of economic benefit in order for an entity to recognise revenue.<br><br>In certain Software Focus Transactions, it is my view that there was no realistic prospect that the VAR would be able to pay the amounts owed to Autonomy in the absence of a transaction with the end-user.  For Software Focus Transactions where this was the case, I consider it self-evident that the 50% probability threshold required for revenue recognition under IAS 18 would not have been met.<br><br>However, in my experience, there being no realistic prospect that a VAR would be able to pay the amounts owed to Autonomy in the absence of a transaction with the end-user can also be an indicator that a Software Focus Transaction had no economic substance.  In this regard I note the guidance of ISA 240, which identifies the following as one of the "*Indicators*" that warrant consideration:<br><br>• "*The transactions involve previously unidentified related parties or parties that do not have the substance or the financial* |

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *strength to support the transaction without assistance from the entity under audit*[7].

In my opinion, the above guidance of ISA 240 makes it clear that it can be highly relevant to the correct application of IFRS if transactions were executed with VARs where there was no realistic prospect that the VAR would be able to pay the amounts owed to Autonomy in the absence of a transaction with the end-user (or assistance from Autonomy). Consequently, where such a condition existed in relation to a Software Focus Transaction, it should be considered when determining whether it was appropriate to recognise revenue. |
| 2.5.7 (c) / 2.5.7 (c) | I disagree that the significant risks and rewards of ownership of goods had not been transferred to the buyer if there was contemporaneous evidence that the buyer could not have independently sold the goods it had acquired to a named end-user, even when the only route through which the buyer would have been able to do so was via a restructuring of the end-users' existing contractual agreements with the seller.

I disagree that the significant risks and rewards of ownership of the goods had not been transferred to the buyer if there was contemporaneous evidence that the buyer was also a co-founder of a named end-user.

If management had determined that the significant risks and rewards of ownership of goods transferred to the buyer, and the other conditions in IAS 18 (Revenue) for revenue recognition are met, then revenue is recognized. | I disagree with Mr Taylor's observation that "*If management had determined that the significant risks and rewards of ownership of goods transferred to the buyer* […] *then revenue is recognized*".  Applying IFRS requires a consideration of the transaction specific conditions which existed as at the date of each Software Focus Transaction, as opposed to just management's determination.

Based on my experience, conditions which could indicate that a transaction did not have economic substance include instances where the only apparent route through which the sale of the software licence to the named end-user could be achieved required a restructuring of existing contracts with Autonomy which the VAR was unable to enact.

In that regard I note the guidance of ISA 240, which highlights the following condition as being a "*risk factors*" which warrants consideration:

• "*Significant, unusual, or highly complex transactions, especially those close to period end that pose difficult "substance over form" questions*".

In my opinion, the above guidance of ISA 240 makes it clear that it can be highly relevant to the correct application of IFRS if the only apparent route through which the sale of the software licence to the named end- |

[7] ISA 240, paragraph A48

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | user could be achieved required a restructuring of existing contracts with Autonomy (which the VAR was unable to enact).  Consequently, where such a condition existed in relation to a Software Focus Transaction, it should be considered when determining whether it was appropriate to recognise revenue.

Mr Taylor disagrees that the "*significant risks and rewards of ownership of goods had not been transferred to the buyer if there was contemporaneous evidence that the buyer was also a co-founder of a named end-user*".  Mr Taylor's comment relates to an observation I made in relation to Software Focus Transaction #041, in which Autonomy sold software to MicroLink, LLC ("**MicroLink**") (liaising with Mr David Truitt, who co-owned MicroLink), for MicroLink to then sell to the end user, DiscoverTechnologies, LLC ("**DiscoverTech**", a company also co-owned by Mr David Truitt).   As noted in my review of this Software Focus Transaction in Appendix F, I have seen nothing to explain the economic or commercial rationale for channelling this transaction through a reseller who was controlled by the same individual as DiscoverTech, rather than concluding the transaction with DiscoverTech directly.  To that end, I note the following "*indicators*" and "*risk factors*" set out in the guidance of ISA 240[8], which in my opinion demonstrates that this conditions of Software Focus Transaction #041 was clearly relevant to an application of IFRS:

- "*Use of business intermediaries for which there appears to be no clear business justification*"; and

- "*The form of such transactions appears overly complex (for example, the transaction involves multiple entities within a consolidated group or multiple unrelated third parties)*". |
| 2.5.7 (d) / 2.5.7 (d) | The relevant conditions for revenue recognition are set out in IAS 18 (Revenue). These conditions do not contain criteria related to the existence of a pattern of behaviour between a seller and a buyer. | In my experience, the existence or emergence of a pattern of behaviour between Autonomy and a VAR can indicate that a Software Focus Transaction does not have an economic substance. |

---

[8] ISA 240, Appendix 1

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | The history between a seller and a buyer can be considered in evaluating the IAS 18 (Revenue) conditions, such as collectibility [sic]. If the IAS 18 (Revenue) conditions for revenue recognition are met, then the transaction is presumed to have economic substance and revenue is recognized. | As explained in the guidance to ISA 240, "*a retrospective review of similar management judgements and assumptions applied in prior periods may also provide insight about the reasonableness of judgements and assumptions supporting management estimates*".  For example, the reasonableness of management's judgement as to whether the revenue recognition criteria for a Software Focus Transaction had been met could be called into question if there were multiple previous transactions with the VAR which had subsequently been reversed or cancelled.

In my opinion, the above guidance of ISA 240 makes it clear that pre-existing patterns of behaviour between Autonomy and a VAR can be highly relevant to the correct application of IFRS.  Consequently, when considering whether it was appropriate to recognise revenue in relation to a Software Focus Transaction, such patterns are relevant to the fact pattern and should be considered. |
| 2.5.7 (e) / 2.5.7 (e) | Revenue must be recognized if the IAS 18 (Revenue) conditions are met on a specific transaction, based on contemporaneous information.

In accordance with IAS 18 (Revenue), if an uncertainty subsequently arises concerning the collectibility [sic] of an amount previously recognized as revenue, no adjustment is recorded to the original revenue recognized. Rather, the uncollectible amount is recorded as an expense. | I disagree with Mr Taylor's observation.   As explained above, if information is obtained from events which occurred after the date of the Software Focus Transaction which gives evidence that, as at the date of the Software Focus Transaction, it was not probable that Autonomy would receive an inflow of economic benefit, this should be considered when determining whether the Software Focus Transaction met the revenue recognition requirements.  In my opinion, Autonomy cancelling amounts owed by the VAR in relation to a Software Focus Transaction, or facilitating the VAR's settlement of the amounts owed by first remitting cash to the VAR, provides evidence that, at the date of the Software Focus Transaction, it was not probable that the VAR would settle the amounts it owed.

For example, in relation to Software Focus Transaction #105 "*UBS Supervision and Archiving*", Autonomy made a "sale" of $7.664 million to Capax Discovery on 30 June 2011, but subsequently wrote the full amount off on 31 August 2011.  I am not aware of a specific event that took place between 30 June 2011 and 31 August 2011 that would result in a change to the "collectability" of the Capax Discovery debt.  In my opinion, the writing off of the amount owed by Capax Discovery is |

![Mazars logo]

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | evidence which is relevant to an assessment of whether, at 30 June 2011, it was probable the Autonomy would receive an inflow of economic benefit from Capax Discovery in relation to the transaction. |
| 2.5.7 (f) / 2.5.7 (f) | Revenue must be recognized if the IAS 18 (Revenue) conditions are met on a specific transaction, based on contemporaneous information.<br><br>The subsequent payment of a commission after the completion of a transaction is a business decision. | In my opinion, the payment of a commission to a VAR in relation to a Software Focus Transaction, despite the VAR having no apparent involvement in the sale to the end-user, is a condition that indicates that the Software Focus Transaction had no economic substance.  ISA 240 identifies that "*Causing an entity to pay for goods and services not received (for example* [...] *kickbacks paid by vendors to entity's purchasing agents in return for inflating prices* [...]*)*" is a potential method through which intentional accounting errors might be made.<br><br>I therefore consider it clear that the payment of commissions to VARs in relation to a Software Focus Transaction, despite the VAR having performed no apparent service to Autonomy, can be highly relevant to an appraisal of whether the Software Focus Transaction had any economic substance at the date of the transaction. |
| 2.6.1 / 2.6.1 | When assessing whether there is a link between different transactions relating to different goods and/or services, the only guidance in IAS 18 (Revenue) to make the assessment relates to determining "commercial effect", which requires judgement. | I agree with Mr Taylor's observation that judgement is required when assessing whether the revenue recognition criteria should be applied to two or more transactions together.<br><br>Appropriate judgement should lead to a presentation which provides a "*faithful representation*" of the economic substance of the transactions. A "*faithful representation*" is one of the fundamental qualitative characteristics of useful financial reporting and one of the components of a "*fair presentation*"; the overarching requirements of financial statements prepared in accordance with IFRS.<br><br>For example, in relation to Software Focus Transaction #036 "*Vidient Systems*", Autonomy and Vidient Systems, Inc ("**Vidient**") entered into a transaction whereby Autonomy "sold" products with a value of $2.5 million to Vidient, and on the following day purchased products from Vidient with a value of $3.0 million.  Vidient was a loss making entity in the nine months to 30 September 2009 and a purchase of $2.5 million |

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | would have largely eliminated its cash reserves. In my opinion, it would be unreasonable to judge that the "*commercial effect*" of Autonomy's sale to and purchase from Vidient could be understood without reference to one another, and similarly I am of the view it would be unreasonable to judge that accounting for these transactions separately would achieve a "*fair presentation*". |
| | | I do not know whether Mr Taylor disagrees with the Misstatements I identified arising from transactions which contained linked or reciprocal transactions. Mr Taylor does not express an opinion disagreeing with my opinions on individual Software Focus Transactions, nor does he express an opinion confirming that he considered Autonomy's original accounting for the Software Focus Transactions appropriate. |
| 2.6.3 / 2.6.3 | Transactions are considered to be linked if "*the commercial effect cannot be understood without reference to the series of transactions as a whole*". This is a judgement made contemporaneously. | Mr Taylor states that he disagrees that "*transactions being in close time proximity to each other, negotiated by the same individuals, or with their mutual existence acknowledged in the negotiations, means that they should be considered together*". I agree with Mr Taylor's observation insofar as none of these factors are individually determinative of whether two transactions be accounted for as one. |
| | I disagree that transactions being in close time proximity to each other, negotiated by the same individuals, or with their mutual existence acknowledged in the negotiations, means that they should be considered together – these are indicators that may be appropriate to consider whether such transactions are linked. | However, in my experience, determining whether "*the commercial effect* [of a transaction] *cannot be understood without reference to the series of transactions as a whole*" requires a consideration of the cumulative evidence of the transaction specific conditions which exists. I have performed this consideration in Appendix F of my Interim Report, and I note that Mr Taylor has not addressed the transaction specific evidence I reviewed. He has also not explained his conclusion as to whether each Software Focus Transaction should have been considered together with certain other linked transactions entered into by Autonomy. |
| | If the collectibility [sic] of a transaction is wholly dependent upon another transaction with the same counterparty, then it may be appropriate to consider them as linked. However, an assessment of collectibility [sic] needs to be performed to first establish the "wholly dependent" judgement. | |
| | I disagree that the lack of fair value assessments means that transactions should be considered together. A fair value condition is not referred to within IAS 18.13 and is not typically undertaken for each and every transaction of a company. | Mr Taylor disagrees that the lack of fair value assessments means that transactions should be considered together. For the avoidance of doubt, I do not suggest that a lack of fair value assessment means that transactions should be considered together. Instead, I considered that a lack of evidence existing to support the amounts payable by the parties |

**MAZARS**

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | as being fair value was relevant to a consideration of whether the transactions should be considered together. |
| | | This is connected to the evidence I had seen that certain Software Focus Transactions (or their linked transactions) were entered into above the fair value of the products or services sold.  Mr Taylor has not provided any comments on whether this is relevant to whether Software Focus Transactions were linked to other transactions.  In my opinion it is clearly relevant. |
| | | I do not know whether Mr Taylor disagrees with the Misstatements I identified arising from transactions which contained linked or reciprocal transactions.  Mr Taylor does not express an opinion disagreeing with my opinions on individual Software Focus Transactions, nor does he express an opinion confirming that he considered Autonomy's original accounting for the Software Focus Transactions appropriate. |
| 2.7 / 2.7 | This section in the Brice Report concerns hosting transactions and how the related revenue should be recognized.<br><br>The Autonomy revenue recognition policy (as set out in both the 2009 and 2010 Annual Report and Accounts) states that Autonomy considered licenses, OEM and hosting transactions to be recognized as "sale of goods" – not rendering of services.<br><br>Mr Brice's opinion that these transactions were rendering of services is contrary to Autonomy's revenue recognition policy. As such, Mr Brice's comments suggest he disagrees with Autonomy's publicly disclosed accounting policy and presentation. | IFRS sets out different revenue recognition criteria for transactions involving the sale of goods, the provision of services, and the use of an entity's assets (such as a royalty arrangement).  The appropriate revenue recognition criteria to apply to a transaction is determined by the substance of the transaction itself.<br><br>The accounting policy identified by Mr Taylor implies that Autonomy was applying the revenue recognition criteria applicable to the sale of goods to hosting transactions (the Software Focus Transactions I reviewed which were "hosting" related to the provision of a service).<br><br>In my opinion it is clearly incorrect to apply the revenue recognition criteria applicable to the sale of goods to transactions which are, in substance, the rendering of a service.<br><br>Moreover, IAS 1 "*Presentation of financial statements*" paragraph 18, explains that "*An entity cannot rectify inappropriate accounting policies either by disclosure of the accounting policies used or by notes or explanatory material*". |

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | As such, Mr Taylor's observation on Section 2.7 of my Interim Report only serves to identify a further error (or poorly presented accounting policies) in Autonomy's financial reporting during the Relevant Period.<br><br>I do not know whether Mr Taylor disagrees with the Misstatements I identified arising from transactions being accounted for as a sale of goods rather than the rendering of services.  Mr Taylor does not express an opinion disagreeing with my opinions on individual Software Focus Transactions, nor does he express an opinion confirming that he considers Autonomy's original accounting for the Software Focus Transactions appropriate. |
| 2.8 / 2.8 | This section in the Brice Report concerns OEM transactions and how the related revenue should be recognized.<br><br>The Autonomy revenue recognition policy (as set out in both the 2009 and 2010 Annual Report and Accounts) states that Autonomy considered licenses, OEM and hosting to be recognized as "sale of goods" – no amounts were stated to be recognized as royalties.<br><br>Mr Brice's opinion that these transactions were royalties is contrary to Autonomy's revenue recognition policy. As such, Mr Brice's comments suggest he disagrees with Autonomy's publicly disclosed accounting policy and presentation. | IFRS sets out different revenue recognition criteria for transactions involving the sale of goods, the provision of services, and the use of an entity's assets (such as a royalty arrangement).  The appropriate revenue recognition criteria to apply to a transaction is determined by the substance of the transaction itself.<br><br>The accounting policy identified by Mr Taylor implies that Autonomy was applying the revenue recognition criteria applicable to the sale of goods to OEM transactions (the Software Focus Transactions I reviewed which were "OEM" transactions were royalty arrangements).<br><br>In my opinion it is clearly incorrect to apply the revenue recognition criteria applicable to the sale of goods to transactions which are, in substance, royalty arrangements[9].<br><br>Moreover, IAS 1 "*Presentation of financial statements*" paragraph 18, explains that "*An entity cannot rectify inappropriate accounting policies either by disclosure of the accounting policies used or by notes or explanatory material*". |

[9] I note that the 2009 PWC IFRS Manual of Accounting explains that "*an up-front non-refundable payment might be made to the entity by another party and then a royalty of one per cent of sales might be receivable thereafter.  In that situation, it would be appropriate to reflect the agreement's substance rather than its form and spread the up-front receipt over the expected number of sales to be made in the future where, in substance, the receipt is an advance royalty*" (2009 PWC IFRS Manual of Accounting, paragraph 9.226).  I do not know whether Mr Taylor considered this element of the 2009 PWC IFRS Manual of Accounting when he addressed my conclusions on OEM transactions

**MAZARS**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | As such, Mr Taylor's observation on Section 2.8 of my Interim Report only serves to identify a further error (or poorly presented policies) in Autonomy's financial reporting during the Relevant Period.<br><br>I do not know whether Mr Taylor disagrees with the Misstatements I identified arising from transactions being accounted for as a sale of goods rather than royalties. Mr Taylor does not express an opinion disagreeing with my opinions on individual Software Focus Transactions, nor does he express an opinion confirming that he considers Autonomy's original accounting for the Software Focus Transactions appropriate. |
| 2.9 / 2.9 | This section in the Brice Report concerns transactions which Mr Brice contends included a "*significant installation process*".<br><br>This is a judgement made contemporaneously. IAS 18 (Revenue) does not provide any guidance on what "significant" means in this context. | I agree that what constitutes a "*significant installation process*" is a matter of judgement. My conclusions on whether a Software Focus Transaction contained a "*significant installation process*" was based on my view of the transaction specific evidence.<br><br>I note that the 2009 PWC IFRS Accounting Manual referred to by Mr Taylor explains, in relation to software sales, that "*Where acceptance is subject to installation and inspection and the **installation process is simple (for example, involving unpacking and loading the software), revenue can be recognised immediately upon the buyer's acceptance of delivery**. However, if, as is often the case, the installation process is more substantial and there is more than an insignificant risk of non-acceptance, revenue recognition should be delayed until the installation and inspection process are complete and customer acceptance has occurred*"[10] [emphasis added]. Mr Taylor has not referred to this guidance when addressing my conclusions in relation to Software Focus Transactions with a "*significant installation process*".<br><br>I do not know whether Mr Taylor disagrees with the Misstatements I identified arising from transactions which contain timing errors. Mr Taylor does not express an opinion disagreeing with my opinions on individual Software Focus Transactions, nor does he express an opinion confirming |

---

[10] 2009 PWC IFRS Manual of Accounting, paragraph 9.101

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

Summary of independent expert accounting opinions of Steven Brice FCA

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | that he considered Autonomy's original accounting for the Software Focus Transactions appropriate. |

**mazars**

Table 1.2: My response to Mr Taylor's observations on Hardware Sales Transactions

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| 3.5.2 (a) / 3.5.2 (a) | While under IFRS, the cost of inventory in a period must be recognized as an expense, I disagree that this means these costs are necessarily all reported as Cost of Sales. | I disagree that the cost of inventory in a period should be reported as anything other than cost of sales. |
| | | The full text of IAS 2.38 is "*The amount of inventories recognised as an expense during the period, <u>which is often referred to as cost of sales</u>, consists of those costs previously included in the measurement of inventory that has now been sold and unallocated production overheads and abnormal amounts of production costs of inventories.  The circumstances of the entity may also warrant the inclusion of other amounts, such as distribution costs*" [emphasis added]. |
| | | Amounts that comprise cost of sales can also be referred to as cost of revenues, which is in fact how Autonomy referred to such costs[11] or cost of goods sold ("**COGS**"). |
| | | Autonomy's accounting policy for cost of revenues stated that it included hardware (paragraph 3.5.2 (b) (i)). |
| | | COGS is self-explanatory – it is the cost to the entity of the goods that it has sold to generate revenue.  Where an entity has purchased hardware to sell to a third party, the cost of that hardware is a cost of the goods sold to the third party. |
| | | I note that when Autonomy deferred certain hardware sales in Q1 2010 (paragraphs 3.4.8 to 3.4.12 of my report), the full cost of the hardware was also deferred, including any amount that Autonomy intended to account for as a sales and marketing cost[12].  If a portion of the cost did represent a sales and marketing expense, it would not have been necessary or appropriate to record that as inventory.  Rather it should have been recorded as a prepayment of expenses, to be recognised in |

---

[11] Autonomy's 2010 consolidated financial statements, Note 2.e)iii)

[12] For example, the Chamberlain email at HP-SEC-00100357-00100359 shows that the cost of the $5,648,474 sale of HDS hardware to Morgan Stanley was $7,343,016.  Deloitte's working paper "Q1-2272 Z Consolidation" shows that the full cost was included in the cost of inventory

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | the profit and loss account as an expense when the marketing services were provided. |
| 3.6.2 / 3.6.2 | The materiality thresholds in Table 2.5 are not relevant to determining whether the hardware sales needed to be disclosed. Therefore, whether the hardware sales represented 5%, 10%, 15%, or some other percentage of Autonomy's revenue, nondisclosure could be reasonable. The relevant assessment was: (i) whether Autonomy had a single reportable operating segment under IFRS 8.5-10; and (ii) whether the hardware sales constituted a dissimilar product and service, or a group of dissimilar products and services, requiring separate disclosure under IFRS 8.32.

Both questions are a matter of judgement. Neither determination is quantitative under IFRS 8 (Operating Segments), which requires a more qualitative assessment, which is consistent with the "management approach" basis of IFRS 8. | I disagree that the materiality thresholds in Table 2.5 are not relevant to determining whether the hardware sales needed to be disclosed under the requirements of IFRS 8 and I note that this quantitative materiality threshold is just one part of the assessment of whether an item is material – whether an item is qualitatively material (i.e. material by its nature) is also required (paragraph 2.3.2).

IFRS 8.32 is a specific disclosure requirement where relevant to the entity. IAS 1.31 confirms that "*An entity need not provide a specific disclosure required by an IFRS if the information is not material*", therefore confirming that if the information that is required to be disclosed under IFRS is material, the disclosure requirement must be complied with.

With regard to IFRS 8.32, the fact of whether Product A is dissimilar to Product B requires the application of judgement. However, if it was judged that they were dissimilar products but Product A was not material to the entity (either quantitatively or qualitatively) then separate disclosure of the revenue earned from Product A would not be required. |
| 3.6.3 (a) / 3.6.3 (a) | As noted in IAS 1.17, "In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs". On this basis, it is only in exceptional circumstances that an accountant would need to look outside of a specific IFRS to determine the appropriate accounting treatment. The requirements for disclosure of revenue are covered by IAS 18 (Revenue) and IFRS 8 (Operating Segments). | I disagree. For a set of financial statements to comply with IFRS, they must apply the requirements of all relevant IFRSs. Mr Taylor ignores the fact that IAS 1 applies to all general purpose financial statements. The objective of IAS 1 is set out below:

"*This Standard prescribes the basis for presentation of general purpose financial statements to ensure comparability both with the entity's financial statements of previous periods and with the financial statements of other entities. It sets out overall requirements for the presentation of*" |

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | financial statements, guidelines for their structure and minimum requirements for their content"[13]. |
| | | IAS 1 requires that: |
| | | "An entity shall apply this Standard in preparing and presenting general purpose financial statements in accordance with International Financial Reporting Standards (IFRSs)"[14]. |
| | | Therefore, whilst IAS 18 prescribes how and when an entity shall recognise and disclose revenue, an entity is also required under IAS 1 to present information, including accounting policies, in a manner that provides relevant, reliable, comparable and understandable information and provide additional disclosures when compliance with the specific requirements in IFRSs is insufficient to enable users to understand the impact of particular transactions, other events and conditions on the entity's financial position and financial performance[15]. |
| 3.6.3 (b) / 3.6.3 (b) | As noted in IAS 1.17, "In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs". On this basis, it is only in exceptional circumstances that an accountant would need to look outside of a specific IFRS to determine the appropriate accounting treatment. The requirements for disclosure of revenue are covered by IAS 18 (Revenue) and IFRS 8 (Operating Segments). | Mr Taylor does not comment upon the rest of IAS 1.17 despite reproducing it in footnote 9 of the Taylor report. For ease of reference, the full text of IAS 1.17 is set out below: "In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs.  A fair presentation also requires an entity: (a) to select and apply accounting policies in accordance with IAS 8 Accounting Policies, Changes in Accounting Estimates and Errors. IAS 8 sets out a hierarchy of authoritative guidance that management considers in the absence of an IFRS that specifically applies to an item. |

---

[13] IAS 1, paragraph 1
[14] IAS 1, paragraph 2
[15] IAS 1, paragraph 17 (b) and (c)

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *(b)   to present information, including accounting policies, in a manner that provides relevant, reliable, comparable and understandable information.* <br><br> *(c)   to provide additional disclosures when compliance with the specific requirements in IFRSs is insufficient to enable users to understand the impact of particular transactions, other events and conditions on the entity's financial position and financial performance*". [Emphasis added] <br><br> It is therefore necessary for an entity to ensure it has complied with paragraphs (a) to (c) above as well as the requirements of the specific relevant accounting standard, in this case IAS 18 and IFRS 8. <br><br> Despite his reliance on the introductory sentence of IAS 1.17, Mr Taylor has not explained why (and indeed if) he disagrees with my conclusions that Autonomy's accounting for certain hardware transactions did not comply with the requirements of IAS 18 or on what basis he is of the opinion that hardware and software are similar products such that separate disclosure under IFRS 8.32 was not required. |
| 3.6.3 (c) | As noted in IAS 1.17, "In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs". On this basis, it is only in exceptional circumstances that an accountant would need to look outside of a specific IFRS to determine the appropriate accounting treatment. The requirements for disclosure of revenue are covered by IAS 18 (Revenue) and IFRS 8 (Operating Segments). | I repeat my response to paragraph 3.6.3(b) above. |
| 3.6.3 (d) / 3.6.3 (d) | I disagree that IAS 18.35 required hardware sales to be separately disclosed. IAS 18.35 required revenue to be split into various categories including "sale of goods". There was no requirement under IAS 18.35 for Autonomy to disclose hardware outside the "sale of goods" category. | I consider that as hardware was a material category of revenue it should have been separately disclosed under IAS 18.35. However, irrespective of whether hardware sales are considered to be a "*significant category of revenue*", in my opinion disclosure is required under IFRS 8 paragraph 32 for each product and service (or each group of similar products and services).  Further IAS 1.17(c) requires an entity to provide additional disclosures to "*enable users to understand the impact of particular transactions*" and ensure a fair presentation |

mazars

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| 3.6.3 (e) / 3.6.3 (e) | I do not consider that the disclosure of inventory expensed requires hardware to be separately identified from other goods. | IAS2.36 (d) requires that "*the amount of inventories recognised as an expense during the period*" is disclosed in the financial statements. I agree that this paragraph does not require the hardware inventory expensed to be separately identified from other inventory expensed, however Autonomy generally had little or no inventory and sales of software did not require physical inventory. |
| | | If therefore Autonomy had disclosed inventory expensed in generating its hardware sales, it would have been apparent to the users of the financial statements that reported revenue was comprised of more than just software sales. |
| 3.6.3 (f) / 3.6.3 (f) | I disagree that it was necessary under IFRS 8 (Operating Segments) to separately disclose hardware sales. | <u>IFRS 8.5</u> |
| | Under IFRS 8.5, Autonomy disclosed that it had one operating segment and so provided a breakdown by geographic region – not between product or other segment. | I do not disagree that Autonomy disclosed it had only one operating segment under IFRS.  Whilst that determination is management judgement, the judgement must still comply with the requirements of IFRS 8.  IFRS 8.5 states: |
| | Under IFRS 8.32, Autonomy was required to disclose revenues for groups of similar products and services. The determination of what constitutes "similar products and services" is an assessment based on management's approach. | "*An operating segment is a component of an entity:* |
| | | *(a) that engages in business activities from which it may earn revenues and incur expenses (including revenues and expenses relating to transactions with other components of the same entity),* |
| | Both questions are a matter of judgement. Neither determination is quantitative under IFRS 8 (Operating Segments), which requires a more qualitative assessment, which is consistent with the "management approach" basis of IFRS 8. | *(b) whose operating results are regularly reviewed by the entity's chief operating decision maker to make decisions about resources to be allocated to the segment and assess its performance, and* |
| | | *(c) for which discrete financial information is available*". |
| | If, under IFRS 8.32, there was a determination of dissimilar goods, then IFRS 8.32 does not identify any quantitative level above which it is necessary to report. It may be that a company would seek guidance from elsewhere in IFRS 8 and could consider the 10% thresholds identified in IFRS 8.13 and IFRS 8.34. | There is no doubt that hardware sales met the conditions at (a) and (c). Autonomy.  It appears from Autonomy's financial statements that the judgement that it had only one operating segment was based on not meeting condition (b); Autonomy stated "*The company's chief operating decision maker is the group's Chief Executive Officer, who evaluates the* |

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *performance of the company on a group wide basis and any elements within it on the basis of information from junior executives and group financial information and is ultimately responsible for entity-wide resource allocation decisions*"[16]. <br><br> See also Deloitte's analysis that I have quoted in response to paragraph 5.2.4 in Appendix H. Therefore, whether or not Autonomy correctly judged it had only one operating segment depends on whether Dr Lynch did or did not regularly review the operating results of hardware sales. <br><br> <u>IFRS 8.32</u> <br><br> IFRS 8.32 does not explain how an entity should assess whether the various products and services it sells are similar not. However, that judgement must have a basis and the result of that judgement encompass the qualitative characteristics of useful financial information by being relevant and a faithful representation, i.e. be complete, neutral and free from error. <br><br> As IFRS 8.32 does not explain how an entity should assess the similarity or otherwise of its products, it is reasonable and appropriate to look for guidance elsewhere in accounting standards. For the purposes of assessing whether operating segments can be aggregated, IFRS 8.12 requires that those operating segments have similar economic characteristics <u>and</u> that the segments are similar in <u>each</u> of the following respects: <br><br> "*(a) the nature of the products or services;* <br><br> *(b) the nature of the production processes;* <br><br> *(c) the type or class of customer for their products and services;* <br><br> *(d) the methods used to distribute their products or provide their services; and* |

---

[16] Autonomy's 2010 consolidated financial statements, Note 5

**MAZARS**

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *(e) if applicable, the nature of the regulatory environment, for example, banking insurance or public utilities*".<br><br>It is apparent that the nature of the production process for hardware (physical construction) is completely different to software (writing code) and the methods by which hardware is distributed (transport) is completely different to the methods by which software is distributed (on-line).  It is also apparent that hardware and software have very different economic characteristics – Autonomy made a gross loss on the majority of its hardware sales but made gross profits in excess of 80% on its software sales.<br><br>If Autonomy had judged that hardware and software were separate operating segments, it would not have been permitted to aggregate these segments under IFRS 8.12 due to the dissimilar characteristics of hardware and software.<br><br>In my opinion, the evidence that hardware and software are dissimilar products is clear.  I have not seen an assessment by Autonomy that justifies why hardware sales were not separately disclosed under IFRS 8.32 and I note that Mr Taylor has not attempted to explain why hardware and software can reasonably be seen as similar products or explain why management's judgement not to separately disclose this information resulted in a faithful representation of its business.<br><br>Furthermore, as noted in Appendix H, PwC consider how an entity should consider materiality where there is no definition in IFRS 8 as follows:<br><br>"*The entity should consider materiality from **both quantitative and qualitative** perspectives.  When considering materiality quantitatively, the standard uses the threshold of 10% or more in determining whether an operating segment is a reportable segment.  Therefore, it may be appropriate to apply the same test to determine whether an individual country's revenue or assets are material for the purpose of separate disclosure*" [emphasis added]. |

