1   PATRICK D. ROBBINS (CABN 152288)
    Attorney for the United States
2   Acting Under Authority Conferred by 28 U.S.C. § 515

3   MARTHA BOERSCH (CABN 126569)
    Chief, Criminal Division
4
    ROBERT S. LEACH (CABN 196191)
5   ADAM A. REEVES (NYBN 2363877)
    KRISTINA N. GREEN (NYBN 5226204)
6   ZACHARY G.F. ABRAHAMSON (CABN 310951)
    Assistant United States Attorneys
7
          450 Golden Gate Avenue, Box 36055
8         San Francisco, California 94102-3495
          Telephone: (415) 436-7014
9         Fax: (415) 436-7234
          Email: Robert.Leach@usdoj.gov
10
    Attorneys for United States of America
11
                        UNITED STATES DISTRICT COURT
12
                      NORTHERN DISTRICT OF CALIFORNIA
13
                           SAN FRANCISCO DIVISION
14

15   UNITED STATES OF AMERICA,              )  CASE NO. 3:18-cr-00577-CRB
                                            )
16        Plaintiff,                        )
                                            )  UNITED STATES' OPPOSITION TO
17        v.                                )  DEFENDANT CHAMBERLAIN'S MOTION *IN*
                                            )  *LIMINE* RE: LYNCH'S PRIOR STATEMENTS
18   MICHAEL RICHARD LYNCH AND              )  AND THE CONFRONTATION CLAUSE
     STEPHEN KEITH CHAMBERLAIN,             )
19                                          )  Pretrial Conference: February 21, 2024, 2 p.m.
          Defendants.                       )  Trial Date: March 18, 2024
20   _____)

21

22                              **INTRODUCTION**

23        The odds of a true *Bruton* problem here are low: Mike Lynch appears to have avoided "facially

24   incriminating" Stephen Chamberlain during his civil testimony in the United Kingdom.  The Court may

25   therefore address any potential Confrontation Clause issues through instructions limiting the jury's

26   consideration of Lynch's past statements.  The government will provide notice of those statements

27   sufficiently in advance of their introduction to permit the parties and Court to determine whether such

28   instructions are necessary.  Exclusion of Lynch's prior statements would be unjustified, and a 30-day

1  pretrial designation deadline is unreasonable in view of upcoming pretrial deadlines and the notice that

2  the government intends to provide.  Chamberlain's request for designations by February 18 or

3  alternatively exclusion should be denied.

4

5  **I.      FACTUAL BACKGROUND**

6        The facts relevant to this motion are straightforward: Defendant Lynch testified at the UK civil

7  fraud trial over the course of 21 days.  That testimony spans a few thousand pages of reported question-

8  and-answer spanning the topics at issue in Hewlett-Packard's ("HP") litigation, including for example

9  Autonomy's products, accounting practices, hardware resales, use of value-added resellers, and ultimate

10  acquisition by HP.

11        Defendant Chamberlain's name appears in the transcript of Lynch's testimony about 400 times.

12  But many of those appearances are simply acknowledgments of the fact that Chamberlain sent or

13  received a certain document, followed by the document's contents.  *See*, *e.g.*, Declaration of Zachary

14  G.F. Abrahamson in Support of United States' Opposition to Defendant Chamberlain's Motion *in*

15  *Limine* re: Lynch's Prior Statements and the Confrontation Clause (hereinafter "Abrahamson Decl."),

16  Decl., Ex A at 6 (*ACL Netherlands BV v. Lynch* Trial Tr., July 2, 2019 at 159:9-160:20) (noting

17  Chamberlain's authorship of an April 8, 2010 e-mail and reviewing its contents), and at 9 (July 3, 2019

18  at 125:4-17) (noting that Lee Welham sent an e-mail to Hussain, copying Chamberlain).  Elsewhere,

19  Chamberlain's name appears in the transcript as prefatory material.  For example, HP's lawyers read

20  Lynch a July 2009 e-mail from Phil Smolek about the reseller Capax that also sought "CEO

21  authorisation per *Steve Chamberlain*."  *Id*. at 10 (July 8, 2019 at 88:24-89:22).  (The subsequent line of

22  questioning had nothing to do with Chamberlain himself.)  Lynch does comment on actions that

23  Chamberlain took or statements that he made, but—as explained further below—those comments

24  generally exculpate Chamberlain.

