1  PATRICK D. ROBBINS (CABN 152288)
   Attorney for the United States
2  Acting Under Authority Conferred by 28 U.S.C. § 515

3  MARTHA BOERSCH (CABN 126569)
   Chief, Criminal Division
4
   ROBERT S. LEACH (CABN 196191)
5  ADAM A. REEVES (NYBN 2363877)
   KRISTINA N. GREEN (NYBN 5226204)
6  ZACHARY G.F. ABRAHAMSON (CABN 310951)
   Assistant United States Attorneys
7
       450 Golden Gate Avenue, Box 36055
8      San Francisco, California 94102-3495
       Telephone: (415) 436-7014
9      Fax: (415) 436-7234
       Email:  Robert.Leach@usdoj.gov
10
   Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 18-577 CRB |
| Plaintiff, | DECLARATION OF ZACHARY G.F. ABRAHAMSON IN SUPPORT OF THE UNITED STATES' OPPOSITION TO DEFENDANT CHAMBERLAIN'S MOTION *IN LIMINE* RE: LYNCH'S PRIOR STATEMENTS AND THE CONFRONTATION CLAUSE |
| v. | |
| MICHAEL RICHARD LYNCH and STEPHEN KEITH CHAMBERLAIN, | |
| Defendant. | Pretrial Conference: February 21, 2024<br>Trial Date: March 18, 2024 |

I, Zachary G.F. Abrahamson, declare as follows:

1. I am a Special Assistant United States Attorney with the United States Attorney's Office for the Northern District of California ("USAO"). I am assigned to the prosecution of the above-referenced case. I make this declaration in support of the United States' Opposition to Defendant Chamberlain's Motion *in Limine* to Preclude Admission of Evidence in Violation of Confrontation Clause.  The statements herein are based in part on personal knowledge and in part on information and belief from my review of documents in this matter and my

1  discussions with counsel for the government, law enforcement agents, and others.

2.  Attached hereto as Exhibit A are true, correct, and highlighted copies of excerpts from the testimony of Michael Lynch in *ACL Netherlands BV v. Lynch*, [2002] EWHC 1178 (Ch) (May 17, 2022), 2022 WL 01557021.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed this 31st day of January 2024.

_____/s/_____

ZACHARY G.F. ABRAHAMSON
Special Assistant U.S. Attorney

# EXHIBIT A



Autonomy Corporation Limited and Ors v Michael Richard Lynch and Anor

Day 39

June 27, 2019

Opus 2 International - Official Court Reporters

Phone: +44 (0)20 3008 5900
Email: transcripts@opus2.com
Website: https://www.opus2.com

Abrahamson Decl., Ex. A-002

HP-SEC-02935337

1   A.  That would be 5 million, yes.
2   Q.  What Mr Chamberlain proposed should be said by EMC
3       involved treating only $20 million as the cost of goods
4       sold, with 11 million being allocated as a sales and
5       marketing expense, correct?
6           That's what it says there?
7   A.  I see the line that says $11m commission for resale and
8       marketing fee, if that's what you're referring to.
9   Q.  What Mr Chamberlain had in mind was that if some of
10      these costs could be treated as a sales and marketing
11      expense, then the transaction (a) would not look like it
12      was a loss-making transaction and (b) it would therefore
13      have less of an impact on gross profit than would be the
14      case if all the costs were simply treated as cost of
15      goods sold; correct?
16  A.  I can't see the front part of your email, but I don't
17      see why this would make it look like it wasn't
18      loss-making.
19  Q.  Well, you would just show the cost of goods sold as
20      being 20 million, you would have sold it for 26 million;
21      that would look as if you'd made a profit of 6 million
22      on it?
23  A.  No, because you would have more costs -- you would still
24      have the costs in marketing as a cost of the
25      transaction, so it would still be a loss-making

189

1       transaction.
2   Q.  Now, to justify part of the expenditure as a sales and
3       marketing expense, it was important to be able to
4       demonstrate that the expenditure had been incurred in
5       furtherance of a marketing initiative, correct?
6   A.  I assume so, yes.
7   Q.  And it was that which you wished to be supported by
8       correspondence with EMC, correct?
9   A.  Well, I'm not involved in this, but I think
10      Mr Chamberlain would like something to support that
11      argument, yes, from reading it.
12  Q.  If you stay on {K3/39.1/1}, just above this, middle of
13      page 1, you can see that Mr Chamberlain's email is
14      forwarded to Mr Sullivan.  Mr Chamberlain says:
15          "[...] this is the sort of thing we need from EMC
16      for internal cost allocation."
17          Do you see that?
18  A.  Yes.
19  Q.  Then top of the page we see that Mr Sullivan responds to
20      Mr Chamberlain's wording, saying that he didn't think
21      EMC would be that specific on cost; do you see that, top
22      of the page?
23  A.  Yes.
24  Q.  He says that what should be sent to EMC is an email that
25      purports to identify what the cost split should be and

190

1       in particular a split between:
2           "1) EMC's product costs.
3           "2) EMC's markup to Autonomy which will include
4       their normal product markup, typically 25%, plus an
5       additional 20 to 25% all paid to EMC as marketing
6       incentive."
7           Yes?
8   A.  That's what it says, yes.
9   Q.  I'll just take you to one more document before we break.
10      If we can go to {K3/40/1}, you'll see Mr Chamberlain's
11      response.  You see his concern was that on the basis put
12      forward by Mr Sullivan, only 5 million could be
13      allocated as a sales and marketing expense but that by
14      a minor tweak that could be increased to 10 million;
15      yes?  The end part of that?  Do you see:
16          "The $5m of mark up would have to be classified as
17      [cost of goods sold] as it refers to normal mark up.
18      Have marked up the stuff below - which is good - with
19      a minor tweak that allows us to show $20m as [cost of
20      goods sold] and $10m of marketing."
21          Just looking at the bit below, you can see it's in
22      bold:
23          "EMC's mark up to Autonomy - typically 25% [...]"
24          So he's changed that figure.  And he's added a third
25      point, an additional 50% paid to EMC as marketing

191

1       incentive.  Do you see that?
2   A.  Yes, I see that.
3   Q.  I'm not sure the detail matters, but what it all
4       reflects, Dr Lynch, was a desire within Autonomy to
5       maximise the amount that could be allocated to sales and
6       marketing; yes?
7   A.  Well, I would say that what Autonomy was trying to do
8       was get the right accounting.
9   Q.  No.  What Autonomy was trying to do was to maximise the
10      amounts that could be allocated to sales and marketing;
11      correct?
12  A.  No, I think it was trying to get the right accounting.
13  Q.  What do you mean by "right accounting"?
14  A.  That the accounting is reflecting the reality of the
15      situation.
16  Q.  You're suggesting that this was the reality of the
17      situation, that Mr Chamberlain drafts an email with
18      a certain proposal, Mr Sullivan says "Well, I don't
19      think I can get that; this is the sort of email I'll
20      send then" and Mr Chamberlain then changes it so as to
21      get more going to sales and marketing than Mr Sullivan
22      had suggested was possible?
23  A.  What is happening at this time -- and I'm not involved
24      but I've seen the emails -- is that a combination of
25      Mr Chamberlain, Mr Sullivan, EMC and ultimately Deloitte

192

1  are trying to get the right answer. It is a complex
2  situation and lots of people are involved in that and
3  they work through it and they ultimately come up with an
4  answer that they're all agreed on and that's what I'm
5  relying on when I go forward.
6  Q.  I suggest to you that that is untrue and you know it's
7      untrue.
8  A.  Which part is untrue?
9  Q.  Everything you've just said is untrue.
10 A.  That a large number of people worked on this from
11     Deloitte, or that --
12 Q.  No. A large number of people were working on this, but
13     not to get to an answer which actually reflected the
14     arrangements. They were trying to get to an answer
15     which enabled Autonomy, you and Mr Hussain and
16     Mr Chamberlain, to account for this in the way that you
17     wanted to account for it, not in the way that it should
18     have been accounted?
19 A.  I have to disagree with you. I think Deloitte were
20     trying to get the right answer, I think Mr Chamberlain
21     was trying to get the right answer, I think Mr Hussain
22     was trying to get the right answer, and I don't believe
23     Deloitte would set out to get the wrong answer.
24 MR RABINOWITZ: I didn't say they would.
25     My Lord, that's a convenient time.

