Gary S. Lincenberg - State Bar No. 123058
    glincenberg@birdmarella.com
Ray S. Seilie - State Bar No. 277747
    rseilie@birdmarella.com
Michael C. Landman – State Bar No. 343327
    mlandman@birdmarella.com
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS & NESSIM, LLP
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant Stephen Keith Chamberlain

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL RICHARD LYNCH AND STEPHEN KEITH CHAMBERLAIN<br><br>Defendants. | CASE NO. 3:18-cr-00577-CRB<br><br>**Defendant Stephen Chamberlain's Reply in Support of Motion in Limine to Exclude Irrelevant and Prejudicial Documents Pursuant to Federal Rule of Evidence 403**<br><br>Date:      February 21, 2024<br>Time:      2:00 p.m.<br>Place:     Courtroom 6<br><br>Assigned to Hon. Charles R. Breyer |

I.     SUMMARY OF ARGUMENT

Mr. Chamberlain's Motion in Limine seeks to exclude three discrete items that are not encompassed by the bill of particulars and do not involve accounting determinations that are the subject of this case. References to the "credit hunt", "dummy cash" and "three options email" are simply irrelevant and will only serve to confuse issues and waste time. Between the lines, the Government's opposition admits as much with regard to the "credit hunt" and "three options" emails. Instead, the Government argues for admissibility because these emails demonstrate Mr. Chamberlain's general willingness to discuss Autonomy's financial objectives and help meet its revenue targets. Of course, there's nothing wrong with that. The question is not whether Mr. Chamberlain sought to help Autonomy meet its financial objectives; it is whether he committed fraud. And the Government has not alleged that the communications reflected in the "three options" or "credit hunt" emails resulted in fraudulent accounting. The "three options" email merely reflects Hussain's request for the Finance Department to do some math. The "credit hunt" email is merely a request to find credits that should be recognized. Neither support any accounting determination at issue.

With respect to the "dummy cash" emails, the Government claims that it is not attempting to imply that the mere use of the word "dummy cash" implies something improper. That's surprising. In the grand jury, the Government asked a witness whether "dummy cash" was "a concept that troubled you." USAO_GJTX 00007790 at 29:14–21. Now the Government claims its purpose is to show how Autonomy made Microlink's debts "go poof". But that is not at all supported by the document. The "dummy cash" emails actually establish the opposite: the use of cash entries to offset an existing debt was *more* transparent than a straightforward write-off, which would simply remove the debt from the ledger. The real Government purpose here is that to non-accountants, the term "dummy" sounds fake, even though it is not. The Court should force the Government to run a tighter ship and not allow things that serve more to mislead and improperly prejudice a lay jury.

Mr. Chamberlain's motion should be granted.

## II. ARGUMENT

### A. "Three Options" Email

The Government's attempt to explain the relevance of Trial Exhibit 1763 (Exhibit 1 to the Declaration of Gary S. Lincenberg ("Lincenberg Decl."))—the April 12, 2011 "three options" email—only heightens the concern that the document will be used improperly.

First, the Government does not dispute that none of the three options listed in the email was actually followed. The email was sent before all of the revenue recognition evidence was even available. None of the math computations were relevant as none of the three scenarios were born out by the final audit evidence.

Second, the Government's contention that the email "shows Chamberlain treating revenue recognition principles as subservient to the financial objectives of Autonomy's management during the conspiracy period"—is not accurate. Opp. at 3. The email, which was sent in the middle of the post-quarter period when Autonomy was working with its auditors to determine what revenue could and could not be recognized, does not mention any "revenue recognition principles." Nor does it suggest that Mr. Chamberlain viewed those principles as "subservient to the financial objectives of Autonomy's management." The email summarizes how different scenarios would impact the financial results; it does not state that Autonomy would press forward with any scenario not supported by the evidence. The Government's overreading of the text of a single, out-of-context email only highlights their intention to use the email to conflate ordinary deliberative communications with something pernicious. The Government should not be permitted to do so.

Third, the citations the Government uses to establish the email's "deep relevance," Opp. at 4, show the opposite. As explained in Mr. Chamberlain's motion, Lee Welham's testimony about the email perfectly encapsulates how the Government intends to misuse it: in *Hussain*, the Government presented this single, out-of-context email to an auditor that was not involved in the communication and had no foundation to testify about it. He nevertheless speculated as to its meaning and then testified that he was "troubled" by it. (The Government neglected to mention to the witness that none of the "options" was ultimately followed).

Finally, the Government fails to address the waste of jury time that would be necessitated if it is permitted to introduce this email. Because the Rule 15 depositions took place before the Court ruled on this motion, counsel covered the "three options" email with two witnesses in the UK. If the Court rules against Chamberlain here, the Rule 15 testimony alone will take about 30 minutes of jury time. Counsel will need another hour of time with other witnesses to walk through the underlying deals discussed in the email, *even though none of the three options were taken and the final revenue figures were different from the figures listed on the email*. That would be a needless waste of time that the Court should prevent.

