Pages 1 - 100

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

```
UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
    vs.                          )  NO. CR 18-00577-CRB
                                 )
MICHAEL RICHARD LYNCH and        )
STEPHEN KEITH CHAMBERLAIN,       )
                                 )
            Defendants.          )
_____)
```

San Francisco, California
Wednesday, February 21, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

ALEX G. TSE
Acting United States Attorney
450 Golden Gate Avenue
San Francisco, California 94102
BY: **ADAM A. REEVES**
**ROBERT S. LEACH**
**ZACHARY ABRAHAMSON**
**KRISTINA GREEN**
**ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Lynch:

CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019
BY: **CHRISTOPHER MORVILLO, ATTORNEY AT LAW**
**CELESTE L. KOELEVELD, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR
Official Reporter, CSR No. 12219

<u>**APPEARANCES**</u>:   **(CONTINUED)**

For Defendant Lynch:
                          STEPTOE & JOHNSON LLP
                          1330 Connecticut Avenue, NW
                          Washington, D.C. 20036
                  BY:   **REID H. WEINGARTEN, ATTORNEY AT LAW**
                        **BRIAN M. HEBERLIG,  ATTORNEY AT LAW**

For Defendant Chamberlain:
                          BIRD MARELLA BOXER WOLPERT NESSIM
                          DROOKS LINCENBERG & RHOW PC
                          1875 Century Park East, 23 Floor
                          Los Angeles, California 90067
                  BY:   **GARY S. LINCENBERG, ATTORNEY AT LAW**
                        **MICHAEL C. LANDMAN, ATTORNEY AT LAW**
                        **RAY SEILIE, ATTORNEY AT LAW**


**Also present:**       **Ali Hasan, Government Paralegal**

PROCEEDINGS

| | |
|---|---|
1 | <u>**Wednesday - February 21, 2024**</u>                    <u>**2:02 p.m.**</u>

2                     <u>**P R O C E E D I N G S**</u>

3                            ---o0o---

4        **THE CLERK:**  All rise.  Court is now in session.  The

5 Honorable Charles R. Breyer presiding.

6      You may be seated.

7      Calling Criminal Action CR-18-0577, USA vs. Michael

8 Richard Lynch, and USA vs. Stephen Keith Chamberlain.

9      Counsel, please step forward and state your appearances

10 for the record.

11        **MR. LEACH:**  Good afternoon, Your Honor.  Robert Leach

12 on behalf of the United States.  I'm joined by Adam Reeves,

13 Kristina Green, Zach Abrahamson; and at counsel table we have

14 Ali Hasan, who's our paralegal on the case.

15        **THE COURT:**  Good.  Good.

16        **MR. MORVILLO:**  Good afternoon, Your Honor.  Chris

17 Morvillo for Dr. Lynch, who's present in the courtroom.  With

18 me is also Reid Weingarten, Celeste Koeleveld, and Brian

19 Heberlig.

20        **THE COURT:**  Good morning.

21        **MR. LINCENBERG:**  Hi, Your Honor.  Gary Lincenberg with

22 Mr. Chamberlain, who's present in court; and from my firm

23 Raymond Seilie and Mike Landman are here.

24        **THE COURT:**  All right.  Good morning.

25      Okay.  Everybody have a seat.

1        This is the -- first, excuse my voice.  I have a cold.

2   It's a cold.  You know, just apparently a very common -- all

3   too common cold; but people say, "Well, that's great.  It's a

4   common cold.  It's not anything else."  So I -- I'll sound a

5   bit peculiar, but that's the way it is.

6        This is the pretrial conference, and so there are a couple

7   of things that I want to try to accomplish in the conference.

8   One, of course, I'm going to go through the motions in limine.

9   I'm not going to have -- I have some specific questions about

10  some of them, but I'm not going to have argument on all of

11  them.  I'm going to tell you what my rulings are and without

12  the benefit of my wisdom behind the rulings because it occurred

13  to me that one of two things will happen.

14       One is there could be a conviction; and if there's a

15  conviction, obviously I'm going to have to write on the subject

16  of the various motions in limine to the extent that they could

17  have impacted a verdict.

18       On the other side, there could be acquittal, and you will

19  never see a piece of paper as to why I thought about A, B, C,

20  or D because I don't think that there's any -- I'm not writing

21  for history.

22       This is a case that will have an outcome one way or the

23  other; and depending on the outcome, something will be written

24  if it's required.  And if not, if there isn't a conviction

25  then, I'm simply going to go quietly into the night and all

**PROCEEDINGS**

 1  these papers that you filed will still be there as a record,

 2  but there will be no conviction.  So no appeal -- no

 3  conviction, no appeal.  That's the end of the matter.  And I

 4  have no opinion at all on the outcome.

 5       So let's go through the various motions in limine starting

 6  with the Government first.

 7       The Government's motion -- and even though they're styled

 8  motions in limine, they're also motions to admit some of them.

 9  So it's -- "in limine" suggests that that means excluded, but

10  it can be -- it's been interpreted by the parties on both sides

11  to be inclusive as well as exclusive, and so let's not be

12  troubled by the nomenclature.

13       The Government's first motion, which is to admit

14  restatement and summary charts, this is not the first time I've

15  addressed it.  Obviously, I did in the *Hussain* trial, in that

16  decision, which was that the restatement was admitted but the

17  summary charts were not.  I don't have a recollection as to

18  whether or not the summary charts were, one, proffered for

19  admission; or, two, used for demonstrative only; or, three,

20  weren't even there, but I think they were there, my

21  recollection is.  Maybe Mr. Reeves recalls.

22            **MR. REEVES:**  My recollection is in the *United States*

23  *vs. Hussain* that the summary charts were used as demonstratives

24  only to aid the witness testimony but were not received in

25  evidence.

**PROCEEDINGS**

1          **THE COURT:**  Okay.  So that would be my -- that would

2    be my intention in this case.  If they are offered, and it's up

3    to the party, it's up to the Government whether they want to

4    offer them, they could only be used for demonstrative purposes.

5    They will not be admitted as exhibits into evidence.

6          Now, the Government states that the summary charts are

7    based on business records that Yelland and Anderson used to do

8    their work.

9          My question to the Government:  Has the Government

10   identified the underlying records that it relied on?

11         Mr. Leach?

12         **MR. LEACH:**  The answer is yes, Your Honor.  In

13   Exhibit 2749 beginning at page --

14         **THE COURT:**  Wait a minute.  I have to write this out.

15   2749.

16         **MR. LEACH:**  -- beginning at page 14, Mr. Yelland

17   itemizes the records he relied on for prep- -- the business

18   records he relied on for preparation of the summary chart.

19   Now, there's some dispute with the other side about are these

20   really business records or are they something else, but the

21   items that Mr. Yelland was relying on to prepare the summary

22   are itemized in Exhibit 2749.

23         **THE COURT:**  So he said what he's relied on, but the

24   dispute is:  Are they business records?

25         So that's -- that's a question.

PROCEEDINGS

1        And, I mean, I recall -- wasn't there some, like, a

2    newspaper article or an interview that somebody gave or

3    something to that nature, and then Yelland says, "Well, I read

4    it, and that forms the basis for -- a basis" -- forget "the" --

5    "a basis for coming to this particular conclusion."

6        Is that -- is my recollection correct in that regard?

7            **MR. LEACH:**  Your recollection is correct, Your Honor.

8        And just to give context for why there's citations to news

9    articles, my understanding is there are some instances where

10   Mr. Yelland learned that Autonomy was no longer in the running

11   to do a software sale because it learned through publicly

12   available information that a competitor had actually

13   consummated that transaction.

14       And just as a salesperson might report to finance "We're

15   not going to close this deal anymore," and the finance

16   executive will make a revenue determination based on that, that

17   was, in certain circumstances, what Mr. Yelland concluded was

18   the reason why there would not be a subsequent transaction

19   because they -- it essentially lost the deal.

20       But the overwhelming majority of the records are e-mails

21   and contracts and invoices and other types of business records

22   that finance professionals use all the time for accounting

23   determinations.

24           **THE COURT:**  Well, let's -- let's see if we can short

25   circuit this.

 1      If, in fact, you're satisfied -- and I'll put that in

 2   quotes -- but if, in fact, you're satisfied with not

 3   introducing the summary charts -- see, I think a summary chart

 4   could go into evidence if, in fact, the records supporting it

 5   are business records -- are exclusively admissible documents,

 6   if they are.  Then that wouldn't -- then my -- I would reverse

 7   my earlier decision.

 8      On the other hand, I have a sense that they're not all

 9   that.  Some are.  Some aren't.  And it's an enormously

10   time-consuming and -- I've got to try to figure out is it

11   really -- well, I don't have to figure out anything.

12      You have to figure out is it so important to the

13   presentation of your case that you want to go through each

14   thing in the summary judgment -- and maybe you've done this

15   already and I just haven't seen it -- each conclusion he has in

16   the summary judgment and say it's Exhibit 2749, it's

17   Exhibit 2750, it's Exhibit -- I have to say, there's no

18   shortage of exhibits in this case.

19      As a matter of fact, I was thinking when I got the first

20   list yesterday morning, that there were -- was it 9,000?

21   13,000? -- that it was 13,000.  I thought:  Well, that's easy.

22   I'll just admit the 13,000 because I'm sure there won't be an

23   objection.

24      I thought that to myself, trying to be funny to myself.

25   But then, of course, you amended it and decided that you needed

**PROCEEDINGS**

1    a few more, so it's now up to 20,000; right?  Okay.

2            **MR. LEACH:**  It's grown.

3            **THE COURT:**  It's growing.  It's growing.

4        I don't know who's going to look at the 20,000.  I don't

5    think I am.  That would mean that the case would go on for

6    about two months and the jury deliberations would go on for two

7    years.  So that's just not going to happen, but we'll try to

8    figure it out.

9            Anyway, I don't know that you're in a position today to

10   say what you want to do about the summary -- the summary -- the

11   summaries.  I am going to permit Yelland to testify about --

12   I guess there were two people that were going to testify about

13   it.  As I did in the first trial, I was going to permit them to

14   testify.

15           **MR. LEACH:**  I appreciate the Court's comments, and we

16   can look -- you know, the summary was prepared by Yelland, who

17   is not a lawyer and who's not thinking about the business

18   records exception necessarily.  And I can look -- to the extent

19   we want to admit the chart itself, we can look closely to what

20   is itemized and whether they are or are not business records.

21           **THE COURT:**  So Yelland was not identified as an expert

22   in the case, but obviously he has, by virtue of his position,

23   experience and training; as a percipient witness, he has -- he

24   has certain knowledge.

25           Is that how he is testifying?  Because you haven't limited

**PROCEEDINGS**

1    him -- you haven't identified him as an expert?

2         **MR. LEACH:**  That is correct, Your Honor; we haven't

3    identified him as an expert.

4         We don't think we're required to under Rule 16.  He does

5    have certain knowledge that he applied in the course of his job

6    duties, but it's all based on his contemporaneous work and not

7    specialized knowledge outside of his role at Autonomy.

8         **THE COURT:**  Okay.

9         All right.  So let me turn to the Defense, moving up here

10   chair by chair.

11        **MR. HEBERLIG:**  Thank you, Your Honor.

12        Hard to stay in my seat.  Brian Heberlig behalf of

13   Dr. Lynch.

14        **THE COURT:**  You'll get your seat back.  Go ahead.

15   Yeah, go ahead.  And just -- we're just addressing them one --

16   these things.

17        **MR. HEBERLIG:**  Absolutely.

18        So there are two points I'd like to hit.  One is the

19   document issue that you just raised.

20        So we actually do have a disagreement with the Government.

21   The charts themselves are not based on the documents that

22   Mr. Yelland identified.

23        What is in that index of documents, you may recall there

24   was like a trolley rolled out with a bunch of documents on it.

25   They're historical records, like the original contracts and

**PROCEEDINGS**

1  some payment records and the like, but what Mr. Yelland

2  testified to was why he restated certain transactions; and that

3  testimony was based on interviews he conducted, information he

4  got from Morgan Lewis or PWC.  None of that underlying material

5  is in the chart, so it's very much only half the picture and,

6  if anything, it supports the original accounting determinations

7  not the restatement.

8      The stuff he relied upon, as partially apparent from his

9  testimony but came to light more from documentation that was

10  discovered after the *Hussain* trial, was pure hearsay:

11  Interviews of employees, work product, and other reports he got

12  from counsel who were conducting the legal investigation.

13     So that goes to both the charts are not supported by

14  underlying business records, and we haven't received the bases

15  for Mr. Yelland's --

16         **THE COURT:**  Well, that's not coming in.

17         **MR. HEBERLIG:**  Understood.

18     But the related point is:  We haven't received the bases

19  for Mr. Yelland's opinions.

20     And what he is offering is quintessential expert

21  testimony.  He's an accountant.  The Government admits in its

22  brief that he's applying his specialized knowledge to the work

23  he did.  It's not just observations.

24     I mean, we've cited Ninth Circuit authority for this

25  concept.  It's not lay opinion.  It would be as if a civilian

1    oversaw an autopsy, saw someone remove a bullet, and opined on

2    what the cause of death was.

3         No.  He is using his accounting expertise to say:  This is

4    why that transaction's restated or this transaction's restated.

5    And the problem with that is we've not received proper

6    disclosure of the bases for his opinions.

7         **THE COURT:**  But don't police do that all the time in

8    criminal cases?  Don't they say "I saw this happen" or "I saw

9    that happen"?

10        And it may or may not be meaningful to a lay jury, but it

11   is -- it's part of the police officer's experience that then

12   causes him to come to certain conclusions.

13        **MR. HEBERLIG:**  Well, they can opine on things that are

14   common sense, like "He appeared to be drunk" or "He appeared to

15   be intoxicated" or "He appeared to be speeding," but they can't

16   say "He appeared to have a .32 blood alcohol level."

17        **THE COURT:**  But they say much more than that.  They

18   say much more than that, "It appeared that he was a drug

19   dealer," "It appeared that he was conducting a drug

20   transaction," where it may not appear to -- it may not look

21   that way to anybody else.

22        **MR. HEBERLIG:**  So that testimony, the Ninth Circuit

23   has said, is expert testimony.  That's the *Figueroa-Lopez* case.

24   I can give the Court a cite to it, but for a DEA agent or

25   someone to come in and say "Based on my experience as an agent,

**PROCEEDINGS**

1   he's engaged in drug transaction activity," that's expert

2   testimony.

3          And if you'd bear with me, it's 125 F.3d 1241.

4              **THE COURT:**  I'm sorry, 125?

5              **MR. HEBERLIG:**  125 F.3d 1241, Ninth Circuit 1997,

6   *Figueroa-Lopez*.

7          Lay opinions reserved for percipient observations where

8   the witness can add a commonsense opinion about what occurred,

9   but there's no common sense at all that applies to these

10  accounting principles.  They're often counterintuitive and they

11  require specialized expertise that no juror is going to have

12  any basis to understand.

13         So it's expert testimony, and that triggers the whole

14  panoply of requirements that the Government hasn't met.  They

15  noticed Mr. Yelland as an expert in the *Hussain* trial.  They

16  did not here, and I think the reason for it's clear.  There

17  have been amendments to the expert disclosures rules where the

18  disclosures are now far different.  You need to have an expert

19  report signed by the expert that goes through every single one

20  of the opinions to be offered and the underlying bases, and we

21  don't have that here.  We don't have anything close to it.

22             **MR. LEACH:**  They have the notice from the *Hussain*

23  case, Your Honor, in which we said, "We don't think he's an

24  expert; but if you do, here's the basis for what he's going to

25  testify to."

