Pages 1 - 47

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,      )
                               )
           Plaintiff,          )
                               )
   vs.                         )   NO. CR 18-00577-CRB
                               )
MICHAEL RICHARD LYNCH and      )
STEPHEN KEITH CHAMBERLAIN,     )
                               )
           Defendants.         )
_____)

San Francisco, California
Wednesday, February 28, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    ISMAIL J. RAMSEY
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue
                    San Francisco, California 94102
            BY:  **ADAM A. REEVES**
                 **KRISTINA GREEN**
                 **ASSISTANT UNITED STATES ATTORNEYS**

                    U.S. DEPARTMENT OF JUSTICE
                    Antitrust Division
                    450 Golden Gate Avenue, Room 10-0101
                    Post Office Box 36046
                    San Francisco, California 94102
            BY:  **ROBERT S. LEACH**
                 **ZACHARY G.F. ABRAHAMSON**
                 **TRIAL ATTORNEYS**

       **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant Lynch:

                    CLIFFORD CHANCE US LLP
                    31 West 52nd Street
                    New York, New York 10019
          BY:  **CHRISTOPHER J. MORVILLO, ATTORNEY AT LAW**
               **CELESTE L. KOELEVELD, ATTORNEY AT LAW**


                    STEPTOE & JOHNSON LLP
                    1330 Connecticut Avenue, NW
                    Washington, D.C. 20036
          BY:  **REID H. WEINGARTEN, ATTORNEY AT LAW**


                    STEPTOE & JOHNSON LLP
                    One Market Plaza
                    Steuart Tower, Suite 1070
                    San Francisco, California 94105
          BY:  **JONATHAN M. BAUM, ATTORNEY AT LAW**

For Defendant Lynch (Via Zoom):
                    STEPTOE & JOHNSON LLP
                    1330 Connecticut Avenue, NW
                    Washington, D.C. 20036
          BY:  **BRIAN M. HEBERLIG, ATTORNEY AT LAW**



For Defendant Chamberlain (Via Zoom):
                    BIRD, MARELLA, RHOW, LINCENBERG,
                      DROOKS & NESSIM LLP
                    1875 Century Park East, 23rd Floor
                    Los Angeles, California 90067
          BY:  **GARY S. LINCENBERG, ATTORNEY AT LAW**



Also Present:         **Ali Hasan, Paralegal**

| | |
|---|---|
| 1 | <u>**Wednesday - February 28, 2024**</u>                              <u>**1:34 p.m.**</u> |
| 2 | P R O C E E D I N G S |
| 3 | ---o0o--- |
| 4 | (Defendant Lynch present, out of custody.) |
| 5 | (Defendant Chamberlain present via Zoom, out of custody.) |
| 6 | **THE CLERK:**  Next matter, calling Criminal Action |
| 7 | CR 18-0577, U.S.A. vs. Michael Richard Lynch and Stephen Keith |
| 8 | Chamberlain. |
| 9 | Counsel, please state your appearances, for the record. |
| 10 | **MR. LEACH:**  Good afternoon, Your Honor.  Robert Leach |
| 11 | on behalf of the United States.  I'm here with Adam Reeves, |
| 12 | Kristina Green, Zack Abrahamson, and our paralegal, Ali Hasan. |
| 13 | **THE COURT:**  Okay.  Good afternoon. |
| 14 | **MR. MORVILLO:**  Good afternoon, Your Honor.  Chris |
| 15 | Morvillo for Dr. Lynch, who's present in the courtroom. |
| 16 | With me is Reid Weingarten, Celeste Koeleveld, Jonathan |
| 17 | Baum and, if the technology is working, Brian Haberlig by |
| 18 | video. |
| 19 | **MR. HABERLIG:**  Good afternoon, Your Honor. |
| 20 | **MR. LINCENBERG:**  Good afternoon, Your Honor.  Gary |
| 21 | Lincenberg by video. |
| 22 | And Mr. Chamberlain advises that he has Zoomed in.  I |
| 23 | don't see him on my screen, but he confirmed that he should be |
| 24 | on. |
| 25 | **THE COURT:**  Okay.  Let's see if we can -- |

1          **THE CLERK:**  Let me double-check.

2          **THE COURT:**  Yeah.  Get him.

3      And, by the way, I indicated that he need not be present

4  and you could participate by Zoom.

5          **MR. LINCENBERG:**  Thank you, Your Honor.

6      There we go.

7          **THE COURT:**  Okay.  Great.

8      So this is a continuation of, in a sense, the pretrial

9  conference issues that were raised that the Court wanted to

10 have further -- take a further look at it in order to arrive at

11 some decisions with respect to the motions in limine.

12     I'd like to address one in particular because I think that

13 some clarity would be helpful at this point, which is the

14 testimony of Mr. Yelland and the prospective testimony of -- is

15 it Ms. Anderson?  I don't know the name of the person.  I think

16 it's Anderson.

17         **MR. REEVES:**  Yes, Your Honor.  Antonia Anderson.

18         **THE COURT:**  Antonia Anderson.  Okay.

19     So that, when it was discussed at the motion in limine,

20 there were several aspects of the testimony:  one, the

21 restatement; two, summary charts; and, three, what would

22 Mr. Yelland and, ostensibly, Ms. Anderson be able to say about

23 it, all of which, by the way, the defense objected to.

24     I ruled that the restatement would come in under *Jasper*,

25 as it did in the first trial, and I've not changed my mind on

1   that issue.

2       I also ruled that a summary could be used for

3   demonstrative purposes and have not changed my mind on that

4   issue.

5       But I think I need to clarify -- and, obviously, if

6   further argument is warranted, I can listen to it -- as to the

7   extent to which the two government witnesses can testify as to

8   what they did or what they saw or what they understood.

9       I note that unlike the first trial, Mr. Yelland was not

10  designated as an expert; and indeed, defense has pointed out

11  that in light of change of law, change of the rules, that may

12  have significant implications to what he can say.

13      I think that's correct.  I think they're right.

14      So I guess I'm asking the Government -- well, first of

15  all, he's not testifying as an expert; right?

16          **MR. LEACH:**  We have not designated him as such,

17  Your Honor.  We did not think it is expert testimony.

18          **THE COURT:**  Well, you did the last time.

19          **MR. LEACH:**  I think we said --

20          **THE COURT:**  The last time you said it was expert

21  testimony.  Today you say it's not expert testimony.  I read

22  the transcript of what you said the last time.  You said it's

23  expert testimony.  You didn't.  Mr. Reeves did.

24      I can quote it.  Do you want me to quote it?

25          **MR. LEACH:**  That's not necessary, Your Honor.

1          **THE COURT:**  It's not necessary.

2      So you said:  He is an expert.  We designate him as an

3   expert.

4      But you didn't this time.  And I'm not asking you why you

5   didn't.  Those are decisions that are made by the parties;

6   they're not made by the Court.  But certain things flow from

7   that.

