Volume 2

Pages 300 - 493

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

```
UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
    vs.                        )    NO. 3:18-CR-00577-CRB
                               )
MICHAEL RICHARD LYNCH and      )
STEPHEN KEITH CHAMBERLAIN,     )
                               )
            Defendants.        )
_____)
```

San Francisco, California
Monday, March 18, 2024

**TRIAL TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    PATRICK D. ROBBINS
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue
                    San Francisco, California 94102
            BY:  **ROBERT S. LEACH**
                 **KRISTINA GREEN**
                 **ADAM A. REEVES**
                 **ASSISTANT UNITED STATES ATTORNEYS**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Rhonda L. Aquilina, No. 9956, RMR, CRR, CRC
              Jennifer Coulthard, No. 14457, RMR, CRR, FCRR
              Official United States Court Reporters

**UNITED STATES COURT REPORTERS**

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiff:
                              U.S. DEPARTMENT OF JUSTICE
 3                            Antitrust Division
                              450 Golden Gate Avenue, Room 10-0101
 4                            Post Office Box 36046
                              San Francisco, California 94102
 5                    BY:     ZACHARY G.F. ABRAHAMSON
                              TRIAL ATTORNEY
 6
     For Defendant Lynch:
 7
                              CLIFFORD CHANCE US LLP
 8                            31 West 52nd Street
                              New York, New York 10019
 9                    BY:     CHRISTOPHER MORVILLO, ATTORNEY AT LAW

10
                              STEPTOE & JOHNSON LLP
11                            1330 Connecticut Avenue, NW
                              Washington, D.C. 20036
12                    BY:     REID H. WEINGARTEN, ATTORNEY AT LAW
                              BRIAN M. HEBERLIG,  ATTORNEY AT LAW
13
                              STEPTOE & JOHNSON LLP
14                            One Market Plaza
                              Steuart Tower, Suite 1070
15                            San Francisco, California 94105
                      BY:     JONATHAN M. BAUM, ATTORNEY AT LAW
16

17   For Defendant Chamberlain:

18                            BIRD, MARELLA, RHOW, LINCENBERG,
                               DROOKS & NESSIM LLP
19                            1875 Century Park East, 23 Floor
                              Los Angeles, California 90067
20                    BY:     GARY S. LINCENBERG, ATTORNEY AT LAW

21

22

23

24

25
```

**UNITED  STATES  COURT  REPORTERS**

1                        **I N D E X**

2    Monday, March 18, 2024 - Volume 2

3                                        <u>PAGE</u>  <u>VOL.</u>
     Jury Instructions                    315    2
4    Opening Statement by Mr. Reeves      320    2
     Opening Statement by Mr. Weingarten  364    2
5    Opening Statement by Mr. Lincenberg  400    2

6
                        **E X H I B I T S**
7
     <u>TRIAL EXHIBITS</u>                  <u>IDEN</u>  <u>EVID</u>  <u>VOL.</u>
8      816                                       474    2

9      3307                                      471    2

10     3308                                      467    2

11     3314                                      480    2

12     3315                                      481    2

13   <u>GOVERNMENT'S WITNESSES</u>                      <u>PAGE</u>  <u>VOL.</u>

14   <u>VAIDYANATHAN, GANESH</u>
      (SWORN)                                    451    2
15
     Direct Examination By Mr. Leach:           451    2
16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1   <u>Monday - March 18, 2024</u>                                    <u>9:00 a.m.</u>

2                          P R O C E E D I N G S

3                              ---o0o---

4        (Proceedings were heard out of presence of the jury:)

5            THE COURT:  Let the record reflect the parties are

6   present.  The jury is not present.

7        I received a request from counsel to address the Court

8   before we started.

9        So, address the Court.

10           MR. HEBERLIG:  Good morning, Your Honor.  Thank you.

11       There are two witnesses:  One issue with one, who is the

12  first witness, and two issues with the second.  The second is

13  not likely to be on the stand today, so it's up to you if you'd

14  like to hear about it now or later.

15           THE COURT:  Later.

16           MR. HEBERLIG:  Okay.  First witness, it's one

17  statement or vignette that is from his 302s.  Perhaps I should

18  have the Government make a proffer of what he would have to

19  say.

20       The essence of it, as I understand it, is he will

21  attribute to a different employee, a man named Joel Scott, not

22  a co-conspirator, a statement to the effect of:  The San

23  Francisco Office of Autonomy was bugged with spyware, and they

24  could read, see, hear everything --

25           THE COURT:  Well, maybe I should hear from the

PROCEEDINGS

1  Government.

2      Go ahead.

3      **MR. LEACH:**  Thank you, Your Honor.  Robert Leach for

4  the United States.

5      The first witness is Ganesh Vaidyanathan.

6      **THE COURT:**  Is who?

7      **MR. LEACH:**  Ganesh Vaidyanathan.  It's a difficult

8  name to pronounce.

9      **THE COURT:**  Got it.  Right.  I mean, actually, I don't

10  have it, but that's okay.

11      **MR. LEACH:**  He worked in Autonomy Finance in the

12  United States.

13      **THE COURT:**  Yes.

14      **MR. LEACH:**  I anticipate he will say that there came

15  occasion in June of 2010, after Brent Hogenson was fired, where

16  he had a conversation with Joel Scott, the general counsel in

17  the United States, who is an agent of Dr. Lynch.  And Mr. Scott

18  said at one point that:  We monitor your emails and we, you

19  know, we know what's going on here in the United States.

20      The Government is not offering this for the truth.  We're

21  not contending that emails were actually bugged, but I do think

22  it's probative of the control that Dr. Lynch exercised over the

23  U.K. operation and on some level the fear and intimidation he

24  injected into operations into the United States.

25      That's the proffer.

PROCEEDINGS

```
 1          THE COURT:  So he's going to say -- he's going to say

 2   that:  I had a conversation with the general counsel of

 3   Autonomy, the U.K. general counsel.  I mean, I don't know --

 4       No, just general counsel?

 5          MR. HEBERLIG:  The U.S.

 6          MR. LEACH:  The U.S. General Counsel.

 7          THE COURT:  Oh, I had a conversation with the United

 8   States general counsel.  This conversation --

 9       When did it allegedly take place?

10          MR. LEACH:  June 2010 during the conspiracy that's

11   alleged, and shortly after, Brent Hogenson, one of the

12   whistleblowers was fired.

13          THE COURT:  Okay.  And he says I -- I, the general

14   counsel, know what you've done or I'm monitoring what you do.

15       So my question is how is that related to the transactions

16   which are at issue here?

17          MR. LEACH:  It's related in the sense that it -- A, it

18   shows the control that the U.K. has over the United States; B,

19   it shows, frankly, the intimidation that Dr. Lynch is imposing

20   on employees at Autonomy, particularly after the Hogenson

21   affair.

22       I wouldn't say it goes to one particular transaction, but

23   it -- you know, I anticipate in the opening, because we heard

24   in the voir dire, that Dr. Lynch is going to tout, you know,

25   Autonomy surveillance activities, vis-a-vis terrorists.
```

UNITED STATES COURT REPORTERS

 1          **THE COURT:**  No, no, I don't think we're going to get

 2    into that.  I mean, maybe we are.  I haven't heard an offer of

 3    proof.  The first time I've heard about that was during the

 4    voir dire, and I think I reacted to that, but I don't know.

 5          If the statement is elicited to try to respond to that

 6    statement, I don't want to -- it's not, you know, tit for tat,

 7    that's not the way the case goes, so I don't know.  But I'm

 8    trying to figure out -- It's at a point where, as I understand

 9    the theory of the Government's case -- well, basically, the

10    theory of the Government's case is that there was concealment,

11    that they concealed the true state of affairs of Autonomy.

12          So here is a statement which suggests to an employee of

13    Autonomy we know -- we're watching you, we know what you're

14    doing.  I don't know, that's somewhat attenuated, but I have to

15    give some more thought to it.

16          Do you want -- you haven't said anything, so -- you have,

17    but you haven't, but go ahead.

18          **MR. HEBERLIG:**  Yeah, so, let me put aside for a second

19    the relevance and 403 issues, because they're substantial.  But

20    fundamentally, it's a hearsay statement that's not covered by

21    an exception.  He's not a co-conspirator, and this notion that

22    he's an agent of Dr. Lynch and the statement was in furtherance

23    of his employment --

24          **THE COURT:**  I don't think it's offered for the truth

25    of the matter.  In other words, I think what is being said here

 1  is that statement by the general counsel to this person will

 2  have the effect on that person of affecting that person's state

 3  of mind; that, gee, I ought not to say anything about what's

 4  really going on here because they're watching me.

 5      It's not hearsay.  I don't think it's hearsay.  They may

 6  or may not be watching him.  So that's the truth of the matter.

 7          MR. HEBERLIG:  I think the truth is demonstrably

 8  untrue because they're not watching him.

 9          THE COURT:  That's fine, but it's not being offered

10  for the truth of the matter.

11          MR. HEBERLIG:  Okay.  Then, so then 403 --

12          THE COURT:  Therefore, it's not hearsay.  What I'm

13  saying is it's not hearsay.

14          MR. HEBERLIG:  Okay.  I hear you.  But in terms of

15  relevance and prejudice, it has nothing to do --

16          THE COURT:  Well, that's the question.

17          MR. HEBERLIG:  -- nothing to do with the charges we're

18  talking about.  Very far removed from Dr. Lynch.

19      First of all, Joel Scott is their witness who will not

20  repeat that he said this, to my understanding.

21      So they're going to call this witness.  He's a

22  government-sponsored witness, who I don't believe will support

23  the statement in any respect.  So the Government will be

24  offering something it knows is not true factually and that its

25  own witness won't support.  It's just a far stretch.

1          THE COURT:  I'm going to think about it for a bit.

2          MR. LEACH:  Thank you, Your Honor.

3          THE COURT:  But we've got a full day ahead.

4     Yes?

5          MR. LINCENBERG:  10-second point.  Recall that with

6     regard to Deloitte, we have a subpoena for them to appear

7     March 18th.  We tried to get an on-call agreement.  Their

8     lawyers refused to sign it unless they get to control or have a

9     say in what he testifies --

10         THE COURT:  Who are the lawyers who are refusing to

11    sign?

12         MR. LINCENBERG:  It's Jim Farrell.  I think he's at

13    Latham right now.

14         THE COURT:  Latham?

15         MR. LINCENBERG:  Yeah.  So, you know, look,

16    government --

17         THE COURT:  That's one of those boutique firms?

18                        (Laughter)

19         MR. LINCENBERG:  Yeah, one of those little guys.

20         THE COURT:  Yeah, right, I got that.  Yeah, okay.

21         MR. LINCENBERG:  We tried to gobble them up, and they

22    didn't...

23     Now, look, Mr. Reeves has been very helpful in helping to

24    arrange and get a commitment that these Deloitte witnesses will

25    appear.

PROCEEDINGS

```
1        I have a subpoena for March 18th --

2           THE COURT:  Are they here?

3           MR. LINCENBERG:  They're not here.  And I've had, in

4    the last 40 years, an example where a judge, when I said, well,

5    we're now in the defense case, and he said, well, you've

6    subpoenaed him for March 18th, you should have enforced it at

7    that point.

8        I'm not looking to have these guys fly in from the U.K.

9    today, but I need to have secure that they're under court order

10   then to appear when we want --

11          THE COURT:  Okay.  Where is Mr. Latham or Mr. Watkins,

12   where are they?

13          MR. LINCENBERG:  Is he in Los Angeles?

14          MR. REEVES:  Your Honor, I can respond to this.

15          THE COURT:  Yes, Mr. Reeves.

16          MR. REEVES:  Good morning, Your Honor.

17          THE COURT:  Good morning.

18          MR. REEVES:  I've had a --

19          THE COURT:  Speak in the microphone, Mr. Reeves, so

20   the --

21          MR. REEVES:  Thank you very much, Your Honor.

22       I've had a running dialogue for nearly two months about

23   this issue with Mr. Lincenberg and with Mr. Jim Farrell, who is

24   at the Gibson, Dunn firm --

25          THE COURT:  It's not Latham?
```

PROCEEDINGS

```
 1            MR. LINCENBERG:  He was with Latham.

 2            MR. REEVES:  All of the subpoenas--

 3            THE COURT:  Another boutique firm.

 4                        (Laughter)

 5            MR. REEVES:  Another boutique, Your Honor, yes, that's

 6     correct.

 7        All of the witnesses from Deloitte that Mr. Lincenberg is

 8     talking about are currently under subpoena by the United States

 9     at the request of the defendant.

10            THE COURT:  Okay.  So here's the deal.  Don't release

11     them.  Don't release them.  Tell them they're still under

12     subpoena.  Even if you're not going to call them, tell them

13     they're still under subpoena, and I'll deal with it.

14            MR. REEVES:  Thank you, Your Honor.

15            THE COURT:  Okay.  And if Gibson or Dunn or Crutcher,

16     or any of those people have a problem, have them come in and

17     we'll talk about it.

18            MR. REEVES:  There will be no problem.  Thank you,

19     your Honor.

20            MR. LINCENBERG:  Thank you, Your Honor.

21            THE COURT:  Yes.  Yes.  Good morning, Mr. Weingarten.

22            MR. WEINGARTEN:  So I'd like to respond to the point

23     about Mr. Lynch's relationship with the intelligence community.

24     I did raise it during voir dire --

25            THE COURT:  Yes, you did.
```

1          **MR. WEINGARTEN:**  -- and it was my intention to talk

2     about it in opening for the following reason.  Mr. Lynch had a

3     30-year relationship with MI5, doing incredible work for them

4     with his software.  And the relevant point is some of the work,

5     some of the important work was in 2011 during the alleged

6     conspiracy.  And on top of that, some of his purchases that are

7     being challenged in the United States relate directly to his

8     effort to converge his relationship with British intelligence

9     to American intelligence.

10         **THE COURT:**  Okay.  So it's going to be brought up in

11    the opening.  So what's -- I did note -- I'm not convinced of

12    the relevance of it, but why is it relevant?  Because he's

13    doing work -- I mean, that he's -- I don't see why it's

14    relevant.  It was relevant if maybe they didn't -- these were

15    government contracts or they didn't pay on time or that they

16    were better than other kinds of contracts and, therefore, they

17    were entitled on an accounting basis to entertain it as a

18    different kind of receivable or something like that.

19         But the work that they were doing I don't think -- number

20    one, I'm not sure it's relevant, and number two, it does have a

21    certain amount of prejudicial effect, because the jury then

22    views this, well, all right, this person is doing work for, you

23    know, the United States Government or world peace or

24    elimination of terrorism.

25         Now, I think I don't want you to mention it in your

1    opening.  I will give some further consideration as to whether

2    or not it should come in.  But it seems to me it's -- it has no

3    demonstrable probative value that I could see.

4         **MR. WEINGARTEN:**  Well, if I may.  There's the ATIC

5    purchase for $9 million that's right in the middle of -- it's a

6    hundred percent related to the intelligence community.

7         **THE COURT:**  Mr. Weingarten, if I change my mind, and

8    I'm capable of changing my mind, as you can see, I will allow

9    it when you get to that purchase in a discussion of that

10    purchase, but not in the opening statement.

11        I understand you may want to put it in the opening

12    statement.  I'm instructing you not to put it in the opening

13    statement, and then we will deal with it when we have

14    discussions about that particular purchase from a witness who

15    is going to testify about that particular purchase.

16        That's the ruling.

17        All right.  So is everybody here?

18         **THE CLERK:**  I need to go check.

19         **THE COURT:**  Okay.  Mr. Reeves, before you start I'm

20    going to instruct the jury.

21         **MR. REEVES:**  Thank you, Your Honor.

22                    (Pause in the proceedings.)

23         **MR. HEBERLIG:**  Your Honor, can we address an issue

24    while we're waiting?

25         **THE COURT:**  Of course.

**PROCEEDINGS**

1      **MR. HEBERLIG:**  The Government just handed over its

2   opening slides for the first time, and they are replete with

3   summary charts that we don't believe are likely to be

4   admissible.  They're not factual evidence.  They include things

5   like real revenue versus actual revenue, the types of things

6   that would be appropriate for closing after the evidence comes

7   in, but there's going to be a real challenge about whether that

8   in fact is the evidence.

9      And I've only gotten through half of them, because we

10   literally got them 30 seconds ago.  But they're not -- the

11   types of slides you see in opening are documents that will be

12   admitted in evidence.  These are pedagogical --

13      **THE COURT:**  I've seen everything in an opening, I

14   guarantee you.  I bet you have, too.

15      But, no, I accept what you're saying.  I understand what

16   you're saying.

17      Okay.  Mr. Reeves, go ahead.

18      **MR. REEVES:**  Your Honor, again, this is not evidence.

19   Many of these summaries are demonstratives that we anticipate

20   using in some form during the trial, and this is a full

21   articulation of the evidence the Government intends to prove in

22   this case.

23      **THE COURT:**  Okay.  I'm going to allow it.  I'm going

24   to allow it.

25                  (Pause in proceedings.)

PROCEEDINGS

```
1        (Proceedings were heard in the presence of the jury:)

2        THE COURT:  Please be seated.

3     Ms. Scott, will you call the case.

4        THE CLERK:  Yes.  Calling criminal action CR-18-0577,

5  USA versus Michael Richard Lynch and Steven Keith Chamberlain.

6     Counsel, please state your appearances for the record.

7        MR. REEVES:  Adam Reeves, Robert Leach, Kristina

8  Green, Zach Abrahamson for the United States.

9     Good morning, Your Honor.

10        THE COURT:  Good morning.

11        MR. WEINGARTEN:  Good morning, Your Honor.  Reid

12  Weingarten, Brian Heberlig, and Chris Morvillo at counsel table

13  for Dr. Lynch.

14        THE COURT:  I think the court reporter had a hard time

15  hearing.

16        MR. WEINGARTEN:  Okay.  I apologize.

17     At counsel table, Brian Heberlig, Chris Morvillo, and Reid

18  Weingarten with Dr. Lynch.

19        THE COURT:  Okay.  Good morning.

20        MR. LINCENBERG:  Good morning, Your Honor.  Gary

21  Lincenberg on behalf of Steve Chamberlain, who is present

22  seated beside me.

