**Volume 3**

**Pages 494 - 794**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
    vs.                        )   **NO. 3:18-CR-00577-CRB**
                               )
MICHAEL RICHARD LYNCH and      )
STEPHEN KEITH CHAMBERLAIN,     )
                               )
            Defendants.        )
_____)

San Francisco, California
Tuesday, March 19, 2024

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

                    PATRICK D. ROBBINS
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue
                    San Francisco, California 94102
            **BY:   ROBERT S. LEACH**
                    **KRISTINA GREEN**
                    **ADAM A. REEVES**
                    **ASSISTANT UNITED STATES ATTORNEYS**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Rhonda L. Aquilina, No. 9956, RMR, CRR, CRC
              Jennifer Coulthard, No. 14457, RMR, CRR, FCRR
              Official United States Court Reporters

1 | **APPEARANCES:  (CONTINUED)**

2 | For Plaintiff:

3 | U.S. DEPARTMENT OF JUSTICE
Antitrust Division
450 Golden Gate Avenue, Room 10-0101

4 | Post Office Box 36046
San Francisco, California 94102

5 | BY:  **ZACHARY G.F. ABRAHAMSON**
     **TRIAL ATTORNEY**

6 |

7 | For Defendant Lynch:

8 | CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019

9 | BY:  **CHRISTOPHER MORVILLO, ATTORNEY AT LAW**

10 |

11 | STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036

12 | BY:  **REID H. WEINGARTEN, ATTORNEY AT LAW**
     **BRIAN M. HEBERLIG,  ATTORNEY AT LAW**

13 |

14 | STEPTOE & JOHNSON LLP
One Market Plaza
Steuart Tower, Suite 1070

15 | San Francisco, California 94105
BY:  **JONATHAN M. BAUM, ATTORNEY AT LAW**

16 |

17 | For Defendant Chamberlain:

18 | BIRD, MARELLA, RHOW, LINCENBERG,
 DROOKS & NESSIM LLP

19 | 1875 Century Park East, 23 Floor
Los Angeles, California 90067

20 | BY:  **GARY S. LINCENBERG, ATTORNEY AT LAW**
     **RAY SEILIE, ATTORNEY AT LAW**

21 |

22 |

23 |

24 |

25 |

Tuesday, March 19, 2024 - Volume 3

## I N D E X

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| | | |
| **VAIDYANATHAN, GANESH** | | |
| (PREVIOUSLY SWORN) | 499 | 3 |
| Direct Examination resumed By Mr. Leach: | 499 | 3 |
| Cross-Examination By Mr. Heberlig: | 574 | 3 |
| **PRASAD, REENA** | | |
| (SWORN) | 713 | 3 |
| Direct Examination by Ms. Green | 713 | 3 |

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1 | | 613 | 3 |
| 428 | | 606 | 3 |
| 797 | | 737 | 3 |
| 849 | | 622 | 3 |
| 918 | | 503 | 3 |
| 1352 | | 524 | 3 |
| 1428 | | 538 | 3 |
| 1900 | | 562 | 3 |
| 1916 | | 563 | 3 |
| 2268 | | 567 | 3 |
| 3312 | | 730 | 3 |
| 3315 | | 595 | 3 |
| 3318 | | 625 | 3 |

|  | **E X H I B I T S (Cont'd)** | | | |
|---|---|---|---|---|
| **TRIAL EXHIBITS** | | **IDEN** | **EVID** | **VOL.** |
| 3320 | | | 502 | 3 |
| 3321 | | | 631 | 3 |
| 3321 | | | 650 | 3 |
| 3564 | | | 666 | 3 |
| 4357 | | | 651 | 3 |
| 6283 | | | 637 | 3 |
| 7694 | | | 706 | 3 |
| 7756 | | | 709 | 3 |
| 7810.3 | | | 587 | 3 |
| 7813 | | | 654 | 3 |
| 7875 | | | 655 | 3 |
| 7875.1 | | | 656 | 3 |
| 7876 | | | 700 | 3 |
| 7876.1 | | | 701 | 3 |
| 7878.1 | | | 583 | 3 |
| 7879 | | | 703 | 3 |
| 7882 | | | 585 | 3 |
| 11934 | | | 557 | 3 |
| 13077 | | | 719 | 3 |
| 13078 | | | 729 | 3 |
| 13084 | | | 749 | 3 |
| 13090 | | | 744 | 3 |
| 13336 | | | 732 | 3 |

1               <u>**E X H I B I T S** (Cont'd)</u>

2    <u>**TRIAL EXHIBITS**</u>                     <u>**IDEN**</u>   <u>**EVID**</u>   <u>**VOL.**</u>

3    15575                                 535    3

4    15704                                 550    3

5    15992                                 569    3

6

7

8                       **--oOo--**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    Tuesday - March 19, 2024                        9:16 a.m.

2                       P R O C E E D I N G S

3                            --oOo--

4        (Jurors enter courtroom.)

5        (Proceedings were heard in the presence of the jury:)

6           THE COURT:  Please be seated.  Let the record reflect

7    all jurors are present, the parties are present, witness has

8    resumed the stand.

9        You may proceed, Mr. Leach.

10          MR. LEACH:  Thank you, Your Honor.

11       (Witness previously sworn.)

12               DIRECT EXAMINATION   (resumed)

13   BY MR. LEACH:

14   Q.   Good morning, Mr. Vaidyanathan.

15   A.   Good morning.

16          MR. LEACH:  Good morning, ladies and gentlemen.

17   BY MR. LEACH:

18   Q.   When we broke yesterday, you were testifying that

19   Mr. Hogenson was fired within a month after you met with

20   Mr. Chamberlain in the Bay Area about various accounting issues

21   you were observing.  Do you recall that testimony?

22   A.   Yes.

23   Q.   I'd like to step back a little bit in time and focus on

24   some of the issues relating to FileTek that you were observing

25   in the June 2010 time period.
```

1    **MR. LEACH:**  First of all, if you could please go back

2    to Exhibit 314 or please display Exhibit 314, which is in

3    evidence.

4           **THE CLERK:**  3314.

5           **MR. LEACH:**  3314.  Excuse me.

6       And if you could zoom in, Mr. Hasan, to the top portion of

7    the email.  Down a little bit more, please.  First half of the

8    document.

9    BY MR. LEACH:

10   **Q.**   And Mr. Vaidyanathan, do you recall this is a May 26,

11   2010, email to Brent Hogenson about payroll issues?

12   **A.**   Yes.

13   **Q.**   And you're writing about how payroll was transitioned to

14   someone named Lourdes -- from Lourdes to someone named Kerrie

15   in May of 2010?

16   **A.**   Yes.

17   **Q.**   You see that language in the first line?

18   **A.**   Uh-huh.

19   **Q.**   And Lourdes was somebody who had worked at Autonomy well

20   before you arrived?

21   **A.**   Yes.

22   **Q.**   Okay.  And in Item No. 1 you wrote "4 employees continuing

23   to get paid post their termination."  Do you see that?

24   **A.**   Yes.

25   **Q.**   Was that one of the accounting issues that you identified?

**VAIDYANATHAN - DIRECT / LEACH**

1    **A.**    Yes.

2    **Q.**    It then says in No. 2, "Several other cases of employees

3    being paid twice."  Is that another issue that you identified

4    in this time period?

5    **A.**    Yes.

6    **Q.**    And you're sending this to Brent Hogenson.  Was

7    Mr. Hogenson supportive of your efforts to identify issues

8    relating to payroll?

9    **A.**    Yes.

10    **Q.**    And generally speaking, was Mr. Hogenson someone you

11    enjoyed working with?

12    **A.**    Absolutely.

13    **Q.**    And was he supportive of looking these accounting issues

14    and trying to escalate them --

15    **A.**    Yes.

16    **Q.**    -- to his superiors?

17        And these payroll issues, do these relate to employees who

18    were looking under Mr. Hussain and Mr. Chamberlain well before

19    you and Mr. Hogenson ever arrived at Autonomy?

20    **A.**    Yes.  They were reporting to Cynthia Watkins, the

21    controller of Autonomy at that point in time.  Payroll reported

22    up into her, and she reported up into Mr. Chamberlain.

23    **Q.**    Okay.  And the date of this is May 26, 2010?

24    **A.**    Yes.

25        **MR. LEACH:**  Let's move forward in time, please, and

 1   I'll move to admit Exhibit 3320.

 2           **THE COURT:**  3320 admitted.

 3       (Trial Exhibit 3320 received in evidence)

 4           **MR. LEACH:**  Thank you, Your Honor.

 5       And if we could start on page 2, Mr. Hasan, and highlight

 6   that top half of the email.

 7   **BY MR. LEACH:**

 8   **Q.**   Mr. Vaidyanathan, do you see the date of June 17th, 2010?

 9   **A.**   Yes.

10   **Q.**   And the subject is FileTek?

11   **A.**   Yes.

12   **Q.**   Okay.  You wrote "Hi Brent, Date of agreement-12/31/2009.

13   Payment-January 2010.  Order through FileTek-3/31/10.  Second

14   purchase from FileTek-5/12/10."  What were you trying to

15   communicate here to Mr. Hogenson?

16   **A.**   Mr. Hogenson had asked me specifically for the FileTek

17   agreement, the date of the agreement, the payments to FileTek,

18   any orders from FileTek, any other purchases subsequent to that

19   date.  So all I did was give him the list of what he had asked

20   for.

21           **MR. LEACH:**  Okay.  And if we could go to page 1,

22   Mr. Hasan.

23   **BY MR. LEACH:**

24   **Q.**   And we see down at the bottom portion of this email

25   Mr. Hogenson writes "What are the dollar amounts?"  Do you see

VAIDYANATHAN - DIRECT / LEACH

1   that?

2   **A.**   Yes.

3   **Q.**   And you write back further up in the chain the initial

4   payment dated 12/31/09 was approximately 10 million and you

5   identify the second one as approximately 11 million and you say

6   the total was 21 million.  Was that the amount of the FileTek

7   software that Autonomy was purchasing?

8   **A.**   Yes.  That is one of the components, correct.

9   **Q.**   Okay.  And was the dollar amount of those transactions

10  part of what was giving you some concern in this June 2010 time

11  period?

12  **A.**   Yes.

13  **Q.**   And was the fact that FileTek also had payables to

14  Autonomy part of your concern?

15  **A.**   That is correct.

16  **Q.**   Were you concerned about something called "roundtrips"?

17  **A.**   That is absolutely correct.

18  **Q.**   And I understand you met with Mr. Chamberlain in the

19  United States in the June 2010 time period and spoke to him

20  about some of the issues you were observing?

21  **A.**   Yes.

22          **MR. LEACH:**  Let me draw your attention to Exhibit 918,

23  and I'll move to admit 918.

24          **THE COURT:**  918 admitted.

25          (Trial Exhibit 918 received in evidence)

VAIDYANATHAN - DIRECT / LEACH

1  BY MR. LEACH:

2  **Q.**   And before I get to 918, Mr. Vaidyanathan, why are

3  roundtrips a concern to you?

4  **A.**   A roundtrip transaction typically means two things.  You

5  have a purchase transaction and a sale transaction at the same

6  time and what it means is if it's not appropriately accounted

7  for, then you'd record a purchase on one side and you'd record

8  a sale on the other side.  So typically the results of the

9  effort channel stuffing.  So I'm saying it would result in

10 recording a purchase on one side and a sale on the other side.

11 This also is also referred to as channel stuffing.  And channel

12 stuffing essentially refers to the concept of sending the

13 reseller or getting an order from the reseller towards the last

14 sort of few days of the quarter, typically the -- you know, for

15 enterprise software companies that's a very common thing to get

16 orders in the last sort of the quarter -- the last few days of

17 the quarter.

18     The issue there, though, is if you resell to a reseller,

19 you're ideally supposed to have some sort of an end user

20 notated to that sale so that you can actually prove the actual

21 sale was to a third-party and not just to the reseller.

22     And there's nothing wrong with selling to a reseller if

23 reseller wants to purchase it for his own consumption, but

24 typically what happens is, a reseller acquires the software

25 with the intent of selling it to other parties, and so the

1    construct there is if you're trying to sell it to another

2    party, then you would have identified the other party already

3    and you would have made a sale to the other party already and

4    the name of the other party would have been notated on the

5    agreement.  So that -- that's what we were looking for, and

6    that's what channel stuffing is.

7        So typically if you -- the reason why everybody looks down

8    at channel stuffing is because of the fact that, you know, if

9    you don't have an appropriate end user identified, then there's

10   a potential that you could have an increase in sales without a

11   potential end user in sight.

12   **Q.**   Thank you.

13       Focusing on Exhibit 918, if we could look at the top half

14   of the document, please.  Is this an email you received from

15   Mr. Chamberlain on or about June 28th, 2010?

16   **A.**   Yes.

17   **Q.**   And do you see the subject "Various"?

18   **A.**   Yes.

19   **Q.**   And Mr. Hogenson was copied on this correct?

20   **A.**   Yes.

21   **Q.**   Okay.  I want to go through the top paragraph with care,

22   if we could.

23       Mr. Chamberlain wrote "Ganesh-just wanted to drop you a

24   note regarding your efforts this quarter.  You have got hold of

25   the rest of the US group very quickly and identified a number

1  of shortfalls, and we can now work together to remedy them over

2  the next quarter or so."  Do you see that?

3  **A.**   Yes.

4  **Q.**   Is this after your meeting with Mr. Chamberlain in the

5  United States?

6  **A.**   Yes.

7  **Q.**   Mr. Chamberlain then wrote, "This has been a stark lesson

8  for me in terms of, quote, 'you get what you pay for' and has

9  really highlighted that if you want quality people, you need to

10  pay for it."  What did you understand that to mean?

11  **A.**   Because the issues that we identified were far more on the

12  legacy -- legacy companies that Autonomy had previously

13  acquired, I think the idea was to, A, give me kudos; and

14  secondly, to say that maybe the quality of the people that they

15  had previously hired was not nearly up to the level that they

16  wanted.

17  **Q.**   You then -- Mr. Chamberlain wrote "We have one run the US

18  organization too lean over the last few years, and the result

19  is a combination of poor bookkeeping and the other item we have

20  seen over this weekend."  Do you see that reference to another

21  item we have seen this weekend?  What did you understand that

22  to refer to?

23  **A.**   It was around that time that we identified the payroll

24  fraud.  It's a little hazy, but I think the reference was to

25  that.

1  **Q.**   Okay.

2  **A.**   Because that came towards that particular point in time as

3  well.

4  **Q.**   When you say the payroll fraud, what do you mean?

5  **A.**   So there was a payroll fraud happening on the Autonomy,

6  Inc., sort of legal entity.  The payroll provider -- the

7  payroll sort of employee who was running the payroll and the

8  books, Lourdes, was siphoning off money from the payroll almost

9  every other payroll.  We basically let her go based on the

10  payroll issues that we identified, and once we let her go, she

11  submitted a claim for unemployment.  Once she submitted a claim

12  for unemployment, we -- the department, thankfully, sends us

13  a -- sends the employers a letter to verify her last known

14  salary.  Interestingly enough, all the amounts that she had

15  taken basically showed up in that -- in that number because she

16  had faithfully reported them to the IRS.

17       So once we dug deep into exactly whether that is true or

18  not, we found a lot more inconsistencies.  We found that she

19  was getting far more in terms of salary than she was duly

20  authorized per her employment letter to get and we basically

21  found that out, we found out -- we then dug through -- she was

22  using a particular sort of code, earnings code to basically

23  syphon the funds and we basically went and did a research on if

24  anybody else was using that code, did anybody else get paid.

25  So as a result we identified that a GL accountant in the group,

1  a general ledger accountant, who was charged with basically

2  supervising the payroll and basically doing payroll

3  reconciliations, was also in the fraud, and so she was getting

4  paid along with her payroll counterpart.  So we found that out.

5  **Q.**   Thank you.  You've used "we" there a couple of times

6  Mr. Vaidyanathan, and I just want to make sure I understand.

7  Are you the one who discovered this?

8  **A.**   Yes.  I discovered this.  I was -- I shouldn't take all

9  the credit myself, but my payroll person in Interwoven, Andrea

10  Campana, she --

11       (Reporter seeks clarification.)

12       **THE WITNESS:**  Andrea Campana.  She was the payroll

13  person in Interwoven, and she was running -- she was charged

14  with getting all the payrolls together.  I had asked her to

15  take a look at the details of the payroll system and basically

16  get all the information.  So once she looked at what I asked

17  her to look at, she basically got all the details.  That's why

18  I use the term "we."

19  **BY MR. LEACH:**

20  **Q.**   And was Mr. Hogenson supportive of these efforts?

21  **A.**   Absolutely.

22  **Q.**   Okay.  And when you discovered that Lourdes may have been

23  taking money from Autonomy, what did you do?  Who did you call?

24  **A.**   I called the GC, then Joel Scott, and then I think he then

25  called UK and Cambridge.  I think he spoke with Steve

 1  Chamberlain as well as Shushovan I think at the time -- that's

 2  what he told me.

 3      And after that, we had conversations almost every day in

 4  terms of what was going on, what details do we know.  And the

 5  idea then was to get a third-party sort of forensic firm

 6  involved at some point.  So that was the conversations that we

 7  had over that weekend when we discovered it.

 8  Q.  And at some point you had direct conversations with

 9  Mr. Chamberlain --

10  A.  Yes.

11  Q.  -- about it?

12  A.  Yes.

13  Q.  And you believe it was over the weekend in this email

14  referenced here?

15  A.  Yes.

16  Q.  So somewhere around June 28th, 2010?

17  A.  Yes.

18  Q.  And in your mind, was Mr. Hogenson in any way responsible

19  for this payroll fraud?

20  A.  Absolutely not.

21  Q.  Were you responsible in any way for this?

22  A.  Absolutely not.

23  Q.  I want to move forward in time, please, if we could, to

24  July 2010, and at some point did you learn that Mr. Hogenson

25  had been let go from Autonomy?

VAIDYANATHAN - DIRECT / LEACH

1    **A.**    Yes.

2    **Q.**    How did you learn that?

3    **A.**    I learned it subsequently after he got to let go; but

4    before he got let go, Steve Chamberlain called me that morning

5    and he said you will see a bunch of changes happening, there's

6    been a lot of -- there are lots of things that you don't know

7    that have happened and you'll see actions.  I just want to you

8    know that you're okay and, don't worry, we'll get through this

9    was the gist of the conversation that I had with Steve that

10    day.

11    **Q.**    Okay.  What happened next?

12    **A.**    I was in San Jose.  There was a bunch of people.  My

13    colleagues, Percy Tejeda, Reena Prasad, Glenn Fong, all of them

14    were in the San Francisco office and I was told subsequently

15    that Reena Prasad, Percy Tejeda got to let go, one after the

16    other by Joel Scott and one of his attorneys in the

17    San Francisco office.  So obviously we -- I got to know about

18    it post fact, and I was in San Jose, so I wasn't there when the

19    firing happened.

20    **Q.**    And at some point did you meet with Mr. Scott?

21    **A.**    Yes.  That was subsequent to that.  It was I think two

22    days or a week -- within a week of that, week or two of

23    Brent's -- after Brent had been fired.

24    **Q.**    And was Mr. Tejeda in any way responsible for this payroll

25    fraud?

**VAIDYANATHAN - DIRECT / LEACH**

1   **A.**   No.

2   **Q.**   Ms. Prasad?

3   **A.**   No.

4   **Q.**   At some point after the firings of Mr. Hogenson,

5   Mr. Tejeda and Ms. Prasad, did you have another conversation

6   with Steve Chamberlain about what happened?

7   **A.**   Yes.

8   **Q.**   Was this over the phone?

9   **A.**   Yes.   This was over the phone.

10  **Q.**   Okay.   Take a moment and describe for us what

11  Mr. Chamberlain said to you.

12  **A.**   So one of my worries and confusion was we all were

13  doing -- in my mind or in our minds -- the right thing.   And

14  the idea there was to surface the issues, get resolution and

15  get to the right answer, get to the bottom of the issue.

16       And I did the same thing, Reena did the same thing, Percy

17  did the same thing, Brent was doing the same thing in my

18  opinion.   They were not doing anything different.

19       So my question was, everyone else got to let go, I didn't.

20  And I was kind of -- whether you call it, survivor's guilt or

21  whatever it is, I was surprised and shocked.   So one of my

22  questions or one of my main questions to Steve was, okay, why

23  me?   Why am I still around?   If everybody else got fired, I

24  should have been fired too.   I mean, I didn't do anything

25  dramatically different from the others.

1   And his response to that was, no, you surfaced issues;

2   others did other things.

3   And I said, well, what were those things?  I'm not

4   necessarily sure how their things related to -- were different

5   from the stuff that I did.

6   And I was told that, well, you don't know, there's a lot

7   of things you don't know and lots of things have happened over

8   the last week, week, two weeks, and it's a result of that that

9   this has happened.

10  **Q.**   Did Mr. Chamberlain make any comments to you about the

11  reseller transactions that you had brought to his attention?

12  **A.**   Yes.  So I asked him about that as well and he said we

13  talked about the reseller transactions, we talked about all

14  this; what is going on, I'm quite concerned.

15  And his response was, well, he had spoken to Shushovan and

16  he was upset about it himself.  He had spoken to Shushovan and

17  Shushovan was -- well, he said, well, okay, he -- he had done

18  that but he -- we are going to walk away from those practices

19  on a go-forward basis.

20  And one of the things that Steve said to me was, he had

21  made it very clear to Shushovan that if this continued in the

22  future then potentially he was going to basically resign.

23  **Q.**   I want to make sure I understand some of the things you

24  said.  So did Mr. Chamberlain say that he was not very happy

25  with the reseller deals as well?

**VAIDYANATHAN - DIRECT / LEACH**

1    **A.**    Yes.

2    **Q.**    And what did you understand that to mean?

3    **A.**    Well, I -- my understanding was that those transactions

4    were not entirely the way that they were supposed to have been

5    done, so which meant that in other words they were accounted

6    for inappropriately, at the very least; and therefore, when he

7    had this conversation with Shushovan my assumption, based on

8    conversations that I had was, well, it was water under the

9    bridge at this point, we're not going to do this anymore, we

10   are going to do the right thing on a go-forward basis.

11   **Q.**    Did Mr. Chamberlain tell you in substance that Mr. Hussain

12   was directing this?

13   **A.**    Yes.

14   **Q.**    And did Mr. Chamberlain say to you in substance that we

15   should not have been accounting for it this way?

16   **A.**    Yes.

17   **Q.**    Did Mr. Chamberlain say in substance to you that he knew

18   that Autonomy was taking a risk?

19            **MR. SEILIE:**    Objection, leading.

20            **THE COURT:**    Sustained.

21   **BY MR. LEACH:**

22   **Q.**    Did the concept of risk-taking come up in this

23   conversation, Mr. Vaidyanathan?

24   **A.**    Yes.

25   **Q.**    What was said?

**VAIDYANATHAN - DIRECT / LEACH**

1   **A.**   The conversation was in prior quarters, in prior years

2   maybe we had -- maybe the Autonomy had taken a few more risks

3   than necessary and the idea was, okay, we are done with all

4   that right now, and that was it.   That was the substance of the

5   conversation.

6   **Q.**   When you say "Done with all of that," what did you

7   understand that to mean?

8            **MR. HEBERLIG:**   Your Honor, I'm going to object to the

9   understanding.   He can express what words were spoken.

10           **THE COURT:**   Overruled.

11           **THE WITNESS:**   So my understanding there was the

12   reseller deals were the key portion of the topic, so my

13   understanding was that we'd have no more deals of that nature

14   on a go-forward basis.

15   **BY MR. LEACH:**

16   **Q.**   And why would -- in your mind would you no longer have

17   deals of that nature going forward?

18   **A.**   It basically meant that you would focus on the business

19   rather than focusing on targets and numbers.

20   **Q.**   I think you said Mr. Chamberlain told you that he

21   threatened to quit.

22   **A.**   If this happened again, yes.

23   **Q.**   What did he say?

24   **A.**   He said, well, he had this conversation with Shushovan and

25   if -- if this happened again then he had told Shushovan then

1   that I'd quit as well, this can't go.  This can't go on

2   anymore.

3   **Q.**   Did the concept of FileTek or Capax or a company called

4   Microtech come up in these conversations?

5   **A.**   It might have.  I don't recollect at this point.

6   **Q.**   When Mr. Chamberlain told you the reseller deals would not

7   happen again, what did you understand that to refer to?

8           **MR. SEILIE:**  Objection, calls for speculation.

9           **THE COURT:**  Overruled.

10          **THE WITNESS:**  So I think the reseller deals were --

11  the resellers were the FileTek, Capax, those kind of parties,

12  and I knew that they were resellers in any case.  And so when

13  he said those reseller-type deals that happened at quarter end

14  without end users names on it was what I was thinking that he

15  was referring to, that those would not happen again.

16  **BY MR. LEACH:**

17  **Q.**   And in this conversation with Mr. Chamberlain did he say,

18  in words or substance, that Autonomy should not have been

19  accounting for it this way?

20  **A.**   He said generally we shouldn't be doing -- we shouldn't

21  have done it that way and he said Shushovan took more risks

22  than necessary at that point.

23  **Q.**   Let me move forward in time, Mr. Vaidyanathan, to the

24  third quarter and the fourth quarter of 2010.  In that time

25  period after Mr. Hogenson was left -- let go, did you observe

**VAIDYANATHAN - DIRECT / LEACH**

1  that responsibilities relating to revenue were taken away from

2  you?

3  **A.**   Yes.

4  **Q.**   What happened?

5  **A.**   So previously the revenue responsibilities were with the

6  US team.  That was taken over to -- what was explained to us

7  was there were lots of things that are happening.  Information

8  is not in one place.  Information is there in the -- at

9  headquarters in the UK as well as here.  Given that we have

10  more of the information available in the UK, it made sense for

11  the accounting to be done for revenue from the UK.

12  **Q.**   Who told you that?

13  **A.**   Steve.

14  **Q.**   Was that frustrating to you?

15  **A.**   Yes, it is, because typically when you look at

16  responsibilities, you would like to have everything.  I had a

17  title of director of accounting and you take away revenue from

18  that, then it becomes just only part of accounting, not the

19  entire piece of accounting.  So it was -- from a career

20  standpoint wasn't great.

21  **Q.**   In your own mind did you feel as if information was being

22  kept from you?

23         **MR. SEILIE:**  Objection, calls for speculation.

24         **THE COURT:**  Overruled.

25         **THE WITNESS:**  So given what happened, my sense was the

1    reason they wanted to keep it in the UK was because of the

2    events that had happened in -- over summer of 2010 and because

3    we had found certain issues, linkages and things of that

4    nature, the construct there was, okay, if we do the accounting

5    in the UK, it might be easier, at least wouldn't raise that

6    many flags.

7    **BY MR. LEACH:**

8    **Q.**    When you say "they," who do you mean?

9    **A.**    I mean the management, the management in the UK from a

10    finance standpoint, Shushovan and team there.

11    **Q.**    I want to focus on the topic of hardware,

12    Mr. Vaidyanathan.  At some point in time did you learn that

13    Autonomy was reselling hardware?

14    **A.**    Yes.

15    **Q.**    What did you learn?

16    **A.**    So two things.  Initially it started off as -- because of

17    the fact that we were selling hardware, we were selling

18    software, it made more sense to sell appliances to customers.

19    And by appliances, typically one gets the feeling that it is

20    basically a hardware on which your software is mounted.  And

21    typically what happens on appliances, the hardware is designed

22    in such a manner that it accommodates the nuances of the

23    software that is mounted on top of it.  So, in other words, the

24    software is made to order and the software -- sorry.  The

25    hardware is made to order and the software then works with the

VAIDYANATHAN - DIRECT / LEACH

1  hardware to produce one joint cumulative experience for the
2  customer.  So that's how it started off.  We were doing -- we
3  were doing it previously with EMC and then we standardized on
4  Dell.  And the idea there was more people have Dell, and at
5  that time Dell and EMC were not combined, to the best of my
6  recollection, and the idea was more people have Dell servers
7  and things of that nature, so it made more sense to standardize
8  on Dell.  And so the hardware was bought separately, the
9  software was sold separately.  I didn't see them usually being
10 sold as an appliance.

11      Typically what happens in an appliance sale is, the
12 hardware is drop shipped, the software is mounted on the
13 hardware and then shipped to the -- to the customer eventually.

14      Sometimes it so also happens that the hardware is sent
15 directly to the -- to the end user.  The software is downloaded
16 on to that machine by the -- by the customer himself, plus
17 professional services from the company, they help the company
18 mount the software on the hardware.  So both options are
19 possible.

20      I never saw a situation at Autonomy where the -- where we
21 were selling a true appliance where we were selling a software
22 mounted on top of a hardware, then selling them both to the
23 customer.  They were drop shipped, so the assumption was the
24 customer was basically installing the software on the hardware
25 themselves.

1   **Q.**   You said a lot there, sir, and I just want to make sure

2   I'm tracking.  You've used the word "appliance" a couple of

3   times.

4   **A.**   Yes.

5   **Q.**   What do you mean by appliance?

6   **A.**   So an appliance is a combination of hardware and software.

7   And as I said, the appliance -- the hardware is engineered to

8   make sure to make sure the software works seamlessly with the

9   product, gives the end user a more wholesome experience.

10   **Q.**   Can you give us an example of an appliance that we might

11   be familiar with?

12   **A.**   This is usually a firewall, it's usually typically behind

13   the scenes.  So as most firewalls work, you have a server and

14   then the software sits on top of the server.  The software does

15   pretty much most of the work, but the software is the -- it

16   works with the hardware that is engineered to prevent --

17   engineered to make sure that it prevents all the malicious

18   attacks from the outside.  So that's one example.

19        And there are multiple.  I mean, there is -- you could

20   have software engineered with hardware all the time,

21   multiple -- multiple companies in the valley have tried it

22   before.  They are -- the fad went out I think about 2012, 2013

23   timeframe.

24   **Q.**   All right.  And in this 2010 time period, did you observe

25   Autonomy selling appliances with hardware and software on it,

VAIDYANATHAN - DIRECT / LEACH

1    or did you observe something different?

2    **A.**    I observed them selling hardware and the overall

3    understanding was that they were selling appliances.  That's

4    what I was told.

5    **Q.**    Who told you that?

6    **A.**    Steve.

7    **Q.**    Okay.  Was that convincing to you?

8    **A.**    Sorry?

9    **Q.**    Was that convincing to you?

10   **A.**    Not really because I was seeing hardware being shipped.

11   There's no correlation between the hardware and the software

12   sale that was being made, unless they were being made at a

13   different level.

14        And typically you would see all these softwares that are

15   supposed to work with an appliance are not easily downloadable

16   by the user, so it requires some sort of professional services

17   to basically make sure the software actually works well with

18   the hardware assuming that you're shipping the hardware

19   separately and the software separately.

20   **Q.**    And what types of hardware did you observe Autonomy

21   selling in this 2010 time period?

22   **A.**    So initially it started off with servers.  Initially it

23   started off with a bunch of hardware, various kinds, various

24   processing capabilities and such.  Subsequently it devolved

25   into sales of anything that Dell sold.  So we were selling

**VAIDYANATHAN - DIRECT / LEACH**

1  mice, backpacks, adapters, you name it.  So they were not

2  necessarily things you would mount any Autonomy software on,

3  but I came to the understanding that it was -- we were selling

4  hard -- we were reselling Dell's hardware to customers and we

5  were selling that as -- at a loss to the -- to the customer.

6      So the idea was, theoretically, you're making a lot of

7  profit on the software and if you throw in the hardware as

8  well, then potentially the customer gets -- he's more sticky,

9  he's more inclined to buy.  The idea was to basically -- you're

10 making a loss on the hardware, but you're making up for the

11 money on the software side.

12 **Q.**   Who told you that?

13 **A.**   That also came from Steve.

14 **Q.**   Did you view selling backpacks as selling an appliance?

15 **A.**   No.

16 **Q.**   Did you view selling mice as selling an appliance?

17 **A.**   Absolutely not.

18 **Q.**   Did you view selling monitors as selling an appliance?

19 **A.**   No.

20 **Q.**   Was Autonomy selling laptops and desktops too?

21 **A.**   Yes.

22 **Q.**   And did you view those as selling appliances?

23 **A.**   Yeah, no.  I mean, I would have expected, from an

24 appliance standpoint, that you sell servers.

25 **Q.**   Why do you say that?

**VAIDYANATHAN - DIRECT / LEACH**

1    **A.**    Because that's what is used to mount the software on.  You

2    typically mount it on a server and stick that server in your

3    data center and connect that to your infrastructure so that it

4    can prevent whatever it's supposed to be preventing or use it

5    for whatever it's supposed to be used for.

6    **Q.**    Did you observe any evidence that these hardware -- the

7    sales of laptops and desktops and backpacks and mice were

8    inducing customers to buy software?

9    **A.**    No.  I basically assumed that it started off that way and

10    then it became a sort of a thing where you offered a discount

11    to the customers and the customer is buying stuff basically

12    because he was getting it cheaper than what he would get when

13    he bought it from Dell.

14    **Q.**    Over time did you become concerned about the quantum of

15    hardware sales?

16    **A.**    Yes.

17    **Q.**    Why did you become concerned?

18    **A.**    Because typically -- the initial idea was some of these

19    items, well, we let some of these customers buy some of these

20    items.  We know they're not significant, it's -- from an

21    overall materiality standpoint, it's not material to the

22    financial statements as a whole.  So that was the general

23    construct initially, okay?  It's, yeah, it's not necessarily

24    hardware or software, but -- yeah, it's hardware, maybe it's

25    the other way, but it is not something that concerns or affects

1    the opinion of the financial statements as a whole.

2        Now, once the overall magnitude of the sales started

3    jumping to about -- if I remember correctly it was north of 20

4    million plus a quarter, gets you to about roughly over a

5    hundred million and if that is the case, then assuming that a

6    bunch of them are not necessarily in the realm of being

7    appliance-related stuff, then it gets you into this sort of

8    thing that you should be disclosing that separately in your

9    financial statements.

10        Overall revenue of Autonomy was roughly a billion at that

11    point in time, and so this was over the 10 percent level and

12    that becomes material at that point in time, so I was starting

13    to get concerned.

14    Q.    From time to time would you review Autonomy's public

15    filings?

16    A.    Yes, I did.

17    Q.    Did you see any disclosures of hardware sales?

18    A.    No.

19    Q.    And did that concern you?

20    A.    Yes, it did, but I was always told that IFRS was different

21    from US GAAP.  My recollection of any kind of GAAP is that if

22    there is something significant, it needs to be disclosed, and

23    this wasn't.  And my recollection of the financial statements

24    was there was only two lines there and there was only a

25    software line, so I'm assuming everything was done through the

 1   software.

 2          **MR. LEACH:**  Let me direct your attention to

 3   Exhibit 1352, and I'll move it into evidence.

 4          **THE COURT:**  1352 admitted.

 5          (Trial Exhibit 1352 received in evidence)

 6   **BY MR. LEACH:**

 7   **Q.**   I'm displaying to you, Mr. Vaidyanathan, what appears to

 8   be Autonomy Corporation's annual report for December 31st,

 9   2010.  Do you see that?

10   **A.**   Yes.

11   **Q.**   Did you review documents like this from time to time?

12   **A.**   Yes, I've seen these before.

13   **Q.**   Okay.  And what is the annual report?  What is this?

14   **A.**   So an annual report is the -- is two things, actually.

15   One is it has the financial statements for the year.  It has an

16   auditor's report that is appended where the auditors opine on

17   the financial statements.

18          The other things that it contains also were the board of

19   directors' report on the financial statements plus all sorts of

20   other specific details that were required by the SEC equivalent

21   in the UK specifically regarding some communication or some

22   remuneration or things of that nature.

23   **Q.**   Let me draw your attention, please, to page 6.

24          Do you see the heading "Chief Executive's Review"?

25   **A.**   Yes.

VAIDYANATHAN - DIRECT / LEACH

1   **Q.**   And do you see an image of Dr. Lynch --

2   **A.**   Yes.

3   **Q.**   -- below that?

4   **A.**   Yes.

5   **Q.**   And if we could draw your attention to page 9.

6        Do you see a signature above the heading

7   "Dr. Michael R. Lynch, chief executive officer and cofounder"?

8   **A.**   Yes.

9   **Q.**   And if we could please look at page 14.

10       Do you see the heading "Business overview" at the top left

11  corner --

12  **A.**   Yes.

13  **Q.**   -- Mr. Vaidyanathan?

14       And is there a description here of Autonomy's business

15  model, the way it sells products?

16  **A.**   Yes.

17  **Q.**   Okay.  I want to focus on the description of appliance

18  down at the bottom right corner.

19  **A.**   Uh-huh.

20  **Q.**   Do you see where it says, "Appliance.  This is currently a

21  small part of Autonomy's business, focused on quick

22  time-to-value and high return.  When customers have an urgent

23  need to deploy IDOL either for regulatory or commercial

24  imperatives we are able to provide a pre-installed license or

25  appropriate hardware to start generating an immediate return."

**VAIDYANATHAN - DIRECT / LEACH**

1    Do you see that language?

2    **A.**    Yes.

3    **Q.**    Is that what you observed with the sale of -- or the

4    resale of Dell laptops, desktops, mice, adapters and backpacks?

5    **A.**    No.

6    **Q.**    It then says, "The value of these solutions is

7    attributable almost entirely to the functions offered by the

8    license, so although there are some hardware costs involved,

9    the margin profile is not widely dissimilar to our traditional

10   license business."  Do you see that?

11   **A.**    Yes.

12   **Q.**    What did you understand that to mean?

13   **A.**    Well, the only way that makes sense is if you -- if you

14   combine the hardware portion and the software portion and then

15   you say that the overall sort of license -- margin profile on

16   that particular or those set of deals are not dramatically

17   different from the overall population of deals that were done

18   otherwise of appliances.  That is the only way that makes

19   sense.

20   **Q.**    Did that make sense to you?

21   **A.**    No, it did not.

22   **Q.**    Why didn't that make sense to you?

23   **A.**    That's because the value of the hardware sales was

24   approaching over 10 percent.  10 percent is not something I

25   would characterize as small.  In my sort of view of the world,

**VAIDYANATHAN - DIRECT / LEACH**

1  anywhere between above 2 percent starts becoming meaningful.

2  Somewhere between 5 percent you've got to start looking at

3  whether you need to disclose it separately or not.  Anything

4  above that you've got to figure out whether that makes a

5  difference to the readers of the financial statements.  So

6  that's how I've always viewed numbers, and typically you go

7  back and look at the accounting guidance associated with this,

8  the stock -- guidance associated with -- the SEC guidance here

9  in the US associated with this and then make your determination

10  appropriately with the auditors.

11  **Q.**  So inside Autonomy you understood because you were

12  reviewing some of the paperwork that the hardware sales

13  included laptops, desktops, monitors, mice, backpacks?

14  **A.**  Yes.

15  **Q.**  And from time to time you would review the -- you know,

16  the public-leaning statements about Autonomy's appliance

17  businesses.  Did you view a disconnect there?

18  **A.**  Yes.  I did view it -- I mean this one is clearly a

19  disconnect.  If you go and look at the financial statements

20  themselves, they don't have a separate line for hardware.

21      So my view was they -- at least in my mind I internalized

22  it as they must have gone and talked with the auditors, somehow

23  the auditors must have been fine with it.  The auditors would

24  have caught this because it's above their materiality threshold

25  they would have certainly looked at it, so . . .

1  Q.   And was the laptops and the monitors that were being sold,

2  did Autonomy ever take physical possession of those?

3  A.   No.

4  Q.   And why was that significant to you?

5  A.   Well, that flies completely against what is said here in

6  specific because it says it provides a pre-install license.

7  The license, if you pre-install it means that you would take

8  possession of the hardware.  And if you said you would take

9  possession of the hardware, you would have expected some

10 inventory on your books because you can never sell everything

11 that you bought for on the same day.

12      And typically people if you don't manufacture it, it

13 doesn't make any sense to hold on to that inventory on your

14 books, so you would rather have it dropped shipped, which is

15 what Autonomy did.  And if it was mice and backpacks like they

16 were selling, it made no sense to take that.  It would just add

17 to logistical delays and you'll have more of a loss.

18      (Reporter seeks clarification.)

19         THE WITNESS:  Logistical delays and you would add to

20 the potential loss on that transaction.

21 BY MR. LEACH:

22 Q.   Let's do our best, Mr. Vaidyanathan, to speak slowly and

23 deliberately so everybody can hear you and understand you.

24 Again, thank you for your patience there.

25      In your own mind why did you have -- why did you think

1   Autonomy was selling Dell laptops?

2   **A.**   So I thought initially when I looked at those transactions

3   and they were all software related, hardware related, that held

4   together in the sense that, you know, yes, you can actually

5   have hardware and software that was being sold separately, and

6   that would potentially, you know, be -- can be qualified as an

7   appliance eventually if the customers actually installed the

8   software onto the hardware.

9        Now, when you start selling mice and monitors and laptops

10  and desktops and things of that nature, then it becomes more of

11  a revenue sort of generating item than anything else.  And

12  because we were selling that at a loss of anywhere between 8 to

13  14 percent -- there were stages -- roughly a 10 percent loss on

14  the overall sort of Dell contract, when you sell those items at

15  a loss, you have a revenue item that shows up in revenue

16  because of the sales of those items.  You have a loss based on

17  that that needs to be accounted for because the hardware is

18  obviously expensive and it doesn't -- you are selling at a loss

19  clearly.  So that loss needs to be accounted for as well and

20  that -- while it was generating revenue -- so it took the

21  pressure off the revenue portion -- it was creating pressure on

22  margins.

23  **Q.**   When you say it was putting pressure on margins, what do

24  you mean?

25  **A.**   So typically software companies back in the day with

1    traditional perpetual sale businesses, so perpetual use

2    software essentially saying that you sell -- it's a one-time

3    sale and after all you do is you sell maintenance to those

4    customers.  That was the model back then for pretty much most

5    software companies around the world.

6        And there were new companies at that point in time like

7    Salesforce.com, that were trying on the Cloud -- they were

8    trying to move to the Cloud using a repetitive sort of sales

9    business, but it had not caught on back them.

10        The idea there was to -- when you talk about these sort of

11   sales -- so once you sell the initial sort of software product,

12   the only future revenue stream from those customers is the

13   maintenance renewal.  There's nothing else.  So if you

14   basically include hardware in your revenue, then it adds to

15   your revenue number, but that revenue number is not generating

16   the kind of profitability margins that a software sale actually

17   generates.

18        Because we did not use too much of externally developed

19   software or technology in our products, the overall sort of

20   expense for generating or producing software was low.  So if

21   that is the case, then this would then -- if you include this

22   as software revenue, this would increase the revenue number but

23   it would decrease the profitability associated with the

24   software sale.  So obviously that is what I meant when I --

25   when I mentioned that it would basically put pressure on the

1    margins.

2    **Q.**    At some point in time did you learn that Autonomy was

3    recording some of the cost relating to the hardware not in

4    gross profit but in sales and marketing?

5    **A.**    Yes.

6    **Q.**    Did that cause you concern?

7    **A.**    Yes.

8    **Q.**    Why?

9    **A.**    Typically when you sell hardware or when you say sell

10   software, costs associated directly with selling the hardware

11   or the software needs to be recorded against that item in cost

12   of goods sold, so it would impact gross margin.

13          In this potential case, from a Dell hardware standpoint,

14   we were told not to book it to the close -- cost of goods sold

15   line.

16   **Q.**    Who told you that?

17   **A.**    Lisa Haas.

18   **Q.**    Does she work for Mr. Chamberlain?

19   **A.**    Yes.

20   **Q.**    Did you view it as deceptive in any way to put the

21   hardware costs in sales and marketing?

22   **A.**    Yes.

23   **Q.**    Did you also have conversations with Mr. Chamberlain

24   whether the hardware revenue should be reported at a gross

25   amount or a net amount?

**VAIDYANATHAN - DIRECT / LEACH**

1    **A.**    Yes.

2    **Q.**    Okay.  And what does that mean?

3    **A.**    So the gross versus net concept applies to almost every

4    sort of accounting level across jurisdictions, so typically the

5    idea is to check whether you are selling the goods or services

6    as a principal or as an agent.  So if you sell it as a

7    principal, then you can clearly record it as a sale; there's no

8    issues.  If you record it as an agent, then you've got to

9    figure out whether you added any more value to that particular

10    thing.  Does the customer view you as the person you're selling

11    it from, whether -- controlled paths.  There are a few tests

12    that you apply.  And presuming that you pass those tests, then

13    can you either classify it as gross, which means you can take

14    the net total revenue and the cost to the cost line, so putting

15    both sides on financial statements.

16        In other circumstances where you do not pass this test,

17    what you would do is, you would net the two, essentially saying

18    you have $10 of sale from revenue and you got, let's say, $9

19    for purchases; you would net the two, and you will show 1 on

20    your income statement.

21    **Q.**    And you had conversations with Mr. Chamberlain about this?

22    **A.**    Yes.

23    **Q.**    Because you had concerns about Autonomy recording it at

24    the net -- or the gross rather than the net?

25    **A.**    Yes.

1        **MR. SEILIE:**  Objection, foundation.

2        **THE COURT:**  Overruled.

3   **BY MR. LEACH:**

4   **Q.**   And what did Mr. Chamberlain say to you?

5        **MR. SEILIE:**  Objection, foundation as to time and

6   place, Your Honor.  We don't know when this conversation has

7   happened.

8        **THE COURT:**  Okay.  Can you lay a foundation as to the

9   approximate date?  Sustained.

10  **BY MR. LEACH:**

11  **Q.**   During the period -- during the period 2010 did you have

12  conversations with Mr. Chamberlain about this?

13  **A.**   Yes.

14  **Q.**   And what did he say?

15       **MR. SEILIE:**  Still vague, Your Honor.

16       **THE COURT:**  Well, I don't know how vague it is.  Can

17  you identify when in 2010 he had these conversations or not?

18  **BY MR. LEACH:**

19  **Q.**   Sitting here today, Mr. Vaidyanathan, do you know the

20  specific date and time when you had this conversation?

21  **A.**   I can't give you a specific date for certain.  I think

22  it's in the second half 2010.

23  **Q.**   Second half of 2010?

24  **A.**   Yes.

25  **Q.**   And you have clear memory of this conversation with

1    Mr. Chamberlain?

2    **A.**    We've had several conversations on this topic, so . . .

3    **Q.**    Okay.  What did he say?

4    **A.**    Well, the concept was --

5         **MR. SEILIE:**  Same objection, Your Honor.  There's

6    no --

7         **THE COURT:**  Yeah.  Overruled.  Go ahead.

8         **THE WITNESS:**  So the idea here was to understand from

9    him, hey, I'm missing something, can we be very clear as to

10   exactly how we got around this just so that my knowledge gets

11   provided.

12        And he said, well, we've gone through this entire detail

13   with auditors along with a bunch of facts are associated with

14   this at the corporate level, and so we are -- we got

15   comfortable that it should be close.

16   **BY MR. LEACH:**

17   **Q.**    Did he say, in words or substance, that you should back

18   off?

19   **A.**    He didn't say it that way but that's -- that's what I

20   thought.  I mean, when he said that, well, it's all been

21   discussed with the auditors, there's no point in discussing it,

22   so . . .

23   **Q.**    Let me move forward in time, Mr. Vaidyanathan, to the end

24   of 2010, and I want to ask you some questions about a company

25   called VMS or Video Monitoring Systems.  Is that a company you

1  became familiar with at your time at Autonomy?

2  **A.**   Yes.

3        **MR. LEACH:**   Let me draw your attention and I'll move

4  into evidence Exhibit 15575.

5        **THE COURT:**   One -- I'm sorry?

6        **MR. LEACH:**   15575.

7        **THE COURT:**   15575 admitted.

8      (Trial Exhibit 15575 received in evidence)

9        **MR. LEACH:**   And if we could start, Mr. Hasan, down at

10  the bottom half of the email.

11  **BY MR. LEACH:**

12  **Q.**   Mr. Vaidyanathan, do you see an email from you dated

13  Friday, December 31st, 2010, with the subject "FA register"?

14  **A.**   Yes.

15  **Q.**   What does "FA register" refer to?

16  **A.**   "FA" refers to fixed assets.

17  **Q.**   What are fixed assets?

18  **A.**   So fixed assets are assets -- or items that a company

19  acquires and puts them on the balance sheet with the intent of

20  using them for periods greater than one year.  And the intent

21  is that you've got to basically establish a useful life.  Based

22  on the useful life the asset is then amortized over the useful

23  life, typically over three years or five years.

24  **Q.**   So the monitor you're looking at, the computers that the

25  Court is using, would those be fixed assets of the Court?

1  A.   Yes.

2  Q.   Okay.  And this -- you were writing here "Chris Goodfellow

3  urgently needs to look at the FA register."  Was Mr. Goodfellow

4  somebody who worked in the UK in tech?

5  A.   That's my recollection.

6  Q.   Okay.

7  A.   I believe that.

8  Q.   And Huaimin Ding, who was that?

9  A.   So Huaimin was the deal accountant at Zantaz in the US,

10  and Zantaz is a group company of Autonomy in the US and she

11  used to work for me.

12        MR. LEACH:  Okay.  And if we could look briefly at the

13  top, Mr. Hasan.

14  BY MR. LEACH:

15  Q.   Huaimin Ding writes back to you on the last day of 2010

16  with a copy to Mr. Chamberlain "Please see attached for Zantaz

17  US fixed asset listing in FA register as of today.  Let me know

18  if you have any questions."  Do you see that?

19  A.   Yes.

20        MR. LEACH:  Okay.  And I'd like to look briefly at the

21  attachment, the Excel file, very briefly.  And if we could just

22  zoom in to the top portion with the header, please.  Thank you,

23  Mr. Hasan.

24  BY MR. LEACH:

25  Q.   Do you see the heading Autonomy Zantaz US No. 2?

**VAIDYANATHAN - DIRECT / LEACH**

1    A.    Yep.

2    Q.    And it says "Asset Listing Report"?

3    A.    Uh-huh.

4    Q.    And in column E there's a description for "Dell tape drive

5    LTO"?

6    A.    Yes.

7    Q.    And then there's a location column in F.  Do you see that?

8    A.    Yes, sir.

9    Q.    And do you see the abbreviations "PLS"?

10   A.    Yes.

11   Q.    Is that Pleasanton?

12   A.    Yes.

13   Q.    Beneath that it's "LV."  Is that Las Vegas?

14   A.    That's correct.

15   Q.    And then further down there's "SAC."  Is that Sacramento?

16   A.    Yes.

17   Q.    And is this essentially a listing of all of the computers

18   that Autonomy is using in Zantaz in order to run its Zantaz

19   business?

20   A.    That's correct.

21   Q.    Okay.  So the DigitalSafe that you talked about yesterday,

22   this is computers and equipment that are being used to maintain

23   those DigitalSafes on behalf of banks?

24   A.    Yes.  So this would contain not only that, it would

25   contain pretty much everything else that was not necessary to

1   run just DigitalSafe, so anything that Zantaz, the company,

2   acquired to basically run its financial statements or to run

3   its business, so essentially could include furniture and

4   fixtures and other stuff as well, but this was primarily the

5   equipment.

6   **Q.**   And is this all used equipment?  I mean, it's being used

7   by Autonomy at the time?

8   **A.**   Yes.  It's all used.

9   **Q.**   Okay.  And did you develop an understanding of why you

10   were being asked to provide a list of fixed assets to Chris

11   Goodfellow and Steve Chamberlain?

12   **A.**   At that point in time I don't think I knew.

13   **Q.**   Okay.  Did you come to understand it?

14   **A.**   Subsequently, after a few contracts, yes, I understood

15   exactly why.

16   **Q.**   And what were you asked to do?

17   **A.**   Well, I was -- we were only asked to provide a listing.

18   That was all we were asked to do.  I don't think we were asked

19   to do anything else on this specific topic.

20       **MR. LEACH:**   Okay.  Let's look at Exhibit -- and I'll

21   move into evidence -- 1428.

22       **THE COURT:**   1428 admitted.

23       (Trial Exhibit 1428 received in evidence)

24       **MR. LEACH:**   And if we could zoom into the top,

25   Mr. Hasan, with the header and the attachments.

**VAIDYANATHAN - DIRECT / LEACH**

1   That's good.

2 **BY MR. LEACH:**

3 **Q.** Do you recognize this document, Mr. Vaidyanathan?

4 **A.** Yes.

5 **Q.** Okay.  And is this an email from you to Steve Chamberlain

6 and Matt Stephan dated January 6, 2011?

7 **A.** Yes.

8 **Q.** Do you see the subject "VMS invoice"?

9 **A.** Yes.

10 **Q.** And there's a number of attachments.  I want to start to

11 get you oriented with the one fourth from the bottom, "VMS

12 Second Amend to Software License."  Do you see that?

13 **A.** Yes.

14   **MR. LEACH:**  And if we could go, please, to page 7.

15 **BY MR. LEACH:**

16 **Q.** Is this the attachment, Mr. Vaidyanathan?

17 **A.** Looks like it.

18 **Q.** Okay.  And do you see the heading "Second software license

19 agreement"?

20 **A.** Yes.

21   **MR. LEACH:**  If you could zoom in to the top half,

22 Mr. Hasan.

23   Down a little bit more.  That's good.  Thank you.

24 **BY MR. LEACH:**

25 **Q.** And do you see the -- do you see the date -- effective

VAIDYANATHAN - DIRECT / LEACH

1    date of December 31st, 2010?

2    **A.**    Yes.

3    **Q.**    And in paragraph 2 it says, "Hardware.  By execution below

4    VMS unconditionally and irrevocably agrees to purchase from

5    Autonomy and Autonomy agrees to sell to VMS the hardware and

6    other equipment identified in the schedule attached to the

7    second amendment."  Do you see that?

8    **A.**    Yes.

9    **Q.**    And in this time period did you come to understand that

10   Autonomy was selling hardware to VMS?

11   **A.**    Yes.

12           **MR. LEACH:**    Okay.  Let's look at the next page,

13   page 8, please.  And if we could zoom in on paragraph 3 all the

14   way down -- little bit more so we capture the rows.

15       Thank you, Mr. Hasan.

16   **BY MR. LEACH:**

17   **Q.**    Do you see in paragraph 3 where it says, "Purchase price,

18   VMS shall pay to Autonomy the sum of 6,004,066 and 90/100th in

19   United States dollars."  Do you see that?

20   **A.**    Yes.

21   **Q.**    So $6.4 million?

22   **A.**    Uh-huh.

23   **Q.**    And you see a payment schedule where there are various

24   installments over a period of time?

25   **A.**    Right.

1          **MR. LEACH:**  Okay.  And let's go to page 9, please,

2    Mr. Hasan.  And if we could zoom in on the top half.  That's

3    great.

4    **BY MR. LEACH:**

5    Q.   Is this a list of the hardware that you understood VMS was

6    purchasing?

7    A.   Yes.

8    Q.   Okay.  Do you see where it says "Type 1 Server (quantity

9    purchased 1,361)"?

10   A.   Yes.

11   Q.   Did this indicate to you that VMS was purchasing 1,361

12   Type 1 servers?

13   A.   Yes.

14   Q.   And each of those Type 1 servers was to include the

15   product listed below, including 1HP and then there's a number.

16   Do you see that?

17   A.   Yes.

18   Q.   Okay.  And further below it says "Type 3 servers,

19   (quantity purchased 227)."  Do you see that?

20   A.   Yes.

21   Q.   And each of those 227 Type 3 servers were to include some

22   additional product as listed there.  Was that what your

23   understanding was?

24   A.   Yes.

25   Q.   Okay.  So VMS was purchasing 6 million of hardware listed

**VAIDYANATHAN - DIRECT / LEACH**

1  there.  Was that your understanding, based on this agreement?

2  A.   Yes.

3        MR. LEACH:   Okay.  Let's go back to page 1, Mr. Hasan.

4  BY MR. LEACH:

5  Q.   And I want to focus on what you wrote to Mr. Chamberlain.

6  You wrote "Hi Steve, Matt.  I just caught something while

7  trying to ensure that we book the cost of hardware revenue for

8  the revenue taken."  Do you see that?

9  A.   Yes.

10  Q.   And what did you mean by that?

11  A.   So I was just trying to make sure that the -- when you

12  book the revenue, I was trying to make sure the costs got

13  booked as well because it was a sizeable purchase, and I just

14  want to make sure the costs are booked.

15  Q.   And the costs of the revenue would be --

16  A.   In cost of revenue, yes.

17  Q.   -- cost of all the hardware we just saw in the agreement?

18  A.   Yes.

19  Q.   Okay.  Down at the bottom you wrote "For the VMS contract,

20  it seems that we have a purchase order of approx GBP" -- is

21  that pounds?

22  A.   Yes.

23  Q.   -- "1.8M" -- is that 1.8 million?

24  A.   That's correct.

25  Q.   -- "issued out of the UK."

**VAIDYANATHAN - DIRECT / LEACH**

1    **A.**    Uh-huh.

2    **Q.**    What did you mean by that?

3    **A.**    So typically you would not -- we didn't manufacture the

4    hardware, so if you are selling hardware you would have to get

5    the hardware from someplace.  So my assumption was that it

6    would have been backed by purchase orders with Windows who made

7    the hardware.  So my point was, yes, I found out that there was

8    a purchase order of 1.8 billion -- 1.8 million British Pounds

9    in the UK, so part of that was already taken care of.  So I

10    just wanted to make sure that the balance was recorded

11    correctly.

12    **Q.**    And in your mind the balance was to be recorded from fixed

13    assets that Autonomy had, used hardware in its own facilities?

14    **A.**    No.

15    **Q.**    No?  What was it to be covered from?

16    **A.**    My assumption was because we didn't manufacture hardware,

17    we would basically be buying hardware from someplace and giving

18    it.  I was expecting a Dell order worth the difference to be

19    based out of the US.

20    **Q.**    Okay.  Did you come to learn that there was no additional

21    order to cover the hardware costs?

22    **A.**    Yeah, because I didn't see it in the Dell purchase orders,

23    so I didn't see one, and so that led to the question and I just

24    wanted to make sure that we captured the cost.

25    **Q.**    Okay.  And there's some additional attachments to -- well,

 1   let me first look at the -- you reference a --

 2          MR. LEACH:  If we could go to page 2, Mr. Hasan, and

 3   that paragraph at the top.

 4   BY MR. LEACH:

 5   Q.   You wrote, "The other issue that I noted seems to be that

 6   the PO that we raised to Insight UK doesn't seem to cover all

 7   items in appendix to the contract amendment."  What did you

 8   mean by that?

 9   A.   So it's pretty much what we -- we just talked about.  The

10   overall number was about 6 million, thereabouts.

11          My understanding was, we had 1.8 million GDP or the UK, so

12   I was looking; roughly that's give or take 2 million in US.

13   The question was for the balance and it said we have some items

14   in stock, so it was just kind of odd.

15   Q.   What do you mean it was kind of odd?

16   A.   We have never sold -- we don't sell used items to

17   customers.  We sell new equipment to customers.  Nobody will

18   buy used equipment unless they're absolutely desperate.

19          MR. LEACH:  Let me look briefly at the PO.  If we

20   could go to page 27, Mr. Hasan.

21   BY MR. LEACH:

22   Q.   Is this the purchase order for the 1.8 million Pounds of

23   new hardware that you were referring to?

24   A.   Yes.

25   Q.   And there's a description for Type 1 servers.  Do you see

VAIDYANATHAN - DIRECT / LEACH

1  that?

2  **A.**    Yes.

3  **Q.**    And the quantity is -- for at least some of them is 390.

4  Do you see that?

5  **A.**    Yes.

6  **Q.**    Was part of the issue you were wrestling with here is

7  we've bought some hardware from Insight to resell to VMS,

8  where's the remainder going to come from and how are we going

9  to book those costs?

10  **A.**    Yes, that was the question.

11      And secondly, this wasn't -- it wasn't very clear to me

12  how many Type 1 servers these were.  There's a whole bunch of

13  components here.

14      The agreement referred to a specific number of servers.

15  This looked like it's part of the order, it doesn't look as

16  though -- because I couldn't tell how many chassis you need to

17  build one server, so it's very difficult with the information

18  on this to tell how many you can actually make out of this.

19  **Q.**    And is that the issue you were escalating to

20  Mr. Chamberlain?

21  **A.**    So yes.  So one is that.  The second was, okay, you've

22  got -- you've got this, where's the balance coming from.  I

23  don't know how many these are, so where's the balance coming

24  from.

25  **Q.**    Okay.  Let's look at page 16.  Do you see the email from

1    Chris Goodfellow to Richard Eads with the subject "Stock for

2    VMS"?

3    **A.**    Yes.

4    **Q.**    And Richard Eads, was he a colleague of yours in finance?

5    **A.**    Yes.

6    **Q.**    Did he work in eTalk?

7    **A.**    Yes.  He was controller for eTalk --

8    **Q.**    Okay.

9    **A.**    -- and head of procurement for the Autonomy Group in the

10    US.

11    **Q.**    Okay.  And you see where Mr. -- and stock, is that a

12    reference to fixed assets?

13    **A.**    Well, at that time I didn't know, but it appears to be so.

14    **Q.**    Okay.  And Mr. Goodfellow is writing "956 servers plus

15    3SAN's in stock.xlsx."  Do you see that?

16    **A.**    Yes.

17    **Q.**    And if we go to page 12, do you see a further listing of

18    stock for VMS with locations in Sacramento, and various serial

19    numbers?

20    **A.**    Yes.

21    **Q.**    And because these were attached to the email, did you

22    understand that these servers were going to be used to satisfy

23    the VMS purchase?

24    **A.**    Yes.

25    **Q.**    Did that seem odd to you?

1    **A.**    Yes.

2    **Q.**    Why was that odd to you?

3    **A.**    Because, typically, you don't sell fixed assets to

4    customers to satisfy an order.  You would generally keep -- you

5    would sell stock, so stock as an inventory.  So you would

6    buy -- which is why I was expecting a purchase order, right?  I

7    didn't expect to use what we already have.

8        So this seemed as though either we had just bought those

9    and we had just capitalized them and therefore we would not

10   theoretically be using them, therefore we were using those

11   for -- to satisfy the order instead of buying new.  That is the

12   only -- only explanation I could think of, but logically --

13   typically if you're going to sell fixed assets and you're doing

14   that, that should not be from a fixed asset standpoint, it

15   should be inventory.

16   **Q.**    Did you ever see any evidence that these servers that

17   Autonomy was using for its own purposes in Sacramento and

18   Pleasanton and Las Vegas were actually delivered to VMS?

19   **A.**    No, I did not see.

20   **Q.**    Okay.  Did you ever see any evidence that these servers

21   that were being used by Autonomy were, you know, somehow

22   cordoned off and stopped being used so that VMS could use them

23   some day?

24   **A.**    No.

25   **Q.**    Okay.  Did you see anything that suggests to you that

1  these servers that would make up the balance of this order were

2  actually sent to VMS?

3  **A.**   No.  Also, I did not know whether these fully satisfied

4  the order.

5  **Q.**   Okay.  Moving forward and -- was that odd to you?

6  **A.**   Yes.

7  **Q.**   Why was that odd to you?

8  **A.**   For two reasons.  One, if you are -- if you are taking

9  revenue for that particular order because you're developing

10 hardware, the idea would be to take revenue, and if you are

11 taking revenue, then you should book the cost.  If you book --

12 for you to book the cost, because you don't manufacture the

13 hardware, you needed to do two things.  One, you needed to get

14 the hardware from someplace else and drop ship it on the same

15 day.  If that wasn't done, then potentially the sale also

16 couldn't be recorded.  If you bought it from somewhere, then

17 that cost should be recorded on the books as a cost of sale.

18       Second, it should be -- you should have -- if you're

19 doing -- if you are selling part of fixed assets to sort out

20 the order, then you should declassify those fixed assets from

21 fixed assets and record the amount as a inventory cost-of-sales

22 item.

23 **Q.**   Did you ever get a satisfactory answer to your questions

24 from Mr. Chamberlain?

25 **A.**   No.

**VAIDYANATHAN - DIRECT / LEACH**

1  **Q.**   Okay.  At this point in time were you reluctant to ask

2  questions?

3  **A.**   Yes.

4  **Q.**   Why were you reluctant?

5  **A.**   Well, we had -- by then I had known that -- you know,

6  Brent had actually asked the questions of the -- of our

7  committee to the management in the UK.  I also knew that he had

8  told us that he was going to the SEC in the US, he was also

9  going to the SFO -- the Serious Fraud Office in the UK.  I knew

10  he was going there.  I didn't know whether he went or not

11  but -- and the -- subsequently -- obviously nothing happened.

12       We were told that Deloitte went through all of that, they

13  found that everything was in order and then at that point in

14  time my assumption was, well, there must be something more that

15  I don't know that clearly other people have looked at and

16  they've found it satisfactory.  Clearly I'm in the -- I don't

17  have all the information that is needed to process this piece

18  of -- this transaction.

19  **Q.**   Moving forward in time after the HP acquisition is

20  announced but before it's closed, did you write off any amounts

21  relating to VMS?

22  **A.**   Yes.

23  **Q.**   What did you do?

24  **A.**   We were asked to write off the entire amount that was due

25  from VMS.  There was a bunch of -- bunch of items that we were

VAIDYANATHAN - DIRECT / LEACH

1   asked to write off.

2   **Q.**   The entire amount that was owed for the hardware?

3   **A.**   I think it was -- if I remember correctly -- I'm going off

4   memory here -- I think it was roughly $10 million.

5            **THE COURT:**  I'm sorry, what did you say?

6            **THE WITNESS:**  It was 10 million.

7   **BY MR. LEACH:**

8   **Q.**   I want to ask you a few questions about the first quarter

9   of 2011 and the second quarter of 2011.  And if I could draw

10  your attention to Exhibit 15704, which I'd move into evidence.

11           **THE COURT:**  15704 admitted.

12      (Trial Exhibit 15704 received in evidence)

13  **BY MR. LEACH:**

14  **Q.**   Do you recognize this, Mr. Vaidyanathan?

15  **A.**   Yes.

16  **Q.**   What is this?

17  **A.**   So this was an email from Steve talking about two deals --

18  that we are reselling FileTek software for those two customers.

19  **Q.**   So Mr. Chamberlain -- and the date of this email is March

20  31st, 2011.  Do you see that?

21           **MR. LEACH:**  And if we could zoom in, Mr. Hasan, to the

22  top.

23  **BY MR. LEACH:**

24  **Q.**   Is that the last day of Autonomy's first quarter of 2011?

25  **A.**   Yes.

1  Q.   Okay.  And Mr. Chamberlain writes to you, "Ganesh, as part

2  of the deals with Morgan Stanley and HP, we are reselling

3  FileTek software.  Our own license is for internal use, and so

4  we are (reluctantly) having to pay a resale fee."  Do you see

5  that language?

6  A.   Yes.

7  Q.   And it goes on "We have paid for the HP piece from the

8  UK -- needed to be with FileTek opening of business day -- and

9  MS can only be paid once we get our deal.  Basically, we will

10  not execute until we have our deal."  Do you see that language?

11  A.   Yes.

12  Q.   And do you know why Mr. Chamberlain was sending this to

13  you?

14  A.   Because we needed to basically pay FileTek that particular

15  day.

16  Q.   Was this arrangement odd to you?

17  A.   Yes.  I don't think until then we had resold other

18  people's software.  We had other people selling our software.

19  This was the first I had heard of us reselling somebody else's

20  software.

21  Q.   What do you mean by that, that was the first time you

22  heard of this?

23  A.   So typically when software companies sell products, they

24  sell through either the direct channel or through resellers.

25  So direct channel you're in that -- the salesperson will then

1  go to the customer, broker the sale directly, and that will

2  come to the company.

3       When you go through a reseller, the reseller basically

4  contacts the customer, ensures that he or the reseller is in

5  areas where direct sales channels can't reach, and that's why

6  you expand your reach with resellers.

7       There also you have the third-party coming in and the

8  contact will be three-way sort of discussions and eventually

9  the deal gets consummated.  So that was what I was familiar

10  with from a standpoint of Autonomy.  We were using both of

11  those channels to expand our footprint, so we were having

12  resellers sell our software, we were having -- selling directly

13  as well.  We were not reselling somebody else's software.  That

14  was not my recollection.

15  **Q.**   And was there anything about the timing of this that

16  caused concerns in your mind?

17  **A.**   I mean, typically last day of the quarter, again, if you

18  are selling -- reselling software, nobody would have a

19  transaction on the last day of the quarter with immediate pay

20  terms.  Typically, you would have payment terms, say, net 30 or

21  whatever, that would happen, but I've not seen typically

22  customers come in and say you resell my software, I need you to

23  pay right away and that needs to be resold to a third-party

24  customer, so it was hard.

25       Typically in the Autonomy world I've seen large contracts

1   come in during the last day or last two days of the quarter;

2   not unusual for a software company, but the resellers typically

3   you would see some of these being talked about much before, not

4   typically on the last day.

5   **Q.**   And if I'm understanding you correctly, the fact that

6   payment was due on March 31st, that was different from other

7   software selling arrangements that you were familiar with?

8   **A.**   Correct.

9   **Q.**   Okay.  Did you develop concerns in your own mind that

10   Autonomy was paying FileTek so FileTek could pay Autonomy?

11   **A.**   So we've had all these deals with FileTek.  Anyway there

12   was a lot of buy transactions, there were sell transactions,

13   this -- and FileTek was one of the vendors that I had brought

14   up in mid-2010, so it looked like another of those

15   transactions, but I couldn't tell -- I couldn't tell why we

16   were reselling FileTek software.

17        FileTek is not, as far as I know at that point in time,

18   not a huge sort of software vendor that vendors like Morgan

19   Stanley and HP would use.  They would, more likely than not,

20   buy Autonomy software.  They would buy a DigitalSafe, they

21   would buy other things, but I'm not necessarily sure that they

22   would understand what a FileTek software was being used for.

23   And for us to resell that software seemed odd.  As I said, we

24   had not done this before, so it appeared to me that this was,

25   you know, one more of those transactions with FileTek which I

1    don't have a complete grip on.

2    **Q.**    And did you -- and is part of that because that

3    responsibility had been taken away from you?

4    **A.**    Yeah.    I couldn't see the other side of the transaction at

5    all.

6    **Q.**    But did you develop concerns that what you had observed in

7    2010 was happening further in 2011?

8         **MR. SEILIE:**    Objection, leading.

9         **THE COURT:**    Overruled.

10         **THE WITNESS:**    My worry because of my 2010 experience

11    was -- and because we are selling to the same sort of reseller

12    with potential circular sort of transaction, I was a little

13    worried.

14    **BY MR. LEACH:**

15    **Q.**    At this point in time were you worried about maintaining

16    your employment?

17    **A.**    Yes.    As I said, I came into the US in 2008 and as we all

18    know, 2008 wasn't a great time to immigrate to the US.    We had

19    the worst recession in recent memory.    That didn't go really

20    well.

21         I recruited my family from India and I pretty much sold

22    everything in India and I had come to the US and within three

23    months of that the economy went south, Interwoven was in sale

24    proceedings, we got eventually bought out in 2009, and in 2010

25    this event happened with Brent and a few others getting fired.

1    My -- I could not legally work in the country if I didn't have

2    a permit.  I was -- my Green Card was in the process of being

3    processed, you know.  If I had to go back to India at that

4    point in time, it would have been a terrible financial blow to

5    me and the family, so it was -- it was concerning.

6    **Q.**    Did you work with Matt Stephan at all?

7    **A.**    Yes.

8    **Q.**    Who is Mr. Stephan?

9    **A.**    Mr. Stephan was based out of the UK.  He was responsible

10   for revenue, if I recall, back in -- he was based out of the

11   UK, and he was responsible for the Autonomy's revenue

12   recognition.  He and another lady, I think Poppy Prentis, both

13   of them were involved in A, revenue; and B, other corporate

14   matters relating to the US.

15   **Q.**    We saw Mr. Stephan on the VMS email from the end of 2010.

16   Do you have -- do you know if he left Autonomy at some point?

17   **A.**    Yes, he did.

18   **Q.**    Do you have any information why?

19         **MR. HEBERLIG:**  Objection, Your Honor.

20         **THE COURT:**  Sustained.

21   BY MR. LEACH:

22   **Q.**    Did have you conversations with Mr. Stephan about his

23   experience in the UK?

24         **MR. HEBERLIG:**  Objection, Your Honor.

25         **MR. SEILIE:**  Objection.

1          **MR. HEBERLIG:**  Same objection.

2          **THE COURT:**  Well, I'm going to admit it because it's

3     not coming in for the truth of the matter but, rather, this

4     witness's state of mind.

5          **MR. SEILIE:**  Objection as to foundation and to time of

6     these conversations and place, Your Honor.

7          **THE COURT:**  Okay.  Can you . . .

8     BY MR. LEACH:

9     **Q.**   Do you know when Mr. Stephan left, Mr. Vaidyanathan, his

10    reasons for leaving Autonomy?

11    **A.**   Oh, Yes, I did.  I was -- I was -- I thought he was a good

12    sort of accountant with a strong head on his shoulders in terms

13    of understanding the nuances of accounting pretty well, so --

14    and I got along pretty well with him, so I asked him why he was

15    leaving, and he said that he was leaving because, A, he wanted

16    to get back to Australia -- he was Australian -- and second, he

17    said that, well, with all that's going on, I'm better out of

18    here than in here.

19    **Q.**   And was that something that weighed on your mind in terms

20    of staying at Autonomy?

21    **A.**   Yes.  Again, if I could have left, assuming my permit

22    situation was sorted out and the economy was slightly better,

23    then I would have left right then because at that point in time

24    nobody could -- nobody in the US was hiring employees who

25    needed some sort of a visa or a visa backup or employee permit.

1    Q.   Let me move forward to the time of the second quarter of

2    2011.

3         THE COURT:   I think maybe we'll take a recess now.

4         MR. LEACH:   Great.

5         THE COURT:   Ladies and gentlemen, we're going to be in

6    recess until 5 minutes to 11:00.   Remember the admonition given

7    to you.   Do not discuss the case, allow anyone to discuss it

8    with you, form or express any opinion.

9         (Recess taken at 10:39 a.m.)

10        (Proceedings resumed at 10:57 a.m.)

11        (Jurors enter courtroom.)

12        THE COURT:   Okay.   Please let the record reflect all

13   jurors are present, the parties are present.   You may proceed.

14        MR. LEACH:   Thank you, Your Honor.

15   BY MR. LEACH:

16   Q.   Mr. Vaidyanathan, we were on the second quarter of 2011,

17   the last quarter before the HP acquisition, and I wanted to

18   draw your attention to Exhibit 11934, move it into evidence.

19        THE COURT:   11934 admitted.

20        (Trial Exhibit 11934 received in evidence)

21        MR. LEACH:   And Mr. Hasan, if we could please zoom in

22   on the top half.

23   BY MR. LEACH:

24   Q.   Is this an email from Steve Chamberlain to you with a copy

25   to Lisa Harris?

**VAIDYANATHAN - DIRECT / LEACH**

1    **A.**    Yes.

2    **Q.**    And what was Lisa Harris's role in the -- in the UK?

3    **A.**    She was group accountant, group chief accountant if I

4    remember correctly, and she was responsible for the overall

5    financial statements.

6    **Q.**    From time to time would she make comments to you about

7    meeting EPS figures?

8    **A.**    Yes.

9    **Q.**    What did she say?

10    **A.**    She would gently say that we need to get to a particular

11    EPS number that Shushovan had in mind and that was the -- that

12    was the goal.  And she would make references to certain things

13    that we have to do to get there.

14    **Q.**    Did -- at times did those seem results oriented to you?

15    **A.**    Yes.

16    **Q.**    On this occasion, June 30th, 2011, Mr. Chamberlain is

17    writing relating to something called DiscoverTech.  Were you

18    familiar with something called DiscoverTech?

19    **A.**    Yes.

20    **Q.**    Was that another one of the resellers we've been

21    discussing?

22    **A.**    Yes.

23    **Q.**    This says, "Need to process payment of 4.4M today.

24    Attached are the relevant docs and approvals.  Again, once I

25    have executed agreement and invoice, I will forward for

1    processing."  Was this Mr. Chamberlain directing you to prepare

2    for a $4.4 million payment to DiscoverTech?

3    A.    Yes.

4    Q.    And did you have similar concerns about this payment that

5    you had to the FileTek transaction from the previous quarter?

6    A.    Typically with resellers after 2010 I looked at pretty

7    much most of them with a greater degree of caution, didn't know

8    exactly what this was all about at that point in time, but

9    yeah.  If it relates to a deal towards the last day of the

10   quarter or so, it was something to worry about in my mind.

11   Q.    Was there something about the payment being made on the

12   last day of the quarter for software that weighed in your mind?

13   A.    Yes.  I mean, typically, again, if you're trying to do a

14   deal with a reseller, you would not necessarily have to pay the

15   amount right away and didn't understand why we were paying

16   something to a reseller.  Typically they buy stuff from you, so

17   it would be the other way around, but it seemed odd.

18   Q.    It seemed odd to you?

19   A.    Yeah.

20   Q.    All right.  Let me draw your attention to page 7.

21         MR. LEACH:  I'm sorry.  Page 3, Mr. Hasan.

22   BY MR. LEACH:

23   Q.    Do you see the heading "Software Distributor Agreement"?

24   A.    Yes.

25   Q.    And this appears to be an agreement or a draft agreement

1  between Autonomy and Discover Technologies?

2  A.    Yes.

3  Q.    And in your experience was it usual for Autonomy to

4  purchase software to resell to others?

5  A.    We did not.

6  Q.    You did not do that?

7  A.    We did not do that and my -- the last time we did that was

8  the FileTek thing we just talked about.  Again, this was odd.

9  Q.    This was odd?

10  A.    This was odd.

11  Q.    Okay.  If I could draw your attention to page 13.

12         MR. LEACH:  And if we could zoom in on the top half

13  down to Mr. Chamberlain's signature or signature block.

14  BY MR. LEACH:

15  Q.    Do you see an email from Steve Chamberlain dated June

16  30th, 2010, to Mike Lynch, Shushovan Hussain with a copy to

17  Joel Scott and Andrew Kanter?

18  A.    Yes.

19  Q.    Who is Mr. Kanter?

20  A.    He was the CTO -- COO, sorry.  He was the COO, chief

21  Operating Officer of Autonomy.

22  Q.    Was he also a lawyer?

23  A.    Yes, he was.

24  Q.    And Mr. Chamberlain wrote "Both-need your approval to

25  proceed on this."  Do you see that?

VAIDYANATHAN - DIRECT / LEACH

1    A.    Yes.

2    Q.    And at the top do you see where Mr. Hussain responds with

3    a copy to Steve Chamberlain and Mike Lynch "Based on

4    discussions with stoufer and the resale value on a number of

5    our strategic accounts I am ok."  Do you see that?

6    A.    Yes.

7    Q.    And did you take that as approval that you could make this

8    $4.4 million payment to DiscoverTech?

9    A.    Yes.  It appears as though they were okay with the overall

10   reseller agreement with DiscoverTech.

11   Q.    Are there particular levels within Autonomy that,

12   Mr. Hussain and Dr. Lynch needed to approve?

13   A.    If I recall correctly, everybody in the US had approval

14   limits of about $250.

15   Q.    I'm sorry, $250?

16   A.    Yes.

17   Q.    That was the most you could spend --

18   A.    Yes.

19   Q.    -- in the US?

20   A.    Yes.

21   Q.    Okay.

22   A.    Without approval.  Anything above that required approval.

23         And I think Steve's approval limit was, I think, $10,000.

24   Anything above that required approvals from Shushovan, Andy and

25   Mike.

1  **Q.**   Let me draw your attention to Exhibit 1900, 1900.

2           **MR. LEACH:**  I move it into evidence.

3           **THE COURT:**  1900 admitted.

4       (Trial Exhibit 1900 received in evidence)

5  **BY MR. LEACH:**

6  **Q.**   Mr. Vaidyanathan, is this an email from you to Steve

7  Chamberlain and Joel Scott dated June 30th, 2011?

8  **A.**   Yes.

9  **Q.**   And does this also relate to DiscoverTech and the

10 $4.4 million payment we saw in the prior exhibit?

11 **A.**   Yes.

12 **Q.**   You wrote "Hi Steve, here you go.  We wired 4.4M and did

13 not take the 1% early payment discount that Exhibit A states."

14 What did you mean by that?

15 **A.**   So there's no reason to pay a reseller or anyone in

16 advance unless they give you some sort of a discount for early

17 payment and the agreement specifically called for that.

18 Because the approval was to pay 4.4 million, we wired the

19 4.4 million; we didn't take the 1 percent discount.

20       And to me 1 percent of 4.4 million was sizable enough

21 given the amounts that we were looking at from a materiality

22 standpoint at least from the US standpoint that was sizeable,

23 and so my mind here was to take the discount, take the discount

24 if we potentially could.

25 **Q.**   So you paid the $4.4 million --

1  **A.**  Yes.

2  **Q.**  -- because Mr. Chamberlain directed you to do that?

3  **A.**  Correct.

4  **Q.**  And you did not take advantage of this early payment

5  discount.  What did that convey to you?

6  **A.**  Well, there are only two reasons why that could have

7  happened.  One is because of the paucity of time people miss

8  the 1 percent early payment threshold; that's one possibility.

9  The other possibility was we had basically negotiated a

10  $4.4 million deal, the 1 percent was just stated there and

11  there might have been discussions around the agreement and not

12  necessarily documented in the agreement that necessitated the

13  payment of the 4.4 million.

14  **Q.**  And was this your effort to maybe get some money back for

15  Autonomy?

16  **A.**  Yes.

17  **Q.**  Do you know if that ever happened?

18  **A.**  No, it didn't happen.

19       **MR. LEACH:**  Let's go to 1916.  I'll move that into

20  evidence.

21       **THE COURT:**  1916 admitted.

22   (Trial Exhibit 1916 received in evidence)

23  **BY MR. LEACH:**

24  **Q.**  And Mr. Hasan, if we could move into the top half down to

25  Mr. Chamberlain's signature block.  Is this another email from

1    Mr. Chamberlain to you with a copy to Elizabeth Harris at the

2    end of the quarter June 30th, 2011, is it another example of

3    that?

4    **A.**    Yes.

5    **Q.**    And does this one relate to FileTek?

6    **A.**    Yes, and this was a -- if I remember correctly back to

7    our -- we acquired -- seized the assets from Iron Mountain, and

8    this was associated with those customers.

9    **Q.**    What happened with Iron Mountain?  Explain that.

10    **A.**    We -- I think we had roughly a $400 million acquisition of

11    the digital business of Iron Mountain.  Iron Mountain decided

12    to sell off their digital business, digital archiving business

13    because we had a digital archiving business and Zantaz's idea

14    was to combine the two or use them as a complimentary sort of

15    vehicle to sell more to customers.

16    **Q.**    This reads "Extension of" -- or Mr. Chamberlain is writing

17    here "Extension of existing agreement to cover DRC-CM

18    customers."  Is that a reference to Iron Mountain?

19    **A.**    Yes.

20    **Q.**    "Need to pay $1,596,146.06 today.  I will forward executed

21    agreement and invoice as soon as I have it.  Please be ready to

22    move on this one."  Do you see that?

23    **A.**    Yes.

24    **Q.**    Is this another example of a direction to you to pay a

25    reseller on the last day of the quarter?

VAIDYANATHAN - DIRECT / LEACH

1    **A.**    Yes.

2    **Q.**    And did you have similar concerns relating to this that

3    you had to the FileTek and DiscoverTech transactions that we

4    were looking at?

5    **A.**    Yes.  After 2010 I viewed every payment to a reseller with

6    caution, with more eyes than I usually would have, asked more

7    questions but I knew that, you know, those were -- those

8    questions are not going to be answered in my mind.

9         **MR. LEACH:**  Let me draw your attention to page 6, and

10   if we could zoom in to -- Well, let's first start on page 7.

11   **BY MR. LEACH:**

12   **Q.**    Do you see an email from someone named Gary Szukalski to

13   Joel Scott, Bill Loomis and Stouffer Egan?

14   **A.**    Yes.

15   **Q.**    Do you recognize any of those names?

16   **A.**    No.  I have not interacted with them.

17   **Q.**    Well, how about Mr. Egan, did he have interaction with

18   them?

19   **A.**    Yes, he was the chief sales guy for Autonomy, Inc.

20   **Q.**    Okay.  And does Mr. Szukalski appear to be passing on a

21   proposal/quote relating to Autonomy and Iron Mountain?

22   **A.**    Yes.

23        **MR. LEACH:**  And if we could zoom out and look at the

24   top.

25   \\\

1  BY MR. LEACH:

2  Q.   Do you see where Mr. Egan is forwarding that to Shushovan

3  Hussain and Pete M?

4  A.   Uh-huh.

5  Q.   Do you know who Pete M is?

6  A.   Pete Menell.  He was the CTO at Autonomy.

7            MR. LEACH:   Okay.  And if we could zoom out and go to

8  page 6 up at the top.

9  BY MR. LEACH:

10 Q.   And do you see an email from Mike Lynch to Steve

11 Chamberlain dated June 30th, 2011?

12 A.   Yes.

13 Q.   And in response to Mr. Chamberlain's email "Mike-given an

14 amount of 1.6 million we also need your approval on this.

15 Thanks.  Steve Chamberlain."  Do you see that?

16 A.   Yes.

17 Q.   And Dr. Lynch wrote "Ok as long as we are selling it on."

18 Do you see that?

19 A.   Yes.

20 Q.   Did you take that as approval to make the $1.596 million

21 payment to FileTek?

22 A.   Yes.

23 Q.   At this point in time, June of 2011, did you have concerns

24 that these payments to resellers were being used to get

25 resellers money to pay for Autonomy software?

1   **A.**   I was -- well, I was seeing a lot less of it as compared

2   to what we had seen in 2010, so I took it as we were not doing

3   as many as we were doing before.

4   **Q.**   But you still saw it?

5   **A.**   Yes.

6   **Q.**   And did you have concerns in your own mind that this was

7   to get resellers' money?

8   **A.**   This was more of the same, yes.

9   **Q.**   More of the same?

10  **A.**   Yes.

11  **Q.**   Meaning what?

12  **A.**   Meaning more of the same where you are selling -- you're

13  buying software from resellers and then the resellers are

14  buying your software, so it was more of those similar type of

15  transactions.

16  **Q.**   You mean round-trip transactions?

17  **A.**   That -- that was my assumption and worry.

18  **Q.**   Let me draw your attention, please, to Exhibit 2268.

19       **MR. LEACH:**   I'd move it into evidence.

20       **THE COURT:**   2268 admitted.

21  (Trial Exhibit 2268 received in evidence)

22       **MR. LEACH:**   And if we could start, Mr. Hasan, on page

23  2 in the top half.  Actually, to get the header of the email we

24  need to look at the bottom of page 1.

25  \\\

VAIDYANATHAN - DIRECT / LEACH

1   BY MR. LEACH:

2   **Q.**   Do you see an email from Lisa Harris to Cheri Mezzapelle;

3   am I pronouncing that correctly?

4   **A.**   Yeah.

5   **Q.**   And Steve.  Do you see that?

6   **A.**   Yes.

7           **MR. LEACH:**   Okay.  And now if we can go to page 2,

8   Mr. Hasan.

9   BY MR. LEACH:

10  **Q.**   Ms. Harris is writing with a copy to you and Helen

11  Bradley, "Hi Cheri.  We need to pay 8.2M to Microtech LLC

12  today" in bold underline.  Do you see that language?

13  **A.**   Yes.

14  **Q.**   Microtech, was that one of the resellers that you had

15  concerns about?

16  **A.**   Yes.

17  **Q.**   "I believe that you have enough money in the Comerica

18  account to cover this.  I have noted the bank account details

19  below (they should be the same as the ones you have on file

20  already).

21       "The payment is authorized by MRL, Shushovan, Pete and

22  Steve."  Do you see that?

23  **A.**   Yes.

24  **Q.**   MRL, did you understand that to be Mike Lynch?

25  **A.**   Yes.

**VAIDYANATHAN - DIRECT / LEACH**

1   Q.   Shushovan, that's Shushovan Hussain?

2   A.   Yes.

3   Q.   Pete, is that Pete Menell?

4   A.   That is correct.

5   Q.   And Steve, is that Steve Chamberlain?

6   A.   Yes.

7   Q.   "I have copied Steven into this email so he can confirm

8   that this payment is properly authorized."  Do you see that?

9   A.   Yes.

10  Q.   Okay.  Let's go to page 1.  And in the bottom half do you

11  see where Mr. Chamberlain writes to you, Lisa Harris and others

12  "Confirmed" for the $8.2 million payment to Microtech?

13  A.   Yes.

14  Q.   And do you believe that payment was made?

15  A.   Yes, it was.

16  Q.   Let me draw your attention, please, to 15992.

17          MR. LEACH:  I move it into evidence.

18          THE COURT:  15992 admitted.

19      (Trial Exhibit 15992 received in evidence)

20          MR. LEACH:  And if we could zoom into the top, please.

21  There you go.

22  BY MR. LEACH:

23  Q.   This is an email from Mr. Chamberlain to you on August

24  17th, 2011, with a copy to Lisa Harris, Ms. Mezzapelle and

25  Seema Khan.

VAIDYANATHAN - DIRECT / LEACH

1   **A.**   Yes.

2   **Q.**   And do you see the subject FileTek Inc. --

3   **A.**   Yes.

4   **Q.**   -- or FileTek invoice?  Excuse me.

5   **A.**   Yes.

6   **Q.**   Is this another direction from Mr. Chamberlain for you to

7   make a wire payment to a reseller for product?

8   **A.**   Yes.

9   **Q.**   And Mr. Chamberlain wrote "Not happy.  I sent approvals

10  earlier (to Lisa) and have paid FileTek many times before.  I

11  have attached approvals again and also dug out details from

12  previous payment.  Please get this paid."  Do you see that

13  language?

14  **A.**   Yes.

15  **Q.**   What did you understand that to mean?

16  **A.**   That we had not paid FileTek and he had asked us to pay it

17  previously, it had not been paid then and he was asking us to

18  pay it that day.

19  **Q.**   That day?

20  **A.**   Yeah.

21  **Q.**   Was there some sense of urgency in your mind?

22  **A.**   I was under the assumption that our friends at FileTek had

23  escalated up the chain.

24  **Q.**   Okay.  Is this another example of Mr. Chamberlain asking

25  you to approve of payments to a reseller?

**VAIDYANATHAN - DIRECT / LEACH**

1  **A.**   Yes.

2  **Q.**   And did you have similar concerns that you had in relation

3  to the other ones that we've looked at?

4  **A.**   That's correct.

5  **Q.**   The next day, August 18th, 2011, did you learn that HP was

6  acquiring Autonomy?

7  **A.**   Yes.

8  **Q.**   Was that news to you?

9  **A.**   It was.

10  **Q.**   Were you surprised?

11  **A.**   Very.  Very surprised.

12  **Q.**   Okay.  In your mind did you develop concerns about why

13  these payments to FileTek and Microtech were being made shortly

14  before the HP acquisition?

15  **A.**   My --

16      **MR. HEBERLIG:**  Objection.  That mischaracterizes the

17  testimony.

18      **THE COURT:**  Overruled.

19      **THE WITNESS:**  So my --

20      Can you repeat the question again?  Sorry.

21  **BY MR. LEACH:**

22  **Q.**   In your own mind, how did the announcement of the

23  acquisition affect your view of some of these last minute

24  payments to Microtech and FileTek?

25  **A.**   So, typically, you go through a diligence process before

1   any company acquires another company.  Given the nature of the

2   UK sort of law regarding the acquisition, there's only so many

3   procedures one could do, so my assumption was, we were trying

4   to clean up the historical items on the balance sheet in

5   conjunction with the announcement.

6   Q.   What do you mean by "Clean up the items on the balance

7   sheet"?

8   A.   So you have a lot of receivables, you had a lot of

9   payables from resellers, you had a bunch of these transactions

10  lying on the books, so the construct was you are going to --

11  you are going to be acquired by a company.  At that point in

12  time there will be more details required of us to produce and

13  the intent was to make sure the books and accounts were as

14  clean as possibly they could be in an attempt to make sure that

15  we get on with our post-acquired lives in a mutually beneficial

16  manner.

17  Q.   These are inferences that you were drawing in the moment

18  based on your knowledge --

19  A.   Yeah.  This was completely me --

20       (Overlapping speakers.)

21       **COURT STENOGRAPHER:**  I'm sorry.  I'm sorry.  Could you

22  repeat your question?

23       **MR. LEACH:**  Thank you.  That wasn't clear.

24  **BY MR. LEACH:**

25  Q.   These were inferences that you were drawing in your own

VAIDYANATHAN - DIRECT / LEACH

1  mind at the time?

2  **A.**   That's correct.

3  **Q.**   After the announcement of the HP acquisition but before

4  the close, were you asked to cancel any transactions or write

5  off any debts?

6  **A.**   I thought we were -- my recollection is a little hazy, but

7  I thought we wrote off a bunch of debt on the books on AR.   I

8  thought we wrote off a bunch.

9  **Q.**   Did that include some of the resellers that we've looked

10  at?

11  **A.**   Yes.

12  **Q.**   Did that include VMS?

13  **A.**   Yes.

14  **Q.**   Did that corroborate, in your mind, that -- some of the

15  concerns you had relating to the resellers?

16  **A.**   Absolutely.

17       **MR. LEACH:**  May I have a moment, Your Honor?

18       (Brief pause.)

19       **MR. LEACH:**  Nothing further, Your Honor.

20       **THE COURT:**  Okay.  Cross-examination?

21       **MR. HEBERLIG:**  Thank you, Your Honor.

22    May I hand up a couple of binders, Your Honor?

23       **THE COURT:**  Thank you.

24       **MR. HEBERLIG:**  I have a smaller one that's 3500

25  materiality.  May I approach the witness or --

1          THE COURT:  Oh, go, yes, of course --

2          MR. HEBERLIG:  -- hand them up?

3          THE COURT:  -- and you don't have to ask permission,

4   just go ahead.

5          MR. HEBERLIG:  Thank you, Your Honor.

6      Here you go, sir.  You don't need to open that now.

7      May I proceed?

8          THE COURT:  Please.

9          MR. HEBERLIG:  Thank you, Your Honor.

10                        <u>CROSS-EXAMINATION</u>

11  BY MR. HEBERLIG:

12  Q.   Good morning.  Can you give me the correct pronunciation

13  of your last name so I get it right?

14  A.   It's Vaidyanathan.

15  Q.   Vaidyanathan?

16  A.   Yeah.

17  Q.   Okay.  I'm Brian Heberlig.  I represent Dr. Lynch.  You

18  and I have not met before, correct?

19  A.   Correct.

20  Q.   And just as we have never met before, you have also never

21  met Mike Lynch, correct?

22  A.   Oh, I've met him once in the San Jose office when Autonomy

23  had just acquired Interwoven.

24  Q.   All right.  But you have never had any conversation with

25  Mike, correct?

1  A.    No.  Yeah.  That's correct.

2  Q.    Okay.  And so you've never discussed with Mike any of the

3  matters that you've talked about in court today, correct?

4  A.    Not personally.

5  Q.    Meaning you have not had a conversation --

6  A.    No, I haven't.

7  Q.    -- with Mike Lynch about the matters that you testified

8  about?

9  A.    Yes.

10  Q.    Now, I believe you said that you were educated in India;

11  is that right?

12  A.    That's correct.

13  Q.    And that's where you got your accounting degree?

14  A.    Yes.

15  Q.    And you're a chartered accountant?

16  A.    Yes.

17  Q.    Which is the confidentiality of a CPA but in India?

18  A.    Yes.

19  Q.    You're not a US CPA?

20  A.    I am not.

21  Q.    And you've never had any training in the IFRS or what's

22  known as the International Financial Reporting Standards,

23  correct?

24  A.    That's correct.

25  Q.    Pardon?

1    A.    That's correct.

2    Q.    Okay.  I'd like just to cover a little bit about your work

3    history.  I'll come back to your time at Interwoven and

4    Autonomy, but just so we have it correct the roles you had

5    starting at Interwoven -- again, I'll come back in more

6    detail -- you started at Interwoven in the India office; is

7    that correct?

8    A.    Yes.

9    Q.    And when was that again?

10   A.    2004.

11   Q.    And in the beginning, am I right, that you spent part of

12   your time geographically in India and from time to time you

13   traveled to the US as well?

14   A.    That's correct.

15   Q.    Interwoven was in California, right?

16   A.    Yes.

17   Q.    In the Bay Area?

18   A.    That is correct.

19   Q.    All right.  In 2008 you moved to the US full-time, right?

20   A.    Yes.

21   Q.    Still with Interwoven?

22   A.    Yes.

23   Q.    And you were located in California?

24   A.    Correct.

25   Q.    And at that time Interwoven had a finance group of about

1  10 to 15 people?

2  **A.**   That's -- that's correct.

3  **Q.**   And among that group were your colleagues Brent Hogenson.

4  **A.**   Uh-huh.

5  **Q.**   Reena Prasad?

6  **A.**   Uh-huh.

7  **Q.**   And Percy Tejeda?

8  **A.**   Yes.

9  **Q.**   And you worked closely with all three of those

10  individuals?

11  **A.**   Correct.

12  **Q.**   And you all stayed together when you joined Autonomy,

13  correct?

14  **A.**   Correct.

15  **Q.**   And when you left Autonomy, you continued to work with

16  some of those individuals, correct?

17  **A.**   Yes.

18  **Q.**   You went to another software company called TIPCO?

19  **A.**   Yes.

20  **Q.**   And that was a US public company?

21  **A.**   Correct.

22  **Q.**   And Mr. Hogenson was already there, correct?

23  **A.**   Yes.

24  **Q.**   And you worked with him when you got there?

25  **A.**   Correct.

1   Q.   And Ms. Prasad also worked there for a period of time as

2   well?

3   A.   Correct.

4   Q.   And I think you said that you had a close working

5   relationship with Mr. Hogenson?

6   A.   That's correct.

7   Q.   All right.  So let's go back and focus on your time at

8   Interwoven before Autonomy bought the company.  Okay?

9        They were a US software company, correct?

10  A.   Yes.

11  Q.   And they were publicly traded on the NASDAQ Stock

12  Exchange?

13  A.   Correct.

14  Q.   As a US company, Interwoven followed what was known as US

15  Generally Accepted Accounting Principles or GAAP, correct?

16  A.   Correct.

17  Q.   And the accounting decisions you made at Interwoven were

18  required to comply with GAAP?

19  A.   Correct.

20  Q.   Now, in -- moving forward, in January of 2009, Autonomy

21  agreed to purchase Interwoven, correct?

22  A.   Correct.

23  Q.   And it was a big deal?

24  A.   It was.

25  Q.   Autonomy agreed to pay 775 million, or thereabouts, for

1    Interwoven?

2    **A.**    Correct.

3    **Q.**    And that deal officially closed in March of 2009?

4    **A.**    Yeah.

5    **Q.**    And after that, Autonomy owned Interwoven?

6    **A.**    Yes.

7    **Q.**    Now, Autonomy was a British software company?

8    **A.**    Uh-huh.

9    **Q.**    It had operations all around the world?

10    **A.**    Yes.

11    **Q.**    And it was incorporated in the United Kingdom?

12    **A.**    Uh-huh.

13    **Q.**    It was a public company, but it traded on the London stock

14    exchange, right?

15    **A.**    Correct.

16    **Q.**    And its main finance department was in the Cambridge

17    office in UK, correct?

18    **A.**    Correct.

19    **Q.**    And that's where Mr. Chamberlain was located?

20    **A.**    Yes.

21    **Q.**    Now, Autonomy also had offices in London?

22    **A.**    Uh-huh.

23    **Q.**    And -- is that a yes?

24    **A.**    Yes.

25    **Q.**    Sorry.  I just didn't hear you.

1    A.   Yes.

2    Q.   And that's where the chief financial officer, Shushovan

3    Hussain, was located?

4    A.   Yes.

5    Q.   And that's also where Mike Lynch was located --

6    A.   Yes.

7    Q.   -- correct?

8         And he was the CEO?

9    A.   Yes.

10   Q.   That's chief executive officer?

11   A.   Yes.

12   Q.   Now, as a UK company, Autonomy followed the IFRS, correct?

13   A.   Yes.

14   Q.   Again, the International Financial Reporting Standards.

15   A.   Correct.

16   Q.   And just to be crystal clear about this, even though

17   Interwoven, before the acquisition, had followed US GAAP?

18   A.   Uh-huh.

19   Q.   After the acquisition, now owned by a UK company, it was

20   required to comply with IFRS, correct?

21   A.   Correct.

22   Q.   Okay.  So the rules of what accounting standard applies

23   are based on where the parent company is located, right?

24   A.   Correct.

25   Q.   And as a British company, an international company, IFRS

1    controlled?

2    **A.**    Correct.

3    **Q.**    Now, that first year after the acquisition, am I right

4    that the UK financial department or finance department did not

5    do much to integrate you and your colleagues from Interwoven?

6    **A.**    Yes.

7    **Q.**    I think you already said you didn't get any training or

8    tutorial on the IFRS, correct?

9    **A.**    Yes.

10    **Q.**    And you had very little interaction that first year with

11    the UK finance department, right?

12    **A.**    Yes.

13    **Q.**    And you also didn't have a whole lot of interaction with

14    your counterparts at the other American businesses that were

15    part of Autonomy.  Is that also fair?

16    **A.**    Well, we would talk from time to time, but not as detailed

17    as one cohesive financing team.

18    **Q.**    All right.  And so that first year you were largely still

19    focused on the legacy Interwoven business --

20    **A.**    Yes.

21    **Q.**    -- correct?

22    **A.**    Yes.

23    **Q.**    Now, your responsibilities from preacquisition to post --

24    again, in just that first year -- remained largely the same,

25    right?

1   A.   Pretty much.

2   Q.   And they included something called "accounts payable"?

3   A.   Yes.

4   Q.   And just so we're clear on what that means, that is the

5   department that pays Autonomy's bills, right?

6   A.   Yes.

7   Q.   Including things that Autonomy purchased?

8   A.   Uh-huh.

9   Q.   And just regular old bills like electricity and utilities?

10   A.   Correct.

11   Q.   Now, there came a time in 2010 when there was an effort to

12   consolidate the financial function in Autonomy's American

13   businesses, correct?

14   A.   Correct.

15   Q.   And you testified about that.  I want to just get a little

16   more detail about the American businesses of Autonomy.

17   A.   Uh-huh.

18   Q.   I think you described them as companies called -- Zantaz

19   was one?

20   A.   Uh-huh.

21   Q.   ETalk was another?

22   A.   Yes.

23   Q.   Verity?

24   A.   Uh-huh.

25   Q.   And Autonomy, Inc.?

1   **A.**   Yes.

2   **Q.**   And then of course Interwoven?

3   **A.**   Yes.

4   **Q.**   Is it fair to say those were the principal American

5   businesses of Autonomy that you can recall?

6   **A.**   Yes.  There was a few others, but they were all tiny.

7   **Q.**   All right.  I'd like to show you an organizational chart

8   if I may.

9   **A.**   Uh-huh.

10   **Q.**   Bear with me one second.  It's Exhibit 7878.1.

11          **THE COURT:**  I'm sorry, what is it?

12          **MR. HEBERLIG:**  Sorry, Your Honor.  It is 7878.1 and

13   that is tab 46A of the binder.

14          **THE COURT:**  Tab 46 is 7878?

15          **MR. HEBERLIG:**  Right.  It's A, 46A, the document right

16   behind that.

17          **THE COURT:**  Oh, 46A.  Thank you very much.

18          **MR. HEBERLIG:**  Yes, sir.

19          **THE COURT:**  Okay.  Admitted.

20      (Trial Exhibit 7878.1 received in evidence)

21          **MR. HEBERLIG:**  Thank you.

22      Can we show that to the witness, please, and the jury.

23          **THE CLERK:**  Thank you.

24          **MR. HEBERLIG:**  Thank you.  Sorry.

25      All right.  I know that this is a little small to read.

1    I'm going to ask if we could first zoom in on the left-hand

2    side of the document from the parent company on down.

3    BY MR. HEBERLIG:

4    Q.   Okay.  So this is an organizational chart -- am I

5    right? -- of the various corporate entities of Autonomy?

6    A.   Yes.

7    Q.   And at the very top is the Autonomy corporation of England

8    and Wales, correct?

9    A.   Uh-huh.

10   Q.   And is what we're seeing on the left-hand side Autonomy's,

11   essentially, European and Asian businesses?

12   A.   Correct.

13   Q.   So there's Autonomy Systems Limited, correct?

14   A.   Uh-huh.

15   Q.   And then a bunch of companies that are underneath.

16        MR. HEBERLIG:   Let's shift over to the right-hand side

17   of the document, please.

18   BY MR. HEBERLIG:

19   Q.   Okay.  So this is the part of the business that I think is

20   sometimes referred to as the Americas Group.  Is that familiar

21   with you?

22   A.   Uh-huh.

23   Q.   Okay.  And again, they're those companies we just talked

24   about, the principal American businesses of Autonomy, right?

25   A.   Yeah.

1  Q.   And Interwoven is one of the roughly five.  I'm sorry.  I

2  think you just have to give a verbal --

3  A.   Yes.

4  Q.   Okay.  Thank you.

5  A.   Yes.  Sorry.

6       MR. HEBERLIG:  We can take that down.

7  BY MR. HEBERLIG:

8  Q.   So the announcement of this new financial structure

9  occurred -- do you recall? -- on April 19th, 2010?

10 A.   I don't remember the date, but --

11 Q.   Let me see if I can help with that.

12       MR. HEBERLIG:  I'd like to call up Exhibit 7882 --

13       THE COURT:  7882.

14       MR. HEBERLIG:  -- which is tab 49 in the binder.

15       THE COURT:  Okay.  Admitted.

16       MR. HEBERLIG:  Thank you, Your Honor.

17     (Trial Exhibit 7882 received in evidence)

18 BY MR. HEBERLIG:

19 Q.   Could we just start with the bottom email?

20     All right.  Do you see this is an announcement on April

21 19th.  It's from some email account on behalf of Brent

22 Hogenson.  Do you see that?

23 A.   Uh-huh.

24 Q.   And is it fair to say this was the rollout of the new

25 consolidated Americas team?

1    **A.**   Yes.

2    **Q.**   All right.  And you are listed among the people who were

3    getting a new assignment as a result of this consolidation?

4    **A.**   Correct.

5    **Q.**   Going forward, you would be reporting to the corporate

6    controller, and you'd be responsible for the general ledger

7    reporting and payroll, correct?

8    **A.**   Yes.

9         **MR. HEBERLIG:**   Okay.  And there are some others on

10   this document.  Maybe we can scroll to the next page, please.

11   If you could just highlight the top part.

12   **BY MR. HEBERLIG:**

13   **Q.**   So we've heard the name before Percy Tejeda.  He was going

14   to be responsible going forward for revenue, correct?

15   **A.**   Uh-huh.

16   **Q.**   But again, that was revenue of the Americas businesses,

17   not the entire Autonomy group, right?

18   **A.**   Correct.

19   **Q.**   All right.  And we have Ms. Reena Prasad, correct?

20   **A.**   Uh-huh.

21   **Q.**   And she was responsible for collections and credit?

22   **A.**   Correct.

23   **Q.**   And that function -- am I right? -- is sort of the

24   flip-side of accounts payable, that you handled; while you paid

25   Autonomy's bills, she helped collect them?

1  **A.**   That's correct.

2  **Q.**   So if people owed money to Autonomy, her job was to get it

3  paid?

4  **A.**   Correct.

5         **MR. HEBERLIG:**   And then if we scroll back out --

6  actually, I think we're done with that one.

7       Let's talk about your new reporting structure.  I have

8  another org chart, Judge, that's Exhibit 7810.3.

9         **THE COURT:**   7810.3 admitted.

10      (Trial Exhibit 7810.3 received in evidence)

11        **MR. HEBERLIG:**   That's at tab 37.  And if we could go

12  to page 2, please -- I'm sorry, page 13.

13      All right.  I will enlarge this.  Maybe we could do that

14  now, Bret.

15  **BY MR. HEBERLIG:**

16  **Q.**   First of all, you see this is an org chart of the finance

17  function?  Oh, we just lost it.

18        **MR. HEBERLIG:**   Could you just go back out for a sec?

19  **BY MR. HEBERLIG:**

20  **Q.**   Do you see that finance function is up there in the

21  left-hand corner?

22  **A.**   Yep.

23        **MR. HEBERLIG:**   Okay.  Now, Bret, if you wouldn't mind

24  making it a little bit larger.

25  \\\

1    BY MR. HEBERLIG:

2    Q.   All right.  So does this depict the finance function as it

3    existed at the time of this consolidation?

4    A.   Yes.

5    Q.   So let's just take a moment.  Obviously Mr. Hussain, at

6    the top, was the CFO, correct?

7    A.   Correct.

8    Q.   And he was in the UK.  Below him was Steve Chamberlain,

9    correct?

10   A.   Yes.

11   Q.   I want to focus on the Americas side, but -- but just

12   briefly, on the left-hand side of the document under Lisa

13   Harris, that's where all the UK accountants resided, correct?

14   A.   Right.

15   Q.   EMEA means Europe, Middle East and Africa?

16   A.   Correct.

17          MR. HEBERLIG:  All right.  Now let's focus on the

18   right-hand side, please.

19   BY MR. HEBERLIG:

20   Q.   And we see you sort of in the middle of the document,

21   right?

22   A.   Uh-huh.

23          MR. HEBERLIG:  Can we highlight Mr. Vaidyanathan?

24   He's right here.

25   \\\

VAIDYANATHAN - CROSS / HEBERLIG

1    BY MR. HEBERLIG:

2    Q.   All right.  So let's just talk about who you reported to

3    in your reporting chain.  Your direct supervisor was a Cynthia

4    Watkins, correct?

5    A.   Uh-huh.

6    Q.   And she was the controller; is that her position?

7    A.   Yes.

8    Q.   Okay.  And Ms. Watkins reported to Mr. Hogenson?

9    A.   Yes.

10   Q.   And he was the head of finance again for the Americas?

11   A.   Yes.

12   Q.   And then he reported up to Steve Chamberlain who reported

13   up to Shushovan Hussain?

14   A.   Yes.

15   Q.   And not depicted on this chart, but you understood that,

16   Mr. Hussain reported to Mike Lynch, right?

17   A.   Yes.

18   Q.   So essentially there's five rungs on the corporate ladder

19   between Mike Lynch as the CEO and you in your position within

20   the Americas finance department?

21   A.   Correct.

22           MR. HEBERLIG:  We can take that down.

23   BY MR. HEBERLIG:

24   Q.   A little bit more focus on your responsibilities with

25   respect to paying Autonomy's bills.  That included some of the

VAIDYANATHAN - CROSS / HEBERLIG

1   software purchases that you testified about in your direct

2   examination, correct?

3   **A.**   Correct.

4   **Q.**   And we'll get into some of those, but let's focus for a

5   second on revenue recognition.  That was not on your plate at

6   this time in the Autonomy Americas group, correct?

7   **A.**   Correct.

8   **Q.**   And even though there was someone assigned within the

9   Americas group to handle revenue, that was Mr. Tejeda, correct?

10  **A.**   Correct.

11  **Q.**   It's fair to say that all major revenue recognition

12  decisions at Autonomy were made in the UK?

13  **A.**   Yes.

14  **Q.**   And as a UK company that followed the IFRS, Autonomy

15  preferred to have UK accountants trained in the IFRS handling

16  the company's revenue recognition?

17          **MR. LEACH:**   Objection, foundation.

18          **THE COURT:**   Sustained.

19  BY MR. HEBERLIG:

20  **Q.**   Was that logical to you?

21  **A.**   Yes.

22  **Q.**   Thank you.

23          Now, a few words about the company's outside auditors.

24  **A.**   Uh-huh.

25  **Q.**   They're -- Autonomy's outside auditors were with a firm

1  called Deloitte, correct?

2  **A.**    That's correct.

3  **Q.**    And Deloitte was one of the big four accounting firms?

4  **A.**    That's correct.

5  **Q.**    And that's generally understood to mean the top four

6  accounting firms in the world?

7  **A.**    That is correct.

8  **Q.**    The team -- the Deloitte team working for Autonomy was

9  located principally in the United Kingdom, correct?

10  **A.**    Correct.

11  **Q.**    And the UK finance team of Autonomy was responsible for

12  interfacing with Deloitte during their audits and reviews,

13  correct?

14  **A.**    From an overall standpoint, that's correct.

15  **Q.**    Okay.  That wasn't one of your principal responsibilities,

16  correct?

17  **A.**    Getting the audit done from a US standpoint, to the extent

18  it related to the US, was US responsibility; but overall, yes,

19  it was a UK responsibility.

20  **Q.**    So the US had to package up some materials and send them

21  to the UK that were relevant for the --

22  **A.**    No, no.  The way it would happen is, the -- Deloitte would

23  have some agreed-upon procedures that would need to be done.

24  The San Jose unit of Deloitte would come in and audit us.

25  **Q.**    Okay.  And that occurred at the end of the quarters,

1    correct?

2    **A.**   Yeah, quarters, sometimes toward the end of the year.  End

3    of the year for certain.

4    **Q.**   All right.  And you understood that the main interface

5    with Deloitte was occurring at the end of the quarter in the

6    United Kingdom on site in those Cambridge offices, correct?

7    **A.**   Correct.

8    **Q.**   And just a few more about your responsibilities.  So

9    you're familiar with the process -- generally familiar -- with

10   the process by which Autonomy would issue quarterly earnings

11   releases to the public, correct?

12   **A.**   Yes.

13   **Q.**   And you were not involved in working on those, right?

14   **A.**   No.

15   **Q.**   You were familiar with the general process that Autonomy

16   went through to have conference calls with investment analysts

17   after the quarter closed, correct?

18   **A.**   Yes.

19   **Q.**   And you were not involved in preparing anyone for those

20   investment analyst calls?

21   **A.**   No.

22   **Q.**   Likewise, there were annual financial statements prepared

23   by Autonomy that were much more detailed than the quarterly

24   press releases, correct?

25   **A.**   That's correct.

1  **Q.**   All right.  And you weren't involved in preparing the

2  wording or the layout of those annual financial statements,

3  correct?

4  **A.**   No, I wasn't.

5  **Q.**   Am I right that you did not receive copies of what

6  Deloitte provided to the audit committee on a quarterly basis

7  in connection with its reviews?

8  **A.**   No, I wasn't.

9  **Q.**   And so obviously you had no firsthand information about

10  what Deloitte was discussing with the audit committee about the

11  transactions you've testified about today?

12  **A.**   No, I don't.

13  **Q.**   All right.  Let me focus you on the period of time between

14  April and May of 2010 -- all right? -- and just so sort of

15  frame out the timeframe.  We looked at the document before

16  where you got the new assignment on April 19th, correct?

17  **A.**   Uh-huh.

18  **Q.**   And I think you testified yesterday that as soon as you

19  got that new assignment one of your first things that you did

20  was to start looking at the procedures of the various American

21  businesses, correct?

22  **A.**   Correct.

23  **Q.**   So that started in late April 2010?

24  **A.**   Thereabouts.

25  **Q.**   And just to frame it from a timing perspective,

1    Mr. Hogenson was fired in July of 2010, correct?

2    **A.**    Sounds about right.

3    **Q.**    So there's a three month give-or-take period between when

4    you began that effort and when Hogenson was gone?

5    **A.**    Yes.

6    **Q.**    All right.  I think you said that what you did in

7    connection with this process was what anyone would do when

8    assuming a new job like you did, correct?

9    **A.**    Yes.

10   **Q.**    Essentially get your arms around the situation of what's

11   going on at these other American companies, right?

12   **A.**    Correct.

13   **Q.**    Your search for those issues was not motivated by any

14   suspicion or belief that there were accounting problems at

15   Autonomy at the time?

16   **A.**    That's correct.

17   **Q.**    And that effort of looking into those issues I believe

18   culminated in a spreadsheet that you sent to Mr. Hogenson.

19   There may have been multiple versions, but one at least we've

20   seen was in early June of 2010.  Do you remember that?

21   **A.**    Yes.

22   **Q.**    I think it came up in your direct examination.

23   **A.**    Yes.

24          **MR. HEBERLIG:**  Let's display that document, please.

25   It's Exhibit 3315.

1          **THE COURT:**  In evidence.

2      (Trial Exhibit 3315 received in evidence)

3  **BY MR. HEBERLIG:**

4  **Q.**   And just let's look at the email first, but I'm

5  principally interested in the attachment, but just to --

6      So this is June 7th, 2010, you to Hogenson attaching a

7  list of issues and we see attachment there, it's a spreadsheet

8  at .xls, correct?

9  **A.**   Yes.

10          **MR. HEBERLIG:**  Let's look at that spreadsheet.  Let's

11  start with page 2.  And just for now enlarge the headings down

12  to like No. 3.

13  **BY MR. HEBERLIG:**

14  **Q.**   All right.  This was I believe a PDF, but it was an Excel

15  spreadsheet, correct?

16  **A.**   It was an Excel spreadsheet.

17  **Q.**   That's how you kept track of the issues?

18  **A.**   Yeah.

19  **Q.**   All right.  Now, first and foremost, this was not a list

20  of accounting improprieties that you had discovered, correct?

21  **A.**   Yeah.  This was the list of issues that needed resolution?

22  **Q.**   Many of them were straight just process issues like the

23  first few we see here, correct?

24  **A.**   Yes.

25  **Q.**   And if we focus on the first entry -- it's a little hard

1   to read because it's crossed out -- does that mean you actually

2   tackled this one --

3   **A.**   Yes.

4   **Q.**   -- by June 10th -- by June 7th?

5   **A.**   Yes.

6   **Q.**   All right.  That first entry looks to be a sort of a data

7   entry problem about what was going on with payroll.  Is that a

8   fair summary?

9   **A.**   That appears -- yeah.  Well, it's -- if you don't give

10  the -- if multiple people are involved in the processing of

11  commissions and then you get different data, different types of

12  versions of data and then your payroll will be incorrect,

13  you'll have all sorts of control-related issues.

14  **Q.**   Not a good idea to have multiple people entering data on

15  the same issue; better to get it down to one, right?

16  **A.**   Correct.

17  **Q.**   That's a process issue?

18  **A.**   Yes, yes.

19  **Q.**   And throughout this document we see somewhere around a

20  dozen or so other process issues, and you characterize them as

21  such, right?

22  **A.**   Yeah.

23  **Q.**   Okay.  Now, there are some other issues on the list that

24  you identify as a systems issue, and why don't we look at one

25  of those on page 3.

1          And it's No. -- No. 3 -- No. 2.  I'm sorry.  Can't read

2    my -- all right.  So this is in the section of systems issues,

3    correct?

4    **A.**    Uh-huh.

5    **Q.**    And this No. 2 issue, "Explore the possibility of setting

6    up ACH for all units in North America," right?

7    **A.**    Yes.

8    **Q.**    And ACH is electronic bill pay?

9    **A.**    Yes.

10   **Q.**    Okay.  So obviously not anything remotely resembling

11   accounting fraud, correct?

12   **A.**    Yeah.

13   **Q.**    Okay.  And there are about another dozen or so issues that

14   are in this list that are identified as systems issues,

15   correct?

16   **A.**    Correct.

17   **Q.**    There are some --

18            **MR. HEBERLIG:**  We can take that blow up down --

19   **BY MR. HEBERLIG:**

20   **Q.**    There are some other issues identified as accounting

21   related, right?

22   **A.**    Yes.

23   **Q.**    But even those, characterized as accounting issues, were

24   not issues that were involving accounting fraud or

25   improprieties; is that fair?

1    **A.**    It's fair.

2    **Q.**    And if we look at just one of them on page 3 that is

3    No. 3, this is something having to do with an accrual process

4    and the fact that the different American businesses were

5    handling it different ways, correct?

6    **A.**    Yes.

7    **Q.**    And an accrual is like an accounting estimate right?

8    **A.**    Yes.

9    **Q.**    And it's important to have that done properly, right?

10   **A.**    Yes.  It could -- if -- in this particular case, you are

11   not recording the cost.  That's what it meant.  There are

12   financial implications.

13   **Q.**    So bringing these four businesses together let's all sort

14   of row in the same direction, do the same thing, right?

15   **A.**    Correct.

16   **Q.**    All right.  So let's talk about the one entry in this

17   document you discussed with the government at the very end

18   related to FileTek.

19           **MR. HEBERLIG:**  And if we could go to page 5 and blow

20   up that portion about capitalized software.

21   **BY MR. HEBERLIG:**

22   **Q.**    All right.  Do you recall discussing this in direct

23   examination?

24   **A.**    Yes.

25   **Q.**    I'm going to come back to FileTek in greater detail, but

1    looking at this entry am I correct that there is nothing in

2    your write-up of the issue that is focused on this being a

3    potentially linked transaction?

4    **A.**    That is correct.  At this point I am not.

5              **MR. HEBERLIG:**  Okay.  We can take that one down.

6    **BY MR. HEBERLIG:**

7    **Q.**    You described, I believe, a meeting with Steve Chamberlain

8    to discuss these issues in your summary spreadsheet in

9    person --

10   **A.**    Correct.

11   **Q.**    -- correct?

12        And that was -- that document was I think June 7.  It was

13   sometime thereafter but still in the month of June?

14   **A.**    Yes.

15   **Q.**    In San Jose at your offices?

16   **A.**    Yes.

17   **Q.**    Okay.  And you reviewed the spreadsheet with him?

18   **A.**    That's correct.

19   **Q.**    All right.  Let me transition to another topic, and that

20   has to this do with Autonomy's software sales using

21   resellers --

22   **A.**    Okay.

23   **Q.**    -- okay?

24        And you testified about that at some length in your

25   direct?

**VAIDYANATHAN - CROSS / HEBERLIG**

1    **A.**    Yes.

2    **Q.**    All right.  Just so we're on the same page, it is

3    common -- is it not? -- for software companies to sell their

4    products using resellers?

5    **A.**    It is common.

6    **Q.**    All right.  And we heard some examples in opening

7    statements -- I don't think you were here -- one example given

8    was a farmer selling potatoes to McDonald's, McDonald's sells

9    them on as French fries.  I know that's a sort of simplistic

10   example.

11        In that scenario the middleman, McDonald's, would

12   essentially be performing the reseller role?

13   **A.**    Yes.

14   **Q.**    Maybe another way to look at it, a supplier sells baked

15   beans to a grocery store, the grocery store puts them on the

16   shelves.  The sale to the grocery store of the product is the

17   sale to the reseller, right?

18   **A.**    Yes.

19   **Q.**    So if you think about it in Autonomy terms, they sell

20   software to a reseller, and the reseller goes out and tries to

21   find someone to buy it, right?

22   **A.**    Correct.

23   **Q.**    Okay.

24        And before you joined Autonomy, when you were at

25   Interwoven, it's fair to say Interwoven sold its software quite

1  often using resellers and strategic partners?

2  **A.**   Correct.

3  **Q.**   And there's nothing wrong with that, is there?

4  **A.**   There's nothing wrong.

5  **Q.**   In the year before Autonomy acquired Interwoven, am I

6  correct that Interwoven sold in the neighborhood of 65 percent

7  of its new license orders using resellers or other strategic

8  partners?

9  **A.**   I don't necessarily recall that number, but we did sell

10  quite a bit through the indirect channel.

11  **Q.**   Okay.  Does it seem roughly familiar?  I mean, I could try

12  to refresh you, but is that in the ballpark of what you

13  remember?

14  **A.**   I don't remember, to be honest.

15  **Q.**   All right.  Let's see if I can then.  I'll tell you what,

16  I'll move on and we'll come back to that one.

17      On the reseller sales, focusing still on your time at

18  Interwoven, we've already talked about the fact that Interwoven

19  followed US GAAP, right?

20  **A.**   Uh-huh.

21  **Q.**   And under Interwoven's accounting policies, the company

22  recognized revenue in connection with reseller sales when the

23  reseller sold the product to an end user, correct?

24  **A.**   Yes.

25  **Q.**   Okay.  And under the Interwoven policy, again, under US

1  GAAP, it was the end user that was the customer, not the

2  reseller?

3  **A.**    In the books it was the reseller who was the customer, but

4  the -- you always have an end user noted -- denoted in that

5  agreement, almost calling the agreement almost tripartite.

6  **Q.**    But for purposes of recognizing revenue, just so we're

7  clear, so when the company would record in its books we've

8  received revenue, at Interwoven it wasn't upon the sale to the

9  reseller, it was when the reseller sold to the end user?

10  **A.**    It was when the company sold to the reseller and the

11  reseller had -- we had evidence that the reseller had an end

12  user who was contacted by it.

13  **Q.**    Right.  So the evidence you required -- this sort of

14  accounting jargon, but persuasive -- excuse me -- persuasive

15  evidence of an arrangement with the end user, right?

16  **A.**    That is correct.

17  **Q.**    That's it?

18  **A.**    That's correct.

19  **Q.**    And typically persuasive evidence of an arrangement with

20  an end user is a contract?

21  **A.**    Is a contract?

22  **Q.**    Okay.  Again, just so we're on the same page then, you

23  recognized revenue in most cases when there was a contract in

24  the hands of an end user to buy the software?

25  **A.**    Correct.

1  **Q.**   And that's how most US companies following US GAAP

2  accounted for reseller sales, correct?

3  **A.**   Correct.

4  **Q.**   Have you heard of that method described before as "sell

5  through"?

6  **A.**   Yeah.

7  **Q.**   Okay.  Now Autonomy, as a UK company, I think we've

8  already established followed IFRS, right?

9  **A.**   Uh-huh.

10  **Q.**   And it recognized its revenue pursuant to the IFRS

11  criteria, right?

12  **A.**   With a caveat.

13  **Q.**   Okay.  Well, I think we've established you were not very

14  familiar with the IFRS revenue recognition criteria, correct?

15  **A.**   No.  With a caveat.

16  **Q.**   Pardon?

17  **A.**   With a caveat.

18  **Q.**   Okay.  Well, I'll let the government explore the caveat,

19  but let me ask my questions.

20      Am I right that under Autonomy's accounting policy,

21  Autonomy recognized revenue upon the sale to the reseller, not

22  the end user?

23  **A.**   I don't think that was necessarily true.  We had evidence

24  of the third-party end user in most cases.

25  **Q.**   That's fair, but let me -- let me see if I can clarify

1   that.

2       Autonomy, when it sold to resellers, it had a contract

3   with a reseller, typically would identify the intended end user

4   of the product, correct?  We can go look at a few, if you'd

5   like.

6   **A.**   Yes.

7   **Q.**   Okay.  But while they identify the intended end user,

8   their policy -- the accounting policy the company followed --

9   was upon the sale to the reseller, even if there was no

10  contract yet in place with the end user, the company recognized

11  revenue.  Did you understand that from your time at Autonomy?

12  **A.**   No.  That is not what I understood.

13  **Q.**   Okay.

14      Can you identify the provision of the IFRS that governs

15  the recognition of revenue for contracts like this?

16  **A.**   So couple of things here.

17  **Q.**   That's a -- that's actually a specific question.  Can you

18  identify the provision --

19          **THE COURT:**  He's answering the question.  Go ahead.

20          **THE WITNESS:**  So couple of things.  First, the

21  specific guidance on the IFRS for revenue recognition was

22  listed in the accounting policy of Autonomy.  That is one.

23      The second piece that was associated with this was that

24  Autonomy stated that they would follow the rules of US GAAP in

25  all practical possibilities to the extent possible.

1  BY MR. HEBERLIG:

2  Q.    Yeah.   Where did they state that, in your recollection?

3  A.    I thought it was somewhere in the accounting policy.

4  Q.    Isn't it a fact that the accounting policy was laid out in

5  the annual reports filed by the company --

6  A.    Yes.

7  Q.    -- correct?

8  A.    Yes.

9  Q.    And they were, during the time that that's relevant to

10 this case, 2009 and 2010, both years annual reports were filed,

11 correct?

12 A.    Yes.

13 Q.    And in those annual reports am I not correct that the

14 company made quite explicitly clear that the accounting

15 policies were followed both generally and with respect to

16 revenue recognition with the IFRS?

17 A.    I seem to recall that it -- it stated in the form of

18 revenue recognition policy it said we will follow US GAAP.

19 That is my recollection.

20 Q.    Okay.   I guess we'll do this.   2009 annual report,

21 Exhibit 428, which I believe is in evidence.

22          THE COURT:   Why number is it?

23          MR. HEBERLIG:   428.

24          THE COURT:   I don't think it is in evidence.

25          MR. HEBERLIG:   Oh.   If it's not, then I offer it.

1  It's the 2000 --

2          **THE COURT:**  Okay.  428?

3          **MR. HEBERLIG:**  428.

4          **THE COURT:**  Okay.  Admitted.

5      (Trial Exhibit 428 received in evidence)

6          **MR. HEBERLIG:**  And if we can go to page 36, please, of

7  the document.  And if we could enlarge the portion that talks

8  about company law.

9      Actually, before you enlarge that can you just back out

10  for a sec?

11  **BY MR. HEBERLIG:**

12  **Q.**   This is in the statement of director's responsibilities in

13  the annual report, correct?

14  **A.**   Yes.

15  **Q.**   All right.  And it's signed by Michael Lynch and Shushovan

16  Hussain?

17  **A.**   Yes.

18          **MR. HEBERLIG:**  All right.  Now we can enlarge that

19  paragraph, please.

20  **BY MR. HEBERLIG:**

21  **Q.**   I'll give you a second just to read it.

22  **A.**   Yes.

23  **Q.**   All right.  Would you agree with me, at least in this

24  portion of the report, it makes clear that the company's group

25  financial statements are prepared in accordance with the IFRS?

1    **A.**    Yes.

2          **MR. HEBERLIG:**    And if we can go to the

3    responsibilities statement a little bit later in the same page

4    before the signature block.

5    **BY MR. HEBERLIG:**

6    **Q.**    All right.    Again, this is -- this is Mr. Lynch,

7    Mr. Hussain affirming that to the best of their knowledge, the

8    financial statements were prepared in accordance with the IFRS,

9    correct?

10    **A.**    Yes.

11    **Q.**    No mention of US GAAP in either section we just read,

12    correct?

13    **A.**    Not in this, yes.

14    **Q.**    And why don't we look at the actual specific revenue

15    recognition policies that were disclosed by the company.

16    **A.**    Okay.

17          **MR. HEBERLIG:**    Can we go to page 428-042?    And

18    highlight down there starting at No. 2, "Significant Accounting

19    Policies" on down.

20    **BY MR. HEBERLIG:**

21    **Q.**    All right.    Do you see there, there's a -- these are sort

22    of the detailed notes of the financial statement, but there's a

23    note there on the basis of accounting, correct?

24    **A.**    Yes.

25    **Q.**    And the basis of accounting is that the international

1  financial -- excuse me -- that the financial statements have

2  been prepared in accordance with the IFRS, correct?

3  **A.**   Yes.

4  **Q.**   US GAAP not mentioned anywhere?

5  **A.**   No.

6  **Q.**   All right.  Well, let's go to the revenue recognition

7  section of this, little heading e) on the next page.

8      This talks about how the group calculates revenue

9  recognition, correct?

10  **A.**   Yes.

11  **Q.**   And it talks about "as required by IAS 18," right?

12  **A.**   Yes.

13  **Q.**   And that is a provision of the IFRS, correct?

14  **A.**   Correct.

15  **Q.**   Okay.  Again --

16          **MR. HEBERLIG:**  And you could -- let's zoom out and

17  allow the witness to scan a bit --

18  **BY MR. HEBERLIG:**

19  **Q.**   -- no reference anywhere in Autonomy's revenue recognition

20  policy that it follows US GAAP, right?

21  **A.**   Yeah.

22  **Q.**   Is that fair?

23  **A.**   Fair.

24  **Q.**   And you would agree that a company's annual financial

25  statement is the most authoritative source of its accounting

1  policies, correct?

2  **A.**    Correct.

3  **Q.**    That's what goes to the investing public every year,

4  right?

5  **A.**    Correct.

6  **Q.**    And it's well recognized whether you're in the US or the

7  UK that the annual statement has the most detailed information

8  and is the most authoritative source?

9  **A.**    That is correct.

10  **Q.**    So can we agree that Autonomy did, in fact, follow the

11  IFRS in its accounting policies?

12          **MR. LEACH:**  Objection, foundation.

13          **MR. HEBERLIG:**  I think I just laid it.

14          **THE COURT:**  No.  I think what you've established is

15  that they said they did.  I mean, whether they did or not is

16  another issue.

17          **MR. HEBERLIG:**  That's fair.

18  **BY MR. HEBERLIG:**

19  **Q.**    They certainly never said to the investing public -- as I

20  think you suggested a moment ago -- that they were, instead of

21  following IFRS, following US GAAP, right?

22  **A.**    Yes.  I don't think they said that on the annual financial

23  statements.  That is -- you are right.  They didn't say that

24  there.

25  **Q.**    That was the authoritative source for the market --

1   **A.**   Correct.

2   **Q.**   -- to understand what the company was doing?

3   **A.**   Correct.  They didn't say it there.

4   **Q.**   Now, back to where I was on resellers, are you familiar --

5   do you have detailed knowledge of the IFRS rules on when it's

6   appropriate to recognize revenue upon a sale to a reseller,

7   given your lack of training?

8   **A.**   Well, revenue recognition typically is not dramatically

9   different from an IFRS standpoint.  US GAAP at that point in

10  time was more proscriptive.  The IFRS, in my opinion, was a

11  little bit more principle based.  That was the sort of

12  underlying difference between the two.

13      You would not -- you would not achieve a dramatically

14  different result, in my opinion, from an IFRS standpoint to a

15  US GAAP standpoint.

16  **Q.**   Let me pick up on what you said there so -- in terms of

17  the differences between the two.

18      The US GAAP is a proscriptive standard I think as you

19  described it?

20  **A.**   Uh-huh.

21  **Q.**   It is a standard -- it is a series of rules, correct?

22  **A.**   Correct.

23  **Q.**   And they're often quite detailed on what can and can't be

24  done, right?

25  **A.**   Correct.

1    **Q.**   And in particular, with respect to software, there's sort

2    of a long, multi-page pronouncement on how you account for

3    software revenue recognition, correct?

4    **A.**   Correct.  Correct.

5    **Q.**   In the UK under the IFRS I think you said it was more

6    principles based, right?

7    **A.**   Correct.

8    **Q.**   And so there are more general guidelines on how you apply

9    accounting principles, correct?

10   **A.**   Correct.

11   **Q.**   And so you would agree that an accountant applying those

12   policies would often have to exercise judgment, correct?

13   **A.**   Yes.

14   **Q.**   And sometimes under a general principles-based policy like

15   that, two reasonable accountants can reach different judgments

16   on the same issue and both not be wrong or perhaps both be

17   right; is that fair?

18   **A.**   That's fair.

19           **MR. HEBERLIG:**  All right.  When does the Court wish to

20   go to today?

21           **THE COURT:**  Is this a good time?

22           **MR. HEBERLIG:**  Unfortunately, I have more to go, so

23   yes.

24           **THE COURT:**  Pardon me?

25           **MR. HEBERLIG:**  Unfortunately I have some more to go.

 1            THE COURT:  Oh, no, no, that's all right I don't want

 2    to cut you off at all.  I mean, I just -- we can take a break

 3    now if that's suitable for your --

 4            MR. HEBERLIG:  It's your pleasure.  I could go all

 5    day.

 6            THE COURT:  Well, my pleasure is always take a break.

 7        All right.  Ladies and gentlemen, we're going to take our

 8    recess now.  There's going to be a 45-minute recess.  Quarter

 9    of 1:00, please.  Remember the admonition.  Don't discuss the

10    case, allow anyone to discuss it with you, form or express any

11    opinion.  I'll see you here in 45 minutes.

12        (Recess taken at 12:00 p.m.)

13        (Proceedings resumed at 12:01 p.m.)

14        (Proceedings were heard outside the presence of the jury:)

15            THE COURT:  Okay.  Let the record reflect that the

16    jurors have retired.  Is this a -- is this an appropriate time

17    to have this discussion on the issue that you raised -- on the

18    issue that you raised?  Is it appropriate now or do you want to

19    do it later or what?

20            MR. LINCENBERG:  We can do it now or later.

21            THE WITNESS:  Well, I think it would be a good idea to

22    do it now so I know what it is, and then we can discuss it

23    later, whoever wants to go forward.  Mr. Weingarten?

24            MR. WEINGARTEN:  I can start.  We got an email from

25    Mr. Leach --

1    **THE COURT:**  Yeah.

2    **MR. WEINGARTEN:**  -- last night or this morning, I

3    can't remember which, advising us that one of the jurors had

4    contact with an AUSA and the juror is going to law school and

5    wants legal advice.  The part that was concerning is that the

6    juror sought the contact with the AUSA on the day of selection.

7    **THE COURT:**  May I see the email from Mr. Leach?  Okay.

8    Let's have that marked as a -- as a court exhibit.  One moment,

9    please.

10    (Trial Exhibit 1 received in evidence)

11    (Brief pause.)

12    **THE COURT:**  So let me just read it out loud, make sure

13    I understand this without naming names.  The USA -- assistant

14    USA responded to the email -- oh.

15    On March 13th the juror emailed the assistant USA saying

16    he had been accepted to law school and he wanted to talk to the

17    assistant US attorney, whom he knew, about law school and he

18    said, "I got called for jury duty, so I find myself at the

19    federal building."  The AUSA responded the following day, which

20    is -- the 14th was the actual jury selection day, right?  So

21    the 13th was before anybody came into court.  The 14th he's

22    here and the USA said he'd be happy to talk to him about law

23    school, suggested dates and then asked the juror, by the way,

24    when are you scheduled for jury duty, and then that afternoon

25    the juror said that he was in the federal building.  This would

1   have been at 2:05, prior to the time that he had been

2   designated on the jury, prior, 2:05.  I mean, he had been in

3   the courtroom, he had been voir dired, but he had not been

4   designated.

5       He said it was for a criminal case being prosecuted by

6   your office, said to let him know if it would be improper for

7   them to speak if he was selected for jury service, and there

8   have been no responses.

9       Okay.  Yes, Mr. Weingarten.  Okay.  So those are the

10  facts, right?

11          **MR. WEINGARTEN:**  Right.

12          **THE COURT:**  No dispute about the facts, or is there?

13          **MR. WEINGARTEN:**  No, no.  I mean, there are three

14  issues, Judge.  One, there's a possibility it's utterly benign,

15  that's one possibility; two is, you know, all he wants to do in

16  his life is be an AUSA here, and we just didn't know that; and

17  number three --

18          **THE COURT:**  That would be a life's ambition, wouldn't

19  it?

20          **MR. WEINGARTEN:**  And number three, he didn't -- on his

21  questionnaire, you know, there's a specific question about

22  contact with law enforcement and whatever, and there's an

23  answer of no that's inconsistent with what you just read.  So I

24  think, at a minimum, he needs to be asked about it.

25          **THE COURT:**  I don't know it's inconsistent or not.  I

 1  mean, I don't know.  I mean, I don't know.  Maybe it is.  Maybe

 2  it is.  I mean, it's not obvious to me that because I know a

 3  lawyer in the US Attorney's Office, I don't know.  I could read

 4  it -- I'm not disagreeing with you, okay?

 5      So I got it.  I -- maybe what I would do is after court

 6  today is bring him out.  If you have some questions that you

 7  want me to ask him -- it's better that I ask him the questions

 8  rather than you.  You don't want to ask him questions anyway,

 9  make him feel uncomfortable and so forth and I can just say,

10  look, we've been advised -- been advised that you did know --

11  you do know somebody in the US Attorney's Office, that before

12  you were selected as a juror you had some contact with him and

13  the parties want to be assured that . . . and then whatever you

14  want to know about it.

15          MR. WEINGARTEN:  That's fair.

16          THE COURT:  Okay.  That you won't favor or whatever

17  those exact --

18          MR. LINCENBERG:  Your Honor, may I?

19          THE COURT:  Mr. Lincenberg, go right ahead.

20          MR. LINCENBERG:  And I might go into a little bit.  I

21  mean, when you say we know the facts I might go into a little

22  bit the conversation he had with the AUSA in 2022.  My guess

23  is, this was a young guy, he's talking to him, he sees this

24  great career.

25          THE COURT:  Okay.  I can do that.  It's a great

1  career.  I know people who actually have their children who go

2  into the United States Attorney's Office.  It's -- it's

3  possible.  It's not a career ender.

4          MR. LINCENBERG:  No, but a lot of these people decide

5  they need to move them back East.

6          THE COURT:  I even know -- I even know of a famous

7  father who was in the United States Attorney's office in the

8  Southern District of New York.  That was not a career ender for

9  him.  He was able to provide for employment for his children,

10  so that was -- that's even a remarkable story, right?  There

11  are a lot of them, hundreds of stories.

12     Okay.  You give me some questions you would like to ask.

13  Now if -- and then I'll see okay if that's okay because the

14  answers may suggest further questions.

15          MR. WEINGARTEN:  Good.

16          THE COURT:  Okay.  Thank you very much.

17          MR. REEVES:  Thank you.

18          THE CLERK:  We'll just mark this as Court Exhibit 1.

19     (Luncheon recess was taken at 12:08 p.m.)

20  **AFTERNOON SESSION**                            **12:48 p.m.**

21     (Jurors enter courtroom.)

22        (Proceedings were heard in the presence of the jury:)

23          THE COURT:  Okay.  Let the record reflect all jurors

24  are present, parties are present.

25     You may proceed.

1          **MR. HEBERLIG:**  Thank you, Your Honor.

2     **BY MR. HEBERLIG:**

3     **Q.**   Good afternoon, Mr. Vaidyanathan.

4     **A.**   Good afternoon.

5     **Q.**   Did I get that correct?

6     **A.**   Yes.

7     **Q.**   Just before we move on from the reseller revenue

8     recognition policy, are you familiar generally with the concept

9     under the IFRS of the ability to recognize revenue upon the

10    sale to a reseller as opposed to an end user?

11    **A.**   Generally, yes.

12    **Q.**   Okay.  And I don't recall, but do you know the provision

13    of the IFRS that governs revenue recognition?

14    **A.**   Not the topic, no.

15    **Q.**   Okay.  IAS-18, that's not a standard you're familiar with?

16    **A.**   Well, I've read it in passing, not -- not actually

17    practiced it.

18    **Q.**   All right.  And just to follow up, if the factors under

19    IAS-18 are met upon a sale to a reseller, is it your

20    understanding that under IFRS it can be permissible to

21    recognize revenue?

22    **A.**   Yes.

23    **Q.**   Okay.  Let me change topics and address briefly the

24    subject of potentially linked transactions?

25    **A.**   Yes.

**VAIDYANATHAN - CROSS / HEBERLIG**

1  **Q.**   Okay.  Those are transactions, am I right, in which a

2  company sells something to a customer from which it also buys

3  something?

4  **A.**   Yes.

5  **Q.**   And that occurred, in your experience, at Autonomy?

6  **A.**   Correct.

7  **Q.**   And I believe you testified that those types of

8  transactions, because there's a buy/sell relationship with the

9  customer, need to be evaluated for potential linkage?

10  **A.**   Correct.

11  **Q.**   Okay.  And that's why you were flagging that term.

12       Now, the prosecutor, in a couple of his questions,

13  injected the term "roundtrip" transaction, but I noted that

14  wasn't something that originally came from your answer; do you

15  recall?

16  **A.**   Yes.

17  **Q.**   All right.  That term "roundtrip" transaction is not

18  itself a term that is defined in any of the accounting

19  standards --

20  **A.**   No.

21  **Q.**   -- we're talking about, right?

22  **A.**   No, it's not.

23  **Q.**   That's like some slang kind of term that accountants use?

24  **A.**   Yeah, I mean, that's correct.

25  **Q.**   And I'm correct that there is nothing wrong, as a general

1  matter, with two companies buying and selling products from

2  each other?

3  **A.**   That is correct.

4  **Q.**   Under the accounting rules there can be, but are not

5  always, consequences when that occurs?

6  **A.**   Correct.

7  **Q.**   And even if there are those consequences and transactions

8  are deemed linked, that doesn't mean it's illegal for a company

9  to buy and sell products from one another, correct?

10 **A.**   Correct.

11          **MR. LEACH:**  Objection, foundation.

12          **THE COURT:**  Overruled.

13 BY MR. HEBERLIG:

14 **Q.**   Let me repeat it.

15          **THE COURT:**  He answered it.

16          **MR. HEBERLIG:**  I'm not sure the jury heard.

17 BY MR. HEBERLIG:

18 **Q.**   Did you say correct?

19 **A.**   Yes.

20 **Q.**   Okay.  Not illegal, you can still buy and sell, right?

21 **A.**   Correct.

22 **Q.**   It's just that you might have to account for the

23 transaction differently?

24 **A.**   Yes.

25 **Q.**   And just like the revenue recognition standard we were

**VAIDYANATHAN - CROSS / HEBERLIG**

 1   talking about, under the IFRS there are principles for

 2   determining whether two transactions are sufficiently linked

 3   that they need to be accounted for together, correct?

 4   **A.**   There should be.

 5   **Q.**   Okay.  But you yourself are not familiar with what those

 6   standards are?

 7   **A.**   No.

 8   **Q.**   Do you agree that the test for what is a linked

 9   transaction is a fact-specific inquiry that requires judgment?

10   **A.**   A linked transaction is something that is fact-specific,

11   yes.

12   **Q.**   And that it requires accounting judgment to determine

13   whether in fact two transactions are linked?

14   **A.**   Well, I think the how-to-account-for-it is where the

15   accounting judgment comes in.  I think the fact whether they're

16   linked or not is obviously it's factual.

17   **Q.**   Okay.  Fair enough.  So first you have to determine as a

18   factual matter whether or not two transactions are linked?

19   **A.**   Correct.

20   **Q.**   And then if you conclude the two transactions are linked,

21   then you need to apply accounting judgment as to how you

22   account for it?

23   **A.**   Correct.

24   **Q.**   Okay.  And the judgment would be applied in the case of

25   Autonomy under the IFRS standards, correct?

1  **A.**    Correct.

2  **Q.**    So let's talk specifically about Autonomy's transactions

3  with Filetek, okay?

4  **A.**    Sure.

5  **Q.**    Now.  Am I right that you became aware of those

6  transactions because you were in charge of accounts payable and

7  had to pay some bills to Filetek?

8  **A.**    Yes.

9  **Q.**    And when Autonomy bought software for Filetek, you would

10  process the payment and ensure that the relevant approvals had

11  been obtained, correct?

12  **A.**    Correct.

13  **Q.**    Now, you yourself did not negotiate the purchase of that

14  software from Filetek at any time, correct?

15  **A.**    Yeah, no, I did not.

16  **Q.**    And you did not work with either the U.K. finance

17  department or Deloitte on how to recognize revenue, if at all,

18  from those transactions, correct?

19  **A.**    Yeah, I did not.

20  **Q.**    And, therefore, you're not familiar with whatever work

21  papers or reports may have been provided by Deloitte to the

22  audit committee on these particular transactions?

23  **A.**    That's correct.

24  **Q.**    So let me direct you to June of 2010.  Around that time

25  period you asked around within Autonomy to see who was familiar

1  with this software product that Autonomy had purchased from

2  Filetek, correct?

3  A.   Yes.

4  Q.   Now, let me pull up a document about that.

5         THE COURT:  This is in evidence.

6         MR. HEBERLIG:  I don't think it is.  It's Exhibit 849,

7  an email exchange between you and someone named Mike Sullivan

8  and then subsequently I believe Mr. Hogenson.

9         THE COURT:  849 admitted.

10       (Exhibit 849 received in evidence.)

11        THE COURT:  It's tab 3.

12        MR. HEBERLIG:  Oh, yes.  Thank you.  I will try to say

13  that every time.  Thank you.

14  BY MR. HEBERLIG:

15  Q.   Let's start with your email first, down at the bottom.

16       Sorry, Bret.

17       All right.  So this is you to Mike Sullivan, June 8th,

18  subject line, software purchased, correct?

19  A.   Yes.

20  Q.   And you ask him, in sum and substance, about a large

21  software license purchase from a company called Filetek,

22  correct?

23  A.   Yes.

24  Q.   And then if we go up to Mr. -- first of all, Mr. Sullivan,

25  he worked for Zantaz, correct?

1    A.    That's correct.

2    Q.    And that was one of those five American businesses of

3    Autonomy, right?

4    A.    Correct.  Correct.

5    Q.    All right.  Let's go to Mr. Sullivan's response, please.

6          Mr. Sullivan responded later that same day to you:  "I am

7    not aware of this.  We don't use it for EDD."

8          Now, first of all, let me pause there.

9          EDD is a part of Zantaz that stands for eDiscovery; is

10   that correct?

11   A.    Yes.

12   Q.    And that was the part of the Zantaz business that sold

13   software to companies that had big litigation needs or other

14   requirements that have a solution that allowed the storage and

15   searching of documents, correct?

16   A.    Correct.

17   Q.    That was Zantaz's EDD product?

18   A.    That is right.

19   Q.    And that's where Mr. Sullivan was focused, right?

20   A.    Yeah.

21   Q.    All right.  And he says, in his response to you:  While we

22   don't use it for EDD, I'm checking with the DigitalSafe team,

23   right?

24   A.    Yes.

25   Q.    And that is essentially the other half of Zantaz; is that

1  correct?

2  **A.**   Yes, the other product, correct.

3  **Q.**   The other part, maybe it's not half.

4       But that was the portion of Zantaz that sold a product

5  known as DigitalSafe?

6  **A.**   Correct.

7  **Q.**   And that was used to archive and store and allow to be

8  searched big data, right?

9  **A.**   Right.

10 **Q.**   Typically from a financial institution or other large

11 company?

12 **A.**   Correct.

13 **Q.**   And some of those financial institution companies hosted

14 their data with Zantaz, correct?

15 **A.**   Mm-hmm.

16 **Q.**   Are you familiar with what that means?

17 **A.**   Yes.  Yes.

18 **Q.**   Am I right that it means they had these big pools of data,

19 like emails and documents that they're required to keep for

20 regulatory purposes, and they're stored on servers that are run

21 by Zantaz, correct?

22 **A.**   Yes.

23 **Q.**   Okay.  And that's what's known as "hosted?"

24 **A.**   Yes.

25 **Q.**   In broad strokes?

1    **A.**    In broad strokes, yes.

2    **Q.**    And then there are some other customers of Autonomy,

3    typically a financial institution, that might use DigitalSafe

4    to host the data internally at their own company, correct?

5    **A.**    Correct.

6    **Q.**    Okay.  Now, later in the day --

7        Let's take this one down and go to 3318, which is tab 22.

8        **THE COURT:**  3318 admitted.

9        (Trial Exhibit 3318 received in evidence.)

10   **BY MR. HEBERLIG:**

11   **Q.**    And if we got go to --

12       **THE COURT:**  Tab, I'm sorry, tab 22?

13       **MR. HEBERLIG:**  Is that what I said?

14       **THE CLERK:**  Yes.

15       **THE COURT:**  Thank you.

16   **BY MR. HEBERLIG:**

17   **Q.**    All right.  And do you see at the top of this page 2,

18   that's where we sort of left off in the chain, right, where he

19   said --

20       Sorry, actually, scroll back out.

21       The one before was you asking him, as you recall, he said

22   "I'll ask around," and this is his email essentially asking

23   around?

24   **A.**    Yes.

25   **Q.**    And he forwards it to you, correct?

1   **A.**   Yeah, correct.

2   **Q.**   Let's go to the forward to you, page 1, please.

3         And, obviously, you've got this whole chain, right, when

4   you get forwarded an email, the rest of the chain follows.

5   **A.**   Mm-hmm.

6   **Q.**   So even though you weren't on those initial emails, they

7   came to your inbox?

8   **A.**   Mm-hmm.

9   **Q.**   One of the people who responded to Mr. Sullivan's inquiry

10  was named Roger Wang; do you see that?

11  **A.**   Yes.

12  **Q.**   Can we highlight that email?

13        Mr. Wang was the, or a, vice-president of product

14  development for Autonomy, correct?

15  **A.**   Yeah.

16  **Q.**   He advised Mr. Sullivan and team that the software -- and

17  again, we're talking about the Filetek software, correct?

18  **A.**   Yeah.

19  **Q.**   He said that it's database archiving software that we've

20  OEMed to deploy in the hosted environment, correct?

21  **A.**   Correct.

22  **Q.**   And then he goes on to say the first target customers are

23  Kraft and BofA, right?

24  **A.**   Right.

25  **Q.**   So, let me just break that down.

VAIDYANATHAN - CROSS / HEBERLIG

1    He said "we've OEMed the software," not we plan to OEM it,

2  right?

3  **A.**   Yes.

4  **Q.**   All right.  And "OEMed," you understand that stands for

5  Original Equipment Manufacturer?

6  **A.**   Yes.

7  **Q.**   So if a company like Autonomy buys someone else's software

8  and OEMs it, that means they've essentially built it into their

9  own products to sell off, right?

10  **A.**   Yes.

11  **Q.**   Okay.  And so Mr. Wang is representing that's what

12  occurred with respect to the Filetek software; it got OEMed

13  into a product that would be deployed in the hosted

14  environment, right?

15    Now, could we go up to the next email in the chain.  And

16  the next two.  Thank you.

17    So Mr. Sullivan forwards it to you, this is maybe a day or

18  two later:  Looks like we're using this in hosting, right?

19  **A.**   Yeah.

20  **Q.**   And hosting is the other part of the business we talked

21  about, the DigitalSafe part that he said he'd ask around about

22  because he doesn't really work in it normally, right?

23  **A.**   Right.

24  **Q.**   And you forwarded that on to Mr. Hogenson:  "See Rogers

25  message below.  Looks like it" -- Filetek software, correct?

1    **A.**    Mm-hmm.

2    **Q.**    ... "Is actually being used in our California center."

3    **A.**    Yep.

4    **Q.**    "I have a call in to Roger to figure out more.  I will

5    keep you posted," correct?

6    **A.**    Correct.

7    **Q.**    Okay.  Now, you never connected with Roger, did you, on

8    this issue?

9    **A.**    I think we -- I don't remember right now, but I would have

10    certainly reached out to Roger.  Whether the conversation took

11    place or not, I don't recall.

12    **Q.**    You don't recall?

13    **A.**    Yeah.

14    **Q.**    Okay.  We haven't seen any record of it, and you don't

15    independently recall?

16    **A.**    I don't recall.

17          **MR. LEACH:**  Objection, Your Honor.  Counsel is

18    testifying about what he's seen.

19          **MR. HEBERLIG:**  I'll withdraw that half.

20    **BY MR. HEBERLIG:**

21    **Q.**    You don't recall whether you spoke to Mr. Wang, okay.

22          Now, let's talk about some of the people that you didn't

23    reach out to to inquire about the Filetek software, okay?

24    **A.**    Mm-hmm.

25    **Q.**    We just saw there Mr. Sullivan, you did.  But am I right

1  that you never spoke with any of Autonomy's senior product

2  developers and engineers in the U.K. to find out how they were

3  using the Filetek software?

4  **A.**   No, I did not.

5  **Q.**   For instance, you didn't speak with a gentleman named Pete

6  Menell, right?

7  **A.**   No, I did not.

8  **Q.**   He was Autonomy's Chief Technology Officer; you knew that,

9  correct?

10  **A.**   Yes.

11  **Q.**   Okay.  But you didn't speak with him?

12  **A.**   No, I did not.

13  **Q.**   You didn't speak with two individuals named Fernando

14  Lucini or Chris Goodfellow either, did you?

15  **A.**   No.

16  **Q.**   But you knew that they were two senior product developers

17  in the U.K., sort of high up in the ranks of the product

18  development team?

19  **A.**   At that time, no.  Chris Goodfellow I became acquainted of

20  later, not at that time.

21  **Q.**   All right.  And when you became his acquaintance, did you

22  understand that that's the position that he held?

23  **A.**   Yeah, I knew he was senior up in the organization.

24  **Q.**   So instead of those gentlemen, am I right that you spoke

25  to someone you described as a low-level IT guy in California

1  named James Gromar or Greomar (phonetic); does that ring a

2  bell?

3  **A.**    James Greomar, yeah.

4  **Q.**    You spoke to him, right?

5  **A.**    Yeah, yeah, I spoke with him.

6  **Q.**    And you described him, right, as the low-level IT guy from

7  California, right?

8  **A.**    Yeah, because he was not senior up in the ladder.

9  **Q.**    Right.  Is it fair to say he was the guy when new

10  employees would come in, he'd sort of set up their laptops and

11  work stations.  I mean, he handled IT for the company?

12  **A.**    He was the IT guy for the Americas, yes.

13  **Q.**    Perhaps not surprisingly he was not familiar with the

14  Filetek product, correct?

15  **A.**    He was not.

16  **Q.**    And you also spoke with a low-level engineer in the

17  Pleasanton Office of Autonomy named Ryan Smith, correct?

18  **A.**    He was VP.  He was not low level, in my opinion.

19  **Q.**    Okay.  And put aside his title, am I correct that you

20  spoke with a Ryan Smith in engineering in Autonomy's Pleasanton

21  office?

22  **A.**    Yes.

23  **Q.**    All right.  And that's, again, an office here in the Bay

24  Area, not in the U.K.?

25  **A.**    Correct.

1    Q.   Am I right, he told you that Filetek software had features

2    that Autonomy did not already have in the Zantaz solution?

3    A.   Correct.

4    Q.   So this is the second employee who confirmed that the

5    Filetek software purchased from Filetek was both being used and

6    OEMed and had features that Autonomy didn't already have?

7    A.   Yep.

8    Q.   Let's look at the rest of your email exchange with

9    Mr. Hogenson.  It's 3321, which is --

10              THE COURT:  3321 admitted.

11              MR. HEBERLIG:  Thank you.

12       (Trial Exhibit 3321 received in evidence.)

13   BY MR. HEBERLIG:

14   Q.   Tab 24.  Just go to the second page first, please.

15   Actually, we can start at the first page.  I think we just

16   talked about Mr. Smith.

17       So, take a look at your bottom message.  This is in

18   reference to Ryan Smith, correct?

19   A.   Yes.

20   Q.   Okay.  (As read) Now, I didn't know where it was

21   downloaded, in my conversation with Steve.

22       That's a reference to Steve Chamberlain?

23   A.   That's correct.

24   Q.   (As read) I was told that Pete has a writeup on the

25   justification of the purchase.

1          Pete is Pete Menell?

2     **A.**   That's correct.

3     **Q.**   All right.  And you didn't inquire of Mr. Menell for a

4     copy of that writeup, correct?

5     **A.**   No, I did not.

6     **Q.**   Okay.  Even though it was described as a writeup that

7     justified the purchase of Filetek software that had caused

8     these red flags for you?

9     **A.**   Correct, I did not.

10    **Q.**   Okay.  And then I think you testified about this, that

11    Steve didn't know about the second purchase, came as a

12    surprise, and that was a reference to Mr. Chamberlain?

13    **A.**   Yes.

14    **Q.**   And the date of this email is June 20th, correct?

15    **A.**   Yes.

16    **Q.**   And so that's before the close of the second quarter of

17    2010?

18    **A.**   Correct.

19    **Q.**   And that second purchase had occurred about a month

20    earlier in May; do you recall that?

21    **A.**   Thereabouts.

22    **Q.**   Okay.  So Mr. Chamberlain himself was not a sales or

23    business exec, right?

24    **A.**   No, he's not.

25    **Q.**   He's not the one negotiating the contracts with companies

1    like Filetek?

2    **A.**   Correct.

3    **Q.**   All right.  And given the timing of this email, he

4    wouldn't necessarily have learned about the purchase until the

5    books are closed and the accounting is being done at the end of

6    quarter 2; is that fair?

7            **MR. LEACH:**  Objection, speculation.

8            **THE COURT:**  Sustained.

9    BY MR. HEBERLIG:

10   **Q.**   Now, you referred to -- well, strike that.

11          Let's move on about 9 months later to a different exhibit

12   that the Government showed you during your direct examination.

13   And am I right that at that time you learned about a different

14   way in which Autonomy was using Filetek software?

15   **A.**   Yes.

16   **Q.**   Okay.  And broad strokes we'll look at the document, but

17   you learned that Autonomy had resold Filetek software as part

18   of larger deals with other customers, right?

19   **A.**   Correct.

20   **Q.**   And in particular -- why don't we look at Exhibit 15704,

21   which is in evidence, and just highlight the top there.

22   Perfect.

23          So you recall being asked about this one on direct,

24   correct?

25   **A.**   Yes.

VAIDYANATHAN - CROSS / HEBERLIG

1  Q.   So this is at the end of quarter 1, 2011, you were asked

2  to help process a payment to buy software, an additional

3  license I should say, from Filetek, so that Autonomy could sell

4  on the product, the Filetek software, to Morgan Stanley and

5  Hewlett Packard as part of larger deals, correct?

6  A.   Yes.

7  Q.   And Mr. Chamberlain explained in his email that the reason

8  why there needed to be an additional purchase of the software

9  is that the original licenses were only for internal Autonomy

10 use, correct?

11 A.   That's what he says, yes.

12 Q.   Right, like, for instance, internal use in that hosted

13 data center in California we just saw, correct?

14 A.   Yep.

15 Q.   Right.  This was a different type of use; this was an

16 actual resale to two other companies, and Filetek sold a

17 different license so that Autonomy could do that.  That's

18 what's represented in the email, correct?

19 A.   Yes.

20 Q.   You yourself did not negotiate the Morgan Stanley deal --

21 A.   No.

22 Q.   -- or the Hewlett Packard deal, right?

23 A.   No.

24 Q.   I'm sorry, we'll just have to not talk over each other.

25 I'll try my best.

VAIDYANATHAN - CROSS / HEBERLIG

1    **A.**    Sorry.

2    **Q.**    That's okay.

3         Now, the purchase price -- I don't know if we can see it

4    from this page.  Why don't we look at page 5 of this exhibit,

5    down at the bottom.  Just keep that number in mind, $740,000.

6         If we scroll up, this I believe was for the Morgan Stanley

7    piece of the license; do you see that up top there?

8    **A.**    Yes.

9    **Q.**    All right.  Now, if we go back out, please, to page 1.

10   These were attached as sort of the approval documentation,

11   right?

12   **A.**    Mm-hmm.

13   **Q.**    Is that your standard -- sorry, about that.

14        Is that standard you would get, when asked to process a

15   payment like this, you'd get like a little package of materials

16   that would include things like the invoice, contract, and then

17   maybe some email approvals, who authorized the purchase?

18   **A.**    Yes.

19   **Q.**    Because you yourself could not authorize a $740,000

20   purchase without someone higher up in the company?

21   **A.**    Correct.

22   **Q.**    Okay.  If we're back on this page, the request you got

23   from Mr. Chamberlain to process this said:  "The approvals from

24   Andy and Sushovan are below;" do you see that?

25   **A.**    Yes.

1   Q.   And "Andy" is a reference to Andy Kanter?

2   A.   Yes.

3   Q.   And "Sushovan" Mr. Hussain?

4   A.   Yes.

5   Q.   Now, no reference to Mike Lynch there, correct?

6   A.   Yes.

7   Q.   And I just want to clear up something on your testimony.

8   You talked about the need for certain approvals of expense

9   levels within Autonomy?

10  A.   Yes.

11  Q.   And I think at one point you said for approvals over a

12  certain level, you needed to get the approval of Kanter,

13  Hussain and Lynch, but did you really mean to say "or?"

14  A.   Top of my mind it was over 10,000 you're required to, for

15  certain.  I can't recall which one is which.  Certainly above a

16  particular threshold we needed Mike.

17  Q.   All right.  Well, I assume that must have been above this

18  particular threshold of roughly $750,000, because the approvals

19  here are from Andy and Sushovan, correct?

20  A.   Yes.

21  Q.   Now, you have, when you received this email, you have no

22  reason to doubt that these were real deals with Morgan Stanley

23  and Hewlett Packard that included the Filetek software, do you?

24  A.   No reason to doubt it.

25  Q.   And did you investigate; did you ask for copies of the

1    Morgan Stanley contract or the HP contract to confirm that

2    Autonomy was in fact selling solutions that included Filetek?

3    **A.**    No, because revenue was not mentioned.  I didn't ask the

4    question.

5    **Q.**    Okay.

6    **A.**    And because we had already done this the previous year, I

7    didn't ask.

8    **Q.**    Why don't we just take a look at one of those contracts,

9    the Morgan Stanley contract, which is Exhibit 6283.

10            **THE COURT:**  6283.

11            **MR. HEBERLIG:**  Tab 30.

12        Did you say "admitted?"

13            **THE COURT:**  Admitted.

14        (Trial Exhibit 6283 received in evidence.)

15    **BY MR. HEBERLIG:**

16    **Q.**    Just highlight the first paragraph so we can confirm this

17    was the Morgan Stanley contract with -- technically with

18    Zantaz, but Zantaz is part of Autonomy, correct?

19    **A.**    Yes.

20    **Q.**    And the date is March 31st, 2011?

21    **A.**    Correct.

22    **Q.**    That's the same date as the approval that we were just

23    taking a look at, correct?

24    **A.**    Yes.

25    **Q.**    And let's look at page 2 of the contract.  That's a sort

1  of recitation of the -- well, go back to 1 so we could see what

2  the list is.

3      It's a listing of the various things that Morgan Stanley

4  was purchasing from Autonomy, correct?

5  **A.**  Right.

6  **Q.**  And there's a whole host of features related to

7  DigitalSafe, right?

8  **A.**  Yes.

9  **Q.**  And, again, is that archiving the things that the banks

10  would use for their emails and such?

11  **A.**  Correct.

12  **Q.**  Now we can go to page 2, please.  And right above the

13  number 2, can you just enlarge that section?

14      So, among the capabilities that Morgan Stanley contracted

15  to purchase from Autonomy was structured data load

16  capabilities, as provided by Filetek StorHouse/RFS and RM

17  software, right?

18  **A.**  Mm-hmm.

19  **Q.**  Okay.  And that's the software that we're talking about

20  from Filetek, correct?

21  **A.**  Correct.

22  **Q.**  Okay.  And no reason to dispute that this is an actual

23  contract signed between Autonomy and Morgan Stanley?

24  **A.**  No reason to dispute.

25  **Q.**  All right.  We can take that down.

1        Now, fast forward a few months later to June of 2011.  The

2    Government showed you some other documents related to Filetek,

3    and I'd like to explore those.

4        Before I do, these relate to a -- some business that came

5    about as a result of an acquisition of a company called Iron

6    Mountain, right?

7    **A.**   Right.

8    **Q.**   And just so we all understand what we're talking about

9    there, Autonomy bought Iron Mountain or at least its digital

10   assets?

11   **A.**   That's correct.

12   **Q.**   Much like it had bought Interwoven a year or so earlier?

13   **A.**   Correct.

14   **Q.**   All right.  And after Autonomy bought Iron Mountain, do

15   you recall that Iron Mountain had its own data storage

16   customers who were using a product different than DigitalSafe

17   called DRC-CM?

18   **A.**   I don't recall that name, but, yeah, I've seen that being

19   referenced in multiple emails, yes.

20   **Q.**   Okay.  And do you recall that Autonomy, after acquiring

21   Iron Mountain and this product and customer base, was intent on

22   migrating that business to its own DigitalSafe hosting

23   environment?

24   **A.**   Yes.

25   **Q.**   That makes sense after an acquisition, right?

```
 1   A.    Correct.

 2   Q.    And the Filetek software was identified as a product that

 3   could help for that migration; do you remember that?

 4             MR. LEACH:  Objection, foundation.

 5             MR. HEBERLIG:  That's why I'm asking the question.

 6             THE COURT:  Overruled.

 7             THE WITNESS:  So.

 8             THE COURT:  If he knows.

 9   BY MR. HEBERLIG:

10   Q.    If you know.

11   A.    It was supposed to be for that.

12   Q.    It was supposed to be for that, right?

13   A.    Yeah.

14   Q.    Now let's look at the email.  This is in evidence at 1916.

15   Let's first enlarge the top email.

16        Again, this is the same pattern, right?  A request comes

17   to you:  We need to process a payment, and it's got a package

18   of stuff attached to it, right?

19   A.    Correct.

20   Q.    All right.  This one is related to Filetek, correct?

21   A.    Correct.

22   Q.    And it's described as an extension of the existing

23   agreement -- agreement to cover DRC-CM customers; do you see

24   that?

25   A.    Yes.
```

VAIDYANATHAN - CROSS / HEBERLIG

1  Q.   And do you understand that that's a reference to those

2  Iron Mountain data storage customers?

3  A.   Correct.

4  Q.   Okay.  Now, let's look at some of the backup that you

5  received.

6       If we can turn to page 4 of this document.

7       And this is a copy, it appears, am I right, of the actual

8  license that Filetek was selling to Autonomy for these

9  purposes?

10  A.   Yes.

11  Q.   Could we highlight the box there or enlarge it?

12       All right.  Now, do you see here that the license type is

13  described as (As read) limited or restricted to use within the

14  Iron Mountain digital record center for compliant messaging, so

15  on so forth, DRC-CM, right?

16  A.   Yes.

17  Q.   And there are three particular customers identified:

18  Barclay's Capital, Bank of America, and Morgan Stanley, right?

19  A.   Yes.

20  Q.   Precisely the type of big customers, financial

21  institutions Autonomy wanted to migrate to DigitalSafe, right?

22  A.   Correct.

23  Q.   Now, we can take that part down.

24       Another part of the package you received was an email

25  approval, and I'd like to take a look at that.  It's at page 7.

1        And if we can start -- before you blow anything up, down

2    at the bottom is an email from Gary Szukalski, the person you

3    said you weren't familiar with from Filetek, right?  We

4    actually don't need to enlarge that.

5        That email gets forwarded on by someone named Stouffer

6    Egan to Sushovan Hussain and Peter M; is that Peter Menell?

7    **A.**   That's correct.

8    **Q.**   The CTO?

9    **A.**   Yes.

10   **Q.**   All right.  And this is Mr. Egan's request for approvals,

11   correct?

12   **A.**   Yes.

13   **Q.**   And he describes the need for this product as the

14   extension of the license to cover off the big 3 customers.

15       Do you understand that that's a reference to the 3 big

16   financial institutions we just looked at?

17   **A.**   Yes.  Yes.

18   **Q.**   Those big 3 on the Iron Mountain product there (As read)

19   we would like to use this license for only the 6 months needed

20   to migrate or upgrade that platform.

21       Let me pause there.  That's what we just talked about

22   right, trying to get the Iron Mountain stuff to Autonomy?

23   **A.**   Correct.

24   **Q.**   Okay.  And also, his understanding is, this would save

25   considerable hardware cost.

1          Do you know what that was a reference to?

2    A.   No, not really.

3    Q.   Okay.

4    A.   I was --

5    Q.   But that was -- oh, sorry.

6    A.   My assumption was he was trying to justify the -- justify

7    the purchase.

8    Q.   And one way in which he might justify it, in this case a

9    $1.5 million purchase, is just say it's saving the need to

10   spend $3 million on hardware?

11   A.   Potentially, yes.

12   Q.   And that's what he's saying there, putting aside the

13   numbers?

14   A.   Correct.

15   Q.   Now, Mr. Egan also flags that there's a discount in the

16   contract on the software for a prompt cash payment; do you see

17   that?

18   A.   Yes.

19   Q.   And that was also something that from time to time would

20   be in contracts where Autonomy was buying things from

21   customers, right?

22   A.   Correct.

23   Q.   And a discount for prompt cash payment perhaps is common

24   sense, but a customer might say:  If you can pay me this week,

25   I'll give you 5 percent off.  Is that the type of discount

1  we're talking about?

2  **A.**   Yeah, typically not a week, but, yeah, you're right.   If

3  you pay in advance of your contracted terms, then customers can

4  give you -- vendors can give you a discount, correct.

5  **Q.**   Now, let's go out of this one and go, please, to page 6.

6      The same email just further on showed approval from Mike

7  Lynch for this purchase, correct?

8  **A.**   Yes.

9  **Q.**   And I think that may have been reviewed with you on your

10  direct examination?

11  **A.**   Yes.

12  **Q.**   Can we enlarge that?

13      And after this whole chain gets forwarded to Mike Lynch, a

14  lot of the information about the migrating and why we're using

15  the software, he approves it and he says:   "Okay, as long as

16  we're selling it on," correct?

17  **A.**   Correct.

18  **Q.**   And "selling it on" you understood to mean using what

19  we're buying to sell to other customers?

20  **A.**   That is correct.

21  **Q.**   We could take this one down.

22      We'll move to the next document the Government showed you

23  related to Filetek also concerning Iron Mountain.

24  **A.**   Mm-hmm.

25  **Q.**   This is just a few months later in August of 2011, okay?

1  **A.**    Okay.

2  **Q.**    Do you recall around that time Iron Mountain had a

3  different product that was known as LiveVault?

4  **A.**    I don't recall.

5  **Q.**    Maybe searching the archives of your vault.

6      Well, let me see if I can refresh your memory from the

7  document.

8      I think this was admitted as 15992.  And, again, similar

9  pattern, right?  The first email in the chain is to you with

10 instructions on how to process a wire to Filetek?

11 **A.**    Mm-hmm.

12 **Q.**    And we can see that there's an attachment to the email

13 that was the backup support that you needed to approve the

14 wire?

15 **A.**    Correct.

16 **Q.**    All right.  I'd like to take a look at some of that

17 backup.  Let's start, please, with page 8 of the backup.  Bear

18 with me one sec.  All right.  It's actually the very top email

19 on this page, so I think we have to go to 7 to see who is

20 writing it.  Thank you.

21     Okay.  I want you to focus on the email at the top there.

22     **MR. HEBERLIG:**  Maybe we can enlarge that, Bret, all

23 the way down, please, to capture his -- capture the email.

24 BY MR. HEBERLIG:

25 **Q.**    All right.  So this is mid-August of 2011, Mr. Hussain

1    writing to handful of people, including Dr. Lynch, Andrew

2    Kanter, Stouffer Egan, Peter Menell, right?

3    **A.**    Yes.

4    **Q.**    And it's about the approval to expand Filetek to the IRM

5    data centers; do you see that?

6    **A.**    Yes.

7    **Q.**    And you know that IRM stands for Iron Mountain?

8    **A.**    Iron Mountain.

9    **Q.**    Okay.  And in sum and substance he says (As read) we've

10   completed the negotiations.  Based on the digital run rate

11   revenues of around 150 million a year, the final number is

12   approximately -- I'm sorry, the final number which is

13   approximately 7 million is fine, and so on and so forth; do you

14   see that?

15   **A.**    Yes.

16   **Q.**    And did you understand there that he was estimating that

17   the product would lead to in the neighborhood of $150 million

18   in revenue?

19   **A.**    Yes.

20   **Q.**    Okay.  For which they're paying $7 million?

21   **A.**    For the software, yes.

22   **Q.**    Okay.  So not a bad business deal, if those terms are

23   correct?

24   **A.**    Yeah.

25   **Q.**    And if we go to page 7, Mike Lynch also responds here.

1  His message is (As read) Yep, if this gets their zero op margin

2  stuff to our architecture, right?

3  **A.**    Yes.

4  **Q.**    And did you understand that to mean Iron Mountain was

5  hosting this product in a low-profit environment that Autonomy

6  wanted to migrate its own architecture?

7  **A.**    Correct.

8  **Q.**    Okay.  And if the product got migrated to Autonomy's

9  architecture, Autonomy ran DigitalSafe a healthy profit,

10  correct?

11  **A.**    Correct.  Correct.

12  **Q.**    So good business.  Take zero margin stuff we just bought,

13  transfer it over to high margin Autonomy data centers, and if

14  these numbers are correct, pay 7 million to get 150; is that

15  what's going on here?

16  **A.**    Yep.

17  **Q.**    Okay.  And you have no reason to doubt the commercial

18  justifications that you were provided in these emails, correct?

19  **A.**    That's correct.

20  **Q.**    All right.  We can take that down.

21        Now, a little bit on the -- your testimony regarding the

22  price of the software from Filetek.

23  **A.**    Mm-hmm.

24  **Q.**    And, actually, even before we get to the price, I think

25  you described it as somewhat of an oddity that Autonomy would

1  buy software from a party like Filetek.  Do you recall that

2  testimony?

3  **A.**  Yep.

4  **Q.**  And you characterized Filetek as a reseller?

5  **A.**  Yes.

6  **Q.**  But Filetek was a company that also manufactured software

7  like StorHouse, correct?

8  **A.**  Yeah, I didn't -- yes.  Yes.

9  **Q.**  You weren't familiar with Filetek, correct?

10  **A.**  I wasn't familiar with Filetek.

11  **Q.**  It was not Microsoft?

12  **A.**  It was not Microsoft, certainly.

13  **Q.**  Okay.  But it did produce software, right?

14  **A.**  Mm-hmm.

15  **Q.**  And as we've just walked through, it was software that

16  Autonomy represented it had a need for in various capacities in

17  its business?

18  **A.**  Yes.

19  **Q.**  Now, you opined, I believe, that you thought the price of

20  the software was high; is that right?

21  **A.**  Yes.

22  **Q.**  Okay.  And at the time of these events, am I right that

23  you had worked at three software companies, including Autonomy

24  being one of them?

25  **A.**  Yes.

VAIDYANATHAN - CROSS / HEBERLIG

1  Q.   Okay.  And you yourself are not a software developer, are
2  you?
3  A.   I'm not.
4  Q.   Okay.  And you're not a software engineer?
5  A.   No.
6  Q.   Okay.  And you understand, however, from your familiarity
7  with the business, that Autonomy could have tried to develop
8  its own software to do the same sort of functionality as
9  StorHouse, right?
10  A.   Correct.
11  Q.   That's always an option for a software company?
12  A.   Yeah.
13  Q.   But to do so Autonomy would have had to devote engineering
14  manpower, right?
15  A.   Correct.
16  Q.   It would have had to take away its creative software
17  engineers working on IDOL and SPE and all these other products
18  to make these StorHouse connectors?
19  A.   Correct.
20  Q.   And that would have cost time and money, right?
21  A.   Right.
22  Q.   So a different alternative for a company in Autonomy's
23  position could be to buy the software from a company that
24  already produced it?
25  A.   Correct.

1    Q.    And that sort of commercial strategy is not rare.  Those

2    are decisions that software businesses make every day?

3    A.    Yeah, make to buy always -- you always make a decision.

4    Q.    Correct.  Now, when you were asking around about these

5    Filetek purchases, you obtained a copy of the relevant

6    contracts, correct?

7    A.    Of this contract, yes.

8    Q.    Okay.  And the contracts had information in them about the

9    pricing for the purchase of the software?

10   A.    Correct.

11   Q.    All right.  Let me see if we could take a look at one of

12   those.  It's Exhibit 3321.

13        THE COURT:  3321 admitted.

14        (Trial Exhibit 3321 received in evidence.)

15        MR. HEBERLIG:  Tab 24.  That is actually an email.

16   Bear with me one second.

17        THE COURT:  Yeah.

18   BY MR. HEBERLIG:

19   Q.    My apologies.  I guess while it's up, this is an email

20   that confirms that you forwarded the contract to Mr. Hogenson;

21   do you see that at the top there.

22   A.    Yes.

23   Q.    Okay.  So just consistent with your recollection, you did

24   obtain a copy of the contract in the relevant period?

25   A.    Yes.

1    **Q.**    All right.  Let's actually go to the contract now, which

2    is 4357.

3            **THE COURT:**  4357 admitted.

4        (Trial Exhibit 4357 received in evidence.)

5    **BY MR. HEBERLIG:**

6    **Q.**    And that's tab 27.

7        All right.  Sorry, this appears to be the contract, right,

8    between Autonomy and Filetek, right?

9    **A.**    Mm-hmm.

10   **Q.**    And this is the first one at the end of December 2009?

11   **A.**    Yes.

12   **Q.**    Okay.  Let's go to page 15, please, and this is the

13   pricing information, first of all.

14           **MR. HEBERLIG:**  Can you just highlight the middle

15   section there, Bret?

16   **BY MR. HEBERLIG:**

17   **Q.**    That's the number we've talked about.  I think it was in

18   some of the other documents, roughly 7.5 million for the

19   software?

20   **A.**    Mm-hmm, yes.

21   **Q.**    For which Autonomy received a discount of 45 percent; do

22   you see that?

23   **A.**    Yes.

24   **Q.**    So a discount of 6 million, taking it down from 13,5

25   essentially to 7,5?

1    A.    Yep.

2    Q.    Okay.  Now, let's go to the next page and talk about what

3    Autonomy was buying for this, and if we could just highlight

4    those additional terms and conditions.

5         All right.  So am I correct that the pricing, number one,

6    it reflected a five-year term of use of the software, right?

7    A.    Yes.

8    Q.    And it was for Autonomy's Zantaz customers, right?  And,

9    again, those are the DigitalSafe customers --

10   A.    Correct.

11   Q.    -- who host their data with Zantaz?

12   A.    I didn't know at that time, but, yeah.

13   Q.    And what this represents is for each of those

14   approximately 60 customers who own -- you see there 166 TB; do

15   you recognize that to be terabytes of data?

16   A.    Yes.

17   Q.    The product could be used with all of them, right?  I'm

18   sorry?

19   A.    I didn't get the question.

20   Q.    Sorry.  So this is reflecting the terms that the license

21   was for the Zantaz customers and their data effectively, right?

22   A.    Correct.  Correct.

23   Q.    Okay.  And among other things it talks about -- it's for

24   the management of 10 PB of primary file data, and so on; do you

25   see that?

VAIDYANATHAN - CROSS / HEBERLIG

1    **A.**    Yes.

2    **Q.**    And do you recognize "PB" to be an abbreviation for

3    petabyte?

4    **A.**    Yes.

5    **Q.**    Okay.  So at the time, this Autonomy had one of the

6    largest data clouds in the world, correct; do you remember

7    that?

8    **A.**    Not that I'm aware of.

9    **Q.**    Do you remember a data cloud in the neighborhood of 10 to

10    17 petabytes of data?

11    **A.**    I've heard those numbers, but whether that was the largest

12    in the world at the time, I have no idea.

13    **Q.**    All right.  And just to put that in perspective, a

14    petabyte is a thousand terabytes or a million gigabytes,

15    correct?

16    **A.**    Yeah.

17    **Q.**    Okay.  And so the pricing of the software was geared

18    towards the size of data that it was going to be used for,

19    correct?

20    **A.**    That's what this appears to suggest, yes.

21    **Q.**    And you yourself have no experience pricing software that

22    could be used to manage data in such a large data cloud, do

23    you?

24    **A.**    No.  Typically we've seen pricing with -- in terms of

25    bytes and terabytes and petabytes, but not this type, no.

1    Q.    Okay.  Now, we can take that down.

2        There's a second purchase from Filetek on May 10th of

3    2010, and let's just briefly look at that contract as well,

4    which was 7813.

5            MR. HEBERLIG:  I don't believe it's in yet, Judge.

6    That's tab 41.

7            THE COURT:  7813 admitted.

8        (Trial Exhibit 7813 received in evidence.)

9    BY MR. HEBERLIG:

10   Q.    All right.  And, again, let's just highlight the pricing

11   information first.

12       The second purchase, again, you reviewed this on direct.

13   This is for 8.2 million, correct?

14   A.    Yes.

15   Q.    And let's just see what the differences were --

16       Well, before we move on.  Again, 45 percent discount off

17   the total, right?

18   A.    Mm-hmm.

19   Q.    And there's one of those early pay discounts of 2 percent,

20   right?

21   A.    Correct.

22   Q.    So if Autonomy chose to, it could pay this bill early and

23   it would reap savings of $167,000?

24   A.    That's correct.

25   Q.    All right.  Let's look at the terms and conditions on the

1    next page.  And just enlarge those for a moment.

2        All right.  So the difference is this proposal now, as

3    compared to the last one, is geared toward the expanding

4    information growth of the Zantaz customers, and it permits the

5    use of the product within the DigitalSafe environment.  There

6    doesn't appear to be any limitation on the number of customers

7    like we saw in the last contract, correct?

8    **A.**    Yes.

9    **Q.**    All right.  And, likewise, this also talks about unlimited

10   capacity restrictions, so not even limited anymore by that 10

11   petabyte restriction.  However much data Autonomy brings in,

12   they can use Filetek, correct?

13   **A.**    Yes.

14   **Q.**    Okay.  And that's what you understood the differences to

15   be between the two contracts?

16   **A.**    That's my recollection.

17   **Q.**    And we can take this down and go back to the first page,

18   which was you I believe forwarding this information to

19   Mr. Hogenson.

20       And I'm sorry, that's a different exhibit, which is 7875,

21   which is tab 43 and not yet in evidence.

22           **THE COURT:**  7875 admitted.

23       (Trial Exhibit 7875 received in evidence.)

24   **BY MR. HEBERLIG:**

25   **Q.**    Okay.  Can we just enlarge the top?  Thank you.

1          All right.  So, again, we're in the late June time frame?

2    A.    Mm-hmm.

3    Q.    Both Filetek purchases have already occurred, and this is

4    you forwarding information to Mr. Hogenson, correct?

5    A.    Correct.

6    Q.    And as an attachment Filetek.pdf?

7    A.    Yes.

8    Q.    All right.  Let's take a look at that information.

9          Go to, please, the attachment, which is 7875.1, 7875.1.

10   It's just the attachment to this email.

11              **THE COURT:**  Okay.  Admitted.

12         (Trial Exhibit 7875.1 received in evidence.)

13              **MR. HEBERLIG:**  Thank you.

14   **BY MR. HEBERLIG:**

15   Q.    And, again, this is another sort of package of

16   information.  I'll just scroll through it quickly.  But first

17   one here appears to be the confirmation of the payment,

18   correct?

19   A.    Correct.

20   Q.    Let's go to the next page.  That's the invoice for the

21   payment, correct?

22   A.    Yes.

23   Q.    Okay.  Let's go to the approval emails again, and I'd like

24   to start on page 7.  And on page 7 can we focus on the email

25   from Joel Scott to Mr. Hussain and Dr. Lynch.

1    All right.  So this appears to be back and related to the

2  second purchase of Filetek, correct, based on the date of the

3  email?

4  **A.**    Correct.

5  **Q.**    Okay.  And this is presented from Mr. Scott to Mr. Hussain

6  and Mr. Lynch.

7    Who was Mr. Scott again?

8  **A.**    Mr. Scott is the -- he was the general counsel for

9  Autonomy in the U.S. and the UCO of the U.S. as well.

10  **Q.**    All right.  And he's explaining here that he wants their

11  approval for this purchase, correct?

12  **A.**    Correct.

13  **Q.**    And let's go to what Mr. Hussain's initial response was

14  just above.

15    All right.  Now, his response was (As read) I need to

16  analyze this a bit more.  It's a large deal.  Can you give me

17  more justification.

18    Is that essentially what he's saying there?

19  **A.**    Yes.

20  **Q.**    And Mr. Scott does, correct?  Let's look at the next email

21  in the chain.  I won't get into the details, but after that

22  explanation how does Mr. Hussain then respond?  Let's take a

23  look.

24    All right.  He's summarizing the deal here, and among the

25  reasons he gives for his approval, am I correct, he says (As

1    read) Given that the alternative would have been to buy

2    Filetek, probably for a hundred million, this seems worthwhile

3    to me.  It's rare for us to buy an OEM license, but given the

4    success of SPE and the first Filetek purchase, I'm okay.

5          That's what Mr. Hussain said, correct?

6    A.    Yes.

7    Q.    Were you familiar with the SPE product?

8    A.    Not really, no.

9    Q.    Do you know what SPE stood for?

10   A.    No.

11   Q.    Okay.  So let's scroll up then and see if Mike Lynch

12   approved the purchase.

13         So this is what Mike Lynch said.  It referred to a

14   conversation with Pete.  And, again, you recognize that to be

15   Pete Menell?

16   A.    Yes.

17   Q.    The CTO.  They spoke about, according to this email, the

18   first bit of tech; do you see that?

19   A.    Yes.

20   Q.    And do you interpret that to mean the first purchase of

21   the Filetek software --

22   A.    Mm-hmm.

23   Q.    -- that Mr. Menell had been using, correct?

24   A.    Yes.  Yes.

25   Q.    Mike also referred to a bank -- well, BAML deal; do you

1   see that?

2   A.   Yes.

3   Q.   Do you know if that stands for Bank of America or --

4   A.   In some places its referred to as BofA and some places

5   BAML, but I guess it's the same thing.

6   Q.   Okay.  (As read) Refer to a deal with them worth 35, and

7   says, I guess it will look like small beer by comparison with

8   the 2 billion we're thinking of in this area, so okay then

9   despite my dislike of spending money.

10       And that's the approval he gave, correct?

11  A.   Yes.

12  Q.   And these were the real-time approvals that you gathered

13  up and sent to Mr. Hogenson, correct?

14  A.   Correct.

15  Q.   These were not emails prepared after the fact, after

16  Mr. Hogenson started raising questions about the Filetek

17  transaction, correct?

18  A.   That's correct.

19  Q.   From the date of these emails these were sent before

20  Autonomy agreed to buy Filetek software, right?

21  A.   Buy the product, yes.

22  Q.   Buy the what?

23  A.   Buy their product, yes.

24  Q.   I'm sorry, I just had a hard time understanding.

25  A.   Buy their product.

**VAIDYANATHAN - CROSS / HEBERLIG**

1   **Q.**  Buy the product, yeah.

2   **A.**  Yeah.

3   **Q.**  Okay.  You have no personal information that contradicts

4   the commercial justifications that are given in these

5   approvals, do you?

6   **A.**  No.

7   **Q.**  And am I correct that nowhere in any of these messages

8   we've been reviewing did anyone say, hey, Filetek owes us a lot

9   of money, so it would be great to make up a reason to pay them

10   for something?

11   **A.**  No.

12   **Q.**  We didn't see that anywhere in all of those approvals we

13   went through, correct?

14   **A.**  No.

15   **Q.**  We can take that down.

16       When you had conversations with Mr. Chamberlain about

17   Filetek, did you ever ask him whether Deloitte had assessed the

18   fair value of the purchases?

19   **A.**  When we talked about resellers in general --

20   **Q.**  No, I'm talking about the Filetek software.  We're on the

21   topic of your opinion that the Filetek software was overpriced?

22   **A.**  Yeah, yeah, yeah.

23   **Q.**  Did you -- when you discussed that with him, did you ever

24   ask him, hey, did Deloitte assess the fair value of that

25   software?

1  **A.**   Yeah, typically auditors don't assess the fair value of

2  any software that you buy, so I didn't ask them about that in

3  specific.  The auditors always check whether they have the

4  right documentation for a price for a software that was

5  purchased, and whether that software is being used.  They would

6  not typically comment on whether it was overpriced or

7  underpriced.

8  **Q.**   So your understanding is under the IFRS it was not

9  relevant whether the products that were being purchased were at

10  fair value?

11  **A.**   Eventually at the end of the day when you look at your

12  assets and liabilities, and you look at software in general,

13  they would ask you for an overall sort of estimation, whether

14  they were impaired or not.  They would not ask you specifically

15  about individual software purchases.

16  **Q.**   How about if an accountant was assessing whether there was

17  a linked transaction, which is, after all, the questions you

18  had about these deals, right?

19  **A.**   Correct.  Correct.

20  **Q.**   In making that assessment, isn't a key question whether

21  you're paying fair value for what you're getting?

22  **A.**   The assessment in making the linkage decision is about

23  whether those, A, whether those contracts are being made by the

24  same person, that is one; and the second is whether the amounts

25  are intricately linked one way or the other; and third, more

1 importantly is about whether one drove the -- one drove the

2 other transaction.

3 **Q.**   And yet another factor, am I right, and you can correct me

4 if I'm wrong, is you want to make sure there's fair value.

5 Because if two people are buying things in a linked

6 transaction, and the things are worth 5 million and they say

7 I'll pay a hundred million for it, that could lead to an

8 artificial recognition of revenue, right?

9 **A.**   Correct.

10 **Q.**   So fair value is important in assessing whether two

11 transactions are linked?

12 **A.**   Well, tangentially, yes.  You would look at everything

13 together, but, yes.

14 **Q.**   Okay.  And so back to my original question:  Did you ever

15 ask Mr. Chamberlain whether Deloitte had conducted a fair value

16 analysis of the Filetek software?

17 **A.**   Individually for these transactions, no.

18 **Q.**   Did you ever ask him if Autonomy in the U.K. finance

19 department had conducted a fair value analysis of the Filetek

20 software?

21 **A.**   Not specifically on Filetek.  On oral resellers, yes.

22 **Q.**   Did you ask him whether Autonomy had solicited information

23 from other customers to compare how they priced things similar

24 to Filetek, anything like that?

25 **A.**   No.

1  Q.   Now, just one more question about this situation.  We've

2  seen -- one more topic I should say.

3       We've seen that Autonomy and Filetek bought and sold

4  software between the companies, correct?

5  A.   Correct.

6  Q.   And at different times each company owed the other money,

7  right?

8  A.   Right.

9  Q.   And there were times when both companies owed each other

10 money?

11 A.   Yeah.

12 Q.   Okay.  And there are, correct me if I'm wrong, commercial

13 reasons in a scenario like that where Autonomy might want to

14 pay its debt quickly to entice a prompt payment in return?

15 A.   Potentially.

16 Q.   Are you familiar with a statistic known as Days Sales

17 Outstanding, or DSOs?

18 A.   Yes.

19 Q.   Am I right, that's a statistic that measures how long it

20 takes a company to get its bills paid?

21 A.   Yes.

22 Q.   And that's something that like just about every company

23 Autonomy reported to the market?

24 A.   Well, I don't know whether they reported to the market or

25 not, but it's a metric that almost every company measures and

1    it's measured on.

2    **Q.**    And you expect it to be in their financial statements,

3    right?

4    **A.**    It never would be in the financial statements.

5    **Q.**    In their disclosures, the annual reports?

6    **A.**    There's no legal requirement to disclose it.  If you chose

7    to disclose it, great.

8    **Q.**    Are you aware one way or another whether Autonomy did

9    disclose it?

10   **A.**    In their earnings call they might have.

11   **Q.**    Okay.  And am I right that the faster Autonomy's customers

12   pay their bills, the lower their DSOs are?

13   **A.**    Correct.

14   **Q.**    Okay.  So as a general matter it certainly was in

15   Autonomy's interest to get its bills paid quickly?

16   **A.**    Yeah, that's correct.

17   **Q.**    All right.  Let me ask you a few questions about a

18   different company.

19   **A.**    Mm-hmm.

20   **Q.**    DiscoverTech.  You recall some questions about

21   DiscoverTech in your direct examination?

22   **A.**    Yes.

23   **Q.**    And it was another reseller that Autonomy did business

24   with?

25   **A.**    Yes.

1  **Q.**   I think you testified about a $4.4 million payment to

2  DiscoverTech end of June 2010; do you remember that?

3  **A.**   Yes.

4  **Q.**   All right.  Let's take a look at that document, which I

5  believe is in evidence at 11 -- 11934.

6           **THE COURT:**  11934 is in evidence.

7           **MR. HEBERLIG:**  Yes, thank you.

8  BY MR. HEBERLIG:

9  **Q.**   Okay.  So, again, this is end of June, 2011, another one

10  of those packages that came your way for the payment to be

11  processed with the backup, right?

12  **A.**   Yes.

13  **Q.**   And why don't we start with scrolling through the

14  attachments.  Let's look at page 3.

15       This is the contract that you're being asked to pay,

16  correct?

17  **A.**   Yes.

18  **Q.**   All right.  Let's jump all the way ahead to page 13 with

19  one of these email approval documents.

20       And if we can blow up maybe the first half, including

21  Mr. Chamberlain's email.

22       All right.  This is relating to that payment, both

23  directed at Sushovan Hussain and Mike Lynch:  "Need your

24  approval to proceed on this," right?

25  **A.**   Yes.

1    Q.    Okay.  And Mr. Hussain approves based on discussions with

2    Stouffer, and he says:  "The resale value on a number of our

3    strategic accounts."

4    A.    Yes.

5    Q.    Okay.  And this related to a software product called

6    DiscoverPoint; do you remember that?

7    A.    Not, not completely, but --

8    Q.    So you're not familiar with the DiscoverPoint software

9    product --

10    A.    I don't recall at this point.

11    Q.    Really sorry, but you have to let me finish my question.

12    A.    Sorry.

13    Q.    Are you familiar with the DiscoverPoint software product

14    that Autonomy purchased from this company?

15    A.    I wasn't familiar at the time.

16    Q.    Unfamiliar?

17    A.    Unfamiliar.

18    Q.    Okay.  Let's look at Mike Lynch's approval; that was in a

19    separate email, 3564, which is tab 25 not yet in evidence.

20            THE COURT:  3564 admitted.

21        (Trial Exhibit 3564 received in evidence.)

22    BY MR. HEBERLIG:

23    Q.    And just quickly at the top there, do you see that Mike

24    also approved, as long as we're selling through, right?

25    A.    Yeah.

1  Q.   And do you understand that to be a reference to reselling

2  the product on to other customers?

3  A.   Correct.

4  Q.   Okay.  And, again, from real time you have no reason to

5  believe that these commercial justifications were incorrect?

6  A.   That's right.

7  Q.   Do you know whether Autonomy in fact sold the software on

8  as part of larger package deals with customers?

9  A.   No.

10  Q.   Okay.  Did you understand that that was the intent behind

11  this?

12  A.   That was the intent.

13  Q.   Okay.  All right.  We can take that down.

14       A few questions about the company VMS; do you remember

15  those -- that topic coming up in your Direct?

16  A.   Yes.

17  Q.   All right.  Now, your testimony I believe was that VMS was

18  a reseller?

19  A.   Yes.

20  Q.   Okay.  Were you aware that VMS was in fact a world leader

21  in the provision of content to its customers in the form of

22  data feeds that would consist of web sites and blogs and

23  newspapers and the like?

24  A.   No.

25  Q.   So where did you get this understanding that VMS was a

 1 reseller?

 2 **A.**    VMS -- there was two contracts with VMS.  There was one a

 3 buy contract and then there was a sell contract, so I inferred

 4 that there was -- they were a reseller.

 5 **Q.**    So you inferred that they were a reseller solely by virtue

 6 of the fact that we sold something to them and they bought

 7 something from us?

 8 **A.**    Yes.

 9 **Q.**    Okay.  Were you aware at all of Autonomy's history with

10 VMS's commercial history?

11 **A.**    No.

12 **Q.**    Any knowledge whatsoever about Autonomy considering buying

13 the company back in 2007?

14 **A.**    No.

15 **Q.**    Okay.  Just a blank slate on that topic?

16 **A.**    Yeah.

17 **Q.**    Would you agree with me that your conclusion that it was a

18 reseller was just an inference from the buy/sell?

19 **A.**    It was an inference.

20 **Q.**    You actually don't know that to be the case, right?

21 **A.**    I don't.

22 **Q.**    You spent some time testifying about a 4th quarter end of

23 the year transaction in 2010 regarding this fixed asset

24 register; do you remember that?

25 **A.**    Yes.

VAIDYANATHAN - CROSS / HEBERLIG

1    **Q.**    Okay.  Let's just pull up that document briefly.  It's in

2    evidence as Exhibit 1428.

3        First of all, am I right that Mike Lynch was not copied on

4    any of these emails?

5    **A.**    I don't remember that.

6    **Q.**    You don't recall the prosecutor showing you an email in

7    Direct with Mike Lynch being in the middle of this issue of

8    what's in the warehouse, what isn't?

9    **A.**    No, I don't remember that off the top of my head, no.

10   **Q.**    And so you don't have any evidence that he was aware of or

11   involved in any of these discussions about how to fulfill the

12   VMS contract?

13   **A.**    No.

14   **Q.**    Okay.  And in your experience, the details of delivery and

15   inventory and stock are not typically the things that the CEO

16   of the company would be focused on?

17           **MR. LEACH:**  Objection, foundation.

18           **THE COURT:**  Sustained.

19   BY MR. HEBERLIG:

20   **Q.**    Now, let's take a quick look at 15575 in evidence, and

21   this was the exchange about the fixed asset register; do you

22   see that?

23       Let's just enlarge the top one.

24       Do you recall your testimony about this?

25   **A.**    Yes.

VAIDYANATHAN - CROSS / HEBERLIG

1  Q.   And if I have the issue correct, I think you put it the

2  questions you had were how Autonomy was able to fulfill this

3  particular hardware order with things from the fixed asset

4  registry?

5  A.   Yes.

6  Q.   Okay.  Now, and I won't go to the spreadsheet, but do you

7  recall it listed a bunch of equipment, correct?

8  A.   Correct.

9  Q.   And I think you said that one scenario you didn't know was

10 that there was some equipment in there that had been newly

11 acquired, perhaps even still in the box, right?

12 A.   I wouldn't say that.  I would say that we installed,

13 because if you were in -- if you were -- if it's in the fixed

14 asset register, it basically means that it's been put to use.

15 It could have been unboxed; it could have been plugged in.

16 Q.   So you don't know from going to the warehouse or the --

17 where the fixed assets were, whether these in fact were used

18 products or not; you don't have any personal observation?

19 A.   No, no, but the accounting, the way this would work was

20 you would not put anything in fixed assets unless you had a

21 date of installation.

22 Q.   Typically, right?

23 A.   Yes.  Yes.

24 Q.   Okay.  Now, let's just look at the contract real quickly

25 that the Government showed you, and that's Exhibit 1428 in

 1    evidence.  Oh, I'm sorry, and it's page 7.

 2        Do you recall going through this in your Direct?

 3    **A.**    Yes.

 4    **Q.**    And this is an example of a contract where Autonomy was

 5    selling hardware to VMS with the expectation that it would be

 6    loaded with software, right?

 7    **A.**    Yes.

 8    **Q.**    And we can see that from the language here in 2 and 2A,

 9    that the hardware was being sold to VMS, and the expectation is

10    it would be loaded with Autonomy software, right?

11    **A.**    Well, it says it may be delivered as bought off or

12    otherwise embedded in, yes.

13    **Q.**    And part of the documentation you saw is there was a --

14    this was the $6 million hardware contract.  There was also a

15    parallel $5 million software sale, Autonomy to VMS at the same

16    time?

17    **A.**    Correct.

18    **Q.**    And you understood that they were going to be used

19    together, right, at VMS?

20    **A.**    Yes.

21    **Q.**    Okay.  Now, I'll come back to this topic, but under your

22    definition would that constitute an appliance or not?

23    **A.**    If you sold hardware to a customer and then you sold

24    software to a customer, and then you'd put that together at

25    some point in time, whether at the customer's premises or your

**VAIDYANATHAN - CROSS / HEBERLIG**

1  premises, that could constitute an appliance, correct.

2  **Q.**   Okay.  So this arrangement at least appears to be

3  consistent with your understanding of an appliance?

4  **A.**   Correct.

5  **Q.**   Let's go to MicroLink.  We can take that down.

6       You recall testifying about Autonomy's acquisition of a

7  reseller named MicroLink?

8  **A.**   Yes.

9  **Q.**   Okay.  And I'm going to get to the documents, but just to

10  sort of frame this discussion.  You were shown a document that

11  reflected certain intercompany writeoffs; do you remember that?

12  **A.**   Yes.

13  **Q.**   And on a high level we're going to get to the details, but

14  it would appear that you were suggesting that Autonomy acquired

15  this reseller company MicroLink in order to be able to write

16  off its debts to MicroLink or from MicroLink?

17  **A.**   Typically when you acquire a company, you write off the

18  intercompany.  And if a company -- if you acquire a company

19  that owes debt to you, ideally that is extinguished on

20  acquisition.

21  **Q.**   And I just want to make sure I'm clear.  I was a little

22  confused by your testimony.

23       Were you stating that it was your understanding that that

24  was the purpose of the acquisition or was just something that

25  could have happened?

1  **A.**   No, you typically don't -- well, typically you don't

2  acquire resellers.  I haven't seen too many companies acquiring

3  resellers.

4      So the construct of a company acquiring a reseller, one of

5  the rationales for that could be to basically get rid of the

6  inter-company debt.

7  **Q.**   All right.  And let me just pick up on what you said.

8      So it's somewhat rare for a company like Autonomy to

9  purchase a reseller, correct?

10  **A.**   Correct.  Correct.

11  **Q.**   But in this instance you knew, did you not, that MicroLink

12  handled a number of secret classified deals for Autonomy with

13  U.S. Federal Government customers?

14  **A.**   Yes.

15  **Q.**   Do you recall that?

16  **A.**   Yes, it had a bunch of government customers, yes.

17  **Q.**   And to handle that work, MicroLink had a number of

18  employees with United States security clearances, correct?

19  **A.**   Yes.

20  **Q.**   And those types of security clearances are generally

21  difficult to obtain, correct?

22  **A.**   Yes.

23  **Q.**   And they're particularly difficult to obtain for foreign

24  nationals, are they not?

25  **A.**   Maybe, I don't know.  Might be.

VAIDYANATHAN - CROSS / HEBERLIG

1    Q.   Or a foreign company like Autonomy?

2    A.   Yeah, possibly.

3    Q.   So one alternative motive for the acquisition could have

4    been to acquire those classified assets that Autonomy was to

5    that point doing business through MicroLink as a reseller?

6    A.   Possibly.

7    Q.   But you don't know because you weren't privy to the

8    discussions about why Autonomy was buying MicroLink, right?

9    A.   Correct.

10   Q.   Now, let's take a look at, in evidence, Exhibit 816, which

11   is that spreadsheet the Government reviewed with you.

12   A.   Mm-hmm.

13   Q.   And if we can enlarge as much as we can -- keep going a

14   little bit if you don't mind.

15        Okay.  This is the document you reviewed with the

16   Government, correct?

17   A.   Yes.

18   Q.   And just to orient what we're looking at, in column B,

19   customer name, MicroLink, that was Autonomy's customer, right?

20   A.   Yes.

21   Q.   This is a reflection of sort of the pre-acquisition state

22   of affairs?

23   A.   Yes.

24   Q.   Column D appears to be the end users to which MicroLink

25   was selling the product, correct?

1  **A.**    Yes.

2  **Q.**    Okay.  And then we see dollar amounts and the like.

3       I just want to focus on some of those end users for a

4  moment.

5       Can we start -- well, first of all, the Government, I

6  think, highlighted to you in row 6 the United States Air Force.

7  **A.**    Yes.

8  **Q.**    That was one of the MicroLink customers, correct?

9  **A.**    Yeah.

10 **Q.**    And then in line 9, we see something called JIC PAC, Joint

11 International Ctr.  Do you recognize that as a reference to the

12 Joint Intelligence Center for the Pacific, an organization that

13 is dedicated to military intelligence?

14 **A.**    I didn't recognize that, but must be, on the form.

15 **Q.**    What about line 11, there it just says U.S. Federal

16 Government.  Any idea whether that was -- what agency we're

17 talking about there?

18 **A.**    No, just says U.S. Government, so . . .

19 **Q.**    Just a neutral -- what about line 17, so this is another

20 customer of Autonomy through MicroLink, Geospatial Intelligence

21 A; is that another government intelligence organization?

22 **A.**    I have no idea.

23 **Q.**    You just don't know?

24 **A.**    I don't know.

25 **Q.**    Okay.  Line 20, Naval Commander SU, are you familiar with

1    what they do?

2    **A.**    No, it appears to be a government agency.

3    **Q.**    Just two more.  Line 28, Defense Intelligence, similar,

4    appear to be one of these classified contracts?

5    **A.**    Yeah.

6    **Q.**    And the last one, line 29, the Naval Criminal

7    Investigative Service, do you recognize that from the TV show

8    NCIS?

9    **A.**    Yeah.

10    **Q.**    And there are also some other federal government agencies

11    on the list that appear to be unclassified, right, like the

12    postal service in line 10, IRS in line 25; do you see that?

13    **A.**    Yeah.

14    **Q.**    Federal Reserve, line 27, and, lastly, the U.S. Department

15    of State in line 37; did I get those correct?

16    **A.**    Yes.

17    **Q.**    And it's your understanding that these were all U.S.

18    Government agencies, some classified, some not, either sold to

19    or targeted by MicroLink with Autonomy software?

20    **A.**    Yes.

21    **Q.**    Scroll up to the top of this document if we can.

22           The Government focused you on columns K and L and the

23    writeoffs.  I just want to -- I'm not going to devote much time

24    to it, but I want to make sure I understand.

25           So after the acquisition, am I right that Autonomy would

1  now own MicroLink?

2  **A.**    Correct.

3  **Q.**    Okay.  And if it owned MicroLink and MicroLink owed it

4  debt before the acquisition, it wouldn't make sense to keep

5  that on the books, right?

6  **A.**    Correct.

7  **Q.**    Because that was debt that Autonomy now effectively owed

8  to itself?

9  **A.**    Correct.

10  **Q.**    So was it your understanding that that's what was going on

11  here, a writing off of internal company debts?

12  **A.**    So, yeah, this is what I was trying to explain previously

13  as well.  Typically if you have a receivable from a party, and

14  if you have a payroll, those would get knocked off.

15        So typically one would think that the receivable and

16  payable were in the U.S. because it's a U.S. entity.  So I was

17  expecting to see the payable and the receivable in the U.S.

18  itself, but the actual -- and therefore by knocking those off,

19  they would get knocked off.  But the accounting was more

20  reflective of, you know, transferring this back to any

21  holdings, which was another holding company.

22        The -- I thought at that point in time the idea was to

23  move it to a different spot where other adjustments would be

24  made from a consolidation standpoint, and then they would get

25  consolidated in the U.K.

VAIDYANATHAN - CROSS / HEBERLIG

1    **Q.**   And you thought that because of your belief that NA

2    Holdings was a U.K. company?

3    **A.**   No, I was under the impression it's a holding company and

4    maybe the consolidation happens at that entity or at an entity

5    higher above that, so it's anywhere out of the U.S. purview at

6    that point in time.

7         Typically you wouldn't see that.  You would see all of

8    them happening real time, but...

9    **Q.**   When you say out of the U.S. purview, I thought, correct

10   me if I'm wrong, I thought I understood your testimony to be

11   that this was happening in the U.K. with U.K. companies; is

12   that --

13   **A.**   Yeah, the NA Holdings was not a company that we handled

14   out of the U.S.

15   **Q.**   Well, let's take a look back at what's exhibit admitted

16   already 78, 78.1, organizational chart?

17   **A.**   Mm-hmm.

18   **Q.**   And let's just highlight the right-hand side there again,

19   down to the -- you don't even need to do that much.  There you

20   go.

21        So Autonomy NA Holdings there is in fact a holding company

22   that owned Interwoven and the other U.S. companies, and it's

23   described as a U.S. company, right?

24   **A.**   Yeah, I don't remember doing the accounting for this

25   entity.

VAIDYANATHAN - CROSS / HEBERLIG

1   Q.   Understood.  And you actually, to the extent you said it

2   was a U.K. company, you may have been mistaken, you don't

3   actually know whether it was a U.S. or U.K. company, do you?

4   A.   No, I -- I think what I was trying to say was more or less

5   controlled by the U.K., not -- we didn't -- I don't think we

6   did accounting for that in the U.S.  That's as far as I can

7   recall.

8   Q.   So it was that the accounting was there, not that the

9   company was there?

10  A.   Correct.

11  Q.   Because we can see here the company was a U.S. company?

12  A.   Correct.

13  Q.   And you recall there was an issue with this MicroLink

14  acquisition that because of those sensitive classified

15  programs, they needed to keep separate books in the U.S.

16  disassociated from Autonomy, right?

17  A.   That's correct.

18  Q.   And wasn't that the reason given for this process on the

19  spreadsheet we looked at?  Why don't we take a look back at the

20  email, and that's Exhibit 7 --

21       Bear with me.  Sorry, Judge.  816.

22       If we go to the second page of this one -- I'm sorry, I

23  went too fast.  Why don't we show who this is an email to and

24  from on the first page.

25       This is the one you reviewed with the Government I believe

1  from Lisa Harris to you and others about this issue?

2  **A.**   Yes.

3  **Q.**   All right.  So then now let's go to the second page, and

4  this is Lisa Harris speaking.  Just highlight the bottom

5  paragraph if you will.

6      So she describes here this knockout process.  It says

7  "normally we'd do this in the subsidiary books."  And that's

8  what you expected to happen, right, the normal knockout through

9  the subsidiary books?

10 **A.**   Yeah.  Well, typically the consolidation happens at a

11 level higher than subsidiary books.  It happens in the -- in a

12 level above where you -- there's local books are kept at the

13 local level, and the consolidation happens at a level that's

14 above, above that level.

15     If you -- if I have to rephrase and explain, then you have

16 individual entities, and then you have receivables and

17 payables, and because you can't knock off the receivables and

18 payables of those legal entities in those legal entities, you

19 do it one level above where you aggregate all the receivables

20 in one side, payables on the other side, and then you knock it

21 off.

22 **Q.**   I profess I'm thoroughly confused.  Were you -- was this a

23 problem or not?  I mean, are you sitting there with some

24 concerns about this or is this just a inter-company issue,

25 because it's not clear?

1    **A.**    So individually the software that was being sold was

2    individually sold to those companies to MicroLink.  So

3    individually you have Zantaz selling or you have Autonomy, Inc.

4    selling to MicroLink in the past, okay.  So the receivable and

5    payable are at that level, but now you're consolidating at NA

6    Holdings level, right?

7    **Q.**    Right.

8    **A.**    So you technically are then moving the debts from various

9    other places to NA Holdings; you knock it off.

10    **Q.**    And here Ms. Harris is saying that's occurring because

11    Alan -- and Alan is the person at MicroLink, correct?

12    **A.**    Yes.

13    **Q.**    Alan needs to keep his book true to U.S. GAAP.

14        Did you understand that's in reference to the issue we

15    were just talking about; MicroLink had to keep essentially U.S.

16    books --

17    **A.**    Yes.

18    **Q.**    -- because of the classified work?

19    **A.**    Yes.

20    **Q.**    Okay.  And that's why she's using NA Holdings as a U.S.D,

21    U.S. dollar ledger, is that at least what she explained in the

22    email?

23    **A.**    Yes.

24    **Q.**    And is it plausible, based on what she discussed there or

25    what we've discussed about MicroLink's business?

1    **A.**    Yes.

2    **Q.**    Thank you.

3    **A.**    This is -- my understanding was if that entire listing was

4    in the MicroLink books, they would be in the respective

5    subsidiary books as well.

6    **Q.**    Okay.

7    **A.**    And all of those would need to be canceled and knocked

8    off.

9    **Q.**    Fair enough.  We can take that down.

10    Let's move on to Microtech.

11    You were asked about Exhibit 2268 in evidence?

12        **THE COURT:**  Well, let's take a little recess here.

13    Ladies and Gentlemen of the Jury, we'll be in recess until

14    2:20.  Remember the admonition given to you:  Don't discuss the

15    case, allow anyone to discuss it with you, form or express any

16    opinions.

17    (Jurors exit courtroom.)

18        (Proceedings were heard out of presence of the jury:)

19        **THE COURT:**  Okay.  The jury has retired.  About how

20    much longer do you have, do you think?

21        **MR. HEBERLIG:**  I hope about 45 minutes.

22        **THE COURT:**  Oh, 45 minutes.  And then how long?

23        **MR. SEILIE:**  Probably about an hour, hour and 15, Your

24    Honor.

25        **THE COURT:**  Okay.  So we're not going to finish this

VAIDYANATHAN - CROSS / HEBERLIG

 1   witness today.

 2          MR. HEBERLIG:  I'll try to take the break to

 3   streamline a little.

 4          THE COURT:  Great.

 5          MR. HEBERLIG:  The Government covered a lot.

 6          THE COURT:  I like that, streamline.  Let's try to

 7   finish this witness today.

 8          MR. HEBERLIG:  We'll do our best.

 9          THE COURT:  Okay.  Thank you.

10                  (Recess taken at 2:04 p.m.)

11              (Proceedings resumed at 2:21 p.m.)

12       (Jurors enter courtroom.)

13          (Proceedings were heard in the presence of the jury:)

14          THE COURT:  Let the record reflect all the jurors are

15   present.

16       You may proceed.

17          MR. HEBERLIG:  Thank you, Your Honor.

18   BY MR. HEBERLIG:

19   Q.   I'd like to shift and address the topic of the hardware

20   transactions, okay?

21       After Interwoven was acquired by Autonomy, you learned

22   sometime into 2009 that Autonomy was selling hardware, correct?

23   A.   Yes.

24   Q.   And in your experience many software companies do sell

25   hardware, right?

1    **A.**    Yes.

2    **Q.**    And those sales continued throughout your time at

3    Autonomy?

4    **A.**    Yes.

5    **Q.**    Am I right that you were not involved in the discussions

6    that came up with the commercial strategy for the hardware

7    sales?

8    **A.**    No.

9    **Q.**    Your role was limited to helping pay for hardware that was

10    part of these deals?

11    **A.**    Correct.

12    **Q.**    You never discussed hardware transactions with Mike Lynch,

13    right?

14    **A.**    No.

15    **Q.**    Or Hussain, Sullivan, Stouffer Egan, none of those guys?

16    **A.**    None.

17    **Q.**    You said you had a few conversations with Mr. Chamberlain

18    or Lisa Harris about them, right?

19    **A.**    Yes.

20    **Q.**    And on a high level from those conversations, you

21    understood that Autonomy was selling hardware as part of a

22    strategic effort designed to sell more software?

23    **A.**    Correct.

24    **Q.**    And you learned that hardware sales were typically at a

25    loss?

1    **A.**    Yes.

2    **Q.**    They were essentially a loss leader designed to induce

3    more software sales; is that fair?

4    **A.**    Yes.

5    **Q.**    Now, when Autonomy sold hardware, it did get paid by its

6    customers, right?

7    **A.**    Yes.

8    **Q.**    And those sales did generate revenue, correct?

9    **A.**    Yes.

10   **Q.**    And that revenue had to be recorded in some way on the

11   books and records?

12   **A.**    Correct.

13   **Q.**    Are you aware of or did you obtain a copy of a memorandum

14   prepared by Autonomy's finance department about the hardware

15   sales dated mid-October 2009 that was intended for Deloitte and

16   the audit committee?

17   **A.**    No.

18   **Q.**    Okay.  And you've never read that memo?

19   **A.**    No.  Steve talked to me about it, but I didn't ask for a

20   copy.

21   **Q.**    And did you understand that in the beginning of the

22   hardware sales, Autonomy had a strategic relationship with a

23   company -- a hardware supplier named EMC?

24   **A.**    Yes.

25   **Q.**    And they were working together to try to develop a

1  product, a hardware sale-type product?

2  **A.**   That I'm not aware of, but I know that there was a

3  relationship with EMC.  We bought a lot of EMC hardware.

4  **Q.**   Okay.  But the nature of the relationship from your

5  discussions you don't know?

6  **A.**   No.

7  **Q.**   And then are you also aware of the fact in 2010, so

8  sometime into the program, Autonomy shifted its approach and

9  started selling software to big financial institutions as part

10 of an effort to be sort of a one-stop shop for the big banks?

11 **A.**   I mean, we were always selling to large Fortune 500

12 companies, so I didn't notice anything dramatically different

13 from one way or the other.  These banks and these financial

14 institutions were customers one way or the other already, so we

15 were selling more to them, not less.

16 **Q.**   And just sticking with the banks, they were -- I think

17 we've already talked about this -- they were these huge

18 data-driven organizations that were hosting a lot of their

19 stuff with Autonomy?

20 **A.**   Correct.

21 **Q.**   And Autonomy did large dollar software transactions with

22 those banks, correct?

23 **A.**   Correct.

24 **Q.**   And to the extent the banks were requesting one-stop shop,

25 help us with all of our needs, it would make commercial sense

1  for Autonomy to help fulfill that role?

2  **A.**   Correct.

3  **Q.**   When you spoke with Mr. Chamberlain about the hardware

4  sales, I think you alluded to this in your Direct, he assured

5  you that the program had been discussed with Deloitte, correct?

6  **A.**   Correct.

7  **Q.**   Yes?

8  **A.**   Yes.

9  **Q.**   Okay.  And said something about an entire hardware

10  analysis that the U.K. finance department would review with

11  Deloitte every quarter?

12  **A.**   I don't remember that, but certainly we had a discussion

13  about it, and the understanding was a memo was prepared, shared

14  with Deloitte, and Deloitte was okay with the findings.

15  **Q.**   And did you also, am I correct, that you also got some

16  confirmation of that fact in a discussion you had with a

17  Deloitte auditor named Lee Welham?

18  **A.**   In -- I don't remember that conversation specifically,

19  but, yes, we did have a conversation about the accounting that

20  was being done over the U.K. and that Deloitte was well aware

21  of all the accounting that was being done.

22  **Q.**   And can you just explain, I'm not sure I got it the first

23  time.  What did you discuss and what was your takeaway from the

24  conversation?

25  **A.**   So I met with Lee when he came for an audit post the

1  events of summer of 2010, and I met him I think previously as

2  well maybe, I don't recall.  But that conversation we talked

3  about, and he said, hey, we've looked at all the analysis,

4  we've taken look at all the memos, all the questions that were

5  asked, and we know -- we know about all the transactions that

6  are being processed, and we are comfortable.

7       We didn't talk about anything specific in particular, but

8  he was very guarded about what he said, and I was very guarded

9  about what I said, because I didn't know what he knew, and I

10  didn't know what I knew myself.  So it was a very general

11  conversation.

12      So I don't recall that being very specific about

13  specifically related to hardware, other than just generally

14  saying he was aware of everything that had gone on, and that

15  Deloitte was comfortable.

16  Q.   In the context of that conversation, jumped ahead a little

17  bit, that came up after Mr. Hogenson had been terminated; you

18  understood that Deloitte played a role in reviewing those

19  issues, and this was him providing some assurance to you that

20  don't worry, we've analyzed the issues and we're okay with the

21  accounting?

22  A.   That is correct.

23  Q.   And just so the jury is clear, Lee Welham is the person

24  you spoke with?

25  A.   Yes.

1   **Q.**   And he's sort of the day-to-day leader of the Deloitte

2   audit team?

3   **A.**   Right, he was.

4   **Q.**   Not the partner, but he's sort of the manager?

5   **A.**   Yeah, yeah, he was the manager, yes.

6   **Q.**   Okay.  I think we've already touched on the topic of

7   appliance.  But I did want to ask, so you said a couple times

8   in your testimony, you spoke about the sales of items like mice

9   and computer bags and the like, so a few questions about that.

10       We just talked about the nature of being a one-stop shop

11  for big financial institutions.  Institutions like that had a

12  need for those types of products?

13  **A.**   Sure, I'm sure they did.

14  **Q.**   Every big business does, right?

15  **A.**   Yeah.

16  **Q.**   Did you ever attempt to quantify what amount of the

17  hardware sales fell into this category; does less than one

18  percent appear consistent with your experience?

19  **A.**   The -- I don't remember off hand the total amount, but the

20  hardware sales were more -- were less of the usual types that

21  we were seeing previously, more of the ones that I referred to

22  as, you know, the normal IT sort of stuff that you would see on

23  a day-to-day basis rather than, you know, servers from an

24  appliance perspective.

25  **Q.**   Just to unpack that.  So in the beginning for some period

1    of time, typically what was being sold to these customers was

2    big servers, storage items that they could keep their data on,

3    consistent with Autonomy's software products, correct?

4    **A.**    Correct.

5    **Q.**    Okay.  And then as the program evolved, you saw some sales

6    with these big financial institutions of the like that you

7    described?

8    **A.**    Yeah, quite a bit.

9    **Q.**    Okay.  Now, let me ask you about the topic of expense

10   allocation.

11   **A.**    Okay.

12   **Q.**    Do you recall getting some questions about that topic?

13   **A.**    Mm-hmm.

14   **Q.**    And they related to how you allocated the expenses paid

15   for the hardware on the company's books and records?

16   **A.**    Correct.

17   **Q.**    And so revenue is one thing, there are all sorts of ways

18   in which you can recognize revenue, but there's also expense.

19   When you pay for something, you have to put that on the books

20   as well, correct?

21   **A.**    Correct.

22   **Q.**    And you, during your time at Autonomy during this period,

23   you were not responsible for making those expense

24   determinations at the consolidated company level in the U.K.?

25   **A.**    No, not at the consolidated company level.

1    **Q.**   Those decisions occurred in the U.K. like the other big

2    picture accounting decisions, correct?

3    **A.**   Correct.  Correct.

4    **Q.**   And are you familiar with the principles under the IFRS

5    that related to these issues?

6    **A.**   Which in particular?

7    **Q.**   Well, I guess let me put it a different way.  Do you

8    understand that the IFRS rules that accounting -- that govern

9    Autonomy's accounting didn't define how to allocate costs

10   between categories like costs of goods and sales and marketing?

11   **A.**   Well, I don't know the IFRS rules, but I can't imagine

12   that they would be dramatically different from what normal GAAP

13   would be.

14   **Q.**   Okay.  But you're completely speculating there, because

15   you don't know the IFRS rules, correct?

16   **A.**   No, I don't.

17   **Q.**   Okay.  So back to my question:  You don't know whether the

18   IFRS rules define how to allocate between costs of goods and

19   sales and marketing; is that fair?

20   **A.**   Well, I don't think specifics, that's fair.

21   **Q.**   Okay.  Would you agree that where you allocate an expense

22   can turn on the purpose for the expenditure?

23   **A.**   I didn't understand the question.

24   **Q.**   Do you agree as a general matter that where you categorize

25   an expense can depend on the purpose for which you made the

VAIDYANATHAN - CROSS / HEBERLIG

1  expenditure?

2  **A.**   Correct.

3  **Q.**   So, for instance, if a company, say a telephone provider

4  is giving away free phones to induce companies to sign up for

5  the service.  The cost of the phone in that scenario could be

6  viewed as a marketing expense?

7  **A.**   Correct.

8  **Q.**   And likewise, a coffee shop that decides it wants to sell

9  cake at bargain prices to get people in the door to buy more

10 coffee, the price of the cake could be viewed as a marketing

11 expense, correct?

12 **A.**   Correct.

13 **Q.**   And so if Autonomy was viewing the sale of hardware to its

14 software customers is a way to induce them to buy more

15 software, it could view a portion of those expenses as sales

16 and marketing?

17 **A.**   Yeah, it's, again, I don't know specifically what

18 provision under the IFRS guidance that would say that.  I

19 haven't personally seen it.  I don't -- therefore, I can't

20 comment on that.

21     My general understanding of GAAP is that --

22 **Q.**   I'm sorry, but this is a case that's focused on IFRS.

23         **MR. LEACH:**  Your Honor, can the witness be allowed to

24 answer?

25         **MR. HEBERLIG:**  We don't need an understanding of GAAP.

1    That's not --

2           **THE COURT:**  Withdraw the question.  Go ahead.

3    **BY MR. HEBERLIG:**

4    **Q.**   I think you've answered my question.  Thank you.

5          There was some testimony back and forth about the hardware

6    sales or some questions and answers about gross versus net

7    accounting.

8    **A.**   Correct.

9    **Q.**   Okay.  And without getting into the details, you did not

10   have discussions with either the U.K. finance department or

11   Deloitte about that issue, correct?

12   **A.**   I did not.

13   **Q.**   Okay.  And do you know whether Deloitte and two of the

14   other Big Four accounting firms analyzing the same issue

15   concluded that gross is appropriate, not net?

16   **A.**   Possible.

17   **Q.**   That's possible?

18   **A.**   Possible.

19   **Q.**   All right.  Last topic on hardware relates to disclosure.

20   **A.**   Mm-hmm.

21   **Q.**   I think you testified that you believed, given the

22   magnitude of the hardware sales as you saw them, that you

23   believed Autonomy should have disclosed hardware sales

24   separately in its financials?

25   **A.**   Correct.

1  **Q.**   Did I get that correct?

2  **A.**   Right.

3  **Q.**   And you said something about, you know, if the revenue

4  approached 10 percent, maybe even lower, that, in your view,

5  warranted disclosure in the financials?

6  **A.**   Correct.

7  **Q.**   All right.  Before I get into some details, you did not

8  discuss the threshold for disclosure of anything in Autonomy's

9  financials with Deloitte and the U.K. finance department,

10  correct; that wasn't your job?

11  **A.**   Well, generally I had conversation with Steve and Lisa,

12  but not specifically.  It is not my limit.

13  **Q.**   Okay.  Now, is it your view that selling hardware --

14  software companies selling hardware of the type and magnitude

15  that we've seen should have disclosed hardware as a separate

16  line item?

17  **A.**   Well, depending on the circumstances, I've seen it done

18  differently.  Some include it in the software line, but

19  disclose it so it includes hardware with X dollars.  Sometimes

20  they say it's an appliance, and, therefore, they don't disclose

21  it separately.  Sometimes they call it hardware separately, a

22  separate line item on the financial statements.  So it's been

23  done differently --

24  **Q.**   Right.

25  **A.**   -- depending on the nature and volume and the amount.

1  **Q.**   And so we talked about it earlier, you left Autonomy and

2  you went to a software company called TIBCO?

3  **A.**   Correct.

4  **Q.**   All right.  And am I right that TIBCO, that software

5  company, also sold some hardware?

6  **A.**   Yeah.

7  **Q.**   And it did not separately disclose that hardware in a line

8  item on its financials?

9  **A.**   That is correct.

10  **Q.**   Okay.  And TIBCO was also selling hardware that didn't

11  have software loaded onto it; is that correct?

12  **A.**   No.

13  **Q.**   It was selling hardware that did not otherwise include

14  software?

15  **A.**   It was selling appliances.

16  **Q.**   My question is, did it sell a tangible hardware product

17  that did not include software on it?

18  **A.**   No.

19        **MR. HEBERLIG:**  Your Honor, I have Exhibit 7812.

20        **THE COURT:**  7812.

21        **MR. HEBERLIG:**  Is a Form 10-K from TIBCO that is a

22  public filing.  I believe the Court can take judicial notice of

23  it.  I'd like to --

24        **THE COURT:**  Well, let me take a look at it.  Is it a

25  tab?

 1              MR. HEBERLIG:  It is a tab 40.

 2              THE COURT:  Pardon me?

 3              MR. HEBERLIG:  4-0 from the year the witness joined

 4   TIBCO.

 5              THE COURT:  What page?

 6              MR. HEBERLIG:  65.

 7              MR. LEACH:  Your Honor, I object under 401 and 40 --

 8              THE COURT:  Pardon me?

 9              MR. LEACH:  I object under 401, 403.  It's well after

10   the time period.

11              MR. HEBERLIG:  I'd be happy to make a proffer at

12   sidebar.

13              THE COURT:  Well, wait a minute.  You say it's after

14   the time period.  What is the time period?

15              MR. HEBERLIG:  Fiscal year 2012 where it's a question

16   related to the testimony that we just received.

17              THE COURT:  Well, but it's subsequent to it, so I'm

18   not going to allow it at this time.

19              MR. HEBERLIG:  May I please make a proffer at sidebar?

20              THE COURT:  Yeah, later.  Later.  Okay.  We'll return

21   to it.

22   BY MR. HEBERLIG:

23   Q.   Okay.  Well, putting aside whether the software was

24   sold -- excuse me -- the hardware was sold as an appliance or

25   without software on it, I believe you did just confirm that

1   TIBCO in its disclosures did not have a separate line item for

2   hardware, correct?

3   **A.**   Correct.

4   **Q.**   So it reported its hardware sales in the software license

5   line?

6   **A.**   Correct.

7   **Q.**   Okay.  And it included some disclosure about the rough

8   magnitude of the hardware sales; do you remember that?

9   **A.**   Not off the top of my head, at this point.

10  **Q.**   Okay.  My question is, isn't it the case -- well, let me

11  back up.

12      You testified that it was misleading for Autonomy to not

13  disclose hardware sales separately that approached 10 percent

14  of revenue, correct?

15  **A.**   Correct.

16  **Q.**   And my question to you, sir, is didn't TIBCO also have

17  hardware sales that approached or were greater than 10 percent

18  of its license revenue that it disclosed in simply the software

19  license line item?

20          **MR. LEACH:**   Objection, Your Honor, 401, 403, vague as

21  to time.

22          **MR. HEBERLIG:**   The year after, when you joined the

23  company.  I'm sorry, in 2012 --

24          **THE COURT:**   You're saying 2012, but that's subsequent

25  to the acquisition, right?

1          **MR. HEBERLIG:**  This is to address his testimony that

2    it was misleading.

3          **THE COURT:**  Okay.  Fine.  The objection is sustained.

4    **BY MR. HEBERLIG:**

5    **Q.**  All right.  Let's talk about the issues surrounding

6    Mr. Hogenson's termination.

7    **A.**  Okay.

8    **Q.**  You, I believe, testified that you had raised some

9    questions or you're aware that Mr. Hogenson was raising some

10   questions over in the U.K.?

11   **A.**  Yes.

12   **Q.**  And some of the materials that Mr. Hogenson provided

13   included I believe some Filetek information that you gave to

14   him?

15   **A.**  He must have.  I --

16   **Q.**  He must have?

17   **A.**  He must have.

18   **Q.**  Did you have that understanding at the time?

19   **A.**  He asked for a bunch of information.  He said he was going

20   to -- he had in his possession a bunch of other information

21   from some of my other colleagues.  He was going to piece it all

22   together and then explain to them.  So I have no idea what he

23   did with the documents I provided to him, but I understood that

24   that was for that purpose.

25   **Q.**  The Filetek information?

1    **A.**    The other information, too, that he had asked me for.

2    **Q.**    Okay.  Including Filetek?

3    **A.**    Yeah.

4    **Q.**    Yeah.  And did Mr. Hogenson share with you the response he

5    got from Autonomy's U.K. management regarding those issues,

6    including some contemporaneous documentation?

7    **A.**    He didn't share anything with me, whether in writing or in

8    orally.  He was saying that I can't share, I won't talk, so...

9    **Q.**    Okay.  Did he, without sharing the information, tell you

10   that he did receive a response from U.K. management on these

11   issues or was it just a blank slate?

12   **A.**    He basically said the talks were -- he was discussing, and

13   he said -- from the look on his face it didn't appear as though

14   it was going well.

15   **Q.**    Appears as though what?

16   **A.**    It didn't look as though it was going well, from the look

17   on his face.

18   **Q.**    Okay.  But he didn't share with you anything he received

19   in response to his inquiries?

20   **A.**    No.

21   **Q.**    Now, let's address this topic of the payroll issues that

22   the Government covered with you on Direct.

23       Am I right that in early May 2010, that's when you first

24   surfaced this issue with Mr. Hogenson in that document we saw

25   on Direct?  And maybe I can pull it up and refresh your memory

1  about it.

2  **A.**   Which payroll issue?  There were two payroll issues:  One

3  was the payroll fraud, and one were process and other sort of

4  minor details associated with payroll.

5  **Q.**   So not the process issues that we saw your spreadsheet

6  with like the ACH stuff.  I'm talking about the fraud.  I'm

7  talking about the embezzlement.

8  **A.**   Yeah, so the fraud was discussed with Mr. Hogenson, with

9  Mr. Scott.

10  **Q.**   Right.  And I'm just trying to time when that was.

11       So let me pull up 7876, which I believe is -- it may not

12  be in evidence.  Hold on.  I don't think it is.  It's tab 45.

13       **THE COURT:**  7876?

14       **MR. HEBERLIG:**  Yes.

15       **THE COURT:**  Admitted.

16   (Trial Exhibit 7876 received in evidence.)

17       **UNIDENTIFIED SPEAKER:**  You want the spreadsheet?

18       **MR. HEBERLIG:**  No, just the email first.

19       **THE COURT:**  45, right?

20       **MR. HEBERLIG:**  Yes.  There is a related email which

21  I'm going to -- which is 7876.1, it's the spreadsheet

22  attachment.  I'm going to show that in a moment, if I may offer

23  that.

24       **THE COURT:**  7876.1 admitted.

25       **MR. HEBERLIG:**  Thank you.

1          (Trial Exhibit 7876.1 received in evidence.)

2    **BY MR. HEBERLIG:**

3    **Q.**   All right.  So this is early May, May 4, 2010, you to

4    Mr. Hogenson, attaching a list of issues, correct?

5    **A.**   Yep.

6    **Q.**   Okay.  And now let's look at the attachment and what it

7    says regarding this payroll issue.

8          7876.1, the password, yeah, Lotus.

9          All right.  If we can go to number 6.  Can you highlight

10   that in some way so it's clear?

11         Okay.  Do you see what we've indicated there in row 6 of

12   the spreadsheet?

13   **A.**   Yeah.

14   **Q.**   So this is your report to Mr. Hogenson of the issue, and

15   it talks about a payroll clerk named Lourdes; am I correct?

16   **A.**   Yes.

17   **Q.**   She was the person who like administered the paychecks and

18   payroll?

19   **A.**   That is correct.

20   **Q.**   All right.  And the issue that you discovered in early May

21   was that she had continued to pay a certain number of employees

22   who had left the company for some four months before?

23   **A.**   Correct.

24   **Q.**   So they were supposed to have been off the books, they

25   departed the company, but they were still getting paid under

 1   the payroll?

 2   **A.**   Correct.

 3   **Q.**   And this person Lourdes was responsible for the issues?

 4   **A.**   Well, she was the payroll clerk; she should have taken

 5   more care.

 6   **Q.**   All right.  And what you say in the corner or in the

 7   right-hand side is that "Lourdes needs to be further trained on

 8   the process," right?

 9   **A.**   Yes.

10   **Q.**   And that was what you and Mr. Hogenson believed that the

11   issue entailed as of early May 2010?

12   **A.**   That is correct.

13   **Q.**   Okay.  And of course it was later determined that the same

14   person, Lourdes, was the one who embezzled a million and a half

15   dollars from the company, right?

16   **A.**   Probably more, but, yeah.

17   **Q.**   Probably more?

18   **A.**   Yeah.

19   **Q.**   Okay.  But as of early May, the solution was she needed to

20   be further trained, right?

21   **A.**   Correct.

22   **Q.**   And Mr. Hogenson waited nearly a full month to report this

23   information to the U.K. Finance Group; do you recall that?

24   **A.**   No, this was -- this would have been on the list of issues

25   that -- the final list was the list where I discussed with

1    Steve.

2    **Q.**    Well, let's take a look at Exhibit 7879, and that is tab

3    47.  And I would offer it.

4            **THE COURT:**  Okay.  7879 admitted.

5        (Trial Exhibit 7879 received in evidence.)

6    **BY MR. HEBERLIG:**

7    **Q.**    All right.  So we were looking just a moment ago at the

8    early May email.  This is now May 26 of 2010, Mr. Hogenson

9    writing to Mr. Hussain, and Mr. Chamberlain seeking termination

10   approval for the payroll clerk we were just discussing, Lourdes

11   Dionisio, right?

12   **A.**    Yes.

13   **Q.**    Okay.  And let's just take a look at how Mr. Hogenson

14   characterizes the issue:  "There have been significant errors."

15        Errors, right?  Not fraud, right?

16   **A.**    Mm-hmm.

17   **Q.**    Not embezzlement?

18   **A.**    Mm-hmm.

19   **Q.**    Okay.  "There have been significant errors in the San

20   Francisco payroll that's driven this decision to terminate

21   Ms. Dionisio," and then he goes through this issue with the

22   four employees continuing to get paid, right?

23   **A.**    Yep.

24   **Q.**    Okay.  And do you remember you provided that information

25   to Mr. Hogenson?

**VAIDYANATHAN - CROSS / HEBERLIG**

1  **A.**    Yes.

2  **Q.**    He cut and paste from one of your emails?

3  **A.**    Correct.

4  **Q.**    Okay.  And that's the end of May 2010.

5          Now, that, in fact, was not the scenario, correct?  It

6  wasn't just significant errors and payments to four employees

7  when had left the company.  At this time, and occurring for

8  some months before, this woman had embezzled more than a

9  million and a half dollars from the company?

10 **A.**    She had embezzled money prior, and there was only one

11 payment that we found in 2010, one or two I think in 2010, and

12 that stopped immediately after we took over.

13 **Q.**    I understand.  I'm not suggesting that you facilitated her

14 embezzlement.  But my question is at this time when

15 Mr. Hogenson was describing the situation as involving

16 significant errors, in fact, there had been a million and a

17 half dollars embezzled from the company; you learned that

18 later, didn't you?

19 **A.**    Not at that point in time, yes.

20 **Q.**    You didn't learn it at that point in time, correct?

21 **A.**    Right.

22 **Q.**    And the passage of time from early May to May 26th doesn't

23 indicate a terrible amount of urgency on this issue, correct?

24 **A.**    Correct, we were just -- we were trying to understand the

25 extent of the issues at that point in time, and information

1    from Lourdes wasn't very forthcoming.  It was taking time.

2    **Q.**   Now, it would have been apparent if you had gone to the

3    payroll records and investigated what this woman had done, that

4    she had in fact embezzled a million and a half dollars, but

5    that effort wasn't undertaken at this time, was it?

6    **A.**   That is correct.

7    **Q.**   It was only when fortuitously the California Unemployment

8    Department, after this employee filed for unemployment noticed

9    you her prior wages, that you and Mr. Hogenson detected this

10   issue?

11   **A.**   That is correct.

12   **Q.**   And upon that notice, roughly a month or so after this,

13   then all of a sudden the million and a half dollar embezzlement

14   became clear; is that fair?

15   **A.**   That is correct.

16   **Q.**   Okay.  We can take that down.

17        Am I right that also during the second quarter of 2010, at

18   Mr. Hogenson's direction, a number of policies and procedures

19   were changed in the Americas finance department without the

20   authorization of the U.K. finance department?

21   **A.**   Not necessarily aware of that.  My assumption was --

22   **Q.**   That's just are you aware; do you recall that?

23   **A.**   Well, I know a number of policies were changed, but all of

24   those were discussed.  I mean, these were not changed without

25   us telling anybody.

1    Q.    So you have a firm memory 14 years ago today that all of

2    the policy changes that were undertaken in the Americas were

3    done with full authorization from the U.K.?

4    A.    We would not, at that point in time, we would not do

5    anything without checking with the U.K. first.

6    Q.    Okay.

7    A.    That was the -- that was what we were told to do, and

8    that's what we would have done.

9    Q.    So that's a firm memory?

10   A.    That's my recollection, yes.

11   Q.    You're confident -- let me just ask the question.

12        You are confident that no policies were changed in the

13   Americas without the authorization of the U.K. finance

14   department?

15   A.    We would have informed the U.K. for certain.

16   Q.    But you did receive emails from Mr. Hussain sent to

17   Mr. Hogenson and forwarded on to you in which he reprimanded

18   Mr. Hogenson for changing company policy without authorization

19   right around this time period, didn't you?

20   A.    I don't recall that.

21   Q.    Well, let's take a look at Exhibit 7694.

22        THE COURT:    7694 admitted, which is?

23        MR. HEBERLIG:    Tab 34.

24        (Trial Exhibit 7694 received in evidence.)

25   BY MR. HEBERLIG:

1  Q.   And let's just scroll down to the second page, please, and

2  highlight if we can the message from Mr. Hussain to

3  Mr. Hogenson.

4       And we'll look at it in a second, but this is subsequently

5  forwarded to you.

6  A.   Yeah, right.

7  Q.   So Mr. Hussain has a list of issues for Mr. Hogenson a few

8  days into or after the close of quarter 2 where (As read) a

9  number of communication issues have arisen with your team that

10 we need to clear out; do you see that?

11 A.   Yes.

12 Q.   All right.  And one of them, bullet point 1:  I understand

13 that Steve, that's Steve Chamberlain, correct; is that your

14 understanding?

15 A.   Yes, that's Steve Chamberlain.

16 Q.   (As read) Has requested a number of times raw information

17 and has not received it.  Can that be sent tonight regarding --

18 and there's some, you know, maintenance issues and accruals

19 that he was seeking information on.  Am I reading that

20 correctly?

21 A.   Yeah.

22 Q.   All right.  Now, how about the second point?  He says (As

23 read) It appears that you have informed members of your team

24 not to speak directly to Steve Chamberlain, the group VP of

25 finance.  Can you confirm whether this is the case or whether

1    there's some misunderstanding.

2          Now, did you receive an instruction like that from

3    Mr. Hogenson?

4    **A.**    Absolutely not.

5    **Q.**    Okay.  So that's incorrect?

6    **A.**    Yeah.

7    **Q.**    All right.  Now, let's look at the third bullet point.

8          Mr. Hussain is complaining there that (As read) policy

9    decisions which are typically set at the group level, not at

10   the operational level --

11         And that's a reference to the operational units in

12   America, correct?

13   **A.**    Mm-hmm.

14   **Q.**    Okay.  (As read) I note from some of the correspondence

15   with Steve, it appears that you are changing policy on certain

16   matters without direction from the group's senior financial

17   personnel.  Can you please confirm that you will revert to

18   current standing group policy on matters, right?  That's what

19   he said?

20   **A.**    Yeah.

21   **Q.**    And your recollection is that didn't occur?

22   **A.**    That's not my recollection at all.

23   **Q.**    That's not your recollection.

24         Okay.  And let's just look at the top email where

25   Mr. Hogenson forwards this information along.  And he asks

1  you -- he forwards it to you, and you recognize the other

2  individuals, right, Ms. Prasad and Mr. Tejeda?

3  **A.**    Yes.

4  **Q.**    And asked that you work with Steve and the finance group,

5  and to ensure that accurate information is provided, okay?

6  **A.**    Yes.

7  **Q.**    Okay.  Now, you can take that one down.

8       Am I correct that an issue also arose where members of the

9  Americas finance organization were authorizing payments or

10  write-offs that were in excess of company policy without

11  approval from the U.K.?

12  **A.**    That I'm not aware of.

13  **Q.**    You're not aware of that issue either?

14  **A.**    No.

15  **Q.**    Do you recall being the recipient of an admonition from

16  Mr. Chamberlain reminding the group about the nature of the

17  policy levels?

18       And it's not a memory test.  How about Exhibit 7756, which

19  is tab 35.

20            **THE COURT:**  7756 admitted.

21       (Trial Exhibit 7756 received in evidence.)

22  **BY MR. HEBERLIG:**

23  **Q.**    And this is July 22, 2010?

24  **A.**    Mm-hmm.

25  **Q.**    And let's focus on Mr. Chamberlain's message.

1    And you're included as a recipient along with the rest of

2    the -- well, several individuals from the Americas financial

3    organization and some from out, right?

4    **A.**    Yep.

5    **Q.**    He's issuing a reminder of the approval levels that were

6    required for any payment within the finance department, right?

7    **A.**    Mm-hmm.

8    **Q.**    And it includes, if we scroll down to number 5, credit

9    notes.

10    What is a credit note?

11    **A.**    So typically if you give a credit to a customer about --

12    for any sort of services that you provided to them, and you are

13    recognizing that they don't need to pay that amount, you give

14    them a credit note and say you don't need to pay me for that

15    number.  It's an internal document, but it requires approvals

16    before you say that a particular amount will not be collected.

17    **Q.**    And do you recall that throughout your time that those

18    approvals, at least above $5,000, needed to be obtained from

19    the U.K. finance department?

20    **A.**    Yes.

21    **Q.**    And so any credit note or write-off above that amount that

22    hadn't received U.K. finance approval was unauthorized in

23    violation of company policy?

24    **A.**    It would be, if there was a specific policy around that,

25    then absolutely.

1   **Q.**  All right.  We can take that one down, and just a couple

2   more.

3       You testified about the fact that you learned of the HP

4   acquisition essentially at the same time as the members of the

5   public, correct?

6   **A.**  Yes.

7   **Q.**  Okay.  That announcement was on August 18, 2011?

8   **A.**  Yeah.

9   **Q.**  Thereabouts?

10   **A.**  Yeah, thereabouts, must be.

11   **Q.**  And so you had no advanced notice of the deal?

12   **A.**  No.  No.

13   **Q.**  And I believe this is common sense, but you weren't

14   involved then in any of the due diligence that occurred in the

15   period of time prior to the deal being announced?

16   **A.**  Absolutely not.

17   **Q.**  Okay.  And you obviously weren't involved in the

18   negotiation over the price or the strategic goals behind it?

19   **A.**  No.

20       **MR. HEBERLIG:**  Okay.  Subject to the discussion I'd

21   like to have, I have nothing further.

22       **THE COURT:**  Thank you.  Okay.

23       **MR. LEACH:**  Your Honor, may we approach about a

24   scheduling issue briefly?

25       **THE COURT:**  Right now?  I mean, right this minute?

1          **MR. REEVES:**  Yes, please, Your Honor.

2          **THE COURT:**  All right.  Ladies and Gentlemen, if you'd

3     like to get up stretch, go ahead.  Talk.

4          (At sidebar - not reported.)

5          **THE COURT:**  Ladies and Gentlemen, we're going to

6     interrupt this witness's testimony at this point because there

7     is another witness who has a conflict later on tomorrow.  And

8     so if we get her on today and finish with her tomorrow, that

9     will be a great accommodation to the witness.

10         And so just my admonition to you is we have not finished

11    with this witness's testimony.  Keep it in mind.  It will be

12    resumed tomorrow afternoon.  And I want to thank the parties

13    for being so understanding.  They agreed to this.  They agreed

14    to this.  And we're going to have that from time to time.

15         We have witnesses who have all sorts of issues, especially

16    since a number of them are outside the country, and you just

17    have to multi-listen.

18         Okay.  You can step down, and we'll resume your testimony

19    tomorrow, at some point tomorrow.  Just stay in touch with the

20    U.S. Attorney if you will.

21         Great.  Thank you very much.  Call your next witness.

22         **MS. GREEN:**  Thank you, Your Honor.  The Government

23    calls Ms. Reena Prasad.

24         **THE COURT:**  Okay.  Thank you.

25         **THE CLERK:**  Please raise your right hand.

1       **REENA PRASAD,**

2   called as a witness for the GOVERNMENT, having been duly sworn,

3   testified as follows:

4           **THE WITNESS:**  I do.

5           **THE CLERK:**  Thank you.  Please be seated.

6       Please state your full name for the record and spell your

7   last name.

8           **THE WITNESS:**  My name is Reena Prasad.  My last name

9   is spelled P-R-A-S-A-D.

10                  **DIRECT EXAMINATION**

11  **BY MS. GREEN:**

12  **Q.**   Good afternoon, Ms. Prasad.

13  **A.**   Good afternoon.

14  **Q.**   Could you provide us with a brief overview of your

15  educational background?

16          **THE COURT:**  You have to speak in the microphone?

17          **MS. GREEN:**  I apologize, Your Honor.

18          **THE COURT:**  That's all right.

19  **BY MS. GREEN:**

20  **Q.**   Could you provide us with a brief overview of your

21  educational background?

22  **A.**   Sure.  I graduated from U.C. Davis in 1999 with a

23  bachelor's -- bachelor of Arts in International Relations with

24  a concentration in business economics.

25  **Q.**   And where did you work following graduation?

**PRASAD - DIRECT / GREEN**

1  **A.**  Following graduation I was hired by Hewlett Packard.

2  **Q.**  And was that for approximately one year?

3  **A.**  Yeah, just over a year.

4  **Q.**  And where did you work after that?

5  **A.**  I wanted to move back to the Bay Area, so I looked for a

6  job and was hired by Interwoven in 2000.

7  **Q.**  In 2009, approximately, was Interwoven acquired by a

8  company called Autonomy?

9  **A.**  Yes, that's correct.

10  **Q.**  And from that point on did you work at Autonomy until

11  approximately mid-2010?

12  **A.**  Yes, that's correct.

13  **Q.**  What type of company was Interwoven?

14  **A.**  They were a software company, a content management

15  software.

16  **Q.**  What were your job responsibilities at Interwoven?

17  **A.**  They started out -- the company was smaller, so I was part

18  of the customer accounting services group.  We did order

19  processing, invoicing, credit and collections, maintenance

20  renewals.  Then within three months I was promoted to

21  supervisor, and throughout my time with Interwoven I was

22  promoted about every three years.  It wasn't until I think it

23  was 2004 I took over collections solely.

24  **Q.**  And you've mentioned credit and collections.  What is

25  that?

**PRASAD - DIRECT / GREEN**

1   **A.**   Collections, credit and collections is evaluating credit

2   worthiness of our customers and collecting, contacting the

3   customers, following up on their outstanding invoices.

4   **Q.**   So just generally did your job involve following up on

5   outstanding invoices and getting in payments to the company?

6   **A.**   Yes, I did that for about ten years.

7   **Q.**   Who did you report to at Interwoven prior to the Autonomy

8   acquisition?

9   **A.**   Initially I reported to Yvonne Borrell.  After the

10  Interwoven acquisition of iManage, I reported I believe to

11  Mr. Percy Tejeda.

12  **Q.**   And just for the benefit of the jury, was that Interwoven

13  acquisition of iManage, was that in approximately 2003?

14  **A.**   I believe so, yes.

15  **Q.**   So from that point on you were reporting to Mr. Tejeda?

16  **A.**   Yes, that's correct.

17  **Q.**   After the Autonomy acquisition of Interwoven in 2009, how

18  did your job responsibilities change, if at all?

19  **A.**   They changed -- I was still in the same type of function,

20  but I was managing larger accounts receivable, more people.  I

21  was managing the collections teams from all the different

22  entities of Autonomy in the Americas.

23  **Q.**   You mentioned accounts receivable, what is that?

24  **A.**   Accounts receivable is a listing of all of the outstanding

25  invoices that customers owe payment on.

**PRASAD - DIRECT / GREEN**

1  Q.   So after the Autonomy acquisition, were you essentially

2  still handling collections, payments coming in just from more

3  entities at that point?

4  A.   Yes, yes, that's correct.

5  Q.   At some point in time did you become the Director of

6  Credit and Collections?

7  A.   Yes, I did.  I was promoted.

8  Q.   And what were your day-to-day responsibilities in that

9  role?

10  A.   My day-to-day responsibilities were managing a team of

11  about 13 people in various offices, managing escalated

12  accounts.  If there were problems or delays with, you know,

13  customers or resellers I would get involved, I would be

14  notified.  I would be communicating with management on a

15  regular basis on what cash was expected, and sharing updates

16  with them.

17  Q.   And when you mentioned problems or delays, are you

18  referring to problems or delays with respect to collecting

19  payment from the individuals that had been or the entities that

20  had been issued invoices?

21  A.   Yes, that's correct.

22  Q.   Who did you report to at Autonomy -- at Autonomy after

23  that acquisition, the Autonomy acquisition?

24  A.   After the Autonomy acquisition, I think initially for a

25  short time I was reporting to Mr. Tejeda, and then I started

**PRASAD - DIRECT / GREEN**

1  reporting to the CFO of the Americas, Mr. Brent Hogenson.

2  **Q.**   And where did Mr. Hogenson work prior to Autonomy buying

3  Interwoven?

4  **A.**   Prior to Autonomy?

5  **Q.**   Yes.

6  **A.**   And prior to Interwoven?

7  **Q.**   Did Mr. Hogenson work at Interwoven?

8  **A.**   I apologize.

9  **Q.**   Of course.

10  **A.**   Mr. Hogenson worked at Interwoven prior to Autonomy.

11  **Q.**   And did you report up ultimately to any others in the U.K.

12  above Mr. Hogenson?

13  **A.**   My direct boss was Mr. Hogenson, but I reported up through

14  Mr. Chamberlain.

15  **Q.**   And did he report up to Mr. Hussain?

16  **A.**   That's correct.

17  **Q.**   What location did you work in initially?

18  **A.**   I --

19  **Q.**   What office location?

20  **A.**   Under Autonomy?

21  **Q.**   Under Autonomy, yes.

22  **A.**   Uh-huh.  I worked in the San Jose office.

23  **Q.**   What was Mr. Chamberlain's role at Autonomy?

24  **A.**   Mr. Chamberlain's role I believe was Vice-President of

25  Finance.

PRASAD - DIRECT / GREEN

1    Q.    Did you interact with Mr. Chamberlain?

2    A.    Yes, regularly.

3    Q.    You said "regularly," so you had quite frequent

4    communication with Mr. Chamberlain?

5    A.    I'm sorry, what did you say?

6    Q.    Did you have quite frequent communication with

7    Mr. Chamberlain?

8    A.    Yes, by email, phone calls, group calls, yeah.

9    Q.    And on what topics generally would you and Mr. Chamberlain

10   interact?

11   A.    We would be discussing collections, outstanding invoices,

12   large dollar amounts, any kind of problematic accounts, and

13   past due invoices.

14   Q.    You mentioned two terms there that I want to make sure the

15   jury understands.

16   A.    Okay.

17   Q.    You first said "outstanding invoices," what is that?

18   A.    Okay.  An outstanding invoice is once an invoice is

19   generated and it's -- it's reflected on our accounts

20   receivable, it's outstanding, meaning there's a due date and

21   it's owed to the company, the payment is owed to the company.

22   Q.    And you also mentioned past due accounts.

23   A.    Mm-hmm.

24   Q.    What do you mean by "past due accounts" or "past due

25   debt?"

**PRASAD - DIRECT / GREEN**

1    **A.**    Okay.  There's a due date on the invoice, and if the

2    customer, reseller or partner hasn't paid by the due date, then

3    it's past due.

4    **Q.**    And you would have discussions with Mr. Chamberlain about

5    issues related to past due accounts, collections, et cetera?

6    **A.**    That's correct.

7            **MS. GREEN:**  I would like to admit Exhibit 13077.

8            **THE COURT:**  13077 admitted.

9        (Trial Exhibit 13077 received in evidence.)

10           **MS. GREEN:**  Mr. Hasan, can we make the top half of the

11    page bigger, please?  Great.  Thank you.

12    **BY MS. GREEN:**

13    **Q.**    Is this an email from you, Ms. Prasad, to Mr. Chamberlain

14    dated April 22nd, 2010?

15    **A.**    Yes, it is.

16    **Q.**    And just looking at that email, what were you sending to

17    Mr. Chamberlain on this date?

18    **A.**    List -- excuse me, a report of invoices that were due

19    after June 30th, 2010.

20           **MS. GREEN:**  And looking at page 2, please, Mr. Hasan.

21    Thank you.  And if we can make the emails bigger.  Thank you.

22    **BY MS. GREEN:**

23    **Q.**    Were you sending this email to Mr. Chamberlain as a result

24    of a request from him to send that information?

25    **A.**    Yes, that's correct.

1  Q.    Is this an example of you giving an update to

2  Mr. Chamberlain on outstanding debts of the company?

3  A.    Yes.

4  Q.    And let's go back to page 1, please.

5        Were there attachments to your email?

6  A.    Yes.

7        MS. GREEN:  And let's go to page 7, which is one of

8  those attachments, and can we make that bigger, please,

9  Mr. Hasan.  Thanks.

10  BY MS. GREEN:

11  Q.    What does this page show?

12  A.    It shows the outstanding invoices over and under a certain

13  dollar amount with a total.

14  Q.    And the total is approximately 36.6 million due after

15  June 30th, 2010; is that right?

16  A.    That's correct.

17        MS. GREEN:  And let's go to page 8, please.

18        And can we make the table and the title bigger, please,

19  Mr. Hasan.  Thank you.

20  BY MS. GREEN:

21  Q.    Does this show Autonomy's invoices that are due after

22  June 30th, 2010?

23  A.    Yes, it does.

24  Q.    And it is only the ones over 250,000; is that right?

25  A.    That's correct, for that page, yes.

PRASAD - DIRECT / GREEN

1           **THE COURT:**  Could we go back to the preceding

2  document?  Can you blow it up?  It says Summary of Invoices Not

3  Due in Q2.  Is that -- they're not due?

4           **MS. GREEN:**  As in they're due after Q2, 20 --

5           **THE COURT:**  I'm sorry?

6           **MS. GREEN:**  Yes, those are invoices due after

7  June 30th, 2010, so the --

8           **THE COURT:**  I see.  So those are invoices that are due

9  after Q -- in Q3 and on?

10           **THE WITNESS:**  Yes, they have later due dates.

11           **THE COURT:**  Later due dates.

12       Okay.  Thank you very much.  Thank you.

13           **MS. GREEN:**  Thank you, Your Honor.

14       And let's go back to the email, please, page 1, and let's

15  zoom in on the email again, Mr. Hasan, please.

16  **BY MS. GREEN:**

17  **Q.**    What is the subject line of the email?

18  **A.**    Debtors not Collectible in Q2.

19  **Q.**    And what did you understand that to mean?

20  **A.**    Customers with invoices that did not have an invoice

21  date -- an invoice due date by the end of the quarter at the

22  end of June.

23           **MS. GREEN:**  And if we could go back to page 8, please,

24  Mr. Hasan, and zoom in on the table, please.  Just there is

25  fine.

1    BY MS. GREEN:

2    Q.    Do you see some customer names there, MicroLink and Capax

3    Global?

4    A.    I do.

5    Q.    And do you recognize those names?

6    A.    I do.

7    Q.    What types of companies were Capax and MicroLink,

8    generally?

9    A.    Resellers.

10   Q.    And what is your understanding of what a reseller is?

11   A.    A reseller would re-sell our product or our company's

12   product to another company, an end user.

13   Q.    We've talked about past due debt.  We've touched on that.

14   While you were handling collections at Autonomy, did you

15   encounter any issues collecting past due debts owed to

16   Autonomy?

17   A.    Yes, I did.

18   Q.    And can you describe generally the issues that you were

19   seeing?

20   A.    Through resellers?

21   Q.    Yes, resellers.

22   A.    There were many resellers that were not confirming --

23   either had past due or not confirming when payments would be

24   made, and I was told either by the reseller or someone else

25   that the end user deals were not finalized or in place.

**PRASAD - DIRECT / GREEN**

1    Q.    So were you encountering issues collecting payments from

2    resellers?

3    A.    Yes, I was.

4    Q.    And was the -- I just want to clarify what you just said.

5         Was the reason that you were being given for not being

6    able to collect those payments, that the reseller didn't have

7    an end user customer in mind or in place?

8    A.    That's correct.  If there's no end user, then there's no

9    payment coming from the end user to the reseller, and

10    oftentimes the reseller is saying they won't pay Autonomy

11    because they don't have that payment from an end user.

12    Q.    From your perspective as head of collections, whether or

13    not a reseller had an end customer lined up or in mind for that

14    product, did that affect whether or not they owed money and had

15    to pay Autonomy for that deal?

16    A.    No, the reseller would still be on the hook for payment

17    for paying Autonomy.

18    Q.    But, nevertheless, you were being given this reason as a

19    reason why the resellers were not paying; is that correct?

20    A.    That's correct.  That's correct.

21    Q.    As head of collections were you concerned about the past

22    due debts for Autonomy?

23    A.    Yes, I was.

24    Q.    And why was that concerning to you?

25    A.    From the resellers specifically or in general?

PRASAD - DIRECT / GREEN

1   **Q.**   Resellers and in general, what's the issue with that?

2   **A.**   We're not receiving the cash.

3   **Q.**   And does that mean it's just sitting on your accounts

4   receivable?

5   **A.**   That's correct, it's sitting on the accounts receivable,

6   you know, I'm looking at a report, and the invoices and

7   outstanding amounts are getting older and older and adding up.

8   **Q.**   Are you familiar with the term "DSO?"

9   **A.**   I am, yes.

10  **Q.**   What does that stand for?

11  **A.**   DSO stands for Days Sales Outstanding, and what that is,

12  just in a kind of high level, is a measure of how quick -- how

13  quickly your customers are paying their bills, their invoices.

14  **Q.**   And is that metric important?

15  **A.**   Yes, I believe so.

16  **Q.**   Why is that?

17  **A.**   I -- it, it's public information.  It, it shows that your

18  accounts receivable is healthy, and like how quickly they're

19  paying the invoices, that they're happy customers.

20  **Q.**   Does that -- fair to say that at a basic level a company

21  wants to show it's collecting the money --

22  **A.**   Yes.

23  **Q.**   -- on its invoices?

24  **A.**   Yes.

25  **Q.**   While head of collections did you encounter any issues

1  related to invoices not being due or collectible until far out

2  in the future?

3  **A.**   Yes.

4  **Q.**   And was that a concern for you?

5  **A.**   It was.

6  **Q.**   And why was that a concern?

7  **A.**   There were large, large amounts of money with extended

8  payment terms or pushed-out payment terms that were not due in

9  a time frame that I was familiar -- that I was used to.  So

10 they would have push-out payment terms, you know, months if not

11 further out.

12 **Q.**   And how is that problematic from a collections point of

13 view?

14 **A.**   It's problematic because, well, the cash isn't coming in,

15 right.  But then also, I mean, if you have an invoice sitting

16 out there for so long, from my experience the chances are there

17 could be more problems or delays in actually collecting that

18 payment.  People change positions or approvers or things like

19 that, so there's more chance for it to be problematic.

20 **Q.**   Did you speak with Mr. Chamberlain about the past due debt

21 at Autonomy, past due accounts?

22 **A.**   Yes, I did, regularly.

23 **Q.**   You had been involved in working in collections trying to

24 collect money debts since you had joined Interwoven in 2000; is

25 that right?

PRASAD - DIRECT / GREEN

1    **A.**    That's correct, ten years, about ten years.

2    **Q.**    Ten years.  And ordinarily what process would you follow

3    to try and follow up on outstanding invoices?

4    **A.**    Ordinarily we had a pretty defined process.  The billing

5    team would generate the invoice, it would appear on my reports,

6    and in the system that I had access to; and then within about

7    ten days to 2 weeks my team would follow up with the customer,

8    reseller to confirm that they've received the invoice,

9    everything looked good, there was no questions, make sure, you

10   know, make sure everything was fine, and then continue to

11   follow up until it's going through their accounts payable

12   department and paid.

13   **Q.**    During your time handling collections in 2009 and 2010 at

14   Autonomy, were there times where you did not proceed with your

15   ordinary process in your collection efforts?

16   **A.**    Yes.

17   **Q.**    Could you describe what happened that would be different?

18   **A.**    If -- so that was our typical process.  Either my team or

19   myself would be following that process.

20        Can you repeat the question?

21   **Q.**    Yeah.  What would happen at Autonomy that was different

22   with respect to your process?

23   **A.**    Sure.  There were times that I was asked to hold off on

24   collecting payment or contacting the customer, also sometimes

25   called chasing the payment.

**PRASAD - DIRECT / GREEN**

1  **Q.**   And who would ask you to do that?

2  **A.**   Mr. Steve Chamberlain.

3  **Q.**   So he would ask you to hold off on collecting payment from

4  certain resellers?

5  **A.**   That's correct.

6  **Q.**   And other customers sometimes?

7  **A.**   I believe so.  I can't remember exactly.

8  **Q.**   Do you remember that happening with resellers?

9  **A.**   Yes, mm-hmm.

10  **Q.**   When Mr. Chamberlain told you to, you know, go hands off

11  or hold off on collecting certain payments, did you retain

12  visibility into what Mr. Chamberlain did with respect to those

13  accounts at that point?

14  **A.**   No, I did not.  I was not involved in that.

15  **Q.**   Did you find this odd?

16         **MR. SEILIE:**  Objection, vague.

17         **THE COURT:**  Overruled.

18         **THE WITNESS:**  Did I find it odd?  Yes, well, yes, it

19  was different than what I was used to.  I thought it was odd.

20  I didn't have more information.

21  **BY MS. GREEN:**

22  **Q.**   So what did you find unusual about it?

23  **A.**   That I didn't know the details of why I would be asked to

24  stop collecting payment.  I didn't know -- I didn't have any of

25  the details or involved in any of those conversations or

PRASAD - DIRECT / GREEN

1    emails.

2    **Q.**    And fair to say that in collections and being head of

3    collections, typically collecting payment would be an area that

4    was your responsibility; is that right?

5    **A.**    Absolutely, I was the Director of Credit and Collections.

6    **Q.**    We're going to focus a bit more on the resellers.

7    **A.**    Okay.

8    **Q.**    Did you recall anything about payment collection efforts

9    with respect to a reseller called MicroLink?

10   **A.**    MicroLink, yes.

11   **Q.**    What do you recall about that?

12   **A.**    MicroLink I believe was a reseller that had a substantial

13   amount of money outstanding, over -- a lot, millions.

14   **Q.**    And from a collections perspective, what do you remember

15   about that?

16   **A.**    That one was --

17         **MR. SEILIE:**    Objection, vague as to time.

18         **THE WITNESS:**    What?

19         **THE COURT:**    Sustained.

20   **BY MS. GREEN:**

21   **Q.**    In 2010 do you -- well, 2009, do you remember being told

22   anything with respect to collecting payments from MicroLink?

23   **A.**    Yes, I was told not to.  I was told it was hands off.

24   **Q.**    And who told you to go hands off on collecting payments

25   from MicroLink?

PRASAD - DIRECT / GREEN

1   **A.**   Mr. Chamberlain.

2           **MS. GREEN:**  I would like to show Exhibit 13078.

3           **THE COURT:**  13078 admitted.

4      (Trial Exhibit 13078 received in evidence.)

5           **MS. GREEN:**  And can we make that bigger, Mr. Hasan,

6   please?

7   BY MS. GREEN:

8   **Q.**   Is this an email from you to Percy Tejeda on May 3rd,

9   2010?

10  **A.**   Yes, it is.

11  **Q.**   What's the subject line?

12  **A.**   Oh.  MicroLink.

13  **Q.**   And taking a look at that email, how much did MicroLink

14  owe Autonomy as of this date?

15  **A.**   As of that date they owed 24.7 million.

16  **Q.**   You testified previously they owed Autonomy a fair amount

17  of money?

18  **A.**   That's correct.

19  **Q.**   Is this what you were referring to?

20  **A.**   Yes, it is.

21  **Q.**   You're asking (As read) would you agree that I should pull

22  the MicroLink invoices out of our target calculations and lower

23  the AR for AU, Inc. by 24.7 million.

24          What is AR a reference to?

25  **A.**   AR refers to accounts receivable.

**PRASAD - DIRECT / GREEN**

1  **Q.**  And AU, is that a reference to Autonomy?

2  **A.**  That's correct.

3  **Q.**  What were you asking here?

4  **A.**  I was asking that since we were asked not -- my team was

5  asked not to collect on the outstanding amount, then I would

6  pull it out of our cash collection targets, our calculations,

7  and not include it.

8  **Q.**  So you were going to pull out the 24 million from what you

9  expected to collect in at Autonomy for Q2 2010; is that right?

10  **A.**  Yes, that's correct, yes.

11  **Q.**  And is Matt, who is that a reference to?

12  **A.**  The reference is to Matt Stephan.

13  **Q.**  Who did he report to?

14  **A.**  He reported to Mr. Chamberlain in the U.K.

15  **Q.**  Ultimately was this 24 million removed from your

16  calculations of what you would be collecting in for that

17  quarter?

18  **A.**  Yes, it was.

19       **MS. GREEN:**  I would like to show Exhibit 3312, please.

20       **THE COURT:**  3312 admitted.

21       (Trial Exhibit 3312 received in evidence.)

22       **MS. GREEN:**  Thank you, Your Honor.

23  **BY MS. GREEN:**

24  **Q.**  Is this an email -- I'm just going to ask you a few brief

25  questions on this.

PRASAD - DIRECT / GREEN

```
 1        Is this an email chain that was forwarded to you,
 2   Ms. Prasad?
 3   A.   It was, yes.
 4        MS. GREEN:  And can we zoom out, Mr. Hasan, just to
 5   give Ms. Prasad a chance to read that bottom email, and we can
 6   make the bottom email bigger.
 7        And then it goes on to the next page, so please take a
 8   moment to read it?
 9        THE WITNESS:  Just one moment.
10        MS. GREEN:  Please keep scrolling, Mr. Hasan.
11        THE WITNESS:  Okay.
12   BY MS. GREEN:
13   Q.   So this email discusses MicroLink and a change being made
14   to the accounts receivable in the amount of 15.9 million; is
15   that right?
16   A.   That's correct.
17   Q.   And let's scroll up, please.
18        Was this email forwarded to you?
19   A.   It was.
20   Q.   And just a high level, what did you understand to be
21   happening here with this email?
22   A.   My understanding was that they were clearing the
23   $15 million from our accounts receivable.
24   Q.   Clearing the 15.9 million from the accounts receivable?
25   A.   That's correct.
```

PRASAD - DIRECT / GREEN

1  Q.   And was this forwarded to you because accounts receivable

2  is, you know, within your purview so you need to know what

3  is --

4  A.   Disappearing.

5  Q.   Yes, what is disappearing.

6       Okay.  Let's go to Exhibit 13336, please, 13336?

7            MS. GREEN:  Yes, Your Honor.  Thank you.

8            THE COURT:  13336 admitted.

9       (Trial Exhibit 13336 received in evidence.)

10           MS. GREEN:  And could we make that email bigger,

11 Mr. Hasan, please?

12 BY MS. GREEN:

13 Q.   This is an email that you received from Helen Ku; is that

14 right?

15 A.   Yes.

16 Q.   And the date of this email is July 2nd, 2010; is that

17 right?

18 A.   That's correct.

19 Q.   There is an attachment here entitled "Autonomy Aging

20 3/31/10."

21 A.   That's correct.

22 Q.   What is an Autonomy aging report?

23 A.   It is basically what I was mentioning previously, the

24 accounts receivable listing.

25 Q.   And there's a mention -- there's the use of the term

**PRASAD - DIRECT / GREEN**

1    "reserve" in this email.  Are you familiar with the term

2    "reserves?"

3    **A.**    I am, yes.

4    **Q.**    And generally what is that and how does that relate to

5    accounts receivable?

6    **A.**    If there is -- it's basically setting aside monies for

7    invoices or accounts that there -- we believe we might have

8    some difficulty in collecting.

9    **Q.**    Great.  And let's take a look at this aging report that

10    was attached to the email.

11        **MS. GREEN:**  So can we go to page 12, please,

12    Mr. Hasan.

13    **BY MS. GREEN:**

14    **Q.**    Is this the start of that report, the first page?

15    **A.**    It is.

16        **MS. GREEN:**  Great.  And let's go to page 16, and can

17    we make -- can we make the bottom section of this page,

18    starting from the MicroLink entities bigger, just so the

19    witness can see them?

20        And then scroll to the next page, please, Mr. Hasan.  Oh,

21    sorry, it disappeared.  Back where you were.  No, the other

22    way.  Sorry.  Thanks.  Keep scrolling that way.

23        So we see MicroLink listed there.  Keep going, please,

24    Mr. Hasan.

25    \\\

PRASAD - DIRECT / GREEN

1    BY MS. GREEN:

2    Q.   Do you see a series of MicroLink invoices there?

3    A.   Yes, I see several.

4    Q.   And these are invoices that payment had not yet been

5    collected yet; is that right?

6    A.   That's correct.

7            MS. GREEN:   And let's look at page 13, please.   And

8    can we make the section showing Capax bigger, please,

9    Mr. Hasan?

10   BY MS. GREEN:

11   Q.   Do you see a series of invoices there for an entity called

12   Capax?

13   A.   I do, yes.

14   Q.   And that was another reseller; is that right?

15   A.   That's correct.

16   Q.   Did you encounter collection difficulties with respect to

17   the reseller Capax?

18   A.   Yes, I did.

19   Q.   And what do you recall about that?

20           MR. SEILIE:   Objection, vague as to time.

21           THE COURT:   Lay a foundation.

22   BY MS. GREEN:

23   Q.   When do you remember -- when do you remember noticing

24   collection issues with respect to Capax?

25   A.   I noticed collection issues when the account was escalated

1  from one of my team members to myself -- actually, even I

2  was -- my collector was having difficulty collecting on that,

3  and I got involved.  It was escalated to me, and I followed up

4  on the account with the reseller directly.

5       And I had -- there was a conversation with one of the

6  executives there at Capax.  I spoke to him directly, and he had

7  told me that the end user deal for one of the deals was not

8  firmed up, was not in place.  Yes, that's when I noticed there

9  were --

10  **Q.**   Was the individual that you're referring to who you spoke

11  to there, Mr. John Baiocco?

12  **A.**   That's correct, yes.

13  **Q.**   And he told you this, it sounds like, in the context of

14  you having a conversation with him about collecting payments?

15  **A.**   Yes, I was working to establish -- I was calling him to

16  establish when we could expect payment and to help coordinate

17  that, and that's when he told me on the phone.

18  **Q.**   And was it your understanding that he was telling you that

19  about the end user because it was impacting when he planned to

20  pay Autonomy?

21  **A.**   That's correct.  He wouldn't pay us until he was paid.

22  **Q.**   From your position in collections did that concern you?

23  **A.**   Yeah, I was just going to say that.  It concerned me

24  because if he's not going to pay us until he's paid by an end

25  user, but the end user deal is not in place, then what is the

**PRASAD - DIRECT / GREEN**

1    likelihood of getting paid?

2    **Q.**   And what did you do -- what did you do after receiving

3    that information from Mr. Baiocco?

4    **A.**   I shared that with my superiors, Mr. Hogenson and

5    Mr. Chamberlain.

6    **Q.**   And what response did you receive?

7    **A.**   I don't know how like what the span was between sharing it

8    with them and when I was told, but I was asked not to chase

9    payment by Mr. Chamberlain specifically on a couple of the

10   reseller deals, invoices.

11   **Q.**   Specifically on a couple of the accounts?

12   **A.**   Yes.  Yes.

13   **Q.**   So is this an example of the situation you discussed

14   earlier in your testimony about Mr. Chamberlain directing you

15   to go hands off on collecting payment?

16   **A.**   That's correct.

17   **Q.**   I'm going to ask about another -- another reseller,

18   MicroTech?

19   **A.**   MicroTech, okay.

20   **Q.**   Did you have any issues collecting payment from MicroTech?

21   **A.**   Yes, I remember that one, mm-hmm.  I had issues collecting

22   from MicroTech.  They were also a reseller, and it was very

23   similar.

24   **Q.**   What do you remember?

25   **A.**   MicroTech had a deal that I was trying to also confirm

PRASAD - DIRECT / GREEN

1   when we could expect payment.  The end user was the Vatican,

2   and I remember that because I remember the Vatican, and it was

3   a large amount.  And I was told, I believe it was by the sales

4   team, that the end user deal was not in -- was not firmed up.

5   It wasn't a solid deal, yes, that's what I remember.

6   Q.   And how did that affect you from a collections

7   perspective?

8   A.   Well, I was tracking to collect that payment.  It's out

9   there and due and wanted to collect that large amount of money

10  for the company.  But if, again, if the end user deal wasn't

11  solid, they wouldn't be paying the reseller, and the reseller

12  was saying that they wouldn't be paying us.

13  Q.   Did you escalate that issue to anyone?

14  A.   Yes, I did.

15  Q.   To whom?

16  A.   To both Mr. Hogenson and Mr. Chamberlain.

17  Q.   And what direction did you receive?

18  A.   For that one I was asked to hold off on collecting, be

19  hands off on collecting, and to not chase payment.

20  Q.   And who directed you to do that?

21  A.   Mr. Chamberlain.

22  Q.   Let's look at Exhibit 797, please.

23       **THE COURT:**  797 admitted.

24       (Trial Exhibit 797 received in evidence.)

25       **MS. GREEN:**  Just to make it a little bit bigger,

```
 1    Mr. Hasan, can we -- that's good.  Actually, can we make it
 2    slightly bigger, and we'll just scroll if we need to.  It's a
 3    little hard to read.  Slightly bigger, please, Mr. Hasan.  Like
 4    let's do the top of the email down to the first, down to the
 5    MicroTech paragraph.  That's good.  Thank you so much,
 6    Mr. Hasan.
 7    BY MS. GREEN:
 8    Q.   Is this an email from you to Brent Hogenson with
 9    Mr. Tejeda copied on May 4th, 2010?
10    A.   Yes, it is.
11    Q.   You write (As read) I was hoping to catch you before you
12    left today.  We have already completed the analysis of days
13    past due.
14         You mentioned two reports that you were attaching.
15    Analysis of days past due, is that again a reference to like
16    past due debt?
17    A.   Yes.
18         MS. GREEN:   Okay.  And let's zoom in on the Capax
19    paragraph, please, Mr. Hasan.
20    BY MS. GREEN:
21    Q.   You write with respect to Capax (As read) High Risk Capax.
22    I was told that this is a very difficult account to collect on,
23    and $8 million of the $9 million is already past due.  I am
24    going to work with the collector closely to set appropriate
25    payment expectations with the Capax executives.
```

1          You classify Capax as high risk?

2    **A.**   Mm-hmm, yes.

3    **Q.**   What did you mean by that?

4    **A.**   That there was a problem -- that I believed there was high

5    risk of -- it was at risk of not being -- the cash was at risk

6    of not being collected within a certain time frame.

7    **Q.**   And typically how did you decide if a reseller was high

8    risk from your perspective?

9    **A.**   If -- how would I -- repeat that, please.

10   **Q.**   I'll reclarify.  I'll clarify the question.

11   **A.**   Okay.

12   **Q.**   In this case what caused you to determine that Capax was

13   high risk?

14   **A.**   Well, they were first -- they were past due.  I had been

15   informed that it was difficult to collect on, and that I --

16   it's difficult to collect on.

17   **Q.**   And at this point in time were they past due on 8 million

18   of the $9 million that they owed?

19   **A.**   Yes, that's correct.

20   **Q.**   Let's zoom out and look at the MicroTech paragraph,

21   please.

22         Thank you so much.

23         You write (As read) High Risk - MicroTech.

24         As mentioned, the Autonomy, Inc. team had indicated that

25   this was a "hands off" account.

1          What did you mean by that?

2   **A.**   That I was asked -- that we shouldn't be collecting on it.

3   **Q.**   And is that a reference to what you previously discussed

4   with me about being told to go hands-off by Mr. Chamberlain on

5   collecting?

6   **A.**   Yes, that's correct.

7   **Q.**   And, again, here you've designated MicroTech high risk?

8   **A.**   Yes.

9   **Q.**   Is that because of the difficulty you foresaw collecting

10  the money?

11  **A.**   It was.  And if no one is -- if I may.  If the collectors

12  are not working to collect the payment to make sure it comes in

13  on time, if no one is doing that, then there's risk that it

14  won't come in on time.

15          MS. GREEN:  Understood.  And zooming out, please,

16  Mr. Hasan, and let's zoom in on the bottom two paragraphs with

17  the write-offs.  So, no, starting from the one above, please.

18  Thank you so much.

19  **BY MS. GREEN:**

20  **Q.**   We're going to talk about write-offs in a bit more detail

21  later, but did you propose certain write-offs in this email?

22  **A.**   Yes, I did.

23  **Q.**   What is a write-off?

24  **A.**   A write-off would be -- a write-off would occur when an

25  invoice is deemed uncollectible.

**PRASAD - DIRECT / GREEN**

1   Q.   And are you writing it off -- what are you writing it off

2   of, just in layman's terms for our benefit?

3   A.   Sure.  So then you would be removing it from the accounts

4   receivable.

5   Q.   Thank you so much.

6        And have you had experience with write-offs during your

7   employment prior to joining Autonomy?

8   A.   Yes.

9   Q.   At Autonomy what was your role with respect to write-offs?

10  A.   My role was to review the accounts receivable and identify

11  those accounts that were uncollectible, and then propose --

12  compile that and propose it to management.

13  Q.   And just looking at the example here, the top paragraph,

14  you're discussing certain write-offs that were approved to be

15  written off by Cambridge but then were then put back on the

16  books.

17       What is Cambridge a reference to?

18  A.   The Cambridge finance team, yeah.

19  Q.   The Cambridge finance team of Autonomy?

20  A.   Yes.

21  Q.   And in this scenario what did you mean when you said they

22  were approved to be written off but then put back on the books?

23  A.   There were several invoices that were on the accounts

24  receivable, and many -- they were past due, very old, and then

25  they were credited in the system and I guess approved to be

**PRASAD - DIRECT / GREEN**

1   written off, but then they reappeared on the accounts

2   receivable.  They were put back on the books.

3   **Q.**   Do you know why that happened?

4   **A.**   I don't.

5   **Q.**   And you mentioned they were very old.  We see a reference

6   here to 300 to 1600 days past due?

7   **A.**   Yes.

8   **Q.**   In your experience is, you know, 1600 days past due, do

9   you consider that a pretty significant past due amount?

10  **A.**   That's very significant.

11  **Q.**   And you attached spreadsheets to this email; is that

12  right?

13  **A.**   That's correct.  Yes, that's correct.

14  **Q.**   And you previously reviewed those spreadsheets; is that

15  right?

16  **A.**   Yes.

17  **Q.**   We're going to look at those.  But back to resellers, and

18  we've been talking about resellers and end customers, was a

19  primary reason you were given from the resellers as to

20  collections the reason they were not paying was because of this

21  issue with not having an end user in place?

22  **A.**   Yes, that -- we talked about a couple of resellers, but

23  there were several.

24  **Q.**   We're going to look at one of those attachments.

25          **MS. GREEN:**  Mr. Hasan, could you open 790 -- 797-0005.

**PRASAD - DIRECT / GREEN**

 1    It's in Excel, please.

 2            **THE COURT:**  Is that a different exhibit.

 3            **MS. GREEN:**  No, it's the same exhibit.  It's just the

 4    attachment.  Thank you, Your Honor.

 5        And can we go to tab -- oh, you've opened it in pdf.

 6    Okay.  Great.  We'll use the pdf version.

 7    **BY MS. GREEN:**

 8    **Q.**  Well, while we're on the first page, was this one of your

 9    attachments to the email?

10    **A.**  Yes, I believe so.

11    **Q.**  Let's go to page 46 of the pdf.

12        I know this is small, so we're going to zoom in on the

13    relevant rows.

14            **MS. GREEN:**  Mr. Hasan, can you zoom in on the rows

15    where the MicroTech is listed.  Yep, perfect.

16        Still very small, so if you need this to be bigger, let me

17    know, and I'll just try to pull out the relevant information.

18            **THE WITNESS:**  I can see it, sure.

19    **BY MS. GREEN:**

20    **Q.**  Do you see a series of MicroTech invoices here?

21    **A.**  Yes, I do.

22    **Q.**  And these are outstanding invoices; is that right?

23    **A.**  That's correct.

24    **Q.**  I want to draw your attention to the last row that is

25    zoomed in.  And I know it's small, so I'll bring out some of

```
 1   the numbers there.
 2        Do you see an invoice that was dated March 31st, 2010?
 3   A.   That's correct.
 4   Q.   And it had a due date of June 29th, 2010; is that right?
 5   A.   Yes.
 6   Q.   What was the amount on that invoice?
 7   A.   That was $11,550,000.
 8   Q.   And who is the supposed end customer listed for that
 9   invoice to MicroTech?
10   A.   That is the Vatican library.  That is the one that I
11   mentioned previously.
12   Q.   The one that you mentioned previously where you were
13   having difficulty collecting and were told to go hands-off?
14   A.   Yes, and that there was -- the end user deal was not in
15   place.
16        MS. GREEN:  Let's look at Exhibit 13090, please.
17        Could we please admit it?  It's not yet admitted.  Sorry,
18   Your Honor.  May we admit Exhibit 13090?
19        THE COURT:  Oh, sorry, 13090, is that what you said?
20        MS. GREEN:  Yes, please.  Thank you.
21        THE COURT:  I was thinking about something else.
22   Okay.  Thank you.  13090 admitted.
23   (Trial Exhibit 13090 received in evidence.)
24        MS. GREEN:  Thank you so much, Your Honor.
25        THE COURT:  Sorry.
```

1    **MS. GREEN:** And let's go -- let's start with page 7 of

2    this email, please, Mr. Hasan. And can we zoom in to make the

3    email -- no, you don't need to do -- let's just do the text

4    portion, so we can -- the text is so small. Thank you so much,

5    Mr. Hasan.

6    BY MS. GREEN:

7    Q.   Do you see an email here from Mr. Chamberlain dated May 7,

8    2010?

9    A.   Yes, I do.

10   Q.   And you received this email?

11   A.   Yes.

12   Q.   What's the subject line of this email?

13   A.   The subject line is Barclay's financed deals.

14   Q.   Did Mr. Chamberlain obtain financing from Barclay's for

15   certain deals that had not been paid by the Autonomy customer?

16   A.   Yes, that's correct.

17   Q.   And I'm not going to make you go through every page of

18   this, so we'll just scroll.

19       **MS. GREEN:** Can we zoom out please, Mr. Hasan, and

20   just scrolling down, because it's quite long.

21   BY MS. GREEN:

22   Q.   Does this email list some of the deals where

23   Mr. Chamberlain had obtained financing?

24   A.   Yes, that's correct.

25       **MS. GREEN:** And let's go to page 17, please. Great.

**PRASAD - DIRECT / GREEN**

1    And can we zoom in on the text?

2    **BY MS. GREEN:**

3    **Q.**    Is this what he wrote after he listed those transactions?

4    **A.**    Yes, that's correct.

5    **Q.**    What did you understand Mr. Chamberlain to be

6    communicating here?

7    **A.**    My understanding was that these particular deals above had

8    been financed through Barclay's where Barclay's would pay -- so

9    these invoices are invoices to end users or partners.

10    Barclay's would pay the invoices, we'd receive the money, apply

11    it to the outstanding invoices so they would be removed from

12    the AR, accounts receivable, and then we would still collect

13    the money from the end user or partner.  And when that money

14    came in, we would pay Barclay's back or the money would go to

15    Barclay's.

16    **Q.**    That was your understanding about how this should work; is

17    that right?

18    **A.**    That was my understanding, yes.

19    **Q.**    If the end user or the customer or the party that had

20    transacted with Autonomy initially had been paying its

21    invoices, would there have been anything to finance with

22    Barclay's, in your mind?

23    **A.**    Would there be a need to?

24    **Q.**    Right.

25    **A.**    I wouldn't think so.

**PRASAD - DIRECT / GREEN**

1  Q.   Because the money had already been paid?

2  A.   That's correct, it would come direct.

3       MS. GREEN:  And let's go to page 3, please.  And can

4  you zoom in on Mr. Chamberlain's email, please.

5  BY MS. GREEN:

6  Q.   So after that email did you receive another email from

7  Mr. Chamberlain dated May 12, 2010?

8  A.   Yes.

9  Q.   And he writes "give me a list of blue chip customers that

10 you think we can finance."

11 A.   Yes.

12 Q.   And just at a high level, what did you understand

13 Mr. Chamberlain to be seeking here?

14 A.   He wanted a list of additional customers that we could

15 finance their receivables through Barclay's or something

16 similar that we had in the past.

17       MS. GREEN:  And going to page 1, please.  And let's

18 zoom in on the email, please.  Thank you so much.

19 BY MS. GREEN:

20 Q.   And in response to Mr. Chamberlain's email, did you put

21 together a list of deals that you thought could be financed,

22 potentially?

23 A.   I did.

24 Q.   And what was your basis for putting something on that

25 list?

**PRASAD - DIRECT / GREEN**

1    **A.**    I put -- my basis was to include invoices that were not

2    yet due but from customers that may not pay promptly.

3    **Q.**    And let's look at -- you attached an Excel; is that right?

4    **A.**    Yes.

5    **Q.**    And to be clear, this went to Mr. -- this email went to

6    Mr. Tejeda; is that right?

7    **A.**    That's true.

8    **Q.**    And you can read your email, but were you sending this to

9    Mr. Tejeda -- or why were you sending this to Mr. Tejeda first?

10    **A.**    This -- we didn't do -- we didn't do a lot of financing in

11    the past, so I was kind of bouncing it off of him to get his

12    opinion and include him on that.

13    **Q.**    His opinion as to whether this might be what

14    Mr. Chamberlain is looking for?

15    **A.**    Correct, yes.

16    **Q.**    Great.  And let's look at the Excel, please.  And I know

17    this is dense, so we're just going to look at one item on each

18    tab of these.

19        So this is your summary of what you proposed potentially

20    looking to finance; is that right?

21    **A.**    Yes.

22    **Q.**    Let's look at tab 2, which is the Autonomy tab -- and,

23    Yep, that's great.  Let's just stop there.

24        Do you see Capax and MicroLink invoices listed there?

25    **A.**    Yes.

1  **Q.**   And were these some of the invoices that you thought might

2  be good candidates for this financing?

3  **A.**   Yes.

4  **Q.**   Was that because you foresaw --

5  **A.**   Difficulties collecting.

6  **Q.**   Great.  And let's look at tab 4, please, the Zantaz tab,

7  and let's zoom in on the top invoice.

8       Do you see an entity entitled Discovery Technologies

9  there?

10 **A.**   Yes, I do.

11 **Q.**   And was that another reseller?

12 **A.**   That's correct.

13 **Q.**   And were you proposing an invoice here that

14 Mr. Chamberlain might want to consider for financing?

15 **A.**   Yes.

16 **Q.**   Let's look at Exhibit 13084.

17      **THE COURT:**  13084 admitted.

18      (Trial Exhibit 13084 received in evidence.)

19 **BY MS. GREEN:**

20 **Q.**   We're going to focus a little bit on Capax now.

21 **A.**   Okay.

22 **Q.**   Do you recall that email that we looked at previously

23 where you mentioned, you know, Capax; you had designated Capax

24 as high risk, and you mentioned you were going to try and

25 follow up regarding payments; do you remember that?

1   **A.**    I do, yes.

2   **Q.**    Okay.  So did you follow up with Capax regarding the

3   payments it owed to Autonomy?

4   **A.**    Yes, I did.

5   **Q.**    And let's go to page 2, please, and let's zoom in on the

6   bottom email, just the very bottom one where it says from Reena

7   Prasad.

8        So that's the email you send on April 29th, 2010.

9        **MS. GREEN:**  And let's go to the next page, please,

10  Mr. Hasan, just so she can see the email, and can we zoom in on

11  that email, please?

12  **BY MS. GREEN:**

13  **Q.**    And this is an email that you write to Nancy Gilman and J.

14  Baiocco at Capax; is that Mr. Baiocco at Capax?

15  **A.**    Yes, Mr. John Baiocco, I believe.

16  **Q.**    And the subject line says "Autonomy invoices equal

17  8.1 million due?"

18  **A.**    Yes.

19       **MS. GREEN:**  And can we zoom out of that, please, so we

20  can see the table below, and can we zoom in on the table?

21  **BY MS. GREEN:**

22  **Q.**    What was your purpose in sending this email to Mr. Baiocco

23  at Capax?

24  **A.**    My purpose was that a member of my team was having

25  difficulty collecting or getting a response or confirmation of

1  payment.  So because of the sizable dollar amount, I reached

2  out to them to try to coordinate payment with them and confirm

3  when we could expect to receive it.

4  **Q.**   And did the outstanding invoices here total 15.3 million?

5  **A.**   Yes.

6  **Q.**   8 million of which was past due?

7  **A.**   Yes.

8  **Q.**   And just briefly, let's look at your email on page 1.

9        **MS. GREEN:**  And can we zoom in on the middle email,

10  please.  Yes, perfect.

11       **THE WITNESS:**  Mm-hmm.

12  **BY MS. GREEN:**

13  **Q.**   Who -- you write this email on May 12th, 2010 to Rex

14  Andrada and Dean Revard copying Cynthia Watkins.

15       Who were -- who was Rex Andrada?

16  **A.**   Rex worked on the collections team out of our San

17  Francisco office.

18  **Q.**   And who was Dean Revard?

19  **A.**   I believe he was part of the sales team.

20  **Q.**   And who was Cynthia Watkins?

21  **A.**   Ms. Watkins worked in finance out of the U.K. office.

22  **Q.**   And you write (As read) Thanks, Rex.  You can call, but do

23  not threaten additional legal escalation, et cetera.  I

24  understand this is quite a sensitive account.  Simply call in

25  and ask them if they have a status update on the below invoices

**PRASAD - DIRECT / GREEN**

1    and ask when we can expect to receive payment.

2        What did you mean when you wrote "I understand this is

3    quite a sensitive account."

4    **A.**    I had been told that there -- that this account -- let's

5    see.  I had been told that there were discussions outside of

6    what I was familiar with, meaning not to push them so hard.  I

7    was --

8    **Q.**    Had you received direction about not pushing Capax for

9    payment?

10   **A.**    Yes, that's correct.

11   **Q.**    Who provided that direction to you?

12   **A.**    Mr. Chamberlain.

13   **Q.**    And is that why you were terming them a sensitive account

14   here?

15   **A.**    That's correct, yes.

16           **THE COURT:**  All right.  Ladies and Gentlemen, we'll

17   take our recess today.

18       Remember the admonition given to you:  Don't discuss the

19   case, allow anyone to discuss it with you, form or express any

20   opinion.

21       You're excused.  Thank you very much.  Long day.  I

22   appreciate it.

23       (Jurors exit courtroom.)

24           (Proceedings were heard out of presence of the jury:)

25           **THE COURT:**  Okay.  Let the record reflect, all the

1    jurors have left.

2        What I'd like to do now is inquire into the juror who has

3    had contact with the U.S. Attorney's Office.  Then we'll take a

4    recess and we'll resume and take care of all the -- I know you

5    want to put something on the record, and there's another issue

6    with this witness, and so forth and so on.

7        So we're just going to do one thing at a time.

8        The juror now, Mr. Lincenberg.

9        **MR. LINCENBERG:**  The Court wanted us to provide -- I

10   wrote out some questions.

11       **THE COURT:**  Pardon?

12       **MR. LINCENBERG:**  The court asked some questions.  I

13   wrote out a few questions.

14       **THE COURT:**  That's great.  Okay.  I'll take them.

15       Let me indicate, I looked at the questionnaire.  He didn't

16   answer any question that I can find in any misleading fashion.

17   Do you know what you were referring to?

18       **MR. WEINGARTEN:**  We'll get it.

19       **THE COURT:**  Okay.

20       **MR. BAUM:**  It's question 44.

21       **THE COURT:**  Which one is it?

22       **MR. BAUM:**  Sorry, Your Honor, it's question 44.

23       **THE COURT:**  Question 44.  Question 44 is as follows:

24   Have you or any family member ever had occasion to contact the

25   United States Attorney's Office or District Attorney's Office,

1   including -- okay.  And he says no.

2       Okay.  So that literally may be --

3           **MR. LEACH:**  Your Honor, first the date the

4   questionnaire was completed I think is early March, before his

5   contact with the AUSA on March 13.  So at the time he made this

6   statement I think it was true.

7       And the context of the statement is have you reported

8   something to law enforcement; have you been the victim of a

9   crime?  I don't read that question as saying do you have a

10  friend or colleague or have you ever reached out to somebody

11  about career advice at the U.S. Attorney's Office.

12          **THE COURT:**  Okay.  I think it's truthful.  I think it

13  was truthful, but let's -- let me look at Mr. Lincenberg's

14  questions.

15          **MR. LEACH:**  We've not seen this, Your Honor.

16          **THE COURT:**  I understand.

17          **MR. LINCENBERG:**  And it would be helpful --

18          **THE COURT:**  Sorry, you should use the microphone.  It

19  would be helpful.  What?

20          **MR. LINCENBERG:**  Your Honor, it might be helpful to

21  have the AUSA here who had the communication with the person.

22          **THE COURT:**  I don't know.  Let's see.  Let's see what

23  he says.  Let's see what the witness says.  Take it one step at

24  a time.  It might be helpful, it might be meaningless, I don't

25  know.  I'm not going to have a big grand thing if I don't need

1   it.

2           **MR. LINCENBERG:**  No, but we have an email from

3   Mr. Leach passing on information from somebody else who has

4   more firsthand information who is in the building.

5           **THE COURT:**  Okay.  Right.  Okay.  Perfect.  Have a

6   seat, everybody.  Bring in the juror.  He can just sit in the

7   jury box.

8           (Juror enters courtroom.)

9           **THE COURT:**  Good afternoon.  You probably didn't think

10  you'd be here, but we have a few questions, and I'll tell you

11  what has occurred so you understand why we're asking you some

12  questions.

13      We received information that you had a contact, that is, a

14  conversation with someone in the United States Attorney's

15  Office during the last week or so.

16          **A JUROR:**  Yes, before I was selected for the jury.

17          **THE COURT:**  Before you were selected for the jury,

18  right.  And it was a contact with -- do you recall the name of

19  the U.S. Attorney that you spoke to.

20          **A JUROR:**  Yes, Sailaja Paidipaty, I believe was her

21  name.

22          **THE COURT:**  Okay.  And during that -- let me break it

23  down in pieces for you.

24      Have you had a contact with any other Assistant U.S.

25  Attorney?

1      **A JUROR:**  No.

2      **THE COURT:**  Do you know these people who are seated at

3  counsel table?

4      **A JUROR:**  No.

5      **THE COURT:**  Okay.  And with respect to the attorney

6  that you did know, how did you know that attorney?

7      **A JUROR:**  She is a friend of a friend.

8      **THE COURT:**  A friend of a friend.

9      Okay.  Have you ever had any discussion or heard any

10  discussion by the friend of a friend or the U.S. Attorney's

11  office about this case that you're now hearing?

12      **A JUROR:**  Not at all.

13      **THE COURT:**  Okay.  You indicated that what, you are a

14  law student or about to be a law student?

15      **A JUROR:**  I am going to be a law student in August.

16      **THE COURT:**  Congratulations.  Where are you going?

17      **A JUROR:**  Northwestern Pritzker.

18      **THE COURT:**  Okay.  And we were told or advised that

19  there was some discussion about your interest in possibly going

20  into the United States Attorney's Office, a United States

21  Attorney's Office; is that a fair characterization?

22      **A JUROR:**  I had asked her about her career when I was

23  exploring whether I wanted to go to law school back a year,

24  year and a half ago.

25      **THE COURT:**  And is that the reason for the

```
 1   communication, that is, you wanted to get her opinion about

 2   what it's like to be a lawyer?

 3       A JUROR:  Yeah.  When I reached out to her, I reached

 4   out to her a week ago prior to showing up for jury selection,

 5   and I wanted to speak to her, now that I had gotten my

 6   acceptance, about her career, where she had worked, how she

 7   found work in the private sector versus government, and any

 8   advice she would have for anybody going into law school, so,

 9   yeah.

10       THE COURT:  And was that the only contact you've had

11   with her recently?

12       A JUROR:  That's the only contact I had with her

13   recently.

14       THE COURT:  Okay.  Now, let me ask a different

15   question.  Obviously, I assume that she was in your

16   conversation with you forthcoming, friendly, helpful,

17   hopefully.  But the question we need to know is whether because

18   of your contact with her, whether you have any -- whether

19   you're favorably disposed to, you know, to consider the United

20   States Attorney's position here as distinct from giving both

21   sides an absolute fair trial; do you understand what I'm

22   saying?

23       In other words, is the field, and only you can tell me

24   this, is the field absolutely even between the U.S. Attorney's

25   Office and the defense in terms of how you would listen to
```

1   their arguments and the evidence?

2          **A JUROR:**  I can understand the concerns, but I can

3   assure all that the field is absolutely even in that regard.  I

4   was speaking to Salija purely because I met her at a party,

5   realized she was a lawyer, immediately wanted to talk to her as

6   an additional insight as I made my decision considering I don't

7   know many attorneys.

8          **THE COURT:**  Okay.  And if you were to rule in favor of

9   the defense in this case, the end of the case, would that cause

10  you any concern in terms of your career or opportunities to be

11  a lawyer?

12         **A JUROR:**  Not in the slightest.

13         **THE COURT:**  Okay.  All right.  So why don't you go

14  back there.  I'm going to have a little discussion with the

15  lawyers, and we can see where we go from there.

16         **A JUROR:**  Sure.  Absolutely.

17         **THE COURT:**  Thank you.

18      (Juror exits courtroom.)

19         **THE COURT:**  Mr. Lincenberg.

20         **MR. LINCENBERG:**  Just to note, Your Honor, I know the

21  Court just had a chance to look at the email, but the

22  conversation according to Mr. Leach's email, which is the only

23  information we have, was actually two years ago.  That was

24  supposedly more at length, not --

25      Apparently there was a second conversation a week ago.

1    But as I read your email, Mr. Leach, it was that there was a

2    more extended conversation two years ago.

3        **MR. LEACH:**  I didn't hear that at all, Your Honor.  I

4    heard the defendant describing one conversation.

5        **THE COURT:**  He's not the defendant.  He's a juror.

6                        (Laughter)

7        **MR. LEACH:**  It's been a long day.

8        **THE COURT:**  He's not a defendant yet.

9        **MR. LEACH:**  Which is why it's great that I think he

10    should be excused.

11        **THE COURT:**  He'll never go to law school after this.

12                        (Laughter)

13        **MR. LEACH:**  Exactly.  I apologize, Your Honor.

14        **THE COURT:**  Oh, not to me.

15        **MR. LEACH:**  I think he was describing the conversation

16    he had back, I think it was March 2020.  I also think he was

17    describing the more recent reach-out that he made that didn't

18    amount to anything.

19        **THE COURT:**  The email says May, and he confirmed that.

20    He said a couple years ago he reached out to her, and then he

21    phoned her again when he got admitted to law school, and that's

22    the second conversation.

23        **MR. LINCENBERG:**  I'm not sure what took place in the

24    conversation in May of 2022.  I know the Court inquired, as I

25    heard it, about a conversation a week ago or so.

1       **THE COURT:**  I think he said that -- well, what I heard

2  him say was that he reached -- that she was a lawyer, he had

3  met her, and he wanted to discuss whether to go to law school,

4  whether he should pursue a career in the law.

5      Subsequently, when admitted to the law school, he phoned

6  her again.  That's -- those are the two contacts that you're

7  consistent with.

8      Well, okay.  I see no basis to recuse him.  Do you want me

9  to admonish him?  Is there anything I should say?

10      **MR. LINCENBERG:**  I don't want an admonition.  Just for

11  the record I would say --

12      **THE COURT:**  Go ahead.

13      **MR. LINCENBERG:**  -- I believe he should be excused.

14  We went through a jury questionnaire and a voir dire if

15  somebody had contact with the U.S. Attorney's Office, in the

16  middle of the voir dire process, on the day that the Court is

17  asking all the jurors:  Is there anything else we should know,

18  and so forth, he's communicating with their colleague down the

19  hall.

20      It seems inappropriate.  It seems information we would

21  have wanted to have known during voir dire.  It seems to me

22  it's a basis for excusing a juror.

23      **THE COURT:**  Well, you have the information now.  So

24  the question is, if you're asking me the question -- you're not

25  asking me any question -- but if you were asking me the

1  question would I excuse him for cause, the answer is I would

2  not.

3          **MR. LINCENBERG:**  That's not the question.  The

4  question is whether that information would have been important

5  to us in assessing whether to keep him on the jury.

6          **THE COURT:**  Okay.  I understand that.  I understand

7  that.  Did you not know he was a law student?

8          **MR. LINCENBERG:**  No, we did not know.  He's not a law

9  student.

10          **THE COURT:**  Well, he's not a law student yet.

11          **MR. LINCENBERG:**  I don't believe there was any

12  information, correct me if I'm wrong, I don't believe there was

13  any information about him intending to go to law school.

14          **MR. LEACH:**  I didn't see any information in the

15  questionnaire about an interest in law school, Your Honor, but

16  I don't think that's relevant at all.

17          **THE COURT:**  Okay.  Well, is there any other question

18  you want me to ask him?

19          **MR. LINCENBERG:**  Well, I honestly would like to hear

20  from the AUSA about the details of their conversation, but --

21          **THE COURT:**  That's not unreasonable.  That's not

22  unreasonable.  But we're not going to do it today.  That's

23  unreasonable.

24      Anything else I need to ask him?

25          **MR. LINCENBERG:**  No.

 1          **THE COURT:**  Okay.  Fine.  So subject to hearing

 2   something that is of concern by the Assistant U.S. Attorney,

 3   and I think it's perfectly legitimate.  She had a conversation

 4   with a juror, so I think you're entitled -- we're all entitled

 5   to know -- we've heard one version of it, and now we're

 6   entitled to hear the rest of it.

 7          Okay.  That's fine.  Would you thank him very much.  Tell

 8   him we'll see him tomorrow as part of the jury.

 9          Well, now that I'm up, I guess we can talk about a couple

10   of things before we end for the day.  Why don't we deal with

11   the record on the matter that I ruled -- well, I didn't give

12   any reasons for it.  I just said I'll rule, but I think it is

13   a -- yeah, if you would file that under seal, or whatever it

14   is, and Mr. Lincenberg's questions as well so it's part of the

15   record, if you want it filed.

16          **MR. LINCENBERG:**  That's fine, please.

17          **THE COURT:**  Yeah, okay.

18          **MR. HEBERLIG:**  I can explain.

19          **THE COURT:**  Well, I can tell you what I think.

20          **MR. HEBERLIG:**  Sure.  My purpose may not have been

21   clear.  Obviously I didn't want to do any speaking colloquy

22   with the jury here.  But my purpose was not for the truth of

23   what was in the information; it was to impeach his testimony

24   that it would be unreasonable or was unreasonable for

25   Autonomy --

**PROCEEDINGS**

 1          **THE COURT:**  You were going to impeach him on a

 2   document that was created subsequent to the time of conspiracy,

 3   of the action.  It was I forget which exhibit number it was.

 4          **MR. HEBERLIG:**  Explain.  So he left --

 5          **THE COURT:**  But that's right; isn't that correct?

 6   That is, whether it was a 10-K, or whatever it was, was for a

 7   period subsequent to the incident.

 8      So he said, as I recall his testimony, he said no, I don't

 9   think it would be disclosed, whatever it is, or listed, and

10   something about hardware sales.  And you want to impeach him on

11   the company's subsequent -- by the way, a company he

12   identified, I got that.

13          **MR. LEACH:**  His company.

14          **THE COURT:**  Yeah, their subsequent whatever it was.

15          **MR. HEBERLIG:**  10-K annual statement.

16          **THE COURT:**  I get them all confused.

17          **MR. HEBERLIG:**  I just make the proffer.

18          **THE COURT:**  You go right ahead.

19          **MR. HEBERLIG:**  So the essence of his testimony was it

20   was unreasonable and misleading for Autonomy not to disclose

21   hardware as a separate line item in his financials, and I got

22   him to confirm that on cross-examination.  And in part he said

23   it's because the amount of the hardware was between 5 and

24   10 percent of Autonomy's software sales.

25      So the proffer of what's in the 10-K, he leaves Autonomy

1  in April of 2012, and he immediately joins this company TIBCO;

2  it's a software company, a public software company, and he's in

3  their finance department, presumably knowledgeable of their

4  financial statements.

5       TIBCO, like Autonomy, discloses its revenue in two line

6  items:  License revenue and service revenue.  And, according to

7  this form 10Q, they not only sell hardware, but they disclose

8  that hardware is roughly 5 percent of revenue, okay.

9       When you look at their revenue, 60 percent of the billion

10  dollars in revenue is from services, 40 percent is from

11  hardware.  5 percent of a billion dollars, $50 million.

12       The hardware, excuse me, the software revenue they're

13  selling, and including the hardware revenue within in a single

14  line item, is $400 million.  So they're selling more than

15  10 percent in hardware, just more likely than Autonomy was, and

16  yet disclosing it in the single line item, license revenue.

17       And it's not for the truth of the matter asserted, it's to

18  impeach his testimony that no reasonable company -- or it was

19  misleading for Autonomy to present its financials that way when

20  the next month he went to another company who did it the exact

21  same way.  That's the proffer.

22       **MR. LEACH:**  I just think it's comparing apples and who

23  knows what, Your Honor.  Who knows who prepared the 10-K, what

24  their auditors were telling them, what the board was telling

25  them, what the audit committee was telling them, you know, what

**PROCEEDINGS**

1  the real composition of the revenue of this completely separate

2  company in 2012 was.  I just think it's massively confusing.

3          **MR. HEBERLIG:**  It's explained in the 10-K, which I can

4  walk him through.

5          **THE COURT:**  Yeah, but what happens -- what happens if

6  company A is accused of not disclosing a dishonest financial.

7  So this person goes to company B.  And by the way, they do the

8  same thing that company A does.

9          **MR. HEBERLIG:**  Right.

10          **THE COURT:**  Okay.  And to which I say, why is that

11  necessarily relevant?  If you have, quote, two wrongdoers --

12          **MR. HEBERLIG:**  Totally agree.

13          **THE COURT:**  If you have two wrongdoers, and it doesn't

14  become relevant qua impeachment just to ask him the question:

15  Well, in the company you joined; did they do it the same way?

16  Which I think is what the impeachment is.

17          **MR. HEBERLIG:**  The impeachment --

18          **THE COURT:**  And I don't -- then you create your own

19  impeachment.  And in my view, while it may be relevant, it's

20  outweighed by 403 because it introduces all sorts of questions

21  as to what's going on in TICO or TIBO, or whatever the heck

22  they are, and what they're looking at, and how they're getting

23  advice, and whatever the issue is.  So it creates a sideshow,

24  an additional issue as to what did TI --is it TICO?

25          **MR. HEBERLIG:**  TIBCO.

1      **THE COURT:**  TIBCO, what did they do and why did they

2    do it?  That's, actually, no, it's not coming in on that issue,

3    because it seems to me it's classic 403.

4       I'm trying to keep this case just right on what happened

5    during up to 2000 to the acquisition, and this is outside that

6    period of time, that's number 1.  I think it introduces outside

7    issues that will have a tendency to confuse and not illuminate

8    the jury.  I don't know that it directly impeaches this

9    particular witness because I don't know to what extent he had

10   control over it, and to what extent he knew about it, and to

11   what extent he was involved in those transactions.

12      So on all of those bases I'm going to overrule your offer.

13      Now, that's not to say that you couldn't bring in some

14   witness who says, oh, by the way, I think companies do that all

15   the time during this period of time.  I'm not saying you have

16   to accept his testimony as gospel or whatever.

17      Is it right that God created civil litigation?

18      **MR. HEBERLIG:**  Only for certain cases.

19      **THE COURT:**  Because yesterday, Mr. Weingarten, you

20   said that.  God created civil litigation.  I was wondering who

21   to blame.  Now I know.

22                          (Laughter)

23      By the way, who created criminal litigation?  That's

24   another issue.

25      **MR. HEBERLIG:**  Maybe the Devil, I don't know.

 1    May I just confirm then that this would not be a subject

 2  the Government intends to get into on redirect?

 3    **THE COURT:**  Oh, no, I don't think you can get into it

 4  on redirect, absolutely.  I mean, if they get into it on

 5  redirect, you can do whatever you want to do.

 6    **MR. LINCENBERG:**  Okay.  I wanted to just add a

 7  post-ruling argument onto that, because what was really

 8  interesting with this witness is how many times --

 9    **THE COURT:**  This witness being?

10    **MR. LINCENBERG:**  Mr. Ganesh.  Ganesh, I can't

11  pronounce his last name.

12    With Ganesh, what was really interesting is how many times

13  the Government led him into this conversation about how unusual

14  something was.  And here counsel gets up and the very two

15  companies he's working for are disclosing something the same

16  way, and the Court is not letting me even cross-examine --

17    **THE COURT:**  Are you teaming up on me, is that it?  You

18  don't think he did a good enough job?

19    **MR. LINCENBERG:**  He did as good of a job as I've ever

20  seen, frankly.  I think he's phenomenal.  But I just ask the

21  Court not to be too tied down to while this is a little

22  different date than 2011 --

23    **THE COURT:**  Well, I'm a little tied down to it.  I

24  mean, you want to -- do you want a ground rule?  You want to

25  see how I'm trying the case from a judge's point of view.  Yes,

1   indeed, I am very concerned about time periods.  I'm very

2   concerned that when we start to exceed them, the scope of the

3   case goes wildly out of control, and, you know, guess what?

4   We're not finished one witness yet on day 3, so we probably

5   would have finished with this gentleman, but...

6           MR. LINCENBERG:  But we're not talking about the

7   post-acquisition issue here.  We're talking about

8   impeachment --

9           THE COURT:  I understand that.

10          MR. LINCENBERG:  -- about statements made by witnesses

11  for years and years and years after --

12          THE COURT:  Impeachment is an entirely appropriate way

13  of dealing with witnesses.  However, in doing so, I could look

14  at 403.  And in this case I find, for the reasons I've already

15  stated, that I'm not going to permit that impeachment piece

16  right there.  Other pieces of impeachment, go ahead.  I mean,

17  you've already had him for two hours on the stand, or

18  thereabouts, and he'll be on the stand for another hour

19  tomorrow, and then I don't know whether there will be any

20  redirect or not.

21      But, you know, you'll get your fair shot.  You'll get a

22  fair shot.  Every exhibit has come in.

23          MR. HEBERLIG:  Understood.

24          THE COURT:  Not a problem here.

25      So what else -- I thought there was something else.

1        Yes, go ahead, please.

2            MR. HEBERLIG:  This is the second witness, the woman

3   who is on the stand right now.

4            THE COURT:  Right.

5            MR. HEBERLIG:  And there are two issues that are

6   somewhat related.  I'll just give you the brief background.

7        So she, as you know, worked for Mr. Hogenson.  Not only

8   was Mr. Hogenson terminated, but she and another colleague were

9   also terminated, Reena Prasad and Percy Tejeda.

10       So there was pre-trial litigation after the Government

11  gave 404(b) notice that the terminations were 404(b) evidence

12  they wanted to introduce.  We moved to exclude it on two

13  grounds:  One, that just the fact of the firings was not proper

14  404(b) notice.  Fine, that was one issue.  The second was even

15  if you conclude that is appropriate 404(b), there are

16  settlement agreement with Autonomy including the amounts that

17  they were paid from Autonomy should not come into evidence

18  because they're unduly prejudicial.  They might suggest to the

19  jury an admission of liability.

20       So we litigated that issue.  And in the Government's

21  opposition or response to our motion, they included a footnote

22  that says:  The Government does not intend to offer evidence of

23  the settlement agreements with Hogenson, Tejeda and Prasad, but

24  reserves the right to do so depending on the cross-examination

25  of the witnesses.

**PROCEEDINGS**

 1      So we dropped that issue in our reply brief.  The Court

 2 had no occasion to rule on it because it was no longer a live

 3 issue.

 4      We got the Government's exhibit list for this witness I

 5 think yesterday, and they now want to introduce as substantive

 6 evidence her settlement agreement and the amount that she was

 7 paid.

 8      We understand that the terminations the Court has ruled

 9 are relevant and are coming in, we accept that ruling.  But

10 this is a separate category that the Court didn't rule upon or

11 consider specifically.

12          **THE COURT:**  That's perfectly fair to raise it.

13          **MR. HEBERLIG:**  Okay.  And the related issue is that a

14 number of the witnesses' 302s she has reported that as a result

15 of the termination, some years on, perhaps continuing to today,

16 she suffers from PTSD, acute depression and anxiety, and the

17 Government would like to elicit that from her, and our position

18 is it's irrelevant, and it's prejudicial under 403, and this is

19 not a wrongful termination or intention of emotional distress

20 case.  Those are the two issues.

21          **THE COURT:**  Okay.  Well, I don't think -- well, of

22 course is it really the Government's intention to go into her

23 emotional state, and so forth?

24      And I guess, in part, I mean, in fairness to the position

25 of the parties, we haven't heard any cross-examination, and I'm

1   not quite sure how the cross-examination goes, because I

2   haven't heard it, but if it goes to, well, you have a -- I

3   don't know how it goes.  Does it go, well, you've got a grudge

4   against the defendant.  Does it go -- I don't know what's going

5   to be shown.

6       I would say ordinarily, absent some type of

7   cross-examination that I think opens the door, both those

8   things would be out, especially the PTSD and her emotional

9   state, and so forth.  You know, unless something happens, I

10  would not allow that in because it's highly prejudicial.  It

11  blames Autonomy for her present state of mind and her

12  condition, and that's very, very -- that's highly prejudicial,

13  so I wouldn't let that in.

14      Number 2, as to the settlement agreement, and I don't know

15  what the amounts are in the -- what are --

16      **MR. HEBERLIG:**  75k for this witness.  55 to her, 20 to

17  her lawyer.

18      **MR. LEACH:**  Your Honor, it's 750,000.

19      **THE COURT:**  Oh, I misheard?

20      **MR. HEBERLIG:**  That's Hogenson.

21      **MR. LEACH:**  For Brent Hogenson.

22      **MR. HEBERLIG:**  We're talking about this witness.

23      **THE COURT:**  We're talking about this witness, okay.

24  My hearing is so bad.

25      Can you what?  Yes, can you talk?  Of course, go right

 1  ahead.

 2          **MR. REEVES:**  Sorry to interrupt.

 3          **THE COURT:**  Go in front of the microphone.

 4          **MR. REEVES:**  I'd like to -- this issue is going to

 5  extend into three witnesses:  Ms. Prasad, Mr. Tejeda and

 6  Mr. Hogenson.  The issue of well being is going to extend into

 7  two witnesses, Ms. Prasad and I would argue Mr. Hogenson.  I'm

 8  happy to elaborate on that.

 9          And I think it's really important to understand that there

10  are three different settlement agreements led I believe by

11  Mr. Hogenson in the amount of $750,000, so it's not $75,000 for

12  all of them.  Mr. Hogenson was paid $750,000.

13          So I'll let my colleagues, a bit off the record, but I

14  want to emphasize to the Court that this extends into the next

15  I think three of the next four witnesses.

16          **THE COURT:**  Well, let's take the 750 and put it to the

17  side for a moment, because that's the magnitude of a settlement

18  I think that deserves some further consideration by the Court.

19          But I don't know that a $50,000 settlement really is very

20  probative of anything.  I mean, you know, she was there for a

21  while, she was suddenly terminated.  I mean, I think that if

22  you get into -- well, you were fired, weren't you, then,

23  well --

24          **MR. HEBERLIG:**  Well, they're going to bring that out I

25  assume on direct.

1      **THE COURT:**  Well, I know, I've got to take it sort of

2  one step at a time.

3      You say, well, you were fired, weren't you?  Yes, I was

4  fired.  Then you want to say, well, did you receive any

5  compensation for your termination?  And there are two answers

6  to it:  Yes and yes, and 50,000, and, yes, and whatever the sum

7  is, and they can be divided.

8      If it's relevant that they -- I think it's -- if somebody

9  is fired -- well, I have to think about this more.

10      Maybe I should hear the Government and try to figure out

11  how it comes in.  Why is it relevant?  Why is it relevant to

12  the case?

13      **MS. GREEN:**  Thank you, Your Honor.

14      We believe this is relevant and admissible under 408,

15  which explicitly allows for settlement agreements to be

16  admitted.  It provides a non-exhaustive list of exceptions, one

17  of which is proving an effort to obstruct a criminal

18  investigation or prosecution.

19      We heard from Mr. Vaidyanathan today about Mr. Hogenson

20  raising his concerns with a number of regulatory agencies:  The

21  SEC, the SFO in England, the FRRP, another regulatory body in

22  the U.K., and it's our position that these settlements show a

23  pattern of behavior by Autonomy to essentially silence

24  witnesses who could be witnesses to a criminal investigation

25  related to the false and misleading statements.  And I think

1  even looking at some of the language in the settlement

2  agreement shows, shows that point.

3      And I'm happy to point Your Honor to an example.  But just

4  taking Ms. Prasad's agreement, which by the way had been

5  entered into after Mr. Hogenson had been terminated, and after

6  he had his settlement agreement, in addition to all the

7  confidentiality clauses, it specifically says, if there -- if

8  the individuals, in this case Ms. Prasad, receives a subpoena

9  or a document demand for documents or testimony, Prasad shall

10 immediately notify Autonomy of the receipt of such subpoena or

11 deposition notice or document demand, and shall cooperate in

12 any effort by Autonomy to object or to -- or quash such

13 subpoena or object to or obtain a motion for a protective order

14 related to such deposition notice or document demand.

15     Prasad understands that time is of the essence in

16 responding to such a subpoena or deposition notice or document

17 demand, and any delay in notifying Autonomy of the receipt of

18 such a document shall be severely prejudicial to Autonomy and

19 shall be deemed a material breach of this agreement.

20     So that's just one example from her agreement.  But we

21 think there's a pattern here.  And particularly thinking about

22 the defendant's openings where a large part of

23 Mr. Weingarten's, and I believe also Mr. Lincenberg's openings,

24 was about how Mr. Hogenson was terminated for just cause, we

25 think these agreements in this case are admissible and

1  particularly relevant.

2          **THE COURT:**  Well, I don't want to reach the issue of

3  Mr. Hogenson -- is that his name?  I think that's a different

4  issue.  I think that they certainly did highlight the reasons

5  for the termination, and so forth.

6      And when that becomes -- I mean, I want to deal with

7  further discussion on that.  I don't need to -- I don't feel I

8  need to rule on it, because we're talking about this particular

9  witness.  Can you introduce evidence of the, quote, settlement

10 agreement and amount with respect to this particular witness?

11 And I'm trying to figure out what is the relevance with respect

12 to this.

13     At this point, without hearing any cross about the

14 circumstances of her departure, not a single cross -- and I

15 understand you intend to ask the question, I'm not telling you

16 don't, you intend to ask a question "Were you terminated from

17 Autonomy," and I suppose you'll ask were you given any reasons

18 for it.

19     And then -- okay.  Question, can she ask that?  I assume

20 is that over your objection or not or you don't care or what?

21         **MR. HEBERLIG:**  Well, we move to --

22         **THE COURT:**  Just to that.

23         **MR. HEBERLIG:**  We moved to exclude the terminations.

24 The Court, as I understand it, denied that motion.  But, yes,

25 we do object.  We think it's inappropriate, not proper 404(b),

 1  and the Government's argument is precisely the incorrect

 2  argument you're permitted to make under 408.

 3      They want to say that these settlement agreements were

 4  hush money.  It's preposterous on its face.  Hogenson, Tejeda

 5  Prasad have all cooperated with the Government for years and

 6  have never once spoken to Autonomy.  The idea that those

 7  settlement agreements obstructed a government investigation I

 8  submit is frivolous.

 9          THE COURT:  I think they're called attempted

10  obstructions.  I mean, to put it in the right context, listen,

11  you're not the first company and you have nothing to do with

12  it.  Your client is not the first company to do non-disclosure

13  agreements, and so forth, that say the sorts of things that

14  that said.

15      Okay.  In this case it appears to have been, from what I

16  can -- from what you've just said, ineffective.  I mean, unless

17  of course you've taken some action with respect to recovery of

18  the amount of money that was paid.

19          MR. HEBERLIG:  No.

20          THE COURT:  Or anything along that line like written

21  to her and said that she's in breach of the agreement or

22  anything of that nature.

23      Okay.  Absent all of that, I don't see how it fits 408(b).

24  I just don't know that it fits that way.  I have other concerns

25  about a $750,000 payment.  I think that that -- I think it may

1    be fair -- no, I think I'm not going to say anything until I

2    hear more about it.

3        Okay.  But this is just this case with 50,000.  So if

4    you're asking the question can you -- can you ask her what

5    happened with respect to her employment, I think the answer is

6    yes, that she was terminated.  Can you ask the further

7    question:  Did you enter into a settlement agreement with

8    respect to that matter, and I think she can say yes.  As to any

9    of the terms, no.

10        MR. HEBERLIG:  If she does that, then we have to bring

11   out the settlement agreement, because that will necessarily

12   imply that Autonomy admitted wrongdoing, when in fact the

13   settlement agreement says there is an express reservation of

14   liability, both sides, and we're going to wind up with a mini

15   trial.

16        THE COURT:  You're saying you want the settlement

17   agreement in evidence?

18        MR. HEBERLIG:  Absolutely not.  I want you to preclude

19   them from eliciting that she entered into a settlement

20   agreement.  It's not relevant or probative.

21        THE COURT:  Well, I don't know that you have to say

22   agreement.  It may be that you say did you resolve any claims

23   you had with respect to Autonomy?

24        MR. HEBERLIG:  There were no lawsuits filed, so how

25   are any potential claims relevant?  She was terminated.  The

1    issue is, I suppose the Government will say that --

2         THE COURT:   Okay.  Here is the problem with that.

3    Somebody's fired, right.  Okay.  The presumption is somebody is

4    fired, they did something wrong.  They were fired.  They were

5    fired.  Well, did they fight back?  Did they object to it?  Did

6    they question the validity of their termination?

7         If you don't -- I think actually you're sort of right, in

8    that, if you go down the path, you have to stop it earlier.

9    You can't say whether she was terminated or not.

10        If she was terminated, and if that's relevant, then I

11   think she can say I resolved my claims with respect to -- or

12   the parties resolved their claims, however the words -- however

13   we fashion it.

14        MR. HEBERLIG:   Obviously if that occurs --

15        THE COURT:   Pardon?

16        MR. HEBERLIG:   If that occurs --

17        THE COURT:   Well, I think we have to talk about it.

18        MR. HEBERLIG:   Well, if it does, let me just provide a

19   preview of the mini trial that will ensue.  I will have to

20   examine her about the settlement agreement and the express

21   reservation of liability that both parties had.  I'll have to

22   get into the pittance that Autonomy paid to settle this claim

23   that was tantamount to about a day's worth of work by a legal

24   team.

25        I mean, it's all a sideshow that has nothing to do with

1   the issues the jury is being asked to resolve.

2       I mean, frankly, the termination --

3          **THE COURT:**  Well I wonder, I wonder -- let's start at

4   the beginning.

5       I wonder why it is significant that she was terminated.

6   Let's think about that for a minute.  I think it is significant

7   with whatever his name is.  What is his name?

8          **MR. HEBERLIG:**  Mr. Hogenson.

9          **MR. LEACH:**  Hogenson, Your Honor.

10         **THE COURT:**  Hogenson.  This is what happens, you just

11  forget names.

12      Okay.  Mr. Hogenson.  I think it is significant with

13  respect to him.  I mean, he was much higher up, he had a lot of

14  contact, and a lot has been made of it already in the -- in the

15  statement, so let's just put that to the side.

16         **MR. LEACH:**  Your Honor, if I can inject just a little

17  bit on the record on this point.

18      First of all, the indictment alleges that Dr. Lynch

19  intimidated, pressured, and paid off persons who raised

20  complaints about or openly criticized Autonomy's financial

21  practices.  So this is not 404(b).  We allege hush money in the

22  indictment with respect to these three witnesses.

23      Now, with respect to Ms. Prasad, this becomes very

24  significant when Joel Scott testifies, because he's going to

25  say he asked Sushovan Hussain or Steve Chamberlain, I need to

1    look at the testimony, why was Reena fired?  And he's told

2    because she stuck her head over the parapet.

3         And we think the import of that statement is they were

4    asking too many questions.  They were poking their nose where

5    they were on the right track, and this was an effort to silence

6    them from going to the FSA, from continuing to cooperate with

7    the SFO.  We think it's clearly permitted by 408(b), and it has

8    great resonance with respect to Mr. Hogenson.

9         But the fact that she's fired is critical to sort of --

10   why do you fire Reena Prasad whose only job here is to collect

11   money from Capax?  Why do you do that?  You do that because

12   they're asking too many questions.  That's a reasonable

13   inference based on the record here.

14        And I don't want -- if they want to argue $50,000 is a

15   pittance to somebody, I can't wait for them to make that

16   argument to this jury.  It's clearly probative of an overall

17   scheme to silence people who are asking too many questions at

18   Autonomy.

19        **MR. HEBERLIG:**  Just because it's in the indictment

20   doesn't make it -- I mean, there's all sorts of things in the

21   indictment that are surplusage and not relevant.

22        These people aren't named in the indictment.  There's this

23   vague hush money allegation that my memory is was in the

24   severed count.  I could be wrong about that, but I thought it

25   was in Count 17.  If it's not, regardless --

PROCEEDINGS

1    **MR. LEACH:**  I'm reading from Count --

2    **THE COURT:**  Whoa, whoa, is it in the other counts or

3  not?

4    **MS. GREEN:**  No, it's not.

5    **THE COURT:**  Sorry?

6    **MR. LEACH:**  I am reading from Count One of the

7  indictment, Your Honor.

8    **MR. HEBERLIG:**  But the fact that something is in an

9  indictment as part of a background allegation --

10    **THE COURT:**  Well, but that's notice.  That is an

11  indication of notice.

12    **MR. HEBERLIG:**  Sure.  But they noticed it as 404(b)

13  for a reason, because I'm sure they weren't prepared to rely on

14  that alone.  And then they waived the argument by withdrawing

15  it from their motion, so we were not afforded a full

16  opportunity to brief this issue, and here we are the day before

17  the witness goes on.  I mean, there's -- we haven't had the

18  opportunity to brief 408.  I believe it clearly doesn't apply

19  to this situation.  I believe it's wholly inappropriate to

20  argue hush money from no admit/no deny settlements.  That's not

21  what these are about.  These are nuisance settlements, and

22  there's no evidence whatsoever that they were intended to or

23  had the effect of obstructing any investigation.  That's just

24  government making stuff up.

25    **THE COURT:**  Well, I'm not quite sure it's making it

1    up.  It's in the words of the document itself.

2          **MR. HEBERLIG:**  The words of the document are standard

3    civil settlement.  Every company that settles with an employee

4    includes all sorts of releases and give us notice if you're

5    ever subpoenaed relating --

6          **THE COURT:**  This isn't just noticing, it's telling

7    them to object.  I don't have it in front of me.  Do I have it

8    in front of me?  Is it in the exhibit book or something?

9       Okay.  Well, I think maybe what I have to do is think

10   about it, try that one.  If you want to write something on

11   it --

12         **MR. HEBERLIG:**  Sure.

13         **THE COURT:**  -- you've got the whole evening.

14         **MR. HEBERLIG:**  That's fine.  We will endeavor to do

15   that.

16      And I guess the question, you asked about

17   cross-examination, and sort of what -- you know, the

18   Government's initial position was if we opened the door, then

19   the settlement agreements would come in.  But it would be

20   helpful to understand, you know, what is permissible and what's

21   not on cross.

22         **THE COURT:**  Oh, well, of course, absolutely.  So, I

23   mean, I think before she takes the stand tomorrow, I have to --

24   I have to decide.

25         **MR. HEBERLIG:**  Right.  But, no, what I'm saying is,

**PROCEEDINGS**

1    depending on your ruling, if you keep it out, okay, but say

2    that certain things could open the door, I mean, I can tell you

3    what I'm expecting to do on cross and it might change depending

4    on the Court's ruling.  I don't want to walk into something and

5    then have the Court say, oh, now the door is wide open, because

6    I might decide it's not worth it.  So that's the type of thing

7    that frankly we would have briefed had the Government not

8    withdrawn its request to put these into evidence.

9        But, you know, we can try to put something together

10   tonight.  We did brief the issue, and the Government in

11   response, rather than oppose our motion, said we don't intend

12   to do it.  So, I mean, our position is clear and on the record,

13   you know, I think if there's support for their position that's

14   beyond what's been said in court today, the onus is really on

15   them.

16            **THE COURT:**  Did he say -- I mean, refresh my

17   recollection, did the Government say, no, no, we're not going

18   to go into this?

19            **MR. HEBERLIG:**  Yes, they did.

20            **MR. LEACH:**  We said we did not currently intend to

21   offer the settlements unless they opened the door.  They opened

22   the door wide open in Opening, Your Honor.  Mr. Weingarten

23   stood up and said Hogenson was rightly fired because he was

24   involved in this payroll fraud, and, you know, the accounting

25   allegations had nothing to do with it.

**PROCEEDINGS**

1      We think the door was clearly opened by the Opening.  You

2  know, having looked closer at 408, we see it's a rule of

3  inclusion, not exclusion, there are exceptions.  And we submit

4  this trial is about was this really -- was Hogenson really

5  fired for good cause?  If so, great, the jury will find against

6  us.  We say he was fired because he was asking too many

7  questions, because they knew he was asking too many questions,

8  because they wanted to silence him with the FSA, and it was an

9  effort to obstruct.

10      **THE COURT:**  Well, I think I'm talking about

11  Ms. Prasad, not Mr. Hogenson.

12      **MR. HEBERLIG:**  They didn't flip positions based on the

13  opening.  We got notice they intended to do this the night

14  before the openings.  And their request was we could open the

15  door on cross-examination.  I think that that's a convenient

16  argument.  But their position was clear.  We don't intend to do

17  it unless the door is open on cross.  Arguments are arguments,

18  but we have a witness on the stand.

19      **THE COURT:**  Well, I don't quite subscribe to that,

20  because I think an opening statement, an opening statement is,

21  while it's not evidence, is a pretty big salvo to the jury as

22  to what the case is all about.  And so I know it's not

23  evidence.  I know it's just a form of argument, but it really

24  is ringing a lot of bells.

25      And I sit here, and I'm convinced that at least the

 1    defense takes the position that Mr. Hogenson was terminated

 2    because of his malfeasance or ineffective service as a person.

 3    I think Mr. Weingarten said, well, wouldn't you fire him

 4    anyway?  Look what he did.  It was graphically, it was

 5    graphically argued to the jury, or presented, that Hogenson was

 6    ejected because of ineptitude and a shortage of his

 7    performance, and that's been fought in questions that I've

 8    heard so far in the case.  Do you have any -- the witness, the

 9    first witness said:  I thought he was good, I never knew that

10    he had done anything wrong, so forth and so on.

11         And by the way, that wasn't in your cross-examination.  I

12    mean, you didn't -- I don't think, maybe I can't recall

13    everything, but I think the first cross-examination didn't

14    address that issue.  But maybe Mr. Lincenberg's, I don't know

15    whether it will be you or your colleague, plan to -- you

16    haven't done your cross, so I haven't heard anything about

17    that.

18         **MR. LEACH:**  Your Honor, I think the first

19    cross-examination was trying to suggest that Mr. Hogenson was

20    slow in raising these payroll issues --

21         **THE COURT:**  Yes, that's right.

22         **MR. LEACH:**  -- and trying to pass them off as errors,

23    and this is such egregious misconduct that we have to fire him.

24         **THE COURT:**  That's right.

25         **MR. LEACH:**  We think the evidence already shows and

1    will continue to --

2         THE COURT:  But he is going to be separately

3    addressed, separately addressed.

4         I'm just trying to figure out what to do about this

5    witness, and I haven't made up my mind.  If you want to tell me

6    anything tomorrow morning or tonight, you can file.  I'll read

7    it at 3:00 a.m.  I wake up at 3:00 a.m. to do the Wordle, so I

8    can be the first person on the West Coast to do the Wordle, but

9    I could also read whatever you write.

10         You.  When I say "you," Mr. Weingarten, I mean the large

11    you, the people who are seated behind you.

12         MR. WEINGARTEN:  I understand.

13         THE COURT:  Those people.

14         MS. GREEN:  Your Honor --

15         THE COURT:  Yes.

16         MS. GREEN:  I would like to briefly address the other

17    point that Mr. Heberlig raised.  I understand you're deciding

18    on the settlement agreement issue, but he did also talk about

19    the distress that she suffered after she was terminated.

20         Let me just tell you in one sentence what she was expected

21    to say, so we have the same framework.

22         I did intend to elicit that when she was terminated, she

23    will say that that had a drastic impact on her, that she

24    suffered from severe anxiety and depression at that point, and

25    that since that time she has struggled to hold down a job.  So

 1  that's all she's going to say.  It's going to be about one

 2  minute.

 3          THE COURT:  She's not going to say it on my watch.

 4  Just listen, no, no, no, because that -- then they, you know --

 5          MS. GREEN:  But may I just briefly --

 6          THE COURT:  By the way, I don't doubt that that

 7  happened.  That's not the issue, whether it happened or not,

 8  but it's not probative because it doesn't prove anything.  It

 9  proves her damages.  It proves her damages, but it doesn't

10  prove anything.

11      You know, they're not contesting we didn't terminate her,

12  and they're not contesting that they didn't pay her money, if

13  that becomes an issue.  And, you know, I mean, wow, I mean, it

14  really does -- it really does introduce --

15          MS. GREEN:  I agree.

16          THE COURT:  -- A lot of collateral matters and

17  tremendous sympathy for her at the expense of the defendants.

18          MS. GREEN:  I agree with Your Honor on all those

19  points.

20          THE COURT:  Oh, well, good.

21          MS. GREEN:  The only reason that I believe that

22  this -- and I hear those concerns.  The reason I believe it's

23  particularly relevant in this case is not for those reasons,

24  but because it goes to her credibility, and I want you to think

25  back to Mr. Lincenberg's --

1        **THE COURT:**  How does that go to her credibility?

2        **MS. GREEN:**  I'm going to explain.

3     So Mr. Lincenberg's opening, if you'll recall, he spent a

4  significant amount of time talking about how long ago this

5  conduct was, and he suggests, and I think he even used the word

6  in opening, he made the point and strongly suggests that these

7  individuals have been meeting with the Government extensively

8  since that period of time, and that they have essentially been

9  programmed now by the Government to tell the story --

10       **THE COURT:**  Well, I want to address something on that

11  issue, because I think I don't want to blindside anybody.

12     First of all, it seems to me any party is perfectly free

13  to argue that the passage of time would dim a recollection, you

14  know, and the passage of time has been considerable in this

15  case.

16     Number 2, I think that they can point out that there were

17  multiple meetings with the U.S. Attorney and where there was a

18  discussion of what the testimony would be.  I understand that.

19  Of course they're looking at contemporary emails.  It's not

20  like they created the emails two years ago.

21     What I am concerned about, and I have received no

22  indications that it would be your intention, so I'm not -- I'm

23  not suggesting it would be, but I don't want to hear any

24  argument or suggestion that the delay in bringing this case was

25  occasioned by the Government, and I think the reason is

1    obvious, right?  Right?  Any problem with that?

2        **MR. LINCENBERG:**  No problem with that.

3        **THE COURT:**  Directly or indirectly.

4        **MR. LINCENBERG:**  That's not part of our defense.

5        **THE COURT:**  I wouldn't think so.

6        Okay.  So there's no mention about that.

7        I do think, though, look, I mean, witnesses come here

8    today; why couldn't you comment that maybe they could have come

9    here the day before yesterday or five years ago or four years

10   ago, but that's so much.  I mean, still, people's recollections

11   do fade over time, and I think that's a perfectly proper line

12   of argument with respect to it.

13       **MS. GREEN:**  And the reason her memory hasn't faded is

14   precisely because this was such a drastic event in her life.

15   That was our position.  So it goes to their suggestion that,

16   you know, their story has changed, they've been programmed --

17       **THE COURT:**  They haven't done any of that yet.  They

18   haven't done a bit of cross-examination.  If they do, if they

19   do suggest, well, how, you know, like how can you remember

20   these things?  You know, the passage of time, how can you

21   remember them?  Then of course you can go, well, this was a

22   tremendously traumatic event, and let me tell you what

23   happened, why I was traumatized.  But I don't think they're

24   going to go that way.

25       **MR. LINCENBERG:**  Not with this witness.

1          **THE COURT:**  And not with what I just said.

2          **MR. LINCENBERG:**  Yeah.  Your Honor, one other small

3    point.

4          **MR. REEVES:**  Your Honor, can I please add to the

5    proffer on this very issue about harm to the witnesses, which

6    it will come up in a very different and unusual way, I

7    anticipate, when we get to Mr. Hogenson.

8      We have the opposite problem with Mr. Hogenson than

9    Ms. Prasad, insofar as he, I believe -- well, let me put out

10   there.  He has declined to meet with and prepare for his

11   testimony since approximately 2015.

12     Mr. Hogenson has moved out of the country, and has -- a

13   highly trained professional has decided to effectively withdraw

14   from corporate America and live in Latin America.  I think he's

15   doing fine, but I know that he actively wants to not remember

16   this case, and I think that is in fact probative of a trauma

17   that he endured as a result of this --

18          **THE COURT:**  I don't know --

19          **MR. REEVES:**  I'm not asking to introduce it.

20          **THE COURT:**  Look, I never got my medical agree.  I

21   never -- I have no idea what trauma is.  I see trauma every day

22   in this place.

23     Now, I will tell you that if he becomes an uncooperative

24   witness, a witness who is not forthcoming, as you've described

25   him, I don't care whether it's his trauma, whether, you know,

 1   the defense allegedly caused his trauma or something else

 2   caused his trauma.  I'll let you impeach him.  I'll let you

 3   show him documents.  I'll let you go some distance, I don't

 4   know how far, and it depends on what he says, and it depends on

 5   what he's reluctant to say, and what he does say, and then what

 6   he would say, what I would allow you to say about him.

 7        I don't know.  I don't know.  I said that he's in a

 8   different category, and I still think he is.

 9           MR. REEVES:  Two more details, Your Honor.

10           THE COURT:  Yes.

11           MR. REEVES:  I think it's appropriate for me to say

12   that there were threats of wrongful termination made by

13   Mr. Hogenson against Autonomy, and that is the context in which

14   the settlement was arrived at; and, second, the

15   successor-in-interest --

16           THE COURT:  Well, are we talking about Hogenson,

17   right?  I don't want to talk about Hogenson right now.

18           MR. REEVES:  Okay.

19           THE COURT:  I'm dealing with Prasad.

20           MR. LINCENBERG:  I have a small point with the two

21   witnesses, Prasad and Ganesh.

22        I understand that there's going to be witness schedules,

23   and counsel wants the witness -- this next witness to come out

24   of order, and so forth.  I get it.  We'll try to be flexible.

25   We didn't object on this occasion.

**PROCEEDINGS**

 1    I also don't want the defense to be jammed on this.  You

 2  know, this is something --

 3          **THE COURT:**  She's almost finished.

 4          **MR. LINCENBERG:**  It would have been helpful for us to

 5  hear about this a little earlier.  We have, you know, sometimes

 6  there's different lawyers doing different witnesses and

 7  documents in the room.

 8          **THE COURT:**  I agree with you.

 9          **MR. LINCENBERG:**  And now they're saying this witness

10  is still going, and I have no idea how long the witness is

11  going to go tomorrow.

12          **THE COURT:**  I do.  How long do you have with her?

13          **MS. GREEN:**  It should be --

14          **THE COURT:**  Assuming we don't go into any of the

15  things that we've just discussed.

16          **MS. GREEN:**  I should be able to finish within an hour,

17  so before the --

18          **THE COURT:**  That long?

19          **MR. LINCENBERG:**  Okay.  Well, we're going to probably

20  have an hour.  I don't know what the Lynch team has.

21          **THE COURT:**  Well, I'm sorry if she has a 1:30

22  appointment.  I mean, I'm not going to -- we're going to finish

23  with her.  I don't know what to do about that.  If I have to

24  phone some office or something, I'll do that.

25    But I will start with her at 9:15.  I'll be out here by

 1    9:00 to tell you what I want to do about this issue, and then

 2    just -- and then just conclude with her and do your thing.

 3              **MS. GREEN:**  And we --

 4              **THE COURT:**  I mean, really?  The cross-examination

 5    here of her?

 6              **MR. HEBERLIG:**  Not from me.

 7              **THE COURT:**  I'm just trying to figure out, did he say

 8    anything you disagreed with?

 9              **MR. LINCENBERG:**  We had -- we've already had 45

10    minutes, and we're going to have another hour.  I don't know

11    how long it's going to go.  It may be that we get done with

12    her.  I just don't want to be jammed when something like this

13    happens, that's all.

14              **THE COURT:**  Nobody is going to jam you.  Nobody is

15    going to jam you.  You're going to be unjammed.  Just think of

16    what she said and whether, are you going to prove that she's

17    wrong, that no one told her to go after these accounts

18    receivable?  They said, look, you want the Vatican to pay?

19    Show up.  You know where they are.  Knock on the door.  But I

20    guess the Vatican didn't actually owe any money; is that right?

21    I don't know.  Do you care to comment on that?

22              **MR. HEBERLIG:**  End of the day, I don't believe the

23    deal finished with the Vatican.  MicroTech owed the money.

24              **THE COURT:**  Yeah.  But Vatican had no legal obligation

25    to pay Autonomy.  It was an end user, right?

PROCEEDINGS

1          **MR. LEACH:**  Correct.

2          **THE COURT:**  Okay.  Well, there you go.

3          **MS. GREEN:**  Thank you.

4          **THE COURT:**  Goodnight everybody.

5          **ALL COUNSEL:**  Goodnight Your Honor.

6      (Adjourned at 4:54 p.m.)

7                      --oOo--

8

9                  **CERTIFICATE OF REPORTERS**

10         We certify that the foregoing is a correct transcript

11    from the record of proceedings in the above-entitled matter.

12

13

14    RHONDA AQUILINA, RMR, CRR
      Official Court Reporter
15    CA CSR# 9956

16

17    JENNIFER L. COULTHARD, RMR, CRR
      Official Court Reporter
18    CA CSR#14457

19

20    DATED:  MARCH 20, 2024

21

22

23

24

25