Exhibit B

| From: | Brent Hogenson |
|---|---|
| Sent: | Monday, July 26, 2010 12:16 PM |
| To: | whistle@fsa.gov.uk |
| Subject: | Qualified Disclosure Questions |
| Attachments: | Finance concerns; 2009-10-01 - First Amend to Capax VAR Ahreement.pdf; FW: Lilly; Capax December 2009 Agreement.pdf; FW: Capax; Capax Kraft Q3 2009.pdf; Capax Payment Schedule.xls; RE: Commission Payments; discover whitepaper.pdf; Eli Lilly June 2010 Agreement.pdf; Eli Lilly SMS Meetings.doc; Incident; Kraft December 2009 Agreement.pdf; Letter to Capax Dec 29 2009.pdf |

July 26, 2010

Intelligence Department
The Financial Services Authority
25 The North Colonnade
Canary Wharf
London E14 5HS
011442070669200

Dear FSA Agent,

United States District Court
Northern District of California

**Trial Exhibit 1012**

Case No:  CR 18-0577 CRB
Date Entered: _____
By: _____
Deputy Clerk

**My Background:**
My name is Brent Hogenson and I am the Chief Financial Officer in the Americas for Autonomy Corporation PLC (stock symbol AU), which is traded on the London Stock Exchange.  I became an employee of Autonomy when Autonomy acquired Interwoven Inc. in March 2009 where my role was Vice President of Finance from 2003 through 2009.  Autonomy promoted me to CFO of Americas in mid 2009 and approved the consolidation of the Autonomy finance teams in the Americas at multiple subsidiaries and business units under a finance leadership team that I recommended in April 2010.  I am a Certified Public Accountant in the State of California and spent the early part of my accounting career at Arthur Andersen in the audit division.  I am 49 years old and have been in finance leader roles for the past 20 plus years of my career primarily with companies listed on the NASDAQ stock exchange.  This is the first time in my career that I have sent a potential whistle blowing letter to a regulatory agency.

My only motive for sending this letter to the FSA is to ensure that the Autonomy financial statements provided to investors are materially correct and are not misleading current or potential investors.  Autonomy has treated me very well since the acquisition of Interwoven in March 2009, noted by the following:

1) I have been promoted twice in the past 5 quarters, first to the CFO of Americas and second to the President of Interwoven.
2) My base salary has been significantly increased during an economic period where few employees received an increase to base salary
3) I have received almost 100% of my quarterly bonus for the past 5 quarters in a period where few employees received that high of a percentage of their potential quarterly bonus
4) I have received multiple new stock option grants over the past 5 quarters
5) At the annual sales meeting in January 2010, I was one of a very few (approximately 15 out of all operations/sales employees) that received an award for performance in 2009
6) I have been a significant part of the Interwoven/iManage operations/sales management which performed well in the last 5 quarters and I believe that we also performed well in Q2 2010.  Therefore, my job satisfaction has been quite high.

1

7) I have restricted stock units that vest in June and July 2010, where the approximate value exceeds $150k—a significant value to me.

Prior to June 22, 2010 when I reported my concerns to Mike Lynch, CEO of Autonomy, Autonomy had treated me very well and I had no motive other than to ensure that the Autonomy financial statements provided to investors are materially correct and are not misleading current or potential investors.

**Upfront Disclosure:**
Before proceeding to the questions that I have raised related to our financial statements there is one issue that should be acknowledged. On June 25, 2010, the finance team in Americas working with the Human Resources Department identified a potential fraudulent activity from the Autonomy Inc. team in San Francisco. This team reported into the Corporate Controller in the Americas who reported into the VP of Finance in Cambridge between 2005 through mid 2009 and to me between mid 2009 through today.

Autonomy started an investigation after we received a notice from EDD when a terminated payroll employee applied for unemployment insurance (see attached email titled Incident). This employee applied for unemployment insurance when we terminated her for payroll errors found in our Q2 review initiated when we consolidated the finance functional leaders on the Americas team. I have attached an email titled Termination Approval which documents the payroll errors and has the termination approval on May 26th. The investigation subsequent to June 25, 2010 has identified that four employees of Autonomy, Inc. and the San Francisco finance team, including the Corporate Controller, are potentially involved and that the fraudulent payroll activity has been occurring since 2005 or 2006. The Corporate Controller has been placed on leave until the investigation is complete.

I would acknowledge that this fraudulent activity has occurred for many years including a short period while I have been CFO of Americas and that it was also found due to actions taken at my recommendation to consolidate the Americas finance teams. I would also like to be very clear that I had no knowledge of this fraudulent activity prior to June 25, 2010 and specifically when I reported my concerns to Mike Lynch on June 22, 2010.

**Introduction to the Questions:**
We consolidated the Autonomy finance team in the Americas from all subsidiaries and business units under functional finance leaders during the second quarter of 2010. As part of this effort, I asked these functional finance leaders to review all financial accounts, account reconciliations and significant transactions across all subsidiaries and business units in the Americas as I wanted to ensure that there were no material issues within the Americas.

During this Q2 internal review, the functional finance leaders, who report to me in the Americas, identified a few questions and I have provided additional detail below and in the attachments to this email. On June 22, 2010, I reported these questions to Mike Lynch, the CEO of Autonomy, and requested a meeting with the Audit Committee. There were numerous telephone discussions and exchanges of emails over the following few days. However, I did not have confidence that my questions would get to the Audit Committee in a complete form. On June 26, 2010, I sent my questions directly to Deloitte, Autonomy Auditors, and sent a copy of the email to Mike Lynch. Also on July 7, 2010, Percy Tejeda, the Director of Revenue in the America, who brought many of the questions below to my attention during this Q2 internal review, documented his concerns from our review in an email to me, which I have attached to this email named Percy Finance Concerns.

On July 22, 2010, Autonomy released first half 2010 financial statements in a press release and had an earnings call with analysts and investors. Between June 26, 2010 and July 22, 2010 I had numerous email exchanges with Autonomy management and the Senior Member of the Autonomy Audit Committee. However, neither the Audit Committee nor Deloitte have contacted me prior to July 26, 2010 or any member of the functional finance

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008340
Exh 1012-0002

leaders in the Americas to further understand the questions detailed below.  On July 26, 2010, I had a conference call with members of the Audit Committee and the COO of Autonomy.  On this call I was asked if I had any further questions to those previously provided and then told that none of my questions were serious in nature.  I expressed that I was uncomfortable and not confident about the company's procedures and concerned by the nature and lack of response to my questions and that it appeared that my questions were closed by Autonomy without a serious review or even discussion with me.  Therefore I am sending my questions below and the attached documents directly to the FSA.

**Questions:**
**#1) Is revenue properly recognized on reseller transactions where there may be no End User and the Autonomy sales team subsequently completes an agreement directly with the End User?**

Below are two examples of a reseller transaction where in both examples Capax is the reseller.

**Example One:**
In Q4 2009, reseller Capax gave Autonomy an order for $6,286K for Eli Lilly (attached to this email named Capax December 2009 Agreement), of which license revenue recognized in Q4 2009 was $5,987K.  The $6,286K was due for payment from Capax on March 31, 2010.  As part of our normal collection calls, the collection team contacted Capax in early June, 2010 to confirm the payment date.  The collection team had a difficult time getting a response from Capax and, as this was a large amount, asked me to call the reseller.  The Director of Credit and Collections in the Americas and I called John Baicco, the Managing Partner at Capax, to follow up on the payment date.  John asked me if I had discussed the agreement with two members of the Autonomy senior management team.  I told him that I would but continued to request payment information.  He then told me that the Eli Lilly deal had not closed in Q4 2009 and that he would not be able to make payment until the Eli Lilly deal closed and he had received payment from Eli Lilly.

In June 2010, Eli Lilly executed a License Agreement directly with Autonomy (attached to this email named Eli Lilly June 2010 Agreement) for a total value of $5,567K and license value of $5,303K.  The transaction executed by Autonomy directly with Eli Lilly was $719K less than the reseller transaction recognized as revenue in Q4 2009.

In reviewing the SMS customer notes (SMS tracks all Autonomy sales meeting activity) related to Eli Lilly during the period of Q4 2009 through Q2 2010, I discovered that, following the revenue recognition in Q4 2009, there were still many pending steps in the sales process requiring the Autonomy sales team to complete in order to close the transaction with Eli Lilly.  There was no mentioning of any steps or sales process to be performed by Capax in the SMS notes.  I have attached screen shots of meeting notes from SMS during this period to this email named Eli Lilly SMS Meetings.

The Autonomy Revenue Policy requires that the license fees be fixed and determinable prior to recognizing revenue.  IFRS IAS – 18 section 14 (c) states "the amount of revenue can be measured reliably."   Based on Autonomy's Revenue Policy and IFRS guideline, I believe that the agreement with the reseller, Capax, could potentially be viewed as a consignment.  The Autonomy Revenue policy is written very similarly to the requirements under SOP 97-2 and in previous quarter earnings release presentations during 2009 where Autonomy reported the quarterly results there was a footnote on a slide that approximately stated – where IFRS is silent as to revenue recognition Autonomy follows the requirements of SOP 97-2 (I am not sure of the exact wording but believe that this is close and should be able to be confirmed by reviewing the four quarterly earnings presentations provided during the 2009 earnings calls).  Also see Question 6 below.

Do the items listed below call into question if the Capax (Eli Lilly) Agreement that was recognized as revenue in Q4 2009 was fixed and determinable under the Autonomy Revenue Policy and could be measured reliably under IFRS?

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008341
Exh 1012-0003

1) The payment from Capax is more than 90 days past the due date on their agreement and the Managing Partner stated that they would not pay Autonomy without payment from Eli Lilly.
2) The Autonomy contract with Eli Lilly in June 2010 grants Autonomy right to designate the payee and Autonomy agrees that payment to designated payee releases Eli Lilly of the payment obligation. Autonomy might have designated payment under our Eli Lilly agreement to Capax and have Capax pay Autonomy.  I have attached an email from Cambridge finance named Cambridge Inv Instructions, which instructs the Americas finance team to create pro forma invoices and send them to Capax for them to send to Eli Lilly.
3) Autonomy completed the agreement in June 2010 and closed the deal directly with Eli Lilly, not through a contract between Capax and Eli Lilly
4) The Autonomy sales channel was significantly involved in the ongoing sales effort without any mentioning of Capax's involvement in the SMS notes subsequent to recognizing revenue in Q4 2009.
5) The contractual terms between Autonomy and Eli Lilly have a contingency clause where acceptance testing is required against some of the licensed software; however, the contingency clause was not included in the Capax agreement.
6) The contractual terms between Autonomy and Eli Lilly have added significant warranty provisions that were not included in the Capax agreement.
7) The contractual terms between Autonomy and Eli Lilly have added a change in the maintenance service period for products subject to acceptance testing that was not included in the Capax agreement.
8) Autonomy does not have the right to invoice Eli Lilly for products subject to acceptance testing until acceptance testing is complete


**Example Two:**
In Q3 2009 Capax signed an order with Autonomy (attached to this email named Capax Kraft Q3 2009) where the End User was identified as Kraft and Autonomy recognized a $4M license fee as revenue in Q3 2009.  In December 2009, Kraft executed a License Agreement directly with Autonomy (attached to this email named Kraft December 2009 Agreement) with a license fee of $4M.  In a letter from the Autonomy COO of Americas to Capax on December 29, 2010 (attached to this email named Letter to Capax Dec 29 2009), Autonomy agreed to remove the payment obligation due from Capax related to the signed Kraft order in Q3 2009 and pay Capax a one time fee of $400K in exchange of Capax not to collect or attempt to collect from Kraft (even though Capax never had an agreement with Kraft or an obligation from Kraft to pay Capax).  Based on the above information, should Autonomy recognize the Capax revenue in Q3 2009?

**Additional Information:**
There are many significant payments due from resellers in the Americas on our accounts receivable aging reports that remain unpaid and significantly beyond the invoice due date.  These invoices may be considered uncollectable but are not yet reserved for as of June 22, 2010.  However, Autonomy stated in its 2009 Annual Report and the presentations to investors during the earnings calls that its bad debt is only less than 1% of its revenues.  There have been discussions between legal and finance in the Americas with many of these resellers where it has been noted that many of these invoices remain past due as a result of no end user agreement.  I have attached a spreadsheet named Problem Accounts where the notes under the Updates column were made by the Americas collection team.   Also, note the amount past due from Microlink in Question #3 below.

Commission payments to sales reps are generally not accrued or paid when the reseller agreement is recognized as revenue but rather if and when the end user transaction is complete.

There are multiple similar reseller transactions to these two examples which have been recognized as revenue from 2008 through Q1 2010, many of which range between $1M and $11M per transaction.  To ensure you have complete information, I attached to this email the past nine quarterly revenue spreadsheets dating back to

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008342
Exh 1012-0004

Q1 2008-named QX 20XX Closed Deals. These spreadsheets were prepared by the Corporate Controller of Autonomy, Inc, Zantaz, Etalk and Verity (Subsidiaries or Business Units) working out of the San Francisco Autonomy office. I have reviewed these spreadsheets and highlighted in yellow potentially similar transactions to the two examples above of reseller transaction, which are primarily transactions where the Sales Rep is only identified as MGMT. If the terms of the reseller agreements are not final or Autonomy has significant work remaining to close the deal with the end user, the cumulative effect of the potential reseller transactions without an end user agreement may be material to the Autonomy Financial Statements between 2008 and Q1 2010.

**#2) When Autonomy contractually agrees to potentially overpay a reseller for services performed, does the potential overpayment impact current license revenue transactions with the same reseller where the payment of the license transaction is due from the reseller in future periods that may be similar in timing to the potential overpayment by Autonomy to the reseller for services?**

I have attached the following documents to this email:
1) 2009-10-01 First Amend to Capax Var Agreement
2) Problem Accounts – filter the Bill To column to Capax Global and review the future payment terms along with the comments in the Updates column.
3) Capax Payment Schedule – details payments due to and due from Capax
4) Capax Increase payment by 125K – Autonomy agrees to increase monthly payments to Capax for EDD by $225K and Support by $125K

In considering the answer to this question, note that the 2009-10-01 First Amend to Capax Var Agreement allows Capax to invoice Autonomy customers for the maintenance fees in current and future annual periods. Capax will pay Autonomy 15% of the maintenance fees collected from Autonomy customers supported by Capax and keep 85% of the maintenance fees collected. The historical profit margin achieved by Autonomy on maintenance revenue is approximately 85%, but in this amendment we are providing Capax with a revenue stream into the future of 85% of the collected maintenance fees. If you filter the Bill To column in the attached Problem Accounts spreadsheet to Capax Global and review the outstanding invoices with significantly extended payment terms and the associated comments from the collection team in the Updates column, you may note that it is possible that Autonomy has provided 85% of the collected maintenance fee to Capax to cover the future payments due from Capax where there may not be an end user agreement.

**#3) Is there a financial statement impact from the potential related party relationships identified below on recorded revenue transactions?**

The following information is from the attached spreadsheet labeled Q4 2009 Closed Deals prepared by the Corporate Controller of Autonomy, Inc.

| Inv Date | Reseller – End User | Sales Rep | Lic Revenue |
|----------|---------------------|-----------|-------------|
| 31-Dec | Microlink – (1) | MGMT | 2,000,000 |
| 30-Dec | MicroTech LLC – (1) | MGMT | 9,523,810 |
| 31-Dec | MicroTech LLC – Amazon | MGMT | 131,418 |
| 31-Dec | MicroTech LLC - Avaya | MGMT | 360,000 |
| 31-Dec | MicroTech LLC - Honeywell | MGMT | 1,800,000 |
| 31-Dec | MicroTech LLC - KPMG | MGMT | 153,000 |
| 31-Dec | MicroTech LLC – Manu Life | MGMT | 1,080,000 |
| 31-Dec | MicroTech LLC – MS | MGMT | 4,656,000 |

(1) The end user on these transactions is Discover Technologies. See related parties section of this question below.

5

Per the attached email named Commission Payments on Reseller Deals, there was no commission accrued on these deals in Q4 2009 when Autonomy recognized revenue in the Q4 financial statements.

