Exhibit F

**DOLL AMIR & ELEY LLP**
Gregory L. Doll (SBN 193205)
[ HYPERLINK "mailto:gdoll@dollamir.com" ]
Ronald M. St. Marie (SBN 101398)
[ HYPERLINK "mailto:rstmarie@dollamir.com" ]
1888 Century Park East, Suite 1106
Los Angeles, CA 90067
Telephone: 310.557.9100
Facsimile:  310.557.9101

**FUTTERMAN DUPREE DODD CROLEY MAIER LLP**
Daniel A. Croley (SBN
[ HYPERLINK "mailto:daniel@dfdlaw.com" ]
180 Sansome Street
17th Floor
San Francisco, CA 94104
Telephone: 415.399.3845
Facsimile: 415.399.3838

Attorneys for Defendants
AUTONOMY CORPORATION, AUTONOMY INC.,
and INTERWOVEN, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| BRENT HOGENSON, | CASE NO. |
| Plaintiff, | **DEFENDANTS' MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO DISMISS THE COMPLAINT PURSUANT TO RULE 12(B)** |
| v. | |
| AUTONOMY CORPORATION, a Public Limited Company of the United Kingdom, Inclusive;  AUTONOMY, INC., a New Jersey Corporation; and INTERWOVEN, INC., a Delaware Corporation, | |
| Defendants. | |

[ PAGE  \* MERGEFORMAT ]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[ PAGE   \* MERGEFORMAT ]

D010816353

**K11/162/2**

EXH 4150-0002

**NOTICE OF MOTION**

**TO THE COURT, TO PLAINTIFF BRENT HOGENSON, AND TO HIS COUNSEL OF RECORD:  PLEASE TAKE NOTICE** that on [date] at [time], or as soon thereafter as counsel may be heard, before the Honorable [Judge], Defendants Autonomy Corporation plc, Autonomy Inc., and Interwoven Inc. (collectively "Autonomy/Interwoven"), will and hereby does move this Court for an order:  (a) compelling arbitration of the disputes set forth in the Complaint of Plaintiff Brent Hogenson ("Hogenson") or, in the alternative (b) dismissing the Complaint pursuant to Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure.

Concerning Autonomy/Interwoven's motion to compel arbitration:  Defendants seek to establish that Hogenson's claims are subject to arbitration pursuant to a binding arbitration agreement.  Hogenson aims to avoid arbitration by asserting a federal claim under the recently enacted Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act" or "Act"), which appears to exempt from arbitration claims by whistleblowers who were terminated from their employment for providing information in a prescribed manner to the Securities & Exchange Commission ("SEC").  On the face of statute, however, Hogenson's alleged conduct does not fall within the purview of the Act.  In his Complaint, Hogenson alleges that he was terminated on July 28, 2010.  He then alleges, nearly a month after his termination, on August 20, 2010, that he provided information to the SEC.  Thus, Hogenson could not have suffered an adverse employment action as a result of providing information to the SEC given that he had already been terminated at the time he provided such information.  The Dodd-Frank Act is plainly inapplicable.

Concerning Autonomy/Interwoven's alternative motion to dismiss:  Hogenson's Dodd-Frank claim represents his sole basis for asserting federal jurisdiction in this case.  For reasons already stated, Hogenson cannot assert a valid claim under the Dodd-Frank Act because he suffered no adverse employment action as a result of providing information to the SEC.  Accordingly, in the alternative or in addition to compelling arbitration in this matter, Autonomy/Interwoven moves to dismiss the Dodd-Frank Act claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  In the event such dismissal occurs, Hogenson's remaining state law claims should also be dismissed for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

[ PAGE  \* MERGEFORMAT ]

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

This lawsuit represents a regrettable attempt by Plaintiff Brent Hogenson ("Hogenson") to manufacture federal jurisdiction and launch a preemptive strike against his former employer ("Autonomy/Interwoven"), which is currently investigating him for embezzlement and other civil and criminal wrongdoing.

As the former President of Interwoven and CFO of the Americas for Autonomy, Hogenson was responsible for a payroll department, the members of which perpetrated the largest (at least $2.6 million) embezzlement scheme in the company's history.  Indictments have been handed down; arrests have been made; and the investigation continues to this day.

During Autonomy/Interwoven's investigation into these events, it discovered that Hogenson had authorized $300,000-$400,000 of payments to third parties without proper approval.  It further discovered that Hogenson had been tampering with evidence and otherwise interfering with its investigation, even going so far as to convince an unwitting employee of Autonomy/Interwoven's IT department to "wipe his hard drive clean," thereby permanently erasing the contents of his computer.  Hogenson made a sudden trip out of town, and lied to the company about his whereabouts.  He refused to return to the office for a final interview, claiming a back injury; though he apparently was able to board a plane to Panama shortly thereafter.

When the company had nearly completed its investigation, and confronted Hogenson with his multiple acts of wrongdoing, any of which, alone, warranted termination, Hogenson – now represented by counsel – apparently filed a complaint to the Financial Services Authority ("FSA"), an independent non-governmental body, quasi-judicial body, responsible for the financial regulation of the financial services industry in the United Kingdom.

