PATRICK D. ROBBINS (CABN 152288)
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
KRISTINA N. GREEN (NYBN 5226204)
ZACHARY G.F. ABRAHAMSON (CABN 310951)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7014
    Fax: (415) 436-7234
    Email:  Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 18-577 CRB |
| Plaintiff, | |
| v. | UNITED STATES' OFFER OF PROOF REGARDING CHRIS YELLAND |
| MICHAEL RICHARD LYNCH AND STEPHEN KEITH CHAMBERLAIN, | Trial Date:  March 18, 2024 |
| Defendants. | Pretrial Conference:  February 21, 2024 |

As requested by the Court at the February 28 and April 9, 2024 hearings, the government respectfully provides a summary of the proposed testimony it intends to elicit from Chris Yelland based on the Court's rulings:

PROPOSED TESTIMONY

1. I graduated from the University of Warwick in or about 1989. In April 1990, I joined Arthur Anderson, which at the time was one of the five biggest accounting firms worldwide. I qualified as a Chartered Accountant while at Arthur Anderson and was a Chartered Accountant at all times relevant to the events described in my testimony.

2. After more than three years of work at Arthur Anderson, I joined the Financial Training Company ("FTC") in 1993 as a tutor. FTC was a small professional training company which trained people to become chartered, certified, and/or management accountants. In my role at FTC, I lectured on various aspects of accountancy and business practice.

3. In 1995, I joined the accounting team at Rover Group, a UK-based car manufacturer. I started off as an operational audit manager. I was later promoted to U.K. Accounting Manager.

4. In January 2000, I moved to Compaq and was with Compaq when it merged with HP. I worked in various finance roles within HP. In September 2010 I was promoted to Finance Director of HP's EMEA Software business and in April 2012 I was promoted to the position of CFO of Autonomy, which had been acquired by HP in the autumn of 2011. Stephen Chamberlain had been in that role. I used an office Mr. Chamberlain formerly used. In the office, I found notebooks that appear to have belonged to Mr. Chamberlain and have notes referenced transactions I became familiar with during my time at Autonomy. I gave those notebooks to investigators for HP. They are marked as Exhibits 11673, 11674, 11675, 11676, 11677, and 11678.

5. Autonomy Corporation plc was a holding company for a group of related companies engaged in the business of software development and distribution, including U.S.-based companies Autonomy, Inc. and ZANTAZ, Inc. and a U.K.-based company, Autonomy Systems Limited ("ASL"). ASL licensed Autonomy software to other entities in the Autonomy group and participated in the earnings of its fellow group companies. Specifically, ASL had "transfer pricing" and other arrangements with other Autonomy group companies. Pursuant to those arrangements, amounts equal to, typically, 96.5% of the revenues of other Autonomy group companies were transferred to ASL. In other words, when transactions by certain Autonomy group companies generated revenue, that generated revenue for ASL. An error or misstatement in one of the sales company's books would affect both the group accounts and ASL's accounts.

6. During the time period 2009 to 2011, Autonomy Corporation plc issued press releases to the market announcing earnings for the group as a whole, and ASL publicly filed financial statements reporting revenue earned in part through its licensing agreements with Autonomy group companies.

7.  I became a director of ASL on or about July 5, 2012, shortly after becoming Autonomy CFO. ASL was subject to the Companies Act of 2006 in the U.K. ASL's directors (including me) were required to prepare financial statements for each financial year that provided a true and fair view of the state of affairs of the company at year end and the profit and loss. Its directors were forbidden from approving financial statements unless they were satisfied that the financial statements gave a true and fair view of the assets, liabilities, financial position, and profit or loss of the company. ASL also was required to keep adequate accounting records that were sufficient to show and explain the company's transactions and disclose with reasonable accuracy at any time the financial position of the company and enable the directors to ensure that the financial statements comply with the Companies Act. In addition, ASL's directors were required to publicly file ASL's financial statements with the Registrar of Companies (Companies House). Criminal penalties attached to each of these obligations, and I took them seriously.

