Jonathan M. Baum (SBN: 303469)
**Steptoe LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA  94105
Telephone:  (510) 735-4558
jbaum@steptoe.com

Reid H. Weingarten
Brian M. Heberlig
Michelle L. Levin
Nicholas P. Silverman
Drew C. Harris
(Admitted Pro Hac Vice)
**Steptoe LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 506-3900

Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone:  (212) 878-3437
christopher.morvillo@cliffordchance.com

*Attorneys for Defendant*
*Michael Richard Lynch*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL RICHARD LYNCH and<br>STEPHEN KEITH CHAMBERLAIN,<br><br>Defendants. | Case No.: 3:18-cr-00577-CRB<br><br>Judge: Hon. Charles Breyer<br><br>**DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO PRECLUDE NIGEL UPTON'S TESTIMONY REGARDING LOSS**<br><br>Court:  Courtroom 6 – 17th Floor<br>Date Filed:  April 21, 2024<br>Trial Date:  March 18, 2024 |

The government intends to call Nigel Upton as a witness on April 22, 2024.  Upton, who previously testified in the *Hussain* trial, will testify that he purchased HP stock based on various representations in HP's August 2011 announcement of the acquisition of Autonomy, including Autonomy's focus on unstructured data analysis, its record of growth and high profit margins, and the fact that HP predicted that the acquisition would be "accretive to [HP's] earnings."[1] Upton later sold HP stock as a result of HP's November 2012 write-down announcement, purportedly losing roughly half of the value of his investment.[2]  If Upton is permitted to testify that he sold his shares as a result of HP's write-down of Autonomy, or that he suffered a loss when he sold his shares, then Dr. Lynch should be entitled to introduce responsive evidence that the write-down in Autonomy's value was not caused by any alleged fraud by Dr. Lynch and that the drop in HP's share price in 2012 was caused by factors unrelated to Autonomy.[3]

Despite the fact that loss is not an element that the government need prove in connection with securities fraud, *see, e.g.*, Ninth Circuit Model Jury Instr. 15.47 (noting in connection with Title 15 securities fraud that "[i]t is not necessary that the defendant made a profit or that anyone actually suffered a loss"), in its opening statement the government emphasized that Dr. Lynch portrayed Autonomy as a company that was "potentially worth billions and billions" and one that would be "a money-making machine" for HP, "and HP ate it up."  *United States v. Lynch*, Tr. at 321 (government opening statement).  The government asserts that those representations turned out to be false and caused, as the government characterized it in opening statements, "an $11 billion fraud."  *Id*. at 320.  The government now seeks to elicit from Nigel Upton testimony that he sold HP shares and suffered a significant loss as a result.  If the government is permitted to

---

[1] *United States v. Hussain*, Tr. at 359-64 (claiming that this information was "relevant" and "important to me" in deciding to invest); Ex. 20063.04 at 11-12 (grand jury testimony claiming that HP's statement that the acquisition would be accretive to earnings "was critical" and "was foundational for me to decide whether or not to invest in [HP]").

[2] *See Hussain*, Tr. at 371-372 ("Q:  And what prompted you to sell the shares? A:  The press release that announced the write-down of the value of Autonomy purchased by HP."); *id*. at 391 ("Q:  Question four (reading:  'If so, was the impairment HP realized relating to Autonomy relevant to your decision to sell?'  How did you answer?' A: Yes.").

[3] Earlier today the government advised the defense that, while it does not intend to elicit testimony from Upton regarding the write-down, it does intend to elicit that Upton sold his shares at a loss.

1  elicit this testimony, the defense should be permitted to introduce evidence that the write-down

2  was not driven by HP's investigation of any purported fraud, but rather by HP's failure to

3  achieve the aggressive synergies it predicted at the time of the acquisition.  Moreover, the

4  defense should be permitted to introduce evidence that HP's share price had dropped

5  precipitously before the write-down was announced (and before any information regarding

6  Autonomy's post-acquisition performance was made public).  Therefore, even if the write-down

7  had been caused by the discovery of pre-acquisition fraud at Autonomy, Upton's losses were not.

8  If the government opens the door to HP's post-acquisition performance, the defense should be

9  permitted to walk through it with responsive evidence and testimony.

10                                            *        *        *

11         Prior to the acquisition, HP valued Autonomy based on anticipated synergies from

12  pairing Autonomy's IDOL unstructured data search and analytics capabilities with the structured

13  data capabilities of HP's Vertica division.  These predicted synergies, and the promise of HP's

14  expansion into the software space, drove HP's acquisition strategy and its pricing of the deal.  At

15  the time of the acquisition, HP, relying on a discounted cash flow model, valued Autonomy

16  inclusive of the synergies it projected to achieve at $17.6 billion.

17         Following the acquisition, HP abruptly reversed course and pivoted away from its

18  software strategy.  At the same time, HP's overall business was collapsing and its share price

19  was falling fast.  Leading up to the November 2012 write-down, HP wrote down *three other*

20  companies it had recently acquired.  In the third quarter of 2012 alone, HP wrote down $1.2

21  billion from Compaq and $8 billion from Electronic Data Systems.  HP's share price continued

22  to fall, triggering an impairment analysis.  That impairment analysis led to the November 2012

23  write-down of Autonomy.

