# EXHIBIT 6

**To:** Branch, Betsy[betsy.branch@hp.com]
**From:** Sunderwala, Meeta
**Sent:** Thur 12/13/2012 5:07:43 PM
**Importance:** Normal
**Subject:** RE: Draft of SEC memo

I forgot I need to take Grant to doc now.  We getting him ready to go.  I will text you to call me if I can join


**From:** Branch, Betsy
**Sent:** Thursday, December 13, 2012 2:03 PM
**To:** Sunderwala, Meeta
**Subject:** Re: Draft of SEC memo


Will call. Waiting on EY to get here.

Sent from my iPhone


On Dec 13, 2012, at 12:51 PM, "Sunderwala, Meeta" <meeta.sunderwala@hp.com> wrote:

> 650-743-3696
>
>
> **From:** Branch, Betsy
> **Sent:** Thursday, December 13, 2012 12:46 PM
> **To:** Sunderwala, Meeta
> **Subject:** Re: Draft of SEC memo
>
>
> Thanks. I will go through your comments when I get to HP. There is a meeting at 2 with EY on the memo. Do you want us to call you?
>
> Sent from my iPhone
>
>
> On Dec 13, 2012, at 12:23 PM, "Sunderwala, Meeta" <meeta.sunderwala@hp.com> wrote:
>
>> Betsy,

FOIA CONFIDENTIAL TREATMENT REQUESTED
HP-SEC-00252370

I kept my comments to a few high level areas:  (Can you also please include me on distribution/discussions for this letter so I can see comments as this evolves, thanks)

1)   As discussed last night, it would be extremely difficult to calculate the portion of the impairment that relates to accounting improprieties/misrepresentations (if asked to push back to Q4'11).  We would have to isolate how the rebaselining items each specifically impact our forecast assumptions to derive a value.  The rebaselining itself also has significant judgments that we would need to verify in detail with the Autonomy finance team.  The acctg guidance states: *Even if an acquirer thinks it might have overpaid in some sense, the amount of overpayment would be difficult, if not impossible, to quantify. Thus, the Boards concluded that in practice, it is not possible to Identify and reliably measure an overpayment at the acquisition date.  Accounting for overpayments is best addressed through subsequent impairment testing when evidence of a potential overpayment first arises."*  I think we should stress this point again in the "alternatives considered" section, that if one considered that the portion of the charge related to acctg improprieties/misrepresentations relates to an overpayment and then point to this guidance that states that we should still record the impairment in the period when the evidence arises.

2)   Last night we had discussed the statement "The Company completed the initial purchase accounting in the fourth quarter of 2011 and finalized the valuation of goodwill and intangible assets in Q1'12. "   Since measurement period is not the focus of this discussion, I think it may be OK to leave as is, as the adjustments made in Q3 and Q4 are not material.   However, we should have one more discussion to close on this since one can see that our GW adjustments number changed from Q2 to Q4 (although not material change)

3)   On page 5, we discuss "significant customer dissatisfaction issues". I got some clarification from Steve Fieler on this because we do not want there to be a misunderstanding that a statement like this is implying there is a problem with the technology.  Here is my response to EY's question regarding this topic.  I suggest adding that the customer dissatisfaction

issues related to problems with the legacy go-to-market strategy:

**It is our understanding, that HP's assessment of the development and sophistication of the IDOL technology has changed since October 2011. Please discuss how the change of this assessment was factored in the analysis of the migration curve.**

HP:  HP's assessment of the development and sophistication of the IDOL technology has not changed since October 2011.  Based on discussions with Steve Fieler, Software Finance VP, there have been several customer returns of the product (post acquisition) which have caused management to raise questions regarding the technology.  However, upon investigation, HP management discovered there were some significant issues with the go-to-market strategy used by some members of the legacy Autonomy sales force to sell the IDOL product.  Customer returns related to two main areas: 1) Claims were made about the features or functionality of the product within a specific customer's environment which were not valid and 2) Commitments were made to deliver services to assist in integrating the software into a customer's environment; however, Autonomy did not have the expertise to deliver these services, causing cost overruns/delays which eventually led to customer disputes and return of the product.  These issues with the sales force are being addressed.  Management believes the customer returns relate to the go-to-market strategy and do not change HP's views regarding the development and sophistication of the technology at the time of acquisition.  Furthermore, we had discussions with the Autonomy technology lead which confirmed that the current assumptions regarding the technology are the same as at the time of acquisition.  Therefore, it is appropriate that the technology migration curve and useful life are consistent with the original valuation.  There were also misrepresentations made during the diligence period, regarding product mix (i.e. SaaS vs license sales) which caused a change in assumptions on revenue growth rates and margins; however, this was also not related to issues with the underlying technology.  These revised forecasts are reflected in the current technology valuation.

**From:** Branch, Betsy
**Sent:** Wednesday, December 12, 2012 8:28 PM

FOIA CONFIDENTIAL TREATMENT REQUESTED  HP-SEC-00252372

**To:** Sunderwala, Meeta
**Subject:** Draft of SEC memo

Meeta,

Attached is a draft of the pre-clearance memo.  This version was sent to EY's National office tonight.   We can discuss more when we talk.

Betsy

FOIA CONFIDENTIAL TREATMENT REQUESTED HP-SEC-00252373