Jonathan M. Baum (SBN: 303469)
**Steptoe LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA 94105
Telephone: (510) 735-4558
jbaum@steptoe.com

Reid H. Weingarten
Brian M. Heberlig
Michelle L. Levin
Nicholas P. Silverman
Drew C. Harris
(Admitted Pro Hac Vice)
**Steptoe LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900

Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 878-3437
christopher.morvillo@cliffordchance.com

*Attorneys for Defendant*
*Michael Richard Lynch*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL RICHARD LYNCH and STEPHEN KEITH CHAMBERLAIN,<br><br>Defendants. | Case No.: 3:18-cr-00577-CRB<br><br>Judge: Hon. Charles Breyer<br><br>**DEFENDANT MICHAEL RICHARD LYNCH'S MOTION *IN LIMINE* TO EXCLUDE PROPOSED EXPERT TESTIMONY ON MERE "DIFFERENCES OF OPINION"**<br><br>Court: Courtroom 6 – 17th Floor<br>Date Filed: April 27, 2024<br>Trial Date: March 18, 2024 |

During the fourth week of trial, the Court inquired about transactions where the government disagrees with Deloitte's contemporaneous accounting judgment but does not allege that pertinent facts were withheld from Deloitte.  "I am focused on the issue of what if Deloitte is wrong in their conclusions on a number of things but that they had all of the pertinent facts with respect to the transaction for accounting purposes?"  Apr. 10, 2024, Tr. at 3909.  The Court described those transactions as involving mere "differences of judgment."  *Id.* at 3911.

A criminal conviction cannot turn on a "battle of experts" over which accounting judgment is correct.  *See id.* at 3911 ("I'm not having a trial over a battle of experts.  This is a criminal case," to which the government responded, "We agree.")  *Id*.  Autonomy provided Deloitte with the same contracts and documents now being reviewed by the government and its accounting expert, Steven Brice.  The fact that Deloitte and Brice reached different accounting judgments may be of some interest from an academic perspective, but it has no place in this criminal trial.  No one is suggesting, nor could anyone suggest, that Deloitte's accounting judgments were so obviously misguided and wrong that no one could have relied upon them, much less that reliance upon Deloitte's judgments establishes criminal intent.  Due process and fundamental fairness do not permit the conviction of a defendant based on the contention that he should have hired Mazars instead of Deloitte.

Because a criminal case cannot be based on mere differences of opinion among experts, the Court concluded (without objection) that it would preclude transactions involving such differences of opinion based on the same documents from going to the jury:

- "I won't let a jury listen to whose judgment was right and whose judgment was wrong.  They're not going to hear that case. . . . They're not going to be given those transactions."  *Id.* at 3912.  The government responded, "Your Honor, broadly I agree with you."  *Id.*

- "[I]f the accounting firm is saying these are judgment calls and they were given the requisite information, I don't know why that's a basis of a criminal indictment or a basis of evidence for the jury to consider."  *Id.* at 3914-15.  The government did not disagree.  *Id.* (noting that its dispute was the "given the requisite information" premise).

Consistent with the Court's comments, Dr. Lynch moves to exclude the government's proposed expert testimony on transactions involving mere differences of accounting judgment—four categories of transactions in which the government expert and Deloitte have reviewed the same documents and reached different judgments.

The four categories representing mere differences of judgment are:

(1) how to report revenue from hybrid data hosting transactions where Autonomy sold both a license and a service (Brice Report § 2.7 (Silverman Decl. Ex. A));

(2) how to report revenue from sales to OEMs (Brice Report § 2.8);

(3) how to report revenue from transactions involving post-sale installation of Autonomy's software (Brice Report § 2.9); and

(4) how to report transactions with Iron Mountain occurring near the time that Autonomy acquired Iron Mountain (Brice Report § 2.10).

