# EXHIBIT K

| SW-11-096 – Iron Mountain Information Management, Inc ("Iron Mountain - OEM") | |
| --- | --- |
| **Amount of sample item:** | $16.500 million |
| **Period initially recognised:** | Q2 2011 |
| **Date of contract:** | May 2011 |
| **Total contracted amount:** | $11.500 million |
| **Reported revenue stream:** | IDOL OEM: $16.500 million |

**Summary of the transaction**

This transaction relates to three agreements between Autonomy and Iron Mountain Information Management, Inc. ("**Iron Mountain**")[1]:

- the "*Value Added Reseller Agreement*", dated "*May ___, 2011*" (the "**Iron Mountain Reseller Agreement**");

- the "*Autonomy Purchase Quotation*", dated 16 May 2011 (the "**Iron Mountain Software Agreement**"); and

Around the time of the Iron Mountain Reseller Agreement and the Iron Mountain Software Agreement, Autonomy and Iron Mountain also executed the "*Order Form*", which was undated (the "**Iron Mountain Subscription Agreement**"). The Iron Mountain Subscription Agreement is not part of my sample, and I do not consider it in detail in this review[2].

Whilst the Iron Mountain Reseller Agreement and the Iron Mountain Subscription Agreement were undated, both were executed before 3 June 2011.

**The Iron Mountain Reseller Agreement**

The Iron Mountain Reseller Agreement gave Iron Mountain the right to sell certain Autonomy's "*Products*" and "*Service Products*" to end-users for a three year term.

In exchange, Iron Mountain would be required to pay Autonomy "*royalty fees*" based on the fees charged by Iron Mountain for the "*Products*" and "*Service Products*". These "*royalty fees*" were to be calculated as follows:

- for the "*Connected Backup*", and "*NearPoint*", products, the royalty fee payable was 50% of the fee charged by Iron Mountain to end-users;

- for the "*DRC-CM*", "*Autonomy LiveVault Services*", "*Autonomy Connected Services*" product services, the royalty fee payable was 50% of the fee charged by Iron Mountain to end-users; and

---

[1] SEC-AUSA5-EPROD-000532167

[2] In summary, pursuant to the Iron Mountain Subscription Agreement, Autonomy would provide "*Subscription Services*" for a term of three years. Iron Mountain would pay Autonomy a "*Pre-paid Fee*" of $1,500,000 in relation to these "*Subscription Services*"

| SW-11-096 – Iron Mountain Information Management, Inc ("Iron Mountain - OEM") |
| --- |

- for the "*Autonomy Tape Restoration Services*" product service, the royalty fee payable was 70% of the fee charged by Iron Mountain to end-users;
- for the "*Autonomy Records Manager*" and "*Autonomy Oracle Fetch*", the royalty fee was slightly different, insofar as Autonomy agreed to sell these products to Iron Mountain at a 60% discount, in order for Iron Mountain to sell these products to end-users.

These royalties would offset against a "*Prepayment*" of $9,500,000[3], until such time as the "*Prepayment*" was exhausted. The "*Prepayment*" was payable in two tranches ($3,500,000 due on the "*Effective Date*" of the Iron Mountain Reseller Agreement, and the remaining $6,000,000 payable one year thereafter), and was "*non-refundable*" and "*noncancellable*".

The Iron Mountain Reseller Agreement also included "*Support Fees*" in the amount of 10% of amounts paid by end-users to Iron Mountain in relation to the products / service products.

Autonomy's ledgers record that Autonomy recognised revenue of $9,500,000 in relation to the Iron Mountain Reseller Agreement on 30 June 2011.

**The Iron Mountain Software Agreement**

The Iron Mountain Software Agreement related to the sale of an "*Autonomy IDOL Server*" with various functionalities.

The "*TOTAL LICENSE FEE*" for the Iron Mountain Software Agreement was $1,500,000.

The Iron Mountain Software Agreement also included a "*SUPPORT AND MAINTENANCE FEE*" of $75,000.

Autonomy's ledgers record that Autonomy recognised revenue of $1,500,000 in relation to the Iron Mountain Software Agreement. However in Autonomy's Q2 2011 Report, the Iron Mountain Software Agreement was reported as having generated $7,000,000 of "*License Revenue*".

