Jonathan M. Baum (SBN: 303469)
**Steptoe LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA  94105
Telephone:  (510) 735-4558
jbaum@steptoe.com

Reid H. Weingarten
Brian M. Heberlig
Michelle L. Levin
Nicholas P. Silverman
Drew C. Harris
(Admitted Pro Hac Vice)
**Steptoe LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 506-3900

Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone:  (212) 878-3437
christopher.morvillo@cliffordchance.com

*Attorneys for Defendant*
*Michael Richard Lynch*

# UNITED STATES DISTRICT COURT

## NORTHERN  DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL RICHARD LYNCH and STEPHEN KEITH CHAMBERLAIN,<br><br>Defendants. | Case No.: 3:18-cr-00577-CRB<br><br>Judge: Hon. Charles Breyer<br><br>**DEFENDANT MICHAEL RICHARD LYNCH'S OFFER OF PROOF REGARDING TESTIMONY OF LEO APOTHEKER AND ANDREW GERSH**<br><br>Court:  Courtroom 6 – 17th Floor<br>Date Filed:  April 27, 2024<br>Trial Date:  March 18, 2024 |

Defendant Michael Richard Lynch submits this offer of proof in light of the anticipated testimony of Leo Apotheker and Andrew Gersh, whom the government intends to call on Monday, April 30, 2024, to the effect that they were unaware of Autonomy's standalone hardware sales and that if they had known of those sales, they would have viewed Autonomy as less valuable.  In response to that evidence, the defense offers two categories of proof.

First, the defense seeks to demonstrate that the hardware sales did not materially affect the valuation of Autonomy; indeed, absent the hardware sales, the defense will argue, Autonomy was more valuable.  In other words, HP got the benefit of its bargain when it purchased Autonomy, regardless of the hardware sales, and was therefore not defrauded.  That conclusion is fully supported by the Ninth Circuit's April 9, 2024 decision in *United States v. Milheiser*, __ F.4th __, 2024 WL 1517377 (9th Cir. 2024), which makes clear that "misrepresentations about collateral matters [that] may have led to the transaction" cannot support a fraud conviction where "the buyer still got the product that she expected at the price she expected." *Id.* at *7.

Second, the defense intends to establish that high-ranking executives at HP received information about Autonomy's hardware sales after the acquisition and took no action whatsoever, demonstrating that the information did not come as a surprise to HP.  Indeed, the hardware sales continued without interruption after the acquisition and HP included revenues from those sales as part of Autonomy's license revenues.

In support of these arguments, Dr. Lynch seeks to rely on limited post-acquisition evidence, including evidence that demonstrates (1) that HP's valuation of Autonomy did not change materially after the acquisition, even when, on HP's telling, it became aware of the hardware sales, and (2) that HP, in any event, knew all along of Autonomy's hardware sales.

I.   **EVIDENCE OF HP'S POST-ACQUISITION VALUATIONS OF AUTONOMY IS ADMISSIBLE TO ESTABLISH THAT HP GOT THE BENEFIT OF ITS BARGAIN AND WAS NOT DEFRAUDED**

The government will elicit testimony from Apotheker, Gersh, and potentially others that they would have viewed Autonomy as being less valuable had they known that Autonomy had derived approximately 10% of its revenues from hardware sales in 2010 and 2011.  To counter

that evidence, Dr. Lynch should be permitted to present post-acquisition evidence of HP's valuations of Autonomy that establish that the hardware sales had no material impact on Autonomy's value, meaning that HP got exactly what it bargained for when it acquired Autonomy.  In other words, an element of the offense—that the defendant contemplated some harm or injury to the victim—is not satisfied.  If anything, assuming the government's allegations regarding Autonomy's inflated revenue figures are true, HP might have been deceived when it purchased Autonomy, but not defrauded.  Fraud-in-the-inducement is not fraud in the Ninth Circuit.  Rather, the government must establish that HP was cheated—that it was somehow harmed (or would have been, if the allegations are true)[1]—and evidence of the impact of the hardware sales on Autonomy's value, or lack thereof, demonstrates that HP was not in fact defrauded.

