Jonathan M. Baum (SBN: 303469)
**Steptoe LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA  94105
Telephone:  (510) 735-4558
jbaum@steptoe.com

Reid H. Weingarten
Brian M. Heberlig
Michelle L. Levin
Nicholas P. Silverman
Drew C. Harris
(Admitted Pro Hac Vice)
**Steptoe LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 506-3900

Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone:  (212) 878-3437
christopher.morvillo@cliffordchance.com

*Attorneys for Defendant*
*Michael Richard Lynch*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL RICHARD LYNCH and STEPHEN KEITH CHAMBERLAIN,<br><br>Defendants. | Case No.: 3:18-cr-00577-CRB<br><br>Judge: Hon. Charles Breyer<br><br>**DEFENDANT MICHAEL RICHARD LYNCH'S OPPOSITION TO THE GOVERNMENT'S MOTION TO ADMIT OTHERWISE PRECLUDED EVIDENCE**<br><br>Court:  Courtroom 6 – 17th Floor<br>Date Filed:  April 29, 2024<br>Trial Date:  March 18, 2024 |

## I. INTRODUCTION

The government contends that the defense's cross-examination of Joel Scott has "opened the door" to three categories of otherwise precluded evidence. ECF No. 458. The government's motion mischaracterizes Mr. Scott's testimony and seeks to open new entire subjects in response to narrowly tailored references to discrete events that were clearly probative of Mr. Scott's potential bias. The defense has not opened the door to any of the contested categories of evidence, and allowing the government to open up new areas would significantly widen the scope of Mr. Scott's testimony, consume additional trial time, and require the defense to contextualize the new testimony by exploring Mr. Scott's motivations when he spoke to HP in 2012 and 2013.

## II. THE DEFENSE HAS NOT OPENED THE DOOR TO TESTIMONY REGARDING MR. SCOTT'S MEETING WITH MR. SCHULTZ IN MAY 2012

The government argues that questions about a meeting Mr. Scott had with HP's outside counsel in January 2013, where he was threatened with prosecution and asked to confirm his loyalty to HP, opened the door to questions about Mr. Scott's statements to in-house HP counsel, John Schultz, eight months earlier, in May 2012, to rebut an allegation of recent fabrication. *Id*. at 2. This is incorrect; according to Ninth Circuit precedent, the door would only be opened by a "partial, misleading use of the evidence itself." *See*, *e.g*., *United States v. Sine*, 493 F.3d 1021, 1038 (9th Cir. 2007) ("Presenting a theory of the case that can be effectively rebutted by otherwise-inadmissible evidence . . . does not by itself open the door to using such evidence; only partial, misleading use of the evidence itself can do so.").

The defense did not use the testimony in any misleading way. Rather, the defense inquired about the threats that HP's outside counsel made to Mr. Scott in the context of exploring how those threats affected Mr. Scott's state of mind. *See* Trial Transcript ("Tr.") at 5748-49 (Q: "Do you remember saying that you had no loyalty to your former bosses? A: I don't specifically remember saying that.); *id*. at 5749 ("Q: And you said you wanted to be as helpful as possible to HP; is that right? A: That sounds correct.").

The defense could have focused on how Mr. Scott had changed his story over time,[1] but it consciously chose not to.  Indeed, the evidence of Mr. Scott's shifting narrative is ripe.  In Mr. Scott's first meeting with HP's outside counsel in November 2012, Mr. Scott said he "believed there was always an end user for the reseller deals" and that, after Brent Hogenson's allegations, he "concluded everything was appropriate under IFRS."  In his second meeting with Morgan Lewis in January 2013, Mr. Scott said that Mr. Hogenson "acted based on his own agenda and that agenda did not appear to be doing the right thing for the sake of doing the right thing."  In fact, the majority of the statements Mr. Scott made in these meetings contrast starkly with the story he told during his direct examination.  However, in line with its motion filed in advance of his testimony, the defense consciously avoided asking questions about the substance of Mr. Scott's first two Morgan Lewis interviews.  The door was not opened.

