# EXHIBIT 1



DATE:     January 17, 2013

SUBJECT:  Memorandum of Interview with Joel Scott – January 17, 2013

| Tab No. | Document Description |
|---|---|
| 1 | 6/30/11 Email from Guiao to Scott re. the Abbott Reseller Agreement |
| 2 | 6/30/11 Email from Wilner to Sullivan stating that Abbott never authorizes forward-looking commitments |
| 3 | 6/29/11 Emails between Guiao, Chamberlain, Hussain, and Scott re. Abbot deal, culminating with Guiao sending Scott a amendment to Abbot deal and a P.O. for Capax |
| 4 | 8/22/11 Email from Scott to Hussain re. Dave Truitt's concerns about the Abbott reseller arrangement |

I.  **Interview Overview**

On January 17, 2013, Leslie Caldwell, Susan Resley, and Martha Stolley, all of Morgan Lewis and Bockius ("MLB") conducted an in-person interview of Joel Scott ("Scott"), Autonomy's former General Counsel. Jenny Harrison of MLB also attended. The interview lasted approximately one hour and was in connection with HP's internal investigation of former Autonomy management and Autonomy's business and accounting practices. This was the third time Scott was interviewed in connection with this investigation.

II. **Resellers**

   A.  *Abbott Labs/Discovertech*

Scott recalled the name "Abbott", but could not recall any specifics of the deal. He was surprised that it was a hosting deal because he did not recall Abbott Labs using the digital safe and, if it was a hosting transaction, it would have involved digital safe.

The discussed price of $9.75 million for the Abbott Labs deal sounded high to Scott. He thought it was around $500,000. $9 million also sounded high for the Discovertech deal if it was just for Abbott Labs.

Scott still did not remember the specifics regarding the Abbott Labs deal, even after shown an email where he forwarded a Capax P.O. to Guiao with Abbott Labs as the end user (Tab 1). He did not know why Discovertech, not Capax, was ultimately used for the deal. Probably Stouffer Egan ("Egan") or Sushovan Hussain ("Hussain") told Scott to create the Capax P.O. and then, a short time later, told him to create a different P.O. for Discovertech.

Scott did not recall contacting Capax or Discovertech before he created the P.O.s. He usually just usually created them, sent them off to the reseller, and collected the signed copy. He did not

FOIA CONFIDENTIAL TREATMENT REQUESTED                                                      HP-SEC-00329259

EXH 20053.03-0001

know if Discovertech knew it was entering into such a contract, but assumed it did since it returned a signed copy of the P.O. Generally, Egan or Hussain spoke with Dave Truitt at Discovertech and then had Scott prepare the P.O. Scott could not think of a time when a reseller was not expecting a P.O. when he sent it one.

Scott was not aware that the General Counsel at Abbott Labs told Autonomy that Abbott Labs would never sign such a forward-looking deal (Tab 2). Scott insisted that the Abbott Labs deal was not an unusual deal. He believed that Autonomy still chased the Abbott Labs deal after the quarter end; they would not just give up on it. While Scott was not in the loop on the General Counsel's statement (Tab 2), he was aware of the deal and involved in drafting of P.O.s (Tab 3).

Scott told Hussain that Dave Truitt balked at the possibility of post-HP acquisition issues (Tab 4). Scott did not recall writing this email or speaking with Truitt; however, Hussain often told Scott to tell Truitt certain things.

The Abbott Labs deal did not stick in Scott's head because most of the transactions were probably done on June 30th, which, as the last day of the quarter, was always a very busy day. There were always many demands to "do this, do this, do this" on the final day of the quarter and, since so much was going on, nothing stuck in his memory.

Discover Engine was a product that Autonomy bought from Discovertech. Autonomy "OEM'ed" it in its own products, meaning Autonomy would buy it, then incorporate or bundle it with Autonomy's own product and then sell the full product to the customer. Scott recalled other software purchases similar to Discover Engine that occurred toward the end of the quarter, such as Discover Point and some Capax software. Such purchases made him raise his eyebrows and wonder if they were ways for Autonomy to compensate Discovertech or Capax.

Scott recalled a flurry of activity in June and July of 2011, right before the August 18 announcement of the HP acquisition. He could not recall the specifics, but remembered some transactions right after the announcement, such as the purchase of Discover Engine software from Discovertech. There could have been a legitimate business purpose for this "flurry of activity", but it was also possible that the transactions were used to give money back to whoever Autonomy purchased software from. Scott could not recall if he questioned these transactions because there were many transactions that he asked Andy Kanter, Egan, and Hussain about. He could not recall any specific transaction he questioned, but he did ask several times if certain deals were legitimate. He never took any action beyond asking questions because he did not know what else to do. He saw that nothing happened when other people raised issues. For example, nothing happened after Brent Hogenson raised issues to Hussain, Egan, Deloitte, the SFO, and the SEC.

