Gary S. Lincenberg - State Bar No. 123058
  glincenberg@birdmarella.com
Ray S. Seilie - State Bar No. 277747
  rseilie@birdmarella.com
Michael C. Landman – State Bar No. 343327
  mlandman@birdmarella.com
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS & NESSIM, LLP
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant Stephen Keith
Chamberlain

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:18-cr-00577-CRB |
| Plaintiff, | **Defendant Stephen Chamberlain's Supplemental Brief in Support of Defendant Michael Lynch's Motion to Preclude Testimony of Antonia Anderson** |
| vs. | |
| MICHAEL RICHARD LYNCH AND STEPHEN KEITH CHAMBERLAIN | Assigned to Hon. Charles R. Breyer |
| Defendants. | |

# I.      INTRODUCTION AND BACKGROUND

In addition to the reasons set forth in Dr. Lynch's motion, ECF No. 456—which Mr. Chamberlain joined in full, ECF No. 463—the Court should also exclude Ms. Anderson's testimony for a separate and independently sufficient reason: her knowledge about the pre-acquisition transactions in many cases originated from—and was almost entirely influenced by—her post-acquisition work as an HP employee through 2017. If Ms. Anderson is permitted to testify, the Court will be presented with two difficult options: either allow Mr. Chamberlain's counsel to delve into post-acquisition events to establish her biases—therefore revisiting the Court's decision that post-acquisition evidence is inadmissible under Rule 403—or deprive Mr. Chamberlain of his Sixth Amendment right to cross-examine Ms. Anderson about how her positions formed and regarding her credibility.

Ms. Anderson's work at Autonomy before HP's acquisition of Autonomy is extremely limited; as Dr. Lynch's motion observes, it is fully subsumed by Lee Welham's scope of knowledge. Beginning in 2007 through the beginning of 2011, Anderson worked as an assistant manager with the Deloitte outside auditor team that reviewed and audited Autonomy's financial statements. Ex. 1[1] at 1. Her position at Deloitte was junior to the one held by Mr. Welham. Ex. 2 at 1. In early 2011, Ms. Anderson left Deloitte. She began working for Autonomy's Cambridge finance team starting in May 2011. Ex. 1 at 1, 13. She did not have responsibility over revenue deals with Autonomy the first quarter she worked there. Ex. 1 at 13. Based on her prior statements, her testimony in the *Hussain* trial, and counsel's review of documents, it does not appear that the Government intends to elicit much testimony from Ms. Anderson about the work she performed during the few months she

---

[1]    Exhibit numbers in this pleading refer to the exhibits accompanying the concurrently-filed Declaration of Ray S. Seilie.

worked at Autonomy prior to HP's acquisition.[2]

The bulk of Ms. Anderson's knowledge about the issues in this case—including her knowledge about pre-acquisition events—comes from her work *after* the acquisition. Ex. 2 at 7. Applying hindsight, Ms. Anderson reviewed Autonomy's accounting for deals in the pre-acquisition period and claimed in interviews with the government that she felt "shock" at certain details she reviewed. *Id*.; *see also* Ex. 3 at 5 ("[Ms. Anderson] has seen things which, *in hindsight*, were different than how AU presented them to Deloitte." (emphasis added)). Notably, despite this supposed "shock," once HP announced its $8.8 billion write-down in October 2012, Ms. Anderson confided in a colleague that, "[I]t's so frustrating though reading things in the press that i know aren't true!" Ex. 4.

Ms. Anderson eventually changed her tune. She spoke at least five times to HP's attorneys in connection with their investigation of Autonomy's accounting. She was promoted to Director of Revenue, the position she held when she first spoke to the prosecution about this case. Ex. 1 at 1. She has cooperated with the Government since then.

