# Exhibit 2

FD-302 (Rev. 5-8-10)



# FEDERAL BUREAU OF INVESTIGATION

Date of entry  12/11/2017

    ANTONIA ANDERSON (ANDERSON), date of birth December 29, 1980, was re-interviewed at the United States Attorney's Office, 450 Golden Gate Avenue, 11th floor, San Francisco, California.  Ed Swanson and August Gugelmann represented ANDERSON during the interview.  ANDERSON was interviewed pursuant to a proffer agreement with the United States Attorney's Office.  Assistant United States Attorney (AUSA) Robert Leach, AUSA Adam Reeves, and FBI Forensic Accountant Marlene Smith were also present for the interview.

    ANDERSON will start her employment at Micro Focus in September 2017.  ANDERSON stated her understanding of the agreement with the United States government was to be truthful.

    ANDERSON became a manager at Deloitte in approxmately 2009.  LEE WELHAM (WELHAM) was senior to ANDERSON at that time but ANDERSON did not report to WELHAM.  MATT HUGHES (HUGHES) was ANDERSON's mentor at Deloitte at that time.  ANDERSON viewed all partners at Deloitte as her bosses.  At that time, Deloitte Cambridge office had four partners, RICHARD KNIGHTS (KNIGHTS), NIGEL MERCER (MERCER), DAVID HALSTEAD (HALSTEAD), and STUART HENDERSON (HENDERSON).  ANDERSON is now married to HALSTEAD who is still a partner at the Deloitte Cambridge office.

    ANDERSON joined the Autonomy audit team at Deloitte around the time of the Zantaz acquisition.  ANDERSON left Deloitte in 2011.

    During Q1 2009, ANDERSON's role on the Autonomy audit team was to review contracts and prepare summaries of audit findings.  ANDERSON also reviewed other team member's work.  ANDERSON worked with WELHAM, ROB KNIGHT (KNIGHT), and KNIGHTS at that time.

**HP-SEC-00134320-338**

    ANDERSON drafted part of this document and reviewed the whole document.  The "Key risks" part of this document highlighted the risks Deloitte saw during the audit and provided guidance on how to address them.  Capax Global LLC listed on page 4 was a Value Added Reseller (VAR).  A VAR is a company which sold Autonomy software to end users.  A

Investigation on  08/18/2017  at  San Francisco, California, United States (In Person)

File #  318A-SF-2582907-302                                                    Date drafted  08/18/2017

by  KWOK LESTER, SMITH MARLENE

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318A-SF-2582907-302

Continuation of FD-302 of  (U) Interview of Antonia Anderson  , On  08/18/2017  , Page  2 of 8

draft of this report was sent to both STEPHEN CHAMBERLAIN (CHAMBERLAIN) and SUSHOVAN HUSSAIN (HUSSAIN) to get feedback from management and to make sure the information was correct and accurate. The final report was sent to the Audit Committee for review. The "key risks" were a Deloitte product and were derived from Deloitte's decisions and judgement. Deloitte derived the key risks from talking to Autonomy's finance group. Deloitte also reviewed and tested sales contracts. THOMAS MURRAY (MURRAY) was at the same level at Deloitte as ANDERSON. However, ANDERSON was a manager a little longer than MURRAY. Microlink listed on page 11 was also a VAR. ANDERSON noted that Deloitte questioned the substance of the Microlink transaction.

**Autonomy Corporation plc - Report to the Audit Committee - Q2 2009**

ANDERSON drafted part of this document and reviewed the whole document. ANDERSON remembered the Morgan Stanley transaction noted on page 13. The Morgan Stanley deal was valued at approximately $6M. Morgan Stanley needed hardware on site as part of the in-house digital storage solution and Autonomy sold Morgan Stanley the hardware. The issue Deloitte had was delivery. Deloitte did not have positive proof that delivery of the hardware was made.

**Memo - From Thomas Murray - July 13 2009**

ANDERSON did not remember having discussions with HUSSAIN regarding switching the vendor of the Morgan Stanley hardware deal from Hitachi to EMC. ANDERSON did not remember why the vendor was switched but stressed the important part of the transaction from Deloitte's perspective was the delivery of the hardware.

