1    Gary S. Lincenberg - State Bar No. 123058
        glincenberg@birdmarella.com
2    Ray S. Seilie - State Bar No. 277747
        rseilie@birdmarella.com
3    Michael C. Landman - State Bar No. 343327
        mlandman@birdmarella.com
4    Abraham Rejwan - State Bar No. 335927
        arejwan@birdmarella.com
5    BIRD, MARELLA, RHOW, LINCENBERG,
     DROOKS & NESSIM, LLP
6    1875 Century Park East, 23rd Floor
     Los Angeles, California 90067-2561
7    Telephone: (310) 201-2100
     Facsimile: (310) 201-2110
8
     Attorneys for Defendant
9    Stephen Keith Chamberlain

10

11                 **UNITED STATES DISTRICT COURT**

12    **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

13

| | |
|---|---|
| 14    UNITED STATES OF AMERICA, | CASE NO. 3:18-cr-00577-CRB |
| 15             Plaintiff, | **Defendant Stephen Chamberlain's Motion for Judgment of Acquittal Under Rule 29** |
| 16             vs. | |
| 17    MICHAEL RICHARD LYNCH and STEPHEN KEITH CHAMBERLAIN, | Judge: Hon. Charles R. Breyer |
| 18             Defendants. | Court: Courtroom 6 – 17th Floor |
| 19    | Trial Date: March 18. 2024 |

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.    ARGUMENT ....................................................................................... 8

    A.    Legal Standard ........................................................................... 8

    B.    No Evidence of Mr. Chamberlain's Intent to Participate in the Alleged Conspiracy and Scheme to Defraud ............................ 9

        1.    Reseller Deals .................................................................. 11

        2.    Alleged Linked Transactions ......................................... 15

        3.    Hardware ......................................................................... 17

        4.    Hosting ............................................................................ 20

        5.    Alleged Backdating ........................................................ 21

        6.    Miscellaneous Allegations ............................................. 22

    C.    Materiality ................................................................................ 22

    D.    Mr. Chamberlain Did Not Cause, Aid, or Abet the Transmission of Wire Communications Alleged in Counts 2 through 15, Nor Did He Reasonably Foresee Them as a Necessary or Natural Consequence of a Scheme to Defraud ................................... 23

        1.    Count 2 (Joel Scott Email) ............................................. 23

        2.    Counts 3, 7, 8 (Press Releases for 2010, Q1 2011, and Q2 2011) ............................................................................... 24

        3.    Counts 4 and 5 (HALO Conference Calls) .................... 24

        4.    Count 6 (Malcolm Hyson Email on April 4, 2011) ....... 25

        5.    Counts Nine Through Twelve (Due Diligence Calls) ..... 25

        6.    Counts Thirteen and Fourteen ....................................... 26

        7.    Count Fifteen .................................................................. 27

II.   CONCLUSION ................................................................................. 28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Neder v. United States*,
   527 U.S. 1 (1999) ........................................................................................ 6, 19

*United States v. Alarcon–Simi*,
   300 F.3d 1172 (9th Cir. 2002) ............................................................................ 5

*United States v. Jinian*,
   725 F.3d 954 (9th Cir. 2013) .............................................................................. 6

*United States v. Kamer*,
   781 F.2d 1380 (9th Cir. 1986) ............................................................................ 7

*United States v. Krasovich*,
   819 F.2d 253 (9th Cir. 1987) .............................................................................. 7

*United States v. Lapier*,
   796 F.3d 1090 (9th Cir. 2015) ............................................................................ 7

*United States v. Loveland*,
   825 F.3d 555 (9th Cir. 2016) .............................................................................. 7

*United States v. Melchor-Lopez*,
   627 F.2d 886 (9th Cir. 1980) ...................................................................... 6, 7, 8

*United States v. Milwitt*,
   475 F.3d 1150 (9th Cir. 2007) ............................................................................ 6

*United States v. Nevils*,
   598 F.3d 1158 (9th Cir. 2010) ............................................................................ 6

*Webb v. Solarcity Corp.*,
   884 F.3d 844 (9th Cir. 2018) .............................................................................. 7

**Statutes**

18 U.S.C. § 1343 ................................................................................................ 20

**Other Authorities**

Rule 15 ................................................................................................................. 17

Rule 29 ................................................................................................................... 7

Rule 29(a) ............................................................................................................... 5

Defendant Stephen Chamberlain moves for a judgment of acquittal on Count 1 (Conspiracy to Commit Wire Fraud) and Counts 2 through 15 (Substantive Wire Fraud Counts) on the basis that the Government has failed to prove Mr. Chamberlain's knowledge of or intent to participate in the alleged scheme. The Government's evidence establishes that Mr. Chamberlain acted in good faith and openly disclosed information material to the accounting decisions.

Government witnesses universally state the following:

-   Those who dealt with Mr. Chamberlain uniformly testified that Mr. Chamberlain was open, honest and performed his job in good-faith.

-   *Every* finance team member who testified stated that they never saw or heard of Mr. Chamberlain directing anyone to lie to auditors and they never saw any evidence that Mr. Chamberlain lied to the auditors. Nor did they lie themselves. Quite the opposite, they were encouraged to be open and honest with Deloitte.

With regard to each of the specific transactions at issue, the Government failed to adduce evidence that Mr. Chamberlain acted with intent to defraud:

-   <u>Alleged side agreements</u>.[1] Whether the oral communications were or were not side agreements, no one told Mr. Chamberlain or his team about them when they were performing their revenue recognition accounting function. Although Mr. Egan testified that he discussed with Mr. Hussain what he could and could not say to customers, Mr. Egan *conceded* he never told Mr. Chamberlain about oral

---

[1]   The evidence suggests there were no side agreements. The resellers all acknowledge they were on risk per the written contract. They testified in varying forms that Egan and Hussain gave them various oral assurances, at various times, that Autonomy would work with them to help resell the software or find other ways to help them. None of this, however, is relevant here as no one informed Cambridge finance team members of such conversations *at the time* they were performing the revenue recognition accounting work.

communications with customers. Resellers either did not believe there to be side agreements or testified that they did not discuss those agreements with Mr. Chamberlain. To the extent they had any communications with Mr. Chamberlain, such dealings consisted primarily of providing audit confirmations and financial information related to collectability. In other words, the communications with Mr. Chamberlain included written confirmations of the *absence* of any alleged side agreements.

