THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION. If you are in any doubt about the Offer or the action you should take, you are recommended to seek your own personal financial advice immediately from your stockbroker, bank manager, solicitor, accountant or other independent financial adviser duly authorised under the Financial Services and Markets Act 2000 if you are taking advice in the United Kingdom or, if you are in a territory outside the United Kingdom, from another appropriately authorised independent financial adviser.

You should read the whole of this document and any documents incorporated into it by reference. In addition, this document should be read in conjunction with the accompanying personalised Form of Acceptance (if you hold Autonomy Shares in certificated form) the terms of which are deemed to form part of the Offer if your Autonomy Shares are held in certificated form.

If you have sold or otherwise transferred all of your Autonomy Shares (other than pursuant to the Offer), please forward this document, and the accompanying documentation (but not the personalised Form of Acceptance) at once to the purchaser or transferee or to the stockbroker, bank or other agent through whom the sale or transfer was effected, for onward transmission to the purchaser or transferee. However, these documents must not be forwarded, transmitted or distributed in or into or from any Restricted Jurisdiction. If you have sold or otherwise transferred only part of your holding of Autonomy Shares, you should retain these documents.

The release, publication or distribution of this document in jurisdictions other than the United Kingdom or the United States may be restricted by law and therefore any persons who are not resident in the United Kingdom or the United States, or who are subject to the laws or regulations of any jurisdiction other than the United Kingdom or the United States, should inform themselves about, and observe, any applicable requirements. Any failure to comply with the applicable requirements may constitute a violation of the laws and/or regulations of any such jurisdiction.

# Recommended Cash Offer

## for

# AUTONOMY CORPORATION PLC

## by

# HEWLETT-PACKARD VISION B.V.

## (an indirect wholly-owned subsidiary of Hewlett-Packard Company) at £25.50 per Autonomy Share

Your attention is drawn to the letter from the Chairman of Autonomy which contains the unanimous recommendation of the Autonomy Directors to accept the Offer, which is set out on pages 1 to 4 of this document.

The procedure for acceptance of the Offer is set out on pages 17 to 21 of this document, and in respect of certificated Autonomy Shares, is further described in the Form of Acceptance.

To accept the Offer in respect of Autonomy Shares held in certificated form, the accompanying Form of Acceptance should be completed and returned, together with the relevant share certificate(s) and/or other document(s) of title, as soon as possible and, in any event, so as to be received by Capita Registrars no later than 1.00 p.m. on 12 September 2011.

To accept the Offer in respect of Autonomy Shares held in uncertificated form you should make your acceptance electronically through CREST so that the TTE Instruction settles no later than 1.00 p.m. on 12 September 2011. If you are a CREST sponsored member, you should refer to your CREST sponsor, as only your CREST sponsor will be able to send the necessary TTE Instruction to Euroclear.

Barclays Capital, which is authorised and regulated in the United Kingdom by the Financial Services Authority, is acting exclusively for HP and HP Vision and no one else in connection with the Offer and will not be responsible to anyone other than HP and HP Vision for providing the protections afforded to its clients or for providing advice in relation to the Offer or in relation to the matters described in this document or any transaction or arrangement referred to herein.

Perella Weinberg Partners, which, through its affiliate Perella Weinberg Partners UK LLP, is authorised and regulated in the United Kingdom by the Financial Services Authority, is acting exclusively for HP and HP Vision and no one else in connection with the Offer and will not be responsible to anyone other than HP and HP Vision for providing the protections afforded to its clients or for providing advice in relation to the Offer or in relation to the matters described in this document or any transaction or arrangement referred to herein.

Qatalyst Partners, which is authorised and regulated in the United Kingdom by the Financial Services Authority, is acting exclusively for Autonomy and no one else in connection with the Offer and will not be responsible to anyone other than Autonomy for providing the protections afforded to its clients or for providing advice in relation to the Offer or in relation to the contents of this document or any transaction or any other matters referred to herein.

Citigroup Global Markets Limited, which is authorised and regulated in the United Kingdom by the Financial Services Authority, is acting exclusively for Autonomy and no one else in connection with the Offer and will not be responsible to anyone other than Autonomy for providing the protections afforded to its clients or for providing advice in relation to the Offer or in relation to the contents of this document or any transaction or any other matters referred to herein.

Goldman Sachs International, which is authorised and regulated in the United Kingdom by the Financial Services Authority, is acting exclusively for Autonomy and no one else in connection with the Offer and will not be responsible to anyone other than Autonomy for providing the protections afforded to its clients or for providing advice in relation to the Offer or in relation to the contents of this document or any transaction or any other matters referred to herein.

J.P. Morgan Limited which is authorised and regulated in the United Kingdom by the Financial Services Authority, is acting exclusively for Autonomy and no one else in connection with the Offer and will not be responsible to anyone other than Autonomy for providing the protections afforded to its clients or for providing advice in relation to the Offer or in relation to the contents of this document or any transaction or any other matters referred to herein.

Merrill Lynch International, which is authorised and regulated in the United Kingdom by the Financial Services Authority, is acting exclusively for Autonomy and no one else in connection with the Offer and will not be responsible to anyone other than Autonomy for providing the protections afforded to its clients or for providing advice in relation to the Offer or in relation to the contents of this document or any transaction or any other matters referred to herein.

UBS Limited, which is authorised and regulated in the United Kingdom by the Financial Services Authority, is acting exclusively for Autonomy and no one else in connection with the Offer and will not be responsible to anyone other than Autonomy for providing the protections afforded to its clients or for providing advice in relation to the Offer or in relation to the contents of this document or any transaction or other matters referred to herein.

## OVERSEAS SHAREHOLDERS

Unless otherwise determined by HP Vision or required by the City Code (and permitted by applicable law and regulation) the Offer is not being, and will not be, made, directly or indirectly, in or into or by the use of mails of, or by any other means (including, without limitation, electronic mail, facsimile transmission, telex, telephone, internet or other forms of electronic communication) of interstate or foreign commerce of, or any facility of a national securities exchange of, any Restricted Jurisdiction, and will not be capable of acceptance by any such use, means, instrumentality or facility or from within any Restricted Jurisdiction.

Accordingly, unless otherwise determined by HP Vision or required by the City Code (and permitted by applicable law and regulation), copies of this document and the Form of Acceptance and any related documents are not being, and must not be, directly or indirectly, mailed or otherwise forwarded, distributed or sent in or into or from any Restricted Jurisdiction and persons receiving such documents (including custodians, nominees and trustees) should observe any applicable legal or regulatory requirements in those jurisdictions and must not mail, or otherwise forward, distribute or send any such documents in, into or from any Restricted Jurisdiction, as doing so may invalidate any purported acceptance of the Offer. Any person (including custodians, nominees and trustees) who would, or otherwise intends to, or who may have a legal or contractual obligation to, forward this document and any related documents to any jurisdiction outside the United Kingdom or the United States should inform themselves of, and observe, any applicable legal or regulatory requirements of such jurisdiction, seek appropriate advice and read paragraph 15 of the letter from HP and HP Vision set out in Part II to this document and paragraph 7 of Part B of Appendix I to this document before doing so.

This document has been prepared for the purposes of complying with English law and the City Code and the information disclosed may not be the same as that which would have been disclosed if this document had been prepared in accordance with the laws and regulations of any jurisdiction outside the United Kingdom.

## NOTICE TO US INVESTORS

The Offer is being made for securities of a United Kingdom company and Autonomy Shareholders in the United States should be aware that this document, the Form of Acceptance and any other documents relating to the Offer have been prepared or will be prepared in accordance with the City Code and United Kingdom disclosure requirements, format and style, all of which differ from those in the United States. Autonomy's financial statements and all financial information that is included in this document, or any other documents relating to the Offer, have been or will be prepared in accordance with United Kingdom generally accepted accounting principles and International Financial Reporting Standards and may not be comparable to financial statements of United States companies.

The Offer, which is open to Autonomy Shareholders in the United States, will be subject to a limited extent to US tender offer rules and securities laws (Regulation 14E), and will otherwise be made in accordance with the requirements of the City Code, the Panel, the London Stock Exchange and the Financial Services Authority. Accordingly, the Offer will be subject to disclosure and other procedural requirements, including with respect to withdrawal rights, offer timetable, settlement procedures and timing of payments that are different from those generally applicable under United States domestic tender offer procedures and law. In the United States, the Offer will be deemed made solely by HP Vision and not by any of its financial advisers.

Autonomy is a company incorporated under the laws of England and Wales. The directors of Autonomy are residents of countries other than the United States. As a result, it may not be possible for Autonomy Shareholders in the United States to effect service of process within the United States upon Autonomy or its officers or directors or to enforce against any of them judgements of the United States predicated upon the civil liability provisions of the federal securities laws of the United States. It may not be possible to sue Autonomy or its officers or directors in a non-US court for violations of the United States securities laws. There is also substantial doubt as to enforceability in the United Kingdom in original actions, or in actions for the enforcement of judgements of United States courts, based on the civil liability provisions of United States federal securities laws.

In accordance with the City Code and normal United Kingdom market practice and pursuant to Rule 14e-5(b)(12) under the United States Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), HP Vision or its nominees or brokers (acting as agents) may from time to time make certain purchases of, or arrangements to purchase, Autonomy Shares outside the United States, otherwise than

i

HP-SEC-01661690
Exh 2307-0002

pursuant to the Offer, before or during the period in which the Offer remains open for acceptance, such as in open market purchases at prevailing prices or privately negotiated purchases at negotiated prices. In the event that HP Vision or its nominees or brokers (acting as agents) purchase or make arrangements to purchase Autonomy Shares for a consideration greater than the Offer Price, the Offer Price will be increased to match the higher price paid outside the Offer. Such purchases, or arrangements to purchase, will comply with all applicable United Kingdom rules, including the City Code and the rules of the London Stock Exchange. In addition, in accordance with the City Code, normal United Kingdom market practice and Rule 14e-5(b)(12) under the Exchange Act, Barclays Capital will continue to act as an exempt principal trader in Autonomy securities on the London Stock Exchange. These purchases may occur in the open market or as privately negotiated transactions.

Information regarding such purchases and activities which is required to be made public in the United Kingdom pursuant to the City Code will be reported to a Regulatory Information Service and will be available to all investors (including US investors) on the London Stock Exchange website at www.londonstockexchange.com.

## FORWARD-LOOKING STATEMENTS

This document, oral statements made regarding the Offer and other information published by HP, HP Vision or Autonomy, including information included or incorporated by reference in this document, may contain statements that are, or may be, "forward-looking statements". These statements are based on the current expectations of the management of Autonomy, HP and HP Vision (as the case may be) and are naturally subject to uncertainty and changes in circumstances. The forward-looking statements contained herein may include statements about the expected effects on Autonomy or HP of the Offer, the expected timing and scope of the Offer, strategic options and all other statements in this document other than historical or current facts. Without limitation, any statements preceded or followed by or that include the words "targets", "plans", "believes", "expects", "aims", "intends", "will", "may", "should", "could", "would", "can", "continue", "opportunity", "anticipates", "estimates", "projects", or words or terms of similar substance or the negative thereof, are forward-looking statements. Forward-looking statements are not guarantees of future performance. Forward-looking statements involve risk and uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements. Many of these risks and uncertainties relate to factors that are beyond the companies' abilities to control or estimate precisely, such as: (i) future capital expenditures, expenses, revenues, earnings, synergies, economic performance, indebtedness, financial condition, dividend policy, losses and future prospects; (ii) business and management strategies and the expansion and growth of Autonomy's or HP's operations and potential synergies resulting from the Offer; and (iii) the effects of government regulation on Autonomy's or HP's business. There are a number of factors that could cause actual results and developments to differ materially from those expressed or implied by such forward-looking statements. These factors include, but are not limited to, the satisfaction of the conditions to the Offer, failure to consummate the proposed acquisition, failure to realise the benefits of the proposed acquisition, significant transaction costs and/or unknown liabilities and general economic and business conditions that affect the companies following the proposed acquisition as well as additional factors, such as changes in economic conditions, changes in the level of capital investment, success of business and operating initiatives and restructuring objectives, changes in consumer habits and preferences, competitive product and pricing pressures, customers' strategies and stability, changes in the regulatory environment, fluctuations in interest and exchange rates, the outcome of litigation, government actions and natural phenomena such as floods, earthquakes and hurricanes. Other unknown or unpredictable factors could cause actual results to differ materially from those in the forward-looking statements. These forward-looking statements are based on numerous assumptions regarding the present and future business strategies of the companies and the environment in which each will operate in the future. Investors are cautioned not to place undue reliance on the forward-looking statements, which speak only as of the date of this document. All subsequent oral or written forward-looking statements attributable to HP, HP Vision or Autonomy or any of their respective members, directors, officers or employees or any persons acting on their behalf are expressly qualified in their entirety by the cautionary statement above. All forward-looking statements included in this document are based on information available to HP, HP Vision and Autonomy on the date of this document and are made only as of the date of this document. Undue reliance should not be placed on such forward-looking statements. None of Autonomy, HP or HP Vision assumes any obligation, nor does any of them intend, to update publicly or revise forward-looking statements, whether as a result of new information, future events or otherwise, except to the extent legally required.

FOIA CONFIDENTIAL TREATMENT REQUESTED

## DEALING AND OPENING POSITION DISCLOSURE REQUIREMENTS

Under Rule 8.3(a) of the City Code, any person who is interested (directly or indirectly) in 1% or more of any class of relevant securities of an offeree company or of any paper offeror (being any offeror other than an offeror in respect of which it has been announced that its offer is, or is likely to be, solely in cash) must make an Opening Position Disclosure following the commencement of the offer period and, if later, following the announcement in which any paper offeror is first identified.

An Opening Position Disclosure must contain details of the person's interests and short positions in, and rights to subscribe for, any relevant securities of each of (i) the offeree company and (ii) any paper offeror(s). An Opening Position Disclosure by a person to whom Rule 8.3(a) applies must be made by no later than 3.30 p.m. (London time) on the 10th Business Day following the commencement of the offer period and, if appropriate, by no later than 3.30 p.m. (London time) on the 10th Business Day following the announcement in which any paper offeror is first identified.

Relevant persons who deal in the relevant securities of the offeree company or of a paper offeror prior to the deadline for making an Opening Position Disclosure must instead make a Dealing Disclosure.

Under Rule 8.3(b) of the City Code, any person who is, or becomes, interested (directly or indirectly) in 1% or more of any class of relevant securities of the offeree company or of any paper offeror must make a Dealing Disclosure if the person deals in any relevant securities of the offeree company or of any paper offeror. A Dealing Disclosure must contain details of the dealing concerned and of the person's interests and short positions in, and rights to subscribe for, any relevant securities of each of (i) the offeree company and (ii) any paper offeror, save to the extent that these details have previously been disclosed under Rule 8. A Dealing Disclosure by a person to whom Rule 8.3(b) applies must be made by no later than 3.30 p.m. (London time) on the Business Day following the date of the relevant dealing.

If two or more persons act together pursuant to an agreement or understanding, whether formal or informal, to acquire or control an interest in relevant securities of an offeree company or a paper offeror, they will be deemed to be a single person for the purpose of Rule 8.3.

Opening Position Disclosures must also be made by the offeree company and by any offeror and Dealing Disclosures must also be made by the offeree company, by any offeror and by any persons acting in concert with any of them (see Rules 8.1, 8.2 and 8.4).

Details of the offeree and offeror companies in respect of whose relevant securities Opening Position Disclosures and Dealing Disclosures must be made can be found in the Disclosure Table on the Takeover Panel's website at www.thetakeoverpanel.org.uk, including details of the number of relevant securities in issue, when the offer period commenced and when any offeror was first identified. If you are in any doubt as to whether you are required to make an Opening Position Disclosure or a Dealing Disclosure, you should contact the Panel's Market Surveillance Unit on +44 (0)20 7638 0129.

Note: References to "Rules" are to the rules of the City Code. The terms "offeror", "offeree company", "offer period", "interested" (and related variations), "relevant securities", "deals" (and related variations) and "acting in concert" all bear the same meanings given to them in the City Code.

## PUBLICATION ON WEBSITES

A copy of this document is and will be available free of charge, subject to certain restrictions relating to persons resident outside the United Kingdom or the United States, for inspection on HP's website at http://www.hp.com/investor/offerdocuments and Autonomy's website at http://news.autonomy.com, during the course of the Offer.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661692
Exh 2307-0004

### ACTION TO BE TAKEN TO ACCEPT THE OFFER

1.  **If you hold your Autonomy Shares in certificated form (that is, not in CREST)**, you should:

    (a)  complete the Form of Acceptance in accordance with the instructions printed thereon and in paragraph 16 of the letter from HP and HP Vision set out in Part II of this document; and

    (b)  return the completed, signed and witnessed (in the case of an individual) Form of Acceptance (together with your valid share certificate(s) and any other document(s) of title), by post or (during normal business hours) by hand, to Capita Registrars, Corporate Actions, The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU as soon as possible, but in any event, so as to be received by Capita Registrars not later than 1.00 p.m. (London time) on 12 September 2011. Further details on the procedure for acceptance of the Offer, if you hold any of your Autonomy Shares in certificated form are set out in paragraph 16 of Part II of this document and in the accompanying Form of Acceptance. A reply paid envelope for use within the United Kingdom only is enclosed for your convenience and may be used by holders of Autonomy Shares in certificated form for returning their Forms of Acceptance.

2.  **If you hold your Autonomy Shares in uncertificated form (that is, in CREST)**, you should follow the procedures set out in paragraph 16 of the letter from HP and HP Vision in Part II of this document and send (or procure that there is sent) a TTE Instruction(s) to settle not later than 1.00 p.m. (London time) on 12 September 2011. Further details on the procedures for acceptance of the Offer if you hold any of your Autonomy Shares in uncertificated form are set out in paragraph 16 of Part II of this document. If you are a CREST sponsored member, you must refer to your CREST sponsor before taking any action as only your CREST sponsor will be able to send the necessary TTE Instructions to Euroclear to enable you to accept the Offer.

## ACCEPTANCES OF THE OFFER SHOULD BE RECEIVED BY 1.00 P.M. (LONDON TIME) ON 12 SEPTEMBER 2011.

---

**If you require assistance, please telephone Capita Registrars, receiving agent for the Offer, on 0871 664 0321 (when telephoning from within the United Kingdom) or +44 20 8639 3399 (when telephoning from outside the United Kingdom) between 9.00 a.m. and 5.00 p.m. (London time) Monday to Friday (except United Kingdom public holidays). Calls to the helpline from the 0871 664 0321 number are charged at 10 pence per minute from a BT landline. Other network providers' costs may vary. Calls to the helpline from outside the United Kingdom will be charged at the applicable international rate. Different charges may apply to calls made from mobile telephones and calls may be recorded and randomly monitored for security and training purposes. The helpline cannot provide advice on the merits of the Offer nor give any financial, legal or tax advice.**

---

**This summary page should be read in conjunction with the rest of the document. You are recommended to seek personal financial advice from your independent financial adviser duly authorised under the Financial Services and Markets Act 2000 if you are taking advice in the United Kingdom or, if you are in a territory outside the United Kingdom, from another appropriately authorised independent financial adviser.**

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661693
Exh 2307-0005

# CONTENTS

| | | Page |
|---|---|---|
| **Part I: Letter of recommendation from the Chairman of Autonomy** | | 1 |
| 1. | Introduction | 1 |
| 2. | The Offer | 1 |
| 3. | Background to and reasons for recommending the Offer | 2 |
| 4. | Irrevocable undertakings | 2 |
| 5. | Management, employees and locations | 2 |
| 6. | Autonomy Share Schemes | 2 |
| 7. | Autonomy Convertible Bonds | 3 |
| 8. | Offer Agreement | 3 |
| 9. | Compulsory acquisition, de-listing and re-registration | 3 |
| 10. | United Kingdom, United States and the Netherlands taxation | 3 |
| 11. | Action to be taken to accept the Offer | 3 |
| 12. | Further information | 4 |
| 13. | Recommendation | 4 |
| **Part II: Letter from HP & HP Vision** | | 5 |
| 1. | Introduction | 5 |
| 2. | The Offer | 6 |
| 3. | Recommendation | 6 |
| 4. | Irrevocable undertakings | 6 |
| 5. | Background to and reasons for the Offer | 7 |
| 6. | Information on HP and HP Vision | 8 |
| 7. | Information on Autonomy | 8 |
| 8. | Financing of the Offer | 9 |
| 9. | Management, employees and locations | 9 |
| 10. | Autonomy Share Schemes and Autonomy Convertible Bonds | 9 |
| 11. | Interests and Dealings in Autonomy Shares | 10 |
| 12. | Offer Agreement | 10 |
| 13. | United Kingdom, United States and the Netherlands taxation | 12 |
| 14. | Compulsory acquisition, de-listing and re-registration | 16 |
| 15. | Overseas Shareholders | 16 |
| 16. | Procedure for acceptance of the Offer | 17 |
| 17. | Settlement | 21 |
| 18. | Further information | 22 |
| 19. | Action to be taken | 22 |
| **Appendix I: Conditions and further terms of the Offer** | | 23 |
| Part A: Conditions of the Offer | | 23 |
| Part B: Further terms of the Offer | | 30 |
| Part C: Form of Acceptance | | 43 |
| Part D: Electronic Acceptance | | 47 |
| **Appendix II: Financial information relating to Autonomy** | | 51 |
| **Appendix III: Financial information relating to HP** | | 53 |
| **Appendix IV: Additional information** | | 55 |
| **Appendix V: Glossary & Definitions** | | 71 |

v

(This page has been left blank intentionally.)

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661695
Exh 2307-0007

**PART I**

**LETTER OF RECOMMENDATION FROM THE CHAIRMAN OF
AUTONOMY CORPORATION PLC**



(incorporated in England and Wales with registered number 3175909)

| | |
|---|---|
| Directors: | Registered office: |
| Robert Webb | Cambridge Business Park |
| Dr. Mike Lynch | Cowley Road |
| Sushovan Hussain | Cambridge |
| Jonathan Bloomer | Cambridgeshire |
| Richard Gaunt | CB4 0WZ |
| Dr. Frank Kelly | |
| John McMonigall | |

22 August 2011

*To Autonomy Shareholders and, for information only, to persons with information rights, participants in the
Autonomy Share Schemes and holders of Autonomy Convertible Bonds*

Dear Autonomy Shareholder,

**RECOMMENDED CASH OFFER FOR AUTONOMY CORPORATION PLC BY
HEWLETT-PACKARD VISION B.V. (AN INDIRECT WHOLLY-OWNED SUBSIDIARY OF
HEWLETT-PACKARD COMPANY)**

1. **Introduction**

   On 18 August 2011, the Boards of HP and Autonomy announced that they had reached agreement
   on the terms of a recommended cash offer to be made by HP Vision, an indirect wholly-owned
   subsidiary of HP, for the entire issued and to be issued share capital of Autonomy.

   I am writing to you on behalf of the Autonomy Directors to explain the background to, and terms of,
   the Offer and to explain why the Autonomy Directors, who have been so advised by Qatalyst
   Partners, are recommending unanimously that Autonomy Shareholders accept the Offer, as the
   Autonomy Directors have irrevocably undertaken to do (or procure to be done) in respect of their
   entire beneficial interests in Autonomy Shares representing approximately 9.12 per cent of the
   existing issued share capital of Autonomy.

   The formal Offer, together with details of the procedure for acceptance, is contained in the letter
   from HP and HP Vision, which is set out in Part II of this document.

2. **The Offer**

   The Offer is being made on the following basis:

   |  | |
   |---|---|
   | **for each Autonomy Share** | **£25.50 in cash** |

   The Offer Price represents a premium of approximately:

   - 64 per cent to the Closing Price of £15.58 per Autonomy Share on 17 August 2011, being the
     last Business Day prior to the commencement of the Offer Period;

   - 58 and 50 per cent to the average Closing Price of an Autonomy Share of £16.18 and £17.02
     over the one and three months, respectively, preceding the commencement of the Offer Period;

   - 36 per cent to the fifty-two week high price of an Autonomy Share of £18.81;

   - 59 per cent to the average Closing Price of £16.00 per Autonomy Share over the twelve month
     period to 17 August 2011, being the last Business Day prior to the commencement of the Offer
     Period; and

   - 4 per cent to the Closing Price of £24.52 per Autonomy Share on 19 August 2011, being the last
     Business Day prior to the publication of this document.

   The Offer values Autonomy's fully diluted share capital at approximately £7,091 million.

1

FOIA CONFIDENTIAL TREATMENT REQUESTED

3.    **Background to and reasons for recommending the Offer**

Since its founding in 1996, the vision of Autonomy has been to become one of the leading enterprise infrastructure software businesses on a global basis and create excellence in its proprietary technology offering, employment opportunities and financial performance. Today, Autonomy, through its industry leading IDOL platform, is leading the movement towards delivery of cloud based software solutions. Over the last five years, Autonomy has grown its revenues at a compound annual growth rate of approximately 55 per cent and adjusted operating profit at a rate of approximately 83 per cent. Autonomy's recent operating and financial performance has been strong, including its most recent results for the quarter ending 30 June 2011.

Accordingly, in recommending the Offer, the Autonomy Directors have given careful consideration to the fundamental and future value of the business and to the reasonable expectations of Autonomy Shareholders. In particular, the Autonomy Directors considered that the Offer represents an opportunity for Autonomy Shareholders to receive cash at a premium of approximately:

- 64 per cent to the Closing Price of £15.58 per Autonomy Share on 17 August 2011 (being the Closing Price on the Business Day prior to the commencement of the Offer Period);

- 53 per cent to the average Closing Price of £16.62 per Autonomy Share over the six month period to 17 August 2011, being the last Business Day prior to the commencement of the Offer Period; and

- 36 per cent to the fifty-two week high price of an Autonomy Share of £18.81.

In addition, becoming part of HP provides a unique opportunity to drive increased penetration and cross-selling of Autonomy's solutions on a global scale through the additional resources and assets available to the enlarged group. The Autonomy Directors believe that becoming part of a larger organisation will also extend the opportunities available to Autonomy employees.

The Autonomy Directors believe that the Offer by HP Vision provides both an attractive value to Autonomy Shareholders and allows for the accelerated development of the Autonomy business with an exceptional combined offering.

4.    **Irrevocable undertakings**

Your attention is drawn to paragraph 4 of Part II of this document regarding the fact that HP Vision, in aggregate has received irrevocable undertakings from the Autonomy Directors to accept, or procure the acceptance of, the Offer in respect of a total of approximately 22,200,066 Autonomy Shares, representing approximately 9.12 per cent of the existing issued share capital of Autonomy.

Further details of these irrevocable undertakings are set out in paragraph 4 of Appendix IV of this document.

5.    **Management, employees and locations**

HP attaches great importance to the skills and experience of the existing management and employees of Autonomy and, accordingly, has given assurances to the Board of Autonomy that, upon and following the Offer becoming or being declared wholly unconditional, the existing employment rights of the management and employees of Autonomy will be fully safeguarded. No incentivisation arrangements have been proposed to any member of Autonomy's management team who is interested in Autonomy Shares.

It is intended that, upon the Offer becoming or being declared wholly unconditional, each of the non-executive directors of Autonomy will resign from his office as a director of Autonomy.

Dr. Mike Lynch, the Founder and CEO of Autonomy, will continue to lead the Autonomy business and will report to Léo Apotheker, President and CEO of HP. Following the acquisition, Autonomy will operate as a separate business group, which will be core to a new division within HP. There are currently no plans for a reduction in the work force of Autonomy.

6.    **Autonomy Share Schemes**

The Offer extends to any Autonomy Shares unconditionally allotted or issued or unconditionally allotted and fully paid (or credited as fully paid) pursuant to the exercise of options under the Autonomy Share Schemes before the date on which the Offer closes (or, subject to the City Code, by such earlier date as HP Vision may decide).

2

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661697
Exh 2307-0009

To the extent that such options are not exercised, and if the Offer becomes or is declared unconditional in all respects, appropriate proposals will be made to holders of options under the Autonomy Share Schemes which will include the offer for participants under the Autonomy US Plans to exchange their options for new equivalent options over HP Shares. Autonomy has agreed not to exercise its discretion under the Autonomy US Plans (where relevant) to accelerate vesting where the option exchange is offered.

Participants in the Autonomy Share Schemes will be contacted separately regarding the effect of the Offer on their options under the Autonomy Share Schemes and, where applicable, the actions they can take in respect of these options.

7.  **Autonomy Convertible Bonds**

The Offer will extend to any Autonomy Shares unconditionally allotted or issued or unconditionally allotted and fully paid (or credited as fully paid) pursuant to the valid conversion of any Autonomy Convertible Bonds before the date on which the Offer closes (or, subject to the City Code, by such earlier date as HP Vision may decide).

To the extent that such Autonomy Convertible Bonds are not converted, appropriate proposals will be made in due course to holders of the Autonomy Convertible Bonds. The Convertible Bond Offer will give holders of the Autonomy Convertible Bonds the same consideration they would receive if, after the Offer becomes or is declared unconditional in all respects, they were to exercise their conversion rights pursuant to the terms of the Autonomy Convertible Bonds and accept the Offer in respect of the Autonomy Shares arising on conversion. For illustrative purposes, based on a closing date of 12 September 2011, the Autonomy Convertible Bonds would have an adjusted exercise price of £16.5965. The Convertible Bond Offer will be conditional on the Offer becoming or being declared unconditional in all respects.

HP Vision has reserved the right to adjust the terms of the Convertible Bond Offer if, prior to the date on which the Offer becomes or is declared unconditional in all respects, Autonomy takes any action which results in or would result in any material adjustment to the conversion price of the Autonomy Convertible Bonds.

The document containing the full terms and conditions of the Convertible Bond Offer will be despatched as soon as practicable.

8.  **Offer Agreement**

HP, HP Vision and Autonomy have entered into an Offer Agreement in connection with the Offer. The Offer Agreement includes, among other things, an inducement fee, a non-solicitation undertaking, a right to match and obligations and understandings between HP, HP Vision and Autonomy regarding the conduct and timing of the Offer and regulatory clearances.

Further details of these undertakings and the terms of the Offer Agreement are set out in paragraph 12 of Part II to this document.

9.  **Compulsory acquisition, de-listing and re-registration**

Your attention is drawn to paragraph 14 of Part II to this document in relation to HP Vision's intentions with regard to the compulsory acquisition, de-listing and cancellation of trading in Autonomy Shares and the re-registration of Autonomy following the Offer becoming unconditional in all respects.

10.  **United Kingdom, United States and the Netherlands taxation**

Your attention is drawn to paragraph 13 of Part II to this document in relation to certain limited aspects of the taxation of certain Autonomy Shareholders. If you are in any doubt about your own tax position or you are subject to taxation in any jurisdiction other than the United Kingdom, the United States or the Netherlands, you should consult an appropriately authorised independent professional adviser immediately.

11.  **Action to be taken to accept the Offer**

Your attention is drawn to paragraph 16 of Part II to this document and, if you hold Autonomy Shares in certificated form, to the accompanying Form of Acceptance.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661698
Exh 2307-0010

Your decision as to whether to accept the Offer will depend upon your individual circumstances. If you are in any doubt as to the action you should take, you should seek your own independent financial advice.

If you hold your Autonomy Shares in certificated form (that is, not in CREST), you should:

(A) complete the Form of Acceptance in accordance with the instructions printed thereon and in paragraph 16 of Part II to this document; and

(B) return the completed, signed and witnessed (in the case of an individual) Form of Acceptance (together with your valid share certificate(s) and any other document(s) of title), by post or (during normal business hours), by hand to Capita Registrars, Corporate Actions, The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU as soon as possible, but in any event, so as to be received by Capita Registrars not later than 1.00 p.m. (London time) on 12 September 2011. Further details on the procedure for acceptance of the Offer, if you hold any of your Autonomy Shares in certificated form are set out in paragraph 16 of Part II of this document and in the accompanying Form of Acceptance. A reply paid envelope for use within the United Kingdom only is enclosed for your convenience and may be used by holders of Autonomy Shares in certificated form for returning their Forms of Acceptance.

If you hold your Autonomy Shares in uncertificated form (that is, in CREST), you should follow the procedures set out in paragraph 16 of Part II of this document and send (or procure that there is sent) a TTE Instruction(s) to settle not later than 1.00 p.m. (London time) on 12 September 2011. Further details on the procedures for acceptance of the Offer if you hold any of your Autonomy Shares in uncertificated form are set out in paragraph 16 of Part II of this document. If you are a CREST sponsored member, you must refer to your CREST sponsor before taking any action as only your CREST sponsor will be able to send the necessary TTE Instructions to Euroclear to enable you to accept the Offer.

