Jonathan M. Baum (SBN: 303469)
**Steptoe LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA  94105
Telephone:  (510) 735-4558
jbaum@steptoe.com

Reid H. Weingarten
Brian M. Heberlig
Michelle L. Levin
Nicholas P. Silverman
Drew C. Harris
(Admitted Pro Hac Vice)
**Steptoe LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 506-3900

Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**Clifford Chance US LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone:  (212) 878-3437
christopher.morvillo@cliffordchance.com

*Attorneys for Defendant
Michael Richard Lynch*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL RICHARD LYNCH and STEPHEN KEITH CHAMBERLAIN,<br><br>Defendants. | Case No.: 3:18-cr-00577-CRB<br><br>Judge: Hon. Charles Breyer<br><br>**DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF RULE 29(A) MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT 16**<br><br>Court:  Courtroom 6 – 17th Floor<br>Date Filed:  May 28, 2024<br>Trial Date:  March 18, 2024 |

Count 16 is a securities fraud count, not a wire fraud count, and as the Superseding Indictment itself makes clear, it requires proof of a scheme and artifice "to obtain . . . money and property in connection with *the purchase and sale of securities of HPQ*."  SI ¶ 30 (emphasis added).  But the government has adduced no such evidence with respect to Dr. Lynch.  The government's Opposition Brief (ECF No. 526) ("Opp.") devotes pages and pages to recounting evidence of discussions that took place between HP and Autonomy over the course of 2011 while only briefly mentioning the securities fraud statute, the allegations in Count 16, or any statements purportedly connected to "the purchase and sale of securities of HPQ."  Yet the courts have repeatedly held that defrauding a publicly traded company does not constitute securities fraud under 18 U.S.C. § 1348, which instead requires fraud "in connection with the purchase or sale of . . . any security of an issuer."

The government's Opposition Brief sets forth three bases for conviction on Count 16, but each misses its mark because none relates to any action taken by Dr. Lynch "in connection with the purchase and sale of securities of HPQ."  This is a natural consequence of the government's decision to focus its presentation on Dr. Lynch's alleged involvement in a scheme to defraud HP, with only three witnesses providing testimony—and only brief snippets, at that—relating to Count 16.  *See* Rule 29 Motion (ECF No. 505) ("Mot.") at 2–4.  Having failed to lay an adequate foundation for Count 16 at trial, the government now relies on creative, but inadequate, arguments in an attempt to prevent its collapse.

In *Hussain*, the linchpin of the government's case on Count 16 was the attachment of the HP press announcement to the Irrevocable Undertaking, which the jury concluded connected Mr. Hussain to the statements in the HP press announcement.  But in the absence of evidence that the HP press announcement was attached to Dr. Lynch's Irrevocable Undertaking—Exhibit 2308, the Irrevocable Undertaking, has no attachment, and the attachment it references is a press announcement by Autonomy, not HP—the jury has no basis for concluding Dr. Lynch signed off on, or was even aware of the existence or contents of, any statement directed at HPQ shareholders or relating to "the purchase and sale of securities of HPQ."  Evidence that

Dr. Lynch allegedly defrauded HP management cannot fill this evidentiary gap; that is simply the wrong type of evidence for a securities fraud charge.

Moreover, the government does not address its failure to adduce evidence showing that the statements concerning Autonomy that were presented to former stockholder Nigel Upton were false, or that Dr. Lynch had the requisite intent to defraud HPQ investors. As the government concedes, falsity and intent to defraud are essential elements of securities fraud. Opp. at 8.

Because no reasonable juror could convict on Count 16, the Court should enter a judgment of acquittal.

## ARGUMENT

None of the three positions the government sets forth in its Opposition Brief constitutes an adequate basis upon which a reasonable juror could find that Dr. Lynch engaged in securities fraud "in connection with" securities of HPQ.

*First*, the government argues that "when Dr. Lynch is misleading his public company acquirer in pursuit of an $11 billion acquisition—a jury could properly find Dr. Lynch guilty of securities fraud." Opp. at 1–2. But evidence of fraud against HP is not the same as fraud involving the purchase and sale of HPQ securities. The Courts have recognized, in *Hussain* and elsewhere, that defrauding a public issuer is not sufficient to constitute securities fraud. In *Hussain*, the Ninth Circuit relied on case law in which the defendant produced or caused the statements at issue, and knew or should have known that they would reach investors. *United States v. Hussain*, 972 F.3d 1138, 1147 (9th Cir. 2020) (citing *McGann v. Ernst & Young*, 102 F.3d 390, 394, 397 (9th Cir. 1996) and *SEC v. Wolfson*, 539 F.3d 1249, 1261 (10th Cir. 2008)). As a result, in holding that the "in connection with" element was met in *Hussain*, the Ninth Circuit focused on the "HP press release" and relied on "Hussain's assurances that the financial information in the press release was accurate." *See id.* at 1146–48. The mere fact that Hussain had defrauded HP, without any nexus to HPQ shareholders, would not have sufficed, nor would evidence that Hussain had defrauded Autonomy shareholders, because the statute requires fraud "in connection with the purchase or sale of . . . any security of an issuer," 18 U.S.C. § 1348(b),