Case 3:18-cr-00577-CRB   Document 298-1   Filed 01/17/24   Page 188 of 289

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice FCA

**mazars**

# Appendix J: My corrected version of Mr Levitske's analysis of year-over-year revenue growth

| | | Q1 2009 | Q2 2009 | Q3 2009 | Q4 2009 | Q1 2010 | Q2 2010 | Q3 2010 | Q4 2010 | Q1 2011 | Q2 2011 | H1 2010 | H1 2011 | H1 growth % | Q2 growth % | LTM-1 | LTM | LTM growth % |
| | | $000 | $000 | $000 | $000 | $000 | $000 | $000 | $000 | $000 | $000 | $000 | $000 | % | % | $000 | $000 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Reported revenue** | *Note 1* | 129,779 | 195,192 | 191,606 | 223,111 | 194,180 | 221,125 | 210,556 | 244,505 | 219,793 | 256,250 | 415,305 | 476,043 | 14.6% | 15.9% | 830,022 | 931,104 | 12.2% |
| **HARDWARE** | | | | | | | | | | | | | | | | | | |
| Hardware adjustments | *Appendix G* | | (6,000) | 6,000 | - | 4,300 | 1,300 | (5,600) | (3,400) | (2,500) | (200) **Note 2** | | | | | | | |
| **Adjusted revenue (for hardware)** | | 129,779 | 189,192 | 197,606 | 223,111 | 198,480 | 222,425 | 204,956 | 241,105 | 217,293 | 256,050 | 420,905 | 473,343 | 12.5% | 15.1% | 841,622 | 919,404 | 9.2% |
| **LINKED TRANSACTIONS** | | | | | | | | | | | | | | | | | | |
| Linked transactions adjustments | *Appendix F* | - | (8,571) | - | (10,500) | (8,500) | - | (7,683) | (4,750) | (6,448) | - | | | | | | | |
| **Adjusted revenue (for linked transactions)** | | 129,779 | 186,621 | 191,606 | 212,611 | 185,680 | 221,125 | 202,873 | 239,755 | 213,345 | 256,250 | 406,805 | 469,595 | 15.4% | 15.9% | 811,022 | 912,223 | 12.5% |
| **VAR TRANSACTIONS** | | | | | | | | | | | | | | | | | | |
| VAR transactions adjustments | *Appendix F* | (7,456) | (7,762) | (12,325) | (19,915) | (16,815) | 4,506 | (16,121) | (18,799) | (20,757) | (25,583) | | | | | | | |
| **Adjusted revenue (for VAR transactions)** | | 122,323 | 187,430 | 179,281 | 203,196 | 177,365 | 225,631 | 194,435 | 225,706 | 199,036 | 230,667 | 402,996 | 429,703 | 6.6% | 2.2% | 785,473 | 849,843 | 8.2% |
| **HOSTING TRANSACTIONS** | | | | | | | | | | | | | | | | | | |
| Hosting transactions adjustments | *Appendix F* | (9,204) | (5,978) | 690 | (14,710) | (7,593) | (27,370) | (2,654) | (6,106) | (9,082) | (11,341) | | | | | | | |
| **Adjusted revenue (for hosting transactions)** | | 120,575 | 189,214 | 192,296 | 208,401 | 186,587 | 193,755 | 207,902 | 238,399 | 210,711 | 244,909 | 380,342 | 455,620 | 19.8% | 26.4% | 781,039 | 901,921 | 15.5% |
| **OTHER SOFTWARE TRANSACTIONS** | | | | | | | | | | | | | | | | | | |
| Royalty arrangements | *Appendix F* | (5,000) | (4,360) | 385 | 385 | 385 | 385 | 396 | 418 | 418 | (1,832) | | | | | | | |
| Timing errors | *Appendix F* | - | - | - | (2,015) | - | (667) | (3,373) | 223 | 2,682 | - | | | | | | | |
| Errors of valuation | *Appendix F* | - | - | - | - | - | - | - | - | - | (15,818) | | | | | | | |
| **Adjusted revenue (for other software transactions)** | | 124,779 | 190,832 | 191,991 | 221,481 | 194,565 | 220,843 | 207,579 | 245,146 | 222,893 | 238,600 | 415,408 | 461,493 | 11.1% | 8.0% | 828,880 | 914,218 | 10.3% |
| **TOTAL ADJUSTMENT FOR SOFTWARE TRANSACTIONS** | | | | | | | | | | | | | | | | | | |
| Software transaction adjustments | | (21,660) | (26,671) | (11,250) | (46,755) | (32,523) | (23,146) | (29,435) | (29,014) | (33,187) | (54,574) | | | | | | | |
| **Adjusted revenue (for software transactions)** | | 108,119 | 168,521 | 180,356 | 176,356 | 161,657 | 197,979 | 181,121 | 215,491 | 186,606 | 201,676 | 359,636 | 388,282 | 8.0% | 1.9% | 716,348 | 784,893 | 9.6% |
| **TOTAL ADJUSTMENT FOR SOFTWARE AND HARDWARE TRANSACTIONS** | | | | | | | | | | | | | | | | | | |
| Total adjustment | | (21,660) | (32,671) | (5,250) | (46,755) | (28,223) | (21,846) | (35,035) | (32,414) | (35,687) | (54,774) | | | | | | | |
| **Adjusted revenue (for software and hardware transactions)** | | 108,119 | 162,521 | 186,356 | 176,356 | 165,957 | 199,279 | 175,521 | 212,091 | 184,106 | 201,476 | 365,236 | 385,582 | 5.6% | 1.1% | 727,948 | 773,193 | 6.2% |

**Note 1**: HP-SEC-00567458 (Q1 2009), HP-SEC-00009847 (Q2 2009), HP SEC 00025166 (Q3 2009), HP-SEC-00097914 (Q4 2009), HP-SEC-00009127 (Q1 2010), FTIGJ00002722 (Q2 2010), HP-SEC-00155426 (Q3 2010) and HP-SEC-00024459 (Q4 2010), HP-SEC-00024002 (Q1 2011), HP-SEC-00564873 (Q2 2011)

**Note 2**: The adjustment of $3.400 million in Q4 2010 is explained at paragraph 3.4.22 of my report. The amount in Q2 2011 is a net amount comprising: (i) a reversal of $2.500 million from Q1 2011 and, (ii) a further removal of $2.700 million which was then reversed in Q3 2011.

mazars

# 1    Appendix K: My comments on the analyses relating to software in the Levitske Report

## Issues with Mr Levitske's use of my work in his category "*Linked transactions*"

1.1.1    At paragraph 2.1.12 of the Levitske Report, Mr Levitske states:

"[My Interim Report] *alleges that Autonomy paid more to purchase goods from customers in certain alleged linked transactions than the same customer paid to purchase software from Autonomy.  From a financial statement analysis perspective, <u>eliminating the revenue from these transactions would also require reducing corresponding alleged linked costs and expenses</u>*" [emphasis added].

1.1.2    In performing his analysis on the "*Alleged Linked Transactions*", Mr Levitske therefore:

(a)    removes the revenue recognised by Autonomy in relation to the "*Alleged Linked Transactions*"; and

(b)    adds back the "*Costs and Expenses Related to Alleged Linked Transactions*".  The costs and expenses figure used by Mr Levitske is the full value of the purchases made by Autonomy as part of the "*Alleged Linked Transactions*", and the full amount is added back as at the date of the purchase.

1.1.3    I disagree with Mr Levitske's adjustment at 1.1.2(b) above.  This is because Autonomy did not recognise any "*Costs and Expenses Related to Alleged Linked Transactions*" at the point of the initial sales.  Instead, Autonomy's purchases from its counterparties were "capitalised" on its balance sheet, and recorded as an amortisation expense over the estimated useful life of the "asset" it had purchased.

1.1.4    For example, on 31 May 2010, Autonomy paid FileTek, Inc ("**FileTek**") $11,518,214 in relation to a purchase of FileTek's "*StorHouse*" software and related maintenance.   However, Autonomy did not record a cost of $11,518,214 on 30 May 2010, but rather, as explained by Deloitte "*capitalised* [the purchased software] *as an intangible asset and is to be amortised over the life of the licence, being 5 years*"[1].  As such, the "*Costs and Expenses Related to the* [Software Focus Transaction #049]" recorded by Autonomy were $191,970 per month[2] for a

---

[1] Deloitte's Report to the Audit Committee on Q2 2010, page 10
[2] Or $575,910 per quarter

mazars

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

period of 60 months commencing in June 2010, as opposed to the $11,518,214 adjustment in May 2010 proposed by Mr Levitske[3].

1.1.5   I have corrected Mr Levitske's analysis in **Appendix L** to take account of the above, and note the following impacts on his conclusions:

(a)   Mr Levitske states that after adjusting for the "*Allegedly Linked Transactions*", the "*Profit from operations is now greater than reported during both the First Half of 2010 and the First Half of 2011*".  This is incorrect, as once the abovementioned error is corrected in Mr Levitske's analysis, profit from operations in H1 2010 and H1 2011 is actually **lower** than reported; and

(b)   Mr Levitske states that after adjusting for the "*Allegedly Linked Transactions*", the "*profit from operations margin, as a percent of revenue, is now greater for both the First Half of 2010 and the First Half of 2011*".  This is incorrect as once the abovementioned error is corrected in Mr Levitske's analysis, profit from operations margin, as a percent of revenue, is actually **lower**.

1.1.6   Mr Levitske also states, in his "*Summary Conclusion*", that if "*the revenues for linked transactions are removed along with corresponding costs and expenses: a) Autonomy would have had higher profits and higher profit margins*"[4].  For the reasons set out above, I disagree with Mr Levitske's conclusion.  Removing the revenues for linked transactions along with corresponding costs and expenses would actually have lead to Autonomy having lower profits and lower profit margins.

### Issues with Mr Levitske's use of my work in his category "*VAR Transactions*"

1.1.7   Mr Levitske's analysis of "*VAR Transactions*" is, to an extent, affected by the same issue as his analysis of the "*Alleged Linked Transactions*", insofar as certain "*VAR Transactions*" were only settled once Autonomy had first made purchases from the VAR.  Whilst Mr Levitske has adjusted the "*Costs and Expenses Related to Alleged VAR Transactions*", in his analysis all of the costs are adjusted as at the date of the sale from Autonomy to the VAR.  This is incorrect as:

---

[3] In the case of the "*Alleged Linked Transaction*" adjusted by Mr Levitske in relation to Software Focus Transaction #084 "*Tottenham*", I understand that Autonomy amortised the cost of sponsoring Tottenham Hotspur "*by reference to the number of Premier League home games played*" (see Deloitte's Report to the Audit Committee on the Q3 2010 Review, page 8).  As the "*Alleged Linked Transaction*" identified in relation to Software Focus Transaction #084 related to the sponsorship of Tottenham Hotspur in the 2011 / 2012 football season (which commenced in August 2011), I would not expect any expense to have been recorded in the Relevant Period
[4] Expert Report of Mr Levitske, paragraph 3.1.3 a)

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

mazars   Summary of independent expert accounting opinions of Steven Brice
FCA

(a) in some instances Autonomy capitalised these costs, and recognised them as an amortisation expense over the estimated useful life of the "asset" it had purchased; and

(b) in other instances, whilst Autonomy recorded the purchase as an expense, the date of Autonomy's purchase from the VAR was not in the same reporting period as the date of Autonomy's sale to the VAR.

1.1.8   Addressing each quarter in turn:

(a) in Q1 2010, Mr Levitske identified costs and expenses related to "*linked payment*[s] *to VAR*" in the amount of $8.72 million.  This amount appears to relate to the following Software Focus Transactions:

(i) Software Focus Transaction #050 "*MicroTech*".  This Software Focus Transaction was entered into on 31 March 2010 and Autonomy recognised revenue of $11.000 million on that date.  It appears that the "*linked payment*[s] *to VAR*" identified by Mr Levitske in relation to this Software Focus Transaction were:

- a payment of $4,321,331 made by Autonomy on 31 December 2010 in relation to an Advance Technology Innovation Centre[5].  This amount was capitalised as an intangible asset on Autonomy's balance sheet recognised as an amortisation expense over three years[6].  As such, the "*Costs and Expenses Related to Alleged VAR Transactions*" figure used by Mr Levitske in relation to this payment should have been $120,037 per month[7], or $360,111 per quarter, starting from 1 January 2011; and

- a payment of $2,400,000 made by Autonomy on 30 June 2011, in relation to a purchase of "*DiscoverEngine*" software[8].  This amount was recorded as a "cost of sale" in Q2 2011 and therefore should be included in the "*Costs and Expenses Related to Alleged VAR Transactions*" in Q2 2011 in Mr Levitske's analysis;

---

[5] The full amount of the payment to MicroTech in relation to the Advance Technology Innovation Centre was $9.6 million
[6] Deloitte's Report to the Audit Committee on the 2010 Audit, page 18
[7] Being $4,321,331 / 36 months
[8] This payment was made to DiscoverTech, who I understand it is alleged then remitted the cash to MicroTech so as to enable them to settle their debt with Autonomy

**mazars**

(ii)     Software Focus Transaction #045 "*FSA – Capax*".  This Software Focus Transaction was entered into on 31 March 2010 and Autonomy recognised revenue of $4.286 million on that date.  It appears that the "*linked payment to VAR*" identified by Mr Levitske in relation to this Software Focus Transaction was a payment of $2,000,000 made by Autonomy to Capax Discovery on 29 June 2011 in relation to "*NearPoint Software Support*".  This amount was capitalised as an intangible asset on Autonomy's balance sheet, but because the transaction occurred on the last date of the Relevant Period, no "*Costs and Expenses Related to Alleged VAR Transactions*" should have been recorded in Mr Levitske's analysis;

(b)     In Q1 2011, Mr Levitske identified "*linked payment*[s] *to VAR*" in the amount of $11.64 million.  I have been unable to fully reconcile Mr Levitske's figure to my workings, but it appears to relate to the following Software Focus Transactions[9]:

(i)     Software Focus Transaction #085 "*Bank of America - MT*".  This Software Focus Transaction was entered into on 30 March 2011 and Autonomy recognised revenue of $3.860 million on that date.  It appears that the "*linked payment to VAR*" identified by Mr Levitske in relation to this Software Focus Transaction was a payment of $714,082 made by Autonomy to MicroTech in June 2011 in relation to a "*Maintenance and Support Agreement*".  My review of Autonomy's general ledger indicates that no expense was recorded in relation to this payment[10], and as such Mr Levitske's analysis should not include an adjustment in its regard;

(ii)     Software Focus Transaction #088 "*McAfee – Capax*".  This Software Focus Transaction was entered into on 31 March 2011 and Autonomy recognised revenue of $5.000 million on that date.  It appears that the "*linked payment to VAR*" identified by Mr Levitske in relation to this Software Focus Transaction was a payment of $6.000 million made by Autonomy to Capax Discovery on 31 August 2011 in relation to a "*Commercial Software License Agreement*".  Mr Levitske's analysis should not include an adjustment in relation to this payment as it post-dates the Relevant Period; and

---

[9] The total payments identified below come to $8.714 million
[10] The "double entry" to this payment appears to have been allocated to the general ledger code 291762, which is a balance sheet account, rather than an income statement account.  Refer to "*ORG BAT*" reference "*173396*" in Autonomy's general ledger for 2011

**mazars**

    (iii)    Software Focus Transaction #091 "*Prisa*".  This Software Focus Transaction was entered into on 31 March 2011 and Autonomy recognised revenue of $3.600 million on that date.  It appears that the "*linked payment to VAR*" identified by Mr Levitske in relation to this Software Focus Transaction was a payment of $4.400 million made by Autonomy on 30 June 2011, in relation to a purchase of "*DiscoverPoint Engine*" software.  This amount was recorded as a "*cost of sale*" in Q2 2011[11] and therefore should be included in the "*Costs and Expenses Related to Alleged VAR Transactions*" in Q2 2011 in Mr Levitske's analysis.  I note that the adjustment to be included in Mr Levitske's analysis in relation to this Software Focus Transaction should be $2.000 million, as Mr Levitske had previously determined that $2.400 million related to Software Focus Transaction #050 "*MicroTech*"; and

    (c)    in Q2 2011, Mr Levitske identified "*linked payment to VAR*" in the amount of $8.2 million.  This amount appears to relate to Software Focus Transaction #121 "*USPS archive – mt*".  This Software Focus Transaction was entered into on 30 June 2011 and Autonomy recognised $7.000 million of revenue on that date.  It appears that the "*linked payment to VAR*" identified by Mr Levitske in relation to this Software Focus Transaction was a payment of $8.200 million made by Autonomy to MicroTech on 16 August 2011 in relation to an "*Autonomy Solution Stack*".  Mr Levitske's analysis should not include an adjustment in relation to this payment as it post-dates the Relevant Period.

1.1.9    In addition, Mr Levitske's analysis includes an adjustment line named "*VAR transactions allegedly recognized too early - ins*".  I take this adjustment to be a reference to instances where the revenue recognition criteria for a Software Focus Transaction was subsequently met after the initial VAR transaction (for example, when Autonomy reached a direct deal with a named end-user).  Whilst I understand the rationale for this adjustment, I am unable to reconcile the figure used by Mr Levitske to my workings.  Specifically:

    (a)    in Q1 2010, Mr Levitske includes "*VAR transactions allegedly recognized too early - ins*" in the amount of $4.66 million.  Based on my understanding of Mr Levitske's adjustment, the appropriate figure to use should have been $8.156 million[12];

---

[11] Deloitte's Report to the Audit Committee on the Q2 2011 Review, page 7

[12] Being the revenue recognised in Q1 2010 arising from Software Focus Transactions #020 "*NSA*" ($3.500 million) and #038 "*Dell – Morgan Stanley*" ($4.656 million, noting that this is not the revenue recognition criteria being met, but is instead the reversal of a credit note raised which would not have been necessary if not for the original VAR transaction)

**mazars**

(b)   in Q2 2010, Mr Levitske includes "*VAR transactions allegedly recognized too early - ins*" in the amount of $10.07 million.  Based on my understanding of Mr Levitske's adjustment, the appropriate figure to use should have been $4.185 million[13];

(c)   in Q1 2011, Mr Levitske includes "*VAR transactions allegedly recognized too early - ins*" in the amount of $8.32 million.  Based on my understanding of Mr Levitske's adjustment, the appropriate figure to use should have been $2.262 million[14];

(d)   in Q2 2011, Mr Levitske includes "*VAR transactions allegedly recognized too early - ins*" in the amount of $10.69 million.  Based on my understanding of Mr Levitske's adjustment, the appropriate figure to use should have been $2.705 million[15]; and

(e)   from Q2 2010 onwards, Mr Levitske does not include the revenue release of $0.321 million relating to Software Focus Transaction #028.  Based on my understanding of Mr Levitske's adjustment "*VAR transactions allegedly recognized too early – ins*", this amount should be included.

1.1.10   Finally, Mr Leviske includes an adjustment called "*VAR transactions allegedly recognized too early – outs*" of $7.000 million in Q2 of 2011 which I understand relates to Software Focus Transaction #121.  Based on my understanding of this adjustment, it appears that Mr Leviske has included this as a Linked Transaction.  However, in Appendix F the primary basis for concluding that revenue should not be recognised is that it failed to meet the revenue recognition criteria of IAS 18 and consequently, to ensure a like-for-like comparison with the tables in my report, I have treated it as a VAR rather than a linked transaction.  This classification has no effect on the overall adjustment.

1.1.11   I have corrected and updated Mr Levitske's analysis in **Appendix L** to take account of the above, and note the following impacts on his conclusions:

(a)   Mr Levitske states that after adjusting for the "*VAR transactions*", the "*profit from operations margin, as a percent of revenue, is approximately unchanged for both the First Half of 2010 and the First Half of 2011*".  This is incorrect, as once the abovementioned errors are corrected in Mr Levitske's analysis, profit from operations margin in H1 2010 and H1 2011 is actually **notably lower** than reported; and

---

[13] Being the revenue recognised in Q2 2010 arising from Software Focus Transactions #046 "*PMI (Discover)*" ($4.185 million)

[14] Being the revenue recognised in Q1 2011 arising from Software Focus Transactions #040a "*Capax*" ($2.262 million)

[15] Being the revenue recognised in Q2 2011 arising from Software Focus Transactions #082 "*KPMG*" ($2.705 million)

**mazars**

(b)   Mr Levitske states that the "*rate of year-over-year change (growth) in profit from operations is lower than the year-over-year change based upon the originally reported amounts. However, profits are still growing*".  This is incorrect, as once the abovementioned errors are corrected, Autonomy's year-over-year profit actually fell from H1 2010 to H1 2011.

## Appendix L: My corrected version of Mr Levitske's analyses of the adjustments relating to software

| Alleged Linked Transactions | Q1 2010 | Q2 2010 | Q1 & Q2 2010 | Q1 2011 | Q2 2011 | Q1 & Q2 2011 | H1 2010 to H1 2011 | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Change | % Change |
| Revenue | $194.18 | $221.13 | $415.31 | $219.79 | $256.25 | $476.04 | $60.73 | 14.62% |
| *Alleged Linked Transaction Adjustments* | ($8.50) | - | ($8.50) | ($6.45) | - | ($6.45) | | |
| Total Revenue Less Alleged Linked Transaction Adjustments | $185.68 | $221.13 | $406.81 | $213.34 | $256.25 | $469.59 | $62.78 | 15.43% |
| Total Cost of Revenues | $36.08 | $45.22 | $81.30 | $39.23 | $48.49 | $87.72 | | |
| Operating Expenses | $84.98 | $98.90 | $183.88 | $95.94 | $124.80 | $220.74 | | |
| Total Cost of Revenues and Operating Expenses | $121.06 | $144.12 | $265.18 | $135.17 | $173.29 | $308.46 | | |
| *Costs and Expenses Related to Software Focus Transaction #049* | - | ($0.38) | ($0.38) [1] | ($0.58) | ($0.58) | ($1.15) [2] | | |
| *Costs and Expenses Related to Software Focus Transaction #084* | - | - | - | - | - | - [3] | | |
| Total Cost of Revenues and Operating Expenses Less Alleged Linked Transaction Adjustments | $121.06 | $143.74 | $264.80 | $134.59 | $172.71 | $307.31 | | |
| Profit from Operations | $73.12 | $77.01 | $150.13 | $84.62 | $82.96 | $167.58 | $17.45 | 11.62% |
| *% of Corresponding Revenue* | | | *36.15%* | | | *35.20%* | | |
| Profit from Operations with Adjustments | $64.62 | $77.39 | $142.01 | $78.75 | $83.54 | $162.28 | $20.27 | 14.27% |
| *% of Corresponding Revenue* | | | *34.91%* | | | *34.56%* | | |

**Source(s)**

All figures are sourced from Attachment B to the Expert Report of Mr Levitske, unless otherwise noted.

(1) Being two months' worth of amortisation changes incurred in relation to Autonomy's purchase of "Storhouse" software from FileTek, Inc, on 30 May 2010. The $11,518,214 cost was to be amortised over 5 years ($11,518,214 / 60 months = $191,970 per month)

(2) Being three months' worth of amortisation changes incurred in relation to Autonomy's purchase of "Storhouse" software from FileTek, Inc, on 30 May 2010. The $11,518,214 cost was to be amortised over 5 years ($11,518,214 / 60 months = $191,970 per month, or $575,910 per quarter)

(3) I understand that Autonomy amortised the cost of the Tottenham Hotspur shirt sponsorship by reference to the number of Premier League home games played. As the 2011 / 2012 football season commenced in August 2011, I would not expect there to be any sponsorship expense recorded in the Relevant Period.

| VAR Transactions | Q1 2010 | Q2 2010 | Q1 & Q2 2010 | Q1 2011 | Q2 2011 | Q1 & Q2 2011 | H1 2010 to H1 2011 | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Change | % Change |
| Revenue | $194.18 | $221.13 | $415.31 | $219.79 | $256.25 | $476.04 | $60.73 | 14.62% |
| *VAR transactions allegedly recognized too early - outs* | ($9.70) | - | ($9.70) | ($10.90) | ($28.60) | ($39.50) | | |
| *VAR transactions allegedly recognized too early - ins* | $8.16 | $4.51 | $12.66 [1] | $2.58 | $3.03 | $5.61 [1] | | |
| *VAR transactions allegedly linked to payment to VAR* | ($15.30) | - | ($15.30) | ($12.50) | - | ($12.50) | | |
| Total Revenue Less Alleged Linked Transaction Adjustments | $177.34 | $225.64 | $402.97 | $198.97 | $230.68 | $429.65 | $26.68 | 6.62% |
| Total Cost of Revenues | $36.08 | $45.22 | $81.30 | $39.23 | $48.49 | $87.72 | | |
| Operating Expenses | $84.98 | $98.90 | $183.88 | $95.94 | $124.80 | $220.74 | | |
| Total Cost of Revenues and Operating Expenses | $121.06 | $144.12 | $265.18 | $135.17 | $173.29 | $308.46 | | |
| *Costs and Expenses Related to Software Focus Transaction #045* | - | - | - [1] | - | - | - [1] | | |
| *Costs and Expenses Related to Software Focus Transaction #050* | - | - | - [1] | ($0.36) | ($2.76) | ($3.12) [1] | | |
| *Costs and Expenses Related to Software Focus Transaction #085* | - | - | - [1] | - | - | - [1] | | |
| *Costs and Expenses Related to Software Focus Transaction #088* | - | - | - [1] | - | - | - [1] | | |
| *Costs and Expenses Related to Software Focus Transaction #091* | - | - | - [1] | - | ($2.00) | ($2.00) [1] | | |
| *Costs and Expenses Related to Software Focus Transaction #121* | - | - | - [1] | - | - | - [1] | | |
| Total Cost of Revenues and Operating Expenses Less Alleged Linked Transaction Adjustments | $121.06 | $144.12 | $265.18 | $134.81 | $168.53 | $303.34 | | |
| Profit from Operations | $73.12 | $77.01 | $150.13 | $84.62 | $82.96 | $167.58 | $17.45 | 11.62% |
| *% of Corresponding Revenue* | | | *36.15%* | | | *35.20%* | | |
| Profit from Operations with Adjustments | $56.28 | $81.52 | $137.79 | $64.16 | $62.15 | $126.31 | ($11.48) | (8.33%) |
| *% of Corresponding Revenue* | | | *34.19%* | | | *29.40%* | | |

**Source(s)**

All figures are sourced from Attachment B to the Expert Report of Mr Levitske, unless otherwise noted. (I note there are some immaterial rounding differences to Attachment B to the Expert Report of Mr Levitske.)

(1) Refer to Appendix K

Exhibit C



**Summary of Expert Opinions of Philippe Cerf**

**United States of America vs Michael Lynch and Stephen Chamberlain**

**7 December 2023**



## <u>Summary of Expert Opinions</u>

**Background**

1.  I, Philippe Cerf, of Martello Expert Services, Warnford Court, 29 Throgmorton Street, London EC2N 2AT, have been instructed by Clifford Chance LLP to provide a summary of the principal considerations surrounding the acquisition and takeover of a UK public company.

2.  I attach my CV in Appendix A and would highlight that during my career I have been involved with multiple UK acquisitions advising both the buyer (i.e., the "**Bidder**") and the seller (i.e., the "**Target**").

3.  I confirm that I have not authored or published any articles on this or any other topic over the past 10 years and further that during the past 4 years I have not testified as an expert at trial or by deposition.

4.  I began my investment banking career in 1989, at First Boston in New York, then moved to Banque Indosuez as a Mergers and Acquisition ("**M&A**") Professional in Paris. In 1994, I moved to London to join Lehman Brothers. During my time at Lehman Brothers, I acted as both an M&A banker and industry coverage banker for industry verticals including technology, industrials, and healthcare. I was promoted to Managing Director in 2001.

5.  I joined Credit Suisse in London as a Managing Director in the M&A Group, where I initially worked as a generalist M&A advisor while retaining coverage responsibility for a number of accounts principally in the technology space. I then took the position of co-Head of TMT EMEA while remaining a Vice Chairman of the EMEA M&A Group.[1] I also acted as co-Chairman of the Credit Suisse Investment Banking Committee Advisory Panel, which was asked to review all public M&A transactions, fairness opinions, and certain valuation presentations undertaken by Credit Suisse bankers in the EMEA region. I left Credit Suisse in June 2021 and have since acted as an independent advisor and board member.

---

[1] TMT refers to Technology, Media, and Telecommunications sectors.



**Bidder Approach**

6. In the following paragraphs, I have set out the typical approach and considerations when a potential Bidder approaches a Target regarding M&A in the UK context.

7. An approach by a potential Bidder is often made via the Chairman of the Target board. If the initial approach takes the form of a conversation, it would be followed up by a written indication of interest. This indicative, non-binding letter to the Target board would include a price or a price range at which the Bidder was prepared to launch a transaction. The initial bid letter would also include the principal conditions subject to which the Bidder was prepared to proceed to a firm bid.

8. In most cases, these conditions include the request for a period of due diligence as well as securing the unanimous recommendation of the Target board in favour of the transaction. Upon reception of the initial bid letter, the Target board would decide whether or not to engage with the Bidder and thereby facilitate an offer to its shareholders.

9. In most cases, UK boards are receptive to approaches from a well-financed Bidder at an attractive premium to the current share price. The Target board has a fiduciary duty to engage with such a Bidder and offer its shareholders the potential benefit of the premium on offer. Ultimately, the decision whether or not to accept an offer lies with the Target's shareholders (i.e., to tender their shares in an offer or vote for a merger transaction), the Board's duty is not to deprive the shareholders from the opportunity to opine on such offer.

10. The duty of the Bidder board is to be in a position to evaluate all aspects, strategic, operational, and financial, of the proposed transaction. The Bidder board will want to ascertain that their management team has built a convincing case that the transaction will have a positive financial impact for their shareholders. For the Bidder board, getting the necessary comfort around these aspects trumps any tactical considerations including conducting an expeditious process or reducing interloper risk.[2]

11. The time period required for the Bidder to present a firm offer to the Target's board is primarily related to the time required to complete their due diligence requirements. The negotiation of the terms of a deal can be done in a matter of days once the parties have agreed on a price.

---

[2] An interloper is a competing Bidder.



12.     The Target has a duty to limit the disclosure of sensitive non-public information to the Bidder during the diligence process. As Bidders often also directly or indirectly compete with the Target, caution is required in the disclosures. Under UK takeover (i.e., acquisition) rules, any information made available to a Bidder needs to also be given to any potential interloper. Therefore, the Target has an additional reason to protect its most sensitive information as it could fall into the hands of a direct competitor if such a competitor were to approach the Target with a proposal to top the initial Bidder's offer.

13.     The Target's board will typically seek to document a price negotiation that will result in a higher price at the announcement of a transaction than the Bidder's initial offer.