25        //

26        //

27        //

28

U.S. OPP. TO CHAMBERLAIN MIL RE
LYNCH STATEMENTS AND CONFR. CLAUSE  2

1

## II.    ARGUMENT

### a.  Defendant Chamberlain overstates the risk of a Confrontation Clause violation here.

A *Bruton* problem is not a given each time two co-defendants are jointly tried.  As the Supreme Court recently observed in *Samia v. United States*, 599 U.S. 635, 639 (2023), "when prosecutors seek to introduce a nontestifying defendant's confession implicating his codefendants, a constitutional concern *may* arise." (emphasis added).  That's because "[o]rdinarily, a witness whose testimony is introduced at a joint trial *is not considered to be a witness 'against' a defendant if the jury is instructed* to consider that testimony only against a codefendant." *Samia*, 599 U.S. at 649-50 (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)) (emphasis added).[1]  *Bruton* represents a "narrow exception to that principle," *Samia*, 599 U.S. at 650, applicable to confessions that "directly implicate a defendant." *Id*. at 652; *see also Richardson*, 481 U.S. at 207 (describing *Bruton* as excepting "the facially incriminating confession of a nontestifying codefendant").  For a confession that "[is] not incriminating on its face, and [becomes] so only when linked with evidence introduced later at trial," *Richardson*, 481 U.S. at 208, proper limiting instructions avoid a Confrontation Clause violation.  *Samia*, 599 U.S. at 652 (2023).

Perhaps because trials of fraud conspiracies inevitably involve asynchronous events, multiple witnesses, and interdependent motives, Confrontation Clause issues are frequently resolved by instruction in white collar settings.  *See*, *e.g.*, *United States v. Johnson*, 297 F.3d 845, 852 (9th Cir. 2002) (in multidefendant conspiracy trial for wire fraud, district court properly refused to sever trial where one co-defendant's out-of-court confessions did not "involve[g] a confession of guilt implicating [another co-defendant]" and limiting instructions issued), *United States v. Olano*, 62 F.3d 1180, 1186 (9th Cir. 1995) (in multidefendant conspiracy trial for bank fraud, district court properly refused to sever where co-defendants' prior testimony "did not have a sufficiently 'devastating' or 'powerful' inculpatory impact to be incriminatory on its face").  As explained further below, it is likely that the Lynch statements at issue here will be appropriate subjects for limiting instructions.

---

[1] This result, *Samia* noted, flowed from the "almost invariable assumption of the law that jurors follow their instructions." *Samia*, 599 U.S. at 650 (quoting *Richardson*, 481 U.S. at 206).

**b. The Posture and Contents of Lynch's Civil Testimony Suggest that a Confrontation Clause Violation is Unlikely Here.**

Measured against the standards above, a Confrontation Clause violation is unlikely here. Lynch's UK testimony was hardly an exercise in finger-pointing. Instead, Lynch spent most of his time on the stand putting forth his own exculpatory version of events and quibbling with the framing of questions posed by HP. Critically for purposes of this motion, that resistance extended to matters involving Chamberlain. For example, when questioned about an e-mail from Chamberlain about the accounting treatment of hardware sales, Lynch pushed back against the inference that Chamberlain sought to mischaracterize them:

> Q: What Mr Chamberlain proposed should be said by EMC involved treating only $20 million as the cost of goods sold, with 11 million being allocated as a sales and marketing expense, correct? That's what it says there?
>
> [Lynch]: I see the line that says $11m commission for resale and marketing fee, if that's what you're referring to.
>
> Q: What Mr Chamberlain had in mind was that if some of these costs could be treated as a sales and marketing expense, then the transaction (a) would not look like it was a loss-making transaction and (b) it would therefore have less of an impact on gross profit than would be the case if all the costs were simply treated as cost of goods sold; correct?
>
> [Lynch]: I can't see the front part of your email, but I don't see why this would make it look like it wasn't loss-making.

Abrahamson Decl., Ex. A at 3 (July 1, 2019, at 189:2-18).

Later, HP's lawyers walked Lynch through a Chamberlain e-mail that tried to juice Autonomy's marketing expenses attributable to EMC. HP's lawyers then asked Lynch to admit that Autonomy (through Chamberlain) "was trying . . . to maximise the amounts that could be allocated to sales and marketing[.]" *Id*. at 3 (July 1, 2019 at 192:3-15). Again, Lynch pushed back: "[Lynch]: No, I think [Autonomy] was trying to get the right accounting." *Id.* This back-and-forth continued, with Lynch ultimately offering his view that "at this time . . . a combination of Mr Chamberlain, Mr Sullivan, EMC and ultimately Deloitte are trying to get the right answer." *Id*. at 3-4 (July 1, 2019 at 192:23-193:5).[2]

---

[2] The transcript of Lynch's UK trial testimony is replete with such dodges. At one point, HP's lawyer asked Lynch about a Chamberlain e-mail regarding significant hardware revenue in the second quarter of 2010 where Chamberlain wrote, "Disaster." Lynch's response: "I don't know what Mr

U.S. OPP. TO CHAMBERLAIN MIL RE
LYNCH STATEMENTS AND CONFR. CLAUSE  4

Self-serving assertions like these are not the inculpating confessions that *Bruton* fears.

Even where Lynch appears to distance himself from Chamberlain's conspiratorial conduct, Lynch declines to adopt an inculpating frame of that conduct. For example, HP's lawyers asked Lynch about a Chamberlain e-mail forwarded by Brent Hogenson wherein Chamberlain suggested that the reseller Capax would pay Autonomy only after Capax itself got paid. Asked if he "bother[ed] to contact Mr Chamberlain," Lynch said simply that he "did not investigate the fact basis of this letter; that was not what I was asked to do." *Id.* at 14 (July 10, 2019 at 31:22-32:11).