193

1  MR JUSTICE HILDYARD: Yes. Dr Lynch, we now break off until
2      10.30 tomorrow. You remember the warning I gave
3      previously.
4  (4.23 pm)
5                (The hearing adjourned until
6             Tuesday, 2 July 2019 at 10.30 am)

194

                              INDEX
DR MICHAEL LYNCH (continued) ........................1
    Cross-examination by MR RABINOWITZ ............1
(continued)

195

196

```
 1  A.  In many customer cases, they were buying hardware to run
 2      Autonomy software --
 3  Q.  Well, they may or may not have been; yes?
 4  A.  Well, they may not have been in other cases, yes,
 5      correct. But you asked me whether -- you gave me
 6      a definitive statement that none of it was used that way
 7      and I disagree with that.
 8  Q.  So to the extent that this gave the impression that
 9      Autonomy was selling hardware so that it would be used
10      with Autonomy software, that would not be right;
11      correct?
12  A.  It would be right in some circumstances and not correct
13      in other circumstances.
14  Q.  It's simply a case that it could be used, it may or may
15      not be used, yes?
16  A.  Once we sell the hardware to someone they own it. They
17      can do what they like with it and we can't control it,
18      and in fact if we did control it we would fall foul of
19      the IFRS rules because we would have managerial control.
20          And again, I just want to be clear, there's
21      certainly situations where the hardware was sold and it
22      was not to be used with Autonomy software. But there
23      were situations where the hardware was sold and it was
24      going to be used with Autonomy software. So there's
25      both cases.
                              37

 1  Q.  So when you saw this:
 2          "During Q3 2009 Autonomy has extended this
 3      relationship by entering into a number of additional
 4      transactions with EMC whereby Autonomy and EMC sell to
 5      existing Autonomy customers product which is
 6      subsequently used with Autonomy software."
 7          You didn't correct it to say "which may or may not
 8      be used with Autonomy software", you were happy for this
 9      to give the impression that the sale was so that it
10      could be used with Autonomy software?
11  A.  As I'm saying to you, I don't know, as I sit here, what
12      they actually did with the software. That may well be
13      correct. In the more general case, as we move through
14      time, especially later, then there are sales there that
15      I do know for definite were not intended to be used with
16      Autonomy software.
17  Q.  Let's look at the next paragraph. This says that the
18      transactions described above:
19          "[...] represent the commencement of a significant
20      new partnership between EMC and Autonomy to develop EMC
21      data cells such that they are readily compatible with
22      Autonomy software and in particular the Digital Safe."
23          In fact we saw the arrangement was a straightforward
24      purchase of hardware from EMC for resale to customers,
25      correct?
                              38

 1  A.  Well, again, I disagree with that. The form for
 2      actually shipping the hardware may well have been that
 3      contract which you showed me, but that's not the reality
 4      of what was going on at the time.
 5  Q.  Look at the next paragraph. We have this:
 6          "In recognition of the investment that EMC need to
 7      make to ensure marketing focus and further development
 8      of the cells, Autonomy has paid a premium to EMC."
 9          EMC had not agreed to make any investment, had it?
10  A.  My understanding was that it had, yes. I don't know any
11      particular numbers, but the principle was what was
12      agreed, yes.
13  Q.  What was the basis of your understanding?
14  A.  What I was being told by Mr Sullivan -- indirectly,
15      I didn't talk to Mr Sullivan directly.
16  Q.  Being told by him indirectly. What do you mean by that?
17  A.  That was the information that is being fed up --
18  Q.  By whom to you?
19  A.  From Mr Sullivan to people in finance, talking to me and
20      to people like the technical people.
21  Q.  No, give me a name. Give me names. Who is it who told
22      you that Mr Sullivan had said that EMC were going to
23      make an investment with this money?
24  A.  I don't remember specifically who it was, but I would
25      expect it to be a combination of Dr Menell, Mr Hussain,
                              39

 1      Mr Chamberlain, those sort of people.
 2  Q.  The suggestion there that there had been any discussion
 3      between Autonomy and EMC about Autonomy paying a premium
 4      for these purposes, again that was untrue?
 5  A.  Well, that's not my knowledge of the situation.
 6  Q.  Look at the next paragraph. It says:
 7          "The purpose of the premium is to enable EMC to
 8      provide marketing dollars, encourage the EMC sales force
 9      to jointly sale, develop EMC cells and provide joint
10      marketing with Autonomy."
11          Again, Dr Lynch, completely untrue?
12  A.  Well, it's not, because that's what happened: EMC and
13      Autonomy ended up doing joint marketing.
14  Q.  When do you say that happened?
15  A.  Well, for example, I know there was a joint marketing
16      meeting at JPMC.
17  Q.  When do you say that happened?
18  A.  I believe that that's somewhere around this period.
19      I don't know the date without looking it up.
20  Q.  You are suggesting that Autonomy paid a premium to EMC
21      so that EMC would provide marketing dollars for that
22      joint marketing effort, are you?
23  A.  I'm saying that this is a reasonable representation of
24      what I understood at the time, yes.
25  Q.  I suggest to you that you knew this represented nowhere
                              40
```

## 157

1    copied on this but this is Mr Sullivan emailing
2    Mr Hussain on 31 March giving preliminary figures from
3    the Dell deals. He identifies that some $25.6 million
4    of revenue recognition would be achieved through the
5    Dell hardware sales, although he says the exact position
6    would remain unclear, do you see that, for a while? He
7    says:
8        "We will not have actual shipping numbers until end
9    of day today [...]"
10 A.  So for Q1 it's saying 18 million, not 25.
11 Q.  I think he's saying revenue 25 and then he's trying to
12   work out how much of that will fall into Q1 and how much
13   of that will fall into Q2.
14 A.  So revenue for Q1 is 18.
15 Q.  Is 18. So he's estimating, exactly, 18 for Q1 and then
16   potentially 7 million for Q2. He says you won't know
17   until the end of the day.
18       Can you go, please, to {K7/101/1}. This is another
19   email from Mr Sullivan to Ms Watkins and Mr Hussain,
20   "Latest Dell", on 31 March at 10.54, presumably US time,
21   yes? And he says:
22       "Here is the latest. I added some new orders and
23   updated the shipped numbers which have improved. We
24   will receive the final numbers from Dell tomorrow
25   morning, but this should be close."

## 158

1        Then if you look at the attachment at {K7/101.1/1}.
2    You won't have it, I think it's a spreadsheet. Make it
3    slightly smaller, please. Thank you.
4        So if you just look at column F, you can see that
5    the figure for Q1 2010 for recognisable revenue produced
6    by selling Dell hardware is at 19.2 million. Do you see
7    that? Bottom of the column.
8  A. I see 19.2. I don't know whether that's recognisable
9    revenue or not.
10 Q. Well, it's all revenue that Mr Sullivan is identifying
11   in respect of Q1 in terms of shipped, in terms of what
12   has been shipped.
13 A. All I'm saying is there are a number of tests that have
14   to be performed before you know something is revenue.
15 Q. All right. If you look at column -- we'll come back to
16   that then.
17       A decision was made after quarter end not to
18   recognise all that revenue for Q1 2010, correct?
19 A. I understand there was a delivery issue around some
20   revenue, yes.
21 Q. Let's just have a look at that. {K7/219/1} please. Do
22   you have it? An email dated 8 April, so well after
23   quarter end, yes?
24 A. Yes.
25 Q. And it's from Mr Chamberlain to Cynthia Watkins,

## 159

1    Autonomy's chief controller, and to others. The subject
2    of his email was "Revenue adjustments".
3        All of these individuals had accounting-related
4    functions within Autonomy, correct?
5  A. Yes, I think they're all accountants.
6  Q. And they were looking at finalising the Q1 2010 accounts
7    at this time, yes?
8  A. They'll be working through the quarter, yes.
9  Q. Mr Chamberlain says:
10       "Firstly, I apologise for the constant changing of
11   your numbers. Powers greater than me are making these
12   decisions and whilst I understand them I know they will
13   be causing you a lot of pain."
14       The powers greater than Mr Chamberlain making these
15   decisions were Mr Hussain, yes?
16 A. I don't know. I'm not on the email.
17 Q. Were you one of the people involved with this?
18 A. No, I would play no role in these decisions.
19 Q. Just looking at the next paragraph, we can see that the
20   adjustments Mr Chamberlain is notifying Ms Watkins about
21   affect, among other things, the hardware revenue. Do
22   you see that? This is point 2.
23 A. Point 2, yes.
24 Q. He says:
25       "We need to make adjustments to revenue which

## 160

1    affects hardware revenue and costs as well as normal
2    licence.
3        "1) Defer Capax [...]
4        "2) Defer additional hardware deals as per
5    attached - some ins and outs from last night's
6    schedule."
7        The reason it had been decided to defer some
8    hardware revenue from this quarter was because whilst
9    including the Dell sales would obviously boost revenue,
10   the fact that achieving this revenue could only be done
11   at a cost greater than the revenue received created an
12   issue for earnings per share, correct?
13 A. No, I understand that the reason was that one of the --
14   the contracts were conditional on a series of terms.
15   One of those terms was to do with the confirmation that
16   the goods had arrived and been accepted and there was
17   some issue, I understand -- I didn't know this at the
18   time -- to do with whether the goods had been accepted
19   or not and if the goods hadn't been accepted then they
20   couldn't be recognised and that was the problem.
21 Q. Can we go, please, to {K7/219.1/1}. If you look at
22   column F marked "Q1-per MS", Mr Sullivan, you can see
23   that those were hardware revenue figures produced by
24   Mr Sullivan, yes?
25 A. I don't know.