For these reasons, Trial Exhibit 1763 should be excluded.

### B. "Credit Hunt" Emails

The "credit hunt" emails involve Mr. Chamberlain asking his colleagues to search for overlooked "credits" that could legitimately be used to offset costs. The Government does not suggest otherwise. Instead, it asks the Court to permit a trial strategy of conflating Mr. Chamberlain's general desire to see his company do well with a willingness to commit fraud.

The Government argues that these emails establish "pressures" on Mr. Chamberlain "to post strong financial metrics." Opp. at 6. But if that is all that is required to establish relevance in this case, there would be no reason for a bill of particulars: following the government's logic, *any communication that suggests that Mr. Chamberlain was working towards Autonomy's financial targets would be probative of fraud, whether or not the communication related to a fraudulent accounting decision.* The Government does not even claim that any line was crossed in connection with these emails.

Finally, allowing the Government to introduce the "credit hunt" emails would again result in a needless waste of time and juror confusion. Mr. Chamberlain would have to respond to such evidence by spending time with no less than four trial witnesses involved in the emails to demonstrate to the jury that Autonomy did not end up recognizing any improper credits as a result of these "hunts" even though the Government is not alleging that it did.

The Court should exclude Trial Exhibits 735, 3305, 3308, 14221, 15296, 15298, 15299, 15300, 15303, and 16196. Lincenberg Decl. Exs. 2–11.

C. **"Dummy Cash" Emails**

The Government claims that it is seeking to introduce Exhibit 816 (Lincenberg Decl. Ex. 12) as part of its narrative explanation of Autonomy's purchase of Microlink, and not because it intends to ask the jury to ascribe a superficial and pejorative misunderstanding of the word "dummy cash," Opp. at 7. In light of the way the Government used this in the grand jury, Chamberlain questions that claim. There, the Government questioned Ganesh Vaidyanathan (who is on the government's witness list) about the mere use of the term:

> Q. And that word, "dummy cash," that Ms. Harris used with you, is that a concept that troubled you?
>
> A. Really troubled me.
>
> Q. Why is that?
>
> A. Because you don't post dummy things into any sort of books anyway. It's just—and the language is not necessarily—I attributed that to the difference between their sort of English and ours…

USAO_GJTX 00007790 at 29:14–21.

Moreover, the Government explanation of the probative value of this communication is inconsistent with the face of the email itself. The Government claims that these emails show "the mechanics of how Autonomy made MicroLink's debts go 'poof.'" Opp. at 7. It actually shows the opposite. Ms. Harris's email confirms that the "dummy cash" entry is a ledger entry that offsets the Microlink debt without removing the accounting entry for the latter:



The end result of the entry—as described in the email—was two separate entries in

Autonomy's books: one that shows Microlink's existing debt to Autonomy, and a contra-entry (the "dummy cash") establishing that it would be treated as an intercompany debt after the acquisition. The net effect is full transparency in Autonomy's books about how it treated Microlink's pre-acquisition debts. In other words, instead of making these debts "go poof"—i.e., by simply erasing the debts from Autonomy's balance sheet—the use of "dummy cash" entries ensured that Autonomy's books would show exactly what happened: an entry for the debt, offset by a separate entry showing that Autonomy intended to treat what was previously a third-party debt as an intracompany debt. (Notably, these entries did not affect the accounting treatment of the debts owed to Microlink by the end users of Autonomy's products, a substantial amount of which were ultimately repaid to Autonomy post-Microlink-acquisition and not written off). The Government's misapprehension of these emails only strengthens Mr. Chamberlain's concern that presenting them to the jury will result in confusion and unfair prejudice.

Puzzlingly, the Government cites in its favor the fact that the defense in the *Hussain* trial began with the "dummy cash" issue in its cross-examination of Alan Rizek. Opp. at 8. But that shows the opposite: it establishes that the Government's use of the term was so prejudicial (relative to any probative value) that the defense needed to prioritize clarifying that term. The same will be true here. As with the other documents addressed in Mr. Chamberlain's motion, if the Government is permitted to introduce "dummy cash" emails to the jury, Mr. Chamberlain's defense will be forced to spend court time explaining that the term simply applies to the use of an offsetting debit entry, that the accounting entries did not result in a misleading ledger, and that the mere use of the term "dummy cash" does not denote anything sinister.

The Court should exclude Exhibit 816.

### III. CONCLUSION

For these reasons, the Court should grant Mr. Chamberlain's motion.

| | |
|---|---|
| DATED: February 7, 2024 | Gary S. Lincenberg<br>Ray S. Seilie<br>Michael C. Landman<br>Bird, Marella, Rhow,<br>Lincenberg, Drooks & Nessim, LLP |
| | By: _/s/ Gary S. Lincenberg_<br>        Gary S. Lincenberg<br>Attorneys for Defendant Stephen Keith Chamberlain |