1   They have his testimony from the *Hussain* trial.  They have

2   any number of 302s from the Government's meetings with

3   Mr. Yelland, and they have Mr. Yelland's testimony in the U.K.

4   civil case.  So the idea that they don't know what's coming

5   from Mr. Yelland or the bases for what his testimony is I -- I

6   think is vastly overstated.

7   And everything my friend on the other side is saying

8   applies equally to any accountant who's doing their job in the

9   ordinary course of their business.

10   Accountants look at paper, they ask questions of their --

11   of their sales force, they ask questions of their accounting

12   force, and then they record transactions.  And what the

13   restatement here is, is financial statements.  And the logic of

14   the Defense argument, if applied, would exclude a whole host of

15   testimony about --

16   **THE COURT:**  So but now I'm going back to counsel.  The

17   *Figueroa* case, I -- of course, it doesn't come to mind, which

18   it means I'll go take a look at it -- that didn't involve an

19   accountant, did it?  Or do you have a case that involved an

20   accountant in which the accountant testified in the -- a

21   criminal case, in the trial and then was -- and the issue is

22   could he have testified as a percipient witness, could he have

23   testified as a -- I mean, a lay witness can give an opinion.

24   That's not the prohibition that the Evidence Code provides that

25   you can't do that.

 1          But does he have to be declared an expert and then satisfy

 2     the requirements?

 3          Is there such a case?

 4               MR. HEBERLIG:  We did cite a case.  It was actually

 5     one of Your Honor's cases.

 6               THE COURT:  Uh-oh.

 7               MR. HEBERLIG:  The *Pattison* -- the *Pattison* case,

 8     P-A-T-T-I-S-O-N.  There wasn't a reported decision from you,

 9     but you ruled from the bench in a setting like this that this

10     kind of testimony would be expert testimony.

11               THE COURT:  Do you have the cite or is it in your

12     brief?

13               MR. HEBERLIG:  It's in our briefs.  It's appended to

14     our brief.

15               THE COURT:  Come on.  You have 10 people working on

16     this case.  Just give me the --

17               MR. HEBERLIG:  Someone while I'm talking will --

18               THE COURT:  -- cite.  You don't have to give it right

19     away, but give me the cite.

20               MR. HEBERLIG:  We'll give it to you.  It did go up on

21     appeal.  I think it had a different case name.  It was *SEC vs.*

22     *Sabhlok*, and the Ninth Circuit said what was admissible were

23     observations of an accountant, but not opinions, not the type

24     of specialized knowledge here.

25          And the difference in the kind of testimony my colleague

**PROCEEDINGS**

1    is discussing is it's one thing for an auditor who did the

2    underlying accounting in real time as part of their job to say

3    "This is what I looked at, this was the accounting decision we

4    reached."  That's arguably fact testimony.

5         But that's not what Mr. Yelland did.  He recreated, years

6    after the fact, transactions that he had nothing to do with, in

7    real time, based on information that lawyers and accountants

8    fed him who were doing a legal investigation.  It's totally

9    different.

10         **THE COURT:**  Isn't it sort of a mix?  He is there

11   trying to figure out what he's got.  He's looking at something.

12   He's looking at books and records of an entity which now they

13   own, and he's going through it to figure out what is the

14   current -- what -- relatively current status of all of these

15   things.  He's looking at it because that's the way you have

16   to -- if you're going to operate something, you have to look at

17   it.

18         Well, I think what you'll find, if you look, we laid it

19   out in Appendix A of our motion, that's not what he testified

20   to.  He said that he made inquiries and learned such things as

21   Autonomy never used the software products that it bought.

22         Well, he didn't specify what those inquiries were at the

23   *Hussain* trial, but we now know from discovery that he was

24   talking to Morgan Lewis or PWC, or maybe even talking to an

25   engineer at Autonomy years after the fact, and then he's just

1   repeating that hearsay.

2       It's not his judgment from reviewing a contract or a set

3   of books.  He's baking into his testimony, without disclosing

4   it, hearsay and other information that would not be admissible

5   unless, arguably, it's expert testimony.  But then we have the

6   problems we haven't received the underlying basis, and the

7   reason why we haven't is HP continues to assert privilege over

8   its communications with Mr. Yelland.

9       Well, a few of them slipped through the filter.  And

10  I believe what happened is the other auditing firm -- Ernst &

11  Young, that was brought in by HP when HP fired Deloitte --

12  produced some materials pursuant to these MLAT requests.  And

13  they had a separate job, if you may remember, to review what

14  Mr. Yelland was working on with the goal of offering their

15  opinion like Deloitte offered in real time.

16      In the end, they didn't do so.  They disclaimed an

17  opinion, but there was back and forth between Mr. Yelland and

18  Ernst & Young about why he was restating certain transactions.

19  And it's only from that source -- and it's partial and

20  incomplete -- that we know, in several instances that we've

21  cataloged in our brief, he went to PWC and Morgan Lewis and

22  said:  Do you have any reason or any information that the

23  FileTek StorHouse transaction was not a real commercial purpose

24  and was improperly accounted for?

25      A short while later, Morgan Lewis and PWC sent an e-mail

1   to Mr. Yelland's colleague and said, "Yes, despite the fact

2   that the contemporaneous document suggests it was bought for a

3   commercial purpose, we've done some interviews of people" --

4   unspecified in the e-mail, we don't know who they were -- "and

5   those interviews told us something different."

6        Mr. Yelland's colleague took that e-mail, it was a

7   paragraph of information, cut and paste it, put it into their

8   memorandum that they sent to EY as the basis for the

9   restatement.

10        None of that was known at the *Hussain* trial because that

11  document had not been produced yet.  And many more like it are

12  still being withheld on privilege grounds, so we have no basis

13  to cross-examine Mr. Yelland and say:  Our inquiries determined

14  that that transaction didn't have any economic substance.

15        The inquiries are not reflected in the documents on that

16  trolley or in the index of materials that counsel says the

17  summary chart was based on.  We have no idea what they are,

18  save for this one memorandum and a few scraps of e-mails that

19  made it through the privilege filter.  I don't know if that was

20  a mistake on their part or what, but they paint a very

21  different picture than the one that was presented at the

22  *Hussain* trial.

23        **MR. LEACH:**  My friend is overstating the extent of

24  Mr. Yelland's reliance on anything from PWC or Morgan Lewis.

25  And his rule swallows up what the *Jasper* case says, which is

1   that even a restatement, even one that follows an internal

2   investigation, even one that is prepared in the context of

3   litigation is, at the end of the day, financial statements.

4        Mr. Yelland's questions in that one document, which

5   they've cherrypicked, is in the context of:  Did your

6   investigation unearth any evidence contrary to the accounting

7   conclusions that I'm required to make under U.K. law and I am

8   required to file under essence penalty of perjury?

9        And his receipt of one document on that case doesn't

10  undermine his reliance on the underlying records.

11       **THE COURT:**  Well, isn't another way to look at it is

12  he comes up and he gives his opinion?  He gives 12 categories

13  or 5 categories.  He says whatever he says.  And then either

14  you or Defense counsel comes in and says, "Okay, what did you

15  base Conclusion Number 1 on?"

16       And he says, "Well, I base it on six things or one thing."

17       And let's take the easy case, the one thing -- because if

18  it was six things, you could say "Exclude Number 6" -- would

19  you come to the same conclusion?  Would it make any difference?

20  And then that's a matter of argument and it's a matter of

21  weight.

22       Let's say he says one thing and it's inadmissible.  It's

23  inadmissible.  Then -- then it goes out.  I mean, you know, the

24  problem -- the old problem of motions in limine -- I mean, it's

25  not an old problem but it's a continual problem -- is that

**PROCEEDINGS**

1    you -- is that the balance between admissibility or allowing

2    him to submit it and every opinion having a solid basis in fact

3    sometimes is a function of cross-examination.  It's the

4    cross-examination that points out the weakness or the -- of

5    the -- and it could come up in direct as well.  I understand

6    that.

7         **MR. HEBERLIG:**  Your Honor, save for the fact that

8    Rule 16 and Federal Rule of Evidence 702, 703 says the Defense

9    is entitled to know.

10        **THE COURT:**  Okay.  So that's what I have to take a

11   look at.

12        Okay.  So I've sort of addressed in my mind, I've

13   addressed the second part, what we've been talking about, and

14   you're saying, "Look, Judge, you don't have to go there.  If

15   he's an expert, they have -- or they were required to give all

16   the bases for his particular opinion, and they should -- he

17   hasn't done that and so he's out."  That's your point.

18        **MR. HEBERLIG:**  That's our point.  And if you,

19   nonetheless --

20        **THE COURT:**  Okay.  I'll take a look at that.  I'll

21   take a look at that again.

22        **MR. HEBERLIG:**  I guess the last point I'll make is if

23   you nonetheless decide he's in, then we're entitled to the

24   privilege documents they continue to withhold because they're

25   the basis for --

**PROCEEDINGS**

 1        **THE COURT:**  Maybe, maybe not.  When I say you're

 2   entitled -- when you say you're entitled, you're saying that

 3   for fair cross-examination, you need it.

 4        **MR. HEBERLIG:**  Yes, and we've renewed our request for

 5   that.

 6        **THE COURT:**  There's a remedy for that because if you

 7   can't get it because somebody is withholding it or the

 8   consequences of trying to obtain it are -- you know, involve

 9   levels of delay that I don't think -- at least I don't want,

10   then there are other remedies.  There are other remedies

11   available.

12        **MR. HEBERLIG:**  It's a classic short versus sealed.  I

13   mean, the remedy is it doesn't come in.

14        **THE COURT:**  Maybe that doesn't.  I don't know.  So --

15        **MR. LEACH:**  I just want to be clear.

16        **THE COURT:**  Yeah, let's be clear.

17        **MR. LEACH:**  I don't have a document from HP on this

18   subject that we have not produced in discovery.  I think he --

19        **THE COURT:**  He's not saying that.

20        **MR. HEBERLIG:**  I'm not.

21        **THE COURT:**  He's saying they don't give it to anybody.

22        **MR. LEACH:**  Well --

23        **MR. HEBERLIG:**  Yeah.

24        **THE COURT:**  I mean, I got a request to issue a

25   subpoena or something for all those documents, which are not --

**PROCEEDINGS**

1          **MR. HEBERLIG:**  We have dozens and dozens of Yelland's

2    e-mails with HP's lawyers that are heavily redacted, and

3    they're all around the time period that he's working on the

4    restatement.  If his communications with the HP lawyers were

5    designed to gather information for the public restatement,

6    they're not privileged and we're entitled to them.

7          **THE COURT:**  I'm not going to get into that argument.

8    First of all, Hewlett Packard is not here.

9          **MR. HEBERLIG:**  Well, they're -- actually their lawyers

10   are here.

11         **THE COURT:**  Well --

12         **MR. HEBERLIG:**  I'll give you that cite, if you'd like,

13   Your Honor, to the *Pattison* case.

14         **THE COURT:**  That's a pretty good rejoinder.

15         **MR. HEBERLIG:**  It's Criminal Number 08 -- I'm sorry,

16   Civil, it's an SEC case I think; I'm not sure.  08-cv-4238, and

17   I believe it's Docket 173.  We attached the relevant excerpt to

18   our brief.

19         **THE COURT:**  Okay.  Thank you very much.

20         **MR. HEBERLIG:**  Thank you.

21         **THE COURT:**  So I'll go take a look at that.

22      Yes, Mr. Leach.  You can add anything you want to add.  Go

23   ahead.

24         **MR. LEACH:**  *Pattison* is unpublished and is before

25   *Jasper*, and I don't think should be accorded the weight my

1   friend suggests.

2            **THE COURT:**  Okay.

3            **MR. HEBERLIG:**  A final word, if I may.

4       *Jasper* only had to do with the restatement, not whether

5   someone could come in and provide expert testimony about the

6   reasons for the restatement.  You have to separate the two.

7   The restatement is just a document.

8       And the restatement in this case is a sum total of

9   numbers.  It's a profit and loss statement and a balance sheet.

10           **THE COURT:**  Right.

11           **MR. HEBERLIG:**  It doesn't say anything about any

12  transaction being restated.  That comes only from Mr. Yelland.

13  So it's not covered by *Jasper*.  *Jasper* only allows, arguably,

14  the business record that's the restatement.  We gave our

15  reasons for why it's not a business record; but I recognize

16  *Jasper* says what it says, but that does not control the

17  admissibility of Mr. Yelland's testimony.

18           **MR. LEACH:**  Then bring in the general ledger entries

19  where the adjustment is made and ask the witness "Why did you

20  do that?"

21      His suggestion that *Jasper* doesn't cover this, I think,

22  swallows up the case in its entirety and basically means

23  professionals -- an engineer, a lawyer, an accountant, anybody

24  with a degree -- can't explain what they did.

25           **THE COURT:**  I mean, I am confronted with what seems to

 1   be somewhat of an anomaly to say:  The document comes in but

 2   you can't explain what -- how you got to what you got to in the

 3   document.

 4           MR. LEACH:  Exactly.

 5           THE COURT:  I mean, if you just say, "Well, here it

 6   is, and we have no questions," you know, and -- or they say

 7   "Now, why did you make this entry?"

 8       "Objection."

 9       You know, "Sustained."

10       I mean, it would just -- it would render the document

11   itself meaningless, I think.  I think you're -- the conclusion

12   on that score is:  Don't let in the document.

13       You can't explain why you did what you did or what it

14   shows, you can't explain it.  I don't understand how it's

15   probative.  It's just a series of numbers that are untethered

16   to how they -- how they were ascertained.

17       Anyway, I'll take a look at the cites and go back to that.

18   Thank you.

19           MR. LEACH:  Thank you.

20           THE COURT:  Now, the Government in motion -- let's

21   see...

22       Okay.  So let me go to the second motion in limine, which

23   is to admit evidence of Mr. Lynch's control, knowledge, and

24   intent.  And there were, I think, four items, the testimony

25   from Joel Scott -- pardon me -- the testimony from Joel Scott,

1  the testimony from Alex Mars, a sales video, and then sort of

2  the image, the James Bond piranha.  Maybe there's some other

3  things that are in that group.

4      Well, as to the sales video and as to the James Bond, I

5  think he had doors named or conference rooms of James Bond and

6  then there was some analogy about piranhas.  I think that's all

7  excludable because it's -- its probative value is -- to me, is

8  outweighed by its prejudicial effect.

9      As to the statements from Joel Scott and Alex Mars, I'm

10 not sure they are excludable because one of the issues --

11 though, I haven't -- I haven't seen the case so I can't tell

12 you, but I think one of the issues in the case was -- will be:

13 To what extent did this defendant control the operations of the

14 company?

15     You know, you have CEOs who pay no -- I'm not going to say

16 "pay no attention" -- who do not get into any details, who

17 simply have lieutenants or other employees -- and I'm not

18 passing judgment on it -- just basically running the company,

19 and they're there to make some very big and important

20 decisions.

21     I think that the statements of Scott and Mars put into

22 perspective the degree to which Mr. Lynch exercised or -- at

23 least in his mind -- and what he wanted to communicate to

24 people demonstrated control.