8      What flows from the failure to designate Mr. Yelland's

9   testimony as an expert is the following.  Oh, I was going to be

10  very dramatic.  I was getting the rules of --

11     Would you please get the Federal Rules of Criminal

12  Procedure so I can read 701(c).

13     I can tell you from memory what it says.  In (c), it says

14  a person can't give -- a lay witness can't give opinion

15  testimony if (a), (b) -- here we go.  Saved by my law clerk, as

16  I always am.

17     (As read):

18         "If a witness is not testifying as an expert,

19     testimony in the form of an opinion is limited to one

20     that is:  (a) rationally based on the witness's

21     perception."

22     Okay.  He can do that.

23     (As read):

24         "Helpful to clearly understanding the witness's

25     testimony or to determining a fact in issue."

1          That's what he would be doing.

2          (As read):

3               "(c) not based on scientific, technical, or other

4          specialized knowledge within the scope of Rule 702."

5          So it occurs to me, that guy's an accountant.  That's

6     right within -- that's not everybody's perception.  I can't do

7     accounting.  Not that I'm the test of the reasonable layperson,

8     but I don't do accounting.  Jurors don't do accounting.  They

9     can't tell you what a receivable is in a technical sense.  They

10    may say, "Oh, I know what a receivable is.  It's money that

11    you're owed."

12         Sure, they can say that, but that's not helpful because

13    that's not the test.  It's not the test in an accounting case

14    whether something is -- it could be in this, a bit.  There's

15    some of this in this, whether it's receivable, money owed, and

16    so forth.

17         But the whole definition of what is a receivable -- when

18    is it accounted, what is it accounted for, when can it be

19    recognized, when is it too speculative, when is it within the

20    period and when is it without the period, when can it be

21    considered revenue for accounting purposes and when can it

22    not -- those are all highly -- well, I don't need to say that.

23    They're technical questions.  They fall right within the

24    definition of expertise.

25         And that's what Mr. Reeves said the last time around.  He

1    said it.  I mean, I got page after page, which starts on

2    page 84 of the transcript of the proceedings on February 6th,

3    2018.  It's right there.

4         So he's not an expert.  I beg your pardon.  He's an

5    expert.  He's not been qualified as an expert; he's not been

6    noticed as an expert; and so I don't see how he can give

7    testimony under 701.  And he can't give it under 703 --

8    sorry -- 702 because you didn't notice him.

9         So what can he say?  I think all he can say is -- and I'm

10   now paraphrasing it.  I'll hear, if you think I'm wrong, just

11   tell me why I'm wrong.

12        I think what he can say is:  I was an accountant.  I was

13   hired by X.  I worked at Hewlett-Packard, the Autonomy Division

14   of Hewlett-Packard on or about a particular date.  And I was

15   given the responsibility of reviewing the financials that had

16   been submitted by Autonomy in connection with the merger.

17        Okay.  He can say all that.

18        "And what did you do?"

19        "I reviewed all of the finances."

20        "Okay.  And what resulted from that?"

21        "I issued a restatement."

22        "Okay.  And is this the restatement?"

23        "Yes."

24        "Admitted."

25        "Well, why did you do it -- how did you do it?"

1    Well, he could say, "I looked at the receivables" or "I

2    looked at the figures."

3    "Okay.  And then what did you find?"

4    I think he can say, "I came to a different conclusion" or

5    "I added them up differently from the way they were added up by

6    Autonomy."

7    I guess he could say that.

8    "And as a result, what happened?"

9    "Here is the restatement with my additions."

10    "Well, why did you include this as a receivable or reject

11    that as a receivable?"

12    I don't think he can say that because that calls for

13    expert opinion, and that's what you told me the last time

14    around.

15    So, I mean, there's a lot to be said for -- maybe there's

16    a lot to be said for inconsistency or consistency, but that

17    doesn't make sense to me.  I mean, the rules are pretty clear.

18    Now, so I don't know why -- I mean, I think this witness

19    can say, "I did a restatement.  I looked at the figures.  I

20    came to a different conclusion."

21    The "why" calls for expert opinion.

22    Just like a coroner at an autopsy, "I opened up the body

23    and I saw Part A, Part B, Part C."

24    "What does Part A mean?"

25    Uh-uh.  What Part A means, maybe it means poison; maybe it

means a heart attack; maybe it means something else.  That's expert opinion, I think.  Just because he sees it doesn't make him a non-expert.

Now, there are a lot of fuzzy areas in here, because cops testify all the time as to, quote, experience and expert opinions.  But I think this is -- I think it's a mistake to say:  Well, because a cop does, therefore an accountant can.  I don't think that's right.

And I think each expert, each person giving an opinion has to be evaluated according to the reasons and how he or she presents him- or herself and what does it mean.  What does it mean?

And then I looked at the case out of the Second Circuit -- Are you familiar with the Second Circuit?  Been to the Second Circuit before?  Which I thought:  Oh, great, I've got a Second Circuit case.  Wait till I hear what the defense has to say about the Second Circuit, you know, because this is big stuff.  It's the Second Circuit -- the *Bank of China* case, which has been quoted by the parties.

And the *Bank of China* case -- great.  The *Bank of China* case said -- I know somewhere here I'm going to find it.

Oh.  Some officers testify who had reviewed the loans of the Bank of China, and they presented evidence that the loans were somehow improper or fraudulent.

No, this is not what I was looking for.

1          Here it is.  It was the testimony of Huang Yangxin.  Huang

2   Yangxin, a Bank of China employee, testified as follows:

3   that certain transactions of the defendant did not comport

4   with the business community's understanding of normal, up-front

5   transactions; and that it is considered fraud when an importer

6   presents a trust receipt to a bank to obtain a loan, et cetera,

7   et cetera.

8          Okay.  The Circuit said that (as read):

9              "Testimony admitted pursuant to 701 must be

10         'rationally based on the perception of the witness.'"

11         That's the "(a)."  And that's true in that case; true in

12   this case.

13         (As read):

14             "To some extent, Huang's testimony was based on

15         his perceptions."

16         True in that case; true in this case.

17         (As read):

18             "As a Bank of China employee, Huang was assigned

19         to investigate defendants' activities at the tail-end

20         of their scheme and after Bank of China stopped doing

21         business with them.  Huang's senior role at the Bank

22         and his years of experience in international banking

23         made him particularly well-suited to undertake such

24         an investigation and was likely a factor in the

25         Bank's decision to assign the task to him.  The fact

that Huang has specialized knowledge, or that he
carried out the investigation because of that
knowledge, does not preclude him from testifying
pursuant to Rule 701" --

That's true.  Then they go on (as read):

-- "so long as the testimony was based on the
investigation and reflected his investigatory
findings and conclusions, and was not rooted
exclusively in his expertise in international
banking."

What does that mean?  I mean, what exactly does that mean
when you start to parse it?  Because of course it's based on
his knowledge and his experience and the fact he's perceiving
it.  But all of that has no -- it's got to be tethered to
something.  And what it's tethered to is his expertise.  That's
what it's tethered to, just like a coroner's expertise is in
cause of death and his years of medical training and
experience.

And then they go on to say, the Second Circuit:  Well,
maybe it was a mistake, but if it was, it was harmless error.

Which to me is like, okay, this case means nothing,
because it's not; it's not clear; it's not clear what he could
say and what he couldn't say.