23        THE COURT:  All right.  Good morning.  Have a seat.

24     Good morning, ladies and gentlemen of the jury.  Thank

25  you.  Thank you for being prompt.
```

UNITED STATES COURT REPORTERS

1    We are about to start the trial.  Before we do so, I would

2  like to give you, in addition to the instruction that I gave

3  you last Thursday night on your departure, a few additional

4  instructions that I think will be of use to you in the course

5  of the trial.

6

7                        **JURY INSTRUCTIONS**

8        **THE COURT:**  These are called Preliminary Instructions.

9  At the end of the trial I will give you detailed written

10  instructions, and, as I indicated, each of you will get a

11  package of instructions.  They'll be written out.  You'll have

12  your own package and so you won't have to laboriously take

13  notes of any instruction that I give you, because it will be in

14  written form.

15        When you deliberate, it will be your duty to weigh and to

16  evaluate all the evidence received in the case, and in that

17  process to decide the facts.  To the facts as you find them you

18  will apply the law as I give it to you, whether you agree with

19  the law or not.

20        You must decide the case solely on the evidence and the

21  law before you.  Perform these duties fairly and impartially.

22  You should not be influenced by any person's race, color,

23  religious beliefs, national ancestry, sexual orientation,

24  gender identity, gender or economic circumstances.

25        Also, do not allow yourself to be influenced by personal

likes or dislikes, sympathy, prejudice, fear, public opinion or

biases, including unconscious biases.  Unconscious biases are

stereotypes, attitudes or preferences that people may

consciously reject but may be expressed without conscious

awareness, control or intention.  Like conscious bias,

unconscious bias can affect how we evaluate information and

make decisions.

Now, as you know, this is a criminal case brought by the

United States Government.  The Government charges these two

defendants with a number of specific offenses.

The charges against the defendants are contained in an

indictment.  The indictment simply describes the charges the

Government brings against a defendant.  The indictment is not

evidence and does not prove anything.

The defendants have pled "Not Guilty" to the charges, and

are presumed to be innocent unless and until the Government

proves a defendant guilty beyond a reasonable doubt.

In addition, the defendant, each defendant has the right

to remain silent and never has to prove innocence or present

any evidence.

The evidence you are to consider in deciding what the

facts are consists of:

First, the sworn testimony of any witness; and

Second, the exhibits that are received in evidence; and

Third, any facts to which the parties agree.

 1          The following things are not evidence, and you must not

 2    consider them as evidence in deciding the facts of the case:

 3          First, arguments and statements of the attorneys;

 4          Second, questions and objections of the attorneys;

 5          Third, testimony that I instruct you to disregard, even if

 6    you see or hear something when the Court is not in session,

 7    even if it's done by one of the parties or by one of the

 8    witnesses.

 9          Evidence may be direct or circumstantial.  You are to

10    consider both direct and circumstantial evidence.  Either can

11    be used to prove a fact.  The law makes no distinction between

12    the weight to be given to either direct or circumstantial

13    evidence.  It is for you to decide how much weight to give to

14    any evidence.

15          There are rules of evidence that control what can be

16    received in evidence.  When a lawyer asks a question or offers

17    an exhibit in evidence and a lawyer on the other side thinks

18    it's not permitted by the rules of evidence, that lawyer may

19    object.  If I overrule the objection, the question may be

20    answered or the exhibit received.  If I sustain the objection,

21    the question cannot be answered or the exhibit cannot be

22    received.

23          Whenever I sustain an objection to a question, you must

24    ignore the question and must not guess what the answer would

25    have been.

1    Sometimes I may order that evidence be stricken from the

2  record and that you disregard or ignore the evidence.  That

3  means that when you are deciding the case, you must not

4  consider the evidence that I told you to disregard.

5    In deciding the facts in this case, you may have to decide

6  which testimony to believe and which testimony not to believe.

7  You may believe everything a witness says or part of it or none

8  of it.

9    In considering the testimony of any witness, you may take

10  into account:

11    First, the witness's opportunity and ability to see or

12  hear or know the things testified to;

13    Second, the witness's memory;

14    Third, the witness's manner while testifying;

15    Fourth, the witness's interest in the outcome of the case,

16  if any;

17    Fifth, the witness's bias or prejudice, if any;

18    Sixth, whether other evidence contradicted the witness's

19  testimony;

20    Seventh, the reasonableness of the witness's testimony in

21  light of all the other evidence; and

22    Eight, any other factors that bear on believability.

23    You must avoid bias, conscious or unconscious, based on a

24  witness's race, color, religious beliefs, national ancestry,

25  sexual orientation, gender identity, gender or economic

1    circumstances in your determination of credibility.

2        The weight of the evidence as to a fact does not

3    necessarily depend on the number of witnesses who testify about

4    it.  What is important is how believable the witnesses are and

5    how much weight you think their testimony deserves.

6        If you wish, you may take notes to help you remember the

7    evidence.  If you do take notes, please keep them to yourself

8    until you and your fellow jurors go to the jury room to decide

9    the case.  Do not let note taking distract you from being

10   attentive.

11       When you leave the courtroom for recesses, your notes

12   should be left in the courtroom or in the jury room.  No one

13   will read your notes.  Whether or not you take notes, you

14   should rely on your own memory of the evidence.  Notes are only

15   to assist your memory.  You should not be overly influenced by

16   your notes or those of your fellow jurors.

17       The next phase of this trial will now begin.  First, each

18   side may make an opening statement.  An opening statement is

19   not evidence.  It is simply an outline to help you understand

20   what the party expects the evidence will show.  A party is not

21   required to make an opening statement.

22       And let me emphasize, during the course of this opening

23   statement, you may see charts or graphs or compilation of

24   figures.  That's not evidence.  It is what a party believes the

25   evidence will ultimately show in the case.

1        The counts -- the Government will then present after

2    opening statements evidence, and the counsel for defendants may

3    cross-examine.  Then, if defendants choose to offer evidence,

4    counsel for the Government may cross-examine.

5        After the evidence has been presented, I will instruct you

6    on the law that applies to this case and the attorneys will

7    make closing arguments.

8        After that you will go to the jury room to deliberate on

9    your verdict.

10       So with that, we will start with the Government's opening

11   statement.

12       Mr. Reeves.

13           **MR. REEVES:**  Thank you, Your Honor.

14                    **OPENING STATEMENT**

15           **MR. REEVES:**  May it please the Court, Ladies and

16   Gentlemen of the Jury, in early 2011, Mike Lynch, then the CEO

17   of Autonomy, a software company with headquarters in San

18   Francisco and the United Kingdom, met with executives of the

19   Hewlett Packard company at their headquarters in Palo Alto, and

20   he spun a fabulous tale of corporate success.  The evidence in

21   this case will prove that this was the scene of an $11 billion

22   fraud.

23       Using Autonomy's recently-filed 2010 Annual Report, which

24   the co-defendant Steven Chamberlain helped prepare, Dr. Lynch

25   regaled HP with Autonomy's, quote, record revenues of

1    approximately $870 million.

2         Critically, Dr. Lynch emphasized that Autonomy's success

3    was attributable to, quote, organic growth in its core business

4    product IDOL.  IDOL, you will learn, was software that helped

5    companies search what's called unstructured data.

6         Unstructured data is data like emails, Word documents and

7    videos that are not organized in a database.  If, as Dr. Lynch

8    portrayed, Autonomy was growing organically because of the

9    market demand for IDOL, then the company's market value was

10   enormous, potentially worth billions and billions.

11        This was music to HP's ears.  HP, one of Silicon Valley's

12   most storied tech companies, was trying to transition from a

13   successful hardware seller into the lucrative world of software

14   sales.  You will learn that it costs a lot to make a computer

15   with all of its components and chips.  The amount of profit or

16   margin you can make on the sale of each computer is limited, a

17   few percentage points at best.

18        By contrast, with software, most of the costs are upfront.

19   Once the product is ready, it costs next to nothing to make

20   each additional software increment.  The amount of profit or

21   margin you can make on software approaches 90 percent.

22        And that is the story Mike Lynch pressed on HP.  He led

23   them to believe Autonomy was growing organically through demand

24   for a product that had extraordinarily high margins, a

25   money-making machine, and HP ate it up.  They thought this kind

of pure software company was exactly what they needed.  And in August 2011, HP agreed to pay over $11 billion to acquire Autonomy.

And in October 2011 when the deal closed, Steve Chamberlain made about 2.5 million pounds, and Mike Lynch walked away with about 500 million pounds.

Mike Lynch and Steve Chamberlain had only one problem. Autonomy's financial statements were materially false and misleading.  Autonomy's story of success was in fact an elaborate multi-layered, multi-year fraud.

In early 2009, in the wake of the financial crisis, Autonomy's growth was slowing.  Deals were slowing, and those that happened took longer.  It was becoming harder and harder to meet market expectations and maintain the growth trajectory that made Autonomy so attractive to investors.

In early 2009, the defendants had a choice, except that Autonomy was no different from the rest of the tech sector, and that growth was slowing or cheat.

The evidence will show they started to use a variety of accounting tricks to make Autonomy's revenue growth look better than it really was.  They backdated contracts to bring revenue into the quarter.  They pretended Autonomy had shipped goods it had not really shipped.  And with increasing frequency, Autonomy started to buy its own revenue from third parties like value-added resellers in roundtrip or so-called barter deals.

1    Autonomy purchased products and services it did not need

2  or use at inflated prices so these resellers and partners could

3  then buy Autonomy's products for less money.  You will learn

4  that these deals made no sense, unless you were trying to

5  falsely inflate your revenue.

6    To carry out this fraud, the defendants had to lie to

7  Autonomy's auditors, and they did that again and again over 10

8  quarters.  You will learn that the job of misleading the

9  auditors fell principally to Steve Chamberlain and his boss

10  Sushovan Hussain, Autonomy's Chief Financial Officer.

11    Mike Lynch had a different job.  His job was to persuade

12  the market that Autonomy was a, quote, pure software company,

13  when in fact it wasn't.  Mike Lynch knew that Autonomy was

14  reselling millions and millions of dollars of computer hardware

15  at a loss.  Autonomy was selling monitors, computer mice and

16  laptops with no Autonomy software on them.

17    In 2010, hardware resold at a loss made up about

18  approximately 100 million or over 10 percent of Autonomy's

19  total revenue.  Why would Dr. Lynch do that?  Answer:  To

20  inflate the total revenue and make the company look like it was

21  growing faster than it really was.

22    And Mike Lynch was very good at his job.  You will learn

23  that he was a dominating, controlling, intimidating boss.  For

24  many years he ran Autonomy with an iron fist.  He beguiled the

25  London stock market and the aspiring British tech sector into

OPENING STATEMENT / REEVES

 1    cheering his every move, and the evidence will show that he was

 2    the driving force behind this massive fraud.

 3         To understand how the sophisticated fraud was possible,

 4    you first need to understand a little bit more about Autonomy.

 5    Autonomy was a public company traded on the London stock

 6    market.  You will hear that Autonomy had investors all over the

 7    world, including many here in the United States.

 8         In 2009, Autonomy's fraudulent revenue claims pushed its

 9    stock to nearly 20 pounds.  That kind of growth motivated HP to

10    pay a premium to acquire the company in 2011, which is why you

11    see the price shoot up to about 25 pounds.

12         Here is the location of Autonomy's executive offices in

13    London, in St. James Square near Buckingham Palace.  This is

14    where Dr. Lynch and Sushovan Hussain principally worked.

15         This is a picture of the Cambridge office where

16    Mr. Chamberlain and the finance department worked.  Cambridge

17    is only a short train ride north of London.  This is also where

18    the auditors did most of their work on site at Autonomy.

19         And here is the San Francisco headquarters of Autonomy in

20    downtown San Francisco.  This is where many of the deals you

21    will hear about were negotiated.

22         It is true that Dr. Lynch and his executive team worked

23    from the United Kingdom, but it's also true that the bulk of

24    Autonomy's business and most of its important customers were

25    right here in the United States.  Indeed, in 2010, fully

 1  68 percent of Autonomy's revenues came from the Americas.

 2      Three of Autonomy's most important acquisitions were also

 3  companies in the Bay Area.  In 2005, Autonomy bought a U.S.

 4  company called Verity, which was based in Sunnyvale and was one

 5  of its biggest competitors.  Verity made a useful, if

 6  unremarkable, indexing software called KeyView.  You will learn

 7  that Dr. Lynch sometimes falsely claimed KeyView sales were

 8  IDOL sales in order to boost his claims that IDOL was growing

 9  organically.

10      In 2007, Autonomy bought a U.S. company called Zantaz,

11  which was based in Pleasanton.  Zantaz had a service called

12  DigitalSafe, which, as the name suggests, basically was an

13  electronic safe that banks, insurance companies, and other

14  companies could use to save data like emails in a way that

15  could be searched easily.  This was a big change for Autonomy,

16  because Zantaz's customers were used to paying month-to-month

17  for the storage of their data.  You will learn that Autonomy

18  discounted these lucrative long-term Zantaz service contracts

19  in order to boost short-term revenue and claim a sale of IDOL

20  license, which the DigitalSafe customers usually did not want

21  and did not use.

22      And in 2009, Autonomy bought yet another U.S. company

23  called Interwoven, which was based in San Jose.  Interwoven had

24  a software product called Team Site that helped companies

25  manage their web site content.  You will learn that the

1  analyst, the London market analyst following Autonomy, had a

2  lot of questions about why Autonomy would buy a web content

3  business.  Those were very good questions, and they provoked

4  some very misleading answers by Autonomy.

5      Sushovan Hussain was Mike Lynch's right-hand man.  They

6  shared the same office suite and worked within only a few feet

7  of each other.  That is important for two reasons:  First, even

8  though he's not here, you will learn that Mr. Hussain was the

9  central person in carrying out this fraud, because he ran the

10  fraudulent deals, and he falsely accounted for those deals.

11      And second, the evidence will give rise to a reasonable

12  inference that Hussain's centrality was exactly how Mike Lynch

13  wanted it.  He could exercise control over Autonomy's financial

14  statements through his control of Hussain, but without creating

15  a clear paper trail leading back to him.

16      Two other people had key roles in Mike Lynch's universe.

17  They were Andy Kanter, the general counsel, and Pete Menell,

18  the Chief Technology Officer.

19      Dr. Lynch used Kanter as his enforcer with would-be

20  whistleblowers or analysts who were critical of Autonomy.  And

21  Dr. Lynch used Mr. Menell to create what you will learn were,

22  quote, pretextual, end quote, reasons for buying technology

23  Autonomy didn't need to fund the round trip deals Hussain was

24  putting together.

25      Dr. Lynch and these three critical lieutenants formed the

 1  executive management team at Autonomy, but Steve Chamberlain

 2  had a critical role, too.  His job was to handle the auditors.

 3  Hussain relied on Mr. Chamberlain, his number two in finance,

 4  to pass off backdated documents and other misleading

 5  information about the fraudulent deals to the auditors.

 6      You will hear from the other Autonomy managers on this

 7  chart.  Christopher or Stouffer Egan was the head of sales.  He

 8  worked closely with Dr. Lynch and Hussain.  Egan received

 9  immunity in this case and is cooperating with the Government.

10  If you credit his testimony, Stouffer Egan will give you the

11  insider perspective of how Autonomy was boosting its revenue

12  and creating the false appearance of growth.

13      Mike Sullivan came from Zantaz.  In this case he will tell

14  you about the EMC and Dell hardware he sold for Autonomy at a

15  loss.

16      Joel Scott was one of the in-house lawyers working at

17  Autonomy here in San Francisco.  He will tell you about how

18  many of Autonomy's deals concerned him.

19      Ian Black worked at Autonomy for years, often very closely

20  with Dr. Lynch.  He will tell you about how tightly Dr. Lynch

21  ran Autonomy.

22      Matt Stephan worked closely with Mr. Chamberlain in

23  Autonomy's finance department, until he got too fed up with

24  trying to justify Autonomy's accounting for the fraudulent

25  deals, at which point he left.

OPENING STATEMENT / REEVES

1        Harald Collett was Autonomy's head of OEM sales.  You will

2   learn that OEM means Original Manufacturer Equipment.  Autonomy

3   claimed to be selling IDOL to other companies to embed or to

4   OEM in their products.  Harald Collett will tell you about how

5   that was not always true.

6        And finally, Mark Geall was both an analyst following

7   Autonomy and then an insider at Autonomy until he also left

8   because of his concerns about the truthfulness of Autonomy's

9   public disclosures.

10        Let's talk about the evidence of the defendants' fraud and

11   how it worked.

12        The correct beginning point is the London stock market and

13   its expectation for Autonomy's growth.  Please take a moment to

14   familiarize yourself with this bar chart.  You will see several

15   versions of this chart as we layer in the problems with

16   Autonomy's financial reporting.

17        First is for the 10 quarters that are relevant to the

18   charges in this case.  They run from the first quarter of

19   2009 through the second quarter of 2011 when HP bought

20   Autonomy.  This chart shows you the market's consensus

21   estimates.  Think revenue targets for Autonomy for each of

22   those quarters.

23        Emails like these will show you that hitting consensus

24   estimates, hitting the market's targets for Autonomy was the

25   absolute total focus of Mike Lynch.

 1          As the quarter grew closer and closer, you will see

 2     Hussain telling Dr. Lynch what deals they need in order to hit

 3     the market's consensus estimates.

 4          As you will learn, even after the close of the quarter,

 5     Hussain was pushing Mr. Chamberlain defined revenue that got

 6     Autonomy to the consensus estimates for the quarter.  And guess

 7     what?  Autonomy usually managed to somehow meet or exceed the

 8     market's consensus estimates.

 9          The gray segments show you the amount of revenue Autonomy

10     claimed for each of those 10 quarters.  You will see that

11     Autonomy was at or near the market consensus estimates each

12     quarter.  Please take a close look at these gray segments.

13          I'm now going to walk you through the evidence you can

14     anticipate hearing that shows these revenue claims by Autonomy

15     were false and misleading.

16          How was Autonomy able to meet the market's quarterly

17     consensus estimates so often?  The evidence will leave no

18     doubts in your minds that it was through fraud.

19          The segments in red were fraudulently recognized revenue

20     that should not have been included in Autonomy's financial

21     statements in those quarters.  These red segments should have

22     been subtracted from the gray totals Autonomy fraudulently

23     claimed.  How will you know that?

24          The Government retained an independent expert to render an

25     opinion about the correct accounting at Autonomy based on

1  complete information, not the lies Autonomy fed to its

2  auditors.  The independent expert reviewed Autonomy's books and

3  records carefully.  It took a long time.  It cost a lot of

4  money.  The Government spent that money in order to get the

5  accounting right.  In the end, the opinion of the independent

6  expert will leave no reasonable doubt about the materiality and

7  scale of the fraud at Autonomy.

8      How was Autonomy able to falsify millions and millions of

9  dollars in revenue for two and a half years?  That brings us to

10 Autonomy's value-added resellers, or VARS, as they're often

11 called in this case.  Those VARS were Capax Discovery, a

12 service provider in New Jersey.  There are three interrelated

13 VARs:  MicroLink, MicroTech, and DiscoverTech in Virginia.

14     You're going to hear a lot about these VARs through the

15 people who ran them.  John Baiocco at Capax will tell you about

16 the handshake deals.  Think oral side agreements he had with

17 Autonomy.

18     And the Truitt brothers, Dave and Steve, will tell you how

19 their companies bought software from Autonomy and figured out

20 over time that they did not have to pay for it until Autonomy

21 sold it to a real customer or end user or otherwise paid them.

22     Finally, you'll hear from Bill Loomis from Filetek.  The

23 evidence will show Mr. Loomis drove a very hard bargain with

24 Autonomy.  He said he would buy Autonomy software but only if

25 Autonomy bought Filetek software for millions more, and he did

1   it twice.  If that sounds like a great deal for Filetek and a

2   bad deal for Autonomy, you're absolutely right.

3        Now, it's perfectly fine to use resellers.  In fact, it's

4   a common practice in the software industry, but you will learn

5   that it is not okay to verbally reassure the resellers that

6   they don't have to pay until there's a final sale to an end

7   user or to otherwise make side agreements with them about

8   payment terms.

9        You will hear from at least two witnesses from Deloitte,

10  the public accounting firm Autonomy hired to review and audit

11  their financial statements.  These witnesses will tell you

12  about the careful, methodical steps the auditors undertook in

13  their quarterly reviews and year-end audits to check whether

14  Autonomy's financial statements were fairly presented, the

15  standard Autonomy was expected to meet.

16       There are two important things to remember about Deloitte.

17  First, it was Autonomy's, not Deloitte's responsibility to

18  fairly and accurately present its financial statements to the

19  public.  Deloitte's job was to render an opinion about whether

20  Autonomy did that.  You will learn that this distinction was

21  important to the auditors because the responsibility for

22  getting the accounting right always rested with Autonomy, not

23  Deloitte.

24       Second, the witnesses from Deloitte will tell you that

25  Autonomy's financial statements came in two parts:  The

1  narrative in the front half, as they describe it, and the

2  numbers in the back half, by which they mean the balance sheet,

3  statement of operations and other core financial statements.

4      The auditors will tell you that their standard of review

5  was different for these two parts of the financial statements.

6  They carefully audit the numbers in the back half, and they

7  read Autonomy's front half or narrative to ensure that

8  descriptions of those numbers are correct.

9      Deloitte did not audit how Autonomy chose to describe its

10 business in the front half of the financial statements.

11     Let's turn to the evidence of how the defendants carried

12 out their scheme to defraud.  Here are the types of accounting

13 fraud that happened at Autonomy.

14     You will learn that side agreements are oral promises.

15 Every one of you on the jury has heard about people who avoid

16 putting things in writing.  Why do people do that?  Each of you

17 already knows.  People do that to hide what's really happening.

18     A side agreement means that not all the terms and

19 conditions of the deal are in the relevant contracts.  If the

20 contracts are not right, you can't get the accounting right.

21 In this case, you will learn that Autonomy used side agreements

22 to assure software purchases -- purchasers that Autonomy would

23 pay them before the purchaser had to pay back Autonomy.  You

24 will learn that if the auditors knew about the side agreements,

25 the revenue from that deal may not be recognized, which was

exactly why Autonomy made sure these were oral or handshake
deals.

Backdating.  Backdating is simple.  Backdating is
falsifying a document to suggest it happened during the quarter
when it really happened after the quarter.  In the course of
the trial you're going to learn that dates like March 31st,
June 30th, September 30th, and December 31st, the day the
quarters at Autonomy ended and the cutoff for its financial
reporting occurred, were when the deals, many of the deals were
finalized.

You will learn that the end of Autonomy's quarters were
always a frenzied period.  Autonomy did not always get enough
deals to meet their quarterly goals, so they backdated some
deals to pretend they had enough revenue.

Roundtrips were barter deals.  Also simple.  I pay you
$110, you pay me $100, we pretend that the deals are not really
related.  I recognize $100, even though I'm losing $10.  That's
a roundtrip.  Add a few zeros, and that was what Autonomy was
doing to hit its numbers.

Channel stuffing.  Also simple.  It is shipping more
products to distributors and retailers saying you can sell then
they can sell.  This was done with Autonomy's resellers.  The
resellers would take the software, not pay for it, while
Autonomy tried to sell it to a real customer called, in this
case, an "end user."  When the sales to the end user failed, as

1  they sometimes did, the software and debt piled up with the

2  reseller.  Why would the reseller agree to channel stuffing?

3  They got paid a commission like 10 percent margin on every

4  deal.  Why would Autonomy channel stuff?  To fraudulently pad

5  its revenue.

6      Pretend delivery.  It speaks for itself.  For hardware,

7  you have to actually deliver the hardware to recognize the

8  revenue.  What did Autonomy sometimes do?  They just phonied up

9  the documents to pretend they delivered the hardware.

10     Finally, accelerated hosting deals.  Also not that hard to

11 figure out.  If you have a regular long-term revenue stream

12 like the fees Autonomy was getting for hosting and maintaining

13 a ton of bank records, Autonomy would discount those future

14 revenues in order to get a big revenue bump upfront.  It's not

15 more complicated than front loading some more revenue now in

16 exchange for a massive revenue loss later.

17     Ladies and Gentlemen, there's a lot of jargon around these

18 deals.  Please don't worry about that.  Keep your eye on the

19 dollars.  Keep asking yourself does this deal make any sense?

20 If, based on the evidence, you believe the answer is no, trust

21 your own judgment.  Trust your own common sense.

22     By the end of the trial you're not going to be experts in

23 accounting, but you will be experts in the accounting fraud at

24 Autonomy.

25     Let's discuss some of the specific examples of each of

 1  these types of accounting fraud, starting with side agreements.

 2      In the second quarter of 2009, Capax Discovery bought what

 3  was known as EDD Software or eDiscover software from Autonomy

 4  for approximately $7.5 million.  You will learn that there was

 5  no way Capax Discovery could actually pay for that software.

 6  The evidence will show the only reason Capax agreed to buy the

 7  software was because of a side agreement or handshake deal that

 8  Autonomy would pay Capax the money to pay for the software.

 9      And that's exactly what happened over the course of the

10  next year.  Capax billed for so-called, quote, EDD processing

11  work.  This was work that Capax did not do and Autonomy did not

12  need.  Invoices like these were phony business records intended

13  to mislead the auditors about what happened.  And Autonomy paid

14  the bills, often right around the time it wanted Capax to do

15  another deal.

16      Why did Autonomy pay for work that never happened and it

17  did not need?  Because there was a side agreement that Autonomy

18  would pay Capax on the back end so that Capax could pay

19  Autonomy for the EDD software.  Documents like this are

20  examples of Autonomy cooking its books.

21      You will learn that Capax became a prolific partner of

22  Autonomy's.  Capax and Autonomy did multi -- multiple

23  million-dollar deals at the end of 8 of the 10 quarters that

24  are in question.  Some were similar sales of EDD software where

25  Autonomy agreed to pay Capax on the back end.  Other deals were

1    reseller deals in which Autonomy had a side agreement with

2    Capax that Capax did not have to pay for the software until

3    there was a sale to the final customer or end user.

4        The documents in this case will leave no doubt that Mike

5    Lynch approved of some of these deals, because exhibits like

6    this one showed Dr. Lynch approving the payments to Capax.

7        Backdating.  An example of one of the backdated deals

8    happened in January 2011, after the quarter closed, involving a

9    $3.5 million sale of software to DiscoverTech with the end

10   user, Bank of America.

11       The documents will prove that the deal was agreed to on or

12   around January 25th, twenty-five days after the quarter ended.

13   That deal was then backdated to make it look like it happened

14   in the quarter when it didn't.  How?  With documents like this.

15   The evidence will prove that Autonomy falsified the date and

16   backdated it to December 31st, allegedly in the quarter, so

17   they could recognize revenue on it in Q4.

18       Steve Chamberlain knew the deal was backdated, because it

19   comes to him late on January 26th.  Steve Chamberlain then

20   turned around and lied to the auditors when he said Autonomy

21   had not received a confirmation from DiscoverTech that it owed

22   the $3 million as of December 31st.  Mr. Chamberlain falsely

23   suggested that the debtor confirmation had not been included

24   because the deal had not been invoiced at year-end.

25       The evidence will show that that was a deliberate attempt

 1    to mislead Deloitte about the fact that the deal was backdated,

 2    and falsely suggest that the $3 million contract existed on

 3    December 31st when it didn't.  In fact, a $3 million deal was

 4    not on the original debtor's confirmation, because no contract

 5    existed on December 31st, 2010, not because it hadn't been

 6    invoiced.  This is an example of Steve Chamberlain feeding the

 7    auditors an outright lie.

 8        There will be multiple backdated contracts in this case.

 9        Roundtrips.  One of the clearest examples of Autonomy's

10    roundtrip or barter deals were two of the deals it did with

11    Filetek.  The first one was in Q4 2009 for approximately

12    $8.5 million.  In order to induce Filetek to pay that kind of

13    money, Autonomy had to simultaneously agree to purchase

14    approximately $10.4 million in software from Filetek.  The

15    money was going in a big circle.  Autonomy was paying nearly $2

16    million extra to get this revenue.

17        The evidence will show that Mike Lynch knew about this

18    barter deal.  Exhibit 394 is an example of a spreadsheet.

19    Hussain kept tracking deal status and how much revenue Autonomy

20    still needed to hit the quarter's consensus estimates.  Hussain

21    often shared these spreadsheets with Dr. Lynch, as he did here.

22        The spreadsheets are dense, but if you spend time with

23    them, and the FBI has, they reveal how Hussain kept Dr. Lynch

24    apprized of the status of deals and how aspects of the fraud

25    really worked.  This spreadsheet shows that Dr. Lynch knew

1  about the arrival of the $8 million in revenue from Filetek.

2       That's important, because these exhibits show that

3  Dr. Lynch was simultaneously approving the payment of about $10

4  million to Filetek.  Evidence like this will show you that

5  Dr. Lynch saw and participated in both sides of this roundtrip

6  or barter deal.

7       There was a second roundtrip with Filetek in the next

8  quarter.  Filetek bought an Autonomy license for approximately

9  $9 million, while Autonomy bought a Filetek license for

10  approximately $11.5 million, two and a half million dollars

11  more.  Again, Mike Lynch approved the payment for this

12  roundtrip or barter deal to FileTek in Q1 2010.

13       You will learn that there were often detailed writeups

14  purporting to justify why Autonomy needed software from a

15  partner like Filetek.  The evidence will show that these

16  technical justifications were false documents created to

17  mislead the auditors.

18       Chris Goodfellow, an Autonomy software engineer, will

19  testify that Autonomy did not need and did not use Filetek

20  software.

21       Stouffer Egan, who negotiated this deal, described these

22  technical justifications as, quote, pretextual emails, end

23  quote.  Meaning, Autonomy pretended to justify the purchase

24  when the real reason for the purchase was to induce Filetek to

25  buy Autonomy software.

1          Channel stuffing.  A good example of the evidence of

2     Autonomy's channel stuffing was its relationship with MicroLink

3     and David Truitt.  By 2009, Autonomy and MicroLink had entered

4     into a number of deals.  MicroLink had not fully paid Autonomy

5     for a number of those deals.  Nevertheless, Autonomy sold

6     MicroLink more software for approximately $4.8 million in the

7     second quarter of 2009.

8          There are additional deals in 2009 in Q3 and Q4.

9          Now, Ladies and Gentlemen, you'll learn that the problem

10    with channel stuffing, selling stuff to companies to re-sell

11    where there's no demand for the product, is that the channel

12    can get really stuffed, and that's exactly what happened with

13    MicroLink.

14         By late 2009, Autonomy had sold so much to MicroLink that

15    MicroLink owed Autonomy over $24 million.  That's a big

16    receivable.  It could raise a lot of questions about whether

17    this was real revenue or not in Autonomy's deals with

18    MicroLink.

19         So, the defendants came up with a plan to wipe that debt

20    off the books by buying MicroLink at the end of 2009.  In this

21    document, Mr. Chamberlain is discussing that very idea with

22    Alan Rizek, the finance officer from MicroLink.

23         Mike Lynch sure agreed with this plan and okayed the

24    purchase of MicroLink for $55 million, and that's what happened

25    on or about January 4th, 2010.

1    Pretend deliveries.  You'll learn that to recognize

2 revenue on a sale, you have to deliver the product.  To deliver

3 software is usually pretty easy to do.  All it takes is the

4 click of a button to send the software electronically to the

5 purchaser, but to deliver the hardware is much harder.  It

6 often takes coordinating inventory, warehouses, trucks,

7 sometimes it does not all happen on time, and that was exactly

8 what happened in this hardware deal in 2009.

9    Mr. Egan put together a deal to sell Morgan Stanley's $6

10 million in hardware, but near the end of June, Egan alerted

11 Mike Lynch that there may be problems actually getting all of

12 it delivered in time.

13    Again, the answer to this problem was for Steve

14 Chamberlain to falsify the documents.  In this document, after

15 the close of the quarter, he's asking Mike Sullivan to do that

16 and get EMC, the hardware provider, to say that it had shipped

17 the hardware on June 30th when it hadn't.  That's why Mike

18 Sullivan says "No."

19    Undeterred, Steve Chamberlain arranged for Sullivan to get

20 versions of the pro forma, or estimated invoices for the

21 hardware changed to remove the reference to the fact that the

22 invoices were estimates and not final.  And then Steve

23 Chamberlain passed off the altered invoices to the auditors and

24 falsely convinced them that the $6 million in hardware revenue

25 should be recognized because the hardware had been delivered

1   before the end of the quarter when it hadn't.

2       Before I move into the last type of accounting fraud,

3   accelerated hosting, I want to pause for a moment and alert you

4   to the evidence that will be provided by Brent Hogenson and

5   others from his finance team.

6       To do that, I want to start by looking again at the bar

7   chart with the red segments signifying the amounts of

8   accounting fraud.  One bar is not like the others.  One bar

9   does not have any red signifying fraud.  That's the bar for Q2,

10  2010.  Why?  Why was that?  The answer, you will learn, was

11  that the time period of Q2 2010 was the time period when the

12  first whistleblower in the case emerged, Brent Hogenson.

13      Brent Hogenson, you'll learn, was a finance officer that

14  came to Autonomy from Interwoven.  He was the CFO of Autonomy

15  Americas.  People on Hogenson's team, like Reena Prasad and

16  Percy Tejeda, were responsible for collecting money from

17  Autonomy's partners like Capax.  They will tell you how they

18  called Capax for payment and learned that Capax was not going

19  to pay until Autonomy paid Capax.

20      For a finance officer operating outside of this criminal

21  conspiracy, that was potentially very troubling news and may

22  have suggested a real problem with the revenue Autonomy had

23  recognized on sales to Capax.

24      This problem rolled up to Brent Hogenson, who looked into

25  it further and discovered more problems with the deals relating

1    to Filetek.  In this way Brent Hogenson was learning some of

2    the same facts and details of this case that you will be

3    learning about in the course of this trial.

4        The evidence will show that Brent Hogenson quickly

5    elevated his concerns to the CEO Mike Lynch and others at

6    Autonomy, whereupon he was met with some very stiff resistance

7    by Dr. Lynch.

8        Mr. Hogenson persisted and still elevated his concerns

9    further to the auditors.  What you'll learn is that Brent

10   Hogenson was eventually fired together with his coworkers.

11   Joel Scott, the general counsel for Autonomy Americas, who

12   worked in San Francisco, will describe the facts and

13   circumstances surrounding the terminations and the concerns

14   that he had about being involved in them.  This evidence

15   suggests that Brent Hogenson spoke up as a whistleblower and

16   got punished for his troubles.

17       Accelerated license revenue.  This is the last type of

18   accounting fraud.  The accelerated hosting deals that were

19   improperly recognized as revenue by Autonomy are in the orange

20   segments.

21       You'll see the largest of these orange segments,

22   27 million, was in the second quarter of 2010, the very quarter

23   around Mr. Hogenson's whistleblower complaint.

24       The evidence suggests that Autonomy could not engage in

25   fraudulent transactions with the VARs in the same quarter that

 1    Hogenson was raising complaints about the fraudulent

 2    transactions with the VARs.  So to make its consensus

 3    estimates, Autonomy doubled down on its use of accelerated

 4    hosting deals.

 5         The accelerated hosting deals involved the Zantaz business

 6    unit at Autonomy and some of the largest banks in the world

 7    like J.P. Morgan Chase, Morgan Stanley, and Deutsche Bank.  The

 8    banks had deals with Zantaz to store their voluminous bank

 9    records in what they called a DigitalSafe.  Importantly, the

10    banks paid big quarterly fees or regular fees to store this

11    information, and the revenue for that service was recognized as

12    a service as it was provided over time.

13         Let's look at one of these deals.  One of the biggest of

14    the accelerated hosting deals was with J.P. Morgan Chase at the

15    end of Q2 2010.  Autonomy went to the bank at the end of the

16    quarter, offered to substantially discount their DigitalSafe

17    hosting service if JPMC would buy software from Autonomy that

18    the bank did not need or use.  This allowed Autonomy to claim a

19    license sale, a software license sale, but at the expense of

20    losing a ton of revenue in future quarters.

21         Exhibit 16983 is an Excel spreadsheet that shows you how

22    much of a discount Autonomy was willing to offer.  The original

23    hosting deal was for approximately $68 million over time.  If

24    JPMC bought the software for $8.6 million, then Autonomy would

25    give it a 69 percent discount of approximately $46 million.

1    Ladies and Gentlemen, those numbers speak for themselves about

2    how desperate Autonomy was for revenue in Q2 2010.

3        This is a demonstrative exhibit of how the payments would

4    occur over time and what happened as a result of the

5    discounting.  And this is the amount of revenue that Autonomy

6    got for that massive discount.

7        That brings us to a new form of fraud revealed by the

8    evidence.  Dr. Lynch's false and misleading disclosures about

9    whether Autonomy was selling hardware.  You're going to learn

10   it was.  It was selling lots of it over many quarters.  And the

11   evidence will show that Dr. Lynch did everything he could to

12   conceal those hardware sales from the market and eventually

13   from buyers like HP.

14       On Autonomy's web site, Dr. Lynch claimed Autonomy was a

15   rare example of a pure software company.  He falsely suggested

16   that much of Autonomy's revenue was from the sale of IDOL and

17   other high-margin software products when, in fact, millions and

18   millions of Autonomy's revenue was from the resale at a loss of

19   hardware devoid of any Autonomy software.

20       The claim that Autonomy was a pure software company was in

21   fact totally untrue, and Dr. Lynch knew it was untrue, which is

22   why he worked so hard to hide the scale of Autonomy's

23   software -- hardware sales.

24       This bar chart introduces Autonomy's hardware sales in

25   yellow.  It was millions and millions of Autonomy's revenues.

 1    In the four quarters of 2010 alone, hardware accounts for

 2    almost $100 million of Autonomy's total revenues.  Ladies and

 3    Gentlemen, that's a lot, and if the market knew that reality,

 4    you will learn that investors would have dumped Autonomy stock

 5    and its value would have plummeted.  So Dr. Lynch worked very

 6    hard to hide Autonomy sales, and his ways of doing that you'll

 7    learn were especially sophisticated.

 8        A couple of things about hardware.  First, much of the

 9    revenue from Autonomy's resale of EMC and Dell hardware was at

10    a loss but was still good revenue, but you may find it was

11    incredibly bad business.

12        Second, the auditors knew and approved some of Autonomy's

13    hardware sales.  There were important exceptions and real

14    issues around the accounting for the expense of the hardware,

15    but Autonomy rightly claimed some of the hardware it sold as

16    revenue.

17        Third, the fraud relating to the hardware comes in how

18    Autonomy characterized the revenue it derived from the hardware

19    sales.  Dr. Lynch falsely suggested to the market that it was

20    software revenue when it wasn't.

21        Lastly, every single tech company buys and sells some

22    hardware.  What was different about Autonomy was the scale of

23    its hardware sales.  The evidence will show that no pure

24    software company sells hardware devoid of software on the scale

25    that Autonomy did.

1      You will learn that Autonomy resold at a loss monitors,

2   keyboards, computer mice, things that could never contain

3   Autonomy software.  Autonomy also resold EMC and Dell laptops

4   at a loss, but the evidence will show that these laptops also

5   did not contain Autonomy software.

6      You will learn that to re-sell the EMC and Dell hardware,

7   Autonomy had to effectively insert itself into the complex

8   supply chain arrangements of major banks like Bank of America.

9      SHI is a business that sold substantial amounts of Dell

10  hardware to Bank of America.  In order to insert itself into

11  the sales chain, Autonomy purchased Dell hardware and resold it

12  to SHI at a loss.  SHI then sold that hardware on to the Bank

13  of America.

14     Zones was another tech supplier to major corporations like

15  Target.  Autonomy did the same thing with Zones for the same

16  reasons.  You will learn that Autonomy told its auditors it was

17  selling hardware as a software marketing initiative to gain

18  entry to major customers like Bank of America.

19     A witness involved in the hardware procurement from SHI,

20  however, will tell you that she never disclosed Autonomy's role

21  to the -- in the hardware sales to Bank of America, and she was

22  not aware of anyone else at SHI who did as well.

23     Why does that matter?  It matters because it shows that

24  far from being a pure software company, a significant amount of

25  Autonomy's revenue was derived from acting as a

OPENING STATEMENT / REEVES

 1   straight-forward hardware reseller.  It helped show that

 2   Autonomy's purported explanation to its auditors for why it was

 3   engaging in hardware sales was misleading.  And the scale of

 4   Autonomy's hardware sales at a loss shows its desperation to

 5   inflate its revenue numbers even if it came at a multi-million

 6   dollar cost.

 7        In terms of dollars, the deals with SHI and Zones were

 8   some of the Autonomy's biggest contracts, a fact that Autonomy

 9   was especially careful to hide from HP.

10        There's no question that Mike Lynch knew all about the

11   hardware sales.  Mike Sullivan will explain how Dr. Lynch and

12   other executives talked about how easy it would be to sell a

13   lot of hardware at discounted prices.  They even joked about

14   how many Porsches Mike Sullivan would earn from selling

15   20 million or more in hardware.

16        Again, there's no question that Dr. Lynch, here indicated

17   by his initials "MRL," knew about the hardware sales because he

18   approved Sullivan's substantial sales commissions for those

19   hardware sales.

20        Let's take a close look at Exhibit 214, an email in late

21   Q3 2009 from Mr. Hussain to Dr. Lynch letting him know how bad

22   sales have been.  It says:  (As read) Yesterday was very bad.

23   Interwoven 2 million off and U.S. IDOL 6 million off.  Covered

24   with part JMC/EMC.

25        I submit to you the evidence will show you that was a

1  reference to the hardware sales, and they're covering their

2  quarter with the hardware sales.