In Q1 2010 we invoiced the following (detail from the Problem Accounts spreadsheet attached to this email):

| Inv Date | Revenue Summary | Sales Rep | Inv Amount |
|----------|-----------------|-----------|------------|
| 31-Mar   | Microtech LLC – Vatican | Blank | 11,550,000 |
| 31-Mar   | Discover Technologies – Citi | Blank | 4,394,250 |

I have been told by the finance team in San Francisco that transactions without a sales rep identified are transactions where the end user has not completed the agreement by the end of the quarter in which Autonomy recognizes revenue. The end user identified above may be a placeholder for an agreement to be negotiated subsequent to the invoice date. Per the attached spreadsheet Q1 2010 Closed Deals, Autonomy may have closed the deals with Manulife and Morgan Stanley in Q1 2010 as they are removed from the spreadsheet with negative numbers at the bottom of tab IDOL-K2-UltraSeek. There are many other transactions on the quarterly closed deals spreadsheets to these resellers that have been closed on the last day of a quarter where the Sales Rep is MGMT throughout 2008 and Q1 2010.

**Related Party Data:**

In February 2010, Autonomy acquired Microlink for $55M. At the time of the acquisition, Autonomy had approximately $16M of outstanding accounts receivable with due dates as follows:

| Due Date | Amount | |
|----------|--------|--|
| March 31, 2009 | 6,875,000 | 10 months past due |
| June 30, 2009 | 4,576,200 | 7 months past due |
| Sept 18, 2009 | 203,250 | 4 months past due |
| Sept 30, 2009 | 2,008,238 | 4 months past due |
| Feb 14, 2010 | 2,300,000 | (1) |
| Total | 15,962,688 | |

(1) The February 14th invoice above is an invoice to Discovery Technologies, which had license revenue of $2,000,000 and maintenance of $300,000 for a total of $2,300,000.

In the attached email named Q210 Sales Commission Accrual you will find the following statement and a list of transactions related to Microlink from 2007 through 2009 where there has been no commission accrual. Note the comment below from the email written by a Sales Operations employee at Autonomy Inc. in San Francisco which states "Microlink not expecting the deals to close." There are a large number of deals identified in this email following the statement below:

- Below is a list of past Microlink deals. No accrual has been reflected for these deals on the accrual worksheet. I believe these will be written off. Also, I listed the Microlink deals that are no longer being tracked for commission purposes due to Microlink not expecting the deals to close.

Microlink's Address is as follows:
8330 Boone Blvd
Suite 300
Vienna, VA 22182
Phone: 703-556-4440

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

MicroTech's Address is as follows:
8330 Boone Blvd
Suite 600
Vienna, VA 22182
Phone: 703-691-1073

Discover Technologies has a very limited website.  There is a whitepaper titled Automation Speeds the Ability to Collaborate and Turbo-Charges the Enterprise Search User Experience.  The bottom of the pages of this whitepaper (attached to this email named Discover Whitepaper) has the following information:
www.DiscoverTechnologies.com | 703-556-4400 | info@microlinkllc.com

Is it possible that the Microlink acquisition in Q1 2010 was partially done to provide a vehicle to 1) remove the $16M in outstanding invoices where a large percent were significantly past due and where there may not be an End User to pay Microlink; and 2) potentially provide a cash balance to pay invoices on reseller agreements with potential related parties (MicroTech and Discovery Technologies) where there may not be an end user.

**#4) Have the barter transactions below been reviewed for the economic benefit and fair value on both sides of the transactions to ensure that they are properly recorded in our financial statements?**

Autonomy made the following purchases of software from FileTek, Inc.:
| | |
|---|---|
| December 31, 2009 | 10,367,280 |
| May 11, 2010 | 11,518,214 |

Autonomy sold the following license and maintenance revenue to FileTek as follows:
| | |
|---|---|
| December 31, 2009 | 8,480,000 IDOL Product |
| March 31, 2010 | 9,010,000 500 users Liquid Office plus some OEM product |

In a barter transaction, my understanding is that IFRS is not substantially different from GAAP and requires validation of the fair value and economic benefit on both sides of the transaction.  My information is limited; however, I have asked Sean Sullivan, Liquid Office Sales VP, for a low and high range of a liquid office transaction with 500 to 1000 users.  The range that he gave me was $300,000 to $1,000,000, which is only a part of the March 31, 2010 transaction and does not include the OEM product, which is difficult for me to find fair value.

**#5) Does the revenue accrued and included in the Q1 2010 financial statements related to maintenance renewals reflect the potentially possible renewals from customers who have not yet agreed to renew expired maintenance agreements?**

In Q1 2010 a combined Autonomy, Inc, Etalk, Zantaz and Verity business units recorded a revenue accrual of $6,591K related to an estimate of customers renewing their maintenance contracts where the service period had lapsed prior to March 31, 2010.  In our Q2 internal review as part of consolidating the Americas finance team, it was noted that this revenue accrual calculation assumed a significant percentage (almost 100%) of the maintenance renewals that were up to 12 months beyond the end of their last service period and these business units recorded the revenue for the lapsed service period in the Q1 financial statements.  In our Q2 internal review, we recalculated the potential renewal revenue associated with these accounts using reasonable renewal percentages based upon the length of time from the end of the last maintenance service period and noted that the Q1 2010 revenue accrual was potentially overstated by $4.8M.  All judgment accounts including accruals and reserves are specifically the responsibility of the finance team at the Autonomy head office in Cambridge.

**FOIA CONFIDENTIAL TREATMENT REQUESTED**                                    HP-SEC-00008345
Exh 1012-0007

**#6) Is it possible that a regular user of the market may be mislead by the following statements within the information either known or provided to analysts and investors by Autonomy in the Annual Report and/or the web presentation along with the quarterly earnings calls in 2009?**

1) Autonomy is a publicly traded company listed on the London Stock Exchange and would generally follow IFRS and IAS 18 as it applies to revenue recognition.
2) In the Autonomy earnings release presentations to analysts and investors during 2009 there was a footnote on a slide that approximately stated – where IFRS is silent as to revenue recognition Autonomy follows the requirements of GAAP or SOP 97-2 (I am not sure of the exact wording but believe that this is close and should be able to be confirmed by reviewing the four quarterly earnings presentations provided during the 2009 earnings calls).   This has been noticed and discussed between multiple members of the finance teams in both the Americas and Cambridge.
3) The Autonomy Revenue Policy from the 2009 annual report includes the following:
   a. Revenues from software license agreements are recognized where there is **persuasive evidence of an agreement** with a customer (contract and/or binding purchase order), **delivery of the software has taken place**, **collectability is probable** and the **fee** has been contractually agreed and is not subject to adjustment or refund (i.e. **is fixed and determinable**).
   b. Paragraph 8 of SOP 97-2 is as follows:
   "revenue should be recognized when all of the following criteria are met.
   • **Persuasive evidence of an arrangement** exists.
   • **Delivery has occurred**.
   • The vendor's **fee is fixed or determinable**.
   • **Collectability is probable**."
   I have highlighted the words or phrases that are the same or similar between a. and b. above.

Is it possible that the items above provide a false or misleading impression as to if Autonomy follows SOP 97-2 for revenue recognition, to a regular user of the London Stock Exchange when buying or selling Autonomy stock?

**<u>Finally:</u>**
The purpose of this letter to the FSA is to provide assistance in ensuring that the Autonomy financial statements provided to investors are materially correct and are not misleading current or potential investors.  I am concerned that Autonomy will deflect the focus on the six questions above by focusing attention on the item identified in the Upfront Disclosure section.  I agree that the Upfront Disclosure section is important; however, I also believe that it is important to address the six questions asked above.

Not all of the attachments identified in this email will fit in the size requirements of one email.  Therefore, I will send additional emails with the attachments that are not sent with this email.

Please confirm the receipt of these emails by return email.  I will be available at your request to answer any questions.

Regards,

**Brent Hogenson**
**President Autonomy Interwoven**
**CFO Autonomy Americas**
**Tel: 408.953.7058**
**Mobile: 408.718.1376**
**E-mail: brent.hogenson@autonomy.com**

8

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

| From: | Percy Tejeda |
|---|---|
| Sent: | Wednesday, July 07, 2010 7:20 PM |
| To: | Brent Hogenson |
| Cc: | Percy Tejeda |
| Subject: | Finance concerns |

Hi Brent,

I wanted to follow up with you regarding certain items that I noted during the review process related to the reorganization of the Americas finance organization (effective late April 2010).  As we have discussed during the periodic meetings we have had throughout May and June 2010 related to this review process, I have been reviewing the processes and calculations performed by the revenue teams of Autonomy Inc (San Francisco), Zantaz (Pleasanton) and e-Talk (Dallas).  This review was to make sure I understood the current policies and procedures in place for each unit, so as to further my understanding of the applicable revenue cycles.  During this review, I noted 4 areas of concerns that I raised to you during these meetings, which I felt warranted further scrutiny.  Can you provide me with an update on the status of these areas of concerns?   Specifically, I want to make sure that these concerns have been heard at the appropriate level of Autonomy, to ensure that the accounting for the transactions described below is correct or, if it is not, that appropriate accounting adjustments are made.  The following is a summary of these concerns and some  background as well.

Concern 1  - Eli Lilly/Capax resale license order

In May 2010, as part of my increased responsibility regarding Autonomy Americas revenue contracts, I was sent by Livius Guiao (Autonomy Corporate Counsel), a draft of a license agreement between Autonomy, Inc. and Eli Lilly that was currently being negotiated.  I reviewed the contract and identified certain clauses in such contract that I believed would affect the revenue recognition of the transaction, as currently drafted.  I sent the draft contract and my revenue recognition concerns – i.e. extended warranty and product acceptance—to Steve Chamberlain for his input and guidance, as this was one of the first transactions that I was reviewing for non-Interwoven business.  Steve responded back to me that I needed a bit of background on this deal and followed-up with a phone call, telling me that the license revenue associated with the Eli Lilly license transaction had already been recognized in Q4 2009 (in the amount of $6.0 million in license revenue), and that he would send me the contract from Q4 2009 (between Autonomy and Capax) – which he did.  He then stated that he noted that there would be a shortfall in license revenue between the license transaction with Capax in Q4 2009 and the contract currently being negotiated between Autonomy and Eli Lilly – and that Matt Stephan (Autonomy Finance Manager) should raise such shortfall to Sushovan Hussain.

I raised this to your attention, since I had concerns regarding the timing of revenue recognition associated with the Q4 2009 transaction, and whether this was indicative of a practice of Autonomy (and could there be more).

In mid June 2010, I was notified that the license agreement between Autonomy and Eli Lilly did close, and such contract included the acceptance language for one of the products and specific warranty for another.  During the week of June 21, I received various e-mails from Steve instructing me to reach out to Livius in Autonomy Legal to determine how a discount included in the Autonomy / Eli Lilly contract should be allocated between the fees for the product subject to acceptance and the rest of the fees.  Once such determination was done by Livius, Steve asked me to then create a proforma invoice for the fees that would not be subject to acceptance and send such proforma invoice to Capax, so that they could then send an invoice on their paper to Eli Lilly, to get paid and then, presumably, to pay Autonomy on the invoices due from the Q4 2009 license transaction.  I responded back to Steve that I was not comfortable with doing that.  He then proceeded to call me at least 4 times and walked me through on the phone what needed to be done.  I did not create such proforma invoice nor contact Capax.  Instead, I forwarded to you the e-mails I had received from Steve related to the Q4 2009 transaction, as well as the instructions he had sent me.

On June 25, the Order Entry team reached out to me regarding the system status of the Autonomy/Eli Lilly contract signed in June, as the order had been entered as a new order.  I sent a note to Steve to provide guidance and he responded back stating that Autonomy should not be billing this order and then asked Joel Scott (COO of Autonomy Americas) whether Autonomy should ship the software to Eli Lilly.  Joel responded on June 28 that delivery to Eli Lilly should occur.  During the week of June 28, Mark Langowski (VP Operations of Autonomy) stated that the June order in the system could not stay as "contingent" in the Autonomy order entry system and needed to be moved forward.  He directed the Order Entry team to process the order.  I believe I sent you these e-mails as well.

The Autonomy / Eli Lilly order from June 2010 was not billed by Autonomy and my understanding is that license revenue on such June 2010 contract was not recognized.

Concern 2 – Quarter-end Maintenance Revenue Accrual

1

HP-SEC-00008392
Exh 1012-0009

As part of our review process associated with the reorganization of the Americas Finance organization, I requested copies of the Q1 2010 revenue schedules submitted to Corporate for the Autonomy, Inc., Zantaz and e-Talk groups, as well as the related supporting calculations.  In reviewing the maintenance revenue schedules, I identified that a large portion of the quarterly maintenance revenue booked  by Autonomy, Inc./Verity, Zantaz and e-Talk had historically been booked by posting a journal entry at the end of the quarter, to accrue maintenance revenue for maintenance contracts that had not yet been renewed but that were likely to renew.  Since the dollar amount of such journal entries were significant when compared to the total quarterly maintenance revenue (approx. 25% - 50%), I raised this to your attention.

To better understand the support for these journal entries, I reviewed and discussed (in May 2010) the calculation and the source reports used in such calculations with the accounting staff that booked such entries.  I identified the following:

-   Autonomy, Inc. – Such calculation was done by Cynthia Watkins at the end of Q1.  She used a "configurations" report out of Oracle that would identify the support contracts that were showing as "Active" in the system.  She would then calculate the applicable maintenance revenue associated for the period from the last expiration date through the quarter-end date, and use such report to support her journal entry.  She referred to such journal entry amount as a standing journal entry and that the amount was somewhat fixed and the report was just used to support such amount.  I asked her if she consulted with the Autonomy Renewals team in determining the likelihood of the renewals and whether the "configurations" report was accurate.  She mentioned that she did not consult with the Renewals team.  When she walked me through the report, we noticed that for the March report, the report included a line item for a renewal for Eli Lilly, which had approximately $1.5 million of back maintenance revenue associated with it.  Cynthia stated that the line item was an error, as Eli Lilly had done a deal in Q3 2009, that no longer made the maintenance renewal opportunity for Eli Lilly valid – and could be viewed as a potential error.  Based on that observation, I inquired with the Autonomy Renewals team to understand the "configurations" report in more detail (as this one potential error could signal that there were more potential errors in such source report) and Emily Raynal, Autonomy Renewals specialist, stated that such report could have potentially erroneous data, as a renewal that had been declined would need to be updated manually within the system to show as "declined" but that this practice of correcting the status within Oracle may not consistently happen.  She also mentioned that she was not usually consulted by Cynthia when such accrual calculation was done.

-   E-Talk – Such calculation was done by Courtney Linxwiler, Controller of e-Talk.  During my conversation with her, she walked me through her process, which included making an assessment (with consultation with the e-Talk Renewals and Collection teams) of the risk associated with non-renewal.  The assessments were "low", "moderate" and "high" and Autonomy's policy was to accrue for the maintenance revenue associated with the renewal opportunities that had been assessed as "low" and "moderate".  She mentioned that Autonomy have always been aggressive with such assessment and that for the March accrual 2010, she originally had submitted an revenue accrual amount of approximately $1.5M and was directed to review the calculation again to find more revenue, at which time she stated that she changed the assessment for certain accounts from "high" to "moderate", which resulted in a revised revenue accrual amount of approximately $1.7 million.  In addition, when I reviewed the supporting schedule used in the calculation, I noted various renewal opportunity line items that dated back more than 1 year from the March 31, 2010 date, and asked Courtney why the team felt that such items were likely to renew.  She said that once in a while, a renewal for a contract with an expiration date that is more than 1 year old would come in, so they left such items in the report.
-   Zantaz -  This calculation was performed by Ying Liu, Controller of Zantaz.  During my conversation with her, she walked me through her process and we walked through the report that she used to make such calculation.  She mentioned that she received the schedule from a financial analyst and then calculated the amount associated with any non-current contracts for the respective last expiration date until the applicable quarter-end.  I asked her whether she consulted with the Renewals team to determine probability of renewal and she said no.  I asked her if she verified the accuracy of the report and she said no.  I discussed such report with Melissa  Buhagiar, Autonomy Renewals specialist, and asked her whether such report was used by her to identify renewal opportunities and she stated that such report may not be accurate and may not be reflecting an accurate renewal status, given that such report is created and updated manually.  I requested that Melissa do a quick review of the March 31, 2010 report and identify any potential errors in such report.  The items identified by Melissa accumulated to a potential difference in maintenance revenue of approximately $500K.