Hogenson's motive, no doubt, was to create the impression that he was a "whistleblower," about to be fired in retaliation for his FSA claim.  But his claim was misguided – shown to be flawed by Autonomy/Interwoven's Audit Committee as well as its outside auditors at Deloitte – apparently rooted in a fundamental misunderstanding of international accounting rules. Autonomy/Interwoven's stock is traded exclusively on the London Stock Exchange, under the

[ PAGE   \* MERGEFORMAT ]

D010816353

K11/162/4

EXH 4150-0004

1    jurisdiction of the FSA.  Autonomy/Interwoven is not a registrant with the Securities & Exchange

2    Commission ("SEC").  It is not subject to SEC reporting requirements or other legislation affecting

3    other U.S. companies, such as the Sarbanes-Oxley Act.[1]  And it does not conduct its accounting or

4    report its earnings in a manner identical to companies publicly traded in the U.S.

5          Hogenson never filed such a complaint with the SEC at any time prior to his termination

6    from the company.  The significance of this fact, as it pertains to this motion, is that Hogenson's

7    sole basis for claiming federal question jurisdiction in this lawsuit – thereby seeking to avoid his

8    binding arbitration agreement with the company – consists of his First Claim for Relief under the

9    Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act" or "Act").

10   The Dodd-Frank Act was enacted on July 21, 2010, and provides that if a narrowly defined

11   "whistleblower" is terminated as a result of providing information in a specific manner *to the SEC*,

12   he may be able to assert a claim under the Act, and his claim may be exempt from arbitration.[2]

13         Hogenson is no such employee.  As Hogenson admits in his Complaint, he was terminated

14   by Autonomy/Interwoven on July 28, 2010.  It was not until nearly a month later, on August 20,

15   2010, that he chose to lodge a complaint with the SEC, in a transparent effort to avail himself of the

16   new legislation.  Logic as well as law dictates that Hogenson could not have suffered an adverse

17   employment action because of information he provided to the SEC *given that his employment had*

18   *already been terminated by the time he provided it*.  The Dodd-Frank Act, on its face, is

19   inapplicable here, and thus provides no basis for Hogenson to avoid his binding arbitration

20   agreement.

21         Hogenson has claims he wishes to assert against Autonomy/Interwoven.

22   Autonomy/Interwoven has claims it wishes to assert against Hogenson.  The appropriate forum for

---

24   [1]    *See* Request for Judicial Notice

25   [2]    Counsel has used the word "may" insofar as the constitutionality of the various provisions
26   of the Dodd-Frank Act has yet to be determined by the Courts.  It is uncertain whether the Act's
     stated right to a jury trial even in the face of pre-existing arbitration agreements would be applied
     retroactively to agreements entered into prior to the effective date of the Act.  Such analysis is
27   beyond the scope of this motion, which is narrowly tailored to the issue of demonstrating that the
     Act, on its face, does not apply to Hogenson, insofar as it only applies to whistleblowers who suffer
28   adverse employment actions for providing information *to the SEC*.

[ PAGE  \* MERGEFORMAT ]

K11/162/5

EXH 4150-0005

1    the parties to litigate their disputes is before the American Arbitration Association in San Francisco,

2    California.  By this motion, Autonomy/Interwoven asks the Court to dismiss or stay this action, and

3    compel Hogenson to arbitrate in the agreed-upon forum.  Alternatively, Autonomy/Interwoven asks

4    this Court to dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1).

5    **II.      STATEMENT OF ISSUES TO BE DECIDED**

6         1.      Pursuant to the Federal Arbitration Act, should this action be dismissed or stayed in

7    favor of arbitration in light of Hogenson's arbitration agreement with the company?

8         2.      Pursuant to Federal Rule of Civil Procedure 12(b)(6), should Hogenson's Dodd-

9    Frank claim be dismissed in light of the fact that Hogenson was not, and could not have been,

10   terminated in retaliation for providing information to the SEC, given that he did not provide any

11   such information to the SEC until nearly a month after he was terminated?

12        3.      Pursuant to Federal Rule of Civil Procedure 12(b)(1), should Hogenson's remaining

13   state law employment claims be dismissed for lack of subject matter jurisdiction given that

14   Hogenson's only basis for federal jurisdiction – his Dodd-Frank Act claim – is invalid, and thus

15   there is no basis to exercise supplemental jurisdiction in this case?

16   **III.     STATEMENT OF FACTS**

17        **A.      Hogenson's Arbitration Agreement**

18        Under an employment agreement dated March 14, 2001, Hogenson was hired as Vice President,

19   Corporate Controller of iManage, Inc.  His employment agreement included an arbitration provision,

20   located on the third page of a customized three-page agreement—the same page that Hogenson signed.

21   The arbitration provision states:

> In the event of any dispute or claim relating to or arising out of our employment
> relationship, you and the Company agree that all such disputes shall be fully and
> fairly resolved by binding arbitration conducted by the American Arbitration
> Association in San Francisco, California.  HOWEVER, we agree that this
> arbitration provision shall not apply to any dispute or claim relating to or arising
> out of the misuse or misappropriation of the Company's trade secrets or
> proprietary or confidential information.

26        **B.      Interwoven and Autonomy:  iManage's Successors in Interest**

27        Interwoven, Inc. acquired iManage in 2003, and Autonomy acquired Interwoven in 2009.  In

28   each of those transactions, the successor-in-interest assumed all of iManage's assets, debts, contracts,

[ PAGE  \* MERGEFORMAT ]

1   rights, responsibilities, liabilities, and obligations.  Effective November 23, 2009, Hogenson received

2   the title of President of Interwoven and CFO of the Americas, with a base salary of $250,000 and a

3   target bonus of $75,000.