8.  ASL's financial statements were prepared in accordance with United Kingdom Generally Accepted Accounting Practice (United Kingdom Accounting Standards and applicable law). In preparing these financial statements, ASL's directors were required to (1) select suitable accounting policies and then apply them consistently; (2) make reasonable and prudent judgments and accounting estimates; (3) state whether applicable U.K. Accounting Standards have been followed; and (4) prepare the financial statements on the going concern basis.

9.  On or about September 30, 2011, ASL filed a Report and Financial Statements for the year ended December 31, 2010, as required by the Companies Act. *See* Trial Ex. 1373. It was executed by Sushovan Hussain, who was one of ASL's two directors at the time.

10. At some point, I became concerned that ASL's 2010 financial statements were misstated and that ASL had an obligation under U.K. law to restate them. My team and I undertook a substantial accounting review of Autonomy Corporation plc and ASL's historical financial statements. We reviewed voluminous business records. The review took substantial time. My team and I gathered all relevant information we could.

11. I ultimately determined a restatement of ASL's previously filed financial statements was required. (Because Autonomy Corporation plc was purchased by HP it was no longer required to file

1  financial statements.)  On or about January 31, 2014, ASL filed with the Registrar of Companies its
2  Report and Financial Statements for the 10 months ended October 31, 2011 (the "Restatement"). *See*
3  Ex. 2445.  I signed the Restatement on behalf of the Board, subject to my duties under U.K. law and all
4  of the criminal penalties described above.  In the Restatement, ASL reduced its publicly reported
5  revenue (or turnover) from £175,632,000 to £81,293,000.  *Compare* Trial Ex. 1373 at 10 *to* Trial Ex.
6  2445 at 13.  ASL also reduced its retained earnings balance (profit and loss account) at December 31,
7  2009, from £188,010,000 to £108,882,000, which reflects a substantial decrease in 2009 revenue.
8  *Compare* Trial Ex. 1373 at 11 *to* Trial Ex. 2445 at 37.  The Restatement further reflects that ASL
9  engaged Ernst & Young LLP ("E&Y") as its statutory auditor, but that E&Y disclaimed an opinion
10 because (1) "further adjustments might have been required" if additional information evidence had been
11 available, including information that might be identified from ongoing investigations; (2) "further
12 adjustments might be required to the intercompany balances" if additional information and evidence
13 were available; and (3) the Company's earnings and financial position may be further impacted by
14 additional errors found in the accounting of fellow group undertakings."  The restatement was the
15 product of significant care and deliberation and is a business record of ASL.

16        12.    The Restatement reflects adjustments for numerous transactions that impacted both
17 ASL's financial statements and Autonomy Corporation plc's financial statements.  As part of the
18 accounting review, my team and I determined the adjustments were required both under United
19 Kingdom Accounting Standards and International Financial Reporting Standards, with which Autonomy
20 Corporation plc's financial statements purported to comply.

21        13.    To illustrate the impact of the ASL Restatement on Autonomy Corporation plc's publicly
22 reported results, I prepared summary charts based on Autonomy business records.  *See* Ex. 2749.  The
23 summary charts itemize how individual transactions or groups of transactions comprise the Restatement
24 and their annual and quarterly impacts both on ASL's accounts and Autonomy Corporation plc's
25 accounts.

26        14.    For example, on page one of Ex. 2749, in the column "Retained Earnings (Note 3) / As at
27 Dec 2009," I list the "Originally Stated" revenue for ASL as £188.01m.  This is drawn from ASL's prior
28 filings before I became a Director.  I then list "Adjustments in respect of restated transactions," which

reflects the amount of revenue reduction based on specific restated transactions in the Restatement. These adjustments were made to the books of ASL as part of the Restatement. For example, the restatement of the "MicroTech / Discover Technologies" transaction reduced reported ASL revenue (within retained earnings) for 2009 by £5.74. The "Capax Discovery (EDD)" transaction reduced reported ASL revenue (within retained earnings) for 2009 by £1.27m. The restatement of the "Filetek" transaction reduced reported ASL revenue (within retained earnings) for 2009 by £6.30m. I also list adjustments related to "hosting transactions" relating to reductions for hosting transactions as a whole and "other adjustments" that do not necessarily fit a particular category. The total adjustments for all restated transactions is £80.13m. This reduced ASL's reported revenue to £107.88. I also account for an adjustment relating to a change in accounting policy. Page 1 also lists the amount of hardware revenue recognized with 2009 and expresses the percentage of restated transactions as compared to prior reported results.