24         On November 20, 2012, HP announced a write-down of $8.8 billion.  HP publicly

25  claimed that over $5 billion of the write down was rooted in purported accounting fraud.

26  However, as contemporaneous communications amongst HP executives and with HP's external

27  advisors reveal, that claim was false.

28         Prior to the write-down, HP accountant Meeta Sunderwala wrote that HP's impairment

---

calculations were "*nonsensical*" and that the finance team would have to adopt "*crazy*" assumptions to sufficiently reduce Autonomy's carrying value. *See* Koeleveld Declaration in Support of Defendant Michael Richard Lynch's Motion to Preclude Nigel Upton's Testimony Regarding Loss ("Koeleveld Decl."), Ex. 1. Shortly after the write-down, HP employees conceded that the write-down was not driven by any alleged accounting fraud: "[w]e've never formally prepared anything to attribute the [accounting] irregularities to the amount of the write down." Koeleveld Decl., Ex. 2. Moreover, almost all of the investigation by Morgan Lewis and PricewaterhouseCoopers occurred *after* HP had decided on the amount of the write-down. This timeline of events undermines any contention that the write-down was driven by the discovery of any fraud.

Importantly, HP's auditors from Ernst and Young ("EY") rejected HP's contention that the majority of the write-down was attributable to accounting fraud. In November 2012, in a memorandum to HP about the impairment, EY stated that the write-down was attributable to changes in forward-looking sales forecasts and expectations around synergies, and did not attribute any quantifiable portion of the write-down to alleged fraud. *See* Koeleveld Decl., Ex. 3. Shortly thereafter, in January 2013, EY opined that the alleged accounting fraud would not have made a material difference in Autonomy's valuation. EY opined that the allegations, if true, would have had minimal effects on cash flow, and therefore would only have affected HP's valuation of Autonomy by a maximum of $300 million—*an amount that would not have been material to either HP's decision to purchase Autonomy or to the purchase price*. *See* Ex. 8228 at 18 ("Given the wide range of valuations at the time of the acquisition a $300 million change in valuation is not expected to have altered the Company's purchasing decision or the overall amount paid.").[4] In addition, after the write-down, Sunderwala confirmed that the $5 billion reduction in Autonomy's value that HP attributed to fraud actually encompassed the loss of

---

[4] EY also noted that as of January 31, 2012, a date by which HP undisputedly knew the extent of Autonomy's hardware sales, the information related to Autonomy's alleged fraud "was not known." Ex. 8228 at 18. In other words, HP and EY did not believe that Autonomy had committed fraud by withholding information about the extent of Autonomy's hardware sales.

unrealized synergies (and therefore could not have been driven by fraud). *See* Koeleveld Decl., Ex. 4. EY refused to sign off on language in HP's press release attributing the majority of the write-down to fraud. *See* Koeleveld Decl., Ex. 5. A few weeks after the write-down, Sunderwala reiterated that "*it would be extremely difficult to calculate the portion of the impairment that relates to accounting improprieties/misrepresentations . . . .*" Koeleveld Decl., Ex. 6.

If the government is permitted to elicit from Upton that he sold his HP shares at a loss, thereby allowing the jury to infer that this loss was caused by Dr. Lynch's actions, the defense should be permitted to introduce the documents cited above and related communications that reveal that the write-down was not driven by any alleged pre-acquisition fraud. In addition, if the government is permitted to elicit this testimony from Upton, the defense should be permitted to introduce evidence that the diminution in value of HP's shares in the months preceding the write-down had nothing to do with Autonomy. HP's share price dropped from approximately $13.50 per share on August 18, 2011 (the day the acquisition was announced) to $6 per share the day before the write-down on November 20, 2012. During this period, HP did not disclose information regarding Autonomy's interim financial performance to the market and Autonomy's contribution to HP's overall performance was immaterial. Therefore, any losses Upton suffered had nothing to do with any alleged fraud at Autonomy.

## CONCLUSION

For the reasons stated herein, the government should be precluded from eliciting from Nigel Upton testimony relating to the write-down and any losses Upton suffered relating to his investment in HP stock. If Upton is permitted to testify regarding these topics, the defense should be permitted to introduce evidence regarding the true reasons for the write-down and for HP's poor performance in 2012.

Dated: April 21, 2024                    Respectfully submitted,

                                         By:  */s/ Celeste L.M. Koeleveld*
                                         Celeste L.M. Koeleveld

                                         Christopher J. Morvillo
                                         Celeste L.M. Koeleveld
                                         Daniel S. Silver
                                         (Admitted Pro Hac Vice)
                                         **CLIFFORD CHANCE US LLP**
                                         31 West 52nd Street
                                         New York, NY 10019
                                         Telephone:  (212) 878-3437

                                         Jonathan M. Baum (SBN: 303469)
                                         **STEPTOE LLP**
                                         One Market Street
                                         Steuart Tower, Suite 1070
                                         San Francisco, CA  94105
                                         Telephone:  (510) 735-4558

                                         Reid H. Weingarten
                                         Brian M. Heberlig
                                         Michelle L. Levin
                                         Nicholas P. Silverman
                                         Drew C. Harris
                                         (Admitted Pro Hac Vice)
                                         **STEPTOE LLP**
                                         1114 Avenue of the Americas
                                         New York, NY 10036
                                         Telephone:  (212) 506-3900

                                         *Attorneys for Defendant*
                                         *Michael Richard Lynch*