In each of these four categories, Brice's opinion amounts to no more than a difference of judgment with Deloitte based on the same documentary evidence. Indeed, Brice's opinion as to his view of the correct accounting treatment rests *solely* on documents like contracts. Thus, there is no allegation as to these categories that information was withheld from Deloitte. The Court should therefore exclude evidence regarding these four categories.

I. **Sections 2.7-2.10 of the Brice Report Amount to Disagreements with Deloitte's Conclusions Based on the Same Information Provided to Deloitte**

A. Section 2.7 – *Hybrid Data Hosting Transactions*

Hybrid Data Hosting Transactions are sales in which Autonomy sold its customers both a good—a license to use Autonomy software—and a service—ongoing data hosting in Autonomy's storage space. When Autonomy sold its customers a license and ongoing data hosting, Autonomy categorized (i) the license portion of revenue as sale of goods, recognized upon contract execution, and (ii) the data hosting portion of revenue as sale of services, recognized rateably over time. Autonomy disclosed this practice to both Deloitte and the market. *See, e.g.*, Silverman Decl. Ex. B at 51 n.2(i), (ii) (2010 Annual Report describing treatment of

transactions that include license and service elements). Brice concluded, based on the contract language, that the license and storage components of the transactions should have been treated together as the rendering of services and recognized rateably over the life of the contract. *See* Silverman Decl. Ex. A at 26-28 (Brice Report §§ 2.7.4-2.7.7).

A representative example of Brice's opinions relating to these "hosting" services involves a transaction between Autonomy and Bank of America in Q1 2009. Brice's opinions are based entirely on the contract language. *See* Silverman Decl. Ex. C (Appendix F, Software Focus Transaction SW-09-013). Deloitte, on the other hand, reviewed the exact same contract and came to a different accounting conclusion. *See* Silverman Decl. Ex. D (Deloitte workpaper for Bank of America agreement). In other words, Deloitte and Brice disagree over the correct accounting treatment of the same contract based on the contract itself.

### B.   Section 2.8 – *OEM Sales*

Autonomy typically sold licenses to Original Equipment Manufacturers (OEMs) in exchange for "an upfront non-refundable fee," followed by "license payments of around three percent of product sales" once the OEM used Autonomy's software to develop and sell its own product. *See* Silverman Decl. Ex. E (2009 Annual Report and Accounts). These sales were recognized up-front upon contract execution as the sale of goods and disclosed in that category on Autonomy's financial statements; Autonomy did not report any royalty revenue. *See id.* at 41 n.2(e). Deloitte approved of this treatment. Based on his interpretation of the contracts, Brice opines that the "upfront non-refundable payments" constituted "prepayment of royalty fees," not sale of goods, and should have been recognized as such over the life of the contract. *See* Silverman Decl. Ex. A at 30 (Brice Report §§ 2.8.3- 2.8.4).

A representative example of Brice's opinions related to these OEM transactions involves a transaction between Autonomy and Verdasys in Q1 2009. Based on the contract language, Brice opines that the transaction should have been accounted for as "a royalty arrangement," "not the sale of a good." *See* Silverman Decl. Ex. F (Appendix F, Software Focus Transaction SW-09-012). Deloitte, on the other hand, reviewed the exact same contract and came to a

different accounting conclusion: the non-refundable fees should be recognized upfront (i.e., as a sale of goods). *See* Silverman Decl. Ex. G (Deloitte workpaper for Verdasys agreement). In other words, Deloitte and Brice disagree over how to recognize the same non-refundable prepaid sublicense fee.

### C. Section 2.9 – Transactions Involving Post-Sale Installation or Implementation of Purchased Software

Section 2.9 of the Brice Report relates to whether revenue from contracts involving post-sale installation or implementation of Autonomy's software could be recognized at the time of contract execution or only after the installation or implementation period. Autonomy recognized revenue either when "no significant obligations remain," or when "[customer] acceptance has occurred," and disclosed that policy in its annual reports. Silverman Decl. Ex. B at 51 (2010 Annual Report) at 51. Brice cites five transactions in which he concludes from the contract language that installation was a "significant" part of the contract, which he opines prevented the recognition of revenue until installation and implementation were complete. *See* Silverman Decl. Ex A at 31-32 (Brice Report §§ 2.9.1-2.9.2). Deloitte reviewed the exact same contracts in real time and agreed with Autonomy that no significant post-delivery obligations existed, which allowed revenue to be recognized upon execution of the contract.