The difference between the contracted value of the Iron Mountain Software Agreement and its value, as reported in Autonomy's Q2 2011 Report, is because Autonomy determined that the Iron Mountain Software Agreement was a part of its acquisition of certain assets of Iron Mountain (see below). As such, Autonomy were required to undertake an exercise to determine the "*fair value*" of the software sold pursuant to the Iron Mountain Software Agreement, and to recognise revenue from the transaction at that value.

Autonomy calculated the "*fair value*" of the Iron Mountain Software Agreement in the spreadsheet "*OEM analysis*" (the "**Iron Mountain Software Agreement Fair Value Analysis**"). The Iron Mountain Software Agreement Fair Value Analysis determined that the "*fair value*" of the "*licence for Q2 2011*"

---

[3] $1,500,000 of the "*Prepayment*" was to be offset against sales of "*Autonomy Records Manager*" and "*Autonomy Oracle Fetch*" specifically, with the remaining "*Prepayment*" to be offset against royalties payable in relation to the remaining products and product services in the Iron Mountain Reseller Agreement

**SW-11-096 – Iron Mountain Information Management, Inc ("Iron Mountain - OEM")**

*transaction with* [Iron Mountain]" was $7,000,000[4]. This figure was with reference to the size of previous transactions Autonomy had entered into with "*Verdasys*"[5], "*EMC*"[6], and "*HP*"[7], [8].

**Autonomy's acquisition of Iron Mountain assets**

On 15 May 2011 Autonomy and Iron Mountain Incorporated entered into a "*Purchase and Sale Agreement*"[9] (the **Autonomy / Iron Mountain Acquisition**"), pursuant to which Autonomy acquired shares in certain subsidiaries and assets of Iron Mountain Incorporated. In exchange Autonomy agreed to pay Iron Mountain Incorporated an initial purchase price of:

- $380,000,000 plus

- the "*Estimated Working Capital*"[10] of the acquired subsidiaries.

The purchase price would then be adjusted to reflect the difference between the "*Estimated Working Capital*" included in the initial purchase price and the actual working capital of the acquired subsidiaries on the Closing Date[11].

On 2 June 2011, Mr Stephen Chamberlain emailed Mr Andrew Kanter and Mr Sushovan Hussain with the subject "*Funds flow*"[12]. In that email, Mr Stephen Chamberlain explained the "*funds flow*" associated with the Autonomy / Iron Mountain Acquisition and noted "*Final amount due is $388,606,101 subject to their agreement*".

The final amount due comprised the following:

- "*purchase consideration*" of $380,000,000; and

- "*working capital estimate*" of $16,617,301; less

- "*amount allocated to Iron Mountain Digital SARL*" of $423,700; less

- "*half of premerger notification fee for HSR filing*" of $62,500; less

- "*total due under commercial agreements*" of $7,525,000, which itself comprised:

---

[4] HP-SEC-02161744

[5] The transaction referred to by Autonomy is SW-09-012

[6] The transactions referred to by Autonomy are SW-09-018 and SW-10-071

[7] The transaction referred to by Autonomy is SW-11-121

[8] The Iron Mountain Software Agreement Fair Value Analysis also referred to previous transactions with "*Filetek*", "*VMS*" and "*Capax*", but these transactions were ultimately excluded from the analysis as "*Autonomy is a fundamental part of the customers offering*"

[9] HP-SEC-02148318

[10] "*Estimated Working Capital*" being the "*estimated Net Working Capital as of the Closing Date*". "*Net Working Capital*" is defined in the Autonomy / Iron Mountain Acquisition as being "*the combined current assets of the Business, reduced by the combined current liabilities of the Business* […]"

[11] I understand that the "*Closing Date*" of the Autonomy / Iron Mountain Acquisition was 3 June 2011 (SEC-AUSA5-EPROD-000572801)

[12] HP-SEC-02147388. Ms Lisa Harris and Dr Michael Lynch were in copy

**mazars**

| SW-11-096 – Iron Mountain Information Management, Inc ("Iron Mountain - OEM") |
|---|

> o   The first instalment of the "*Prepayment*" due pursuant to the Iron Mountain VAR Agreement of $3,500,000;
>
> o   The first year maintenance due pursuant to the Iron Mountain VAR Agreement of $950,000;
>
> o   The "*Subscription Fee*" due pursuant to the Iron Mountain Subscription Agreement of $1,500,000;
>
> o   The "*TOTAL LICENSE FEE*" due pursuant to the Iron Mountain Software Agreement of $1,500,000; and
>
> o   The "*SUPPORT AND MAINTENANCE FEE*" due pursuant to the Iron Mountain Software Agreement of $75,000.