### A.      Fraud-in-the-Inducement Does Not Establish Wire Fraud

Ninth Circuit law is clear that not all deceptions that induce a transaction constitute fraud.  Rather, to constitute fraud, the scheme must contemplate that the putative victim will suffer a loss of money or property, because "wire fraud requires the intent to deceive *and* cheat—in other words, to deprive the victim of money or property by means of deception."  *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) (emphasis in original).  On April 9, 2024, the Ninth Circuit affirmed that making "a misrepresentation that would be expected to and did cause a business to part with money" does not constitute fraud; rather, the victim business must be "deceived . . . about the nature of the bargain."  *Milheiser*, ___ F.4th ___, 2024 WL 1517377, at *1-2.  In *Milheiser*, the defendants' sales companies induced businesses to buy toner for printers by pretending to be a business's regular toner supplier and by suggesting that the price for toner was increasing.  *Id*. at *2.  Although some purchasers testified that they would not have placed the order with the defendants' sales companies "if they had realized they were not dealing with their regular supplier"—indeed, many had contracts entitling them to reduced-price or free toner

---

[1] To be clear, this is not an argument about actual loss or harm, but about whether an element of the offense—an intent to defraud, meaning to deceive and cheat—has been established where the evidence shows that the victim would not have been cheated under the facts alleged.

through that supplier—or if they had "known the price of toner was not increasing," there was "no evidence presented at trial suggesting that any businesses did not receive the toner or that any of the toner had defects." *Id*. at *3.  The government argued that defendants were guilty of fraud because they made misrepresentations that caused businesses to "part with money," and the defendants were convicted of mail fraud. *Id*. at *4-5.

The Ninth Circuit reversed, making clear that "depriving an individual of accurate information alone [does not] constitute[] fraud." *Id*. at *5 (citing *United States v. Yates*, 16 F.4th 256, 263 (9th Cir. 2021)).  Rather, the scheme to defraud must not only "deceive" the victim into spending money, but also deprive the victim of "something of value." *Id*. (quoting *Shaw v. United States*, 580 U.S. 63, 72 (2016)).  Accordingly, "not just any lie that secures a sale constitutes fraud, and . . . the lie must instead go to the nature of the bargain." *Id*. at *7.  "The nature of the bargain requirement properly excludes from liability cases in which a defendant's misrepresentations about collateral matters may have led to the transaction but the buyer still got the product that she expected at the price she expected." *Id*.  It is therefore not enough that a misrepresentation have "a natural tendency to influence, or [be] capable of influencing, a person to part with money or property." *Id*. at *8.  "[T]o support a conviction for fraud, a false statement must directly or indirectly deceive the victim about the nature of the bargain." *Id*.  Because the companies purchasing toner from the defendants got what they paid for, they were not deceived *and* cheated, and the defendants' convictions were overturned.

In determining that fraud-in-the-inducement is not fraud, the Ninth Circuit joined several other circuits that have come to the same conclusion. *Id*. at *6-7 (discussing *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970), *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), and *United States v. Guertin*, 67 F.4th 445 (D.C. Cir. 2023)).  The common thread running through these cases is that the defendants' lies induced the alleged victim into parting with money or property in an exchange, but such fraudulent inducement alone was insufficient to support a fraud conviction because the alleged victim received the essential benefit of the bargain.  Fraud requires more than deceptive inducement—it requires intent to

cheat through deception about the "essential aspects of the transaction." *Milheiser*, ___ F.4th ___, 2024 WL 1517377, at *7.

**B.      Dr. Lynch is Entitled to Present Exculpatory Post-Acquisition Evidence that Demonstrates, at Best, Fraud-in-the-Inducement, not a Scheme to Deceive *and* Cheat HP**

Consistent with Ninth Circuit case law that fraudulent inducement alone does not amount to a scheme to defraud, a key pillar of Dr. Lynch's defense is that he contemplated no loss or harm to HP; indeed, he went to work at HP following the acquisition.  Rather, HP got precisely what it bargained for when it acquired Autonomy because the allegedly inflated revenue figures did not affect the valuation of Autonomy.  Thus, the defense expects the evidence to show that HP's pre-acquisition valuation of Autonomy, which turned on a discounted-cash-flow (DCF) model, would not have been inflated by hardware sales, because those hardware sales did not materially affect Autonomy's cash flows and thus its value.  Indeed, if the hardware sales— which occurred at a loss—are removed from Autonomy's financial statements, Autonomy's cash flows, growth rate, and earnings increase, making Autonomy an even *more* valuable company.