If the Court disagrees and concludes that the door was opened, then counsel will need to revisit Mr. Scott's earlier interviews to elicit statements that were favorable to the defense.  The defense will also need to show the many changes in Mr. Scott's prior testimony, which do not go clearly in one direction.  *See* Koeleveld Declaration, Exhibit 1 at 3 (Morgan Lewis Interview of Joel Scott, Jan. 17, 2013) ("Ms. Caldwell acknowledged that Scott did the right thing when he offered to cooperate with HP, but after his initial meeting, he essentially stopped cooperating and has not been candid in his interviews.  Scott stated that he was very specific in his discussions with Schultz, but Ms. Caldwell pointed out that in his interviews with MLB, he has just speculated and not relayed any specific details.").

In addition, if the Court finds that the door was opened to questions about Mr. Scott's May 2012 meeting with Mr. Schultz, that in turn raises all of the questions about the permissible scope of Mr. Scott's testimony about that meeting that Dr. Lynch raised in his Motion to Clarify Scope of Joel Scott Testimony Regarding Post-Acquisition Events, ECF No. 439 at 3-5

---

[1] The government asserts that defense counsel opened the door by stating that the 2013 meeting compelled Mr. Scott to "change[] his story." ECF No. 458 at 2.  Defense counsel made this argument during a sidebar out of the presence of the jury.  *See* Tr. at 5743.

DEFENDANT MICHAEL RICHARD LYNCH'S OPPOSITION TO THE GOVERNMENT'S MOTION TO ADMIT OTHERWISE PRECLUDED EVIDENCE
3:18-CR-00577-CRB
2

(identifying evidence that defense must be permitted to present if Mr. Scott testifies about the May 2012 meeting with Mr. Schultz). As explained in that motion, if Mr. Scott is permitted to testify about his meeting with Mr. Schultz, fairness would require that the defense be permitted to elicit testimony explaining the context of *that* meeting, including that Dr. Lynch had just been fired from HP, that Mr. Scott had recently learned that his rival, Christopher Egan, was under consideration to become head of Autonomy within HP, and that Mr. Scott was vying for the position. And if Mr. Scott is allowed to testify that he "disclosed" Autonomy's hardware sales to Mr. Schultz and that Mr. Schultz was surprised to learn of the hardware sales, Dr. Lynch must also be permitted to introduce evidence that, Mr. Schultz's apparent ignorance aside, HP had long known about Autonomy's hardware sales.

### III.  THE DEFENSE HAS NOT OPENED THE DOOR TO EVIDENCE OF DR. LYNCH'S PAYMENT OF OTHERS' LEGAL FEES

The government next argues that questions about how HP has paid Mr. Scott's legal fees and kept him on paid administrative leave for three years opened the door to testimony about how Dr. Lynch has covering Mr. Chamberlain's legal fees and those of "other relevant people." ECF No. 458 at 1-2, 5. The government does not explain how the door was opened, and it is not apparent what one payment of legal fees has to do with the other, or how questioning Mr. Scott about a three-year paid administrative leave has anything to do with Dr. Lynch. Evidence about HP paying Scott's legal fees and keeping him on administrative leave with pay for three years at a salary of $300,000 per year was an appropriate subject for cross examination because it is probative of Mr. Scott's potential bias. Even if, as the government now suggests, HP was obligated to pay Mr. Scott's legal fees and keep him on the payroll for three years,[2] Mr. Scott's longstanding and substantial financial ties with HP support an inference that he is

---

[2] It is far from clear that HP was obligated to cover Mr. Scott's legal fees. Morgan Lewis's interview memo from the Jan. 17, 2013 interview states as follows: "Scott asked if HP would cover the costs of hiring counsel, but Ms. Caldwell did not know. It would not be unheard of for a company to indemnify attorney fees, but Scott must raise the matter with HP's legal department." Koeleveld Decl., Exhibit 1 at 4.

beholden to the purported victim in this case and may, as a result, be shading his testimony in the government's favor.