III.  **Moving Forward**

After discussing Abbott Labs, Ms. Caldwell told Scott that it was not productive to continue speaking with him unless he was going to be more candid. She explained that he could help clarify many issues, but it appeared that he was not doing so because he did not want to acknowledge his own level of complicity. The documents show that, as General Counsel, Scott

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-00329260

EXH 20053.03-0002

was an integral part of Autonomy, was a key player, and was in the middle of many "bad" deals. Scott's statements that he felt things were not kosher, but did not act, do not ring true.

Ms. Caldwell further told Scott that he probably will be approached by the government (either the SEC or criminal prosecutors) and he must decide how he will respond because they will not believe his current story since it is inconsistent with the documents. As an example, Ms. Caldwell showed Scott an August 22, 2011 email from Scott informing Hussain that David Truitt was concerned he would not get paid due to the recently announced HP acquisition (Tab 4). Ms. Caldwell was not accusing Scott of being the mastermind, but the email showed Scott was not just doing the paperwork.

Scott countered that he drafted and sent out P.O.s and chased payments, but he was never involved with revenue targets and never knew what debts were outstanding. He also felt his career was limited at Autonomy because he did ask questions. However, as Ms. Caldwell noted, his limit was fairly high as he was General Counsel and COO of the Americas. Moreover, putting titles aside, the documents and testimony show that Scott played a key part. He must have known the deals were bad after working on them for over two years.

Scott asked Autonomy management about certain deals and was consistently told that the IFRS was more relaxed that US laws; however, he never looked at IFRS himself. Moreover, as Ms. Caldwell pointed out, Scott knew that sometimes the deals did not come to fruition and that Autonomy had a mechanism to compensate the reseller for taking the risk.

Scott struggled to determine what he could have done differently and asked Ms. Caldwell what she would have done. She explained that she had never been in such a situation and that she understood it was difficult. However, she warned Scott that the SEC and DOJ tend to hold lawyers to higher standards than rank-and-file employees. Scott understood this, but felt that the SEC, Deloitte, and the UK regulators did nothing when Hogenson raised issues causing him to believe there was nothing he could do. Scott could have quit, but he felt doing so would not solve anything. He also never found another compelling job opportunity. Given his intense work schedule at Autonomy (usually working from 5 am to 11 pm), he did not have any time to search for a new job. He barely had any time with his family.

As soon as Scott had an opportunity to talk to someone without the threat of being fired, he contacted John Schultz and spoke with him. This took a lot of courage since Scott was, and still is, afraid of Lynch's retaliation. Ms. Caldwell acknowledged that Scott did the right thing when he offered to cooperate with HP, but after his initial meeting, he essentially stopped cooperating and has not been candid in his interviews. Scott stated that he was very specific in his discussions with Schultz, but Ms. Caldwell pointed out that in his interviews with MLB, he has just speculated and not relayed any specific details.

Scott questioned what crimes he was possibly facing. Ms. Caldwell explained that, based on her own personal interpretation, the documents raise criminal issues, such as mail or wire fraud. However, she could not advise him as to which crimes stemmed from where.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329261

EXH 20053.03-0003

Scott also wanted to know what Ms. Caldwell would currently do if she were in his position. Ms. Caldwell explained that she could not give him advice, but that she predicted the government will contact him and warned him that it is a crime to make a false statement to the federal government.

Ms. Caldwell could not advise Scott to seek counsel. HP may provide him with recommendations for counsel. Scott asked if HP would cover the costs of hiring counsel, but Ms. Caldwell did not know. It would not be unheard of for a company to indemnify attorney fees, but Scott must raise the matter with HP's legal department.

Ms. Caldwell explained that HP wants to hear the true story, Scott's unvarnished recollection, even if that makes Scott look bad; however, Scott does not have to cooperate with the investigation. The interviews' purpose is purely fact-finding, not making judgments or pointing fingers. Ms. Caldwell acknowledged that documents can be taken out of context or look different with the benefit of hindsight, so hearing Scott's recollections was important to HP. However, Scott must think about himself and how he wants to handle the situation going forward.

Scott stated he would talk with HP about his options and then decide what to do next. He intentionally did not obtain representation yet because he wanted to be helpful and not make the situation adversarial. He has no loyalty to his former bosses and wanted to be as helpful as possible to HP. Ms. Caldwell will inform Paul Roeder of today's conversation so that he will expect Scott's call.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329262

EXH 20053.03-0004