If these circumstances are presented in full to the jury, the jury could reasonably infer that Ms. Anderson did not find fault with Autonomy's accounting until doing so served to assist HP in support of its litigation position. A jury could also infer that HP provided Ms. Anderson with continued employment and promotions as a reward for her willingness to provide testimony favorable to HP in this and other proceedings. Excluding Ms. Anderson from testifying prevents the tension that would otherwise arise between the Court's ruling on post-acquisition evidence and Mr. Chamberlain's rights under the Confrontation Clause to explore

---

[2]   To the extent the Government believes that Ms. Anderson will provide testimony about work she personally performed during this short period of time—rather than work by other individuals during this time that she reviewed after the acquisition—Mr. Chamberlain requests an offer of proof detailing such testimony.

1   Ms. Anderson's biases. Given the Court's ruling that post-acquisition period

2   evidence is beyond the scope of this trial, the Court must preclude her from

3   testifying altogether about her views of Autonomy's pre-acquisition transactions, as

4   her work in the later period is inextricably entwined with how she came to those

5   views.

6   **II.     ARGUMENT**

7           As Dr. Lynch's motion explains, if the Government is calling Ms. Anderson

8   simply to provide testimony about what Deloitte might or might not have done in a

9   variety of hypothetical scenarios, that testimony should be excluded as cumulative

10  of Lee Welham's under Rule 403. And if the Government intends to elicit testimony

11  from Ms. Anderson regarding her views on Autonomy's preacquisition accounting,

12  that testimony should be excluded as unnoticed expert opinion. These reasons—

13  detailed fully in Dr. Lynch's motion—are sufficient to exclude Ms. Anderson's

14  testimony.

15          But even if the Court reject those arguments, there is a third, independently

16  sufficient reason to preclude Ms. Anderson's testimony: it would necessarily open

17  the door to a full-blown exploration of the post-acquisition period, during which Ms.

18  Anderson was an HP employee who worked on HP's efforts to blame Autonomy's

19  former executives for its failed acquisition and bestowed professional benefits on

20  Ms. Anderson while she was cooperating with its lawyers and the Government. The

21  Court has ruled that those topics are inadmissible under Rule 403. Assuming the

22  Court adheres to its prior ruling, unless the Court precludes Ms. Anderson's

23  testimony, Mr. Chamberlain will be deprived of his Sixth Amendment right to cross-

24  examine Ms. Anderson about her motivations and biases.

25          This is no mere conjecture about the content of her testimony. In her most

26  recent disclosed interview with the Government on January 18, 2024—the first one

27  she provided after the Court severed Count 17 from this trial—Ms. Anderson

28  continued to confirm that her understanding of Autonomy's pre-acquisition

accounting is based on (1) information she learned about through her post-acquisition work for HP, or (2) information she received in connection with the *United States v. Hussain* trial and the UK civil proceeding.

Specifically, Ms. Anderson told the Government that she "learned additional information she did not know while she worked at Deloitte, AUTONOMY, or HP through her participation in the United States (US) v. Hussain trial and the UK civil trial." Ex. 5 at 1. To the extent her knowledge did not come from these proceedings, her prior statements and emails indicate that her knowledge about certain deals was based on information she received from HP as part of her work to identify accounting errors during HP's post-acquisition "rebasing" exercise. For example:

- On January 18, 2024, Ms. Anderson told the government that she was aware of potential issues concerning EDD invoices related to Capax through her work with HP after the acquisition. Ex. 5 at 1.

- The same interview notes state, "Details about the Microlink acquisition were new to" Ms. Anderson, i.e., she did not learn about any issues regarding the Microlink acquisition until the *Hussain* trial and/or the UK civil trial. Ex. 5 at 1-2.

- The same notes state that Ms. Anderson was aware of possible issues relating to Autonomy's transactions with Filetek based on her post-acquisition work for HP. Ex. 5 at p. 3.

- In an earlier interview on August 18, 2017, Ms. Anderson told the government that she was "shocked and disappointed" to see a Bank of America contract she reviewed in 2012, as part of her work for HP. Ex. 2 at 7.