**HP-SEC-01548863-866 - July 13, 2009 - Subject: EMC/MS**

The purpose of this email was to provide proof of delivery for the EMC hardware.

**US SEC EX 00006478 - 7/15/2009 - Subject: EMC**

EMC could not provide proof of delivery but Morgan Stanley had stated acceptance of the hardware. With no other evidence, Deloitte required Autonomy to provide a representation in the management representation letter stating that delivery was made. In the letter, Autonomy management confirmed delivery of the hardware to Morgan Stanley. The management representation letter is an important part of the audit process. Without this management representation letter, Deloitte was not going to sign off on the review.

US_FBI_E-00022747

EXH 5008-0002

### HP SEC 01844685-687

This is the management representation letter Deloitte requested from Autonomy management that confirmed delivery of the hardware to Morgan Stanley. ANDERSON recognized HUSSAIN's signature on the last page of this document. The letter confirmed delivery of the hardware on June 30, 2009. If the delivery was made in either July or August, then the revenue should not have been recognized in Q2 2009, but instead should have been recognized in the following quarter. ANDERSON did not know when or if Morgan Stanley took delivery of the hardware. Management representation letters generally contain opinions of management, but the letter rarely contained factual matters because factual matters could be supported with documents.

HUSSAIN explained to ANDERSON Autonomy needed to sell both software and hardware to keep their existing customers. Autonomy was selling hardware at a loss but will recover the losses from the increased software sales.

### HP SEC 01835486-495

This email contained an outstanding list. The outstanding list was information Deloitte needed from Autonomy in order to complete the review/audit. COGS stated in 01835490 meant cost of goods sold. At the time of the audit, there was a debate between Deloitte and Autonomy management as to whether some expenses should be recognized as COGS or sales and marketing costs. ANDERSON was not sure if MIKE LYNCH (LYNCH) was part of this discussion.

SPE was an Autonomy product. ANDERSON had no memory of a technical discussion regarding SPE with PETE MENNEL (MENNEL).

Deloitte needed to determine the commercial and technical rationale for the Microlink software purchase for $5.2M. Deloitte had to determine whether there was a need for the purchase of the software and how the software would generate revenue. Deloitte also needed to know if the software was sold at a fair price. Basically, Deloitte needed to determine why the software was purchased.

### Exhibit 910

This was a memo from HUSSAIN explaining the strategy for Autonomy to sell hardware. This memo was relevant because it explained Autonomy's strategy to sell hardware.

### Exhibit 995

STUART HENDERSON (HENDERSON) was a partner at Deloitte. HENDERSON worked at Deloitte's Cambridge office. HENDERSON was the independent review partner for the Autonomy audit. HENDERSON wanted to ensure Microlink had a commercial use for their purchases and had a need for it.

**HP SEC 01820297**

This email was an accounting discussion regarding capital cost associated with the development of the SPE project. There were several standards that must be met before a cost could be classified as a capital cost. Labor time spent on the project must be properly recorded. Without properly recorded times the cost could not be classified as a capital cost, but instead would need to be classified as an expense. This was a big audit issue during this quarter.

**Exhibit 996**

This email contained a copy of the Audit Committee report for Q3 2009. ANDERSON drafted part of this report and reviewed the whole report. The "Key risks" portion of the report explained revenue recognition for the hardware sales and Deloitte's findings on the hardware sales.

Deloitte determined it was appropriate to recognize revenue in the Capax Discovery LLP (Capax) deal with Kraft Foods because Capax, an Autonomy VAR, was current with their payments to Autonomy. Capax had made all payments due to Autonomy. Capax being current on their payments to Autonomy was relevant to Deloitte because it demonstrated Capax had the ability to pay and there would be no collection risk.

ANDERSON was unaware of a side deal between Capax and Autonomy regarding an EDD project. It would have been relevant to know about any side deals.

Page 6 of the report gave an explanation regarding classifying the expenses for hardware sales. There were discussions between Deloitte and Autonomy as to whether to classify hardware sales expenses as COGS or as marketing expenses. This decision would have made an impact of how analysts viewed Autonomy. Analysts would have found it strange for a software company to have a large COGS. This was a big issue during this quarter and it took a lot of time and effort to resolve it. Deloitte had many discussions with HUSSAIN regarding this topic.