- <u>Alleged linked transactions</u>. The Government's case was essentially that the services provided by the resellers, or products purchased from the resellers, were of no value.[2] Not one witness testified that Mr. Chamberlain had any reason to doubt that all products and services were purchased at fair value and supported by a sound commercial rationale. When Mr. Chamberlain asked questions about commercial rationale, fair value and collectability, he asked those questions because he knew the answers were required to make revenue recognition decisions and to explain those decisions to the auditors. There is no reasonable dispute that commercial rationale was decided by others at Autonomy and provided to Mr. Chamberlain and Deloitte. Mr. Chamberlain was in the same shoes as the auditors. He received information from the sales and technical staff, analyzed it, and made revenue recognition decisions. As far as Mr. Chamberlain was concerned, just as Deloitte was concerned, all of the transactions were supported by a commercial rationale and conducted at fair value.

---

[2]   The evidence suggests that Autonomy's purchases had value and were done for purposes other than to fund the resellers' software purchases. For example, there has been extensive testimony of the value of the Storhouse, the software purchased from Filetek, as well as testimony regarding legitimate efforts to integrate Storhouse into IDOL.

- <u>Hardware</u>. First, as to Mr. Chamberlain, there is no evidence that he had any reason to believe that the hardware sales were not what they were represented to be: part of a commercial strategy to boost software sales. That is what members of Autonomy's core management team told the Cambridge finance team and Deloitte. Deloitte tested this in large part through memos and statements from members of upper management. Mr. Welham confirmed that the accounting was proper based on the information known to Deloitte. This was the same information known to Mr. Chamberlain. Second, there is no reason whatsoever to impugn the painstaking, open and transparent process the Cambridge finance teams conducted at the end of every quarter to establish what hardware had been delivered and what had not. In some cases Deloitte accepted this evidence. In some cases Deloitte required a management representation letter from Mr. Hussain. But in no event was Deloitte misled by Mr. Chamberlain or any member of his team about the basis for concluding that hardware had been delivered (or not). To suggest otherwise, the Government misinterpreted invoicing and shipping records that had nothing to do with whether the hardware had been delivered and accepted by the customer such that revenue had to be recognized, as the cross examination of Government witnesses (*e.g.*, Ms. Horan) made clear. Third, Mr. Chamberlain had no role in Autonomy's decision—reviewed by Deloitte—about the extent to which it explained its hardware reselling strategy in its financial statements or on earnings calls.

- <u>Hosting</u>. The Government has not established that Autonomy withheld anything from Deloitte in connection with their review of these agreements. The Government has not presented any evidence that Mr. Chamberlain had any reason to believe that the accounting was improper, let alone fraudulent. Indeed, based on the same information known to Mr. Chamberlain, Deloitte approved it.

- <u>Alleged Backdating</u>. Count Two of the indictment focuses on a January 26, 2011 email from Joel Scott to Mr. Chamberlain regarding a $3.5 million piece of

6

the $19.5 million sale to resellers on December 31, 2010 for end user Bank of America. The Government argues that Mr. Chamberlain deceived Deloitte because the DiscoverTech agreement was dated December 31 but signed on January 25. Mr. Welham and Ms. Anderson testified that if the $3.5 million sale agreement was first reached in January 2011 then it would be improper to recognize revenue in 2010.

Testimony by the Government's witnesses, however, established the following:  First, Mr. Welham conceded that nothing in IFRS requires that an agreement be in writing. Second, the legal department prepared the agreement with DiscoverTech in January. Mr. Scott confirmed that his legal department did not view the preparation of an agreement in January which was dated as of the December 31 effective date of the agreement to be unlawful. Third, Mr. Egan, who negotiated the December reseller agreement, testified that he did *not* view this amendment as a backdated agreement. Fourth, Mr. Scott testified that Mr. Hussain told him resellers had agreed to the $3.5 million piece in December (corroborating why Mr. Egan did not view it as backdated). Fifth, emails among Messrs. Chamberlain, Welham and Mercer show unequivocally that Deloitte was aware that the DiscoverTech agreement was first signed in late January. Sixth, while Mr. Scott testified on direct that Mr. Chamberlain told him that the reseller deal was not recognized until Q1 2011, he completely walked this back on cross after being shown Mr. Chamberlain's email to the contrary. He further conceded his memory was faulty in light of Autonomy's press release to the contrary. Seventh, Ms. Anderson confirmed that the $3.5 million piece was characterized to Deloitte as a last minute revenue adjustment after quarter end. Deloitte was told this was revenue from an additional deal. Finally, the $3.5 million at issue was far below the $22 million 2010 materiality threshold.

- <u>Alleged Misrepresentations to HP</u>.  Counts 6 through 8 pertain to sale negotiations between senior Autonomy and HP executives and a follow-up press release. Mr. Chamberlain is jointly charged even though he had no involvement in

these negotiations or press release.

Counts 9 through 14 relate to the due diligence process in early August 2011. Overt Act aa of the conspiracy count charges that on August 4, 2011 Chamberlain provided to HP and its advisors false listings of top customers. The Government presented testimony from one witness, Andy Gersh, that Mr. Chamberlain was present on a few due diligence phone calls. Mr. Gersh attributed no information about top contracts to Mr. Chamberlain. Mr. Gersh admitted that he was not a part of the HP-Hussain calls happening at the same time. Unlike in *Hussain*, the Government did not call the HP witness, Manesh Sarin, in this case.[3]

-    Other Allegations. Allegations relating to OEM, SPE, and statements to analysts do not involve Mr. Chamberlain.