12. **Further information**

Your attention is drawn to Part II of this document, to the Appendices to this document and to the Form of Acceptance accompanying this document. The Appendices and Form of Acceptance contain material information which may not be summarised elsewhere in this document.

Qatalyst Partners is acting as lead financial adviser to Autonomy. Autonomy has also received financial advice from Citigroup Global Markets Limited, Goldman Sachs International, J.P. Morgan Limited, Merrill Lynch International and UBS Limited. UBS Limited is acting as corporate broker to Autonomy.

13. **Recommendation**

The Autonomy Directors, who have been so advised by Qatalyst Partners, consider the terms of the Offer to be fair and reasonable. In providing their advice to the Autonomy Directors, Qatalyst Partners has taken into account the commercial assessments of the Autonomy Directors. Qatalyst Partners is acting as the independent financial adviser to Autonomy for the purposes of providing independent advice to the Autonomy Directors on the Offer under Rule 3 of the City Code.

Accordingly, the Autonomy Directors recommend unanimously that Autonomy Shareholders accept the Offer, as the Autonomy Directors have irrevocably undertaken to do (or procure to be done) in respect of their entire beneficial interests in Autonomy Shares representing approximately 9.12 per cent of the existing issued share capital of Autonomy.

Autonomy Shareholders who wish to accept the Offer are strongly recommended to consider this document and to take their own independent advice having regard to their own particular circumstances and investment objectives before deciding whether to accept the Offer.

Yours faithfully,

Robert Webb
Chairman
For and on behalf of
Autonomy Corporation plc

4

HP-SEC-01661699
Exh 2307-0011

**PART II**

**LETTER FROM HEWLETT-PACKARD COMPANY**
**&**
**HEWLETT-PACKARD VISION B.V.**



HP Vision Directors:
Catherine A. Lesjak
Paul T. Porrini
Sergio E. Letelier

HP Directors:
Raymond J. Lane
Marc L. Andreessen
Léo Apotheker
Lawrence T. Babbio, Jr.
Sari M. Baldauf
Rajiv L. Gupta
John H. Hammergren
Ann M. Livermore
Gary M. Reiner
Patricia F. Russo
Dominique Senequier
G. Kennedy Thompson
Margaret C. Whitman

HP Vision
Registered office:
Startbaan 16
1187 XR Amstelveen
The Netherlands

HP Registered Office:
3000 Hanover Street
Palo Alto
California
94304
United States

22 August 2011

*To Autonomy Shareholders and, for information only, to persons with information rights, participants in the Autonomy Share Schemes and holders of Autonomy Convertible Bonds*

Dear Autonomy Shareholder,

**RECOMMENDED CASH OFFER FOR AUTONOMY CORPORATION PLC BY HEWLETT-PACKARD VISION B.V. (AN INDIRECT WHOLLY-OWNED SUBSIDIARY OF HEWLETT-PACKARD COMPANY)**

1.   **Introduction**

On 18 August 2011, the Boards of HP and Autonomy announced that they had reached agreement on the terms of a recommended cash offer to be made by HP Vision, an indirect wholly-owned subsidiary of HP, for the entire issued and to be issued share capital of Autonomy.

This document and, if you hold Autonomy Shares in certificated form, the accompanying Form of Acceptance, contains the formal Offer (including its terms and conditions) and also contains certain other information on HP, HP Vision and Autonomy.

**Acceptances of the Offer should be received as soon as possible and, in any event, by no later than 1.00 p.m. (London time) on 12 September 2011.**

Please read carefully paragraph 16 below which sets out the procedure for acceptance of the Offer. Your attention is drawn, in particular, to the conditions and further terms of the Offer set out in Appendix I to this document and, if you hold Autonomy Shares in certificated form, in the Form of Acceptance. Your attention is also drawn to the information relating to HP and HP Vision contained in paragraph 6 of this letter and as set out in Appendix III to this document, and the information on Autonomy contained in paragraph 7 of this letter and as set out in Appendix II to this document. **Your attention is further drawn to the letter from the Chairman of Autonomy, set out in Part I of this**

5

HP-SEC-01661700
Exh 2307-0012

document, which sets out the reasons why the Autonomy Directors recommend unanimously that all Autonomy Shareholders accept the Offer.

2. **The Offer**

The Offer is being made on the following basis:

<table>
<tr><td>for each Autonomy Share</td><td>£25.50 in cash</td></tr>
</table>

The Offer Price represents a premium of approximately:

- 64 per cent to the Closing Price of £15.58 per Autonomy Share on 17 August 2011, being the last Business Day prior to the commencement of the Offer Period;

- 58 and 50 per cent to the average Closing Price of an Autonomy Share of £16.18 and £17.02 over the one and three months, respectively, preceding the commencement of the Offer Period;

- 36 per cent to the fifty-two week high price of an Autonomy Share of £18.81;

- 59 per cent to the average Closing Price of £16.00 per Autonomy Share over the twelve month period to 17 August 2011, being the last Business Day prior to the commencement of the Offer Period; and

- 4 per cent to the Closing Price of £24.52 per Autonomy Share on 19 August 2011, being the last Business Day prior to the publication of this document.

The Offer values Autonomy's fully diluted share capital at approximately £7,091 million.

The Offer extends to any Autonomy Shares which are unconditionally allotted or issued and fully paid (or credited as fully paid) on the date of the Offer and any such shares allotted or issued pursuant to the exercise of existing options under the Autonomy Share Schemes or the conversion of any Autonomy Convertible Bonds on or before the date on which the Offer closes (or such earlier date as HP Vision may, subject to the City Code, decide, not being earlier than the date on which the Offer becomes unconditional as to acceptances).

Autonomy Shares to be acquired under the Offer will be acquired by HP Vision fully paid and free from all liens, charges, equitable interests, encumbrances, rights of pre-emption and other third party rights or interests and together with all rights now or hereafter attaching thereto, including, without limitation, the right to receive and retain all dividends and other distributions (if any) announced, declared, made or paid hereafter.

Further terms and conditions of the Offer are set out in Appendix I to this document and, in the case of Autonomy Shares held in certificated form, in the accompanying Form of Acceptance.

The procedure for acceptance of the Offer is set out in paragraph 16 of this letter.

For summary information on certain limited aspects of the United Kingdom, the United States and the Netherlands taxation consequences of accepting the Offer for Autonomy Shareholders resident in the United Kingdom, the United States or the Netherlands for tax purposes, please refer to paragraph 13 of this letter.

3. **Recommendation**

**Your attention is drawn to the letter of recommendation from the Chairman of Autonomy in Part I of this document. That letter sets out the reasons why the Autonomy Directors, who have been so advised by Qatalyst Partners, consider the terms of the Offer to be fair and reasonable and recommend unanimously that all Autonomy Shareholders accept the Offer, as the Autonomy Directors who hold or are otherwise beneficially entitled to Autonomy Shares have irrevocably undertaken to do in relation to their own beneficial interests in Autonomy Shares representing, in aggregate, approximately 9.12 per cent of the existing share capital of Autonomy.**

4. **Irrevocable undertakings**

HP Vision has received irrevocable undertakings to accept the Offer from the Autonomy Directors in respect of their entire beneficial holdings of 22,200,066 Autonomy Shares, representing, in aggregate, approximately 9.12 per cent of the existing issued share capital of Autonomy. The irrevocable undertakings given by the Autonomy Directors will cease to be binding only if the Offer lapses or is

6

HP-SEC-01661701
Exh 2307-0013

withdrawn. Further details of these irrevocable undertakings are set out in paragraph 4 at Appendix IV of this document.

5.   **Background to and reasons for the Offer**

The acquisition of Autonomy will significantly expand HP's offerings in the market for enterprise information software. Autonomy's leading IDOL platform combined with HP's strength in complementary products, services and infrastructure will enable the combined business to deliver a next-generation information platform, analytical applications and performance optimisation solutions.

The majority of enterprise information today is text, voice and video but existing information and analytical solutions have focused primarily on structured information from transactional applications. HP believes that with Autonomy, it can re-invent the Enterprise Information platform to include structured and unstructured data and increase the efficiency, effectiveness and automation of enterprise business processes while dramatically improving the user experience of today's workforce.

The acquisition of Autonomy is consistent with HP's stated strategy of expanding its software portfolio capabilities and HP expects the acquisition to deliver benefits to Autonomy and the combined customer base and to the enlarged group:

*New Solutions, Products and Services*

- New Industry & LOB Solutions (Healthcare, Financial Services, Retail, IT, Legal, Customer Service, Sales);

- New unified analytic and optimisation platform and applications;

- IT Performance Suite Software – Storage Archiving & Back-Up solutions and Help Desk solutions;

- Digitisation & Printing – Intelligent Document Processing solutions;

- Services – Information and Document Processing practices;

- Mobile offerings leveraging tablets, phones, PCs, printers, servers, storage; and

- Cloud data management expertise from its cloud offering of over 30 petabytes.

These new solutions, products and services can advance HP's route to markets via one of the largest enterprise sales and services organisations in the world.

*Strategic and Financial Benefits*

- **Positions HP as leader in large and growing space:** Autonomy has a strong position in the $20 billion Enterprise Information Management space, which is growing at 8 per cent annually and is uniquely positioned to continue growth within this space. Furthermore, key Autonomy assets would provide HP with the ability to reinvent the $55 billion Business Analytics software and services space, which is growing at 8 per cent annually.

- **Complements HP's existing technology portfolio and enterprise strategy:** Autonomy offers solutions that are synergistic across HP's enterprise offerings and strengthens capabilities for data analytics, the cloud, industry capabilities and workflow management. This will bolster HP's cloud offerings with key assets for information management and data analytics. Autonomy also complements existing HP offerings from ESSN, software, services and IPG.

- **Provides differentiated IP for services and extensive vertical capabilities in key industries:** Acquiring Autonomy would provide differentiated IP for services, including extensive vertical capabilities in key industries such as government, financial services, legal, pharmaceutical and healthcare.

- **Provides IPG a base for content management platforms:** Autonomy provides HP with a content management platform and accelerates a major component of the IPG enterprise strategy to continue its growth of document and content management and higher value commercial printing opportunities.

7

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661702
Exh 2307-0014

- **Enhances HP's financial profile:** Autonomy's strong growth and profit margin profile complements HP's efforts to improve its business mix by focusing on enterprise software and solutions. Autonomy has a consistent track record of double-digit revenue growth, with 87 per cent gross margins and 43 per cent operating margins in calendar year 2010.[1]

- **Accretive to HP's Earnings:** HP expects the acquisition to be accretive to Non-GAAP earnings per share for HP shareholders in the first full year following completion.[2]

6. **Information on HP and HP Vision**

HP is a leading global provider of products, technologies, software, solutions and services to individual consumers, small and medium-sized businesses and large enterprises, including customers in the government, health and education sectors. HP's offerings span:

- multi-vendor customer services, including infrastructure technology and business process outsourcing, technology support and maintenance, application development and support services and consulting and integration services;

- enterprise information technology infrastructure, including enterprise storage and server technology, networking products and solutions, information management software and software that optimizes business technology investments;

- personal computing and other access devices; and

- imaging and printing-related products and services.

Headquartered in Palo Alto, California, HP serves customers in more than 170 countries on six continents and had approximately 324,600 employees worldwide as of 31 October 2010.

For the 12 months to 31 October 2010, HP reported net revenues of $126,033 million and earnings from operations of $11,479 million. As at 31 October 2010, HP had total assets of $124,503 million and stockholders' equity of $40,781 million. On 18 August 2011, HP announced its financial results for its third fiscal quarter ended 31 July 2011. This announcement and details of these results can be accessed at http://www.hp.com/investor/home.

HP also announced on 18 August 2011 that the board of directors of HP had authorised the evaluation of strategic alternatives for its Personal Systems Group, including the exploration of the separation of its PC business into a separate company through a spin-off or other transaction. This announcement can be found on HP's website at http://www.hp.com/hpinfo/newsroom.

Further information on HP can be found on its website at http://www.hp.com/investor/home.

HP Vision is a newly incorporated company formed for the purpose of the Offer and is an indirect wholly-owned subsidiary of HP. HP Vision is incorporated under the laws of the Netherlands and has not traded since incorporation, nor has it entered into any obligations, other than in connection with the Offer and the financing of the Offer.

7. **Information on Autonomy**

Autonomy, a global leader in infrastructure software for the enterprise, spearheads the Meaning Based Computing movement. Its IDOL platform allows computers to harness the ample richness of human information, forming a conceptual and contextual understanding of any piece of electronic data, including unstructured information, such as text, email, web pages, voice and video. Autonomy's software powers the full spectrum of mission-critical enterprise applications, including pan-enterprise search, customer interaction solutions, information governance, end-to-end eDiscovery, records management, archiving, business process management, web content management, web optimization, rich media management and video and audio analysis.

Founded in 1996, Autonomy is headquartered in Cambridge, UK and San Francisco, USA with offices throughout the world. As at 30 June 2011, it had approximately 2,700 employees worldwide.

---

(1) These are derived from Autonomy non-IFRS reported figures which exclude the effect of certain specific, non-recurring and non-cash charges.

(2) This statement regarding earnings enhancement is not intended to be a profit forecast and should not be interpreted to mean that the earnings per HP share, or of the combined group, for the current or future financial periods will necessarily be greater than those for the relevant preceding financial period.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661703
Exh 2307-0015

Autonomy has over 25,000 customer accounts with global companies, law firms and public sector agencies including AOL, BAE Systems, the BBC, Bloomberg, Boeing, Citigroup, Coca Cola, Daimler AG, Deutsche Bank, DLA Piper, Ericsson, FedEx, Ford, GlaxoSmithKline, Lloyds Banking Group, NASA, Nestlé, the New York Stock Exchange, Reuters, Shell, Tesco, T-Mobile, the US Department of Energy, the US Department of Homeland Security and the US Securities and Exchange Commission. Autonomy's IDOL is the de-facto standard among more than 400 OEMs (including Symantec, Citrix, HP, Novell, Oracle, Sybase and TIBCO) and Autonomy is a significant cloud player with over 30 petabytes of customer information under management.

Autonomy continues to grow strongly and profitably, reporting record revenue in Q2 2011 of $256 million. For the six months to 30 June 2011, Autonomy reported revenue of $476 million with adjusted operating margin of 42 per cent. As at 30 June 2011, Autonomy had a gross cash position of $736 million. For the full year ended 31 December 2010, Autonomy reported revenue of $870 million with adjusted operating margin of 43 per cent.

Your attention is drawn to the financial information on the Autonomy Group contained in Appendix II to this document.

8.  **Financing of the Offer**

The cash consideration payable by HP Vision under the terms of the Offer will be funded from a combination of HP's existing cash resources held outside the US and debt financing which has been arranged by Barclays Capital, the terms of which are summarised in paragraph 7.2 of Appendix IV. Further details of the financing of the Offer are set out in paragraphs 7 and 10 of Appendix IV to this document.

Barclays Capital and Perella Weinberg Partners, as joint financial advisers to HP Vision, have confirmed that they are satisfied that sufficient financial resources are available to HP Vision to enable it to satisfy, in full, the cash consideration payable to Autonomy Shareholders as a result of full acceptance of the Offer.

9.  **Management, employees and locations**

HP attaches great importance to the skills and experience of the existing management and employees of Autonomy and, accordingly, has given assurances to the Board of Autonomy that, upon and following the Offer becoming or being declared wholly unconditional, the existing employment rights of the management and employees of Autonomy will be fully safeguarded. No incentivisation arrangements have been proposed to any member of Autonomy's management team who is interested in Autonomy Shares.

It is intended that, upon the Offer becoming or being declared wholly unconditional, each of the non-executive directors of Autonomy will resign from his office as a director of Autonomy.

Dr. Mike Lynch, the Founder and CEO of Autonomy, will continue to lead the Autonomy business and will report to Léo Apotheker, President and CEO of HP. Following the acquisition, Autonomy will operate as a separate business group, which will be core to a new division within HP. HP has no current intentions to change the locations of Autonomy's places of business and there are currently no plans for a reduction in the work force of Autonomy.

10.  **Autonomy Share Schemes and Autonomy Convertible Bonds**

10.1  **Autonomy Share Schemes**

The Offer extends to any Autonomy Shares unconditionally allotted or issued or unconditionally allotted and fully paid (or credited as fully paid) pursuant to the exercise of options or awards under the Autonomy Share Schemes before the date on which the Offer closes (or, subject to the City Code, by such earlier date as HP Vision may decide).

To the extent that such options are not exercised, and if the Offer becomes or is declared unconditional in all respects, appropriate proposals will be made to holders of options under the Autonomy Share Schemes which will include the offer for participants under the Autonomy US Plans to exchange their options for new equivalent options over HP Shares. Autonomy has agreed not to exercise its discretion under the Autonomy US Plans (where relevant) to accelerate vesting where the option exchange is offered.

9

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661704
Exh 2307-0016

Participants in the Autonomy Share Schemes will be contacted separately regarding the effect of the Offer on their options under their schemes and, where applicable, the actions they can take in respect of these options.

10.2 **Autonomy Convertible Bonds**

The Offer will extend to any Autonomy Shares unconditionally allotted or issued or unconditionally allotted and fully paid (or credited as fully paid) pursuant to the valid conversion of any Autonomy Convertible Bonds before the date on which the Offer closes (or, subject to the City Code, by such earlier date as HP Vision may decide).

To the extent that such Autonomy Convertible Bonds are not converted, appropriate proposals will be made in due course to holders of the Autonomy Convertible Bonds. The Convertible Bond Offer will give holders of the Autonomy Convertible Bonds the same consideration they would receive if, after the Offer becomes or is declared unconditional in all respects, they were to exercise their conversion rights pursuant to the terms of the Autonomy Convertible Bonds and accept the Offer in respect of the Autonomy Shares arising on conversion. For illustrative purposes, based on a closing date of 12 September 2011, the Autonomy Convertible Bond would have an adjusted exercise price of £16.5965. The Convertible Bond Offer will be conditional on the Offer becoming or being declared unconditional in all respects.

HP Vision reserves the right to adjust the terms of the Convertible Bond Offer if, prior to the date on which the Offer becomes or is declared unconditional in all respects, Autonomy takes any action which results in or would result in any material adjustment to the conversion price of the Autonomy Convertible Bonds.

The document containing the full terms and conditions of the Convertible Bond Offer will be despatched as soon as practicable.

11. **Interests and Dealings in Autonomy Shares**

HP Vision currently has no interest in Autonomy's existing issued share capital.

Details of the interests and dealings in Autonomy Shares are set out in paragraph 3 of Appendix IV to this document.

12. **Offer Agreement**

HP, HP Vision and Autonomy have entered into an Offer Agreement in connection with the Offer. The Offer Agreement includes, among other things, provisions covering the following matters:

12.1 **Inducement fee**

Autonomy has agreed that it will pay HP Vision an inducement fee of one per cent of the value of Autonomy's fully diluted equity share capital by reference to the price per Autonomy Share under the Offer subject to possible adjustments for UK VAT if (i) the Autonomy Directors do not provide a unanimous and unqualified recommendation of the Offer in the Offer Document (other than where the Autonomy Directors determine or announce they are recommending or resolving to recommend a Competing Proposal or for a temporary failure to provide a recommendation of the Offer during the period when the Autonomy Directors are considering whether or not to recommend a Competing Proposal for the purposes of the matching rights (as summarised below)); (ii) the Autonomy Directors withdraw, qualify or adversely modify their recommendation of the Offer (other than where the Autonomy Directors determine or announce they are recommending or resolving to recommend a Competing Proposal or for a temporary withdrawal, qualification or adverse modification of their recommendation of the Offer during the period when the Autonomy Directors are considering whether or not to recommend a Competing Proposal for the purposes of the matching rights); (iii) the Autonomy Directors do not provide a unanimous and unqualified recommendation of a revised offer announced by HP Vision pursuant to exercise of its matching rights; or (iv) a Competing Proposal is made and becomes or is declared unconditional in all respects or is otherwise completed. Autonomy will not be obliged to pay any amount which the Panel determines would not be permitted by Rule 21.2 of the City Code or to pay any amount which would not be permitted to be paid under the Listing Rules.

10

HP-SEC-01661705
Exh 2307-0017

12.2   **Non-solicitation**

Autonomy has also agreed that (i) it will not, and it will procure that no member of the Autonomy Group nor any of its or their representatives will, directly or indirectly (a) knowingly solicit, initiate, or encourage the submission of proposals or offers in relation to a Competing Proposal (provided that this does not prevent Autonomy or any other member of the Autonomy Group or its or their representatives responding to any approach, proposals or offers); or (b) will not provide information to any person in relation to a Competing Proposal except as required under Rule 20.2 or as is necessary for the Autonomy Directors to comply with their fiduciary duties and applicable laws, rules and regulations, or which the Autonomy Directors reasonably consider is a reasonable request and is required by the requesting party to proceed with a Competing Proposal; and (ii) it will notify HP Vision of any approach, proposal or offer in relation to any Competing Proposal, so far as lawful to do so, but not the identity of the approaching party or the terms of the proposal and of any requests made by other persons under Rule 20.2 of the City Code.

12.3   **Matching right**

If the Autonomy Directors determine that a Competing Proposal constitutes a Superior Proposal, Autonomy has agreed to notify HP Vision and provide the material details which led to such conclusion and notify HP Vision of the date of any meeting of the Board of Autonomy convened to consider whether or not to recommend the Superior Proposal and until which time Autonomy has agreed (subject to compliance with the Autonomy Directors' fiduciary and legal duties and applicable laws, rules and regulations) not to recommend any Superior Proposal or withdraw any Scheme setting out Offer proposals from HP Vision. If within two Business Days of receipt of the notice of the Superior Proposal, HP Vision fails to confirm that it intends to increase its offer to a price or financial value equal to or greater than that provided under the Superior Proposal; or, having provided the above confirmation, HP Vision fails within two Business Days of such confirmation to announce its revised offer, then the Autonomy Directors shall be entitled to withdraw, qualify or modify their recommendation of the Offer. Otherwise, Autonomy has agreed to procure that the Autonomy Directors recommend the revised offer of HP Vision (subject to compliance with their fiduciary and legal duties and applicable laws, rules and regulations).

12.4   **Conditions and regulatory filings**

HP has agreed to use all reasonable endeavours to procure the satisfaction of certain regulatory conditions as set out in paragraphs 1(B) and 1(C) of Part A of Appendix I as soon as practicable. Autonomy has agreed that it will work co-operatively with HP to prepare all regulatory filings required to obtain the clearances, consents, permissions and waivers necessary or reasonably considered appropriate by HP.

12.5   **Switch to a Scheme**

If HP Vision determines that it wishes to implement the acquisition of Autonomy by way of a Scheme, it has agreed do so on substantially the same terms and conditions as set out in the Announcement and Autonomy has agreed to undertake or cause to be taken all reasonable steps to promptly implement a Scheme and to consult with and keep HP Vision informed of all dealings with the Panel and the Court in connection with the Scheme.

12.6   **Acceptance period**

HP Vision has agreed with Autonomy that until such time as the Offer becomes or is declared unconditional as to acceptances, it will extend the Offer for such further period as may be agreed between HP Vision and Autonomy (or in the absence of an agreement by the time the extension would need to be announced, by the lesser of seven days and the period remaining until the sixtieth day after the day upon which the Offer Document is published), provided always that HP Vision will not be obliged to extend the period during which the Offer may become or be declared unconditional as to acceptances beyond midnight on the sixtieth day after the date of this document.

11

HP-SEC-01661706
Exh 2307-0018

13.   **United Kingdom, United States and the Netherlands taxation**

13.1  **United Kingdom taxation**

The comments set out below summarise certain limited aspects of the United Kingdom taxation treatment of certain Autonomy Shareholders in connection with the acceptance of the Offer. They are based on current law and an understanding of current HM Revenue & Customs practice as at the date of this document (both of which are subject to change, sometimes with retrospective effect).

The comments are intended as a general guide for information purposes and should be treated with appropriate caution. They are not intended as tax advice and do not purport to describe all the tax considerations which may be relevant to a particular shareholder. The comments apply only to Autonomy Shareholders who (i) are resident (and, if individuals, ordinarily resident) for United Kingdom tax purposes in the United Kingdom (or who, although neither resident nor, in the case of individuals, ordinarily resident in the United Kingdom for United Kingdom tax purposes, carry on a trade, vocation or profession though a branch, agency or permanent establishment in the United Kingdom for the purposes of which they have held, used or acquired their Autonomy Shares); (ii) hold Autonomy Shares as an investment (otherwise than under any scheme which benefits from special tax exemptions) and not as employment-related securities or securities to be realised in the course of a trade; and (iii) are the absolute beneficial owners of those Autonomy Shares.

**If you are in any doubt as to your tax position or if you may be subject to taxation in any jurisdiction other than the United Kingdom, you should consult an appropriately qualified independent professional adviser immediately.**

*United Kingdom taxation of chargeable gains*

The receipt by an Autonomy Shareholder of cash under the Offer will generally constitute a disposal, or part disposal, of the relevant Autonomy Shares for the purposes of United Kingdom taxation of chargeable gains. Such a disposal or part disposal may give rise to a liability to United Kingdom taxation of chargeable gains depending on the Autonomy Shareholder's individual circumstances (including the availability of exemptions, reliefs and allowable losses) and, in particular, the Autonomy Shareholder's base cost in his or her holding of Autonomy Shares.

*Autonomy Share Schemes*

Special tax provisions may apply to Autonomy Shareholders who have acquired or acquire their Autonomy Shares by exercising options under the Autonomy Share Schemes, including provisions imposing a charge to United Kingdom income tax when such options are exercised. Such Autonomy Shareholders are advised to seek independent professional advice.

*Stamp duty and stamp duty reserve tax ("SDRT")*

No United Kingdom stamp duty or SDRT should be payable by Autonomy Shareholders as a result of accepting the Offer.

13.2  **United States taxation**

*Certain US federal income tax considerations*

The following is a summary of certain US federal income tax considerations related to the disposition of Autonomy Shares by US Holders (as defined below). This summary is not a complete analysis of all potential US federal income tax consequences relating thereto, nor does it address any tax consequences arising under the laws of any state, local or foreign jurisdiction, or any tax considerations under US federal estate or gift tax laws. This summary is based on the US Internal Revenue Code of 1986, as amended (the "**IRC**"), Treasury regulations promulgated thereunder, published rulings, administrative pronouncements, and judicial decisions, all as currently in effect. All of the foregoing are subject to change (possibly with retroactive effect) or different interpretations which could affect the tax consequences described herein. No ruling has been or will be sought from the US Internal Revenue Service (the "**IRS**") with respect to any of the US federal income tax considerations regarding the Autonomy Shares and the matters discussed below, and there can be no assurance that the IRS will not tax a contrary position, or that any such contrary position would not be sustained by a court.

12

HP-SEC-01661707
Exh 2307-0019

This summary is limited to persons who hold Autonomy Shares as capital assets within the meaning of section 1221 of the IRC (that is, generally for investment). This summary does not discuss all of the US tax considerations that may be relevant to Autonomy Shareholders in light of their particular circumstances or that may be subject to special rules, including, but not·limited to, Autonomy Shareholders who, for US federal income tax purposes are financial institutions, "financial services entities", regulated investment companies, real estate investment trusts, holders that have received Autonomy Shares in connection with Performance of Services, as compensation, holders subject to the alternative minimum tax, insurance companies, pension funds, tax-exempt organisations, grantor trusts, partnerships or other pass-through entities, dealers in securities or currencies, taxpayers who elect to mark-to-market their securities, persons holding Autonomy Shares as part of a hedging or constructive sale transaction, "straddle", conversion transaction or other integrated transaction, US persons whose functional currency is not the US dollar, holders who at any time actually or constructively owned ten per cent or more of Autonomy issued share capital by vote, or persons subject to tax pursuant to the provisions of US tax law applicable to expatriates or former long-term residents of the US or non-US holders).

For purposes of this summary, the term "**US Holder**" means a beneficial owner of Autonomy Shares that is, for US federal income tax purposes:

- an individual citizen or resident of the US;

- a corporation, or other entity treated as a corporation for US federal income tax purposes, created in or under the laws of the US or of any political subdivision thereof or therein;

- an estate the income of which is subject to US federal income taxation regardless of its source; or

- a trust if a court within the US is able to exercise primary supervision over the administration of the trust and one or more US persons have the authority to control all substantial decisions of the trust, or a trust that has a valid election in effect under applicable US Treasury regulations to be treated as a US person.

If an entity or arrangement treated as a partnership for US federal income tax purposes holds any Autonomy Shares, the tax treatment of a partner in the partnership will generally depend on the status of the partner and upon the activities of the partnership. If you are a partner of a partnership that holds the Autonomy Shares, you should contact your tax adviser regarding the tax consequences of the sale of Autonomy Shares pursuant to the Offer.

**The following summary of certain US federal income tax consequences is for information purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of Autonomy Shares. Autonomy Shareholders should consult their advisers regarding their particular US federal income, state and local tax consequences of disposing of their Autonomy Shares.**

**Internal Revenue Service Circular 230 Notice: TO ENSURE COMPLIANCE WITH US TREASURY DEPARTMENT CIRCULAR 230, US HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF UNITED STATES FEDERAL TAX ISSUES IN THIS DOCUMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY US HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON US HOLDERS UNDER THE INTERNAL REVENUE CODE, STATE, OR LOCAL LAW; (B) SUCH DISCUSSION IS INCLUDED HEREIN IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) US HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

*Sale of Autonomy Shares*

Subject to the application of the PFIC rules discussed below, upon the sale of Autonomy Shares pursuant to the Offer, a US Holder will generally recognise gain or loss for US federal income tax purposes in an amount equal to the difference between the US dollar value of the amount of cash received and the US Holder's adjusted tax basis in the Autonomy Shares. Such gain or loss generally will be capital gain or loss and will be long-term capital gain or loss if the US Holder's holding period in the Autonomy Shares exceeds one year at the time of the disposition.

13

HP-SEC-01661708
Exh 2307-0020

Individual US Holders currently are subject to a maximum tax rate of 15 per cent on long-term capital gain for taxable years beginning before 1 January 2013. The deductibility of capital losses is subject to limitations.

*Passive foreign investment company*

The foregoing discussion assumes that Autonomy is not a "passive foreign investment company" for US federal income tax purposes (a "**PFIC**") with respect to the US Holder. Generally, a non-US company will be a PFIC for any tax year in which either (i) 75 per cent or more of its gross income is passive income or (ii) the average percentage, by fair market value, of its assets that produce or are held for the production of passive income is 50 per cent or more. "Passive income" includes, for example, dividends, interest, certain rents and royalties, certain gains from the sale of stock and securities, and certain gains from commodities transactions.

If Autonomy is treated as a PFIC for any taxable year during which a US Holder holds Autonomy Shares tendered in the Offer, gain on the disposition of such Autonomy Shares by such US Holder will be subject to tax as an "excess distribution" and allocated ratably to all days in the US Holder's holding period. Amounts allocated to the current year and any year before the Company was a PFIC are included in income for the current year. The remainder is taxable at the highest marginal rates applicable to ordinary income for the "prior-year PFIC period," *i.e.*, days in the US Holder's prior taxable year during which the Company was a PFIC. The resulting tax for amounts allocable to the prior-year PFIC period is subject to interest charges to reflect the value of the US income tax deferral. The excess distribution rules would not apply if the US Holder has made a valid mark-to-market election, in which case the mark-to-market rules for PFICs would apply.

PFIC status is determined annually and depends upon the composition of a company's income and assets from time to time. Autonomy has not determined whether it is a PFIC for the current year, nor has Autonomy reached any conclusions regarding its status as a PFIC with respect to any time in the past. HP Vision is not in a position to determine whether Autonomy is a PFIC in the current year or with respect to any time in the past. US Holders are encouraged to consult their own tax advisers regarding the potential application of the PFIC regime in the event Autonomy is determined to have been a PFIC during the holding period for their Autonomy Shares.

*Foreign currency considerations*

A US Holder that receives pounds and converts such pounds into US dollars on the day the amount is otherwise includible in income for US federal income tax purposes, generally will not be required to recognize gain or loss arising from exchange rate fluctuations. A US Holder that receives pounds and converts them into US dollars subsequent to such day will generally have foreign exchange gain or loss based on any appreciation or depreciation in the value of the pounds against the US dollar (subject to certain de minimis exceptions), which will generally be US source ordinary gain or loss.

*Information reporting and backup withholding*

Payments made to certain US Holders of Autonomy Shares may be subject to information reporting and US federal backup withholding, currently at a rate of 28 per cent, on cash payments received in exchange for Autonomy Shares.