and the issuer specified in Count 16 was, as here, HPQ. The securities fraud statute does not "convert every common-law fraud that happens to involve securities into securities fraud." *SEC v. Zandford*, 535 U.S. 813, 819–20 (2002). Nor does the statute "reach all commercial transactions that are fraudulent and affect the price of a security in some attenuated way." *Stoneridge Investment Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 160–62 (2008). Instead, the securities must be the "lynchpin" of the fraud. *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 872 (9th Cir. 2010). Alleged misrepresentations by Dr. Lynch to HP management, purportedly made to induce HP to acquire Autonomy, do not meet this standard.

*Second*, the government argues that Dr. Lynch warranted in his Irrevocable Undertaking (Exhibit 2308) that all of the statements made in HP's press release were true. Lacking any evidence to support this proposition, the government is left to argue that "[t]he jury may reasonably infer that Dr. Lynch, a detail-oriented founder-CEO who personally drove acquisition talks with HP, 'provided' Autonomy's prior financial statements for inclusion in documents related to HP's offer." Opp. at 11. If this is the government's case on Count 16, then no reasonable jury could convict him on it. The evidence is that HP obtained information about Autonomy to include in its press release from publicly available financial statements about Autonomy. Tr. 7844:4–45:2 (Andy Johnson). The government points to no evidence that Dr. Lynch in fact "'provided' Autonomy's prior financial statements for inclusion in documents related to HP's offer," Opp. at 11, much less any evidence that Dr. Lynch provided prior financial statements for inclusion in a document directed to HPQ shareholders, as required under the securities fraud statute. In fact, there has been no evidence whatsoever that Dr. Lynch had any role in preparing, providing statements for inclusion in, or even reviewing either of the two press announcements referenced by the government—Exhibits 2295 and 2306. *See* Opp. at 10.

The government attempts to use the fact that a "draft press announcement" was allegedly "attached" to the Irrevocable Undertaking as evidence that Dr. Lynch knew in advance what the two press announcements in evidence—Exhibit 2295 and Exhibit 2306—would say. But the

Irrevocable Undertaking introduced into evidence has no attachment at all, *see* Exh. 2308, and the fact that there are two press announcements in evidence does not mean, as the government argues, that it must have been one of those two announcements—as opposed to some other announcement or draft document, the contents of which are not known—that was attached to the Irrevocable Undertaking. Further, as the Irrevocable Undertaking itself makes clear (and as Mr. Apotheker confirmed on the witness stand), if anything, the Irrevocable Undertaking attached an *Autonomy* (not HP) press announcement. Mot. at 8 (citing Tr. at 6233:21–25 (Leo Apotheker)). An Autonomy press release directed at Autonomy stockholders is not a proper basis for conviction on Count 16. *See* Mot. at 3 n.2.[1] And the fact that there is overlapping language in HP's and Autonomy's announcements does the government no good; even if, counterfactually, there were evidence that Dr. Lynch had knowledge of the contents of Autonomy's press announcement, no reasonable jury could find beyond a reasonable doubt on that basis that Dr. Lynch had knowledge of the contents of HP's.

*Third*, and finally, the government points to the publication of Autonomy's second quarter 2011 financials in July 2011, arguing that "Dr. Lynch knew then that any financial statement published by Autonomy would be reasonably calculated to influence transactions in the securities of its potential acquirer, HP." Opp. at 2. But this is not what the government pleaded in the Superseding Indictment, which states that the securities fraud took place "In or about August 2011," a clear reference to the HP press release, a reference to which was included in the Superseding Indictment apparently for the sole purpose of Count 16 and incorporated by reference into that Count. *See* SI ¶ 23.bb. The government should not be permitted in realtime