14.     The Target board have some latitude in determining what they deem to be an attractive price and will use that negotiation leverage with the Bidder. Bidders are, in a majority of cases, reluctant to bypass the Target board and go directly to the Target shareholders without a recommended deal. In order to secure the Target board's recommendation, Bidders are usually prepared to engage in price negotiations which see their proposed deal price rise above the initial bid.


**Due Diligence**

15.     Due diligence is a requirement of the Bidder to access non publicly disclosed information to assess any potential risks associated with the Target's business, operations, and financials. Due diligence also serves to refine any preliminary assumptions regarding the synergies that the transaction could generate and to flag any post-acquisition integration issues.[3] Other aspects, such as analysing any competition issues triggered by the transaction, can also be a due diligence topic.

16.     The due diligence process to confirm a bid for a UK publicly listed company is a bespoke process. There are no general rules, and each due diligence process has its own unique characteristics. In particular, the length of the exercise and the scope of information made available to the Bidder is usually decided after a discussion between the parties. The UK Takeover Code is a set of rules and frameworks based on guiding principles for takeovers, first established in 1968.[4]

---

[3] Synergies are when the value of a merged firm is greater than the combined value of the two separate firms either as a result of increased revenue projections or as a result of delivering the same revenue from a reduced cost base.

[4] https://www.thetakeoverpanel.org.uk/the-code.



The UK Takeover Code does not mandate that the Target disclose any particular information, and Targets do not have an obligation to provide information to Bidders, whether or not Bidders request the information.

17.  Both the Bidder and the Target usually seek to compromise on the scope of the information provided with an understanding between the parties that the focus of the process should be on material issues. The objective of both parties is to keep the due diligence process as efficient as possible to decrease uncertainty and to decrease the risk that the confidentiality of the process is broken due to a leak.

18.  In agreeing the length and scope of the due diligence there is a balance between the Bidder's requirement to acquire sufficient information to satisfy its board and the Target's desire to protect confidential information.

19.  In addition, the Target board needs to be constructive as they have a fiduciary duty to deliver the best possible transaction to their shareholders.

20.  In this context, the length and scope of the due diligence will predominantly be determined by the Bidder, who can decide when they are satisfied with the scope of disclosure. If information is important to a Bidder, then the Bidder will not conclude a deal unless, and until, it is provided. Depending on the complexity of the Target's business, the type of issues that the Bidder believes need to be investigated, and how detailed the Bidder wants its review to be, the length of the exercise can vary considerably.

21.  Bidders have a strong negotiation position and are generally able to secure what they believe to be a reasonable time frame and scope of investigations to access the required information.

22.  A limited number of senior managers of the Target including the Chief Executive Officer ("**CEO**") and the Chief Financial Officer ("**CFO**") are involved in the due diligence process. The CEO would typically be present in general discussions about the strategy and prospects of the Target. The CEO would be expected to engage in high-level discussions about financial prospects but would typically delegate more detailed discussions about the Target's operations and financials to other executives.

23.  The CFO will be involved in the more detailed discussions regarding the Target's financials and may ask other executives like the Chief Legal Officer to discuss risk areas they are more intimately familiar with. Depending on the issues to be discussed, the Target may involve a select number of other senior executives to cover topics including product, sales, research and



development, or human resources. In certain cases, Targets may limit discussions to a very small group (three to four people) of their senior executives. Involving a larger group and giving access to selected outside advisors would be a sign of relative openness to the Bidder conducting more thorough investigations.

24. From time to time a Bidder may request the opportunity to question the Target's auditors as part of the due diligence process. In my experience, auditor access or making a data room available are not normal practice and indicate a cooperative stance by a Target.

25. The due diligence process balances the requirements and obligations of both the Bidder and the Target and generally lasts between six and eight weeks. Whilst I have seen shorter due diligence periods with a highly motivated Bidder and longer periods for complicated transactions, throughout my career the majority fell into the six- to eight-week period. For longer due diligence periods, milestones can be agreed where the Bidder updates the Target at pre-agreed intervals throughout the process.

**Confidentiality**

26. Generally, both the Bidder and the Target will have a preference that the deal negotiation remains confidential until they are ready to publicly announce the transaction. However, the UK Takeover Code can mandate a public announcement in certain circumstances.

27. Where there is a significant movement in the Target share price during the offer period (the offer period starts at the point where the Bidder is seriously considering an offer for the Target, even before an actual approach to the Target has taken place), the UK Takeover Panel can mandate a public announcement.[5]

28.  All share price movements are considered during the offer period, whether or not they are linked to a specific leak regarding the process. This risk is considered as part of the due diligence process; the longer the period and the more executives and advisors involved, the risk of share price movements either due to a leak or market developments increases.

29. If the UK Takeover Panel decides that a share price movement requires public disclosure of the proposed takeover, the Bidder has two choices. It can either make an offer announcement or an announcement that it has no intention to make an offer. The Bidder becomes subject to

---

[5] The UK Takeover Panel is an independent body, established in 1968, whose main functions are to issue and administer the UK Takeover Code and to supervise and regulate takeovers and other matters to which the UK Takeover Code applies.



what is referred to in the UK as the "*put up or shut up*" ("**PUSU**") regime. Under the PUSU regime, a Bidder will be given 28 days to state that it has the firm intention to make an offer or that it has no current intention of making an offer.

30.    Therefore, confidentiality is key to completing a deal. For example, if a leak were to trigger the 28 days to make an offer under UK takeover rules and an eight-week due diligence period was needed, it would likely force the Bidder to abandon the deal.

**Interloper Risk**

31.    At any point in the UK deal process there is always a risk that an interloper intervenes with a competing bid. This can be in response to a rumour, a coincidence, or after the deal is announced.

32.    There are limited deal protection mechanisms available to bidders of UK listed companies. Break fees are rare and usually capped at 1% of the equity consideration.[6] Furthermore, the board of the Target has a fiduciary duty to consider any competing offers that might improve the outcome for the Target shareholders.

33.    The general approach by Bidders is to try to announce a recommended transaction first and to put the onus on any interloper to top it before the deal becomes unconditional. Any competing bidder is therefore constrained by the timetable set by the transaction announced by the first Bidder.

34.    A Bidder will also think about setting the price at a high enough value to deter any interloper from entering the process. This may result in the Bidder 'negotiating against themselves' (i.e., to put in a higher price than they would if they thought interloper risk were negligible).

35.    To reduce interloper risk, the Bidder will typically ask for a non-solicitation provision. This means that the Target cannot actively look for a counteroffer. The Target has, however, an obligation to entertain any unsolicited bona fide approach from a potential competing bidder.

36.    Any non-public information made available to a Bidder by the Target during the acquisition process must be made available to any other genuine party (i.e., an interloper) intending to bid for the Target. This is the case even where the interloper is a competitor and introduces the risk that confidential competitive information is handed over to a competitor in the event that the

---

[6] A break fee is a fee paid to a party as compensation for a broken deal or contract failure.



transaction does not proceed. Accordingly, the most confidential competitive information is disclosed, if at all, late in the process when a deal is almost certain.

37.     Accordingly, the risk of an interloper entering the negotiations and usurping the original Bidder is significant and this will influence both Target and, in particular, Bidder behaviour.


**Deal Negotiation**

38.     During the acquisition process, the Bidder needs to take into consideration its internal constraints including conducting due diligence and satisfying the Bidder board that the acquisition makes strategic and financial sense. At the same time, the Bidder must acknowledge the objectives of the Target's board which include getting the highest price for their shareholders and limiting the period of uncertainty before reaching a firm agreement between the parties.

39.     A Bidder who has initiated transaction talks with a Target wants to retain the advantage of being ahead of any potential competition. To achieve this objective, a Bidder will typically make their best efforts to show the Target board that they are serious, prepared to deliver transaction terms that will satisfy the Target board, and to do this in an expeditious manner. The latter means that the Bidder must find a compromise between taking the appropriate time to conduct their due diligence and appearing to the Target board to move ahead as swiftly and efficiently as possible.

40.     A Bidder is exposed to share price fluctuations during the period of negotiations with the Target board. If the share price improves during the negotiations, the attractiveness of the offer premium gets eroded.[7] As discussed above, a large movement in share price can also lead to a premature disclosure requirement. The only way to reduce market risk is to expedite the process leading to the announcement of a transaction. This is a tactical consideration that Targets will share.


**Deal Execution Considerations**

41.     A Bidder will strive for a unanimous recommendation from the Target board and irrevocable undertakings from insiders holding shares to tender them or to vote for the transaction before

---

[7] The offer premium represents the degree to which the price offered to the bidder is above the prevailing market share price. If the share price rises, the offer premium (and hence the relative of attractiveness of the deal) declines.



the Bidder commits to this transaction. The purpose is to show shareholders that the transaction is strongly endorsed by their representatives and to create momentum for acceptance of the announced transaction by the market. Irrevocable undertakings can also be sought from institutional investors, but this is determined on a case-by-case basis depending on the shareholders involved and the perceived reception of the transaction by investors.

42. A deal price that is accompanied by a unanimous recommendation from the Target board and irrevocable undertakings from internal shareholders will also serve to discourage potential interlopers. At the margin, this may incentivise a Bidder to select a higher price that guarantees the Target's support.

43. When a firm intention to make an offer is made (via a rule 2.5 announcement),[8] it is binding on the Bidder. There is practically no exit for a Bidder once the conditions precedent to a deal are satisfied. A Bidder announcing an intention to make a firm offer for a listed UK company must therefore be satisfied that the strategic fit and quality of the Target as well as the terms of the transaction are beneficial to the Bidder's shareholders.

44. UK listed companies have very few tools to prevent or thwart unsolicited take-over approaches. There are no legal provisions such as poison pills or dual classes of shares to give the Target board additional negotiation leverage or the ability to block a transaction that is deemed unsatisfactory to the board.[9]

45. It is therefore common to retain defence advisors (financial and legal) in order to be fully prepared in case of an unsolicited approach. 'Being prepared' means, among other topics, that advisors will keep the board updated on a regular basis regarding developments in the company's share price and shareholder base, brief the board on valuation metrics including intrinsic valuation based on the company's internal financial projections and establish a list of potential suitors, usually the most credible strategic buyers who could consider a transaction with the Target.

46. A Target board in the UK can be assumed to be well prepared in particular on what constitutes the fair value of the company even in the event that an unsolicited approach occurs. The Target

---

[8] A rule 2.5 announcement is a bidder's announcement of a firm intention to make an offer under Rule 2.5 of the UK Takeover Code. Rule 2.5 specifies that a firm intention to make an offer should only be made when a bidder has every reason to believe that it can and will continue to be able to implement the offer.

[9] A poison pill is a defence strategy used by the directors of a public company to prevent activist investors, competitors, or other would-be acquirers from taking control of the company by buying up large amounts of its stock. A dual class of shares means that a company offers two types (or classes) of shares to differentiate between shares with different dividend payouts and voting rights.



board will also have been briefed on other relevant valuation metrics including the level of premia on the share price paid in precedent UK public acquisition transactions. While the level of such premia may fluctuate over time, it is generally acknowledged that a premium in the 20% to 40% range over recent average share prices would usually be considered as a level worth serious consideration by a Target board.

47.   With the ordinary premium of an acquisition offer in the range of 20% to 40%, in my opinion, in ordinary circumstances an offer as high as 70% could not be ignored by the board and would also act as a deterrent to a potential interloper. [10]

48.   Furthermore, a board or management that failed to engage with a highly desirable acquisition offer, such as a 70% premium would, in my opinion, run into a conflict with its shareholders. Ultimately, the shareholders have the authority to remove the board but these circumstances are rare.


Signed: _____

Philippe Cerf

Martello Expert Services, Warnford Court, London, EC2N 2AT

---

[10] The board would be expected to take advice on any acquisition offer. The advisors would present the board with a variety of valuation metrics on which to assess the share premium of the offer.

Exhibit D

**Alix**Partners

**United States**

**-v-**

**(1) Michael Richard Lynch**
**(2) Stephen Chamberlain**

**Summary of Independent Expert Accounting Opinions of Mr Greig Taylor FCA**

**December 7, 2023**

AlixPartners, LLP
909 3rd Ave
New York
NY 10022

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

# Contents ....................................................................

**1    Introduction** ........................................................................ 1
   1.1    Introduction .................................................................... 1
   1.2    Scope of Work and Information Relied Upon .............................. 1
**2    Overview of IFRS** ................................................................ 3
   2.1    Introduction .................................................................... 3
   2.2    Accrual Accounting vs Cash Accounting .................................. 3
   2.3    Rules vs Principles Based .................................................. 4
   2.4    Changes Over Time .......................................................... 5
   2.5    Hierarchy in IFRS ............................................................ 6
   2.6    Autonomy's Financial Reporting .......................................... 7
**3    Revenue Recognition Under IFRS** ............................................ 8
   3.1    Introduction .................................................................... 8
   3.2    Conditions to Recognize Revenue from Sale of Goods ................. 8
   3.3    Conditions to Recognize Revenue from Rendering of Services ....... 14
   3.4    Additional Considerations for Revenue Recognition ................... 15
   3.5    Identification of the Customer and Transaction Components ......... 18
**4    Adjusting or Restating the Accounting Treatment of Transactions** ......... 21
   4.1    Transactions Where Conditions Subsequently Change ............... 21
   4.2    Adjustments After the End of an Accounting period ................... 22
   4.3    Subsequent Adjustments for Changes in Policy, Estimates or Errors ......... 23
**5    Disclosures and Presentation** ............................................... 27
   5.1    Disclosure Requirements Under IAS 18 (Revenue) ................... 27
   5.2    Disclosure Requirements Under IFRS 8 (Operating Segments) ....... 27
   5.3    Expenses ...................................................................... 29
   5.4    Financial Disclosures Not Part of the Financial Statements .......... 31
**6    Capitalization of Expenses** ................................................. 32
**7    Declaration** ..................................................................... 34


**APPENDICES**
**1    Summary of Qualifications and Experience** ............................. 35
**2    List of Documents Relied Upon** ........................................... 37
**3    Comments on Summary of Independent Expert Accounting Opinions of Mr Brice ... 38**

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

# 1      Introduction

## 1.1      Introduction

1.1.1      I am Greig Taylor FCA, a Partner and Managing Director of AlixPartners, LLP, whose offices are at 909 3rd Ave, New York, NY 10022, United States.  I am a Fellow of the Institute of Chartered Accountants in England and Wales.  A summary of my experience and qualifications is attached at Appendix 1.  I have included a list of all publications I have authored in the previous ten years, and a list of all cases in which, during the previous four years, I have testified as an expert or by deposition.

1.1.2      I am instructed by Clifford Chance US LLP, lawyers acting on behalf of Dr Michael Richard Lynch, the former chief executive officer of Autonomy Corporation plc (**"Autonomy"**), to act as an Independent Expert Accountant in relation to a dispute with the United States.

1.1.3      This summary report sets out my opinions and the bases thereon in respect of the relevant accounting standards, International Financial Reporting Standards (**"IFRS"**), under which Autonomy prepared its financial statements during the period January 1, 2009 to September 30, 2011 (the **"Relevant Period"**).

1.1.4      This summary report is structured as follows:

(a)      Overview of IFRS, section 2;

(b)      Revenue Recognition Under IFRS, section 3;

(c)      Adjusting or Restating the Accounting Treatment of Transactions, section 4;

(d)      Disclosures and Presentation, section 5;

(e)      Capitalization of Expenses, section 6; and

(f)      Declaration, section 7.

1.1.5      I have also been instructed to review and comment on the Summary of Independent Expert Accounting Opinions of Steven Brice FCA (**"Mr Brice"**) dated 8 November 2023 (the **"Brice Report"**).  In particular, I have been asked to consider certain sections where Mr Brice provides an opinion on the application of IFRS and set out my observations on his opinions. I provide my comments in Appendix 3.

## 1.2      Scope of Work and Information Relied Upon

1.2.1      My summary report is based on the information available to me.  Appendix 2 sets out the list of sources I have relied upon.

1.2.2      I have used work performed by qualified accountants working under my direction, control, and supervision.  The opinions expressed in this summary report, however, are my own.  I report as an expert and not as a witness of fact.

1.2.3    AlixPartners, LLP's fees for this engagement are not contingent on the outcome of these proceedings.  AlixPartners, LLP is being compensated at a rate of US$1,140 per hour for my time and between US$585 and US$1,115 per hour for staff working under my direction.

1.2.4    This summary report has been prepared solely for use in these proceedings.  In all other respects, this summary report (including attached appendices) is confidential and should not be used, reproduced, or circulated for any other purpose, in whole or in part, without my prior written consent.  Neither I, nor AlixPartners, LLP, will accept liability, if any, and only then as outlined in our engagement letter, to any other party other than the party that engaged AlixPartners, LLP.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

## 2      Overview of IFRS

### 2.1      Introduction

2.1.1      IFRSs comprise International Financial Reporting Standards, International Accounting Standards (**"IAS"**), and Interpretations developed by the IFRS Interpretations Committee. Until 2000, issued accounting standards were called "IAS" and issued by the International Accounting Standards Committee.  Following a reorganization in 2000, later standards were called "IFRS" and were issued by the International Accounting Standards Board (**"IASB"**). Previously issued IASs remain applicable unless replaced by a subsequent IFRS.  In this summary report, where I refer to IFRS, I refer collectively to IFRS, IAS, and Interpretations (unless otherwise stated).

2.1.2      IFRSs are a set of financial reporting standards which set out accounting principles followed by companies preparing and publishing their financial statements.  IFRSs set out the recognition, measurement, presentation, and disclosure requirements dealing with transactions and events that are important in a company's financial statements.  From 2005 onwards, the European Union required publicly traded companies, such as Autonomy, to prepare their financial statements under IFRS.[1]

### 2.2      Accrual Accounting vs Cash Accounting

2.2.1      IFRS is an accrual accounting based system for recording transactions of a business.  The concept under accrual accounting is that the financial impact of transactions (e.g., revenues or expenses) is recorded when the transaction occurs, which may not be at the same time as when amounts are actually paid or received (which would be the basis under cash accounting).

2.2.2      As a simple example, consider a company that over the course of one year sells a widget to a customer each quarter during Q1, Q2 and Q3 for $50 each, with payment due in the following quarter.  To make the three widgets, the company had to purchase goods from a supplier for $90 in Q1, for which payment is not due until Q3.

2.2.3      Under accrual accounting, the $50 revenue from the three sales to the customer is recorded in Q1, Q2 and Q3 as the transactions occur, along with the associated cost of making those sales (under the matching principle):

| Accrual basis | Q1 | Q2 | Q3 | Q4 | Total |
|---|---|---|---|---|---|
| Revenue | 50 | 50 | 50 | - | 150 |
| Expense | (30) | (30) | (30) | - | (90) |
| **Profit** | **20** | **20** | **20** | **-** | **60** |

---

[1]      https://www.iasplus.com/en/news/2002/June/news504.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

---

2.2.4    Under cash accounting, the same transactions are recorded when the cash is paid or received:

| Cash basis | Q1 | Q2 | Q3 | Q4 | Total |
|---|---|---|---|---|---|
| Revenue (cash received) | - | 50 | 50 | 50 | 150 |
| Expense (cash paid) | - | - | (90) | - | (90) |
| **Profit (net cash)** | **-** | **50** | **(40)** | **50** | **60** |

2.2.5    In the examples above, the net effect of accounting for these transactions over the year is that the company records a profit of $60 and receipt of $60 cash, but the timing of when these amounts are recorded throughout the year is different.

2.2.6    Inherently, while cash accounting records transactions when cash is paid or received, accrual accounting requires judgement as it is necessary to assess when each transaction (both sales and purchases) should be recognized.  IFRS sets out the approach which should be adopted by companies to recognize transactions under the accrual basis.

2.2.7    The specific timing of when revenue recognition will occur will depend on when the necessary conditions of IAS 18 (Revenue) have been achieved (which I discuss in more detail in section 3 below).   In certain circumstances, it may be appropriate to either delay or defer the recognition of revenue to a later period (with any cash received being recorded as "Deferred Revenue", a liability on the balance sheet).  As disclosed in Autonomy's 2009 Annual Report and Accounts, if significant post-delivery obligations exist or if a sale of goods is subject to customer acceptance, revenue is deferred until no significant obligations remain or acceptance has occurred.  Similarly, where amounts are contingent upon acceptance of services, revenue is deferred until the acceptance criteria are met.

## 2.3    Rules vs Principles Based

2.3.1    Different accounting standards exist along a spectrum of rules and principles.  Whilst neither is a purely rules-based nor a purely principles-based system, it is accepted that the United States generally accepted accounting principles (**"US GAAP"**) are considered a more rules-based approach whereas IFRS is a more principles-based approach.  As such, there is a greater need under IFRS for a company to apply its judgement in certain areas than under US GAAP.

2.3.2    Where principles are to be applied, there are circumstances where two different accountants, faced with the same transaction, would record the transaction in different ways.  That is not to say that one accountant is wrong and the other is right; instead, it is a recognized feature of the application of principles under IFRS that different, but valid, accounting results can be reached due to the application of differing management or accounting judgements.

2.3.3    Examples of this may arise when a forward-looking assessment is necessary, such as the assessment of the collectibility of a debt.  Another example would be the assessment of the fair value of assets and liabilities.  Both topics are discussed in more detail later in this summary report.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

## 2.4     Changes Over Time

2.4.1     On a periodic basis, new and revised accounting standards and interpretations are issued by the accounting standard setters, which replace or update previous standards, or deal with new topics.  As a result, accounting practices and requirements change over time.  This is the same for all accounting standards, including IFRS.

2.4.2     An example of this evolution is the different versions of IAS 1 which have been issued.  The original IAS 1 (Disclosure of Accounting Policies) was issued in 1975.  This standard, along with IAS 5 (Information to Be Disclosed in Financial Statements) and IAS 13 (Presentation of Current Assets and Current Liabilities) was replaced by a revised IAS 1 (Presentation of Financial Statements) in 1997.  A further revised version of IAS 1 was issued in December 2003 with amendments made in September 2007 and June 2011 (as well as other amendments after the Relevant Period).[2]

2.4.3     Autonomy was a UK company (which first listed on the EASDAQ in 1998,[3] moving to London in 2000[4]).  Following the EU's requirement, from 2005 Autonomy presented its quarterly and annual financial information under IFRS.  This first-time adoption of IFRS by Autonomy required a transition and translation period from its previous accounting basis, UK GAAP, beginning in 2004.  After this fist-time adoption, IFRS continually evolved throughout the Relevant Period.  Per Autonomy's Annual Report and Accounts, in 2009, two new and revised standards were in effect, and 14 new and revised standards and four interpretations were issued by the International Financial Reporting and Interpretations Committee ("**IFRIC**") were in issue but not yet in effect.[5]  By 2010, five new and revised standards were in effect, and seven new and revised standards and IFRIC interpretations were in issue but not yet in effect.[6]

2.4.4     No industry-specific guidance on revenue recognition for software was provided under IFRS.  The same revenue recognition standard (IAS 18 (Revenue)) which was issued in 1993 and remained applicable until 2018 (other than minor changes) applied equally to software as to any other product generating revenue.[7]

2.4.5     I understand that Autonomy's business was built around its IDOL technology which could be tailored to a customer's requirements.  For example, Autonomy's 2010 Annual Report and Accounts explain that Autonomy offered over 500 different functions and connectors to over 400 different data repositories as part of its product suite, and that its products and offerings were continually evolving.[8]

2.4.6     It is against this background in the Relevant Period (i.e., the recent first-time adoption of IFRS, non-existent industry-specific IFRS guidance, the continuing introduction of new

---

[2]     https://www.ifrs.org/issued-standards/list-of-standards/ias-1-presentation-of-financial-statements/.
[3]     https://www.theguardian.com/business/1999/nov/17/autonomycorporationbusiness.
[4]     https://money.cnn.com/2000/10/31/europe/autonomy/index.htm.
[5]     Note 1 to the 2009 Annual Report and Accounts (page 40).
[6]     Note 1 to the 2010 Annual Report and Accounts (page 49).
[7]     The only exception being construction projects, where a specific standard, IAS 11 (Construction Contracts), applied.
[8]     Note 5 to the 2010 Annual Report and Accounts (page 58).

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

standards and interpretations, and an evolving product offering), that Autonomy was applying IFRS.

## 2.5     Hierarchy in IFRS

2.5.1     IFRSs are mandatory pronouncements.  When preparing a set of IFRS-compliant financial statements, all IFRSs must be implemented (albeit not all IFRSs will be relevant to all companies).  Each IFRS is based upon a framework which addresses the concepts underlying the financial information presented in a company's financial statements.  As each IFRS addresses a specific topic, and all IFRSs are based upon the same framework, there is limited scope for overlap or inconsistency to arise.

2.5.2     As stated in paragraph 17 of IAS 1 (Presentation of Financial Statements), *"In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs".*[9] On this basis, it is only in exceptional circumstances that an accountant would need to look outside of a specific IFRS to determine the appropriate accounting treatment.

2.5.3     While the application of an IFRS is based on the specific text of the standard itself, there are often other sources which can provide context or guidance which may assist in interpreting the appropriate approach.  For example:

(a)     IFRSs are typically accompanied by a "Basis for Conclusions" document and "Implementation Guidance", which do not form part of the IFRS.  These documents summarize the IASB's considerations in reaching its conclusions when developing the associated standard and provide illustrative examples of the application of the IFRS;

(b)     IFRIC Interpretations, which are intended to provide consensus on the appropriate accounting treatment and authoritative guidance on accounting issues that have arisen under IFRS; or

(c)     major accounting firms often publish their own guidance or commentary on IFRSs which can assist when assessing the application of a standard.

2.5.4     As referenced above, there are also frameworks issued by the IASB which address the concepts underlying the financial information presented in a company's financial statements. The first framework (Framework for the Preparation and Presentation of Financial Statements) was published in 1989 and adopted by the IASB in April 2001.  This framework was superseded in September 2010 by the Conceptual Framework for Financial Reporting. In respect of preparers of financial statements, the frameworks state they are provided to assist preparers of financial statements in applying IFRSs and in dealing with topics that

---

[9]     IAS 1.17 further states that "*A fair presentation also requires an entity: (a) to select and apply accounting policies in accordance with IAS 8 Accounting Policies, Changes in Accounting Estimates and Errors.  IAS 8 sets out a hierarchy of authoritative guidance that management considers in the absence of an IFRS that specifically applies to an item. (b) to present information, including accounting policies, in a manner that provides relevant, reliable, comparable and understandable information. (c) to provide additional disclosures when compliance with the specific requirements in IFRSs is insufficient to enable users to understand the impact of particular transactions, other events and conditions on the entity's financial position and financial performance.*"

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

have yet to form the subject of an IFRS.[10]  Additionally, both frameworks clarify that neither framework: (i) is an IFRS and hence does not define standards for any recognition, measurement, or disclosure issue; nor (ii) overrides any specific IFRS.

## 2.6      Autonomy's Financial Reporting

2.6.1      During the Relevant Period, Autonomy prepared its consolidated financial statements (for each year ended 31 December) and quarterly results (for each quarter ended March 31, June 30, September 30 and December 31) under IFRS as applied by the European Union.  I refer to Autonomy's annual report and accounts (which include its financial statements) as **"Annual Report and Accounts"** and its quarterly reports as **"Quarterly Results"**.

2.6.2      The Quarterly Results include statements which typically confirm that, while they have been prepared under IFRS, they do not include all disclosures under IFRS.  This is not uncommon as quarterly and half yearly reports are more limited than annual report and accounts.  In fact, IFRS does not require companies to issue quarterly results.  As such, I understand that the accounting policies adopted by Autonomy were consistently applied when preparing the Quarterly Results and the Annual Report and Accounts.

---

[10]      The frameworks are also provided to assist various other groups, including the IASB in developing IFRS, auditors in forming an opinion as to whether financial statements conform with IFRS, and users of financial statements in interpreting financial statements prepared under IFRS.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

# 3      Revenue Recognition Under IFRS

## 3.1      Introduction

3.1.1      During the Relevant Period, the relevant IFRS related to revenue recognition was IAS 18 (Revenue).  This standard was issued in December 1993 and was effective from 1 January 1995, superseding IAS 18 (Revenue Recognition) which had been approved in 1982, and subsequently replaced in 2018 by IFRS 15 (Revenue from Contracts with Customers).  By complying with IAS 18 (Revenue), an entity achieves a fair presentation with regard to the recognition of revenue.

3.1.2      IAS 18 (Revenue) prescribes the accounting treatment of revenue arising from the sale of goods, the rendering of services, and the use by others of entity assets yielding interest, royalties and dividends.

3.1.3      The more principles-based nature of IFRS, along with the lack of any industry-specific guidance on software revenue recognition and the bespoke nature of the products offered by Autonomy, meant that IAS 18 (Revenue) required judgement in application.  As a result, different accountants could validly form different conclusions when presented with the same transactions, each of which could be appropriate under IAS 18 (Revenue).

## 3.2      Conditions to Recognize Revenue from Sale of Goods

3.2.1      With respect to the sale of goods, IAS 18.14 requires all the following five conditions to have been satisfied before revenue can be recognized:[11]

(a)      the entity has transferred to the buyer the significant risks and rewards of ownership of the goods;

(b)      the entity retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold;

(c)      the amount of revenue can be measured reliably;

(d)      it is probable that the economic benefits associated with the transaction will flow to the entity; and

(e)      the costs incurred or to be incurred in respect of the transaction can be measured reliably.

3.2.2      Once these five conditions have all been satisfied, revenue shall be recognized.

3.2.3      IAS 18.15-17 provide commentary on condition (a), IAS 18.9-12 provide commentary on the measurement of revenue in relation to condition (c), IAS 18.18 provides commentary

---

[11]      When discussing a specific paragraph of an IFRS, I employ the following shorthand: "IAS 18.14" represents "IAS 18 (Revenue), paragraph 14".

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

on condition (d), and IAS 18.19 provides commentary on condition (e).  No commentary is provided in IAS 18 (Revenue) in relation to condition (b).  I summarize each of the five conditions related to the recognition of revenue for the sale of goods below.

3.2.4    The IFRS Foundation (of which the IASB is part) published an annual "IFRS Briefing for Chief Executives, Audit Committees and Boards of Directors".  This document sets out summaries of IFRS at a high level and in non-technical language for Chief Executives, members of Audit Committees, Boards of Directors, and others who want a broad overview of IFRSs and the business implications of implementing them.[12]  The summary of IAS 18 (Revenue) in the 2009, 2010, and 2011 editions of this document sets out the following in respect to the conditions to recognize revenue from the sale of goods:

> *"In general, revenue is recognised when it is probable that economic benefits from the transaction will flow to the entity and those benefits can be measured reliably.*
>
> *Revenue from the sale of goods is recognised when specified conditions are satisfied. For example:*
>
> *• significant risks and rewards of ownership have been transferred to the buyer; and*
>
> *• the entity has neither continuing managerial involvement in, nor effective control over, the goods."*

3.2.5    No further commentary is provided in this document to expand on these conditions or explain how they should be interpreted.