Other descriptions of Chamberlain's role at Autonomy stop far short of a "facially incriminating" confession implicating Chamberlain in fraud. For example, asked to identify who told Lynch that EMC planned to invest certain Autonomy discounts, Lynch said, "I don't remember specifically who it was, but I would expect it to be a combination of Dr Menell, Mr Hussain, Mr Chamberlain, those sort of people." *Id.* at 5 (July 2, 2019 at 39:21-40:1). Later, in discussion of whether Autonomy's auditors at Deloitte could fairly be characterized in 2011 as "independent," Lynch affirmed that "one of Mr Kanter, Mr Hussain or Mr Chamberlain" would have approved a final letter to the UK's Financial Reporting Review Panel. *See id.* at 15 (July 11, 2019 at 17:4-10). And in the midst of an exchange about the reseller FileTek, Lynch agreed that "Mr Chamberlain, Mr Egan, Mr Hussain and Mr Scott [were] all aware by [February 2011] that FileTek [was] overdue on its debt of $10 million." *Id.* at 16 (July 15, 2019 at 151:24-152:9). These fragmented references to Chamberlain's role in certain events are inculpating—if at all—"only when linked with evidence introduced later at trial." *Richardson*, 481 U.S. at 208. They are therefore properly addressed through limiting instructions.

As for Lynch's testimony about e-mails that Chamberlain's sent, Lynch's responses often add little beyond Chamberlain's own words—which will come into this trial as party admissions or through

---

Hussain and Mr Chamberlain are discussing." Abrahamson Decl., Ex. A at 7 (July 3, 2019 at 60:16-22). Later, asked if a reference to Arcpliance sales that Chamberlain suggested in an Autonomy release was "misleading," Lynch said, "I don't think it's a misleading statement. It might not be the best one and Deloitte and Mr Chamberlain worked on it." *Id.* at 8 (July 3, 2019 at 121:20-122:19). At one point, HP's lawyers asked Lynch about notes made by Chamberlain that suggested that Chamberlain viewed a transaction with Capax as "circular." Lynch disagreed, testifying that "you'll find throughout the correspondence among the accountants that they will talk about things being . . . circular, but what they are meaning is they have a set of processes they have to do for them." *Id.* at 12-13 (July 8, 2019 at 108:19-109:10).

another hearsay exclusion.  For example, during questioning about a reciprocal transaction involving VMS, HP's lawyer asked Lynch about an e-mail where Chamberlain wrote that "[t]he tricky bit on this from a rev[enue] rec[ognition] perspective will be demonstrating fair value."  Abrahamson Decl., Ex. A at 17-18 (July 16, 2019 at 24:13-25:8).  HP's lawyer then asked Lynch the uncontroversial follow-up: "Mr Chamberlain's concern from a revenue recognition point is demonstrating that the transactions are being carried out at fair value, correct?"  Lynch answered, "That's correct," and the questioning moved on.  *Id*.

The fact that Lynch's transcript contains few "gotcha" moments for Chamberlain should surprise no one: At the time of the UK trial, Lynch was well-represented by at least seven lawyers who doubtless prepared him extensively for the testimony he offered.  The point of that testimony was to exonerate Lynch—and, by association, the Autonomy agents who reported to him.  Plus, at the time of the UK trial in the summer of 2019, Lynch and Chamberlain had *already been indicted* on the conspiracy charges here.  So Lynch's team knew that testimony at the London civil trial could create admissions against him at the later California criminal trial—a trial wherein the government would claim that he and Chamberlain conspired.  Against that backdrop, offering "facially incriminating" statements about Chamberlain during Lynch's civil testimony would seem an unlikely strategy.

### c.  In view of the unlikelihood of significant Confrontation Clause risks, Chamberlain's request for a 30-day designation deadline is unreasonable.

In view of the authorities and the record set forth above, the government submits that demanding designations 30 days in advance of trial is unreasonable.  The government has complied with its *Brady* and Rule 16 obligations and will continue to do so, including by providing sufficient advance notice of statements from Lynch's civil testimony that the government intends to admit.  Realistically, the government will not introduce such statements until—at the earliest—the last week of March.  (April is more likely.)  Moreover, the analytical exercise of reviewing Lynch's statements to determine if they merit limiting instructions will not be unduly burdensome.  The Court should therefore reject Chamberlain's request for a February 18 designation deadline.

//

//

**III.    CONCLUSION**

The Court should deny Chamberlain's motion to preclude admission of evidence in violation of the Confrontation Clause.


DATED:  January 31, 2024                                    PATRICK D. ROBBINS
                                                           Attorney for the United States Attorney
                                                           Acting Under Authority Conferrred by
                                                           28 U.S.C. § 515


                                         By:  _____/s/ Zack Abrahamson_____
                                                  ROBERT S. LEACH
                                                  ADAM A. REEVES
                                                  KRISTINA N. GREEN
                                                  ZACHARY G.F. ABRAHAMSON
                                                  Assistant United States Attorneys