**Page 57**

1     correct?
2 A. That's the premise of the question, yes.
3 Q. So by including the Arcpliance hardware, you had been
4     able to show growth of 13%, if you strip that out, it
5     goes down to 7%, yes?
6 A. No, this is a proposed question, it doesn't mean that
7     the question is correct. So, for example, to do that
8     calculation correctly you would have to take out any
9     hardware sales that were a year earlier, for example.
10    So the important thing is this is not a statement of our
11    position, this is a question that someone had just come
12    up with as part of the brainstorming exercise that we
13    then come up with an answer for, or a suggested answer
14    for.
15 Q. If you took out 31.1 million, which was the actual
16    figure for hardware this quarter, rather than
17    10 million, that would obviously have a very much more
18    substantial effect on your growth figures, correct?
19 A. On our growth?
20 Q. On your growth figure.
21 A. No, the growth figure would be the same; the growth
22    figure excluding hardware would be changed of course.
23 Q. Okay. If we just look at your next --
24 A. By the way, that was a calculation that Deloitte would
25    do.

**Page 58**

1 Q. If we look at the next planned response in the next
2    column:
3       "Arcpliance is just one of the standard ways for
4    a customer to choose to buy IDOL and that product has
5    been an option for around two years. Because of
6    particular regulatory challenges for some big companies
7    there happened to be more Arcpliance than usual shipped
8    in Q2."
9       Not really an answer to a question about what taking
10    even 10 million of hardware sales out of the revenue
11    figure would do to your growth position, is it?
12 A. No it's not, because we haven't disclosed what the
13    hardware sales would have been a year earlier.
14 Q. We can see some further questions and answers if we go,
15    please, to page 15 {K9/480.2/15}. Question 82:
16       "[Cost of goods sold]: how much hardware?"
17       Answer:
18       "We don't break out the internal sub-components of
19    our sales. How a customer chooses to consume our
20    technology is matter for them. Our goal is to sell IDOL
21    in whatever form."
22       Then the example: "resister in a radio".
23       You were talking this quarter, Dr Lynch, of hardware
24    sales comprising some 14% of your revenue, yes?
25 A. Yes.

**Page 59**

1 Q. The suggestion that that is no different to the resister
2    in a radio was seriously misleading, wasn't it?
3 A. I disagree.
4 Q. You did include hardware in cost of goods sales,
5    didn't you?
6 A. Yes, we did.
7 Q. And the figure would have been fairly material,
8    wouldn't it?
9 A. Would have been?
10 Q. Material. What would it have been in this quarter?
11 A. I don't know without looking it up.
12 Q. Not like a resister in a radio, would it?
13 A. I disagree. The disclosure of these numbers was
14    actively checked by Deloitte and they were very happy
15    with the situation that was arrived at. And of course
16    they actually not only tick off the press release that
17    gives all this information but they then listen to the
18    conference call and at no point did they consider that
19    anything that was said was misleading.
20 Q. This question and answer was not checked by Deloitte.
21 A. Yes, but this question and answer wasn't actually used
22    on the call either.
23 Q. No. But what this demonstrates is your willingness, if
24    necessary, to mislead the analysts in order to avoid
25    giving any information about the hardware?

**Page 60**

1 A. Might I remind you that this document is produced by
2    20 people in a room round a table, throwing in
3    questions, often the point being the questions are
4    incorrect in their premise and then people brainstorming
5    answers and then it's that that is used to go away and
6    come up with answers and that's why the answers on the
7    call are not the same as the answers in the document.
8 Q. We'll come to the call in a moment.
9       Can you go, please, to {K9/303.1/1}. If you go to
10    the email at the foot of page 1, it's Ms Watkins
11    emailing Mr Chamberlain on 7 July, so a week or so after
12    Q2 2010 had closed. She says "hardware cost is coming
13    in at $45 million" and she then provides a breakdown, do
14    you see that, to get to the 45 million?
15 A. Yes.
16 Q. ==If you read up, Mr Chamberlain forwards that email to==
17    ==Mr Hussain and he says "Disaster". He obviously==
18    ==considered that recognising such a large amount of==
19    ==hardware sales would be a disaster because it would push==
20    ==down earnings per share, correct?==
21 A. ==I don't know what Mr Hussain and Mr Chamberlain are==
22    ==discussing.==
23 Q. What else do you think it might have been?
24 A. I don't know. I can't speculate on an email that I'm
25    not involved in, I haven't seen until today.

```
 1      disclosure on impact of strategic hardware sales should
 2      be made in the front end. We shall send you an updated
 3      draft tomorrow morning."
 4          And you would accept that that would accurately
 5      reflect what had been decided?
 6   A. Well, I wasn't at the audit committee but there was
 7      a statement added to the press release to show the
 8      impact of the strategic hardware sales, so I assume that
 9      this is accurate.
10   Q. We'll see what did happen. Can you go, please, to
11      {K9/460/1}. So, as you see, there's an email from
12      Mr Welham to Mr Mercer:
13          "Nigel,
14          "See Steve's proposed wording for strategic deals
15      and COGS allocation highlighted in yellow in the
16      attached."
17          Steve is presumably Mr Chamberlain, do you think
18      that's likely?
19   A. I assume so, yes.
20   Q. If you go over to {K9/461/1} and we go on to page 2
21      {K9/461/2}. You can see under the heading "Gross
22      profits and gross margins", there is a shaded bit right
23      at the bottom and the bit that Mr Chamberlain is
24      proposing to add to meet the concern of the audit
25      committee and indeed Deloitte that the market should be
```

121

```
 1      told about the hardware sales is this:
 2          "The fall in gross margins in Q2 2010 was in line
 3      with our expectations due to the Arcpliance sales as
 4      discussed last quarter."
 5          Now, we know for this quarter that there were
 6      hardware sales of $31 million, yes?
 7   A. I assume that's correct, yes.
 8   Q. And that constituted 14% of the total revenue for that
 9      quarter, yes?
10   A. Yes.
11   Q. And this is what was going to be said:
12          "The fall in gross margins [...] was in line with
13      our expectations due to the Arcpliance sales as
14      discussed last quarter."
15          Even that very limited reference to hardware would
16      have been misleading, wouldn't it?
17   A. I don't think it's a misleading statement. It might not
18      be the best one and Deloitte and Mr Chamberlain worked
19      on it.
20   Q. The pure hardware sales, or the hardware sales were not
21      Arcpliance sales, were they?
22   A. We disagree on some of that. Some of the sales which
23      you call "pure" were Arcpliance sales.
24   Q. So some of those sales. You're not suggesting that
25      $31 million of those sales --
```

122

```
 1   A. No, I'm not suggesting all of it.
 2   Q. What percentage are you saying were Arcpliance sales?
 3   A. It varied from quarter to quarter, but for example most
 4      of the inventory in Q1 that leads into Q2 are Arcpliance
 5      sales.
 6   Q. Okay, well, we have 31 million of hardware sales. What
 7      percentage in Q2 2010 do you say were sales of
 8      Arcpliance?
 9   A. I would have to go away and work through that.
10   Q. You've just said that what is being said here is broadly
11      accurate and I'd like to know on what basis you're
12      saying that?
13   A. I'm sorry, you're asking me to do calculations without
14      the material in front of me. What I can tell you is --
15      what I do know is the majority of the inventory which
16      was in Q1, which was about 10 million, the majority of
17      that was Arcpliance, my understanding, and that was then
18      sold into Q2 and so that will have had an effect on the
19      gross margin.
20   Q. What this was proposing to say was that the fall in
21      gross margins was in line with your expectations due to
22      the Arcpliance sales. You say that that is accurate.
23      I'm suggesting to you that in circumstances where
24      hardware sales constituted $31 million of your total
25      revenues, this was not accurate, it was in fact
```

123

```
 1      misleading?
 2   A. Well, the fall is a delta and of course there were
 3      hardware sales in the previous quarter and the previous
 4      quarter to that. So, you know, we're not talking about
 5      the absolute number, we're talking about the change in
 6      it, the fall in gross margins. So you have to take into
 7      account where you're coming from as to where you're
 8      going to.
 9   Q. Deloitte took the view that this wording was inadequate,
10      correct?
11   A. Sorry?
12   Q. Deloitte took the view that this wording was inadequate?
13   A. Yes, they did.
14   Q. But you maintain that it was not?
15   A. No, I think it's a good starting conversation for
16      working with Deloitte to get an answer that everyone
17      agrees on. The important thing here is that none of
18      this is happening in the shadows. Deloitte are fully
19      aware of it and they're working on it and they're
20      working in an open, collaborative way and with the audit
21      committee and everyone is trying to come to the right
22      answer. Deloitte know all the hardware sales, they
23      understand the type of hardware, they understand the
24      customers and what we're trying to do here is come up
25      with a good set of wording which they're comfortable to
```

124

## Page 125

1  tick off and that we're comfortable with and it's an
2  iterative process. Again we're working through sets of
3  drafts here.
4  Q. Let's just go to {K9/468/1}. This is an email from
5     Mr Welham to Mr Hussain, copied also to Mr Chamberlain
6     and sent the same day, 21 July. In the second paragraph
7     he says:
8        "On gross margin disclosure, all our reviewers have
9     raised this as an issue. The minimum required wording
10    would be something along the lines of 'The fall in gross
11    margins in Q2 2010 was in line with our expectations due
12    to the Arcpliance and other strategic hardware sales'.
13    The audit committee were also of the view that some form
14    of explicit disclosure on this point should be
15    included."
16       Do you recollect Deloitte making this point?
17 A. I don't think I was on the email.
18 Q. You weren't happy with Deloitte's additional wording,
19    were you?
20 A. I wouldn't say happy, just a discussion going on in the
21    company about what the best way of handling this is.
22 Q. You were not happy with anything coming out of Autonomy
23    in relation to this quarter referring to other strategic
24    hardware sales?
25 A. I think that would raise some other questions, yes,