25     So I was -- I wanted to make sure that as to Mr. Scott

**PROCEEDINGS**

```
 1   he's going to testify, my understanding, about his disclosures
 2   that happened in the spring of 2012; is that right?
 3                MR. LEACH:  It's actually January of 2011, Your Honor.
 4                THE COURT:  Oh, it's January of 2011?
 5                MR. LEACH:  Yes.  Well before the acquisition.
 6                THE COURT:  Okay.  Well, what I wanted to make sure I
 7   understood -- because I have a fairly bright line in my mind --
 8   is that when people discuss events, if they -- if these events
 9   took place subsequent to the date of the acquisition, then it's
10   almost like presumptively they're not coming in.  Now, there
11   may be exceptions to it, and I think I've already identified
12   one of exceptions, which would be the restatement.
13       But if, in fact, he's saying something was said to him at
14   a particular time which was post-acquisition, I think I have to
15   have a better idea why it would come in.  If he is saying "He
16   told me preacquisition X, Y, or Z," then, assuming it's
17   relevant and probative, that it probably could come in.
18       Now, Mr. Morvillo.
19                MR. MORVILLO:  Thank you, Your Honor.
20       I think we're probably not going to quibble with the
21   Government or the Court that one of the key issues in this case
22   is going to be the degree of control that Dr. Lynch exercised
23   over Autonomy and -- as relevant to some of allegations in this
24   case.  And so there will be testimony along those lines.
25   Certainly likely far more probative of issues relating to the
```

**PROCEEDINGS**

1    accounting and disclosures that will be the center of this

2    case.

3         I think what we have an issue with, with respect to

4    Mr. Marshall's statement and Mr. Scott's statement are

5    references to the Mafia.  You have, I think properly,

6    identified that the Mafia video and the references to the Bond

7    villains and the piranhas have no place in front of the jury

8    here.

9         And I would submit that comments like this also should be

10   excluded.  There are ways to contextualize what -- and

11   paraphrase what Mr. Scott remembers being told, but references

12   to "We're a Mafia family" --

13        **THE COURT:**  Do I have substitute language?  I mean,

14   do -- the point is, yes, it's the Mafia which conjures in a

15   person's mind, I think, complete control and serious

16   consequences for failure to go outside the permissible scope of

17   the control or of the conduct that's at issue.  But that's --

18   that's pretty probative.  I mean, that's -- that's called, you

19   know, evidence against you.

20        You know, you go and you say "I'm going to run this place

21   like the Mafia," well, I don't know.  Does that mean -- I guess

22   you can argue:  Well, you know, he had no control -- no

23   interest in controlling any of these things.  But this gives

24   some --

25        **MR. MORVILLO:**  This --

1        **THE COURT:**  -- lie to that, doesn't it?

2        **MR. MORVILLO:**  Of course, the reference to the Mafia

3    is exaggerated and cartoonish; right?

4        There is evidence of control.  There's evidence of -- that

5    would be appropriate relating to Dr. Lynch's knowledge of

6    certain facts and his involvement in certain disclosure

7    decisions.

8        But to layer on top of that, an illegal criminal

9    enterprise, what -- there is no allegation in this case that

10   there were any murders or extortion or bribery or RICO

11   activity.  And layering and allowing the jury to hear evidence

12   about such conduct in an offhand comment like this, I think

13   does cause severe prejudice and outweighs any probative value

14   from whatever testimony they have to offer about how they felt

15   that Dr. Lynch controlled things.

16       And these -- both of these statements relate to and are

17   part of a broader conversation where the reference to the mob

18   doesn't have to come up.  It's about -- one is about

19   co-piloting and "Don't tell the pilot how to fly the plane."

20   That's fine.  That's different.  But when it gets into

21   references to the Mafia, which are obviously joking in the

22   context and they have no probative value into what's actually

23   happening in the moment --

24       **THE COURT:**  Well, the joke -- the joke is that you're

25   not going to -- the joke is you're not going to be

1    assassinated.  That's the exaggeration.  If you don't do X,

2    you're not going to be taken care of as the way the Mafia would

3    take care of you.  That's the joke.  It's not a good joke but,

4    I mean, that's the joke.

5        But what he's trying to communicate -- at least arguably

6    what he's trying to communicate is "I am serious about

7    controlling the manner in which this company operates."

8        And then you couple it with -- I thought there's some

9    evidence, but I could be wrong in this -- that he maintained --

10   he insisted on having authority for approving all expenditures

11   over a certain amount.  I don't know what.  I thought -- my

12   recollection is there's some evidence of that.

13              MR. LEACH:  $30,000.

14              THE COURT:  $30,000.

15       Well, then you start to -- you start to get an

16   appreciation of the degree to which he is controlling the

17   company.  And as you candidly said, that's -- indeed the

18   Defense in part -- in part -- is going to explore the degree to

19   which he did control the company because there -- there may be

20   people who did all sorts of things.  Maybe.  Arguably.  That's

21   what the Government has said.  And to what extent was he

22   involved in any of this?  Involved in a -- maybe not a specific

23   sense but in a general sense?

24       I don't know.  I -- I think it does come in.  If -- if

25   there's something better than the Mafia that you guys can agree

**PROCEEDINGS**

1  on, I'll be glad to consider it.

2    I don't like the word "Mafia."  I agree with you,

3  Mr. Morvillo, but those were -- those were allegedly your

4  client's words.  Not -- nobody picked them up and picked them

5  out.

6    **MR. MORVILLO:**  And I understand we can cross-examine

7  the witness as to whether they understood it as a real threat

8  to them or whether it was a joke or the context in which it was

9  made --

10    **THE COURT:**  And they say, "Well, we thought the whole

11  thing was a joke."  I mean -- and, sure, they can say that, and

12  they'll either be believed in that regard or won't.

13    **MR. MORVILLO:**  But, of course, you go down that path

14  and then they start to say things, "Well, that's the way it

15  felt to me.  It did feel like the mob."  And all of a sudden

16  you're in a situation where these cartoonish images of mobsters

17  and gangsters are planted in the jury's mind.

18    **THE COURT:**  I think this is one of those things that,

19  to some extent, it depends.  You know, if it's just the only

20  evidence standing alone out there for which the Government is

21  relying that that shows he controlled the operation, I think

22  I'd be more sympathetic to your position.

23    If it's part and parcel of a woven tapestry where they're

24  going to show this piece and that piece and that piece and that

25  piece and that piece -- which is my sense of what they are

**PROCEEDINGS**

1  going to do because that's what they did in the last case --

2  then it becomes -- it becomes meaningful and probative.

3       Because one of the questions always is:  Why didn't

4  somebody say:  Well, where are the whistleblowers?  Where are

5  the people who say "Stop.  I'm not doing that.  That's a

6  violation of this or that"?  Why didn't they say that?

7       That's what -- if I were on a jury, that's what I would be

8  thinking.  Why didn't -- if they are actually engaged in what

9  the Government says that they were engaged in, then why didn't

10  they -- why didn't they say something?

11       To some extent this and other pieces may explain that.  It

12  may not, you argue.  You're not going to be cut off.

13       Okay.  Let's move on.

14       Okay.  So let's go to -- we might as well take on the --

15  your experts.

16       Who is going to address this?  Okay.

17            **MR. HEBERLIG:**  Our motion or the Government's?

18            **THE COURT:**  Well, I'm looking at the Government's

19  motion.  The Government's motion, it's Number 3, and it's the

20  motion to exclude expert testimony.

21       We have Mr. Cerf, Mr. Taylor, and Mr. Levitske.

22       The one I -- let's -- I would allow Greg Taylor to

23  testify.  I mean, I don't think we need any -- now, the

24  argument is:  Well, he's got all these opinions out there on

25  all these accounting standards that have nothing to do with

**PROCEEDINGS**

1   this case.

2       Really?  Okay.  If they don't and you ask him a question

3   and he gives that "Well, according to Accounting Standard

4   Number 16," or whatever it is, then the Government objects.

5       I mean, it's like anything else.  They say it's

6   irrelevant, and I've sort of -- I think I have in mind the

7   Government's argument.  I have in mind -- I don't know that I

8   have necessarily in mind your argument, though.  I think you

9   will explain why you think it's relevant.  Okay?

10      And I'm just not going to sit here today and try to weigh,

11  because I think it is a weighing proposition, this opinion.  I

12  think he comes in, and subject to any objection the Government

13  has as to any aspect of his testimony.  I'm not going to have a

14  separate *Daubert* hearing so we're going to do it once.  Then it

15  depends.  It depends.  I would let that in.

16          **MS. GREEN:**  Your Honor, may I be heard briefly on one

17  aspect of the Taylor report?

18          **THE COURT:**  Sure.

19          **MS. GREEN:**  So I divide the Taylor report into two

20  categories.  The bulk of the report, the main part of it is, as

21  you said, on the accounting standards, we don't believe that's

22  relevant.  Fine.  We will defer to Your Honor on that.

23      But my real issue is with Appendix 3 of the Taylor report,

24  and I don't know to what extent they are planning to elicit

25  testimony from that appendix; but in that appendix, what he

 1   does is take statements from Mr. Brice's report and then just

 2   assert, with no basis for that assertion, that he disagrees

 3   with --

 4          THE COURT:  Assert, yeah, okay.  Guess what?  I've

 5   done this for 25 years.  I've heard experts get up and say

 6   "That person can't be believed.  Can't be believed."

 7          I say, "Oh, really.  Why not?"

 8          "Well, I don't have any reasons.  He just can't be

 9   believed.  I saw him.  I don't like him."

10          You know, that's called cross-examination.  That's what

11   it's about.

12          Now, Mr. Cerf is in a slightly different position

13   because -- and you can tell me if I got it wrong.  When I read

14   through the Cerf proffer, Cerf is going to testify as to --

15   I'll use the word "practices," but I mean a lot more than

16   that -- that exist or existed at the time of the acquisition as

17   viewed by an individual or a company or the public or

18   regulators or whomever as either adhering to or contrary to

19   practices that existed in the United Kingdom, and that's what I

20   thought.

21          So I read that.  And I thought to myself:  So what?  So

22   what?  You know, there would have been -- the "what" could

23   easily have been answered if in the agreement, that is the

24   merger agreement, it was said, "By the way, we are producing

25   all of this," or "we are making these representations based

1    upon -- solely based upon standards that have been adopted by

2    the United Kingdom without reference to any international

3    standards of accounting."

4        If they said that, assuming the Government would indict,

5    we'd be here and we'd listen to hours of what happens in

6    England or the United Kingdom, but that's not -- number one,

7    that's not what happened.

8        Number two, it would -- I will certainly grant the -- you

9    the possibility that the English system is quite different.

10   Maybe it is.  Maybe it isn't.  But it certainly could be.  They

11   have different standards, different practices, different

12   procedures.  I got all that.

13       And if he was being tried for his failure to adhere to the

14   regulations of the United Kingdom in this transaction, it would

15   be that case.  That's not this case.

16       If I -- if the Government got up and said, "We think he

17   violated U.K. Principle Number 62" -- whatever it is,

18   Accounting Principles -- so what?

19       I mean, there may be a "what."  There may be some

20   explanation to it, and it may have some probative value.  But

21   this, to me, Mr. Cerf's testimony in its entirety, is exactly

22   what you don't want in a case for a judge to be a gatekeeper

23   because it is -- it is putting forth to the jury an alternative

24   regulatory and practical structure of how business transactions

25   are conducted in a place other than the United States of

1    America.

2        By the way, they may be great -- they may be a preferable

3    structure.  I'm not -- I'm not trying to give an evaluation of

4    it.  It's an irrelevant structure, unless the argument is going

5    to be made -- and I have to watch this, I'll give you this --

6    if the argument is going to be made -- and I don't know whether

7    it is or not -- that, look, Mr. Lynch thought because of his --

8    because of his experience, location, he thought that he was in

9    compliance with British standards and they were British

10   accounting standards and so forth, and they were the operative

11   standards, then I guess what I'm saying is I don't know.

12       I mean, I would say -- and this may seem like a weasel way

13   out of it, but I'd say it depends.  He hasn't testified in

14   front of me.  I don't know.  You know, I don't know if he's

15   going to testify in this case.  I mean, I never ask the Defense

16   that.  It's none of my business.  You make that decision

17   hopefully one day before he is to be called.  I mean, and at

18   least that.  I mean, if you're going to -- you can make it

19   earlier, but that's not something that's required of him.

20       And I don't operate on cases to say, "Okay.  He's going to

21   testify so we're going to let this in or not let it in."  If

22   he's going testify and if it becomes relevant, then I will

23   consider Mr. Cerf's testimony.

24       Otherwise, I find it classic -- is it 403?  Is that the

25   right code section?  Yeah.  Out.

1          Finally, Mr. Levitske.

2               **MR. HEBERLIG:**  Can I just --

3               **THE COURT:**  You want to take a stab at Mr. Cerf?

4               **MR. HEBERLIG:**  I think you may misunderstand the point

5     we --

6               **THE COURT:**  Go ahead.

7               **MR. HEBERLIG:**  So there will be witness testimony from

8     HP executives about the due diligence process, and I believe

9     all of them will say it was their first time going through the

10    acquisition of a U.K. company.  They will testify, or at least

11    they did testify in the *Hussain* trial, that Autonomy was very

12    tight and limited in what it disclosed in due diligence, and

13    I believe some will say "to the point that we believe they

14    concealed information from us."

15         What Mr. Cerf provides is relevant context for the nature

16    of the disclosures that occurred during a U.K. company takeover

17    where the relevant point is in the U.K., whatever you disclose

18    to the bidder also needs to be made equally available to any

19    company that comes in with a competing offer -- which is unlike

20    acquisitions in the United States.  You can't NDA your way

21    around that.

22         So the reason why this is relevant, there's an explanation

23    for why Autonomy was close to the vest in what it disclosed;

24    and as Mr. Cerf opines in his report, it's only when you get

25    very close to the acquisition that the disclosures occur.

1          **THE COURT:**  So you're saying there's an alternative

2    explanation?

3          **MR. HEBERLIG:**  To?

4          **THE COURT:**  There's an alternative explanation.  One

5    explanation is he didn't want them to see these -- what was

6    actually happening in the company.  That's one explanation.

7          **MR. HEBERLIG:**  Sure.

8          **THE COURT:**  That's certainly the Government's

9    explanation now.

10       But you're saying:  No.  There's an alternative

11   explanation, and that is under the rules of the United Kingdom

12   in mergers and acquisitions he wasn't required to do so, or he

13   did it in a particular way.

14         **MR. HEBERLIG:**  And there was testimony from the

15   Government witnesses in the *Hussain* trial, but people who were

16   not experts in the UK takeover procedures and law because it

17   was their first time having gone through it.  So this is just

18   context for the disclosures.

19         **THE COURT:**  Well, context.  Context matters.  But did

20   he at all?  Is there anything in the agreements -- and I have

21   to tell you, it's been a while since I've seen it -- which

22   discusses the standards to which statements are going to be --

23   documents are going to be produced and -- or not produced and

24   standards which are going to be applied or not applied?  Is

25   there anything in all of that, all of those agreements --

PROCEEDINGS

1              MR. HEBERLIG:  Yes.

2              THE COURT:  -- that reflect that it was the British --

3      the British system and not the -- some other system that was

4      operative?

5              MR. HEBERLIG:  Yes, absolutely.

6              THE COURT:  There is?

7              MR. HEBERLIG:  I'm happy to explain what they are if

8      you'd like.

9              THE COURT:  Go ahead.

10             MR. HEBERLIG:  So there was an agreement between the

11     parties about, you know, what information would be exchanged

12     and how it would be treated confidentially.  HP's first draft

13     to Autonomy said, "You need to provide to us all documents we

14     reasonably request."  And that language was struck out by

15     lawyers, outside lawyers -- this wasn't some backroom deal --

16     and the language was:  No.  Under the British system, it's

17     effectively *caveat emptor*.  We only disclose what we need to

18     disclose because under the UK takeover laws, whatever we give

19     you, Oracle could show up tomorrow and say "Give us the file."

20     And they're our competitor; and if the deal doesn't go through,

21     we're mortally wounded in our business dealings there forward.