I mean, they go on to say:  Oh, it would be a great
mistake to allow him explanations -- they say (as read):

1              ". . . explanations regarding typical

2         international banking transactions or definitions of

3         banking terms and any conclusions that he made," then

4         they go on to say, "that were not a result of his

5         investigation" -- again, I'm not quite sure what that

6         means -- "were improperly admitted."

7         So that's what it's -- if it's useful, if it's useful, it

8    doesn't really change the playing field for 701 and 702.  The

9    rule changed.  And the rule said:  Look, if you're going to

10   have an expert, you've got to notice him, you've got to give

11   his report out, and the defense has to qualify him -- has to be

12   in a position where they can cross-examine him.

13        So my view is, all those -- he can say very vanilla things

14   about it; that is to say, "Here is a restatement," and he can

15   say "My understanding is this is not a proper receivable."

16   I guess he can say that.  I mean, I'll listen to conversation

17   on that because I don't think you can backdoor his expertise

18   opinion because he's not an expert.  I mean, he's not noticed

19   as an expert.

20        But I think that two things.  Number one, I think all he's

21   going to do is lay a foundation for the document.  Number two,

22   I don't know why you need two witnesses on that subject.

23   Anderson doesn't have to testify.

24        I don't think he could say very much about the document

25   other than "I looked at this transaction.  I put these in

Column A and deducted it from Column B, and I came up with
Column C, a different figure."

Okay.  So that's what he's going to say.

Now, Brice, that's a different issue.  That's a different
issue.  Brice can rely on it for several reasons.  Number one,
it's in evidence, so we don't have to go and -- you don't have
to go and show it's reliable.  He doesn't have to.  It's in
evidence.  He can say he considered it.

And he's subject to cross-examination, by the way.  I'm
not saying you accept it.  I'm just saying whether it's
admissible.

But I think all those definitions, all the reasons why
Mr. Yelland put it in Column A or Column B can't come in.
Okay.  So, is that clear?  I mean, am I clear on that subject?

Does the defense think I need to be clearer, or are you
concerned?

Mr. Morvillo, now's your chance to shine in the sun.

**MR. MORVILLO:**  Well, I'm going to defer to my
colleague, Mr. Heberlig, who argued --

**THE COURT:**  Yes.  Actually, he's very good.  I'm sorry
he's not here.

**MR. MORVILLO:**  I am too.

**THE COURT:**  He is one of the clearest lawyers I have
ever encountered.  I just want to tell him that because, i.e.,
what he said to me, even with my common cold, what he said to

1    me actually resonated.  It actually caused me to go back and

2    look at this thing with some concern.

3         I don't consider -- I know judges consider themselves

4    experts in evidence, but it's a changing field, and people are

5    entitled to rely on the rules, entitled to rely on the rules.

6         So, go ahead.

7              MR. HEBERLIG:  May I, Your Honor?  Can you hear me?

8              THE COURT:  Yes.  Go ahead.

9              MR. HEBERLIG:  Okay.  Thank you.

10        I think I do understand the ruling.  The only, I guess,

11   clarification I'm seeking -- I understand that the restatement

12   itself comes in and Mr. Yelland can lay the foundation for it.

13        The issue I have or the question, I suppose, I have is,

14   the restatement itself is simply the balance sheet and the

15   profit and loss statement.  So it has a column that says "These

16   Were the Original Numbers" and then "These Are the Restated

17   Numbers," but it does not descend to any particulars about what

18   transactions were changed or how you got from Column A to

19   Column B.  That information came only from Yelland's testimony

20   and from the summary charts that were based on his testimony.

21        As I think we explained and I'm hearing from the Court's

22   ruling, that testimony was a combination of his opinion and

23   reporting what other people told him, which is hearsay.

24        Now, if he were properly designated as an expert, experts

25   in some cases can rely on hearsay.  He's not.  Under 701, the

1    lay opinion rule that Your Honor cited, a witness can't testify

2    based on hearsay.  I mean, we included the case law on that

3    point in our motion too.  So I think, based on the way

4    Your Honor has ruled, he's limited to authenticating the

5    restatement, and the restatement comes in.

6         But it's hard for me to understand how he could do

7    anything further with respect to the chart that, if you recall,

8    he created.  And the chart purports to represent how the parent

9    company's financials would have looked if restated.  But they

10   weren't restated; right?  And so for him to explain that

11   process and to explain why Transaction A moved from the correct

12   column to the incorrect column, everything he would say about

13   that would be based on impermissible either hearsay or

14   expertise.

15        And we couldn't cross-examine him if he were able to say,

16   "Well, yeah, I moved" -- pick the File Tech transaction --

17   "I moved that from a 'It was okay to recognize up-front' to

18   'It should have been recognized over time.'"  I don't -- that

19   testimony would be based on, as we showed in our papers, what

20   he learned from Morgan Lewis and PwC.

21        So it seems to me he's limited to putting in the

22   restatement.  And then they're allowed to, you know, offer

23   charts and summaries, but they have to come through Mr. Brice

24   or be based on fact witness testimony that will occur at trial

25   from the people who participated in the transactions.  They'll

1    be calling resellers and other people who, in real time, will

2    say whatever they're going to say.  "We had a side agreement"

3    or, you know, "This shouldn't have been properly recognized."

4         But until they've established that through fact testimony,

5    I don't think Mr. Yelland could come in and they could display

6    the chart to him and he could say, "Oh, yeah, that one, that

7    one, that one, they're all bad," because it's all based on an

8    impermissible foundation.

9         **THE COURT:**  Well, of course, I need to hear from

10   the Government how they -- what exactly is Yelland going to

11   say?  Because I think if we take it piece by piece, I can then

12   look at it, and we can discuss whether he can say that or not.

13        If he says, for example, "I took Transaction A" -- if he

14   comes in and he says, "These are my totals" -- okay? -- "These

15   are my totals," he can say, "I conducted an investigation and

16   these are my totals.  These are my totals, and they're

17   reflected in this restatement."

18        Now, can he say, as an example, "Well, what were the

19   component parts of the re-totals?"  Let's say he's asked that

20   question.

21        So he says, "Transaction A, B, C, and D.  I took those

22   that were in Column A and I put them in Column B."

23        Can he say that?  That's Question Number 1.

24        I think he can't say Question Number 2:  Why did you do

25   it?  Why did you take it from Column A to Column B?  Because

1    I think that's a function of his expertise.

2         But that he constructed the chart a particular way, he can

3    explain the chart as it is, but can't explain the "why" of the

4    chart, that is, why did he put these things in a particular

5    column, because that requires his expertise.  That's what

6    I think.

7         Now, is the Government on board with that?  Well, before I

8    go back to the defense, is the Government on board with that,

9    or do you think that you can do something else?

10        Mr. Leach.

11        **MR. LEACH:**  Well, I wouldn't say "on board,"

12   Your Honor.  I think we disagree with where the Court is

13   landing on this.  But I understand the distinction the Court is

14   drawing between the "What are the component parts of the

15   restatement" versus the "Why you put them in Column A versus

16   Column B."

17        **THE COURT:**  Well, I'm not asking you to agree.  In

18   fact, I actually don't think in this entire case I've ever

19   asked the parties to agree with me because I know they're not

20   agreeing with me on both sides.