3     Continuing:  Mr. Hussain says:  (As read) But now worried

4  more will fall out.  Am at 189 million to 190 million.

5     That's a reference to the amount of revenue they have in

6  the quarter four days before the end of the quarter.

7     Continuing:  (As read) With 3.7 million of EMC stuff.

8     Again, a reference to hardware.

9     (As read) We have 41 million so 10.3 left to recognize.

10    Okay.  And I submit to you, when you've heard all the

11 evidence, that that's a reference to the amount of hardware

12 they have and how they're using it.

13    Ladies and Gentlemen, a careful reading of this email

14 suggests that Autonomy is stockpiling its hardware revenue in

15 case software deals fall out.  Why would Dr. Lynch and

16 Mr. Hussain do that?  To assure that they would receive the

17 consensus estimates for the quarter, using more and more

18 hardware if they have to do so.

19    A close look at the Q3 2009 bar chart shows you that

20 without all this hardware revenue in yellow, Autonomy would

21 have missed its consensus estimates by nearly $42 million.

22 Analysts will tell you that a miss of that magnitude would have

23 been calamitous for a company like Autonomy.

24    But there's a problem with reselling hardware at a loss to

25 pad your revenues.  It costs a lot, and it's hard to hide those

1    costs on your balance sheet, but the defendants came up with a

2    sophisticated way to do it.

3        Let's take a close look at Autonomy's balance sheet for

4    the third quarter of 2009.  You got total revenues, but then

5    you have the cost of those revenues or what is known as cost of

6    goods sold.  When you subtract what it costs to make your

7    product, you get your gross product.

8        Now, from this figure of gross product, you can derive the

9    so-called gross margin or the value of your product by doing

10   some simple math.

11       Investors and analysts will tell you that gross margin was

12   one of the most important performance metrics of them all.

13   Autonomy crowed about its high gross margins which were often

14   around 90 percent.

15       To keep its gross margins high, the defendants had to get

16   the expenses for all the hardware it was selling into operating

17   expenses or, as the terms are used, below the line that you use

18   to calculate gross profit.  And the evidence will show that the

19   creative way that they did that was to say that millions of the

20   hardware expenses were for sales and marketing and development

21   costs.

22       Now, that's a lot of accounting, I know, but it reduces

23   itself to some very simple math.

24       Take your total revenue, you subtract what that revenue,

25   what it cost to make that revenue, and you get gross profit.

OPENING STATEMENT / REEVES

1    Once you have your gross profit, if you divide by the amount of

2    revenue you get, that equals your gross margin, the key metric

3    for the market about the value of your product.

4         In the case of software, you might have an example like

5    this.  You have -- you sell software for $100.  It costs you

6    approximately $10 to make.  You have a gross profit of $90.

7    That gives you a gross margin of 90 percent.

8         It's different for hardware.  You sell a hardware

9    component for $100.  It costs you a lot more to make, maybe

10   $90, so your gross profit is only $10, and your gross margin is

11   only 10 percent.

12        You'll learn that Autonomy wasn't even doing that well.

13   Autonomy was selling hardware for $100 that cost it, in this

14   hypothetical, $110.  It was losing $10 on every deal.  That's a

15   negative margin.  That causes a lot of consternation within

16   Autonomy, certainly between Dr. Lynch and Mr. Hussain.

17        Please take a close look at Exhibit 281.  This is a

18   fascinating look at how these two people worked together.  What

19   was Sushovan Hussain so worried about?  (As read) Mike, I'm

20   burnt out, given my anal nature.  I'm spending all my time,

21   (awake and asleep) worrying about the 10 minutes on Tuesday,

22   when they were going to talk to and announce their earnings and

23   talk to the analysts.

24        The evidence will show that Mr. Hussain was worried about

25   how Autonomy will ever explain to the market that it had

 1    approximately $40 million in expenses for the hardware it sold.

 2    If Hussain told the truth about what they were doing, it would

 3    crush Autonomy's claims about being a high-margin software

 4    seller.

 5        No problem.  Mike Lynch stepped in for Mr. Hussain in the

 6    earnings call.  What he says during the earnings call is both

 7    highly sophisticated and deeply deceptive.  Let's go through

 8    why.

 9        Mike Lynch pretended that the expenses associated with the

10    hardware was really expenses relating to developing and

11    marketing an alleged new product launch called "SPE," and the

12    so-called quick-start program they had around it.  That means

13    the expenses would go to sales and marketing critically below

14    the line to calculate gross margin.  It was a way of hiding the

15    hardware expenses below the line.

16        But you will learn that what Mr. Lynch was calling SPE was

17    not new and did not cost millions to develop or market, but

18    that was still what Dr. Lynch told the analyst.

19        Autonomy told its auditors something very different.

20    Autonomy told its auditors that the hardware was part of a

21    strategic software sales initiative with major hardware

22    providers like EMC.  But Dr. Lynch does not tell that to the

23    analysts, because if you told the market Autonomy was selling

24    $42 million in hardware, it would have called into question the

25    valuation models the market had for Autonomy as a pure software

 1   provider.

 2       But analysts, you will learn, can be quite persistent.

 3   Analysts like David Toms, who you'll hear from, kept asking

 4   about Autonomy's hardware sales.  So Dr. Lynch doubles down

 5   with false statements like this one:  Quote, so what we are not

 6   doing here is acting like a generic company that resells

 7   hardware, end quote.

 8       In fact, Ladies and Gentlemen, you will learn that was

 9   exactly what Autonomy was doing:  Reselling generic hardware at

10   a loss, and Mike Lynch was straight out lying about it to

11   perpetuate the false narrative that Autonomy only sold

12   high-margin software when in fact they were selling a ton of

13   low-margin hardware.

14       Hardware was not the only thing Mike Lynch was lying

15   about.  You will learn that he was deceptively claiming that

16   Autonomy's IDOL software was incorporated into other companies'

17   products, a process called Original Equipment Manufacturer, or

18   OEM, when, in fact it really wasn't OEMed.

19       Starting in the first quarter of 2010, Autonomy began to

20   disclose, allegedly, how much of its revenue was OEM.  The

21   amount of OEM revenue Autonomy said it had earned is indicated

22   in these dark blue segments.  You'll learn that the OEM revenue

23   is an especially valuable form of revenue.  When you OEM your

24   product in another company's product, that company sells your

25   stuff for you.  All you have to do is sit back and collect the

 1  royalties.  Companies can earn money for doing nothing by

 2  OEMing.

 3      And there was a -- there was a problem.  Dr. Lynch's

 4  claims about OEM revenue were not true.  When you look closely

 5  at Autonomy's records, the Government's independent expert will

 6  say the amounts in the light blue segment were invalidly

 7  claimed as OEM revenue.  That evidence is corroborated by

 8  Harald Collett, Autonomy's former head of OEM sales.

 9  Mr. Collett will tell you how Dr. Lynch urged him to make false

10  and misleading statements about Autonomy's OEM sales to

11  investors.  He will tell you how Autonomy was falsely calling

12  Verity's product KeyView, which was widely OEMed, IDOL OEM, and

13  he will describe the difficulties Autonomy had actually OEMing

14  IDOL with most major customers.

15      All this evidence stands in stark contrast to Mike Lynch's

16  public claims about OEM.  Here, Dr. Lynch insisted that OEM

17  IDOL -- withdrawn -- IDOL OEM turns one-off sales into

18  multi-year commitment annuity streams.  That was the way it was

19  supposed to work.  But if you credit Mr. Collett, you will find

20  that it didn't work that way at all at Autonomy, and Mike Lynch

21  knew it.  Dr. Lynch's false and misleading statements about OEM

22  were yet another way for him to fraudulently burnish Autonomy's

23  image as a growth company.

24      And that leads to the evidence of the last and deepest of

25  Mike Lynch's deceptions, his claims about Autonomy's so-called

1    organic growth.  You will learn that analysts, following

2    Autonomy, kept coming back to one fundamental question:  Was

3    Autonomy's growth due to organic revenue, demand for IDOL or

4    was it from acquiring other companies and their revenue,

5    non-organic revenue?

6        If Autonomy was growing organically, as Dr. Lynch so often

7    claimed, then its market value was enormous.  If it was growing

8    only because it was acquiring other companies and the revenue

9    from their products, then it was growing inorganically, and the

10    demand for IDOL may be flattening, making the value of Autonomy

11    much less attractive to investors.

12        Quarter after quarter you will learn some of the analysts

13    struggled to figure out this critical question out.  It played

14    straight into the valuation models that supported their

15    recommendations about whether to buy, hold or sell Autonomy

16    stock.

17        You will learn that Autonomy made it very hard for them to

18    figure this out by constantly changing its definitions of its

19    revenue, so they could not really compare quarter-over-quarter,

20    year-over-year growth in IDOL sales.

21        This slide is different from the other bar charts I've

22    shown you today.  It's a conceptual slide.  It comes and will

23    be used with the analysts in this case.  It endeavors to show

24    what the analysts will describe as one of their fundamental

25    questions about Autonomy.

OPENING STATEMENT / REEVES

1          This slide tracks IDOL sales at Autonomy from its IPO, its

2     inception, to its acquisition by HP, and it adds in, based on

3     best available information, the amounts of revenue from Verity,

4     Zantaz, and Interwoven, and the other companies Autonomy

5     acquired along the way.  This is what analysts like David Toms,

6     Mark Geall, and Daud Khan will tell you they endeavored to

7     assess in order to calculate the true market value of Autonomy

8     and its prized product IDOL.  Conceptually what is suggested by

9     this evidence is that demand for IDOL was flatlining, was not

10    growing.

11         That possibility is accentuated when you add in the

12    numbers for the carefully concealed hardware sales in yellow.

13    Again, the analysts in the market did not know about the scale

14    of Autonomy's hardware sales.  If they had, their assessment,

15    you will learn, of Autonomy's growth potential would have

16    dimmed even further.

17         The questions by the analysts following Autonomy raised

18    the possibility that demand for IDOL was bottoming out, and

19    Autonomy was a public company whose stock was going nowhere.

20    Worse, these questions raised the possibility that Autonomy's

21    vaunted growth story was all an artifice.

22         Ladies and Gentlemen, that was why Mike Lynch went to such

23    lengths to silence critics like the analyst Daud Khan.  You

24    will learn that Mr. Khan was an analyst by Cazenove, a firm

25    acquired by J.P. Morgan Chase.  Mr. Khan was one of the few

OPENING STATEMENT / REEVES

 1   analysts who questioned Autonomy's organic growth claims.  He

 2   will tell you about the difficulty he had getting accurate

 3   year-over-year figures for IDOL sales given the ever-changing

 4   definitions Autonomy offered to describe its financial

 5   performance.

 6       When Mr. Khan dared to criticize Autonomy in his analyst

 7   notes, Dr. Lynch arranged to have him physically excluded from

 8   the company's earnings calls.  Mr. Khan could listen to the

 9   calls, but he could not be there.

10       Worse, Autonomy filed a referral with the equivalent of

11   the SEC in the U.K. about Mr. Khan's allegedly -- alleging that

12   Mr. Khan did something wrong.  I submit to you that that was a

13   false referral, and you will learn that the referral ultimately

14   went nowhere.

15       All the same, much of the evidence in this trial will bear

16   out and prove Mr. Khan's concerns about Autonomy's organic

17   growth claims and show to you that they were well founded.

18       What happened to Daud Khan is another example of a

19   knowledgeable professional speaking up and getting punished for

20   it.

21       Please take a close look at this document.  Evidence like

22   this, late-night email between Dr. Lynch in December 2010 from

23   Mr. Hussain suggest that they, too, knew that Autonomy's

24   organic growth claims was an artifice.

25       (As read) Really don't know what to do, Mike.  As I

1    guessed, revenue fell away completely.  We've covered up with

2    BofA and hopefully DB, Deutsche Bank, and Department of

3    Interior, DOI, but if latter two don't happen, it's totally

4    bad.

5         This is what Mr. Hussain is telling Dr. Lynch roughly two

6    plus weeks before the end of the quarter, before the end of the

7    year-end.

8         So Mr. Hussain recommends, continuing:  (As read) So

9    radical action is required, really radical.  We can't wait

10   anymore.  Everywhere I look at U.S. IDOL, it's bad.

11        Ladies and Gentlemen, that is Mr. Hussain laying it out

12   there to his boss.  What does Mike Lynch do?  The evidence will

13   leave no doubt that within a matter of weeks Dr. Lynch was in

14   Palo Alto at HP's headquarters hyping his company secretly

15   desperate to sell.

16        Which brings us to the last chapter, the fraud on HP.

17   This is a timeline of the meetings that Dr. Lynch participated

18   in in early 2011.  His promotion of Autonomy is complemented by

19   the false and misleading claims by Autonomy in its Q1 and Q2

20   2011 press releases, and the falsity of many of those revenue

21   claims are advanced by further fraud involving the due

22   diligence period of HP's consideration of the possible deal.

23        Let's look closely at some of that evidence.

24        You will hear evidence from a series of HP executives

25   about their evaluation of Autonomy as a possible acquisition.

1    One of the key things they wanted to know was who were

2    Autonomy's top customers and what were Autonomy's top

3    contracts.

4        You will learn that HP asked the right questions, but

5    emails like this one will show you that Autonomy and Steve

6    Chamberlain went out of their way to give HP the wrong answers.

7    In this email Mr. Hussain was telling Mr. Chamberlain to split

8    out SHI, DiscoverTech, Capax and Zones - all major customers of

9    Autonomy, and all, if properly disclosed to HP, highly

10   problematic for Autonomy for all the reasons I've discussed

11   today.

12       Documents like this one, Exhibit 2144, will show you that

13   Dr. Lynch was supervising this process involving Mr. Hussain

14   and Mr. Chamberlain.  In the end, all of the highlighted deals,

15   the VAR deals that were afflicted with the accounting fraud,

16   were stripped out of the document that ultimately went to HP.

17       This is what HP gets.  You can see what is missing.  This

18   evidence suggests the defendants at Autonomy knew that they had

19   to conceal both the fraudulent VAR deals and the hardware deals

20   with Zones in order to get HP to buy Autonomy, and that's

21   exactly what happened.

22       Ladies and Gentlemen, based on this evidence, the

23   defendants are charged with the following offenses:  They're

24   both charged with in Count One with conspiracy.  And the Court

25   will inform you that the elements of conspiracy involve an

1  agreement among one or more persons, and in this case an

2  agreement to commit a federal offense.  And in this case the

3  defendants and the others that they worked with conspired to

4  falsify Autonomy's financial statements and public disclosures.

5       The defendants are also charged with multiple counts of

6  wire fraud.  One of the core elements of wire fraud is what's

7  known as a scheme or artifice to defraud.  You will learn, in

8  the Court's instructions, that a scheme or artifice to defraud

9  can be false or misleading statements made in order to obtain

10 money or property committed with an intent to defraud.

11      A scheme carried out using interstate wires forms the

12 basis for wire fraud.  And in this case there were multiple

13 meetings, phone conversations, emailing, and documents that are

14 all charged to support the wire fraud counts - all conveying

15 the false information that I've gone through this morning.

16      Finally, there is a final count against Dr. Lynch only.

17 It's a charge involving securities fraud.  Let me explain that

18 a little bit.

19      When HP acquired or announced that it was acquiring

20 Autonomy, it issued a press release.  HP's press release

21 announcing the acquisition of Autonomy contained

22 representations about Autonomy's financial performance.  HP

23 required that Dr. Lynch sign this document verifying that the

24 representations about Autonomy were all true.  That's what

25 you're looking at right now.  The problem is those

 1    representations were not true, and Mike Lynch knew that they

 2    weren't true, and, as a result, buyers and sellers of HP stock

 3    were defrauded, as alleged in the securities fraud count

 4    against Dr. Lynch.

 5        The evidence in this case will leave no reasonable doubt

 6    that Autonomy's financial statements and public disclosures

 7    were materially false and misleading.  It will leave no doubt

 8    that Steve Chamberlain lied to and misled Autonomy's auditors

 9    about key aspects of this scheme to defraud.  It will leave no

10    doubt that Dr. Lynch made false and misleading statements to

11    the investing public and ultimately HP about the scale of

12    Autonomy's hardware sales.

13        The evidence will prove that Autonomy routinely paid

14    millions more for the deals it closed than the revenue it

15    received.  Indeed, the evidence will establish that some of

16    Autonomy's biggest deals made no sense whatsoever except to

17    artificially inflate revenue.

18        All of which raises the question:  Was Autonomy an

19    unsustainable fraud?  I submit to you that Sushovan Hussain's

20    late-night email to Mike Lynch certainly suggests as much.

21    After all, Hussain told Dr. Lynch:  "We can't wait anymore."

22        Why would Mike Lynch and Steve Chamberlain, both

23    successful professionals, ever commit these crimes?  The

24    evidence suggests it was for the oldest of reasons:  Money.  Or

25    in the case of Mike Lynch, money and power.

 1          Ladies and Gentlemen of the Jury, the evidence in this
 2   case will come in like pieces in a big puzzle.  Please be
 3   patient.  Please keep an open mind and let the pieces come
 4   together over the course of the trial.
 5          None of you were selected as jurors because of your
 6   knowledge of accounting.  All of you were selected because of
 7   your common sense and life experience.  All of you have had to
 8   grapple with people who say one thing and then do something
 9   else.  The same thing happened here.  If you think the deal
10   supporting Autonomy's financial statements make no sense,
11   please trust your own judgment.
12          When all the pieces are in place, I submit to you that
13   there will be no reasonable doubt of the defendants' guilt on
14   all counts.
15          Thank you very much.
16          **THE COURT:**  Okay.  Ladies and Gentlemen, as I
17   indicated before the trial started, you as the jurors will
18   decide this case solely based on the evidence presented in the
19   courtroom.  That means that after you leave here for a recess,
20   which we're about to take, or for the evening, you must not
21   conduct any independent research about this case, the matters
22   in the case, the legal issues in the case, or the individuals
23   or other entities involved in the case.  This is important for
24   the same reasons that jurors have long been instructed to limit
25   their exposure to traditional forms of media, including

 1  information such as television and newspapers, and now social

 2  media as well.

 3      You also must not communicate with anyone in any way about

 4  the case, and you must ignore any information about the case

 5  that you might see while browsing the Internet or any social

 6  media feeds.

 7      Now, from time to time, you will understand that you will

 8  be using the elevators that's used by everybody in the

 9  proceedings, and over a period of the trial you will get to

10  know these people rather well.  So you might think that, gee,

11  it's all right to say "good morning" or "good afternoon" or

12  "good evening" or chat with them.  Well, it actually isn't.

13  They are extremely nice people, all of them, but, but they are

14  instructed to have no communication with you, and I suggest

15  that you have no communication with them.

16      From time to time people will not be, who are involved in

17  the trial or witnessing the trial, may not be aware that you're

18  there as a juror, and they may be discussing something.  Please

19  move away from them.  And if you hear anything that's

20  inappropriate, discussing the merits of the case in any way,

21  would you please tell Ms. Scott about it.  But I really, you

22  know, encourage you to govern your own conduct in the case.

23      We will be in recess until 11:15.  You're adjourned.

24      (Jurors exit courtroom.)

25          (Proceedings were heard out of presence of the jury:)

 1          **THE COURT:**  Okay.  Let the record reflect the jurors

 2   have left.

 3        Mr. Weingarten, do you know how long approximately you're

 4   going to be?  I don't want to interrupt -- I mean, you'd like

 5   to do it in one fell swoop, what's --

 6          **MR. WEINGARTEN:**  Certainly not more than 75 minutes,

 7   90, you know --

 8          **THE COURT:**  Okay.

 9          **MR. WEINGARTEN:**  I didn't time it.

10          **THE COURT:**  No, that's okay.  I just -- I think what

11   we'll do is we'll go through your opening and then we'll take

12   our noon recess, and then when we return --

13        Is that all right, Mr. Lincenberg?  Is that okay with you?

14          **MR. LINCENBERG:**  Sure.

15          **THE COURT:**  Okay.  And then during the next recess

16   we'll discuss other issues that have come up.

17        Okay.  Thank you.  We're in recess.

18                  (Recess taken at 10:57 a.m.)

19                (Proceedings resumed at 11:15 a.m.)

20          **THE COURT:**  Okay.  Do you want to bring in the jury?

21          **THE CLERK:**  Yes.

22        (Jurors enter courtroom.)

23          (Proceedings were heard in the presence of the jury:)

24          **THE COURT:**  Okay.  Please be seated.

25        Let the record reflect all the jurors are present, parties

**UNITED STATES COURT REPORTERS**

 1    the present.

 2         Mr. Weingarten, you may proceed.

 3                         **OPENING STATEMENT**

 4         **MR. WEINGARTEN:**  May it please the Court, Ladies and

 5    Gentlemen, good morning.

 6         Let me begin by congratulating my professional friend,

 7    Mr. Reeves, on his powerful opening statement.  It was

 8    powerful, and it was advocacy.  It was black and white.  And

 9    you know what?  You're going to see in this trial that ain't

10    the way the world works.  The world works in grey, the world is

11    complicated, and the advocacy you heard this morning was

12    advocacy.

13         I wrote 77 things in the course of his opening statement

14    that I wanted to respond to substantively with legitimate,

15    strong, powerful arguments coming from the opposite direction.

16    And if I did that, it would be next Tishah B'Av before we were

17    done with the 77 arguments, and that's an ethnic expression

18    which means we'd never be there.  So of course I'm not going to

19    do that.

20         But happily, I did agree with one thing Mr. Reeves said.

21    He talked about patience and an open mind at the very end of

22    his presentation, and he took the words right out of my mouth.

23    I'm going to ask you for the same thing.  Because I promise you

24    this, too.  Virtually every witness they call, we will chip

25    away, we will cross-examine, we will impeach, we will cause you

OPENING STATEMENT / WEINGARTEN

1   to have doubts.  Where he claims there's fire, you will only

2   see smoke.  That's why you're here for all these weeks.  The

3   advocacy was fine.  That's what lawyers do.  The real world is

4   different, and that's what you're about to see.

5       Let me give you an example.  Mr. Reeves talked about the

6   MicroLink acquisition, $55 million, and clearly implied the

7   only reason Mike did that -- and Mike Lynch to some people

8   Dr. Lynch.  He has a Ph.D.  To me he's "Mike."  The only reason

9   he did it, because he needed the revenue to count and MicroLink

10  owed them $16 million.

11      Well, how about the other side of the story that you

12  didn't hear?  MicroLink is a critical government employee doing

13  really important work in Washington, D.C. with virtually every

14  branch of the United States Government, including the Defense

15  Department, the FBI, and the NSA, and that's the business he

16  wanted to get in.  Didn't hear that.

17      Now, I'm not faulting Mr. Reeves.  What I'm suggesting is

18  you heard a wonderfully prepared piece of advocacy that

19  seriously misses the entire story, and that's why we're here,

20  and it's going to be a long process.  And every day I'm

21  guessing we're going to get closer and closer to the truth, and

22  you're going to conclude that a lot of what you heard today

23  about accounting fraud was nothing other than normal business

24  done by Mike Lynch.

25      Backdating.  Oh my God, backdating.  Well, you know,

OPENING STATEMENT / WEINGARTEN

1   there's benign backdating.  If you and I enter into an

2   agreement on December 31st and we don't paper it, and, for

3   whatever business reason, three days later or six months later

4   it's important to memorialize, and there was a legitimate

5   agreement, there's nothing wrong with that.  That's utterly and

6   completely benign.

7         And I'm betting you, let's see who is right here.

8   Mr. Reeves said there's going to be a lot of backdating in this

9   case.  I'm betting you that you will have witnesses on the

10  stand for the Government who will say that backdating they

11  engaged in was utterly benign.  That's not what you heard this

12  morning.

13        The one that really flipped me out was the HP story, and

14  this is really where we draw swords.  HP, the victim.  My

15  goodness.  When HP bought Autonomy, and I'm going to get to

16  this a little later in greater detail, but I just can't help

17  myself right now.  When HP bought Autonomy, Autonomy was rated

18  as a $6 billion business by the market.  That's how they were

19  valued by the market.

20        HP, because they were in such desperate shape, they so

21  needed to do something, paid over $11 billion essentially for

22  Mike's software.  They valued it at $17 billion to their board.

23  Of course didn't disclose that, because of the synergies,

24  meaning all of the wonderful stuff big, powerful HP could do

25  with Mike's software.

1          And you'll see a document in this case that behind the

2     scenes when they were really talking about how much Autonomy

3     was going to be worth to them, $46 billion, and they're talking

4     about, oh my God, had we known about that hardware, we would be

5     outraged.  In the bowels of HP they were valuing Mike's company

6     at $46 billion.  You didn't hear that this morning either.

7          And the hardware, had we known, had we known about the

8     hardware, we would have been appalled.  We never would have

9     bought this company.

10         Well, guess what?  They sold hardware to Autonomy before

11    the sale.  All they had to do was hit their customer list and

12    they would have figured out Autonomy was buying hardware.

13    Ironically, during the due diligence they sold another

14    $2 million plus of hardware to Autonomy, and in the data room

15    itself there were contracts, hardware contracts.  You didn't

16    hear that this morning.  Only that Autonomy was deceiving HP

17    about the hardware.  There were so many ways HP could have or

18    should have known about the hardware.  If the consequences of

19    this were not so serious, it would make me laugh.

20         One more important thing came out of this morning.  Well,

21    many important things came out this morning, but this one in

22    particular.  Let me just take a sip of water.

23         Hogenson, the whistleblower.  You heard a story that a CFO

24    in the United States came forward, made allegations about the

25    accounting, and Mike fired him because he didn't want those

OPENING STATEMENT / WEINGARTEN

1    allegations to get out in the open and blow the lid off

2    Autonomy.  That's the implication of what you heard this

3    morning.

4        We say bunk.  This guy Hogenson was presiding over the

5    largest accounting fraud in the history of Autonomy.  People

6    under him for about a year were stealing.  He never caught it.

7    An investigation started, and then, lo and behold, Hogenson

8    files a whistleblower complaint.  In the course of the original

9    investigation, allegations surface about Hogenson himself.  And

10   he's going -- he's on the witness list, and I'm looking forward

11   to this.  We're going to settle this one in court.  Who is

12   right here?

13       They say Mike fired him.  And Mike didn't fire him, Joel

14   Scott fired him because the whistleblowing.  We're saying he

15   was fired because of his own conduct.  His own conduct over and

16   over and over again made him completely unqualified to be the

17   CFO of a public company.  And you're going -- it's all going to

18   be before you, and you can use this as a litmus test.  Who is

19   pushing the envelope too far?  Is the Government?  Did they

20   properly say Mike Lynch misbehaved?

21       We're saying to you Mike Lynch treated him with grace.  He

22   was open to the allegations.  He got a little annoyed when

23   everything Mike Lynch said the audit committee wanted for

24   Hogenson to do and Hogenson did just the opposite, so he got

25   annoyed with him.  But he ordered independent investigations.

1    And Joel Scott, the general counsel in the United States,

2    interviewed him.  There's a tape of it so you can hear it, and

3    then fired him right in the interview.

4         Now, is the Government suggesting that Mike Lynch was in

5    Joel Scott's ear or that there was some technology that Mike

6    was using to get this guy to fire Hogenson against his will?

7    The story is preposterous.  The bottom line is Hogenson was

8    utterly unqualified to be the CFO, and he was properly fired,

9    and I believe that's what you're going to see in court soon.

10        Okay.  That's my reaction to this morning.

11        Let's see what else I can add to the opening statement.

12        I want to introduce you to Autonomy.  I want you to know a

13   little bit more about what Autonomy was and what they did.

14        Autonomy was formed in 1996.  Mike organized it.  It grew

15   like Topsy.  It soon had over 2,000 employees.  It had over

16   25,000 customers.  It was operating in 20 countries.  They

17   attracted the best and the brightest.  They acted like an

18   anti-bureaucratic, anti-big-business startup.  They moved at

19   breakneck speed, and I'm told they were kind of cool for a

20   techie company.  And of course at the center of all this is the

21   magnificent software that he created.  It helped around

22   hospitals, it helped catch crooks, it helped deliver the news,

23   and it did many, many, many other things.  Virtually every

24   significant company in the world used IDOL software around

25   2010.

OPENING STATEMENT / WEINGARTEN

1     And let's just have number 1, if we could put it on the

2  screen.  I just wanted to give you an idea of the size of it

3  and people working all over the world.  You know, it was kind

4  of a far-flung empire for Mike to run.

5     Number 2, please.  All of this is sort of subsets of

6  corporate organizations, and, again, there's more than 50, and,

7  you know, Mike was responsible for all of it, so it was a

8  complicated empire.

9     And finally, number 3, some of the customers, I get a kick

10 out of the fact that United States -- the irony that United

11 States agencies, including the SEC, are included, BBC, U.K.

12 parliament.  It was a big organization that grew very, very

13 fast.

14     I heard Mr. Reeves talk on a number of occasions this

15 morning about flatlining.  You know, there was a big recession

16 in the United States in 2008, and a lot of companies,

17 particularly financial companies, suffered, but not this

18 company, not Autonomy.  And it goes directly contrary to the

19 theory they were flatlining, and they had to start cheating if

20 they wanted to sell themselves, because otherwise they'd be

21 dead.  That's not what happened.  Just the opposite.

22     They were growing in 2008 and on, and the best way to show

23 this is cash.  You'll hear the expression in this trial "cash

24 is king."  You can't fake it.  How much do you have?  How much

25 cash does your business produce?  Cash is largely how companies

OPENING STATEMENT / WEINGARTEN

 1  evaluate other companies.

 2       And let's take a look at number 4.  Cash generated by

 3  Autonomy from 2006 to 2010.  And look at from 2008:  179.

 4  2009:  287.  2010:  363.  Growing, growing, growing.  Does that

 5  look like a flatlining company to you?

 6       And you'll hear evidence in this case that at this very

 7  time there was always about a billion dollars in cash in the

 8  bank, and you can't fake that.

 9       And, you know, conspiracies have been charged, fraud has

10  been charged.  What the Polish star in this case, not one penny

11  missing from what Autonomy represented to HP that they had, not

12  one -- no one put a penny in their pocket in this case.

13       And, again, in 2008 there was a recession, and a lot of

14  financial institutions were in trouble.

15       Autonomy built software for investigating compliance

16  programs and lawsuits, and as a result the demand skyrocketed.

17  The software was so powerful that no competitor was near them,

18  and it sold like hotcakes.  Flatlining?  No.  An upward trend

19  in profits, cash and stock price.

20       And let's just have another word about the software.

21  Many, many large companies bought it, paid for it, were happy

22  with it, and bought more of it.

23       Meg Whitman, the eventual CEO of HP -- and it's ironic,

24  we're getting recommendations from HP given where we are --

25  called the software almost magical.

OPENING STATEMENT / WEINGARTEN

1        Leo Apotheker, a sophisticated European software guy who

2   ended up the CEO of HP, called it the gold standard and magical

3   software.  An HP web site said its ability to retrieve

4   information surpassed even Google.  And of course HP, with

5   virtually no real due diligence, was happy to pay over

6   $11 billion for our software.

7        How about number 5, these are just ads from the

8   sophisticated rags about our software.  The middle one:

9   Computer Weekly:  *Autonomy Dominates Search Space Reports, IDC*.

10       One down:  *Autonomy Won the Enterprise Search Wars*.

11       Then GlobalCIO:  *The World's Largest Private Cloud:  Who

12  is number one?*

13       And from the opening you might have gotten the impression,

14  is all they did at Autonomy was commit crimes.

15       Let's look at 6.  6 shows -- the green part is the revenue

16  in the period of the charged indictment, and it's over

17  $2 billion.  The yellow is hardware lost.  All the losses that

18  Mr. Reeves talked about, if you add up that money, that's what

19  you get.  And then the reciprocal deals, the red, so it's just

20  a comparison of conduct that's not being challenged by the

21  Government versus the conduct that is.

22       All right.  Let's talk about my client.  I'll give you the

23  briefest summary of his life.  He's 58.  Born outside of

24  London.  Irish parents, poor.  Dad a fireman, mom a nurse.

25  Brilliant student from the get-go.  Loved music.  Jazz musician

OPENING STATEMENT / WEINGARTEN

 1    early on.  Couldn't afford a synthesizer so he built one.

 2    That's the kind of kid he was at a very early age.  Cambridge

 3    scholarship in math, physics, engineer, and just brilliant at

 4    every turn.  A Ph.D. in machine learning.  Machine learning

 5    obviously is part of artificial intelligence.

 6         I'm sure you'll hear a lot about it at this trial.

 7         Mike invented ways for machine learning to solve problems.

 8    That's sort of the essence of his being an inventor.

 9         First big one was he helped police with comparing

10    fingerprints, and then he figured out a way to decipher large

11    amounts of data and spot links to crack crime.  And this is

12    what grew into Autonomy in 1996, and at the center of Autonomy

13    from that moment forward was IDOL.  That's what he called the

14    software:  Intelligence Data Operating Layer.

15         And Mr. Reeves did get at this.  But, simply stated, back

16    then, I don't know how it is anymore, there's structural data

17    and there's unstructured data.  The structured data,

18    spreadsheets, databases organized information, it's the stuff

19    that Oracle does so well.  The unstructured data is the

20    real-life stuff:  Emails, voicemails, videos, photos and prose.

21    That's where IDOL focused.

22         Most data obviously is unstructured, but back then most

23    software at the time worked on structured data.

24         Mike was way ahead of everybody for a long time using his

25    technology to find significance and meaning out of the

 1  unstructured stuff, and that was his claim to fame.

 2      Basic IDOL expanded into over 500 applications doing

 3  different things in the unstructured world with the same

 4  magical technology.  Examples:  Banks, archiving emails to

 5  comply with regulations, reviewing emails to spot compliance

 6  violations, manage data for litigation, energy companies,

 7  listening to call centers that can be critical, anticipate the

 8  questions, provide answers.  The Government, recognize unusual

 9  patterns in money flow to identify money laundering, compare

10  footage of landscape through the tech explosive devices.

11      He served at a time as Autonomy's CEO until May 2012 when

12  he was fired by HP.

13      Now, let me just say this generally.  The prosecutor this

14  morning described Mike almost in stick term -- stick form ways,

15  that he was a dictator, that he had iron control over Autonomy.

16  This is a flush-and-blood guy.  He had back then a phenomenally

17  complicated life, with Autonomy just being a small part of it.

18  He had critically important positions in the government.  He

19  was incredibly involved in public service stuff.  He had a huge

20  farm that was active, and he was a significant part of it.  I'm

21  hopeful that in the course of this trial you can get all this

22  information with particularity.

23      And we're going to tell you these things, and we're going

24  to want to tell you these things not because we want you to

25  admire him or like him.  We want you to know him.  We believe

 1  the better you know him, the better off we are.

 2      Let's talk about Mike as a CEO.  There are different kinds

 3  of CEOs.  Maybe some of you work for one of these kinds.  They

 4  are sales guy CEOs who come out of sales and that's what they

 5  live and breathe.  That was not Mike.  Mike was the opposite of

 6  that.  That's not Mike.

 7      And then there's the MBA, buttoned-up CEO type.  That's

 8  surely not Mike either.  He was a start-up guy, that's him.

 9  That's where he's most comfortable.  Eating the cold pizza at

10  2:00 o'clock in the morning inventing something.

11      But he's also the disrupting CEO, that's his greatest joy,

12  to go where no one else has gone to make a contribution.

13      His management style:  Run the best and brightest and let

14  them run.  And if he's interested in something, he's all over

15  it.  And if he's not interested in something, not so much.  And

16  what is he interested in?  Well, surely first and foremost

17  tech, what's next and what can we do, what can we invent?  And

18  he's also incredibly interested in strategy, marketing.  I

19  mean, his basic business was to manage data for large

20  companies:  How can I do it better, a constant question he

21  asked.  Important hires, all over it.  Key customers,

22  occasionally largely with the Wall Street banks, and

23  certainly -- and it's consistent with what you heard this

24  morning, he was an interface with the markets.

25      And acquisitions are important.  They're fewer than with

OPENING STATEMENT / WEINGARTEN

1    many companies.  There are companies that seem to buy other

2    companies every week.  That wasn't Autonomy.  But the big

3    question was buy a company and get a specific piece of

4    software, a specific piece of technology or build it.  And he

5    was surrounded by fabulous, talented engineers who always

6    wanted to build it, but often he chose to buy.

7         Fairly stated, big picture:  Mister outside.

8         What is he not so interested in?  Sales.  Not a salesman

9    at his very core.  Legal, not so interested in what's going on

10   in his legal office at the company.  HR?  Nope.  And yes,

11   accounting.  Not an accountant, not interested in accounting,

12   just wasn't his thing, and that's just the truth.  And

13   administrative stuff, oh, my God, not that either.  But he was

14   obviously a very smart, confident CEO.  He knew the basics, not

15   much interested in the subject.  He relied on others to do the

16   day-to-day stuff.

17        And you know, it started this morning.  They will endeavor

18   to make him omniscient omnipotent and omnipresent at Autonomy.

19   Not true.  Not true because he had so many other interests and

20   responsibilities, obviously impossible, there are only 24 hours

21   in a day, and this is important.  8,000 miles and many, many

22   time zones separated him from the great majority of the conduct

23   these guys don't like, which happened here.

24        And you know this, and it's obvious, as you can see from

25   some of our exhibits, this was a large international company.

 1  It would be unfair and inconsistent with the instructions

 2  you're going to get from the judge to hold Mr. Lynch, Mike

 3  responsible for every misdeed or every piece of wrongdoing

 4  anywhere and everywhere in the company.  That just wouldn't be

 5  right.

 6       And also true it was subtle, but I suspect there will be

 7  some efforts to try to make you not like Mike Lynch, and let's

 8  just be straight about that.  Mike Lynch is a hard charger.  He

 9  can be demanding.  He can have an edge.  He can be aggressive.

10  He can impose exacting standards.  In his perspective, he

11  wanted the best from people, wanted people to reach their

12  potential at work, and fundamentally believed this was his duty

13  as the CEO.

14       How did people respond?  Many people admired him.  Many

15  relished the challenge of working with him and the opportunity

16  to make lots of money.  Many wanted to please him, and this

17  could be relevant at this trial.  Some couldn't handle the

18  challenge of working with him and were intimidated by him.

19  That's also true.  And some had less than satisfactory

20  experiences with him and hold him responsible to this day, and

21  I'm guessing you're going to see examples of every category at

22  this trial.

23       Now, Mr. Reeves introduced the idea that we're in an

24  accounting world here.  I had a trial lawyer friend who once

25  said if there's no sex, drugs or rock & roll in a case he's not

OPENING STATEMENT / WEINGARTEN

 1    trying it.  He would not try this case.  This is an accounting

 2    case.  And no offense to any accountants or people related to

 3    accountants, they do incredibly important work, and we'd all be

 4    lost without accountants, but it can be dry, and there will be

 5    parts of this case that will be dry.

 6        A concept that is critically important to this case is

 7    Autonomy's accounting was run under the IFRS standard.  That's

 8    the standard of almost the entire world.  Here in the United

 9    States we have GAAP, Generally Accepted Accounting Principles.

10    Hugely important, because there's confusion afoot between the

11    two systems.

12        IFRS is generally called principles-based.  GAAP is

13    generally called rules-based.  The IFRS principles-based means

14    it's a set of guidelines, overarching principles.  Where on the

15    United States side accountants are more used to specific rules

16    particularly when it comes to software.  I mean, you're going

17    to see over and over again people getting mixed up between the

18    two.

19        But on the IFRS side, which is really important, you

20    frequently hear it said that you can have two principled

21    accountants wrestling on the same problem coming out on the

22    opposite sides without either being wrong and certainly either

23    being corrupt.  And you're going to have witnesses for the

24    Government, at least one expert that they've announced, who are

25    going to come out with after-the-fact opinions about the

 1  propriety of some accounting that we're going to challenge, and

 2  just remember that principle that you'll hear from IFRS.

 3      And of course at the center of this case it's going to be

 4  the concept of the significance of making your numbers.  It's

 5  going to be a big deal.  And the implication from this morning

 6  was if you endeavor to make your numbers, there's something

 7  off, there's something wrong, there's something not right.

 8      Children, get inside.  Autonomy was trying to make its

 9  numbers.  They sure did, and so does every other public company

10  in the universe.  Public companies always want to hit their

11  consensus numbers.  You'll learn all about how those consensus

12  numbers are formed, and it's a sign that a company is doing

13  well.  And management has a duty to shareholders to preserve

14  and protect and grow the business, and making the consensus

15  numbers is part of the duty.  It's not a mystery.  This is not

16  controversial.  It's the law of the land.  Not really the law

17  of the land, but it's how public companies work.

18      And understand, you can do about a million legitimate

19  things at the end of the quarter to pump up your revenue, to

20  pump up your sales.  You can hire more salesmen; you can offer

21  bonuses; you can do gimmicks; you can do a two-for-one; you can

22  lower prices.  This is as normal as apple pie.  This happens,

23  and it happened in -- the equivalent happened in this case.

24      And it's true if you don't make their numbers, your stock

25  price can go down.  And in this case there are 10 quarters in

1    play, and we didn't make our consensus numbers about half the

2    time.

3           Please put up number.  Number 8.

4           So there are essentially 10 quarters that are covered by

5    the indictment, and about five of them we didn't make our

6    numbers.  And in truth, the stock went down just a little bit,

7    and then the stock went back up and normalized.  The point

8    being -- and I guess we weren't so hot at making our numbers

9    during the conspiracy if we missed five times.  It's a little

10   ironic, but it wasn't the end of the world.  You know, 5 times

11   out of 10 Autonomy didn't make its numbers.  There was no

12   bankruptcy, no hari-kari, and the stock price went back up.

13          In truth, you'll learn that Mike despised living