Concern 3 – Age of Invoices and Bad Debt Provisions

As part of the review process related to the Finance reorganization, Reena Prasad and I requested copies of the March 31, 2010 accounts receivable aging reports and bad debt reserve detail.  Upon reviewing such detail, it was noted that many invoices were significantly past due and that a specific provision for such invoices had not been assigned to them.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008393
Exh 1012-0010

Reena, as part of her review process, would look into such specific accounts and determine why such delinquent invoices had not been reserved for. I had not heard an update on this but this was concerning when I reviewed the aging reports and specific reserve items.

Concern 4 – Capax EAS support outsourcing arrangement

At the end of December 2009, Phil Smolek, Financial Analyst for Zantaz, left Autonomy and one of the duties that he did was assigned to my team (at the direction of Jim Crumbacher, Autonomy Associate General Counsel) as he needed someone to do the calculations.

As part of an arrangement that was entered into by Autonomy in October 2009, Autonomy agreed to outsource the support obligations for certain Autonomy EAS product customers to Capax, at a cost of 85% of the renewal value to be paid to Capax. Phil provided the workbook supporting his calculations and walked myself and Maureen Lara through the calculation. From December 2009 – March 2010, Maureen would do the calculation and identify the amount per the calculation. Commencing in January 2010, Jim Crumbacher would direct Maureen and me (or forward directions from Andy Kanter, COO of Autonomy) to add an additional monthly amount of $125,000 to the calculated amount needed to be paid to Capax. The explanation given to us at the time was that the expected outsourcing for EAS support was not going as originally projected. Such amount would be added to the PO request and such request was sent to Andy Kanter and Sushovan Hussain, CFO of Autonomy, and both approved each month's PO amount.

In February 2010, Jim requested a schedule of payments from Finance, which would show the amount of payments made by Autonomy to Capax under the EAS support outsourcing arrangement, as well as for EDD processing activities. Since Maureen nor I were involved in calculating the amounts for the EDD processing activities, we requested such amounts from Jane Allen, Zantaz Finance. In putting together the initial schedule, there were certain round amounts included in the EDD processing payment (including a $500,000 payment in December). When I asked Jim about this, he said just to list it as "EDD Services". In the schedule, such payments under both  arrangements were then compared against payments made by Capax for a transaction where Capax was to pay approximately $12,450,000 to Autonomy. Such schedule then resulted in a net amount.  We prepared the initial schedule in March 2010, and were requested to update such schedule on an as-requested basis.

In May 2010, when I first was made aware of the Capax / Eli Lilly arrangement from Q4 2009 (as detailed in Concern 1 above), I started to have concerns regarding the nature of the payments made to Capax (as Capax had been the reseller involved in the Q4 2009 Eli Lilly order) under the EAS outsourcing and EDD processing arrangements (many of which did not have supporting calculations, to the best of my knowledge), and, in the schedule template provided by Jim, such payments were netted against payments due/made by Capax under a payment schedule.   I raised these concerns to you as there appeared to be the potential that such arrangements could be tied to each other.

Please advise if you have updates on these concerns I raised.

Kind regards,

**Percy Tejeda**
Director of Revenue
Autonomy Interwoven
Tel: 408.953.7157
Mobile: 916.420.0995

E-mail: percy.tejeda@autonomy.com
Visit www.autonomy.com

3

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

This document produced in native file format only

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008347
Exh 1012-0012

**From:**            Percy Tejeda
**Sent:**            Monday, June 28, 2010 3:03 PM
**To:**              Brent Hogenson
**Subject:**       FW: Capax

---

**From:** James Crumbacher [mailto:jamesc@autonomy.com]
**Sent:** Friday, February 12, 2010 10:18 AM
**To:** Percy Tejeda
**Subject:** FW: Capax

Percy, we need to get the amount of the PO issued to Capax for the EAS support increased by $125K per month, per Andy Kanter and Stouffer below.  Can you please be sure that happens?

**Jim Crumbacher**
Associate General Counsel
Autonomy, Inc.
One Market
Spear Tower, 19th Floor
San Francisco, CA 94105
Phone: (415) 625-1447
Mobile: (415) 439-9434
Email: jamesc@autonomy.com

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

---

**From:** Andrew Kanter [mailto:andrewk@autonomy.com]
**Sent:** Friday, February 12, 2010 3:31 AM
**To:** 'James Crumbacher'
**Cc:** 'Stouffer Egan'
**Subject:** RE: Capax

There's an increase in the outsourced EDD by $225k and support by $125k.  Can you do an updated PO for each?  This is for Jan and Feb.

---

**From:** James Crumbacher [mailto:jamesc@autonomy.com]
**Sent:** 11 February 2010 20:23
**To:** 'James Crumbacher'; 'Andrew Kanter'
**Subject:** RE: Capax

Hi, Andy,  Stouffer just stopped in and said you have some information for me on this.  Can you let me know what I can do to assist in raising the PO for the EDD work?  Thanks.

**Jim Crumbacher**
Associate General Counsel
Autonomy, Inc.
One Market
Spear Tower, 19th Floor
San Francisco, CA 94105
Phone: (415) 625-1447

1

HP-SEC-00008367
Exh 1012-0013

Mobile: (415) 439-9434
Email: jamesc@autonomy.com

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

**From:** James Crumbacher [mailto:jamesc@autonomy.com]
**Sent:** Tuesday, February 09, 2010 11:17 AM
**To:** 'Andrew Kanter'
**Subject:** RE: Capax

Hi, Andy,

Following up on this matter.  What can I do to help move the EDD processing piece of this along?  Let me know, as John B. Capax is calling.  Thanks.

**Jim Crumbacher**
Associate General Counsel
Autonomy, Inc.
One Market
Spear Tower, 19th Floor
San Francisco, CA 94105
Phone: (415) 625-1447
Mobile: (415) 439-9434
Email: jamesc@autonomy.com

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

**From:** James Crumbacher [mailto:jamesc@autonomy.com]
**Sent:** Thursday, February 04, 2010 2:48 PM
**To:** 'Andrew Kanter'
**Subject:** Capax

Andy,

I talked with Stouffer, and we're not lagging on paying Capax for EDD...it seems we're lagging in actually sending them EDD work we said we'd send.  There's apparently a certain amount of work (dollar value) that we intend to send their way...Stouffer says you have those numbers.  If you can get me the applicable numbers, I'll work with the Boston team to get work farmed out to Capax in those amounts (that way, we can raise a PO against that work and get them paid).  Please let me know how much EDD work we intend to send Capax's way.

On EAS, my understanding from Finance is that they've submitted PO requests for the EAS support, and are working on finalizing the terms of a new support order to take into account additional "subcontracted" customers.

**Jim Crumbacher**
Associate General Counsel
Autonomy, Inc.
One Market
Spear Tower, 19th Floor
San Francisco, CA 94105
Phone: (415) 625-1447
Mobile: (415) 439-9434
Email: jamesc@autonomy.com

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008368
Exh 1012-0014



# Automation Speeds the Ability to Collaborate and

# Turbo-Charges the Enterprise Search User Experience

Malcolm Hyson

Discover Technologies

CTO



**FOIA CONFIDENTIAL TREATMENT REQUESTED**



**Automating Expertise, Profiles, and Ability to Collaborate
Turbo-Charges the Enterprise Search User Experience**

## Contents

Introduction ........................................................................................................3

Introducing DISCOVERPOINT – A MOSS-based Search and Collaboration Tool.......4

The Discover Technologies Extensible Search Framework ........................................

Automation Speeds the Ability to Collaborate ......................................................5

Enterprise Social Networking Enhances Organizational Collaboration....................5

Next Steps ...........................................................................................................6

About Discover Technologies.................................. **Error! Bookmark not defined.**

About the Author ..................................................................................................8

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008381
Exh 1012-0016



**Automating Expertise, Profiles, and Ability to Collaborate
Turbo-Charges the Enterprise Search User Experience**

## Introduction

Enterprise search platforms continue gaining acceptance within corporate environments. The ability to leverage a single application to search an increasing number of information sources and content types is spearheading successful deployment of enterprise search technologies.  However, an ever increasing pool of information has diluted the user's ability to quickly find relevant information. Moreover, as more types of content are introduced into an enterprise (blogs, wikis, tweets), retrieval and rendering of these results become increasingly more complex, has caused productivity losses and a decreasing enterprise search system return on investment (ROI).

With content being constantly created and updated, knowledge workers must have a way to automatically select the right pieces of content and share information across the enterprise. In other words, they must possess the right enterprise search and collaboration tool. This tool must be designed to automatically locate, categorize and deliver relevant content to the user.

www.DiscoverTechnologies.com | 703-556-4400 | info@microlinkllc.com

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008382
Exh 1012-0017



**Automating Expertise, Profiles, and Ability to Collaborate Turbo-Charges the Enterprise Search User Experience**

**The Discover Technologies Extensible Search Framework**

Discover Technologies developed its Extensible Search Framework (VXSF framework) with extensibility in mind from the beginning and for easy integration with the MOSS search center architecture. VXSF allows organizations to deliver the enhanced capabilities of enterprise search in conjunction with an internal collaboration platform without changing the current MOSS user search experience.

Discover Technologies' architecture, based on the .NET framework, supports the use of any enterprise search engine. While it's not unusual to spend significant portions of a corporate IT budget to design, implement, and deploy an enterprise search, the creation of the end user experience is sometimes overlooked. However, if you don't deliver a usable and compelling UX, organizations soon come to the realization that users view the system as not meeting their needs, and may even abandon their usage.

That problem is solved with our framework. No code is required to add custom fields, configure the front end UX modify the result display, both the format and what is presented to the user.

## Introducing DiscoverPoint – A MOSS-based Search and Collaboration Tool

Discover Technologies' DiscoverPoint offers the best of enterprise search, collaboration and corporate networking by bringing the user the power of all three components into the familiarity of Microsoft's SharePoint. DiscoverPoint is the linchpin for leveraging these technologies and simplifying information discovery.

With these powerful traits, DiscoverPoint significantly reduces the amount of time knowledge workers spend searching for critical information and related subject matter experts they require for effective collaboration. Aside from these benefits, DiscoverPoint makes enterprise search proactive.

It easily and automatically propels to new levels of utilization the most important and best content in an organization; that is, the people themselves, whose minds author, store and maintain valuable data.

Plus, the perennial problems that disparate information poses are eliminated. With DiscoverPoint, silo organizations working on the same project at the same time and not knowing it are a thing of the past.  Even in small matters, DiscoverPoint deals with pockets of the proverbial "failures to communicate" within companies and does away with them.

www.DiscoverTechnologies.com | 703-556-4400 | info@microlinkllc.com

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008383
Exh 1012-0018



**Automating Expertise, Profiles, and Ability to Collaborate**

**Turbo-Charges the Enterprise Search User Experience**

## Automation Speeds the Ability to Collaborate

As a knowledge worker completes more searches, he or she builds search tracks. These tracks help other knowledge workers find each other through related searches and form the basis for knowledge workers to build their community of experts. Those communities are further built on the content they have created, and group memberships. Building a community of interest gives the knowledge worker instant accessibility to others within the organization with similar search tracks and speeds their ability to collaborate.



However, not all search engines have this ability. Moreover, for those that do, they don't have the ability to automate this process. Automation is key to the success of any organization that relies on accurate, synthesized, and approved information. A high level of automation can keep you abreast of the latest information without having to reconstruct the search. Put another way, the knowledge worker becomes proactive, rather than reactive and can immediately begin the analysis needed on data, instead of wasting more time searching.

## Enterprise Social Computing Enhances Organizational Collaboration

Businesses have started embracing the benefits of social networking. As social networking popularity grows, Discover Technologies believes Enterprise 2.0 will become a standard way employees conduct business. For the company with workers scattered around the globe all working on a similar projects, the ability to use their SharePoint portal similar to Facebook elevates the portal to a crucial level of business process and designed to create a highly efficient user

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008384
Exh 1012-0019



**Automating Expertise, Profiles, and Ability to Collaborate Turbo-Charges the Enterprise Search User Experience**

experience. Thus, knowledge workers can more easily and quickly find data they need and use SharePoint to collaborate with internal experts.

Functions include:

- Automatically pushes information based on previous searches and documents viewed
- Easily form groups or communities that are related to their particular interest.
- Create posts and status updates from within SharePoint.
- Recommend experts or members from the knowledge worker's community



OCS integration along with Expert results. Also shown is the ability to immediately see an Expert's recent documents or posts to evaluate their ability to provide assistance with your particular issue.

## Next Steps

Even organizations investing in a centralized document management system are finding that the popularity of SharePoint and other portals create additional places where users may store documents. The key reason for portals' success is their ease of use and they provide users with a common interface. Unfortunately, as more content gets added to these sites, your original document management solution becomes less and less relevant. In an ideal situation knowledge workers can use the organizational search engine that has indexed content across all data stores throughout an organization, all within the corporate portal. Consequently, an enterprise search system of this caliber saves the knowledge worker valuable

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008385
Exh 1012-0020



**Automating Expertise, Profiles, and Ability to Collaborate
Turbo-Charges the Enterprise Search User Experience**

time and effort since the information is displayed in one location using a common interface.

Therefore, as an initial step toward achieving optimal search and collaboration, company management must ask questions like:

- "How do different people within my company find each other when they need information on the same subject?"
- "How much time are they spending conducting searches?"
- And more importantly, "How many items of importance are not found because my knowledge workers aren't searching for them?"



Discover Technologies Enterprise Networking brings a new era of collaboration to the organization. In addition to posting and commenting, you can be notified when one of your colleagues has added new content to the system. This is another way AIS provides proactive searching to bring your knowledge workers the information they need.

Discover Technologies is available to help answer your questions and can provide the right choice for resolving search and collaboration issues. There are several reasons Discover Technologies is the best selection. Its development team has unparalleled experience with search and collaboration, hence considerably reducing risk for companies. The company's expertise, reputation, and credibility in the collaboration and search market are well documented with successful completion of multiple SharePoint platform customer projects and continue to exploit new and innovative search concepts and their integration into the enterprise. In the area of platform expertise, a team of unrivaled technical professionals has developed and continues to enhance Discover Technologies' software suite. These professionals use supported best practices from an enterprise search perspective and Microsoft development practices.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008386
Exh 1012-0021



## About the Author

Malcolm Hyson is Chief Technology Officer at Discover Technologies. He is responsible for development and implementation of feature rich, dynamically-searchable software products. With more than 16 years experience, he has successfully planned, coordinated and managed large-scale information technology projects and programs. Mr. Hyson's work with global integrators has given him tremendous insights and perspectives helping him to earn the respect of his colleagues and information technology executives. Mr. Hyson received a B.S. in Computer Science from George Mason University.

www.DiscoverTechnologies.com  |  703-556-4400  | info@microlinkllc.com

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008387
Exh 1012-0022

PURCHASE ORDER   Exhibit "B" from AUTONOMY VALUE ADDED RESELLER AGREEMENT ("Agreement")

September 30, 2009 ("Effective Date")

| From : | Capax Discovery, LLC ("VAR") |
|---|---|
| | 1955 Wehrle Drive, Williamsville, NY 14231-0490 |

| To: | Autonomy, Inc. |
|---|---|
| | One Market |
| | Spear Tower, 19th Floor |
| | San Francisco, CA 94105 |

This Purchase Order is issued under and pursuant to a Value Added Reseller Agreement dated June 30, 2009, entered into between Autonomy and VAR ("the Agreement").

The terms set forth below to the extent they contradict the Agreement shall supersede the Agreement provided Autonomy has signed this Purchase Order accepting it. All other terms and conditions contained in the Agreement shall remain in full force and effect.