4       **C.**    **Autonomy/Interwoven Begins to Uncover an Embezzlement Scheme**

5       In mid-May of 2010, Autonomy/Interwoven's General Counsel discovered that an employee

6   named Lourdes Dionosio in the payroll division of the company, under Hogenson's supervision, had

7   cut payroll checks to four former employees who were no longer with the company.  On June 1, 2010,

8   Ms. Dionosio was terminated for what initially was believed to be incompetence.  But when Ms.

9   Dionosio subsequently filed for unemployment, she reported her 2009 wages as $449,740 – roughly

10  seven times her annual salary.  Further investigation revealed that this was only the tip of the iceberg

11  and that she had actually embezzled at least $1,015,358.68 from the company.

12      Autonomy/Interwoven's investigation intensified.  By June 26, 2010, Autonomy/Interwoven

13  discovered that another employee, Hannah Yau, an accountant responsible for booking payroll entries,

14  also under Hogenson's supervision, had received $502,524.89 in annual wages – over five times the

15  amount of her annual salary.  The date of this discovery was Saturday, July 26, 2010.

16      **D.**    **Hogenson Begins His Own Concurrent "Investigation" Transparently Designed to**

17            **Deflect Attention from the Wrongdoing in His Department.**

18      On the same day – Saturday, July 26, 2010 – Hogenson suspiciously sent a letter to

19  Autonomy/Interwoven's auditors at Deloitte with a series of questions concerning the company's

20  revenue recognition policies.  During the preceding weeks, amidst the embezzlement investigation

21  involving his supervisees, Hogenson had begun forwarding confidential company documents to his own

22  private gmail account (something Autonomy/Interwoven would not discover until later, and which

23  practice Hogenson continued through the date of his termination), and hinting to

24  Autonomy/Interwoven's senior management that he was about to raise questions about the company's

25  financial reporting.

26      After his email to Deloitte, Autonomy's CEO, Michael Lynch, responded to Hogenson the next

27  day stating that he was surprised that Hogenson had failed to follow proper procedures for such a

28

[ PAGE  \* MERGEFORMAT ]

1  matter, that he was surprised Hogenson had raised questions for which he had no information, and

2  noting that there were basic errors in Hogenson's submission to the outside auditors.

3       Hogenson copied Autonomy's Audit Committee with his questions, for which he was cautioned

4  by the senior member of that committee for "raising basic factual errors that could have been resolved

5  with a simple phone call" and "sending correspondence to the Board without even checking the basic

6  facts with your boss."  Indeed, Hogenson reported to the CFO of the company, and never even bothered

7  to consult with him on any of the supposed questions.

8       To this date, it is important to note, that no one – including Deloitte, the Audit Committee, and

9  Hogenson – has found any improprieties whatsoever in Autonomy/Interwoven's financial reporting.

10  Yet, two days later, without any evidence of actual wrongdoing, Hogenson emailed himself a copy of

11  the guidelines for whistleblowing under FSA rules.

12       **E.**    **Autonomy/Interwoven's Investigation Continues to Uncover Wrongdoing by**

13              **Hogenson, While He Attempts to Achieve "Whistleblower" Status.**

14       All the while, Autonomy/Interwoven was continuing to investigate Hogenson and his

15  department.  Autonomy/Interwoven discovered, for starters, that Hogenson had made a series of

16  unauthorized payments to third parties totaling $300,000-$400,000.  Soon after this discovery,

17  Hogenson made a sudden trip out of town, purportedly on business for the company, but deceived the

18  company about his whereabouts.  Autonomy/Interwoven discovered that Hogenson had ordered a

19  member of the IT department to wipe his hard drive clean, destroying all of the information on his

20  computer.  On July 26, 2010, Autonomy/Interwoven made a request that Hogenson come to the San

21  Francisco office for an interview about these unauthorized payments to third parties.  Hogenson

22  refused, stating that he had had "serious back surgery within the last two years" and this prevented him

23  from traveling such distances in a car.  That same day, with the writing clearly on the wall about his

24  future with the company, he filed a complaint with the FSA.

25       On July 28, 2010, Autonomy/Interwoven emailed Hogenson to discuss his alleged wrongdoing,

26  particularly his unauthorized payments to third parties.  Hogenson claimed that his cell phone battery

27  was too low for such a conversation.  Autonomy/Interwoven emailed Hogenson, and asked that he call

28  the company from a land line to discuss his alleged wrongdoing.  Hogenson refused to engage.  He was

[ PAGE   \* MERGEFORMAT ]

1    terminated that day.  Approximately a week later, he travelled to Panama.  After returning to the U.S.,

2    on August 20, 2010, he purportedly filed a claim with the SEC.

3         Hogenson contacted Autonomy/Interwoven in September 2010 and threatened to file a lawsuit

4    based on purported wrongful termination and violation of the Whistleblower Protection of 1934

5    Securities Exchange Act.  Mr. Hogenson's demand letter attached a "draft complaint" setting forth his

6    allegations, which he threatened to file on October 11, 2010 – precisely one week before he knew the

7    company would be reporting its quarterly earnings.

8         (On October __, pursuant to the arbitration clause in Hogenson's employment contract,

9    Autonomy/Interwoven initiated an arbitration action against Hogenson to resolve all issues related to

10   his employment.  Hogenson has refused to arbitrate and insists that this Court is the proper forum for

11   resolution of disputes related to his employment.)