15.    In the column "Revenue / Total 2010," I list the "Originally Stated" revenue for ASL that year as £175.63m, which is drawn from ASL's prior filings before I became a Director. I then list "Adjustments in respect of restated transactions," which reflects the amount of revenue reduction based on certain restated transactions. These adjustments were made to the books of ASL as part of the Restatement. For example, the restatement of the "FileTek / United States Veterans Administration Authority" transaction reduced reported ASL revenue for 2010 by £6.03. The "MicroTech / Biblioteca Apostolica Vaticana (Vatican Library)" transaction reduced reported ASL revenue for 2010 by £5.74m.

16.    In the column "Revenue / Jan – Oct 2011," I list the "Originally Stated" revenue for ASL that period as £108.64, which is drawn from ASL's books and records before I became a Director. This amount had not been publicly reported but is what the books reflected when I assumed responsibility. I then listed "Adjustments in respect of restated transactions," which reflects the amount of revenue reduction based on certain transactions I and my team adjusted. These adjustments were made to the books of ASL as part of the restatement. For example, based on my team's review, ASL adjusted its books to reduce revenue associated with the "MicroTech / Hewlett Packard" transaction for 2011 by £3.25m.

U.S.' OFFER OF PROOF
CASE NO. CR 18-577 CRB                                   5

17. The adjustments listed on page 1 accurately reflect adjustments made to the books and records of ASL as a result of my and my team's accounting review.

18. Pages 4 through 13 of Ex. 2749 reflect the impact of the Restatement and adjustments to ASL's books on the group revenue as previously reported. For example, on page 4, I list a column "Revenue / Q1 2009." The row "Originally stated revenue" is drawn from Autonomy Corporation plc's public filings. The rows under "Total restated transactions" list transactions restated or adjusted in the Restatement in terms of their USD impact on the group accounts. As part of the restatement, my team and I adjusted the books and records of the Autonomy subsidiary responsible for the Capax Discovery (EDD) transaction to reduce revenue by $7.5 million, which is reflected in row 3. This reduced ASL's revenue by virtue of transfer pricing. The overall impact to the group accounts was a $7.5 million reduction in revenue. The remaining adjustments on page 4 and the remaining pages through page 13 accurately reflect adjustments made to Autonomy's books to complete the ASL restatement. In the summaries, I also list hardware revenue that was recorded and express the adjustments and revenue as percentages.

19. To provide another example, page 8 of Ex. 2749 reflects the impact of the Restatement and adjustments to ASL's books on the group revenue as previously reported. On page 8, I list a column "Revenue / Q1 2010." The row "Originally stated revenue" is drawn from Autonomy Corporation plc's public filings ($194.18m). The rows under "Total restated transactions" list transactions restated or adjusted in the Restatement in terms of their USD impact on the group accounts. As part of the Restatement, my team and I adjusted the books and records of the Autonomy subsidiary responsible for the "MicroTech / Biblioteca Apostolica Vaticana (Vatican Library)" transaction to reduce revenue by $11 million. This reduced ASL's revenue by virtue of transfer pricing. The overall impact to the group accounts was a $11 million reduction in revenue. The remaining adjustments on page 8 and the remaining pages 4 through page 13 accurately reflect adjustments made to Autonomy's books to complete the ASL restatement. In the summaries, I also list hardware revenue that was recorded and express the adjustments and revenue as percentages.

DATED: April 10, 2024

PATRICK D. ROBBINS
Attorney for the United States
Acting Under Authority Conferrred by
28 U.S.C. § 515

By: *Robert S. Leach*

ROBERT S. LEACH
ADAM A. REEVES
KRISTINA N. GREEN
ZACHARY G.F. ABRAHAMSON
Assistant United States Attorneys