A representative example of Brice's opinions related to these post-sale installation contracts involves a transaction between Autonomy and Pfizer in Q3 2009. Based on the contract language listing installation as a "Deliverable," Brice opined that revenue should not have been recognized until after the second statement of work specifying post-sale implementation (which he referenced as "Installation"). *See* Silverman Decl. Ex. H (Appendix F, Software Focus Transaction SW-09-027). Deloitte, on the other hand, reviewed the exact same contract and came to a different accounting conclusion. *See* Silverman Decl. Ex. I (Deloitte workpaper for Pfizer agreement). Deloitte concluded that because the implementation would be subject to a second statement of work, and the Installation deliverable was not "an[] unusual term[]," Autonomy properly recognized revenue from the first statement of work when

the software was sold to Pfizer.  In other words, Deloitte and Brice disagree over whether implementation pursuant to a second statement of work should delay recognition of revenue in the first statement of work.

D.     **Section 2.10 – Iron Mountain Transactions**

Section 2.10 of the Brice Report relates to Autonomy's software transactions with Iron Mountain around the time that Autonomy acquired Iron Mountain.  Because the software transactions occurred in close proximity to the acquisition, the accounting rules required a determination of whether the transactions were effectively part of the business combination and, if so, whether they were conducted at fair value.  Deloitte devoted substantial attention to this issue and concluded, based on a fair value study, that one of the transactions should be revalued and the other need not be.  Deloitte reported its findings to Autonomy's Audit Committee.[1] Brice's opinions are based on a critique of Deloitte's fair value study in which he disagrees with the comparable sales that Deloitte chose and reaches his own valuation, expressly second-guessing Deloitte's analysis.[2]

In each of these instances, Brice opines that Deloitte reached the wrong accounting determination, based on the same information considered by Deloitte in real time.

**II.     Mere Differences of Judgment Between Deloitte and the Government's Expert Are Unhelpful to the Jury, a Waste of Time, Confusing, and Unfairly Prejudicial Under Fed. R. Evid. 702 and 403**

It is well established that accounting standards "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v.*

---

[1] Silverman Decl. Ex. J (Deloitte Q2 2011 Report to the Audit Committee).

[2] *See* Silverman Decl. Ex. K (Appendix F, Software Focus Transaction SW-11-096).  Brice also opines that one of the Iron Mountain transactions should have been accounted for as a royalty arrangement based on the face of the contract, whereas Deloitte concluded that the prepaid, nonrefundable payment in the exact same contract should be accounted for up-front as the sale of a good.  *Compare* Silverman Decl. Ex. L (Deloitte's workpapers for the Iron Mountain reseller contract), *with* Silverman Decl. Ex. K (Appendix F, SW-11-096).

*Comm'r*, 439 U.S. 522, 544 (1979); *accord* Expert Report of Greig Taylor § 2.3.2, Dkt. 309-3 (Under IFRS, "there are circumstances where two different accountants, faced with the same transaction, would record the transaction in different ways."); Apr. 9, 2024, Tr. at 3897 (accounting has "[no] black and white answer in many cases" and "there's always judgment" required) (Direct examination of Lee Welham); Apr. 9, 2024, Tr. at 3555 (Q: "There are often, on particular issues where no bright-line rule applies, a range of acceptable accounting decisions that could be made, right?" A: "That's probably fair, yes.") (Cross examination of Lee Welham). Flexible accounting concepts "do not always (or perhaps ever) yield a single correct figure," and differences of judgment amounting to "merely the difference between two permissible judgments" are not fraudulent. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) (en banc) (citing *Christidis v. First Penn. Mort. Trust*, 717 F.2d 96, 100 (3d Cir. 1983) (accounting treatment "could be fraudulent only if, when they were established, the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices")). Disagreements between Deloitte and the government's expert are emblematic of transactions that can be reported in different manners, not evidence of fraud.