The Autonomy / Iron Mountain Acquisition was a business combination, as defined in IFRS 3 "*Business Combinations*" ("**IFRS 3**"). Pursuant to IFRS 3, Autonomy was required to determine whether other transactions between itself and Iron Mountain entered into in the lead up to the Autonomy / Iron Mountain Acquisition were separate from the acquisition, or whether in substance, the transactions formed part of the acquisition[13]. Where the latter is the case, the acquiror is required to determine the "*fair value*"[14] of the asset transferred and include this in the value of the total consideration it is deemed to have paid for the business[15].

Autonomy determined that the Iron Mountain Software Agreement was part of the Autonomy / Iron Mountain Acquisition. As such Autonomy performed the Iron Mountain Software Agreement Fair Value Analysis and found the fair value to be $7,000,000.

It does not appear that Autonomy determined that the Iron Mountain Reseller Agreement was part of the Autonomy / Iron Mountain Acquisition.

---

[13] IFRS 3.51, with guidance at IFRS 3.B50

[14] "*fair value*" meaning "*The amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction*"

[15] Correctly applied, this requirement should prevent parties from artificially inflating / deflating the purchase prices paid for acquisitions via the simultaneous transfer of assets at below / above their "*fair value*"

**mazars**

---

**SW-11-096 – Iron Mountain Information Management, Inc ("Iron Mountain - OEM")**

**Issues identified by Mazars**

**A. The fair values of the Iron Mountain Reseller Agreement and the Iron Mountain Software Agreement, and therefore the revenue recognised, were overstated**

As explained above, Autonomy determined that the Iron Mountain Software Agreement was a part of the Autonomy / Iron Mountain Acquisition, and therefore performed an analysis to determine the *"fair value"* of the Iron Mountain Software Agreement. This analysis was set out in the Iron Mountain Software Fair Value Analysis.

The Iron Mountain Software Fair Value Analysis was described by Deloitte in the following terms "*Management has determined fair value with reference to seven similar sized licence deals*[16]. *An average licence value was calculated for sales where IDOL search was the core product offering. This generated a value of $10.6 million, but did include one significant outlier. Excluding this outlier the revised average was $7.4 million. Management has therefore determined that an appropriate estimation of fair value is $7.0 million*"[17].

In my view, the "*fair value*" determined Iron Mountain Software Agreement Fair Value Analysis, and consequently the revenue recognised in the in relation to the Iron Mountain Software Agreement, was overstated. I have reached this conclusion because, whilst the Iron Mountain Software Agreement Fair Value Analysis determined a fair value of $7,000,000, this fair value was determined with reference to only four transactions[18]. In my view it is unlikely that four transactions would give a meaningful set of comparable transactions from which to determine a fair value. Moreover:

a)  three of these four transactions do not relate to the sale of a license, but instead related to royalty arrangements[19]. As such, the amounts payable were not *"Licence"* fees (as stated in the Iron Mountain Software Agreement Fair Value Analysis) but were instead prepaid royalties. In my opinion, it is not appropriate to determine the fair value of a software license with reference to the value of prepaid royalties; and

b)  the commercial effect of two of these four transactions cannot be understood without reference to purchases that Autonomy made from the customer, with the net effect of the series of transactions being an outflow of economic benefit from Autonomy[20]. In my opinion, it is not appropriate to determine the fair value of a software license with reference to previous transactions which, in substance, resulted in a net outflow of economic benefit from Autonomy.