While Dr. Lynch's valuation expert will explain why Autonomy's value to HP was not materially impacted by the hardware sales,[2] Dr. Lynch should also be permitted to present exculpatory post-acquisition proof that supports his defense that HP was not defrauded, namely, HP's own post-acquisition valuations of Autonomy *after* the alleged fraud was revealed.  Those valuations explicitly considered the impact on Autonomy's value—at the time of the acquisition—of the hardware sales (and also the reseller transactions, the purchases from customers, and the hosting transactions) and found no material impact on that valuation.

For example, in summer 2012, HP considered whether there was a need to take a write-down against Autonomy's book value (the value of the company as reflected on HP's balance sheet) in light of its reduced earnings forecast following the unsuccessful integration of Autonomy's business into HP.  Even at that point in July 2012, after hearing from a purported

---

[2] The government has recently moved to preclude Dr. Lynch's valuation expert.  ECF No. 453.  Dr. Lynch will respond to that motion separately.

"whistleblower" about hardware sales and other purported accounting misconduct, and after having had full access to Autonomy's books and records for almost one year, HP concluded that Autonomy was worth $13.7 billion, $2 billion *more* than what HP had recently paid for it, and HP attributed Autonomy's poor performance to the challenges of operating Autonomy in the HP environment.  As a result, HP's leadership did not see Autonomy's temporary struggles as indicative of longer-term revenue and margin projections.

After the November 2012 write-down,[3] EY (HP's auditor) evaluated how revenue adjustments due to alleged accounting irregularities would have affected HP's original valuation of Autonomy and concluded that the impact would not have been material.  EY therefore advised HP that the "known accounting errors [do] not materially impact the valuation" at the time of the acquisition.[4]

Evidence that HP's own post-acquisition valuations of Autonomy did not materially change even after the alleged "known accounting errors" purportedly came to light is powerful evidence that HP was not cheated or defrauded, and that no harm to HP was contemplated by the alleged scheme.  The government will doubtless attempt to elicit from witnesses like Leo Apotheker, Manish Sarin, Andy Johnson, and Andy Gersh that they would have valued Autonomy differently had they known about the hardware sales they claim they were unaware of.  Dr. Lynch should be able to cross-examine these witnesses with HP's internal valuations and present evidence of those valuations to counter the government's claim that a fraud occurred; this evidence goes not only to the truth of what happened, but also to the credibility of these witnesses and supports Dr. Lynch's lack of criminal intent.

Notably, the point of presenting post-acquisition valuations of Autonomy is not to blame HP for any post-acquisition diminution in Autonomy's value or for failing to achieve projected synergies and to successfully integrate Autonomy.  The point of introducing the valuations is to

---

[3] Emails surrounding the write-down itself demonstrate that, while HP publicly announced that more than $5 billion of the write-down was attributable to accounting misconduct, the write-down was in fact attributable to HP's failure to achieve the synergies it projected at the time of the acquisition, not accounting misconduct.

[4] One of HP's preacquisition models valued Autonomy at $17.6 billion, taking synergies into account.  *See* Bates SF-03853-AUSA-00133984.

demonstrate that the alleged deception surrounding hardware sales did not affect those valuations, meaning that HP got the benefit of its bargain.  HP was a reasonable investor and its assessment of what was unimportant to valuing Autonomy is just as probative as the contrary testimony adduced by the government.  Such valuation evidence is limited in scope and will not open the proverbial Pandora's box of post-acquisition evidence.

In the alternative, if Dr. Lynch is not permitted to present post-acquisition evidence that HP's valuation of Autonomy was not changed by purported revelations about hardware sales, HP witnesses should not be permitted to opine that Autonomy would have been less valuable absent the hardware sales.  Otherwise, the jury would be left with a misleading, one-sided presentation about the impact of the hardware sales on Autonomy's valuation.  Unless Dr. Lynch is able to fully defend against any suggestion that the hardware sales negatively affected the value of Autonomy, testimony from Apotheker, Sarin, Johnson, and Gersh about how their opinions of Autonomy's valuation was affected by hardware sales should be precluded.