Although the government does not say, it appears that the government seeks to admit evidence that Dr. Lynch has been voluntarily paying legal fees for Mr. Chamberlain and others for an entirely different and unrelated purpose, namely, to support an argument that Dr. Lynch somehow obstructed the government's investigation by paying "hush money" in the form of legal fees to former Autonomy employees. That allegation is one of the allegations that forms the basis for Count 17, the count that has been severed, and it accordingly has no place in this trial. The questions about Mr. Scott's legal fees and paid administrative leave have nothing to do with Dr. Lynch's payment of others' legal fees, and evidence that Dr. Lynch has paid Mr. Chamberlain's legal fees and those of others should be precluded as irrelevant and unduly prejudicial.

## IV. THE DEFENSE HAS NOT OPENED THE DOOR TO MR. SCOTT'S DISCUSSION WITH DR. LYNCH REGARDING THE LEGALITY OF THE HOGENSON PHONE CALL

Finally, the government argues that questions about whether Mr. Scott raised his concerns "about the reseller deals and the various other things that we're talking about" to Dr. Lynch, Tr. at 5755-56, somehow opened the door to testimony about Mr. Scott's discussion with Dr. Lynch concerning the legality of Mr. Scott's having recorded his phone call with Brent Hogenson. ECF No. 458 at 2. This argument lacks merit. To begin with, the defense's question was focused on Mr. Scott's purported concerns related to Autonomy's business practices, which are the subject of this case. The point of the question was not to argue that Mr. Scott had never raised questions in his entire career, but to demonstrate that Mr. Scott simply did not perceive that anything was wrong with Autonomy's business transactions at the time.

This is highly relevant given that the legality of Autonomy's business transactions is the subject of this case, but it does not somehow "open the door" to unrelated testimony about whether Mr. Scott may have believed he violated California Penal Code section 632 by recording a phone call with Mr. Hogenson, and how Dr. Lynch purportedly reacted to Mr. Scott's *after-the-*

*fact* expression of concern about that issue.  In fact, Mr. Scott's willingness to raise concerns to Dr. Lynch about his apparent worry about his personal conduct in recording a phone call, while never once raising concerns about Autonomy's business practices, is actually probative to show that Mr. Scott *did not* feel true concern at the time about Autonomy's business practices.

While evidence about Dr. Lynch's reaction to Mr. Scott's expression of concern about the legality of Mr. Scott's conduct in recording may be useful to tarnish Dr. Lynch's character, it carries no probative value.  The Court has correctly held that this testimony, which is akin to propensity evidence, is highly prejudicial and properly excluded under Rule 403.  *See* ECF No. 438; Tr. at 5030 (excluding the evidence because "to introduce evidence that someone was indifferent to the law is highly prejudicial," and this evidence is "of questionable probative value.")

In sum, Mr. Scott's concern about whether he personally did something wrong by recording the call,[3] and Dr. Lynch's reaction to those concerns, have nothing to do with whether or not Mr. Scott was concerned, at the time, about Autonomy's business transactions.  The door was not opened and should remain shut.

---

[3] As Dr. Lynch argued in his prior motion, Mr. Scott was incorrect; the recording was arguably legal because Mr. Hogenson would not have had an expectation of privacy on a call related to an official investigation of his workplace conduct that was attended by the company's general counsel and agents of an outside investigation firm. *See* ECF No. 438.

## CONCLUSION

For the reasons stated herein, the Court should deny the government's motion to admit otherwise precluded evidence.

Dated: April 29, 2024

Respectfully submitted,

By:   /s/ Celeste L.M. Koeleveld
Celeste L.M. Koeleveld

Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**CLIFFORD CHANCE US LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 878-3437

Jonathan M. Baum (SBN: 303469)
**STEPTOE LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA 94105
Telephone: (510) 735-4558

Reid H. Weingarten
Brian M. Heberlig
Michelle L. Levin
Nicholas P. Silverman
Drew C. Harris
(Admitted Pro Hac Vice)
**STEPTOE LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900

*Attorneys for Defendant*
*Michael Richard Lynch*