Ms. Anderson's views about any of these transactions cannot be separated from the biases she formed after the acquisition, even if the Government attempts to frame the questions as based on her pre-acquisition knowledge. For example, if the Government showed her information about a Filetek deal and asked her to provide testimony about the appropriateness of any revenue recognition decision relating to that deal, any testimony she provided would potentially be infected by the views she

formed *after* the acquisition, even if carefully phrased as relating solely to the pre-acquisition period. To fully explore her bias and credibility, Mr. Chamberlain would need to cross-examine her in part by eliciting that she had not learned about the facts that gave rise to her concerns until after the acquisition; that at the time she learned about those facts, her employer was trying to establish that its unsuccessful acquisition of Autonomy was the fault of its former principals; and that after Ms. Anderson aligned herself with HP's position, she was promoted to Director of Revenue. Each of these facts is directly relevant to Ms. Anderson's biases.

Such need for cross-examination would not be limited to the specific transactions she mentioned in her prior interviews. Ms. Anderson has been involved in HP's legal efforts to cast blame Autonomy's former employees for years, and has been exposed to information cherry-picked by HP and prosecutors to support their version of events. For a significant portion of that time, she also depended on HP for employment. Amid that backdrop, *any testimony* she provides about Autonomy's revenue recognition decisions would need to be cross-examined with an exploration of the pressures on her and the biases that Ms. Anderson may have developed while working for HP after the acquisition.

Nor can Ms. Anderson testify about her general impressions of Mr. Chamberlain without being subject to cross-examination about her post-acquisition activities. To the contrary, Ms. Anderson was *explicit* that her views of what Chamberlain knew pre-acquisition was based on hindsight:

> A few times during the AUTONOMY audit, CHAMBERLAIN would instruct the audit team to speak to HUSSAIN about specific deals. This happened with at least one deal per quarter. ***At the time ANDERSON thought that AUTONOMY did not let him get involved in all deals.*** Now ANDERSON believed that CHAMBERLAIN knew about all the deals but did not want to talk to the auditors about them as a way to keep his hands clean.

Ex. 5 at 2 (emphasis added). The only testimony about Ms. Anderson's

*contemporaneous* knowledge of what Mr. Chamberlain knew is reflected in her statement that she "thought that AUTONOMY did not let [Mr. Chamberlain] get involved in all deals." Her subsequent speculation that Mr. Chamberlain "knew all about the deals" was based on information she reviewed after the acquisition, presumably hand-selected by her employer. Should Ms. Anderson be permitted to offer her hindsight speculation that Mr. Chamberlain "knew about all the deals," counsel could not effectively cross-examine her regarding her biases unless permitted to explore her involvement in that process.

Limiting Mr. Chamberlain's cross-examination to pre-acquisition events would, in the case of Ms. Anderson, amount to a deprivation of his Sixth Amendment confrontation rights. Under the Confrontation Clause, defendants cannot be prevented from asking questions during cross-examination that "cut[] right to the heart of [a witness's] credibility." *United States v. Adamson*, 291 F.3d 606, 613 (9th Cir. 2002); *see also Davis v. Alaska*, 415 U.S. 308, 316–17 (1974) ("[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."). In *United States v. Adamson*, 291 F.3d 606, 613 (9th Cir. 2002)—another case in which prosecutors pursued criminal charges based on facts uncovered as part of an investigation by HP—the Ninth Circuit held that it was reversible error for a trial court to prevent a defense attorney from introducing as prior inconsistent statements a cooperating witness's statements and conduct from an earlier interview with HP. The court held,

> [b]y limiting the scope of the defense's cross-examination, the district court effectively precluded [the defendant] from attacking [the cooperator's] credibility and denied the jury access to information it needed in order to appraise [the cooperator's] biases and motivations. That was error.

*Id.* at 613.