**DEL00050587-0588**

318A-SF-2582907-302

Continuation of FD-302 of (U) Interview of Antonia Anderson , On 08/18/2017 , Page 5 of 8

    CHRIS ROBERTSON (ROBERTSON) was a Deloitte AQ partner assigned to the Autonomy engagement but worked out of the Birmingham office.  At the time of the interview, ANDERSON did not have any memories regarding the topics discussed in this email.

### HP SEC 01820713

    When CHAMBERLAIN said "This has been a challenging quarter", ANDERSON believed he meant the short deadlines during this quarter were challenging.  ANDERSON commented that all quarters were challenging and it was typical to have challenging audits.

### HP SEC 00100680-0682 & HP SEC 00100685

    HP SEC 00100685 is an outstanding list for Q4 2009 audit.  Deal number 140 was the Morgan Stanley digital safe deal.  The software licensing revenue would be recognized upfront.  There were disagreements on whether the storage fee contract was at fair value.  It was important because the value of the licensing fee might need to be revalued as well.

    The outstanding list requested Microtech's financial information.  Deloitte wanted Microtech's financial information to assess Microtech's financial health.  Deloitte also wanted to determine Microtech's ability to sell to end users and the end users' ability to pay Microtech.  All this information was used to gauge Microtech's ability to pay Autonomy.

    The outstanding list requested Capax's payment history.  If Deloitte was aware of a side agreement between Capax and Autonomy regarding payments then Deloitte might not have allowed the revenue to be recognized.

### Exhibit 53

    This memo was prepared to determine if the two linked deals, Autonomy's license sale to Filetek Inc and Autonomy's purchase of a software from Filetek, made sense from a commercial perspective.  The memo provided evidence for commercial usefulness of both the Filetek software for Autonomy and the Autonomy software for Filetek.  The memo also provided quotes from other vendors to show the prices of software comparable to the Filetek software offered by other vendors.

### Exhibit 54

    This email was associated with the purchase of Microlink by Autonomy.  In support of the audit, ANDERSON was asking for information regarding Microlink.  ANDERSON spoke to HUSSAIN regarding this topic but

did not remember the exact details of what they talked about. Due to the ongoing business deals at the time, Deloitte needed to determine if Discover Tech and Microtech were related, meaning did the two companies have the same owners. That fact was important to ensure fair value of any and all business deals between these two companies and Autonomy. Autonomy management assured Deloitte that Discover Tech and Microtech were unrelated.

**HP SEC 01958277-8279**

This email contained another version of the outstanding list. Deal 170 was the Discover Tech deal. Profiling was an Autonomy product. Deloitte requested other Profiling deals to compare to the Discover Tech deal. Deloitte also wanted to determine Discover Tech's ability to pay for the software. Discovery Tech did not have an agreement with the end user MircoTech. That fact was important because Deloitte was told this transaction was a VAR transaction.

Deal 150 was the Filetek deal. Deloitte requested documents to find evidence that the parties of the deal were not related and that the deal was done at fair value.

ANDERSON believed she did not talk to either ALAN RIZEK (RIZEK) or DAVID TRUITT (TRUITT) regarding this matter.

**HP SEC 01958475-8477**

This email contained another version of the outstanding list. The big question on this outstanding list was to determine the ownership of MicroTech. Deloitte also wanted to determine if there was a relationship between Discover Tech and Microlink.

**Exhibit 58**

This document contained information regarding the testing done on large contracts in the audited quarter. Deloitte generally tested every contract that generated revenue over $1M. ANDERSON was familiar with the VAR MicroTech deal valued at approximately $10M. This contract was done around the same time as the Autonomy purchase of Microlink for $55M. Deloitte needed to know if MicroTech and Microlink were related. If the companies were related, then the net purchase price for Microlink would be $45M and Autonomy would have benefited with an increase of $10M in revenue. Basically, if the companies were related, MicroTech would have use part of the Microlink $55M to pay the $10M Autonomy invoice. Additionally, ANDERSON did not have any information that stated MicroTech and Microlink were related. At the time of the audit, ANDERSON

318A-SF-2582907-302

| Continuation of FD-302 of | (U) Interview of Antonia Anderson | , On | 08/18/2017 | , Page | 7 of 8 |

did not know TRUITT was the owner of MicroTech.  TRUITT being the owner of MicroTech was an important fact for the audit team to know in order for them to appropriately determine the fair value of the deals.