In short, the Government's witnesses have corroborated Mr. Chamberlain's innocence. Without evidence of an intentional, materially misleading statement or omission to Deloitte, the Government cannot establish Mr. Chamberlain's intent to participate in the alleged scheme to defraud.

# I.    ARGUMENT

## A.    Legal Standard

Rule 29(a) states that "[a]fter the government closes its evidence, … the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Alarcon–Simi,* 300 F.3d 1172, 1176 (9th Cir. 2002)).

---

[3]   The Court may recall from the *Hussain* case that Sarin was the one who could testify to specifically what he requested from Mr. Hussain.

Evidence is insufficient to support a verdict where, construed in favor of the government, it is "insufficient to establish every element of the crime," including "where mere speculation, rather than reasonable inference, supports the government's case" or "there is a total failure of proof of a requisite element." *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (cleaned up).

### B.    No Evidence of Mr. Chamberlain's Intent to Participate in the Alleged Conspiracy and Scheme to Defraud

The essential elements of conspiracy are "an agreement to accomplish an illegal objective coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit the underlying substantive offense." *United States v. Melchor-Lopez*, 627 F.2d 886, 890 (9th Cir. 1980) (citation omitted). The elements of wire fraud are: "(1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme; and (3) a specific intent to defraud." *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013).

The "scheme to defraud" element further requires proof of materiality. *Neder v. United States*, 527 U.S. 1, 25 (1999). In order words, in order to establish a scheme to defraud, the government must prove that the underlying misrepresentation(s) had "a natural tendency to influence, or [were] capable of influencing, the decision of the [entity] to which [they were] addressed." *Id.* (citation omitted).

Another crucial "aspect of the 'scheme to defraud' requirement" is specific intent: "there is no fraudulent scheme without specific intent." *Jinian*, 725 F.3d at 960 (citation omitted). "The specific intent to deceive or defraud element of the mail and wire fraud crimes requires the prosecution to prove that the defendant intended to defraud an identifiable individual." *United States v. Milwitt*, 475 F.3d 1150, 1156 (9th Cir. 2007). It is especially important for the government to prove specific intent with regard to the alleged victim where, as here, the government relies on alleged

nondisclosures, because "nondisclosure does not rise to criminal proportions" as wire fraud unless the government proves the defendant had a duty of disclosure to the alleged victim. *United States v. Kamer*, 781 F.2d 1380, 1386 (9th Cir. 1986).

Because the essence of an alleged conspiracy is the agreement, the government must prove, consistent with the superseding indictment, exactly what the agreement was. Where, as here, the superseding indictment charges a single conspiracy, a conviction cannot be based on what amounts to either no conspiracy at all or "multiple conspiracies instead of the single charged conspiracy." *United States v. Lapier*, 796 F.3d 1090, 1097-98 (9th Cir. 2015); *see also United States v. Loveland*, 825 F.3d 555, 561–63 (9th Cir. 2016) (reversing denial of Rule 29 motion, explaining that there was "no evidence of an agreement, so the evidence was insufficient to support [defendant's] conspiracy conviction"). There cannot be a conviction for conspiracy where, as here, "there is no evidence of any common purpose of a single enterprise." *Lapier*, 796 F.3d 1101 (quotation marks omitted). Evidence that is consistent with a common legal enterprise certainly cannot support a conviction. A common objective to "maintain a high share price," for example, does not make a criminal conspiracy. *See Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018).

A shared *illegal* objective "is an essential element of any conspiracy conviction," and the government must prove not only "knowledge of the illegal objective, it must also prove an agreement with a co-conspirator to pursue that objective as a common one." *United States v. Krasovich*, 819 F.2d 253, 255 (9th Cir. 1987). There "can be no conviction for guilt by association, and it is clear that mere association with members of a conspiracy," or even "knowledge, approval of, or acquiescence in the object or purpose of the conspiracy, without an intention and agreement to accomplish a specific illegal objective, is not sufficient to make one a conspirator." *Melchor-Lopez*, 627 F.2d at 891. In *Melchor-Lopez*, the alleged co-conspirators had lengthy discussions about importing heroin, but the government did

1   not offer sufficient evidence of "a mutual understanding to accomplish a specific
2   objective or of an intention to be bound by any agreement." *Id.* at 889-90. The
3   government attempted to make up for its failure of proof by relying on the principle
4   that the agreement need not be explicit, and may be inferred from circumstantial
5   evidence, but "this evidentiary principle does not reduce the government's burden of
6   proof," and "recitation of this rule" cannot "relieve the government of its burden to
7   prove every element of the crime beyond a reasonable doubt." *Id.* at 891-92.

8        Here, the Government has failed to establish Mr. Chamberlain's intent to join
9   an unlawful agreement. Instead, the Government has presented evidence of
10  accounting decisions made by Autonomy's finance department that required the
11  exercise of judgment and as to which different accountants may have reached
12  different conclusions. Ultimately, the accounting decisions at issue in this case were
13  made by Mr. Hussain, the CFO who signed Autonomy's financial statements. But
14  the Government has failed to provide any evidence that those decisions were
15  fraudulent, much less that Mr. Hussain and Mr. Chamberlain formed an agreement
16  to prepare materially false and misleading financial statements. Nor has the
17  Government offered any evidence that Mr. Chamberlain was aware of any
18  underlying facts that, according to the Government, caused Autonomy's financial
19  statements to be misleading. Finally, the Government failed to offer evidence that
20  Mr. Chamberlain acted with the criminal intent to support an incorrect accounting
21  decision.