US federal backup withholding will generally not apply, however, to a US Holder who furnishes a correct taxpayer identification number and certifies that he, she or it is not subject to backup withholding on IRS Form W-9 (or other appropriate form), or is otherwise exempt from backup withholding. The amount of any backup withholding may be allowed as a credit against a US Holder's US federal income tax liability and may entitle such US Holder to a refund, provided that certain required information is timely furnished to the IRS.

13.3 **Netherlands taxation**

The following summary outlines certain Netherlands tax consequences in connection with the acceptance of the Offer. All references in this summary to the Netherlands and Netherlands laws are to the European part of the Kingdom of the Netherlands and its laws only.

14

HP-SEC-01661709
Exh 2307-0021

The summary is based on the tax laws and practice in force in the Netherlands on the date of this document. These laws and practice are subject to changes that could prospectively or retrospectively affect the Netherlands tax position of Autonomy Shareholders.

The summary does not purport to provide a comprehensive description of all the Netherlands tax aspects that could be of relevance to the acceptance of the Offer by a Autonomy Shareholder who may be subject to a special tax treatment.

**Autonomy Shareholders should consult their own professional advisers with respect to the tax consequences (based on their individual circumstances) of the acceptance of the Offer.**

*General*

For purposes of Netherlands personal income tax and corporate income tax, Autonomy Shares legally owned by a third party such as a trustee, foundation or similar entity or arrangement (a "**Third Party**"), may under certain circumstances have to be allocated to the (deemed) settlor, grantor or similar originator (the "**Settlor**") or, upon death of the Settlor, his/her beneficiaries (the "**Beneficiaries**") in proportion to their entitlement to the estate of the Settlor of such trust or similar arrangement (the "**Separated Private Assets**").

This summary does not address the tax consequences for a holder of Autonomy Shares who has a substantial interest in Autonomy. Generally, an Autonomy Shareholder will have a substantial interest (*aanmerkelijk belang*) in Autonomy if he holds directly or indirectly (and for individual holders alone or together with his partner and/or certain other close relatives), or as Settlor or Beneficiary of Separated Private Assets,

(A) (i) the ownership of, (ii) certain other rights, such as usufruct, over, or (iii) rights to acquire, shares (whether or not already issued) representing 5 per cent or more of the total issued and outstanding capital (or the issued and outstanding capital of any class of shares) of Autonomy; or

(B) (i) the ownership of, or (ii) certain other rights, such as usufruct over, profit participating certificates ("*winstbewijzen*") that relate to 5 per cent or more of the annual profit of the Company or to 5 per cent or more of the liquidation proceeds of the Company.

This summary does not address the tax consequences for Autonomy Shareholders receiving income or realizing capital gains in their capacity as (former) employees, (former) directors and/or (former) supervisory directors.

This summary does not address the tax consequences of a holder of Autonomy Shares who:

(A) is resident or deemed to be resident in the Netherlands or (if such Autonomy Shareholder is an individual) has elected to be taxed as a resident for Netherlands income tax purposes;

(B) has an enterprise or an interest in an enterprise that is, in whole or in part, carried on through a permanent establishment (*vaste inrichting*) or a permanent representative (*vaste vertegenwoordiger*) in the Netherlands and to which enterprise or part of an enterprise, as the case may be, the Autonomy Shares are attributable; or

(C) if such holder is an individual, derives income or capital gain from or in connection with the Autonomy Shares which forms "a benefit from miscellaneous activities" (*resultaat uit overige werkzaamheden*) (which, for instance, would be the case (i) if the holder's activities with respect to the Autonomy Shares exceed "normal active asset management" (*normaal, actief vermogensbeheer*) in the Netherlands or (ii) if income and gains are derived from the holding, whether directly or indirectly, of (or a combination of) shares, debt claims or other rights (together, a *lucratief belang*) that the holder thereof has acquired under such circumstances that such income and gains are intended to be remuneration for work or services performed by such holder (or a related person) in the Netherlands, whether within or outside an employment relation, where such lucrative interest provides the holder thereof, with certain economic benefits that have a relation to the relevant work or services).

*Netherlands (withholding) tax consequences*

Holders of Autonomy Shares will not be subject to Netherlands (withholding) taxes solely as a result of the acceptance of the Offer.

15

HP-SEC-01661710
Exh 2307-0022

*Other taxes and duties*

No Netherlands capital tax, registration tax, custom duty, transfer tax, stamp duty or any other similar documentary tax or duty, other than the court fees, will be payable in the Netherlands in respect of or in connection with the acceptance of the Offer.

14. **Compulsory acquisition, de-listing and re-registration**

If the Offer becomes or is declared wholly unconditional, and sufficient acceptances under the Offer are received, HP Vision intends to procure that Autonomy will make an application for the cancellation of the listing of Autonomy Shares on the Official List and for the cancellation of trading of the Autonomy Shares on the London Stock Exchange's main market for listed securities. In addition, Autonomy Shareholders should note that Autonomy may cease to be eligible for listing if less than 25 per cent of Autonomy Shares are in public hands, which for these purposes would exclude interests in more than 5 per cent. In this event, HP Vision intends to request the FSA to cancel Autonomy's listing on the basis that Autonomy no longer satisfies all the continuing obligations for maintaining a listing.

**De-listing is likely to significantly reduce the liquidity and marketability of any Autonomy Shares in respect of which the Offer has not been accepted.**

If the Offer becomes or is declared unconditional in all respects it is anticipated that cancellation of listing on the Official List and cancellation of trading on the London Stock Exchange will take effect no earlier than 20 Business Days after the earliest of: (i) the date on which HP Vision has obtained, at a general meeting, the prior approval of a resolution for the cancellation from a majority of not less than 75 per cent of the holders of the Autonomy Shares as (being entitled to do so) vote in person or, where proxies are allowed, by proxy; (ii) the date on which HP Vision has, by virtue of its shareholdings and acceptances of the Offer, acquired or agreed to acquire 75 per cent of the voting rights attaching to the Autonomy Shares; or (iii) the first date of issue of compulsory acquisition notices under Part 28 of the Companies Act.

It should be noted that cancellation of listing on the Official List and cancellation of trading on the London Stock Exchange may occur earlier in the event that, as a consequence of less than 25 per cent of Autonomy Shares being in public hands, the FSA determines that Autonomy is no longer eligible for listing. HP Vision will notify Autonomy Shareholders when the De-listing Resolution has been passed (or the compulsory acquisition notices served) and confirm that the notice period has commenced and the anticipated date of cancellation.

If HP Vision receives acceptances of the Offer in respect of, and/or otherwise acquires, 90 per cent or more of the Autonomy Shares to which the Offer relates and 90 per cent or more of the voting rights attaching to such shares and assuming all other conditions of the Offer have been satisfied or waived (if they are capable of being waived), HP Vision intends to exercise its rights pursuant to Sections 974 to 991 of the Companies Act to acquire compulsorily, on the same terms as the Offer, the remaining Autonomy Shares in respect of which the Offer has not been accepted.

It is also intended that, following the Offer becoming or being declared unconditional in all respects, Autonomy will seek to re-register as a private company under the relevant provisions of the Companies Act.

15. **Overseas Shareholders**

**The attention of Overseas Shareholders (and any person, including, without limitation, any custodian, nominee or trustee who may have an obligation to forward any document in connection with the Offer outside the United Kingdom or the United States) is drawn to paragraph 7 of Part B of Appendix I to this document, to paragraph 1.2 of Part C of Appendix I to this document and to the relevant provisions of the Form of Acceptance (for holders of Autonomy Shares in certificated form) and to paragraph 1.2 of Part D of Appendix I to this document (for holders of Autonomy Shares in uncertificated form).**

The availability of the Offer to persons not resident in the United Kingdom or the United States may be affected by laws or regulations of the relevant jurisdiction. Persons who are subject to the laws or regulations of any jurisdiction other than the United Kingdom or the United States should inform themselves about the laws or regulations of any such relevant jurisdictions and observe any applicable

16

requirements. If you remain in any doubt, you should consult your professional adviser in the relevant jurisdiction without delay.

Unless otherwise determined by HP Vision, or required by the City Code, and permitted by applicable law and regulation, the Offer referred to in this document and the accompanying documents is not being and will not be made, directly or indirectly, in or into any Restricted Jurisdiction. This document does not constitute an offer in any Restricted Jurisdiction and the Offer should not be accepted by any such use, means, instrumentality or facility or otherwise from or within any Restricted Jurisdiction. Accordingly, copies of this document and the Form of Acceptance and any related documents are not being, and must not be, mailed, transmitted or otherwise forwarded, distributed or sent in whole or in part in, into or from any Restricted Jurisdiction and persons receiving such documents (including, without limitation, custodians, nominees and trustees) must not mail, transmit or otherwise forward, distribute or send any such documents in, into or from any Restricted Jurisdiction, as doing so may render invalid any purported acceptance of the Offer. Notwithstanding the foregoing, HP Vision will retain the right to permit the Offer to be accepted and any sale of securities pursuant to the Offer to be completed if, in its sole discretion, it is satisfied that the transaction in question can be undertaken in compliance with applicable laws and regulations.

All Autonomy Shareholders (including without limitation, custodians, nominees and trustees) who intend to forward, distribute or send this document and the accompanying documents to any jurisdiction outside the United Kingdom or the United States should read paragraph 7 of Part B of Appendix I to this document and seek appropriate advice before taking any action.

Accordingly:

- accepting Autonomy Shareholders who hold their Autonomy Shares in certificated form (that is, not in CREST) who are unable to give the representations and warranties set out in paragraph 1.2 of Part C of Appendix I to this document and who put "No" in Box 3 of the Form of Acceptance will be deemed not to have validly accepted the Offer; and

- accepting Autonomy Shareholders who hold their Autonomy Shares in uncertificated form (that is, in CREST) who are unable to give the representations and warranties set out in paragraph 1.2 of Part C of Appendix I to this document will not be able to validly accept the Offer.

16. **Procedure for acceptance of the Offer**

This section should be read in conjunction with Appendix I to this document and, in respect of Autonomy Shares held in certificated form, the accompanying Form of Acceptance and notes thereto which are deemed to form part of the terms of the Offer in respect of such Autonomy Shares.

Holders of Autonomy Shares in certificated form (that is, not in CREST) may only accept the Offer in respect of such shares by completing and returning the accompanying Form of Acceptance in accordance with the procedure set out in paragraphs 16.1(A) to (E) below.

Holders of Autonomy Shares in uncertificated form (that is, in CREST) may only accept the Offer in respect of such shares by TTE Instruction in accordance with the procedure set out in paragraphs 16.2(A) to (D) below.

If you hold Autonomy Shares in both certificated form and uncertificated form, you should follow the procedures set out in the paragraphs below for each type of holding separately.

If you are in any doubt as to the procedure for acceptance, please telephone Capita Registrars, receiving agent for the Offer, on 0871 664 0321 (when telephoning from within the United Kingdom) or +44 20 8639 3399 (when telephoning from outside the United Kingdom) between 9.00 a.m. and 5.00 p.m. (London time) Monday to Friday (except United Kingdom public holidays). Calls to the helpline from the 0871 664 0321 number are charged at 10 pence per minute from a BT landline. Other network providers' costs may vary. Calls to the helpline from outside the United Kingdom will be charged at the applicable international rate. Different charges may apply to calls made from mobile telephones and calls may be recorded and randomly monitored for security and training purposes. The helpline cannot provide advice on the merits of the Offer nor give any financial, legal or tax advice. You are reminded that if you are a CREST sponsored member, you should contact your CREST sponsor before taking any action.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661712
Exh 2307-0024

If your Autonomy Shares are in the course of being converted from uncertificated to certificated form, or from certificated to uncertificated form, please refer to paragraph 16.3 below.

**16.1   Autonomy Shares held in certificated form (that is, not in CREST)**

This paragraph should be read in conjunction with the Form of Acceptance.

(A)   Completion of the Form of Acceptance

To accept the Offer in respect of your Autonomy Shares held in certificated form, you must complete the Form of Acceptance in accordance with the instructions set out below and on the Form of Acceptance.

The instructions printed on the Form of Acceptance are deemed to form part of the terms of the Offer.

You should complete a separate Form of Acceptance for Autonomy Shares held in certificated form but under different designations.

Additional Forms of Acceptance are available from Capita Registrars at the address set out in paragraph 16.1(B) below or through contacting the helpline. The instructions for completing a Form of Acceptance in the paragraph below apply, where relevant, to each separate Form of Acceptance to be completed by you.

To accept the Offer in respect of all your Autonomy Shares held in certificated form, you must complete Box 1 on the Form of Acceptance. If appropriate, you should also complete Box 3 and 4. In all cases, you must sign Box 2 of the Form of Acceptance in accordance with the instructions printed on the Form of Acceptance. If you are an individual you must sign in the presence of a witness, who should also sign in accordance with the instructions printed on the Form of Acceptance. Any Autonomy Shareholder which is a company should execute the Form of Acceptance in accordance with the instructions printed on it.

To accept the Offer in respect of less than all of your Autonomy Shares, you must insert in Box 1 of the Form of Acceptance such lesser number of Autonomy Shares in respect of which you accept the Offer. If you do not insert a number in Box 1 or insert a number greater than your entire registered certificated holding, and you have signed Box 2, your acceptance will be deemed to be in respect of all Autonomy Shares in certificated form held by you. In addition, you must be able to make the representations and warranties set out in paragraph 1.2 of Part C of Appendix I of this document.

The Offer may only be accepted by Autonomy Shareholders who are not Restricted Overseas Persons.

Neither HP Vision nor Capita Registrars accepts any liability for any instructions which do not comply with the conditions set out in this document, the Form of Acceptance and any accompanying materials.

(B)   Return of Form of Acceptance

To accept the Offer in respect of Autonomy Shares held in certificated form, the completed Form of Acceptance must be returned, together with your share certificate(s) and/or other document(s) of title for your Autonomy Shares, to Capita Registrars by post or (only during normal business hours) by hand at Capita Registrars, Corporate Actions, The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU, as soon as possible, and in any event so as to be received by no later than 1.00 p.m. (London time) on 12 September 2011. A first class reply paid envelope is enclosed for your convenience and may be used by Autonomy Shareholders for returning a Form of Acceptance from within the United Kingdom. No acknowledgement of receipt of documents will be given.

Any Form of Acceptance received in an envelope postmarked in a Restricted Jurisdiction or otherwise appearing to HP Vision or any of its agents to have been sent from any of these jurisdictions may be rejected as an invalid acceptance of the Offer. For further information on Overseas Shareholders, see paragraph 15 above.

18

HP-SEC-01661713
Exh 2307-0025

(C)  Documents of title

If your Autonomy Shares are held in certificated form, the completed, signed and witnessed Form of Acceptance should be accompanied by the relevant share certificate(s) and/or other document(s) of title. If, for any reason, your share certificate(s) and/or other document(s) of title is/are not readily available or is/are lost, the Form of Acceptance should still be completed, signed, witnessed and returned as stated above so as to arrive by no later than 1.00 p.m. (London time) on 12 September 2011.

You should send any share certificate(s) and/or other document(s) of title that you have available, accompanied by a letter stating that the balance will follow as soon as possible or that you have lost one or more of your share certificate(s) and/or other document(s) of title. You should then arrange for the relevant share certificate(s) and/or other document(s) of title to be forwarded as soon as possible. No acknowledgement of receipt of document(s) will be given.

In the case of loss, you should write as soon as possible to Autonomy's registrars, Computershare Investor Services PLC, The Pavilions, Bridgwater Road, Bristol BS99 6ZZ requesting a letter of indemnity for lost share certificate(s) and/or other document(s) of title which, when completed in accordance with the instructions given, should be returned to Capita Registrars as set out in paragraph 16.1(B) above.

(D)  Validity of acceptances

Without prejudice to Part B and Part C of Appendix I to this document, and subject to the provisions of the City Code, HP Vision reserves the right to treat as valid in whole or in part any acceptance of the Offer which is not entirely in order or which is not accompanied by the relevant share certificate(s) and/or other document(s) of title. In that event, no payment of cash under the Offer will be made until after the relevant share certificate(s) and/or other document(s) of title or indemnities reasonably satisfactory to HP Vision have been received whilst the Offer remains open for acceptances.

(E)  Overseas Shareholders

The attention of Autonomy Shareholders holding Autonomy Shares in certificated form and who are citizens or residents of jurisdictions outside the United Kingdom or the United States is drawn to paragraph 7 of Part B and paragraph 1.2 of Part C of Appendix I.

16.2  **Autonomy Shares held in uncertificated form (that is, in CREST)**

(A)  General

Holders of Autonomy Shares in uncertificated form (that is, in CREST) may only accept the Offer in respect of such Autonomy Shares by TTE Instruction in accordance with this paragraph 16.2(A) and, if those Autonomy Shares are held under different member account IDs, such holders should send a separate TTE Instruction for each member account ID.

If your Autonomy Shares are held in uncertificated form, to accept the Offer you should take (or procure the taking of) the action set out below to transfer the Autonomy Shares in respect of which you wish to accept the Offer to the appropriate escrow balance(s) (that is, send a TTE Instruction), specifying Capita Registrars (in its capacity as a CREST participant under the Escrow Agent's relevant participant ID referred to below) as the Escrow Agent, as soon as possible and in any event so that the TTE Instruction settles not later than 1.00 p.m. (London time) on 12 September 2011. Note that settlement cannot take place on weekends or bank holidays (or other times at which the CREST system is non-operational)—you should therefore ensure you time the input of any TTE Instructions accordingly.

The input and settlement of a TTE Instruction in accordance with this paragraph 16.2(A) will (subject to satisfying the requirements set out in Part B and Part D of Appendix I) constitute an acceptance of the Offer in respect of the number of Autonomy Shares so transferred to escrow.

If you are a CREST sponsored member, you should refer to your CREST sponsor before taking any action. Only your CREST sponsor will be able to send the TTE Instruction(s) to Euroclear in relation to your Autonomy Shares.

19

HP-SEC-01661714
Exh 2307-0026

By submitting a TTE Instruction, the Autonomy Shareholder for whom the acceptance is made represents that he has read and understood Part D of Appendix I to this document and agrees to be bound by the terms therein.

After settlement of a TTE Instruction, you will not be able to access the Autonomy Shares concerned in CREST for any transaction or charging purposes. If the Offer becomes or is declared unconditional in all respects, the Escrow Agent will transfer the Autonomy Shares concerned to itself in accordance with paragraph 1.4 of Part D of Appendix I to this document.

You are recommended to refer to the CREST Manual published by Euroclear for further information on the CREST procedures outlined below.

**You should note that Euroclear does not make available special procedures, in CREST, for any particular corporate action. Normal system timings and limitations will therefore apply in connection with a TTE Instruction and its settlement. You should therefore ensure that all necessary action is taken by you (or by your CREST sponsor) to enable a TTE Instruction relating to your Autonomy Shares to settle prior to 1.00 p.m. (London time) on 12 September 2011. In this connection you are referred in particular to those sections of the CREST Manual concerning practical limitations of the CREST system and timings.**

(B)   To accept the Offer

To accept the Offer in respect of Autonomy Shares held in uncertificated form, you should send (or, if you are a CREST sponsored member, procure that your CREST sponsor sends) to Euroclear a TTE Instruction in relation to such shares. A TTE Instruction to Euroclear must be properly authenticated in accordance with Euroclear's specifications for transfers to escrow and must contain, in addition to any other information that is required for a TTE Instruction to settle in CREST, the following details:

(i)    the ISIN number for the Autonomy Shares (this is GB0055007982);

(ii)   the number of Autonomy Shares in respect of which you wish to accept the Offer (i.e. the number of Autonomy Shares to be transferred to escrow);

(iii)  your member account ID;

(iv)   your participant ID;

(v)    the participant ID of the Escrow Agent in its capacity as CREST receiving agent (this is RA10);

(vi)   the member account of the Escrow Agent for the Offer on its basic terms (this is HEWAUT01);

(vii)  the intended settlement date. This should be as soon as possible and, in any event, not later than 1.00 p.m. (London time) on 12 September 2011;

(viii) the corporate action number of the Offer which is allocated by Euroclear and can be found by viewing the relevant corporate action details in CREST;

(ix)   input with a standard delivery instruction priority of 80; and

(x)    the contact name and telephone number inserted in the shared note field.

(C)   Validity of acceptances

A Form of Acceptance which is received in respect of Autonomy Shares held in uncertificated form will not constitute a valid acceptance and will be disregarded. Holders of Autonomy Shares in uncertificated form who wish to accept the Offer should note that a TTE Instruction will only be a valid acceptance of the Offer as at the relevant closing date if it has settled on or before 1.00 p.m. (London time) on that date.

Without prejudice to Part B and Part D of Appendix I to this document and subject to the provisions of the City Code, HP Vision reserves the right to treat as valid in whole or in part any acceptance of the Offer which is not entirely in order or which is not accompanied by the relevant TTE Instruction. In that event, no payment of cash under the Offer will be made until after the TTE Instruction has settled.

20

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661715
Exh 2307-0027

(D)  Overseas Shareholders

The attention of Autonomy Shareholders holding Autonomy Shares in uncertificated form, and who are citizens or residents of jurisdictions outside the United Kingdom or the United States, is drawn to paragraph 7 of Part B and paragraph 1.2 of Part D of Appendix I.

16.3  **General**

HP Vision will make an appropriate announcement if any of the details contained in this paragraph 16 change for any reason that is material for Autonomy Shareholders.

Normal CREST procedures (including timings) apply in relation to any Autonomy Shares that are, or are to be, converted from uncertificated to certificated form, or from certificated to uncertificated form, during the course of the Offer (whether any such conversion arises as a result of a transfer of Autonomy Shares or otherwise). Holders of Autonomy Shares who are proposing so to convert any such shares are recommended to ensure that the conversion procedures are implemented in sufficient time to enable the person holding or acquiring the Autonomy Shares as a result of the conversion to take all necessary steps in connection with an acceptance of the Offer (in particular, as regards delivery of share certificate(s) or other document(s) of title or transfers to an escrow balance as described above) prior to 1.00 p.m. (London time) on 12 September 2011.

**If you are in any doubt as to the procedure for acceptance, please telephone Capita Registrars on 0871 664 0321 (when telephoning from within the United Kingdom) or +44 20 8639 3399 (when telephoning from outside the United Kingdom) between 9.00 a.m. and 5.00 p.m. (London time) Monday to Friday. Calls to the helpline from the 0871 664 0321 number are charged at 10 pence per minute from a BT Landline. Other network providers' costs may vary. Calls to the helpline from outside the UK will be charged at the applicable international rate. Different charges may apply to calls made from mobile telephones and calls may be recorded and randomly monitored for security and training purposes. The helpline cannot provide advice on the merits of the Offer nor give any financial, legal or tax advice. You are reminded that, if you are a CREST sponsored member, you should contact your CREST sponsor before taking any action.**

17.  **Settlement**

17.1  Subject to the Offer becoming, or being declared, unconditional in all respects (except as provided in paragraph 7 of Part B of Appendix I to this document in the case of certain Overseas Shareholders) and provided that the TTE Instruction, Form of Acceptance, share certificate(s) and/or other document(s) of title are in order, settlement of the consideration to which any Autonomy Shareholder is entitled under the Offer will be effected (i) in the case of acceptances received, valid and complete in all respects, by the date on which the Offer becomes or is declared wholly unconditional, within 14 days of such date; or (ii) in the case of acceptances of the Offer received, valid and complete in all respects, after the date on which the Offer becomes or is declared unconditional in all respects but while it remains open for acceptance, within 14 days of such receipt, in the following manner:

(A)  Autonomy Shares in certificated form (that is, not in CREST)

Where an acceptance relates to Autonomy Shares held in certificated form, settlement of any cash consideration to which the accepting Autonomy Shareholder is entitled will be despatched by first class post (or by such other method as may be approved by the Panel) to accepting Autonomy Shareholders or their appointed agents (but not into any Restricted Jurisdiction). All such cash payments will be made in United Kingdom pounds sterling by cheque drawn on a branch of a United Kingdom clearing bank.

In the case of joint holders of Autonomy Shares, those cheques will be despatched (at the risk of such Autonomy Shareholders) to the joint holder whose name and address is printed on the Form of Acceptance or, if appropriate, Box 4 or, if no such name and address is set out, to the first-named holder at his registered address (outside a Restricted Jurisdiction).

(B)  Autonomy Shares in uncertificated form (that is, in CREST)

Where an acceptance relates to Autonomy Shares held in uncertificated form, the cash consideration to which the accepting Autonomy Shareholder (or the first named Autonomy Shareholder in the case of joint holders) is entitled will be paid by means of a CREST payment

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661716
Exh 2307-0028

in favour of the accepting Autonomy Shareholder's payment bank in respect of the cash consideration due, in accordance with CREST payment arrangements. HP Vision reserves the right to settle all or any part of the consideration referred to in this paragraph 17.1(B) for all or any accepting Autonomy Shareholder(s) in the manner referred to in paragraph 17.1(A) if, for any reason, it wishes to do so.

(C)   General

If the Offer does not become or is not declared unconditional in all respects and lapses or is withdrawn:

(i)   in the case of Autonomy Shares held in certificated form, the relevant Form of Acceptance, share certificate(s) and/or other document(s) of title will be returned by post (or by such other method as may be approved by the Panel) within 14 days of the Offer lapsing or being withdrawn to the person or agent whose name and address (outside any Restricted Jurisdiction) is set out above Box 1 or, if appropriate, in Box 4 on the Form of Acceptance or, if none is set out, to the first-named or sole holder at his registered address (provided that no such documents will be sent to an address in any Restricted Jurisdiction); and

(ii)   in the case of Autonomy Shares held in uncertificated form, the Escrow Agent will, immediately after the lapsing or withdrawal of the Offer (or within such longer period as the Panel may permit, not exceeding 14 days of the lapsing or withdrawal of the Offer), give TFE Instructions to Euroclear to transfer all Autonomy Shares held in escrow balances and in relation to which it is the Escrow Agent for the purposes of the Offer to the original available balances of the Autonomy Shareholders concerned.

17.2   All remittances, communications, notices, certificates and documents of title sent by, to or from Autonomy Shareholders or their appointed agents will be sent at their own risk.

17.3   Except with the consent of the Panel, settlement of the consideration to which any Autonomy Shareholder is entitled under the Offer will be implemented in full in accordance with the terms of the Offer without regard to any lien, right of set-off, counterclaim or other analogous right to which HP Vision may otherwise be, or claim to be, entitled against such Autonomy Shareholder.

18.   **Further information**

The terms and conditions of the Offer are set out in full in Appendix I to this document. Your attention is drawn to the further information in the Appendices, which form part of this document and, if your Autonomy Shares are held in certificated form, to the accompanying Form of Acceptance which should be read in conjunction with this document.

19.   **Action to be taken**

**To accept the Offer in respect of Autonomy Shares held in certificated form you must complete the Form of Acceptance in accordance with the instructions printed on it and return it together with your share certificate(s) or other document(s) of title to Capita Registrars by post or (only during normal business hours) by hand at Capita Registrars, Corporate Actions, The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU as soon as possible, but in any event so as to arrive by no later than 1.00 p.m. (London time) on 12 September 2011. The procedure for acceptance is set out in paragraph 16.1 of this letter and in the Form of Acceptance. Acceptances in respect of Autonomy Shares held in uncertificated form should be made electronically through CREST so that the TTE Instruction settles not later than 1.00 p.m. (London time) on 12 September 2011 in accordance with the procedure set out above in paragraph 16.2 of this letter.**

Yours faithfully,

Léo Apotheker
President and Chief Executive Officer
For and on behalf of
Hewlett-Packard Company

Catherine A. Lesjak
Director
For and on behalf of
Hewlett-Packard Vision B.V.

22

# APPENDIX I

## CONDITIONS AND FURTHER TERMS OF THE OFFER

### PART A CONDITIONS OF THE OFFER

1. **Conditions of the Offer**

The Offer is subject to the following conditions:

(A)  valid acceptances being received (and not, where permitted, withdrawn) and/or members of the HP Group having acquired or agreed to acquire (pursuant to the Offer or otherwise), directly or indirectly, by not later than 1.00 p.m. on the first closing date of the Offer (or such later time(s) and/or date(s) as HP Vision may, subject to the rules of the City Code, decide) in respect of not less than 75 per cent (or such lesser percentage as HP Vision may decide) in nominal value of the Autonomy Shares to which the Offer relates and not less than 75 per cent (or such lesser percentage as HP Vision may decide) of the voting rights carried by the Autonomy Shares to which the Offer relates, provided that, unless agreed by the Panel, this condition will not be satisfied unless HP Vision and/or any members of the HP Group shall have acquired or agreed to acquire (pursuant to the Offer or otherwise), directly or indirectly, Autonomy Shares carrying, in aggregate, over 50 per cent of the voting rights then normally exercisable at a general meeting of Autonomy on such basis as may be required by the Panel (including for this purpose, to the extent (if any) required by the Panel, any voting rights attaching to any shares which are unconditionally allotted or issued before the Offer becomes or is declared unconditional as to acceptances, whether pursuant to the exercise of conversion or subscription rights or otherwise). For the purpose of this condition:

   (i)  the expression "Autonomy Shares to which the Offer relates" shall be construed in accordance with Chapter 3 of Part 28 of the Companies Act;

   (ii)  Autonomy Shares which have been unconditionally allotted but not issued before the Offer becomes or is declared unconditional as to acceptances, whether pursuant to the exercise of any outstanding subscription or conversion rights or otherwise, shall be deemed to carry the voting rights which they will carry upon issue;

   (iii)  shares that cease to be held in treasury are Autonomy Shares to which the Offer relates; and

   (iv)  valid acceptances shall be deemed to have been received in respect of Autonomy Shares which are treated for the purposes of Part 28 of the Companies Act as having been acquired or contracted to be acquired by HP Vision by virtue of acceptances of the Offer;

(B)  all filings having been made and all or any applicable waiting periods under the United States Hart-Scott Rodino Antitrust Improvements Act 1976 and the regulations thereunder including any extensions thereof having expired, lapsed or been terminated, as applicable, in each case in respect of the Offer and the proposed acquisition of any shares in, or control of, Autonomy;

(C)  all merger control filings having been made in Austria, Germany and Ireland and either a decision authorising the Offer or no order, instruction or requirement preventing the closing of the Offer, having been issued or made by any of the Austrian Federal Competition Authority, the German Bundeskartellamt or the Irish Competition Authority;

(D)  no government, governmental or quasi-governmental authority (whether supranational, national, regional, local or otherwise) or statutory or regulatory body, or other authority (including any anti-trust or merger control authority), court, tribunal, arbitrary body, institution, investigative body, association, trade agency or professional or environmental body or (without prejudice to the generality of the foregoing) any other person or body in any jurisdiction (each, a "**Relevant Authority**") having decided to take, institute, implement or threaten any action, proceedings, suit, investigation, enquiry or reference, or enacted, made or proposed any statute, regulation, decision, judgement or order or otherwise taken any other step or done any thing, and there not being outstanding any statute, legislation or order, that would or might reasonably be expected to (to an extent or in a manner which is

23

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661718
Exh 2307-0030

material in the context of the Offer or would have a material and adverse effect on the Wider Autonomy Group, taken as a whole):

(i)    make the Offer, or its implementation, or the proposed acquisition of Autonomy or any Autonomy Shares or any other shares or securities in, or wider control of, Autonomy by HP Vision or any member of the Wider HP Group or the subscription by, or allotment to, any member of the Wider HP Group of Autonomy Shares or any matter arising therefrom or relating thereto, void, illegal or unenforceable under the laws of any relevant jurisdiction or otherwise, directly or indirectly, restrict, restrain, prohibit, delay, impose additional conditions or obligations with respect to, or otherwise directly or indirectly restrain, restrict, prohibit, delay or otherwise interfere with the Offer or such acquisition, or require amendment to the terms of the Offer or the acquisition of any Autonomy Shares by HP Vision or any matters arising therefrom;

(ii)    result in a delay in the ability of HP Vision, or render HP Vision unable, to acquire or to hold or to exercise effectively any of the rights of ownership in respect of the Autonomy Shares or loans or securities convertible into Autonomy Shares;

(iii)    require, prevent, delay or adversely affect the divestiture, or alter the terms envisaged for the proposed divestiture, by any member of the Wider HP Group or any member of the Wider Autonomy Group of all or any portion of their businesses, assets or property or impose any limitation on the ability of any of them to conduct their respective businesses or own their respective assets or properties or any part thereof;

(iv)    impose any limitation on the ability of any member of the Wider HP Group to acquire or hold or exercise effectively, directly or indirectly, all or any rights of all or any of the Autonomy Shares (whether acquired pursuant to the Offer or otherwise) or to exercise voting or management control over Autonomy or any member of the Wider Autonomy Group;