---

[1] The government also refers to Exhibit 2307, which was the "Offer Document" referenced by the Irrevocable Undertaking. Like Exhibit 2306, this document was directed to Autonomy shareholders, not HP shareholders. *See, e.g.*, Exh. 2307 at 1 ("If you have sold or otherwise transferred all of your Autonomy Shares (other than pursuant to the Offer), please forward this document, and the accompanying documentation (but not the personalised Form of Acceptance) at once to the purchaser . . . ."); *id.* at 8 (letter addressed "To Autonomy Shareholders" by the Autonomy Directors recommending acceptance of HP's offer, dated August 22, 2011). In any case, there is no evidence that any statements contained in Exhibit 2307 were false or that any false statements were provided by Dr. Lynch for inclusion therein.

to vary from the Superseding Indictment by pursuing a conviction on the basis of a completely different document. *See United States v. Ward*, 747 F.3d 1184, 1189 (9th Cir. 2014) ("A variance involves a divergence between the allegations set forth in the indictment and the proof offered at trial.").

In any event, consistent with the Superseding Indictment's focus on the August 18, 2011 HP press release, the government adduced no evidence at trial that the July 27, 2011 Autonomy earnings release was addressed to or was ever seen by any HPQ stockholders, who had no role in approving the acquisition of Autonomy and anyway would have had no reason to pay any attention to Autonomy's public financials in July 2011.[2] (*Contra* the government's suggestion, Opp. at 12, while Nigel Upton testified that statements in the HP press release, Exhibit 2295, were relevant to his decision to invest in HP stock, Tr. 5281:2-5282:4, he did not testify that he separately reviewed Autonomy's published financials.  David Toms also did not so testify.)  Nor is the July 27, 2011 press release relevant because the information it contained was somehow passed through to HPQ shareholders by HP: the claims in the HP press release that Upton testified were important to him were not based on Autonomy's July 2011 numbers.  But even if they had been, Dr. Lynch could not have known, and there is no evidence that he did know, when Autonomy released its results on July 27 that they could later end up in a press release announcing an acquisition that had not been agreed to yet.

The government relies on *McGann v. Ernst & Young*, 102 F.3d 390 (9th Cir. 1996), for the proposition that because Autonomy's July 2011 earnings release was "reasonably calculated to influence the investing public," Dr. Lynch's approval of that release met the "in connection with" element of § 1348. Opp. at 11. But the identity of the "investing public" is essential to the analysis. In *McGann,* the court held that "an accounting firm acts 'in connection with' securities

---

[2] According to the government's theory, HP could have referenced any information tied to Dr. Lynch in its press release, and Dr. Lynch would be liable for securities fraud, even if HP never provided Dr. Lynch with any notice that this information would be presented to HPQ investors.  But that theory glosses over the "for inclusion" language in the Irrevocable Undertaking completely.

1 trading when it produces an audit report that it knows its client will include in a Form 10-K,"
2 because such "public statements [are] reasonably calculated to influence those who trade
3 securities." *Id.* at 394, 397.  The relevant issuer in *McGann*, though, was the accounting firm's
4 client, whose 10-K the accounting firm contributed to.  The relevant issuer in this case is HPQ,
5 but the July 27, 2011 Autonomy press release was not "reasonably calculated to influence those
6 who trade[d] securities" of HPQ, and any effect the press release may have had on HP's
7 management is not fraud "in connection with the purchase and sale of securities of HPQ," as
8 alleged in Count 16 and as required by § 1348.  *See McGann*, 102 F.3d at 397.

# CONCLUSION

For the foregoing reasons, this Court should grant a judgment of acquittal under Federal Rule of Criminal Procedure 29(a) with respect to Count 16.

Dated: May 28, 2024                                  Respectfully submitted,

*/s/ Celeste L.M. Koeleveld*
Celeste L.M. Koeleveld

Christopher J. Morvillo (Admitted Pro Hac Vice)
Celeste L.M. Koeleveld (Admitted Pro Hac Vice)
Daniel S. Silver (Admitted Pro Hac Vice)
**Clifford Chance US LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 878-3437
christopher.morvillo@cliffordchance.com

Reid H. Weingarten (Admitted Pro Hac Vice)
Brian M. Heberlig (Admitted Pro Hac Vice)
Michelle L. Levin (Admitted Pro Hac Vice)
Nicholas P. Silverman (Admitted Pro Hac Vice)
Drew C. Harris (Admitted Pro Hac Vice)
**Steptoe LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900

Jonathan M. Baum (SBN: 303469)
**Steptoe LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA 94105
Telephone: (510) 735-4558
jbaum@steptoe.com

*Attorneys for Defendant*
*Michael Richard Lynch*