### Transfer of Significant Risks and Rewards of Ownership

3.2.6    IAS 18.15 indicates that, in most cases, the transfer of the significant risks and rewards of ownership coincides with the transfer of legal title or possession to the buyer, which is the case in most retail sales.  This will typically occur when a contract is agreed between the parties and/or when the goods are delivered.  This assessment can require an evaluation of the circumstances of the transaction.

3.2.7    To meet this revenue recognition condition, the seller must transfer the *significant* risks and rewards of ownership to the buyer.  If *insignificant* risks and rewards are retained by the seller, revenue may still be recognized.  The assessment of what constitutes significant and insignificant is not discussed in IAS 18 (Revenue) and thus requires the application of judgement.

3.2.8    IAS 18.16 provides four examples of situations in which an entity may retain (i.e., may not transfer) the significant risks and rewards of ownership: (1) when the entity retains an obligation for unsatisfactory performance not covered by normal warranty provisions; (2) when the receipt of the revenue from a particular sale is contingent on the derivation of

---

[12]    These briefings state that they were prepared by the IFRS Foundation and were not reviewed by the IASB.

revenue by the buyer from its sale of the goods; (3) when the goods are shipped subject to installation and the installation is a significant part of the contract which has not yet been completed by the entity; and (4) when the buyer has the right to rescind the purchase for a reason specified in the sales contract and the entity is uncertain about the probability of return.

3.2.9    These examples would often be subject to specific clauses in the sales contract which would set requirements, obligations, or milestones to be reached.  However, the use of the word "significant" in the third example when installation is part of the product being sold is notable.  There is no further commentary on this threshold (e.g., whether the installation: (i) represented a "significant" amount of the revenue; (ii) was required before the buyer was required to pay; or (iii) would take a "significant" amount of time to complete).  As a result, where installation needs to be considered, this can require judgement to determine whether the "significant" threshold applies.  The "IFRS Briefing for Chief Executives, Audit Committees and Boards of Directors" publications for 2009, 2010, and 2011 note that sales subject to installation and inspection are a circumstance in which the timing of recognition of revenue requires careful consideration.

3.2.10    While the examples in IAS 18.16 are not an exhaustive list, if none of the four examples apply, then the likelihood of the transfer of significant risk and reward increases.

### Degree of Continuing Managerial Involvement and Effective Control

3.2.11    This condition can be linked to the transfer or retention of the significant risks and rewards of ownership as it would be unusual for an entity to maintain managerial involvement to the degree associated with ownership without retaining the significant risks and rewards of ownership.

3.2.12    When discussing the concept of managerial involvement and control, the 2009 guidance published by PwC provides five potential indicators of continuing managerial involvement or retention of effective control: (1) the seller can control the future price of the item; (2) the seller is responsible for the management of the goods subsequent to the sale; (3) the terms of the transaction allow the buyer to compel the seller, or give an option to the seller, to repurchase the item at an amount not equal to fair value; (4) the seller guarantees the return of the buyer's investment or a return on that investment for a significant period; and (5) the seller has control over the re-sale of the item to third parties (for example, the seller can control the selling price, timing or counterparty of any re-sale transaction or, alternatively, resale is entirely prohibited).[13]

3.2.13    As with the examples provided when assessing the transfer of significant risks and rewards, these examples would often be subject to specific clauses in the sales contract which would identify specific rights and obligations.  While these examples are not an exhaustive list, if none of the five examples apply, then the likelihood increases that the entity retains neither

---

[13]    Extract from the 2009 PWC IFRS Manual of Accounting, para. 9.83.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

---

continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold.

3.2.14    PwC also states that it is highly unlikely that an entity would retain continuing managerial involvement to the degree associated with ownership without also retaining the economic benefits of an asset.[14]   As such, a buyer is not likely to accept the seller's continued managerial involvement (to the degree usually associated with ownership) if the buyer paid fair consideration for the goods or services.   To the extent that there is any ongoing managerial involvement, an assessment must be made whether this would be considered equivalent to ownership and would therefore curtail revenue recognition.   It is important to note that this assessment (along with the assessment of the other revenue recognition conditions) will be based on the situation at the time the sale is made – such conditions could subsequently change, and this would not impact the initial recognition of revenue.

### Reliable Measurement of Revenue

3.2.15    To recognize revenue from the sale of goods, there must be a reliable measurement of that revenue.   IAS 18.9-12 discuss "Measurement of revenue".   These paragraphs indicate that:

> *"Revenue shall be measured at the fair value of the consideration received or receivable."*

where fair value is defined (at IAS 18.7) as:

> *"the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction."*

3.2.16    In most transactions, fair value will be the price identified in the associated contract or agreement which will be settled via cash:[15]

> *"The amount of revenue arising on a transaction is usually determined by agreement between the entity and the buyer or user of the asset."* (IAS 18.10)

> *"In most cases, the consideration is in the form of cash or cash equivalents and the amount of revenue is the amount of cash or cash equivalents received or receivable."* (IAS 18.11)

3.2.17    The 2009 guidance published by PwC notes that the contract agreed between the buyer and seller drives key issues such as measurement of consideration (and is also relevant to the measurement of costs and the probability of economic benefits flowing to the vendor).[16]   Therefore, unless it can be demonstrated that the parties involved in the transaction are

---

[14]    Extract from the 2009 PWC IFRS Manual of Accounting, para. 9.82.
[15]    If the receipt of the cash is deferred, then it may be necessary to adjust the amount received to reflect the financing being provided.
[16]    Extract from the 2009 PWC IFRS Manual of Accounting, para. 9.38.

Case 3:18-cr-00577-CRB   Document 298-1   Filed 01/17/24   Page 222 of 289

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

not *"knowledgeable, willing parties in an arm's length transaction"*, then the price identified in a contract will be the amount of the revenue recognized.

## Probable Flow of Economic Benefits

3.2.18   To recognize revenue, it must be probable that the economic benefits associated with the transaction will flow to the entity making the sale.  In simple terms, it is necessary to consider whether the buyer will pay for the goods purchased and the seller will receive the cash.

3.2.19   IAS 18 (Revenue) does not define "probable".  In the absence of a specific definition, one may look for guidance in other standards and interpretations.  IAS 37 (Provisions, Contingent Liabilities and Contingent Assets) and IFRS 5 (Non-Current Assets Held for Sale and Discontinued Operations) define "probable" as *"more likely than not"*.[17]  While IAS 37 states that its definition of "probable" does not necessarily apply to other IFRSs, no such note appears in IFRS 5.[18]

3.2.20   In contrast to IAS 18 (Revenue)'s use of "probable", IAS 39 (Financial Instruments: Recognition and Measurement)[19] uses the phrase "highly probable" when discussing hedging products (e.g., at paragraphs 86(b) and 88(c)).  The associated implementation guidance for IAS 39 (section F.3.7) states that *"The term 'highly probable' indicates a much greater likelihood of happening than the term 'more likely than not'"*.  Based on IAS 39, the decision to describe something as "highly probable" in IFRS rather than simply "probable" (as is the case in IAS 18 (Revenue)) clearly requires a much higher threshold to be applied.

3.2.21   Therefore, a threshold of a greater than 50% chance has been adopted in practice[20] when assessing the likelihood of whether the economic benefits associated with the transaction will flow to the entity under IAS 18 (Revenue).

3.2.22   IAS 18 (Revenue) also does not define "economic benefit".  This term, however, may be considered in the context of the definition of revenue provided at IAS 18.7:

> *"Revenue is the gross inflow of economic benefits during the period arising in the course of the ordinary activities of an entity when those inflows result in increases in equity, other than increases relating to contributions from equity participants."*

3.2.23   In effect, the economic benefit is ultimately the cash received by the seller in exchange for the product sold.[21]  Therefore, the assessment of collectibility may consider whether it is more likely than not (i.e., whether there is a greater than 50% chance) that payment will be received.  Unless the cash is received at the same time the sale is made, there is never 100% certainty that the cash will be received.  Inherently, the test of whether the cash will

---

[17]   IAS 37.23 and IFRS 5, Appendix A (Defined Terms).
[18]   IAS 37.23.
[19]   IAS 39 was issued in March 1999 and was adopted by the IASB in April 2001.
[20]   Extract from the 2009 PWC IFRS Manual of Accounting, para 21.80 and 21.82.
[21]   If payment is not made at the same time as the sale is made, then the increase in economic benefit is the debtor balance (which also increases equity), which will be replaced by cash when payment is made.

Case 3:18-cr-00577-CRB   Document 298-1   Filed 01/17/24   Page 223 of 289

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

be received is a forward-looking exercise and so involves a degree of speculation. Therefore, this is an area where differing judgements can ultimately determine whether revenue from the sale of goods shall be recognized or not.

3.2.24   To make the collectibility assessment, which is made separately for each customer and/or transaction, it is necessary to consider the creditworthiness of the customer based upon the information available at the time. Such an assessment can inform, but cannot guarantee, collectibility of a debt. In addition, a customer's payment history can be a useful guide to the likelihood of collectibility (i.e., it may be reasonable to conclude that it is probable that a customer who has made several prior payments to a seller will do so again). As noted above, collectibility is only necessary to be considered "*more likely than not*" (i.e., a greater than 50% chance) to allow this condition for revenue recognition to be satisfied.

3.2.25   Where an uncertainty subsequently arises about the collectibility of an amount that has been recognized as revenue, the appropriate accounting treatment is generally not to adjust the amount of revenue, but rather to recognize the uncollectible amount as an expense (i.e., as a bad debt) when that uncertainty arises. This expense impacts net profit in the period in which it is recorded, but it does not impact revenue or gross profit in either the original period in which revenue was recognized nor the period in which the expense is recorded. The circumstances where the accounting for a transaction may be adjusted or restated by subsequent events is discussed further in section 4 below.

3.2.26   Autonomy's 2010 Annual Report and Accounts identify an "Allowance for doubtful debts" of 8.5% (2009) and 8.9% (2010) of the amounts due from customers, indicating that by the end of 2010, Autonomy assessed c.US$26 million of amounts owed from customers to be subject to credit risk. This allowance reflected "*management's assessment of the risk of each individual debt taking into account the ageing profile, experience and circumstance*".[22]

### Costs Incurred or to be Incurred in Respect of the Transaction can be Measured Reliably

3.2.27   It is necessary to recognize the revenue and expenses related to a transaction at the same time – in accounting, this concept is referred to as matching. The expenses include costs incurred up to the date of the sale and any subsequent costs. Where these costs cannot be reliably measured (but all other conditions to recognize revenue have been met), any amounts received are accounted for as a liability (i.e. Deferred Revenue) on the balance sheet until the revenue can be recognized.[23]

3.2.28   Identification of these costs can be assisted by IAS 2 (Inventories), which identifies the costs of inventories (or stock) and states that these costs should be matched as an expense to the related revenue:

---

[22]   Note 17a) to the 2010 Annual Report and Accounts (page 66).

[23]   This treatment of amounts received is specifically set out in IAS 18.19 for situations where costs cannot be measured reliably. However, the same would apply to any payments received before revenue had been recognized (i.e., if any of the five conditions for revenue recognition in IAS 18.14 are not satisfied).

(a)   *"The cost of inventories shall comprise all costs of purchase, costs of conversion and other costs incurred in bringing the inventories to their present location and condition."* (IAS 2.10)

(b)   *"The amount of inventories recognised as an expense during the period, which is often referred to as cost of sales, consists of those costs previously included in the measurement of inventory that has now been sold and unallocated production overheads and abnormal amounts of production costs of inventories. The circumstances of the entity may also warrant the inclusion of other amounts, such as distribution costs."* (IAS 2.38)

3.2.29   I separately address how the costs identified in this assessment are disclosed in a company's financial statements in section 5 below.

## 3.3   Conditions to Recognize Revenue from Rendering of Services

3.3.1   With respect to the rendering of services, IAS 18.20 requires that revenue associated with the transaction shall be recognized by reference to the stage of completion of the transaction at the end of the reporting period.   This approach is often called the "percentage of completion method".   IAS 18.25 states that in certain circumstances, the percentage of completion evaluation can be simplified:

> *"For practical purposes, when services are performed by an indeterminate number of acts over a specified period of time, revenue is recognised on a straight-line basis over the specified period unless there is evidence that some other method better represents the stage of completion. When a specific act is much more significant than any other acts, the recognition of revenue is postponed until the significant act is executed."*

3.3.2   In addition, IAS 18.20 requires that the outcome of the transaction can be estimated reliably – this occurs when all four of the following conditions have been satisfied:

(a)   the amount of revenue can be measured reliably;

(b)   it is probable that the economic benefits associated with the transaction will flow to the entity;

(c)   the stage of completion of the transaction at the end of the reporting period can be measured reliably; and

(d)   the costs incurred for the transaction and the costs to complete the transaction can be measured reliably.

3.3.3   Conditions (a), (b) and (d) are identical to those for the sale of goods discussed in section 3.2 above.

3.3.4   One additional consideration for condition (b) for the rendering of services is that such an assessment can be more difficult than for the sale of goods as the revenue (and collection

of this revenue) can extend for years into the future.  Despite this, the assessment must be made at the time of the transaction.

3.3.5   An additional consideration for condition (d) is that this assessment is also likely to be more difficult to undertake compared to the sale of goods.  This is due to the potential for the services to be provided over several years and because the identification of the costs related to provision of services is less distinct than those related to, for example, the manufacture of a product for resale.

3.3.6   In addition to the sale of goods, the "IFRS Briefing for Chief Executives, Audit Committees and Boards of Directors" also covers revenue recognition from rendering of services.  The wording in the 2009, 2010 and 2011 versions of this publication states:

> *"In general, revenue is recognised when it is probable that economic benefits from the transaction will flow to the entity and those benefits can be measured reliably.*
>
> *…*
>
> *For the rendering of services, revenue is recognised as work is performed. This is commonly referred to as the percentage of completion method. However, when the outcome of a service contract cannot be estimated reliably, revenue is recognised only to the extent of expenses recognised that are recoverable."*

3.3.7   No further commentary is provided in this document to expand on these conditions or explain how they should be interpreted.

## 3.4   Additional Considerations for Revenue Recognition

3.4.1   Typically, the revenue recognition criteria in IAS 18 (Revenue) are applied separately to each transaction.  However, in certain instances it is necessary to consider two (or more) transactions together.  This can occur when an exchange of goods or services occurs or when transactions are considered to be linked.  Additionally, it may be necessary to apply the revenue criteria to the separately identifiable components of a single transaction.

### Exchange Transactions

3.4.2   Under IAS 18.12, the accounting for exchange transactions depends on whether the goods or services being exchanged or swapped are considered to be of a similar or dissimilar nature.

3.4.3   The example of an exchange of similar goods included in IAS 18.12 is the exchange of commodities such as milk or oil where suppliers swap inventories at different locations.  In effect, these products are broadly interchangeable or indistinguishable from each other. Under IAS 18.12, no revenue is generated by either party when an exchange of similar goods occurs.

Case 3:18-cr-00577-CRB   Document 298-1   Filed 01/17/24   Page 226 of 289

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

3.4.4    Under 18.12, an exchange of dissimilar goods or services, revenue is generated and is measured at the fair value of the goods or services received (with an adjustment made to reflect the amount of any cash transferred).[24]

3.4.5    As noted above, fair value is defined at IAS 18.7 as:

> *"the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction."*

3.4.6    Therefore, the assessment of fair value is based on a hypothetical sale between parties.  The issue of how important or necessary the item being sold is to the buyer is not part of this assessment.   The assessment of fair value involves judgement.   Judgement becomes particularly important in the valuation of goods or services which are not regularly sold or for bespoke products.

3.4.7    While not explicitly stated, exchange transactions will likely only arise when both parties have agreed such an exchange is occurring, and the exchange is specifically documented within the sale/purchase contract(s).

### Linked Transactions

3.4.8    IAS 18.13 states that *"the [revenue] recognition criteria are applied to two or more transactions together when they are linked in such a way that the commercial effect cannot be understood without reference to the series of transactions as a whole".*

3.4.9    The key concept in IAS 18.13 is whether the "commercial effect" of one transaction can be understood without reference to the series of transactions as a whole.  This determination is a fact-specific exercise performed contemporaneously.  Evaluating transactions in this respect requires considering the circumstances of each transaction (individually and, if necessary, together), which could include management assessments or explanations evaluated at the time the transactions were entered into.

3.4.10    As a result, whether transactions are considered to be linked is another area of IAS 18 (Revenue) where judgement is required, and thus accountants can reach different, valid conclusions for the same transactions.

3.4.11    IAS 18.13 provides an example of an entity which sells goods and, at the same time, enters into a separate agreement to repurchase the same goods at a later date.  As the subsequent repurchase negates the substantive effect of the transaction, the two transactions are considered linked and accounted for together.   A similar example is covered in the Implementation Guidance for IAS 18 (Revenue) at paragraph 5:

> *"Sale and repurchase agreements (other than swap transactions) under which the seller concurrently agrees to repurchase the same goods at a*

---

[24]    If it is not possible to reliably measure the fair value of the goods or services received, the revenue can be assessed based on the fair value of the goods or services provided (with an adjustment made to reflect the amount of any cash transferred).

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

---

*later date, or when the seller has a call option to repurchase, or the buyer has a put option to require the repurchase, by the seller, of the goods.*

*For a sale and repurchase agreement on an asset other than a financial asset, the terms of the agreement need to be analysed to ascertain whether, in substance, the seller has transferred the risks and rewards of ownership to the buyer and hence revenue is recognised. When the seller has retained the risks and rewards of ownership, even though legal title has been transferred, the transaction is a financing arrangement and does not give rise to revenue."*

3.4.12   In these two examples, the terms of the agreements are analysed to understand whether the revenue recognition criteria are satisfied.  The link between the transactions relates to the same goods being sold and repurchased.  When the recognition criteria are applied to the transactions together, the combined transaction does not satisfy the condition of the transfer of significant risks and rewards of ownership of the goods, and hence revenue is not recognized.  The only guidance in IAS 18 (Revenue) in determining whether a link exists between transactions relates to determining "commercial effect", which requires judgement.

3.4.13   When assessing whether two or more transactions involving different goods and/or services could be linked, considerations may include: (i) whether these transactions occurred around the same time; (ii) whether these transactions were negotiated by the same individuals on either side; or (iii) whether the contractual documentation for one transaction directly refers to the potentially linked other transaction.  However, these are indicators and are not determinative of establishing a linked transaction.  For example, in respect of (iii), if the reference in the contractual documentation indicates that the transactions are contingent or dependent on each other, resulting in an obligation, this would support these transactions being linked.  However, in the absence of such an obligation, a link may not be established.

3.4.14   The "IFRS Briefing for Chief Executives, Audit Committees and Boards of Directors" publications for 2009, 2010, and 2011 discuss that sale and repurchase agreements are a circumstance in which the timing of recognition of revenue requires careful consideration.  There is no discussion of linked transactions or the definition of "commercial effect".

### Transactions With Multiple Components

3.4.15   As IAS 18.13 explains, *"in certain circumstances, it is necessary to apply the recognition criteria to the separately identifiable components of a single transaction in order to reflect the substance of the transaction."*

3.4.16   In accordance with IAS 18.13, if a transaction includes the sale of a good and ongoing service, it is necessary to separate the two components of the transaction and recognize revenue when the recognition criteria are met for each component.

3.4.17   IAS 18 (Revenue) provides one example that explains that when the selling price of a product includes an identifiable amount for subsequent servicing, that amount is deferred and recognized as revenue over the period during which the service is performed.  However, IAS 18 (Revenue) does not expand upon how such components should be identified outside

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

of an explicit identification in the selling price.  Where separate components can be identified, it may be necessary to consider the value attributable to each component.  A fair value assessment may be required to split the total price identified in the contract or to confirm the price split included in the contract (although, as noted above, in most instances, the price negotiated between parties will be the fair value).  Given the limited guidance, revenue recognition for transactions with multiple components requires judgement.

3.4.18    The "IFRS Briefing for Chief Executives, Audit Committees and Boards of Directors" publications for 2009, 2010, and 2011 note that transactions with multiple elements are a circumstance in which the timing of recognition of revenue requires careful consideration.  The publications do not include any further definition or guidance on how to determine whether a transaction has multiple elements.

## 3.5    Identification of the Customer and Transaction Components

### Resellers

3.5.1    The use of "Value Added Resellers" (or VARs)[25] was described in Autonomy's Annual Report and Accounts for 2009 and 2010 as "*Autonomy's primary revenue channel*".  A reseller model typically results in goods or services being sold to the reseller, and then a subsequent separate sale is made between the reseller and an end-user.

3.5.2    Under IAS 18 (Revenue), revenue must be recognized when the conditions are met for the sale to the reseller, as the reseller is the customer.  It is not necessary to consider the subsequent sale to any end-user by the reseller.

3.5.3    Achieving the criteria for revenue recognition from a sale to a reseller does not preclude a company from contacting the named or potential end-user of the goods or services on matters related to the goods or services sold to the VAR, including, but not limited to, scenarios where the potential end-user is already a customer of the seller.  This is the case whether the subsequent sale to the end-user has been completed or not.  It is a matter of judgement whether the potential for continued contact between the seller and the end-user constitutes "continuing managerial involvement to the degree usually associated with ownership" or "effective control over the goods sold."  If such contact occurs contemporaneously with the sale to the reseller, revenue will be recognized as long as the relevant conditions in IAS 18 (Revenue) have been satisfied.  If such contact occurs after the sale and recognition of revenue, the recognition of revenue would generally not be impacted by such subsequent events – this issue is discussed further in section 4 below.

### Original Equipment Manufacturers

3.5.4    Autonomy identified original equipment manufacturers (or **"OEMs"**) as another group of customers.  The 2009 Annual Report and Accounts describe the OEM program as one in which "*Autonomy's OEM customers bring Autonomy technology to vertical markets by*

---

[25]    While the common description is "Value Added Reseller", there is no requirement under IFRS for any "value to be added".  A reseller may purchase a product and then sell the same product with no modifications or additional services.

Case 3:18-cr-00577-CRB   Document 298-1   Filed 01/17/24   Page 229 of 289

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

*embedding it in their own solutions*".  As well as an upfront fee, these customers would also pay further amounts based on the sales of the developed product.

3.5.5   In Autonomy's 2009 Annual Report and Accounts, the accounting policy for the sale of goods states that "*The group sells its products as licences to…OEMs…*".  Autonomy's customer in such a scenario is the OEM (and not the subsequent end-user of the developed product), and it is the sale to the OEM which would be considered when evaluating the conditions for revenue recognition.

3.5.6   As part of the OEM transaction, the 2009 Annual Report and Accounts state that "*An OEM pays an upfront non-refundable fee and then writes its new product which can take up to two years depending on its product roadmap and release cycle. Once the product is launched they make license payments of around three percent of product sales to Autonomy.*"

3.5.7   The example provided by Autonomy explains that an upfront non-refundable fee was payable upon the sale of the license to the OEM before the longer term sales volume-based licence fees became payable.   For the upfront non-refundable fee to be recognized as revenue, it needs to meet the conditions for sale of goods under IAS 18.14.  Revenue recognition for the later sales-based licence fees is then also assessed under IAS 18.14 based on the amount of product sold as reported by the OEM.

### Hosting

3.5.8   Autonomy offered "*Hosted Solutions*", summarized in the 2009 Annual Report and Accounts as follows:

> "*Autonomy also operates Software-as-a-Service (SaaS) and hosted solutions, where Autonomy software is run on hardware owned by Autonomy in one of our data centres.*"

3.5.9   The accounting policy for the sale of goods in the 2009 Annual Report and Accounts describes the different components of Autonomy's hosting transactions:

> "*Product revenues from the hosted business relate to the execution of production operations on computers which the company runs in its data centres. Revenues are generated from the use of our software and computers and from us maintaining the data. Customers commit for periods between one month and up to three years.*"

3.5.10   Under the hosting arrangements, Autonomy provided use of its software and computers in its own data centres.

3.5.11   The 2009 and 2010 Annual Report and Accounts clarify that product revenues from the hosting elements of these transactions are generated in two ways:

(a)   "*Paid up front, usually one to three years, in which case the group has an obligation to process the data using the group's software and archive for the contracted length of time using the group's proprietary storage technology. Revenues are allocated*

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

---

*between capture and archiving using the residual method, with the archiving element deferred and recognized rateably over the contracted period of archiving*"; and

(b)   "*Paid on a pay-as-you-go basis, in which case the charge is based on the volumes of data ingested and stored each month. Revenues for pay-as-you-go customers are recognized on a monthly basis as the product is made available to customers. There is no deferred revenue in relation to these customers.*"

3.5.12   Autonomy accounted for the revenue arising from these multiple-element transactions in two separate parts, both of which were subject to the conditions under IAS 18.14.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

# 4 Adjusting or Restating the Accounting Treatment of Transactions

## 4.1 Transactions Where Conditions Subsequently Change

4.1.1   In general, when considering the accounting treatment of a transaction, only contemporaneously available information and evidence is considered. For example, revenue is recognized when the transaction satisfies the necessary conditions under IAS 18 (Revenue) based on contemporaneous evidence.

4.1.2   Once the recognition conditions have been satisfied and revenue is recognized, any subsequent adjustments (if any) because of new information or evidence would be made as separate accounting entries such that both the original accounting entries and subsequent adjustment are included in the company's accounts. For example, as discussed above, to recognize revenue from the sale of goods, all the conditions of IAS 18.14 must be met, which includes condition IAS 18.14(d) related to collectibility. Where a debt from a customer is subsequently considered to be non-recoverable sometime after the revenue from a sale was recognized, the original revenue is not adjusted. Instead, a separate bad debt expense is recorded. The net effect of these accounting entries may result in the revenue and expense cancelling each other out in the period of the adjustment (i.e., the net effect on profit is nil), but both the revenue and bad debt expense accounting entries are recorded.

4.1.3   This accounting treatment is specifically noted in IAS 18.18 in respect of sale of goods and in IAS 18.22 for rendering of services. For example, for sale of goods, IAS 18.18 states:

> "*Revenue is recognised only when it is probable that the economic benefits associated with the transaction will flow to the entity...However, when an uncertainty arises about the collectibility of an amount already included in revenue, the uncollectible amount or the amount in respect of which recovery has ceased to be probable is recognised as an expense, rather than as an adjustment of the amount of revenue originally recognised.*"

4.1.4   To illustrate this concept, I revisit the simple example from section 2 above. Following the sale and recognition of revenue in Q3, it is subsequently determined later within the same Q3 reporting period that the amount due is no longer recoverable (e.g., the customer has communicated that it cannot pay). In this situation, the revenue recognized in Q3 remains valid (as it satisfied the conditions under IAS 18 (Revenue) at the date of recognition), but it is then also necessary to record a bad debt expense for the amount which will not be collected:

|  | Q1 | Q2 | Q3 | Q4 | Total |
|---|---|---|---|---|---|
| Revenue | 50 | 50 | 50 | - | 150 |
| Expense | (30) | (30) | (30) | - | (90) |
| Bad debt expense | - | - | (50) | - | (50) |
| **Profit** | **20** | **20** | **(30)** | **-** | **10** |

4.1.5    The net effect of accounting for these transactions over the year is that the company now records a profit of $10 instead of $60, but it still records revenue of $150.

## 4.2    Adjustments After the End of an Accounting period

4.2.1    Following the end of a financial reporting period, whether at a quarter- or year-end, there is limited scope to revisit and adjust the accounting treatment of transactions.  That is not to say that it is not permissible to determine the appropriate accounting treatment after the period-end – just that the ability to reflect the impact of events after the period-end may be limited.

4.2.2    IAS 10 (Events After the Reporting Period) addresses events which occur between the end of a financial reporting period and the date the financial statements are authorized for issue. Specifically, IAS 10.3 separates such events into two categories:

(a)    adjusting events, being *"those that provide evidence of conditions that existed at the end of the reporting period"*; and

(b)    non-adjusting events, being *"those that are indicative of conditions that arose after the reporting period"*.

4.2.3    IAS 10.8 and IAS 10.10 then explain that for adjusting events an entity shall adjust the amounts recognized in the reporting period in its financial statements.  For non-adjusting events, an entity shall not adjust the amounts recognized in the reporting period in its financial statements.

4.2.4    If, in the example above, it was determined after the end of the Q3 reporting period (i.e., in Q4 but before the date the Q3 financial statements are authorized for issue) that collection is no longer probable, it is necessary to consider whether the factors which have arisen were indicative of conditions which existed at the reporting period-end (in the example, at the end of Q3) or arose after that date.  If it is established that:

(a)    the conditions resulting in the non-payment existed at the end of Q3, then this is an adjusting event for the purposes of the Q3 reporting period and the bad debt expense is recorded in Q3:

| Adjusting event | Q1 | Q2 | Q3 | Q4 | Total |
|---|---|---|---|---|---|
| Revenue | 50 | 50 | 50 | - | 150 |
| Expense | (30) | (30) | (30) | - | (90) |
| Bad debt expense | - | - | (50) | - | (50) |
| **Profit** | **20** | **20** | **(30)** | **-** | **10** |

(b)    the conditions resulting in the non-payment did not exist at the end of Q3, then this is a non-adjusting event for the purposes of the Q3 reporting period and the bad debt expense is recorded when the new condition arose in Q4:

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

| Non-adjusting event | Q1 | Q2 | Q3 | Q4 | Total |
|---|---|---|---|---|---|
| Revenue | 50 | 50 | 50 | - | 150 |
| Expense | (30) | (30) | (30) | - | (90) |
| Bad debt expense | - | - | - | (50) | (50) |
| **Profit** | **20** | **20** | **20** | **(50)** | **10** |

4.2.5   There is no overall difference to the annual revenue, expenses, and profits recorded by the company; the difference is only one of timing of the recognition between the quarters.

4.2.6   Factors which impact the assessment of whether an event is adjusting or non-adjusting are external to the reporting entity.  This increases the difficulty in the application of judgement when establishing the specific timing of events and facts to make the appropriate assessment.

4.2.7   As indicated by IAS 10 (Events After the Reporting Period), the requirement to assess whether to make an adjustment (where appropriate) is limited to the period between the end of the reporting period and the date when the financial statements are authorized for issue.  For example, Autonomy's Quarterly Results were typically issued c.3 weeks after the period-end (with the Annual Report and Accounts issued c.1 month after the period-end) and thus any assessment whether an adjusting or non-adjusting event had occurred is limited to these discrete periods.

## 4.3   Subsequent Adjustments for Changes in Policy, Estimates or Errors

4.3.1   Adjustments to the accounting for specific transactions after the date when the financial statements are authorized for issue are only made if they are covered by items considered in IAS 8 (Accounting Policies, Changes in Accounting Estimates and Errors).