## Page 126

1     I agree with you.
2  Q. It certainly would. Which questions do you think it
3     would raise?
4  A. I think people would be interested in understanding what
5     this new thing that was being explicitly put in this
6     quarter was, whether -- how that related to what they
7     already knew about, which were the strategic solutions.
8     I don't know, it raises -- I'm speculating now.
9  Q. It would point people towards the fact that you were
10    making hardware sales other than Arcpliance sales, which
11    is what you'd previously indicated to the market you
12    were doing, and that's why you didn't want the market to
13    know?
14 A. Well, we'd already told the market that we were doing
15    strategic solutions.
16 Q. You didn't want to highlight, even in this rather
17    limited way, the fact that Autonomy was making hardware
18    sales, correct?
19 A. No, I just wanted a disclosure that Deloitte thought was
20    appropriate and that the company and Deloitte both
21    agreed was a useful disclosure to the market.
22 Q. What does a strategic solution mean?
23 A. Strategic solution means that you're providing the
24    software and the hardware and some services to make
25    a solution.

## Page 127

1  Q. So it's got nothing to do with the sort of transaction
2     we're talking about here, that is to say where you are
3     simply acting as a reseller in respect of --
4  A. No, it can. It can be the one-stop shopping approach
5     where you're a solution provider. So remember what we
6     saw the Zones chap described the business as.
7  Q. Can we go, please, to {K9/469.1/1}. You see the middle
8     email from Mr Chamberlain to Mr Welham and others, also
9     on 21 July, attaching a copy of the press release which,
10    as he explains:
11       "Now has MRL's tweaks."
12       So your changes, yes?
13 A. Yes.
14 Q. And we can see the draft that you are happy with if you
15    go to {K9/469.2/1}. If you go to the bottom of page 1,
16    under the heading "Gross profits and gross margins",
17    last line, do you see it says:
18       "The small variation in gross margins in Q2 2010 was
19    in line with our expectations due to the sales mix as
20    discussed last quarter."
21       So that's what you wanted it to say, yes?
22 A. That was the suggestion, yes.
23 Q. And that told the market nothing about hardware sales
24    beyond those involving the sale of an appliance?
25 A. Correct. It didn't tell them any more than what they

## Page 128

1     already knew.
2  Q. You again were determined that the market shouldn't know
3     the true position about the extent to which hardware
4     sales were being relied upon to boost Autonomy's revenue
5     figures, correct?
6  A. Well, hardware sales won't have been relied on to boost
7     Autonomy's revenue figures, that's incorrect.
8  Q. They were making up, for example in this quarter, 14% of
9     Autonomy's revenue figures?
10 A. Which was already in the forecast.
11 Q. But it's irrelevant whether it was in the forecast or
12    not --
13 A. It is, because if they're not in the forecast -- if
14    you're not going to do them you don't put them in the
15    forecast.
16 Q. But the market didn't know that you were baking into
17    your revenue figures sales from hardware which were
18    unrelated or just sales from hardware full stop?
19 A. If we're talking about market knowledge, the market
20    would know that enterprise software companies sell
21    hardware and various witnesses that we've had have, in
22    various interviews, said that they believed most
23    enterprise software companies sell hardware, they take
24    that as a default position, and that amount, depending
25    on which witness you talk to, is an assumption between

Opus 2 International
Official Court Reporters

Abrahamson Decl., Ex. A-009

transcripts@opus2.com
+44 (0)20 3008 5900

HP-SEC-02935549

### Page 85

1  Dr Menell and Mr Hussain saying:
2      "Pete,
3      "This is [hardware] that Capax is looking at for
4  starting their EDD processing facility. Can you have
5  someone comment on whether the specs look right?"
6      So Capax, as you can see, didn't have the hardware
7  it needed even to start the EDD processing facility;
8  that appears to be what it says, yes?
9  A. That's not my understanding from the time.
10 Q. You see, Mr Egan, Dr Menell, Mr Hussain all know, it
11     appears from this, on 11 May 2009 that Capax was not in
12     a position to provide EDD processing services, because
13     they didn't even have the hardware they needed?
14 A. I disagree. I think that Capax could have been setting
15     up multiple -- you know, it had facilities, it had data
16     centres all ready where it could be running this and it
17     may have wanted to set up a more specialised dedicated
18     facility.
19 Q. Dr Lynch, it says:
20     "This is [the hardware] that Capax is looking at for
21     starting their EDD processing facility."
22 A. Yes, " facility ". It doesn't mean to say they can't run
23     the hardware before that somewhere.
24 Q. I suggest that it's clear from this that Dr Menell knew
25     that they couldn't process EDD certainly in May.

### Page 86

1  Mr Hussain knew that they couldn't do this in the end
2  of May and I suggest the idea that you didn't know is
3  just fanciful?
4  A. First of all, I didn't know and, secondly, I don't
5     believe Dr Menell and Mr Hussain knew, because what was
6     presented to us -- so I remember some of this, which is
7     Mr Egan committed to providing hardware to Mr Baiocco
8     without getting the requisite approvals. When
9     Mr Hussain found out, he was very unhappy about it and
10    the explanation that was given was that Capax were
11    running EDD but because the software had problems, it
12    was running slowly, and Mr Egan wanted to get them
13    more hardware so they could run at speed and he
14    considered that the problem was a problem with the
15    software. And that was what was presented at the time.
16 Q. Do you recall that Mr Egan's evidence was that
17    Mr Hussain and Dr Menell both knew that no services were
18    being provided?
19 A. Yes, I don't think that's accurate.
20 Q. Can we just -- you see that in May -- you've seen this
21    email which says what it says, they're looking to start
22    the EDD facilities. We saw earlier that Mr Hussain had
23    actually approved the purchase orders purporting to
24    outsource specialised EDD processing facilities to Capax
25    in April 2009, do you recall that?

### Page 87

1  A. Yes.
2  Q. It appears that Mr Hussain knew when he approved the
3     purchase orders in April that Capax wasn't in a position
4     to provide EDD processing services?
5  A. His reaction when he found out about Mr Egan's hardware
6     confirms to me that that's not the case.
7  Q. I suggest to you that Mr Hussain wouldn't have kept from
8     you that Capax wasn't in a position to provide EDD
9     services and that the purchase orders were just a means
10    of channelling funds to Capax?
11 A. I think that's inaccurate and I don't understand why,
12    if, as your hypothesis, Mr Hussain knew there was
13    something wrong here, he would have created such a fuss
14    over Mr Egan trying to give some hardware to Capax.
15 Q. Whether or not you were told this by Mr Hussain,
16    Dr Lynch, you didn't believe when you approved the
17    purchase orders in June 2009 that Capax Discovery had
18    provided or was in a position to provide $520,000 of
19    specialised EDD processing services?
20 A. No, I did believe that.
21 Q. What was the basis for that belief, given that you knew
22    Capax had no existing EDD business as at the end
23    of March?
24 A. The staff that had gone to Capax were experienced EDD
25    people that had been hired. I think a name from memory

### Page 88

1  might be Steve Williams or Williamson, something like
2  that. So a team had been hired. Mr Egan had reported
3  to us that they were operating, albeit with a very slow
4  system, and therefore he had gone ahead without going
5  through the proper channels and arranged to get them
6  hardware so that the system would run at speed. So
7  actually -- and then of course Mr Egan is signing off
8  those purchases as the supplier having met their
9  requirements. So that was the basis which I had.
10 Q. Let's just carry on. Autonomy continued to pay
11    Capax Discovery for these non-existent services
12    throughout 2009 and you approved a number of these
13    payments, correct?
14 A. Yes, I did.
15 Q. You recall the payment schedule from the first Capax
16    sale. After the initial instalment of $500,000, there
17    were then a series of instalments of $968,750 payable at
18    three-monthly intervals, yes?
19 A. I'll accept your figures. I don't --
20 Q. So one at the end of July, then at the end
21    of October 2009, and so on, do you recall?
22 A. I don't recall specific numbers, but I assume that
23    you're correct.
24 Q. Let's just pick things up at the beginning of July, a
25    few weeks before the second instalment was due under the

### Page 89

1   first Capax sale. Can you go, please, to {K2/308/1}.
2   So this is an email chain between you and Mr Smolek on
3   10 July 2009. Just below the top Mr Smolek writes to
4   you:
5       "Hi Mike,
6       "Please at your earliest convenience - review &
7   reply with your authorisation to the below listed two
8   purchase requests (requiring CEO authorisation per
9   Steve Chamberlain).
10      "All below listed individual approvals are
11  attached."
12      If you just look down at the first purchase order
13  request, again it says "Outsourced specialised EDD
14  services". The cost is $250,000 and it has been
15  approved by Sullivan and Mr Hussain.
16      Just pausing there, every time I show you this, you
17  say you had a different interpretation of what this
18  meant. I think you say capacity. Where in this do you
19  get that this could have simply been for capacity?
20  A.  My understanding was that these were capacity which
21  could be called on at short notice in order to deal with
22  peak processing.
23  Q.  Who did you get --
24  A.  What I didn't know was whether it was being used or not,
25  but I would have expected the person requesting the POs