22             There was no guarantee until the day the offer was made

23     that this deal would go through, and so that's why the

24     information is withheld and kept close until the very late

25     stages.  And I think you'll hear testimony at trial that HP

1    never came back around and said, "Give us the core stuff that

2    you've been holding on to" because they rushed the due

3    diligence.

4         And they had a deadline and they wanted to announce this

5    on August 18th, along with a whole host of other bad news that

6    HP had that day.  But this is complete context.  The UK

7    takeover -- I don't think the Government will dispute this --

8    the UK takeover law and standards governed this acquisition.

9    It was not a U.S acquisition.

10        **THE COURT:**  What about in terms of making

11   representations?  In terms of the mechanics of how to go

12   forward, I understand that there was some negotiation.  I

13   understand that Hewlett Packard actually had very limited, if

14   any, very limited rights of due diligence, very limited.  They

15   exercised some of them, I think.  Didn't they ask "Give me your

16   10 best contracts" or something like that at some point?

17        But I'm trying to figure out, if you look at the deal as

18   the deal was negotiated, what difference does it make that

19   there was a practice in the United Kingdom which -- which

20   acknowledged or sanctioned -- sanctioned in a good way --

21   sanctioned the withholding of certain documents?

22        Is -- because he's not being accused of violating what --

23   the -- he's not being accused of violating the English

24   standards.  He's being accused of violating the standards that

25   they've agreed upon in the deal, which I understand are, in a

**PROCEEDINGS**

1    sense, international standards, they're accounting standards.

2    And both Hewlett Packard and Autonomy agreed that those were

3    the standards.

4        So now we have different standards, and what you're

5    telling me is that it may be -- I don't know that I would cut

6    you off.  From an expert point of view, I'm cutting you off,

7    because, again, I haven't heard Mr. Lynch.

8        He says, "Well, look, I didn't -- you know, I didn't

9    produce these because we didn't have to produce them, and

10   that's the way we do it in England."  And that's right.

11       Well, maybe that does, to some extent, affect his state of

12   mind.  I don't know.

13           MR. HEBERLIG:  Okay.  That's fine.

14           THE COURT:  But we're not there yet.

15           MR. HEBERLIG:  Understood.

16           THE COURT:  Mr. Levitske.

17           MR. HEBERLIG:  Yes.

18           THE COURT:  Mr. Levitske is a bit of a mystery to me.

19   I don't know what he's saying.  I can't make it out.

20       Now, you can say, "Well, Judge, you're tired.  You've done

21   this so long, you're not really concentrating on this thing."

22   But he uses terms -- I forget where they are -- little in, late

23   in, last in, first out, something else.

24       So what I'm going to do with Mr. Levitske, before getting

25   into it, is accepting the Government's suggestion of a

**PROCEEDINGS**

1   supplemental disclosure pinpointing the bases for the opinions

2   that he's given.  Because as I read the -- Mr. Levitske's

3   opinion, it just doesn't make any sense to me.

4        Now, that's okay.  I'm not the trier of fact, but I think

5   it is a good idea to try to make some sense out of it and then

6   I'll decide if you can.

7        **MR. HEBERLIG:**  Well, first of all, they're not asking

8   for a supplementation of his opinion.  They fully understood

9   his opinion.  Their expert wrote 19 pages in rebuttal and

10  offered three different appendices to rebut it.  So it's not

11  unknown to them what his opinions are.  They quibble about a

12  few of the inputs.

13       And I submit that his disclosure was more than sufficient

14  as evidenced by the rebuttal we got from their expert, but the

15  testimony is very straightforward.

16       I mean, I understand there are a lot of numbers, but I can

17  boil it down like this:  Plenty of Government witnesses

18  testified, "Oh, my God, had I only known about the hardware,

19  this company would have been worth so much less."

20       Okay, that's one category of the transactions.

21       So we asked Mr. Levitske:  Assume the hardware

22  transactions never occurred.  Would the company that you're

23  looking at be worth more or less?

24       He stripped out the hardware revenue, the hardware

25  expenses, and what was left was a company that had more profit,

 1   was growing faster, had more cash on hand; and as he opined,

 2   all things being equal, under a discount cash flow model --

 3   which is the standard in evaluating a mature company like

 4   Autonomy -- it would at least be worth the same, if not more.

 5          THE COURT:  Look, maybe you've done it.  I'm not

 6   asking you to do a lot.  Do the supplemental because,

 7   number one, I think the devil is in the details.  How you

 8   are -- you've come to the conclusion it's worth a lot more or

 9   it's worth more.

10          MR. HEBERLIG:  Not more.  The same.

11          THE COURT:  Of course, what troubles me about all of

12   that is that's not what Hewlett Packard was buying.  Oh, if

13   they were buying -- let's say I sell something and somebody

14   wants diamonds, and I say "Here's a package of diamonds.  It's

15   worth $50 million," and actually -- actually, it has something

16   else in.  It doesn't have -- it has some diamonds and it has

17   some this or that or other things, and you put it all together

18   and it's 50 million.  Is that a fraud?  Is that a fraud?

19          MR. HEBERLIG:  I'm not sure I follow the Court's

20   example.

21          THE COURT:  If I go to you and you want to buy -- and

22   I say "I have $50 million of diamonds to sell you," and you

23   say, "Great.  I'll buy it.  I'd like $50 million worth of

24   diamonds.  I'll give you $50 million for it," and I give you a

25   sack, and in it are diamonds and other things, the total value

1    of which, commercially, is worth more than 50 million, have

2    I -- have I committed a fraud?

3            MR. HEBERLIG:  I'd say they got a helluva deal.  And

4    that is, I mean, frankly similar to what we're talking about

5    here.

6            THE COURT:  They say that I'd say that they were

7    defrauded.

8        I'd say that part of the problem you have here is, yes,

9    you can argue, back out all these hardware sales, if the

10   hardware sales are a component part of the value and I think --

11   I think that's what the Government says, but they can't quite

12   figure it out from Levitske's report -- then I have to -- I

13   have to wonder, when you are selling something representing

14   it's X and actually it's X plus Y, and they don't want Y --

15   they don't want Y, why there's no fraud -- that because what

16   you do get, you do get the witnesses who say, "Well, if you

17   knew it was X plus Y, total value of which was more than

18   11 billion, would you have bought it?"

19       And then I anticipate they'll say "No."

20       And you say "What do you mean?  We think it was worth

21   17 billion."  That's what you do, you say you think it's worth

22   17 billion.

23       And they say "Because we didn't want to go into that kind

24   of business.  That's not what we were interested in.  We're

25   trying to do something else.  Maybe we're wrong.  Maybe we're

1  not reflecting the market.  Maybe we're getting ahead on our

2  skis, but that's not what we bought.  We bought $50 million

3  worth of diamonds."

4      Now, I know you're telling me -- I got this -- there were

5  $50 million worth of diamonds there, and what I'm saying to you

6  is:  Levitske doesn't do it for me because he's very unclear as

7  to how he does his accounting.  And so I'm giving you another

8  run at it, but you've got to supplement and explain how he

9  comes up with the figures that he comes up with.

10      **MR. HEBERLIG:**  That's fine.  I mean, it's a couple of

11  additional mathematical points, but the opinion is the same.

12      And, I mean, I guess I didn't respond well to the -- I

13  think I understand the hypothetical now in real time.  I think

14  you're talking about the difference between deception and

15  fraud.  Fraud you've got to deceive someone to cheat them out

16  of property, but in the example you gave you haven't done that.

17  You've given them all the property they bought and more.  It's

18  just a little different.

19      And there are plenty of federal cases.  I mean, we can

20  supplement our briefs, but there is a difference under federal

21  fraud laws between deceit and fraud.  And in the example you

22  gave, and in the opinion Mr. Levitske would give that it was

23  worth the same, no one's been defrauded.

24      **THE COURT:**  Okay.  You're saying they may have been

25  deceived but they weren't defrauded.

1        **MR. HEBERLIG:**  Correct.

2        **MS. GREEN:**  I think taking the hardware would be a

3   perfect example of that.  By not -- you know, HP thinks they're

4   buying one thing, that was your hypothetical, in fact they're

5   buying 60 percent of one thing and 40 percent of hardware.

6        The nature of that revenue is very different.  It's low

7   margin.  If they didn't want -- in our theory, they didn't want

8   hardware -- a company doing 40 percent of hardware.  They

9   wanted a software company, for example.  So I do think here the

10  theory of fraud is what -- the nature of the transactions and

11  how that was represented.

12       **THE COURT:**  Well, I'm sitting here trying to figure

13  out the difference between deceit and fraud.  So you've given

14  me something to think about.  I will -- I will -- I'll think

15  about that.

16       Anyway, you're going to -- you're telling me, "Hey, Judge,

17  this is easy.  We'll do it."  So great.

18       **MR. HEBERLIG:**  May I just -- I guess one way that this

19  problem --

20       **THE COURT:**  I'm not excluding it right now.

21       **MR. HEBERLIG:**  Okay.

22       **THE COURT:**  I mean, I'm just -- and I'm trying to get

23  you to prepare for trial too at the same time.

24       **MR. HEBERLIG:**  One way that may obviate this issue and

25  we may not need, you know, an expert like Levitske, I don't

1   think it was proper for Government witnesses who are not

2   experts in valuing companies to opine on the stand that "When I

3   learned about the hardware, oh, my gosh, all of a sudden I

4   believed the company was worth far less."

5        I mean, Levitske's opinion is relevant to that kind of

6   testimony.  That's not an element of the offense and it's

7   uninformed opinion speculation.  So if there's a policing of

8   that kind of testimony and it's not admissible from Government

9   witnesses, we may not need to call someone like Mr. Levitske.

10        **THE COURT:**  No, I think you need that testimony

11   because the jury is not going to know.  "So what?"

12        They all look at this thing and say:  So what?  Okay.  So

13   it wasn't all -- it wasn't software.  It was some hardware.  So

14   what?  Like they know the difference.  You know -- and there

15   has to be some explanation:  We don't do hardware.  We don't do

16   windows.  We don't do this.  We don't -- we don't do hardware

17   or we don't want hardware, maybe.

18        **MR. HEBERLIG:**  That may be okay, but to then say "And

19   had we known about the hardware, the company was worth far

20   less," they're not informed and they don't have the expertise

21   to give that opinion.

22        **THE COURT:**  No, it's not expertise.  That's not an

23   expert opinion, I don't think, but it's certainly subject to

24   cross.

25        **MR. HEBERLIG:**  Understood.

**PROCEEDINGS**

1        **THE COURT:**  Okay.  Motion to enforce -- oh, look we're

2  already at Number 5 of the Government's, motion to enforce

3  defendants' reciprocal discovery obligations.

4     All I say is we all recognize a reciprocal motion; right?

5     I'm getting a number of nods that aren't on the record.

6  So I'm looking at the Defense.

7     Mr. Lincenberg, why don't -- you haven't said anything.

8        **MR. LINCENBERG:**  We understand our obligations,

9  Your Honor.

10       **THE COURT:**  Okay.  And your obligation is to provide

11  reciprocal discovery; right?

12       **MR. LINCENBERG:**  Yes, Your Honor.

13       **THE COURT:**  Great.  Okay.  So I'll just sit back and

14  assume you've done it or will do it -- have done it; and if

15  something comes in and they say "What's this," we'll see.

16  Okay?

17       **MR. ABRAHAMSON:**  Thank you, Your Honor.

18       **THE COURT:**  Well done.

19       **MS. KOELEVELD:**  The same goes for Dr. Lynch,

20  Your Honor.

21       **THE COURT:**  Pardon me?

22       **MS. KOELEVELD:**  The same goes for Dr. Lynch.  Thank

23  you.

24       **THE COURT:**  Yes, yes.

25     Okay.  Great.  Thank you so much.

PROCEEDINGS

1          **THE CLERK:**  Counsel, please remember to identify

2    yourself for the court reporter.  Thank you.

3          **THE COURT:**  Okay.  Motion to admit statements of the

4    agents and co-conspirators and exclude -- offered by

5    defendants.

6          Well, statements of Autonomy employees, statements of

7    co-conspirators.  I'm deferring on all of that because I don't

8    know what the statements are, and it depends.  What is the

9    statement?

10          **MR. ABRAHAMSON:**  Zach Abrahamson for the United

11    States.

12          Understood, Your Honor.  We think that, as to the specific

13    statements themselves that we're going to be introducing, those

14    have been disclosed to the Defense in pretrial discovery, but

15    we understand Your Honor's wish to defer the subject until

16    trial, and we're happy to proceed on that basis.

17          **THE COURT:**  Okay.  We're on such a roll here, I'd like

18    to continue and see if we can finish this.

19          Okay.  Let's take Mr. Lynch's motion.  Motion to admit

20    post-acquisition evidence.

21          Well, this the constant tension that exists in this trial

22    and existed in the previous trial; the battle between what

23    happened pre and what happened post, and that the way you

24    understand this transaction is to -- the only way to understand

25    it is to look and see what happened post.

 1      Hewlett Packard ruined the company or didn't market it.

 2 Hewlett Packard was in a necessitous position.  There were

 3 politics going on with respect to the board of directors and

 4 leadership, and all sorts of things were happening, and what

 5 came out of it -- and scapegoating, and what came out of it

 6 ultimately was an accusation that fraud occurred with respect

 7 to a purchase that Hewlett Packard made.  That's the theme.

 8      And I am -- I have no opinion about whether that's

 9 correct -- any of that's correct or not.  But I do have an

10 opinion as to whether or not it's coming in in this case, and

11 it's not.  And the fraud occurred, if it did occur, at the

12 point of the acquisition.

13      Now, there can be certain exceptions to allowing events

14 that took place subsequent to the -- to the acquisition, and I

15 think the restatement is a classic example of it.  The

16 restatement occurred subsequent to the acquisition.  They did

17 that work subsequently, but they're looking back at

18 preacquisition.

19      And so I actually think that -- that you can cross-examine

20 Yelland on the restatement -- basis for accepting the

21 restatement as being a more accurate version of the condition

22 of the company preacquisition is highly relevant, and -- but

23 events that took place that -- pardon me -- that may have

24 confirmed the judgment, supported a judgment, corroborated a

25 judgment subsequent, while it arguably could be relevant in

1   certain proceedings, it's the Court's view that it's -- it's --

2   that its relevance is -- and probative value is clearly

3   outweighed by the undue consumption of time, the effort, the

4   trials within trials that would be necessitated by looking at

5   any of the post-acquisition events.

6       So when a post-acquisition event is being offered by a

7   party, it should be run by the Court outside the presence of

8   the jury.  And I'm not one who likes these particular things;

9   but I think, as a general rule, that's the principle.  I

10  can't -- I'm not going to go piece by piece by piece today

11  because I think the principle basically swallows all of these

12  pieces.

13      I think, though, that it's important for the Defense to

14  establish that they turned over the books and records of

15  Autonomy upon the acquisition or shortly thereafter.  I don't

16  know when it actually occurred.  We did that by way of

17  stipulation.  I think it can be done by way of stipulation.  We

18  don't need a witness on that.

19          **MR. ABRAHAMSON:**  Your Honor?

20          **THE COURT:**  Yes.

21          **MR. ABRAHAMSON:**  Just to clarify the record and avoid

22  the number of sidebars in the trial --

23          **THE COURT:**  Yes, I'd like to do that.