21        But I've got a trial coming up.  So I've got to try to

22   make sure that we have an agreement, that is to say, that we

23   have an acknowledgment that we're going to follow the Court's

24   instructions -- and I'm not suggesting you wouldn't for a

25   moment -- the Court's instructions as to what can come in, what

1    can't.  And also, it helps preparing.  You've got a lot of

2    witnesses to prepare.  And if you're missing part of it from

3    one witness, you want to try to figure out what you need to do

4    with your other witness -- I got that -- on all sides.

5         But are we clear?  Are you on board with the extent to

6    which you are going to ask Mr. Yelland about the restatement?

7              **MR. LEACH:**  I understand the Court's ruling,

8    Your Honor, yes.  And we will not ask -- we will not ask the

9    "why" questions.  I understand the Court's ruling.

10             **THE COURT:**  Okay.  Well, let me turn to the defense

11   now.

12        Does that answer your question?

13        **MR. HABERLIG:**  Well, it answers my question on

14   the Government's position; but here's the issue that we still

15   have.  So the evidentiary foundation for admitting the

16   restatement is it's a business record.

17             **THE COURT:**  Right.

18        **MR. HEBERLIG:**  I understand that, and there is an

19   evidentiary basis for admitting that evidence.

20        What I'm trying to understand is, what is the evidentiary

21   foundation for admitting Yelland's testimony that something

22   moved from Column A to Column B?  It's either based on his

23   expertise, which you've said is not subject to admission, or

24   it's based on what he learned from other people in his

25   investigation, so it's got a hearsay foundation.

1    If it comes in as the Court says, what I'm concerned about

2    is we have very serious substantive objections to the way he

3    restated transactions.  We believe he made a number of

4    fundamental errors, and he was biased in the application of his

5    work by the litigation concerns that HP had at the time.

6    Now, how do we cross-examine Mr. Yelland if he's permitted

7    to say, "Yeah, I moved A to B because I believed it was" --

8    well, I don't know what he'll say.  I suppose if it's just "I

9    moved A to B," it's a bizarre -- I'm trying to understand how

10    it's really relevant.

11    **THE COURT:**  Well, I think it's said this way:

12    "I moved A to B because my understanding is that, under

13    accounting principles, it would be proper to include it in B

14    and not in A."  That's what he's going to say.

15    **MR. HEBERLIG:**  But that's based on accounting

16    principles, which are the expertise that he's not permitted to

17    rely on.

18    **THE COURT:**  Well --

19    **MR. HEBERLIG:**  I mean, how can -- if he says that,

20    then we have to say, "Well, you're wrong.  You're a bad

21    accountant.  You relied on lawyers, not your own expertise."

22    It opens up the whole can of worms.  I don't see how he can do

23    it without both offering inadmissible testimony and requiring

24    us to get into a whole rabbit hole of issues.

25    I get that the restatement can come in, but they should be

```
1   permitted -- or required to prove through fact witnesses why a
2   transaction was not properly accounted for, or an expert, which
3   they plan to call, but not Mr. Yelland.  It won't make sense,
4   and we won't be able to effectively deal with it in this sort
5   of vacuum that the Government is sort of proposing they would
6   do.
7          MR. LINCENBERG:  Your Honor, may I join the colloquy?
8          THE COURT:  Yeah.  Sure.
9          MR. LINCENBERG:  Your Honor, I think where the line is
10  drawn should be as follows:  If the Government says -- if they
11  have fact testimony that DLA was wrong, it was a $5 million
12  deal and should not have been recognized, it's one thing for a
13  summary witness to say "If the Government is correct that that
14  $5 million deal was wrong, this is how the restatement would
15  look."  But if Yelland is doing a restatement which includes
16  100 deals and 50 of them were not even testified to, he can't
17  even just throw out the math for the jury and say "I did this
18  big restatement," even though it's -- you know, half of them
19  are not tethered to any factual testimony that came in during
20  the trial.
21         MR. LEACH:  I feel like they're trying to change the
22  ruling, Your Honor.
23      We want to put in the restatement as the aggregate number
24  of what was restated, and Mr. Yelland should be permitted to
25  describe the "what," what does that consist of.
```

1          "Was this transaction restated?"

2          "Yes."

3          "Was that transaction restated?"

4          "Yes."

5          What I understand the Court to be saying is, the minute we

6      get into the "why" with Mr. Yelland, there's a 701 objection,

7      which we hear loud and clear.  But that's a completely separate

8      issue of whether the restatement is relevant or whether it's

9      summary or whether it includes transactions that are or are not

10     the subject of additional testimony in the case.

11         And if they want to cross-examine Mr. Yelland against --

12     based on his bias, based on his employment, have at it.

13         **THE COURT:**  Well, they do have a problem with

14     cross-examination because -- I'm just trying to figure out how

15     they're going to cross-examine him without his then saying,

16     "Well, you say that I'm biased or this was suggested by Smith

17     or Jones," or something, "or I did it to cover up this and I

18     did it to cover up that."  He says, "That's not the case.  The

19     reason I did it, since you're asking me why I did it, the

20     reason I did it was," and then he gets into the "why."

21         So, I mean, I don't know that -- I'm not saying that --

22     I'm saying it's out; but if they open the door through

23     cross-examination into areas where the "why" would answer the

24     "what" -- sounds like some odd conversation -- but if they get

25     into that area, he can give the "why."  He can give the "why."

1           I mean, this is not the first kind of witness the defense

2      has ever come across or a lawyer has ever come across where the

3      testimony is carefully circumscribed.  And while it may not be

4      satisfying to anybody, for a variety of reasons, it's closed

5      then.  But when it's closed or foreclosed or circumscribed,

6      it's not forever.  I mean, if subjects are raised in

7      examinations, then he's entitled to justify it.

8           So, you know, I'm dealing with very sophisticated lawyers.

9      I'm not telling people how to do it, but I mean, I actually

10     think that almost the question is:  Thank you.  Thank you.

11          "This is what you prepared?"

12          "Yes."

13          "Thank you."

14          You know, if you say -- if you start to get into it, then

15     you get into it, you open up the door and you get right into

16     it.

17          **MR. LINCENBERG:**  Your Honor, that's not addressing the

18     point that I raised.

19          **THE COURT:**  Well, give it to me, again,

20     Mr. Lincenberg.

21          **MR. LINCENBERG:**  Sure.  Because, really, what I think

22     the Court is saying is he can essentially be a summary witness;

23     that if the Government has put on during the trial

24     Transactions 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 and they said you've

25     heard -- there's testimony saying that these five deals, which

1    if the Government's positions are correct and the revenue

2    should not have been recognized, then they add up to

3    $50 million and that there's a restatement that you can

4    mathematically do that corresponds to that.

5         It's really that he -- but if the Government wants to now

6    put in evidence -- because Yelland's restatement goes far

7    beyond what the fact evidence is in this case, and the Court

8    shouldn't be permitting them to put that in through the back

9    door.

10        **THE COURT:**  Well, but that was a business transaction.

11   In other words, I think *Jasper* says it comes in.  It could be

12   subject to cross-examination.  You want to take out 12 of the

13   50 transactions or 50 out of 100 or 100 out of 1000.  Sure, you

14   can do it; but as soon as you go into it, I'm just saying he's

15   entitled then to say why he included it.