14   quarter-to-quarter.  He thought it was the bane of western

15   economic systems.  He wanted to strategize.  He wanted to

16   long-term plan, and he hated the pressure he was under to make

17   the numbers like every other CEO.  And in England it's

18   different.  There's a special law that the CEO has to report to

19   his shareholders at a given time if he anticipates a drop in

20   stock and not making the numbers.  So not only did he have to

21   do it in general, he had to do it in specific, consistent with

22   U.K. law.  And you'll learn that he did form important

23   strategies, completely indifferent to the exigencies of the

24   quarter system, and they were successful.

25          And revenue.  Revenue, revenue, revenue, another

1    prediction.  The fundamental Government position is all we

2    cared about was revenue, and we were prepared to kill and cheat

3    if we didn't make our revenue numbers.  Look, memo to my

4    friends over here:  Of course revenue is important.  We agree,

5    it's good if people buy your stuff.  Salesmen understand this

6    metric, but it's not the only important metric.  It's not even

7    the most important metric.

8        You get people voting differently on this, but certainly a

9    lot of people would say cash is king.  Either you have that

10   10-spot in your wallet or you're not.  There's no fooling

11   around with cash.  And, again, you saw Autonomy's cash

12   skyrocketing and you know, from what I told you, one billion

13   was sitting in the bank.

14       But profit, obviously profit is incredibly important.

15   Call it different things.  Call it margin.  Call it EPS,

16   fundamental issue:  Are you making money?  Common sense.  Which

17   would you prefer, company A, booming revenue but no cash and

18   losing money, because expenses are more than the revenue.  Or

19   company 2:  Half the revenue but lots of cash and big profits,

20   because the expenses are so low.  I mean, the answer is

21   obvious.  So you can have booming revenue, losing money, and

22   your company is not that valuable.

23       This is an important part of the case.  Obviously you know

24   sometimes we sold hardware for a loss.  The Government's basic

25   position is we did it to fool the world.  We did it so the

OPENING STATEMENT / WEINGARTEN

1    world would see our revenue numbers as skyrocketing.

2        The effect of selling hardware for a loss had the opposite

3    effect.  It increased the revenue, but the cash was reduced

4    because we were losing money doing it, and our profit was down.

5    It made the company not more valuable, but less valuable.

6        I have a simple example to make this point.  Number 19,

7    please.

8        Okay.  Hypothetical.  You're looking in the newspaper.

9    For sale is a coffee shop.  Advertised profit:  $1,000.

10        Next page.

11        You visited the coffee shop and you see that there's a

12    loss leader.  To get people to come in and buy your coffee

13    you're selling a delicious piece of cake for a dollar, but

14    you're losing money on the cake.  So the finances are profit

15    from the coffee:  $1,100.  Loss from the cake:  $100.  Total

16    profit a thousand.

17        Okay.  So what does that mean?  Next one.

18        You stop making the cake, just selling the coffee.  Profit

19    from the coffee:  $1,100.  Loss from the cake now $0.  Total

20    profit is more than when you had your loss leader.

21        You get the point.  In a fundamental way, in a fundamental

22    way the hardware sales that we did for loss made the company

23    less valuable, and we would only have done it logically if

24    there was an important business reason connected to it like

25    selling our software.

1        All right.  Let's talk about an important subject.  How
2   did the accounting go at Autonomy?

3        Finance Department, it was located in Cambridge.  It was
4   large.  It was filled with professionals.  It had many Big Four
5   alums.  When we talk about Big Four, there are now four big
6   accounting firms.  That's what I'm talking about with the four
7   big alums, Deloitte being one of them.

8        And Sushovan Hussain, who was mentioned to you this
9   morning, was the CFO and the head of sales.  And he's a very,
10  very important person in this case.  And here's the Sushovan
11  that Mike knew.  He had an incredibly wonderful immigration
12  story.  He was 7 in Bangladesh, didn't speak a word of English,
13  comes to England and had incredible success at school.
14  Graduates with Honors and goes to Cambridge.

15       They will inevitably try to make Mike and Sushovan Siamese
16  twins.  They weren't.  They went to high school together for a
17  year, and then they were both at Cambridge.  They knew each
18  other, but were not close friends.  Sushovan, after college,
19  went into the oil industry, and then in 2001 came to Autonomy.

20       And here's the deal with Sushovan.  He's absolutely
21  brilliant, incredibly hard working, a perfectionist, he's
22  innovative, always looking to advance the ball.  He loved his
23  work as an accountant, and he won awards.  I don't know how
24  many times he was selected to be the CFO of the year in London.
25       And more specifically, Sushovan as CFO in sales wielded

1    enormous authority at Autonomy, something like -- and COO as

2    well.  But he reported to Mike, there's no doubt of that.  Mike

3    was the boss.  Mike was frequently referred to as the Bill

4    Gates of the United Kingdom.  Mike was the boss.  They were not

5    coequals.  Never saying that.  Never will say that.

6         But what is true is Sushovan made virtually all the

7    accounting decisions that the Government challenges.  We will

8    see the evidence that the Government offers and determine which

9    of the challenges they make that we'll fight off.

10        But what won't be controversial is Sushovan, not a

11   coequal, but Heaven knows not a sycophant.  He ran the

12   accounting.  He was strong, determined, and creative, and

13   essentially taught Mike the bulk of what Mike knows about

14   accounting.

15        And what I'm going to say next may be amongst the most

16   important things I say this morning.  Mike never, never had a

17   reason not to trust Sushovan, not to believe in him, not to

18   rely on him, not to believe Sushovan was trying his best to do

19   right by accounting at Autonomy.  I predict there will not be a

20   shred of credible evidence that Mike had any reason to believe

21   that Sushovan was doing improper accounting.

22        Steve Chamberlain was part of the accounting group, and

23   he's represented by another friend of mine who is an excellent

24   lawyer who is going to get up after me.  And all we'll say

25   about Steve Chamberlain is he was an utterly, competent,

 1  honorable, decent guy.  He was certainly not in Mike's inner

 2  circle, but we have nothing but positive feelings for him when

 3  we worked with him.  And when I say "we," of course I'm talking

 4  about Mike.

 5      Now, there was a board at Autonomy, and there was an audit

 6  committee at Autonomy, and this is significant.  They, of

 7  course, had the ultimate authority for the company.  They

 8  signed off on the accounts, and you will see that there was a

 9  real review process at Autonomy.  Mike didn't collect golfing

10  buddies who wanted to get away from the Mrs. and go to a board

11  meeting.  That's not what we had at Autonomy.

12      The Chairman of the Board for a long time was a guy named

13  Robert Webb, one of the most prominent lawyers in all of the

14  United Kingdom.

15      Chairman of the Audit Committee, Jonathan Bloomer.

16      The Dean of Finance and Accounting in the United Kingdom,

17  Richard Perle.  The former Assistant Secretary of Defense in

18  the United States was on the audit committee for a while.

19  These are superstars, not Mike "yes" men.  I hope you meet

20  them, and we're trying to make it happen.  Vacations, distance,

21  age, and illness perhaps are getting in the way.

22      But the point of this, the point of the board, and it's an

23  easy one, and it's an important one.  The very last people you

24  would surround yourself with if you were in the middle of a

25  three-year fraud would be these board members.  That would be

OPENING STATEMENT / WEINGARTEN

1  insane.  These people are smart.  They look, they work, they

2  work closely with Deloitte, and they were not "yes" men.  You

3  would not have them on your board if you were perpetrating a

4  fraud.

5      And then there's Deloitte, one of the Big Four, more than

6  400,000 employees.  Hire them, and I think it's fair to assume

7  competence, integrity and independence.  And they did

8  Autonomy's books.  They were a real presence at Cambridge.

9  They knew software.  Somewhere I got a number that over time

10 more than 50 were assigned to the Autonomy account, and every

11 quarter they came in in force and did the books, and they

12 developed an open professional relationship, and Deloitte

13 signed off on every financial statement at issue in this case.

14     There were open, vigorous debates on some of the issues we

15 care about here.  But the bottom line, if Deloitte said no to

16 an accounting decision, it was no.  And, you know, we heard

17 this morning Deloitte was misled, not told everything.  Every

18 time Sushovan went to the bathroom, he didn't have to tell

19 Deloitte that he was going to the bathroom.  So we'll test

20 every occasion when Deloitte says they were misled.

21     What I think you'll see, from the Deloitte witnesses and

22 the Deloitte work papers, is that they knew the relevant facts

23 about every important issue in this case.  Indeed, we will

24 prove to you that often the Deloitte auditors knew more about

25 some of these deals than Mike did.

 1     Now, Mike in accounting -- and, again, we're in the belly

 2  of the beast here -- not an accountant, not trained in

 3  accounting, not much interested in accounting.  But of course

 4  he's not ignorant about accounting, I'd never say that to you.

 5  I couldn't say that with a straight face.  He's a very smart

 6  guy and a competent CEO, but he had very little involvement

 7  with the day-to-day accounting issues, and very little contact

 8  with Deloitte, and very little contact with the audit committee

 9  on accounting issues.  That's the U.K. model.  CEO accounting,

10  not verboten, but stay away.

11     Here's how it worked.  Mike believed he surrounded himself

12  and hired the best of the best:  Sushovan, the audit committee

13  guys, and Deloitte.  And, you know, let Mike be Mike.  Let him

14  innovate.  Let him push boundaries.  Let him disrupt, and let

15  him make money, and rely on the big three, his finance guys,

16  his audit committee, and Deloitte to do their jobs and protect

17  Mike and Autonomy from accounting harm.

18     You'll probably hear this from more than one person.  Mike

19  had ironically sleepless nights while he was a CEO of Autonomy,

20  but not about accounting.

21         **MR. WEINGARTEN:**  Judge, do you want to --

22         **THE COURT:**  No, go ahead.

23         **MR. WEINGARTEN:**  Okay.

24     All right.  Let's talk about the victim in this case, HP.

25     And it's fair to say why are we here?  Two words, HP,

OPENING STATEMENT / WEINGARTEN

1    Hewlett Packard.  And, yes, they're an iconic company.  Yes,

2    when the history of Silicon Valley is written, they'll talk

3    about Hewlett Packard in the garage and the desktops and the

4    printers.  And they'll also talk about the hard times:  The

5    missed text swings, and the iPhone killing them, their stock

6    collapsing, CEOs flying out the door, one scandal after

7    another, just a horrible record for acquisitions, Compaq, the

8    Ross Perot company, Palm.

9         They were in dire straights when Leo Apotheker from the

10   German software company SAP was hired as CEO.  They were in

11   dire straights.  He likened the situation at HP to a burning

12   platform.  That's a lovely picture of a platform in the North

13   Atlantic in the middle of the winter with the seas roaring and

14   workers are surrounding the rig and the rig blows up and starts

15   on fire.  So the choice for the workers:  Get burnt up on the

16   platform or jump into the North Atlantic in the roiling sea.

17   That's how he saw his company when he was hired.

18        But he had a vision, and Mr. Reeves had that right.  He

19   wanted to turn HP upside down.  You know, the low-margin

20   hardware manufacturer, turned it into a software company,

21   Longshot, made even a Hail Mary.  But Leo Apotheker was

22   determined to give it a try.  And he knew Autonomy.  He admired

23   Autonomy, and for him it was all about Autonomy's technology.

24        And Leo also had a specific dream:  To create HP software

25   that could deal with both the structured and the unstructured

 1   data in a commercially successful way, and he called it the

 2   Holy Grail.  And, ironically, Mike shared this dream, Mike

 3   Lynch.

 4       For him, the next big thing after IDOL was going to be

 5   IDOL not just doing unstructured, but going into the structured

 6   world and doing clever things with structured data that had

 7   never been done before, and he called that product, after a lot

 8   of thinking about it, a lot of experimenting with it, and a lot

 9   of working on it, he called it SPE, the product that Mr. Reeves

10   mentioned and which will be, I'm guessing, an important part of

11   the trial.

12       Enter Frank Quattrone.  Frank Quattrone is one of the most

13   famous bankers for tech companies.  He's out here.  He's a

14   matchmaker, and he knew Mike and admired Mike and admired

15   Autonomy.  And he saw that for whatever reason Autonomy stock

16   went down, and he called up Mike and said:  You're vulnerable.

17   You know, some big giant is going to want your software and is

18   going to pay a ton of money, so do you want me to help you find

19   alternatives or help you get ready?  That was the start of the

20   acquisition.  Not Mike Lynch, oh, my God, my company is

21   falling, apart.  I gotta continue to cheat so I can sell it.

22   That's not what happened.

23       Was Mike desperate to sell?  No.  He was perfectly happy

24   where he was.  He was buying companies, and the last thing you

25   do if you want to get sold to a big giant is buy another

1    company, because it makes integration ten times harder.  It's

2    the very last thing you do.

3         Frank Quattrone said, you know, you're so attractive and

4    your software is so hot, you'll probably get a 70 percent

5    premium.  Mike:  Yikes, that's extraordinary.  That's more than

6    any other company has gotten on the London Exchange in years.

7    A normal premium is 20 percent, not 70 percent.  And Mike, with

8    Frank, said, in U.K. law, there's no poison pill.  If my

9    shareholders are offered 70 percent, they're going to jump on

10   it.

11        The attraction was all about synergy.  I mentioned it in

12   the beginning of my presentation.  Why Leo Apotheker was so hot

13   to get Autonomy was he saw amazing synergies to be created.

14   Synergy as the combined value it was greater than the sum of

15   the individual parts.  And what Leo envisioned was the HP sales

16   army selling IDOL, HP appliances hooked up with IDOL, and

17   mostly the magical Holy Grail, a stack of software including

18   IDOL that could deal with both the structured and the

19   unstructured, and that's where he got the crazy numbers.

20        Number 17, please.

21        No, I have the wrong number.  I apologize.  16.  16.

22        I wanted to make sure you didn't think I was making up

23   that number.  This is an important document, one of the more

24   important documents in this case, to understand why HP bought

25   Autonomy.

 1       This is serious people.  These are serious grownups

 2  putting pen to paper and saying what is the value of Autonomy?

 3  And the number they get, and it was not submitted to the board

 4  but they put it out, was $46 billion.  That's why HP bought

 5  Autonomy.

 6       So Apotheker and Mike meet three times.  First two times

 7  it's just pleasant and they're talking about the world and

 8  technology.  The third time they get down to business, and just

 9  coincidentally it's a time when the U.S. stock market is

10  collapsing.  It's one of those times when the U.S. Government

11  defaulted.  Our bonds were actually downgraded by a rating

12  agency.  The stock market collapsed, including Autonomy stock.

13       So Leo Apotheker says to Mike:  Dude, you gotta come down

14  on your ask.  Look, you know, we can't support these numbers

15  anymore.  And Mike said no.  A clear example that directly

16  contradicts what you heard this morning.  "He was desperate to

17  sell.  His company was falling apart."  No, he turned down

18  Leo's demand.  Leo said:  I'm going to walk unless you come

19  down with your price.

20       Now, eventually there was a negotiation, and eventually

21  there was an agreement, and eventually there was a 70 percent

22  premium.

23       The due diligence that was done by HP or not done by HP is

24  going to be a big battleground in this case, that's for sure,

25  after what I heard this morning.

OPENING STATEMENT / WEINGARTEN

 1        This was an $11 billion deal.  HP got KPMG to lead the due

 2   diligence.  It was remarkably short.  The due diligence was 9

 3   working days.  They spent less than one day for every billion

 4   they spent.  The due diligence was almost exclusively on public

 5   information.

 6        Now, one of the reasons for that was U.K. rules, which are

 7   complicated, and you'll hear at trial, and also because HP was

 8   terrified that Oracle was going to swing into action and take

 9   Autonomy, and they didn't want that, so they wanted to move as

10   fast as they could.  And curiously, the Autonomy side offered

11   up Hogenson, the guy we're going to have the battle over, the

12   whistleblower or not, HP wasn't interested.

13        But here's the real -- here's the real deal.  KPMG never

14   finished their work.  They were called off.  Enough!  And KPMG

15   had not done all the work relating to revenue that they had

16   anticipated they were doing.  Meaning, had HP spent the time to

17   do a normal due diligence, they would have found anything and

18   everything they're complaining about today, including hardware.

19        Why the rush?  Why was HP in such a hurry to -- why did

20   they cut off KPMG?  That sounds like a crazy thing to do.

21   Because they had dreadfully bad news to report to the market in

22   August 2011.  They had to report that they were abandoning Tom,

23   just a failure.  They were announcing they were exploring a

24   spinoff of its personal systems group, one-third of their

25   revenue.  They were disclosing that the quarterly earnings had

OPENING STATEMENT / WEINGARTEN

 1    fallen short again, and they were lowering its revenue and

 2    earnings estimates for the full 2011 fiscal year by 14 percent.

 3    Dreadful news.

 4        So their investment banker said:  Unless you couple the

 5    dreadful news with something happy, something promising, the

 6    shareholders are going to throw you out.  So guess what the

 7    story was?  The story was Autonomy.  The story was they were

 8    changing the world.  They were coming at the world from the

 9    software perspective, and all would be well.

10        But, as fate would have it, that's not what evolved, and

11    it didn't evolve because when Leo presented his synergy story

12    to the board, the CFO at the time, a woman named Kathy Lesjak

13    unexpectedly came out of nowhere and stuck him in the back

14    (demonstrating) and said:  Too expensive, bad deal.

15        Chaos ensues in the boardroom.  Corporate warfare.  It's

16    going to be part of a course in every business school for the

17    next 50 years.

18        Leo prevailed in the immediate, and the board eventually

19    agreed to buy Autonomy for the 11 plus, and they ride with Leo

20    for the moment.  But of course it leaked that the story -- the

21    story of the purchase of Autonomy leaked in I think Bloomberg,

22    so Leo didn't even get the opportunity to tell the story in the

23    way he wanted to.

24        And number 20, the stock just collapsed.  Let's put it up

25    if we can, number 20.

 1      So that's Hewlett Packard stock the day of the

 2  announcement.  And total panic, total panic on the board.  "Can

 3  we get out of this deal?"  No, the Brits are tough when it

 4  comes to deals when you sign a contract.

 5      So instead of getting out of the deal, they fire Leo

 6  unceremoniously and they put Meg Whitman in.  And Meg does a

 7  180-degree turn and says, you know, forget this software.

 8  We're a hardware company.  We make printers.  But, you know, we

 9  own Autonomy now, and we pursue --

10      And so they had a choice:  They could pursue Leo's dream

11  and they could say yes, the synergies are real, let's make it

12  happen or they could treat Autonomy like a stepchild.  And

13  guess which it was?  Two big events.  Meg Whitman fires Mike,

14  so now the dream is surely gone.  And Joel Scott, who you've

15  heard of, for reasons having everything to do with him wanting

16  to get into the HP world, comes running to the general counsel

17  and says, oh, my God, there's so many things wrong with the

18  company including hardware.

19      And Joel Scott is going to be a witness, so we're going to

20  explore this one, too.  But he says things to the lawyer,

21  Schultz, at HP.  But perhaps Schultz didn't know, because he

22  was a lawyer, he's not the CEO, he's not the CFO, but Schultz

23  was told things that HP knew.  So the idea that the

24  whistleblower showed up and the whole world changed is

25  demonstrably false.

OPENING STATEMENT / WEINGARTEN

1    And HP needed someone to blame.  They had an $11 billion

2    debacle on their hands.  The shareholders of course sued them.

3    They looked ridiculous.  At this point Autonomy, without Mike

4    Lynch, was an albatross around their neck.

5    So they needed a scapegoat, and what they did is they

6    began an investigation.  And to their credit, and I say this in

7    sort of a perverse way, they're way better off in finding a

8    scapegoat than they are in integrating a company.  It was

9    relentless.  It was exhaustive.  Millions and millions of

10   emails were searched.  And I think if you did that in any

11   public company in the universe, you'd find stuff.  And the

12   stuff they found, while putting relentless pressure on

13   employees, past and present, using the carrot-and-stick

14   approach effectively, the results were they found the issues

15   that were articulated by the prosecutor today to you, and

16   that's what happened.

17   In truth, in truth there is a routine business dispute

18   between HP and Autonomy that has been transformed into an

19   overblown fraud case, and that's why we'll be here for the next

20   8 weeks.

21   The real dispute, if HP stood up and said, hey, we're not

22   crazy about this revenue, the composition of this revenue.  We

23   didn't know all of it, and we should have paid a little less

24   or, you know, we should negotiate the price.  Okay.  Fine.

25   And we would say, you were crammed with the most

 1  sophisticated lawyers, bankers, and financiers and accountants.

 2  You looked anywhere you wanted to look.  Had you asked or had

 3  you looked, you would have found anything you wanted, and you

 4  got what you bargained for.  You valued us at $46 billion and

 5  you paid 11, that's what we'd say.  And that's why God made

 6  civil trials.

 7       Almost done, Your Honor.

 8       Couple of observations about how things may play out at

 9  this trial.  What do you have to decide?  Obviously you have to

10  decide guilt or innocence.  You're not going to work for Mike

11  Lynch.  You don't have to say "Would I work for the guy?  Would

12  I not work for the guy?  Do I agree with his business

13  decisions?  Do I disagree with his business decisions?  You

14  don't have to do that.  That's easy and obvious.

15       Credibility of witnesses, that's also for you.

16       Memory is a key thing here.  Some of these transactions go

17  back 15 years.  You know, who can remember a transaction from

18  15 years ago?  Does someone have specific memories of

19  transactions 15 years ago?  Find out who has refreshed them.

20  Find out is it HP?  Find out is it the Government?  Find out if

21  it's us.  Those are valid questions.

22       Find out the vantage point that witnesses have of seeing

23  things.  Are they five levels down from Mike Lynch and asking

24  questions about Mike Lynch?  Do they know Mike Lynch?  Are they

25  speculating?  Fair questions.

1        And think about the Stockholm Syndrome, and keep an eye

2    open for this.  There will be witnesses at this trial who

3    worked at Autonomy.  And, yes, it was a ferociously competitive

4    environment, and, yes, they worked long hours, and, yes, the

5    end of quarters were tough, but they loved it, and they were

6    making money, and they were happy.  And then all of a sudden

7    the investigation started and 20 interviews with the Government

8    later not so much.  Stockholm Syndrome.  Keep your eye open for

9    that.

10       Constitutional protections, I couldn't even get close to

11   what the judge did last week in describing them as eloquently

12   as they can be described.  Just reasonable doubt for one

13   second, just an example of it.  How was Mike Lynch going to get

14   away with this?  The day after Autonomy was sold to HP, HP got

15   all Autonomy's books.  All the accounting issues raised before

16   you today were in Autonomy's books.

17       So, let's see, the smartest guy in the world is going to

18   go to work for HP after perpetrating an $11 billion fraud, and

19   the first thing he's going to do is hand over the books that

20   will disclose that fraud.  That's preposterous.  That's

21   reasonable doubt.

22       The charges, Mr. Reeves described them to you.  There's

23   fraud in every count.  There's criminal intent that needs to be

24   proved beyond a reasonable doubt.  I know you know this, but

25   let me say it because it's important.  "Should have known," not

1    enough.  "Must have known," not enough.  He's the CEO, got have

2    known.  You can't substitute guesses and speculation and

3    "should have knowns" for actual evidence.  And common sense

4    doesn't get you there either.  I'm not suggesting in a million

5    years that my friend Mr. Reeves was using common sense as a

6    code for must have known.  I'm not saying that at all, but

7    don't you do it.  Specific intent, criminal charges means you

8    need actual evidence that this man specifically intended to do

9    wrong.

10       The companion of criminal charges when specific intent is

11   required is good faith.  Good faith basically means pure heart.

12   If you're walking around and your heart is pure and you don't

13   believe you've done anything wrong, and the Court requires or

14   the charge requires specific intent, you don't have it.  Even

15   if you had a mistaken belief:  You know, I thought the

16   transaction was fine.  I honestly truthfully believed that.

17   Somewhere along the line the law says it wasn't.  If you're

18   carrying that honest belief, that's good faith.  The judge

19   obviously will help you with his instruction.

20       Motive.  Motive is not a requirement.  It's not an

21   element, but it's the first thing you're going to ask to

22   yourself.  Like why in the world -- why in the world would this

23   man commit fraud, given where he was in the world?  He had all

24   the money in the world.  He had all the prestige in the world.

25   He had all the fame in the world.  He had a multi-faceted

1  fabulous life.  So if you're going to sell some hardware and

2  lie about it and risk his life, his liberty, and his

3  reputation?  Please.

4       Keep an open mind.  I'm echoing my friend here.  They go

5  first.  We're going to chip away.  We're going to cross-examine

6  every one of their witnesses, and we're going to make progress.

7  I don't promise you that, I guarantee you that.

8       And we're going to introduce witnesses, and here's a big

9  one.  We're going to put Mike on the stand.  And defense

10 attorneys don't usually say that, and in most trials you don't

11 usually do it, but we are.  I got a little choked up.  We want

12 you to know we think that helps us.  We know how talented the

13 lawyers are at this table.  We know there will be

14 extraordinarily effective cross-examination, as effective as it

15 could possibly be, and we're ready for it.  You're going to see

16 a different world than you heard about this morning.

17      Look, at the end of the day, here's the deal.  Mike Lynch

18 is not Superman.  He's not perfect.  He's not a saint, but he

19 sure as hell ain't no criminal.  He ain't no crook.  He ain't

20 no fraud, and you're going to be satisfied of that.

21      And at the end of this trial, we're going to come back

22 before you and ask for a verdict of "Not Guilty," and we can't

23 wait.

24      Thank you.

25           **THE COURT:**  Okay.  Ladies and Gentlemen, we're going

1  to take our noon recess.  We will be in recess until

2  1:00 o'clock.

3      Remember the admonition given to you:  Don't discuss the

4  case, allow anyone to discuss it with you, form or express any

5  opinion.  I'll see you at 1:00.

6      (Jurors exit courtroom.)

7          THE COURT:  Okay.  We'll be in recess until 1:00.

8  Thank you.

9          (Luncheon recess was taken at 12:20 p.m.)

10 **AFTERNOON SESSION**                              **1:03 p.m.**

11

12         THE COURT:  Please be seated.  Let the record reflect

13 all jurors are present, parties are present.  Mr. Lincenberg,

14 you may proceed.

15                      **OPENING STATEMENT**

16     **MR. LINCENBERG:**  Thank you, Your Honor.

17     Good afternoon, ladies and gentlemen.  You'll recall my

18 name is Gary Lincenberg.  I'm the lead counsel for Steve

19 Chamberlain.

20     Steve, can you stand up?

21     Steve will be sitting next to us here at the counsel table

22 during the trial, and my job during this opening statement on

23 behalf of Mr. Chamberlain is to talk to you a little bit about

24 what the prosecutors did not tell you.

25     I approach every trial from the defense side, knowing what

1    it was like when I used to be sitting on the government's side

2    where I used to feel like the jurors kind of thought I wore the

3    white hat on the government's side.

4        Now on the defense side I sometimes felt like I had an

5    uphill battle because there was a charge filed, and that charge

6    let's people think that there must be something there, despite

7    the number of times that the judge has -- will instruct you

8    that our clients are innocent unless proven beyond a reasonable

9    doubt.

10       But I know that I have my battle cut out for me, and I

11   can't win that full battle in my opening statement, but what I

12   can do is give you a little bit of an insight into why what the

13   prosecutors are suggesting about Mr. Chamberlain is not

14   accurate.

15       And what I'm going to do at the beginning is lay out about

16   eight bullet points.  Now, different people take notes

17   different styles; you'll do whatever you want to do during the

18   trial.  If you're going to take any notes during my opening, I

19   would suggest you just take notes on these eight bullet points

20   at least for starters so that you can keep track of them.

21       There's a juror with a question, Your Honor.

22           **THE COURT:**  Do you not have a pad?

23           **UNIDENTIFIED JUROR:**  I can't hear you.

24           **MR. LINCENBERG:**  Speak up?  Let me pull the microphone

25   higher.  I'm trying to use this.  Is that better?

OPENING STATEMENT / LINCENBERG

1          **UNIDENTIFIED JUROR:**  Yes.

2          **THE COURT:**  Can you all hear?

3          **MR. LINCENBERG:**  Thank you for letting me know.

4          **THE COURT:**  And thank you very much for doing that.

5    If somebody says something you can't hear, just raise your

6    hand.  Appreciate it.  Thank you.

7          **MR. LINCENBERG:**  Thank you for letting me know.

8        So if you're going to take notes -- and that's up to

9    you -- I would suggest at least jotting down these eight

10   overriding themes that I think are going to be important

11   throughout this trial as you evaluate the evidence as to

12   whether or not it is evidence of proof of my client doing

13   something criminal, as they've alleged.

14       The first point to keep in mind is that Steve did not

15   decide what sales to make.

16       Now, you've heard some evidence that there were different

17   types of software sales to companies called "VARs" or, for

18   short, "resellers" and the government's view that those sales

19   were done near the end of the quarter in order to help meet

20   revenue recognition targets.

21       And you'll see lots of evidence that those sales are valid

22   sales, but what I'm suggesting to you is, it doesn't matter at

23   the end of the day whether you like those sales or not in terms

24   of evaluating my client because Mr. Chamberlain was not a

25   salesman.  He wasn't part of the strategy of whether to sell

 1  hardware, whether to sell something to resellers or not.  He

 2  generally learned about a sale after the sale was completed and

 3  files would be sent to the finance department, to the

 4  accounting group for accounting.  Every so often he'd have a

 5  little input before that if somebody wanted to -- a salesman

 6  had a question about structuring something but, by and large,

 7  he had nothing to do with these sales.

 8       So if the heart or part of the heart of the government's

 9  case is that Autonomy was selling to certain resellers or

10  selling certain hardware in order to increase their revenue to

11  meet targets, whatever the good motive or the bad motive or

12  whatever it is, it has nothing to do with Mr. Chamberlain.

13  He's not the guy who's deciding what sales to make.

14       The second point is that Mr. Chamberlain was not making

15  the final accounting judgments.  Now, was he an accountant?

16  Yes.

17       Did he manage folks in the Cambridge finance team?  Yes.

18       Were there normal transactions, the 90, 95 percent of

19  sales that aren't at issue here where documents came in and

20  they were sent along and there's really no dispute about it and

21  either him or somebody who worked in that office gathered

22  paperwork and sent it on?  Yes.

23       But the deals that the government is going to focus on are

24  those deals where revenue recognition was arguably a closer

25  call.  They've pointed out hardware sales, sales to resellers;

1   ones that they're focusing on.  And where it was particularly a

2   harder call -- and many of these sales involved the exercise of

3   judgment -- those decisions were made at the Autonomy side by

4   the Chief Financial Officer, Shushovan Hussain.

5        Third overriding point:  My client's work was done in

6   realtime.  And this is a real challenge in a trial in 2024 when

7   witnesses are coming into court and they've been interviewed

8   10, 20 times by HP's lawyers, by the prosecutors, and they're

9   putting together this or that or what they later heard and it

10  influences what they have to say.  Mr. Chamberlain didn't have

11  the benefit of any of that in his work.

12       If, on the 1st of January of 2010 some file comes to the

13  finance team and it's their job to gather the evidence for

14  revenue recognition, that's the evidence that is available.

15  Whether some different deal took place six months later,

16  whether nine months later there was a feeling that, you know

17  what, that customer is not paying, that is not information that

18  is available to the accountant at the time.  And you're going

19  to have to compartmentalize some of this testimony and ask

20  yourself as you're listening to it:  What was the realtime

21  information available to Mr. Chamberlain?

22       The fourth point was that Mr. Chamberlain was, at all

23  times, open and honest with the auditors.  Now, this is

24  something which is going to be a part of their case, and the

25  government will contest.  They have to contest it to make their

1   case because on the transactions that they're going to talk

2   about, the auditors approved the transactions.

3       So if you want to claim that somebody was engaged in fraud

4   at Autonomy, you have to say they lied or withheld something

5   from the auditors.  And I would suggest to you that the

6   evidence will show in this regard a couple of things.  First,

7   if there was something that the auditors did not know about

8   that might have been material to them, Mr. Chamberlain didn't

9   know about that.  And I'm going to give you an example of that

10  as we go through our opening statement.

11      There's other times when the government, after their

12  search -- as Mr. Weingarten noted, 10 million emails that they

13  go through, and they're going to find some email and they're

14  going to ask one of the auditors:  Well, if you had seen this

15  email, you know, would that have been relevant to you?

16      And you're going to hear evidence that emails are not what

17  goes into audit files and so forth and so on, and the

18  accounting decisions are based upon the documentation that goes

19  to the finance team and the auditors for the deal.

20      He was always open and honest with the auditors.  And I

21  would suggest to you that as well, the people who worked in his

22  office with him in Cambridge were open and honest in their

23  dealings with the auditors.

24      Next is that the accounting decisions were approved by

25  independent auditors.  And it's really important to keep in

1   mind that these auditors are independent.  They are -- they are

2   obligated to approach accounting revenue recognition decisions

3   with doubt, with skepticism, with the idea that, you know what,

4   that CFO Shushovan Hussain looks like he may be closing this

5   deal for such and such a motive; I'm going to scrutinize it

6   more carefully and make sure that the Is are dotted, the Ts are

7   crossed.  That's their obligation, and they approved all of

8   these decisions at issue.

9       Next you heard some comment in my colleague Mr. Reeves'

10  opening statement about phone calls that Mr. Hussain and

11  Dr. Lynch would have with analysts at the end of each quarter

12  where they talk about this is how the company is doing and

13  stock-market analysts could ask various questions.

14  Mr. Chamberlain never spoke with those analysts.  So I believe

15  the evidence will show that the information that went to those

16  analysts was accurate and honest, to the best of the ability of

17  the folks who were dealing with them, but whether honest or

18  not, has nothing to do with Mr. Chamberlain.

19      Next, you heard that this is a case that, at its core, is

20  a case about Autonomy, Dr. Lynch and selling Autonomy to

21  Hewlett Packard.  And you heard discussion from my colleague

22  Mr. Weingarten that a lot of this conversation took place

23  beginning as early as, I think he said, January of 2011.

24      My client, who was not a part of the core management team,

25  didn't even know about that.  He wasn't -- he didn't learn

OPENING STATEMENT / LINCENBERG

1  about a sale to HP until the sale was essentially agreed to in

2  late July.  And he really made no representations to HP.  He

3  certainly made no misrepresentations.

4       Finally, what the government didn't tell you is sort of

5  the story behind the story of a trial.  And it's kind of hard,

6  frankly, for the defense to bring this out because the

7  government will march into the courtroom witness after witness

8  who is going to be -- and they're going to be pretty polished.

9  These are people who have spent dozens and dozens of hours

10  preparing their testimony in interviews with the FBI and the

11  U.S. Attorney's Office, many of them initially in interviews

12  with the Hewlett Packard attorneys who were interviewing them

13  as they were building their case to claim fraud and try to undo

14  their deal with Dr. Lynch.  And so there's a story there that's

15  important to try to picture and understand because people who

16  come in here and testify feel pressure.

17       There was a name -- Matt Stephan was mentioned as one of

18  the witnesses.  Matt Stephan was somebody who worked in the

19  finance team department, and he's going to be a witness who's

20  going to come into court and provide some testimony favorable

21  to the prosecution in this case.

22       I would suggest to you that what he's going to come into

23  court and say is going to be a very different picture of who

24  Matt Stephan was and what he was saying back at the time he was

25  working at Autonomy.

OPENING STATEMENT / LINCENBERG

1        But what happens when you're a guy who's living in

2   Australia, you happen to be in Washington, DC, and you have the

3   bejesus scared out of you because you learned at a knock on

4   your hotel door that there's FBI agents at the door and they're

5   looking at accounting and:  Mr. Stephan, you can play ball with

6   us or you can have the potential danger of incurring our wrath.

7   And different people respond to pressure in different ways, and

8   we'll get into the particulars of different witnesses, but the

9   story behind the story -- because remember, this case is old.

10  These people have been hammered on for years and years and

11  years and the story behind the story is going to be really

12  important, and it's something that the prosecutors didn't tell

13  you about in their opening statement.

14        You're going to see that my client performed his job in

15  complete good faith.  Now, I don't have the burden of proving

16  that to you, but I will, and the evidence will show that to

17  you.  I don't have the burden of proving that my client is not

18  just not proven guilty but that he's innocent, and I will do

19  that because my client, Steve Chamberlain, is innocent.  He had

20  no intent to defraud anyone, and his good faith will be

21  demonstrated by the time we get to closing statements.  He is

22  an innocent man.

23        Let me take a step back and talk to you a little bit about

24  who Steve Chamberlain is.

25        Steve Chamberlain was born in an industrial town of

1   Birmingham in England.  He was raised by his fine parents,

2   Grenville and Liz, who have flown over here from the United

3   Kingdom to lend their support during his opening statement.

4        Mr. Chamberlain lived in Birmingham until the age of 11

5   when his father Grenville took a job at a scientific

6   instruments company in Cambridge where the senior

7   Mr. Chamberlain worked for the next 40 years.

8        His mother raised Steve and Steve's two sisters while also

9   working as a social worker, and Steve's parents continue to

10  live in the same three-bedroom home where they raised Steve and

11  his two sisters.

12       Steve went back to the University of Birmingham where he

13  got a degree, and he was the first person in his family to ever

14  get a college degree.

15       He married his wife Karen in the green dress who is in the

16  courtroom here, and you will see Karen at different times

17  during the trial.  Karen will not be here for the entire two,

18  three months of this trial because she has a job.  She works in

19  compliance and she does a lot of work for an orphanage and

20  can't spend the entire few months here.  She'll be here as much

21  as she can.  They have two children.  Their children are in

22  their early 20s, and they're back in the United Kingdom.

23       Now, after graduating from the University of Birmingham,

24  Mr. Chamberlain had several different jobs.  I'm not going to

25  discuss every job he had, but there's two primary jobs that are

OPENING STATEMENT / LINCENBERG

1    relevant here.

2        First, he spent about six years working for a big four

3    accounting firm.  The firm later became known as Deloitte.  And

4    you'll recall that's the firm that were the auditors that were

5    auditing Autonomy.

6        And you'll see in this case that a lot of the people who

7    went to the finance -- went to work in finance later at

8    Autonomy came from Deloitte.  And you'll hear from them that

9    when they went to Autonomy, they didn't see anything different

10   from what they had seen at Deloitte and they came to Deloitte

11   because they believed that Steve Chamberlain was an honest,

12   decent man who they had been working with and they wanted to

13   work with in person.

14       Now, today Steve Chamberlain is 51 years old.  He

15   worked -- he's worked at Autonomy from 2005 to 2012.  And since

16   2011, 2012, he has spent the last 12 years caught up as a pawn

17   in a battle between titans, a battle between Hewlett Packard

18   and all the power and money that they brought to the table and

19   Dr. Lynch and he hopes, after this long wait, to be able to

20   clear his good name in this trial.

21       Let's talk about Autonomy's core management team.

22       Now, when I show you this chart, you may recall that my

23   colleague, Mr. Reeves, showed you something similar but a

24   little different.  The top part of the chart was the same, it

25   had Dr. Lynch, Andy Kanter, Shushovan Hussain and Dr. Menell as

 1    the core leaders of this company.  That part is the same.

 2        Below it I have these three gentlemen:  Joel Scott,

 3    Stouffer Egan and Michael Sullivan.  And the reason they're

 4    there is because these were the three individuals who were

 5    basically the leaders of Autonomy in the United States, and

 6    they were the ones who were very involved in making the sales

 7    decisions that are at issue in this case.  Mr. Scott being the

 8    United States-based general counsel and chief operating

 9    officer, Mr. Egan being the US CEO, and Mr. Sullivan being the

10    head of sales.

11        Now, what I want you to focus on here is not so much the

12    titles.  People can have different titles.  I believe that

13    Mr. Reeves mentioned that this person who claims to be a

14    whistleblower, Brent Hogenson, had a title of CFO.  He at one

15    point got the title of United States Chief Financial Officer.

16    He's not on here because he wasn't making the decisions on

17    sales or how to pursue the accounting decisions or providing

18    for the -- to the finance team or to the Deloitte auditors the

19    commercial rationale for the deals and so forth.

20        I also don't have on here the board of directors.  The

21    board of directors are important, they're really relevant to

22    this case, but they're really not the people who were making

23    the decisions that are involved in this case.

24        Now, on the government's slide -- and I'm not sure we can

25    flip to that, but I'd like to just put back up if you're able

 1  to flip it to the government's chart that they had showed.

 2  Yeah.

 3      So you'll notice that in the government's chart -- and

 4  they don't call them the core management team or

 5  decision-makers, but they still wanted to stick Steve

 6  Chamberlain in so that it looked to you like there was this

 7  prominent position.

 8      Now look, he did the work he did and you'll see that work

 9  and you'll review it, but he is not part of the senior

10  management of Autonomy by a long-shot.  His compensation was

11  maybe a 1/100 of Dr. Lynch, maybe 1/30 of Dr. -- of Mr. Hussain

12  or Kanter or Menell, less than Sullivan, Egan, Scott.

13      He earned about 140,000 pounds a year and then he had some

14  bonus that went with that, which -- and he would earn a little

15  more than that, but he wasn't making millions here.

16      And the government also just seems to have willy nilly

17  listed five different people here.  I think maybe they listed

18  because they were going to call them as witnesses, and one of

19  them is Matt Stephan, who, in no way, had any leadership

20  position.  He was a person who, for a while, was in charge of

21  the revenue team.  His testimony is relevant, but it's not the

22  core management team.

23      And if we can go back then to my slides, please.

24      It's important to keep in mind.

25      Now I want to make one other comments about Matt Stephan.

OPENING STATEMENT / LINCENBERG