1.  Software : **Licensor Archiving Solution, comprised of the following proprietary software products:**

   a.  Digital Safe

   b.  Digital Safe Retention-Deletion

   c.  Digital Safe Audit Center Software

   d.  Digital Safe Storebuffer

   e.  Digital Safe Universal Access

   f.  Digital Safe Deduplication

   g.  Digital Safe Connector

   h.  Aungate Legal Hold

   i.  Autonomy IDOL Server Connectors:
      • All connectors made generally and commercially available by Licensor as of the Schedule Effective Date

   j.  Aungate Real-Time Policy Management (RTPM)

2.  Languages : English

3.  Platform : Windows

4.  Number of Copies : One each of (1) above

5.  Number of Instances : One each of (1) above per Server below

6.  Number of Servers : Kraft may install and use the Software in (1) above on a unlimited number of Servers for production and non-production use, all owned or leased and controlled by Kraft

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008388
Exh 1012-0023

7.  Authorized Use : Kraft shall use the Software in connection with archiving, searching, indexing, and culling documents, data, and communications generated by up to 55,200 internal Kraft Users, and for no other purpose. Kraft may use the Digital Safe Audit Center Software referenced in Section 1(b) above in connection with exporting a maximum of 20GB of internal Kraft data per month.

8.  Territory of Software Installation : Australia, Germany, and United States of America. Additional territories for installation subject to the parties' mutual written agreement.

9.  Kraft Technical Support Contacts : Name: _____
Phone: _____
E-mail: _____

Name: _____
Phone: _____
E-mail: _____

10. License Fee : $4,000,000.00 US Dollars, invoiced immediately

11. Maintenance Fee (first year) : 5% of License Fee per annum for Support Services, first year to be invoiced immediately and thereafter invoiced annually in advance of each anniversary of the License Commencement Date. Notwithstanding anything in the Agreement to the contrary, Licensor shall not increase the Maintenance Fee due hereunder for the first three (3) years of Support Services.

12. License and Maintenance Fee Payment Terms : 60 days from receipt of invoice

13. Delivery Address : Shipped EXWorks point of manufacture (per Incoterms 2000) via electronic delivery, such as via FTP transfer.

14. License Commencement date : On Schedule Effective Date

15. License Expiry Date : The Licensed Software is licensed for a perpetual term from the License Commencement Date, subject to termination pursuant to Agreement.

16. Software Escrow : Upon Kraft's request and at Kraft's sole cost and expense, Licensor agrees to place the source code for the Software in Licensor's standard third party source code escrow, for release if Licensor enters into bankruptcy proceedings or ceases to operate its business as a going concern, and then for the sole use to support Kraft's and/or a Kraft Entity's use of the Software as permitted in this Schedule and under the Agreement.

VAR signature

Name          John BAROCCO

Title         Managing Director

Date:         9/30/09

Order Accepted by Autonomy

Date          9/30/09

FOIA CONFIDENTIAL TREATMENT REQUESTED

Mozilla Firefox

File   Edit   View   History   Bookmarks   Tools   Help

https://intranetuk.autonomy.com/intranet/leads4/reports/sales_stats.aspx

Most Visited   Getting Started   Latest Headlines

EIP   |   https://intra...es_stats.aspx ×   |   Autonomy's Board of Direc... ×   |   HR US   ×   |   What is Cur

| | | | | | | |
|---|---|---|---|---|---|---|
| 114740 | Lockheed Martin | autonomy | | | 5/10/2010 | Entered by Jeffc: Rina is still waiting on a "date" to engage will request an amendment over the weekend and present week. |
| 1418919 | Altria Client Services | autonomy | toni | 5/14/2010 | | Entered by Jeffc: Will send more Red/Blue books. They are archiving solution (to replace EV) and EC4/Legal Hold. significant deal in Q3/Q4. |
| 1459012 | Lockheed Martin | autonomy zantaz | Roman.Kreslavsky | 5/17/2010 | | Entered by Roman.Kreslavsky: Conflict of schedule, Ba rescheduling the meeting to an earlier tim |
| 1459012 | Lockheed Martin | autonomy zantaz | Roman.Kreslavsky | 5/17/2010 | | Entered by Jeffc: need to send additional content and sche We'd to continue the discussion and move this t |
| 114740 | Lockheed Martin | autonomy | | | 5/17/2010 | Entered by Jeffc: We will put the amendment together aft custoemr forum in NY on the 8th. |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 5/18/2010 | Entered by Jeffc: Good meeting with many lilly team mem was one of 6 meetings throughout the 2 days for the blue |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 5/18/2010 | Entered by Jeffc: Good meeting with many lilly team mem was one of 6 meetings throughout the 2 days for the blue |
| 1348888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 5/18/2010 | Entered by Jeffc: Good meeting with many lilly team mem was one of 6 meetings throughout the 2 days for the blue |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 5/19/2010 | Entered by Jeffc: Good meeting with many lilly team mem was one of 6 meetings throughout the 2 days for the blue |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 5/19/2010 | Entered by Jeffc: Good meeting with many lilly team mem was one of 6 meetings throughout the 2 days for the blue |
| 1348888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 5/19/2010 | Entered by Jeffc: Good meeting with many lilly team mem was one of 6 meetings throughout the 2 days for the blue |
| 1333354 | Colgate Palmolive | autonomy cardiff zantaz | natalie | | 5/26/2010 | Entered by Jeffc: This is a good deal and we should hav Working with hosting group to get technical discussion a between their remote sites (globally), but this shoul |
| 1425811 | Hall, Render, Killian, Heath & Lyman, P.C. | autonomy zantaz | | | 6/1/2010 | Entered by Jeffc: good meeting. they have litigation proces outsource yet, they will be looking at that later in |
| 84882 | Simon Property Group, Inc. | | juliam | 6/2/2010 | | Entered by Jeffc: good meeting, but not going to happen down-selected to the final 2 and they will engage a boardro of this month/early July. |
| 1348888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 6/2/2010 | Entered by Jeffc: should be signing hte agreement on Mond be complete on Monday. |
| 1333354 | Colgate Palmolive | autonomy cardiff zantaz | natalie | | 6/3/2010 | Entered by Jeffc: good meeting, follow up meeting o discuss/outline POC for this project to mvoe forward |

Done

M

FOIA CONFIDENTIAL TREATMENT REQUESTED



| 1333354 | Colgate Palmolive | autonomy cardiff zantaz | natalie | | 5/26/2010 | Entered by Jeffc: This is a good deal and we Working with hosting group to get technical c between their remote sites (globally), but |
| 1425811 | Hall, Render, Killian, Heath & Lyman, P.C. | autonomy zantaz | | | 6/1/2010 | Entered by Jeffc: good meeting, they have litiga outsource yet, they will be looking at |
| 94882 | Simon Property Group, Inc. | | juliam | 6/2/2010 | | Entered by Jeffc: good meeting, but not going down-selected to the final 2 and they will engac of this month/early J |
| 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 6/2/2010 | Entered by Jeffc: should be signing hte agreem be complete on Mon |
| 1333354 | Colgate Palmolive | autonomy cardiff zantaz | natalie | | 6/3/2010 | Entered by Jeffc: good meeting, follow up discuss/outline POC for this project to m |
| 1442751 | Time Warner | etalk | MartaL | | 6/3/2010 | Entered by Jeffc: they are going forward with an new opportunity there till later in the year whe solution for the Enterprise (not) |
| 1333354 | Colgate Palmolive | autonomy cardiff zantaz | natalie | | 6/7/2010 | Entered by Jeffc: good meeting with follow-up ne through the poc requiremen |
| 114740 | Lockheed Martin | autonomy | | | 6/8/2010 | Entered by Jeffc: discussed pricing and probat have some solution challenges they're holding them resolve. |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 6/8/2010 | Entered by Jeffc: good meeting, they are very c with us and then we'll move i |
| 1428132 | Huron Consulting Group Inc. 6th Failover | autonomy | Autumng | | 6/8/2010 | Entered by Jeffc: good meeting and chris was v get some tech involvement to move them to software. |
| 1333354 | Colgate Palmolive | autonomy cardiff zantaz | natalie | | 6/8/2010 | Entered by Jeffc: good meeting and we're mc announced intent to buy CA RM, which car |
| 1461688 | Bristol Myers Squibb | autonomy | Rochelle.Lao | 6/10/2010 | | Entered by Rochelle.Lao: BMS can't meet to Thursday. Rescheduled for Thur |
| 1461688 | Bristol Myers Squibb | autonomy | Rochelle.Lao | 6/17/2010 | | |
| 54 (revised 44) | | | | | 10 | 39 | 1 (missing) |

This revised meeting count is the sum of non-cancelled face-to-face customer meetings minus incompletes c

Mozilla Firefox

File   Edit   View   History   Bookmarks   Tools   Help

autonomy.com   https://intranetuk.autonomy.com/intranet/leads4/reports/sales_stats.aspx

Most Visited      Getting Started      Latest Headlines

EIP        |  https://intra...es_stats.aspx ×  | Autonomy's Board of Direc... |  HR US        ×

| 1350601 | UBS | | | | 1/12/2010 | Entered by Jeffc: trying to get an understandin process and why AUTN is perceived a 'dis |
| 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 1/13/2010 | Entered by Jeffc: Very good meeting throughо different team members), but all very positive Autonomy hosting of th |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 1/13/2010 | Entered by Jeffc: Good meeting with Blane. He is Goodfellow said we would have these this pa immediately following the Digital Safe project (a |
| 1425811 | Hall, Render, Killian, Heath & Lyman, P.C. | autonomy zantaz | | | 1/13/2010 | Entered by Jeffc: good meeting with Karin. their forward that may require our help in the next |
| 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 1/14/2010 | Entered by Jeffc: good meeting with Becky. she bi of year (Mike Harrington is gone and LouCarrol \ reports to the CFO, no |
| 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | 1/14/2010 | | Entered by Jeffc: Very good meeting throughо different team members), but all very positive Autonomy hosting of th |
| 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | 1/14/2010 | | Entered by Jeffc: Very good meeting throughо different team members), but all very positive Autonomy hosting of the archive. mostly focused with me and Jim Burtofl |
| 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | 1/14/2010 | | Entered by Jeffc: Very good meeting throughо different team members), but all very positive Autonomy hosting of the archive. mostly focused with me and Jim Burtofl |
| 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | 1/14/2010 | | Entered by Jeffc: Very good meeting throughо different team members), but all very positive Autonomy hosting of the archive. mostly focused with me and Jim Burtofl |
| 1428132 | Huron Consulting Group Inc. 6th Failover | autonomy | Autumng | | 1/19/2010 | Entered by Jeffc: Chris noted that he would be at at the show in Ne |
| 1325113 | Lockheed Martin - Electronic Document Discovery | aungate | katyae | | 1/19/2010 | Entered by Jeffc: This meeting is rescheduled fo will be present and best we all get together to |
| 1347267 | Capital One | autonomy | | | 1/20/2010 | Entered by Jeffc: Brutal meeting but in the end, w Brown were with me). Lots of work to do to ge committed to Recommind for Search (including L with ECA. |

Done

Mozilla Firefox

File   Edit   View   History   Bookmarks   Tools   Help

https://intranetuk.autonomy.com/intranet/leads4/reports/sales_stats.aspx

Most Visited    Getting Started    Latest Headlines

| EIP | https://intra...es_stats.aspx × | Autonomy's Board of Direc... × | HR US | What |
|---|---|---|---|---|

| 1333354 | Colgate Palmolive | cardiff zantaz | natalie | 2/1/2010 | | manager and records manager bits. They have a RM project i... to call them in the next week or so. |
| 1443149 | Kelley Drye & Warren Records | autonomy | Rochelle.Lao | 2/3/2010 | | Entered by jeromej; WORKSHEET NOTES: Legal outsourcer... No real business applies. Follow up meeting is not... management/manage |
| 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 2/9/2010 | Entered by Jeffc: Good meeting wiht the DS team in Pleasar... team noted they were very impressed with our thoroughnes... vision. |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 2/9/2010 | Entered by Jeffc: Good meetings with team and I expect htey... is a viable option for htem ... then it becomes a business... |
| 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 2/10/2010 | Entered by Jeffc: Good meetings with team and I expect htey... is a viable option for htem ... then it becomes a business... |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 2/10/2010 | Entered by Jeffc: Good meetings with team and I expect htey... is a viable option for htem ... then it becomes a business... |
| 1401485 | Zimmer Holdings, Inc. | autonomy | Ioni | 2/11/2010 | | Entered by Jeffc: Had to cancel this meeting due to Lilly mee... Fran and Vegas. Working on rescheduling but no communi... note sent cancelling. |
| 1444615 | Ernst & Young | autonomy | eugeneq | 2/16/2010 | | Entered by Jeffc: They needed to reschedule so all 3 coul... |
| 1375971 | UBS | aungate zantaz | | | 2/17/2010 | Entered by Jeffc: visited wiht Peter over dinner. "officially/ "unofficially" told me they chose to move forward with PSS... agreement wiht them. They are becomming frustrated that th... that continues, they will dump them and cal... |
| 1331919 | Time Warner Inc. | autonomy | | | 2/18/2010 | Entered by Jeffc: continue working with Peter/Lorina over th... AUTN's position on shared services and our offerin... |
| 1331919 | Time Warner Inc. | autonomy | | | 2/18/2010 | Entered by Jeffc: provided red book and will work with Lorina... archiving and governance within the clo... |
| 114981 | Freescale Semiconductor, Inc. | autonomy | | | 2/19/2010 | Entered by Jeffc: Sent over Optimost content for htem to read... an Optimost-focused meeting moving for... |
| 98192 | Treacright | | | | 2/19/2010 | Entered by Jeffc: good meeting, they are doing some work for... want me to present to them in early Ap... |
| 114740 | Lockheed Martin | autonomy | | | 2/22/2010 | Entered by Jeffc: working with Aero to get them happy wiht wh... IDOL from Alta Vista |
| 1444615 | Ernst & Young | autonomy | eugeneq | 2/23/2010 | | Entered by Jeffc: rescheduled for mid-week this week, will wo... rescheduled. |
| 1313187 | Avalon Consulting | | | | 2/23/2010 | Entered by Jeffc: follow up wiht Joe in 2 weeks to schedule tir... in dc. |

Done

Mozilla Firefox

File   Edit   View   History   Bookmarks   Tools   Help

https://intranetuk.autonomy.com/intranet/leads4/reports/sales_stats.aspx

Most Visited   Getting Started   Latest Headlines

EIP | https://intra...es_stats.aspx × | Autonomy's Board of Direc... × | HR US

| | 114981 | Freescale Semiconductor, Inc. | autonomy | | | 3/15/2010 | Entered by Jeffc: Good meeting, I thi... who |
| | 1345888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 3/15/2010 | Entered by Jeffc: requested by Li... |
| | 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 3/15/2010 | Entered by Jeffc: requested by Li... |
| | 1442751 | Time Warner | etalk | MartaL | 3/17/2010 | | Entered by Jeffc: good meeting with Lor... the works and we're goi... |
| | 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 3/18/2010 | Entered by Jeffc: deal is moving forward well. I think we... |
| | 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 3/18/2010 | Entered by Jeffc: good meeting with lo... foward with the... |
| | 1446212 | LR Capstone | autonomy cardiff | KathrynB | 3/23/2010 | | Entered by Jeffc: They have a need, b... Technologies to do what they need wit... forward with them to see if the... |
| | 65 (revised 52) | | | | 15 | 37 | 0 |

The revised meeting count is the sum of non-cancelled face-to-face customer meetings r...



| | Proposals Breakdown | |
| --- | --- | --- |
| | LeadId | Company |
| | 1441118 | City of Arlington, TX |
| | 1375971 | UBS |
| | 100376 | Alcon Research |
| | 71307 | Alcon Labratories |
| | 94882 | Simon Property Group, Inc. |
| | 1346888 | Eli Lilly~Digital Safe Transition from EAS |
| | 1428918 | Eli Lilly~Legal Hold Opportunity |
| | 114740 | Lockheed Martin |
| | 1426463 | Pierpont Communications, Inc. |
| | 114981 | Freescale Semiconductor, Inc. |
| | 1333354 | Colgate Palmolive |

Done

This document produced in native file format only

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008369
Exh 1012-0030

**EXHIBIT B**

**PURCHASE ORDER   Exhibit "B" from AUTONOMY VALUE ADDED RESELLER AGREEMENT ("Agreement")**

December 31, 2009

| From : | Capax Discovery, LLC ("VAR")<br>1955 Wehrle Drive, Williamsville, NY 14231-0490 |
|--------|---|

| To: | Autonomy, Inc.<br>One Market<br>Spear Tower, 19th Floor<br>San Francisco, CA 94105 |
|-----|---|

This Purchase Order is issued under and pursuant to a Value Added Reseller Agreement dated June 30, 2009, entered into between Autonomy and VAR ("the Agreement").