12   **IV.    AN ORDER COMPELLING ARBITRATION IS WARRANTED IN THIS CASE.**

13        **A.    The Federal Arbitration Act ("FAA")**

14        Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, an arbitration provision in

15   a contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon

16   grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Under the

17   FAA, "any doubts concerning the scope of arbitrable issues should be resolved in favor of

18   arbitration." *See Moses H. Cone Mem'l Hosp.v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

19   Employment agreements are not exempt from the FAA (except those regarding transportation

20   workers). *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001).

21        "A party aggrieved by the refusal of another to arbitrate under a written arbitration

22   agreement may petition the district court which would, save for the arbitration agreement, have

23   jurisdiction over that action, for an order directing that arbitration proceed as provided for in the

24   agreement." *Delmore v. Ricoh Americas Corp.*, 667 F. Supp. 2d 1129, 1134 (N.D. Cal. 2009); 9

25   U.S.C. § 4.  Hogenson and Autonomy/Interwoven have a dispute that, as discussed below, is

26   governed by a valid, enforceable arbitration agreement.  Autonomy/Interwoven initiated an

27   American Arbitration Association proceeding to resolve the dispute, but Hogenson has refused to

28

[ PAGE  \* MERGEFORMAT ]

K11/162/9

EXH 4150-0009

1    participate and has threatened to file a lawsuit in this court to adjudicate his claims against

2    Autonomy/Interwoven.

3         Because this Court would have jurisdiction over Hogenson's claims (which include a claim

4    for violation of Section 21F of the Securities Exchange Act of 1934, as recently added by the

5    Dodd-Frank Wall Street Reform and Consumer Protection Act) if not for the arbitration agreement,

6    this Court has jurisdiction over Autonomy/Interwoven's petition to compel arbitration.  9 U.S.C.

7    § 4 (permitting party to "petition any United States district court which, save for such [arbitration]

8    agreement, would have jurisdiction under Title 28. . .").

9         **B.**     **The Role of the Courts Under the FAA**

10        When presented with a question of arbitrability, the court's role is limited to determining:

11   (1) "whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement

12   encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126,

13   1130 (9th Cir. 2000).

14        "By its terms, the Act 'leaves no place for the exercise of discretion by a district court, but

15   instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to

16   which an arbitration agreement has been signed." *Id.* (citing *Dean Witter Reynolds, Inc. v. Byrd*,

17   470 U.S. 213, 218 (1985) (emphasis in original).  Any doubts concerning the scope or application

18   of an arbitration provision must be resolved in favor of arbitration.  *Volt Info. Sciences v. Board of*

19   *Trustees of Leland Stanford, Jr. Univ.*, 489 U.S. 468, 475-76 (1989).

20        The parties' disputes have been submitted to the American Arbitration Association, which

21   include the following claims:

22        (i)      Hogenson's assertion that Autonomy/Interwoven's termination of his

23                 employment violated Section 21F of the Securities Exchange Act of 1934, as

24                 recently added by the Dodd-Frank Wall Street Reform and Consumer

25                 Protection Act,

26        (ii)     Hogenson's assertion that Autonomy/Interwoven's termination of his

27                 employment violated California Labor Code § 1102.5,

28

[ PAGE   \* MERGEFORMAT ]

1      (iii)     Hogenson's assertion that Autonomy/Interwoven's termination of his

2             employment constitutes wrongful termination under state common law.

3      While Hogenson may assert that only he had the right to submit these claims to the AAA,

4 that is an issue for the arbitrator to decide.  *See, e.g., Milliman, Inc. v. Health Medicare Ultra, Inc.*,

5 641 F. Supp. 2d 113, 119 (D.P.R. 2009) ("Whether the alleged dispute that led Petitioners to

6 commence arbitration proceedings before the AAA is ripe must ultimately be decided by the

7 arbitrator.").  The question here is whether or not there is a valid arbitration agreement that applies

8 to the dispute that has been submitted to the AAA.  *Id.* at 119 (ordering respondent to participate in

9 pending AAA proceeding initiated by petitioner to adjudicate claims contained in draft complaint

10 respondent sent to petitioner).

11      **C.**     **The Existence of a Valid Arbitration Agreement**

12          **1.**     **Autonomy/Interwoven Can Enforce the 2001 Agreement Signed**

13                 **by Its Predecessor-in-Interest.**

14      The arbitration provision is contained in Hogenson's 2001 agreement with iManage, Inc.  In

15 2003, Interwoven acquired iManage, Inc. and assumed Hogenson's employment agreement.  In

16 2009, Autonomy acquired Interwoven and assumed Hogenson's employment agreement.