During the April 10, 2024 conference, the government did not argue that these transactions would be relevant. Instead, it repeatedly asserted that its "theory of prosecution" was that Deloitte was misled. Apr. 10, 2024, Tr. at 3910; *id.* at 3915 ("Our focus will be on whether [Deloitte was] given the requisite information, Your Honor."); *id.* at 3916 ("[W]e will be litigating about those portions . . . wh[ere] Deloitte was lied to."). With respect to the four categories in Brice Report §§ 2.7-2.10, Deloitte and the government's expert had access to and relied on the same documents. They reached different conclusions because of the flexible nature of accounting judgment, not because of deceit or fraud.

As a result, expert testimony on the four categories where the government's expert and Deloitte reviewed the same materials should be excluded. *See, e.g.*, *Johnson v. Wyeth LLC*, No. 10-cv-2690, 2012 WL 1150857, at *3 (D. Ariz. Apr. 5, 2012) (excluding opinions about

defendant's marketing strategy because "[w]ithout a link between Wyeth's marketing and plaintiff's prescribing doctor, [the expert]'s opinions about the subtle effects of marketing on prescribing practices are irrelevant"); *Generations at Pinnacle Peak LLC v. Whitestone Pinnacle of Scottsdale, Phase II LLC,* No. 17-cv-4597, 2021 WL 9597885, at *7 (D. Ariz. Feb. 22, 2021) (excluding an expert opinion on a topic that had not been advanced as a basis of the claimed wrongdoing). Even if Brice's opinions bore some marginal relevance, the risk of unfair prejudice, confusion, and waste of time would render those opinions inadmissible. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.") (citation omitted); *United States v. Rincon*, 28 F.3d 921, 926 (9th Cir. 1994) ("Given the powerful nature of expert testimony, coupled with its potential to mislead the jury, we cannot say that the district court erred in concluding that the proffered evidence would not assist the trier of fact and that it was likely to mislead the jury."). Expanding on the already-lengthy list of disputed accounting topics would unnecessarily extend the trial and risk jurors getting confused about which topics involved alleged misrepresentations and which topics are mere differences in accounting treatment judgments. The Court should therefore exercise its discretion to exclude the opinions summarized by §§ 2.7-2.10 of the Brice Report.

## CONCLUSION

For the reasons stated herein, the Court should exclude evidence related to mere differences in accounting judgments as summarized in Brice Report §§ 2.7-2.10.

Dated: April 27, 2024

Respectfully submitted,

/s/ *Brian M. Heberlig*
Reid H. Weingarten (Admitted Pro Hac Vice)
Brian M. Heberlig (Admitted Pro Hac Vice)
Michelle L. Levin (Admitted Pro Hac Vice)
Nicholas P. Silverman (Admitted Pro Hac Vice)
Drew C. Harris (Admitted Pro Hac Vice)
**Steptoe LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900

Jonathan M. Baum (SBN: 303469)
**Steptoe LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA 94105
Telephone: (510) 735-4558
jbaum@steptoe.com

Christopher J. Morvillo (Admitted Pro Hac Vice)
Celeste L.M. Koeleveld (Admitted Pro Hac Vice)
Daniel S. Silver (Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 878-3437
christopher.morvillo@cliffordchance.com

*Attorneys for Defendant*
*Michael Richard Lynch*

---

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION *IN LIMINE* TO EXCLUDE PROPOSED EXPERT TESTIMONY ON MERE "DIFFERENCES OF JUDGMENT"
3:18-CR-00577-CRB
8