---

[16] I note that the Iron Mountain Software Agreement Fair Value Analysis actually contains eleven transactions, and the *"fair value"* of the Iron Mountain Software Agreement is benchmarked against four of these transactions (with the remaining 7 discounted as "*Autonomy is a fundamental part of the customer offering*")
[17] SEC-AUSA5-EPROD-000572801
[18] I have reviewed these transactions in SW-09-012, SW-09-018, SW-10-071 and SW-11-121
[19] SW-09-012, SW-09-018 and SW-10-071
[20] SW-10-071 and SW-11-121

| SW-11-096 – Iron Mountain Information Management, Inc ("Iron Mountain - OEM") |
|---|

In addition, it is my opinion that the Iron Mountain Reseller Agreement, which was entered into at the same time as the Iron Mountain Software Agreement, was also part of the Autonomy / Iron Mountain Acquisition. This is because:

a)  email correspondence between Mr Sushovan Hussain and Iron Mountain clearly shows that the Iron Mountain Reseller Agreement was negotiated as a part of the Autonomy / Iron Mountain Acquisition[21]; and

b)  following the Autonomy / Iron Mountain Acquisition, Iron Mountain sought to put out a press release which described the Iron Mountain Reseller Agreement as "*part of this transaction*"[22].

In consequence of this conclusion, it is my view that Autonomy should have determined the "*fair value*" of the Iron Mountain Reseller Agreement. This analysis should have considered, *inter alia*, Mr Sushovan Hussain's email to Iron Mountain during the negotiations of the Autonomy / Iron Mountain Acquisition, during which he noted:

"*The concept I am considering is that since you will need to pay us cash for the patent litigation and the Southboro empty office lease (the cost of which was not included in the p&l we considered for valuation purposes), I could consider a structure whereby I recommend waiving the liability but in return we get a strategic partnership with an oem and committed reseller fees*"[23].

The "*patent litigation*" and the "*Southboro empty office lease*" referred to by Mr Sushovan Hussain appear to relate to ongoing costs or risks that Autonomy would be taking on following Autonomy / Iron Mountain Acquisition, of which it was unaware when initially valued the Iron Mountain business. Instead of requiring Iron Mountain to remunerate Autonomy for these costs, Mr Sushovan Hussain appears to be suggesting that these costs would be waived in exchange for Iron Mountain making a purchase from Autonomy.

In a separate internal email, Mr Sushovan Hussain quantified these costs as follows[24]:

a)  "*patent litigations – which has to be $4.5m*"; and

b)  "*Ongoing lease cost in Southboro is $800k for 9 years, not disclosed to us until yesterday*".

These costs[25] formed the basis of Mr Sushovan Hussain's suggested proposal to Iron Mountain of the following:

"*They made an offer of $6m for 2 years including the use of DRRC, LV and Connected. We take out the latter (because its dealt with separately) gives $5m. This is for the following:*

---

[21] HP-SEC-02145847; HP-SEC-02145835
[22] HP-SEC-02146649
[23] HP-SEC-02145847
[24] HP-SEC-02145835
[25] Along with certain others, set out below

| SW-11-096 – Iron Mountain Information Management, Inc ("Iron Mountain - OEM") |
|---|

*Commitment to resell connected, LV and DRCCM*

*Preferred partner for data restoration*

*Referral fee for all products*

*Internal use Idol*

*If they pay us $6m upfront as revenue then we will accept the* [previously undisclosed costs] *as our cost*"[26]

In my view, Mr Sushovan Hussain's email suggests the following:

a) Iron Mountain had previously made an offer of $5,000,000 in relation products and rights that would eventually be sold pursuant to the Iron Mountain Reseller Agreement[27] and the Iron Mountain Software Agreement[28]; and

b) for an additional $6,000,000 of revenue, Autonomy would waive the cost of, *inter alia*, the "*patent litigation*" and the "*Southboro empty office lease*".

The total revenue implied by Mr Sushovan Hussain's suggested proposal is $11,000,000, which is the same as the combined contractual value of the Iron Mountain Reseller Agreement and the Iron Mountain Software Agreement.

In my opinion, Mr Sushovan Hussain's suggested proposal implies that the combined "*fair value*" of the Iron Mountain Reseller Agreement and the Iron Mountain Software Agreement was c. $5,000,000, as opposed to the $16,500,000 recognised by Autonomy.

In the absence of a preferable method, I have allocated this revised fair value to the Iron Mountain Reseller Agreement and the Iron Mountain Software Agreement in proportion with the contracted values of the Iron Mountain Reseller Agreement and the Iron Mountain Software Agreement. As such, in my view:

a) the fair value of the Iron Mountain Software Agreement was $681,818[29]; and

b) the fair value of the Iron Mountain Reseller Agreement was $4,318,182[30].