## II.    EVIDENCE OF HP'S KNOWLEDGE OF HARDWARE SALES IS ADMISSIBLE TO REBUT ANY TESTIMONY THAT HP WAS UNAWARE OF HARDWARE SALES OR THAT THOSE SALES WERE MATERIAL

The government will no doubt elicit testimony from Apotheker, Gersh, and potentially other HP witnesses that they did not know about Autonomy's hardware sales before the acquisition and were shocked when they learned of them after the acquisition.  To counter that evidence, Dr. Lynch must be permitted to present post-acquisition evidence that (i) confirms that HP was advised during due diligence of hardware sales and understood that those sales were not appliances; (ii) demonstrates that hardware sales were not material to HP's valuations of Autonomy and by extension, HP's decision to acquire Autonomy; and (iii) undermines the credibility of HP witnesses who claim that they were "shocked" when they purportedly learned about hardware sales for the first time after the acquisition.

That evidence includes the following:

- Immediately after the acquisition, Autonomy's trial balances were transferred over to HP, and HP went through the process of mapping Autonomy's accounts onto HP's accounts.

As Lisa Harris explained during her Rule 15 deposition, excerpts of which the defense will seek to admit as part of the defense case, those trial balances showed separate ledger entries for hardware sales and made clear those sales were occurring at a loss.  Evidence of the transfer of the trial balances also includes:

- o **Exhibit 6463**.  In this October 12, 2011 email thread, Autonomy transmitted its "trial balances"—its then-current books and records—directly to various HP and KPMG employees, including Mr. Gersh. Among other things, these trial balances make plain precisely how much hardware Autonomy sold (and the cost of those sales) in 2010 and the first half of 2011. The fact that these detailed records were turned over in early October 2011 tends to disprove HP witnesses' claims that they did not learn the truth until much later. Exhibit 06463 also bears directly on materiality:  that HP had full access to this information right away but took no action whatsoever for at least eight months shows that Autonomy's hardware sales were immaterial.  *See* Koeleveld Decl., Ex. 1 (Tr. Ex. 6463).

- o **Exhibit 2436**.  KPMG Report entitled "Autonomy – closing balance sheet" dated October 24, 2011.  *See* Koeleveld Decl., Ex. 2 (Tr. Ex. 2436).

- HP-owned Autonomy continued selling hardware, including acquiring and selling Dell hardware.  HP projected that revenues from such hardware sales would constitute 10% of Autonomy's total license revenues.  Continuing hardware sales after the acquisition is inconsistent with not knowing about those sales before the acquisition.  If HP had not known about the hardware sales, there would have been meetings and a decision point before deciding whether to continue the hardware sales program.  If HP viewed the hardware sales as a problem, HP would have rejected further hardware sales.  Instead, hardware sales continued without incident.  Evidence that supports continued hardware sales includes **Exhibit 7582**, an email from Christopher Yelland to Bill Veghte dated May 31, 2012, describing the state of Autonomy's revenue pipeline, which "allow[s] for 10% of the lic revenue [for Q4 2012] to be hardware," and including as attachments

revenue spreadsheets from previous quarters that reflect tens of millions of dollars in revenue from hardware sales. *See* Koeleveld Decl., Ex. 3 (Tr. Ex. 7582).

- In the weeks following the acquisition, senior HP executives including CFO Cathie Lesjak and Manish Sarin and their advisers like KPMG's Andy Gersh were repeatedly informed that Autonomy had approximately $100 million in hardware revenue. Yet they did not express surprise or concern about such information, as one would expect they would if they believed they had been misled about Autonomy's hardware sales. Nor did they ask whether this represented appliance sales or hardware sold for marketing purposes. Instead, they treated the hardware revenue as inconsequential. Evidence of such information includes the following:

  o **Exhibit 8229** is a November 4, 2011 email between various individuals at Ernst & Young discussing the auditors' "review of Deloitte workpapers." In this email summary, EY notes—just weeks after the deal closed—that Autonomy "had about $100 million in hardware revenue," and goes on to explain that the revenue "is primarily just pass through revenue for laptops and servers," that the sales were "normally [made] at a loss," and that they did not typically include software— facts that the government alleges were concealed. *See* Koeleveld Decl., Ex. 4 (Tr. Ex. 8229).