In other words, to preserve Mr. Chamberlain's Confrontation Clause rights as

to Ms. Anderson, the Court would need to allow him to cross-examine her on her "biases and motivations," which derive from her post-acquisition employment by HP, HP's knowledge of and involvement in the Government's investigation, and her professional success at HP after she made clear that she was willing to cooperate with the Government and convey HP's version of events in legal proceedings. Specifically, Mr. Chamberlain would need to inquire about the following post-acquisition events:

- Ms. Anderson's initial reaction to hearing HP's announcement of its write-down, during which she stated that she was "reading things in the press that [she knew] aren't true!"

- Ms. Anderson's employment by HP, including the compensation and promotions she received from her employer while she was cooperating with the government.

- Ms. Anderson's work on HP's efforts to cast blame for the failed acquisition on Autonomy's former executives.

- HP's incentive to shift blame for its write-down to Autonomy's pre-acquisition accounting and the concomitant pressure on HP employees like Ms. Anderson to support its story.

Mr. Chamberlain acknowledges that a fulsome cross-examination into these areas would result in a significant consumption of time and would be in tension with the Court's prior rulings on post-acquisition evidence. But the Government cannot have it both ways and, if Ms. Anderson is allowed to testify, Mr. Chamberlain must be permitted to explore the pressures she faced and the biases she formed after the acquisition.

The Government has already presented the testimony of a Deloitte auditor (who played a more direct and senior role in Deloitte's audits of the transactions at issue). Based on Ms. Anderson's prior statements, she is not likely to testify about any contemporaneous observations about either defendant's conduct. Instead, it appears that the Government intends to ask her to act as a summary witness, repeat

earlier testimony from other witnesses, and ask Ms. Anderson to provide her opinion about the significance of that testimony. There is no additional probative value that such testimony would provide that outweighs the resulting need to cross-examine Ms. Anderson on her post-acquisition activities and connection to HP.

## III.   CONCLUSION

For these reasons, as well as those set forth in Dr. Lynch's motion *in limine*, the Court should preclude Antonia Anderson from testifying at trial.

DATED:  May 1, 2024

Gary S. Lincenberg
Ray S. Seilie
Michael C. Landman
Bird, Marella, Rhow,
Lincenberg, Drooks & Nessim, LLP


By: _____

Ray S. Seilie
Attorneys for Defendant Stephen Keith Chamberlain

**DECLARATION OF RAY S. SEILIE**

I, Ray S. Seilie, declare as follows:

1.      I am an active member of the Bar of the State of California and counsel with Bird, Marella, Rhow, Lincenberg, Drooks & Nessim, LLP, attorneys of record for Defendant Stephen Chamberlain in this action. I make this declaration in support of Defendant Stephen Chamberlain's Supplemental Brief in Support of Defendant Michael Lynch's Motion to Preclude Testimony of Antonia Anderson. Except for those matters stated on information and belief, I make this declaration based upon personal knowledge and, if called upon to do so, I could and would so testify.

2.      Attached as **Exhibit 1** is a true and correct copy of a document produced by the Government in this matter, which purports to be a memorandum documenting an October 17, 2014 interview of Antonia Anderson by the Government.

3.      Attached as **Exhibit 2** is a true and correct copy of a document produced by the Government in this matter, which purports to be a memorandum documenting an August 18, 2017 interview of Antonia Anderson by the Government, with relevant excerpts highlighted.

4.      Attached as **Exhibit 3** is a true and correct copy of a document produced by the Government in this matter, which purports to be a memorandum documenting a December 6, 2012 interview of Antonia Anderson by HP's counsel, with relevant portions highlighted.

5.      Attached as **Exhibit 4** is a true and correct copy of a document marked and admitted as Trial Exhibit 6449 in the *Hussain* trial.

6.      Attached as **Exhibit 5** is a true and correct copy of a document produced by the Government in this matter, which purports to be a memorandum documenting a January 18, 2024 interview of Antonia Anderson by the Government, with relevant excerpts highlighted.

I declare under penalty of perjury under the laws of the United States of

1  America that the foregoing is true and correct, and that I executed this declaration

2  on May 1, 2024, at Los Angeles, California.

3

4  _____

5  Ray S. Seilie

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28