Deloitte was interested in the $12M digital safe Morgan Stanley deal because of the large value of the deal and Autonomy's new product, SPE, that Deloitte was not familiar with.  Deloitte needed to know the capabilities of SPE and assess the value of the product.  Based on reasons provided by Autonomy regarding the capabilities of SPE, Deloitte was satisfied with the $12M purchase price of the Morgan Stanley deal.  ANDERSON was not sure if she was involved in this discussion.  Another issue that came up was the reduced storage fees.  If the storage fees were reduced then licensing fees needed to be re-allocated.

**Exhibit 919**

As part of the audit, Deloitte needed to do a collectiblity check on Capax.  As part of the check, Deloitte needed to look at Capax's past payment history, Capax's credit rating, and Capax's ability to pay its current debt.  Deloitte was trying to determine whether Capax would be able to pay Autonomy's invoices if Autonomy did not purchase software from Capax.  Also, Deloitte needed to determine if the software Autonomy purchased from Capax had any real business substance.  Deloitte was trying to prove this transaction was not a round trip transaction.  It would have been a major concern for Deloitte if Deloitte discovered that no services were provided by Capax in this deal and that the sole reason Autonomy paid Capax was for Capax to have the funds to pay Autonomy.

In 2012, ANDERSON was working with CHRIS YELLAND (YELLAND) at Autonomy.  Prior to the write down, ANDERSON found an Autonomy contract with Bank of America that was a direct sale contract.  This was a huge shock to her.  From her days at Deloitte, ANDERSON remembered this particular deal was a VAR deal.  The direct contract with Bank of America was classified as an off-balance contract and it was never invoiced.  This was not what was told to her while she was at Deloitte.  Deloitte had raised issues about VAR deals that were eventually direct contracts, prior to the Bank of America contract while she was at Deloitte.  Deloitte previously told Autonomy that they can not do that and Autonomy had promised not to structure contracts like that again.  The issue with structuring a deal that way was revenue recognition.  In a VAR deal, revenue was recognized when the VAR signs the deal with Autonomy, while in a direct deal, the revenue was recognized when the end user signs the deal with Autonomy.  ANDERSON was both shocked and disappointed when she saw the Bank of America contract because people she trusted turned out to be

US_FBI_E-00022752

EXH 5008-0007

```
318A-SF-2582907-302
```

Continuation of FD-302 of  (U) Interview of Antonia Anderson  , On  08/18/2017  , Page  8 of 8

liars.  The worst part was she even went to work for them.  This event made ANDERSON more risk conscious.

ANDERSON got to know YELLAND better in May 2012.  ANDERSON liked working with YELLAND.  YELLAND had a high standard but had a difficult job.  ANDERSON believed YELLAND did a good job.

### DEL 00241788-1793

This email related to the proof of delivery for the Morgan Stanley Digital Safe deal.

ALEX JACKSON was on ANDERSON's audit team and reported to ANDERSON.  JACKSON was requesting confirmation that SPE was the reason for the increase of the deal to $12M.

### HP_SEC_00028272

For every Autonomy transaction over $100K, Deloitte asked for an information pack that included purchase order, invoices, contracts, and email confirming delivery.  Autonomy had yet to provide the complete information pack for the Vatican(Microtech) deal.

### HP_SEC_01945758-5760

This email contained an outstanding list concerning the Q4 2009 Filetek purchase.

### DEL00073686-3687

This document contained information regarding adjustment to COGS and marketing costs associated with hardware sales.  Deloitte provided Autonomy with guidance to only expense up to the loss as a marketing cost and the remainder will have to be in COGS.  This document indicated that Autonomy ignored Deloitte's guidance and allocated the expense evenly between COGS and marketing.  ANDERSON was not sure from reading this document how Autonomy came up with the even allocation method.