22        **1.    Reseller Deals**

23        With regard to the "reseller deals," the Government's theory is that they were
24  incorrectly accounted for because risk did not transfer to the reseller at the time of
25  the sale.[4] The evidence is that accounting decisions need to be made based on

---

4    The Government also may suggest that Mr. Chamberlain was involved in

1  evidence that existed at the time the accounting decision was made. Tr. 3556:8-11.

2  The Government is likely to argue that risk did not transfer at the time the

3  agreement was made because of alleged handshake agreements that existed between

4  the resellers and Stouffer Egan.

5       On this issue, the resellers testified that they had limited if any interaction

6  with Mr. Chamberlain, that they did not believe there to be side agreements at the

7  time, and/or that they purposefully did not share the existence of any side agreement

8  with Mr. Chamberlain:

| John Baiocco | **Purposefully did not share existence of side agreement with Mr. Chamberlain** |
|---|---|
| | Q. Now, by this time, based on your testimony, you had a handshake agreement with Stouffer Egan, correct? |
| | A. Correct. |
| | Q. But you didn't know if you could share that with Mr. Chamberlain, correct? |
| | A. Correct. |
| | **Tr. 1287:4-22.** |
| Dave Truitt | **Did not believe there to be side agreements at the time** |
| | Q. We've talked a lot – you've talked today about why you wanted to act as a reseller for Autonomy products and that when you acted as a reseller you were on risk; is that fair to say? |

---

21  recognizing revenue on certain deals where collectability was doubtful. But the

22  Government's own accounting witnesses testified that collectability was an area of

23  judgment. Where Autonomy's and Deloitte's judgment disagreed, Mr. Hussain and

24  the Audit Partner would present the disagreement to the Audit Committee, which

25  would make the ultimate decision on behalf of Autonomy. The Government has not

26  presented any evidence that Mr. Chamberlain did anything to falsify evidence of

27  collectability that Mr. Hussain presented to the Audit Committee in making those

28  final judgmental decisions.

| | |
|---|---|
| | A. Yes. |
| | Q. And we also discussed how you would pay for the products that you agreed to buy. Is that fair to say? |
| | A. Yes. |
| | Q. And you did pay? |
| | A. Yes. |
| | **Tr. 2144:1-9.** |
| | **<u>Limited communication with Mr. Chamberlain</u>** |
| | Q. Relative to Mr. Egan, fair to say you had very little communication with Mr. Chamberlain? |
| | A. That's correct. |
| | Q. You traded some emails back and forth? |
| | A. Yes. |
| | Q. Primarily about debtor confirmation letters and Autonomy's attempts to collect from your companies? |
| | A. Yeah, that's right. |
| | **Tr. 2147:1-6.** |
| **Steve Truitt** | **<u>Did not believe there to be side agreement at the time</u>** |
| | A. "…the way I would have felt about [the language regarding side letters or other agreements on the debtor confirmation letters] then on that day was [that] we don't have any side agreements . . . So you can argue that we had a side letter where there was no letter because these arrangements were in place, but I didn't come to agree with that assessment of the situation until later, to be quite honest." |
| | **Tr. 5047:14-5048:2.** |
| | **<u>Limited communication with Mr. Chamberlain</u>** |
| | Q. And you've never met with Mr. Chamberlain, either? |
| | A. I have not. |
| | Q. You don't recall ever speaking with him on the phone; is that right? |

| | | A. I don't think so, just emails and – |
|---|---|---|
| | | Q. Sometimes you received emails from him regarding these debtor confirmation letters that we looked at? |
| | | A. Generally. |
| | | **Tr. 5110:9-16.** |
| | William Loomis | **Did not believe there to be a side agreement at the time** |
| | | Q. In your view, the audit confirmation letter – which sometimes I refer to as a debtor confirmation letter – is accurate, correct? |
| | | A. Yes. |
| | | Q. FileTek was bound to pay for the software that it purchased? |
| | | A. Yes. |
| | | Q. Regardless of what assurances Mr. Egan gave? |
| | | A. Yes. |
| | | Tr. 1905:10-18. |
| | | **Limited communication with Mr. Chamberlain** |
| | | Q. Fair to say you have no recollection of ever speaking with [Mr. Chamberlain]? |
| | | A. I don't recall, but there was the one exhibit where I did reference on the bottom that he was part of a conference call. |
| | | Q. But you have no recollection of that? |
| | | A. I do not have any recollection of that. |
| | | **Tr. 1911:21-1912:1.** |

Mr. Egan testified that he had no recollection of ever disclosing the existence of any handshake agreement to Mr. Chamberlain. Tr. 4619:5-23. There is no evidence that Mr. Chamberlain was aware of any handshake agreement.

The Government may argue that Mr. Chamberlain was aware that Autonomy salespeople continued to play a role in closing the deal with the designated end-user,

or that Mr. Chamberlain was aware that certain resellers had told Autonomy that they would not pay Autonomy until the deal closed with the end-user.

First, as discussed above, Autonomy's accounting decisions needed to be based on information known *at the time* of the original sale to the reseller. These events the Government may cite all occurred *after* the deal with the reseller had closed and thus *could not* be considered by Mr. Chamberlain at the time.

Second, Deloitte was aware—generally by virtue of Mr. Chamberlain or his team informing Deloitte directly—of these facts. Tr. 3918:7-3919:2 (referring to Ex. 4306, which is an example of Chamberlain informing Deloitte of possibility of direct deals); *see also* Ex. 7893 (Chamberlain informing Deloitte of Autonomy's continued involvement with the end-user in a deal sold to a reseller, noting, "We are not contractually obligated to help, but commercially it is in our best interest to assist as ultimately it will help – it will ensure we get paid."). While Deloitte noted that a pattern of deals originally sold to a reseller that ended up going "direct" to the end-user *could* cause them to question revenue recognition on future similar deals, Deloitte *never* told Autonomy or Mr. Chamberlain that the pattern was sufficient to call future deals into question. Tr. 3924:4-25.[5]

### 2.    Alleged Linked Transactions

With regard to the alleged linked transactions, the Government's theory is that Autonomy purchased products or services from its customers that it did not genuinely want in order to give those customers the funds to pay for products or services they had purchased from Autonomy. While there is nothing wrong with making purchases from customers or expecting customers to pay their debts using

---

[5]    Audit Committee Chair Jonathan Bloomer also testified that he was aware of Autonomy's continued contact with end-users and did not view that contact as impacting Autonomy's ability to recognize revenue on the reseller deals. Tr. 9591:2-24.