(v)    save as disclosed in Disclosed Information or as otherwise Publicly Announced, require any member of the Wider Autonomy Group to relinquish, terminate or materially amend in any way any material contract to which any member of the Wider Autonomy Group is a party;

(vi)    except pursuant to Sections 974 to 991 of the Companies Act, require any member of the Wider HP Group or the Wider Autonomy Group to acquire, or offer to acquire any Autonomy Shares or other securities or rights thereover in any member of the Wider Autonomy Group (other than in Autonomy) owned by any third party;

(vii)    impose any limitation on the ability of any member of the Wider HP Group or the Wider Autonomy Group to integrate or co-ordinate its business, or any part of it, with the business of any other member of the Wider HP Group or the Wider Autonomy Group;

(viii)    result in any member of the Wider HP Group or Wider Autonomy Group ceasing to be able to carry on business in a manner in which it presently does so; or

(ix)    otherwise adversely affect any or all of the business, assets, profits, prospects or financial or trading position of any member of the Wider HP Group or the Wider Autonomy Group or the exercise of rights over shares of any company in the Wider Autonomy Group; and

all applicable waiting and other time periods during which such Relevant Authority could decide, institute, implement or threaten any such action, proceeding, suit, investigation, enquiry or reference or otherwise intervene in respect of the Offer or acquisition or proposed acquisition of any Autonomy Shares having expired, lapsed or been terminated;

(E)    all necessary filings and applications in connection with the Offer or its implementation having been made and all necessary authorisations, orders, grants, consents, clearances, licences, confirmations, permissions and approvals ("**Authorisations**"), in any jurisdiction, for or in respect of the Offer, the proposed acquisition of any shares or securities in, or control of, Autonomy or any member of the Wider Autonomy Group by any member of the

24

HP-SEC-01661719
Exh 2307-0031

Wider HP Group having been obtained in terms and in a form reasonably satisfactory to HP Vision from all appropriate Relevant Authorities or (without prejudice to the generality of the foregoing) from any persons or bodies with whom any member of the Wider Autonomy Group has entered into any contractual arrangements (where the absence of such Authorisations would be material in the context of the Offer or would have a material and adverse effect on the Wider Autonomy Group, taken as a whole) and such Authorisations remaining in full force and effect and there being no intimation of any intention to revoke or not to renew the same and all necessary filings having been made, all applicable waiting and other time periods (including extensions thereto) in respect of the Offer or its implementation under any applicable legislation and regulations in any jurisdiction having expired, lapsed or been terminated and all necessary statutory or regulatory obligations in any jurisdiction in respect of the Offer or the proposed acquisition of Autonomy by HP Vision or of the Autonomy Shares or any matters arising therefrom having been complied with;

(F)     save as disclosed in Disclosed Information or as otherwise Publicly Announced, there being no provision of any agreement, instrument, permit, franchise, licence or other arrangement to which any member of the Wider Autonomy Group is a party or by or to which it or any of its assets may be bound or subject or any circumstance which, as a consequence of the Offer or the acquisition of Autonomy or proposed acquisition by any member of the Wider HP Group of some or all of the shares or other securities in Autonomy or because of a change in the control or management of Autonomy or any member of the Wider Autonomy Group by any member of the Wider HP Group, could or might reasonably be expected to result in (to an extent or in a manner which is material in the context of the Offer or would have a material and adverse effect on the Wider Autonomy Group, taken as a whole):

(i)     any monies borrowed by, or other indebtedness (actual or contingent) of, or grant available to, any member of the Wider Autonomy Group becoming or being capable of being declared repayable immediately or earlier than the repayment date stated in such agreement, instrument or other arrangement or the ability of any member of the Wider Autonomy Group to borrow monies or incur any indebtedness being withdrawn, inhibited or becoming capable of being withdrawn or inhibited;

(ii)    any mortgage, charge or other security interest being created over the whole or any part of the business, property or assets of any member of the Wider Autonomy Group or any such security (whenever arising) being enforced;

(iii)   any such agreement, instrument, permit, franchise, licence or other arrangement, or any right, interest, liability or obligation of any member of the Wider Autonomy Group therein, being, or becoming capable of being, terminated or adversely modified or affected or any adverse action being taken or arising thereunder;

(iv)    the value of any member of the Wider Autonomy Group or its financial or trading position being prejudiced or adversely affected;

(v)     any asset of the Wider Autonomy Group being charged or disposed of or any right arising under which any such asset or interest could be required to be disposed or charged;

(vi)    the rights, liabilities, obligations or interests or business of any member of the Wider Autonomy Group in or with any other person, firm or company (or any arrangement relating to such interest or business) being terminated, modified or adversely affected;

(vii)   any asset or interest of any member of the Wider Autonomy Group being or falling to be disposed of or ceasing to be available to any member of the Wider Autonomy Group or any right arising under which any such asset or interest could be required to be disposed of or could cease to be available to any member of the Wider Autonomy Group;

(viii)  any member of the Wider Autonomy Group ceasing to be able to carry on business under any name under which it presently does so; or

25

HP-SEC-01661720
Exh 2307-0032

(ix)    the creation or acceleration of any liability (actual or contingent) by a member of the Wider Autonomy Group,

and no event having occurred which, under any provision of any agreement, arrangement, licence, permit or other instrument to which any member of the Wider Autonomy Group is a party or by or to which any such member or any of its assets may be bound, entitled or subject, could reasonably be expected to result in any of the events or circumstances as are referred to in sub-paragraphs i to ix of this condition;

(G)    since 31 December 2010 and save as Publicly Announced or as disclosed in Disclosed Information, no member of the Wider Autonomy Group having (to an extent or in a manner which is material in the context of the Offer or would have a material and adverse effect on the Wider Autonomy Group, taken as a whole):

(i)    issued or agreed to issue or authorised or proposed the issue of additional shares of any class or issued or authorised or proposed the issue of or granted securities convertible into or exchangeable for, or rights, warrants or options to subscribe for or acquire, such shares or convertible securities or redeemed, purchased or reduced or announced any intention to do so or made any other change to any part of its share capital, save for options granted or awards made pursuant to the Autonomy Share Schemes and Autonomy Shares allotted upon exercise of options under the Autonomy Share Schemes or as between Autonomy and wholly owned subsidiaries of Autonomy or between such wholly-owned subsidiaries;

(ii)    sold or transferred or agreed to sell or transfer any treasury shares;

(iii)    recommended, declared, paid or made or proposed to recommend, declare, pay or make any dividend, bonus or other distribution whether in cash or otherwise other than dividends lawfully paid to Autonomy or wholly-owned subsidiaries of Autonomy or between such wholly-owned subsidiaries;

(iv)    other than in respect of Autonomy Intra Group Transactions, authorised or proposed or announced its intention to propose any acquisition or disposal or transfer of assets or shares or any change in its share or loan capital;

(v)    issued or authorised or proposed the issue of any debentures or, save in the ordinary course of business, incurred or increased any financial indebtedness or contingent financial liability other than between Autonomy and its wholly-owned subsidiaries;

(vi)    other than in respect of Autonomy Intra Group Transactions, disposed of or transferred, mortgaged or encumbered any material asset or any right, title or interest in any material asset or entered into or varied any contract, commitment or arrangement (whether in respect of capital expenditure or otherwise) which is of a long term or unusual nature or which involves or could involve an obligation of a nature or magnitude which is material;

(vii)    entered into or varied or authorised or proposed or announced its intention to enter into or vary any contract, reconstruction, amalgamation, arrangement or other transaction which is of a long term or unusual or onerous nature or is otherwise than in the ordinary course of business other than between Autonomy and its wholly-owned subsidiaries or between such wholly-owned subsidiaries;

(viii)    entered into, or varied the terms of, any contract or agreement with any of the directors or senior executives of the Wider Autonomy Group;

(ix)    other than in respect of Autonomy Intra Group Transactions, merged or demerged with any body corporate or acquired or disposed of or transferred, mortgaged or charged or created any security interest over any assets or any right, title or interest in any asset (including shares and trade investments) (except in the ordinary course of business) or authorised or proposed or announced any intention to propose any merger, demerger, acquisition or disposal, transfer, mortgage, charge or security interest;

(x)    other than in respect of any member which was dormant or solvent at the relevant time, taken or proposed any corporate action or had any legal proceedings started or

26

HP-SEC-01661721
Exh 2307-0033

threatened against it for its winding-up, dissolution or reorganisation or for the appointment of a receiver, administrator, administrative receiver, trustee or similar officer of all or any of its assets and revenues or any analogous proceedings in any jurisdiction or appointed any analogous person in any jurisdiction;

(xi) been unable, or admitted in writing that it is unable, to pay its debts or having stopped or suspended (or threatened to stop or suspend) payment of its debts generally or ceased or threatened to cease carrying on all or a substantial part of its business;

(xii) taken any action with respect to, adopted, entered into, terminated or amended any severance, change in control, retirement, retention, welfare, incentive or similar agreement, arrangement or benefit plan for the benefit or welfare of any current or former director or senior executive;

(xiii) increased in any respect the compensation or fringe benefits of, or paid any bonus to, any director or senior executive;

(xiv) amended or accelerated the payment, right to payment or vesting of any compensation or benefits, including any outstanding options or restricted share awards, other than in accordance with the terms of such compensation or benefits;

(xv) granted any awards under any bonus, incentive, performance or other compensation plan or arrangement or benefit plan, including the grant of share options, share appreciation rights, share based or share related awards, performance units or restricted share, or the removal of existing restrictions in any benefit plans or agreements or awards made thereunder;

(xvi) waived or compromised any material claim;

(xvii) entered into or joined any group, organisation or consortium whereby any member of the Wider Autonomy Group could be subject to obligations of a long term or unusual nature or which involves or could involve an obligation of such a nature or magnitude which is material;

(xviii) made any amendment to its memorandum or articles of association or other incorporation documents;

(xix) made or agreed or consented to:

    (1) any material change to:

        (a) the terms of the trust deeds constituting the pension scheme(s) or share scheme(s) established for its directors, employees or their dependants; or

        (b) the pensions or the benefits which accrue or are payable thereunder; or

        (c) the basis on which qualification for, or accrual or entitlement to such benefits or pensions are calculated or determined; or

        (d) the basis upon which the liabilities (including pensions) or such pension schemes are funded, valued or made; or

    (2) any change to the trustees including the appointment of a trust corporation;

(xx) entered into any contract, transaction or arrangement which is or is reasonably likely to be restrictive to the business of any member of the Wider Autonomy Group or the Wider HP Group other than to a nature and extent which is normal practice in the ordinary course of the business concerned; or

(xxi) entered into any contract, commitment or agreement with respect to any of the transactions or events referred to in this condition (G);

(H) since 31 December 2010 and save as Publicly Announced or as disclosed in Disclosed Information:

(i) no litigation, arbitration, prosecution or other legal proceedings having been instituted, announced or threatened or remaining outstanding by or against any

27

HP-SEC-01661722
Exh 2307-0034

member of the Wider Autonomy Group or to which any member of the Wider Autonomy Group is or may become a party (whether as claimant, defendant or otherwise);

(ii) no adverse change having occurred or deterioration in the business, assets, financial or trading position or profits of any member of the Wider Autonomy Group;

(iii) no steps having been taken which would or are reasonably likely to result in the withdrawal, cancellation, termination or modification of any material licence held by any member of the Wider Autonomy Group which is necessary for the proper carrying on of its business;

(iv) no enquiry or investigation by any Relevant Authority against or in respect of any member of the Wider Autonomy Group having been threatened, announced, implemented or instituted or remaining outstanding; or

(v) otherwise than as a result of the Offer, no material liability (actual, contingent or otherwise) having arisen or become apparent or increased,

in each case, to an extent or in a manner which is material in the context of the Offer or would have a material and adverse effect on the Wider Autonomy Group, taken as a whole;

(I) save as Publicly Announced or as disclosed in the Disclosed Information, HP not having discovered that:

(i) any business, financial or other information concerning any member of the Autonomy Group disclosed, publicly by or on behalf of any member of the Autonomy Group, either contains a misrepresentation of fact or omits to state a fact necessary to make the information contained therein not misleading; or

(ii) any member of the Wider Autonomy Group is subject to any liability, actual or contingent, which is not disclosed in the annual report and accounts of Autonomy for the financial year ended 31 December 2010; or

(iii) any information which affects the import of any information disclosed at any time by or on behalf of any member of the Wider Autonomy Group,

in each case, to an extent or in a manner which is material in the context of the Offer or would have a material and adverse effect on the Wider Autonomy Group, taken as a whole;

(J) save as Publicly Announced or as disclosed in Disclosed Information, HP not having discovered that:

(i) any past or present member of the Wider Autonomy Group has not complied with all applicable legislation or regulations of any jurisdiction with regard to the storage, disposal, discharge, spillage, leak or emission of any waste or hazardous substance or any substance likely to impair the environment or to harm human health or otherwise relating to environmental matters (which non-compliance would be likely to give rise to any liability (whether actual or contingent) on the part of any member of the Wider Autonomy Group) or that there has otherwise been any such disposal, discharge, spillage, leak or emission (whether or not the same constituted a non-compliance by any person with any such legislation or regulations and wherever the same may have taken place) which in any such case would be likely to give rise to any liability (whether actual or contingent) on the part of any member of the Wider Autonomy Group;

(ii) there is or is likely to be, for that or for any other reason whatsoever, any liability (whether actual or contingent) to make good, repair, reinstate or clean up any property now or previously owned, occupied or made use of by any past or present member of the Wider Autonomy Group or any controlled waters under any environmental legislation, regulation, notice, circular or order of any Relevant Authority or third party or otherwise;

(iii) any member of the Wider Autonomy Group has not complied with any applicable law or regulation governing the conduct of its business in any respect which would be

28

HP-SEC-01661723
Exh 2307-0035

likely to give rise to any liability on the part of any member of the Wider Autonomy Group;

    (iv)    there is any contract, agreement or other arrangement which is or is likely to be restrictive on the business of any member of the Wider Autonomy Group or the Wider HP Group; or

    (v)    the conduct of the business of the Wider Autonomy Group infringes the intellectual property rights of any third party,

in each case, to an extent or in manner which is material in the context of the Offer or would have a material and adverse effect on the Wider Autonomy Group, taken as a whole;

(K)    save as Publicly Announced or as disclosed in Disclosed Information, HP not having discovered that any past or present member of the Wider Autonomy Group has:

    (i)    paid or agreed to pay any bribe including any 'inducement fee', given or agreed to give a gift or similar benefit or paid or agreed to pay to a concealed bank account or fund to or for the account of, any customer, supplier, governmental official or employee, representative of a political party, or other person for the purpose of obtaining or retaining business or otherwise engaged in any activity, done such things (or omitted to do such things) in contravention of the UK Bribery Act 2010; or

    (ii)    engaged in any business with or made any investments in, or made any payments to, (i) any government, entity or individual with which US persons are prohibited from engaging in activities or doing business by US laws or regulations, including the economic sanctions administered by the United States Office of Foreign Assets Control or (ii) any government, entity or individual targeted by any of the economic sanctions of the United Kingdom administered by the Bank of England; and

(L)    no circumstance having arisen or event having occurred since the Announcement Date in relation to any intellectual property owned, used or licensed by the Wider Autonomy Group or to any third parties, including:

    (i)    any member of the Wider Autonomy Group losing its title to any intellectual property or any intellectual property owned by the Wider Autonomy Group being revoked, cancelled or declared invalid;

    (ii)    any agreement regarding the use of any intellectual property licensed to or by any member of the Wider Autonomy Group being terminated or varied; or

    (iii)    any claim being filed alleging that any member of the Wider Autonomy Group infringed the intellectual property rights of a third party or any member of the Wider Autonomy Group being found to have infringed the intellectual property rights of a third party,

in each case, which is material in the context of the Wider Autonomy Group taken as a whole.

2.    HP Vision reserves the right to waive, in whole or in part, all or any of conditions 1(B) to 1(L) (inclusive) above.

Except with the Panel's consent, HP Vision will not invoke any of the above conditions (except for condition 1(A)) so far as to cause the Offer not to proceed, to lapse or to be withdrawn unless the circumstances which give rise to the right to invoke the relevant conditions are of material significance to HP Vision in the context of the Offer.

3.    The Offer will be governed by English law and will be subject to the jurisdiction of the English courts. The Offer will also comply with the applicable rules and regulations of the Financial Services Authority, the Listing Rules, the City Code and the Exchange Act.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661724
Exh 2307-0036

## APPENDIX I

### PART B FURTHER TERMS OF THE OFFER

The following further terms apply to the Offer and except where the contrary is expressed or the context otherwise requires, any reference in this document and in the Form of Acceptance to:

(i) the "**acceptance condition**" means the condition set out in paragraph 1.1(A) of Part A of this Appendix I;

(ii) "**acceptances to the Offer**" includes deemed acceptances of the Offer;

(iii) "**acting in concert**" with HP Vision means any such person acting or deemed to be acting in concert with HP Vision for the purposes of the City Code and/or the Offer;

(iv) the "**Offer**" means the Offer and any revision, variation or renewal thereof or extension thereto;

(v) the "**Offer being unconditional**" or the "**Offer becoming unconditional**" means the acceptance condition being or becoming or being declared satisfied whether or not any other condition of the Offer remains to be fulfilled; and references to the Offer having become or not become unconditional shall be construed accordingly;

(vi) the Offer "**becoming wholly unconditional**" means the Offer being or becoming or being declared wholly unconditional;

(vii) the "**Offer Period**" means, in relation to the Offer, the period commencing on 18 August 2011 until whichever of the following dates shall be the latest:

    (A)  1.00 p.m. on 12 September 2011;

    (B)  the date on which the Offer becomes unconditional; or

    (C)  the date on which the Offer lapses;

(viii) "**Day 39**" of the Offer shall mean 30 September 2011;

(ix) "**Day 42**" of the Offer shall mean 3 October 2011;

(x) "**Day 46**" of the Offer shall mean 7 October 2011;

(xi) "**Day 60**" of the Offer shall mean 21 October 2011; and

(xii) "**Day 70**" of the Offer shall mean 31 October 2011.

### 1. Acceptance period

1.1 The Offer will initially be open for acceptance until 1.00 p.m. (London time) on 12 September 2011. Although no revision is envisaged, if the Offer is revised it will remain open for acceptance for a period of at least 14 days, or such longer period as may be required by applicable law (or such other period as may be permitted or required by the Panel and under the Exchange Act), from the date HP Vision publishes the revised offer documentation. Except with the consent of the Panel, HP Vision may not revise the Offer or publish any revised offer documentation after Day 46 of the Offer or, if later, the date falling 14 days prior to the last date on which the Offer can become unconditional.

1.2 The Offer, whether revised or not, shall not (except with the consent of the Panel) be capable of becoming, or being declared, unconditional after midnight (London time) on Day 60 (or any earlier time and/or date beyond which HP Vision has stated that the Offer will not be extended unless HP Vision has, where permitted, withdrawn that statement or extended the Offer beyond the stated earlier date) nor of being kept open for acceptance after that time and date unless it has previously become unconditional, provided that HP Vision reserves the right, with the permission of the Panel, to extend the Offer to a later time(s) and/or date(s). Except with the consent of the Panel, HP Vision may not, for the purpose of determining whether the acceptance condition has been satisfied, take into account acceptances received or purchases of Autonomy Shares made after 1.00 p.m. (London time) on Day 60 (or any earlier time and/or date beyond which HP Vision has stated that the Offer will not be extended unless HP Vision has, where permitted, withdrawn that statement or extended the Offer beyond the stated earlier date) or, if the Offer is so extended, any such later time and/or date as may be agreed with the Panel. If the latest time at which the Offer may become unconditional is extended beyond midnight (London time) on Day 60, acceptances received and purchases of

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661725
Exh 2307-0037

Autonomy Shares made in respect of which the relevant documents are received by Capita Registrars after 1.00 p.m. (London time) on the relevant date may (except where the City Code otherwise permits) only be taken into account with the agreement of the Panel.

1.3   If the Offer becomes unconditional, it will remain open for acceptance for not less than 14 days from the date on which it would otherwise have expired. If the Offer has become unconditional and it is stated by or on behalf of HP Vision that the Offer will remain open until further notice or if the Offer will remain open for acceptance beyond Day 70 of the Offer, then not less than 14 days' notice in writing will be given prior to the closing of the Offer to those Autonomy Shareholders who have not accepted the Offer.

1.4   If a competitive situation arises (as determined by the Panel) and is continuing on the Business Day preceding Day 60, HP Vision will enable holders of Autonomy Shares in uncertificated form who have not already validly accepted the Offer but who have previously accepted the competing offer to accept the Offer by special form of acceptance to take effect on Day 60. It shall be a condition of such special form of acceptance being a valid acceptance of the Offer that:

(A)   it is received by Capita Registrars on or before Day 60;

(B)   the relevant Autonomy Shareholder shall have applied to withdraw their acceptance of the competing offer but that the Autonomy Shares to which such withdrawal relates shall not have been released from escrow before Day 60 by the escrow agent to the competing offer; and

(C)   the Autonomy Shares to which the special form of acceptance relates are not transferred to escrow in accordance with the procedure for acceptance set out in this document on or before Day 60, but an undertaking is given that they will be so transferred as soon as possible thereafter.

Autonomy Shareholders wishing to use such special forms of acceptance should apply to Capita Registrars, Corporate Actions, The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU or on 0871 664 0321 (when telephoning from within the United Kingdom) or +44 20 8639 3399 (when telephoning from outside the United Kingdom) between 9.00 a.m. and 5.00 p.m. (London time) on or before the Business Day preceding Day 60 in order that such forms can be despatched. Notwithstanding the right to use such special form of acceptance, holders of Autonomy Shares in uncertificated form may not use a Form of Acceptance (or any other purported acceptance form) for the purpose of accepting the Offer in respect of such shares.

1.5   If a competitive situation arises (as determined by the Panel) after a "no increase" and/or "no extension" statement (as referred to in the City Code) has been made by HP Vision in relation to the Offer, HP Vision may, if it specifically reserved the right to do so at the time such statement was made, or otherwise with the consent of the Panel, choose not to be bound by and withdraw such statement and be free to revise or extend the Offer provided that it complies with the requirements of the City Code and, in particular, that:

(A)   it announces such withdrawal and that it is free to extend or revise the Offer (as appropriate) as soon as possible, and in any event, within four Business Days after the firm announcement of the competing offer or other competitive situation;

(B)   notifies Autonomy Shareholders in writing thereof at the earliest practicable opportunity or, in the case of Autonomy Shareholders with registered addresses outside the United Kingdom or whom HP Vision knows to be nominees, trustees or custodians holding Autonomy Shares for such persons, by announcement in the United Kingdom at the earliest practicable opportunity; and

(C)   any Autonomy Shareholders who accepted the Offer after the date of the "no extension" or "no increase" statement are given a right of withdrawal in accordance with paragraph 3.4 of this Part B of Appendix I.

1.6   HP Vision may, if it has reserved the right to do so at the time the statement was made (or otherwise with the consent of the Panel), choose not to be bound by the terms of a "no increase" or "no extension" statement and may publish an increased or improved offer (either as to the value or nature of the consideration offered or otherwise) or in any circumstance permitted by the Panel.

1.7   HP Vision may, if it has reserved the right to do so at the time the statement was made (or otherwise with the consent of the Panel) and Autonomy makes an announcement of the kind referred to in

31

HP-SEC-01661726
Exh 2307-0038

Rule 31.9 of the City Code after Day 39, choose not to be bound by a "no increase" or "no extension" statement and revise or extend the Offer with the consent of the Panel, provided that HP Vision complies with the requirements of the City Code and other applicable law and in particular that notice to this effect is given as soon as possible (and in any event within four Business Days of the date of Autonomy's announcement) and Autonomy Shareholders (except those resident in Restricted Jurisdictions) are informed in writing at the earliest opportunity.

1.8     For the purpose of determining at any particular time whether the acceptance condition has been satisfied, HP Vision shall be entitled to take account only of those Autonomy Shares carrying voting rights which have been unconditionally allotted or issued or which arise as a result of the exercise of subscription or conversion rights before that time and written notice of the allotment or issue of which, containing all the relevant details, has been received by Capita Registrars from Autonomy or its agents at the address specified in paragraph 3.1 of this Part B of Appendix I. Notification by telex, email or facsimile transmission will not constitute valid written notice for this purpose.

1.9     HP Vision reserves the right to treat as valid in whole or in part any acceptance of the Offer which is not entirely in order or which is not accompanied by the relevant share certificate(s) and/or other relevant document(s) of title or not accompanied by the relevant TTE Instruction (subject to paragraphs 5.1(A) and 5.1(B) of this Part B of Appendix I).

## 2.     Announcements

2.1     Without prejudice to paragraph 3.1 of this Part B of Appendix I, by 8.00 a.m. (London time) on the Business Day (the "**relevant day**") following the day on which the Offer is due to expire or becomes or is declared unconditional or is revised or extended, as the case may be (or such later time(s) or date(s) as the Panel may agree), HP Vision will make an appropriate announcement and simultaneously inform a Regulatory Information Service of the position. Such announcement will also state (unless otherwise permitted by the Panel):

(A)     the number of Autonomy Shares for which acceptances of the Offer have been received (showing the extent, if any, to which acceptances have been received from persons acting in concert with HP Vision or in respect of Autonomy Shares which were subject to an irrevocable commitment or a letter of intent procured by HP Vision or any of its associates);

(B)     details of any relevant securities of Autonomy in which HP Vision or any person acting in concert with HP Vision has an interest or in respect of which that person has a right to subscribe, in each case specifying the nature of the interests or rights concerned. Similar details of any short positions (whether conditional or absolute and whether in the money or otherwise), including any short position under a derivative, any agreement to sell or any delivery obligation or right to require another person to purchase or take delivery, will also be stated;

(C)     details of any relevant securities of Autonomy in respect of which HP Vision or any persons acting in concert with it has an outstanding irrevocable commitment or letter of intent; and

(D)     details of any relevant securities of Autonomy in respect of which HP Vision or any person acting in concert with HP Vision has borrowed or lent, save for any borrowed shares which have been either on-lent or sold,

and will in each case specify the percentages of each class of relevant securities of Autonomy represented by these figures. Any such announcement will include a prominent statement of the total number of Autonomy Shares which HP Vision may count towards satisfaction of the acceptance condition and the percentage of Autonomy Shares represented by this figure.

2.2     Any decision to extend the time and/or date by which the acceptance condition has to be fulfilled may be made at any time up to, and will be announced not later than, 8.00 a.m. (London time) on the relevant day (as defined in paragraph 2.1 of this Part B of Appendix I) (or such later time and/or date as the Panel may agree). The announcement will state the next expiry date (unless the Offer is then unconditional in which case a statement may instead be made that the Offer will remain open until further notice). In computing the number of Autonomy Shares represented by acceptances and/or purchases, there may be included or excluded for announcement purposes, subject to paragraph 5 of this Part B of Appendix I acceptances and purchases which are not in all respects in order or not accompanied by the relevant share certificates and/or other document(s) of title or not accompanied by the relevant TTE Instruction or which are subject to verification, save that those which could not

32

be counted towards fulfilment of the acceptance condition under Notes 4, 5 and 6 on Rule 10 of the City Code shall not (unless agreed by the Panel) be included.

2.3   In this Appendix I, references to the making of an announcement or the giving of notice by or on behalf of HP Vision include the release of an announcement to the press by HP, any public relations consultants or by Barclays Capital or Perella Weinberg Partners, in each case on behalf of HP Vision, and the delivery by hand telephone, telex or facsimile or other electronic transmission of an announcement to a Regulatory Information Service. An announcement made otherwise than to a Regulatory Information Service shall be notified simultaneously to a Regulatory Information Service (unless otherwise agreed by the Panel).

2.4   A copy of any announcement made by HP Vision in accordance with this paragraph 2 will be available, subject to certain restrictions relating to persons resident in Restricted Jurisdictions, for inspection on HP's website at http://www.hp.com/investor/offerdocuments as soon as possible after the making of such announcement and in any event by no later than 12 noon (London time) on the following Business Day and will remain on such website while the Offer remains open for acceptances.

2.5   Without limiting the manner in which HP Vision may choose to make any public announcement and, subject to the obligations of HP Vision under applicable law and paragraph 2.4 above, HP Vision will have no obligation to publish, advertise or otherwise communicate any such public announcement other than by making a release to a Regulatory Information Service.

3.   **Rights of withdrawal**

3.1   If HP Vision, having announced the Offer to be unconditional, fails to comply by 3.30 p.m. (London time) on the relevant day (as defined in paragraph 2.1 of this Part B of Appendix I) (or such later time and/or date as the Panel may agree) with any of the other relevant requirements specified in paragraph 2.1 of this Part B of Appendix I, an accepting Autonomy Shareholder may (unless the Panel agrees otherwise) immediately thereafter withdraw his acceptance of the Offer by written notice received by post or by hand (only during normal business hours) at Capita Registrars, Corporate Actions, The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU. Alternatively, in the case of Autonomy Shares held in uncertificated form, withdrawals can also be effected in the manner set out in paragraph 3.9 of this Part B of Appendix I. Subject to paragraph 1.2 of this Part B of Appendix I, this right of withdrawal may be terminated not less than eight days after the relevant day (as defined in paragraph 2.1 of this Part B of Appendix I) by HP Vision confirming, if such be the case, that the Offer is still unconditional, and complying with the other requirements specified in paragraph 2.1 of this Part B of Appendix I. If any such confirmation is given, the first period of 14 days referred to in paragraph 1.3 of this Part B of Appendix I will start from the date of such confirmation and compliance.

3.2   If by 1.00 p.m. (London time) on Day 42 of the Offer (or such later time and/or date as the Panel may agree) the Offer has not become unconditional, an accepting Autonomy Shareholder may withdraw his acceptance at any time thereafter by written notice received by Capita Registrars on behalf of HP Vision and in the manner referred to in paragraph 3.1 of this Part B of Appendix I (or, in the case of Autonomy Shares held in uncertificated form, in the manner set out in paragraph 3.9 of this Part B of Appendix I) before the earlier of:

(A)   the time when the Offer becomes unconditional; and

(B)   the final time for lodgement of acceptances of the Offer which can be taken into account in accordance with paragraph 1.2 of this Part B of Appendix I.

3.3   If an accepting Autonomy Shareholder withdraws his acceptance, all documents of title and other documents lodged with the Form of Acceptance will be returned as soon as practicable following the receipt of the withdrawal (and in any event within 14 days) and Capita Registrars will immediately give instructions for the release of securities held in escrow.

3.4   If a "no increase" and/or "no extension" statement has been withdrawn in accordance with paragraph 1.5 of this Part B of Appendix I, any Autonomy Shareholder who accepts the Offer after the date of such statement may withdraw his acceptance thereafter by written notice or otherwise in the manner referred to in paragraph 3.1 of this Part B of Appendix I (or, in the case of Autonomy Shares held in uncertificated form, in the manner set out in paragraph 3.9 of this Part B of

33

HP-SEC-01661728
Exh 2307-0040

Appendix I) not later than the eighth day after the date on which HP Vision sends notice of the withdrawal of such statement to Autonomy Shareholders.

3.5  Except as provided by this paragraph 3 of Part B of Appendix I or as otherwise permitted by HP Vision (either generally or for any particular Autonomy Shareholder), acceptances of the Offer shall be irrevocable, except as otherwise may be required by applicable law.

3.6  In this paragraph 3, "**written notice**" (including any letter of appointment, direction or authority) means notice in writing bearing the original signature(s) of the relevant accepting Autonomy Shareholder(s) or his/their agent(s) duly appointed in writing (evidence of whose appointment in a form reasonably satisfactory to HP Vision is produced with the notice). Telex, email, facsimile or other electronic transmissions or copies will not be sufficient to constitute written notice. No notice which is postmarked in, or otherwise appears to HP Vision or its agents to have been sent from or otherwise evidences use of any means or instrumentality of interstate or foreign commerce of, any Restricted Jurisdiction will be treated as valid.

3.7  To be effective, a written notice of withdrawal must be received on a timely basis by Capita Registrars and must specify the name of the person who has tendered the Autonomy Shares to be withdrawn and (if share certificates have been tendered) the name of the holder of the relevant Autonomy Shares if different from the name of the person who tendered the Autonomy Shares.

3.8  HP Vision may, in its absolute discretion, allow any acceptance of the Offer to be withdrawn, in whole or in part, without allowing withdrawal of other acceptances, insofar as is necessary to enable the relevant Autonomy Shares to be purchased by it otherwise than pursuant to the Offer.