### Changes in Accounting Policies

4.3.2   Under IAS 8.5, "*Accounting policies are the specific principles, bases, conventions, rules and practices applied by an entity in preparing and presenting financial statements.*"  For example, there are various methods to depreciate (or spread the cost) of a fixed asset over its useful life.  Once a company has selected a specific accounting policy (where IFRS permits different approaches), it is rare that such a policy can be changed.  Specifically, IAS 8.14 only allows such a change where it is required by IFRS or the change would result in providing more reliable and relevant information.

4.3.3   IAS 8.22 states that a change in accounting policy should be retrospectively applied to prior period and any other comparative amounts presented as if the new accounting policy had always been applicable.  As a result, this is an adjustment which could be made retrospectively.

### Changes in Accounting Estimates

4.3.4   Under IAS 8.5, "*A change in accounting estimate is an adjustment of the carrying amount of an asset or a liability, or the amount of the periodic consumption of an asset, that results from the assessment of the present status of, and expected future benefits and obligations*

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

---

*associated with, assets and liabilities.*"  A change in accounting estimate affects an amount in financial statements that is subject to measurement uncertainty (e.g., is not an adjustment which could be made retrospectively).  As noted in IAS 8.34, by its nature, a change in an accounting estimate may arise as a result of new information and therefore does not relate to prior periods and is not the correction of an error.  As a result, such a change is not an adjustment which can be made retrospectively.

4.3.5    IAS 8.35 recognizes that it can be difficult to establish whether an adjustment is a change in accounting policy or a change in estimate.  Such a determination results in different accounting treatments (i.e., whether an adjustment is made retrospectively or not).  When it is difficult to distinguish between the two, the change is treated as a change in accounting estimate, and hence is not an adjustment which can be made retrospectively.

### Errors

4.3.6    Under IAS 8.5:

> *"Prior period errors are omissions from, and misstatements in, the entity's financial statements for one or more prior periods arising from a failure to use, or misuse of, reliable information that:*
>
> *(a) was available when financial statements for those periods were authorised for issue; and*
>
> *(b) could reasonably be expected to have been obtained and taken into account in the preparation and presentation of those financial statements.*
>
> *Such errors include the effects of mathematical mistakes, mistakes in applying accounting policies, oversights or misinterpretations of facts, and fraud."*

4.3.7    Therefore, the key criteria for establishing a misstatement relates to the failure to use, or misuse of, available contemporaneous reliable information which the reporting entity could reasonably be expected to have obtained.  If it is not reasonably expected that the entity could have obtained such contemporaneous reliable information, or the information was not available when the financial statements were authorized for issue, then the failure to use or misuse it cannot be considered in terms of assessing a misstatement.

4.3.8    Financial statements do not comply with IFRS if they contain either material misstatements or immaterial misstatements made intentionally to achieve a particular presentation of an entity's financial position, financial performance, or cash flows.  According to IAS 8.42, material misstatements in prior periods should be corrected retrospectively.

### Materiality

4.3.9    Under IAS 8.5:

> *"Material Omissions or misstatements of items are material if they could, individually or collectively, influence the economic decisions that users*

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

---

> *make on the basis of the financial statements. Materiality depends on the*
> *size and nature of the omission or misstatement judged in the surrounding*
> *circumstances. The size or nature of the item, or a combination of both,*
> *could be the determining factor."*

4.3.10    As defined in IAS 8 (Accounting Policies, Changes in Accounting Estimates and Errors), the assessment of "materiality" is not wholly quantitative.

4.3.11    Materiality defines the threshold after which financial information becomes relevant to the decision-making needs of the users.  Materiality is a subjective concept.  As different users may focus on different elements of the financial statements, their assessment of materiality for each element may also differ.  In addition, the level of materiality will also depend on the company being considered.

4.3.12    The concept of materiality is fundamental to an audit.  It is applied by auditors at the planning stage, as well as when performing the audit and evaluating the effect of identified misstatements on the audit and of uncorrected misstatements, if any, on the financial statements.

4.3.13    The subjective nature of materiality is captured in International Standards on Auditing (**"ISA"**) 320 (Materiality on Planning and Performing an Audit), which sets out the requirements for applying the concept of materiality in planning and performing audits of financial statements but does not include a definition for materiality.

4.3.14    A publication by the Institute for Chartered Accountants in England & Wales on ISA 320 entitled "Materiality in the audit of financial statements" explains that "*The truth is one size does not fit all. Auditors need to use their professional judgement to determine an appropriate benchmark and the chosen benchmark needs to be justifiable, with the rationale clearly documented.*"[26]  Judgement is an underlying theme in ISA 320, which makes nine references to "judgment" and "professional judgment".

### Use of Hindsight

4.3.15    When considering whether a retrospective restatement is necessary for a change in accounting policy or to correct a prior period misstatement, IAS 8.53 states:

> *"Hindsight should not be used when applying a new accounting policy to,*
> *or correcting amounts for, a prior period, either in making assumptions*
> *about what management's intentions would have been in a prior period or*
> *estimating the amounts recognised, measured or disclosed in a prior*
> *period".*

4.3.16    Therefore, any application of hindsight is prohibited when considering whether a transaction needs to be restated for a change in accounting policy or to correct a prior period misstatement.

---

[26]    https://www.icaew.com/-/media/corporate/files/technical/iaa/materiality-in-the-audit-of-financial-statements.ashx.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

4.3.17 Examples of events which could occur after a transaction is recorded but which would not result in a retrospective restatement are:

(a) where a customer subsequently did not pay their debt

(i) if revenue is recognized under IAS 18 (Revenue) on the sale to the customer, the original revenue would remain and a bad debt expense would also be recognized;

(b) where a separate, subsequent sale by a customer of the same goods to its end-user did not ultimately complete

(i) if revenue is recognized under IAS 18 (Revenue) on the sale to the customer, the completion or otherwise of an onward sale to the customer's end-user is not relevant;

(c) where a customer subsequently did not use the purchased goods in the manner contemplated by the parties at the time of the sale

(i) if revenue is recognized under IAS 18 (Revenue) on the sale to the customer, what the customer subsequently does with the purchased goods is not relevant;

(d) where, having sold goods to a customer, the customer subsequently sells goods to the seller

(i) if revenue is recognized under IAS 18 (Revenue) on the sale to the customer, the later sale from the customer to the seller is not relevant.

4.3.18 Furthermore, the recording of a transaction is not a misstatement if certain reliable information is subsequently obtained which was not reasonably expected to have been obtained contemporaneously. Examples of information subsequently obtained which would not result in a misstatement are:

(a) internal email correspondence between individuals within a customer;

(b) financial information of a customer that was not publicly or reasonably available to the seller; and

(c) re-recording of historic transactions by another party after the fact.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

# 5      Disclosures and Presentation

## 5.1      Disclosure Requirements Under IAS 18 (Revenue)

5.1.1      Under IAS 18.35, a company is required to disclose:

> "*(b) the amount of each significant category of revenue recognised during the period, including revenue arising from:*
>
> > *(i) the sale of goods;*
> >
> > *(ii) the rendering of services;*
> >
> > *(iii) interest;*
> >
> > *(iv) royalties;*
> >
> > *(v) dividends; and*
>
> *(c) the amount of revenue arising from exchanges of goods or services included in each significant category of revenue.*"

5.1.2      IAS 18 (Revenue) indicates that "significant" revenue categories are the five groupings listed above but does not preclude additional "significant" categories being disclosed if the revenue recognized is not captured within those five categories. Therefore, the "sale of goods" category captures the sales of all goods, with no additional requirement in IAS 18 (Revenue) for it (or any of the other categories) to include further sub-categories.

5.1.3      Autonomy applied IAS 18.35 by separately disclosing the amount of revenue in relation to the sale of goods and the rendering of services in the notes to the Annual Report and Accounts for the Relevant Period.

## 5.2      Disclosure Requirements Under IFRS 8 (Operating Segments)

5.2.1      IFRS 8 (Operating Segments) became effective from 1 January 2009 and so was a new accounting standard to implement during the Relevant Period. This IFRS sets out the information which a company should disclose to "*enable users of its financial statements to evaluate the nature and financial effects of the business activities in which it engages and the economic environments in which it operates*".[27] This information can include disclosures related to the products sold, the geographies where the company operates, and the company's customers.

---

[27]      IFRS 8.1.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

---

### Segmental Reporting

5.2.2    The most extensive disclosures required under IFRS 8 (Operating Segments) are those related to operating segments.  IFRS 8.5 defines an operating segment as:

> *"a component of an entity:*
>
> *(a) that engages in business activities from which it may earn revenues and incur expenses (including revenues and expenses relating to transactions with other components of the same entity),*
>
> *(b) whose operating results are regularly reviewed by the entity 's chief operating decision maker to make decisions about resources to be allocated to the segment and assess its performance, and*
>
> *(c) for which discrete financial information is available."*

5.2.3    Having identified operating segments, it is then necessary for a company to determine whether it is necessary to report these operating segments under IFRS 8.11-19. Autonomy's 2009 and 2010 Annual Report and Accounts identify that it had one operating segment and provided a segmental analysis of this operating segment based on a geographical split.

### Entity-Wide Disclosures

5.2.4    In addition to the segmental reporting, IFRS 8 (Operating Segments) also required certain entity-wide disclosures at a revenue-only level.  If a company provided a geographic split as its segmental reporting, under IFRS 8.32, it was required to *"report the revenues from external customers for each product and service, or each group of similar products and services".*

5.2.5    IFRS 8.32 permits grouping "*similar products and services*".   However, there is no commentary or guidance in IFRS 8 (Operating Segments) as to how "similar products and services" should be determined.  As a result, the definition of "similar products and services" is a matter of judgement.

5.2.6    Some assistance may be found by considering the Basis for Conclusions for IFRS 8 (Operating Segments).  While not forming part of IFRS 8, paragraph BC1 of this document states that it *"summarises the International Accounting Standards Board's considerations in reaching the conclusions in IFRS 8".*  IFRS 8 (Operating Segments) was introduced as a replacement for IAS 14 (Segment Reporting) to be consistent with the existing US GAAP (SFAS 131 (Disclosures about Segments of an Enterprise and Related Information)).[28] Paragraph BC4 of the IFRS 8 Basis for Conclusions states that the requirements of SFAS 131 are *"based on the way that management regards an entity, focusing on information about the components of the business that management uses to make decisions about operating*

---

[28]      IFRS 8 Basis for Conclusions BC2, BC3, and BC16.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

---

*matters"*.  As such, the objective of the standard is to provide further information to the users of the accounts which would be available to and considered by management.

5.2.7    On this basis, the determination of what constitutes "similar products and services" is an assessment based on management's approach (i.e., if management did not receive the split in information or did not consider it to be relevant, then a further split of products and services would not be necessary).

5.2.8    Another consideration is whether IFRS 8.32 indicates a quantitative threshold above which disclosure is required.

5.2.9    The lack of any stated quantitative basis or threshold in IFRS 8.32 suggests a more qualitative approach is preferred, which is consistent with the "management approach" basis of IFRS 8 (Operating Segments).  In other words, for purposes of segmental reporting under the IFRS 8, the standard for disclosure (i.e., management approach) is not the same as the standard of materiality (i.e., user approach).

5.2.10   The underlying basis for IFRS 8 (Operating Segments) and the limited details on how to implement the entity-wide disclosures suggest a range of interpretations could have been made when implementing this new standard.  This is illustrated by a post implementation review of IFRS 8 by the IASB in July 2013.  In relation to entity-wide disclosures, the feedback noted that:[29]

> *"Many participants think that entity-wide disclosures are poorly understood … Many think that entity-wide disclosures are inconsistently applied across entities and it is claimed that regulators frequently challenge the entity-wide disclosures made."*

## 5.3    Expenses

5.3.1    As noted in section 3 above, in order to recognize revenue, the costs incurred or to be incurred need to be measured reliably.  Such costs are recognized as expenses at the same time as the revenue under the matching principle.  IAS 2.38 (Inventories) states that:

> *"The amount of inventories recognised as an expense during the period, which is often referred to as cost of sales, consists of those costs previously included in the measurement of inventory that has now been sold and unallocated production overheads and abnormal amounts of production costs of inventories. The circumstances of the entity may also warrant the inclusion of other amounts, such as distribution costs."*

5.3.2    The wording in IAS 2 (Inventories) is not definitive when it comes to how these costs should be recorded in the profit and loss account as it only refers to the expense of inventory costs

---

[29]    Page 24 of IFRS Post-Implementation Review: IFRS 8 Operating Segments (July 2013).

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

---

as "*often referred to as cost of sales*".[30]  This wording does not preclude these costs from being recorded as expenses elsewhere in the profit and loss account.

5.3.3    There is limited guidance in IFRS on where a specific expense should be recorded within the profit and loss account.  As a result, there is no explicit requirement or guidance under IFRS regarding how expenses should be allocated to particular line items in the financial statements.

5.3.4    The accounting issue is whether the expense must be recorded within a certain cost line item in the financial statements (e.g., within "cost of revenues" or "costs of goods sold") or whether it could, even partially, be recorded within another expense category.  As the wording in IAS 2 (Inventories) is not definitive, this may lead to the potential for certain expenses to be recorded within different cost line items in the financial statements.

5.3.5    IAS 1 (Presentation of Financial Statements) contains guidance on the presentation of expenses and discusses how a profit and loss account is structured:

> "*An entity shall present an analysis of expenses recognised in profit or loss using a classification based on either their nature or their function within the entity, whichever provides information that is reliable and more relevant.* (IAS 1.99)

> *Entities are encouraged to present the analysis in paragraph 99 in the statement of comprehensive income or in the separate income statement (if presented).* (IAS 1.100)

> *Expenses are subclassified to highlight components of financial performance that may differ in terms of frequency, potential for gain or loss and predictability. This analysis is provided in one of two forms."* (IAS 101)

5.3.6    Of the two forms of presentation identified (being nature of expense and function of expense), Autonomy used the function of expense method (with expenses reported as "Cost of revenues", "Research and development", "Sales and marketing", "General and administrative", and "Other costs").  With regards to this option, IAS 1.103-104 states:

> "*The second form of analysis is the 'function of expense' or 'cost of sales' method and classifies expenses according to their function as part of cost of sales or, for example, the costs of distribution or administrative activities. At a minimum, an entity discloses its cost of sales under this method separately from other expenses. This method can provide more relevant information to users than the classification of expenses by nature, but **allocating costs to functions may require arbitrary allocations and involve considerable judgement**….*

---

[30]        IAS 2.38.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

---

> *An entity classifying expenses by function shall disclose additional information on the nature of expenses, including depreciation and amortisation expense and employee benefits expense."* [emphasis added]

5.3.7    The wording in IAS 1 (Presentation of Financial Statements) does not include any specific definition or set criteria for categorization of expenses nor does it include a definition of "cost of sales".  In addition, the standard recognizes that the allocation of costs between functions *"may require arbitrary allocations and involve considerable judgement".*

## 5.4    Financial Disclosures Not Part of the Financial Statements

5.4.1    Under IAS 1.10, a complete set of financial statements comprises:

> *"(a) a statement of financial position as at the end of the period;*
> *(b) a statement of comprehensive income for the period;*
> *(c) a statement of changes in equity for the period;*
> *(d) a statement of cash flows for the period;*
> *(e) notes, comprising a summary of significant accounting policies and other explanatory information; and*
> *(f) a statement of financial position as at the beginning of the earliest comparative period when an entity applies an accounting policy retrospectively or makes a retrospective restatement of items in its financial statements, or when it reclassifies items in its financial statements."*

5.4.2    IAS 1.49-50 further state that it is only the financial statements that are subject to IFRS and that disclosures which are not part of the financial statements are not subject to IFRS:

> *"An entity shall clearly identify the financial statements and distinguish them from other information in the same published document.*
>
> *IFRSs apply only to financial statements, and not necessarily to other information presented in an annual report, a regulatory filing, or another document.   Therefore, it is important that users can distinguish information that is prepared using IFRSs from other information that may be useful to users but is not the subject of those requirements."*

5.4.3    Therefore, IAS 1 (Presentation of Financial Statements) clearly states that IFRSs apply only to financial statements.   The standard also clearly states that reports and statements presented outside of financial statements (e.g., a financial review by management) are outside the scope of IFRSs.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

# 6      Capitalization of Expenses

6.1.1    When a company makes a purchase, the accounting entry for that purchase will reflect either an expense or an asset.  Broadly:

(a)    an expense is a purchase which is fully utilized in a single accounting period.  The amount is fully included in the profit and loss for that period; and

(b)    an asset is a purchase which will be used in a later accounting period or over a number of accounting periods.  The amount is recorded on the balance sheet and then expensed in the period(s) it is used.

6.1.2    In certain circumstances, costs which would generally be considered expenses are required to be recognized as an asset (or capitalized).  In particular, IAS 38 (Intangible Assets) requires "Development" expenditure to be capitalized.[31]   Autonomy's Q3 2009 Quarterly Results and 2009 Annual Report and Accounts referred to this process as follows:

"*Under IAS 38 the company is required to capitalize certain aspects of its research and development activities. The amount of R&D that was capitalized in third quarter of 2009 was $11.7 million (Q3 2008: $3.0 million), increasing year-on-year primarily due to the new IDOL SPE product reaching commercial exploitation phase, but is expected to return to historical levels in the fourth quarter."* (Q3 2009 Quarterly Results)

"*R&D capitalization increased in the year primarily due to the new IDOL SPE product reaching commercial exploitation phase Q3 2009, and returned to historical levels in Q4 2009. The net margin impact for the full year is 2% (2008: 1%). Capitalization has returned to traditional levels of approximately 2.5% of revenues after completion of IDOL SPE in Q3 2009.*" (2009 Annual Report and Accounts)

6.1.3    IAS 38.8 defines "development" as

"*the application of research findings or other knowledge to a plan or design for the production of new or substantially improved materials, devices, products, processes, systems or services before the start of commercial production or use.*"

6.1.4    IAS 38.57 sets out the criteria which must be met for costs related to development to be capitalized:

"*(a) the technical feasibility of completing the intangible asset so that it will be available for use or sale.*

---

[31]    The ability to capitalize certain costs of development is a significant difference between IFRS and US GAAP (where all such costs are expensed as incurred).  This difference only applies to development costs.  Under both IFRS and US GAAP, research costs are expensed as incurred.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

---

*(b) its [entity's] intention to complete the intangible asset and use or sell it.*

*(c) its [entity's] ability to use or sell the intangible asset.*

*(d) how the intangible asset will generate probable future economic benefits. Among other things, the entity can demonstrate the existence of a market for the output of the intangible asset or the intangible asset itself or, if it is to be used internally, the usefulness of the intangible asset.*

*(e) the availability of adequate technical, financial and other resources to complete the development and to use or sell the intangible asset.*

*(f) its [entity's] ability to measure reliably the expenditure attributable to the intangible asset during its development."*

6.1.5    As such, it is only when a clear path to develop and sell the related product has been identified and recorded that development costs are capitalized.[32] The specific determination of when these criteria have been achieved includes input from several areas of a business, including management (who will likely decide to commit to the new product), technical staff (who will provide input into the timing and costs required to develop the product), and sales/marketing staff (who will provide input into the appetite in the market for the product).

6.1.6    When the various criteria are met, it is then necessary to identify the specific costs to be capitalized.  IAS 38.66 states that "*The cost of an internally generated intangible asset comprises all directly attributable costs necessary to create, produce, and prepare the asset to be capable of operating in the manner intended by management*".  Additionally, IAS 38.67(a) sets out the specific costs which are excluded from capitalization, which include "*selling, administrative and other general overhead expenditure unless this expenditure can be directly attributed to preparing the asset for use*".

6.1.7    The identification of such costs requires a company's technical/development teams to assist a finance function in identifying the costs which would qualify as development costs.  This would include both external costs and internal costs (such as staff costs per IAS 38.66).

6.1.8    In respect of staff costs, these would include wages, salaries, and all other benefits paid to employees.  The cost of an employee may need to be split between amounts to be capitalized and amounts to be directly expensed (e.g., by reference to timesheets or other estimation).  Such a split would require management estimation or judgement and is not necessarily the result of precise measurement.

---

[32]    The wording of IAS 38.57 is that "*An intangible asset arising from development (or from the development phase of an internal project) **shall** be recognised if…*" [emphasis added].  Therefore, it is a requirement (not a choice) to capitalize development costs where the criteria for capitalization are satisfied.

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

# 7   Declaration

7.1.1     I confirm that the contents of this summary report are true to the best of my knowledge and belief and that opinions I have expressed represent my true and complete professional opinion.

……………………………………………………………………………

Greig Taylor FCA

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Appendices to the Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

---

# Appendix 1: Summary of Qualifications and Experience

| | |
|---|---|
| **Position** | Partner and Managing Director<br>AlixPartners<br>909 Third Avenue, New York, NY 10022 |
| **Previous Positions** | Senior Managing Director – FTI Consulting, New York<br>Senior Manager – Deloitte Financial Advisory Services, New York<br>Manager – Audit – Deloitte, London<br>Staff – Audit, Arthur Andersen, London |
| **Education** | B.A. (Hons) Modern History – University of Manchester, England<br>Fellow of Institute of Chartered Accountants in England and Wales |
| **Professional History** | Greig is an experienced financial and accounting expert witness with more than 20 years of experience in resolving disputes involving accounting, valuation, and economic damages. Greig has testified in numerous international arbitrations as well as in ad hoc proceedings under UNCITRAL rules and free-trade agreements and has been admitted as an expert witness in domestic and international courts.<br><br>Greig serves as an expert in technical accounting related disputes. These disputes involve a broad range of circumstances and legal claims, including ownership disputes involving breach of fiduciary duty and fraud claims, and SEC investigations.<br><br>Greig's experience includes breach-of-contract and loss-of-profits claims, expropriations, minority-shareholder and joint-venture disputes, and claims arising following acquisitions and sales of businesses.<br><br>Greig has led and conducted forensic accounting investigations and assignments throughout the world under various accounting and legal protocols. |
| **Recognition** | Greig is listed in Who's Who Legal / Lexology since 2014 as a leading expert witness, as a Thought Leader in the USA and for Arbitration, and as a Global Elite Thought Leader for Quantum of Damages. |
| **Expert Testimony During Past Four Years** | 2020. Hotel TOC, Inc. v. 1. Trump Panama Hotel Management LLC, 2. Trump International Hotels Management, LLC, ICC Case No. 23149/MK.<br>•       Wrote reports and provided expert testimony.<br><br>2020. BCBC Singapore Pte Ltd & Another v PT Bayan Resources TBK & Another, Singapore International Commercial Court Case No. SGHC(I) 2.<br>•       Wrote reports and provided expert testimony.<br><br>2021. Confidential. ICC arbitration. Appointed as expert witness by a German agri-science business in a multi-$billion post-acquisition M&A dispute.<br>•       Wrote reports and provided expert testimony.<br><br>2021. In Re: SC SJ Holdings, LLC, et al., in the United States Bankruptcy Court for the District of Delaware, Case No. 21-10549 (JTD).<br>•       Wrote reports, deposed and provided expert testimony.<br><br>2021. Confidential. AAA arbitration. Appointed as expert witness by private equity fund in relation to claims of breach of contract and fraud.<br>•       Wrote reports and provided expert testimony.<br><br>2022. Virgin Hotels San Francisco, LLC v. 250 Fourth Development, L.P., Superior Court of California County of San Francisco, Case No. CGC-20-584350.<br>•       Wrote reports and provided expert testimony. |

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Appendices to the Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

2022.  Confidential.  AAA arbitration.  Appointed as expert witness by a US manufacturer of dental treatments in relation to claims for lost profits.
- Wrote reports and provided expert testimony.

2022.  The Santa Barbara Smokehouse, Inc. and DHBrands Limited v. Empresas Aquachile S.A., Agrosuper S.A. and AquaChile, Inc., US District Court for the Central District of California, Case No. 2:2019cv10733.
- Wrote reports and deposed.

2022.  Confidential.  ICDR Arbitration.  Appointed as expert witness by a US financial services company in relation to claims of breach of contract and fraud.
- Wrote reports and provided expert testimony.

2023.  Confidential. HKIAC arbitration.  Appointed as expert witness by cryptocurrency miner in relation to claims of breach of contract.
- Wrote reports and provided expert testimony.

**List of Publications During Past Ten Years**
- "From Survival to Resilience: How Hotels Can Pivot Towards Success" – AlixPartners, LLP.

- Practice Note: "Discounted Cash Flow" – Practical Law

- "M&A and Shareholder Arbitrations" - Global Arbitration Review's fourth edition of The Guide to Damages in International Arbitration

- "Risky Business: The Consequences of Counting on Liability Alone" – NYSBA's Spring 2019 Edition of New York Dispute Resolution Lawyer

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Appendices to the Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

## Appendix 2: List of Documents Relied Upon

| Document |
| --- |
| 2009 PWC IFRS Manual of Accounting |
| Article Titled "Autonomy breaks into $1bn league", Dated November 16, 1999 |
| Article Titled "Autonomy comes home", Dated October 31, 2000 |
| Article Titled "Europe adopts regulation requiring IAS by 2005", Dated June 08, 2005 |
| Autonomy's 2009 Annual Report and Accounts |
| Autonomy's 2010 Annual Report and Accounts |
| Autonomy's Q3 2009 Quarterly Results |
| Conceptual Framework for Financial Reporting (2010) |
| Framework for the Preparation and Presentation of Financial Statements (1989) |
| History of IAS 1 (Presentation of Financial Statements) |
| IAS 1 (Presentation of Financial Statements) |
| IAS 2 (Inventories) |
| IAS 8 (Accounting Policies, Changes in Accounting Estimates and Errors) |
| IAS 10 (Events After the Reporting Period) |
| IAS 18 (Revenue) |
| IAS 18 (Revenue) Implementation Guidance |
| IAS 37 (Provisions, Contingent Liabilities and Contingent Assets) |
| IAS 38 (Intangible Assets) |
| IAS 39 (Financial instruments: Recognition and Measurement) |
| IAS 39 (Financial instruments: Recognition and Measurement) Implementation Guidance |
| ICAEW Publication Titled "Materiality in the audit of financial statements" |
| IFRS 5 (Non-Current Assets Held for Sales and Discontinued Operations) |
| IFRS 8 (Operating Segments) |
| IFRS 8 (Operating Segments) Basis for Conclusions |
| IFRS Briefing for Chief Executives Audit Committees Boards of Directors (2009) |
| IFRS Briefing for Chief Executives Audit Committees Boards of Directors (2010) |
| IFRS Briefing for Chief Executives Audit Committees Boards of Directors (2011) |
| IFRS Post-Implementation Review: IFRS 8 (Operating Segments) (July 2013) |
| ISA 320 (Materiality on Planning and Performing an Audit) |

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Appendices to the Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

# Appendix 3: Comments on Summary of Independent Expert Accounting Opinions of Mr Brice

## A3.1    Introduction

A3.1.1    I have been instructed to review and comment on the Summary of Independent Expert Accounting Opinions of Steven Brice FCA (Mr Brice) dated 8 November 2023 (the Brice Report).   In particular, I have been asked to consider certain sections where Mr Brice provides an opinion on the application of IFRS and set out my observations where I disagree with his opinions.   I have not been asked to opine on the specific facts or allegations related to any particular transactions.

A3.1.2    The tables below include the relevant opinion by Mr Brice and my observation on his opinion and, where applicable, a reference to the commentary I provide on this issue in my summary report.   Where I do not comment on a particular paragraph, this does not mean that I agree with the opinion of Mr Brice.