### Page 90

1   to have made sure that there was a reasonable level of
2   usage.
3   Q.  Who do you say you got that understanding from, that it
4   was simply for capacity?
5   A.  Well, it would have come up, presumably ultimately, from
6   Mr Egan.
7   Q.  You say ultimately from Mr Egan. Who told you --
8   A.  I assume he was the person that told that into the
9   system. I don't know who would have specifically given
10  me that idea, but that's what I thought we were buying.
11  Q.  So just looking at this, again we see at the top of the
12  page, you give your approval, you say "Ok". And so that
13  would be 250,000 on top of the over half a million you
14  had authorised for payment just a month earlier, yes?
15  A.  Yes.
16  Q.  Again I suggest you would have talked to someone from
17  your core management team to make sure you knew why
18  these sums were being paid and for what?
19  A.  No, I think if you see Mr Egan's name on there and it's
20  been signed off by people, then I'm happy with that.
21  Q.  You wouldn't have spoken to anyone?
22  A.  I don't think so, no.
23  Q.  I suggest that is extremely unlikely, Dr Lynch.
24  A.  Well, I think you're incorrect in that suggestion.
25  Q.  Unless you already knew what was going on here?

### Page 91

1   A.  Sorry?
2   Q.  Unless you already knew precisely what was going on
3   here?
4   A.  No, I think if you look at these emails, you'll see
5   exactly the same pattern, whether it's this thing or
6   many of the other things that I had approved.
7       Of course you're looking at this in isolation
8   without looking at all the other approvals I deal with.
9   Q.  You actually approved a further large purchase order
10  a few weeks later, yes?
11  A.  I assume so, yes.
12  Q.  Let's have a look at that {K2/402/1}. Start on page 2
13  {K2/402/2}. This is an email from Mr Sass to Mr Egan
14  and Mr Hussain dated 31 July 2009, and you will recall
15  that was the date the second instalment was due to be
16  paid under the first Capax sale, yes?
17  A.  I presume so, if you state it.
18  Q.  Mr Sass says -- sorry, in order to see that is Sass you
19  have to see the bottom of page 1. Mr Sass says:
20      "I received a call from John Baiocco. He indicated
21  that he is waiting for 4 POs at 250k each and asked that
22  I reach out for status as he has an invoice due. Please
23  advise."
24      If we go over to page 1 {K2/402/1}, about halfway
25  up, Mr Egan you see emails Mr Kanter and a number of

### Page 92

1   others and he says:
2       "Andy,
3       "I think we discussed in UK. Can your group pick
4   this up? Mike Sullivan can provide the what, but it
5   needs you to then get the approvals done and manage the
6   POs out on time."
7       It looks from this as if Mr Kanter and Mr Egan have
8   had some sort of discussion about the Capax purchase
9   orders in the UK?
10  A.  Yes.
11  Q.  I can ask Mr Kanter what he discussed with Mr Egan, but
12  it's obvious, isn't it, that the emails we see are not
13  a complete record of the discussions that would have
14  taken place within your core management team, and indeed
15  with you, about these purchase orders?
16  A.  I don't know whether they're a complete record or not.
17  Q.  Can we go next to {K2/408/1}. You see at the bottom of
18  the page there's an email from Mr Smolek to a number of
19  others including Mr Hussain, Mr Kanter, Mr Egan and
20  Mr Sass on the same day, 31 July with a subject
21  "Capax Discovery - [purchase order] approval
22  needed - July 31, 2009."
23      Just pausing there, we've seen rather a number of
24  people at Autonomy involved in the process of paying
25  Capax for these supposed EDD services, yes?

## Page 105

1  your approval will also be required. Do you see that?
2  A. Yes, I do.
3  Q. Above that Mr Hussain's response begins at page 1
4  {K4/118/1} and ends on page 2. Just looking at page 1:
5  "Thanks Phil, Mr Baiocco is calling everyone and
6  expressing disgust etc. However there is no one here
7  who is giving me confidence that the process for
8  handover is well understood, that the numbers are being
9  monitored, that the cash flow is being monitored, that
10 the lists are being monitored etc."
11      So it appears that Mr Baiocco is contacting people
12 at Autonomy other than Mr Egan and complaining, yes?
13 A. I don't -- yes, I assume so.
14 Q. Then still on page 1, two-thirds of the way down
15 Mr Scott asked Mr Crumbacher to put together a table
16 showing revenue from Capax and EDD purchases to Capax as
17 well as EAS to Capax as well?
18 A. Yes.
19 Q. And Mr Crumbacher forwards that request to Mr Smolek the
20 same day and he says:
21 "Phil,
22 "Joel wants us to put together a table per the
23 below. I can get the revenue from Capax and EAS
24 numbers, but have no insight into the EDD.
25 "Can you help with the EDD numbers, please?"

## Page 106

1       If we then go to page 125, {K4/125/1}, you see this
2  is an email from Mr Crumbacher, later on the same day,
3  13 November, and he says:
4       "I talked to Phil about the EDD sub-contracting
5  'process'. Long story short, there really isn't one.
6  Sullivan and Stouffer approve sending EDD processing
7  work to Capax at a processing rate of $200 [per]
8  gigabyte. There is no statement or work, order form,
9  contract, or other ordering document or agreement to
10 evidence the outsourcing of these services, other than
11 a [purchase order]. Further, there is no specific
12 outsourcing agreement under which we would outsource the
13 EDD processing work in this manner; the EDD licence
14 agreement contemplates them paying us for EDD processing
15 work, not the other way around.
16      "So far, we've paid [1.77 million] for these
17 outsourced EDD services. An additional [purchase order]
18 is open (not finally approved/issued) for an additional
19 $250,000 making the grand total for our EDD processing
20 services $2,020,000 to date. Going forward, Andy Kanter
21 is to be involved in approving the EDD outsourcing
22 [purchase orders]."
23      Then he refers to the EAS support documentation.
24      So it looks as if Mr Crumbacher has had
25 a conversation with Mr Smolek about the EDD process?

## Page 107

1  A. Yes, it does.
2  Q. Is it usual for there to be nothing at all to evidence
3  the outsourcing of the services? No statement, no work,
4  no form, no contract, is that the sort of lack of
5  paperwork that you would expect for a genuine services
6  being asked for and provided?
7  A. No, I would expect more paperwork than that.
8  Q. This just may be a convenient place to deal with the
9  document that we have at {K1/279.1/1}. This on screen
10 you can see is a notebook. It was a notebook maintained
11 by Mr Chamberlain that covered some of his time at
12 Autonomy. Can you go, please, to page 134
13 {K1/279.1/134}. At the bottom of page 134 we see the
14 words "2008 tax comps" and a date 19 November 2009. If
15 we then go over the page to page 135 {K1/279.1/135}, you
16 can see a heading "MRL meeting". Do you see that?
17 A. Yes, I do.
18 Q. That suggests that you had a meeting with Mr Chamberlain
19 at some point?
20 A. There's one in my schedule for I think it's a couple of
21 weeks after when this looks like it's being written,
22 yes.
23 Q. And these are obviously his notes from that meeting,
24 yes?
25 A. No, I think it's the other way round. I think these are

## Page 108

1  things he might want to discuss at that meeting.
2  Q. Okay. Second bullet point, if you look at the left, one
3  is "Commercial rationale" and then there's a reference
4  to "EMC". Second bullet point, "Circular transactions",
5  he refers to "VMS", "MicroLink" and the third one is
6  "Capax". We'll come back to VMS and MicroLink later.
7       So you see the reference to Capax and it appears
8  from this that Mr Chamberlain either had or intended to
9  have a conversation with you on the basis of a view that
10 he had, at least, that Capax was a circular transaction;
11 would you agree it looks that way?
12 A. No, that's not how I would interpret it. The accounting
13 department always treated transactions where we bought
14 and sold from the same party as circular or reciprocal
15 or whatever phrase you want to use because they have to
16 apply sort of tests as though they are, to show they're
17 not. So these are customers that we were buying from
18 and selling to at the same time.
19 Q. Well, he plainly thought in his mind that these were
20 circular transactions, that's why he's called them
21 circular transactions?
22 A. No, as I said, it's an accounting term and you'll find
23 throughout the correspondence among the accountants that
24 they will talk about things being ... and there's various
25 things, quid pro quo, reciprocal, circular, but what

Opus 2 International — Official Court Reporters — Abrahamson Decl., Ex. A-012 — transcripts@opus2.com — +44 (0)20 3008 5900

HP-SEC-02935663

### Page 109

1  they are meaning is they have a set of processes they
2  have to do for them. And what he has here is a series
3  of different items to do with how he's doing the
4  accounting. So commercial rationale for EMC we've
5  discussed. Financial statement exposure is our debtor's
6  position. Accrued income, deferred revenue. And then
7  the business where perhaps we should be recognising the
8  sales on cash, so Italy tends to have a very slow pay
9  rate, so does South America. Eepad was a Nigerian
10  reseller that was very slow paying --
11 Q. I want to focus if I may on circular transactions and
12  the reference to "Capax". Do you accept that you had
13  a discussion with Mr Chamberlain about Capax under this
14  heading "Circular transactions"?
15 A. I don't know whether the meeting actually happened. It
16  may well have done, but, as I say, the accounting
17  department as I understood it always referred to things
18  in this form in order to do the right tests.
19 Q. I suggest that it's obvious from this that there was
20  a discussion between you and Mr Chamberlain in which you
21  talked about Capax as a circular transaction?
22 A. I'm not sure the meeting actually happened, but it may
23  have happened at a different time to what was scheduled.
24  But it wouldn't have been very remarkable to me to have
25  a meeting like this anyway.