24          **MR. ABRAHAMSON:**  -- should we take from this colloquy

25  that the waterfront of post-acquisition events contained in the

**PROCEEDINGS**

```
 1   parties' briefing on this matter is presumptively excluded,

 2   with the exception of Christopher Yelland's restatement?

 3            THE COURT:  Yes.

 4            MR. ABRAHAMSON:  Okay.

 5       May I have just one moment to confer, Your Honor?

 6            THE COURT:  Yes.

 7                 (Government counsel conferring.)

 8            MR. ABRAHAMSON:  Thank you, Your Honor.

 9       Nothing further from the Government.

10            THE COURT:  Okay.  Second motion, Mr. Lynch's motion,

11   motion to exclude restatement.  I've already addressed it.

12       Motion to exclude opinion testimony of Chris Yelland, I'm

13   coming -- oh, Mr. Weingarten.

14            MR. WEINGARTEN:  Yes.  I wanted to say -- I wanted to

15   say --

16            THE COURT:  Am I running right by your field of

17   expertise here?

18            MR. WEINGARTEN:  You did.

19            THE COURT:  Go ahead.

20            MR. WEINGARTEN:  Look, I've been here before.  We've

21   talked about post-ac a number of times.

22            THE COURT:  Right.

23            MR. WEINGARTEN:  In the most fundamental way, we think

24   this subject is central to our defense.  In a word, we don't

25   think HP was defrauded.  I think in a word, we believe there
```

1   was no fraud on HP by Mike Lynch.

2       And there are so many instances where it is obvious to us,

3   and apparently we've not made it clear to the Court, that

4   there's exculpatory evidence based upon the record to date,

5   post-acquisition conduct by Mike Lynch.

6       Just by way of example, he went to work there.  He would

7   have to be the largest idiot in the world to go to work at HP

8   when the first day at work HP is going to have his books if, in

9   fact, there was a fraud.  He went to work there.  He didn't go

10  to Namibia and hide.

11      In addition, there will be evidence that there were

12  discussions as soon as he got to HP about hardware that he

13  participated in.  How in the world can we conduct this Defense

14  without introducing such evidence?

15      **THE COURT:**  You're going to have to do your best.

16      By the way, in Namibia?  That's where the giraffes are;

17  right?  You can't hide anything from the giraffes.

18      So, anyway, I understand what you're saying and you have

19  your record.  A similar, but not identical, argument was made

20  in *Hussain*'s case.  Similar.  That they were entitled to bring

21  in post-acquisition evidence.

22      And, listen, maybe we'll never get there.  Maybe we will

23  get there.  I don't know.  But there is -- it's clear to me

24  this becomes an entirely different case.  It becomes who -- who

25  and what impaired Autonomy?  Who and what did what and when

 1   to -- to Autonomy and who is responsible for it?  That's --

 2   that is years of testimony.

 3         **MR. WEINGARTEN:**  Judge, can I -- I anticipated time

 4   might be an issue in terms of the post-ac stuff.  We represent

 5   to the Court that if we are allowed to introduce what we think

 6   is absolutely necessary to our defense, it would take one trial

 7   day.

 8         **THE COURT:**  Oh.  What about them?  What about the

 9   Government then wanting to rebut all of that?  I mean, you

10   can't -- you can't do it that way.

11       Anyway, thank you, Mr. Weingarten.  I appreciate what you

12   said, and I'm not going to allow it, but your record's there.

13         **MR. WEINGARTEN:**  Okay.

14         **THE COURT:**  Okay.  Motion to limit expert testimony of

15   Steven Brice.  Denied.

16       Motion to exclude certain categories of evidence.  Well,

17   of course the video is out.  Dr. Lynch's house is out.  I mean,

18   we're not -- we're not showing the jury who may or may not be

19   favorably disposed to people who have a lot of money.  The

20   money itself is there.  The fact that, as I understand it, his

21   wife earned 6 -- or obtained $16 million in this transaction,

22   if that's true, that's there because it does go to motivation.

23       How he spent the money?  Irrelevant.  I mean, unless

24   there's some nexus to he needed this money because he had to

25   and, therefore, that explains why he did what he did.

1        But, no, I don't -- we're not -- he's not on trial for

2   being a wealthy person, and he's not on trial for acquiring

3   things which wealthy people can acquire.  That's not -- that's

4   not appropriate.  So that's all out.

5        Mr. Morvillo?

6            MR. MORVILLO:  I'm sorry, Your Honor.  I didn't want

7   to interrupt you.

8            THE COURT:  You were anticipating.

9            MR. MORVILLO:  The jury is certainly going to hear

10   that Dr. Lynch made a significant amount of money on the

11   transaction, $800 million or some such.

12            THE COURT:  Right.  They'll hear that.

13            MR. MORVILLO:  They will hear that.

14            THE COURT:  Right.

15            MR. MORVILLO:  That's certainly coming in.  Why the

16   jury needs to hear that his wife made $16 million on top of

17   that seems to fall into 403 land.  There's really not that much

18   probative value when $800 million is earned by the defendant.

19            THE COURT:  I'm not exploring.  I don't know about

20   relationships.  I don't know how things are divided.  I don't

21   know community property laws -- if there are.  I don't know who

22   gets what.  I'm not interested in it.  I mean, I just think

23   that's undue consumption of time, but I think it's important.

24   It is -- it is a logically motivating factor for a person's

25   conduct whether --

 1          MR. MORVILLO:  She's no different than any other

 2   shareholder in the case, other than her relationship with her

 3   husband.

 4          THE COURT:  Well, it may be that we leave out

 5   16 million and we simply say "As a shareholder, she benefited

 6   in some sum of money."

 7          MR. MORVILLO:  That's fine.  That's fine.

 8          THE COURT:  There you go.  You got a victory.  There

 9   you go.

10          MR. MORVILLO:  Thank you.  I'm going to sit down now.

11          THE COURT:  No, no, stand up.  You're doing very well.

12      Okay.  So joint motion to preclude misleading accounting

13   terms and improper hypotheticals.

14          MR. MORVILLO:  Your Honor, I'm sorry --

15          THE COURT:  Yes.  Go ahead.

16          MR. MORVILLO:  -- before we move off of this motion --

17          THE COURT:  Yes.

18          MR. MORVILLO:  -- there were issues relating to some

19   404(b) that were tied up in the prior motion that we were just

20   discussing.

21          THE COURT:  Okay.

22          MR. MORVILLO:  The issue with respect to the analyst

23   Daud Khan being excluded from earnings calls and --

24          THE COURT:  My recollection is I let all this in in

25   the earlier trial --

PROCEEDINGS

1          **MR. MORVILLO:**  You did.  You did, yes.

2          **THE COURT:**  -- and I'm adhering to that ruling.

3          **MR. MORVILLO:**  So that you're --

4          **THE COURT:**  It's in.

5          **MR. MORVILLO:**  -- you're going to allow it in?

6          **THE COURT:**  Yeah.

7          **MR. MORVILLO:**  It does predate the alleged conspiracy.

8          **THE COURT:**  Yeah.  Still it can come in.  It can come

9    in, can't it?  Is there some -- I mean, you're talking about

10   what the habit, the custom, how it was done?

11         **MR. MORVILLO:**  I think what winds up happening with

12   the Daud Khan situation is there are explanation as to why that

13   happened that have nothing to do with the allegations in this

14   case.  It happens.

15         **THE COURT:**  Okay.  I'll listen to it.

16     What does the Government say?

17         **MR. LEACH:**  Your Honor, the events relating to

18   Daud Khan span from 2008 through 2010, so kind of straddle the

19   time period of the conspiracy, and it's relevant to showing the

20   way Dr. Lynch reacts when he hears somebody is critical of his

21   company.

22     He -- first, he threatens Mr. Khan in a meeting that

23   Mr. Khan will testify to, and this occurs in 2008.

24     Second, he excludes Mr. Khan from participating in analyst

25   calls, which is highly unusual, highly extraordinary, and we

1    think probative of a consciousness of guilt and a sensitivity

2    to having his accounting judgments and his numbers questioned.

3         Third, they launch a pretextual investigation of Mr. Khan

4    by the FSA -- which goes absolutely nowhere -- in an attempt to

5    silence him from being critical of the company.

6         And it's only in -- so we think all of this is relevant to

7    his state of mind, his following of the -- of what's happening

8    on the analyst calls and how the market is reacting to even

9    what they're going to argue is dissident criticism.  And so for

10   all the reasons this was relevant in *Hussain* they're relevant

11   even more so in this case because Dr. Lynch is in the room

12   making the threat to Mr. Khan.  He, we argue, is acting through

13   his general counsel, Andy Kantor, with respect to excluding

14   them from the calls; and we think it's highly probative of his

15   state of mind, his control of the company, and his reaction to

16   negative news.

17        **MR. MORVILLO:**  The problem is, of course, it happens

18   almost a year before the relevant events in this case, and it

19   is going to cause perhaps a -- quite a bit of a tangent in

20   terms of explaining the context of his exclusion, the report to

21   the FSA, the background, the concerns that Dr. Lynch had with

22   the inaccuracies that he perceived to be in Mr. Khan's report.

23   There will be substantial, potentially, testimony about all of

24   this.

25        **THE COURT:**  Well, so the answer is if the Government

1    thinks it's so probative, they make that determination.  And I

2    think it it's arguably probative if, in fact, it invites the

3    type of response you're suggesting it does.  You're not

4    precluded from responding.

5        So, let's see, the accounting terms, improper

6    hypotheticals, please have your witnesses try to explain in

7    English what they're talking about so at least there's a

8    possibility that the jury will be able to follow it.  So I'm

9    not going to sit here today and talk about improper

10   hypotheticals or the wrong term.

11       Motion -- you have Mr. Chamberlain's motion, motion to

12   exclude evidence violating the confrontation clause.

13       Well, yes, Mr. Morvillo?

14       **MR. MORVILLO:**  I'm sorry.  I just want to go back one

15   second.

16       Part of the motion that we were just discussing relating

17   to Mr. Khan relates to a subject called organic growth, and the

18   question that that raises is to calculate organic growth -- and

19   I'm happy to explain what organic growth is if it would help

20   the Court -- you need to go back years.

21       And to -- if the Government is going to allow the

22   testimony of analysts to talk about organic growth, which is a

23   method for -- that's not an IFRS function, it is not a legal

24   obligation, it's a company-defined term.  If they're going to

25   permit analysts to testify that there was a misrepresentation

1    of Autonomy's organic growth, we have to go back in time, in

2    history, to look at the -- what the organic growth issue or

3    misrepresentations are linked to.

4        It's a way of isolating revenue from acquisitions to show

5    that what -- how the company is growing is just based on its

6    own product, and so you take out revenue from acquisitions and

7    you look at the organic IDOL growth.  To do that, you have to

8    look at what the acquisitions were, when the acquisitions

9    occurred; and if we look at what we have seen from some of the

10   analysts, they're talking about acquisitions that occurred in

11   2005, 2006, 2007 to lead up to an argument that, in 2009,

12   organic growth was overstated.

13       And so that opens up a whole history of discovery and

14   allegations and issues with respect to the acquisitions and the

15   purpose of the acquisitions and the revenues and the growth

16   from those acquisitions that should be cut off here.

17       Now, if the Government is just going to introduce

18   testimony relating to organic growth in the relevant time

19   period, that's a different story, but it still could impact the

20   history.

21           **THE COURT:**  Mr. Reeves?

22           **MR. REEVES:**  Your Honor, when Dr. Lynch went to

23   Palo Alto in early 2011 and met with executives representing HP

24   and pitched the sale to HP of Autonomy, his best and principal

25   argument was the organic growth history of his company.

**PROCEEDINGS**

1      Counsel is correct, to understand the deception associated

2   with that lie -- set of lies, it is necessary to look at the

3   acquisitions that happened historically.  That's exactly what

4   the analysts testified about during the relevant period.

5   They're constantly endeavoring to understand what the demand

6   was for IDOL, the core product of Autonomy, as versus how the

7   growth may be established or what part of the growth related to

8   the acquisition of different companies.

9      There are three companies that are relevant here --

10  Varity, Zantaz, and Interwoven; and I think in order to

11  understand the analysts' testimony about the importance of

12  organic growth and in order to understand the nature of the

13  deceptions that Dr. Lynch and others on behalf of Autonomy gave

14  to Hewlett Packard, some amount of discussion about those

15  acquisitions is necessary.

16     I do not agree that this is a distraction.  It will be

17  difficult.  It comes through the witnesses that we've already

18  identified.  And so I accept the fact that this is a relevant

19  argument to the period in question or that's alleged in the

20  indictment, and it will require some historical look-back

21  around those acquisitions, but I do not believe that the

22  evidence is automatically a distraction or a trial within a

23  trial or going to take too much time.

24          MR. MORVILLO:  There's a whole host of discovery that

25  we don't have relating to the -- there's a 2006 acquisition of

**PROCEEDINGS**

 1    Varity, a 2007 acquisition of Zantaz.  All of this is predating

 2    the period for which we have discovery and the allegations in

 3    the indictment, and so it really is a sideshow.

 4         **THE COURT:**  But I don't know that the Government has

 5    it.

 6      Do you have it?

 7         **MR. REEVES:**  No.  If we have it, they have it,

 8    certainly with regard to the acquisition issues.

 9         **THE COURT:**  Okay.  Well, okay.

10         **MR. MORVILLO:**  Then we're in a situation, Judge, if

11    this is going to be relevant, we're going to need to issue

12    subpoenas to HP to get these records.

13         **THE COURT:**  Well, that depends.  It depends on what

14    they say about it.  It depends on what they say about it.  Then

15    it depends on the extent to which you want to contest it, and

16    it depends on how important it is.  It depends on all of these

17    things that I can't rule about -- rule in advance.

18         **MR. MORVILLO:**  Well --

19         **THE COURT:**  I can rule it's either in or out.  And

20    what the Government says is it's really integral to the sales

21    pitch that was being made to Hewlett Packard.

22      Now, he can be wrong, maybe.  There's no evidence of that.

23    In that case, you won't have to do very much.  But he may be

24    right, that it was said and important; and then the question

25    is:  How do you address it?

**PROCEEDINGS**

1    **MR. MORVILLO:**  Well, that is the question, Judge;

2    right?  How do we address it?  When an analyst stands up here

3    and says that the accusation of Varity was not as important to

4    the company as they led the public to believe, how are we

5    supposed to respond to that when we don't have discovery

6    relating to it?

7         **THE COURT:**  I'm not sure you don't have discovery

8    relating to it.  I don't know where the documents are.

9         **MR. REEVES:**  If -- to the extent we have relevant

10   discovery relating to the acquisitions, it's been produced.

11        **THE COURT:**  Witnesses testify all the time, all the

12   time without documentation to back up their assertion.  The

13   Government's obligation is to provide the documentation to the

14   extent the Government has it.  They tell me they have it

15   somewhere in their 20,904 exhibits.  If it's there, it's there.

16        **MR. MORVILLO:**  I don't believe it is.  That's the

17   problem.  We're going to have witnesses coming in starting to

18   talk about things that they're not HP employees, they're not

19   Autonomy employees.  They're analysts who are going to come in

20   and talk about their notes from 2007, 2008 that we are left to

21   just confront on cross-examination their recollections, but

22   there is likely contemporary documents from that time period

23   that are highly relevant.

24        **THE COURT:**  But they say if those documents exist, you

25   have them.