16        **MR. LINCENBERG:**  But if that's the Court's ruling --

17        **THE COURT:**  He's not a summary witness.  He's not a

18   summary witness.  He's a percipient witness in that he prepared

19   a business record, and that comes in according to *Jasper*.

20        **MR. HEBERLIG:**  It does.  But the problem -- and maybe

21   I didn't articulate it properly.  The business record that's

22   the restatement itself does not contain any of this information

23   that Mr. Yelland's going to testify to.  It is only a summary

24   of the numbers.

25        And so then you look to:  Well, what is the basis for him

1    to say this transaction, that transaction and the other

2    transaction were, quote, in the restatement?  There's not a

3    theory of admissibility by which that gets in.  It's either

4    expert testimony, it's his opinion, or he's repeating hearsay

5    that he learned from other people.

6         The restatement itself, if you look at *Jasper*, that's the

7    securities filing; it's the 10-K.  Here, we have the equivalent

8    what was filed with the company's house.  But there are plenty

9    of cases -- and I think the *Homestore* is probably the best case

10   to look at -- that say you don't then also get the accompanying

11   filing that has the report from the law firm that did the

12   special investigation that goes through all the reasons and the

13   detail.  And that's essentially what Yelland's going to be

14   providing.

15        **THE COURT:**  I think it would be helpful to write out

16   Mr. Yelland's testimony.  I think that would be helpful.

17        **MR. LEACH:**  Happy to do that, Your Honor.

18        **THE COURT:**  And then we can look at it, and you can

19   object to it.  I can rule on it, and we'll all know what it is,

20   and we'll be able to handle it from that basis.  Okay?  Anybody

21   have a problem with that?

22        **MR. HEBERLIG:**  Not here.

23        **MR. LINCENBERG:**  No, Your Honor.

24        **THE COURT:**  All right.  Thank you.

25        Well, I think that's really what I wanted to address

1   because it seemed to me that was a big opening that I left on

2   Wednesday last.

3        Is there anything else that -- I have you all here.

4        **MR. LINCENBERG:**  Your Honor, I have one small point,

5   if I may.

6        **THE COURT:**  Yes.

7        **MR. LINCENBERG:**  When does the Court anticipate that

8   we will receive the completed jury questionnaires?

9        **THE COURT:**  That's a very good question.  Not sure.

10  I think it's going out --

11       Isn't it going out, like, Monday of next week?

12       **THE LAW CLERK:**  They said it's probably going to go

13  out on Tuesday of next week, and they said they'd aim to get it

14  to us by the 12th, but that hasn't been confirmed.

15       **THE COURT:**  Okay.  Well, we can do a couple of things.

16  We can have -- which I think is what you'd like -- sort of a

17  rolling disclosure of it.

18       So maybe what we'll do is on -- I'm now thinking about --

19  it goes out on Tuesday.

20       It's electronic; right?

21       **THE LAW CLERK:**  Yes.

22       **THE COURT:**  Did they strike the Capitol Police

23  question?

24       **THE LAW CLERK:**  Yes.

25       **THE COURT:**  Why it was in the questionnaire, I have no

1    idea.   Is there some reason why we wanted to know whether

2    prospective jurors had any connection with the United States

3    Capitol Police?

4         **MR. LEACH:**  None is coming to mind, Your Honor.

5         **THE COURT:**  None came to my mind either.

6         **MR. LEACH:**  We used Hussain as a template, and it

7    might have made its way in that way, but I don't have a memory.

8         **THE COURT:**  So I exercised my Article III powers and

9    took it out.

10        By the way, there's another thing I have no idea why it's

11   always in, are questions like:  Did you serve on a jury in the

12   past?  You always ask that.  So what?  Did you have a good

13   time?  I don't think it says that.  It says:  Were you able to

14   arrive at a verdict?  So what?

15        Really what you might like to know is whether the person

16   was a holdout.  I think you might want to know that.  But

17   whether they had a good time?  You know, life's filled with

18   good times and bad times.  I don't know that -- anyway, I left

19   all that stuff in because it just seemed to me that it was --

20   that I didn't particularly want to take on the Jury

21   Commissioner and deal with that.

22        So it goes out on Tuesday, and maybe by Friday we'll have

23   some responses.  To the extent we have responses, we'll figure

24   out a way to get them to you.  Okay?

25        **MR. LINCENBERG:**  Thank you.  That would be wonderful.

1    Thank you.

2          **THE COURT:**  I do believe that jury selection is

3    important.  I'm not trying to limit you in that regard.

4          And then we'll just see, on a rolling basis, how many come

5    in.  Maybe we can give you some more on Tuesday the following

6    week.  Is that okay, whoever asked that?

7          **MR. LINCENBERG:**  Yes.

8          **THE COURT:**  Mr. Lincenberg, were you the one?

9          **MR. LINCENBERG:**  Yes.  I was saying "yes."  And I

10   appreciate that.  Thank you.

11         **THE COURT:**  All right.  I mean, everybody -- yeah,

12   okay.  So that's what I'll try to do.  That's what I'll try to

13   do.

14         What else?

15         **MR. LEACH:**  Nothing further, Your Honor.

16         **THE COURT:**  Nothing further?

17   Mr. Weingarten?  Mr. Weingarten, you always wait till the

18   end and then you just say, "I have one small, small favor to

19   ask, one small favor."  Yes?

20         **MR. WEINGARTEN:**  One small favor.  A big one.  No, I'm

21   just kidding about that.

22         And I don't want every time you see me, there's a

23   presumption I'm talking about post-acquisition evidence, but

24   this is one of those.  And it's a small issue.

25         Obviously, we are thinking about all the things you said

1    at the last hearing about post-acquisition.  The issue we have

2    is, as we've indicated, we're thinking very seriously about

3    putting our client on the stand, and we think there is all

4    sorts of exculpatory evidence that he has to offer in the

5    post-acquisition period.

6        Some of it we've proffered.  But what we would like to do

7    is lay it out with more specificity.  And it's not my habit to

8    give the Government prosecutors my direct examination of my

9    client two weeks before trial.  So what we'd like to do is

10    offer it to you ex parte.

11        **THE COURT:**  Well, let me think about this for

12    a minute.  Well, first of all, obviously, I need the Government

13    to -- I need the Government to weigh in.

14        So I don't know that the Court has to say or should say

15    what the Court will or will not allow the defendant to testify

16    to until the conclusion of the Government's case.  That's

17    number one.

18        The decision of whether to put the defendant on, no matter

19    what you tell me today, will always be reserved to the defense

20    until I tell them it's not.

21        **MR. WEINGARTEN:**  Of course.

22        **THE COURT:**  And I'll tell them it's not when I'm ready

23    to either end the case -- I mean, that is, conclude the

24    testimony of the defense -- or not.

25        So it's something that you reserve till the end, and you

 1    can reserve it in any way you want to.  But, of course, you can

 2    change your mind.  You can do any number of things.