```
 1        The government, Mr. Reeves, stated to you in his opening
 2   that Matt Stephan left the company when he got too fed-up
 3   justifying Autonomy's deals, at which point he left.
 4   Mr. Reeves said Matt Stephan left the company when he got too
 5   fed-up justifying Autonomy's deals, at which point he left.
 6        I want to put a little checkmark if you're taking notes
 7   and keep that in mind.
 8        Matt Stephan will come into court and he'll testify that
 9   beginning in early 2010, he started having questions about some
10   of these sales and Mr. Chamberlain had questions about some of
11   these sales.
12        These guys are working in Cambridge in a back-office
13   finance team.  They don't know why there's so much effort to
14   close a deal at the end of the quarter.  Frankly, it's not
15   their business, to some degree.  They don't know necessarily
16   why or they may get an explanation of the commercial rationale
17   for hardware sales, but it's not their business.
18        What they know is that when these deals come in that are
19   closer calls that there's going to be a lot more work on their
20   end, all in this jammed three-week period at the end of a
21   quarter.  It's a pain to deal with and it's going to be
22   scrutinized by the auditors and they'll gossip in the back
23   room:  I don't like these deals, whatever, it's a pain, you
24   know, the auditors are pushing, they want to talk to the CFO.
25   That type of conversation happens.
```

1    Matt Stephan, according to Mr. Reeves, left the company in

2    around January, February, 2010, because he got fed-up with it.

3    Let me read to you a couple of emails of Matt Stephan from

4    first -- September of 2010, eight months later.  This is an

5    email to -- he's actually sending it to a woman named Poppy who

6    worked in the finance team, a friend of his who worked in the

7    finance team, and it's a draft email to send to Steve.

8    "Hi, Steve.  I have a proposal for you to consider" --

9    blah, blah, blah, blah -- "I would like you to consider

10   transferring me full-time to San Francisco to run the revenue

11   teams for the group" -- blah, blah, blah, he goes on --

12   "obviously such a change would have an impact on my existing

13   duties in the UK.  Don't worry.  To ensure that you aren't

14   impacted at the quarter end, I'd be happy to come back to the

15   UK for a couple of weeks each quarter once the US books were

16   closed to help us get through the audit."

17   Very different -- Matt Stephan's words eight months

18   later -- very different from the picture that Mr. Reeves

19   mentioned to you.  And I raise that not because it's some big

20   piece of evidence here.  It's because I don't want you to give

21   this benefit that they have the white hat and, therefore, if

22   they're presenting evidence, that must be right; because it's

23   not.  That statement is completely contradicted by the

24   evidence.

25   Mr. Stephan writes another email in February of 2011, and

 1    this is around the time when he's leaving Autonomy, but he's

 2    leaving to move back to Australia.  He's married, there were

 3    marital difficulties, the wife wanted to move back to

 4    Australia, so forth and so on -- you'll hear the story -- and

 5    he writes an email.

 6         February 2011 "I'm sorry to say that I've decided to call

 7    it a day on my time at Autonomy and my time in the UK.  It's

 8    been six good years in the UK, but it feels like the right time

 9    to go home."

10         Writes another email.  "If you'd be interested in

11    accepting my help to smooth the transition, I could work

12    remotely as a contractor from Australia."

13         Two different sides of the coin.

14         So just because you hear something that comes out in the

15    government's case or the prosecution's opening, please keep an

16    open mind and wait until you hear the full story.

17         Now, the government, Mr. Reeves, also mentioned in his

18    opening statement that while Dr. Lynch earned -- I think he

19    said -- $500 million at the sale to Hewlett Packard, he said

20    that Mr. Chamberlain -- it was dollars or pounds, I can't

21    remember -- that Mr. Chamberlain earned 2.5 million.  And not

22    the biggest point in the world.  The idea is, though, that he

23    wants to jazz you up so that you think there's this big motive

24    or something, but what he's saying is not true.

25         And what I put on the board that I quickly pulled out

during the short lunch break was the pay stub, which shows that

when it came to the share options and then you adjust it for

the share options adjusted, there's about 900,000 there.  And

then if you look after taxes, the 900,000 becomes about

466,000, not 2.5 million.  So you'll see this evidence in this

case, but if you were taking a note about that amount during

the prosecutor's opening, I suggest you revisit your pad and

put three question marks next to it until you hear the

evidence.

So let's talk about the finance department for a moment.

Now, I've broken up here on this chart -- or it wasn't my

chart, but there was a chart prepared at some point of nine

different areas of Autonomy:  Sales, legal, operations,

technology, subsidiaries, investor relations, marketing,

research and development, and finance.

Mr. Chamberlain had no role in the first eight.

You heard about Mr. Hussain, who was not only the CFO but

also the head of sales.  Mr. Chamberlain had nothing to do with

sales.

So let's talk about the finance department for a moment.

The finance department was led by Shushovan Hussain.  He had an

office in Cambridge, but he largely worked out of London.

London is about -- I'm going to get this wrong, but I think

it's about 80 miles or so from Cambridge, and Mr. Hussain

generally worked in that headquarter office for Autonomy in

1    London.

2        There was a finance team in Cambridge of which

3    Mr. Chamberlain was in charge of that finance group, and that

4    finance group basically sat in an open floor plan.  He didn't

5    have some big fancy office in the corner, wasn't closed off

6    from anybody.  Basically at different times there may have been

7    eight, ten, twelve people working in that office doing

8    different functions, and they all sat, essentially, on top of

9    each other.

10       And you're going to hear testimony from people who sat at

11   some of the desks I popped out.  I didn't put their names in

12   this because they moved around at different times, but

13   essentially those are the witnesses, people who oversee costs,

14   people who oversaw revenue and the like.

15       And the reason I put this graphic up for you is because

16   this open floor plan was also emblematic of the way they did

17   their accounting work.  They were very open.  They talked back

18   and forth, they'd get up, they'd go over to somebody else's

19   desk, they'd yell across the room; very open, working as a

20   team.

21       And during the audit process when the Deloitte auditors

22   would descend on the offices in Cambridge, the finance team

23   offices, they had open access to this.  They were given a

24   conference room so that they could work privately, but they

25   also had open access and worked around this room.

OPENING STATEMENT / LINCENBERG

 1          And the finance team did their work pursuant to the United

 2    Kingdom's accounting standards or principles that apply to

 3    public companies that are listed on the UK or the FTSE Stock

 4    Exchange.

 5          So you're going to hear all this discussion about GAAP,

 6    the US principles, which are more rules-based, the UK

 7    standards, which had a little bit more judgment and discretion

 8    built into some of the decisions.

 9          All you need to know for right now as you judge

10    Mr. Chamberlain, keep -- understand that he performed his job

11    based upon the only standards that he received education on and

12    that he was a chartered accountant to be able to perform, and

13    he should be judged accordingly under those standards.

14          Now, part of the story behind the story -- the story

15    behind the trial is also that Mr. Chamberlain had on his plate

16    and his team had on their plate a lot of different functions.

17    So while 90 percent of the case or 80 percent is going to be

18    dealing with revenue, that wasn't what the majority of his time

19    was spent on.

20          You see where I wrote integrations?  Mr. Chamberlain, in

21    particular, spent a lot of time when, for example, Autonomy

22    purchased that company Interwoven.  There was a lot of time for

23    him to help manage the accounting side of that integration and

24    work people into the Autonomy ecosphere, and he had to manage

25    the people and there was bookkeeping and costs and taxes and so

 1  forth.  Obviously taxes not at issue here but a big part of the

 2  time that kept Mr. Chamberlain incredibly busy.

 3      Now, there's also another group of accountants, and you'll

 4  hear some witnesses who I've bucketed as regional accountants.

 5  You'll hear some testimony from some folks who worked in

 6  accounting in the United States and the people you're going to

 7  hear from are people who came over from one of the US companies

 8  that Autonomy bought, in particular people who came over from

 9  this company Interwoven, all right?  And we'll get back to

10  them, but I wanted to just show you what the finance team

11  generally looked like.

12      And when you look at and go back to that original point

13  and ask the question who are the accounting decision-makers,

14  the accounting decision-makers at Autonomy, first, second and

15  third, are Shushovan Hussain.  He's the chief financial

16  officer.  And particularly when we're dealing with these areas

17  where there's areas where the auditors are raising questions or

18  where there's questions of judgment and he is -- he is the one

19  who is making those decisions.

20      But no decision is final until it's approved or rejected

21  by Deloitte.

22      Now, Mr. Reeves made a point of saying to you:  Autonomy

23  is responsible for their accounting.  They are responsible for

24  their accounting, but it would be wrong to ignore that their

25  accounting goes nowhere unless it's approved by Deloitte.  So

 1  it's not just Autonomy that's responsible for the accounting.

 2  It's also Deloitte.  If they come back and reject something,

 3  it's not going to go well and it's not going to be what the

 4  final accounting numbers are.

 5       So let's look at Deloitte for a moment.  So Deloitte is

 6  this massive accounting firm and just for Autonomy they had

 7  dozens of people who would be involved.  You had people called

 8  senior auditors who would swarm in for several weeks at the end

 9  of a quarter to do reviews; or, if it was at the end of the

10  year, for an audit, and would be scouring the books and working

11  with the folks in Cambridge.  They had a level above of that of

12  audit managers, they had a global audit manager.  They had a

13  whole level of people -- technical assurance.

14       So, for example, Mr. Reeves mentioned to you this product

15  SPE that was developed by the company and they're going to

16  raise questions about that product and then -- and the

17  accounting relating to it.  Deloitte has a person who has

18  technical capability who can and did meet with the people at

19  Autonomy who are the research or development or

20  chief-technology-officer-type folks who can answer those

21  questions.

22       Mr. Chamberlain can gather information from them and send

23  it on to Deloitte, but he can't answer the technical questions.

24  If there's a question that the auditors have of whether

25  something is a fair value or what the purpose of it is, the

OPENING STATEMENT / LINCENBERG

auditors will give a call to the chief technology officer.  And
it was open book for them to talk to people throughout the
company.  They weren't just confined to deal with the people in
the finance department.

You also have here something called an "engagement quality
assurance partner."  This is because Deloitte, the number one,
two, and three things that are important to them are their
reputation.  It's an organization with integrity, and they have
a partner who's just devoted to looking over the work of others
in their own firm and make sure it's of high quality.

They have somebody called an "independent review partner,"
somebody who has nothing to do with Autonomy but is also going
to look things over to make sure that Deloitte is acting with
independence and professional skepticism.  All these people are
demanding documents, asking questions, reviewing things.

And then you have the most important person, which is the
partner, because things make their way up to the partner and
when there's particular issues that partner, if he has issues
with the company, will generally get ahold of Shushovan Hussain
and test them with Mr. Hussain.

So Deloitte will either approve or reject of a deal and
then there's a whole another layer of review and that next
layer of review is the board of directors.  And as my colleague
mentioned, the board of directors has accountants who are the
top guys in the field to also deal with any questions that the

 1   auditors have, deal with issues and make sure that the

 2   accounting is being performed properly.

 3        Now, if we take a step back and you say:  How does this

 4   impact Mr. Chamberlain who's doing his work in the Cambridge

 5   finance office, when do you work and your CFO says this is a

 6   correct judgment and the auditors approve it and the

 7   independent board approves it, that gives you comfort that the

 8   work that you're doing is proper and that you're performing

 9   your job in good faith.

10        So how do you test for whether or not accounting is being

11   done properly on a sale under IFRS, the UK standards?  There's

12   several factors.  I'm going to highlight three that the

13   government has suggested are issues in their opening statement.

14   The first is transfer of risk.  And transfer of risk basically

15   means that the -- if somebody signs a contract to buy

16   something, are they putting themselves on risk?  They owe that

17   money, there's a contract; in selling it, are they giving up

18   the product.

19        And you look to different things.  The first step is to

20   look at the purchase order or the sales agreement.  And what

21   the finance team will look at and what the auditors will look

22   at first is, is there a measurable amount?  We're paying a

23   dollar for ten widgets.  Okay.  We have a quantity and a price.

24   Are there any side agreements?  If there's a side agreement

25   then risk is not being transferred.  Is there generally

1    exchange of the benefits of risk and reward?

2        Now, one issue that comes up in this case is the fact that

3    Autonomy was selling product and recognizing revenue when they

4    sold it to one of these reseller companies.  We'll use Capax as

5    an example that was mentioned by the prosecutors.  And some

6    people are of the view that if you're selling a product to

7    Capax but it's intended that Capax will resell it to Eli Lily,

8    for example -- big pharmaceutical company out of Indiana --

9    that maybe you should only -- maybe you should only recognize

10   that revenue once it's resold to Eli Lily.  That's not what the

11   law provides for under IFRS.  The law under IFRS says you can

12   legitimately have an accounting policy that says that if you

13   meet the criteria for revenue recognition that when you sell

14   that product to the reseller you recognize it.

15       I put up an example here that is not perfectly analogous,

16   but I know some of this accounting stuff can be dry, and so I

17   wanted to at least have a little fun with this.

18       Take a farmer who sells potatoes to McDonald's.  Now,

19   McDonald's wants to turn those potatoes into French fries and

20   resell them to an end-user, a person who comes in and is a

21   customer.  But whether or not McDonald's sells those French

22   fries or throws them out or the like, the sale under IFRS can

23   be properly recognized when the farmer sells the potatoes to

24   McDonald's.

25       Now, the government discusses a little bit here that

OPENING STATEMENT / LINCENBERG

 1   Mr. Hussain had a motive for selling to these resellers just to

 2   hit revenue targets at the end of the quarter.  And you'll hear

 3   a lot of testimony about that.  A point that I want you to keep

 4   in mind at this point is that Mr. Hussain's motive or a

 5   salesman's motive is not really a factor that the finance team

 6   takes into account under IFRS.

 7       There's no motive factor that says:  You know what, on

 8   December 26th Macy's is going to lower the price of sweatpants

 9   by 50 percent and some guy in the accounting department says,

10   "Why are they doing that?  They could get a hundred dollars

11   instead of $50 for these sweatpants."

12       That's not the role of people in finance.  It's the role

13   of people in sales or at the head of the company, whoever is

14   making those strategic decisions.

15       The second factor is delivery.  Now, the delivery means

16   that you have to release control of the product.  If you're

17   dealing with software, this is easy.  Company pushes a button

18   and the software licenses are sent over to the customer.

19       Mr. Reeves brings it up in the context of hardware.  In

20   hardware you have to prove that there was delivery of the

21   product within the quarter in order to recognize the revenue.

22   And you'll see that delivery can be defined many different

23   ways.  Delivery can be when it leaves your warehouse or it can

24   be when it arrives at the customer's warehouse or it can be

25   after the customer signs off that I've inspected the hardware

1  that has come in and been delivered or it can be in a warehouse

2  where there's a consignment arrangement, all sorts of different

3  things that come down to whatever the contract says, but that's

4  one of the factors.

5      And the third is collectibility, and collectibility is a

6  question of whether or not, in your judgment, it's more likely

7  than not that the customer is going to pay.  So all of these

8  factors are done, an accounting decision is made and then it's

9  reviewed by Deloitte.  And you'll see deal after deal where

10 this process takes place, Deloitte does their review and they

11 approve of the accounting for the sale.

12     So what I'm next going to do is take you through a couple

13 of sample deals and I'm going to use these deals as samples so

14 you have a little bit of an idea of what the finance team is

15 actually doing on a basis.

16     So let's use an example of a sale of software in the

17 fourth quarter of 2009 to Capax.  Now, the government has two

18 problems with this sale and the accounting in their 20/20

19 hindsight analysis.  The first is, they say there was no

20 transfer of risk because there was a side agreement between the

21 salesman and the guy at Capax.  And the second is, they say

22 this wasn't really collectable.  There wasn't sufficient

23 evidence that Capax had the money, could afford to pay it.  And

24 they go one step further, they say in order to help with

25 collectibility that that was the reason why Autonomy had also

 1    bought services from Capax.

 2        You recall Mr. Reeves said that Capax was a company that

 3    provided support services, maintenance, and things like that to

 4    service the people who buy Autonomy's product.

 5        So let's go through and I have a picture of an orange file

 6    because there were actually orange files that the paperwork was

 7    kept in, in the Cambridge office.

 8        So let's first talk about transfer of risk.  First thing

 9    you do is you look at the sales agreement and the sales

10    agreement states in it specifically that "This agreement sets

11    forth a complete and exclusive agreement . .  no alterations,

12    modifications or additions to this agreement shall be valid

13    unless made in writing."

14        So the contract is the primary piece of evidence that says

15    that this is the written agreement and the only agreement that

16    governs this sale, and it says that there cannot be any side

17    agreements.

18        The next thing you have is verification.  The auditors

19    don't just look at the purchase order or the contract.  They

20    want an independent confirmation letter from the customer.  So

21    in this case that I have on the screen you have Capax sending

22    an audit confirmation letter to Deloitte that there are no side

23    letters or other agreements.  That's the evidence that goes to

24    Mr. Chamberlain or the people in his finance team who are

25    dealing with this sale.

OPENING STATEMENT / LINCENBERG

 1          But the government says there's another thing that took

 2   place.  They said there were side conversations between a guy

 3   named John Baiocco who is going to testify later this week, I

 4   believe, who worked for Capax and Stouffer Egan, a salesman at

 5   Autonomy.  And you're going to have these guys come in and say:

 6   You know what, I, Stouffer Egan, talked to Baiocco and he

 7   agreed to sign the agreement but I told him don't worry, we're

 8   not going to make you -- leave but holding the bag if you can't

 9   pay.

10          And the government says that's a side agreement.  That's

11   an oral agreement which undercuts that first factor of transfer

12   of risk.

13          Now, let's put aside for today whether it really is a side

14   agreement or whether six months later somebody going to a

15   customer and say:  Hey, I'll work with you, I'm not going to

16   make pay for it until you get the money in is really a side

17   agreement doesn't matter to me.

18          What matters to me and Mr. Chamberlain is it that this is

19   concealed from Mr. Chamberlain.

20          Egan and Baiocco are not telling Mr. Chamberlain of their

21   oral side conversations.  And it's concealed, by the way, not

22   just from Steve Chamberlain, it's concealed from the whole

23   finance team in Cambridge.

24          Chamberlain is, himself, not necessarily involved in all

25   of this.  Sometimes it's the person in charge of the revenue

 1   team, a Matt Stephan or other people who took over that

 2   function.

 3         And in fact, it has to be concealed for Mr. Chamberlain if

 4   Egan wants to accomplish his goal if his goal is to get this

 5   sale recognized so he can earn his commission or whatever the

 6   motive is.  If there was an oral side agreement and he told the

 7   finance team, it won't get approved.  So when the auditor later

 8   comes in and the government says Mr. Welham -- Mr. Deloitte,

 9   had you known that there was an oral side agreement would you

10   have still recognized the revenue on this or approved it, he

11   would say no, that would have been material to me.

12         Well, ladies and gentlemen, guess what?  That also would

13   have been material to Steve Chamberlain.

14         And the reseller's actions corroborate what is obvious,

15   that the finance team in Cambridge did not know about whatever

16   oral conversations took place.

17         And you see that in various emails.  I've pulled one to

18   give you an example of it.

19         Here's this guy John Baiocco writing to one of his

20   colleagues in December of 2009.  It says, hey I'm getting

21   harassed by Chamberlain, meaning the collections folks at

22   Autonomy are calling Capax to pay money that they owe that is

23   past due.

24         Now, why would Chamberlain be harassing him if he knew

25   they didn't really have to pay this money?  He's harassing him

OPENING STATEMENT / LINCENBERG

 1  because there's an agreement, it's an agreement in writing.  He

 2  doesn't know whatever he and Egan may have talked about, and

 3  Capax owes the money.  He says I don't know what to tell.

 4  According to him, we owe you around 6 million, and he's getting

 5  nervous.  That's the type of reseller action that slows that

 6  Mr. Chamberlain is not in on whatever agreement, oral or not,

 7  that they may have going on with Mr. Egan.  It was concealed

 8  from my client.

 9       So the second aspect of that Capax sale that the

10  government challenges is that the money really wasn't

11  collectible.

12       Now, finance's job is to go out and gather evidence

13  regarding collectibility.  Remember that's one of the factors

14  that has to be satisfied under IFRS in order for revenue to be

15  recognized.

16       And here's an example of what takes place.  I use an

17  example that my client's name is on.  In January of 2010, he

18  writes an email -- and here he's emailing with Egan, who's the

19  salesman and Hussain who is his boss -- about Capax history and

20  collectibility because one thing you do is, you look at the

21  history of payments from Capax.  And what's interesting in here

22  is he says, "This is what we need to meet collectibility.  We

23  need to show that Capax can pay $8 million next quarter even if

24  they don't get paid by Eli Lily."

25       So the idea was Capax was taking on this risk because they

1  believed that they could resell the license to Eli Lily.

2  Chamberlain is saying, hey, you've got to show -- we have to

3  show collectibility whether or not they ever get paid by Eli

4  Lily.  That's the way the finance team approached their job.

5       So the next thing that the government does, or the next

6  thing that we see happen is, Deloitte reviews all of the

7  evidence in that orange folder, they ask whatever questions

8  they have.  If there's an issue that they want to raise with

9  the CFO Hussain, they do so, and they find that -- they

10  conclude that the deal is recoverable.

11       These are audit work papers.  Audit work papers will be

12  one of the types of documents you see a lot of in this case,

13  and they approved the deal.

14       Now, the government goes one step further.  They say that

15  ah ha, but the only way you made it collectable is you had this

16  little thing where you had these fake invoices to buy services

17  from Capax, so you're sending them the money so they can send

18  them back.  That doesn't meet the test of collectibility.

19       Now, let me take a step back first and say it is not

20  unusual for companies to buy and sell with each other.  It's

21  not at all unusual in the technology world for a company like

22  Autonomy that sells certain software to also purchase services

23  or maintenance help from these resellers.  That's what they're

24  sort of in the business to do, these resellers, they're

25  software sometimes, these resellers.

OPENING STATEMENT / LINCENBERG

 1    And the other thing to note is as this is coming in is,

 2  there's others in the finance department who are primarily

 3  involved in reviewing this work.  But let's go through this

 4  particular example just to run through one of these software

 5  sales.

 6    So Autonomy contracts with Capax to pay money to Capax for

 7  Capax to provide support services.

 8    Remember what Mr. Weingarten mentioned to you, that in

 9  2009 we're coming out of a recession.  The Wall Street banks

10  are getting hit with a lot of litigation and there's this need

11  for Autonomy to be able to not only sell their product but

12  provide the support services.  And the powers that be at

13  Autonomy decide that it would be helpful to bring in a

14  contractor to assist with that.  Okay?  That's fine.

15    And in realtime in 2009, you have one of the salesmen who

16  is dealing with Capax here, and he is advising that we have a

17  legitimate contract with Capax and Capax is performing the work

18  that they're supposed to be performing and that's the

19  information that makes its way to the finance team.  Again,

20  that has to be the information that makes its way to the

21  finance team if the people who are doing this -- this is a

22  caricature of one of the witnesses, Mr. Sullivan -- if they're

23  going to accomplish their goals.

24    But out of the other side of his mouth, Mr. Sullivan is

25  going to come into court in 2024 and we expect that he's going

1  to say Capax was never performing this work.

2      Again, you can decide whether Capax was or was performing

3  the work, what the true purpose of the contract was, what the

4  value of it was.  I think they'll show that the evidence is

5  convincing that there was a need for the Capax services, but it

6  has nothing to do with Mr. Chamberlain.

7      The finance team is informed that this is a real contract

8  for services and the work is being performed.  So the fact that

9  in 2020 hindsight somebody can come into the courtroom and talk

10 to you and say:  Hey guys on the jury, work wasn't really being

11 performed, that doesn't help you decide what was in my client's

12 state of mind.  You have to decide based upon the evidence in

13 realtime what was told to him in January of 2010, and this part

14 on the right side was concealed from the finance team.

15     So let's fast forward about six months from the sample

16 Capax-Eli Lily deal and talk about Mr. Hogenson.  So

17 Mr. Hogenson, you'll recall, is this accountant in the United

18 States.  And Mr. Hogenson had come out of Interwoven and he had

19 been doing all of his accounting under US GAAP accounting

20 standards and they had certain issues on how they recognized a

21 sale.  So, for example, I think that Mr. Hogenson is going to

22 say that even when we sold to a reseller, we only recognized

23 the revenue if there was a contract at least in place to sell

24 it on to an end user.  Fine.  That's what he was used to and

25 that's a more conservative approach.

1        Now, in early 2010, the former Interwoven accountants such

2   as Mr. Hogenson, are now working for Autonomy.  And at Autonomy

3   they're now seeing this and saying, wow, that's not the way we

4   do did it or whatever in this integration process and they're

5   raising questions.  And Mr. Hogenson raises questions and first

6   he sends a letter to the CEO Dr. Lynch.  And in the letter he

7   raises questions about a few different deals.  And with regard

8   to Capax, the sale that I talk about just to play it through,

9   with regard to that deal, he basically says "If Deloitte

10  reviews the Capax-Lily files and they can answer these nine

11  different questions I have and say that it was properly

12  recorded, I would consider this issue closed."  Makes sense.

13  This is new to him.  He wants to make sure that Deloitte has

14  reviewed it because it's not his job to deal with the auditors

15  and if he doesn't want to just trust Mr. Chamberlain or Hussain

16  or whoever that this is all getting to Deloitte or it's just

17  very different for him and he wants to raise the questions,

18  fine, raise them.  So he raises them and Deloitte reviews them

19  and Deloitte brings in another group of independent people to

20  join the folks who are reviewing Mr. Hogenson's allegations

21  because from Deloitte's point of view this is serious.

22        This is a whistleblower dealing with accounting issues

23  that we, Deloitte, have signed off on and we're going to dig in

24  and not just accept this and rereview it.

25        And they prepare a report to the board of directors of

1   Autonomy dealing with it and they note, first, that with regard

2   to this Capax-Lily deal that back when it was audited in

3   January of 2010, we concurred that it was appropriate to

4   recognize revenue.  We've now investigated it again.  We've

5   looked at all of these different questions that have been

6   raised by Mr. Hogenson and we come to the same conclusion even

7   under heightened scrutiny.  "The determination of the revenue

8   recognition on the Capax sale is . . . consistent with what our

9   understanding was at the time," and they again approve the

10  transaction.  And this was for several transactions that were

11  raised by Mr. Hogenson, some dealing with purchases from

12  customers, some deal with revenue accruals, some deal with

13  sales to resellers.  I gave you the -- in detail the example of

14  Capax-Lily, but they did this review of several different

15  questions that Mr. Hogenson had raised and they approved it

16  initially and they reapproved it again.

17       Now, take a step back and say what is the importance of

18  this with regard to Mr. Chamberlain and his state of mind?  So

19  we had that these transactions were initially approved by the

20  chief financial officer and Deloitte and the board if it got to

21  the board.  Now it's being investigated under this heightened

22  scrutiny and accounting work that his team has been involved

23  with has been challenged by Mr. Hogenson.  And after that

24  challenge, the auditors say all of this accounting is good.

25  That, again, provides comfort to Mr. Chamberlain that he's

1    performing his job in good faith.

2         If Deloitte had come back and said:  You know what, I

3    agree with Hogenson's questions, I think there's a real issue

4    here and we're not going to recognize revenue on resellers'

5    deals anymore or whatever the other issue might have been, that

6    would have been a very different story and the accounting would

7    have continued very different, but my client, who doesn't have

8    the ability -- and it's not his job to challenge what sales the

9    salesmen and management are making or their strategy, he just

10   does the accounting work -- is comforted that even the work of

11   Dr. Lynch and the strategy that he has envisioned and the sales

12   team is something that is being reviewed and rereviewed.  He is

13   acting in good faith.

14        What's also important here is that we're now operating

15   under double heightened scrutiny because now you have --

16   there's a -- there's a new partner.  Deloitte changes their

17   partners.  There's a new partner, an independent -- who --

18   named Mr. Mercer who's now overseeing the team and they've gone

19   through these deals for several quarters on reseller sales and

20   on hardware sales and they've scrutinized them and they've

21   either approved or disapproved and frankly sometimes they

22   comment and say we're approving this but I don't know if we'll

23   approve it next time because whatever, it's a close call on

24   collectibility or whatever the issue might be.  Heightened

25   scrutiny.

OPENING STATEMENT / LINCENBERG

 1     And that takes us to the next reseller deal, the second

 2   reseller deal that I want to discuss with you.  And I want to

 3   discuss it because the government raised it in their opening

 4   statement and this is a fourth quarter 2010 sale, a large sale

 5   to three resellers.

 6     So the background is this:  Autonomy had a big customer,

 7   Bank of America.  They had been selling I think tens of

 8   millions of dollars' worth of product to Bank of America over

 9   the prior couple of years and they were in a negotiation to

10   sell about $20 million worth of product to Bank of America in

11   December of 2010.  That sale didn't conclude by the end of 2010

12   so the folks involved -- again, at a much different and higher

13   level than Mr. Chamberlain -- decide we want to recognize the

14   revenue in 2010 and there's three resellers who are willing to

15   take on the risk of purchasing this product because they

16   believe it's going to be resold to Bank of America.  In fact --

17   in fact, a deal does end up getting concluded with Bank of

18   America, but it didn't get concluded until a month or so later.

19     Three different resellers.  Why three resellers?

20   Apparently because $20 million is a lot of money and if

21   somebody is going to be on risk, you have three different

22   companies, it's less of a risk to each of those companies;

23   whatever their reasoning is.  This is not Mr. Chamberlain who's

24   making these decisions.  And there's a complex series of events

25   and then paperwork gets sent over to the finance team to deal

1    with this and determine whether the deal should be recognized.

2        And to complicate it even more, there's an amendment.  So

3    a deal is concluded on December 31st or so, but in January

4    there's an amendment and the amendment is to add three and a

5    half million dollars to the DiscoverTech portion of that deal,

6    DiscoverTech being one of the resellers that was buying part of

7    it.

8        Now, this is open and known and it results in what's

9    called a "consolidation adjustment," which is one of these

10   esoteric accounting terms.  But what it really means to us is

11   triple heightened scrutiny because when there's a consolidation

12   adjustment there, that's one of those flags and a signal to the

13   auditors to look at it even more extensively and there's

14   lawyers involved in preparing these documents in January

15   relating to a sale that had concluded in December of 2010.

16       Let me repeat that last part that I said because

17   Mr. Reeves in his opening wants to suggest that my client is

18   impermissibly involved in the backdating of this $3.5 million

19   adjustment.

20       There are lawyers involved, the people who are doing the

21   contract, such as Joel Scott, his team a guy named Livius

22   Guaio.  The lawyers, the guys who provide legal advice, the

23   guys who work on the contracts, they're preparing this

24   documentation.  And here's an example of an email from Livius

25   Guaio, one of the lawyers, dealing with this -- dealing with

 1    the preparation of the documentation.

 2         And then the question is:  All right.  Well, is this

 3    concealed from Deloitte?  And the prosecutors want you to

 4    believe that it was.

 5         And I would suggest to you that the evidence will be very

 6    clear that Deloitte knew exactly what's going on because they

 7    have what's called "Outstanding items lists" throughout the --

 8    after the end of the quarter.  And when you get to January 5th

 9    and then January 10th and then January 15th, you know, you're

10    starting at the point where you should have all the

11    documentation.

12         Here it's not until January 26th that there's signed

13    documentation to Deloitte.  And here you see, for example, a

14    January 25th email that is sent by somebody, Antonia Anderson,

15    who at the time was at Deloitte and involves a whole bunch of

16    Deloitte people.  And they're talking about this outstanding

17    list -- Can we go through it at some point? -- this is on

18    January 25th.  Items are on the list are -- when are we going

19    to get the documentation covering -- they used to call it the

20    B of A deal rather than the reseller deal, which is the way

21    they used to refer to them.  And you see a discussion, "This is