The terms set forth below to the extent they contradict the Agreement shall supersede the Agreement provided Autonomy has signed this Purchase Order accepting it. All other terms and conditions contained in the Agreement shall remain in full force and effect.

| | | | |
|---|---|---|---|
| 1. | End User | : | Eli Lilly and Company |
| 2. | Software | : | Licensor Archiving Solution, comprised of the following proprietary software products: |
| | | |     a.   Digital Safe |
| | | |     b.   Digital Safe Retention-Deletion |
| | | |     c.   Digital Safe Audit Center Software |
| | | |     d.   Aungate Legal Hold (Notification, Preservation & Collection) |
| | | |     e.   Aungate Real-Time Policy Management (RTPM) |
| 3. | Languages | : | English |
| 4. | Platform | : | Windows |
| 5. | Number of Instances | : | One each of (1) above per server below |
| 6. | Number of Servers | : | End User may install and use the Software on an unlimited number of Servers for production and non-production use, all owned or leased and controlled by End User. |
| 7. | Authorized Use | : | End User shall use the Software in connection with archiving, searching, indexing, preserving and collecting documents generated by up to 50,000 internal End User Users, and for no other purposes. |
| 8. | Territory of Software Installation | : | United States |
| 9. | Licensee Technical Support Contacts | : | Name:  _____<br>Phone:  _____<br>E-mail:  _____ |

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

Name: _____
Phone: _____
E-mail: _____

10. License Fee                          :   $5,986,827.00 US Dollars, invoiced immediately

11. Maintenance Fee (first year)         :   $299,342.00 US Dollars, invoiced immediately

12. License Fee and Maintenance          :   90 days from receipt of invoice
    Fee Payment Terms

13. Delivery Address                     :   Shipped ExWorks point of manufacture (per Incoterms 2000) via electronic
                                             delivery, such as FTP transfer.

14. License Commencement Date            :   On Schedule Effective Date

15. License Expiry Date                  :   None, subject to termination pursuant to Agreement.

VAR signature

Name        John Barocco

Title       PArTner

Date:       12/31/09

Order Accepted by Autonomy

Date        12/31/09

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

## Licensing Schedule

**This Licensing Schedule ("Schedule")** is executed as of this December 18, 2009 (**"Schedule Effective Date"**) by and between **Autonomy, Inc., ("Licensor")** and **Kraft Foods Global, Inc. ("Kraft")**. This Schedule is issued under and subject to the terms and conditions of the Master License Agreement by and between Licensor and Kraft dated December 10, 2007 (the **"Agreement"**). Capitalized terms not otherwise defined in this Schedule shall have the meanings given them in the Agreement. Licensor represents that it is a "Licensor Affiliate" of Interwoven, Inc., as such term is defined under the Agreement.

### PRODUCTS OR SERVICES

Subject to payment in full of the fees hereunder and subject to the terms and conditions of the Agreement and of this Schedule, the following software (the "<u>Software</u>") shall be licensed for use by Kraft:

1. Software : **Licensor Archiving Solution, comprised of the following proprietary software products:**

   a.   Digital Safe

   b.   Digital Safe Retention-Deletion

   c.   Digital Safe Audit Center Software

   d.   Digital Safe Storebuffer

   e.   Digital Safe Universal Access

   f.   Digital Safe Deduplication

   g.   Digital Safe Connector

   h.   Aungate Legal Hold

   i.   Autonomy IDOL Server Connectors:
   - All connectors made generally and commercially available by Licensor as of the Schedule Effective Date

   j.   Aungate Real-Time Policy Management (RTPM)

2. Languages : English

3. Platform : Windows

4. Number of Copies : One each of (1) above

5. Number of Instances : One each of (1) above per Server below

6. Number of Servers : Kraft may install and use the Software in (1) above on a unlimited number of Servers for production and non-production use, all owned or leased and controlled by Kraft

7. Authorized Use : Kraft shall use the Software in connection with archiving, searching, indexing, and culling documents, data, and communications generated by up to 55,200 internal actively-archiving Kraft Users (as defined by the active directory list to be provided by Kraft from time to time but no less frequently daily), and for no other purpose. Kraft may use the Digital Safe Audit Center Software referenced in Section 1(b) above in connection with exporting a maximum of 20GB of internal Kraft data per month.

Licensing Schedule - Page 1 of 6

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

8. Territory of Software installation : Australia, Germany, and United States of America. Additional territories for installation subject to the parties' mutual written agreement.

9. Kraft Technical Support Contacts :
   Name: _____
   Phone: _____
   E-mail: _____

   Name: _____
   Phone: _____
   E-mail: _____

10. License Fee : $4,000,000.00 US Dollars, invoiced immediately and payable as follows:

    - US $3,500,000.00 shall be payable net 30 days from the date of invoice
    - US $500,000.00 shall be payable net 120 days from the date of invoice

11. Maintenance Fee (first year) : 5.0% of License Fee per annum for Support Services, first year to be invoiced immediately and thereafter invoiced annually in advance of each anniversary of the License Commencement Date. Notwithstanding anything in the Agreement to the contrary, Licensor shall not increase the Maintenance Fee due hereunder for the first three (3) years of Support Services.

12. License and Maintenance Fee Payment Terms : Licensee Fee payable as provided in Section 10 above. Maintenance Fees are net 60 days from receipt of invoice. Fees may be paid to Licensor or its designated payee.

13. Delivery Address : Shipped EXWorks point of manufacture (per Incoterms 2000) via electronic delivery, such as via FTP transfer.

14. License Commencement date : On Schedule Effective Date

15. License Expiry Date : The Licensed Software is licensed for a perpetual term from the License Commencement Date, subject to termination pursuant to Agreement.

16. Software Escrow : Upon Kraft's request and at Kraft's sole cost and expense, Licensor agrees to place the source code for the Software in Licensor's standard third party source code escrow, for release if Licensor enters into bankruptcy proceedings or ceases to operate its business as a going concern, and then for the sole use to support Kraft's and/or a Kraft Entity's use of the Software as permitted in this Schedule and under the Agreement.

17. Additional Users : Provided Kraft is not otherwise in breach of its respective obligations hereunder, for a period of Twenty-Four (24) months from the Schedule Effective Date:

    (a) Kraft may license the Digital Audit Center Software referenced in Item 1 above for use in connection with exporting Kraft data in excess of the amount of data authorized pursuant to Section 7 above, in increments of 10TB per each such additional license, such to payment of an additional license fee in an amount equal to Fifty Thousand United States Dollars (US $50,000.00) per additional license , plus an amount equal to 5% of such additional license fee for the first year of Maintenance Services in connection therewith, and subject to the parties' mutual execution of an amendment or Licensing Schedule reflecting same.

    (b) Kraft may license the Software in Item 1 above for use by Kraft in connection with Users in excess of the 55,200 internal Kraft Users

Licensing Schedule - Page 2 of 6

FOIA CONFIDENTIAL TREATMENT REQUESTED

otherwise authorized pursuant to Item 7 above, in increments not less than 1,000 additional Users, subject to payment of the Discounted Additional License Fee as set forth in the table below, plus an amount equal to 5% of such Discounted Additional License Fee for the first year of Maintenance Services in connection therewith, and subject to the parties' mutual execution of an amendment or Licensing Schedule reflecting same.

| Number of Users Added | Discounted Additional License Fee |
|---|---|
| 1,000 – 4,999 Additional Users | US $100.00 per Additional User |
| 5,000 – 9,999 Additional Users | US $95.00 per Additional User |
| 10,000 + Additional Users | US $88.00 per Additional User |

Maintenance and Support:  Notwithstanding anything in the Agreement to the contrary, Licensor shall provide maintenance and support services for the Software in Section 1 above in accordance with Licensor's standard terms of maintenance and support attached hereto as Exhibit LS-1 ("Support Services").  The initial effective date of Support Services is the License Commencement Date.  All support matters must be logged into and initiated through the Licensor electronic helpdesk system by Kraft. Licensor will not be liable for any failures or delays arising as a result of Kraft's failure to properly log tickets, nor shall any support provided outside of the system be a waiver of these terms.

**This Licensing Schedule shall be null and void and of no effect unless signed and returned by Kraft to Licensor on or before December 18, 2009.**

This Licensing Schedule is executed by Licensor and Kraft, effective as of the Schedule Effective Date.

Autonomy, Inc.

By: _christopher Egan_

Title: _CEO_

Date: _12-18-09_

Kraft Foods Global, Inc.:

By: _Lisa Ward_

Title: _Sr. Buyer_

Date: _12/22/09_

Licensing Schedule - Page 3 of 6

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008374
Exh 1012-0035

**Exhibit LS-1**
**Maintenance and Support**

For all licensees who purchase support services, Licensor provides support in English in the form of Error Corrections, Software Updates, and Telephone Hotline Support ("Support Services") to up to two (2) designated technical contacts. The term of Support Services shall be for one (1) year terms commencing from the Commencement Date, as renewed annually thereafter. Support Services will automatically be renewed for additional one (1) year periods on the Commencement Date unless Kraft notifies Licensor in writing of its desire not to renew Support Services at least thirty (30) days prior to the end of the existing Support Services period. If Kraft fails to pay any Maintenance Fee when due, Licensor reserves the right to withhold provision of Support Services until receipt of such payment. By way of example and not of limitation, continued availability of Support Services following any automatic renewal shall be deemed conclusive evidence of renewal by Kraft. Support Services are provided only for (i) the current release of the Product, and (ii) the most recent previous release of the Product for six months following availability of the current release.

DESCRIPTION OF SERVICES PROVIDED DURING A SUPPORT PERIOD

A) Error Corrections. Licensor shall exercise commercially reasonable efforts to correct any error reported by Kraft in the current unmodified release of the Product in accordance with the priority level reasonably assigned to such error by Licensor. If a reported error has caused the Product to be inoperable, or Kraft's notice to Licensor states that the reported error is substantial and material with respect to Kraft's use of the Product, Licensor shall use its reasonable commercial efforts to correct expeditiously such error or to provide a software patch or bypass around such error. Kraft acknowledges that all reported errors may not be corrected. Licensor shall have no obligation to support: (i) altered, damaged or modified Software or any portion of the Software incorporated into other software; (ii) problems caused by Kraft's negligence, abuse, misapplication or use of the Software other than as specified in the Documentation, or other causes beyond the control of Licensor; or (iii) Software installed on a system that is not supported by Licensor. Licensor shall have no liability for changes in Kraft's hardware necessary to use the Software due to a workaround or maintenance release.

B) Software Updates. Licensor provides, at no additional cost, one (i) copy of documentation and one (I) copy of, or authorization to copy, new maintenance releases of the Product, which are not designated by Licensor as new products for which it charges a separate fee ("Updates"). Licensor, may in its sole discretion, modify the Product and deliver Software Updates to its customers which may add new and/or eliminate existing features, functions, operating environment and/or hardware platforms to the Product.

C) Telephone Hotline Support. Licensor provides telephone assistance to all licensees who have purchased Support Services. Telephone Hotline Support hours of operation are from 8 am to 5 pm Local Time Monday through Friday excluding Licensor recognized holidays. Support telephone numbers and email addresses may be found on Licensor's website at www.autonomy.com. Licensor Support personnel are available to answer questions related to Licensor's supported products and how they perform with compatible hardware systems. Assistance in the development of custom applications for Licensor's products is not included in standard hotline support. If licensees wish to acquire such support, it is available through Licensor's Consulting group at the then-current consulting rates.

PRIORITY LEVELS OF ERRORS

In the performance of Support Services, Licensor applies the following priority ratings to problems reported by licensees.

A) Priority I Errors.

Description: Program errors, which prevent some function or process from substantially meeting the functional specification, which seriously affect the overall performance of the function or process and for which no work-around is known.

Licensor Response: Licensor shall promptly initiate the following procedures: (1) assign a senior Licensor engineer to correct the error; (2) notify senior Licensor Management that such errors have been reported and that steps are being taken to correct the error; (3) provide Kraft with periodic reports on the status of corrections; (4) commence work to provide Kraft with a work-around until final solution is available; (5) provide final solution to Kraft as soon as it is available.

B) Priority II Errors.

Description: Program errors, which prevent some function or process from substantially meeting the functional specification, but which have a reasonable work-around.

Licensing Schedule - Page 4 of 6

Licensor Response: Licensor shall provide a work-around to Kraft and shall exercise commercially reasonable efforts to include the fix for the error in the next software maintenance release.

C) Priority III Errors.

Description: Program errors, which prevent some portion of a function from substantially meeting functional specification but which do not seriously affect the overall performance of the function.

Licensor Response: Licensor may include the fix for the error in the next major release of the Product.

## LICENSEE'S OBLIGATIONS RELATING TO SUPPORT SERVICES

Kraft shall provide cooperation and assistance to Licensor in Licensor's efforts to provide Support Services. Such cooperation and assistance include but are not limited to:

A) a reasonable and timely response to Licensor's requirements and communications;

B) the timely transmittal and release to Licensor of appropriate and accurate documentation and information;

C) the prompt review and analysis of the work performed by Licensor;

D) making facilities and personnel available to assist Licensor when and if reasonably requested.

E) providing information as Licensor may reasonably request to provide the Support Services and ensuring that such information is accurate and complete;

F) providing access to the Kraft's premises and/or facilities as are reasonably necessary for the performance of the Support Services;

G) being responsible for ensuring that any equipment and/or hardware belonging to or furnished by Kraft is properly installed and is sufficient and suitable for its purpose and that any adjustments, which may be required, are carried out expeditiously;

H) ensuring that all relevant licenses and permissions are obtained where the provision of the Support Services necessitates Licensor's use of third party software;

I) maintaining a reasonable number of certified Licensor support engineers;

J) being responsible for maintaining backups of its data, or otherwise protecting its data against loss, damage or destruction before any services are performed by Licensor;

K) Kraft shall be responsible for all Systems Administration functions, including but not limited to:

    i)   Database Set-up and Maintenance
    ii)  Operating Systems Maintenance
    iii) Client Software installation, as required
    iv)  Maintenance of Minimum hardware and software requirements
    v)   Virus Scanning software installation and maintenance
    vi)  Software license management (physical security of Licensor media and necessary 3rd party software media)
    vii) Third party software and operating system patches and virus protection updates

## REMOTE SUPPORT

Licensor requires remote access to Kraft's system to enable remote troubleshooting and corrective action work. Kraft shall make available for the Software execution, at the location designated in the Product Schedule, equipment and the Platform in accordance with Licensor's environment specifications. Kraft shall provide remote access for the Software for as long as Licensor provides Support Services for the Software. Serviceability of Kraft's Site(s) is dependent on remote access to Kraft's system and an active Kraft contact. Kraft is responsible for providing Licensor

Licensing Schedule - Page 5 of 6

FOIA CONFIDENTIAL TREATMENT REQUESTED

with remote access dial-up telephone numbers and passwords or Virtual Private Networking (VPN) connectivity. Licensor will provide remote support upon approval from Kraft on an Licensor request or through verbal confirmation. Kraft acknowledges that Licensor may at times access Kraft's system in order to review recent corrective actions and their impact on Kraft's system performance.  If remote access is not granted, Kraft shall be invoiced in accordance with Licensor's then-current time and materials rates; additionally, if, in Licensor's reasonable opinion, the problem requires Licensor to provide on-site Support Services, Kraft will reimburse Licensor for travel and other expenses actually incurred in connection with performance of such Support Services as approved in advance in writing by an authorized Kraft representative.  .