17 Autonomy/Interwoven terminated Hogenson's employment later in 2010.  The dispute between

18 Hogenson and Autonomy/Interwoven concerns Hogenson's allegations that

19 Autonomy/Interwoven's termination of Hogenson's employment violates state and federal law.

20      The arbitration provision contained in the 2001 Agreement is binding on Hogenson and

21 Autonomy/Interwoven even though the agreement was signed on behalf of iManage, Inc. and not

22 by Autonomy/Interwoven.  "Courts have held that nonsignatories of arbitration agreements may be

23 bound by the agreement under ordinary contract and agency principles."  *Britton v. Co-op Banking*

24 *Group*, 4 F.3d 742, 745 (9th Cir. 1993).  This includes the principle that a successor-in-interest to a

25 contract can enforce its rights under the contract.  *Id.* at 746.  Applying this principle, a court in this

26 district recently rejected an employee's attempt to avoid arbitration on the ground that the

27 employee entered into an employment agreement (containing an arbitration clause) with the

28 employer's predecessor-in-interest.  *Delmore v. Ricoh Americas Corp.*, 667 F. Supp. 2d 1129, 1134

[ PAGE  \\* MERGEFORMAT ]

K11/162/11

EXH 4150-0011

1   (N.D. Cal. 2009). The court held that "[the original employer's] contractual rights vested in [the

2   current employer] after the merger took place, and therefore, [the current employer] can enforce the

3   agreement against Plaintiff." *Id.*

4           The evidence here demonstrates that, as part of its acquisition of Interwoven, Autonomy

5   assumed the rights and obligations set forth in Hogenson's employment contract. Indeed, as set

6   forth in the Declaration of Andrew M. Kanter ... [provide detail about mergers and assumption of

7   rights and obligations] ... Thus, as in *Delmore*, Autonomy/Interwoven is entitled to enforce the

8   arbitration provision contained in Hogenson's employment contract.

9                   **2.      The 2001 Agreement Is Valid Under Applicable Law.**

10          As discussed above, the FAA requires the district court to enforce a valid arbitration

11  agreement. In determining the validity of an arbitration agreement, federal courts "should apply

12  ordinary state-law principles that govern the formation of contracts." *First Options of Chicago,*

13  *Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Thus, "although courts may not invalidate arbitration

14  agreements under state laws applicable only to arbitration provisions," general contract defenses

15  such as fraud, duress, or unconscionability may operate to invalidate arbitration agreements.

16  *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). Here, there is no basis under

17  California law to invalidate Hogenson's arbitration agreement on any of those grounds.

18                  **a.      The Law of Unconscionability**

19          Given the frequency with which parties attempt to invalidate arbitration agreements on the

20  grounds of unconscionability, it makes sense to discuss the applicable law concerning

21  unconscionability in these moving papers. Under California law, in order for a court to exercise its

22  discretion to refuse to enforce a contract or clause under the doctrine of unconscionability, the

23  clause or contract must be both procedurally unconscionable and substantively unconscionable.

24  *Armendariz v. Foundation Health Psychare Svcs. Inc.*, 24 Cal 4th 83, 114 (2000). While both types

25  of unconscionability must be present in order to invalidate a contract, they need not be present in

26  the same amounts. Rather, a "sliding-scale" approach is used such that "the more substantively

27  oppressive the contract term, the less evidence of procedural unconscionability is required to come

28  to the conclusion that the term is unenforceable, and vice versa." *Id.*

[ PAGE   \* MERGEFORMAT ]

1       The arbitration provision was not buried in a lengthy, confusing document.  Hogenson's

2  employment contract was three-pages long, personalized, and written in clear, unambiguous

3  language.  The arbitration provision was clear, and it appeared on the third page of the document—

4  the page signed by Hogenson to indicate his acceptance of the terms of the contract.  Hogenson is

5  and was a sophisticated business person—he was hired as Vice President, Corporate Controller in

6  2001 and eventually became the Chief Financial Officer.  He knowingly entered into a contract

7  containing an arbitration provision in exchange for a generous compensation and benefits package,

8  and under prevailing law his employer would be required to pay the costs of arbitration.

9       Under similar circumstances, courts have found "a minimum degree of procedural

10  unconscionability." *Dotson v. Amgen, Inc.*, 181 Cal. App. 4th 975, 981 (2010) (finding "minimal"

11  procedural unconscionability where patent attorney's "take-it-or-leave-it" employment agreement

12  contained arbitration clause).  Given the low degree of procedural unconscionability in Hogeson's

13  employment agreement, a high degree of substantive unconscionability would be required to find

14  the agreement unenforceable. *Id.* at 982.

15       Substantive unconscionability "focuses on the harshness and one-sided nature of the

16  substantive terms of a contract." *Delmore v. Ricoh Americas Corp.*, 667 F. Supp. 2d 1129, 1137

17  (N.D. Cal. 2009).  Even a contract of adhesion is enforceable as long as it contains a "modicum of

18  bilaterality," or "at least some reasonable justification for [its] one-sidedness." *Armendariz*, 24 Cal.

19  4th at 117-18.  Here, the obligation to arbitrate is completely bilateral: both parties agreed that any

20  and all disputes, other than those relating to misuse of company trade secrets or confidential

21  information, would be resolved by binding arbitration.

22       The exception for claims relating to the misuse of company trade secrets or confidential

23  information is reasonable because: a) protection of trade secrets is essential for computer software

24  companies, and b) arbitrators do not have the power to grant injunctive relief, which is often

25  necessary to enforce obligations regarding trade secrets. *See Delmore*, 667 F. Supp. 2d at 1138

26  (arbitration clause was bilateral and enforceable notwithstanding clause permitting employer to

27  pursue judicial remedies for misappropriation of trade secrets or confidential information).