---

[26] HP-SEC-02145835
[27] The "*Commitment to resell connective, LV and DRCCM*" and "*Referral fee for all products*"
[28] The "*Internal use Idol*"
[29] ($1,500,000 / $11,000,000) * $5,000,000
[30] ($9,500,000 / $11,000,000) * $5,000,000

| SW-11-096 – Iron Mountain Information Management, Inc ("Iron Mountain - OEM") |
|---|

**B.   The Iron Mountain Reseller Agreement was not the sale of a good but was instead a royalty arrangement**

Notwithstanding the above, it is my view that the "*Prepayment*" set out in the Iron Mountain Reseller Agreement was, in substance, a prepayment of amounts that would otherwise be due to Autonomy from Iron Mountain, following the completion of sales by Iron Mountain to end-users. I consider that this type of revenue meets the definition of royalties, which are defined in IAS 18.5(b) as "*charges for the use of long-term assets of the entity, for example, patents, trademarks, copyrights and computer software*". I have reached this view because:

a)   the software licenses granted to Iron Mountain in the Iron Mountain Reseller Agreement were subject to restrictions to its use such that Iron Mountain, as the licensee, was not able to exploit those rights freely; and

b)   clause 9.1 of the Iron Mountain Reseller Agreement obliged Iron Mountain "*to provide Autonomy from time to time as Autonomy may reasonably request, order and sales reports detailing its End Users (including contact names and details), Products and Service Products sold, for purposes of monitoring VAR's obligations under the terms of this Agreement*"; and

c)   the "*Royalty Fees*" payable by Iron Mountain pursuant to the Iron Mountain Reseller Agreement were calculated as portion of the sales that Iron Mountain made of the products and service products set out therein. In my opinion this is clearly a description of a royalty, and as such the "*Prepayment*" should therefore be considered a prepaid royalty.

IAS 18.33 requires royalties to be accrued "*in accordance with the terms of the relevant agreement and are usually recognised on that basis unless, having regard to the substance of the agreement, it is more appropriate to recognise revenue on some other systematic and rational basis*". As such it is my view that the \$9,500,000[31] "*Prepayment*" set out in the Iron Mountain Reseller Agreement should not have been recognised as revenue as at the date of the agreement, but should instead have been recognised as revenue systematically in proportion with when the "*Prepayment*" was utilised, that is, based on Iron Mountain's sales of the products set out therein.

---

[31] Assuming that \$9,500,000 reflected the fair value of the Iron Mountain Reseller Agreement

**mazars**

| SW-11-096 – Iron Mountain Information Management, Inc ("Iron Mountain - OEM") |
|---|

**Conclusion and proposed adjustment**

In my opinion:

- the Iron Mountain Reseller Agreement did not satisfy the revenue recognition criteria of IAS 18 in relation to the sale of a good and the revenue recognised in Quarter 2 2011 in relation to the Iron Mountain Reseller Agreement should be reversed; and

- the Iron Mountain Software Agreement did satisfy the revenue recognition criteria of IAS 18 in relation to the sale of a good, however the revenue recognised by Autonomy in Quarter 2 2011 exceeded the fair value of the goods sold. As such an adjustment should be made to reduce the revenue recognised in relation to the Iron Mountain Software Agreement to its fair value of $681,818.

My adjustment is summarised in the table below:

| SW-11-096 – Iron Mountain Information Management, Inc ("Iron Mountain - OEM") | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Q1 2009 $000 | Q2 2009 $000 | Q3 2009 $000 | Q4 2009 $000 | Q1 2010 $000 | Q2 2010 $000 | Q3 2010 $000 | Q4 2010 $000 | Q1 2011 $000 | Q2 2011 $000 |
| **Original accounting** | | | | | | | | | |
| Revenue (Iron Mountain Reseller Agreement) | | | | | | | | | 9,500 |
| Revenue (Iron Mountain Software Agreement) | | | | | | | | | 7,000 |
| **Proposed adjustment** | | | | | | | | | |
| Revenue (Iron Mountain Reseller Agreement) | | | | | | | | | (9,500) |
| Revenue (Iron Mountain Software Agreement) | | | | | | | | | (6,318) |
| **Adjusted accounting** | | | | | | | | | |
| Revenue (Iron Mountain Reseller Agreement) | | | | | | | | | |
| Revenue (Iron Mountain Software Agreement) | | | | | | | | | 681 |