  o **Exhibit 8234** is a November 9, 2011 email from EY to HP, in which they summarize their review of Deloitte's workpapers, "not[ing] there was approximately $100M of hardware revenue and some of it was sold at a loss . . . ." The accompanying presentation specifically notes that approximately 11% of Autonomy's revenues came from sales of hardware. *See* Koeleveld Decl., Ex. 5 at 7 (Tr. Ex. 8234).

  o **Exhibit 5721** is a November 11, 2011 email from EY to HP, setting out an agenda for a "Q4 EY CFO Session" scheduled for that day. (This meeting would have been attended by HP's CFO, Cathie Lesjak.) Among other things, the

attached agenda sets out that Autonomy's "revenue includes $115M of hardware." *See* Koeleveld Decl., Ex. 6 at 7 (Tr. Ex. 5721).

   o **Exhibit 8231** is a November 11, 2011 EY memorandum received and reviewed by Mr. Gersh that summarizes EY's review of Deloitte's audit papers. This memorandum, circulated just weeks after the acquisition closed, explicitly discusses hardware sales, noting that Autonomy sold over $115 million of hardware at a loss in FY10 and split the cost between cost of sales and sales & marketing. The memorandum also identifies other issues, such as linked transactions, reciprocal arrangements, VAR agreements, hosting, OEM arrangements and linked transactions, which the government alleges were concealed from HP. The memorandum demonstrates that none of these issues— not hardware sales, not the other categories—were hidden from or misrepresented to HP. On the contrary, it is apparent from the memorandum that Autonomy made no effort to conceal these issues from HP, and that HP was not "shocked" to learn the "truth." *See* Koeleveld Decl., Ex. 7 (Tr. Ex. 8231).

   o **Exhibit 2451** is a November 15, 2011 email exchange between Manish Sarin and Kathryn Harvey in which Ms. Harvey writes, "During discussions with Autonomy folks in conjunction with our valuations, we learned that they have had approx. $100M/ year in revenue coming from the sale of Dell HW products. Was just curious if you were aware of this when you put the model together? *It doesn't have any impact on our valuations*, but it likely won't be part of Autonomy's future revenue stream and didn't know whether it was included in their revenue forecasts/targets." (emphasis added). Ms. Harvey was working on valuing Autonomy for HP's books and records post-acquisition. *See* Koeleveld Decl., Ex. 8 at 2 (Tr. Ex. 2451).

• Although HP's witnesses have claimed in the past that they thought Autonomy's hardware revenues were revenues from the sales of appliances, that claim makes no sense. If the hardware sales were appliances with an estimated profit margin of 80% (somewhat lower

than software, but still far higher than standalone hardware), then $100 million in hardware revenues would translate to $500 million in appliance revenues, meaning that over half of Autonomy's revenues came from appliances.  Under the circumstances, the notion that a reference to $100 million in hardware revenue is or may be a reference to appliance sales is absurd at best, and more likely, deliberately false testimony.

## III.    CONCLUSION

Dr. Lynch should be permitted to present exculpatory post-acquisition evidence that demonstrates that HP was aware of Autonomy's standalone hardware sales and that those sales did not diminish Autonomy's value.

1 | Dated: April 27, 2024

2 | Respectfully submitted,

3

4 | By:  _/s/ Celeste L.M. Koeleveld_
Celeste L.M. Koeleveld

5

6 | Christopher J. Morvillo
Celeste L.M. Koeleveld

7 | Daniel S. Silver
(Admitted Pro Hac Vice)

8 | **CLIFFORD CHANCE US LLP**
31 West 52nd Street

9 | New York, NY 10019

10 | Telephone:  (212) 878-3437

11 | Jonathan M. Baum (SBN: 303469)
**STEPTOE LLP**

12 | One Market Street

13 | Steuart Tower, Suite 1070
San Francisco, CA  94105

14 | Telephone:  (510) 735-4558

15 | Reid H. Weingarten

16 | Brian M. Heberlig
Michelle L. Levin

17 | Nicholas P. Silverman
Drew C. Harris

18 | (Admitted Pro Hac Vice)

19 | **STEPTOE LLP**
1114 Avenue of the Americas

20 | New York, NY 10036
Telephone:  (212) 506-3900

21

22 | *Attorneys for Defendant*
*Michael Richard Lynch*

23

24

25

26

27

28

---