1   funds from those purchases, the Government's theory is that these alleged linked

2   transactions were incorrectly accounted for on a gross rather than net basis, and that

3   Deloitte was misled into believing the accounting was proper.

4        The Government has not presented any evidence that Mr. Chamberlain was

5   involved in making the decision to purchase the items at issue. To the contrary,

6   emails offered into evidence show that these purchases were negotiated by Mr.

7   Egan, Mr. Hussain, and members of Autonomy's technical team. *See*, *e.g.*, Ex. 792.

8   Nor has the Government presented any evidence that Mr. Chamberlain was aware

9   that Autonomy did not genuinely want the products or services that they had

10   purchased.

11        Instead, the Government's evidence shows that Mr. Chamberlain was in the

12   same position as Deloitte and, like Deloitte, would have no reason to believe that

13   Autonomy was making multi-million dollar purchases without adequate commercial

14   rationale, assuming that were the case. Tr. 3947:4-22. Moreover, Deloitte generally

15   had even more information about the commercial rationale of an Autonomy

16   purchase than Mr. Chamberlain. Tr. 3804:1-3807:10 (testimony regarding technical

17   demonstration to Deloitte that was attended by Deloitte's technical expert, Ben

18   Johnstone, who was "more familiar with the actual technology than a typical auditor

19   or accountant," *see* Tr. 3883:24-3884:1).

20        Both Deloitte and Mr. Chamberlain reviewed these accounting decisions

21   based on information available to them at the time. In connection with that review,

22   Deloitte and Mr. Chamberlain would sometimes seek information from Autonomy's

23   sales and technical staff. Tr. 3891:9-3892:5 (general testimony from Welham re

24   going to sales/technical staff at Autonomy). To the extent the Government argues

25   that the sales and technical staff provided false information to Mr. Chamberlain, the

26   Government has failed to adduce any evidence that Mr. Chamberlain was aware the

27   information he was receiving was inaccurate. The only Government witness who

28   arguably testified to providing false information related to the commercial rationale

1  for these deals testified that he never discussed the pretextual nature of any emails

2  with Mr. Chamberlain. Tr. 4622:11-4623:5.

3          **3.      Hardware**

4          With regard to the alleged hardware transactions, the Government's theory is

5  that Autonomy resold hardware for the sole purpose of boosting its revenue figures,

6  that Autonomy failed to properly disclose those sales to the market, that Autonomy

7  improperly accounted for some of the costs of those sales as sales and marketing

8  expenses, and that Autonomy falsely recognized revenue on certain sales before all

9  the relevant IFRS factors were met.[6] That has been disproven. But regardless, there

10 is no evidence that Mr. Chamberlain knew of any improper purpose of the hardware

11 sales, that he concealed the existence of the hardware sales to anyone, that he had

12 anything to do with the decision to categorize some of the spend as sales and

13 marketing, or that he knew that certain relevant IFRS factors were not met before

14 Autonomy recognized revenue on certain hardware sales. Once again, the evidence

15 shows that Mr. Chamberlain was in the same position as Deloitte. Like Deloitte, Mr.

16 Chamberlain relied on representations made to him regarding the hardware sales on

17 issues related to accounting and disclosure.

18         With regard to the alleged failure to properly disclose the hardware sales, the

19 Government has not presented any evidence that Mr. Chamberlain was a party to

20 any improper concealment. Autonomy was within its right to choose not to

21 separately disclose the hardware sales in Autonomy's financial statements. Tr.

22 3606:8-24. The Government did not offer any evidence that Mr. Chamberlain

23 misled Deloitte in any manner that affected Deloitte's conclusion on this issue.

24 Moreover, the Government presented no evidence that Mr. Chamberlain made any

25 statements to investors, let alone allegedly misleading statements about Autonomy's

26 _____

27 [6]  Mr. Chamberlain was not involved in deciding how to calculate or disclose non-

28 IFRS financial metrics such as OEM sales.

1   hardware sales.

2       The Government may point to the lists of Autonomy's customers and

3   contracts that Autonomy provided to HP during the due diligence process, which

4   exclude some hardware sales. While Mr. Chamberlain was involved in the

5   preparation of those lists, the Government has not presented any evidence that Mr.

6   Chamberlain acted with criminal intent in preparing the lists. To the contrary, the

7   evidence shows that Mr. Chamberlain prepared a list that included hardware sales

8   when first asked to prepare one by Mr. Hussain. Tr. 8287:15-8289:19; Ex. 2066.

9   Subsequent to that, Mr. Hussain provided further instructions—instructions that Mr.

10  Chamberlain followed, in preparing future drafts of the lists. Tr. 8289:23-8290:5;

11  Ex. 2067. In responding to Mr. Hussain, Mr. Chamberlain made clear that the

12  revised lists did not contain hardware revenue. Tr. 8290:15-24; Ex. 2075. There is

13  no evidence in the record about why Mr. Hussain asked Mr. Chamberlain to revise

14  the list. Mr. Hussain may well have understood that HP, already a major hardware

15  supplier, would have had no interest in Autonomy's hardware customers.

16  Regardless of Mr. Hussain or HP's reason for the change, the Government has

17  presented no evidence of Mr. Chamberlain's trying to defraud HP.