3.9  In the case of Autonomy Shares held in uncertificated form, if withdrawals are permitted pursuant to paragraph 3.1, 3.2 or 3.4 of this Part B of Appendix I, an accepting Autonomy Shareholder may withdraw his acceptance through CREST by sending (or, if a CREST sponsored member, procuring that his CREST sponsor sends) an ESA instruction to settle in CREST in relation to each Electronic Acceptance to be withdrawn. Each ESA instruction must, in order for it to be valid and settle, include the following details:-

(A)  the number of Autonomy Shares to be withdrawn, together with their ISIN number (this is GB0055007982);

(B)  the member account ID of the withdrawing shareholder, together with his participant ID;

(C)  the member account ID of the Escrow Agent included in the relevant Electronic Acceptance (this is HEWAUT01), together with the Escrow Agent's participant ID (this is RA10);

(D)  the CREST transaction ID of the Electronic Acceptance to be withdrawn;

(E)  the intended settlement date for the withdrawal;

(F)  the corporate action number for the Offer, which is allocated by Euroclear and can be found by viewing the relevant corporate action details in CREST; and

(G)  input with a standard delivery instruction priority of 80.

Any such withdrawal will be conditional upon Capita Registrars verifying that the withdrawal request is validly made. Accordingly, Capita Registrars will on behalf of HP Vision reject or accept the withdrawal by transmitting in CREST a receiving agent reject ("**AEAD**") or receiving agent accept ("**AEAN**") message.

3.10  Autonomy Shares in respect of which acceptances have been properly withdrawn in accordance with this paragraph 3 of Part B of Appendix I may subsequently be re-assented to the Offer by following one of the procedures described in paragraph 14 of Part II of this document at any time while the Offer remains open for acceptance.

3.11  All questions as to the validity (including time of receipt) of any notice of withdrawal will be determined by HP Vision, whose determination, except as may be determined otherwise by the Panel, will be final and binding. None of HP Vision, Capita Registrars, Autonomy or any other person will be under any duty to give notice of any defects or irregularities in any notice of withdrawal or incur any liability for failure to give such notice.

34

HP-SEC-01661729
Exh 2307-0041

**4.    Revised Offer**

4.1   No revision of the Offer is envisaged. However, if the Offer (in its original or any previously revised form(s)) is revised (either in its terms and conditions or in the value or nature of the consideration offered or otherwise) and such revision represents, on the date on which it is announced (on such basis as HP Vision may consider appropriate), an improvement (or no diminution) in the value of the Offer as so revised compared with the consideration or terms previously offered or in the overall value received and/or retained by a Autonomy Shareholder (under the Offer or otherwise), the benefit of the revised Offer will, subject as provided in paragraphs 4.3, 4.4 and 7 of this Part B of Appendix I, be made available to any Autonomy Shareholder who has accepted the Offer in its original or previously revised form(s) and not validly withdrawn such acceptance in accordance with paragraph 3 above (hereinafter called "**Previous Acceptors**"). The acceptance of the Offer by or on behalf of a Previous Acceptor in its original or any previously revised form(s) shall, subject as provided in paragraphs 4.3, 4.4 and 7 of this Part B of Appendix I, be treated as an acceptance of the Offer as so revised and shall also constitute the separate and irrevocable appointment of HP Vision and each of its directors as his attorney and/or agent with authority:

(A)   to accept any such revised Offer on behalf of such Previous Acceptor;

(B)   if such revised Offer includes alternative forms of consideration, to make on his behalf elections for and/or accept such alternative forms of consideration in such proportions as such attorney and/or agent in his absolute discretion thinks fit; and

(C)   to execute on behalf of and in the name of such Previous Acceptor all such further documents (if any) and to do all such further things (if any) as may be required to give effect to such acceptances and/or elections.

In making any such election and/or acceptance, such attorney and/or agent shall take into account the nature of any previous acceptances made by or on behalf of the Previous Acceptor and such other facts or matters as he may reasonably consider relevant.

Subject to paragraphs 4.3 and 4.4 of this Part B of Appendix I, the powers of attorney and authorities conferred by this paragraph 4 and any acceptance of a revised Offer pursuant thereto shall be irrevocable unless and until the Previous Acceptor becomes entitled to withdraw his acceptance under paragraph 3 of this Part B of Appendix I and duly and validly does so.

4.2   The deemed acceptance referred to in paragraph 4.1 of this Part B of Appendix I shall not apply and the authorities conferred by that paragraph shall not be exercised, to the extent that a Previous Acceptor:

(A)   in respect of Autonomy Shares held in certificated form, lodges with Capita Registrars, within 14 days of the publication of the document containing the revised Offer (or such later date as HP Vision may determine), a Form of Acceptance (or other form validly issued by or on behalf of HP Vision) in which he validly elects to receive the consideration receivable by him under such revised Offer in some other manner than that set out in his original acceptance; or

(B)   in respect of Autonomy Shares held in uncertificated form, sends (or, if a CREST sponsored member, procures that his CREST sponsor sends) an ESA Instruction to settle in CREST in relation to each Electronic Acceptance in respect of which an election is to be varied. Each ESA instruction must, in order for it to be valid and settle, include the following details:

(i)    the number of Autonomy Shares in respect of which the changed election is made, together with their ISIN number (this is GB0055007982);

(ii)   the member account ID of the Previous Acceptor, together with his participant ID;

(iii)  the member account ID of the Escrow Agent included in the relevant Electronic Acceptance (this is HEWAUT01), together with the Escrow Agent's participant ID (this is RA10);

(iv)   the CREST transaction ID of the Electronic Acceptance in respect of which the election is to be changed;

(v)    the intended settlement date for the changed election;

(vi)   the corporate action number for the Offer, which is allocated by Euroclear and can be found by viewing the relevant corporation action details in CREST;

35

HP-SEC-01661730
Exh 2307-0042

and, in order that the desired change of election can be effected, must include:

(vii)  the member account ID of the Escrow Agent relevant to the new election; and

(viii)  input with a standard delivery instruction priority of 80.

4.3  Any such change of election in respect of Autonomy Shares held in uncertificated form will be conditional upon Capita Registrars verifying that the request is validly made. Accordingly, Capita Registrars will on behalf of HP Vision reject or accept the requested change of election by transmitting in CREST an AEAD or AEAN message.

4.4  The deemed acceptance referred to in paragraph 4.1 of this Part B of Appendix I shall not apply and the authorities conferred by that paragraph shall not be exercised if, as a result thereof, the Previous Acceptor would (on such basis as HP Vision may consider appropriate) thereby receive and/or retain (as appropriate) less in aggregate in consideration under the revised Offer than he would have received and/or retained (as appropriate) in aggregate as a result of acceptance of the Offer in the form in which it was previously accepted by him or on his behalf (unless such Previous Acceptor has previously agreed in writing to receive and/or retain (as appropriate) less in aggregate consideration). The authorities conferred by paragraph 4.1 of this Part B of Appendix I shall not be exercised in respect of any election available under the revised Offer save in accordance with this paragraph.

4.5  HP Vision and Capita Registrars reserve the right to treat an executed Form of Acceptance or TTE Instruction in respect of the Offer (in its original or any previously revised form(s)) which is received (or dated) on or after the announcement or issue of any revised Offer as a valid acceptance of the revised Offer and/or, where applicable, a valid election for or acceptance of any of the alternative forms of consideration made available pursuant thereto. Such acceptances shall constitute an authority in the terms of paragraph 4.1 of this Part B of Appendix I, mutatis mutandis, on behalf of the relevant Autonomy Shareholder.

## 5.  Acceptances and purchases

5.1  Notwithstanding the right reserved by HP Vision to treat an acceptance of the Offer as valid (even though, in the case of Autonomy Shares held in certificated form, the relevant Form of Acceptance is not entirely in order or not accompanied by the relevant share certificate(s) and/or other document(s) of title), except as otherwise agreed by the Panel:

(A)  an acceptance of the Offer shall not be treated as valid for the purposes of the acceptance condition unless the requirements of Note 4 and, if applicable, Note 6 on Rule 10 of the City Code are satisfied in respect of it (and the Autonomy Shares to which such acceptance relates do not fall within Note 8 of Rule 10 of the City Code);

(B)  a purchase of Autonomy Shares by HP Vision or its nominee(s) or, in the case of a Rule 9 offer, any person acting or deemed to be acting in concert with HP Vision (or such person's nominee) will only be treated as valid for the purposes of the acceptance condition if the requirements of Note 5 and, if applicable, Note 6 on Rule 10 of the City Code are satisfied in respect of it (and the Autonomy Shares to which such acceptance relates do not fall within Note 8 of Rule 10 of the City Code); and

(C)  before the Offer may become unconditional, Capita Registrars must have issued a certificate to HP Vision which states the number of Autonomy Shares in respect of which acceptances have been received which comply with paragraph 5.1(A) of this Part B of Appendix I and the number of Autonomy Shares otherwise acquired, whether before or during the Offer Period, which comply with paragraph 5.1(B) of this Part B of Appendix I. Copies of that certificate will be sent to the Panel and to Qatalyst Partners, Autonomy's financial adviser, as soon as possible after it is issued.

## 6.  General

6.1  If HP Vision is required by the Panel to make an offer or offers for Autonomy Shares under the provisions of Rule 9 of the City Code, HP Vision may make such alterations to the conditions in Part A of this Appendix I, as are necessary to comply with the provisions of that Rule.

6.2  Except with the consent of the Panel, the Offer will lapse unless all the conditions have been satisfied or (if capable of waiver) waived or, where appropriate, have been determined by HP Vision in its reasonable opinion to be or remain satisfied in each case by midnight (London time) on 3 October

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661731
Exh 2307-0043

2011 or by midnight (London time) on the date which is 21 days after the date on which the Offer becomes unconditional, whichever is the later, or such later date as HP Vision may, with the consent of the Panel, decide. If the Offer lapses for any reason, the Offer will cease to be capable of further acceptance and HP Vision and Autonomy Shareholders shall cease to be bound by acceptances received on or before the date on which the Offer lapses. HP Vision shall be under no obligation to waive or treat as satisfied any of the conditions set out in paragraphs 1.1(D) to (L) (inclusive) in Part A of this Appendix I by a date earlier than the latest date specified or referred to above for the satisfaction thereof notwithstanding that such condition or the other conditions of the Offer may at such earlier date have been waived or satisfied and that there are at such earlier date no circumstances indicating that any of such conditions may not be capable of being satisfied.

6.3    HP Vision reserves the right to elect to implement the acquisition of Autonomy, with the consent of the Panel, by way of scheme of arrangement pursuant to Part 26 of the Companies Act. In such event, such scheme will be implemented on the same terms (subject to appropriate amendment), so far as applicable, as those which will apply to the Offer. In particular the condition set out in paragraph 1.1(A) of Part A of this Appendix I will not apply and the scheme of arrangement will become effective and binding following:

(A)    approval at each Court Meeting (or any adjournment thereof) by a majority in number of the relevant class of Autonomy Shareholders present and voting, either in person or by proxy, representing 75 per cent or more in value of the Autonomy Shares held by such holders;

(B)    the resolution(s) required to approve and implement the scheme of arrangement and to be set out in the notice of a general meeting of the holders of Autonomy Shares being passed by the requisite majority at such general meeting; and

(C)    the sanction of the scheme of arrangement and confirmation of any reduction of capital involved therein by the Court (in both cases with or without modifications, on terms reasonably acceptable to HP and HP Vision) and a copy of the order of the Court sanctioning the scheme of arrangement and confirming the cancellation of share capital which forms part of it being delivered for registration to the Registrar of Companies in England and Wales and being registered by him.

6.4    The Offer extends to all Autonomy Shares unconditionally allotted or issued and fully paid (or credited as fully paid) on the date of the Offer, and any further Autonomy Shares unconditionally allotted or issued and fully paid (or credited as fully paid) pursuant to the exercise of options under the Autonomy Share Schemes or the conversion of any Autonomy Convertible Bonds on or before the date on which the Offer closes (or such earlier date as HP Vision may, subject to the City Code, decide, not being earlier than the date on which the Offer becomes unconditional as to acceptances).

6.5    Autonomy Shares will be acquired by HP Vision fully paid and free from all liens, charges, equitable interests, encumbrances, rights of pre-emption and other third party rights or interests and together with all rights now or hereafter attaching thereto, including, without limitation, the right to receive and retain all dividends and other distributions (if any) announced, declared, made or paid hereafter.

6.6    The Offer is made on 22 August 2011 and is capable of acceptance from that date. The Offer is being made by means of this document and by means of an advertisement dated on or shortly after 22 August 2011 to be inserted in the London Gazette. Copies of this document, the Form of Acceptance and any related documents are available, subject to certain restrictions relating to persons resident in Restricted Jurisdictions, for inspection on HP's website at http://www.hp.com/investor/offerdocuments and from Capita Registrars at the address set out in paragraph 3.1 of this Part B of Appendix I.

6.7    The terms, provisions, instructions and authorities contained in or deemed to be incorporated in the Form of Acceptance will, in respect of Autonomy Shares held in certificated form, also constitute part of the terms of the Offer. The provisions of this Appendix I shall be deemed to be incorporated in and form part of each Form of Acceptance. Words and expressions defined in this document have the same meanings when used in the Form of Acceptance, unless the context otherwise requires.

6.8    The Offer and all acceptances thereof and all elections pursuant thereto and the relevant Form of Acceptance or Electronic Acceptance and all contracts made pursuant thereto and action taken or made or deemed to be taken or made under any of the foregoing and the relationship between a Autonomy Shareholder and HP Vision or Capita Registrars shall be governed by and construed in accordance with English law. Execution of a Form of Acceptance by or on behalf of a Autonomy

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661732
Exh 2307-0044

Shareholder or the making of an Electronic Acceptance by or on behalf of a Autonomy Shareholder will constitute his agreement that:

(A) the Courts of England are (subject to paragraph 6.8(B) of this Part B of Appendix I) to have exclusive jurisdiction to settle any dispute which may arise in connection with the creation, validity, effect, interpretation or performance of, or the legal relationships established by, the Offer and the Form of Acceptance or the Electronic Acceptance or otherwise arising in connection with the Offer and the Form of Acceptance or the Electronic Acceptance, and for such purposes that he irrevocably submits to the jurisdiction of the English Courts; and

(B) paragraph 6.8(A) of this Part B of Appendix I is included for the benefit of HP Vision and Capita Registrars and accordingly, notwithstanding the exclusive agreement in paragraph 6.8(A) of this Part B of Appendix I, HP Vision and Capita Registrars shall each retain the right to, and may in its absolute discretion, bring proceedings in the courts of any other country which may have jurisdiction and that he irrevocably submits to the jurisdiction of the courts of any such country.

6.9 Any reference in this document and in the Form of Acceptance to 12 September 2011 shall, except those in paragraph (vii) (definition of "**Offer Period**") of this Part B of Appendix I and paragraph 1.1 of this Part B of Appendix I and where the context otherwise requires, be deemed, if the expiry date of the Offer has been extended, to refer to the expiry date of the Offer as so extended.

6.10 Any omission or failure (or decision not) to despatch this document, (where relevant) the Form of Acceptance, any other document relating to the Offer or any notice required to be despatched under the terms of the Offer to, or any failure to receive the same by, any person to whom the Offer is made, or should be made, shall not invalidate the Offer in any way or create any implication that the Offer has not been made to any such person. Subject to paragraph 7 of this Part B of Appendix I, the Offer extends to all Autonomy Shareholders to whom this document, (where relevant) the Form of Acceptance and any related documents may not be despatched, or who may not receive such documents, and such persons may collect copies of those documents from Capita Registrars at the address set out in paragraph 3.1 of this Part B or inspect this Offer Document, subject to certain restrictions relating to persons resident in Restricted Jurisdictions, on HPs' website at http://www.hp.com/investor/offerdocuments while the Offer remains open for acceptances.

6.11 If the Offer does not become, or is not declared, unconditional in all respects and lapses or is withdrawn:

(A) in respect of Autonomy Shares held in certificated form, the Forms of Acceptance and any share certificate(s) and/or other document(s) of title will be returned by post (or by such other method as may be approved by the Panel) within 14 days of the Offer lapsing, at the risk of the person entitled thereto, to the person or agent whose name and address (outside any Restricted Jurisdiction) is set out in the relevant box on the Form of Acceptance or, if none is set out, to the first-named or sole holder at his registered address. No such documents will be sent to an address in any Restricted Jurisdiction;

(B) in respect of Autonomy Shares held in uncertificated form, the Escrow Agent will, immediately after the lapsing of the Offer (or within such longer period as the Panel may permit not exceeding 14 days after the lapsing of the Offer), give TFE Instructions to Euroclear to transfer all Autonomy Shares held in escrow balances and in relation to which it is the Escrow Agent for the purposes of the Offer to the original available balances of the Autonomy Shareholders concerned; and

(C) the Offer will cease to be capable of further acceptance and accepting Autonomy Shareholders and HP Vision will thereupon cease to be bound by the Form of Acceptance or Electronic Acceptance submitted before the time when the Offer lapses or is withdrawn.

6.12 All powers of attorney, appointments as agent and authorities on the terms conferred by or referred to in this Appendix I or (where relevant) in the Form of Acceptance are given by way of security for the performance of the obligations of the Autonomy Shareholder concerned and are irrevocable (in respect of powers of attorney, in accordance with section 4 of the Powers of Attorney Act 1971), except in the circumstances where the donor of such power of attorney, appointment or authority is entitled to withdraw his acceptance in accordance with paragraph 3 of this Part B of Appendix I and duly and validly does so.

38

HP-SEC-01661733

Exh 2307-0045

6.13  Without prejudice to any other provision in this Part B of Appendix I, HP Vision and Capita Registrars reserve the right to treat acceptances of the Offer as valid in whole or in part acceptances of the Offer if not entirely in order or not accompanied by the relevant TTE Instruction or (as applicable) relevant share certificate(s) and/or other document(s) of title or if received by or on behalf of either of them at any place or places or in any manner determined by either of them otherwise than as set out herein or, in respect of Autonomy Shares held in certificated form, in the Form of Acceptance.

6.14  All communications, notices, certificates, documents of title and remittances to be delivered by or sent to or from Autonomy Shareholders (or their designated agent(s)) will be delivered by or sent to or from such Autonomy Shareholders (or their designated agent(s)) at their risk. No acknowledgement of receipt of any Form of Acceptance, Electronic Acceptance, transfer by means of CREST communication, notice, share certificate and/or other document of title will be given by or on behalf of HP Vision.

6.15  HP Vision reserves the right to notify any matter (including the making of the Offer) to all or any Autonomy Shareholder(s) with registered address(es) outside the United Kingdom or the United States or whom HP Vision knows to be nominees, trustees or custodians for such persons by announcement or paid advertisement in any daily newspaper published and circulated in the United Kingdom in which case such notice shall be deemed to have been sufficiently given notwithstanding any failure by any such Autonomy Shareholders to receive or see such notice, and all references in this document to notice in writing (other than in paragraph 3 of this Part B of Appendix I) shall be construed accordingly.

6.16  If sufficient acceptances under the Offer are received and/or sufficient Autonomy Shares are otherwise acquired whether pursuant to the Offer or otherwise, HP Vision intends to apply the provisions of sections 979 to 991 of the Companies Act to acquire compulsorily any outstanding Autonomy Shares to which the Offer relates on the same terms as the Offer.

6.17  It is also intended that, following the Offer becoming, or being declared, unconditional in all respects, when HP Vision has by virtue of its shareholding and acceptances of the Offer acquired or agreed to acquire Autonomy Shares carrying at least 75 per cent of the voting rights attaching to the ordinary share capital of Autonomy, HP Vision will procure the making of an application by Autonomy to cancel the listing of Autonomy Shares on the Official List and to cancel admission to trading in Autonomy Shares on the London Stock Exchange's market for listed securities. At least 20 Business Days' notice of cancellation will be given after the earliest of either (i) the date on which HP Vision has obtained, at a general meeting, the prior approval of a resolution for the cancellation from a majority of not less than 75 per cent of the holders of the Autonomy Shares as (being entitled to do so) vote in person or, where proxies are allowed, by proxy; (ii) the date on which HP Vision has, by virtue of its shareholdings and acceptances of the Offer, acquired or agreed to acquire 75 per cent of the voting rights attaching to the Autonomy Shares; or (iii) the first date of issue of compulsory acquisition notices under Part 28 of the Companies Act. The cancellation of listing and admission to trading of Autonomy Shares would significantly reduce the liquidity and marketability of any Autonomy Shares not assented to the Offer.

6.18  In relation to any acceptance of the Offer in respect of Autonomy Shares which are held in uncertificated form, HP Vision reserves the right to make such alterations, additions or modifications to the terms of the Offer as may be necessary or desirable to give effect to any purported acceptance of the Offer, whether in order to comply with the facilities or requirements of CREST or otherwise, provided such alterations, additions or modifications are consistent with the requirements of the City Code or are otherwise made with the consent of the Panel.

6.19  For the purposes of this document, the time of receipt of a TTE Instruction, an ESA instruction or an Electronic Acceptance shall be the time at which the relevant instruction settles in CREST.

6.20  All references in this Appendix I to any statute or statutory provision shall include a statute or statutory provision which amends, consolidates or replaces the same (whether before or after the date hereof).

7.   **Overseas Shareholders**

7.1  The making and availability of the Offer outside, or to citizens, residents or nationals of jurisdictions outside, the United Kingdom or the United States or to nominees, custodians or trustees for such

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661734
Exh 2307-0046

persons, may be prohibited or affected by the laws and regulations of the relevant jurisdictions. Overseas Shareholders should fully acquaint themselves with and observe any applicable legal and regulatory requirements.

7.2   No person receiving a copy of this document and/or a Form of Acceptance in any jurisdiction other than the United Kingdom or the United States may treat the same as constituting an invitation or offer to him, nor should he in any event use such Form of Acceptance, if, in the relevant jurisdiction, such invitation or offer cannot lawfully be made to him or such Form of Acceptance cannot lawfully be used without contravention of any relevant or other legal requirements. In such circumstances, this document and/or such Form of Acceptance are deemed to be sent for information purposes only.

7.3   It is the responsibility of any Overseas Shareholder wishing to accept the Offer to satisfy himself as to the full observance of the laws and regulatory requirements of the relevant jurisdiction in connection therewith, including the obtaining of any governmental, exchange control or other consents which may be required and the compliance with other necessary formalities and the payment of any issue, transfer or other taxes or other requisite payments due in such jurisdiction. Any such Overseas Shareholder will be responsible for any such issue, transfer or other taxes or other requisite payments by whomsoever payable and HP Vision, and any person acting on behalf of HP Vision, shall be fully indemnified and held harmless by such Overseas Shareholder for any such issue, transfer or other taxes as HP Vision (or any person acting on behalf of any of them) may be required to pay.

**Overseas Shareholders should inform themselves about and observe any applicable legal or regulatory requirements. If you are an Overseas Shareholder and you are in doubt about your position, you should consult your independent professional adviser in the relevant jurisdiction.**

7.4   This document does not constitute an offer to Restricted Overseas Persons and the Offer is not being, and will not be, made, directly or indirectly, in or into or by the use of the mails of, or by any means or instrumentality (including, without limitation, facsimile transmission, telex, telephone, internet or e-mail) of interstate or foreign commerce of, or by any facilities of a national securities exchange of, any Restricted Jurisdiction, and is not capable of acceptance by any such use, means, instrumentality or facility from within a Restricted Jurisdiction. Neither this document nor the accompanying Form of Acceptance nor any related document is being mailed, and must not be mailed, transmitted or otherwise forwarded, distributed or sent in whole or in part in, into or from a Restricted Jurisdiction (including to Autonomy Shareholders with registered addresses in any Restricted Jurisdiction or to persons whom HP Vision or its agent knows to be custodians, nominees or trustees holding Autonomy Shares for such persons) and persons receiving such documents (including, without limitation, custodians, trustees and nominees) must not mail or otherwise forward, distribute or send any of them in, into or from any Restricted Jurisdiction or use the mails of any Restricted Jurisdiction or any such means or instrumentality for any purpose, directly or indirectly, in connection with the Offer. Doing so may invalidate any purported acceptance of the Offer.

7.5   Envelopes containing Forms of Acceptance should not be postmarked in a Restricted Jurisdiction or otherwise despatched from a Restricted Jurisdiction and all acceptors must provide addresses outside a Restricted Jurisdiction for the receipt or the remittance of cash or for the return of Form(s) of Acceptance and (in relation to Autonomy Shares held in certificated form) share certificate(s) for Autonomy Shares and/or other document(s) of title.

7.6   An Autonomy Shareholder will be deemed not to have validly accepted the Offer or to have made a valid election thereunder if:

(A)   he puts "No" in Box 3 of the Form of Acceptance and thereby does not give the representations and warranties set out in paragraph 1.2 of Part C of this Appendix I;

(B)   having inserted in or having completed Box 4 of the Form of Acceptance with a registered address in a Restricted Jurisdiction, he does not insert in Box 4 of the Form of Acceptance the name and address of a person or agent outside a Restricted Jurisdiction to whom he wishes the consideration to which he is entitled under the Offer to be sent;

(C)   he inserts in Box 4 of the Form of Acceptance the name and address of a person or agent in a Restricted Jurisdiction to whom he wishes the consideration to which he is entitled under the Offer and/or any documents to be sent;

40

HP-SEC-01661735
Exh 2307-0047

(D)  in any case, the Form of Acceptance received from him is received in an envelope postmarked in, or which otherwise appears to HP Vision or its agents to have been sent from, or otherwise evidences use of any means or instrumentality of interstate or foreign commerce of, a Restricted Jurisdiction; or

(E)  he makes a Restricted Escrow Transfer pursuant to paragraph 7.11 of this Part B of Appendix I unless he also makes a related Restricted ESA instruction (as defined in paragraph 7.11 of this Part B of Appendix I) which is accepted by Capita Registrars.

HP Vision reserves the right, in its sole discretion, to investigate, in relation to any acceptance, whether the representations and warranties set out in paragraph 1.2 of Part C or (as the case may be) Part D of this Appendix I have been truthfully given by the relevant Autonomy Shareholder and are correct and, if such investigation is made and, as a result, HP Vision cannot satisfy itself that such representations and warranties are true and correct, such acceptance and any election thereunder may be rejected as invalid.

7.7  If, in connection with the making of the Offer, any person (including, without limitation, any custodian, nominee and/or trustee), notwithstanding the restrictions set out in paragraph 1.2 above and whether pursuant to a contractual or legal obligation or otherwise, sends, forwards or otherwise distributes this document, the Form of Acceptance or any related documents, in, into or from a Restricted Jurisdiction or uses the mails of, or any means or instrumentality (including, without limitation, facsimile transmission, telex, telephone, internet or e-mail) of interstate or foreign commerce of, or any facility of a national securities exchange of, a Restricted Jurisdiction in connection therewith, such person should: (i) inform the recipient of such fact; (ii) explain to the recipient that such action may invalidate any purported acceptance or election by the recipient; and (iii) draw the attention of the recipient to this paragraph 7 of Part B of Appendix I.

7.8  If any written notice from a Autonomy Shareholder withdrawing his acceptance in accordance with paragraph 3 of this Part B of Appendix I is received in an envelope postmarked in, or with otherwise appears to HP Vision or its agents to have been sent from, a Restricted Jurisdiction, HP Vision reserves the right in its absolute discretion to treat that notice as invalid.

7.9  Any acceptance of the Offer by Autonomy Shareholders holding Autonomy Shares in certificated form who are unable to give representations or warranties set out in paragraph 1.2 of Part C of this Appendix I or Autonomy Shareholders holding Autonomy Shares in uncertificated form who are unable to give the representations and warranties set out in paragraph 1.2 of Part D of this Appendix I is liable to be disregarded.

7.10  HP Vision reserves the right, in its absolute discretion, to treat any acceptance as invalid if it believes that such acceptance may violate applicable legal or regulatory requirements.

7.11  If a Autonomy Shareholder holding Autonomy Shares in uncertified form is unable to give the representations and warranties set out in paragraph 1.2 of Part D of this Appendix I but nevertheless can provide evidence satisfactory to HP Vision that he is able to accept the Offer in compliance with all relevant legal and regulatory requirements, he may only purport to accept the Offer by sending (or if a CREST sponsored member, procuring that his CREST sponsor sends) both:

(A)  a TTE Instruction to a designated escrow balance detailed below (a "**Restricted Escrow Transfer**"); and

(B)  one or more valid ESA instructions (a "**Restricted ESA instruction**") which specify the form of consideration which he wishes to receive (consistent with the alternatives offered under the Offer).

Such purported acceptance will not be treated as a valid acceptance unless both the Restricted Escrow Transfer and the Restricted ESA instruction(s) settle in CREST and HP Vision decides, in its absolute discretion, to exercise its right described in paragraph 7.12 of this Part B of Appendix I to waive, vary or modify the terms of the Offer relating to Overseas Shareholders, to the extent required to permit such acceptance to be made, in each case during the acceptance period set out in paragraph 1 of this Part B of Appendix I. If HP Vision accordingly decides to permit such acceptance to be made, Capita Registrars will on behalf of HP Vision accept the purported acceptance as an Electronic Acceptance on the terms of this document (as so waived, varied or modified) by transmitting in CREST an AEAN message. Otherwise, Capita Registrars will on behalf of HP Vision

41

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661736
Exh 2307-0048

reject the purported acceptance by transmitting in CREST an AEAD message. Each Restricted Escrow Transfer must in order for it to be valid and settle, include the following details:

(A) the ISIN number for the Autonomy Shares (this is GB0055007982);

(B) the number of Autonomy Shares in respect of which the Offer is to be accepted;

(C) the member account ID and participant ID of the Autonomy Shareholder;

(D) the participant ID of the Escrow Agent (this is RA10) and its member account ID specific to a Restricted Escrow Transfer (this is RESTRICT);

(E) the intended settlement date. This should be as soon as possible and, in any event, not later than 1.00 p.m. (London time) on 12 September 2011;

(F) the corporate action number for the Offer which is allocated by Euroclear and can be found by viewing the relevant corporate action details in CREST;

(G) input with a standard delivery instruction priority of 80; and

(H) the contact name and telephone number inserted in the shared note field.

Each Restricted ESA instruction must, in order for it to be valid and settle, include the following details:

(A) the ISIN number for the Autonomy Shares (this is GB0055007982);

(B) the number of Autonomy Shares relevant to that Restricted ESA instruction;

(C) the member account ID and participant ID of the accepting Autonomy Shareholder;

(D) the member account ID and participant ID of the Escrow Agent set out in the Restricted Escrow Transfer;

(E) the participant ID and the member account ID of the Escrow Agent relevant to the form of consideration required (details of which are set out in this document);

(F) the CREST transaction ID of the Restricted Escrow Transfer to which the Restricted ESA instruction relates to be inserted at the beginning of the shared note field;

(G) the intended settlement date. This should be as soon as possible and, in any event, not later than 1.00 p.m. (London time) on 12 September 2011;

(H) the corporate action number of the Offer which is allocated by Euroclear and can be found by viewing the relevant corporate action details in CREST; and

(I) input with a standard delivery instruction priority of 80.

7.12 The provisions of this paragraph 7 and/or any other terms of the Offer relating to Overseas Shareholders may be waived, varied or modified as regards specific Autonomy Shareholder(s) or on a general basis by HP Vision in its absolute discretion. Subject thereto, the provisions of this paragraph 7 of Part B of Appendix I supersede any terms of the Offer inconsistent with them. References in this paragraph 7 of Part B of Appendix I to a Autonomy Shareholder shall (as appropriate) include the person or persons executing a Form of Acceptance or making an Electronic Acceptance and, in the event of more than one person executing a Form of Acceptance or making an Electronic Acceptance (as the case may be), the provisions of this paragraph shall apply to them jointly and severally.

7.13 Neither HP Vision nor Capita Registrars nor any person on behalf of any of them shall have any liability to any person for any loss or alleged loss arising from any decision as to the treatment of acceptances of the Offer on any of the bases set out above or otherwise in connection therewith.