## A3.2    Mr Brice's Opinions Related to Software Sales Transactions

A3.2.1    The table below includes my review of sections 2.4 to 2.10 of the Brice Report.   These sections include his opinions in relation to software sales transactions:

| Paragraph of Brice Report | My Observations | Paragraph(s) of My Report |
|---|---|---|
| 2.4.1 (b) | I disagree that, under IAS 8 (Accounting Policies Changes in Accounting Estimates and Errors) and IAS 18 (Revenue), it is appropriate to consider correspondence between individuals within a counterparty in relation to a transaction to determine whether to recognize revenue.   It is not reasonably expected that a company could have obtained such contemporaneous information. | 4.1.1, 4.3.18 |
| 2.4.1 (d) | I disagree that, under IAS 8 (Accounting Policies Changes in Accounting Estimates and Errors) and IAS 18 (Revenue), it is appropriate to consider financial information of a company's counterparty, such as financial statements and bank confirmations of payments or receipts to determine whether to recognize revenue.   It is not reasonably expected that a company could have obtained such contemporaneous information.<br><br>To the extent a counterparty's financial statements are available to the company, they may be used in the company's assessment of collectibility.  The assessment of collectibility is subject to judgement and may include other indicators of the counterparty's creditworthiness. | 3.2.24, 4.1.1, 4.3.18 |
| 2.4.8 | I disagree that, under IAS 8 (Accounting Policies Changes in Accounting Estimates and Errors) and IAS 18 (Revenue), it is appropriate to consider a subsequent restatement of certain comparative figures to determine whether to recognize revenue.   It is not reasonably expected that a company could have obtained such information contemporaneously. | 4.1.1, 4.3.15 to 4.3.16, 4.3.18 |
| 2.5.4 (a) | I disagree that the significant risks and rewards of ownership of the goods had clearly not been transferred to the buyer if there was contemporaneous evidence that the buyer made no efforts to sell the goods it had acquired to a named end-user.<br><br>I disagree that the significant risks and rewards of ownership of the goods had clearly not been transferred to the buyer if there was contemporaneous evidence that the buyer could not have independently sold the goods it had acquired to a | 3.2.7, 3.5.2, 4.3.17 |

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Appendices to the Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

| Paragraph of Brice Report | My Observations | Paragraph(s) of My Report |
|---|---|---|
| | named end-user, even when the only route through which the buyer would have been able to do so was via a restructuring of the end-users' existing contractual agreements with the seller. | |
| | If management had determined that the significant risks and rewards of ownership of goods transferred to the buyer, it is not relevant whether the buyer made efforts to sell the goods to a named end-user. | |
| 2.5.4 (b) | The evaluation of whether the seller retains continuing managerial involvement to the degree usually associated with ownership or effective control over the goods sold is made at the time of the sale. If the conditions for revenue recognition are satisfied at the time of the sale, then any subsequent changes would not affect the initial revenue recognized. | 3.5.3, 4.1.1 to 4.1.2 |
| | The seller is not prohibited from contacting the end-user after the sale to the buyer has completed. To the extent the seller continued to discuss the specific transaction with the end-user, it would be necessary to assess the seller's level of involvement and it would be a matter of judgement whether this was demonstrative of "continuing managerial involvement to the degree usually associated with ownership or effective control over the goods sold". | |
| 2.5.4 (c) | Under IFRS, a threshold of a greater than 50% chance has been adopted in practice to assess probability. This assessment is subjective and is made at the time of the original sale, without the use of hindsight. Financial information about a buyer's cash position or profitability is not the only indicator of whether collectibility is probable. Subsequent purchases from a buyer, or subsequent evidence that a buyer did not pay its debt, do not form part of the original assessment of probability. | 3.2.18 to 3.2.24, 4.3.15 to 4.3.17 |
| 2.5.6 | I disagree that additional requirements of IFRS need to be considered over and above the revenue recognition conditions of IAS 18 (Revenue). | 2.5.1 to 2.5.2, 3.1.1 to 3.1.2 |
| | The relevant conditions for revenue recognition are set out in IAS 18 (Revenue). If these conditions are met, then the financial statements are presumed to present a faithful representation of the transactions and events that they purport to represent. | |
| 2.5.7 (a) | I disagree that additional requirements of IFRS need to be considered over and above the revenue recognition conditions of IAS 18 (Revenue). | 2.5.1 to 2.5.2, 3.1.1 to 3.1.2 |
| | The relevant conditions for revenue recognition are set out in IAS 18 (Revenue). None of these conditions contain criteria related to the extent of negotiations or the timing within an entity's reporting period required to agree a transaction. If the IAS 18 (Revenue) conditions for revenue recognition are met, revenue is recognized. | |
| 2.5.7 (b) | Under IFRS, a threshold of a greater than 50% chance has been adopted in practice to assess probability, not "realistic prospects". This assessment is subjective and is made at the time of the original sale, without the use of hindsight. | 3.2.2, 3.2.18 to 3.2.24, 4.3.15 to 4.3.16 |
| | If collectibility is deemed to be probable, and the other conditions in IAS 18 (Revenue) for revenue recognition are met, then revenue is recognized. | |
| 2.5.7 (c) | I disagree that the significant risks and rewards of ownership of goods had not been transferred to the buyer if there was contemporaneous evidence that the buyer could not have independently sold the goods it had acquired to a named end-user, even when the only route through which the buyer would have been able to do so was via a restructuring of the end-users' existing contractual agreements with the seller. | 3.2.7, 3.5.2, 4.3.17 |
| | I disagree that the significant risks and rewards of ownership of the goods had not been transferred to the buyer if there was contemporaneous evidence that the buyer was also a co-founder of a named end-user. | |
| | If management had determined that the significant risks and rewards of ownership of goods transferred to the buyer, and the other conditions in IAS 18 (Revenue) for revenue recognition are met, then revenue is recognized. | |

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Appendices to the Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

| Paragraph of Brice Report | My Observations | Paragraph(s) of My Report |
|---|---|---|
| 2.5.7 (d) | The relevant conditions for revenue recognition are set out in IAS 18 (Revenue). These conditions do not contain criteria related to the existence of a pattern of behavior between a seller and a buyer.<br><br>The history between a seller and a buyer can be considered in evaluating the IAS 18 (Revenue) conditions, such as collectibility.  If the IAS 18 (Revenue) conditions for revenue recognition are met, then the transaction is presumed to have economic substance and revenue is recognized. | Sections 3.2 and 3.3 |
| 2.5.7 (e) | Revenue must be recognized if the IAS 18 (Revenue) conditions are met on a specific transaction, based on contemporaneous information.<br><br>In accordance with IAS 18 (Revenue), if an uncertainty subsequently arises concerning the collectibility of an amount previously recognized as revenue, no adjustment is recorded to the original revenue recognized.  Rather, the uncollectible amount is recorded as an expense. | 4.1.1 to 4.1.3 |
| 2.5.7 (f) | Revenue must be recognized if the IAS 18 (Revenue) conditions are met on a specific transaction, based on contemporaneous information.<br><br>The subsequent payment of a commission after the completion of a transaction is a business decision. | 4.1.1 |
| 2.6.1 | When assessing whether there is a link between different transactions relating to different goods and/or services, the only guidance in IAS 18 (Revenue) to make the assessment relates to determining "commercial effect", which requires judgement. | 3.4.8 to 3.4.14 |
| 2.6.3 | Transactions are considered to be linked if "*the commercial effect cannot be understood without reference to the series of transactions as a whole*".  This is a judgement made contemporaneously.<br><br>I disagree that transactions being in close time proximity to each other, negotiated by the same individuals, or with their mutual existence acknowledged in the negotiations, means that they should be considered together – these are indicators that may be appropriate to consider whether such transactions are linked.<br><br>If the collectibility of a transaction is wholly dependent upon another transaction with the same counterparty, then it may be appropriate to consider them as linked.  However, an assessment of collectibility needs to be performed to first establish the "wholly dependent" judgement.<br><br>I disagree that the lack of fair value assessments means that transactions should be considered together.  A fair value condition is not referred to within IAS 18.13 and is not typically undertaken for each and every transaction of a company. | 3.4.8 to 3.4.14 |
| 2.7 | This section in the Brice Report concerns hosting transactions and how the related revenue should be recognized.<br><br>The Autonomy revenue recognition policy (as set out in both the 2009 and 2010 Annual Report and Accounts) states that Autonomy considered licenses, OEM and hosting transactions to be recognized as "sale of goods" – not rendering of services.<br><br>Mr Brice's opinion that these transactions were rendering of services is contrary to Autonomy's revenue recognition policy.  As such, Mr Brice's comments suggest he disagrees with Autonomy's publicly disclosed accounting policy and presentation. | 3.5.8 to 3.5.12 |
| 2.8 | This section in the Brice Report concerns OEM transactions and how the related revenue should be recognized.<br><br>The Autonomy revenue recognition policy (as set out in both the 2009 and 2010 Annual Report and Accounts) states that Autonomy considered licenses, OEM and hosting to be recognized as "sale of goods" – no amounts were stated to be recognized as royalties.<br><br>Mr Brice's opinion that these transactions were royalties is contrary to Autonomy's revenue recognition policy.  As such, Mr Brice's comments suggest he disagrees with Autonomy's publicly disclosed accounting policy and presentation. | 3.5.4 to 3.5.7 |

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Appendices to the Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

| Paragraph of Brice Report | My Observations | Paragraph(s) of My Report |
|---|---|---|
| 2.9 | This section in the Brice Report concerns transactions which Mr Brice contends included a "significant installation process".<br><br>This is a judgement made contemporaneously.  IAS 18 (Revenue) does not provide any guidance on what "significant" means in this context. | 3.2.6 to 3.2.10 |

## A3.3    Mr Brice's Opinions Related to Hardware Sales Transactions

A3.3.1    The table below includes my review of sections 3.4-3.6 of the Brice Report.  These sections include his opinions in relation to hardware sales transactions:

| Paragraph of Brice Report | My Observations | Paragraph(s) of My Report |
|---|---|---|
| 3.5.2 (a) | While under IFRS, the cost of inventory in a period must be recognized as an expense, I disagree that this means these costs are necessarily all reported as Cost of Sales. | Section 5.3 |
| 3.6.2 | The materiality thresholds in Table 2.5 are not relevant to determining whether the hardware sales needed to be disclosed. Therefore, whether the hardware sales represented 5%, 10%, 15%, or some other percentage of Autonomy's revenue, nondisclosure could be reasonable. The relevant assessment was: (i) whether Autonomy had a single reportable operating segment under IFRS 8.5-10; and (ii) whether the hardware sales constituted a dissimilar product and service, or a group of dissimilar products and services, requiring separate disclosure under IFRS 8.32.<br><br>Both questions are a matter of judgement.  Neither determination is quantitative under IFRS 8 (Operating Segments), which requires a more qualitative assessment, which is consistent with the "management approach" basis of IFRS 8. | Section 5.2 |
| 3.6.3 (a) | As noted in IAS 1.17, *"In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs"*.   On this basis, it is only in exceptional circumstances that an accountant would need to look outside of a specific IFRS to determine the appropriate accounting treatment.   The requirements for disclosure of revenue are covered by IAS 18 (Revenue) and IFRS 8 (Operating Segments). | 2.5.2, Sections 5.1 and 5.2 |
| 3.6.3 (b) | As noted in IAS 1.17, *"In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs"*.   On this basis, it is only in exceptional circumstances that an accountant would need to look outside of a specific IFRS to determine the appropriate accounting treatment.   The requirements for disclosure of revenue are covered by IAS 18 (Revenue) and IFRS 8 (Operating Segments). | 2.5.2, Sections 5.1 and 5.2 |
| 3.6.3 (c) | As noted in IAS 1.17, *"In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs"*.   On this basis, it is only in exceptional circumstances that an accountant would need to look outside of a specific IFRS to determine the appropriate accounting treatment.   The requirements for disclosure of revenue are covered by IAS 18 (Revenue) and IFRS 8 (Operating Segments). | 2.5.2, Sections 5.1 and 5.2 |
| 3.6.3 (d) | I disagree that IAS 18.35 required hardware sales to be separately disclosed. IAS 18.35 required revenue to be split into various categories including "sale of goods".  There was no requirement under IAS 18.35 for Autonomy to disclose hardware outside the "sale of goods" category. | Section 5.1 |
| 3.6.3 (e) | I do not consider that the disclosure of inventory expensed requires hardware to be separately identified from other goods. | - |

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Appendices to the Summary of Independent Expert Accounting Opinions of Greig Taylor FCA

| Paragraph of Brice Report | My Observations | Paragraph(s) of My Report |
|---|---|---|
| 3.6.3 (f) | I disagree that it was necessary under IFRS 8 (Operating Segments) to separately disclose hardware sales. | Section 5.2 |
| | Under IFRS 8.5, Autonomy disclosed that it had one operating segment and so provided a breakdown by geographic region – not between product or other segment. | |
| | Under IFRS 8.32, Autonomy was required to disclose revenues for groups of similar products and services.  The determination of what constitutes "similar products and services" is an assessment based on management's approach. | |
| | Both questions are a matter of judgement.  Neither determination is quantitative under IFRS 8 (Operating Segments), which requires a more qualitative assessment, which is consistent with the "management approach" basis of IFRS 8. | |
| | If, under IFRS 8.32, there was a determination of dissimilar goods, then IFRS 8.32 does not identify any quantitative level above which it is necessary to report.  It may be that a company would seek guidance from elsewhere in IFRS 8 and could consider the 10% thresholds identified in IFRS 8.13 and IFRS 8.34. | |

Exhibit E

CONFIDENTIAL

UNITED STATES OF AMERICA

v.

MICHAEL RICHARD LYNCH AND STEPHEN KEITH CHAMBERLAIN

# EXPERT REPORT OF JOHN LEVITSKE

December 7, 2023

ON BEHALF OF:        Michael Richard Lynch

PREPARED FOR:       Clifford Chance US LLP

John Levitske

**December 7, 2023**



**HKA Global, LLC**
300 South Wacker Drive
Suite 2600
Chicago, Illinois 60606

UNITED STATES OF AMERICA v MICHAEL RICHARD LYNCH
and STEPHEN KEITH CHAMBERLAIN
Expert Report of John Levitske

CONFIDENTIAL

# CONTENTS

**1.   INTRODUCTION** ..................................................................................................................... **3**

**1.2**   QUALIFICATIONS ...............................................................................................................3

**1.3**   RETENTION ........................................................................................................................7

**1.4**   DISCLOSURE OF INTERESTS ..........................................................................................8

**1.5**   RESERVATIONS .................................................................................................................9

**2.   SUMMARY OF OPINIONS** .................................................................................................. **9**

Hardware Transactions ...............................................................................................................11

Alleged Linked Transactions ......................................................................................................12

VAR Transactions .......................................................................................................................12

Multi-Period Hosting Transactions .............................................................................................14

Cash Flow ...................................................................................................................................16

**2.2**   VALUATION METHODS ....................................................................................................17

**3.   SUMMARY CONCLUSION** ............................................................................................... **20**

Hardware Transactions ...............................................................................................................20

Alleged Linked Transactions ......................................................................................................20

VAR Transactions .......................................................................................................................20

Multi-Period Hosting Transactions .............................................................................................21

Financial Statement Analysis and Valuation ..............................................................................21

**4.   SIGNATURE OF EXPERT** ................................................................................................ **24**

## APPENDICES

**APPENDIX 1 – JOHN LEVITSKE RESUME**

**APPENDIX 2 – LIST OF DOCUMENTS RELIED UPON**

## ATTACHMENTS

**ATTACHMENT A - ADJUSTMENTS FOR HARDWARE TRANSACTIONS Q1 - Q2 2010 COMPARED TO Q1 - Q2 2011**

**ATTACHMENT B - ADJUSTMENTS FOR ALLEGED LINKED TRANSACTIONS Q1 - Q2 2010 COMPARED TO Q1 - Q2 2011**



December 7, 2023

**ATTACHMENT C - ADJUSTMENTS FOR VAR TRANSACTIONS Q1 - Q2 2010 COMPARED TO Q1 - Q2 2011**

**ATTACHMENT D - SAMPLE OF REPRESENTATIVE MULTI-PERIOD HOSTING TRANSACTIONS - COMPARISON OF ANNUAL REVENUE RECOGNITION UP-FRONT VS. RATABLY - SAMPLE TRANSACTIONS FROM BRICE REPORT TABLE 2.10**

**ATTACHMENT E - MULTI-PERIOD HOSTING TRANSACTIONS - REVENUES AS ADJUSTED**

**ATTACHMENT F – ADJUSTMENTS FOR MULTI-PERIOD HOSTING TRANSACTIONS Q1 - Q2 2010 COMPARED TO Q1 - Q2 2011**

**ATTACHMENT G – ADJUSTMENTS FOR HARDWARE, LINKED, VAR, AND MULTI-PERIOD HOSTING TRANSACTIONS Q1 - Q2 2010 COMPARED TO Q1 - Q2 2011**



December 7, 2023

# 1.     INTRODUCTION

1.1.1   HKA was retained by Clifford Chance US LLP, counsel for Dr. Michael Richard Lynch in this matter. I, John Levitske, a Partner at HKA, was asked to serve as a defense expert to advise regarding valuation process and relevant considerations in the process related to the acquisition of a former software company called Autonomy Corporation plc ("Autonomy") by Hewlett Packard Company ("HP").

## 1.2     QUALIFICATIONS

1.2.1   I, John Levitske, CFA, ASA, CPA/ABV/CFF/CGMA, CIRA, MCFLC, MBA, JD, am currently employed as a Partner of HKA Global, LLC ("HKA"), based in the company's Chicago, Illinois office. My office contact information is: 300 South Wacker Drive, Suite 2600, Chicago, Illinois, USA; email johnlevitske@hka.com; telephone +1.312.521.7484.

1.2.2   I am a business appraiser, financial analyst, and forensic accountant with more than 35 years of experience. I am experienced in the valuation of companies and stakeholder interests.

1.2.3   I am a member of HKA's Forensic Accounting and Commercial Damages practice. HKA is a global consultancy in risk mitigation, dispute resolution, expert witness, and litigation support with more than 1,000 consultants, experts, and advisors in over 50 offices across 18 countries. The United States headquarters of HKA is in Philadelphia, Pennsylvania and the global headquarters is in London, England. Further information regarding HKA is at www.HKA.com.

1.2.4   I hold several professional credentials in business valuation, finance, and forensic accounting: Chartered Financial Analyst (CFA) by the CFA Institute; Accredited Senior Appraiser (ASA) in Business Valuation by the American Society of Appraisers; Accredited in Business Valuation (ABV), Certified in Financial Forensics (CFF), and Chartered Global Management Accountant (CGMA) by the American Society of Certified Public Accountants; and Certified Insolvency and Restructuring Advisor (CIRA) by the Association of Insolvency and Reorganization Advisors. In addition, I am a licensed Certified Public Accountant (licensed in Illinois and Pennsylvania).

1.2.5   I attained a Master of Business Administration degree, *cum laude*, from the University of Notre Dame, and Bachelor of Science in Business Administration, with a major in accounting, and Juris Doctor degrees from Duquesne University. I also completed Executive Education in Corporate Valuation at the University of Pennsylvania, Finance at New York University, and Financial Modeling at the University of Georgia.



December 7, 2023

1.2.6    Prior to HKA, I worked with Big Four public accounting, global valuation and corporate financial advisory, and international business advisory and expert consulting firms. I founded a business valuation dispute analysis practice, co-founded an acquisition agreement vetting practice, and was one of the leaders of a post-acquisition dispute practice.

1.2.7    I also currently teach as an adjunct faculty member at Benedictine University's Goodwin College of Business in Lisle, Illinois. I previously served as a Chartered Financial Analyst (CFA) Examination grader, and a national exam question writer for the Uniform Certified Public Accountant (CPA) Exam and the American Institute of Certified Public Accountants' Accredited in Business Valuation Exam. I previously taught finance and accounting at the University of Pittsburgh and auditing at Point Park University. In addition, I served as a member of the Standing Committee on Audit of the American Bar Association entity.

1.2.8    I have previously been accepted as an expert witness in business valuation, economic damages, and forensic accounting in courts and arbitration proceedings in the United States, the Caribbean and Europe. I was selected several times to *Who's Who Legal (WWL) – Consulting Experts, Financial Advisory and Valuation – Quantum of Damages* and in 2023 as a *"Global Leader"* in that recognition category. Previously, I was selected to *Leaders League: USA Best Arbitration Support Firms, Leading Firms Tier, Key Figure*, 2019 and *Who's Who Legal: International Arbitration, Commercial Experts*, 2011.

1.2.9    Below is a summary of my professional employment history.

    a)   HKA Global, LLC, Partner, 2023 - present

    b)   Benedictine University, Adjunct Faculty Lecturer, 2022 - present

    c)   Ankura Consulting Group, Senior Managing Director, 2017 - 2022

    d)   Huron Consulting Group, Senior Director, 2016 - 2017

    e)   Houlihan Lokey, Managing Director, 2014 - 2016

    f)   Duff & Phelps, Managing Director, 2005 - 2014

    g)   Standard & Poor's, a business unit of McGraw-Hill Companies, Managing Director, 2004 - 2005

    h)   FTI Consulting, Director, 2003 - 2004



December 7, 2023

i)    KPMG, Director, 2000 - 2003

j)    Deloitte, Director, 1995 - 2000

k)    Mark I. Wolk & Associates, CPA's, Director, 1985 - 1995

l)    Group "L" Investors & Developers, Partner, 1980 - 1985

m)    Westinghouse Electric Corporation, Associate Accounting Analyst, 1979 - 1980.

1.2.10    Below is a list of publications I authored or co-authored in the previous 10 years.

a)    "Business Divorce", In Recent Developments in Business and Corporate Litigation, American Bar Association, Business Law Section, 2023, 2022, 2021 and 2020 editions

b)    "Has the Pandemic Increased the Need for Expert Witnesses in M&A Disputes?", American Bar Association, Litigation Section, Expert Witnesses Committee, *December 2021*

c)    "The Independent Accountant or Business Valuator as Advisor to the Mediator", American Bar Association, Litigation Section, Expert Witnesses Committee, *December 2021*

d)    "Measuring Valuation Damages for Breach of Fiduciary Duty Claims in Shareholder Disputes During the COVID-19 Pandemic", *Sound Advice*, *July 2021*

e)    "Contemporary Considerations for Drafting Buy-Sell and Valuation Provisions in Limited Liability Company Operating Agreements", *Business Law Today*, *May 2021*

f)    "Innovative Dispute Resolution: The Independent Business Valuator as Advisor to the Mediator in Business Disputes", Ankura.com, *January 2021*

g)    "Internal Corporate Investigations", In *Guide for In-House Counsel*, American Bar Association, Business Law Section, *2020*

h)    "Internal Corporate Investigations", *Business Law Today*, Parts 1 and 2, *December 2019 & April 2020*

i)    "Preparing In-House Counsel and External Lawyer Advocates for Effective, Good-Faith Mediation of Mergers & Acquisitions", *Business Law Today*, *February 2018*



December 7, 2023

j)   "Reflections on the 1-2-3's of Mediation of a Merger & Acquisition Dispute", *Business Law Today*, *July 2017*

k)   "Well-Established Principles Key to Expert Witness Testimony", *Paradigm*, *July 2017*

l)   "Current Dell Appraisal Rights Litigation Case on Appeal in Delaware Chancery Court May Provide Valuation Insights", *Paradigm*, *June 2017*

m)   "Why It Pays to Invest in Expert Analysis", *Paradigm*, *March 2017*

n)   "Managing Post-Merger & Acquisition Purchase Price Disputes", In *ADR Handbook for the Business Lawyer*, American Bar Association, Business Law Section, *2016*.

1.2.11   Below is a list of other cases in which, during the previous 4 years, I testified as an expert at trial or by deposition.

| Year | Forum | Action or Proceeding | Description |
|---|---|---|---|
| 2022 | Eastern Caribbean Supreme Court, High Court of Justice, Territory of the Virgin Islands, Law Division | Ikana Holdings S. de R.L. v. Putney Capital Management Ltd. et al. | Expert Testimony at Trial |
| 2021 | Circuit Court of Cook County, Illinois, Law Division | George Whetsell and Whetsell Family Trust v. Prism Healthcare Partners LTD, et al. | Expert Testimony at Trial |
| 2020 | Circuit Court of Cook County, Illinois, Law Division | George Whetsell and Whetsell Family Trust v. Prism Healthcare Partners LTD, et al. | Expert Testimony at Deposition |
| 2020 | Superior Court of New Jersey, Morris County, Law Division | Ashland LLC, International Specialty Products, Inc., and ISP Environmental Services, Inc. v. G-I Holdings Inc., Building Materials Corporation of America d/b/a GAF Materials Corporation and GAF Corporation, et al. | Expert Testimony at Deposition |
| 2020 | U.S. Bankruptcy Court, Northern District of Texas, Chapter 11 | In re: TriVascular Sales LLC et al., Debtors | Expert Testimony at Deposition |



December 7, 2023

## 1.3   RETENTION

1.3.1   HKA was retained by Clifford Chance US LLP, counsel for Dr. Michael Richard Lynch in this matter. I, John Levitske, a Partner at HKA, was asked to serve as an expert to advise regarding valuation process and relevant considerations related to the acquisition of Autonomy.

1.3.2   In this regard, I was asked to consider select asserted revenue adjustments to the interim historical financial statements of Autonomy for the First Half of 2010 (six months ended June 30, 2010) and the First Half of 2011 (six months ended June 30, 2011) ("Subject Period"), and I was asked to render opinions on the following areas in paragraphs 1.3.3 through 1.3.7.

1.3.3   The impact of each of the asserted revenue adjustments on the amounts of profit from operations, profit from operations margins, and the year-over-year percentage change or growth between the First Half of 2011 compared to the First Half of 2010 in the context of how companies are generally valued. The specific asserted revenue adjustments are in the categories of:

    a)   Hardware Transactions

    b)   Allegedly Linked Transactions

    c)   Value Added Reseller ("VAR") Transactions

        i)   Direct VAR Transactions

        ii)   Allegedly Linked VAR Transactions

1.3.4   In addition, I was asked to consider certain specific asserted revenue adjustments to the interim historical financial statements of Autonomy for 2009 through the First Half of 2011 (six months ended June 30, 2011) relating to multi-period hosting transactions, and I was asked to render opinions on the following areas in paragraphs 1.3.5 through 1.3.7.

1.3.5   The impact of the asserted revenue adjustments for multi-period hosting transactions on revenues, cash, profit from operations, and year-over-year percentage change or growth by providing an illustration using some of the amounts of the actual contracts at issue. In addition, I compared the impact on revenues and year-over-year percentage change or growth using all of the amounts of all of the actual contracts at issue.

1.3.6   Whether the asserted revenue adjustments, listed above in 1.3.3 through 1.3.5, likely did or did not have a significant impact on cash flow during the Subject Period.



December 7, 2023

Case 3:18-cr-00577-CRB   Document 298-1   Filed 01/17/24   Page 262 of 289

UNITED STATES OF AMERICA v MICHAEL RICHARD LYNCH
and STEPHEN KEITH CHAMBERLAIN                                    CONFIDENTIAL
Expert Report of John Levitske

1.3.7   Valuation methods for valuing companies (and their equity) for a potential acquisition in order of preference from a valuation principles perspective, for a well-established, mature operating company: Discounted Cash Flow Method, Earnings-based measures, or Revenues-based measures.

1.3.8   In preparing this Report, I considered:

a)   The United States' Voluntary Bill of Particulars ("VBOP") and the summary tables it incorporates[1] and the Independent Accounting Expert Report of Mr. Brice ("Brice Report").[2] For purposes of my work and this Report, I assumed the accuracy of the specific revenue adjustments asserted in the VBOP and in the Brice Report that I relied upon.

b)   Generally accepted valuation theory, practice and standards regarding companies and stocks. During the course of my work, I considered valuation standards, textbooks and other valuation and finance publications, as well as certain assumptions I have been asked to make by counsel as explained below.

c)   Public research regarding companies and industry related to this Report.

1.3.9   HKA billed for my services on this matter at a rate of $750 per hour. Hourly rates for other team members who worked on this engagement under my supervision are in the range of $285 to $675. The opinions expressed in this Report are mine and mine alone. No compensation to be paid to HKA is contingent on the outcome of this matter or the content of my opinions.

## 1.4   DISCLOSURE OF INTERESTS

1.4.1   I am not aware of any actual or potential conflicts of interest that may affect my opinion in connection with any of the Parties, witnesses or advisers involved in this matter or indeed with the project itself.

1.4.2   Should I become aware of any conflicts of interest in the future I will promptly notify those who retained HKA.

1.4.3   I confirm that I have no financial or other interest in the outcome of this action.

---

[1] United States' Voluntary Bill of Particulars, dated October 8, 2023, and related tables.

[2] Summary of independent expert accounting opinions of Steven Brice, FCA, dated November 8, 2023 and Appendices. HKA has not been provided with the underlying data that supports the Brice Report and Appendices. I have made certain assumptions as directed by counsel and I have made certain assumptions to facilitate analysis.



December 7, 2023

## 1.5    RESERVATIONS

1.5.1    This is a summary Report. My opinions are summarized below and are based on the documents and information in my possession as of the date of this Disclosure. I reserve the right to amend this Report if further information or documents are provided to me or otherwise become available to me. Also, I am continuing to review the information in this case and may have updates to supplement this Report. I reserve the right to respond to any additional information obtained through discovery or issues raised by other experts, if any. In addition, I reserve the right to prepare additional exhibits, charts, graphs, tables, demonstratives, and diagrams to summarize or support the opinions and analyses set forth in this Report.

1.5.2    If called as a witness at trial, I may testify to some or all of the opinions in this Report. I will notify Clifford Chance, in writing, if, for any reason, my existing Report requires any correction or qualification that impacts my opinion(s).

## 2.    SUMMARY OF OPINIONS

### 2.1.1    ASSERTED REVENUE ADJUSTMENTS

2.1.2    My opinions are summarized below regarding the impact of the asserted revenue adjustments on the amounts of  profit from operations, profit from operations margins, and the year-over-year percentage change or growth between the First Half of 2011 compared to the First Half of 2010 in the context of how companies generally are valued.

2.1.3    In developing the valuation of a company, the insights obtained from financial statement analysis are often considered. For example, financial statement ratio analysis and comparisons of the changes in the most recent period with the same prior period may provide insights into profitability, growth or variability which are important valuation factors. All other things equal, projections of higher profits, higher expected profit margins, higher expected growth, higher expected cash flows and less expected variability are factors contributing to higher valuations.

2.1.4    Different companies often make different choices among acceptable alternative accounting methods. Different choices among accounting methods can affect the reported figures, and the calculated ratios and comparative changes. For the purposes of my Report only, I have assumed, hypothetically, that the revenue accounting adjustments asserted in the VBOP and the Brice Report that I have relied upon in this Report are appropriate. I have been asked to opine about the impact of applying those hypothetical adjustments to Autonomy's historical reported financial statements, as described herein.



December 7, 2023

2.1.5    In assessing the impact of each of the asserted revenue adjustments on the amounts of  profit from operations, profit from operations margins, and the year-over-year percentage change or growth between the First Half of 2011 compared to the First Half of 2010 in the context of how companies generally are valued, I considered the specific asserted revenue adjustments in the following categories:

a)    Hardware Transactions

b)    Allegedly Linked Transactions

c)    Value Added Reseller ("VAR") Transactions

    i)    Direct VAR Transactions

    ii)    Allegedly Linked VAR Transactions

d)    Multi-Period Hosting Transactions, as further discussed below.

2.1.6    Then, based on my knowledge of financial statement analysis in the context of business valuation, I considered whether these asserted items are in effect an issue of:

a)    Reclassification to a different line in the financial statement,

b)    Timing, or

c)    A corresponding counter-transaction.

2.1.7    Next, I applied the asserted revenue adjustments for the First Half of 2010 and First Half of 2011, and also made corresponding reclassifications, timing adjustments or counter-transaction adjustments based upon information from the Brice Report and the VBOP, as well as certain assumptions I was asked to make.

2.1.8    The Second Quarter of 2011 is the last reported financial quarter before the acquisition. As a result, a comparison of the First Half of 2011 (i.e., First and Second Quarter of 2011) to the First Half of 2010 (i.e., First and Second Quarter of 2010) is the most recent same period of comparison available using public information when valuing Autonomy around August 18, 2011 ("Valuation Date'"). Furthermore, in financial statement analysis for valuation purposes, the most recent periods are often given the most weight – all other things equal.



December 7, 2023

**Hardware Transactions**

2.1.9    According to the Brice Report, hardware transactions occurred and were included in Autonomy's reported revenue but were not segregated into a separate disclosed line item in Autonomy's reported revenue. I have been asked to opine about the impact on financial statement analysis in the context of a valuation of removing the hardware revenues in the Subject Period. Furthermore, I understand the costs of hardware sales generally exceeded the revenues from hardware sales, and that the costs of hardware sales were included as costs and expenses in the financial statements of Autonomy, just not segregated.

2.1.10   In Attachment A, I prepared a summary comparison of the common size (as a percent of revenue) historical income statement components of Autonomy's  profit from operations with and without the asserted hardware transactions – for the periods of First Half of 2011 compared to the First Half of 2010. I removed the alleged hardware-related revenue adjustments indicated in the VBOP and also removed the related costs that are already included in cost of goods sold ("COGS") and expenses as indicated in HP's "Rebaselining" Summary[3] (Rebaselining Exercise). Attachment A removes both the sales and costs in the interest of consistency and has the same effect from a financial statement analysis perspective as if the hardware sales and costs were both reclassified out of components of  profit from operations.

2.1.11   As illustrated in Attachment A, after the hardware transaction adjustments:

   a)   Profit from operations is now greater than reported during both the First Half of 2010 and the First Half of 2011.

   b)   The profit from operations margin, as a percent of revenue, is now greater for both the First Half of 2010 and the First Half of 2011.

   c)   The rate of year-over-year change (growth) in revenue is now greater than the year-over-year change based upon the originally reported amounts.

   d)   The rate of year-over-year change (growth) in profit from operations is approximately 1 percentage point lower than the year-over-year change based upon the originally reported amounts.

---

[3] K26_263.1.xlsx I was asked to assume that the adjustments suggested in the "Rebaselining Exercise" are accurate.



December 7, 2023

**Alleged Linked Transactions**

2.1.12   The Brice Report alleges that Autonomy paid more to purchase goods from customers in certain alleged linked transactions than the same customers paid to purchase software from Autonomy. From a financial statement analysis perspective, eliminating the revenue from these transactions would also require reducing corresponding alleged linked costs and expenses.