### Page 110

1 Q. We don't know whether it did or didn't happen. If it
2  happened, do you accept that you would have talked about
3  Capax as a circular transaction?
4 A. We might well have talked about them from the point of
5  view of how he was going to do the accounting and what
6  evidence he would need, yes.
7 Q. But you have no recollection of this beyond that?
8 A. No, I don't.
9 Q. Can we go next to {K4/229/1}. The bottom email is from
10  Mr Crumbacher to Mr Kanter on 1 December. Mr Crumbacher
11  says -- you see the heading 2009-11-13 Capax revenue
12  summary project". He says:
13    "Andy,
14    "Attached is what I provided to Sushovan, updated to
15  include the 750,000 PO request for EDD services that is
16  currently pending your approval. The $250k PO
17  I mentioned to you as being 'open' has since been
18  approved and paid.
19    "I talked to Phil and on the $250k EDD services PO
20  request, he's only waiting for your okay to proceed,
21  Sushovan has approved.
22    "Also, Capax has not yet paid the $968,750 that was
23  due 10/31/2009. Otherwise, they are current on payments
24  to us."
25    Then at the top you see that Mr Kanter forwards his

### Page 111

1  exchange with Mr Crumbacher to Mr Egan asking him to
2  call Mr Egan or Mr Hussain and again would you accept
3  that it looks from this as if Mr Hussain and Mr Kanter
4  were involved in the process of issuing purchase orders
5  for the supposed EDD services?
6 A. They were involved in the process, yes. In that
7  Mr Hussain would have to approve it just as I would.
8 Q. There were, we can see, plainly discussions with
9  Mr Kanter and Mr Hussain with Mr Egan about this?
10 A. Yes.
11 Q. Can we go, please, to {K4/303/1}. We can start on
12  page 2 {K4/303/2}. At the bottom of page 2 there is
13  an email from Mr Chamberlain to Mr Baiocco, copying
14  Mr Egan, mentioning that payment is overdue and asking
15  for an update; do you see that?
16 A. Yes.
17 Q. Second half of page 2. Then above that, it starts on
18  page 1, you can see it's almost a month later at the
19  beginning of December, there is a chasing email from
20  Mr Chamberlain to Mr Baiocco. It says:
21    "John - I have not heard from you since my last
22  email almost a month ago. The following amounts are now
23  due."
24    And you see the reference to the $968,750 amount.
25    "The outstanding balance is now very significant and

### Page 112

1  I need to understand when we can expect payment on these
2  overdue amounts."
3    Then if you go back to page 1, in the middle of the
4  page we see Mr Chamberlain chasing Mr Baiocco again on
5  15 December:
6    "I have not had a response to the email below. I am
7  now very concerned that I have not had any response to
8  my repeat requests. Please advise as soon as possible
9  status on the payments below."
10    Top email on the same page, Mr Baiocco emails
11  Mr Hussain asking to discuss Mr Chamberlain's email, do
12  you see that?
13 A. Yes, I do.
14 Q. And again it looks as if Mr Baiocco wanted to have
15  direct discussions with Mr Hussain about the position,
16  yes?
17 A. Well, he's trying not to pay his bills by the look of
18  it.
19 Q. Or at least discuss the arrangement?
20 A. I disagree. I don't think Mr Hussain knew of any
21  arrangements.
22 Q. Go, please, to {K4/486/1}, just rounding off this piece.
23  It's an email from Mr Hussain to a number of others on
24  29 December, so about two weeks after the point in time
25  when Mr Baiocco asked to have a direct discussion with

**Page 29**

1     other view of this?
2 Q. Can you try and avoid giving long speeches, please, in
3     answer to questions, we don't have a lot of time.
4     Please focus on my questions.
5 MR MILES: Well, the question was: why was it inappropriate?
6 MR RABINOWITZ: He could have said "Because someone else was
7     conducting the investigation", not have the same speech
8     again.
9 MR MILES: He's also entitled to explain what happened.
10 MR RABINOWITZ: Let me carry on.
11 MR JUSTICE HILDYARD: Well, it was quite an open-ended
12     question but, equally, the answer was reminiscent of an
13     answer you'd previously given, Dr Lynch, so try to be as
14     precise as you can. I know how difficult that is
15     sometimes. Difficult for each party.
16 MR RABINOWITZ: Just still on this page, final paragraph on
17     page 2, Mr Hogenson says there is no information in the
18     SMS customer notes relating to Eli Lily of any steps in
19     the sales process to be performed by Capax. So
20     Mr Hogenson is making the point that there is no
21     evidence of Capax as distinct from Autonomy trying to
22     onsell the software it had ostensibly bought, and you
23     understood that that is what he was saying?
24 A. We would not record that information anyway. We have
25     no --

**Page 30**

1 Q. No, Dr Lynch. Listen to my question. You understood
2     that the point he was making is that there is no
3     evidence of Capax as distinct from Autonomy trying to
4     onsell the software that it had ostensibly bought, and
5     you understood that that is what he was saying here?
6 A. No I didn't, because it didn't make sense to me because
7     we don't record that information so there would be no
8     evidence whether they had or hadn't.
9 Q. You said yesterday you didn't have any first-hand
10     knowledge of whether it was Autonomy that negotiated
11     with Eli Lily even after the VAR deal. When you
12     received Mr Hogenson's letter, did you check that what
13     he said was true?
14 A. As we've discussed, I did not execute the investigation
15     of what Mr Hogenson was saying.
16 Q. So the answer is no?
17 A. Could you repeat the question?
18 Q. Did you check whether what Mr Hogenson was saying was
19     true?
20 A. I don't know how -- no, I didn't, but I don't know how
21     I would have done anyway.
22 Q. So the answer is "no"?
23 A. "No".
24 Q. I suggest that's because it wasn't news to you at all,
25     you knew about this already?

**Page 31**

1 A. No, the reason why I wouldn't have checked it was, first
2     of all, as I explained, I was asked to just gather what
3     Mr Hogenson was saying. But, secondly, there is no
4     requirement for an end user for a sale to the reseller
5     so what happens after that sale is not relevant. And
6     then, thirdly, I knew that nowhere in Autonomy do we
7     record what our resellers do after we have sold them the
8     software. In fact it would be impossible for us to do
9     that because that's their private business.
10 Q. Did you bother to look at the SMS notes?
11 A. No, I didn't.
12 Q. If we then go on to page 3 {K9/19/3}, at the top of the
13     page, again Mr Hogenson refers specifically to IAS 18,
14     section 14. But you say, do you, that you didn't bother
15     looking at IAS14 even at this stage?
16 A. I'm not an accountant. This was something that the
17     accountants would deal with.
18 Q. So the answer is "No, I didn't". Yes? The answer is
19     "No, I didn't"?
20 A. I suspect I didn't. I don't know but I suspect
21     I didn't.
22 Q. Just look at the lower part of this page. You see that
23     Mr Hogenson has copied and pasted an email from
24     Mr Chamberlain saying -- just looking at what it says,
25     focusing on the second sentence of the first paragraph,

**Page 32**

1     talking about:
2         "When they [Capax] get paid they will need to pass
3     on to us [...]".
4         And that suggested that Mr Chamberlain was not
5     expecting Capax to pay until they got paid, correct?
6 A. I don't know, it may be that we're paying -- we're
7     buying something from them and expect them to pay their
8     debt immediately, I don't know.
9 Q. Did you bother to contact Mr Chamberlain?
10 A. As I have said, I did not investigate the fact basis of
11     this letter; that was not what I was asked to do.
12 Q. You see that Mr Chamberlain in this email appears to be
13     instructing Autonomy employees to prepare an invoice for
14     Capax to send to Eli Lily. Were you in any way
15     surprised that Autonomy was preparing an invoice for
16     a reseller to send to an end user?
17 A. No, that's normal procedure.
18 Q. Just go on to page 5 {K9/19/5}. Do you see the heading
19     "Related party concern" referring to "MicroLink". We'll
20     come to MicroLink later, but we see that Mr Hogenson
21     raises a concern about the MicroLink acquisition and he
22     says:
23         "[...] Autonomy wrote off [...] $16M of outstanding
24     accounts receivable [...]"
25         And that was true, wasn't it?

reworded as per point above."
       Do you see that?
3  A.  Yes, I do.
4  Q.  Can I take it that one of Mr Kanter, Mr Hussain or
5      Mr Chamberlain would have relayed to you that Deloitte
6      did not think the team could be described as
7      "independent"?
8  A.  I don't remember them doing that, no. But they would
9      have signed off the final letter and its form anyway,
10     Deloitte.
11 Q.  And had they told you that it could not be described as
12     "independent", that would have come as no surprise to
13     you because you knew that Mr Knight was playing
14     a material role in that team, correct?
15 A.  That's not correct.
16 Q.  If we can then go back to the letter that we saw at
17     {K16/5/1}, we looked at the second paragraph which says
18     that:
19         "[...] a comprehensive procedure was undertaken to
20     investigate these matters when first raised, overseen by
21     Autonomy's audit committee working with a different team
22     at Deloitte [...]".
23         Then it says:
24         "[...] (ie separate from the historical audit team,
25     led by the new audit engagement partner [...])"