**PROCEEDINGS**

```
 1           MR. MORVILLO:  Well, they have not sought them from
 2    HP.
 3           THE COURT:  Well, then they don't have them.
 4           MR. MORVILLO:  They don't have them.  We don't have
 5    them, but --
 6           THE COURT:  There's no obligation they have to.
 7           MR. MORVILLO:  Here's the problem, Judge, of course,
 8    because the conspiracy starts in January of 2009.
 9           THE COURT:  Whenever it starts, they don't have to --
10    they don't have to -- even if it happened on the last day of
11    the conspiracy, they don't have to get the documents.  That's
12    just the way it is.
13           MR. MORVILLO:  But we should have a right to issue
14    subpoenas to get documents relevant to a relevant allegation in
15    the case.
16           THE COURT:  Well, I'm not ruling on your trial
17    subpoenas.  That's up to you.
18        Okay.  Turning to Mr. Lincenberg.
19           MR. HEBERLIG:  Your Honor, may I address one issue
20    before we move to Mr. Lincenberg?
21           THE COURT:  Yes.
22           MR. HEBERLIG:  Thank you.  It's Brian Heberlig again,
23    Dr. Lynch.
24        This relates to Mr. Brice.  It's not asking the Court to
25    revisit the ruling on the motion, but there is some interplay
```

**PROCEEDINGS**

1   between the testimony that you're considering of Mr. Yelland

2   and the testimony of Mr. Brice.

3        And you may recall in the *Hussain* trial that the

4   Government was essentially given a choice as to which witness

5   to call.  And so our request would be if the Court permits

6   Mr. Yelland to give expert opinion testimony about the reasons

7   for the restatement, to exclude Mr. Brice under 403.

8        **THE COURT:**  I'm not going to do that.  I don't know.

9   The problem I have is when a trial commences, and I've said

10  certain things to the jury about length of trial and how we're

11  progressing, and then there was -- I called it a bit of a

12  shuffle, that the deck was being reshuffled -- and I don't like

13  decks to be reshuffled, though -- listen, circumstances change,

14  so maybe you do reshuffle.  But I think it was a trial decision

15  at the time because of the exigent circumstances that existed,

16  and I'm not going to -- I'm not going to foreclose them from

17  that, but thank you anyway for pointing that out.

18       **MR. HEBERLIG:**  Yes, Your Honor.

19       **THE COURT:**  Now, Mr. Lincenberg.  Oh, not

20  Mr. Lincenberg.

21       **MR. LANDMAN:**  Good afternoon, Your Honor.

22       **THE COURT:**  You're not Mr. Lincenberg.

23       **MR. LANDMAN:**  Michael Landman for defendant

24  Chamberlain.

25       **THE COURT:**  Okay.  So here is what I was going to

1   do -- oh, then I'll get to that point.  My clerk reminded me.

2       The motion to exclude evidence violating the confrontation

3   clause, well, that's a serious problem and I won't know and the

4   Government says we won't know until we see what the statements

5   are.

6       I thought that it's a reasonable request of the Defense to

7   require the Government to identify these statements.  I don't

8   know they have any objection to do so, do you?

9           MR. REEVES:  I certainly have no objection to

10  identifying the statements, the admissions by the defendants,

11  before they're offered in evidence.  I think I've offered to

12  confer about a schedule --

13          THE COURT:  What --

14          MR. REEVES:  -- that would provide sufficient notice,

15  and I really don't think we can square this issue up until

16  we've had that dialogue.

17          MR. LANDMAN:  Your Honor, our request in the motion

18  was to provide the notice in advance of trial, and so any

19  further conferring -- you know, we would like these statements

20  and in our reply we modified that to next week -- by next week.

21  Because as Your Honor knows, we have an enormous amount to do

22  to prepare for trial.

23      And when we were here seven or eight months ago, we asked

24  for a trial date in May, and part of the -- part of

25  Your Honor's reason for making a more aggressive trial date is

**PROCEEDINGS**

1    that the ambush was out and the Government was not going to

2    hide the ball and the Government was going to make early

3    disclosures so that we knew what we were defending against.

4        This is just another example in a series of examples where

5    the Government is not willing to show its evidence in advance.

6        **THE COURT:**  We're not getting -- no, no.  We're not

7    getting into that; right?  Everybody's getting along extremely

8    well.

9            **MR. LANDMAN:**  Well --

10           **THE COURT:**  We don't need examples.

11           **MR. LANDMAN:**  Okay.  Well, this is --

12           **THE COURT:**  It rises and falls on the strength of the

13   showing that you needed.

14       By the way, yes, you do.  I've agreed with you, you need

15   it.

16       Okay.  So it would be useful to give it to them -- when

17   can you get them done?

18           **MR. REEVES:**  I think -- I'm happy to provide an

19   initial set of admissions at the end of -- how about a week

20   from this Friday?

21           **THE COURT:**  That sounds good.

22           **MR. REEVES:**  And to begin the dialogue.

23       And I understand that -- you know, I strongly object to

24   any description that the Government has not provided ample

25   notice.

PROCEEDINGS

1          THE COURT:  No, no.  I'm not -- believe me --

2          MR. REEVES:  I couldn't help myself.  I'm sorry,

3   Your Honor.

4          THE COURT:  -- I'm actually not going there.

5          MR. REEVES:  Okay.  I'll listen to the Court.

6          THE COURT:  I'm just too irritable.  I'm going to yell

7   at somebody.

8          MR. REEVES:  We too are preparing a trial.  It is

9   complicated, and we want to --

10          THE COURT:  But you have to do it anyway.

11          MR. REEVES:  Yeah.  I want to reserve --

12          THE COURT:  It's a big thing.  That is to say, a

13   defendant's statement is usually of a heightened attention.

14          MR. REEVES:  Agreed, Your Honor.  I think this will

15   fall into place with the specifics, and we're happy to begin

16   the process a week from this Friday.

17          THE COURT:  Great.  Okay.  That's called a good start.

18          MR. LANDMAN:  Thank you, Your Honor.

19          THE COURT:  Okay.  Yes, sir.

20          MR. LANDMAN:  If I could just briefly be heard on

21   I believe it was Defendants' Joint Motion in Limine Number 6

22   regarding the account -- misuse of accounting principles.

23          THE COURT:  Sure.

24          MR. LANDMAN:  I understand Your Honor's ruling that

25   the witness should -- witnesses should appropriately describe

**PROCEEDINGS**

1    accounting principles, and I understand that we'll obviously

2    have the opportunity to cross-examine them to the extent they

3    don't.

4         One aspect of that motion that I'd like to speak to is

5    the Government's misuse of accounting terms in opening and

6    closing statements.  And some of the Government's response to

7    the defendants' joint motion is that we use the terms that the

8    witnesses use, and --

9         **THE COURT:**  You're talking about their opening and

10   you're also talking about their closing?

11        **MR. LANDMAN:**  Correct.

12        **THE COURT:**  I hope I'll be here for their closing.  I

13   guarantee you I'll be here for their opening.  I go into a big

14   song and dance about how openings are not evidence, that

15   whatever the lawyers say is simply their expectation of what

16   the evidence will show.  There's no evidentiary value in it at

17   all.

18        Let's not worry about that.  I'm not going -- I'm not

19   going to have a dress rehearsal of the opening.

20        **MR. LANDMAN:**  No, I understand.  And I'll leave it

21   with just it's the defendants' position that this is a

22   complicated accounting case and in the Government's attempts to

23   simplify it for the jury, the defendants just request that they

24   are precise with the terminology that they use.

25        **THE COURT:**  Listen, let's say they're not.  Let's -- I

1    mean, think about what you're saying.  Let's say they're not.

2         MR. LANDMAN:  It's --

3         THE COURT:  If they're not, if they're not, your side

4    will get up and show the jury why the imprecision is misleading

5    and why the imprecision is unfair and why they're relying on

6    the imposition to get a conviction in this case; whereas, if

7    they were more precise, it wouldn't -- it wouldn't result in a

8    conviction.

9         Think about that.  That's what advocacy is.  That's why

10   lawyers are good.  Not because they script the whole thing, but

11   that they -- they look for examples, if there are examples, of,

12   overbearing, unwarranted assertions.

13        MR. LANDMAN:  Understood, Your Honor.  Thank you.

14        THE COURT:  Yeah, you can do it, I guarantee you.  I

15   see a lot of lawyers at that table who have specialized in

16   doing that sort of thing.  So I think that will -- that will

17   happen.

18        Okay.  I don't know that I've addressed Joel Scott and

19   John Schultz.  I said I was admitting that testimony.  This is

20   the Government's Motion in Limine Number 4.

21        MR. ABRAHAMSON:  I think it's probably worth

22   clarifying that, Your Honor, because --

23        THE COURT:  Go ahead.

24        MR. ABRAHAMSON:  -- the Joel Scott and John Schultz

25   testimony are examples of post-acquisition events the

**PROCEEDINGS**

 1   Government had proffered.

 2          **THE COURT:**  Yes.

 3          **MR. ABRAHAMSON:**  And so to the extent Your Honor's

 4   ruling is that the waterfront of events in those --

 5          **THE COURT:**  Okay.  Run them by me, so then we'll talk

 6   about it.

 7          **MR. ABRAHAMSON:**  Sure.

 8          **THE COURT:**  Go ahead.

 9          **MR. ABRAHAMSON:**  Yeah.  So Joel Scott are a set of

10   disclosures made to HP's internal legal around May of 2012, and

11   John Schultz is July 2012 episode where Dr. Lynch made certain

12   statements directly to Mr. Schultz who was then the general

13   counsel of Hewlett Packard.

14      Is there further question?  I'm happy to keep going, but

15   that's the basic summary.

16          **THE COURT:**  Well, Mr. Weingarten, let me hear your

17   position.

18          **MR. WEINGARTEN:**  This is consequential evidence.

19          **THE COURT:**  Yeah, go ahead.

20          **MR. WEINGARTEN:**  Schultz was the general counsel of

21   HP.  From our perspective, it was an interview that was an

22   ambush.  He was trying to elicit evidence from Mike that was

23   useful to his investigation.  So at a minimum, if this evidence

24   is admitted, at a minimum, I have to be able to cross-examine

25   him effectively.  I have to be able to impeach him.

1          **THE COURT:**  Why wouldn't you be able to?

2          **MR. WEINGARTEN:**  Because much of the raw material is

3   post-acquisition.  What I would use would be almost entirely

4   post-acquisition.

5          And in addition, let's just say Mike Lynch testifies.

6   Then, of course, he would be in a position to respond to the

7   allegation that he mislead Schultz entirely based upon a long

8   story of what happened post-acquisition.

9          **THE COURT:**  So I think I better give more

10  consideration to this.  I may require an offer of proof --

11         **MR. ABRAHAMSON:**  That's fine.

12         **THE COURT:**  -- and do it outside the presence of the

13  jury because it seems somewhat collateral.  But I need to know

14  exactly what he's going to say.  Then I have to figure out to

15  what extent does that open the door to Mr. Weingarten, who's

16  standing next to the door with his foot wedged into the

17  slightest opening in order to prevent it from being closed.  So

18  I have to think about that.  He -- it's certainly fair that he

19  gets -- that he can cross-examine these things.  What he -- the

20  scope of the cross-examination, though, is not unlimited.

21         **MR. ABRAHAMSON:**  Your Honor, the Government is happy

22  to prepare an offer of proof.

23         **MR. WEINGARTEN:**  The Joel Scott thing is similarly

24  situated.  He was the general counsel for Autonomy in the

25  United States.  A couple of days after Mike Lynch was fired by

**PROCEEDINGS**

 1  HP, he ran to Schultz and made statements.  Obviously, I should

 2  be in a position to be able to cross-examine him about

 3  contemporaneous events all of which are post-ac.

 4       **MR. ABRAHAMSON:**  We have the same position,

 5  Your Honor.

 6       **THE COURT:**  Okay.  Let's see it.

 7            (Pause in proceedings.)

 8       **THE COURT:**  Where are we?

 9       **MR. SEILIE:**  Your Honor, I think the only remaining

10  motion is Mr. Chamberlain's motion to exclude three specific

11  categories of documents.

12       **THE COURT:**  Right.

13       **MR. SEILIE:**  And, you know, your Honor, the spirit of

14  this motion is essentially what Your Honor has already

15  addressed in connection with some of the post-acquisition

16  evidence, which is these are documents that would implicate

17  accounting decisions that the Government has not alleged are

18  fraudulent and which aren't listed on the Bill of Particulars.

19      So to take one example, the credit hunt e-mails which are

20  addressed in the motion.  Now, these e-mails refer to something

21  called a credit hunt, which is essentially where my client,

22  Mr. Chamberlain, asked some of his colleagues to go over

23  Autonomy's records in certain quarters and look for overlooked

24  credits or overlooked revenue from previous quarters that they

25  should use to offset costs and improve the books.

**PROCEEDINGS**

1          There's no allegation that any of these hunts resulted in

2    a faulty accounting decision.  There's no allegation that

3    Mr. Chamberlain was attempting to encourage the manufacturing

4    of any credits.

5          The only thing that included allowing the Government to

6    introduce these e-mails would do is require us to put on in our

7    defense case or during cross-examination evidence relating to

8    these credits, which are unchallenged, which are not listed in

9    the Bill of Particulars, that helps establish that there was

10   nothing improper about them.  And that kind of --

11         **THE COURT:**  Doesn't it demonstrate Mr. Chamberlain's

12   focus on finding additional revenue for Autonomy to report?

13   Isn't that the purpose of it?

14         **MR. SEILIE:**  But Mr. Chamberlain's focus on finding

15   accurate revenue to report is irrelevant to the allegation of

16   fraud, Your Honor.  The fact that he's motivated to make the

17   company look better is something that any employee of any

18   company has.

19         And if that rationale is sufficient to allow the

20   introduction of evidence relating to accounting decisions that

21   have nothing to do with the Bill of Particulars, then there's

22   no point to having a Bill of Particulars because then the

23   Government could just bring in evidence of any accounting

24   decision and say, "Look, Mr. Chamberlain wanted this number to

25   look good."  And then we would have to defend that number even

**PROCEEDINGS**

1    if it's not alleged to be fraudulent, even if there's no

2    evidence that there was anything wrong with them.

3         **THE COURT:**  Isn't that by way of defense to the

4    evidence?  You say, "Look, there's nothing improper about it."

5         **MR. SEILIE:**  Well, what --

6         **THE COURT:**  What you just said to me seems to be

7    pretty good cross-examination.  That doesn't mean it's

8    irrelevant.

9         **MR. SEILIE:**  Your Honor, if that's the case, then we

10   would have to go -- for example, one of these e-mails is from

11   April 29th, 2010.  So that's in the process of preparing the

12   books for the first quarter of 2010.

13        **THE COURT:**  Okay.

14        **MR. SEILIE:**  So if Your Honor allows the Government to

15   bring in this evidence, then what we would have to do is

16   introduce evidence of every single credit that's taken in

17   Autonomy's books and show that there was nothing wrong with any

18   of them.

19        **THE COURT:**  Why?

20        **MR. SEILIE:**  Because that's the only way to

21   demonstrate the Government's implication that there is

22   something wrong with going on these credit hunts, that there

23   was -- that Mr. Chamberlain was implicitly encouraging them to

24   do something wrong.

25        **THE COURT:**  You can do it in one or two questions.

1              **MR. SEILIE:**  I'm not sure how that -- I don't know

2      that that's accurate, Your Honor.

3              **THE COURT:**  When the trial goes on, I'll show you how

4      to ask the questions.  Okay.

5              **MR. SEILIE:**  And, Your Honor, I think another good

6      example is the three-options e-mail that also addressed in our

7      motion.

8          Now, again, what this e-mail is in the context of the

9      overall audit process, is it's a deliberative communication

10     between Mr. Chamberlain and Mr. Hussain where, you know,

11     Mr. Hussain set some targets, some financial targets, for the

12     company.  Nothing illegal about that.  And Mr. Chamberlain is

13     spelling out certain scenarios that would result in the meeting

14     of those targets.  None of these options were ultimately

15     selected and none of them were ultimately used in the final

16     accounting decision.