 3        Now, the question is, to what extent do I or should I say

 4    "I'd allow A in and B not," or "C in or D not," sort of go

 5    through the defense proffer what he would testify to, because

 6    obviously, if I say "I'm going to let A, B, and C in" -- or

 7    I'll give the contrary.

 8        If I'm going to say "I'm not going to allow X, Y and Z,"

 9    the defendant could very well say, "In light of the fact that

10    he's not allowing X, Y and Z, I'm not going to testify."  And

11    then it becomes an appellate point.  And so be it.  That's the

12    way the game -- that's the way trials work.

13        I need to think more about your proposal.  I just need to

14    think it through.

15            **MR. WEINGARTEN:**  Sure.

16            **THE COURT:**  I also feel I should get input from

17    the Government.  Clearly, I should get input from

18    the Government as to what they think the proper procedure

19    should be, though I am pretty much convinced, without hearing

20    anything more on the subject, that I wouldn't give any opinion

21    about it until the conclusion of the Government's case.

22        In other words, I'm not going to help you, guide you in

23    your cross-examination of witnesses based on a view that the

24    defendant would not be allowed to say X or go into X subject or

25    Y subject or Z subject.

1    **MR. WEINGARTEN:**  I guess where this came from, at the

2    last hearing, there were discussions about the Government's

3    proposed witnesses Schultz and Scott.  And I was left with the

4    impression that what the Court was interested in was proffers

5    from the lawyers to get a better handle on what

6    post-acquisition evidence may be relevant and why it's

7    relevant.

8        The Court's order was somewhat inconsistent with my

9    understanding and indicated that Schultz and Scott can testify.

10   And then, obviously, we'll deal with that as lawyers deal with

11   it.  But from that, I got the impression that, you know, as you

12   said a million times, you have an open mind; the trial hasn't

13   started; and that perhaps there's been a failure of advocacy

14   from our point.  We've not sufficiently explained why we think

15   the post-acquisition evidence is so important and so relevant

16   and so exculpatory.

17       **THE COURT:**  Well, you raise two questions.

18       If we're going back to those two witnesses, I was

19   satisfied that those witnesses and their proffer was relevant

20   and admissible.  Now, that may be inconsistent with your

21   understanding of what my rule was.  I'll go back and take a

22   look at it.

23       Listen, I do that.  It's okay.  You can tell me five times

24   to look at it, and maybe on the fifth time, I'll change my

25   mind, which doesn't mean I've got a will of Jell-O; it just

1  simply means that I want to try to get -- look, that's okay.

2  You don't have to worry about it.  It's perfectly all right to

3  have a light motif in the case and to insist on it.

4      But if it's inconsistent with what I've said, I want to

5  try to figure out why it's inconsistent.  So I'll go back and

6  look at that.  I'll go back and look at it.

7      I have to tell you, overall my view hasn't changed.  So I

8  have to see whether there was something, that somehow I carved

9  out something or let something in.  And I'm -- well, I don't

10 need to say any more on that.

11     Mr. Reeves?

12         **MR. REEVES:**  Thank you, Your Honor.

13     I think it's important that we get these issues right, and

14 I appreciate the dialogue and the forethought around them.

15     I think the Court -- I think there are two key principles

16 that the Court has begun to put his finger on in response to

17 Mr. Weingarten's point.

18     First, let's wait and see how the case comes in.

19 The Government listened very carefully to the Court's rulings

20 in the pretrial conference.  I can assure you, we are trying to

21 refine our case around the bright line that the Court talked

22 about with regard to post-acquisition conduct.  Okay?  We are

23 paying attention to that.  I think that will serve the purposes

24 of a fair trial in very important ways.

25     "Why?" is the second point.  The crime was or was not

committed by October 2011. That is critical. Any evidence that comes in after that should properly be reflective or probative of what happened before that date. Okay?

And I think we can all understand that. And I think that certainly is going to shape the Government's case, and it should properly, I think, extend into any defense case, any defense testimony.

This is going to get very nuanced and very detailed very quickly, but I think all of us are facile now with some of the topics that it might extend to. But if the case really comes in with that kind of bright line, as I think, broadly speaking, it should, then that is -- that should almost certainly shape any resulting defense case.

But any judgment on that has to wait until the case is really heard and the issues have been joined properly, as they will be in the course of the Government's case-in-chief.

**THE COURT:** Okay. Well, I'll wait. I mean, we'll wait.

**MR. WEINGARTEN:** Okay.

**THE COURT:** What else?

**MR. WEINGARTEN:** That's enough.

**MR. REEVES:** Thank you, Your Honor.

**THE COURT:** Okay. Maybe I should look at, like, holidays or something, where we might want to tell the jury -- I mean, I think the next time I'm going to see you is the jury

1    day.  Right?

2           **MR. REEVES:**  Yes.

3           **THE COURT:**  So I would tell them that it is

4    anticipated that we won't meet -- let's see -- on Fridays; on

5    Thursday, April 25th.

6        What's happening May 13th, 14th, and 15th?

7           **THE CLERK:**  Let me see.

8        D.C.  You're going to be in D.C.

9           **THE COURT:**  D.C.

10          **THE CLERK:**  Mm-hmm.

11          **THE COURT:**  Okay.  What?  I'm on some wonderful

12   committee?

13          **THE CLERK:**  Yes.

14          **THE COURT:**  What committee is that?

15          **THE CLERK:**  IJRC.

16          **THE COURT:**  International Judicial -- okay.  I may --

17   I may -- this is more important.  I mean, I may figure out a

18   way to do that.  I don't have to tell them.

19       But obviously, May 27th, which is Memorial Day.

20          **MR. REEVES:**  We'll be done by Juneteenth, I promise,

21   Your Honor.

22          **THE COURT:**  June 19th?

23          **MR. REEVES:**  Yes.  That's the next federal holiday

24   after Memorial Day.

25          **THE COURT:**  This case will be done by June 19th.

1          **MR. REEVES:**  I just wanted to offer some reassurance.

2          **THE COURT:**  Pardon me?

3          **MR. REEVES:**  I wanted to offer some reassurance.

4          **THE COURT:**  Yeah.  The problem is, every time I cut

5    back on somebody, I get a longer court estimate.

6       I mean, I don't understand.  What do you guys do?  I mean,

7    what's going on?  You're going to lose these people in a morass

8    of -- I mean, it's long enough.  It doesn't have to be any

9    longer.

10         **MR. REEVES:**  We agree.  I have certainly given it a

11   great deal of thought, and I anticipated some of the Court's

12   reactions to our estimate.

13         **THE COURT:**  Well, I'm easily anticipated.

14      Okay.  So, anything else?  Anything else?

15         **MR. LINCENBERG:**  Your Honor, I'm --

16         **THE COURT:**  Yes, Mr. Lincenberg.

17         **MR. LINCENBERG:**  I was informed by my office, I didn't

18   personally view the Court's calendar, but I was informed that

19   there is no court on April 1.  The Court didn't mention that

20   just now; so I'm raising it.

21         **THE COURT:**  I see it's red.  Oh, no, no.  That's

22   March 1.  April 1?  What's happening on April 1?

23         **THE CLERK:**  Fresno.

24         **THE COURT:**  I'm changing that, whatever it is.

25         **THE CLERK:**  Okay.