22    what we need, supporting documentation for this consolidation

23    adjustment, $3.5 million." And they approve the amendment and

24    you see a back and forth going on within Deloitte.

25         So here you see, for example, on January 28th, Lee Welham

discussing it.  Lee Welham was one of those audit managers in
that chart and he's discussing it with a guy four levels above
him, the audit partner, Nigel Mercer, and he's saying, "The
3.5 million is the increase in the B of A deal that went
through as a consolidation adjustment."

All of this is openly disclosed and is obvious to Deloitte
during this period of time, and Deloitte ends up approving the
deal despite all of this evidence because they review it and I
think if you look at their audit work paper they say, all
right, well, there's evidence that there was an agreement
reached in December, there was a consolidation adjustment.
They looked and they said it's also pretty clear that Bank of
America is going to close the deal.  In their minds that
impacted on the question of collectibility, and they approved
of the deal.

So that's evidence that the government didn't tell you.
They didn't tell you that there are lawyers involved in this.
They didn't tell you about all the back and forth with Deloitte
as they're gathering all of this documentation, and they didn't
tell you that all of this was done in this period of, like,
triple heightened scrutiny, because this is a deal -- it's a
lot of money with three different resellers and the like.

And if you take a step back and again ask:  How does that
play on the mind of my client, this deal, which Deloitte might
have decided not to approve but they approved it and they

1  approved it and Mr. Chamberlain was comforted by the decisions

2  that his boss and Deloitte are making, and there's lawyers

3  involved, that they're saying it's okay.

4      Let me turn now to hardware and talk a little bit about

5  hardware.  I know I've been talking for a while.  I know this

6  is not cops-and-robbers-type stuff, and I really greatly

7  appreciate your right trying to stay with me.  I'm not going

8  through the 30 deals or anything that are at issue here, but I

9  want to give you a sample because, whether boring or not, this

10  was the life of my client from where he sat in Cambridge,

11  England, and I think it's important to give you a preview of

12  this.

13      So with regard to hardware, there's a couple of issues

14  that the government's raised, and I'm going to deal with the

15  two primary ones they mentioned impacting my client.

16      One is -- falls under cost accounting.  And by cost

17  accounting, as opposed to revenue accounting, it's are you

18  accounting for the cost of your transaction properly.

19      So if we go back to my McDonald's example, let's say

20  McDonald's, with their happy meals, gives away a little toy to

21  a little kid in the hope that they can sell another Big Mac.

22  How do you account for the cost of McDonald's in buying those

23  little plastic toys?  Well, you could say it's a cost of goods

24  sold and it should be accounted for as a cost of goods sold.

25      You could also say, well, they're spending this money,

 1  it's a loss, they're not making any money on the toy itself,

 2  but it's part of their marketing budget, they're trying to sell

 3  more hamburgers; or you could say it should be some of both.

 4  And this was the issue that the finance team had to deal with

 5  when it came to sales of hardware.

 6      So the first thing to keep in mind is -- as you're judging

 7  my client, remember, he works under these principles that are

 8  set forth in England called "IFRS," and there's really no

 9  guidance at the time that was provided to the accountants for

10  determining whether part of this cost should be under cost of

11  goods sold or part of it should be under sales and marketing.

12      So the first thing that they do is they say all right,

13  well, what's the purpose?  And he can't determine the purpose

14  but management advises of the marketing purpose and the finance

15  team and Deloitte are generally advised that hey, you know, we,

16  Autonomy, have these really big customers, J.P. Morgan, Morgan

17  Stanley, Bank of America, and we're operating in a really

18  competitive marketplace and anything we can do to embed

19  ourselves deeper with these companies, get them more hooked

20  into us and buying from us, it's worth -- it's worth a little

21  marketing work.

22      They say if we can sell some hardware at a loss, maybe

23  down the road -- as we've now seen -- the world develops and

24  everything is now bundled together.  You have software, maybe

25  it gets bundled with hardware, whatever the thinking is of the

strategist.  Makes a lot of sense.  The rationale for doing so

makes sense that some of these costs would be under sales and

marketing.

    And, in fact, that's what the accounting folks come to a

conclusion at Autonomy that we're going to say that some of the

costs of the buying of the hardware and reselling at a loss,

some of that cost should be attributed to cost of goods sold

and some to sales and marketing.

    Ultimately, it's the CFO who makes the decision on this.

Ultimately, it's the Deloitte accounting firm that reviews it.

    Now, Mr. Reeves, in his opening statement, stated, quote,

"Defendants came up with a sophisticated way to hide the costs

of hardware sales on its balance sheet.  Defendants came up

with a sophisticated way to hide the costs of hardware sales on

its balance sheet."

    So let's look at what the evidence shows because if what

he's saying is true then what that means is, they hid it from

Deloitte.  They didn't tell Deloitte that they were going to

put some of that cost in sales and marketing, right?  If you're

hiding it and Deloitte's signing off on financial statements

and so forth, that's got to be what's going on.

    The problem is the answer is wrong.  That's not what was

done.  It was all openly disclosed to Deloitte.  In fact, there

were a whole series of conversations at several different times

between the Richard Knights, for example, was the audit

OPENING STATEMENT / LINCENBERG

 1  partner, the guy at the top of that big chart of all these

 2  Deloitte auditors, he's discussing it in this case with the CFO

 3  and the CEO and he's saying, you know, there's three potential

 4  landing areas here.  Remember, no IFRS guidance.  We're trying

 5  to make a judgment call.  We can either say it's cost of goods

 6  sold, we can say it's sales and marketing or we can say it's

 7  something in the middle.  On this occasion they reviewed it and

 8  they decided that it should be something in the middle.  Should

 9  be X percentage to marketing, Y percentage to cost of goods

10  sold.

11       And actually, six months later, Deloitte came back and

12  said, you know what, we're not going to accept your

13  recommendation and we're going to lower the percentage that

14  goes to sales and marketing and increase cost of goods sold.

15  Not what Autonomy wanted, but that's what they did.  They

16  rejected the Autonomy position, and that's where it ended up.

17       But overall what you'll see is all of the audit work

18  papers relating to these decisions where Deloitte reviews the

19  split of costs and in this case we consider the transaction to

20  be fairly stated.

21       If we go back to Mr. Reeves' statement, hidden?  It's

22  right out there in the open.  It's in all of the audit work

23  papers.  That's the only place my client comes into play.  He's

24  not even involved at the high-level meetings between the audit

25  partner and others, but the work that the finance department is

1    doing is being sent over to audit -- to the auditors.

2         So there's a second issue that the prosecutor mentioned in

3    his opening, and it dealt with delivery.  And in his opening

4    statement Mr. Reeves referred to deals where there was, quote,

5    pretend delivery.  And he said that Mr. Chamberlain was

6    involved in preparing false documents that were presented to

7    Deloitte to fabricate delivery of EMC hardware in the second

8    quarter of 2009.

9         Ladies and gentlemen, the evidence will show that that

10   statement is not accurate.  What the evidence will show is that

11   Steve received, in early July, information that came straight

12   from the customer dealing with delivery.  And he didn't edit it

13   or anything, he forwarded it on.  So I'm going to race through

14   a few of these, but you'll see emails that are between Cynthia

15   Watkins and the person at Morgan Stanley with this order

16   number, and it all matches up.  It gets to Mr. Chamberlain and

17   he forwards it to Lee Welham at Deloitte.  The evidence of the

18   delivery to Morgan Stanley.

19        Now, if they want to challenge whether delivery took place

20   or not, take your best shot, but it had nothing to do with my

21   client.  My client is passing on the evidence that he receives.

22        Moreover, what we see in the record is that as part of

23   this, Deloitte was scrutinizing this transaction and they went

24   to Mr. Hussain because Mr. Hussain was basically indicating

25   that the evidence of delivery is complicated.  And you're going

 1    to see evidence of delivery can be complicated.  Every day

 2    there's new -- there's a million different little invoices for

 3    a mouse or a laptop or whatever that's coming in at different

 4    times -- and the number changes from day to day based on what's

 5    been delivered -- and they wanted as a backstop, the CFO of

 6    Autonomy, the decision-maker, to sign what we call a management

 7    representation letter, which Mr. Hussain did with respect to

 8    this transaction.  Deloitte reviewed it and made their

 9    determination.

10        Now, one last point in connection with these deals.  I've

11    emphasized to you that I'd like you to pay attention to what my

12    client's role was in this case and the fact that these

13    accounting decisions are made by the CFO and they're going to

14    try to stuff something down my shirt by asking some guy -- so

15    Mr. Chamberlain made this decision? -- because 90 percent of

16    these deals, you know, they aren't really at issue in this

17    case.  It's just, you know, paperwork's in, a lot of it's in

18    months ahead of time.  I'm talking about these reseller deals

19    and the hardware sales that are at issue in this case.

20        And you'll see that there were times, in fact, when

21    Mr. Chamberlain even got frustrated by -- by the paperwork

22    that's coming in last minute because a lot of these deals are

23    closed at the end of the quarter.  And that's not an indictment

24    of the people who are making the strategy to come up with a

25    sale.  It's not an indictment of anybody particularly in the

OPENING STATEMENT / LINCENBERG

1    software business but in a lot of businesses.  The end of the

2    quarter is when sales are done.

3         You know, you hear about how Macy's sells some high

4    percentage of their inventory during the Christmas time period,

5    for example.  Well, customers know that they're going to get

6    the best deal near the end of a quarter because companies want

7    to lock in revenue for the quarter, and so they get sales and

8    negotiate and the like, but it does make the job of all the

9    folks sitting in Cambridge, Steve Chamberlain, Lisa Harris,

10   Poppy Prentice, Matt Stephan, the people working with them,

11   exasperated because all of a sudden it's now January 1 and

12   you're getting all of this new documentation you have to deal

13   with for the next several weeks, you got all these auditors in

14   your office; and when it comes to delivery, numbers are

15   changing and when a number changes it's not just that it

16   changes and what's recognized, but it offsets from what is

17   deferred and all of these complicated accounting decisions that

18   make me happy that I never went into accounting.  And you see

19   some frustration from time to time.

20        Here Mr. Chamberlain is noting to his team:  I'm sorry,

21   the numbers are coming in; powers greater than me are making

22   these decisions -- "powers greater than me" being the

23   decision-maker, the CFO -- and I understand it's going to be

24   causing you a lot of pain -- because they're working nights and

25   weekends in these first couple of weeks after the end of the

OPENING STATEMENT / LINCENBERG

1  quarter -- and, guys, I recognize it; I'm going to push hard

2  for you to get more bonuses for your hard work and the like.

3  That's where he fits in to this picture.

4       Now we finally get to what I think is the heart of this

5  case, which is this sale to HP.  And you'll recall those first

6  eight bullet points I mentioned to you, one of them was that

7  Steve Chamberlain made no representations to HP; not just no

8  misrepresentations, no representations.  Never spoke to them

9  about the sale.  He wasn't in on the negotiations.  He wasn't

10  even told that the sale occurred until it was agreed to.  But

11  the government wants to tag him and bring him into this and

12  there's one little area that they popped something up on the

13  screen during the opening statement, so I'm going to address

14  it, and that had to do with this due diligence period.

15       So let's try and take ourselves back 13 years, it's July

16  27th of 2011.  Shushovan Hussain says:  Hey, Steve, guess what,

17  we're selling the company, blah, blah, blah, blah, for the next

18  couple of weeks there's going to be some due diligence that

19  we're going to be dealing with HP.

20       And one of the things that happens during this due

21  diligence period is that the CFO, Hussain, asks Mr. Chamberlain

22  for a list of the top 40 customers.

23       Now, I want you to go back, I'm going to test your memory.

24  What did Mr. Reeves say about this?  What he said was that

25  Autonomy and Steve Chamberlain went out of their way to give HP

OPENING STATEMENT / LINCENBERG

 1    the wrong answer.  Mr. Reeves' words -- I'm going to state them

 2    again at closing argument -- "Autonomy and Steve Chamberlain

 3    went out of their way to give HP the wrong answer."

 4        Ladies and gentlemen, I don't care how many people they

 5    call from HP, you're going to hear a couple people say, yeah,

 6    Steve may have been on a call or two.  You're not going to hear

 7    one of them say that they made a request of Steve Chamberlain

 8    for any list of customers.

 9        The evidence is going to be that Mr. Hussain made a

10    request of Steve Chamberlain.  And when he requested a list of

11    the top 40 customers, Mr. Chamberlain responded to his boss and

12    he gave a list of the top 40 customers, software, hardware,

13    everything.  He responded exactly with what his boss had asked

14    him for.  The government neglected to mention that.

15        Then what happens is Mr. Hussain asks him for another

16    list.  He says give me a list of our top software customers.

17        Now, the government wants to conflate this because it's

18    their argument that Hussain sent to HP only the software

19    company's customers to somehow conceal the hardware customers.

20    It's nonsense.  HP had the information.  But it had nothing to

21    do with Mr. Chamberlain.  He's just responding to another

22    request for his boss.

23        So the boss comes back, give me the software customers.

24    Not surprising that a hardware company like HP that is now

25    looking to go into the software business might also want a

1 breakout of who the software big customers are.

2      Whatever it is, Mr. Chamberlain is not involved.  He's

3 just responding to his boss's request.  And when he sends him

4 back that list, he makes clear these are software -- these are

5 the software customers, licensed sales and maintenance hosted.

6 That's all software talk.  No representations, much less

7 misrepresentations made by my client to HP.

8      Ladies and gentlemen, proof in a criminal case requires

9 evidence and it requires credible evidence.  It requires

10 evidence that would withstand not just the professional

11 skepticism that an auditor might apply to a company, it

12 requires more skepticism than that because people walk into

13 this room innocent -- just as innocent as I am or you are --

14 unless and until that type of proof is offered.  It can't just

15 be assumptions.

16      It cannot be the case that a prosecutor can come in and

17 talk about something when it's divorced from what my client was

18 responding to.  You can't just accept idle statements in a

19 vacuum unless there's real evidence beyond a reasonable doubt.

20      And this is a unique case also because it's so old.  So

21 people are coming into this room in 2024 and talking to you

22 about some meeting or conversation they had on March 18th of

23 2009.  Some of you are 28, 29, 30 years old.  What were you

24 doing on March 18th of 2009?  Do you remember?

25      Instead what you're going to see are people who are

OPENING STATEMENT / LINCENBERG

1   programmed and who are reading emails.  It sort of becomes

2   trial by email.  They don't have the context but they're just

3   reading emails because those are words on paper and it's harder

4   to dispute because you see it visually, but this is what we're

5   dealing with.  We're dealing with something that is 15 years

6   old, and these little nuances which can make or break the most

7   important decision that's going to be rendered in my client's

8   life to date, and that's why there's such a high burden of

9   proof.

10      At the end of the day, I'm confident that you will learn

11  the truth, which is that Steve Chamberlain performed his job in

12  good faith throughout his time at Autonomy.  He is an innocent

13  man, not simply somebody who the government is going to fail to

14  prove guilty.  He is an innocent man.  And I believe that when

15  you hear all of the evidence that's the judgment you will make

16  because that is the only judgment that on the facts of this

17  case the evidence will compel or that justice will allow.

18  Thank you.

19          **THE COURT:**  Okay.  Ladies and gentlemen.  We'll take a

20  recess now, 15 minutes.  Remember the admonition given to you.

21  Don't discuss the case, allow anyone to discuss it with you,

22  form or express any opinion.  Recess.

23          (Recess taken at 2:30 p.m.)

24          (Proceedings resumed at 2:45 p.m.)

25          **THE COURT:**  Bring in the jury.

1       (Proceedings heard in the presence of the jury:)

2           THE COURT:  Please be seated.  Let the record reflect

3   all jurors are present, parties are present.

4       You may call your first witness.

5           MR. LEACH:  Thank you, Your Honor.

6       United States calls Ganesh Vaidyanathan.

7           THE CLERK:  Please raise your right hand.

8           (Witness sworn.)

9           THE WITNESS:  I do.

10          THE CLERK:  Thank you.

11      Please state your full name for the record and spell your

12  last name.

13          THE WITNESS:  Ganesh Vaidyanathan,

14  V-A-I-D-Y-A-N-A-T-H-A-N.

15                  <u>GANESH VAIDYANATHAN</u>,

16  called as a witness for the Plaintiff, having been duly sworn,

17  testified as follows:

18                  <u>DIRECT EXAMINATION</u>

19  BY MR. LEACH:

20  Q.   Good afternoon, sir.  Where do you work?

21  A.   I work for a company called Cloud Software Group.

22  Q.   What do you do at Cloud Software Group?

23  A.   I'm the chief accounting officer.

24  Q.   The chief accounting officer?

25  A.   That's correct.

VAIDYANATHAN - DIRECT / LEACH

1  Q.   Okay.  Are you familiar with a company called Autonomy?

2  A.   Yes.

3  Q.   Did you work in the finance department of Autonomy from

4  approximately 2009 to 2012?

5  A.   Yes.

6  Q.   Were you located in the United States or in the United

7  Kingdom?

8  A.   United States.

9  Q.   Okay.  Would you tell us a little bit about your

10 educational background, please.

11 A.   I'm a chartered accountant from India, and I worked for

12 about five years with -- five plus years with Pricewaterhouse

13 in India.  Post that I worked another five years with KPMG,

14 again in India.  And then I also have an ICWA, which is a cost

15 and accountants -- cost and management accountant background,

16 so I have that degree as well.

17      And then after that I worked for HP in India, again,

18 before I joined a company called Interwoven in the U.S.  And

19 after that with Autonomy and then with TIPCO, which then

20 became --

21 Q.   Thank you.  Let me try to break that down a little bit, if

22 I could.

23      You said you're a chartered accountant.  What is that?

24 A.   A chartered accountant is a CPA equivalent out of India.

25 Q.   Okay.  And so you hold a license in India?

VAIDYANATHAN - DIRECT / LEACH

1   **A.**    Yes.

2   **Q.**    And you made a reference to something called a CPA.

3   What's that?

4   **A.**    It's a certified public accountant in the US.  I don't

5   hold that degree, but it's an equivalent to it.

6   **Q.**    And what do you have to do to be a chartered accountant?

7   **A.**    You've got to -- it's complicated.  It's -- you've got to

8   be a graduate and you've got to do -- undergo three years of

9   articleship training and give about 16 exams across a variety

10  of topics from accounting to law to audit to basically earn the

11  degree.  And at the time when I passed it was about 1 or 2 of

12  the total candidates appearing for the exam who passed the

13  exam.

14  **Q.**    Mr. Vaidyanathan, we have a court reporter who's taking

15  down everything we say, and so we need to make sure we're not

16  speaking over each other and we're talking slowly and

17  deliberately so we can have a good record.

18  **A.**    Okay.

19  **Q.**    You also said you worked for something or two firms called

20  PWC and KPMG.  What are those?

21  **A.**    PWC is Pricewaterhouse Coopers.  They are one of the big

22  four accounting firms, and so is KPMG.  They go only by their

23  initials these days.  They used to be called differently, now

24  they only use their initials.

25  **Q.**    Are the other two big four Ernst & Young and Deloitte?

VAIDYANATHAN - DIRECT / LEACH

1    A.    That's correct.

2    Q.    And do you remain a chartered accountant today?

3    A.    Yes.

4    Q.    You testified that you worked for HP at some point in

5    time --

6    A.    Yes.

7    Q.    -- before Interwoven?

8    A.    Yes.

9    Q.    Was that roughly in the early 2000 time period?

10   A.    Yes from 2004 to 2006.

11   Q.    And that was in India?

12   A.    That is correct.

13   Q.    And did you join a company called Interwoven in or about

14   2006?

15   A.    Yes.

16   Q.    What was Interwoven?

17   A.    Interwoven was a web content and document management

18   software company based in the US.  It was listed on the NASDAQ

19   at that time and I joined the Indian arm because the -- because

20   I didn't have a work visa to work in the US.  Subsequently on

21   obtaining my visa I came back to the US in 2008 and that's when

22   I joined the US accounting team.

23   Q.    So did I hear you immigrated to the United States --

24   A.    Yes.

25   Q.    -- in or about 2008?

UNITED STATES COURT REPORTERS

1  **A.**   That is correct.

2  **Q.**   Okay.  And you said Interwoven was in the business of web

3  content management.  What types of products did Interwoven have

4  and what did -- what terms did they go by?

5  **A.**   Yeah.  One of the -- they had two major classes of

6  software.  One was called TeamSite.  TeamSite was the original

7  software product that was used in web content management

8  developing intranets, websites, managing the content on that.

9  That was the purpose of that product.

10       WorkSite was the other one.  WorkSite was document

11  management.  It was like Documentum or like Work -- SharePoint,

12  if you will, for Microsoft.  That is a compatible product, but

13  it was very similar to that.

14  **Q.**   And did Interwoven have a product called iManage?

15  **A.**   Yes, which is the WorkSite product.  That is the brand

16  name it went by.

17  **Q.**   And what did you do for Interwoven in or around the 2008

18  time period?  What was your role?

19  **A.**   Yeah.  I was a corporate accounting manager for

20  Interwoven.

21  **Q.**   And what did you do as a corporate accounting manager?

22  **A.**   So I was responsible for the monthly and quarterly close

23  program.  I was responsible for the quarterly financial

24  statements, interacting with the auditors, making sure I

25  responded to audit comments, writing memos supporting the

1    company's position and helping to close the audit as well as

2    quarterly and annual financial statements.

3    Q.    And did I hear you correctly, Interwoven was a public

4    company at the time?

5    A.    Yes.

6    Q.    What does that mean to be a public company?

7    A.    The shares are listed -- of that company would be listed

8    on a stock exchange.  In the case of Interwoven it was the

9    NASDAQ, so it's available for trading in the market and others

10   can purchase and buy and sell shares of that company.

11   Q.    In or around 2009 was Interwoven acquired?

12   A.    Yes.

13   Q.    Who was Interwoven acquired by?

14   A.    Autonomy.

15   Q.    And did you go to work for Autonomy at some point after

16   the Interwoven acquisition?

17   A.    Yes.

18   Q.    Okay.  And did you continue to work for Autonomy up

19   through the acquisition of Autonomy by HP in or around October

20   of 2011?

21   A.    Yes.

22   Q.    You left HP and when did you leave HP?

23   A.    I left HP somewhere I think it's April 2012.

24   Q.    And today you are the chief accounting officer for Cloud

25   Software Group?

1   **A.**   Yes.

2   **Q.**   What are your duties as the chief accounting officer for

3   Cloud Software Group?

4   **A.**   It's pretty much responsibility -- the responsibility is

5   for the entire accounting function of the group with the

6   exception of taxes and financial planning analysis, pretty much

7   the entire accounting function, whether it's payroll, AP,

8   accounting operations.

9           (Reporter seeks clarification.)

10          **THE WITNESS:**  Whether it's accounts payable or

11  accounts receivable or general ledger operations or accounting

12  operations or technical accounting, all that was available.

13  **BY MR. LEACH:**

14  **Q.**   And is Cloud Software Group a public company?

15  **A.**   No, it is not.  It was formed by the combination of TIPCO

16  and Citrix.  Citrix was a publicly-traded company until

17  September 2022 until TIPCO acquired Citrix in a transaction.

18  **Q.**   Do you continue to have engagement with Cloud Software

19  Group's outside auditors in your role as the chief accounting

20  officer?

21  **A.**   That is correct.

22  **Q.**   Okay.  I want to draw your attention to the time period

23  shortly after Autonomy's acquisition of Interwoven in or around

24  2009.

25          In that time period, sir, where were you working?  Where,

1   physically, were you?

2   **A.**   This was -- timeframe again?

3   **Q.**   2009, please.

4   **A.**   2009 I was working in the San Jose office, out of the

5   San Jose office.

6   **Q.**   And what was your title in 2009 after the Autonomy

7   acquisition?

8   **A.**   It was accounting manager and it was supposed to be

9   controller for Interwoven, but that didn't essentially come

10  through.  But eventually, subsequently I got the title of

11  director of accounting.

12  **Q.**   You subsequently became the director of accounting?

13  **A.**   Correct.

14  **Q.**   Okay.  And who were some of the individuals you worked

15  with within Interwoven shortly after the Autonomy acquisition?

16  **A.**   The erstwhile management -- finance management team of

17  Interwoven was more or less retained, so I worked with Brent

18  Hogenson, who was the -- who was the VP of finance for

19  Interwoven, subsequently became the CFO of Americas for the

20  combined Autonomy Group.

21      And then I worked with Percy Tejada -- he was responsible

22  for revenue for Interwoven, subsequently became the revenue --

23  responsibility for revenue for the entire Autonomy Group -- and

24  then with Reena and then with Glenn Fong.

25      Reena was the head of collections for Interwoven,

1  subsequently ended up heading collections for the Autonomy

2  Group as well as Glenn Fong was responsible for renewals.  So

3  these were the key people I worked with, all of them excellent

4  work.

5  **Q.**  Okay.  Let me break that down a little bit.  You mentioned

6  someone named Brent Hogenson?

7  **A.**  Yes.

8  **Q.**  And he was the CFO of the Americas?

9  **A.**  Yes.

10  **Q.**  What did that mean?

11  **A.**  So he had ultimate responsibility for finance across the

12  Americas for the entire Autonomy Group.

13  **Q.**  And when you say the "entire Autonomy Group," does that

14  mean more than just Interwoven?

15  **A.**  Yes.  So we had -- we had a few group companies.  One was

16  Autonomy, Inc.  This was the original company that Autonomy set

17  up when they came into the US, plus there were a few other

18  companies called Verity.  That was another acquisition that

19  Autonomy purchased subsequently.  There was a company called

20  Zantaz -- Zantaz, Inc.  That was based out of Pleasanton here,

21  again, in the Bay Area.

22      And then there was a company called ETAK that was based

23  out of Texas, if I remember correctly, and those were the

24  primary companies that I'm aware of.  There were a few others,

25  but they were -- didn't have too much in terms of financial

VAIDYANATHAN - DIRECT / LEACH

 1    assets or liabilities.

 2    Q.    You mentioned a company called Verity.  That was an

 3    acquisition by Autonomy before you arrived?

 4    A.    Yeah.

 5    Q.    And what was the primary product associated with Verity?

 6    A.    It escapes me at this point.

 7    Q.    Okay.  That's fine.

 8          You are also mentioned a company called Zantaz out of

 9    Pleasanton.

10    A.    Yeah.

11    Q.    What was the nature of the Zantaz business?

12    A.    So that was into archiving solutions, so it was archiving

13    and storing emails and other data for key financial

14    statement -- key financial institutions like banks and other

15    such institutions doing compliance as well as other work, so

16    more or less keeping -- call it storage solutions, digital

17    storage solutions for those flag -- industry.

18    Q.    Are you familiar with the term DigitalSafe?

19    A.    Yes.  That is a flagship product for Zantaz.

20    Q.    A flagship product for Zantaz?

21    A.    That is correct.

22    Q.    Okay.  So when Mr. Hogenson becomes the CFO of Americas in

23    or around this 2009, 2010 time period, he assumed

24    responsibility not just for Interwoven but for these other

25    entities, Autonomy, Inc., Verity, Zantaz?

VAIDYANATHAN - DIRECT / LEACH

1    **A.**    Yes.

2    **Q.**    Okay.  You mentioned someone named Percy Tejada, and

3    Mr. Tejada was in charge of revenue?

4    **A.**    Yes.

5    **Q.**    And like Mr. Hogenson after the Interwoven acquisition did

6    that begin to extend to other Autonomy companies like Autonomy,

7    Inc. --

8    **A.**    Yeah.

9    **Q.**    -- Verity and Zantaz?

10    **A.**    Yeah.

11    **Q.**    Okay.

12    **A.**    That is correct.

13    **Q.**    You also mentioned someone named Reena.  Is that Reena

14    Prasad?

15    **A.**    Yes.

16    **Q.**    Okay.  And was she someone you had worked with at

17    Interwoven?

18    **A.**    Yes.

19    **Q.**    And she was responsible for collections?

20    **A.**    Yes.

21    **Q.**    What does that mean?

22    **A.**    So collections involves getting the receipt -- getting

23    money from the accounts receivable accounts, if you will, so it

24    involved calling up the customers with respect to invoice

25    copies, asking them for payments, asking them for -- for timely

VAIDYANATHAN - DIRECT / LEACH

1  payments.  Sometimes they'll be delayed.  Send reminders for

2  payments so on and so forth and my job was to basically collect

3  the cash that was outstanding from the accounts receivable.

4  Q.  After the acquisition of Interwoven in or around 2009, did

5  you become familiar with someone named Steve Chamberlain?

6  A.  Yes.

7  Q.  Who was Mr. Chamberlain?

8  A.  Mr. Chamberlain was the VP of finance at Autonomy based

9  out of the UK.

10  Q.  And how did you interact with Mr. Chamberlain?  What was

11  your relationship?

12  A.  Well, Mr. Chamberlain was -- he was a frequent visitor to

13  the US.  We used to have conversations pretty regularly.  We

14  spoke sometimes on a weekly basis.  We traded several emails,

15  so the relationship was pretty -- pretty direct.

16  Q.  Okay.  You said Mr. Chamberlain would come to the United

17  States?

18  A.  Yes.

19  Q.  Tell us about that.

20  A.  So every quarter if not more frequently he would come in.

21  This was -- the intent was to basically have a discussion about

22  whatever the operations were in the US and talk about problems

23  if any, issues if any, identify any -- anything that needed to

24  be fixed, so essentially more of an operational sort of trip

25  where he would meet with pretty much most of the stakeholders,

VAIDYANATHAN - DIRECT / LEACH

1  whether it's finance, whether it was sales and others, he would

2  meet with most stakeholders; more of a trip that was undertaken

3  to understand the operations of the US.

4  **Q.**   And this is would happen three or four times a year,

5  in-person meetings --

6  **A.**   Yes.

7  **Q.**   -- with Mr. Chamberlain?

8  **A.**   Yes.

9  **Q.**   Here in the United States?

10  **A.**   That is correct.

11  **Q.**   Okay.  And did you -- I think I heard you say you had

12  phone and email interactions with Mr. Chamberlain?

13  **A.**   Yes.

14  **Q.**   Was that on a regular basis?

15  **A.**   Yes.

16  **Q.**   And did that continue all the way up through 2011?

17  **A.**   Yes.

18  **Q.**   Are you familiar with the name Shushovan Hussain?

19  **A.**   Yes.

20  **Q.**   Who is Mr. Hussain?

21  **A.**   Mr. Hussain was the CFO for Autonomy on a worldwide basis,

22  so he is also based out of the UK and, you know, he would visit

23  the US too from time to time.  I met him I think at least twice

24  in the US.

25  **Q.**   How regularly would Mr. Hussain come to the United States?

VAIDYANATHAN - DIRECT / LEACH

1  **A.**   I thought he was here at least every quarter, but I could

2  be wrong on that.  I have seen him personally at least twice in

3  the US.

4  **Q.**   And do you know the name Michael Lynch?

5  **A.**   Yes.

6  **Q.**   Who is Dr. Lynch?

7  **A.**   Dr. Lynch was the CFO -- CEO, sorry, of Autonomy and he

8  was based in the UK.

9  **Q.**   And was your interaction with Dr. Lynch significantly more

10  limited than your interactions with Mr. Chamber?

11  **A.**   Absolutely.

12  **Q.**   I want to draw your attention, Mr. Vaidyanathan, to the

13  time period the first quarter of 2010 so roughly a year after

14  the acquisition of Interwoven and if you could give us please a

15  high sense of what you were doing in your role as director of

16  accounting in that time period?

17  **A.**   Yeah.  So one of the things that we had -- we as in as a

18  group working with Brent who had wanted to do was looking at

19  the financial statements of each and every entity that we had

20  recently inherited, and the intent was to basically come up

21  with a list of accounting issues with a list of items that we

22  could raise to Steve and the rest of the team in the UK with an

23  intent of trying to make sure that we address those issues

24  because we knew that Autonomy was listed in the UK and the

25  intent was to make sure we address all the issues as quickly as

 1  we possibly can with an intent to sort of solve it before it
 2  became an issue -- bigger issue in the future.
 3  **Q.**   Why did you want to come up with a list of accounting
 4  issues?  Explain that.
 5  **A.**   So typically when you take over a company and you start
 6  looking at financial statements of that company the first -- at
 7  least the first statement of affairs and the first thing you
 8  should do is basically go back and looking at the various
 9  financial statement captions one by one with a view of
10  understanding them as to what is the frequency, is there
11  anything special about them, should we take more -- more care
12  or less care on certain financial statement components as the
13  need may be.  So that was Intent No. 1.
14       Intent No. 2 was to basically see if there was anything
15  that was causing a problem whether with -- that might affect
16  the financial statements of the company as a whole from -- that
17  existed in the financial statements at that point in time, so
18  with an idea of fixing it.
19       And the third was to look at the financial statements as a
20  whole trying to see if there's anything else that are not
21  issues currently but would become issues in the future and so
22  you would basically go back and study and ferret out those
23  issues as well so you have a laundry list of issues to
24  basically focus on.  That way you drive the business of the
25  company as well as keeping financial discipline.

VAIDYANATHAN - DIRECT / LEACH

1    So that was the three-prong sort of approach that we took

2    in order to -- and this is what I think anybody would do to --

3    in order to stop afresh at any company.

4    Q.    And when you say "start afresh," you were very familiar

5    with Interwoven, and so you're looking at Zantaz and Verity and

6    Autonomy, Inc., and the other Autonomy companies that you had

7    no irresponsible for before?

8    A.    That's correct.

9    Q.    Okay.  And generating this list of accounting issues, that

10   was your goal?

11   A.    That was my goal; that was Brent's goal.  He had asked all

12   of us to basically go back and look at issues because we

13   brought up issues one-by-one when we started getting some of

14   these financial captions, and so he basically told us to say

15   okay, you know what, I can't handle all these issues

16   one-by-one, why don't you go back, look at your individual

17   areas, come back with a list and then I incorporated them into

18   a master list and we discussed that with the UK.

19   Q.    When did this effort to generate a list of accounting

20   issues begin?

21   A.    We started -- I think the timeline is a little hazy right

22   now, but I think the moment we got the responsibility of the

23   entire group I think it was somewhere in the March timeframe of

24   2010 -- I could be wrong there, but generally around that time

25   period is when we started.  And the idea was by the time, you

VAIDYANATHAN - DIRECT / LEACH