Licensing Schedule - Page 6 of 6

FOIA CONFIDENTIAL TREATMENT REQUESTED

**SECOND AMENDMENT**
**TO**
**COMMERCIAL UNMODIFIED SOFTWARE LICENSE AGREEMENT WITH**
**MAINTENANCE SERVICES**

ELI LILLY AND COMPANY AND ITS AFFILIATES ("Lilly") and AUTONOMY, INC. ("Licensor") as parties to the Commercial Unmodified Software License Agreement with Maintenance Services (the "**Agreement**") effective as of June 27, 2008, desire to amend that Agreement via this Second Amendment to the Agreement (the "**Amendment**"), as of June 15, 2010 ( the "**Amendment Effective Date**"). Lilly and Licensor may each be referred to as a "**Party**" and, collectively, as the "**Parties**." In consideration of the mutual promises and covenants set forth in this Amendment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  **Addition of Section 5.9.** Section 5.9 of the Agreement is hereby inserted as follows:

    "*5.9  Acceptance Testing.   Any Product furnished by Licensor (except as expressly identified in an applicable Exhibit B as not being subject to Acceptance Testing), shall be subject to Acceptance Testing as follows:*

    *5.9.1  Following initial delivery of the Product (the "Delivery  Date") or, with respect to the ALH Software, the date on which Autonomy completes (or would have completed but for the unreasonable delay of Lilly) the implementation, installation, setup, configuration, and other services necessary for Lilly to use and test the ALH Software (including testing of the ALH Software as it relates and interoperates with other Products) (the "Start Date"), Lilly shall, within four (4) months from the Delivery Date (or in the case of the ALH Software, the Start Date), as may be extended in accordance with Section 5.9.3 below (the "Acceptance Period"), operate the Product to determine in Lilly's reasonable estimation, whether: (i) the Product performs in material (such materiality determination to be in Lilly's reasonable discretion) accordance with its applicable Documentation and Specifications; (ii) meets any facilities usage or run time limits and standards agreed upon in writing between the parties; (iii) any other acceptance criteria which may be agreed upon in writing between the parties and identified as additional Acceptance Criteria in such writing (for purposes of the ALH Software listed in Exhibit B-2, the criteria set forth in Exhibit J-2 shall apply, and shall be deemed Acceptance Criteria related thereto); and (iv) the Product otherwise meets the requirements as expressly set forth in the Agreement ((i)-(iv) are collectively referred to herein as the "Acceptance Criteria").*

    *5.9.2  If the Product materially conforms, in Lilly's reasonable discretion, to the Acceptance Criteria, Lilly shall so notify Licensor in writing by completing Exhibit L, Product Acceptance Certificate by the end of the Acceptance Period and the Product, Documentation and Deliverables shall be deemed to be accepted.  In such case, the Acceptance Date shall be the date that the software satisfactorily completes all of the tests specified above.*

    *5.9.3  If the Product fails to meet the Acceptance Criteria, Lilly shall notify Licensor of such failure in writing by the end of the Acceptance Period, and Licensor shall have a reasonable time in which to correct, modify, or improve the non-conforming Product to cause it to meet the Acceptance Criteria.  After submission of the corrected, modified or improved Product, Lilly shall have*

BDDB01 6079010v17

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008354
Exh 1012-0039

thirty (30) additional calendar days to reconduct all Acceptance Testing as described in this Section. This process shall be repeated as may be necessary until the Product is accepted or deemed accepted hereunder; provided, however, that if the Product is not deemed accepted or accepted hereunder within one-hundred eighty (180) days after the Delivery or Start Date, as the case may be ("Extended Acceptance Period"), Lilly shall have the right and option to cancel its purchase of the nonconforming Product(s).

5.9.4   *Maintenance*.   To the extent Lilly has purchased Maintenance Services from Licensor, such Maintenance Fees for Products not subject to Acceptance Testing shall begin to accrue as of the Delivery Date, and such Maintenance Fees for Products subject to Acceptance Testing shall begin to accrue as of the Acceptance Date, both of which to be subject to the provisions of Section 5.9.5.1 below.

5.9.5   *Failure to Pass Acceptance Testing*.   If the Product fails to materially conform, within Lilly's reasonable discretion, to the Acceptance Criteria within the Extended Acceptance Period, then Lilly may, at its sole discretion, elect any or all of the following options:

5.9.5.1 Lilly may terminate the Agreement to the extent it applies to Lilly's purchase of the nonconforming Product(s) and remove the Product failing to meet the requirements described herein. If Lilly has licensed from Licensor any additional Products that may not be operated without the nonconforming Product ("Related Products"), Lilly may elect to also terminate its licenses for those Related Products or accept a corresponding, mutually agreed upon discount or refund in the fees to such Related Products.   If Lilly has licensed from Licensor any additional Products whose functionality is substantially and adversely affected by the removal of a non-conforming Product, Licensor shall discount or refund to Lilly a mutually agreed upon portion of the fees to such affected Product that corresponds to the reduced functionality thereof. Lilly's license to the nonconforming Product and any Related Products (if Lilly elects to terminate its license to such Related Products) will be deemed terminated and Lilly will receive a full reimbursement (or discount, if Lilly so elects) from Licensor within thirty (30) days for any and all fees that it may have paid for the nonconforming Product(s) (including terminated Related Products) and related Maintenance Services and any other related implementation, setup, installation, configuration, or other such services.   Lilly may, at its sole option, extend the Acceptance Period or Extended Acceptance Period subject to Lilly's right to cancel and obtain reimbursements if the Product is not repaired within such extension period.

5.9.5.2 Lilly may, at its sole option, accept a workaround developed by Licensor for any Product failing to meet the Acceptance Criteria, contingent upon a mutually agreed upon discount in the License and any related Maintenance Fees and implementation fees charged to Lilly for such Product.

5.9.6   *Deemed Acceptance.*   In the event Lilly does not complete and deliver to Licensor a Product Acceptance Certificate by the end of the Acceptance Period

2

BDDB01 6079010v17

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008355
Exh 1012-0040

*or Extended Acceptance Period, as the case may be, the applicable Products shall be deemed accepted by Lilly as of the end of the applicable Acceptance Period or Extended Acceptance Period. Licensor shall deliver to Lilly written notice of the expiration of the Acceptance Period at least thirty (30) days (the "Minimum Notice Period") but no more than forty-five (45) days prior to the end of such Acceptance Period. If Licensor fails to deliver or delays such written notice in accordance with the terms of this Section 5.9.6, the Product shall not be deemed accepted until the Minimum Notice Period has elapsed from the date Lilly receives such notice.*

*5.9.7 Invoicing. In no event may Licensor invoice Lilly for any Product until such Product has been accepted by Lilly in accordance with this Section 5.9."*

**2. Clarification.** For the avoidance of doubt, the unnumbered section between Sections 6.1.1 and 6.2 of the Agreement shall remain as-is.

**3. Amendment to Section 6.1.1.** Section 6.1.1 of the Agreement is hereby deleted in its entirety and restated as follows:

*"6.1.1 At delivery and throughout the Warranty Period, the Software shall substantially (such question of substantiality to be in Lilly's reasonable discretion) perform in accordance with the Specifications and the Documentation supplied by Licensor to Lilly with the Software. Further, throughout their respective Warranty Periods, all Software listed in Exhibit B and the Digital Safe Software listed in Exhibit B-2 shall substantially (such question of substantiality to be in Lilly's reasonable discretion) perform in accordance with the applicable Specific Warranty set forth on Exhibits J and J-2, respectively. This warranty applies only to problems discovered by Lilly during the aforesaid Warranty Period and then reported to Licensor either during the Warranty Period or within five (5) days thereafter. Licensor shall not be responsible to the extent failures are caused by: (a) Lilly's failures to use the Software in accordance with instructions included in the documentation provided to Lilly by Licensor; or (b) the modification of the Software by any person other than Licensor, its employees, agents, affiliates or subcontractors (unless such modification was suggested by Licensor)."*

**4. Amendment to Section 25.2.** Section 25.2 of the Agreement is hereby deleted in its entirety and restated as follows:

*"25.2 Except for each party's confidentiality obligations hereunder, infringement indemnification, and Lilly's obligations to protect Licensor's intellectual property rights and restriction on use of Product, in no event will Licensor or its licensors, or Lilly, be liable for any special, indirect, incidental, punitive or consequential damages (including, without limitation, loss of profits and business interruption), regardless of the form of action, even if the claim was reasonably foreseeable or if the party was advised of the possibility of such damages, arising out of or in connection with their respective obligations under this Agreement."*

**5. Addition of Section 38.** Section 38 of the Agreement is hereby inserted as follows:

*"Section 38    Compliance with Regulations and Lilly and Policies*

*38.1 In the performance of its obligations under this Agreement, Licensor shall comply with all (i) Applicable Laws, (ii) the Lilly policies described in Sections*

3

BDDB01 6079010v17

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008356
Exh 1012-0041

*38.1.1 and 38.1.2 below, and (iii) any Lilly policies and professional standards which may be mutually agreed upon in writing between the parties.*

*38.1.1 Applicable provisions of the Anti-Bribery Commitments for Lilly Procurement Contracts as revised by Lilly from time to time and published at http://supplierportal.lilly.com or otherwise made available to Licensor;*

*38.1.2 Any instructions or policies set forth by Lilly which relate to compliance by Lilly or its Affiliates with any US or other Governmental Authority mandates, settlements, or adjudications, including the Corporate Integrity Agreement (the "CIA") between Lilly and the Office of Inspector General, US Department of Health and Human Services, dated January 14, 2009, and any disclosure requirements set forth hereunder.*

*38.2 All the requirements of this Section are in addition to all of Licensor's other obligations under this Agreement."*

**6. Amendment to Exhibit A.** Section A.1.50 of Exhibit A is hereby deleted and replaced with the following:

*"Warranty Period, for Products subject to Acceptance Testing, is the period of time beginning upon the Acceptance Date and expiring six (6) months thereafter, or, for Products not subject to Acceptance Testing, the period of time beginning upon the Delivery Date and expiring twelve (12) months thereafter."*

**7. Amendment to Exhibit B.** Exhibit B-2 to this Amendment is hereby incorporated into the Agreement as Exhibit B-2 thereunder.

**8. Amendment to Exhibit J.** Exhibit J-2 to this Amendment is hereby incorporated into the Agreement as Exhibit J-2 thereunder.

**9. Addition of Exhibit L to the Agreement.** Pursuant to this Amendment, an Exhibit L to the Agreement shall be issued to provide for Deliverable acceptance on Exhibit L. Such Exhibit L is attached hereto as Schedule 1 and is incorporated by reference.

**10. Counterparts.** This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**11. Effectiveness.** This Amendment shall become effective upon the execution hereof by both Parties.

**12. Continuing Effect.** Other than as expressly modified in this Amendment, all of the terms and conditions of the Agreement shall continue in full force and effect. This Amendment shall be deemed a part of, and incorporated by reference into, the remainder of the Agreement.

IN WITNESS WHEREOF, the parties have executed this Second Amendment to the Agreement as of the date of the last signature below.

4

BDDB01 6079010v17

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**HP-SEC-00008357**
Exh 1012-0042

| ON BEHALF OF AUTONOMY, INC.: | ON BEHALF OF ELI LILLY AND COMPANY: |
|---|---|
| Signed: | Signed: |
| Name:   Joel Scott | Name: |
| Title:   COO | Title: |
| Date:   June 15, 2010 | Date: |

5

BDDB01 6079010v17

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008358
Exh 1012-0043

| ON BEHALF OF AUTONOMY, INC.: | ON BEHALF OF ELI LILLY AND COMPANY: |
|---|---|
| Signed: | Signed: |
| Name: | Name: Edward J. Roberson |
| Title: | Title: Sr. Director |
| Date: | Date: June 15, 2010 |

BDDB01 6079010v17

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008359
Exh 1012-0044

<u>**Schedule 1**</u>

**Exhibit L IT Product Acceptance Certificate**

Licensor Name:

PO #:

Lilly Customer Name:

Submitted Deliverable(s):

| Date Submitted | Description | Date Rejected | Acceptance Date | Acceptance on behalf of Lilly (Printed Name) | Signature |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

Rejected Submissions:

| Date Submitted | Description | Date Rejected | Acceptance Date | Acceptance on behalf of Lilly (Printed Name) | Signature |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

**TERMS AND CONDITIONS MAY NOT BE ADDED TO THIS DOCUMENT**

6

BDDB01 6079010v17

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008360
Exh 1012-0045

## EXHIBIT B-2: SOFTWARE AND FEES

| Product | Term | Subject to Acceptance Testing | Authorized Use | Data Volume | Price |
|---|---|---|---|---|---|
| Digital Safe Software, including:<br>  Audit Center | Perpetual | No | 35,000 Mailboxes | Unlimited internal enterprise data | $3,953,564.00 |
| ALH, including:<br>  Notification Module<br>  Collection and Preservation Module<br>  Real Time Policy Management | Perpetual | Yes | 45 internal named users; up to 35,000 desktops, for Investigation and Discovery | Unlimited internal enterprise data | $2,941,069.00 |
| Software discount | N/A | N/A | N/A | N/A | <$1,591,202.00> |
| Total Net License Fee | N/A | N/A | N/A | N/A | $5,303,431.00 |
| Digital Safe Annual Maintenance and Support | One (1) year | N/A | N/A | N/A | $157,898.15 |
| ALH Annual Maintenance and Support | One (1) year | N/A | N/A | N/A | $107,273.40 |
| *TOTAL* | | | | | *$5,568,602.50* |

1. Languages : English

2. Platform : Windows

3. Number of Developers : Five (5) concurrent, internal developers may access the Software solely for development purposes.

4. Territory of Software installation : United States of America

5. Licensee Technical Support Contact :
   Name:   Paul Susemichel
   Title:    Associate Consultant - IT
   Phone   317.277.9950
   Email:   psusemichel@lilly.com

6. License and Support Fee Payment Terms : The ALH license fee and ALH Annual Maintenance and Support Fee shall be invoiced upon the Acceptance Date. All other fees set forth above shall be invoiced immediately. All fees shall be due and payable in accordance with the terms of the Agreement, as amended.

7. Delivery : Software is shipped EXW point of manufacture (per Incoterms 2000) via electronic delivery.

8. Additional Terms : At Licensor's discretion and express direction, Lilly shall (i) submit any purchase order (or other order document) for the Products set forth above, and/or pay any fees due hereunder, to Licensor's expressly designated payee (which Licensor shall deem to be satisfaction of Lilly's payment obligations hereunder). Notwithstanding the foregoing, Lilly's rights and obligations shall not otherwise be affected by submission of a purchase

7

BDDB01 6079010v17

FOIA CONFIDENTIAL TREATMENT REQUESTED

order (or other order document), or payment of fees to a third party, and Licensor shall continue to be bound by its obligations under the Agreement and all amendments thereto.  For the avoidance of doubt, any and all refunds due to Lilly by Licensor under the Agreement, as amended, shall be an obligation of Licensor, not any third party to which Lilly may direct payment. The annual maintenance fees shall be five percent (5%) of the net purchase price after all discounts are applied.  Such five percent (5%) pricing shall be fixed for five (5) years following the date of purchase.

8

BDDB01 6079010v17

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008362
Exh 1012-0047

**EXHIBIT J-2:**
**DIGITAL SAFE SPECIFIC WARRANTY AND ADDITIONAL ALH ACCEPTANCE CRITERIA**

# 1.0 ALH – ACCEPTANCE CRITERIA

The ALH Software, provided it is appropriately configured per mutually agreed upon and documented configuration settings, and/or the corresponding Autonomy Administration, and/or User Guide Documentation, will contain the capabilities outlined below, in addition to and/or as documented in the respective product documentation.

## 1.1 Legal Notices/Notifications

The system shall enable Lilly to create, modify, distribute and manage status of a minimum of 100 active legal matter notifications.   Management includes:

- distributing notices within a 12-hour period, which can include attachments, to 25,000 custodians provided adequate connectivity to the Lilly directory and the email system is available to the ALH system.
- custodian shall be able to complete surveys/interviews in one or more sessions without loss of data due to timeout
- near real-time tracking of custodian acknowledgement status received and processed by ALH
- summary notification of custodian change in employment status
- automated sending of reminder notices within a 12-hour period of the scheduled time, provided adequate connectivity to the Lilly directory and the email system is available to the ALH system.

The software shall allow for litigation business users to access near real-time reports/views into all actions related to custodian notifications received and processed by ALH, including:

- Delivery of notifications
- Custodian acknowledgment of notifications
- Survey/Interview responses
- Delivery/Acknowledgement status summary at the custodian and matter levels

Custodians shall have the ability to access/review active notices addressed to them, even if the notice may have been removed from the custodian's mailbox.  The system shall allow at least 5,000 concurrent users on the system Web Desktop. Excluding network latency, the Web Desktop is expected to support a typical server-side response to a page request in a minute or less.