28

[ PAGE   \* MERGEFORMAT ]

K11/162/13

EXH 4150-0013

1    Moreover, the parties' agreement to have employment disputes arbitrated by the American

2    Arbitration Association ensures that the employer will pay all costs unique to the arbitration, and

3    ensures that a neutral arbitrator will have the discretion to permit whatever discovery is necessary

4    to fully and fairly adjudicate the claims.  *Roman v. Superior Court*, 172 Cal. App. 1462, 1475, 1478

5    (2009) (rejecting employee's contention that arbitration provision, by incorporating AAA rules, did

6    not provide for adequate discovery and did not ensure that employee did not incur arbitration

7    costs); *Delmore*, 667 F. Supp. 2d at 1137 (recognizing AAA rules provide for neutral arbitrators,

8    sufficient discovery, a written award, and appropriate allocation of arbitration fees).

9        **b.    The Law of Severability**

10    Finally, if the only arguably unconscionable provision of an arbitration clause is a singular

11    provision creating lack of mutuality regarding the scope of trade secret claims, courts of this district

12    routinely opt to sever the offending provision rather than disregard the contract altogether.  *See Martin*

13    *v. Ricoh Americas Corp.* 2009 WL 1578716, 5 -6  (N.D.Cal. 2009); *Arreguin v. Global Equity Lending,*

14    *Inc.,* 2008 WL 4104340 (N.D.Cal. 2008); *Siglain v. Trader Publ. Co.,* 2008 WL 3286974 (N.D.Cal.

15    2008).  Notably, both parties to this agreement have claims against one another, and

16    Autonomy/Interwoven aims to establish that all claims be sent to arbitration pursuant to Hogenson's

17    2001 Agreement.

18        **D.    The Scope of the Arbitration Agreement**

19    The arbitration filed with the American Arbitration Association concerns the following

20    issues in dispute—(i) Hogenson's assertion that Autonomy/Interwoven's termination of his

21    employment violated Section 21F of the Securities Exchange Act of 1934, as recently added by the

22    Dodd-Frank Wall Street Reform and Consumer Protection Act, (ii) Hogenson's assertion that

23    Autonomy/Interwoven's termination of his employment violated California Labor Code § 1102.5,

24    and (iii) Hogenson's assertion that Autonomy/Interwoven's termination of his employment

25    constitutes wrongful termination under state common law.

26    The arbitration clause in Hogenson's employment contract applies to "any dispute or claim

27    relating to or arising out of [the] employment relationship."  This language of the arbitration

28    provision is sufficiently broad to include all of the claims at issue in the arbitration, including

[ PAGE  \* MERGEFORMAT ]

1   Hogenson's statutory claims under state and federal law.  *See Gilmer v. Interstate/Johnson Lane*

2   *Corp.*, 500 U.S. 20, 35 (1991) (former employee's claims under Age Discrimination in

3   Employment Act of 1967 were encompassed by arbitration provision concerning "any dispute,

4   claim or controversy" arising out of employment or termination of employment).  As the Supreme

5   Court stated in *Gilmer*, "having made the bargain to arbitrate, the party should be held to it unless

6   Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights

7   at issue."  *Id.* at 26.

8       **E.**       **There Is No Applicable Arbitration Exemption Under the Dodd-Frank Act.**

9           **1.**       **The Act Applies Only to Those Providing Information to the SEC.**

10          The Dodd Frank Act's protection of whistleblowers is limited to retaliation for

11  communications to, and cooperation with, the SEC.  There is no protection offered for

12  communications to or cooperation with foreign oversight agencies such as the FSA:

13          (h) PROTECTION OF WHISTLEBLOWERS.—(1) PROHIBITION AGAINST
14          RETALIATION.—

15          (A) IN GENERAL.—No employer may discharge, demote, suspend, threaten,
    harass, directly or indirectly, or in any other manner discriminate against, a
16  whistleblower in the terms and conditions of employment because of any lawful act
    done by the whistleblower--
17

18          (i) in providing information **to the Commission** in accordance with this
    section;
19

20          (ii) in initiating, testifying in, or assisting in any investigation or judicial or
    **administrative action of the Commission** based upon or related to such information; or
21

22          (iii) in making disclosures that are required or protected under the Sarbanes–
    Oxley Act of 2002 (15 U.S.C. 7201 et seq.), the Securities Exchange Act of 1934 (15
23  U.S.C. 78a et seq.), including section 10A(m) of such Act (15 U.S.C. 78f(m)), section
    1513(e) of title 18, United States Code, and any other law, rule, or regulation **subject to**
24  **the jurisdiction of the Commission.**

25  15 USCA § 78u–6(h) [Section 922(h) of the Dodd Frank Act]; emphasis added.

26          Unequivocally, the Dodd Frank Act does not protect every employee who fashions himself

27  to be a whistleblower.  It only protects those whistleblowers who specifically provide information

28

[ PAGE   \* MERGEFORMAT ]

*to the SEC.* This reading is consistent with the definition of whistleblower set forth in the Dodd

Frank Act. As defined, whistleblower means:

> (6) WHISTLEBLOWER.--The term 'whistleblower' means any individual who provides, or 2 or more individuals acting jointly *who provide, information relating to a violation of the securities laws* <u>*to the Commission*</u>, in a manner established, by rule or regulation, by the Commission.

15 USCA § 78u–6(a)(6) [Section 922(a)(6) of the Dodd Frank Act]; emphasis added.[3]

**2.      No Basis Exists to Expand the Act to Foreign Agencies Such as the FSA.**

Hogenson's attempt to expand the scope of the whistleblower protections to include those

who communicate to and cooperate with the FSA runs afoul of the well-guarded principles of

statutory construction.