18      With regard to the allegation that Autonomy recognized revenue on hardware

19  sales before the relevant IFRS criteria were met, the Government has failed to

20  present any evidence that Mr. Chamberlain was aware that the relevant criteria had

21  not yet been met, or even that the criteria had not been met in the first place. For

22  example, the Government alleges that a Q2 2009 sale to Morgan Stanley should not

23  have been recognized because the hardware was not delivered until after the close of

24  the quarter. As an initial matter, this misses the point because, based on the terms of

25  the contract, the IFRS criteria could be met upon shipment of the goods from EMC

26  to Morgan Stanley. Ex. 158 (Deloitte seeking audit confirmation that EMC shipped

27  the goods as of June 30). The Government did not call any EMC witness to testify

28  that the goods had not been shipped by June 30. Moreover, the Government did not

1  call any witness to testify that Mr. Chamberlain was aware that the hardware had not

2  been shipped or delivered by June 30.

3      Rather, the evidence shows that Mr. Chamberlain informed Deloitte that there

4  was imperfect evidence of delivery and shared the third-party confirmations that he

5  did have, which Deloitte concluded were sufficient to establish that the IFRS criteria

6  had been met pre-quarter-end. Exs. 150, 158, 9805. Mr. Chamberlain's open

7  disclosure of the evidence in his possession, and his open disclosure of the evidence

8  still missing, undercuts the Government's theory of fraud, which itself is

9  unsupported by any evidence.

10     The Government also alleges that a Q4 2010 sale to VMS should not have

11 been recognized because the hardware had not yet been shipped. In this case, the

12 applicable hardware was repurposed from Autonomy's existing stock and allocated

13 to VMS on or before December 31, 2010. The Government contends that the

14 hardware was not properly designated for delivery to VMS; whether or not this is

15 accurate, Government has not presented any evidence that Mr. Chamberlain knew

16 the hardware had not been properly designated. The Government's key witness on

17 this issue testified that, while he had concerns about the feasibility of repurposing

18 certain hardware for VMS, he did not share those concerns with Mr. Chamberlain.

19 Tr. 5512:10-16.

20     Moreover, this allegation fails because the Government did not present any

21 evidence that Mr. Chamberlain participated in this alleged improper accounting in

22 any meaningful way. The evidence shows that it was Mr. Hussain who asked

23 Messrs. Goodfellow and Dr. Menell if Autonomy was able to repurpose any

24 hardware for VMS and it was Messrs. Goodfellow and Dr. Menell who worked to

25 identify the hardware to be repurposed. Tr. 5487:10-5488:8; Tr. 5492:4-11. Mr.

26 Goodfellow did not tell Mr. Hussain that there was any problem with repurposing

27 the hardware; nor did he communicate any issue to Richard Eads when he sent the

28 spreadsheet containing a list of the repurposed hardware. Tr. 5488:17-19; Tr.

5492:17-20. Matt Stephan was the individual in Autonomy finance who explained this transaction to Deloitte and Mr. Goodfellow provided accurate information to Mr. Stephan in connection with Deloitte's review. Tr. 5493:15-5497:6. Ultimately, Dr. Menell confirmed to Deloitte that the hardware had been assigned to VMS. Ex. 1530.

Finally, the Government alleges that Autonomy recognized revenue on various immaterial sales of hardware to Software House International (SHI) that the Government alleges were not delivered within the relevant quarter. The evidence shows that Mr. Chamberlain delegated the task of reviewing the applicable delivery notes on these deals to other members of his team and the Government has not introduced any evidence from Mr. Chamberlain's team members that he instructed them to fraudulently recognize revenue on any transaction, let alone these specific transactions. *See* Poppy Gustafsson Rule 15 Deposition at 83:13-22. In the few examples where Mr. Chamberlain had some involvement in Deloitte's review of the deal, the evidence shows that Mr. Chamberlain was open and honest with Deloitte. Tr. 5661:3-5664:2; 5671:16-5672:1.

There is simply no evidence that Mr. Chamberlain did anything to facilitate any potentially fraudulent aspect of these transactions.

### 4.    Hosting

Here the Government's theory is that Autonomy restructured its hosting agreements with customers in order to improperly accelerate revenue recognition. Poppy Gustafsson helped with the structuring and pricing these transactions. Tr. 5474:19-24. Autonomy's technical team had a lot of input into her work. Tr. 5474:19-5477:12. The evidence shows that Deloitte reviewed these restructured agreements in depth and found there to be no improper acceleration of revenue. Tr. 3848:9-3853:13. Autonomy openly disclosed that it operated both up-front and pay-as-you-go hosted business. Ex. 1352 at 51. The Government presented no evidence that Mr. Chamberlain did anything improper with respect to these hosting

1   agreements. On occasion, he was on emails where accurate information was shared

2   with Deloitte.

### 5.   Alleged Backdating

4          With regard to alleged backdating of documents, the Government's theory is

5   that individuals at Autonomy either backdated or instructed others to backdate

6   agreements in order to improperly recognize revenue in a prior quarter in the

7   absence of an agreement in principle in that prior quarter. The Government

8   presented no evidence that Mr. Chamberlain participated in, let alone was aware of,

9   any concealment from Deloitte of when agreements were reached. The Government

10  focused heavily on paperwork for a $3.5 million DiscoverTech amendment that was

11  signed in January 2011. The Government's witnesses and the exhibits establish that

12  Deloitte was informed of this. Tr. 3985:20-25; 6813:18-21. Deloitte's Outstanding

13  Lists throughout the second half of January shows a continuing request for "full

14  documentation (when ready)." Tr. 3979:20-3980:1; Exs. 9779.1 (Row 9 of attached

15  spreadsheet); 1493 (Row 2 of attached spreadsheet).