42

HP-SEC-01661737
Exh 2307-0049

# APPENDIX I

## PART C FORM OF ACCEPTANCE

### (FOR AUTONOMY SHARES IN CERTIFICATED FORM)

1. Each Autonomy Shareholder by whom, or on whose behalf, a Form of Acceptance is executed irrevocably undertakes, represents, warrants and agrees to and with HP Vision and Capita Registrars (so as to bind him, his personal representatives, heirs, successors and assigns) to the following effect:

1.1 that the execution of the Form of Acceptance, whether or not any other boxes are completed, shall constitute:

(A) an acceptance, subject to paragraph 7 of Part B of this Appendix I, of the Offer in respect of the number of Autonomy Shares held in certificated form inserted or deemed to be inserted in Box 1 of the Form of Acceptance; and

(B) an undertaking to execute any further documents, take any further action and give any further assurances which may be required to enable HP Vision to obtain the full benefit of this Part C of Appendix I and/or to perfect any of the authorities expressed to be given hereunder or otherwise in connection with such Autonomy Shareholder's acceptance of the Offer,

in each case, on and subject to the terms and conditions set out or referred to in this document and the Form of Acceptance and that, subject only to the rights of withdrawal set out in paragraph 3 of Part B of this Appendix I, each such acceptance shall be irrevocable provided that if: (a) Box 1 or any other Box is not completed; or (b) the total number of Autonomy Shares inserted in Box 1 is greater than the number of Autonomy Shares comprised in the acceptance, but the Form of Acceptance is signed, it will be deemed to be an acceptance of all of the Autonomy Shares comprised in the acceptance.

For the purposes of this Appendix I and the Form of Acceptance, the phrase 'Autonomy Shares comprised in the acceptance' shall mean the number of Autonomy Shares inserted in Box 1 or, if no number is inserted in Box 1 (or a number greater than the relevant Autonomy Shareholder's registered holding of Autonomy Shares) is inserted, the greater of: (1) the relevant Autonomy Shareholder's entire holding of Autonomy Shares as disclosed by the register of members made available to Capita Registrars prior to the time the relevant Form of Acceptance is processed by them; (2) the relevant Autonomy Shareholder's entire holding of Autonomy Shares as disclosed by the register of members made available to Capita Registrars prior to the latest time for receipt of the Form of Acceptance which can be taken into account for determining whether the Offer is unconditional; and (3) the number of Autonomy Shares in respect of which certificates or documents of title or an indemnity in lieu thereof is received by Capita Registrars;

1.2 unless "No" is put in Box 3 of the Form of Acceptance, that such Autonomy Shareholder:

(A) has not, directly or indirectly, received or sent copies or originals of this document, the Form of Acceptance or any related documents in, into or from a Restricted Jurisdiction, or any other jurisdiction where such actions may constitute or result in the Offer constituting a breach of any legal or regulatory requirements, and has not otherwise utilised in connection with the Offer or the execution or delivery of the Form of Acceptance, directly or indirectly, the mails or any means or instrumentality (including, without limitation, facsimile transmission, telex, telephone, internet or e-mail) of interstate or foreign commerce of, or any facility of a national securities exchange of, a Restricted Jurisdiction;

(B) if an Overseas Shareholder, has observed the laws of the relevant jurisdiction, obtained all requisite governmental, exchange control and other required consents, complied with all necessary formalities and paid any issue, transfer or other taxes or other requisite payments due in any such jurisdiction in connection with such acceptance and that he has not taken or omitted to take any action that will or may result in HP Vision or any other person acting in breach of the legal or regulatory requirements of any such jurisdiction in connection with the Offer or his acceptance thereof and he is lawfully entitled to make such election under the laws of any jurisdiction to which he is subject;

(C) is accepting the Offer from outside a Restricted Jurisdiction and has not executed, mailed or sent the Form of Acceptance in or from a Restricted Jurisdiction; and

43

HP-SEC-01661738
Exh 2307-0050

(D) in respect of the Autonomy Shares held in certificated form to which the Form of Acceptance relates, is not, and is not accepting the Offers through, an agent or a fiduciary acting on a nondiscretionary basis for a principal, unless such principal is a corporation or partnership and such agent or fiduciary is an authorised employee of such principal or such principal has given all instructions with respect to the Offer from outside a Restricted Jurisdiction;

1.3 that, in relation to Autonomy Shares held in certificated form, the execution of the Form of Acceptance and its delivery to Capita Registrars constitutes, subject to the Offer becoming, or being declared, unconditional in all respects in accordance with its terms and to the accepting Autonomy Shareholder not having validly withdrawn his acceptance, the irrevocable and separate appointment of each of HP Vision, Capita Registrars and any director of, or person authorised by, any of them, as such shareholder's attorney and/or agent (the "**attorney**"), and an irrevocable instruction and authorisation to the attorney (in accordance with section 4 of the Powers of Attorney Act 1971):

    (A) to complete and execute all or any form(s) of transfer and/or other document(s) at the discretion of the attorney in relation to the Autonomy Shares referred to in paragraph 1.1 of this Part C of Appendix I in favour of HP Vision or such other person or persons as HP Vision or its agents may direct in connection with acceptance of the Offer;

    (B) to deliver such form(s) of transfer and/or other document(s) at the discretion of the attorney with the certificate(s) and/or other document(s) of title relating to such Autonomy Shares for registration no earlier than one Business Day after the Offer becomes or is declared unconditional in all respects and within six months of the Offer becoming, or being declared, unconditional in all respects; and

    (C) to execute all such other documents and do all such other acts and things as may in the opinion of the attorney be necessary or expedient for the purposes of, or in connection with, the acceptance of the Offer pursuant to the Form of Acceptance and to vest the Autonomy Shares referred to in paragraph 1.1 of this Part C of Appendix I in HP Vision or its nominee(s);

1.4 that, in relation to Autonomy Shares held in certificated form, the execution of the Form of Acceptance and its delivery to Capita Registrars constitutes, subject to the Offer becoming, or being declared, unconditional in all respects and to the accepting Autonomy Shareholder not having validly withdrawn his acceptance, separate irrevocable authorities and requests (subject to paragraph 7 of Part B of this Appendix I):

    (A) to Autonomy or its agents to procure the registration of the transfer of those Autonomy Shares referred to in paragraph 1.1 of this Part C of Appendix I pursuant to the Offer and the delivery of the share certificate(s) and/or other document(s) of title in respect of the Autonomy Shares, or satisfactory indemnities, to HP Vision or as it may direct;

    (B) to HP Vision or its agents to procure the despatch by post (or by such other method as may be approved by the Panel) of the cheque for the cash consideration to which an accepting Autonomy Shareholder is entitled or, at the risk of such Autonomy Shareholder, to the person or agent whose name and address (outside a Restricted Jurisdiction) is set out in Box 4 of the Form of Acceptance or, if none is set out, to the first-named or sole holder at his registered address (outside a Restricted Jurisdiction);

1.5 that the execution of the Form of Acceptance and its delivery to Capita Registrars constitutes the irrevocable appointment of HP Vision, Capita Registrars and/or their respective directors and agents as the relevant Autonomy Shareholder's attorney and/or agent within the terms of paragraph 4 of Part B of this Appendix I in respect of the Autonomy Shares held in certificated form comprised in the acceptance;

1.6 that, subject to the Offer becoming, or being declared, unconditional in all respects (or in the case of voting by proxy, if the Offer would become, or be declared, unconditional in all respects or lapse immediately upon the outcome of the resolution in question or in such other circumstances as HP Vision may request and the Panel may permit) and pending registration:

    (A) HP Vision or its agents shall be entitled to direct the exercise of any votes and any or all other rights and privileges (including the right to requisition the convening of a general meeting of Autonomy or of any class of its shareholders) attaching to any Autonomy Shares held in certificated form in respect of which the Offer has been accepted or is deemed to have been accepted and in respect of which such acceptance has not been validly withdrawn; and

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661739
Exh 2307-0051

(B)   the execution of the Form of Acceptance in respect of the Autonomy Shares comprised in such acceptance and in respect of which such acceptance has not been validly withdrawn:

(i)   constitutes an authority to Autonomy and/or its agents from such Autonomy Shareholder to send any notice, circular, warrant, document or other communication which may be required to be sent to him as a Autonomy Shareholder in respect of such Autonomy Shares (including any share certificate(s) or other document(s) of title issued as a result of conversion of such Autonomy Shares into certificated form) to HP Vision at its registered office;

(ii)   constitutes to the irrevocable appointment of HP Vision or any of its directors or agents to sign, on such Autonomy Shareholder's behalf, such documents and do such things as may in the opinion of such person seem necessary or desirable in connection with the exercise of any votes or other rights or privileges attaching to such Autonomy Shares (including, without limitation, an authority to sign any consent to short notice of a general or separate class meeting as his attorney and/or agent and on his behalf and/or to attend and/or execute a form of proxy in respect of such Autonomy Shares appointing any person nominated by HP Vision to attend general and separate class meetings of Autonomy (or any adjournment thereof) and to exercise or refrain from exercising the votes attaching to such Autonomy Shares on such Autonomy Shareholder's behalf), such votes (where relevant) to be cast so far as possible to satisfy any outstanding conditions of the Offer; and

(iii)   will also constitute the agreement of such Autonomy Shareholder not to exercise any such rights without the consent of HP Vision and the irrevocable undertaking of such Autonomy Shareholder not to appoint a proxy or representative for or to attend any such general meeting or separate class meeting,

save that this authority will cease to be valid if the acceptance is validly withdrawn;

1.7   that he will deliver, or procure the delivery, to Capita Registrars at the address and in the manner referred to in paragraph 3.1 of Part B of this Appendix I, his share certificate(s) and/or other document(s) of title in respect of all the Autonomy Shares in certificated form held by him in respect of which the Offer has been accepted or is deemed to have been accepted and in respect of which such acceptance has not been validly withdrawn, or an indemnity reasonably acceptable to HP Vision in lieu thereof, as soon as possible and in any event within six months of the Offer becoming, or being declared, unconditional in all respects;

1.8   that he is the sole legal and beneficial owner of the Autonomy Shares held in certificated form in respect of which the Offer is accepted or deemed to be accepted or he is the legal owner of such Autonomy Shares and he has the necessary capacity and authority to execute the Form of Acceptance;

1.9   that the Autonomy Shares held in certificated form in respect of which the Offer is accepted or deemed to be accepted are sold fully paid and free from all liens, charges, equitable interests, encumbrances, rights of pre-emption and other third party rights or interests and together with all rights now or hereafter attaching thereto, including, without limitation, the right to receive and retain all dividends and other distributions (if any) announced, declared, made or payable hereafter;

1.10   that the terms and conditions of the Offer contained in this document shall be deemed to be incorporated in, and form part of, the Form of Acceptance which shall be construed accordingly;

1.11   that, if he accepts the Offer, he will do all such acts and things as shall in the opinion of HP Vision or Capita Registrars be necessary or expedient to vest the Autonomy Shares referred to in paragraph 1.1 of this Part C of Appendix I in HP Vision or its nominee(s) or such other person as HP Vision may decide;

1.12   that he agrees to ratify each and every act or thing which may be done or effected by HP Vision or Capita Registrars or any of their respective directors or agents or Autonomy or its agents, as the case may be, in the proper exercise of any of its or his powers and/or authorities under this document and to indemnify each such person against any losses arising therefrom, other than losses as a result of the negligence or wilful default of such person;

45

HP-SEC-01661740
Exh 2307-0052

1.13 that the execution of the Form of Acceptance constitutes his agreement to the terms of paragraph 6.11 of Part B of this Appendix I;

1.14 that on execution and delivery, the Form of Acceptance shall take effect as a deed;

1.15 that, if any provision of Part B of this Appendix I or this Part C of Appendix I shall be unenforceable or invalid or shall not operate so as to afford HP Vision or Capita Registrars and/or any of their respective directors or agents the full benefit of the authority expressed to be given therein, he shall with all practicable speed do all such acts and things and execute all such documents that may be required to enable those persons to secure the full benefits of Part B of this Appendix I and this Part C of Appendix I; and

1.16 that he is not a client (as defined in the FSA Handbook) of Barclays Capital or Perella Weinberg Partners in connection with the Offer.

2. References in this Part C to a Autonomy Shareholder shall include references to the person or persons executing a Form of Acceptance and, in the event of more than one person executing a Form of Acceptance, the provisions of this Part C shall apply to them jointly and severally.

46

HP-SEC-01661741
Exh 2307-0053

## APPENDIX I
### PART D ELECTRONIC ACCEPTANCE

1.   Each Autonomy Shareholder by whom, or on whose behalf, an Electronic Acceptance is made irrevocably undertakes, represents, warrants and agrees to and with HP Vision and Capita Registrars (so as to bind him, his personal representatives, heirs, successors and assigns) to the following effect:

1.1   that the Electronic Acceptance shall constitute an acceptance of the Offer in respect of the number of Autonomy Shares held in uncertificated form to which a TTE Instruction relates on and subject to the terms and conditions set out or referred to in this document and that, subject only to the rights of withdrawal set out in paragraph 3 of Part B of this Appendix I, each such acceptance shall be irrevocable;

1.2   that such Autonomy Shareholder:

(A)   has not, directly or indirectly, received or sent copies or originals of this document or any related documents in, into or from a Restricted Jurisdiction, or any other jurisdiction where such actions may constitute or result in the Offer constituting a breach of any legal or regulatory requirements, and has not otherwise utilised in connection with the Offer, directly or indirectly, the mails of or any means or instrumentality (including, without limitation, facsimile transmission, telex, telephone, internet or e-mail) of interstate or foreign commerce of, or any facility of a national securities exchange of, a Restricted Jurisdiction;

(B)   if an Overseas Shareholder, he has observed the laws of the relevant jurisdiction, obtained all requisite governmental, exchange control and other required consents, complied with all other necessary formalities and paid any issue, transfer or other taxes or other requisite payments due in any such jurisdiction in connection with such acceptance and that he has not taken or omitted to take any action that will or may result in HP Vision or any other person acting in breach of the legal or regulatory requirements of any such jurisdiction in connection with the Offer or his acceptance thereof and that he is lawfully entitled to make such election under the laws of any jurisdiction to which he is subject;

(C)   was outside the Restricted Jurisdictions at the time of the input and settlement of the relevant TTE Instruction(s); and

(D)   in respect of the Autonomy Shares held in uncertificated form to which the Electronic Acceptance relates, is not, and is not accepting the Offer through, an agent or a fiduciary acting on a non-discretionary basis for a principal, unless such principal is a corporation or partnership and such agent or fiduciary is an authorised employee of such principal or such principal has given all instructions with respect to the Offer from outside a Restricted Jurisdiction;

1.3   that in relation to Autonomy Shares held in uncertificated form, the Electronic Acceptance constitutes, subject to the Offer becoming, or being declared, unconditional in all respects in accordance with its terms and to an accepting Autonomy Shareholder not having validly withdrawn his acceptance, the irrevocable and separate appointment of each of HP Vision, Capita Registrars and any director of, or person authorised by any of them, as such shareholder's attorney and/or agent (the "**attorney**"), and an irrevocable instruction and authorisation to the attorney (in accordance with section 4 of the Powers of Attorney Act 1971) to do all such acts and things as may in the opinion of the attorney be necessary or expedient for the purposes of, or in connection with, the acceptance of the Offer and to vest the Autonomy Shares referred to in paragraph 1.1 of this Part D of Appendix I in HP Vision or its nominee(s);

1.4   that the Electronic Acceptance constitutes the irrevocable appointment of the Escrow Agent as such shareholder's attorney and/or agent and an irrevocable instruction and authority to the attorney:

(A)   subject to the Offer becoming, or being declared, unconditional in all respects in accordance with its terms and to the accepting Autonomy Shareholder not having validly withdrawn his acceptance, to transfer, no earlier than one Business Day after the Offer becomes or is declared wholly unconditional, to itself (or to such other person or persons as HP Vision or its agents may direct) by means of CREST all or any of the Autonomy Shares held in uncertificated form to which such Electronic Acceptance relates (but not exceeding the number of Autonomy Shares held in uncertificated form in respect of which the Offer is accepted or deemed to be accepted); and

47

HP-SEC-01661742
Exh 2307-0054

(B)   if the Offer does not become, or is not declared, unconditional in all respects, to give instructions to Euroclear, immediately after the lapsing of the Offer (or within such longer period as the Panel may permit, not exceeding 14 days of the lapsing of the Offer), to transfer all such Autonomy Shares to the original available balance of the accepting Autonomy Shareholder;

1.5   that the Electronic Acceptance constitutes, subject to the Offer becoming, or being declared, unconditional in all respects and to an accepting Autonomy Shareholder not having validly withdrawn his acceptance, separate irrevocable authorities and requests (subject to paragraph 7 of Part B of this Appendix I):

(A)   to Autonomy or its agents to procure, no earlier than one Business Day after the Offer becomes or is declared wholly unconditional, the transfer to HP Vision, or as it may direct, by means of CREST all or any of the Autonomy Shares held in uncertificated form referred to in paragraph 1.1 of this Part D of Appendix I pursuant to the Offer;

(B)   to HP Vision or its agents to procure the making of a CREST payment obligation in favour of the Autonomy Shareholder's payment bank in accordance with the CREST payment arrangements in respect of any cash consideration to which such shareholder is entitled, provided that:

(i)   HP Vision may (if, for any reason, it wishes to do so) determine that all or any part of any such cash consideration shall be paid by cheque despatched by post; and

(ii)   if the Autonomy Shareholder concerned is a CREST member whose registered address is in a Restricted Jurisdiction, any cash consideration to which such shareholder is entitled shall be paid by cheque despatched by post, in any case at the risk of such shareholder and such cheque shall be despatched to the first-named or sole holder at an address outside a Restricted Jurisdiction or as otherwise determined by HP Vision;

1.6   that the Electronic Acceptance constitutes the irrevocable appointment of HP Vision, Capita Registrars and/or their respective directors and agents as the relevant Autonomy Shareholder's attorney and/or agent within the terms of paragraph 4 of Part B of this Appendix I in respect of the Autonomy Shares held in uncertificated form referred to in paragraph 1.1 of this Part D of Appendix I;

1.7   that, subject to the Offer becoming, or being declared, unconditional in all respects (or, in the case of voting by proxy, if the Offer would become unconditional in all respects or lapse immediately upon the outcome of the resolution in question or in such other circumstances as HP Vision may request and the Panel may permit) and pending registration:

(A)   HP Vision or its agents shall be entitled to direct the exercise of any votes and any or all other rights and privileges (including the right to requisition the convening of a general meeting of Autonomy or of any class of its shareholders) attaching to any Autonomy Shares held in uncertificated form in respect of which the Offer has been accepted or is deemed to have been accepted and in respect of which such acceptance has not been validly withdrawn; and

(B)   an Electronic Acceptance constitutes in respect of the Autonomy Shares held in uncertificated form comprised in such acceptance and in respect of which such acceptance has not been validly withdrawn:

(i)   an authority to Autonomy and/or its agents from such Autonomy Shareholder to send any notice, circular, warrant, document or other communication which may be required to be sent to him as a member of Autonomy in respect of such Autonomy Shares (including any share certificate(s) or other document(s) of title issued as a result of conversion of such Autonomy Shares into certificated form) to HP Vision at its registered office;

(ii)   an irrevocable appointment of HP Vision or any of its directors or agents to sign on such Autonomy Shareholder's behalf, such documents and do such things as may in the opinion of such person seem necessary or desirable in connection with the exercise of any votes or other rights or privileges attaching to such Autonomy Shares (including, without limitation, an authority to sign any consent to short notice of a general or separate class meeting as his attorney and/or agent and on his behalf and/or to attend, and/or execute a form of proxy in respect of such Autonomy Shares appointing any person nominated by

48

HP-SEC-01661743
Exh 2307-0055

HP Vision to attend general and separate class meetings of Autonomy (or any adjournment thereof) and to exercise or refrain from exercising the votes attaching to such Autonomy Shares on such Autonomy Shareholder's behalf), such votes (where relevant) to be cast so far as possible to satisfy any outstanding conditions of the Offer; and

(iii)  the agreement of such Autonomy Shareholder not to exercise any such rights without the consent of HP Vision and the irrevocable undertaking of such Autonomy Shareholder not to appoint a proxy or representative for or to attend any such general meeting or separate class meeting, save that this authority will cease to be valid if the acceptance is validly withdrawn;

1.8    that he is the sole legal and beneficial owner of the Autonomy Shares held in uncertificated form in respect of which the Offer is accepted or deemed to be accepted or he is the legal owner of such Autonomy Shares and he has the necessary capacity and authority to effect an Electronic Acceptance;

1.9    that the Autonomy Shares held in certificated form in respect of which the Offer is accepted or deemed to be accepted are sold fully paid and free from all liens, charges, equitable interests, encumbrances, rights of pre-emption and other third party rights or interests and together with all rights now or hereafter attaching thereto, including, without limitation, the right to receive and retain all dividends and other distributions (if any) announced, declared, made or payable hereafter;

1.10   that, if he accepts the Offer, he will do all such acts and things as shall in the opinion of HP Vision or Capita Registrars be necessary or expedient to vest the Autonomy Shares referred to in paragraph 1.1 of this Part D of Appendix I in HP Vision or its nominee(s) or such other person as HP Vision may decide and all such acts and things as may be necessary or expedient to enable Capita Registrars to perform its functions as Escrow Agent for the purposes of the Offer;

1.11   that he agrees to ratify each and every act or thing which may be done or effected by HP Vision or Capita Registrars or any of their respective directors or agents or Autonomy or its agents, as the case may be, in the proper exercise of any of its or his powers and/or authorities under this document and to indemnify each person against any losses arising therefrom, other than losses as a result of the negligence or wilful default of such person;

1.12   that if, for any reason, any Autonomy Shares in respect of which a TTE Instruction has been effected in accordance with paragraph 16.2 of Part II of this document are converted to certificated form, he will (without prejudice to paragraph 1.7(B)(i) of this Part D of Appendix I) immediately deliver or procure the immediate delivery of the share certificate(s) or other document(s) of title in respect of all such Autonomy Shares so converted to Capita Registrars at the address and in the manner referred to in paragraph 3.1 of Part B of this Appendix I or to HP Vision at its registered office or as HP Vision or its agents may direct and he shall be deemed upon conversion to undertake, represent, warrant and agree in the terms set out in Part C of this Appendix I in relation to such Autonomy Shares without prejudice to the application of this Part D as far as HP Vision deems appropriate;

1.13   that the creation of a CREST payment obligation in favour of his payment bank in accordance with the CREST payment arrangements referred to in paragraph 1.5(B) of this Part D of Appendix I shall, to the extent of the obligation so created, discharge in full any obligation of HP Vision to pay to him the cash consideration to which he is entitled pursuant to the Offer;

1.14   that in consideration of HP Vision making any revised offer available to him as referred to in paragraph 4 of Part B of Appendix I, the deemed acceptances, elections and authorities referred to in such paragraph 4 shall, subject to the right of withdrawal set out in paragraph 3 of Part B of Appendix I, be irrevocable;

1.15   that the making of an Electronic Acceptance constitutes his agreement to the terms of paragraphs 6.11 of Part B of this Appendix I;

1.16   that by virtue of the CREST regulations, the making of an Electronic Acceptance constitutes an irrevocable power of attorney by the relevant Autonomy Shareholder in the terms of all the powers and authorities expressed to be given by Part B, this Part D and (where applicable by virtue of paragraph 1.12 of this Part D of Appendix I) Part C of this Appendix I to HP Vision, Capita Registrars and any of their respective agents;

49

HP-SEC-01661744
Exh 2307-0056

1.17    that if any provision of Part B or this Part D of Appendix I shall be unenforceable or invalid or shall not operate so as to afford HP Vision or Capita Registrars or any of their respective directors or agents the full benefit or authority expressed to be given therein, he shall with all practicable speed do all such acts and things and execute all such documents that may be required to enable those persons to secure the full benefits of Part B and this Part D of Appendix I; and

1.18    that he is not a client (as defined in the FSA Handbook) of Barclays Capital or Perella Weinberg Partners in connection with the Offer.

2.      References in this Part D to a Autonomy Shareholder shall include references to the person or persons making an Electronic Acceptance and, in the event of more than one person executing an Electronic Acceptance, the provisions of this Part D shall apply to them jointly and to each of them.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661745
Exh 2307-0057

## APPENDIX II

## FINANCIAL INFORMATION RELATING TO AUTONOMY

Financial information in respect of Autonomy is set out below as required by Rule 24.2(e) of the City Code. References in the first column are to Rule 24.2(a) of the City Code, referring to information required to be set out in accordance with Rule 24.2(e). The documents referred to in the table, the contents of which have previously been announced through a Regulatory Information Service, are incorporated by reference into this document.

| Code Reference | Information | Reference |
|---|---|---|
| Rule 24.2(a)(i) | For the last 3 financial years for which the information has been published, revenue, profit or loss before and after taxation, the charge for tax, exceptional items, minority interests, the amount absorbed by dividends and earnings per share | Autonomy Annual Report and Accounts 2010, consolidated income statement on page 45<br><br>Autonomy Annual Report and Accounts 2009, consolidated income statement on page 36<br><br>Autonomy Annual Report and Accounts 2008, consolidated income statement on page 26 |
| Rule 24.2(a)(v) | Details relating to items referred to above in respect of any interim statement or preliminary announcement made since the last published audited Annual Report and Accounts | Autonomy Unaudited Interim Results for the Six Months ended 30 June 2011, condensed consolidated income statement on page 9 |
| Rule 24.2(a)(ii) | A statement of the assets and liabilities shown in the last published audited Annual Report and Accounts | Autonomy Annual Report and Accounts 2010, consolidated balance sheet on page 46 |
| Rule 24.2(a)(iii) | A cash flow statement if provided in the last published audited Annual Report and Accounts | Autonomy Annual Report and Accounts 2010, consolidated cash flow statement on page 48 |
| Rule 24.2(a)(vii) | Significant accounting policies together with any points from the notes to the Accounts which are of major relevance to an appreciation of the figures | Autonomy Annual Report and Accounts 2010, Note 2 of the notes to the consolidated financial statements on pages 49 to 56<br><br>Autonomy Annual Report and Accounts 2009, Note 2 of the notes to the consolidated financial statements on pages 40 to 47<br><br>Autonomy Annual Report and Accounts 2008, Note 2 of the notes to the consolidated financial statements on pages 30 to 36<br><br>Autonomy Unaudited Interim Results for the Six Months ended 30 June 2011, Note 3 to the condensed set of consolidated financial statements on pages 13 and 14 |

51

All documents referred to in the above table are available as "read only" format for reviewing or downloading free of charge on Autonomy's website at the following addresses:

| No | Information | Source of information |
|----|-------------|----------------------|
| 1. | Autonomy Annual Report and Accounts 2010 | http://www.autonomy.com/content/Investors/ financial-reports/index.en.html |
| 2. | Autonomy Annual Report and Accounts 2009 | http://www.autonomy.com/content/Investors/ financial-reports/index.en.html |
| 3. | Autonomy Annual Report and Accounts 2008 | http://www.autonomy.com/content/Investors/ financial-reports/index.en.html |
| 4. | Autonomy Unaudited Interim Results for the Six Months ended 30 June 2011 | http://www.autonomy.com/content/Investors/ financial-reports/index.en.html |

The financial information incorporated by reference into this document is contained in Autonomy's audited consolidated statutory accounts for the financial years ended 31 December 2010, 31 December 2009 and 31 December 2008 and Autonomy's unaudited interim results for the six months ended 30 June 2011.

Please see paragraph 14 of Appendix IV of this document for details of obtaining hard copies of documents incorporated by reference into this document.

**No incorporation of website information**

Neither the content of Autonomy's website, nor the content of any website accessible from hyperlinks on Autonomy's website, is incorporated into, or forms part of, this document.

52

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661747
Exh 2307-0059

### APPENDIX III

### FINANCIAL INFORMATION RELATING TO HP

Financial information in respect of HP is set out below as required by Rule 24.2(c) of the City Code. References in the first column are to Rule 24.2(a) of the City Code, referring to information required to be set out in accordance with Rule 24.2(c). The documents referred to in the table are incorporated by reference into this document.

| Code Reference | Information | Reference |
|---|---|---|
| Rule 24.2 (a)(i) | For the last 3 financial years for which the information has been published, revenue, profit or loss before and after taxation, the charge for tax, exceptional items, minority interests, the amount absorbed by dividends and earnings per share | HP Annual Report 2010, consolidated statements of earnings on page 73 HP Annual Report 2009, consolidated statements of earnings on page 80 HP Annual Report 2008, consolidated statements of earnings on page 81 |
| Rule 24.2 (a)(v) | Details relating to items referred to above in respect of any interim statement or preliminary announcement made since the last published audited accounts | HP Form 8-K, consolidated statements of earnings on pages 1 and 2 of Exhibit 99.2 of HP's Current Report |
| Rule 24.2 (a)(ii) | A statement of the assets and liabilities shown in the last published audited accounts | HP Annual Report 2010, consolidated balance sheet on page 74 |
| Rule 24.2 (a)(iii) | A cash flow statement if provided in the last published audited accounts | HP Annual Report 2010, consolidated statements of cash flows on page 75 |
| Rule 24.2 (a)(vii) | Significant accounting policies together with any points from the notes to the accounts which are of major relevance to an appreciation of the figures | HP Annual Report 2010, note 1 to the consolidated financial statements on pages 77 to 86 in relation to significant accounting policies and note 2 to note 19 to the consolidated financial statements on pages 86 to 155 otherwise HP Annual Report 2009, note 1 to the consolidated financial statements on pages 84 to 95 in relation to significant accounting policies and note 2 to note 19 to the consolidated financial statements on pages 95 to 160 otherwise HP Annual Report 2008, note 1 to the consolidated financial statements on pages 85 to 95 in relation to significant accounting policies and note 2 to note 18 to the consolidated financial statements on pages 95 to 158 otherwise |
| Rule 24.2 (a)(iv) | All known material changes in the financial or trading position of the company subsequent to the last published audited accounts | HP Unaudited Quarterly results for the three months ended 31 July 2011, pages 1 to 13 |

53

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661748
Exh 2307-0060

All documents referred to in the above table are available as "read only" format for reviewing or downloading free of charge on HP's website at the following addresses:

| No. | Information | Source of information |
|-----|-------------|----------------------|
| 1. | HP Annual Report 2010 | http://h30261.www3.hp.com/ phoenix.zhtml?c=71087&p=irol-reportsannual |
| 2. | HP Annual Report 2009 | http://h30261.www3.hp.com/ phoenix.zhtml?c=71087&p=irol-reportsannual |
| 3. | HP Annual Report 2008 | http://h30261.www3.hp.com/ phoenix.zhtml?c=71087&p=irol-reportsannual |
| 4. | HP Unaudited Quarterly results for the three months ended 31 July 2011 | http://h30261.www3.hp.com/ phoenix.zhtml?c=71087&p=quarterlyearnings |
| 5. | HP Form 8-K | http://services.corporate-ir.net/SEC.Enhanced/ SecCapsule.aspx?c=71087&fid=7732360 |

The financial information incorporated by reference into this document is contained in HP's audited consolidated statutory accounts for the financial years ended 31 October 2010, 31 October 2009 and 31 October 2008, HP's unaudited interim accounts for the three months ended 31 July 2011 and HP's Form 8-K filed with the US Securities and Exchange Commission on 18 August 2011.

Please see paragraph 14 of Appendix IV of this document for details of obtaining hard copies of documents incorporated by reference into this document.

**No incorporation of website information**

Neither the content of HP's website, nor the content of any website accessible from hyperlinks on HP's website, is incorporated into, or forms part of, this document.

54

HP-SEC-01661749
Exh 2307-0061

## APPENDIX IV

### ADDITIONAL INFORMATION

1.  **Responsibility statements**

1.1 The Directors of HP Vision, whose names are set out in paragraph 2.1 below, accept responsibility for the information contained in this document relating to HP Vision (other than that relating to the Autonomy Group, the Directors of Autonomy and their immediate families, related trusts and persons connected with the Directors of Autonomy, the views and opinions set out in the letter from the Chairman of Autonomy in Part I of this Offer Document above). To the best of the knowledge and belief of the directors of HP Vision (each of whom has taken all reasonable care to ensure that such is the case), the information contained in this document for which they accept responsibility is in accordance with the facts and does not omit anything likely to affect the import of such information

1.2 The FIC Members, whose names are set out in paragraph 2.3 below, Léo Apotheker and Shane Robison (further details of whom are set out in paragraph 2.4 below) accept responsibility for the information contained in this document relating to HP Vision and HP (other than that relating to the Autonomy Group, the Directors of Autonomy and their immediate families, related trusts and persons connected with the Directors of Autonomy, the views and opinions set out in the letter from the Chairman of Autonomy in Part I of this Offer Document above). To the best of the knowledge and belief of the FIC Members, Léo Apotheker and Shane Robison (each of whom has taken all reasonable care to ensure that such is the case), the information contained in this document for which they accept responsibility is in accordance with the facts and does not omit anything likely to affect the import of such information.

1.3 The Directors of Autonomy, whose names are set out in paragraph 2.5 below, accept responsibility for the information contained in this document relating to the Autonomy Group, the Directors of Autonomy, their immediate families, related trusts and persons connected with the Directors of Autonomy. To the best of the knowledge and belief of the Directors of Autonomy (who have taken all reasonable care to ensure that such is the case), the information contained in this document for which they accept responsibility is in accordance with the facts and does not omit anything likely to affect the import of such information.