2.1.13   As illustrated in Attachment B, after these adjustments for Allegedly Linked Transactions:

a)   Profit from operations is now greater than reported during both the First Half of 2010 and the First Half of 2011.

b)   The profit from operations margin, as a percent of revenue, is now greater for both the First Half of 2010 and the First Half of 2011.

c)   The rate of year-over-year change (growth) in revenue is now greater than the year-over-year change based upon the originally reported amounts.

d)   The rate of year-over-year change (growth) in profit from operations is lower than the year-over-year change based upon the originally reported amounts. However, profits are still growing.

**VAR Transactions**

2.1.14   The Brice Report alleges revenue recognition issues with certain VAR transactions. Accordingly, I identified and considered what type of VAR transaction was involved. I was also asked by counsel to make certain assumptions regarding these transactions which I explain below.

2.1.15   With respect to certain of the VAR transactions, Autonomy allegedly entered into a transaction with the named end user in a subsequent period to sell the same or similar software for the same or similar amounts of revenue, then cancelled the amounts owed by the VAR in the original transaction. For these VAR transactions allegedly made directly to end users in subsequent periods (which I have identified as "Direct VAR Transactions"), I have been asked to assume that the revenue from the direct sale to the end user would have been properly recognized in the quarter in which the direct sale was made, and that the accounting difference relates only to the timing of when revenue should have been recognized; there is no allegation of missing revenue. In 2010, because some transactions did not go direct within the Subject Period, the revenue would be lower in the First Quarter of 2010, but would have been recognized in the Third Quarter of 2010, which is not included in our analysis. In 2011, because some transactions did not go direct



December 7, 2023

CONFIDENTIAL

until after the end of the Subject Period, the revenue would be lower in the Second Quarter of 2011, but there were several deals that would have been recognized only one quarter later in the Third Quarter of 2011.

2.1.16   With respect to certain VAR transactions, the VAR paid cash for the transaction, but allegedly only as a result of Autonomy buying other goods from the VAR. From a financial statement analysis perspective, if Autonomy's purchases from the VARs are deemed linked transactions, preventing revenue from being recognized in the original VAR transactions, it is necessary to also eliminate the corresponding expense associated with the allegedly linked purchases from the VARs. Because these transactions were treated in the Brice Report as linked, I have been asked to consider the effect of offsetting or netting the revenue and I was asked by counsel to assume that the related expense was recorded in the same period in which the select VAR transaction was recognized as revenue. Sometimes the corresponding allegedly linked expense was higher than the allegedly linked revenue and sometimes the associated expense was lower. The net effect would reduce, offset, or exceed the impact of the asserted revenue adjustment depending on the particular transaction. I refer to these transactions in the Report as "Allegedly Linked VAR Transactions."

2.1.17   Two VAR transactions entered into during the Second Quarter of 2011 were later cancelled when sales did not close with the end user.

2.1.18   As illustrated in Attachment C, the overall result of adjusting for these VAR transactions indicates, from a financial statement analysis perspective:

   a)   Profit from operations would be lower than originally reported for both the First Half of 2010 and the First Half of 2011.

   b)   The profit from operations margin, as a percent of revenue, is approximately unchanged for both the First Half of 2010 and the First Half of 2011.

   c)   The rate of year-over-year change (growth) in revenue is now lower than the year-over-year change based upon the originally reported amounts. However, revenue is still growing.

   d)   The rate of year-over-year change (growth) in profit from operations is lower than the year-over-year change based upon the originally reported amounts. However, profits are still growing.



**Multi-Period Hosting Transactions**

2.1.19   For the multi-period hosting transactions, I have assumed, hypothetically, the accuracy of the information in the Brice Report which reclassified up-front license revenue to revenue recognized ratably, on a straight-line basis over the contract durations for the various transactions. In this regard, I reviewed the summaries provided in Appendix F of the Brice Report for the relevant multi-period hosting transactions. I also prepared:

a)   Attachment D which is an illustration that compares hypothetical Company A and Company B but uses the actual contract amounts and actual contract durations of a sample of three selected multi-year hosting transactions listed in Table 2.10 and Appendix F of the Brice Report. These three selected multi-year hosting transactions were executed before June 30, 2011. In Attachment D, Company A represents revenues as reported by Autonomy and Company B represents revenues as restated by the Brice Report.

2.1.20   Attachment D indicates that:

a)   With regards to revenue, although revenue is initially lower during the early years for Company B:

   i)   Total revenue is the same for Company A and Company B over the contract duration.

   ii)   The average revenue per year is the same for both Company A and Company B.

   iii)   Company B has more years of revenue than Company A.

   iv)   Company B has revenue in every year of the contract duration.

   v)   Company A has no revenue (zero revenue) in more than one year.

b)   With regards to Cash, the cash inflow is the same for both Company A and Company B

c)   With regards to profit contribution, although the profit contribution amount is initially lower during the early years for Company B:

   i)   Total profit contribution is the same for both Company A and Company B over the contract duration.

   ii)   The average profit contribution per year is the same for both Company A and Company B.



December 7, 2023

    iii)   Company B has more years with profit contribution than Company A.

    iv)   Company B has profit contribution in every year of the contract duration.

    v)   Company A has zero profit contribution in more than one year.

d)   With regards to the year-over-year percentage change in revenue during years 1 through 3 (2009 through 2011):

    i)   The year-over-year percentage change in revenue (growth) is greater in the first years for Company B than Company A.

    ii)   The year-over-year percentage change in revenue (growth), on average, is greater for Company B than Company A.

e)   With regards to the year-over-year percentage change in cash during year 1 through 3 (2009 through 2011):

    i)   The year-over-year percentage change in cash (growth) is the same for Company A and Company B.

    ii)   The year-over-year percentage change in cash (growth), on average, is the same for Company A and Company B.

f)   With regards to the year-over-year percentage change in profit contribution during year 1 through 3 (2009 through 2011):

    i)   The year-over-year percentage change in profit contribution (growth) is greater in the first years for Company B than Company A.

    ii)   The year-over-year percentage change in profit contribution (growth), on average, is greater for Company B than Company A.

2.1.21   The patterns of revenue and profit contribution with hypothetical Company A and Company B are different, but the patterns of cash inflow are the same. In fact, the patterns of revenue and profit contribution for hypothetical Company A vary more than hypothetical Company B and even drop to zero during the contract durations. The patterns of revenue and profit contribution for hypothetical Company B reflect a layering effect which accumulates and smooths the patterns; and depending on the mix (e.g., amounts, timing, and number of contracts) can reflect greater growth or less variability for hypothetical Company B as compared to hypothetical Company A.



December 7, 2023

Consequently, the patterns of revenue and profit contributions with hypothetical Company B are comparatively more predictable than hypothetical Company A.

2.1.22    In addition, I compared the impact on revenues and year-over-year percentage change or growth using the actual amounts of all of the transactions presented in Table 2.10 of the Brice Report. This analysis is illustrated in a graph, showing adjusted revenue on a quarterly basis, and table as Attachment E. This corroborates my above observations regarding revenue patterns for hypothetical Company B as compared to hypothetical Company A. It also shows that for the First Half of 2011, as compared to the First Half of 2010, the revenue growth percentage, with the asserted revenue adjustments, would be greater than it would be with the reported revenues.[4] It should be noted that the revenue depicted in Attachment E is based solely on the transactions in the Brice Report. Thus, to the extent the graph could be read to show declining revenue beginning in 2013, that is because multi-period hosting transactions entered into after the second quarter of 2011 were not considered in Table 2.10 of the Brice Report.

**Cash Flow**

2.1.23    I also considered whether the asserted revenue and expense adjustments listed above likely did or did not have a significant impact on cash flow during the Subject Period.

2.1.24    Generally, the asserted adjustments I have analyzed are in the nature of a reclassification to a different line in the financial statement issue, a timing issue, or a corresponding counter-transaction issue. From a financial statement analysis perspective in the context of valuation, the asserted revenue accounting adjustments are incomplete and do not include related costs, expenses, corresponding counter-transaction items, or reassignments. Furthermore, I also note that there is no assertion that the cash received or earned by Autonomy related to these transactions was not received.

        a)    Hardware Transactions. All of the revenues, related costs and expenses were already recognized. In total, these transactions resulted in a loss during the Subject Period. Therefore, removing the revenues, related costs and expenses for the Hardware Transactions would likely increase cash flow during the Subject Period.

---

[4] HKA relied on Appendix F of the Brice Report in making revenue adjustments for the multi-period hosting transactions. We have assumed the amounts and information contained in Appendix F of the Brice Report are accurate. We did not independently verify the amounts and information contained in Appendix F of the Brice Report. For purposes of its analysis, HKA was asked to assume the contract revenue would be recognized ratably over the duration of the contract. HKA assumed Autonomy received all the cash up-front.



December 7, 2023

b)  Alleged Linked Transactions. The assessment regarding whether there is cash flow impact for Alleged Linked Transactions is similar to Hardware Transactions. In total, these transactions resulted in a loss during the Subject Period. From a financial statement analysis perspective, eliminating the revenue from these transactions would also require reducing corresponding costs and expenses. Therefore, removing the revenues, related costs and expenses for the Alleged Linked Transactions would likely increase cash flow during the Subject Period.

c)  VAR Transactions. The assessment regarding whether there is cash flow impact for VAR Transactions is similar to Hardware Transactions and Linked Transactions. Where applicable, I was asked by counsel to assume that the related expense was recorded in the same period in which the select VAR transaction was recognized as revenue. In total, these transactions resulted in a loss during the Subject Period. Therefore, removing the revenues, related costs and expenses for the VAR Transactions would likely increase cash flow during the Subject Period.

d)  Multi-Period Hosting Transactions. This is a timing issue regarding that asserted revenue should be spread over the contract duration as opposed to up-front. I was asked to assume the full amount of cash was received and recorded up-front. Moving a portion of the revenue from a current period to recognize ratably over later periods requires increasing deferred revenue liability in the current period. I have assumed the applicable gross profit margin of multi-period hosting revenue is the same as that of the company and that the incremental cash outlays over the lifetimes of the contracts are nominal. Increasing deferred revenue as an offset to decreasing earned revenue results in, this case in, a net positive impact to cash flows during the Subject Period. My calculations are summarized in Attachment F.

## 2.2   VALUATION METHODS

2.2.1   My comments and opinions are summarized below regarding valuation methods for valuing companies for a potential acquisition in order of preference from a valuation principles perspective, for a well-established, mature operating company. The Discounted Cash Flow Method is generally the most-preferred method, earnings-based methods second, and revenues-based methods third.

2.2.2   Valuation of companies and stocks are generally an estimate based on variables perceived to be related by an analyst to future investment returns or comparisons with similar investments. Selection of the most appropriate valuation methodology involves informed judgment. Analysts often consider and weigh multiple valuation models or factors in the process. For well-established operating companies which generate significant cash flows from the sales of services or goods,



December 7, 2023

the most common methodologies are the Income Approach – Discounted Cash Flow ("DCF") Method, the Market-Approach – Guideline Public Company ("GPC") Method, and the Market-Approach – Merger & Acquisition ("M&A") Method.

2.2.3   Valuation is forward looking. A well-established, mature operating company has value to a potential investor because the investor believes it will generate cash flows in the future. Value depends on the magnitude, timing, and risk of the cash flows expected to be generated in the future. Furthermore, many companies use free cash flow to manage the company and measure performance. Free cash flow is the cash flow which a company generates after collection of receivables, payment of costs and expenses, and after making working capital and other capital investments.

2.2.4   The DCF Method is a fundamental valuation technique based upon these forward-looking valuation principles. The DCF Method calculates the present value of future expected free cash flows using a discount rate. Expected free cash flow, or expected earnings as a key component of and translated into expected free cash flow, is generally the most important variable. Free cash flow is based on expected cash flow from operations plus it factors in the necessary reinvestment in fixed assets and working capital. In many cases, the DCF Method best fits the facts and is most tailored to the economics of the subject company because the DCF Method directly incorporates the specific operating characteristics and projections of future financial performance and variations of the company. The DCF Method is custom-tailored to the economics of the company.

2.2.5   The advantage of using free cash flow is that it can be used directly in a DCF framework to value the company or equity. Other earnings-related measures, such as net income, EBIT, or EBITDA,[5] lack this ability because they either omit cash flows or double count in some way. For example, EBIT and EBITDA are before-income tax statistics, but cash flows available to the company or equity must be after tax. In addition, earnings-related measures do not account for differences in capital structures among companies, reinvestments in capital assets, and reinvestments in working capital to maintain or optimize the value of the company. Revenue-related measures have even greater issues with omitting cash flows or double-counting in some way, plus issues with assuming sameness of service, product and operating cost and margin structures.

2.2.6   Ultimately, selection of valuation method is often influenced by the purpose of the valuation and the perspective of an analyst. A potential buyer evaluating a controlling equity position in a target company often values the company using the DCF Method or the forecasted free cash flows,

---

[5] "EBIT" is Earnings Before Interest and Taxes. "EBITDA" is Earnings Before Interest, Taxes, Depreciation, and Amortization.



December 7, 2023

because such free cash flows can be redirected by such an acquirer without affecting the value of the acquisition.

2.2.7    Fundamental valuation analysis assumes that an investment has an intrinsic valuation which can be quantified through a rigorous evaluation of relevant variables. Intrinsic value is also sometimes called fundamental value: the value on the basis of available facts to be the fundamental value that will become the market value when other investors reach the same conclusion.

2.2.8    The Market Approach is a general way of determining a value indication by using one or more methods that compare the subject to similar businesses. The Market Approach methods are relative valuation techniques based upon relative comparison with guideline public companies or guideline transactions of companies. Under the Market-Approach – Guideline Public Company ("GPC") Method, market multiples are derived from market prices of stocks of companies that are engaged in the same or similar lines of business and that are actively traded on a free and open market. Under the Market-Approach – Merger & Acquisition ("M&A") Method, pricing multiples are derived from transactions of significant interests in companies engaged in the same or similar lines of business. The Market Approach methods are ways to estimate and apply a Multiple of Earnings or Multiple of Revenue as a valuation ratio to estimate relative value.

2.2.9    The two Market Approach methods may provide some additional insight but by their nature are not as tailored to the specific economics of the subject company. Further, issues arise regarding whether the selected benchmark companies are sufficiently comparable and whether the share prices of the benchmark companies are free of aberrations. In addition, issues arise regarding the availability of financial information, and the motivations and knowledge of the parties, with selected transactions. The Market Approach methods are not custom-tailored to the future economics of the subject company like the DCF Method. Therefore, the Market Approaches are relative valuation techniques, and not fundamental valuation techniques.

2.2.10   One of the additional advantages of using a DCF framework for valuation is that it can be custom tailored to include the estimated additional free cash flows and potential value of synergies anticipated by a prospective buyer of the company in combination with the economics and value of the target company.

2.2.11   Consequently, regarding valuation methods for valuing companies for a potential acquisition in order of preference from a valuation principles perspective, for a well-established, mature operating company: the Discounted Cash Flow Method is generally the most-preferred method, Earnings-based methods second, and Revenues-based methods third.



December 7, 2023

## 3.      SUMMARY CONCLUSION

3.1.1    When comparing Autonomy's financial results from First Half of 2011 to First Half of 2010:

**Hardware Transactions**

3.1.2    If the asserted hardware sales are removed along with corresponding costs and expenses:

a)    Autonomy would have had higher profits and higher profit margins.

b)    Autonomy's revenue growth percentage would have been higher.

c)    Autonomy's cash flow would likely have been higher.

**Alleged Linked Transactions**

3.1.3    If the revenues for linked transactions are removed along with corresponding costs and expenses:

a)    Autonomy would have had higher profits and higher profit margins.

b)    Autonomy's revenue growth would have been higher.

c)    Autonomy's cash flow would likely have been higher.

**VAR Transactions**

3.1.4    If the revenues for VAR transactions are removed along with the corresponding costs and expenses:

a)    Autonomy would have had lower profits.

b)    Autonomy would have had and a higher profit margin in the First Half of 2010 and a lower profit margin in the First Half of 2011.

c)    Autonomy's revenue growth would have been lower.

d)    Autonomy's cash flow would likely have been higher.



December 7, 2023

**Multi-Period Hosting Transactions**

3.1.5   If the multi-period hosting transactions in which license revenue was originally recognized in full up front in the quarter in which the deal was executed were instead accounted for by recognizing the revenue ratably on a straight-line basis over the duration of the contract, the result would be:

    a)   The revenue would have been spread out over a longer period.

    b)   The total amount of revenue and profit would have been the same.

    c)   The cash would have been received in the same time periods.

    d)   Although this would have resulted in initially less revenue, the results after adjustments would have indicated growth, plus future revenue and profit streams that are longer and steadier, for which the clients had already paid in full.

    e)   These adjustments result in a net positive impact on cash flows during the Subject Period.

**Financial Statement Analysis and Valuation**

3.1.6   The Second Quarter of 2011 is the last reported financial quarter before the acquisition. Comparison of the First Half of 2011 to the First Half of 2010 is the most recent same period of comparison available of public information when valuing Autonomy in August 2011.

3.1.7   In financial statement analysis for valuation purposes, the most recent periods are often given the most weight – all other things being equal.

3.1.8   Valuation is forward-looking. All other things equal, projections of higher expected profits, higher expected profit margins, higher expected growth, and less expected variability are factors contributing to higher valuations. Higher expected future cash flows is also a factor contributing to higher valuations.

3.1.9   For a well-established, mature operating company: the Discounted Cash Flow Method is generally the most-preferred method for valuing companies for a potential acquisition in order of preference from a valuation principles perspective, Earnings-based methods second, and Revenues-based methods third.

3.1.10   Generally, a comprehensive valuation of a company considers all facts and factors relevant to valuation and requires application of informed judgment by the analyst. Ultimately, a valuation is



December 7, 2023

based upon a selected or developed prophesy, or range of prophesies, as to the long-term future of a company and there is no specific formula for a valuation.

a)   As I discussed above, the Discounted Cash Flow valuation method based upon a forecast of Free Cash Flows is the most preferred method for valuation of a mature operating company. A company has value to an investor because the investor believes it will generate cash flows in the future: value depends on the magnitude, timing and risk of the cash flows which is expected to be generated. Historical returns are not the focus of valuation, but analysis of historical information may provide insights into certain valuation factors.

b)   A valuation analyst will use informed judgment in assessing and weighing the facts and factors. In this situation, the short-term snapshot of historical financial information items and assertions regarding Autonomy which I have analyzed in this Report for the Subject Period are of the type that would be relevant considerations among the total mix of information.

c)   In addition, the types of related financial statement analysis adjustments which I have made also would be relevant considerations in developing a valuation.

   i)   Furthermore, from an economic perspective, it is my understanding that the hardware, allegedly linked and VAR transaction activities at issue could be discontinued from Autonomy's operations. This would be a relevant consideration.

   ii)   Similarly, the multiple years of revenue and income, and greater predictability of multi-year hosting revenues and profits would also be a relevant consideration. In addition, the growth and layering effect in multi-year hosting revenues as a result of the adjustments would be a relevant consideration.

d)   I considered the total mix of financial statement analysis adjustments I applied in this Report for the Subject Period, and tabulated them in a schedule Attachment G. This schedule includes all of the financial statement analysis adjustments to revenues, costs of revenues and expenses, plus it includes related income tax and deferred (unearned) revenue items. Consequently, my schedule captures the main items affecting cash flow, as well as profit from operations. This provides a holistic view of the impact on cash flow.

   i)   Although total revenue and total profit from operations, after adjustments, are less in each of the Subject Period:

      - The cash flow during the First Half of 2010 is increased.



December 7, 2023

- The cash flow during the First Half of 2011 is increased.

- In total, the amount of cash flow for combined First Half of 2010 and First Half of 2011 is increased.

- The year-over-year percentage change for revenues (growth), after adjustments is greater.

- The profit margin percentage for the First Half of 2010 and the First Half of 2011 are both greater.

- The year-over-year percentage change for profit from operations (growth), after adjustments is similar.

ii)     Accordingly, these would be relevant considerations in assessing historical cash flow as part of a financial statement analysis in the context of a valuation, provide insights to an analyst who is assessing selection of or developing a forecast of free cash flow for a DCF. All other things equal, higher expected cash flows contribute to higher valuation when analyzing a company.

3.1.11   Valuation is an imperfect science, there are imprecisions, and often ranges of point estimates of value are developed. In my financial statement analysis, I made certain assumptions to facilitate the analysis and captured the major items affecting cash flow. Cash flow to a business and to a valuation are important. The DCF Method calculates the present value of future expected free cash flows using a discount rate. Expected free cash flow, or expected earnings as a key component of and translated into expected free cash flow, is generally the most important variable. In the snapshot of the Subject Period, the asserted revenue adjustments would result in a limited impact on the cash flow. All other things equal, assuming the accuracy of the adjustments in the Brice Report and the Rebaselining Exercise that I have relied upon, it is my opinion that, in isolation, the overall impact of the amounts of the adjustments alone discussed in this Report would not likely materially change the valuation of a well-established, mature operating company like Autonomy, as of the Valuation Date.



December 7, 2023

## 4.    SIGNATURE OF EXPERT

Respectfully submitted,

*John Levitske*

John Levitske

December 7, 2023



CURRICULUM VITAE
# JOHN LEVITSKE
**PARTNER**



## QUALIFICATIONS

MBA (*cum laude*), University of Notre Dame, USA
JD, Duquesne University School of Law (Law Review), USA
BSBA, Duquesne University, USA
Accredited Senior Appraiser (ASA) in Business Valuation
Accredited in Business Valuation (ABV)
Certified in Financial Forensics (CFF)
Certified Insolvency and Restructuring Advisor (CIRA)
Certified Public Accountant (CPA), licensed in Illinois and Pennsylvania
Chartered Financial Analyst (CFA) Charterholder
Chartered Global Management Accountant (CGMA)
Master Certified Forensic Litigation Consultant (MCFLC)

## MEMBERSHIPS

American Bar Association
- Co-Chair, Investigations, Enforcement and White-Collar Subcommittee of the Business Law Section's Business & Corporate Litigation Committee
- Former Chair, Dispute Resolution Committee of the Business Law Section
- Former Member at Large, Standing Committee on Audit of the ABA national entity

National Board Member and former National President, Forensic Expert Witness Association
Founding Member, Chicago Bar Association, Business Divorce and Complex Ownership Disputes Committee

## PERSONAL DEVELOPMENT

Who's Who Legal (WWL): Consulting Experts, Financial Advisory and Valuation – Quantum of Damages, *2019 – 2023 ("Global Leader" in 2023)*
Corporate Valuation, University of Pennsylvania, The Wharton School, Executive Education, *2022*
Frontiers of Finance, New York University, Stern School of Business, Executive Education, *2022*
Spreadsheet Modeling, Cornell University, College of Engineering, Executive Education, *2022*
Financial Modeling, University of Georgia, Terry College of Business, Executive Education, *2022*
Leaders League: USA Best Arbitration Support Firms, Leading Firms Tier, Key Figure, *2019*
Forensic Expert Witness Association's National Meritorious Service Award, *2019*
The Fellows of the American Bar Foundation, *2018 - present*
Who's Who Legal: International Arbitration, Commercial Experts, *2011*

Dale Carnegie Leadership Training for Managers, 2003
KPMG FLS Leadership Forum and Advanced Leadership Forum, 2001, 2003
The Dale Carnegie Course, 1995

## PROFILE

**John Levitske** is a business appraiser, financial analyst, and forensic accountant with more than 35 years of experience. John serves as a senior advisor to companies, legal counsel, executives, and investors regarding business valuation, financial, accounting, and damages issues in complex commercial matters such as business, shareholder, bankruptcy, corporate governance, alter-ego, private equity, and mergers and acquisitions (M&A) transaction disputes. He provides expert advice when disagreements or uncertainties arise regarding quantifications of value, price, accounting (GAAP and IFRS), or economic damages of a business or stakeholder interest. John works across all industries and is experienced with both private and public companies, in domestic and international disputes.

He has worked with Big Four public accounting, global valuation and corporate financial advisory, and international business advisory and expert consulting firms for over 25 years. He also founded a business valuation dispute analysis practice, co-founded an acquisition agreement vetting practice, and was one of the leaders of a post-acquisition dispute practice. John's expert witness work has included jury and bench trials, mediations, and arbitrations (e.g., ICC, LCIA, SCC, AAA, JAMS, FINRA, and ad hoc) in the United States and internationally. He has testified as an expert witness in the United States, Europe, and the Caribbean. John has also served as a neutral arbitrator and as an independent advisor to the mediator.

John currently teaches as an adjunct faculty member at Benedictine University's College of Business and has served as a Chartered Financial Analyst (CFA) Examination grader. He has also taught accounting, finance, and auditing at the University of Pittsburgh and Point Park University; and served as a national exam question writer for the Uniform Certified Public Accountant (CPA) Exam and the American Institute of Certified Public Accountants' Accredited in Business Valuation Exam.

## PRESENTATIONS & SPEAKING ENGAGEMENTS

John has lectured on valuation, financial analysis, forensic accounting, and M&A dispute topics to various professional groups, including the American Bar Association, American Society of Appraisers, Association of Insolvency and Reorganization Advisors, Chicago Bar Association, and DailyDAC-Financial Poise.

## PUBLICATIONS & PAPERS – PREVIOUS 10 YEARS

"**Business Divorce**", In *Recent Developments in Business and Corporate Litigation*, American Bar Association, Business Law Section, *2023, 2022, 2021 and 2020 editions*
"**Has the Pandemic Increased the Need for Expert Witnesses in M&A Disputes?**", American Bar Association, Litigation Section, Expert Witnesses Committee, *December 2021*
"**The Independent Accountant or Business Valuator as Advisor to the Mediator**", American Bar Association, Litigation Section, Expert Witnesses Committee, *December 2021*
"**Measuring Valuation Damages for Breach of Fiduciary Duty Claims in Shareholder Disputes During the COVID-19 Pandemic**", *Sound Advice*, *July 2021*
"**Contemporary Considerations for Drafting Buy-Sell and Valuation Provisions in Limited Liability Company Operating Agreements**", *Business Law Today*, *May 2021*
"**Innovative Dispute Resolution: The Independent Business Valuator as Advisor to the Mediator in Business Disputes**", Ankura.com, *January 2021*
"**Internal Corporate Investigations**", In *Guide for In-House Counsel*, American Bar Association, Business Law Section, *2020*
"**Internal Corporate Investigations**", *Business Law Today*, Parts 1 and 2, *December 2019 & April 2020*
"**Preparing In-House Counsel and External Lawyer Advocates for Effective, Good-Faith Mediation of Mergers & Acquisitions**", *Business Law Today*, *February 2018*
"**Reflections on the 1-2-3's of Mediation of a Merger & Acquisition Dispute**", *Business Law Today*, *July 2017*

"**Well-Established Principles Key to Expert Witness Testimony**", *Paradigm*, *July 2017*
"**Current Dell Appraisal Rights Litigation Case on Appeal in Delaware Chancery Court May Provide Valuation Insights**", *Paradigm*, *June 2017*
"**Why It Pays to Invest in Expert Analysis**", *Paradigm*, *March 2017*
"**Managing Post-Merger & Acquisition Purchase Price Disputes**", In *ADR Handbook for the Business Lawyer*, American Bar Association, Business Law Section, *2016*

## EMPLOYMENT HISTORY

- HKA Global, LLC, Partner, *2023 - present*
- Benedictine University, Adjunct Faculty Lecturer, *2022 - present*
- Ankura Consulting Group, Senior Managing Director, *2017 - 2022*
- Huron Consulting Group, Senior Director, *2016 - 2017*
- Houlihan Lokey, Managing Director, *2014 - 2016*
- Duff & Phelps, Managing Director, *2005 - 2014*
- Standard & Poor's, a business unit of McGraw-Hill Companies, Managing Director, *2004 - 2005*
- FTI Consulting, Director, *2003 - 2004*
- KPMG, Director, *2000 - 2003*
- Deloitte, Director, *1995 - 2000*
- Mark Wolk & Associates, CPA's, Director, *1985 - 1995*
- Group "L" Investors & Developers, Partner, *1980 - 1985*
- Westinghouse Electric Corporation, Associate Accounting Analyst, *1979 – 1980*

## TESTIMONY – PREVIOUS 4 YEARS

| Year | Forum | Action or Proceeding | Description |
|------|-------|---------------------|-------------|
| 2022 | Eastern Caribbean Supreme Court, High Court of Justice, Territory of the Virgin Islands, Law Division | Ikana Holdings S. de R.L. v. Putney Capital Management Ltd. et al. | Expert Testimony at Trial |
| 2021 | Circuit Court of Cook County, Illinois, Law Division | George Whetsell and Whetsell Family Trust v. Prism Healthcare Partners LTD, et al. | Expert Testimony at Trial |
| 2020 | Circuit Court of Cook County, Illinois, Law Division | George Whetsell and Whetsell Family Trust v. Prism Healthcare Partners LTD, et al. | Expert Testimony at Deposition |
| 2020 | Superior Court of New Jersey, Morris County, Law Division | Ashland LLC, International Specialty Products, Inc., and ISP Environmental Services, Inc. v. G-I Holdings Inc., Building Materials Corporation of America d/b/a GAF Materials Corporation and GAF Corporation, et al. | Expert Testimony at Deposition |
| 2020 | U.S. Bankruptcy Court, Northern District of Texas, Chapter 11 | In re: TriVascular Sales LLC et al., Debtors | Expert Testimony at Deposition |

## CONTACT INFORMATION

Email johnlevitske@hka.com
Tel +1 312 521 7484
Location: 300 South Wacker Drive, Suite 2600,
Chicago, IL 60606  USA

United States of America v. Michael Richard Lynch and Stephen Keith Chamberlain
List of Documents Relied Upon

Appendix 2



| Documents |
| --- |
| Summary of independent expert accounting opinions of Steven Brice, FCA, dated November 8, 2023 and Appendices. |
| United States' Voluntary Bill of Particulars, dated October 8, 2023, and related tables |
| K26_263.1 ("Rebaselining Exercise") |
| Autonomy Corporation PLC Interim Results for the Six Months Ended June 30, 2010 |
| Autonomy Corporation PLC Interim Results for the Six Months Ended June 30, 2011 |
| Autonomy Corporation PLC Annual Report and Accounts for the year ended 31 December 2010 |
| British Pound to US Dollar Spot Exchange Rates for 2011 |
| Capital IQ Historical GBPUSD Exchange Rate - March 2011 |



United States of America v. Michael Richard Lynch and Stephen Keith Chamberlain

Adjustments for Hardware Transactions

Q1 - Q2 2010 Compared To Q1 - Q2 2011

Attachment A

| Hardware Transactions | Q1 2010[a] | Q2 2010 | Q1 & Q2 2010 | Q1 2011[a] | Q2 2011 | Q1 & Q2 2011 | H1 2010 to H2 2011 | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Change | % Change |
| Revenues | $ 194.18 | $ 221.13 | $ 415.31 [1] | $ 219.79 | $ 256.25 | $ 476.04 [2] | $ 60.73 | 14.62% |
| *Hardware Adjustment* | (11.84) | (31.06) | (42.90) [3] | (20.09) | (20.85) | (40.94) [3] | | |
| Total Revenue Less Hardware Adjustments | $ 182.34 | $ 190.07 | $ 372.41 | $ 199.70 | $ 235.40 | $ 435.10 | $ 62.69 | 16.83% |
| | | | | | | | | |
| Total Cost of Revenues | 36.08 | 45.22 | 81.30 [1] | 39.23 | 48.49 | 87.73 [2] | | |
| | | | | | | | | |
| Operating Expenses | 84.98 | 98.90 | 183.87 [1] | 95.94 | 124.80 | 220.74 [2] | | |
| | | | | | | | | |
| Total Cost of Revenues and Operating Expenses | $ 121.05 | $ 144.12 | $ 265.17 | $ 135.17 | $ 173.30 | $ 308.47 | | |
| *Costs and Expenses Related to Alleged Hardware Revenues* | (13.21) | (34.66) | (47.87) [4] | (21.53) | (23.39) | (44.92) [4] | | |
| Total Cost of Revenues and Operating Expenses Less Hardware Adjustments | $ 107.84 | $ 109.46 | $ 217.30 | $ 113.64 | $ 149.91 | $ 263.54 | | |
| | | | | | | | | |
| Profit from Operations | $ 73.13 | $ 77.01 | $ 150.14 [1] | $ 84.62 | $ 82.95 | $ 167.57 [2] | $ 17.43 | 11.61% |
| *% of Corresponding Revenue* | | | *36.15%* | | | *35.20%* | | |
| Profit from Operations After Adjustments | $ 74.50 | $ 80.61 | $ 155.11 | $ 86.06 | $ 85.49 | $ 171.56 | $ 16.45 | 10.60% |
| *% of Corresponding Revenue* | | | *41.65%* | | | *39.43%* | | |

**Source(s):**
(1) Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2010, page 7.
(2) Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2011, pages 10-11.
(3) United States' Voluntary Bill of Particulars, dated October 8, 2023, Table "Summary of Revenue Adjustments (Detailed) - 2009 To October 2011".
(4) K26_263.1.xlsx (Rebaselining Exercise).