17

1      I've already put to you that you knew that members
2      of the historical audit team were involved. To describe
3      the team in a letter to the regulator as "different" and
4      "separate" from the historical audit team was
5      deliberately misleading?
6  A.  It certainly wasn't deliberately misleading. I had
7      little involvement with these letters and they went
8      through Deloitte and so I assume that Deloitte is happy
9      with whatever finally gets sent when they sign it off.
10 Q.  You knew, Dr Lynch, that if you had told Deloitte that
11     Mr Hogenson was alleging wrongdoing, Deloitte would have
12     taken a different approach to its inquiry?
13 A.  Mr Hogenson communicated directly with Deloitte and, as
14     far as I recall, Deloitte did know that Mr Hogenson was
15     alleging some level of wrongdoing, yes.
16 Q.  Can we go, please, in this letter to page 3 {K16/5/3}.
17     You see the letter here deals with Kraft, top of the
18     page, do you see that?
19 A.  I do.
20 Q.  And again it begins by copying and pasting paragraphs 10
21     to 12 of the FRRP letter which dealt with the issue of
22     Kraft. Then below that we see the company's response.
23 A.  Yes.
24 Q.  Can you see the paragraph just below the middle of the
25     page which starts:

18

1      "In an almost unique series of events, Kraft sought
2      to enter into a different agreement directly with
3      Autonomy in a subsequent quarter."
4         Now, the impression this seeks to give, Dr Lynch, is
5      that it was unexpected and came as a surprise to
6      Autonomy that Kraft should seek to enter into an
7      agreement directly with Autonomy rather than negotiating
8      with Capax Discovery, yes?
9  A.  Or that Kraft would not contract with Capax, yes.
10 Q.  But it was neither unexpected nor surprised, was it?
11 A.  I think it was a surprise. We did expect Kraft to
12     contract with Capax.
13 Q.  And it wasn't --
14 A.  I wasn't involved at the time, as we discussed, but
15     that's always been my understanding.
16 Q.  I suggest you had a different understanding. You knew
17     that Capax had been used as a placeholder and that Capax
18     had had no discussions before the agreement was made
19     with Capax in relation to Kraft and indeed that it was
20     always intended that Autonomy alone would continue the
21     negotiations with Kraft?
22 A.  As we discussed yesterday, I did not hold that view and
23     I don't understand, under IFRS, this concept of
24     a placeholder, in that if a willing buyer places an
25     order with Autonomy, then that is the sale. What then

19

1      happens after that is a separate item and, as we
2      discussed, if there was a need or a desire to sell
3      more stock in some way in that quarter, that could be
4      done without naming an end user.
5  Q.  Never mind IFRS. The letter is making a statement of
6      fact, Dr Lynch?
7  A.  And I don't have any problem with what's written on the
8      letter. To my knowledge that's perfectly reasonable.
9  Q.  Just going back to what you say in this letter, where
10     you say:
11         "In an almost unique series of events [...]".
12         It wasn't almost unique either, was it? This is
13     precisely how Autonomy used the VAR transactions such as
14     those we've been looking at with Kraft and indeed
15     Eli Lily and others we'll come to: entering into a VAR
16     transaction at quarter end but then Autonomy simply
17     picking up where it had left off in its direct
18     negotiations with the end user, correct?
19 A.  That's not correct. Autonomy did, I believe, over
20     10,000 VAR transactions in this period and this was
21     extremely rare, the number of them was very small as
22     part of those 10,000.
23 Q.  I suggest this is another highly misleading statement
24     being made to the FRRP, isn't it?
25 A.  I disagree.

20

### Page 149

1    it was running in the production safe Kraft in April.
2    So this is another separate thing where someone is
3    trying to get it up and running. This doesn't look like
4    it's been done as an NAS, it's being done at the code
5    level and that's what's going to be happening all over
6    the place, it's a generically useful piece of
7    technology.
8  Q. Towards the top of the page, about a fifth of the way
9    down, we see that someone called Steve Barclay sends
10   an email on 30 November 2010 and he says what he has
11   done and he asks:
12     "Do you have any more information about the plan for
13   StorHouse? I'm not sure what would be best to do next
14   with it."
15    Do you see that? Last sentence.
16  A. I do. I have no idea who Steve Barclay is. He'll be
17   some junior engineer somewhere.
18  Q. Look at the top email, Mr Gallagher replies:
19    "The plan is to use it to archive some data from
20   Kraft I believe."
21    Do you see that?
22  A. I do.
23  Q. I suggest again all of this is consistent with this
24   being a solution in search of a problem?
25  A. I disagree. Again, what's happening here is a different

### Page 150

1    approach to doing an integration, but we know from
2    various emails that the ability to do this in the Kraft
3    production safe was up by April.
4  Q. This process of finding a problem for which this can be
5   a solution is something you would have discussed with
6   Dr Menell?
7  A. No. And FileTek goes on to be used in many different
8   areas as a generic piece of useful technology.
9  Q. Do you accept the evidence of Mr Wang and Mr Goodfellow
10   that StorHouse was never used for Kraft?
11  A. Well, it was in place and ready to go. The fact that we
12   couldn't persuade Kraft to send us their structured data
13   is a rather different fact.
14  Q. So you do accept it?
15  A. It was all done and ready to go. It was in the
16   production safe and Kraft had loaded some data into it,
17   but what they didn't do was turn on the fire hose.
18  MR RABINOWITZ: My Lord, that may be a convenient time,
19   subject to your Lordship.
20  MR JUSTICE HILDYARD: Yes. Mid-afternoon break.
21  (3.21 pm)
22        (A short break)
23  (3.35 pm)
24  MR RABINOWITZ: Dr Lynch, can you turn, please, to
25   {K14/452/1}. The bottom email is from Matt Stephan

### Page 151

1    dated 17 January 2011. He says:
2     "The audit letters for the above resellers [Capax,
3   FileTek and MicroTech] are all still outstanding."
4    In the email above, Mr Chamberlain replies on
5   19 January 2011 saying:
6     "We still need all three of these as well as an
7   indication of when FileTek will pay the $3m that was due
8   on 31 [December]."
9    Mr Hussain then forwards that email to Mr Egan and
10   his message is:
11    "Please help."
12    Do you see that?
13  A. Yes, I do.
14  Q. Did Mr Hussain tell you that he'd enlisted Mr Egan's
15   help with this problem?
16  A. I wouldn't expect so, no.
17  Q. Mr Egan in his evidence -- it is at paragraph 109
18   {C/5/29}, I don't suggest we turn it up -- explained
19   that he spoke to Mr Szukalski in early February 2011 and
20   said that one way or another Autonomy would find
21   a solution to FileTek's outstanding debt. You don't
22   have any basis for disputing that evidence, do you?
23  A. Well, I wasn't part of the conversation, no.
24  Q. Can we go, please, to {K15/279/1}. You can see that
25   this is an email from Mr Chamberlain to Mr Egan on the

### Page 152

1    subject of FileTek, copying Mr Scott and Mr Hussain,
2    dated 11 February. Mr Chamberlain says:
3     "Need to get an update on FileTek as to when the
4    $10m will be paid. $3m was due 31 [December] with the
5    balance due 31 [January] so all now due."
6     Do you accept that Mr Chamberlain, Mr Egan,
7    Mr Hussain and Mr Scott are all aware by this point that
8    FileTek is overdue on its debt of $10 million?
9  A. Yes, it appears so.
10  Q. That is not something they would have all kept from you,
11   is it?
12  A. Yes. I wouldn't be dealing with debtors unless there
13   was something for me to do. It also wouldn't be that
14   remarkable for people to be late on their debts either.
15  Q. With a debt that size, $10 million?
16  A. Sadly not remarkable, no.
17  Q. But sufficiently large for it to be brought to your
18   attention?
19  A. No. If it got to the point where the auditors had
20   a concern about it and it was beyond the normal debt
21   provisioning cycle then I guess so, but it's not
22   something I would be involved in.
23  Q. Can you go, please, to {K16/388/1}. You see this is
24   an email dated 29 March 2011 from Mr Crumbacher to
25   Mr Chamberlain regarding Morgan Stanley and he asks