17             **THE COURT:**  Why?  The question isn't:  Were they used?

18         The question is:  Was he thinking about them and what did

19     they mean?

20         What they meant was that he was looking for revenue

21     recognition.

22             **MR. SEILIE:**  Right.  But, Your Honor, if any -- if

23     the Court determines that any conversation about revenue

24     recognition is relevant, then I'm not sure what the point of

25     the Bill of Particulars was.

**PROCEEDINGS**

1    Now, we came in here and said Mr. Chamberlain has to make

2  hundreds of accounting decisions every quarter, thousands

3  throughout the period of time that the Government has claimed

4  there was a conspiracy.  We said we need to know exactly what

5  accounting decisions the Government believes are fraudulent.

6    THE COURT:  How do you respond to the Bill of

7  Particulars?

8    MR. ABRAHAMSON:  Your Honor, the Government also has

9  an obligation to prove an underlying conspiracy and a scheme to

10  defraud, and e-mails like the three-options e-mail show one of

11  defendants in his own words engaging with a co-conspirator

12  who's been convicted around questions of revenue recognition in

13  light of questions about Autonomy's financial performance.

14    THE COURT:  All right.  I'm going to permit those

15  categories in evidence.

16    MR. ABRAHAMSON:  Thank you, Your Honor.

17    THE COURT:  Let me talk about housekeeping.

18    So let's talk about jury selection.  The jury selection

19  is -- I previously indicated it was the 13th?

20    MR. REEVES:  Thursday.

21    THE COURT:  The 13th first.  Now it's the 14th.  Does

22  everybody know it's the 14th?  It's a Thursday.

23    MR. REEVES:  Thursday the 14th.

24    THE COURT:  Okay.  I have excused, I don't know what

25  the number is, individuals who have responded that they have a

**PROCEEDINGS**

 1   hardship or that otherwise they would be excludable or would be

 2   considered to be excused.

 3        Let me tell you how I drew the line.  I did not draw the

 4   line on any for-cause challenge.  That is -- by the way, I'm

 5   not even sure I saw any, but they weren't forwarded to me.

 6   What was forwarded to me was if a juror said, "I have a prepaid

 7   vacation," "I am the sole support of my sole proprietorship,"

 8   "I take care of my relative," "I am a full-time student," those

 9   type of recognized hardships are excused.

10        If you need further details, I can give them to you.  I

11   just don't have them in front of me, but I'm certainly aware of

12   a recent case, *U.S. vs. Ehmer*, that came out of the

13   Ninth Circuit about two months ago, in which they explained in

14   great detail how the jury selection process worked, and

15   essentially it was:  For hardship, a judge*, sua sponte*, can

16   exclude the person for cause.  A judge cannot do it without

17   consultation with counsel.

18        So I haven't done any.

19        I'm hopeful that I will get a sufficient number of -- I

20   don't know if it's called venire men -- the venire, whatever it

21   is, the panel --

22            **MR. REEVES:**  The panel.

23            **THE COURT:**  -- that we will have 6 alternates, 12

24   jurors.  That's because I don't want to try it again.  I don't

25   think anybody wants to try it again.

1    So that's what I'm going to do on the 14th.  Before that

2  date, you will get a copy of the questionnaire.  I made some

3  adjustments to the questionnaire, but I think I basically kept

4  it intact because the parties agreed to it, and hopefully it

5  will enlighten and expedite your decisions as to who you want

6  on it.

7    Do you know the manner in which I pick a jury?  You do,

8  Mr. Lincenberg.

9        **MR. LINCENBERG:**  I do, but go ahead.

10        **THE COURT:**  Okay.  And they do.

11    All right.  So in the Jury Commissioner's Office, they

12  have a -- they out of a random wheel will select the order in

13  which jurors appear, and that will be the order that dictates

14  the order in which they are called upon to serve or at least

15  called upon to be questioned.

16    And they'll come into the courtroom and they'll fill -- I

17  don't want to use the ceremonial courtroom, so what I'm going

18  to encourage the parties is to try to limit the attorney

19  participation so I can fill up the pews with the -- with the --

20  you know, the group.

21    I think I probably -- I think we'll probably end up

22  somewhere in the neighborhood of between 80 and 100.  That's my

23  hope.  I need 43, by the way, according to my calculations,

24  which changes every time.

25        **MR. LINCENBERG:**  How many do you have now that

PROCEEDINGS

1    survived the hardship?

2        **THE COURT:**  I think we have somewhere in the

3    neighborhood of 80, and hopefully we'll have a few more.

4        So you will have -- I think we can do a couple of things.

5    One is, if the parties agree after you look at the -- after you

6    look at it and you agree that so and so should be excused, I'll

7    consider it.  I won't necessarily agree, but I certainly will

8    take it into consideration.

9        My concern is having to do this twice, so -- and also

10   excusing people who otherwise shouldn't be excused.

11       I mean, there was some lawyer who said, because he

12   indicated what his occupation was, he said, "Well, my practice

13   is too busy.  I can't sit on a jury."  He's got a really busy

14   practice.  Well, that's enviable, but I'm not going to excuse

15   him.  You know, I just don't excuse people like that.

16       I had a mediator.  Once a mediator said, "Well," she said,

17   "I can't serve on this jury."

18       "Why?"

19       She said, "Well, I can't be fair," which struck me as an

20   interesting comment from a mediator.

21                        (Laughter.)

22       **THE COURT:**  You know, so I get these situations and

23   then somebody says, "Well, in six months, I've got to go to

24   Sri Lanka or somewhere."  So I don't necessarily -- I am

25   generous in my excusing people; however, you know, there's no

1   need to bring in people if you both think that they're not

2   favorable; but the idea is not to winnow it down, the idea is

3   to beef it up.

4        People change.  Suddenly they'll be sitting there and

5   they'll say, "Gee, this is interesting."  I don't know that's

6   going to happen in this case but, you know, somehow they're

7   intrigued.

8        I mean, I give all of these, you know, Fourth of July

9   speeches about what a great privilege it is to serve on the

10  jury, you know, what the presumption of innocence means, what

11  the burden of proof means.  I do all that.

12       And I especially do the fact that a defendant need not

13  prove anything.  Doesn't have to testify.  Doesn't have to put

14  on any evidence and those facts cannot be used against him; and

15  even though you may want to hear his story, he's not under any

16  obligation to tell you a story at all.  I don't know to what

17  extent that will be useful in this case, but I'll treat this

18  case like any other case.

19       So they're sort of indoctrinated.  They're indoctrinated

20  from the point of view that jury service is not only an

21  obligation but a rare opportunity to participate in the civics

22  of our country.

23       So I generally get a pretty good "Let's do it."  Not

24  always.  Not always.  Especially with the length of this and

25  the subject matter of this case, you're not terribly attractive

PROCEEDINGS

 1    to jurors.

 2        So we will pick the jury that day and then start the trial

 3    on the following Monday.

 4            **MR. LINCENBERG:**  A couple of questions about what the

 5    Court has reviewed.

 6        First with regard to the questionnaires, it sounds like

 7    the Court is going to send out more questionnaires if you're at

 8    about 80 and you're not sure if there will be how many people

 9    coming in.  Is that the Court's thought?

10            **THE COURT:**  I don't know what's happening.

11            **THE LAW CLERK:**  They sent followup, like second

12    notices to people who hadn't responded.  So some of them got it

13    the first time, but maybe they didn't fill it out on paper.

14            **MR. LINCENBERG:**  Okay.

15            **THE LAW CLERK:**  So we're waiting on that.

16            **THE COURT:**  A lot of people don't respond the first

17    time, and so you have to send out a reminder.

18            **MR. LINCENBERG:**  So in that regard, as I understand

19    it, the Court sent out a questionnaire discussing a certain

20    time frame based upon what the Court had heard, that the

21    Government's trial estimate -- I can't recall if at that point

22    it was four weeks or five weeks.

23        So the Court's aware, the Government has had different

24    estimates as they've evaluated their case.  It's gone up from

25    four to five, to what we understand now is six-plus weeks of

**PROCEEDINGS**

1    the Government's case.

2         And as we look at the calendar and we check the Court's

3    calendar, there's also some weeks when the Court anticipates

4    being dark parts of some weeks.  So, for example, the week of

5    April 22nd, what we saw was that the Court was anticipating

6    being dark on Wednesday and Thursday of that week.

7         So let's just say the Government is six-plus of court

8    days, maybe we're not talking seven weeks.  Who knows if

9    there's a COVID outbreak or whatever happens that there may

10   even be delays.  The Defense has the same estimate for the

11   Defense case of four weeks.

12        We also -- if you figure maybe two weeks of jury

13   deliberations, we have some concern -- you know, the

14   questionnaire went out, I think, talking about 10 weeks or so,

15   and maybe it would be worthwhile to let the jurors know it

16   really could be 13 weeks.

17        Again, the Defense estimate is no different, but the

18   Government's estimate has increased.  And also looking at the

19   Court's calendar, depending or how far we go, there's a couple

20   of weeks --

21             **THE COURT:**  Don't worry about the Court's calendar.

22   I'll adjust.  This case is a priority on the Court's calendar.

23   So, you know, if I have to not go to the Ninth Circuit, I don't

24   go to the Ninth Circuit.  If I can't go here, I can't go there,

25   that's okay.

1        However, you raise an issue as to the Government's

2   increase in their -- in their estimation, which I find

3   remarkable since the only thing that happened that I saw was

4   severing a count.  And I think the comment was made, "Well,

5   then our case will be shorter."  And then come up here and they

6   tell me it's going to be longer.  Maybe I ought to put the

7   count back in if it will get a shorter trial.

8        But I don't know what's going on; that is to say, I have

9   no idea what stipulations have been entered into.  I would find

10  it remarkable if there's an argument about authenticity of

11  documents.  Just -- you know, maybe there is.

12        **MR. LINCENBERG:**  I don't think that's an issue,

13  Your Honor.

14        **THE COURT:**  No, I wouldn't think so.  I don't think we

15  need any custodians.  I think -- I think that it really is the

16  responsibility of the Government to cut way back on their

17  presentation, and then it depends on the cross.  If the cross

18  is such where you bring into doubt or you create a doubt or you

19  raise an issue that can be satisfied or addressed by the

20  Government in further questioning or a second witness or a

21  third witness, sure.  But I've found that that's not

22  necessarily the case.  That may be one approach you want to

23  take, but I'd be surprised if it is in this case.

24        This is, in large part, an accounting case.  In large

25  part, not completely, but in large part facts may be different

**PROCEEDINGS**

1   interpretations, but the facts are the facts.  What happened

2   happened.  And I'd be surprised if -- you know, I don't know.

3   I don't know what factual disputes will be there; and obviously

4   if there's a factual dispute, you're entitled to explore that.

5       But I doubt if you're going to explore factual disputes

6   that aren't really factual disputes because you lose a jury

7   when you do that.

8       And I think that I'm going to run a fairly tight ship on

9   the Government's evidence.  That is, I'm not going to allow

10  them to, you know, just constantly beat the dead horse.  If

11  they have 10 exhibits that show the same thing, they ask one

12  question:  The Exhibits 2, 3, 4, 5, and 6, are they part of

13  this transaction?

14      Yes.

15      Admitted.

16      Yes.

17      Or do they show anything different?

18      No.

19      You don't have to go through:  Now we look at Exhibit 2.

20  Now we look at Exhibit 3.  Now we look at Exhibit 4.

21      I don't want any of that.

22          **MR. LINCENBERG:**  Your Honor, I'll leave it to

23  Mr. Reeves to, you know, discuss his case and their feeling of

24  the need for whatever length he wants.  I think it's important

25  in terms of even juror qualification.

1          And also we asked the Court, you know, from the Defense

2     perspective, and we don't get to control what obviously the

3     Government puts in, but one thing we tried to do, you know,

4     early on I came in two years ago asking for a Bill of

5     Particulars.  Throughout the time, you know, the Court has

6     indicated we're going to try to have notice and tighten it.

7     That Bill of Particulars has monumentally expanded.

8          And with regard to some of the motions in limine, for

9     example, where we were trying to keep out things that are

10    accounting decisions that aren't really part of what's charged

11    there, the Court denied our motions in limine.

12         I can give, you know, just a small example of what I think

13    is going to contribute to a longer trial, and maybe necessary,

14    on this little credit hunt issue, which respectfully from the

15    Defense side was sort of a no-brainer.  They've got so much

16    evidence, so many transactions they're putting in.  Do we

17    really need to get into transactions that are by all accounts

18    perfectly legal?

19         And we just did Rule 15 depositions, and two of the

20    witnesses, I don't know, I probably had to spend 30 or

21    40 minutes covering credit hunts or whatever just because it

22    may be coming in.  We weren't sure how the Court's going to

23    rule.  Now we have that testimony that will be played.

24         And there's a lot of things out there like this that are,

25    you know -- so, you know, I just ask -- I ask the Court to bear

1   that in mind.  The Court is calling balls and strikes as best

2   as the Court can, but there is a consumption of time element

3   that relates to that.

4        **MR. REEVES:**  Can I please respond?

5        I think the schedule is important and I appreciate this

6   dialogue, and I think it's important for the Court and the

7   parties to be realistic about this.  I think that has broadly

8   been accomplished by the jury questionnaire, which was

9   screening the jurors for 10 weeks of service, approximately

10  mid-March through the end of May.  And currently the Government

11  is estimating that this trial will conclude by the end of May.

12  Approximately.

13       What changed?  Counsel asked the question what changed in

14  the Government's case.  What changed was the experience around

15  the Rule 15 depositions, which, I want to compliment counsel, I

16  thought went forward with a high degree of cooperativeness but

17  also revealed one key thing.  The cross-examinations were

18  exceptionally long.

19       That is a function, as I acknowledged to counsel, about

20  the uncertainty about what the trial record would be, but it's

21  also reflective of the absence of Court in policing repetitive,

22  I would argue, objectionable testimony.

23       As a result of that, I don't know exactly -- I remember

24  the *Hussain* case well, and we've spent a great deal of time

25  thinking about our schedule and tightening our case; but when

1   we realistically factor in cross-examinations by not one but

2   two defendants, good counsel asking, I hope, good questions, I

3   expect good questions, all of our estimates of our witnesses

4   have a factor of one and a half to two times for the

5   cross-examinations.

6        We have a 22-hour trial week, 5.5 hours per day.  We added

7   in the Court's dark days and sort of really tacked out what the

8   schedule would be.  We see us rounding out sometime in early

9   May.  That should allow for a Defense case in mid-May.

10       Every case I've ever done I've heard that the Defense case

11  is going to be enormous.  That was exactly what John Keker said

12  about the *Hussain* case.  Okay.  We'll plan several weeks, a

13  couple -- two to three weeks for a Defense case.  I think that

14  roughly gets us to end of May.

15       I would not mind in screening with the jurors that they be

16  reminded of service through Memorial Day, through approximately

17  June 1, possible leaving it a little loose.  I just think the

18  key thing for all parties, and I think I'm speaking for

19  the Court as well, is to not undersell the duration of the jury

20  service so that we come in under that.

21       But the Government has worked incredibly hard to really

22  estimate its trial coming back from London and the Rule 15s.

23  We increased the estimated duration of the cross-examinations.

24  That's what resulted in the extension of time estimate to the

25  parties, but I still think we're broadly on track, and at this

**PROCEEDINGS**

1  point we're playing on a case-in-chief that we expect to wrap

2  up in early May.

3      **MR. LINCENBERG:**  Let me comment on that, if I may.