1          **THE COURT:**  I volunteered to go -- have any of you

2    been to Fresno, California?

3          **MR. LEACH:**  Yes.

4          **THE COURT:**  You have?

5          **MR. BAUM:**  Yes, Your Honor.

6          **THE COURT:**  You have.  Well, my condolences.

7       So anyway, I volunteered to do sentencings in Fresno,

8    California.  And I'm now changing those dates for Fridays; so

9    it's not going to interfere with the case.

10      So, Mr. Lincenberg, unless you have a client who needs to

11   be sentenced in Fresno, which I doubt --

12         **MR. LINCENBERG:**  Your Honor, I make it my practice

13   that if I have to go to Fresno, I at least don't stay

14   overnight.

15         **THE COURT:**  Yeah, right.  It's quite a place.

16      But they just got a new judge in Fresno.  Very, very good

17   judge.  Kirk Sherriff.

18         **MR. LEACH:**  There's a new "sheriff" in town.

19         **MR. REEVES:**  Your Honor --

20         **THE COURT:**  Yes, Mr. Reeves.

21         **MR. REEVES:**  -- just to ground this a little bit,

22   right now I had not been tracking in any way that the Court

23   might be dark on April 1st.

24      I'm glad to hear that it won't because we have a full

25   lineup of witnesses that day, we anticipate.

1         The only dark day that we are currently planning on is the
2    one the Court has identified, April 25th.
3         We understand that the Court is dark on May 13 through 15;
4    and if the trial is still continuing at that point, I
5    understand the Court might reconsider its trip to D.C. then.
6             **THE COURT:**  Yeah, yeah.  No, I'm considering it right
7    now.  Consider that we'll go ahead with trial --
8             **MR. REEVES:**  Okay.  Thank you, Your Honor.
9             **THE COURT:**  -- on those days.
10            **MR. REEVES:**  Because, again, we are juggling a great
11   many witness schedules, many of whom are foreign witnesses, and
12   so that is not an uncomplicated undertaking.
13        So thank you for that clarity.
14            **THE COURT:**  So let's talk a little bit about exhibits,
15   all 19,862 exhibits.
16        How are you going to do this?  How does it come in?  What
17   are you guys going to say about exhibit numbers?  You're going
18   to get up and say, "Here's Exhibit Number 1428,"
19   bah-bah-bah-bah.
20        Tell me choreography.  I want to know who's getting up and
21   how is it coming in.
22            **MR. REEVES:**  Sure.
23            **THE COURT:**  I mean, I think I did cover this, but I
24   want to make sure that we don't just grind to a halt.
25            **MR. REEVES:**  I sure hope we don't grind to a halt.  I

1   thought you did cover it in the pretrial conference, that we're

2   going to move as much as possible to using electronic exhibits

3   for everybody.  The parties have agreed to give notice of their

4   exhibits in advance.  We'll be pursuing that.  We'll give them

5   the exhibit numbers we intend to use.

6       We will be displaying them on the monitor for the witness

7   and qualifying them and seeking a ruling on the admissibility

8   or use of the exhibit.  If it's then published, we expect it to

9   be published to the jury electronically.

10      I think I'm preparing myself to have a set of -- hard-copy

11  set of exhibits for my own examination, our examinations and

12  not anything more; that, otherwise, we're utilizing just

13  electronic exhibits.

14      And I think the only stumbling block might be the

15  authentication, if it comes up, about the completeness of a

16  document with a particular witness.  But I don't think that'll

17  be a big stumbling block, and it might happen on a one-off

18  basis.

19      So in that sense, I hope it goes smoothly.  But I accept

20  that it is slightly different from the way we did the Hussain

21  trial and maybe some other trials.

22      We're going to, at the Court's direction, avoid seeking

23  permission to approach the witness and things like that, and we

24  hope that we'll keep it moving.

25      I know that there are a great many exhibits.  That's a

1  function of three heavily litigated cases coming together with

2  relevant documents that are compiled amongst three big cases.

3  This is a big case, and it has a lot of exhibits.  But we're

4  not going to be seeking to introduce 19,000 exhibits.

5          **THE COURT:**  Okay.  Is there going to be a reference --

6  and if so, how do you want to deal with it? -- with the United

7  Kingdom litigation?

8          **MR. REEVES:**  I think that's the subject of --

9  I believe a stipulation is being worked up between the parties.

10 We would welcome a stipulation that identifies the existence of

11 preceding proceedings, but with a careful omission and

12 non-discussion of any outcome.

13         **THE COURT:**  Okay.

14         **MR. REEVES:**  I think it's going to be quite difficult

15 to talk about the case realistically without reference to a

16 U.K. proceeding, a prior proceeding as euphemisms for the U.K.

17 civil action and the case of *United States vs. Hussain*.

18         **THE COURT:**  Okay.  You can work that out?

19         **MR. MORVILLO:**  Yes, we are in the process of working

20 that out with the Government, Your Honor.

21     Obviously, no testimony should be offered about the

22 results of those proceedings; but the existence of them,

23 I think, is going to be something that many witnesses will be

24 asked about.

25     And it raises a question that I'd just like to get

1    the Court's guidance on.  One of the issues, of course, that

2    we're all confronting is that we've been dealing with this case

3    for more than a decade; and as a result, there's a lot of prior

4    statements of witnesses, whether they're 302s, SEC testimony,

5    grand jury testimony, testimony in England, testimony in the

6    Hussain trial.

7        In terms of refreshing recollection or impeachment, we're

8    not going with hard copies.  Would you like hard copies of the

9    3500 material that should be displayed --

10       **THE COURT:**  Well, let's talk about that because that's

11   rather useful.  And let's divide it in the two categories that

12   you suggested.

13       A refreshed recollection, you can give anything to a

14   witness to see if it refreshes their recollection.  They can't

15   read it out loud, but they can look at it, and that's fine and

16   I don't see that there's any problem with that.

17       The problem that I see, in my experience, is the

18   impeachment.  And the problem with the impeachment is

19   frequently that the document or purported statement that is

20   used as a basis for impeaching the witness isn't directly

21   contradictory to what the witness said.

22       So I am a person who actually requires a, basically,

23   direct contradiction.

24       I have found, over the years, that there have been

25   instances when a witness on the stand just says something quite

1   different from what that witness said on an earlier occasion

2   and that it's important to demonstrate that.

3        I've also found that there have been more instances in

4   which, one, the witness -- it's not directly contradictory; or,

5   two, that which he is being asked is not something he said but,

6   rather, what somebody wrote in a 302 or some document which

7   purported to be what he said.

8        Now, you could say, "Did you ever tell Jones X?"  And "X"

9   being not "X" in terms of his testimony.  Obviously, assuming

10  it's important, you can ask that question.  But you can't

11  introduce X's statement or the impeaching statement.

12       And I'm telling you guys; you all know that already.  But

13  it really does get you to focus, I think, pretty much on how

14  you're going to impeach somebody and how you tailor the

15  questions in order to move it along and in order to create the

16  impression that you want to create; that is, the witness is not

17  credible.  An overall impression.  You saw.  Not credible.

18       But it doesn't go -- it's very hard to show it by way of

19  indirection, I think is what I'm saying.  And the problem with

20  indirection is it becomes terribly time-consuming and confusing

21  and not really establishing the point.