```
 1    know, Steve comes in on his next visit, we present him with
 2    a -- with a laundry list of items that we have either fixed, we
 3    are going to fix or we think are potential issues that we need
 4    to solve.
 5    Q.   I'm going to come back to this list of accounting issues,
 6    but I'd like to first direct your attention to some documents
 7    from the March and April or the April time period of 2010.  And
 8    if we could draw the witness's attention to what we've marked
 9    as Exhibit 3308.
10         THE COURT:  3308 admitted.
11         (Trial Exhibit 3308 received in evidence)
12    BY MR. LEACH:
13    Q.   Mr. Vaidyanathan, we've placed before you Exhibit 3308.
14         MR. LEACH:  And, if we could, just briefly zoom into
15    the top portion of the email on the first page.
16    BY MR. LEACH:
17    Q.   There's an email titled "Credit hunt," and it's from
18    Shushovan Hussain to Steve Chamberlain and Brent Hogenson.  Do
19    you see that?
20    A.   Yes.
21    Q.   Were you familiar with this term "Credit hunt"?
22    A.   Yes.  It was a -- it was a quarterly sort of a duty that
23    we did to basically go back and look at the financial
24    statements to make sure whether -- if we had any credits --
25    accruals on the balance sheet that we could potentially release
```

VAIDYANATHAN - DIRECT / LEACH

 1   if they were no longer needed.

 2   **Q.**    Let me ask a slightly different question.  Were you

 3   familiar with this term "Credit hunt" before your days at

 4   Autonomy?

 5   **A.**    No.

 6   **Q.**    And how did that term strike you, was there anything

 7   unusual about it?

 8   **A.**    Yeah.  Typically one would basically look at both sides of

 9   the balance sheet.  One would look at the assets side of the

10   balance sheet to see if there are any assets that no longer

11   require -- are no longer required, should be written off or

12   provided for that side.

13       Similarly you'd look at the liability side too.  So under

14   normal circumstances you would refer to that as a balance sheet

15   cleanup.  You would not refer to that as a credit hunt.

16   **Q.**    How do you distinguish this balance sheet cleanup from the

17   credit hunt you were asked to do at Autonomy?  Help me

18   understand that.

19   **A.**    So typically when you look at the balance sheet you have

20   the asset side as well as the liability side.  And on the asset

21   side, you would potentially look at the assets and say, hey, is

22   there a -- is there a particular asset that does not -- is

23   not -- is not appearing at its rightful value?  So you would

24   take a provision on that -- on that particular asset.  So that

25   would be a negative to the P&L.

VAIDYANATHAN - DIRECT / LEACH

1           Similarly, you would look at any sort of AR that requires

2      provisioning.  If it's not collectible, then potentially you

3      would reserve for that AR and things of that nature.  So you'd

4      look at that.  That would be on the asset side.

5           And on the liability side what you would do is you would

6      do something very similar.  You would look at all the accruals

7      you had made previously, whether those were for the right

8      number or whether those have already been paid so they are no

9      longer required, they need to be divest.  So you would do both

10     and you would not just do one.

11     **Q.**   You've used some accounting terms, sir, that I just want

12     to make sure we're all on the same page for.

13          AR, is that accounts receivable?

14     **A.**   Yes.

15     **Q.**   And what is that?

16     **A.**   Accounts receivable refers to the sum that is paid --

17     payable by the customers when you invoice them for goods and

18     services that are deliverable to them.

19     **Q.**   And you used the term "accrual."  What does that mean?

20     **A.**   Accrual refers to the act of booking an expense for a

21     particular service or goods that have been received for which

22     the renderer hasn't sent you invoices yet.

23     **Q.**   And you testified that this credit hunt that you were

24     asked to participate in was focused on credits on the balance

25     sheet and not another portion of the balance sheet?

**UNITED STATES COURT REPORTERS**

VAIDYANATHAN - DIRECT / LEACH

1   A.    Yes.

2   Q.    Was that unusual to you?

3   A.    Well, typically you would not see it referred to that way.

4   You would see it referred to as a balance sheet cleanup.  So

5   what we would have normally done is you would say, hey, here

6   are the assets that you need to write off or provide for, here

7   is the accruals that you need to kind of sort of release and

8   you would net the two or put them in their respective

9   geographies where they belong to, and that's what you would do,

10  just looking for one side of the balance sheet was all.

11  Q.    Did this credit hunt that Mr. Hussain asked you to

12  participate in seem unduly focused on one particular area?

13  A.    Yeah.  It appeared to be focused only on the liability

14  side of the balance sheet, not on the asset side.

15  Q.    And was that common, in your experience, at other public

16  companies?

17  A.    No.  Typically you would not be asked to -- looking at --

18  you would not be asked to look at one side of the balance

19  sheet.  You would be asked to look at the financial statements

20  as a whole.

21  Q.    Did it feel like Autonomy was only looking for the good

22  things and not the bad things?

23  A.    It felt like that.

24  Q.    Thank you.

25        Let me now direct your attention to Exhibit 3307.

1          **THE COURT:**  3307 admitted.

2          (Trial Exhibit 3307 received in evidence)

3          **MR. LEACH:**  Thank you, Your Honor.

4      And this is another -- if we could zoom into the top,

5  Mr. Hasan.

6  **BY MR. LEACH:**

7  **Q.**  The subject of this email, Mr. Vaidyanathan, is "Need

8  savings."  Do you see that?

9  **A.**  Yes.

10 **Q.**  And it's from someone named Cynthia Watkins.  Who is

11 Cynthia Watkins?

12 **A.**  Cynthia Watkins was the controller at Autonomy, Inc.

13 **Q.**  Okay.  And was she somebody you had worked with at

14 Interwoven?

15 **A.**  No.  She was a peer.

16 **Q.**  A peer who had come from the -- from Autonomy before you

17 arrived?

18 **A.**  That's correct.

19 **Q.**  Okay.  And this time period, April 11th, 2010, is that

20 time meaningful for your work in connection with the financial

21 statements of Autonomy?

22 **A.**  Yes, because I -- that was the time maybe I had started to

23 look for the -- we had resumed group responsibilities I think

24 and then that's when we were starting to look at documents for

25 the rest of the group companies and starting to sort of iron

 1  out our areas overall.

 2          MR. LEACH:  Thank you.  And last document in this

 3  chain if we could please look at Exhibit 3308 just for the

 4  witness only.

 5          THE COURT:  Sorry, which one?

 6          MR. LEACH:  3308.

 7          THE COURT:  That's in already.

 8          MR. LEACH:  Oh, I'm sorry.

 9          THE COURT:  3308, 3307.

10          MR. LEACH:  Yes.  Thank you, Your Honor.  Thank you.

11  BY MR. LEACH:

12  Q.   Let me move forward in time, Mr. Vaidyanathan, to the

13  second quarter of 2010 and ask you some questions about a

14  company called MicroLink.  Are you familiar with a company

15  called MicroLink?

16  A.   Yes.

17  Q.   What was MicroLink?

18  A.   MicroLink was a distributor for Autonomy products, and it

19  had extensive dealings with Autonomy at that point in time.

20  Q.   Was this a company you were familiar with before you got

21  to Autonomy?

22  A.   No.

23  Q.   And when you say a distributor, were they a reseller?

24  A.   Yes.

25  Q.   Okay.  And what is a reseller?

1    **A.**    A reseller is a person who basically doesn't -- who

2    basically takes somebody else's product and resells it to the

3    end customer.

4    **Q.**    And how did you learn about MicroLink?

5    **A.**    MicroLink was one of the -- I mean, we had been told that

6    they were a reseller of Autonomy products, so that was one.

7        The second was they had receivables in the financial

8    statements that were due, so that was obviously another area

9    that I knew about them.

10        And the third was they typically would have dealings with

11    Autonomy to its last week of the quarter, which is what most

12    typical software companies would have at that point in time.

13    Your last -- last week of the quarter is your heaviest, so they

14    would have last of dealings with Autonomy at that point in

15    time.

16    **Q.**    When you say MicroLink had receivables, were those

17    receivables owed to Autonomy?

18    **A.**    Yes, that is correct.

19    **Q.**    Okay.  And in or around this time period, the second

20    quarter of 2010, did you learn that MicroLink owed a

21    significant amount of money to Autonomy?

22    **A.**    Yes.

23    **Q.**    And did you also learn that Autonomy had acquired

24    MicroLink for approximately $55 million?

25    **A.**    Yes.

VAIDYANATHAN - DIRECT / LEACH

1  Q.   Okay.  Let me draw your attention -- and was part --

2  strike that.

3       Was part your responsibilities as director of accounting

4  to essentially bring MicroLink's books into Autonomy Inc.'s

5  books?

6  A.   Yes.

7  Q.   Let me draw your attention to Exhibit 816.

8            THE COURT:  816 admitted.

9            (Trial Exhibit 816 received in evidence)

10           MR. LEACH:  And you can display that, Mr. Hasan.

11      If we could initially zoom into the top portion of this,

12  please, Mr. Hasan.

13 BY MR. LEACH:

14 Q.   This appears to be an email dated May 18th, 2010, from

15 Lisa Harris to you and someone named Ken Wong.  Who is

16 Ms. Harris?

17 A.   Ms. Harris was the -- I'm forgetting her title, but she

18 was the group chief accountant based out of the UK for

19 Autonomy.

20 Q.   Where was she based?

21 A.   In the UK.

22 Q.   Okay.  And in the CC line there's someone named Alan Rizek

23 and Poppy Prentice.  Who are they?

24 A.   Poppy Prentice was based out of the UK as well.  She

25 worked with Lisa and the UK team, UK accounting team.  Alan

VAIDYANATHAN - DIRECT / LEACH

1  was -- if I remember correctly, he was the controller for

2  MicroLink.

3  Q.   There's a subject line "AR posting in Autonomy, Inc.

4  books."  Do you see that?

5  A.   Yes.

6  Q.   Okay.  Is this email part of the effort to bring

7  MicroLink's books into Autonomy's books after the acquisition?

8  A.   Yes.

9        MR. LEACH:  If we could scroll down, please,

10 Mr. Hasan, and zoom in -- oh, no, no, no.  Same page, please,

11 page 1, and zoom in on the first -- the "Hi gentlemen" and all

12 the way down to the third line.

13      That will do.  Thank you.

14 BY MR. LEACH:

15 Q.   Ms. Harris is writing "Hi, gentlemen.  I need you to post

16 dummy cash as per the attached in Autonomy Inc.'s AR - the

17 other side of the entry needs to go to Inc.'s interco with NA

18 Holdings."

19      There's some accounting terminology here Mr. Vaidyanathan

20 that I want to make sure we understand.  What is -- AR is

21 accounts receivable; is that what you understood?

22 A.   That's correct.

23 Q.   "Inc.'s interco," is that a reference to Autonomy Inc.'s

24 intercompany accounts?

25 A.   That's correct.

VAIDYANATHAN - DIRECT / LEACH

1    Q.    And NA Holdings, what's that?

2    A.    That's the holding company in the UK.  That was probably

3    that intercompany there.

4    Q.    And Ms. Harris wrote to you "I need to you post dummy cash

5    as per the attached."  What is dummy cash?

6    A.    Well, the idea was to basically -- when you consolidate

7    two entities together, you typically eliminate, you know,

8    assets and liabilities as well as the receivables, payables,

9    you also eliminate costs and revenues, so that is part of the

10   consolidation process.  The idea is not to enrich yourself at

11   the expense of yourself, right?

12        So in this particular scenario it appeared to me at that

13   point in time that there was some receivable transaction,

14   obviously MicroLink owed Autonomy, Inc.  There was some

15   adjustment that needed to be done at holding-company level, and

16   so we were offsetting the AR to -- and moving the AR to

17   intercompany at the holding-company level.

18   Q.    Was this essentially an effort to write off the debts that

19   MicroLink owed to Autonomy?

20   A.    That's what it seemed.  It appeared as though that they

21   had some other sort of detail probably at a holding level,

22   which it was going to be offset with.  Typically you would not

23   see this, but that's what it appeared to me at least.

24   Q.    What do you mean typically you would not see this?

25   A.    So typically you would have AR, you would have -- you

VAIDYANATHAN - DIRECT / LEACH

 1    would have AR on one side.  One side owes the other, so from

 2    one side you will have accounts receivable, on the other side

 3    you will have accounts payable and those will be knocked off in

 4    the region in which they are currently existing.

 5        It appeared to me that this was going through the holding

 6    company, so -- and they were doing consolidations there, so the

 7    idea was maybe they could gain offset there.  Typically you

 8    would see it at the US level, but since the consolidation was

 9    being done at the "whole core" level, I thought they were

10    trying to do it at that level there.  That's why it was moving

11    through intercompany.

12        So typically you would offset AR as well as AP, you would

13    not move it through intercompany.

14            (Reporter seeks clarification.)

15        **THE WITNESS:**  You would not offset it.  You would

16    offset it in the US, you would offset the AR with the AP.  You

17    would not move it through intercompany.

18    **BY MR. LEACH:**

19    **Q.**   Was this concerning to you?

20    **A.**   It was interesting because I did not -- the -- because I

21    was not aware of the consolidation that was going on in the --

22    in the UK, so it was hard to guess.

23        This is not the way we would do it normally.  This is not

24    the way I have seen it done normally, but --

25            **MR. LEACH:**  Let me look -- if we could look at the

 1   attachment, please, Mr. Hasan, the Excel file that's attached.

 2   And if we could look -- zoom in on the top left portion, maybe

 3   the first four or five rows.  That's good.

 4   **BY MR. LEACH:**

 5   **Q.**   There's a heading or there's some numbers at the top in

 6   column K and column L.  Do you see that --

 7   **A.**   Yes.

 8   **Q.**   -- sir?

 9         The 24,717,000 -- the $24 million number, what is that and

10   what is the $15 million number in parentheses?

11   **A.**   So the 24 million -- again, I'm going off memory -- it

12   appears that the 24 million number is the total of the entire

13   receivable from MicroLink that has individual sort of customer

14   names and user names, if you will, associated with that and

15   then this entry was clearing off a portion of that -- of that

16   number.  That's the 15 million.  That's the dummy cash entry

17   that you see in column M.

18   **Q.**   So at this time period MicroLink owed $24 million to

19   Autonomy, and Autonomy is writing off approximately $16

20   million.  Is that what it appears to you?

21   **A.**   Yes.  Yes.

22   **Q.**   Okay.  There's a line with -- or a column with the

23   headings "Cust, Cust Name, Sales Rep, VAR name."  Do you see

24   that?

25   **A.**   Yes.

1  **Q.**   The customer name, so MicroLink is the customer to

2  Autonomy; am I reading that correctly?

3  **A.**   Yes.

4  **Q.**   And if there's a VAR name, that is essentially the company

5  MicroLink is purporting to sell Autonomy software to?

6  **A.**   Yeah.  That would be the end-user.

7  **Q.**   Okay.  And so for row 5 it lists MicroLink.  Does that

8  indicate to you that MicroLink is the end user for that amount?

9  **A.**   Yes.

10  **Q.**   Okay.  And that amount is approximately $6.875 million?

11  **A.**   Correct.

12  **Q.**   And so in row 6, there's a VAR named U.S. Air Force.  Do

13  you see that?

14  **A.**   Yes.

15  **Q.**   And further to the right there's post dummy cash of

16  $410,000?

17  **A.**   Yes.

18  **Q.**   Is that essentially a direction to write off that amount

19  on Autonomy's books?

20  **A.**   Yes.

21  **Q.**   Let me go back to -- you testified earlier about a list of

22  accounting issues that you --

23         **MR. LEACH:**  You can take this down, Mr. Hasan.  Thank

24  you.

25  \\\

1    BY MR. LEACH:

2    Q.    -- that you were working on with Mr. Hogenson and other

3    part of your team.

4         Let me first direct your attention to Exhibit 3314.

5              THE COURT:  3314 admitted.

6              (Trial Exhibit 3314 received in evidence)

7    BY MR. LEACH:

8    Q.    Do you recognize this, Mr. Vaidyanathan?

9    A.    Yes, I do.

10   Q.    What is this?

11   A.    So this was a list of issues that I sent over to Brent

12   back in the day.  These were issues that we had determined

13   based on our review of the financial statements at that point

14   in time.

15             MR. LEACH:  And if we could zoom in, Mr. Hasan, to the

16   first half of the document.

17   BY MR. LEACH:

18   Q.    Do you see the date of May 26, 2010?

19   A.    Yes.

20   Q.    Okay.  And you wrote "Per your request, here's the summary

21   of the various payroll issues that we found on the Autonomy

22   payroll since we transmitted [sic] the payroll from Lourdes to

23   Kerrie on May 3rd, 2010."  Do you see that?

24   A.    Yes.

25   Q.    And these payroll issues that you're identifying, did

VAIDYANATHAN - DIRECT / LEACH

1  those relate to Interwoven or did they relate to other Autonomy

2  companies that Autonomy had well before the Interwoven

3  acquisition?

4  A.    They were relating to Autonomy companies prior to the

5  acquisition.

6  Q.    Okay.  So these were issues that were new to you --

7  A.    Yes.

8  Q.    -- during this time period?

9        And you're escalating these to Mr. Hogenson with the

10  intent of bringing them to the UK's attention in a package of

11  accounting issues?

12  A.    Correct.  One was to basically summarize all these issues

13  and address them to the extent they can, and the other one was

14  to escalate them to the UK.

15        **MR. LEACH:**  Let's go to 3315.

16        **THE COURT:**  3315 is admitted.

17        (Trial Exhibit 3315 received in evidence)

18        **MR. LEACH:**  And if we could zoom into the top

19  Mr. Hasan.

20  **BY MR. LEACH:**

21  Q.    Mr. Vaidyanathan, do you see does this appear to be an

22  email from you to Mr. Hogenson on June 7th, 2010?

23  A.    Yes.

24  Q.    And the subject is "Issues list."  What does that refer

25  to?

1  **A.**    So this is the issues list for previous other issues that

2  we had discovered on the or after we assumed responsibility for

3  the rest of the group companies in Autonomy.  This is -- this

4  included even the payroll ones, but this was a comprehensive

5  list.

6         **MR. LEACH:**  And if we could draw your attention,

7  please, to the attachment, Mr. Hasan -- or, I'm sorry, I think

8  it's page 3 of the exhibit.

9      And if we could go to the bottom of page 3, please.

10  Strike that.  The bottom of page 5, please.

11  **BY MR. LEACH:**

12  **Q.**    Do you see the heading "Capitalized Software,"

13  Mr. Vaidyanathan?

14  **A.**    Yes.

15  **Q.**    And this says -- and is this kind of the format of how you

16  categorized the issues, you would have a description, a

17  category like accounting you would put them in, an action item

18  and then dates and whether or not the issue was open?

19  **A.**    Yes.  I mean the -- the intent there was to -- and this

20  was somewhere in June.  The intent was to basically get it

21  right for the quarter.  If there are certain items required

22  more work, then you potentially do more work in June and after

23  the quarter end you would try and get it -- get it sorted out,

24  but the intent was to get it done right for the right -- for

25  that quarter, that's correct.

VAIDYANATHAN - DIRECT / LEACH

1   Q.   Okay.

2       And here you're talking about "Term licenses we have

3   purchased from Filetek, a reseller."  Do you see that?

4   A.   Yes.

5   Q.   Were you familiar with Filetek before your days at

6   Autonomy?

7   A.   No.

8   Q.   And what were you learning about Filetek in this time

9   period and why did you include it in this issues list?

10  A.   So one of the -- well, Filetek was a reseller of Autonomy

11  products as well as we bought software from Filetek or at least

12  it appeared to be.

13      The intent there is -- from an accounting standpoint you

14  typically look at whether the software is being used for a

15  particular purpose, what's the intent of the software, does the

16  software do certain specific things, is it important from a

17  long-term standpoint.  Based on that you determine useful life,

18  based on that you would figure out how to amortize or expense

19  the -- expense the item.

20      In -- when I -- on this specific topic, the license's

21  nature was not very clear from when I spoke with the accounting

22  team or I spoke with the IT team, they were not very clear

23  about what those licenses were -- licenses were and what they

24  were being used for, so that basically -- if that is not very

25  clear then there's a problem in terms of the accounting, and I

VAIDYANATHAN - DIRECT / LEACH

 1    don't know whether the accounting needed to be addressed or

 2    changed or things of that nature.

 3        The second problem with that thing was the coding of the

 4    expense.  So depending on the nature of the item, the expense

 5    would be coded to the various financial statement captions

 6    whether it is cost of goods sold or it is research and

 7    development or sales and marketing, for that matter.

 8        So here because the nature of the software that was bought

 9    wasn't very clear, it was very difficult to understand whether

10    if we booked to a particular section of the income statement or

11    another section of the income statement.  So there were two

12    issues intertwined to one.

13    Q.    You mentioned that Filetek was a reseller.  Why did that

14    play into your thought process about this software purchase?

15    A.    So typically when you have sales to a party and you

16    purchase from that party, both those contracts need to be

17    evaluated to determine linkage.

18        So typically what would you do is you would evaluate and

19    see whether those two contracts were interlinked by any sort of

20    imagination or not, whether they serve the same purpose,

21    whether it was those two needed to be offset, they needed to

22    be -- were they different purchases, were they different

23    things, you know, altogether, and should they be accounted for

24    differently vis-á-vis accounted for the way they were being

25    accounted for.

VAIDYANATHAN - DIRECT / LEACH

1        So that is why I wrote what I wrote because typically the

2   moment you have transactions with customers, they needed to be

3   evaluated for linkage.  And based on that, that would drive the

4   accounting.

5   Q.   And at this period, May of 2010, were you -- did you have

6   concerns or questions in your mind about whether sales to

7   Filetek were linked to purchases from Filetek?

8   A.   Yes, because I was hearing from Percy as well on the

9   accounting side.

10        MR. HEBERLIG:  Objection.  Objection, hearsay.

11        THE COURT:  I think he's asking whether he would be

12   concerned.  Overruled.

13        THE WITNESS:  So I was hearing from Percy as well

14   because he saw this on the revenue side and I was seeing it

15   from the purchasing side, and so we were trying to see whether

16   they had been evaluated for linkage and they were accounted for

17   in the right manner or not, and so it was -- that is why I was

18   starting to get a little concerned.

19   BY MR. LEACH:

20   Q.   And was there anything about the amount of the software

21   purchase that raised questions in your mind?

22   A.   Yes.

23   Q.   How so?

24   A.   So typically a software company for the size of the

25   company that was Autonomy back then purchasing software at such

VAIDYANATHAN - DIRECT / LEACH

 1   large quantities from parties that weren't necessarily known to

 2   sell software was an oddity, in my mind at least.  And so my

 3   thought processes there was, okay, this is a company we have

 4   not heard of before, probably sells -- it sells purportedly

 5   some software that is used for archiving purposes, but the IT

 6   department that was using it and the data center department

 7   that was using it wasn't very clear about its usage.

 8       Typically if you have software that is purchased at such

 9   high value, everybody would be all over it, and so that was, in

10   my opinion, a question that needed to be asked and addressed.

11   **Q.**   Did you undertake some type of effort to see how

12   significantly Filetek software was being used within Autonomy

13   in the US?

14   **A.**   Yes.  So once this was -- I don't know whether it was in

15   connection with this or something else or another transaction

16   on Filetek, but I did -- I did go back and ask the CEO of one

17   of the -- of the business units called Zantaz.  So this was

18   supposed to be a software that was important for data archival

19   solutions, and so I went and asked the CEO of that unit, if you

20   will, the business unit head whether he was aware of that

21   transaction.  He wasn't very aware of that transaction at all,

22   and so he referred me to somebody else.  I went and checked

23   with that person.  He also said he knew something peripherally.

24   It didn't come across as though they knew exactly what the

25   software was, where it was housed, what was being hosted and so

VAIDYANATHAN - DIRECT / LEACH

1    on.

2    **Q.**    Did this inquiry give you comfort that Filetek software

3    was actually being used?

4    **A.**    It raised a bunch of flags in my mind because if you're

5    buying software at that level and people don't know about it,

6    then it's kind of a red flag right there.

7    **Q.**    With respect to the list of accounting issues that you and

8    Mr. Hogenson and others were -- were preparing, did you also

9    learn about sales to other value-added resellers?

10   **A.**    Yes.  There was -- there was a few of them.  There was

11   Filetek, there was one called -- there was Capax, there was

12   another one called I think DiscoverTech, there was another one

13   called VMS.  Those are all the ones that I -- off the top of my

14   head I can think of.

15   **Q.**    Okay.  And why were you -- why did you have questions

16   about those firms?  What was troubling you?

17   **A.**    Two or three things.  One was the number of transactions

18   with those parties.  So typically that alone, by itself, would

19   not be a significant cause of concern, but the very fact that,

20   you know, you're having really large volume of -- in terms of

21   value of software that is being resold by those parties.

22       Secondly, they would show up towards the very end of the

23   quarter and sometimes without end-user names.  That, to me, was

24   more concerning.

25       So typically in other companies that I'd been a part of

1    you would always when you sold to resellers the intent was to

2    always have the name an end user so you know that you're

3    selling to an established third-party and that the accounting

4    transaction is valid.

5        In some cases here we would not be aware of the end user

6    third-party at all because it used to be pretty much at the

7    very end of the quarter, so it's very hard to tell and we won't

8    have an end user name on those transactions.

9        So A, these resellers are not something that are well

10   known.  Most of the resellers that are large enough to do such

11   transactions would be of the -- you know, you have, quote,

12   multiple reseller -- resellers in the US that are large.  You

13   have CDW, for example, you have a few others that have large

14   transactions and they're capable of doing multibillion --

15   multimillion dollar transactions through their -- through their

16   portals.

17       These names were not something that I'd heard of before,

18   so that also added to the --

19   Q.   Did you also have concerns that Autonomy was purchasing

20   product from some of the resellers as a means to pay down its

21   debts?

22   A.   The Filetek one was a one that I was previously aware of.

23   There was a couple of others.  VMS was another one that I

24   subsequently got to know.  Around this time when I wrote this

25   email I wasn't aware of VMS because I don't think that

 1  transaction had occurred at that point in time, that occurred

 2  later.  So Filetek for certain and there were a few others as

 3  well that we had purchased software from in addition to just

 4  Filetek.

 5  **Q.**  And in or around June of 2010, did you meet with

 6  Mr. Chamberlain about some of the concerns that you and

 7  Mr. Hogenson were developing?

 8  **A.**  Yes.

 9  **Q.**  Tell us what happened, please.

10  **A.**  So we -- this entire list I sat down and discussed with

11  Steve.  This was somewhere in San Jose in the San Jose office

12  of Interwoven and we talked about this.  We went through every

13  issue that I had raised here.  We discussed it at length and,

14  you know, Steve was surprised about the number of issues and

15  the depth to which we had gone and get those -- got those

16  issues surfaced, so he was all very happy with the amount of

17  work we had done, and he was commending us for doing the amount

18  of work and diligence that we had done at that point in time.

19  **Q.**  He was commending you at that point in time?

20  **A.**  Yes.

21  **Q.**  Okay.  And how did this meeting with Mr. Chamberlain end?

22  **A.**  Oh, he said he's going to basically go back and make sure

23  that most of these are addressed one way or the other.  We were

24  supposed to go back and provide information, additional

25  information.  He would go back and look at other information,

VAIDYANATHAN - DIRECT / LEACH