## 1.2 Custodian Management

The solution shall not be limited by a single point of integration for the purpose of aggregating workforce (employee, contactors, collaborators) into a name normalized database.  The solution will allow Lilly to be able to feed data from one or more data sources for the purpose of updating workforce records provided these feeds are all provided in an Autonomy-specified fashion and normalized format.

## 1.3 Policy Management

Creating and modifying policies in ALH shall integrate with the hosted archive.   The following types of policies must be supported:

9

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008363
Exh 1012-0048

### 1.3.1 Preservation/Hold Policies

Implementing a preservation policy against the Digital Safe including for the application of business retention shall not be functionally limited in the number of parameters chosen from the system-available list used to define the preservation policy criteria. The policy criteria shall allow for combinations of supported search criteria predefined and configured within the software and related index, including, but not limited to:

- keywords and/or phrases, up to 6,000 characters
- Boolean expressions
- wild cards
- Date restrictions (single or multiple ranges)
- Custodian list (including custodians identified within any expanded distribution list metadata)
- Metadata (such as document type, form type, e.g. voice mail and instant message types)
- Predefined workbooks created in Investigator within the hosted solution

### 1.3.2 Collect Policies/Tasks

ALH will implement a related collection task in Digital Safe, which can use a workbook in Investigator within the hosted solution.

Implementing a collection task against the Digital Safe shall include options for: 1) not collecting documents previously collected for that matter; and 2) exact de-duplication and thread de-dulication of e-mail.

The solution shall provide tracking of the collection options chosen and collection status, including data volume/counts as a result of the collection process as well as any known exceptions that may have occurred.

For future platform growth the solution architecture shall allow Lilly to collect from other supported data repositories (including SharePoint and Documentum), accessible through the system network, provided suitable network connectivity and bandwidth exists.

10

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008364
Exh 1012-0049

## 2.0 DIGITAL SAFE - WARRANTY

During the Warranty Period, the Digital Safe platform, provided it is mutually discussed and appropriately configured per Autonomy's recommendation and/or the corresponding Administration and User Guide Documentation, will interoperate with ALH and Investigator, and provide the ability to process supported content allowing for archive, search, and export of electronically stored information (ESI) in a repeatable manner via the capabilities outlined below, in addition to and/or as documented in the respective product documentation. The Digital Safe shall be capable of supporting 12 concurrent search, workbook and collection tasks.

### 2.1 Archive - Ingestion

The archive shall allow for the ability to buffer, process, store and index content from a live journaling stream from the Lilly Microsoft Exchange 2010 system without any loss of data once said data has been successfully delivered to the Digital Safe system.

### 2.2 Preservation / Hold Enforcement

The software shall not have limitations on the number of active preservations (represented by associated policies within Digital Safe). The Digital Safe shall enforce policies from ALH for the purpose of document-level retention.

### 2.3 Query/Search Execution

The archive platform will index an email and its attachments as a combined entity in the system such that a search in that system will return a single result for the combined email and attachment even where the email body matches only one criterion and the attachment another from the same query (i.e. a search for "Foot AND Ball" would return said email as a result if "Foot" was in the email and "Ball" was in an attachment of said email). The combined object shall consist of all recognized attached, embedded and nested documents inside a single email.

The archive shall be able to execute 10 concurrent queries. Queries originating in either ALH or Investigator shall allow for combinations of search criteria predefined and configured within the software and related index, including, but not limited to:

- keywords and/or phrases, up to 6,000 characters
- Boolean expressions
- wild cards
- Date restrictions (single or multiple ranges)
- Custodians (including custodians identified within any expanded distribution list metadata and name normalized data)
- Metadata (such as document type, form type, e.g. voice mail and instant message types)
- Predefined workbooks created in Investigator within the hosted solution

### 2.4 Workbook

Investigator shall allow 10 users to simultaneously initiate work booking of query result sets. Investigator shall not be limited by the number of workbooks within the system. An individual record within the system should not be limited by the number of workbooks associated with the individual record.

11

BDDB01 6079010v17

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008365
Exh 1012-0050

## 2.5 Collect/Export and Related Tasks

The Digital Safe shall execute collection tasks initiated from ALH. Collection/Export from the Digital Safe shall be capable of 10 concurrent collections/exports, with minimal impact to live stream ingestion and other system processes (i.e. policy management and workbook creation).

The system shall allow for an average daily export (de-duplicated and threaded content, compressed) volume of 15-20 GB per day. With advance notice the capacity can be increased to meet needs of increased volume.

Execution of collection tasks initiated from ALH against the Digital Safe shall include options for: 1) not collecting documents previously collected for that matter; and 2) exact de-duplication and thread de-duplication of e-mail.

The Digital Safe shall provide data to ALH regarding the tracking of collection status, including data volume/counts, as a result of the collection process, as well as any known exceptions that may have occurred.

The software shall be able to export content from the Digital Safe archive in configured/predetermined batch file size and placed in a predetermined system network-accessible FTP location mutually defined by Lilly and Autonomy.

## 2.6 Content Disposition

The software shall be capable of supporting manual or semi-automated methods of purging/disposing of aged archive system-managed content without active holds applied via integration with ALH.

Content managed by the system archive must be sufficiently locked/protected in the archive whenever one or more active preservation/hold policies apply to the stored object.

BDDB01 6079010v17

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008366
Exh 1012-0051

| | |
|---|---|
| **From:** | Kerrie Wheelock Clark [kwheeloc@autonomy.com] |
| **Sent:** | Monday, June 28, 2010 11:21 AM |
| **To:** | Brent Hogenson |
| **Subject:** | Incident |

Hello Brent,

Friday morning June 25th, I was contacted by Tina Wali from Human Resources in regards to a letter that she had received from the California EDD offices.
The notice was asking Autonomy to verify the earnings of Lourdes Dionosio who had been terminated 06/01/2010 and was requesting Unemployment funds.

Upon looking at the EDD notice I could see clearly that something was wrong.  The employee earned an annual salary of $63,000.00 per year.  However the earnings for this employee for 2009 showed $449,740.00.
I contacted ADP and had them open a case (Case # 9762631-1) in order to get further documentation and details of these earnings.

At the same time I went into the employees profile in ADP and could see that the employee had been paid "Other" earnings throughout 2009, and part of 2010.  I notified ADP of this and requested that they pull copies of the employees W2's for me.  Right now I have 2005, 2006, 2007, 2008, and 2009 ordered and should receive these today or tomorrow.  The employee was not employed prior to 2005.

Because we had recently transitioned over to the new ADP platform, all historical data pertaining to the employees earnings prior to 2009 were not available to me.  That is why I was left to rely on ADP to pull reports.

The ADP representative informed me that after running a wage report for Autonomy, Lourdes Dionosio had earned $1,188,608.68 from mid 2007, 2008, 2009, and part of 2010.  He could not go back any further than that due to there limitations on historical data on certain types of reports.

After I got off the phone with ADP. and after much thought as to the magnitude of the situation and all possible ramifications, I ran an Earnings report for 2009 for earnings code "O – Other".  This report would be able to tell me which employees in Q4 2009, and Q1 and Q2 2010 were paid these types of earnings.  Upon running this report I found that there was not one, but two employees receiving payments just about every pay period ranging from $7,000.00 to $49,000.00.

I contacted ADP again and requested that all W2's for this second employee Hannah Yau be run for 2005 thru 2009. I expressed to ADP that we needed as much as they could pull as far back as they could pull it for both employees.

Right now I am still waiting on W2 copies for these two employees for 2005 thru 2008.  I am also expecting to receive numerous reports that will document or support these findings.

Hope this helps.

Thanks Brent,
Kerrie


*Kerrie Wheelock-Clark*
*Autonomy and Verity Payroll*

*160 E. Tasman Dr.*
*San Jose, CA  95134*

Phone: 408) 953-7222
Efax:   408) 716-2734

1

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

Email: kwheeloc@autonomy.com

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**HP-SEC-00008379**
Exh 1012-0053



Autonomy

December 29, 2009

Autonomy, Inc.
One Market Street
Spear Tower, 19th Floor
San Francisco, CA
94105

Phone: (415) 243 9955
Fax: (415) 243 9984
www.autonomy.com

**SENT VIA ELECTRONIC MAIL**

Capax Discovery, LLC
Attn: Mr. John Baiocco
1955 Wehrle Drive
Williamsville, NY 14231-0490

     Re:    Revised Payment Arrangement

Dear Mr. Baiocco:

As you know, Capax Discovery LLC ("Capax") and Autonomy, Inc. ("Autonomy") are parties to that certain Value added Reseller Agreement dated as of May, 2009 (the "Agreement"), and the purchase order thereunder dated September 30, 2009 (the "PO"), pursuant to which Capax purchased certain products and services for resale to Kraft Foods Global, Inc. ("Kraft"). In accordance with the terms of the PO, Capax is obligated to pay to Autonomy license fees in the amount Four Million Dollars (US $4,000,000.00). However, Kraft has indicated to Autonomy that it shall pay to Autonomy directly the license fees due for the software to be licensed to Kraft in connection with the PO. Accordingly, Autonomy shall cancel the license fees due from Capax pursuant to the PO, subject to the terms of this letter. For clarification, the parties acknowledge that, subject to the terms hereof, neither party shall have any further liability or obligation with respect to the PO.

1.     Capax agrees that it has not collected, and shall not collect or attempt to collect from Kraft any license fees related to software to be licensed to Kraft pursuant to the PO, and any and all rights Capax may have to receive such fees are hereby assigned, transferred and conveyed to Autonomy.

2.     Capax hereby represents and warrants that it has not encumbered any rights being assigned hereunder.

3.     Upon execution hereof, Autonomy shall pay to Capax a one-time fee of Four Hundred Thousand Dollars (US $400,000.00). Further, upon receipt by Autonomy of all license fees due from Kraft for software licenses granted in connection with the PO, Autonomy shall refund to Capax any license fees paid by Capax and received and acknowledged by Autonomy under the PO prior to the date hereof; the parties acknowledge that such amount to be refund totals Four Hundred Thousand Dollars (US $400,000.00). Payment of the amounts described in this Section 3 shall constitute payment in full for any and all fees due to Capax from Autonomy arising out of or in any way relating to the PO and/or the software, hardware and/or services licensed and/or provided to Kraft in connection with the transaction contemplated by PO. For avoidance of doubt, except for the foregoing amount expressly set forth in this Section 3, Autonomy shall owe to Capax no additional fees, costs or other amounts, whether pursuant to the Agreement, the PO or otherwise, related to or arising out of any transaction with Kraft.

4.     Once duly executed by Capax below, this letter shall constitute a valid and binding written agreement (the "Letter Agreement") between Capax and Autonomy dated effective as of December 23, 2009. This Letter Agreement is entered into pursuant to the terms of the Agreement; however, in the event of conflict or inconsistency between the terms of the

**FOIA CONFIDENTIAL TREATMENT REQUESTED**



Autonomy

Agreement and the terms of this Letter Agreement, this Letter Agreement shall prevail.  The parties expressly agree that this Letter Agreement and the applicable terms of the Agreement as incorporated herein supersede all prior or contemporaneous, oral or written understandings, representations, conditions, and other communications between the parties relating to the subject matter hereof.

Please sign below to acknowledge agreement by Capax to the terms set forth above.

Very truly yours,

Joel Scott
Chief Operating Officer

ACKNOWLEDGED, AGREED AND CERTIFIED AS TO THE ABOVE:

CAPAX DISCOVERY, LLC

By: _____

Name: _Thomas Leonard on behalf of John Baiocco_

Title: _Director Solution Sales_

Date: _Dec 29 2009_

HP-SEC-00008371
Exh 1012-0055

**First Amendment**
**to**
**Autonomy, Inc. Value Added Reseller Agreement**

Autonomy, Inc., ("Autonomy"), Capax Discovery, LLC, , Capax Global, LLC, Capax Discovery LTD  and Capax Global LTD hereby enter into this First Amendment ("First Amendment"), effective as of October 1, 2009 ("First Amendment Effective Date") to amend the Autonomy, Inc. Value Added Reseller Agreement between the parties dated May 2009 (the "Agreement") as amended, as follows:

WHEREAS, VAR (as defined in Section 3 below) is currently authorized to perform certain support Services for existing licensees and customers of Autonomy's EAS Product(s) (such customers hereinafter the "EAS Customers"); and

WHEREAS, the parties desire to further define the plan and scope of those support Services and expand VAR's right and capability to provide such support Services for such EAS Customers;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and in the Agreement, the receipt adequacy, and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. **Capitalized Terms**.  Any capitalized terms not defined herein shall have the meaning set forth in the Agreement.

2. **Term**.  The parties agree that the Effective Date of the Agreement is May 30, 2009.

3. **Capax Global, LLC**.  By the parties' execution below and as such term is defined and used therein, the term "VAR" shall be deemed to include  Capax Discovery, LLC ("Discovery") and/or Capax Global, LLC ("Global") and/or Capax Discovery LTD ("Discovery LTD") and/or Capax Global LTD ("Global LTD").  For clarification, either Discovery or Global or Discovery LTD or Global LTD may serve as "VAR" under the Agreement, as same is amended hereunder.  By signature below, each of Global, Discovery LTD and Global LTD hereby agrees to be bound by the terms and conditions of the Agreement.

4. **Scope of Support Services; Training and Transition.**

   a. Scope.  The parties acknowledge and agree that VAR shall provide only "first-line" and "second-line" support to and for the benefit of EAS Customers.  For clarification, "first-line" and "second-line" support shall be deemed to include receiving telephone, email, or web-based support requests from EAS Customers, initial troubleshooting in conjunction with such EAS Customers (on their use of the EAS software only) in order to assist EAS Customers with such support requests, coordinating with Autonomy to respond thereto, and timely responding to EAS Customers' requests for telephone, email, or web-based support Services.  As used herein, such support Services shall be hereinafter referred to as "Front Line EAS Support".  In performing Front Line EAS Support, VAR shall refrain, without Autonomy's prior written consent and approval, from logging, indicating, or confirming with an EAS Customer or other third party requesting support Services on an EAS Customer's behalf that a given support request representing an "error", "defect", "change request", or any other similar designation may give rise to an implication that the EAS software licensed to such EAS Customer is defective, requires an upgrade or update to its features or functionalities, or requires a bug fix or workaround in order to properly function.  In performing Front Line EAS Support, VAR shall not, in any event other than as contemplated in Section 6, inform EAS Customers that it serves as the role of "subcontractor", or otherwise disclose to EAS Customers for which VAR provides Front Line EAS Support that VAR, and not Autonomy, is providing such Front Line EAS Support.

      i. VAR Support Personnel.  VAR shall be solely responsible for hiring all required personnel in order to adequately provide the Front Line EAS Support contemplated hereunder.  VAR  shall be responsible for the performance of background investigation checks on employees hired by VAR to perform Front Line EAS Support hereunder, which shall include, at a minimum, verification of (A) previous employment; (B) criminal history including, at a minimum, a county-level criminal convictions search in the counties of the employee's current and previous residences and work locations for the past seven (7) years; (C) personal identity, including a trace of the employee's Social Security Number to verify his/her identity; and (D) education, including a verification of the employee's highest degree earned. VAR shall ensure that applicable employees performing Front Line EAS Support shall have successfully passed a drug test or, if the employees undergoing testing are enrolled in a comprehensive drug-free workplace program, have successfully passed a urine specimen drug test, except to the extent such testing is precluded by applicable law.  All employees hired by VAR to provide Front Line EAS Support shall successfully complete Autonomy standard EAS SE certification and training at Autonomy's cost.

      ii. Support Facilities.  All Front Line EAS Support shall be performed utilizing Autonomy's existing support infrastructure.  Autonomy will make available to VAR, at no additional charge, its telephone support line and its email and web-based support systems, in order to facilitate VAR's provision of Front Line EAS

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008349
Exh 1012-0056

Support to and for the benefit of EAS Customers as required by this Agreement. Further, Autonomy will make available to VAR, at no additional charge, reasonable desk space and office facilities in Autonomy's support facility located in Calgary, Alberta, Canada (or in such other location as the parties may mutually agree) for up to five (5) of VAR's support personnel; provided, however, VAR shall be responsible, at its sole cost and expense, for procuring office space and facilities for any additional employees providing Front Line EAS Support. VAR and Autonomy shall each designate one (1) person to serve as senior liaison for purposes of coordinating the Front Line EAS Support to be performed by VAR hereunder and the other support Services to be performed by Autonomy, as well as for escalation of support issues raised by EAS Customers.

b.  <u>Transition Period</u>.  Commencing on the First Amendment Effective Date and for a period of six (6) months thereafter, or a lesser period, subject to Autonomy's approval (hereinafter the "<u>Transition Period</u>"), the parties shall work together in good faith to (i) commence and complete training for the applicable VAR personnel providing Front Line EAS Support, and (ii) begin transitioning to VAR, pursuant to this First Amendment, EAS Customers for purposes of VAR providing Front Line EAS Support therefore.  VAR shall assign personnel to work with Autonomy support personnel in Autonomy's Calgary support facility (or such other facility(ies) as the parties may mutually agree), in order for such personnel to become sufficiently trained on the use of Autonomy support facilities and adherence to Autonomy support policies and procedures.  Autonomy shall provide copies of training materials and technical documentation, together with the related softcopy documentation including but not limited to the training manuals, the training presentations, and training wm images, in native and editable format regarding the EAS Products as may reasonably be required to facilitate training of VAR's support personnel and for purposes of enabling VAR to provide specialized custom client training for EAS Customers from time to time.  During the Transition Period, Autonomy may commence subcontracting EAS Customers to VAR, pursuant to Section 4 below. Further, during said Transition Period and with written consent from Autonomy and subject to any contractual and/or other legal obligations of Autonomy or VAR, VAR may commence contacting EAS Customers who licensed the EAS Products through other resellers of Autonomy or its affiliates, for purposes of assuming support obligations for such EAS Customers.  At the end of the Transition Period, the parties shall meet in good faith and if VAR has demonstrated to Autonomy's reasonable satisfaction that (a) its personnel have successfully completed the training and certification required hereunder, and (b) it is capable of providing the Front Line EAS Support as contemplated hereunder without adverse impact to Autonomy and/or the EAS Customers, or their respective business operations, VAR shall become designated Autonomy's "preferred EAS provider", and Autonomy shall commence subcontracting and/or referring, as the case may be, EAS Customers to VAR for purposes of Front Line EAS Support.