As the Supreme Court has repeatedly stated: "[W]e begin with the understanding that

Congress 'says in a statute what it means and means in a statute what it says there.'" *Hartford

Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 1947 (2000),

quoting *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391

(1992). "[W]hen 'the statute's language is plain, the sole function of the courts' – at least where the

disposition required by the text is not absurd – 'is to enforce it according to its terms.'" *Id., quoting

United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290

(1989).

When Congress identifies a specific person, entity, or type of claim in a statute (as here, a

specific type of whistleblower who provides information to the SEC in a particular manner), it is

not within the province of the courts to expand those terms:

> The statute is awkward, and even ungrammatical; but that does not make it ambiguous on the point at issue. In its first part, the statute authorizes an award of compensation to one of three types of persons: trustees, examiners, and § 327 professional persons. A debtor's attorney not engaged as provided by § 327 is simply not included within the class of persons eligible for compensation. In subsection (A) the statute further defines what type of compensation may be awarded: compensation that is reasonable; and for actual, necessary services; and rendered by four types of persons (the same three plus attorneys). Unless the applicant for compensation is in

---

[3] It is also noteworthy that as Plaintiff concedes, Autonomy Corporation PLC stock is traded on the London Stock Exchange and therefore is a not a domestic publicly traded company governed by the Sarbanes–Oxley Act of 2002.

D010816353

K11/162/16

EXH 4150-0016

one of the named classes of persons in the first part, the kind of service rendered is irrelevant.

*Lamie v. U.S. Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 1030 (2004).

Indeed, the Supreme Court has repeatedly cautioned restraint in interpreting congressional legislation in an expansive manner, particularly where, as here, the language of the statute is unambiguous on its face:

> [W]e are not free to so expansively interpret the Pittman Act's reservation. In *Western Nuclear*, we had no choice but to speculate about congressional intent with respect to the scope of the amorphous term "minerals." Here, by contrast, Congress has textually narrowed the scope of the term by using the modifier "valuable." The preeminent canon of statutory interpretation requires us to "presume that [the] legislature says in a statute what it means and means in a statute what it says there." Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous. We think the term "valuable" makes clear that Congress did not intend to include sand and gravel in the Pittman Act's mineral reservation.

*BedRoc Ltd., LLC v. U.S.*, 541 U.S. 176, 183-184, 124 S.Ct. 1587, 1593 (U.S. 2004).

See also *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 1947 (2000):

> Here, the statute appears quite plain in specifying who may use § 506(c) – "[t]he trustee." It is true, however, as petitioner notes, that all this actually "says" is that the trustee may seek recovery under the section, not that others may not. The question thus becomes whether it is a proper inference that the trustee is the only party empowered to invoke the provision. We have little difficulty answering yes.

By the Dodd-Frank Act, Congress did not create a system of protection for any person claiming to be a "whistleblower." Congress has addressed the need for whistleblower protection in other limited circumstances, *see e.g.* 29 U.S.C.A. § 1140 (protecting whistleblowers in ERISA proceedings), and here has expressly limited the statute's reach to information provided to the SEC. Congress did not go down the slippery slope of including other foreign agencies, even those with which the SEC might have "longstanding relationships," nor would it proper to expand the reach of the statute beyond its stated intent.

Simply put, there is nothing ambiguous about the term "Commission" in the Dodd-Frank Act: "The term 'Commission' means the Securities and Exchange Commission, except in the context of the Commodity Futures Trading Commission." Dodd-Frank Act § 2.5. And if Congress had meant to expand the statute's protection to anyone who provided information to foreign entities such as the FSA, it would have included those entities in the

[ PAGE   \* MERGEFORMAT ]

1  statute. *See U.S. v. Deeb*, 175 F.3d 1163, 1167 (9th Cir. 1999) ("By clear and unambiguous

2  language, the statute's coverage is limited to "fraud in the *sale* of securities." If Congress

3  had intended to include fraud in the *purchase* of securities in RICO's definition of

4  "racketeering activity," it would only have needed to insert the words "or purchase" after

5  "sale" as it did in 15 U.S.C. § 78j. It chose not to do so, and we will not punish the

6  appellants in this case by torturing the explicit terms of the RICO statute to mean something

7  more than the words can bear."); *Columbia Basin Land Protection Ass'n v. Schlesinger*, 643

8  F.2d 585, 606 (9th Cir. 1981) ("Section 505 of FLPMA states that the BPA must comply with

9  State standards.… If Congress had meant to include local plans such as that of Franklin

10  County, they could have easily worded the statute to reflect that intent. We therefore hold

11  that the BPA is not required to comply with the terms of the Franklin County Comprehensive

12  Plan.") Hogenson's Dodd-Frank Act claim provides no basis for Hogenson to avoid his

13  arbitration agreement in this case.