16         The Government's primary witness on this topic, General Counsel Joel Scott,

17  testified that Mr. Hussain told Messrs. Scott and Chamberlain that Mr. Hussain

18  would be transparent with Deloitte in explaining why this $3.5 million should be

19  recognized in Q4 2010 as part of the wider reseller deal for end-user Bank of

20  America. Tr. 6797:10-22; 6809:20-6810:5. The evidence shows that Mr. Hussain

21  met with Nigel Mercer, Deloitte's partner, and Lee Welham, Deloitte's Senior Audit

22  Manager in London on January 26, 2011. Tr. 3992:3-16. Two days later, Messrs.

23  Mercer and Welham confirm that the $3.5 million purchase order was represented to

24  be an increase above and beyond the $7 million DiscoverTech purchase order that

25  was documented December 31, 2010. Ex. 9737. This $3.5 million was recorded as a

26  "consolidation adjustment," raising the already heightened scrutiny that Deloitte was

27  exercising over sales to resellers at this time. Tr. 3997:1-4.

28

### 6.    Miscellaneous Allegations

The Government suggested, primarily through its expert, that Autonomy made other misrepresentations in its financial statements relating to royalties and areas of valuation. The evidence shows that Deloitte reviewed the contracts related to alleged royalties and came to a different accounting judgment from the Government's expert.

With regard to the valuation of licenses sold to Iron Mountain at or around the time of Autonomy's acquisition of Iron Mountain's digital assets, the Government's evidence is based solely on the testimony of its expert—testimony that is untethered to witness testimony and inconsistent with Deloitte's real time review and approval of these transactions. Tr. 8838:20-24; 8841:20-8842:1. Moreover, the expert testified that one of the bases of his assumption was flawed. Tr. 8992:9-8994:3. There is insufficient evidence on this record to suggest Mr. Chamberlain made an incorrect accounting decision, let alone that he acted with intent to defraud.

### C.    Materiality

The Government must establish Mr. Chamberlain's intent to participate in a joint effort to make a *material* fraudulent representation. *Neder*, 527 U.S. at 25. To the extent the Government's case rests on a handful of minor transactions, such as the $3.5 million DiscoverTech deal that was recognized in Q4 2010 despite evidence that the agreement was not reached until January 2011, that evidence is insufficient evidence of Mr. Chamberlain's participation in a material fraudulent misrepresentation. *Id.*

Shareholder Nigel Upton and HP CEO Leo Apotheker testified that minor earnings misses and variations in Autonomy's financial metrics were not material to them. Tr. 5283:22-5284:1 (Upton "not certain" that his investment would have been affected if Autonomy's reported gross margins had been lower, noting, "[i]f it had been *significantly* lower, then it most likely would have had *some* effect") (emphasis added); Tr. 5989:1-17 (minor earnings "misses" were not relevant to Mr.

Apotheker's decision to acquire Autonomy). Mr. Upton testified that he only read HP's press release. Tr. 5275:18-5276:3 (referencing Ex. 2295). Mr. Apotheker testified that he read only Autonomy's 2010 annual report. Tr. 5998:5-24. For context, Mr. Welham testified that the level of materiality for 2010 was $22 million. Tr. 3717:21-3718:8. In order to establish Mr. Chamberlain's involvement in a material fraudulent scheme, the Government must prove beyond a reasonable doubt Mr. Chamberlain's conduct contributed to a material misrepresentation. And as discussed above, the Government has failed to do so.

**D.     Mr. Chamberlain Did Not Cause, Aid, or Abet the Transmission of Wire Communications Alleged in Counts 2 through 15, Nor Did He Reasonably Foresee Them as a Necessary or Natural Consequence of a Scheme to Defraud**

Mr. Chamberlain is charged in Counts 2 through 15 with various substantive wire fraud counts, in violation of 18 U.S.C. § 1343. Mr. Chamberlain did not cause or aid these wire transmissions.  Nor is there evidence that he reasonably foresaw them as a necessary or natural consequence of a scheme to defraud of which he was aware.

## 1.     Count 2 (Joel Scott Email)

Count 2 relates to an email that Mr. Chamberlain received from Joel Scott on January 26, 2011, which attached a purchase order from DiscoverTech that the Government alleges was backdated. As noted above, Mr. Chamberlain disclosed to Deloitte the DiscoverTech documents that he received from Deloitte and openly discussed with Deloitte that signatures on documents were not obtained until late January.

Moreover, the Government has failed to establish that Mr. Chamberlain should be liable for Count 2 on a Pinkerton theory of liability. In order to be liable under Pinkerton for the acts of other members of the conspiracy, the Government must prove the following elements beyond a reasonable doubt: (1) a member of the conspiracy committed the wire fraud offense as alleged in that count; (2) the person

was a member of the conspiracy; (3) the person committed this act in furtherance of the conspiracy; (4) Mr. Chamberlain was a member of the same conspiracy at the time the wire fraud offense was committed; and (5) the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement. *See* Ninth Circuit Manual of Model Criminal Jury Instructions § 11.6.

As discussed above, the Government has failed to present evidence of Mr. Chamberlain's knowledge of or participation in a scheme to defraud. And specifically here, disclosing to Deloitte that agreements were not yet signed as to the $3.5 million piece of the reseller transaction, confirmed by Deloitte's internal emails and treatment of this as an after-quarter adjustment, shows that Mr. Chamberlain did not intend to further any conspiracy.

Moreover, the revenue effect of this $3.5 million piece was far below the materiality threshold and thus could not form the basis of a material fraudulent representation to support the alleged wire fraud scheme.

### 2. Counts 3, 7, 8 (Press Releases for 2010, Q1 2011, and Q2 2011)

Counts 3, 7, and 8 related to the press releases for 2010, Q1 2011, and Q2 2011, respectively. As discussed above, ***Mr. Chamberlain neither prepared, approved, nor released these statements to the press.*** They were issued after Mr. Hussain signed the financial statements and Autonomy executives approved of the issuance of the press releases. *See*, *e.g.*, Ex. 1352 at 45. As the VP of Finance, it was Mr. Chamberlain's job to manage the finance team and help Deloitte get the information it needed during the audit. Tr. 3884:21-23; 3888:21-3889:1. If there was a disagreement in accounting judgment among members of the finance team, it was Mr. Hussain's judgment that controlled. Tr. 1466:20-23.