2.  **Directors**

2.1 The names of the Directors of HP Vision are as follows:

| Name | Position |
| --- | --- |
| Catherine A. Lesjak | Director |
| Paul T. Porrini | Director |
| Sergio E. Letelier | Director |

The business address of Catherine Lesjak and Paul Porrini is Hewlett-Packard, 3000 Hanover Street, Palo Alto, California, United States.

The business address of Sergio Letelier is Hewlett-Packard International Sarl, 150 route du Nant d'Avril, 1217 CH-1217 Meyrin 2, Switzerland.

HP Vision is an indirect wholly-owned subsidiary of HP. It was incorporated in the Netherlands as a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) on 15 August 2011 with the trade register of the Chamber of Commerce of Amsterdam under number 53342577. Its registered office is at Startbaan 16, 1187 Amstelveen, the Netherlands.

55

HP-SEC-01661750
Exh 2307-0062

2.2    The names of the Directors of HP and their respective functions are as follows:

| Name | Position |
| --- | --- |
| Raymond J. Lane | Chairman |
| Marc L. Andreessen | Independent Director |
| Léo Apotheker | President and Chief Executive Officer |
| Lawrence T. Babbio, Jr. | Independent Director |
| Sari M. Baldauf | Independent Director |
| Shumeet Banerji | Independent Director |
| Rajiv L. Gupta | Independent Director |
| John H. Hammergren | Independent Director |
| Ann M. Livermore | Director |
| Gary M. Reiner | Independent Director |
| Patricia F. Russo | Independent Director |
| Dominique Senequier | Independent Director |
| G. Kennedy Thompson | Independent Director |
| Margaret C. Whitman | Independent Director |

The business address of each of the Directors of HP is Hewlett-Packard, 3000 Hanover Street, Palo Alto, California 94304 USA.

2.3    The names of the FIC Members and their respective functions are set out below.

| Name | Position |
| --- | --- |
| Lawrence T. Babbio, Jr. | Member of Finance and Investment Committee |
| Shumeet Banerji | Member of Finance and Investment Committee |
| John H. Hammergren | Member of Finance and Investment Committee |
| Dominique Senequier | Member of Finance and Investment Committee |
| G. Kennedy Thompson | Member of Finance and Investment Committee |

2.4    Léo Apotheker (President and Chief Executive Officer of HP) is a director of HP and, a member of the Executive Committee, of HP. Shane Robison (Executive Vice-President and Chief Strategy and Technology Officer of HP), is also a member of the Executive Committee of HP.

2.5    The names of the Directors of Autonomy and their respective functions are as follows:

| Name | Position |
| --- | --- |
| Robert Webb | Non-Executive Chairman |
| Michael Lynch | Chief Executive Officer |
| Sushovan Hussain | Chief Financial Officer |
| Jonathan Bloomer | Non-Executive Director |
| Richard Gaunt | Non-Executive Director |
| Frank Kelly | Non-Executive Director |
| John McMonigall | Non-Executive Director |

The business address of each of the Directors of Autonomy is Cambridge Business Park, Cowley Road, Cambridge, CB4 0WZ, United Kingdom.

3.    **Disclosure of interests and dealings in relevant securities**

3.1    **Definitions**

For the purposes of this paragraph 3:

(A)    "**acting in concert**" with a person means any other person acting or deemed to be acting in concert with that first person for the purposes of the City Code and the Offer;

(B)    "**Autonomy relevant securities**" means relevant securities (such term having the meaning given to it in the City Code in relating to an offeree) of Autonomy including Autonomy Shares and any securities carrying rights to convert or subscribe for Autonomy Shares;

56

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661751
Exh 2307-0063

(C) "**dealing**" or "**dealt**" means:

  (i) acquiring or disposing of securities, or the right (whether conditional or absolute) to exercise or direct the exercise of the voting rights attaching to the securities, or of general control of securities;

  (ii) taking, granting, acquiring, disposing, entering into, closing out, terminating, exercising (by either party) or varying an option (including a traded option contract) in respect of any securities;

  (iii) subscribing or agreeing to subscribe for securities;

  (iv) exercising or converting, whether in respect of new or existing securities, any securities carrying conversion or subscription rights;

  (v) acquiring or disposing of, entering into, closing out, exercise (by either party) of any rights under, or varying, a derivative referenced, directly or indirectly, to securities;

  (vi) entering into, terminating or varying the terms of any agreement to purchase or sell securities; and

  (vii) any other action resulting, or which may result, in an increase or decrease in the number of securities in which a person is interested or in respect of which he has a short position;

(D) "**derivative**" includes any financial product whose value in whole or in part is determined directly or indirectly by reference to the price of an underlying security;

(E) "**disclosure period**" means the period commencing on 18 August 2010 (being the date 12 months prior to 18 August 2011) and ending on 19 August 2011 (being the latest practicable date prior to the publication of this document);

(F) "**HP relevant securities**" means relevant securities (such term having the meaning given to it in the City Code in relation to an offeror) of HP including any shares in the equity share capital of, or carrying voting rights in, HP and any securities carrying rights to convert or subscribe for any such shares;

(G) "**offer period**" means the period commencing on 18 August 2011 and ending on 19 August 2011 (being the latest practicable date prior to the publication of this document);

(H) a person having an "**interest**" or being "**interested**", in any securities includes where a person:

  (i) owns securities;

  (ii) has the right, whether conditional or absolute, to exercise or direct the exercise of the voting rights attaching to securities or has general control of them;

  (iii) by virtue of any agreement to purchase, option or derivative, has the right or option to acquire securities or call for their delivery or is under an obligation to take delivery of them, whether the right, option or obligation is conditional or absolute and whether it is in the money or otherwise;

  (iv) is a party to any derivative whose value is determined by reference to the price of securities and which results, or may result, in his having a long position in them; or

  (v) has long economic exposure, whether absolute or conditional, to changes in the price of those securities (but a person who only has a short position in securities is not treated as interested in those securities);

(I) "**Note 11 arrangement**" includes any indemnity or option arrangement, and any agreement or understanding, formal or informal, of whatever nature, relating to Autonomy relevant securities which may be an inducement to deal or refrain from dealing therein;

(J) "**relevant securities**" means Autonomy relevant securities and HP relevant securities;

(K) "**related parties**", in relation to a director, means those persons whose interests in shares the director would be required to disclose pursuant to Part 22 of the Companies Act and related regulations; and

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661752
Exh 2307-0064

(L)   "**short position**" means any short position (whether conditional or absolute and whether in the money or otherwise) including any short position under a derivative, any agreement to sell or any delivery obligation or right to require another person to purchase or take delivery.

3.2   **Interests in relevant securities**

*Interests in Autonomy relevant securities*

(A)   As at the close of business on 19 August 2011 (being the latest practicable date prior to the publication of this document):

(i)   None of HP, HP Vision, the Directors of HP Vision and their related parties or persons acting in concert with HP Vision, were interested, directly or indirectly, in any Autonomy relevant securities.

(ii)   The Autonomy Directors and their respective related parties were interested, directly or indirectly, in the following Autonomy relevant securities:

| Name | Number of Autonomy Shares |
|---|---|
| Michael Lynch | 20,288,320 |
| Sushovan Hussain | 399,274 |
| Richard Gaunt | 2,372,601 |
| Robert Webb | 8,941 |

(iii)   The Autonomy Directors held the following options in respect of Autonomy Shares under the Autonomy Share Schemes:

| Name | Scheme | Number of Autonomy Shares under Option | Exercise Price (£) | Date of Grant | Normal Exercise Period |
|---|---|---|---|---|---|
| Sushovan Hussain | Autonomy 1996 UK | 6,334 | 8.19 | 1/8/2007 | 7 years |
| Sushovan Hussain | Autonomy 1996 UK | 38,666 | 8.61 | 19/12/2007 | 7 years |
| Sushovan Hussain | Autonomy 1996 UK | 35,000 | 8.765 | 7/3/2008 | 7 years |
| Sushovan Hussain | Autonomy 1996 UK | 35,000 | 8.75 | 24/6/2008 | 7 years |
| Sushovan Hussain | Autonomy 1996 UK | 35,000 | 10.3 | 8/8/2008 | 7 years |
| Sushovan Hussain | Autonomy 1996 UK | 30,000 | 11.92 | 26/2/2009 | 7 years |
| Sushovan Hussain | Autonomy 1996 UK | 5,000 | 11.92 | 26/2/2009 | 7 years |
| Sushovan Hussain | Autonomy 1996 UK | 35,000 | 11.84 | 29/7/2009 | 7 years |
| Sushovan Hussain | Autonomy 1996 UK | 50,000 | 15.67 | 1/2/2010 | 7 years |
| Sushovan Hussain | Autonomy 1996 UK | 75,000 | 16 | 11/2/2011 | 7 years |
| Michael Lynch | Autonomy 1996 UK | 50,000 | 3.05 | 22/9/2005 | 7 years |
| Michael Lynch | Autonomy 1996 UK | 30,000 | 4.25 | 15/5/2006 | 7 years |
| Michael Lynch | Autonomy 1996 UK | 25,000 | 3.835 | 11/9/2006 | 7 years |
| Michael Lynch | Autonomy 1996 UK | 12,000 | 6.455 | 29/3/2007 | 7 years |
| Michael Lynch | Autonomy 1996 UK | 38,000 | 8.19 | 1/8/2007 | 7 years |
| Michael Lynch | Autonomy 1996 UK | 45,000 | 8.61 | 19/12/2007 | 7 years |
| Michael Lynch | Autonomy 1996 UK | 35,000 | 8.765 | 7/3/2008 | 7 years |
| Michael Lynch | Autonomy 1996 UK | 35,000 | 8.75 | 24/6/2008 | 7 years |
| Michael Lynch | Autonomy 1996 UK | 25,000 | 10.3 | 8/8/2008 | 7 years |
| Michael Lynch | Autonomy 1996 UK | 30,000 | 11.92 | 26/2/2009 | 7 years |
| Michael Lynch | Autonomy 1996 UK | 5,000 | 11.92 | 26/2/2009 | 7 years |
| Michael Lynch | Autonomy 1996 UK | 30,000 | 11.84 | 29/7/2009 | 7 years |
| Michael Lynch | Autonomy 1996 UK | 75,000 | 16 | 11/2/2011 | 7 years |

(B)   As at the latest practicable date prior to the publication of this document (which, in respect of Merrill Lynch International and Qatalyst Partners was the close of business on 19 August 2011 and in respect of Citigroup Global Markets Limited, Goldman Sachs International, J.P. Morgan

58

Limited and UBS Limited was the close of business on 18 August 2011), persons acting in concert with Autonomy:

(i)     were interested, directly or indirectly, in the following Autonomy relevant securities:

| Name | Number of Autonomy Shares |
|------|---------------------------|
| UBS Financial Services Inc | 7,630 |
| Managed Account Advisors, LLC | 32,425 |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 2,000 |

(ii)    held the following short positions in relation to Autonomy Shares:

| Name | Number of Autonomy Shares |
|------|---------------------------|
| UBS Securities LLC | 30,667 |

*Interests in HP relevant securities*

(C)     As at the close of business on 19 August 2011 (being the latest practicable date prior to the publication of this document):

(i)     Autonomy held no interests, rights to subscribe or short positions in HP relevant securities.

(ii)    The Autonomy Directors and their respective related parties were interested, directly or indirectly, in the following HP relevant securities:

| Name | Number of HP Shares |
|------|---------------------|
| Richard Gaunt | 6,000 |

(iii)   Save as disclosed at paragraph 3.2(C)(ii) above, the Autonomy Directors and their respective related parties held no interests, rights to subscribe or short positions in HP relevant securities.

## 3.3   Dealings in relevant securities

*Dealings in Autonomy relevant securities*

(A)     During the disclosure period, the following dealings in Autonomy relevant securities by or on behalf of HP Vision or persons acting in concert[1] with HP Vision have taken place[2]:

| Entity | Security | Trade Period Starts | Trade Period End | Total Bonds Bought Value | Low Price | High Price | Total Bonds Sold Value | Low Price | High Price |
|--------|----------|-------|-----|-------|-----------|------------|-------|-----------|------------|
| Barclays Capital Inc | Convertible Bond | 18/07/2011 | 17/08/2011 | 200,000 | 108.875 | 113.625 | 200,000 | 108.875 | 113.625 |
| Barclays Capital Inc | Convertible Bond | 18/06/2011 | 17/07/2011 | 0 | na | na | 0 | na | na |
| Barclays Capital Inc | Convertible Bond | 18/05/2011 | 17/06/2011 | 250,000 | 115.250 | 115.250 | 250,000 | 115.250 | 115.250 |
| Barclays Capital Inc | Convertible Bond | 18/02/2011 | 17/05/2011 | 850,000 | 111.125 | 111.750 | 850,000 | 111.125 | 111.750 |
| Barclays Capital Inc | Convertible Bond | 18/11/2010 | 17/02/2011 | 1,300,000 | 109.500 | 109.500 | 1,300,000 | 109.500 | 109.500 |
| Barclays Capital Inc | Convertible Bond | 18/08/2010 | 17/11/2010 | 350,000 | 109.500 | 117.750 | 350,000 | 109.500 | 117.750 |

---

(1)    Information relating to dealings in Autonomy relevant securities in the disclosure period by persons acting in concert with HP Vision has been given in relation to Barclays Capital as at the close of business on 18 August 2011 as the latest practicable date for which information relating to dealings could be collected in relation to Barclays Capital was the close of business on 18 August 2011.

(2)    Aggregation of dealings has been carried out in accordance with Note 2 to Rule 24.3 of the City Code. All acquisitions and disposals are aggregated separately and have not been netted off. The highest and lowest prices per Autonomy Share have been stated. A full list of dealings is available for inspection as set out in paragraph 13.8 of this Appendix IV.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661754
Exh 2307-0066

| Entity | Security | Trade Period | | Total Shares Bought | | | Total Shares Sold | | |
| | | Starts | End | Number | Low Price | High Price | Number | Low Price | High Price |
|---|---|---|---|---|---|---|---|---|---|
| Barclays Capital Inc | Ordinary Shares | 18/07/2011 | 17/08/2011 | 117,573 | 15.00 | 17.30 | 117,573 | 15.00 | 17.30 |
| Barclays Capital Inc | Ordinary Shares | 18/06/2011 | 17/07/2011 | 71,795 | 16.24 | 17.56 | 71,795 | 16.24 | 17.56 |
| Barclays Capital Inc | Ordinary Shares | 18/05/2011 | 17/06/2011 | 156,080 | 17.75 | 17.98 | 156,080 | 17.75 | 17.98 |
| Barclays Capital Inc | Ordinary Shares | 18/02/2011 | 17/05/2011 | 394,190 | 14.93 | 17.32 | 394,190 | 14.93 | 17.32 |
| Barclays Capital Inc | Ordinary Shares | 18/11/2010 | 17/02/2011 | 402,353 | 13.33 | 16.09 | 402,353 | 13.33 | 16.09 |
| Barclays Capital Inc | Ordinary Shares | 18/08/2010 | 17/11/2010 | 860,605 | 13.60 | 18.61 | 860,605 | 13.60 | 18.61 |

| Entity | Security | Trade Period | Total Shares Bought | | Total Shares Sold | |
| | | | Number | Price | Number | Price |
|---|---|---|---|---|---|---|
| Barclays Capital Inc | Ordinary Shares | 18/08/2011 | 59 | 15.15 | 59 | 15.15 |

(B) During the disclosure period, no dealings in Autonomy relevant securities by the Directors of HP or HP Vision or their respective related parties have taken place.

(C) During the disclosure period, no dealings in Autonomy relevant securities by persons who are party to a Note 11 arrangement with HP Vision and any person acting in concert with HP Vision have taken place.

(D) During the offer period, there have been no dealings in Autonomy relevant securities by the Autonomy Directors and their respective related parties.

(E) During the offer period, the following dealings in Autonomy relevant securities by persons acting in concert[3] with Autonomy have taken place:

| Registered Holder | Date | Transaction | Number of Autonomy Shares | Price per share |
|---|---|---|---|---|
| Merrill Lynch International[4][5] | 19/08/11 | Acquisition | 35,467 | £24.87-£24.9925 |
| Merrill Lynch, Pierce, Fenner & Smith Inc.[5] | 19/08/11 | Acquisition | 200 | USD 41.15 |

(F) During the offer period, no dealings in Autonomy relevant securities by persons who are party to a Note 11 arrangement with Autonomy or any person acting in concert with Autonomy have taken place.

*Dealings in HP relevant securities*

(G) During the offer period, no dealings in HP relevant securities by Autonomy have taken place.

(H) During the offer period, no dealings in HP relevant securities by the Autonomy Directors have taken place.

3.4   **General**

Save as disclosed in paragraphs 3.2 and 3.3, as at the close of business on 19 August 2011 (being the latest practicable date prior to the publication of this document[6][7]):

(A) None of:

(i) HP Vision;

---

(3) Information relating to dealings in Autonomy relevant securities during the offer period by persons acting in concert with Autonomy has not been given in relation to Citigroup Global Markets Limited, Goldman Sachs International, J.P. Morgan Limited and UBS Limited as the latest practicable date for which information relating to dealings could be collected in relation to these entities was the close of business on 18 August 2011, prior to the commencement of the offer period.

(4) Aggregation of dealings has been carried out in accordance with Note 2 to Rule 24.3 of the City Code. All acquisitions and disposals are aggregated separately and have not been netted off. The highest and lowest prices per Autonomy Share have been stated. A full list of dealings is available for inspection as set out in paragraph 13.8 of this Appendix IV.

(5) These transactions took place as a consequence of book flattening. The Panel informed Merrill Lynch International on an ex parte basis that such transactions were permissible and have no City Code consequences.

(6) In relation to Citigroup Global Markets Limited, Goldman Sachs International, J.P. Morgan and UBS Limited, each a person acting in concert with Autonomy, the latest practicable date prior to publication of this document was the close of business on 18 August 2011.

(7) In relation to Barclays Capital, a person acting in concert with HP Vision, the latest practicable date prior to publication of this document was the close of business on 18 August 2011.

60

    (ii)   the Directors of HP or their respective related parties;

    (iii)  the Directors of HP Vision or their respective related parties;

    (iv)  any person acting in concert with HP Vision; or

    (v)   any person who is a party to a Note 11 arrangement with HP Vision or any person acting in concert with HP Vision,

had any interest in or right to subscribe for any Autonomy relevant securities or any short position in respect of Autonomy relevant securities (or save for any borrowed shares which have been on-lent or sold) had borrowed or lent any Autonomy relevant securities (including, for these purposes, any financial collateral arrangements of the kind referred to in Note 4 on Rule 4.6 of the City Code), nor has any such person dealt in any Autonomy relevant securities during the disclosure period[8].

(B)  None of:

    (i)   Autonomy;

    (ii)  the Directors of Autonomy or their respective related parties;

    (iii)  any person acting in concert with Autonomy; or

    (iv)  any person who is a party to a Note 11 arrangement with Autonomy or any person acting in concert with Autonomy,

had any interest in or right to subscribe for any Autonomy relevant securities (or, in the case of Autonomy and the Directors of Autonomy and their respective related parties, HP relevant securities) or any short position in respect of any Autonomy relevant securities (or, in the case of Autonomy and the Directors of Autonomy and their respective related parties, HP relevant securities), nor has any such person dealt in any Autonomy relevant securities (or, in the case of Autonomy and the Directors of Autonomy and their respective related parties, HP relevant securities) during the offer period.[9]

(C)  Neither Autonomy nor any person acting in concert with Autonomy had borrowed or lent any Autonomy relevant securities (including, for these purposes, any financial collateral arrangements of the kind referred to in Note 4 on Rule 4.6 of the City Code), save for any borrowed shares which have been either on-lent or sold.

(D)  Autonomy has not redeemed or purchased any Autonomy Shares or any securities convertible into rights to subscribe for or options in respect of or derivatives referenced to Autonomy Shares during the disclosure period.

## 3.5  No arrangements

(A)  Neither HP Vision nor any person acting in concert with HP Vision has any Note 11 arrangement with any person.

(B)  Neither Autonomy nor any person acting in concert with Autonomy has any Note 11 arrangement with any person.

---

[8]    Information relating to dealings in Autonomy relevant securities in the disclosure period by persons acting in concert with HP Vision has been given in relation to Barclays Capital as at the close of business on 18 August 2011 as the latest practicable date for which information relating to dealings could be collected in relation to Barclays Capital was the close of business on 18 August 2011.

[9]    Information relating to dealings in Autonomy relevant securities in the offer period by persons acting in concert with Autonomy has not been given in relation to Citigroup Global Markets Limited, Goldman Sachs International, J.P. Morgan Limited and UBS Limited as the latest practicable date for which information relating to dealings could be collected in relation to these entities was the close of business on 18 August 2011, prior to the commencement of the offer period.

61

HP-SEC-01661756
Exh 2307-0068

4. **Irrevocable undertakings**

4.1 Irrevocable undertakings have been given by the Autonomy Directors in respect of Autonomy Shares as detailed below. Together these Autonomy Shares in aggregate amount to 22,200,066 Autonomy Shares, representing approximately 9.12 per cent of the existing issued share capital of Autonomy.

| Name | Number of Autonomy Shares | Percentage of issued share capital (%) |
|---|---|---|
| Michael Lynch | 19,808,546 | 8.136 |
| Sushovan Hussain | 9,978 | 0.004 |
| Richard Gaunt | 2,372,601 | 0.975 |
| Robert Webb | 8,941 | 0.004 |

4.2 The irrevocable undertakings provided by these Autonomy Directors will remain binding in the event of a competing offer being made for Autonomy and cease to be binding only in the event the Offer lapses or is withdrawn without having become wholly unconditional.

4.3 The Autonomy Directors have also agreed not to withdraw any acceptance of the Offer in relation to the Autonomy Shares subject to these undertakings and not to knowingly solicit, initiate or encourage the submission of proposals or offers from any person (other than HP Vision) in relation to a Competing Proposal, provided that this shall not prevent a director (as a member of the board of directors of Autonomy) from responding to any approach, proposal or offer made by any person (other than HP Vision), provided that the approach, proposal or offer has not been made as a consequence of any breach of the undertaking not to knowingly solicit, initiate or encourage the submission of any proposals or offers in relation to a Competing Proposal.

4.4 In the event HP elects to implement the acquisition of Autonomy by way of a Scheme, the Directors have agreed to vote in favour of resolutions to be proposed in connection with the Scheme and any related reduction of share capital.

5. **Market quotations**

The following table shows the closing middle market quotations for Autonomy Shares, as derived from the London Stock Exchange Daily Official List on (i) the first Business Day in each of the six months immediately before the date of this document; (ii) 17 August 2011 (being the last Business Day prior to the commencement of the Offer Period); and (iii) 19 August 2011 (being the latest practicable date prior to the publication of this document):

| Date | | Price per Autonomy Share |
|---|---|---|
| 1. | **First Business Day** | |
| | 1 March 2011 | £16.52 |
| | 1 April 2011 | £16.03 |
| | 3 May 2011 | £16.36 |
| | 1 June 2011 | £17.94 |
| | 1 July 2011 | £17.03 |
| | 1 August 2011 | £16.64 |
| 2. | **Last Business Day prior to commencement of Offer Period** | |
| | 17 August 2011 | £15.58 |
| 3. | **Latest practicable date prior to publication of this document** | |
| | 19 August 2011 | £24.52 |

6. **Autonomy Share Schemes and Autonomy Convertible Bonds**

6.1 The Offer extends to any Autonomy Shares unconditionally allotted or issued or unconditionally allotted and fully paid (or credited as fully paid) pursuant to the exercise of options under the Autonomy Share Schemes before the date on which the Offer closes (or, subject to the City Code, by such earlier date as HP Vision may decide).

To the extent that such options are not exercised, and if the Offer becomes or is declared unconditional in all respects, appropriate proposals will be made to holders of options under the

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661757
Exh 2307-0069

Autonomy Share Schemes which will include the offer for participants under the Autonomy US Plans to exchange their options for new equivalent options over HP Shares. Autonomy has agreed not to exercise its discretion under the Autonomy US Plans (where relevant) to accelerate vesting where the option exchange is offered.

Participants in the Autonomy Share Schemes will be contacted separately regarding the effect of the Offer on their options under the Autonomy Share Schemes and, where applicable, the actions they can take in respect of these options.

The Offer will extend to any Autonomy Shares unconditionally allotted or issued or unconditionally allotted and fully paid (or credited as fully paid) pursuant to the valid conversion of any Autonomy Convertible Bonds before the date on which the Offer closes (or, subject to the City Code, by such earlier date as HP Vision may decide).

To the extent that such Autonomy Convertible Bonds are not converted, appropriate proposals will be made in due course to holders of the Autonomy Convertible Bonds. The Convertible Bond Offer will give holders of the Autonomy Convertible Bonds the same consideration they would receive if, after the Offer becomes or is declared unconditional in all respects, they were to exercise their conversion rights pursuant to the terms of the Autonomy Convertible Bonds and accept the Offer in respect of the Autonomy Shares arising on conversion. For illustrative purposes, based on a closing date of 12 September 2011, the Autonomy Convertible Bond would have an adjusted exercise price of £16.5965. The Convertible Bond Offer will be conditional on the Offer becoming or being declared unconditional in all respects.

HP Vision reserves the right to adjust the terms of the Convertible Bond Offer if, prior to the date on which the Offer becomes or is declared unconditional in all respects, Autonomy takes any action which results in or would result in any material adjustment to the conversion price of the Autonomy Convertible Bonds.

The document containing the full terms and conditions of the Convertible Bond Offer will be despatched as soon as practicable after the date on which the Offer Document is posted to Autonomy Shareholders.

7.    **Material contracts**

7.1   In addition to the Offer Agreement (the terms of which are summarised in paragraph 7.2(A) below), the following contracts, not being contracts entered into in the ordinary course of business, which are or may be material, have been entered into by members of the Autonomy Group within the two years immediately preceding the commencement of the Offer Period:

(A)   **Purchase and Sale Agreement**

Purchase and Sale Agreement, dated as of 15 May 2011 (the "**Purchase and Sale Agreement**"), by and among (1) Autonomy (as Purchaser), (2) Iron Mountain Incorporated, Iron Mountain Information Management Inc., Iron Mountain New Zealand Ltd., Iron Mountain Australia Pty Ltd. and Iron Mountain Canada Corporation (as Asset Sellers) and (3) Iron Mountain Information Management Inc. and Iron Mountain Asia Pacific Holdings Limited (as Stock Sellers), pursuant to which:

(i)    Autonomy agreed to purchase all of the issued and outstanding shares of capital stock and other equity securities held by the Stock Sellers in the following companies: (a) U.S. Digital Assets, LLC, (b) Mimosa Systems, Inc., (c) Stratify, Inc., (d) Iron Mountain Digital GmbH, (e) Iron Mountain Digital S.A.R.L., (f) Iron Mountain Digital Limited and (g) Iron Mountain Digital K.K.;

(ii)   Autonomy agreed to purchase certain assets from the Asset Sellers, including assets relating to archiving, eDiscovery and online backup; and

(iii)  the aggregate purchase price payable was an amount in cash equal to $380,000,000 plus a preliminary working capital adjustment (resulting in a total consideration of $401,000,000), with Autonomy also agreeing to assume certain specified liabilities. The preliminary purchase price allocation in the unaudited interim results for the six months ended 30 June 2011 (which are incorporated into this document by Appendix II) attributed a value of $200,000,000 to purchased intangibles comprising purchased

63

technology, customer relationships and brand names, with the balance being attributed to goodwill in the form of future operating synergies.

(B) **Autonomy Convertible Bonds**

£496,900,000 in principal amount of convertible bonds of £50,000 each (the "**Autonomy Convertible Bonds**") as constituted by a trust deed dated 4 March 2011 between Autonomy and Bank of America Trustees Limited as trustee for the holders of the Autonomy Convertible Bonds. The Autonomy Convertible Bonds are convertible into ordinary shares of Autonomy and carry a semi-annual coupon of 3.25 per cent per annum and an initial conversion price of £20.6334 per ordinary share. The Autonomy Convertible Bonds were issued at 100 per cent of their principal amount and, unless previously redeemed, converted or cancelled, will mature on 4 March 2015, at which time Autonomy will redeem the Autonomy Convertible Bonds at their principal amount. The conversion rights can be exercised at any time up to and including 18 February 2015, or (if Autonomy calls for redemption of such Autonomy Convertible Bonds prior to 4 March 2015) ten business days prior to the date fixed for redemption by Autonomy.

Autonomy may redeem all, but not some only, of the Autonomy Convertible Bonds then outstanding at their principal amount (together with accrued but unpaid interest) to the date fixed for redemption:

(i) on or after 25 March 2013, and prior to maturity, subject to the condition that the price of the ordinary shares in a specified period prior to Autonomy giving notice of redemption is at least 130 per cent of the then prevailing conversion price;

(ii) at any time, if there have been redemptions, conversions or cancellations in respect of 85 per cent or more in principal amount of the Autonomy Convertible Bonds originally issued; or

(iii) within a specified period of a change of control of Autonomy or an offer to Autonomy shareholders to acquire all or a majority of the issued ordinary share capital of Autonomy and (such offer having become or been declared unconditional in all respects) the right to cast more than 50 per cent of the votes at a general meeting of Autonomy vesting in any person.

The Autonomy Convertible Bonds are admitted to trading on the London Stock Exchange.

7.2 The following contracts, not being contracts entered into in the ordinary course of business, which are or may be material, have been entered into by HP Vision and its subsidiaries within the two years immediately preceding the commencement of the Offer Period:

(A) **Offer Agreement**

HP, HP Vision and Autonomy have entered into an Offer Agreement in connection with the Offer. The Offer Agreement includes, among other things, provisions covering the following matters:

(i) Inducement fee

Autonomy has agreed that it will pay HP Vision an inducement fee of one per cent of the value of Autonomy's fully diluted equity share capital by reference to the price per Autonomy Share under the Offer (subject to possible adjustments for UK VAT) if (i) the Autonomy Directors do not provide a unanimous and unqualified recommendation of the Offer in the Offer Document (other than where the Autonomy Directors determine or announce they are recommending or resolving to recommend a Competing Proposal or for a temporary failure to provide a recommendation of the Offer during the period when the Autonomy Directors are considering whether or not to recommend a Competing Proposal for the purposes of the matching rights (as summarised below)); (ii) the Autonomy Directors withdraw, qualify or adversely modify their recommendation of the Offer (other than where the Autonomy Directors determine or announce they are recommending or resolving to recommend a Competing Proposal or for a temporary withdrawal, qualification or adverse modification of their recommendation of the Offer during the period when the Autonomy Directors are considering whether or not to recommend a Competing Proposal for the purposes of the matching rights); (iii) the Autonomy Directors do not provide a unanimous and unqualified recommendation of a

64

HP-SEC-01661759
Exh 2307-0071

revised offer announced by HP pursuant to exercise of its matching rights; or (iv) a Competing Proposal is made and becomes or is declared unconditional in all respects or is otherwise completed. Autonomy will not be obliged to pay any amount which the Panel determines would not be permitted by Rule 21.2 of the City Code or to pay any amount which would not be permitted to be paid under the Listing Rules.

(ii)     Non-solicitation

Autonomy has also agreed that (i) it will not, and it will procure that no member of the Autonomy Group nor any of its or their representatives will, directly or indirectly (a) knowingly solicit, initiate, or encourage the submission of proposals or offers in relation to a Competing Proposal (provided that this does not prevent Autonomy or any other member of the Autonomy Group or its or their representatives responding to any approach, proposals or offers); or (b) will not provide information to any person in relation to a Competing Proposal except as required under Rule 20.2 or as is necessary for the Autonomy Directors to comply with their fiduciary duties and applicable laws, rules and regulations, or which the Autonomy Directors reasonably consider is a reasonable request and is required by the requesting party to proceed with a Competing Proposal; and (ii) it will notify HP Vision of any approach, proposal or offer in relation to any Competing Proposal (but not the identity of the approaching party or the terms of the proposal), so far as lawful to do so, and of any requests made by other persons under Rule 20.2 of the City Code.