**Note(s):**
(a) The Interim Results for 2010 and 2011 contain only Q2 and total Half Year values. Q1 is calculated as the difference between the Half Year and Q2 values.

United States of America v. Michael Richard Lynch and Stephen Keith Chamberlain
**Adjustments for Alleged Linked Transactions**
**Q1 - Q2 2010 Compared To Q1 - Q2 2011**

Attachment B

| Alleged Linked Transactions | Q1 2010[a] | Q2 2010 | Q1 & Q2 2010 | Q1 2011[a] | Q2 2011 | Q1 & Q2 2011 | H1 2010 to H2 2011 Change | % Change |
|---|---|---|---|---|---|---|---|---|
| Revenues | $ 194.18 | $ 221.13 | $ 415.31 [1] | $ 219.79 | $ 256.25 | $ 476.04 [2] | $ 60.73 | 14.62% |
| *Alleged Linked Transaction Adjustments* | (8.50) | - | (8.50) [3] | (6.45) | - | (6.45) [4] | | |
| Total Revenue Less Alleged Linked Transaction Adjustments | $ 185.68 | $ 221.13 | $ 406.81 | $ 213.34 | $ 256.25 | $ 469.59 | $ 62.78 | 15.43% |
| | | | | | | | | |
| Total Cost of Revenues | 36.08 | 45.22 | 81.30 [1] | 39.23 | 48.49 | 87.73 [2] | | |
| | | | | | | | | |
| Operating Expenses | 84.98 | 98.90 | 183.87 [1] | 95.94 | 124.80 | 220.74 [2] | | |
| | | | | | | | | |
| Total Cost of Revenues and Operating Expenses | $ 121.05 | $ 144.12 | $ 265.17 | $ 135.17 | $ 173.30 | $ 308.47 | | |
| *Costs and Expenses Related to Alleged Linked Transactions* | - | (11.52) | (11.52) [3] | (7.01) | - | (7.01) [4][5][b] | | |
| Total Cost of Revenues and Operating Expenses Less Alleged Linked Transaction Adjustments | $ 121.05 | $ 132.60 | $ 253.65 | $ 128.16 | $ 173.30 | $ 301.45 | | |
| | | | | | | | | |
| Profit from Operations | $ 73.13 | $ 77.01 | $ 150.14 [1] | $ 84.62 | $ 82.95 | $ 167.57 [2] | $ 17.43 | 11.61% |
| *% of Corresponding Revenue* | | | *36.15%* | | | *35.20%* | | |
| Profit from Operations with Adjustments | $ 64.63 | $ 88.53 | $ 153.16 | $ 85.19 | $ 82.95 | $ 168.14 | $ 14.98 | 9.78% |
| *% of Corresponding Revenue* | | | *37.65%* | | | *35.81%* | | |

**Source(s):**
(1) Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2010, page 7.
(2) Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2011, pages 10-11.
(3) Summary of independent expert accounting opinions of Steven Brice, FCA, dated November 8, 2023, Appendix F: SW-10-049 FileTek, Inc (FileTek).pdf, page 1-2.
(4) Summary of independent expert accounting opinions of Steven Brice, FCA, dated November 8, 2023, Appendix F: SW-11-084 Tottenham Hotspur Plc (Tottenham).pdf, page 1, 3.
(5) Capital IQ Historical GBPUSD Exchange Rate - March 2011.

**Note(s):**
(a) The Interim Results for 2010 and 2011 contain only Q2 and total Half Year values. Q1 is calculated as the difference between the Half Year and Q2 values.
(b) £4,370,000 at the Historical Exchange Rate on March 31, 2011 of £0.62305 GBP/USD = $7,013,883.32.



**United States of America v. Michael Richard Lynch and Stephen Keith Chamberlain**
**Adjustments for VAR Transactions**
**Q1 - Q2 2010 Compared To Q1 - Q2 2011**

Attachment C

| VAR Transactions[a] | Q1 2010[b] | Q2 2010 | Q1 & Q2 2010 | Q1 2011[b] | Q2 2011 | Q1 & Q2 2011 | Change | % Change |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | H1 2010 to H2 2011 | |
| Revenues | $ 194.18 | $221.13 | $ 415.31 [1] | $ 219.79 | $256.25 | $ 476.04 [2] | $ 60.73 | 14.62% |
| *VAR transactions allegedly recognized too early - outs* | (9.70) | - | (9.70) [3] | (10.90) | (21.60) | (32.50) [3] | | |
| *VAR transactions allegedly recognized too early - ins* | 4.66 | 10.07 | 14.73 [3] | 8.32 | 10.69 | 19.01 [3] | | |
| *VAR transactions allegedly linked to payment to VAR* | (15.30) | - | (15.30) [3] | (12.50) | (7.00) | (19.50) [3] | | |
| Total Revenue Less VAR Adjustments | $ 173.84 | $231.20 | $ 405.04 | $ 204.71 | $238.34 | $ 443.05 | $ 38.01 | 9.38% |
| Total Cost of Revenues | 36.08 | 45.22 | 81.30 [1] | 39.23 | 48.49 | 87.73 [2] | | |
| Operating Expenses | 84.98 | 98.90 | 183.87 [1] | 95.94 | 124.80 | 220.74 [2] | | |
| Total Cost of Revenues and Operating Expenses | $ 121.05 | $144.12 | $ 265.17 | $ 135.17 | $173.30 | $ 308.47 | | |
| *Costs and Expenses Related to Alleged VAR Transactions* | (8.72) | - | (8.72) [3] | (11.64) | (8.20) | (19.84) [3] | | |
| Total Cost of Revenues and Operating Expenses Less VAR Adjustments | $ 112.33 | $144.12 | $ 256.45 | $ 123.53 | $165.10 | $ 288.63 | | |
| Profit from Operations | $ 73.13 | $ 77.01 | $ 150.14 [1] | $ 84.62 | $ 82.95 | $ 167.57 [2] | $ 17.43 | 11.61% |
| *% of Originally Reported Revenue* | | | 36.15% | | | 35.20% | | |
| Profit from Operations with Adjustments | $ 61.51 | $ 87.09 | $ 148.59 | $ 81.18 | $ 73.24 | $ 154.42 | $ 5.83 | 3.92% |
| *% of Adjusted Revenue* | | | 36.69% | | | 34.85% | | |

**Source(s):**
(1) Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2010, page 7.
(2) Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2011, pages 10-11.
(3) Summary of independent expert accounting opinions of Steven Brice, FCA, dated November 8, 2023, Table 2.8 and Appendix F.

**Note(s):**
(a) These amounts are only the part of the asserted adjustment that falls within the Subject Period.
(b) The Interim Results for 2010 and 2011 contain only Q2 and total Half Year values. Q1 is calculated as the difference between the Half Year and Q2 values.



**Attachment D**

United States of America v. Michael Richard Lynch and Stephen Keith Chamberlain
Sample of Representative Multi-Period Hosting Transactions
Comparison Of Annual Revenue Recognition Up-Front vs. Ratably
Sample Transactions From Brice Report Table 2.10

---

**Company A**

SW-09-013 Bank of America, NA - $9.2 million contract license amount, 60 month duration
SW-10-059 JP Morgan Chase Bank, N.A. - $8.7 million contract license amount, 60 month duration
SW-11-086 Deutsche Bank AG - $7.1 million contract license amount, 60 month duration

Revenue Recognition Method Selected:
License Revenue Recognized 100% Up Front

### Revenue

| Year | SW-09-013 Bank Of America, NA[1] | SW-10-059 JP Morgan Chase Bank, N.A.[2] | SW-11-086 Deutsche Bank AG[3] | Total | Year-Over-Year % Change | Years of Revenue |
|---|---|---|---|---|---|---|
| 2009 | $ 9,204,762 | $ - | $ - | $ 9,204,762 | | 1 |
| 2010 | - | 8,700,000 | - | 8,700,000 | -5.5% | 1 |
| 2011 | - | - | 7,100,000 | 7,100,000 | -18.4% | 1 |
| 2012 | - | - | - | - | -100.0% | 0 |
| 2013 | - | - | - | - | | 0 |
| 2014 | - | - | - | - | | 0 |
| 2015 | - | - | - | - | | 0 |
| 2016 | - | - | - | - | | 0 |
| Total | $ 9,204,762 | $ 8,700,000 | $ 7,100,000 | $ 25,004,762 | | 3 |
| Average | | | | $ 3,125,595 | -41.3% | |

### Cash Received

| Year | SW-09-013 Bank Of America, NA[1] | SW-10-059 JP Morgan Chase Bank, N.A.[2] | SW-11-086 Deutsche Bank AG[3] | Total | Year-Over-Year % Change | Years of Cash Received |
|---|---|---|---|---|---|---|
| 2009 | $ 9,204,762 | $ - | $ - | $ 9,204,762 | | 1 |
| 2010 | - | 8,700,000 | - | 8,700,000 | -5.5% | 1 |
| 2011 | - | - | 7,100,000 | 7,100,000 | -18.4% | 1 |
| 2012 | - | - | - | - | -100.0% | 0 |
| 2013 | - | - | - | - | | 0 |
| 2014 | - | - | - | - | | 0 |
| 2015 | - | - | - | - | | 0 |
| 2016 | - | - | - | - | | 0 |
| Total | $ 9,204,762 | $ 8,700,000 | $ 7,100,000 | $ 25,004,762 | | 3 |
| Average | | | | $ 3,125,595 | -41.3% | |

### Profit Contribution At 87% Gross Profit Margin[4](a)  87.2%

| Year | SW-09-013 Bank Of America, NA[1] | SW-10-059 JP Morgan Chase Bank, N.A.[2] | SW-11-086 Deutsche Bank AG[3] | Total | Year-Over-Year % Change | Years of Profit Contribution |
|---|---|---|---|---|---|---|
| 2009 | $ 8,025,430 | $ - | $ - | $ 8,025,430 | | 1 |
| 2010 | - | 7,585,339 | - | 7,585,339 | -5.5% | 1 |
| 2011 | - | - | 6,190,334 | 6,190,334 | -18.4% | 1 |
| 2012 | - | - | - | - | -100.0% | 0 |
| 2013 | - | - | - | - | | 0 |
| 2014 | - | - | - | - | | 0 |
| 2015 | - | - | - | - | | 0 |
| 2016 | - | - | - | - | | 0 |
| Total | $ 8,025,430 | $ 7,585,339 | $ 6,190,334 | $ 21,801,103 | | 3 |
| Average | | | | $ 2,725,138 | -41.3% | |

---

**Company B**

SW-09-013 Bank of America, NA - $9.2 million contract license amount, 60 month duration
SW-10-059 JP Morgan Chase Bank, N.A. - $8.7 million contract license amount, 60 month duration
SW-11-086 Deutsche Bank AG - $7.1 million contract license amount, 60 month duration

Revenue Recognition Method Selected:
License Revenue Recognized Ratably on Straight-Line Bases Over Contract Duration

### Revenue

| Year | SW-09-013 Bank Of America, NA[1] | SW-10-059 JP Morgan Chase Bank, N.A.[2] | SW-11-086 Deutsche Bank AG[3] | Total | Year-Over-Year % Change | Years of Revenue |
|---|---|---|---|---|---|---|
| 2009 | $ 1,380,714 | $ - | $ - | $ 1,380,714 | | 1 |
| 2010 | 1,840,952 | 870,000 | - | 2,710,952 | 96.3% | 1 |
| 2011 | 1,840,952 | 1,740,000 | 1,065,000 | 4,645,952 | 71.4% | 1 |
| 2012 | 1,840,952 | 1,740,000 | 1,420,000 | 5,000,952 | 7.6% | 1 |
| 2013 | 1,840,952 | 1,740,000 | 1,420,000 | 5,000,952 | | 1 |
| 2014 | 460,238 | 1,740,000 | 1,420,000 | 3,620,238 | | 1 |
| 2015 | - | 870,000 | 1,420,000 | 2,290,000 | | 1 |
| 2016 | - | - | 355,000 | 355,000 | | 1 |
| Total | $ 9,204,762 | $ 8,700,000 | $ 7,100,000 | $ 25,004,762 | | 8 |
| Average | | | | $ 3,125,595 | 58.5% | |

### Cash Received

| Year | SW-09-013 Bank Of America, NA[1] | SW-10-059 JP Morgan Chase Bank, N.A.[2] | SW-11-086 Deutsche Bank AG[3] | Total | Year-Over-Year % Change | Years of Cash Received |
|---|---|---|---|---|---|---|
| 2009 | $ 9,204,762 | $ - | $ - | $ 9,204,762 | | 1 |
| 2010 | - | 8,700,000 | - | 8,700,000 | -5.5% | 1 |
| 2011 | - | - | 7,100,000 | 7,100,000 | -18.4% | 1 |
| 2012 | - | - | - | - | -100.0% | 0 |
| 2013 | - | - | - | - | | 0 |
| 2014 | - | - | - | - | | 0 |
| 2015 | - | - | - | - | | 0 |
| 2016 | - | - | - | - | | 0 |
| Total | $ 9,204,762 | $ 8,700,000 | $ 7,100,000 | $ 25,004,762 | | 3 |
| Average | | | | $ 3,125,595 | -41.3% | |

### Profit Contribution At 87% Gross Profit Margin[4](a)  87.2%

| Year | SW-09-013 Bank Of America, NA[1] | SW-10-059 JP Morgan Chase Bank, N.A.[2] | SW-11-086 Deutsche Bank AG[3] | Total | Year-Over-Year % Change | Years of Profit Contribution |
|---|---|---|---|---|---|---|
| 2009 | $ 1,203,814 | $ - | $ - | $ 1,203,814 | | 1 |
| 2010 | 1,605,086 | 758,534 | - | 2,363,620 | 96.3% | 1 |
| 2011 | 1,605,086 | 1,517,068 | 928,550 | 4,050,704 | 71.4% | 1 |
| 2012 | 1,605,086 | 1,517,068 | 1,238,067 | 4,360,221 | 7.6% | 1 |
| 2013 | 1,605,086 | 1,517,068 | 1,238,067 | 4,360,221 | | 1 |
| 2014 | 401,271 | 1,517,068 | 1,238,067 | 3,156,406 | | 1 |
| 2015 | - | 758,534 | 1,238,067 | 1,996,601 | | 1 |
| 2016 | - | - | 309,517 | 309,517 | | 1 |
| Total | $ 8,025,430 | $ 7,585,339 | $ 6,190,334 | $ 21,801,103 | | 8 |
| Average | | | | $ 2,725,138 | 58.5% | |

---

**Observations: Company A vs. Company B**

**Company B Revenue** — Company B Year-Over-Year % Change During First 3 Years
- Total revenue: same — Greater
- Average revenue per year: same — Greater on Average
- Number of years with revenue: more
- Number of years with no revenue: less (none)

**Company B Cash** — Company B Year-Over-Year % Change During First 3 Years
- Total cash received: same — Same
- Average cash received per year: same — Same on Average
- Number of years with cash received: same
- Number of years with no cash received: same

**Company B Profit Contribution** — Company B Year-Over-Year % Change During First 3 Years
- Total profit: same — Greater
- Average profit per year: same — Greater on Average
- Number of years with profit contribution: more
- Number of years with no profit contribution: less (none)

---

Source(s):
(1) Summary of independent expert accounting opinions of Steven Brice, FCA, dated November 8, 2023, Appendix F: SW-09-013 Bank of America, NA (Bank of America).pdf.
(2) Summary of independent expert accounting opinions of Steven Brice, FCA, dated November 8, 2023, Appendix F: SW-10-059 J P Morgan Chase Bank, N.A. (JPMC).pdf.
(3) Summary of independent expert accounting opinions of Steven Brice, FCA, dated November 8, 2023, Appendix F: SW-11-086 Deutsche Bank AG (DB Restructure).pdf.
(4) Autonomy Corporation plc Annual Report and Accounts for the year ended 31 December 2010, page 16 and 45.

Note:
(a) The gross profit margin is based on the gross profit as reported in Autonomy's 2010 annual report [($701,573,000 + $57,280,000) / $870,366,000 = 87%].

United States of America v. Michael Richard Lynch and Stephen Keith Chamberlain
Multi-Period Hosting Transactions
Revenues As Adjusted

Attachment E





| Earned Revenue | Q1 2010 | Q2 2010 | Q1 & Q2 2010 | Q1 2011 | Q2 2011 | Q1 & Q2 2011 | Yr-Over-Yr % Change |
|---|---|---|---|---|---|---|---|
| As Reported | $ 8,915,000 | $ 29,249,000 | $ 38,164,000 | $ 14,162,180 | $ 17,465,698 | $ 31,627,878 | -17.1% |
| As Adjusted | $ 1,321,705 | $ 1,878,893 | $ 3,200,598 | $ 4,819,898 | $ 5,670,766 | $ 10,490,663 | 227.8% |
| Deferred Revenue | $ (7,593,295) | $ (27,370,107) | $ (34,963,402) | $ (9,342,282) | $ (11,794,932) | $ (21,137,215) | |

United States of America v. Michael Richard Lynch and Stephen Keith Chamberlain
Adjustments for Multi-Period Hosting Transactions
Q1 - Q2 2010 Compared To Q1 - Q2 2011

Attachment F



| Multi-Period Hosting Transactions | Q1 2010[a] | Q2 2010 | Q1 & Q2 2010 | | Q1 2011[a] | Q2 2011 | Q1 & Q2 2011 | | Change | % Change |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | H1 2010 to H2 2011 | |
| Revenues | $ 194.18 | $ 221.13 | $ 415.31 (1) | | $ 219.79 | $ 256.25 | $ 476.04 (2) | | $ 60.73 | 14.62% |
| *Multi-Period Hosting Revenue Recognized Too Early - Net* | (7.59) | (27.37) | (34.96) (3) | [A] | (9.34) | (11.79) | (21.14) (3) | [A] | | |
| Total Revenue less Hosting Adjustments | $ 186.59 | $ 193.76 | $ 380.35 | | $ 210.45 | $ 244.46 | $ 454.90 | | $ 74.56 | 19.60% |
| | | | | | | | | | | |
| Total Cost of Revenues | 36.08 | 45.22 | 81.30 (1) | | 39.23 | 48.49 | 87.73 (2) | | | |
| | | | | | | | | | | |
| Operating Expenses | 84.98 | 98.90 | 183.87 (1) | | 95.94 | 124.80 | 220.74 (2) | | | |
| | | | | | | | | | | |
| Total Cost of Revenues and Operating Expenses | $ 121.05 | $ 144.12 | $ 265.17 (1) | | $ 135.17 | $ 173.30 | $ 308.47 | | | |
| *Costs and Expenses Related to Multi-Period Hosting Transactions* | (0.97) | (3.51) | (4.48) (b) | [B = A * (1 - 87%)] | (1.20) | (1.51) | (2.71) (b) | [B = A * (1 - 87%)] | | |
| Total Cost of Revenues and Operating Expenses Less Hosting Adjustments | $ 120.08 | $ 140.61 | $ 260.69 | | $ 133.97 | $ 171.79 | $ 305.76 | | | |
| | | | | | | | | | | |
| Profit from Operations | $ 73.13 | $ 77.01 | $ 150.14 (1) | [C] | $ 84.62 | $ 82.95 | $ 167.57 (2) | [C] | $ 17.43 | 11.61% |
| *% of Corresponding Revenue* | | | 36.15% | | | | 35.20% | | | |
| Profit from Operations with Adjustments | $ 66.51 | $ 53.15 | $ 119.66 | [D] | $ 76.47 | $ 72.67 | $ 149.14 | [D] | $ 29.49 | 24.64% |
| *% of Corresponding Revenue* | | | 31.46% | | | | 32.79% | | | |
| | | | | | | | | | | |
| Change In Profit From Operations | | | $ (30.48) | [E = D - C] | | | $ (18.43) | [E = D - C] | | |
| Income Tax[4][5] | | | (7.62) (c) | [F = E * 25%] | | | (4.79) (d) | [F = E * 26%] | | |
| Impact to Cash Flow Net of Income Tax | | | $ (22.86) | [G = E - F] | | | $ (13.64) | [G = E - F] | | |
| | | | | | | | | | | |
| *Cash Flow Items* | | | | | | | | | | |
| Impact Net of Income Tax | | | $ (22.86) | [H = G] | | | $ (13.64) | [H = G] | | |
| Increase in Deferred (Unearned) Revenue Liability | | | 34.96 | [I = -A] | | | 21.14 | [I = -A] | | |
| Net Impact to Cash Flows of Selected Items All Else Equal | | | $ 12.10 | [J = H + I] | | | $ 7.50 | [J = H + I] | | |
| | | | | | | | | | | |
| **Reported Cash Flow from Operations** | | | $ 190.80 (1) | [K] | | | $ 192.50 | [K] | | |
| *% Increase to Cash Flow from Operations* | | | 6.3% | [L = J / K] | | | 3.9% | [L = J / K] | | |

Source(s):
(1) Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2010, page 7.
(2) Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2011, pages 10-11.
(3) Summary of independent expert accounting opinions of Steven Brice, FCA, dated November 8, 2023, Table 2.10 and Appendix F.
(4) Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2010, page 4.
(5) Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2011, page 5.

Note(s):
(a) The Interim Results for 2010 and 2011 contain only Q2 and total Half Year values. Q1 is calculated as the difference between the Half Year and Q2 values.
(b) The gross profit margin is based on the gross profit as reported in Autonomy's 2010 annual report [($701,573,000 + $57,280,000) / $870,366,000 = 87%].
(c) From "Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2010", page 4: "The full year effective tax rate for 2010 is 25%". $(30.48) * 25% = $(7.62).
(d) From "Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2011", page 5: "The full year effective tax rate for 2011 is currently forecast at 26%". $(18.43) * 26% = $(4.79).



**United States of America v. Michael Richard Lynch and Stephen Keith Chamberlain**
**Adjustments for Hardware, Linked, VAR, and Multi-Period Hosting Transactions**
**Q1 - Q2 2010 Compared To Q1 - Q2 2011**

Attachment G

| All Adjustments | Q1 2010[a] | Q2 2010 | Q1 & Q2 2010 | | | Q1 2011[a] | Q2 2011 | Q1 & Q2 2011 | | H1 2010 to H2 2011 Change | % Change |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | $ 194.18 | $221.13 | $ 415.31 | [1] | | $ 219.79 | $ 256.25 | $ 476.04 | [2] | $ 60.73 | 14.62% |
| Multi Period Hosting Revenue Recognized Too Early - Net | (7.59) | (27.37) | (34.96) | [3] | [A] | (9.34) | (11.79) | (21.14) | [3] [A] | | |
| VAR transactions allegedly recognized too early - outs | (9.70) | - | (9.70) | [4] | | (10.90) | (21.60) | (32.50) | [4] | | |
| VAR transactions allegedly recognized too early - ins | 4.66 | 10.07 | 14.73 | [4] | | 8.32 | 10.69 | 19.01 | [4] | | |
| VAR transactions linked to payment to VAR | (15.30) | - | (15.30) | [4] | | (12.50) | (7.00) | (19.50) | [4] | | |
| Hardware Adjustment | (11.84) | (31.06) | (42.90) | [5] | | (20.09) | (20.85) | (40.94) | [5] | | |
| Linked Transaction Adjustments | (8.50) | - | (8.50) | [6] | | (6.45) | - | (6.45) | [7] | | |
| Total Revenue Less Adjustments | $ 145.90 | $172.77 | $ 318.68 | | | $ 168.83 | $ 205.70 | $ 374.53 | | $ 55.85 | 17.53% |
| | | | | | | | | | | | |
| Total Cost of Revenues | 36.08 | 45.22 | 81.30 | [1] | | 39.23 | 48.49 | 87.73 | [2] | | |
| | | | | | | | | | | | |
| Operating Expenses | 84.98 | 98.90 | 183.87 | [1] | | 95.94 | 124.80 | 220.74 | [2] | | |
| | | | | | | | | | | | |
| Total Cost of Revenues and Operating Expenses | $ 121.05 | $144.12 | $ 265.17 | | | $ 135.17 | $ 173.30 | $ 308.47 | | | |
| Costs and Expenses Related to Multi Period Hosting Revenues | (0.97) | (3.51) | (4.48) | [8](b) | [B = A * (1 - 87%)] | (1.20) | (1.51) | (2.71) | [8](b) [B = A * (1 - 87%)] | | |
| Costs and Expenses Related to Alleged Var Revenues | (8.72) | - | (8.72) | [4] | | (11.64) | (8.20) | (19.84) | [4] | | |
| Costs and Expenses Related to Alleged Hardware Revenues | (13.21) | (34.66) | (47.87) | [5] | | (21.53) | (23.39) | (44.92) | [5] | | |
| Costs and Expenses Related to Alleged Linked Transactions | - | (11.52) | (11.52) | [6] | | (7.01) | - | (7.01) | [7](9)(c) | | |
| Total Cost of Revenues and Operating Expenses Less Adjustments | $ 98.15 | $ 94.43 | $ 192.58 | | | $ 93.79 | $ 140.19 | $ 233.98 | | | |
| | | | | | | | | | | | |
| Profit from Operations | $ 73.13 | $ 77.01 | $ 150.14 | [1] | [C] | $ 84.62 | $ 82.95 | $ 167.57 | [2] [C] | $ 17.43 | 11.61% |
| % of Corresponding Revenue | | | 36.15% | | | | | 35.20% | | | |
| Profit from Operations with Adjustments | $ 47.75 | $ 78.34 | $ 126.10 | | [D] | $ 75.04 | $ 65.50 | $ 140.54 | [D] | $ 14.45 | 11.46% |
| % of Corresponding Revenue | | | 39.57% | | | | | 37.53% | | | |
| | | | | | | | | | | | |
| Change In Profit From Operations | | | $ (24.04) | | [E = D - C] | | | $ (27.03) | [E = D - C] | | |
| Income Tax[10](11) | | | (6.01) | (d) | [F = E * 25%] | | | (7.03) | (e) [F = E * 26%] | | |
| Impact to Cash Flow Net of Income Tax | | | $ (18.03) | | [G = E - F] | | | $ (20.00) | [G = E - F] | | |
| | | | | | | | | | | | |
| *Cash Flow Items* | | | | | | | | | | | |
| Impact Net of Income Tax | | | $ (18.03) | | [H = G] | | | $ (20.00) | [H = G] | | |
| Increase in Deferred (Unearned) Revenue Liability | | | 34.96 | | [I = -A] | | | 21.14 | [I = -A] | | |
| Net Impact to Cash Flows of Selected Items All Else Equal | | | $ 16.93 | | [J = H + I] | | | $ 1.14 | [J = H + I] | | |
| | | | | | | | | | | | |
| Reported Cash Flow from Operations | | | $ 190.80 | [1] | [K] | | | $ 192.50 | [1] [K] | | |
| % Increase to Cash Flow from Operations | | | 8.9% | | [L = J / K] | | | 0.6% | [L = J / K] | | |

Source(s):
(1) Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2010, page 7.
(2) Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2011, pages 10-11.
(3) Summary of independent expert accounting opinions of Steven Brice, FCA, dated November 8, 2023, Table 2.10 and Appendix F.
(4) Summary of independent expert accounting opinions of Steven Brice, FCA, dated November 8, 2023, Table 2.8 and Appendix F.
(5) United States' Voluntary Bill of Particulars, dated October 8, 2023, "Summary of Revenue Adjustments (Detailed) - 2009 To October 2011".
(6) Summary of independent expert accounting opinions of Steven Brice, FCA, dated November 8, 2023, Appendix F: SW-10-049 FileTek, Inc (FileTek).pdf, page 1-2.
(7) Summary of independent expert accounting opinions of Steven Brice, FCA, dated November 8, 2023, Appendix F: SW-11-084 Tottenham Hotspur Plc (Tottenham).pdf, page 1, 3.
(8) Autonomy Corporation plc Annual Report and Accounts for the year ended 31 December 2010, page 16 and 45.
(9) Capital IQ Historical GBPUSD Exchange Rate March 2011.
(10) Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2010, page 4.
(11) Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2011, page 5.

Note(s):
(a) The Interim Results for 2010 and 2011 contain only Q2 and total Half Year values. Q1 is calculated as the difference between the Half Year and Q2 values.
(b) The gross profit margin is based on the gross profit as reported in Autonomy's 2010 annual report [($701,573,000 + $57,280,000) / $870,366,000 = 87%].
(c) £4,370,000 at the Historical Exchange Rate on March 31, 2011 of £0.62305 GBP/USD = $7,013,883.32.
(d) From "Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2010", page 4: "The full year effective tax rate for 2010 is 25%". $(24.04) * 25% = $(6.01).
(e) From "Autonomy Corporation PLC Announces Interim Results For The Six Months Ended June 30 2011", page 5: "The full year effective tax rate for 2011 is currently forecast at 26%". $(27.03) * 26% = $(7.03).