## Page 21

 1     "Autonomy tried unsuccessfully to convince Moreover
 2     to change their mind."
 3         I'm not disputing that there was a change in the
 4     software they were using, my Lord.
 5         Can we go to {K2/108/1}. This, as you can see, is
 6     an email from Mr Hussain to Mr Egan on 22 June 2009.
 7     Mr Hussain says:
 8         "We need big VMS - more commercial just
 9     disappeared."
10         What appears to be happening here is that Mr Hussain
11     is saying to Mr Egan: because more commercial has
12     disappeared, the deal with VMS has to be a big one,
13     correct?
14  A. Yes, I think that's correct.
15  Q. Mr Hussain is dictating the size of the deal with VMS by
16     reference to Autonomy's revenue needs that quarter, not
17     the value of anything that Autonomy is proposing to sell
18     to VMS, correct?
19  A. No, he's talking about the sale to VMS, he wants a large
20     sale to VMS. He's not talking about the size of the
21     purchase.
22  Q. Can we go, please, to {K2/129/1}. This is an email from
23     Mr Hussain to you on 24 June with the subject "16.30
24     status update". The body of the email is a list of
25     counterparties with whom Autonomy is trying to close

## Page 22

 1     deals that quarter, correct?
 2  A. Yes.
 3  Q. Two from the bottom there's a reference to "VMS - in
 4     process at between 7-9m" and you would have understood
 5     that to be the amount Autonomy was looking to recognise
 6     in revenue from a deal with VMS in Q2 2009?
 7  A. I don't know about looking. It's more what he thinks
 8     the negotiation will come out at.
 9  Q. Okay. On any view, that's a reasonably big deal, yes?
10  A. I'm sorry?
11  Q. On any view that's a reasonably big deal for this
12     quarter?
13  A. Reasonably big, yes.
14  Q. Can you go, please, to {K2/134/1}. This, as you can
15     see, is an email from Mr Hussain to Mr Egan later the
16     same day, 24 June 2009. Mr Hussain is updating Mr Egan
17     on various deals. It says:
18         "Please give me an update overnight."
19         If you look at the last line:
20         "Hitachi - unlikely and JPMC $1m lower so I am $2m
21     short - therefore need VMS at $8m or $9m."
22         Again, Mr Hussain is dictating the size of the deal
23     with VMS by reference to Autonomy's revenue needs for
24     that quarter, correct?
25  A. No, he is saying what he would like to get out of VMS.

## Page 23

 1     Obviously there is a whole series of variables: what can
 2     be offered, what discounts can be offered, how much you
 3     throw in for a particular amount, all of that gets
 4     modulated in the process of closing the quarter.
 5  Q. He does say "therefore need VMS". He is putting it on
 6     the basis of what is needed from VMS?
 7  A. He would certainly like to have a VMS deal of
 8     8-9 million, so I guess what he's telling Mr Egan is to
 9     try and aim for that, whatever package is put together.
10  Q. VMS wasn't a big company at the time, was it?
11  A. Sorry?
12  Q. VMS was not a big company at the time, was it?
13  A. It depends how you define "big". I think when we looked
14     at buying it in 2007, and this is very much from the
15     depths of my memory, I think it was around 120 million
16     in value.
17  Q. Do you accept that a $7-9 million software purchase
18     would have been a large deal for VMS to fund on its own?
19  A. No, because their business was -- their business was
20     processing data and data feed and Autonomy was the
21     technology and they had done multiple purchases of
22     Autonomy over the years. It was an end-to-end Autonomy
23     shop.
24  Q. I don't know if that is an answer to my question. I'll
25     just ask it again.

## Page 24

 1     Do you accept that a $7-9 million software purchase
 2     would have been a large deal for VMS to fund on its own?
 3  A. I don't know about its funding ability. As I say, we
 4     would be the primary input for their business, so
 5     I wouldn't know what their financial position was at
 6     that time.
 7  Q. Can we go, please, to {K2/137/1}. Just looking first at
 8     the bottom email, you see an email from Mr Egan to VMS
 9     on 23 June 2009, attaching some draft terms. Then above
10     that, Mr Egan forwards them to Mr Hussain asking him how
11     to structure the deal, do you see that?
12  A. Yes, I do.
13  Q. Then at the top is an email from Mr Chamberlain to
14     Mr Egan on 25 June. He says this:
15         "The tricky bit on this from a rev rec perspective
16     will be demonstrating fair value.
17         "Eg this is currently priced as us paying them $9m
18     and them paying us $7m for the licence - ie net outflow
19     $2m. We need to prove that this is fair value and that
20     the net $2m is not appropriate at $3m to license to them
21     and $1m to us. All the support we can get on that will
22     be helpful."
23         So it appears from this that Autonomy was
24     contemplating paying VMS 9 million for something,
25     selling a software licence to VMS for 7 million, leading

1  to a net outflow from Autonomy of 2 million in VMS's
2  favour, correct?
3  A.  Well, that would be the negotiating position as of
4     the 25th, yes.
5  Q.  And Mr Chamberlain's concern from a revenue recognition
6     point is demonstrating that the transactions are being
7     carried out at fair value, correct?
8  A.  That's correct.
9  Q.  Can we go, please, to {K2/135/1}. This is the same day,
10    25 June 2009. Mr Egan is emailing you and Mr Hussain
11    with an update on various deals and he says here:
12       "Here are updates and I need a decision/input from
13    you first thing in Miami (6am-ish)."
14       If you look at the penultimate paragraph, do you see
15    the side heading of "VMS"?
16 A.  Yes, I do.
17 Q.  We'll see what Mr Egan says:
18      "We need at 9.30 am to go over products etc.  Then
19    I meet Peter on Friday at 11.00 am to finalise numbers.
20    He has cancelled 2 of 3 customer meetings on Friday to
21    do this with me. He also confirmed that he can do the
22    deal if it is a good one for VMS without additional
23    board input."
24      Again, Peter" I suggest is a reference to
25    Peter Wengryn the CEO of VMS. Does that sound about

25

1     right to you?
2  A.  I don't see any reason to disagree.
3  Q.  What did you understand Mr Egan to mean when he said
4     that Mr Wengryn could do the deal if it was a good one
5     for VMS?
6  A.  If it was a deal that he liked the terms of then he
7     didn't need to go to his board to get it signed off.
8  Q.  Presumably you were aware that Autonomy was planning on
9     purchasing something from VMS for 9 million?
10 A.  I may well have been. I don't know whether I was or
11    not.
12 Q.  Obviously the greater the difference between what
13    Autonomy paid VMS and what VMS had to pay Autonomy, the
14    better the deal for VMS, correct?
15 A.  No, it depends what software they're getting and what
16    they're having to give us in what we buy from them. So
17    the important thing to understand about all of this is
18    these are real things, there's software that they use to
19    run their business and there's aggregated data feeds
20    that are being produced and, as in any deal, it's what
21    rights are you giving away for what cost and then what
22    rights are you gaining for what cost. So all of that
23    has to be negotiated.
24 Q.  Can we go, please, to {K2/154.1/1}. As you see, this is
25    an email from Mr Hussain to you on 28 June copying

26

1     Mr Egan, Dr Menell and Mr Kanter:
2       "Mike,
3       "As you know VMS have bought IDOL multiple times and
4     are an excellent reference for us. Gerry Louw and
5     Pete Wengryn of VMS have often expressed a desire to
6     extend the relationship and we have come close in the
7     past in selling more software to them.
8       "We have been in discussions to extend the
9     relationship and it appears there is significant
10    interest in our rich media software and the Interwoven
11    products. Stouffer has the detail but it looks like we
12    could have a large sale of $5m to $9m based on the
13    amount of software they want to buy. I have talked to
14    Pete Wengryn over the weekend and he is v interested in
15    buying this quarter.
16      "Following the [Interwoven] acquisition we also been
17    considering integrating the VMS services (news and ads)
18    as part of our WCM offering. I believe this could be
19    a significant advantage in future sales. We will draft
20    up a business plan for the WCM offering featuring VMS
21    for your approval."
22      The VMS service, just going back to the third
23    paragraph, you see a reference to "VMS services (news
24    and ads)", that's a reference to VMS data feed, correct?
25 A.  Yes, that's right.

27

1  Q.  And WCM stands for web content management?
2  A.  Yes, so that's the Interwoven business of the Interwoven
3     business.
4  Q.  This isn't the first time Mr Hussain had mentioned
5     a deal with VMS to you, correct?
6  A.  I don't know if that's the case or not.
7  Q.  We saw him mention that a VMS deal was needed on 19 June
8     and that it was in progress at between 7 and 9 million
9     on 24 June, correct?
10 A.  Sorry, when you say a deal, you mean a purchase or
11    a sale?
12 Q.  Those were sales.
13 A.  Yes, so -- yes, I've seen emails that show that he'd
14    informed me of a sale.
15 Q.  Can you explain why this email reads as if it's the
16    first contact you and Mr Hussain have had on VMS?
17 A.  Sorry, do I?
18 Q.  Can you explain why this email reads as if it's the
19    first contact you and Mr Hussain have had on VMS?
20 A.  Well, I don't view it that way, but it certainly seems
21    to be laying out the fact that we're going to be doing
22    a purchase, which I may or may not have heard of before
23    this point.
24 Q.  Well, we've seen two emails where he tells you about the
25    sales, correct?

28