4      First, early May confirms what I'm suggesting.  I guess

5  that's seven weeks or so.  It's fairly lengthy.

6      Second, just to the small points of the Rule 15

7  depositions, first of all, there were three depositions.  Two

8  of them the Government had cross-examinations.  I thought they

9  were actually pretty efficient.  I have no dispute.  Apparently

10  counsel's objecting to the one of their witnesses for whom

11  there was a thorough cross-examination.  It was not overly

12  lengthy, but the cross-examination has to be thorough.  So I

13  don't think that that should be contributing to any change in

14  the estimate, but it is what it is.

15      The Government's estimating early May.  Right now I'm not

16  quibbling.  I'm not saying that we can control what they do,

17  but I'm raising with the Court --

18      **THE COURT:**  I can.

19      **MR. LINCENBERG:**  -- if they're early May, it's six,

20  seven weeks.

21      **THE COURT:**  I can control it.  I can control it.  If I

22  hear repetitive questions, if I hear questions on issues that

23  aren't in dispute, I cut you off.  I don't care where you are.

24      **MR. REEVES:**  We would welcome that.

25      **THE COURT:**  Not at the time, but that's what I do.  I

**PROCEEDINGS**

1    run the railroad.

2          **MR. LINCENBERG:**  I get it, but it tends to redound to

3    the deficit -- to the detriment of the Defense because the

4    Defense --

5          **THE COURT:**  You see, you say that.  I don't -- I don't

6    know that that's the case.  I'm trying to figure out why.

7          **MR. LINCENBERG:**  Because we go second; and all of a

8    sudden, we're pushing up against some dates.  And, you know,

9    Mr. Reeves says, "You know, I hear a lot of times the Defense

10   is going to put on a big case and they don't."

11        He's right, a lot of times they don't.  And they may

12   prepare to do so.

13        I would expect that in this case, I would expect Dr. Lynch

14   is going to testify.  I would expect that Mr. Chamberlain is

15   going to testify.  It sounds like there's going to be some

16   experts.  We have some Rule 15.  There may be a few other

17   witnesses.

18        The examinations of defendants tend to be a certain length

19   of time so we're estimating four weeks.  Maybe it will be less,

20   but that brings us into June, and that's a -- that's pretty

21   lengthy.  And it's certainly longer than what the Court has

22   been time-testing, you know, with hardship in the questionnaire

23   thus far.

24        **THE COURT:**  Okay.  Thank you.

25        **MR. LINCENBERG:**  So really where it just leaves us, at

1    least at this point, is I think in terms of talking to the

2    jurors, they should anticipate --

3        **THE COURT:**  But the problem is you start talking about

4    June, you know, "Well, I have my kids out of school," "I have

5    my June vacation," "I have my this," "I have my that."

6        You know, I mean, if you get a commitment from people

7    upfront that, in a sense, they'll go as long as it takes, even

8    if it takes the summer, you're not going to get a jury.

9        I mean, if you're going to get a jury, how many postal

10   workers do you want on your jury?

11       **MR. LINCENBERG:**  But -- we get it.  We're not looking

12   for a trial to go till late June.

13       **THE COURT:**  Well, then I think that --

14       **MR. LINCENBERG:**  We just don't want it to cut into us.

15       **THE COURT:**  Well, I think that -- I think you make a

16   decision when you hear cross -- when you hear the examination,

17   you make a decision whether or not you want to cross and to

18   what extent you're going to prove something.  You do that all

19   the time.  I've seen you do that all the time.  Sometimes no

20   questions.

21       **MR. LINCENBERG:**  I get it, but we have over 40

22   Government witnesses and --

23       **THE COURT:**  I don't know that we're going to have over

24   40 Government witnesses.  You've got to -- you've got to look

25   at this.  I was dumbfounded when I saw that exhibit list.

1      I mean, I guess it's because we don't want to listen to

2   the Defense say mid-trial "Where is Document Number 18,436,

3   subpart A?"  And they don't want -- you don't want to say "We

4   never gave it to you," even though it's Document Number 18,462,

5   part A.

6      Anyway, fine.  Everybody's been inclusive, but those

7   aren't trial decisions.  Those are discovery steps.  And trial

8   decisions are:  Where are the 20 documents or 30 documents, the

9   50 documents that are going to make a difference in this case?

10   That's the trial decision.

11      Where is the bit of testimony that's going to make a

12   difference in this case?

13      And I think everybody knows what the case is.  Well, I say

14   "everybody" -- I'm not sure I do -- but I have to believe that

15   the parties know this case so much better than the Court and --

16   and what they intend to do.  They've spent countless hours

17   going through the *Hussain* case and the United Kingdom case.

18      So, you know, it's not like, "Gee, we have no idea what

19   the Government is going to do in this case."  I think you've

20   got a very good idea what the Government is going to do in this

21   case.  Now, they may not do it but you certainly have a good

22   idea, and then you plan your defense around that case, unless

23   you have something else to say about it.  Maybe you do.  Maybe

24   you do.

25      But it's a case that -- essentially, I'm going to say

**PROCEEDINGS**

1   without surprises, but there's never a case without surprises,

2   but it's a case of limited surprises and limited unknowns.  I

3   doubt if you saw somebody on that witness list you had no idea

4   what they were going to testify about.

5          MR. LINCENBERG:  That's not the point obviously, but

6   when we get doubling and tripling of Bill of Particulars and we

7   hear counsel say, "Your Honor, anything that deals with revenue

8   recognition has to do with this case," and I think, you know,

9   my concern is that we're going to be rolling through the weeks

10  and all of a sudden, you know, people are going to be blaming

11  the Defense because we're doing our cross-examination of the

12  witnesses.

13         THE COURT:  They're not going to blame you.  They're

14  not going to blame you unless it's your fault.

15         MR. LINCENBERG:  A couple of other small points

16  relating to what the Court covered.  With regard to the number

17  of strikes, we would ask instead of 10 and 6, that the Court

18  make it 12 and 7.  We have two different defendants.  We have

19  some slight different things that we're looking at for our

20  clients.  It's a lengthy --

21         THE COURT:  I'm doing 12 and 6.

22         MR. LINCENBERG:  What?

23         THE COURT:  I'm doing 12 and 6.

24         MR. LINCENBERG:  12 and 6, okay.

25     And with regard to the weeks, I just note for the Court

**PROCEEDINGS**

1  that the abbreviated week that the Court has of April 22

2  through 25, where right now the Court's schedule is to not be

3  here on that Wednesday and Thursday, I note that --

4        **THE COURT:**  I will be here Wednesday.

5        **MR. LINCENBERG:**  You will be?

6        **THE COURT:**  I will be here Wednesday.  I won't be here

7  Thursday.  I will be here Wednesday.

8        **MR. REEVES:**  So that's yes to April 24th, Wednesday?

9        **THE COURT:**  Yes, to April 24th.

10        **MR. REEVES:**  And no to Thursday, April 25th?

11        **THE COURT:**  Yeah.

12        **MR. REEVES:**  Okay.

13        **MR. LINCENBERG:**  I would --

14        **THE COURT:**  And it's no to April 25th unless I see

15  some disaster.  It's not a secret.  It's the Northern District

16  meets and goes through various issues that the judges have.

17  And I've always gone because I've always found it to be useful,

18  but it's not like it's written in stone.  If I can't go and

19  it's more important that I devote that as a trial day, I'll let

20  you know, but that's April.  And I'll let you know.  I'll try

21  to let you know fairly early on.

22        **MR. LINCENBERG:**  Okay.  And I would also --

23        **THE COURT:**  Also the other thing I just wanted to make

24  clear, if it's not clear already, there's no problem in

25  rearranging order of witnesses.  In other words, if somebody

1   comes and they need to testify because they're going home or

2   something, then I interrupt a witness's testimony, put it on.

3   There's no problem at all.  That is just a matter of courtesy.

4   Just let the other side know that that's really what you want

5   to do.

6          **MR. LINCENBERG:**  We understand that, Your Honor.

7          **MR. REEVES:**  Thank you, Your Honor.  That was

8   important in the *Hussain* case, and I anticipate it will be

9   important in this trial.

10          **THE COURT:**  Yeah, especially if you have witnesses

11   coming from the United Kingdom.

12          **MR. LINCENBERG:**  I would note that that week of April

13   22nd, and I'm not asking the Court to do anything about it,

14   Monday night is the first night of Passover.  There's a number

15   of attorneys on both sides of the table who it impacts, and

16   we're all out of town.  I'm not asking the Court to change the

17   schedule, but just to keep it in mind if there's some shakeup.

18          **THE COURT:**  I'll keep it in mind.

19          **MR. LINCENBERG:**  Okay.  One other thing I wanted to

20   mention for the record, so to speak.  I mentioned at our last

21   hearing that with regard to the Deloitte witnesses, that we did

22   not yet have an on-call agreement signed.

23          **THE COURT:**  Right.

24          **MR. LINCENBERG:**  And the Court made some helpful

25   comments, which I also passed on to their counsel.  And we're

1    trying to work out -- it looks like we may have -- get to the

2    point where we have an on-call agreement.  I've made some

3    accommodations as have counsel for those witnesses, but we

4    don't yet have one.  And I just note again for the record,

5    unless we get one, we intend to have those witnesses here on

6    March 18th.

7              THE COURT:  Okay.  Well, I'll order them.

8              MR. LINCENBERG:  Yeah.

9              THE COURT:  That's it.

10             MR. REEVES:  Your Honor, could I be heard briefly on

11   that?

12             THE COURT:  Yeah, sure.

13             MR. REEVES:  I think the simpler remedy with regard to

14   the Government-issued Rule 17 subpoenas to Nigel Mercer and

15   Richard Knight is to adjourn the return date for those

16   subpoenas to a realistic date so that retired individuals

17   living in foreign countries --

18             THE COURT:  I think that's a function of sitting down

19   and working it out.

20             MR. REEVES:  I'm happy to do that.

21             THE COURT:  You have to work it out with counsel in

22   England and --

23             MR. LINCENBERG:  And I believe we'll get it worked

24   out.  I just --

25             THE COURT:  I'm sure it is.

PROCEEDINGS

1          MR. LINCENBERG:  It's important to me so I want to

2     have it on the record.

3          THE COURT:  No one wants to say, "Well, I'm the judge

4     so you're here."

5          MR. REEVES:  Yeah.  Your Honor, I know there's been a

6     lot of work on this, but I'm informed by the counsel for

7     Deloitte that has represented to the United States that his

8     clients plan to appear and testify with or without the

9     requested on-call agreement.  They will be here.

10         At the request of counsel, the Defense counsel, we issued

11    these subpoenas pursuant to the cooperation agreement.

12    I believe they are, in that technical sense, witnesses of the

13    United States, and I take it quite seriously that they will

14    appear when we ask them to be here and I expect them to be

15    here.  And we can set that date reasonably and we're happy to

16    do that.

17         MR. LINCENBERG:  And we -- again, we've been very

18    grateful to Mr. Reeves for his assistance with that and we

19    continue to be, and I believe we'll get it worked out.  I just,

20    you know, don't want to be caught with my pants down on this.

21         MR. REEVES:  Let that be our hardest problem.

22         THE COURT:  Okay.  Anything else from anybody?

23    Mr. Leach.

24         MR. LEACH:  Yes, Your Honor.  Briefly on the mechanics

25    around exhibits.  What is the Court's preference in terms of

1    witness binders and physical copies?  I think --

2            THE COURT:  Well, I think it would be useful -- I'll

3    be guided also by the Defense in this regard.  What I have

4    found useful is witness binders and you get a witness binder

5    for each witness -- I mean, for each juror and you put them all

6    in.

7            And, you know, I guess if there's an argument about should

8    Number 6 come in, we can have that discussion at the end of the

9    day or before it's presented, or something of that nature, but

10   usually we don't have those arguments.

11           MR. LEACH:  Your Honor, I think what we were

12   contemplating was, you know, to provide the documents

13   electronically to the Court and to display them to the jurors

14   rather than physical copies.

15           THE COURT:  Right.  Oh, you're not going to give them

16   a book?

17           MR. LEACH:  I think given the number of exhibits and

18   the number of jurors and alternates and considerations of the

19   U.S. Attorney's Office, it's just impractical.

20           THE COURT:  Well, they all have computers -- I mean,

21   they all have screens.  Just show them on the screen.

22           And what I don't want do, the couple things I don't do,

23   one is unless -- unless there's an objection to a particular

24   exhibit, I admit it.

25           You don't have to show it.  You don't have to lay a

**PROCEEDINGS**

1    foundation:  Is this a true and accurate representation of

2    da-da-da?  You don't have to do any of that.  You don't have to

3    say "Can I approach the witness?"

4        It's just like, you know, let's forget about the courtroom

5    and do it like you would have a conversation with somebody.

6    You know, will you look at Tab 6?  Tab 6 goes up.  Done,

7    you know.  And if -- and what I might do if Tab 6 isn't in

8    evidence, I might say "Without objection, admitted."  So you

9    don't -- we just cut down on the time -- that time.

10           **MR. LEACH:**  Understood.  And I think all parties are

11   working towards that, Your Honor.  I just -- I don't want to

12   have to make unnecessary copies if we don't have to; and if

13   the Court is willing to take an electronic set, if we --

14           **THE COURT:**  I'm willing to take an electronic set.

15           **MR. LEACH:**  Okay.  Thank you.

16           **THE COURT:**  Mr. Morvillo.

17           **MR. MORVILLO:**  One small issue.

18       Dr. Lynch's bail currently allows him to be away from his

19   house between 9:00 a.m. and 9:00 p.m.

20           **THE COURT:**  Right.

21           **MR. MORVILLO:**  We would like for the purposes starting

22   this week to extend that period so that he can work with

23   counsel while we're here --

24           **THE COURT:**  Granted.

25           **MR. MORVILLO:**  -- starting from 7:00 a.m. to midnight,

**PROCEEDINGS**

1    Your Honor.

2            **THE COURT:**  Granted.

3            **MR. MORVILLO:**  Thank you.

4            **THE COURT:**  Mr. Weingarten.

5            **MR. WEINGARTEN:**  Thank you, Your Honor.

6        And I'm not beating a dead horse and I'm not obsessed with

7    post-ac, I just have a procedural question.

8            **THE COURT:**  Yes.

9            **MR. WEINGARTEN:**  So I understood the Court's rule to

10   be if we're contemplating using or making reference to anything

11   post-acquisition, cross-examining a government witness,

12   introducing evidence, even making argument and jury

13   presentations, we present it to you first.

14           **THE COURT:**  Yes.

15           **MR. WEINGARTEN:**  Okay.  Now, would it be helpful if we

16   presented it to you somewhat in advance?  In other words,

17   something like a trial memo or a trial brief or --

18           **THE COURT:**  Sure.

19           **MR. WEINGARTEN:**  Okay.  You would welcome that.

20           **THE COURT:**  Sure.

21           **MR. WEINGARTEN:**  Okay.  Thank you.

22           **MR. LEACH:**  Nothing further, Your Honor.

23           **THE COURT:**  Okay.  Good night.

24           **MR. LINCENBERG:**  Thank you, Your Honor.

25           **MR. MORVILLO:**  Thank you.

PROCEEDINGS

1          **THE CLERK:**  Court is in recess.

2                (Proceedings adjourned at 4:19 p.m.)

3                        ---o0o---

4

5                **CERTIFICATE OF REPORTER**

6          I certify that the foregoing is a correct transcript

7     from the record of proceedings in the above-entitled matter.

8

9     DATE:   Friday, February 23, 2024

10

11

12

13

14     _____
       Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219

15           Official Reporter, U.S. District Court

16

17

18

19

20

21

22

23

24

25