22       So that I'm telling everybody how to do it seems a little

23  senseless because you're going to do it the way you've done it

24  for years and had success with it; but at least I can tell you

25  how I would react to it, which is the first time you get to see

1    it, and it's -- I don't want -- I don't either want my time

2    wasted, the jury's time wasted.

3         And I'm actually certain you're not going to do it.  Okay?

4    But at least I wanted to articulate it.  And they know because

5    they've been subject to it.

6         **MR. LEACH:**  I appreciate the Court's comments,

7    Your Honor, and I think this is primarily an issue for the

8    cross-examinations.

9         **THE COURT:**  Yeah.

10        **MR. LEACH:**  I do think it might be useful if we have

11   hard copies of the 3500 material.  I worry -- I expect on the

12   direct examinations, witnesses will have seen documents at some

13   point in the past, will have a basis to authenticate them.

14        For the prior testimony or FBI 302s, I think it could

15   become time-consuming and possibly confusing for the witness if

16   they're relying exclusively on the screen.  So --

17        **THE COURT:**  Well, I just don't want to spend a lot of

18   time.  Any way you can get them to look at it and see it.

19        Are you sharing technology?  Are you bringing in your own

20   technology?  How's that working?

21        **MR. MORVILLO:**  I believe that we're bringing in our

22   own technology, but I assume it's going to work seamlessly with

23   one another here.

24        We have not had that --

25        **THE COURT:**  Have you talked about that?

1          **MR. MORVILLO:**  -- conversation yet, no.

2          **THE COURT:**  You absolutely have to talk to Ms. Scott.

3          **MR. MORVILLO:**  I have had that conversation with

4    Ms. Scott.

5          **THE COURT:**  By the way, she's in charge of everything.

6    If you need to know the pecking order in this Court, she's at

7    the top.  I'm right below her, but she's at the top.  Okay.  So

8    whatever she says is just the way we're going to do it.

9        And if you need my IT person to come in like a day before

10   or something like that, fine.

11         **MR. MORVILLO:**  I discussed this with Ms. Scott last

12   week, and we agreed that perhaps the afternoon of jury

13   selection, we can bring our people in to --

14         **THE COURT:**  Absolutely.

15         **MR. MORVILLO:**  -- take a look.

16         **THE COURT:**  Absolutely.  Anything you need.

17         **MR. MORVILLO:**  One of the concerns I have, Judge,

18   about the prior testimony is that I'm expecting, given the

19   passage of time here, that people just may not remember

20   something that they did remember six, seven, eight, nine years

21   ago when they testified previously; and so in those

22   circumstances, you should want to refresh their recollection

23   with their prior testimony.

24       I assume that you'd want us to do that the way you would

25   do it with a piece of 3500 material, an interview; but given

1   that it's sworn testimony, it's something that has a greater

2   indicia of reliability and could be displayed.

3       How would you want us to handle something like that?

4           THE COURT:  I don't let it in until I'm convinced that

5   it is, quote, admissible.  So, I mean, you can ask about it.

6   You can show them.  You can ask about it.  But as far as it

7   coming in as an exhibit, that has to be subject to a

8   discussion.

9           MR. MORVILLO:  Understood.

10      (Discussion off the record between the Courtroom Deputy

11  and the Court.)

12          THE CLERK:  And you're foregoing binders for yourself;

13  right, Judge?

14          THE COURT:  Yes.

15          THE CLERK:  Thank you.

16          THE COURT:  Right

17          THE CLERK:  No court binders.

18          MR. LEACH:  I'm sorry.  No court binders; correct?

19      Okay.  Thank you.

20          MR. MORVILLO:  Would you like a binder of the 3500

21  material?  But not the exhibits.  I just want to make sure that

22  we have what the Court needs.

23          THE COURT:  I think I need something to look at.

24          MR. MORVILLO:  We will have binders for the Court and

25  the witness for 3500 material.

```
 1              MR. LEACH:  I anticipate we'll have an iPad,
 2   Your Honor, with all the exhibits loaded on there in a way
 3   that's easily accessible for the Court.
 4              MR. REEVES:  But if it's not an exhibit, we might not
 5   have it.  We would ask for it too, please.
 6              MR. MORVILLO:  If it's 3500 material, you mean?
 7              MR. REEVES:  Correct.
 8              MR. MORVILLO:  Yes, of course.
 9              MR. REEVES:  Okay.  Thank you.
10              THE COURT:  Okay.  Openings statements, that'll be
11   Monday.
12              MR. LEACH:  Monday, the 18th.
13              THE COURT:  And how long do we anticipate the openings
14   to be?
15              MR. REEVES:  The Government plans on an opening
16   statement of approximately one hour.
17              THE COURT:  And the defense?
18              MR. WEINGARTEN:  There's a lot to say.  I would
19   respectfully ask for not more than 90 minutes.
20              THE COURT:  And that's on your client's behalf --
21              MR. WEINGARTEN:  Yes.
22              THE COURT:  -- Mr. Chamberlain?
23        Mr. Lincenberg?
24              MR. LINCENBERG:  I would ask for not more than 89
25   minutes.
```

1          **THE COURT:**  Not more than 89 minutes.

2          **MR. LINCENBERG:**  I'm joking.  I will try to be about

3   75 minutes or so.

4          **THE COURT:**  Okay.  So defense is not reserving?

5   You're not going to reserve your opening?

6          **MR. WEINGARTEN:**  Oh, no.

7          **THE COURT:**  Okay.  All right.  Okay.  Fine.

8      Now, openings, I always remind the jury that it's not

9   evidence.

10         **MR. WEINGARTEN:**  What is the Court's practice?  I

11  mean, I'm assuming -- I'll have a demonstrative or two.  I'm

12  assuming I may show a piece of evidence that is certain to be

13  admitted.  Is that normal in the court, that --

14         **THE COURT:**  That's normal, even for me.

15         **MR. WEINGARTEN:**  Okay.

16         **THE COURT:**  Yeah.  Okay.  I think that's fine.

17     Anything else?  No?

18         **MR. LEACH:**  No, Your Honor.

19         **THE COURT:**  Mr. Lincenberg, anything?

20         **MR. LINCENBERG:**  No.  Thank you, Your Honor.

21         **THE COURT:**  Okay.  Thank you very much, everybody.  I

22  know this was short notice, but I wanted to do this before we

23  went too much further.

24         **MR. WEINGARTEN:**  Thank you, Your Honor.

25         **MR. LEACH:**  Thank you, Your Honor.

1          **THE COURT:**  Okay.  Thank you.

2      We're in recess.

3          **MR. MORVILLO:**  Thank you, Your Honor.

4              (Proceedings adjourned at 2:43 p.m.)

5                      ---o0o---

6

7              <u>**CERTIFICATE OF REPORTER**</u>

8          I certify that the foregoing is a correct transcript

9      from the record of proceedings in the above-entitled matter.

10

11     DATE:  Monday, March 4, 2024

12

13

14                      *Ana Dub*

15     _____

16          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
            CSR No. 7445, Official United States Reporter
17

18

19

20

21

22

23

24

25