```
 1   if any, that was available outside of the -- at the HQ level,
 2   if any, and we would all come up with a way of accounting for
 3   these transactions in the right manner.
 4   Q.   And at some point in time had you learned that Brent
 5   Hogenson had also elevated some of these issues to Dr. Lynch?
 6   A.   I knew he was elevating the concerns to management.  I
 7   knew he was elevating the concerns to Shushovan and Dr. Lynch.
 8   I didn't know when he did it, I didn't know how he did it, but
 9   he was going to.
10       The entire intent was to basically raise this to
11   management team in the UK.
12   Q.   And shortly after raising these issues was Mr. Hogenson
13   fired?
14   A.   Yes, he was fired.  I didn't know -- I don't know the
15   timeframe because I didn't know exactly when he raised those
16   issues, but he was fired a month or so after our discussions
17   initially.
18           MR. LEACH:  Your Honor?
19           THE COURT:  Okay.  Ladies and gentlemen, we're going
20   take our recess for the evening.  Remember the admonition given
21   to you.  Don't discuss the case, allow anyone to discuss it
22   with you, form or express any opinion.
23       We'll start at 9:15 tomorrow.  Thank you very much.
24       And you can step down.
25           (Jury retires at 3:45 p.m.)
```

**PROCEEDINGS**

1          (Proceedings were heard outside the presence of

2      the jury:)

3          **THE COURT:**  Okay.  Let the record reflect that the

4   jury and alternates have retired.

5      So I think that you were furnished -- at least I hope

6   so -- a copy of the communication that the Court received from

7   the alternate, Mr. Dang.  Did you -- did you see that or not?

8   Have you not seen it?

9          **MR. LEACH:**  We have, Your Honor.

10         **MR. MORVILLO:**  I have seen it, Your Honor.  I'm not

11  sure about Mr. Lincenberg.

12         **THE COURT:**  So in it -- well, the letter itself is

13  explanatory.  And also attached to it is proof of ownership of

14  shares in a mutual fund of Hewlett Packard.  I think it's --

15  it's in there.

16     So what is it -- what -- first let me talk to the defense.

17  What do you want to do?

18         **MR. HEBERLIG:**  Get rid of him.

19         **THE COURT:**  You want to excuse him?

20         **MR. MORVILLO:**  We do, Your Honor.

21         **MR. HEBERLIG:**  If he ever becomes a juror and he's

22  Alternate No. 1, he's nothing but trouble.

23         **THE COURT:**  Do you have any objection?

24         **MR. LEACH:**  We have no objection to excusing Alternate

25  No. 1.  I would say it's more based on the second part raised

 1  in this letter, the conflicts that are emerging.

 2        THE COURT:  Yeah.  Well, it's like I didn't do it but

 3  if I did it, I was sleep; but if I was sleep, I was

 4  intoxicated; and if I was intoxicated, I drove past the limit;

 5  and if so, I've committed a crime, but the statute's run, never

 6  the -- I mean, it was just an ongoing series of why he doesn't

 7  want to serve.

 8        MR. LEACH:  It's obvious he does not want to serve.

 9        THE COURT:  Yeah.  I don't know.  I think -- you know,

10  it's the first day.  I just don't know if I have to admonish

11  him at all.  I just wanted assurance that no one's going to

12  reach out to him.  I wouldn't assume anybody would reach out to

13  him.  I mean, it's like how did I do in my opening?  What's the

14  difference?

15       Okay.  I will excuse him.

16       Let me just call your attention to one other matter which

17  was brought to my attention is that Juror No. 12, Mr. Ricci

18  Jack, R-I-C-C-I, is an acquaintance of my law clerk, an

19  acquaintance that -- it's a friend of hers.  He is a friend of

20  a friend of my law clerk's.  They have met on two occasions in

21  a large group, the last time being October, and she assures me

22  that she's never even vaguely mentioned this case or any other

23  case, and there's no ongoing situation, so I simply wanted to

24  point that out to the parties just because it's my job to point

25  things out to the parties.

PROCEEDINGS

1       Okay.  So tomorrow we will start at 9:15.  Thank you very

2   much.

3           **MR. LEACH:**  Thank you, Your Honor.

4           **THE COURT:**  I thought the openings were really

5   interesting.  So if that's the measure -- I don't know that

6   that is the measure, but it's -- the parties all did an

7   excellent job and thank you very much.

8       And I know, you know, I'm admitting these documents, I'm

9   not listening to a lot of objections.  It's just my feeling in

10  a matter with really sophisticated words that so much can be

11  dealt with on cross, you know?  So many things can be put in

12  context.  That's not true about everything, I got that, but

13  this is a long trial and we just don't want to get bogged down

14  to the extent we don't have to with colloquy with the Court, me

15  getting into it -- which is never a good thing -- and/or the

16  lawyers going back and forth, so I just put that out as a

17  general observation.  I want to thank the parties for being so

18  prompt and responsive.  Good night.  I'll see you tomorrow.

19          **MR. LEACH:**  Thank you, Your Honor.

20          (Adjourned at 3:49 p.m.)

21                      --oOo--

22

23

24

25

**UNITED STATES COURT REPORTERS**

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3          We certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    _____

7    RHONDA AQUILINA, RMR, CRR
     Official Court Reporter
8    CA CSR# 9956

9

10

11   _____
     JENNIFER L. COULTHARD, RMR, CRR
12   Official Court Reporter
     CA CSR#14457
13

14   DATED:  MARCH 18, 2024

15

16

17

18

19

20

21

22

23

24

25