5.  **Subcontracting EAS Support.**  As set forth in Section 6.5 of the Agreement, VAR may, from time to time, submit purchase orders to Autonomy relating to Autonomy's purchase of certain support Services from Autonomy, and, further, has the right to provide support to and for the benefit of EAS Customers.  As set forth in this First Amendment, the parties agree that, from time to time and subject to Autonomy's agreements, including with the applicable EAS Customers, Autonomy may subcontract Front Line EAS Support for select EAS Customers to VAR by executing and submitting to VAR a Support Order, in form and content as is set forth on Attachment 1 to this First Amendment and which is incorporated into the Agreement by this reference (hereinafter a "<u>Support Order</u>").  Each such Support Order shall state with specificity, the following information:

(a)  The name of the EAS Customer the support Services for which are being subcontracted to VAR, including the name and contact information of any named support contacts for such EAS Customer;

(b)  The date on which the applicable annual support and maintenance period for such EAS Customer is scheduled to become renewed;

(c)  The number of months remaining on the then current and paid-up support and maintenance period (such remaining period the "<u>Remaining Maintenance Term</u>");

(d)  The configuration of EAS software licensed to such EAS Customer, including (i) parent and child server configuration, (ii) Client Access License configuration, and (iii) aggregate number of Client Access Licenses licensed by such EAS Customer.

(e)  The annual support and maintenance fee actually paid by such EAS Customer for the then-current support and maintenance period (the "<u>Current Annual Fee</u>");

(f)  The annual support and maintenance fee anticipated to be paid by such EAS Customer for each subsequent annual renewal of support and maintenance Services (the "<u>Renewal Annual Fee</u>"); and

(g)  The date upon which the Support Order shall become effective.

Upon VAR's acceptance of a Support Order from Autonomy (which may be evidenced by its signature thereon or its performance of the support Services subcontracted thereunder), VAR shall perform Front Line EAS Support to and for the benefit of the EAS Customer identified in such Support Order.  In consideration therefore, Autonomy shall pay VAR the following fees with respect to each EAS Customer the Front Line EAS Support for which is subcontracted hereunder:

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008350
Exh 1012-0057

(a) *Remaining Term Fee*: For each month then remaining in the EAS Customer's Remaining Maintenance Term, Autonomy shall pay to VAR an amount equal to eighty-five percent (85%) of 1/12[th] of the Current Annual Fee; and

(b) *Renewal Term Fee*: For each month commencing upon such time as the EAS Customer renews its annual maintenance and support services with Autonomy and subject to the EAS Customer's payment of the applicable annual maintenance and support services fee for such annual renewal, Autonomy shall pay to VAR an amount equal to eighty-five percent (85%) of 1/12[th] of the Renewal Annual Fee (provided, however, in the event the actually amount paid by the EAS Customer is different than the Renewal Annual Fee, the amount due hereunder shall be determined by reference to such actual amount paid by the applicable EAS Customer).

For clarification, the Remaining Term Fee and Renewal Term Fee more fully described in subsections (a) and (b) above shall be paid monthly and in advance. The parties acknowledge that no Renewal Term Fee shall become due and owing for any EAS Customer that fails or declines to renew its annual maintenance and support services with Autonomy. Further, Autonomy's obligation to pay the Remaining Term Fee and/or Renewal Term Fee above shall be contingent on Autonomy receiving payment from each applicable EAS Customer. Autonomy shall provide reasonable reports, but no less frequently than once per calendar quarter, setting forth the aggregate number of EAS Customers subcontracted under this First Amendment and the number of such EAS Customers that renewed annual maintenance and support services during the applicable calendar quarter. The parties shall work together in good faith to facilitate the support services contemplated hereunder.

6. **Support for Reseller EAS Customers.** Upon completion of the Transition Period (or upon such earlier date, as determined by Autonomy), VAR may commence providing Front Line EAS Support directly for EAS Customers who licensed EAS Products through another authorized reseller or distributor of Autonomy (such EAS Customers hereinafter "Indirect EAS Customer"). In such event, Autonomy shall provide reasonable assistance to VAR to facilitate VAR's contracting directly with such Indirect EAS Customers for the provision of Front Line Support, which may include providing VAR with reasonable information regarding the date the then-current term of maintenance and support services for each such Indirect EAS Customer is set to expire, subject always to any confidentiality obligations of Autonomy. For each Indirect EAS Customer with respect to which VAR agrees to provide Front Line EAS Support, VAR shall pay to Autonomy an amount equal to fifteen percent (15%) of the applicable maintenance and support services fee paid by such Indirect EAS Customer to VAR. Such sum shall be paid annually to Autonomy upon such Indirect EAS Customer's renewal of their maintenance and support services through VAR. VAR shall provide Autonomy with written notice of each Indirect EAS Customer with respect to which it agrees to provide Front Line EAS Support, and shall report to Autonomy no less frequently than once per calendar quarter on the aggregate maintenance renewal fees collected therefrom in each such quarter.

7. **Term and Termination.** The term of this First Amendment shall commence on the First Amendment Date and terminate on the date it becomes terminated pursuant to this Section 7. Autonomy may terminate this First Amendment and/or any Support Order hereunder upon not less than sixty (60) days prior written notice to VAR. Further, Autonomy may terminate this First Amendment pursuant to Section 14.2 of the Agreement. VAR may terminate this First Amendment or any Support Order hereunder in the event Autonomy materially breaches its obligations hereunder or thereunder and fails to cure such material breach within thirty (30) days of the date of VAR's notice thereof. In the event this First Amendment becomes terminated, all applicable Support Orders hereunder shall immediately become terminated. A Support Order shall automatically become terminated with respect to a particular EAS Customer upon such time as such EAS Customer has terminated its maintenance and support services. Upon termination of a Support Order hereunder, the parties shall work in good faith to transition Front Line EAS Support services for the affected EAS Customers thereunder to an alternative provider of such services (which may be Autonomy); in connection therewith, VAR agrees that, upon Autonomy's reasonable request and subject to the parties' continued obligation to pay fees due hereunder, VAR shall continue providing Front Line EAS Support Services for such affected EAS Customers for a period of up to six (6) months from the date an applicable Support Order became terminated. Upon termination of an applicable Support Order, VAR shall immediately return to Autonomy all information concerning the affected EAS Customer(s) thereunder, and such information shall at all times remain Confidential Information of Autonomy under Section 19 of the Agreement. Termination of a Support Order hereunder shall not relieve Autonomy of any obligation to make payment thereunder prior to the effective date of such termination, and termination of this First Amendment shall not relieve VAR of its obligation to payment in connection with any Indirect EAS Customer prior to the effective date of such termination.

8. **Integration.** Except as expressly amended and supplemented hereby, the Agreement shall remain in full force and effect. In the event of any inconsistency between the provisions of this First Amendment and the provisions of the Agreement, the terms of this First Amendment shall control and take precedence.

**[signature page follows]**

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008351
Exh 1012-0058

IN WITNESS WHEREOF, each of VAR and Autonomy has caused this First Amendment to be signed and delivered by its duly authorized representative First .

**Autonomy, Inc.:**

Signed: _____

Name: _Andrew Kanter_

Title: _Company Secretary_

Date: _10 OCT 2009_

**Capax Discovery, LLC:**

Signed: _____

Name: _John BAIOCCO_

Title: _Managing Partner_

Date: _10/12/07_

**Capax Global, LLC:**

Signed: _____

Name: _John BAIOCCO_

Title: _Managing Partner_

Date: _10/12/07_

**Capax Discovery LTD:**

Signed: _____

Name: _John BAIOCCO_

Title: _Managing Partner_

Date: _10/12/09_

**Capax Global LTD:**

Signed: _____

Name: _John BAIOCCO_

Title: _Managing Partner_

Date: _10/12/09_

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008352
Exh 1012-0059

**Attachment 1 to First Amendment**

**Sample Support Order**

**SUPPORT ORDER NO. [▨▨▨▨▨▨▨▨▨▨▨]**

**Effective Date: [DATE]**

| From : | Autonomy, Inc. (on behalf of itself and its affiliate, ZANTAZ, Inc.)<br>One Market Plaza<br>Spear Tower, 19th Floor<br>San Francisco, CA  94015 |
|---|---|

| To: | [VAR]<br>[VAR ADDRESS] |
|---|---|

This Support Order is issued under and pursuant to that certain First Amendment to the Autonomy, Inc. Value Added Reseller Agreement dated October [▨▨▨], 2009 entered into between Autonomy and VAR (the "First Amendment" and, together which such Agreement, the "Agreement").  This Support Order shall become effective as of the Effective Date above.

The terms set forth below to the extent they contradict the Agreement shall supersede the Agreement provided Autonomy has signed this Support Order and VAR has accepted it, in accordance with the First Amendment.  All other terms and conditions contained in the Agreement shall remain in full force and effect.  By execution below, Autonomy shall engage VAR to perform Front Line EAS Support to and for the benefit of the following EAS Customers, pursuant to the terms of the Agreement and First Amendment.

| EAS Customer (name, contact information) | Scheduled Maintenance and Support Renewal Date | Remaining Maintenance Term (in months) | EAS Configuration and Software Information | Current Annual Fee (fee paid for current annual support term) | Renewal Annual Fee (anticipated fee for renewal of annual support services) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**This Support Order shall be subject to the terms of the Agreement and First Amendment.**

**Autonomy signature:** _____
**Print Name:** _____
**Print Title:** _____
**Date:** _____


**Order Accepted by VAR:** _____
**Date:** _____

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008353
Exh 1012-0060

| From: | Laura Dann [ldann@autonomy.com] |
|---|---|
| Sent: | Monday, June 28, 2010 12:39 PM |
| To: | Brent Hogenson |
| Subject: | RE: Commission Payments |

Hi Brent.

Currently no commissions have been paid on the deals listed below.  The deals were entered into Oracle as Non-Commission and are reflected in the commission report as House – Non Commissions.  The information highlighted in green in the table below is a summary of the information I have on file.

| Inv Date | Reseller – End User | Sales Rep | Lic Revenue | Company Name |
|---|---|---|---|---|
| 31-Dec | Microlink – Discovery LLC | MGMT | 2,000,000.00 | DISCOVER TECHNOLOGIES, LLC |
| 30-Dec | MicroTech LLC – (Blank) | MGMT | 9,523,810.00 | DISCOVER TECHNOLOGIES, LLC |
| 31-Dec | MicroTech LLC – Amazon | MGMT | 131,418.00 | AMAZON.COM LLC |
| 31-Dec | MicroTech LLC - Avaya | MGMT | 360,000.00 | AVAYA COMMUNICATIONS |
| 31-Dec | MicroTech LLC - Honeywell | MGMT | 1,800,000.00 | HONEYWELL CORPORATION |
| 31-Dec | MicroTech LLC - KPMG | MGMT | 153,000.00 | KPMG - US & CANADA |
| 31-Dec | MicroTech LLC – Manu Life | MGMT | 1,080,000.00 | MANUFACTURERS LIFE INSURANCE |
| 31-Dec | MicroTech LLC – MS | MGMT | 4,656,000.00 | MORGAN STANLEY |
| 31-Dec | Capax – Eli Lilly | MGMT | 5,987,000.00 | ELI LILLY AND COMPANY |

Thanks,
Laura

**From:** Brent Hogenson [mailto:Brent.Hogenson@autonomy.com]
**Sent:** Sunday, June 27, 2010 12:54 PM
**To:** Laura Dann
**Subject:** Commission Payments

Hi Laura,

Have we paid commissions to sales reps for the transactions below?  If yes, who was the sales rep, how much commission was paid and what month was the commission paid.

| Inv Date | Reseller – End User | Sales Rep | Lic Revenue |
|---|---|---|---|
| 31-Dec | Microlink – Discovery LLC | MGMT | 2,000,000 |
| 30-Dec | MicroTech LLC – (Blank) | MGMT | 9,523,810 |
| 31-Dec | MicroTech LLC – Amazon | MGMT | 131,418 |
| 31-Dec | MicroTech LLC - Avaya | MGMT | 360,000 |
| 31-Dec | MicroTech LLC - Honeywell | MGMT | 1,800,000 |
| 31-Dec | MicroTech LLC - KPMG | MGMT | 153,000 |
| 31-Dec | MicroTech LLC – Manu Life | MGMT | 1,080,000 |
| 31-Dec | MicroTech LLC – MS | MGMT | 4,656,000 |
| 31-Dec | Capax – Eli Lilly | MGMT | 5,987,000 |

Thanks,

1

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**Brent Hogenson**
**President Autonomy Interwoven**
**CFO Autonomy Americas**
**Tel: 408.953.7058**
**Mobile: 408.718.1376**
**E-mail: brent.hogenson@autonomy.com**

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008401
Exh 1012-0062

| From: | Percy Tejeda |
|---|---|
| Sent: | Tuesday, June 22, 2010 10:32 PM |
| To: | Brent Hogenson |
| Subject: | FW: Lilly |
| Attachments: | Lilly and Capax.xls |

FYI.

**From:** Stephen Chamberlain [mailto:stephenc@autonomy.com]
**Sent:** Tuesday, June 22, 2010 8:23 AM
**To:** Percy Tejeda
**Cc:** 'J. Livius Guiao'
**Subject:** Lilly

Percy – depending on how discount is allocated need to instruct Capax to invoice first instalment. I need to talk to Sushovan and Stouffer regarding the overall shortfall. When they get paid they will need to pass on to us to start to settle their amount due to us.

Please prepare pro-forma invoice for Capax to send to Lilly and I will check with Sushovan prior to sending out.

Thanks

**Steve Chamberlain**
**VP, Finance**
**Autonomy**

Cambridge Business Park
Cowley Road
Cambridge
CB4 0WZ

Direct tel: 01223 448017
Mobile tel: 07795 601794
Fax: 01223 448040

E-mail: stephenc@autonomy.com
Web: www.autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged  information.  If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone.  Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies.  No reliance may be placed on this message without written confirmation from an authorised representative of the company.  Autonomy Systems Limited, Registered Office:  Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008348
Exh 1012-0063