14  **V.      ALTERNATIVELY, THIS CASE SHOULD BE DISMISSED UNDER RULE 12(b).**

15      **A.      Legal Standards For Motions To Dismiss Under Rule 12(b)(6)**

16      The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is to test

17  the legal sufficiency of a complaint. Dismissal for failure to state a claim under Federal Rule of

18  Civil Procedure 12(b)(6) is appropriate when it appears beyond doubt that the non-moving party

19  can prove no set of facts in support of its claim. *Manshardt v. Fed. Judicial Qualifications Comm.*,

20  401 F.3d 1014, 1016 (9th Cir. 2005). Although the court must take all well-pleaded allegations of

21  material fact as true and construe them in the light most favorable to the non-moving party,

22  "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to

23  dismiss." *Adams v. Johnson,* 355 F.3d 1179, 1183 (9th Cir. 2004) (citing *Sprewell v. Golden State

24  Warriors,* 266 F.3d 979, 988 (9th Cir. 2001).

25      **F.      Summary of Allegations Relevant to Motion to Dismiss**

26      According to the Complaint, Hogenson alleges that after being promoted to the position of

27  Chief Financial Officer in 2009, he discovered certain improprieties in the reporting of financial

28  information by Defendants. Those issues were first raised with Defendants on June 22, 2010.

[ PAGE  \* MERGEFORMAT ]

1   (Complaint ¶ 20.)  In July 2010, he learned that Autonomy/Interwoven management did not intend

2   to further investigate his charge.  (*Id.*, ¶ 21.)  By mid July 2010, he was told that management had

3   closed its investigation of his charges.  (*Id.* ¶ 25.)  On July 26, 2010, Hogenson alleges that he

4   reported his concerns to the "FSA."  (*Id.*)  Hogenson was terminated as an employee on July 28,

5   2010.  (*Id.*)  He filed information with the SEC on August 20, 2010.  (*Id.*, ¶ 26.)

6         Hogenson alleges on information and belief, that "Autonomy's true reason for terminating

7   him was to retaliate against him for raising complaints about financial and accounting irregularities

8   for his stated intent to raise these issues with the appropriate regulatory authorities and for his

9   disclosures to the FSA."  (Complaint ¶ 26.)  Thus, Hogenson does not allege that he was terminated

10  for his disclosures to the SEC because those disclosures occurred after his termination.

11         **G.    Hogenson's First Claim For Relief (Dodd-Frank) Fails as a Matter of Law.**

12         Hogenson was terminated almost a month before he alleges he provided information to the

13  SEC.  He therefore has no right or standing to claim he was terminated for that report.  His Dodd

14  Frank Act claim is based on an expansion of the protections for whistleblowers beyond any

15  reasonable reading of that law.  Indeed, Plaintiff's reading requires a reworking of the definition of

16  the term whistleblower as used in the Dodd Frank Act.  Accordingly, Plaintiff cannot state a valid

17  claim for relief under the Act.

18         **D.    Hogenson's Second And Third Claims For Relief Should Be Dismissed Upon**

19                **Dismissal Of The First Claim For Lack Of Subject Matter Jurisdiction.**

20         Plaintiff alleges that this court has subject matter jurisdiction over the Second and Third

21  Claims for Relief as part of its exercise of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

22  Section 1367(c)(3) provides that once the court dismisses the claim or claims over which it has

23  original jurisdiction, the court can dismiss those over which it exercises supplemental jurisdiction:

24         **(c)**  The district courts may decline to exercise supplemental jurisdiction over a claim

25         under subsection (a) if—. . . **(3)**  the district court has dismissed all claims over which

26         it has original jurisdiction.…

27         It is Defendants' position that the remaining state claims should be adjudicated in binding

28  arbitration.  To the extent that this Court decides not to compel the parties to arbitrate their disputes,

[ PAGE  \* MERGEFORMAT ]

1  however, there is no good reason why this court should exercise its jurisdiction over the state

2  claims in exercise of supplemental jurisdiction.

3  **VII.**    **CONCLUSION**

4        Under the FAA, "any doubts concerning the scope of arbitrable issues should be resolved in

5  favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25

6  (1983).  The contracts at issue here evidence a clear intent to arbitrate the current dispute between

7  Hogenson and Autonomy/Interwoven.  The arbitration provision in the employment agreement

8  covers "any dispute or claim relating to or arising out of [the] employment relationship," except for

9  claims concerning the company's trade secrets or proprietary or confidential information.  That

10  clear language, particularly in light of the general principle that "arbitration agreements are favored

11  and are to be broadly construed with doubts resolved in favor of coverage," *see id*, compels

12  Hogenson to submit his claims to arbitration.  Accordingly, pursuant to the FAA, the Court should

13  "make an order directing the parties to proceed to arbitration in accordance with the terms of the

14  agreement." *See* 9 U.S.C. § 4.

15        Hogenson cannot assert a valid claim under the Dodd-Frank Act.  To the extent Hogenson

16  seeks to avoid arbitration on the basis of this infirm claim, his position is without merit.  In the

17  alternative to sending this entire dispute to arbitration, Autonomy/Interwoven respectfully requests

18  that the Court dismiss Hogenson's First Claim for Relief under Federal Rule of Civil Procedure

19  12(b)(6) and his remaining claims under Federal Rule of Civil Procedure 12(b)(1).

20

21

22  Dated:  [ DATE \@ "MMMM d, yyyy" ]              **DOLL AMIR & ELEY LLP**

23

24        United States District Court

25        Northern District of California

26        **Trial Exhibit 4150**

27  Case No:    CR 18-0577 CRB
    Date Entered: _____
28  By:  _____
              Deputy Clerk

By: _____
     GREGORY L. DOLL
Attorneys for Defendants AUTONOMY
CORPORATION, AUTONOMY INC.,
and INTERWOVEN, INC.

[ PAGE  \* MERGEFORMAT ]

D010816353