### 3. Counts 4 and 5 (HALO Conference Calls)

Counts 4 and 5 relate to two videoconferences between Autonomy and HP

executives. ***Mr. Chamberlain was neither a part of, nor even aware of, these calls.*** Tr. 8444:3-4, 15-19.  The Government has presented no evidence that he caused these wires to be transmitted, aided and abetted in their transmission, or could even reasonably foresee that they would be used in furtherance of the alleged scheme to defraud.

### 4.      Count 6 (Malcolm Hyson Email on April 4, 2011)

Count 6 relates to an email sent by Malcolm Hyson to Stouffer Egan attaching a letter agreement, March 31, 2011, relating to DiscoverTech's purchase of a $3.6 million license for end-user Prisa. Mr. Chamberlain did not cause this email to be sent nor did he aid or abet in its transmission. Using the testimony of Messrs. Egan and Dave Truitt, the Government will likely argue that the agreement was backdated in order to allow Autonomy to recognize $3.6 million in revenue in Q1 2011. Messrs. Egan and Dave Truitt both testified that this was done at Mr. Hussain's direction. Messrs. Egan and Dave Truitt were both consistent about the fact that Mr. Hussain's request to backdate the agreement discussed among the three of them but not others. Tr. 4432:21-4433:7; 2029:7-2031:9. ***The Government has not presented any evidence that Mr. Chamberlain was aware that this agreement was backdated.***

Nor can the Government argue that Mr. Chamberlain is responsible for this alleged wire under a Pinkerton theory of liability. The amount of the deal was below the materiality threshold for Q1 2011 and the Government has not provided evidence that Mr. Chamberlain reasonably foresaw that others would backdate this agreement, much less conceal the dating from Deloitte. The same is true of the other deals in which the Government claims backdating (Q1 2010 Vatican and Q4 2009 Sales Consulting/Poste).

### 5.      Counts Nine Through Twelve (Due Diligence Calls)

Counts Nine through Twelve relate to due diligence calls in early August 2011 in connection with HP's planned acquisition of Autonomy. The Government alleges that Autonomy made material false representations during these calls,

namely, by failing to disclose the existence of Autonomy's hardware sales. One of the attendees of these calls, Andy Gersh, testified that he and his team failed to ask any questions about how much hardware Autonomy sold despite being aware that Autonomy sold at least "some hardware." Tr. 8182:16-25 (Mr. Gersh acknowledged that he did not ask about hardware); 8186:16-19 (Mr. Gersh aware that Autonomy was selling some hardware). Another attendee, Andy Johnson, testified that he did not recall Mr. Chamberlain attending any particular call and had "little if no interaction" with Mr. Chamberlain during the due diligence process. Tr. 8445:22-8446:10.

Mr. Gersh also testified that "Mr. Hussain and Mr. Chamberlain" told him that Autonomy had conducted certain VSOE studies, which Mr. Gersh testified he found "unusual." Tr. 8082:9-8083:1. The Government has not elicited any testimony whether these occurred.  The presence or lack of VSOE studies was immaterial to HP or other Autonomy shareholders. Mr. Gersh testified that he formed the view that Autonomy's VSOE studies, to the extent they existed, were insufficient under U.S. GAAP. Tr. 8265:17-19. There is no evidence that the existence, or lack thereof, of VSOE studies was in any way material to the acquisition.  Indeed, Mr. Gersh never followed up with Autonomy to obtain VSOE studies before the acquisition, Tr. 8268:15-17; Tr. 8083:2-4, confirming the immateriality of this particular topic.

### 6.    Counts Thirteen and Fourteen

Counts Thirteen and Fourteen relate to documents provided by Autonomy to HP during the due diligence process. ***Mr. Chamberlain did not cause these documents to be provided nor did he aid and abet in their transmission.*** At most, the Government's evidence shows that Mr. Chamberlain played a role in putting together lists of Autonomy's top customers and contracts requested of him by Mr. Hussain. That is where the evidence stops. The Government has not presented any evidence about what HP requested of Autonomy and whether what was ultimately provided to HP is different from what HP requested, much less that Mr.

Chamberlain knew anything more than what Mr. Hussain asked him to do. There is certainly no evidence whatsoever that Mr. Chamberlain intended to deceive HP. Mr. Chamberlain followed Mr. Hussain's instructions to modify the lists to take out hardware revenue and list the end-customer instead of the reseller, nothing more.

### 7.    Count Fifteen

Count Fifteen relates to a request from Capita Registrars to Manish Sarin and Andy Johnson, HP executives, requesting payments from HP to Autonomy shareholders in connection with the acquisition. ***This has nothing to do with Mr. Chamberlain.*** Mr. Chamberlain did not cause or aid and abet in this request. While a letter request for payment is a natural result of a fraudulent scheme, the Government has failed to present sufficient evidence that Mr. Chamberlain intended to join any conspiracy to defraud HP. Mr. Chamberlain was not aware of the possibility of an acquisition by HP until less than a month before the deal was announced. Mr. Chamberlain played a ministerial role in the due diligence process and the Government has not presented any evidence of Mr. Chamberlain's intent to mislead HP or knowledge of and intent to join any conspiracy to mislead HP.

## II.     CONCLUSION

For the foregoing reasons, the Court should grant Mr. Chamberlain's motion for a judgment of acquittal on all counts for which he is charged.

DATED:  May 26, 2024

Gary S. Lincenberg
Ray S. Seilie
Michael C. Landman
Avi Rejwan
Bird, Marella, Rhow, Lincenberg,
Drooks & Nessim, LLP


By:     */s/ Gary S. Lincenberg*
Gary S. Lincenberg
Attorney for Defendant Stephen Keith Chamberlain