(iii)    Matching right

If the Autonomy Directors determine that a Competing Proposal constitutes a Superior Proposal, Autonomy has agreed to notify HP Vision and provide the material details which led to such conclusion and notify HP Vision of the date of any meeting of the Board of Autonomy convened to consider whether or not to recommend the Superior Proposal and until which time Autonomy has agreed (subject to compliance with the Autonomy Directors fiduciary and legal duties and applicable laws, rules and regulations) not to recommend any Superior Proposal or withdraw any Scheme setting out Offer proposals from HP Vision. If within two Business Days of receipt of the notice of the Superior Proposal, HP Vision fails to confirm that it intends to increase its offer to a price or financial value equal to or greater than that provided under the Superior Proposal; or, having provided the above confirmation, HP Vision fails within two Business Days of such confirmation to announce its revised offer, then the Autonomy Directors shall be entitled to withdraw, qualify or modify their recommendation of the Offer. Otherwise, Autonomy has agreed to procure that the Autonomy Directors recommend the revised offer of HP Vision (subject to compliance with their fiduciary and legal duties and applicable laws, rules and regulations).

(iv)     Conditions and regulatory filings

HP has agreed to use all reasonable endeavours to procure the satisfaction of certain regulatory conditions as set out in paragraphs b. and c. of Appendix I as soon as practicable following the Announcement Date. Autonomy has agreed that it will work co-operatively with HP to prepare all regulatory filings required to obtain the clearances, consents, permissions and waivers necessary or reasonably considered appropriate by HP.

(v)      Switch to a Scheme

If HP Vision determines that it wishes to implement the acquisition of Autonomy by way of a Scheme, it has agreed do so on substantially the same terms and conditions as set out in the Announcement and Autonomy has agreed to undertake or cause to be taken all reasonable steps to promptly implement a Scheme and to consult with and keep HP Vision informed of all dealings with the Panel and the Court in connection with the Scheme.

(vi)     Acceptance period

HP Vision has agreed with Autonomy that until such time as the Offer becomes or is declared unconditional as to acceptances, it will extend the Offer for such further period as may be agreed between HP Vision and Autonomy (or in the absence of an agreement

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661760
Exh 2307-0072

by the time the extension would need to be announced, by the lesser of seven days and the period remaining until the sixtieth day after the day upon which the Offer Document is published), provided always that HP Vision will not be obliged to extend the period during which the Offer may become or be declared unconditional as to acceptances beyond midnight on the sixtieth day after the day on which the initial Offer Document in respect of the Offer is published.

(B)   **Bridge Facility**

364 Day Bridge Credit Agreement, dated as of 18 August 2011 (the "**Bridge Facility**"), by and among HP, as Borrower, the lenders party thereto, Barclays Bank PLC, as Administrative Agent and Barclays Capital, as Sole Lead Arranger and Sole Bookrunner, pursuant to which the lenders thereunder shall make available £5,000,000,000 to HP in order to fund a portion of the cash consideration payable by HP Vision under the terms of the Offer (including associated fees and expenses). Borrowings will bear interest at an annual rate based on, for borrowings in Dollars of the United States, LIBOR or an alternate base rate, as the election of HP, and for borrowings in Pounds Sterling, LIBOR, plus in both cases an applicable margin based on the long-term debt ratings of HP. The facility agreement contains customary certain funds provisions, representations and warranties, covenants, prepayment provisions and events of default. HP intends to supplement the Bridge Facility with existing cash resources and currently intends to refinance any drawings under the Bridge Facility with a mix of capital markets issuances of bonds and a substantial amount of cash that is currently held outside the US.

8.   **Service agreements and letters of appointment**

8.1   Autonomy Systems has entered into a service agreement with Mr. Hussain. Autonomy has entered into a service agreement with Dr. Lynch. Autonomy has entered into letters of appointment with each of the Non-Executive Directors. The terms of these service agreements and letters of appointment, together with the dates when each director joined Autonomy/Autonomy Systems, are summarised below:

| Name | Date of appointment | Notice period to be given by Autonomy/ Autonomy Systems and Director | Current annual salary/basic fees |
|---|---|---|---|
| **Executive Directors** | | | |
| Michael Lynch | 9 July 1998 | 6 months | £377,685 |
| Sushovan Hussain | 27 June 2001 | 12 months | £339,916 |
| **Non-Executive Directors** | | | |
| Robert Webb | 1 May 2009 | 3 months | £120,000 |
| Frank Kelly | 1 May 2010 | 3 months | £60,000 |
| Jonathan Bloomer | 1 August 2010 | 3 months | £60,000 (with additional fee of £20,000 for chairing Audit Committee) |
| John McMonigall | 2 July 1998 | 3 months | £60,000 |
| Richard Gaunt | 9 July 1998[10] | 3 months | £60,000 |

8.2   *Executive Directors*

Neither of the Executive Directors has a fixed term service contract.

Executive Directors are eligible for a cash bonus of 50% of base salary for basic achievement and up to an additional 50% of base salary for over performance against pre-agreed financial targets and also strategic targets. In 2010, Dr. Lynch and Mr. Hussain each achieved a bonus of 50% of base salary. Autonomy also has a deferred bonus policy, in which Executive Directors are granted share options following the achievement of pre-agreed financial targets and strategic targets, with vesting over subsequent years. Executive Directors are eligible for a single annual grant of options over up to 150,000 shares if the performance levels are achieved. In 2010, Dr. Lynch and Mr. Hussain were each

(10)   Mr. Gaunt commenced service as a Non-Executive Director in 2006.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661761
Exh 2307-0073

issued 75,000 share options. Autonomy also operates a deferred share bonus policy, in which it grants shares which vest depending on the extent to which the business meets targets over a three year period. The maximum annual award level for Executive Directors is 100% of base salary. In the event of a change of control during the performance period, performance will be measured at the latest possible date before the change of control to assess the proportion vested based on performance. The proportion of the award that may then be released will then be time pro-rated. The Remuneration Committee will have discretion to disapply the impact of time pro-rating and to permit up to 100% of awards to vest on a change of control, if due to exceptional business circumstances returns to shareholders are considered to be at a superior level.

Each Executive Director is entitled to: (i) a company car or car allowance; (ii) private medical insurance; (iii) participate in the matching pension scheme; and (iv) performance-related bonus remuneration (as discussed above).

The service agreements contain standard provisions allowing Autonomy/Autonomy Systems to terminate summarily for cause, such as a serious breach of their employment agreement. Autonomy Systems is entitled to terminate Mr. Hussain's employment summarily on making a payment of basic salary (less tax and other statutory deductions) in lieu of notice. Neither service agreement has been entered into or amended within six months of the date of this document.

Mr. Hussain's employment agreement (as amended by supplemental agreements and letters) indicates that he is entitled to a cash severance benefit on a change of control. A cash severance benefit equal to 12 months salary will be payable on covered terminations (i.e. within one month before or 12 months after the change on a termination by Autonomy Systems without cause or a constructive dismissal). In addition, medical benefits continue for 12 months following the covered termination (including eligible dependents). Options granted to Mr. Hussain since May 2002 which do not accelerate on a change of control will automatically accelerate if his service terminates through an involuntary termination effected within 6 months of a change of control.

8.3   *Non-Executive Directors*

All Non-Executive Directors are appointed under Autonomy's Articles of Association, which require that one third of all directors shall retire at each Annual General Meeting but that all directors must seek re-election at least every three years (they are also subject to review by the Nominating Committee prior to being considered for election or re-election by shareholders). None of the letters of appointment has been entered into or amended within six months of the date of this document.

Non-Executive Directors are entitled to basic fees only (as set out in the table above) and do not participate in any bonus or performance related plans or any of the Autonomy Group's share incentive, option or pension schemes.

Non-Executive Directors are entitled to be reimbursed for their reasonable out-of-pocket expenses incurred in attending board meetings and committees of the board.

The appointment of each Non-Executive Director is terminable on 3 months notice or payment of salary in lieu of notice. The appointment of Mr. Webb, Professor Kelly and Mr. Bloomer will also terminate automatically with no right to compensation if an offer for the entire issued share capital of Autonomy becomes wholly unconditional.

## 9.   Basis of calculations and sources of information

9.1   The maximum value of the Offer attributable to the entire issued and to be issued ordinary share capital of Autonomy (and other statements made by reference to the issued share capital of Autonomy) is based on there being 243,469,433 Autonomy Shares now in issue together with options of which 9,464,327 are in the money based on the Offer Price and a US Dollar / Sterling exchange rate of 1.6543, with an aggregate exercise price of £122,381,051 and Autonomy Convertible Bonds with a principal amount of £496,900,000.

9.2   Other statements made by reference to the issued share capital of Autonomy are based on there being 243,469,433 Autonomy Shares in issue.

9.3   The Offer made is based on there being no declaration or payment of any further dividends on any Autonomy Shares, including any interim dividend.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661762
Exh 2307-0074

9.4   Unless otherwise stated, the financial information relating to Autonomy is extracted from Autonomy's annual report and accounts for the year ended 31 December 2010 or Autonomy's unaudited interim results for the six months ended 30 June 2011.

9.5   Unless otherwise stated, the Closing Prices of Autonomy Shares represent the closing middle market prices for Autonomy Shares on the relevant dates as derived from the Daily Official List.

9.6   The one, three and twelve month average share prices for Autonomy Shares have been calculated using the closing middle market prices for Autonomy Shares on the relevant dates as derived from Bloomberg Professional, a service operated by Bloomberg Finance L.P.

9.7   The fifty-two week high price for Autonomy Shares has been calculated using the intra-day middle market prices for Autonomy Shares on the relevant dates as derived from Bloomberg Professional, a service operated by Bloomberg Finance L.P.

## 10.   Financing arrangements and cash confirmation

10.1   The cash consideration payable by HP Vision under the terms of the Offer will be funded from a combination of HP's existing cash resources and debt financing which has been arranged by Barclays Capital and as summarised in paragraph 7.2 above.

HP Vision does not intend that the payment of any interest or other charges under the debt financing arranged with Barclays Capital will depend to any significant extent on the business of any member of the Autonomy Group.

10.2   Barclays Capital and Perella Weinberg Partners, as joint financial advisers to HP Vision, have confirmed that they are satisfied that sufficient resources are available to HP Vision to enable it to satisfy, in full, the cash consideration payable by HP Vision under the terms of the Offer.

## 11.   Persons acting in concert

11.1   In addition to HP, the Directors of HP and the Directors of HP Vision, the persons who are acting in concert within the meaning given in the City Code, with HP Vision, include:

| Name | Type | Registered Office | Relationship with HP Vision |
|---|---|---|---|
| Barclays Capital | Adviser | Barclays Bank PLC's registered office: 1 Churchill Place, London E14 5HP | Financial Adviser in relation to the Offer and Corporate Broker |
| Perella Weinberg Partners | Adviser | 767 Fifth Avenue New York NY 10153, United States | Financial Adviser in relation to the Offer |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661763
Exh 2307-0075

11.2 In addition to the Directors of Autonomy the persons who are acting in concert, within the meaning given in the City Code, with Autonomy include:

| Name | Type | Registered Office | Relationship with Autonomy |
|---|---|---|---|
| Qatalyst Partners LLP | Adviser | 4 Park Place London SW1A 1LP | Lead Financial Adviser and sole Rule 3 Adviser in relation to the Offer |
| Citigroup Global Markets Limited | Adviser | Citigroup Centre Canada Square Canary Wharf London E14 5LB | Joint Financial Adviser in relation to the Offer |
| Goldman Sachs International | Adviser | Peterborough Court 133 Fleet Street London EC4A 2BB | Joint Financial Adviser in relation to the Offer |
| J.P. Morgan Limited | Adviser | 125 London Wall London EC2Y 5AJ | Joint Financial Adviser in relation to the Offer |
| Merrill Lynch International | Adviser | 2 King Edward Street London EC1A 1HQ | Joint Financial Adviser in relation to the Offer |
| UBS Limited | Adviser | 1 Finsbury Avenue London EC2M 2PP | Corporate Broker and Joint Financial Adviser in relation to the Offer |

## 12.   General

12.1 Save as disclosed in this document, HP Vision is not a party to any agreement or arrangement which relates to the circumstances in which it may or may, not invoke, or seek to invoke a condition to the Offer.

12.2 Save as disclosed in this document, the Directors of Autonomy are not aware of any material change in the financial or trading position of the Autonomy Group since 31 December 2010, being the date to which the last published audited accounts of Autonomy were prepared.

12.3 Save as disclosed in this document, no agreement, arrangement or understanding (including any compensation arrangement) exists between HP Vision or any person acting in concert with HP Vision for the purposes of the Offer and any of the Directors or recent Directors, shareholders or recent shareholders of Autonomy or any person interested or recently interested in the Autonomy Shares having any connection with or dependence upon the Offer.

12.4 There is no agreement, arrangement or understanding whereby the beneficial ownership of any of the Autonomy Shares to be acquired by HP Vision pursuant to the Offer will be transferred to any person, save that HP Vision reserves the right to transfer any such Autonomy Shares to any member of the HP Group or to a nominee.

12.5 Save as disclosed in this document, HP Vision does not intend that the payment of interest on, repayment of, or security for, any liability (contingent of otherwise) will depend to any significant extent on the business of Autonomy.

12.6 Barclays Capital has given and not withdrawn its written consent to the issue of this document with the inclusion of the references to its name in the form and context in which they appear.

12.7 Perella Weinberg Partners has given and not withdrawn its written consent to the issue of this document with the inclusion of the references to its name in the form and context in which they appear.

12.8 Qatalyst Partners has given and not withdrawn its written consent to the issue of this document with the inclusion of the references to its name in the form and context in which they appear.

12.9 Save as disclosed in this document, there has been no material change to any of the information contained in announcements published by HP Vision, HP and Autonomy in relation to the Offer since the commencement of the Offer Period.

69

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661764
Exh 2307-0076

12.10 Save as disclosed in the HP Unaudited Quarterly results for the three months ended 31 July 2011 incorporated by reference in Appendix III to this document, the Directors of HP are not aware of any material change to the financial or trading position of the HP Group since 31 October 2010, being the date to which the last published audited accounts of HP were prepared.

13.  **Documents available for inspection**

Copies of the following documents will be published on HP's website (http://www.hp.com/investor/ offerdocuments) and Autonomy's website (http://news.autonomy.com) and will also be available for inspection at the offices of Gibson, Dunn & Crutcher LLP, Telephone House, 2-4 Temple Avenue, London EC4Y 0HB, during normal business hours on any weekday (Saturdays, Sundays and public holidays excepted), in either case while the Offer remains open for acceptance:

13.1  The constitutional documents of HP and HP Vision;

13.2  The Memorandum and Articles of Association of Autonomy;

13.3  The published audited consolidated accounts of Autonomy for each of the two financial years ended 31 December 2010 and 31 December 2009;

13.4  The published annual report and accounts of HP for each of the two financial years ended 31 October 2010 and 31 October 2009;

13.5  The written consents referred to in paragraphs 12.6 to 12.8 of this Appendix IV;

13.6  The Offer Agreement and the Bridge Facility referred to in paragraph 7 of this Appendix IV;

13.7  The irrevocable undertakings referred to in paragraph 4 of this Appendix IV;

13.8  A full list of the dealings referred to in paragraph 3.3 of this Appendix IV; and

13.9  This document and the Form of Acceptance.

14.  **Documents incorporated by reference**

14.1  Appendix II incorporates financial information on the Autonomy Group by reference to Autonomy's audited annual report and accounts for the financial periods ended 31 December 2008, 31 December 2009 and 31 December 2010 and the unaudited interim results for the six months ended 30 June 2011. These documents are available for inspection on the following website:

http://www.autonomy.com/content/Investors/financial-reports/index.en.html

Please refer to Appendix II for the relevant page numbers of the documents referred to above.

Any Autonomy Shareholder, person with information rights, holders of options under the Autonomy Share Schemes or holders of Autonomy Convertible Bonds may request a copy of such documents and all future documents, announcements and information sent to such person in relation to the Offer in hard copy form. A hard copy of such documents will not be sent to such persons unless requested from Capita Registrars at Corporate Actions, Capita Registrars, The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU or by telephone on 0871 664 0321 (when telephoning from inside the United Kingdom) or +44 208 639 3399 (when telephoning from outside the United Kingdom) between 9.00 a.m. and 5.00 p.m. (London time) Monday to Friday (except United Kingdom public holidays). Calls to the 0871 664 0321 number are charged at 10 per minute including VAT. Calls to the +44 208 639 3399 number from outside the United Kingdom are charged at applicable international rates. Calls may be recorded and monitored randomly for security and training purposes. The helpline cannot provide advice on the merits of the Offer or give legal, financial or tax advice. If requested, copies of documents will be provided within two Business Days of such a request.

14.2  Appendix III incorporates financial information on HP by reference to HP's audited annual report and accounts for the financial periods ended 31 October 2008, 31 October 2009 and 31 October 2010 and the unaudited quarterly earnings for its third fiscal quarter ended 31 July 2011. These documents are available for inspection on the following website:

http://www.hp.com/investor/home

Please refer to Appendix III for the relevant page numbers of the documents referred to above.

A copy of such documents can be obtained in hard copy from Capita Registrars in the manner set out in paragraph 14.1 above.

15.  **Date of despatch and publication**

This document was despatched and published on 22 August 2011.

70

HP-SEC-01661765
Exh 2307-0077

# APPENDIX V
## GLOSSARY & DEFINITIONS

In this document the following definitions and glossary of use apply, unless the context requires otherwise:

| | |
|---|---|
| "Announcement" | the joint announcement dated 18 August 2011 made by HP and Autonomy whereby HP Vision announced its firm intention to make a recommended cash offer for Autonomy |
| "Announcement Date" | 18 August 2011 |
| "Associates" | has the meaning given in Part 28 of the Companies Act |
| "Autonomy" or the "Company" | Autonomy Corporation plc, a company registered in England and Wales with registered number 03175909 |
| "Autonomy Convertible Bonds" | the 3.25 per cent convertible bonds due March 2015 convertible into ordinary shares of Autonomy, issued by Autonomy and admitted to trading on the London Stock Exchange |
| "Autonomy Directors" or "Directors of Autonomy" or "Board of Autonomy" or "Autonomy Board" | the board of directors of Autonomy, or any one of them (as appropriate) |
| "Autonomy Group" | Autonomy and its subsidiaries and subsidiary undertakings |
| "Autonomy Intra Group Transactions" | acquisitions, disposals or transfers of assets or shares or other securities, rights or interests between Autonomy and wholly-owned subsidiaries of Autonomy or between wholly-owned subsidiaries of Autonomy |
| "Autonomy Shares" | the fully paid ordinary shares of ⅓ pence each in the capital of Autonomy |
| "Autonomy Shareholders" | the holders of Autonomy Shares |
| "Autonomy Share Schemes" | the Autonomy Corporation plc Discretionary Share Option Scheme 1996, together with the Autonomy US Plans |
| "Autonomy Systems" | Autonomy Systems Limited, a company registered in England and Wales with registered number 03063054 |
| "Autonomy US Plans" | the Autonomy Corporation plc US Share Option Plan 1998; the Autonomy Corporation plc US Share Option Plan 2008; the Cardiff Software Inc. 1997 Equity Incentive Plan; the Cardiff Software Inc. 2000 Stock Option Plan; the Discovery Mining Inc. 2003 Stock Incentive Plan; the iManage Inc. 1997 Stock Option Plan; the iManage Inc. 2000 Non-Officer Stock Option Plan; the Interwoven Inc. 1999 Equity Incentive Plan; the Interwoven Inc. 2000 Stock Incentive Plan; the Interwoven Inc. 2003 Acquisition Plan; the Interwoven Inc. 2008 Equity Incentive Plan; the Optimost LLC 2006 Equity Compensation Plan; the Virage Inc. 1997 Stock Option Plan; the Verity, Inc. 1996 Non Statutory Stock Option Plan; the Verity Canada 1997 Non Statutory Stock Option Plan; and the Zantaz Inc. 1998 Stock Plan |
| "Barclays Capital" | Barclays Capital, the investment banking division of Barclays Bank PLC |
| "Board of HP Vision" | the board of directors of HP Vision |
| "Business Day" | a day, not being a public holiday, Saturday or Sunday, on which clearing banks in London are open for normal business |
| "Capita Registrars" | Capita Registrars, receiving agent for the Offer |

71

HP-SEC-01661766
Exh 2307-0078

| | |
|---|---|
| "certificated" or "certificated form" | in relation to a share or other security, a share or other security title to which is recorded in the relevant register of the share or other security as being held in certificated form (that is, not in CREST) |
| "Citigroup Global Markets Limited" | Citigroup Global Markets Limited, joint financial adviser to Autonomy |
| "City Code" | the City Code on Takeovers and Mergers |
| "Closing Price" | the closing middle market quotation of a Autonomy Share as derived from the Daily Official List or Bloomberg Professional |
| "Companies Act" | the United Kingdom Companies Act 2006, as from time to time amended |
| "Competing Proposal" | bears the meaning as set out in the Offer Agreement, being any approach, proposal or offer (whether or not subject to pre-conditions) put forward by a third party who is not acting in concert with HP Vision for: (i) an offer (as defined in the City Code) for 30 per cent or more of the share carrying voting rights in Autonomy (whether proposed to be implemented by way of tender offer or scheme of arrangement); or (ii) any transaction which would comprise a Class 1 transaction under the Listing Rules for Autonomy |
| "Convertible Bond Offer" | the offer to be made by HP Vision to holders of Autonomy Convertible Bonds pursuant to Rule 15 of the City Code referred to in paragraph 7 of Part I and paragraph 10.2 of Part II of this document |
| "Court" | the High Court of Justice of England and Wales |
| "Court Meeting" | the meeting or meetings of each class of Autonomy Shareholders to be convened pursuant to an order of the Court pursuant to Section 896 of the Companies Act for the purpose of considering and, if thought fit, approving any scheme of arrangement |
| "CREST" | the relevant system (as defined in the Uncertificated Securities Regulations) in respect of which Euroclear is the operator (as defined in the Uncertificated Securities Regulations) |
| "CREST Manual" | the CREST manual issued by Euroclear including updates up to July 2008 |
| "CREST member" | a person who is, in relation to CREST, a member (as defined in the Uncertificated Securities Regulations) |
| "CREST participant" | a person who is, in relation to CREST, a participant (as defined in the Uncertificated Securities Regulations) |
| "CREST payment" | has the meaning given in the CREST Manual |
| "CREST sponsor" | a person who is, in relation to CREST, a sponsor (as defined in the Uncertificated Securities Regulations) |
| "CREST sponsored member" | a CREST member admitted to CREST as a sponsored member |
| "Daily Official List" | the daily official list of the London Stock Exchange |
| "Dealing Disclosure" | has the meaning given in Rule 8 of the City Code |
| "Directors of HP" or "HP Directors" | the board of directors of HP, or any one of them (as appropriate) |
| "Directors of HP Vision" or "HP Vision Directors" | the board of directors of HP Vision, or any one of them (as appropriate) |

72

HP-SEC-01661767
Exh 2307-0079

| | |
|---|---|
| "Disclosed Information" | any information which has been (i) fairly disclosed (in writing) by or on behalf of the Autonomy Group or any of its advisers to HP Vision or any of its advisers in connection with or in contemplation of the Offer prior to the date of the Announcement; or (ii) disclosed in Autonomy's report and accounts for the year ended 31 December 2010; or (iii) disclosed in the Announcement |
| "eDiscovery" | the process in which electronic data is sought, located, secured and searched with the intention of using it as evidence in legal or regulatory proceedings |
| "Electronic Acceptance" | the inputting and settling of a TTE Instruction which constitutes or is deemed to constitute an acceptance of the Offer on the terms set out in this document |
| "ESA" | Escrow Account Adjustment Input (AESN), transaction type "ESA" as described in the CREST Manual |
| "ESSN" | HP's Enterprise Servers, Storage and Networking business group |
| "Escrow Agent" | Capita Registrars (in its capacity as a CREST participant under ID: RA10) |
| "Euroclear" | Euroclear United Kingdom and Ireland Limited, the operator of CREST |
| "Exchange Act" | the United States Securities Exchange Act of 1934, as amended |
| "FIC Members" | members of the Finance and Investment Company of the Board of Directors of HP whose names are listed in paragraph 2.3 of Appendix IV |
| "Form of Acceptance" | the form of acceptance, election and authority relating to the Offer accompanying this document, which may only be completed by holders of Autonomy Shares in certificated form |
| "FSA" or "Financial Services Authority" | the Financial Services Authority of the United Kingdom |
| "FSA Handbook" | the handbook of rules made by the FSA as amended from time to time |
| "GAAP" | Generally Accepted Accounting Principles |
| "Goldman Sachs International" | Goldman Sachs International, joint financial adviser to Autonomy |
| "HP" | Hewlett-Packard Company, a Delaware corporation |
| "HP Group" | HP and its Associates and affiliates |
| "HP Shares" | the fully paid shares of common stock, par value $0.01 in the capital of HP |
| "HP Vision" | Hewlett-Packard Vision B.V., a company registered in the Netherlands with company number 53342577 |
| "IDOL" | Intelligent Data Operating Layer™ |
| "IFRS" | International Financial Reporting Standards |
| "IPG" | HP's imaging and printing business group |
| "J.P. Morgan Limited" | J.P. Morgan Limited, joint financial adviser to Autonomy |
| "LIBOR" | London Interbank Offer Rate |

73

HP-SEC-01661768
Exh 2307-0080

| | |
|---|---|
| "Listing Rules" | the rules and regulations made by the Financial Services Authority in its capacity as the United Kingdom Listing Authority under the Financial Services and Markets Act 2000, and contained in the United Kingdom Listing Authority's publication of the same name |
| "London Stock Exchange" | London Stock Exchange plc |
| "Meaning Based Computing" | the ability for a machine to form an understanding of all information, whether structured, semi-structured or unstructured, and recognise the relationships that exist within it |
| "member account ID" | the identification code or number attached to any member account in CREST |
| "Merrill Lynch International" | Merrill Lynch International, joint financial adviser to Autonomy |
| "non-executive directors" | the non-executive directors of Autonomy as listed in paragraph 8.1 of Appendix IV |
| "OEM" | an Original Equipment Manufacturer |
| "Offer" | the recommended cash offer made by HP Vision to acquire the issued and to be issued Autonomy Shares (other than any Autonomy Shares held by HP Vision within the meaning of Section 974(2) of the Companies Act or any of its Associates) in accordance with Part 28 of the Companies Act, on the terms and subject to the conditions set out in this document, and, in relation to any Autonomy Shares in certificated form, the Form of Acceptance and, where the context admits, any subsequent revision, variation, extension or renewal thereof |
| "Offer Agreement" | the agreement between HP, HP Vision and Autonomy dated 18 August 2011, containing certain obligations and undertakings in relation to implementation of the Offer |
| "Offer Document" | this document, which is being sent to holders of Autonomy Shares and for information only to any persons with information rights, to participants in the Autonomy Share Schemes and to holders of the Autonomy Convertible Bonds, and contains, amongst other things, the terms and conditions of the Offer |
| "Offer Period" | has the meaning given to it in paragraph (vii) of Part B of Appendix I |
| "Offer Price" | £25.50 per Autonomy Share |
| "Official List" | the Official List of the United Kingdom Listing Authority |
| "Opening Position Disclosure" | has the meaning given in Rule 8 of the City Code |
| "Overseas Shareholders" | Autonomy Shareholders who are resident in, or nationals or citizens of, jurisdictions outside the United Kingdom or the United States or who are nominees of, or custodians, trustees or guardians for, any such residents, citizens or nationals |
| "Panel" | the Panel on Takeovers and Mergers |
| "participant ID" | the identification code or membership number used in CREST to identify a particular CREST member or other CREST participant |
| "Perella Weinberg Partners" | Perella Weinberg Partners LP and certain of its corporate advisory affiliates, joint financial adviser to HP and HP Vision |
| "Publicly Announced" | announced publicly and delivered to a Regulatory Information Service prior to the Announcement Date |

74

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661769
Exh 2307-0081

| | |
|---|---|
| **"Purchase and Sale Agreement"** | has the meaning given to it in paragraph 7.1(A) of Appendix IV |
| **"Qatalyst Partners"** | Qatalyst Partners LLP, lead financial adviser and sole Rule 3 adviser to Autonomy |
| **"Regulatory Information Service"** | any of the services set out in Appendix III to the Listing Rules |
| **"Restricted Jurisdictions"** | any jurisdiction where local laws or regulations may result in a significant risk of civil, regulatory or criminal exposure if information concerning the Offer is sent or made available to Autonomy Shareholders in that jurisdiction |
| **"Restricted Overseas Persons"** | either a person (including an individual, partnership, unincorporated syndicate, unincorporated organisation, trust, trustee, custodian, executor, administrator or other legal representative) in, or resident in, a Restricted Jurisdiction |
| **"Scheme" or "scheme of arrangement"** | a scheme of arrangement under Part 26 of the Companies Act which may be made between Autonomy and the holders of Autonomy Shares other than those beneficially owned by HP, HP Vision or Autonomy |
| **"subsidiary", "subsidiary undertaking", "associated undertaking" or "undertaking"** | have the meanings given by section 1162 and Schedule 7 of the Companies Act and section 736 of the Companies Act 1985, except that, for the purposes of subsections 1162(2)(a) and (d), a company shall also be treated as a member of another company if any shares in that other company are held by a person: (i) acting on behalf of the company or any of its subsidiaries; or (ii) by way of security provided by the company or any of its subsidiaries |
| **"Substantial Interest"** | a direct or indirect interest in 20 per cent or more of the voting or equity capital (or equivalent) of an undertaking |
| **"Superior Proposal"** | bears the meaning as set out in the Offer Agreement, being a bona fide Competing Proposal which the Autonomy Directors consider, acting reasonably and in good faith and after consultation with their legal and financial advisers, is capable of being announced and is likely to be completed in accordance with its terms taking into account all financial, regulatory and other aspects of such proposal (including the ability of the proposing party to complete the transactions contemplated by such proposal) and which, if implemented, would be superior to the Offer from a financial point of view for Autonomy Shareholders, and which the Autonomy Directors are minded to recommend |
| **"TFE Instruction"** | Transfer from Escrow instruction (as described in the CREST Manual) |
| **"treasury shares"** | any Autonomy Shares held by Autonomy as treasury shares |
| **"TTE Instruction"** | Transfer to Escrow instruction (as described in the CREST Manual) |
| **"UBS Limited"** | UBS Limited, joint financial adviser and corporate broker to Autonomy |
| **"uncertificated" or "in uncertificated form"** | a share or other security, title to which is recorded in the relevant register of the share or security as being held in uncertificated form in CREST, and title to which, by virtue of the Uncertificated Securities Regulations, may be transferred by means of CREST |
| **"Uncertificated Securities Regulations"** | the Uncertificated Securities Regulations 2001 (S.I. 2001 No. 3755), as from time to time amended |

75

HP-SEC-01661770
Exh 2307-0082

| | |
|---|---|
| "**United Kingdom**" or the "**UK**" | United Kingdom of Great Britain and Northern Ireland and its dependent territories |
| "**United States**" or the "**US**" | the United States of America, its territories and possessions, any state of the United States and the District of Columbia |
| "**VAT**" | value added tax as referred to in the UK Value Added Tax Act 1994 or any tax of a similar nature levied in any other EU member state or which may be substituted for such tax |
| "**Wider Autonomy Group**" | Autonomy and the subsidiaries and subsidiary undertakings of Autonomy and associated undertakings (including any joint venture, partnership, firm or company in which any member of the Autonomy Group is interested or any undertaking in which Autonomy and such undertakings (aggregating their interests) have a Substantial Interest) |
| "**Wider HP Group**" | HP and the subsidiaries and subsidiary undertakings of HP and associated undertakings (including any joint venture, partnership, firm or company in which any of HP (or its subsidiary and subsidiary undertakings) is interested or any undertaking in which HP and such undertakings (aggregating their interests) have a Substantial Interest |
| "**£**" | United Kingdom pound sterling, the lawful currency of the UK from time to time (and references to "**pence**" shall be construed accordingly) |
| "**$**" | United States dollars, the lawful currency of the United States from time to time |

In this document:

(a) All times referred to are London time unless otherwise stated.

(b) All references to legislation in this document are to English legislation unless the contrary is indicated. Any reference to any provision of any legislation shall include any amendment, modification, re-enactment or extension thereof.

(c) Words importing the singular shall include the plural and vice versa, and words importing the masculine gender shall include the feminine or neutral gender.

(d) References to "**Parts**" and "**Appendices**" are to parts of, and appendices to, this document.

(e) Terms defined in the CREST Manual shall, unless the context otherwise requires, bear the same meanings where used in this document.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661771
Exh 2307-0083

(This page has been left blank intentionally.)

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661772
Exh 2307-0084

(This page has been left blank intentionally.)

United States District Court
Northern District of California

**Trial Exhibit 2307**

Case No:    <u>CR 18-0577 CRB</u>
Date Entered: _____
 By:  _____
                     Deputy Clerk

**Merrill Corporation Ltd, London**
11ZCZ77401